**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 (BAH/GMH) |
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to: ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH) |
| OXBOW CARBON & MINERALS LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY, et al.,<br><br>Defendants. | Civil Action No. 11-1049 (BAH) |

**PLAINTIFFS' COUNTERSTATEMENT OF FACTS**

# TABLE OF CONTENTS

**Page**

I. THE UNITED STATES RAIL FREIGHT INDUSTRY IS HIGHLY CONCENTRATED AS A RESULT OF DEREGULATION AND MERGERS ...............1

II. DEFENDANTS' CONDUCT PRIOR TO THE CHALLENGED PRICE FIXING CONSPIRACY ...............4

A. In The Pre-Conspiracy Period, Defendants Experienced A Long-Term Structural Decline In Rail Freight Rates ...............4

B. Defendants Attributed The Decline In Rates To Competition Among The Railroads ...............6

C. Prior To 2003, The Defendants Did Not Coordinate To Impose Uniform Fuel Surcharges ...............8

D. Prior To 2003, Defendants Had Set Up A System Of Fuel Surcharge Best Practices That Encouraged Unilateral And Differentiated Action, And Set Forth How They Should Communicate With Each Other About Fuel Surcharges ...............11

E. As A Result Of Customer Pushback And Competitive Pressures, Defendants Were Unsuccessful In Their Attempts To Impose Unilateral Fuel Surcharges Widely Prior to 2003 ...............15

1. NS ...............15

2. CSX ...............20

3. UP ...............23

4. BNSF ...............27

F. Prior To The Conspiracy, Individual Defendants Recouped Fuel Cost Changes Via Base Rate Escalation Provisions Tied To Indices That Weighted Actual Cost Factors, Including the Cost Of Fuel ...............32

G. Prior To The Conspiracy Period, Fuel Prices Were Low, Flat, and Not Expected to Rise ...............34

III. THE DEFENDANTS' CONDUCT DRAMATICALLY CHANGED AS THEY EMBARKED ON THE CONSPIRACY TO COORDINATE FUEL SURCHARGES AS A MEANS TO RAISE ALL-IN RATES FOR FREIGHT TRANSPORTATION ...............36

A. Beginning In Early 2003, Defendants Engaged In a Series Of Extraordinary Meetings And Communications Regarding Their Synchronization, Application, And Enforcement Of Rail Fuel Surcharges ...............37

B. Defendants Agreed To Adopt Common Fuel Surcharge Methodologies ...............43

1. CSX and UP Internally Recommend Different Changes to Their Respective Fuel Surcharge Programs. ...............43

2. CSX Adopted The Same FSC-Escalation Method From UP's Revised Program Despite Never Having Considered It Internally Before. ....46

3. Without Internal Analysis, UP Announced a More Aggressive Fuel Surcharge Formula Incorporating Characteristics CSX Had Discussed Internally ....51

4. After CSX's Announcement, NS's Don Seale Met with Defendants' CMOs and Decided to Adopt CSX's More Aggressive Fuel Surcharge ....53

5. BNSF Considered Adopting a Competitively Advantageous Mileage-Based Fuel Surcharge But Abandoned Those Plans Upon Agreement with Defendants ....56

6. All Four Defendants Continued Their Coordination On Fuel Surcharges At the Spring 2003 NFTA Meetings, During Which UP Announced It Would Match CSX's Fuel Surcharge....61

7. Immediately Following the Spring 2003 NFTA Meeting, BNSF Made "Urgent" Changes To Its Fuel Surcharge Program ....62

8. UP Then Changed its Fuel Surcharge Formula to "Match" BNSF's More Aggressive Formula and NS Mandated Widespread FSC Application....65

9. After Customer Outcry, Some Defendants Briefly Discounted Their Fuel Surcharges—Causing Others to Call for a "Stable Approach" to Fuel Surcharges in the Industry, and for Defendants to Agree to "Uniform Application" ....69

10. Defendants' Senior Executives Continued To Meet and Coordinate On Fuel Surcharges....72

11. Under the Auspices of the AAR, Defendants Continued Their Coordination, and Solidified a "Potential Industry Position" on Surcharges....74

12. After Concluding By April 17, 2003 That "At This Point, We Do Plan to Modify Our FSC," Technical Issues Delayed NS's Implementation of CSX's Fuel Surcharge Formula for a Few Months ....78

13. Defendants' New Fuel Surcharges Had Significantly More Earning Power Than Their Predecessor Programs ....86

14. BNSF Once Again Considered Switching to a Competitively Advantageous Mileage-Based Fuel Surcharge—and Once Again Capitulated to the Other Defendants' Pushback ....89

15. Defendants' Conspiracy Included Intermodal Fuel Surcharges ....92

a. Prior to 2003, Defendants Were Unsuccessful In Their Attempts To Impose Unilateral Fuel Surcharges On Intermodal Shippers ....92

b. Defendants' Conspiracy Extended to Intermodal Traffic ....96

c. Defendants' Discussions and Meetings Encompassed Intermodal Traffic. ....110

16. Defendants' Conspiracy Included Fuel Surcharges on Coal. ....113

C. Defendants Enforced Their Conspiratorial Fuel Surcharges ....127

1. Defendants Coordinated to Apply and Enforce Rail Freight Surcharges Across Their Customers Uniformly, Across-the-Board, and Without Exception ....127

a. BNSF ....139

b. CSX ....151

c. NS ....161

d. UP ....168

2. Defendants Monitored Each Other to Ensure That No Member of the Cartel Cheated on the Conspiracy ....176

3. Defendants Openly Communicated with Each Other About Their Policies Forbidding Discounting of Base Rates to Offset Fuel Surcharges ....178

D. Defendants Coopted Trade Groups And Steered Industry Standards To Facilitate Their Conspiracy ....179

1. Defendants Controlled and Used the AAR to Facilitate Their Conspiracy ....179

2. Defendants Collectively Forced the AAR to Publish a New Cost Index in Furtherance of Defendants' Fuel Surcharge Conspiracy ....181

3. The STB Found Defendants' Fuel Surcharges to be an "Unreasonable" Practice With "*Virtually No Prospect* of Reflecting the Actual Increase in Fuel Costs" ....199

IV. DEFENDANTS' CONDUCT IS CONSISTENT WITH COLLUSION, AND NOT WITH COMPETITION ....205

A. Defendants Jointly Maintained The False Pretexts That The AIILF Was An AAR Cost-Adjustment Index, That NS's Re-Basing Would Lower Its Fuel Surcharge, And That Their Coordinated Fuel Surcharge Programs Were Intended To Recover Fuel Costs ....205

1. NS ....207

2. UP ....213

3. CSX ....216

4. BNSF..........218

B. After Receiving Push Back From The Other Defendants, BNSF Acted Contrary To Its Unilateral Self Interest By Largely Ignoring The Internal Recommendation Of Its Sales People To Switch To A Mileage-Based Fuel Surcharge..........221

C. Defendants' Fuel Surcharge Programs Were Nearly Identical And Moved In Lockstep, Notwithstanding That Defendants Variation In Fuel Costs And Hedging Activities Among Defendants..........223

V. DEFENDANTS' FUEL SURCHARGE CONSPIRACY DIVORCED DEFENDANTS' FUEL COST RECOVERY FROM ACTUAL FUEL COSTS, REVERSING THE DOWNWARD TREND IN DEFENDANTS' RATES..........235

A. The Fuel Surcharge Program Divorced Fuel Surcharge Rates From Actual Fuel Costs..........235

B. Defendants' Conspiratorial Fuel Surcharge Programs Increased Their Rates And Profits..........243

1. UP..........245

2. NS..........247

3. CSX..........248

4. BNSF..........249

C. Defendants Later Modified Their Surcharge Programs, But Continued Earning Supra-Competitive Profits..........251

VI. THE UNITED STATES RAIL FREIGHT INDUSTRY WAS SUSCEPTIBLE TO COLLUSION..........261

A. The Rail Freight Industry Has Significant Barriers To Entry..........261

B. Demand For Rail Freight Services Is Inelastic..........263

C. Rail Freight Transportation Services Are Interchangeable Across Defendants..........265

D. Defendants Sold Rail Service Throughout the United States..........266

E. Pricing Is Transparent And Defendants Frequently Communicated On Pricing..........268

F. A History of Regulation and Communication Among the Defendants Built an Institutional Understanding of Pricing..........270

Pursuant to Fed. R. Civ. P. 56 and Rule 7(h) of the Local Rules of the United States District Court for the District of Columbia, the undersigned Plaintiffs (together, "Plaintiffs") respectfully submit this Counterstatement of Material Facts as to which Plaintiffs contend that there exist genuine issues to be tried on admissible evidence on the question of whether Defendants CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), BNSF Railway Company ("BNSF"), and Union Pacific Railroad Company ("UP," and collectively with CSX, NS, and BNSF, "Defendants") conspired to use fuel surcharges as a means to raise all-in rates for rail freight transportation.

## I. THE UNITED STATES RAIL FREIGHT INDUSTRY IS HIGHLY CONCENTRATED AS A RESULT OF DEREGULATION AND MERGERS

1. Defendants CSX, NS, UP, and BNSF are the four largest railroads in the United States. CSX Answer to Second Consolidated Amended Complaint, Dkt. No. 163, ¶ 29; NS Answer to Second Consolidated Amended Complaint, Dkt. No. 165, ¶ 30; BNSF Answer to Second Consolidated Amended Complaint, Dkt. No. 166, ¶ 31; Union Pacific Answer to Second Consolidated Amended Complaint, Dkt. No. 164, ¶ 32. The four Defendants accounted for almost 94% of rail freight transportation in the United States from 2000 – 2008 (the "relevant time period"). PX0583, United States Government Accountability Office, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed," GAO-07-94, October 2006, at p. 19; PX0750, AAR-E-00004091 (AAR Railroad Ten-Year Trends, 1996-2005), at '127 (showing that the four Defendants accounted for almost 94 percent of the Class I industry's revenue ton-miles in 2005); *id.* at 101; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 40-42 (Defendants accounted for approximately 90% of track miles in the United States and 94% of all rail freight revenue); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 62 (D.D.C. 2012) ("2012 Class Cert. Opinion").

2. For most of the twentieth century, railroads "had to apply to the Interstate Commerce Commission ("ICC") for approval of an across-the-board rate increase." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 35 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019); *see also* PX0641, U.S. Government Accountability Office, "Freight Rail Pricing: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers," Report to Congressional Committees, December 2016, p. 4 (explaining that the ICC regulated "almost all of the rates that railroads charged shippers to ensure that the rates were reasonable and just").

3. But two acts of Congress, the Railroad Revitalization and Regulatory Reform Act of 1976, and the Staggers Rail Act of 1980, substantially reduced the ICC's regulatory responsibilities and encouraged greater reliance on market forces to determine rail freight rates. *See* PX0641, U.S. Government Accountability Office, "Freight Rail Pricing: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers," Report to Congressional Committees, December 2016, p. 4.

4. In partially deregulating the rail freight industry, these Acts gave railroads increased freedom to set rates for rail freight transportation, allowed railroads to enter into contracts with shippers, authorized the ICC to exempt broad classes of service from ICC regulation and prohibited the ICC from regulating rates and service on contract and exempt traffic shipments (collectively rate unregulated traffic). *See* PX0641, U.S. Government Accountability Office, "Freight Rail Pricing: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers," Report to Congressional Committees, December 2016, pp. 4-5.

5. In 1995, Congress enacted legislation that sunset the ICC, transferred many rail regulatory functions previously exercised by the ICC to a new federal agency, the Surface

Transportation Board ("STB"), and strengthened several deregulatory provisions in the Staggers Act. PX0583, United States Government Accountability Office, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed," GAO-07-94, October 2006, at pp. 6-7.

6. After the passage of the Staggers Act in 1980, there were around 40 Class I railroads (railroads exceeding $250 million in annual revenue). By 1995 there were only eleven, by 1997 there were only nine, and by 2000 there were eight. PX0567, Ivaldi, M., and McCullough, G., "Welfare Tradeoffs in U.S. Rail Mergers."

7. The consolidation of the railroad industry was so alarming that the federal government imposed significant hurdles to any further mergers or acquisitions. *See* PX0556, Surface Transportation Board, "Surface Transportation Board Issues New Rules Governing Major Railroad Mergers & Consolidations," news release, June 11, 2001.

8. This consolidation led to a highly concentrated industry. As of 2005, Defendants accounted for nearly 94% of all freight revenue in the United States. PX0583, United States Government Accountability Office, Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed, GAO-07-94, October 2006, at p. 20; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 40-42; PX0750, AAR-E-00004091 (AAR Railroad Ten-Year Trends, 1996-2005), at '127 (showing that the four Defendants accounted for almost 94 percent of the Class I industry's revenue ton-miles in 2005); *see also* 2012 Class Cert. Opinion at 62 ("There is no question that the rail freight industry is concentrated in the hands of the four defendants—they possess 90 percent market share based on track miles and control 94 percent of the market based on freight revenue.").

9. The four Defendants accounted for over eight times as many "miles of road" during the conspiracy period as the three other remaining Class I railroads *combined*. PX0672, Surface Transportation Board, Office of Economics, Environmental Analysis and Administration, Statistics of Class I Freight Railroads in the United States, 2003.

10. In 2007, Defendants accounted for over 90% of the country's track miles and generated more than 94% of the industry's revenue. PX0751, Wisconsin Federation of Cooperatives, "Railroaded! A Fact Sheet on Captive Shipping"; *see also* 2012 Class Cert. Opinion at 62.

11. The U.S. Department of Justice evaluates market concentration using the Herfindahl-Hirschman Index (HHI), a commonly accepted assessment of industry concentration. In 1978, the railroad industry's index was 589. By 2004, the index reached 2,263, well above the 1,000 HHI trigger point at which the Department of Justice scrutinizes mergers. PX0642, McCullough, G.J., "US Railroad Efficiency: A Brief Economic Overview," University of Minnesota, Department of Applied Economics.

12. In fact, one of Defendants' experts, Dr. Dennis Carlton, has studied the median number of colluding competitors in each (known) transportation cartel and concluded it is most often ***four*** would-be rivals. PX0732, Dennis William Carlton, Jeffrey M.. Perloff, Modern Industrial Organization 134 n.13 (4th Ed. 2014).

## II. DEFENDANTS' CONDUCT PRIOR TO THE CHALLENGED PRICE FIXING CONSPIRACY

### A. In The Pre-Conspiracy Period, Defendants Experienced A Long-Term Structural Decline In Rail Freight Rates

13. According to a Surface Transportation Board ("STB") study of historical rail rates, Defendants UP, BNSF, NS, and CSX prior to 2003 faced declining rail freight rates:



Figure 1. STB Rail Rate Index 1985 to 2007
Real Revenue Per Ton-Mile (1985=100)

PX0593, Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, Study of Railroad Rates: 1985-2007 (Jan. 16, 2009), at 2.

14. According to the study, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." PX0593, Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, Study of Railroad Rates: 1985-2007 (Jan. 16, 2009) at 1.

15. Defendants were aware of this trend. *See* PX0596, Seale (NS) Dep., Feb. 26, 2010, at 110-11 (agreeing with STB analysis that NS revenue per ton mile decreased from 1985-2000); PX0598, Adams (UP) Dep. Mar. 4, 2010, at 242-43 (agreeing with NS presentation reflecting declining revenues between 1980-2000, and prices increasing around 2004-2005); PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '981 slide 6 (reflecting decreasing average revenue per car, and decreasing revenue); PX0612, Gooden (CSX) Dep., July 16, 2010, at 33-34 (line haul rates had declined between 1981-

2002); PX0631, Goode (NS) Dep., Jan. 13, 2011, at 41-42 (rail rates decreased between the 1980s and the early 2000s).

**B. Defendants Attributed The Decline In Rates To Competition Among The Railroads**

16. Following the enactment of the Staggers Act, Defendants (and their corporate predecessors) began competing aggressively with one another for shippers' business. Defendants have admitted, and their contemporaneous documents show, that they competed aggressively with each other prior to 2003, when the alleged conspiracy began. This included "very vicious historical price wars" and what one Defendant described as "Destructive Pricing for Rail Share," which made it difficult for any Defendant to increase its pricing without potentially sacrificing business to one of its competitor railroads. PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 85-87 ("some competitive pricing . . . that competition did result in a loss of a lot of revenue," and "in a historical context . . . there have been a history of some very vicious historical price wars."); PX0205, CSXFSC000199146 (CSX email re "BHAG SLT Presentation" attaching "The Billion Dollar BHAG: Growing CSX Rail Revenues to $8.2 Billion by 2004" presentation, June 13, 2002), at '149 (CSX presentation listing competitive "challenges" which "hindered railroad revenue growth in the past," including "Destructive Pricing for Rail Share"); PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 88 ("The Defendants recognized the trend of declining prices and revenues between 1985 and 2003. The Defendants' records also reflect that the rail industry historically experienced competition during this time period, including intense price competition between railroads vying for volume.").

17. One CSX internal email in 2000 observed "Doesn't look like a lot of opportunity to push our prices up. As the old saying goes—'competition is great, as long as you are on the

buying side.'" PX0218, CSXFSC000327518 (CSX internal email re "Response—Conference call last Friday," Feb. 22, 2000), at '518.

18. A UP internal email from 2000 observed: "The BN is kicking the UP's ass' . . . they are going after all of our business." PX0486, UPFSC_0016299 (UP internal email re "More BNSF competitive info", Nov. 2, 2000), at '300. In 2001, UP recognized that a potential 3% across-the-board price increase on rail freight shipments would result in revenue loss of two to three times that amount because of "intense BNSF competition." PX0481, UPFSC0002090 (UP internal email chain re "2001 Price and Price Increase Plans," Jan. 27, 2001) at '090.

19. NS's David Goode acknowledged at his deposition that there was price competition among the railroads between the mid-90s and the early 2000s. PX0631, Goode (NS) Dep., Jan. 13, 2011, at 41-42; *see also* PX0614, Glennon (NS) Dep., July 20, 2010, at 18-19 (testifying that "some railroads may not have been actually applying a fuel surcharge at the very beginning. . . . not all of them were successful initially, but they were later," and that when NS bid against other railroads, it often went up against "competitive bids . . . where a fuel surcharge was not being applied and that created some concerns on [NS's] part."); *id.* at 19 ("[W]hen you are trying to negotiate a contract, if you have a fuel surcharge and the . . . competitive bid doesn't, it puts you at a disadvantage."); PX0287, NS_010032689 (NS internal email chain re "Renewal of NSSC 82990 'ADM' Veg Oil," July 30, 2003), at '689 (NS employees strategizing how to win a contract and noting "CSXT seems to be getting the upper hand with non FSC multi-year contracts"); PX0280, NS_10013754 (NS internal email chain re "Fuel Surcharge Provisions," June 9, 2000), at '754 (NS internally noting that CSX would not apply fuel surcharges on a competitive line); PX0274, NS_010013312 (NS email chain re "NSSC80D13," April 5, 2000) at '312 (customer

objecting to new fuel surcharge, and NS employee noting that this was "another test of the fuel surcharge").

20. An internal BNSF document stated in 2002 that unless the railroads were "together," prices would remain low: "The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. ***We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy***." PX0127, BNSF-0574516 (May 28, 2002 Enterprise Wide Risk Assessment), at '617 (emphasis added); PX0128, Metadata to PX0127, at 17.

21. In the 15 years before 2003, Defendants recovered less than 50% of cost increases from fuel from their customers. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 101 (citing PX1141, BNSF-0783587, at '589 (2003 Citigroup analyst report)).

### C. Prior To 2003, The Defendants Did Not Coordinate To Impose Uniform Fuel Surcharges

22. Michael Giftos, the self-proclaimed "inventor" of fuel surcharges and the Chief Commercial Officer of CSX, implemented CSX's fuel surcharge program in 2000 without speaking to another railroad beforehand. PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 31, 43-44; PX0210, CSXFSC000247060 (CSX Memo re "Fuel Cost Recovery Charge Program," September 2000) at '060 ("CSXT will be implementing an emergency fuel cost recovery charge on all local and interline freight . . . "); PX0163, CSXFSC000000357 (CSX internal email re "Fuel Surcharge Change" and attached presentation, Mar. 19, 2003), at '359 (noting that CSX's fuel surcharge program was based on the WTI, with a trigger price of $28); PX0462, UPFSC0000436 (CSX

request for concurrence from UP, Sept. 29, 2000) at ‘436 (CSX requests concurrence from UP to implement a fuel surcharge “on most joint-line rates” with UP).

23. CSX’s fuel surcharge issued in 2000 would be triggered once the West Texas Intermediate (“WTI”) oil index went above $28 WTI for thirty consecutive days and would add a 2% fuel surcharge for every $5 increase in the WTI index. PX1142, CSXFSC000254436 (CSX Transportation Tariff 8100, Merchandise Fuel Surcharge – (Item 9100).

24. BNSF did not apply a fuel surcharge until February 2000 at the earliest. PX0061, BNSF-0033167 (internal BNSF email chain re “FUEL SURCHARGE”, April 28, 2006) at ‘167, ‘168 (after the BN ATSF merger, “we had a fuel surcharge of 2% when the price of WTI exceeded $28 a barrel for 10 consecutive days. It apparently had no real application until Feb. 2000.”); *see also* PX0044, BNSF-0026751 (BNSF Pricing Update, Changes to the BNSF Carload Fuel Surcharge Calculation, Apr. 30, 2001) at ‘752-53 (2001 changes to BNSF’s carload fuel surcharge program, including switching indices from West Texas Intermediate to Highway Diesel Fuel).

25. Effective October 1, 2000, BNSF had a fuel surcharge with a trigger of $28 WTI, where the rate was set at 2% and increased 1% for every $2.50 increase in the WTI index. The trigger price was calculated based on the monthly average of the WTI index. *See* PX0771, BNSF-0516344, (BNSF Rules Book 6100, Oct. 1, 2000) at ‘369 (Item 3375 – Fuel Surcharge).

26. As of July 1, 2001, BNSF had revised its fuel surcharge to have a $1.30 HDF trigger price, where the rate was set at 1% and increased 0.5% for every $.05 increase in the HDF index. The trigger price remained calculated based upon a monthly average of the HDF index. PX1143, BNSF0511674, (BNSF Rules Book 6100, January 1, 2001) at ‘799 (Item 3375-A – Fuel Surcharge, Effective July 1, 2001).

27. UP implemented a fuel surcharge program for its carload business in December 2002. *See* PX1144, UPFSC0355699 (internal UP email attaching UP Fuel Surcharge Press Release, October 31, 2002). The UP fuel surcharge would be triggered if the price of fuel exceeded $28 WTI for thirty consecutive days. It was set at 2% and would increase 2% for every $5 increase in the WTI index. *See* PX1140, UPFSC0493611 (UP Fuel Surcharge Customer Page).

28. Effective June 1, 2000, NS had a fuel surcharge program with a trigger price at $28 WTI, and a rate of 2%, which would increase 2% for every $5 increase in the WTI index. NS's trigger price was determined based upon the WTI index for the prior 30 consecutive days. *See* PX1145, NS_0102489956 at 963 (NS Conditions of Carriage #1-B, Rule 255 – Fuel Surcharge)

29. Prior to 2003, Defendants did not attempt to impose the fuel surcharges on a coordinated basis. Don Seale, then NS's Senior Vice President of Merchandise Marketing, testified that he was not aware of any communications with the other Defendants before NS adopted its initial fuel surcharge program in 2000, and that NS did not coordinate that initial program with other Defendants. PX0596, Seale (NS) Dep., Feb. 26, 2010, at 51 (agreeing that the 2000 fuel surcharge was "the first time . . . that Norfolk Southern had had a fuel surcharge"), 107-09 (Seale did not recall having discussions with NS or CSX before adopting the first fuel surcharge program); PX0631, Goode (NS) Dep., Jan. 13, 2011, at 53 (NS's Goode did not recall having discussions about fuel surcharges with counterparts at other railroads at any time prior to 2003); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 145-46 (NS's Moorman did not recall any discussions with other railroads about fuel surcharges prior to 2003).

30. Giftos, then CSX's Chief Commercial Officer, likewise testified that CSX's initial fuel surcharge program in 2000 resulted solely from internal CSX discussions. In the one instance where Giftos briefly discussed fuel surcharges with his counterpart at UP (Jack Koraleski) a year

or two after the 2000 fuel surcharge was adopted, Koraleski "was surprised to learn that [CSX] had a fuel surcharge program," even though it had "been in place for some time." PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 26-31, 197-98.

31. Consistent with this lack of coordination prior to 2003, in March 2001, BNSF's Tom Jacobowski reported that he had consulted with other carriers about the concept of a uniform fuel surcharge, and that the railroads explicitly decided not to impose uniform fuel surcharges. PX0078, BNSF-0121901 (BNSF email chain re "Fuel Surcharge Modifications," March 6, 2001), at '901-02 ("Tom J. [of BNSF] provided feedback from rail carriers regarding the concept of establishing an industry wide fuel surcharge formula. Rail carriers unanimously choose not to act on an industry standard fuel surcharge.").

32. As set forth in further detail below, prior to 2003, Defendants' fuel surcharges were applied only sporadically, were the subject of competition among the Defendants, were frequently subject to negotiation and discount, or even waiver, and even when included, often were not triggered, or were triggered at only low levels. *Infra* ¶¶ 46–77.

### D. Prior To 2003, Defendants Had Set Up A System Of Fuel Surcharge Best Practices That Encouraged Unilateral And Differentiated Action, And Set Forth How They Should Communicate With Each Other About Fuel Surcharges

33. The Association of American Railroads ("AAR") is a trade association of railroads operating in the United States. PX0643, About Us, Association of American Railroads, *available at* https://www.aar.org/about-us/.

34. Defendants [redacted]. PX0607, Hamberger (AAR) Dep., June 7, 2010, at 91.

35. Defendants also made up the majority of the votes on the AAR's board of directors because, as one witness testified, [redacted]

[redacted] PX0607, Hamberger (AAR) Dep., June 7, 2010, at 83.

36. There are two types of interline shipments: (1) "joint-line" movements, where one rate is applicable for the entire movement from rail origin to rail destination, and the two or more railroads whose routes are used agree among themselves what portion of the total revenue will go to each railroad; and (2) "Rule 11" interline shipments, where the railroads each invoice the customer separately for their share of the interline move without the need for carrier-to-carrier discussion of prices. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 35[1]; PX0592, Whiteside, Terry, "Interchange Between Shortline and Major Carriers in U.S.," January 2009; PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 243.

37. Communication and agreement over fuel surcharges are not among the logistical aspects necessary for interline service, whether joint-line or Rule 11. In Rule 11 service, each carrier separately negotiates with and invoices the shipper directly for its portion of the movement, without the need for carrier-to-carrier discussion of price, let alone FSCs. PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 243. In joint-line service, default rules apply for application of fuel surcharges and participating carriers may implement unilateral fuel surcharges. PX0360, NS_024000001 (email chain re "Fuel Surcharge Processing—Best Business Practices Document," Jan. 16, 2001, attaching Fuel Surcharge Processing Best Business Practices Document), at '006; PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 179-180. To the extent participating carriers

---

1 Drs. Berheim and Marx served reports in all cases in which they were retained. Dr. Bernheim and Dr. Marx served a joint opening report in each case, and Dr. Bernheim's portion of the joint report was identical in every case. Accordingly, Plaintiffs have appended Drs. Bernheim and Marx's opening report for American Honda Motor Co., Inc. ("Honda") as an exemplar. Dr. Bernheim served a reply rebuttal report in each case, and Plaintiffs have appended Dr. Bernheim's rebuttal report for Crowley as an exemplar. Dr. Marx also served a rebuttal report in each case, and Plaintiffs have appended Dr. Marx's rebuttal report for Honda as an exemplar.

desired to implement a common fuel surcharge on common joint-line traffic, that can be accomplished with a simple "yes/no" question. PX0363, NS_058001091 (Email enclosing minutes from Nov. 16, 2000 meeting and "Fuel Surcharge Best Practices Document," Dec. 11, 2000), at '092. No further discussion is necessary.

38. More than 40% of Defendants' interline traffic during the Conspiracy Period was shipped on Rule 11 price authorities. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 24 fig.9.

39. In 2000, the AAR's Interline Revenue Management Committee ("IRM") established a "technical advisory group" ("TAG") to "creat[e] a best practices document for joint line fuel surcharge processing." PX0363, NS_058001091 (Email enclosing minutes from Nov. 16, 2000 meeting and "Fuel Surcharge Best Practices Document," Dec. 11, 2000), at '092-96 ("the AAR's Interline Revenue Management (IRM) committee formed this Technical Advisory Group (TAG) subcommittee to review and develop a best business practices document for processing fuel surcharges within the AAR's IRM systems and processes."); PX0518, UPFSC_0238066 (UP email re "AAR Committees and Committee Handbook," Jan. 19, 2007, attaching AAR Committee Structure 2004) at '117 (reflecting Interline Revenue Management Working Committee); PX0161, CSXFSC000000118 (BNSF-NS-UP email chain re "Fuel Surcharge Industry Mtg Agenda for 11/16, 17 in Ft Worth," Nov. 14, 2000) at '118 (the TAG "was charged with preparing a report to the IRM that takes into account the following issues: . . . State Best Business Practices . . . .").

40. When TAG first started meeting, its members agreed that "[t]here was to be no discussion of actual prices, specific customers or procedures for collecting. The focus was to remain on creating a best practices document for joint line fuel surcharge processing." PX0363, NS_058001091 (Email enclosing minutes from Nov. 16, 2000 meeting and "Fuel Surcharge Best Practices Document," Dec. 11, 2000), at '092.

41. The IRM and TAG consisted of lower-level, technical personnel from various railroads who handled interline and billing issues. PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 161, 169 ([redacted]); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 72, 198 (describing lower-level technical employees as the ones "that have been doing this [i.e., handling joint-line billing issues] for years. They know how to do it. They know when they have to do it. They know the right way to do it and they just did it. . . . [They did it] in the depths of [the] organization."); PX0003, AAR_P_00001314 (AAR Committee Structure 2001), at '429.

42. TAG established a set of best practices for inter-Defendant concurrence on bilateral (*i.e.*, joint rate) fuel surcharges, which did not contemplate executive-level or lengthy negotiations or discussions, but rather a simple "yes," "no," or "modification." PX0360, NS_024000001 (email chain re "Fuel Surcharge Processing—Best Business Practices Document," Jan. 16, 2001, attaching Fuel Surcharge Processing Best Business Practices Document), at '003 ("Acknowledgement [of a request for fuel surcharge concurrence request for interline shipment] would be in the form of Yes, No, or a modification.").

43. Under this arrangement, it was unnecessary for the railroads to discuss how they would divide revenue from fuel surcharges on their interline shipments, because they agreed ahead of time that "fuel surcharges should be divided between the participating carriers at the same division of the line . . . in the absence of bilateral agreements." PX0360, NS_024000001 (email chain re "Fuel Surcharge Processing—Best Business Practices Document," Jan. 16, 2001, attaching Fuel Surcharge Processing Best Business Practices Document), at '003; PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 181-183.

44. The resulting best practices document on interline fuel surcharge administration was presented to and adopted by the AAR's Network Efficiency Management Committee ("NEMC") in early 2001. PX0461, UPFSC 0621620 (AAR-UP email re "presentations", Jan. 31, 2001, attaching "Business Best Practice: Fuel Surcharge" presentation); PX0360, NS_02400001 (email chain re "Fuel Surcharge Processing—Best Business Practices Document," Jan. 16, 2001, attaching Fuel Surcharge Processing Best Business Practices Document), at '001("Attached is a copy of the Interline Revenue Management Committee final report on 'Fuel Surcharge Processing—Best Business Practices Document' . . . The report has been approved by the IRM Committee . . . ."); PX0544, UPFSC-A 0449390 (Network Efficiency Management Committee Oct. 20, 2000 Meeting Minutes, Feb. 1, 2001) at '396.

45. Under these best practices, a railroad could implement a "unilateral fuel surcharge" without seeking or receiving concurrence from the participating carrier on a joint line shipment. This meant that a railroad could still assess a fuel surcharge where it "did not seek concurrence from a connecting carrier on a participating joint line move," or where one railroad "sought concurrence from a connecting carrier [for an FSC] on a joint line move and that concurrence was denied." PX0360, NS_024000001 (email chain re "Fuel Surcharge Processing—Best Business Practices Document," Jan. 16, 2001, attaching Fuel Surcharge Processing Best Business Practices Document), at '006; PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 179-180.

### E. As A Result Of Customer Pushback And Competitive Pressures, Defendants Were Unsuccessful In Their Attempts To Impose Unilateral Fuel Surcharges Widely Prior to 2003

#### 1. NS

46. NS toyed with adding fuel surcharges unilaterally and without coordination with the other Defendants between 2000 and 2003. *See, e.g.*, PX0596, Seale (NS) Dep., Feb. 26, 2010, at 107-09 (testifying that there were no efforts to communicate or coordinate with other Defendants

before announcing NS's original fuel surcharge program in 2000); *see also* PX0631, Goode (NS) Dep., Jan. 13, 2011, at 53 (testifying he does not recall discussions with other railroads about fuel surcharges prior to 2003); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 145-46 (testifying that he does not recall any discussions with other railroads about fuel surcharge issues prior to 2003).

47. But during this pre-conspiracy period, NS's fuel surcharge formula did not apply automatically to private price authorities (i.e., negotiated contracts). PX0253, NS_010076080 (NS internal email re "UP FSC - NS Concurrence Eff," July 16, 2003), at '082, (in July 2003, NS noted that "most RRs exempt a significant portion of their traffic from a FSC . . . ."); *id.* at '112 ("Existing private authorities would more than likely have to be renegotiated . . . Since a large percentage of our traffic moves on private authorities, it would take up to a year to achieve good coverage.").

48. In addition, NS struggled to impose fuel surcharges in this pre-conspiracy period—NS faced competitive pressures from the other railroads in relation to fuel surcharges, and customers repeatedly complained about the surcharges. *See, e.g.*, PX0614, Glennon (NS) Dep., July 20, 2010, at 18-19 (testifying that "some railroads may not have been actually applying a fuel surcharge at the very beginning. . . . not all of them were successful initially, but they were later," and that when NS bid against other railroads, it often went up against "competitive bids . . . where a fuel surcharge was not being applied and that created some concerns on [NS's] part."); *id.* at 19 ("[W]hen you are trying to negotiate a contract, if you have a fuel surcharge and the . . . competitive bid doesn't, it puts you at a disadvantage."); PX0287, NS_010032689 at 689 (NS email re "Renewal of NSSC 82990 'ADM' [redacted]" July 30, 2003), at '689 (NS employees strategizing how to win a contract and noting "CSXT seems to be getting the upper hand with non FSC multi-year contracts"); PX0280, NS_010013754 (NS internal email chain re "Fuel Surcharge

Provisions," June 9, 2000), at '754 (NS internally noting that CSX would not apply fuel surcharges on a competitive line, including strongly-worded complaint from shipper regarding NS's "ill-advised fuel surcharge program"); PX0274, NS_010013312 (NS email chain re "NSSC80D13," April 5, 2000) at '312 (customer objecting to new fuel surcharge, and NS employee noting that this was "another test of the fuel surcharge"); PX0282, NS_010013810 (internal NS email chain re "Fuel Surcharge," June 21, 2000), at '810 ("Customers are picking up on the surcharge situation and are starting to get nasty. What can we tell them? Need something quickly."); PX0278, NS_010013633 (internal NS email chain re [redacted]" May 27, 2000) at '633 ("[redacted]); PX0284, NS_010026782 (internal NS email re "Fuel Surcharge Change Pro/Con" and attachment, Apr. 25, 2003), at '784 ("under the heading "Customer push back," that more aggressive fuel surcharge programs risked "losing the surcharge altogether").

49. Before 2003, multiple shippers threatened not to pay NS fuel surcharges or made it difficult for NS to collect surcharge bills. *See, e.g.*, PX0280, NS_010013754 (NS internal email chain re "Fuel Surcharge Provisions," June 9, 2000), at '754-55 (shipper warning NS that "No attempt will be made to maintain fuel surcharges in our rate data base. You will have to send 'balance due' bills for every surcharge that you wish to collect" and "Investigating / processing fuel surcharge bills will have VERY low priority," and that "[i]f the fuel surcharge provisions are implemented, we will discontinue the use of, and/or not renew four of the five quotes"); PX0273, NS_010013190 (NS internal email chain re "Credit Cut List," April 25, 2001), at '190 ("The real issue right now is to get them to pay the fuel surcharge."); PX0354, NS_013006745 (NS internal email re "[redacted]" Nov. 28, 2000), at '748 (noting that NS shipper had "over $50,000 in unpaid FSC bills"); PX0322, NS_010072905 (NS internal email re "NS Fuel

Surcharge", Sept. 30, 2002) at '905 ("Customers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause on newly negotiated private publication with a duration of one year or less.").

50. During the pre-2003 period, in the face of significant pressure from customers and competition from other railroads, NS often negotiated, waived, or reduced its fuel surcharges. *See, e.g.*, PX0614, Glennon (NS) Dep., July 20, 2010, at 18-19 (testifying that "some railroads may not have been actually applying a fuel surcharge at the very beginning . . . . not all of them were successful initially, but they were later," and that when NS bid against other railroads, it often went up against "competitive bids . . . where a fuel surcharge was not being applied and that created some concerns on [NS's] part."); PX0319, NS_010072620 (internal NS email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 27, 2003), at '620 (noting that, as of March 2003, "[m]any" NS customers have "negotiate[d] out of the SC"); PX0275, NS_010013399 (internal NS email chain re Fuel Surcharge, May 2, 2000), at '399 (NS employees advocating for waiving fuel surcharge for shippers who were "saying no, never, etc." to the new program, and ("If they balk on the fuel surcharge, negotiate the fixed percentage higher . . . as a compromise. If fixed percentage won't sell, go with unadjusted RCAF . . . ."); PX0370, OLI109143, at '146 (2000 NS contract: NS [redacted]); PX0279, NS_010013722 (internal NS email re "NSRQ52302", June 12, 2000), at '722 (regarding waiver or modification of fuel surcharge); PX0276, NS_010013420 (internal NS email re "NS-C-12408", May 2, 2000), at '420 (noting "customer complaints" regarding fuel surcharge program and explaining "[w]e shouldn't blindside a customer by unilaterally putting a fuel surcharge in a new or amended contract particularly one negotiated prior to the corporate policy decision regarding its implementation"); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 67-68 (testifying that he had

approved some waivers of fuel surcharges between 2000-2003); PX0281, NS_010013795 (NS-Cargill email re "CARGILL FUEL SURCHARGE; Contract Final Open Issue II", June 22, 2000), at '795 ("With Don Seale's approval we have offered to waive the surcharge language in exchange for an additional 1% increase across the board."); PX0253, NS_010076080 (NS internal email re "UP FSC - NS Concurrence Eff," July 16, 2003), at '082 (in July 2003, NS noted that "most RRs exempt a significant portion of their traffic from a FSC . . . ."); PX0275, NS_010013399 (internal NS email chain re "Fuel Surcharge," May 2, 2000), at '399 (Brugman: "What latitude do I have to waive or modify the fuel surcharge provision in contracts?" Quesenberry: "If they balk on the fuel surcharge, negotiate the fixed percentage higher . . . If fixed percentage won't sell, go with unadjusted RCAF . . . .").

51. Prior to early 2003, shippers were able to negotiate with NS to remove fuel surcharges. *See, e.g.*, PX0319, NS_010072620 (internal NS email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 27, 2003), at '620 (noting that, as of March 2003, "[m]any" NS customers have "negotiate[d] out of the SC"); PX0275, NS_010013399 (internal NS email chain re "Fuel Surcharge," May 2, 2000), at '399 (NS employees advocating for waiving fuel surcharge for shippers who were "saying no, never, etc." to the new program, and "if they balk on the fuel surcharge, negotiate the fixed percentage higher . . . as a compromise . . . .").

52. NS knew it could lose customers if it imposed fuel surcharges when other railroads did not. PX0287, NS_010032689 (internal NS email re "Renewal of NSSC 82990 'ADM' Veg Oil", July 31, 2003), at '689 (NS employees strategizing how to win a contract and noting "CSXT seems to be getting the upper hand with non FSC multi-year contracts"); PX0280, NS_010013754 (NS internal email chain re "Fuel Surcharge Provisions," June 9, 2000), at '754 (NS internally noting that CSX would not apply fuel surcharges on a competitive line); PX0277, NS_010013612

(internal NS email chain re "Fuel Comments," June 9, 2000) at '612 (NS develops "plans to [] keep [] track of lost business account [sic] the FSC").

53. NS allowed its individual marketing personnel authority to reduce or eliminate fuel surcharges prior to 2003. *See* PX0275, NS_010013399 (internal NS email chain re "Fuel Surcharge," May 2, 2000) at '399 ("If they balk on the fuel surcharge, negotiate the fixed percentage higher"); PX0276, NS_010013420 (internal NS email chain re "NS-C-12408," May 2, 2000) at '420 (NS is "flexible" with regards to "the fuel surcharge clause" "to the point of taking it out if its a deal buster"); PX0322, NS_010072905 (internal NS email chain re "NS Fuel Surcharge," Sept. 30, 2002) at '905 ("Customers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause on a newly negotiated private publication with a duration of one year or less.").

54. NS's Director of Marketing Services, Pat Glennon, agreed regarding the 2001 and 2002 period that even when it was placed in contracts "the fuel surcharge wasn't being triggered" given the price of fuel, and "[a]t that point the fuel surcharge was *theoretically billable*." PX0614, Glennon (NS) Dep., July 20, 2010, at 26 (emphasis added); *id.* at 16 ("Q. Do you recall how often the fuel surcharge was triggered in the period of 2000 to 2003? A. Not precisely. I remember it kicked in at 2 percent and then at some point, maybe 2001, it probably dropped off."); *id.* at 22 (fuel surcharge was not triggered again until Q4 of 2002); DA05698 (NS formula was triggered at 2% from June 30 to October 30, 2000).

**2. CSX**

55. CSX developed a fuel surcharge program in 2000 that generated "relatively low" revenue prior to 2003. PX0612, Gooden (CSX) Dep., July 16, 2010, at 101 (revenue from pre-2003 program was "relatively low to where it needed to be").

56. CSX's fuel surcharges were applied "minimal[ly]" before the conspiracy period—one employee was even "embarrassed" by how rarely they were imposed. PX0621, McNulty (CSX) Dep., Aug. 10, 2010, at 118-19 (FSC implementation was "fairly minimal" in 2001 and 2002 at CSX); PX0612, Gooden (CSX) Dep., July 16, 2010, at 101 (agreeing that the "fuel surcharge revenue the company was generating prior to adoption of this new program in March of 2003 was" "[l]ow—relatively low to where it needed to be"); *id.* 226 (Gooden noting that he was "embarrassed" regarding fuel surcharge coverage, which in 2003 was "very low").

57. CSX's early attempts to apply fuel surcharges elicited customer pushback and competition from other railroads. *See, e.g.*, PX0216, CSXFSC000324671 (internal CSX email re "ADM and Fuel Surcharge", Nov. 12, 2002), at '671 (perceiving a "threat of losing business to the NS," CSX offered shipper ADM a discounted fuel surcharge pursuant to which ADM would receive a rebate if the WTI dropped below $23 per barrel); PX0195, CSXFSC000128907 (CSX internal email re "CSXT Fuel Surcharge Value," Aug. 20, 2002) at '907 ("Customers may view a more aggressive CSXT fuel surcharge negatively, particularly on NS competitive business . . . ."); *see also* PX0594, McIntyre (CSX) Dep., Feb. 18, 2010, at 104-07 (testifying to customer pushback and competition with NS on fuel surcharges); PX0209, CSXFSC000247016 (letter from Citizens Gas & Coke Utility to CSX, Oct. 5, 2000), at '016 (shipper rebuffing CSX's efforts to impose a fuel surcharge). For example, Plaintiff AK Steel and CSX executed a "Wraparound Contract Memorandum of Understanding" in November 2002 covering AK Steel's larges shipments on CSX and none of the Wraparound Contracts contained FSCs. PX1146, AKSteel-00115481 (AK/CSXT Wraparound Contract – Memorandum of Understanding, Nov. 11, 2002), at '481.

58. The customer pushback and competition from other railroads during this period resulted in CSX regularly providing discounts from or even waivers of the fuel surcharge. PX0216,

CSXFSC000324671 (internal CSX email re "ADM and Fuel Surcharge", Nov. 12, 2002), at '671 (perceiving a "threat of losing business to the NS," CSX offered shipper ADM a discounted fuel surcharge pursuant to which ADM would receive a rebate if the WTI dropped below $23 per barrel); *see also* PX0160, CSXFSC000000096 (internal CSX email re "Fuel Surcharge Information" and attachments, Oct. 24, 2000), at '101 ("Customer relations – if customer balks - Explain business case - Explain underlying rationale - Urge acceptance - If customer continues to balk, end the conversation on the issue Do not threaten customer with consequences"); PX0223, CSXFSC000499039 (Amendment No. 16 to Contract CO-C-00157), at '040 ("Any Fuel Surcharge balance due prior to January 1, 2002 will be waived. No Fuel Surcharge will be incurred during the Term."); PX0200, CSXFSC000153248 (CSX internal email re "Sunoco Fuel Surcharge," June 12, 2003), at '248 (agreeing to cap Sunoco's Fuel Surcharge at 2%); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 58 (explaining that before 2003 "if you could negotiate an index in your contract that captured fuel, that would be acceptable. So you didn't have to have the fuel surcharge"); PX0772, CSXFSC000232488 (CSX internal email re "PCS – Fuel Surcharge Comparison by RR," Jan. 23, 2003), at '488 (noting substantial waivers and refunds of pre-conspiracy fuel surcharges for shipper PCS).

59. There is no evidence that, prior to the conspiracy, senior CSX executives needed to approve fuel surcharge waivers or discounts.

60. The general inability to unilaterally impose fuel surcharges meant that CSX was not meeting its revenue goals during the period from 2000 to early 2003. CSX had made it a goal to increase revenues by $1 billion between 2002 and 2004, but by the spring of 2003 was unable to meet even its normal budget goals for fuel surcharge revenue. PX0612, Gooden (CSX) Dep., July 16, 2010, at 31-32; *see also* PX0205, CSXFSC000199146 (CSX email re "BHAG SLT

Presentation" attaching "The Billion Dollar BHAG: Growing CSX Rail Revenues to $8.2 Billion by 2004" presentation, June 13, 2002), at '147, '151 (identifying current revenue as over $7 billion, and "Big Hairy Audacious Goal" revenue as over $8 billion); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 94-97, 105-08 (CSX missed the first month goal by $29 million, and discussed implementing fuel surcharges more broadly to make up revenue); PX0204, CSXFSC000190646 (CSX internal email re "Financial Update from Monday MJW Staff Meeting" attaching CSX Surface Transportation Financial Update presentation, Feb. 4, 2003), at '648 ("January Operating Income was $2.7M, $(29)M below Plan and $(24)M below 2002"); *see also* PX201, CSXFSC000156699 (internal CSX email chain re "memo fr pmg to dir rpts re budget mtg fu 031803.doc," March 18, 2003), at '699-700 (identifying "[i]ncremental revenue from fuel surcharge changes" as one way to close a gap in operating income in March 2003); PX0213, CSXFSC000290276 (internal CSX meeting re "PMG Staff Mtg", March 21, 2003), at '276 ("Following the 'somewhat tense' budget meeting on Monday, I just wanted to send a follow up note to reinforce the importance of looking at opportunities for increasing revenues and reducing costs in Q2.").

61. In the pre-conspiracy period, CSX's fuel surcharge was rarely triggered, and remained low. *See* PX0612, Gooden (CSX) Dep., July 16, 2010, at 101 (CSX's fuel surcharge program developed before the alleged conspiracy period of 2003-2008 generated "relatively low" revenue).

**3. UP**

62. In the pre-conspiracy period UP did not have a specific fuel surcharge policy, but instead applied stand-alone fuel surcharges only in "isolated" and "minimal" situations, and the impact of the fuel surcharges "didn't show up in terms of our financials." PX0616, Young (UP)

Dep. Aug. 4, 2010, at 55 (agreeing that "[b]efore 2003 . . . it [would] be fair to say that the impact of fuel surcharge was somewhat minimal."); *id.* at 28 (agreeing that "any fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels."); *id.* at 169 (In the 2000, 2001 timeframe, fuel surcharges were not "a significant piece of our business and . . . didn't show up in terms of our financials, the impact."); PX0604, Eisele (UP) Dep., May 12, 2010, at 77 (noting that in pre-conspiracy period, "fuel cost recovery . . . as a mechanism . . . had not, in a broad sense, been implemented"); PX0490, UPFSC_0042871 (internal UP email re IP Fuel Surcharge Timing, Oct. 3, 2002), at '871 ("[S]trategy has been to avoid fuel surcharges and negotiate increases into our price"); PX0611, Knight (UP) Dep., July 9, 2010, at 23-24 (testimony by UP's CFO that, from 2000-2002, "there was not a [FSC] policy. There were some isolated situations where there were surcharges, but I don't—there's no policy position"); PX0492, UPFSC_0047327 (internal UP email re "BNSF 1% Fuel Surcharge Eff 6/1," Apr. 30, 2002), at '327 ("Our strategy remains to negotiate pure price upfront vs. a surcharge. It's more sustainable, easier to administer, and more effective with customers.").

63. Prior to mid-2003, UP's fuel surcharge program was limited to certain tariffs and circulars and exempted private shipments in its Industrial Products group (which accounted for 21% of UP's total commodity revenue in 2004). *See, e.g.*, PX0466, UPFSC0000675 (UP-CSX email chain re "UP Fuel Surcharge – Project 1106," Jan. 9, 2003), at '675 ("The UP 'standard' fuel surcharge program we put into place last month, so far, is applicable only in connection with our tariff & circular prices"); PX0406, UPFSC 0195600 (UP internal email re Fuel Surcharges, Jan. 15, 2003), at '601 ("Most private IP UP-created documents are not affected at this time"); *see also* PX0611, Knight (UP) Dep., July 9, 2010, at 23-24 ("My recollection is there was not a [fuel

surcharge] policy [in the 2000-2002 time period]. There were some isolated situations where there were surcharges, but I don't – there's no policy position.").

64. During the pre-conspiracy period, UP faced significant customer pushback when it attempted to impose fuel surcharges. PX0514, UPFSC_0184102 (UP internal email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 12, 2003), at '102 (internal email noting "I'm sure you are aware of the fact that ***there appears to be a lot of [interest]/push back coming [from] customers/consultants directed at challenging our fuel surcharges.*** Attached is an example from IP . . . however ***I understand this is a growing issue in other commodity groups as well***.") (emphases added); PX0611, Knight (UP) Dep., July 9, 2010, at 59 (recalling that UP received push back from customers directed at fuel surcharges in early 2003).

65. In the pre-conspiracy period, UP regularly discounted fuel surcharges, or waived them altogether, when confronted with customer or competitive pressures. *See* PX0416, UPFSC 0308795 ([redacted] June 13, 2001), at Mitsui worksheet, (reflecting that UP [redacted]); PX0219, CSXFSC000328691 (CSX internal email re "Important Message from Mike Giftos," Sept. 22, 2000), at '691 (UP stated in September 2000 that UP had "hesitate[d]" to implement fuel surcharges "because of the competitive issues out there"); PX0488, UPFSC0029999 (internal UP email re "Fuel Surcharge and 3229," Jan. 15, 2003), at '999 ("If you have business at risk because of a fuel based increase in 3229, Bob suggested you use a refund allowance to offset the price increase to shield the traffic from being lost."); PX0531, UPFSC_0437015 (internal UP email and attaching draft UP-K-Line letter, May 4, 2000), at '016 (UP [redacted]); PX0506, UPFSC 0117070 (internal UP email re [redacted] May 7, 2002), at '070 (noting that [redacted]

[redacted]); PX0532, UPFSC_0438393 (UP email re [redacted] Sept. 24, 2002), at '393 ("[redacted]); PX0489, UPFSC_0033490 (internal UP email re "Chemicals' Input for May Board Meeting," May 15, 2001), at '491 (BNSF and UP [redacted]); *see also* PX0448, UPFSC_0256361 (internal UP email re "Fuel Surcharge," Dec. 10, 2001), at '361 (list of [redacted] from December 2001).

66. In the pre-conspiracy period, shippers had the ability to negotiate with UP concerning fuel surcharges. For example, Plaintiff US Magnesium [redacted] December 2002 that [redacted] PX0546, USM005467 (US Magnesium-UP email chain re Master contract, Dec. 19, 2002) at '647 (confirming [redacted]); PX0600, Kaplan (US Magnesium) Dep., Mar. 10, 2010, at 38 ("[redacted]").

67. In the pre-conspiracy period, even when UP did succeed in imposing a fuel surcharge term in a given contract, the fuel surcharge provision was rarely triggered, and remained at low levels. PX0616, Young (UP) Dep., Aug. 4, 2010, at 25-26 ("We had fuel surge [sic] programs in many contracts, but because fuel had not run up, they were never implemented"); *id.* 28 (agreeing that "any fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels"); *id.* at 169 (the fuel surcharge "wasn't a significant piece of [UP's] business" in 2000 and 2001 and it "didn't show up in terms of [UP's] financials, the impact."); *see also* PX0490, UPFSC 0042871 (internal UP email re "IP Fuel Surcharge Timing," Oct. 3, 2002), at '871 ("The remaining documents with surcharge language

are not yet at a level where the surcharge kicks in."); PX1147, P_AEE_00000223 ([redacted]), at '243-44 ([redacted]).

**4. BNSF**

68. On July 10, 2000, BNSF implemented a fuel surcharge program with a WTI-index trigger, which was applicable to certain business segments. PX0042, BNSF-0010162 (BNSF memo to all industrial products carload customers, July 10, 2000), at '162.

69. On July 1, 2001, BNSF revised its program to use an HDF trigger. PX0162, CSXFSC000000272 (CSX email re "Changes to BNSF Fuel SC," Feb. 27, 2003), at '272 ("BNSF, effective July 1, 2001, will use the Highway Diesel Fuel (HDF) index instead of the West Texas Intermediate Oil (WTI) index . . . .").

70. Prior to the conspiracy, BNSF's fuel surcharge program was triggered only sporadically and at low percentages. *See, e.g.*, PX0613, Rose (BNSF) Dep., July 16, 2010, at 20-21 (fuel surcharges around 2000 "never hit the strike price and—and we never collect[ed]."); PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 42 ("[F]uel surcharges that were put in place in 2000 weren't collecting a lot of money"); PX0064, BNSF-0033650 (BNSF email re "Verify Intermodal Fuel Surcharge," attaching pricing update to shippers, Mar. 27, 2002), at '652 ("You were advised in BNSF's *Fuel Surcharge Pricing Update* dated December 11, 2001, that the BNSF fuel surcharge would resume when the [HDF Price] Index reached $1.24. The Index has exceeded that price, therefore the BNSF fuel surcharge will resume effective April 3, 2002. . . . The surcharge amounts for the period commencing April 3 [through April 9] is . . . 1.5%.").

71. BNSF was limited in its ability to impose fuel surcharges prior to the spring of 2003. PX0088, BNSF-0328865 (BNSF memo re "Fuel Surcharge Questions," Jan. 15, 2003), at '865 (approximately 27% of BNSF business was covered by a fuel surcharge in 2002, resulting in only $23 million in fuel surcharge revenue); PX0139, BNSF-FSC_000411 (BNSF Fuel Surcharges Fuel Surcharge Review Team Recommendations Presentation draft, Apr. 14, 2003), at '430 (reflecting that as of March 21, 2003, BNSF's fuel surcharge program did not apply to $2.2 billion of $4.2 billion in its total estimated revenue); PX0037, BNSF_LOG0000054 (internal BNSF email re "Fuel Surcharge Modifications?" Feb. 15, 2001), at '055 ("Only 19% of Carload takes fuel surcharge" as of February 2001); PX0103, BNSF-0391761 (internal BNSF email re "BNC 68612 Amendment 13 for Ag. Processing," June 1, 2001), at '761 ("Please note: For all Ag Products, their rule is no Fuel SC per Steve Bobb's email of 4/19/01. If there will be a Fuel SC, they will tell us. This includes Bulk Foods & Fertilizer. Therefore, don't question their [Price Authorities] if they don't include Fuel SC."); PX0109, BNSF-0478450 (internal BNSF email re "Review of Audit Teams Contract Process Recommendations" and attachments, June 19, 2002), at '453 ("7 (23%) [of a sample of contracts] specifically stated that fuel surcharge provisions do not apply (2 Consumer Products, 5 Industrial Products). . . . We recommend the omission of a fuel surcharge be approved as part of the DOA process."); PX0087, BNSF-0328513 (list of "CUSTOMERS NOT CHARGED FUEL SURCHARGE IN 2002" lists approximately 200 Consumer Products group customers).

72. When BNSF attempted to impose fuel surcharges in the pre-conspiracy period, BNSF experienced significant customer pushback, and as a result, it frequently failed to collect, applied discounts to, or simply waived, fuel surcharges. PX0101, BNSF-0390248 (internal BNSF email re "Sappi-Fine FSC," Feb. 21, 2003), at '250 ([redacted]

[redacted]); PX0088, BNSF-0328865 (BNSF memo re "Fuel Surcharge Questions," Jan. 15, 2003), at '865 (approximately 27% of BNSF business was covered by a fuel surcharge during 2002, resulting in only $23 million in fuel surcharge revenue); PX0037, BNSF_LOG0000054 (internal BNSF email re "Fuel Surcharge Modifications?," Feb. 15, 2001), at '055 ("Only 19% of Carload takes fuel surcharge" as of February 2001); PX0048, BNSF-0027470 (BNSF-International Paper email chain re "EXORBITANT Rail Fuel Cost Recovery"), at '470 ([redacted]); PX0599, Kyei (BNSF) Dep., March 4, 2010, at 56 (BNSF "participation was low" in 2001); *id.* at 82-84 (similar); PX0134, BNSF-FSC_000047 (BNSF Fuel Surcharges presentation, Apr.14, 2003) at '052 (reflecting 26.7% "participation rate" in 2002, and 36.1% estimated participation rate in 2003); PX0045, BNSF-0026922 (internal BNSF email re "Fuel Surcharge Exceptions" and attachments "Commodities Exempt from FSR" and "Subj to Fuel Surcharge But Not Applied," Nov. 15, 2002) at '923 ("The major exceptions fall into the categories of: 1) Commodity Exemptions, 2) Price Authorities that do not have fuel surcharge provisions and 3) Provisions for fuel surcharge are in document, but Marketing/Sales has authorized an exception."); PX0102, BNSF-0391757 (BNSF email re "RPMS TEAM MEETING notes" and attachment "Forest Product Business Unit Fuel Surcharge Application, Apr. 9, 2001), at '760 ("The surcharge is not generally applied to: Bricks, Gypsum Wallboard, Crushed Stone . . . ."); *see also* PX0384, UPFSC_0030470 (internal UP email re "BNSF Fuel Surcharge," May 10, 2001), at '470 (UP employees discussing circulating customer reactions with respect to BNSF's planned change to a new fuel surcharge).

73. BNSF struggled to impose fuel surcharges in the pre-conspiracy period because of competitive concerns. BNSF wrote in a May 28, 2002 Enterprise Wide Risk Assessment that "We

are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." PX0127, BNSF-0574516 (BNSF Enterprise Wide Risk Assessment, May 28, 2002) at '617; see also PX0128, Metadata to PX0127, at 17.

74. BNSF recognized internally in January 2003 that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive" due to "competition," "industry practices," and "contract negotiating power." PX0088, BNSF-0328865 (BNSF memo re "Fuel Surcharge Questions," Jan. 15, 2003), at '866; *see also* PX0489, UPFSC_0033490 (internal UP email re "Chemicals' Input for May Board Meeting," May 15, 2001), at '491 (BNSF and UP [redacted]); PX0049, BNSF-0027614 (internal BNSF email chain re "Pulpboard Boxcar permit," Mar. 21, 2003), at '618 ([redacted]); PX0092, BNSF-0343051 (internal BNSF email attaching "Fuel Expense Management" slide, Mar. 28, 2003), at '052 (warning that "costs" of a fuel surcharge include "[m]arket share" and "[g]ood will").

75. On April 29, 2003, BNSF informed UP that BNSF would not be adopting the 5% fuel surcharge it had proposed for May 2003 and would instead be adopting a 2% surcharge. UP's Bob Toy wrote that "Fuel surcharge $ are melting away at the competition. ***In a downward-pressure environment, what's on paper must not work in the real world***." PX0508, UPFSC_0129813 (internal UP email re BNSF Reducing Fuel Surcharge 5/1 to 2%, Apr. 29, 2003), at '813 (emphasis added); PX0114, BNSF-0495601 (BNSF email re "Update: BNSF Carload Fuel

Surcharge—May, 2003," attaching "Update: BNSF Carload Fuel Surcharge May 2003," Apr. 30, 2003), at '602 (announcing the reduced fuel surcharge).

76. Only about 25-30% of BNSF customers were subject to fuel surcharges in the pre-conspiracy period, which BNSF considered to be "low." PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 27, 29 (BNSF's fuel surcharge participation rates as of January 2003 were "in the 25 to 30 percent range," which John Lanigan found to be "low" and made it his goal to increase); PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 56 (BNSF "participation was low" in 2001); *id.*, at 82-84; PX0134, BNSF-FSC_000047 (BNSF Fuel Surcharges presentation, Apr.14, 2003) at '052 (reflecting 26.7% "participation rate" in 2002, and 36.1% estimated participation rate in 2003); PX0045, BNSF-0026922 (internal BNSF email re "Fuel Surcharge Exceptions" and attachments "Commodities Exempt from FSR" and "Subj to Fuel Surcharge But Not Applied," Nov. 15, 2002) at '923 (discussing shippers with fuel surcharge exemptions); PX0102, BNSF-0391757 (BNSF email re "RPMS TEAM MEETING notes" and attachment "Forest Product Business Unit Fuel Surcharge Application, Apr. 9, 2001), at '760 ("The surcharge is not generally applied to: Bricks, Gypsum Wallboard, Crushed Stone . . . .").

77. BNSF acknowledged in early 2003 that one factor limiting success in applying fuel surcharges was that the option to apply surcharges had been put in the hands of individual marketing personnel. PX0176, CSXFSC000000270 (internal CSX email chain re "CSXT/NS Fuel Surcharge History," July 12, 2000), at '270 ("BNSF advised their list of price authorities subject to their fuel surcharge was small because their leaders put the option in the hands of individual marketing personnel.").

### F. Prior To The Conspiracy, Individual Defendants Recouped Fuel Cost Changes Via Base Rate Escalation Provisions Tied To Indices That Weighted Actual Cost Factors, Including the Cost Of Fuel

78. Prior to the conspiracy, the Defendants frequently adjusted base rates (i.e., freight rates initially set forth in a contract) using indices—the Rail Cost Adjustment Factors ("RCAF")—that accounted for changes in all of a railroads' input prices and costs, including fuel. *See*, *e.g.*, PX0605, Rockey (AAR) Dep., May 18, 2010, 84-90; PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 261-62; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 70.

79. The RCAF was based on the All-Inclusive Index, or "AII," published by the AAR. PX0017, AAR-E-00078595 (AAR Railroad Cost Indexes, Dec. 2002). The ICC, and subsequently the STB, reviewed the AAR's quarterly AII calculations, and after making any corrections, published two versions of the RCAF quarterly, the RCAF-U (a factor unadjusted for productivity) and the RCAF-A (adjusted for productivity). *See* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶¶ 67-72. Significantly, the ICC determined that with the RCAF in place, there would be no future need for railroads to maintain separate rail fuel surcharges:

> [T]he procedures established in this decision will permit railroads to recover fuel cost increases along with other cost increases on a quarterly basis. Regulatory lag will be minimal under the proposed forecasting method. *Maintaining a separate fuel surcharge mechanism for fuel would, in our view, serve no useful purpose*

*Id.* ¶ 69 (emphasis added) (quoting PX0915, *Railroad Cost Recovery Procedures*, ICC Ex Parte No. 290 (Sub-No. 2) (Apr. 8, 1981) at p. 852).

80. According to UP, the RCAF "looks at actual costs through the industry." PX0113, BNSF-0481756 (UP 3Q2004 Earnings Call, Oct. 21, 2004), at '763.

81. CSX's chief commercial officer, Mike Giftos, testified that the RCAF "did a pretty good job of capturing our costs and so presumably it did capture fuel prices." PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 48, 63.

82. CSX would not apply the fuel surcharge if the shipment was already covered by another cost escalation formula. *See, e.g.*, PX0160, CSXFSC000000096 (internal CSX email re "Fuel Surcharge Information" and attachments, Oct. 24, 2000), at '098 (a surcharge "[d]oes not apply to contracts with government index escalators"); PX0159, CSXFSC000000061 (CSX "Commercial Team—FAQ'S" concerning fuel surcharges), at '061 (providing that the fuel surcharge will not apply to "contracts that contain a price escalator index published by a government entity, such as RCAF"); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 45-46 ("So if we had a contract with a customer and it had an index that would escalate or adjust the prices up or down, if it had the downward adjustment in it, and that index cap should increase in cost of fuel, then we didn't need—my instructions to our sales and marketing group were, you did not need to get the fuel surcharge on that particular traffic.").

83. In the pre-conspiracy period, at least one Defendant determined it would be inappropriate to impose a fuel surcharge *in addition to* escalators, like the RCAF. PX0361, NS_026002535 (internal NS email re "Fuel Surcharge Status as of 12/31/00," Jan. 4, 2001), at '535 (NS intermodal employee noting to Don Seale and others in January 2001 that "we have finally been forced to acquiesce on some of the International contracts and stop charging an FSC where there is an RCR. Even our attorney's [sic] said we were on shakey [sic] ground, and after a year of assessing and collecting this from a few carriers, we have terminated it"); *see also* PX0613, Rose (BNSF) Dep., July 16, 2010, at 23-24 (customers did not "want to pay a fuel surcharge on top of RCAF" and complained, "rightly so," that the RCAF was an existing "mechanism to recover

fuel”). NS routinely discounted or waived fuel surcharges in contracts prior to 2003. *See, e.g.*, PX1148, NS-MDLII-00213141 (NS-[redacted] email re “NS Charleston’s rate,” Apr. 26, 2000), at ‘141 (“NS agrees to waive any fuel surcharge for the year 2000 in exchange for the above compromise”); PX0281, NS_010013795 (NS-Cargill email re “CARGILL FUEL SURCHARGE; Contract Final Open Issue II”, June 22, 2000), at ‘795 (“With Don Seale’s approval we have offered to waive the surcharge language in exchange for an additional 1% increase across the board.”).

84. Prior to the conspiracy period, UP [redacted] PX0532, UPFSC_0438393 (UP email re “Vulcan Fuel Surcharge Concept,” Sept. 24, 2002), at ‘393 (“[redacted]); PX0531, UPFSC_0437015 (internal UP email and attaching draft UP-K-Line letter, May 4, 2000), at ‘016 ([redacted]).

### G. Prior To The Conspiracy Period, Fuel Prices Were Low, Flat, and Not Expected to Rise

85. Prior to 2003, fuel prices were, as Defendants’ own expert observed, “low and did not change much.” PX0773, Carlton MDL II Rpt., Aug. 15, 2023, ¶ 90; *see also id.* ¶¶ 29–30 (noting that fuel prices pre-2003 were lower and less volatile than post-2003); PX0648, Carlton Corrected MDL I Merits Rpt., Feb 6, 2013, ¶ 148 (noting that pre-2003 fuel prices were “low and flat”); PX0637, Kalt Corrected MDL I Merits Rpt., Mar. 1, 2013, fig.IV-5A (showing that, immediately prior to the alleged conspiracy, in early- to mid-2003, fuel prices decreased).

86. Immediately prior to the alleged conspiracy, in early- to mid-2003, fuel prices decreased. *See, e.g.*, PX0038, BNSF_LOG0006542 (BNSF "Second Quarter 2003 Financial Presentation," July 22, 2003), at '559 ("Fuel price dropped in the second quarter" of 2003).

87. And as the alleged conspiracy was being hatched, "fuel prices were actually expected to fall." PX0648, Carlton Corrected MDL I Merits Rpt., Feb 6, 2013, ¶¶ 61, 148; PX0776, Israel MDL II Rpt., Aug. 15, 2023, ¶ 77 ("futures prices pointed to falling prices for WTI"); PX0775, Tucker MDL II Rpt., Aug. 15, 2023, ¶ 151 & tbl.10 (showing that in March 2003, it was projected that WTI prices would fall below $28 and stay above $23 all the way through September 2005); PX0774, Johnson MDL II Rpt., Aug. 15, 2023, ¶ 144 ("NYMEX futures projections from March 2003 and September 2003 show that WTI prices were expected to be between $23 and $28 for most of the months covered by the projections."); *see also* NS Br. 5 (stating that "forecasts predicted declining fuel prices" at the time BNSF, CSX, and UP changed their fuel surcharges and, as the year progressed, fuel prices continued to be "stable," with "forecasts predicted prices to decline to $24/bbl by February 2004").

88. In early- and mid-2003, industry experts did not expect the price of fuel to rise in 2004. For instance, the July 2003 Global Petroleum Monthly, which NS reviewed, stated "West Texas Intermediate (WTI) is still expected to average around $27/barrel (bbl) for the rest of this year, though trending downwards from current levels as stocks rise and Iraq returns. Fundamentals continue to look bearish for 2004, and we expect WTI to dip below $25/bbl in the first half of next year." PX0342, NS_010218296 (NS email re "Fuel surcharge," and attachment "Global Petroleum Monthly July 2003," July 29, 2003), at '301; *see also* PX0344, NS_010275443 (NS email re "FSC Testimony," attaching NS's Statement Before The STB, Apr. 27, 2006), at '449 ("In March 2003, EIA accurately forecasted a decline in the price of WTI to around $27 by the end of 2003");

PX0774, Johnson MDL II Rpt., Aug. 15, 2023, ¶ 144 ("NYMEX futures projections from March 2003 and September 2003 show that WTI prices were expected to be between $23 and $28 for most of the months covered by the projections."). PX0775, Tucker MDL II Rpt., Aug. 15, 2023, ¶ 151 & tbl.10 (showing that in March 2003, it was projected that WTI prices would fall below $28 and stay above $23 all the way through September 2005); PX0776, Israel MDL II Rpt., Aug. 15, 2023, ¶ 77 ("futures prices pointed to falling prices for WTI").

89. An internal NS email chain in April 2003 stated that "[f]uel costs are dropping" and "it appears we may be entering ***an extended period of reasonable oil costs***." PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '522 (emphasis added).

90. CSX's Michael Giftos similarly testified that, in Spring 2003 he "thought fuel prices were going down." PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 109.

91. Furthermore, when there was an uptick in fuel prices in late 2003, NS expected that to be only temporary. NS later represented to the STB that NS "thought … that the oil price increases we began to see as 2003 progressed were temporary." PX0344, NS_010275443 (NS email re "FSC Testimony," attaching NS's Statement Before The STB, Apr. 27, 2006), at '447.

## III. THE DEFENDANTS' CONDUCT DRAMATICALLY CHANGED AS THEY EMBARKED ON THE CONSPIRACY TO COORDINATE FUEL SURCHARGES AS A MEANS TO RAISE ALL-IN RATES FOR FREIGHT TRANSPORTATION

92. Defendants recognized that widespread application of stand-alone fuel surcharges would not be feasible unless Defendants were jointly committed to this outcome. As BNSF stated once the conspiracy was underway, while "reliance on fuel surcharge as a mechanism to control fuel prices . . . is working well now, it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail." PX0126, BNSF-0574195 ("Enterprise-Wide Risk Assessment BNSF Railway Risk Profile" presentation, Sept. 12, 2005), at '216; *see also* PX0123,

BNSF-0571509 ("2005 Enterprise-Wide Risk Assessment Leadership Team Meeting," Aug. 19), at '517 (identifying as a top risk the "[risk] that competitors reverse course on using a fuel surcharge").

### A. Beginning In Early 2003, Defendants Engaged In a Series Of Extraordinary Meetings And Communications Regarding Their Synchronization, Application, And Enforcement Of Rail Fuel Surcharges

93. High-level communications between Defendants about fuel surcharges were very rare prior to 2003. PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 194-98 (CSX's former CEO testifying that prior to 2003 the only discussion he could recall with an executive of another railroad about fuel surcharges was with UP's CMO (Jack Koraleski) in 2001 or 2002, and that, during that call, "Mr. Koraleski was surprised to learn that we had a fuel surcharge program. . . . [H]e apparently didn't know about it."); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 109 ("Q. Was there any effort made at the time that you announced the original fuel surcharge in 2000, to coordinate your fuel surcharge with the fuel surcharges of any other railroads? A. No.").

94. In fact, Defendants were not able to identify any meetings between January 1, 2000 and March 2003, that senior executives of more than one Defendant railroad attended, at which fuel surcharges were discussed. PX0644, BNSF's Supp. Interrog. Resp., Feb. 8, 2011, at Response No. 2 (between January 1, 2000 and March 17, 2003 there were no "Meetings between one or more Senior Executives of [BNSF] and one or more Senior Executives of another Defendant at which FSCs were discussed"); PX0645, NS's Supp. Interrog. Resp., Feb. 8, 2011, at Response No. 2 (between January 1, 2000 and March 17, 2003 there were no "Meetings between one or more Senior Executives of [NS] and one or more Senior Executives of another Defendant at which FSCs were discussed"); PX0647, CSX's Supp. Interrog. Resp., Feb. 8, 2011, at Response No. 2 (between January 1, 2000 and March 12, 2003 there were no "Meetings between one or more Senior Executives of [CSX] and one or more Senior Executives of another Defendant at which FSCs were

discussed"); PX0646, UP's Supp. Interrog. Resp., Feb. 8, 2010, at Response No. 2 (between January 1, 2000 and March 12, 2003 there were no "Meetings between one or more Senior Executives of [UP] and one or more Senior Executives of another Defendant at which FSCs were discussed").

95. Beginning in 2003, Defendants' highest-ranking executives engaged in a series of unprecedented meetings, emails, phone calls, and other communications regarding their synchronization, application, and enforcement of rail fuel surcharges. *See, e.g.*, PX1149, CSXFSC000191685 (internal CSX email re "CSXT/NS Fuel Surcharge History," Feb. 12, 2003), at '685 (noting discussion between CSX marketing executive Clyde McIntyre and his "NS counterpart" concerning fuel surcharges); PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("Fuel surcharges → Uniform application across the industry would be helpful."); PX0474, UPFSC0001088 (handwritten notes summarizing June 3, 2003 CSX-UP meeting) at '088 ("Fuel surcharge—GIFTOS, CSX has not seen outcry that UP has. CSX may begin a modest hedge program (WARD). Both roads start at a $23 trigger. May have to revisit $23 if stay high."); PX0243, NS_001000422 (BNSF-NS Joint Marketing Meeting notes, July 30, 2003), at '424 (CMOs "John Lanigan and Don Seale agreed to lead a discussion of a potential ***industry position on fuel surcharge provisions*** at the next N.E.M.C. meeting.") (emphasis added); PX0664, CSXFSC000000476 (internal CSX email re "Fuel Surcharge Overview Clarence 03.ppt," Oct. 9, 2003) at '476 ("BNSF stated that 82% of their carload and Intermodal business either had a fuel surcharge or an escalator on the revenue."); PX0777, BNSF-0030435 (internal BNSF email re "Automotive fuel surcharges," Mar. 21, 2005), at '435 ("[A] negative fuel surcharge ahs [*sic*] been discussed at the industry level and no carrier can automatically apply this surcharge, which would force manual rating for all interline carriers

participating in the movement."); *see also* PX1150, NS_016000133 (NS "Entertainment Expenses of David R. Goode," Feb. 27, 2003), at '134 (noting a business discussion on January 7, 2003, that took place at a "Golf Outing, Tiburon Gulf Club, Naples, FL" with CEOs of NS and BNSF); PX1151, AAR-P-00001127 (notes from a [redacted], Feb. 7, 2003), at '127, 134; PX0595, Giftos (CSX) Dep., Feb. 25, 2010, 19:19-20:7 (discussing NEMC meeting); PX0612, Gooden (CSX) Dep., July 16, 2010, at 15:24-16:2 (same); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 12:12-18 (same); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 10:19-24 (same).

96. The meetings at which Defendants coordinated their fuel surcharge programs were conducted outside the presence of counsel and without other safeguards to prevent collusion. PX0604, Eisele (UP) Dep., May 12, 2010, at 88 (testifying that there was no requirement or practice that attorneys attend "Alliance" meetings and that he could not recall a single time a lawyer from UP, CSX, or NS ever attended such a meeting); PX0616, Young (UP) Dep., Aug. 4, 2010, at 214-15, 252-53, 259, 286-87 (UP's Chairman, President, and CEO, testifying that he could not recall the identity of a single lawyer who ever provided him any antitrust training at any time from 2003 to 2008, despite testifying that he "generally relied on [his] antitrust training" to know "what you can and can't talk about," and no indication of attorneys attending various meetings); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 31-32 (testifying that lawyers were "[n]ot always" present when Koraleski talked to other executives and that Koraleski did not always include lawyers on phone conversations with his counterparts).

97. Defendants' conversations veered beyond what was advised by their own antitrust guidance. PX0723, UPFSC_0081986 (UP internal email re "New BNSF Mileage Fuel Surcharge—Project 2188," Mar. 29, 2005), at '986 ("No one should contact or communicate with

BNSF (or any competitor for that matter) regarding any prices (***other than joint line prices pertaining to shipments in which UP and the railroad being contacted both participate***) . . . or anticipated price actions."); PX0724, UPFSC_0675711 ("Antitrust Compliance Ag Products Staff Meeting" presentation, Oct. 27, 2004), at '735-36 ("Avoid inappropriate communications with competitors about topics such as pricing, business plans, or customers," and "DO NOT discuss with one customer or competitor UP's actions with respect to other customers or competitors."); PX0725, CSXFSC00676473 (CSX Antitrust Compliance Do's and Don'ts), at '473 ("Do – Make it clear when contacting another railroad that you are talking only about joint line rates with that carrier. Don't – Allow your conversation to wander to generalizations about freight rates 'in the market,' or your single line rates."); PX0726, CSXFSC000001040 (CSX email re "Announcement of Fuel Surcharge Changes" and attachments, Mar. 2, 2007), at '048 ("Limit your discussion to that joint line rate."); PX0727, NS_002000110 (guidelines for industry meetings, Apr. 6, 1988), at '111 (NS prohibited the "discussion of rates or practices in connection with any traffic other than the specific joint-line traffic"); PX0728, BNSF-0817755 (BNSF Code of Conduct, Feb. 2004), at '761 ("Information exchanged . . . regarding pricing of joint-line movements must be limited to essential elements of the specific undertaking with that carrier. Under no circumstances can pricing plans or pricing policies with respect to single-line rates or charges be discussed with representatives of a competing carrier. Also, no information concerning a joint-line movement may be provided to carriers not involved in the movement."); PX0013, AAR-000389 ([redacted]. 13, 2005), at '390 (CSX executive noting that [redacted]).

98. Defendants did not institute protocols to record or transcribe their meetings accurately. PX0604, Eisele (UP) Dep., May 12, 2010, at 89 ("There was no stated process by which that—what transpired in the meetings would be recorded."); *id.* at 100 (testify that he was not aware of anyone being assigned to take notes); *id*. at 141 (testifying that he was not aware of any specific effort to "ensure that the minutes prepared from Alliance meetings accurately reflected what was actually discussed at the meetings"); PX0631, Goode (NS) Dep., Jan. 13, 2011, at 157-58, 224-25, 227-28 (testifying that he was not aware of any "effort to ensure that what occurred at these meetings was accurately recorded in some way"); PX0616, Young (UP) Dep., Aug. 4, 2010, at 225-26 ("Q. Is there any formal document that governed the Alliance relationship between UP and CSX at any time during the period 2002 through 2008? A: I'm not aware of any."); PX0605, Rockey (AAR) Dep., May 18, 2010, at 188-89 ([redacted]); PX0598, Adams (UP) Dep., Mar. 4, 2020, at 34-35 (no UP policy that so-called "concurrence communications" with other railroads occur in writing); *id*. at 57 (no UP requirement to memorialize phone conversations with employees at other railroads about pricing or fuel surcharge issues); *id.* at 68-72 (testifying that there was no written record of conversations with counterparts).

99. Defendants' executives also engaged in private side discussions about pricing. PX0604, Eisele (UP) Dep., May 12, 2010, at 193 ("Side discussions took place all the time at these meetings, over breaks, over lunch, whatever the case might be."); PX0427, UPFSC_0002667 (UP email re "Price Increase Programs," Feb. 26, 2001), at '667 (Koraleski wrote, "I think I mentioned to each of you (and also at our staff meeting last week) that I have had discussions with each of the Railroads regarding April 1 price increases. . . ." Adams replied that "Kurt [Schroder] will coordinate with his counterparts on the other carriers to obtain concurrence . . . ."); PX0605,

Rockey (AAR) Dep., May 18, 2010, at 188-89 (AAR would [redacted]); PX0598, Adams (UP) Dep., Mar. 4, 2020, at 68-72 (at NEMC meetings, senior officials would "go off and have a conversation," including on "pricing."); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 239-40 ("[NEMC] just happened to be a place where several people—where you could meet individually with several people at . . . the same time."); *id.* at 60-61 (CMOs would sit together at NEMC dinner receptions to cultivate relationships); *id.* at 232 (side meetings between CMOs during NEMC events could be held "at the hotel, it could be at the AAR headquarters, it could be at the Union Pacific [Washington, D.C.] headquarters office"); PX0607, Hamberger (AAR) Dep., June 7, 2010, at 195-97 [redacted]).

100. Defendants' trade association, the AAR, did not have any policies to prevent "rump sessions" occurring outside AAR meetings, and took no steps to prevent them. PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 62.

101. Defendants were aware that they were all having "bilateral" discussions about coordinating fuel surcharges around the same time. PX0616, Young (UP) Dep., Aug. 4, 2010, at 224 ("Q. And you were aware, while [UP] w[as] meeting with CSX and NS, that those other railroads . . . were holding, quote, unquote, Alliance meanings [sic] with BNSF, correct? A. I'd heard that."); PX0403, UPFSC 0184811 (internal UP email, with attached UP 2006 CEO Evaluation Comments from Jim Young, Feb. 2, 2007), at '816 (confirming awareness of "alliances between BNSF and Eastern carriers"); PX0604, Eisele (UP) Dep., May 12, 2010, at 282-83 (acknowledging communications between BNSF and eastern carriers which "[c]ould have happened in any form or forum"); PX0400, UPFSC_0174543 (internal UP email re "FSC," Feb.

7, 2007), at '543 (Koraleski (UP) saying that Seale (NS) "just told me BNSF is using PC Miler as well").

102. Defendants ceased holding high-level "Alliance" meetings some time in 2006, after the STB began inquiring into their fuel surcharge practices. *See, e.g.*, PX0604, Eisele (UP) Dep., May 12, 2010, at 169-71, 253 ("I have no recollection of meetings having been schedule after May of 2006."); PX0611, Knight (UP) Dep., July 9, 2010, at 280-82 (Alliance meetings stopped being scheduled); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 279-280 (Alliance meetings ceased).

103. Defendants' own expert, Dr. Dennis Carlton, admitted that inter-Defendant meetings at trade associations and in other contexts can "facilitate the establishment and enforcement of cartels." PX0778, Carlton MDL I Dep., Nov. 11, 2021, at 214–17. Dr. Carlton went even further, admitting that "Alliance" meetings could be "misused" by Defendants as a forum to fix prices. PX0779, Carlton MDL II Dep., Oct. 25–26, 2023, at 136–38.

## B. Defendants Agreed To Adopt Common Fuel Surcharge Methodologies

### 1. CSX and UP Internally Recommend Different Changes to Their Respective Fuel Surcharge Programs.

104. Prior to March 2003, CSX's CSX EVP of Sales and Marketing Clarence Gooden had been under "pressure from Sales to lower" CSX's standard fuel surcharges. PX0047, BNSF-0027276 (BNSF email re "Fuel Surcharges Result in Big Railroad Profits," March 10, 2003), at '276 (describing Gooden comments at an event, and that he was under "pressure from Sales to lower" the fuel surcharges and that "CSXT is not making any profit on their fuel surcharge").

105. On March 11, 2003, CSX internally recommended changes to its original fuel surcharge program that would have resulted in a significantly less aggressive escalation rate. The internal recommendation would have lowered CSX's strike price from $28 to $23 per barrel on the WTI index, imposed a 1.0% surcharge when the $23 strike price was reached, and escalated at

only a 0.5% surcharge increase for each $2.50 increase in the WTI thereafter. This proposed change would have caused CSX's fuel surcharge to escalate at half the rate of the coordinated fuel surcharges that CSX ultimately implemented. PX0181, CSXFSC000036491 (internal CSX email re "Fuel surcharge 1 pager," attaching "Fuel Surcharge Merchandise 2003" presentation, Mar. 11, 2003), at '494 ("Recommended changes to the Fuel Surcharge program[:] • Start the program at $23/barrel • Base on prior months average • Effective September 1, 2003 • Finalize with Legal and Accounting • Notify customers in April[.]"); *id.* at '495 ("Details of the new program[:] • Based on prior months average 16th of 2 months prior to 15th of last month • Continue to be based on WTI as published in the WSJ – average of the days published • Starts at $23 per barrel – 1% • Half percent increase for every $2.50 increase in WTI • Change monthly[.]."); *id.* at '496 (revising CSX surcharge, which increased 2% for every $5 increase to the WTI index, to increase only 1% for every $5 increase to the WTI index). As originally contemplated, this proposed formula was "lower than the rest of the industry," more customer-friendly, and "Anti-trust concerns" would be "significantly eased as compared to copying another railroad's program." PX1152, CSXFSC000098458 (internal CSX fax re "Fuel Surcharge", Mar. 19, 2003), at '458.

106. Gooden was involved in CSX's fuel surcharge assessments at Giftos's request. PX0177, CSXFC000036620 (CSX internal email re "March 3rd PMG Staff Meeting," Feb. 28, 2003) at '620 (concerning a March 3 meeting with Giftos to discuss fuel surcharges); PX0612, Gooden (CSX) Dep., July 16, 2010, at 49-52.

107. Also on March 11, 2003, UP internally circulated a "Revised Surcharge proposal" recommending changes to its original fuel surcharge program. It retained the $28 WTI strike price of UP's existing program, but which would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula (which called for a 2.0% increase for every $5 increase

in the WTI index). PX0501, UPFSC)0075385 (internal UP email re "jjk fuel revisited" and attachments, Mar. 11, 2003), at '386 ("Union Pacific Revised Fuel Surcharge Recommendation[:] • Surcharge is implemented at $28.00 and 2% • Establish the Threshold Percentage at 0.4% for each per dollar for WTI beyond $28.00 . . . .").

108. UP recognized that its Revised Surcharge proposal from March 11, 2003 would yield "a more aggressive surcharge" because of the change in the "stairsteps." PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 92.

109. UP's finance team had been "pressuring" its CMO to change its fuel surcharge formula to make it more aggressive. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 76-78.

110. CSX's internal fuel surcharge recommendation had a more aggressive trigger than UP's internal recommendation ($23 WTI vs. $28 WTI) and UP's internal recommendation had a more aggressive escalation formula with a steeper slope and more frequent increases than CSX's internal recommendation (0.4%/$1.00 WTI vs. 0.5%/$2.50 WTI):

**Figure 12**
**UP and CSXT March 2003 Internal FSC Recommendations**



PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 100 fig.12 & n.255 (comparing UP's internal FSC formula recommendation to CSX's internal recommendation).

### 2. CSX Adopted The Same FSC-Escalation Method From UP's Revised Program Despite Never Having Considered It Internally Before.

111. Only eight days later, on March 19, 2003, CSX announced a new standard fuel surcharge program with the $23 WTI trigger price it had been considering, *but with the more aggressive escalation formula that only UP (not CSX) had considered internally*. CSX's CEO and chief commercial officer chose to adopt this new program after conferring with Gooden. *See, e.g.*, PX0163, CSXFSC000000357 (CSX internal email re "Fuel Surcharge Change" and attached presentation, Mar. 19, 2003), at '357 ("A Press Release will go out today stating that CSXT will be changing the Fuel Surcharge program . . . ."); PX0612, Gooden (CSX) Dep., July 16, 2010, at 97-98 (noting that CSX's chief commercial officer, Michael Giftos, also spoke with Clarence Gooden about the switch).

112. The new CSX program retained the lower $23 WTI trigger that CSX had proposed on March 11, but abandoned the planned change to a relaxed escalation schedule. Instead, CSX adopted a more aggressive escalation formula ***that was identical to the one contemplated in UP's*** "Revised Surcharge proposal." *See* PX0185, CSXFSC000084489 (CSX press release, Mar. 20, 2003), at '489. No internal records at CSX show that CSX had *ever considered* the escalation formula that it adopted before announcing it.

113. The new formula escalated at twice the rate of the one CSX had been considering (i.e., CSX was considering a 0.5% surcharge for each $2.50 increase over the trigger price, but enacted a formula that applied a 0.4% surcharge for each $1.00 over the trigger price). *Compare* PX0181, CSXFSC000036491 (internal CSX email re "Fuel surcharge 1 pager," attaching "Fuel Surcharge Merchandise 2003" presentation, Mar. 11, 2003), at '495, *with* PX0185,

CSXFSC000084489 (CSX press release, Mar. 20, 2003), at '489; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 162 fig.16 ([redacted] *id.* ¶ 173 fig.17 (showing [redacted]

114. This new CSX fuel surcharge applied to all of CSX's carload traffic. *See* PX0185, CSXFSC000084489 (CSX press release, Mar. 20, 2003), at '489.

115. Under CSX's new policy, CSX would assess a 0.4% surcharge when the price of oil on the WTI exceeded $23 per barrel, and an additional 0.4% for every $1 increase thereafter. *See, e.g.*, PX0185, CSXFSC000084489 (CSX press release, Mar. 20, 2003), at '489; *see also* PX0163, CSXFSC000000357 (CSX internal email re "Fuel Surcharge Change" and attached presentation, Mar. 19, 2003), at '362-63 (PowerPoint presentation reflecting "Changes to the program").

116. By replacing its old formula, which increased fuel surcharge percentages only when the WTI increased by $5 increments, with one that increased fuel surcharge percentages when the WTI increased by just $1 increments, CSX ensured that its new fuel surcharge would be *at all times* between 0 and 1.6% higher than its old one:

**Figure 16**

**Examples of FSC Percentage Increases Due to Changed Formula Slope**

| WTI Price | FSC Percentage | | |
|---|---|---|---|
| | Old Formula | New Formula | Increase |
| $28.00 | 2.0% | 2.0% | 0.0% |
| $29.00 | 2.0% | 2.4% | 0.4% |
| $30.00 | 2.0% | 2.8% | 0.8% |
| $31.00 | 2.0% | 3.2% | 1.2% |
| $32.00 | 2.0% | 3.6% | 1.6% |
| $33.00 | 4.0% | 4.0% | 0.0% |
| $34.00 | 4.0% | 4.4% | 0.4% |
| $35.00 | 4.0% | 4.8% | 0.8% |
| $36.00 | 4.0% | 5.2% | 1.2% |
| $37.00 | 4.0% | 5.6% | 1.6% |
| $38.00 | 6.0% | 6.0% | 0.0% |

Note: The same "stepped" increases apply for all higher WTI increments.
Source: CSXFSC000084489-490 at 489; CSXFSC000000281-298 at 283.

PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 162 fig.16.

**CSXT Modified Fuel Cost Recovery Program Index**

| WTI $/Barrel | | Old CSXT Surcharge | New CSXT Surcharge |
|---|---|---|---|
| $ | 23 | | 0.0% |
| $ | 24 | | 0.4% |
| $ | 25 | | 0.8% |
| $ | 26 | | 1.2% |
| $ | 27 | | 1.6% |
| $ | 28 | 2% | 2.0% |
| $ | 29 | 2% | 2.4% |
| $ | 30 | 2% | 2.8% |
| $ | 31 | 2% | 3.2% |
| $ | 32 | 2% | 3.6% |
| $ | 33 | 4% | 4.0% |
| $ | 34 | 4% | 4.4% |
| $ | 35 | 4% | 4.8% |

1 CSX

PX0312, NS_010058122 (NS email chain re "Fuel Surcharge Change Pro/Con," Apr. 25, 2003), at '136.

117. Unlike CSX's predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. *See, e.g.*, PX0185, CSXFSC000084489 (CSX press release, Mar. 20, 2003), at '489; PX0163, CSXFSC000000357 (CSX internal email re "Fuel Surcharge Change" and attached presentation, Mar. 19, 2003), at '357 ("The changes [to the program] are: 1) based on prior months average - not 30 consecutive business days[.]"); *id.* at '362 (PowerPoint presentation describing "Changes to the program").

118. CSX's new program was substantially more aggressive than its predecessor program, as CSX stated that "it is actually a large increase in fuel surcharge billings" as compared to the prior program—"maybe as much as 100%." PX0163, CSXFSC000000357 (CSX internal email re "Fuel Surcharge Change" and attached presentation, Mar. 19, 2003), at '357.

119. Contemporaneous with CSX's adoption of its new fuel surcharge program, other Defendants called it out for what it was: a "more aggressive formula" and a "money grab." PX0253, NS_010076080 (NS internal email re "UP FSC - NS Concurrence Eff," July 16, 2003), at '080 (noting that the new fuel surcharge adopted by CSX "looks more [sic] too much like a money grab"); PX0326, NS_010073840 (NS internal email chain re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004) at '843 (reflecting that new NS formula (which matched CSX formula) would have resulted in earlier and higher fuel surcharges if applied in 2002 and 2003 compared to NS's existing formula); PX0781, UPFSC 0102504 (UP internal email re "CSXT Changes Fuel Surcharge Language," Mar. 20, 2003), at '504 ("As information, the new CSXT fuel surcharge is more aggressive than its existing form."); PX0614, Glennon (NS) Dep., July 20, 2010, at 42 (NS

describing CSX's revised methodology as "definitely . . . more aggressive" and "definitely yielded more revenue"); PX0252, NS_010073466 (NS internal email re "Fuel Surcharge Policy Review," Nov. 7, 2003), at '466-67 ("Any FSC change, particularly to a more aggressive formula like the CSXT's, has the potential to complicate rate negotiations and generate billing disputes with customers, . . . Both points would significantly reduce potential FSC yield if we were to swap out formulas in the short term. It is even conceivable that we could experience a net decline in revenue if customers were to withhold line-haul payments pending the resolution of FSC complaints/disputes."); PX0301, NS_010042203 (internal NS memo re "Fuel Surcharge – CSXT vs. NS Comparison," Apr. 7, 2003), at '203 ("[T]he CSXT formula would have produced additional $7,083,472 in NS revenue in 2002 and YTD 2003 had it been in effect."); *id.* ("Not only does the FSC kick sooner [sic] in at $23 vs $28, the actual FSC is higher at $28.01. This opens us to the argument that we are not only taking the FSC sooner, at higher costs to the customers, but that we are raised [sic] the FSC . . . ."); PX0284, NS_010026782 (internal NS email re "Fuel Surcharge Change Pro/Con" and attachment, Apr. 25, 2003), at '783 (same); *id.*at '785 ("The CSXT standard clearly produces significantly more compensation, and it does it sooner and more consistently.").

120. NS's manager for pricing systems testified that the formula change from $28 WTI to $23 WTI was "not the same" as before, "definitely was more aggressive" and "definitely yielded more revenue" than the prior surcharge program. PX0614, Glennon (NS) Dep., July 20, 2010, at 42, 67. NS's internal analyses concluded that "CSXT increased the FSC%" to something that "clearly produces significantly more compensation, and it does it sooner and more consistently." PX0312, NS_010058122 (NS email chain re "Fuel Surcharge Change Pro/Con," Apr. 25, 2003),

at '123, '125. "Not only does the FSC kick sooner in at $23 vs $28, the actual FSC is higher at $28.01, . . . at higher costs to the customers . . . ." *Id.* at '123.

121. CSX's John Couch admitted at the time that "[w]hile the [changes] seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." PX0163, CSXFSC000000357 (CSX internal email re "Fuel Surcharge Change" and attached presentation, Mar. 19, 2003), at '357; *see also* PX0242, NS_001000373 (NS internal email re "UP FSC - NS Concurrence Eff," July 16, 2003), at '373 (NS employees internally noting that CSX's program "looks . . . too much like a money grab").

### 3. Without Internal Analysis, UP Announced a More Aggressive Fuel Surcharge Formula Incorporating Characteristics CSX Had Discussed Internally

122. Shortly after CSX's announcement, UP announced that it had abandoned its pre-existing $28 WTI strike price and had instead adopted the same approach as the CSXT—that is, UP announced its intention to use the $23 WTI strike price contemplated in the CSX internal proposal circulated on March 11, 2003 and UP's own escalation formula that CSX had adopted. *See* PX0782, NS_010302286 (AAR email re "Morning report", Apr. 8, 2003), at '286 ("On April 4, Union Pacific Railroad announced plans to adjust its surcharge 0.4 percent for every dollar oil prices rise above $23 per barrel, as determined by the 30_day average price of West Texas Intermediate (WTI) crude oil reported in the Wall Street Journal.").

123. UP announced that its new program that would "adjust its surcharge 0.4 percent for every dollar oil prices rise above $23 per barrel, as determined by the 30_day average price of West Texas Intermediate (WTI) crude oil reported in the Wall Street Journal." *Id.*

124. UP's decision to adopt CSX's methodology was made without justification or analysis by UP's finance team. The finance team declared it was "[not] in the best position to discuss why $23 [trigger]" because "[t]o be honest, we were not aware of the threshold until we

saw the press release so we are not in the best position to describe how and why that threshold was selected." PX0402, UPFSC_0184695 (internal UP email re "Fuel Surcharge Q&A and Supporting Info," May 2, 2003), at '695; *see also id.* ("I am not sure of all the factors that went into it. I don't think the historical information and analysis we have on our side will help to 'defend' the $23 threshold.").

125. Likewise, Koraleski testified that he did not recall any specific financial analysis at UP supporting its decision to adopt the CSX methodology. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 151-52 ("Q. . . . do you recall whether that analysis—that specific analysis by the finance team of whether this program should be adopted took place? A. No, I don't recall a specific analysis. . . . Q. . . . do you recall a specific analysis about whether this specific change should be made at UP by the finance team? A. No, I don't. Q. Do you recall anyone presenting to you an analysis—a financial analysis about whether this specific change should be made? A. No, I don't.").

126. UP adopted CSX's program despite some internal recognition at UP that the new fuel surcharge was "complex/confusing and would be problematic to administer." PX0499, UPFSC 0069867 (UP internal email re "New CSX Fuel Surcharge Program," Mar. 25, 2003), at '867.

127. It was not until nearly a month *after* UP had decided to adopt CSX's methodology that UP prepared "draft documents supporting the fuel surcharge." PX0402, UPFSC_0184695 (internal UP email re "Fuel Surcharge Q&A and Supporting Info," May 2, 2003), at '695.

128. UP recognized that the changes would lead to more fuel surcharges, because the changes "eliminat[e] the requirement that the price of oil remain above (or below when prices are

declining) a specific threshold for 30 consecutive" days. PX0473, UPFSC0001074 (UP "Fuel Surcharge FAQ—INTERNAL USE ONLY"), at '074.

#### 4. After CSX's Announcement, NS's Don Seale Met with Defendants' CMOs and Decided to Adopt CSX's More Aggressive Fuel Surcharge

129. Immediately after CSX announced its new fuel surcharge program in March 2003, Senior Vice President of Merchandise Marketing Don Seale assigned Charlie Brenner and Pat Glennon to analyze NS's potential adoption of it. PX0320, NS_010072632 (NS internal email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 20, 2003), at '632-33.

130. On March 22, 2003, Seale (NS) asked another NS employee "to determine if Accounting/Billing for the CSX format would be doable." PX0366, NS 001000215 (NS internal email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 24, 2003), at '216.

131. On March 24, Glennon (NS) again emailed Seale (NS), noting that "[i]f we were to adopt something like CSXT's we could not simply announce it and have it apply across the board at least not on contracts and possibly not on customer specific quotes . . . ." *Id.* at '215.

132. On April 1, Glennon received word from UP that "[i]t sounds like UP will adopt the CSXT fuel surcharge" and expressed his "expect[ation] that'll push us over the top as well." PX0912, NS_062203025 (NS internal email re "REWRITE OF NS CONDITIONS OF CARRIAGE," Apr. 1, 2003), at '025.

133. NS's other employees opined that "there is no need to implement a change," that "the fuel clause should only be used to recover extraordinary costs" and "should not be a means of getting a price increase NS was unable to obtain through negotiations," and that "adoption of the new CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs." PX0254, NS_001000316 (NS internal email re "Fuel Surcharge Change Pro/Con," Apr. 17, 2003), at '317, '319. NS's employees also analyzed that "NS' current

fuel hedging and fuel surcharge collections are effective at protecting NS exposure to fuel price increase." *Id.* at '317. Indeed, NS recognized that no fuel surcharge was necessary to recover fuel costs because "[f]uel costs are dropping" and "it appears we may be entering an extended period of reasonable oil cost." PX0268, NS_010004393 (NS internal email re "Fuel Surcharge Review - April 25," Apr. 29, 2003), at '393.

134. On April 1, Glennon reported that UP had told him that it was nearing adopting CSX's fuel surcharge, which NS used to analyze following suit. PX0912, NS_062203025 (NS internal email re "REWRITE OF NS CONDITIONS OF CARRIAGE," Apr. 1, 2003), at '025 ("It sounds like the UP will adopt the CSXT fuel surcharge" and expressing his "expect[ation] that'll push us over the top as well").

135. On April 7, 2003 Glennon again reported privately learning that UP was considering and would likely be matching CSX's formula. DA05709, NS_010058178 (internal NS memo re "Fuel Surcharge – CSXT vs. NS Comparison," Apr. 7, 2003), at '710 ("The UP hasn't announced but it appears that it will.").

136. He also reported that he had spoken with CSX "privately" concerning CSX's strategy to implement its new FSC in public and private authorities. *Id.* at '711 ("CSXT is taking the position that they are simply referring to the FSC clause in their T[erms] & C[onditions] and that by changing the FSC clause in the T&C will implement that new FSC in all publications, public and private. That assumption is questionable for private authorities, particularly contracts, and they privately admit that."); *Id.* at '712 ("[CSX's] opening position that since their contracts simply refer to their T&C, which will be changed, the contracts are automatically subject to the new FSC. Privately, they admit that this is a stretch and expect strong customer opposition.").

137. As of April 15, 2003, NS was uncertain whether it would modify its fuel surcharge. After a meeting at which Glennon presented Seale and NS's group VP's a "Pro/Con" analysis of adopting CSX's new fuel surcharge formula, NS's group VPs had advocated against changing NS's FSC because, combined with NS's hedging program, the existing FSC was entirely adequate to mitigate NS's fuel costs. And its account executives opined that "there is no need to implement a change" and "adoption of the new CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs." PX0254, NS_001000316 (NS internal email re "Fuel Surcharge Change Pro/Con," Apr. 17, 2003), at '316, '317, '319. Glennon reported privately that "I don't have any indication what we might do." *Id.* at '317; *see also* PX0783, NS_008003618 (NS email re "Reissuing Of The Conditions Of Carriage," Apr. 15, 2003) (reflecting uncertainty as to whether NS would be "planning an FSC change"); PX0913, NS_010004541 (NS internal email re "Fuel Surcharge Change Pro/Con," Apr. 15, 2003), at '541 ("Fox said that he thought Don was going to hold off on any changes for now consistent with [Glennon's] advice").

138. At the meeting, Don Seale asked NS's group vice presidents to analyze by May 1st whether NS should change its fuel surcharge process. PX1153, NS_010004403 (NS internal email re "Fuel Surcharge basis change issue," Apr. 21, 2003), at '403 ("Mr. Seale has asked that each of you, along with me, participate on a team to look at the issue of if and when we should change our fuel surcharge process."). Seale requested that a recommendation be made by May 1, 2003, which was a day when Seale would be at a meeting of the AAR's NEMC, comprised of the other Defendants' CMOs. *Id.* ("We need a consensus recommendation to DWS by May 1st."); PX1154, AAR-P-00001095 ([redacted], May 1, 2003), at '096 ([redacted] dated "April 30/May 1"); PX0350, NS_013002633 (NS expense reports and supporting documentation for

Donald Seale, May 21, 2023), at '633 (showing he flew company plane on April 30 and attended "AAR mtg" on May 1).

139. The same day Seale assigned his team to analyze whether to change NS's fuel surcharge, he and NS's CMO Ike Prillaman travelled to UP's campus for a three-day unsupervised getaway with the CMO's for all Defendants. UP's CMO Jack Koraleski hosted the April 15 to 17 get-together in honor of UP's biggest rival BNSF's CMO, and all Defendants' CMOs or CMOs-in-waiting attended. PX0356, NS_015000201 (NS expense reports and supporting documentation for Ike Prillaman, May 22, 2003), at '220 ("During the reception at the last NEMC/SOMC meeting in Jacksonville, it was suggested that we find an appropriate time and venue to bid farewell to brother Schultz . . . ."); *id.* at '201 (showing Prillaman's attendance); PX0350, NS_013002633 (NS expense reports and supporting documentation for Donald Seale, May 21, 2023), at '633 (showing Seale's attendance); *id.* at '646-47 (reflecting that CSX's SVP and future CMO Gooden would attend); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 269 (CSX's CMO Giftos testifying to attending).

140. On April 17, 2003, the day Seale returned from his getaway with the other Defendants' executives, he reported privately (cc'ing NS's other attendee Prillaman) that "at this point, we do plan to modify our FSC." PX0254, NS_001000316 (NS internal email re "Fuel Surcharge Change Pro/Con," Apr. 17, 2003), at '316. Seale's team had not met, let alone generated a consensus recommendation whether to change NS's fuel surcharge.

**5. BNSF Considered Adopting a Competitively Advantageous Mileage-Based Fuel Surcharge But Abandoned Those Plans Upon Agreement with Defendants**

141. In early 2003, BNSF thought it could gain a competitive advantage by using a mileage-based fuel surcharge (as opposed to the revenue-based fuel surcharge it later agreed to apply). PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 97-98 ("Q. Okay. And does this slide

accurately summarize the conclusions that were reached at the meeting on February 24th of 2003? A. I believe so. Q. And one of those conclusions was in the first bullet point which mentions leaning towards a mileage based fuel surcharge. Is that correct? A. Yes."); *id.* at 113 ("Q. Okay. Does this slide set forth the recommendations of your team? A. Yes, the summary recommendations. Q. And one of the recommendations of your team was to go to a mileage based program. Right? A. Yes."); PX0090, BNSF-0330835 (BNSF internal email re "Updated: Fuel Surcharge Review Team" and attachments, Mar. 13, 2003), at '835 ("Please review the attached documents before the meeting. Both documents cover analysis on John's initial idea of implementing a Cost Per Mile (CPM) methodology."); *id.* at '838 ("Conclusions from 2/24 Meeting • Leaning toward Cost Per Mile (CPM) Fuel Surcharge Formula"); *see also* PX0613, Rose (BNSF) Dep., July 16, 2010, at 132 (CEO and CMO of BNSF "always had bias toward mileage-based fuel surcharges").

142. Because of the length of BNSF's average shipments as compared to the other Defendants, BNSF (and the other Defendants) believed that use of a mileage-based fuel surcharge represented a competitive advantage for BNSF. PX0249, NS 001001082 (NS internal email re "BNSF," July 1, 2005), at '082 (following a conversation with BNSF CMO John Lanigan, NS CMO Don Seale reported to his boss that "it is clear that BNSF sees an advantage in a mileage based fuel surcharge due to its greater length of haul, and a corresponding disadvantage for us due to our shorter hauls"); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 184-187 (noting that BNSF's greater length of haul made mileage-based FSCs a competitive advantage); *see also* PX0634, Anderson (BNSF) Dep., May 26, 2011, at 107 (BNSF's lengths of hauls are "more than double what it is on [CSX and NS]" and BNSF "ha[d] a philosophy of putting more horsepower

on our trains, . . . so our fuel expense is much higher relative to our general expenses than any of the other class 1's.").

143. Thus, by February 24, 2003, BNSF's Review Team internally proposed switching to a mileage-based fuel surcharge (rather than a rate-based one). PX0132, BNSF-FSC 000002 (BNSF email chain re "Fuel Surcharge Review Team" and attachments, Mar. 18, 2003), at '016. And as of March 10, 2003, BNSF was still "Leaning toward Cost Per Mile (CPM) Fuel Surcharge Formula," in place of its existing rate-based fuel surcharge. *Id.* at '028. PX132, BNSF-FSC_000002 (BNSF email re "Updated: Fuel Surcharge Review Team," March 18, 2003, and presentations), at '022 (Fuel Surcharges Cost Recovery Improvements – Part 2 Presentation, March 10, 2003).

144. On March 13, 2003, Lanigan requested an urgent review of BNSF's fuel surcharge program to be completed "in about two to three weeks," and seeking recommendations "for a new [mileage-based] program." PX0106, BNSF_0456278 (internal BNSF email re "Updated: Fuel Surcharge Review Team," Mar. 13, 2003), at '278 ("Both documents cover analysis on John[ Lanigan]'s initial idea of implementing a Cost Per Mile (CPM) methodology. The resulting surcharge is applied on a mileage basis based on the miles per gallon consumed. John needs our recommendation(s) in about two to three weeks.").

145. The BNSF Review Team had scheduled a meeting for March 18, 2003 to "help finalize this study" for Lanigan. PX0132, BNSF-FSC 000002 (BNSF email chain re "Fuel Surcharge Review Team" and attachments, Mar. 18, 2003), at '002. And BNSF broached a mileage-based fuel surcharge with other Defendants. For example, internal NS emails refer to the fact that "BNSF did make a technical inquiry" with NS about changing to a mileage-based fuel

surcharge. PX0312, NS_010058122 (NS email chain re "Fuel Surcharge Change Pro/Con," Apr. 25, 2003), at '122.

146. During this period, BNSF's senior executives met with NS's senior executives, and BNSF's John Lanigan played "phone tag" with NS's Don Seale. PX0145, BNSF-FSC000643, at '643 (BNSF-NS Senior Team Meeting Agenda, Mar. 18, 2003); PX0237, NS_001000225 (NS-BNSF email chain re "your call" in which Lanigan and Seale discussed playing "phone tag" and made plans to "catch up next week" at the upcoming National Freight Transportation Association (NFTA) meeting).

147. And around the time, BNSF Chief Marketing Officer John Lanigan also had phone conversations and other meetings with his marketing counterparts at the other Defendants. PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 283-286; *see, e.g.*, PX0023, BNSF_CAL-0005323 (calendar entry reflecting that on February 18, 2003, at least BNSF's Lanigan had "Dinner w/NS").

148. While the Review Team was still working, Lanigan attended the Spring National Freight Transportation Association ("NFTA") meeting at the Wigwam resort in Arizona on April 2-6, 2003, where he knew he would see senior marketing officers from UP, CSX, and NS. *See, e.g.*, PX0356, NS_015000201 (NS expense reports and supporting documentation for Ike Prillaman, May 22, 2003), at '208. Almost immediately afterward, on April 9, Lanigan issued a new directive that price authorities without BNSF's rate-based FSCs would be "DOA" (dead on arrival): "Effective ***immediately and urgently*** per John Lanigan. Authority to omit FSC provision is to be ***granted to VP's only (who will also clear with John).*** This ***needs to be communicated immediately.***" PX0050, BNSF-0027935 (internal BNSF email re "DOA ON FSC," Apr. 9, 2003),

at '935 (emphases added). Lanigan did not discuss this change with his team before announcing it. *See* PX0628, Garin (BNSF) Dep., Aug. 16, 2010, at 245.

149. Abruptly thereafter—and despite its preference for a competitively advantageous mileage-based program—BNSF decided to stick with rate-based fuel surcharges and defer implementation of any mileage-based program to the "[l]onger [t]erm." PX0081, BNSF-0325512 (Draft BNSF FUEL SURCHARGES Fuel Surcharge Review Team Recommendations Presentation, March 31, 2003), at 10; *see also* PX0469, UPFSC0000852 (UP internal email re "Fuel Surcharge-Miles," April 3, 2003) at '852 (referencing discussions with BNSF regarding a possible mileage-based formula); PX0356, NS_015000201 (NS expense reports and supporting documentation for Ike Prillaman, May 22, 2003), at '202; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 183-192 ([redacted]).

150. As discussed *infra*, BNSF would quickly go on to change its rate-based FSC to match the aggression of UP and CSX's recent changes. PX0084, BNSF-0327011 (BNSF internal email re "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011 (discussing changes to carload and intermodal programs: "[N]otes on the fuel surcharge meeting . . . on April 29, 2003," which state: "The changes in the Carload Program going forward are as follows: . . . • The carload strike price will be $1.25. (This reflects the $23 WTI crude strike price being used by UP in their new carload fuel surcharge table.) . . . ."); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 97 (testifying that $1.25 on the HDF is "roughly equivalent" to $23 on the WTI).

### 6. All Four Defendants Continued Their Coordination On Fuel Surcharges At the Spring 2003 NFTA Meetings, During Which UP Announced It Would Match CSX's Fuel Surcharge

151. Seale (NS), Lanigan (BNSF), and other senior marketing executives from all four Defendants, including Koraleski (UP), Gooden (CSX), and NS's CMO Ike Prillaman, then attended the Spring 2003 NFTA meeting April 2-6, 2003. PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 64 (testifying that the Spring Business Meeting of the NFTA was held at Wigwam on April 2-6, 2003); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 258 (testifying he may have attended the April 2003 NFTA meeting); PX0350, NS_013002633 (NS expense reports and supporting documentation for Donald Seale, May 21, 2023), at '637; PX0313, NS_010058958 (email to NFTA Board re "NFTA INFORMATION," May 27, 2003), at '959; PX0356, NS_015000201 (NS expense reports and supporting documentation for Ike Prillaman, May 22, 2003), at '207; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 165-66 (CMOS would typically have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, at 137:2–7 (Gooden would have seen railroads' CMOs at the NFTA meeting).

152. Koraleski flew to Arizona for the Spring 2003 NFTA meeting immediately following a UP revenue meeting where fuel surcharges were discussed and where UP apparently made the formal decision to adopt the fuel surcharge methodology that mirrored CSX's. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 163:25–165:25.

153. UP had already informed NS that it was nearing adopting CSX's fuel surcharge, which NS used to analyze following suit. PX0912, NS_062203025 (NS internal email re "REWRITE OF NS CONDITIONS OF CARRIAGE," Apr. 1, 2003), at '025 ("It sounds like UP will adopt the CSXT fuel surcharge" and expressed his "expect[ation] that'll push us over the top as well"); *see also* PX0312, NS_010058122 (NS email chain re "Fuel Surcharge Change Pro/Con," Apr. 25, 2003), at '123 ("The UP hasn't announced but it appears that it will.").

154. Lanigan (BNSF) and Seale (NS) claimed at deposition that they could not recall the discussion that they had at NFTA. PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 83-86 ("I don't recall the substance of discussions I had with Mr. Seale or anyone else at that [NFTA] meeting."); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 258-59 (not recalling whether he met with Lanigan at April 2003 NFTA meeting).

155. In early April 2003—*in the midst of the Spring 2003 NFTA meeting at which Defendants' senior executives were discussing fuel surcharges*—UP announced that it would be applying its new standard fuel surcharge program to both local and interline traffic. *See, e.g.*, PX0784, AAR-E-00115738 (UP Comments, Ex Parte No. 661 – Rail Fuel Surcharges, Apr. 27, 2006), at ' 746 ("[I]n April 2003, . . . UP converted the WTI carload surcharge basis from the WTI price published for 30 consecutive days in The Wall Street Journal to a WTI monthly average price. We also modified the surcharge schedule to initiate the fuel surcharge and calculate it at 0.4% for each dollar tier above the monthly average of $23 per barrel.").

### 7. Immediately Following the Spring 2003 NFTA Meeting, BNSF Made "Urgent" Changes To Its Fuel Surcharge Program

156. Promptly following the Spring 2003 NFTA meeting, BNSF's Lanigan issued an immediate directive mandating inclusion of fuel surcharge provisions in contracts and requiring Lanigan's own clearance for any exception: "***Effective immediately and urgently*** per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be ***granted to VP's only (who will also clear with John)***. This needs to be communicated immediately as well." PX0050, BNSF-0027935 (internal BNSF email re "DOA ON FSC," Apr. 9, 2003), at '935 (emphases added); PX0613, Rose (BNSF) Dep., July 16, 2010, at 71-72 (around the first half of 2003, "there's no doubt" that BNSF "narrowed down the flexibility of the pricing managers to apply fuel surcharges"); PX0122, BNSF-0570919 (internal BNSF email re "Revisions to Best Pricing

Practices," Apr. 24, 2003), at '919 ("a change in the Delegation of Authority, as it pertains to the 'Omission of Fuel Surcharges', was approved by John Lanigan and his Sr. Mgmt team. In the past, a Director or above could approve the omission but effective immediately, a Vice President's approval will be required. As a result, we have made a few changes to the Best Pricing Practices (BPP) guide . . . ."); PX0140, BNSF-FSC_000469 (BNSF Fuel Surcharge Script, May 2, 2003), at '471 ("The delegation of authority has been moved to the Vice President level in carload business units.").

157. This was a stark change from BNSF's prior practice of not requiring such senior approval. *Supra* ¶ 77. Lanigan did not discuss this change with his team before announcing it. *See* PX0628, Garin (BNSF) Dep., Aug. 16, 2010, at 245:15-21.

158. By April 14, 2003, BNSF's fuel surcharge Review Team had determined that it would be "favorable for competitive reasons" if BNSF lowered its trigger price from $1.30 HDF to $1.10 HDF. PX0139, BNSF-FSC_000411 (BNSF Fuel Surcharges Fuel Surcharge Review Team Recommendations Presentation draft, Apr. 14, 2003), at '421.

159. Then on April 23, 2003, BNSF and CSX senior executives held a meeting. PX0033, BNSF_CAL-0007200 (April 23, 2003 calendar entry re "BNSF/CSX mtg," reflecting attendance by Matt Rose, John Lanigan, Mike Ward, Mike Giftos, Clarence Gooden, and others).

160. And on April 30—the very day BNSF finalized the changes to its fuel surcharge program—BNSF's Lanigan and Schultz, UP's Koraleski, NS's Seale, and CSX's Giftos and Gooden [redacted]. PX1154, AAR-P-00001095 ([redacted], May 1, 2003), at '096 ([redacted] dated "April 30/May 1"); PX1156, AAR-P-00000648 (April 30, 2003

[redacted]); PX1078, AAR-P-00000642 (May 1, 2003 [redacted]).

161. BNSF changed its fuel surcharge program to make it more aggressive by decreasing the formula's trigger price from $1.30 to $1.25 HDF, a trigger price that BNSF said "reflected the $23 WTI crude price used by UP" (and CSX). PX0141, BNSF-FSC_000486 (BNSF memo re "Status of BNSF Fuel Surcharge Programs," July 1, 2003), at '486 ("[P]lease find below a summary of recent major changes in our fuel surcharge programs (i.e., in boldface text) . . . ***The carload strike price will be $1.25*** . . . .") (emphasis in original); PX0084, BNSF-0327011 (BNSF internal email re "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011 (discussing changes to carload and intermodal programs: "[N]otes on the fuel surcharge meeting . . . on April 29, 2003," which state: "The changes in the Carload Program going forward are as follows: . . . • The carload strike price will be $1.25. (This reflects the $23 WTI crude strike price being used by UP in their new carload fuel surcharge table.) . . . ."); PX0115, BNSF-0511809 (BNSF Rule Book 6100-A) at '834 (May 7, 2003 rule effecting $1.25 trigger price); *see also* PX0044, BNSF-0026751 (BNSF Pricing Update, Changes to the BNSF Carload Fuel Surcharge Calculation, Apr. 30, 2001) at '753 (announcement of $1.30 trigger price); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 97 ($1.25 on the HDF is "roughly equivalent" to $23 on the WTI); PX0914, BNSF-0572384 at '387 (BNSF describing changes to its FSC "an effort to have its Fuel Surcharge Program more closely aligned with [its] competition.").

162. Under its new program, BNSF would apply a 0.5% surcharge when the HDF index reached $1.25, and an additional 0.5% for every $.05 that the index exceeded $1.25. *See, e.g.*, PX0115, BNSF-0511809 (BNSF Rule Book 6100-A), at '834.

163. BNSF summarized the immediate changes to its fuel surcharge program as encompassing formulas, coverage, and exception management: (1) charging FSCs even below 1%, which was not done before; (2) decreasing the formula's trigger price from $1.30 HDF to $1.25 HDF—meaning that the FSC could kick in at a lower fuel price; (3) mandating that BNSF increase the volume of shipments covered by FSCs; and (4) requiring escalation of any exceptions to the VP level. PX0084, BNSF-0327011 (BNSF internal email re "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011.

**8. UP Then Changed its Fuel Surcharge Formula to "Match" BNSF's More Aggressive Formula and NS Mandated Widespread FSC Application**

164. On the very day BNSF finalized the changes to its fuel surcharge program, BNSF's Lanigan and Schultz, UP's Koraleski, NS's Seale, and CSX's Giftos and Gooden [redacted] PX1154, AAR-P-00001095 ([redacted], May 1, 2003), at '096 ([redacted] dated "April 30/May 1"); PX1156, AAR-P-00000648 (April 30, 2003 NEMC [redacted]); PX1078 AAR-P-00000642 (May 1, 2003 NEMC [redacted]).

165. Within days, NS implemented policies to facilitate FSC adoption, including a requirement that all new contracts incorporate any standard NS FSCs, with exceptions requiring the approval of SVP Seale, aligning with the approval requirements that CSX and BNSF had internally implemented. PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '522. Also within days—and again, not long after the Spring 2003 NFTA meeting—UP's Koraleski called a meeting with a "[f]ocus on 'fuel surcharge.'" DA01531 (May 5, 2003 UP meeting agenda).

166. There, UP determined to "follow the BNSF's fuel surcharge," but with an $1.35 HDF trigger price. DA01533 (May 5, 2003 UP email). UP acknowledged that it had adopted a formula "identical" to BNSF's. PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '975 ("What are key differences between UP's fuel surcharge and others in the industry? *Updated 5/9/03*—UP's carload surcharge is based on the DOE Highway Diesel Fuel (HDF) price[] as is BNSF's carload surcharge. UP's mirrors BNSF's except that UP does not apply a 1% surcharge when the price is between $1.30 and $1.349/gallon."); PX0610, Lanigan (BNSF) Dep. at 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical").

167. UP did not switch its fuel surcharge program to compete with its rival BNSF; ***it internally acknowledged that it switched fuel surcharge programs "[t]o match BNSF's 'standard' HDF based surcharge."*** PX0502, UPFSC_0075761 (UP internal email re "Fuel Surcharge—WTI vs. HDF," Oct. 20, 2004), at '761 (emphasis added); PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '975.

168. This brought the two western competitors into direct lockstep. *See* PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '975 ("[T]he following should provide all you need to transition to the new surcharge policy."); *id.* ("What are key differences between UP's fuel surcharge and others in the industry? *Updated 5/9/03*—UP's carload surcharge is based on the DOE Highway Diesel Fuel (HDF) price[] as is BNSF's carload surcharge. UP's mirrors BNSF's except that UP does not apply a 1% surcharge when the price is between $1.30 and $1.349/gallon."); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical"); PX500, UPFSC_0070045 (internal UP email re "Revised Fuel Surcharge

Communication Materials," May 8, 2003) at '045-46 (internal planning regarding new program); PX0355, NS_0014001716 (NS internal email re "FSC Revenue Comparison", May 16, 2003), at '717 (regarding the new UP formula, "The difference [from BNSF] is the higher kick in threshold of $1.35 per gallon ($1.25 base). . . . Once it kicks in, ***it is identical to the BNSF FSC***. . . . The practical effect is to suppress smaller increases until the $1.35 threshold is met, then increases are applied back to the $1.25 base.") (emphasis added); PX0242, NS_001000373 (NS internal email re "UP FSC - NS Concurrence Eff," July 16, 2003), at '373 (the program "goes back and picks up the skipped %s") (emphasis added); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 104 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019) (concluding that "[t]he evidence shows that defendants employed these fuel surcharges in lockstep"); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 157 & n.438 ("436UP changed its trigger price from $28/barrel WTI to $1.35/gallon HDF, which also effectively amounted to a reduction" (footnote omitted)).

169. The HDF index generally remained above $1.35 for the remainder of the conspiracy period, making the nominal difference between BNSF and UP formulas "inconsequential." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 102; PX0785, Elzinga Rpt., July 9, 2018 (corrected Aug. 7, 2018), at 55 [redacted]).

170. This UP program would calculate the trigger price "based on the DOE Highway Diesel Fuel (HDF) price" on a "monthly" basis. PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '975.

171. UP scheduled its new surcharge to come into effect on June 1, 2003—the same date BNSF's formula was scheduled to become effective. PX0115, BNSF-0511809 (BSNF Rule Book

6100-A), at '834 (BNSF: "Issued May 7, 2003—Effective June 1, 2003"); PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '982 ("UPRR Fuel Surcharge *Timing & Details*[:] Issued May 9, 2003; applies to affected documents June 1, 2003").

172. UP immediately informed the other Defendants, including BNSF, of its decision. Discussing UP's adoption of BNSF's methodology, one CSX employee "hope[d] that we can agree on what is best—and adopt a standard format among the class 1s." PX0165, CSXFSC000000408 (CSX internal email re "Revised UP Fuel Surcharge Program to become effective June 1, 2003", May 11, 2003), at '408.

173. BNSF acknowledged that UP's wholesale adoption of BNSF's methodology was "big news" because "[t]he ideal scenario is to have BNSF and UPRR have the same FSC methodology." PX0091, BNSF-0342448 (BNSF internal email re "Updated Up FSC effective 6/1/03", May 12, 2003), at '448.

174. UP and BNSF thus implemented fuel surcharges that were in sync, and began setting and adjusting them at the same time and levels. *See* PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '975 ("UP's mirrors BNSF's except that UP does not apply a 1% surcharge when the price is between $1.30 and $1.349/gallon."); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical").

175. During the very period when UP and BNSF brought their fuel surcharges into virtual lockstep, UP's and BNSF's senior officials were communicating directly with each other. UP's and BNSF's chairmen and CEOs had one-on-one conversations, including by telephone, as did their CMOs. *See, e.g.*, PX0522, UPFSC_0343267 (Mar. 10, 2003 letter from BNSF's CEO to

UP's CEO referencing "previous[] discuss[ions]" and suggesting future meetings); PX0538, UPFSC_0466673 (UP CEO Dick Davidson calendar entry reflecting call with BNSF's Matt Rose); PX0535, UPFSC_0466624 (Davidson calendar entry reflecting travel with BNSF's Matt Rose); PX0541, UPFSC_0466746 (reflecting meeting with NS's David Goode and BNSF's Matt Rose); PX0029, BNSF_CAL-0004878 (reflecting "visit" from UP's Koraleski); PX0537, UPFSC_0466657 (Davidson: "Lunch with David Goode"); PX0540, UPFSC_0466744 (Ward and Giftos (CSX) dine with Koraleski and Young (UP) following CSX/UP Strategy Meeting).

176. Customers did not demand UP's adoption of BNSF's fuel surcharge program and no customer complaints were addressed by UP adopting an even more direct competitor's fuel surcharge. Customers viewed UP's initial synchronization with CSX as "price collusion," DA01453, and its subsequent synchronization with BNSF as even less defensible. *See* DA01455 ("I have trouble understanding how Highway Diesel Fuel Prices are legitimately used as an index when the rail industry buys in such volume and strategically stores fuel in such quantities that there starts to be a credibility question . . . ."); *see also* PX0786, UPFSC 0045717 (UP internal email re "Fuel Surcharge Feedback from Potlatch," May 5, 2003) at '717 (stating that customers would view the impending adoption of BNSF's FSC *even worse* than the adoption of CSX's).

177. After UP matched BNSF's fuel surcharge, UP senior executives told their counterparts at CSX that UP's fuel surcharge led to a customer "outcry." PX0474, UPFSC0001088 (handwritten notes summarizing June 3, 2003 CSX-UP meeting) at '088.

**9. After Customer Outcry, Some Defendants Briefly Discounted Their Fuel Surcharges—Causing Others to Call for a "Stable Approach" to Fuel Surcharges in the Industry, and for Defendants to Agree to "Uniform Application"**

178. After CSX and UP adopted their new fuel surcharge formula, NS reported that "[t]he CSXT formula faces continued opposition, particularly in private publications" and that

"[w]hile CSXT may appear to be holding the line, we expect customer resistance will result in a significant amount of back door concessions, particularly with larger customers." PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '522.

179. Customer opposition initially caused Defendants to relent with temporary, systematic discounts. BNSF discounted its May 2003 fuel surcharge rate from 5% to 2% and NS reported that "UP flipped on the FSC," delayed its application of its new FSC, and will not implement it June 1," but would "take a fresh look at it." PX0303, NS_010042321 (NS internal email re "UP FSC," May 12, 2003), at '321; PX0114, BNSF-0495601 (BNSF email re "Update: BNSF Carload Fuel Surcharge—May, 2003," attaching "Update: BNSF Carload Fuel Surcharge May 2003," Apr. 30, 2003), at '602 ("BNSF has elected to amend Item 3375 of BNSF Rules book 6100-A effective May 1, 2003, to reduce the Carload Fuel Surcharge to **two percent (2%) for the month of May, 2003.**").

180. BNSF admitted a 5% surcharge "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage," but limited its discount to that month because UP and CSX had "announced revisions to their FSC programs" that would cause them to "be more closely aligned with BNSF's HDF program." PX0124, BNSF-0572402 (BNSF email chain re "Fuel Surcharge Program Changes," May 2, 2003), at '406.

181. After hearing that BNSF had reduced "its FSC to 2% . . . even though their formula calls for 5%," and in anticipation of an upcoming "conversation with UP," NS's Don Seale complained to his boss Ike Prillaman that "the industry is not looking good on this issue [fuel surcharges] and a stable approach has been the best approach." PX0303, NS_010042321 (NS

internal email re "UP FSC," May 12, 2003), at '321; *see also* PX0302, NS_010042306 (NS internal email re "UP-NS Alliance Agenda," May 5, 2003) at '307 (sending NS-UP meeting agenda for upcoming May 14, 2003 meeting).

182. Two days later, on May 14, 2003, NS and UP senior executives (including Seale, Prillaman, and Koraleski) met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers," and discussed how to "work together on this opportunity," including whether they should do so "through the AAR [Association of American Railroads]." If they could not go through the AAR, they resolved to achieve the same ends by "handl[ing] the opportunity on a bilateral basis," *i.e.*, by talking to the other Defendants on one-to-one bases. PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361 ("Discussion followed on fuel surcharges and various application processes as used by different roads. Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers. There was some question as to whether or not the industry can work together on this opportunity, probably through the AAR, or do roads have to handle the opportunity on a bilateral basis.").

183. They assigned Mr. Seale and UP CMO Jack Koraleski to follow up on these issues. *See id.* at '360-61; *see also* PX0485, UPFSC 0014100 (May 6, 2003 conference call between Koraleski, Seale, and others to devise agenda for May 14, 2003 "Alliance" meeting); PX0396, UPFSC 0127235 (UP email re "UP NS Alliance Conference Call August 15, 2003," July 28, 2003), at '235 (reflecting that follow up conference calls to May 14, 2003 meeting took place between NS and UP executives on at least July 8, 2003, and August 15, 2003).

184. Minutes from the meeting reflect that UP and NS executives agreed that "[u]niform application [of fuel surcharges] across the industry would be helpful." PX0460, UPFSC_0616651

(handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("Fuel surcharges → Uniform application across the industry would be helpful").

185. Many of the participants claimed at deposition that they could not recall what was discussed at the May 14, 2003 meeting. PX0616, Young (UP) Dep., Aug. 4, 2010, at 229-32 ("I don't recall much," and did "[n]ot specifically" recall); PX0631, Goode (NS) Dep., Jan. 13, 2011, 124 (testifying that he "[doesn't] remember specific conversations"); *id.* at 170 ("I don't recall this meeting."); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 198 ("Q. Do you recall this meeting? A. No, not particularly."); PX0633, Davidson (UP) Dep., Feb. 24, 2011, at 158-161 (testifying that he did not specifically, or generally, recall the discussion).

### 10. Defendants' Senior Executives Continued To Meet and Coordinate On Fuel Surcharges

186. [Intentionally omitted].

187. On May 29-30, 2003, members of the AAR Board—including Seale (NS), Rose (BNSF), and Ward (CSX)—[redacted] *See, e.g.*, PX0787, AAR-P-00004011 (Minutes of AAR Board Meeting, May 29-30, 2003), at '011; PX0351, NS_013002675 (Don Seale Travel Expense Report, June 19, 2003), at '682-84 (reflecting expenses for May 29-30 AAR Board Meeting).

188. On June 3, 2003, CSX and UP senior executives (including Koraleski, Giftos, and Gooden) met and discussed fuel surcharges. *See* PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 (reflecting discussion of both railroads starting at a $23 trigger point); PX0167, CSXFSC000000416 (CSX-UP email re "CSX/UP Alliance Meeting Minutes 06/03/03" attaching minutes of June 3, 2003 meeting, June 6, 2003), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes.").

189. The day of the June 3, 2003 meeting, at Mike Giftos's request, CSX's John Couch emailed Giftos and Gooden a chart comparing CSX's fuel surcharge program to the other Defendants' programs. PX0166, CSXFSC000000414 (CSX internal email re "Fuel Surcharge Last 16 month comp," June 3, 2003) (attaching comparison of new CSX formula to other railroads' formulas in past).

190. At the June 3, 2003 meeting, CSX and UP senior executives assessed the customer opposition the companies were receiving to their efforts to apply their fuel surcharges. PX0167, CSXFSC000000416 (CSX-UP email re "CSX/UP Alliance Meeting Minutes 06/03/03" attaching minutes of June 3, 2003 meeting, June 6, 2003), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."); PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Fuel surcharge – GIFTOS, CSX has not seen outcry that UP has").

191. CSX and UP senior executives also discussed their trigger points for their fuel surcharge programs and agreed that, if fuel prices stayed high, they might have to consider raising their trigger points. PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Both roads start at a $23 trigger. May have to revisit $23 if stay high.").

192. Handwritten notes of the June 3, 2003 "Alliance" meeting show that the prepared "minutes" were sanitized to omit key discussions on fuel surcharges. *Compare* PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Fuel surcharge—GIFTOS, CSX has not seen outcry that UP has. CSX may begin a modest hedge program (WARD). Both roads start at a $23 trigger. May have to revisit $23 if stay high."), *with* PX0167, CSXFSC000000416 (CSX-UP email re "CSX/UP Alliance Meeting Minutes 06/03/03" attaching minutes of June 3, 2003 meeting, June 6, 2003), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes.").

193. The participants claimed at deposition not to be able to recall what was discussed at the June 3, 2003 meeting. *See* PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 253-56 (testifying that he did not recall the discussions about fuel surcharges at the meeting); PX0612, Gooden (CSX) Dep., July 16, 2010, at 141 ("I do not remember being at this meeting and having a discussion of fuel surcharges."); PX0604, Eisele (UP) Dep., May 12, 2010, at 130, 135 (testifying that he could not recall attending, or the discussion on customer reaction to fuel surcharges); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 216 ("No, I don't specifically recall that discussion . . . .").

### 11. Under the Auspices of the AAR, Defendants Continued Their Coordination, and Solidified a "Potential Industry Position" on Surcharges

194. On June 23, 2003, Defendants' CEOs met under the auspices of the AAR at Chicago Midway International Airport. *See, e.g.*, PX0534, UPFSC_0466514 (calendar entry for "AAR CEO meeting"), at '514 (attendees: UP's Dick Davidson and Ike Evans, BNSF's Matt Rose, CSX's Mike Ward, NS's David Goode, and the AAR's Ed Hamberger). Notably, ***the other members of the AAR board did not attend this meeting—only the Defendants' CEOs met***. The next day, after flying together to Washington D.C., Goode (NS) and Evans (UP) dined together. *See* PX0358, NS_016000006 (reimbursement report for Goode (NS) reflecting attendance at June 24, 2003 dinner), at '056.

195. AAR "CEO" meetings were an occasion for Defendants' CEOs to discuss "industry conditions," and dinners between CEOs were also occasions to have private discussions about "business issues." *See, e.g.*, PX0631, Goode (NS) Dep., Jan. 13, 2011, at 182, 202.

196. On July 30, 2003, top marketing executives of NS and BNSF discussed a "potential industry position" on fuel surcharges and jointly appointed Lanigan (BNSF) and Seale (NS) to lead a discussion on the topic at the next meeting of the AAR's Network Efficiency Management Committee ("NEMC") scheduled for September 11, 2003. PX0243, NS_001000422 (BNSF-NS

Joint Marketing Meeting notes, July 30, 2003), at '424 (CMOs "John Lanigan and Don Seale agreed to lead a discussion of a potential ***industry position on fuel surcharge provisions*** at the next N.E.M.C. meeting.") (emphasis added); *see also* PX0596, Seale (NS) Dep., Feb. 26, 2010, at 225-29 (testifying that discussions regarding an industry standard fuel surcharge "certainly could have taken place" both within NS, and between NS and other railroads); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 138-143 (testifying as to discussion with NS about proposing "industry position, industry standard, standard methodology" at NEMC meeting); PX0021, BNSF_CAL-0003386 (July 22, 2003 Lanigan calendar entry re "NS Opportunities," listing "NS Attendees" including Don Seale).

197. This discussion on an "industry position" was not intended to be limited to interline traffic. PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 143-45, 151 ("We didn't specifically state it one way or the other.").

198. NS's Seale testified that he did not recall the specifics of the July 30, 2003 discussion. PX0596, Seale (NS) Dep., Feb. 26, 2010, at 267 ("I don't recall specifics of the meeting . . . .").

199. Defendants' executives met on several occasions leading up to the September 11, 2003 NEMC meeting. On August 12, 2003, Defendants' CEOs held a breakfast meeting at the New York Palace Hotel. PX0025, BNSF_CAL-0007136 ("AAR CEOs brkfst. mtg." including "MKR, Mike Ward, Ike Evans, David Goode," Aug. 12, 2003) at '136 (noting that the meeting was limited to "following CEOs only: MKR [Matt Rose of BNSF], Mike Ward [CSX], Ike Evans [UP], David Goode [NS]."). On August 29, 2003, BNSF CEO Matt Rose and NS CEO David Goode played golf together in Denmark. *See, e.g.*, PX0035, BNSF_CAL-0007289 (Aug. 20, 2003 calendar entry re golf outing); PX0631, Goode (NS) Dep., Jan. 13, 2011, at 197-98 (testifying that

he played golf with BNSF CEO Rose, and regarding fuel surcharges "I can't be sure of that but I don't recall that it did" come up).

200. Defendants' executives also attended NFTA's Fall Business Meeting, which was held September 4-7, 2003 at the Kingsmill Resort in Virginia. PX0357, NS_015000482 (NS CMO expense reimbursement for NFTA Fall Business Meeting), at '489; PX0359, NS_016000081 (NS CEO expense reimbursement for NFTA Fall Business Meeting), at '081; PX0289, NS_010033053 (NFTA email re "BOARD MEETING MINUTES," Sept. 10, 2003), at '053 (reflecting attendance by, *inter alia*, David Garin (BNSF), Clarence Gooden (CSX), Don Seale (NS)); *see also* PX0631, Goode (NS) Dep., Jan. 13, 2011, at 159 (explaining that Defendants' CEOs would have discussions about business topics at NFTA meetings).

201. On September 11, 2003, Defendants' executives met at the NEMC meeting. After the meeting, Seale (NS) emailed Lanigan (BNSF) that he "[e]njoyed our visit at NEMC, and look[ed] forward to seeing [Lanigan] again soon." PX0244, NS_001000431 (BNSF-NS email chain re BNSF/NS Minutes, Sept. 11, 2003), at '431. Seale also confirmed that NS had reviewed the meeting minutes of the July 30, 2003 meeting—at which NS and BNSF discussed a potential industry position" on fuel surcharges—and determined that the minutes are "concise minutes of our meeting." *Id*. Finally, Seale (NS) informed BNSF that NS's executives "will work with their counterparts at BNSF to advance each of the identified projects and action items" that they had agreed to on July 30, 2003. *Id.*

202. That same day, NS and CSX CEOs held an "Alliance" meeting and planned future meetings. At this meeting, Goode (NS) and Ward (CSX) agreed to meet "more frequently—every 90-120 days rather than every 6 months." PX0168, CSXFSC0000000467 (CSX internal email re "NS-CSX Alliances," Sept. 17, 2003), at '467.

203. On September 12, 2003, the CEOs of the four Defendants held a conference call under the auspices of the AAR. *See, e.g.*, PX0457, UPFSC_0466737 (calendar entry, Sept. 12, 2003), at '737 (reflecting attendees: UP's Dick Davidson and Ike Evans, BNSF's Matt Rose, CSX's Mike Ward, NS's David Goode, and the AAR's Ed Hamberger). The other members of the AAR Board did not attend this meeting. *See id*.

204. Defendants' executives continued to meet through the end of the year. On September 5, 2003, the "AAR CEOs" spoke by telephone. *See, e.g.*, PX0026, BNSF_CAL-0007244 (Matt Rose (BNSF) calendar entry, Sept. 5, 2003), at '244 ("AAR CEOs" spoke by telephone). On September 15, 2003, NS executives (including Seale) met with their counterparts from UP at NS's headquarters in Virginia. *See* PX0290, NS_010033217 (NS-UP email re "Draft of NS-UP Minutes Alliance Meeting 9/15/03," Sept. 17, 2003); PX0444, UPFSC_0186625 (NS-UP email re "NS/UP Alliance Meeting—May 14," Sept. 6, 2003), at '625-26 (making arrangements for Sept. 15 meeting including Goode (NS CEO), Seale (NS SVP), Dick Davidson (UP Chairman, President, and CEO), and Koraleski (UP EVP)). On November 4, 2003, NS officials including its current CEO, Wick Moorman, met with CSX officials in Jacksonville. PX0346, NS_011001321 (Charles Moorman (NS) travel expense report), at '321 (reflecting Jacksonville, FL "CSX Meeting"). On November 18, 2003, BNSF's Matt Rose and CSX's Mike Ward held a meeting. *See, e.g.*, PX0024, BNSF_CAL-0007127 (Matt Rose (BNSF) calendar entry, Nov. 18, 2003), at '127 (BNSF's Matt Rose and CSX's Mike Ward held a meeting).

205. During this period, NS also was familiar with CSX's positions on implementation of fuel surcharges. PX0333, NS_010075745 (NS email re "Fuel Surcharge Change Pro/Con" and attachments, Apr. 7, 2003), at '747 ("That assumption is questionable for private authorities, particularly contracts, and [CSX] privately admit that."); *id.* ("Privately, [CSX] admit that this is

a stretch and expect strong customer opposition."); PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '522 (April 29, 2003 email: "CSXT is expecting significant customer opposition to this approach and they may still relent. However, they at least have a case to argue.").

### 12. After Concluding By April 17, 2003 That "At This Point, We Do Plan to Modify Our FSC," Technical Issues Delayed NS's Implementation of CSX's Fuel Surcharge Formula for a Few Months

206. As discussed above, by April 17 2003, NS's adoption of a conspiratorial fuel surcharge was a foregone conclusion. PX0254, NS_001000316 (NS internal email re "Fuel Surcharge Change Pro/Con," Apr. 17, 2003), at '316 (stating that Seale had already determined that "at this point, we do plan to modify our FSC").

207. Because of technical constraints, however, NS did not formally implement CSX's fuel surcharge formula for a few months: Glennon explained that NS's adoption was not immediately feasible because "[t]he current SC language is coded in all our publications" and "[t]ransitioning would take some thought." PX0320, NS_010072632 (NS internal email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 20, 2003), at '632.

208. Because NS's fuel surcharge program provision was encoded directly into its contracts, NS had to wait for its contracts to come up for renewal before its fuel surcharge provisions could be added. *See, e.g.*, PX0242, NS_001000373 (NS internal email re "UP FSC - NS Concurrence Eff," July 16, 2003), at '373 ("The first step is to remove the current FSC note that locks us into the current FSC…we print it into each rate publication. We are in the process of changing that to a simple reference to the C/C. . . .").

209. As NS's Glennon explained—confirming his intention to apply the new coordinated fuel surcharges across the board: "If we were to adopt something like CSXT's, we could not simply announce it and have it apply across the board, at least not on contracts and

possibly not on customer specific quotes (open to debate)." PX0319, NS_010072620 (internal NS email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 27, 2003), at '620; *see also* PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '522-23 ("Due to the way NS hard codes the surcharge into NS publications, public and private, we would have to actually republish each one before we could transition that publication to the new formula."); PX0333, NS_010075745 (NS email re "Fuel Surcharge Change Pro/Con" and attachments, Apr. 7, 2003), at '747 ("NS actually inserts the current SC in all publications. If we adopt a new FSC, to make it effective, we will have to republish each authority subject to the new FSC."); PX0321, NS_010072769 (internal NS email re "Fuel Surcharge basis change issue," Apr. 22, 2003), at '769 ("NS opted to insert (not just a reference) the FSC in all its publications. We actually have to republish each publication to change it. In the case of contracts, we'd have to renegotiate."); PX0284, NS_010026782 (internal NS email re "Fuel Surcharge Change Pro/Con" and attachment, Apr. 25, 2003), at '784 ("NS actually inserts the current SC in all publications. If we adopt a new FSC, to make it effective, we will have to republish each authority subject to the new FSC."); PX0323, NS_010073115 (internal NS email re "7/10 Fuel Surcharge Meeting – Background Info," July 3, 2003), at '116 (detailing "transition issues," including that "The NS fuel surcharge text has been inserted into each NS publication that is subject to the NS FSC. As a result, we cannot simply change the FSC text in the NS Conditions of Carriage and expect a revised formula to take effect universally"); PX0285, NS_010027051 (internal NS email re "Fuel Surcharge Note Conversion," Aug. 5, 2003), at '051 (reflecting "Product Managers are being strongly encouraged to use the new C/C based FSC note . . . ."); PX0252, NS_010073466 (NS internal email re "Fuel Surcharge Policy Review," Nov. 7, 2003), at '466 ("proceed with the program to remove the full text FSC note from private NS authorities and position ourselves for a

conversion . . . ."); PX0251, NS 00100253 (NS internal email re "Fuel Surcharge Change Pro/Con" and attachments, Apr. 25, 2003), at '253 ("Due to the way NS chose to originally publish the FSC, if we choose to make a change, we cannot take the CSXT approach and announce the change, across all publication types, effective on a specific date. We would have to follow a phased implementation plan . . . ."); PX0324, NS_010073194 (NS internal email re "Fuel Surcharge notes," July 23, 2003), at '194 ("We currently publish the entire text of our Fuel Surcharge (FSC) provisions in all of our publications through note 6766. In order to provide more flexibility should these provisions change and to shorten the length of our publications, we have created a new note which will simply refer to the surcharge provisions as published in NS-1 Conditions of Carriage."); PX0348, NS_013001765 (internal NS email re "Fuel Surcharge Policy Review," Nov. 4, 2003), at '765 (reflecting need to convert contract form).

210. By contrast, BNSF, CSX, and UP, were able to quickly implement the coordinated revised fuel surcharges in 2003, because their fuel surcharge provisions were incorporated *by reference* into their price authorities, meaning these Defendants could merely revise the referenced provisions to reflect new fuel surcharge formulas. PX0046, BNSF-0027020 (BNSF email re "Carload Price Authorities to be changed thru mass maintenance adding new Fuel Surcharge templates," Dec. 10, 2002), at '020 ("Fuel+6100 Standard (Fuel Surcharge to apply, per BNSF Rules Book 6100)"); PX0609, CSX Resp. to Plaintiffs' First Interrog. and Fourth Req. for Prod. of Docs. Ex. C – Fuel Surcharge Key, p 1 ("Fuel surcharges apply as provided for in CSXT Fuel Surcharge Publication 8100/8200 as of the date of shipment."); PX1079, CSXFSC000247042; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 126 (NS replaced full-text FSC notes with references to the conditions of carriage in 50% of its contracts as of November 2003); PX0983, Leitzinger MDL I Reply Rpt., Dec. 16, 2021, ¶ 118 (NS estimated it would be finished with the

transition in November 2003); PX0982, Leitzinger MDL I Rpt., Sept. 15, 2020, at 21 n.83 ("CSXT incorporated its new FSC into the 8100 and 8200 tariffs referenced by many of its price authorities.").

211. Notably, NS adopted CSX's fuel surcharge notwithstanding that NS had internally determined that the heating oil index more closely tracked NS's actual fuel costs—a fact that NS had shared with CSX in April 2003. PX0608, Neikirk (NS) Dep., June 15, 2010, at 92 ("Q. . . . you determined that NS's fuel prices were tied more closely to a heating oil index than the WTI? A. I did run correlations on both and, yes, they are– historical fuel prices at the time I did those analyses tied more closely to home heating oil. Q. Do you recall when you ran these analyses? A. It would have been between 2000, 2003, probably several times."); *id.* at 63-64 ("Q. And did NS believe the heating oil index more closely tracked its fuel purchases? A. Yes. . . . Q. And did NS inform CSX that it believed its fuel costs were most closely tied to the heating oil index? A. I believe we did."); PX0164, CSXFSC00000396 (CSX email re "N77CS 04-21-03 meeting at NS," Apr. 17, 2003), at '399 (questions from CSX to NS re: "Benchmarking Successful Fuel Hedging Practices," including "What type of correlation do you have with WTI, Gulf Coast, other?"); PX0352, NS_013003157 (September 2, 2005 letter from NS's Don Seale to presidents of the National Industrial Transportation League and National Grain and Feed Association), at '157 (acknowledging that NS would maintain its "current formula despite data that suggests that the price of WTI crude oil is not increasing as rapidly as diesel fuel.").

212. An evaluation conducted by NS's group vice presidents ("GVPs") confirmed the existence of structural barriers, noting, "[p]robably the most important point" why NS could not adopt CSX's program immediately was that "[e]ven if we adopted the CSX proposal immediately, we would see very little revenue generated in the short term [because d]ue to the way NS hard

codes the surcharge into NS publications, public and private, we would have to actually republish each one before we could transition that publication to the new formula." PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '522.

213. In fact, Seale's team concluded that NS's fuel surcharge should not be modified: "in light of the recently announced changes by CSXT and UP," "NS should not adopt the CSXT formula," immediately because "the change is in fact a blatant general rate increase, and will appear so to customers" and that NS could exploit its competitors' increased surcharge for "leverage." PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '522. Contrary to Defendants' belated justification for their fuel surcharges, Seale's team recognized that no fuel surcharge was necessary to recover fuel costs because "[f]uel costs are dropping" and "it appears we may be entering an extended period of reasonable oil cost." *Id.*

214. Nonetheless, Seale—having already made up his mind—took the team up on its suggestion that NS undertake a number of changes "to better position NS to accommodate a FSC change if and when the decision is made." *Id.* at '523.

215. Because immediate adoption was impossible, Glennon and the GVPs then worked out the roadmap towards adoption later in the year or 2004. PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '523 ("The consensus recommendation is that we do not adopt the CSXT formula *at this time*. However, the group suggests the adoption of the following changes to better position NS to accommodate a FSC change if and when the decision is made. . . . If we were to consider a change, the ideal scenario would to [sic] begin the process of removing the FSC text now, let the FSC issue fade and then be in a better position to switch late this year or next year.") (emphasis added).

216. In November 2003, Seale again pushed NS's GVPs regarding implementation of a fuel surcharge, which they voted to delay, instead endorsing the plan to "[c]ontinue laying the groundwork for a conversion, but delay a formal decision until 2QTR04." PX0292, NS_010033391 (NS email re "Fuel Surcharge Policy Review," Nov. 9, 2003), at '391.

217. NS proceeded with that implementation of the conspiratorial fuel surcharges in early 2004, even though NS had no unilateral self interest in changing its fuel surcharge formula. Before adopting the coordinated fuel surcharges, NS had recognized that "***NS's current fuel hedging and surcharge collections are effective at protecting NS exposure to fuel price increases. As such, adoption of the new CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs.***" PX0262, NS_009000161 (NS internal email re "Fuel Surcharge Change Pro/Con", Apr. 15, 2003), at '161 (emphasis added); *see also* PX0608, Neikirk (NS) Dep., June 15, 2010, at 123-126 ("Q. And let's just go to the last sentence of Mr. Heslep's e-mail. It says, 'However, my general sense is that the combined effect of hedging and fuel surcharges do a decent job of protecting NS income from significant spikes in diesel fuel costs.' Do you see that? A. I do. Q. And do you agree with Mr. Heslep's summary of your analysis? A. If you are confined to this time period, I do."); PX0558, NS 2003 Annual Report and Form 10-K, at K37 (discussing success of hedging program); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 161-62 (NS's hedging program was "effective in carrying out the intention we had for it," which was to "protect, if you will, ourselves and our budget against unforeseen changes in the cost of fuel").

218. In January 2004, NS formally determined that it was adopting, effective March 1, 2004, the new fuel surcharge program, which was identical to the program announced by CSX in March 2003 and—as reflected in an internal email ***not for customer distribution***—was intended

to "standardize" NS's fuel surcharge program with that of the other Defendants. PX0347, NS_013001654 (NS email re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004), at '654-56 ("**CONFIDENTIAL – NOT FOR CUSTOMER DISTRIBUTION** **Marketing/Sales:** NS will soon announce a revised Fuel Surcharge (FSC) program to be effective March 1, 2004. This will raise customer relations and rate maintenance issues that will require your full attention. NS will essentially adopt the CSXT FSC formula. This is [sic] action is being taken for a number of reasons: . . . • **Standardization of FSC provisions in the East.** . . . NS adoption of the CSXT formula will place both of the major Eastern carriers on the same standard . . . ."); PX0235, NS_001000124 (NS internal email re "Modified Fuel Surcharge—Coal and Merchandise," Jan. 8, 2004), at '124 (Don Seale (NS): "[O]ur new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003. So, even though we will undoubtedly experience some customer opposition to the change, the formula is already in the market place, and our customers in the east will have a uniform application."); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 34-35 (testifying that NS switched even some customers under contract from the $28 WTI formula to the $23 WTI formula); PX0560, NS 3/1/2004 FSC Program Terms (reflecting NS fuel surcharge formula effective March 1, 2004, including $23 WTI trigger and a 0.4% increase in surcharge for every dollar increase in the WTI).

219. [Intentionally omitted].

220. As with CSX's program, NS would assess a 0.4% fuel surcharge when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter—thus using the escalation formula originally developed within UP. Like CSX, BNSF, and UP, NS's program would now be based on the monthly average price of the WTI index. PX0235, NS_001000124 (NS internal email re "Modified Fuel Surcharge—Coal and

Merchandise," Jan. 8, 2004), at '124 (Don Seale (NS): "The surcharge will adjust upward by 0.4% for each subsequent $1 increase in WTCO above the minimum threshold based on a 30 day monthly average using calendar days instead of business days. . . . Additionally, our new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003. So, even though we will undoubtedly experience some customer opposition to the change, the formula is already in the market place, and our customers in the east will have a uniform application.").

221. And shortly thereafter, before the new NS fuel surcharges were to take effect, having previously stripped from anyone below the GVP level the power to exempt contracts from inclusion of fuel surcharges, Don Seale then even rescinded the power of GVPs to approve exceptions to fuel surcharges, centralizing that authority solely with himself. PX0326, NS_010073840 (NS internal email chain re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004) at '841 ("Any deviations from the new standard must have GVP approval and must be reviewed by Pricing Services for applicability"); PX0293, NS_010034040 (NS internal email re "fuel surcharge—NS," Mar. 11, 2004), at '040 ("I assume that in all cases there is to be no deviation from NS's published FSC without your prior approval. . . . Correct."); PX0272, NS_010007412 (NS internal email re "FSC," June 11, 2004), at '412 ("What Don [Seale] said was that when [the contract is] with the FSC that he would allow contracts to be negotiated with 80% RCAF or above, but in no instance would there not be the new FSC").

222. NS and CSX thereafter implemented fuel surcharges that were in synch with one another, and began setting and adjusting them at the same time and levels. *See, e.g.*, PX0347, NS_013001654 (NS email re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004), at '654-56 ("NS will essentially adopt the CSXT FSC formula."); PX0235, NS_001000124 (NS internal

email re "Modified Fuel Surcharge—Coal and Merchandise," Jan. 8, 2004), at '124 ("[O]ur new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003.").

223. Although NS and CSX's formula calculated fuel surcharges on a different index from UP and BNSF's formula, Defendants' formulas were designed to move in virtual lockstep, irrespective of the dependent index. *See* PX0362, NS_033000559 (NS "FSC Rebase Analysis" Memo, Feb. 12, 2006), at '559 (NS/CSX formula also in virtual lockstep with UP/BNSF formula); *see also* PX0749 (BNSF Rules Book 6100 Carload Fuel Surcharge, Feb. 5, 2010); PX0722 (NS 3/1/2004 FSC Program History, Jan. 5, 2011); PX0746 (UP Carload Rate Based Standard HDF Fuel Surcharge, Feb. 5, 2010); PX0747 (CSX Fuel Surcharge Archive, Feb. 11, 2004).

**13. Defendants' New Fuel Surcharges Had Significantly More Earning Power Than Their Predecessor Programs**

224. The fuel surcharge methodology that CSX announced, that UP quickly adopted (before switching to BNSF's equally onerous fuel surcharge), and that NS implemented after sorting out logistical issues, was substantially more aggressive than any Defendant's predecessor program. Defendants contemporaneously acknowledged this. Internally, CSX stated that "it is actually a large increase in fuel surcharge billings" as compared to the prior program—"maybe as much as 100%." PX0163, CSXFSC000000357 (CSX internal email re "Fuel Surcharge Change" and attached presentation, Mar. 19, 2003), at '357. Before adopting CSX's methodology, UP and NS recognized it as a "more aggressive" formula with more earning power and a "money grab." PX0253, NS_010076080 (NS internal email re "UP FSC - NS Concurrence Eff," July 16, 2003), at '080 (noting that the new fuel surcharge adopted by CSX "looks more [sic] too much like a money grab"); PX0326, NS_010073840 (NS internal email chain re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004) at '843 (reflecting that new NS formula (which matched CSX formula) would have resulted in earlier and higher fuel surcharges if applied in 2002 and 2003 compared to

NS's existing formula); PX0781, UPFSC 0102504 (UP internal email re "CSXT Changes Fuel Surcharge Language," Mar. 20, 2003), at '504 ("As information, the new CSXT fuel surcharge is more aggressive than its existing form."); PX0252, NS_010073466 (NS internal email re "Fuel Surcharge Policy Review," Nov. 7, 2003), at '466-67 ("Any FSC change, particularly to a more aggressive formula like the CSXT's, has the potential to complicate rate negotiations and generate billing disputes with customers, . . . Both points would significantly reduce potential FSC yield if we were to swap out formulas in the short term. It is even conceivable that we could experience a net decline in revenue if customers were to withhold line-haul payments pending the resolution of FSC complaints/disputes."); PX0301, NS_010042203 (internal NS memo re "Fuel Surcharge – CSXT vs. NS Comparison," Apr. 7, 2003), at '203 ("[T]he CSXT formula would have produced additional $7,083,472 in NS revenue in 2002 and YTD 2003 had it been in effect."); *id.* ("Not only does the FSC kick sooner [sic] in at $23 vs $28, the actual FSC is higher at $28.01. This opens us to the argument that we are not only taking the FSC sooner, at higher costs to the customers, but that we are raised [sic] the FSC . . . ."); PX0284, NS_010026782 (internal NS email re "Fuel Surcharge Change Pro/Con" and attachment, Apr. 25, 2003), at '783 (same); *id.*at '785 ("The CSXT standard clearly produces significantly more compensation, and it does it sooner and more consistently.").

225. CSX's new fuel surcharge—which was quickly adopted by UP—reset the industry baseline for aggressiveness, which BNSF matched by decreasing its formula's trigger price from $1.30 to $1.25 HDF, a trigger price that BNSF said "reflected the $23 WTI crude price used by UP" (at the time) and CSX. PX0084, BNSF-0327011 (BNSF internal email re "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011 (discussing changes to carload and intermodal programs: "[N]otes on the fuel surcharge meeting . . . on April

29, 2003," which state: "The changes in the Carload Program going forward are as follows: . . . • The carload strike price will be $1.25. (This reflects the $23 WTI crude strike price being used by UP in their new carload fuel surcharge table.) . . . ."); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 97 ($1.25 on the HDF is "roughly equivalent" to $23 on the WTI);.

226. When UP switched and adopted a formula "identical" to BNSF's, both UP and BNSF were operating at the more aggressive baseline that Defendants had standardized. PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at PIN; PX0610, Lanigan (BNSF) Dep. at 119; PX0502, UPFSC_0075761 (UP internal email re "Fuel Surcharge—WTI vs. HDF," Oct. 20, 2004), at '761 (emphasis added) (UP switched fuel surcharge programs "[t]o match BNSF's 'standard' HDF based surcharge.").

227. Under the fuel prices expected at the time Defendants adopted their new FSCs, the new surcharges were expected to yield increased billings that were impossible under the old ones. *See* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 121-125 ("[T]he right way to test that these changes represented a meaningful . . . change is to consider their impact in the context of price expectations at the time."). Projecting forward, a $23 WTI trigger was expected to capture significant fuel surcharges that $28 triggers would not. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 121-125. In fact, WTI prices were expected to settle below $28 but above $23 for the next two-and-a-half years. PX0775, Tucker MDL II Rpt., Aug. 15, 2023, ¶ 151 & tbl.10 (plotting NYMEX future projections showing that in March 2003 it was projected that WTI prices would fall below $28 and stay above $23 all the way through September 2005); *see also* PX0774, Johnson MDL II Rpt., Aug. 15, 2023, ¶ 144 ("NYMEX futures projections from March 2003 and September 2003 show that WTI prices were expected to be between $23 and $28 for most of the months covered by the projections."). Looking backwards to January 2000, the new $23 WTI

trigger would have captured fuel surcharges in 14 months where the old $28 WTI trigger would have captured none. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 157-58. Thus, the new $23 WTI trigger price was expected to yield billings that would not have been possible under pre-conspiracy formulas.

### 14. BNSF Once Again Considered Switching to a Competitively Advantageous Mileage-Based Fuel Surcharge—and Once Again Capitulated to the Other Defendants' Pushback

228. In August 2004, Lanigan (BNSF) reconstituted the fuel surcharge Review Team, to again consider switching to a mileage-based fuel surcharge. PX0136, BNSF-FSC_000155 (BNSF internal email re "Fuel Surcharge—MPG Tables Revisited," Aug. 30, 2004), at '155; *see also* PX0054, BNSF-0028783 (BNSF internal email re "Fuel surcharge by mile meeting notes," Sept. 7, 2004), at '783 ("Meeting on Sept 3 to discuss calculating fuel surcharge bead on mileage").

229. BNSF's proposed mileage-based fuel surcharge program was originally designed to apply "to all traffic, both interline and local." PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 235.

230. At the same time, a number of major shipping associations were pressing BNSF—as well as other Defendants—to convert to a mileage-based fuel surcharge. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 188–191; *see also* PX0362, NS_033000559 (NS "FSC Rebase Analysis" Memo, Feb. 12, 2006), at '560 (NS document referring to "customer and political pressure" for mileage-based FSCs); PX0112, BNSF-0480574 (BNSF internal email re "AAR," May 5, 2006), at '574 (Lanigan (BNSF CMO): "Need more than innuendo from our 'peers' that don't want to change. . . . I had three customers at NARS tell me they wanted us to go to mileage-based.").

231. BNSF's mileage-based fuel surcharge program was met with pushback from the other Defendants. *See, e.g.*, PX0112, BNSF-0480574 (BNSF internal email re "AAR," May 5,

2006), at '574 (Matt Rose (BNSF CEO): "Hamburger is hearing from the other rr that the 'market' is not happy with our approach on fuel. Advise.").

232. The other Defendants had *de facto* veto power over the application of BNSF's mileage-based fuel surcharge to portions of BNSF traffic because technical changes had "to be approved by industry Shipment Conditions Committee (all REN participants—BNSF, CN, CPR, CSXT, KCS, NS, UP)." DA04559 at '561; *see also id.* at '563 ("Next steps[:] ● Executive-level support from each REN partner . . . . ● Address new surcharge with . . . [AAR's] NEMC (Network Efficiency Management Committee)").

233. BNSF's decisions not to adopt a mileage-based fuel surcharge on any traffic were made with input from its interline partners—CSX, NS, and UP—even though the vast majority of BNSF's traffic was local or Rule 11. *See* BNSF Br. 6-7, 11 (admitting that BNSF received input from CSX, NS, and UP concerning its proposed mileage-based fuel surcharge); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 24 & fig.9 (showing that [redacted]).

234. BNSF could have at any time "generally implemented mileage-based fuel surcharges on its own local traffic and Rule 11 traffic (*i.e.*, traffic where a shipper makes separate arrangements with each railroad used for separate legs of an interline shipment), leaving surcharges on its interline traffic rate-based." BNSF Br. 11.

235. Instead of taking full advantage of its competitive advantage through mileage-based fuel surcharges, however, BNSF did not break with the other Defendants, only using mileage-based fuel surcharge for some local shipments starting in early 2006, and with quite limited application. PX0137, BNSF-FSC_000218 (BNSF email re "New Fuel Surcharge Program," Mar. 29, 2005), at '218 (announcing mileage-based fuel surcharge); PX0788, BNSF-FSC00223 (BNSF

News Release, Mar. 28, 2005), at '223 ("The mileage-based fuel surcharge will apply to movements that originate and terminate on BNSF, and to the BNSF portion of Rule 11 shipments . . . ."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 188–192 & fig.18 (noting that BNSF largely abandoned its adoption of a mileage-based fuel surcharge, applying it on only 14% of BNSF's shipments in 2006); *id.* ¶ 24 & fig.9 (noting that the vast majority of BNSF's traffic was local or Rule 11). The remaining traffic remained subject to the conspiratorial rate-based fuel surcharge.

236. When BNSF did finally implement mileage-based fuel surcharges on a limited volume of its traffic in 2006, it expressly preserved the same $1.25 HDF trigger price, with a goal of revenue neutrality. PX0086, BNSF-0327878 (July 2005 BNSF Communication Plan regarding "Mileage-Based Fuel Surcharge Program"), at '884 (emphasizing internally that its new program "[c]ollects the same amount of fuel surcharge revenue across our overall customer base as the percentage based program it replaces"); PX0062, BNSF-0033275 (BNSF internal email re "Potential MBFSC Test IP Customers," June 23, 2006), at '275 ("John Lanigan has told the [mileage-based fuel surcharge team] that he wants this to be a revenue neutral event for BNSF . . . ."); PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023 ¶ 145; *see also* PX0138, BNSF-FSC 000280 (BNSF email, Oct. 20, 2005, forwarding BNSF announcement titled "BNSF Details Fuel-Surcharge Plan for Coal, Agricultural Products" to customers) at '280 (announcing program will take effect in 2006); PX0510, UPFSC0157274 (BNSF email, Mar. 29, 2005) (informing all carriers of its change).

237. It was not until January 2009—six years after BNSF started considering a mileage-based fuel surcharge program—that BNSF extended its mileage-based fuel surcharge to all of its rate-unregulated traffic. DA04950; DA04939-41.

### 15. Defendants' Conspiracy Included Intermodal Fuel Surcharges

#### a. Prior to 2003, Defendants Were Unsuccessful In Their Attempts To Impose Unilateral Fuel Surcharges On Intermodal Shippers

238. In the period prior to the conspiracy, due to the competition between Defendants, Defendants struggled to impose fuel surcharges on intermodal shippers. For example, after NS initiated an intermodal fuel surcharge in March 2000, a number of shippers began "ignoring them or disputing them," even though the surcharges never exceeded more than 3%. PX0717, NS_037004332 (NS internal email re "Fuel Surcharge Status," June 15, 2000), at '334; PX0789, NS_062194917 (NS internal email re "International Fuel Surcharges," Mar. 19, 2000) at '917 ("We have delayed implementation of the FSC for Hyundai and OOCL pending further discussions this week."). While NS felt it "really need[ed] this money," PX0717, NS_037004332 (NS internal email re "Fuel Surcharge Status," June 15, 2000), at '334, NS caved to customer resistance and decided to "[d]iscontinue billing and waive outstanding immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it," PX0719, NS_037004300 (NS internal email re "International Fuel Surcharge—July 1 Modification," June 19, 2000). NS officials cautioned that "***[t]his must be done as quietly as possible to ensure we do not jeopardize the FSC on the non-contract, non-international customers***." *Id.* (emphasis added). In June 2000, NS made the decision "to stop applying the fuel surcharge to International accounts that [were] under contract." PX0718, NS_036018393 (NS email re "Fuel Surcharge Amendments—International," June 21, 2000), at '393. Before the conspiracy, NS also determined it would be inappropriate to impose a fuel surcharge in addition to cost escalators, like the RCAF, including on intermodal traffic. PX0361, NS_026002535 (internal NS email re "Fuel Surcharge Status as of 12/31/00," Jan. 4, 2001), at '535 (NS intermodal employee noting to Don Seale and others in January 2001 that "we have finally been forced to acquiesce on some of the International contracts and stop charging

an FSC where there is an RCR. Even our attorney's [sic] said we were on shakey [sic] ground, and after a year of assessing and collecting this from a few carriers, we have terminated it"); *see also* PX0613, Rose (BNSF) Dep., July 16, 2010, at 23-24 (customers did not "want to pay a fuel surcharge on top of RCAF" and complained, "rightly so," that the RCAF was an existing "mechanism to recover fuel"). Prior to the conspiracy, intermodal shippers' contracts with NS generally did not include FSC provisions or included FSCs with limited application. *See* PX0889, Bernheim & Marx MDL II Rpt. (NYK), Mar. 1, 2023, ¶ 283 (NYK had long-term contracts with NS that did not typically include FSCs); PX0897, Bernheim & Marx MDL II Rpt. (Yang Ming), Mar. 1, 2023, ¶¶ 282-83 (Yang Ming had contracts with NS prior to 2003 that did not include FSC provisions or had FSCs with limited application).

239. Likewise, from December 2001 to April 2002, CSX discontinued its intermodal fuel surcharge program. *See, e.g.*, PX0791, Crawford (CSX) Dep., July 27, 2011, at 37; PX0792, CSX Intermodal Fuel Surcharge Chronology (from 2000 to May 14, 2007); PX0195, CSXFSC000128907 (CSX internal email re "CSXT Fuel Surcharge Value," Aug. 20, 2002) at '907 ("Customers may view a more aggressive CSXT fuel surcharge negatively, particularly on NS competitive business . . . ."); PX0594, McIntyre (CSX) Dep., Feb. 18, 2010, at 104-07 (testifying to customer pushback and competition with NS on fuel surcharges); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 58 (explaining that before 2003 "if you could negotiate an index in your contract that captured fuel, that would be acceptable. So you didn't have to have the fuel surcharge"); PX1080, CSXT_FSC_MDLII_0077221 (reflecting that prior to the Conspiracy Period many intermodal shippers had "total exclusions" from CSX's FSCs, including Plaintiffs MOL and NYK). One CSX employee described the difficult conditions facing CSX: "Doesn't look like a lot of opportunity to push our prices up. As the old saying goes—'competition is great,

as long as you are on the buying side.'" PX0218, CSXFSC000327518 (CSX internal email re "Response—Conference call last Friday," Feb. 22, 2000), at '518. CSX's EVP of Sales and Marketing, Clarence Gooden, confirmed that the revenue the fuel surcharge program generated before 2003 was "[l]ow—relatively low to where it needed to be." PX0612, Gooden (CSX) Dep., July 16, 2010, at 100-101. Prior to the conspiracy, intermodal shippers' contracts with CSX generally did not include FSC provisions or included FSCs with limited application. *See* PX0889, Bernheim & Marx MDL II Rpt. (NYK), Mar. 1, 2023, ¶ 283 (NYK had long-term contracts with CSX prior to the spring of 2003 that typically did not include FSCs); PX0905, Bernheim & Marx MDL II Rpt. (MOL), Mar. 1, 2023, ¶¶ 282, 288 (MOL had long-term contracts with CSX, and before 2003 paid de minimis FSCs); PX0897, Bernheim & Marx MDL II Rpt. (Yang Ming), Mar. 1, 2023, ¶¶ 282-83 (Yang Ming had contracts with CSX prior to 2003 that did not include FSC provisions or had FSCs with limited application).

240. In the west, BNSF and UP too failed to implement intermodal fuel surcharges both due to customer resistance and competition between themselves. In 2002, BNSF noted that UP was attempting to capture the international shipping market by forgiving outstanding balances and "waiving and defer[ing] price (RCAF) increases" on intermodal traffic. PX0793, BNSF_II_03902582 (BNSF presentation re "Consumer Products Staff Meeting," Feb. 8, 2002) at 78. UP was unsuccessful in broadly enforcing its fuel surcharge before the conspiracy, including on intermodal traffic. *See, e.g.*, PX0448, UPFSC_0256361 (internal UP email re "Fuel Surcharge," Dec. 10, 2001), at '362 (list of fuel surcharge exceptions from December 2001, including for multiple intermodal shippers); PX0514, UPFSC_0184102 (UP internal email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 12, 2003), at '102 (internal email noting "I'm sure you are aware of the fact that there appears to be a lot of [interest]/push back coming [from]

customers/consultants directed at challenging our fuel surcharges. Attached is an example from IP . . . however I understand this is a growing issue in other commodity groups as well."); *see also* PX1081, UPFSC0351396 (UP-Rail Inc. email re "Agreement Confirmation – potential next step," Mar. 24, 2005) at '403 ("intermodal" is a UP "commodity group"). An internal UP analysis of its fuel surcharge coverage determined that from September 2002 through August 2003, 66 percent of its intermodal shipments did not have fuel surcharge provisions. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 254-55; PX0413, UPFSC 0276428 (internal UP email re "FUEL SURCHARGE RECOVERY," Jan. 15, 2004), at '440 ("Within the last 12 month period, 66% of [intermodal] shipments did not have fuel surcharge provisions . . . ."). Prior to the conspiracy, intermodal shippers' contracts with UP generally did not include FSC provisions or included FSCs with limited application. *See* PX0905, Bernheim & Marx MDL II Rpt. (MOL), Mar. 1, 2023, ¶¶ 282, 288 (MOL had long-term contracts with UP and before 2003 paid de minimis FSCs).

241. For its part, BNSF noted that as of April 2003, it "still [had] some major exceptions" to the application of its fuel surcharge program to intermodal (and carload) traffic. PX0055, BNSF-0028786 (BNSF Fuel Surcharge Review Team Recommendations presentation, Apr. 14, 2003), at '792; *see also* PX0795, BNSF-0657309 (BNSF presentation re "Fuel Surcharge Review," Mar. 1, 2001) at '312 (noting no FSC applications to international contracts in 2001); DA04086 at 90 (showing only 1.9% of BNSF's intermodal fuel surcharge revenue was actually billed during that time). Indeed, in January 2003, BNSF's EVP and CMO Chuck Schultz responded to a series of "Fuel Surcharge Questions" from CEO Matt Rose, including "Why can't we get more fuel surcharges or RCAF escalation in each of the forecast groups?" PX0088, BNSF-0328865 (BNSF memo re "Fuel Surcharge Questions," Jan. 15, 2003), at '866. These groups included intermodal and carload traffic. *Id.* Schultz responded that "***competition***" and "***contract negotiating power all***

***play a role***," and did not mention multi-year contracts. *Id.* (emphasis added). The effect was that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* Prior to the conspiracy, intermodal shippers' contracts with BNSF generally did not include FSC provisions or included FSCs with limited application. *See* PX0889,

[redacted]

**b. Defendants' Conspiracy Extended to Intermodal Traffic**

242. Defendants aligned (and enforced) their standard intermodal fuel surcharges, consistent with their overall conspiracy on coordinating fuel surcharges. For example, in October 2004, CSX modified its intermodal fuel surcharge to come into lockstep with NS and BNSF. *See* DA06916 (June 2004 "CSX Intermodal Fuel Surcharge Review" presentation), at DA06924 (discussing how to revise its intermodal surcharge formula to "begin[] standardization across industry"); PX0797, NS_037031133 (NS internal email re "CSX Fuel Surcharge Scale," Sept. 7, 2004), at '133 ("Effective Monday October 4, 2004, CSX Intermodal will modify its Fuel Surcharge (FSC) program for linehaul and bundled drayage transportation services."); PX0798, CSXFSC000263988 (Fuel Surcharge Presentation, Dec. 28, 2005) at '000 ("CSXI's fuel surcharge is consistent with the rest of the intermodal fuel surcharges."); *see also* PX0799, BNSF-0656598 (BNSF internal email re "Lanigan Update – DRAFT," Mar. 27, 2006) at '598 ("[T]he eastern road's program is slightly higher than that of the western roads for carload and virtually identical

for the intermodal programs."). As a result, CSX's, NS's, and BNSF's formulas became identical. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, Fig.III-6 (comparing formulas).

243. Even though BNSF's and UP's intermodal formulas were slightly different, UP set its published intermodal FSC rate to equal that of BNSF's, irrespective of what their formula stated. *See, e.g.*, PX0390, UPFSC 0055388 (UP internal email re "Urgent—April's Intermodal Fuel Surcharge," March 23, 2005), at '388 (UP employee recommending to "align[]" UP intermodal FSC formula to BNSF scale); *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 109 & Fig.III-7 ("The figure shows that the modifications UP made to its intermodal program brought it progressively closer to BNSF's program, even though the companies expressed their formulas in different ways.").

244. UP did this by modifying the "fuel weight" multiplier in its intermodal formula whenever it yielded a fuel surcharge that was meaningfully different from BNSF's intermodal formula. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, Fig.III-7; *see also* DA19001 (UPFSC 0078792 at 93) (UP's "Intermodal FSC calculation was changed . . . to try and lower the variance between UPRR's Intermodal Surcharge and the comparable BNSF program."); PX0804, UPFSC 0165317 (internal UP email re "June's Intermodal FSC," May 25, 2006), at '317 (adjusting UP's fuel surcharge downward 2.5% because it was "higher than BNSF's"); PX0390, UPFSC 0055388 (UP internal email re "Urgent—April's Intermodal Fuel Surcharge," March 23, 2005), at '388 (UP employee recommending to "align[]" UP intermodal FSC formula to BNSF scale). For example, in August 2006, UP's Intermodal Group Vice President and General Manager, John Kaiser, adjusted the applicable fuel surcharge downward by 2.7% by lowering the fuel weight, "to stay in line with the market," after discussing the matter with Koraleski. PX0805, UPFSC 0029414 (UP internal email re "2007 Fuel Surcharge," Aug. 18, 2006), at '414 ("For intermodal, the current

formula drives a 25% surcharge. However, as base prices have risen and fuel prices have escalated, our formula has started to deviate from the marketplace."); *see also* PX0733, Coalson (UP) Dep., May 25, 2011, at 75-76.

245. In August 2006, NS consolidated its domestic and international intermodal fuel surcharge programs into one formula, which continued to mirror both CSX and BNSF. PX0801, NS_062118743 (NS internal email re "Fuel Surcharge for Intermodal," July 11, 2006), at '743 ("Over the next several weeks, we are modifying the General International Fuel Surcharge scale. The transition from the former International Scale to the Intermodal Department Scale will be completed August 15, 2006. . . . This will reduce confusion by consolidation to one Intermodal FSC scale."). NS observed that "[t]he consolidated FSC scale will bring NS International more in line with industry FSC levels." *Id.* NS emphasized that the new scale would be the "starting point for any future contract negotiations or new contracts." PX0802, NS_062204458 (internal NS email re "Fuel," July 11, 2006) at '458.

246. Defendants viewed any differences as immaterial. For example, BNSF's VP of International Intermodal Marketing, Fred Malesa, told shipper [redacted] PX0800, BNSF_II_04007073 (draft BNSF letter to [redacted]), at '073. Similarly, when BNSF compared its fuel surcharge programs in 2006 with those of CSX and NS, it noted that "the eastern road's program is slightly higher than that of the western roads for carload and *virtually identical for the intermodal programs*." PX0799, BNSF-0656598 (BNSF internal email re "Lanigan Update – DRAFT," Mar. 27, 2006) at '598 (emphasis added).

247. Plaintiffs' experts' analyses show that [redacted]. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 110, Fig.III-8; PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023¶¶ 120-21, Figs. 5, 6. Even one of Defendants' experts admitted that all four Defendants' intermodal "FSC rates move closely together" during the Conspiracy Period. PX0637, Kalt Corrected MDL I Merits Rpt., March 1, 2013, ¶ 200.

248. Fuel surcharge payment coverage was substantially higher during the Conspiracy Period than during the pre-2003 period. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 166. PX0986, McClave MDL II Reply Rpt., Nov. 15, 2023, at 58 ("[redacted]").

249. During the Conspiracy Period, like their carload programs, Defendants sought to apply their intermodal fuel surcharges as broadly as possible, without exception, and credited their profits to that policy. See, e.g., PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 257 (agreeing that it "was the policy that when a legacy contract expired, a fuel surcharge was to be added."); PX0437, UPFSC 0051559 (UP presentation, "2005 Analyst Meeting", May 20, 2005), at '560, slide *3 (UP "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."); PX0806, UPFSC 0013015 (UP Presentation re "San Antonio Intermodal Facility Strategy, Apr. 11, 2005) at slide *3 ("Price improvement . . . driven by . . . Implementation of full fuel surcharge in International contract rates."); PX0807, UPFSC 0457242 (internal UP presentation, 2006), at '243 (describing negotiations with [redacted] "Their biggest concern is going from no fuel surcharge

to full intermodal surcharge which today stands at 22%, but we're not backing down"); PX0808, BNSF_II_03969515 (BNSF "2005-2009 Long Range Plan", Feb. 2, 2005) at slide 21 ("International profitability enhancement" called for "[f]uel cost recovery at 100%"); PX0082, BNSF-0326595 (BNSF internal email re "Fuel Surcharge Adherence," June 7, 2006) at 1 (BNSF conducted internal reviews to ensure "total FSC discipline on all [its] traffic," including intermodal); *see also* PX0809, BNSF_II_03913505 (BNSF draft presentation re "Consumer Products Fuel Surcharge Update," Sept. 27, 2004) at 12 ("Transition customers on non-standard programs to the •standard fuel surcharge program where possible"); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 195-96 (NS's policy of having "very broad and hopefully complete" FSC coverage applied to carload and intermodal traffic, as well as to both captive and non-captive shippers); PX0224, CSXFSC000672464 (email re "CSXI Fuel Surcharge" and presentation, "CSXI Fuel Surcharge," May 11, 2005), at 471 (stated CSX's intermodal policy of requiring application of "[f]ull Fuel Surcharge on all customers—No Exceptions!"); PX0802, NS_062204458 (internal NS email re "Fuel," July 11, 2006) at '458 (NS executives stressing in 2006 that NS's intermodal fuel surcharge scale would be the "starting point for any future contract renegotiations or new contracts.").

250. Defendants also began charging fuel surcharges where they had failed during the pre-Conspiracy Period. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 108, Fig.III-6. For instance, [redacted] but BNSF *never* [redacted] prior to the Conspiracy Period. *See* PX0884, [redacted]), at '900; PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023¶ 103. But during the Conspiracy Period, BNSF told [redacted] that it [redacted]

[redacted] and [redacted] *See* PX0885, BNSF_II_03982221 ([redacted]) at '221; PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 103. Likewise, during the Conspiracy Period (July 2004), BNSF [redacted] However, [redacted] [redacted] on the basis that, pre-conspiracy, [redacted] *See* PX0889, Bernheim & Marx MDL II Rpt. (NYK), Mar. 1, 2023, ¶ 284; PX0890, [redacted] July 12, 2004), at '195-96. Ultimately, [redacted] PX0812, [redacted] at '856, '859.

251. And when [redacted] during the Conspiracy Period, [redacted] PX0888, Papp (Maersk) Dep., June 9, 2022, at 102-104 [redacted]); PX1068, [redacted] ("[redacted]

[redacted]).

252. For example, when intermodal shipper NYK [redacted], the contract included [redacted] *See* PX0889, Bernheim & Marx MDL II Rpt. (NYK), Mar. 1, 2023, ¶ 285; PX0891, BNSF-0800523 ([redacted]); PX0892, NYK-00039994 (NYK email re BNSF meeting, Apr. 27, 2005), at '99; PX0893, Keller (NYK) Dep., Apr. 13, 2022, at 40-41; PX0812, Payne (NYK) Dep., Sept. 21, 2022, at 74-75. Similarly, in late 2006, when Yang Ming and BNSF [redacted], BNSF explained that [redacted]e). *See* PX0897, Bernheim & Marx MDL II Rpt. (Yang Ming), Mar. 1, 2023, ¶ 287; PX0900, Lee (Yang Ming) Dep., Sept. 27, 2022, at 47-48, 50; PX0904, BNSF-03982135 ([redacted]), at '142.

253. Likewise, when UP and MOL entered into a new contract in early 2005 that included [redacted]t, MOL [redacted], but UP responded that [redacted] PX0905, Bernheim & Marx MDL II Rpt. (MOL), Mar. 1, 2023, ¶ 286; PX0907, P_MOL_000014205 (Comments from Contract Meeting – MOL Western Region RFP UPRR Meeting, Feb. 10, 2005), at '206; PX0814, DeSimon (MOL) Dep., Sept. 7,

2022, at 93-94; *see also* PX0908, UPFSC_II_00524884 (MOL Meeting Summary, Feb. 24, 2005), at '884 ("[redacted]").

254. This is further corroborated by expert economic analysis that took into account the existence of individual negotiations on intermodal contracts and demonstrated that individual intermodal Plaintiff shippers were impacted by the conspiracy. *See, e.g.*, PX1083, Marx MDL II Rebuttal Rpt. (Crowley), Nov. 15, 2023, ¶¶ 48-49; PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 111-113.

255. Intermodal fuel surcharge concessions were negligible and immaterial during the Conspiracy Period, especially when compared to the pre-Conspiracy Period. [redacted] and, despite Yang Ming's vigorous efforts, [redacted], stating that [redacted] *See* PX0897, Bernheim & Marx MDL II Rpt. (Yang Ming), Mar. 1, 2023, ¶ 284; PX0898, BNSF_II_03982949 ([redacted]), at '951; PX0933, YML-00024484 ([redacted]), at '484-85; PX0899, YML-00029769 (email between BNSF and Yang Ming re [redacted]), at '769. Yang Ming also entered into agreements with CSX in 2004 and 2007 where CSX was unwilling to offer any improvement over its published fuel surcharge subject to a 1% discount. *See* PX0897, Bernheim & Marx MDL II Rpt. (Yang Ming), Mar. 1, 2023, ¶ 292; PX0902, YML-00054677 (Draft CSX contract effective June 1, 2004 to May 31, 2007), at '678; PX0900, Lee (Yang Ming)

Dep., Sept. 27, 2022, at 67:10-68:2, 68-69, 69:14-70:5; PX0903, YML-00021543 (CSX contract effective Aug. 1, 2007 to July 31, 2010), at '553.

256. Defendants [redacted] For example, [redacted] PX0886, P_MAERSK00002936 (email re BNSF Meeting 2006-11-02 and attached meeting minutes, Nov. 3, 2006), at '936; PX0887, Lagaay (Maersk) Dep., June 16, 2022, at 130:7-23. Maersk's Wim Lagaay stated that "[redacted] to which Pat Kinne [of BNSF] responded that [redacted] PX0886, P_MAERSK00002936 (email re BNSF Meeting 2006-11-02 and attached meeting minutes, Nov. 3, 2006), at '939-40; *see also* PX0887, Lagaay (Maersk) Dep., June 16, 2022, at 131:16-133:3 ("[redacted]"); PX0888, Papp (Maersk) Dep., June 9, 2022, at 101-02.

257. Intermodal shipper NYK in an exchange of letters between October 2005 and February 2006 similarly stated that BNSF's fuel surcharge formula was over-recovering its fuel costs. *See* PX0889, Bernheim & Marx MDL II Rpt. (NYK), Mar. 1, 2023, ¶ 286. NYK proposed [redacted]. PX0893, Keller (NYK) Dep., Apr. 13, 2022, at 41:19-56:3; PX0894, BNSF-648889 (letters from NYK to BNSF, Oct. 25, 2005, Nov. 18, 2005, Jan. 20, 2006), at '889-96; PX0895, BNSF-0648897 (letters from BNSF to NYK, Oct. 28, 2005, Dec. 13, 2005, Feb. 3, 2006), at '904; PX0896, BNSF_II_03924114 (letter from BNSF to NYK, Dec. 5, 2005), at '114-15. But BNSF indicated to NYK that [redacted], and BNSF's CMO John Lanigan explained that [redacted] PX0893, Keller (NYK) Dep., Apr. 13, 2022, at 65:5-66:9; PX0895, BNSF-0648897 (letters from BNSF to NYK, Oct. 28, 2005, Dec. 13, 2005, Feb. 3, 2006), at '904; PX0889, Bernheim & Marx MDL II Rpt. (NYK), Mar. 1, 2023, ¶ 286. In a later letter, BNSF's VP of International Intermodal Fred Malesa [redacted], stating that "[redacted]. PX0800, BNSF_II_04007073 (draft BNSF letter to NYK's Peter I. Keller, Dec. 5, 2005), at '073.

258. In March 2006, BNSF recognized internally that Defendants' coordination of fuel surcharges for intermodal shipments made them a "'profit-center' … for the customers that participate[.]" PX0020, BNSF_0691131 (presentation re BNSF Railway Fuel Surcharge—Comparison Of Class 1 Programs, Mar. 27, 2006), at '138; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 222 (BNSF recognized FSCs internally as "revenue maximization"); PX0769,

Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 153 (BNSF did not charge FSCs to a number of intermodal shippers prior to the conspiracy period, but by 2008, only three intermodal shippers were on non-standard FSC programs)

259. BNSF's "2005-2009 Long Range Plan" for "International profitability enhancement" called for "[f]uel cost recovery at 100%." PX0808, BNSF_II_03969515 ("2005-2009 Long Range Plan", Feb. 2, 2005), at slide 21. In 2004, BNSF noted that several of its largest pre-conspiracy intermodal contracts—which were also some of BNSF's largest contracts company-wide—had either heavily discounted fuel surcharges or none at all. PX0796, BNSF-0354762 (BNSF presentation re "Fuel Cost Recovery Analysis," May 12, 2004), at '776 (tracking expiration date of non-fuel-surcharge international intermodal contracts); PX0099, BNSF-0368425 (internal BNSF email re "SGB FSC Update" and attached presentation titled "BNSF Fuel Surcharge Update," Apr. 5, 2004), at '432 (same). BNSF conducted internal reviews to ensure "total FSC discipline on all [its] traffic," including intermodal. PX0082, BNSF-0326595 (BNSF internal email re "Fuel Surcharge Adherence," June 7, 2006); *see also* PX0809, BNSF_II_03913505 (BNSF draft presentation re "Consumer Products Fuel Surcharge Update," Sept. 27, 2004), at slide 12("Transition customers on non-standard programs to the standard fuel surcharge program where possible"); PX0020, BNSF_0691131 (Fuel Surcharge Comparison of Class 1 Programs, Mar. 27, 2006), at '138.

260. In fact, UP's finance department calculated a "recovery percentage" of 188% for its intermodal group for the first quarter of 2005. PX0430, UPFSC 0020640 (UP email re "1Q 2005 IMC Fuel Surcharge Recovery," Apr, 19, 2005), at '640.

261. Defendants' coordinated approach to intermodal fuel surcharge application resulted in greater fuel surcharge application. Plaintiffs' experts show that intermodal fuel surcharge

payment coverage was substantially higher during the Conspiracy Period. *See. e.g.*, PX0986, McClave MDL II Reply Rpt., Nov. 15, 2023, at 58 ("[redacted]"); PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 157-66; PX0985, McClave MDL II Rpt., Mar. 1, 2023, at 5-8.

262. Defendants, including CSX, also exchanged information about their fuel surcharge coverage progress on intermodal shipments. *See, e.g.*, PX0169, CSXFSC000000476 (internal CSX email chain re "Fuel Surcharge Overview Clarence 03," Oct. 9, 2003), at '476 ("The BNSF stated that 82% of their carload and intermodal business either had fuel surcharge or an escalator on the revenue.").

263. Rail freight is the only viable method for transporting international liners' cargo from ports to the vast majority of inland destinations. Trucks are more expensive and there are not enough trucks to service the volume of cargo coming off the ships. For example, [redacted] testified that [redacted] PX0812, [redacted] Dep., Sept. 21, 2022, at 20-21; PX0934, [redacted] Dep., June 28, 2022, at 48:5-14 (Maersk [redacted]); PX0814, [redacted] Dep., Sept. 7, 2022, at 20:7-22:11 ("[redacted]

[redacted]).

264. [redacted] PX0934, Kleijn (Maersk) Dep., June 28, 2022, at 48-49; *id.* at 49-50. [redacted] PX0813, Kelly (MOL) Dep. (Vol. II), Feb. 3, 2022, at 290-295; PX0815, Rubin (K Line) Dep., Aug. 29, 2022, at 69-70 ("[redacted]").

265. Competition from trucking was limited to shorter-haul (and lower weight) movements. As described by the American Association of State Highway and Transportation Officials, "Railroads handle the long-haul movement of large quantities of containers and trailers between major hubs such as seaports and major population centers, while truckers handle the short-haul movement to/from the customer's 'front door.'" PX0935, AAR-E-00076582 (American

Association of State Highway and Transportation Officials Freight-Rail Bottom Line Report), at 617; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 53-54; *id.* ¶ 49 ("rail transportation also is often the preferred mode of transport—even over relatively short distances—for" heavier shipments); PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 16.

266. Shipping distance affects the relative utility of rail versus trucking. As described by Glenn Eddy (VP in charge of intermodal transportation for Maersk), [redacted] PX1084, Eddy (Maersk) Dep., May 20, 2022, at 41; PX816, Nielsen (Maersk) Dep., June 20, 2022, at 21:21–23:11 ([redacted]); PX1085, Pan (Yang Ming) Dep., July 20, 2022, at 22:21-23:5 (Yang Ming would [redacted] PX1084, Eddy (Maersk) Dep., May 20, 2022, at 43 [redacted]).

267. The limited competition from trucking *decreased* during the Conspiracy Period. As one Plaintiff expert explained, due to highway congestion "during the Conspiracy Period there was not enough trucking capacity available to take meaningful share from Defendants. . . . All in all, there was little chance that any significant portion of Defendants' intermodal traffic along these

[long-distance intermodal] routes would be diverted to trucks during the Conspiracy Period." PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023 ¶¶ 25-27 & Fig.2.

**c. Defendants' Discussions and Meetings Encompassed Intermodal Traffic.**

268. At their meetings during the Conspiracy Period, Defendants' executives met and had far-ranging discussions—*none* of which carved out intermodal shipments or shippers—concerning fuel-surcharges, including an "industry position," "uniform application across the industry," and the "same process" at each of the four railroads. *See, e.g.*, PX0243, NS_001000422 (BNSF-NS Joint Marketing Meeting notes, July 30, 2003), at '424 ("John Lanigan and Don Seale agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next N.E.M.C. meeting"); PX0460, UPFSC 0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("Fuel surcharges → Uniform application across the industry would be helpful"); PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361 ("Discussion followed on fuel surcharges and various application processes as used by different roads. Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers. There was some question as to whether or not the industry can work together on this opportunity, probably through the AAR, or do roads have to handle the opportunity on a bilateral basis.").

269. Along these lines, Defendants did not approach application of their intermodal fuel surcharges differently from their other fuel surcharges during the Conspiracy Period. For example, UP's CMO Mr. Koraleski testified at deposition that, starting in 2003, UP moved away from "contract specific" application of fuel surcharges to intermodal traffic but to a "more general approach" that Koraleski referred to as "fuel surcharges on a uniform basis." PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 93-95 (in reference to March 12 email stating that "up until that time,

we were intermodal and we were contract specific in most cases, and now we were going to go to a more general approach" which Koraleski referred to as "fuel surcharges on a uniform basis"); *id.* at 277-78 (testifying that UP was "asking all customers for" the standard fuel surcharge program).

270. Defendants exchanged information about their fuel surcharge coverage progress on intermodal shipments. PX0169, CSXFSC000000476 (internal CSX email chain re "Fuel Surcharge Overview Clarence 03," Oct. 9, 2003), at '476 ("Clarence [CSX EVP of Sales and Marketing], Ward [CSX CEO] and Giftos [CSX Chief Commercial Officer] met with the BNSF last week. BNSF stated that 82% of their carload and intermodal business either had fuel surcharge or an escalator on the revenue.").

271. Defendants' senior intermodal executives participated in these meetings. BNSF CMO Lanigan attended and was responsible for "the intermodal . . . operations" of BNSF. PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 19. UP CMO Koraleski admitted that the intermodal group reported up to him. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 226; *see also* PX0733, Coalson (UP) Dep., May 25, 2011, at 16 (UP intermodal AVP agreeing that the "CMO or the CEO had the ultimate marketing and pricing responsibility for the intermodal group"). And NS CMO Seale testified that he oversaw the intermodal business. PX0596, Seale (NS) Dep., Feb. 26, 2010, at 281 (referring to input on fuel surcharges "from my vice-president of intermodal"); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 200 (testifying that the intermodal group reported to Seale); PX0818, NS_003001956 (NS org. chart, Apr. 25, 2005) at '2044. The same is true with respect to CSX, at which the president of CSX's intermodal division, CSXI, reported directly to Clarence Gooden, CSXT's EVP & Chief Commercial Officer, who oversaw both carload and intermodal fuel surcharges. PX0635, Jenkins (CSX) Dep., July 27, 2011, at 40 (CSX AVP testifying that Gooden served as the executive vice president for sales and marketing "for all of CSXT and

intermodal"); PX0729, CSXFSC000001106 (CSX organizational chart), at '106. CSX has acknowledged that Plaintiffs have always asserted that CSXI—CSX's intermodal affiliate—is part of the conspiracy. *See, e.g.*, PX0774, Johnson MDL II Rpt., Aug. 15, 2023, at 9 (mentioning CSXI 603 times in his report and stating that Plaintiffs' experts "offer opinions implicating CSX Intermodal . . . in the alleged conspiracy and finding damages from CSXI based on its revenue-based FSCs during the alleged conspiracy period"). All of these individuals participated heavily in the conspiratorial meetings regarding coordinating across-the-board fuel surcharges in order to increase all-in freight rates. *See, e.g.*, PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 19 (testifying that he was responsible "the intermodal . . . operations" of BNSF).

272. Beyond this, those directly overseeing the intermodal business on a day-to-day basis also participated in these unprecedented meetings. For example, NS's VP of Intermodal Mike McClellan attended the May 14, 2003 meeting between NS and UP executives at which they discussed "Fuel surcharges → Uniform application across the industry would be helpful." PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting reflecting attendance of Mike McClellan, NS intermodal executive, May 14, 2003), at '652, '661.

273. Defendants' internal documents and testimony expressly discuss implementation of the new fuel surcharge policy with respect to intermodal traffic. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 93-95 (in reference to March 12, 2003 email stating that "up until that time, we were intermodal and we were contract specific in most cases, and now we were going to go to a more general approach" which Koraleski referred to as "fuel surcharges on a uniform basis"); *id.* at 277-78 (testifying that UP was "asking all customers for" the standard fuel surcharge program); PX0224, CSXFSC000672464 (email re "CSXI Fuel Surcharge" and presentation, "CSXI Fuel Surcharge," May 11, 2005), at '471 (CSX intermodal policy requiring application of "[f]ull Fuel

Surcharge on all customers—No Exceptions!"); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 22 (NS's published or "preferred" FSC was "applicable across all lines of business"); *id*. 195-96 (NS's policy of having "very broad and hopefully complete" FSC coverage applied to carload and intermodal traffic, as well as to both captive and non-captive shippers). As one internal UP presentation noted, UP "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions." PX0437, UPFSC 0051559 (UP presentation, "2005 Analyst Meeting", May 20, 2005), at '560, slide 3.

### 16. Defendants' Conspiracy Included Fuel Surcharges on Coal.

274. Before the Conspiracy Period, Defendants struggled to apply FSCs to their carload traffic—especially coal traffic. For example, in January 2003, BNSF's EVP and CMO Chuck Schultz responded to a series of "Fuel Surcharge Questions" from CEO Matt Rose by presenting an analysis that showed that *zero* percent of BNSF's coal business was "surchargeable" at that time and concluding that, as to coal and other commodity groups, "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." PX0088, BNSF-0328865 (BNSF memo re "Fuel Surcharge Questions," Jan. 15, 2003), at '865-66.

275. Defendants applied their fuel surcharges on coal during the Conspiracy Period with the same goal as their conspiracy writ large: forcing shippers to accept fuel surcharges on "as many contracts as possible." PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 29-30 (agreeing that NS's coal business group "tried to negotiate the standard fuel surcharge into as many contracts as possible"); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 104 (explaining the interest in adopting FSCs because coal FSC adoption was heretofore low, so "if we could get some additional revenue by increasing the fuel surcharge coverage on coal, let's get it"); *id.* at 183 (discussing how CSX wanted to "continue to expand [FSC program] coverage to 100%"); PX1086, UPFSC0000301

(Comments of Robert Knight CFO of Union Pacific, Apr. 27, 2006), at '309 (referring to coal FSCs as "modifi[cations of the] surcharge schedule," not as separate FSCs for the coal business); PX0611, Knight (UP) Dep., July 9, 2010, at 38–39 (explaining that UP's "objective" was to have FSCs as "adequate fuel recovery mechanisms in every -- in every contract we negotiated"); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 186–187 (agreeing that, in early 2004, the directive from CEO Matt Rose was that the FSC structures "were attempting to increase the participation rate of all customers," including coal); PX0655, (Q2 2005 BNSF Earnings Call, Aug. 11, 2005), at 18 (stating publicly that BNSF's "zero tolerance policy" that "any contract it comes due will be renewed with a fuel surcharge" was taking longer for coal contracts given their lengthy nature); PX0932, UPFSC 0584356 (BNSF 2006 Q2 Earnings Call, June 25, 2006), at '363 (BNSF CEO: "we're getting [FSCs] in, as each one of those [coal] contracts comes up").

276. The impact on coal shippers was particularly acute because [redacted] PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 17. BNSF's pre-Conspiracy Period coal shipper participation rate for fuel surcharges was zero percent. PX0088, BNSF-0328865 (BNSF memo re "Fuel Surcharge Questions," Jan. 15, 2003), at '865. During the pre-Conspiracy Period, CSX, NS, and UP routinely waived fuel surcharges on coal. *See, e.g.*, PX1087, CSXFSC000513010 (email thread between CSX and South Carolina Public Service Authority, Nov. 15, 2002) at 010-011 (CSX waived all fuel surcharges and wrote off all past due amounts for fuel surcharges as part of negotiations for a new contract with South Carolina Public Service Authority); PX1088, NS 010014131 (NS email re "Fuel Surcharge", Feb. 16, 2000), at '131 ("fuel surcharges can be waived-depending on circumstances"). And [redacted]

[redacted] PX1089, Strnatka (NIPSCO) Dep., Mar. 2, 2022, at 20:1-25, 138:19-139:16; PX1090, Neff (Ameren) Dep., Feb. 10, 2022, at 78:21-25;183:25-184:7; 185:17-25; PX1147, P_AEE_00000223 (Rail Transportation Agreement ICC-UP-C-39455 between UP and Ameren Energy Fuels and Services), at '243-44 (Ameren-UP contract with AAR [redacted]).

277. Furthermore, the pre-Conspiracy Period competition for coal transportation was fierce. PX1091, BNSF-0574311 at '365 ("We have a price war going on in the West".); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 85-87 (testifying that one of the challenges in raising prices and railroad revenue growth was "a very, very rich history of railroad pricing wars."). This bore out in that coal rates declined 35% between 1985 and 2004. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 329 (citing PX0583, United States Government Accountability Office, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed," GAO-07-94, October 2006, at pp. 13-14 & n.11). However, during the Conspiracy Period that changed with [redacted], PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 451, and [redacted]. PX0974, Parsons (Southern Pltfs.) Dep., Nov. 4, 2021, at 19, 50-52, 54, 156, 158; Howell (Southern Pltfs.) Dep. 27, 194-199; PX1092, Mullins (Southern Pltfs.) Dep., Oct. 26, 2021, 114:23-115:5; PX1093, NS_010160064 (email between NS and NIPSCO on [redacted]), at '064; PX1094, P_NI_00006036 (communication between CSX and NIPSCO on [redacted]), at '036; PX1095, P_NI_00008507; PX1089, Strnatka (NIPSCO) Dep., Mar. 2, 2022, at 21:14-24; PX1090, Neff (Ameren) Dep., Feb. 10, 2022,

at 186:19-25, 189:11-191:10; PX1096, Simmons Dep., Sept. 16, 2022, at 92; PX1097, Browne (WEPCO) Dep., April 26, 2022, 20-21. [redacted]. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 329.

278. Defendants approached application of their fuel surcharge programs to coal traffic just as they did for carload traffic. The eastern railroads, CSX and NS, shipped coal using the *standard* carload fuel surcharges. *See* PX0340, NS_010162682 (NS-UP email re "NS Fuel Surcharge for unit coal trains," Oct. 5, 2005), at '682 ("We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."); PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574 ("***Changes to the policy***[:] • Everything is subject to fuel surcharge . . . • Exceptions elevated" (emphasis added)); PX0235, NS_001000124 (NS internal email re "Modified Fuel Surcharge—Coal and Merchandise," Jan. 8, 2004), at '124 ("[O]ur new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003. So, even though we will undoubtedly experience some customer opposition to the change, the formula is already in the market place, and our customers in the east will have a uniform application.").

279. UP described its fuel surcharge on coal as a mere "variation from the standard HDF program" it applied to carload shipments. PX0766, STB *Ex Parte* 661 Comments from Union Pacific Railroad Company, Apr. 27, 2006, at 11. When it modified its fuel surcharge on coal during the Conspiracy Period, it still viewed it as materially similar to its carload program. *See* PX0611, Knight (UP) Dep., July 9, 2010, at 90-91 ("Q. Okay. All right. Then -- then you wrote that Union Pacific's coal business has a separate fuel surcharge program. Do you see that? A. I do. Q. And you refer to something that occurred in November 2004. Do you see that? A. I do. Q. Now, that

fuel surcharge for the coal business was also HDF-based, correct? A. That's correct. Q. And it began at the same exact trigger point as the -- the carload HDF surcharge, correct? A. I believe that is correct. . . . Q. And -- and then up until $1.60 per gallon, the increase in both programs was exactly the same, correct? A. Again, I think -- I think that's right. Q. And then the only change from the standard HDF program is that after $1.60 per gallon, the -- this coal surcharge increase is slightly more, correct? A. That is correct.").

280. Defendants' discussions of fuel surcharge application did not exempt coal traffic. NS and UP discussed "fuel surcharges and various application processes as used by different roads," reaching "[c]onsensus . . . that it would be a positive outcome if all roads had the same process in the eyes of our customers" or NS and BNSF agreed to pursue a "potential industry position" on fuel surcharge application, they did not exempt fuel surcharges on coal from their ambition. PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361; PX0460, UPFSC 0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652; PX0243, NS_001000422 (BNSF-NS Joint Marketing Meeting notes, July 30, 2003), at '424. In fact, NS and UP's discussion of uniform fuel surcharge application immediately followed a general discussion on "the state of the economy and how it was reflected in business volumes by various commodities," including their "optimis[m] about coal volumes picking up." PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361.

281. Many of the same executives involved in Defendants' decisions to implement fuel surcharges on coal shipments were the same executives involved in general management policies, including those for carload FSCs. *See* PX0090, BNSF-0330835 (BNSF internal email re "Updated: Fuel Surcharge Review Team" and attachments, Mar. 13, 2003), at '835 (noting John Lanigan's

involvement evaluating FSC programs and analyzing issues with coal cost recovery); PX0243, NS_001000422 (BNSF-NS Joint Marketing Meeting notes, July 30, 2003), at '424 (John Lanigan discussing a "potential industry position on fuel surcharges" with Donald Seale); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 10 (vice-president of NS's coal group); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 31 (claiming to be "the inventor of . . . the fuel surcharge"); *id.* at 77 (noting his supervision over the coal group).

282. Though all railroads sought to impose FSCs on coal shipments, the issue was more pronounced at the Western railroads, UP and BNSF, [redacted]. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 109 ("[redacted]"); PX0249, NS 001001082 (NS email, July 1, 2005), at '082 (explaining that BNSF has greater length of haul compared to NS). In the western Powder River Basin coal region, sixteen mines produced 43% of all domestic coal. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 497 (citing U.S. Energy Information Administration data).

283. UP and BNSF both wanted to make more revenue from their coal business, as the proportion of coal contracts with fuel surcharges was among the lowest of all sectors. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 17; ("[redacted]"); *id.* ¶ 490 ("[redacted]"); PX0611, Knight (UP) Dep., July 9, 2010, at 38-39 (UP's "objective" was to have FSCs as "adequate fuel recovery mechanisms in every [] in every contract we negotiated"); *id.* at 252 (November 2003

"tongue-in-cheek" suggestion to raise coal rates by 50% was because "we need to be doing as good a job of increasing our returns -- which happens to be the lowest in our coal business . . . . "); PX0090, BNSF-0330835 (BNSF internal email re "Updated: Fuel Surcharge Review Team" and attachments, Mar. 13, 2003), at '835 (noting low fuel recovery rates for coal); PX0820, BNSF-0648196 (BNSF memo re "Fuel Cost Recovery Analysis," May 10, 2004), at '196 ("Due to the long-term nature of Coal contracts, Coal fuel surcharge coverage trails the other business groups by year-end 2008."); PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 194 (In early 2004, BNSF CEO Matt Rose "endorsed having a fuel surcharge and contracts, coal contracts having fuel surcharge clauses").

284. At the same time as BNSF and UP were considering their new fuel surcharges in 2004, the BNSF and UP CEOs had "several conversations" about a coal train trip the UP and BNSF organized for the STB. PX0633, Davidson (UP) Dep., Feb. 24, 2011, at 248-250; PX0538, UPFSC_0466673 (UP CEO Davidson calendar entry from March 24, 2004 about call with BNSF CEO "Matt Rose re: coal trip"). These discussions began in March 2004. BNSF and UP executives traveled together on this trip in August 2004. *See* PX0823, UPFSC_0367622 (Richard K. Davidson Expense Report) at '622-26 (showing UP CEO's travel on August 3, 2004 as part of the Powder Basin joint coal trip); PX0821, UPFSC_0585694 (Agenda for Powder River Basin Train Trip) , at '694-95; PX0822, UPFSC_II_00310203 (UP internal email re STB trip to PRB in August 2004) , at '203-04; PX0633, Davidson (UP) Dep., Feb. 24, 2011, at 24, 248-50. During this period, Defendants' senior executives also met regularly during and on the sidelines of AAR meetings. *See, e.g.*, PX0931, UPFSC 0339562 (Ike Evans (UP) monthly calendar), at '562 (calendar entry for June 17, 2004 "AAR CEO" dinner).

285. These discussions paralleled BNSF and UP's public communications to each other, which began in early 2003. Before then, price negotiations for coal shipping contracts had been confidential. *See* PX0881, Brandl (UP) Dep., Mar. 1, 2018, at 40-41 ("Now, before UP introduced 111, it entered into individually negotiated contracts with its coal shipping customers; isn't that correct? A. That is correct. Q. And the -- those contracts were confidential between the shipper and UP; isn't that correct? A. That is correct."); PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 13, 2023), ¶ 57 [redacted]"); PX0824, Richie (Oxbow) Dep., Dec. 15, 2017, at 85-86. However, in January 2003, BNSF published Tariff 90068, revealing previously confidential rates for its coal customers. PX0825, UPOX000049109 (Tariff 90068); PX0826, UPOX000115757 (UP discussion notes on BNSF Tariff 90068), at '761–62. BNSF acknowledged that the public pricing meant BNSF's rates were available at some point to its PRB competitor, UP. PX1098, Meyne (BNSF) Dep., Mar. 15, 2022, at 238.

286. UP immediately convened meetings to analyze this new, public tariff and began regularly reviewing BNSF's tariff to track changes on an ongoing basis. PX0826, UPOX000115757 (UP discussion notes on BNSF Tariff 90068), at '761-62. UP Vice President and General Manager Lance Fritz pitched a similar strategy to UP's Board of Directors, focused on "transparent" pricing and departing from head-to-head competition. PX0827, UPOX000114501 (UP energy business team presentation), at '512. UP issued its own public pricing program for coal shipments (Circulars 111 and 112) in early 2004. *See generally* PX0828, UPOX000115969 (UP Circular 111); PX0829, UPOX000087492 (UP Circular 111); PX0881, Brandl (UP) Dep., Mar. 1, 2018, at 40–41.

287. Against this backdrop, By the end of 2004 (at which time the FSC conspiracy was in full swing), BNSF and UP—the primary shippers of U.S. coal—[redacted] See PX0785, Elzinga Rpt., July 9, 2018 (corrected Aug. 7, 2018), at 65.

288. BNSF and UP initially used their standard fuel surcharges for coal, but in 2004 increased the fuel surcharges on coal shipments in ways that were nearly identical to each other and that differed only in minor ways from their respective carload programs. UP's and BNSF's new FSCs on coal shipments were modeled after Defendants' carload FSC programs, adopted just a year earlier. PX0611, Knight (UP) Dep., July 9, 2010, at 90-91 ("Q. [Y]ou wrote that Union Pacific's coal business has a separate fuel surcharge program. Do you see that? A. I do. Q. And you refer to something that occurred in November 2004. Do you see that? A. I do. Q. Now, that fuel surcharge for the coal business was also HDF-based, correct? A. That's correct. Q. And it began at the same exact trigger point as the -- the carload HDF surcharge, correct? A. I believe that is correct. . . . Q. And -- and then up until $1.60 per gallon, the increase in both programs was exactly the same, correct? A. Again, I think -- I think that's right. Q. And then the only change from the standard HDF program is that after $1.60 per gallon, the -- this coal surcharge increase is slightly more, correct? A. That is correct.").

289. Both carriers had adopted functionally equivalent fuel surcharge programs on coal. PX1099, BNSF-FSC000532 (Item 3380), at '532; PX0734, UPFSC0001251 (UP internal email, Sept. 13, 2004), at '251; *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 106 ("[I]n the months following November 2004, when UP implemented of its Conspiracy Period program, the HDF price varied between $1.90 and $2.50 per gallon. As a result, the difference in

the fuel surcharge percentages for the two programs was approximately 1.2% on average [during this initial time period], compared to 13%–14% for the average surcharge.”).

290. BNSF’s fuel surcharge on coal started at .5% if HDF hit $1.24 (one penny less than BNSF’s carload trigger price of $1.25 HDF), and increased by 0.5% for every $.04 increase in HDF (while BNSF’s carload fuel surcharge likewise started at 0.5% and ascended by 0.5% for every $.05 increase in HDF). *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, fig.III-5; PX0734, UPFSC0001251 (UP internal email, Sept. 13, 2004), at ‘252 (new scale); PX0735, UPFSC0001272 (UP internal email re “fuel surcharge modification,” Oct. 1, 2004), at ‘274 (new scale).

291. UP’s fuel surcharge on coal started at 1.5% if HDF hit $1.35 (as did UP’s carload fuel surcharge) and went up by 0.5% for every $.05 increase in HDF (as did UP’s carload fuel surcharge)—until $1.60 HDF, at which point it went up by .75% for every $.05 increase in HDF. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, fig.III-5; PX0734, UPFSC0001251 (UP internal email, Sept. 13, 2004), at ‘252 (new scale); PX0735, UPFSC0001272 (UP internal email re “fuel surcharge modification,” Oct. 1, 2004), at ‘274 (new scale).

292. UP’s $1.35 trigger price for its coal traffic fuel surcharge was immaterially different from BNSF’s. By summer 2004, when their fuel surcharges on coal first began, HDF was well above $1.25 (BNSF) and $1.35 (UP)—where it stayed throughout the Conspiracy Period. PX0785, Elzinga Rpt., July 9, 2018 (corrected Aug. 7, 2018), at 55 [redacted]). Defendants’ expert, Professor Dennis Carlton conceded as much:

Figure 6

**UP's and BNSF's Public Surcharges Applied to Coal**

Rate-Based: July 2003 – December 2005




PX0929, Carlton Corrected *Oxbow* Rpt., Nov. 16, 2018, at 18 fig.6. Dr. Carlton's chart shows that following UP's adoption of coal FSCs, the BNSF and UP FSCs on coal shipments moved in virtual lockstep and during the overall Conspiracy Period; the average difference between the carriers' monthly FSCs they applied to their coal traffic during the Conspiracy Period was just over two percentage points. PX0989, Jacobs Reply Rpt., Dec. 21, 2023, ¶ 75. This differential was merely a drop in a much larger bucket of BNSF and UP price increases that coal shippers reported to the STB during the Conspiracy Period. *See* PX0930, STB Ex Parte No. 705, Statement of Western Coal Traffic, *Competition in the Railroad Industry*, Apr. 13, 2011, at 16 ("[B]etween 2003 and 2010 the going rate level for coal transportation [for competitive PRB traffic] nearly tripled.").

293. After UP's announcement in November 2004 that [redacted], Defendants' [redacted]. PX0830, Frankel Rpt., July 9, 2018, at ex. 1c.

294. [redacted] PX0819, Jacobs MDL II Rpt.,

Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 445. [redacted]. *Id.* at ¶ 497 (Figure VI.3. shows [redacted]).

295. Even though BNSF and UP [redacted], they were still able to [redacted]. PX0785, Elzinga Rpt., July 9, 2018 (corrected Aug. 7, 2018), at 58.

296. As BNSF and UP adopted their FSC programs on coal shipments, NS and CSX—which shipped much less coal—began to include much more coal shipments in their FSC programs. PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 23 (But you would agree with me at this time [in October 2005] the majority of the coal business group's business used the standard fuel surcharge? . . . THE WITNESS: Well, I can agree that at that time we had a fuel surcharge that we were trying to implement in our contracts."); *id.* at 36-37 (Q. Okay. Do you have a general sense of how [the Coal Business Group] did in terms of increasing fuel surcharge coverage from 2004 onward? . . . THE WITNESS: I know that periodically -- I mean, I know it increased. Yes. As contracts expired, we put fuel surcharges in. And so I know it increased."); PX0831, Jenkins (CSX) Dep., Aug. 24, 2010, at 105-106 ("Q. Yes. And does this chart show that the coal group's fuel surcharge coverage was approximately 20 percent in 2004? A. Yes. Although, I'm not certain, and maybe it's here in these tables of numbers, what the adjustments for Duke, Santee Cooper, and Progress mean. Q. Okay. Well -- A. And those are big customers, so it would have an influence on the percentages. Q. Okay. And am I correct that according to this chart that the coal group

projected that the fuel surcharge coverage would reach 83 percent by the end of 2008? . . . THE WITNESS: Yeah. I guess that's a projection, but I -- we would have to look at when this graph was prepared. It's certainly the case that it looks like it was prepared prior to 2008, so it would be a projection."); PX0180, CSXFSC000006857 (internal CSX email re "FSC coverage graphs," Jan. 20, 2006), at '858 (showing increase in fuel-surcharge application on CSX shipments, including coal); PX1100, NS_010002352 (NS internal presentation, Jan., 10 2006) at '365 (showing 99.4% of the Utility South Coal Business Group's volume covered by fuel surcharge); *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 17 ("[redacted]").

297. When BNSF implemented more aggressive FSCs on coal in July 2004, NS could simply "leave" the FSC formula for coal (and other commodity groups) "as is" because it was working as expected to generate substantial revenues : "At present the [NS] FSC and fuel hedging programs combine to protect fuel prices with an approximate 200% effectiveness. That is, the two programs combine to offset by two times the negative operating income impact of higher spot fuel prices." PX0297, NS_010034936 (NS internal email re FSC Options, July 16, 2004), at '936, '942.

298. [redacted]. PX0989, Jacobs Reply Rpt., Dec. 21, 2023, fig. II.10.

299. Customers did not view Defendants' carload and coal programs as differing in any significant way. PX0666, STB Ex Parte 661, Comments from Western Coal Traffic League, Apr. 27, 2006, at 8–9 ("UP and BNSF's programs have similar characteristics. . . . Both UP and BNSF

are aggressively implementing their fuel surcharge programs and they have been very successful in collecting fuel surcharges.”). And economic analysis shows [redacted]. *See* PX0817, Bernheim MDL II Rebuttal Rpt. Fig.III-4; PX0830, Frankel Rpt., July 9, 2018, at ex. 1c; PX0929, Carlton Corrected *Oxbow* Rpt., Nov. 16, 2018, at 18 fig.6.

300. As a result, the application of FSCs to Defendants' coal traffic increased considerably during the Conspiracy Period. PX0612, Gooden (CSX) Dep., July 16, 2010, at 203-04 (testifying that coal FSC coverage went up from 20% in 2004 to 55% by the end of 2007, and was projected to reach 83% by the end of 2008); PX0072, BNSF-0048722 (BNSF email re "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 (showing 100% of new or renewed coal price authorities received the standard FSC in prior six months). Within a year of its change, BNSF had achieved "record" revenues for its "coal segment, even with slightly lower volumes" of traffic, and it publicly pointed to FSCs as a source of that growth. PX0655, (Q2 2005 BNSF Earnings Call, Aug. 11, 2005), at 1, 3.

301. Defendants' coordinated conduct allowed Defendants to apply FSCs on coal traffic broadly, over the resistance of coal shippers and regardless any specific formula. For example, the Western Coal League explained to the STB in October 2006 that Defendants "have apparently decided to move away from the RCAF (at least insofar as incorporating the RCAF's fuel index) by implementing more lucrative fuel surcharges mechanisms that have operated to the economic detriment of their customers and the Nation's commerce." PX0928, BNSF-0655729 (Comments of the Western Coal Traffic League), at '739.

### C. Defendants Enforced Their Conspiratorial Fuel Surcharges

#### 1. Defendants Coordinated to Apply and Enforce Rail Freight Surcharges Across Their Customers Uniformly, Across-the-Board, and Without Exception

302. As discussed further below, starting in the conspiracy period, Defendants sought universal implementation of rate-based fuel surcharges virtually without exception. *See, e.g.*, *infra* ¶¶ 318–320, 330, 333, 346, 348, 356.

303. Once the Defendants began coordinating their fuel surcharges in 2003, Defendants told shippers that the fuel surcharges were mandatory and not negotiable. *See* PX0832, P_ARS00006589 (Email re Norfolk Southern Meeting April 24-25, 2005), at '590 [redacted]"); PX0833, NS_010014618 (NS internal email re "TOTAL – Midwest Forward Storage Proposal (1st Revised Offer," May 20, 2005)) at '618 (NS [redacted]); PX0834, NS_010019411 (NS internal email re "Air Products," Jan. 12, 2006), at '411 (NS told Air Products, [redacted]); PX0835, NS_010127556 (NS internal email re "US Steel------Fuel surcharge and finance charge," Mar. 9, 2004), at '556 (NS employee informing coworkers to [redacted]); PX0836, NS-MDLII-00010681 (NS-NLMK email re "Slab Rail Rates – NS 18381," Aug. 17, 2005), at '684 (NS told NLMK that [redacted]); PX0923, NS _010161012 (Exelon email re "Exelon Rail Contract," Dec. 20, 2004), at '012 (NS responded to Excelon's negotiation that [redacted]); PX0837, BNSF-0029519 (BNSF email re "Fuel Surcharge," Oct. 21, 2004) at '521 (BNSF told Georgia Gulf Corporation, "[t]he fuel surcharge is now mandatory at BNSF for any and all contracts"); *see also id.* (internal BNSF email stating,

"[b]elieve me, no one wants to be an author of a price authority without FSC."); PX0838, BNSF-0783834 ([redacted], [redacted]); PX0839, CSXFSC000149573 (CSX-Degussa email re "Degussa Master Contract for CH & AG & Fuel Surcharge," Sept. 27, 2005), at '573 (CSX advised Degussa that the FSC "was an item which was not negotiable"); PX0840, CSXFSC000153223 (CSX internal email re "Response to Jerri Baker Email - P&G Contract; Fuel Surcharge," June 16, 2003), at '223 (CSX internally reported pushback from customers including P&G, but determined it was "willing to hold firm on our current fuel surcharge and tell P&G that it's non-negotiable"); PX0841, UPFSC_II_00038265 (UP internal email re "Weyerhaeuser Offsets," Jan. 21, 2004), at '265 (UP reported telling Weyerhaeuser that [redacted]); PX0842, UPFSC_II_00458845 (UP internal email re "Proposed UP Scrap Doc," Nov. 3, 2004), at '846 (UP told IPSCO [redacted]); PX0924, UPFSC_II_X_00004853 (email re "WEPCO Comments on Circ. 111 - Oak Creek and Pleasant Prairie," Dec. 16, 2004), at '856 (response from UP to WEPCO's [redacted]); PX1101, UPFSC_II_00185191 (email re "Response to SA RFP Questions," Apr. 8, 2005), at '192 (UP email: [redacted]); PX1102, P_SO_00004939 (email re [redacted] because [redacted]); PX1103, TMS-00000329 (BNSF letter to Toyota Logistics Services re: "rate requirements," May 16, 2005), at '329 (BNSF letter:

[redacted]); PX1104, NS-MDLII-00126889 (email re "GA Power - Charleston, SC to Hammond, Wansley and Yates," April 18, 2006), at '889 (NS told Southern that [redacted]); PX1105, P_AEE_00001689 (UP Ameren Meeting – Omaha), at '692 (UP told Ameren that the [redacted]); PX1090, Neff (Ameren) Dep., Feb. 10, 2022, at 189-91 (BNSF and UP told Ameren [redacted]); PX1106, P_NI_00008834 (email re "Approved Transportation Contract," June 21, 2004), at '837 (NS told NIPSCO [redacted]); PX1093, NS_010160064 (email between NS and NIPSCO on [redacted]), at '064 ("[redacted] PX1094, P_NI_00006036 (communication between CSX and NIPSCO on [redacted]), at '036 (CSX refused NIPSCO's request to [redacted], telling NIPSCO that [redacted]); PX1095, P_NI_00008507 (letter from NIPSCO re "Union Pacific Railroad Circular," May 3, 2005), at '507 (UP refused to negotiate [redacted]); PX1089, Strnatka (NIPSCO) Dep., Mar. 2, 2022, at 21 (NS [redacted]).

304. Plaintiff US Magnesium's experience is reflective of the sudden shift. US Magnesium's master contract with UP [redacted]. *See generally* PX0459, UPFSC_0615263 (UPRC Signed Contract UP-C-36937, Jan. 1, 2000). In December 2002, while negotiating [redacted], a UP sales representative

suggested that US Magnesium should [redacted]. US Magnesium objected, and UP [redacted]. PX0546, USM005467 (US Magnesium-UP email chain re Master contract, Dec. 19, 2002) at '647 (confirming [redacted]). But the next year when [redacted], UP refused to negotiate [redacted]. The UP salesperson informed U.S. Magnesium that [redacted] PX0547, USM005663 (Email re "Contract Renewal," Dec. 22, 2003), at '663 (emphasis added).

305. NS and Exxon's October 2003 negotiations similarly reflect [redacted]. When the contract came up for renewal in the Conspiracy Period, NS proposed [redacted]. PX0927, P_EXXON00003424 (ExxonMobil Rail Freight NS Review Power Point Presentation, May 20, 2004) at 9. Exxon determined that [redacted] *Id.* at 10; *see also* PX0882, P_EXXON00002860, (email re "June 30, 2004 SCC Minutes," Sept. 18, 2004) at '862 ("[redacted]"). When Exxon [redacted], NS [redacted]. PX0883, NS_010034533, (NS internal email re "Update: ExxonMobil traffic Bid," June 2, 2004) at '533 ("[redacted]

[redacted]").

306. Customer after customer told the STB that fuel surcharges were non-negotiable when it was investigating Defendants' rate-based fuel surcharges. For example, **AES Corporation:** "[T]he incorporation by reference of a carrier's 'public' fuel surcharges into a new contract is typically made with no modifications, over the strong objection of the shipper, and such inclusion is mandated on a 'take it or leave it basis.'" PX0577, STB Ex Parte 661, Comments of the AES Corporation, Apr. 27, 2006, at 14; *see also* PX0581, STB Ex Parte 661, Transcript, May 11, 2006, at 104 ("Acceptance of the tariff fuel surcharge is presented on a take it or leave it basis, non-negotiable."); *id.* ("[T]he fuel surcharges have been imposed in addition to significant base-rated increase [sic] as AES' rail transportation contracts have come up for renewal in the past several years."); **Alliance of Automobile Manufacturers:** "The Alliance finds that some of the railroads' unwillingness to justify their surcharge methodologies is frustrating. Our attempts to obtain supporting documentation have been rebuffed. Surcharges have become 'non-negotiable,' enacted by unilateral decree." PX0579, STB Ex Parte 661, Statement of Alliance of Automobile Manufacturers, May 11, 2006, at 3; **Ameren Energy:** "The requests for supporting documentation basically are rebuffed and the surcharges have become non-negotiable." PX0581, STB Ex Parte 661, Transcript, May 11, 2006, at 121; **American Chemistry Council:** "[T]here's no negotiation on fuel surcharges today. It's a take it or leave it thing. You want this—you want to move your goods. Here's the price and oh, by the way, you will pay a fuel surcharge and we'll publish that arbitrarily without any discussion with you whatsoever." *Id.* at 242; **Edison Electric Institute:** "There is a widespread perception that large companies such as utilities or other rail shippers are fully capable of protecting their interests with the railroads because the firms are all large and have

the resources to do so. That is completely flawed logic . . . The very fact that railroads could systematically, and substantially, over-recover for their fuel costs is vivid proof of their market power, and the abuses of it that the railroads have committed." PX0586, STB Ex Parte 661, Comments Edison Electric Institute, Apr. 2, 2007, at 3; **Griffin Industries Inc.:** "[A]ll of the roads have nearly identical methods of determining and levying fuel surcharges. . . . The 'take it or leave it' attitude we have seen has made this situation even more unacceptable." PX0582, STB Ex Parte 661, Comments from Griffin Industries, May 11, 2006, at 1, 3; **Mittal Steel USA:** "[T]hese surcharges are presented as a 'take it or leave it' proposition." PX0576, STB Ex Parte 661, Comments from Mittal Steel, Apr. 27, 2006, at 5; **Western Coal Traffic League:** "UP reports that its 'fuel surcharge will be included on all repriced business' and that all of its newly negotiated 'long-term contracts' will include UP's 'standard fuel surcharge.'" PX0666, STB Ex Parte 661, Comments from Western Coal Traffic League, Apr. 27, 2006, at 22; **Dyno Nobel Inc.:** [redacted] PX1107, Godfrey (Dyno) Dep., Nov. 10, 2021, at 118:19-20; **Wisconsin Elec. Power Co.:** [redacted] PX1097, Browne (WEPCO) Dep., Apr. 26, 2022, at 21; *see also infra* ¶¶ 321, 332, 347, 357.

307. Once the Defendants began coordinating their fuel surcharges in 2003, variations from the coordinated fuel surcharges were infrequent. *See, e.g.*, *infra* ¶¶ 322, 335, 349, 358.

308. The infrequent variations from the coordinated fuel surcharges were negotiated from the inflated baseline set by the coordinated fuel surcharge. *See, e.g.*, *infra* ¶¶ 323, 334, 350, 359.

309. Likewise, once the Defendants began coordinating their fuel surcharges in 2003, Defendants adopted a common policy of not discounting base rates to offset fuel surcharges. *See, e.g.*, *infra* ¶¶ 324, 336, 351, 361.

310. Defendants also each centralized approval of any exceptions to their fuel surcharges within the most senior management. *See, e.g.*, *infra* ¶¶ 325, 331, 352, 360.

311. Once the conspiracy was underway, Defendants also each tracked their progress toward achieving 100% fuel surcharge coverage during the conspiracy period. *See, e.g.*, *infra* ¶¶ 326–327, 338, 353, 362.

312. Defendants each succeeded in substantially increasing their fuel surcharge coverage during the conspiracy period. *See, e.g.*, *infra* ¶¶ 328, 339, 354, 363.

313. Plaintiffs' expert Dr. Douglas Bernheim used Defendants' transaction data to "demonstrate that fuel surcharge payment coverage increased dramatically during the" conspiracy. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155. The following graph shows the dramatic change in fuel surcharge coverage during the conspiracy:

**Figure IV-14: Frequency of fuel surcharges**[245]



*Id.* Fig.IV-14; *see also id.* ¶ 166 (graphical analyses showed that "fuel surcharge payment coverage was substantially higher during the Conspiracy Period than during the Benchmark Period, and had not been rising systematically to any substantial degree prior to the Conspiracy Period"); *id.* ¶ 173 (graphical analyses showed that "fuel surcharge revenues (as a percent of net revenues) were substantially higher during the Conspiracy Period than during the Benchmark Period, and had not been rising systematically to any substantial degree prior to the Conspiracy Period."). Economic regression analyses confirmed that Defendants' increased fuel surcharge coverage was not attributable to changing fuel prices, changing fuel price volatility, or a preexisting trend. *Id.* ¶ 183 ("[T]here was a substantial increase in the Defendants' use of fuel surcharges during the first five quarters of the Conspiracy Period. This change is not explained by the economic factors that would govern fuel surcharge usage in a competitive setting and to which the Defendants have pointed in other venues: movements in the price of diesel fuel and its volatility. The sharpness and suddenness of the change implies the existence of a break in behavior, for which the cartel is the only available explanation. There is no evidence of a pre-existing trend during the Benchmark Period sufficient to account for the observed increase in the Defendants' use of fuel surcharges."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 175 ("The large increases in FSC coverage that occurred notwithstanding the rapidly rising fuel prices suggest a strong shift in pricing power to the railroads during this period—a shift of the sort that collective coordination in pricing would create.").

314. Plaintiffs' expert Dr. James T. McClave analyzed Defendants' data and "measure[d] the change . . . in the number of Plaintiffs' Price Authorities containing FSCs," finding that [redacted]. PX0985, McClave MDL II Rpt., Mar. 1, 2023, at 5-6. Similarly, he found

that [redacted]. *Id.* at 6. The following graph shows the dramatic change in fuel surcharge coverage during the conspiracy:

[redacted]

*Id.* at 6 fig.1. He prepared similar figures for each Plaintiff that retained him, illustrating [redacted]d. *Id.* App'x A & figs.A.1-A.37 (demonstrating [redacted]). For example, during the pre-Conspiracy Period, [redacted]:

[redacted]

*Id* at App'x A fig.A.5.

315. Dr. McClave also prepared a table showing the difference in FSC coverage between the pre-Conspiracy and Conspiracy Periods over three metrics (percent of FSC PAs, percent of revenue associated with FSC PAs, and the percent of shipments on FSC PAs), showing [redacted]

[redacted]

*Id.* at 7 tbl.1. And he prepared a table showing consistent results for Plaintiffs on a Defendant-by-Defendant basis. PX0986, McClave MDL II Reply Rpt., Nov. 15, 2023, App'x A tbls. A-1-A-37 (demonstrating [redacted]). For example, FSC coverage [redacted]:

[redacted]

*Id.* at App'x A tbl.A.11. He concluded that, "Defendants' data clearly establish that for Plaintiffs, [redacted] PX0985, McClave MDL II Rpt., Mar. 1, 2023, at 7.

316. Plaintiffs' expert Dr. Jeffrey J. Leitzinger analyzed the "[redacted]" finding that:

a. BNSF's coverage increased [redacted]

b. CSXT's coverage increased for [redacted]

c. NS's coverage increased for [redacted]

d. UP's coverage increased [redacted]

PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 171.

317. The mere fact that Defendants may have in some instances negotiated certain FSCs (rather than simply apply their standard formula), or in other instances may not have ultimately required an FSC, in no way undermines the existence of the alleged conspiracy. To the contrary, it is entirely unsurprising that Defendants did not achieve perfect 100% standard FSC application, despite their best efforts. PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 108-111.

**a. BNSF**

318. Following the meetings and coordination with other Defendants discussed above, BNSF in early 2003 began implementing its fuel surcharge program more widely and without exception—what BNSF called a "zero tolerance policy," a "New Methodology," and a "recent major change[] in our fuel surcharge program[]." PX0655, (Q2 2005 BNSF Earnings Call, Aug. 11, 2005), at 18 (BNSF implemented a "zero tolerance policy" whereby "[a]ny contract it comes due will be renewed with a fuel[]surcharge," and BNSF stated as of August 2005 that it had "been in that mode for a year-and-a-half"—that is, since early 2003); *see also* PX0083, BNSF-0326832 (internal BNSF email re "Publication and No Fuel Surcharge," Mar. 3, 2005) at '832 ("Fuel Surcharge application is a critically important item to the company and it is the intent of our Sr. Management that every price authority should contain FSC provisions."); PX0142, BNSF-FSC_000488 (BNSF internal email re "Fuel Analysis 3-11-04," Mar. 11, 2004), at '488 (summarizing CEO Matt Rose's instructions that "[a]ll contracts should have a fuel surcharge clause"); PX0140, BNSF-FSC_000469 (BNSF Fuel Surcharge Script, May 2, 2003), at '471 ("***Roll out of New Methodology*** . . . Participation rates will increase as opportunities present themselves

by price authority. The delegation of authority has been moved to the Vice President level in carload business units.") (emphasis added); PX0122, BNSF-0570919 (internal BNSF email re "Revisions to Best Pricing Practices," Apr. 24, 2003), at '921 ("All new prices should be subject to the fuel surcharge. All existing prices should be attempted to be modified to include the fuel surcharge as they come up for negotiation. Any prices that do not include the fuel surcharge will require your Vice President's approval."); PX0105, BNSF-0404221 (BNSF Price and Fuel Escalation General Guidelines, Jan. 2004), at '221 ("Every Contract should include a fuel surcharge clause. All new and all renewing contract negotiations should have a fuel surcharge as the goal . . . All other exceptions such as Discounted Fuel Surcharge programs need approval from appropriate Group Vice- President."); PX0141, BNSF-FSC_000486 (BNSF memo re "Status of BNSF Fuel Surcharge Programs," July 1, 2003), at '486 ("[P]lease find below a summary of recent major changes in our fuel surcharge programs (i.e., in boldface text) . . . ***Participation rates will be increased as opportunities present themselves by price authority*.** Lumber and Panel Products were added to the program."); PX0080, BNSF-0325449 (BNSF internal memo re "Fuel Cost Recovery Analysis," May 28, 2004), at '449 ("Mandate for Fuel Surcharge Programs. The Marketing Team should strive for 100% of fuel coverage by account."); *id.* at '453 ("Marketing Team should strive for 100% fuel coverage by account. Every price authority should have a fuel surcharge applied. All contracts should have a fuel surcharge clause. *All contracts requiring CEO's signature will not be signed without provisions for total fuel coverage*."); PX0057, BNSF-0029497 (internal BNSF email re "10-11-04 JPL Staff Meeting Minutes," Oct. 19, 2004), at '497 (conveying request to create summary of "any new or extended Industrial Product price authority . . . that did not have FSC", and "all IP price authorities due to expire in 30-60-90 days, that do not currently have a FSC, but will need to have one included going forward . . . They obviously want

to draw more attention to application of the FSC and zero exceptions will be the goal."); PX0055, BNSF-0028786 (BNSF Fuel Surcharge Review Team Recommendations presentation, Apr. 14, 2003), at '789 ("Improve percent of revenue base that is surcharged (Participation rates)"); PX0072, BNSF-0048722 (BNSF email re "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 210 (agreeing that "mandate" was that "marketing team should strive for 100 percent fuel coverage"); *id.* at 231-32 ("adherence reports" were a means of tracking "whether we're achieving the level of participation rates"); *id.* at 235-36 (agreeing that "goal was to achieve 100 percent coverage"); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 182-90 (document stating that "Every contract should include a fuel surcharge clause" correctly stated BNSF policy, and agreeing that CEO Matt Rose had an expectation that the marketing team "should strive for 100 percent" fuel surcharge coverage); *id.* at 208-09 (agreeing that "zero exceptions" was BNSF's goal); PX0625, Jacobowski (BNSF) Dep., Aug. 12, 2010, at 23 (agreeing that BNSF's "goal was to apply the standard fuel surcharge to 100 percent of [its] shippers," that "any exceptions had to be approved by senior management," and that he "worked hard to meet those goals"); PX0613, Rose (BNSF) Dep., July 16, 2010, at 77-78 ("certainly, it was our marketing guidance as well as the spirit of what we were trying to do to apply fuel surcharges to every contract," and "I don't recall signing any . . . contracts that didn't have a fuel surcharge"); PX0580, Transcript of Surface Transportation Board Public Hearing, Rail Fuel Surcharges, Ex Parte No. 661, May 11, 2006, at 272 ("Our surcharge program is the same for all customers, and it's highway diesel fuel and then it starts at $1.25 . . . ."); PX0323, NS_010073115 (internal NS email re "7/10 Fuel Surcharge Meeting – Background Info," July 3, 2003), at '115 (BNSF "FSC has been in effect for a long time, but [BNSF] only began aggressively

applying within the last year."); PX1108, Epich (BNSF) Dep., Mar. 22, 2022, at 85 (testifying that [redacted]).

319. BNSF's CEO began demanding a "quarterly review of all price authorities issued without a FSC because he feels all of they [sic] should all have them." PX0837, BNSF-0029519 (BNSF email re "Fuel Surcharge," Oct. 21, 2004) at '521. BNSF's negotiators understood the implication: "Believe me, no one wants to be an author of a price authority without FSC." *Id.*

320. BNSF began implementing its fuel surcharge program to swaths of commodity groups to which no fuel surcharge previously applied. PX0140, BNSF-FSC_000469 (BNSF Fuel Surcharge Script, May 2, 2003), at '470 ("The fuel surcharge has increased with higher HDF prices, and it is impacting more of our customers as additional commodity groups have been added to the program."); PX0141, BNSF-FSC_000486 (BNSF memo re "Status of BNSF Fuel Surcharge Programs," July 1, 2003), at '486 ("*Participation rates will be increased as opportunities present themselves by price authority*. Lumber and Panel Products were added to the program."); *see also* PX0084, BNSF-0327011 (BNSF internal email re "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011-12 ("[N]otes on the fuel surcharge meeting . . . on April 29, 2003," which state "[t]he delegation of authority has been moved to the Vice President level in carload business units."); PX0142, BNSF-FSC_000488 (BNSF internal email re "Fuel Analysis 3-11-04," Mar. 11, 2004), at '488 ("Contracts requiring [CEO's] signature but excluding full fuel surcharge provisions will not be signed").

321. BNSF's fuel surcharge became non-negotiable. PX0142, BNSF-FSC_000488 (BNSF internal email re "Fuel Analysis 3-11-04," Mar. 11, 2004), at '488 (summarizing CEO Matt Rose's instructions that "[a]ll contracts should have a fuel surcharge clause," and stating that

"Contracts requiring [CEO's] signature but excluding full fuel surcharge provisions will not be signed"); PX0080, BNSF-0325449 (BNSF internal memo re "Fuel Cost Recovery Analysis," May 28, 2004), at '453 ("Marketing Team should strive for 100% fuel coverage by account. Every price authority should have a fuel surcharge applied. All contracts should have a fuel surcharge clause. *All contracts requiring CEO's signature will not be signed without provisions for total fuel coverage*."); PX0057, BNSF-0029497 (internal BNSF email re "10-11-04 JPL Staff Meeting Minutes," Oct. 19, 2004), at '497 ("zero exceptions will be the goal."); PX0058, BNSF-0031225 (BNSF Fuel Cost Recovery Analysis presentation, Mar. 14, 2005), at '226 ("Marketing Team will strive for 100% fuel coverage by account. Every price authority will have a fuel surcharge applied. All contracts will have a fuel surcharge clause."); PX0072, BNSF-0048722 (BNSF email re "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); PX0655, (Q2 2005 BNSF Earnings Call, Aug. 11, 2005), at 18 ("We have a zero tolerance policy. Any contract it comes due will be renewed with a fuel surcharge and we have been in that mode for a year-and-a-half and have been very successful at implementing fuel surcharge."); PX0932, UPFSC 0584356 (BNSF 2006 Q2 Earnings Call, June 25, 2006), at '363 (BNSF CEO: "we're getting [FSCs] in, as each one of those [coal] contracts comes up").

322. Variations from the coordinated fuel surcharges were uncommon. PX0072, BNSF-0048722 (BNSF email re "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); PX0097, BNSF-0355735 (BNSF Fuel Surcharge Effective Participation), at '735 (showing Fuel Surcharge Effective Participation rising from 38.2% in 2003 to 85.9% across "total" BNSF business units, and from 50.2% to 99.5% in Agriculture, 54.6% to 89.1% in Industrial, and

42.7% to 95.4% in Consumer); PX0104, BNSF-0391864 (BNSF internal email re "Gallo PA's," Dec. 2, 2005), at '865 (regarding "changing the FSC methodology from the current non-standard calculation" to the published "standard FSC," and "expir[ing]" non-standard price authorities and "chang[ing] the FSC to the BNSF Standard"); PX0074, BNSF-0049138 (BNSF internal email re "12.04.06 JPL Staff Meeting Minutes" and attached BNSF "Fuel Cost Recovery Analysis" presentation, Dec. 13, 2006), at '151–52 (showing that between May 1, 2006 and September 30, 2006, BNSF entered 76 new and renewed price authorities, 73 included the standard fuel surcharge, the remaining 3 were one-time, special moves with fuel price built into the rate); PX0130, BNSF-0631688 (BNSF's "Fuel Cost Recovery Analysis" presentation, September 12, 2005), at '693–95 (showing that between May 1, 2005 and July 31, 2005, 222 of the 223 price authorities entered into by BNSF's industrial products group contained the standard fuel surcharge and that the one outlier price authority contained an even higher fuel surcharge); PX0060, BNSF-0032575 (BNSF internal email re "Fuel Surcharge—Final" and attached "Fuel Cost Recovery Analysis" presentation, Dec. 16, 2005) at '581–82 (showing that between August 1, 2005 and October 31, 2005, 90 of the 92 price authorities entered into by BNSF's industrial products group contained the standard fuel surcharge, and the remaining two were one-time, special moves with fuel price built into the rate); PX0070, BNSF-0042771 (BNSF email re "John Lanigan's Staff Meeting Minutes 06-13-2005," June 17, 2005, and attached "Fuel Cost Recovery Analysis" presentation dated June 13, 2005), at '777–79 (showing that between February 1, 2005 and April 30, 2005, 248 of 252 price authorities entered into by BNSF's industrial products group contained the standard fuel surcharge, and the remaining 4 built fuel into the rate or involved shippers to which BNSF intended to apply fuel surcharges to in short order); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 182-86, 208-09 (explaining that BNSF's strategy was to include a fuel surcharge

in every contract and grant shippers no exceptions); PX0613, Rose (BNSF) Dep., July 16, 2010, at 77-78 (explaining BNSF policy requiring executive approval for contracts without fuel surcharges and noting that he did not approve a single contract between 2003 and 2008 without a fuel surcharge); PX0628, Garin (BNSF) Dep., Aug. 16, 2010, at 66-68 (as of June 1, 2006, only seven of BNSF's 4,000 to 6,000 IP customers paid a nonstandard fuel surcharge), 111-29 (applied standard fuel surcharge to 248 out of 252 price authorities during time period, outlier non-standard fuel surcharge rate was actually greater than published fuel surcharge); *see also* PX0625, Jacobowski (BNSF) Dep., Aug. 12, 2010, at 28-33 (testifying that the 24 shippers he listed as having paid non-standard BNSF fuel surcharges may have *also* paid the BNSF standard fuel surcharge, and that his chart does not reflect the amount of revenue those shippers paid on non-standard vs standard fuel surcharges).

323. BNSF's new fuel surcharge program was the common starting point for all negotiations. PX0624, Allen (BNSF) Dep., Aug. 12, 2010, at 24-27 ("[A. [O]ur initial opening offer is almost always one that includes a standard fuel surcharge . . . Q. So if I understand you correctly, you started the negotiation with a given customer with the $1.25 HDF standard fuel surcharge program as the starting point? A. That's correct."); PX1098, Meyne (BNSF) Dep., Mar. 15, 2022, at 229:6-11 (testifying that after a certain point any proposal he made would include a fuel surcharge).

324. BNSF also adopted a policy of not discounting base rates in order to offset fuel surcharges. *See, e.g*. PX0142, BNSF-FSC_000488 (BNSF internal email re "Fuel Analysis 3-11-04," Mar. 11, 2004), at '488 (summarizing CEO Matt Rose's instructions that "Trading fuel surcharges for price will not be encouraged"); PX0080, BNSF-0325449 (BNSF internal memo re "Fuel Cost Recovery Analysis," May 28, 2004), at '453 ("Marketing Team should not discount a

fuel surcharge to raise price."); PX0058, BNSF-0031225 (BNSF Fuel Cost Recovery Analysis presentation, Mar. 14, 2005), at '226 ("Marketing Team will not discount a fuel surcharge to raise price."); PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 197 ("Q: Now Mr. Rose also told you that trading fuel surcharges for price will not be encouraged. Correct? A: Yes . . . what this meant was don't discount your fuel surcharge to raise prices."); *id.* at 216-217 (agreeing that "one of the CEO's mandates was that the marketing team should not discount a fuel surcharge to raise price"); PX0613, Rose (BNSF) Dep., July 16, 2010, at 192 (noting that it was "never [his] understanding" that "in pursuing the goal of increasing fuel surcharge coverage BNSF was significantly foregoing rate increases"); PX0099, BNSF-0368425 (internal BNSF email re "SGB FSC Update" and attached presentation titled "BNSF Fuel Surcharge Update," Apr. 5, 2004), at '430 (identifying as part of "CEO's Goals for Marketing's Fuel Surcharge Programs," that "[d]iscounted programs [were] unacceptable. CEO will not sign contracts not meeting the above criteria . . . Minimize price/fuel surcharge tradeoffs."); PX0077, BNSF-0070502 (BNSF memo re In Recognition of Your Great Leadership, Mar. 15, 2005), at '502 ("As you know, the combination of sound price escalation using this index and a fuel surcharge should tremendously help our bottom-line for years to come. . . . [M]ost wanted to discount the programs for price . . . It was amazing for me to see how your leadership and vision helped steer the course . . . .").

325. And after BNSF had begun coordinating its fuel surcharges with the other Defendants BNSF mandated that approval of exceptions to fuel surcharges would be centralized at the VP level, who in turn would need clearance from CMO John Lanigan. PX0050, BNSF-0027935 (internal BNSF email re "DOA ON FSC," Apr. 9, 2003), at '935 ("Effective ***immediately and urgently*** per John Lanigan. Authority to omit FSC provision is to be ***granted to VP's only (who will also clear with John).*** This ***needs to be communicated immediately*** as well.")

(emphases added); PX0122, BNSF-0570919 (internal BNSF email re "Revisions to Best Pricing Practices," Apr. 24, 2003), at '919 ("a change in the Delegation of Authority, as it pertains to the 'Omission of Fuel Surcharges', was approved by John Lanigan and his Sr. Mgmt team. In the past, a Director or above could approve the omission but effective immediately, a Vice President's approval will be required."); PX0140, BNSF-FSC_000469 (BNSF Fuel Surcharge Script, May 2, 2003), at '471 ("The delegation of authority has been moved to the Vice President level in carload business units."); *see also* PX0083, BNSF-0326832 (internal BNSF email re "Publication and No Fuel Surcharge," Mar. 3, 2005) at '832 ("Group Vice President approval is required to create any new price documents, or to extend any existing price authority without FSC.").

326. Throughout the conspiracy period, BNSF tracked its increasing coverage rates and decreasing exception rates. PX0141, BNSF-FSC_000486 (BNSF memo re "Status of BNSF Fuel Surcharge Programs," July 1, 2003), at '486 ("We need to routinely track any additions to the program and assess the effectiveness of our participation rates through exception management and tracking."); PX0080, BNSF-0325449 (BNSF internal memo re "Fuel Cost Recovery Analysis," May 28, 2004), at '455-56 (tracking fuel surcharge participation by year); PX0057, BNSF-0029497 (internal BNSF email re "10-11-04 JPL Staff Meeting Minutes," Oct. 19, 2004), at '497 (conveying request after "Marketing Leadership team agreed to monitor adherence of new and renewing price authorities in our fuel surcharge programs once a quarter"); PX0058, BNSF-0031225 (BNSF Fuel Cost Recovery Analysis presentation, Mar. 14, 2005), at '238-46 (tracking fuel surcharge coverage and opportunities); PX0065, BNSF-0033700 (BNSF Fuel Cost Recovery Analysis, Dec. 4, 2006), at '705-07 (presentation tracking coverage rates and identifying price authorities and contracts without fuel surcharges); PX0142, BNSF-FSC_000488 (BNSF internal email re "Fuel Analysis 3-11-04," Mar. 11, 2004), at '488 (summarizing CEO Matt Rose's desire

to "see a list of big shippers not paying fuel surcharges," and to "review our participation rates by account"); PX0055, BNSF-0028786 (BNSF Fuel Surcharge Review Team Recommendations presentation, Apr. 14, 2003), at '791-93 (tracking participation rates in 2002, and estimated increasing rates for 2003); PX0053, BNSF-0028686 (internal BNSF email re "FSC," Sept. 1 2004), at '686 ("There has been a lot of focus on the FSC recently with Matt Rose and John Lanigan wanting to know: 1) The number of Price Authorities (PA's) not subject to FSC; 2) New PA's in 2004 not subject to FSC; 3) 2004 renewals not converted to FSC."); PX0082, BNSF-0326595 (BNSF internal email re "Fuel Surcharge Adherence," June 7, 2006), at '595 (BNSF's chief economist noting that "senior management" was interested in "verify[ing] whether there was total FSC discipline on all our traffic, local and interline" and directing others to "enhance [their] reporting on non-standard FSC programs and associa[t]ed reasons"); PX0070, BNSF-0042771 (internal BNSF email re "John Lanigan's Staff Meeting Minutes 06-13-2005," June 17, 2005), at '776-788 (presentation titled "Fuel Cost Recovery Analysis" tracking fuel surcharge implementation and revenues); PX0060, BNSF-0032575 (BNSF internal email re "Fuel Surcharge—Final" and attached "Fuel Cost Recovery Analysis" presentation, Dec. 16, 2005) at '576-589 (presentation titled "Fuel Cost Recovery Analysis," tracking fuel surcharge implementation and revenues); PX0072, BNSF-0048722 (BNSF email re "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '725-44 (presentation titled "Fuel Cost Recovery Analysis," tracking fuel surcharge implementation and revenues); PX0074, BNSF-0049138 (BNSF internal email re "12.04.06 JPL Staff Meeting Minutes" and attached BNSF "Fuel Cost Recovery Analysis" presentation, Dec. 13, 2006), at '139-40 (staff meeting minutes reflect discussion of fuel-surcharge compliance), '146-67 (presentation titled "Fuel Cost Recovery Analysis," tracking fuel surcharge implementation and revenues); PX0043, BNSF-0022474

(BNSF 4 Q 2003 Financial Presentation), at '478 (BNSF reporting that it had moved fuel surcharge coverage "up 20 to 25 basis points" over 2003); PX0079, BNSF-0320766 (internal BNSF memo re "2006 Plan Issues," Dec. 7, 2005), at '766-67 (memo to CEO Matt Rose detailing "Drivers of Fuel Surcharge" revenue, including greater participation and higher fuel-surcharge rates); PX0068, BNSF-0041531 (internal BNSF email re "2004 authorities without Fuel Surcharge," Sept. 13, 2004) at '533 ("The good news is that about 92% of all contracts signed this year have FSC.").

327. BNSF also informed the other Defendants of its increased fuel surcharge coverage, and its policies against exceptions. *See* PX0096, BNSF-0355372 (internal BNSF email re "FSC," July 27, 2005), at '372 (noting that UP had "reported higher FSC coverage" than had BNSF for that quarter).

328. During the conspiracy period, BNSF was successful in applying its fuel surcharge program more broadly than it was able to prior to joining the conspiracy. PX0072, BNSF-0048722 (BNSF email re "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); *id.* at '728 (reflecting increasing coverage during conspiracy period); PX0068, BNSF-0041531 (internal BNSF email re "2004 authorities without Fuel Surcharge," Sept. 13, 2004), at '532-33 ("Matt [Rose, BNSF's CEO] has asked for an accounting of all contracts signed this year without a fuel surcharge to be discussed at the Exec Team Offsite on Monday . . . The good news is that about 92% of all contracts signed this year have FSC."); PX0655, (Q2 2005 BNSF Earnings Call, Aug. 11, 2005), at 18 ("We have a zero tolerance policy. Any contract it comes due will be renewed with a fuel surcharge and we have been in that mode for a year-and-a-half and have been very successful at implementing fuel surcharge."); PX0080, BNSF-0325449 (BNSF internal memo re "Fuel Cost Recovery Analysis," May 28, 2004), at '449 (noting increase

of 62% fuel surcharge revenue between 2003 and 2004, and a rise in BNSF's fuel surcharge "top-line revenue participation rates" and "bottom-line expense coverage rates" to date and projecting significant increases by 2008); *see* PX0058, BNSF-0031225 (BNSF Fuel Cost Recovery Analysis presentation, Mar. 14, 2005), at '246 (reflecting fuel surcharge coverage anticipated to be increasing from 51% to 86% between 2004 and 2009); PX0580, STB Hearing Transcript, Ex Parte No. 661, May 11, 2006, at 271-72 (explaining that BNSF has 75% fuel surcharge effectiveness); PX0055, BNSF-0028786 (BNSF Fuel Surcharge Review Team Recommendations presentation, Apr. 14, 2003), at '791-93 (tracking participation rates in 2002, and estimated increasing rates for 2003).

329. BNSF saw the "effective" amount of its revenue covered by the standard fuel surcharges (and fuel surcharge- derived revenues) expand to 54.2% by the end of 2004 ($357 million in revenues), to 67.7% in 2005 ($1.1 billion in revenues), and to 78% in 2006 ($1.7 billion in revenues). PX0038, BNSF_LOG0006542 (BNSF "Second Quarter 2003 Financial Presentation," July 22, 2003), at '571 (reflecting 44.2% coverage as of May 2003); PX0097, BNSF-0355735 (BNSF Fuel Surcharge Effective Participation), at '735 (showing Fuel Surcharge Effective Participation rising from 38.2% in 2003 to 85.9% across "total" BNSF business units, and from 50.2% to 99.5% in Agriculture, 54.6% to 89.1% in Industrial, and 42.7% to 95.4% in Consumer); PX0075, BNSF_0057052 (internal BNSF email re "2006 Q4 Analyst notes," Jan. 10, 2007), at '053-54 (showing 78% "Fuel Surcharge Effectiveness" in 2006); PX0563, BNSF Annual Report and 2004 Form 10-K, at 14 ($357 million in fuel surcharge revenue); PX0572, BNSF 2005 Annual Report and Form 10-K, at 21 ($1.1 billion in fuel surcharge revenue); PX0584, BNSF 2006 Annual Report and Form 10-K, at 18 ($1.7 billion in fuel surcharge revenue); PX0072, BNSF-

0048722 (BNSF email re "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '726-28 (summarizing year-over-year increases in BNSF's fuel-surcharge revenue).

**b. CSX**

330. Likewise, CSX fundamentally changed its internal policy during the conspiracy period so as to apply and enforce surcharges uniformly across its customer base, and specifically described the fact that "Everything is subject to fuel surcharge" and "Exceptions elevated" as being ***"[c]hanges to the policy***," and its executives described this in deposition testimony as a "***new fuel surcharge program***." PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574 ("***Changes to the policy***[:] • Everything is subject to fuel surcharge . . . • Exceptions elevated"); PX0197, CSXFSC000153058 (CSX internal email re "CSXT Price Authorities having no fuel surcharge," Mar. 20, 2003), at '058 ("Clarence asked that you review the contracts that don't have a fuel surcharge and develop action plans to implement a fuel surcharge."); PX0188, CSXFSC000090880 (internal CSX email re Fuel Surcharge & RCAF/Fuel Coverage, Aug. 3, 2005), at '881 (referencing "updated audit on how much of our business is covered by fuel surcharge," and effort to increase coverage "of our traffic base to 100%"); PX0186, CSXFSC000086200 (CSX internal email re "Fuel Surcharge will change from 18.8% to 19.2% July 1, 2006," June 5, 2006), at '200 ("We have very clear instructions with our team to pursue FSC . . . Here are some specific directions we've given the team that will help CSX's overall success: 1) all renewals include fuel—***very very few exceptions*** as we discussed last month. 2) any multiyear deals must include FSC in the out years . . 3) [renewals] should incorporate our FSC program [even] though these master contracts likely have an RCAF component . . . ."); PX0193, CSXFSC000108545 (internal CSX email re "Pricing," Feb. 12, 2006), at '545 (email marked "high" importance, delineating CSX's "firm" pricing policies: "NO

ONE is authorized to approve a renewal with an increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge"); PX0207, CSXFSC000212937 (internal CSX email re [redacted] renewal, March 31, 2006), at '937 (giving approval for exception because "[t]his one had very unique circumstances" and noting "We will have very few exceptions"); *see also* PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 126 (testifying that "***new fuel surcharge program***" program "applied as broadly as it possibly could"); *id.* at 159 ("So we needed to recover from as broad a base as we possibly could"); *id.* at 288-89 (confirming that goal was 100% coverage); PX0594, McIntyre (CSX) Dep., Feb. 18, 2010, at 254 (agreeing that 100 percent coverage was the goal); PX0612, Gooden (CSX) Dep., July 16, 2010, at 191-96 (testifying that CSX was applying the fuel surcharge as broadly as possible, and "I was going to try to have zero [exceptions] as my goal"); PX0667, Q3 2006 CSX Earnings Conference Call, Oct. 18, 2006, at 13 ("I probably told you this before, but since we implemented our fuel surcharge, we do not renew contracts without our fuel surcharge coverage in those contracts. So as contracts come up for renewal this year, they will all be renewed with the fuel surcharge provisions in them."); PX0626, Piacente (CSX) Dep., Aug. 13, 2010, at 7-10 (testifying that since he became the vice president in the chemical and fertilizer group in mid-2004 "[i]t was always our goal to try and accomplish" obtaining the standard CSX fuel surcharge," ***which was a contrast from earlier times where "[w]e had a standard fuel surcharge published, but at that time the goal was not to use necessarily that hard and fast***." (emphasis added)).

331. CSX's new policy mandated fuel surcharge application and stripped from sales and marketing employees the power to issue exceptions, centralizing that authority within senior management. PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574 ("Changes to the policy[:] • Everything is subject to fuel

surcharge . . . • ***Exceptions elevated***") (emphasis added); PX0612, Gooden (CSX) Dep., July 16, 2010, at 191-92 (testifying that any exceptions to the fuel surcharge program had to be approved by Gooden, which he approved "[v]ery infrequently"); PX0224, CSXFSC000672464 (email re "CSXI Fuel Surcharge" and presentation, "CSXI Fuel Surcharge," May 11, 2005), at '471 (CSX intermodal policy requiring application of "[f]ull Fuel Surcharge on all customers—No Exceptions!"); PX0186, CSXFSC000086200 (CSX internal email re "Fuel Surcharge will change from 18.8% to 19.2% July 1, 2006," June 5, 2006), at '200 ("We have very clear instructions with our team to pursue FSC . . . Here are some specific directions we've given the team that will help CSX's overall success: 1) all renewals include fuel—***very very few exceptions*** as we discussed last month. 2) any multiyear deals must include FSC in the out years . . 3) [renewals] should incorporate our FSC program [even] though these master contracts likely have an RCAF component . . . ."); PX0193, CSXFSC000108545 (internal CSX email re "Pricing," Feb. 12, 2006), at '545 ("•NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge. It does not matter how good the deal is or what stage it stands in the negotiations or when negotiations started."); PX0207, CSXFSC000212937 (internal CSX email re [redacted] renewal, March 31, 2006), at '937 (giving approval for exception because "[t]his one had very unique circumstances" and noting "We will have very few exceptions"); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 159-60 ("CSX has thousands of customers and I could be in the business of having a fuel surcharge program or if I listened to every customer, I could have thousands of fuel surcharge programs. I was firm."); *id.* at 288-89 (noting CSX's goal was "100 percent coverage"); PX0594, McIntyre (CSX) Dep., Feb. 18, 2010, at 248-49, 254 (discussing CSX's "goal" to increase its fuel surcharge coverage to "100 percent"); PX0627, Cerwonka (CSX) Dep., Aug. 13, 2010, at 7-8, 19-20 (testifying that CSX "strove to get fuel surcharge coverage" and noting that she lacked authority

to approve contracts without the standard CSX fuel surcharge); *see also* PX0214, CSXFSC000317571 (internal CSX email chain re "Pricing guidelines update," Dec. 20, 2005), at '571 (requiring senior management sign-off for any "price renewals less than 8 percent," then updated to 10%); PX0181, CSXFSC000036491 (internal CSX email re "Fuel surcharge 1 pager" attaching "Fuel Surcharge Merchandise 2003" presentation, Mar. 11, 2003), at '493 ("Need a written policy that Fuel Surcharge will apply on all new moves – even those with RCAF(u) – Exceptions to SVP.").

332. During the conspiracy period CSX's fuel surcharge became non-negotiable. PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574 ("[e]verything is subject to fuel surcharge"); PX0193, CSXFSC000108545 (internal CSX email re "Pricing," Feb. 12, 2006), at '545 (email marked "high" importance, delineating CSX's "firm" pricing policies: "NO ONE is authorized to approve a renewal with an increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge"); PX0207, CSXFSC000212937 (internal CSX email re [redacted] renewal, March 31, 2006), at '937 ("***We will have very few exceptions***") (emphasis added); PX0667, Q3 2006 CSX Earnings Conference Call, Oct. 18, 2006, at 13 ("I probably told you this before, but since we implemented our fuel surcharge, we do not renew contracts without our fuel surcharge coverage in those contracts. So as contracts come up for renewal this year, they will all be renewed with the fuel surcharge provisions in them."); PX0848, CSXFSC000150231 (CSX internal email re "Pricing Successes & Exceptions," Jan. 26, 2007), at '231 (noting executive pressure to secure "10+% [rate increases] and full fuel" and no "exceptions to price and fuel").

333. CSX's new policy applied to all types of shippers. *See, e.g.*, PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574

("Changes to the policy[:] • ***Everything is subject to fuel surcharge*** . . . • Exceptions elevated") (emphasis added); PX0197, CSXFSC000153058 (CSX internal email re "CSXT Price Authorities having no fuel surcharge," Mar. 20, 2003), at '058 ("Clarence asked that you review the contracts that don't have a fuel surcharge and develop action plans to implement a fuel surcharge."); PX0188, CSXFSC000090880 (internal CSX email re Fuel Surcharge & RCAF/Fuel Coverage, Aug. 3, 2005), at '881 (referencing "updated audit on how much of our business is covered by fuel surcharge," and effort to increase coverage "of our traffic base to 100%"); PX0186, CSXFSC000086200 (CSX internal email re "Fuel Surcharge will change from 18.8% to 19.2% July 1, 2006," June 5, 2006), at '200 ("We have very clear instructions with our team to pursue FSC . . . Here are some specific directions we've given the team that will help CSX's overall success: 1) all renewals include fuel—***very very few exceptions*** as we discussed last month. 2) any multiyear deals must include FSC in the out years . . 3) [renewals] should incorporate our FSC program [even] though these master contracts likely have an RCAF component . . . .") (emphasis added); PX0193, CSXFSC000108545 (internal CSX email re "Pricing," Feb. 12, 2006), at '545 (email marked "high" importance, delineating CSX's "firm" pricing policies: "NO ONE is authorized to approve a renewal with an increase of less than 10%" and "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***") (emphasis added); PX0207, CSXFSC000212937 (internal CSX email re DAK renewal, March 31, 2006), at '937 (giving approval for exception because "[t]his one had very unique circumstances" and noting "We will have very few exceptions"); *see also* PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 126 (testifying that "new" program "***applied as broadly as it possibly could***, subject to -- the exceptions that we had agreed to") (emphasis added); *id.* at 159-60 ("So we needed to recover from as broad a base as we possibly could"); *id.* at 288-89 (confirming that goal was 100% coverage); PX0594, McIntyre (CSX) Dep.,

Feb. 18, 2010, at 254 (agreeing that 100 percent coverage was the goal); PX0612, Gooden (CSX) Dep., July 16, 2010, at 191-96 (testifying that CSX was applying the fuel surcharge as broadly as possible, and "I was going to try to have zero [exceptions] as my goal"); PX0667, Q3 2006 CSX Earnings Conference Call, Oct. 18, 2006, at 13 ("I probably told you this before, but since we implemented our fuel surcharge, we do not renew contracts without our fuel surcharge coverage in those contracts. So as contracts come up for renewal this year, they will all be renewed with the fuel surcharge provisions in them."); PX0198, CSXFSC000153185 (internal CSX email re "Fuel Surcharges Result in Big Railroad Profits," March 17, 2003), at '187 ("Studies have shown that, in aggregate, captive shippers don't pay higher prices than non-captive shippers.").

334. CSX's new fuel surcharge program was the common starting point for all negotiations. *See* PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 126 (testifying that "new" program "applied as broadly as it possibly could, subject to -- the exceptions that we had agreed to"); PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574 ("Changes to the policy[:] • ***Everything is subject to fuel surcharge . . . • Exceptions elevated***") (emphasis added); PX0193, CSXFSC000108545 (internal CSX email re "Pricing," Feb. 12, 2006), at '545 (email marked "high" importance, delineating CSX's "firm" pricing policies: "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***") (emphasis added); PX0207, CSXFSC000212937 (internal CSX email re [redacted] renewal, March 31, 2006), at '937 ("***We will have very very few exceptions***") (emphasis added); PX0667, Q3 2006 CSX Earnings Conference Call, Oct. 18, 2006, at 13 ("I probably told you this before, but since we implemented our fuel surcharge, ***we do not renew contracts without our fuel surcharge coverage in those contracts***. So as contracts come up for renewal this year, they will all be renewed with the fuel surcharge provisions in them.") (emphasis added).

335. Variations from the coordinated fuel surcharges were uncommon. PX0192, CSXFSC000104871 (CSX internal email re "2007 Fuel Surcharge Coverage for Food and Consumer," Aug. 25, 2006), at '871 ("2006 Outlook . . . Coverage 91.2%" and "2007 Outlook . . . Coverage 93.4%"); PX0207, CSXFSC000212937 (internal CSX email re [redacted] renewal, March 31, 2006), at '937 ("***We will have very few exceptions***.") (emphasis added); PX0215, CSXFSC000320866 (internal CSX email re "Norfalco & Fuel Surcharge in General," Sept. 18, 2006), at '866 ("Fuel surcharge coverage was discussed a lot this morning. . . . [W]e have to get coverage up. . . . Overall, I think he is going to be very selective on deals he approves for an exception to fuel."); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 164-65 ("I recall there being ***one customer*** . . . ***where we made an exception to a rather, you know, clear, unambiguous, rigid policy***.") (emphasis added); PX0200, CSXFSC000153248 (internal CSX email re "Sunoco Fuel Surcharge," June 12, 2003), at '248 (CSX agrees to "short term deal with Sunoco" that caps Sunoco's fuel surcharge at 2% in June 2003); PX0199, CSXFSC000153235 (internal CSX email re "Sunoco Fuel Surcharge," Dec. 10, 2003), at '235 (observing that Sunoco had "now agreed to pay our standard fuel surcharge").

336. CSX also adopted a policy of not discounting base rates to offset fuel surcharges. *See, e.g.* PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574 ("Long term contracts can have RCAF(u), AII LF, or fixed increases of at least 5%/year—***plus fuel surcharge***") (emphasis added); PX0193, CSXFSC000108545 (internal CSX email re "Pricing," Feb. 12, 2006), at '545 (email marked "high" importance, delineating CSX's "firm" pricing policies: "***NO ONE is authorized to approve a renewal with an increase of less than 10***%" ***and*** "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***") (emphases added); PX0214, CSXFSC000317571 (internal CSX email chain re "Pricing guidelines

update," Dec. 20, 2005), at '571 (requiring senior management sign-off for any "price renewals less than 8 percent," then updated to 10%); PX0612, Gooden (CSX) Dep., July 16, 2010, at 187 (discussing this 8% policy).

337. While CSX's Industrial and Agricultural Products group suggested that RCAF(u) could sometimes be an "acceptable alternative" to its standard FSC, it made clear that "in most cases we prefer fixed [rate] increases with Fuel Surcharge"—and "with the exception of AG" the Industrial and Agricultural Products group's business units "*lead the company in Fuel Surcharge coverage*." DA06930, DA06937 (reporting FSC coverage statistics by various commodity types). When one shipper, Aventine, successfully pushed back on FSCs in 2003, CSX nevertheless pursued a "modified fuel surcharge" with a slightly higher trigger price and confirmed the same approach internally for "other major 'objectors'"—identifying just two shippers in that category. DA05933. Similarly, in 2006, CSX made peace with a modified FSC when it obtained the massive corresponding "13 and 14% [rate] increases we are proposing," and CSX acknowledged internally that the shipper at issue nevertheless "pay[s] full fuel on any circular business we do with them, this only involves their contracts. Several major contracts come up next year . . . having fuel agreed to and not a negotiation each time will keep . . . ADM signed up for fuel." DA02898.

338. CSX closely tracked its efforts toward achieving its 100% fuel surcharge coverage, and strategized about how to impose the surcharge on all shippers. PX0197, CSXFSC000153058 (CSX internal email re "CSXT Price Authorities having no fuel surcharge," Mar. 20, 2003), at '058 (noting that senior executive ordered CSX employees to all price authorities without a fuel surcharge and determine how to "convert" them to the "new program"); PX0217, CSXFSC000326206 (CSX email re "2004-2011 Fuel Coverage Scorecard," Jan. 24, 2007, and attachment) (analysis showing increased coverage from 41% in 2004 to 54% in 2006, and

projecting further increases to 65% by 2007, 75% by 2008, 83% by 2009, 84% by 2010, and 85% by 2011); *see also* PX0180, CSXFSC000006857 (internal CSX email re "FSC coverage graphs," Jan. 20, 2006), at '858 (showing increase in fuel-surcharge application on CSX shipments); PX921, CSXFSC000148017 (ACTUAL Q2 '05 EARNINGS RELEASE Q&A, Aug. 5, 2005) at '030 ("We've got coverage on fuel surcharge either through the surcharge or some type of mechanism to recover fuel in the range of 75% to 80% of our revenue. A year ago the number was around 70%. On new contracts since late 2003, all of our new contracts have been recovered either through surcharge or through other mechanisms.").

339. During the conspiracy period, CSX was successful in substantially increasing its fuel surcharge coverage, for example, raising its coverage from 41% in 2004 to 54% in 2006, and was projecting further increases in coming years: 65% by 2007, 75% by 2008, 83% by 2009, 84% by 2010, and 85% by 2011. PX0217, CSXFSC000326206 ("Fuel Surcharge Coverage," Jan. 2007), at '207; *see also* PX0180, CSXFSC000006857 (internal CSX email re "FSC coverage graphs," Jan. 20, 2006), at '858 (showing increase in fuel-surcharge application on CSX shipments); PX0220, CSXFSC000350617 (internal CSX email re Fuel Surcharge & RCAF/Fuel Coverage, Aug. 5, 2005), at '617 (noting that "the percentage of [the Automotive Service Group's] traffic that contains a fuel recovery mechanism of one variety or another is 96% . . . There are only two auto contracts that do not have a recovery mechanism and they will be addressed upon contract expiration . . . ."); PX1109, CSXFSC000452408 (internal CSX email re Fuel surcharge: Urgent, June 10, 2006) at '408 (noting that all Southern deals since December 2005 have full fuel surcharge); *see also* PX0671, Johnson MDL I Rpt., Feb. 15, 2013, ¶ 35 & Ex. 3.

340. Plaintiff Olin's [redacted]

[redacted]. PX0603, Gilley (Olin) Dep., May 5, 2010, at 136-137; PX0368, OLI060845 (Contract Number CSXT-C-69151), at '851.

341. [redacted]. PX0603, Gilley (Olin) Dep., May 5, 2010, at 149-152; PX0369, OLI061119 (Railroad Transportation Contract CSXT-C-82971).

342. While [redacted], it was understood that [redacted]. PX0603, Gilley (Olin) Dep., May 5, 2010, at 150, 152, 167; PX0721, OLI059435 (December 2003 notes reflecting [redacted]); PX0720, OLI059433 (January 2004 notes reflecting [redacted]).

343. [redacted]. PX0603, Gilley (Olin) Dep., May 5, 2010, at 150-155.

344. After 2004, [redacted]. PX0654, Bahn (Olin) Dep., July 7, 2010, at 167; PX0603, Gilley (Olin) Dep., May 5, 2010, at 150 ("[redacted]").

345. Olin [redacted]. PX0603, Gilley (Olin) Dep., May 5, 2010, at 150 ("[redacted]").

**c. NS**

346. Beginning in early 2003, NS adopted a policy of across-the-board application of the coordinated fuel surcharges, without exception. *See, e.g.*, PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '523 ("*Issue instructions* that no contract can negate or freeze the application of the NS Conditions of Carriage without prior approval of Don Seale.") (emphasis added); PX0326, NS_010073840 (NS internal email chain re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004) at '841 (NS adopted new fuel surcharge which led to "Standardization of FSC provisions in the East") ("there will be pressure to compromise on the new FSC standard. We should resist attempts to create FSC variations."); PX0263, NS_009000243 (NS internal email re Surcharge Bullets, June 9, 2004), at '244-45 ("New surcharge program generally replacing older surcharge program as contracts rollover"); PX0340, NS_010162682 (NS-UP email re "NS Fuel Surcharge for unit coal trains," Oct. 5, 2005), at '682 ("We only have 1 fuel surcharge mechanism which applies to all commodities."); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 126 ("We were trying to have coverage, fuel surcharge coverage, at 100 percent of our business"); PX0614 Glennon (NS) Dep., July 20, 2010, at 56-58 (describing pressure "to make sure that a fuel surcharge was in place" on every contract); PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 37-38 (agreeing that "NS had a policy to try and apply the standard fuel surcharge to as many customers as possible" and noting that nonstandard fuel surcharges required executive approval); PX0623, Osborne (NS) Dep., Aug. 11, 2010, at 38-41, 48-49 (describing policy "to make sure that a fuel surcharge was applied" and noting that "Don Seale had to review and approve" any nonstandard fuel surcharges); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 29-30 (agreeing that NS's coal business group "tried to negotiate the standard fuel surcharge into as many contracts as possible"); PX0272, NS_010007412 ((NS internal email re

"FSC," June 11, 2004), at '412 ("All deals must have the new FSC . . . in no instance would there not be the new FSC," and "[A]ll new contracts with have the new FSC, no exceptions"); PX0347, NS_013001654 (NS email re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004), at '655-56 ("There will [be] pressure to compromise on the new FSC standard. We should resist attempts to create FSC variations. Any deviations from the new standard must have GVP approval and must be reviewed by Pricing Services for applicability. I anticipate this will be an issue, particularly . . . over the next six months."); PX0293, NS_010034040 (NS internal email re "fuel surcharge—NS," Mar. 11, 2004), at '040 (confirming that "in all cases there is to be no deviation from NS's published FSC without [Seale's] prior approval"); PX0349, NS_013001781 (NS internal email re 2006 Fuel Surcharge Application, March 15, 2006), at '781 ("Please have your teams tabulate and provide a list of the largest remaining contracts . . . that do not have fuel surcharge application and the time lines you are pursuing to modify the deals to add fuel."); PX0259, NS_007000489 (NS internal email re "meeting Fri 4/22?," Apr. 14, 2005), at '489 (noting that at NS, "[t]here are relatively few publications with no FSC, nonstandard FSC or blends of FSCs"); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 126 (NS was "trying to have coverage, fuel surcharge coverage, at 100 percent of our business"); PX0614, Glennon (NS) Dep., July 20, 2010, at 56-58 ( "There is a policy to have a fuel surcharge applied," and agreeing that it was the intent of NS to apply the program as broadly as possible to all traffic); PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 37-38 (agreeing that NS "had a policy to try and apply the standard fuel surcharge to as many customers as possible," and exceptions required GVP and VP approval); PX0623, Osborne (NS) Dep., Aug. 11, 2010, at 38-41, 48-49 ("the goal of the effort here was to have as much of our traffic covered by a fuel surcharge," and exceptions from the standard fuel surcharge required Done Seale's approval); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 29 (agreeing that the direction from Seale

was that "in no instance would there not be the new FSC"); PX0272, NS_010007412 (NS internal email re "FSC," June 11, 2004), at '412 ("[A]ll new contracts will have the new FSC, no exceptions"); PX0850, NS_010015719 (confidential "Chemicals Business Group Pricing Guidelines, Aug. 26, 2005), at '719 ("All Norfolk Southern prices should be subject to fuel surcharge protection. For contacts that are in writing and signed by both parties, there should be a separate article in the body of the contract captioned "Fuel Surcharge" which reflects the same Norfolk Southern fuel surcharge language as contained in the Conditions of Carriage.").

347. During the conspiracy period, NS's fuel surcharge became non-negotiable. PX0299, NS_010035994 (NS FSC Status presentation), at '995 ("[F]ill the gaps[, p]hase out the old FSC[, n]egotiate a FSC—every time[.]"); PX0340, NS_010162682 (NS-UP email re "NS Fuel Surcharge for unit coal trains," Oct. 5, 2005), at '682 ("We only have 1 fuel surcharge mechanism which applies to all commodities. Our Corporate directive is to stay with the standard language and avoid modifying it."); PX0293, NS_010034040 (NS internal email re "fuel surcharge—NS," Mar. 11, 2004), at '040 (confirming that "in all cases there is to be no deviation from NS's published FSC without [Seale's] prior approval"); PX0326, NS_010073840 (NS internal email chain re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004) at '841 ("[T]here will [be] pressure to compromise on the new FSC standard. We should resist attempts to create FSC variations."); PX0259, NS_007000489 (NS internal email re "meeting Fri 4/22?," Apr. 14, 2005), at '489 (noting that at NS, "[t]here are relatively few publications with no FSC, nonstandard FSC or blends of FSCs"); PX0272, NS_010007412 (NS internal email re "FSC," June 11, 2004), at '412 ("[A]ll new contracts will have the new FSC, no exceptions"); PX0851, UPFSC_II_00135378 (internal UP email re: [redacted] Feb. 9, 2005),

at '378 ("[redacted]").

348. NS's policy applied to all commodity groups and price authorities. PX0560, NS 3/1/2004 FSC Program Terms, Mar. 1, 2004 (announcing that "[t]he revised surcharge program applies to all local and joint line traffic moving on NS issued price authorities (public and private) that" reference NS's conditions of carriage); PX0614, Glennon (NS) Dep., July 20, 2010, at 56-58 (agreeing that "it was the intent of Norfolk Southern to apply [the fuel surcharge program] as broadly as possible to all traffic"); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 23 ("We were seeking general application"); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 22 (NS's published or "preferred" FSC was "applicable across all lines of business"); *id.* at 195-96 (NS's policy of having "very broad and hopefully complete" FSC coverage applied to carload and intermodal traffic, as well as to both captive and non-captive shippers); PX0316, NS_010066633 (NS internal email re FSC Cover Summary 01-01-06, Feb. 8, 2006), at '633-36 (cataloguing application of fuel surcharges across all commodity groups).

349. Variations from the coordinated fuel surcharges were uncommon. PX0293, NS_010034040 (NS internal email re "fuel surcharge—NS," Mar. 11, 2004), at '040 (Osborne: "I assume that in all cases there is to be no deviation from NS's published FSC without your prior approval." Seale: "Correct."); PX0340, NS_010162682 (NS-UP email re "NS Fuel Surcharge for unit coal trains," Oct. 5, 2005), at '682 ("We only have 1 fuel surcharge mechanism which applies to all commodities. Our Corporate directive is to stay with the standard language and avoid modifying it."); *id.* ("I was advised that those deals with higher [trigger] thresholds will not be renewed as NS wants the same surcharge to apply to all."); PX0259, NS_007000489 (NS internal email re "meeting Fri 4/22?," Apr. 14, 2005), at '489 ("There are relatively few publications with

no FSC, nonstandard FSC or blends of FSCs"); PX0307, NS_010049215 (internal NS email re Revenue Yield Report—1QTR05, Apr. 13, 2005), at '216 ("The effective FSC coverage (70% to 75%) will improve over time and could exceed 80% by June [2005]."); PX0300, NS_010037907 (NS internal email re FSC Coverage for 2005, Jan. 27, 2006), at '907 ("The updated FSC coverage percentage, all groups combined is 85.5%"); PX0614, Glennon (NS) Dep., July 20, 2010, at 178-91 (discussing NS's widespread application of the rate-based fuel surcharge and agreeing that "there [were] relatively few publications with a nonstandard fuel surcharge"); PX0622, Kraemer (NS) Dep., Aug. 11, 2010, at 27-30 (noting that despite thousands of shippers in the agriculture group, NS considered only about a dozen exceptions to its fuel-surcharge program per year); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 244 (Q: "If I were to look at any point . . . between 2003 and today and I were to look at the fuel surcharge provisions that any of your customers are paying, I am going to find, am I not, that those customers are paying fuel surcharges pursuant to a very small handful of generally applicable formulas at any point in time?" A: "I think that is a true statement."); PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 16, 36–38 (admitting that NS had "a policy to apply the standard fuel surcharge to as many customers as possible" and that his purported list of exceptions could include duplicates).

350. NS's new fuel surcharge program was the common starting point for all negotiations. *E.g.*, PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 23 (NS's published FSC served as a "common starting point, if you will, in every negotiation"); *see also* PX0925, Schaaf (NS) Dep., Jan 17, 2023, at 176:11-20 (confirming that, in negotiating FSCs, "the default position [for NS] would be to offer NS's standard fuel surcharge"); PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 38-40 ("Q. But the goal was to at least start from trying to get the standard fuel surcharge in any authority, right? A. That is correct."); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 23 ("Q. You

would agree, then, that there was a standard fuel surcharge that you were trying to implement in your contracts at this time? A. Right."); *id.* at 129 ("Q. But it was your experience generally that [the Coal Business Group] would propose a standard fuel surcharge as a starting point in negotiation? [A.] Well, I generally did . . . ."); PX1110, NS_010161012 (Email re: Exelon Rail Contract, Dec. 20, 2004), at '012-013 (NS initial demand to Constellation in 2004 for a contract renewal started with its standard fuel surcharge, a 13 percent increase in base rate and an annual base rate adjustment using the RCAF-U, which included a fuel component).

351. NS also adopted a policy of not discounting base rates to offset fuel surcharges. *See, e.g*. PX0293, NS_010034040 (NS internal email re "fuel surcharge—NS," Mar. 11, 2004), at '040 ("I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."); PX0294, NS_010034244 (NS internal email re ADM/Staley FSC Program, Apr. 14, 2004) at '244 ("I am concerned that Pat [Glennon] feels we may be foregoing rate increases because we are applying a fuel surcharge. I had previously addressed this with the GVPs but I will do so again. I expect market based price increases to be applied independent of the FSC, and we should absolutely not be deferring any rate increases because we are applying the FSC."); PX0596, Seale (NS) Dep., Feb. 26, 2010, at 299-301 ("Do not trade one off [base rate increases] to gain the other [fuel surcharges]. That was the directive."); PX0614, Glennon (NS) Dep., July 20, 2010, at 55 ("I mean there was pressure not to reduce the base price, to get a fuel surcharge applied . . . ."); PX0328, NS_010074352 (internal email re Revenue Yield, Apr. 20, 2004), at '352 (noting that at the same time that NS's fuel surcharge coverage was increasing because "old contracts are renegotiated to include FSC clauses," NS "concurrently t[ook] significant rate increases on the base rates").

352. NS centralized approval of any exceptions to its fuel surcharge policy within senior management. PX0270, NS_010004522 (internal NS email chain re "Fuel Surcharge Review—April 25," Apr. 30, 2003), at '523 ("*Issue instructions* that no contract can negate or freeze the application of the NS Conditions of Carriage without prior approval of Don Seale.") (emphasis added); PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 38 (admitting that "for any authority that would have either a nonstandard fuel surcharge or no fuel surcharge, it required group vice-president approval," and that he himself had to authorize "any [fuel surcharge] authority [that] was going to contain any nonstandard fuel surcharge"); PX0753, Harris (NS) Dep., May 21, 2013, at 231-232 (noting that NS's documents show that salespeople needed permission from executives to deviate from standard fuel surcharge); *id.* at 272-274 (explaining his analysis was skewed by inclusion of legacy contracts, among other factors).

353. NS tracked its success towards its goal of 100% coverage. *See, e.g.,* PX0349, NS_013001781 (NS internal email re 2006 Fuel Surcharge Application, March 15, 2006), at '781 ("ALL: Please have your teams tabulate and provide a list of the largest remaining contracts (include annual revenue involved) that do not have fuel surcharge application and the time lines you are pursuing to modify the deals to include fuel. At the end of 2005 we estimated that we had 85% of our revenue covered by some version of the FSC. I want to see how much we plan to move this upward in 2006 and 2007."); PX0259, NS_007000489 (NS internal email re "meeting Fri 4/22?," Apr. 14, 2005), at '489 (noting that at NS, "[t]here are relatively few publications with no FSC, nonstandard FSC or blends of FSCs"); PX1100, NS_010002352 (NS internal presentation, Jan. 10, 2006) at '365 (99.4% of the Utility South Coal Business Group's volume covered by fuel surcharge).

354. During the conspiracy period, NS was successful in substantially increasing its fuel surcharge coverage, for example, raising its coverage from 41.6% of its traffic by revenue in March 2003 to 85.5% by January 2006. PX0300, NS_010037907 (NS internal email re FSC Coverage for 2005, Jan. 27, 2006), at '907 ("The update FSC coverage percentage, all groups combined is 85.5%"); *see also* PX0349, NS_013001781 (NS internal email re 2006 Fuel Surcharge Application, March 15, 2006), at '781 ("At the end of 2005 we estimated that we had 85% of our revenue covered by some version of the FSC."); PX0304, NS_010047416 (internal NS presentation), at '417 ("The 'no FSC' gap is shrinking as larger customer[] hold outs agree to some form of energy cost recovery program."); PX0307, NS_010049215 (internal NS email re Revenue Yield Report—1QTR05, Apr. 13, 2005), at '216 ("The effective FSC coverage (70% to 75%) will improve over time and could exceed 80% by June [2005].").

**d. UP**

355. Beginning in June 2003, UP executives stated "surcharge exceptions now require VP approval" and "our goal is to have no exceptions." PX1111, UPFSC 0048922 (internal UP email re [redacted], June 19, 2003), at '922; *see also* PX0414, UPFSC 0276597 (UP internal email chain re Fuel Surcharge Provisions, Jan. 5, 2004), at '597 ("ANY deviation from [the Highway Diesel Fuel surcharge] policy requires advance sign-off by Bob Toy. Have heard some rumors recently that people have been trying to 'game' the system. Not a good idea."). That policy was reinforced throughout the conspiracy period and, by October 2004, UP executive Chuck Adams announced he would personally review any attempted exceptions. PX0410, UPFSC 0274880 (internal UP email re AIILF request, Oct. 15, 2004), at '881 (announcing policy that any contract issued without UP's fuel surcharge would be subject to review process); PX0413, UPFSC 0276428 (internal UP email re "FUEL SURCHARGE

RECOVERY," Jan. 15, 2004), at '428 ("I've asked each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."); PX0385, UPFSC 0032168 (UP internal email re Fuel Related Revenue, Jan. 28, 2004), at '168 (analyzing "company-wide surcharge programs," reflecting UP conducting "analysis of fuel-related revenue coverage by business team," and advising that "Fuel recover will get a lot of attention in 2004, both coverage rate and recovery rate"); PX0411, UPFSC 0275003 (UP internal email re Contact Person for Fuel Surcharge Information, Nov. 4, 2004) at '003 (discussing plan to implement the new HDF-based surcharge "to all business as it becomes available for action (the expiration date of contracts, etc.)"); PX0445, UPFSC 0195683 at slide 5 (UP presentation and related notes detailing 2005 goal of further fuel surcharge implementation in all new and expiring contracts); PX0517, UPFSC 0217870 (Q3 2005 UP Earnings Conference Call, Oct. 27, 2005), at '871 ("With high diesel fuel prices continu[ing] to . . . impact our earnings, we have an absolute mandate with our fuel surcharge program to take that higher cost out of the equation as existing contracts are renewed."); PX0429, UPFSC_0011961 (internal UP email re "ER&A Top 5 Cost/Profitability Issues," May 9, 2006), at '961 ("We get numerous requests from Marketing to determine whether the fuel surcharge revenue obtained from specific customers is greater than the incremental fuel expense assigned to the customers' movements. This flys [sic] in the face of the effort to move all customers to the standard program and to keep application of the fuel surcharge program as simple and understandable as possible."); PX0446, UPFSC_0215503 (internal UP email re "Latest with words—Almost done" and attaching presentation, , Jan. 29, 2006), at '504 notes to slide 23 ("Fuel surcharge will be a part of every deal we do."); PX0401, UPFSC 0183975 (UP internal email re "5th Update—UP Surcharge Q&A" and attachment, May 9, 2003), at '976 ("[UP Industrial Product's] sole surcharge moving forward is the Highway Diesel Fuel (name TBD) surcharge. It applies to all public documents . . . and new

or renewed private documents."); PX0391, UPFSC 0066571 (internal UP email re Toyota Fuel Surcharge Analysis, Aug. 2, 2005), at '571 (concerning "mandate that all business should be subject" to a fuel surcharge); PX0389, UPFSC 0050501 (internal UP email re JRY and RMK New Closing Board Slides, attaching UP presentation, Sept. 8, 2005), at slide 4 (listing "Fuel Cost Recovery" as a "New Contract Requirement[]"); PX0381, UPFSC 0011248 (internal email re CONFIDENTIAL: Revised Brainstorming List, Apr. 9, 2003), at '250 (identifying implementation of policy requiring "100% fuel price recovery" in "all future contracts"); PX0437, UPFSC 0051559 (internal UP email re Analyst Presentation, attaching UP presentation, May 20, 2005), at '560, slide *3 (noting UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."); PX0604, Eisele (UP) Dep., May 12, 2010, at 260 (UP uses "fuel cost recovery" and "fuel surcharge mechanism" interchangeably); PX0418, UPFSC 0342882 (UP-GM letter, April 22, 2005), at '883 ("Our new proposal includes our standard fuel surcharge program that we are uniformly requiring of all of our customers."); PX0597, Draper (UP) Dep., Mar. 3, 2010, at 80-85 ("It's my understanding that marketing people had been instructed to apply the HDF standard program wherever possible . . . others in marketing told me that that edict had come down.") (describing internal UP analysis conducted to impose fuel surcharge on "every pricing document" and noting that "someone relatively senior . . . needed to . . . bless" the imposition of a nonstandard fuel surcharge); PX0616, Young (UP) Dep., Aug. 4, 2010, at 71-75, 120 ("[Y]ou would start negotiations from, with that methodology" of "us[ing] the AIILF in conjunction with the fuel surcharge[.]"); PX0611, Knight (UP) Dep., July 9, 2010, at 34-42 (describing UP's "objective" to impose fuel surcharges on all applicable contracts, and agreeing that it was UP's "company position to apply a fuel surcharge on every freight bill . . . it can."); PX0517, UPFSC 0217870 (Q3 2005 UP Earnings Conference Call,

Oct. 27, 2005), at '871 ("With high diesel fuel prices continu[ing] to . . . impact our earnings, we have an absolute mandate with our fuel surcharge program to take that higher cost out of the equation as existing contracts are renewed."); PX0387, UPFSC 0042030 (UP internal email re Regressions Analysis, March 24, 2005), at '030 ("I have also attached an exhibit that was requested by Rob as to when will each business team be 100% covered as well as what percentage of business is already covered under a fuel surcharge program"); PX0551, 2005 UP Analyst Fact Book, at 11 ("As Union Pacific renegotiate this business to market rates, it will also include Union Pacific's standard fuel surcharge.").

356. UP's new policy applied across the board to all commodity groups. *See, e.g.*, PX0340, NS_010162682 (NS-UP email re "NS Fuel Surcharge for unit coal trains," Oct. 5, 2005), at '682 ("We only have 1 fuel surcharge mechanism which applies to all commodities," and to which Listwak responded, "deals with higher [fuel surcharge] thresholds will not be renewed as NS wants the same surcharge to apply to all."); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 254-55, 277 ("Q: The question is, as of April 2005, was Union Pacific uniformly requiring its standard fuel surcharge program of its customers? A: We were asking all customers for that…"); PX0533, UPFSC 0444823 (presentation titled "November 2006 Board of Directors Strategy Session," Nov. 16, 2006), at '941 ("[W]e are incorporating fuel surcharge provisions in all of our agreements"); *see also* PX0597, Draper (UP) Dep., Mar. 3, 2010, at 321-22 (explaining that UP "adopted a standard surcharge program that it intended to be common across its customers" because of "the difficulty of doing it on a customer-by-customer basis"); PX0391, UPFSC 0066571 (internal UP email re Toyota Fuel Surcharge Analysis, Aug. 2, 2005), at '571 ("It is my understanding Jack [Koraleski] has issued a mandate that all business should be subject to the HDF program (the standard program . . .)"); PX0418, UPFSC 0342882 (UP-GM letter, April 22, 2005),

at '883 ("[redacted]); PX0559, Q4 2003 UP Earnings Conference Call, Feb. 4, 2004, at 4 (noting that UP "implemented a broad-based [fuel surcharge] program in June" of 2003); PX0560, NS 3/1/2004 FSC Program Terms ("Effective 3/1/2004, NS implemented a revised fuel surcharge program. The revised surcharge program applies to all local and joint line traffic moving on NS issued price authorities (public and private) that reference the NS Conditions of Carriage 1-series or NS Conditions of Carriage 2-series").

357. During the conspiracy UP's fuel surcharge became non-negotiable. PX0517, UPFSC 0217870 (Q3 2005 UP Earnings Conference Call, Oct. 27, 2005), at '871 ("With high diesel fuel prices continu[ing] to . . . impact our earnings, we have an absolute mandate with our fuel surcharge program to take that higher cost out of the equation as existing contracts are renewed."); PX0446, UPFSC_0215503 (internal UP email re "Latest with words—Almost done" and attaching presentation, , Jan. 29, 2006), at '504 notes to slide 23 ("Fuel surcharge will be a part of every deal we do."); PX0381, UPFSC 0011248 (internal email re CONFIDENTIAL: Revised Brainstorming List, Apr. 9, 2003), at '250 (identifying implementation of policy requiring "100% fuel price recovery" in "all future contracts"); PX0418, UPFSC 0342882 (UP-GM letter, April 22, 2005), at '883 [redacted]); PX0852, UPFSC_II_00111046 (UP-Toyota email re: "Response to SA RFP Questions," Apr. 11, 2005), at '046 ("[redacted]").

358. Variations from the coordinated fuel surcharges were uncommon. PX0391, UPFSC 0066571 (internal UP email re Toyota Fuel Surcharge Analysis, Aug. 2, 2005), at '571 ("It is my

understanding Jack [Koraleski] has issued a mandate that all business should be subject to the HDF program (the standard program . . .)").

359. UP's new fuel surcharge program was the common starting point for all negotiations. PX0616, Young (UP) Dep., Aug. 4, 2010, at 71-75 ("[Y]ou would start negotiations from, with that methodology" of "us[ing] the AIILF in conjunction with the fuel surcharge[.]"); PX0926, Grimes (UP) Dep., Apr. 6, 2022 131-32 (confirming UP used its "standard" published FSC in negotiations "as a starting point"); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 93-95 (in reference to March 12 email stating that "up until that time, we were intermodal and we were contract specific in most cases, and now we were going to go to a more general approach" which Koraleski referred to as "fuel surcharges on a uniform basis"); *id.* at 271 (testifying to his request that UP employees use the AIILF with the standard fuel surcharge as "at least the going-in position"); *id.* at 277-78 (testifying that UP was "asking all customers for" the standard fuel surcharge program); PX0437, UPFSC 0051559 (UP presentation, "2005 Analyst Meeting", May 20, 2005), at '560, slide *3 (noting UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."); PX0620, Gehl (UP) Dep., Aug. 10, 2010, at 55-56 ("Q. . . . UP was proposing its standard program, even if not accepted, it was an effort to at least influence the discussion on . . . fuel surcharge, correct? A. Correct, yes."); PX0619, Pagan (UP) Dep, Aug. 9, 2010, at 53-54 (discussing exception of "a discount off the standard program" and "90 percent of the standard carload fuel surcharge"); *id.* at 55 ("Q. And at that time, is it your understanding . . . UP was making a proposal based on the standard UP program? A. Correct. . . . Q. . . . Was that – was that a starting point for the discussions that resulted in the eventual agreement which we saw – or you say in the declaration is 90 percent of that? A. I – I suppose you could consider this e-mail here the starting point. And

then as you – as you read forward, you can see the progression and where we ended up."), *id.* at 76 ("Q. And was it in the course of the negotiations that UP agreed to give a discount off the standard surcharge? A. It was.").

360. UP centralized approval for exceptions within senior management. PX0414, UPFSC 0276597 (UP internal email chain re Fuel Surcharge Provisions, Jan. 5, 2004), at '597 ("ANY deviation from that policy requires advance sign-off by Bob Toy."); PX0410, UPFSC 0274880 (internal UP email re AIILF request, Oct. 15, 2004), at '881 (announcing policy that any contract issued without UP's fuel surcharge would be subject to review process and noting that Chuck Adams, UP executive, would "review . . . the exceptions").

361. UP adopted a policy of not discounting base rates to offset fuel surcharges. *See, e.g.* PX0414, UPFSC 0276597 (UP internal email chain re Fuel Surcharge Provisions, Jan. 5, 2004), at '597 ("The Highway Diesel Fuel surcharge policy is required for any new and renewed contracts within Industrial Products. ANY deviation from that policy requires advance sign-off by Bob Toy. Have heard some rumors recently that people have been trying to 'game' the system. Not a good idea."); PX0551, UP 2005 Analyst Fact Book, at 10 (attributing UP's record revenue in 2005 in part to its fuel-surcharge program, suggesting that UP did not couple surcharges with discounted base rates).

362. UP tracked its progress towards 100% fuel surcharge coverage. *See, e.g.*, PX0413, UPFSC 0276428 (internal UP email re "FUEL SURCHARGE RECOVERY," Jan. 15, 2004), at '428 (2004 statistics); PX0387, UPFSC 0042030 (UP internal email re Regressions Analysis, March 24, 2005), at '030 ("I have also attached an exhibit that was requested by Rob as to when each business team be [sic] 100% covered as well as what percentage of business is already covered under a fuel surcharge program."); PX0385, UPFSC 0032168 (UP internal email re Fuel

Related Revenue, Jan. 28, 2004), at '168 (reflecting UP conducting "analysis of fuel-related revenue coverage by business team," and advising that "Fuel recover will get a lot of attention in 2004, both coverage rate and recovery rate"); PX0505, UPFSC_0099019 (internal UP email thread re Fuel Surcharge – 1Q Analyst Package, April 10, 2007), at '19 (noting that "85% of our business is covered by a fuel surcharge program"); PX0530, UPFSC0433046 (internal UP email attaching presentation given by Jack Koraleski, May 8, 2007), at '050 (Jack Koraleski noted that UP achieved "record fuel surcharge coverage" in 2006); PX0853, UPFSC 0042033 (Presentation re "Incremental Fuel Expense Recovery Due to Fuel Surcharges," Mar. 24, 2005) at '033 (showing fuel surcharge coverage by revenue reached 65% in 2004, 72% in 2005, 85% in 2006, 89% in 2007, and 91% in 2008); PX0393, UPFSC 0076935 (internal UP email re Fuel Surcharge Presentation, October 2005) at '936 (2005 statistics).

363. UP was successful in substantially increasing its fuel surcharge coverage, for example, raising its coverage revenue from 42% in August 2003, to 65% by the end of 2004, to 74% by October 2005, to 85% by March 2007. PX0413, UPFSC 0276428 (internal UP email re "FUEL SURCHARGE RECOVERY," Jan. 15, 2004), at '428 (2004 statistics); PX0393, UPFSC 0076935 (internal UP email re Fuel Surcharge Presentation, October 2005) at '736 (2005 statistics) ("Recommendation: No Compelling reason for changing / reducing UP's fuel surcharge programs"); PX0505, UPFSC_0099019 (internal UP email thread re Fuel Surcharge – 1Q Analyst Package, April 10, 2007), at '19 (noting that "85% of our business is covered by a fuel surcharge program"); PX0530, UPFSC0433046 (internal UP email attaching presentation given by Jack Koraleski, May 8, 2007), at '050 ("I want to start with "Congratulations" for the many successes of 2006 . . . We put record volume on the railroad, helped drive improved service, posted record core price improvement and record fuel surcharge coverage, saw dramatic improvement in

customer satisfaction, and finished under our expense plan.”); PX0853, UPFSC 0042033 (Presentation re “Incremental Fuel Expense Recovery Due to Fuel Surcharges,” Mar. 24, 2005) at ‘033 (showing fuel surcharge coverage by revenue reached 65% in 2004, 72% in 2005, 85% in 2006, 89% in 2007, and 91% in 2008); PX0393, UPFSC 0076935 (internal UP email re Fuel Surcharge Presentation, October 2005) at ‘936 (2005 statistics); PX1112, UPFSC_0076936 at slide 8 (showing fuel surcharge coverage by business group).

### 2. Defendants Monitored Each Other to Ensure That No Member of the Cartel Cheated on the Conspiracy

364. To make sure that no one cheated on the conspiracy, Defendants monitored each other’s fuel surcharge coverage data, and communicated about implementation of the new agreed fuel surcharges. These many exchanges and communications included, among others:

- PX0851, UPFSC_II_00135378 (internal UP email re: “FW: Actions to Take with Railroad's 9% and 12% Fuel Surcharges,” Feb. 9, 2005), at ‘378 (“I spoke to the NS this morning and they said that 90% of all their agreements/contracts are subject to their fuel surcharge and is non-negotiable.”).
- PX0340, NS_010162682 (NS-UP email re NS Fuel Surcharge for unit coal trains, Oct. 5, 2005), at ‘682 (NS reminding UP that “[w]e only have 1 fuel surcharge mechanism which applies to all commodities. Our Corporate directive is to stay with the standard language and avoid modifying it.”);
- PX0664, CSXFSC000000476 (internal CSX email chain re Fuel Surcharge Overview Clarence 03, Oct. 9, 2003) (reflecting high-level discussion of fuel surcharge coverage rates in context where record indicates discussion was not limited to interline movements);

- PX0413, UPFSC 0276428 (internal UP email re FUEL SURCHARGE RECOVERY, Jan. 16, 2004), at '429-30 (assessing BNSF's claim "'that UP has 40-45% of our business covered with a fuel surcharge'");
- PX0854, CXSFSC000104116 (internal CSX memorandum re: "Fuel Surcharge Deviations," Apr. 30, 2004), at '116 (summarizing other railroads' fuel surcharges as well as "Market Intelligence Regarding Exceptions").
- PX0855, UPFSC 0045323 (internal UP presentation re "Fuel Surcharge," Dec. 19, 2005) at '323 slides 3, 20 (tracking monthly fuel surcharge rates for BNSF, CSX, and NS).
- PX0856, CSXFSC000263976 (internal CSX presentation re: "Fuel Surcharge Presentation, May 9, 2006"), at '979 (industry comparison chart of fuel surcharges as calculated by CSX).
- PX0096, BNSF-0355372 (internal BNSF email re "FSC," July 27, 2005), at '372 (noting that UP had "reported higher FSC coverage" than had BNSF for that quarter);
- PX0189, CSXFSC000096276 (CSX internal email re "BN Questions," July 23, 2003), at '276 (CSX saying that "BN had both a % of total fuel expense increase coverage (60%) and percentage of contracts with surcharge (80%)");
- PX0664, CSXFSC000000476 (internal CSX email chain re Fuel Surcharge Overview Clarence 03, Oct. 9, 2003), at '476 ("CSXT originated (local and forwarded [meaning non-interline shipments as well as interline shipments where CSX is the first carrier] . . . that 15% had an escalator . . . and that 75% has fuel surcharge."); and
- PX0508, UPFSC 0129813 (internal UP email re BNSF Reducing Fuel Surcharge 5/1 to 2%, April 29, 2003), at '813 ("Fuel surcharge $ are melting away at the competition. In a

downward-pressure environment, what's on paper must not work in the real world. On 4/1, they announced it would be 5% in May. Now 2%.").

365. The statistics Defendants exchanged were not remotely limited to interline traffic (let alone interline traffic handled solely by the railroads exchanging the information), and these statistics also spanned carload and intermodal traffic. PX0664, CSXFSC000000476 (internal CSX email re "Fuel Surcharge Overview Clarence 03.ppt," Oct. 9, 2003) at '476 (reflecting high-level discussion of fuel surcharge coverage rates in context where record indicates discussion was not limited to interline movements); PX0413, UPFSC 0276428 (internal UP email re "FUEL SURCHARGE RECOVERY," Jan. 15, 2004), at '429-30 (assessing BNSF's claim "'that UP has 40-45% of our business covered with a fuel surcharge'"); PX0096, BNSF-0355372 (internal BNSF email re "FSC," July 27, 2005), at '372 (noting that UP had "reported higher FSC coverage" than had BNSF for that quarter); PX0189, CSXFSC000096276 (CSX internal email re "BN Questions," July 23, 2003), at '276 (CSX saying that "BN had both a % of total fuel expense increase coverage (60%) and percentage of contracts with surcharge (80%).")

366. [redacted] PX0785, Elzinga Rpt., July 9, 2018 (corrected Aug. 7, 2018), at 36 (citing PX0732, Dennis William Carlton, Jeffrey M.. Perloff, Modern Industrial Organization 135–36, 138 (4th Ed. 2014)

### 3. Defendants Openly Communicated with Each Other About Their Policies Forbidding Discounting of Base Rates to Offset Fuel Surcharges

367. Defendants openly communicated with one another regarding the policy against discounting base rates to offset the coordinated fuel surcharges. PX1113, BNSF-0574073 (report titled "BNSF Automotive Rules and Policies Guide," July 1, 2005) at '083 ("All transportation

services of motor vehicle shipments. . .will be subject to any fuel cost recovery surcharge implemented by BNSF or imposed on BNSF, regardless of price authority, contract or agreement.”).

### D. Defendants Coopted Trade Groups And Steered Industry Standards To Facilitate Their Conspiracy

#### 1. Defendants Controlled and Used the AAR to Facilitate Their Conspiracy

368. Defendants control the industry’s main trade association, the Association of American Railroads (“AAR”). Both voting on the AAR board, and contribution of AAR dues, are based on freight and revenue, and as of 2003 Defendants accounted for over 90 percent of rail freight shipments in the United States. Defendants thus dominated the AAR board and [redacted]. PX0607, Hamberger (AAR) Dep., June 7, 2010, at 91 ([redacted]); *id.* at 83 ([redacted]); PX0605, Rockey (AAR) Dep., May 18, 2010, at 36-37 ([redacted]); *id.* at 109 ([redacted]); PX0018, AAR-E-00116414 (AAR bylaws); PX0004, AAR-000001 (AAR directory 2007); PX0016, AAR-E-00028627 (AAR directory 2004).

369. Edward Hamberger served as the AAR’s president from 1998 to 2019. *See* PX0607, Hamberger (AAR) Dep., June 7, 2010, at 14. At his deposition in 2010, [redacted]. PX0607, Hamberger (AAR) Dep., June 7, 2010, at 85.

370. [redacted]. *See, e.g.*, PX0607, Hamberger (AAR) Dep., June 7, 2010, at 89-90; 92-94; PX0534, UPFSC 0466514 (June 23, 2003 Davidson (UP) calendar entry), at '514 (featuring an "AAR CEO meeting" including Evans (UP), Rose (BNSF), Ward (CSX), Goode (NS), and Hamberger (AAR)); PX0025, BNSF_CAL-0007136 ("AAR CEOs brkfst. mtg." including "MKR, Mike Ward, Ike Evans, David Goode," Aug. 12, 2003) at '136.

371. Defendants and their CEOs [redacted]. PX0605, Rockey (AAR) Dep., May 18, 2010, at 220-24 (Defendants [redacted]); PX0013, AAR-000389 ([redacted]), at '391 (BNSF executive noting [redacted]").

372. On multiple occasions, Defendants shared information about their fuel hedging strategies, *in conjunction with* their fuel surcharge programs, including formulas, application rules, and coverage strategies. *See* PX0869, AAR-E-00069063 ([redacted]5) at '063, '067 (sharing [redacted]); PX0221,

CSXFSC000372050 (minutes of an AAR Treasury/Finance Division meeting, Nov. 14, 2004), at '051 ( "Fuel hedging—cross fertilization discussions were held among the railroad representatives as to the extent and methods employed for fuel hedging"); *see also* PX0019, AAR-P-00003356 (notes on [redacted], Nov. 14, 2004), at '356; PX0608, Neikirk (NS) Dep., June 15, 2010, at 152-162, 184-190 (noting [redacted]); PX0264, NS_009000247 (NS email re Finance Committee Fuel Hedging Presentation attaching Review of Norfolk Southern Fuel Hedge and Surcharge Programs, June 4, 2004) at '251; PX0257, NS_004000760 (NS email re AAR PPT Presentation, attaching "Summary of Norfolk Southern's Fuel Hedging Program" AAR Treasurer's Meeting, Nov. 1, 2005), at '760; PX0258, NS_004000782 (NS-BNSF-AAR email re Treasury/Finance Division Meeting Presentations, and attaching Summary of Norfolk Southern's Fuel Hedging Program presentation, Oct. 26, 2005), at '782.

373. One of Defendants' own experts recognized that there was no legitimate reason for Defendants to share this this type of competitively sensitive information with each other, *i.e.*, their competitors. *See* PX0779, Carlton MDL II Dep., Oct. 25–26, 2023, at 657 ("[I]t's not obvious to me why competitors share their strategic plans about anything with each other . . . it's not obvious to me why private firms share any competitive information with each other"); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 180 ("[O]ne would expect Defendants to treat their hedging strategies and results as important (and proprietary) competitive information.").

### 2. Defendants Collectively Forced the AAR to Publish a New Cost Index in Furtherance of Defendants' Fuel Surcharge Conspiracy

374. The Rail Cost Adjustment Factor ("RCAF") had long been used in the industry in many multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs. PX0615, Couch (CSX) Dep., Aug. 3, 2010, at 168 (noting that "[i]n multiple year

contracts, we would always have an escalator in there that would recapture our inflationary costs . . . ."); PX0443, UPFSC 0181674 (internal UP email re Fuel Surcharge Q&A and Supporting Info, May 5, 2003), at '674 (in preparing for rollout of new fuel surcharge, UP internally noted that "Dow frequently asks why RCAFU doesn't recover fuel costs over time. I believe that it does over a year or so. I don't see a question regarding the need for a surcharge even if we are using RCAFU.").

375. Defendants recognized that the RCAF thus was a significant, historical impediment to across-the-board application of the agreed fuel surcharges. *See* PX0615, Couch (CSX) Dep., Aug. 3, 2010, at 168; PX0443, UPFSC 0181674 (internal UP email re Fuel Surcharge Q&A and Supporting Info, May 5, 2003), at '674.

376. The RCAF is a weighted index that [redacted]. PX0605, Rockey (AAR) Dep., May 18, 2010, at 84-90 [redacted]); PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 261-62 ("Q. And that fuel component [of the RCAF] was based on, at least in part, forecasts of

fuel prices by the supply officers at the -- at the railroads, correct? A. . . . [A]s my understanding, it was based on actual data submitted by the supply officers to the AAR, and then the AAR had a process to forecast that price into the future.").

377. The RCAF was based on an index known as the All-Inclusive Index ("AII") published by the AAR. PX0017, AAR-E-00078595 (AAR Railroad Cost Indexes, Dec. 2002), at '611-620.

378. The RCAF is a "robust" index, refined over the years, that uses a forecast-error adjustment to address any unexpected changes in fuel costs. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 261 ("Q. And that fuel component [of the RCAF] was based on, at least in part, forecasts of fuel prices by the supply officers at the -- at the railroads, correct? A. . . . [A]s my understanding, it was based on actual data submitted by the supply officers to the AAR, and then the AAR had a process to forecast that price into the future."); PX0763, UPFSC 0195843 (March 3, 2000 draft letter from Evans (UP) to Hamberger (AAR)), at '843 (explaining that "the existing RCAF process adequately provides for timely pass-through since it forecasts cost changes one quarter in advance"); [redacted]

379. UP's President stated in a 2004 earnings call that the "RCAF . . . looks at actual costs through the industry." PX0113, BNSF-0481756 (UP 3Q2004 Earnings Call, Oct. 21, 2004), at '763; *see also* PX0763, UPFSC 0195843 (March 3, 2000 draft letter from Evans (UP) to Hamberger (AAR)), at '843 (explaining that "the existing RCAF process adequately provides for timely pass-through since it forecasts cost changes one quarter in advance").

380. Mike Giftos, CSX's chief commercial officer, testified that the RCAF "did a pretty good job of capturing our costs and so presumably it did capture fuel prices." PX0595, Giftos

(CSX) Dep., Feb. 25, 2010, at 48; *see also id.* at 63 ("It was acceptable to me at that time. . . ."), 140 ("I thought about it as an alternative, an acceptable alternative.").

381. Internally, Defendants relied on the RCAF to estimate cost changes. *See, e.g.*, PX0441, UPFSC 0066427 (internal UP email chain, May 5, 2005), at '427 (UP's Mark Draper: "using the RCAFU estimate (change in price of inputs) appears to be a reasonable way to estimate cost changes during the next few years.").

382. Defendants recognized that imposing a stand-alone fuel surcharge where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping," which "can occur when a carrier both escalates a base rate using an index (such as the RCAF) that includes changes in the cost of fuel and applies a fuel surcharge to the same movement covering the same time period." PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 10 (internal quotation marks omitted); *see also* PX0451, UPFSC_0354399 (internal UP email chain, June 10, 2004), at '399 ("[C]alculating RCAFU w/o Fuel . . . allows us to couple a fuel surcharge with a rate adjustment that does not contain fuel. It avoids the 'double dipping' complaint we hear from customers."); PX0329, NS_010074364 (NS-Guardian email re renew NSSC 81397 - Guardian, De Witt, IA, Apr. 20, 2004), at '364 (complaint to NS that imposing a fuel surcharge in conjunction with the RCAF results in "double dipping"); PX0266, NS_010000494 (internal NS email re All less fuel, Sept. 19, 2006) at '494 (acknowledging "all the questions [NS]get[s] on 'double dipping'"); PX0386, UPFSC 0037119 (internal UP email re Eastern fuel adjustment clauses, Apr. 10, 2003) at '119 (relaying customer's view that "if eastern RR's [sic] tried to put a fuel adjuster on top of an RCAFU adjuster that would be double dipping and he is not willing to be double dipped"); PX0398, UPFSC 0151957 (internal UP email re RCAFU w/o Fuel Adjustment Strategy, June 10, 2004), at '958 ("The AAR has recently started calculating RCAFU w/o Fuel.

This allows us to couple a fuel surcharge with a rate adjustment that does not contain fuel. It avoids the 'double dipping' complaint we hear from customers."); PX0613, Rose (BNSF) Dep., July 16, 2010, at 40 ("We heard from several customers that were concerned that they were already paying a fuel component through the RCAF methodology."); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 58-59 (explaining that "[redacted]).

383. Pat Glennon, at the time NS's director of price administration, observed, "Philosophically, it is hard to defend applying both a FSC [fuel surcharge] and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages." PX0327, NS_010073903 (NS internal email re RCAF-U vs new Fuel Surcharge, Feb. 13, 2004), at '903.

384. BNSF's Chief Economist, Sam Kyei, testified that the RCAF's inclusion of a "fuel component" impeded broad application of fuel surcharges:

> Q. So if fuel were removed from the RCAF, then you could attach a fuel surcharge to that contract. Is that correct?
>
> A. Yes.
>
> ***
>
> Q. RCAF was basically an impediment to increasing the coverage of the fuel surcharge. Correct?
>
> A. The RCAF fuel component, yes.

PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 134, 205; *see also* PX0613, Rose (BNSF) Dep., July 16, 2010, at 24 (customers did not "want to pay a fuel surcharge on top of RCAF" and complained, "rightly so," that the RCAF was an existing "mechanism to recover fuel").

385. Defendants knew that their coordinated fuel surcharges would generate substantially more revenue than the RCAF fuel price escalator and that this would be at the expense of customers. *See, e.g.*, PX0327, NS_010073903 (NS internal email re RCAF-U vs new Fuel Surcharge, Feb. 13, 2004), at '903 (NS's Alby Pfeifer: "If the choice to a customer is to have an increase based on RCAF-U including the fuel factor and no fuel surcharge vs. RCAF-U without fuel and a fuel surcharge the answer clearly is that the customer is better off with the RCAF including fuel and no surcharge. Conversely the railroad stands to collect considerably more under the current fuel surcharge program.").

386. To facilitate the widespread, across-the-board application of their agreed, rate-based fuel surcharges, Defendants therefore [redacted]. *See, e.g.*, PX0613, Rose (BNSF) Dep., July 16, 2010, at 24 (removing fuel component from RCAF would permit railroads to impose fuel surcharges without being accused of "double-dipping"); PX0857, AAR-E-00036814 (Email from Crimmel (AAR) to Vander Helm (Tensaka), Jan. 18, 2007), at '814 [redacted]; PX0858, AAR-000247 (AAR 2004 Policy & Economics Accomplishments), at '247 [redacted] (emphasis omitted)); PX0859, AAR-000401 (email from AAR to BNSF, Oct. 1, 2007), at '402 [redacted]).

387. In March 2003, CSX requested that the AAR create an "RCAF with fuel held constant." PX0184, CSXFSC000040566 (CSX-AAR email re RCAF with Fuel Held Constant, Mar. 31, 2003), at '566.

388. CSX made this request to sanitize and gain "customer acceptance" for its new approach under which contracts with fuel escalation provisions based on RCAF would be replaced with higher revenue-producing contracts that eliminated that escalation provision and replaced it with the new percentage-based fuel surcharge. *See* PX0184, CSXFSC000040566 (CSX-AAR email re RCAF with Fuel Held Constant, Mar. 31, 2003), at '566 ("We have discussed this at length internally. We think we would have better customer acceptance if this were to come from the AAR. What would be the process to get the AAR to publish this new modified index?").

389. Defendants also understood that using the AAR to adopt the AIILF would legitimize their efforts to impose fuel surcharges on private contracts. *See* PX0634, Anderson (BNSF) Dep., May 26, 2011, at 123-125 ("Q: What would have happened with customers if BNSF had its own index? A: In my experience working with customers, they're . . . not comfortable with something that they can't validate and usually has some independence associated with it, such as a third party producing index . . . The customers, based on my experience, would not be comfortable with a black box or something that is calculated, you know, just internal to the BNSF. There's just not that level of customer trust."); *see also* PX0613, Rose (BNSF) Dep., July 16, 2010, at 204:12-206:19 ("[UP] soon got to the point where they didn't think that we could publish it and that—that we needed the AAR to add . . . an additional index.").

390. By [redacted]F, Defendants anticipated increased ability to impose their fuel surcharge programs. *See* PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 141-143; *see also* P PX0858, AAR-000247 [redacted]

[redacted]), at ‘247 [redacted]).

391. The AAR initially resisted, however, because it was concerned "about the AAR publishing a version of the RCAF that was not calculated the way the law says the RCAF should be calculated." PX0184, CSXFSC000040566 (CSX-AAR email re RCAF with Fuel Held Constant, March 31, 2003), at ‘566.

392. Defendants jointly revisited this issue in the fall of 2003, following executive-level discussions about how they could use the AAR to facilitate implementation of their coordinated fuel surcharge programs. *See, e.g.*, PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at ‘361 ("Discussion followed on fuel surcharges and various application processes as used by different roads. Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers. There was some question as to whether or not the industry can work together on this opportunity, probably through the AAR, or do roads have to handle the opportunity on a bilateral basis."); PX0243, NS_001000422 (BNSF-NS Joint Marketing Meeting notes, July 30, 2003), at ‘424 (CMOs "John Lanigan and Don Seale agreed to lead a discussion of a potential ***industry position on fuel surcharge*** provisions at the next N.E.M.C. meeting.") (emphasis added); PX0026, BNSF_CAL-0007244 (Matt Rose (BNSF) calendar entry, Sept. 5, 2003), at ‘244 ("AAR CEOs" spoke by telephone); PX0024, BNSF_CAL-0007127 (Matt Rose (BNSF) calendar entry, Nov. 18, 2003), at ‘127 (BNSF's Matt Rose and CSX's Mike Ward held a meeting); PX0025, BNSF_CAL-0007136 ("AAR CEOs brkfst. mtg." including "MKR, Mike Ward, Ike Evans, David Goode," Aug. 12, 2003) at ‘136; *see also* PX1114, BNSF_II_03913162 (BNSF 3rd Quarter 2003 Financial

Presentation, Oct. 21, 2003) at '075 (John Lanigan says BNSF was "going to be looking at ways" to take the "fuel component" and "split out" or "carv[e] that out" of RCAF to replace it with "a pure fuel surcharge.").

393. Matthew Rose, BNSF's CEO, [redacted] PX0005, AAR-000159 ([redacted], Nov. 24, 2003), at '159 ([redacted]); *see also* PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 133, 135-137 (explaining that BNSF asked the AAR to promulgate an all-inclusive index without fuel); PX0076, BNSF-0069941 (BNSF letter to AAR, Nov. 3, 2003), at '941 (Matt Rose: "I would also like to know what it would take to start producing such an index on a go-forward basis, beginning January 1, 2004. This will add value to the industry by giving the railroads another mechanism for contract escalation that will be publicly available and approved by the STB."); PX0119, BNSF-0545130 (BNSF staff meeting notes, Dec. 2, 2003), at '130 (noting Matt Rose discussed "Proposed Answers to Craig Rockey's [an AAR employee] Memo"); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 158-161 (explaining that Rose "decided to approach AAR" to create the new index); PX0006, AAR-000164 (AAR Meeting Material, Dec. 11, 2003), at '166 (handwritten notes summarizing meeting: [redacted]); PX0135, BNSF-FSC_000075 (BNSF 3rd Quarter 2003 Financial Presentation, Oct. 21, 2003), at '077 (Lanigan indicated intention to "carv[e]" fuel out of RCAF to "insert[] a pure fuel surcharge"); PX0014, AAR-000403 (internal AAR email thread re AIILF, Aug. 16, 2006) ("[redacted]

[redacted]").

394. At an AAR board meeting on December 11, 2003, Defendants [redacted]. PX0006, AAR-000164 (AAR Meeting Material, Dec. 11, 2003), at '166 ("[redacted]").

395. Defendants recognized that the AIILF was an extraordinary step that would benefit the "bottom line" of all Defendants and facilitate their ability to impose fuel surcharges. *See also* PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 157-58 (explaining that the new index "would allow us to apply the BNSF specific fuel surcharges"); PX0605, Rockey (AAR) Dep., May 18, 2010, at 45 ("[redacted]"); PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 134, 205 ("Q. So if fuel were removed from the RCAF, then you could attach a fuel surcharge to that contract. Is that correct? A. Yes. . . . Q. RCAF was basically an impediment to increasing the coverage of the fuel surcharge. Correct? A. The RCAF fuel component, yes.").

396. The official agenda for and minutes of the December 11, 2003 AAR board meeting omit any reference to [redacted]. PX0006, AAR-000164 (AAR Meeting Material, Dec. 11, 2003), at '163-66.

397. Handwritten notes by AAR personnel, however, reflect [redacted] PX0006, AAR-000164 (AAR Meeting Material, Dec. 11, 2003), at '166.

398. At Defendants' direction, the AAR met this deadline. *See, e.g.*, PX0007, AAR-000207 (AAR Railroad Cost Indexes, Dec. 2003), at '207 ("This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel."); PX0015, AAR-E-00023720 ([redacted]); PX0857, AAR-E-00036814 (Email from Crimmel (AAR) to Vander Helm (Tensaka), Jan. 18, 2007), at '814 ("[redacted]"); PX0157, BNSF-FSC_000766 (NEMC Agenda, Nov. 11, 2004), at '767 (reflecting UP proposal for publication of AIILF, which "would facilitate and support carrier initiatives for cost recovery," specifically "use of this index, coupled with a Fuel Surcharge"); PX0184, CSXFSC000040566 (CSX-AAR email re RCAF with Fuel Held Constant, Mar. 31, 2003), at '566 ("What would be the process to get the AAR to publish this new modified index?").

399. The AAR's Craig Rockey acknowledged that [redacted] PX0605, Rockey (AAR) Dep., May 18, 2010, at 109; *see also* PX0612, Gooden (CSX) Dep., July 16, 2010, at 178.

400. BNSF's chief economist, Sam Kyei, later lauded the move as groundbreaking and beneficial to the entire industry:

> In December 2003, [Matt Rose] . . . got the A.A.R. to establish a non-fuel RCAF index, now called the All-Inclusive Index Less Fuel (or AII-LF). In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this. . . . [T]he combination of sound price escalation using this index and a fuel surcharge should tremendously help our bottom-line for years to come. In fact, . . . the ***entire rail industry should benefit from the escalation options the new index provides***.

PX0077, BNSF-0070502 (BNSF memo re In Recognition of Your Great Leadership, Mar. 15, 2005), at '502 (emphasis added).

401. Having jointly created the AIILF, each Defendant used it to facilitate its widespread imposition of the coordinated fuel surcharges. Defendants adopted policies regarding use of the AIILF in conjunction with fuel surcharges. PX0598, Adams (UP) Dep., Mar. 4, 2020, at 87 (AIILF became UP's "default" index); PX0597, Draper (UP) Dep., Mar. 3, 2010, at 173 (explaining that UP encouraged the application of AIILF "in conjunction with a fuel surcharge"); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 181-82 (agreeing that "the policy of the BNSF as of January 2004" was to "strongly recommend[] that RCAF contracts migrate to the all-inclusive index less fuel (AII-LF) index or an RCAF index excluding fuel component and apply a fuel surcharge"); PX0613, Rose (BNSF) Dep., July 16, 2010, at 45 (AIILF "is what I would call our standard"); PX0616, Young (UP) Dep., Aug. 4, 2010, at 73-75 (agreeing that the AIILF was the "starting point" in contract negotiations); PX0612, Gooden (CSX) Dep., July 16, 2010, at 183-84 (explaining CSX adopted policy of using AIILF "as much as we practically could" and that there could "be no exceptions without [his] approval"); PX0339, NS_010155750 (NS internal email re Auto FSC, Aug. 8, 2006), at '750 ("There are no Automotive contracts containing FSC that also have the fuel component included in the base rate escalator. Most use the AAR All-Inclusive Index Less Fuel (AIILF) . . . ."); PX0305, NS_010047819 (NS internal email thread re adoption of the AIILF, Nov. 23, 2004), at '819 (NS executives noting that the publication of the AIILF "has been accomplished" and telling one another to "better add this [the AIILF] to your list of options and be ready to track"); PX0105, BNSF-0404221 (BNSF Price and Fuel Escalation General Guidelines, Jan. 2004), at '221 ("It is strongly recommended that RCAF contracts migrate to the All Inclusive Index Less Fuel (AII-LF) index or an RCAF index excluding fuel component and apply a fuel surcharge."); PX0052, BNSF-0028109 (BNSF email re "RCAF Less Fuel," Jan. 20, 2004), at '110 ("Lanigan and the VP's have agreed to start escalating contracts with this new

index"); PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 187-88 (describing "series of meetings with the business . . . units" instructing them to use AIILF); PX0170, CSXFSC000000569 (CSX "Commercial Prices—Escalators" presentation, May 2004), at '574 ("Changes to the policy: Everything is subject to fuel surcharge . . . long term contracts can have RCAF(u), AII LF, or fixed increases of at least 5%/year—plus fuel surcharge"); PX0171, CSXFSC000000577 (internal CSX email re Presentation on price and margin improvement, May 11, 2004), at '577 ("I think you may want to consider using the [AIILF] plus fuel surcharge . . . unlike the RCAF(u), when fuel prices come down the AII LF + fuel surcharge will not go negative."); PX0439, UPFSC 0056669 (internal UP email, Oct. 8, 2004), at '669 ("Jack [Koraleski] is wanting marketing to use the AIILF and then add the HDF (Highway Diesel Fuel) to cover our fuel surcharge."); PX0410, UPFSC 0274880 (internal UP email re AIILF request, Oct. 15, 2004), at '880-81 ("Jack, in a voice mail to your direct reports you indicated you wanted them to be using the All Inclusive Index Less Fuel (AIILF) coupled with the Highway Diesel Fuel Surcharge . . . ." and announcing that UP's "cost recovery policy is to use the All Inclusive Index Less Fuel (AIILF) without discounts, coupled with the Highway Diesel Fuel Surcharge."); PX0480, UPFSC0001895 (internal UP email chain re New Rate Adjustment—All Inclusive Index Less Fuel (AIILF), September 2004), at '902 ("UPRR is now endorsing the use of the [AIILF] as an acceptable standard rate adjustment in our pricing documents."); PX0409, UPFSC 0274789 (internal UP email chain re AIILF request, Oct. 14, 2004), at '789 (discussing new "Cost Recovery Policy" directing employees to use the AIILF "without discounts" and considering whether to "expend political capital with the AAR to get this index published"); PX0182, CSXFSC000036522 (internal CSX email chain re 2004 Contract Information, May 11, 2004), at '522 ("The conclusion is that All Inclusive ex Fuel with the fuel surcharge is superior to the RCAFU stand alone."); PX0398, UPFSC 0151957 (internal UP email

re RCAFU w/o Fuel Adjustment Strategy, June 10, 2004), at '958 (directing "shift in rate adjustment strategy from RCAFU to RCAFU w/o Fuel + Fuel Surcharge"); PX0442, UPFSC 0067005 at '005 (Sept. 26, 2005 email from UP to customer DAS Auto [redacted]); PX0214, CSXFSC000317571 (internal CSX email chain re "Pricing guidelines update," Dec. 20, 2005), at '571 (CSX directive that all contracts "include fuel, or aiilf, plus fuel").

402. In 2004, Defendants determined that having the AAR make public the new AIILF index, which had formerly been in an AAR publication only available for purchase, would facilitate the implementation of coordinated fuel surcharges. *See* PX0172, CSXFSC000000643 (CSX internal email re SOMC, NEMC, Joint SOMC-NEMC Meeting Agendas, October 29, 2004) at '643 ("UP is recommending an agenda item to determine if there is additional carrier interest in having [AIILF] publish[ed] [on the AAR website] . . . This publication would allow customers a point to go to for monitoring and understanding the changes in the index. This would facilitate and support carrier initiatives for cost recovery.").

403. Defendants viewed the AAR website as a "'neutral' but authoritative location" for the AAR to publish the new index. PX0415, UPFSC 0279097 (All Inclusive Fuel Index presentation, Nov. 11, 2004), at 6.

404. Defendants concluded publication on the AAR website would lend the AIILF credibility and disguise the fact that Defendants, not the AAR, were the drivers behind its use. *See, e.g.*, PX0615, Couch (CSX) Dep., Aug. 3, 2010, at 176-177 ("[AIILF], whatever you want to call it, we were looking for the AAR to post it for customers . . . [Post] [t]he index. Almost like a third party, here's an analysis of railroad cost increases less fuel."); PX0458, UPFSC 0488760 (internal

UP email re CPS Fuel Escalator, Nov. 2, 2006), at '760 (recommending that customer be told that "AIILF calculations [are] performed by the AAR" in order to facilitate acceptance of UP's standard HDF surcharge and the AIILF); PX0477, UPFSC0001303 (internal UP email thread re AIILF request, Oct. 12, 2004) at '303-305 ("It is important that we have [the AIILF] available on the web available to shippers free of charge.") ("I think it would be helpful if the AAR made the AIILF values available on their web-site").

405. In mid-2004, UP proposed that Defendants discuss at an upcoming November 2004 meeting of the AAR's Network Efficiency Management Committee ("NEMC") the publication of the AIILF on the AAR's website. PX0415, UPFSC 0279097 (All Inclusive Fuel Index presentation, Nov. 11, 2004), at 6.

406. [redacted] PX0860, AAR-E-00114941 (AAR Interline Price Application Committee Rules of Order, Dec. 1, 2006), at '942.

407. UP circulated an "agenda item" for the November 2004 meeting, recommending that the AIILF be published on the AAR website because it would "facilitate and support" Defendants' use of fuel surcharges. PX0157, BNSF-FSC_000766 (NEMC Agenda, Nov. 11, 2004), at '767; PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 269.

408. CSX internally recognized that ***"it would likely be an anti-trust violation to discuss/suggest setting an AIILF industry fuel surcharge formula program at NEMC."*** PX0172, CSXFSC000000643 (CSX internal email re SOMC, NEMC, Joint SOMC-NEMC Meeting Agendas, October 29, 2004) at '643 (emphasis added); *see also* PX0612, Gooden (CSX) Dep., July 16, 2010, at 179-80 (testifying that prior to attending the NEMC meeting, he was informed by lawyers that AIILF publication should not be discussed at NEMC).

409. Nevertheless, on November 11, 2004, UP made a presentation to the other Defendants at the NEMC meeting, stressing that they would all benefit from AIILF publication on the AAR website. PX0415, UPFSC 0279097 (All Inclusive Fuel Index presentation, Nov. 11, 2004), at '097; PX0598, Adams (UP) Dep., Mar. 4, 2020, at 126-29 (discussing his presentation).

410. Following the presentation, Defendants [redacted]. PX0008, AAR-000260 (Minutes of the AAR NEMC Meeting, Nov. 11, 2004), at '262 ("[redacted]").

411. The publication of the AIILF on the AAR website had nothing to do with NEMC's designated functions. *See, e.g.*, PX0605, Rockey (AAR) Dep., May 18, 2010, at 126-29; PX0518, UPFSC_0238066 (UP email re "AAR Committees and Committee Handbook," Jan. 19, 2007, attaching AAR Committee Structure 2004) at '107 (outlining mission).

412. Defendants then further agreed to keep this action "low key" and directed the AAR not to take any action that would bring attention to their joint conduct. *See, e.g.*, PX0440, UPFSC_0062891 (email thread between UP and AAR re AIILF, Nov. 2004), at '892-93 (Adams (UP) provides detailed instructions to Rockey (AAR) concerning layout of AAR website page with AIILF); PX0453, UPFSC_0364655 (email thread between UP and AAR re AIILF, Nov. 2004), at '655-56 (Rockey (AAR) responds); PX0454, UPFSC_0364660 (email thread between UP and AAR continuing this discussion, Nov. 19 2004).

413. The AAR circulated the proposed layout for the AIILF web page to UP, which forwarded it to the other Defendants, who responded with their avowed "support." *See, e.g.*, PX0412, UPFSC 0275191 (UP-BNSF-AAR email chain re All-Inclusive Index Minus Fuel, Nov. 19, 2004), at '191; PX0150, BNSF-FSC_000764 (BNSF Synopsis of NEMC Agenda, Nov. 11, 2004), at '765 ("BNSF created AIILF . . . Approval to not only publish but seek STB agreement

of a publishable AIILF index would be a huge step forward for rail cost recovery. Obviously, we support"); PX0009, AAR-000264 (internal AAR email thread discussing [redacted] Nov. 11, 2004); PX0010, AAR-000269 (Rockey (AAR) email to Adams (UP), Nov. 12, 2004), at '269 (noting [redacted]); PX0011, AAR-0000347 (Adams (UP) email to Rockey (AAR), Nov. 16, 2004), at '347 (providing [redacted]).

414. UP recognized this as "an important step in promoting the AIILF index." *See, e.g.*, PX0440, UPFSC_0062891 (internal UP email re AIILF, Nov. 18, 2004), at '891; *see also* PX0150, BNSF-FSC_000764 (BNSF Synopsis of NEMC Agenda, Nov. 11, 2004), at '765 ("BNSF created AIILF . . . Approval to not only publish but seek STB agreement of a publishable AIILF index would be a huge step forward for rail cost recovery. Obviously, we support").

415. The AAR had initially resisted online publication of the AAILF, in part because it would cause a financial loss to the AAR. Previously the AIILF was only available via subscription to AAR's quarterly RCR Cost Index publication (which cost $80 annually). Putting the AIILF on the AAR website would mean a loss of subscription fees. PX0410, UPFSC 0274880 (internal UP email re AIILF request, Oct. 15, 2004), at '880 ("Currently, the AAR publishes AIILF in their quarterly RCR Cost Index publication. This publication requires paid subscription—$80.00 per year. . . . In discussion with the Craig Rockey and Clyde Crimmal, AAR, they indicated they are not inclined to publish just this one index. Additionally, it is a revenue subscription loss to the AAR.").

416. But because the Defendants controlled the AAR, the trade organization acquiesced to publishing the AIILF on its website, after UP expended "political capital." PX0410, UPFSC

0274880 (internal UP email re AIILF request, Oct. 15, 2004), at ‘880; PX0598, Adams (UP) Dep., Mar. 4, 2020, at 112-13 (UP was “expending political capital” by asking the AAR to publish the AIILF on its website “Because we would be asking it—to put it on the website for ourselves.”); PX0012, AAR-000358 (NS-UP-BNSF-CSX-AAR email re All-Inclusive Index Less Fuel, Nov. 23, 2004), at ‘358 (AAR: “[redacted]); PX0412, UPFSC 0275191 (UP-BNSF-AAR email chain re All-Inclusive Index Minus Fuel, Nov. 19, 2004), at ‘‘191 (BNSF signing off on AAR webpage with AIILF).

417. During the conspiracy period, [redacted]. *See generally, e.g.*, PX0916, [redacted] ([redacted] contract with CSX, May 18, 2005), at 154–55; PX0917, [redacted] ([redacted] contract with BNSF, Sept. 17, 2004), at 164–67; PX0918, [redacted] ([redacted] contract with UP, Dec. 16, 2008), at 731–32; PX0919, [redacted] ([redacted] contract with NS, Dec. 7, 2017), at 570.

418. The new AIILF index also enhanced the impact of the conspiracy for the railroads as it aided the overall industry as it sought to impose fuel surcharges across the board. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶¶ 8.

419. The NEMC was dissolved in September 2009 on the advice of counsel after this litigation brought to light some of Defendants’ conduct in that forum. *See, e.g.*, PX0598, Adams (UP) Dep., Mar. 4, 2020, at 67 (“Q. And why did NEMC cease to exist? A. I just heard it was on advice of counsel.”); PX0607, Hamberger (AAR) Dep., June 7, 2010, at 96-97 (“[redacted]”); PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2,

2011, at 130 (testifying that [redacted]); PX0613, Rose (BNSF) Dep., July 16, 2010, at 196 ("And I also think on advice of counsel that they made a recommendation to eliminate it."); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 128-31 (discussing disbanding of NEMC); PX0001, AAR NEMC-E00000007 (AAR email re "NEMC," Sept. 28, 2009), at '007; PX0002, AAR NEMC-P00000001 (AAR Board of Directors Meeting Minutes, June 2, 2009), at '003.

420. Today, there is no equivalent AAR committee that brings together Defendants' CMOs. *See, e.g.*, PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 54; PX0607, Hamberger (AAR) Dep., June 7, 2010, at 98 ("[redacted]); PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 137-139 (testifying that [redacted].

### 3. The STB Found Defendants' Fuel Surcharges to be an "Unreasonable" Practice With "*Virtually No Prospect* of Reflecting the Actual Increase in Fuel Costs"

421. The Surface Transportation Board ("STB") is an "independent federal agency that is charged with the economic regulation of various modes of surface transportation, primarily freight rail." PX0678, About STB, *available at* https://prod.stb.gov/about-stb/.

422. Congress passed the Staggers Rail Act in 1980, deregulating much of the rail freight industry and permitting rates to be determined by private contract. *See* PX0641, U.S. Government Accountability Office, "Freight Rail Pricing: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers," Report to Congressional Committees, December 2016, p. 4, 6.

423. The STB has certain jurisdiction over the prices of rail freight shipments that are under public tariffs, rather than private contracts. *See* PX0641, U.S. Government Accountability Office, "Freight Rail Pricing: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers," Report to Congressional Committees, December 2016, p. 1.

424. On the other hand, shipments of rail freight under private contracts are exempt from STB price regulation. *See* PX0641, U.S. Government Accountability Office, "Freight Rail Pricing: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers," Report to Congressional Committees, December 2016, p. 1.

425. After receiving many complaints from shippers, the STB announced that it would hold a hearing in May 2006 regarding the use of fuel surcharges in the rail-freight industry. PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 1-2.

426. At the May 2006 hearing, "the shipper community expressed deep dissatisfaction with the railroad industry's methods of assessing fuel surcharges," because "calculating a fuel surcharge as a percent of the base rate results in collecting from captive shippers more than the increased fuel costs associated with their particular traffic," and because "railroads are double dipping." PX0653, STB *Rail Fuel Surcharges*, Ex Parte No. 661, Jan. 26, 2007, at 1.

427. The STB concluded in January 2007 that Defendants' rate-based fuel surcharge program constituted an "industry-wide unlawful" and "unreasonable practice." PX0676, *House Committee on Transportation and Infrastructure: Hearing on Rail Competition and Service*, 110th Cong. 8–9 (2007) (statement of Surface Transportation Board Chairman, Charles D. Nottingham); PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 6, 10.

428. The STB identified the disconnect between fuel surcharges and the cost of fuel, concluding that the railroads' rate-based programs "cannot fairly be described as merely a cost

recovery mechanism," and had "***virtually no prospect*** of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 6 (emphasis added).

429. The STB added that Defendants' fuel surcharge program was "***a misleading and ultimately unreasonable practice***," finding that "***there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied***." PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 7 (emphasis added); *see also id.* at 9 ("For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate—when practical alternatives are available—***would permit them to continue to mislead their customers and would be unfair***.") (emphasis added).

430. The STB thus gutted Defendants' pretextual explanation for their fuel-surcharge programs, holding that a "fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 6-10.

431. The STB attributed this disconnect between fuel surcharges and marginal fuel costs to the fact that the Defendants' fuel surcharges were applied to the entirety of the shipper's rates—rates the carriers had set under "differential pricing" principles to cover both shipment costs and profits in varying amounts. PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 6. The base rate differences between shippers and the fact that fuel surcharges were applied to the entire base rate (not just the portion of the base rate that corresponded to the railroad's fuel cost) meant that fuel surcharges did not align with costs. *Id.* Thus, the STB held "a surcharge that is tied to the level of the base rate rather than to fuel consumption for the movement to which the

surcharge is applied cannot fairly be described as merely a cost recovery mechanism." *Id.* Similarly, the STB observed, "[t]wo shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges." *Id.*

432. The "railroads largely concede[d]" before the STB that their rate-based surcharges were "not tied to the fuel consumption associated with the individual movements to which they [were] applied." PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 1; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 248 (D.C. Cir. 2013) ("The STB was especially troubled by the disconnect between the purported rationale for the fuel surcharges—fuel cost recovery—and the formula's dependence on base rates, which need not reflect the marginal fuel costs of a particular shipment.").

433. The STB ruled that if a "carrier chooses to use a fuel surcharge program, it must be based upon attributes of a movement that directly affect the amount of fuel consumed. In other words, there must be a reasonable nexus to fuel consumption." PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 9.

434. Following the proceedings, the STB's then-Chairman told Congress:

> In January of this year we issued a decision declaring it ***an industry-wide unlawful practice for carriers to use a fuel surcharge to recover more than the increased fuel costs attributable to . . . particular movement[s] [of traffic]***. . . . This action ended an industry practice of charging fuel surcharges as a percentage of a shipper's base rate regardless of the actual fuel costs associated with the transportation of the shippers' goods.

PX0676, *House Committee on Transportation and Infrastructure: Hearing on Rail Competition and Service*, 110th Cong. 8–9 (2007) (statement of Surface Transportation Board Chairman, Charles D. Nottingham) (emphasis added).

435. Moreover, following the STB decision, Defendants did not stop applying the coordinated rate-based surcharges where they were included in existing contracts, nor did it hasten these changes for rate-unregulated traffic (at issue in this litigation) beyond the purview of the STB. Indeed, Defendants *deferred* application of any mileage-based fuel surcharges on existing contracts until after those contracts expired. *See* PX0498, UPFSC 0068712 (UP "Sales Talking Points-UPRR FSC Plans For Internal UPRR Use Only March 2007"), at '713 ("Union Pacific's intention to eventually roll all business, including contracts as they expire, to a mileage-based FSC program."); PX0222, CSXFSC000385966 (CSX email re "Announcement of Fuel Surcharge Changes," Mar. 2, 2007), at '969 ("When your contract expires, your rates will adjust to the new fuel surcharge plus any market-based rate adjustment.").

436. Further, Defendants continued to [redacted] after the STB decision and [redacted]. *See* PX1115, P_SO_00016237 (Southern Company email, April 26, 2007) ([redacted]); PX1116,P_NI_00009495 ([redacted]) ([redacted] included [redacted] despite [redacted]). For example, during negotiations for a [redacted], [redacted] PX1117, P_SO_00008751 (email chain between Southern and NS, May 20, 2008), at '751. [redacted]. PX1118,

P_SO_00000368 (NS-C-9444, effective Sept. 1, 2008), at '382. Likewise, CSX, NS, and UP [redacted] after the STB decision. *See, e.g.*, PX919, P_SO_00000535 (NS-C-19435, effective Nov. 1, 2007); PX1120, P_SO_00000572 (UP-C-52624, effective Jan. 1, 2008); PX1121, P_SO_00015951 (Amendment 1 to CSXT-C-83609, effective July 1, 2008).

437. Moreover, even after the STB hearing, Defendants continued to discuss fuel surcharges privately with one another. For example, UP's Koraleski reported internally in February 2007 that he had discussed fuel surcharges with his counterparts at the other Defendants. PX0511, UPFSC0169555 (internal UP email, Feb. 7, 2007), at '555 ("CSX is going down the PC Miler approach. NS is planning to do away with the fuel surcharge altogether an[d] just change rates when they need to.").

438. On February 9, 2007, CSX CMO Clarence Gooden scheduled a late-evening Friday "Discussion w/BNSF re: Fuel Surcharge." PX0730, CSXFSC000258350 (calendar entry), at '350. CSX did this despite internally recognizing around the same time that "*Anti-trust laws require each railroad to establish its FSC program independently*." PX0179, CSXFSC000006567 (Potential Fuel Surcharge Questions from Customers and Talking Points, Mar. 2, 2007), at '571 (emphasis added).

439. In addition to the Surface Transportation Board's adverse ruling, each Defendant has been the target of a state grand jury subpoena and/or state grand jury inquiry concerning its Rail Fuel Surcharges, as Defendants admitted in their 2007 and 2008 SEC Form 10-Ks. PX0764, CSX 2007 Form 10-K, at '100 ("In 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the civil actions . . . It is possible that . . . other federal or state agencies could

initiate investigations into similar matters."); PX0589, BNSF 2007 Form 10-K, at '10 ("The Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges."); PX0762, NS 2007 Form 10-K, at K16 ("NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation."); PX0706, UP 2007 Annual Report, at 15 ("[T]he Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter.").

## IV. DEFENDANTS' CONDUCT IS CONSISTENT WITH COLLUSION, AND NOT WITH COMPETITION

### A. Defendants Jointly Maintained The False Pretexts That The AIILF Was An AAR Cost-Adjustment Index, That NS's Re-Basing Would Lower Its Fuel Surcharge, And That Their Coordinated Fuel Surcharge Programs Were Intended To Recover Fuel Costs

440. In furtherance of their conspiracy, Defendants jointly maintained a series of pretexts. First, Defendants jointly tried to make the AIILF appear as an AAR-driven cost adjustment index, rather than what it actually was: a vehicle to facilitate Defendants' implementation of their new coordinated fuel surcharges. *Supra* ¶¶ 368–421.

441. Second, Defendants jointly maintained the pretext that NS's "rebasing" of its fuel surcharges on the eve of the 2006 STB hearing was an effort to reduce fuel surcharges, rather than what it was—a scheme to "bake" the fuel surcharges into NS's base rates. *Infra* ¶¶ 559–587.

442. Third, Defendants also jointly a maintained the pretext that their new fuel surcharges were meant to be a fuel cost recovery mechanism. As described in detail above, starting in the early parts of 2003, Defendants' senior-most executives embarked on a series of extraordinary communications, meetings, and phone calls about fuel surcharges, coordinating the

across-the-board use of rate-based fuel surcharges as a mechanism to raise all-in freight rates. *Supra* ¶¶ 92-302. They jointly discussed that "uniform application across the industry would be helpful," PX0460, UPFSC 0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652, and that they should have the same fuel surcharges "in the eyes of our customers" and how to "work together on this opportunity," PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361, all in furtherance of the pretext of using coordinated rate-based fuel surcharges as a means of increasing all-in freight rates.

443. Indeed, as noted above, the STB in 2007 observed and called out the pretextual nature of Defendants' programs: "For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate—when practical alternatives are available—***would permit them to continue to mislead their customers and would be unfair.***" PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 9 (emphasis added); *see also id.* at 7 ("[T]he term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied . . . [I]mposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice.").

444. In fact, as another section of this Court previously found by a preponderance of the evidence, and as discussed further below, *infra* ¶¶ 446–475, 524–553, there is "substantial documentary evidence that indicates that defendants . . . viewed their fuel surcharge programs as profit centers," rather than pure cost recovery measures. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel*

*Surcharge Antitrust Litig. – MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019); *see also* PX0861, AAR-E-00053984, (AAR email re "Class I Railroads – Fuel Surcharge," May 30, 2006) at '984 [redacted].

445. The pretext of fuel cost recovery was also undercut because Defendants had different fuel costs, fuel efficiencies, and fuel-price-hedging practices. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, Ex. B06 (showing Defendants' varying fuel efficiencies from 2002 to 2008, as measured in gross ton miles per gallon, across commodities); PX0594, McIntyre (CSX) Dep., Feb. 18, 2010, at 43, 276. For example, BNSF's lengths of hauls are "more than double what it is on [CSX and NS]" and BNSF "ha[d] a philosophy of putting more horsepower on our trains, . . . so our fuel expense is much higher relative to our general expenses than any of the other class 1's." PX0634, Anderson (BNSF) Dep., May 26, 2011, at 107; *see also id.* ("[W]e burn almost three times as much fuel [as CSX and NS]."). Defendants with lower fuel costs acted against their financial self interest by surrendering their competitive advantage to participate in the Conspiracy. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 180 & n.506 (explaining that better fuel efficiency and lower fuel costs would be sources of competitive advantage that were in competitors' self-interest to protect).

**1. NS**

446. Outwardly, to the public and its customers, NS claimed its fuel surcharge program was a fuel cost recovery program that merely passed on increased fuel costs to shippers. PX0677, Interview with Norfolk Southern CEO David Goode, *CEO Wire*, Dec. 12, 2005, at 2 (NS CEO Moorman: "Well, we, like almost every other transportation company, have a [fuel surcharge]

program in which we are able to pass on the increased cost of fuel"); PX0255, NS_003000754 (letter from Goode (NS) to National Grain and Feed Association, Apr. 28, 2003), at 1 ("Our fuel surcharge was designed to be fair and equitable with all our customers to share the cost of significant increases in crude oil and related diesel fuel prices. . . . [W]e would prefer an environment where fuel surcharges are moot, but at this time, we feel we have in place an equitable fuel cost recovery mechanism that spreads cost absorption between NS and our customers."); PX0347, NS_013001654 (NS email re "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004), at '659 (talking-points memo justifying NS's adoption of the coordinated FSC as a "means to cover broad fluctuations in operating costs due to fuel prices"); PX0862, P_DUKE00087935 (letter from NS to Duke Energy, Sept. 3, 2008), at '935 (describing [redacted]); PX0863, P_EASTMAN00010160 (email from NS to Eastman, May 31, 2007) at '160 [redacted]; PX0864, P_MAERSK00004328 (US Rail – Steering Committee Update, May 15, 2006), at '328 (stating that NS [redacted]).

447. But by the time of the STB's investigation into Defendants' fuel surcharge programs, NS had given up the pretext that it was pricing to its fuel costs. PX0250, NS 001001193 (Written Statement of NS, STB Ex Parte 661, Apr. 27, 2006), at '209 ("Defendants' coordinated Fuel Surcharges were not "calibrate[d] . . . to recover the incremental cost of fuel"); *id.* at '205 (in 2005, NS's "increase in fuel surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."); *see also* PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 7 (STB ruling that Defendants' fuel surcharge program was "a misleading and ultimately

unreasonable practice," and finding that "there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied").

448. NS's CEO has testified that NS's fuel surcharge program was designed not only to account for fuel costs, but also to "price to the market." PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 48-49 ("Q. Let me ask you to assume $23 trigger FSC and . . . $30 a barrel oil. A. Okay. Q. It is true, is it not, that the fuel surcharge in that environment is intended to recover the increment between 23 and 30? A. It is intended to do two things. Q. Okay. A. It is intended to account for that increase in our cost structure. But remember, again, we don't price to cost, we price to the market."); *id*. at 65 ("Q. Before we broke, Mr. Moorman, we were talking about what you testified were the two purposes of the FSC. . . . And just to refresh, the—one purpose is to, it is true, is to recover the incremental cost of fuel over the long-term fuel price, correct? A. That is part of the program. Q. And the other purpose is to raise rates, correct? A. The other purpose is to ensure that we price at the market."); *id*. at 57-58 (A purpose of the FSC "was to make sure that we had a mechanism in place to charge at a market level in what was a very dynamic market . . . . [I]f you are—can within the marketplace charge prices, which allow you to have an equal profit margin or a higher profit margin than you did previously, that is—that is part of business, that is what is part of what you are trying to accomplish when you run any business."); *id*. at 126 ("At the end of the day, we don't price to cost, we price to the market."); *id*. at 74-75 (not aware of any public statement in which NS disclosed that its fuel surcharge program was designed not only to recover fuel costs but also to achieve market pricing).

449. NS's CEO clarified that the fuel surcharge program was designed to set the price "as high as [NS] could within the confines of the marketplace." PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 140; *id*. at 48-49, 57-58, 62-66, 74-75, 126 ("pricing to market" involved raising

rates); PX0338, at NS_010137225 (NS email re "DRG on CNBC talks about fuel prices and rail traffic-corrected e-mail," Oct. 7, 2005), at '225 ("The fact of the matter is that we have been using the upward pressure on trucks to crank up pricing an our own FSC, so the 'gap' between trucks and rail is being managed").

450. Indeed, in July 2004, NS recognized that its "[c]urrent FSC [fuel surcharge] revenues exceed the relative increase in fuel costs when compared to the $23 WTI base." PX0297, NS_010034936 (NS internal email re 7/9 conf call—FSC Options, July 16, 2004), at '938; PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 172 ("highly unlikely" that this document would have misrepresented the data); *id.* at 59-60 (received quarterly reports during comparing incremental fuel costs and fuel surcharge revenues; a "significant number" of these showed over-recovery); *id.* at 110 ("Q. And so the incremental FSC revenue received in 2005, exceeded the increase in fuel costs that was experienced in 2005, correct? A. That seems to be the case.); *see also* PX0291, NS_010033378 (NS email re "Fuel Surcharge Coverage," Nov. 4, 2003), at '378 ("Do I understand this correctly in that we apply the fuel surcharge based on the non-hedged cost to NS? So, it is possible to bill/collect more than what we actually paid for fuel in a given quarter?"); PX0315, NS_010064372 (email from Smith to Lawson re NS FSC-Summary, with attachment, June 30, 2005), at '373 (June 30 2005, FSC Internal Summary) ("Given some broad assumptions, NS averaged 146% of expense coverage for fuel YTD 2005 . . . ."); PX0608, Neikirk (NS) Dep., June 15, 2010, at 182-83 ("And the fourth bullet point [on an internal NS "FSC Strategies and Options document] says, 'Current FSC revenues cover approximately 120% of the relative increase in fuel cost when compared to a WTI base price of $23 per barrel, or $0.73 per gallon NS diesel.' A. I do. Q. Did you perform that analysis? A. I don't know if I did or not. Q. But that—is that consistent with the analyses you were performing around that time? A. It is. It is

in the ballpark of the immediately prior month"); PX0317, NS_010067104 (NS email re "recent contract discussions NSSQ 36961," Mar. 11, 2006), at '104 (customer telling NS "[t]he unilateral imposition of fuel surcharges continues to be problematic, particularly when compared to the actual cost of fuel for specific movements. We view the fuel surcharge as another source of revenue for the NS since it greatly exceeds the actual fuel used for car movement.").

451. For instance, in 2006, NS collected approximately $1.03 billion in fuel surcharge revenue, a number that exceeded by approximately $54 million NS's total (not incremental) fuel costs for the same year. PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 96; PX0267, NS_010002881 (NS email re "Fuel Surcharge Status through February 2007," with attachment, Mar. 5, 2007), at '883 (listing "FSC Billed list Net of I/L Settlement and H/L Payment Total For 2006 as $1,03,415,664); PX0703, NS 2006 Form 10-K, at K44 (listing NS's 2006 diesel fuel expense as $977 million).

452. Focusing on NS's incremental fuel costs—that is, fuel costs above those accounted for in base rates—NS over-recovered by "an even wider margin." PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 99-100 ("Q. The $1 billion—$1,031,000,000 of FSC revenue— A. Yes. Q. —that was achieved in 2006— A. Right. Q. —was—we may have previously agreed to this but it was— it was higher than the total fuel costs for 2006, correct? A. Right. Right. Q. And it also was higher by an even wider margin than the incremental—the portion of the total fuel price that reflects incremental increase over the core assumption that was used as the trigger? A. We agreed on that. Yes."); *see also id.* at 85-87 (in 2006 NS "recognized an increase in FSC revenue that was $100 million more than the increase in [its] diesel fuel cost during that year"; that $100 million accounted for approximately one half of the increase in NS's net income and one quarter of the increase in its operating income for 2006).

453. NS declined to implement any sort of pricing directive to ensure against fuel surcharges resulting in over-recovery of fuel costs, as such a policy would have been "[in]consistent with pricing to the market." PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 106-07; *id.* at 134 (agreeing that NS does not "do pricing in a way to ensure that the FSC is not recovering more than – [its] fuel costs.").

454. To the contrary, NS leadership hoped to hide the fact that the fuel surcharge program was a profit center. PX0286, NS_010027582 (NS internal email re Conversation, May 18, 2004) at '582 ("Pat Glennon told me today that based on the high level numbers from accounting it seems like all the Merchandise rev/car increases are coming from fuel surcharges. I'm not sure Don [Seale] would be in agreement with having this widely known . . . ."); PX0296, NS_010034752 (email from Don Seal to Denise Deas, July 2, 2004) at '752 ("Release the table to Finance showing the estimated total FSC amount. For the purpose of gauging FSC collection versus anticipated expenses in our fuel cost the breakout by group is not required and I would prefer this not be sent to Finance"); PX0341, NS_010187734 (internal email re 1QTR04 Revenue Yield, Aug. 31, 2004 ), at '734 ("I'm not sure I understand the last sentence that FSC remains a non-issue. It directly impacts the gains in revenue per car and in FP with over 90% coverage on NS originated business with the fuel surcharge at higher level than same period last year, how can it not have an impact???"); PX0331, NS_010075153 (June 21, 2004 email detailing FSC's as a percentage of revenue gain) at '154 ("[T]he net revenue per car yield for the months of January through March appear to be heavily dependent on FSC revenues for most of the reported gains."); PX0307, NS_010049215 (internal NS email re Revenue Yield Report—1QTR05, Apr. 13, 2005), at '215 ("Don't pass this report around. It can be misinterpreted and used to draw erroneous revenue conclusions in other areas"); PX0314, NS_010062715 (internal email, Jan. 7, 2005), at

‘715 (“We have our story that it is market based. How much longer we can get by with that remains a subject of debate.”); P PX0261, NS_007001911 (internal email, Aug. 2, 2004 ), at ‘911 (“Revenues from the combined FSC/hedging program appear to exceed current fuel costs.”); PX0562, NS Q2 2004 Earnings Conference Call, July 28, 2004, at 97 (NS: “We’ll report that to you on a quarterly basis, what the numbers that you want to know? Questioner: “Percentage of revenue with fuel surcharges? . . . Revenues that have fuel surcharges attached to them?” NS: “I don’t think we want to be that specific.”); PX0330, NS_010075119 (NS email re “Hedging and the FSC,” June 18, 2004), at ‘119 (“He left a message that he would talk but not put anything in writing. . . . Yes, we harvest more than our cost thru the various programs like hedge and an aggressive FSC, but that since some traffic takes [no] FSC at all (30 to 40% we need the high FSC to cover the gaps. In other words, we won’t get anything that we can use publicly.”).

455. When a customer complained about potential over-recovery, NS’s Pat Glennon privately conceded, “[f]or what it is worth, I don’t have a good formula/mathematical based response. . . . [I]t’d be hard to make a case that [the then-prevailing surcharge] is right on the mark. Therefore, we don’t argue the point.” PX0337, NS_010091342 (email from Virgil Corcoran to Pat Glennon, June 16, 2006) at ‘342. He then concluded, “[b]ottom line, who says we must price to cost[?]” *Id.*; *see also* PX1122, Zintak (CF Indus.) Dep., at 36 [redacted].

**2. UP**

456. Like NS and the other Defendants, UP propounded to its customers and the public the false proposition that the “standard fuel surcharge program that we are uniformly requiring of all of our customers” was a “full-recovery fuel surcharge program.” PX0418, UPFSC 0342882

(UP-GM letter, April 22, 2005), at '883; *see also* PX0865, UPFSC_II_00159524, (email from UP to California Steel, Oct. 3, 2005) at '525 (describing UP's FSC as a "fuel cost recovery program"); PX0866, P_GM00053190 (UP Customer Notification to GM, Mar. 21, 2007) at '190 ("To our customers: From the beginning of our fuel surcharge program in 2002, Union Pacific's goal has been to have a fuel surcharge that recovers incremental fuel costs as a result of the extraordinary increase in energy prices.").

457. But as early as 2003, UP recognized that "on a straight percentage basis a [customer] with a higher rate will pay a higher surcharge although he may not be using a higher amount/cost of fuel." PX0514, UPFSC_0184102 (UP internal email re "EXORBITANT Rail Fuel Cost Recovery," Mar. 12, 2003), at '102.

458. UP's internal analyses acknowledged it was significantly over recovering fuel costs on the shipments to which fuel surcharges were applied, concluding from the start that "[f]or every $1 in additional [fuel] cost we would have recovered" more than $1.00 under the new surcharge. PX0434, UPFSC 0046300 (Fuel Surcharge Analysis spreadsheet, Apr. 28, 2003), at '301; PX0452, UPFSC 0361546 (handouts provided during Director meeting regarding "Fuel Surcharge Recovery Analysis," Oct. 3, 2005) at '572 (acknowledging that UP's standard fuel surcharge would yield more than 100% of incremental fuel expenses when applied to entire revenue base); PX0402, UPFSC 0184695 (internal UP email re "Fuel Surcharge Q&A and Supporting Info," May 2, 2003), at '695 (observing that the $23 trigger price cannot be "'defend[ed]'" to customers on the basis of "the historical information and analysis we have on our side"); PX0435, UPFSC 0046663 (internal UP email regarding "FSC Recovery at Various Fuel Price Levels," Nov. 18, 2005), at '663 (Nov. 17, 2005 email from Adams (UP) to Bob Toy (UP) explaining "expect[ation]" that agriculture, industrial products, and chemical would yield a "composite fuel recovery

percentage [of] much greater than 100%"); PX0447, UPFSC 0233086 (UP email re "Customers at Risk with Current FSC Program," Dec. 20, 2005), at '086 ("[G]ive me your feedback where you believe we are at risk on business where we are 'over-recovering' fuel on business. . . ."); PX0433, UPFSC_0045322 (UP email re "Fuel Surcharge Feedback" and attachment, Dec. 19, 2005), at '323 (noting that a drawback of "Maintain[ing] existing HDF Fuel Surcharges" was that that "[d]oes not address over and under recovery for individual customers/markets").

459. UP's finance department calculated a "recovery percentage" of 188% for its intermodal group for the first quarter of 2005. PX0430, UPFSC 0020640 (UP email re "1Q 2005 IMC Fuel Surcharge Recovery," Apr, 19, 2005), at '640.

460. An October 2005 presentation shows UP estimated greater than 100% of incremental fuel cost recovery through fuel surcharges for each of its six business groups. *See, e.g.*, PX0395, UPFSC 0103468 (internal UP email re Fuel Surcharge Presentation attaching Fuel Surcharge Analysis presentation, Oct. 12, 2005), at '469 (reflecting that the "Fuel Recovery %" is over 100% for all business groups listed); PX0422, UPFSC 0440263 (internal UP email, Oct. 10, 2005) at '263 ("Overall UP recovery rate for HDF FSC was 119%"); PX0432, UPFSC 0045248 (UP email re "Fuel Surcharge Recovery Exhibit," Nov. 16, 2004), at '249; PX0519, UPFSC0257900 (internal UP email, Nov. 17, 2004) at '900 ("[W]e are recovering 127% of fuel on the fertilizer network. . . ."); PX0436, UPFSC 0047141 (internal UP email, Dec. 20, 2005) at '141 (identifying a list of customers who are most likely to challenge "the UP Fuel Surcharge program as unfair" because UP was "recovering greater than 100% of incremental fuel costs. . . ."); *see also* PX0704, UP 2004 Annual Report, Dec. 31, 2004, at 19 (discussing UP's hedging program); PX0611, Knight (UP) Dep., July 9, 2010, at 164 (agreeing that the fuel cost recovery for UP's six business groups was listed as over 100%).

461. A few months later, UP employees recognized that "it appears that the fuel surcharge exceeds the increased cost of fuel" and asked "how can we justify that to our customers?" PX0382, UPFSC 0013039 (topic outline for internal meeting, Mar. 20, 2006), at '040.

462. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value'" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." PX0391, UPFSC 0066571 (internal UP email re Toyota Fuel Surcharge Analysis, Aug. 2, 2005), at '571; PX0611, Knight (UP) Dep., July 9, 2010, at 258 ("I would say I was the leader in believing that we should earn a margin on the cost of fuel.").

463. In 2006, UP CEO Jim Young argued in his internal self-evaluation submitted to the UP board for purposes of setting his compensation that "[t]he . . . $393 million year-over-year price-driven increase in fuel cost was *more than offset* by Marketing's aggressive fuel cost recovery program and Operating's effective fuel conversation practices." PX0403, UPFSC 0184811 (internal UP email, with attached UP 2006 CEO Evaluation Comments from Jim Young, Feb. 2, 2007), at '817 (emphasis added).

464. Internally, UP articulated the need "to protect the company (1) from any appearance of building rates with high fuel costs and then charging fuel surcharge and (2) from any embarrassment this appearance would bring should a regulatory agency investigate this pricing mechanism." PX0449, UPFSC_0263385 (internal UP email, Mar. 10, 2006), at '385; *see also* PX1122, Zintak (CF Indus.) Dep., at 36 [redacted].

**3. CSX**

465. CSX, like the other Defendants, misleadingly publicized its fuel surcharge program as a "fuel cost recovery program." PX0185, CSXFSC000084489 (CSX press release, Mar. 20,

2003), at ‘489; PX0196, CSXFSC000152731 (CSX internal email re Effective June 1, 2003 CSXT Fuel Surcharge Is Modified To Be More Responsive To Market Conditions, with attached mailers to shippers, Mar. 27, 2003), at ‘732; PX0864, P_MAERSK00004328 (US Rail – Steering Committee Update, May 15, 2006), at ‘328 (stating that CSX “confirmed intent with FSC [is] primarily to recover incremental costs”). Senior CSX official Giftos wrote to several shipper groups that the coordinated fuel surcharges were an “attempt to recoup” just “***some*** of the huge increases in our costs.” PX0190, CSXFSC000098453 (letter from CSX to various shippers, May 13, 2003) at ‘453 (emphasis added); *see also* PX0867, CSXFSC000153239 (letter from CSX to Lyondell Chemical Company, Aug. 26, 2003), at ‘239–40 (attributing the new FSC to “[t]he cost of fuel – and the volatility of fuel prices” and claiming the new FSC “would enable us, and you, to be held to a more accurate reflection of the cost of fuel – as it increases or decreases”). And CSX’s chairman and CEO Michael Ward “defended the company’s fuel surcharge policy, saying ‘in no way is this designed to make us money.’” PX0353, NS_013006723 (email, with included article titled “CSX CEO sees truck diesel allowing ’07 price rises.” Apr. 20, 2006), at ‘724.

466. But internally, CSX recognized that its fuel surcharges overcovered on the shipments to which they were applied. Indeed, CSX said internally that “[i]f we had 100% fuel surcharge coverage, ***we would actually be recovering twice the incremental fuel expense above the surcharge trigger point***.” PX0187, CSXFSC000086525 (internal CSX email re Fuel Surcharge, June 3, 2004), at ‘525 (noting further that “[c]urrently, approximately 36% of CSXT revenue is covered by fuel surcharge. At this level, we recover about 70% of our incremental fuel expense above the surcharge trigger point of $23 per barrel (WTI)”).

467. Like the other Defendants, CSX took steps to hide its over recovery on fuel surcharges. PX0187, CSXFSC000086525 (internal CSX email re Fuel Surcharge, June 3, 2004),

at '525 (vice president of CSX receiving information acknowledging that CSX would recover twice the incremental fuel expenses above the surcharge trigger point if they could achieve 100% fuel surcharge coverage, and replying "***please don't communicate to anybody outside this company that a customer who pays [the fuel surcharge] is paying twice his fair share***.") (emphasis added); PX0173, CSXFSC000000850 (Fuel Surcharge Strategy, Apr. 10, 2006), at '857 ("[W]hile we have under-recovered until now, increased coverage would lead to in-year over-recovery starting 2006."); *see also* PX1122, Zintak (CF Indus.) Dep., at 36 ("[A]ny time we asked the railroads to provide information that they weren't making money on the fuel surcharge, we never got anything back from them.").

**4. BNSF**

468. Publicly, BNSF joined the other Defendants in claiming that its fuel surcharge program was "designed to cover the spikes in fuel prices" and that "[t]he FSC allows BNSF to recover a portion of its increased expense when the price of diesel fuel increases significantly." PX0125, BNSF-0572444 (BNSF Fuel Surcharge Script), at '444; PX0613, Rose (BNSF) Dep., July 16, 2010, at 101 ("So we—we just went down the path with a principle that we said to our customers, that we said to the regulator, that we said to politicians that over the long term we want our fuel costs—our fuel revenue to mirror our fuel costs and not that—we could have gone down another path to make it a—more focused on a revenue enhancer.").

469. BNSF told its customers that its fuel surcharge program was "standard fuel cost recovery," which was part of the "requirement for BNSF to recover the cost of fuel." PX0868, P_MAERSK00008769 (Letter from BNSF to Maersk, Dec. 20, 2004) at '769; *see also* PX1122, Zintak (CF Indus.) Dep., at 36 [redacted].

470. Internally, however, BNSF, like the other three Defendants, understood that "the [fuel surcharge] program is a revenue maximization program, not protection against fuel prices," and that fuel surcharges "make money. Big money." PX0093, BNSF-0344944 (internal BNSF email re (Larger) Marketing Staff Meeting, Jan. 2, 2004), at '944; PX0110, BNSF-0479452 (email between Kevin Kaufman and Mathew Rose, May 5, 2006), at '452 ("[F]act is that [FSCs] make money. Big money."); PX0112, BNSF-0480574 (BNSF internal email re "AAR," May 5, 2006), at '574-75 (Rose: "Hamburger is hearing from the other rr that that the "market" is not happy with our approach on fuel. Advise" . . . Branscum: "Not surprising they are unhappy since it appears some make money on FSC.").

471. Indeed, BNSF's finance team recognized that the fuel surcharge program was not about fuel cost recovery. In early January 2004, on the heels of the adoption of the AIILF at the AAR, David Burr, an assistant VP of fuel and risk management, wrote that "I do not want [chief marketing officer] John Lanigan indicating that we endorse the [fuel surcharge] program over hedging. ***We believe the [fuel surcharge] program is a revenue maximization program, not protection against fuel prices***." PX0093, BNSF-0344944 (internal BNSF email re (Larger) Marketing Staff Meeting, Jan. 2, 2004), at '944 (emphasis added).

472. In March 2006, BNSF recognized internally that Defendants' coordination of fuel surcharges for intermodal shipments made them a "'profit-center' … for the customers that participate." PX0020, BNSF_0691131 (presentation re BNSF Railway Fuel Surcharge—Comparison Of Class 1 Programs, Mar. 27, 2006), at '138.

* * *

473. Defendants' joint efforts to increase prices by imposing these above-cost fuel surcharges reversed the trend of declining prices since the deregulation of the railroad industry and

the emergence of competition among railroads. Prices fell consistently until the alleged conspiracy began, but with the beginning of the conspiracy period prices steadily increased. PX0593, Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, Study of Railroad Rates: 1985-2007 (Jan. 16, 2009), at 2 fig.1 (reflecting STB Rail Rate Index from 1985 to 2007).

474. Independent studies confirm the over-recovery resulting from the imposition of the new standard fuel surcharges. PX0656, U.S. Dept. of Agriculture and U.S. Dept. of Transportation Study of Rural Transportation Issues, Apr. 2010, at ix ("There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001 to 2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."); *id*. at 260 (chart showing the increasing spread between fuel costs and fuel surcharges for grain, which expanded substantially beginning in 2003-04 and continuing thereafter); *id*. at 272 ("Rail rates have increased rapidly since 2004 resulting in a surge of railroad profitability. The increase reflects not only increased rail costs, but aggressive pricing and over-recovery of fuel costs. Fuel surcharges seemingly should reimburse railroads for the increase in fuel costs, not be sources of additional revenue."); PX0683, Analysis of Rail Fuel Surcharges During the Period 2003-2007, Report to American Chemistry Council, July 25, 2007, at p.2 (calculating over-recovery during 2003-07 of more than $6 billion).

475. Contemporaneous evidence also confirms that the fuel surcharges operated to increase freight rates during the conspiracy period, far beyond the relative increase in Defendants' fuel costs. PX0297, NS_010034936 (NS internal email re 7/9 conf call—FSC Options, July 16, 2004), at '938 (In July 2004, NS recognized that its "[c]urrent [fuel surcharge] revenues exceed the relative increase in fuel costs when compared to the $23 WTI base."); PX0630, Moorman (NS)

Dep., Jan. 7, 2011, at 172 ("highly unlikely" that this document would have misrepresented the data); *id*. at 59-60 (received quarterly reports during comparing incremental fuel costs and fuel surcharge revenues; a "significant number" of these showed over-recovery); PX0330, NS_010075119 (NS email re "Hedging and the FSC," June 18, 2004), at '119 ("He left a message that he would talk but not put anything in writing. . . . Yes, we harvest more than our cost thru the various programs like hedge and an aggressive FSC, but that since some traffic takes [no] FSC at all (30 to 40% we need the high FSC to cover the gaps. In other words, we won't get anything that we can use publicly."); PX0315, NS_010064372 (email from Smith to Lawson re NS FSC-Summary, with attachment, June 30, 2005), at '373 ("Given some broad assumptions, NS averaged 146% of expense coverage for fuel YTD 2005"); PX0395, UPFSC 0103468 (internal UP email re Fuel Surcharge Presentation attaching Fuel Surcharge Analysis presentation, Oct. 12, 2005), at '469 (reflecting that the "Fuel Recovery %" is over 100% for all business groups listed); PX0422, UPFSC 0440263 (internal UP email, Oct. 10, 2005) at '263 ("Overall UP recovery rate for HDF FSC was 119%"); PX0432, UPFSC 0045248 (UP email re "Fuel Surcharge Recovery Exhibit," Nov. 16, 2004), at '249; PX0519, UPFSC0257900 (internal UP email, Nov. 17, 2004) at '900 ("[W]e are recovering 127% of fuel on the fertilizer network. . . .").

### B. After Receiving Push Back From The Other Defendants, BNSF Acted Contrary To Its Unilateral Self Interest By Largely Ignoring The Internal Recommendation Of Its Sales People To Switch To A Mileage-Based Fuel Surcharge

476. As discussed above, in both 2003 and again in 2004 BNSF considered switching from a rate-based fuel surcharge to a mileage-based fuel surcharge. *Supra* ¶¶ 141–150, 228–237.

477. Implementation of a mileage-based fuel surcharge program would have been in BNSF's unilateral self-interest, given BNSF's relatively long average length of haul, as compared to the other Defendants. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 184-187. BNSF's CEO

Rose acknowledged at his deposition that BNSF customers were "push[ing] back" on rate-based fuel surcharges and that BNSF believed "fuel is best represented by tons and miles and not by the freight bill—revenue side of the freight bill." PX0613, Rose (BNSF) Dep., July 16, 2010, at 25. As one contemporaneous internal BNSF email noted, "[t]he customer support for our fsc mileage application was overwhelming. The eastern rr and cn are nervous." PX0041, BNSF_0001325 (internal BNSF email, Oct. 5, 2005), at '325.

478. The other Defendants recognized that using mileage-based, as opposed to rate-based surcharges, would put the other Defendants at a competitive disadvantage as compared to BNSF, because BNSF had longer hauls than the eastern railroads. PX0249, NS 001001082 (NS internal email re "BNSF," July 1, 2005), at '082 (following a conversation with BNSF CMO John Lanigan, NS CMO Don Seale reported to his boss that "it is clear that BNSF sees an advantage in a mileage based [fuel surcharge] due to its greater length of haul, and a corresponding disadvantage for us due to our shorter hauls"); PX0306, NS_010049047 (internal NS email, Mar. 30, 2005), at '047 (NS concluding that "BN's 'mileage' based *proposal*" could be "less equitable to eastern carriers")(emphasis added); PX0309, NS_010052639 (internal NS email, Jan. 26, 2006), at '640 ("A mileage based FSC seriously complicates the way a RR publishes, quotes and bills a FSC."); PX0362, NS_033000559 (NS "FSC Rebase Analysis" Memo, Feb. 12, 2006), at '560 ("The BNSF has announced a new mileage based program . . . . Other RRs may be pressured to react in some manner."); PX0310, NS_010053814 (internal NS email, June 13, 2005), at '814 (discussing options for implementing a mileage based FSC because they "might need it to keep up with the BNSF. . . ."); PX0614, Glennon (NS) Dep., July 20, 2010, at 225-226 (agreeing that if there was a switch to a mileage-based fuel surcharge, NS would have to double its fuel surcharge to earn as much as it had under rate-based fuel surcharge); PX0225, CSXFSC000675379 (CSX Intermodal

presentation "Intermodal Fuel Surcharge: Mileage vs. Revenue Based (current method)," Aug. 22, 2005), at '385 (CSX "negatively impacted" by a mileage-based fuel surcharge "due to the higher density and more developed highway network in the East"); *see also* PX0118, BNSF-0535331 (BNSF internal email re MKR speaker notes, Mileage Based Fuel Surcharge Implementation, Apr. 11, 2007), at '331 ("Current methodology divides the FSC by revenue percent. Therefore, the East refuses to go to mileage based FSC splits because they will no longer be able to collect their FSC premium."); PX0173, CSXFSC000000850 (Fuel Surcharge Strategy, Apr. 10, 2006), at '862 ("A mileage based fuel surcharge would reduce our competitive position on lower [revenue per car] traffic."); PX0455, UPFSC_0394743 (internal UP email, Mar. 30, 2005), at '743 (acknowledging [redacted]).

479. As detailed above, *supra* ¶¶ 141–150, 228–237, rather than simply implement the more favorable mileage-based surcharges recommended by the BNSF sales team, BNSF's senior executives decided to first consult with the other Defendants. And after receiving "pushback" from the other Defendants, BNSF decided to forego use of the mileage-based fuel surcharges except in very limited circumstances involving local shipments.

### C. Defendants' Fuel Surcharge Programs Were Nearly Identical And Moved In Lockstep, Notwithstanding That Defendants Variation In Fuel Costs And Hedging Activities Among Defendants

480. "From 1980 to 2007, rail employee productivity rose 428 percent, locomotive productivity rose 124 percent, the productivity of each mile of track rose 225 percent, and fuel efficiency [measured in gallons per ton-mile] rose 85 percent." PX0679, Association of American Railroads, "U.S. Freight Railroad Productivity," Feb. 2009, at 1.

481. BNSF achieved record fuel efficiency during the conspiracy period. PX0680, BNSF—Fuel Efficiency ("BNSF's fuel efficiency has increased by 7.7 percent since 1999.");

PX0697, BNSF 2007 Annual Report, at 13 ("[W]e were able to achieve record fuel efficiency with a nearly 3 percent improvement over 2006, avoiding the purchase of more than 38 million gallons of fuel, saving $90 million. . . .").

482. BNSF's Chief Economist testified that BNSF's "fuel intensity"—the ratio of fuel cost to total expenses—varied over time with, among other things, improvement in fuel efficiency, and varied across commodity groups. PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 67-79.

483. NS internal personnel likewise indicated that fuel efficiency improved from 2003 through 2005. PX0345, NS_011000108 (NS email re "Gross Ton Miles/Gallon," Jan. 4, 2006), at '108 ("We have achieved a 5.9% improvement in fuel efficiency from 1996. As you can see, from 2004 to 2005 we have improved 0.13% in efficiency.").

484. Between 1998 and 2009, UP improved its fuel efficiency by 20 percent. PX0681, Union Pacific, 2009 Sustainability and Citizenship Report, June 2010, at 9 ("Since 1998, Union Pacific has improved fuel efficiency by 20 percent."); *see also* PX0706, UP 2007 Annual Report, at 21 ("Our fuel conservation efforts allowed us to improve our consumption rate by 2%. Locomotive simulator training, operating practices, and technology all contributed to this improvement, saving approximately 21 million gallons of fuel in 2007.").

485. CSX significantly improved fuel efficiency during the Conspiracy Period. PX0211, CSXFSC000279958 (draft fuel surcharge talking points, Apr. 5, 2006), at '958 (CSX "actively works toward increased fuel efficiency. In 2005, CSX improved fuel efficiency 2.4%. The company achieved 1.28 gallons per thousand gross ton miles in 2005, versus 1.32 gallons in 2004. This equated to about 19 million fewer gallons of fuel consumed in 2005 compared to 2004.").

486. AAR studies likewise confirm Defendants' significant improvements in fuel efficiency. PX0682, AAR, "Railroads: Green From the Start," July 2009, at 1 ("In 2008, U.S.

freight railroads moved a ton of freight an average of 457 miles per gallon (up from 436 in 2007) Rail fuel efficiency is up 94 percent since 1980.").

487. The AAR's Craig Rockey testified that [redacted]. PX0605, Rockey (AAR) Dep., May 18, 2010, at 248 [redacted].

488. Each of the Defendants' own fuel efficiency varied from that of the other Defendants. *See, e.g.*, PX0345, NS_011000108 (NS email re "Gross Ton Miles/Gallon," Jan. 4, 2006), at '108 (NS "achieved a 5.9% improvement in fuel efficiency from 1996" to 2006, from "2004 to 2005 [NS] improved 0.13% in efficiency," whereas BNSF improved fuel efficiency by about 1% from 2004 to 2005, and BNSF's 2005 fuel efficiency was 758 GTM/gallon of diesel fuel, whereas NS's fuel efficiency in 2005 was 748.8 GTM/gallon of diesel fuel); PX0283, NS_010017370, The Railroad Week in Review, Nov. 4, 2005, at '374.

489. Defendants also operated different hedging programs, which yielded widely varying hedge benefits against fuel price changes. PX0705, UP 2003 Form 10-K, at 26; PX0585, UP 2006 Form 10-K, at 35; PX0707, UP 2008 Form 10-K, at 79; PX0711, CSX 2003 Form 10-K, at 18; PX0699, CSX 2004 Form 10-K, at 11; PX0700, CSX 2005 Form 10-K, at 15; PX0701, CSX 2006 Form 10-K, at 35; PX0588, CSX 2007 Form 10-K, at 46; PX0712, BNSF 2001 Form 10-K, at 15; PX0713, BNSF 2002 Form 10-K, at 12; PX0696, BNSF 2003 Form 10-K, at 13; PX0563, BNSF 2004 Form 10-K, at 16; PX0572, BNSF 2005 Form 10-K, at 24; PX0584, BNSF 2006 Form 10-K, at 23; PX0589, BNSF 2007 Form 10-K, at 16; PX0698, BNSF 2008 Form 10-K, at 17; PX0714, NS 2002 Form 10-K, at p. K62; PX0558, NS 2003 Form 10-K, at K27; PX0702, NS

2004 Form 10-K, at K26; PX0708, NS 2005 Form 10-K, at 39; PX0703, NS 2006 Form 10-K, at 33; PX0590, NS 2007 Form 10-K, at K38.

490. At the outset of the conspiracy, NS employees internally noted that NS's advantages in hedging called into question the benefits to NS of adopting the fuel surcharges that CSX had adopted. NS employees characterized the fuel surcharges that CSX had adopted in March 2003 as a "means of getting a price increase NS was unable to obtain through negotiations" and that implementation of CSX's program was not justified because "NS's current fuel hedging and fuel surcharge collections are effective at protecting NS exposure to fuel price increases." PX0254, NS_001000316 (NS internal email re "Fuel Surcharge Change Pro/Con," Apr. 17, 2003), at '317-19 ("Given our fuel hedging initiative, has NS lost more than the surcharge produced? If not, then there is no need to implement a change . . . To me the fuel clause should only be used to recover extraordinary costs. It should not be a means of getting a price increase NS was unable to obtain through negotiations. . . . The facts seem to support the notion that NS' current fuel hedging and fuel surcharge collections are effective at protecting NS exposure to fuel price increases. As such, adoption of the new CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs."); *see also* PX0608, Neikirk (NS) Dep., June 15, 2010, 125 ("And let's just go to the last sentence of Mr. Heslep's e-mail. It says, 'However, my general sense is that the combined effect of hedging and fuel surcharges do a decent job of protecting NS income from significant spikes in diesel fuel costs.' Do you see that? A. I do. Q. And do you agree with Mr. Heslep's summary of your analysis? A. If you are confined to this time period, I do."); PX0264, NS_009000247 (NS email re Finance Committee Fuel Hedging Presentation attaching Review of Norfolk Southern Fuel Hedge and Surcharge Programs, June 4, 2004) at '251 (justifying the NS Fuel Hedge Program because "[p]revious fuel surcharge

mechanisms did not adequately compensate for fuel cost fluctuations."); PX0558, NS 2003 Annual Report and Form 10-K, at 5 (discussing success of hedging program); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 161-62 (NS's hedging program was "effective in carrying out the intention we had for it," which was to "protect, if you will, ourselves and our budget against unforeseen changes in the cost of fuel").

491. In the first quarter of 2003, NS's hedging program reduced its average price of diesel by 25% from $1.06/gallon to $0.80/gallon. PX0254, NS_001000316 (NS internal email re "Fuel Surcharge Change Pro/Con," Apr. 17, 2003), at '317-18.

492. At the end of 2003, when NS prepared to adopt the Defendants' coordinated fuel surcharges, NS in fact already had 63% of projected 2004 fuel consumption hedged. PX0558, NS 2003 Annual Report and Form 10-K, at K27.

493. According to BNSF's 2003 annual report, BNSF's hedging program covered 65% of fuel purchased, saving it 5.4 cents per gallon on that volume of fuel purchases. PX0696, BNSF 2003 Annual Report and Form 10-K, at 12.

494. In its 2003 annual report, CSX announced that 18% of its projected 2004 fuel purchases were hedged, but that it planned to increase this coverage to 76% by July 2005. PX0665, CSX Corporation 2003 Annual Report, at 36.

495. UP's sophisticated hedging program used financial instruments such as "swaps," "collars," and "caps" that, according to UP, "act much like an insurance policy against high fuel prices." PX0473, UPFSC0001074 (UP "Fuel Surcharge FAQ"), at '076.

496. Defendants recognized that fuel hedging and the fuel surcharges they assessed were inter-related. *See, e.g.*, PX0332, NS_010075401 (internal NS email, Aug. 2, 2004), at '401 [redacted]

[redacted]; PX0438, UPFSC_0056546 (internal UP email, Feb. 10, 2010), at '546 ("Given the success of the fuel surcharge program we have been reevaluating our hedging strategy.").

497. Defendants each had different costs of fuel, different fuel efficiencies, and different fuel hedging practices. PX0594, McIntyre (CSX) Dep., Feb. 18, 2010, at 43, 276; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, Ex. B06 (showing Defendants' varying fuel efficiencies from 2002 to 2008, as measured in gross ton miles per gallon, across commodities); PX0634, Anderson (BNSF) Dep., May 26, 2011, at 107 (BNSF's lengths of hauls are "more than double what it is on [CSX and NS]" and BNSF "ha[d] a philosophy of putting more horsepower on our trains, . . . so our fuel expense is much higher relative to our general expenses than any of the other class 1's."); *id.* at 107 ("[W]e burn almost three times as much fuel [as CSX and NS].").

498. Defendants fuel costs and efficiency levels improved over time. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, Ex. B06 (showing Defendants' improving fuel efficiencies from 2002 to 2008, across commodities).

499. Better fuel efficiency and lower fuel costs would typically be sources of competitive advantage that were in competitors' self-interest to exploit and protect. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 180 & n.506.

500. Rather than using their varied fuel efficiencies and hedging benefits to their competitive advantage in pricing, Defendants [redacted] *See, e.g.*, PX0631, Goode (NS) Dep., Jan. 13, 2011, at 66-67 ("Q: [I]f Norfolk Southern could figure out ways to be more cost efficient that could . . . give it a competitive advantage over its competitors, correct? A. It could."); *id.* at 72 (if done well,

a fuel hedging program "could have a favorable impact on cost"); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 161 ("Fuel certainly drives pricing and competition. It is one of the drivers of pricing competition in the marketplace."); PX0608, Neikirk (NS) Dep., June 15, 2010, at 35-68 (NS met with CSX to discuss fuel hedging).

501. Defendants shared information with one another regarding their fuel costs, hedging practices, and fuel surcharge policies and implementation. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 177-182.

502. In April 2003, at the start of the conspiracy, NS [redacted] and meeting notes state that [redacted] PX0164, CSXFSC00000396 (CSX email re "N77CS 04-21-03 meeting at NS," Apr. 17, 2003), at '399.

503. NS shared with its eastern competitor, CSX, its knowledge and experience on fuel hedging, how NS's hedging program was structured and monitored, and alternatives to fuel hedging instruments. *See, e.g.*, PX0608, Neikirk (NS) Dep., June 15, 2010, at 24-25, 35-68.

504. [redacted] NS discussed [redacted] PX0164, CSXFSC00000396 (CSX email re "N77CS 04-21-03 meeting at NS," Apr. 17, 2003), at '399; PX1124, NS_009003425 (NS presentation to CSX re "Summary of Norfolk Southern Fuel Hedging Program", Apr. 21, 2003), at '427.

505. Typically, a company does not teach its largest competitor lessons in [redacted] PX0164, CSXFSC00000396 (CSX email re "N77CS 04-21-03 meeting at NS," Apr. 17, 2003), at '399; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 180; PX0633, Davidson (UP) Dep., Feb. 24, 2011, at 183 (testifying that he would not have discussed UP's hedging strategy with any other Defendants because it would have raised legal concerns and "[i]t was our own business").

506. Defendants thereafter would [redacted]. PX0605, Rockey (AAR) Dep., May 18, 2010, at 220-24; PX0013, AAR-000389 (NS-BNSF-CSX-UP-AAR email chain re "Agenda for the Nov. 6-8 AAR Treasury/Finance Div. Annual Meeting," Aug. 13, 2005), at '391.

507. At a November 14, 2004 meeting of the AAR's Treasury/Finance Division, Defendants [redacted] PX0221, CSXFSC000372050 (minutes of an AAR Treasury/Finance Division meeting, Nov. 14, 2004), at '051; *see also* PX0019, AAR-P-00003356 (notes on hedging presentations of each Defendant, Nov. 14, 2004), at '356; PX0608, Neikirk (NS) Dep., June 15, 2010, at 184-190 (testifying regarding [redacted]); PX0264, NS_009000247 (NS email re Finance Committee Fuel Hedging Presentation attaching Review of Norfolk Southern Fuel Hedge and Surcharge Programs, June 4, 2004) at '247; PX0257, NS_004000760 (NS email re AAR PPT Presentation, attaching "Summary of Norfolk Southern's Fuel Hedging Program" AAR Treasurer's Meeting, Nov. 1, 2005), at '760; PX0258, NS_004000782 (NS-BNSF-AAR email re Treasury/Finance Division Meeting Presentations, and attaching Summary of Norfolk Southern's Fuel Hedging Program presentation, Oct. 26, 2005), at '782.

508. And at a November 8, 2005 meeting, BNSF shared its "Hedge Strategy" and also provided information about its fuel surcharge program, including that "Marketing is aggressively seeking expansion of the fuel surcharge recovery rate"). PX0869, AAR-E-00069063 ([redacted] Nov. 8, 2005) at '067.

509. Defendants also provided each other with fuel surcharge statistics for their traffic—both carload and intermodal—that were not limited to their interline movements. *See, e.g.*, PX0851, UPFSC_II_00135378 (internal UP email re: "FW: Actions to Take with Railroad's 9% and 12% Fuel Surcharges," Feb. 9, 2005), at '378 ("I spoke to the NS this morning and they said that 90% of all their agreements/contracts are subject to their fuel surcharge and is non-negotiable. Their fuel cost for 2004 was $450 million vs ours at $1.8 billion. There are some exceptions but none within their food and consumer group.").

510. Similarly, a UP executive testified that he would not have discussed UP's hedging strategy with other Defendants: "Well, I mean, I don't know why I would discuss it with anybody. It was our own business." PX0633, Davidson (UP) Dep., Feb. 24, 2011, at 183. The executive even indicated that he would have had legal concerns about sharing such information, and probably "would have asked some lawyer's advice on that." *Id*. at 184.

511. Notwithstanding their different fuel efficiencies, fuel costs, and hedge benefits, Defendants' fuel surcharges were nearly identical and moved in lockstep:

**MONTHLY FSC PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |

| MONTH | BNSF | UP |
|---|---|---|
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

**MONTHLY FSC PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |

| MONTH | CSX | NS |
|---|---|---|
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06* | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

* On April 24, 2006, NS announced its rebasing of fuel surcharges.

PX0749 (BNSF Rules Book 6100 Carload Fuel Surcharge, Feb. 5, 2010); PX0722 (NS 3/1/2004 FSC Program History, Jan. 5, 2011); PX0746 (UP Carload Rate Based Standard HDF Fuel Surcharge, Feb. 5, 2010); PX0747 (CSX Fuel Surcharge Archive, Feb. 11, 2004). As these tables show, BNSF and UP fuel surcharge percentages are identical starting in July 2003. And CSX and NS fuel surcharge percentages were identical starting in March 2004. Although eastern and western railroads used different benchmarks (HDF vs. WTI), the formulas were nonetheless functionally identical. As a result, all four Defendants applied roughly identical fuel surcharges throughout the Conspiracy Period. *Id.*

512. During the conspiracy, Defendants' corporate officers explicitly barred their companies from taking hedging into account in setting fuel surcharge rates. *See, e.g.*, PX0142, BNSF-FSC_000488 (BNSF internal email re "Fuel Analysis 3-11-04," Mar. 11, 2004), at '488

(BNSF CEO's directive that company "should not consider Hedging as offset for fuel exposure"); PX0080, BNSF-0325449 (BNSF internal memo re "Fuel Cost Recovery Analysis," May 28, 2004), at '453 ("Marketing Team should not consider the Hedging Program as an offset to their fuel expenses (i.e., programs should be self sufficient."); PX0740, BNSF-0654642 ("BNSF's Fuel Surcharge Position"), at '643 (BNSF's "position" was that "hedging is an internal choice and that an equitable FSC formula should not take into account hedging gains and losses"); PX0741, CSXFSC000333177 (CSX "Fuel Surcharge Talking Points), at '178 ("CSX fuel surcharge mechanism is separate from our fuel hedging program[:] Surcharge is used to share incremental fuel costs with our customers[;] Hedging is used to smooth out fuel price volatility and does not lower overall cost over the long run.").

## V. DEFENDANTS' FUEL SURCHARGE CONSPIRACY DIVORCED DEFENDANTS' FUEL COST RECOVERY FROM ACTUAL FUEL COSTS, REVERSING THE DOWNWARD TREND IN DEFENDANTS' RATES

### A. The Fuel Surcharge Program Divorced Fuel Surcharge Rates From Actual Fuel Costs

513. The Defendants' coordinated rate-based fuel surcharges did not reflect the cost of fuel on the shipments to which they were applied. PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 6 (concluding that the Defendants' fuel surcharges stand "virtually no prospect of reflecting the actual increase in fuel costs."); PX0870, BNSF-0026682 (internal BNSF email re" "Fuel Surcharge/Challenge," Oct. 5, 2005), at '682-83 ( "agree[ing]" that "[f]uel surcharges based on percent of per car revenue are unfair to shippers since there is no correlation between the freight rate and fuel usage" and stating "BNSF prices our services based on what the market will allow, not the costs associated with providing those services"); *see also* PX0871, CSXFSC000292532 (internal CSX presentation re: "Tropicana Fuel Review," July 1, 2003), at '538 ("Recommend[ing] not giving detailed costing information to customer" because "customer

is purchasing a complete service product – many components besides fuel costs"); PX0872, UPFSC 0499486 (internal UP email re: "Toyota Fuel Surcharge Analysis," Aug. 2, 2005), at '486 ("UPRR should be proposing a rate to the customer that UPRR believes is the maximum the customer will pay. Similarly, the fuel surcharge we propose should be the maximum that the customer will accept, not some 'trying to make whole' value – at least that's the position I have heard stated repeatedly from Finance Sr. Management.").

514. As a result, in 2003, there was a structural break in the relationship between fuel prices and freight rates occurred. Specifically, Defendants' freight "prices rose more rapidly than their costs." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 130; *see also id.* ¶ 133 ("[A]ll-in rates rose much more rapidly than costs through much of the Conspiracy Period. As a result, the Defendants enjoyed substantial increases in price-cost margins. It is important to note that the RCAF includes capital costs, accounting for potential increases in interest expenses over the course of the Conspiracy Period."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 201 (describing [redacted], especially coming as it did against a backdrop of much higher fuel costs"); *id.* ¶ 204 (finding that "prices during the alleged period of collusion were significantly above the levels that market conditions would otherwise support," which "strongly indicates collusive behavior"); PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 465 ("[A]t the time that Defendants' fuel expenses increased, so did their operating profit margin as a percent of their revenues."); PX0684, Laurits R. Christensen Associates, Inc., Analysis of Competition, Capacity, and Service Quality, v. 2, Revised Final Report Prepared For Surface Transportation Board, November 2009, at 9-16 to 9-17 ("We note the puzzling result of apparently negative technical change. The estimated LCV v / L Time becomes positive in 2003. The

theoretical interpretation of this phenomenon is technical regress rather than technical progress. We believe that interpretation is fairly implausible, but the statistical significance of the effect, along with corroborating evidence from the productivity analyses, suggest that something happened around 2003 to cause the variable cost curve to shift up rather dramatically.").

515. This increase in freight rates far exceeded the relative increase in Defendants' fuel costs. *See supra* ¶¶ 446–475, 524–553; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 414 (during Conspiracy Period, [redacted]); PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 133 ("[A]ll-in rates rose much more rapidly than costs through much of the Conspiracy Period. As a result, the Defendants enjoyed substantial increases in price-cost margins."). Defendants knew that [redacted]. *See, e.g.*, PX0873, CSXFSC000270515 (internal CSX presentation), at '517 ("Current FSC policy recoups more $$ than CSX cost"); PX0874, NS-MDLII-00171062 (internal NS presentation re: "Industrial Products Marketing 2008 RPU Analysis," Nov. 28, 2007) at 6–7 (showing both rate-based fuel surcharges and rebasing program over-recovered fuel costs); PX0875, UPFSC 0080071 (internal UP spreadsheet re: "Simplot Fuel Surcharge Analysis," Mar. 2005), at '071 (reflecting [redacted]).

516. Economic analyses by Plaintiffs' experts confirms that Defendants over-recovered their fuel costs through their fuel surcharge programs. *See, e.g.*, PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 149 ("I find that all four Defendants significantly over-recovered the incremental cost of fuel for shipments subjected to their coordinated fuel surcharge programs. Over

the entire period, fuel surcharges on shipments recovered 199% of associated incremental fuel costs for NS, 182% for CSX, 126% for BNSF, and 155% for UP."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, Ex. E08 (showing, for Plaintiffs that had retained Dr. Leitzinger, that [redacted]).

517. Economic analyses by Plaintiffs' experts also show Defendants' fuel surcharge revenue rose dramatically during the conspiracy. *See, e.g.*, PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128 (finding that "prices remained on a steep upward trend until late 2008"); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-218 (demonstrating, based both on economic analyses and Defendants' own analyses, that [redacted]). Dr. Bernheim also "computed fuel surcharges as a fraction of overall net revenue in every month from January 2000 through December 2008" and found "that fuel surcharges accounted for a rapidly growing fraction of the Defendants' revenue during the cartel's operation." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 156. The figure below illustrates the dramatic rise in fuel surcharges as a percentage of Defendants' net revenue during the conspiracy:




*Id.* Fig.IV-15.

518. "[C]ost increases are not usually passed on in their entirety" to companies' customers, yet Defendants were able to *increase* profits when faced with cost increases during the conspiracy period. PX0685, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 395b1, Wolters Kluwer (database updated Sept. 2020); *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 26 ("[N]on-conspiratorial factors cannot account for the dramatic increase in fuel surcharge coverage or revenue during the operation of the alleged cartel."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 231 ("[E]conomic theory holds that in a highly concentrated oligopoly—such as the rail freight market was prior to the alleged conspiracy—firms will not typically pass through the entirety of their cost increases into higher sales prices.").

519. Expert Dr. Jeffrey J. Leitzinger conservatively assumed that Defendants could have passed through 100% of their incremental fuel costs, and found that Defendants nonetheless over-recovered [redacted]. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, Ex. E08

(showing, for Plaintiffs that had retained Dr. Leitzinger, that [redacted]). The more likely but-for result would have been significantly less than 100% passthrough of Defendants' incremental fuel costs, as had been the case in the pre-Conspiracy Period. PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 165-174; *id.* ¶ 166 ("[T]he more likely result in light of railroad industry structure would be margin compression, meaning that Defendants would have passed through *less than* the entirety of their fuel cost increases."); *id.* ¶ 170 ("'[U]nilateral conduct' is what was happening prior to the alleged conspiracy, and it led to significantly *less* than 100% recovery [of Defendants' incremental fuel costs].")

520. As Defendants' fuel surcharges became more divorced from their actual costs, economic theory dictates that Defendants would have been unable to sustain (let alone increase) such extreme over-recoveries. PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 194 ("[T]he competitive pressure for [renegotiations, waivers, or base rate discounts] would have increased significantly with the large increases in FSC payments during the Damages Period."). Defendants' own experts recognized that rising fuel surcharges would incentivize shippers to renegotiate their price authorities. *See* PX0670, Kalt Merits Dep., May 28, 2013, at 264 (testifying that when long term contracts "get out of step with current market conditions," it creates pressure for the disadvantaged party to breach or renegotiate the contract); PX0778, Carlton MDL I Dep., Nov. 11, 2021, at 136-37 (Defendants' expert admitting that although "contracts, as a general matter, are written not to be necessarily renegotiated . . . it doesn't mean if there is a dramatic change in circumstances, they – they couldn't be.").

521. Absent conspiratorial conduct, Defendants' fuel surcharge coverage levels would have been expected to *decrease* , and Defendants would have been expected to revise their FSCs

to be less onerous as fuel prices rose and became further divorced from Defendants' actual costs. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 175 ("The large increases in FSC coverage that occurred notwithstanding the rapidly rising fuel prices suggest a strong shift in pricing power to the railroads during this period—a shift of the sort that collective coordination in pricing would create."); PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 315 [redacted]); PX0844, Leitzinger MDL I Dep. at 100-101 ("[A]s you move later into 2004, 2005, you start to see higher fuel prices and that the bite so to speak that created by rate based FSCs would have become that much greater and in my view that would have -- in a competitive environment created substantial pushback against rate based FSCs."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 204 ("[P]rices during the alleged period of collusion were significantly above levels that market conditions would otherwise support[, which] strongly indicates collusive behavior . . . .").

522. Absent conspiracy, Defendants could not have sustained such over-recovery. In early 2003, BNSF reduced its FSC across-the-board for its customers, but never did again after the conspiracy began. *See supra* ¶ 75. On May 12, 2003, NS's Don Seale learned that BNSF had reduced "its FSC to 2% . . . even though their formula calls for 5%," and in anticipation of an upcoming "conversation with UP," Seale complained to his boss that "***the industry is not looking good on this issue [fuel surcharges]*** and a stable approach has been the best approach." *See, e.g.*, PX0303, NS_010042321 (NS internal email re "UP FSC," May 12, 2003), at '321 (emphasis added); PX0302, NS_010042306 (sending NS-UP meeting agenda for upcoming May 14, 2003 meeting). Two days later executives from NS and UP (including Seale and Jack Koraleski), discussed "***fuel surcharges and various application processes as used by different roads***,"

reaching "***[c]onsensus . . . that it would be a positive outcome if all roads had the same process in the eyes of our customers.***" PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361. Meeting notes reflect NS and UP's agreement: "Fuel surcharges: ***Uniform application across the industry would be helpful***." PX0460, UPFSC 0616651 (handwritten notes from NS/UP Alliance Meeting, May 14, 2003), at '652 (emphasis added). They further questioned "***whether or not the industry can work together on this opportunity, probably through the AAR***," controlled by the four Defendants, or whether they should instead "handle the opportunity on a bilateral basis," *i.e.*, through one-to-one discussions with the other railroads. PX0241, NS_001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361. NS's Seale and UP's Koraleski were assigned to follow up on these issues. *Id*. And, on July 30, 2003, top marketing executives of NS and BNSF including Don Seale and John Lanigan had the same discussion that NS and UP had in May concerning a "***potential industry position***" on FSCs, then jointly appointed BNSF's Lanigan and NS's Seale to lead a discussion on the topic at the next meeting of the AAR's NEMC scheduled for September 11, 2003. PX0243, NS_001000422 (BNSF-NS Joint Marketing Meeting notes, July 30, 2003), at '424 (emphasis added); *see also* PX0596, Seale (NS) Dep., Feb 26, 2010, at 226-29; PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 138-43; PX0021, BNSF_CAL_0003386, ("NS Attendees," July 22, 2003). There were never programmatic reductions of FSCs again.

523. Unlike Defendants, other Class I railroads Canadian National Railway Company and Canadian Pacific Railway *reduced* their fuel surcharges during the Conspiracy Period as pressure from shippers mounted. *See* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 132. A CP representative testified before the STB that CP several times reduced its FSC in

response to customer feedback and to bring its FSCs into line with incremental increases in CP's price of fuel. PX0845, Testimony of Marcella Szel, STB Public Hearing, Ex Parte 661, May 11, 2006, at 292. In April and October 2005, CN reduced its FSC rates by approximately 25% and then a further 15%. PX0846, Statement of Canadian National Railway Company, Ex Parte No. 661, Apr. 27, 2006, at 3. A 2006 NS document states that [redacted] PX0847, NS_008002540 (NS presentation re "Fuel Surcharge Review," Mar. 10, 2006) at '551.

**B. Defendants' Conspiratorial Fuel Surcharge Programs Increased Their Rates And Profits**

524. The Surface Transportation Board described the increase in inflation-adjusted rail freight rates during the conspiracy period as a "significant change, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." PX0593, Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, Study of Railroad Rates: 1985-2007 (Jan. 16, 2009), at 1.

525. Defendants enjoyed record revenue from July 2003 through December 2008, reversing the historic downward trend in rail freight rates. PX0593, Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, Study of Railroad Rates: 1985-2007 (Jan. 16, 2009), at 2 fig.1; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 105 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019) (summarizing increases in revenue and noting that "NS saw fuel revenue for certain businesses grow exponentially").

526. Government reports further confirm that the Defendants' profitability skyrocketed from July 2003 to December 2008. A Senate Commerce Committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail

companies have become over the last decade." PX0686, The Current Financial State of the Class I Freight Rail Industry, Committee on Commerce, Science, and Transportation – Office of Oversight and Investigations Majority Staff – Staff Report for Chairman Rockefeller (Sept. 15, 2010), at 4.

527. Economic analyses by Plaintiffs' experts confirms that Defendants' profits increased as a result of their coordinated fuel surcharge programs. *See, e.g.*, PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 133 ("[A]ll-in rates rose much more rapidly than costs through much of the Conspiracy Period. As a result, the Defendants enjoyed substantial increases in price-cost margins."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-218 (demonstrating, based both on economic analyses and Defendants' own analyses, that [redacted]; *id.* ¶ 201 (describing [redacted]); *id.* ¶ 204 (finding that "prices during the alleged period of collusion were significantly above the levels that market conditions would otherwise support," which "strongly indicates collusive behavior").

528. Those increases in profits cannot be explained by improvements in general economic conditions. *See, e.g.*, PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 141("Defendants' share prices substantially outperformed the rising S&P 500 index throughout most of the Conspiracy Period. Comparisons with other broad market indexes, such as the Dow Jones Industrial Average, are similar in this regard. Consequently, improvements in general economic conditions cannot explain most of the increase in the perceived profitability of the Defendant railroads; the explanation must lie elsewhere."); PX0769, Leitzinger MDL II Rpt., Mar.

1, 2023, ¶ 204 (finding that "prices during the alleged period of collusion were significantly above the levels that market conditions would otherwise support," which "strongly indicates collusive behavior"); *id.* ¶ 201 (describing [redacted], especially coming as it did against a backdrop of much higher fuel costs").

**1. UP**

529. From 2005 through 2007, UP reported record revenues and profits virtually year. PX0551, UP 2005 Analyst Fact Book, at 5; PX0553, UP 2006 Analyst Fact Book, at 4; PX0554, Q1 2006 UP Earnings Conference Call, Apr. 20, 2006, at 1, 4, 9; PX0555, UP 2007 Analyst Fact Book, at 4; PX0552, Q4 UP 2005 Earnings Conference Call, Jan. 19, 2006, at 2-3.

530. UP saw its $112 million in commodity revenue from fuel surcharges in 2003 grow to $330 million in 2004, $1 billion in 2005, and $1.65 billion in 2006. PX0564, UP 2004 Form 10-K, at 16 ("We recognized $330 million and $112 million in commodity revenue from our fuel surcharge programs in 2004 and 2003, respectively."); PX0573, UP 2005 Form 10-K, at 20 ("In 2005, our fuel surcharge programs generated $1 billion in commodity revenue . . . ."); PX0585, UP 2006 Form 10-K, at 19 ("Our fuel surcharge programs (excluding index based contract escalators that contain some provision for fuel) generated an additional $656 million in commodity revenue compared to 2005 . . . .").

531. UP, in their SEC Form 10-K for fiscal year 2004, reported: "We increased [2004] operating revenues by 6% year-over-year to $12.2 billion, the highest level in our history, as vigorous economic growth led to unprecedented demand for our services. . . .The higher revenue was attributable primarily to additional fuel surcharges, better pricing yields, and increased carloads, and reflects our continued focus on our Yield Strategy." PX0564, UP 2004 Form 10-K,

at 13; PX0585, UP 2006 Form 10-K, at 17 ("[R]ecord revenue levels [in 2006] in all of our six commodity groups, primarily driven by better pricing and fuel surcharges.").

532. UP's First Quarter 2006 Earnings Report states that, "commodity revenue was an all-time record of $3.5 billion, up 18 percent, compared to $3.0 billion in 2005. Drivers of the increase were a 4 percent increase in volumes as well as increased fuel surcharge revenue and yields." PX0710, Union Pacific, "Union Pacific Posts Record Results," April 20, 2006, at 1.

533. UP's operating income for 2006 was $2,884,000,000, up from $1,795,000,000 in 2005, which represented a 60.7% growth. PX0591, UP 2007 10-K, at 19.

534. UP achieved a "best ever" performance in nearly every key financial measure during 2006. PX0553, 2006 Analyst Fact Book, at 4; PX0397, UPFSC 0129982 (letter to the Board of Directors of UP from Jim Young, Oct. 19, 2006) at '982 ("best ever records were set for revenue"); PX0585, UP 2006 Form 10-K, at 17 ("[R]ecord revenue levels [in 2006] in all of our six commodity groups, primarily driven by better pricing and fuel surcharges.").

535. At the time, UP attributed these record figures in large part to fuel surcharges. PX0705, UP 2003 Form 10-K, at 15 ("The higher revenue was primarily attributable to increased carloads of these commodities, improved average revenue per car and fuel surcharges, and reflects the revenue diversity of our rail franchise, as well as continued focus on our Yield Strategy."); PX0564, UP 2004 Form 10-K, at 16 ("Average revenue per car (ARC) improved 3% to $1,236 in 2004 compared to a 2% increase in 2003, while revenue carloads increased 2% and 1% in 2004 and 2003, respectively. The increase in both periods was driven by fuel surcharges, price increases, and index-based contract escalators."); PX0573, UP 2005 Form 10-K, at 17 ("We achieved record revenue levels in all of our six commodity groups, primarily driven by fuel surcharges and better pricing."); PX0585, UP 2006 Form 10-K, at 17 ("We achieved record revenue levels in all of our

six commodity groups, primarily driven by better pricing and fuel surcharges."); PX0591, UP 2007 Form 10-K, at 22 ("Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated $1.5 billion in commodity revenue in 2007."); PX0707, UP 2008 Form 10-K, at 27 ("Freight revenues vary with volume (carloads) and average revenue per car (ARC). ARC is driven by changes in price, traffic mix and fuel surcharges.").

**2. NS**

536. From 2003 through 2006, NS reported record revenues and profits virtually every year. PX0562, NS Q2 2004 Earnings Conference Call, July 28, 2004, at 90; PX0689, Q4 2005 NS Earnings Conference Call, Feb. 8, 2006, at 5; PX0742, Q4 2006 NS Earnings Conference Call, Jan. 24, 2007, at 2.

537. NS saw fuel surcharge revenue for its Merchandise, Coal, and Intermodal businesses grow from about $11.6 million in 2002, to approximately $61.7 million, $208 million, $650 million, and $974 million in 2003, 2004, 2005, and 2006, respectively. PX0267, NS_010002881 (NS email re "Fuel Surcharge Status through February 2007," with attachment, Mar. 5, 2007), at '883.

538. NS reported: "All market groups collected significant fuel surcharges, which accounted for approximately 40% of the 2006 increase in revenues and about one-third of the 2005 increase." PX0703, NS 2006 Form 10-K, at K21.

539. In 2006, NS's "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume." PX0703, NS 2006 Form 10-K, at K20.

540. In 2006 and NS's operating income increased 20.7%. PX0590, NS 2007 10-K, at K20 (showing operating income increasing to $2.557 billion in 2006 from $2.117 in 2005).

541. NS attributed these record figures in large part to fuel surcharges. PX0702, NS 2004 Form 10-K, at K18; PX0708, NS 2005 Form 10-K, at K21 ("Approximately one-third of the revenue increase was due to higher fuel surcharge amounts."); PX0703, NS 2006 Form 10-K, at K20 ("NS' 2006 results reflect substantial increases in revenues (up $880 million, or 10%) resulting primarily from higher pricing, including increased fuel surcharges."); PX0709, NS 2008 Form 10-K, at K22 ("[B]oth revenue improvements were the result of increased average revenue per unit, including fuel surcharge revenue, which more than offset decreased traffic volumes.").

**3. CSX**

542. From 2005 through 2007, CSX reported record revenues and profits virtually every year. PX0690, Q4 2005 CSX Earnings Conference Call, Feb. 7, 2006, at 1, 5; PX0667, Q3 2006 CSX Earnings Conference Call, Oct. 18, 2006, at 1, 2; PX0691, Q2 2007 CSX Earnings Conference Call, July 18, 2007, at 1, 2; PX0692, Q3 2007 CSX Earnings Conference Call, Oct. 17, 2007, at 4.

543. CSX saw its fuel surcharge revenue rise from $72 million in 2003, to $201 million in 2004, to $525 million in 2005, and $821 million in 2006. PX0203, CSXFSC000182739 (Fuel Surcharge Strategy presentation, Feb. 14, 2007), at '751.

544. CSX operating revenue increased $948 million in 2005, "the primary components of the revenue gain" being "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." PX0701, CSX 2006 Form 10-K, at 25; PX0183, CSXFSC000036584 (CSX internal email re Meeting on Fuel Surcharge, June 12, 2003), at '584 ("The story is that we can explain away big chunks of easily, other chunks are hard to explain because of bad data, and that very little of the traffic is actually deficit.").

545. In 2006, CSX's operating income increased by 37.9%. PX0588, CSX 2007 10-K, at 24 (showing operating income increasing to $2.138 in billion in 2006 from $1.550 in 2005).

546. CSX attributed these record figures in large part to fuel surcharges. PX0699, CSX 2004 Form 10-K, at 11; PX0700, CSX 2005 Form 10-K, at 25; PX0701, CSX 2006 Form 10-K, at 20, 25.

547. From 2000 to 2003, CSX underwent a period of financial hardship, during which time there was increased railroad competition for declining railroad traffic. *See* PX0774, Johnson MDL II Rpt., Aug. 15, 2023, ¶¶ 117, 131.

**4. BNSF**

548. From 2004 through December 2006, BNSF reported record revenues. PX0743, Q3 2005 BNSF Earnings Conference Call, Nov. 8, 2005, at 1; PX0744, Q3 2006 BNSF Earnings Conference Call, Oct. 24, 2006, at 1; PX0695, Q3 2007 BNSF Earnings Conference Call, Oct. 23, 2007, at 1.

549. BNSF's annual fuel surcharge revenue also rose dramatically from approximately $110.5 million in 2003, to $357 million in 2004, to $1.06 billion in 2005, and approximately $1.7 billion in 2006. PX0107, at BNSF-0458200 (BNSF internal email re Fuel Analysis and attachment, Sept. 14, 2004), at '203 (showing 2003 fuel surcharge revenue); PX0065, BNSF-0033700 (BNSF Fuel Cost Recovery Analysis, Dec. 4, 2006), at '701 (2004, 2005, and 2006 fuel surcharge revenue).

550. BNSF reported that "freight revenues in 2005 included fuel surcharges of approximately $1.1 billion compared with approximately $350 million in the prior year." PX0572, BNSF 10-K for 2005, at 21; PX0584, BNSF 10-K for 2006, at 18 ("Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 . . . .").

551. In 2006 BNSF's operating income increased 20.3%. PX0589, BNSF 2007 10-K, at 13 (showing operating income increasing to $3.521 in billion in 2006 from $2,927 in 2005).

552. BNSF's 2006 freight revenues "increased 15 percent to a record high of $14.5 billion on double-digit increases in each of our four business units." PX0584, BNSF 2006 Form 10-K, at 16.

553. BNSF attributed these record figures in large part to fuel surcharges. PX0572, BNSF 2005 Form 10-K, at 18 ("The 17 percent increase in revenue is attributable to growth in unit volumes, rates and fuel surcharges, partially offset by a slight decrease due to business mix . . . BNSF expects to see strong revenue growth in the 10 to 13 percent range in freight revenues. Half of the revenue growth is anticipated to be driven by volume, and the remainder is expected from pricing and fuel surcharges."); *id*. at 21 ("Freight revenues in 2005 included fuel surcharges of approximately $1.1 billion compared with approximately $350 million in the prior year. Growth in rates and fuel surcharges drove average revenue per car/unit up 12 percent in 2005 to $1,258 from $1,126 in 2004."); PX0584, BNSF 2006 Form 10-K, at 16 ("Of the 15-percent increase in freight revenue, 6 percent, 6 percent and 5 percent was attributable to unit growth, price and fuel surcharges, respectively"); *id*. at 18 ("Freight revenues include approximately $1.7 billion in fuel surcharges compared with approximately $1.1 billion in the prior year."); PX0589, BNSF 2007 Form 10-K, at 15 ("Freight revenues reflected a 3-percent decrease in unit volumes. Freight revenues included an increase of approximately $150 million in fuel surcharges compared with the same 2006 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2007 to $1,488 from $1,367 in 2006."); PX0698, BNSF 2008 Form 10-K, at 15-16 ("The 14-percent increase in freight revenue includes 10-percent and 6-percent increases attributable to fuel surcharges and prices, respectively, partially offset by a decrease due to lower

unit volumes. . . . Freight revenues included an increase of approximately $1,460 million in fuel surcharges compared with the same 2007 period.”).

### C. Defendants Later Modified Their Surcharge Programs, But Continued Earning Supra-Competitive Profits

554. In March 2005, BNSF announced that starting on January 1, 2006, it would switch to a mileage-based fuel surcharge for a limited number of shipments of agricultural products and coal. PX0089, BNSF-0329108 (BNSF email re “New Fuel Surcharge Program,” March 28, 2005, and attachments), at ‘110 (“BNSF Announces First Mileage-Based Fuel Surcharge Program In the Rail Industry”); PX0138, BNSF-FSC_000280 (October 20, 2005 internal BNSF email forwarding BNSF announcement to customers, “BNSF Details Fuel-Surcharge Plan for Coal, Agricultural Products”); PX0510, UPFSC0157274 (March 29, 2005 email from BNSF informing all carriers of its change). The new mileage-based surcharge did not apply to interline traffic. PX0089, BNSF-0329108 (BNSF email re “New Fuel Surcharge Program,” March 28, 2005, and attachments), at ‘110 (“The remaining 25 percent represent joint-rate interline movements with other Class I railroads and will continue to be covered by BNSF’s existing percentage fuel surcharge due to current interline billing systems and practices.”); PX0086, BNSF-0327878 (July 2005 BNSF Communication Plan regarding “Mileage-Based Fuel Surcharge Program”), at ‘884 (listing as a goal of the mileage-based program to “collect[] the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces”); PX0062, BNSF-0033275 (BNSF internal email re “Potential MBFSC Test IP Customers,” June 23, 2006), at ‘275 (“John Lanigan has told the [mileage-based fuel surcharge] team that he wants this to be a revenue-neutral event for BNSF[.]”).

555. After BNSF’s announcement, NS analyzed the costs and benefits of adopting the “BN standard,” and noted “[w]e need to act quickly since we may need a timely policy response

if the CSXT or UP respond to the BN move." PX0308, NS_010049761 (June 13, 2005 internal NS email regarding "BNSF New FSC Process") at '763. NS internally noted that BNSF's program was billed as being "revenue neutral," and thus its "assumption [was] that BNSF will bill the same amount of total dollars as before." PX0265, NS_009004585 (April 11, 2005 internal NS email thread regarding fuel evaluation) at '585.

556. In October 2005, BNSF announced that its mileage-based program would at first apply only to coal and agricultural customers, and that BNSF would announce an effective date for intermodal, automotive, and other carload customers at a later date. PX0504, UPFSC0088184 (October 24, 2005 internal UP email sharing announcement, "BNSF Details Fuel-Surcharge Plan For Coal, Agricultural Products"), at '184.

557. In January 2006, BNSF implemented its mileage-based program for coal and agriculture customers. PX0089, BNSF-0329108 (BNSF email re "New Fuel Surcharge Program," March 28, 2005, and attachments).

558. In March 2006, UP recognized that "it appears that the fuel surcharge exceeds the increased cost of fuel" and asked "how can we justify that to our customers?" UP employees also considered whether the company should "roll the fuel surcharge into the base prices?" PX0382, UPFSC 0013039 (topic outline for internal meeting, Mar. 20, 2006), at '040; PX0876, UPFSC0029884 (internal UP email re: "Conversion of FSC to Price," Apr. 12, 2007), at '884 ("I am trying to design a method to approximate how much (in the way of dollars) to move from Fuel Surcharge to Price for the May-Dec 2007 time period as a result of our recent actions.").

559. In April 2006, NS was the first railroad to announce a change to its rate-based fuel surcharge formula to raise the trigger price, but simultaneously increase its base rates, a practice

referred to as "rebasing." *See* PX0311, NS_010055313 (June 21, 2006 internal NS email regarding "FSC Customer Inquiries").

560. The rebase was a cosmetic change, made at the height of the STB's investigation into Defendants' fuel surcharge practices and immediately before the STB hearing about them with intent to deflect scrutiny and mislead the STB. *See, e.g.*, PX0116, BNSF-0533077 (April 24, 2006 announcement forwarded by Roger Hsieh to George Gillen, "Norfolk Southern to Adjust Fuel Surcharge").

561. NS raised its trigger price from $23 per barrel to $64 per barrel, and changed the initial surcharge and surcharge increment from 0.4% to 0.3% for each $1 above the trigger price. This change "was coupled with an increase of 16.4% in base rates." PX0260, NS_007000883 (email conveying that NS ultimately concluded that a 16.4% base rate increase would allow it a "full [fuel surcharge] pass thru" under the new program); PX0617, Lawson (NS) Dep., August 5, 2010, at 65; PX0877, P_DFI_000026193 (NS-DFI email, June 15, 2006), at '193 [redacted]); PX0925, Schaaf (NS) Dep., Jan 17, 2023, at 155 (testifying that the 16.4% base rate increase "would have been the difference between the 23-dollar fuel and [the] 64-dollar fuel."). Indeed, Mike Donnelly, President of Plaintiff Donnelly, responded to a Rate Authority from NS, with [redacted] to which the NS product manager wrote, [redacted]

[redacted] PX0230, DON018705 (NSSC 80657), at '705.

562. NS informed the STB of the changes to its fuel surcharge program in a written submission as part of the STB's fuel surcharge proceeding, including the misleading statement that it had "deci[ded] to reduce its fuel surcharge percentage." PX1170, NS 001001195 (Written Statement of NS, STB Ex Parte 661, April 27, 2006), at '207.

563. Noticeably absent from NS's submission was any mention that its rebase would also come with a 16.4% *increase* in base rates that precisely reallocated the percentage removed from the fuel surcharge into the base rate. PX0260, NS_007000883 (email conveying that NS ultimately concluded that a 16.4% base rate increase would allow it a "full [fuel surcharge] pass thru" under the new program).; PX0861, AAR-E-00053984, (AAR email re "Class I Railroads – Fuel Surcharge," May 30, 2006) at '984 [redacted].

564. In its April 24, 2006 press release, NS likewise omitted that the base rate increases were being used to offset the purely cosmetic change to the fuel surcharge rates. PX0236, NS 001000130 (NS Press Release, "Norfolk Southern To Adjust Fuel Surcharge," April 24, 2006), at '130.

565. The result was [redacted] *See* PX0230, DON018705 (NS product manager noting that [redacted]); PX0086, BNSF-0327878 (July 2005 BNSF Communication Plan regarding "Mileage-Based Fuel Surcharge Program"), at '884 (listing as a goal of the mileage-based program to "collect[] the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces"); PX0062, BNSF-0033275 (BNSF internal

email re "Potential MBFSC Test IP Customers," June 23, 2006), at '275 ("John Lanigan has told the mileage-based fuel surcharge team that he wants this to be a revenue-neutral event for BNSF.").

566. NS had actually conducted an analysis to determine the amount of base rate increase that would be needed "to bake in [the existing $23] FSC to [base] rate." PX0318, NS_010067297 (March 21, 2006 spreadsheet analysis). As NS's 30(b)(6) witness Mr. Schaaf explained the 16.4% "would have been the difference between the 23-dollar fuel and [the] 64-dollar fuel. That would have been a mathematical calculation." PX0925, Schaaf (NS) Dep., Jan 17, 2023, at 155.

567. NS's CEO and Chairman admitted that if the railroad increased its trigger point, "it was also our policy that we would include a base-rate increase that would effectively make that neutral from a revenue standpoint." PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 187.

568. NS representatives informed the other Defendants of its rebasing program *before* it was formally announced to the public. *See, e.g.*, PX0098, BNSF-0367622 (BNSF internal email re Proposed BNSF FSC, April 20, 2006), at '622 (discussing NS's proposal before that proposal was publicly announced).

569. Other Defendants recognized NS's rebasing strategy as an opportunity to lock in inflated all-in rates. *See, e.g.*, PX0511, UPFSC0169555 (internal UP email, Feb. 7, 2007), at '555 ("NS is planning to do away with the fuel surcharge altogether an[d] just change rates when they need to.").

570. UP executives noted that "NS has had no negative feedback on their re-basing, even though it only touches 6%." PX0529, UPFSC0425311 (July 7, 2006 internal UP email), at '312.

571. They looked at BNSF as they considered changes, noting "we may need to keep the status quo given competition from BNSF—assuming BNSF does not change their surcharge formula." *Id.*, at '312. And they laid out the benefits of NS's approach: "Keep in mind that if fuel

suddenly drops and we have not re-based, we will lose price opportunity. We would be better off going on the offensive and deciding what is best for us, rather than reacting to changes in the external environment." *Id.*

572. BNSF kept a close eye on NS's program. BNSF's economists concluded that adopting the NS program would "basically swap approximately $1.1B of FSC into your rates." PX0098, BNSF-0367622 (BNSF internal email re Proposed BNSF FSC, April 20, 2006), at '622; *see also* PX0063, BNSF-0033442 (internal BNSF email re "NS FSC," July 20, 2006), at '442 (discussing NS program).

573. [Intentionally omitted].

574. CSX did not object to NS's change; it even considered adopting the very same formula itself, including the base rate escalation. *See, e.g.*, PX0880, CSXFSC000350517 (CSX internal email re: "E-team Fuel Surcharge Presentation." July 20, 2006) at '517 ("We will start to over-recover versus our target fuel cost in the second half of 2006. . . We would like to offer a rebased fuel surcharge because: . . . [it] [a]llows us to permanently lock in a large portion into price."); id. at 520–21 (noting that "the proposed rebased program would effectively 'lock in' the fuel surcharge between $23 and $64" and "[t]he rebased program would convert a large portion of the expected 2007–2008 over-recovery into price.").

575. In August 2006, UP's fuel surcharge team met to discuss "recommended actions in response to the STB fuel surcharge proposals." The team considered various rebasing percentages, eliminating the fuel surcharge entirely, refunding over-recovery, and doing nothing. PX0383, UPFSC 0028265 (August 14, 2006 UP "Fuel Surcharge Team Meeting" agenda), at '266-67.

576. That same month, UP continued its internal discussions. One email noted that "[a]t this point, Ed Sims is heading up an effort that will change the way we approach the fuel surcharge.

The first step [is] to recalibrate and rebase the fuel surcharge [and] to just roll some of the money into a new base and reduce the size of the fuel surcharge . . . ." PX0404, UPFSC 0185789 (August 21, 2006 internal UP email), at '789. Like BNSF, UP took steps to limit the people involved in this decision-making process. *See id.* ("For your info ONLY").

577. In September 2006, an internal UP email discussed various ways "to move forward with a re-based surcharge" and noted that the company's CEO "does not want to leave any money on the table after re-basing." PX0527, UPFSC 0404052 (September 18, 2006 internal UP email), at '052.

578. When the WTI fell below $64 for a short period in late 2006 and early 2007 and NS's re-based fuel surcharge was not triggered, NS did not refund the extra portion of the fuel surcharge it had converted to base rate. NS customers complained and found no relief. *See* DA05568 ("[Don Seale] reported that customers which have been 'rebased' to the new FSC have been complaining to him and ***requesting*** a refund. This is a result of baking in a 16.4% increase to reflect the FSC at the $64 per barrel level and then having oil prices drop to <$52 per barrel.") (emphasis added); DA05895; DA05913 ("I think most customers are bothered by the 'out of market' FSC rebase level."). Quite the opposite, NS actually conveyed to customers at the time that "***[w]e are not refunding anything if WTI stays below $64***." DA05763 (emphasis added); *see* DA05565 ("[W]e never indicated we would refund charges when WTI dropped below $64. . . . Finally, our rates are market-based and ***we do not see a need at this point to reduce our base rates***.") (emphasis added)).

579. Around 2007, UP adopted a mileage-based fuel surcharge for certain shipments. *See* PX0498, UPFSC 0068712 (UP "Sales Talking Points-UPRR FSC Plans For Internal UPRR Use Only March 2007"), at '712-13 ("We plan to implement the new mileage based FSC on

exempt business at a later date, but not later than January 1, 2008 . . . It is Union Pacific's intention to eventually roll all business, including contracts as they expire, to a mileage-based FSC program.); *see also* PX0736, UPFSC0195429 (UP "Marketing Update" presentation, May 3, 2007), at p. 6 (recognizing in presentation notes that UP intended to move all its business to the mileage-based program).

580. Internally, UP "[did] not believe that there will be a negative revenue impact to Union Pacific . . . The basing of the new fuel surcharges at a higher level will require the incorporation of some of the current fuel surcharge revenue into the customers' base prices." PX0498, UPFSC 0068712 (UP "Sales Talking Points-UPRR FSC Plans For Internal UPRR Use Only March 2007"), at '713.

581. An internal UP presentation revealed that all-in rates on certain lines would actually *increase* under the new program. PX0417, UPFSC 0331506 (May 4, 2007 UP "Mileage Based Fuel Surcharge" presentation). The presentation warned employees to "NOT forward this" information to customers. *Id.* at 5.

582. CSX made a similar change as BNSF when it switched from a rate-based to a mileage-based fuel surcharge in April 2007. An internal CSX presentation made clear that there were "no exceptions" to the new mileage-based program and the 11.5% standard price adjustment increase to protect CSX's bottom line and "in order to ensure no value erosion as part of the" change. PX0174, CSXFSC000002351 (CSX internal email, Feb. 25, 2007, and attached presentation), at '356; *see also* PX1125, P_SO_00008380 (CSX email to Southern Company, Oct. 26, 2007), at '380 [redacted]; PX0976,

P_SO_00008376 (Southern Company internal email, Nov. 5, 2007) (CSX proposed [redacted]).

583. CSX's internal analysis revealed that "[t]he proposed rebased program would effectively 'lock in' the fuel surcharge between $23 and $64." PX0175, CSXFSC000002658 (July 24, 2006 CSX "Fuel Surcharge Strategy" presentation), at '663. And CSX noted that "[t]he rebased program *would convert a large-portion of the expected 2007 – 2008 over-recovery into price*." *Id.* at '666 (emphasis added).

584. CSX made clear that "[w]e will implement clear guidelines and measures to make sure that no value erosion is incurred as we rebase." PX0175, CSXFSC000002658 (July 24, 2006 CSX "Fuel Surcharge Strategy" presentation), at '673; *see also* PX0174, CSXFSC000002351 (CSX presentation regarding "Impact from mileage based FSC," March 2007), at '355-56 (recognizing that there were to be "no exceptions" to CSX's new mileage-based program, further "ensur[ing] no value erosion as part of the" change).

585. Defendants' change to mileage-based surcharges maintained the same overall revenue as the existing coordinated rate-based fuel surcharge programs. *See* PX0086, BNSF-0327878 (July 2005 BNSF Communication Plan regarding "Mileage-Based Fuel Surcharge Program"), at '884 (listing as a goal of the mileage-based program to "collect[] the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces"); PX0222, CSXFSC000385966 (CSX email re "Announcement of Fuel Surcharge Changes," Mar. 2, 2007), at '973 ("Any new contract/quote package must meet the same economics of the contract under its current terms."); PX0062, BNSF-0033275 (BNSF internal email re "Potential MBFSC Test IP Customers," June 23, 2006), at '275 ("John Lanigan has told

the mileage-based fuel surcharge team that he wants this to be a revenue-neutral event for BNSF."); PX0179, CSXFSC000006572 (CSX "Internal Announcement on FSC Changes – March 2, 2007"), at '574 (internal CSX memo noting that mileage-based program would "keep the economics the same"); PX0498, UPFSC 0068712 (UP "Sales Talking Points-UPRR FSC Plans For Internal UPRR Use Only March 2007"), at '713 (noting that UP "[did] not believe that there will be a negative revenue impact to Union Pacific" by switching to a mileage-based surcharge); PX0861, AAR-E-00053984, (AAR email re "Class I Railroads – Fuel Surcharge," May 30, 2006) at '984 [redacted]); PX1125, P_SO_00008380 (CSX email to Southern Company, Oct. 26, 2007), at '380 ("Converting the existing fuel surcharge to the mileage based fuel surcharge supports the direction we have received to go to a mileage based FSC. This works by taking the current rate, including fuel, and converting to the equivalent mileage rate basis."); *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 232 ("CSX and UP's conversions to a mileage-based FSC program were coupled with rebasing of the base rates. The companies made this transition in a way that maintained the same overall revenue as the existing coordinated rate-based fuel surcharge programs."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 233 ("As alluded to above, some of the price authorities that included FSCs, particularly those with NS, were rebased in the latter part of the Damages Period. This rebasing had two elements. First, the base fuel price underlying the surcharge calculation was increased, thereby reducing the calculated FSC. Second, the base rate under the price authority was increased sufficiently to offset the reduction in the FSCs. As an economic matter, this rebasing served effectively to lock in the surcharge effects of higher fuel prices such that the shipper would continue to incur those added payments even when fuel prices declined.").

586. In March 2007, a UP employee internally flagged [redacted] PX0543, UPFSC 0499516 (UP email re "Newmont," March 29, 2007), at '517. Another UP employee responded that [redacted] *Id.* at '516.

587. In April 2007, internal BNSF analysis showed that CSX, NS, and UP had all rebased. PX0069, BNSF-0042424 (2007 BNSF Analysis of New FSC Program), at '427; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶¶ 23, 415-40, 527-29, 533 (showing that NS, UP, CSX and BNSF all increased base rates to include the value of rate-based fuel surcharges while concurrently increasing trigger prices); PX0948, Jacobs Dep., Aug. 2, 2023 at 501-04.

## VI. THE UNITED STATES RAIL FREIGHT INDUSTRY WAS SUSCEPTIBLE TO COLLUSION

### A. The Rail Freight Industry Has Significant Barriers To Entry

588. The barriers to enter the railroad industry are almost insurmountable. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 64-69. [redacted] freight. *Id.*; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶¶ 273-77. A single mile of track costs upwards of millions of dollars to build and even more to maintain. *See* PX0673, Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs, 111th Cong. 1 (2009) at p. 226 (UP's Chairman, President, and CEO James Young testifying that building a new mile of track cost $2.5 million plus the expense of acquiring the land and other

expenditures incurred before beginning construction); PX0674, James Young, "Freight Train Blues," Infrastructure US Magazine, June 2009, at 2.

589. The costs of maintaining track also are staggering. For example, UP estimates it wears out two miles of track every day, and that it costs between $450,000 and $600,000 to replace each mile of track. PX0674, James Young, "Freight Train Blues," Infrastructure US Magazine, June 2009, at 2.

590. Rail freight operators must maintain and own their rail network and terminals. Before a new entrant even can compete for customers, it must invest significant capital to acquire rights of way, prepare roadbeds, install tracks and signals, and construct bridges and terminals. PX0561, U.S. Department of Transportation, Federal Highway Administration, "Western Uniformity Scenario Analysis: A Regional Truck Size and Weight Scenario Requested by the Western Governors' Association," at X-1.

591. The railroads exhibit economies of scale and scope, meaning they generally become more profitable as they grow in size. PX0394, UPFSC 0082995 (UP "Fertilizer Team's Approach to Selling our Service!" presentation, Dec. 8, 2004), notes to slide 2 ("[R]ailroads have huge *fixed* costs, especially infrastructure, that do not vary with the level of traffic . . . The more traffic they can carry on a given line, the more they can 'spread' their costs. Hence, density is important to railroads.") (emphasis in original).

592. Defendants' class certification expert did not dispute that the rail freight industry has significant barriers to entry. *See* 2012 Class Cert. Opinion at 64 ("Nor does Dr. Willig dispute Dr. Rausser's contention that there are significant barriers to entry.").

593. "[I]n industries that—like the rail freight industry—entail high fixed costs," the motive for collusion is magnified, particularly when the players compete fiercely on price like

Defendants did prior to 2003. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 78; *see also* PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 85-87 ("[T]here was some competitive pricing . . . that competition did result in a loss of a lot of revenue," and "in a historical context . . . there have been a history of some very vicious historical price wars.").

**B. Demand For Rail Freight Services Is Inelastic**

594. Demand for Defendants' services is inelastic. Their businesses are concentrated in commodities and distances over which rail was the most cost-efficient transport option, so they could sustain artificially high prices without losing so many customers as to make the higher prices unprofitable. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 43-63; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶ 499.

595. Defendants themselves recognized that rail freight transportation faced limited competition from other methods of transportation between 2000 and 2008. In explaining the differences between rail and truck, CSX's CEO Michael Ward stated, "in the face of higher fuel price, greater congestion on the highways, and driver shortages, the trucking industry is finding that it makes sense for them to perform the short haul deliveries to and from the customer while the long haul deliveries are carried by rail." PX0569, CSX 2Q2005 Earnings Call, August 10, 2005, at 5.

596. CSX's Chief Commercial Officer Michael Giftos noted that CSX was successfully able to stymie other forms of competition: "I think we can continue to take trucks off the highway . . . with truckers facing exceptionally high cost . . . with respect to insurance, with respect to drivers, with some new federal regulations affecting emission controls and their capital structure. The rail truck comparison in economics is favoring railroads . . . ." PX1201, BNSF-0495575 (CSX 2Q2003 Earnings Call, Nov. 7, 2003), at '589.

597. UP's President and CEO Jim Young recognized that the rail industry benefited from higher fuel prices, in part because it made it "more expensive for the truckers to haul" and led to "trucking companies [wanting] to put more business on the railroads." PX0578, CNBC Interview of Jim Young, May 8, 2006, at 2.

598. These acknowledgments by Defendants reflected that there are not good substitutes for rail for all commodities. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 43-63 (demand for rail freight services is inelastic given the impracticality or impossibility of using other modes of transportation for commodities like coal, hazardous chemicals, and finished automobiles. And shippers of commodities like coal have little choice but to use rail, as there are no feasible transportation alternatives. *See id.* ¶ 52 ("[C]oal is a particularly important commodity for rail transportation. Some shipments of coal moving straight from a mine to a power plant can be accomplished exclusively by rail."). In short, shippers are forced to use rail for long haul, low value, high volume shipments for which trucking is not economical. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 44 ("[R]ail transportation is generally preferred for long-distance shipments of lower value, heavier weight, and less time-sensitive freight.").

599. For certain commodities and beyond certain distances, demand for rail services becomes inelastic. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 43-63 (demand for rail freight services is inelastic given the impracticality or impossibility of using other modes of transportation for commodities like coal, hazardous chemicals, and finished automobiles); *see also* 2012 Class Cert. Opinion at 64 (crediting "Dr. Rausser's conclusion that demand for freight services generally is inelastic. As he explains, 'an analysis of the industry demonstrates that Defendants' businesses are concentrated in commodities and distances over which rail is the most

cost efficient transport option and therefore the demand that they faced was in general inelastic.'") (citations omitted).

600. Because demand for rail freight if sufficiently inelastic, "there was no reason to expect much erosion in Class I rail freight traffic as a result of" Defendants' conspiratorial fuel surcharges. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 43.

**C. Rail Freight Transportation Services Are Interchangeable Across Defendants**

601. Defendants' rail freight transportation services are homogeneous and interchangeable, with large shippers commonly using the rail freight services of more than one Defendant. *See* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 70-74; PX0989, Jacobs Reply Rpt., Dec. 21, 2023, ¶ 46; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶¶ 78, 80. The service that is offered to the market is simply the movement of goods between origin and destination. Illustrating the homogenous nature of the provided service, some shippers even use their own railway cars. PX0583, United States Government Accountability Office, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed," GAO-07-94, October 2006, at p. 16-17.

602. Because the services are homogenous and therefore interchangeable, shippers choose between railroads based on price. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 70–74. Because shippers choose between railroads based on price, there are incentives for railroads to restrict the resulting price competition by collusion. This is in contrast to industries where there is brand loyalty, which means a customer will stick with a certain service provider regardless of price. The rail freight industry does not have such loyalty, as evidenced by the extent to which customers switch between multiple railroads. *See id.*; *see also* 2012 Class Cert. Opinion at 64 (disagreeing "with defendants that 'there are a lot of individualized factors that drive shippers to

choose between different rail freight service providers,'" and concluding that "Dr. Rausser persuasively has explained that customers routinely switch between railroads for shipments along the same routes, 'confirming that they see the railroads' services as interchangeable.'") (citations omitted). Further, demonstrating the interchangeability of Defendants' services, large shippers commonly shipped with more than one Defendant and displayed little loyalty to any particular railroad. *See id.* ¶¶ 70-74.

**D. Defendants Sold Rail Service Throughout the United States**

603. Defendants' network comprises the entirety of the nation.




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, Fig.II-1.

604. Even shippers that are served by only a single railroad, so-called "captive shippers," still participate in the nationwide geographic market for rail freight services. NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that railroads serving captive shippers face "competitive constraints [that] are real," and that "even where there is only one railroad serving a facility, there are market factors at play." PX1204, BNSF_II_04048059 (Written

Statement of Charles W. Moorman, Sept. 20, 2007), at '074; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 99-100 (D.D.C. 2017) ("captive shippers are subject to competitive forces and therefore can suffer antitrust injury.").

605. Moorman explained further: "Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will los[e] the business.… Another major source of competition is geographic competition…. In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real." PX1204, BNSF_II_04048059 (Written Statement of Charles W. Moorman, Sept. 20, 2007), at '074.

606. UP's CEO, James Young, testified that railroads place "competitive constraints" on each other even with respect to captive shippers. PX0616, Young (UP) Dep. Aug. 4, 2010, at 200-01.

607. CSX wrote internally that "[s]tudies have shown that, in aggregate, captive shippers don't pay higher prices than non-captive shippers." PX0198, CSX000153185 (CSX internal email chain re Fuel Surcharge Result in Big Railroad Profits, attaching CSX Talking Points Response to Escalation Resource – Fuel Surcharge Alert, March 17, 2003), at '187. And CSX's chief operating officer testified that "across the board, I wouldn't say that [captive shippers] pay any more than non-captive shippers." PX0612, Gooden (CSX) Dep., July 16, 2010, at 263.

**E. Pricing Is Transparent And Defendants Frequently Communicated On Pricing**

608. In the rail freight industry, collusion is facilitated by the fact that railroad pricing comes in the form of price authorities, which provide the base freight charges, surcharges, accessorial charges, and fuel surcharges associated with a specific rail freight movement. There are three types of price authorities: contracts, private price quotes, and tariffs. Contracts are privately negotiated, and can cover regulated or non-regulated shipments. Private price quotes are issued by the rail carrier without the agreement of the affected shippers. And tariffs are pricing documents exclusively governing rate-regulated movements. PX0570, Willet, F., "The U.S. Producer Price Index for Line-Haul Railroads (NAICS 482111)," U.S. Bureau of Labor Statistics, September 25, 2005, at p. 4.

609. Defendants can easily observe one another's pricing. Railroads are subject to a common carrier obligation, and therefore must post their tariff rates, which contain the charges associated with a freight movement, and must provide service to all customers at the posted rate. PX0675, DiMichael, N.J., "Rail Common Carrier Obligation/Contracts," presented to the Southwest Association of Rail Shippers on February 19, 2009.

610. Current and expired tariff rates are easily accessible by the public, including on the internet. PX0570, Willet, F., "The U.S. Producer Price Index for Line-Haul Railroads (NAICS 482111)," *U.S. Bureau of Labor Statistics*, September 25, 2005, at 5.

611. Published tariff rates provide insight into privately-negotiated rates, as the two generally move in lockstep. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 97 ("Because posted prices often serve as starting points for negotiations with customers, an agreement to increase posted prices can shift the entire distribution of transactions prices upwards, especially if customers construe the posted prices as conveying information concerning costs.

Consequently, in the current context, one would expect an agreement to coordinate on the structure and imposition of fuel surcharges to impact the entire distribution of fuel surcharge payments, including those made by shippers that negotiated non-standard fuel surcharge provisions."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 144 ("Defendants were able to monitor each other's compliance with the alleged agreement. . . . Information about FSCs charged by the different railroads was widely available."); *id.* (describing "level of transparency not available with other modes of transportation").

612. Defendants also communicate with each other about "interline" shipments, or shipments across multiple Defendants' railways. PX0568, BNSF News Release, "New Quicker Interline Pricing Method Available at BNSF.com," March 22, 2005, http://www.bnsf.com/media/news/articles/2005/03/2005_03_22a.html; PX0566, CSX News Release, "Interline Prices Now Available on CSX.com," Jan. 10, 2005.

613. Because Defendants that participate in a joint-line interline shipment were communicating with each other about the rates on that shipment, Defendants had a ready vehicle, in the form of existing lines of communication with competitors, to exchange and monitor broader pricing information, enabling their conspiracy. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 116-123 (defendants had existing lines of communication, including as a result of interline arrangements); *see also* 2012 Class Cert. Opinion at 64 (Dr. Rausser "explains that rail freight pricing nevertheless is established, well-defined, and easily understood. As Dr. Rausser states: '[F]reight railroad companies use common types of price authority documents, which provide a detailed account of all the base freight charges, surcharges, accessorial, and fuel surcharges associated with a specified rail movement.' Although rail freight is, of course, a service, rather than a good, 'that service is well defined and highly standardized using commodity classifications

for the material shipped, tonnage as a measure of quantity, and miles representing the distance traveled.' Thus, '[i]ntelligence on price quotes for this service can be exchanged and both parties in the exchange know exactly what they are talking about,' which 'eases the costs of monitoring for a cartel.' Moreover, the allegedly conspiratorial mechanism applied by defendants — standardized fuel surcharges—does not require constant communications once the details of the surcharge have been agreed upon. And although Dr. Willig contends that the existence of private price quotes creates practical incentives to 'cheat' or 'deviate' by offering concessions, as the Court previously has found by a preponderance of the evidence, the examples of discounting are, at best, anomalies.") (citations omitted).

### F. A History of Regulation and Communication Among the Defendants Built an Institutional Understanding of Pricing

614. Many categories of rail freight pricing are made publicly available on the internet and, every few months, Defendants were able to divulge their fuel surcharge strategies and their progress made towards uniform coverage on earnings calls and in meetings with industry analysts. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 144; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023 (revised Apr. 12, 2023), ¶¶ 297, 305; PX1126, UPFSC 0257929 at '954 (In their Q2 2005 earnings call, a BSNF representative said, "We have a zero tolerance policy. Any contract it [sic] comes due will be renewed with a fuel surcharge and we have in that mode for a year-and-a-half and have been very successful in implementing fuel surcharge [sic]. So it's all about timing. Our longer-term goal is to get to well over 90% fuel surcharge coverage. . . ."); PX1127, Testimony of Tom Hunt, Surface Transportation Board Public Hearing: Rail Fuel Surcharges, STB Ex Parte No. 661 (May 11, 2006), at 267 ("We disclose our effectiveness rate [the percentage of traffic subject to FSCs] and we did it on the last analyst call at around 75 percent expecting we do about 80 percent by end of this year [2006]."); PX1128, CSXFSC000060859, CSX Q3 2006 Earnings Conference

Call, October 18, 2006, at '875 (In their Q3 2006 earnings call, the Chief Sales and Marketing Officer of CSX stated that, "we do not renew contracts without our fuel surcharge coverage in those contracts. So as contracts come up for renewal this year, they will all be renewed with the fuel surcharge provisions in them."); PX1129, Testimony of Donald Seale, Surface Transportation Board Public Hearing: Rail Fuel Surcharges, STB Ex Parte No. 661 (May 11, 2006), at 315 ("We've got 85 percent of our revenues now covered by some form of fuel surcharge.").

Dated: November 12, 2024

Respectfully submitted,

*/s/ Michael D. Hausfeld*

Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
James Hamilton
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
jhamilton@hausfeld.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody*

*/s/ Sami H. Rashid*

Sami H. Rashid
Richard I. Werder, Jr.
Alexandre J. Tschumi
Alexandria ("Alexee") Deep Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alextschumi@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium, Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa*

*Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/ William J. Blechman*
Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.

*World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars*

1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Heidelberg Materials US, Inc. (f.k.a .Lehigh Hanson, Inc.), PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

*/s/ Craig P. Seebald*
Craig P. Seebald (D.C. Bar No. 438968)
Stefanie Jackson (D.C. Bar No. 1673265)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
sjackson@velaw.com

Jason M. Powers
James L. Leader, Jr.
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2522
(713) 615-5809 (Facsimile)
jpowers@velaw.com
jleader@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)

*(KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton*

Daniel M. Jaffe (D.C. Bar No. 461185)
SLOVER & LOFTUS LLP
1828 L Street, NW
Suite 1000
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining, LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Constellation Energy Generation, LLC, f/k/a Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company, d/b/a WE Energies*

*/s/ David C. Eddy*
David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Blue Water Industries, LLC; Brewer Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

*/s/ Joseph M. Vanek*
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (admitted *pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

/s/ *Raj Mathur*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Raj Mathur
Scott Glass
SUSMAN GODFREY, L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: 212-336-8330
rmathur@susmangodfrey.com
sglass@susmangodfrey.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC,*

*Attorneys for Plaintiff Mitsubishi Motors North America, Inc.*

/s/ *Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
Caitlin R. Thomas
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com
caitlin.thomas@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

/s/ *Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH

*Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/ Kirk T. May*

Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

*/s/ David J. Lender*

David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

*Attorneys for Plaintiffs*
*Lansing Ethanol Services, LLC, et al.*

Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

*/s/ Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Sabrina Merold (D.C. Bar No. 1738065)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

*/s/ James P. Denvir*
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)

*/s/ Michael Schaper*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

*/s/ Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com

James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

/s/ *Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

/s/ *Michael C. Dell'Angelo*
Michael C. Dell'Angelo (Bar No. PA0090)
Michael J. Kane
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net

Daniel J. Walker (Bar No. 219439)
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East

dbirk@eimerstahl.com
srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

/s/ *Daniel B. Goldman*
Daniel B. Goldman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

Washington, D.C. 20001
(202) 559-9740
dwalker@bm.net

Sophia Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd.
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

*/s/ Leo D. Caseria*

Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

*/s/ Ronald J. Aranoff*

Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

*/s/ Conte C. Cicala*

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*/s/ Kayleigh T. Keilty*
Kayleigh T. Keilty (Bar No. 18969)
Austin G. Strine (Bar No. 20637)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359
(410) 332-8603 (telephone)
(410) 332-8081 (facsimile)
kayleigh.keilty@saul.com
austin.strine@saul.com

James A. Morsch
Casey T. Grabenstein
SAUL EWING LLP
161 N. Clark St., Suite 4200
Chicago, Illinois 60601
jim.morsch@saul.com
casey.grabenstein@saul.com

*Attorneys for Plaintiff Environmental Protection & Improvement Company, LLC*

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

*/s/ Roman M. Silberfeld*
Roman M. Silberfeld
D.D.C. Bar ID: CA00002
ROBINS KAPLAN LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5800
Email: rsilberfeld@robinskaplan.com

Stephen P. Safranski (admitted *pro hac vice*)
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
Email: ssafranski@robinskaplan.com

*Counsel for Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC*