**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 (BAH/GMH) |
| OXBOW CARBON & MINERALS LLC, et al.,<br>Plaintiffs,<br>v.<br>UNION PACIFIC RAILROAD CO., et al.,<br>Defendants. | Civil Action No. 11-1049 (BAH) |
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to: ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH) |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs hereby respond and object to Defendants' Statement of Undisputed Material Facts in support of Defendants' Motions for Summary Judgment.

Defendants begin their Statement of Undisputed Material Facts with a "Statement" about the applicable legal standard. Plaintiffs respectfully refer the Court to the "Legal Standard" section of Plaintiffs' Memorandum in Opposition to Defendants' Joint and Individual Motions for Summary Judgment.

In addition, Defendants' Statement of Undisputed Material Facts is deficient and fails to comply with the Local Rules in several respects. The Statement is not limited to actual facts (as compelled by the point-counterpoint structure of the Local Rules), much less material facts (as required by Federal Rule of Civil Procedure 56). Instead, Defendants' Statement includes pure legal conclusions (*e.g.*, "Undisputed Fact" No. 50, which proposes "No Plaintiff adduces admissible evidence to carry its burden as to its damages"), statements lacking any citations to the evidentiary record (*e.g.*, Supporting Fact 54.1, which cites only a Supreme Court decision and the Federal Rules of Civil Procedure), and statements that are simply irrelevant (*e.g.*, "Undisputed Facts" Nos. 46, 55, which concern whether a lawyer's affidavit purports to compile damages claims). Indeed, Plaintiffs have separately moved to strike the improper declarations offered by attorneys in this case ("Motion to Strike the Declaration of Eric Fanchiang and Kelsey Bryan"). Defendants' Statement of Undisputed Material Facts is further improper because Defendants do not cite this document or any of its "Undisputed Facts" in their motions for summary judgment. *Cf. Brugh v. Mount Aloysius Coll.*, 2019 WL 7505741, at *2 (W.D. Pa. Aug. 15, 2019) ("If any of those facts were essential to the Court's decision on their Motion for Summary Judgment, it seems that Defendants would have referenced those facts in their brief.").

Because each purported fact identified by Defendants would be deemed admitted under the Local Rules if not controverted, Defendants' approach of listing legal conclusions, inferences, and vague or general matters as "material facts" obligates Plaintiffs to respond to an inappropriately broad set of express and implied assertions—often as to conclusions that Defendants know are contested matters and the subject of conflicting evidence. Although Plaintiffs respond below to each listed fact out of an abundance of caution, Plaintiffs submit the Defendants' motions for summary judgment are not accompanied by a statement of material facts in compliance with Local Rule 7(h).

**<u>Material Undisputed Fact No. 0</u>**

**Fuel surcharges are a rational, common pricing mechanism adopted unilaterally by many businesses in response to fluctuating fuel prices, including by other railroads and transportation providers during the alleged conspiracy period.**

<u>Supporting Facts:</u>

1.1 Other railroads, including the three non-defendant Class I railroads during the alleged conspiracy period (CN, CP, and KCS), also adopted rate-based fuel surcharges before and during the alleged conspiracy period.[1]

1.2 Trucking, ocean shipping, and airline transportation companies adopted rate-based fuel surcharges before and during the alleged conspiracy period.[2]

---

[1] DA25148 at 57-58 (Israel Rpt. ¶ 60, Tbl. 4, 8/15/23); DA06654 (CN); DA06650 at 52 (CP); DA06562 at 64 (CP); DA03855 at 59 (CP); DA04451 at 61-62 (CN, CP, KCS); DA06866 at 66-94 (KCS); [redacted]

[2] DA25148 at 58-59 (Israel Rpt. ¶ 61, Tbl. 5, 8/15/23); DA11527 at 36, 40, 55 (U. S. Dep't of Transp., Calculation of Bunker Fuel, Currency, and Inland Freight Fuel Price Adjustment Factors for USTRANSCOM Commercial Shipping Contracts: Final Report (July 2009), https://rosap.ntl.bts.gov/view/dot/12116); DA04034 at 40 (September 2002 Bear Stearns report concluding that the trucking industry has an "increasing ability to recapture the impact from rising

1.3 Certain Plaintiffs' experts agreed that "fuel surcharges would have been charged by the defendants during the [alleged conspiracy] period absent a conspiracy," including "the same kinds of fuel surcharges that were charged prior to [that] period," "standardized fuel surcharges," and "rate based fuel surcharges."[3]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 1**

Admitted only that certain transportation providers not named as Defendants in this litigation used fuel surcharges ("FSCs") before and during the alleged "Conspiracy Period" (March 2003 to at least December 2008). Otherwise, disputed. Plaintiffs dispute that rate-based FSCs are "rational," that Defendants adopted FSCs "unilaterally," or that Defendants adopted FSCs "in response to fluctuating fuel prices."

**Defendants' FSCs were not "rational."** The STB identified the disconnect between FSCs and the cost of fuel, concluding that the railroads' rate-based programs had "*virtually no prospect* of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." PX0653, STB *Rail Fuel Surcharges*, *Ex Parte* No. 661, Jan. 26, 2007, at 6 (emphasis added). The STB added that Defendants' fuel surcharge program was "*a misleading and ultimately unreasonable practice*," finding that "there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is

---

fuel expense through floating fuel surcharge mechanisms"); DA04289 at 300 (February 24, 2003 compilation of rate-based fuel surcharges used by several large trucking companies).

[3] DA07504 at 07 (Rausser 9/24/10 119:3-121:6); *see also* DA25302 at 12 (Leitzinger 7/26/23 121:9-122:4) ("it's certainly a possibility that there would have been fuel surcharges" absent the alleged conspiracy, including the same fuel surcharges formulas)); [redacted]

applied." *Id.* at 7 (emphasis added); *see also id.* at 9 ("For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate—when practical alternatives are available—would *permit them to continue to mislead their customers and would be unfair*.") (emphasis added). The STB thus gutted Defendants' pretextual explanation for their fuel surcharge programs, noting that the surcharges paid by shippers did not reflect the actual cost of fuel on those shipments. *Id.* at 6–10; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 248 (D.C. Cir. 2013) ("The STB was especially troubled by the disconnect between the purported rationale for the fuel surcharges—fuel cost recovery—and the formula's dependence on base rates, which need not reflect the marginal fuel costs of a particular shipment.").

Defendants' conspiratorial fuel surcharge programs generated substantially more in revenue than Defendants' actual fuel costs. Defendants themselves recognized that their fuel surcharge programs charged shippers significantly more than the cost of fuel, thus generating significant profits. Plaintiffs Counterstatement of Material Fact ("COF") ¶¶ 445, 447–78, 526–58; *see also* COF ¶¶ 513–23. Indeed, Judge Friedman concluded that there is "substantial documentary evidence that indicates that defendants . . . viewed their fuel surcharge programs as profit centers." *In re Rail Freight Fuel Surcharge Antitrust Litig*., 292 F. Supp. 3d 14, 103 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019).

Econometric analysis by Plaintiffs' experts confirms what Defendants contemporaneously recognized: Defendants' conspiratorial fuel surcharge programs generated substantially more revenue than actual fuel costs. Dr. Bernheim concluded: "I find that all four Defendants significantly over-recovered the incremental cost of fuel for shipments subjected to their

coordinated fuel surcharge programs. Over the entire period, fuel surcharges on shipments recovered 199% of associated incremental fuel costs for NS, 182% for CSX, 126% for BNSF, and 155% for UP." *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 149; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 413–14 ("[redacted]"); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 195-201 (discussing [redacted]).

Defendants also improved fuel efficiency during the conspiracy period, but did not reflect those improvements in its fuel-surcharge program, further decoupling fuel surcharges assessed to customers from Defendants' actual cost of fuel. For example, CSX significantly improved fuel efficiency during the conspiracy period. *See, e.g.*, PX0211, CSXFSC000279958 (April 5, 2006 draft fuel surcharge talking points), at '958 (CSX "actively works toward increased fuel efficiency). In 2005, CSXT improved fuel efficiency by 2.4%. The company achieved 1.28 gallons per thousand gross ton miles in 2005, versus 1.3 gallons in 2004. This equated to about 19 million fewer gallons of fuel consumed in 2005 compared to 2004."). Moreover, during most of the conspiracy period, CSX operated a hedging program, which provided it greater protection from changes in the price of fuel. PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, at n.504–05 (¶¶ 179–180, 223) ("[redacted]

[redacted]). In its 2003 annual report, CSX announced that 18% of its projected 2004 fuel purchases were hedged, but that it planned to increase this coverage to 76% by July 2005. PX0665, CSX Corporation 2003 Annual Report, at 36. Nonetheless, like the other Defendants, CSX during the conspiracy did not take hedging into account in setting fuel surcharge rates. PX0741, CSXFSC000333177 (CSX "Fuel Surcharge Talking Points"), at '178 ("CSX fuel surcharge mechanism is separate from our fuel hedging program[:] Surcharge is used to share incremental fuel costs with our customers[;] Hedging is used to smooth out fuel price volatility and does not lower overall cost over the long run."); *see also* COF ¶¶ 480–512.

**Defendants did not adopt fuel surcharges "in response to" fuel prices**. Defendants did not even *expect* the price of fuel to rise at the time they entered the conspiracy. COF ¶¶ 85–91; *see, e.g.*, PX0344, NS_010275443 (email re: "FSC Testimony," attaching NS's Statement Before The STB, April 27, 2006) at '447 (NS to STB: "[NS] thought . . . that the oil price increases we began to see as 2003 progressed were temporary"); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 109:6 (testifying that in Spring 2003, he "thought fuel prices were going down"). One of Defendants' own experts, Dr. Kalt, conducted an analysis of fuel price trends that demonstrated that the conspiracy in fact was immediately preceded by a *decrease* in fuel prices. PX0637, Corrected Kalt Merits Rpt., March 1, 2013, Fig. IV-5A. Another of Defendants' experts, Dennis Carlton, opined that January 1, 2000 to July 1, 2003 was "a time period when fuel costs were generally low and flat." PX0648, Corrected Carlton Merits Rpt., Feb. 6, 2013, ¶ 148. And Defendants' experts confirm a forward-looking expectation that fuel prices would fall. *Id.* ¶¶ 61 ("at the start of the

alleged conspiracy, *fuel prices were actually expected to fall*" (emphases added)); PX0766, Israel MDL II Rpt., Aug. 15, 2023, at 49 ("futures prices pointed to falling prices for WTI"); PX0775, Tucker MDL II Rpt., Aug. 15, 2023, at 59 tbl.10 (plotting NYMEX future projections showing that in March 2003 it was projected that WTI prices would fall below $28 and stay above $23 all the way through September 2005); PX0774, Johnson MDL II Rpt., Aug. 15, 2023, at ¶ 144 ("NYMEX futures projections from March 2003 and September 2003 show that WTI prices were expected to be between $23 and $28 for most of the months covered by the projections."); *see also* NS Br. 5 (stating that "forecasts predicted declining fuel prices" at the time BNSF, CSX, and UP changed their FSCs and that, as the year progressed, fuel prices continued to be "stable," with "forecasts predicted prices to decline to $24/bbl by February 2004"). Defendants themselves recognized that their fuel surcharge programs charged shippers significantly more than the cost of fuel, thus generating significant profits. COF ¶¶ 445, 447–478, 526–58.

**Admissible evidence also contradicts the misleading suggestion that Defendants adopted fuel surcharges unilaterally or independently**. *See, e.g.*, Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 8, 11–15, 17–20, 23–27, 30–34, 38–45, 51–52.

Defendants have also proffered no evidence suggesting that other transportation carriers adopted fuel surcharges "unliterally" or "in response to" fuel prices. Rather, FSCs *have* been the subject of collusion in other transportation industries—including in the same timeframe. *See, e.g.*, *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *31 (N.D. Cal. May 9, 2011) (denying motions to dismiss antitrust claims involving fuel surcharges). Indeed, toward the beginning of this litigation, 21 air freight carriers *pleaded guilty* to a price-fixing conspiracy involving FSCs, resulting in over $1.8 billion in criminal fines. *In re Air Cargo*

*Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *4 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503, at *1 (E.D.N.Y. July 10, 2015).

**Supporting Fact 1.3 is further disputed because Defendants misrepresent expert testimony.** Contrary to Defendants' suggestion, Dr. Rausser in fact was stating that [redacted] Dr. Rausser agreed [redacted] DA07504 at 07 (Rausser Dep. 119:3-121:6). Indeed, Dr. Rausser's expert report explains that [redacted]. PX0636, Rausser Merits Rpt., Oct. 15, 2012, at 99-112.

Defendants similarly mischaracterize Dr. Bernheim's testimony. In the very answer from which they selectively quote, Dr. Bernheim explained [redacted] PX1073, Bernheim MDL II Dep., July 31, 2023, at 184:16–185:2.

Likewise, Defendants imply that Dr. Jacobs testified that the Defendants would use the same type of coordinated fuel surcharges absent the conspiracy. He did not. Dr. Jacobs explicitly testified that [redacted] PX0948, Jacobs MDL II Dep., Aug. 2, 2023, at 40:15-20. Dr. Jacobs also opined that [redacted] PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 317, 324-25.

Moreover, Defendants selectively quote only a portion of Dr. Leitzinger's answer in deposition. In the full answer, Dr. Leitzinger testified that [redacted] PX0844, Leitzinger MDL I Dep., Mar. 15, 2023, 114:20-115:1.

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**Material Undisputed Fact No. 2**

**Diesel fuel was a substantial and growing component of Defendants' costs during the alleged conspiracy period.**

Supporting Facts:

2.1 Defendants are significant consumers of diesel fuel, which they use to fuel their locomotives as well as other operations. For example, in 2003, UP used 1.3 billion gallons of fuel to operate its rail network, and its fuel costs during just the first half of 2006 totaled $1.486 billion.[4]

2.2 Defendants' fuel costs as a share of their total operating costs increased significantly during the 2000s. CSX Corporation's (CSXT's parent company) and NS's fuel cost share of total expenses before July 2003 was between 5% and 10%, and it peaked at 25% during the alleged conspiracy period. BNSF's and UP's fuel cost share of total expenses before July 2003 was generally between 10% and 15%, and it peaked at 36% and 32%, respectively, during the alleged conspiracy period.[5]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 2**

Admitted only insofar as diesel fuel was a component of Defendants' costs during the alleged Conspiracy Period and Defendants accurately represent their own self-reported statistics, but disputed that this fuel component was "substantial" or "growing" for this entire period or that Defendants expected fuel prices to increase at the time of the conspiracy.

Plaintiffs dispute that Defendants' fuel costs "increased significantly" during this period. Defendants rely on Dr. Carlton's analysis for this proposition, but that analysis shows Defendants' fuel cost share of total operating cost fluctuated during the Conspiracy Period and for some

[4] DA19004 at 10; DA19222 at 30.

[5] DA25097 at 138-39 (Carlton Rpt. ¶ 228, Fig. 17, 8/15/23).

quarters was lower than the pre-Conspiracy Period. DA25097 at 138-39 (Carlton Rpt. ¶ 228, Fig. 17, 8/15/23.

Plaintiffs dispute this statement to the extent it misleadingly implies that Defendants' conspiratorial fuel surcharges were designed to recover the cost of fuel or did, in fact, recover only their cost of fuel. The STB identified the disconnect between fuel surcharges and the cost of fuel, concluding that the railroads' rate-based programs had "*virtually no prospect* of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." PX0653, STB *Rail Fuel Surcharges*, *Ex Parte* No. 661, Jan. 26, 2007, at 6 (emphasis added); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 248 (D.C. Cir. 2013) ("The STB was especially troubled by the disconnect between the purported rationale for the fuel surcharges—fuel cost recovery—and the formula's dependence on base rates, which need not reflect the marginal fuel costs of a particular shipment."); COF ¶¶ 426–442. Defendants also improved fuel efficiency during the conspiracy period, but did not reflect those improvements in its fuel-surcharge program, further decoupling fuel surcharges assessed to customers from Defendants' actual cost of fuel. *See* COF ¶¶ 481–91, 500–03; *see also* COF ¶¶ 513–23. Defendants did not even *expect* the price of fuel to rise at the time they entered the conspiracy. COF ¶¶ 85–91.

Defendants' conspiratorial fuel surcharge programs generated substantially more in revenue than Defendants' actual fuel costs. *See* COF ¶¶ 513–23. During the conspiracy, Defendants consistently observed that the fuel surcharges were significantly over-recovering compared to actual fuel costs. COF ¶¶ 445, 447, 450–75, 561. Judge Friedman concluded that there is "substantial documentary evidence that indicates that defendants . . . viewed their fuel surcharge programs as profit centers." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F.

Supp. 3d 14, 103 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019).

Econometric analysis by Plaintiffs' experts confirms what Defendants contemporaneously recognized: Defendants' conspiratorial fuel surcharge programs generated substantially more revenue than actual fuel costs. Dr. Bernheim concluded: "I find that all four Defendants significantly over-recovered the incremental cost of fuel for shipments subjected to their coordinated fuel surcharge programs. Over the entire period, fuel surcharges on shipments recovered 199% of associated incremental fuel costs for NS, 182% for CSX, 126% for BNSF, and 155% for UP." *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 149; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 413-414 ("I [redacted]"); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 195-201 (discussing [redacted]). Dr. Bernheim also concluded that during the conspiracy, "there was a substantial increase in the Defendants' use of fuel surcharges," and "[t]his change is not explained by the economic factors that would govern fuel surcharge usage in a competitive setting and to which the Defendants have pointed in other venues: movements in the price of diesel fuel and its volatility." *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 183.

**<u>Material Undisputed Fact No. 3</u>**

**The price of oil generally increased between 2000 and 2008.**

<u>Supporting Facts:</u>

3.1 Spot prices per barrel for West Texas Intermediate ("WTI") crude oil, as recorded by the U.S. Energy Information Administration ("EIA"), generally rose from 2000 to 2008, and are reflected in the following chart and cited data series.[6]




[6] https://www.eia.gov/dnav/pet/hist/rwtcW.htm (WTI crude oil spot prices); DA25097 at 105-06 (Carlton Rpt. ¶ 29, Fig. 2, 8/15/23).

3.2 The weekly retail prices of U.S. No. 2 diesel (commonly referred to as Highway Diesel Fuel ("HDF")), as recorded by the EIA, generally rose from 2000 to 2008, and are reflected in the following chart and cited data series.[7]




**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 3</u>**

Disputed to the extent that the statement implies that oil prices rose at a steady rate from 2000 to 2008, that they were rising when Defendants entered the conspiracy, or that they were expected to increase when Defendants entered the conspiracy. Further disputed to the extent that the statement misleadingly implies that Defendants' individual fuel costs were equivalent or tracked the "price of oil generally" despite Defendants' hedging and cost-containment strategies. Admitted only that Defendants' graphs accurately reflect HDF and WTI prices during this period.

There is compelling admissible evidence contradicting Defendants' misleading implications that oil prices rose at a steady rate from 2000 to 2008, that oil prices were rising when

---

7 https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W (HDF diesel fuel prices); DA25097 at 105-06 (Carlton Rpt. ¶ 29, Fig. 2, 8/15/23).

Defendants entered the conspiracy, and/or that Defendants had expected oil prices to rise at the time they entered the conspiracy. In fact, when Defendants entered the conspiracy, fuel prices were "low," and "flat" or declining, and Defendants' own experts testified to this effect. PX0648, Carlton Merits Rpt., Feb. 6, 2013, ¶¶ 61, 148.

According to Defendants, their experts, and contemporaneous industry publications, at the outset of the conspiracy fuel prices were expected to fall. COF ¶¶ 85–91; *see also* PX0344, NS_010275443 (email re: "FSC Testimony," attaching NS's Statement Before The STB, Apr. 27, 2006), at '449 ("In March 2003, EIA accurately forecasted a decline in the price of WTI to around $27 by the end of 2003"), *id.* at '447 (representing that NS believed "the oil price increases we began to see as 2003 progressed were temporary"); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 109:6-7 (testifying that in Spring 2003 he "thought fuel prices were going down."); PX0648, Carlton Merits Rpt., Feb. 6, 2013, ¶ 61 (UP expert opining that "at the start of the alleged conspiracy, fuel prices were actually expected to fall."); PX0652, Ordover Merits Rpt., Jan. 22, 2013, at 6 (BNSF expert opining that "[t]he relevant fuel prices were not predicted to increase significantly at the time that the alleged conspiracy was formulated."); PX0766, Israel MDL II Rpt., Aug. 15, 2023, at ¶ 77 ("futures prices pointed to falling prices for WTI"); PX0775, Tucker MDL II Rpt., Aug. 15, 2023, at 59 tbl.10 (plotting NYMEX future projections showing that in March 2003 it was projected that WTI prices would fall below $28 and stay above $23 all the way through September 2005); PX0774, Johnson MDL II Rpt., Aug. 15, 2023, at ¶ 144 ("NYMEX futures projections from March 2003 and September 2003 show that WTI prices were expected to be between $23 and $28 for most of the months covered by the projections."); *see also* NS Br. 5 (stating that "forecasts predicted declining fuel prices" at the time BNSF, CSX, and UP changed their FSCs and that, as the year progressed, fuel prices continued to be "stable," with "forecasts

predicted prices to decline to $24/bbl by February 2004"); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 159-160, Fig. 15.

**<u>Material Undisputed Fact No. 4</u>**

**During the alleged conspiracy period, the national economy grew more rapidly than in years prior, and Defendants faced increased demands for their services and capacity constraints.**

<u>Supporting Facts:</u>

4.1 U.S. gross domestic product grew in 2003 (2.9%), 2004 (3.8%), 2005 (3.5%), and 2006 (2.9%), which was on average more than twice the growth rate in 2001-2002 (1.0% and 1.7%).[8]

4.2 Defendants faced generally increasing demand from 2003 through 2007.[9]

4.3 Defendants faced capacity constraints from 2003 through 2006.[10]

---

[8] U.S. Bureau of Econ. Analysis, Gross Domestic Product (Page last modified on Dec. 18, 2023), https://www.bea.gov/resources/learning-center/what-to-know-gdp.

[9] DA06895 at 96 (U.S. Dep't of Transp. Inspector General, Quality of Service Provided to Rail Shippers, Report No. CR-2011-045, at 11 (Feb. 15, 2011) ("[D]emand increased by nearly 12 percent and continued to grow through 2007."); DA06899 at 903 (Cong. Budget Office, Freight Rail Transportation: A Review of the 2004 Experience 2 (2005) (noting "unprecedented surge in demand"); DA06904 at 908 (Fed. Highway Admin., U.S. Dep't of Transp., *Financing Freight Improvements* 4 (Jan. 2007) ("Railroads are currently serving record volumes"); DA05280 at 83 (NS 2004 Annual Report) ("A combination of trends—increasing congestion on the highways, demand for better transportation options in environmental terms, fuel price pressures and regulatory changes affecting the trucking industry—are coming together to result in significantly increased demand for rail freight."); DA06895 at 96 ("Representatives of one railroad noted that they normally plan for 2 to 4 percent in annual growth, but as early as 2003, demand increased by nearly 12 percent and continued to grow through 2007.")); DA17664 at 75 (CSX Corp. 10-K for Year Ended Dec. 31, 2004 at 11 ("demand created from a generally strong industrial economy propelled all merchandise markets and CSXI to record revenue levels")); DA19334 at 41 (UP 10-K for Year Ended Dec. 31, 2006 at 6 ("Due to continuing demand for rail service and capacity constraints, we may experience network difficulties, including congestion and reduced velocity…")); DA15978 at 80-83 (2005 BNSF Annual Report at 1-4 (noting "unprecedented demand for rail transportation")).

[10] DA19334 at 41 (UP 10-K for Year Ended Dec. 31, 2006 at 6 ("Due to continuing demand for rail service and capacity constraints, we may experience network difficulties, including congestion and reduced velocity…")); DA06897 at 98 (U.S. Dep't of Agriculture Agricultural Marketing Serv., *Study of Rural Transportation Issues* 332 (Apr. 2010) ("Capacity constraints were common

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 4</u>**

Admitted only that Defendants' Supporting Fact 4.1 accurately reports U.S. GDP growth from 2001 to 2006. Otherwise, disputed to the extent that the statement misleadingly implies that increased demand for Defendants' services, capacity constraints, or increased U.S. GDP caused the inflated all-in freight rates paid by Plaintiffs.

The cited evidence does not support the misleading implication that increased U.S. GDP or alleged capacity restraints caused the inflated all-in freight rates paid by Plaintiffs. Defendants have only submitted as evidence partial and incomplete portions of the cited reports, and selectively cherry-picked statements. For example, while Defendants submit two pages from the 2010 USDA Study of Rural Transportation Issues, they omit other portions of the report that attribute their record profits during the conspiracy period to fuel surcharges. *See* PX0656, U.S. Dept. of Agriculture and U.S. Dept. of Transportation Study of Rural Transportation Issues, April 2010, at ix ("There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001 to 2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."); *id*. at 260 (chart showing the increasing spread between fuel costs and fuel surcharges for grain, which expanded substantially beginning in 2003-04 and continuing thereafter); *id*. at 272 ("Rail rates have increased rapidly since 2004 resulting in a surge of railroad profitability. The increase reflects not only increased rail costs, but aggressive pricing and over-recovery of fuel costs. Fuel surcharges seemingly should reimburse railroads for the increase in fuel costs, not be sources of additional revenue.").

---

from 2003 through the first half of 2006.")); *see also* DA24069 at 183 (Leitzinger Rpt. ¶ 221, 11/15/23); DA23888 at 961 [redacted]

Defendants' other cited sources likewise reveal that this fact is, at best, disputed. Defendants cite Dr. Leitzinger's report to establish their capacity constraints, but Dr. Leitzinger, relying upon contemporaneous third-party studies of the railroad industry, makes clear that Defendants were operating *under* capacity and experienced *declining* congestion during the conspiracy period. PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 221. One of those studies, published in 2009 by Christensen Associates, found that "there currently do not appear to be global or network-wide rail capacity constraints." PX0993, Laurits R. Christensen Associates Inc., A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition, Nov. 2009, at ES-28. Another study found that, as of September 2007, 88% of "primary corridor mileage is operating below practical capacity, 12 percent is near or at practical capacity, and less than 1 percent is operating above capacity." PX0994, Cambridge Systematics, National Rail Freight Infrastructure Capacity and Investment Study, Sept. 2007, 4-9 (references omitted).

Defendants also present no evidence linking GDP growth to increased demand for rail freight transportation, or that the growth was powered by growth in sectors that make significant use of rail freight transportation.

The cited evidence does not support the statement that Defendants faced increasing demand from 2003 to 2007, or the misleading implication that increased demand was the cause of inflated all-in rail freight rates. Defendants' own evidence notes that "[o]ther factors helped moderate demand for rail transportation." DA06899, at DA06903. Defendants' own evidence also notes that weaker demand for freight rail transportation began in late 2006. DA06897 at 98 (Study of Rural Transportation Issues, US Departments of Agriculture and Transportation, Apr. 2010). Plaintiffs' experts have determined that supply of and demand for freight rail could not explain Defendants'

pricing decision. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 21 (finding demand surge for rail did not explain rise in prices as demand changes were controlled for in his analysis); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 8-9, Fig. 2 (alleged conspiracy created overcharges); PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 213-15 (opining that demand growth slowed, and congestion decreased).

Moreover, admissible evidence demonstrates that the inflated all-in freight rates paid by Plaintiffs are not a result of increases in demand for services or capacity constraints, but instead a result of a conspiracy among Defendants to impose pretextual and non-negotiable fuel surcharges, across-the-board and with uniform directives to minimize discounts and waivers. *See* Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 8, 11–15, 17–20, 23–27, 30–34, 38–45, 51–52. The foregoing evidence is sufficient to dispute Defendants' assertions and implications regarding demand and capacity. At the same time, expert regression analysis, and Dr. Leitzinger's analysis comparing Defendants' incremental fuel costs to certain Plaintiffs' FSC payments, further confirms [redacted] COF ¶¶ 445, 447, 450–478, 561; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 240, Ex. E08. In any event, each of Plaintiffs' economic experts' regression models control for measures of demand. *See*, *e.g.*, PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 203, 241–42; PX0985, McClave MDL II Rpt., Mar. 1, 2023, at 16 (Dr. McClave included "include[d] quarterly changes in the Gross Domestic Product (GDP) in both models as a measure of general demand related to the strength of the economy" as well as a variable for "a more specific measure of demand for rail shipments, the total monthly number of rail freight carloads reported by AAR, including a seasonal adjustment calculated by the Bureau of Transportation Statistics" and "[t]he number of non-intermodal carloads is included

as a demand variable in my non-intermodal model, and the number of intermodal carloads is included as a demand variable in my intermodal model."); PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 199, 210, 257, 264.

**<u>Material Undisputed Fact No. 5</u>**

**Defendants are in vertical or joint-venture relationships with each other with respect to their interline business.**

<u>Supporting Facts:</u>

5.1 CSXT and NS both operate rail freight transportation networks with a geographic footprint generally east of the Mississippi River; BNSF and UP both operate networks with geographic footprints generally west of the Mississippi.[11]

5.2 Interline shipments, where two or more railroads carry the shipment on different segments of an origin-destination pair, are necessary for the operation of the rail network in the United States.[12] Railroads that act as interline partners—often an eastern railroad partnering with a western railroad—have a vertical or joint venture relationship.[13]

5.3 Approximately 30-45% of Defendants' revenue from unregulated traffic during the alleged conspiracy period came from interline shipments.[14]

---

[11] DA25097 at 101-02 (Carlton Rpt. ¶¶ 17-18, 8/15/23); DA12504 at 09.

[12] DA25302 at 13 (Leitzinger 7/26/23 140:6-17); DA25057 at 59-61 [redacted]

[13] DA25097 at 102-03 (Carlton Rpt. ¶ 19, 8/15/23); DA25302 at 13 (Leitzinger 7/26/23 140:19-25); DA25148 at 49 (Israel Rpt. ¶ 14, 8/15/23); DA06436 at 39-40 [redacted]

[14] DA25097 at 102-03 (Carlton Rpt. ¶ 19, 8/15/23); *In re Rail Freight Fuel Surcharge*, 725 F.3d 244, 247-48 (D.C. Cir. 2013) ("*DC Cir. I*").

5.4 Congress has required railroads to establish interline "through routes," which are generally subject to "joint rates," also known as "through rates."[15]

5.5 The Surface Transportation Board, which regulates the rail industry in the United States, has encouraged "interline partnerships" and "joint marketing agreements" to facilitate efficient interline rail service.[16]

5.6 Interline partners must communicate regarding joint pricing, operations, marketing, as well as other aspects of their joint business.[17]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 5</u>**

Objection. Defendants' "Undisputed Fact No. 5" contains multiple legal conclusions not properly included in Defendants' Statement of Undisputed Facts, including Supporting Facts 5.4 and 5.5. What "Congress has required" or the meaning of regulations issued by the Surface Transportation Board are questions of law, not matters of fact. Indeed, Defendants cite only legal sources (regulations and caselaw) to substantiate Supporting Facts 5.4 and 5.5. These improper legal conclusions should be disregarded on summary judgment. *See, e.g.*, *Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C. 2007) (disregarding legal conclusions couched as "fact[s]" on summary judgment); *Cobell v. Norton*, 260 F. Supp. 2d 110, 129 (D.D.C. 2003) ("This statement represents a conclusion of law, not a statement of fact. Therefore, the Court will deny summary judgment for plaintiffs as to this issue."); *Matthews v. Am. Psychological Soc'y*, 2006 WL 8460393, at *1 (D.D.C. July 27, 2006) ("Such legal conclusions, while proper in Plaintiff's accompanying Opposition, are not properly included in Plaintiff's Statement of Facts.").

---

[15] 49 U.S.C. §§ 10701(a), 10703, 10705(a); *see Balt. Gas & Elec. Co. v. United States*, 817 F.2d 108, 110 (D.C. Cir. 1987).

[16] 49 C.F.R. § 1180.1(c).

[17] DA25295 at 98 [redacted]; DA25302 at 14 [redacted]; DA25148 at 56 (Israel Rpt. ¶ 52, 8/15/23).

Admitted only that CSX and NS operate *primarily* "east of the Mississippi River" and BNSF and UP operate *primarily* "west of the Mississippi River." However, all four railroads operate at multiple junctions along the Mississippi River and elsewhere like Chicago, and all four railroads service destinations on both sides of the Mississippi River. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 35. Further admitted that moving a shipment across the Mississippi River can involve, but does not necessarily require, interlining between more than one railroad. *Id.* ¶¶ 33, 35.

Otherwise, disputed. Disputed insofar as Defendants imply that all interline shipments require collaboration between railroads to establish "jointline" rates or to coordinate and agree upon fuel surcharges, that they had "substantial interline business" constituting up to one-third of their revenue that would require such "collaboration" on "jointline" rates (including fuel surcharges), and that Defendants' purported vertical relationship with any and all Defendants extended to all of their interline business with any and all Defendants. Also disputed insofar as "interline business" is vague and can encompass both "jointline" and "Rule 11" shipments. Finally, disputed to the extent Defendants misleadingly imply that they are not primarily or exclusively *horizontal* competitors.

Admissible evidence contradicts the suggestion that *all* interline shipments require collaboration between railroads to establish "jointline" rates (or by implication FSCs), or that "30-45%" of Defendants' revenues would require such "collaboration" on "jointline" rates (or FSCs). In fact, there are two types of "interline" shipments—"jointline" shipments, where the participating railroads issue a single rate (and invoice) to the shipper, and "Rule 11" shipments, where there is *no* need to discuss pricing, because the two railroads invoice the customers *separately* for their portions of the shipment. PX0653, *Rail Fuel Surcharges*, STB Ex Parte No.

661, Jan. 25, 2007, at 7. Dr. Bernheim explained that for non-joint-line interline shipments, also known as "Rule 11" shipments, shippers "negotiate with carriers for each leg of the shipment separately." *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 35; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 302-03 & nn.625-27 (observing that Rule 11 shipments do not require rate discussions with interline partners); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 24 ("in local and Rule 11 shipments, there is no need for railroads to agree on prices"). And in fact, in 2000–2008, only 5.9% of UP's total traffic, by ton-mile, derived from "joint-line" shipments with BNSF, NS, or CSX—while 87% of UP's total traffic consisted of "local" (*i.e.*, single-line) shipments (65.7%) or "Rule 11" shipments (21.3%). PX0648, Carlton Corrected Merits Rpt., Feb. 6, 2013, at 15, Table 3.3. Defendants' own expert William Rennicke opined that, across all railroads' carload traffic, only "15 percent [comprising "joint-line" shipments] requires concurrence," while the remaining 85% of carload traffic ("single-line" and "Rule 11" traffic) does not. PX0660, Rennicke MDL I Dep., at 224:11-12.

The cited evidence also does not support the suggestion that any given Defendant was in a "vertical" or "joint venture" relationship with all other Defendants as to all "interline business." *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2021 WL 663669, at *6, *33 (D.D.C. Feb. 19, 2021) (concluding that Defendants "generally are *competitors* with one another," including on "single-line traffic and interline traffic in which they do not participate" (emphasis added)).

Admissible evidence also contradicts the suggestion that interline shipments require Defendants to coordinate and agree upon FSCs—and particularly not coordination by the senior-most executives at their companies. In fact, in 2000, Defendants [redacted]

[redacted]. PX003, AAR_P_00001314 (AAR Committee Structure 2001), at ‘429. [redacted] PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 161, 169. CSX’s chief commercial officer, Michael Giftos, testified that before the conspiracy, “concur[rence] in the application of our fuel surcharge program” occurred “down in the depths of his organization” and that “there’s people that have been doing this for years. They know how to do it. They know when they have to do it. They know the right way to do it and they just did it.” PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 72, 198. The resulting best practices document resolved that a railroad could implement a fuel surcharge on its own without seeking concurrence from the interline partners on the route. PX0360, NS_024000001 (email chain re “Fuel Surcharge Processing—Best Business Practices Document,” Jan. 16, 2001, attaching Fuel Surcharge Processing Best Business Practices Document), at ’006; PX0632, Usher (AAR 30(b)(6)) Dep., Feb. 2, 2011, at 179-80; *see* COF ¶¶ 33–45.

Additional admissible evidence contradicts that any given Defendant was in a “vertical” or “joint venture” relationship with all other Defendants as to all of its “interline business.” In fact, the STB has recognized that the Defendants compete against one another. PX0661, Surface Transportation Board, DOT, “Major Rail Consolidation Procedures,” STB *Ex Parte* No. 582, June 7, 2001, at 556 (pointing to overlap amongst “many of the connections of large” “eastern and western railroads,” and stating: “Thus, a merger between any two U.S. Class I rail carriers . . . would surely threaten certain shippers with a loss of some indirect competition,” and “significant losses in geographic competition could occur even; where carriers truly are ‘end-to-end,’ because

there are many commodities . . . that have a limited number of sources."); PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 255-56.

Moreover, Defendants also regularly described themselves as *horizontal* competitors, rather than as "vertical" partners or "joint" venturers. *See*, *e.g.*, PX0755, AAR, *Railroads Face Fierce Competition*, ("Railroads are private companies that compete against each other for business."); PX0756, House Committee on the Judiciary Subcommittee on Courts and Competition Policy, Hearing on H.R. 233 Railroad Antitrust Enforcement Act of 2009, Written Testimony of Association of American Railroads, at 10 ("railroads must compete on price and service--subject to the antitrust laws"). All Defendants also compete even on an "interline" basis. PX0595, Giftos Dep., Feb. 5, 2010, at 298-99 ("Q. And so if you -- if you ended up coming up with a business opportunity that involved an end to end movement between the UP and CSX, who would you be competing against? A. Well, there's -- there's the possibility that we could do it with the BN. I mean, the BN and CSX also connect in St. Louis and Chicago. And the BN also serves the Powder River Basin. So the competition -- there is competition for those interline movements. In the case of the western carriers we compete with both BN and -- BN and UP compete for some of the traffic with CSX.").

Defendants have even testified that they face competition from each other for so-called "captive" shippers that are served by only a single railroad at a destination. NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that such captive shippers can harness competition among all four railroads in the country to negotiate more favorable rates. Specifically, Moorman testified railroads serving captive shippers face "competitive constraints [that] are real," and that "even where there is only one railroad serving a facility, there are market factors at play." PX01204, Written Statement of Charles W. Moorman, Sept. 20, 2007, at 16.

Moorman explained further that: "Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, . . . we will lose the business.… Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real." *Id.* at 15-16. UP's CEO, James Young, likewise testified that railroads place "competitive constraints" on each other even with respect to captive shippers. PX0616, Young (UP) Dep., Aug. 4, 2010, at 201.

Defendants also characterized themselves as horizontal competitors with respect to fuel surcharges and irrespective of any need to coordinate on joint-line rates. For example, BNSF wrote in a May 28, 2002 Enterprise Wide Risk Assessment that "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges ***but our rail competitors do not*** and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." PX0127, BNSF-0574516 (BNSF Enterprise Wide Risk Assessment, May 28, 2002) at '617 (emphasis added); PX0128, Metadata to PX0127, at 17; PX0129, BNSF-0574516 (Enterprise Wide Risk Assessment Supporting Comments, May 28, 2002), at '624_011.

Any after-the-fact suggestion that the Defendants were not competing with each other also is belied by BNSF's observation, in 2005 in the midst of the conspiracy, that while "reliance on fuel surcharge as a mechanism to control fuel prices … is working well now, ***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail***." PX0126, BNSF-0574195 (Enterprise Wide Risk Assessment BNSF Railway Risk Profile, Sept. 12, 2005), at '216 (emphasis added); *see also* PX0123, BNSF-0571509 (2005 Enterprise Wide Risk Assessment Leadership Team Meeting, Aug. 19), at '517 (identifying as a top risk the "[r]isk that competitors reverse course on using a fuel surcharge"); *see also* PX0614, Glennon (NS) Dep., July 20, 2010, at 18-19 (testifying that "some railroads may not have been actually applying a fuel surcharge at the very beginning. . . . not all of them were successful initially, but they were later," and that when NS bid against other railroads, it often went up against "competitive bids . . . where a fuel surcharge was not being applied and that created some concerns on [NS's] part."); *id.* at 19 ("[W]hen you are trying to negotiate a contract, if you have a fuel surcharge and the . . . competitive bid doesn't, it puts you at a disadvantage."); PX0195, CSXFSC000128907 (CSX internal email re: CSXT Fuel Surcharge Value, Aug. 20, 2002) at '907 ("Customers may view a more aggressive CSXT fuel surcharge negatively, particularly on NS competitive business . . . ."); PX0508, UPFSC0129813 (internal UP email re: BNSF Reducing Fuel Surcharge 5/1 to 2%, Apr. 29, 2003), at '813 (emphasis added) (UP's Bob Toy wrote that "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world.").

Dr. Bernheim explained that, despite any purported geographic differences, "the eastern and western railroads had a common interest in raising all-in rates." PX0817, Bernheim Rebuttal Expert Rpt., Nov. 15, 2023, ¶ 31; *see id.* ¶¶ 29–35. Dr. Bernheim also noted that "other

documented price fixing conspiracies included sellers that had both horizontal and vertical relationships with each other." *Id.* ¶ 35. Likewise, Dr. Jacobs noted that "a coordinated approach [amongst all four railroads] to gain buyer acquiescence is recognized as a viable collusive strategy in economic literature." PX0989, Jacobs Reply Expert Rpt., Dec. 21, 2023, ¶ 48. Moreover, as Dr. Leitzinger explained, "the corresponding economic benefit to the alleged conspirators is that each railroad then obtains a larger increase in profit for the remaining portion of its shipments than it loses by way of reduced overall shipment volume" and that "the economic calculus supporting the alleged conspiracy is the same with or without interline movements." PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 95.

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**<u>Material Undisputed Fact No. 6</u>**

**Fuel surcharge programs adopted by Defendants before March 2003 were adopted independently.**

<u>Supporting Facts:</u>

6.1 Plaintiffs admit that fuel surcharge programs adopted by Defendants before March 2003 were adopted independently.[18]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 6</u>**

Admitted only that Plaintiffs do not allege Defendants' fuel-surcharge programs before March 2003 were conspiratorial.

Disputed to the extent that the statement misleadingly implies that the limited fuel surcharge programs adopted prior to early 2003 were similar to the more aggressive, broadly-imposed, non-negotiable fuel surcharge programs Defendants imposed during the conspiracy period, and to the extent the statement misleadingly implies that the fuel surcharge programs in place after early 2003 were a continuation of the programs in place prior to early 2003, or were also the result of unilateral conduct. *See* Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 8, 11–15, 17–20, 23–27, 30–34, 38–45, 51–52.

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as

[18] DA06363 at 66; *see also* DA20295 at 352 (Rausser Rpt., 10/15/12); DA07435 at 36, 37; DA06292 at 93, 94 (admitting no evidence of alleged conspiracy "prior to March 2003"); *see also In re Rail Freight Fuel Surcharge*, 2020 WL 5016922, at *26 (D.D.C. Aug. 25, 2020) (Howell, J.) ("*Tolling I*") (MDL I plaintiffs "alleged that defendants' conduct from 2000 to 2003 was unilateral, not coordinated").

a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**Material Undisputed Fact No. 7**

**Many of the Plaintiffs were subject to rate-based fuel surcharges in contracts with Defendants before the alleged conspiracy period.**

Supporting Facts:

7.1 *MDL I* Plaintiff Olin paid rate-based fuel surcharges before January 1, 2003.[19] *MDL I* Plaintiff Strates Shows paid rate-based fuel surcharges prior to March 1, 2003.[20] *MDL I* Plaintiff Donnelly paid rate-based fuel surcharges before January 1, 2003.[21] *MDL I* Plaintiff [redacted] paid rate-based fuel surcharges prior to March 1, 2003.[22] *MDL I* Plaintiff Dust Pro was subject to a rate-based fuel surcharge at least as early as 2002, and it paid rate-based fuel surcharges for shipments made before July 1, 2003.[23]

7.2 Documents produced in *MDL II* show that at least 74% of *MDL II* Plaintiffs were party to a Defendant price authority with a rate-based fuel surcharge before the alleged conspiracy period.[24]

---

[19] DA06598 at 604; DA06656 at 59-60 (Olin-NS fuel surcharge); DA06292 at 95 (Olin admission).

[20] DA06516 at 17 (Strates 172:11-21); DA06763 at 70; DA06771 at 77-78; DA06292 at 98 (RFA Nos. 176, 177) (Strates admission).

[21] DA06520 at 22 (Donnelly-NS fuel surcharge); DA06292 at 96 (No. 176) (Donnelly admission).

[22] DA06506 at 08 (Kaplan (US Magnesium) 81:1-83:3); DA06802 at 02 (U.S. Magnesium-UP fuel surcharge); DA06292 at 99 (No. 176) ([redacted]

[23] DA06511 at 14 (Snow (Dust Pro) 51:11-52:4); DA00713 at 813-14 (Kalt Rpt. ¶¶ 153-154 & Fig. IV-8A, 3/1/13) (analysis of Dust Pro transaction data); DA06529 (Dust Pro-UP fuel surcharge); DA06292 at 97 (No. 180) (Dust Pro admission).

[24] DA25427 (Attachment A to the Declaration of Kelsey S. Bryan, Schedule of *MDL II* Price Authority Documents) (reflecting such price authorities for 89 of 121 *MDL II* shippers). Defendants have omitted the voluminous backup material from the Defendants' Appendix, but will provide them at the Court's request.

7.3 Defendants' transaction data show that roughly 90% of *MDL II* Plaintiffs moved traffic under a price authority with a rate-based fuel surcharge before the alleged conspiracy period.[25]

7.4 Transaction data from January and February 2003—immediately before the alleged conspiracy period—shows that between 33% and 49% (depending on the Defendant) of revenue from *MDL II* Plaintiffs included a fuel surcharge.[26]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 7**

Admitted only that before the conspiracy, certain Defendant price authorities were subject to rate-based fuel surcharges. Disputed to the extent Defendants imply that they collected these fuel surcharges, which were commonly negotiated with individual shippers or waived entirely. Merely because a price authority included a rate-based fuel surcharge does not mean, in the pre-Conspiracy Period, that the shipper actually *paid* that fuel surcharge. COF ¶¶ 46–77. Defendants misleadingly imply that the limited rate-based fuel surcharges included in some of Plaintiffs' pricing documents (and paid occasionally prior to the start of the conspiracy) were similar to the more aggressive, broadly imposed fuel surcharges Plaintiffs and other shippers were subject to during the conspiracy. Also disputed to the extent that Defendants misleadingly imply that the imposition of limited rate-based fuel surcharges in the pre-Conspiracy Period means that Defendants' more aggressive, broadly imposed fuel surcharges Plaintiffs and other shippers paid during the Conspiracy Period were the result of unilateral conduct. *See* Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 8, 11–15, 17–20, 23–27, 30–34, 38–45, 51–52. In fact, none of the Defendants was successful at broadly imposing fuel surcharges before the

---

[25] DA24614 at 618-736 (Tucker Rpt. App'xs B, Exs. 4, 8/15/23) (figures for each Plaintiff); DA25407 (summary of same).

[26] DA24614 at 15 (Tucker Rpt. Tbl. 8, 8/15/23).

conspiracy, and they faced customer pushback and competition from the other railroads when they attempted to do so. COF ¶¶ 46–77.

In addition, the cited evidence does not support the statement. DA00713 (Kalt Corrected Merits Rpt., Mar. 1, 2013, at Fig. IV-8A) does not reflect that Plaintiff DustPro actually paid a rate-based fuel surcharge prior to the conspiracy period. Rather, the notes accompanying Dr. Kalt's Figure IV-8A, which Defendants claim reflect DustPro having agreed to pay a fuel surcharge to UP in December 2002, in fact reflect that [redacted] *Id.* (emphases added). Dr. Kalt does not describe the distinction he draws here between [redacted] and [redacted]—but it is plain that even if a price authority contains a fuel surcharge provision, that does not mean that the fuel surcharge was actually triggered or paid. *Id.* Accordingly, [redacted]

[redacted]

Further disputed that "many" Plaintiffs paid rate-based fuel surcharges before the conspiracy. Analyzing Defendants' transaction data, Dr. Bernheim concluded that "fuel surcharge payment coverage increased dramatically during the cartel's operation." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1; *see also id.* at App'x A, Figs. A.1-A.37. The following graph prepared by Dr. Bernheim shows the dramatic change in fuel surcharge coverage during the conspiracy:

**Figure IV-14: Frequency of fuel surcharges**[245]




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155, Fig. IV-14.

Other experts reached the same conclusion. Dr. Jacobs found that the share of Defendants' revenue that included a positive fuel surcharge grew from an average of 10.2% prior to the

conspiracy to 65.5% after July 2003. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 337 and Figure V.1. He determined this increase was not the result of any preexisting "trend," but rather, demonstrated an aggressive expansion of surcharges. PX0989, Jacobs Reply Rpt., Dec. 21, 2023, ¶¶ 104-109 and Figures II.22 & II.23; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 166-75 ("[redacted]); PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 80-96 ("[T]he evidence does not support [Defendants' experts'] view" that [redacted]). Defendants contemporaneously recognized that their fuel-surcharge coverage had increased during the conspiracy period. *See* COF ¶¶ 329, 342, 357, 366; *see also* COF ¶¶ 302–63.

Defendants also cite inadmissible evidence to support Supporting Facts Nos. 7.3 and 7.4. The expert report of Avram S. Tucker is not admissible evidence, as explained in Plaintiffs' Motion to Exclude Avram S. Tucker (MDL I Dkt. No. 1175; MDL II Dkt. No. 996). Nor is DA25427 (Attachment A to the Declaration of Kelsey S. Bryan, Schedule of MDL II Price Authority Documents) ("Bryan Attachment A") (reflecting such price authorities for 89 of 121 MDL II shippers), admissible, as explained in Plaintiffs' Motion to Strike the Declarations of Eric Fanchiang and Kelsey Bryan. Bryan Attachment A also contains inaccurate and misleading information about specific price authorities. For example, Bryan Attachment A contends that [redacted]; yet Defendants omit [redacted]. PX0999, P_KEYCON00000191 (Letter from Wagner to the Owners Committee re: C-9124, May 1, 2003), at '191-92. Similarly, Bryan Attachment A contends that [redacted] and therefore Bryan Attachment A

[redacted] PX1000, P PHIL00085104 (UP – Confidential Rail Transportation Contract), at '107. Further, Tucker Appendix B shows that [redacted] PX0995, Tucker Appendix B for Phillips 66, at Exs. 5–6. Similarly, Bryan Attachment A contends that [redacted] However, [redacted] *See, e.g.*, PX1001, NS-MDLII-00069866 (Norfolk Southern Price Authority NS 18563) at '69878; PX1002, P_SMUCKER00000007 (Appendix A to Master Transportation Contract REG-NS-C18540) at '007; PX1003, NS-MDLII-00065421 (Email re: Contract *Last Request* - NS-12622; NS-15720; NS-18563; NS-17831); PX1004, NS-MDLII-00067917 (Norfolk Southern Price Authority NS 18563); PX1005, P_SMUCKER00000081 (Transportation Contract REG-NS-C-18748) at '81); *see also* PX1006, Wilson (Smucker) Dep., 164-166 (regarding [redacted]). Similarly, the Bryan Attachment A contends that [redacted] But [redacted] PX1007, NS-MDLII-00108273 (Norfolk Southern Corp. documents), at '290 ("[redacted] Further, Tucker Appendix B shows that [redacted] PX0996, Tucker Appendix B for Vulcan, at 24, Ex. 7.

**Material Undisputed Fact No. 8**

**At the time the alleged conspiracy was formed, Defendants did not make parallel changes to the trigger prices in their published carload fuel surcharges.**[*]

Supporting Facts:

8.1 Immediately prior to the alleged formation of the conspiracy, UP, NS and CSXT had identical trigger prices for their carload fuel surcharges of WTI $28 per barrel, and BNSF had a trigger price of HDF $1.30 per gallon.[27]

8.2 CSXT changed its trigger price to WTI $23.01 per barrel effective June 1, 2003.[28]

8.3 BNSF changed its trigger price to HDF $1.25 per gallon effective June 1, 2003.[29]

8.4 UP changed its trigger price to HDF $1.35 per gallon effective June 1, 2003.[30]

8.5 NS did not change its trigger price in 2003, remaining at WTI $28 per barrel.[31]

8.6 As of June 1, 2003, no two Defendants had the same trigger price for their published carload fuel surcharges.

**Plaintiffs' Response to Defendants' Undisputed Fact No. 8**

Objection. The question of whether or not Defendants' changes to their fuel surcharge methodology were sufficiently "parallel" is a legal question, and not properly included in Defendants' Statement of Undisputed Fact. *See Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C.

---

[*] During at least part of the supposed conspiracy, each Defendant's carload surcharge *was* its coal surcharge; two Defendants adopted a distinct coal surcharge midway through the alleged conspiracy period (*see infra*, ¶ 14 (BNSF), ¶ 34.3 (UP)), and two Defendants never had a distinct coal surcharge (*see infra*, ¶ 21 (CSXT), ¶ 28 (NS)). For simplicity, this Statement of Undisputed Material Facts refers to published "carload" surcharges as embracing both carload and coal traffic, except with reference to BNSF's and UP's coal traffic during the respective periods when those railroads used different coal-specific fuel surcharges.

[27] *See infra*, ¶ 11.5 (BNSF), ¶ 17.3 (CSXT), ¶ 23.2 (NS), ¶ 31.1 (UP).

[28] *See infra*, ¶ 20.9.

[29] *See infra*, ¶ 13.9.

[30] *See infra*, ¶ 33.6.

[31] *See infra*, ¶ 26.

2007) (disregarding legal conclusions couched as "facts" on summary judgment); *Cobell v. Norton*, 260 F. Supp. 2d 110, 129 (D.D.C. 2003) ("This statement represents a conclusion of law, not a statement of fact. Therefore, the Court will deny summary judgment for plaintiffs as to this issue."); *Matthews v. Am. Psychological Soc'y*, 2006 WL 8460393, at *1 (D.D.C. July 27, 2006) ("Such legal conclusions, while proper in Plaintiff's accompanying Opposition, are not properly included in Plaintiff's Statement of Facts."); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002) (holding that evidence of parallel conduct supported inference of conspiracy).

Admitted that Supporting Facts 8.2–8.4 accurately represent the trigger prices of CSX, BNSF, and UP's published carload formulas as of June 1, 2003. Admitted that NS did not formally *announce* a change to its published carload formula's trigger price in 2003, but disputed that NS did not *decide* to change its published carload formula in 2003. To the contrary, NS internally stated in April 2003, "*we do plan to modify our FSC*." PX0254, NS001000316 (NS internal email re: "Fuel Surcharge Change Pro/Con," Apr. 17, 2003), at '316 (emphasis added); *see also* COF ¶¶ 129–40, 209–26.

Further disputed that Defendants' fuel surcharge programs were not "parallel" or did not move in parallel during the conspiracy period. Defendants contemporaneously recognized that despite any minor differences in trigger prices, their fuel surcharge formulas were functionally identical. *See, e.g.,* PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical"); PX0355, NS_0014001716 (NS internal email re: "FSC Revenue Comparison", May 16, 2003), at '716 (regarding the new UP formula, "The difference [from BNSF] is higher kick in threshold of $1.35 per gallon ($1.25 base). . . . Once it kicks in, ***it is identical to the BNSF FSC***. . . . The practical effect is to suppress

smaller increase[s] until the $1.35 threshold is met, then increases are applied back to the $1.25 base.") (emphasis added); PX0347, NS_013001654 (NS email re: NS Fuel Surcharge Change 03/10/04, Jan. 8, 2004), at '654-56 ("**CONFIDENTIAL – NOT FOR CUSTOMER DISTRIBUTION** **Marketing/Sales:** NS will soon announce a revised Fuel Surcharge (FSC) program to be effective March 1, 2004. This will raise customer relations and rate maintenance issues that will require your full attention. NS will essentially adopt the CSXT FSC formula. This is [sic] action is being taken for a number of reasons: . . . • **Standardization of FSC provisions in the East.** . . . NS adoption of the CSXT formula will place both of the major Eastern carriers on the same standard . . . ."); PX0401, UPFSC_0183975 (UP internal email re: 5th Update—UP Surcharge Q&A dated May 9, 2003), at '975 ("UP's carload surcharge is based on the DOE Highway Diesel Fuel (HDF) price, as is BNSF's carload surcharge. UP mirrors BNSF's except that UP does not apply a 1% surcharge when the price is between $1.30 and $1.349/gallon."); PX0610, Lanigan (BNSF) Dep., June 22, 2010 at 119 ("Q: . . . My question is if the HDF price is $1.35 a barrel -- per gallon or above, then your program produced the same fuel surcharge percentage as the UP program. Correct? A: Yes, they appear to be similar."); PX0502, UPFSC_0075761 (UP internal email re: "Fuel Surcharge—WTI vs. HDF," Oct. 20, 2004), at '761 (UP switched fuel surcharge programs "[t]o match BNSF's 'standard' HDF based surcharge."); *see also, e.g.*, COF ¶¶ 170–71, 222, 223, 225, 226.

Disputed to the extent the statement misleadingly implies that Defendants did not impose the same trigger prices and that they did not make parallel changes to their fuel surcharge programs as part of their conspiracy. Admissible evidence contradicts the misleading implication that Defendants did not agree to or impose the same fuel surcharges. Prior to the Conspiracy Period, Defendants' senior executives had *never* met and discussed fuel surcharges. COF ¶ 22–32. But

beginning in early 2003, Defendants' highest-ranking executives engaged in meetings, which included discussion of fuel surcharges. *See, e.g.*, COF ¶¶ 146–47, 155, 159–60, 182–97, 199–204; *see generally* COF ¶¶ 92–442 (describing voluminous evidence related to inter-Defendant meetings).

Defendants agreed to several changes to their fuel surcharge programs that made them more parallel and aggressive. First, Defendants lowered the "trigger" or "strike" price at which fuel surcharges would be imposed. CSX and UP announced the same $23 WTI trigger price in late March and early April 2003, even though over a month later UP decided to instead use the HDF index. COF ¶¶ 111–28. NS matched CSX's $23 WTI trigger price as soon as NS was ready to implement its formula in January 2004. COF ¶¶ 129–40, 209–26. BNSF changed its fuel surcharge program to make it more aggressive by decreasing the formula's trigger price from $1.30 to $1.25 HDF, a trigger price that BNSF said "reflected the $23 WTI crude price used by UP" (and CSX). COF ¶ 161; *see* COF ¶¶ 165–66. And while ostensibly using a higher strike price than BNSF, when UP announced its $1.35 HDF price on May 9, 2003, UP itself said that UP's formula "***mirrors BNSF's***" except for the trigger price, COF ¶¶ 166–74, and other Defendants likewise recognized that the UP and BNSF formulas were essentially the same. PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical"); PX0355, NS_0014001716 (NS internal email re: "FSC Revenue Comparison," May 16, 2003), at '716 (regarding the new UP formula, "The difference [from BNSF] is higher kick in threshold of $1.35 per gallon ($1.25 base) . . . Once it kicks in, it is identical to the BNSF FSC . . . The practical effect is to suppress smaller increase[s] until the $1.35 threshold is met, then increases are applied back to the $1.25 base."). Whether Defendants' trigger prices were "the same" *on June 1, 2003*—that is, on one particular day in a years-long conspiracy—is not material.

Defendants aligned their formulas—and their trigger prices—throughout the conspiracy, and contemporaneously recognized that they were doing so. *See, e.g.*, COF ¶¶ 171–74, 222, 224, 225–26.

Second, Defendants changed the way they calculated fuel surcharge triggers. Before the conspiracy, three of the four Defendants required that fuel prices exceed the trigger price for *30 consecutive days* before a fuel surcharge would be imposed; if fuel prices exceeded the trigger price for 29 days, but dipped below the trigger on the 30th day, a fuel surcharge would not be billed. But beginning in early 2003, CSX, UP and NS changed their policies to match what BNSF had been doing: imposing fuel surcharges any time the *average price over the prior month* exceeded the trigger price—even if fuel prices dipped below the trigger for some number of days during the 30-day period. *See* COF ¶¶ 117, 122–23, 158, 223.

Third, during the Conspiracy Period, Defendants' fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. COF ¶¶ 302–63.

Defendants at the time acknowledged that the changes were "actually a large increase in fuel surcharge billings" by "maybe as much as 100%," that they were a "money grab" as a result of a "more aggressive formula" which "clearly produces significantly more compensation," that they were "definitely . . . more aggressive" and "definitely yielded more revenue" than the prior program, and that they constituted a "profit-center." *See* COF ¶¶ 118–21, 224–27.

Admissible evidence also contradicts the misleading implication that Defendants' fuel surcharges did not move in parallel during the conspiracy period. In fact, notwithstanding the ostensible differences in their fuel surcharge formulas, Defendants' fuel surcharges were nearly identical and moved in parallel throughout the conspiracy period:

**MONTHLY FSC PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

**MONTHLY FSC PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |

| MONTH | CSX | NS |
|---|---|---|
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06* | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

* On April 24, 2006, NS announced its rebasing of fuel surcharges.

COF ¶ 514; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, Fig. III.8; PX0770, Bernheim & Marx MDL II Rpt. ¶ 103 & Fig. III-4 (plotting "actual surcharge implied by each Defendant's carload fuel surcharge policy" and noting that "there were no meaningful ex post differences between the policies of CSX and NS in the east, or between the policies of UP and BNSF in the west"); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 103-09, Fig. 13; *id.* at ¶ 152 [redacted]); *id.* at ¶¶ 152-56 ([redacted]).

Admissible evidence also contradicts the misleading implication that, because NS did not change its fuel surcharge formula until early 2004, that it did not enter a conspiratorial agreement with the other Defendants regarding its fuel surcharges. Before early 2003, NS senior executives had never had meetings with executives of the other Defendants at which fuel surcharges were discussed. COF ¶ 29; *see* COF ¶¶ 22–32. By late April 2003, NS had determined that "at this point, *we do plan to modify our FSC*." PX0254, NS001000316 (NS internal email re: "Fuel Surcharge Change Pro/Con," April 17, 2003), at '316 (emphasis added); *see also* COF ¶¶ 129–40, 209–26.

NS's involvement in the conspiracy during 2003 included full involvement in the Defendants' coordinated effort to have the Association of American Railroads adopt a new index, the All Inclusive Index Less Fuel ("AIILF"), as a means to facilitate, and give credibility to, Defendants' scheme to impose rate based fuel surcharges, notwithstanding the existence of another cost-escalation index, the Rail Cost Adjustment Factor ("RCAF"), which the Defendants knew already enabled Defendants to recover their actual fuel costs. COF ¶¶ 371–410. The reason that NS did not alter its surcharge formula until several months later was a technical obstacle: the language of NS's fuel surcharge formula was encoded directly into NS contracts, meaning NS had to wait for its contracts to come up for renegotiation before updating its fuel surcharge provision. COF ¶¶ 207–23.

**Material Undisputed Fact No. 9**
**Defendants' published carload fuel surcharge formulas effective in June 2003 and March 2004 did not generate materially more revenue at fuel prices prevailing during the alleged conspiracy period than would have been generated by Defendants' 2000 to 2002 published carload fuel surcharge formulas.**

Supporting Facts:

9.1 When, effective June 1, 2003, UP changed its October 2002 carload fuel surcharge, it changed the trigger from $28/bbl WTI to $1.35/gal HDF. This change was of no consequence

during the alleged conspiracy period because (except for a few days) oil and diesel fuel prices were always above both triggers.[32] The other changes UP made, principally adopting the HDF index, had the effect of making UP's carload fuel surcharge less aggressive than UP's October 2002 WTI carload fuel surcharge, such that it generated surcharge rates at prevailing fuel prices from July 2003 to April 26, 2007 that were on average 0.63% lower than rates under UP's October 2002 formula.[33]

9.2 When, effective June 1, 2003, BNSF changed its July 2001 carload fuel surcharge, it reduced its trigger to $1.25 HDF from $1.30 HDF, and assessed a 0.5% surcharge at the new threshold rather than 1% at the old threshold. This change was of no consequence during the alleged conspiracy period because fuel prices remained above both triggers.[34] BNSF's 2003 published carload formula, effective June 1, 2003, generated surcharge rates at prevailing fuel prices from July 2003 (the beginning of the *MDL I* putative class period) through 2008 (the end of the *MDL I* putative class period) that were identical to those under its July 2001 published carload fuel surcharge formula.[35]

9.3 The combination of (a) NS's 2000 published carload fuel surcharge formula from July 2003 (the beginning of the *MDL I* putative class period) through February 2004 (when NS's modified published carload fuel surcharge took effect) and (b) NS's 2004 published carload formula from March 2004 through June 2006 (after which NS rebased its fuel surcharge) generated

---

[32] DA06450 at 59-60 (Rausser 3/4/14 253:22-254:4).

[33] DA25148 at 66-67, 75-76 (Israel Rpt. ¶¶ 173-174, 182-183 & Fig. 37, 8/15/23).

[34] DA25097 at 106, 115 (Carlton Rpt. Figs. 2, 6, 8/15/23); DA06450 at 59-60 (Rausser 253:22-254:4); *see also* Class Cert. Hr'g Tr. at 503:21-25, *MDL I* ECF 824 (Sept. 28, 2016) (Rausser Cross Examination) ("Q. You've testified that because the class period fuel prices were above both the old and new BNSF triggers, that they were, in your words, not relevant to the determination of injury in the class period, correct? A. Once again, ex-post.").

[35] DA25148 at 66-70 (Israel Rpt. ¶¶ 173-174, 176 & Fig. 34, 8/15/23); [redacted]

surcharge rates at prevailing fuel prices from July 2003 through June 2006 that were on average [redacted] higher than under NS's 2000 published carload fuel surcharge formula.[36]

9.4 CSXT's 2003 published fuel surcharge formula, effective June 1, 2003, generated surcharge rates from July 2003 (the beginning of the *MDL I* putative class period) to April 23, 2007 (when it adopted a mileage-based fuel surcharge) that were on average 1.4% higher than under its 2000 published fuel surcharge formula.[37]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 9</u>**

Disputed.

The cited evidence does not support the proposition that the conspiracy-period fuel surcharges "did not generate materially more revenue" than the pre-Conspiracy Period fuel surcharges. *Even Defendants' own cited sources and "Supporting Facts"* state that [redacted] Applied to tens of billions of dollars of revenue, such an increase is "material."

Further disputed that Defendants' changes to their fuel-surcharge programs in the spring of 2003, following direct communications among their highest executives about fuel surcharges, were "of no consequence" or "did not generate materially more revenue at fuel prices prevailing during the alleged conspiracy period." Defendants struggled to apply and collect fuel surcharges

---

[36] [redacted]); *see also* DA25148 at 66-67, 73-74 (Israel Rpt. ¶¶ 173-174, 179-181 & Fig. 36, 8/15/23).

[37] DA21943 at 2063 ([redacted]); DA25148 at 66-67, 71-72 (Israel Rpt. ¶¶ 173-174, 177-178 & Fig. 35, 8/15/23).

during the pre-Conspiracy Period. No Defendant was successful at broadly imposing fuel surcharges before the conspiracy, and they faced customer pushback and competition from the other railroads when they attempted to do so. COF ¶¶ 46–77. Dr. Bernheim noted that Defendants' "nominal revenue per carload was relatively flat from January 2000 through the end of 2002" and "these early fuel surcharge programs did not generate substantial revenue for the Defendants." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 75, 82; *see id.* ¶¶ 71–82; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 157 ("Defendants' Conspiracy Period carload FSC formulas yielded higher payments than their predecessors at then-current fuel market conditions.").

But during the Conspiracy Period, Defendants' fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. COF ¶¶ 302–63. Defendants' conspiratorial agreement resulted in an increase in the number of contracts that included fuel surcharges, and a substantial increase in the amount of revenue subject to fuel surcharges during the conspiracy period. *Id.* As a result of the conspiracy, Defendants were therefore successful in significantly increasing their fuel surcharge coverage to more contracts and revenue than in the pre-Conspiracy Period. *Id.* Defendants therefore earned substantially more revenue and profit from fuel surcharges during the conspiracy. COF ¶¶ 450–78, 527–56.

Plaintiffs' experts found that Defendants' fuel surcharge revenue rose dramatically during the conspiracy. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 350 (Defendants' rate-based FSC revenues increased from $16.2 million in 2002 to $3 billion in 2008—182 times the amount of fuel surcharges collected in 2002); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-18, Figs. 20-26. Dr. Bernheim found that once the conspiracy began, "prices remained on a steep

upward trend until late 2008." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128. Dr. Bernheim also "computed fuel surcharges as a fraction of overall net revenue in every month from January 2000 through December 2008" and found "that fuel surcharges accounted for a rapidly growing fraction of the Defendants' revenue during the cartel's operation." *Id.* ¶ 156; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 208-14, Figs. 20-23; PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim indicates the dramatic rise in fuel surcharges as a percentage of Defendants' net revenue during the conspiracy:

**Figure IV-15: Fuel surcharge as percentage of net revenue**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 156, Fig. IV-15; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, Fig. V.3. Dr. Bernheim also concluded that "non-conspiratorial factors cannot account for the dramatic increase in fuel surcharge coverage or revenue during the operation of the alleged cartel." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 26,

157–184. Dr. Bernheim found that during the conspiracy, Defendants generally increased their operating margins, *id.* ¶¶ 134–138, and saw an "increase in perceived profitability" in the market and thus drastically drove up their stock prices, outperforming the S&P 500, *id.* ¶¶ 139–141; *see also* COF ¶¶ 524–53. Defendants' conspiracy achieved striking success in part because Defendants' conspiratorial fuel-surcharge programs, which they were now able to apply far more broadly and uniformly than in the pre-Conspiracy Period, recovered dramatically more than the cost of fuel. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 142–152; *see also* COF ¶¶ 513–23.

Defendants contemporaneously acknowledged the contribution of increases in fuel surcharge revenues, resulting from both higher fuel surcharge rates and greater fuel surcharge coverage across shippers, to improved financial performance. COF ¶¶ 526–58. Explicit references to these contributions appeared in their SEC annual reports (Form 10-Ks). For example, in 2006, all four Defendants remarked on the importance of fuel surcharge revenue in driving overall revenue gains. According to NS, "[a]ll market groups collected significant fuel surcharges, which accounted for approximately 40% of the 2006 increase in revenues and about one-third of the 2005 increase." PX0703, NS 2006 Form 10-K, at K21. Likewise, according to UP, its "fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated an additional $656 million in commodity revenue compared to 2005, contributing 5% to commodity revenue growth." PX0585, UP 2006 Form 10-K, at 19. BNSF and CSX made similar statements. For example, CSX wrote: "Operating Revenue increased $948 million in 2006 to $9.6 billion, compared to $8.6 billion for the prior year. The primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." PX0701, CSX 2006 Form 10-K, at 25. And BNSF

wrote, "Freight revenues include approximately $1.7 billion in fuel surcharges compared with approximately $1.1 billion in the prior year. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005." PX0584, BNSF 2006 10-K, at 18. Defendants made similar statements in other years. *See, e.g.*, PX0698, BNSF 2008 Form 10-K, at 16 ("Freight revenues of $17,503 million for 2008 were $2,154 million, or 14 percent higher than 2007. Freight revenues reflected a 3-percent decrease in unit volumes. Freight revenues included an increase of approximately $1,460 million in fuel surcharges compared with the same 2007 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 18 percent in 2008 to $1,751 from $1,488 in 2007.").

Defendants contemporaneously observed that the changes made to their fuel surcharge programs—rather than being "of no consequence," as Defendants now claim—were adopted knowing they would cause "actually a large increase in fuel surcharge billings" by "maybe as much as 100%," that they were a "money grab" as a result of a "more aggressive formula" which "clearly produces significantly more compensation," and that they were "definitely . . . more aggressive" and "definitely yielded more revenue" than the pre-conspiracy surcharges, and constituted a "profit-center." *See* COF ¶¶ 118–21, 224–227.

Admissible evidence also contradicts the suggestion that Defendants' more aggressive trigger prices were "of no consequence" due to increasing fuel prices during the conspiracy period. In fact, as detailed above, admissible evidence demonstrates that at the time Defendants entered into the conspiracy in early 2003, fuel prices were "low and flat" and were not expected to increase, COF ¶¶ 85–91, such that Defendants recognized at that time that lowering their fuel surcharge trigger prices made their fuel surcharges more aggressive than they otherwise would have been. *See* COF ¶¶ 118–21, 227–30; *e.g.*, PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 92 (recognizing

that UP's Mar. 11, 2003 Revised Surcharge proposal would yield "a more aggressive surcharge"); PX0163, CSXFSC000000357 (CSX internal email re: Fuel Surcharge Change, March 19, 2003), at '357 (noting that the new fuel surcharge means a "large increase in fuel surcharge billings" as compared to the prior program—"maybe as much as 100%." ); PX0614, Glennon (NS) Dep., July 20, 2010, at 42, 66–67 (testifying that the formula change from $28 WTI to $23 WTI was "not the same" as before and was "definitely was more aggressive" than the prior program); PX0301, NS_010042203 (internal NS memo re Fuel Surcharge—CSXT vs. NS Comparison, Apr. 7, 2003), at '203 ("the CSXT formula would have produced additional $7,083,472 in NS revenue in 2002 and YTD 2003 had it been in effect."), *id.* ("Not only does the FSC kick sooner in [sic] at $23 vs $28, the actual FSC is higher at $28.01."); PX0055, BNSF-0028786 (BNSF Fuel Surcharges Fuel Surcharge Review Team Recommendations, Apr. 14, 2003), at '794 ("BNSF is more aggressive on fuel surcharges than U.S. rail carload competition").

Admissible evidence also contradicts the suggestion that BNSF's Conspiracy Period fuel surcharge program generated the same fuel surcharges as its pre-Conspiracy Period program. In fact, as a result of competition, in May and June 2003, BNSF reduced its fuel surcharge rate across-the-board as to all traffic—far below the rate that its pre-conspiracy fuel surcharge formula would have yielded—down as low as 2% (compared to the 5% that its published formula actually called for). PX0508, UPFSC0129813 (internal UP email re: BNSF Reducing Fuel Surcharge 5/1 to 2%, Apr. 29, 2003), at '813; PX0114, BNSF-0495601 (BNSF email re: Update: BNSF Carload Fuel Surcharge—May 2003, April 30, 2003), at '602 (announcing the reduced fuel surcharge). After July 1, 2003, BNSF never again, for the remainder of the conspiracy, ever implemented an across-the-board fuel surcharge reduction. As UP recognized at the time when it observed BNSF's programmatic discounting: "Fuel surcharge $ are melting away at the competition. ***In a***

***downward-pressure environment, what's on paper must not work in the real world***." PX0508, UPFSC0129813 (internal UP email re: BNSF Reducing Fuel Surcharge 5/1 to 2%, April 29, 2003), at '813 (emphasis added). Defendants' singular focus on the formula ignores the reality that BNSF's (and the other Defendants') formulas were not locked in stone, and BNSF (and the other Defendants) could have provided relief to shippers as fuel surcharges mounted.

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**Material Undisputed Fact No. 10**

**A substantial share of Plaintiffs' carload and coal traffic during the alleged conspiracy period was not subject to the allegedly conspiratorial published carload fuel surcharges.**

Supporting Facts:

10.1 Documents produced in *MDL II* show that at least 54% of *MDL II* Plaintiff shippers entered into or amended a Defendant price authority without a fuel surcharge during the alleged conspiracy period.[38]

10.2 Defendants' transaction data show that 96% of *MDL II* Plaintiff shippers moved traffic under at least one Defendant price authority without a fuel surcharge that was entered into or

[38] DA25427 (Attachment A to the Declaration of Kelsey S. Bryan, Schedule of *MDL II* Price Authority Documents) (reflecting such price authorities for 65 of 121 *MDL II* shippers).

amended during the alleged conspiracy period—more than 4,000 price authorities comprising 19% of all price authorities entered into or amended during that period.[39]

10.3 Documents produced in *MDL II* show that at least 58% of *MDL II* Plaintiff shippers entered into or amended a Defendant price authority with a non-standard fuel surcharge (*i.e.*, one that differed from the Defendant's published carload fuel surcharge) during the alleged conspiracy period.[40]

10.4 Defendants' transaction data show that 91% of *MDL II* Plaintiffs moved traffic under at least one Defendant price authority with a non-standard fuel surcharge that was entered into or amended during the alleged conspiracy period—more than 3,800 price authorities, comprising another 18% of all price authorities entered into or amended during that period.[41]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 10</u>**

Disputed.

Defendants cite inadmissible evidence to support "Undisputed Fact No. 10." The expert report of Avram S. Tucker is not admissible evidence, as explained in Plaintiffs' Motion to Exclude Avram S. Tucker (MDL I Dkt. No. 1175; MDL II Dkt. No. 996).

Nor is DA25427 (Attachment A to the Declaration of Kelsey S. Bryan, Schedule of MDL II Price Authority Documents) ("Bryan Attachment A") (purporting to reflect such price authorities for 65 of 121 *MDL II* shippers), admissible, as explained in Plaintiffs' Motion to Strike the Declarations of Eric Fanchiang and Kelsey Bryan. Bryan Attachment A also contains inaccurate and misleading information about specific price authorities. For example, Bryan

[39] DA24614 at 737-42 (Tucker Rpt. Sched. 8.1, cols 2 & 4, 8/15/23).

[40] DA25427 (Attachment A to the Declaration of Kelsey S. Bryan, Schedule of *MDL II* Price Authority Documents) (reflecting such price authorities for 70 of 121 *MDL II* shippers).

[41] DA24614 at 743-48 (Tucker Rpt. Sched. 10.1, cols. 2 & 4, 8/15/23).

Attachment A identified [redacted] This is misleading. [redacted] *See* PX1008, P_WESTLAKE00004440 (Email re: Contract Presentation for file, Mar. 7, 2008); PX1009, P_WESTLAKE00004441 (Rail Savings Presentation, Mar. 7, 2008); PX1010, P_WESTLAKE00012703 (Master Rail Transportation Contract between Westlake and UP, Sept. 16, 2004). During the negotiations of this master contract, Westlake [redacted] but UP told them that the [redacted] *See* PX1011, Spittler (Axiall/Westlake) Dep., Feb. 17, 2022, at 15-16, 77, 104-105. Ultimately, UP [redacted] *See* PX1008, P_WESTLAKE00004440 (Email re: Contract Presentation for file, Mar. 7, 2008); PX1009, P_WESTLAKE00004441 (Rail Savings Presentation, Mar. 7, 2008). Westlake [redacted] *See* PX1010, P_WESTLAKE00012703, (Master Rail Transportation Contract between Westlake and UP, Sept. 16, 2004) at '711; PX1012, Anderson (Axiall/Westlake) Dep., Sept. 9, 2022, 237; 244; 247; 304-305 (regarding [redacted]). Further, Bryan Attachment A states that [redacted] In fact, [redacted]

[redacted], *see* PX1013, Mantz (CVR) Dep., Feb. 10, 2022, at 96, and Tucker Appendix B shows [redacted] PX0997, Tucker Appendix B for CVR, at Exhibit 5.1 - CVR. Bryan Attachment A also states that [redacted]. But Tucker Appendix B shows that [redacted] PX0998, Tucker Appendix B for PCS, at 221. Similarly, Bryan Attachment A identifies [redacted] In fact, [redacted] *See* PX1014, BNSF_II_03929635 (BNSF Email re: Conoco/Dupont Bifurcation/Reassignment, Nov. 19, 2002), at '635, '639 (attaching [redacted] and reflecting that [redacted]); *see also* PX1015, BNSF_II_04040733 (BNSF Email re: Conoco Master Bifurcation, Dec. 4, 2002), at '733 ("[redacted]). The [redacted] reflected not [redacted] but [redacted] In [redacted] BNSF [redacted] PX1016, P_PHIL00055001 (Letter from BNSF to ConocoPhillips re: Price

Authority, [redacted] after which ConocoPhillips [redacted] PX1017, Turner (Phillips 66 30(b)(6)) Dep., Sept. 22, 2022, at 60, 72-73. Bryan Attachment A also identifies [redacted] But the Shell/Motiva witness who [redacted] explained that [redacted] PX1018, Strack (Shell/Motiva) Dep., Sept. 21, 2022, 156-160.

Plaintiffs dispute Defendants' characterization of "a substantial share of Plaintiffs' carload and coal traffic." Defendants support this claim only by lumping *price authorities* into categories and then comparing how many price authorities fall into each category. That exercise cannot support Defendants' assertion about a "substantial share" of Plaintiffs' traffic. Even assuming Defendants correctly identify which price authorities contain "non-standard" fuel surcharges or lack fuel surcharges (and they do not, as explained elsewhere, including in the prior paragraph), to make claims about the "share of Plaintiffs' carload and coal traffic," Defendants would have to consider the volume of *commerce* actually shipped in these various categories. Supporting Fact 10.3, for example, misleadingly calculates its 58% statistic by looking at the number of price authorities rather than how much revenue or commerce was in fact covered the respective fuel surcharges. Other characterizations by Defendants in this "Undisputed Fact" are similarly misleading. Supporting Fact 10.4 includes an MDL II plaintiff if even a single price authority involving that shipper included a "non-standard" fuel surcharge, without calculating the volume of commerce subject to a "non-standard" fuel surcharge.

Further, admissible evidence contradicts the misleading suggestion that simply because some individual contracts during the Conspiracy Period did not contain a fuel surcharge, any of the Defendants were not engaged in a conspiracy. Defendants themselves recognized that variations from the coordinated fuel surcharges were infrequent. *See, e.g.*, PX0207, CSXFSC000212937 (internal CSX email re: [redacted] renewal, March 31, 2006), at '937 ("[redacted]"); PX0072, BNSF-0048722 (BNSF email re: "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); PX0272, NS_010007412 (NS internal email re: "FSC," June 11, 2004), at '412 ("All deals must have the new FSC . . . in no instance would there not be the new FSC," and "[A]ll new contracts with have the new FSC, no exceptions"); PX0391, UPFSC 0066571 (internal UP email re: Toyota Fuel Surcharge Analysis, June 2, 2005), at '571 ("It is my understanding Jack [Koraleski] has issued a mandate that all business should be subject to the HDF program (the standard program . . .)"); *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155 & Fig. IV-14 ("Using the transaction data supplied by the Defendants, I have computed the fraction of transactions, weighted by net revenue, on which shippers paid fuel surcharges in every month from January 2000 through December 2008 ('payment coverage') . . . All of the lines [in Fig. IV-14] demonstrate that fuel surcharge payment coverage increased dramatically during the cartel's operation."); *id.* ¶¶ 157–84 (concluding that "[n]on-conspiratorial factors cannot account for the dramatic increase in fuel surcharge coverage"). During the Conspiracy Period, Defendants' fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management; *accord* COF ¶¶ 302–63.

Judge Friedman made factual findings in MDL I directly contrary to this "Undisputed Fact." Citing deposition testimony and other record evidence, the Court found by a preponderance of the evidence that "during the [relevant] period defendants uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible. . . . And any deviations from defendants' standard fuel surcharge programs were rare. Furthermore, each defendant enforced strict policies ensuring across-the-board application of these standardized fuel surcharge programs on all of their shippers." *Rail Freight*, 287 F.R.D. at 50 (citing PX0622, Kraemer (NS) Dep., Aug. 11, 2010, at 30; PX0627, Cerwonka (CSX) Dep., Aug. 13, 2010, at 7–8, 19–20; PX0628, Garin (BNSF) Dep., Aug. 16, 2010, at 67–68; *See* PX0624, Allen (BNSF) Dep., Aug. 12, 2010, at 25–27; PX0625, Jacobowski (BNSF) Dep., Aug. 12, 2010, at 23 ; PX0617, Lawson (NS) Dep., Aug. 5, 2010 at 37–38 ; PX0551, Union Pacific 2005 Analyst Fact Book, June 27, 2005, at 11; PX-0623, Osborne (NS) Dep., Aug. 11, 2010, at 38–41, 48–49; PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 29–31; PX0626, Piacente (CSX) Dep., Aug. 13, 2010, at 7–10.). The Court noted, for example, that contemporaneous CSX communications provided "very clear instructions" and "specific directions" mandating fuel surcharges: "all renewals include fuel—*very very few exceptions* as we discussed last month"; "any multiyear deals must include FSC in the out years"; and renewals "should incorporate our FSC program . . . [even] though these master contracts likely have an RCAF component." *Rail Freight*, 287 F.R.D. at 51; *see also* PX0186, CSXFSC000086200 (CSX internal email re: [redacted] 5, 2006), at '200.

This "Undisputed Fact" is simply a variation of an argument that has long been rejected in this litigation. Defendants have previously argued "that the evidence of aggressive, uniform, and standardized fuel surcharges is not reflective of reality." *Rail Freight*, 287 F.R.D. at 49. The *MDL*

*I* Court rejected Defendants' argument in analyzing NS's contention that it "applied fifty distinct fuel surcharge formulas during the [c]lass period." *Id.* As the Court observed, that assertion crumbled in deposition, when NS's own Vice President David Lawson "admitted that during the alleged conspiracy period NS had 'a policy to apply the standard fuel surcharge to as many customers as possible,' . . . that 'for any authority that would have either a nonstandard fuel surcharge or no fuel surcharge, it required group vice-president approval,' . . . that he himself had to authorize 'any [fuel surcharge] authority [that] was going to contain any nonstandard fuel surcharge,' . . . that the 50 distinct non-standard fuel surcharges could include 'duplicates.' . . . and that his declaration provided no information as to the percentage of NS customers that were using the standard fuel surcharge at any time during the class period." *Rail Freight*, 287 F.R.D. at 50; *see* PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 16, 36-38; *accord* COF ¶¶ 302–63.

In 2017, the Court confirmed its earlier findings, reasoning that "[*t*]***he documentary record in this case has not changed***." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d at 103 (emphasis added). "On remand, plaintiffs again present substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id*.

Defendants point to occasional "non-standard" fuel surcharges or the absence of fuel surcharges in price authorities—but do not dispute here that those price authorities were negotiated from the inflated baseline of Defendants' conspiratorial standard fuel surcharge and were subject to the same enforcement policies and fuel-cost-recovery pretext. Dr. Bernheim concluded: "Because posted prices often serve as starting points for negotiations with customers, an agreement

to increase posted prices can shift the entire distribution of transactions prices upwards, especially if customers construe the posted prices as conveying information concerning costs. Consequently, in the current context, one would expect an agreement to coordinate on the structure and imposition of fuel surcharges to impact the entire distribution of fuel surcharge payments, including those made by shippers that negotiated non-standard fuel surcharge provisions." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 97; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 202-38 (discussing railroads' negotiating approaches); *id.* at ¶¶ 443-44 & n.820 (describing how coordination on list prices and surcharges produces supracompetitive prices in markets where final prices are negotiated). Dr. Leitzinger also used a regression model to "account for existing market conditions—for example, costs and other supply and demand factors—and then test whether base rates were systematically higher than those conditions would have predicted during the Conspiracy Period," finding that "base rates on carload shipments with rate-based FSCs averaged 3.7% higher over the Conspiracy Period than market conditions would otherwise have predicted . . . The corresponding figure for intermodal shipments with rate-based FSC activity was 2.3%." PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 241-46 & Ex. E09. Dr. Leitzinger found that "[t]he estimated impact on base rates [was] statistically significant in both cases." *Id.* ¶ 244; *accord Rail Freight*, 287 F.R.D. at 50 (finding that "the evidence in the record makes plain, and the railroad executives themselves admitted, that during the class period defendants uniformly began their negotiations with their standard fuel surcharge program").

Defendants confirmed that infrequent variations from the coordinated fuel surcharges were negotiated from the inflated baseline set by the coordinated fuel surcharge. COF ¶¶ 323, 334, 337, 350, 359; *see, e.g.*, PX0624, Allen (BNSF) Dep., Aug. 12, 2010, at 24-27 ("[A. [O]ur initial opening offer is almost always one that includes a standard fuel surcharge . . . Q. So if I understand

you correctly, you started the negotiation with a given customer with the $1.25 HDF standard fuel surcharge program as the starting point? A. That's correct."); PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 38-40 ("Q. But the goal was to at least start from trying to get the standard fuel surcharge in any authority, right? A. That is correct."); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 23 ("Q. You would agree, then, that there was a standard fuel surcharge that you were trying to implement in your contracts at this time? A. Right."); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 23 (NS's published FSC served as a "common starting point, if you will, in every negotiation"); PX0616, Young (UP) Dep., Aug. 4, 2010, at 71-75 ("Q. So Union Pacific's policy – its standard policy was to use the AIILF in conjunction with the fuel surcharge, correct? A. [. . .] This is where you would start negotiations from, with that methodology."); *see* COF ¶¶ 323, 334, 350, 359.

**Material Undisputed Fact No. 11**

**BNSF unilaterally adopted carload fuel surcharges before the alleged conspiracy period.**

Supporting Facts:

11.1 BNSF had a rate-based fuel surcharge provision for carload traffic since at least the early 1990s.[42]

11.2 In 2000, a BNSF team reviewing the carload fuel surcharge recommended inserting a single rate-based fuel surcharge provision in BNSF's operative "Rules Book 6100," which are BNSF's "public price rules."[43]

[42] DA03855 at 60.

[43] DA03523 at 24-25; *see also* DA15581 at 86.

11.3 BNSF modified its carload fuel surcharge formula, effective April 1, 2000, to "a floating rate based upon the monthly average price of fuel" using the WTI index.[44]

11.4 In April 2001, BNSF's internal Fuel Surcharge Review Team evaluated the correlation between fuel indices and BNSF's fuel costs, finding that the HDF index had a 99% correlation with its fuel costs and the WTI index had a 93% correlation.[45]

11.5 On April 30, 2001, BNSF announced that it would modify its carload fuel surcharge formula, effective July 1, 2001, by switching from WTI to the HDF index; BNSF also announced a new strike price ($1.30 HDF) and published the new carload fuel surcharge formula in table format. At a strike price of $1.30 HDF, the carload surcharge was 1%, increasing by 0.5% for every $0.05 increase in HDF.[46]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 11**

Admitted only that Plaintiffs do not allege BNSF's fuel-surcharge programs before March 2003 were conspiratorial.

---

[44] DA03523 at 23, 26; DA03548.

[45] DA03862 at 62-63; DA03908 at 19-21, 32-34; DA15859 at 69 (Kyei (BNSF) 45:16-24).

[46] DA03963 at 63-65.

**<u>Material Undisputed Fact No. 12</u>**

**BNSF unilaterally worked to expand fuel surcharge coverage before the alleged conspiracy period.**

<u>Supporting Facts:</u>

12.1 Starting in 2000, at the direction of "[t]op [management]," BNSF pursued "a more aggressive policy" that would impose fuel surcharges "on all prices we can," including "[p]rices that don't specifically reference the Rules Book," "to help recover [its] higher costs."[47]

12.2 Throughout 2000, BNSF expanded coverage of its carload fuel surcharge to additional types of carload traffic.[48]

12.3 BNSF's internal documents show that, by December 1, 2000, BNSF's fuel surcharge coverage (by revenue) was 19% of its total traffic, including 42% of intermodal traffic, 25% metals, 21% minerals and machinery, 22% forest, 15% chemicals, and 11% auto.[49]

12.4 In February 2001, BNSF documented concerns about discounting (or forgoing increases in) base rates as an offset to fuel surcharges.[50]

12.5 In March 2001, 23% of BNSF's total traffic by revenue was covered by a fuel surcharge, according to internal BNSF tracking.[51]

12.6 By February 2002, an internal BNSF team recommended that "[e]very contract should include a fuel surcharge clause" and "[a]ny deviation from…policy should require the approval of the Business Unit VP."[52]

---

[47] DA03549 at 49-50; DA03982 at 84; *see also* DA03515; DA03523 at 23-24; DA03855 at 59.
[48] DA03515; DA03855 at 59; DA03523 at 23-24.
[49] DA03855 at 61.
[50] DA03862 at 63-64.
[51] DA03868 at 74.
[52] DA04019 at 19-20; *see also* DA04048 at 66, 71, 80.

12.7 BNSF's 2002 price escalation guidelines required every contract to include a fuel surcharge.[53]

12.8 In November 2002, BNSF was "making a concerted effort to increase the application of fuel surcharges to Carload documents."[54]

12.9 For 2002, according to BNSF's tracking documents, approximately 27% of BNSF's total traffic by revenue was covered by a fuel surcharge, including around 45% for consumer products and industrial products, 65.1% for minerals, 58% for construction products, some types of intermodal traffic at 100%, but with agriculture, lumber, and coal ranging from 0% to less than 5%.[55]

12.10 By early 2003, BNSF's internal documents show it expanded its fuel surcharge coverage to agricultural products and lumber.[56]

12.11 As of March 21, 2003, according to BNSF's numbers, BNSF's total carload traffic had a 45.2% fuel surcharge participation rate by revenue, with agriculture up to 64% and industrial products up to 61.8%.[57]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 12</u>**

Disputed, including to the extent that Defendants misleadingly imply that BNSF successfully imposed and increased coverage of fuel surcharges prior to the conspiracy, or that

[53] DA04019 at 19-21; *see also* DA04083; DA04084 at 84-85; DA03988 at 90, 94; DA04104 at 05-07; DA04086 at 86-94.

[54] DA04083 (November 2002 email regarding expansion of fuel surcharge to "293 rate documents that were formerly exempt"); *see also* DA04084 at 84-85 (agricultural); DA04095 at 97 (lumber).

[55] DA04086 at 89; *see also* DA04104 at 05-07.

[56] DA04084 at 84-85 (November 2002 email regarding adding fuel surcharge to agricultural shipments); DA04095 at 97 (January 2003 notice to lumber customers about implementing fuel surcharge effective March 1, 2003); DA04108 (January 2003 agricultural contract renewal with fuel surcharge).

[57] DA04451 at 72; *see also* DA04286 at 86-87.

BNSF's Conspiracy Period agreement to impose fuel surcharges across-the-board did not represent a change from its pre-Conspiracy Period practices. Also disputed to the extent that Defendants misleadingly imply that BNSF's pre-conspiracy fuel surcharges were actually triggered or collected upon, or that because contracts or revenue were "covered by" a fuel surcharge during the pre-Conspiracy Period, that fuel surcharges were actually triggered or collected for that revenue or those contracts. Also disputed to the extent that Defendants misleadingly imply that BNSF had implemented a policy requiring senior-executive-level approval of exceptions prior to the conspiracy rather than simply internally *recommending* that such a policy be put in place.

Admissible evidence demonstrates that the Defendants, including BNSF, were unsuccessful in unilaterally imposing fuel surcharges broadly prior to the conspiracy, including as a result of competition among Defendants. COF ¶¶ 68–77 (BNSF), ¶¶ 46–67 (other Defendants); *see, e.g.*, PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 101–120; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 86-88. For example, BNSF wrote in 2002 that it was "challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace" and that BNSF would lose business if it implemented fuel surcharges, or would have to decrease its base rates to offset any fuel surcharges. PX0127, BNSF-0574516 (BNSF May 28, 2002 Enterprise Wide Risk Assessment) at '617; PX0128, Metadata to PX0127. Even as of early 2003, only 27% of BNSF's business was covered by any kind of a fuel surcharge. PX0088, BNSF-0328865 (BNSF memo re Fuel Surcharge Questions), at '866 ("The reasons limiting our ability to pass on fuel cost recovery charges vary—the source of competition . . . . Therefore, any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive.").

Moreover, during the pre-Conspiracy Period, Defendants' less aggressive fuel surcharges were rarely triggered and often were not collected when they were triggered. COF ¶¶ 46–77. For example, BNSF executives testified that BNSF's pre-conspiracy fuel surcharges "never hit the strike price and—and [BNSF] never collected." PX0613, Rose (BNSF) Dep., July 16, 2010, at 20-21; *accord* PX0599, Kyei (BNSF) Dep., March 4, 2010, at 42 ("[F]uel surcharges that were put in place in 2000 weren't collecting a lot of money").

In early 2003, Defendants, including BNSF, agreed to several changes to their fuel surcharge programs, including lowering the "trigger" or "strike" price at which fuel surcharges would be imposed. COF ¶¶ 111–128, 129–40, 209–26. BNSF specifically lowered its trigger price from $1.30 HDF to $1.25 HDF to "reflect" the $23 WTI trigger price. COF ¶ 161; PX0141, BNSF-FSC_000486 (BNSF memo re Status of BNSF Fuel Surcharge Programs, July 1, 2003), at '486 (summarizing status and recent changes to fuel surcharge program); PX0084, BNSF-0327011 (April 30, 2003 BNSF internal email re: "Fuel Surcharge Program Changes (Updated w/ Hedging Info)," April 30, 2003, and attachment), at '011 ("The carload strike price will be $1.25. (This reflects the $23 WTI crude strike price being used by UP in their new carload fuel surcharge table.) . . . ."). And UP switched from $28 WTI to a $1.35 HDF formula. COF ¶ 166–74. UP's new $1.35 HDF trigger was ostensibly less aggressive than BNSF's $1.25 HDF trigger, but in reality once the threshold was met the fuel surcharge mirrored BNSF's, and picked up any of the fuel surcharge it had skipped over between $1.25 and $1.35 HDF. PX0355, NS_0014001716 (NS internal email re: "FSC Revenue Comparison", May 16, 2003), at '716 (regarding the new UP formula, "The difference [from BNSF] is higher kick in threshold of $1.35 per gallon ($1.25 base) . . . Once it kicks in, it is identical to the BNSF FSC . . . The practical effect is to suppress smaller increase[s] until the $1.35 threshold is met, then increases are applied back to the $1.25 base.").

In addition, during the Conspiracy Period, Defendants' fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. COF ¶¶ 302–63. For example, BNSF implemented a "zero tolerance policy" in early- to mid-2003 whereby "[a]ny contract [that] comes due will be renewed with a fuel surcharge." PX0655, 2Q2005 BNSF Earnings Call, Aug. 11, 2005, at 5:17-18; PX0142, BNSF-FSC 000488 (BNSF internal email re: "Fuel Analysis 3-11-04," March 11, 2004), at '488 ("Contracts requiring [CEO's] signature but excluding full fuel surcharge provisions ***[would] not be signed***") (emphasis added); PX0072, BNSF-0048722 (BNSF email re: "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 **(**BNSF achieved "[v]irtually no exceptions."). At the time, BNSF referred to the changes in policy as a "***New Methodology***," and a "***recent major change in our fuel surcharge programs***." PX0140, BNSF-FSC 000469 (BNSF Fuel Surcharge Script, May 2, 2003), at '471 ("***Roll out of New Methodology*** . . . Participation rates will increase as opportunities present themselves by price authority. The delegation of authority has been moved to the Vice President level in carload business units.") (emphasis added); PX0141, BNSF-FSC_000486 (BNSF memo re "Status of BNSF Fuel Surcharge Programs," July 1, 2003), at '486 ("[P]lease find below a summary of recent major changes in our fuel surcharge programs (i.e., in boldface text) . . . ***Participation rates will be increased as opportunities present themselves by price authority*.** Lumber and Panel Products were added to the program.").

Defendants cite DA04019 and DA04048 to misleadingly imply that by 2002, BNSF already had centralized approval of exceptions to its fuel surcharge policy. But those documents actually reflect only that [redacted] In fact, even as of February 2003, BNSF contemporaneously explained that it had "small"

fuel surcharge coverage because it had ***"put the option in the hands of individual marketing personnel,"*** PX0176, CSXFSC000000270 (CSX internal email chain re "CSXT/NS Fuel Surcharge History," July 12, 2000) at '270 (emphasis added). It was not until immediately following meetings with the other Defendants regarding fuel surcharges, *see* pp. 33-34, *supra*, that BNSF, in early April 2003, announced a *new policy* requiring *two levels of senior approval* for exceptions to its fuel surcharge policy: "Effective ***immediately and urgently*** per John Lanigan. Authority to omit FSC provision is to be ***granted to VP's only (who will also clear with John).*** This ***needs to be communicated immediately.***" PX0050, BNSF-0027935 (BNSF internal email re: DOA ON FSC, April 9, 2003), at '935 (emphasis added). And while, in the pre-Conspiracy Period, BNSF may have had an *aspirational goal* of imposing fuel surcharges where possible, as reflected above, BNSF did not impose a "zero tolerance policy" until early 2003. *See* PX0655, 2Q2005 BNSF Earnings Call, Aug. 11, 2005, at 5:17–18.

During the Conspiracy Period, Defendants, including BNSF, were successful in substantially increasing their fuel surcharge coverage. COF ¶¶ 321–32; *see* COF ¶¶ 302–20, 333–63. As a result, the coordinated fuel surcharges enabled Defendants, including BNSF, to earn increased revenues and profits during the conspiracy period. COF ¶¶ 526–58; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-219, Figs. 20-26; PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 130–152.

Dr. Bernheim found that Defendants' "early fuel surcharge programs did not generate substantial revenue for the Defendants." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 82; *see id.* ¶¶ 71–82; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023 ¶ 157 ("Defendants' Conspiracy Period carload FSC formulas yielded higher payments than their predecessors at then-current fuel market conditions."). Dr. Bernheim also concluded that "fuel surcharge payment

coverage increased dramatically during the cartel's operation." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim shows the low levels of coverage BNSF experienced before the conspiracy and a dramatic increase once BNSF entered the conspiracy:

**Figure IV-14: Frequency of fuel surcharges[245]**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155, Fig. IV-14.

Other experts reached the same conclusion. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 337 and Fig. V.1; PX0989, Jacobs MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 104-107 and Figs. II.22 & II.23; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 166-175 ("[redacted]"); PX0984, Leitzinger MDL II Reply Rpt., ¶¶ 80-96 ("[T]he evidence does not support [Defendants'

experts'] view" that "the increases in coverage seen during the Conspiracy Period were merely a continuation of a trend that predated the alleged conspiracy").

**Material Undisputed Fact No. 13**

**In 2003, BNSF unilaterally changed the strike price of its carload fuel surcharge formula from $1.30 HDF to $1.25 HDF after extensive internal analysis.**

Supporting Facts:

13.1 In January 2003, John Lanigan joined BNSF as Chief Marketing Officer ("CMO") after working in the trucking industry, where he had been involved in developing a fuel surcharge program.[58]

13.2 Starting in February 2003 through March and April of 2003, CMO Lanigan convened a formal review of BNSF's fuel surcharge programs.[59]

13.3 Sam Kyei, BNSF's Chief Economist, led a "Fuel Surcharge Review Team," which included 16 other BNSF employees.[60]

13.4 The Review Team considered a move to a mileage-based fuel surcharge and other fuel surcharge changes such as reducing the strike price.[61]

---

[58] DA03099 at 102, 103 (Lanigan (BNSF) 10:20-12:12, 14:22-16:23).

[59] DA03099 at 108-09 (Lanigan (BNSF) 36:16-37:11); DA15859 at 64, 79-80 (Kyei (BNSF) 27:23-28:16, 94:3-98:13); DA04114 at 16-54 (slide decks dated February 24 and March 10, 2003); DA04112 (scheduling "Pre-Meeting" for March 10 meeting); DA04114 (scheduling "two back-to-back meetings" for March 13 and 14); DA04155 (agenda for March 14 meeting); DA04204 (agenda for March 19 meeting); DA04159 at 200 (agenda for March 21 meeting); DA04216 (agenda for March 26 meeting); DA04239 (agenda for March 28 meeting); DA04330 (agenda for April 4 meeting); DA04451 at 53-68 (Review Team Recommendations dated April 14, 2003).

[60] DA04451 at 54; DA15859 at 64 (Kyei (BNSF) 27:23-28:16).

[61] DA04114 at 14, 17.

13.5 By March 28, 2003, BNSF's General Director of Revenue Accounting had identified systems, accounting, and customer issues with a change to a mileage-based fuel surcharge program.[62] The Team also decided to "fight one battle at a time" and focus on "increased participation" rather than a "radical" change to a mileage-based fuel surcharge.[63]

13.6 By March 31, 2003, the BNSF Fuel Surcharge Review Team had prepared a draft presentation that recommended that BNSF "[c]oncentrate on improving participation rates" in the "[s]hort term" and "[f]ix systems issues" in the "[l]onger term" before implementing mileage-based programs.[64]

13.7 During the Fuel Surcharge Review Team's review of BNSF's carload fuel surcharge, CSXT and UP each announced modifications to their published carload fuel surcharges. On March 20, 2003, CSXT publicly announced its modifications.[65] The Review Team included CSXT's new fuel surcharge in its analysis.[66] On April 4, 2003, UP issued announced modifications to its WTI-based carload fuel surcharge.[67] The Review Team learned about and included UP's new carload fuel surcharge as the team refined its analysis in April 2003.[68]

13.8 On April 14, 2003, BNSF's Fuel Surcharge Review Team reported its recommendations.[69] The Review Team recommended that BNSF stick with a "percent of revenue basis (short term)"

---

[62] DA04258 at 58-59.
[63] DA04240 at 48.
[64] DA04261 at 81.
[65] DA02616 at 16-17.
[66] DA04451 at 61.
[67] DA01449 at 49-50.
[68] DA04451 at 61, 65.
[69] DA04451 at 53-68.

and consider a mileage-based formula as a "possibl[e] long term" project.[70] It also recommended to reduce the "strike price" of BNSF's carload fuel surcharge to $1.10.[71]

13.9 On May 7, 2003, BNSF reduced its carload formula strike price to $1.25 HDF from $1.30 HDF, assessed a 0.5% surcharge at that threshold, and kept the same increment formula from July 2001, increasing by 0.5% for every $0.05 over the strike price, with an effective date of June 1, 2003.[72]

13.10 At all fuel prices above $1.30 HDF, BNSF's 2003 and 2001 carload formulas would produce an identical surcharge (i.e. 1% plus 0.5% for every $0.05 over $1.30 HDF).[73]

13.11 At all fuel prices below $1.25 HDF, BNSF's 2003 and 2001 carload formulas would produce an identical surcharge (i.e. 0%).[74]

13.12 In a July 1, 2003 memorandum, BNSF Chief Economist Kyei stated that BNSF's $1.25 strike price "reflected the $23 WTI crude price used by UP" in the carload fuel surcharge UP had announced on April 4, 2003 but did not implement.[75]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 13</u>**

Disputed. The cited evidence does not support the statement. None of the cited documents shows that BNSF acted unilaterally.

Admissible evidence demonstrates that BNSF's conspiracy-period fuel surcharge—including its $1.25 HDF strike price—was not the result of unilateral conduct, but instead a result of Defendants' conspiracy. Around February 2003, BNSF employees began analyzing possible

---

[70] DA04451 at 68.

[71] DA04451 at 68.

[72] DA03978 at 79.

[73] DA03963 at 65; DA04603 at 03; DA03978 at 79.

[74] DA03963 at 65; DA04603 at 03; DA03978 at 79.

[75] DA04415 at 15; DA01449 at 50.

changes to BNSF's fuel surcharge methodology. COF ¶ 141. Because of the length of BNSF's average shipments as compared to those of the other Defendants, BNSF and the other Defendants recognized that use of a mileage-based fuel surcharge represented a competitive advantage for BNSF. PX0249, NS 001001082 (NS internal email re: BNSF, July 1, 2005), at '082 (NS: "[I]t is clear that BNSF sees an advantage in a mileage based FSC due to its greater length of haul, and a corresponding disadvantage for us due to our shorter hauls."); *see* COF ¶ 142. Thus, by February 24, 2003, BNSF's Review Team internally proposed switching to a mileage-based fuel surcharge (rather than a rate-based one). COF ¶ 143.

But then, in late March and early April 2003, other Defendants announced rate-based fuel-surcharge programs. CSX and UP each announced that they would lower their trigger prices from $28 WTI to $23 WTI. PX0185, CSXFSC000084489 (CSX press release, March 20, 2003), at '489.

Shortly thereafter, BNSF's senior-most executives engaged in meetings with their counterparts. Senior executives from all four Defendants met at the April 2–6, 2003 NFTA meeting. COF ¶ 148; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting). Promptly following the Spring 2003 NFTA meeting, BNSF's Lanigan, who attended the meeting, issued an immediate directive mandating inclusion of fuel surcharge provisions in contracts and requiring Lanigan's own clearance for any exception: "***Effective immediately and urgently*** per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be ***granted to VP's only (who will also clear with John)***. This needs to be communicated immediately as well." PX0050, BNSF-0027935 (internal BNSF email re: "DOA ON FSC," Apr. 9, 2003), at '935 (emphases added); *see also* PX0613, Rose (BNSF) Dep., July 16, 2010, at 71-72 (around the first half of 2003, "there's no doubt" that BNSF

"narrowed down the flexibility of the pricing managers to apply fuel surcharges"). Lanigan did not discuss this change with his team before announcing it. *See* PX0628, Garin (BNSF) Dep., Aug. 16, 2010, 245:15-21. This reflected a change in BNSF's prior practice of not requiring such senior approval. *Cf.* PX0176, CSXFSC00000270 (CSX internal email chain re "CSXT/NS Fuel Surcharge History," July 12, 2000), at '270 ("BNSF advised their list of price authorities subject to their fuel surcharge was small because their leaders put the option in the hands of individual marketing personnel."). On April 15–17, 2003, CMOs and CMOs-in-waiting *from all four Defendants* participated in an unsupervised getaway, with no other employees invited. COF ¶ 139. On April 23, 2003, BNSF and CSX senior executives also held a meeting. COF ¶ 159. On April 30, 2003, BNSF executives met again with their counterparts from CSX, NS, and UP. COF ¶ 160. At around same time, senior executives from other Defendants also met and discussed fuel surcharges. *See, e.g.*, COF ¶¶ 186–92.

Contemporaneous with these meetings, BNSF—rather than switch to a mileage-based program—announced that it would likewise lower its trigger price from $1.30 HDF to $1.25 HDF to "reflect[] the $23 WTI crude strike price," PX0084, BNSF-0327011 (April 30, 2003 BNSF internal email re: "Fuel Surcharge Program Changes (Updated w/ Hedging Info)," April 30, 2003, and attachment), at '011; *see also* PX0141, BNSF-FSC_000486 (BNSF Carload Program memo), at '486. BNSF decided to defer implementation of its preferred and competitively advantageous mileage-based programs to the "Longer Term." PX0081, BNSF-0325512 (Draft BNSF Fuel Surcharges Fuel Surcharge Review Team Recommendations Presentation, March 31, 2003), at '532; *see* COF ¶ 149, 161–63.

On the very day of BNSF's announcement and the next day, UP's Koraleski, BNSF's Lanigan and Schultz, NS's Seale, and CSX's Giftos and Gooden together attended a gathering

under the auspices of the AAR's "Network Efficiency Management Committee" (or "NEMC"), a group comprised of the railroads' CMOs. COF ¶¶ 160, 164. Within days of BNSF's announcement of a lower $1.25 HDF trigger price, Koraleski called a UP meeting with a "[f]ocus on 'fuel surcharge.'" DA01531 (May 5, 2003 UP meeting agenda); COF ¶ 165. UP then announced that it too would lower its trigger price to $1.35 HDF. COF ¶ 166. While UP ostensibly had a higher trigger price than BNSF, UP in fact admitted that it intended "[t]o match BNSF's 'standard' HDF based surcharge," PX0502, UPFSC_0075761, and Defendants understood that once UP's fuel surcharge kicked in, it in fact mirrored BNSF's (which, in turn, was set at a trigger price that "reflect[s]" CSX's $23 WTI price). PX0242, NS 001000373 (internal NS email, July 16, 2003), at '373; PX0084, BNSF-0327011 (BNSF internal email re: "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011; *see* PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 97 ($1.25 on the HDF is "roughly equivalent" to $23 on the WTI); COF ¶¶ 161, 168, 225. BNSF acknowledged that UP's wholesale adoption of BNSF's methodology was "big news" because "[t]he ideal scenario is to have BNSF and UPRR have the same FSC methodology." PX0091, BNSF-0342448 (BNSF internal email re: "Updated UP FSC effective 6/1/03," May 12, 2003), at '448; *see also* COF ¶¶ 165–74.

On July 30, 2003, BNSF and NS's senior executives had a meeting. The minutes of this meetings reflect additional discussion of fuel surcharges: "John Lanigan and Don Seale agreed to lead a discussion of a ***potential industry position*** on fuel surcharge provisions at the next N.E.M.C. meeting." PX0243, NS 001000422 (BNSF/NS Joint Marketing Meeting, July 30, 2003), at '424 (emphasis added). During the very period when UP and BNSF brought their fuel surcharges into virtual lockstep, UP's and BNSF's senior officials were also communicating directly with each

other. UP's and BNSF's chairmen and CEOs had one-on-one conversations, including by telephone, as did their CMOs. COF ¶ 175.

BNSF executives continued meeting with the other Defendants' senior executives throughout 2003, including at N.E.M.C. meetings. *See, e.g.*, COF ¶¶ 194–96, 199–204.

Admissible evidence also contradicts the suggestion that BNSF's pre-conspiracy fuel-surcharge program and its Conspiracy Period fuel-surcharge program would produce the same revenues. In fact, Defendants struggled to apply and collect fuel surcharges during the pre-Conspiracy Period, and none of the Defendants was successful at broadly imposing fuel surcharges before the conspiracy. COF ¶¶ 46–77. Indeed, as a result of competition, in May and June 2003 BNSF temporarily reduced its fuel surcharge rate across-the-board as to all traffic—far below the rate that its pre-conspiracy fuel-surcharge formula would have yielded—that is, as low as 2% compared to the 5% that its published formula actually called for. PX0508, UPFSC0129813 (internal UP email re: BNSF Reducing Fuel Surcharge 5/1 to 2%, April 29, 2003), at '813; PX0114, BNSF-0495601 (BNSF email re: Update: BNSF Carload Fuel Surcharge—May 2003, April 30, 2003), at '602 (announcing the reduced fuel surcharge).

But after July 1, 2003 BNSF never implemented a unilateral, across the board fuel surcharge reduction for the remainder of the conspiracy period.

As a result of the conspiracy, Defendants' fuel surcharges became non-negotiable and were applied across the board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. COF ¶ 303 (providing many examples of Defendants telling shippers that fuel surcharges were mandatory and not negotiable); *see* COF ¶¶ 302–63. This was true specifically for BNSF. COF ¶¶ 318–29.

During the Conspiracy Period, Defendants—including BNSF—exchanged data tracking their progress toward universal coverage; shared information about fuel costs, hedging practices, and fuel surcharge policies and implementation; and monitored each other to ensure that no member of the cartel cheated on the conspiracy. COF ¶¶ 364–67; 501–10. BNSF was also actively involved in Defendants' coordinated effort to cause the AAR to adopt the AIILF, to facilitate Defendants' imposition and collection of the new coordinated fuel surcharges, particularly given that there already was an existing cost-escalation index, the RCAF, that would have enabled Defendants to recoup their actual fuel costs. COF ¶¶ 367–20.

As a result of the conspiracy, Defendants, including BNSF, were successful in significantly increasing their fuel surcharge coverage to more contracts and revenue than in the pre-Conspiracy Period. COF ¶¶ 318–29; *see, e.g.,* PX0072, BNSF-0048722 (BNSF email re: "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); PX0655, Q2 2005 BNSF Earnings Conference Call at 18 ("We have a zero tolerance policy. Any contract [that] comes due will be renewed with a fuel surcharge and we have been in that mode for a year-and-a-half and have been very successful at implementing fuel surcharge."); PX0080, BNSF-0325449 (BNSF internal memo re Fuel Cost Recovery Analysis, May 28, 2004), at '449 (noting rise in BNSF's fuel surcharge "top-line revenue participation rates" and "bottom-line expense coverage rates" to date and projecting significant increases by 2008); PX0058, BNSF-0031225 (BNSF Fuel Cost Recovery Analysis presentation, March 14, 2005), at '246 (reflecting fuel surcharge coverage increasing from 51% to 86% between 2004 and 2009); PX0580, STB Hearing Transcript, *Ex Parte* No. 661, May 11, 2006, at 271-72 (explaining that BNSF has 75% fuel surcharge effectiveness); PX0055, BNSF-0028786 (BNSF Fuel Surcharge Review Team Recommendations, April 14,

2003), at '791-93 (tracking "improving participation rates"); PX0038, BNSF_LOG0006542 (BNSF Second Quarter 2003 Financial Presentation, July 22, 2003), at '571 (reflecting 44.2% coverage as of May 2003); PX0097, BNSF-0355735 (BNSF Fuel Surcharge Effective Participation), at '735 (showing "Fuel Surcharge Effective Participation" rising from 38.2% in 2003 to 85.9% across "total" BNSF business units, and from 50.2% to 99.5% in Agriculture, 54.6% to 89.1% in Industrial, and 42.7% to 95.4% in Consumer).

BNSF recognized that its conspiracy-period fuel surcharges were a "revenue maximization program, not protection against fuel prices," and that these coordinated fuel surcharges made "money. Big money," and were a "profit center." PX0093, BNSF-0344944 (internal BNSF email re: (Larger) Marketing Staff Meeting, Jan. 4, 2004), at '944; PX0110, BNSF-0479452 (email re: AAR, May 5, 2006); PX0020, BNSF_0691131 (March 27, 2006 Fuel Surcharge Comparison Of Class 1 Programs), at '138. Admissible evidence further demonstrates that BNSF's fuel surcharge program was not designed merely to recoup fuel costs. *See* COF ¶¶ 468–72.

Defendants, including BNSF, earned increasing, supracompetitive revenues and profits from fuel surcharges over the course of the conspiracy period. COF ¶¶ 526–58. Plaintiffs' experts found in their quantitative analyses that Defendants' fuel surcharge revenue rose dramatically during the conspiracy. *See, e.g.*, PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 350 ([redacted]); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-218, Figs. 20-26. Dr. Bernheim found that once the conspiracy began, "prices remained on a steep upward trend until late 2008." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128. Dr. Bernheim also "computed fuel surcharges as a fraction of overall net revenue in every month from January 2000 through December 2008" and found "that fuel surcharges

accounted for a rapidly growing fraction of the Defendants' revenue during the cartel's operation." *See id.* ¶ 128; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim indicates the dramatic rise in fuel surcharges as a percentage of Defendants' net revenue during the conspiracy, including for BNSF:

**Figure IV-15: Fuel surcharge as percentage of net revenue**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 156, Fig. IV-15; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, Fig. V.3. Dr. Bernheim also concluded that "non-conspiratorial factors cannot account for the dramatic increase in fuel surcharge coverage or revenue during the operation of the alleged cartel." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 157–184. Dr. Bernheim found that during the conspiracy, Defendants, including BNSF, generally increased their operating margins, *id.* ¶¶ 134–138, and saw an "increase in perceived profitability" in the market and thus drastically drove up their stock prices, outperforming the S&P 500, *id.* ¶¶ 139–141; *see also* COF ¶¶ 524–53. Defendants' conspiracy achieved striking success in part

because Defendants' conspiratorial fuel-surcharge programs, which they were now able to apply far more broadly and uniformly than in the pre-Conspiracy Period, recovered dramatically more than the cost of fuel. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 142–152; *see also* COF ¶¶ 513–23.

__**Material Undisputed Fact No. 14**__

**In mid-2004, BNSF unilaterally adopted the industry's first standard coal-specific fuel surcharge.**

__Supporting Facts:__

14.1 In 2003, BNSF's Fuel Surcharge Review Team determined that BNSF's existing coal traffic pricing mechanisms were falling significantly short of recovering fuel costs for that traffic.[76]

14.2 In April 2004, BNSF began discussing "potential approaches/methodologies for a separate coal [fuel surcharge] program."[77]

14.3 BNSF believed a coal fuel surcharge separate from the carload and intermodal fuel surcharges would be "more accurate" and "fair."[78]

14.4 One June 8, 2004, BNSF announced a coal specific rate-based fuel surcharge, effective July 1, 2004.[79] The new coal fuel surcharge had a strike price of $1.24 HDF and assessed a 0.5% surcharge when the HDF monthly average exceeded $1.24, with an additional 0.5% surcharge for every $0.04 increase in the HDF above $1.24.[80]

---

[76] DA04114 at 28; *see also* DA04426 at 28.
[77] DA15645.
[78] DA15756 at 59 (Anderson (BNSF) *Oxbow* 30(b)(6) 22:1-24).
[79] DA15709.
[80] DA15709 at 10-13.

**Plaintiffs' Response to Defendants' Undisputed Fact No. 14**

Disputed.

Disputed that BNSF "unilaterally" adopted this somewhat more aggressive fuel surcharge on coal. None of the cited documents show that BNSF acted unilaterally. To the contrary, there is substantial admissible evidence that BNSF and UP's implementation of somewhat more aggressive fuel surcharges on coal was conspiratorial and part and parcel of Defendants' agreement to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. [redacted] PX0785, Corrected Elzinga Rpt., July 9, 2018 (corrected Aug. 7, 2018), at 53–55 & n.256; PX0830, Frankel Rpt., July 9, 2018, ¶ 34 & Ex. 1c.

Disputed that the document cited in support of Supporting Fact 14.1 demonstrates "that BNSF's existing coal traffic pricing mechanisms were falling significantly short of recovering fuel costs for that traffic." The documents cited show only that BNSF believed that its fuel cost recovery in 2002 using the RCAF, did not adequately recover fuel costs. DA04114 at 28 (analysis of 2002 RCAF cost recovery); DA04450 (1993–2003 RCAF fuel cost recovery analysis) (cited in a May 28, 2004 BNSF interoffice memo, DA04426 at 28). The documents do not address the recovery under its then existing carload fuel surcharge in the aggregate or on a shipment basis. The analysis undertaken was in response to John Lanigan's request to consider implementing a mileage-based FSC, and not the percentage-of-rate FSC that BNSF implemented. DA04128 ("Both documents cover analysis on John's initial idea of implementing a Cost Per Mile (CPM) methodology. The resulting surcharge is applied on a mileage basis based on the miles per gallon consumed.").

Further, studies purporting to show that BNSF needed to apply higher fuel surcharges on its coal traffic because it incurred higher fuel costs on this traffic compared to those it incurred on its carload traffic were the product of pretextual exercises, with no economically sound cost-of-service justification for the carrier's imposition of higher coal FSCs. [redacted] PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 323, [redacted] *Id.* at 116 n.652 (quoting a leading independent study on railroad fuel consumption/costs by train type).

Moreover, BNSF's assertion that applying rate-based FSCs (and increasing them on its coal traffic) were the product of its concerns about "fairness" was expressly rejected by the STB. The STB found that the Defendants' rate-based FSCs "cannot be fairly described as merely a cost adjustment mechanism." PX0653, STB *Rail Fuel Surcharges*, Ex Parte No. 661, Jan. 26, 2007, at 6.

Following the unprecedented meetings between railroad executives in 2003 (*see, e.g.*, COF ¶¶ 139, 146–48, 175, 182–95), UP and BNSF's fuel surcharges on coal arose at the same time senior executives engaged in extensive additional discussions, including a coal-related "train trip on the coal line in eastern Wyoming" that BNSF's and UP's CEOs began discussing in March 2004 and which both CEOs attended in August 2004. COF ¶¶ 282–84; PX0538, UPFSC_0466673 (UP CEO Dick Davidson calendar entry reflecting March 25, 2004 call with BNSF's Matt Rose re: "Matt Rose re coal trip," Mar. 24, 2004), at '673; PX0633, Davidson (UP) Dep., Feb. 24, 2011, at 248-250; *see also* PX0522, UPFSC_0343267 (letter from BNSF's CEO to UP's CEO referencing "previous[] discuss[ions]" and suggesting future meetings, Mar. 10, 2003); PX0541, UPFSC_0466746 (reflecting meeting with NS's David Goode and BNSF's Matt Rose, Dec. 12,

2003); PX0029, BNSF_CAL_0004878 (email reflecting "visit" from UP's Koraleski, Nov. 24, 2003), at '878. In August 2004, the two CEOs along with the senior managers of the coal marketing departments took the discussed coal train trip in the PRB, and shortly afterward, UP published its coal FSCs. PX1062, UPFSC_II_003100203 (UP internal email re: STB trip to PRB, July 2004).

Contrary to the position that Defendants now take—that these surcharges were "separate" and somehow different from the general carload fuel surcharges—Defendants maintained at the time that they were nothing new. For example, UP announced the increased surcharge to its customers as a mere "modification," PX1169, Letter from L. Fritz, Oct. 1, 2004, at '974, and UP described its more aggressive fuel surcharge program on coal to the STB as a mere "variation from the standard HDF program" it applied to carload shipments. PX0766, STB *Ex Parte* 661 Comments from Union Pacific Railroad Company, April 27, 2006, at 11. The fuel surcharge on coal adopted by UP was indeed similar to its carload program. PX0611, Knight (UP) Dep., July 9, 2010, at 90-91 ("Q. Okay. All right. Then -- then you wrote that Union Pacific's coal business has a separate fuel surcharge program. Do you see that? A. I do. Q. And you refer to something that occurred in November 2004. Do you see that? A. I do. Q. Now, that fuel surcharge for the coal business was also HDF-based, correct? A. That's correct. Q. And it began at the same exact trigger point as the -- the carload HDF surcharge, correct? A. I believe that is correct. . . . Q. And -- and then up until $1.60 per gallon, the increase in both programs was exactly the same, correct? A. Again, I think -- I think that's right. Q. And then the only change from the standard HDF program is that after $1.60 per gallon, the -- this coal surcharge increase is slightly more, correct? A. That is correct.").

BNSF's fuel surcharge on coal was similar to UP's program, both in terms of its features and in the eyes of the two railroads' customers. As the Western Coal Traffic League summarized for the STB in 2006:

> UP and BNSF's programs have similar characteristics . . . [E]ach utilizes DOE's HDF On-Highway Diesel Fuel price for applying surcharges. Each program's fuel surcharge percentage changes as the utilized DOE reported HDF prices change. Each program bases fuel surcharges on a percentage of line-haul revenue . . . [E]ach fuel surcharge program employs a two-month 'lag' in applying surcharges derived from the basis month from which the surcharges are applied (e.g., the fuel surcharge to be applied by UP and BNSF in May 2006 will utilize a basis month of March 2006 for determining the applicable fuel surcharge for May) . . . Both UP and BNSF are aggressively implementing their fuel surcharge programs and they have been very successful in collecting fuel surcharges.

PX0666, STB *Ex Parte* No. 661, Statement of Western Coal Traffic League, April 27, 2006, at 8–9; *see also* COF ¶¶ 302–63.

BNSF and UP's fuel surcharges on coal were substantially similar throughout the conspiracy period, further disputing BNSF's assertion that its decision was "unilateral." For the vast majority of the Conspiracy Period, the differences between BNSF's and UP's fuel surcharge programs on coal were generally less than two percent. COF ¶ 289–93; *see* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 106 ("While some of the provisions in BNSF's and UP's conspiracy fuel surcharge programs for coal shipments differed, they implied similar surcharges at the time of their adoption. Specifically, in the months following November 2004, when UP implemented of its Conspiracy Period program, the HDF price varied between $1.90 and $2.50 per gallon. As a result, the difference in the fuel surcharge percentages for the two programs [during this initial time period] was approximately 1.2% on average, compared to 13%–14% for the average surcharge."); PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 118 (finding [redacted]

[redacted]).

Admissible evidence contradicts Defendants' statement that their "existing coal traffic pricing mechanisms" before the conspiracy "were falling significantly short of recovering fuel costs for [coal] traffic." To the contrary, UP thought that forecasted values for the fuel component of RCAF matched well with the realized values of fuel costs. *See* PX0763, UPFSC 0195843 (March 3, 2000 draft letter from Evans (UP) to Hamberger (AAR)), at '843 (explaining that "the existing RCAF process adequately provides for timely pass-through since it forecasts cost changes one quarter in advance"); PX0512, UPFSC0181674 (UP email re: "Fuel Surcharge Q&A and Supporting Info," May5, 2003), at '674 (UP's Doug Glass notes, "Dow frequently asks why RCAFU doesn't recover fuel costs over time. I believe that it does over a year or so"); PX0830, Frankel Rpt., July 9, 2018, ¶¶ C.2.8–10 & Ex. C1a (showing [redacted]); *id.* at Ex. 10a (showing [redacted]).

BNSF and UP coal customers were subject to the policies adopted and implemented by Defendants during the Conspiracy Period to ensure that their fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, with approval of exceptions centralized in senior management—further contradicting Defendants' suggestion that these fuel surcharges were "unilateral" or not conspiratorial. *See* COF ¶¶ 302–63; *e.g.*, PX0142, BNSF-FSC 000488 (BNSF internal email re: Fuel Analysis 3-11-04, Mar. 11, 2004), at '488 ("Contracts requiring [BNSF CEO's] signature but excluding full fuel surcharge provisions ***[would] not be signed***" and further noting that the CEO "expects Coal to use fuel surcharge programs to recover 100% of its fuel exposure") (emphasis added); PX0411, UPFSC 0275003 (UP internal email re: Contact Person for Fuel Surcharge Information, Nov. 4, 2004) at '003 (discussing

plan to implement the new HDF-based surcharge "to all business as it becomes available for action (the expiration date of contracts, etc.)"); PX0445, UPFSC_0195683 at '683 (UP presentation and related notes detailing 2005 goal of further fuel surcharge implementation in all new and expiring contracts); PX0517, Q3 2005 UP Earnings Conference Call, Oct. 27, 2005, at '871-72 ("With high diesel fuel prices continu[ing] to . . . impact our earnings, we have an absolute mandate with our fuel surcharge program to take that higher cost out of the equation as existing contracts are renewed."); *see also* PX0666, STB *Ex Parte* 661, Statement of Western Coal Traffic League, Apr. 27, 2006, at 9 ("Both UP and BNSF are aggressively implementing their fuel surcharge programs and they have been very successful in collecting fuel surcharges."). The application of FSCs to Defendants' coal traffic increased considerably during the Conspiracy Period. COF ¶ 312; *see, e.g.*, PX0072, BNSF-0048722 (BNSF email re: "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '729 (showing that 100% of new or renewed BNSF coal price authorities received the standard FSC in prior six months). Within a year of its change, BNSF had achieved "record" revenues for its "coal segment, even with slightly lower volumes" of traffic, and publicly pointed to FSCs as a source of that growth. PX0655 (Q2 2005 BNSF Earnings Call) at 1, 3.

**<u>Material Undisputed Fact No. 15</u>**

**BNSF unilaterally adopted a mileage-based fuel surcharge program during the period of the alleged conspiracy on rate-based fuel surcharges.**

<u>Supporting Facts:</u>

15.1 In August 2004, BNSF's CMO Lanigan directed Chief Economist Kyei and the BNSF Fuel Surcharge Review Team to review again whether to develop a mileage-based fuel surcharge.[81]

---

[81] DA15859 at 94 (Kyei (BNSF) 236:15-24); DA04481.

15.2 In October 2004, BNSF's Review Team provided recommendations on a mileage-based surcharge program.[82] The Review Team found that the change to mileage-based surcharges would require "[a]pplication systems changes," and BNSF's interline partners would "need to modify interline settlement systems to accept fuel surcharge calculated on [mileage] basis."[83]

15.3 On March 29, 2005, BNSF announced "the railroad industry's first mileage-based fuel surcharge program," which BNSF planned to implement on January 1, 2006.[84] This mileage-based fuel surcharge program was to apply to all "movements that originate and terminate on BNSF"; "the BNSF portion of Rule 11 shipments, a type of interline shipment where each carrier bills the customer separately"; and "certain movements involving BNSF and one or more short lines."[85]

15.4 BNSF's Review Team found that the majority of BNSF's customers either did "not support the change" to a mileage-based surcharge (45%) or would only "consider the change with adjustments" (27%).[86] The Review Team found that only 28% supported the move as announced.[87]

15.5 On October 20, 2005, BNSF announced that "its mileage-based fuel surcharge program will take effect for Coal and Agricultural Products customers January 1, 2006, as scheduled," but "[a]n effective date for the mileage-based program for intermodal, automotive and other carload customers will be announced later," because "some customers need more time to make adjustments to their own information systems to accommodate the new program."[88]

---

[82] DA04521 at 32-35.
[83] DA04521 at 41, 44.
[84] DA04573 at 73, 75.
[85] DA04573 at 75.
[86] DA04626 at 28; *see also* DA04605 at 05-06; DA04581 at 81-82.
[87] DA04626 at 28.
[88] DA04635 at 36.

15.6 BNSF's mileage-based fuel surcharge formula became effective on January 1, 2006 for coal and agricultural customers.[89]

15.7 After the STB's decision in 2007, BNSF extended its mileage-based surcharge to all regulated traffic and to some additional interline carload traffic.[90]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 15**

Disputed, including to the extent that Defendants imply that BNSF's decision to apply mileage-based fuel surcharges to only a minority of local traffic beginning in 2006 was a unilateral decision, or constituted a withdrawal from the conspiracy.

The cited evidence does not support the statement. None of the cited documents shows that BNSF acted unilaterally.

In fact, admissible evidence demonstrates that BNSF's decision to apply mileage-based fuel surcharges to limited traffic beginning in 2006 was not a "unilateral" decision, nor did it constitute a withdrawal from the conspiracy. Rather, BNSF *delayed* its implementation of a mileage-based fuel surcharge for several years, and limited its eventual application, precisely because of BNSF's agreement with the other Defendants to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible.

Around February 2003, BNSF employees began analyzing possible changes to BNSF's fuel surcharge methodology. PX0599, Kyei (BNSF) Dep., March 4, 2010, at 97-98; *id.* at 113-15; PX0090, BNSF-0330835 (BNSF internal email re: "Updated: Fuel Surcharge Review Team," March 13, 2003, and attachments), at '835; *id.* at '838. Because of the length of BNSF's average

[89] DA03560 at 91-93.

[90] DA04658 at 60-61; DA04950; DA04939 at 39-41.

shipments as compared to those of the other Defendants, BNSF and the other Defendants recognized that use of a mileage-based fuel surcharge represented a competitive advantage for BNSF. PX0249, NS 001001082 (NS internal email re: BNSF, July 1, 2005), at '082 (NS: "[I]t is clear that BNSF sees an advantage in a mileage based FSC due to its greater length of haul, and a corresponding disadvantage for us due to our shorter hauls."). Thus by February 24, 2003, BNSF's Review Team internally proposed switching to a mileage-based fuel surcharge (rather than a rate-based one). PX0132, BNSF-FSC 00002 (BNSF email re: "Updated: Fuel Surcharge Review Team," March 18, 2003, and attached presentations), at '016. As of March 10, 2003, BNSF was still "Leaning toward Cost Per Mile (CPM) Fuel Surcharge Formula," in place of its existing rate-based fuel surcharge. *Id.* at '028.

But then, in late March and early April 2003, other Defendants announced rate-based fuel-surcharge programs. CSX and UP each announced that they would lower their trigger prices from $28 WTI to $23 WTI. PX0185, CSXFSC000084489 (CSX press release, March 20, 2003), at '489.

Shortly thereafter, BNSF's senior-most executives engaged in meetings with their counterparts. Senior executives from all four Defendants met at the April 2–6, 2003 NFTA meeting. COF ¶ 148; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting). Promptly following the Spring 2003 NFTA meeting, BNSF's Lanigan issued an immediate directive mandating inclusion of fuel surcharge provisions in contracts and requiring Lanigan's own clearance for any exception: "***Effective immediately and urgently*** per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be ***granted to VP's only (who will also clear with John)***. This needs to be communicated immediately as well." PX0050, BNSF-0027935 (internal BNSF email re: "DOA

ON FSC," April 9, 2003), at '935 (emphases added); PX0613, Rose (BNSF) Dep., July 16, 2010, at 71-72 (around the first half of 2003, "there's no doubt" that BNSF "narrowed down the flexibility of the pricing managers to apply fuel surcharges"). Lanigan did not discuss this change with his team before announcing it. *See* PX0628, Garin (BNSF) Dep., Aug. 16, 2010, 245:15-21. This reflected a change in BNSF's prior practice of not requiring such senior approval. *Cf.* COF ¶ 77. On April 15–17, 2003, CMOs and CMOs-in-waiting from all four Defendants participated in an unsupervised getaway, with no other employees invited. COF ¶ 139. On April 23, 2003, BNSF and CSX senior executives also held a meeting. COF ¶ 159. At the same time, senior executives from other Defendants also met and discussed fuel surcharges. *See, e.g.*, COF ¶ 188, 190–92.

Following these meetings, BNSF—rather than switch to a mileage-based program—announced that it would likewise lower its trigger price from $1.30 HDF to $1.25 HDF to "reflect[] the $23 WTI crude strike price." PX0084, BNSF-0327011 (BNSF internal email re: "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011; PX0141, BNSF-FSC_000486 (BNSF memo re "Status of BNSF Fuel Surcharge Programs," July 1, 2003), at '486. BNSF decided to defer implementation of its preferred and competitively advantageous mileage-based programs to the "Longer Term." PX0081, BNSF-0325512 (Draft BNSF Fuel Surcharges Fuel Surcharge Review Team Recommendations Presentation, Mar. 31, 2003), at '532.

Within days of BNSF announcing a lower $1.25 HDF trigger price—UP announced that it too would lower its trigger price to $1.35 HDF. COF ¶ 166. While UP ostensibly had a higher trigger price than BNSF, UP in fact admitted that it intended "[t]o match BNSF's 'standard' HDF based surcharge," PX0502, UPFSC_0075761, and Defendants understood that once UP's fuel

surcharge kicked in, it in fact mirrored BNSF's (which, in turn, was set at a trigger price that "reflect[s]" CSX's $23 WTI price). PX0242, NS 001000373 (internal NS email, July 16, 2003), at '373; PX0084, BNSF-0327011 (BNSF internal email re: "Fuel Surcharge Program Changes (Updated w/ Hedging Info)" and attachment, Apr. 30, 2003), at '011; *see* PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 97 ($1.25 on the HDF is "roughly equivalent" to $23 on the WTI); COF ¶¶ 161, 168, 225. BNSF acknowledged that UP's wholesale adoption of BNSF's methodology was "big news" because "[t]he ideal scenario is to have BNSF and UPRR have the same FSC methodology." PX0091, BNSF-0342448 (BNSF internal email re: "Updated UP FSC effective 6/1/03", May 12, 2003,) at '448; *see* COF ¶ 168.

On July 30, 2003, BNSF and NS's senior executives had a meeting. The minutes of this meetings reflect additional discussion of fuel surcharges: "John Lanigan and Don Seale agreed to lead a discussion of a ***potential industry position*** on fuel surcharge provisions at the next N.E.M.C. meeting." PX0243, NS 001000422 (BNSF/NS Joint Marketing Meeting, July 30, 2003), at '424 (emphasis added). During the very period when UP and BNSF brought their fuel surcharges into virtual lockstep, UP's and BNSF's senior officials were also communicating directly with each other. UP's and BNSF's chairmen and CEOs had one-on-one conversations, including by telephone, as did their CMOs. COF ¶ 175. BNSF executives continued to meet with executives from other Defendants through the end of 2003, including at N.E.M.C. meetings. *See, e.g.*, COF ¶¶ 194–96, 199–204.

A year later, BNSF again considered switching to a mileage-based program. PX0136, BNSF-FSC 000155 (BNSF internal email re: "Fuel Surcharge – MPG Tables Revisited," Aug. 30, 2004), at '155. But once again, BNSF ***abandoned*** what would have been a unilaterally self-interested effort. COF ¶¶ 228–37. Instead, BNSF only began using a mileage-based fuel surcharge

for some local shipments in early 2006 (three years after it began considering a mileage-based formula), but with limited application. PX0137, BNSF-FSC 000218 (BNSF email re: New Fuel Surcharge Program, March 28, 2005, and attachments), at '218, '220; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 184-192 & Fig. 18 (BNSF considered mileage-based FSC programs in March/April 2003 and August-November 2004, then shelved them each time based on feedback from other Defendants); PX0983, Leitzinger MDL I Reply Rpt., Dec. 16, 2021, 32-35 (¶ 61(i)-(m)) (discussing BNSF's two abandoned attempts to switch to a mileage-based FSC in 2003 and 2004). NS's Jim Nash considered the cost of adopting a mileage-based fuel surcharge in early 2005, following BNSF's announcement, but concluded: "As you can see, we are in a 'wait and see mode'. I'd like to put this project 'oh [sic] hold' for now. Should the industry veto this proposal, it will be canceled." PX0310, NS_010053814 (NS internal email re: BNSF New FSC Process, June 13, 2005), at '814. Ultimately, Defendants did "veto" this proposal, and BNSF did not expand its mileage-based program (although it had previously announced its intent to do so) until after the STB ruling, to be effective on April 25, 2007. P1020, BNSF-0515745 (BNSF Rules Book 6100-A), at '778-81; PX1021, CSXFSC000000767 (CSX internal email re: "BNSF FSC," Aug. 18, 2005), at '767 ("The BNSF new mileage based fuel surcharge appears to be revenue neutral."); *see* COF ¶¶ 235–37.

In short, BNSF's decision to delay implementation of a competitively advantageous mileage-based fuel surcharge *for at least three years*, and even then to implement it only in a limited manner, was the result not of "unilateral" decisionmaking, but rather of Defendants' collusion.

Moreover, BNSF's limited adoption of mileage-based fuel surcharges cannot be deemed to be unrelated to the conspiracy when it was designed to be "revenue neutral" as compared to its

rate-based fuel surcharges. *See* PX0086, BNSF-0327878 (BNSF Draft Communication Plan regarding "Mileage-Based Fuel Surcharge Program Update," July 2005), at '884 (listing as a goal of the mileage-based program to "collect[] the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces"); PX0062, BNSF-0033275 (BNSF emails regarding "Potential MBFSC Test IP Customers," June 21-23, 2006), at '275 ("John Lanigan has told the [mileage-based fuel surcharge] team that he wants this to be a revenue-neutral event for BNSF[.]"); COF ¶ 236; *see also* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 145 ("Additionally, the mileage-based FSC program that BNSF eventually rolled out was designed to be 'revenue neutral' for BNSF. As explained in a BNSF document, one of BNSF's 'three key goals' for the program was that the mileage-based FSC 'collects the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces.'"). The other Defendants similarly designed their mileage-based fuel surcharges to be revenue neutral with respect to their rate-based fuel surcharges. *See, e.g.*, COF ¶¶ 580–85; *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 232. That Defendants set up their mileage-based fuel surcharges in way to gain the same revenues as their conspiratorial rate-based fuel surcharges is in no way at odds with the conspiracy.

Also, despite Defendants' recognition in talking points following the STB's ruling that "[n]o industry level discussions were or are allowed on" the fuel surcharges, DA01692-98, at '97, BNSF and the other Defendants continued to have such discussions in the wake of the STB ruling. For example, UP's Koraleski reported internally in February 2007 that he had discussed fuel surcharges with his counterparts at the other Defendants. PX0511, UPFSC0169555 (UP internal email re: "Mileage Based FSC Timetable," Feb. 7, 2007), at '555 ("CSX is going down the PC Miler approach . . . NS is planning to do away with the fuel surcharge altogether an[d] just change

rates when they need to.”). Two days later, on February 9, 2007, CSX CMO Clarence Gooden scheduled a late-evening Friday “Discussion w/BNSF re: Fuel Surcharge.” PX0730, CSXFSC000258350 (Gooden calendar entry), at ‘350. CSX did this despite internally recognizing around the same time that “*Anti-trust laws require each railroad to establish its FSC program independently*.” PX0179, CSXFSC000006567 (CSX internal email re: “Announcement of Fuel Surcharge Changes,” Mar. 2, 2007, and attachments), at ‘571 (emphasis added).

**Material Undisputed Fact No. 16**

**There is no direct evidence that BNSF participated in the conspiracy that Plaintiffs allege.**

Supporting Facts:

16.1 No current or former BNSF employee has testified to participating in the conspiracy alleged by Plaintiffs.

16.2 No current or former employee of any other Defendant has testified that BNSF participated in the conspiracy alleged by Plaintiffs.

16.3 No documents contain a statement by any current or former Defendant employee that BNSF participated in the conspiracy alleged by Plaintiffs.

**Plaintiffs’ Response to Defendants’ Undisputed Fact No. 16**

Disputed.

There is no evidence to support the statement.

Further disputed because whether or not there is “direct evidence” and what constitutes “participat[ion] in the conspiracy” are legal conclusions, not a statement of fact.

To the extent Defendants are permitted to offer such a conclusory, unsubstantiated, legal conclusion as a “Fact,” Plaintiffs offer the entirety of these Responses as well as the entirety of

their Counterstatement of Material Facts as containing abundant, admissible evidence demonstrating that BNSF (through its senior executives and other employees) participated in the conspiracy to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See, e.g.*, Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 5, 8, 11–15, 36, 38–45, 51–52.

__**Material Undisputed Fact No. 17**__

**CSXT unilaterally adopted a carload fuel surcharge before the alleged conspiracy period.**

__Supporting Facts:__

17.1 Fuel prices rose from historic levels and became increasingly volatile in 1999-2000, reaching prices of $21-23 per barrel WTI and higher in the summer of 2000,[91] resulting in a substantial increase in CSXT's fuel costs.[92]

17.2 During the summer of 2000, CSXT considered adopting a fuel surcharge, and examined rate-based fuel surcharges adopted earlier that year by BNSF, NS, and CSX Intermodal.[93]

17.3 On September 22, 2000, CSXT publicly announced that that it was implementing a rate-based carload fuel surcharge, effective October 25, 2000.[94] Under its surcharge formula, "[f]or every five dollars the price of West Texas Intermediate oil (the industry standard for tracking oil

---

[91] Energy Information Admin. (EIA), Petroleum & Other Liquids, Spot Prices, https://www.eia.gov/dnav/pet/hist/rwtcW.htm.

[92] DA01945 at 2041 (CSX Corp. 2000 Form 10-K (March 31, 2001): "[S]oaring fuel costs…also affected financial results"), DA01945 at 2058 ("[f]uel expense [in 2000] was $260 million higher than 1999"), DA01945 at 2055-56; DA00513 at 586 (Ex. 26); DA02851.

[93] DA02860; DA02134; DA02137 at 38; DA17582 at 88-90 (Giftos (CSXT) 29:4-31:2).

[94] DA02851; DA02843.

prices, also know [sic] as WTI) goes above $23 a barrel (for 30 consecutive days), a 2% recovery charge will be added."[95] Thus, CSXT applied a surcharge at WTI $28 per barrel.

17.4 The fuel surcharge went into effect at 2% on October 25, 2000 based on fuel prices at the time.[96]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 17**

Admitted only that Plaintiffs do not allege CSX's fuel-surcharge programs before March 2003 were conspiratorial.

**Material Undisputed Fact No. 18**

**CSXT's pre-"conspiracy" carload fuel surcharge formula announced in 2000 was identical to other railroads' carload fuel surcharge formulas.**

Supporting Facts:

18.1 CSXT's published carload fuel surcharge formula announced on September 22, 2000 was identical to the rate-based surcharge formula used by NS.[97]

18.2 CSXT's published fuel surcharge formula announced on September 22, 2000 was identical to UP's published carload formula announced on October 31, 2002.[98]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 18**

Disputed, including to the extent that the statement misleadingly implies that Defendants actually charged identical fuel surcharges during the pre-Conspiracy Period.

---

[95] DA02843 at 45.

[96] DA02867.

[97] DA02137 at 38; DA02843 at 47.

[98] *See* DA02843 at 47; DA01372.

Admissible evidence demonstrates that the 2000 CSX fuel surcharge formula was not "identical" to the other Defendants' published carload formulas throughout the 2000–2003 period. In fact, when CSX implemented its carload fuel surcharge in October 2000, only NS and BNSF had fuel surcharges—and BNSF's fuel surcharge was *different* from what CSX implemented. CSX's fuel surcharge in 2000 had a $28 WTI trigger price, started at 2%, and increased 2% for every $5 price increase; its trigger price was satisfied when fuel prices were at or above the trigger price for 30 consecutive days. PX0637, Kalt Corrected Merits Rpt., Mar. 1, 2013, Appendix A Fig. IV-1B, at 75. In contrast, BNSF's fuel surcharge had a $28 WTI trigger, but used a "fuel intensity factor"—apparently designed to measure "BNSF's fuel expense" as compared to its "total expenses"—that CSX's did not. *Id.*; PX0599, Kyei (BNSF) Dep., Mar. 4, 2010, at 67-68. Moreover, BNSF's trigger price was based upon the prior month's *average* fuel prices, and thus the trigger price did not need to be maintained for 30 consecutive days. PX0637, Kalt Corrected Merits Rpt., Mar. 1, 2013, Appendix A Fig. IV-1B, at 75. Moreover, CSX did not implement a fuel surcharge until four months *after* NS (which implemented its first published carload formula in June 2000), *id.*, and UP had *no* published carload formula until over *two years after CSX*, starting in December 2002. *Id.*

Furthermore, admissible evidence demonstrates that, regardless of what the fuel surcharge formula was on *paper*, Defendants, including CSX, competed with each other with respect to fuel surcharges before the conspiracy period. *See* COF ¶¶ 46–77; *e.g.*, PX0280, NS_010013754 (NS internal email chain re Fuel Surcharge Provisions, June 9, 2000), at '754 (NS internally noting that CSX would not apply fuel surcharges on a competitive line); PX0216, CSXFSC000324671 (CSX internal email chain re ADM and Fuel Surcharge, Nov. 5, 2002), at '671-72 (in November 2002, perceiving a "threat of losing business to the NS," CSX [redacted]

[redacted]); PX0195, CSXFSC000128907 (CSX internal email re: CSXT Fuel Surcharge Value, Aug. 20, 2002) at '907 ("Customers may view a more aggressive CSXT fuel surcharge negatively, particularly on NS competitive business . . . ."); PX0127, BNSF-0574516 (BNSF May 28, 2002 Enterprise Wide Risk Assessment Supporting Comments) at '617 ("We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin[s] in other aspects in order to keep the business with the surcharges where we do apply it."); PX0128, Metadata to PX0127, at 17.

CSX's fuel surcharges were therefore applied "minimal[ly]" before the conspiracy period—one employee was even "embarrassed" by how rarely they were imposed. PX0612, Gooden (CSX) Dep., July 16, 2010, at 101 (agreeing that the "fuel surcharge revenue the company was generating prior to adoption of this new program in March of 2003 was "[l]ow – relatively low to where it needed to be"); *id.* at 226 (Gooden noting that he was "embarrassed" regarding fuel surcharge coverage, which in 2003 was "very low"); PX0621, McNulty (CSX) Dep., Aug. 10, 2010, at 118-19 (FSC implementation was "minimal" in 2001 and 2002 at CSX); *see* COF ¶¶ 55–61. Admissible evidence further demonstrates that during the pre-Conspiracy Period, CSX frequently discounted or waived its fuel surcharge, leading to customers paying myriad, individually negotiated fuel surcharges. COF ¶¶ 55–61.

Moreover, even in the instances in which fuel surcharges were included in pricing authorities, Defendants' less aggressive pre-conspiracy fuel surcharges were rarely triggered, and even when triggered they remained low. *Id.*; PX0612, Gooden (CSX) Dep., July 16, 2010, at 101

(CSX's fuel surcharge program developed before the conspiracy generated "relatively low" revenue).

Thus, it is largely irrelevant whether CSX or other Defendants had similar *published* fuel surcharge formulas before conspiring, because the *effective* fuel surcharges of CSX and the other Defendants rarely resembled the published formulas during the pre-Conspiracy Period.

**Material Undisputed Fact No. 19**

**CSXT unilaterally worked to expand fuel surcharge coverage before the alleged conspiracy period.**

Supporting Facts:

19.1 CSXT announced that its new carload fuel surcharge would "apply to local as well as interline freight movements."[99]

19.2 CSXT's fuel surcharge was accompanied by a policy to apply the surcharge to all tariffs and private price quotes, and to all new and renewing contracts "unless government-based escalator [*i.e.* RCAF] applies."[100]

19.3 WTI oil prices fell and generally stayed below $28 from late 2001 until September 2002, which by operation of CSXT's fuel surcharge formula meant no surcharge was assessed in that period.[101]

---

[99] DA02851.

[100] DA02144 at 46, 58; DA02851; *see also* DA02834 at 35.

[101] EIA, Petroleum & Other Liquids, Spot Prices, https://www.eia.gov/dnav/pet/hist/rwtcW.htm; *see* DA02310 at 11.

19.4 The proportion of CSXT's unregulated traffic (by revenue) that paid a rate-based fuel surcharge was above 39% by February 2003.[102]

19.5 CSXT continued to enter into or extend numerous contracts with *MDL I* and *MDL II* Plaintiffs during the alleged conspiracy period with RCAF(u) escalation clauses and no fuel surcharge.[103]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 19**

Disputed to the extent that Defendants misleadingly imply that CSX successfully imposed and increased coverage of fuel surcharges prior to the conspiracy, or that CSX's Conspiracy Period agreement to impose fuel surcharges across-the-board did not represent a change from its pre-Conspiracy Period practices.

Defendants' cited sources do not support this fact. Defendants selectively quote the PowerPoint cited in Supporting Fact 19.2. DA02144–60. The presentation makes clear that, before the conspiracy, CSX applied fuel surcharges only in "***[c]ertain contracts***" and expressly carved out many types of contracts to which CSX did not, as a matter of policy, even attempt to apply fuel surcharges: "contracts with government index escalators," "contracts that specifically say 'Rate not subject to adjustment,'" and "approximately 265" additional contracts. DA02144 at 46 (emphasis added). The same document then gives two additional exceptions to the application of fuel surcharges, telling employees that "***[i]f positively stated adjustment can't be obtained or if contract is longer than two (2) years***, use government-based index (e.g., RCAF-U; GDP) . . . if

[102] DA21943 at 2036 (Bernheim Rpt. Fig. IV-14, 3/1/23); *see also* DA20487 at 665 (Rausser Rpt. Fig. 68, 6/12/13) (revenue-weighted coverage analysis of transaction data); DA06450 at 62 (Rausser 3/4/14 290:23-293:12) (confirming that he did not dispute the "coverage levels, the numbers" reflected in these analyses); DA25207 at 21 (Johnson Rpt. Ex. 40, 8/15/23). CSXT's transaction data production in this case starts in April 2001.

[103] *See* CSXT Mem. App. A (listing and identifying DA pages for contracts with *MDL I* and *MDL II* Plaintiffs).

government based index is used, ***fuel surcharge does not apply***[.]" DA02144 at 57 (emphasis added). And CSX made clear that if "customer continues to balk" at a fuel surcharge, CSX employees should not "threaten customer with consequences." DA02144 at 49. This document is consistent with many other documents showing that Defendants, including CSX, did not uniformly or successfully impose fuel surcharges prior to the conspiracy, in sharp contrast to their no-exception policies during the conspiracy. *Compare* COF ¶¶ 55–61, *with* COF ¶¶ 330–45. DA02851 (press release) reflects only an announcement that CSX's fuel surcharge would "apply to local as well as interline freight movements." It does not address CSX's actual ability or success in broadly applying and collecting fuel surcharges. Likewise, DA02144 at 46 (the presentation), DA02851 (a press release), and DA02834 at 35 (a CSX pricing guideline)—do not speak to how often CSX applied or collected fuel surcharges in practice.

Admissible evidence demonstrates that CSX did not successfully impose or increase coverage of fuel surcharges prior to the conspiracy, including as a result of competition among Defendants. *See* COF ¶¶ 55–61; *see also* PX0612, Gooden (CSX) Dep., July 16, 2010, at 101 (agreeing that the "fuel surcharge revenue the company was generating prior to adoption of this new program in March of 2003 was" "[l]ow – relatively low to where it needed to be"); *id.* at 226 (Gooden noting that he was "embarrassed" regarding fuel surcharge coverage, which in 2003 was "very low"); PX0621, McNulty (CSX) Dep., Aug. 10, 2010, at 118-19 (FSC implementation was "minimal" in 2001 and 2002 at CSX); PX0322, NS_010072905 (NS internal email re: "NS Fuel Surcharge", Sept. 30, 2002) at '905 (internal NS email: "[B]ased on customer comments, they [CSX] appear to be more lax in applying surcharge to private authorities. This does have competitive implications for NS.").

Moreover, during the pre-conspiracy period, Defendants' less aggressive fuel surcharges were rarely triggered and often were not collected when they were triggered. *See* COF ¶¶ 46–77. CSX's early attempts to apply fuel surcharges elicited customer pushback and competition from other railroads, regularly resulted in CSX regularly providing discounts from or even waivers of the fuel surcharge. *See* COF ¶¶ 57–58. The diminishing margins and the general inability to impose fuel surcharges meant that CSX was not meeting its revenue goals during the 2000–2003 period. *See* COF ¶ 60.

All of this changed as a result of Defendants' conspiratorial agreement to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See, e.g.*, COF ¶¶ 118–21, 228–31, 302–63. During the Conspiracy Period, Defendants' fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. *See* COF ¶¶ 303, 330–345; *e.g.*, PX0170, CSXFSC00000569 (CSX Commercial Prices—Escalators presentation, May 2004), at '574 (CSX summarized its "[c]hanges to the policy" to require that "[e]verything is subject to fuel surcharge," with "[e]xceptions elevated."); *see also* PX0193, CSXFSC000108545 (CSX internal email re: Pricing, Feb. 12, 2006) at '545 ("NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge.").

Dr. Bernheim found that Defendants' "early fuel surcharge programs did not generate substantial revenue for the Defendants." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 82; *see id.* ¶¶ 71–82; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 157 ("Defendants' Conspiracy Period carload FSC formulas yielded higher payments than their predecessors at then-current fuel market conditions."). Dr. Bernheim also concluded that "fuel

surcharge payment coverage increased dramatically during the cartel's operation." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim shows the low levels of coverage CSX experienced before the conspiracy and a dramatic increase once CSX entered the conspiracy:

**Figure IV-14: Frequency of fuel surcharges**[245]




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155, Fig. IV-14.

Other experts reached the same conclusion. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 337 and Fig. V.1; PX0989, Jacobs MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 104-107 and Figs. II.22 & II.23; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 166-175 ("the percentage of shipments covered by FSCs did increase significantly for all four Defendants during the Conspiracy Period"); PX0984, Leitzinger MDL II Reply Rpt., ¶¶ 80-96 ("[T]he evidence does not support [Defendants'

experts'] view" that "the increases in coverage seen during the Conspiracy period were merely a continuation of a trend that predated the alleged conspiracy").

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**<u>Material Undisputed Fact No. 20</u>**

**CSXT unilaterally modified its existing carload fuel surcharge formula in 2003.**

<u>Supporting Facts:</u>

20.1 By October 2002, the WTI price again moved and stayed above $28, and CSXT briefly re-applied a 2% fuel surcharge on October 17, 2002.[104]

20.2 CSXT's 2% fuel surcharge was removed on December 11, 2002 when WTI prices again fell below $28 for just over 30 days, before they immediately spiked again, re-triggering the surcharge six weeks later in late January 2003.[105]

20.3 From late 2002 into March 2003, CSXT employees considered changes to its published carload fuel surcharge formula, including an assessment of formulas used by CSXI and BNSF, and possible modifications to lower the formula's trigger, modify its slope, use smaller increments,

[104] DA02310 at 11.

[105] DA02669; DA02935; *see also* DA02310 at 11.

change to a different index (*i.e.* HDF), and the time period for determining whether fuel price changes would prompt a change in the surcharge rate.[106]

20.4 By mid-February 2003, the WTI price had risen above $33 per barrel, the next increment at which CSXT's formula would raise its surcharge rate, and on March 7, 2003, CSXT advised customers that its carload surcharge might change from 2% to 4% as a result.[107]

20.5 After twenty-nine consecutive days above $33, the WTI closing price on March 18, 2003 (published in the March 19 Wall Street Journal) dropped to $31.68, such that CSXT's carload fuel surcharge remained at 2%, instead of increasing to 4%.[108]

20.6 CSXT's Chief Commercial Officer, Michael Giftos, concluded that CSXT's existing carload fuel surcharge formula was "fundamentally flawed" and needed to be modified, and obtained CEO Michael Ward's permission to do so early on March 19, 2003.[109]

20.7 Mr. Giftos worked with CSXT Director of Market Strategy, John Couch, and others within CSXT through the evening of March 19 and into March 20 to analyze options to change the carload fuel surcharge formula,[110] ultimately settling on a modification to the existing WTI-based formula over adopting BNSF's HDF-based formula.[111]

---

[106] DA02713 (Aug. 20, 2002); DA02790 at 90-91 (Feb. 26, 2003); DA02167 at 72, 74, 76, 78 (Mar. 3, 2003); DA02286 at 87-91 (Mar. 11, 2003); DA01831 at 41-42, 45 (Couch (CSXT) 92:20-94:6, 110:24-111:20).

[107] DA02933 at 33-34.

[108] DA02935; DA07080 at 80-81; DA01831 at 45 (Couch (CSXT) 112:11-23).

[109] DA17582 at 611-13, 617-21, 635 (Giftos (CSXT) 99:3-101:9, 108:13-110:1, 110:11-112:6, 129:6-23); DA01927 at 33-34 (Ward (CSXT) 124:25-128:22); *see* DA02185.

[110] DA02185; DA02186; DA02640; DA06915; DA02267; DA02292; DA01831 at 47-48, 52-53 (Couch 118:7-123:22, 138:5-141:25); DA17582 at 635-37 (Giftos (CSXT) 129:24-131:4).

[111] DA02639 at 39-43; *see* DA01831 at 52 (Couch (CSXT) 139:3-140:13).

20.8 CSXT publicly announced it was modifying its carload fuel surcharge formula on March 20, 2003, to be effective in June 2003, "[i]n an effort to more quickly respond to changing market conditions and the continued volatility in fuel prices."[112]

20.9 Under the modified formula, (1) the applicable surcharge percentage would be determined each month based on the thirty-day average WTI price, eliminating the requirement that the WTI price be above each incremental trigger for 30 consecutive days for the percentage to change; (2) the trigger price was lowered to $23.01; and (3) the existing 2%/$5 WTI increments were broken out into increments of 0.4% for every $1 increase or decrease in the WTI price.[113]

20.10 CSXT made no further changes to its published carload fuel surcharge formula until it switched to a mileage-based fuel surcharge in April 2007.[114]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 20</u>**

Disputed.

The cited evidence does not support the proposition that CSX acted unilaterally. Defendants provide no contemporaneous accounts of CSX's decision making—let alone evidence demonstrating that CSX at the time determined that its existing fuel surcharge formula was "fundamentally flawed." Instead, CSX relies exclusively on after-the-fact deposition testimony from its own executives, Giftos and Ward, as well as a single one-page memorandum (DA02185) announcing the new program, but in no way describing CSX's internal decision-making process.

Nor does the cited evidence support the statement that Giftos worked with CSX Director of Market Strategy, John Couch, and others within CSXT through the evening of March 19 and into March 20 to analyze options to change the fuel surcharge formula. Defendants cite no

---

[112] DA02616 at 16; DA02745.

[113] DA02886 at 90.

[114] DA02792 at 95, 97; DA02201 at 06.

contemporaneous evidence to support the proposition that on the evening of March 19, 2003, CSX undertook an analysis of fuel surcharge options. DA02185 is a one-page, perfunctory memo that does not describe or outline any internal analysis, let alone the sort of detailed quantitative analysis one would expect before a major corporation makes a change in policy affecting hundreds of millions of dollars in commerce. DA02186 and DA06915 are emails from March 19, 2003 that indicate CSX had already settled on a new formula by the afternoon of March 19, 2003. DA02640 and DA02292 are a press release announcing the changes. The only evidence of internal evaluation on March 19, 2003 is in testimony by John Couch (DA01831 at 47–48, 52–53), but Couch testified that he does not recall the meeting that preceded the analysis on March 19, and he provides no specifics about what sort of analysis was done. Indeed, CSX's own executives contemporaneously recognized that the justifications given for the change in program in the March 19 memo were pretextual. While the March 19 memo states that the purpose of the new fuel surcharge was to better respond to increases in fuel prices, ***John Couch admitted at the time that*** "***[w]hile the [changes] seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%.***" PX0163, CSXFSC000000357 (CSX internal email re: "Fuel Surcharge Change," March 19, 2003), at '357 (emphasis added); *see also* PX0242, NS 001000373 (NS internal email re: "UP FSC—NS Concurrence Eff," July 16, 2003), at '373 (NS employees internally noting that CSX's program "looks . . . too much like a money grab").

Furthermore, admissible evidence demonstrates that beginning in 2003, CSX's fuel surcharge program was not the result of "unilateral" decision-making, but rather was the result of Defendants' agreement to impose pretextual and non-negotiable fuel surcharges, across-the-board and with uniform directives to minimize discounts and waivers, in order to increase all-in freight rates. Starting in 2003, CSX executives engaged in discussions about rail fuel surcharges with their

counterparts. *See* COF ¶ 95; *e.g.*, PX0474, UPFSC0001088 (handwritten notes summarizing June 3, 2003 CSX-UP meeting), at '088 (reflecting discussion of both railroads starting at a $23 trigger point); PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."). PX0664, CSXFSC000000476 (CSX internal email re: "Fuel Surcharge Overview Clarence 03," Oct. 9, 2003) (internal email reflecting high-level discussion of fuel surcharge coverage rates: "BNSF stated that 82% of their carload and Intermodal business either had a fuel surcharge or an escalator on the revenue.").

On March 11, 2003, CSX internally recommended changes to its original fuel surcharge program that would have lowered its strike price from $28 to $23 per barrel on the WTI index, imposed a 1.0% surcharge when the $23 strike price was reached and an additional 0.5% surcharge for each $2.50 increase in the WTI thereafter. These changes would have caused CSX's fuel surcharge to escalate at half the rate of the coordinated fuel surcharges that CSX ultimately implemented. *See* COF ¶¶ 104–07.

On March 19, 2003, CSX announced a new standard fuel surcharge program. *See* COF ¶ 111. The new CSX program retained the lower $23 trigger that CSX had proposed on March 11, but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in ***UP's internal*** "Revised Surcharge proposal." *See* PX0185, CSXFSC000084489 (CSX press release, March 20, 2003), at '489; COF ¶ 112–18. CSX's new program was substantially more aggressive than the program it had been considering earlier, as CSX stated that "it is actually a large increase in fuel surcharge billings" and "maybe as much as 100%." PX0163, CSXFSC000000357 (CSX internal email re: "Fuel Surcharge Change," March 19, 2003), at '357; *see* COF ¶¶ 113, 118–21. There is no evidence that CSX had ever

independently considered or analyzed that escalation formula before suddenly announcing it was adopting it. COF ¶ 112.

Among other things, under CSX's new policy, CSX would assess a 0.4% surcharge when the price of oil on the WTI exceeded $23 per barrel, and an additional 0.4% for every $1 increase thereafter. *See, e.g.*, PX0185, CSXFSC000084489 (press release re "CSX Transportation Announces Modification to Its Fuel Cost Recovery Program," March 20, 2003); *see also* PX0163, CSXFSC000000357 (CSX email re: "Fuel Surcharge Change" and attachment, Mar. 19, 2003), at 5 (PowerPoint presentation comparing old and new surcharge formulas). And unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. *Id.*

Admissible evidence also demonstrates that the fuel surcharges CSX imposed as part of the conspiracy were different and more aggressive than those imposed before the conspiracy. *See* COF ¶¶ 117–21, 224–27. According to a CSX executive at the time, "[w]hile the [new program] seems somewhat benevolent, *it is actually a large increase in fuel surcharge billings* – maybe as much as 100%." PX0163, CSXFSC000000357 (CSX email re: "Fuel Surcharge Change," March 19, 2003), at '357 (emphasis added). Contemporaneous with CSX's adoption of its new fuel surcharge program, other Defendants called it out for what it was: a "more aggressive formula" and a "money grab." PX0253, NS 010076080 (NS internal email re: UP FSC—NS Concurrence Eff, July 16, 2003), at '080 (noting that the new fuel surcharge adopted by CSX "looks more too much like a money grab"); PX0252, NS010073466 (NS internal email re: Fuel Surcharge Policy Review, Nov. 7, 2003), at '466-67 ("Any FSC change, particularly to a more aggressive formula like the CSXT's, has the potential to complicate rate negotiations and generate billing disputes

with customers .... Both points would significantly reduce potential FSC yield if we were to swap out formulas in the short term. It is even conceivable that we could experience a net decline in revenue if customers were to withhold line-haul payments pending the resolution of FSC complaints/disputes."); PX0301, NS_010042203 (internal NS memo re Fuel Surcharge—CSXT vs. NS Comparison, April 7, 2003), at '203 ("the CSXT formula would have produced additional $7,083,472 in NS revenue in 2002 and YTD 2003 had it been in effect."), *id.* ("Not only does the FSC kick sooner in at $23 vs $28, the actual FSC is higher at $28.01. This opens us up to the argument that we are not only taking the FSC sooner, at higher costs to the customers, but that we are raised [sic] the FSC . . ."); PX0284, NS_010026782 (internal NS email re: "Fuel Surcharge Change Pro/Con"), '783 (same); *id.*at '785 ("The CSXT standard clearly produces significantly more compensation, and it does it sooner and more consistently.").

Soon after, UP announced that it too had abandoned its pre-existing $28 WTI strike price and had instead adopted the same approach as the CSXT—that is, UP announced its intention to use the $23 WTI strike price (and same escalation formula) contemplated in the earlier CSX internal proposal. *See* COF ¶¶ 122–28. UP adopted CSX's program despite some internal recognition at UP that the new fuel surcharge was "complex/confusing and would be problematic to administer." PX0499, UPFSC 0069867.

NS also matched CSX's formula—and NS and CSX's formula remained in lockstep during the conspiracy. *See* COF ¶¶ 129–40, 218–20; *e.g.*, PX0347, NS_013001654 (NS email re: "NS Fuel Surcharge Change 03/10/04," Jan. 8, 2004), at '654-56 ("NS will essentially adopt the CSXT FSC formula."); PX0235, NS 001000124 (NS internal email re: "Modified Fuel Surcharge—Coal and Merchandise," Jan. 8, 2004), at '124 ("[O]ur new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003.").

During this period, CSX's senior executives met with their counterparts at BNSF, CSX, and UP. CSX executive Clarence Gooden attended the Spring 2003 NFTA meeting on April 2–6, 2003. COF ¶ 148; *see also* PX0629, PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting). On April 15–17, 2003, CMOs and CMOs-in-waiting from all four Defendants participated in an unsupervised getaway, with no other employees invited. COF ¶ 139. On April 23, 2003, BNSF and CSX senior executives held a meeting.

On June 3, 2003, CSX and UP senior executives met and discussed fuel surcharges. *See* PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 (reflecting discussion of both railroads starting at a $23 trigger point); PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."). The day of the June 3, 2003 meeting, at Mike Giftos's request, CSX's John Couch emailed Giftos and Gooden a chart comparing CSX's fuel surcharge program to the other Defendants' programs. PX0166, CSXFSC000000414 (CSX internal email re: "Fuel Surcharge Last 16 month comp", June 3, 2003) (attaching comparison of new CSX formula to other railroads' formulas in past.). At the June 3, 2003 meeting, CSX and UP senior executives assessed the customer opposition the companies were receiving to their efforts to apply their fuel surcharges. PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."); PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Fuel surcharge – GIFTOS, CSX has not seen outcry that UP has").

CSX and UP senior executives also discussed their trigger points for their fuel surcharge programs and agreed that, if fuel prices stayed high, they might have to consider raising their trigger points. PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Both roads start at a $23 trigger. May have to revisit $23 if stay high."). Handwritten notes of the June 3, 2003 "Alliance" meeting show that the prepared "minutes" were sanitized to omit key discussions on fuel surcharges. *Compare* PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Fuel surcharge—GIFTOS, CSX has not seen outcry that UP has. CSX may begin a modest hedge program (WARD). Both roads start at a $23 trigger. May have to revisit $23 if stay high."), *with* PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."); *see also* COF ¶¶ 188–92.

CSX executives continued meeting with the other Defendants' senior executives throughout 2003. *See, e.g.*, COF ¶¶ 194–96, 199–204.

During the Conspiracy Period, Defendants—including CSX—exchanged data tracking their progress toward universal coverage; shared information about fuel costs, hedging practices, and fuel surcharge policies and implementation; and monitored each other to ensure that no member of the cartel cheated on the conspiracy. COF ¶¶ 364–67; 500–10. CSX was also actively involved in Defendants' coordinated effort to cause the AAR to adopt the AIILF, to facilitate Defendants' imposition and collection of the new coordinated fuel surcharges, particularly given that there already was an existing cost-escalation index, the RCAF, that would have enabled Defendants to recoup their actual fuel costs. COF ¶¶ 367–420.

CSX's new program was more aggressive in its enforcement. *See* COF ¶¶ 330–45. During the conspiracy, CSX stopped offering customers discounts or waivers on its fuel surcharges, and

instead adopted an aggressive and unwavering approach when negotiating fuel surcharges. Like the other Defendants, CSX refused to waive or discount its fuel surcharges. *See, e.g.*, PX0186, CSXFSC000086200 (CSX internal email re: Fuel Surcharge will change from 18.8% to 19.2% July 1, 2006), at '200 ("We have very clear instructions with our team to pursue FSC . . . all renewals include fuel . . ."); PX0188, CSXFSC000090880 (internal CSX email re: Fuel Surcharge & RCAF/Fuel Coverage, Aug. 3, 2005), at '881 (referencing "updated audit on how much of our business is covered by fuel surcharge," and effort to increase coverage "of our traffic base to 100%"). Shippers testified they were told to "take it or leave it" and that fuel surcharges were mandatory and not negotiable. *See* COF ¶ 306.

During the Conspiracy Period, CSX was therefore successful in substantially increasing its fuel surcharge coverage. COF ¶¶ 338–39; PX0217, CSXFSC000326206 (CSX email re: "2004-2011 Fuel Coverage Scorecard" and attachment, Jan. 24, 2007) (discussing, among other things, that CSX raised its fuel surcharge coverage from 41% in 2004 to 54% in 2006, and was projecting further increases in coming years: 65% by 2007, 75% by 2008, 83% by 2009, 84% by 2010, and 85% by 2011); *see also* PX0217, CSXFSC000326206 ("Fuel Surcharge Coverage," Jan. 24, 2007), at '207; *see also* COF ¶¶ 330–45; PX0180, CSXFSC000006857 (internal NS email re: FSC coverage graphs, Jan. 20, 2006), at '858 (showing increase in fuel-surcharge application on CSX shipments); PX0220, CSXFSC000350617 (internal CSX email thread, August 2005), at '617 (noting that "the percentage of [the Automotive Service Group's] traffic that contains a fuel recovery mechanism of one variety or another is 96% . . . There are only two auto contracts that do not have a recovery mechanism and they will be addressed upon contract expiration . . . ."); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-219, Figs. 20-26; PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 130–152.

Admissible evidence further demonstrates that CSX's fuel surcharge program was not designed merely to recoup fuel costs. *See* COF ¶¶ 465–67; *e.g.*, PX0187, CSXFSC000086525 (CSX internal email re: Fuel Surcharge, June 3, 2004), at '525 (internal CSX email from June 2004 making clear that any shipper with a fuel surcharge was paying far more than its cost of fuel: "If we had 100% fuel surcharge coverage, we would actually be recovering twice the incremental fuel expense above the surcharge trigger point," and noting further that "[c]urrently, approximately 36% of CSXT revenue is covered by fuel surcharge. At this level, we recover about 70% of our incremental fuel expense above the surcharge trigger point of $23 per barrel (WTI)."). And CSX deliberately hid its over recovery from customers. *See* COF ¶ 467; *e.g.*, PX0187, CSXFSC000086525 (internal CSX email re: Fuel Surcharge, June 3, 2004), at '525 (vice president of CSX receiving information acknowledging that CSX would recover twice the incremental fuel expenses above the surcharge trigger point if they could achieve 100% fuel surcharge coverage, and replying "please don't communicate to anybody outside this company that a customer who pays [the fuel surcharge] is paying twice his fair share.").

Defendants, including CSX, earned increasing, supracompetitive revenues and profits from fuel surcharges over the course of the conspiracy period. COF ¶¶ 526–58. Plaintiffs' experts found in their quantitative analyses that Defendants' fuel surcharge revenue rose dramatically during the conspiracy. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 350 (Defendants' rate-based FSC revenues increased from $16.2 million in 2002 to $3 billion in 2008—182 times the amount of fuel surcharges collected in 2002); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-218, Figs. 20-26. Dr. Bernheim found that once the conspiracy began, "prices remained on a steep upward trend until late 2008." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128. Dr. Bernheim also "computed fuel surcharges as a fraction of overall net revenue in every month

from January 2000 through December 2008" and found "that fuel surcharges accounted for a rapidly growing fraction of the Defendants' revenue during the cartel's operation." *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim indicates the dramatic rise in fuel surcharges as a percentage of Defendants' net revenue during the conspiracy, including for CSX:

**Figure IV-15: Fuel surcharge as percentage of net revenue**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 156, Fig. IV-15.

Dr. Bernheim also concluded that "non-conspiratorial factors cannot account for the dramatic increase in fuel surcharge coverage or revenue during the operation of the alleged cartel." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 26, 157–184. Dr. Bernheim found that during the conspiracy, Defendants, including CSX, generally increased their operating margins, *id.* ¶¶ 134–138, and saw an "increase in perceived profitability" in the market and thus drastically

drove up their stock prices, outperforming the S&P 500, *id.* ¶¶ 139–141; *see also* COF ¶¶ 524–53. Defendants' conspiracy achieved striking success in part because Defendants' conspiratorial fuel-surcharge programs, which they were now able to apply far more broadly and uniformly than in the pre-Conspiracy Period, recovered dramatically more than the cost of fuel. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 142–152; *see also* COF ¶¶ 513–23.

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**<u>Material Undisputed Fact No. 21</u>**

**CSXT did not adopt a fuel surcharge specifically applicable only to coal traffic during the alleged conspiracy period.**

<u>Supporting Facts:</u>

21.1 At no time during the alleged conspiracy period did CSXT adopt a fuel surcharge specifically applicable only to coal traffic.[115]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 21</u>**

Admitted only insofar as CSX applied its carload fuel surcharge formula to coal shipments during the conspiracy.

[115] DA25148 at 79 (Israel Rpt. ¶ 188, 8/15/23).

**Material Undisputed Fact No. 22**

**There is no direct evidence that CSXT participated in the conspiracy that Plaintiffs allege.**

Supporting Facts:

22.1 No current or former CSXT employee has testified to participating in the conspiracy alleged by Plaintiffs.

22.2 No current or former employee of any other Defendant has testified that CSXT participated in the conspiracy alleged by Plaintiffs.

22.3 No documents contain a statement by any current or former Defendant employee that CSXT participated in the conspiracy alleged by Plaintiffs.

**Plaintiffs' Response to Defendants' Undisputed Fact No. 22**

Disputed.

There is no evidence to support the statement.

Further disputed because whether or not there is "direct evidence" and what constitutes "participat[ion] in the conspiracy" are legal conclusions, not a statement of fact.

To the extent Defendants are permitted to offer such a conclusory and unsubstantiated legal conclusion as a "Fact," Plaintiffs offer the entirety of these Responses as well as the entirety of their Counterstatement of Material Facts as containing abundant, admissible evidence demonstrating that CSX (through its senior executives and other employees) participated in the conspiracy to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See, e.g.*, Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 5, 8, 17, 18, 19, 20, 21, 36, 37, 38–45, 51–52.

**Material Undisputed Fact No. 23**

**NS unilaterally adopted a carload fuel surcharge before the alleged conspiracy period.**

Supporting Facts:

23.1 NS implemented a rate-based fuel surcharge tied to the WTI crude oil index in June 2000 for its carload and coal traffic (the "2000 NS carload formula").[116]

23.2 Under the 2000 NS carload formula, shippers were assessed a surcharge of 2% of their price authority's base rate if the WTI remained above $28 for 30 consecutive "reporting" days, as reported in *The Wall Street Journal*, and triggered an additional 2% each time the WTI remained above successive $5 thresholds for 30 consecutive reporting days.[117]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 23**

Admitted only that Plaintiffs do not allege NS's fuel-surcharge programs before March 2003 were conspiratorial.

**Material Undisputed Fact No. 24**

**NS's pre-"conspiracy" carload fuel surcharge formula announced in 2000 was identical to other railroads' carload fuel surcharge formulas.**

Supporting Facts:

24.1 The 2000 NS carload formula was identical to the CSXT published carload fuel surcharge formula from October 2000 until June 2003.[118]

[116] DA05698; DA05529 at 30-31; DA05940.

[117] DA05623; DA05698; DA05529 at 30-31; DA18419 at 21 (Glennon (NS) 14:14-15:12).

[118] *See supra*, ¶ 18.1.

24.2 The 2000 NS carload formula was identical to the UP published carload fuel surcharge formula from December 2002 until June 2003.[119]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 24</u>**

Disputed, including to the extent the statement misleadingly implies that NS's 2000 fuel surcharge formula was at all times "identical to other railroads' fuel surcharge formulas," or that Defendants did not compete with respect to fuel surcharges prior the conspiracy period.

The cited evidence does not support the statement, and in fact undercuts Defendants' purportedly undisputed facts. DA02137 at 38 (CSX Merchandise Marketing and Sales, Fuel Surcharge, Sept. 15, 2000) (cited in Supporting Fact 18.1, which Defendants incorporate here) makes clear that there was *no* CSX carload fuel surcharge formula as of the date of the document, and makes no suggestion that there was any UP fuel surcharge program in place at that time. *Id.* ("Several class I carriers have implemented a fuel surcharge . . . . *It may be advantageous for CSXT to follow suit*.") (emphasis added). In addition, it describes material *differences* between BNSF and NS's formulas. *Id.* (BNSF formula uses a "Fuel factor increase of .102," and fuel surcharge was "*Currently at 3.4%*," while NS does not use the fuel factor increase, and NS's formula was "*Currently at 2%*"). DA02867 (Notification of Fuel Cost Recovery Charge, Oct. 13, 2000) announces only that CSX "will implement a fuel cost recovery charge of 2% on October 25th [2000]." It does not describe what CSX's formula was, nor does it describe what any of the other Defendants' formulas were at that time. And DA01380 (UP email re: "Fuel Surcharges," Jan. 15, 2003) sets out "*key differences*" among Defendants' fuel surcharges as of November 2002. It states that "UP's carload surcharge is based on West Texas Intermediate (WTI) price of oil, as is NS' & CSX'," but does not describe BNSF's fuel surcharge as based on WTI. In addition, that document

---

[119] DA01380 at 80-81.

states that "UP, NS, and CSX count 'reporting' days, not calendar days," but does not suggest that BNSF did so as well. Next, DA01380 reflects the many exceptions Defendants, including UP, took to fuel surcharge application before the conspiracy, resulting in a lack of uniformity across the industry. DA01380, in an internal UP email from January 2003, states that UP employees should not apply fuel surcharges where UP "g[a]ve away significant revenue (e.g., $50,000 in revenue)" and to "Very short-term document[s] (e.g., 6 months or less)"). DA1380 at 82. One component of Defendants' conspiracy was eliminating inter-Defendant variation on exceptions to fuel surcharges like these, and instead adopting a uniform, industry-wide position to impose fuel surcharges as widely as possible.

Admissible evidence demonstrates that the 2000 NS fuels surcharge formula was not "identical" to the other Defendants' published carload formulas throughout the 2000-2003 period. In fact, when NS implemented its carload fuel surcharge in June 30, 2000, only BNSF had a fuel surcharge—and the BNSF fuel surcharge was different. NS's fuel surcharge had a $28 WTI trigger price, started at 2%, and increased 2% for every $5 price increase; its trigger price was satisfied only if the price of fuel had been at or above the trigger price for the prior 30 consecutive days. PX0637, Kalt Corrected Merits Rpt., March 1, 2013, Appendix A, at 75, Fig. IV-1B. In contrast, BNSF's fuel surcharge had a $28 WTI trigger, but used a "fuel intensity factor"—apparently designed to measure "BNSF's fuel expense" as compared to its "total expenses"—that NS's did not. PX0599, Kyei (BNSF) Dep., March 4, 2010, at 67-68. Moreover, BNSF's trigger price was based upon the prior month's *average* fuel prices, meaning that the trigger price did not have to be satisfied for a full 30 consecutive days. PX0637, Kalt Corrected Merits Rpt., March 1, 2013, Appendix A, at 75, Fig. IV-1B. Moreover, CSXT did not implement a fuel surcharge until four months *after* NS, in October 2000. *Id.* Meanwhile UP had *no* published carload formula until

December 2002, *two and a half years after NS* had adopted the surcharges at issue in 2000. *Id.* DA05940, an internal NS email from NS analyzing fuel surcharges in the industry cited by Defendants in Supporting Fact, makes clear CSX chose a different approach: instead of fuel surcharges, "CSXT has opted for a general increases on tariff rates." DA05940 at 41.

Admissible evidence also demonstrates that in the pre-conspiracy period, regardless of whether the Defendants' fuel surcharge formulas had similarities on *paper*, NS and the other Defendants competed on the basis of their fuel surcharge programs. COF ¶¶ 46–77; *e.g.*, PX0614, Glennon (NS) Dep., July 20, 2010, at 18-19 (testifying that "some railroads may not have been actually applying a fuel surcharge at the very beginning . . . . not all of them were successful initially, but they were later," and that when NS bid against other railroads, it often went up against "competitive bids . . . where a fuel surcharge was not being applied and that created some concerns on [NS's] part."); *id.* at 19 ("[W]hen you are trying to negotiate a contract, if you have a fuel surcharge and the . . . competitive bid doesn't, it puts you at a disadvantage."); PX0287, NS_010032689 (internal NS email re: [redacted], July 30, 2003), at '689 (NS employees [redacted]); PX0280, NS_10013754 (NS internal email chain re Fuel Surcharge Provisions, June 9, 2000), at '754 (NS internally noting that CSX would not apply fuel surcharges on a competitive line); PX0253, NS 010076080 (NS internal email re: UP FSC—NS Concurrence Eff, July 16, 2003), at '082 (in July 2003, NS noted that "most RRs exempt a significant portion of their traffic from a FSC . . . ."); PX0277, NS_010013612 (internal NS email chain re Fuel Comments, June 9, 2000) at '612 (NS develops plans to keep "track of lost business [sic] account the FSC"); PX0508, UPFSC0129813 (internal UP email re: BNSF Reducing Fuel Surcharge 5/1 to 2%, April 29, 2003), at '813 ("Fuel surcharge $ are melting away at the

competition. In a downward-pressure environment, *what's on paper must not work in the real world*.") (emphasis added).

Relatedly, in the pre-Conspiracy Period, NS received substantial customer pushback in its attempts to impose fuel surcharges unilaterally, with customers refusing to pay fuel surcharges, or negotiating out of them altogether. COF ¶¶ 46–54; *e.g.*, PX0319, NS_010072620 (internal NS email re: EXORBITANT Rail Fuel Cost Recovery, March 27, 2003), at '623 (noting that, as of early 2003, "[m]any" NS customers have "negotiate[d] out of the SC"); PX0280, NS_010013754 (NS internal email chain re Fuel Surcharge Provisions, June 9, 2000), at '754–55 (shipper warning NS that "No attempt will be made to maintain fuel surcharges in our rate data base. You will have to send 'balance due' bills for every surcharge that you wish to collect" and "Investigating / processing fuel surcharge bills will have VERY low priority," and that "[i]f the fuel surcharge provisions are implemented, we will discontinue the use of, and/or not renew four of the five quotes"); PX0275, NS_010013399 (internal NS email chain re Fuel Surcharge, May 2, 2000) at '399 (NS employees advocating for waiving fuel surcharge for shippers who were "saying no, never, etc." to the new program); PX0274, NS_010013312 (NS email chain re NSSC80D13, April 3-5, 2000) at '312 (customer objecting to new fuel surcharge, and NS employee noting that this was "another test of the fuel surcharge"); PX0280, NS_010013754 (NS internal email chain re Fuel Surcharge Provisions, June 9, 2000), at '755 (strongly worded complaint from shipper regarding NS's "ill-advised fuel surcharge program"); PX0282, NS_010013810 (internal NS email chain re Fuel Surcharge, June 21, 2000), at '810 ("Customers are picking up on the surcharge situation and are starting to get nasty. What can we tell them? Need something quickly."); PX0278, NS_010013633 (internal NS email chain re Cargill Master, May 27, 2000) at '633 ("Cargill [redacted] surcharge."); PX0273, NS_010013190 (NS internal

email chain re Credit Cut List, April 25, 2001), at '190 ("The real issue right now is to get them to pay the fuel surcharge."); PX0354, NS_013006745 (NS internal email re: Conagra Fuel Surcharge, Nov. 28, 2000), at '748 (noting that [redacted]. Indeed, NS wrote in early 2003, under the heading "Customer Push Back," that more aggressive fuel surcharge programs risked "losing the surcharge altogether." PX0284, NS_010026782 at '784 (internal NS email re: "Fuel Surcharge Change Pro/Con" and attachment, Apr. 25, 2003).

Moreover, even in the instances in which fuel surcharges were included in pricing authorities, Defendants' less aggressive pre-conspiracy fuel surcharges were rarely triggered, and even then they remained low. *See* COF ¶¶ 54, 61, 62, 67, 70. Given the scarcity of NS contracts with fuel surcharge clauses during the pre-Conspiracy Period, and the rarity of those clauses being triggered, NS testified that its pre-conspiracy fuel surcharges were only "theoretically billable." PX0614, Glennon (NS) Dep., July 20, 2010, at 26; *see also* DA05698 (NS formula was triggered at 2% from June 30 to October 30, 2000); PX0614, Glennon (NS) Dep., July 20, 2010, at 16 ("Q. Do you recall how often the fuel surcharge was triggered in the period of 2000 to 2003? A. Not precisely. I remember it kicked in at 2 percent and then at some point, maybe 2001, it probably dropped off."); *id.* at 22 (fuel surcharge was not triggered again until Q4 of 2002).

Therefore, even if Defendants' assertion that "NS's pre-'conspiracy' carload fuel surcharge formula announced in 2000 was identical to other railroads' carload fuel surcharge formulas" were true (and it is not), it is misleading because admissible evidence demonstrates that NS competed against other Defendants with respect to fuel surcharges, struggled to impose its 2000 NS formula, and frequently waived or failed to collect fuel surcharge revenue. *See* COF ¶¶ 46–54. Thus, it is largely irrelevant whether NS or other Defendants had similar *published* fuel surcharge formulas

before conspiring, because the *effective* fuel surcharges of NS and the other Defendants during the pre-Conspiracy Period rarely resembled the published formulas in practice.

**Material Undisputed Fact No. 25**

**NS unilaterally worked to expand fuel surcharge coverage before the alleged conspiracy period.**

Supporting Facts:

25.1 When it implemented the 2000 surcharge, NS added the new formula to all public rates (open quotes and tariffs).[120] In April 2000, as NS prepared to announce the new formula, NS product managers were instructed "to add the fuel surcharge note to all new/reissued contracts…."[121] As the new formula was implemented, NS's marketing personnel were directed to apply a fuel surcharge to all carload and coal price authorities or obtain approval from senior executives for exceptions.[122] Don Seale, NS's Senior Vice President of Marketing Services, reiterated the instruction to "secure fuel surcharge increases [on] ALL business" in September 2000.[123]

25.2 NS started tracking its fuel surcharge coverage when it implemented the 2000 NS carload formula.[124]

---

[120] DA05612.

[121] DA05612.

[122] DA05612; DA05613; DA06050; DA05529 at 32; DA05008 at 12, 30-31 (Seale (NS) 22:7-23:14; 125:20-127:2; 130:19-131:6); DA04996 at 99 (Moorman (NS) 195:4-24); DA05638 at 38-40; DA05633 at 33-37; DA05615 at 15-16; DA05621 at 21-22; DA05572; DA05619 at 19-20; DA05945.

[123] DA06050; DA05945 at 46.

[124] *See, e.g.*, DA05948 (attaching a spreadsheet containing "the status of the fuel surcharge billing for merchandise traffic as of August 1, 2000"); DA05986 (attaching a spreadsheet containing "the fuel surcharge billing for merchandise and coal traffic as of September 1 [2000]"); DA05974 at

25.3 NS's tracking documents show that, as of February 2003, roughly 52% of carload revenue and 82% of carload rate authorities were subject to a fuel surcharge.[125]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 25**

Disputed to the extent that Defendants misleadingly imply that NS successfully imposed and increased coverage of fuel surcharges prior to the conspiracy, or that NS's Conspiracy Period agreement to impose fuel surcharges across-the-board did not represent a change from its pre-Conspiracy Period practices.

The cited evidence does not support the alleged fact. DA06050 (NS email re: "Fuel Surcharge—Hot!," Sept. 27, 2000) does not state that NS had a policy of imposing fuel surcharges on all published rate authorities and contracts, or that it did so in a non-negotiable manner during the pre-Conspiracy Period. In fact, that document is a single email to the Western Metals and Construction Group ("Met/Con West"), which says "*Met/Con West*—In conference call this morning with DWS, GGW and other GVP's and Directors we were *given our charge to work with our customers* and secure fuel surcharge increases [on] ALL business," states that they intend to ask customers "*to embrace this effort*," and refers to sending letters on the topic to their "top" accounts. *Id*. (emphasis added). The document does not speak to a non-negotiable policy imposed upon shippers on a take-it-or-leave-it basis. Defendants effectively concede this purported policy was never implemented or followed, claiming that two-and-a-half years later only "roughly 52% of carload revenue . . . w[as] subject to a fuel surcharge," Defs. Supporting Fact. No. 25.3 (though in fact, as explained below, even this number is substantially overstated).

---

74-79 (attaching a spreadsheet containing "the status of the fuel surcharge billing as of December 31, 2001").

[125] DA05765.

The evidence that Defendants cite for the proposition that "NS started tracking its fuel surcharge coverage when it implemented the 2000 NS formula" are not analyses of NS's "fuel surcharge coverage" at all—and undermine NS's claim that it had a pre-conspiracy policy that "fuel surcharges should be added to all published rate authorities and into new or renewing contracts." DA05974 (NS email re: "Fuel Surcharge Status for Year-End 2001," Jan. 16, 2002), the parent email to the data that Defendants cite (DA05976), makes clear that data does not reflect tracking of fuel surcharge *coverage*, but rather of *amounts billed and collected*. That data does not speak to what percentage of NS traffic had a fuel surcharge.

But more to the point, it is also directly *contrary* to what NS claims is an undisputed "Fact." This email reflects that "Effective October 31 [2002], *NS discontinued assessing a fuel surcharge on merchandise and coal traffic*," and that "*Effective December 1 [2002], NS also stopped billing a fuel surcharge on intermodal traffic*," and that "*This will be the last edition of the fuel surcharge report*." *Id.* (emphasis added). Thus, this document indicates, if anything, that NS did *not* have a policy that "fuel surcharge should be added to all published rate authorities and into new or renewing contracts," as NS claims.

Likewise, DA05948 (NS email re: "Fuel Surcharge Status," Aug. 4, 2000) describes the "*status* of the fuel surcharge *billing* for merchandise traffic," and described the total amounts "billed, collected, and corrected," but it said *nothing* about how much of NS's traffic was covered by fuel surcharges at the time—whether there was 1% coverage, or 99% coverage. DA05986 (NS email re: "Fuel Surcharge Status, Sept. 8, 2000) similarly discusses the status of the amounts "billed, corrected and paid," but says *nothing* about how much of NS's traffic was covered by a fuel surcharge.

And data underlying the cited email (DA05765), NS internal email re: "Fuel Surcharge Info," March 26, 2003) showed that only 41.6% of carload revenue could be determined to be subject to a fuel surcharge provision (excluding intermodal), and that NS made arbitrary assumptions about coverage as to additional categories as to which it was "Unable to determine authority," or where "Authority has some sections with the fuel surcharge and some without." DA05767–68 ("I split the unmatched category 50/50. Same for authorities that had some rates subject to the SC and other rates that were not."). Finally, the email recognized that "[s]ome big authorities that move a lot of traffic *are not subject the SC*," and that "[m]any higher volumes authorities that do move traffic are not subject to the SC note." DA05765 (emphasis added).

It also states that "*We did not even [try] to isolate non-standard SC provisions*," *id.* (emphasis added), such that the coverage analysis does not reflect the extent of coverage by the published fuel surcharge formula. Nor does the amount of *coverage* say anything about the amount of fuel surcharges actually triggered or their collection during a period when fuel surcharges remained largely "theoretically billable." PX0614, Glennon (NS) Dep., July 20, 2010, at 26; *id.* at 16 ("Q. Do you recall how often the fuel surcharge was triggered in the period of 2000 to 2003? A. Not precisely. I remember it kicked in at 2 percent and then at some point, maybe 2001, it probably dropped off.").

Finally, admissible evidence demonstrates that NS and the other Defendants competed on the basis of their fuel surcharge programs during the pre-Conspiracy Period. *See* COF ¶¶ 46–77; *e.g.*, PX0614, Glennon (NS) Dep., July 20, 2010, at 18-19 (testifying that "some railroads may not have been actually applying a fuel surcharge at the very beginning . . . . not all of them were successful initially, but they were later," and that when NS bid against other railroads, it often went up against "competitive bids . . . where a fuel surcharge was not being applied and that created

some concerns on [NS's] part."); *id.* at 19 ("[W]hen you are trying to negotiate a contract, if you have a fuel surcharge and the . . . competitive bid doesn't, it puts you at a disadvantage."); PX0280, NS_10013754 (NS internal email chain re Fuel Surcharge Provisions, June 9, 2000), at '754 (NS internally noting that CSX would not apply fuel surcharges on a competitive line); PX0277, NS_010013612 (internal NS email chain re Fuel Comments, June 9, 2000) at '612 (NS develops plans to keep "track of lost business [sic] account the FSC").

Relatedly, in the pre-Conspiracy Period, NS received substantial customer pushback in its attempts to impose fuel surcharges unilaterally, with customers refusing to pay fuel surcharges, or negotiating out of them altogether. *See* COF ¶¶ 48–51; *e.g.*, PX0319, NS_010072620 (internal NS email re: EXORBITANT Rail Fuel Cost Recovery, March 27, 2003), at '623 (noting that, as of early 2003, "[m]any" NS customers have "negotiate[d] out of the SC"); PX0280, NS_010013754 (NS internal email chain re Fuel Surcharge Provisions, June 9, 2000), at '755 (shipper warning NS that "No attempt will be made to maintain fuel surcharges in our rate data base. You will have to send 'balance due' bills for every surcharge that you wish to collect" and "Investigating / processing fuel surcharge bills will have VERY low priority," and that "[i]f the fuel surcharge provisions are implemented, we will discontinue the use of, and/or not renew four of the five quotes"); PX0275, NS_010013399 (internal NS email chain re Fuel Surcharge, May 2, 2000) at '399 (NS employees advocating for waiving fuel surcharge for shippers who were "saying no, never, etc." to the new program); PX0278, NS_010013633 (internal NS email chain re Cargill Master, May 27, 2000) at '633 ("Cargill [redacted] PX0274, NS_010013312 (NS email chain re NSSC80D13, April 5, 2000) at '312 (customer objecting to new fuel surcharge, and NS employee noting that this was "another test of the fuel surcharge"); PX0280, NS_010013754 (NS internal email chain re Fuel Surcharge

Provisions, June 9, 2000), at '755 (strongly worded complaint from shipper regarding NS's "ill-advised fuel surcharge program"); PX0282, NS_010013810 (internal NS email chain re Fuel Surcharge, June 21, 2000), at '810 ("Customers are picking up on the surcharge situation and are starting to get nasty. What can we tell them? Need something quickly."); PX0273, NS_010013190 (NS internal email chain re Credit Cut List, April 25, 2001), at '190 ("The real issue right now is to get them to pay the fuel surcharge."); PX0354, NS_013006745 (NS internal email re: [redacted], Nov. 28, 2000), at '748 (noting that [redacted]). Indeed, NS wrote in early 2003, under the heading "Customer Push Back," that more aggressive fuel surcharge programs risked "losing the surcharge altogether." PX0284, NS_010026782 at '784 (NS internal email re: Fuel Surcharge Change Pro/Con, Apr. 7, 2003).

Moreover, even in the instances in which fuel surcharges were included in pricing authorities, Defendants' less aggressive pre-conspiracy fuel surcharges were rarely triggered, and even then they remained low. *See, e.g.*, COF ¶ 54, 61–67, 70. Given the scarcity of NS contracts with fuel surcharge clauses, and the rarity of those clauses being triggered, NS testified that its pre-conspiracy fuel surcharges were only "theoretically billable." PX0614, Glennon (NS) Dep., July 20, 2010, at 26; *see also* PX0752, DA05698 (NS formula was triggered at 2% from June 30 to October 30, 2000); PX0614, Glennon (NS) Dep., July 20, 2010, at 16 ("Q. Do you recall how often the fuel surcharge was triggered in the period of 2000 to 2003? A. Not precisely. I remember it kicked in at 2 percent and then at some point, maybe 2001, it probably dropped off."); *id.* at 22 (fuel surcharge was not triggered again until Q4 of 2002). Documents like DA05612, which purportedly instruct NS employees to apply fuel surcharges broadly, have little relevance given that *in reality*, NS, like the other Defendants, struggled to impose fuel surcharges before the conspiracy and those fuel surcharges were rarely collected.

All of this changed as a result of Defendants' conspiratorial agreement to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See, e.g.*, COF ¶¶ 118–21, 228–31, 302–63. During the Conspiracy Period, Defendants' fuel surcharges, including NS's, became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. *See* COF ¶¶ 303, 346–354; *e.g.*, PX0270, NS_010004522 (internal NS email chain re Fuel Surcharge Review—April 25, April 29, 2003), at '522 ("*Issue instructions* that no contract can negate or freeze the application of the NS Conditions of Carriage without prior approval of Don Seale.") (emphasis added); PX0299, NS_010035994 (NS FSC Status presentation), at '995 ("[F]ill the gaps[, p]hase out the old FSC[, n]egotiate a FSC—every time[.]"); PX0340, NS_010162682 (NS-UP email re: NS Fuel Surcharge for unit coal trains, Oct. 5, 2005), at '682 ("We only have 1 fuel surcharge mechanism which applies to all commodities. Our Corporate directive is to stay with the standard language and avoid modifying it.").

Dr. Bernheim found that Defendants' "early fuel surcharge programs did not generate substantial revenue for the Defendants." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 82; *see id.* ¶¶ 71–82; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023 ¶ 157 ("Defendants' Conspiracy Period carload FSC formulas yielded higher payments than their predecessors at then-current fuel market conditions."). Dr. Bernheim also concluded that "fuel surcharge payment coverage increased dramatically during the cartel's operation." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim shows the low levels of coverage NS experienced before the conspiracy and a dramatic increase once NS entered the conspiracy:




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155, Fig. IV-14.

Other experts reached the same conclusion. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 337 and Fig. V.1; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 166-175 ("the percentage of shipments covered by FSCs did increase significantly for all four Defendants during the Conspiracy Period"); PX0984, Leitzinger MDL II Reply Rpt., ¶¶ 80-96 ("[T]he evidence does not support [Defendants' experts'] view" that "the increases in coverage seen during the Conspiracy period were merely a continuation of a trend that predated the alleged conspiracy").

**Material Undisputed Fact No. 26**

**NS internally reviewed the modified CSXT carload fuel surcharge formula on three occasions in 2003 before unilaterally changing its published carload formula.**

Supporting Facts:

26.1 On March 20, 2003, the day CSXT announced its modified carload formula, Don Seale wrote an email to Pat Glennon, NS's Manager of Pricing Systems, and asked whether the modified CSXT formula would be "more complex or 'easier to administer.'"[126] Glennon responded with a list of "Positives" and "Negatives."[127]

26.2 In April 2003, Glennon prepared a memo "recap[ping] the case for and against changing the NS public carload fuel surcharge standard in response to the recent action announced by CSXT."[128]

26.3 The NS Group Vice Presidents ("GVPs") were requested to provide a "consensus recommendation" to Don Seale on "the issue of if and when we should change our fuel surcharge process."[129] On April 29, 2003, the recommendation from the team was to "retain the current NS formula."[130] NS did not change its fuel surcharge at that time.

26.4 On June 30, 2003, Seale asked the GVPs to conduct a second review of the 2000 NS carload formula.[131] NS decided not to modify the 2000 NS carload formula after the second review.[132]

---

[126] DA05769 at 69-70.

[127] DA05769.

[128] DA05820.

[129] DA05709.

[130] DA05574.

[131] DA05843; DA05717 at 17-18.

[132] DA05673 ("Pat Glennon makes some very good points here in favor of not modifying our trigger for the FSC at this time. I am inclined to agree."); DA05095 at 95-96.

26.5 On October 31, 2003, Seale asked the GVPs to conduct a third review of the 2000 NS carload formula.[133] During this third review, the GVPs considered that NS had not been successfully attracting new business due to its lower fuel surcharge,[134] and that fuel prices did not decline as projected in the spring and summer of 2003.[135]

26.6 NS made the decision in December 2003, nine months after CSXT first publicly announced its revised carload formula, to announce a fuel surcharge that followed the modified CSXT carload formula.[136] On January 8, 2004, Seale informed Chief Marketing Officer Prillaman and CEO Goode that NS would publicly announce the 2004 published carload formula on January 9, 2004, and it would become effective beginning on March 1, 2004.[137]

26.7 NS implemented the 2004 published carload formula in the same way it implemented the 2000 NS carload formula, applying it to public price authorities in a mass computer update on March 1, 2004, and negotiating with shippers to add the carload fuel surcharge to new and renewing contracts and price authorities thereafter.[138]

---

[133] DA05647; DA05125.

[134] DA05008 at 23-24, 30 (Seale (NS) 72:22-74:2, 127:13-128:12 ("[W]e had hoped that customers would award more business to us by having a lower fuel surcharge. We did not see that taking place over the course of 2003.")); DA05844 (stating on November 6, 2003 that "[s]o far, I have seen no evidence that our customers are rewarding NS versus CSX for maintaining a more reasonable FSC program."); *see also* DA05641 (August 15, 2003 email from the chemicals GVP proposing that NS stick with its existing fuel surcharge program).

[135] DA05574 (predicting in April 2003 that fuel prices would drop).

[136] DA05477; DA05655; DA05008 at 12-13, 30 (Seale (NS) 24:20-25:16; 127:13-128:12).

[137] DA05936.

[138] DA05576 at 77 ("The new FSC will be applied to private authorities as they are renegotiated and reissued by Product Managers."); DA05847 at 48 ("Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation."); DA18419 at 23 (Glennon (NS) 102:9-23).

26.8 NS issued 2,925 new or amended rate authorities from March 2003 through February 2004, when NS's 2004 published carload formula became effective.[139] NS did not use the modified CSXT formula in any of these 2,925 rate authorities; instead, NS used different types of fuel surcharges, including the 2000 NS carload formula.[140]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 26</u>**

Disputed.

The cited evidence does not support the statement that during what Defendants refer to as NS's "third review" of the fuel surcharge formula in October 2003, the GVPs considered that fuel prices did not decline as projected in the spring and summer of 2003. The only piece of evidence Defendants cite for that proposition is DA05574 (NS email re: "Fuel Surcharge Review—April 25," April 29, 2003), an email which pre-dates the purported "third review" by six months.

Nor does the cited evidence support the statement that NS unilaterally made the decision to modify its fuel surcharge formula in December 2003. DA05936, which Defendants cite in support of this proposition, is an NS email re: "Modified Fuel Surcharge—Coal and Merchandise" on January 8, 2004 announcing the change. The email does not reflect when the decision was made.

Admissible evidence demonstrates that NS did not make the decision to change its fuel surcharge based on "unilateral[]" internal analysis, but instead as a result of the conspiracy. *See,*

---

[139] DA24749 at 66-67 (Wright Rpt. ¶ 105, 10/10/23).

[140] *See* DA24749 at 66-67 (Wright Rpt. ¶ 105, 10/10/23); *see, e.g.*, DA06526 at 26-27 (Donnelly contract with the 2000 formula written into the text, entered in July 2003 and effective August 1, 2003); DA05406 at 06, 10 (Cargill contract with the 2000 formula written into its text, entered in January 2004); DA05274 at 74, 76 (Alpha Coal contract with 2% fuel surcharge triggered when WTI fuel price remained above $38 for 30 consecutive days, entered in January 2004); DA05432 at 34, 50 (General Motors contract with 2% fuel surcharge triggered when WTI fuel price remained above $37 for 90 consecutive days, entered in July 2003).

*e.g.* PX0241, NS 001000360 (UP-NS email chain re "Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361 (NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers," and discussed how to "work together on this opportunity," including whether they should do so "through the AAR [Association of American Railroads]" or "handle the opportunity on a bilateral basis"); PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("***Fuel surcharges → Uniform application across the industry would be helpful***" (emphasis added)); PX0243, NS 001000422 (July 30, 2003 BNSF-NS Joint Marketing Meeting), at '424 (reflecting July 30, 2003 BNSF-NS meeting, at which John Lanigan and Seale "agreed to lead a discussion of a ***potential industry position on fuel surcharge provisions*** at the next" AAR NEMC meeting (emphasis added)).

On March 22, NS's Seale asked another NS employee "to determine if Accounting/Billing for the CSX format would be doable." PX0366, NS001000215 at '216. On March 24, Glennon (NS) again emailed Seale (NS), "[i]f we were to adopt something like CSXTs we could not simply announce it and have it apply across the board at least not on contracts and possibly not on customer specific quotes . . . ." *Id.* at '215 (reflecting Defendants' effort to have the new fuel surcharges "apply across the board").

NS executives including Don Seale attended the Spring 2003 NFTA meeting on April 2–6, 2003. COF ¶ 148; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting). By April 7, 2003—the day after the NFTA conference—NS had determined that it could implement CSX's fuel surcharge program if it "follow[ed] a phased implementation plan for public authorities and the renegotiation

and reissue of the private publications." DA05820. ***By April 14, 2003, Seale had already determined that "at this point, we do plan to modify our FSC.***" PX0254, NS001000316 (NS internal email thread re "Fuel Surcharge Change Pro/Con," April 2003), at '316 (emphasis added). By April 29, 2003, NS internally adopted a set of "changes to better position NS to accommodate a FSC change if and when the decision is made," including "[r]emov[ing] the full FSC text from all publications as they are reissued," because "[o]nce the majority of the publications are converted, we will be in a better position to implement a blanket adoption . . . ." DA05574. That plan was hatched to put NS "in a better position to switch late this year or next year." *Id.* By July 3, 2003, NS was "already in the process of preparing the new generic 9255 FSC note that simply refers to the [Conditions of Carriage], w/o the full [fuel surcharge] text" and "position[ing] to make a universal change." DA05717 at '18. On July 21, 2003, NS revised its internal systems to "create[] a new note which will simply refer to the surcharge provisions as published in NS-1 Conditions of Carriage" so that NS could "more easily adopt and implement a revised FSC formula." DA05674-75. By November 7, 2003, NS was "proceed[ing] with the program to remove the full text FSC note from private NS authorities and position ourselves for a conversion" and only "roughly 50% of the private publications still ha[d] the full text note." DA05847; *see also* DA05125 at '27 ("We are in the process of replacing the full text with reference to the Conditions of Carriage. Have replaced the FSC in most public authorities and about half of the private authorities.").

Indeed, as reflected in the preceding paragraph, Defendants' cited documents and testimony acknowledge that this technical constraint of NS's fuel surcharge provision in its private contracts was the primary obstacle to adoption of CSX's fuel surcharge formula. *See* DA05820 (April 7, 2003: "Due to the way NS chose to originally publish the FSC, if we chose to make a change, we cannot take the CSXT approach and announce the change, across all publication types,

effective on a specific date. We would have to follow a phased implementation plan for public authorities and the renegotiation and reissue of private publications."); DA05574 (April 29, 2003: "Probably the most important point: . . . Due to the way NS hard codes the surcharge into NS publications, public and private, we would have to actually republish each one before we could transition that publication to the new formula. Since each contract and private quote would have to be renegotiated, probably at renewal, the bulk of our traffic would not be subject to the new formula this year."); DA05717 (July 3, 2003: "The NS fuel surcharge text has been inserted into each NS publication that is subject [sic] the NS FSC. As a result, we cannot simply change the FSC text in the NS Conditions of Carriage and expect a revised formula to take effect universally. The specific text in the rate publication takes precedence."); DA05673 (July 30, 2003: "Practical issues[:] While we are free to change the Conditions of Carriage, most private NS authorities contain the full text NS FSC. If we changed the timing portion of the FSC in the C/C, it would only affect public authorities and new private authorities."); DA05095 (July 23, 2003: "A challenge here however is customers whose contracts and rates have been established subject to our current Conditions of Carriage which contains the current FSC, will argue that we cannot change the terms of those rates by reissuing a modified FSC in a new provision of our Conditions of Carriage. In short, they see this as breaking the contract . . . ."); DA05125 at '27 (November 4, 2003: "Technical issue. Prior to June of this year NS inserted the full FSC text in each publication. We are in the process of replacing the full text with reference to the Conditions of Carriage. Have replaced the FSC in most public authorities and about half of the private authorities."); DA05847 (November 7, 2003: "50% of NS publications still contain the full text note. It will require another 6 months to convert the majority of the remaining publications on their rollover dates, not counting the multi-year contracts."); DA05936 (January 8, 2004: "This additional fuel recovery, however,

will phase in as existing contracts and private rates that contain the current surcharge expire and are renegotiated, so the full amount will not be realized in 2003 [sic]."); *see also* DA05008 at 30-31 (Seale (NS) 128:19-129:6 (agreeing "Norfolk Southern couldn't necessarily [in 2003] apply a changed fuel surcharge program across the board in the manner that CSX did" because "of the way that Norfolk Southern had written the original fuel surcharge into various of its pricing authorities").

Thus, all NS analyses were based on the premise that NS would be changing its fuel surcharge formula (as it has already decided in the Spring of 2003, as discussed above), but would have to retain its existing one until structural barriers were removed. *See, e.g.*, PX0268, NS_010004393 ("The [GVP] consensus was that NS should not adopt the CSXT and should, *for the time being*, retain the current NS formula." (emphasis added)); PX0254, NS001000316 ("at this point, we do plan to modify our FSC."). And as reflected in the above documents, NS worked tirelessly to remove this barrier, and prepare itself for changing its fuel surcharge formula. On January 8, 2004, after NS had announced a revision to its fuel-surcharge program, Glennon internally explained: "NS will essentially adopt the CSXT FSC formula. This is [sic] action is being taken for a number of reasons:…***Standardization of FSC provisions in the East***...***NS adoption of the CSXT formula will place both of the major Eastern carriers on the same standard and regain some of the uniformity that was lost with the June 2003 changes***." PX0347, NS_013001654 (NS email re: NS Fuel Surcharge Change 03/10/04, Jan. 8, 2004), at '654-56 (emphasis added); *see also* PX0235, NS 001000124 (NS internal email re: Modified Fuel Surcharge—Coal and Merchandise, Jan. 8, 2004), at '124 (Don Seale (NS): "[O]ur new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003. So, even though we will undoubtedly experience some customer opposition to the change, the formula is already in the

market place, and our customers in the east will have a uniform application."); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 34-35 (testifying that NS switched even some customers under contract from the $28 WTI formula to the $23 WTI formula); PX0560, NS 3/1/2004 FSC Program Terms (reflecting NS fuel surcharge formula effective March 1, 2004, including $23 WTI trigger and a 0.4% increase in surcharge for every dollar increase in the WTI).

During this period of transition, NS's executives continued discussing fuel surcharges with their counterparts at Defendants. On May 14, 2003, NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers," and discussed how to "work together on this opportunity," including whether they should do so "through the AAR [Association of American Railroads]" or "handle the opportunity on a bilateral basis." PX0241, NS 001000360 (UP-NS email chain re "Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361. Minutes from the meeting reflect that UP and NS executives agreed that "[u]niform application [of fuel surcharges] across the industry would be helpful." PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("Fuel surcharges → Uniform application across the industry would be helpful"). They assigned Mr. Seale and UP CMO Jack Koraleski to follow up on these issues. *See Id.* at '360-61; *see also* PX0485, UPFSC 0014100 (May 6, 2003 conference call between Koraleski, Seale, and others to devise agenda for May 14, 2003 "Alliance" meeting); PX0396, UPFSC 0127235 (UP email re: "UP NS Alliance Conference Call August 15, 2003," July 28, 2003), at '235 (reflecting that follow up conference calls to May 14, 2003 meeting took place between NS and UP executives on at least July 8, 2003, and August 15, 2003).

On July 30, 2003, top marketing executives of NS and BNSF discussed a "potential industry position" on fuel surcharges and jointly appointed Lanigan (BNSF) and Seale (NS) to

lead a discussion on the topic at the next meeting of the AAR's Network Efficiency Management Committee ("NEMC") scheduled for September 11, 2003. PX0243, NS 001000422 (July 30, 2003 BNSF-NS Joint Marketing Meeting), at '424 (CMOs "John Lanigan and Don Seale agreed to lead a discussion of a potential ***industry position on fuel surcharges*** at the next N.E.M.C. meeting.") (emphasis added).

NS executives continued to meet with Defendants' executives throughout 2003. *See, e.g.*, COF ¶¶ 194–96, 199–204.

NS admits the decision to adopt a fuel surcharge was ultimately made by Senior Vice President of Merchandise Marketing Don Seale. *See* NS Br. 5–6. This is significant because Don Seale was the protagonist of NS's most damning conspiratorial conduct, *all of which was happening contemporaneously with the narrative NS spins*. *See, e.g.*, PX0241, NS 001000360 (UP-NS email chain re Draft Minutes of NS-UP meeting of 5-13-03, June 30, 2003), at '361 (reflecting May 14, 2003 meeting between NS, including Seale, and UP, at which "[c]onsensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers" and a desire that "the industry can work together on this opportunity probably through the AAR . . . ." and Seale was assigned follow up); PX0243, NS 001000422 (July 30, 2003 BNSF-NS Joint Marketing Meeting), at '424 (reflecting July 30, 2003 BNSF-NS meeting, at which John Lanigan and Seale "agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next" AAR NEMC meeting). Again, "[f]ollow up" was assigned *to Seale*. And on July 30, 2003, BNSF and NS again held a meeting of senior executives. PX0243, NS 001000422 (July 30, 2003 BNSF-NS Joint Marketing Meeting), at '424. Thus, the sole decision maker identified by NS reached "[c]onsensus" that all Defendants should have the "same fuel surcharge process" and agreed with the other Defendants to work towards a "potential industry

position on fuel surcharge provisions" through the AAR. As discussed above, during this period, NS was also backchanneling information from CSX—its competitor—about its implementation of fuel surcharges. *See* COF ¶¶ 502–07.

NS makes too much of its group vice presidents' ("GVPs") involvement in internal work, notwithstanding Seale's ultimate decision-making authority (and involvement in the communications about coordinating with the other Defendants). But according to Seale—who NS admits had the ultimate authority—NS's adoption of a conspiratorial fuel surcharge was a foregone conclusion by April 2003. COF ¶¶ 140, 206.

NS tells a story of thoughtful analyses, but this ignores that, as detailed above, (i) NS's immediate reaction to CSX's formula was that it "is in fact a blatant general rate increase, and will appear so to customers," PX0270, NS_010004522 (internal NS email chain re Fuel Surcharge Review—April 25, April 29, 2003), at '522; (ii) NS had multiple times determined that its actual fuel costs more closely tracked the heating oil index than the WTI index, PX0608, Neikirk (NS) Dep., June 15, 2010, at 63-64, 92; and (iii) NS had also determined that its "current fuel hedging and surcharge collections are effective at protecting NS exposure to fuel price increases. As such, adoption of the new CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs," PX0262, NS_009000161; *see* COF ¶ 217. Yet contrary to its unilateral self-interest, NS proceeded to participate with the other Defendants in developing coordinated fuel surcharges and coordinated implementation, and took the necessary steps to begin implementing the coordinated surcharges by early 2004. *See* COF ¶¶ 206–23.

During the Conspiracy Period, Defendants—including NS—exchanged data tracking their progress toward universal coverage; shared information about fuel costs, hedging practices, and fuel surcharge policies and implementation; and monitored each other to ensure that no member

of the cartel cheated on the conspiracy. COF ¶¶ 364–367; 501–10. NS was also actively involved in Defendants' coordinated effort to cause the AAR to adopt the AIILF, to facilitate Defendants' imposition and collection of the new coordinated fuel surcharges, particularly given that there already was an existing cost-escalation index, the RCAF, that would have enabled Defendants to recoup their actual fuel costs. COF ¶¶ 367–420.

During the conspiracy period, NS was successful in substantially increasing its fuel surcharge coverage. COF ¶¶ 346–54; *e.g.*, PX0259, NS_007000489 (NS internal email re: meeting Fri 4/22, Apr. 14, 2005), at '489 ("There are relatively few publications with no FSC, nonstandard FSC or blends of FSCs"); PX0307, NS_010049215 (internal NS email re: Revenue Yield Report—1QTR05, Apr. 13, 2005), at '216 ("The effective FSC coverage (70% to 75%) will improve over time and could exceed 80% by June [2005]."); PX0300, NS_010037907 (NS internal email re: FSC Coverage for 2005, Jan. 27, 2006), at '907 ("The updated FSC coverage percentage, all groups combined is 85.5%"); PX0614, Glennon (NS) Dep., July 20, 2010, at 178-91 (discussing NS's widespread application of the rate-based fuel surcharge and agreeing that "there [were] relatively few publications with a nonstandard fuel surcharge"); PX0622, Kraemer (NS) Dep., Aug. 11, 2010, at 27-30 (noting that despite thousands of shippers in the agriculture group, NS considered only about a dozen exceptions to its fuel-surcharge program per year); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-219, Figs. 20-26; PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 130–152.

Admissible evidence further demonstrates that NS's fuel surcharge program was not designed merely to recoup fuel costs. *See* COF ¶¶ 446–55.

Defendants, including NS, earned increasing, supracompetitive revenues and profits from fuel surcharges over the course of the conspiracy period. COF ¶¶ 526–58. Plaintiffs' experts found

in their quantitative analyses that Defendants' fuel surcharge revenue rose dramatically during the conspiracy. *See, e.g.*, PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 350 (Defendants' rate-based FSC revenues increased from $16.2 million in 2002 to $3 billion in 2008—182 times the amount of fuel surcharges collected in 2002); Leitzinger, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-218, Figs. 20-26. Dr. Bernheim found that once the conspiracy began, "prices remained on a steep upward trend until late 2008." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128. Dr. Bernheim also "computed fuel surcharges as a fraction of overall net revenue in every month from January 2000 through December 2008" and found "that fuel surcharges accounted for a rapidly growing fraction of the Defendants' revenue during the cartel's operation." *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim indicates the dramatic rise in fuel surcharges as a percentage of Defendants' net revenue during the conspiracy, including for NS:

**Figure IV-15: Fuel surcharge as percentage of net revenue**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 156, Fig. IV-15.

Dr. Bernheim also concluded that "non-conspiratorial factors cannot account for the dramatic increase in fuel surcharge coverage or revenue during the operation of the alleged cartel." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 26, 157–184. Dr. Bernheim found that during the conspiracy, Defendants, including NS, generally increased their operating margins, *id.* ¶¶ 134–138, and saw an "increase in perceived profitability" in the market and thus drastically drove up their stock prices, outperforming the S&P 500, *id.* ¶¶ 139–141; *see also* COF ¶¶ 524–53. Defendants' conspiracy achieved striking success in part because Defendants' conspiratorial fuel-surcharge programs, which they were now able to apply far more broadly and uniformly than in the pre-Conspiracy Period, recovered dramatically more than the cost of fuel. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 142–152; *see also* COF ¶¶ 513–23.

**<u>Material Undisputed Fact No. 27</u>**

**NS's 2006 decision to rebase its carload fuel surcharge formula was unilateral and different from any other railroad.**

<u>Supporting Facts:</u>

27.1 On April 24, 2006, NS announced a new rebased carload fuel surcharge formula.[141] The rebased carload fuel surcharge formula had a trigger price of $64 and would increase by 0.3% for every $1 increase in average monthly WTI, effective July 1, 2006.[142] Concurrent with this change, NS announced a rate increase of 16.4%, effective July 1, 2006, on published rate authorities and sought to increase rates in private authorities as they came up for renewal.[143]

27.2 No Defendant rebased its carload fuel surcharge in response to the NS change.

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 27</u>**

Disputed.

The cited evidence does not support the statement. None of the cited documents show that NS acted unilaterally. And no evidence is cited to support Defendants' statement that "[n]o other defendant rebased its carload fuel surcharge in response to the NS change." Furthermore, documents cited for these facts—including the "effective" date of July 1, 2006—do not relate to the private contracts (and other arrangements exempt from STB rate-regulation) at issue in this litigation. DA05191 (explaining the rebase formula relates only to traffic "moving on Norfolk Southern issued tariff and public quotes."); DA18281 ("The initial roll out will focus on public prices, but private prices will be addressed as they come up for renegotiation."); DA00147 at 50 ("NS modified its *public carload fuel surcharge mechanism* . . . As contracts expired, NS *began*

---

[141] DA05191.

[142] DA05191.

[143] DA18281; DA00147 at 50.

*the process* of negotiating rates with contract customers that in many cases included this new fuel surcharge, and adjusted the base rates both for the fuel surcharge and for market-based changes." (emphasis added)).

Moreover, admissible evidence demonstrates that NS's rebasing was not a unilateral, self-interested action, but rather strategic behavior in furtherance of the conspiracy. The rebase was a cosmetic change, made at the height of the STB's investigation into Defendants' fuel surcharge practices and immediately before the STB hearing, with intent to deflect scrutiny and mislead the STB. PX0116, BNSF-0533077 (April 24, 2006 announcement forwarded by George Gillen to Roger Hsieh, "Norfolk Southern to Adjust Fuel Surcharge"). While NS increased its trigger price from $23 WTI to $64 WTI, so that NS misleadingly could suggest to the STB it had "deci[ded] to reduce its fuel surcharge percentage," PX1170, NS 001001195 (Written Statement of NS, STB *Ex Parte* 661, Apr. 27, 2006), at '207, NS at the same *increased its based rates* by 16.4% so as "to bake in FSC to [base] rate," PX0318, NS_010067297 ("NS Fuel Surcharge Model" spreadsheet, March 21, 2006). The rebase thus constituted a complete transfer of the coordinated fuel surcharges into the base rates. As Sam Kyei, BNSF's Chief Economist explained internally at BNSF about NS's rebasing, "You basically swap approximately $1.1 B of FSC into your rates." PX0098, BNSF-0367622 (BNSF internal email re: Proposed BNSF FSC, Apr. 21, 2006), at '622; *see also* PX0318, NS_010067297 ("NS Fuel Surcharge Model" spreadsheet, March 21, 2006) (reflecting that NS had conducted an analysis to determine the amount of base rate increase that would be needed "to bake in [the existing $23] FSC to [base] rate").

NS contemporaneously admitted that rebasing was "a wash," because it simply moved existing fuel surcharges into base rates. Mike Donnelly, President of Plaintiff Donnelly, responded to [redacted], with [redacted] to which the NS product manager wrote,

"Not really. The fuel rebase was a 16.4% factor which is in effect a wash because the fuel component that this is now subject to is only at 2.1% for July." *See* PX0230, DON018705 (emails between Mike Donnelly and NS, July 3, 2006), at '705.

BNSF talking points from April 2007 indicate that all three railroads were rebasing "to a higher strike price for fuel, UP = $2.30, . . . CSXT = $2.00 . . . [with a] freight rate increase to offset the lower fuel surcharge" or "imbedding" the fuel surcharge in their higher rates ("NS has announced that all of their freight rates will have fuel cost imbedded"), with a "target population" for all carriers of only "public documents." DA04662.

**Material Undisputed Fact No. 28**

**NS did not adopt a distinct fuel surcharge specifically applicable only to coal traffic during the alleged conspiracy period.**

Supporting Facts:

28.1 At no time during the alleged conspiracy period did NS adopt a distinct fuel surcharge specifically applicable only to coal traffic.[144]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 28**

Admitted only insofar as NS applied its carload fuel surcharge formula to coal shipments during the conspiracy.

[144] DA18074; DA18072; DA25148 at 79 (Israel Rpt. ¶ 188, 8/15/23).

**Material Undisputed Fact No. 29**

**There is no direct evidence that NS participated in the conspiracy that Plaintiffs allege.**

Supporting Facts:

29.1 No current or former NS employee has testified to participating in the conspiracy the Plaintiffs allege.

29.2 No current or former employee of any other Defendant has testified that NS participated in the conspiracy the Plaintiffs allege.

29.3 No documents contain a statement by any current or former Defendant employee that NS participated in the conspiracy the Plaintiffs allege.

**Plaintiffs' Response to Defendants' Undisputed Fact No. 29**

Disputed.

There is no evidence to support the statement.

Further disputed because whether or not there is "direct evidence" and what constitutes "participat[ion] in the conspiracy" are legal conclusions, not a statement of fact.

To the extent Defendants are permitted to offer such a conclusory, unsubstantiated, legal conclusion as a "Fact," Plaintiffs offer the entirety of these Responses as well as the entirety of their Counterstatement of Material Facts as containing abundant admissible evidence demonstrating that NS (through its senior executives and other employees) participated in the conspiracy to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See, e.g.,* Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 5, 8, 23, 24, 25, 26, 27, 28, 36, 38–45, 51–52.

**<u>Material Undisputed Fact No. 30</u>**

**UP unilaterally adopted carload fuel surcharges before the alleged conspiracy period.**

<u>Supporting Facts:</u>

30.1 By the year 2000, over 1,600 UP carload price documents used the "FMC/Fuel" rate-based surcharge.[145] This applied a 2% surcharge when the WTI per-barrel price was at least $32 for 60 days, and increased the surcharge by 2% for each $7 increase in the WTI price thereafter.[146]

30.2 UP announced its first published carload fuel surcharge on October 31, 2002, effective December 1, 2002.[147] It applied a 2% surcharge when the WTI index remained at or above $28 per barrel for 30 consecutive reporting days, and increasing by an additional 2% for each $5 increase in the WTI price.[148]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 30</u>**

Admitted only that Plaintiffs do not allege UP's fuel surcharge programs before March 2003 were conspiratorial.

**<u>Material Undisputed Fact No. 31</u>**

**UP's pre-"conspiracy" carload fuel surcharge formula announced in 2002 was identical to other railroads' carload fuel surcharge formulas.**

<u>Supporting Facts:</u>

31.1 The UP published carload fuel surcharge formula announced on October 31, 2002 was identical to the NS and CSXT published carload fuel surcharges in effect at the time.[149]

---

[145] *See* DA01241 at 42, 47-48 (Declaration of Charles M. Adams, ¶ 3, Ex. 1, 6/18/10).
[146] DA01389 at 90-91.
[147] DA01372 at 372-375.
[148] DA01380 at 80-84.
[149] *See supra*, ¶¶ 18.2, 24.2.

**Plaintiffs' Response to Defendants' Undisputed Fact No. 31**

Disputed, including to the extent the statement misleadingly implies that Defendants did not compete with respect to fuel surcharges prior the conspiracy period, and to the extent that the statement misleadingly implies that the fuel surcharges UP attempted to impose prior to the alleged conspiracy were similar to the fuel surcharges imposed during the conspiracy.

Admissible evidence demonstrates that UP's fuel-surcharge methodology was not "identical" to the other Defendants before the conspiracy. In fact, NS, BNSF, and CSX had all implemented their initial published formulas by October 2000—but UP had *no* published fuel surcharge for *over two more years*. PX0637, Kalt Corrected Merits Rpt., March 1, 2013, Appendix A, at 75, Fig. IV-1B. UP's CFO testified that "there was *not* a [fuel surcharge] policy" at UP from 2000 to 2002, but only "isolated situations where there were surcharges." PX0611, Knight (UP) Dep., July 9, 2010, at 23-24 (emphasis added); PX0466, UPFSC0000675 (UP-CSX email chain re UP Fuel Surcharge, Jan. 9, 2003), at '675 ("The UP 'standard' fuel surcharge program we put into place last month, so far, is applicable only in connection with our tariff & circular prices"); PX0490, UPFSC0042871 (internal UP email re: IP Fuel Surcharge Timing, Oct. 3, 2002), at '871 ("strategy has been to avoid fuel surcharges and negotiate increases into our price").

Moreover, even once UP did implement a published fuel surcharge formula—in December 2002, just before the start of the conspiracy period—UP's fuel surcharge formula was *different* from that of BNSF. UP's had a $28 WTI trigger price, started at 2%, and increased 2% for every $5 price increase; its trigger price was calculated on the fuel prices for prior 30 consecutive days. PX0637, Kalt Corrected Merits Rpt., March 1, 2013, Appendix A, at 75, Fig. IV-1B. In contrast, BNSF's fuel surcharge had a $28 WTI trigger, but used a "fuel intensity factor"—apparently designed to measure "BNSF's fuel expense" as compared to its "total expenses"—that UP's did

not. PX0599, Kyei (BNSF) Dep., March 4, 2010, at 67-68. Moreover, BNSF's trigger price was based upon the prior month's *average* fuel prices. *Id.*

Furthermore, admissible evidence demonstrates that, regardless of what the fuel surcharge formula was on *paper*, Defendants, including UP, before the Conspiracy Period competed with each other with respect to fuel surcharges, leading to discounts and waivers of the fuel surcharge. *See* COF ¶¶ 62–67 (UP); COF ¶¶ 46–61, 68–77 (other Defendants); *e.g.*, PX0127, BNSF-0574516 (BNSF May 28, 2002 Enterprise Wide Risk Assessment) at '617 ("We are challenged to mitigate the risk through fuel surcharges, particularly as the ***UP does not use a fuel surcharge in the competitive marketplace*** . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it.") (emphasis added); PX0128, Metadata to PX0127, at 17; PX0416, UPFSC 0308795 ([redacted] negotiation background), at Mitsui worksheet, Cell C40 (reflecting that [redacted]); PX0219, CSXFSC000328691 (CSX internal email re: "Important Message from Mike Giftos", Sept. 22, 2000), at '691 (UP stated in September 2000 that UP had "hesitate[d]" to implement fuel surcharges "because of the competitive issues out there"); PX0488, UPFSC0029999 (internal UP email re: "Fuel Surcharge and 3229," Jan. 15, 2003), at '999 ("If you have business at risk because of a fuel based increase in 3229, Bob suggested you use a refund allowance to offset the price increase to shield the traffic from being lost."); PX0531, UPFSC0437016 (UP-K-Line letter), at '016 (UP [redacted]); PX0506, UPFSC0117070 (internal UP email re: "[redacted], May 7, 2002), at '070 (noting that UP [redacted]

[redacted]); PX0532, UPFSC0438393 (UP email re: [redacted] Sept. 24, 2002), at '393 [redacted]"); PX0489, UPFSC0033490 (UP internal email re: "Chemicals' Input for May Board Meeting," May 15, 2001), at '393 (BNSF and UP [redacted]); *see also* PX0508, UPFSC0129813 (internal UP email re: BNSF Reducing Fuel Surcharge 5/1 to 2%, April 29, 2003), at '813 ("Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, *what's on paper must not work in the real world*.") (emphasis added).

Moreover, even in the instances in which fuel surcharges were included in pricing authorities, Defendants' less aggressive pre-conspiracy fuel surcharges were rarely triggered, and even when triggered they remained low and subject to non-collection. *See* COF ¶¶ 54, 62–67, 70; *e.g.*, PX0616, Young (UP) Dep., Aug. 4, 2010, at 25-26, 28, 55, 169 (UP executive testifying that "[t]he impact" of UP surcharges "didn't show up in terms of [UP's] financials," given that "because fuel had not run up, they were never implemented," and because "[a]ny fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels.").

Therefore, even if Defendants' assertion that UP's pre-Conspiracy Period fuel surcharges was "identical" to the other Defendants' fuel surcharges were true (and it is not), admissible evidence demonstrates that UP during the pre-Conspiracy Period competed with other Defendants with respect to fuel surcharges, struggled to impose its fuel surcharge broadly, and frequently waived or failed to collect revenue billed pursuant to it. *See* COF ¶¶ 62–67. Thus, regardless of

whether UP or other Defendants had similar *published* fuel surcharge formulas, UP's (and other Defendants') *effective* fuel surcharges rarely resembled the published formulas.

**Material Undisputed Fact No. 32**

**UP unilaterally worked to expand fuel surcharge coverage before the alleged conspiracy period.**

Supporting Facts:

32.1 In October 2002, UP committed itself to applying its new published carload surcharge to all of its carload traffic unless regulation or pre-existing contracts prevented doing so.[150]

32.2 Coverage of the 2002 UP published carload surcharge escalated rapidly in late 2002 and early 2003, including 100% coverage on all carload shipments that used public tariffs.[151]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 32**

Disputed.

Disputed to the extent that Defendants misleadingly imply that UP successfully imposed and increased coverage of fuel surcharges prior to the conspiracy, or that UP's Conspiracy Period agreement to impose fuel surcharges across-the-board did not represent a change from its pre-Conspiracy Period practices.

The cited evidence does not support the proposition that in October 2002, UP committed itself to implementing its new published carload surcharge program to all of its carload traffic

[150] DA01326 at 61 ("on all new price documents effective immediately"); DA01362 at 66 ("Effective immediately, all new pricing documents and amendments created must now contain the Fuel Surcharge language recently approved by the Marketing and Sales Management team."); DA01372 at 72-75 ("The new surcharge will apply to most Union Pacific pricing documents for local and interline freight movements, with the exception of those which have a fuel surcharge provision or specify otherwise.").

[151] DA20487 at 673 (Rausser Rpt. Fig. 76, 6/12/13); DA00713 at 810-811 (Kalt Rpt. Fig. IV-7A, ¶ 148, 3/1/13).

unless regulation or pre-existing contracts prevented doing so. Defendants do not cite any evidence that supports this proposition. DA01326 consists of a *recommendation* and does not speak to what policy UP actually adopted. PX0405, UPFSC 0188733 ("Fuel Surcharge Analysis" presentation, Oct. 15, 2002), at '327. DA01372-75 is only an announcement of the modified formula. PX0465, UPFSC0000540 ("For Immediate Release," Oct. 31, 2002), at '540 (UP announcing "it is joining others in the transportation industry implementing a fuel cost recovery charge."). And DA01362 at 66, an internal UP email explaining the surcharge modification and the only document actually outlining a UP policy, refers only to "new pricing documents and amendments," but does not discuss existing contracts.

Admissible evidence demonstrates that UP did not successfully impose or increase coverage of fuel surcharges prior to the conspiracy. *See* COF ¶¶ 62–67. For example, UP's own CFO testified that in the 2000-2002 time period "*[t]here was not a [FSC] policy*. There were some isolated situations where there were surcharges, but I don't – *there's no policy position*." PX0611, Knight (UP) Dep., July 9, 2010, at 23-24; *see also* PX0616, Young (UP) Dep., Aug. 4, 2010, at 55 ("Before 2003 . . . it [would] be fair to say that the impact of fuel surcharge was somewhat minimal."); *id.* at 28 ("[A]ny fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels."); *id.* at 169 (in the 2000, 2001 timeframe, fuel surcharges were not "a significant piece of our business and . . . didn't show up in terms of our financials, the impact."); PX0604, Eisele (UP) Dep., May 12, 2010, at 77 (in pre-Conspiracy Period, "fuel cost recovery . . . as a mechanism . . . had not, in a broad sense, been implemented"); PX0490, UPFSC0042871 (internal UP email re: IP Fuel Surcharge Timing, Oct. 3, 2002), at '871 ("strategy has been to avoid fuel surcharges and negotiate increases into our price"); PX0492, UPFSC0047327 (internal UP email re: BNSF 1% Fuel Surcharge Eff 6/1, April 30, 2002), at '327

("Our strategy remains to negotiate pure price upfront vs. a surcharge. It's more sustainable, easier to administer, and more effective with customers."); PX0466, UPFSC0000675 (UP-CSX email chain re UP Fuel Surcharge, Jan. 9, 2003), at '675–76 ("The UP 'standard' fuel surcharge program we put into place last month, so far, is applicable only in connection with our tariff & circular prices"); PX0406, UPFSC 0195600 (UP internal email re: Fuel Surcharges, Jan. 15, 2003), at '601 ("Most private IP UP-created documents are not affected at this time . . . ."); PX0127, BNSF-0574516 (BNSF May 28, 2002 Enterprise Wide Risk Assessment Supporting Comments) at '617 ("We are challenged to mitigate the risk through fuel surcharges, particularly as the ***UP does not use a fuel surcharge in the competitive marketplace.***") (emphasis added); PX0128, Metadata to PX0127, at 17.

Like the other Defendants, UP also faced customer pushback when it did attempt to impose fuel surcharges during the pre-Conspiracy Period, resulting in waivers and discounts on fuel surcharges. COF ¶¶ 64–66; *e.g.*, PX0514, UPFSC0184102 (UP internal email re: "EXORBITANT Rail Fuel Cost Recovery," March 12, 2003), at '102 (internal email noting "I'm sure you are aware of the fact that ***there appears to be a lot of interest/push back coming from customers/consultants directed at challenging our fuel surcharges.*** Attached is an example from IP . . . however, I understand this is a growing issue in other commodity groups as well.") (emphasis added); PX0219, CSXFSC000328691 (CSX internal email re: "Important Message from Mike Giftos," Sept. 22, 2000), at '691 (UP's CEO stated in September 2000 that UP had "hesitate[d]" to implement fuel surcharges "because of the competitive issues out there"); PX0488, UPFSC0029999 (internal UP email re: "Fuel Surcharge and 3229," Jan. 15, 2003), at '999 ("If you have business at risk because of a fuel based increase in 3229, Bob suggested you use a refund allowance to offset the price increase to shield the traffic from being lost."); *see also, e.g.*, PX0508, UPFSC 0129813, at '813

(fuel surcharges were "melting away at the competition" and "what's on paper must not work in the real world").

Moreover, even in the instances in which fuel surcharges were included in pricing authorities, Defendants' less aggressive pre-conspiracy fuel surcharges were rarely triggered, and even when triggered, remained low or not collected. COF ¶ 67. Indeed, UP executives testified that "[t]he impact" of UP surcharges "didn't show up in terms of [UP's] financials," given that "because fuel had not run up, they were never implemented," and because "[a]ny fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels." PX0616, Young (UP) Dep., Aug. 4, 2010, at 25-26, 28, 55, 169.

All of this changed as a result of Defendants' conspiratorial agreement to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See, e.g.*, COF ¶¶ 118–21, 227–35, 305–63. During the Conspiracy Period, Defendants' fuel surcharges, including UP's, became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. *See* COF ¶¶ 355–63 (UP), 302–54 (other Defendants); *e.g.*, PX0611, Knight (UP) Dep., July 9, 2010, at 34-42 (describing UP's "objective" to impose fuel surcharges on all applicable contracts, and agreeing that it was UP's "company position to apply a fuel surcharge on every freight bill . . . it can."); PX0517, UPFSC 0217870 (Q3 2005 UP Earnings Conference Call, Oct. 27, 2005), at '871 ("With high diesel fuel prices continue to go impact our earnings, we have an absolute mandate with our fuel surcharge program to take that higher cost out of the equation as existing contracts are renewed."); PX0411, UPFSC 0275003 (UP internal email re: Contact Person for Fuel Surcharge

Information, Nov. 4, 2004) at '003 (discussing plan to implement the new HDF-based surcharge "to all business as it becomes available for action (the expiration date of contracts, etc.)").

Dr. Bernheim found that Defendants' "early fuel surcharge programs did not generate substantial revenue for the Defendants." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 82; *see id.* ¶¶ 71–82; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023 ¶ 157 ("Defendants' Conspiracy Period carload FSC formulas yielded higher payments than their predecessors at then-current fuel market conditions."). Dr. Bernheim also concluded that "fuel surcharge payment coverage increased dramatically during the cartel's operation." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim shows the low levels of coverage UP experienced before the conspiracy and a dramatic increase once UP entered the conspiracy:

**Figure IV-14: Frequency of fuel surcharges[245]**



PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 155, Fig. IV-14.

Other experts reached the same conclusion. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 337 and Fig. V.1; Jacobs MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 104-107 and Figs. II.22 & II.23; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 166-175; PX0984, Leitzinger MDL II Reply Rpt., ¶¶ 80-96 ("[T]he evidence does not support [Defendants' experts'] view" that "the increases in coverage seen during the Conspiracy Period were merely a continuation of a trend that predated the alleged conspiracy").

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**Material Undisputed Fact No. 33**

**UP unilaterally changed its published carload fuel surcharge in 2003, no longer following CSXT and NS, and differentiating itself from BNSF.**

Supporting Facts:

33.1 In early 2003, UP came to recognize shortcomings in its 2002 carload fuel surcharge formula after an unexpected one day dip of WTI prices required last minute changes to UP and customer billing and budgets, and resulted in significant lost recovery of increased fuel costs.[152]

[152] DA01254 at 55 (Koraleski (UP) 77:14-78:25); DA01554 at 55.

33.2 UP considered various proposals and counterproposals to adjust the carload fuel surcharge in response.[153]

33.3 On March 20, 2003, CSXT issued a press release stating that it was changing its published carload fuel surcharge to use a $23.01 WTI trigger price and a 0.4% surcharge, increasing an additional 0.4% for each $1 change in the average WTI price for the prior month.[154]

33.4 UP debated internally whether to match that formula for UP local traffic. UP announced its decision to match the CSXT formula in a press release on Friday, April 4, 2003, effective June 1, 2003.[155]

33.5 After announcing the new WTI-based carload fuel surcharge formula, UP continued to undertake significant internal debate and research about the formula, partly in response to customer complaints about its announcement.[156]

33.6 On May 5, 2003, UP decided to abandon the previously announced $23.01 WTI carload surcharge and to move instead to a different HDF-based surcharge with a $1.35 trigger price.[157]

---

[153] DA19321 at 27 (Adams (UP) 3/4/10 177:1-7).

[154] DA01430.

[155] DA01449 at 49.

[156] DA01453 (April 11, 2003 email reporting "a growing number of customers that have begun to share their resentment to our planned fuel surcharge language (and that of CSX)"); DA01468 (UP internally analyzing fuel indices, historic fuel prices, and fuel surcharge options in April 2003); DA01492 (UP internally analyzing publicly available information about other railroads' fuel surcharges to "compar[e] the various programs"); DA01494 (April 2003 email noting customer requests for UP to review its fuel surcharge program and seeking analysis regarding changes to the fuel market, possible trigger prices, correlation of fuel indices to UP fuel costs, and performance of various methodologies in recouping UP's increased fuel costs); DA01497 (same); DA01518 (April 28, 2003 UP internal "Fuel Surcharge Analysis" presentation); DA01524 (April 28, 2003 email requesting additional analysis regarding fuel surcharges); DA01525 (May 2, 2003 UP internal memorandum with analysis related to fuel surcharge program); DA01534 at 36 (May 5, 2003 comparison of various fuel surcharge formulas).

[157] DA01531 at 32 (May 5, 2003 internal UP meeting agenda with "[f]ocus on 'fuel surcharge'"); DA01544 at 46-53 (May 5, 2003 internal UP meeting presentation regarding UP June 1, Surcharge

33.7 At this time, BNSF had a HDF-based carload surcharge with a $1.30 trigger price.[158] UP's $1.35 trigger price was less aggressive in that it would not assess a surcharge when diesel fuel was priced between $1.30 and $1.35 per gallon.

33.8 There is substantial internal documentation of UP's analysis of, and rationale for, the change in plans.[159]

33.9 UP announced this change to its published carload fuel surcharge formula on May 9, 2003, effective June 1, 2003.[160]

33.10 On May 7, 2003, BNSF announced it was dropping its trigger price to $1.25.[161] UP kept its trigger price at $1.35 and that formula went into effect on June 1, 2003.[162]

33.11 The published carload fuel surcharge UP implemented on June 1, 2003 was based on an HDF formula, while NS and CSXT both continued to use fuel surcharge formulas based on WTI.[163]

---

Plan); DA01554 at 54-62 (May 7, 2003 compilation of information related to UP's new HDF-based fuel surcharge program).

[158] DA01534 at 39-43; DA01554 at 56.

[159] DA01468 (UP internal analysis of fuel indices, historic fuel prices, and fuel surcharge options in April 2003); DA01492 (UP internal analysis of publicly available information about other railroads' fuel surcharges to "compar[e] the various programs"); DA01494 (UP compiling analysis regarding changes to the fuel market, possible trigger prices, correlation of fuel indices to UP fuel costs, and performance of various methodologies in recouping UP's increased fuel costs in April 2003); DA01497 (same); DA01518 (April 28, 2003 UP internal "Fuel Surcharge Analysis" presentation); DA01524 (April 28, 2003 email requesting additional analysis regarding fuel surcharges); DA01525 (May 2, 2003 UP internal memorandum with analysis related to fuel surcharge program); DA01534 (May 5, 2003 comparison of various fuel surcharge formulas); DA01544 (May 5, 2003 internal UP presentation regarding plan for and reasoning behind UP June 1, Surcharge Plan).

[160] DA01563.

[161] DA04603.

[162] DA01563.

[163] *See supra*, ¶¶ 33.3, 33.6, 23.1.

33.12 UP did not make any change to its published carload fuel surcharge at any time between June 1, 2003, and April 26, 2007, when it moved to a mileage-based fuel surcharge.[164]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 33**

Disputed.

The cited evidence does not support the statement. None of the cited documents shows that UP acted unilaterally. No evidence cited by Defendants indicates that UP personnel engaged in meaningful debate about its fuel surcharge formula or that there is substantial internal documentation of UP's analysis of, and rationale for, the change in plans.

Defendants misleadingly rely on DA04603–04 and DA01563 to support their implication that Defendants' different trigger prices were inconsistent with the alleged conspiratorial objective. "By 5/9/03, UP had adopted an HDF-based carload FSC (also effective 6/1/03) that, as described in an internal UP document, 'mirrors BNSF's except that UP does not apply a 1% surcharge when the price is between $1.30 and $1.349/gallon.' UP and BNSF then retained those same standard carload FSC formulas throughout the Conspiracy Period. . . . [M]onthly average published HDF prices were above $1.35/gallon—meaning that the UP and BNSF formulas yielded identical results—throughout the Conspiracy Period. . . . Trigger prices for Defendants' FSCs were always met, and surcharges became a significant component of shippers' freight costs." PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, at n.280, Fig. 17, ¶¶ 108, 173; *accord* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 102 ("[BNSF and UP's] fuel surcharges differed only for fuel prices between $1.25/gallon and $1.35/gallon. With fuel prices generally exceeding the trigger as the conspiracy progressed, the latter difference was inconsequential. Thus, for all practical purposes, the conspiracy homogenized fuel surcharge formulas for carloads in the West.").

---

[164] DA01700.

Furthermore, admissible evidence demonstrates that beginning in 2003, UP's fuel surcharge program was not the result of "unilateral" decision-making, but rather the result of Defendants' agreement to impose pretextual and non-negotiable fuel surcharges, across-the-board and with uniform directives to minimize discounts and waivers, in order to increase all-in freight rates. Starting in 2003, UP executives engaged in meetings about rail fuel surcharges with their counterparts at BNSF, NS, and CSX. *See* COF ¶ 95; PX0474, UPFSC0001088 (handwritten notes summarizing June 3, 2003 CSX-UP meeting) at '088 ("Fuel surcharge—GIFTOS, CSX has not seen outcry that UP has. CSX may begin a modest hedge program (WARD). Both roads start at a $23 trigger. May have to revisit $23 if stay high.").

On March 11, 2003, UP internally circulated a "Revised Surcharge proposal," which retained the $28 WTI strike price of UP's existing program, but which would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula (which called for a 2.0% increase for every $5 increase in the WTI index); PX0501, UPFSC_0075385 (UP internal email re: "jjk fuel revisited," March 11, 2003, and attachments), at '386 ("Union Pacific Revised Fuel Surcharge Recommendation[:] • Surcharge is implemented at $28.00 and 2% • Establish the Threshold Percentage at 0.4% for each per dollar for WTI beyond $28.00 . . . .").

On March 19, 2003, CSX announced a new standard fuel surcharge program. CSX's CEO and chief commercial officer chose to adopt this new program after conferring with Gooden. *See, e.g.*, PX0163, CSXFSC000000357 (CSX internal email re: Fuel Surcharge Change, March 19, 2003), at '357; PX0612, Gooden (CSX) Dep., July 16, 2010, at 96-98. The new CSX program retained the lower $23 trigger that CSX had proposed on March 11, but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's *internal* "Revised Surcharge proposal." *See* PX0185,

CSXFSC000084489 (CSX press release, March 20, 2003), at '489. CSX's new program was substantially more aggressive than the program it had been considering earlier in 2003—CSX stated that "it is actually a large increase in fuel surcharge billings" and "maybe as much as [redacted] PX0163, CSXFSC000000357 (CSX internal email re: Fuel Surcharge Change, March 19, 2003), at '357. Contemporaneous with CSX's adoption of its new fuel surcharge program, other Defendants called it out for what it was: a "more aggressive formula" and a "money grab." PX0253, NS 010076080 (NS internal email re: UP FSC—NS Concurrence Eff, July 16, 2003), at '080; *see* COF ¶¶ 112–13, 118–21.

Soon after, UP announced that it had abandoned its pre-existing $28 WTI strike price, the same approach as CSXT. *See* COF ¶¶ 122–23. UP adopted CSX's program despite some internal recognition at UP that the new fuel surcharge was "complex/confusing and would be problematic to administer." PX0499, UPFSC_0069867. UP's decision to adopt CSX's methodology was made without justification or analysis by UP's finance team. COF ¶ 124. Koraleski testified that he did not recall any specific financial analysis at UP supporting its decision to adopt the CSX methodology. COF ¶ 125.

UP's Koraleski attended the Spring 2003 NFTA meeting on April 2-6, 2003, which was also attended by Defendants' other senior marketing officers. COF ¶ 148; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting). On April 15–17, 2003, CMOs and CMOs-in-waiting from all four Defendants participated in an unsupervised getaway, with no other employees invited. COF ¶ 139.

After these meetings, and after BNSF announced it would lower its trigger to $1.25 HDF to "reflect" the $23 WTI trigger, UP changed course and announced it would lower its trigger price to $1.35 HDF (rather than $23 WTI). *See* COF ¶ 161, 166. UP's new $1.35 HDF trigger was ostensibly less aggressive than BNSF's $1.25 HDF trigger, but in reality once the threshold was met the fuel surcharge mirrored BNSF's, and picked up any of the fuel surcharge it had skipped over between $1.25 and $1.35 HDF. PX0355, NS_0014001716 (NS internal email re: "FSC Revenue Comparison", May 16, 2003), at '717 (regarding the new UP formula, "The difference [from BNSF] is higher kick in threshold of $1.35 per gallon ($1.25 base). . . . Once it kicks in, it is identical to the BNSF FSC. . . . The practical effect is to suppress smaller increase[s] until the $1.35 threshold is met, then increases are applied back to the $1.25 base."); *see* COF ¶¶ 167–68 (outlining how this change brought UP and BNSF into lockstep); *accord* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 102; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 240, 247, and Fig. III.8; PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, at n.280, Fig. 17, ¶¶ 108, 173.

During the very period when UP and BNSF brought their fuel surcharges into virtual lockstep, UP's and BNSF's senior officials were communicating directly with each other. On May 14, 2003, NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers," and discussed how to "work together on this opportunity," including whether they should do so "through the AAR [Association of American Railroads]" or "handle the opportunity on a bilateral basis." PX0241, NS 001000360 (UP-NS email chain re "Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361. Minutes from the meeting reflect that UP and NS executives agreed that "***[u]niform application [of fuel surcharges] across the industry would be helpful***." PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("Fuel surcharges → Uniform

application across the industry would be helpful") (emphasis added). They assigned Mr. Seale and UP CMO Jack Koraleski to follow up on these issues. PX0241, NS_001000360, at '360-61; *see also* PX0485, UPFSC 0014100 (May 6, 2003 conference call between Koraleski, Seale, and others to devise agenda for May 14, 2003 "Alliance" meeting); PX0396, UPFSC 0127235 (UP email re: "UP NS Alliance Conference Call August 15, 2003," July 28, 2003), at '235 (reflecting that follow up conference calls to May 14, 2003 meeting took place between NS and UP executives on at least July 8, 2003, and August 15, 2003).

On June 3, 2003, CSX and UP senior executives met and discussed fuel surcharges. *See* PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 (reflecting discussion of both railroads starting at a $23 trigger point); PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."). The day of the June 3, 2003 meeting, at Mike Giftos's request, CSX's John Couch emailed Giftos and Gooden a chart comparing CSX's fuel surcharge program to the other Defendants' programs. PX0166, CSXFSC000000414 (CSX internal email re: "Fuel Surcharge Last 16 month comp," June 3, 2003) (attaching comparison of new CSX formula to other railroads' formulas in past). At the June 3, 2003 meeting, CSX and UP senior executives assessed the customer opposition the companies were receiving to their efforts to apply their fuel surcharges. PX0167, CSXFSC000000416 (CSX-UP email re: "CSX/UP Alliance Meeting Minutes 06/03/03," June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."); PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Fuel surcharge – GIFTOS, CSX has not seen outcry that UP has"). CSX and UP senior executives also discussed their trigger points for their fuel surcharge programs

and agreed that, if fuel prices stayed high, they might have to consider raising their trigger points. PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Both roads start at a $23 trigger. May have to revisit $23 if stay high."). Handwritten notes of the June 3, 2003 "Alliance" meeting show that the prepared "minutes" were sanitized to omit key discussions on fuel surcharges. *Compare* PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Fuel surcharge—GIFTOS, CSX has not seen outcry that UP has. CSX may begin a modest hedge program (WARD). Both roads start at a $23 trigger. May have to revisit $23 if stay high."), *with* PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."); *see also* COF ¶¶ 188–93.

UP's and BNSF's chairmen and CEOs had one-on-one conversations, including by telephone, as did their CMOs. COF ¶ 175. UP executives continued meeting with the other Defendants' senior executives throughout 2003. *See, e.g.*, COF ¶¶ 194–96, 199–204.

Admissible evidence demonstrates that UP's change to the HDF rather than the WTI was to align its fuel surcharge with BNSF, its western competitor, in furtherance of the agreement to keep all surcharges the same "in the eyes of the customer." UP internally acknowledged that it switched fuel surcharge programs "[t]o match BNSF's 'standard' HDF based surcharge." PX0502, UPFSC_0075761 (UP internal email re: "Fuel Surcharge - WTI vs. HDF - Project 2108," Oct. 20, 2004), at '761. UP scheduled its new surcharge to come into effect on June 1, 2003—the same date BNSF's formula was scheduled to become effective. PX0115, BNSF-0511809 (BSNF Rules Book 6100-A), at '834 (BNSF: "***Issued May 7, 2003 – Effective June 1, 2003***"); PX0401, UPFSC 0183975 (internal UP email re: "5th Update - IP Surcharge Q&A," May 9, 2003, and two attachments), at '982 ("UPRR Fuel Surcharge *Timing & Details*[:] Issued May 9, 2003; applies to

affected documents June 1, 2003"). UP's formula was designed to be identical to BNSF's. PX0401, UPFSC0183975 (UP internal email re: 5th Update—UP Surcharge Q&A dated May 9, 2003) at '975 ("UP's mirrors BNSF's except that UP does not apply a 1% surcharge when the price is between $1.30 and $1.349/gallon."); PX0610, Lanigan (BNSF) Dep., June 22, 2010, at 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical"). BNSF acknowledged that UP's wholesale adoption of BNSF's methodology was "big news" because "[t]he ideal scenario is to have BNSF and UPRR have the same FSC methodology." PX0091, BNSF-0342448 (BNSF internal email re: "Updated UP FSC effective 6/1/03," May 12, 2003), at '448; *see* COF ¶ 168.

During the Conspiracy Period, UP was therefore successful in substantially increasing its fuel surcharge coverage. COF ¶¶ 355–63; *e.g.*, PX0611, Knight (UP) Dep., July 9, 2010, at 34-42 (describing UP's "objective" to impose fuel surcharges on all applicable contracts, and agreeing that it was UP's "company position to apply a fuel surcharge on every freight bill . . . it can."); PX0505, UPFSC_0099019 (internal UP email thread re Fuel Surcharge – 1Q Analyst Package, Apr. 10, 2007), at '19 (noting that "85% of our business is covered by a fuel surcharge program"); PX0530, UPFSC0433046 (internal UP email attaching presentation given by Jack Koraleski, May 8, 2007), at '050 (Jack Koraleski noted that UP achieved "record fuel surcharge coverage" in 2006); PX0853, UPFSC 0042033 (Presentation re "Incremental Fuel Expense Recovery Due to Fuel Surcharges," Mar. 24, 2005) at '033 (showing fuel surcharge coverage by revenue reached 65% in 2004, 72% in 2005, 85% in 2006, 89% in 2007, and 91% in 2008); PX0393, UPFSC 0076935 (internal UP email re: Fuel Surcharge Presentation, October 2005) at '936 (2005 statistics); PX1063, OX0080195 (email re: "Carmeuse/Skyline," June 27-28, 2005), at '195 ("[redacted]

[redacted]); PX1064, OX0062849 (email re: "UPCQ 90726 – 2007 RATES," Oct. 31, 2006) at '849 ([redacted]); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 206-219, Figs. 20-26; PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 130–152.

Admissible evidence further demonstrates that UP's fuel surcharge program was not designed merely to recoup fuel costs. *See* COF ¶¶ 456–64.

During the Conspiracy Period, Defendants—including UP—exchanged data tracking their progress toward universal coverage; shared information about fuel costs, hedging practices, and fuel surcharge policies and implementation; and monitored each other to ensure that no member of the cartel cheated on the conspiracy. COF ¶¶ 364–67; 500–10. UP was also actively involved in Defendants' coordinated effort to cause the AAR to adopt the AIILF, to facilitate Defendants' imposition and collection of the new coordinated fuel surcharges, particularly given that there already was an existing cost-escalation index, the RCAF, that would have enabled Defendants to recoup their actual fuel costs. COF ¶¶ 367–420.

Defendants, including UP, earned increasing, supracompetitive revenues and profits from fuel surcharges over the course of the Conspiracy Period. COF ¶¶ 524–53. Plaintiffs' experts found in their quantitative analyses that Defendants' fuel surcharge revenue rose dramatically during the conspiracy. PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 350 ([redacted]); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023,

¶¶ 206-218, Figs. 20-26. Dr. Bernheim found that once the conspiracy began, "prices remained on a steep upward trend until late 2008." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128; Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 452-53. Dr. Bernheim also "computed fuel surcharges as a fraction of overall net revenue in every month from January 2000 through December 2008" and found "that fuel surcharges accounted for a rapidly growing fraction of the Defendants' revenue during the cartel's operation." *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 128; *see also* PX0985, McClave MDL II Rpt., Mar. 1, 2023, 5–8, Fig. 1 & Table 1. The following graph prepared by Dr. Bernheim indicates the dramatic rise in fuel surcharges as a percentage of Defendants' net revenue during the conspiracy, including for UP:

**Figure IV-15: Fuel surcharge as percentage of net revenue**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 156, Fig. IV-15; *see also* Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 337 and Fig. V.1; PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 147 ("Defendants enjoyed a widespread increase in profitability following the commencement

of the alleged conspiracy . . . Defendants emphasized the importance of their FSC programs to the record levels of revenue and profits they achieved during the Conspiracy Period."). Dr. Bernheim also concluded that "non-conspiratorial factors cannot account for the dramatic increase in fuel surcharge coverage or revenue during the operation of the alleged cartel." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 26, 157–184. Similarly, Dr. Jacobs concluded that these Defendant actions "are consistent with collusion" (Jacobs MDL II Rpt., March 1, 2003, ¶¶ 265-287) and are not explained by non-conspiratorial factors. (Jacobs MDL II Reply Rpt., Nov. 1, 2023, ¶¶ 131-192). Dr. Bernheim found that during the conspiracy, Defendants, including UP, generally increased their operating margins, *id.* ¶¶ 134–138, and saw an "increase in perceived profitability" in the market and thus drastically drove up their stock prices, outperforming the S&P 500, *id.* ¶¶ 139–141; *see also* COF ¶¶ 524–53. Similarly, Dr. Jacobs found that UP, and the other Defendants, collected "significantly more in FSC revenue than they incurred in in incremental fuel cost" and "a[s] the percentage of [Defendants'] fuel expense increased in the Alleged Conspiracy Period, Defendants' profit margin increased in tandem." Jacobs MDL II Rpt., March 1, 2003, ¶¶ 413, 465. Defendants' conspiracy achieved striking success in part because Defendants' conspiratorial fuel-surcharge programs, which they were now able to apply far more broadly and uniformly than in the pre-Conspiracy Period, recovered dramatically more than the cost of fuel. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 142–152; *see also* COF ¶¶ 513–23.

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as

a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**Material Undisputed Fact No. 34**

**UP continued to independently change and monitor its fuel surcharge programs during the alleged conspiracy period.**

Supporting Facts:

34.1 In the summer of 2004, UP learned from public sources that BNSF had adopted a separate, more aggressive, fuel surcharge for coal traffic—it used a lower trigger of HDF $1.24 (as compared to the carload's HDF $1.25 trigger) and smaller increments of 0.5% for each $0.04 increase (as compared to the carload formula's 0.5% for each $0.05 increase).[165]

34.2 UP undertook an analysis of its own fuel surcharge program and UP's Finance Department proposed that UP also implement a coal-specific fuel surcharge because its carload fuel surcharge was not recovering UP's incremental fuel costs on heavy fuel burning coal traffic.[166]

34.3 On October 1, 2004, UP ultimately adopted a new coal-specific surcharge, but it did not match BNSF's. UP chose an initial trigger of HDF $1.35, $0.11 higher than BNSF. Between HDF $1.35 and $1.60, UP's coal surcharge tracked its published carload surcharge. Beginning at HDF $1.60, it adjusted in increments of 0.75% for each $0.05 change in the HDF price (giving UP a different trigger price and a different slope from the BNSF coal formula).[167]

---

[165] DA01599.

[166] DA01602 (comparing UP's carload fuel surcharge and BNSF's coal fuel surcharge and concluding that "BN's is better"); DA01612 at 12 (analyzing fuel cost recovery of UP's business groups).

[167] DA01622 at 22-23, DA01624 (announcing UP's coal fuel surcharge effective November 1, 2004, to qualifying coal shippers).

34.4 In March 2005, UP learned from public sources that BNSF had announced a mileage-based fuel surcharge program.[168]

34.5 UP conducted an internal analysis of BNSF's new mileage-based program when details were posted on BNSF's website in August 2005.[169] UP chose not to adopt a mileage-based fuel surcharge program at this time.

34.6 In 2005 and 2006, UP analyzed the coverage and performance of its carload fuel surcharge program, considering whether adjustments were needed to try to ensure UP was approaching, but not surpassing, its goal of 100% incremental cost recovery as a railroad. UP chose not to adjust its carload fuel surcharge at that time.[170]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 34**

Disputed.

The cited evidence does not support the proposition that UP first learned of BNSF's new fuel surcharge formula for coal from public sources in the summer of 2004. Rather, that cited evidence consists of a single email (DA01599–601) where one UP employee, Linda Brandl, states that "the BNSF website has a new fuel surcharge for Coal." The document does not reflect whether the website is how UP first learned about this formula.

Nor does the cited evidence support the proposition that UP first learned of BNSF's mileage-based fuel surcharge via public sources in March 2005. The cited documents (DA01629–32) consist of three March 29, 2005 internal UP emails, each of which contains a link to BNSF's

---

[168] DA01629.

[169] DA01648; DA01633; DA01662 (September 12, 2005 UP internal analysis of "UP vs. MBFSC" incremental fuel cost recovery); DA01661 (September 1, 2005 UP internal analysis of "Fuel Surcharge as % of Price Versus Mileage Based Fuel Surcharge").

[170] *See, e.g.*, DA19038 (December 2005 "Fuel Surcharge Meeting Minutes and Potential Alternatives"); DA19053 ("Fuel Surcharge " Presentation of fuel surcharge risks and options).

announcement and the announcement itself. None of the emails suggest the website was how UP learned of the program, or whether UP learned of it from another source.

In addition, the cited materials do not support the statement that UP acted unilaterally. No document cited by Defendants states that UP acted unilaterally. As explained in Plaintiffs' Response to Defendants' Undisputed Fact No. 33, admissible evidence demonstrates that beginning in the spring of 2003, UP coordinated its fuel surcharge program with those of the other Defendants.

There is also substantial admissible evidence that BNSF and UP's implementation of somewhat more aggressive fuel surcharges on coal was conspiratorial and part and parcel of Defendants' agreement to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. [redacted] PX0785, Corrected Elzinga Rpt., July 9, 2018 (corrected Aug. 7, 2018), at 53–55 & n.256; PX0830, Frankel Rpt., July 9, 2018, ¶ 34 & Ex. 1c.

Following the unprecedented meetings between railroad executives in 2003 (*see, e.g.*, COF ¶¶ 139, 146–48, 175, 182–95), UP and BNSF's fuel surcharges on coal arose at the same time senior executives engaged in extensive additional discussions, including a coal-related "train trip on the coal line in eastern Wyoming" that BNSF's and UP's CEOs began discussing in March 2004 and which both CEOs attended in August 2004. COF ¶¶ 282–84; PX0633, Davidson (UP) Dep., Feb. 24, 2011, at 248-250; PX0538, UPFSC_0466673 (UP CEO Dick Davidson calendar entry reflecting March 25, 2004 call with BNSF's Matt Rose re: "Matt Rose re coal trip," Mar. 24, 2004), at '673; *see also* PX0522, UPFSC_0343267 (letter from BNSF's CEO to UP's CEO

referencing "previous[] discuss[ions]" and suggesting future meetings, Mar. 10, 2003), at '267; PX0541, UPFSC_0466746 (reflecting meeting with NS's David Goode and BNSF's Matt Rose, Dec. 12, 2003), at '746; PX0029, BNSF_CAL_0004878 (email reflecting "visit" from UP's Koraleski, Nov. 24, 2003) at '878.

Contrary to the position that Defendants now take—that these surcharges were "separate" and somehow different from the general carload fuel surcharges—Defendants maintained at the time that they were nothing new. For example, UP announced the increased surcharge to its customers as a mere "modification," PX1169 (letter from UP's Lance Fritz re "Fuel Surcharge Modification," Oct. 1, 2004), at '974, and UP described its fuel surcharge program on coal shipments to the STB as a mere "variation from the standard HDF program" it applied to carload shipments. PX0766 (STB *Ex Parte* 661 Comments from Union Pacific Railroad Company, Apr. 27, 2006), at 11. The fuel surcharge on coal adopted by UP was indeed similar to its carload program. PX0611, Knight (UP) Dep., July 9, 2010, at 90-91 ("Q. Okay. All right. Then -- then you wrote that Union Pacific's coal business has a separate fuel surcharge program. Do you see that? A. I do. Q. And you refer to something that occurred in November 2004. Do you see that? A. I do. Q. Now, that fuel surcharge for the coal business was also HDF-based, correct? A. That's correct. Q. And it began at the same exact trigger point as the -- the carload HDF surcharge, correct? A. I believe that is correct. . . . Q. And -- and then up until $1.60 per gallon, the increase in both programs was exactly the same, correct? A. Again, I think -- I think that's right. Q. And then the only change from the standard HDF program is that after $1.60 per gallon, the -- this coal surcharge increase is slightly more, correct? A. That is correct.").

BNSF's fuel surcharge on coal was similar to UP's program, both in terms of its features and in the eyes of the two railroads' customers. As the Western Coal Traffic League summarized for the STB in 2006:

> UP and BNSF's programs have similar characteristics . . . [E]ach utilizes DOE's HDF On-Highway Diesel Fuel price for applying surcharges. Each program's fuel surcharge percentage changes as the utilized DOE reported HDF prices change. Each program bases fuel surcharges on a percentage of line-haul revenue . . . [E]ach fuel surcharge program employs a two-month 'lag' in applying surcharges derived from the basis month from which the surcharges are applied (e.g., the fuel surcharge to be applied by UP and BNSF in May 2006 will utilize a basis month of March 2006 for determining the applicable fuel surcharge for May) . . . Both UP and BNSF are aggressively implementing their fuel surcharge programs and they have been very successful in collecting fuel surcharges.

PX0666, STB *Ex Parte* No. 661, Statement of Western Coal Traffic League, Apr. 27, 2006, at 8–9; *see also* COF ¶¶ 302–63.

BNSF and UP's fuel surcharges on coal were substantially similar throughout the Conspiracy Period, further disputing BNSF's assertion that its decision was "unilateral." For the vast majority of the Conspiracy Period, the differences between BNSF's and UP's fuel surcharge programs on coal were generally less than two percent. COF ¶¶ 289–93; *see* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 106 ("While some of the provisions in BNSF's and UP's conspiracy fuel surcharge programs for coal shipments differed, they implied similar surcharges at the time of their adoption. Specifically, in the months following November 2004, when UP implemented of its Conspiracy Period program, the HDF price varied between $1.90 and $2.50 per gallon. As a result, the difference in the fuel surcharge percentages for the two programs [during this initial time period] was approximately 1.2% on average, compared to 13%–14% for the average surcharge."); PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 118 (finding that [redacted]

[redacted]).

BNSF and UP coal customers were subject to the policies adopted and implemented by Defendants during the Conspiracy Period to ensure that their fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, with approval of exceptions centralized in senior management. *See, e.g.*, PX0411, UPFSC 0275003 (UP internal email re: "Contact Person for Fuel Surcharge Information," Nov. 4, 2004) at '003 (discussing plan to implement the new HDF-based surcharge "to all business as it becomes available for action (the expiration date of contracts, etc.)"); PX0445, UPFSC_0195683 (UP presentation and speaker notes), at '683 (detailing 2005 goal of further fuel surcharge implementation in all new and expiring contracts); PX0517, UPFSC 0217870 (transcript of Q3 2005 UP Earnings Conference Call, Oct. 27, 2005), at '871-72 ("With high diesel fuel prices continu[ing] to . . . impact our earnings, we have an absolute mandate with our fuel surcharge program to take that higher cost out of the equation as existing contracts are renewed."); PX0142, BNSF-FSC 000488 (BNSF internal email re: "Fuel Analysis 3-11-04," March 11, 2004), at '488 ("Contracts requiring [BNSF CEO's] signature but excluding full fuel surcharge provisions *[would] not be signed*" and further noting that the CEO "*expects Coal to use fuel surcharge programs to recover 100% of its fuel exposure*") (emphasis added); *see also* PX 0666, STB *Ex Parte* 661, Statement of Western Coal Traffic League, Apr. 27, 2006, at 9 ("Both UP and BNSF are aggressively implementing their fuel surcharge programs and they have been very successful in collecting fuel surcharges."); *see also* COF ¶¶ 302–63.

Admissible evidence also contradicts the misleading suggestion that UP's failure to adopt a mileage-based fuel surcharge in 2005—that BNSF's decision to apply mileage-based fuel

surcharges to only a minority amount of local traffic beginning in 2006—might somehow imply that either UP or BNSF were no longer participating in the conspiracy. BNSF repeatedly ***abandoned*** what would have been a unilaterally self-interested effort in imposing mileage-based fuel surcharges. Instead, BNSF only began using a mileage-based fuel surcharge for some local shipments in early 2006 (three years after it began considering a mileage-based formula), but with limited application. *See* COF ¶¶ 554–57, 565, 585. Given this, BNSF's decision to delay implementation of a competitively advantageous mileage-based fuel surcharge *for at least three years*, and even then to implement it only in a limited manner, was the result not of "unilateral" decisionmaking, but rather of Defendants' collusion, including with UP. Moreover, BNSF's limited adoption of mileage-based fuel surcharges (or UP's failure to adopt a mileage-based fuel surcharge) in 2006 cannot be deemed to be unrelated to the conspiracy when BNSF designed its mileage-based fuel surcharge program to be "revenue neutral" compared to its rate-based fuel surcharges. *See, e.g.*, PX0086, BNSF-0327878 (BNSF Communication Plan regarding "Mileage-Based Fuel Surcharge Program Update," July 2005), at '884 (listing as a goal of the mileage-based program to "collect[] the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces"); *see also* COF ¶¶ 554–55, 565, 585.

UP's cited documents also misleadingly suggest that UP was not covering its incremental fuel cost on coal traffic in 2004. *See* DA01602. The documents rely on 2002 average coal contract prices, to which the UP conspiratorial carload surcharge could not have applied. DA01622-23 also demonstrates that UP's fuel surcharge on coal was a profit center, based on UP's analysis indicating that contribution per car generally increases as the cost of fuel increases. The analysis is based on the average revenue per car, which increased significantly as UP's all-in rates per coal car increased during the Conspiracy Period (primarily as legacy contracts expired), thereby

ensuring further FSC revenue above UP's alleged fuel cost per car. [redacted] PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 323, and [redacted] *Id.* at 116 n.652 (quoting a leading independent study on railroad fuel consumption/costs by train type).

Moreover, UP's documents make clear that its adoption of a mileage-based surcharge would not have a "negative revenue impact" because UP designed the FSC to make sure it continued to earn the same revenues that were generated by rate-based fuel surcharges. *See*, *e.g.*, DA01692–98, at '93 ("When implementing the new fuel surcharge program, we will reprice our business . . . The basing of the new fuel surcharge at a higher level will require the incorporation of some of the current fuel surcharge revenue into the customers' base prices."). BNSF also utilized a "revenue neutral" approach when it began its limited application of mileage-based fuel surcharges in 2006. *See* COF ¶¶ 554–57, 565, 585. It was also the same approach that CSX utilized when it announced that it would be implementing a mileage-based fuel surcharge. COF ¶¶ 582–85; PX0179, CSXFSC000006567 (CSX "Internal Announcement on FSC Changes," March 2, 2007), at '574 (internal CSX memo: mileage-based program would "keep the economics the same"); *see also* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, at ¶ 145 ("Additionally, [redacted]); *id.* ¶ 96 ("[redacted]").

Finally, admissible evidence contradicts Defendants' suggestion that UP tried to achieve no more than "100% incremental cost recovery as a railroad." To the contrary, UP's internal analyses acknowledged it was significantly over recovering fuel costs on the shipments to which fuel surcharges were applied. *See, e.g.*, PX0452, UPFSC_0361546 (handouts provided during Director meeting regarding "Fuel Surcharge Recovery Analysis," Oct. 10, 2005), at '555 (acknowledging that UP's standard fuel surcharge would yield more than 100% of incremental fuel expenses when applied to entire revenue base). UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value'" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." PX0391, UPFSC 0066571 (internal UP email re: "Toyota Fuel Surcharge Analysis," June 2, 2005), at '571; PX0611, Knight (UP) Dep., July 9, 2010, at 258 ("I would say I was the leader in believing that we should earn a margin on the cost of fuel."); *see also* COF ¶¶ 456–64. Dr. Bernheim found that UP recovered 155% of UP's incremental fuel costs during the conspiracy period. PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 149; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 413-414 [redacted]"); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 195-201 (discussing [redacted]); Frankel Rpt., July 9, 2018, ¶¶ C.2.8–10 & Ex. C1a (showing [redacted]).

**<u>Material Undisputed Fact No. 35</u>**

**There is no direct evidence that UP participated in the conspiracy that Plaintiffs allege.**

<u>Supporting Facts:</u>

35.1 No current or former UP employee has testified to participating in the conspiracy the Plaintiffs allege.

35.2 No current or former employee of any other Defendant has testified that UP participated in the conspiracy the Plaintiffs allege.

35.3 No documents contain a statement by any current or former Defendant employee that UP participated in the conspiracy the Plaintiffs allege.

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 35</u>**

Disputed.

There is no evidence to support the statement.

Further disputed because whether or not there is "direct evidence" and what constitutes "participat[ion] in the conspiracy" are legal conclusions, not a statement of fact.

To the extent Defendants are permitted to offer such a conclusory, unsubstantiated, legal conclusion as a "Fact," Plaintiffs offer the entirety of these Responses as well as the entirety of their Counterstatement of Material Facts as containing abundant, admissible evidence demonstrating that UP (through its senior executives and other employees) participated in the conspiracy to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See, e.g.*, Plaintiffs' Responses to Defendants' Material Undisputed Facts Nos. 5, 8, 30, 31, 32, 33, 34, 36, 38–45, 51–52.

**<u>Material Undisputed Fact No. 36</u>**

**Intermodal traffic is distinct from carload and coal traffic.**

<u>Supporting Facts:</u>

36.1 Intermodal rail freight traffic is distinct from carload and coal traffic.[171]

36.2 Intermodal traffic moves in standardized containers by rail and another mode of transportation (*e.g.*, truck or ship), whereas carload traffic moves only over rail.[172]

36.3 Intermodal traffic requires special-purpose network facilities and equipment to transition shipments from one mode to another, distinct from that used for carload traffic.[173]

36.4 Intermodal traffic faces significant competition from trucks,[174] which widely used fuel surcharges during the relevant period.[175]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 36</u>**

Admitted that intermodal rail freight traffic has distinctions from carload and coal traffic; that intermodal traffic generally moves in standardized containers by rail and another mode of transportation whereas carload traffic moves only over rail; and that intermodal traffic can require special-purpose network facilities and equipment to transition shipments from one mode to another. Plaintiffs dispute that Defendants' coordinated, conspiratorial fuel surcharge programs did not apply to all traffic, including intermodal traffic. *See* Plaintiffs' Responses to Defendants' Undisputed Facts Nos. 37–45.

---

[171] *See In re Rail Freight Fuel Surcharge*, 292 F. Supp. 3d 14, 35 (D.D.C. 2017) ("*Class Cert. II*"); DA11743 at 44-47 (U.S. Dep't of Transp., *Freight Rail Overview: How, What, and Where Freight Moves*, https://railroads.dot.gov/rail-network-development/freight-rail-overview).

[172] *Class Cert. II*, 292 F. Supp. 3d at 123; DA15740 at 41 (Declaration of George T. Duggan ¶ 4 (June 29, 2010)).

[173] *See* https://www.up.com/customers/track-record/tr060821-what-is-intermodal-equipment.htm.

[174] DA25097 at 103-04 (Carlton Rpt. ¶ 22, 8/15/23); DA25148 at 52-54 (Israel Rpt. ¶¶ 18, 21, 8/15/23).

[175] *See supra*, ¶ 1.2; DA25148 at 60 (Israel Rpt. Fig. 13, 8/15/23).

Defendants' cited sources do not support Supporting Fact 36.4. For the proposition that "Intermodal traffic faces significant competition from trucks," Defendants proffer two citations: Defendants cite Dr. Carlton's MDL II report at paragraph 22, which states, without citation, that "intermodal traffic faces competition from trucks and thus faces different competitive conditions than, say, coal." DA25097 at 103-04 (Carlton Rpt. ¶ 22, 8/15/23). However, Dr. Leitzinger found "little chance" that any intermodal traffic on the major long-distance routes would have been diverted to trucks during the Conspiracy Period. PX0984, Leitzinger MDL II Reply Rpt., ¶¶ 26-27 ("All in all, there was little chance that any significant portion of Defendants' intermodal traffic along [the major long-distance intermodal routes] would be diverted to trucks during the Conspiracy Period."). Even if Dr. Carlton's statement is true—and it is not during the conspiracy period, for the reasons below—it establishes only that intermodal traffic *can* compete with trucking, not that such competition is "significant." Nor does Defendants' second citation, DA25148 at 52-54 (Israel Rpt. ¶¶ 18, 21, 8/15/23), support this proposition. Dr. Israel's only support for his claims are (i) STB decisions *from the early 1980s* about *rate-regulated traffic*, which is not at issue in this litigation, and (ii) a graph depicting the share of Defendants' unregulated traffic that is intermodal, which has nothing to do with competition from trucking. *Id.* As Dr. Bernheim notes, Defendants' expert Dr. Israel "d[id] not assess the extent to which trucking actually provides an option on any given route." PX0770, Bernheim MDL II Reply Rpt. ¶ 558 & n.541.

For the proposition that trucking companies "widely used fuel surcharges during the relevant period," Defendants proffer two citations: Defendants cite Supporting Fact 1.2, which states "Trucking, ocean shipping, and airline transportation companies adopted rate-based fuel surcharges before and during the alleged conspiracy period." Plaintiffs admit that "certain transportation providers not named as Defendants in this litigation used fuel surcharges," Plaintiffs'

Response to Defendants' Undisputed Fact No. 1, but Defendants fail to establish that trucking companies' fuel surcharges were used "widely," were subject to uniform programs and policies among trucking companies, or enforced in the same way as Defendants during the conspiracy period, across-the-board and with uniform directives to minimize discounts and waivers. Nor does Defendants' second citation, DA25148 at 60 (Israel Rpt. Fig. 13, 8/15/23), support this proposition. Dr. Israel's Figure 13 compares the average, publicly reported fuel surcharge rates (not accounting for discounts, waivers, etc.) of various trucking companies, Defendants' published intermodal fuel surcharges, and Defendants' intermodal carload fuel surcharges. Defendants cannot use carefully chosen trucking companies' fuel-surcharge programs to establish that the trucking industry "widely" used fuel surcharges; Defendants have proffered no evidence systematically analyzing the use of fuel surcharges in the trucking industry. *See* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 124-128 (noting, *inter alia*, that Dr. Israel bases his claim about trucking FSC rates on a sample of only 12 trucking companies); *see also* PX1029, S. Goodwin (Hyundai/Kia) Dep., Dec. 8, 2021, at 36:5–37:8 (explaining that [redacted]); *see also* PX0812, Payne (NYK) Dep., Sept. 22, 2022, at 411:7-9, 412:3-6 ("[redacted] NYK [redacted] A. Yes. [. . .] Q. Did NYK [redacted] And these various averaged, published formulas and the resulting fuel-surcharge rates—which generally move together because the price of oil is the same for all industries—say nothing about "competition" between intermodal traffic and trucking, let alone establish that "competition" is "significant." [redacted]

[redacted]. *See, e.g.*, PX1028, M. Nave (Old World Industries, LLC) Dep., Jan. 7, 2022, at 218:17-219:6 (testifying that [redacted]. In addition, the price of oil is not a meaningful measurement of the actual cost of fuel for all modes of transportation as none of these modes use unrefined oil and each carrier's cost of its actual fuel (*e.g.*, diesel fuel) differed by location, time period, and the effects of hedging, if applicable. *See, e.g.*, COF ¶¶ 480–512.

Defendants recognized that their freight services, including intermodal services, were often *not* competitive with trucking. CSX's CEO Michael Ward stated "*in the face of higher fuel price, greater congestion on the highways, and driver shortages, the trucking industry is finding that it makes sense for them to perform the short haul deliveries to and from the customer while the long haul deliveries are carried by rail.*" PX0569, CSX 2Q2005 Earnings Call, August 10, 2005 (emphasis added). CSX's Chief Commercial Officer Michael Giftos noted that CSX was successfully able to stymie other forms of competition: "I think we can continue to take trucks off the highway . . . with truckers facing exceptionally high cost . . . with respect to insurance, with respect to drivers, with some new federal regulations affecting emission controls and their capital structure. The rail truck comparison in economics is favoring railroads . . . ." PX0557, CSX 2Q2003 Earnings Call, November 7, 2003. UP's President and CEO Jim Young recognized that the rail industry benefited from higher fuel prices, in part because it made it "more expensive for the truckers to haul" and led to "trucking companies [wanting] to put more business on the railroads." PX0578, CNBC Interview of Jim Young, May 8, 2006; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 43-56 (demand for rail freight services is inelastic given the impracticality or impossibility of using other modes of transportation for commodities like coal,

hazardous chemicals, and finished automobiles). And shippers of commodities like coal and gravel have little choice but to use rail, as there are no feasible transportation alternatives. *See id.*; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 499 ("Competition for coal shipments primarily occurred between rail providers, as there was little competition coming from other transportation service providers."). In short, "trucking has characteristics th[at] limit its utility for much of the freight business served by railroads." PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 49. For these reasons, the "railroads would have faced a low price elasticity of demand." PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 63; PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶ 499 (finding price elasticity of demand for rail transport of commodities that are transported long distances with few alternatives to rail is "relatively inelastic").

The evidence makes clear that trucks are not a realistic alternative. Rail freight is the only viable method for transporting international liners' cargo from ports to the vast majority of inland destinations across longer distances. [redacted] *See, e.g.*, PX0814, DeSimon (MOL) Dep. Tr. 20:7-22:11 ("[redacted]); PX1085, Pan (Yang Ming) Dep., July 20, 2022, at 22:21-23:5 (Yang Ming would [redacted]); PX0812, Payne (NYK) Dep., Sept. 21, 2022, at 20:3-22:18 ("[redacted] NYK [redacted]

[redacted]); PX0813, Kelly (MOL) Dep., Feb. 3, 2022, at 290:20-295:9 ("[redacted]); PX0815, Rubin (K Line) Dep., Aug. 29, 2022, 69:22-70:14 ("[redacted]); PX0816, Nielsen (Maersk) Dep., June 20, 2022, 21:21–23:9 (testifying, consistent with testimony of other Maersk witnesses, that [redacted]); PX0935, AAR-E-00076582 (American Association of State Highway and Transportation Officials (AASHTO) Freight-Rail Bottom Line Report), at '617 (AASHTO: "Railroads handle the long-haul movement of large quantities of containers and trailers between major hubs such as seaports and major population centers, while truckers handle the short-haul movement to/from the customer's 'front door.'").

Plaintiffs' experts confirmed that during the conspiracy period, trucks generally did not present significant competition to rail-freight shipping, including for intermodal shipments. *See* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 26-27 ("All in all, there was little chance that any significant portion of Defendants' intermodal traffic along [the major long-

distance intermodal routes] would be diverted to trucks during the Conspiracy Period."); PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 44, 49–63. For example, rail freight is the only viable method for transporting international liners' cargo from ports to the vast majority of inland destinations. [redacted] *See* COF ¶¶ 264–66. NYK's Payne testified that [redacted] PX0812, Payne (NYK) Dep., Sept. 21, 2022, at 20:16-21; PX0934, Kleijn (Maersk) Dep., June 28, 2022, at 48:5-14 (Maersk: [redacted]). Moreover, competition from trucking was limited to shorter-haul (and lower weight) movements. As described by AASHTO, "[r]ailroads handle the long-haul movement of large quantities of containers and trailers between major hubs such as seaports and major population centers, while truckers handle the short-haul movement to/from the customer's 'front door.'" COF ¶¶ 265; PX0935, AAR-E-00076582 (AASHTO Freight-Rail Bottom Line Report), at '617; *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 53–54; *id.* ¶ 49 ("[R]ail transportation also is often the preferred mode of transport—even over relatively short distances—for" heavier shipments); PX0769, Leitzinger MDL II Rpt. ¶¶ 53-54; *id.* ¶ 49 ("rail transportation also is often the preferred mode of transport—even over relatively short distances—for" heavier shipments); PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 16; *cf.* PX0817, Bernheim (Crowley) MDL II Reply Rpt., Nov. 15, 2023, ¶ 558 & n.541 (discussing how Defendants' expert Dr. Israel "does not assess the extent to which trucking actually provides an option on any given route").

**<u>Material Undisputed Fact No. 37</u>**

**Defendant CSX Transportation did not provide intermodal rail service during the alleged conspiracy period.**

37.1 Defendant CSX Transportation, a subsidiary of CSX Corporation, provided carload, but not intermodal, rail service during the alleged conspiracy period. A different CSX Corporation subsidiary, CSX Intermodal, which was not a Defendant in *MDL I*, provided intermodal service.[176]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 37</u>**

Plaintiffs dispute that CSX Intermodal (CSXI) "was not a Defendant in MDL I." To the contrary, CSX Intermodal merged into CSXT in 2010. DA16506 at 09 (CSX Corp. 2010 SEC Form 10-K at 4) ("[CSXI] was a subsidiary of CSX [Corporation] until it merged with CSXT during 2010."). As a named Defendant in MDL I, CSXT subsumed CSXI. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Time-Barred Damages Claims, § V ("Plaintiffs' Claims Arising from Intermodal Transactions with CSXI Are Tolled").

Moreover, during the relevant period, CSXI reimbursed CSX for costs related to intermodal operations, and CSXT collected revenue on behalf of CSXI. *See, e.g.*, CSX Transportation, Quarterly Report (Form 10-Q), at 10 (May 5, 2004), available at <u>https://www.sec.gov/Archives/edgar/data/88128/000095014404004803/g88909e10vq.htm;</u> *see also* PX1173, Johnson MDL I Dep., May 31, 2013, at 95 ("Q. To your knowledge, did CSXI, as opposed to CSXT engage in any hedging during the class period? A. My understanding was that the hedging was by CSXT . . ."); *id.* at 96:18-25 ("Q. So was the CSXT purchases of fuel for both CSXT and CSXI during the class period? A. My understanding is that CSXI bought the fuel from CSXT . . ."). CSX has acknowledged that Plaintiffs have always asserted that CSXI is part of the

[176] *Class Cert. II*, 292 F. Supp. 3d at 123 & n.37; DA16501 at 03 (CSX Corp. 2007 SEC Form 10-K at 3); DA16506 at 09 (CSX Corp. 2010 SEC Form 10-K at 4).

conspiracy. *See, e.g.*, PX0671, Johnson Merits Rpt., Jan. 22, 2013, at 3 n.7 (mentioning CSXI 347 times in his report and stating that Plaintiffs' expert "offers opinions implicating CSXI in the alleged conspiracy and finding damages on CSXI shipments subject to revenue-based FSCs during the Class Period," which prompted Dr. Johnson to "analyze and address CSXI's conduct and the economic context for its business as well").

Additionally, disputed to the extent this implies that CSXT is not liable for the conspiracy's impact on CSX's intermodal shipments or that Plaintiffs cannot recover any damages Defendants' conspiracy caused on Plaintiffs' intermodal transactions with CSXI. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Time-Barred Damages Claims, § V ("Plaintiffs' Claims Arising from Intermodal Transactions with CSXI Are Tolled").

**Material Undisputed Fact No. 38**

**BNSF, CSXI, NS, and UP unilaterally adopted different standard intermodal fuel surcharges before 2003.**

Supporting Facts:

38.1 BNSF published a fuel surcharge formula for intermodal shipments in March 2000,[177] and revised that formula in September 2001.[178]

38.2 In March 2000, NS began assessing a "general Fuel Surcharge of 4% on all Intermodal Rule 11, Local and Forwarded Traffic."[179] In March 2001, NS created a formula for international intermodal traffic to be applied to shipments to and from ocean carriers.[180] No later than April

---

[177] DA03969.

[178] DA03985 at 86; DA03969 at 70, 73-74; DA07082 at 96-97 (Anderson BNSF 30(b)(6) 140:22-141:1).

[179] DA07392.

[180] DA07387; DA18426.

2002, NS implemented a different rate-based fuel surcharge formula for domestic intermodal shipments.[181]

38.3 CSX Intermodal created its intermodal fuel surcharge formula effective April 2000.[182]

38.4 Beginning in the fall of 2000, UP assessed a rate-based fuel surcharge on intermodal shipments,[183] which was changed later that year to a formula based upon the HDF index.[184] UP's intermodal fuel surcharge was unique when UP introduced it, and different from BNSF's, NS's, and CSXI's formula throughout the alleged conspiracy period, in that it multiplied the difference between the current average HDF price and the base HDF price, by a fuel weight component (originally 20%).[185]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 38**

Admitted only that BNSF, CSXI, NS, and UP announced intermodal fuel surcharges at various points before 2003. Disputed that those intermodal fuel surcharges were standard before 2003, including because [redacted]. *See* Plaintiffs' Response to Defendants' Undisputed Fact No. 39.

---

[181] DA07564; DA07572 at 73.

[182] DA02137 at 38; DA03007.

[183] DA01271.

[184] DA01293; DA19037.

[185] DA01101 at 215 (Carlton Rpt., 2/6/13); DA19292.

**Material Undisputed Fact No. 39**

**BNSF, CSXI, NS, and UP each independently sought increased intermodal fuel surcharge coverage before the alleged conspiracy period.**

Supporting Facts:

39.1 Defendants' transaction data for intermodal shipments show that, in 2002, CSXI and UP already were including fuel surcharges in at least 60% of new or amended agreements, and BNSF's and NS's coverage trend was already on a steep upward trajectory.[186]

39.2 By the fourth quarter of 2002, BNSF internally reported that 40.7% of its intermodal revenue was covered by a fuel surcharge.[187]

39.3 By the start of the supposed conspiracy, CSXI, NS, and UP already had high levels of incorporation of surcharges into new price authorities.[188]

39.4 During the relevant period, intermodal contracts were "relatively long term (usually about three to five years)."[189]

39.5 Some Plaintiffs' expert noted that "most intermodal contracts [] 'are multi-year contracts'" and therefore, the fuel surcharges "took time to roll out."[190]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 39**

Disputed. Defendants were unsuccessful in broadly applying fuel surcharges before the conspiracy and encountered resistance from customers and competition from other railroads during their attempts, including on intermodal shipments. Even in cases where fuel surcharges were part

---

[186] DA25148 at 64 (Israel Rpt. Fig. 33, 8/15/23).

[187] DA04086 at 90.

[188] DA25148 at 64 (Israel Rpt. Fig. 33, 8/15/23).

[189] DA15740 at 44 (Declaration of George T. Duggan ¶ 12, 6/26/10); *see also* DA23325 at 428-29 (Leitzinger Rpt. ¶ 167, 3/1/23); DA24749 at 52-53 (Wright Rpt. ¶ 41, 10/10/23).

[190] DA23325 at 428-29 (Leitzinger Rpt. ¶ 167, 3/1/23); *see also* DA20295 at 361-62 (Rausser Rpt., 10/15/12) [redacted]

of pricing authorities, the less aggressive pre-conspiracy surcharges were rarely triggered and, when they were, they remained low and only “theoretically billable.” COF ¶¶ 46–77. That was equally true of Defendants’ attempt to impose fuel surcharges on intermodal traffic before the conspiracy. Defendants were unable to obtain high rates of fuel surcharge coverage and payment on intermodal traffic before the conspiracy.

Before the conspiracy, Defendants internally recognized that they were unable to successfully apply and enforce fuel surcharges on customers—including on intermodal traffic. Defendants suggest in Supporting Facts 39.4 and 49.5 that they had limited success imposing fuel surcharges on intermodal shipments because intermodal contracts were typically multi-year agreements. To support that proposition, Defendants cite an employee declaration submitted in litigation (years after the pre-Conspiracy Period) and their own expert reports (submitted two decades after the pre-Conspiracy Period). But that was *not the reason* Defendants gave in contemporaneous documents before the conspiracy. Instead, Defendants attributed their inability to impose fuel surcharges during this period, including on intermodal shipments, to competitive dynamics and customer negotiations.

**BNSF**. Like the other Defendants, BNSF was unsuccessful in broadly enforcing its fuel surcharge before the conspiracy, including on intermodal traffic. COF ¶¶ 240–41. In April 2003, BNSF noted it had made significant exceptions to its fuel surcharge program in the past years, including all international intermodal shipping under contract. PX0055, BNSF-0028786 (BNSF Fuel Surcharge Review Team Recommendations presentation, Apr. 14, 2003), at ‘792; *see also* PX0795, BNSF 0657309 (BNSF presentation re “Fuel Surcharge Review,” Mar. 1, 2001), at ‘312 (noting no FSC applications to international contracts in 2001).

For example, prior to the conspiracy, Maersk's master contract with BNSF included [redacted] but BNSF [redacted] *See* PX0984, Leitzinger MDL II Reply Report, Nov. 15, 2023, ¶ 103; P_MAERSK00000893 ([redacted]), at '900. During the Conspiracy Period, however, BNSF told Maersk that it [redacted] and began [redacted] *See* PX0885, BNSF_II_03982221 (BNSF letter to Maersk, Apr. 28, 2004) at '221; PX0984, Leitzinger MDL II Reply Rpt., Nov. 15 2023, ¶ 103; *see also* COF ¶¶ 238–41.

**CSX**. Like the other Defendants, CSX was unsuccessful in broadly enforcing its fuel surcharge before the conspiracy, including on intermodal traffic. COF ¶ 239. From December 2001 until April 2002, *CSX discontinued its intermodal fuel surcharge program entirely*. PX0791, Crawford (CSX) Dep., July 27, 2011, at 36-37; *see, e.g.*, PX0195, CSXFSC000128907 (CSX internal email re: "CSXT Fuel Surcharge Value," Aug. 20, 2002) at '907 ("Customers may view a more aggressive CSXT fuel surcharge negatively, particularly on NS competitive business . . . ."); PX0594, McIntyre (CSX) Dep., Feb. 18, 2010, at 104-07 (testifying to customer pushback and competition with NS on fuel surcharges); PX0595, Giftos (CSX) Dep., Feb. 25, 2010, at 58 (explaining that before 2003 "if you could negotiate an index in your contract that captured fuel, that would be acceptable. So you didn't have to have the fuel surcharge"); *see also* PX1080, CSXT_FSC_MDLII_00772214 (CSX email re: "FSC customer exception spreadsheet" and attached spreadsheet, Apr. 15, 2002), at '214-15 (reflecting that prior to the Conspiracy Period many intermodal shippers had "total exclusions" from CSX's fuel surcharges, including Plaintiffs

MOL and NYK). CSX's Vice President of Sales and Marketing, Clarence Gooden, who oversaw both the carload and intermodal fuel surcharge programs, confirmed that the revenue the fuel surcharge program generated before 2003 was "[l]ow—relatively low to where it needed to be." PX0612, Gooden (CSX) Dep., July 16, 2010, 100-101. A CSX employee described the conditions facing the railroads in February 22, 2000 as: "Doesn't look like a lot of opportunity to push our prices up. As the old saying goes—'competition is great, as long as you are on the buying side.'" PX0218, CSXFSC000327518 (CSX internal email re: "Response—Conference call last Friday," Feb. 22, 2000), at '518; *see also* COF ¶¶ 238–41.

**NS**. Like the other Defendants, NS was unsuccessful in broadly enforcing its fuel surcharge before the conspiracy, including on intermodal traffic. COF ¶ 238. In March 2000, NS tried to apply a 3% FSC to its international intermodal contracts, which was unsuccessful. PX0789, NS_062194917 (NS internal email re: "International Fuel Surcharges," Mar. 19, 2000) at '917 ("We have delayed implementation of the FSC for Hyundai and OOCL pending further discussions this week."). After NS initiated this intermodal fuel surcharge, a number of shippers began "ignoring them or disputing them," even though the surcharges never exceeded more than 3%. *Id.*; PX0717, NS_037004332 (NS internal email re: "Fuel Surcharge Status," June 15, 2000), at '434. While NS felt it "really need[ed] this money," *id.*, NS caved to customer resistance and decided to "[d]iscontinue billing and waive outstanding immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it," PX0719, NS_037004300 (NS internal email re: "International Fuel Surcharge—July 1 Modification," June 19, 2000), at '330. NS officials cautioned that "[t]his must be done as quietly as possible to ensure that we do not jeopardize the FSC on the non-contract, non-international customers." *Id.*; *see also* PX0718, NS_036018393 (NS email re: "Fuel Surcharge Amendments—International," June 21, 2000), at '393 ("Intermodal has

made the decision to stop applying the fuel surcharge to International accounts that are under contract."); *see also* PX0614, Glennon (NS) Dep., July 20, 2010, at 18-19 (testifying that "some railroads may not have been actually applying a fuel surcharge at the very beginning. . . . not all of them were successful initially, but they were later," and that when NS bid against other railroads, it often went up against "competitive bids . . . where a fuel surcharge was not being applied and that created some concerns on [NS's] part."); PX0319, NS_010072620 (internal NS email re: "EXORBITANT Rail Fuel Cost Recovery," Mar. 27, 2003), at '620 (noting that, as of March 2003, "[m]any" NS customers have "negotiate[d] out of the SC").

To the extent NS applied fuel surcharges on some (but not all) of its international intermodal contracts before the conspiracy, the applicable formula used varied from contract to contract. PX0790, NS_013001960, at '962 (2006 email chart comparing legacy international shipping contracts); *see also* COF ¶ 238–41.

**UP**. Like the other Defendants, UP was unsuccessful in broadly enforcing its fuel surcharge before the conspiracy, including on intermodal traffic. COF ¶ 240. *See, e.g.*, PX0448, UPFSC_0256361 (internal UP email re: "Fuel Surcharge," Dec. 10, 2001), at '362 (list of fuel surcharge exceptions from December 2001, including for multiple intermodal shippers); PX0514, UPFSC_0184102 (UP internal email re: "EXORBITANT Rail Fuel Cost Recovery," Mar. 12, 2003), at '102 (internal email noting "I'm sure you are aware of the fact that there appears to be a lot of [interest]/push back coming [from] customers/consultants directed at challenging our fuel surcharges. Attached is an example from IP . . . however I understand this is a growing issue in other commodity groups as well."); *see also* PX1081, UPFSC0351396 (UP email re: "Agreement Confirmation – potential next step" and attached agreement, Mar. 18, 2005), at '403 ("intermodal" is a UP "commodity group").

In 2002, BNSF noted that UP was trying to capture the international shipping market shared by, in part, forgiving outstanding balances and waiving or deferring RCAF increases. PX0793, BNSF_II_03902582 (BNSF presentation re "Consumer Products Staff Meeting," Feb. 8, 2002), at slide 78 ("UP's Strategy is to Capture Market Share").

To the extent UP had fuel surcharges on some (but not all) of its international intermodal contracts before the conspiracy, the applicable formula used varied from contract to contract. PX0794, UPFSC 0318946 (International Contracts – Terms and agreements), at '947-52 (comparing international intermodal contract terms c. 2001); *see also* COF ¶ 240, 242–44.

* * *

Before the conspiracy, Defendants' intermodal fuel surcharges were also triggered only sporadically and at low percentages. *See, e.g.*, PX0064, BNSF-0033650 (BNSF email re: "Verify Intermodal Fuel Surcharge," Aug. 28, 2006, attaching pricing update to shippers dated Mar. 27, 2002), at '652 ("You were advised in BNSF's Fuel Surcharge Pricing Update dated December 11, 2001, that the BNSF fuel surcharge would resume when the [HDF] Index reached $1.24. The Index has exceeded that price, therefore the BNSF fuel surcharge will resume effective April 3, 2002. . . . The surcharge amounts for the period commencing April 3 [through April 9] is . . . 1.5%."); PX0614, Glennon (NS) Dep., July 20, 2010, at 26 (agreeing that before the conspiracy, "the fuel surcharge wasn't being triggered" given the price of fuel, and "[a]t that point the fuel surcharge was ***theoretically billable***") (emphasis added); PX0616, Young (UP) Dep. Aug. 4, 2010, at 55 (agreeing that "[b]efore 2003 . . . it [would] be fair to say that the impact of fuel surcharge was somewhat minimal."); *id.* at 28 (agreeing that "***any fuel surcharges*** that were triggered during the 2000 through 2002 time period never reached significant percentage levels") (emphasis added); *id.* at 25-26 ("We had fuel surge [sic] programs in many contracts, but because fuel had not run up,

they were never implemented"); *id.* 28 (agreeing that "any fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels"); *id.* at 169 (the fuel surcharge "wasn't a significant piece of [UP's] business" in 2000 and 2001 and it "didn't show up in terms of [UP's] financials, the impact.").

Defendants' failure to widely impose fuel surcharges on intermodal traffic changed after their conspiratorial agreement to impose more aggressive, non-negotiable rate-based fuel surcharges broadly, with uniform directives to minimize discounts and waivers, to as many shippers as possible. *See* Plaintiffs' Responses to Defendants' Undisputed Facts Nos. 40–45.

Defendants cite testimony of some Plaintiffs' experts regarding intermodal contract length, but Dr. Leitzinger also cited evidence that intermodal contracts were part of the conspiracy to apply freight surcharges to as many contracts as possible, and that UP's policy, for example, was to apply FSCs to intermodal contracts universally when intermodal contracts expired. *See* PX0769, Leitzinger MDL II Rpt., ¶ 128.

Finally, Plaintiffs object to Defendants' reliance on testimony and evidence proffered by former expert witness Dr. Gordon Rausser. Dr. Rausser is not an expert in any MDL II case, and no MDL II plaintiff has retained Dr. Rausser. Dr. Rausser's expert reports and deposition testimony are not admitted into evidence in MDL II. In addition, MDL I plaintiffs Strates Shows, Inc. and Donnelly Commodities Incorporated do not rely on Dr. Rausser and will not call him as a witness at trial. Any evidence from Dr. Rausser is thus irrelevant as to all MDL II cases and these two MDL I cases.

**<u>Material Undisputed Fact No. 40</u>**

**Neither BNSF, CSXI, NS, nor UP changed its standard intermodal fuel surcharge during 2003 or early 2004.**

<u>Supporting Facts:</u>

40.1 During the 2003 and early 2004 timeframe, neither BNSF, CSXI, NS, nor UP made any changes to its pre-2003 published intermodal fuel surcharges.[191]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 40</u>**

Admitted only that no Defendant modified its published intermodal formula between January 2003 and October 2004. However, disputed that nothing about Defendants' intermodal formulas "changed" during this period. To the contrary, before the conspiracy, Defendants were unsuccessful in broadly applying fuel surcharges before the conspiracy and encountered resistance from customers and competition from other railroads during their attempts, including on intermodal traffic. COF ¶¶ 238–41. Plaintiffs incorporate by reference here Plaintiffs' Response to Defendants' Undisputed Fact No. 39.

Defendants' failure to widely impose fuel surcharges on intermodal traffic "changed" after their conspiratorial agreement to impose more aggressive, non-negotiable rate-based fuel surcharges broadly, with uniform directives to minimize discounts and waivers, to as many shippers as possible. Those changes resulted from Defendants' senior-most executives, including executives responsible for intermodal traffic, participating in meetings and discussions with their competitors about fuel surcharges. During the conspiracy period, despite any purported differences in formulas, all four Defendants' intermodal programs were in lockstep. Expert analyses of Defendants' data also confirms that their intermodal fuel surcharges tracked each other closely.

[191] DA25148 at 77 (Israel Rpt. Tbl. 13, 8/15/23); DA21943 at 2001 [redacted]

Plaintiffs incorporate by reference here Plaintiffs' Responses to Defendants' Undisputed Fact Nos. 41–44.

**Material Undisputed Fact No. 41**

**BNSF did not change its published intermodal fuel surcharge during the alleged conspiracy period.**

Supporting Facts:

41.1 BNSF's published intermodal formula remained unchanged from September 2001 through 2008.[192]

41.2 From September 2001 through 2008, BNSF's intermodal formula had a 1% surcharge at a trigger price of $1.24 HDF and increased by 0.5% for every $0.04 increase in HDF.[193]

41.3 When BNSF announced the railroad industry's first mileage-based fuel surcharge program in March 2005, to go into effect January 1, 2006, intermodal customers objected to the change.[194] In response, BNSF agreed that its new mileage-based fuel surcharge would not immediately apply to intermodal shippers.[195]

[192] DA04664 at 664-938; DA21943 at 2001 [redacted]

[193] DA03985 at 86; DA03514; DA21943 at 2001 [redacted]

[194] *See, e.g.*, DA15641 (negative feedback from Plaintiff ABF Freight); DA14512 [redacted]

[195] DA04635 at 36.

**Plaintiffs' Response to Defendants' Undisputed Fact No. 41**

Admitted only that BNSF used one published intermodal formula during the conspiracy period. However, disputed that nothing about BNSF's intermodal fuel surcharge "changed" during the conspiracy. The fact that BNSF did not modify its intermodal fuel surcharge formula during the conspiracy is of little relevance, because Defendants' imposition of non-negotiable rate-based fuel surcharges on intermodal traffic during the conspiracy, broadly and with uniform directives to minimize discounts and waivers, was part and parcel of Defendants' conspiratorial agreement. There is substantial evidence in the record that Defendants' conspiracy extended to BNSF's intermodal shipments.

**Before the conspiracy, BNSF was unsuccessful in broadly applying fuel surcharges and encountered resistance from customers and competition from other railroads during its attempts, including on intermodal traffic**. COF ¶¶ 240–43. Even in cases where fuel surcharges were part of pricing authorities, BNSF's pre-conspiracy intermodal surcharges were rarely triggered and, when they were, they remained low and only "theoretically billable." *Id.*; *see* COF ¶¶ 46–77. Parity already existed (at least in terms of Defendants' intermodal formulas) during the pre-Conspiracy Period, but coverage and consistent application did not, due to the competition between Defendants pre-2003. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 107–12 & Fig. III-6.

**In the face of pre-conspiracy struggles to impose and collect fuel surcharges covering intermodal traffic, BNSF's senior-most executives, including executives responsible for intermodal traffic, participated in meetings and discussions with their competitors about fuel surcharges**. None of the discussions in the unprecedented, conspiratorial meetings beginning in 2003 excluded or carved out intermodal shipments. For example, BNSF Chief Marketing Officer Lanigan testified that he was responsible for "the intermodal . . . operations" of BNSF. PX0610,

Lanigan (BNSF) Dep., June 22, 2010, at 19. Senior executives from all four Defendants, including Lanigan, met at the April 2–6, 2003 NFTA meeting. COF ¶ 148; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting). Promptly following the Spring 2003 NFTA meeting, BNSF's Lanigan issued an immediate directive mandating inclusion of fuel surcharge provisions in contracts and requiring Lanigan's own clearance for any exception: "***Effective immediately and urgently*** per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be ***granted to VP's only (who will also clear with John)***. This needs to be communicated immediately as well." PX0050, BNSF-0027935 (internal BNSF email re: "DOA ON FSC," April 9, 2003), at '935 (emphases added). Lanigan did not discuss this change with his team before announcing it. *See* PX0628, Garin (BNSF) Dep., Aug. 16, 2010, 245:15-21. This reflected a change in BNSF's prior practice of not requiring such senior approval. PX0613, Rose (BNSF) Dep., July 16, 2010, at 71-72 (around the first half of 2003, "there's no doubt" that BNSF "narrowed down the flexibility of the pricing managers to apply fuel surcharges"); *see* COF ¶¶ 77, 156–57. On April 15–17, 2003, CMOs and CMOs-in-waiting from all four Defendants participated in an unsupervised getaway, with no other employees invited. COF ¶ 139. On April 23, 2003, BNSF and CSX senior executives also held a meeting. COF ¶ 159. At the same time, senior executives from other Defendants also met and discussed fuel surcharges. *See, e.g.*, COF ¶¶ 182–84, 186–192.

On July 30, 2003, BNSF and NS's senior executives had a meeting. The minutes of this meetings reflect additional discussion of fuel surcharges across the industry, not limited to carload shipments: "John Lanigan and Don Seale agreed to lead a discussion of a ***potential industry position*** on fuel surcharge provisions at the next N.E.M.C. meeting." PX0243, NS 001000422

(BNSF/NS Joint Marketing Meeting, July 30, 2003), at '424 (emphasis added). UP's and BNSF's chairmen and CEOs also had one-on-one conversations, including by telephone, as did their CMOs. COF ¶ 175. BNSF executives continued to meet with executives from other Defendants through the end of 2003, including at N.E.M.C. meetings. *See, e.g.*, COF ¶¶ 194–96, 199–204. These far-ranging discussions were not restricted to any particular customer segments, and there is no indication that intermodal shipments were excluded from the discussions.

**Defendants' internal documents and testimony expressly discuss implementing the new fuel surcharge policy with respect to intermodal traffic**. In 2004, BNSF noted that several of its largest intermodal contracts—which were also some of BNSF's largest contracts company-wide—had heavily discounted fuel surcharge programs, or no fuel surcharge program at all. PX0796, BNSF-0354762 (BNSF presentation re "Fuel Cost Recovery Analysis," May 12, 2004), at '776 (tracking expiration date of non-FSC international intermodal contracts); PX0099, BNSF-0368425 (internal BNSF email re: "SGB FSC Update" and attached presentation titled "BNSF Fuel Surcharge Update," Apr. 5, 2004), at '432 (same). Accordingly, BNSF's "2005-2009 Long Range Plan" for "International profitability enhancement" called for "[f]uel cost recovery at 100%." PX0808, BNSF_II_03969515 ("2005-2009 Long Range Plan", Feb. 2, 2005), at slide 21. To this end, BNSF conducted internal reviews to ensure "total FSC discipline on all [its] traffic." PX0082, BNSF-0326595 (BNSF internal email re: "Fuel Surcharge Adherence," June 7, 2006), at p. 1; *see also* PX809, BNSF_II_03913505 (BNSF draft presentation "Consumer Products Fuel Surcharge Update," Sept. 27, 2004) at slide 12 ("Transition customers on non-standard programs to the standard fuel surcharge program where possible"); COF ¶ 259.

The evidence also shows that while BNSF initially charged many of the intermodal shippers, [redacted], based on a discounted FSC program or the customers' own FSC

programs, BNSF eventually switched these intermodal shippers to BNSF's standard, more aggressive fuel surcharge later in the conspiracy period. *See* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 101 *et seq.* In late 2006, when Yang Ming and BNSF [redacted], BNSF explained that [redacted]. *See* PX0897, Bernheim & Marx MDL II Rpt. (Yang Ming), Mar. 1, 2003, ¶ 287; PX0900, Lee (Yang Ming) Dep., Sept. 27, 2022, at 47-48, 50.

The enforcement of Defendants' conspiratorial scheme led to the retroactive application of intermodal FSCs from 2004 onwards. For example, prior to the conspiracy, Maersk's master contract with BNSF included [redacted], but BNSF [redacted]. *See* PX0984, Leitzinger MDL II Reply Report, Nov. 15, 2023, ¶ 103; P_MAERSK00000893 ([redacted]), at '900. During the Conspiracy Period, however, BNSF told Maersk that [redacted]. *See* PX0885, BNSF_II_03982221 (BNSF letter to Maersk, Apr. 28, 2004) at '221; PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 103; *see also* COF ¶¶ 238–41. *See* PX0889, Bernheim & Marx (NYK) MDL II Rpt., Mar. 1, 2023, ¶ 284; PX0890, NYK-00013195 (NYK letter to BNSF re [redacted], July 12, 2004), at '195-96. Ultimately, NYK [redacted] PX0812, Payne (NYK) Dep.,

Sept. 21, 2002, at 68:20-70:5; PX1082, Payne (NYK) Dep. Ex. 9, NYK-00000856 (NYK email re: [redacted], Dec. 1, 2004, and attached letter from BNSF to NYK, Nov. 19, 2004), at '856, '859.

**Defendants, including BNSF, exchanged information about their fuel surcharge coverage progress on intermodal shipments**. *See, e.g.*, PX0169, CSXFSC000000476 (internal CSX email chain re Fuel Surcharge Overview Clarence 03, Oct. 9, 2003), at '476 ("The BNSF stated that 82% of their carload and intermodal business either had fuel surcharge or an escalator on the revenue.").

**During the conspiracy period, despite any purported differences in formulas, all four Defendants' intermodal programs were in lockstep**. In October 2004, CSX modified its intermodal fuel surcharge to come into lockstep with NS and BNSF. And UP made similar modifications so that it would match the others' intermodal fuel surcharges throughout the conspiracy period. *See* DA06916 (June 2004 "CSX Intermodal Fuel Surcharge Review" presentation), at DA06924 (discussing how to revise its intermodal surcharge formula to "begin[] standardization across industry"); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 155 (NS changed its international intermodal FSC to be identical with BNSF and CSX effective August 2006); *id.* at ¶ 156 ("[T]here is evidence that when the UP formula yielded a result that differed from those of the other Defendants, UP altered its announced percentage to match the others.").

In 2005, BNSF's Fred Malesa, VP International Intermodal Marketing, told intermodal shipper NYK in negotiations: [redacted] PX0800, BNSF_II_04007073 (draft BNSF letter to NYK's Peter I. Keller, Dec. 5, 2005), at '073 (emphasis added). Defendants' own expert

conceded that all four Defendants' intermodal "FSC rates move closely together" during the conspiracy. PX0637, Kalt MDL I Corrected Merits Rpt., Mar. 1, 2013, ¶ 200.

Even purported "changes" to intermodal formulas during the Conspiracy Period in fact led to greater uniformity. While the companies might have expressed their formulas in different ways, during the conspiracy period, UP made changes to its intermodal program to bring it closer to BNSF's program. COF ¶¶ 243–44.

**Expert analyses of Defendants' data also confirms that their intermodal fuel surcharges tracked each other closely**. PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 120–21 & Figs. 5, 6. Dr. Bernheim confirmed, for example, that BNSF and UP's intermodal fuel surcharges closely tracked each other during the conspiracy:




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 110 & Fig. III-8.

**<u>Material Undisputed Fact No. 42</u>**

**NS made only two changes to its published intermodal fuel surcharges during the alleged conspiracy period, in 2006 and 2007.**

<u>Supporting Facts:</u>

42.1 Both NS's domestic intermodal fuel surcharge and its international intermodal fuel surcharge were based on the HDF index, but with differing components that resulted in different charges.[196]

42.2 NS did not change its domestic intermodal fuel surcharge during the alleged conspiracy period.

42.3 In August 2006, NS began applying the domestic formula to international intermodal traffic.[197]

42.4 A year later, NS shifted to a monthly, rather than weekly, adjustment period for its international intermodal fuel surcharge formula in response to customer concerns.[198]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 42</u>**

Disputed that NS's only "changes" to its intermodal fuel surcharges during the conspiracy were modifications to its published formula. Defendants' imposition of non-negotiable rate-based fuel surcharges on intermodal traffic during the conspiracy, broadly and with uniform directives to minimize discounts and waivers, was part and parcel of Defendants' conspiratorial agreement. There is substantial evidence in the record that Defendants' conspiracy extended to NS's intermodal shipments.

---

[196] DA07387; DA07561 at 61, 63; DA21943 at 2001 [redacted]

[197] DA07389.

[198] DA18001 at 4 (Declaration of Jim Bolander ¶ 11, 6/28/10).

**Before the conspiracy, NS was unsuccessful in broadly applying fuel surcharges and encountered resistance from customers and competition from other railroads during its attempts, including on intermodal traffic**. COF ¶ 238. Even in cases where fuel surcharges were part of pricing authorities, NS's pre-conspiracy intermodal surcharges were rarely triggered and, when they were, they remained low and only "theoretically billable." *Id.*; *see* COF ¶¶ 46–77. Parity already existed (at least in terms of Defendants' intermodal formulas) during the pre-Conspiracy Period, but coverage and consistent application did not, due to the competition between Defendants pre-2003. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 107–12 & Fig. III-6.

**In the face of pre-conspiracy struggles to impose and collect fuel surcharges covering intermodal traffic, NS's senior-most executives, including executives responsible for intermodal traffic, participated in meetings and discussions with their competitors about fuel surcharges**. None of the discussions in the unprecedented, conspiratorial meetings beginning in 2003 excluded or carved out intermodal shipments, and instead referred to uniformity "across the industry" and an "industry position." *See, e.g.*, PX0241, NS 001000360 (UP-NS email chain re "Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361 (NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers," and discussed how to "work together on this opportunity," including whether they should do so "through the AAR [Association of American Railroads]" or "handle the opportunity on a bilateral basis"); PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("***Fuel surcharges → Uniform application across the industry would be helpful***" (emphasis added)); PX0243, NS 001000422 (July 30, 2003 BNSF-NS Joint Marketing Meeting), at '424 (reflecting July 30, 2003 BNSF-NS meeting, at which

John Lanigan and Seale "agreed to lead a discussion of a ***potential industry position on fuel surcharge provisions*** at the next" AAR NEMC meeting (emphasis added)).

NS CMO Seale, who attended the above meetings, testified that he oversaw the intermodal business. PX0596, Seale (NS) Dep., Feb. 26, 2010, at 281 (referring to input on fuel surcharges "from my vice-president of intermodal"); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 200 (testifying that the intermodal group reported to Seale).

Beyond this, those directly overseeing the intermodal business on a day-to-day basis also participated in these meetings. For example, NS's VP of Intermodal Mike McClellan attended the May 14, 2003 meeting between NS and UP executives at which they discussed "Fuel surcharges → Uniform application across the industry would be helpful." PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting reflecting attendance of Mike McClellan, NS intermodal executive, May 14, 2003), at '652, '661.

NS executives continued to meet with executives from other Defendants through the end of 2003, including at N.E.M.C. meetings. *See, e.g.*, COF ¶¶ 194–96, 199–204. These far-ranging discussions were not restricted to any particular customer segments, and there is no indication that intermodal shipments were excluded from the discussions.

Following these meetings, Defendants' coordinated adherence to new and strict fuel surcharge enforcement policies, with uniform directives to minimize discounts and waivers, during the Conspiracy Period was applied equally to intermodal shippers. PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 22 (NS's published or "preferred" FSC was "applicable across all lines of business"); *id.* 195-96 (NS's policy of having "very broad and hopefully complete" FSC coverage applied to carload and intermodal traffic, as well as to both captive and non-captive shippers).

**During the conspiracy period, despite any purported differences in formulas, all four Defendants' intermodal programs were in lockstep**. In October 2004, CSX modified its intermodal fuel surcharge to come into lockstep with NS and BNSF. And UP made similar modifications so that it would match the others' intermodal fuel surcharges throughout the conspiracy period. *See* DA06916 (June 2004 "CSX Intermodal Fuel Surcharge Review" presentation), at DA06924 (discussing how to revise its intermodal surcharge formula to "begin[] standardization across industry"); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 155 (NS changed its international intermodal FSC to be identical with BNSF and CSX effective August 2006); id. at ¶ 156 ("[T]here is evidence that when the UP formula yielded a result that differed from those of the other Defendants, UP altered its announced percentage to match the others.").

In 2005, BNSF's Fred Malesa, VP International Intermodal Marketing, told intermodal shipper NYK in negotiations: [redacted] PX0800, BNSF_II_04007073 (draft BNSF letter to NYK's Peter I. Keller, Dec. 5, 2005), at '073 (emphasis added). Defendants' own expert conceded that all four Defendants' intermodal "FSC rates move closely together" during the conspiracy. PX0637, Kalt MDL I Corrected Merits Rpt., Mar. 1, 2013, ¶ 200.

In August 2006, NS consolidated its domestic and international intermodal fuel surcharge programs so that they operated under the domestic formula, lining up with both CSX and BNSF. *See* PX0801, NS_062118743 (NS email re: "Fuel Surcharge for Intermodal", July 11, 2006), at '743; *see, e.g.*, PX1174, NS_013000010 (NS email re: [redacted] Oct. 3, 2006), at '010. NS pitched this change in part as bringing its international intermodal fuel surcharge "more in line with industry FSC levels[.]" PX0801, NS_062118743 (NS email re: "Fuel Surcharge for Intermodal", July 11, 2006), at '743. NS executives emphasized that the standard scale would be

the "starting point for any future contract negotiations or new contracts[.]" PX0802, NS_062204458 (NS email re: "Fuel", July 11, 2006), at '458.

**Expert analyses of Defendants' data also confirms that their intermodal fuel surcharges tracked each other closely**. Dr. Bernheim confirmed, for example, that NS and CSX's intermodal fuel surcharges closely tracked each other during the conspiracy:

**Figure II-8: Defendant Conspiracy Period intermodal fuel surcharges (actual surcharge percentage by fuel price)**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 110 & Fig. III-8 *see also* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 120–21 & Figs. 5, 6.

**Material Undisputed Fact No. 43**

**UP changed its published intermodal fuel surcharge twice during the alleged conspiracy period, both times making it less aggressive.**

Supporting Facts:

43.1 UP's intermodal fuel surcharge formula was constructed differently from the other railroads' intermodal fuel surcharges, calculating the surcharge percentage as a fraction (expressed in percent, and known as the "fuel weight") of the percentage by which the HDF index exceeded a given level.[199]

43.2 In March 2005, UP changed its intermodal fuel surcharge formula for the first time since 2000, lowering the fuel weight component from 20% to 18.5%.[200]

43.3 UP began analyzing further adjustments to its intermodal fuel surcharge in late 2005[201] and, in late 2006, UP reduced the fuel weight component again, this time to 16.5%, "to remain market competitive."[202]

43.4 UP's changes to its intermodal fuel surcharge formula in 2005 and 2006 resulted in lower intermodal fuel surcharge rates.[203]

43.5 Effective January 1, 2007, UP adjusted its intermodal fuel surcharge to change based on the weekly (as opposed to monthly) HDF index.[204]

---

[199] DA21943 at 2001 [redacted]; DA01101 at 1215 (Carlton Rpt., 2/6/13).

[200] DA19001at 02.

[201] DA01666 at 66-67; *see also* DA19001.

[202] DA19045.

[203] DA25234 at 49-50 [redacted]

[204] DA19085; DA19077 at 77-78.

**Plaintiffs' Response to Defendants' Undisputed Fact No. 43**

Disputed that UP's only "changes" to its intermodal fuel surcharges during the conspiracy were modifications to its published formula. Defendants' imposition of non-negotiable rate-based fuel surcharges on intermodal traffic during the conspiracy, broadly and with uniform directives to minimize discounts and waivers, was part and parcel of Defendants' conspiratorial agreement. There is substantial evidence in the record that Defendants' conspiracy extended to UP's intermodal shipments.

**Before the conspiracy, UP was unsuccessful in broadly applying fuel surcharges and encountered resistance from customers and competition from other railroads during its attempts, including on intermodal traffic**. COF ¶ 240. Even in cases where fuel surcharges were part of pricing authorities, UP's pre-conspiracy intermodal surcharges were rarely triggered and, when they were, they remained low and only "theoretically billable." *Id.*; *see* COF ¶¶ 46–77. To the extent UP had fuel surcharges on some (but not all) of its international intermodal contracts before the conspiracy, the applicable formula used varied from contract to contract. COF ¶ 240. Parity already existed (at least in terms of Defendants' intermodal formulas) during the pre-conspiracy period, but coverage and consistent application did not, due to the competition between Defendants pre-2003. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 107–12 & Fig. III-6.

**In the face of pre-conspiracy struggles to impose and collect fuel surcharges covering intermodal traffic, UP's senior-most executives, including executives responsible for intermodal traffic, participated in meetings and discussions with their competitors about fuel surcharges**. UP's Koraleski admitted that the intermodal group reported up to him. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 226; *see also* PX0733, Coalson (UP) Dep., May 25, 2011,

at 16 (UP intermodal AVP agreeing that the "CMO or the CEO had the ultimate marketing and pricing responsibility for the intermodal group").

None of the discussions in the unprecedented, conspiratorial meetings beginning in 2003 excluded or carved out intermodal shipments. Instead, those meetings were attended by Koraleski and referred to uniformity "across the industry" and an "industry position." *See, e.g.* PX0241, NS 001000360 (UP-NS email chain re "Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361 (NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers," and discussed how to "work together on this opportunity," including whether they should do so "through the AAR [Association of American Railroads]" or "handle the opportunity on a bilateral basis"); PX0460, UPFSC_0616651 (handwritten notes from NS/UP Alliance Meeting, Omaha, NE, May 14, 2003), at '652 ("Fuel surcharges → Uniform application across the industry would be helpful"). NS and UP assigned Mr. Seale and UP CMO Jack Koraleski to follow up on these issues. *See* PX0241, NS 001000360 (UP-NS email chain re "Draft Minutes of NS-UP meeting of 5-14-03," June 30, 2003), at '361 ; *see also* PX0485, UPFSC 0014100 (email re: "UP-NS Commercial Conference Call and Summit Prep", Mar 5, 2003), at '100 (May 6, 2003 conference call between Koraleski, Seale, and others to devise agenda for May 14, 2003 "Alliance" meeting); PX0396, UPFSC 0127235 (UP email re: "UP-NS Alliance Conference Call August 15, 2003," July 28, 2003), at '235-36 (reflecting that follow up conference calls to May 14, 2003 meeting took place between NS and UP executives on at least July 8, 2003, and August 15, 2003).

Koraleski also attended the Spring 2003 NFTA meeting April 2–6, 2003, as did Defendants' other senior marketing officers. COF ¶ 148; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden

(CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting).

UP executives continued to meet with executives from other Defendants through the end of 2003, including at N.E.M.C. meetings. *See, e.g.*, COF ¶¶ 194–96, 199–204. These far-ranging discussions were not restricted to any particular customer segments, and there is no indication that intermodal shipments were excluded from the discussions.

Following these meetings, Defendants' coordinated adherence to new and strict fuel surcharge enforcement policies, with uniform directives to minimize discounts and waivers, during the Conspiracy Period was applied equally to intermodal shippers. For example, UP internal documents expressly discuss implementation of the new fuel surcharge policy with respect to intermodal traffic. PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 93-95 (in reference to March 12 email stating that "up until that time, we were intermodal and we were contract specific in most cases, and now we were going to go to a more general approach" which Koraleski referred to as "fuel surcharges on a uniform basis"); *id.* at 277-78 (testifying that UP was "asking all customers for" the standard fuel surcharge program); PX0437, UPFSC_0051559 (UP presentation, "2005 Analyst Meeting," May 20, 2005), at 560 slide 3 (noting UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions.").

Koraleski agreed that it "was the policy that when a legacy contract expired, a fuel surcharge was to be added." PX0629, Koraleski (UP) Dep., Dec. 2, 2010, at 257:17-20; *see also* PX0806, UPFSC 0013015, (UP Presentation re "San Antonio Intermodal Facility Strategy, Apr. 11, 2005), at slide 3 ("Price improvement . . . driven by . . . [i]mplementation of full fuel surcharge in International contract rates."); PX0437, UPFSC 0051559 (internal UP email re: Analyst

Presentation, attaching UP presentation, May 20, 2005), at '560, slide *3 (noting UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."); PX0807, UPFSC 0457242 (internal UP presentation, 2006), at '243 (describing negotiations with [redacted]); *see also* PX0804, UPFSC 0165317 (internal UP email re: "June's Intermodal FSC," May 25, 2006), at '317 (John Kaiser, Intermodal Group VP and General Manager, manually adjusting UP's fuel surcharge downward 2.5% because it was "higher than BNSF's"); PX0803, UPFSC 0078792 (UP email re: "Comparison of Intermodal FSC Program to Standard of HDF Program," Oct. 18, 2005), at '792-93 (internal analysis comparing intermodal surcharge program to standard HDF program). In August 2006, Kaiser again adjusted rates downward 2.7%, by lowering the fuel weight, "to stay in line with the market[,]" after discussing the matter with Jack Koraleski. PX0805, UPFSC 0029414 (UP email re: "2007 Fuel Surcharge", Aug. 18, 2006), at '414; PX1019, UPFSC 0555394 (UP email re: "4QE & 2007 Fuel Surcharge for Prophecy Opening", Aug. 17, 2006), at '394-95; PX0733, Coalson (UP) Dep., May 25, 2011, at 76.

**During the conspiracy period, despite any purported differences in formulas, all four Defendants' intermodal programs were in lockstep**. In October 2004, CSX modified its intermodal fuel surcharge to come into lockstep with NS and BNSF. And UP made similar modifications so that it would match the others' intermodal fuel surcharges throughout the conspiracy period. *See* DA06916 (June 2004 "CSX Intermodal Fuel Surcharge Review" presentation), at DA06924 (discussing how to revise its intermodal surcharge formula to "begin[] standardization across industry"); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 155 (NS changed its international intermodal FSC to be identical with BNSF and CSX effective August

2006); id. at ¶ 156 ("[T]here is evidence that when the UP formula yielded a result that differed from those of the other Defendants, UP altered its announced percentage to match the others.").

In 2005, BNSF's Fred Malesa, VP International Intermodal Marketing, told intermodal shipper NYK in negotiations: [redacted] PX0800, BNSF_II_04007073 (draft BNSF letter to NYK's Peter I. Keller, Dec. 5, 2005), at '073 (emphasis added). Defendants' own expert conceded that all four Defendants' intermodal "FSC rates move closely together" during the conspiracy. PX0637, Kalt MDL I Corrected Merits Rpt., Mar. 1, 2013, ¶ 200.

UP adjusted its intermodal formula several times during the conspiracy period, each time making it closer to BNSF's intermodal formula. COF ¶¶ 243–44. Beginning in March 2005, UP's "Intermodal FSC calculation was changed . . . to try and lower the variance between UPRR's Intermodal surcharge and the comparable BNSF program." PX0803, UPFSC 0078792 (UP email re: "Comparison of Intermodal FSC Program to Standard of HDF Program", Oct. 18, 2005), at '792-793; *see also* PX0390, UPFSC 0055388 (UP internal email re: "Urgent – April's Intermodal Fuel Surcharge," Mar. 23, 2005), at '388 ("UP employee recommending to "align[]" UP intermodal FSC formula to BNSF scale); PX0388, UPFSC 0045567 (UP internal email re: "September's Intermodal Fuel Surcharge," Aug. 24, 2005), at '567 (UP adopting same intermodal surcharge as BNSF); PX0805, UPFSC 0029414 (UP internal email re: "2007 Fuel Surcharge," Aug. 18, 2006), at '414 ("For intermodal, the current formula drives a 25% surcharge. However, as base prices have risen and fuel prices have escalated, our formula has started to deviate from the marketplace."); PX0733, Coalson (UP) Dep., May 25, 2011, at 75-76. While BNSF's and UP's intermodal formulas were slightly different, UP set its published intermodal FSC rate to equal that of BNSF's, irrespective of what the formula stated. COF ¶ 243. The documentary evidence

Defendants rely on for UP shows that UP made the changes to its intermodal fuel surcharge program in March 2005 to move to the "comparable BNSF program." DA01666 at 67; *see* COF ¶¶ 243–44; *see also* PX0390, UPFSC 0055388 (UP internal email re: "Urgent—April's Intermodal Fuel Surcharge," Mar. 23, 2005), at '388 (UP employee recommending to "align[]" UP intermodal FSC formula to BNSF scale); PX0388, UPFSC 0045567 (UP internal email re: "September's Intermodal Fuel Surcharge," Aug. 24, 2005), at '567 (UP adopting same intermodal surcharge as BNSF); PX0664, CSXFSC000000476 (CSX email re: "Fuel Surcharge Overview Clarence 03", Oct. 9, 2003) (John Couch of CSX reported that at a meeting with BNSF, "BNSF stated that 82% of their carload and Intermodal business either had a fuel surcharge or an escalator on the revenue.").

**Expert analyses of Defendants' data also confirms that their intermodal fuel surcharges tracked each other closely**. PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 120-21 & Figs. 5, 6. Dr. Bernheim confirmed, for example, that BNSF and UP's intermodal fuel surcharges closely tracked each other during the conspiracy:




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 110 & Fig. III-8.

**<u>Material Undisputed Fact No. 44</u>**

**CSXI changed its published intermodal fuel surcharge once during the alleged conspiracy period, in 2004.**

<u>Supporting Facts:</u>

44.1 In 2004, CSX Intermodal studied other published fuel surcharge formulas and, in September 2004, announced a modified intermodal surcharge formula effective October 2004 that matched the intermodal fuel surcharges of BNSF and Pacer (an intermodal marketing company, transportation broker, and CSXI customer).[205]

[205] DA03007; DA06916 at 24; DA06840 at 40-41.

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 44</u>**

Disputed that CSX's only "change" to its intermodal fuel surcharges during the conspiracy was a modification to its published formula. Defendants' imposition of non-negotiable rate-based fuel surcharges on intermodal traffic during the conspiracy, broadly and with uniform directives to minimize discounts and waivers, was part and parcel of Defendants' conspiratorial agreement. There is substantial evidence in the record that Defendants' conspiracy extended to CSX's intermodal shipments.

**Before the conspiracy, CSX was unsuccessful in broadly applying fuel surcharges and encountered resistance from customers and competition from other railroads during its attempts, including on intermodal traffic**. COF ¶ 239. Even in cases where fuel surcharges were part of pricing authorities, CSX's pre-conspiracy intermodal surcharges were rarely triggered and, when they were, they remained low and only "theoretically billable." *Id.*; *see* COF ¶¶ 46–77. From December 2001 until April 2002, CSX *discontinued its intermodal fuel surcharge program entirely*. COF ¶ 239. Parity already existed (at least in terms of Defendants' intermodal formulas) during the pre-Conspiracy Period, but coverage and consistent application did not, due to the competition between Defendants pre-2003. *See* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶¶ 107–12 & Fig. III-6.

**In the face of pre-conspiracy struggles to impose and collect fuel surcharges covering intermodal traffic, CSX's senior-most executives, including executives responsible for intermodal traffic, participated in meetings and discussions with their competitors about fuel surcharges**. *See* COF ¶¶ 268–73. The president of CSX's intermodal division, CSXI, reported directly to Clarence Gooden, CSXT's EVP & Chief Commercial Officer, who oversaw both carload and intermodal fuel surcharges. *See, e.g.*, PX0635, Jenkins (CSX) Dep., July 27, 2011, at 40 (CSX AVP testifying that Gooden served as the executive vice president for sales and marketing

"for all of CSXT and intermodal"); PX0729, CSXFSC000001106 (CSX organizational chart), at '106. None of the discussions in the unprecedented, conspiratorial meetings beginning in 2003 excluded or carved out intermodal shipments. Senior executives from all four Defendants, including Gooden, met at the April 2-6, 2003 NFTA meeting. COF ¶ 148; *see also* PX0629, Koraleski (UP) Dep., Dec. 2, 2010, 165:9-167:4 (CMOs would have discussions at NFTA meetings); PX0612, Gooden (CSX) Dep., July 16, 2010, 137:2-7 (Gooden would have seen railroads' CMOs at the NFTA meeting); Plaintiffs' Response to Defendants' Undisputed Fact No. 37.

On June 3, 2003, CSX and UP senior executives met and discussed fuel surcharges. *See* PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 (reflecting discussion of both railroads starting at a $23 trigger point); PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."). The day of the June 3, 2003 meeting, at Mike Giftos's request, CSX's John Couch emailed Giftos and Gooden a chart comparing CSX's fuel surcharge program to the other Defendants' programs. PX0166, CSXFSC000000414 (CSX internal email re: "Fuel Surcharge Last 16 month comp", June 3, 2003) (attaching comparison of new CSX formula to other railroads' formulas in past.). At the June 3, 2003 meeting, CSX and UP senior executives assessed the customer opposition the companies were receiving to their efforts to apply their fuel surcharges. PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes."); PX0474, UPFSC0001088 (handwritten notes summarizing meeting) at '088 ("Fuel surcharge – GIFTOS, CSX has not seen outcry that UP has").

CSX and UP senior executives also discussed their trigger points for their fuel surcharge programs and agreed that, if fuel prices stayed high, they might have to consider raising their trigger points. *Id.* ("Both roads start at a $23 trigger. May have to revisit $23 if stay high."). Handwritten notes of the June 3, 2003 "Alliance" meeting show that the prepared "minutes" were sanitized to omit key discussions on fuel surcharges. *Compare id.* ("Fuel surcharge—GIFTOS, CSX has not seen outcry that UP has. CSX may begin a modest hedge program (WARD). Both roads start at a $23 trigger. May have to revisit $23 if stay high."), *with* PX0167, CSXFSC000000416 (CSX-UP email re: CSX/UP Alliance Meeting Minutes 06/03/03, June 6, 2003, attaching minutes of June 3, 2003 meeting), at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes.").

Following these meetings, Defendants' coordinated adherence to new and strict fuel surcharge enforcement policies, with uniform directives to minimize discounts and waivers, during the Conspiracy Period was applied equally to intermodal shippers. PX0224, CSXFSC000672464 (CSX email re: "CSXI Fuel Surcharge," May 11, 2005, and presentation, "CSXI Fuel Surcharge"), at '471 (CSX intermodal policy requiring application of "[f]ull Fuel Surcharge on all customers—No Exceptions!").

CSX executives continued to meet with executives from other Defendants through the end of 2003, including at N.E.M.C. meetings. *See, e.g.*, COF ¶¶ 194–96, 199–204. These far-ranging discussions were not restricted to any particular customer segments, and there is no indication that intermodal shipments were excluded from the discussions.

**During the conspiracy period, despite any purported differences in formulas, all four Defendants' intermodal programs were in lockstep**. In October 2004, CSX modified its intermodal fuel surcharge to come into lockstep with NS and BNSF. CSX revised its intermodal fuel surcharge program, which covered both international and domestic intermodal shipments, in

October 2004, changing the formula to have the same trigger price, initial surcharge, fuel increment, and surcharge increment as NS's domestic intermodal FSC program. *See* PX0797, NS_037031133 (NS email re: "CSX Fuel Surcharge Scale", Sept. 7, 2004), at '133-34; PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, Fig. III-6. And UP made similar modifications so that it would match the others' intermodal fuel surcharges throughout the conspiracy period. *See* DA06916 (June 2004 "CSX Intermodal Fuel Surcharge Review" presentation), at DA06924 (discussing how to revise its intermodal surcharge formula to "begin[] standardization across industry"); *see also* PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 155 (NS changed its international intermodal FSC to be identical with BNSF and CSX effective August 2006); *id.* at ¶ 156 ("[T]here is evidence that when the UP formula yielded a result that differed from those of the other Defendants, UP altered its announced percentage to match the others.").

In 2005, BNSF's Fred Malesa, VP International Intermodal Marketing, told intermodal [redacted] PX0800, BNSF_II_04007073 ([redacted]), at '073 (emphasis added). Defendants' own expert conceded that all four Defendants' intermodal "FSC rates move closely together" during the conspiracy. PX0637, Kalt MDL I Corrected Merits Rpt., Mar. 1, 2013, ¶ 200.

**Defendants, including CSX, exchanged information about their fuel surcharge coverage progress on intermodal shipments**. *See, e.g.*, PX0169, CSXFSC000000476 (internal CSX email chain re Fuel Surcharge Overview Clarence 03, Oct. 9, 2003), at '476 ("The BNSF stated that 82% of their carload and intermodal business either had fuel surcharge or an escalator on the revenue.").

**Expert analyses of Defendants' data also confirms that their intermodal fuel surcharges tracked each other closely**. Dr. Bernheim confirmed, for example, that NS and CSX's intermodal fuel surcharges closely tracked each other during the conspiracy:

**Figure II-8: Defendant Conspiracy Period intermodal fuel surcharges (actual surcharge percentage by fuel price)**




PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 110 & Fig. III-8; *see also* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶¶ 120–21 & Figs. 5, 6.

<u>**Material Undisputed Fact No. 45**</u>

**A substantial share of Plaintiffs' intermodal traffic during the alleged conspiracy period was not subject to the allegedly conspiratorial published intermodal fuel surcharges.**

<u>Supporting Facts:</u>

45.1 Among Plaintiffs, intermodal traffic was concentrated in just 11 Plaintiffs responsible for 99.5% of all revenues associated with intermodal shipments—eight intermodal-only shippers

(ABF Freight Systems, Inc., Central Transport International, High Level Management Ventures f/k/a Interdom, Kawasaki Kisen Kaisha, Ltd., Lotte Global Logistics (North America) Inc., Mitsui O.S.K. Lines, Ltd., Nippon Yusen Kabushiki Kaisha, and Yang Ming Marine Transport Corp.) and three intermodal-heavy shippers (AP Moeller–Maersk, United Parcel Service, Inc./UPS Ground Freight, Inc., and Crowley Maritime Corp.).[206]

45.2 Documents and testimony reflect that 10 of the 11 large intermodal shippers agreed to non-standard fuel surcharges with BNSF, CSXI, NS, or UP during the alleged conspiracy period.[207]

45.3 Defendants' transactional data show that all of those 11 shippers moved traffic under a contract entered into or amended during that period that had either a non-standard fuel surcharge or no fuel surcharge, with such contracts representing more than 60% of those Plaintiffs' new or amended contracts after July 1, 2003.[208]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 45</u>**

Disputed.

Defendants cite inadmissible evidence to support "Undisputed Fact No. 45." The expert report of Avram S. Tucker is not admissible evidence, as explained in Plaintiffs' Motion to Exclude Avram S. Tucker (MDL I Dkt. No. 1175; MDL II Dkt. No. 996). Further, relying primarily on price authorities used for "one off" and other irregular shipments, Defendants misleadingly claim in 45.3, relying on Tucker's expert report, that "more than 60%" of the price authorities the eleven intermodal shipper Plaintiffs entered into or amended during the Conspiracy Period "had either a

---

[206] *See* DA25148 at 206 (Israel Rpt. Tbl. C-9, 8/15/23).

[207] *See* DA25427 (Attachment A to the Declaration of Kelsey S. Bryan, Schedule of *MDL II* Price Authority Documents).

[208] *See* DA24614 at 737-48 (Tucker Rpt. Scheds. 8.1 & 10.1, 8/15/23) (reflecting that, of those eleven Plaintiffs' 1,898 new or amended contracts after July 1, 2003, some 807 had a non-standard fuel surcharge and another 391 had no fuel surcharge).

non-standard fuel surcharge or no fuel surcharge." In fact, even assuming Defendants' classifications are accurate, only 0.2% of all Conspiracy Period revenue for the eleven intermodal Plaintiffs was not subject to a fuel surcharge, and only 5.7% was subject to a non-standard fuel surcharge. (This information is reflected in the data file underlying Mr. Tucker's schedules. *See* Tucker Rpt. Sch. 8 Series, 10 Series, 2.8. Given the size of the file, Plaintiffs have not included it as an exhibit, but can provide it if requested by the Court.).

Nor is DA25427 (Attachment A to the Declaration of Kelsey S. Bryan, Schedule of MDL II Price Authority Documents) ("Bryan Attachment A") (reflecting such price authorities for 89 of 121 MDL II shippers), admissible, as explained in Plaintiffs' Motion to Strike the Declarations of Eric Fanchiang and Kelsey Bryan. Further, Bryan Attachment A contains factual inaccuracies. For example, Defendants contend that NYK [redacted]. DA25453. This claim is not only incorrect; it also contradicts Defendants' assertion in the Fanchiang Declaration that [redacted] *See* DA25830. In fact, NYK [redacted] PX1183, BNSF_II_03900596 ([redacted]), at '596-98. [redacted] PX0890, NYK-00013195 (letter from NYK to BNSF re [redacted], July 12, 2004), at '195-96. In response, NYK [redacted] and told BNSF that

[redacted] *Id.* The document cited by Defendants in Bryan Attachment A shows that [redacted] PX1185, NYK-00000859 (letter from BNSF to NYK, Nov. 19, 2004), at '859. Thus, Defendants' documentary evidence reflects an agreement between NYK and BNSF that included a fuel surcharge.

Admissible evidence also contradicts the misleading suggestion that simply because some individual contracts during the Conspiracy Period did not contain a fuel surcharge, any of the Defendants were not engaged in a conspiracy. Defendants themselves recognized that variations from the coordinated fuel surcharges were infrequent. *See, e.g.*, PX0207, CSXFSC000212937 (internal CSX email re: [redacted] renewal, Mar. 31, 2006), at '937 ("We will have very few exceptions."); PX0072, BNSF-0048722 (BNSF email re: "John Lanigan Staff Meeting 4-11-06" and attachments, July 14, 2006), at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); PX0272, NS_010007412 (NS internal email re: "FSC," June 11, 2004), at '412 ("All deals must have the new FSC" and "in no instance would there not be the new FSC," and "[A]ll new contracts with have the new FSC, no exceptions"); PX0391, UPFSC 0066571 (internal UP email re: Toyota Fuel Surcharge Analysis, Aug. 2, 2005), at '571 ("It is my understanding Jack [Koraleski] has issued a mandate that all business should be subject to the HDF program (the standard program . . .)"). During the Conspiracy Period, Defendants' fuel surcharges became non-negotiable and were applied across-the-board with a goal of 100% fuel surcharge coverage, and approval of exceptions was centralized in senior management. COF ¶¶ 302–63.

Plaintiffs dispute Defendants' characterization of "a substantial share of Plaintiffs' intermodal traffic." Defendants support this claim only by lumping *price authorities* into categories and then comparing how many price authorities fall into each category. That exercise cannot support Defendants' assertion about a "substantial share" of Plaintiffs' traffic. Even assuming Defendants correctly identify which price authorities contain "non-standard" fuel surcharges or lack fuel surcharges (and they do not, as explained elsewhere), to make claims about the "share of Plaintiffs' intermodal traffic," Defendants would have to consider the volume of *commerce* actually shipped in these various categories. As discussed above, Supporting Fact 45.3, for example, misleadingly calculates its 60% statistic by looking at the number of price authorities, rather than how much revenue or commerce was in fact covered the respective fuel surcharges. Other characterizations by Defendants in this "Undisputed Fact" are similarly misleading. Supporting Fact 45.2 includes an intermodal shipper in its "10 of the 11 large intermodal shippers" characterization if even a single price authority involving that shipper included a "non-standard" fuel surcharge, without calculating the volume of commerce subject to a "non-standard" fuel surcharge.

Judge Friedman made factual findings in MDL I directly contrary to this "Undisputed Fact." Citing deposition testimony and other record evidence, the Court found by a preponderance of the evidence that "during the [relevant] period defendants uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible. . . . And any deviations from defendants' standard fuel surcharge programs were rare. Furthermore, each defendant enforced strict policies ensuring across-the-board application of these standardized fuel surcharge programs on all of their shippers." *Rail Freight*, 287 F.R.D. at 50 (citing PX0622, Kraemer (NS) Dep., Aug. 11, 2010, at 30; PX0627,

Cerwonka (CSX) Dep., Aug. 13, 2010, at 7–8, 19–20; PX0628, Garin (BNSF) Dep., Aug. 16, 2010, at 67–68; *See* PX0624, Allen (BNSF) Dep., Aug. 12, 2010, at 25–27; PX0625, Jacobowski (BNSF) Dep., Aug. 12, 2010, at 23 ; PX0617, Lawson (NS) Dep., Aug. 5, 2010 at 37–38 ; PX0551, Union Pacific 2005 Analyst Fact Book, June 27, 2005, at 11; PX-0623, Osborne (NS) Dep., Aug. 11, 2010, at 38–41, 48–49; PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 29–31; PX0626, Piacente (CSX) Dep., Aug. 13, 2010, at 7–10.). The Court noted, for example, that contemporaneous CSX communications provided "very clear instructions" and "specific directions" mandating fuel surcharges: "all renewals include fuel—*very very few exceptions* as we discussed last month"; "any multiyear deals must include FSC in the out years"; and renewals "should incorporate our FSC program . . . [even] though these master contracts likely have an RCAF component." *Rail Freight*, 287 F.R.D. at 51; *see also* PX0186, CSXFSC000086200 (CSX internal email re: "Fuel Surcharge will change from 18.8% to 19.2% July 1, 2006," June 5, 2006), at '200.

This "Undisputed Fact" is simply a variation of an argument that has long been rejected in this litigation. Defendants have previously argued "that the evidence of aggressive, uniform, and standardized fuel surcharges is not reflective of reality." *Rail Freight*, 287 F.R.D. at 49. The *MDL I* Court rejected Defendants' argument in analyzing NS's contention that it "applied fifty distinct fuel surcharge formulas during the class period." *Id.* As the Court observed, that assertion crumbled in deposition, when NS's own Vice President David Lawson "admitted that during the alleged Conspiracy Period NS had 'a policy to apply the standard fuel surcharge to as many customers as possible,' . . . that 'for any authority that would have either a nonstandard fuel surcharge or no fuel surcharge, it required group vice-president approval,' . . . that he himself had to authorize 'any [fuel surcharge] authority [that] was going to contain any nonstandard fuel surcharge,' . . . that the 50 distinct non-standard fuel surcharges could include 'duplicates.' . . . and

that his declaration provided no information as to the percentage of NS customers that were using the standard fuel surcharge at any time during the class period.'" *Id.* at 50; *see* PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 16, 36, 38; *accord* COF ¶¶ 302–63.

In 2017, the Court confirmed its earlier findings, reasoning that "***[t]he documentary record in this case has not changed***." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d at 103 (emphasis added). "On remand, plaintiffs again present substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.*

Defendants point to occasional "non-standard" fuel surcharges or the absence of fuel surcharges in price authorities—but do not dispute here that those price authorities were negotiated from the inflated baseline of Defendants' conspiratorial standard fuel surcharge and were subject to the same enforcement policies and fuel-cost recovery pretext. Dr. Bernheim concluded: "Because posted prices often serve as starting points for negotiations with customers, an agreement to increase posted prices can shift the entire distribution of transactions prices upwards, especially if customers construe the posted prices as conveying information concerning costs. Consequently, in the current context, one would expect an agreement to coordinate on the structure and imposition of fuel surcharges to impact the entire distribution of fuel surcharge payments, including those made by shippers that negotiated non-standard fuel surcharge provisions." PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 97; *see also* PX0819, Jacobs MDL II Rpt., Mar. 1, 2023, ¶¶ 202-38 (discussing [redacted]); *id.* ¶¶ 443-44 & n.820 (describing how [redacted]

[redacted]). Dr. Leitzinger also used a regression model to "account for existing market conditions—for example, costs and other supply and demand factors—and then test whether base rates were systematically higher than those conditions would have predicted during the Conspiracy Period," finding that "base rates on carload shipments with rate-based FSCs averaged 3.7% higher over the Conspiracy Period than market conditions would otherwise have predicted. The corresponding figure for intermodal shipments with rate-based FSC activity was 2.3%." PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶¶ 241-46 & Ex. E09. Dr. Leitzinger found that "[t]he estimated impact on base rates [was] statistically significant in both cases." *Id.* ¶ 244; *accord Rail Freight*, 287 F.R.D. at 50 (finding that "the evidence in the record makes plain, and the railroad executives themselves admitted, that during the class period defendants uniformly began their negotiations with their standard fuel surcharge program").

Defendants confirmed that infrequent variations from the coordinated fuel surcharges were negotiated from the inflated baseline set by the coordinated fuel surcharge. COF ¶¶ 326, 337–38, 353–54, 361–63; *see, e.g.*, PX0624, Allen (BNSF) Dep., Aug. 12, 2010, at 24–26 ("[A. [O]ur initial opening offer is almost always one that includes a standard fuel surcharge . . . Q. So if I understand you correctly, you started the negotiation with a given customer with the $1.25 HDF standard fuel surcharge program as the starting point? A. That's correct."); PX0617, Lawson (NS) Dep., Aug. 5, 2010, at 38–40 ("Q. But the goal was to at least start from trying to get the standard fuel surcharge in any authority, right? A. That is correct."); PX0618, Listwak (NS) Dep., Aug. 6, 2010, at 23 ("Q. You would agree, then, that there was a standard fuel surcharge that you were trying to implement in your contracts at this time? A. Right."); PX0630, Moorman (NS) Dep., Jan. 7, 2011, at 23 (NS's published FSC served as a "common starting point, if you will, in every negotiation"); PX0616, Young (UP) Dep., Aug. 4, 2010, at 71-75 ("Q. So Union Pacific's policy

– its standard policy was to use the AIILF in conjunction with the fuel surcharge, correct? A. [. . .] This is where you would start negotiations from, with that methodology."); *see* COF ¶¶ 323, 334, 350, 359.

**Material Undisputed Fact No. 46**

**Plaintiffs' claimed damages arising from intermodal traffic are compiled in Attachment B to the Declaration of Kelsey S. Bryan.**

Supporting Facts:

46.1 Plaintiffs' claimed damages arising from intermodal traffic are compiled in Attachment B to the Declaration of Kelsey S. Bryan.[209]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 46**

Objection. The Declaration of Kelsey S. Bryan is inadmissible, as explained in Plaintiffs' Motion to Strike the Declarations of Eric Fanchiang and Kelsey Bryan. In addition, this is not a "fact" within the meaning of Local Rule 7(h). Finally, the Declaration of Kelsey S. Bryan does not even identify all the sources of information apparently used to compile these claimed damages, as Ms. Kelsey notes: "The information summarized in Attachment B was *primarily* derived from Plaintiffs' expert reports and the supporting data provided by Plaintiffs' experts." DA25422 at 424 ¶ 8 (emphasis added). Plaintiffs' claimed damages are compiled in their respective opening and rebuttal expert reports.

[209] DA25464.

**Material Undisputed Fact No. 47**

**During the alleged conspiracy period, the pricing of different Plaintiffs' shipments varied significantly due to numerous and diverse factors.**

Supporting Facts:

47.1 Rail freight customers move their shipments between thousands of unique origin-destination pairs.[210]

47.2 Rail pricing depends on characteristics specific to each shipment, which vary by location, commodity, volume, service considerations, costs, customer preferences and negotiating leverage, and competitive options.[211]

47.3 During the alleged conspiracy period, as fuel prices rose and new regulations constrained truck capacity, especially from late 2003 to 2006, trucks became less competitive with rail, resulting in a diversion of demand from trucks to rail and causing rail prices to increase, with a disproportionate effect on routes and commodities for which trucking is a particularly close substitute for rail.[212]

---

[210] DA22832 at 961 (Jacobs Rpt. ¶ 330, 3/1/23 [redacted] DA25148 at 61 (Israel Rpt. ¶ 101, 8/15/23).

[211] *See, e.g.*, *Rail Fuel Surcharges*, EP 661, 2007 WL 201205, at *4 (S.T.B. Jan. 25, 2007) ("*Rail Fuel Surcharges*") (acknowledging that "railroads rely on differential pricing" accounting for various factors); DA25302 at 17 (Leitzinger 7/26/23 170:25-172:06) (explaining commodity and route combinations produced "thousands…of individual prices"); [redacted]

[212] DA23325 at 67-70 (Leitzinger Rpt. ¶¶ 57-61, 3/1/23) (citing railroad documents showing shift from truck to rail due to fuel prices); DA24890 at 92-93, 95-96 (Leitzinger 3/15/22 24:22-26:11, 55:19-59:20) (explaining demand shift from trucks to rail due to "market factors including fuel prices, and capacity, and driver issues"); [redacted]

47.4 During the alleged conspiracy period, a surge in demand, and resulting congestion in parts of the country's rail network, caused prices to increase on certain routes.[213]

47.5 During the alleged conspiracy period, shipments of "toxic inhalation hazards" experienced substantial price increases in the wake of train derailments in 2004 and 2005 involving releases of chlorine gas, when railroads faced increased liability and insurance costs for such traffic.[214]

---

[redacted]

[213] *See supra*, ¶ 4; *see also* DA24069 at 183 (Leitzinger Rpt. ¶ 221, 11/15/23); [redacted]

[214] *See, e.g.*, DA14068 at 73-74 [redacted]

47.6 Both before and during the alleged conspiracy period, the portion of traffic subject to a given surcharge formula differed from one Plaintiff to another.[215]

47.7 Some, but not all, of the Plaintiffs were subject to rate-based fuel surcharges in contracts with the Defendants before the alleged conspiracy period.[216]

47.8 Some, but not all, of Plaintiffs' traffic during the alleged conspiracy period was not subject to the allegedly conspiratorial fuel surcharges.[217]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 47</u>**

Objection. Defendants' "Supporting Facts" are duplicative of other facts asserted in this document and do not comply with the Local Rules. For example, Defendants cite *only other facts in this document* and no record evidence to substantiate Supporting Fact 47.8, violating Local Rule 7(h)(1)'s requirement that each fact "include references to the parts of the record relied on to

[redacted]

[215] DA24614 at 15 (Tucker Rpt. Tbl. 6, 8/15/23) (transaction data shows that in the first two months of 2003, between 46% and 71% (depending on the Defendant) of the MDL II Plaintiffs' price authorities had a fuel surcharge); *id.* at 737-741 (Tucker Rpt. Sched. 8.1, 8/15/23) (transaction data shows that the share of an individual *MDL II* Plaintiff's price authorities entered into on or after July 1, 2003 without a fuel surcharge ranged from 0% to 63%, with significant variation in between).

[216] *See supra*, ¶ 7; DA24207 at 287-323 (McClave Rpt. App. A, 11/15/23); DA23720 at 26, 41 (McClave Rpt. at 7 (Tbl. 1), 22, 3/1/23).

[217] *See supra*, ¶ 10 ¶ 45.

support the statement." Defendants also cite inadmissible evidence to support Supporting Facts No. 47.6. The expert report of Avram S. Tucker is not admissible evidence, as explained in Plaintiffs' Motion to Exclude Avram S. Tucker (MDL I Dkt. No. 1175; MDL II Dkt. No. 996).

Admitted only that rail-freight customers move shipments between thousands of origin-destination pairs and aspects of rail-freight pricing can depend on certain shipment-specific characteristics.

Plaintiffs dispute that rail-freight pricing is entirely heterogeneous or that Defendants did not adopt pricing policies affecting all or substantially all rail traffic. Defendants' fuel surcharge programs were designed to apply to *all contracts* and *all traffic* in the same way, as Defendants contemporaneously recognized. *See, e.g.*, PX0614, Glennon (NS) Dep., July 20, 2010, at 56-58 (testifying "[t]here is a policy to have a fuel surcharge applied," and agreeing that it was the intent of NS to apply the program as broadly as possible to all traffic); PX0272, NS_010007412 (NS internal email re: "FSC," June 11, 2004), at '412 ("[A]ll new contracts will have the new FSC, no exceptions"); PX0122, BNSF-0570919 (internal BNSF email re: "Revisions to Best Pricing Practices," April 24, 2003), at '921 ("All new prices should be subject to the fuel surcharge. All existing prices should be attempted to be modified to include the fuel surcharge as they come up for negotiation."). Fuel surcharges *do not distinguish between* and *do not depend* on the purported "unique origin-destination pairs" or "characteristics specific to each shipment." Rate-based fuel surcharges function in the same manner no matter the origin, destination, type of commodity, or length of move, or any other purportedly shipper-specific characteristics. "The design of the alleged conspiracy sidestepped the need for Defendants to coordinate rates across thousands of different commodity/route combinations. By agreeing—as is alleged in this case—to: (i) coordinate FSC formulas; (ii) broadly impose and enforce those formulas; and (iii) refrain from

competing away FSC driven rate premiums by discounting base rates, Defendants could raise rates across all of those thousands of combinations." PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 111; *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 92 (explaining fuel surcharges applied "across all products and forms of shipments" and "Defendants took steps to make these surcharges universal [and] to make them uniform within categories"). Fuel surcharges *did not* "var[y] significantly" among shippers—they were imposed across the board, to as many shippers as possible, and with uniform directives to minimize discounts and waivers. COF ¶¶ 302–63.

Other elements of Defendants' pricing, like RCAF and AIILF, are similarly designed to apply and function in the same manner across all Defendant price authorities, irrespective of any purported differences between shippers or shipments. *See, e.g.*, COF ¶¶ 374–81, 386–87. Many private contracts also determine rates or a formula for rates for substantial volumes of commerce over years—creating uniformity in the price shippers pay despite purported differences in "each shipment." *See, e.g.*, PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 44 ("Privately negotiated contracts sometimes specify fixed prices (or base rates) and sometimes establish a formula or process by which those prices may adjust during the contract period, which can span many years.").

Disputed to the extent that Supporting Fact 47.3 misleadingly implies that rising fuel prices, new regulations, and a "diversion" of demand from trucks to rail caused the inflated all-in freight rates paid by Plaintiffs. Plaintiffs incorporate by reference here Plaintiffs' Response to Defendants' Undisputed Fact No. 4. Plaintiffs' experts investigated these contentions and determined that "US railroad shipments rising over the conspiracy period relative to trucking . . . is entirely consistent with cartelization." *See* PX0817, Bernheim MDL II Rebuttal Rpt. (Nov. 15, 2023), ¶¶ 786-87;

PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 16 ("trucking is not a transportation mode that would preclude the exercise of market power by colluding Class I railroads").

Disputed to the extent that Supporting Fact 47.4 misleadingly implies that increased demand for Defendants' services or capacity constraints caused the inflated all-in freight rates paid by Plaintiffs. Plaintiffs incorporate by reference here Plaintiffs' Response to Defendants' Undisputed Fact No. 4.

Disputed to the extent that Supporting Fact 47.5 misleadingly implies that railroad liability and insurance costs related to shipments of "toxic inhalation hazards" caused the inflated all-in freight rates paid by Plaintiffs. Plaintiffs' experts even controlled for these costs specifically in their regression modeling. *See, e.g.*, PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 256 ("My baseline calculations control for shipment characteristics such as . . . an indicator for the Graniteville chlorine spill[.]"), PX0769, Leitzinger MDL II Rpt., Mar. 1, 2023, ¶ 242 ("Beginning in January 2006, I included an indicator for chlorine shipments, to account for potential increases in base rates for these shipments triggered by a January 2005 NS chlorine spill.").

In response to Supporting Fact 47.7, admitted only that, before the conspiracy, certain Defendant price authorities included rate-based fuel surcharges, however discounted or waived. Plaintiffs incorporate by reference here Plaintiffs' Response to Defendants' Undisputed Fact No. 7.

Admissible evidence contradicts the misleading suggestion in Supporting Fact 47.8 that simply because some individual contracts during the Conspiracy Period did not contain a fuel surcharge, any of the Defendants was not engaged in a conspiracy. Plaintiffs incorporate by reference here Plaintiffs' Responses to Defendants' Undisputed Fact Nos. 10 and 45.

**Material Undisputed Fact No. 48**

**Certain *MDL I* Plaintiffs' experts, and all *MDL II* Plaintiffs' experts, calculate alleged overcharges using average alleged elevation across rail shippers.**

Supporting Facts:

48.1 In *MDL I* and *MDL II*, Dr. Leitzinger offers his opinions as to certain Plaintiffs' alleged overcharges based on averages calculated from each Defendant's aggregated shipment data across shippers.[218]

48.2 In *MDL I* and *MDL II*, Dr. McClave offers his opinions as to certain Plaintiffs' alleged overcharges based on averages calculated from each Defendant's aggregated shipment data across shippers.[219]

48.3 In *MDL II*, Dr. Bernheim offers his opinions as to alleged overcharges based on averages calculated from each Defendant's aggregated shipment data across shippers.[220]

48.4 In *MDL II*, Dr. Marx's overcharge estimates are based on Dr. Bernheim's average overcharges. Dr. Marx purports to individualize Dr. Bernheim's average overcharges by multiplying these average overcharges by a statistical calculation, representing the relation between changes in a given Plaintiff shipper prices and changes in a Defendant's average prices.

[218] DA23325 at 467-68 (Leitzinger Rpt. ¶¶ 236-240, 3/1/23) (for fuel surcharge overcharge model, averaging fuel cost per ton-mile of all shipments by a Defendant in a year to estimate but-for world fuel cost recovery); DA23325 at 69-71 (Leitzinger Rpt. ¶¶ 242, 244-246, 3/1/23) (for "base rate overcharge" model, one non-intermodal regression of "all shipments under Defendant price authorities," and one of all intermodal shipments); DA21509 at 65-67 (Leitzinger Rpt. ¶¶ 101-105, 9/15/20).

[219] DA23720 at 37-38, 41-43 (McClave Rpt. 18-19, 22-23, 3/1/23) (one regression for all non-intermodal traffic and one for intermodal traffic); DA21637 at 58-60, 62 (McClave Rpt. 22-24, Tbl. 1, 9/15/20); DA25024 at 32 (McClave 7/11/23 47:13-48:22).

[220] DA21943 at 2082-90 (Bernheim/Marx Rpt. ¶¶ 233-262, 3/1/23) ("market-wide" regression for all traffic); DA21943 at 2088-90 (Bernheim/Marx Rpt. ¶¶ 257-261, 3/1/23) (for Dr. Bernheim, one average overcharge percentage [redacted] per Defendant); DA25234 at 53-54 (Bernheim 7/31/23 180:19-182:11) [redacted]

This calculation does not distinguish between price changes with allegedly conspiratorial and non-conspiratorial causes.[221]

48.5 In *MDL II*, Dr. Jacobs offers his opinions as to certain Plaintiffs' alleged overcharges based on averages calculated from each Defendant's aggregated shipment data across shippers.[222]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 48**

Objection. Defendants' incorrect characterizations of Plaintiffs' expert analysis is not appropriately included in this Statement of Undisputed Fact. Defendants' assertions here are the subject of their "Motion Under Federal Rules of Evidence 702 and 403 to Exclude Average Damages Opinions," and are appropriately considered, if at all, under the framework of Federal Rules of Evidence 403, 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Plaintiffs respectfully refer the Court to their Brief in Opposition to Defendants' Motion Under Federal Rules of Evidence 702 and 403 to Exclude Average Damages Opinions.

---

[221] DA21943 at 2095-96 (Bernheim/Marx Rpt. ¶¶ 270-74 & nn.299-307, 3/1/23) [redacted]

[222] DA22832 at 3020-21, 3026-27 (Jacobs Rpt. ¶¶ 483, 485-487, 489, 502-03, 3/1/23) (one regression for all [redacted] shipments)); DA22832 at 3027-28 (Jacobs Rpt. ¶¶ 503-04, Fig. VI.5, 3/1/23) (one average overcharge percentage each [redacted] shipments, and one [redacted]).

**<u>Material Undisputed Fact No. 49</u>**

**Plaintiffs have access to individualized proof of the causes of their alleged overcharges.**

<u>Supporting Facts:</u>

49.1 Plaintiffs sought discovery from Defendants of documents and communications concerning the terms of Plaintiffs' shipments with Defendants, negotiations related to those Plaintiffs' shipments, and Defendants' analysis of pricing for those Plaintiffs' shipments.[223]

49.2 Defendants prioritized production of Plaintiffs' price authorities in *MDL II*, substantially completing those production by spring of 2021.[224]

49.3 Defendants produced more than 7 million pages of documents to *MDL II* Plaintiffs, more than three quarters of which were price authorities.[225]

49.4 Defendants took 342 depositions of *MDL II* Plaintiffs' negotiators. Plaintiffs took 31 depositions of Defendants' negotiators.[226]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 49</u>**

Objection. Defendants violate Local Rule 7(h) by presenting legal arguments as "Undisputed Facts." This purported "Undisputed Fact" is in fact legal argument copied verbatim from Defendants' principal summary-judgment brief (Def. Br. 98–99), is not properly included in Defendants' Statement of Undisputed Fact, and should be disregarded on summary judgment. *See, e.g.*, *Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C. 2007) (disregarding legal conclusions couched as "facts" on summary judgment); *Cobell v. Norton*, 260 F. Supp. 2d 110, 129 (D.D.C. 2003) ("This statement represents a conclusion of law, not a statement of fact. Therefore, the Court

[223] DA10519.

[224] DA09312 at 30.

[225] DA25412 at 13 (Woods Decl. ¶ 3).

[226] DA09296 at 97.

will deny summary judgment for plaintiffs as to this issue."); *Matthews v. Am. Psychological Soc'y*, 2006 WL 8460393, at *1 (D.D.C. July 27, 2006) ("Such legal conclusions, while proper in Plaintiff's accompanying Opposition, are not properly included in Plaintiff's Statement of Facts."). Defendants have also not defined "individualized proof" here. As explained in Plaintiffs' Opposition to Defendants' Motion Under Federal Rules of Evidence 702 and 403 to Exclude Average Damages Opinions, each Plaintiff expert produced separate damages estimates for each Plaintiff, and those estimates varied widely as a percentage of each shipper's rail freight spending. Plaintiffs respectfully refer the Court to their Opposition to Defendants' Motion Under Federal Rules of Evidence 702 and 403 to Exclude Average Damages Opinions.

**Material Undisputed Fact No. 50**

**No Plaintiff adduces admissible evidence to carry its burden as to its damages.**

Supporting Facts:

50.1 No Plaintiff adduces admissible evidence to carry its burden as to its damages.[227]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 50**

Objection. Not only is this "Undisputed Fact" incorrect—Plaintiffs have adduced ample evidence to show genuine disputes of material fact—but it is also not properly included in Defendants' Statement of Undisputed Fact and should be disregarded on summary judgment. *See, e.g.*, *Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C. 2007) (disregarding legal conclusions couched as "facts" on summary judgment); *Cobell v. Norton*, 260 F. Supp. 2d 110, 129 (D.D.C. 2003) ("This statement represents a conclusion of law, not a statement of fact. Therefore, the Court will deny summary judgment for plaintiffs as to this issue."); *Matthews v. Am. Psychological*

[227] *See* Fed. R. Civ. P. 56(c)(1)(B); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

*Soc'y*, 2006 WL 8460393, at *1 (D.D.C. July 27, 2006) ("Such legal conclusions, while proper in Plaintiff's accompanying Opposition, are not properly included in Plaintiff's Statement of Facts."). Whether a party has carried its evidentiary burden is a question of law on summary judgment and ultimately a question for the finder of fact. Defendants' citations in support of this so-called "fact"—Federal Rule of Civil Procedure 56 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)—confirm that they have failed to comply with Local Rule 7(h) by failing to cite record evidence and improperly representing legal conclusions as facts.

**Material Undisputed Fact No. 51**

**Defendants had already made increasingly divergent changes to their fuel surcharge programs leading up to the January 25, 2007 STB decision.**

Supporting Facts:

51.1 BNSF announced a unique coal-specific fuel surcharge in June 2004.[228]

51.2 UP implemented its own coal-specific fuel surcharge, different from BNSF's, in November 2004.[229]

51.3 BNSF announced the industry's first mileage-based fuel surcharge in March 2005 and implemented it in January 2006.[230]

51.4 NS reformulated its 2004 carload rate-based fuel surcharge in April 2006 to increase the trigger from $28 to $64, decrease the incremental slope from 0.4% to 0.3% per $1 changes in WTI

[228] *See supra*, ¶ 14.

[229] *See supra*, ¶¶ 34.1-34.3.

[230] *See supra*, ¶ 15.

prices, and adjust base rates upward (called “rebasing”) to reduce the fuel surcharge rates applied to customers.[231]

**<u>Plaintiffs’ Response to Defendants’ Undisputed Fact No. 51</u>**

Objection. Defendants’ Supporting Facts 51.1–51.4 are duplicative of other facts asserted in this document and do not comply with the Local Rules. Defendants cite *only other facts in this document* and no record evidence to substantiate these Supporting Facts, violating Local Rule 7(h)(1)’s requirement that each fact “include references to the parts of the record relied on to support the statement.”

Disputed that Defendants made “increasingly divergent changes to their fuel surcharge programs” during this period. Defendants proffer no evidence to support their claim that their fuel surcharge programs were “increasingly divergent,” a phrase they do not define. To the contrary, the changes Defendants point to—fuel surcharges on coal, BNSF’s mileage-based fuel surcharge, and NS’s rebased fuel surcharges—resulted from direct discussions among Defendants’ executives and were part and parcel of Defendants’ agreement to impose more aggressive non-negotiable rate-based fuel surcharges, across the board and with uniform directives to minimize discounts and waivers, to as many shippers as possible, as explained in Plaintiffs’ Responses to Defendants’ Undisputed Facts Nos. 14, 15, 27, 34, and 52. Plaintiffs incorporate by reference Plaintiffs’ Responses to Defendants’ Undisputed Facts Nos. 14, 15, 27, 34, and 52 here. These changes also were not “divergent” from the conspiratorial carload (or intermodal) formulas, because they either maintained or increased the supracompetitive revenue and profits Defendants derived from their conspiratorial agreement.

[231] *See supra*, ¶ 27.

**Material Undisputed Fact No. 52**

**The January 25, 2007 STB decision spurred further changes to Defendants' fuel surcharge programs, including movement away from rate-based fuel surcharges to varying extents and in a variety of different ways.**

Supporting Facts:

52.1 On January 25, 2007, the Surface Transportation Board issued a decision concluding that rate-based fuel surcharges on rate-regulated traffic could constitute an unreasonable practice.[232]

52.2 In March 2007, CSXT announced that it would begin using a mileage-based fuel surcharge formula to price shipments subject to public tariffs, effective April 23, 2007,[233] and generally applied this mileage-based formula to its unregulated traffic in private non-intermodal price quotes and new and renewing contracts thereafter.[234]

52.3 On March 21, 2007, UP announced a new mileage-based fuel surcharge for all regulated traffic effective April 26, 2007, which would also apply to non-intermodal unregulated traffic as contracts were renewed.[235] UP's mileage-based fuel surcharge was rebased, meaning UP raised the trigger price and applied the surcharge percentage to a higher base rate that included more of the fuel cost.[236]

52.4 BNSF publicly announced plans to move shipments of local and Rule 11 (interline forwarded) traffic in two of its four business units (Agriculture and Coal) to mileage-based surcharges effective January 1, 2006, more than a year before the STB's decision.[237]

---

[232] *Rail Fuel Surcharges*, 2007 WL 201205.

[233] DA02201 at 06.

[234] DA02792 at 95 ("Convert all CSXT [regulated traffic] to mileage-based FSC…on April 23…[with unregulated] converted at renewal"); DA02201 at 08; DA01927 at 37-38 (Ward (CSXT) 204:8-205:14); DA01886 at 98 (Gooden (CSXT) 259:25-260:19).

[235] DA01700 at 00-05; DA01692 at 92-98.

[236] DA01700 at 00-05.

[237] DA04635 at 36; DA04652 at 52-57.

52.5 By the time of the STB ruling, BNSF had already announced that it had converted to mileage-based fuel surcharges for unregulated local and Rule 11 (interline forwarded) agricultural and coal shipments.[238]

52.6 After the STB decision, BNSF expanded its existing mileage-based fuel surcharge program to encompass regulated traffic.[239]

52.7 BNSF did not rebase its mileage-based fuel surcharge, which resulted in a competitive advantage for BNSF as compared to UP.[240]

52.8 After the STB decision, NS did not convert traffic to mileage-based fuel surcharges, and instead eliminated fuel surcharges on all of its regulated shipments, on March 16, 2007.[241] NS continued using rate-based fuel surcharges, including its 2006 rebased formula, for its unregulated shipments.

52.9 Non-defendant railroads—including all the Class I railroads in 2007 not named as Defendants here (Kansas City Southern, Canadian National, and Canadian Pacific)—also reacted to the STB decision by changing their fuel surcharge formulas.[242]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 52**

Disputed. The STB did not merely conclude that rate-based fuel surcharges "could" constitute an ureasonable practice. The STB concluded their rate-based programs constituted an "industry-wide unlawful" and "unreasonable practice." PX0676, *House Committee on Transportation and Infrastructure: Hearing on Rail Competition and Service*, 110th Cong. 8–9

---

238 DA04652 at 52-57.

239 DA03788 at 824-26.

240 DA01699 ("A significant drop in fuel [prices] would likely force [UP] to reduce base rates to stay competitive" with BNSF.).

241 DA05573.

242 DA13810 at 12-13 (KCS); DA13814 (CN); DA19034 (CP).

(2007) (statement of Surface Transportation Board Chairman, Charles D. Nottingham); *see* PX0653, *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 26, 2007, at 6, 10. The STB added that Defendants' fuel surcharge program was "***a misleading and ultimately unreasonable practice***," finding that "there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied." PX0653, STB Rail Fuel Surcharges, Ex Parte No. 661, Jan. 26, 2007, at 7 (emphasis added); *see also id.* at 9 ("For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate—when practical alternatives are available—would ***permit them to continue to mislead their customers and would be unfair***.") (emphasis added). The STB thus gutted Defendants' pretextual explanation for their fuel-surcharge programs, noting that the surcharges paid by shippers often did not reflect the actual cost of fuel on those shipments. *Id.* at 6–10.

Disputed that the STB's decision "spurred further changes to Defendants' fuel surcharge programs." To the contrary, following the STB decision, Defendants did not stop applying the coordinated rate-based surcharges where they were included in existing contracts, nor did it hasten these changes for rate-unregulated traffic (at issue in this litigation) beyond the purview of the STB. Indeed, Defendants *deferred* application of mileage-based fuel surcharges on existing contracts until after those contracts expired. *See* PX0498, UPFSC 0068712 (UP "Sales Talking Points-UPRR FSC Plans For Internal UPRR Use Only March 2007"), at '713 ("Union Pacific's intention to eventually roll all business, including contracts as they expire, to a mileage-based FSC program."); PX0222, CSXFSC000385966 (CSX "Announcement of Fuel Surcharge Changes," Mar. 2, 2007), at '969 ("When your contract expires, your rates will adjust to the new fuel surcharge plus any market-based rate adjustment."). Admissible evidence contradicts Defendants' suggestion that their *announcements* of mileage-based fuel surcharge programs or rebased fuel

surcharges meant those fuel surcharge programs were actually *applied* to unregulated traffic. Shippers continued paying conspiratorial rate-based fuel surcharges throughout 2007, 2008, and beyond. Defendants concede that even after the STB's early 2007 ruling with respect to fuel surcharges on rate-regulated shipments, Defendants did not switch private contracts to mileage-based surcharges until the contracts with rate-based fuel surcharges expired. *See* DA01886, at 98 (Gooden (CSX) Dep., July 16,2010, at 259-260). Private contracts—which were often negotiated as multi-year agreements—continued to apply conspiratorial rate-based fuel surcharges as a result of the conspiracy years after the STB's ruling.

Further disputed that Defendants' mileage-based fuel surcharge programs constituted "movement away" from conspiratorial rate-based fuel surcharges. To the contrary, the evidence shows that Defendants designed their mileage-based fuel surcharges to be revenue neutral with respect to their rate-based fuel surcharges. BNSF internally made clear that its switch to imposing limited mileage-based fuel surcharges was intended to be "a revenue-neutral event for BNSF." PX0062, BNSF-0033275 (BNSF emails regarding "Potential MBFSC Test IP Customers," June 21-23, 2006), at '275 ("John Lanigan has told the mileage-based fuel surcharge team that he wants this to be a revenue-neutral event for BNSF."); *see, e.g.*, PX0086, BNSF-0327878 (July 2005 BNSF Communication Plan regarding "Mileage-Based Fuel Surcharge Program"), at '884 (listing as a goal of the mileage-based program to "collect[] the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces").

In September 2006, an internal UP email discussed various ways "to move forward with a re-based surcharge" and noted that the company's CEO "does not want to leave any money on the table after re-basing." PX0527, UPFSC 0404052 (September 18, 2006 internal UP email), at '052. Around 2007, UP adopted a mileage-based fuel surcharge for certain shipments. COF ¶ 579.

Internally, UP "[did] not believe that there will be a negative revenue impact to Union Pacific . . . . The basing of the new fuel surcharges at a higher level will require the incorporation of some of the current fuel surcharge revenue into the customers' base prices." PX0498, UPFSC 0068712 (UP "Sales Talking Points-UPRR FSC Plans For Internal UPRR Use Only March 2007"), at '713. An internal UP presentation revealed that all-in rates on certain lines would actually *increase* under the new program. PX0417, UPFSC 0331506 (May 4, 2007 UP "Mileage Based Fuel Surcharge" presentation). The presentation warned employees to "NOT forward this" information to customers. *Id.* at 5; *see also* COF ¶¶ 577, 580–81, 585–86; PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 232 ("CSX and UP's conversions to a mileage-based FSC program were coupled with rebasing of the base rates. The companies made this transition in a way that maintained the same overall revenue as the existing coordinated rate-based fuel surcharge programs.").

CSX made a similar change as BNSF when it switched from a rate-based to a mileage-based fuel surcharge in April 2007. An internal CSX presentation made clear that there were "no exceptions" to the new mileage-based program "in order to ensure ***no value erosion*** as part of the" change. PX0174, CSXFSC000002351 (CSX internal email, Feb. 25, 2007, and attached presentation), at '356 (emphasis added). CSX's internal analysis revealed that "[t]he proposed rebased program would effectively 'lock in' the fuel surcharge between $23 and $64." PX0175, CSXFSC000002658 (CSX "Fuel Surcharge Strategy" presentation, July 24, 2006), at 4. And CSX noted that "[t]he rebased program *would convert a large-portion of the expected 2007 – 2008 over-recovery into price*." *Id.* at 7 (emphasis added); PX0222, CSXFSC000385966 (CSX "Announcement of Fuel Surcharge Changes," March 2, 2007), at '973 ("Any new contract/quote package must meet the same economics of the contract under its current terms."); PX0179,

CSXFSC000006567 (CSX "Internal Announcement on FSC Changes – March 2, 2007"), at '574 (internal CSX memo: mileage-based program would "keep the economics the same"); *see also* PX0770, Bernheim & Marx MDL II Rpt., Mar. 1, 2023, ¶ 232 ("CSX and UP's conversions to a mileage-based FSC program were coupled with rebasing of the base rates. The companies made this transition in a way that maintained the same overall revenue as the existing coordinated rate-based fuel surcharge programs."); *see also* COF ¶¶ 582–85.

BNSF talking points from April 2007 indicate that all three railroads were rebasing "to a higher strike price for fuel . . . [with a] freight rate increase to offset the lower fuel surcharge" or "imbedding" the fuel surcharge in their higher rates ("NS has announced that all of their freight rates will have fuel cost imbedded), with a "target population" for all carriers of only "public documents." DA04662.

Similarly, NS's rebasing was not a unilateral, self-interested action, but rather strategic behavior in furtherance of the conspiracy. The rebase was a cosmetic change, made at the height of the STB's investigation into Defendants' fuel surcharge practices and immediately before the STB hearing, with intent to deflect scrutiny and mislead the STB. PX0116, BNSF-0533077 (April 24, 2006 announcement forwarded by George Gillen to Roger Hsieh, "Norfolk Southern to Adjust Fuel Surcharge"), at '077. While NS increased its trigger price from $23 WTI to $64 WTI, so that NS misleadingly could suggest to the STB it had "deci[ded] to reduce its fuel surcharge percentage," PX1170, NS 001001195 (Written Statement of NS, STB *Ex Parte* 661, April 27, 2006), at '207, NS at the same *increased its based rates* by 16.4% so as "to bake in FSC to [base] rate," PX0318, NS_010067297 ("NS Fuel Surcharge Model" spreadsheet, March 21, 2006). The rebase thus constituted a complete transfer of the coordinated fuel surcharges into the base rates. As Sam Kyei, BNSF's Chief Economist explained internally at BNSF about NS's rebasing, "***You***

***basically swap approximately $1.1 B of FSC into your rates***." PX0098, BNSF-0367622 (BNSF internal email re: Proposed BNSF FSC, April 21, 2006), at '622 (emphasis added); *see also* PX0318, NS_010067297 ("NS Fuel Surcharge Model" spreadsheet, March 21, 2006) (reflecting that NS had conducted an analysis to determine the amount of base rate increase that would be needed "to bake in [the existing $23] FSC to [base] rate").

NS contemporaneously admitted that rebasing was "a wash," because it simply moved existing fuel surcharges into base rates. Mike Donnelly, President of Plaintiff Donnelly, responded to [redacted], with [redacted]" to which the NS product manager wrote, "Not really. The fuel rebase was a 16.4% factor which is in effect a wash because the fuel component that this is now subject to is only at 2.1% for July." *See* PX0230, DON018705 (Norfolk Southern Rate Authority Transmittal, July 3, 2006), at '705.

Other Defendants recognized NS's rebasing strategy as an opportunity to lock in inflated all-in rates. *See, e.g.*, PX0511, UPFSC0169555 (internal UP email re: "Mileage Based FSC Timetable," Feb. 7, 2007), at '555 ("NS is planning to do away with the fuel surcharge altogether an[d] just change rates when they need to.").

Additionally, Defendants' senior-most executives continued discussions about fuel surcharges, further undermining Defendants' suggestion that these purported "changes to Defendants' fuel surcharge programs" are inconsistent with the conspiracy. For example, UP's Koraleski reported internally February 2007 that he had discussed fuel surcharges with his counterparts at the other Defendants. PX0511, UPFSC0169555 (internal UP email re: "Mileage Based FSC Timetable," Feb. 7, 2007), at '555 ("CSX is going down the PC Miler approach. NS is planning to do away with the fuel surcharge altogether an[d] just change rates when they need to."). Two days later, CSX CMO Clarence Gooden scheduled a late-evening Friday "Discussion

w/BNSF re: Fuel Surcharge" on February 9, 2007. PX0730, CSXFSC000258350 (Gooden calendar entry), at '350. CSX did this despite internally recognizing around the same time that "*Anti-trust laws require each railroad to establish its FSC program independently*." PX0179, CSXFSC000006567 (CSX "Internal Announcement on FSC Changes – March 2, 2007"), at '571 (emphasis added).

**<u>Material Undisputed Fact No. 53</u>**

**On May 14, 2007, the first shippers filed suit against Defendants alleging that Defendants conspired to apply rate-based fuel surcharges, further putting shippers on notice of the allegedly artificially inflated pricing.**

<u>Supporting Facts:</u>

53.1 On May 14, 2007, shippers filed the first of the lawsuits that would be consolidated into *MDL I*.[243]

53.2 The January 25, 2007 STB decision and the filing of the *MDL I* lawsuits put shippers "on notice…that their agreements with defendants might contain artificially high rate-based fuel surcharges."[244]

53.3 At the time these lawsuits were filed, only one Defendant (NS) still consistently applied rate-based fuel surcharges to unregulated carload traffic.[245]

---

[243] *See, e.g.*, Compl., *Dust Pro, Inc. v. CSX Transp., Inc.*, No. 2:07-cv-2251-DMC (D.N.J. May 14, 2007), ECF 1; *see also* Second Consolidated Am. Class Action Compl., *In re Rail Freight Fuel Surcharge*, No. 07-mc-00489-PLF-GMH (D.D.C. Feb. 3, 2010), ECF 324 (operative class action complaint).

[244] *In re Rail Freight Fuel Surcharge*, 2021 WL 1909777, at *10 (D.D.C. May 12, 2021) ("*Tolling II*").

[245] *See supra*, ¶ 52; DA18419 at 24-25 (Glennon (NS) 212:3-18; 213:24-214:6).

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 53</u>**

Objection. The question of what put shippers "on notice" of potential legal claims is a question of law. As a result, "Material Undisputed Fact No. 53" is not properly included in Defendants' Statement of Undisputed Fact and should be disregarded on summary judgment. *See, e.g.*, *Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C. 2007) (disregarding legal conclusions couched as "facts" on summary judgment); *Cobell v. Norton*, 260 F. Supp. 2d 110, 129 (D.D.C. 2003) ("This statement represents a conclusion of law, not a statement of fact. Therefore, the Court will deny summary judgment for plaintiffs as to this issue."); *Matthews v. Am. Psychological Soc'y*, 2006 WL 8460393, at *1 (D.D.C. July 27, 2006) ("Such legal conclusions, while proper in Plaintiff's accompanying Opposition, are not properly included in Plaintiff's Statement of Facts.").

Admitted only that the first of the cases that were consolidated into *MDL I* was filed on May 14, 2007. Otherwise, disputed, including Defendants' incorrect suggestion that only NS "still consistently applied rate-based fuel surcharges to unregulated carload traffic" at this time. Defendants' *announcements* of a mileage-based fuel surcharge program or rebased fuel surcharges do not support the conclusion that these fuel surcharge programs were actually *applied* to all unregulated traffic. To the contrary, shippers continued paying conspiratorial fuel surcharges throughout 2007, 2008, and beyond. Defendants concede that even after the STB's early 2007 ruling with respect to fuel surcharges on rate-regulated shipments, Defendants did not switch private contracts to mileage-based surcharges until the contracts with rate-based fuel surcharges expired. *See* DA01886, at 98 (Gooden 259:25-260:19); PX0498, UPFSC 0068712, at '712-13; *see also* COF ¶¶ 579–81. Private contracts—which were often negotiated as multi-year agreements—continued to apply conspiratorial rate-based fuel surcharges as a result of the conspiracy years after the STB's ruling. *See also* Plaintiffs' Memorandum in Opposition to Defendants' Joint and Individual Motions for Summary Judgment, §§ III.D–G.

**<u>Material Undisputed Fact No. 54</u>**

**No facts support an inference that the alleged conspiracy existed beyond January 25, 2007, or, at a minimum, May 14, 2007.**

<u>Supporting Facts:</u>

54.1 No facts support an inference that the alleged conspiracy existed beyond January 25, 2007, or, at a minimum, May 14, 2007.[246]

**<u>Plaintiffs' Response to Defendants' Undisputed Fact No. 54</u>**

Objection. Defendants' "Undisputed Fact No. 54" is a legal conclusion not properly included in Defendants' Statement of Undisputed Facts. Whether certain facts are sufficient to "support an inference" about the conspiracy is a question of law. Defendants' only citations in support of this so-called "fact"—Federal Rule of Civil Procedure 56 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)—confirm that they have failed to comply with Local Rule 7(h) by failing to cite record evidence and improperly representing legal conclusions as facts.

Otherwise, disputed. The seeming basis for Defendants' assertion—that their switch from rate-based to mileage-based fuel surcharges means Plaintiffs cannot establish "that the alleged conspiracy extended beyond January 25, 2007"—is incorrect as a matter of law. It is not Plaintiffs' burden to prove that Defendants did *not* withdraw from a conspiracy; it is Defendants' burden to prove that they *did* withdraw from a conspiracy. *See* Plaintiffs' Memorandum in Opposition to Defendants' Joint and Individual Motions for Summary Judgment, § III.B.

Moreover, there is substantial evidence that Defendants rebased their mileage-based fuel surcharges and designed them to be revenue neutral with their rate-based fuel surcharges. Further disputed to the extent that Defendants misleadingly suggest that their actions following the STB's

[246] *See* Fed. R. Civ. P. 56(c)(1)(B); *Celotex*, 477 U.S. at 323.

ruling condemning Defendants' use of rate-based fuel surcharges constituted some kind of withdrawal from the conspiracy or was somehow inconsistent with conspiracy.

The evidence shows that Defendants designed their mileage-based fuel surcharges to be revenue neutral with respect to their rate-based fuel surcharges. *See* COF ¶¶ 554–87; *e.g.*, PX0086, BNSF-0327878 (July 2005 BNSF Communication Plan regarding "Mileage-Based Fuel Surcharge Program"), at '884 (listing as a goal of the mileage-based program to "collect[] the same amount of fuel surcharge revenue across our overall customer base as the percentage-based program it replaces"); PX0222, CSXFSC000385966 (CSX "Announcement of Fuel Surcharge Changes," Mar. 2, 2007), at '973 ("Any new contract/quote package must meet the same economics of the contract under its current terms."); PX0179, CSXFSC000006567 (CSX "Internal Announcement on FSC Changes – March 2, 2007"), at '574 (internal CSX memo: mileage-based program would "keep the economics the same"); PX0498, UPFSC 0068712 (UP "Sales Talking Points-UPRR FSC Plans For Internal UPRR Use Only March 2007"), at '713 (noting that UP "[did] not believe that there will be a negative revenue impact to Union Pacific" by switching to a mileage-based surcharge); *see also* PX0984, Leitzinger MDL II Reply Rpt., Nov. 15, 2023, ¶ 96 ("when CSXT implemented mileage-based FSCs it simultaneously increased the associated base rates in order to 'ensure that the net combination of rate and fuel surcharge remain [sic] at market levels.'"). This behavior supports an inference that the conspiracy continued into 2007 and beyond.

In addition, despite stating in talking points following the STB's ruling that "[n]o industry level discussions were or are allowed on" the fuel surcharges, DA01692-98, at '97, UP had done just that throughout the conspiracy period. *See, e.g.*, COF ¶¶ 182–84. And UP and the other Defendants continued to have such discussions in the wake of the STB ruling. For example, UP's Koraleski reported internally February 2007 that he had discussed fuel surcharges with his

counterparts at the other Defendants. PX0511, UPFSC0169555 (internal UP email re: "Mileage Based FSC Timetable," Feb. 7, 2007) ("CSX is going down the PC Miler approach. NS is planning to do away with the fuel surcharge altogether an[d] just change rates when they need to."). Two days later, CSX CMO Clarence Gooden scheduled a late-evening Friday "Discussion w/BNSF re: Fuel Surcharge" on February 9, 2007. PX0730, CSXFSC000258350 (Gooden calendar entry), at '350. CSX did this despite internally recognizing around the same time that "*Anti-trust laws require each railroad to establish its FSC program independently*." PX0179, CSXFSC000006567 (CSX "Internal Announcement on FSC Changes – March 2, 2007"), at '571 (emphasis added).

Nor was NS's decision to *maintain* rate-based fuel surcharges some kind of withdrawal from the conspiracy or somehow inconsistent with conspiracy. As Defendants note, with respect to the types of shipments that are part of this litigation, NS "continued using rate-based fuel surcharges, including its 2006 rebased formula, for its unregulated shipments." *See* Supporting Fact 52.8. Similar to other Defendants' mileage-based fuel surcharges, NS's rate-based fuel surcharge had been "rebased" in a way to make it "revenue neutral" with NS's pre-existing fuel surcharge. *See* COF ¶¶ 561–73.

Defendants' *announcements* of a mileage-based fuel surcharge program also do not support the conclusion that this fuel surcharge was actually *applied* to all unregulated traffic. To the contrary, shippers continued paying conspiratorial rate-based fuel surcharges throughout 2007, 2008, and beyond. Defendants concede that even after the STB's early 2007 ruling with respect to fuel surcharges on rate-regulated shipments, Defendants did not switch private contracts to mileage-based surcharges until the contracts with rate-based fuel surcharges expired. *See* DA01886, at 98 (Gooden 259:25-260:19). BNSF, CSX, and UP also rebased, baking their earlier rate-based fuel surcharge revenue into the base rates—in conjunction with superficially 'new'

mileage-based fuel surcharges—in the same effort to remain revenue-neutral. COF ¶¶ 577–87. Private contracts—which were often negotiated as multi-year agreements—continued to apply conspiratorial rate-based fuel surcharges as a result of the conspiracy years after the STB's ruling.

Finally, transaction data Defendants produced in this case indicates that Plaintiffs paid rate-based fuel surcharges to Defendants through 2008.

**Material Undisputed Fact No. 55**

**Damages claimed by Plaintiffs related to traffic governed by private rates and open offers created accepted, or amended after January 25, 2007 or after May 14, 2007 are compiled in Attachments C, D, E to the Declaration of Kelsey S. Bryan.**

Supporting Facts:

55.1 Attachments C, D, E to the Declaration of Kelsey S. Bryan identifies Plaintiffs' claimed damages arising from transportation provided after the January 25, 2007 STB decision and after the May 14, 2007 complaint filings under (a) open offers,[247] (b) contracts entered into after the January 25, 2007 STB decision or the May 14, 2007 complaints,[248] and (c) contracts entered into before the January 25, 2007 STB decision or the May 14, 2007 complaints but renewed or amended after those dates.[249]

**Plaintiffs' Response to Defendants' Undisputed Fact No. 55**

Objection. The Declaration of Kelsey S. Bryan is inadmissible, as explained in Plaintiffs' Motion to Strike the Declarations of Eric Fanchiang and Kelsey Bryan. In addition, this is not a "fact" within the meaning of Local Rule 7(h). Finally, the Declaration of Kelsey S. Bryan does not

---

[247] DA25672.
[248] DA25511.
[249] DA25625.

even identify all the sources of information apparently used to compile these claimed damages; as Ms. Bryan notes: "The information summarized in Attachment B was *primarily* derived from Plaintiffs' expert reports and the supporting data provided by Plaintiffs' experts." DA25422, at 24 ¶ 8 (emphasis added).

Defendants' attempt to selectively cite to a limited number of documents in Attachment D of the Bryan Declaration also fails to hold up when these documents are scrutinized. For example, Attachment D contends that [redacted] *See* DA25625 at 39. Yet the document Defendants cite in Attachment D for this point lacks a precise date in the first paragraph (it states merely [redacted]), and is marked up (see [redacted]) and unsigned. PX1022, NS-MDLII-00198378 (NS C-299 Amendment 2), at '378. The document Attachment D attempts to rely on appears to be a draft amendment that has likely not been in effect or signed as is. In the corresponding NS internal email exchange, NS's Steve Stutsman states: "I am confident Jerry will balk at signing this." PX1023, NS-MDLll-00198376 (Email to NS re: Maxi Priority Handling, Mar. 2, 2007), at '376. Similarly, Attachment D argues that [redacted] *See* DA25625 at 56. But the two documents Bryan Attachment D attempts to rely on are both [redacted] *See* PX1024, UPFSC_II_00534026 (UP Amendment AE to UPCQ57199.059), at '026–28; PX1025, UPFSC_II_00534055 (UP Amendment AH to UPCQ 57199.059), at '055–57. Attachment D fails to cite any context explaining which of these Amended Quotes may have actually applied to the contract and when, even though the two amendments could not have both been effective at the same time. *Compare* DA25625 at 56, *with*PX1024, UPFSC_II_00534026 (UP Amendment AE to UPCQ57199.059), at '026–27;

PX1025, UPFSC_II_00534055 (UP Amendment AH to UPCQ 57199.059), at '055–56. There are also numerous other issues with Attachment D. For example, it attempts to rely on [redacted] *See, e.g.*, DA25625 at 31 (citing PX1209, CSXT_FSC_MDLII_00124271 (Private Price List CSXT 90622), at '274 (CSX price list for Conagra re: potash prices stating that [redacted])); *id.* at 44 (citing PX1210, CSXT_FSC_MDLII_00353688 (Private Price List CSXT 656), at '691 (CSX price list for Lafarge, stating same). Defendants cannot use price lists stating that [redacted]"to support their arguments without specifying the controlling terms in those underlying contracts *are*.

Dated: November 12, 2024

Respectfully submitted,

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
James Hamilton
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
jhamilton@hausfeld.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody*

*/s/ Sami H. Rashid*
Sami H. Rashid
Richard I. Werder, Jr.
Alexandre J. Tschumi
Alexandria ("Alexee") Deep Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alextschumi@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium, Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa*

*Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/ William J. Blechman*
Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.

*World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars*

1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Heidelberg Materials US, Inc. (f.k.a .Lehigh Hanson, Inc.), PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

*/s/ Craig P. Seebald*
Craig P. Seebald (D.C. Bar No. 438968)
Stefanie Jackson (D.C. Bar No. 1673265)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
sjackson@velaw.com

Jason M. Powers
James L. Leader, Jr.
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2522
(713) 615-5809 (Facsimile)
jpowers@velaw.com
jleader@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)

*(KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton*

Daniel M. Jaffe (D.C. Bar No. 461185)
SLOVER & LOFTUS LLP
1828 L Street, NW
Suite 1000
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining, LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Constellation Energy Generation, LLC, f/k/a Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company, d/b/a WE Energies*

*Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

*/s/ David C. Eddy*

David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public*

*/s/ Joseph M. Vanek*

Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (admitted *pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiff Mitsubishi Motors North America, Inc.*

*Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

*/s/ Raj Mathur*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Raj Mathur
Scott Glass
SUSMAN GODFREY, L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: 212-336-8330
rmathur@susmangodfrey.com
sglass@susmangodfrey.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC,*

*/s/ Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
Caitlin R. Thomas
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com
caitlin.thomas@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

*/s/ Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH

*Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/ Kirk T. May*

Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

*/s/ David J. Lender*

David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

*Attorneys for Plaintiffs*
*Lansing Ethanol Services, LLC, et al.*

Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

*/s/ Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Sabrina Merold (D.C. Bar No. 1738065)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

*/s/ James P. Denvir*
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)

*/s/ Michael Schaper*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

*/s/ Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com

James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

*/s/ Michael C. Dell'Angelo*
Michael C. Dell'Angelo (Bar No. PA0090)
Michael J. Kane
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net

Daniel J. Walker (Bar No. 219439)
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, D.C. 20001

dbirk@eimerstahl.com
srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

*/s/ Daniel B. Goldman*
Daniel B. Goldman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

(202) 559-9740
dwalker@bm.net

Sophia Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd.
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

/s/ *Leo D. Caseria*

Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

/s/ *Ronald J. Aranoff*

Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

/s/ *Conte C. Cicala*

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

*/s/ Kayleigh T. Keilty*
Kayleigh T. Keilty (Bar No. 18969)
Austin G. Strine (Bar No. 20637)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359
(410) 332-8603 (telephone)
(410) 332-8081 (facsimile)
kayleigh.keilty@saul.com
austin.strine@saul.com

James A. Morsch
Casey T. Grabenstein
SAUL EWING LLP
161 N. Clark St., Suite 4200
Chicago, Illinois 60601
jim.morsch@saul.com
casey.grabenstein@saul.com

*Attorneys for Plaintiff Environmental Protection & Improvement Company, LLC*

*/s/ Roman M. Silberfeld*
Roman M. Silberfeld
D.D.C. Bar ID: CA00002
ROBINS KAPLAN LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5800
Email: rsilberfeld@robinskaplan.com

Stephen P. Safranski (admitted *pro hac vice*)
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
Email: ssafranski@robinskaplan.com

*Counsel for Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC*