# EXHIBIT PX0558

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DECEMBER 31, 2003**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from to

Commission file number 1-8339

NORFOLK SOUTHERN™

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

**No Change**
(Former name, former address and former fiscal year, if changed since last report.)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

The number of shares outstanding of each of the registrant's classes of common stock, as of January 31, 2004: 391,852,750 (excluding 21,016,125 shares held by registrant's consolidated subsidiaries).

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes (X) No ( )

The aggregate market value of the voting common equity held by nonaffiliates as of June 30, 2003 was $7,491,970,330 (based on the closing price as quoted on the New York Stock Exchange on that date).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

# TABLE OF CONTENTS

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)


| | | | Page |
|---|---|---|---|
| Part I. | 1. | Business | K3 |
| | 2. | Properties | K3 |
| | 3. | Legal Proceedings | K14 |
| | 4. | Submission of Matters to a Vote of Security Holders | K14 |
| | | Executive Officers of the Registrant | |
| Part II. | 5. | Market for Registrant's Common Equity and Related Stockholders Matters | K16 |
| | 6. | Selected Financial Data | K17 |
| | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K19 |
| | 7A. | Quantitative and Qualitative Disclosures About Market Risk | K38 |
| | 8. | Financial Statements and Supplementary Data | K39 |
| | 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K74 |
| | 9A. | Controls and Procedures | K74 |
| Part III. | 10. | Directors and Executive Officers of the Registrant | K75 |
| | 11. | Executive Compensation | K75 |
| | 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K75 |
| | 13. | Certain Relationships and Related Transactions | K78 |
| | 14. | Principal Accountant Fees and Services | K78 |
| Part IV. | 15. | Exhibits, Financial Statement Schedule and Reports on Form 8-K | K79 |
| | | Index to Consolidated Financial Statement Schedule | |
| | | Power of Attorney | K86 |
| | | Signatures | K86 |
| | | Exhibit Index | K89 |

# PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 1. Business. and Item 2. Properties.**

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (ICC) (now the Surface Transportation Board [STB]).

Effective Dec. 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective Sept. 1, 1998, NW was merged with and into Norfolk Southern Railway. As of Dec. 31, 2003, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a jointly owned entity, Norfolk Southern and CSX Corporation (CSX) own the stock of Conrail Inc., which owns the major freight railroad in the Northeast. Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity. See also the discussion concerning operation of a portion of Conrail's rail assets, below.

On March 28, 1998, Norfolk Southern closed the sale of its motor carrier company, North American Van Lines, Inc. (NAVL) (see “Discontinued Operations” and Note 17). NAVL's results are presented as “Discontinued operations” in the accompanying financial information.

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). Additionally, Norfolk Southern’s corporate governance guidelines, board committee charters, code of ethics and code of ethical conduct for senior financial officers are available on the company’s website and in print to any shareholder who requests them.

Unless indicated otherwise, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**OPERATION OF A PORTION OF THE CONRAIL RAIL ASSETS -** On June 1, 1999, Norfolk Southern and CSX, through their respective railroad subsidiaries, began operating separate portions of Conrail's rail routes and assets. Substantially all such assets are owned by two wholly owned subsidiaries of Consolidated Rail Corporation (CRC); one of those subsidiaries, Pennsylvania Lines LLC (PRR), has entered into various operating and leasing arrangements, more particularly described in Note 2, with Norfolk Southern Railway. The other subsidiary, New York Central Lines LLC (NYC) has entered into similar arrangements with CSX Transportation, Inc. (CSXT). Certain rail assets (Shared Assets Areas) still are owned by CRC, which operates them for joint and exclusive use by Norfolk Southern Railway and CSXT.

Operation of the PRR routes and assets increased the size of the system over which Norfolk Southern Railway provides service by nearly 50% and afforded access to the New York metropolitan area, to much of the Northeast and to most of the major East Coast ports north of Norfolk, Virginia. Also, leasing

arrangements with PRR augmented Norfolk Southern Railway's locomotive, freight car and intermodal fleet.

**Conrail Corporate Reorganization**

NS, CSX and Conrail are jointly seeking to reorganize Conrail and establish direct ownership and control by NSR and CSXT of PRR and NYC, respectively. The proposed reorganization would replace the operating agreements described above and allow NSR and CSXT to directly own and operate PRR and NYC, respectively. Consummation of the reorganization requires a ruling from the Internal Revenue Service (IRS), the approval of the STB and filings with the SEC. In addition, NS, CSX and Conrail must obtain the consent of Conrail's debt holders to carry out the transaction and will obtain a valuation of PRR and of NYC.

In 2003, the IRS issued a ruling that the reorganization would qualify as a tax-free distribution. Also in 2003, the STB granted its authorization to carry out the reorganization, subject to a condition requiring NS, CSX and Conrail to either: (i) obtain the voluntary consent of the Conrail debt holders; or (ii) propose further proceedings to determine whether the terms offered to the Conrail debt holders are fair, just and reasonable. In 2004, NS, CSX and Conrail intend to file registration statements on Form S-4 with the SEC to allow a proposed exchange offer relating to Conrail's unsecured debt (see below). In order to implement the reorganization approved by the IRS, the companies have engaged an investment banking firm to provide a valuation. The results of the valuation could impact NS' carrying amount of its investment in Conrail and the recording of the corporate reorganization.

As a part of the proposed reorganization, Conrail would undertake a restructuring of its existing unsecured and secured public indebtedness. There are currently two series of unsecured public debentures with an outstanding principal amount of $800 million and 13 series of secured debt with an outstanding principal amount of approximately $321 million. It is currently contemplated that guaranteed debt securities of two newly formed corporate subsidiaries of NSR and CSXT would be offered in a 58%/42% ratio in exchange for Conrail's unsecured debentures. Upon completion of the proposed transaction, the new debt securities would become direct unsecured obligations of NSR and CSXT, respectively, and would rank equally with all existing and future senior unsecured debt obligations, if any, of NSR and CSXT. These new debt securities will have maturity dates, interest rates and principal and interest payment dates identical to those of the respective series of Conrail's unsecured debentures. In addition, these new debt securities will have covenants substantially similar to those of the publicly traded debt securities of NS and CSX, respectively.

Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations of NSR or CSXT.

NS, CSX and Conrail are diligently working to complete all steps necessary to consummate the Conrail corporate reorganization in 2004. Upon consummation of the proposed transaction, NS' investment in Conrail will no longer include amounts related to PRR and NYC. Instead, the assets and liabilities of PRR will be reflected in their respective line items in NS' Consolidated Balance Sheet, and any amounts owed to PRR would be extinguished.

**RAILROAD OPERATIONS -** As of Dec. 31, 2003, NS' railroads operated approximately 21,500 miles of road in the states of Alabama, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, the District of Columbia and in the Province of Ontario, Canada. The miles operated were as follows:

**Mileage Operated as of Dec. 31, 2003**

| | Miles of Road | Second and Other Main Track | Passing Track, Crossovers and Turnouts | Way and Yard Switching | Total |
|---|---|---|---|---|---|
| Owned | 11,707 | 1,383 | 1,623 | 5,972 | 20,685 |
| Operated under lease, contract or trackage rights | 9,813 | 3,435 | 891 | 3,647 | 17,786 |
| Total | 21,520 | 4,818 | 2,514 | 9,619 | 38,471 |

In addition to the lines leased from Conrail previously discussed, NS' railroads have major leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and operate over trackage owned by North Carolina Railway Company (NCRR). The Cincinnati-Chattanooga lease, covering about 335 miles of road, expires in 2026, and is subject to an option to extend the lease for an additional 25 years, at terms to be agreed upon. The trackage rights over NCRR cover approximately 315 miles of road under an agreement through 2014 with the right to renew for two additional 15-year periods.

NS' railroads carry raw materials, intermediate products and finished goods primarily in the Southeast, East and Midwest, and via interchange with other rail carriers, to and from the rest of the United States and parts of Canada. They also transport overseas freight through several Atlantic and Gulf Coast ports. Atlantic ports served by NS include: Norfolk, Virginia; Morehead City, North Carolina; Charleston, South Carolina; Savannah and Brunswick, Georgia; Jacksonville, Florida; Baltimore, Maryland; Philadelphia, Pennsylvania/Camden, New Jersey; Wilmington, Delaware; and the Ports of New York/New Jersey. Gulf Coast ports served include Mobile, Alabama and New Orleans, Louisiana.

The lines of NS' railroads reach most of the larger industrial and trading centers of the Southeast, Northeast, Mid-Atlantic region and Midwest. Chicago, Norfolk, Detroit, Atlanta, Metropolitan New York City, Jacksonville, Kansas City (Missouri), Baltimore, Buffalo, Charleston, Cleveland, Columbus, Philadelphia, Pittsburgh, Toledo, Greensboro, Charlotte and Savannah are among the leading centers originating and terminating freight traffic on the system. In addition, haulage arrangements with connecting carriers allow NS' railroads to provide single-line service to and from additional markets, including haulage provided by Florida East Coast Railway Company to serve southern and eastern Florida, including the port cities of Miami, West Palm Beach and Fort Lauderdale; and haulage provided by The Kansas City Southern Railway Company to provide transcontinental intermodal service via a connection with the Burlington Northern and Santa Fe Railway Company. Service is provided to New England, including the Port of Boston, via haulage, trackage rights and interline arrangements with Canadian Pacific Railway Company and Guilford Transportation Industries. The system's lines also reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia and western Pennsylvania), distribution centers, transload facilities and other businesses located in smaller communities in its service area. The traffic corridors carrying the heaviest volumes of freight include those from the New York City area to Chicago (via Allentown and Pittsburgh); Chicago to Jacksonville (via Cincinnati, Chattanooga and Atlanta); Appalachian coal fields of Virginia, West Virginia and Kentucky to Norfolk, Virginia and Sandusky, Ohio; Cleveland to Kansas City; and Knoxville to Chattanooga. Chicago, Memphis, Sidney/Salem, New Orleans, Kansas City, Buffalo, St. Louis and Meridian are major gateways for interterritorial system traffic.

**Triple Crown Operations -** Until April 1993, NS' intermodal subsidiary, Triple Crown Services, Inc. (TCS), offered intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. On April 1, 1993, the business, name and operations of TCS were transferred to Triple Crown Services Company (TCSC), a partnership in which subsidiaries of NS and Conrail are equal partners. From April 1, 1993, to June 1, 1999, the revenues of TCSC were not consolidated with the results of NS; however, effective June 1, 1999, NS gained control of TCSC and, therefore, now includes TCSC's results in its consolidated financial statements. TCSC offers door-to-door intermodal service using RoadRailer® equipment in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast and the Midwest and Texas/Mexico.

The following table sets forth certain statistics relating to NS railroads' operations for the past 5 years, including operations in the Northern Region that commenced June 1, 1999:

**Rail Operating Statistics**

| | Year Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2000** | **1999** |
| Revenue ton miles (billions) | 183 | 179 | 182 | 197 | 167 |
| Freight train miles traveled (millions) | 73.9 | 72.6 | 70.0 | 74.4 | 61.5 |
| Revenue per ton mile | $0.0353 | $0.0350 | $0.0339 | $0.0312 | $0.0315 |
| Revenue ton miles per man-hour worked | 3,111 | 3,067 | 3,023 | 2,888 | 2,577 |
| Percentage ratio of railway operating expenses to railway operating revenues | 83.5%[1] | 81.5% | 83.7% | 89.7%[2] | 86.3% |

[1]Includes $107 million of costs for a voluntary separation program, which added 1.6 percentage points to the ratio.

[2]Includes $165 million of costs for early retirement and separation programs, which added 2.7 percentage points to the ratio.

**RAILWAY OPERATING REVENUES -** NS' total railway operating revenues were $6.5 billion in 2003. Revenue, shipments and revenue yield by principal railway operating revenue sources for the past five years are set forth in the following table (prior year amounts have been reclassified to conform to the current market groupings).

**Principal Sources of Railway Operating Revenues**

*(Revenues in millions, shipments in thousands, revenue yield in dollars per shipment)*

| | Year Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2000** | **1999** |
| COAL | | | | | |
| Revenues | $ 1,500 | $ 1,441 | $ 1,521 | $ 1,435 | $ 1,322 |
| % of total revenues | 23% | 23% | 25% | 23% | 25% |
| Shipments | 1,615 | 1,610 | 1,695 | 1,687 | 1,519 |
| % of total shipments | 24% | 24% | 26% | 25% | 25% |
| Revenue Yield | $ 929 | $ 895 | $ 897 | $ 851 | $ 870 |

**Principal Sources of Railway Operating Revenues (continued)**

| | Year Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2000** | **1999** |
| *(Revenues in millions, shipments in thousands, revenue yield in dollars per shipment)* | | | | | |
| AUTOMOTIVE | | | | | |
| Revenues | $ 936 | $ 961 | $ 885 | $ 921 | $ 746 |
| % of total revenues | 14% | 15% | 14% | 15% | 14% |
| Shipments | 645 | 662 | 622 | 692 | 611 |
| % of total shipments | 9% | 10% | 9% | 10% | 10% |
| Revenue Yield | $ 1,450 | $ 1,450 | $ 1,423 | $ 1,331 | $ 1,220 |
| CHEMICALS | | | | | |
| Revenues | $ 772 | $ 755 | $ 738 | $ 743 | $ 633 |
| % of total revenues | 12% | 12% | 12% | 12% | 12% |
| Shipments | 426 | 423 | 422 | 443 | 387 |
| % of total shipments | 6% | 6% | 6% | 6% | 7% |
| Revenue Yield | $ 1,815 | $ 1,783 | $ 1,750 | $ 1,678 | $ 1,635 |
| METALS/CONSTRUCTION | | | | | |
| Revenues | $ 699 | $ 692 | $ 674 | $ 689 | $ 567 |
| % of total revenues | 11% | 11% | 11% | 11% | 11% |
| Shipments | 710 | 716 | 703 | 757 | 587 |
| % of total shipments | 10% | 11% | 11% | 11% | 10% |
| Revenue Yield | $ 984 | $ 966 | $ 959 | $ 911 | $ 966 |
| AGR./CONSUMER PRODUCTS/GOVT. | | | | | |
| Revenues | $ 688 | $ 637 | $ 617 | $ 622 | $ 547 |
| % of total revenues | 11% | 10% | 10% | 10% | 11% |
| Shipments | 556 | 518 | 519 | 535 | 496 |
| % of total shipments | 8% | 8% | 8% | 8% | 8% |
| Revenue Yield | $ 1,238 | $ 1,231 | $ 1,188 | $ 1,161 | $ 1,104 |
| PAPER/CLAY/FOREST | | | | | |
| Revenues | $ 634 | $ 603 | $ 612 | $ 630 | $ 578 |
| % of total revenues | 10% | 10% | 10% | 11% | 11% |
| Shipments | 443 | 438 | 450 | 491 | 465 |
| % of total shipments | 7% | 6% | 7% | 7% | 8% |
| Revenue Yield | $ 1,431 | $ 1,378 | $ 1,357 | $ 1,285 | $ 1,243 |
| INTERMODAL | | | | | |
| Revenues | $ 1,239 | $ 1,181 | $ 1,123 | $ 1,119 | $ 849 |
| % of total revenues | 19% | 19% | 18% | 18% | 16% |
| Shipments | 2,466 | 2,354 | 2,214 | 2,242 | 1,896 |
| % of total shipments | 36% | 35% | 33% | 33% | 32% |
| Revenue Yield | $ 502 | $ 502 | $ 507 | $ 499 | $ 448 |
| TOTALS | | | | | |
| Railway Operating Revenues | $ 6,468 | $ 6,270 | $ 6,170 | $ 6,159 | $ 5,242 |
| Railway Shipments | 6,861 | 6,721 | 6,625 | 6,847 | 5,961 |
| Railway Revenue Yield | $ 943 | $ 933 | $ 931 | $ 900 | $ 879 |

**COAL TRAFFIC -** Coal, coke and iron ore -- most of which is bituminous coal -- is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 172 million tons in 2003, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania and Kentucky. Revenues from coal, coke and iron ore accounted for about 23% of NS' total railway operating revenues in 2003.

Coal, coke and iron ore tonnage by market for the past five years are set forth in the following table.

**Coal, Coke and Iron Ore Tonnage by Market**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2000** | **1999** |
| | *(tons in thousands)* | | | | |
| Utility | 129,904 | 127,747 | 132,325 | 119,284 | 107,381 |
| Domestic Metallurgical | 20,486 | 21,578 | 20,457 | 25,003 | 21,399 |
| Export | 12,312 | 11,342 | 13,872 | 19,845 | 18,373 |
| Other | 9,624 | 9,733 | 11,377 | 10,781 | 10,348 |
| | 172,326 | 170,400 | 178,031 | 174,913 | 157,501 |

Total coal handled through all system ports in 2003 was 35 million tons. Of this total, 11 million tons (including coastwise traffic) moved through Norfolk, Virginia, 2 million tons moved through the Baltimore Terminal, 13 million tons moved to various docks on the Ohio River, and 9 million tons moved to various Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, DaimlerChrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks and minerals. The agriculture, consumer products and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol and items for the military. The paper, clay and forest products group includes lumber and wood products, pulpboard and paper products, woodfibers, woodpulp, scrap paper and clay. General merchandise carloads handled in 2003 were 2.78 million, compared with 2.76 million handled in 2002, an increase of 1%.

In 2003, 134 million tons of general merchandise freight, or approximately 66% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis and Louisville.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers and other shippers. Intermodal units handled in 2003 were 2.47 million, compared with 2.35 million handled in 2002, an increase of 5%.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis of Financial Conditions and Results of Operations."

**FREIGHT RATES -** In 2003, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices. However, in 2003 there were significant coal movements moving under common carrier (tariff) rates that had previously moved under rates contained in transportation contracts. Beginning Jan. 1, 2002, coal moving to Duke Energy's (Duke) Belew's Creek, Allen, Buck and Dan River generating stations moved under common carrier rates and beginning April 1, 2002, coal moving to Carolina Power and Light's (CP&L) Hyco and Mayo plants moved under common carrier rates. In 2002, Duke and CP&L filed rate reasonableness complaints at the STB alleging that NS' tariff rates for the transportation of coal were unreasonable. In the Duke proceeding the STB initially found NS' rates to be reasonable in November 2003, but subsequently issued technical corrections in February 2004 finding that in certain years some portion of the rates was unreasonable. The case is currently stayed because both parties have indicated that they intend to file petitions for reconsideration, and the STB has not yet ordered any rate relief. In the CP&L proceeding the STB found NS' rates to be unreasonable in December 2003, but upheld a significant portion of NS' tariff increase. Both of the STB's rate decisions remain subject to petitions for rehearing and appeals. Future developments in the two cases could result in additional adjustments, and could have a significant impact on results of operations in a particular quarter.

In 2003, NS' railroads were found by the STB not to be "revenue adequate" based on results for the year 2002. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement and does not adversely impact NS' liquidity or capital resources.

**PASSENGER OPERATIONS -** Regularly scheduled passenger trains are operated by Amtrak on NS' lines between Alexandria and New Orleans, and between Greensboro and Selma, North Carolina. Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia. NS also leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois. Since June 1, 1999, Norfolk Southern Railway has operated former Conrail lines on which Amtrak conducts regularly scheduled passenger operations between Chicago, Illinois, and Detroit, Michigan, and between Chicago and Harrisburg, Pennsylvania.

Also since June 1, 1999, through its operation of PRR's routes, Norfolk Southern Railway has been providing freight service over former Conrail lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over some trackage owned by Amtrak or by New Jersey Transit, the Southeastern Pennsylvania Transportation Authority, Metro-North Commuter Railroad Company and Maryland DOT. Finally, passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Pennsylvania Lines LLC, or by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2003, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in Statement of Financial Accounting Standards No. 131.

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states, the District of Columbia and portions of Canada. The railroad infrastructure makes the company very capital intensive with total property of approximately $12 billion and investment in Conrail of approximately $6 billion.

**Capital Expenditures -** Capital expenditures for road, equipment and other property for the past five years were as follows (including capitalized leases):

| | Capital Expenditures | | | | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| | | | *($ in millions)* | | |
| Road | $ 495 | $ 519 | $ 505 | $ 557 | $ 559 |
| Equipment | 218 | 174 | 233 | 146 | 349 |
| Other property | 7 | 2 | 8 | 28 | 4 |
| Total | $ 720 | $ 695 | $ 746 | $ 731 | $ 912 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2004, NS has budgeted $810 million of capital spending. See the discussion following “Cash used for investing activities,” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**Equipment -** As of Dec. 31, 2003, NS owned or leased the following units of equipment:

| | Owned* | Number of Units Leased** | Total | Capacity of Equipment |
|---|---|---|---|---|
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 2,412 | 777 | 3,189 | 10,951,550 |
| Switching | 104 | 101 | 205 | 300,700 |
| Auxiliary units | 56 | 18 | 74 | -- |
| Total locomotives | 2,572 | 896 | 3,468 | 11,252,250 |
| Freight cars: | | | | (Tons) |
| Hopper | 16,099 | 5,014 | 21,113 | 2,232,141 |
| Box | 16,644 | 4,810 | 21,454 | 1,694,590 |
| Covered hopper | 9,369 | 3,084 | 12,453 | 1,359,205 |
| Gondola | 26,850 | 11,217 | 38,067 | 4,085,456 |
| Flat | 3,111 | 1,435 | 4,546 | 343,587 |
| Caboose | 162 | 50 | 212 | -- |
| Other | 3,250 | -- | 3,250 | 162,514 |
| Total freight cars | 75,485 | 25,610 | 101,095 | 9,877,493 |
| Other: | | | | |
| Work equipment | 4,479 | 1,022 | 5,501 | |
| Vehicles | 3,629 | 959 | 4,588 | |
| Highway trailers and containers | 877 | 7,345 | 8,222 | |
| RoadRailer® | 5,549 | -- | 5,549 | |
| Miscellaneous | 1,422 | 13,380 | 14,802 | |
| Total other | 15,956 | 22,706 | 38,662 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements and capitalized leases.
** Includes locomotives, freight cars and units of other equipment leased from PRR.

The following table indicates the number and year built for locomotives and freight cars owned at Dec. 31, 2003.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 | 1992-1998 | 1987-1991 | 1986 & Before | Total |
| Locomotives: | | | | | | | | | |
| No. of units | 100 | --* | 160 | 200 | 147 | 592 | 238 | 1,135 | 2,572 |
| % of fleet | 4% | --% | 6% | 8% | 6% | 23% | 9% | 44% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | -- | -- | -- | 112 | 515 | 8,193 | 5,530 | 61,135 | 75,485 |
| % of fleet | --% | --% | --% | --% | 1% | 11% | 7% | 81% | 100% |

*Fifty of the locomotives built in 2001 were purchased in 2002.

As of Dec. 31, 2003, the average age of the locomotive fleet was 15.3 years. During 2003, 91 locomotives, the average age of which was 28.7 years, were retired. The average age of the freight car fleet at Dec. 31, 2003, was 26.6 years. During 2003, 4,855 freight cars were retired.

Since 1988, about 29,000 coal cars have been rebodied. As a result, the remaining serviceability of the freight car fleet is greater than may be inferred from the high percentage of freight cars built in earlier years.

| | Annual Average Bad Order Ratio | | | | |
|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2000** | **1999** |
| Freight cars: | | | | | |
| NS Rail | 7.4% | 8.1% | 6.9% | 5.7% | 3.7% |
| Locomotives: | | | | | |
| NS Rail | 6.2% | 6.3% | 5.8% | 5.5% | 5.3% |

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction and equipment marketability. In past years, the freight car bad order ratio reflected the storage of certain types of cars that were not in high demand. The ratio rose in 2000, 2001 and 2002 as a result of decreased maintenance activity. The decline in 2003 reflected an increase in maintenance activity as well as the retirement of unserviceable units. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls. The ratio rose slightly in 2000 as maintenance activities were curtailed in response to a slowing economy. The elevated ratio through 2003 reflected units out of service related to the resumption of maintenance and modification activities.

**Track Maintenance -** Of the approximately 38,500 total miles of track operated, NS had responsibility for maintaining about 31,000 miles of track with the remainder being operated under trackage rights. Over 75% of the main line trackage (including first, second, third and branch main tracks, all excluding trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 141 pounds per yard. Approximately 40% of NS lines carried 20 million or more gross tons per track mile.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | **2003** | **2002** | **2001** | **2000** | **1999** |
|---|---|---|---|---|---|
| Track miles of rail installed | 233 | 235 | 254 | 390 | 403 |
| Miles of track surfaced | 5,105 | 5,270 | 3,836 | 3,687 | 5,087 |
| New crossties installed (millions) | 2.8 | 2.8 | 1.5 | 1.5 | 2.3 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 424 core stations, 14 secondary stations and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations and AEI data transmissions.

**Traffic Control -** Of a total of 21,500 route miles operated by NS, excluding trackage rights over foreign lines, 10,978 miles are signalized, including 8,091 miles of centralized traffic control (CTC) and 2,887

miles of automatic block signals. Of the 8,091 miles of CTC, 2,487 miles are controlled by data radio originating at 183 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**Other -** The railroads have extensive facilities for support of operations, including freight depots, car construction shops, maintenance shops, office buildings, and signals and communications facilities.

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $910 million as of Dec. 31, 2003, and $864 million at Dec. 31, 2002.

**Environmental Matters -** Compliance with federal, state and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity or competitive position. See the discussion of "Environmental Matters" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," and in Note 18 to the Consolidated Financial Statements.

**EMPLOYEES -** NS employed an average of 28,753 employees in 2003, compared with an average of 28,970 in 2002. The approximate average cost per employee during 2003 was $58,000 in wages and $28,000 in employee benefits.

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 14 different labor unions. See the discussion of "Labor Agreements" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. The Department of Transportation regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, has continued. Significant exemptions are TOFC/COFC (i.e., "piggyback") business, rail boxcar traffic, lumber, manufactured steel, automobiles and certain bulk commodities such as sand, gravel, pulpwood and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well. About 80% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts may be made in 2004 to re-subject the rail industry to unwarranted federal economic regulation. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation

and to the revitalization of the industry. Accordingly, NS will oppose efforts to reimpose unwarranted economic regulation.

**COMPETITION -** There is continuing strong competition among rail, water and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery and consumer products. Even for raw materials, semifinished goods and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

## Item 3. Legal Proceedings.

None.

## Item 4. Submission of Matters to a Vote of Security Holders.

There were no matters submitted to a vote of security holders during the fourth quarter of 2003.

### Executive Officers of the Registrant.

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 1, 2004, relating to the executive officers.

| Name, Age, Present Position | Business Experience During Past Five Years |
|---|---|
| David R. Goode, 63, Chairman, President and Chief Executive Officer | Present position since September 1992. |
| L. I. Prillaman, 60, Vice Chairman and Chief Marketing Officer | Present position since August 1998. |
| Stephen C. Tobias, 59, Vice Chairman and Chief Operating Officer | Present position since August 1998. |

| | |
|---|---|
| Henry C. Wolf, 61, Vice Chairman and Chief Financial Officer | Present position since August 1998. |
| James A. Hixon, 50, Senior Vice President Legal and Government Affairs | Present position since December 1, 2003. Served as Senior Vice President Administration from February 2001 to December 1, 2003, Senior Vice President Employee Relations from November 1999 to February 2001, and prior thereto was Vice President Taxation. |
| Henry D. Light, 63, Senior Vice President Law | Present position since January 2002. Served as Vice President Law from April 2000 to January 2002, and prior thereto was General Counsel Operations. |
| Kathryn B. McQuade, 47, Senior Vice President Finance | Present position since December 1, 2003. Served as Senior Vice President Financial Planning from April 2000 to December 1, 2003, Vice President Financial Planning from August 1998 to April 2000, and prior thereto was Vice President Internal Audit. |
| Charles W. Moorman, 52, Senior Vice President Corporate Planning and Services | Present position since December 1, 2003. Served as Senior Vice President Corporate Services from February 1, 2003, to December 1, 2003; also served as President Thoroughbred Technology and Telecommunications, Inc. since October 1999, and prior thereto was Vice President Information Technology. |
| John P. Rathbone, 52, Senior Vice President Administration | Present position since December 1, 2003. Served as Senior Vice President and Controller from April 2000 to December 1, 2003; prior thereto was Vice President and Controller. |
| Donald W. Seale, 51, Senior Vice President Marketing Services | Present position since December 1, 2003. Served as Senior Vice President Merchandise Marketing from December 1999 to December 1, 2003; prior thereto was Vice President Merchandise Marketing. |
| Daniel D. Smith, 52, Senior Vice President Energy and Properties | Present position since December 1, 2003. Served as President NS Development; prior thereto was President Pocahontas Land Corporation. |
| Marta R. Stewart, 46, Vice President and Controller | Present position since December 1, 2003; prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

**Item 5. Market for Registrant's Common Stock and Related Stockholder Matters.**

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
### STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 52,091 stockholders of record as of Dec. 31, 2003, is traded on the New York Stock Exchange with the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2003 and 2002.

| | Quarter | | | |
|---|---|---|---|---|
| **2003** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 20.89 | $ 22.39 | $ 20.20 | $ 24.62 |
| Low | 17.35 | 18.31 | 18.00 | 18.32 |
| Dividends per share | $ 0.07 | $ 0.07 | $ 0.08 | $ 0.08 |
| **2002** | | | | |
| Market price | | | | |
| High | $ 26.98 | $ 24.45 | $ 23.90 | $ 22.54 |
| Low | 18.26 | 19.85 | 17.20 | 18.70 |
| Dividends per share | $ 0.06 | $ 0.06 | $ 0.07 | $ 0.07 |

**Item 6. Selected Financial Data.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**FIVE-YEAR FINANCIAL REVIEW 1999-2003**

| | 2003[1] | 2002 | 2001 | 2000[5] | 1999[6] |
|---|---|---|---|---|---|
| | | *($ in millions, except per share amounts)* | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 6,468 | $ 6,270 | $ 6,170 | $ 6,159 | $ 5,242 |
| Railway operating expenses | 5,404 | 5,112 | 5,163 | 5,526 | 4,524 |
| Income from railway operations | 1,064 | 1,158 | 1,007 | 633 | 718 |
| Other income – net | 19 | 66 | 99 | 168 | 164 |
| Interest expense on debt | 497 | 518 | 553 | 551 | 531 |
| Income from continuing operations before income taxes and accounting changes | 586 | 706 | 553 | 250 | 351 |
| Provision for income taxes | 175 | 246 | 191 | 78 | 112 |
| Income from continuing operations before accounting changes | 411 | 460 | 362 | 172 | 239 |
| Discontinued operations[2] | 10 | -- | 13 | -- | -- |
| Cumulative effect of changes in accounting principles, net of taxes[3] | 114 | -- | -- | -- | -- |
| Net income | $ 535 | $ 460 | $ 375 | $ 172 | $ 239 |
| **PER SHARE DATA** | | | | | |
| Income from continuing operations before accounting changes – basic and diluted | $ 1.05 | $ 1.18 | $ 0.94 | $ 0.45 | $ 0.63 |
| Net income – basic and diluted | $ 1.37 | $ 1.18 | $ 0.97 | $ 0.45 | $ 0.63 |
| Dividends | $ 0.30 | $ 0.26 | $ 0.24 | $ 0.80 | $ 0.80 |
| Stockholders' equity at year end | $ 17.83 | $ 16.71 | $ 15.78 | $ 15.16 | $ 15.50 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 20,596 | $ 19,956 | $ 19,418 | $ 18,976 | $ 19,250 |
| Total long-term debt, including current maturities[4] | $ 7,160 | $ 7,364 | $ 7,632 | $ 7,636 | $ 8,059 |
| Stockholders' equity | $ 6,976 | $ 6,500 | $ 6,090 | $ 5,824 | $ 5,932 |
| **OTHER** | | | | | |
| Capital expenditures | $ 720 | $ 695 | $ 746 | $ 731 | $ 912 |
| Average number of shares outstanding (thousands) | 389,788 | 388,213 | 385,158 | 383,358 | 380,606 |
| Number of stockholders at year end | 52,091 | 51,418 | 53,042 | 53,194 | 51,123 |
| Average number of employees: | | | | | |
| Rail | 28,363 | 28,587 | 30,510 | 33,344 | 30,897 |
| Nonrail | 390 | 383 | 384 | 394 | 269 |
| Total | 28,753 | 28,970 | 30,894 | 33,738 | 31,166 |

[1] 2003 operating expenses include a $107 million charge for a voluntary separation program. Other income – net includes an $84 million charge to recognize the impaired value of certain telecommunications assets. These charges reduced net income by $119 million, or 30 cents per diluted share.

[2] In 1998, NS sold all the common stock of its motor carrier subsidiary, North American Van Lines, Inc. (NAVL), for $207 million and recorded a $90 million pretax ($105 million, or 28 cents per diluted share, after-tax) gain. Accordingly, NAVL's results of operations, financial position and cash flows are presented as "Discontinued operations." Results in 2001 include an additional after-tax gain of $13 million, or 3 cents per diluted share, that resulted from the expiration of certain indemnity obligations contained in the sales agreement. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per diluted share, resulting from resolution of tax issues related to the transaction.

[3] Net income in 2003 reflects two accounting changes, the cumulative effect of which increased net income by $114 million, or 29 cents per diluted share: a change in accounting for the cost to remove railroad crossties, which increased net income by $110 million, and a change in accounting related to a special-purpose entity that leases certain locomotives to NS, which increased net income by $4 million. This entity's assets and liabilities, principally the locomotives and debt related to their purchase, are now reflected in NS' Consolidated Balance Sheet.

[4] Excludes notes payable to Conrail of $716 million in 2003, $513 million in 2002, $301 million in 2001, $51 million in 2000 and $123 million in 1999.

[5] 2000 operating expenses include $165 million in work force reduction costs for early retirement and separation programs. These costs reduced net income by $101 million or 26 cents per diluted share.

[6] On June 1, 1999, NS began operating a substantial portion of Conrail's properties. As a result, both its railroad route miles and the number of its railroad employees increased by approximately 50% on that date.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Five-Year Financial Review.

## SUMMARIZED RESULTS OF OPERATIONS

### 2003 Compared with 2002

Net income was $535 million, or $1.37 per diluted share, in 2003, up $75 million, or 16%. Results in 2003 included a $10 million, or 3 cents per share, gain from discontinued operations (see Note 17) and a $114 million, or 29 cents per share, benefit related to the cumulative effect of changes in accounting principles (see Note 1). Income from continuing operations before accounting changes, which excludes these items, was $411 million, or $1.05 per diluted share, down $49 million, or 11%, compared with 2002, reflecting higher compensation and benefits costs, which included the costs of a voluntary separation program (see Note 11), and lower nonoperating income that reflected the impairment of certain telecommunications assets (see Note 6). The costs of the voluntary separation program and the asset impairment combined to reduce income by $119 million, or 30 cents per share.

### 2002 Compared with 2001

Net income was $460 million, or $1.18 per diluted share, in 2002, up $85 million, or 23%. Net income in 2001 was $375 million and included a $13 million, or 3 cents per share, gain from discontinued operations (see Note 17); accordingly, income from continuing operations was $362 million, or 94 cents per diluted share. Results in 2002 were $98 million, or 27%, above 2001's income from continuing operations. The improvement was primarily the result of a $151 million, or 15%, increase in income from railway operations.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $6.5 billion in 2003, $6.3 billion in 2002 and $6.2 billion in 2001. The following table presents a three-year comparison of revenues by market group (prior year amounts have been reclassified to conform to the current market groupings).

**Revenues by Market Group**

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | *($ in millions)* | |
| Coal | $ 1,500 | $ 1,441 | $ 1,521 |
| General merchandise: | | | |
| Automotive | 936 | 961 | 885 |
| Chemicals | 772 | 755 | 738 |
| Metals/construction | 699 | 692 | 674 |
| Agriculture/consumer products/ government | 688 | 637 | 617 |
| Paper/clay/forest | 634 | 603 | 612 |
| General merchandise | 3,729 | 3,648 | 3,526 |
| Intermodal | 1,239 | 1,181 | 1,123 |
| Total | $ 6,468 | $ 6,270 | $ 6,170 |

In 2003, revenues increased 3%, reflecting a 2% rise in general merchandise revenues, a 4% improvement in coal revenues, and a 5% increase in intermodal revenues. All but automotive within the general merchandise market group posted increases over 2002. As shown in the following table, most of the revenue improvement was the result of higher traffic volumes. The favorable revenue per unit/mix variance was driven by higher average revenue per unit, offset in part by the effects of unfavorable changes in the mix of traffic, particularly a 5% increase in lower-priced intermodal traffic volume.

**Revenue Variance Analysis**
Increases (Decreases)

| | 2003 vs. 2002 | 2002 vs. 2001 |
|---|---|---|
| | *($ in millions)* | |
| Volume | $ 131 | $ 89 |
| Revenue per unit/mix | 67 | 11 |
| Total | $ 198 | $ 100 |

In 2002, revenues increased 2%, as a 3% rise in general merchandise revenues coupled with a 5% improvement in intermodal revenues offset a 5% decline in coal revenues. All but one of the general merchandise market groups (paper, clay and forest products) posted increases over 2001.

Beginning March 1, 2004, NS will modify its fuel surcharge program for its merchandise and coal traffic. The fuel surcharge program in effect until that time applies a 2% fuel surcharge to line haul freight charges when the WTI crude oil price, as published in the Wall Street Journal, exceeds $28.00 per barrel for 30 consecutive business days. For each $5.00 per barrel increase, an additional 2% fuel surcharge applies. The revised fuel surcharge will be based on the monthly average price of West Texas Intermediate (WTI) crude oil. Line haul freight charges will be adjusted by 0.4% for every dollar the average price exceeds $23 per barrel in the second calendar month prior to the month in which the fuel surcharge is applied. The modification in the fuel surcharge program will cause the amount charged to more closely reflect fuel price fluctuations in today's volatile market.

**COAL** tonnage increased 1% in 2003 and revenues increased 4% versus 2002. Revenue per unit increased 4%, reflecting favorable developments in the coal rate reasonableness proceedings before the STB, as discussed below, as well as increases resulting from more longer haul business and loading

productivity improvements that led to more tons per car. Coal, coke and iron ore revenues represented 23% of total railway operating revenues in 2003, and 86% of NS' coal shipments originated on lines it operates.

In 2002, two of NS' utility customers, Duke Energy (Duke) and Carolina Power & Light (CP&L), filed rate reasonableness complaints at the STB alleging that NS' tariff rates for the transportation of coal were unreasonable. In the Duke proceeding the STB initially found NS' rates to be reasonable in November 2003, but subsequently issued technical corrections in February 2004 finding that in certain years some portion of the rates was unreasonable. The case is currently stayed because both parties have indicated that they intend to file petitions for reconsideration, and the STB has not yet ordered any rate relief. In the CP&L proceeding the STB found NS' rates to be unreasonable in December 2003, but upheld a significant portion of NS' tariff increase. Both of the STB's rate decisions remain subject to petitions for rehearing and appeals. Future developments in the two cases could result in additional adjustments and could have a significant impact on results of operations in a particular quarter. Over the long term, Management believes the STB decisions in the Duke and CP&L proceedings will help support improved pricing for coal transportation services.

In 2002, coal tonnage decreased 4% and revenues declined 5%. Revenue per unit declined slightly, reflecting unfavorable changes in the mix of traffic (more shorter-haul business) that offset the effects of rate increases and gains in tonnage per car.

**Total Coal, Coke and Iron Ore Tonnage**

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | *(In millions of tons)* | |
| Utility | 130 | 128 | 132 |
| Export | 12 | 11 | 14 |
| Domestic metallurgical | 20 | 21 | 21 |
| Other | 10 | 10 | 11 |
| Total | 172 | 170 | 178 |

**Utility coal** tonnage increased 2%, compared to 2002, primarily due to a 6% gain in tonnage moving to the Northeast. These gains were led by a full year's operation of two projects completed in 2002 that captured traffic from truck and barge.

In the first quarter of 2003, higher natural gas prices and colder temperatures caused coal-fired generating stations to run at near capacity in the Northeast, reducing the high stockpiles that were carried forward from 2002. However, the mild temperatures through the remainder of the year diminished seasonal demand for coal. Volumes to utilities in the South decreased 4% due to milder weather and extended power plant outages for the installation of environmental emission-control technology.

In 2002, utility coal tonnage decreased 3%, a result of lower demand that reflected the weak economy, high coal stockpile levels entering the year, mild temperatures in the first quarter, reduced stockpile targets set by utility companies and increased generation from new natural gas-fired plants. Licensing requirements for these new plants resulted in additional generation that temporarily displaced coal-fired generation.

The outlook for utility coal remains positive. Coal-fired generation continues to be the lowest-cost source for electric generation that has additional growth capacity above current levels. Management expects

utilities to use coal-fired plants to meet increased electricity demand because of coal's low generating cost and the strengthening economy. As always, demand will be influenced by the weather.

There remain a number of evolving environmental issues that have the potential to increase or ease cost pressures on the utility coal market, depending upon their outcome. These include a new national energy policy, proposed multi-emissions legislation, mercury emissions standard, new source review and the fate of the United States participation in the Kyoto Protocol. Although developments with these environmental issues could potentially increase cost pressures on coal-fired generation, the outlook remains positive for maintaining coal's position in the power generation mix for regions served by NS. Favorable developments with these issues could actually ease cost pressures on coal-fired generation, further strengthening coal's position.

**Export coal** tonnage increased 9% in 2003, compared to 2002. Export coal through Norfolk, primarily metallurgical coal, increased by 24% in 2003, benefiting from a decline in exports from China. Strong steel production in China increased demand for metallurgical coal and coke and shifted Chinese exports of these commodities to domestic consumption. Also, ocean freight rates are at an all time high. Spot vessel rates from Australia to Europe have more than tripled, while transatlantic rates have increased less dramatically. The combination of the resulting gap in ocean freight rates and the shorter sailing times has given the United States a competitive advantage in European markets. Last, the decline in the value of the dollar against the Euro and Australian Dollar also increased demand for United States metallurgical coal abroad. Coal exported through Baltimore, primarily steam coal, declined 41% due to strong domestic demand for utility coal, as discussed above.

In 2002, export coal tonnage declined 18% compared to 2001. Steam coal exports through Baltimore declined 4%, and export metallurgical coals through Norfolk declined 22%. During the first half of 2002, demand for U.S. coal was soft as international buyers focused their purchases toward other, lower-priced sources. Market uncertainty resulted in late contract settlements and delayed shipments. Late in 2002, demand for U.S. coking coals increased, reflecting a shift in the market as exports from China, Australia and Poland declined. As a result, shipments through Norfolk increased in the fourth quarter of 2002.

Strong domestic steam coal prices and reduced metallurgical coal production have limited export growth in the United States. The stage is set for further recovery in export volumes in 2004. Export growth will depend, however, upon the availability of coal supply from key metallurgical mines on NS. Pricing is also expected to strengthen.

**Domestic metallurgical** coal, coke and iron ore volumes decreased 5% in 2003, when compared to 2002, due to the temporary closing of a large mine that produced low-volatile coal, the continuing consolidation of the steel industry, and fewer blast furnaces operating than in the past.

In 2002, domestic metallurgical coal, coke and iron ore tonnage increased 5%, reflecting higher U.S. steel production, aided by the imported steel tariff program implemented in 2002. In addition, continued strong vehicle production resulted in demand for steel.

Future demand for domestic metallurgical coal, coke and iron ore is uncertain but may increase in 2004 due to the shortage that exists in the world market. Continuation of the anticipated rationalization of the steel industry is expected, resulting in fewer blast furnaces in operation; however, the furnaces that remain are expected to run near capacity. Growth may be limited by the availability of coal supply from a key metallurgical mine on NS that was idled in 2003 but is expected to reopen sometime in the second half of 2004. In addition, the end of the steel tariff in December 2003 could mean lower steel prices worldwide and may lead to further consolidations in the industry.

**Other coal** volumes, principally steam coal shipped to manufacturing plants, finished the year down 1%, when compared to 2002. In 2002, other coal traffic decreased 14%, a result of the weak economy.

**GENERAL MERCHANDISE** traffic volume (carloads) increased 1% in 2003, and revenues increased 2%, principally due to higher average revenues in most business groups and higher agriculture traffic volume. In 2002, traffic volume increased 2%, and revenues increased 3%, reflecting a 9% improvement in automotive revenues.

**Automotive** traffic volume and revenues decreased 3% in 2003, principally due to reduced vehicle production.

In 2002, automotive traffic volume increased 7%, and revenues increased 9%, principally due to a rise in vehicle production and new business. Revenue per unit increased 2%, reflecting some pricing improvements, extended length of haul, special ancillary services and the settlement of a disputed charge.

Automotive revenues in 2004 are expected to be somewhat higher than those of 2003, due to several factors: light vehicle production is predicted to be slightly above the 2003 level, NS has increased rail service to a major customer with a second plant opening towards the end of 2004, and the addition of several new products.

**Chemicals** traffic volume increased 1% and revenue increased 2% compared to 2002. Traffic volume benefited from higher shipments of industrial intermediates, petroleum and environmental products, and plastics. Also contributing to 2003 growth, approximately 2,000 annual carloads of new traffic were diverted from the waterways and highways. Revenue per unit reflected improved pricing to meet market conditions, as well as favorable changes in mix.

In 2002, chemicals traffic volume increased slightly and revenues increased 2%. Higher traffic volume for plastics and a small increase for miscellaneous chemicals offset a decline for petroleum products. Demand for plastics was supported by increases in light vehicle production and housing starts. Traffic volume also benefited from increased shipments through NS' Thoroughbred Bulk Transfer (TBT) facilities that handle chemicals and bulk commodities for customers not located on NS-served lines. Revenue per unit increased as a result of a favorable change in the mix of traffic (more higher-rated business) and market-driven rate increases.

Chemical volume is expected to improve in 2004, primarily due to expectations for a stronger economy and growth from new or expanded plastics plants. However, volume could be adversely affected by the price of energy in North America, particularly that of natural gas and crude oil. Both of these commodities account for more than 50% of the cost of most chemical products, and high North American prices are causing chemical producers increasingly to look off shore for production.

**Metals and construction** traffic volume decreased 1%, but revenues increased 1% in 2003 compared with 2002. The decline in volume resulted from reduced metals volume (mostly iron and steel), offset in part by higher construction traffic. Revenue per unit improved 2%, reflecting favorable pricing and traffic mix changes.

In 2002, metals and construction traffic volume increased 2%, and revenues improved 3%, reflecting improvement in the steel industry, aided by the two-year imported steel tariff program. Metals volume benefited from resumption of production at some mills that closed in 2001 and increased volume from new mills. Construction traffic declined, primarily as a result of reductions in highway projects due to state government budget pressures.

Metals and construction revenues in 2004 are expected to benefit from an improved economic environment and converting motor carrier traffic to rail, although further consolidation in the steel industry is expected. New stone terminals on NS lines in Florida, Georgia and Tennessee will generate additional aggregate business, and new access to existing cement facilities will increase traffic.

**Agriculture, consumer products and government** traffic volume increased 7% and revenues increased 8% compared with 2002. Commodities contributing most to these increases were corn, fertilizer, military, sweeteners and wheat. Only feed, food products and beverages showed a slight decrease. Corn shipments increased 4% in 2003 and revenue was up 8%. Due to the drought of 2002, which caused a depletion of inventories, there was a significant increase in demand for corn to Southeast feed mill customers and poultry producers in eastern Pennsylvania, Maryland, and Delaware, resulting in long haul rail movements from Midwest suppliers to these areas. Higher fertilizer traffic resulted from the re-opening of a large phosphate fertilizer plant. Shipments of military vehicles and military equipment increased 36% over 2002 levels due to the war in Iraq.

In 2002, agriculture, consumer products and government traffic volume decreased slightly compared to 2001, but revenues increased 3%. Traffic volume increases for corn, food products and beverages largely offset declines for soybeans and feed. Corn volume benefited from increased shipments from the Midwest to drought-stricken areas in the East. The increase for food products was primarily the result of new business. Soybean and feed volumes were adversely affected by lower domestic and export demand. Revenue per unit increased because of higher rates, increased length of haul and favorable changes in the mix of traffic.

Agriculture, consumer products and government revenues in 2004 are expected to remain steady, reflecting a more normalized 2003 crop, and the overall strong performance of the other commodities. Traffic levels should benefit from new southeastern feed mills that are expected to come on line by late 2004, as well as more shipments of corn, ethanol and transcontinental shipments of fresh and frozen foods.

**Paper, clay and forest products** traffic increased 1% and revenues increased 5% compared to 2002, principally due to improved domestic demand for paper products. Paper traffic benefited from increased domestic orders for consumer products packaging and from the advertising sector, as well as new business. Newsprint shipments continued to remain soft, largely due to a prolonged decline in demand. Woodchip volume increased significantly as NS-served paper mills experienced shortages and were forced to source wood fiber from more distant suppliers due to wet weather in the Southeast. NS clay revenue was up compared to 2002 due to a strong increase in revenue per carload and a more positive mix as NS handled more long-haul domestic traffic. Lumber business was soft in early 2003 despite strong demand due in part to wet weather and several mill closures. Lumber business was up in the fourth quarter as weather in the Southeast and commodity prices improved.

In 2002, paper, clay and forest products traffic volume declined 3%, and revenues decreased 1%, primarily due to continued weakness in the paper market, especially in the first half of the year. Traffic volume improved later in the year as the paper market strengthened. In addition, NS gained business from conversion of truck shipments to rail and from continued strength in housing starts. Revenue per unit benefited from rate increases and a decline in shorter-haul business.

In 2004, paper, clay and forest product revenues are expected to experience modest growth consistent with the general outlook for the domestic economy. NS revenue growth initiatives will focus on converting motor carrier traffic to rail and offering more transload or rail/truck bundled services to non-rail served customers.

**INTERMODAL** volume increased 5% and revenues increased 5% compared to 2002. Volume growth was driven by improved service performance that enabled the conversion of truck business to rail. Shipments for asset-based truckload carriers increased 14% as these trucking companies used intermodal to reduce their exposure to driver shortages and the need for larger fleets. International volume, which represents 45% of intermodal's volume, grew 9%, primarily a result of strong import trade and new business driven by enhanced service. Triple Crown Services Company (TCS) grew 1% in 2003, hampered by a fleet at full capacity. NS is expanding this fleet in 2004.

In 2002, intermodal traffic volume increased 6%, and revenues increased 5%, compared to 2001. Volume growth was principally the result of new and improved services that resulted in new business, including the conversion of truck business to rail. International traffic, which accounts for about half of intermodal volume, increased 10%, supported by growth in trade activity and new business. Domestic shipments grew 6%, primarily because of new business gained from the conversion of truck shipments. TCS volume increased 4%. Revenue per unit declined as a result of an increase in shorter-haul business and the absence of fuel surcharges that were in place in 2001, which were partially offset by some rate increases.

In 2004, intermodal revenues are expected to benefit from unfavorable forces affecting trucking companies, including changes to the highway hours of service laws, driver shortages, new truck emission standards and, accordingly, higher truck prices. These forces are expected to accelerate truck to rail conversion in addition to creating an environment conducive to rail price increases.

**Railway Operating Expenses**

Railway operating expenses increased 6% in 2003, while carloads increased 2%. Expenses in 2003 included $107 million of costs related to a voluntary separation program to reduce the size of the work force, which resulted in 2% of the 6% expense increase. In 2002, railway operating expenses declined 1%, while carloads increased 1%.

The railway operating ratio, which measures the percentage of railway operating revenues consumed by railway operating expenses, was 83.5% in 2003, compared with 81.5% in 2002 and 83.7% in 2001. The voluntary separation costs added 1.6 percentage points to the 2003 ratio.

The following table shows the changes in railway operating expenses summarized by major classifications.

**Operating Expense Variances**
Increases (Decreases)

| | 2003 vs. 2002 | 2002 vs. 2001 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits* | $ 253 | $ 8 |
| Materials, services and rents | (30) | 13 |
| Conrail rents and services | 7 | (9) |
| Depreciation | (2) | 1 |
| Diesel fuel | 38 | (70) |
| Casualties and other claims | 10 | 28 |
| Other | 16 | (22) |
| Total | $ 292 | $ (51) |

* Includes $107 million of voluntary separation costs in 2003.

**Compensation and benefits** represented 42% of total railway operating expenses and increased 13% in 2003. Almost half of the increase was the result of the $107 million voluntary separation program. The remaining increase was principally due to higher wage rates (including the BLE bonus in lieu of wage increases), which added $45 million, increased health and welfare benefits costs, which were up $44 million, and reduced pension income down $34 million (see Note 11). Approximately $25 million of the increase in health and welfare benefit costs was attributable to retirees, reflecting a higher estimated medical inflation rate. NS expects these costs to be down slightly in 2004, a result of a recent plan amendment and changes in Medicare coverage (see Note 11). However, NS anticipates that this reduction will largely be offset by lower pension income. Therefore, total pension and postretirement expenses in 2004 are expected to be comparable to 2003.

In 2002, compensation and benefits increased slightly and represented 40% of total railway operating expenses. Higher wage rates, reduced pension income (see Note 11) and increased health and welfare benefits costs more than offset savings from reduced employment levels and lower payroll taxes (see the discussion of the Railroad Retirement and Survivors' Improvement Act, below).

The Railroad Retirement and Survivors' Improvement Act, which took effect on Jan. 1, 2002, provides for a phased reduction of the employers' portions of Tier II Railroad Retirement payroll taxes. The phase-in calls for a reduction from 14.2% in 2003 to 13.1% in 2004 and thereafter. In addition, the supplemental annuity tax was eliminated. These changes resulted in an estimated $21 million reduction in payroll taxes in 2003 and are expected to result in savings of $16 million in 2004, compared with 2003. However, these savings are expected to continue to be offset by an increase in the railroad unemployment tax rate, higher payroll taxes on increased wages and a higher wage base. The new law allows for investment of Tier II assets in a diversified portfolio through the newly established National Railroad Retirement Investment Trust. The law also provides a mechanism for automatic adjustment of future Tier II payroll taxes should the trust assets fall below a four-year reserve or exceed a six-year reserve.

**Materials, services and rents** includes items used for the maintenance of the railroad's lines, structures and equipment; the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads; and the net cost of equipment rentals. This category of expenses decreased 2% in 2003 and increased 1% in 2002.

The 2003 decline reflected lower equipment rents costs, down $26 million, and reduced purchased services, down $20 million, including lower expenses for intermodal, automotive and bulk transfer services, and professional and legal fees.

The increase in 2002 was the result of higher volume-related expenses for automotive and intermodal traffic, increased material costs for locomotives, higher expenses for roadway and bridge repairs and increased derailment costs. These higher costs were largely offset by a significant reduction in equipment rents.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners, less the rent paid to NS for the use of its equipment, decreased 7% in 2003 and 14% in 2002. The decline in 2003 was principally the result of lower automotive traffic volume in addition to adjustments relating to periodic studies of equipment rents and favorable settlements of recent bills. In addition, the change in accounting related to certain leased locomotives (see Notes 1 and 6) also reduced equipment rents. The decline in 2002 was principally the result of continued improvement in cycle times, reflecting efficiency gains and, for intermodal equipment, service design and process changes implemented during the year.

Locomotive repair costs increased in 2003 and 2002, due to more maintenance activity. Locomotive and freight car maintenance costs are expected to increase further in 2004.

**Conrail rents and services** increased 2% in 2003 and decreased 2% in 2002. This item includes amounts due to PRR and CRC for use of their operating properties and equipment and CRC's operation of the Shared Assets Areas. Also included is NS' equity in Conrail's net earnings, plus the additional amortization related to the difference between NS' investment in Conrail and its underlying equity (see Note 2). The increase in 2003 reflects lower Conrail earnings and higher expenses in the Shared Assets Areas, whereas the decline in 2002 reflected higher Conrail earnings and lower expenses in the Shared Assets Areas (see “Conrail's Results of Operations, Financial Condition and Liquidity,” below).

**Depreciation** expense was down slightly in 2003 and up slightly in 2002. Substantial levels of capital spending affected both years; however, expense in 2003 benefited from a change in accounting for the cost to remove crossties (see Note 1), and expenses in 2002 benefited from lower rates implemented early in the year following completion of a periodic study (see Note 1, “Properties,” for NS' depreciation policy).

**Diesel fuel** expenses increased 11% in 2003 and decreased 17% in 2002. The increase in 2003 reflects an 11% rise in the average price per gallon and essentially flat consumption. The decline in 2002 reflected a 16% drop in the average price per gallon and slightly lower consumption. Expenses in 2003 and 2002 included benefits of $59 million and $10 million, respectively, from the diesel fuel hedging program (see “Market Risks and Hedging Activities,” below and Note 16). NS has hedged approximately 63% of expected 2004 diesel fuel requirements as of December 31, 2003, at an average price of 78 cents per gallon. Accordingly, if diesel fuel prices are volatile during 2004 it is unlikely that NS will experience the same degree of volatility in its diesel fuel expense.

**Casualties and other claims** expenses (including the estimates of costs related to personal injury, property damage and environmental matters) increased 6% in 2003 and 20% in 2002. The higher expense in 2003 was due to adverse personal injury claims development and derailments earlier in the year as well as higher insurance costs. The increase in 2002 reflected adverse personal injury claims development and higher expenses for loss and damage to lading, as well as higher insurance and environmental remediation costs.

The largest component of casualties and other claims expense is personal injury costs. In 2003, cases involving occupational injuries comprised about 40% of the total employee injury cases settled and 31% of the total settlement payments made. Injuries of this type are often not caused by a specific accident or event, but rather, result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades. NS continues to work actively to eliminate all employee injuries and to reduce the associated costs.

The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS, like many other businesses in the U.S., has experienced difficulty obtaining property and casualty insurance on reasonable terms after the September 11 terrorist attacks. NS has been successful in maintaining a substantial amount of commercial insurance for third-party personal injury, property damage and FELA claims, although both the cost of this insurance and the amount of risk that NS retains

through self-insurance have more than doubled since the attacks. The magnitude of the premium increases that NS experienced in 2002 began to subside in 2003, however.

**Other expenses** increased 8% in 2003 but decreased 10% in 2002. The increase in 2003 was primarily attributable to higher state franchise and sales and use taxes, the absence of a favorable bad debt settlement that benefited 2002 and higher union employee travel expenses. The decline in 2002 reflected lower expenses for property and sales and use taxes.

**Other Income – Net**

Other income – net was $19 million in 2003, $66 million in 2002 and $99 million in 2001 (see Note 3). The decline in 2003 was primarily due to the $84 million telecommunications assets impairment charge that offset increased gains from the sale of properties, higher corporate-owned life insurance returns and lower interest accruals related to tax liabilities. The decline in 2002 was primarily the result of higher interest accruals on federal income tax liabilities, lower gains from the sale of properties and investments, and the absence of a $13 million gain from a nonrecurring settlement that benefited 2001. These reductions were partially offset by reduced discount from the sales of receivables (due to a lower amount of receivables sold and a lower interest rate environment, which favorably affects the amount of discount).

**Income Taxes**

Income tax expense in 2003 was $175 million for an effective rate of 30%, compared with effective rates of 35% in 2002 and 2001. Excluding NS' equity in Conrail's after-tax earnings, the effective rate was 33% in 2003, and 38% in 2002 and 2001.

In 2003, the effective rate was reduced by the favorable resolution of prior years' tax audits. The effective rates in all three years benefited from favorable adjustments upon filing the prior year tax returns and favorable adjustments to state tax liabilities (see Note 4).

In May 2003, the Jobs and Growth Tax Relief Reconciliation Act of 2003 was signed into law. The law increased from 30% to 50% the additional first-year depreciation allowance for property acquired after May 5, 2003, and before January 1, 2005. The 30% additional first-year depreciation allowance was an element of earlier tax legislation. The acceleration of tax depreciation deductions allowed by these laws reduces current taxes and increases deferred tax levels by significant amounts.

**Discontinued Operations**

Income from discontinued operations in 2003 consisted of a $10 million after-tax gain related to the resolution of tax issues arising from the sale of NS' motor carrier subsidiary. Income from discontinued operations in 2001 consisted of a $13 million after-tax gain resulting from the expiration of certain indemnities contained in the sales agreement (see Note 17).

**FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES**

**Cash provided by operating activities,** NS' principal source of liquidity, was $1,054 million in 2003, compared with $803 million in 2002 and $654 million in 2001. The increase in 2003 reflected a smaller change in the amount of accounts receivables sold; declines in receivables sold amounted to $30 million in 2003 and $270 million in 2002 (see Note 5). In 2002, the improvement was the result of higher income

from railway operations and favorable changes in working capital, which were offset, in part, by fewer accounts receivable sold (see Note 5).

Payments made to PRR (which are included in "Conrail Rents and Services" and, therefore, are a use of cash in "Cash provided by operating activities") are largely cash neutral because a significant portion are borrowed back from a PRR subsidiary and, therefore, are a source of cash in "Proceeds from borrowings." NS' net cash flow from these borrowings amounted to $203 million in 2003, $212 million in 2002 and $250 million in 2001.

NS' working capital deficit was $376 million at Dec. 31, 2003, compared with $554 million at Dec. 31, 2002. The improvement resulted principally from an increase in cash flow from operations and a reduction in federal income taxes due within one year. Debt due in 2004 is expected to be paid using cash generated from operations (including sales of accounts receivable) and cash on hand.

NS currently has the capability to increase the amount of accounts receivable being sold under the revolving sale program to meet its more immediate working capital needs. During 2003, the amount of receivables NS could sell under this program ranged from $358 million to $433 million, and the amount of receivables NS sold ranged from zero to $150 million. Moreover, NS has a $1 billion credit facility, which expires in 2006, that it can borrow under or use to support commercial paper debt; however, reductions in its credit rating could limit NS' ability to access the commercial paper markets (see also the discussion of financing activities, below).

NS expects to generate sufficient cash flow from operations to meet its ongoing obligations. This expectation is based on a view that the economy will continue a moderate growth rate through 2004.

**Contractual obligations** at Dec. 31, 2003, related to NS' long-term debt (including capital leases) (see Note 8), operating leases (see Note 9), agreements with CRC (see Note 2), unconditional purchase obligations (see Note 18) and other long-term obligations (see Note 18), are as follows:

| | | Payments Due By Period | | | |
|---|---|---|---|---|---|
| | Total | 2004 | 2005-2006 | 2007-2008 | 2009 and Subsequent |
| | | | *($ in millions)* | | |
| Long-term debt and capital leases | $ 7,160 | $ 360 | $ 811 | $ 1,338 | $ 4,651 |
| Operating leases | 837 | 111 | 164 | 109 | 453 |
| Agreements with CRC | 718 | 32 | 67 | 68 | 551 |
| Unconditional purchase obligations | 166 | 166 | -- | -- | -- |
| Other long-term obligations | 30 | 8 | 16 | 6 | -- |
| Total | $ 8,911 | $ 677 | $ 1,058 | $ 1,521 | $ 5,655 |

NS also has a contractual obligation related to a lease covering 140 locomotives. The lessor is a special-purpose entity formed to enter into this transaction, but it is not related to NS and its owner has a substantive residual equity capital investment at risk in the entity. The lessor owns the locomotives and issued debt to finance their purchase; however, NS has no obligation related to the debt. NS has the option to purchase the locomotives, but also can return them to the lessor. If NS does not purchase the locomotives at the end of the maximum lease term, it is liable for any shortfall in the then fair value of the locomotives and a specified residual value. NS does not expect to be required to make any payments under this provision (see Note 9). As the primary beneficiary of the business of the lessor, effective

Jan. 1, 2003, NS consolidated the assets (locomotives) and liabilities (debt) of this special-purpose entity when it implemented Financial Accounting Standards Board Interpretation No. 46 (see Note 1, "New Accounting Pronouncements").

In addition, NS has contractual obligations to PRR as disclosed in Note 2. However, NS has the ability to borrow back funds from PRR to the extent they are not needed to fund contractual obligations at Conrail. As an indirect owner of Conrail, NS may need to make capital contributions, loans or advances to Conrail to fund its contractual obligations. The following table presents 58% of Conrail's contractual obligations for long-term debt (including capital leases) and operating leases. Conrail has no unconditional purchase or other long-term obligations.

| | | Payments Due by Period | | | |
|---|---|---|---|---|---|
| | **Total** | **2004** | **2005-2006** | **2007-2008** | **2009 and Subsequent** |
| | | | *($ in millions)* | | |
| Long-term debt and capital leases | $ 676 | $ 43 | $ 60 | $ 60 | $ 513 |
| Operating leases | 318 | 34 | 66 | 61 | 157 |
| Total | $ 994 | $ 77 | $ 126 | $ 121 | $ 670 |

**Off balance sheet arrangements** consist of an accounts receivable sale program (see Note 5). Under the program, NS sells without recourse undivided ownership interests in a pool of accounts receivable to two unrelated buyers. NS has no ownership interest in the buyers. The buyers issued debt to fund their initial purchase, and NS used the proceeds it received from the initial purchase primarily to pay down its outstanding debt. NS has no obligation related to the buyers' debt, and there is no existing obligation to repurchase sold receivables. Upon termination of the program, the buyers would cease purchasing new receivables and would retain collections related to the previously sold receivables (see Note 5). As of Dec. 31, 2003, there were no accounts receivable sold, however, NS has the capability to increase the amounts sold, as discussed above.

**Cash used for investing activities** decreased 5% in 2003 and increased 12% in 2002. Property additions, which account for most of the recurring spending in this category, were up 4% in 2003 and down 8% in 2002. Property sales were higher in 2003, which resulted in the net decrease in cash used for investing activities. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | **2003** | **2002** | **2001** | **2000** | **1999** |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road | $ 495 | $ 519 | $ 505 | $ 557 | $ 559 |
| Equipment | 218 | 174 | 233 | 146 | 349 |
| Other property | 7 | 2 | 8 | 28 | 4 |
| Total | $ 720 | $ 695 | $ 746 | $ 731 | $ 912 |

Capital expenditures increased 4% in 2003 and decreased 7% in 2002 (which included $6 million of capitalized leases). The increase in 2003 reflects higher locomotive purchases offset, in part, by lower spending on signal and electrical projects and computers. The decline in 2002 reflected higher spending

on track program work that was offset by fewer locomotive purchases (50 in 2002 compared with 100 in 2001) and lower spending for intermodal facilities.

NS and six other railroads (five Class I railroads and a commuter railroad) have agreed to participate in the Chicago Region Environmental and Transportation Efficiency (CREATE) project in Chicago. The project is a proposed public-private partnership between the railroads and city, state and federal governments to design and implement a comprehensive plan to keep passenger and freight trains moving on schedule through the metropolitan Chicago area, the largest rail transportation hub in the U.S. The intent is to reduce rail and highway congestion and add freight and passenger capacity. The project is estimated to cost $1.5 billion with city, state and federal support. The railroads' financial contribution to the project is contingent upon a binding commitment that establishes the availability, on terms and conditions satisfactory to the railroads, of all required public funding and of third-party properties necessary to complete the entire project. If public funding is secured, the railroads will contribute a total of $232 million towards the project with NS' share slated to be $34 million over an estimated six-year period.

**Track Structure Statistics (Capital and Maintenance)**

| | **2003** | **2002** | **2001** | **2000** | **1999** |
|---|---|---|---|---|---|
| Track miles of rail installed | 233 | 235 | 254 | 390 | 403 |
| Miles of track surfaced | 5,105 | 5,270 | 3,836 | 3,687 | 5,087 |
| New crossties installed (millions) | 2.8 | 2.8 | 1.5 | 1.5 | 2.3 |

**Average Age of Owned Railway Equipment**

| | **2003** | **2002** | **2001** | **2000** | **1999** |
|---|---|---|---|---|---|
| | | | *(years)* | | |
| Freight cars | 26.6 | 25.9 | 25.4 | 24.6 | 23.8 |
| Locomotives | 15.3 | 16.1 | 15.7 | 16.1 | 15.4 |
| Retired locomotives | 28.7 | 28.2 | 22.4 | 24.5 | 22.7 |

The table above excludes equipment leased from PRR (see Note 2), which comprises 17% of the freight car fleet and 22% of the locomotive fleet.

Through its coal car rebody program, which was suspended in 2000, NS converted about 29,000 hopper cars into high-capacity steel gondolas or hoppers. As a result, the remaining service life of the freight-car fleet is greater than may be inferred from the increasing average age shown in the table above.

For 2004, NS has budgeted $810 million for capital expenditures. The anticipated spending includes $517 million for roadway projects, of which $384 million is for track and bridge program work. Also included are projects for communications, signal and electrical systems, as well as projects for environmental and public improvements such as grade crossing separations and signal upgrades. Other roadway projects include marketing and industrial development initiatives, including increasing track capacity and access to coal receivers and vehicle production and distribution facilities, and continuing investments in intermodal infrastructure. Equipment spending of $220 million includes the purchase of 100 locomotives and upgrades to existing units, improvements to multilevel automobile racks, and projects related to computers and information technology, including additional security and backup systems.

**Cash used for financing activities** was $314 million in 2003 and $150 million in 2002. Financing activities provided cash of $151 million in 2001. The comparisons reflect net reductions of debt in 2003 and 2002 and a net increase in 2001. Financing activities include loan transactions with a subsidiary of PRR that resulted in net borrowings of $203 million in 2003, $212 million in 2002 and $250 million in 2001 (see Note 2). Excluding these borrowings, debt was reduced $370 million in 2003, $303 million in 2002 and $20 million in 2001. NS' debt-to-total capitalization ratio (excluding notes payable to the PRR subsidiary) at year end was 50.7% in 2003 and 53.1% in 2002.

In 2003, NS redeemed all publicly held shares of Norfolk Southern Railway’s $2.60 Cumulative Preferred Stock, Series A for a redemption price of $50 per share plus accrued and unpaid dividends, for an aggregate redemption price of $50.2066. The total use of cash was $43 million.

NS currently has in place and available a $1 billion, five-year credit agreement, which provides for borrowings at prevailing rates and includes financial covenants (see Note 8).

NS has outstanding $717 million of its 7.05% notes due May 1, 2037. Each holder of a 2037 note may require NS to redeem all or part of the note at face value, plus accrued and unpaid interest, on May 1, 2004. NS will not know the amount of 2037 notes that it may be required to redeem until April 1, 2004. Should it be necessary, NS has the ability and intent to refinance such notes properly presented.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to change them. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment and other factors that management believes to be reasonable under the circumstances. Management discusses the development, selection and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 11). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market performance). Management engages an independent consulting actuarial firm to aid it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in “Compensation and benefits” on its Consolidated Income Statement, was $25 million for the year ended Dec. 31, 2003, including $19 million related to the voluntary separation program. In recording this amount, NS assumed a long-term investment rate of return of 9%. Investment experience of the pension fund over the past 10-, 15- and 20-year periods has

been in excess of 10%. A one percentage point change to this rate of return assumption would result in a $17 million change to the pension credit and, as a result, an equal change in “Compensation and benefits” expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings and mortality would not be expected to have a material effect on NS' net pension benefit or net pension asset in the future. The net pension asset is recorded at its net present value using a discount rate that is based on the current interest rate environment; therefore, management has little discretion in this assumption.

NS' net cost for other postretirement benefits, which is also included in “Compensation and benefits,” was $80 million for the year ended Dec. 31, 2003, which included $22 million related to the voluntary separation program. In recording this expense and valuing the net liability for other postretirement benefits, which is included in “Other benefits” as disclosed in Note 11, management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 11. Additionally, as discussed in Note 11, recent changes to Medicare are expected to reduce NS’ postretirement benefit costs.

**Properties and Depreciation**

Most of NS' total assets are comprised of long-lived railway properties (see Note 6) and its investment in Conrail (see Note 2). Most of Conrail's assets are long-lived railway properties. As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows or estimated net realizable value. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value. NS is amortizing the excess of the purchase price paid for its investment in Conrail over its share of Conrail's net equity using the principles of purchase accounting, based primarily on the estimated remaining useful lives of Conrail's properties.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. These assumptions are the product of periodic depreciation studies that are performed by a firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' “Depreciation expense” for the year ended Dec. 31, 2003, amounted to $513 million. NS' weighted-average depreciation rates for 2003 are disclosed in Note 6; a one-tenth percentage point increase (or decrease) in these rates would result in a $18 million increase (or decrease) to NS' depreciation expense.

**Personal Injury, Environmental and Legal Liabilities**

NS' expense for “Casualties and other claims” amounted to $181 million for the year ended Dec. 31, 2003. Most of this expense was composed of NS' accrual related to personal injury liabilities (see discussion of FELA in the discussion captioned “Casualties and other claims” on page K27). NS engages an independent consulting actuarial firm to aid in valuing its personal injury liability and determining the amount to accrue during the year. The actuarial firm studies NS' historical patterns of reserving for

claims and subsequent settlements. The actuary also takes into account outside influences considered pertinent. The study uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study was performed as of Sept. 30, 2003, and resulted in a slight decrease to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 18). Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $9 million in 2003, $15 million in 2002 and $12 million in 2001, and capital expenditures totaled approximately $9 million in 2003, and $10 million in both 2002 and 2001. Capital expenditures in 2004 are expected to be comparable to those in 2003.

NS' balance sheets included liabilities for environmental exposures in the amount of $25 million at Dec. 31, 2003, and $29 million at Dec. 31, 2002, (of which $8 million was accounted for as a current liability in each year). At Dec. 31, 2003, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 113 identified locations. On that date, 10 sites accounted for $12 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 113 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

The risk of incurring environmental liability is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be

no assurance that NS will not incur environmentally related liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial condition, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net long-term deferred tax liability totaled $3,223 million at Dec. 31, 2003 (see Note 4). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS has a $22 million valuation allowance on $628 million of deferred tax assets as of Dec. 31, 2003, reflecting the expectation that most of these assets will be realized. For 2003, 2002 and 2001, the effective tax rates, excluding NS' equity in Conrail's earnings, were 33%, 38% and 38%, respectively. For every one half percent change in the 2003 effective tax rate, net income would have changed by $3 million.

**CONRAIL'S RESULTS OF OPERATIONS, FINANCIAL CONDITION AND LIQUIDITY**

Conrail's net income was $203 million in 2003, compared with $180 million in 2002 and $174 million in 2001 (see Note 2). Results in 2003 included $40 million for the cumulative effect on years prior to 2003 of a change in accounting principles as required by Conrail’s adoption of SFAS No. 143. NS excluded this amount from its determination of equity in earnings of Conrail because an amount related to Conrail is included in NS’ cumulative effect adjustment for SFAS No. 143. Conrail’s income before the accounting change was $163 million, $17 million below 2002, reflecting lower income from operations.

Conrail's operating revenues were $918 million in 2003, $893 million in 2002 and $903 million in 2001. The 2003 increase was primarily attributable to higher operating fees related to PRR and NYC. The decrease in 2002 resulted from the expiration of certain equipment leases and lower operating fees, largely because of reduced operating costs in the Shared Assets Areas.

Conrail's operating expenses were $659 million in 2003, $623 million in 2002 and $639 million in 2001. The increase in 2003 was primarily the result of higher expenses for compensation and benefits, and casualties and insurance. The decrease in 2002 reflected lower expenses for materials, services and rents and compensation and benefits, which were offset, in part, by higher costs for casualties and other claims.

Conrail's cash provided by operations decreased $11 million, or 3%, in 2003, and $79 million, or 16%, in 2002. The decrease in 2003 reflects the absence of an IRS refund received in 2002 that was partially offset by a decreased use of cash for casualty payments. The decline in 2002 was primarily the result of the absence of two items that benefited 2001: a $50 million cash payment for transferring to a third party certain rights to license, manage and market signboard advertising on Conrail's property for 25 years and proceeds from a favorable insurance settlement. This was offset, in part, by favorable changes in working capital. Cash generated from operations is Conrail's principal source of liquidity and is primarily used for debt repayments and capital expenditures. Debt repayments totaled $57 million in 2003 and $59 million in 2002. Capital expenditures totaled $35 million in 2003 and $23 million in 2002.

Conrail had a working capital deficit of $22 million at Dec. 31, 2003, and $29 million at Dec. 31, 2002. Conrail is not an SEC registrant and, therefore, presently cannot issue any publicly traded securities. Conrail is expected to have sufficient cash flow to meet its ongoing obligations.

NS' equity in earnings of Conrail, net of amortization, was $58 million in 2003, $54 million in 2002 and $44 million in 2001. NS' other comprehensive income (loss) for 2003, 2002 and 2001, as shown in the Consolidated Statement of Changes in Stockholders' Equity, included a $14 million gain, a $34 million loss and a $41 million loss, respectively, for its portion of Conrail's other comprehensive loss (see Note 13).

## OTHER MATTERS

### Labor Agreements

Approximately 24,000 of NS' railroad employees are covered by collective bargaining agreements with 14 different labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act. Moratorium provisions in these agreements permitted NS and the unions to propose such changes in late 1999; negotiations at the national level commenced shortly thereafter.

Agreements have been reached with the Brotherhood of Maintenance of Way Employes (BMWE), which represents about 4,200 NS employees; the United Transportation Union (UTU), which represents about 6,700 NS employees; the International Brotherhood of Boilermakers and Blacksmiths (IBB), which represents about 100 NS employees; the Transportation Communications International Union (TCU), which represents about 4,400 NS employees; the American Train Dispatchers Department (ATDD), which represents about 400 NS employees; the Brotherhood of Railroad Signalmen (BRS), which represents about 1,100 NS employees; and the Brotherhood of Locomotive Engineers (BLE), which represents about 4,500 NS employees. The agreement with the BLE was through 2004; NS recently reached a further contract extension with BLE through 2009. A tentative agreement with the International Brotherhood of Electrical Workers (IBEW), which represents about 900 NS employees, failed ratification.

Health and welfare issues have been resolved with BMWE, TCU, BRS, BLE and UTU. Health and welfare issues with the other organizations have not yet been resolved.

**Market Risks and Hedging Activities**

NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments.

Diesel fuel costs represented 7% of NS' operating expenses for 2003. The program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for any month within any 36-month period.

As of Dec. 31, 2003, through swap transactions, NS has hedged approximately 63% of expected 2004 diesel fuel requirements. The effect of the hedges is to yield an average cost of 78 cents per hedged gallon, including federal taxes and transportation. A 10% decrease in diesel fuel prices would reduce NS' asset related to the swaps by approximately $38 million as of Dec. 31, 2003.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At Dec. 31, 2003, NS' debt subject to interest rate fluctuations totaled $636 million (excluding debt due to the PRR subsidiary). A 1% increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $6 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On Dec. 31, 2003, the average pay rate under these agreements was 1.6%, and the average receive rate was 7%. During 2003, the effect of the swaps was to reduce interest expense by $10 million. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

As discussed in Note 1, effective Jan. 1, 2003, NS adopted Financial Accounting Standards Board (FASB) Statement No. 143, “Accounting for Asset Retirement Obligations,” (SFAS No. 143) and FASB Interpretation No. 46, “Consolidation of Variable Interest Entities,” (FIN No. 46).

**Inflation**

In preparing financial statements, accounting principles generally accepted in the United States of America require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has most of its capital invested in such assets. The

replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**Trends**

**Federal Economic Regulation --** Efforts may be made in 2004 to reimpose unwarranted federal economic regulation on the rail industry. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business. NS and other rail carriers will oppose any efforts to reimpose unwarranted economic regulation.

**Utility Deregulation --** Deregulation of the electrical utility industry is expected to increase competition among electric power generators; deregulation over time would permit wholesalers and possibly retailers of electric power to sell or purchase increasing quantities of power to or from distant parties. The effects of deregulation on NS and on its customers cannot be predicted with certainty; however, NS serves a number of efficient power producers who are expected to remain competitive in this evolving environment.

**Carbon-Based Fuel --** There is growing concern in some quarters that emissions resulting from burning carbon-based fuel, including coal, are contributing to global warming and causing other environmental changes. To the extent that these concerns evolve into a consensus among policy-makers, the impact could be either a reduction in the demand for coal or imposition of more stringent regulations on emissions, which might result in making coal a less economical source of power generation or make permitting of coal-fired facilities even more difficult. The revenues and net income of NSR and other railroads that move large quantities of coal could be affected adversely.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like “believe,” “expect,” “anticipate” and “project.” Forward-looking statements reflect management's good-faith evaluation of information currently available. However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: domestic and international economic conditions; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; changes in securities and capital markets; and natural events such as severe weather, floods and earthquakes. Forward-looking statements are not, and should not be relied upon as, a guaranty of future performance or results. Nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. The Company undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

The information required by this item is included in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations” under the heading “Market Risks and Hedging Activities.”

**Item 8. Financial Statements and Supplementary Data.**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K40 |
| Independent Auditors' Report | K41 |
| Independent Accountants' Report on Internal Control over Financial Reporting | K42 |
| Consolidated Statements of Income<br>Years ended December 31, 2003, 2002 and 2001 | K43 |
| Consolidated Balance Sheets<br>As of December 31, 2003 and 2002 | K44 |
| Consolidated Statements of Cash Flows<br>Years ended December 31, 2003, 2002 and 2001 | K45 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended December 31, 2003, 2002 and 2001 | K46 |
| Notes to Consolidated Financial Statements | K47 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K79 |

**Report of Management**

January 27, 2004

To the Stockholders
Norfolk Southern Corporation

Management is responsible for the preparation and fair presentation of the financial statements included in this annual report. The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and reflect management's judgments and estimates concerning effects of events and transactions that are accounted for or disclosed.

Management is also responsible for establishing and maintaining effective internal control over financial reporting. The Corporation's internal control over financial reporting includes those policies and procedures that pertain to the Corporation's ability to record, process, summarize and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2003. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management believes the Corporation maintained effective internal control over financial reporting as of December 31, 2003.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of the Corporation's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The Audit Committee is responsible for the appointment and compensation of the independent auditor and approves decisions regarding the appointment or removal of the Vice President-Internal Audit. It meets periodically with management, the independent auditors and the internal auditors to ensure that they are carrying out their responsibilities. The Audit Committee is also responsible for performing an oversight role by reviewing and monitoring the financial, accounting and auditing procedures of the Corporation in addition to reviewing the Corporation's financial reports. The independent auditors and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

KPMG LLP, independent auditors of the Corporation's financial statements, has reported on management's assertion with respect to the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2003.

/s/ David R. Goode
David R. Goode
Chairman, President and
Chief Executive Officer

/s/ Henry C. Wolf
Henry C. Wolf
Vice Chairman and
Chief Financial Officer

/s/ Marta R. Stewart
Marta R. Stewart
Vice President and
Controller

## Independent Auditors' Report

The Stockholders and Board of Directors
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2003 and 2002, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2003. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2003 the Company adopted Financial Accounting Standards Board Statement No. 143, *Accounting for Asset Retirement Obligations*, and Financial Accounting Standards Board Interpretation No. 46, *Consolidation of Variable Interest Entities*.

/s/ KPMG LLP
Norfolk, Virginia
January 27, 2004

**INDEPENDENT ACCOUNTANTS' REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

The Board of Directors
Norfolk Southern Corporation:

We have examined management's assertion, included in the accompanying Report of Management, that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2003 based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting. Our responsibility is to express an opinion on management's assertion based on our examination.

Our examination was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants and, accordingly, included obtaining an understanding of internal control over financial reporting, testing, and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our examination provides a reasonable basis for our opinion.

Because of inherent limitations in any internal control, misstatements due to error or fraud may occur and not be detected. Also, projections of any evaluation of internal control over financial reporting to future periods are subject to the risk that the internal control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assertion that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2003 is fairly stated, in all material respects, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

/s/ KPMG LLP
Norfolk, Virginia
January 27, 2004

**Norfolk Southern Corporation And Subsidiaries**
**Consolidated Statements of Income**

| | Years ended December 31, 2003 | 2002 | 2001 |
|---|---|---|---|
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 6,468 | $ 6,270 | $ 6,170 |
| **Railway operating expenses** | | | |
| Compensation and benefits (Note 11) | 2,275 | 2,022 | 2,014 |
| Materials, services and rents | 1,427 | 1,457 | 1,444 |
| Conrail rents and services (Note 2) | 419 | 412 | 421 |
| Depreciation | 513 | 515 | 514 |
| Diesel fuel | 380 | 342 | 412 |
| Casualties and other claims | 181 | 171 | 143 |
| Other | 209 | 193 | 215 |
| Total railway operating expenses | 5,404 | 5,112 | 5,163 |
| **Income from railway operations** | 1,064 | 1,158 | 1,007 |
| Other income – net (Note 3) | 19 | 66 | 99 |
| Interest expense on debt (Note 6) | (497) | (518) | (553) |
| Income from continuing operations before income taxes and accounting changes | 586 | 706 | 553 |
| Provision for income taxes (Note 4) | 175 | 246 | 191 |
| Income from continuing operations before accounting changes | 411 | 460 | 362 |
| Discontinued operations – gain on sale of motor carrier, net of taxes (Note 17) | 10 | -- | 13 |
| Cumulative effect of changes in accounting principles, net of taxes (Note 1) | 114 | -- | -- |
| **Net income** | $ 535 | $ 460 | $ 375 |
| Earnings per share – basic and diluted (Note 14): | | | |
| Income from continuing operations before accounting changes | $ 1.05 | $ 1.18 | $ 0.94 |
| Discontinued operations | 0.03 | -- | 0.03 |
| Cumulative effect of changes in accounting principles | 0.29 | -- | -- |
| Net income | $ 1.37 | $ 1.18 | $ 0.97 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation And Subsidiaries**
**Consolidated Balance Sheets**

| | As of Dec. 31, 2003 | 2002 |
|---|---|---|
| | *($ in millions)* | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 284 | $ 184 |
| Accounts receivable-net (Note 5) | 695 | 683 |
| Materials and supplies | 92 | 97 |
| Deferred income taxes (Note 4) | 189 | 187 |
| Other current assets | 165 | 148 |
| Total current assets | 1,425 | 1,299 |
| Investment in Conrail (Note 2) | 6,259 | 6,178 |
| Properties less accumulated depreciation (Note 6) | 11,779 | 11,370 |
| Other assets | 1,133 | 1,109 |
| **Total assets** | $ 20,596 | $ 19,956 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable (Note 7) | $ 948 | $ 908 |
| Income and other taxes | 199 | 269 |
| Due to Conrail (Note 2) | 81 | 86 |
| Other current liabilities (Note 7) | 213 | 232 |
| Current maturities of long-term debt (Note 8) | 360 | 358 |
| Total current liabilities | 1,801 | 1,853 |
| Long-term debt (Note 8) | 6,800 | 7,006 |
| Other liabilities (Note 10) | 1,071 | 1,029 |
| Due to Conrail (Note 2) | 716 | 513 |
| Minority interests | 9 | 45 |
| Deferred income taxes (Note 4) | 3,223 | 3,010 |
| **Total liabilities** | 13,620 | 13,456 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; issued 412,168,988 and 410,154,465 shares, respectively | 412 | 410 |
| Additional paid-in capital | 521 | 481 |
| Unearned restricted stock (Note 12) | (5) | -- |
| Accumulated other comprehensive loss (Note 13) | (44) | (65) |
| Retained income | 6,112 | 5,694 |
| Less treasury stock at cost, 21,016,125 and 21,169,125 shares, respectively | (20) | (20) |
| **Total stockholders' equity** | 6,976 | 6,500 |
| **Total liabilities and stockholders' equity** | $ 20,596 | $ 19,956 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation And Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended Dec. 31, 2003 | 2002 | 2001 |
|---|---|---|---|
| | ($ in millions) | | |
| **Cash flows from operating activities** | | | |
| Net income | $ 535 | $ 460 | $ 375 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Net cumulative effects of changes in accounting principles | (114) | -- | -- |
| Depreciation | 528 | 529 | 527 |
| Deferred income taxes | 132 | 178 | 44 |
| Equity in earnings of Conrail | (58) | (54) | (44) |
| Gains and losses on properties and investments | (45) | (47) | (59) |
| Income from discontinued operations | (10) | -- | (13) |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable (Note 5) | (12) | (208) | (74) |
| Materials and supplies | 5 | (7) | 1 |
| Other current assets | (4) | 1 | 46 |
| Current liabilities other than debt | (25) | 35 | (27) |
| Other – net (Notes 6 and 11) | 122 | (84) | (122) |
| Net cash provided by operating activities | 1,054 | 803 | 654 |
| **Cash flows from investing activities** | | | |
| Property additions | (720) | (689) | (746) |
| Property sales and other transactions | 78 | 31 | 156 |
| Investments, including short-term | (106) | (78) | (99) |
| Investment sales and other transactions | 108 | 63 | 88 |
| Net cash used for investing activities | (640) | (673) | (601) |
| **Cash flows from financing activities** | | | |
| Dividends | (117) | (101) | (93) |
| Common stock issued – net | 13 | 42 | 14 |
| Redemption of minority interest | (43) | -- | -- |
| Proceeds from borrowings | 261 | 672 | 1,995 |
| Debt repayments | (428) | (763) | (1,765) |
| Net cash provided by (used for) financing activities | (314) | (150) | 151 |
| Net increase (decrease) in cash and cash equivalents | 100 | (20) | 204 |
| **Cash and cash equivalents** | | | |
| At beginning of year | 184 | 204 | -- |
| At end of year | $ 284 | $ 184 | $ 204 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 510 | $ 525 | $ 550 |
| Income taxes | $ 93 | $ 54 | $ 74 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation And Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**

| | Common Stock | Additional Paid-in Capital | Accum. Other Compre-hensive Loss | Unearned Restricted Stock | Retained Income | Treasury Stock | Total |
|---|---|---|---|---|---|---|---|
| | | | *($ in millions, except per share amounts)* | | | | |
| **Balance Dec. 31, 2000** | $ 405 | $ 392 | $ (6) | $ -- | $ 5,053 | $ (20) | $ 5,824 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 375 | | 375 |
| Other comprehensive loss (Note 13) | | | (49) | | | | (49) |
| Total comprehensive income | | | | | | | 326 |
| Dividends on Common Stock, $0.24 per share | | | | | (93) | | (93) |
| Other (Notes 11 and 12) | 2 | 31 | | | | | 33 |
| **Balance Dec. 31, 2001** | 407 | 423 | (55) | -- | 5,335 | (20) | 6,090 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 460 | | 460 |
| Other comprehensive loss (Note 13) | | | (10) | | | | (10) |
| Total comprehensive income | | | | | | | 450 |
| Dividends on Common Stock, $0.26 per share | | | | | (101) | | (101) |
| Other (Notes 11 and 12) | 3 | 58 | | | | | 61 |
| **Balance Dec. 31, 2002** | 410 | 481 | (65) | -- | 5,694 | (20) | 6,500 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 535 | | 535 |
| Other comprehensive income (Note 13) | | | 21 | | | | 21 |
| Total comprehensive income | | | | | | | 556 |
| Dividends on Common Stock, $0.30 per share | | | | | (117) | | (117) |
| Other (Notes 11 and 12) | 2 | 40 | | (5) | | | 37 |
| **Balance Dec. 31, 2003** | $ 412 | $ 521 | $ (44) | $ (5) | $ 6,112 | $ (20) | $ 6,976 |

*See accompanying notes to consolidated financial statements.*

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,500 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

The railroad transports raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2003): coal (23%); intermodal (19%); automotive (14%); chemicals (12%); metals/construction (11%); agriculture/consumer products/government (11%); and paper/clay/forest products (10%). Ultimate points of origination or destination for some of the freight (particularly coal bound for export and intermodal containers) are outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 14 different labor unions.

Through a jointly owned entity, Norfolk Southern and CSX Corporation own the stock of Conrail Inc., which owns the major Northeast freight railroad. Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity (see Note 2).

### Use of Estimates

The preparation of financial statements in accordance with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Cash Equivalents

"Cash equivalents" are highly liquid investments purchased three months or less from maturity.

### Investments

Marketable equity and debt securities are reported at amortized cost or fair value, depending upon their classification as securities "held-to-maturity," "trading" or "available-for-sale." Unrealized gains and losses for investments designated as "available-for-sale," net of taxes, are recognized in "Accumulated other comprehensive loss."

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock."

**Materials and Supplies**

"Materials and supplies," consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in "Properties."

**Properties**

"Properties" are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Maintenance expense is recognized when repairs are performed. When properties other than land and nonrail assets are sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation rather than recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 3).

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows or estimated net realizable value. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value (see Note 6).

**Revenue Recognition**

Revenue is recognized proportionally as a shipment moves from origin to destination. Refunds are recorded as a reduction to revenues based on management's best estimate of projected liability.

**Derivatives**

NS does not engage in the trading of derivatives. NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures and have designated such instruments as hedging transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Stock-Based Compensation**

NS has stock-based employee compensation plans, which are more fully described in Note 12. NS applies the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and related interpretations in accounting for these plans.

The following table illustrates the effect on net income and earnings per share if NS had applied the fair value recognition provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123), to stock-based employee compensation:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | *($ in millions except per share)* | | |
| Net income, as reported | $ 535 | $ 460 | $ 375 |
| Add: Stock-based employee compensation expense included in reported net income, net of related tax effects | 18 | 14 | 12 |
| Deduct: Stock-based employee compensation expense determined under fair value method, net of related tax effects | (35) | (45) | (29) |
| Pro forma net income | $ 518 | $ 429 | $ 358 |
| Earnings per share: | | | |
| As reported – basic and diluted | $ 1.37 | $ 1.18 | $ 0.97 |
| Pro forma – basic and diluted | $ 1.33 | $ 1.10 | $ 0.93 |

**Required Accounting Changes**

NS adopted Financial Accounting Standards Board (FASB) Statement No. 143, "Accounting for Asset Retirement Obligations," (SFAS No. 143) effective Jan. 1, 2003, and recorded a $110 million net adjustment ($182 million before taxes) for the cumulative effect of this change in accounting on years prior to 2003. Pursuant to SFAS No. 143, the cost to remove crossties must be recorded as an expense when incurred; previously these removal costs were accrued as a component of depreciation. This change in accounting lowered depreciation expense by about $26 million for 2003 (because the depreciation rate for crossties no longer reflects cost to remove) and increased compensation and benefits and other expenses by about $21 million for the year (for the costs to remove retired assets).

NS also adopted FASB Interpretation No. 46, "Consolidation of Variable Interest Entities," (FIN No. 46) effective Jan. 1, 2003, and recorded a $4 million net adjustment ($6 million before taxes) for the cumulative effect of this change in accounting on years prior to 2003. Pursuant to FIN No. 46, NS has consolidated a special-purpose entity that leases certain locomotives to NS (see Note 9). This entity's assets and liabilities at Jan. 1, 2003, included $169 million of locomotives and $157 million of debt related to their purchase as well as a $6 million minority interest liability. This change in accounting increased depreciation and interest expense (to reflect the locomotives as owned assets) and lowered lease expense. The net effect to total railway operating expenses and net income was not material.

**Reclassifications**

Certain amounts in the consolidated financial statements and notes thereto have been reclassified to conform to the 2003 presentation.

**2. Investment in Conrail and Operations Over Its Lines**

**Overview**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC), the major freight

railroad in the Northeast. NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. From time to time, Norfolk Southern and CSX, as the indirect owners of Conrail, may have to make capital contributions, loans or advances to Conrail under the terms of the Transaction Agreement among NS, CSX and Conrail.

Norfolk Southern's railroad subsidiary, NSR, operates as a part of its rail system the routes and assets of Pennsylvania Lines LLC (PRR), a wholly owned subsidiary of CRC, pursuant to operating and lease agreements. CSX Transportation, Inc. (CSXT) operates the routes and assets of another CRC subsidiary under comparable terms.

**Operation of Conrail's Lines**

The June 1999 Operating Agreement between NSR and PRR governs substantially all track assets operated by NSR and has an initial 25-year term, renewable at the option of NSR for two five-year terms. Payments under the Operating Agreement are subject to adjustment every six years to reflect changes in values. NSR also has leased or subleased equipment for varying terms from PRR. Costs necessary to operate and maintain the PRR assets, including leasehold improvements, are borne by NSR. NSR receives all freight revenues on the PRR lines.

NSR and CSXT also have entered into agreements with CRC governing other properties that continue to be owned and operated by CRC (the Shared Assets Areas). NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas.

Future minimum lease payments due to PRR under the Operating Agreement and lease agreements and to CRC under the Shared Assets Areas (SAA) agreements are as follows:

| | PRR Oper. Agmt. | PRR Lease Agmt. | SAA Agmts. |
|---|---|---|---|
| | | *($ in millions)* | |
| 2004 | $ 238 | $ 104 | $ 32 |
| 2005 | 246 | 75 | 33 |
| 2006 | 246 | 61 | 34 |
| 2007 | 246 | 49 | 34 |
| 2008 | 246 | 44 | 34 |
| 2009 and subsequent years | 4,039 | 89 | 551 |
| Total | $ 5,261 | $ 422 | $ 718 |

Operating lease expense related to the agreements, which is included in "Conrail rents and services," amounted to $478 million in 2003, $468 million in 2002 and $467 million in 2001.

**Conrail Corporate Reorganization**

NS, CSX and Conrail are jointly seeking to reorganize Conrail and establish direct ownership and control by NSR and CSXT of PRR and NYC, respectively. The proposed reorganization would replace the operating agreements described above and allow NSR and CSXT to directly own and operate PRR and NYC, respectively. The reorganization would not involve the Shared Assets Areas, and would have no effect on the competitive rail service provided in the Shared Assets Areas. Conrail would continue to own, manage and operate the Shared Assets Areas as previously approved by the Surface Transportation Board (STB).

Consummation of the reorganization requires a ruling from the Internal Revenue Service (IRS), the approval of the STB and filings with the Securities and Exchange Commission. In addition, NS, CSX and Conrail must obtain the consent of Conrail's debt holders to carry out the transaction and will obtain a valuation of PRR and of NYC.

In 2003, the IRS issued a ruling that the reorganization would qualify as a tax-free distribution. Also in 2003, the STB granted its authorization to carry out the reorganization, subject to a condition requiring NS, CSX and Conrail to either: (i) obtain the voluntary consent of the Conrail debt holders; or (ii) propose further proceedings to determine whether the terms offered to the Conrail debt holders are fair, just and reasonable. In 2004, NS, CSX and Conrail intend to file registration statements on Form S-4 with the Securities and Exchange Commission to allow a proposed exchange offer relating to Conrail's unsecured debt (see below). In order to implement the reorganization approved by the IRS, the companies have engaged an investment banking firm to provide a valuation. The results of the valuation could impact NS' carrying amount of its investment in Conrail and the recording of the corporate reorganization.

As a part of the proposed reorganization, Conrail would undertake a restructuring of its existing unsecured and secured public indebtedness. There are currently two series of unsecured public debentures with an outstanding principal amount of $800 million and 13 series of secured debt with an outstanding principal amount of approximately $321 million. It is currently contemplated that guaranteed debt securities of two newly formed corporate subsidiaries of NSR and CSXT would be offered in a 58%/42% ratio in exchange for Conrail's unsecured debentures. Upon completion of the proposed transaction, the new debt securities would become direct unsecured obligations of NSR and CSXT, respectively, and would rank equally with all existing and future senior unsecured debt obligations, if any, of NSR and CSXT. These new debt securities will have maturity dates, interest rates and principal and interest payment dates identical to those of the respective series of Conrail's unsecured debentures. In addition, these new debt securities will have covenants substantially similar to those of the publicly traded debt securities of NS and CSX, respectively.

Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations of NSR or CSXT.

NS, CSX and Conrail are diligently working to complete all steps necessary to consummate the Conrail corporate reorganization in 2004. Upon consummation of the proposed transaction, NS' investment in Conrail will no longer include amounts related to PRR and NYC. Instead, the assets and liabilities of PRR will be reflected in their respective line items in NS' Consolidated Balance Sheet, and any amounts due to PRR would be extinguished.

**Investment in Conrail**

NS is applying the equity method of accounting to its investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated remaining useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax and accounting bases for certain assets. At Dec. 31, 2003, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $3.7 billion.

NS' consolidated balance sheet at Dec. 31, 2003, includes $35 million of liabilities related to the Conrail transaction, principally for contractual obligations to Conrail employees imposed by the Surface Transportation Board when it approved the transaction. Through Dec. 31, 2003, NS had paid $168 million of such costs.

**Related-Party Transactions**

NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and totaled $7 million in 2003 and 2002 and $6 million in 2001.

"Conrail rents and services" includes: (1) expenses for amounts due to PRR and CRC for use by NSR of operating properties and equipment and operation of the Shared Assets Areas and (2) NS' equity in the earnings of Conrail, net of amortization.

A significant portion of payments made to PRR is borrowed back from a subsidiary of PRR. Previously, these loans were made under a demand note; however, in the first quarter of 2002, the subsidiary of PRR exchanged this demand note for a new note due in 2032. As a result, borrowings owed to the subsidiary of PRR now comprise the noncurrent balance "Due to Conrail." The interest rate for these loans is variable and was 1.7% at Dec. 31, 2003. Upon consummation of the proposed reorganization, these loans would be extinguished. The current balance "Due to Conrail" at Dec. 31, 2003, is composed of amounts related to expenses included in "Conrail rents and services," as discussed above.

**Summary Financial Information - Conrail**

The following historical cost basis financial information should be read in conjunction with Conrail's audited financial statements, included as Exhibit 99 to this Annual Report on Form 10-K.

**Summarized Consolidated Statements of Income - Conrail**

| | Years Ended Dec. 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| | | *($ in millions)* | |
| Operating revenues | $ 918 | $ 893 | $ 903 |
| Operating expenses | 659 | 623 | 639 |
| Operating income | 259 | 270 | 264 |
| Other – net | (3) | (10) | (6) |
| Income before income taxes | 256 | 260 | 258 |
| Provision for income taxes | 93 | 80 | 84 |
| Income before accounting change | 163 | 180 | 174 |
| Cumulative effect of change in accounting principle, net of taxes | 40 | -- | -- |
| Net income | $ 203 | $ 180 | $ 174 |

Note: Conrail adopted SFAS No. 143, effective Jan. 1, 2003, and recorded a $40 million net adjustment for the cumulative effect of this change in accounting on years prior to 2003. NS excluded this amount from its determination of equity earnings of Conrail because an amount related to Conrail is included in NS' cumulative effect adjustment for SFAS No. 143.

**Summarized Consolidated Balance Sheets - Conrail**

| | As of Dec. 31, 2003 | 2002 |
|---|---|---|
| | *($ in millions)* | |
| Assets: | | |
| Current assets | $ 257 | $ 300 |
| Noncurrent assets | 7,959 | 7,857 |
| Total assets | $ 8,216 | $ 8,157 |
| | | |
| Liabilities and stockholders' equity: | | |
| Current maturities of long-term debt | $ 58 | $ 57 |
| Other current liabilities | 221 | 272 |
| Long-term debt | 1,067 | 1,123 |
| Other noncurrent liabilities | 2,416 | 2,479 |
| Stockholders' equity | 4,454 | 4,226 |
| Total liabilities and stockholders equity | $ 8,216 | $ 8,157 |

Note: Current assets include amounts due from NS and CSX totaling $136 million at Dec. 31, 2003, and $158 million at Dec. 31, 2002. Noncurrent assets include amounts due from NS and CSX totaling $1,231 million at Dec. 31, 2003, and $892 million at Dec. 31, 2002. Current liabilities include amounts payable to NS and CSX totaling $5 million at Dec. 31, 2003, and $9 million at Dec. 31, 2002.

**3. Other Income - Net**

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | *($ in millions)* | |
| Income from natural resources: | | | |
| Royalties from coal | $ 39 | $ 48 | $ 52 |
| Nonoperating depletion and depreciation | (15) | (14) | (13) |
| Subtotal | 24 | 34 | 39 |
| | | | |
| Gains from sale of properties and investments | 45 | 47 | 59 |
| Rental income | 38 | 36 | 40 |
| Corporate-owned life insurance – net | 21 | (1) | 6 |
| Interest income | 10 | 12 | 15 |
| Discount on sales of accounts receivable (Note 5) | -- | (4) | (17) |
| Impairment of telecommunications assets (Note 6) | (84) | -- | -- |
| Taxes on nonoperating property | (8) | (7) | (11) |
| Other interest expense | (4) | (31) | 1 |
| Charitable contributions | (4) | -- | (4) |
| Equity in earnings (losses) of partnerships | -- | (1) | (8) |
| Other | (19) | (19) | (21) |
| Total | $ 19 | $ 66 | $ 99 |

"Other income - net" includes the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations.

"Other current assets" in the Consolidated Balance Sheets includes prepaid interest of $50 million at Dec. 31, 2003, and $46 million at Dec. 31, 2002, arising from corporate-owned life insurance borrowings.

## 4. Income Taxes

### Provision for Income Taxes

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | *($ in millions)* | |
| Current: | | | |
| Federal | $ 32 | $ 61 | $ 125 |
| State | 11 | 7 | 22 |
| Total current taxes | 43 | 68 | 147 |
| Deferred: | | | |
| Federal | 97 | 145 | 35 |
| State | 35 | 33 | 9 |
| Total deferred taxes | 132 | 178 | 44 |
| Provision for income taxes | $ 175 | $ 246 | $ 191 |

### Reconciliation of Statutory Rate to Effective Rate

Total income taxes as reflected in the Consolidated Statements of Income differ from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | | | *($ in millions)* | | | |
| Federal income tax at statutory rate | $ 205 | 35 | $ 247 | 35 | $ 194 | 35 |
| State income taxes, net of federal tax benefit | 30 | 5 | 26 | 4 | 20 | 4 |
| Equity in earnings of Conrail | (20) | (3) | (19) | (3) | (16) | (3) |
| Corporate-owned life insurance | (8) | (1) | (1) | -- | (3) | -- |
| Other – net | (32) | (6) | (7) | (1) | (4) | (1) |
| Provision for income taxes | $ 175 | 30 | $ 246 | 35 | $ 191 | 35 |

### Deferred Tax Assets and Liabilities

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences.

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| | ($ in millions) | |
| Deferred tax assets: | | |
| Reserves, including casualty and other claims | $ 194 | $ 178 |
| Employee benefits | -- | 26 |
| Retiree health and death benefit obligations | 157 | 138 |
| Taxes, including state and property | 240 | 234 |
| Other | 37 | 16 |
| Total gross deferred tax assets | 628 | 592 |
| Less valuation allowance | (22) | (24) |
| Net deferred tax asset | 606 | 568 |
| Deferred tax liabilities: | | |
| Property | (3,466) | (3,300) |
| Employee benefits | (8) | -- |
| Other | (166) | (91) |
| Total gross deferred tax liabilities | (3,640) | (3,391) |
| Net deferred tax liability | (3,034) | (2,823) |
| Net current deferred tax asset | 189 | 187 |
| Net long-term deferred tax liability | $ (3,223) | $ (3,010) |

Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that future taxable income will support the realization of the other deferred tax assets. The total valuation allowance decreased $2 million in 2003 and increased $6 million in both 2002 and 2001.

**Internal Revenue Service (IRS) Reviews**

Consolidated federal income tax returns have been examined and Revenue Agent Reports have been received for all years up to and including 1999. The favorable resolution of prior years' audits is reflected in the "Other – net" line of the reconciliation of statutory rate to the effective rate, as shown above, and for 2003 comprised most of that line item. The consolidated federal income tax returns for 2000 and 2001 are being audited by the IRS. In addition, the 1998 through 2001 federal income tax returns of a tax credit investment affiliate in which NS owns a minority interest are being audited by the IRS. Management believes that adequate provision has been made for any additional taxes and interest thereon that might arise as a result of IRS examinations.

**5. Accounts Receivable**

Since May 2000, NS has sold, through a bankruptcy-remote special purpose subsidiary, undivided ownership interests in a pool of accounts receivable. The buyers have a priority collection interest in the entire pool of receivables and, as a result, NS has retained credit risk to the extent the pool of receivables exceeds the amount sold. NS services and collects the receivables on behalf of the buyers; however, no servicing asset or liability has been recognized because the benefits of servicing are estimated to be just

adequate to compensate NS for its responsibilities. Payments collected from sold receivables can be reinvested in new accounts receivable on behalf of the buyers. Should NS' credit rating drop below investment grade, the buyers have the right to discontinue this reinvestment.

No accounts receivable have been sold under this arrangement since the third quarter of 2003. At Dec. 31, 2002, $30 million of accounts receivable were sold, and therefore not included in "Accounts receivable, net" on the Consolidated Balance Sheets. NS' retained interest, which is included in "Accounts receivable, net," is recorded at fair value using estimates of dilution based on NS' historical experience. These estimates are adjusted regularly based on NS' actual experience with the pool, including defaults and credit deterioration. NS has historically experienced very low levels of default. The fees associated with sales, which are based on the buyers' financing costs, are included in "Other income – net" (see Note 3).

NS' allowance for doubtful accounts was $7 million at Dec. 31, 2003, and $5 million at Dec. 31, 2002.

## 6. Properties

| | December 31, 2003 | December 31, 2002 | Depreciation Rate for 2003 |
|---|---|---|---|
| | ($ in millions) | | |
| Railway property: | | | |
| Road | $ 11,243 | $ 10,859 | 2.7% |
| Equipment | 5,779 | 5,573 | 4.2% |
| Other property | 569 | 655 | 3.0% |
| | 17,591 | 17,087 | |
| Less accumulated depreciation | (5,812) | (5,717) | |
| Net properties | $ 11,779 | $ 11,370 | |

Railway property includes $477 million at Dec. 31, 2003 and $480 million at Dec. 31, 2002, of assets recorded pursuant to capital leases. Other property includes the costs of obtaining rights to natural resources of $341 million at Dec. 31, 2003 and 2002.

### Impairment of Telecommunications Assets

In 2003, NS recorded an $84 million non-cash reduction in the carrying value of certain telecommunications assets to recognize their impaired value in accordance with the provisions of SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." NS' subsidiary, Thoroughbred Technology and Telecommunications (T-Cubed), developed fiber optic infrastructure with companies in the telecommunications industry. This industry has been in a severe downturn and, accordingly, T-Cubed monitored the carrying amount of these assets through independent fair market value appraisals. As a result of a deterioration in the long-term prospects for these assets, an updated appraisal obtained in the fourth quarter indicated a significant decline in their value.

### Capitalized Interest

Total interest cost incurred on debt in 2003, 2002 and 2001 was $509 million, $529 million and $570 million, respectively, of which $12 million, $11 million and $17 million was capitalized.

## 7. Current Liabilities

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| | ($ in millions) | |
| Accounts payable: | | |
| Accounts and wages payable | $ 491 | $ 446 |
| Casualty and other claims | 218 | 207 |
| Vacation liability | 113 | 117 |
| Equipment rents payable – net | 103 | 116 |
| Other | 23 | 22 |
| Total | $ 948 | $ 908 |
| Other current liabilities: | | |
| Interest payable | $ 104 | $ 118 |
| Retiree health and death benefit obligations (Note 11) | 38 | 31 |
| Liabilities for forwarded traffic | 37 | 34 |
| Accrued Conrail-related costs (Note 2) | 21 | 34 |
| Other | 13 | 15 |
| Total | $ 213 | $ 232 |

## 8. Long-term Debt

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| | ($ in millions) | |
| Notes at average rates and maturities as follows: | | |
| 7.17%, maturing 2004 to 2008 | $ 1,790 | $ 1,840 |
| 7.09%, maturing 2009 to 2011 | 1,000 | 1,200 |
| 8.10%, maturing 2017 to 2021 | 800 | 800 |
| 7.54%, maturing 2027 to 2031 | 1,500 | 1,500 |
| 7.05%, maturing 2037 | 717 | 717 |
| 7.90%, maturing 2097 | 350 | 350 |
| Equipment obligations at an average rate of 3.8%, maturing to 2014 | 636 | 558 |
| Capitalized leases at an average rate of 1.7%, maturing to 2023 | 274 | 306 |
| Other debt at an average rate of 6.2%, maturing to 2019 | 118 | 122 |
| Discounts and premiums, net | (25) | (29) |
| Total long-term debt | 7,160 | 7,364 |
| Less current maturities | (360) | (358) |
| Long-term debt excluding current maturities | $ 6,800 | $ 7,006 |

| | |
|---|---|
| Long-term debt maturities subsequent to 2004 are as follows: | |
| 2005 | $ 509 |
| 2006 | 302 |
| 2007 | 866 |
| 2008 | 472 |
| 2009 and subsequent years | 4,651 |
| Total | $ 6,800 |

Each holder of a 2037 note may require NS to redeem all or part of the note at face value, plus accrued and unpaid interest, on May 1, 2004. Should it be necessary, NS has the ability and intent to refinance such notes properly presented.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment.

Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to satisfy yen-denominated lease payments. These deposits are included in "Other assets" on the balance sheet and totaled $96 million at Dec. 31, 2003, and $86 million at Dec. 31, 2002.

**Shelf Registration**

NS filed on Form S-3 a shelf registration statement with the Securities and Exchange Commission covering the issuance of up to $1 billion of securities. As of Dec. 31, 2003, NS had issued a total of $550 million of notes under this shelf registration.

**Commercial Paper and Credit Agreement**

NS has the ability to issue commercial paper backed by a $1 billion credit agreement that expires in 2006. At Dec. 31, 2003, and Dec. 31, 2002, NS had no commercial paper outstanding. Any borrowings under the credit agreement are contingent on the continuing effectiveness of the representations and warranties made at the inception of the agreement.

**Debt Covenants**

NS is subject to various financial covenants with respect to its debt and under its credit agreement, including a minimum net worth requirement, a maximum leverage ratio restriction and certain restrictions on issuance of further debt. At Dec. 31, 2003, NS was in compliance with all debt covenants.

**9. Lease Commitments**

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to PRR under the Operating Agreement and lease agreements or to CRC under the SAA agreements (see Note 2). Future minimum lease payments and operating lease expense, other than to PRR and CRC, are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2004 | $ 111 | $ 47 |
| 2005 | 94 | 48 |
| 2006 | 70 | 43 |
| 2007 | 61 | 41 |
| 2008 | 48 | 14 |
| 2009 and subsequent years | 453 | 113 |
| Total | $ 837 | $ 306 |
| Less imputed interest on capital leases at an average rate of 7.0% | | (32) |
| Present value of minimum lease payments included in debt | | $ 274 |

**Operating Lease Expense**

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | ($ in millions) | |
| Minimum rents | $ 130 | $ 140 | $ 149 |
| Contingent rents | 63 | 60 | 55 |
| Total | $ 193 | $ 200 | $ 204 |

During 2000, NS entered into an operating lease for 140 locomotives, which is renewable annually at NS' option, has a maximum term of eight years and includes purchase options. The lessor is a special-purpose entity whose activities are limited to those incident to this particular transaction. As discussed in Note 1 under the heading "Required Accounting Changes," NS has consolidated this entity for reporting purposes as of Jan. 1, 2003. For the periods prior to consolidation, the table above includes operating lease expense related to this lease of $13 million in 2002 and $18 million in 2001. If NS does not renew the lease during the eight-year period or does not purchase the locomotives at the end of the maximum lease term, it is liable for any shortfall in the then fair value of the locomotives and a specified residual value. NS does not expect to be required to make any payments under this provision. As of Dec. 31, 2003, the maximum liability under this provision, assuming NS chose not to renew the lease in 2004 and the then fair value of the locomotives was zero, would be $106 million.

**10. Other Liabilities**

| | December 31, 2003 | 2002 |
|---|---|---|
| | ($ in millions) | |
| Retiree health and death benefit obligations (Note 11) | $ 321 | $ 286 |
| Casualty and other claims | 270 | 254 |
| Deferred compensation | 143 | 144 |
| Net pension obligations (Note 11) | 89 | 82 |
| Accrued Conrail-related costs (Note 2) | 14 | 26 |
| Other | 234 | 237 |
| Total | $ 1,071 | $ 1,029 |

**11. Pensions and Other Postretirement Benefits**

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, copayments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Pension Plan Asset Management**

Eleven investment firms manage the Company's defined benefit pension plan's assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, a limited amount of international fixed income securities, domestic and international equity

investments and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. Fixed income investments must have an average rating of "AA" or better and all fixed income securities must be rated "A" or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers' returns are expected to exceed selected market indices by prescribed margins.

The target asset allocation range for equity is between 65% and 75% of the fund's assets, with approximately 10% of the fund's assets allocated to international equity investments. The asset allocation on Dec. 31, 2003, was 25% in fixed income investments and 75% in equity investments, including 9% in international equities. This compared to 33%, 67% and 9%, respectively, on Dec. 31, 2002.

The plan's assumed future returns are based principally on the asset allocation and on the historic returns for the plan's asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes. As of Dec. 31, 2003, the plan had assets of $1.72 billion and a current pension obligation of $1.49 billion.

**Voluntary Separation Program**

Compensation and benefits expense in 2003 includes $107 million of costs related to a voluntary separation program undertaken in the fourth quarter. Through the program, 553 nonagreement employees were separated from service, of which 314 retired under Norfolk Southern's retirement plan. The costs include $66 million for separation payments and other benefits of the program and $41 million of costs related to the pension and other benefit plans.

**Medicare Changes**

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the Act) was signed into law in December 2003. The Act introduces a new prescription drug benefit under Medicare (Medicare Part D) as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is at least actuarially equivalent to Medicare Part D. Norfolk Southern believes that its medical plan's prescription drug benefit will qualify as actuarially equivalent to Medicare Part D based on a review by the plan's external prescription drug administrator of the plan's prescription drug benefit compared with the prescription drug benefit that would be paid under Medicare Part D beginning in 2006. Norfolk Southern has elected to take into account these legislative changes in the measurement of its postretirement benefit obligations in accordance with Financial Accounting Standards Board Staff Position No. 106-1. This resulted in a $45 million decrease in the end-of-year benefit obligation with a corresponding decline in the unrecognized actuarial loss for 2003. There was no effect on the net benefit cost in 2003; however, the effects of the Act will be reflected in the net benefit cost in 2004 and subsequent years. Specific authoritative guidance on the accounting for the Act's subsidy is pending, and that guidance, when issued, could require Norfolk Southern to change information previously reported herein.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,370 | $ 1,324 | $ 592 | $ 479 |
| Service cost | 20 | 17 | 18 | 13 |
| Interest cost | 89 | 91 | 40 | 33 |
| Amendment | -- | -- | (51) | -- |
| Legislative changes | -- | -- | (45) | -- |
| Curtailment loss | 17 | -- | 10 | -- |
| Special termination benefits | -- | -- | 17 | -- |
| Actuarial (gains) losses | 105 | 54 | 65 | 98 |
| Benefits paid | (113) | (116) | (38) | (31) |
| Benefit obligation at end of year | 1,488 | 1,370 | 608 | 592 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,469 | 1,798 | 106 | 118 |
| Actual return on plan assets | 358 | (201) | 24 | (12) |
| Employer contribution | 6 | 6 | 38 | 31 |
| 401(h) account transfer | -- | (18) | -- | -- |
| Benefits paid | (113) | (116) | (38) | (31) |
| Fair value of plan assets at end of year | 1,720 | 1,469 | 130 | 106 |
| **Funded status** | 232 | 99 | (478) | (486) |
| Unrecognized (gain) loss | 208 | 305 | 163 | 169 |
| Unrecognized prior service cost | 21 | 26 | (44) | -- |
| Net amount recognized | $ 461 | $ 430 | $ (359) | $ (317) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Prepaid benefit cost | $ 532 | $ 497 | $ -- | $ -- |
| Accrued benefit liability | (89) | (82) | (359) | (317) |
| Accumulated other comprehensive income | 18 | 15 | -- | -- |
| **Net amount recognized** | $ 461 | $ 430 | $ (359) | $ (317) |

Of the pension plans included above, the unfunded pension plans were the only plans with an accumulated benefit obligation in excess of plan assets. These plans' accumulated benefit obligations were $89 million at Dec. 31, 2003, and $82 million at Dec. 31, 2002. These plans' projected benefit obligations were $103 million at Dec. 31, 2003, and $94 million at Dec. 31, 2002. Because of the nature of such plans, there are no plan assets.

Section 401(h) account transfers to NS, from pension assets, were zero in 2003 and $18 million in 2002 as reimbursement for medical payments for retirees.

During 2003, NS amended its retiree medical plan to require participants retiring after Dec. 31, 2003 to share in any increased medical costs. Contributions will be determined annually and will increase at a

rate similar to that of active nonagreement employees. The amendment decreased the retiree medical benefit obligation by $51 million.

**Pension and Other Postretirement Benefit Costs Components**

| | 2003 | 2002<br>*($ in millions)* | 2001 |
|---|---|---|---|
| ***Pension benefits*** | | | |
| Service cost | $ 20 | $ 17 | $ 15 |
| Interest cost | 89 | 91 | 94 |
| Curtailment loss | 17 | -- | -- |
| Expected return on plan assets | (158) | (179) | (202) |
| Amortization of prior service cost | 5 | 4 | 4 |
| Amortization of initial net asset | -- | -- | (3) |
| Recognized net actuarial gains (losses) | 2 | (13) | (24) |
| Net benefit | $ (25) | $ (80) | $ (116) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 18 | $ 13 | $ 14 |
| Interest cost | 40 | 33 | 33 |
| Curtailment loss | 10 | -- | -- |
| Special termination benefits | 17 | -- | -- |
| Expected return on plan assets | (12) | (13) | (13) |
| Amortization of prior service cost | (7) | -- | -- |
| Amortization of unrecognized losses | 14 | -- | -- |
| Net cost | $ 80 | $ 33 | $ 34 |

**Pension Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 6.25% | 6.75% | 7.25% |
| Future salary increases | 4.5% | 4.5% | 5% |
| ***Pension cost:*** | | | |
| Discount rate | 6.75% | 7.25% | 7.50% |
| Return on assets in plans | 9% | 9% | 10% |
| Future salary increases | 4.5% | 5% | 5% |

**Health Care Cost Trend Assumptions**

For measurement purposes, increases in the per capita cost of covered health care benefits were assumed to be 9% for 2004 and 8% for 2005. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2008 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point | |
|---|---|---|
| | **Increase** | **Decrease** |
| | *($ in millions)* | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 8 | $ (7) |
| Postretirement benefit obligation | $ 65 | $ (47) |

**Contributions for Pension and Other Postretirement Benefits**

NS expects to contribute approximately $7 million to its pension plans and $42 million to its other postretirement benefit plans in 2004.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $18 million in 2003, $11 million in 2002 and $10 million in 2001.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. Since 1999, NS has contributed newly issued shares of Common Stock for its matching contributions. NS' expenses under these plans were $12 million in 2003, $12 million in 2002 and $11 million in 2001.

**12. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board may grant stock options, stock appreciation rights (SARs), restricted shares and performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broadly based issuance, stockholder approval was not required. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock. Options may be granted for a term not to exceed 10 years, but may not be exercised prior to the first anniversary of the date of grant. Options are exercisable at the fair market value of Common Stock on the date of grant.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options or PSUs in an amount commensurate with dividends paid on Common Stock. Tax absorption payments also are authorized in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

**Accounting Method**

As disclosed in Note 1, NS applies APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted shares, dividend equivalents, tax absorption payments and SARs result in charges to net income, while grants of stock options have no effect on net income. Related compensation costs were $29 million in 2003, $23 million in 2002 and $20 million in 2001. NS recognized additional paid-in capital of $2 million in 2003, $6 million in 2002 and $1 million in 2001 related to the tax benefit generated by stock option exercises.

Note 1 includes a table that illustrates the effect on net income and earnings per share had NS applied the fair value recognition provisions of SFAS No. 123 to stock-based employee compensation. The pro forma amounts include compensation costs calculated using the Black-Scholes option-pricing model, with average expected option lives of five years; average risk-free interest rates of 2.8% in 2003, 4.6% in 2002 and 5.1% in 2001; average stock-price volatilities of 33% in 2003, 32% in 2002 and 39% in 2001; and dividend yields of zero in 2003, zero in 2002 and 2% in 2001. These assumptions produced per-share grant-date fair values of $6.60 in 2003, $8.26 in 2002 and
$5.48 in 2001.

**Stock Option Activity**

| | Option Shares | Weighted Average Exercise Price |
|---|---|---|
| Balance 12/31/00 | 28,120,950 | $ 24.96 |
| Granted | 6,985,000 | 15.48 |
| Exercised | (1,079,902) | 16.58 |
| Expired | (612,525) | 26.51 |
| Balance 12/31/01 | 33,413,523 | $ 23.21 |
| Granted | 7,384,000 | 22.49 |
| Exercised | (2,851,538) | 17.48 |
| Expired | (287,341) | 26.73 |
| Balance 12/31/02 | 37,658,644 | $ 23.47 |
| Granted | 5,700,000 | 19.63 |
| Exercised | (781,610) | 16.13 |
| Expired | (863,219) | 24.37 |
| Balance 12/31/03 | 41,713,815 | $ 23.07 |

Of the total options outstanding at Dec. 31, 2003, 36 million were vested and have a weighted-average exercise price of $23.61.

**Stock Options Outstanding**

| Range | Exercise Price Weighted Average | Number Outstanding at 12/31/03 | Weighted Average Remaining Contractual Life |
|---|---|---|---|
| $15.48-$16.94 | $16.27 | 11,568,474 | 6.5 years |
| 19.63-22.49 | 21.21 | 14,070,100 | 7.9 years |
| 24.31-27.69 | 26.84 | 7,658,250 | 3.7 years |
| 29.46-33.25 | 32.09 | 8,416,991 | 4.4 years |
| $15.48-$33.25 | $23.07 | 41,713,815 | 6.1 years |

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals at the end of a three-year cycle. PSU grants and average grant-date fair market values were 946,000 and $19.63 in 2003; 815,000 and $22.49 in 2002; and 817,500 and $15.48 in 2001. PSUs may be paid in the form of shares of Common Stock, cash or any combination thereof. Shares earned and issued may be subject to share retention agreements and held by NS for up to five years.

**Restricted Shares**

420,000 restricted shares were granted in 2003, with a grant-date fair market value of $19.63 and a three-year restriction period. At Dec. 31, 2003, the balance of unearned compensation was $5 million relating to 391,800 restricted shares.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP are as follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Available for future grants 12/31: | | | |
| LTIP | 17,994,726 | 23,645,146 | 30,816,365 |
| TSOP | 2,737,200 | 2,568,200 | 2,535,000 |
| Shares of Common Stock issued: | | | |
| LTIP | 1,412,749 | 2,917,898 | 1,146,346 |
| TSOP | -- | -- | -- |

## 13. Stockholders' Equity

### Accumulated Other Comprehensive Loss

"Accumulated other comprehensive loss" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | | *($ in millions)* | | |
| December 31, 2003 | | | | |
| Unrealized gains on securities | $ 1 | $ (1) | $ -- | $ -- |
| Cash flow hedges | 18 | 46 | (36) | 28 |
| Minimum pension liability | (84) | 12 | -- | (72) |
| Accumulated other comprehensive loss | $ (65) | $ 57 | $ (36) | $ (44) |
| December 31, 2002 | | | | |
| Unrealized gains on securities | $ 6 | $ -- | $ (5) | $ 1 |
| Cash flow hedges | (11) | 35 | (6) | 18 |
| Minimum pension liability | (50) | (34) | -- | (84) |
| Accumulated other comprehensive loss | $ (55) | $ 1 | $ (11) | $ (65) |

“Other comprehensive income (loss)” reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | ($ in millions) | |
| ***Year ended Dec. 31, 2003*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 75 | $ (29) | $ 46 |
| Reclassification adjustments for gains included in net income | (59) | 23 | (36) |
| Subtotal | 16 | (6) | 10 |
| Unrealized gains (losses) on securities | (1) | -- | (1) |
| Minimum pension liability | 11 | 1 | 12 |
| Other comprehensive income (loss) | $ 26 | $ (5) | $ 21 |
| ***Year ended Dec. 31, 2002*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 58 | $ (23) | $ 35 |
| Reclassification adjustments for gains included in net income | (10) | 4 | (6) |
| Subtotal | 48 | (19) | 29 |
| Reclassification adjustments for realized gains on securities included in net income | (9) | 4 | (5) |
| Minimum pension liability | (34) | -- | (34) |
| Other comprehensive income (loss) | $ 5 | $ (15) | $ (10) |
| ***Year ended Dec. 31, 2001*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ (27) | $ 11 | $ (16) |
| Reclassification adjustments for gains included in Net income | 8 | (3) | 5 |
| Subtotal | (19) | 8 | (11) |
| Unrealized gains (losses) on securities | (1) | -- | (1) |
| Minimum pension liability | (35) | (2) | (37) |
| Other comprehensive income (loss) | $ (55) | $ 6 | $ (49) |

In 2003, 2002 and 2001, Conrail recorded a $25 million gain, a $59 million loss and a $70 million loss, respectively, in other comprehensive income (loss) related to its minimum pension liability. NS' “Other comprehensive income (loss)” includes a $14 million gain for 2003, a $34 million loss for 2002 and a $41 million loss for 2001, arising from the Conrail adjustments.

**Undistributed Earnings of Equity Investees**

"Retained income" includes undistributed earnings of equity investees, principally attributable to NS' equity in the earnings of Conrail, of $455 million at Dec. 31, 2003; $375 million at Dec. 31, 2002; and $355 million at Dec. 31, 2001.

**14. Earnings Per Share**

The following table sets forth the calculation of basic and diluted earnings per share:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Income available to common stockholders for basic and diluted computations | $ 535 | $ 460 | $ 375 |
| Basic earnings per share: | | | |
| Weighted-average shares outstanding | 390 | 388 | 385 |
| Basic earnings per share | $ 1.37 | $ 1.18 | $ 0.97 |
| Diluted earnings per share: | | | |
| Weighted-average shares outstanding per above | 390 | 388 | 385 |
| Dilutive effect of outstanding options, PSUs and restricted shares (as determined by the application of the treasury stock method) | 2 | 2 | 1 |
| Adjusted weighted-average shares outstanding | 392 | 390 | 386 |
| Diluted earnings per share | $ 1.37 | $ 1.18 | $ 0.97 |

These calculations exclude options for which the exercise price exceeded the average market price of Common Stock as follows: 28 million in 2003, 24 million in 2002 and 21 million in 2001.

There are no adjustments to "Net income" or "Income from continuing operations" for the diluted earnings per share computations.

**15. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Short-term investments," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives (see Note 16) and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at Dec. 31:

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 32 | $ 40 | $ 30 | $ 39 |
| Notes receivable | 93 | 105 | 93 | 104 |
| Long-term debt | (7,160) | (8,101) | (7,364) | (8,412) |

Quoted market prices were used to determine the fair value of marketable securities; underlying net assets were used to estimate the fair value of other investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of $1 million on Dec. 31, 2003 and 2002. Sales of "available-for-sale" securities were immaterial for the years ended Dec. 31, 2003, 2002 and 2001.

## 16. Derivative Financial Instruments

On Jan. 1, 2001, NS adopted Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS No. 133), as amended by Statement of Financial Accounting Standards No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities" (SFAS No. 138). The Statements establish accounting and reporting standards for derivative instruments and hedging activities, requiring that all derivatives be recognized in the financial statements as either assets or liabilities and that they be measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive income," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge.

NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

### Diesel Fuel Hedging

In the second quarter of 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability. In order to minimize this risk, NS instituted a continuous hedging strategy for a portion of its estimated future fuel needs by entering into a series of swaps in order to lock in the purchase prices of some of its diesel fuel. Management has designated these derivative instruments as cash-flow hedges of the exposure to variability in expected future cash flows attributable to fluctuations in diesel fuel prices.

Following is a summary of NS' diesel fuel swaps:

| | 2003 | 2002 |
|---|---|---|
| Number of swaps entered into during the year | 286 | 288 |
| Approximate number of gallons hedged (millions) | 374 | 393 |
| Approximate average price per gallon of Nymex No. 2 heating oil | $0.76 | $0.66 |

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| Percent of estimated future diesel fuel consumption covered as of Dec. 31, 2003 | 63% | 22% | -- |

Hedges are placed each month by competitive bid among selected counterparties. The goal of this hedging strategy is to average fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for each month within any 36-month period. Diesel fuel costs represented 7%, 7% and 8% of NS' operating expenses for the years ended Dec. 31, 2003, 2002 and 2001, respectively.

In 2001, NS also purchased eight monthly call options at a strike price of 84 cents per gallon of Nymex No. 2 heating oil. The cost of the monthly options, which expired serially through Dec. 31, 2001, was amortized as a component of diesel fuel expense. Because the price of diesel fuel did not reach the strike price at any time during the period the options were outstanding, NS did not record any benefit related to these transactions.

NS' fuel hedging activity resulted in a net decrease in 2003 diesel fuel expenses of $59 million, a net decrease in 2002 diesel fuel expense of $10 million and a net increase in 2001 diesel fuel expense of $8 million. Ineffectiveness related to the use of diesel fuel hedges in 2003, 2002 and 2001 was less than $1 million for each year.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed and floating-rate debt instruments, and by entering into interest rate hedging transactions. NS had $186 million, or 2.8%, and $220 million, or 3.2%, of its fixed rate debt portfolio hedged at Dec. 31, 2003, and Dec. 31, 2002, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and, accordingly, there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

The fair values of NS' diesel fuel derivative instruments at Dec. 31, 2003 and 2002, were determined based upon current fair market values as quoted by third party dealers. Fair values of interest rate swaps were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statement of Cash Flows. “Accumulated other comprehensive loss,” a component of “Stockholders' equity,” included $40 million (pretax) at Dec. 31, 2003, and $29 million (pretax) at Dec. 31, 2002, both relating to an increase in the fair value of derivative fuel hedging transactions that will terminate within 12 months.

The asset and liability positions of NS' outstanding derivative financial instruments were as follows:

| | December 31, | |
|---|---|---|
| | **2003** | **2002** |
| | *($ in millions)* | |
| *Interest rate hedges:* | | |
| Gross fair market asset position | $ 16 | $ 24 |
| Gross fair market (liability) position | -- | -- |
| *Fuel hedges:* | | |
| Gross fair market asset position | 45 | 29 |
| Gross fair market (liability) position | -- | -- |
| Total net asset (liability) position | $ 61 | $ 53 |

**17. Discontinued Operations - Motor Carrier**

On March 28, 1998, NS sold all the common stock of North American Van Lines, Inc. (NAVL), its motor carrier subsidiary. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per share, that resulted from resolution of tax issues related to the transaction. Results in 2001 include an additional after-tax gain of $13 million, or 3 cents per share, that resulted from the expiration of certain indemnities contained in the sales agreement.

**18. Commitments and Contingencies**

**Lawsuits**

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in accrual adjustments that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in expenses in the periods in which such adjustments are known.

**Casualty Claims**

NS is generally self-insured for casualty claims. Claims in excess of self-insurance levels are insured up to excess coverage limits. The casualty claims liability is determined actuarially, based upon claims filed and an estimate of claims incurred but not yet reported. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability will be reflected in operating expenses in the periods in which such adjustments are known.

**Environmental Matters**

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against third parties for recovery of cleanup costs incurred by NS are reflected as receivables in the balance sheet and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all identified sites and in determining any necessary adjustments to initial liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' balance sheets included liabilities for environmental exposures in the amount of $25 million at Dec. 31, 2003, and $29 million at Dec. 31, 2002, (of which $8 million was accounted for as a current liability in each year). At Dec. 31, 2003, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 113 identified locations. On that date, 10 sites accounted for $12 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 113 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmentally related liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on NS' financial condition, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any identified matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

**Purchase Commitments**

NSR had outstanding purchase commitments of approximately $166 million in connection with its 2004 capital program. In addition, Norfolk Southern has committed to purchase telecommunications services totaling $30 million through 2006.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of the Corporation, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, NS and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. Similar provisions exist in NS' accounts receivable sales program.

The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material adverse effect on NS' financial condition, results of operations or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

NS has outstanding warranty liabilities primarily related to work performed at its locomotive facilities. NS has recorded a reserve of $1 million as of Dec. 31, 2003, and less than $2 million as of Dec. 31, 2002 for these warranties.

As of Dec. 31, 2003, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis, due in 2019. Six other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

NS is liable for any shortfall in the then fair market value of certain leased locomotives and a specified residual value for the locomotives if the leases are not renewed, as discussed in Note 9.

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | **March 31** | **June 30** | **Sept. 30** | **Dec. 31** |
| | *(In millions of dollars, except per share amounts)* | | | |
| **2003** | | | | |
| Railway operating revenues | $ 1,561 | $ 1,633 | $ 1,598 | $ 1,676 |
| Income from railway operations | 231 | 298 | 311 | 224** |
| Income from continuing operations before accounting changes | 85 | 137 | 137 | 52** |
| Net income | 209* | 137 | 137 | 52** |
| Earnings per share – basic and diluted: | | | | |
| Income from continuing operations before accounting changes | 0.22 | 0.35 | 0.35 | 0.13** |
| Net income | 0.54* | 0.35 | 0.35 | 0.13** |
| **2002** | | | | |
| Railway operating revenues | $ 1,498 | $ 1,593 | $ 1,598 | $ 1,581 |
| Income from railway operations | 237 | 322 | 311 | 288 |
| Net income | 86 | 119 | 126 | 129 |
| Earnings per share - basic and diluted | $ 0.22 | $ 0.31 | $ 0.32 | $ 0.33 |

* Includes a $114 million, or 29 cents per share, increase related to required accounting changes (see Note 1 on page K47), and a $10 million, or 3 cents per share, gain from discontinued operations (see Note 17 on page K71).

** Includes a $107 million pre-tax charge for a voluntary separation program (see Note 11 on page K59), which reduced net income by $66 million or 17 cents per share. Also includes an $84 million impairment charge (see Note 6 on page K56), which reduced net income by $53 million or 13 cents per share.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

(a) Evaluation of Disclosure Controls and Procedures.

Norfolk Southerns' Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2003. Based on such evaluation, such officers have concluded that, as of December 31, 2003, NS' disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to NS (including its consolidated subsidiaries) required to be included in NS' periodic filings under the Exchange Act.

(b) Changes in Internal Controls.

During the fourth quarter of 2003, management has not identified any changes in NS' internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal controls over financial reporting.

## PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 10. Directors and Executive Officers of the Registrant.

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption "Election of Directors," under the subcaptions "Committees" (including the information appearing under "Audit Committee") and "Corporate Governance" under the caption "Board of Directors;" and under the caption "Section 16(a) Beneficial Ownership Reporting Compliance" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 13, 2004, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under "Executive Officers of the Registrant."

### Item 11. Executive Compensation.

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information appearing under the subcaption "Compensation" under the caption "Board of Directors" for directors and under the caption "Executive Compensation" for executives, including the information appearing in the "Summary Compensation Table" and under the subcaptions "Long-Term Incentive Plan" (including the three tables therein), "Pension Plans" (including the table therein), and "Change in Control Arrangements" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 13, 2004, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

In accordance with General Instruction G(3), information called for by Item 12, Part III, is incorporated herein by reference from the information appearing under the caption "Beneficial Ownership of Stock" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 13, 2004, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Equity Compensation Plan Information (as of Dec. 31, 2003)**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders[1] | 36,024,515 | 23.11[4] | 17,994,726[6] |
| Equity compensation plans not approved by security holders[2] | 8,262,800[3] | 22.91[3,5] | 3,282,200[7] |
| Total | 44,287,315 | 23.07 | 21,276,926 |

1 The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.
2 The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan, the Directors' Restricted Stock Plan and the Safety Incentive Plan.
3 Includes options and performance share units granted under the Long-Term Incentive Plan on five million shares for non-officers and options granted under the Thoroughbred Stock Option Plan.
4 Calculated without regard to 2,328,500 outstanding performance share units.
5 Calculated without regard to 245,000 outstanding performance share units.
6 Of the shares remaining available for grant under plans approved by stockholders, 4,239,000 are available for grant as restricted shares or performance shares under the Long-Term Incentive Plan.
7 Of the shares remaining available for grant under plans not approved by stockholders, 39,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan and 456,706 are available for grant as stock under the Safety Incentive Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by the stockholders at their Annual Meetings on May 10, 1984, on May 11, 1995, and most recently on May 10, 2001, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for officers and other key employees to acquire a proprietary interest in the Corporation. On January 23, 2001, the Board of Directors approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. The Board also adopted an amended plan effective January 23, 2001, subject to stockholder approval, which included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock, with no more than 6 million of such additional shares to be awarded as restricted shares or performance shares (including performance share units earned as performance shares). This amended plan was approved by stockholders on May 10, 2001, resulting in an aggregate of 74,878,604 shares of Common Stock authorized for issuance under LTIP.
Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Performance-Based Compensation

Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares and performance share units (in addition, dividend equivalents may be awarded for options and performance share units). The Committee may establish such terms and conditions for the awards as provided in the plan.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units are performance-based awards which are earned upon achievement of goals the Committee establishes at the time of the grant for three equally weighted performance criteria approved by the stockholders -- return on average invested capital, operating ratio, and total return to NS stockholders as compared with the total return on all stocks comprising the S&P 500 Composite Stock Price Index -- and the units may be payable as shares of Norfolk Southern Common Stock or in cash.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan ("TSOP") on January 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. The plan has not been approved by stockholders. Six million shares of authorized but unissued Common Stock were reserved for issuance under TSOP.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Compensation Committee of the Board of Directors may grant nonqualified stock options and may establish such terms and conditions as provided in the plan.

The option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on January 1, 1994, and is designed to increase ownership of Norfolk Southern's Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been approved by stockholders. Currently, a maximum of 66,000 shares of Corporation Common Stock may be granted under the Plan. To make the grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors, who are not and never have been employees of Norfolk Southern, are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period begins on the date of the grant and ends on the earlier of six months after the eligible director ceases to be a director by reason of disability, retirement or death. Directors will forfeit the right to receive the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement or death.

**Norfolk Southern Corporation Safety Incentive Plan**

The Norfolk Southern Corporation Safety Incentive Plan ("SIP") is designed to provide an additional incentive for eligible agreement employees to work safely. Under the plan, eligible employees who work without injury during the year receive a safety award whose equivalent value is between five and eight shares of Norfolk Southern Common Stock. Awards for the 2003 calendar year were payable in shares of Norfolk Southern Common Stock. SIP was amended effective Jan. 1, 2004, to provide for safety awards for calendar years beginning on or after Jan.1, 2004, to be made in the form of stock units payable in cash on the date of the award, so shares of Norfolk Southern Common Stock will no longer be awarded.

SIP is broadly-based and has not been approved by stockholders. Shares of Common Stock issued under its terms are not registered under the Securities Act of 1933, pursuant to a no-action letter issued by the Securities and Exchange Commission on November 20, 1992. Accordingly, SIP does not define a specific amount of authorized shares for issuance under the plan. The Board approved using up to 500,000 authorized but unissued shares for awards under the plan, and the number of shares remaining under this authorization are included in the number of securities available for future issuance for plans not approved by shareholders.

**Item 13. Certain Relationships and Related Transactions.**

In accordance with General Instruction G(3), information called for by Item 13, Part III, is incorporated herein by reference from the information appearing under the caption "Certain Relationships and Related Transactions" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 13, 2004, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 14. Principal Accountant Fees and Services.**

In accordance with General Instruction G(3), information called for by Item 14, Part III is incorporated herein by reference from the information appearing under the caption "Ratification of Appointment of Independent Public Accountants" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 13, 2004, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A.

## PART IV

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)**

**Item 15. Exhibits, Financial Statement Schedule and Reports on Form 8-K.**

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements


| | |
|---|---|
| Independent Auditors' Report | K41 |
| Independent Accountants' Report on Internal Control Over Financial Reporting | K42 |
| Consolidated Statements of Income, Years ended Dec. 31, 2003, 2002 and 2001 | K43 |
| Consolidated Balance Sheets As of Dec. 31, 2003 and 2002 | K44 |
| Consolidated Statements of Cash Flows, Years ended Dec. 31, 2003, 2002 and 2001 | K45 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended Dec. 31, 2003, 2002 and 2001 | K46 |
| Notes to Consolidated Financial Statements | K47 |


2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:


| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K88 |


Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated By reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended November 25, 2003, are filed herewith. |

4 Instruments Defining the Rights of Security Holders, Including Indentures:

(a) Indenture, dated as of January 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $750 million, incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595).

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation’s Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation’s Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of February 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on February 7, 2001.

(f) Fifth Supplemental Indenture, dated as of July 5, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $250 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on July 5, 2001.

(g) Rights Agreement, dated as of September 26, 2000, between Norfolk Southern Corporation and The Bank of New York, with exhibits thereto, is incorporated herein by reference to Exhibit 4 to Norfolk Southern Corporation's Form 8-K filed on September 26, 2000.

(h) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(i) Seventh Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $100 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(j) Amendment to Rights Agreement, dated as of November 26, 2002, between Norfolk Southern Corporation and The Bank of New York, with exhibits thereto, is incorporated by reference to Exhibit 4 to Norfolk Southern Corporation's Form 8-K filed on November 26, 2002.

In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation’s Form 10-K filed on February 24, 2003.

(b) Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(d) Operating Agreement, dated as of June 1, 1999, by and between Pennsylvania Lines LLC and Norfolk Southern Railway Company is incorporated herein by reference from Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(e) Amendment No. 1, dated as of September 29, 2001, to Operating Agreement, dated as of June 1, 1999, by and between Pennsylvania Lines LLC and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(e) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(f) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(g) Shared Assets Area Operating Agreement for South Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(h) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(i) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(j) Amendment No. 2, dated as January 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(k) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(l) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(m) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(n) The Supplementary Agreement, entered into as of January 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) - extending and amending a Lease, dated as of October 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(o) The Norfolk Southern Corporation Executive Management Incentive Plan, effective January 25, 2000, is incorporated by reference herein from Exhibit 10(1) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(p) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(q) The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(r) The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective January 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(s) The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective January 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(t) The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective January 1, 1994, as restated November 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

(u) Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as “named executive officers” and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders) is incorporated herein by reference from Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(v) Norfolk Southern Corporation Supplemental (formerly, Excess) Benefit Plan, effective as of August 22, 1999, is incorporated herein by reference from Exhibit 10(r) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(w) The Norfolk Southern Corporation Directors' Charitable Award Program, effective February 1, 1996, is incorporated herein by reference from Exhibit 10(v) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(x) The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(x) to Norfolk Southern Corporation’s Form 10-K filed on February 24, 2003.

(y) Agreement, dated as of October 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on November 9, 2001. The agreement was entered into with L. Ike Prillaman, Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, Vice Chairman and Chief Financial Officer.

(z) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation’s Form 10-K filed on February 24, 2003.

(aa) The Norfolk Southern Safety Incentive Plan for Operating Agreement Employees and For Non-Operating Agreement Employees, as amended effective January 1, 2004, is filed herewith.

(bb) The Norfolk Southern Corporation Restricted Stock Unit Plan, effective January 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(cc) The Norfolk Southern Corporation Executive Life Insurance Plan, as amended, effective October 1, 2003, is incorporated herein by reference to Exhibit 10 to Norfolk Southern Corporation's Form 10-Q filed on October 31, 2003.

12 Statement re: Computation of Ratio of Earnings to Fixed Charges.

21 Subsidiaries of the Registrant.

23 Consents of Experts -

(a) Consent of KPMG LLP.
(b) Consent of KPMG LLP and Ernst & Young LLP.

31 Rule 13a-14(a)/15d-14(a) Certifications.

32 Section 1350 Certifications.

99 Conrail Inc. 2003 Annual Report to Stockholders.

(B) Reports on Form 8-K.

A report on Form 8-K was filed December 23, 2003, advising of the Corporation's review of the Surface Transportation Board's decision in Carolina Power & Light Company v. Norfolk Southern Railway Company and attaching as an exhibit the related press release.

A report on Form 8-K was filed December 17, 2003, advising that the Corporation would record a pretax charge of approximately $80 million to its fourth-quarter earnings to recognize the impaired value of certain telecommunications assets and attaching as an exhibit the related press release.

A report on Form 8-K was filed December 1, 2003, advising of a series of senior-level executive and organizational changes following the completion of the Corporation's voluntary separation program for non-agreement employees and attaching as an exhibit the related press release.

A report on Form 8-K was filed November 24, 2003, advising that Norfolk Southern Railway Company would redeem on December 29, 2003, all publicly held shares of its $2.60 Cumulative Preferred Stock, Series A and attaching as an exhibit the related press release.

A report on Form 8-K was filed November 10, 2003, advising that the Corporation had reviewed the Surface Transportation Board's ruling in Duke Energy Corp. v. Norfolk Southern Railway Company and concluded that the impact of the decision on earnings could not be determined at the time and attaching as an exhibit the related press release.

A report on Form 8-K was filed November 6, 2003, advising of the Corporation's review of the Surface Transportation Board's ruling in Duke Energy Corp. v. Norfolk Southern Railway Company and attaching as an exhibit the related press release.

A report on Form 8-K was filed November 5, 2003, advising that the Corporation had expected to record a $107 million charge against fourth-quarter 2003 earnings related to the completion of its voluntary separation program for non-agreement employees and attaching as an exhibit the related press release.

A report on Form 8-K was filed October 29, 2003, advising of the Corporation's third-quarter 2003 results and attaching as an exhibit the related press release, which included the following financial statements for the Corporation and its subsidiaries: Consolidated Statements of Income (Unaudited) for the three months and nine months ended September 30, 2003 and 2002; Consolidated Balance Sheets (Unaudited) for September 30, 2003, and December 31, 2002; and Consolidated Statements of Cash Flows (Unaudited) for the nine months ended September 30, 2003 and 2002.

(C) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(D) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes Henry C. Wolf and James A. Hixon, or either of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints Henry C. Wolf and James A. Hixon, or either of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 12th day of February, 2004.

**NORFOLK SOUTHERN CORPORATION**

By: /s/ David R. Goode
(David R. Goode, Chairman,
President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 12th day of February, 2004, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ David R. Goode<br>(David R. Goode) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Henry C. Wolf<br>(Henry C. Wolf) | Vice Chairman and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |

| | |
|---|---|
| /s/ Alston D. Correll<br>(Alston D. Correll) | Director |
| /s/ Landon Hilliard<br>(Landon Hilliard) | Director |
| /s/ George D. Johnson, Jr.<br>(George D. Johnson, Jr.) | Director |
| /s/ Burton M. Joyce<br>(Burton M. Joyce) | Director |
| /s/ Steven F. Leer<br>(Steven F. Leer) | Director |
| /s/ Jane Margaret O'Brien<br>(Jane Margaret O'Brien) | Director |
| /s/ Harold W. Pote<br>(Harold W. Pote) | Director |
| /s/ J. Paul Reason<br>(J. Paul Reason) | Director |

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2001, 2002 and 2003**
**(In millions of dollars)**

| | Beginning Balance | Additions charged to: Expenses | Additions charged to: Other Accounts | Deductions | Ending Balance |
|---|---|---|---|---|---|
| ***Year ended December 31, 2001*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 12 | $ 6 | $ -- | $ -- | $ 18 |
| Casualty and other claims included in other liabilities | $ 262 | $ 110 | $ 20[1] | $ 127[2] | $ 265 |
| Current portion of casualty and other claims included in accounts payable | $ 223 | $ 22 | $ 142[1] | $ 195[3] | $ 192 |
| ***Year ended December 31, 2002*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 18 | $ 6 | $ -- | $ -- | $ 24 |
| Casualty and other claims included in other liabilities | $ 265 | $ 119 | $ 9[1] | $ 139[2] | $ 254 |
| Current portion of casualty and other claims included in accounts payable | $ 192 | $ 32 | $ 124[1] | $ 141[3] | $ 207 |
| ***Year ended December 31, 2003*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 24 | $ -- | $ -- | $ 2 | $ 22 |
| Casualty and other claims included in other liabilities | $ 254 | $ 134 | $ 6[1] | $ 124[3] | $ 270 |
| Current portion of casualty and other claims included in accounts payable | $ 207 | $ 34 | $ 125[1] | $ 148[4] | $ 218 |

[1]Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2]Reclassifications to/from other assets.

[3]Payments and reclassifications to/from accounts payable.

[4]Payments and reclassifications to/from other liabilities.

## EXHIBIT INDEX

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

| Electronic Submission Exhibit Number | Description |
|---|---|
| 3 (ii) | The Bylaws of Norfolk Southern Corporation, as amended November 25, 2003, are filed herewith. |
| 10 (aa) | The Norfolk Southern Safety Incentive Plan for Operating Agreement Employees and For Non-Operating Agreement Employees, as amended effective January 1, 2004, is filed herewith. |
| 12 | Statement re: Computation of Ratio of Earnings to Fixed Charges. |
| 21 | Subsidiaries of Norfolk Southern Corporation. |
| 23 | Consents of Experts -<br>(a) Consent of KPMG LLP.<br>(b) Consent of KPMG LLP and Ernst & Young LLP. |
| 31 | Rule 13a-14(a)/15d-14(a) Certifications. |
| 32 | Section 1350 Certifications. |
| 99 | Conrail, Inc. 2003 Annual Report to Stockholders. |

Exhibits 23(a), 23(b), 31 and 32 are included; remaining exhibits are not included in copies assembled for public dissemination. These exhibits are included in the 2003 Form 10-K posted on our website at www.nscorp.com under “Investors” and “SEC Filings” or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

# EXHIBIT PX0559

2/4/04 Fin. Disclosure Wire 13:52:27

FD Wire
Copyright 2004 CCBN, Inc. and FDCH e-Media, Inc.

February 4, 2004

Q4 2003UnionPacific Earnings Conference Call - Final

RICHARD DAVIDSON, PRESIDENT & CHIEF EXECUTIVE OFFICER, UNION PACIFIC: Good morning and thank you, brave souls, for joining us this morning for our fourth quarter earning's release. With me this morning are some very familiar faces: Ike Evans our President and Jim Young, our CFO. Jim will discuss the financial performance and Ike can give you some perspective on what to expect in the railroad this year. We will also ask Dennis Duffy, the head of our operations and Jack Koraleski, our Chief Marketing Officer to help fill out the story this morning.

As we close out 2003 we are starting a new chapter in the U. P. history books becoming a pure railroad once again and that was made possible through the IPO of our trucking company, Overnight. Last year the pick up in the LTL fundamentals and the Decertification of the Teamsters Union at Overnight all combined to produce a very successful transaction for us.

Leo Suggs and his management team are now running a great stand-alone company in Richmond, Virginia, and we wish them all the luck in the world. The combination of the IPO and earnings from the continued railroad operations resulted in total earnings per share of $2.12 in the fourth quarter of '03 versus $1.41 a year ago.

Now you will see from the slide there are several different elements that make up those numbers and Jim is going to go through the details with you. I would like to focus on the two bars on the right-hand side of the slide and that is that the railroad saw 5% growth in operating income during the quarter from $562 million in '02 to $589 million in '03. We are encouraged by this gain as the fourth quarter was the only quarter with really meaningful growth during the year. We know that both external and internal factors prevented us from an even better performance.

Internally we were working out manpower and resource shortfalls that resulted from the conservative labor assumptions we made going into '03. We estimate that this issue reduced operating income by something like $30 million in the quarter through a combination of operating inefficiencies and lost revenue opportunities, primarily with grain and intermodal shipments. Externally high fuel costs continued to pressure the bottom line adding about $28 million to expense for the fourth quarter.

Despite the challenges, we still reported a record revenue performance with nearly 5% growth for the quarter. Obviously one factor that contributed to this growth was last year's ILWU court disruption which you may remember took place on the West Coast. But even taking Intermodal out of the equation we would still have seen 4% growth in commodity revenue.

In fact, all six business teams had revenue growth for the quarter something we have not seen since 1999. We think this is a good sign that the economy is improving and Union Pacific is well-positioned to benefit from that improvement.

Much like the fourth quarter there are a number of factors that need to be considered when comparing the full year over year results. Now I will let Jim do the heavy lifting here in terms of the financial detail, but unfortunately we did see a decline in EPS from continuing operations between 2002 and 2003. That decrease is due, in part, to fewer real estate sales an couple of tax adjustments that we enjoyed in '02. Of course, the other major obstacle was fuel price

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

PENGAD 800-631-6989
DEPOSITION EXHIBIT
1
8-4-10 LT

which added $255 million in expense to '03.

As the year progressed we did a better job with our fuel surcharges but we've still got room for improvement there and we would certainly prefer to have the lower fuel prices rather than depend on the surcharges.

I'll return at the end of the presentation to wrap things up with some closing comments but at this point let me turn it over to Jim for a review of the financials. Jim?

JAMES YOUNG, CHIEF FINANCIAL OFFICER, UNION PACIFIC: Thanks, Dick, and good morning everyone. Before we get started I wanted to make certain you refer to the cautionary statement at the end of the press release. Understand that the statement applies to any forward-looking comments that we make here today. So please read it and understand it.

During my presentation I'll be referring to both the press release, financial statements, and slides so you may want to have both available for reference. I'd like to start with the slide that takes you through the fourth quarter EPS. Dick gave you the numbers but I'll break it down a little more.

One item we'll be referencing throughout this year is income from discontinued operations, our sale of Overnight. On the table outside the room and on our website we have amended the 10(K) and 10(Q)s that have restated Overnight as discontinued operations, so you can use that to kind of adjust your models.

So starting with the fourth quarter comparison we need to take Overnight out of the earnings for both years. Three cents per share in 2002 and 84 cents this year. The 84 cents per share this year is made up of Overnight's October earnings of 3 cents and the gain from the sale of overnight on October 31 of 81 cents. Our EPS from continuing operations was $1.28. That's down about 7% to the $1.38 we reported a year ago.

You'll remember that the fourth quarter last year included a large real estate sale to Bella Transit Authority and large tax adjustment. If you take the variability out of both years and you look at taxes and real estate and focus on year over year performance, the real measure in fourth quarter is the 5% increase in operating income which was the first time we had seen any meaningful strength all quarter.

Turning back to page one of the financials of the consolidated income statement we had 5% growth in our operating revenue during the quarter which we converted into a 5% improvement in operating income. If you refer to the slide here other income totaled $46 million. That's up a little bit from the prior quarters but down $62 million from a year ago, the driver being the Bella ETA sale that totaled $73 million a year ago.

I had mentioned in our third quarter call that we thought we had some potential for upside here and we did have some real estate deals close late in the year. Also included in that number we had a charge of $15 million for the redemption of the final $500 million traunch of the $1.5 billion tides. On the full year basis other income is down almost $250 million from year ago; in addition to the V. T. A. sale we had the Utah transitory sale. That was about $141 million. Together they added $214 million to last year's income.

On the flip side for the full year in 2003 we had $45 million in additional costs for the full tides redemption. Looking out to 2004 other income will probably come in somewhere between 50 and $100 million for the full year. It's obviously volatile and the real estate market is looking a little bit weaker at this point.

Turning back to page one of the financials, interest expense is down $20 million, or 13%. It's due to the redemption of the tides, lower debt levels, and favorable interest rates. Our fourth quarter average debt was $8 billion compared to $9.2 billion a year ago. Our tax expense was up about $20 million from year ago on a lower tax base.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

You'll remember that last year we had a take settlement which gave us roughly a 29% effective tax rate in last year's quarter. This year's effective tax rate came in a little lower than originally projected at 33.6%. That's primarily due to lower state taxes during 2003. I've already talked about Overnight and income from discontinued operations. I should point out that the change in fully diluted share count is down almost 18 million shares from a year ago. That's due to the full redemption of tides.

Looking at page two of the financials, reporting our full year results, operating revenue's up 4%. Unfortunately, though, fuel costs were up $255 million for higher prices. Operating expenses up 6% resulting in a 5% decline on our operating income. We already talked about other income.

Interest expense for the year came in at $574 million. It's down $15 million from a year ago. Interestingly if you go back to 2000 we paid almost $723 million in interest expense. So the last three years we cut the interest cost by $150 million.

Full year effective tax rate came in at 35.5, that's about a half a point higher than last year. The accounting change, remember that in the first quarter we recorded the changes associated with FAS 143 that added $274 million after tax and for the full year recorded the 604 compared to then 505 a year ago.

Page three summarizes the railroad's revenue performance. Jack is going to be talking to you about the details. As Dick pointed out we really had a relatively good year where we had all six business groups for the quarter were up and also fourth year.

Slide three in your package; we have a break down of fourth quarter average revenue per car. We've broken it down among the three components which is fuel surcharge, pure price and then mix. In fourth quarter mix reduced our total average revenue per car roughly $3. In part that's the effect of the 9% increase in Intermodal volume. The fuel surcharge revenue added about $11 per car. Remember this includes both the surcharge program and RCF, the contract [indiscernible]. I'll do the math for you but you'll see here we had a pretty good recovery. We recovered about 80% are of our fuel costs in the fourth quarter. Don't put that in next year. A big part of that is timing and the way these contracts work.

I'll talk in a minute about our outlook for fuel recovery for next year. Pure price came in about $10 per car about 1% which is consistent with what we have been saying here for the last several years.

Page four of the financials gives the break down of the railroad operations. One item to mention on revenue although our commodity revenue was up 6%, total operating revenue was up 5%. Our other revenue line was down about $12 million. A little bit lower switching revenue; a little bit less in our subsidiary revenues. That trend I think is more exception for fourth quarter. We should see our results flat to slightly up when we look to next year for other revenue. On the expense side we've got 5% growth in total expenses. Fuel obviously is a big piece as Dick mentioned. We also incurred some costs as a result of our service issues.

If you refer to the slide, salary and benefits were up 5% for the quarter. What I've tried to do here is give you an apples to apples comparison here. If you take a little closer look at the slide, 2% of the increase is attributed to the accounting change; FAS 143, on an apples to apples comparison our labor costs were up 3% for the quarter. You will also note during the quarter we saw a 5% increase in gross ton miles. Our average employee count was down 1%. That drove some good productivity for the quarter.

Unfortunately our labor costs were inflated about ten to $15 million from reduced velocity although a year ago you may recall we had some higher costs from severance and other compensation that more than offset this increase.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Looking at 2004, our employee count is really going to be dependent upon business volumes. We will continue to reduce positions through technology, process improvements, but as we've said our overall ranks could grow, particularly when it comes to train crews if the business demand is there. Our unit cost, though, will continue to decrease on a year over year basis.

Another item that will add some one time cost to this expense category in 2004 is the closing of our St. Louis office. In May of this year we will begin moving roughly 1,000 employees from our St. Louis offices to Omaha and into our new headquarter's building.

In total we'll add about 40 to $50 million to operating expenses for severance and relocation costs that will probably hit the second or third quarter during the move. This will not have, though, an impact on our EPS. In fact our EPS for the year should be flat because---should offset the cost of the relocation because of state tax benefits and improved efficiencies.

Back to the financials: ?Our rent expense is up $4 million in the quarter, primarily reflects Intermodal volumes. Depreciation down around $17 million. That's a function of both the accounting change we implemented back in the first quarter and as you'll recall the second quarter last year we had a new depreciation [inaudible] we still need to cycle here.

Looking out to 2004 our depreciation cost should be up about 5% for the year. Fuel and utilities up $41 million. Our average price per gallon in the fourth quarter came in at 89 cents versus 81 cents a year ago. That added $20 million to our fuel prices.

On a full year basis we paid an average of 19 cents more per gallon. We came in at 92 cents per gallon for full year compared to 73 cents the prior year. That's the highest price we've paid in the company for fuel in 20 years. We added $255 million to our expenses.

One positive, if there are any related to higher fuel costs, of our new fuel surcharge program. As fuel prices stay high in 2003 we became much more aggressive in our search of fuel as you are charges and implemented a broad-based program in June. As a result we recovered about 45% of the increase in fuel prices for 2003.

When you look to this year, 2004, the current outlook is very volatile. For the first first quarter we can very well match last year's quarterly average of 1 dollar per gallon. During the first couple weeks of January we paid around $1.10.

We will continue our efforts to reduce earning's volatility through our various fuel recovery mechanisms. We expect improved recovery in 2004 with a good chance of exceeding the, exceeding 50% for the year. For 2004 we've got about 9% of our consumption covered by costs [inaudible] with entry point of around 90 cents.

Moving back to page four of the financials, material supplies down about $3 million. That's consistent with what we've seen all year. Part of that is offset in other purchase services. On the purchase services and other line item we are up $38 million.

To start off with and again if you look at the slide, down about $3 million from FAS 143. From there we have several items that contributed to increase many of which are volume related. Contract services were up $12 million. That's locomotive and freight car maintenance programs primarily due to volume. Intermodal volume costs were up 10 million. Again very strong Intermodal this year. Things like ramp operations costs. Although part of our velocity slow down did hit this line item here: limo lodging up about $5 million volume and the joint facilities around $4 million which is timing.

If you look at this category our velocity fell off here fourth quarter added around $3 million to this line item. Looking

ahead to 2004 if volumes continue strong and with relocation of our employees from St. Louis this line item could be up around four to 5% for the year. Relocation costs will account for about a third of the increase with higher locomotive maintenance, Intermodal volumes and higher state and local taxes making up the balance. Most of the increase will be front end loaded with our first quarter up around 10%.

The larger first quarter increase reflects getting a jump start in our locomotive program with anticipation of increasing volumes through the year and the timing of joint facility costs. The way to look at this in a full year we are looking four to 5 percent, first quarter around two. You can look at the math that says the rest of the year you can looking for around a two to 3% kind of increase.

Page four of the financials here, the operating statistics are at the bottom of the page. We already touched on several of the measures. [Force] count is down about 10%. Our operating revenue flat even with reduced loss in higher energy costs.

Page five of the financials--our year end balance sheet---a couple observations. Feel pretty good about how things look at year end totally remove the tides from the books $1.5 billion, our all in debt to cap ratio which includes the [indiscernible] is under 45%. By the way that's now better than where we were when we started with the C. and W. merger so we made some progress there. We also ended the year with $527 million of cash on the books.

Page six is the statement of cash flows. First thing to note here is that we restated 2002 cash flow to show Overnight, the gain on the sale of Overnight is shown as discontinued operations. Again, our cash for, cash from operations is up about 10% for the year, $2.2 billion compared to two four.

You will also note that there is big change in the other line item on the cash flow statement under the, cash from operations, primarily attributed to last year's large real estate deals. What happens, we take them out of income, shift them down into asset sales and also you remember we made a pretty substantial [inaudible] to pension last year. Slide eight shows you our free cash flow after dividends. We came in at $524 million.

We had given you guidance of four to $600 million all year so we came in on a little bit higher side. You should note that the $524 million does not include the $620 million we received from the Overnight deal. So we generated over $1.1 million in free cash. Other than debt we did use cash to make $100 million contribution to the railroad pension fund during the year.

As I've said here we look to the future here; I think you need to count on 50 to $75 million of cash put for pensions going forward. Our total cash capital during 2003 came in at 1.75 billion. You need to add about $188 million of capital leases that you will note down at the bottom that brings our capital down to about 1.9 [inaudible]. That concludes our financial discussion. I will turn it over to Ike .

IVOR EVANS, CHIEF OPERATING OFFICER, UNION PACIFIC: Thanks, Jim, and good morning. As Dick mentioned we've asked Dennis and Jack to participate in our call this morning to provide more details about the fourth quarter and give you their outlook.

Before they do that I'd like to take a few moments to look at our company's performance over the last several years. Since 2000 we've grown our revenues at a 3% compounded annual growth rate. We've increased productivity. In fact for the first time in our history we moved over 1 trillion gross ton miles during 2003, up almost 5% from last year's record.

Our customer satisfaction index has risen from 75 to 78. It could have been much stronger this year with a better second half. We've accomplished this with our economy pretty flat the last couple of years. How have we done this? A consistent approach to our yield strategy and quality. Yield means different things to different people.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

At Union Pacific it means leveraging our assets to produce profitable top line growth. It's partnering with our customers to design and deliver transportation products that make them more competitive. It's penetrating new markets to innovative service offerings to compete with or even complement truck services. It's providing value pricing that reflects a premium for the quality service offered and it's performing all of these services in a cost efficient and productive matter. Importantly we are doing this at the backdrop of the best rail franchise in America. And as you'll hear in a few moments, this combination positions us for continued success in 2004.

Looking forward the environment is favorable for Union Pacific and for rails in general. Current economic expectations for this year is opportunity for significant growth. The key driver of that revenue growth is truckload conversions.

Last year we converted roughly 225,000 truckloads in the Union Pacific car loads. This business came from auto parts, cheese, wine, rock, lumber, just to name a few. So it's not as straightforward as going out and signing a big contract to someone like GM or [inaudible]. It means putting feet on the street. We've had great success introducing new products and services.

We are not stopping there. For 2004 our research has identified a $500 million market for [inaudible] manifest customers. Many of them used to ship on rail.

We created a business development team to bring that business to the railroad by offering a variety of transportation options, [inaudible] tracks Intermodal service and transloads indoors for old and new customers. Another potential conversion opportunity comes from the trucking industries new hours of service regulations.

While it's too soon to understand the impact we do know that rail transportation is more economical than truck. Truck capacity is already constrained due to driver shortages and increasing cost. Highway congestion and environmental concerns favor rail transportation. We are leveraging it's possible that these new rules can strengthen our position.

On a year over year basis our customer satisfaction measure was flat and our service delivery index fell off a little. Neither is acceptable. Our goal continues, measurable improvement that is evidence to our customers. Our cost of quality measure suffered as well.

Although we saw an overall improvement it was impacted by the same factors that challenged our customer satisfaction results. We are committed to strong improvement this year. Dennis is going to share with you some of the initiatives directed at improving our quality of service.

This year with greater optimism in the economy we are committed to maintaining an adequate supply of each of our five critical resources. We have processes in place to insure that continues. You heard us talk before about our locomotive freightcar strategies--upgrading our fleets to handle, we also shared our plans to maintain a quality infrastructure that supports our growth initiatives.

At our analyst meeting in St. Louis we talked to you about our aging work force. When we look to the future the combination of attrition and business growth could require annual hiring of around 3,000 employees. Even offsetting some of this with productivity, productivity this represents a major challenge to attract and retain quality people.

As a part of that critical resource---people--our employee strategy to make sure we have the right people in the right place at the right time. The right people means maintaining a pool of quality job applicants for every position. To do this we are using innovative marketing materials to improve [inaudible]. We are developing partnerships with local agency to finds better candidates faster at lower cost per [inaudible]. We are using the process [inaudible] already working for the company [inaudible]. The right time means reducing cycle times for both hiring and training.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On the hiring front we reduced cycle time by 25% through an automated hiring process and our revamped hiring schedule that insures a steady supply of candidates. From a training perspective we accelerated transition of classroom to the field through [inaudible] training. Finally the right placement is developing an accurate manpower planning model.

This fall we fine tuned our quality process used to determine our [inaudible] based on historical attrition rates, business demands, and productivity level. We believe these are the right steps towards insuring that Union Pacific maintains a high quality work force [inaudible].

In fact we were recently recognized by Work Force Management Magazine as the winner of their [inaudible] for efforts to standardize and streamline our hiring process. Our challenge though is to continually improve our processes to be prepared for tomorrow's changing demands.

Before we adapt to the yield strategy in 1999 we did an evaluation of the market and assessment of its potential. We concluded then and what we continue to believe today that our franchise has the ability to grow profitably.

We also believe that we will continue to improve productivity and quality across all areas of our company. The success of our company ultimately be measured by the strength of our financials but that's really one piece of it.

A strong and growing Union Pacific will help our customers fulfill their transportation needs. Our dynamic company can be exciting challenging work place and rewards it's employees for a job well done. Union Pacific is that company. Our time is now. Dennis?

DENNIS DUFFY, EXECUTIVE VICE PRESIDENT - OPERATIONS, UNION PACIFIC: Thank you, Ike, and good morning. I'd like to start today with a quick review of some operating metrics. At the analyst meeting in St. Louis we discussed the various factors such as cruise, capital maintenance and R.C. L--remote control locomotive--that were impacting our operations. As the slide illustrates we continued to be challenged in October and November as we moved the record volumes across our system.

But as our action plans relative to crews and locomotives take hold we are seeing improvements, and our momentum is building as we move further away from the holiday shutdowns. The January numbers show and represent our forecast including the impact of the holidays.

Our latest seven-day average train speed is running at just under 18 miles per hour and our system dwell is about 27 hours. The seven-day recrew rate is under five percent, all positive indicators. The plan is to extend these trends and improve our metrics consistently over subsequent quarters; by providing improved service we will not only increase customer satisfaction but drive out millions of dollars of failure costs that Dick talked about.

Let me describe some of the initiatives underway to insure the continuous improvement. As Ike explained we are taking several aggressive steps to eliminate future risk in the work force. In addition to the planning, hiring and training initiatives he mentioned we are also looking at ways to productively leverage the work force. Let me give you just a few examples. We are currently using remote control locomotives at 50 of our terminals, serving 2700 customers and saving about 680 engineer positions. By the end of 2004 we will nearly complete our roll-out saving another 600 plus jobs.

Our initiatives are reducing nonproduct true starts, including recrews and dead heads through better application of quality principles and maintaining a better balance across our network. And we are working on innovative labor agreements to enhance weekends and holiday protection, improve the availability and utilization of the labor pool, and to address specific customer requirements with customized service.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In addition to employees, locomotives are another of our critical resources that you saw. Through our strategy of fleet modernization and standardization we've seen great results.

Since 2000 the critical reliability measure---average miles between failure event---has improved by a third. During this time we also reduced the horsepower required to get the work done by 7%.

Looking ahead as we increase very well lost locomotive productivity and availability will continue to improve. One mile per hour in system train speed generates 200 to 250 locomotives, and we are applying lean principles in locomotive dwell management to create demand pull at our major terminals and to eliminate bottlenecks in the servicing process and let me give you just my layman's definition of lean. It means removing constraints to balance the workflow and increase the through productivity with fewer resources.

Finally our on board technology will continue to improve our predictive maintenance capabilities, helping avoiding up productivity shop time, expensive overhauls and over the road failures. Our physical plant continues to benefit from a robust capital program.

During 2003 we installed 4.6 million ties and we're planning a similar program this year. These improvements drive down speed restrictions or temporary slow orders, improve overall velocity, and drive service reliability.

Through improved maintenance planning we are also reducing unit labor costs while at the same time minimizing the disruption to train operations by conducting multiple work events simultaneously.

We are also using better materials and technology that lowers the overall stress state of our infrastructure. This equates the longer asset life, less wear and tear with increasing tonnage and fewer maintenance interventions, a critical factor as volume continues to increase.

These are just a few of the reasons that we are able to haul that trillion tons of gross ton miles that Ike talked about earlier and we continue to identify projected bottleneck areas for capacity improvements; thereby insuring that Union Pacific is ready to handle tomorrow's freight demands.

In 2004 we are adding main line capacity in three key areas where our growth opportunities are the greatest. In the central corridor, our main west east route we are focusing on former C. and W. territory across to Iowa that has an antiquated signal and control system.

This is a gateway for Eastern Coal, Industrial Products, and our growing Intermodal business. On the southern tier the focus is on the former SP sunset route west of El Paso which is currently one-third double track.

The plan is to take this up to nearly 60% percent double track over the next three years. This route also feeds key markets to the Chicago, Memphis, Houston and New Orleans. The final corridor is the Chicago, Texas, Mexico route, where we will focus on upgrading single track segments in Illinois and Missouri, to facilitate growth in autos, auto parts and Intermodal.

The strategy employed here is a well coordinated pay as you go approach that addresses the bottlenecks in order of greatest pay off. The 4th key area is safety and security. We had a solid year in 2003. The key metric in employee safety is personal injuries. We had our best year ever in the history of U.P. It was a 19% improvement from the year before.

We measure customer safety improvements in the form of service interruptions caused derailments. Last year we had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

10% fewer incidents and saved $25 million in failure costs. Public safety is primarily grade crossing accidents where we again made a solid 9% reduction in 2003 and continue an overall five-year improvement trend.

Looking ahead we will continue to improve employee safety through better education and training, expanded use of the Web and simulator trading are just two of our key initiatives.

At U. P. we feel strongly that a healthy employee is a safer employee. Smoking cessation, weight management and exercise programs with more than 500 system-wide sponsored health facilities are principal ways we will promote work place wellness in '04.

On the customer side of derailment prevention we are leveraging acoustics and laser technology to detect potential failures in passing trains before they occur and we also reinforced a very focused security strategy aimed at minimizing risk to our rail operations.

Since 911 tighter security has become a standard part of our daily operation. Among several actions, we've restricted access to our yards, shops and other critical facilities using systems and technologies including biometrics, and we've created a redundant back up for all of our dispatching operations, crew calling and other vital systems. If a disruption does occur we can recover in a very short time. The fifth component of our 2004 operating strategy is improving organizational effectiveness which we define as doing the right things the right way the first time.

Applying the six-step problem solving process in every improvement productivity initiative, allowing managers to spend more time in the field through our 8020 initial that I mentioned in St. Louis in November. We are reducing office bureaucracy and mobilizing our managers through the use of computers and wireless communications. Leveraging Six Sigma to reduce the failure cost. We have completed more than, the 65 projects and we are working on several more aimed at process improvement productivity.

And finally applying the lean manufacturing concepts I referred to earlier to select areas in our operation specifically Intermodal ramps and locomotive servicing. We think this offers great promise in reducing inefficiencies and improving throughput.

As Ike said earlier we are not satisfied with our performance last year but we are committed to do improve both the equal of our operations and the reliability of our service in 2004. Our operating plan is driven by the marketing goals that Jack is going to discuss and we are optimistic about the future and improving economy. We plan on being ready to leverage that growth into profitable business. Thank you. Jack?

JOHN KORALESKI, EXECUTIVE VICE PRESIDENT - MARKETING, UNION PACIFIC: Thanks Dennis, and good morning. Good to be here this morning but I have to tell you it's even better to be finally looking at an economy that looks like it's coming back to life for us.

Our fourth quarter revenues would suggest that we really reached a turning point and I will spend a couple minutes and take you through those results, talk about what were the key drivers from each of our six businesses, and give you some insight on how we see 2004 shaping up. In the fourth quarter our carloading strengthened as the overall economy heated up.

You'll recall in the third quarter our [inaudible] were basically flat and that's pretty much the story that we saw for the first three quarters of 2003. You can see that on the yellow bars on this chart. The blue bar shows what happens to the fourth quarter. It represented a real demarcation for us in terms of our overall loadings. They were up 4%.

The chart shows that our largest growth was in Intermodal and we did see Intermodal business pick up in the fourth quarter, even when you consider, though, that that 9% includes the year over year impact of the ILWU lock up.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The real good news story for us is in the industrial products business. Industrial products loadings were strong in nearly everyone of those groups---stone, sand, lumber, gravel, paper, steel, the whole shooting match.

And we are really happy to say that as we have made the transition from 2003 to 2004 that demand seems to be hanging right in there with us so we are feeling pretty good about that.

The other piece of good news is it wasn't just our volume that was up. This slides shows you that same fourth quarter loadings growth but I've also added now the fourth quarter revenue comparisons and you can see, people ask us all the time, how is your yield strategy, is it holding up? And I think this really answers the question better than anything we could say.

Revenue grew 6% on a 4% increase in loadings. It's reflecting our focus on price improvement, our ability to implement the new fuel surcharge, but it's also our new product strategy and the fact that each and every one of those products is able to command a better price in the marketplace because of the performance and service quality that's gone into the planning process.

Fourth quarter we had full year, fourth quarter and full year 2003 had a number of records for us. First of all we set new full year records both in carloadings. We passed 9.2 million, and also commodity revenue at just over $11 billion. We also set revenue records in five of our six businesses. You can see them listed there, energy, Intermodal, auto, industrial products and AG products.

Again in terms of our success of our yield strategy we were able to capture about two-point a price half of that coming from the fuel surcharge and half of that coming from net price increase. That was in an economy that was pretty soft for the first three quarters of the year.

Let me take you through each one of the six businesses and give you some of the feel behind what drove 2003 performance and also what we are looking for in 2004. In AG products we saw strong grain export that was driven by our alliance work with the Canadian Pacific in moving grain over East Port to the Pacific northwest but it was also strong wheat movements to the Gulf ports. We experienced significant increase in volumes to and from Mexico, a push for import beer. We had an aggressive grain export to Mexico and strong shipments of [inaudible], rice, and in addition this year's sugar beet program for us was really huge. It was about 50% larger that we had seen in 2002.

Looking ahead to 2004 we see ethanol as being a big player for us with nearly 30% growth as we work to be able to bring western, West Coast opportunities to light as well as working in conjunction with both C. FX and [inaudible] on East Coast opportunity.

Our bread and butter grain business is our domestic franchise and it's shaping up good for 2004 with long haul movements for feed grains to Texas, California and Arizona. Export demand that continues to show some signs of strength for us with a focus on wheat to the Pacific northwest and also feed grains to Mexico.

Last not least with our rehab and new refrigerated boxcar fleet we are going to add a couple new origins and destinations, and we are looking for a good strong, healthy year for our express lane product. Our automotive volumes were impacted by slow vehicle sales for most of the manufacturers and that kind of continued the trends we had seen for the last couple of quarters. Our share gains with both Nissan and General Motors helped us to offset some of that market sluggishness.

In the year ahead the question is how soon account auto manufacturers between us from incentives and really start to gear up in terms of both sales and production and since we are the largest rail transportation supplier their estimate right now of vehicle growth, vehicle sales being up one to 2%--that should be a big part of our automotive growth next

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

year. But on the other side of our business which is the parts business, we are going to stay absolutely focused on growing our parts business.

We are going to continue to work with manufacturers to develop transportation solutions that will allow them to cut costs and take advantage of our automotive network and that's the whole story behind our highway conversion, to take that business off the highway, save money for our customers, and deliver efficiently and effectively [inaudible].

Our chemical business had its strongest quarter of the year despite the high natural gas prices that had significantly reduced the chemical industries's production rates. Looking forward we are anticipating moderate growth based on an improving economy and stronger industrial production. We are going to continue to focus on the expansion of our pipeline services. We will add some new origins with transflow. And we are also going to be focused on value-added services to achieve an above market growth rate in our chemical bills.

It's important to note, too , that if the continued high feedstock prices exist we stands ready to help our customers which we showed you in St. Louis with [inaudible] to help them redesign their transportation to an import network rather than domestic production, and we are making some good inroads there, and that should help us in 2004 as well.

With respect to our largest segment of business, our energy business, 2003 was the best year ever for our energy group. It was a record-setting year for Powder River Basin and it tied the record that we set for Colorado Utah production in 2001. Demand was strong throughout the second half. It looks like it's going to be strongest especially for Colorado and Utah [inaudible].

Powder River Basin looks to be essentially flat for us this year. We'll have growth from existing customers in the new Omaha public power district contract and that will offset the volume losses from [inaudible] and also from Georgia power and we are going to continue to progressively pursue the development of eastern coal opportunities for western coal with our partners. Industrial products as I mentioned earlier was strong across the board. Housing starts and low interest rates continued to drive lumber volumes.

The improving economy drove industrial production higher and with it the demand for steel, scrap steel, and also paper board. Stone and cement business was strong, favorable weather conditions, strong demands for construction in Texas. In fact in the fourth quarter we set a record in each month of the fourth quarter for rock loadings.

Looking ahead, right now the economic outlook is favorable. Industrial production looks favorable and that's going to drive a favorable outlook for each and every one of these commodities in our industrial product business.

We are going to continue our focus on taking trucks off the highway particularly for lumber paper product and those things going from the Pacific Northwest to California, Arizona, and Nevada, and we are also expecting to see another good year in [inaudible]. Last but not least is Intermodal and while the year over year comparison is skewed somewhat by the 2002 ILWU lock out it's also important to point out that as an overall volume level we set a new record for fourth quarter loadings in our Intermodal business.

We saw strong international and domestic growth. Our UPS business was up dramatically. It was driven by the new LA to Chicago and Little Ferry business that started mid year as well as the LA to Dallas, LA to Memphis, both of which began in September. Our truckload business grew 22%.

So at the end of the year we were able to offset the loss of the [inaudible] and mid shipping business and we were able to offset it with higher margin business to boot so we feel good about that.

In the year ahead we are expecting the growth in imports and even stronger economy to help us on the domestic volumes as well. We are hoping that the new hours of service regulations for trucks will also give our domestic

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

business a boost. Now that we have our full crew base and our service improvement is back on track again well be expanding some of our Blue Streak products to help step up the velocity of our conversion to highway track.

So you put it all together here's what 2004 looks like for us. We expect that overall we are going to see market growth this year of about two to 3%. We talked before about our target is to be able to net at least one point of pure price. We don't see any reason why we won't be able to do that in 2004. And when you net out the loss of Georgia power and [dinagee], we think our penetration or share gain this year is going to come in the one to 2% as primarily coming off the highways. When you add it all up we are looking for growth somewhere in the 4 to 6% range.

We talked before about the power and the diversity of the Union Pacific franchise and it served us as well during those last several years of economic sluggishness and we are pretty excited about the prospect of seeing what we can do in a robust economy.

With that I am going to turn it balk to the Chairman.

RICHARD DAVIDSON: Thank you, Jack, listen to you talk got me excited and reminds me of what a great company we have and the wonderful potential we have. Before I talk about the future I would just like to quickly recap some of the highlights of '03.

Despite the head winds of higher energy prices in a very sluggish first half we had success in a number of areas. We recorded our best ever rail revenue with nearly 4% growth in total in each of the six commodity groups posted yearly gains for the first time since 1999.

We partnered with the CSX to deliver a 60 hour transcontinental service with United Parcel Service which was truly a breakthrough offering. We received over $600 million from the successful sale of Overnight and, in addition, unlocked some cash tax benefits for future years as a result of this transaction. We strengthened our balance sheet in part by retiring a full 1.5 billion of convertible preferred securities issued in 1998.

As Jim mentioned we handed 2003 with an all end debt to cap ratio of [44.8%] the lowest level that we have seen since prior to the two mergers in the mid 90s when we merged with Chicago, Northwestern and southern Pacific. We increased our return to shareholders by raising the quarterly dividend by 30% from 23 to 30 cents a quarter, and that followed the increase in '02 of 15% for a total increase of about 50% over the last two years. And we still ended the year with over 500 million of cash after dividends.

So all in all 2003 was a very good year. But it was also a year that could have been and should have been even better than it was.

Now looking at the year ahead I see a great deal of potential but also some challenges that we have to deal with. The biggest challenge continues to be high energy prices. At today's high levels, earnings could see pressure again in '04.

High prices are a tax on everybody in America and could hamper the economic growth that we are seeing. And it's particularly difficult for our chemical customers as natural gas is their primary feedstock. Now that's it.

I think most people agree that the economy picked up in the last part of '03 and is continuing to show signs of strength as we go into '04. As Ike mentioned that's certainly a positive and that's our responsibility to translate that positive outlook into increased car loadings and increased profits.

One way to achieve that is to improve the reliability of our service and reduce our quality failures. The cost of not doing things right the first time impacts our customer satisfaction, our business growth and obviously the bottom line.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

We must and we will learn from the mistakes of the past to eliminate those errors and drive quality throughout our organization.

You heard Dennis mention a few of his 2004 capital projects a moment ago. Those projects are part of our ongoing efforts to maintain a first rate infrastructure and take advantage of the growth opportunities that are there for us.

Capital spending totaled just under $2 billion in 2003 and while the board hasn't yet looked at or approved our 2004 budget, capital spending this year should again be around $2 billion give or take a little bit. Capex goes hand and hand with our continued focus on improved cash flow.

As we said before we will balance the uses of cash between our capital needs, our continued balance sheet improvement and improving our returns for our shareholders. We are targeting 2004 free cash flow after dividends of over $500 million once again. Now that's significant given the loss of the ongoing cash flow from Overnight as well as the $75 million increase in the dividends that we declared last year.

As for our EPS outlook, the crystal ball continues to be a bit cloudy. We are more optimistic about the overall business outlook than we have been for quite sometime, obviously, however as we have said fuel prices continue to be a real cloud for us, and we are still not certain that the economic rebound is sustainable.

We are confident that we should achieve double-digit EPS growing from continuing operations. Just how far we will get into the double digits will depend upon what happens with fuel price and the economy as we move forward in the year. So we will keep you updated from quarter to quarter on our progress and see how the year unfolds.

Looking at the first quarter, we definitely see some upside from a year ago. We are seeing stronger demands, particularly in AG product, industrial products, and Intermodal; if that continues we look for revenue growth in the four to 6% range. Unfortunately our current fuel prices are above last year's first quarter average of 1 dollar. Now that clearly could be a head wind for us if they stay at these high levels.

Our crude recovery mechanism would somewhat mitigate that where we were from a years ago. You remember we really improved the process in mid year-- last year. We will also see some higher training costs in the first quarter as we work to move our new train members out of the classroom and into the field.

On a year over year basis 2004 will not be affected by FAS 143 and we won't have the three cents per share contribution from Overnight. So given all of those factors we'd look for 30 to 40% EPS growth over of the 57 cents that we reported from continuing operations in 2003.

With that I will close by saying that 2004 looks to be a promising year for our company. Through our yield strategy we will leverage the improving economy into profitable growth opportunities for Union Pacific. And as a result of that we will reward the three stakeholder groups that we have continued to focus on in recent years.

So with that we'd be happy to take a few moments to answer any questions that you might like to pose. Question & Answer Jennifer?

JENNIFER: Could you talk about pension expense, maybe the Delta and pension expense that hit your income statement from '02 to '03 and what you expect the Delta would be from '03 to '04?

JAMES YOUNG: Overall I am trying to think of numbers here. I think we are up around $20 million or so [inaudible] we did lower the return assumption 8%. In '04 we will not see that kind of increase. It's going to be probably single, five to $10 million overall. Our pension fund is, obviously with returns where they are today as you know we put

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

another $100 million in cash in the railroad fund in '03. Our deficit is looking much better, so we are feeling pretty good about that.

JENNIFER: My last question is just on coal contracts are there any coming up that we need to be aware of, and I get a lot of questions from investors about concerns that price or rent per car in the coal world, the western side of the U.S. is falling every time a contract comes up for negotiation. Can you give us to feel comfortable that that isn't happening as contracts get renegotiated?

RICHARD DAVIDSON: Jack, would you like to take that?

JOHN KORALESKI: We do have one contract that's up for negotiation in 2004 and that's TVA. It's not up until the end of 2004 and we are working on that.

In terms of the second part of your question, I think we pretty much will stay with what we said in the past which is that we evaluate each and every one of the deals that come up. We look carefully at the economics of that [inaudible] our ability to invest in the business and look at that very carefully and try to make the right decisions for our shareholders and our customers and our employees.

JENNIFER: Thanks very much .

SCOTT: Just a couple of questions. Dick, maybe you can give us you what will your crystal ball might or might not say what the energy bill is in Congress and obviously there's some things in there that will impact the rail industry.

RICHARD DAVIDSON: It impacts us in many ways and correctly because of the fuel tax that we pay. It's 55, $60 million a year but it also impacts our customers. The utility customers [inaudible] I think right now it's quite frankly it's quite iffy. It seems to be that the one ringer there was thrown in at the last moment it really has impeded it is the MTV E. issue and as I understand it you know Congress is just reconvening and that's one of the first orders of priority is with the administration and leadership of Congress to take another look at this.

I was really optimistic in the fourth quarter but I'd say right now it's really up in the air.

I don't think there's any certainty at all about the outcome of it.

SCOTT: A couple other questions. One would be maybe for Jack. All the things seem to be aligning right for grain and yet it was up 2% in the fourth quarter and I am getting a sense maybe this is the wrong way of looking at it, why wasn't that stronger---it seemed things fell off the bottom of the bucket in addition to things you said were quite strong in terms of exports, in terms of traffic to Mexico, I would have had a sensation that it might have been a better outlook for grain relative to what happened in the fourth quarter.

JOHN KORALESKI: I think when you look at our grain business overall demand was strong. We did mention the fact that with some of the crew shortages we got in a position that we weren't able to handle all the grain demand and we are going to pick that up here in the first quarter [inaudible] [inaudible] [inaudible]

SCOTT: Last quick question maybe for Jim, what's your fuel price assumption in, what's your best crystal ball figure? I am trying to correlate your fuel cost assumption, [inaudible], if you could bracket in a range of fuel prices.

JAMES YOUNG: Scott as I said, a year ago we paid 1 dollar a gallon. Right now my outlook in buying fuel at $1.05 or higher in January although we did a better job isn't recovery than we did a years ago [inaudible] 50% or so it's really tough to tell but it continues where it's at we are going to be above a year ago.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SCOTT: Is that the number that's in your guidance range, are you assuming $1.05 in your guidance range?

JAMES YOUNG: What I am looking at now is its flat year over year so there's a risk if it stays up.

LOUIS: Good morning. Can you talk about, Jim, if there's any [inaudible] of Capex for '04? I know you said [inaudible] 2000 but you also talked about a lot of locomotive work. Secondly can you give a quarter by quarter roll-out of what your fuel hedges look like for '04?

JAMES YOUNG: We are not at this point in time because of the accelerated depreciation pulling [inaudible] locomotives. One of the issues we look at is we are still on AMT. AMT reduces the benefit of the depreciation opportunity.

What we are doing in our locomotive program is really matching volumes. We did pull some locomotions out of '04 and into '03 we do have the potential to move some '05 and '04, but we will match it with volume.

The hedge, the [inaudible] collars that we put in place around 10% of our fuel, nine, 10 percent, is pretty steady. I don't remember exact numbers but it's an entry point of about , 89-90 cents. There is a cap of a buck ten, a floor of about 80 cents. I think as you move through the year you can probably move all three of those numbers down by about a penny or two.

RICHARD DAVIDSON: I'd point out too that talking about capital, we mentioned in St. Louis it is possible it might step capital up a little bit to prevent bottlenecking in areas that Dennis talked about, the old union Pacific SP route south of east St. Louis going down to Arkansas, and then the sunset route between El Paso and southern California ---those are both high growth opportunities for us and those are bottlenecks we talk about; we are always trying to reduce the bottlenecks every year so we can improve the validity of the routes and accept more traffic.

So it wouldn't be a huge number. It might not be any increases. We haven't talked to the board about it yet but there is an opportunity of a slight increase there. But we will balance it [inaudible] [inaudible]

LOUIS: Two quick clarifications---the fuel surcharge can you give us the number that you thought it was going to be and what percent of revenues? And maybe, Jack, is there any impact on the grain with mad cow disease--is that shifting the demand at all for any kind of feed or is that just [inaudible.]

JOHN KORALESKI: On the fuel surcharge, our goal is to continue to increase that. We had very good success in '03. Right now when I look at '04 fuel surcharge including RCF and the mechanisms cover 70 plus percent of business.

The real key, though, is recovery. Having a fuel surcharge that kicks in at 36 bucks doesn't do you a lot of good although I think we were there yesterday. What we are focused on is to continue to move that recovery. I said earlier I am very confident we will be above 50% for the year. Again our goal here is to reduce the volatility.

The programs we have in place today if you think about it we reduced the volatility by about 50%.

In terms of mad cow disease. We have looked through it carefully. In our worst nightmare, it's maybe $5 million of the year [inaudible] [inaudible] [inaudible] [inaudible] [inaudible] [inaudible] [inaudible] Both ways. We also haul grain to chicken feeders. So their desire for protein from chicken [inaudible] [inaudible] [inaudible].

UNIDENTIFIED: A couple of questions--I guess this is for Jim or Dick--as you see the environment getting better could you talk a little bit about incremental operating margins you think you can see in the business, the next dollar of revenues comes X% down to the operating line, can you give us some kind of.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

RICHARD DAVIDSON: I am going to let Ike take that one.

IVOR EVANS: New products and services was introduced on a revenue base now of over $750 million have been growing at a 16% compounded growth rate, and all of those new products and services have a higher profit rate than the services that took place, so we are doing are [inaudible] [inaudible] to answer your question we are bringing the new business we are bringing in is coming incrementally, better profits lines [inaudible] volume also we, we will leverage volume nicely going forward. We are well positioned for that.

UNIDENTIFIED: Also probably also for you, Ike, head count, maybe I'm characterizing this incorrectly but last year part of the problem was the economy got maybe a little bit better a little bit sooner than you would have expected but you were cut short a bit on crews.

Now things have been turning around, January seems to have had strong momentum off of December. How do you make us comfortable that you might not be caught short on crews or playing catching up with an economy accelerating faster than we might thought?

IVOR EVANS: First of all when you look at our failure costs, one cost that we don't want to incur is moving trains for crews so we are going to put ourselves in a situation that that's not the case. Looking forward to the year on a 4% volume growth head count is probably going to be about flat; 6 percent, head count may be a little higher than it was in '03. But at the same time in either scenario our unit costs will be down.

UNIDENTIFIED: Thank you. Just one final question. You talked about operating ratio a bit. Dick this is something you would want to take, I'm guessing.

Let's assume we are in a world where fuel praises maybe they are not 35 or 36 but low 30s. It has a three in front of it. While your performance has been stellar you might be getting board of operating ratios having an an eight in front of it. When you do say good by to the eights?

RICHARD DAVIDSON: That takes a combination of the strong economy and many price reduction on fuel or better fuel economy will make that happen. My crystal ball is not as precise as it used to be because I keep thinking these head winds are going to subside but they've been determined to stay alive. It takes a combination. With either have to have higher revenue and lower fuel or recover a much greater percentage of the fuel price increases in order to truly below buy it.

UNIDENTIFIED: Thank you.

UNIDENTIFIED 2: Two questions, one for Ike, about Intermodal with the pricing pressures that trucks are facing with hours of services whether truck pricing is going to grow a bit this year would your strategy need to participate in that pricing increase or [inaudible] and simply share gains on the Intermodal site?

IVOR EVANS: We commit to do a 1% price increase and we've done it now for four consecutive years and that's, we expect the same kind of pricing increase in '04. We are going to be opportunistic where we can be and that when it presents an opportunity [inaudible]

RICHARD DAVIDSON: I'd say, too, Ike is a little modest but with his real focus on improving profitability at intermodal our yield since the year 2000 has just gone up enormously; I've forgotten the percentage, maybe 30%. It's the combination of more efficient Intermodal operations and price improvement on kind of a selective basis. What is the percentage increase in yield, Jack? It's just huge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JOHN KORALESKI: It's pretty close to 24, 25%.

RICHARD DAVIDSON: I was a little optimistic but it's been a nice area of improvement for us.

UNIDENTIFIED 2: Just to follow up on fuel, what is the lag between your recovery and the actual price of the underlying bill that you're paying? In other words if fuel costs sort of level out here will your recovery go up from the lag affect as you catch up?

JAMES YOUNG: We do have some lag effect and that is particularly based in the portion of fuel we recover through RCAF and about roughly 27% of our business is covered by an RCAF escalation clause of some sort. With respect to the more direct fuel surcharge where we use a D.O. E. highway fuel index we do that on a monthly basis. We are only one month in arrears so we should be able to recover relatively quickly.

UNIDENTIFIED 2: What's a good rule of thumb for the [inaudible]?

JAMES YOUNG: You know, it's very hard to say because we have some contracts that only escalate annually, some that escalate quarterly, some that are on a monthly basis so it really is dependent on the contract.

UNIDENTIFIED 2: Thanks.

UNIDENTIFIED 3: Hi, in terms of the performance metrics that have been talked about for a good portion of the year, how much of that would you say is attributable to the mix of business you've been running through the system as opposed to operational issues, maybe some of the merchandise or industrial areas?

RICHARD DAVIDSON: When you say operational metrics you are talking about train speed hours, crews that sort of thing?

UNIDENTIFIED 3: Correct.

RICHARD DAVIDSON: Probably we have five different opinions here but I'd say that the vast majority of it just had, you know, mid-August business started taking off and, in our old firing methodology it took us five or six months to get a person hired and trained and put to work productively.

That's one of the things through this difficult lesson that we learned that we looked at our quality process and we went through an improvement cycle and we are going to reduce that to [inaudible] considerably but I don't think it had much at all to do with business mix. I think it was pure and simple not enough people and not enough people translated into a reduction of utilization of our locomotives and freight cars and increased hours service tie ups and it was a cascading effect . Now we have that turned around and we are making a come back.

Three months of uncomfortable operations. Mix does have an impact. Intermodal does have a higher average speed than the other groups and it is a minority and the addition of the five critical resources that Ike has talked about and we talked about significantly in the past is more the key driver of it than the mix.

UNIDENTIFIED 3: Thank you.

RICHARD DAVIDSON: Yes.

CRAIG RYAN (ph), BEAR STEARNS: Craig Ryan, Bear Stearns. With respect to chemicals have you seen any

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

uptick in plastics demand or have higher fuel costs tended to [inaudible]

RICHARD DAVIDSON: Ike, you or Jack?

JOHN KORALESKI: For plastics we actually did see an uptick in the fourth quarter that was encouraging. I don't know that I would call it sustained and substantive if natural gas prices continue to bounce up again, they were in the 7-dollar range, things like that, that's pretty tough. But at least at some point in time you have reached the point where there isn't a lot of inventory built up. There's opportunity there and they are producing some level of plastics [inaudible] certainly those natural gas prices are a big issue.

CRAIG RYAN (ph): Also a follow up on that question. How was the yield [inaudible] [inaudible]?

IVOR EVANS: I want to say it was up around 5%.

CRAIG RYAN (ph): Is that a function of higher feed feedstock costs?

IVOR EVANS: No, that wouldn't drive our yield. What would drive our yield is fuel surcharge, RCAF escalation, and to some degree the mix in business. You see plastics with a pick up in some of those kinds of things. You also saw a lot of our business as it spread into things like pipeline service that gives us the opportunity to extend the length of [inaudible] of some of those things [inaudible] .

CRAIG RYAN (ph): Lastly on free cash flow looking forward can you give us a sense of what the operating ratio assumption is behind that number? About 500 million?

JAMES YOUNG: Our goal obviously is to improve it here. We are pretty conservative when we look at our cash numbers. As Dick has said we will match our capital spending here.

We will assume in a relatively higher crude price for our plan this year, it's obviously above that. My concern if fuel stays at 33, 34 bucks a barrel and you are going to see a bigger issue of one that will start to be effecting demand in production, that is clearly a bigger issue.

What we do is pay attention to our demand forecast and we see volumes starting to slow down we will take some action on our capital plan. So we are assuming obviously an improvement in our [inaudible] [inaudible]

UNIDENTIFIED 4: Just maybe a couple of quick ones for Jim. What should we use going forward on your tax rate from [inaudible] perspective and can you elaborate a little bit on the benefits of the Overnight sale relative from a cash standpoint, what it does to your cash flow statement and last question would be you do you need 500 million of cash on your balance sheet? What do you think you might do with that?

JAMES YOUNG: You have three questions there. Longer term, 37% is kind of the long term rate on [inaudible] now that will be a little bit lower this year with tax incentives from our building as we said earlier the cost to relocation and severance that will hit operating income will be offset by [inaudible] and state taxes, that was item one. We don't need $527 million on the books and as Dick had said we want to get maybe a more clear look here.

I am concerned about higher fuels staying in for the year. So we are going to hold on to a little bit of cash for awhile but we are going to step back and take a look at our growth capital, our consistent dividend program and continue to look at debt. As the year goes on we can be a little more clear on that. What was your third question?

Oh, we reported the gain of sales at $620 million. The cash tax piece is in excess of $100 million, about $120 million.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

That will come in over three years. And it will be more front end loaded but we have to, it will happen over '04, '05 . Debt or debt ratios, I think we, you run the business right here and we will continue to see some more improvement. I am looking for ratings upgrades here.

RICHARD DAVIDSON: We were delighted with both agencies picking us up. We felt very good, we feel good being where we were. We had hoped to see [inaudible] Again we are looking at a balanced approach here.

UNIDENTIFIED 5: Can you give me some outlook and some underlying trends on the per employee salaries and interest expenses?

JAMES YOUNG: We are looking at inflation this year in the three, 3.5% range that would be wages and benefits. Our industry has done a good job in terms of terms of reducing double-digit healthcare costs to maybe high single-digit but still going to have three, 3.5%.

If you look at the labor costs per employ you are going to see a couple different things happening there. If you look at our [inaudible] level this year you are going to see mix change quite a bit. I don't know about this year going forward. Our fourth quarter our train crew employees were up almost 400 yet our back office, those areas were down almost 400.

What happens there is you'll [inaudible] is [inaudible] you can make a lot of money as an employee; if you make all your calls when you look at our all of our agreement [inaudible] they are the highest paid employees. As we grow the business we are going to continue as I said I hope we have to hire for volume. That's a nice problem to have. But that average employee cost I think will tend to trend up because primarily [inaudible] inflation. That volume also can come from [inaudible] better services can drive revenue so it's not a negative [inaudible] [inaudible] [inaudible]

RICHARD DAVIDSON: Well, very good. I'm sure there's a lot of people out on the audio portion of this that are thankful that you asked so many questions. I think it will be very helpful expanding our presentation and we appreciate that. Thank you for your interest in our company and we will be communicating with you via the net next time.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All Rights Reserved.]

[Copyright: Content copyright 2004 CCBN, Inc. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2004 FDCH e-Media, Inc. (f/k/a Federal Document Clearing House, Inc.) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon CCBN's or FDCH e-Media's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from CCBN and FDCH e-Media so long as they provide conspicuous attribution to CCBN and FDCH e-Media as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

Copyright ? 2004FDCH-eMedia

---- INDEX REFERENCES ---

COMPANY: UNION PACIFIC CORP; UNITED PARCEL SERVICE INC; ETA AS; GENERAL MOTORS CORP; BEAR STEARNS COMPANIES INC

NEWS SUBJECT: (Corporate Financial Data (1XO59); Corporate Performance (1XO12); Productivity (1PR67); Business Management (1BU42); Business Strategy (1BU97); Corporate Funding (1XO17); Initial Public Offerings (IPOs) (1IN65); Corporate Strategy & Strategic Planning (1XO03); Profit Warnings (1PR33); Economics & Trade (1EC26); Economic Indicators (1EC19))

INDUSTRY: (Enterprise Performance Management (1EN49); Freight Transportation (1FR88); Theoretical Analysis (1TH79); Railroads (1RA98); Investment Management (1IN34); Chemicals (1CH04); Manufacturing (1MA74); Transportation (1TR48); Freight Railroads (1FR84); Financial Services (1FI37); Stocks (1EQ09); Alcohols (1AL99); Commodity Chemicals (1CO31); Land Transportation (1LA43); Securities Investment (1SE57); Railroad Equipment (1RA68); Passenger Railroads (1PA89); Science & Engineering (1SC33); Business Theory (1BU14); Agriculture (1AG63); Real Estate (1RE57); Agriculture, Food & Beverage (1AG53))

REGION: (Missouri (1MI10); Colorado (1CO26); North America (1NO39); Central America (1CE62); Latin America (1LA15); Texas (1TE14); Mexico (1ME48); Utah (1UT90); California (1CA98); Americas (1AM92); USA (1US73); Illinois (1IL01))

Language: EN

OTHER INDEXING: (AG; AMT; BEAR STEARNS; BELLA TRANSIT AUTHORITY; CCBN; CCBN INC; CFO; COLORADO UTAH; CONGRESS; CRAIG; CSX; DECERTIFICATION; DELTA; EL PASO; EPS; ETA; FAS; FAS 143; FEDERAL DOCUMENT CLEARING HOUSE; GENERAL MOTORS; ILWU; IPO; JENNIFER; LA; LOUIS; LTL; MTV; OVERNIGHT; PACIFIC SP; QUESTION ANSWER JENNIFER; RCAF; SCOTT; SITE; SP; TEAMSTERS UNION; TRANSCRIPTION; TRANSCRIPTS; TVA; UP; UNIDENTIFIED; UNION PACIFIC; UNION PACIFIC EARNINGS CONFERENCE; UNITED PARCEL; USERS; UTAH; WORK FORCE) (Arizona; C. FX; Capex; D.O. E. highway; Dennis; Dennis Duffy; Dick; FDCH e-Media; Highway; Housing; Ike; Ike Evans; Industrial Products; Jack; JAMES YOUNG; Jim; Jim Young; JOHN KORALESKI; Leo Suggs; Northwestern; SEC FILINGS)

Word Count: 14004
2/4/04 FINDISCLOSURE 13:52:27
END OF DOCUMENT

# EXHIBIT PX0560

## 3/1/2004 FSC Program Terms

Effective 3/01/2004, NS implemented a revised fuel surcharge program. The revised surcharge program applies to all local and joint line traffic moving on NS issued price authorities (public and private) that reference the NS Conditions of Carriage 1-Series or NS Conditions of Carriage 2-Series.

The formula for determining the fuel surcharge is based on the monthly average price of West Texas Intermediate Crude Oil (WTI Average Price), an industry standard for tracking oil prices. The WTI Average Price for a given calendar month is determined by adding the daily WTI prices published in the Wall Street Journal during a calendar month, and dividing the result by the number of days so published. The result is rounded to the nearest cent.

The fuel surcharge will be 0.4% of the linehaul freight charge for every $1 per barrel, or portion thereof, by which the WTI Average Price exceeds $23, starting at a WTI Average Price of $23.01. The following schedule provides the fuel surcharge within the noted WTI Average Price ranges:

| WTI Average Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $23.00 and Below | No Surcharge |
| $23.01 - $24.00 | 0.4% |
| $24.01 - $25.00 | 0.8% |
| $25.01 - $26.00 | 1.2% |
| $26.01 - $27.00 | 1.6% |
| $27.01 - $28.00 | 2.0% |
| $28.01 - $29.00 | 2.4% |
| $29.01 - $30.00 | 2.8% |
| $30.01 - $31.00 | 3.2% |
| $31.01 - $32.00 | 3.6% |
| $32.01 - $33.00 | 4.0% |
| $33.01 - $34.00 | 4.4% |
| $34.01 - $35.00 | 4.8% |
| $35.01 - $36.00 | 5.2% |
| $36.01 - $37.00 | 5.6% |
| $37.01 - $38.00 | 6.0% |
| $38.01 - $39.00 | 6.4% |
| $39.01 - $40.00 | 6.8% |
| $40.01 - $41.00 | 7.2% |
| $41.01 - $42.00 | 7.6% |
| $42.01 - $43.00 | 8.0% |

Related Links
Average Monthly WTI Price Basis
Tariff NS - 8004 Terms
Tariff NS - 8004 History
Tariff NS - 8003 Terms
Tariff NS - 8003 History
3/1/2004 FSC Program Status
3/1/2004 FSC Program History
6/30/2000 FSC Program Status
6/30/2000 FSC Program Terms
Fuel Surcharge History
Historical Fuel Price News
WTI Daily Reported Prices
Sign Up for Fuel Surcharge Notification

Related Publications
Learn About accessNS

Sign-up for Email Notifications

EXHIBIT
Neikirk 6
LB 6/15/10

| | |
|---|---|
| $43.01 - $44.00 | 8.4% |
| $44.01 - $45.00 | 8.8% |
| $45.01 - $46.00 | 9.2% |
| $46.01 - $47.00 | 9.6% |
| $47.01 - $48.00 | 10.0% |
| $48.01 - $49.00 | 10.4% |
| $49.01 - $50.00 | 10.8% |
| $50.01 - $51.00 | 11.2% |
| $51.01 - $52.00 | 11.6% |
| $52.01 - $53.00 | 12.0% |
| $53.01 - $54.00 | 12.4% |
| $54.01 - $55.00 | 12.8% |
| $55.01 - $56.00 | 13.2% |
| $56.01 - $57.00 | 13.6% |
| $57.01 - $58.00 | 14.0% |
| $58.01 - $59.00 | 14.4% |
| $59.01 - $60.00 | 14.8% |
| $60.01 - $61.00 | 15.2% |
| $61.01 - $62.00 | 15.6% |
| $62.01 - $63.00 | 16.0% |
| $63.01 - $64.00 | 16.4% |
| $64.01 - $65.00 | 16.8% |
| $65.01 - $66.00 | 17.2% |
| $66.01 - $67.00 | 17.6% |
| $67.01 - $68.00 | 18.0% |
| $68.01 - $69.00 | 18.4% |
| $69.01 - $70.00 | 18.8% |
| $70.01 - $71.00 | 19.2% |
| $71.01 - $72.00 | 19.6% |
| $72.01 - $73.00 | 20.0% |
| $73.01 - $74.00 | 20.4% |
| $74.01 - $75.00 | 20.8% |
| $75.01 - $76.00 | 21.2% |
| $76.01 - $77.00 | 21.6% |
| $77.01 - $78.00 | 22.0% |
| $78.01 - $79.00 | 22.4% |
| $79.01 - $80.00 | 22.8% |
| $80.01 - $81.00 | 23.2% |
| $81.01 - $82.00 | 23.6% |
| $82.01 - $83.00 | 24.0% |
| $83.01 - $84.00 | 24.4% |
| $84.01 - $85.00 | 24.8% |
| $85.01 - $86.00 | 25.2% |
| $86.01 - $87.00 | 25.6% |
| $87.01 - $88.00 | 26.0% |
| $88.01 - $89.00 | 26.4% |
| $89.01 - $90.00 | 26.8% |
| $90.01 - $91.00 | 27.2% |
| $91.01 - $92.00 | 27.6% |
| $92.01 - $93.00 | 28.0% |
| $93.01 - $94.00 | |

| | |
|---|---|
| | 28.4% |
| $94.01 - $95.00 | 28.8% |
| $95.01 - $96.00 | 29.2% |
| $96.01 - $97.00 | 29.6% |
| $97.01 - $98.00 | 30.0% |
| $98.01 - $99.00 | 30.4% |
| $99.01 - $100.00 | 30.8% |
| $100.01 - $101.00 | 31.2% |
| $101.01 - $102.00 | 31.6% |
| $102.01 - $103.00 | 32.0% |
| $103.01 - $104.00 | 32.4% |
| $104.01 - $105.00 | 32.8% |
| $105.01 - $106.00 | 33.2% |
| $106.01 - $107.00 | 33.6% |
| $107.01 - $108.00 | 34.0% |
| $108.01 - $109.00 | 34.4% |
| $109.01 - $110.00 | 34.8% |
| $110.01 & Above | * |

* The fuel surcharge will be 34.8% plus an additional .4% of the line-haul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price Per Barrel exceeds $110.00.

The fuel surcharge shall be applied to each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price calculation. The fuel surcharge will change monthly per the table below:

| Calendar Month of WTI Average Price | Fuel Surcharge Applied |
|---|---|
| January | March 1 |
| February | April 1 |
| March | May 1 |
| April | June 1 |
| May | July 1 |
| June | August 1 |
| July | September 1 |
| August | October 1 |
| September | November 1 |
| October | December 1 |
| November | January 1 |
| December | February 1 |

Notice of current fuel surcharge in effect as well as any changes to the fuel surcharge will be provided on the NS Web site. In addition, while the fuel surcharge remains in effect, NS will provide daily updates on the prior, current and projected surcharges. From the tool bar on the main NS Homepage, simply select "Fuel Price News" from the dropdown menu.

Terms and Conditions | Privacy Policy | Contact Us | © Norfolk Southern Corp. Version 1.2.6

# EXHIBIT PX0561

The U.S. Department of Transportation's

# Western Uniformity Scenario Analysis



## A Regional Truck Size and Weight Scenario Requested by the Western Governors' Association

April 2004

# Table of Contents


List of Acronyms ..... ix

**Executive Summary**

Introduction ..... ES-1
Scenario Impacts ..... ES-1
Conclusions ..... ES-9

**I Introduction**

Introduction ..... I-1
Study Purpose ..... I-1
Impact Areas ..... I-1
Updates and Improvements ..... I-2
Outreach ..... I-2
Organization of Analysis ..... I-2

**II Scenario Description**

Introduction ..... II-1
Analysis Year ..... II-3
Base Case 2000 ..... II-4
Analytical Improvements ..... II-6
- Updated Base and Forecast Years ..... II-6
- Scenario Specifications ..... II-7

The Vehicles ..... II-10
The Networks ..... II-11
- Western Uniformity Scenario ..... II-21
- Scenario Description ..... II-22
- The Vehicles ..... II-22
- The Networks ..... II-23
- Access Provisions ..... II-25

**III Freight Distribution and Shipper Costs**

Introduction ..... III-1
Analytical Approach ..... III-1
- Model and Data Updates ..... III-1
- Truck Analysis ..... III-1
- Rail Analysis ..... III-2
- Shipper Cost Analysis ..... III-2

Scenario Impacts ..... III-3
- Low-Cube Case ..... III-5
- High-Cube Case ..... III-7
- Shipper Cost Impacts ..... III-10

**IV Pavement**

Introduction ..... IV-1

Truck-Pavement Interaction .... IV-1
Estimates of Pavement Cost – The National Pavement Cost Model .... IV-3
Scenario Impacts .... IV-4

**V Bridge**

Introduction .... V-1
Impacts of Truck Loads .... V-1
  Stresses .... V-1
  Types of Loads .... V-1
  Critical Stresses for Analysis .... V-2
Design Vehicles, Ratings and the Federal Bridge Formula B .... V-2
  Design Vehicles .... V-2
  Bridge Ratings .... V-3
  Federal Bridge Formula B .... V-3
Description of Bridges in Western Uniformity Scenario States .... V-4
Analysis Methodology .... V-4
  Analysis Tool .... V-4
  Overstress Identification Criterion .... V-5
  Overstress .... V-6
  Base Case Vehicles .... V-7
Analysis Results .... V-9
  Sensitivity Analysis .... V-9
  Analysis Results – Base Case .... V-9
  Cost of Replaced/Strengthened Bridges .... V-10
  Analysis Results – Western Uniformity Scenario .... V-11
  Differential Costs Attributable to the Western Uniformity Scenario Trucks .... V-13
Conclusion .... V-14

**VI Roadway Geometry**

Introduction .... VI-1
Roadway Geometry and Truck Operating Characteristics .... VI-1
  Offtracking .... VI-1
Analytical Approach .... VI-3
Impact Analysis .... VI-4
  Geometric .... VI-4
  Staging Areas .... VI-5
Scenario Impacts .... VI-7
  Geometric Improvements .... VI-7

**VII Safety**

Introduction .... VII-1
Vehicle Safety Performance Analysis .... VII-1
  Analyzed Vehicles .... VII-2
Results .... VII-3

Static Rollover Threshold ........ VII-3
Rearward Amplification ........ VII-6
Load Transfer Ratio ........ VII-8
Crash Database Analysis ........ VII-10
Previous Research ........ VII-11
Summary of Prior Studies ........ VII-16
Crash Database Analysis – Update ........ VII-18
Assessment of Scenario Impacts ........ VII-20
Triples ........ VII-21
Conclusion ........ VII-22
References ........ VII-24

**VIII Traffic Operations**

Introduction ........ VIII-1
Vehicle Characteristics and Their Affect on Traffic Flow and Safety ........ VIII-1
Acceleration and Speed Maintenance ........ VIII-1
Size and Acceleration Impacts on Congestion ........ VIII-3
Intersections ........ VIII-5
Passing on Two-Lane Roads ........ VIII-5
Aerodynamic Effects ........ VIII-6
Offtracking ........ VIII-6
Assessment of Scenario Impacts ........ VIII-7

**IX Energy & Environment**

Introduction ........ IX-1
Analytical Approach ........ IX-1
Energy Consumption ........ IX-1
Air Quality ........ IX-2
Noise Emissions ........ IX-3
Exhaust Emissions ........ IX-3
Scenario Impacts ........ IX-4

**X Rail**

Introduction ........ X-1
Overview of the Class I Railroad Industry ........ X-2
Profile of Study Carriers ........ X-2
Methodology ........ X-3
Study Caveats ........ X-5
Results ........ X-6
Base Case ........ X-6
Low-Cube Case ........ X-6
High-Cube Case ........ X-8
Conclusion ........ X-9

**XI Conclusions**

## Appendix A1 Federal Bridge Formula B

## List of Tables


Table ES-1 Forecasts of 2010 Base Case and Scenario Traffic Under Scenario Assumptions ..... ES-2
Table ES-2 Forecasts of 2010 Base Case VMT by Vehicle Configuration and Western Uniformity VMT Impact for 13 Analyzed States ..... ES-3
Table ES-3 Change in LCV Use by Shipment Type ..... ES-4
Table ES-4 Infrastructure Costs Attributable to the Western Uniformity Scenario ..... ES-5
Table ES-5 Energy and Environmental Impacts of Western Uniformity Scenario ..... ES-8
Table ES-6 Annual Shipper Cost Savings from Western Uniformity Scenario ..... ES-9
Table II-1 Miles by Functional System ..... II-3
Table II-2 Rural and Urban Mileage by State ..... II-4
Table II-3 Operation of Vehicles Subject to the ISTEA Freeze Maximum Size and Weight Limits for 13 Analyzed States ..... II-6
Table II-4 Base Year and Forecast Commercial Vehicle Travel ..... II-8
Table II-5 Domestic Tons (millions) by Mode for Base and Forecast Years ..... II-9
Table II-6 Current Maximum Weight and Length for Scenario States[1] ..... II-11
Table III-1 2010 VMT by Highway Type ..... III-4
Table III-2 Low Cube 2010 LCV VMT by Commodity Group and Flow Type ..... III-6
Table III-3 Total VMT for Base Case and Western Uniformity, Low-Cube Case ..... III-6
Table III-4 High Cube 2010 LCV VMT by Commodity Group and Flow Type ..... III-8
Table III-5 Total VMT for Base Case and Western Uniformity, High-Cube Case ..... III-9
Table III-6 Annual Transportation Cost Savings for Truck Shipments ..... III-10
Table IV-1 Net Tons per ESAL –Study Configurations at Key Weights ..... IV-2
Table IV-2 Scenario Pavement Impacts ..... IV-4
Table V-1 Numbers of Bridges on Various Systems by State ..... V-5
Table V-2 Base Case and Uniformity Vehicles ..... V-8
Table V-3 Analysis of the Base Case Trucks on the Interstate and National Network Highway Systems ..... V-10
Table V-4 Base Case Cost Associated with Full Replacement and Less than Full Replacement for Eight Different Overstress Thresholds ..... V-11
Table V-5 Analysis of the Uniformity Scenario Trucks on the Interstate and National Network Highway Systems ..... V-12
Table V-6 Western Uniformity Scenario Cost Associated with Full Replacement and Less than Full Replacement for Eight Different Overstress Thresholds ..... V-12
Table V-7 Analysis of Additional Overstressed Bridges on Interstate and National Nework Systems ..... V-13
Table V-8 Incremental Cost Differences between Base Case and Western Uniformity Scenario with Full Replacement and Less than Full Replacement for Eight Different Overstress Thresholds ..... V-14
Table VI-1 Dimensions of Base Case Vehicles ..... VI-3
Table VI-2 Offtracking Characteristics ..... VI-4
Table VI-3 Current Access Provisions ..... VI-6
Table VI-4 Scenario Roadway Geometric Impacts ..... VI-7
Table VII-1 List of Analyzed Vehicles ..... VII-3
Table VII-2 Overall Fatal Crash Rates of Single- and Double- Trailers ..... VII-12

Table VII-3 Fatal Accident Rates of Tractor-Semitrailers and Doubles by Operating Environment ... VII-13
Table VII-4 Truck Crashes by Severity Class ... VII-14
Table VII-5 Base Crash Rates ... VII-14
Table VII-6 Collision Rates on the LCV Sub-Network by Vehicle Type ... VII-15
Table VII-7 Summary of Truck Crash Rates ... VII-17
Table VII-8 Travel and Fatal Crashes for Scenario States 1995-1999 ... VII-18
Table VII-9 Fatal Involvement Rates for Scenario States 1995-1999 ... VII-19
Table VII-10 Fatal Involvement Rates for the Scenario States 1995-1999 ... VII-20
Table VIII-1 Horsepower Requirements Select Weight-to-Horsepower Ratios and Gross Vehicle Weights ... VIII-2
Table VIII-2 Truck Passenger Car Equivalents ... VIII-4
Table VIII-3 Percent of Congested Travel for 13 Analyzed States, Year 2000 ... VIII-7
Table VIII-4 Western Uniformity Scenario Traffic Impacts ... VIII-8
Table IX-1 Miles per Gallon by Truck Configuration and Weight ... IX-2
Table IX-2 Noise Passenger Car Equivalents for Trucks ... IX-3
Table IX-3 Energy and Environment Impacts for 13 Analyzed States ... IX-4
Table X-1 Industry and Railroad Cost Elasticities ... X-4
Table X-2 Railroad Cost Studies ... X-5
Table X-3 Base Case Revenues, Freight Service Expense, Contribution, and ROI ... X-6
Table X-4 Low-Cube Case Lost Revenue, Freight Service Expense, Contribution ... X-7
Table X-5 Low-Cube Case Ton-Miles, Freight Service Expense, Revenues from Operation, Contribution, and ROI ... X-7
Table X-6 High-Cube Case Lost Revenue, Freight Service Expense, Contribution ... X-8
Table X-7 High-Cube Case Ton-Miles, Freight Service Expense, Revenues from Operations, Contribution, and ROI ... X-8
Table A-1 Ratios of Moments of Selected Trucks Relative to the HS20 Vehicle ... 1
Table A-2 Ratio of Total Load Moments of the Study Vehicles to the HS20 Design Vehicle ... 4

# List of Figures

Figure II-1 Analysis States ........ II-1
Figure II-2 Comparison of Longer Combination Vehicles with Conventional Trucks .. II-2
Figure II-3 Base Case Federal Truck Size and Weight Limits ........ II-5
Figure II-4 Current Use of Scenario Vehicles ........ II-9
Figure II-5 Current LCV Gross Vehicle Weights ........ II-13
Figure II-6 Current LCV Lengths ........ II-14
Figure II-7 Vehicles Operating in the Western Study States ........ II-15
Figure II-8 Longer Combination Vehicle State Permit and Route Restrictions ........ II-17
Figure II-9 Rocky Mountain Doubles Base Case Network ........ II-19
Figure II-10 Turopike Doubles Base Case Network ........ II-20
Figure II-11 Triples Base Case Network ........ II-20
Figure II-12 The ISTEA Longer Combination Vehicle Freeze ........ II-21
Figure II-13 Western Uniformity Scenario ........ II-23
Figure II-14 Rocky Mountain Double Western Uniformity Scenario Network ........ II-24
Figure II-15 Turnpike Doubles Western Uniformity Scenario Network ........ II-24
Figure II-16 Triples Western Uniformity Scenario Network ........ II-25
Figure III-1 Development of Motor Carrier Market Rates ........ III-2
Figure III-2 Likely Truck Configuration Impacts of the Western Uniformity Scenario III-4
Figure III-3 Impact of Western Uniformity Scenario on VMT by Different Vehicles, Low-Cube Case ........ III-7
Figure III-4 Impact of Western Uniformity Scenario on VMT by Different Vehicles, High-Cube Case ........ III-9
Figure VI-1 Low-Speed Offtracking ........ VI-2
Figure VI-2 High-Speed Offtracking ........ VI-2
Figure VII-1 Illustration of Rollover Initiation ........ VII-4
Figure VII-2 Static Rollover Threshold Current Vehicles and Scenario Vehicles ........ VII-5
Figure VII-3 Major Types of Converter Dollies ........ VII-7
Figure VII-4 Rearward Amplification: Current and Scenario Vehicles ........ VII-8
Figure VII-5 Load Transfer Ratio Current and Scenario Vehicles ........ VII-10
Figure VIII-1 Truck Volumes, Estimated Congested Segments - 1998 ........ VIII-9
Figure VIII-2 Truck Volumes, Estimated Congested Segments – 2020 ........ VIII-9
Figure X-1 Decreasing Cost Industry ........ X-1

## List of Acronyms

| | |
|---|---|
| AAR | Association of American Railroads |
| AASHTO | American Association of State Highway and Transportation Officials |
| BASIC | Bridge Analysis and Structural Improvement Software |
| BFB | Bridge Formula B |
| BNSF | Burlington Northern and Santa Fe Railway Company |
| CSX | |
| CTS&W Study | Comprehensive Truck Size and Weight Study |
| CWS | Carload Waybill Sample |
| DOT | U.S. Department of Transportation |
| EPA | Environmental Protection Agency |
| FAF | Freight Analytical Framework |
| FAF | Freight Analysis Framework |
| FHWA | Federal Highway Administration |
| FSE | Freight Service Expense |
| GVW | Gross Vehicle Weight |
| HCA Study | Highway Cost Allocation Study |
| ITIC | Intermodal Transportation and Inventory Costing model |
| LCV | Longer Combination Vehicle |
| MPG | Miles per Gallon |
| MPH | Miles per Hour |
| NAPCOM | National Pavement Cost Model |
| NBI | National Bridge Inventory |
| NN | National Network for Large Trucks |
| RMD | Rocky Mountain Double |
| ROI | Return On Investment |
| STB | Surface Transportation Board |
| TPD | Turnpike Double |
| TS&W | Truck Size and Weight |
| UP | Union Pacific Railroad Company |
| U.S. | United States of America |
| WASHTO | Western Association of State Highway and Transportation Officials |
| WGA | Western Governors' Association |

# EXECUTIVE SUMMARY



## Introduction

Longer combination vehicles (LCVs) have operated in Western States for many years. Grandfather rights in effect since 1956 have allowed those vehicles to exceed the 80,000-pound federal weight limit on Interstate Highways. Until 1991 States could determine the weights and dimensions allowed under their grandfather rights, but the LCV freeze instituted in the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA) prohibits States from increasing allowable LCV weights on the Interstate System or allowing longer LCVs on the National Network established in the Surface Transportation Assistance Act of 1982. Because grandfather rights in each of the Western States differ, allowable weights and dimensions for LCVs in most Western States vary.

As the U.S. Department of Transportation's *Comprehensive Truck Size and Weight (CTS&W) Study* was nearing completion, the Western Governors' Association (WGA) asked the U.S. DOT to analyze another illustrative truck size and weight scenario in addition to the scenarios already included in the study. The "Western Uniformity Scenario" requested by WGA would assess impacts of lifting the LCV freeze and allowing harmonized LCV weights, dimensions, and routes among only those Western States that currently allow LCVs. Specifically the WGA requested that DOT analyze impacts of expanded LCV operations assuming that weights would be limited only by federal axle load limits and the federal bridge formula, with a maximum gross vehicle weight of 129,000 pounds.

## Scenario Impacts

Scenario impacts are assessed using the same general methods used to analyze impacts of illustrative scenarios in the *CTS&W Study*, although substantial improvements in data and certain analytical methods have been made since that study. Specifically, impacts on safety; pavement, bridge, and other infrastructure costs; shipper costs; energy consumption; environmental quality; traffic operations; and railroad revenues and costs associated with expanded LCV use in Western States are estimated. States included in the analysis are Washington, Oregon, Nevada, Idaho, Utah, Montana, Wyoming, Colorado, North Dakota, South Dakota, Nebraska, Kansas, and Oklahoma. No changes in size and weight limits were assumed for California, Arizona, New Mexico, or Texas. LCVs are not allowed in these States except on a short section of I-15 in Arizona that provides continuity of LCV operations between Nevada and Utah.

Throughout the report impacts are estimated for operations of two different long twin-trailer configurations, one that would have two 48-foot trailers as specified in the WGA request, and one that would have trailer lengths of 45 feet which is consistent with the Western Association of State Highway and Transportation Officials (WASHTO) "Guide for Uniform Laws and Regulations Governing Truck Size and Weight Among the WASHTO States." In this summary, only the impacts of the longer configuration are reported.

Estimated impacts, both positive and negative, of expanded LCV operations in the Western States are substantially smaller than impacts of nationwide LCV operations estimated in the *CTS&W Study*. Several factors account for these smaller impacts including the substantially lower volume of traffic that would be affected by the regional scenario, the lower weights and smaller dimensions assumed for LCVs in the Western Uniformity Scenario compared to the *CTS&W Study*, and the fact that at least some LCV operations already occur in each of the States analyzed in the scenario. This latter factor reduces traffic shifts to the new LCV operations assumed under the scenario and reduces infrastructure costs because the greater weights and dimensions of LCVs have already at least partially been reflected in infrastructure design.

Several types of traffic could be affected by the truck size and weight changes assumed in the scenario. These include short haul truck traffic that moves less than 200 miles, long haul truck traffic that shifts to LCVs from other configurations, rail carload traffic, and rail intermodal traffic. Table ES-1 shows 2010 freight traffic forecasts in the Western States under both current (base case) and scenario size and weight limits. Total truck traffic in the region is estimated to decrease by 25 percent under the scenario assumptions, with the vast majority of that decrease coming from the long-haul trucking sector. Less than one-tenth of one percent of rail traffic in the region is estimated to divert to LCVs under scenario assumptions.

**Table ES-1**
**Forecasts of 2010 Base Case and Scenario Traffic Under Scenario Assumptions**

| | **Base Case Traffic Volume** (millions) | **Scenario Traffic** | |
|---|---|---|---|
| | | **Volume** (millions) | **Percent change** |
| **Total truck (VMT)** | **18,823** | **14,028** | -25.5% |
| Short haul truck (VMT) | 1,844 | 1,743 | -5.5% |
| Long haul truck (VMT) | 16,978 | 12,285 | -27.6% |
| Rail Carload (ton-miles) | 785,399 | 785,181 | -0.03% |
| Rail Intermodal (ton-miles) | 202,168 | 201,993 | -0.09% |

The extent to which traffic would actually shift to LCVs depends on relative transportation and other logistics costs for LCVs compared to the current mode of transportation. These relative costs, in turn, depend on specific characteristics of the shippers, the commodities being shipped, and the origins and destinations of the shipments. The Federal Highway Administration has analytical tools that estimate the influence of these various factors on mode and vehicle choice.

While the data may not reflect the actual costs that a specific firm would face when deciding which mode and which type of vehicle to use in transporting specific commodities from one point to another, they are believed to be representative of commodity movements within and through the study region.

Table ES-2 shows 2010 forecasts of truck traffic by major vehicle configuration for the base case and under scenario assumptions. Estimates of base case LCV travel rely on State-reported traffic counts and analyses of vehicle classification and weigh-in-motion data, but these data collection systems are not designed to provide statistically reliable estimates of total LCV travel. Other data sources including the Census Bureau's Vehicle Inventory and Use Survey have been used to supplement the State reported data, but there is considerable uncertainty about the amount of LCV traffic in the scenario States. Previous studies, especially those focusing on LCV safety, have also noted this uncertainty in the extent of LCV use.

**Table ES-2**
**Forecasts of 2010 Base Case VMT by Vehicle Configuration and Western Uniformity VMT Impact for 13 Analyzed States**

| Vehicle Configuration | Base Case VMT (millions) | Scenario | |
|---|---|---|---|
| | | VMT (millions) | Percent Change |
| 5-axle Tractor Semitrailer | 14,476 | 3,442 | -76% |
| 6-axle Tractor Semitrailer | 1,924 | 938 | -51% |
| 5- or 6-axle Double | 1,351 | 750 | -44% |
| 6-axle Truck Trailer | 626 | 607 | -3% |
| 7-axle Double | 188 | 2,190 | +1,065% |
| 8- or more axle Double | 213 | 5,626 | +2,541% |
| Triples | 45 | 473 | +951% |
| **Total** | **18,823** | **14,028** | -25% |

Despite the fact that LCVs are allowed in all States covered by the scenario, conventional tractor-semitrailers and short twin trailers currently are estimated to account for 94 percent of total heavy truck travel in the region. If all Western States covered by the scenario adopted the scenario weight and dimension limits, there would be an estimated 76 percent reduction in travel by conventional 5-axle tractor-semitrailers, a 44 percent reduction of STAA doubles (5 or 6-axle twin trailers with maximum trailer lengths of 28.5 feet) travel, and a 25 percent reduction in total heavy truck travel. Because shipments that would divert to LCVs are longer than shipments that would not divert, the decrease in total travel is greater than the decrease in shipments by tractor-semitrailer. On a tonnage basis less than half of tractor-semitrailer shipments were estimated to divert to LCVs.

Reductions in conventional truck travel would result in large percentage increases in LCV travel. Nearly a twenty-fold increase in LCV travel is estimated if LCVs were

allowed to operate in Western States according to assumptions in the Western Uniformity Scenario. Over half of that travel would be expected to occur in twin trailer combinations with 8 or more axles that can carry gross weights up to 129,000 pounds.

Table ES-3 shows how current and projected LCV use varies by the type of shipment. LCVs currently account for about 9 percent of total VMT for shipments entirely within the region. Under scenario assumptions that percentage is projected to grow to 78 percent. Currently LCVs are used very little for shipments where one or both trip ends are outside the region. Under scenario assumptions about half the VMT within the region for such shipments would shift to LCVs. This would require carriers to assemble and disassemble the LCVs for travel in States outside the region that do not allow LCVs. Clearly the ability of various types of carriers to efficiently manage such operations would vary, but the cost savings of operating LCVs throughout the region would make them attractive, even for many shipments with trip ends outside the region.

**Table ES-3**
**Change in LCV Use by Shipment Type**

| Shipment Type | Percent of VMT in LCVs | |
|---|---|---|
| | Base Case | Scenario |
| Intra-Regional | 9.2% | 78.0% |
| Inbound | 0.3% | 58.3% |
| Outbound | 0.3% | 52.1% |
| Through | 0.0% | 49.2% |
| Total | 2.4% | 59.1% |

Changes in the amount and characteristics of truck travel under scenario assumptions would affect long-term pavement and bridge costs, and could necessitate interchange and other geometric improvements to accommodate the larger trucks. Table ES-4 shows estimates of these added infrastructure costs associated with expanded LCV operations under the Western Uniformity Scenario. Despite the fact that more LCVs with higher gross weights could be expected to operate under the scenario assumptions, total pavement costs could actually decrease somewhat. Estimates in this study are that pavement costs in the scenario States could decrease by more than 4 percent under the Western Uniformity Scenario. Several factors account for this decrease including the reduction in total truck VMT, a shift of some traffic from lower-order highway systems to the Interstate System that typically has stronger pavements, and the fact that axle load limits are assumed to continue to control loads on individual axle groups. Incremental pavement costs attributable to the scenario were estimated by calculating the difference between total pavement improvement costs over a 20-year period in the scenario States under current size and weight limits and total pavement costs assuming the estimated VMT and weight distributions under the scenario size and weight limits.

As noted in Chapter V, many factors would affect bridge costs if States were allowed to change size and weight limits in accordance with scenario assumptions. Based on information in FHWA's National Bridge Inventory, many bridges in the Western States are being stressed beyond their design levels by vehicles operating under current State size and weight limits and permitting practices. Since bridges are designed with large safety factors, the overstressed bridges are not in danger of collapsing, but their safety margins are reduced. Based on assumptions discussed in Chapter V about long term needs to replace or strengthen overstressed bridges, base case bridge improvement costs attributable to overstress by vehicles currently operating in the scenario States range from about $1.6 billion to $3.3 billion. Incremental costs to accommodate vehicles assumed to operate under the scenario range from $2.3 billion to $4.1 billion. Thus bridge improvement costs in the region attributable to bridge overstresses are estimated to more than double under the Western Uniformity Scenario. Twenty-year average annual bridge costs to either replace or strengthen overstressed bridges were estimated by simply dividing total estimated costs by 20. In practice, States might not be able to spread bridge improvement costs over a 20 year period, but they would not have to improve or replace all bridges before LCVs could use the bridges.

**Table ES-4**
**Added Infrastructure Costs Attributable to the Western Uniformity Scenario**
(millions of 2000 $)

| Infrastructure Element | Base Case Improvement Costs | Total Incremental Cost | 20-Year Annual Incremental Cost | Percent Change in Base Case Costs |
|---|---|---|---|---|
| Pavement Improvements | 65,934* | -2,769 | -138 | -4.2 |
| Bridge Improvements | High 3,257<br>Low 1,586 | 4,125<br>2,328 | 206<br>116 | +127<br>+147 |
| Geometric Improvements | 864 | 776 | 65 | +90 |

* Total estimated pavement preservation cost in scenario States. Base case costs cannot be linked to vehicles with particular weights and dimensions as can bridge and geometric costs

Incremental pavement and bridge costs attributable to the Western Uniformity Scenario are primarily related to the increased weight of vehicles operating in the region. Increases in vehicle length could affect the ability of vehicles to stay within their lanes on curves and to negotiate intersections and freeway interchanges. Like bridges, some highways have geometric design deficiencies to accommodate operations of the current fleet. For instance long vehicles may not be able to avoid running on the shoulders of some interchange ramps or may not be able to stay within their lane when traveling on winding sections of road. Ideally such geometric problems should be corrected, but within the scope of a highway agency's total highway improvement needs, such improvements may be deferred unless they are judged to be a significant safety issue.

Base case costs to improve curves, intersections, and interchanges to accommodate vehicles already operating in the Western States are estimated to be $864 million, $713 million of which is on the Interstate System. Under assumptions of the Western Uniformity Scenario, geometric improvement costs would nearly double to $1,640 million. Like bridge improvements, geometric improvements do not all have to be made before the longer vehicles could operate, but in certain locations safety could be compromised if geometric improvements were delayed. In other locations the primary impact of geometric deficiencies is higher maintenance costs, although when a vehicle cannot stay within the traveled lane there can be a potential safety problem.

In addition to infrastructure costs, there would be several other potential impacts of expanded LCV operations under assumptions in the Western Uniformity Scenario. The most important of those impacts is safety. Other impacts include traffic operations, energy consumption and emissions, and rail competitiveness.

The *CTS&W Study* highlighted many uncertainties that make estimating safety impacts of changes in truck size and weight limits difficult. Data on the number of fatal crashes involving LCVs are available from the National Highway Traffic Safety Administration's Fatality Analysis Reporting System and the University of Michigan Transportation Research Institute's Trucks Involved in Fatal Accidents databases. However, even in States where LCVs currently operate, estimating LCV crash rates is difficult because most States do not collect data on LCV travel. Estimates of LCV travel were available from several States and from some of the larger carriers that operate LCVs, but the data were not complete enough or representative enough to estimate overall LCV crash rates in the Western States. In the *CTS&W Study* the point was made that even if current LCV crash rates were available, those rates might not apply to expanded LCV operations because many companies that had never operated LCVs before would begin using those vehicles, many drivers with little or no previous LCV experience would begin driving LCVs, and large LCVs would be used in places where they have never operated before. Under the Western Scenario some of those uncertainties would be reduced since expanded LCV operations would be in States where LCVs currently are operating. Nevertheless, under the scenario LCVs would be operating in some States at greater weights and larger dimensions than is currently allowed and could be operating on highways they currently are not allowed to use. Even though reductions in overall heavy truck VMT estimated under the scenario would reduce crash exposure, there would still be uncertainties about the safety of expanded LCV operations that would warrant monitoring.

Without data on crash rates it is difficult to quantify safety impacts of allowing more widespread LCV operations in Western States. One set of safety-related factors that can be quantified are stability and control properties of different vehicle configurations. The analysis of vehicle stability and control characteristics conducted for the *CTS&W Study* was updated for this study to reflect the types of trucks currently being operated in Western States and the size and weight limits assumed in this scenario. Three specific performance measures were evaluated, static rollover stability, rearward amplification, and load transfer ratio. Those three measures, which are described in detail in Chapter

VII, indicate the susceptibility of a vehicle to rollover and to rear trailer sway. Stability and control performance of most LCVs currently used in the Western States is as good or better than the performance of STAA doubles (twin 28-foot trailers) that are widely operated in all States. Performance for some configurations is comparable to that of a standard tractor-semitrailer. There are exceptions, however. Conventional triple trailer combinations, in particular, have poorer rearward amplification and load transfer ratios than other vehicles, which makes them more prone to trailer sway and rollover if they have to make a sudden turning movement.

Offsetting the relatively good stability and control properties of LCVs are the greater time required to pass an LCV, the greater offtracking of longer double trailer combinations, the heavier weight of the vehicles which places greater demands on braking systems, and operational problems that longer vehicles create in urban areas where many weaving and merging maneuvers are required.

The Western Association of State Highway and Transportation Officials has developed model regulations for the operation of LCVs, but actual regulations governing LCV operations differ significantly from State to State. Some States have comprehensive regulations covering equipment, drivers and operations while others have no special regulations that apply to LCVs or their drivers. Most States have no program to monitor LCV safety, but in discussions with State officials they did not note particular safety problems with current LCV operations. Some, however, indicated they would not allow operations of LCVs at the weights and dimensions assumed in this study, even if they had the flexibility to do so.

The *CTS&W Study* presented results of focus groups and surveys that indicated a general uneasiness on the part of many motorists in sharing the roads with big trucks. No additional focus group research was conducted for this project and the extent to which these findings reflect attitudes of motorists in Western States is unknown. Many non-technical factors influence truck size and weight policy decisions and public opinion certainly is one of those factors.

The increased use of LCVs estimated under this scenario could also affect traffic operations. Some reductions in congestion and delay could result from the lower truck volumes, but those benefits could be offset by decreased passing opportunities, increased delay if LCVs cannot maintain their speeds on steep grades as well as conventional trucks, increased difficulty merging and weaving in urban areas because of the greater vehicle lengths, and potential delays at intersections and other locations caused by the larger offtracking of LCVs. Many operational problems are directly related to highway geometry. If geometric improvements are made to accommodate LCVs, some operational impacts may be reduced. Adverse impacts on traffic operations affect more than traffic delay. They also can contribute to increased crash risks. A clear demonstration of this is the lower overall crash rates on Interstate highways when compared to other highways.

As shown in Table ES-5, reductions in VMT associated with the Western Uniformity Scenario could reduce fuel consumption associated with freight transportation and could also reduce emissions and highway noise. The 25 percent reduction in truck VMT associated with the scenario is estimated to result in a 12 percent reduction in fuel consumption. Fuel savings are not directly proportional to VMT reductions because fuel economy decreases as vehicle weight increases.

**Table ES-5**
**Energy and Environmental Impacts of Western Uniformity Scenario**

| Impact Area | Change from Base Case |
|---|---|
| Energy Consumption | -12 % |
| Noise Cost | -10 % |
| Emissions * | -12 % |

* Assumes changes in emissions are approximately proportional to changes in fuel consumption.

Reductions in heavy truck travel estimated under the scenario could also reduce noise and emissions. LCVs generally are noisier than conventional trucks, primarily because they have more tires. However the lower volume of truck travel associated with the scenario would result in about a 10 percent reduction in noise-related costs compared to the base case.

Impacts of changes in air quality caused by changes in freight transportation under the Western Uniformity Scenario are difficult to estimate because truck emissions interact with other mobile and stationary sources in complex ways. While a specific change in emissions may not lead to a corresponding change in pollutants in any given area, estimates of changes in emissions would indicate the direction in which air pollution would likely change. There has been little past research on relationships between vehicle size and weight and emissions. Changes in overall truck volumes under the scenario are not likely to cause significant changes in speeds or other traffic characteristics that affect emissions rates. The primary factor that would cause emissions to change is the change in total truck volumes and the change in traffic composition with more LCVs and fewer conventional trucks. Since other environmental, technological, and geographical factors that might affect emissions are assumed to be the same for the base case and the scenario, it is assumed for purposes of this study that total emissions vary directly with changes in fuel consumption. This is consistent with methods used by the Environmental Protection Agency to estimate heavy truck emissions in its Mobile 6 model. Therefore, emissions under the Western Uniformity Scenario are estimated to decrease approximately 12 percent from the base case. The Transportation Research Board's (TRB's) Special Report 267 notes, "basic data on in-use emissions of heavy trucks are extremely limited" and additional research is needed "on how truck traffic volume, the performance characteristics of trucks, and the effect of trucks on the behavior of other drivers affect emissions of all vehicles on a road."

The largest benefits of truck size and weight changes assumed in the Western Uniformity Scenario are shipper cost savings. If more cargo can be moved in each shipment, driver, equipment, and vehicle operating costs will be lower than in the base case. Table ES-6 shows reductions in transport costs that could be realized if all changes in truck size and weight limits assumed in the scenario were adopted. For shipments currently moving by truck, the expanded availability of various types of LCVs could reduce shipper costs by as much as $2 billion per year. This represents a savings of almost 4 percent of total shipper costs for moves by truck in and through the region. Savings would be lower if some States chose not to allow LCVs to operate as widely as is assumed in the scenario. Shippers that currently use railroads also would realize savings. The actual switch from rail to truck is estimated to be small, producing savings of about $3 million annually. A greater savings to rail users would come from rate reductions that railroads would make to keep traffic from switching to trucks. These savings would be about $26 million per year.

**Table ES-6**
**Annual Shipper Cost Savings from Western Uniformity Scenario**

| Source of Savings | Amount (millions of 2000 $) | Percent Change |
|---|---|---|
| Truck to Truck Diversion | 2,036 | 3.9 % |
| Rail to Truck Diversion | 3 | .01 % |
| Rail Discounts | 26 | .11 % |
| Total | 2,065 | n/a |

## Conclusions

Longer combination vehicles have been operating in 13 Western States for many years. Size and weight limits in those States vary as does the extent of the highway network on which LCVs can operate. Some of these differences are due to federal truck size and weight limits, especially grandfather rights under which States can allow vehicles exceeding 80,000 pounds to operate on Interstate Highways. But some of these differences also reflect differences among the States in the vehicle weights and dimensions they believe are appropriate for their highway systems. If States were given the flexibility to increase their truck size and weight limits to levels assumed in this scenario, some States immediately would take full advantage of this flexibility, others might change some but not all size and weight limits, and several might not change truck size and weight limits at all.

Like previous studies that have examined the potential impacts of changing truck size and weight limits, this study has estimated substantial shipper benefits from allowing more widespread use of LCVs. Other benefits from the changes in truck size and weight limits assumed in this scenario are reductions in fuel consumption, emissions, and noise-related costs. The full benefits estimated in this study likely would not be realized, however, because all States would not allow LCV to operate as widely as assumed in this scenario.

Infrastructure and related costs would not be as great as has been estimated in previous studies because LCVs already operate on at least some highways in each of the 13 States included in the analysis. Thus to a certain extent States have already considered LCV weights and dimensions in pavement, bridge, and geometric design. Nevertheless improvements costing several billion dollars were estimated to be needed to correct deficiencies in bridges, interchange ramps, and other highway elements just to accommodate existing truck operations. These deficiencies may not be severe enough to require immediate improvements, but in the long run would likely have to be corrected, especially if LCV volumes increased. If LCV operations expanded under assumptions in this scenario, added infrastructure costs could be from about $300 million to more than $2 billion. Several factors would affect the magnitude of these additional infrastructure costs including the extent to which States allowed larger LCVs to operate, the length limits imposed on double trailer combinations, and the extent to which bridges can be strengthened rather than replaced. Some States may continue to defer non-essential costs as they have done under current truck size and weight limits, but doing so ultimately may increase costs and could increase safety risks as well.

Few Western States charge fees that cover the infrastructure costs associated with LCV operations. The significant exception is Oregon that routinely conducts highway cost allocation studies to estimate the cost responsibility of various truck classes and adjusts truck-related fees according to results of those studies. When LCVs and other heavy trucks do not pay the full costs of their operations, other motorists must make up the difference. This is inequitable to the highway users who must subsidize LCV operations and contributes to an uneven playing field for railroads and other competitors. States already are experiencing budgetary problems as they look to improve the condition and performance of their transportation systems, and Federal Highway Trust Fund revenues to support the Federal-aid highway program have been growing more slowly in recent years. Before any action is taken with respect to changes in truck size and weight limits that could increase highway investment needs, plans for financing those improvements should be developed that include how the longer, heavier trucks responsible for additional costs would contribute to paying those costs. This is consistent with recommendations in the TRBs Special Report 267 in which it concluded, "federal legislation creating the (TRB's recommended) permit program should specify a quantitative test for the revenue adequacy of the permit fees imposed by states that wish to participate….Fees should at least cover estimated administrative and infrastructure costs for the program…"

Safety is always the issue of greatest concern when truck size and weight issues are considered. Data simply are not available upon which to develop reliable estimates of changes in the number of crashes or fatalities that might result from a change in truck size and weight limits such as the Western Uniformity Scenario. While some LCV operators claim the safety experience of LCVs is better than for the conventional vehicles they operate, these claims cannot be borne out for LCV operations as a whole. States in which LCVs operate have not noted particular safety problems with current LCV operations, but they have no formal processes in place to monitor safety. Since there are many uncertainties about the safety of substantially increased use of LCVs as might occur

under the Western Uniformity Scenario, it would be prudent to require such processes before any substantial change in federal truck size and weight limits such as the Western Uniformity Scenario was implemented. In addition to monitoring the on-road safety of LCVs, processes might also be considered to ensure that the vehicles to be used meet some minimum thresholds for stability and control, and that companies operating these vehicles have good safety records and vehicle maintenance programs.

Nationwide, the Department believes that an appropriate balance has been struck on truck size and weight. Western States included in this scenario all can allow LCVs to operate at weights substantially above the 80,000-pound federal limit on Interstate Highways, and a number of other States can allow axle loads exceeding federal limits under grandfather rights. While the widely varying State laws appear to be inefficient, they are the result of political processes that have attempted to balance economic development concerns with concerns for safety and infrastructure protection. This balance has resulted in somewhat different size and weight limits from State to State, but these differences largely reflect factors unique to each State. The pattern of truck size and weight limits that has evolved over the years may not be optimal by any objective measure, but it does allow for some appropriate regional variation without compromising safety, which is the Department's highest priority.

Many proponents of change in truck size and weight limits point to TRB's recommendations in *Special Report 267* as a blueprint for a systematic process to more nearly optimize truck size and weight policy. However, aside from certain segments of the trucking industry and several States interested in truck size and weight increases, strong support for TRB's recommendations has not been evident. The Department has not taken a formal position on the TRB study, in part because it does not favor change in federal truck size and weight policy, but if changes were to be made, the Department believes that the kind of strong monitoring and evaluation that TRB recommends would be essential. Without support for the kind of comprehensive approach to truck size and weight policy and permitting practices recommended by TRB, there would be no mechanism to quickly identify safety or other problems that might arise.

In recent years a number of ad hoc, State-specific exemptions from federal truck size and weight laws have been enacted. For instance, TEA-21 contained special exemptions from federal size and weight limits in four States, Colorado, Louisiana, Maine, and New Hampshire. The Department does not support this kind of piecemeal approach to truck size and weight policy. It makes enforcement and compliance with truck size and weight laws more difficult, it often contributes little to overall productivity, it may have unintended consequences for safety and highway infrastructure, and it reduces the willingness to work for more comprehensive solutions that would have much greater benefits. A regional approach such as the Western Uniformity Scenario could have greater benefits than a series of individual exemptions, but it also could have much more serious adverse consequences unless closely monitored. Unless there were very strong support from State elected officials for a carefully controlled and monitored evaluation of changes in truck size and weight limits such as those in the Western Uniformity Scenario, the risks of adverse impacts from the unmonitored use of LCVs, the divisiveness that

might ensue as the current balance in truck size and weight policy is upset, and the further polarization of this very contentious issue would outweigh the benefits that might be realized. Strong support from elected officials of States within the region for a change in truck size and weight limits has not been evident to date, and there is no compelling Federal interest in promoting changes that are not strongly supported by the affected States.

# CHAPTER I

# Introduction



## Introduction

In 2000 the U. S. Department of Transportation (DOT) issued the *Comprehensive Truck Size and Weight (CTS&W) Study*, the first such study by DOT since 1981. The *CTS&W Study* analyzed five truck size and weight scenarios varying from a rollback of size and weight limits to nationwide operations of longer combination vehicles (LCVs). These scenarios were intended only to illustrate the capabilities of the analytical tools. They were not intended to reflect policy options that might be implemented.

The Western Governors' Association (WGA) requested that DOT analyze an additional scenario that would be limited to Western States already allowing LCVs. Specifically the WGA asked the Department to analyze a policy option that would allow 13 Western States (see Figure II-1) to harmonize LCV weights and dimensions at levels that meet existing federal axle load limits, the Federal Bridge Formula and that are in accordance with guidelines established by the Western Association of State Highway and Transportation Officials (WASHTO). Due to time constraints, the scenario could not be included in the *CTS&W Study* Volume III, but the Department agreed to analyze the scenario in a follow-up report.

This analysis draws heavily on work done for the *CTS&W Study*. General background information on the evolution of truck size and weight limits and previous research on potential impacts of truck size and weight policy changes was included in the *CTS&W Study* Volumes I - IV and is not repeated in this report. This report does discuss the many data and analytical improvements since the *CTS&W Study* and included in the Western Uniformity Analysis. This report is not intended as a "stand-alone" report, important background and methodology information is included in Volumes I – IV of the *CTS&W Study.*

## Study Purpose

The purpose of this analysis is to use the general analytical framework developed in the *CTS&W Study* to analyze impacts of the Western Uniformity Scenario that the WGA asked DOT to analyze. As with scenarios analyzed in the *CTS&W Study*, there is no detailed discussion of regulatory, enforcement, or other implementation issues that would have to be considered before an option such as the Western Uniformity Scenario could be implemented.

## Impact Areas

The impacts of the Western Uniformity Scenario are estimated for 10 impact areas:

Freight Diversion
Shipper Costs
Pavement Costs
Bridge Costs
Roadway Geometry

Safety
Traffic Operations
Environmental Quality
Energy Consumption
Rail Industry Competitiveness

Additional information on each of these impacts can be found in the *CTS&W Study* Volumes II and III.

## Updates and Improvements

The Western Uniformity Scenario analysis includes several substantial improvements to data and methods used in the *CTS&W Study* to estimate scenario impacts. Improvements in the truck and rail data and methods used to analyze pavement, bridge, and safety impacts are discussed in the relevant sections of the report.

One of the biggest improvements is the use of the Freight Analysis Framework (FAF) commodity flow data in place of the very limited truck flow data that was available at the time the *CTS&W Study* was undertaken. The FAF is a comprehensive database widely used by the Federal Highway Administration (FHWA) for a variety of freight operations analyses. It includes estimates of county-to-county flows of all manufacturing and agricultural truck shipments. Also the!database for analyzing potential diversion of rail traffic to larger, heavier trucks has been updated to 2000. These new rail data reflect impacts of the 1990's rail mergers.

## Outreach

During the course of this study FHWA staff met on several occasions with representatives of State Departments of Transportation to understand current LCV operations, regulations and routes. Although all 13 States in the Scenario have assisted with the project, their participation does not necessarily reflect a State's policy direction toward implementation of the LCV sizes, weights and networks analyzed in this report.

FHWA staff met with LCV operators to understand characteristics of their operations. State officials and regional LCV operators were very helpful in providing a picture of current operations, configurations and the LCV shipping environment.

FHWA staff also met with safety groups to understand their concerns about truck operations and especially LCVs.

## Organization of Analysis

As with the *CTS&W Study's* scenario analysis, there is a broad assessment of potential impacts that might result from the changes in truck size and weight (TS&W) limits assumed in this scenario. Chapter II provides a detailed description of assumptions underlying the Western Uniformity Scenario. Chapter III describes methods used to

estimate the shifts in truck traffic that could result from scenario assumptions. These shifts include those rail boxcar and intermodal freight to trucks and from existing truck configurations to larger and heavier configurations that would be allowed under the scenario. Finally Chapter III estimates the impact to shippers' freight bills.

Chapters IV through VI present estimates of scenario impacts on highway agency costs for pavement, bridge, and geometric improvements respectively. Chapters VII through IX estimate external costs (or benefits) that might result under scenario assumptions. The impacts covered in these chapters are safety, traffic operations, and energy consumption and environmental quality respectively. Chapters X estimates reductions in rail traffic and the impacts of the scenario on railroads serving the region. Chapter XI summarizes scenario impacts.

# CHAPTER II

# Scenario Description



## Introduction

The Western Uniformity Scenario requested by the Western Governors' Association (WGA) from the Department of Transportation (DOT) is different than scenarios examined in the *Comprehensive Truck Size and Weight (CTS&W) Study*. Those scenarios focused on nationwide changes to truck size and weight limits. The Western Uniformity Scenario examines the impact of changes in truck size and weight regulations within a 13-State region in which all the States already allow at least some Longer Combination Vehicles (LCV). The States included in the analysis and shown in Figure II-1 are Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington and Wyoming.

**Figure II-1**
**Analysis States**




While all the States included in the scenario already allow LCVs, most do not allow the weights and dimensions analyzed in the Scenario. In discussions with State representatives during the course of this analysis, some said that even if given the flexibility to allow heavier weights they would not do so. Thus it must be remembered that, like the scenarios analyzed in the *CTS&W Study*, this scenario is only illustrative of the impacts that could occur if all the States in the region uniformly adopted the size and weight limits assumed in the scenario.

Several Western States currently do not allow LCVs including California, Texas, New Mexico, and Arizona (except for a very small corner of the State). These States were invited to join in the scenario analysis but all declined.

Figure II-2 shows the principal vehicle configurations examined in this analysis.

**Figure II-2**
**Comparison of Longer Combination Vehicles with Conventional Trucks**



The analysis includes a broad range of commercial truck configurations: five- and six-or-more - axle tractor-semitrailers, several double-trailer combinations with different weights and dimensions, and triple-trailer combinations. All these configurations are present in both the base case and in the Scenario, although not all States allow all the scenario vehicles in the base case.

The impact analysis in this report focuses on the 13 States in the study region. Table II-1 shows their road networks as a percentage of the national networks. This table shows that these States contain a higher percent of rural roads than urban roads when compared to the whole U.S. Table II-2 shows that within the 13 States more than 80 percent of the public road system is classified as rural.[1]

**Table II-1**
**Miles by Functional System**

| Functional Class | 13 Analyzed States | Total US | Percent of Total |
|---|---|---|---|
| Rural Interstate | 8,598 | 33,048 | 26% |
| Rural Other Principal Arterial | 29,563 | 98,911 | 30% |
| Rural Minor Arterial | 32,788 | 137,574 | 24% |
| Rural Major Collector | 123,611 | 433,121 | 29% |
| Rural Minor Collector | 77,356 | 271,815 | 28% |
| Rural Local | 595,492 | 2,109,519 | 28% |
| **Rural Total** | **867,408** | **3,083,988** | **28%** |
| Urban Interstate | 1,591 | 13,379 | 12% |
| Urban Other Freeway and Expressways | 937 | 9,140 | 10% |
| Urban Other Principal Arterial | 5,945 | 53,312 | 11% |
| Urban Minor Arterial | 10,662 | 89,789 | 12% |
| Urban Collector | 10,155 | 88,200 | 12% |
| Urban Local | 68,964 | 598,421 | 12% |
| **Urban Total** | **98,254** | **852,241** | **12%** |
| **Total** | **965,662** | **3,936,229** | **25%** |

Source: Highway Statistics Table HM-50.

## Analysis Year

The analysis year for this scenario is 2010. Forecasts of traffic by commodity, origin and destination, vehicle configuration, weight, and highway functional class are based on current conditions including current truck size and weight limits. Global Insights, formerly DRI/WEFA, developed economic forecasts and traffic volumes were forecast based on those economic assumptions. Distributions of traffic by vehicle class, operating weight, and highway functional class were assumed to remain the same as estimates developed for 2000, the latest year for which actual traffic volume data are available.

[1] The minor exception is the State of Washington with 78% of the public road system designated as rural.

**Table II-2**
**Rural and Urban Mileage by State**

| State | Rural | | Urban | | Total | Percent of Total | |
|---|---|---|---|---|---|---|---|
| | Interstate | Other | Interstate | Other | | Rural | Urban |
| Colorado | 769 | 70,320 | 185 | 14,580 | 85,854 | 83% | 17% |
| Idaho | 526 | 41,590 | 85 | 4,110 | 46,311 | 91% | 9% |
| Kansas | 694 | 123,606 | 180 | 10,244 | 134,724 | 92% | 8% |
| Montana | 1,135 | 65,764 | 56 | 2,546 | 69,501 | 96% | 4% |
| Nebraska | 437 | 87,130 | 45 | 5,154 | 92,766 | 94% | 6% |
| Nevada | 480 | 32,513 | 80 | 5,585 | 38,658 | 85% | 15% |
| North Dakota | 531 | 84,226 | 41 | 1,793 | 86,591 | 98% | 2% |
| Oklahoma | 721 | 98,607 | 209 | 13,159 | 112,696 | 88% | 12% |
| Oregon | 581 | 55,040 | 146 | 11,019 | 66,786 | 83% | 17% |
| South Dakota | 629 | 80,827 | 49 | 2,057 | 83,562 | 97% | 3% |
| Utah | 771 | 33,659 | 167 | 7,610 | 42,207 | 82% | 18% |
| Washington | 501 | 62,293 | 263 | 17,929 | 80,986 | 78% | 22% |
| Wyoming | 826 | 24,000 | 87 | 2,379 | 27,292 | 91% | 9% |

Source: Highway Statistics Table HM-50.

## Base Case 2000

The base case for the scenario represents current patterns of truck and rail operations in the scenario States under current truck size and weight laws. It serves as a base line for estimating impacts of changes in truck size and weight limits assumed in the scenario. The Federal size and weight limits for the base case are shown in Figure II-3.

The base case includes the freeze on LCVs imposed by the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA) that restricts the use of LCVs to the types of operations in effect as of June 1, 1991. The Transportation Equity Act for the 21st Century (TEA-21) continued the LCV freeze. It should be noted that there are two distinct freezes in the ISTEA, one on the weight of LCVs on the Interstate System and the other freeze on the length of the cargo carrying units of combinations with two or more such units on the NN. Table II-3 shows the lengths and weights of twin and triple trailer combinations that each of the 13 States included in the scenario may allow to operate under the LCV freeze.

**Figure II-3**
**Base Case Federal Truck Size and Weight Limits**

- 20,000 POUNDS FOR SINGLE AXLES ON THE INTERSTATE SYSTEM;
- 34,000 POUNDS FOR TANDEM AXLES ON THE INTERSTATE SYSTEM;
- APPLICATION OF BRIDGE FORMULA B FOR OTHER AXLE GROUPS, UP TO THE MAXIMUM OF 80,000 POUNDS FOR GROSS VEHICLE WEIGHT (GVW) ON THE INTERSTATE SYSTEM;
- 102 INCHES FOR VEHICLE WIDTH ON THE NATIONAL NETWORK*;
- 48 FOOT (MINIMUM) FOR SEMITRAILERS IN A SEMITRAILER COMBINATION ON THE NATIONAL NETWORK; AND 28 FOOT (MINIMUM) FOR TRAILERS IN A TWIN-TRAILER COMBINATION ON THE NATIONAL NETWORK.
- GRANDFATHER RIGHTS UNDER WHICH CERTAIN LCVS ARE ALLOWED TO OPERATE IN EACH SCENARIO STATE.
- LONGER COMBINATION VEHICLES WHERE PERMITTED BY STATE LAW AND SUBJECT TO THE LCV FREEZE.

* The National Network (NN) is the system of highways designated by the States in cooperation with FHWA on which the 48-foot semitrailers and short twin trailer combinations that States were required to allow under the Surface Transportation Assistance Act of 1982 (STAA) would be allowed to operate. Those highways were judged by the States to be suitable for use by those truck configurations.

Several States allow heavier weights off the Interstate System than are allowed under the LCV freeze on the Interstate System (see Table II-6). For example, Wyoming allows up to 156,000 pounds on a double-trailer, with the appropriate number and spacing of axles, on State designated, non-Interstate roads, but the freeze limits GVW to 117,000 pounds on Wyoming Interstate. The appropriate weight limit is considered for each road segment in both the base case and the scenario analysis. It is also assumed that no change in technology, operating practices, or relative pricing will take place between the base year (2000) and the analysis year (2010). Finally it is assumed that there would be no change in the TS&W regulations and VMT for any States other than those in the study.

**Table II-3**
**Operation of Vehicles Subject to the ISTEA Freeze**
**Maximum Size and Weight Limits for 13 Analyzed States**
(Length in feet (')/Weight in 1,000 Pounds (K))

| State | Truck Tractor and Two Trailing Units | | Truck Tractor and Three Trailing Units | | Other[2] |
|---|---|---|---|---|---|
| | Length | Weight | Length | Weight | Length |
| Colorado | 111' | 110K | 115.5' | 110K | 78' |
| Idaho | 95' | 105.5K | 95' | 105.5K | 78' - 98' |
| Kansas | 109' | 120K | 109' | 120K | No |
| Montana | 93' | 137.8K | 100' | 131.06K | 88' - 103' |
| Nebraska | 95' | 95K | 95' | (1) | 68' |
| Nevada | 95' | 129K | 95' | 129K | 98' |
| North Dakota | 103' | 105.5K | 100' | 105.5K | 103' |
| Oklahoma | 110' | 90K | 95' | 90K | No |
| Oregon | 68' | 105.5K | 96' | 105.5K | 70'5" |
| South Dakota | 100' | 129K | 100' | 129K | 73' - 78' |
| Utah | 95' | 129K | 95' | 129K | 88' - 105' |
| Washington | 68' | 105.5K | No | | 68' |
| Wyoming | 81' | 117K | No | | 78' - 85' |

(1) No maximum weight is established as this vehicle combination is not considered an "LCV" per the ISTEA definition because it is only allowed up to 80,000 pounds.

(2) A commercial motor vehicle combination with two or more cargo-carrying units not included in descriptions "truck tractor and two trailer units" or "truck tractor and three trailer units."

Source: *Federal Size Regulations for Commercial Motor Vehicles*, FHWA Publication Number FHWA-MC-96-03, for details on specific vehicle combinations see 23 CFR 658, Appendix C.

## Analytical Improvements

Changes since the *CTS&W Study* include (1) updating the truck and rail commodity flow data and the distribution of truck traffic by configuration, highway functional class, and operating weight; (2) a detailed analysis of LCV operations in Western States; and (3) detailed analysis of the road networks on which LCVs currently are allowed.

### Updated Base and Forecast Years

The base year for the *CTS&W Study* was 1994 with a forecast year of 2000. For the Western Uniformity Scenario, base year vehicle miles traveled (VMT) was updated to 2000 using the 2000 Highway Performance Monitoring System (HPMS) data. The HPMS data were augmented by State truck weight data to estimate VMT by configuration, highway functional class, and operating weight, following the same methodology as was used in the 1997 Highway Cost Allocation Study. Table II-4 summarizes the VMT by configuration for the 13 States in the present analysis.

The truck commodity flow database is significantly improved compared with that which was available for the *CTS&W Study*. In the *CTS&W Study* the truck flow data was based

on a national survey of 24,000 truck drivers, but could not be calibrated to national totals and the relevant sample for a regional analysis was very small.

The truck commodity flow data for the scenario analysis is now based on the Freight Analytical Framework (FAF) developed by FHWA.[2] The FAF truck data was created from a synthesis of the 1994 Commodity Flow Survey, 5-year Census and Annual Survey of Manufacturers, county population data, Motor Carrier Industry Financial & Operating Statistics, trade association production and shipment reports, and private data sources. The FAF truck database is calibrated to national totals[3] and is geographically specific. County-to-county flows of nearly 400 different commodities groups are estimated.[4] The database of both private and for-hire trucking comes close to capturing the universe of truck shipments and can be broken apart into regional and State subsets.

The rail shipment database was also updated using the 2000 Rail Waybill. This is an improvement over the 1994 data used in the CTS&W Study since this data reflects rail traffic flows following the round of rail mergers in the mid and late 90's.

Global Insight, a nationally recognized economic forecasting company, (formerly DRI/WEFA) developed the 2010 forecasts of commodity flows using demand-based forecasting to estimate the consumption growth from which truck and rail commodity flows are derived. Table II-5 summarizes forecasts of domestic tons to be hauled by trucks and railroads.

**Scenario Specifications**

Only those trucks likely to be impacted by changes in TS&W limits were explicitly modeled in the analysis. Figure II-4 shows the commercial vehicles included in the analysis and characteristics of how those vehicles are currently used in the Western States. Changes to their operations under the Western Uniformity Scenario are discussed in Chapter III. Specifically the turnpike double would become utilized for more general freight shipments.

Single unit trucks are not included in this analysis since the scenario hypothesizes no changes to their weights or operating conditions and operators are unlikely to switch from single unit trucks to combination trucks.

---

[2] More information on the Freight Analytical Framework (FAF) data is available at www.ops.fhwa.dot.gov/freight.

[3] There was additional calibration for the 13 scenario States to State VMT control totals.

[4] Data utilized the four digit Standard Transportation Commodity Codes (STCC) codes created by the American Association of Railroads.

**Table II-4**
**Base Year and Forecast Commercial Vehicle Travel**
(million VMT)

| State | Single Unit Truck | | Tractor Semi-trailer with 3 to 4 axles | | Tractor Semitrailer with 5 axles | | Tractor Semi-trailer with 6 or more axles | | Truck Trailer with 3 to 4 axles | | Truck Trailer with 5 axles | | Truck Trailer with 6 or more axles | | Double trailer with 5 or 6 axles | | Double trailer with 7 axles | | Double trailer with 8 axles or more axles | | Triple Trailer | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 | 2000 | 2010 |
| Colorado | 1,263 | 1,716 | 155 | 209 | 1,096 | 1,452 | 82 | 112 | 16 | 21 | 27 | 37 | 6 | 8 | 37 | 50 | 21 | 28 | 3 | 5 | 2 | 2 |
| Idaho | 341 | 453 | 49 | 66 | 482 | 635 | 110 | 147 | 2 | 2 | 14 | 19 | 26 | 37 | 30 | 39 | 22 | 30 | 7 | 10 | 7 | 10 |
| Kansas | 933 | 985 | 126 | 138 | 1,151 | 1,280 | 132 | 144 | 11 | 13 | 11 | 13 | 22 | 27 | 47 | 54 | 3 | 4 | 1 | 1 | 1 | 1 |
| Montana | 240 | 255 | 28 | 30 | 396 | 422 | 95 | 104 | 6 | 7 | 9 | 10 | 45 | 53 | 41 | 45 | 14 | 15 | 11 | 13 | 0 | 0 |
| Nebraska | 454 | 300 | 126 | 76 | 2,051 | 318 | 97 | 133 | 6 | 8 | 3 | 8 | 21 | 40 | 9 | 14 | - | - | - | - | 1 | 0 |
| Nevada | 520 | 429 | 79 | 119 | 656 | 1,954 | 31 | 92 | 0 | 6 | 40 | 3 | 30 | 21 | 32 | 9 | 20 | - | 4 | - | 2 | 1 |
| North Dakota | 265 | 646 | 65 | 107 | 272 | 887 | 115 | 42 | 7 | 0 | 6 | 55 | 32 | 43 | 12 | 43 | - | 27 | - | 6 | 0 | 3 |
| Oklahoma | 1,410 | 1,710 | 389 | 467 | 2,639 | 3,153 | 169 | 203 | 21 | 25 | 28 | 35 | 3 | 4 | 54 | 65 | 1 | 2 | - | - | 1 | 1 |
| Oregon | 1,044 | 1,176 | 234 | 260 | 1,078 | 1,217 | 291 | 327 | 0 | 0 | 21 | 24 | 29 | 34 | 705 | 820 | 12 | 14 | 35 | 42 | 22 | 26 |
| South Dakota | 262 | 282 | 36 | 39 | 389 | 417 | 77 | 83 | 4 | 4 | 5 | 5 | 16 | 19 | 19 | 20 | 10 | 11 | 21 | 25 | 0 | 0 |
| Utah | 482 | 651 | 89 | 121 | 753 | 991 | 65 | 87 | 6 | 8 | 20 | 28 | 92 | 132 | 49 | 66 | 25 | 33 | 13 | 19 | 1 | 2 |
| Washington | 1,510 | 1,472 | 120 | 116 | 856 | 829 | 385 | 383 | 18 | 18 | 73 | 74 | 145 | 152 | 72 | 71 | 22 | 21 | 81 | 84 | - | - |
| Wyoming | 149 | 166 | 62 | 73 | 731 | 921 | 56 | 65 | 6 | 8 | 22 | 30 | 44 | 57 | 40 | 54 | 3 | 4 | 6 | 8 | - | - |
| Total | 8,873 | 10,240 | 1,558 | 1,821 | 12,551 | 14,476 | 1,706 | 1,924 | 102 | 120 | 279 | 341 | 511 | 626 | 1,147 | 1,351 | 154 | 188 | 183 | 213 | 37 | 45 |
| Percent of Fleet | 31.8% | 32.7% | 5.6% | 5.8% | 45.0% | 46.2% | 6.1% | 6.1% | 0.4% | 0.4% | 1.0% | 1.1% | 1.8% | 2.0% | 4.1% | 4.3% | 0.6% | 0.6% | 0.7% | 0.7% | 0.1% | 0.1% |

**Table II-5**
**Domestic Tons (millions) by Mode for Base and Forecast Years**

| Mode | 1998 | 2010 |
|---|---|---|
| Air | 9 | 18 |
| Highway | 10,439 | 14,929 |
| Rail | 1,953 | 2,527 |
| Water | 1,082 | 1,344 |
| Grand Total | 13,484 | 18,820 |

*Source: Freight Analytical Framework, FHWA

**Figure II-4**
**Current Use of Scenario Vehicles**

| Configuration Type | Number of Axles | Common Maximum Weight (pounds) | Current Use |
|---|---|---|---|
| Semitrailer | 5 | 80,000 - 99,000 | Most used combination vehicle. It is used for long and short hauls in all urban and rural areas to carry and distribute all types of materials, commodities, and goods |
| | 6 or more | 80,000 - 100,000 | Used to haul heavier materials, commodities, and goods for hauls longer than those of the four-axle single-unit truck. |
| STAA Double | 5, 6 | 80,000 | Most common multi-trailer combination. Used for less-than-truckload (LTL) freight mostly on rural freeways between LTL terminals. |
| B-train Double | 8 | 105,500 - 137,800 | Mostly used in flatbed trailer operations and for liquid bulk hauls |
| Rocky Mountain Double (RMD) | 7 | 105,500 - 129,000 | In the Western States used as a resource hauling vehicle, usually open hopper, tank, or flat. |
| Turnpike Double (TPD) | 9 | 105,500 - 147,000 | Some truckload operations similar to a 5 or 6 axle Semitrailer but mostly a western State resource-hauling vehicle. |
| Triple Trailer Combination | 7 | 90,000 – 129,000 | Similar to an STAA Double, used for less-than-truckload (LTL) freight mostly on rural freeways between LTL terminals. |

## The Vehicles

The truck configurations analyzed in this study conform to the State and Federal regulations and current operations. All of the 13 States analyzed allow variations from Federal truck size and weight limits, but all[5] utilize the Federal Bridge Formula B to control loads placed on bridges. The formula gives the allowable weight on any group of two or more axles in terms of the number and spacing of the axles,

$$W=500[LN/(N-1) + 12N +36]$$

Where

- W = allowable weight on the collection of axles under consideration
- L = length between extreme axles in collection of axles under consideration
- N = number of axles under consideration

In most States (10 out of 13), the Bridge Formula is capped at a fixed value tied to that State's grandfather rights. The States that don't have a fixed cap use the bridge formula as their practical limit. Table II-6 lists the LCV length and gross vehicle weight (GVW) limit for the States analyzed in this study. Figures II-5 and II-6 show the geographical significance of the GVW and length variations on Interstate transportation.

Some States regulate the overall length of the vehicle from front to rear bumper, other States regulate the combined length of the trailers, and still others regulate the length of the individual trailers.

Interviews with shippers provided useful insight into impacts on Interstate operations where no two States have the same truck size and weight limits. Often shippers must study each State's regulations and then design a vehicle to match the State with the most restrictive truck size and weight rules to avoid costly re-configuration at the borders. This sometimes precludes an out-of-state truck operator from bidding on a job since in-state operators already own the most economically efficient configurations.

The wide variety of size and weight rules in the Western States has given rise to uniquely-designed, jurisdictionally-specific vehicles. Figure II-7 provides examples of specific vehicles designed for the unique jurisdictional rules in the Western States. In Figure II-7 the "Montana Truck 2 Sugar Beets GVW 123,000," with 9-axles, 81-feet combined trailer length and a tare weight of 38,100 has a competitive disadvantage in Washington, Idaho or Oregon since resource haulers in those States employ a truck with 7-axles, 68-foot combined trailer length and a lower tare weight of 34,300 pounds (see Figure II-7, "Washington/Idaho/Oregon GVW 105,500"). The heavier tare weight of the Montana truck, due to additional axles and trailer length, translates into a lower payload given Washington, Idaho and Oregon's maximum GVW of 105,500 pounds and higher cost per payload ton mile.

[5] Colorado uses Bridge Formula B in conjunction with its own State formula.

**Table II-6**
**Current Maximum Weight and Length for Scenario States[1]**

| STATE | DOUBLES MAXIMUM LENGTH (FEET) | | DOUBLES MAXIMUM GROSS VEHICLE WEIGHT (POUNDS) | TRIPLES MAXIMUM LENGTH PER TRAILER (FEET) | TRIPLES MAXIMUM GROSS VEHICLE WEIGHT (POUNDS) |
|---|---|---|---|---|---|
| | Rocky Mountain Double | Turnpike Double | | | |
| **Colorado[5]** | 48 + 28.5 | 48 + 48 | 110,000 | 28.5 each | 110,000 |
| **Idaho** | 105 overall | 105 overall | 105,500 | 28.5 each | 105,500 |
| **Kansas** | 48 + 28.5 | 48 + 48 | 120,000 | 28.5 each | 120,000 |
| **Montana** | 95 overall or 81 CTL[3] | 95 overall or 81 CTL[3] | Uncapped BFB[2] | 95' overall | Uncapped BFB[2] |
| **North Dakota** | 110 overall | 110 overall | 105,500 | 110' overall | 105,500 |
| **Nebraska** | 105 CTL[3] | 105 CTL[3] | 95,000 | 28.5 each | empty |
| **Nevada** | 105 CTL[3] up to 48 + 42 | 105 CTL[3] up to 48 + 42 | 129,000 | 28.5 each | 129,000[4] |
| **Oklahoma** | 110 CTL[3] up to 53 + 53 | 110 CTL[3] up to 53 + 53 | 90,000 | 29 each, up to 95' CTL[3] | 90,000 |
| **Oregon[5]** | 68 CTL[3] 40 + 20 | Not allowed | 105,500 | 28.5 each, up to 96' CTL[3] | 105,500 |
| **South Dakota** | 110 CTL[3] | 110 CTL[3] | 129,000 | 28.5 each | 129,000[4] |
| **Utah** | 95' CTL[3] | 95' CTL[3] | 129,000 | 95' CTL[3] | 129,000[4] |
| **Washington** | 68 CTL[3] | Not allowed | 105,500 | Not allowed | Not allowed |
| **Wyoming** | 81 CTL[3] | 81 CTL[3] | 117,000 (Interstate), Uncapped BFB[2] (off-interstate) | Not allowed | Not allowed |

1. Limitations on routings, time-of-day, and/or day-of-week apply within each State.
2. Uncapped Federal Bridge Formula B.
3. Combined Trailer Length.
4. In practice, Bridge Formula B limits the triples to around 123,000 pounds depending on axle spread.
5. State has a variation to the Federal Bridge Formula B for computing axle spread and weights.

## The Networks

The scenario impacts are evaluated based on assumptions concerning the networks that would be available for various types of LCVs. Several networks are considered in the analysis -- the National Network (NN) for large trucks designated pursuant to the STAA of 1982; networks on which the three general types of LCVs (RMD, TPD, and Triples) currently are allowed to operate; and the networks assumed in the scenario to be available for each type of LCV. Under the scenario, routes currently available for LCVs in particular States are assumed to remain

available to those vehicles, even if they are beyond the networks assumed in the scenario to be available to particular configurations.

County-to-county mileages were developed for all 7 networks using the National Highway Planning Network (NHPN)[6] and the 3 current and 3 scenario LCV networks. The NHPN is a comprehensive network database geographically coding for over 400,000 roadway miles including Rural Arterials, Urban Principal Arterials, and all the National Highway System routes. The NHPN is used as a surrogate for the NN since most 53-foot tractor semi-trailers and STAA Doubles have broad access in the analyzed States.

The use of specific highway networks allows the proposed changes in the truck size and weight limits to be measured on specific highway functional classes within each State. For each network, the mileage to and from each county population center was determined. For each origin-destination pair the following information was derived: (1) travel distance based on shortest travel time; (2) estimated travel time; (3) mileage on each highway functional class; and (4) non-network miles between origin/destination to the road network (i.e. drayage distance).

The network routings attempted to include all roads with current operations, but some additional restrictions were beyond the modeling capabilities, including “time of day” restrictions (for example, LCVs are not allowed in Denver, Colorado during rush hour) or “day of the week” restrictions (for example, no LCVs are allowed on Oregon’s coastal roads on the weekends).

Combinations with 48-foot semitrailers and “STAA” double trailers operate on a 200,000-mile network designated under the Surface Transportation Assistance Act of 1982 (STAA). Combinations with semi-trailers longer than 48 feet generally must comply with State routing requirements and provisions to minimize vehicle off-tracking. Figure II-8 shows the current permit requirements and route restrictions for LCVs in each scenario State.

[6] The analysis utilized NHPN Version 3.0, 2000. For more information please refer to www.transtats.bts.gov.

**Figure II-5**
**Current LCV Gross Vehicle Weights**
(pounds)




Notes: RMD is Rocky Mountain Double, TPD is Turnpike Double and BFB is Bridge Formula B

**Figure II-6**
**Current LCV Lengths**
(feet)




Notes: RMD is Rocky Mountain Double, TPD is Turnpike Double and CTL is Combined Trailer Length

**Figure II-7**
**Vehicles Operating in the Western Study States**




| | | | | | | |
|---|---|---|---|---|---|---|
| TARE: | 7,500 lbs | 10,400 lbs | 7,800 lbs | 4,500 lbs | 4,300 lbs | Total: 34,300 lbs |
| TARE: | 12,000 lbs | 30,000 lbs | 30,000 lbs | 16,300 lbs | 16,700 lbs | Total: 105,000 lbs |

**Washington / Idaho / Oregon Truck GVW 105,500 pounds**




| | | | | | | |
|---|---|---|---|---|---|---|
| TARE: | 7,500 lbs | 15,400 lbs | 7,800 lbs | 8,400 lbs | 6,200 lbs | Total: 38,100 lbs |
| TARE: | 11,500 lbs | 32,800 lbs | 32,800 lbs | 21,800 lbs | 23,800 lbs | Total: 123,000 lbs |

**Montana Truck 2 Sugar Beets GVW 123,000 pounds**




| | | | | | | |
|---|---|---|---|---|---|---|
| TARE: | 7,500 lbs | 10,600 lbs | 9,300 lbs | 4,500 lbs | 4,300 lbs | Total: 36,200 lbs |
| TARE: | 11,900 lbs | 32,800 lbs | 37,200 lbs | 13,700 lbs | 13,650 lbs | Total: 109,250 lbs |

**Nebraska Truck GVW 109,250 pounds**




| | | | | | | |
|---|---|---|---|---|---|---|
| TARE: | 7,800 lbs | 10,600 lbs | 7,800 lbs | 6,400 lbs | 6,200 lbs | Total: 38,300 lbs |
| TARE: | 12,000 lbs | 34,000 lbs | 34,000 lbs | 21,800 lbs | 25,700 lbs | Total: 127,500 lbs |

**Nevada Truck GVW 127,500 pounds**




| | | | | | | |
|---|---|---|---|---|---|---|
| TARE: | 7,500 lbs. | 10,900 lbs. | 7,900 lbs. | 6,800 lbs. | 6,400 lbs. | Total: 39,300 lbs |
| LOADED: | 11,900 lbs. | 32,800 lbs. | 32,800 lbs. | 21,600 lbs. | 23,900 lbs. | Total: 123,000 lbs |

**Montana Truck GVW 123,000 pounds**




| | | | | | | |
|---|---|---|---|---|---|---|
| TARE: | 7,500 lbs | 10,600 lbs | 9,300 lbs | 6,400 lbs | 6,200 lbs | Total: 40,000 lbs |
| TARE: | 11,000 lbs | 32,200 lbs | 37,200 lbs | 22,400 lbs | 25,200 lbs | Total: 128,000 lbs |

**Wyoming Truck 128,000 pounds**

**Figure II-8**
**Longer Combination Vehicle State Permit and Route Restrictions**

| State | Permit Required | Route Restrictions |
|---|---|---|
| Colorado | Annual permit required | Restricted to designated Interstate and state highway segments |
| Idaho | Required; good for 1 year from date of issuance | Allowed on National Network (NN) routes and access routes to breakdown areas via interchanges designated for LCVs |
| Kansas | Access permits, valid for 6 months required for access between Kansas Turnpike & terminals located within a 10-mile radius of each tollbooth except at NE end of Turnpike where 20-mile radius allowed. Special Vehicle Combination (SVC) permits, good for 1 year, are required for operation on I-70 between Colorado state line and Exit 19 | Allowed only on Kansas Turnpike, Special Vehicle Combination (SVC) triples allowed only on I-70 from Colorado state line to Exit 19 |
| Montana | Required for double trailer combinations if either trailer exceeds 28.5'. Annual or trip permits available; require continuous travel. Special triple vehicle annual or single trip permit required | Allowed on NN routes except US 87 from milepost 79.3 to milepost 82.5. Doubles have length and access limits. Triples allowed only on Interstate System and granted a 2-mile access off Interstate System for loading or service |
| North Dakota | Required if combination has gross vehicle weight of 80,000 pounds or more | Allowed on all NN routes with 10-mile access from National Network |
| Nebraska | Annual length permit required for cargo-carrying combinations greater than 65' | Triples can only travel empty. LCVs allowed on I-80 from Wyoming state line to Exit 440 (NE50); only doubles allowed a 6-mile access to designated staging areas |
| Nevada | Required | Allowed on all NN routes except US 93 from NV 500 to Arizona state line |
| Oklahoma | Required for all combinations | Allowed on NN and legally-available routes. 5-mile access from legal routes |

| State | Permit Required | Route Restrictions |
| --- | --- | --- |
| Oregon | Permit required if gross vehicle weight is 80,000 pounds or more | Oregon Doubles allowed on all NN routes. Triples allowed only on routes approved by Oregon DOT. Access determined by Oregon DOT |
| South Dakota | Required if combination has gross vehicle weight of 80,000 pounds or more | Doubles with cargo-carrying length of 81.5 feet or less are allowed on all NN routes with statewide access unless restricted by South Dakota DOT. Doubles over 81.5 feet and triples are allowed on the Interstate System and selected state routes. Access must be approved by South Dakota DOT |
| Utah | Required | All NN routes with access routes approved by Utah DOT for combinations of less than 85'. Combinations 85' and over may operate only on NN routes: I-15, I70 from JCT. I15 to Colorado state line, I-80, I-84 from JCT. I80 to Idaho state line, I-215, and UT 201 from I80 Exit 102 to 300 West St. Salt Lake City |
| Washington | Required for cargo-carrying units over 60' but not exceeding 68' | Allowed on all NN and state routes except WA 410 and WA 123 in Mt. Rainier N.P. May be restricted by local ordinances |
| Wyoming | No | Allowed on all NN routes and unlimited access off NN to terminals |

As part of the study's outreach effort, extensive routing maps were created showing the truck size and weight regulations in each State. Figures II-9 through II-11 show the current networks available for RMD (maximum 68-feet combined trailer length), TPD (82-feet combined trailer length and up) and triple trailer combinations. Most States do not prescribe a difference between Rocky Mountain Doubles and Turnpike Doubles; they specify routes for different combined trailer lengths. The distinction between Rocky Mountain Doubles and Turnpike Doubles is made in the maps below to facilitate comparisons in the Western Uniformity Scenario. In general a RMD has a combined trailer length between 68 and 81 feet and a TPD has a combined trailer length between 82 and 101 feet.

**Figure II-9**
**Rocky Mountain Doubles Base Case Network**



**Figure II-10**
**Turnpike Doubles Base Case Network**



**Figure II-11**
**Triples Base Case Network**



**Western Uniformity Scenario**

The LCV freeze imposed by the ISTEA of 1991 responded to public concerns regarding the safety of LCVs as well as concerns regarding rail competitiveness. This freeze prevents the States from changing the weights, lengths, and routes of LCVs. For purposes of the freeze, LCVs are defined as commercial motor vehicles having two or more cargo units and gross weights above 80,000 pounds. Figure II-12 provides additional details on the LCV freeze.

The Western Uniformity Scenario explores the impact of lifting the LCV freeze for 13 Western States and allowing States to set weight limits for LCVs that would be controlled only by federal axle load limits and the Federal Bridge Formula. Trailer lengths would be limited to 48 feet for twin trailer combinations and 28.5 feet for triple trailer combinations. Operations would generally conform to the *Guide for Uniform Laws and Regulations Governing Truck Size and Weight Among the WASHTO States* (January, 2000) that was adopted by the Western Association of State Highway and Transportation Officials (WASHTO).

Several States belonging to WASHTO chose not to participate in the analysis – Arizona, California, New Mexico, and Texas.[7] The non-participating States do not currently have LCV operations. As noted above, a number of States included in the analysis indicated they would not adopt the size and weight limits assumed in the scenario, even if given the flexibility to do so. Thus, like the other *CTS&W Study* Scenarios, this scenario is merely illustrative of the impacts that might occur if assumptions in the scenario were fully implemented.

**Figure II-12**
**The ISTEA Longer Combination Vehicle Freeze**

The Intermodal Surface Transportation Efficiency Act (ISTEA) of 1991 imposed a freeze on States to restrict the operation of Longer Combination Vehicles (LCVs) on the Interstate System to the type of vehicles in use on or before June 1, 1991. The ISTEA defined an LCV as a combination of a tractor and two or more trailing units weighing more than 80,000 pounds that operates on the Interstate. This freeze was continued with the Transportation Equity Act for the 21st Century.

In addition to freezing the weights, lengths and routes of LCVs on the Interstate System, ISTEA froze the lengths and routes of commercial motor vehicles having two or more cargo units on the National Network for Large Trucks. A commercial motor vehicle is a motor vehicle designed or regularly used for carrying freight whether loaded or empty.

Because of the freeze, States that did not allow LCV operations prior to June 1, 1991 are precluded from allowing them. States that did allow LCVs are precluded from lifting restrictions that governed LCV operations as of that date. Such restrictions may include route-, vehicle- and driver- specific requirements.

[7] Hawaii and Alaska are members of WASHTO but were not approached to participate since the analysis focuses on LCV operations on a continuous network.

**Scenario Description**

The Western Uniformity Scenario estimates the impact of lifting the LCV freeze (see Figure II-1) for 13 contiguous States: Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington and Wyoming. These States would be allowed to increase the size and weights of their LCVs to match the WASHTO guidelines. Four of the participating States, Montana, Nevada, South Dakota and Utah would experience little change since they currently operate vehicles at, or above, the scenario limits. The scenario assumes that all States would uniformly adopt the new limits, and therefore captures the maximum impact.

<u>The Vehicles</u>

The scenario focuses on three LCVs, Rocky Mountain Doubles (RMD), Turnpike Doubles (TPD) and Triple-Trailer Combinations (Triples). All lengths and weights are subject ot the BFB limits. All the participating States currently allow RMDs, although combined trailer length limits vary from 68- to 81-feet and weight limits vary from 105,500 to 129,000 pounds. A typical RMD consists of a three-axle truck-tractor with a long front trailer (40- to 48-foot) and a shorter (20- to 28.5-foot) rear trailer. RMDs are used for general freight and resource hauls. The scenario assumes that all 13 States would allow RMDs a combined trailer length of 81-feet and a GVW of 129,000 pounds. The trailers would be allowed up to a 48-foot lead trailer with a 28.5-foot rear trailer.

The scenario also includes the triple-trailer combination. A typical triple consists of a two- or three-axle truck-tractor towing three trailers. Each trailer is usually 28- to 28.5-feet in length. Of the 13 States in the study, only Washington and Wyoming do not currently allow triples. Nebraska allows only empty triples on a very limited network.[8] Triples are mostly utilized by the less-than-truckload industry to move relatively small shipments among their terminal network. The scenario would allow triples to operate up to three 28.5-foot trailers with a GVW of 110,000 pounds.

The longest and heaviest configuration tested in the scenario is the Turnpike Double (TPD). It would be allowed to 129,000 pounds GVW and have either maximum twin 48-foot trailers (101 feet combined trailer length) or maximum twin 45-foot trailers (95 feet combined trailer length). Both cases are tested since the WASHTO guide recommends twin 45-foot trailers, but five of the participating States currently allow the longer TPD, and 48-foot trailers are more common in the general truck fleet.[9] For discussion purposes this breaks the scenario into two cases: (1) the High-Cube Case that includes the twin 48-foot trailers; and (2) the Low-Cube Case that includes the twin 45-foot trailers. Both the High- and Low-Cube Cases include the RMD up to 81-feet combined trailer length and the triple-trailer configurations.

[8] Nebraska allowed a trailer manufacturer to haul empty trailers but they are no longer in business so Nebraska has no triples currently operating in their State.

[9] Also the twin 48-foot TPD was explicitly requested for analysis in the letter from the Western Governor's Association.

Figure II-13 summarizes the main features of the Western Uniformity Scenario.

**Figure II-13**
**Western Uniformity Scenario**



7-axle Rocky Mountain Double Maximum weight 111,000 lbs.



9-axle Turnpike Double Maximum weight 129,000 lbs



10-axle Resource Hauler Maximum weight 129,000 lbs.,



7-axle Triple Maximum weight 110,000 lbs

- **Main Feature**
  - Broad LCV Operations in 13 Western States
- **Available Highway:**
  - TPDs and Triples on Interstate;
  - RMDs and 8-axle B-train on National Network for STAA.
- **Access Provisions:**
  - TPDs and Triples State issues permits;
  - RMDs and 8-axle B-train current Federal and State provisions.
- **Bridge Formula B controls Axles and Allowable Weight up to 129,000 pounds for double and 110,000 pounds for a triple**

<u>The Networks</u>

Highway networks on which various LCVs were assumed to operate under the scenario are as follows: (1) RMDs would be allowed on the NN System and (2) TPDs and triples would be allowed only on the Interstate Highway System. As in the CTS&W Study, a larger network is assumed for RMDs because of their superior ability to negotiate curves and grades. The scenario networks are shown in Figures II-14 through II-16. In creating the scenario networks, it was assumed that States would continue to allow LCVs on all the current routes where LCVs now operate.

**Figure II-14**
**Rocky Mountain Double Western Uniformity Scenario Network**



**Figure II-15**
**Turnpike Doubles Western Uniformity Scenario Network**



**Figure II-16**
**Triples Western Uniformity Scenario Network**



Access Provisions

Current rules in the Western States control access to and from the road networks, see Figure II-8. The scenario assumes that States would continue to control access to and from the networks to mitigate LCV impacts on bridges, pavement, roadway geometry and congestion.

Because of poor off-tracking, or cornering, performance, the scenario assumes that TPDs would be restricted to the designated TPDs network. It is assumed that drivers of these vehicles will use staging areas—large parking lots—to disconnect the extra trailer and attach that trailer to another tractor for delivery to its final destination. Drayage is assumed to be along the most direct route off the network between the shipper or receiver and the network.

Triple-trailer combinations are allowed direct access, under a State-issued permit, to and from the network without disconnecting the trailers for up to 2 miles for loading or service.

# CHAPTER III

# Freight Distribution and Shipper Costs



## Introduction

Changes in truck sizes and weights impact the relative costs of utilizing different truck configurations and modal choice between truck and rail. These cost changes translate into changes in mode choice, changes in shipper costs and changes in the distribution of freight to truck configurations. The changes in the distribution of freight to truck configurations impacts truck vehicle miles traveled (VMT) and the weight distribution of that VMT. The shifts in freight between truck configurations and from rail to truck directly impact shipper costs, highway pavements, safety, energy consumption, air quality, and noise levels.

## Analytical Approach

The analytical approach used in the *CTS&W Study* is essentially unchanged but has been updated to include the newest data sources and expanded modeling of over 1 million truck shipments and explicit modeling of existing LCV shipments. Similar to the *CTS&W Study's* analysis the data is examined with explicit user-controlled assumptions concerning the mode and configuration costs. The discussion in this chapter focuses on the differences between the current analysis and the *CTS&W Study's* analysis. The reader is referenced back to Chapter IV of the *CTS&W Study* for a more general discussion of truck and rail analysis.

### Model and Data Updates

The analysis year for this scenario is 2010 and the base year is 2000. Using the methodology developed for the Department of Transportation's (DOT's) *1997 Federal Highway Cost Allocation (HCA) Study*, year 2000 VMT were developed for the study vehicles disaggregated by weight group, highway functional class and State. The base year data for the rail car mile traffic comes from the Surface Transportation Board's 2000 Waybill Sample.

The 2000 VMT and car mile estimates are forecast to 2010 using commodity-by-commodity demand based forecasting. The forecasts were developed by Global Insight (formerly DRI/WEFA) using their U.S. macroeconomic model. This improves upon the single percentage truck and rail growth rates that were used in the *CTS&W Study*.

<u>Truck Analysis</u>

For purposes of analysis truck traffic is divided into short-haul, long-haul and triples. The short-haul truck analysis focuses on combination trucks that operate less than 200 miles, on a typical haul. In the 13 scenario States this is primarily resource and construction hauls. Operations in four States that currently have double-trailer combinations operating at the scenario's weight limits were used to develop proportional weight distributions and utilization rates for the 9 States that would experience an expansion of their size and weight rules for double-trailer combinations.

The triple-trailer analysis similarly developed weight distributions and utilization rates for the 3 States that currently do not allow triple-trailer operations. Triple-trailer combinations are primarily operated by less-than-truckload carriers who use them to facilitate the movement of small packages between and among their terminals.

Long-haul truck analysis explicitly accounts for changes in transportation costs and the impact of expanded roadway networks. The analysis used the Intermodal Transportation and Inventory Cost Model (ITIC) developed for the *CTS&W Study* and further discussed in Chapter IV of that study. This analysis significantly updates the truck database by using the Freight Analytical Framework (FAF) database. The FAF data provides truck-freight-tonnage flows by commodity type at the county level of detail. FAF freight volumes are assigned to cargo body types using commodity and vehicle data from the *1997 Vehicle Inventory and Use Survey (VIUS)*. The assignment of truck tonnage totals to individual truck movements and configurations is estimated from the application of market freight-rate data to the truck flows routed over the available highway networks. The traffic is assigned to the configuration with the lowest cost as determined by the load size, which is based on commodity density (pounds per cubic foot) and market rates. The configuration's size and weight limit was set to the lowest maximum size and weight allowed in the States traveled in-route from origin to destination. Figure III-1 describes the development of motor carrier origination-destination specific market rates that used Signpost Solutions' *North American Truckload Rate Index.*

**Figure III-1**
**Development of Motor Carrier Market Rates**

- Year 2000 dry van tractor-semitrailer market rate-per-mile data covering 120 market areas and 14,400 origin/destination pairs.
- Rate differentials for non-dry van body types reflect differences from dry van in percent-empty rates, annual-mileage rates and trailer ownership cost.
- Rate differentials for other configurations reflect differences from tractor-semitrailer in engine size, fuel mileage, and cost of 2nd trailer based on length and number of axles.

<u>Rail Analysis</u>

The rail analysis, both intermodal and carload, followed the methodology used in the *CTS&W Study*. The data was updated to the 2000 Carload Waybill Sample and movements that did not travel within or through the 13 analyzed States were excluded.

**Shipper Cost Analysis**

A change in truck size and weight regulations will alter a shipper's logistic costs. "Logistic cost" includes the whole cost of receiving raw inputs and shipping final outputs. Transportation and inventory costs are two of the largest components of a

shipper's logistic costs.  This section updates transportation and inventory totals to 2000; Chapter XII of the *CTS&W Study* contains a more detailed explanation of the trade-off between transportation and inventory costs.

Transportation cost is the cost of moving a shipment from its origin to its destination.  In 2000 rail shippers paid $36 billion in transportation expenses and shippers using commercial trucks paid $481 billion of which $158 billion was intercity shipments (ENO Foundation).  Total logistics costs for all modes, including inventory, administration and carrying costs topped $1.006 trillion or 10.1 percent of year 2000 nominal gross domestic product (GDP).

Changes in truck size and weight also affect inventory costs.  Inventory costs include warehousing, depreciation, taxes obsolescence, insurance, ordering and interest expenses. Total national inventory carrying cost was estimated to be $1.485 trillion in 2000 (Cass Logistics).

The impact on shipper transportation costs is derived from the ITIC model.  As was true with the *CTS&W Study*, estimation of the aggregate changes in inventory cost associated with the illustrative scenario could not be completed within the scope of this study. Shipper costs for truck transportation are computed by multiplying the VMT for each shipment by that shipment's transportation cost, which depends upon the configuration, gross vehicle weight, and the market rate for that origination-destination pair.

Rail shipper transportation cost is computed from revenues reported in the Surface Transportation Board's (STB) Carload Waybill Sample, a sample of rail freight movements.  The Waybill Sample includes expansion factors to allow estimation of total impacts.  The cost of the truck alternative movement of rail traffic traversing the 13 study States is generated for base case and scenario truck configurations to compare with the cost of the move by rail.  Where the scenario's truck cost is below rail variable cost as reported in the Waybill, the traffic diverts to truck.  Where the scenario truck cost is above rail variable cost, but below rail revenue, rail retains the traffic by lowering the rate to match the truck cost.  As a result of the rate reductions made by rail to retain the freight, some shippers who remain on rail benefit from lower rates as well as those shippers who switch from rail to truck.

## Scenario Impacts

The Western Uniformity Scenario is analyzed with two alternative maximum lengths for the longest double trailers.  The two cases both include shorter double-trailer RMDs and triple-trailer combinations but the low-cube case constrains the longest double to 95-feet combined trailer length (this allows up to a twin 45-foot TPD), where as the high-cube case allows the longest double to reach 101-feet combined trailer length (this allows up to a twin 48-foot TPD).  The analysis assumes that the regulations governing the sizes and weights analyzed have been in place long enough to be fully adopted by industry.  Figure III-2 outlines assumptions regarding how freight currently traveling in the affected configurations would respond to the new LCVs.

**Figure III-2**
**Likely Truck Configuration Impacts of the Western Uniformity Scenario**

| Original Truck Configuration | | Likely Reaction to the Scenario |
|---|---|---|
| Five-axle tractor semitrailer | → | Change to Rocky Mountain Double |
| | → | Change to Turnpike Double |
| Five- or Six-axle double-trailer combination (LTL freight) | → | Change to triple-trailer combination (LTL freight) |
| Rocky-Mountain (or short) double-trailer combination | → | More payload |
| Turnpike (or long) double-trailer combination | → | More payload |
| Triple-trailer combination | → | No change |

As Table III-1 shows, total scenario VMT declines from base case levels for all of the highway classifications. The share of VMT on non-Interstate declines in each of the scenario cases as well. The largest decline in non-Interstate truck VMT occurs in the High Cube Case due to the utilization of the longer TPD that is restricted to the Interstate System.

**Table III-1**
**2010 VMT by Highway Type**
(in millions)

| Functional Class | Base Case VMT | Low Cube Case VMT | High Cube Case VMT |
|---|---|---|---|
| **Rural** | | | |
| Interstate | 8,329 | 7,850 | 7,791 |
| Other Principal Arterial | 3,457 | 2,810 | 1,942 |
| Other | 3,127 | 3,098 | 1,906 |
| **Urban** | | | |
| Interstate | 2,001 | 1,631 | 1,360 |
| Freeways/Expressways | 316 | 179 | 107 |
| Other | 1,592 | 1,460 | 922 |
| **Rural and Urban** | | | |
| Interstate | 10,330 | 9,482 | 9,151 |
| Other | 8,493 | 7,547 | 4,877 |
| Total | 18,823 | 17,029 | 14,028 |

The extent of LCV use will depend on the types of commodities moving within and through the region, as well as whether the traffic originates and/or terminates within the region. Tables III-2 and III-4 show the LCV share of VMT for specialized freight, dry freight, and in total for the Base Case and the Western Uniformity Scenario Cases. Intra-regional traffic has the largest penetration of LCVs in the Base Case and both of the

scenario cases. This is expected, as these traffic flows do not have the costly operational disadvantage of separating the configuration for travel outside the region.

**Low-Cube Case**

Table III-3 and Figure III-3 summarize the VMT analysis results for the low-cube case. In this case the 2010 VMT within the analyzed region[10] declines 9.5 percent. It is interesting to examine the impact of the scenario on truck traffic that flows within the 13 analyzed States, through the analyzed States (either across or with an origination or destination with in the analyzed States) and on rail traffic. Within the study region 69 percent of the base case VMT is impacted, 65 percent by shifts from tractor-semitrailer configurations to LCVs and 4 percent by increased weight on existing LCVs. Only 8 percent of the truck travel across the region is impacted (these are moves that have an origination and destination outside the 13 analyzed States). Table III-2 indicates that through-traffic VMT in the 13 States would actually increase from the use of more productive LCVs. This is because the best routing for much of the through-traffic between the Southeast and California in the base case is across Texas, New Mexico and Arizona. With the introduction of more productive LCVs in the west, the scenario routing shifts north to take advantage of the LCV network.[11]

Compared to the "Longer Combination Vehicles Nationwide Scenario" in the *CTS&W Study*, the impact of the regional permit system is very small. As a percent of the rail traffic moving within or through the 13 States, only 0.22 percent of the rail carload miles divert and only 0.07 percent of the intermodal rail miles divert to truck. The restriction of the 45-foot trailers on the turnpike double and the limited 13 State involvement coupled together create a small impact on the railroads. In contrast, the LCVs Nationwide Scenario predicted 9 percent of rail carload miles and 31 percent of rail intermodal miles diverted.

[10] Although it is implicitly assumed that VMT outside the analyzed region would not change there would probably be some small increase in VMT attributable to delivery of single trailers that travel as LCVs within the permitted States.

[11] This potentially overstates the diversion of truck traffic using I-40 in the base case since the shift-up to I-70 would force the trucks to travel through mountain passes where they would encounter steep grades and weather related issues.

**Table III-2**
**Base Case and Low Cube Western Uniformity Scenario**
**2010 LCV Vehicle Miles of Travel in the Analyzed Region**
**by Commodity Group and Flow Type**

| Commodity Group | Flow | VMT By Flow and Commodity Group | | | |
|---|---|---|---|---|---|
| | | Base Case | | Low Cube | |
| | | Total VMT (millions) | Percent in LCVs | Total VMT (millions) | Percent in LCVs |
| Bulk, Tank, Flatbed (Specialized Freight) | Intra-Regional | 2,101 | 12.7% | 1,713 | 88.8% |
| | Inbound | 1,098 | 0.8% | 958 | 40.5% |
| | Outbound | 2,285 | 0.8% | 2,150 | 23.8% |
| | Through | 887 | 0.0% | 895 | 7.1% |
| | Total | 6,370 | 4.6% | 5,716 | 43.5% |
| Dryvan, Reefer (General Freight) | Intra-Regional | 2,406 | 6.2% | 2,063 | 53.9% |
| | Inbound | 2,700 | 0.1% | 2,382 | 35.7% |
| | Outbound | 4,589 | 0.0% | 4,041 | 34.1% |
| | Through | 2,758 | 0.0% | 2,827 | 5.0% |
| | Total | 12,452 | 1.2% | 11,313 | 30.8% |
| All Traffic | Intra-Regional | 4,506 | 9.2% | 3,775 | 69.7% |
| | Inbound | 3,798 | 0.3% | 3,341 | 37.1% |
| | Outbound | 6,874 | 0.3% | 6,191 | 30.5% |
| | Through | 3,645 | 0.0% | 3,722 | 5.5% |
| | Total | 18,823 | 2.4% | 17,029 | 35.0% |

**Table III-3**
**Total VMT for Base Case and Western Uniformity,**
**Low-Cube Case**

| Scenario | Vehicle-Miles-of-Travel (in millions) |
|---|---|
| Base Case | 18,823 |
| Low-Cube Case | 17,029 |
| Percent Change | -9.5% |

**Figure III-3**
**Impact of Western Uniformity Scenario on VMT by Different Vehicles, Low-Cube Case**




## High-Cube Case

Table III-5 and Figure III-4 summarize the analysis results for the high-cube case. The longer turnpike double (up to twin 48-foot trailers) reduces VMT 25.5 percent among the 13 analyzed States. As with the low-cube case, it is interesting to examine the impact of the scenario on truck traffic that flows within the 13 analyzed States, through the analyzed States (either across or with an origination or destination with in the analyzed States) and on rail traffic. Within the study region 76 percent of the base case VMT is impacted, 71 percent by shifts from tractor-semitrailer configurations to LCVs and 5 percent by increased weight on existing LCVs. As compared to the low-cube case, there is a much larger impact on the through-traffic. In the high-cube case 60 percent of the through-traffic tractor-semitrailers divert to LCVs. These truck movements would originate as two single 48-foot tractor-semitrailers but would join as a twin 48-foot TPD for the move across the region and then split apart for delivery outside the region. Such operations could yield substantial benefits for logistics management and large fleet operations. Small single truck owner-operators could be at a competitive disadvantage.

Table III-4 shows that the different types of truck traffic are not impacted equally. The intra-regional traffic has the greatest cost per ton-mile gains since there is no penalty for staging trailers for moves outside the region. The Table also shows that the heavier bulk, tank and flatbed commodities are more likely to divert since they will experience strong gains in the amount of freight each truck can accept. Comparing Tables III-2 and III-4 shows that the longer trailers allowed in the High-Cube Case translate into more diversion for all traffic segments. The High-Cube Case exhibits a substantial jump in the inbound, outbound and through traffic that diverts when compared to the Low-Cube Case. This is because the "penalty" of delivering the trailers outside the 13 State region is less when operating 48-foot trailers than for 45-foot trailers.

As a percent of the rail traffic moving within or through the 13 States, only 0.24 percent of the rail carload miles divert and only 0.10 percent of the intermodal rail miles divert to truck. The restriction of the 48-foot trailers on the turnpike double and the limited 13 State involvement coupled together create a small impact on the railroads.

**Table III-4**
**Base Case and High Cube Western Uniformity Scenario**
**2010 LCV Vehicle Miles of Travel in the Analyzed Region**
**by Commodity Group and Flow Type**

| Commodity Group | Flow | VMT By Flow and Commodity Group | | | |
|---|---|---|---|---|---|
| | | Base Case | | High Cube | |
| | | Total VMT (millions) | Percent in LCVs | Total VMT (millions) | Percent in LCVs |
| Bulk, Tank, Flatbed (Specialized Freight) | Intra-Regional | 2,101 | 12.7% | 1,566 | 96.1% |
| | Inbound | 1,098 | 0.8% | 827 | 56.9% |
| | Outbound | 2,285 | 0.8% | 1,804 | 41.5% |
| | Through | 887 | 0.0% | 664 | 45.8% |
| | Total | 6,370 | 4.6% | 4,861 | 62.3% |
| Dryvan, Reefer (General Freight) | Intra-Regional | 2,406 | 6.2% | 1,853 | 62.7% |
| | Inbound | 2,700 | 0.1% | 1,966 | 58.8% |
| | Outbound | 4,589 | 0.0% | 3,302 | 58.0% |
| | Through | 2,758 | 0.0% | 2,047 | 50.3% |
| | Total | 12,452 | 1.2% | 9,167 | 57.4% |
| All Traffic | Intra-Regional | 4,506 | 9.2% | 3,419 | 78.0% |
| | Inbound | 3,798 | 0.3% | 2,792 | 58.3% |
| | Outbound | 6,874 | 0.3% | 5,105 | 52.1% |
| | Through | 3,645 | 0.0% | 2,711 | 49.2% |
| | Total | 18,823 | 2.4% | 14,028 | 59.1% |

**Table III-5**
**Total VMT for Base Case and Western Uniformity, High-Cube Case**

| Scenario | Vehicle-Miles-of-Travel (in millions) |
|---|---|
| Base Case | 18,823 |
| High-Cube Case | 14,028 |
| Percent Change | -25.5 % |

**Figure III-4**
**Impact of Western Uniformity Scenario on VMT by Different Vehicles, High-Cube Case**



**Shipper Cost Impacts**

Table III-6 shows that shippers who use the LCVs at heavier weights and sizes experience transportation savings. Truck shippers who change configurations would save $1,190 million in the low-cube case and $2,036 million in the high-cube case. Rail shippers who change from rail to truck save $2.3 million in the low-cube case and $3.2 million in the high-cube case. Rail shippers who continue to use the railroad obtain competitive rate reductions of $26 million in the low-cube case and $48 million in the high-cube case. The impact of the lower rail revenues is presented in Chapter X.

**Table III-6**
**Annual Transportation Cost Savings for Truck Shipments**

| | Western Uniformity Scenario | |
|---|---|---|
| | **Low-Cube Case** | **High-Cube Case** |
| **Truck-to-Truck** | | |
| Dollars (millions) | $1,190 | $2,036 |
| Percent Change | 2.3% | 3.9% |
| **Rail-to-Truck** | | |
| Dollars (millions) | $2.3 | $3.2 |
| Percent Change | 0.01% | 0.01% |
| **Rail Discount** | | |
| Dollars (millions) | $26 | $48 |
| Percent Change | 0.06% | 0.11% |

# CHAPTER IV

# Pavement



## Introduction

The *2002 Status of the Nation's Highways, Bridges, and Transit: Conditions and Performance Report to Congress* indicates that $594 billion in highway expenditures, exclusive of those related to bridges, will be required nationwide between 2001 and 2020 just to preserve the physical condition of the existing highway system. Changes in truck size and weight (TS&W) policy could have a major impact on pavement quality and performance characteristics and, therefore, future investment requirements.

As discussed in Chapter 3, uniform TS&W regulations in the Western States would change the distribution of freight to the more productive LCVs, and thus change the configuration characteristics of trucks traveling over the region's roadway pavements. Pavement wear occurs from load related, as well as non-load related factors. Non-load related factors include current pavement condition and environmental factors such as climate, subsoil type, and drainage.

Load related factors include axle weight, number, and width of tires on the axle, and spacing between axles. Because pavement deterioration increases with axle weight, the number of axle loadings and the spacing within axle groups, changes to the distribution of truck configurations traveling in the region could affect pavement wear.

## Truck-Pavement Interaction

The primary determinant of vehicle induced pavement wear severity is the load carried on axles and axle groups. Gross vehicle weight (GVW), in and of itself, has little impact on how much pavement wear a vehicle will cause. The number of axles and spacings between axles on the vehicle, and how the GVW is distributed over those axles, are the key determinants of the amount of stress a vehicle applies to the pavement.

Axle groups, such as tandems or tridems, distribute the load along the pavement, allowing greater weights to be carried and resulting in the same or less pavement distress than that occasioned by a single axle at a lower weight. The spread between two consecutive axles also affects pavement life or performance – the greater the spread, the more each axle in a group acts as a single axle. For example, a spread of 9 to 10 feet results in no apparent interaction of one axle with another, and each axle is considered a separate loading for pavement impact analysis or design purposes. Conversely, the closer the axles in a group are, the greater the weight they may carry without increasing pavement deterioration beyond that occasioned by the same number of single axles.

A common metric used to measure the amount of stress an axle or group of axles applies to pavement is the Equivalent Single Axle Load (ESAL). The ESAL unit expresses the amount of pavement stress occasioned by an 18,000 pound axle. Although ESALs were not used as the basis for estimating pavement impacts for this Study,[12] they are widely understood by those concerned with the pavement impacts of TS&W scenarios, and

[12] Pavement impacts in this study were estimated by Load Equivalency Factors (LEFs) for six pavement distresses. LEFs are similar to ESALs in that they standardize pavement distresses to an 18,000-pound axle equivalent, but the ESAL measure does not differentiate between distresses, such as fatigue, rutting and cracking.

provide a convenient metric for comparisons of pavement stresses between vehicles of different weights and axle configurations.

Table IV-1 shows payload tons per ESAL for study configurations at key weights, indexed to a 5-axle tractor-semitrailer weighing 80,000 pounds. Configurations at weights with an index number over 100 carry more payload per unit of pavement damage than the 5-axle tractor semitrailer, those with an index under 100 carry less.

**Table IV-1**
**Net Tons per ESAL –Study Configurations at Key Weights**
**(indexed: 80,000 pound CS-5=100)**

| Configuration – Axles[1] | GVW | Payload Tons Per ESAL (indexed: 80,000 pound CS-5=100) | |
|---|---|---|---|
| | | **Rigid Pavement** (10 inch thickness) | **Flexible Pavement** (structural number 5, terminal PSI 2.5) |
| 5-axle Tractor Semitrailer | 80,000[1] | 100 | 100 |
| | 85,500[2] | 81 | 83 |
| 6-axle Tractor Semitrailer | 85,000 | 145 | 160 |
| | 97,000 | 98 | 119 |
| 7-axle Tractor Semitrailer | 85,000[1] | 238 | 290 |
| | 101,000[2] | 142 | 189 |
| 5-axle Double-Trailer Combination | 80,000[1] | 126 | 72 |
| | 94,000[2] | 73 | 45 |
| 6-axle Double-Trailer Combination | 80,000 | 221 | 148 |
| | 97,000 | 120 | 86 |
| 7-axle Double-Trailer Combination | 95,000[1] | 202 | 158 |
| | 114,000[3] | 114 | 95 |
| | 121,500[2] | 93 | 79 |
| 8-axle Double-Trailer Combination | 95,000[1] | 255 | 263 |
| | 124,000[3] | 115 | 127 |
| | 126,000[2] | 111 | 124 |
| 9-axle Double-Trailer Combination | 95,000[1] | 380 | 333 |
| | 129,000[2,3] | 139 | 139 |
| 7-axle Triple-Trailer Combination | 90,000[1] | 261 | 142 |
| | 110,000[3] | 143 | 81 |
| | 121,500[2] | 104 | 61 |
| 8-axle Triple-Trailer Combination | 90,000[1] | 369 | 229 |
| | 110,000[3] | 213 | 136 |
| | 126,000[2] | 140 | 93 |

[1] Minimum Current WGA Limit for Configuration
[2] Maximum Current WGA Limit for Configuration
[3] Uniformity WGA Limit for Configuration

The ESAL calculations are based on hypothetical highway sections – rigid pavement of 10 inch thickness and flexible pavement with a structural number of 5 and terminal pavement serviceability index value of 2.5.[13] Actual ESALs (and LEFs) vary by several factors including pavement type, thickness and sub-grade type, as well as the distribution of GVW over the vehicle's axle groups. These theoretical values show relative relationships among axle load, axle type, pavement type, and pavement characteristics, but they do not show the influence of environmental factors and thus should not be used in specific applications.

The payload per ESAL measure reflects the volume of freight that can be moved per unit of pavement distress relative to the distress occasioned by a 5-axle tractor semitrailer at the Federal weight limit of 80,000 pounds. As the table shows, all of the configurations considered for uniform size and weight throughout the region, with the exceptions of the 7-axle double and 7-axle triple on flexible pavement, are less damaging than the 5-axle tractor semitrailer comparison vehicle. In the case of the 7-axle triple, it is important to note that this configuration is expected to divert traffic from the 5-axle double configuration, which is more damaging at 80,000 pounds than the 7-axle triple is at 110,000.

## Estimates of Pavement Cost – The National Pavement Cost Model

The National Pavement Cost Model (NAPCOM) was used to estimate potential pavement impacts resulting from changes in vehicle size and weight limits in the region.[14] NAPCOM is a complex simulation model initially developed in 1992 and subsequently improved for use in the 1997 *Highway Cost Allocation Study (HCA Study)* and 2000 *CTS&W Studies*. The key output of NAPCOM for truck size and weight analysis is the change in overall pavement improvement needs under alternative size and weight policy scenarios. The model is sensitive to different weight policies, depending on truck configuration, including the number of axles. Changes in pavement rehabilitation costs between successive runs of NAPCOM with changed assumptions about the distribution of freight among truck configurations and operating weights are attributed to specific groups of vehicles.

Axle load and frequency information have been estimated based on vehicle-miles-of-travel (VMT) information for various classes of highway vehicles from the 1997 *HCA Study*. *HCA Study's* VMT estimates by vehicle class and weight group have been updated and modified according to the policy options evaluated in this Study as analyzed in the freight distribution phase of the study described in Chapter III.

---

[13] Flexible pavement structural number is a measure of pavement strength determined from materials, thickness and drainage characteristics of the pavement subbase, base and surface layers. Pavement serviceability index is a ride quality measure scaled from 1 to 5. The terminal index value indicates the point where ride quality is unacceptable and requires resurfacing or rehabilitation.

[14] *NAPHCAS Users Guide*, R.D. Mingo, 1998. Unpublished.

## Scenario Impacts

Scenario pavement impacts are measured by comparing NAPCOM results from a scenario run of the model against those from a base case run of the model. A base case run of the model uses the distribution of VMT by vehicle class and operating weight under existing TS&W regulations to estimate the level of pavement damage under the assumption of no change to TS&W policy. A scenario run of the model uses the VMT distribution estimated in the freight distribution phase of the study to estimate the level of pavement damage under the assumed change to TS&W policy. The difference between the scenario result and the base case result is the impact of the policy change.

Table IV-2 shows the impacts for the two scenarios analyzed in this study. Neither scenario changed pavement cost nor the cost share attributable to the study vehicles significantly over the 20-year time horizon modeled by NAPCOM. The low cube scenario's 9.5 percent decline of study vehicle VMT decreases pavement cost by $258 million, 0.4 percent, over the 20-year period. The 25.5 percent decline in vehicle VMT in the high cube scenario decreases pavement cost by $2,787 million, or 4.2 percent.

The relatively small percent change in pavement cost seen in the two scenarios is not surprising. Neither scenario proposes changes to axle weight limits, the primary driver in pavement damage. Overall, the increased size and weight of each scenario moves the same amount of freight ton-miles generating essentially the same axle load equivalents as the base case, but with fewer VMT.

**Table IV-2**
**Scenario Pavement Impacts**

| Analytical Case | VMT in Region (millions) | | Impacts (millions of 2000 $) | | | |
|---|---|---|---|---|---|---|
| | All Highway Vehicles | Study Vehicles | Annual Pavement Cost | 20-Year Pavement Cost | Change from Base Case | Study Vehicles' Share |
| 2010 Base Case | 381,801 | 18,823 | $3,297 | $65,934 | -- | 76.0% |
| Low Cube Scenario | 380,008 | 17,029 | $3,284 | $65,676 | -0.4% | 75.4% |
| High Cube Scenario | 377,006 | 14,028 | $3,157 | $63,147 | -4.2% | 73.0% |

# CHAPTER V

## Bridge



## Introduction

Damage to highway structures represents the most critical infrastructure cost of allowing larger and heavier trucks on the nation's highways. All of the studies performed by the Federal Highway Administration (FHWA), the Transportation Research Board (TRB), and several universities in the last ten years that examined potential impacts of truck size and weight (TS&W) increases have found that the estimated damage to bridges would be the greatest single infrastructure cost caused by larger, heavier trucks.

## Impacts of Truck Loads

Bridges must be strong enough to safely accommodate all vehicular traffic. This accommodation of truck loads is the critical element in the design of highway bridges, except for the few very large bridges where the weight of the bridge itself is so much greater than the traffic loads that the bridge weight is the critical element. The analysis described below examines and compares the bending moments (and therefore the bending stresses) produced by the set of scenario trucks and the base case trucks with the moments caused by the bridge rating vehicle. Before documenting this analysis, bridge behavior when subjected to truck loads is briefly discussed.

### Stresses

In general, bridges must accommodate three forms of stress: bending stress, shear stress and fatigue stress. If a weight were placed at the center of a beam that is supported at each end, the beam would bend, or deflect. Material at the bottom center of the beam would stretch and at the top of the beam it would compress. Truck loads produce a bending moment, which inflicts this stress. A bending moment is a load times a distance; in bridges it is a point or equivalent point load (in cases of uniform or non-point loads) times the distance of that load to the nearest support. There is a direct one-to-one relationship between bending moment and bending stress.

Shear stresses can be thought of as those stresses caused by a force that cuts (i.e., shears) rather than bends the beam. For example, if a very large load were applied very close to the support, there would be no significant bending action (since the distance to the support is very small), however, the beam would resist the "cutting" action, that is, the shear stresses. Fatigue stresses are, most simply, repeated bending stresses. Everyone who has repeatedly bent a paperclip back and forth until it breaks has caused fatigue stresses to the metal of the clip. Although bridge engineers consider and design for all three stresses, in most cases, the bending moment stresses are the critical factor in the design.

### Types of Loads

Trucks affect bridges in several ways. When moving across a bridge, they produce static live loads and dynamic live loads. These loads result in the bridge experiencing bending, shear and fatigue stresses. The weight of the vehicle causes the live load stresses; its movement across the bridge, in conjunction with its weight, causes the dynamic stresses; and the movement, weight and the number of repetitions cause the fatigue stresses. When designing bridges, engineers

typically increase the static load by a fixed percentage (about 10 to 30 percent) to account for the dynamic load.

Additionally, the bridge must withstand dead loads (the weight of the bridge itself, including the weight of future overlays), wind, thermal, earthquake, and other loads. The AASHTO bridge design manuals provide procedures to account for all these stresses.

### Critical Stresses for Analysis

This analysis concentrates on bending moment stresses for several reasons. Generally a bridge designed to accommodate the bending moment stresses caused by the live, dead and dynamic loads, will also accommodate the fatigue and shear stresses. Thermal, wind and seismic stresses are not a function of vehicle weights and dimensions. If the bending stress is excessive, the other stresses usually are excessive as well. This is one reason that bridge replacement often is the best solution for an overstressed bridge. Another important reason is that highway agencies often must improve safety features, alignment, lighting, utilities, and other level of service characteristics if they strengthen a bridge. When costs of these other improvements is added to the cost of strengthening, total bridge replacement often is found to be more cost effective. Strengthening is possible for only some bridge types. Steel girder, some truss and even some prestressed concrete beam bridges can be economically strengthened if they meet all other stress and level of service criteria, but reinforced concrete slab and several other bridge types cannot be easily strengthened.

Bridge analysis for nationwide policy studies must rely on readily available nationwide data. The FHWA's National Bridge Inventory (NBI) is the only such dataset that meets this objective. Unfortunately, the NBI does not contain any detailed data describing the bridge geometry, location of details and the like which effectively rules out the analysis of fatigue, shear or other stresses that require this level of detailed data on the individual bridge design elements. However, the NBI does contain sufficient data describing the bridge length, support type, design type, material, etc., that permits the accurate estimation and computation of the live load and total bending moments. This is an additional reason why previous studies of national TS&W policy issues have either ignored fatigue and other less critical stresses or have handled them in a very simplified manner. But, as noted above, little is gained by considering fatigue or other stresses, since the bending stress is a reasonable proxy for all stresses.

## Design Vehicles, Ratings and the Federal Bridge Formula B

An examination of design vehicles, ratings, and the Federal Bridge Formula B (BFB) is necessary in any study of the impacts of TS&W changes, because these three concepts are interrelated with the concept of bridge overstress, which is the measure used to identify bridges that might require improvement if size and weight limits were changed.

### Design Vehicles

Bridge engineers developed the concept of design vehicles prior to World War II. They are hypothetical vehicles intended to represent the entire truck fleet in the vehicle stream. Use of the design vehicle allows the engineer to design bridges to safely withstand live load stresses caused

by a single envelop vehicle rather than having to estimate stresses for each of the many different types of trucks on the road. Most States use one type of design vehicle, the HS vehicle. The HS vehicle is a three-axle vehicle with the load on the steering axle of X tons, a load on the second axle of 4X tons 14 feet behind the steering axle, and a load on the third axle also of 4X tons spaced 14 to 30 feet from the other non-steering axle. The engineer tests several axle spacings for the distance between the second and third axles to determine which axle spacing produces the maximum stresses. In most cases, the HS vehicle with the short 28-foot wheelbase is most critical. The number immediately following the HS is the total weight of the vehicle in tons divided by 1.8. Consequently, the HS vehicle weighing 72,000 pounds would be the HS20 vehicle, since 36 tons (72,000 pounds) divided by 1.8 is 20. This vehicle would have a 4-ton load on the steering axle and loads of 16 tons on each of the other two other axles.

**Bridge Ratings**

States report two bridge ratings to the FHWA for inclusion in the NBI, the inventory rating and the operating rating. The inventory rating is effectively 55 percent of the yield[15] stress of the bridge and the operating rating is 75 percent of the yield stress. The design stress level for new bridges is effectively the same as the inventory rating, 55 percent of the yield stress. The FHWA requires that states report these ratings in terms of the hypothetical HS vehicle.

To determine the inventory rating of a bridge the analyst will compute the heaviest HS vehicle that can traverse the bridge such that the weakest structural member is effectively at 55 percent of its yield stress. In a well-designed bridge, once loaded, all the designed members will be at or near 55 percent of their yield stress. Generally, that produces a safety factor of 1.8 (1÷0.55). Most States allow full and legal operation of trucks that produce bending moments on a particular bridge less than or equal to the moment caused by this Inventory Rating Vehicle

The operating rating is computed in a fashion similar to the inventory rating except that the maximum stress is set at 75 percent of the yield stress of the weakest structural bridge member. Generally, this produces a safety factor of 1.33 (1÷0.75). Most States do not allow vehicles with or without a permit to travel on bridges that would be stressed beyond their operating rating. The only exception may be for special non-divisible loads for which a detailed engineering analysis of the bridge confirms that a single passage will not measurable harm the bridge.

The FHWA requires States to use a consistent analysis methodology to compute the rating and to report this rating in the HS rating system. This provides consistency across all States. For example, if the heaviest HS design vehicle that can traverse a bridge without exceeding the bridge inventory rating weighs 62,000 pounds, the bridge is rated at HS17.2, since 62,000 pounds is 31 tons, and 31 divided by 1.8 yields 17.2.

**Federal Bridge Formula B**

Every truck has a different HS rating, and that rating is different for every bridge. Consequently, a standard had to be developed that would provide an easily enforceable method to regulate the weight of all types of trucks to protect the nation's bridges. Consequently, the current standard,

[15] The limiting or yield stress is defined as the stress at which steel will undergo permanent deformation.

which is used in virtually all States for all highways, is the Federal Bridge Formula B (BFB). While most States provide some exceptions, usually for a few “grandfathered” trucks or for some economically important truck type (log carriers, grain carriers, etc.), the vast majority of States require trucks to meet BFB. A detailed discussion of BFB is in Appendix V-A.

## Description of Bridges in Western Uniformity Scenario States

Table V-1, in columns 2 through 4, shows the number of records in the NBI and the number and percent of “actual truck-relevant” bridges for each of the Western Uniformity Scenario States. Not all records in the NBI are bridges that would be affected by TS&W policy changes. There are a number of duplicate records, especially bridges over an Interstate Highway that appear twice in the NBI, once for the Interstate highway and once for the route traveling over the highway. Also there are bicycle and pedestrian bridges, railroad bridges, culverts, tunnels, and some structures less than 20 feet long that generally are not considered bridges.

Of the almost 92,000 actual truck-relevant bridges in the 13 States, almost 25 percent are on the National Truck Network for Large Trucks (NN)[16] on which it is assumed scenario vehicles would operate. The numbers of bridges, actual truck-relevant bridges, and the percent of actual truck-relevant bridges on Interstate and other NN highways for each State are shown in columns 5 through 7 in Table V-1.

## Analysis Methodology

The methodology used to estimate bridge costs for this scenario is similar to the method used to estimate bridge costs in the *Comprehensive Truck Size and Weight (CTS&W) Study*. It compares the bridges “overstressed” by the scenario vehicles with the bridges overstressed by the current fleet. Costs of improving or replacing bridges in the former set that are not in the latter set represent the incremental costs associated with the scenario.

### Analysis Tool

The model used in this analysis is the Bridge Analysis and Structural Improvement Software (BASIC) model. The model computes the live load and total load bending moment for any truck configuration, for any span length, for most bridge types, and for both continuous and simple span bridges. Additionally it computes the ratio of those moments to the NBI-reported inventory or operating rating. The model computes live load moments directly for each truck configuration and weight and representative dead loads for each bridge type (reinforced concrete, steel girder, prestressed concrete T beams, etc.) and span length. It assumes a vehicle in every lane of the bridge; lane loadings “kick in” according to AASHTO procedures. Although the model can handle the most prevalent bridge types, it cannot analyze suspension, movable, and timber bridges. BASIC applies State-specific unit construction costs to estimate replacement costs. It computes the square footage of the replacement bridge and then applies the unit cost to estimate the replacement cost.

[16] The National Network for Large Trucks is a 260,000 mile network of highways designated in 23 CFR 658. It includes virtually all the Interstate systems and other arterials that are used relatively extensively by trucks.

**Table V-1**
**Numbers of Bridges on Various Systems by State**

| State | Entire Highway System | | | Interstate and National Network Highways | | |
|---|---|---|---|---|---|---|
| | Number of Records | Number of "Actual" Bridges | Percent of Records that are Actual Bridges | Number of Records | Number of "Actual" Bridges | Percent of Records that are "Actual" Bridges |
| Colorado | 8,933 | 6,435 | 72.0% | 2,861 | 1,774 | 62.0% |
| Idaho | 4,557 | 3,872 | 85.0% | 999 | 747 | 74.8% |
| Kansas | 27,276 | 18,602 | 68.2% | 5,699 | 2,967 | 52.1% |
| Montana | 6,042 | 4,836 | 80.0% | 2,164 | 1,682 | 77.7% |
| North Dakota | 4,823 | 3,788 | 78.5% | 670 | 321 | 47.9% |
| Nebraska | 16,293 | 12,920 | 79.3% | 3,006 | 1,622 | 54.0% |
| Nevada | 1,635 | 843 | 51.6% | 784 | 444 | 56.6% |
| Oklahoma | 24,748 | 16,290 | 65.8% | 2,119 | 1,069 | 50.4% |
| Oregon | 8,037 | 6,971 | 86.7% | 2,136 | 1,496 | 70.0% |
| South Dakota | 6,502 | 5,123 | 78.8% | 5,136 | 4,241 | 82.6% |
| Utah | 3,584 | 2,232 | 62.3% | 1,272 | 852 | 67.0% |
| Washington | 9,228 | 7,279 | 78.9% | 4,095 | 2,766 | 67.5% |
| Wyoming | 3,331 | 2,620 | 78.7% | 1,573 | 1,270 | 80.7% |
| **TOTAL** | 124,989 | 91,811 | 73.5% | 32,514 | 21,251 | 65.4% |

## Overstress Identification Criterion

The stress level that should be used to estimate bridge replacement or major rehabilitation needs has been controversial. The U.S. Department of Transportation, in all of its TS&W studies, has used the inventory rating as the basis for determining whether bridge improvements would be needed if larger, heavier trucks were allowed to operate. The Transportation Research Board, on the other hand, has used the operating rating to identify bridge replacement needs.[17] This has resulted in much lower estimates of bridge improvement needs, but many analysts and bridge engineers believe the use of the operating rating underestimates bridge improvement needs. While States may allow vehicles that would stress bridges up to the operating rating to travel on a limited basis under special permits, many would not allow those vehicles to travel routinely at weights that would stress bridges to their operating rating.

[17] The TRB *Special Reports 225, Truck Weight Limits: Issues and Options* and *227, New Trucks for Greater Productivity and Less Road Wear: an Evaluation of the Turner Proposal* estimated the bridge costs of the TS&W changes under study based on the operating rating of 75 percent of yield stress, whereas reviewers of those reports found much higher bridge costs resulting from the use of the inventory rating of 55 percent of yield stress.

Significant cost differences result from the choice of rating. To test the sensitivity of bridge investment needs to assumptions about the level of stress at which bridge improvements would be made, this study estimates investment needs for several stress levels between the inventory and operating ratings.

Use of the lower stress level (inventory rating) results in many more bridges being identified as needing to be upgraded to accommodate increased weights. This is as expected, since the design rating is effectively the same as the inventory rating on a new bridge. Bridge designers have used the HS20 vehicle as the design standard for most bridges built in the last 50 years, although some States have begun to use the HS25 design vehicle so that the new bridges better accommodate heavier trucks. Use of the HS20 design vehicle resulted in bridges being over-designed for the truck fleet of 50 years ago. However, over time, as trucks were allowed to become heavier, this extra factor of safety has evaporated.

Today, while the HS20 vehicle still envelops most of the current truck fleet (except for LCVs and a few other very heavy trucks in States with "grandfather" rights), it does so with little margin of error. Consequently, small increases in truck weight will result in trucks having stresses greater than the HS20 design vehicle for most bridges. However, since the operating rating stresses are 36 percent greater than the inventory rating stresses, only large increases in truck weight and length will overstress bridges when the operating rating is used as the threshold in defining "overstress."

**Overstress**

The term "overstress" is figurative and does not necessarily mean that a bridge is in danger of failure. The NBI contains an inventory rating for each bridge that represents a stress effectively equivalent to 55 percent of the lowest yield stress of the primary bridge members. The rating is expressed in terms of a standardized vehicle, e.g., the HS20 vehicle. If a bridge has an HS20 inventory rating as reported in the NBI, it means that an HS20 vehicle on each lane produces an acceptable stress for the bridge; any vehicle that creates a greater moment than the HS20 vehicle "overstresses" the bridge. States regularly allow small overstresses, but large overstresses could cause premature deterioration or, if truly excessive, failure of key bridge members.

There are several factors that allow some bridge overstress without compromising safety. First, using the inventory rating as the basis for determining the level of overstress, provides a large measure of safety since it represents stresses of only 55 percent of the yield stress a bridge can withstand. Secondly, bridges have some unmodeled redundancy. The method used by the States to compute the bridge ratings reported to the FHWA do not consider the strength contributed by unmodeled members of the bridge superstructure; consequently, ratings are inherently conservative. Third, the rating methodology considers a truck with a moment equivalent to the rating vehicle in each lane of the bridge. This rarely occurs, especially on low volume roads, and thereby contributes to a considerable factor of safety.

Except in unusual cases, the dead load and the truck live load (times a multiple to account for dynamic stresses) are the prevailing factors in the design of the bridge, and in decisions

concerning whether bridge loadings associated with particular vehicle configurations would necessitate bridge replacement or repairs.

**Base Case Vehicles**

The first step in the analysis of the base case was to identify the vehicles in the current fleet and the highway systems on which they operate. Determining the vehicles currently operating in each study State is difficult because most State permit practices allow widespread use of vehicles that are heavier than Federal weight limits. Base case vehicles include not only vehicles operating at Federal and State weight limits without special permits, but also vehicles operated under monthly or annual permits that allow unlimited trips. In many cases these vehicles operate almost as freely as legal vehicles.

Motor vehicle laws and regulations were examined to discover what the legal and permitted loads and vehicle lengths were in each State. Although every State in the study uses Federal Bridge Formula B to determine truck axle loads and spacings, most States eliminate the 80,000 pound cap for grandfathered trucks, the multi-trip permit trucks, and for trucks operating on most of the non-Interstate highways. In addition, each State had unique overall length and trailer length restrictions.

The next step was to identify a small group of the critical vehicles from the current fleet for actual analysis. The objective was not simply to identify the heaviest trucks, but rather, to identify those trucks that would produce the greatest bending moment, and therefore the greatest bending stresses, on all types of bridges and spans lengths. It was not necessary to analyze every truck in the current fleet, but only the heaviest set of trucks representative of the current fleet. This usually means the heaviest of both short and long trucks. The base case trucks for each State are described in Table V-2.

The specific highway systems on which each set of trucks can operate were identified so that bridges subjected to overstress by the current vehicle fleet could be identified. Since not all overstresses are cause for immediate action, the number of bridges subjected to various levels of overstress was estimated. Bridges on the Interstate System and other parts of the NN were separated from those on other highway systems since the majority of LCV travel is on those higher-order systems.

# Table V-2
## Base Case and Uniformity Vehicles

| State | System | SU2 | | SU3 | | SU4-5 | | CS5 | | CS6 | | CS6-7 | | DB5-7 | | DB5-7 | | DB8 | | DB8 | | DB9 | | DB9 | | DB10 | | DB11 | | TRP | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) | WB (ft) | GVW (kips) |
| CO | All | | | | | 22 | 54 | | | 36 | 74.5 | 67 | 80 | 72 | 80 | | | | | | | | | | | | | | | | |
| | Non-Int | | | | | 22 | 54 | | | 36 | 85 | 67 | 85 | 72 | 80 | | | | | | | | | | | | | | | | |
| | Some Int | | | | | | | | | | | | | 75 | 94 | 97 | 110 | 109 | 126 | 121 | 110 | | | | | | | | | | |
| ID | All | 9 | 38 | | | 26 | 59.5 | 67 | 80 | 55 | 80 | | | 70 | 80 | | | | | | | | | | | | | | | | |
| | Arterials | 13 | 42 | 13 | 55.8 | 20 | 59.5 | 67 | 80 | 55 | 91.5 | | | 72 | 80 | | | | | | | | | | | | | | | | |
| | Special Arterials | | | | | | | | | 55 | 91.5 | | | | | | | | | | | | | | | | | | | 105 | 105.5 |
| | Special Arterials | | | | | | | | | 55 | 91.5 | | | | | | | 61 | 105.5 | | | 83 | 105.5 | | | | | | | | |
| | Special Arterials | | | | | | | | | 55 | 91.5 | | | | | | | | | | | 103 | 105.5 | | | | | | | | |
| KS | All | 9 | 38 | | | 26 | 59.5 | 80 | 80 | 43 | 80 | | | 65 | 80 | 80 | 80 | | | | | | | | | | | | | | |
| | Except Interstate | | | | | | | | | 53 | 85.5 | 67 | 85.5 | 65 | 85.5 | 80 | 85.5 | | | | | | | | | | | | | | |
| | Turnpike | | | | | | | | | | | | | 65 | 92 | | | | | | | 115 | 120 | | | | | 70 | 120 | 98 | 120 |
| MT | All | | | | | 26 | 59.5 | | | 43 | 80 | 43 | 90.6 | 65 | 89.6 | | | 43 | 90.6 | 77 | 108.4 | 91 | 123.2 | 99 | 127.6 | | | | | | |
| ND | All | | | | | 26 | 59.5 | 69 | 80 | 43 | 80 | | | 56 | 80 | 75 | 80 | | | | | | | | | | | | | | |
| | All, less Interstate | 10 | 40 | | | 19 | 60 | | | | | | | 86 | 105.5 | | | | | | | 60 | 105.5 | | | | | | | | |
| NE | All | | | | | 25 | 58.5 | 69 | 80 | 43 | 80 | | | 56 | 80 | 65 | 80 | | | | | | | | | | | | | | |
| | All, less Interstate | 10 | 40 | | | 19 | 60 | | | | | 70 | 95 | 85 | 95 | 60 | 95 | | | | | | | | | | | | | | |
| | Harvest, non-Int | | | | | 19 | 65 | | | | | 60 | 109 | 93 | 109 | | | | | | | | | | | | | | | | |
| NV | All | | | | | 25 | 58.5 | 69 | 80 | 43 | 80 | | | 56 | 80 | 75 | 80 | | | | | | | | | | | | | | |
| | Int and arterials | 10 | 44.5 | | | 19 | 54 | | | | | 74 | 103.7 | | | 86 | 114 | | | | | | | 60 | 91 | 101 | 115 | | | 101 | 128 |
| OK | All | | | | | 25 | 58.5 | 69 | 80 | 43 | 80 | | | 56 | 80 | 65 | 80 | | | | | | | | | | | | | | |
| | All, less Interstate | | | | | | | | | 68 | 90 | 52 | 90 | | | | | 49 | 90 | | | 111 | 90 | | | | | | | | |
| | Toll roads RINT ROPA | | | | | | | | | | | | | | | | | | | | | | | 111 | 108 | 54 | 108 | | | 117 | 108 |
| OR | All | 10 | 40 | | | 19 | 60 | 51 | 80.5 | | | 74 | 101 | 86 | 105 | | | | | | | 60 | 105 | | | | | | | 117 | |
| SD | All | 10 | 40 | | | 19 | 60 | | | | | 74 | 101 | | | | | | | | | | | | | 65 | 113 | 96 | 127.5 | | |
| UT | All | 10 | 40 | | | 26 | 59.5 | 67 | 80 | 43 | 80 | | | 65 | 80 | 80 | 80 | 80 | 80 | | | | | | | | | | | | |
| | Inter & Arterials | | | | | 19 | 60 | | | | | 74 | 101 | | | | | | | | | | | | | 65 | 113 | 96 | 127.5 | 102 | 126 |
| | Specific Arterials | | | | | 19 | 60 | | | | | 74 | 101 | | | | | | | | | | | | | 65 | 113 | 114 | 136 | | |
| WA | All | 10 | 40 | | | 27 | 65 | | | 43 | 80 | | | 63 | 80 | | | | | | | | | | | | | | | | |
| | All, less Interstate | | | | | 23 | 62 | 48 | 83 | | | 73 | 107.5 | | | | | | | | | 88 | 117 | | | | | | | | |
| WY | All | | | | | 23 | 64 | 48 | 83 | | | 73 | 105.5 | | | | | | | | | 88 | 117 | | | | | | | | |
| UNIFORMITY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| National Network | | | | | | | | | | | | | | | | | | 58 | 99 | 92 | 117 | | | | | 92 | 127 | | | | |
| Interstate | | | | | | | | | | | | | | | | | | | | | | | 108 | 129 | | | | | | 106 | 110 |

Truck Descriptions: SU = Single Unit; CS = Combination Truck with Semi-Trailer; DB = Combination Truck with One Semi-Trailer and One Full Trailer; TRP = Combination Truck with One Semi Trailer and Two Full Trailers. The number after the letter designation is the number of axles.

## Analysis Results

### Sensitivity Analysis

The BASIC program computes and compares bending moments of different vehicles. For this study bending moments of scenario vehicles are compared to moments produced by the inventory-rating vehicle. As noted above, this vehicle was chosen because bridges typically are designed based on the inventory rating and the Bridge Formula weight limits for different axle groups are derived from the inventory rating. Since States typically would not replace most bridges subjected to stresses that just exceed the inventory rating, a sensitivity analysis was performed to estimate the number of bridges that would be overstressed at various stress levels. Specifically, the number of bridges that would be overstressed by stresses 5 percent, 10 percent, 15 percent, 20 percent, 25 percent, 30 percent, and 36.4 percent greater than the inventory-rating vehicle was estimated. State responses to the various levels of overstress would vary depending on the particular bridge and the traffic volumes it carries, but this sensitivity analysis provides a basis for estimating the likely range of impacts rather than simply assuming that States would take actions at a single overstress level.

### Analysis Results – Base Case

Table V-3 shows the aggregate number and percent of bridges on the Interstate System and other NN highways that are estimated to be subjected by vehicles in the current fleet to bending stresses equal to or greater than the stresses caused by the inventory-rating vehicle.

In addition, it presents the number and percent of bridges subjected to stresses greater than or equal to 1.05, 1.10, 1.15, 1.20, 1.25, 1.30 and 1.364 times stresses caused by the inventory-rating vehicle. The percent of bridges estimated to experience bending moments greater than the moments caused by the inventory-rating vehicle varies greatly by State, from 92 percent for Colorado to 44 percent for Wyoming. This percentage is a function of the size and weight of the vehicles in the current fleet as well as the strength of the bridges in each State.

Following completion of the *CTS&W Study*, many comments were received indicating that States would not have to replace all structurally-deficient bridges, as was assumed in that study, but rather could strengthen some bridges. As noted above, not all types of bridges can be strengthened, and it would not be cost effective to strengthen others if significant other improvements were required to bring them up to current safety and geometric standards. To reflect the fact some bridges perhaps could be strengthened rather than having to be replaced, a second set of costs is estimated for each set of overstressed bridges. These lower costs are based on the assumption that one half the deficient bridges could be strengthened rather than replaced and that the cost of strengthening would be one-third the replacement cost. These costs and the assumptions upon which they are based are purely illustrative. The number of bridges that could be strengthened rather than having to be replaced cannot be estimated in a study such as this, and the costs to strengthen various types of bridges can vary widely.

**Table V-3**
**Analysis of the Base Case Trucks on the Interstate and National Network Highway Systems**

| State | Number and Percentage of Actual Bridges Experiencing "Overload" for Given Thresholds[1] | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | | 5% | | 10% | | 15% | | 20% | | 25% | | 30% | | 36.4 %[2] | |
| Colorado | 1,626 | 91.7% | 1,574 | 88.7% | 1,288 | 72.6% | 919 | 51.8% | 680 | 38.3% | 532 | 30.0% | 426 | 24.0% | 323 | 18.2% |
| Idaho | 562 | 75.3% | 337 | 45.1% | 173 | 23.2% | 82 | 10.9% | 45 | 6.0% | 29 | 3.8% | 19 | 2.6% | 11 | 1.5% |
| Kansas | 1,974 | 66.5% | 1,494 | 50.4% | 1,123 | 37.9% | 865 | 29.2% | 663 | 22.3% | 515 | 17.4% | 396 | 13.3% | 287 | 9.7% |
| Montana | 1,290 | 76.7% | 862 | 51.3% | 345 | 20.5% | 295 | 17.6% | 243 | 14.4% | 142 | 8.5% | 123 | 7.3% | 86 | 5.1% |
| N. Dakota | 197 | 61.2% | 114 | 35.5% | 59 | 18.2% | 29 | 9.1% | 20 | 6.2% | 14 | 4.2% | 8 | 2.6% | 4 | 1.3% |
| Nebraska | 1,167 | 72.0% | 1,038 | 64.0% | 619 | 38.2% | 376 | 23.2% | 277 | 17.1% | 201 | 12.4% | 168 | 10.3% | 122 | 7.5% |
| Nevada | 403 | 90.7% | 275 | 61.9% | 94 | 21.1% | 23 | 5.1% | 6 | 1.4% | 1 | 0.2% | 1 | 0.2% | 0 | 0.0% |
| Oklahoma | 747 | 69.9% | 341 | 31.9% | 237 | 22.2% | 172 | 16.1% | 144 | 13.4% | 133 | 12.5% | 132 | 12.4% | 122 | 11.4% |
| Oregon | 1,194 | 79.8% | 736 | 49.2% | 348 | 23.3% | 146 | 9.8% | 80 | 5.3% | 55 | 3.7% | 31 | 2.1% | 19 | 1.3% |
| S. Dakota | 3,803 | 89.7% | 2,723 | 64.2% | 2,187 | 51.6% | 1,669 | 39.3% | 1,254 | 29.6% | 1,053 | 24.8% | 947 | 22.3% | 858 | 20.2% |
| Utah | 392 | 46.0% | 81 | 9.5% | 23 | 2.7% | 11 | 1.3% | 7 | 0.9% | 7 | 0.9% | 6 | 0.7% | 6 | 0.7% |
| Washington | 1,840 | 66.5% | 1,134 | 41.0% | 648 | 23.4% | 410 | 14.8% | 293 | 10.6% | 220 | 7.9% | 155 | 5.6% | 126 | 4.6% |
| Wyoming | 553 | 43.5% | 331 | 26.1% | 171 | 13.4% | 80 | 6.3% | 44 | 3.5% | 28 | 2.2% | 19 | 1.5% | 11 | 0.9% |
| TOTAL | 15,749 | 74.1% | 11,041 | 52.0% | 7,315 | 34.4% | 5,079 | 23.9% | 3,756 | 17.7% | 2,931 | 13.8% | 2,431 | 11.4% | 1,975 | 9.3% |

1. "Overload" simply means that the vehicles produce a greater moment (and therefore a greater bending stress) than the bridge's inventory rating computed by the State.
1. Effectively, this represents the operating rating.

Cost of Replaced/Strengthened Bridges

Bridge replacement costs are based on the unit costs per square foot for each State as reported by the State to FHWA. The length and width of the bridge as reported in the NBI are multiplied together to get the area, that area is increased by 25 percent, and the result is multiplied by the unit cost per square foot to estimate the replacement cost. The increase of 25 percent is because FHWA data shows that replacement bridges, for reasons of safety and horizontal and vertical alignment, average about 25 percent longer than the bridges they replace.

Table V-4 below presents the costs associated with each level of overstress for total replacement and for the assumed less-than-full-replacement scenario described above. Based on assumptions in this analysis, base case bridge improvement costs in the scenario States could range from nearly $13 billion to slightly more than $0.5 billion. This is a large range, but as noted above it is unlikely that States would replace or improve many bridges subjected to stresses no greater than those of the basic bridge design vehicle, and it is also unlikely that States would allow bridges to be repeatedly subjected to stresses equivalent to the bridge operating rating without making plans to replace or improve those bridges. If one were to

assume that on average bridges would be replaced or improved when stresses exceeded design stresses by from 15 to 20 percent (about half way between the inventory and operating rating), the range of base case bridge improvement costs would be between $3,257 million and $1,586 million. All of those improvements would not have to be made immediately. If costs were spread over a 20-year period, the average annual cost would be between $163 million and $79 million.

**Table V-4**
**Base Case Cost Associated with Full Replacement and Less than Full Replacement for Eight Different Overstress Thresholds**

| Overstress Threshold (Percentage of Inventory Rating) | Number of Actual Deficient Bridges | Full Replacement Costs ($ millions) | Less Than Full Replacement Costs ($ millions) |
|---|---|---|---|
| 1.00 | 15,749 | $12,922 | $8,614 |
| 1.05 | 11,041 | $8,628 | $5,746 |
| 1.10 | 7,315 | $5,317 | $3,544 |
| 1.15 | 5,079 | $3,257 | $2,171 |
| 1.20 | 3,756 | $2,379 | $1,586 |
| 1.25 | 2,931 | $1,656 | $1,104 |
| 1.30 | 2,431 | $1,294 | $ 863 |
| 1.3664 | 1,975 | $839 | $ 559 |

### Analysis Results – Western Uniformity Scenario

The analysis of the scenario trucks follows identically the procedure for the base case vehicles. Earlier in this Chapter, Table V-2 describes the scenario vehicles. Because some of the vehicles are assumed to operate only on the Interstate System and others on both Interstate and non-Interstate portions of the National Network, each set of highways/vehicles was analyzed separately and the results combined to prevent double counting of overstressed bridges. Table V-5 shows estimates of the number of bridges that would be overstressed at various assumed thresholds relative to the inventory rating, and Table V-6 contains cost estimates to replace or improve those bridges. Again the third column represents the Less Than Full Replacement scenario based on the same assumptions as were used in the Base Case analysis.

The two alternative cases of the Western Uniformity Scenario – the high-cube allowing a combined trailer length of 101-feet and the low-cube that only allows a combined trailer length of 95-feet - do not make a difference in the analysis of bridge impacts.

**Table V-5**
**Analysis of the Uniformity Scenario Trucks on the Interstate and National Network Highway Systems**

| State | Number and Percentage of Actual Bridges Experiencing "Overload" for Given Thresholds[1] | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | | 5% | | 10% | | 15% | | 20% | | 25% | | 30% | | 36.4 %[2] | |
| Colorado | 1,572 | 88.6% | 1,402 | 79.0% | 1,150 | 64.8% | 889 | 50.1% | 687 | 38.7% | 495 | 27.9% | 360 | 20.3% | 230 | 13.0% |
| Idaho | 463 | 62.0% | 346 | 46.3% | 237 | 31.7% | 167 | 22.4% | 108 | 14.5% | 71 | 9.6% | 52 | 7.0% | 36 | 4.8% |
| Kansas | 2,314 | 78.0% | 1,986 | 66.9% | 1,623 | 54.7% | 1,308 | 44.1% | 1,055 | 35.6% | 841 | 28.3% | 689 | 23.2% | 522 | 17.6% |
| Montana | 1,173 | 69.7% | 610 | 36.3% | 397 | 23.6% | 336 | 20.0% | 268 | 15.9% | 138 | 8.2% | 124 | 7.4% | 99 | 5.9% |
| N. Dakota | 228 | 71.0% | 188 | 58.6% | 158 | 49.2% | 106 | 32.9% | 74 | 23.1% | 52 | 16.3% | 36 | 11.1% | 26 | 8.1% |
| Nebraska | 1,421 | 87.6% | 1,132 | 69.8% | 819 | 50.5% | 654 | 40.3% | 484 | 29.9% | 331 | 20.4% | 243 | 15.0% | 182 | 11.2% |
| Nevada | 371 | 83.5% | 289 | 65.2% | 179 | 40.4% | 106 | 23.9% | 77 | 17.4% | 47 | 10.7% | 43 | 9.7% | 41 | 9.3% |
| Oklahoma | 625 | 58.4% | 478 | 44.7% | 418 | 39.1% | 368 | 34.5% | 290 | 27.2% | 172 | 16.1% | 140 | 13.1% | 132 | 12.4% |
| Oregon | 1,181 | 79.0% | 997 | 66.6% | 761 | 50.9% | 526 | 35.2% | 435 | 29.0% | 339 | 22.7% | 307 | 20.5% | 246 | 16.5% |
| S. Dakota | 3,333 | 78.6% | 3,030 | 71.4% | 2,794 | 65.9% | 2,331 | 55.0% | 1,992 | 47.0% | 1,701 | 40.1% | 1,518 | 35.8% | 1,367 | 32.2% |
| Utah | 680 | 79.8% | 571 | 67.0% | 281 | 33.0% | 167 | 19.6% | 100 | 11.7% | 54 | 6.3% | 46 | 5.4% | 31 | 3.6% |
| Washington | 1,815 | 65.6% | 1,463 | 52.9% | 1,162 | 42.0% | 893 | 32.3% | 690 | 25.0% | 487 | 17.6% | 374 | 13.5% | 302 | 10.9% |
| Wyoming | 1,007 | 79.3% | 793 | 62.5% | 627 | 49.4% | 408 | 32.1% | 269 | 21.2% | 169 | 13.3% | 93 | 7.3% | 38 | 3.0% |
| **TOTAL** | **16,183** | **76.2%** | **13,287** | **62.5%** | **10,604** | **49.9%** | **8,260** | **38.9%** | **6,530** | **30.7%** | **4,899** | **23.1%** | **4,023** | **18.9%** | **3,254** | **15.3%** |

1. "Overload" simply means that the vehicles produce a greater moment (and therefore a greater bending stress) than the bridge's inventory rating computed by the State.
2. Effectively, this represents the operating rating.

**Table V-6**
**Western Uniformity Scenario Cost Associated with Full Replacement and Less than Full Replacement for Eight Different Overstress Thresholds**

| Threshold as Percent Greater than Inventory Rating | Number of Actual Deficient Bridges | Full Replacement Costs ($ millions) | Less than Full Replacement Costs ($ millions) |
|---|---|---|---|
| 0 | 16,183 | $13,507 | $9,004 |
| 5 | 13,287 | $11,561 | $7,707 |
| 10 | 10,604 | $9,472 | $6,314 |
| 15 | 8,260 | $7,382 | $4,921 |
| 20 | 6,530 | $5,872 | $3,914 |
| 25 | 4,899 | $3,881 | $2,587 |
| 30 | 4,023 | $3,113 | $2,075 |
| 36.64 | 3,254 | $2,543 | $1,695 |

Differential Costs Attributable to the Western Uniformity Scenario Trucks

Subtracting the numbers of bridges and the replacement costs of the Western Uniformity Scenario results from the results of the base case analysis yields the costs attributable to the scenario vehicles. The number of bridges is presented in Table V-7, and the costs in Table V-8.

**Table V-7**
**Analysis of Additional Overstressed Bridges on Interstate and National Nework Systems**

| State | Number and Percentage of Additional Actual Bridges Experiencing "Overload" for Given Thresholds[1] | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | | 5% | | 10% | | 15% | | 20% | | 25% | | 30% | | 36.4 %[2] | |
| Colorado | -54 | -3.0% | -172 | -9.7% | -138 | -7.8% | -31 | -1.7% | 7 | 0.4% | -37 | -2.1% | -66 | -3.7% | -92 | -5.2% |
| Idaho | -99 | -13.3% | 9 | 1.2% | 63 | 8.5% | 86 | 11.5% | 63 | 8.5% | 43 | 5.7% | 33 | 4.4% | 24 | 3.3% |
| Kansas | 340 | 11.5% | 491 | 16.6% | 499 | 16.8% | 443 | 14.9% | 393 | 13.2% | 326 | 11.0% | 293 | 9.9% | 235 | 7.9% |
| Montana | -117 | -7.0% | -252 | -15.0 % | 51 | 3.1% | 41 | 2.4% | 25 | 1.5% | -4 | -0.2% | 1 | 0.1% | 13 | 0.8% |
| N. Dakota | 31 | 9.8% | 74 | 23.1% | 99 | 30.9% | 76 | 23.8% | 54 | 16.9% | 39 | 12.1% | 27 | 8.5% | 22 | 6.8% |
| Nebraska | 253 | 15.6% | 94 | 5.8% | 199 | 12.3% | 278 | 17.1% | 207 | 12.8% | 130 | 8.0% | 76 | 4.7% | 60 | 3.7% |
| Nevada | -32 | -7.2% | 14 | 3.2% | 86 | 19.3% | 83 | 18.8% | 71 | 16.0% | 46 | 10.4% | 42 | 9.5% | 41 | 9.3% |
| Oklahoma | -122 | -11.4% | 137 | 12.9% | 181 | 16.9% | 196 | 18.3% | 147 | 13.7% | 39 | 3.6% | 7 | 0.7% | 10 | 1.0% |
| Oregon | -13 | -0.9% | 261 | 17.4% | 413 | 27.6% | 380 | 25.4% | 355 | 23.7% | 284 | 19.0% | 276 | 18.4% | 227 | 15.2% |
| S. Dakota | -470 | -11.1% | 306 | 7.2% | 607 | 14.3% | 662 | 15.6% | 737 | 17.4% | 647 | 15.3% | 571 | 13.5% | 509 | 12.0% |
| Utah | 288 | 33.8% | 490 | 57.5% | 258 | 30.3% | 155 | 18.2% | 92 | 10.8% | 47 | 5.5% | 39 | 4.6% | 25 | 2.9% |
| Washington | -26 | -0.9% | 329 | 11.9% | 514 | 18.6% | 483 | 17.5% | 397 | 14.4% | 268 | 9.7% | 219 | 7.9% | 176 | 6.4% |
| Wyoming | 454 | 35.8% | 462 | 36.4% | 456 | 35.9% | 328 | 25.8% | 225 | 17.7% | 140 | 11.1% | 74 | 5.8% | 27 | 2.1% |
| TOTAL | 435 | 2.0% | 2,245 | 10.6% | 3,289 | 15.5% | 3,182 | 15.0% | 2,773 | 13.0% | 1,968 | 9.3% | 1,592 | 7.5% | 1,278 | 6.0% |

1. "Overload" simply means that the vehicles produce a greater moment (and therefore a greater bending stress) than the bridge's inventory rating computed by the State.
2. Effectively, this represents the operating rating.

An examination of these tables reveals some very interesting results. From Table V-7 one sees several negative numbers in the "greater than zero percent" and "greater than 5 percent" overload column. This means that the Western Uniformity Scenario vehicles produce greater moments than the inventory vehicle (or inventory vehicle plus 5 percent) on fewer bridges than the base case vehicles. This is not surprising since it became clear early on in the study that a few States allow some very large and heavy trucks on their systems through monthly or annual permits. Consequently, if those States fully allowed the scenario vehicles to operate *in lieu of, not in addition to*, the currently operating vehicles, fewer bridges would be overstressed. However, as the overstress threshold increases to the Inventory rating plus 10 percent or more, then the scenario vehicles overstress more bridges than the current vehicles.

This occurs for several reasons including the behavior of continuous bridges and the varying effects of long versus short trucks.

**Table V-8**
**Incremental Cost Differences between Base Case and Western Uniformity Scenario with Full Replacement and Less than Full Replacement for Eight Different Overstress Thresholds**

| Threshold As Percent Greater than Inventory Rating | Number of Actual Deficient Bridges | Full Replacement Costs ($ millions) | Less Than Full Replacement Costs ($ millions) |
|---|---|---|---|
| 0 | 435 | $585 | $ 390 |
| 5 | 2,245 | $2,933 | $1,955 |
| 10 | 3,289 | $4,155 | $2,770 |
| 15 | 3,182 | $4,125 | $2,750 |
| 20 | 2,773 | $3,494 | $2,329 |
| 25 | 1,968 | $2,224 | $1,483 |
| 30 | 1,592 | $3,113 | $2,075 |
| 36.64 | 1,278 | $2,543 | $1,695 |

## Conclusion

Many western States already allow operations of vehicles that produce stresses exceeding the inventory rating of many bridges on the National Network in those States. States recognize there is a substantial safety factor built into bridge design when deciding which bridges might need to be replaced or strengthened because of truck loadings, and typically would not consider a bridge stressed only to its inventory rating to require replacement or strengthening. If there were questions about the strength of particular bridges, inspection schedules on those bridges might be accelerated.

Analysis done for this study indicates that fewer than 2,000 bridges currently are subjected to stresses that exceed their operating rating, which typically represents the greatest loads that States allow, even for single trip permits. This analysis assumes that vehicles that are allowed to operate under multi-trip permits may utilize every route on the NN. This assumption may overstate the number of bridges that are subjected to stresses exceeding their operating rating because some permits may contain route restrictions to prevent operations on roads with inadequate bridges. It is unlikely that States would allow widespread operations of trucks that stressed bridges to their operating rating without putting those bridges into their bridge improvement programs for either replacement or strengthening.

In the long term, States likely would replace or strengthen bridges subjected to stresses falling between the inventory and operating rating. Decisions on improvement needs for specific bridges would depend on a variety of factors including the volume and

characteristics of truck traffic using those bridges, the availability of alternative routes, and the degree to which the bridge is being overstressed. For purposes of estimating bridge investment needs associated with the Western Uniformity Scenario, it is assumed that bridges overstressed by 15 to 20 percent compared to the inventory rating would require eventual replacement or strengthening because of those stresses.

Without a detailed structural analysis of each bridge, it is impossible to determine, on a national basis, which bridges States might strengthen rather than replace. Furthermore, the cost to strengthen various bridges could vary widely. The *CTS&W Study* did not consider the potential to strengthen some bridges, but comments from some States indicated that strengthening would be an option for some bridges. For purposes of this analysis it is assumed that 50 percent of the bridges might be able to be strengthened and that the cost to strengthen the bridges would be one-third the cost to replace the bridge.

Based on these assumptions the incremental bridge costs attributable to the Western Uniformity Scenario would be between $2.329 billion and $4.125 billion. In some cases the States could open some bridges to the larger and heavier vehicles assumed in this scenario without having to make the improvements first. States could be expected to determine the priority and timing of needed bridge improvements based on the volumes of traffic and the degree to which the bridge was being overstressed. In some cases States might not allow larger, heavier trucks to use all segments of the network immediately but rather would open segments only when the infrastructure was adequate to accommodate the new vehicles.

# CHAPTER VI

# Roadway Geometry



Western Uniformity Scenario Analysis

## Introduction

This chapter focuses on the interaction of the Western Uniformity Scenario's truck configurations with roadway ramps, interchanges and intersections. The Scenario's longer combination vehicles (LCVs) are potentially less maneuverable than vehicles currently in use.

The addition of longer LCVs on more roadways in the Scenario would require intersection and interchange improvements to allow for the safe operation of these vehicles. Also in the Western Uniformity Scenario TPD and triples would be restricted to a limited network of highways. These trucks would need to be assembled and disassembled at staging areas adjacent to the highway. This chapter includes a discussion of current staging area practices in the Western States and provisions for staging areas under the Scenario.

## Roadway Geometry and Truck Operating Characteristics

This section provides an overview of the relationship between vehicle turning characteristics ("offtracking") and roadway geometry. A more detailed discussion is provided in the *CTS&W Study* Volume II, Chapter VI and Volume III, Chapter VII.

### Offtracking

Offtracking is said to occur when a vehicle makes a turn and it rear wheels do not follow the same path as its front wheels. The magnitude of this generally increases with the spacing between the axles of the vehicle and decreases for larger radius turns. Offtracking is considered in determining the extent to which roadway geometrics would need upgrading to accommodate less maneuverable LCVs. There are two types of offtracking: low-speed and high-speed.

*Low-Speed Offtracking* occurs when a combination vehicle makes a low-speed turn – for example a 90-degree turn at an intersection – and the wheels of the rearmost trailer axle follow a path several feet inside the path of the tractor steering axle. Figure VI-1 illustrates low-speed offtracking in a 90-degree turn for a tractor-semitrailer. Excessive low-speed offtracking makes it necessary for the driver to swing wide into adjacent lanes when making a turn to avoid climbing inside curbs, striking curbside fixed objects or other vehicles. On an exit ramp excessive offtracking can result in the truck tracking inward onto the shoulder or up over inside curbs. For single trailer combinations, this performance attribute is affected primarily by the distance of the tractor kingpin[18] to the center of the trailer rear axle or axle group. For multitrailer combinations the effective wheelbase(s) of all the trailers in the combination, along with the tracking characteristics of the converter dollies, dictate low-speed offtracking. In general longer wheelbases worsen low-speed offtracking.

[18] Kingpin setting refers to the truck-tractor fifth wheel connection point for the kingpin which is located to the front of the semitrailer

**Figure VI-1 Low-Speed Offtracking**




*High-Speed Offtracking* results from the tendency of the rear of the truck to move outward due to the lateral acceleration of the vehicle as it makes a turn at higher speeds. Figure VI-2 illustrates high-speed offtracking for a standard tractor-semitrailer. The speed-dependent component of offtracking is primarily a function of the spacing between truck axles, the speed of the truck, and the radius of the turn; it is also dependent on the loads carried by the truck axles and the truck suspension characteristics.

**Figure VI-2 High-Speed Offtracking**



## Analytical Approach

This study examines the impact that scenario truck configurations would have on freeway interchanges, at-grade intersections, mainline curves and lane widths of the current roadway system, determines what improvements would be needed to accommodate the new trucks, and estimates the costs of these improvements. The focus of this research is to compare the new truck configurations with the current tractor-semitrailers and LCVs operating in the Scenario States.

Unlike the analysis for the *CTS&W Study* Volume III, the base case vehicle in this analysis varies by State depending on that State's grandfather laws under the 1991 ISTEA freeze. The chosen base case vehicle represents the worst vehicle from an offtracking perspective currently allowed on the analyzed roadway segment. For example if the worst off-tracking vehicle currently allowed on the roadway is a TPD then the TPD is used as the base case for that road segment, if the RMD is the worst offtracking vehicle then it is used as the base case vehicle, and if the 53-foot tractor semitrailer has the worst offtracking then it is the base case vehicle. Table VI-1 shows the base case RMD and TPD for each State. This precise framing of the base case is an improvement to the *CTS&W Study's* analysis that used the 48-foot tractor semitrailer at 80,0000 pounds as the base case vehicle for all roads.

**Table VI-1**
**Dimensions of Base Case Vehicles**
(feet)

| State | Rocky Mountain Double | Turnpike Double |
|---|---|---|
| Colorado | 43.5 + 31 | 48 + 48 |
| Idaho | 35 + 20 | 35 + 20 |
| Kansas | 48 + 28.5 | 45 + 45 |
| Montana | 38 + 28 | 45 + 45 |
| Nebraska | 38 + 20 | 38 + 20 |
| Nevada | 48 + 28.5 | 48 + 48 |
| North Dakota | 48 + 28.5 | 48 + 48 |
| Oklahoma | 48 + 28.5 | 48 + 48 |
| Oregon | 35 + 20 | N/A |
| South Dakota | 48 + 28.5 | 48 + 48 |
| Utah | 48 + 28.5 | 48 + 48 |
| Washington | 35 + 20 | N/A |
| Wyoming | 38 + 27 | N/A |

Table VI-2 shows the low-speed offtracking and swept path for the analyzed configurations. The measure is shown for a standard 90-degree right-hand turn with a 42-foot radius[19] negotiated at a speed of 5 kilometers per hour. Low Speed Offtracking is the one measure where the STAA Double outperforms all the other configurations. The long TPD with twin 48-foot trailers performs the worst of the vehicles.

**Table VI-2**
**Offtracking Characteristics**

| Vehicle Description* | Configuration** | Performance Data | |
|---|---|---|---|
| | | Low Speed Offtracking (feet) | Swept Path |
| Single (53') | 3-S2 | 16.12 | 24.12 |
| STAA Double (2@28) | 2-S1-2 | 13.52 | 21.52 |
| RMD (38', 27') | 3-S2-3 | 18.57 | 26.57 |
| RMD (38', 27') | 3-S2-4 | 22.08 | 30.08 |
| RMD (38', 27') | 3-S2-2 | 21.54 | 29.54 |
| RMD (35', 20') | 3-S2-2 | 15.78 | 23.78 |
| RMD (38', 28') | 3-S2-4 | 20.06 | 28.06 |
| RMD (38', 20') | 3-S3-2 | 18.42 | 26.42 |
| RMD (38', 27') | 3-S2-4 | 21.02 | 29.02 |
| RMD (43.5', 31') | 3-S2-4 | 20.78 | 28.78 |
| RMD (38', 27') | 3-S3-4 | 19.13 | 27.13 |
| RMD (48', 28.5') | 3-S2-3 | 21.87 | 29.87 |
| Short TPD (2@45') | 3-S2-4 | 27.98 | 35.98 |
| Long TPD (2@48') | 3-S2-4 | 30.63 | 38.63 |
| Triple A-Train (3@28') | 2-S1-2-2 | 20.38 | 28.38 |
| Triple C-Train (3@28') | 2-S1-2-2 | 20.38 | 28.38 |

* Vehicle description shows the vehicle type where RMD is a Rocky Mountain Double and TPD is a Turnpike Double. The numbers in parenthesis give the length of each trailer.
** The first number in the series indicates the number of axles on the power unit; the next set refers to the number of axles supporting the trailing unit ("s" indicates it is a semitrailer) and the subsequent numbers indicate the number of axles associated with the remaining trailing unit(s).

## Impact Analysis

### Geometric

The four roadway geometric elements impacted by truck offtracking are mainline horizontal curves, horizontal curves on ramps, curb return radii for at-grade ramp terminals and curb return radii for at-grade intersections. Data on these elements were collected for nine States in the CTS&W Study. Two of those States, Kansas and Washington, are in the current Scenario. Data from that two State sample were used by

[19] The *CTS&W Study* analyzed a 38-foot path radius.

researchers to examine the five highway types in the sample States and determined the mainline curve radii based on Highway Performance Monitoring System (HPMS) data. Where HPMS data were not available the sample States provided existing aerial photographs and as-built plans on ramp curve and curb return radii at ramp terminals and intersections.

Roughly 25 rural interchanges, 25 urban interchanges and 25 rural at-grade intersections in each of the sample States were examined. The locations were selected because they carried substantial truck traffic.

The feasibility of widening each curve radius was rated as: minor difficulty (just add a little more pavement), moderately difficult, or extremely difficult (requiring major construction or demolition of existing structures). Sample data were expanded to the National Network for Large Trucks (NN). Estimates were made for the number of locations or mileage that needed improvements and the amount and cost of widening for each truck that offtracks more than the currently operating longest vehicle on that roadway segment.

The amount of widening was based on the offtracking of the scenario trucks. For horizontal curves and ramps, it was decided that no encroachment of shoulders or adjacent lanes would be allowed. For intersections and ramp terminals, trucks were not allowed to encroach upon shoulders, curbs, opposing lanes, or more than one lane in the same direction.

For some facilities, the cost of widening existing highway features is required even for the current vehicle fleet if there are turns and highway curves that cannot accommodate existing trucks. Those costs are reported in the Base Case Scenario. Similar to the bridge cost analysis, the Base Case Scenario results are subtracted from the Western Uniformity Scenario results to estimate the incremental cost of the proposed scenario vehicles.

**Staging Areas**

As shown in Table VI-3, the scenario States vary in their current treatment of staging areas. Most States like Montana and Wyoming specify limited access but do not require staging areas. On the other hand, Idaho publishes a list of staging or “breakdown” areas close to the road network. These staging areas are privately owned and operated at truck stops or warehouse facilities.

**Table VI-3**
**Current Access Provisions**

| State | Provision |
|---|---|
| **Colorado** | Limited to 10 miles |
| **Idaho** | Specified Staging Areas (privately operated) |
| **Kansas** | State Issued Access Permit |
| **Montana** | Triples Limited to 2 miles off Interstate; Doubles - Reasonable Access |
| **Nebraska** | Within 6 miles of Interstate and approved by State |
| **Nevada** | Reasonable Access |
| **North Dakota** | Reasonable Access |
| **Oklahoma** | Limited to 5 miles from Interstate or 4 lane divided highway |
| **Oregon** | Staging at Private Facilities for Triples |
| **South Dakota** | Reasonable Access |
| **Utah** | Off-Interstate Routes as authorized by State |
| **Washington** | Reasonable Access |
| **Wyoming** | Reasonable Access |

To minimize the infrastructure repairs it is assumed the Turnpike Double is not allowed off the Interstate Network, except where already permitted by a State. Also, the triple trailer combination is restricted to the Interstate but that restriction is driven less by offtracking concerns but more by automobile driver concerns. Staging areas are assumed to exist at key rural interchanges and the fringes of major urban areas.

The *CTS&W Study* explicitly estimated the number and cost of staging areas, see Volume III, page VII-9. The present analysis employs the experience of Idaho DOT as a model for how the other 12 States would enact the necessary staging areas. Idaho DOT publishes maps showing the routes for extra-length configurations that provide the locations of breakdown or staging areas. The areas are built and maintained by private companies and users must make arrangements with the owners for use of the staging areas.

Therefore, it is assumed in this study that staging areas would be privately provided and States would make lists and maps publicly available to the truck operators.[20]

[20] To match State practices staging areas are not estimated for this Scenario, but it is recognized that adequate truck parking is a broader but separate problem (see NCHRP 314: Strategies for Managing Increasing Truck Traffic, 2003).

## Scenario Impacts

### Geometric Improvements

The model used in the *CTS&W Study* was used to estimate geometric improvement costs for the Base Case and Western Uniformity Scenarios based on the offtracking performance of the specified truck configurations, and the mileage and location of the roads upon which the vehicles are expected to operate. The 1994 costs were updated to 2000 using the Annual Price Trends for Federal-Aid Highway Construction Composite Index for the Scenario States.[21]

The costs to upgrade the roadway geometry are shown in Table VI-4. This upgrading improves the mainline curves, intersection and interchange features such that the scenario vehicle with the worst offtracking characteristics would not offtrack excessively, that is, offtrack outside the width of its lane.

**Table VI-4**
**Scenario Roadway Geometric Impacts**

| Analytical Case | Worst Offtracking Vehicle On Roadway | Improvement Costs ($ million) | | | | |
|---|---|---|---|---|---|---|
| | | Mainline Curves | Intersections | Interchanges | Total | Incremental to Base Case |
| Base Case | RMD | $47 | $99 | $5 | $152 | |
| | TPD | $112 | $214 | $387 | $713 | |
| | **Total Cost** | **$159** | **$313** | **$393** | **$864** | **NA** |
| Western Uniformity Low Cube | RMD | $165 | $394 | $12 | $571 | |
| | TPD-45 | $109 | $159 | $445 | $714 | |
| | **Total Cost** | **$274** | **$553** | **$457** | **$1,284** | **$420** |
| Western Uniformity High Cube | RMD | $165 | $394 | $12 | $571 | |
| | TPD-48 | $150 | $221 | $698 | $1,069 | |
| | **Total Cost** | **$314** | **$615** | **$710** | **$1,639** | **$775** |

[21] Price Trends for Federal-Aid Highway Construction, FHWA-IF-02-038.

# CHAPTER VII

# Safety



## Introduction

Considerable debate has focused on the safety of commercial heavy trucks, and particularly questioning if changing truck sizes and weights would alter roadway safety. As noted in the *Comprehensive Truck Size and Weight* (*CTS&W*) *Study*, the safety of freight moving on the roadway is a combination of many factors: vehicle miles traveled (VMT) or exposure; vehicle performance characteristics; driver performance and ability; enforcement; roadway design; road conditions; motor carrier management; and vehicle condition and maintenance. Among these factors isolating the impact of TS&W is difficult. Because larger and heavier trucks are a relatively small subgroup of all trucks, differentiating their crash involvement patterns from those of other truck types is problematic. This study will discuss the safety performance and exposure factors for the Western Uniformity Scenario vehicles.

Discussing these safety aspects is not intended to diminish other facets of the safety picture. Difficult to quantify aspects, such as alternative enforcement mechanisms, vehicle maintenance and driver qualifications are discussed in the *CTS&W Study*.

The analysis presented in this chapter confirms three important factors highlighted in the *CTS&W Study*. First, travel on undivided, higher speed-limit roads with many at-grade intersections and entrances significantly increases crash risks compared to travel on Interstate and other roadways with design characteristics similar to Interstate highways. Second, higher traffic density increases the crash risk. Third, TS&W policies can influence vehicle stability and control because they directly impact key vehicle design attributes such as number of axles, track width, wheelbase, number of units in a combination, loaded weight and overall length.

This chapter contains two major sections. The first highlights the vehicle safety performance analysis undertaken for Western Uniformity Scenario. The analysis uses the same methodology as the *CTS&W Study* to examine current western LCVs and the Scenario's LCVs. The second section reviews recent crash data analysis and presents an updated crash data analysis.

## Vehicle Safety Performance Analysis

Three performance measures are often used as indicators of a truck's crash risk: Static Rollover Threshold, Rearward Amplification, and the Load Transfer Ratio. All three metrics describe aspects of a vehicle's inherent propensity to rollover. Crashes where the first event was a truck rollover accounted for 20 percent of the fatal single-vehicle crashes for large trucks in 2000.[22]

Both the current population of LCVs operating in the Western States and the Western Uniformity vehicles were analyzed. All the Scenario's vehicles currently operate in some part of the study region. This allowed the researcher to obtain "real-world" physical

[22] 2000 Large Truck Crash Facts, Publication No. FMCSA-RI-02-002, "Table 25: Crashes Involving Large Trucks by First Harmful Event and Crash Severity."

measurements for the stability input variables (for example, king pin setting, axle spacings, typical loads etc.).

In addition, current LCVs were analyzed because the large differences in State LCV regulations produce significant variations in vehicle design. These differences also translate into variations in vehicle dynamic performance. A sizable effort was made to fully understand the priorities and constraints unique to the Western States that would influence vehicle design particularly with respect to safety performance optimizations. The simulation and safety analysis reflects basic vehicle design, commodity types and loading variations occurring in the Western States.

**Analyzed Vehicles**

Table VII-1 shows the configuration, body type, trailer length(s), articulation type and GVW for the analyzed vehicles. These parameters were used to determine the vehicle stability and control performance.

The analysis includes van-type configurations including: the 5-axle tractor semitrailer, STAA Doubles, Rocky Mountains Doubles (RMD), Turnpike Doubles (TPD) and Triples. The analysis shows results for both the A-train and C-train Triples configurations. The tank vehicles are truck trailers, RMD A-train and its equivalent B-train configuration. This Chapter provides the results for the 96-inch axle width.[23]

The articulation type (see Figure VII-3) strongly influences the vehicle's stability and control. Both the C-dolly and B-train connections effectively eliminate an articulation point and increase stability and dynamic control of the vehicle. On the other hand, the reduced articulation decreases the maneuverability of the vehicle through curves and turns, impacting roadway geometry and traffic operations. The same trade-off exists for the vehicles with wider axle widths (see Woodrooffe, 2003).

The vehicles are evaluated at their respective maximum allowable weight conditions since the Western LCVs used for bulk transport are typically loaded to their maximum allowable gross weight. This represents the most severe operational case for vehicle stability since the center of gravity is the highest.

[23] Results in are shown in the present Chapter for the 96-inch axle width since that is the predominate vehicle width in the U.S. fleet (VIUS, 1997). The report *Western Longer Combination Vehicle Scenario: Vehicle Operations and Safety Analysis* by John Woodrooffe for this study includes analysis for some tank trailers with 102-inch width axles and also extended chassis. The wider trailer and extended chassis are analyzed to show the improvements to stability and control.

**Table VII-1**
**List of Analyzed Vehicles**

| Configuration | Body Type | Trailer Length (Feet) | Articulation Type | GVW (Pounds) |
|---|---|---|---|---|
| STAA Double | Van | 28 X 28 | A-Train | 80,000 |
| Tractor Semitrailer | Van | 53 | - | 80,000 |
| Turnpike Double | Van | 45 X 45 | A-Train | 129,000 |
| Turnpike Double | Van | 48 X 48 | A-Train | 129,000 |
| Rocky Mountain Double | Van | 48 X 28 | A-Train | 117,000 |
| Rocky Mountain Double | Van | 48 X 28 | A-Train | 113,000 |
| Rocky Mountain Double | Hopper | 35 X20 | A-Train | 105,500 |
| Rocky Mountain Double | Hopper | 38 X 28 | A-Train | 123,000 |
| Rocky Mountain Double | Hopper | 38 x 20 | A-Train | 109,250 |
| Rocky Mountain Double | Hopper | 38 x 27 | A-Train | 127,500 |
| Rocky Mountain Double (long) | Hopper | 44 x 31 | A-Train | 123,000 |
| Rocky Mountain Double | Hopper | 38 x 27 | A-Train | 128,000 |
| Rock Mountain Double | Tank | 41 X 22 | A-Train | 117,000 |
| Rock Mountain Double | Tank | 41 X 22 | B-Train | 117,000 |
| Triple | Van | 28 X 28 X 28 | A-Train | 118,500 |
| Triple | Van | 28 X 28 X 28 | C-Train | 118,500 |
| Truck Trailer | Tank | 38 | - | 114,300 |

The load for all van type trailers is 'general freight' occupying the full height of the load space. This assumes general freight has 30 percent of the payload in the top half of the container and 70 percent in the bottom half. Thus, the load has a relatively high center of gravity but not as high as a homogeneous load of the same dimensions. The analysis for the *CTS&W Study* used a homogeneous load to maximize the instability. Such a loading is atypical. Fancher et al[24] found general freight to have the 30 – 70 distribution and that is the distribution used in the present analysis.

## Results

This section discusses the stability results for Static Rollover Threshold, Rearward Amplification and Load Transfer Ratio. These factors measure the impact of a sudden lane change, swerve and/or curve if negotiated at too great a speed potentially resulting in a rollover accident.

### Static Rollover Threshold

Static Rollover Threshold is a significant vehicle performance measure because it reflects overall vehicle stability for both emergency lane changes and typical negotiation of a well-designed roadway curve. The likelihood for a vehicle having to perform an evasive maneuver during a given trip is very low. By comparison, all vehicles must routinely

[24] Fancher, P.S., Ervin, R.D., Winkler, C.B., Gillespie, T.D. 1986. *A Factbook of the Mechanical Properties of the Components for Single-Unit and Articulated Heavy Trucks. Phase 1. Final Report.* Michigan University, Ann Arbour, Transportation Research Institute. 190 p. Sponsor: National Highway Traffic Safety Administration, Washington, D.C. Report No. UMTRI-86-12/DOT/HS 807 125. UMTRI-74246

negotiate curves and turns. In either case, vehicles with a low Static Rollover Threshold will be challenged.

The Static Rollover Threshold is the minimum amount of lateral acceleration needed to result in wheel lift-off from the ground – the point at which the vehicle then rolls over (Figure VII-1). Higher scores indicate better performance. Larger, heavier vehicles do not necessarily have poorer Static Rollover Threshold performance than smaller, lighter ones. The important variables are how the payload is distributed along the length of the vehicle and the height of the center of gravity. In general the lower the center of gravity and the more uniformly distributed the payload then the more stable the vehicle.

**Figure VII-1**
**Illustration of Rollover Initiation**



Static Roll Threshold can vary with the density of the commodity by up to 25 percent. On the other hand, since each van trailer is "loaded" with 70 percent of the load in the bottom half and 30 percent in the top half, all van trailers will have a rollover threshold of approximately 0.36g. These values represent a van with 96-inch width. Most new van trailers have a 102-inch width, producing a 5 percent improvement in roll stability. Static Rollover Threshold of the tanker fleet is approximately 0.40g, that is approximately 22 percent better than van trailers. This is due to the lower center of mass of the tank trailers relative to the van trailers.

Figure VII-2 shows the Static Rollover Threshold for 17 analyzed vehicles. The first 8 were chosen from the fleet of current vehicles operating in the West and the latter 9 are the Scenario vehicles – some of which already operate in the West. Static Rollover Threshold less than 0.30 is considered very poor, between 0.30 and 0.35 is poor, between 0.35 and 0.40 is good and greater than 0.40 is excellent. All the configurations analyzed have a good to excellent rating for Static Rollover Threshold.

As shown in Figure VII-2, most of the van trailer Scenario vehicles perform worse than the STAA double. This is critical since currently over 50 percent of the LCVs in the Western States are van-trailers,[25] a pattern that would continue under the Scenario. Past studies have shown that the Static Rollover Threshold can be improved through different vehicle designs – such as wider vehicles, lower floor heights; new equipment such as enhanced electronic braking, tire and suspension systems; and B-train and C-dolly trailer connections (see Figure VII-3). The B-train improvement can be seen comparing the final two vehicles in Figure VII-2, a RMD tanker versus the B-train, with all other variables held constant, there is a 3 percent improvement.

**Figure VII-2**
**Static Rollover Threshold**
**Current Vehicles and Scenario Vehicles**




[25] Vehicle Inventory and Use Survey, 1997.

**Rearward Amplification**

When articulated vehicles undergo rapid steering, the effect at the trailer is magnified. This can result in excessive movement of trailers, which can be very dangerous if, for instance, they move into other lanes and interfere with other vehicles. In the extreme, LCVs' rearward amplification can cause rear trailers to rollover.

Rearward amplification is influenced by the center-of-gravity, axle group weights, wheelbase dimensions, coupling types and locations, drawbar dimensions, suspension and tire characteristics. Mathematically, rearward amplification is the ratio of the lateral acceleration experienced at the rearmost trailer in a combination to that of the tractor, when a lane-change evasive maneuver is executed. In this case, values of 2.0 or less indicate acceptable performance.[26]

Figure VII-4 shows that certain configurations of LCVs are more prone than typical tractor-semitrailers to rearward amplification. For example, rearward amplification is 1.73 times greater for trucks with twin 28-foot trailers than for typical tractor semi-trailers, but can be 2.18 times worse for triple-trailers (with their five points of articulation) than it is for typical tractor semi-trailers. The type of mechanism connecting the trailers can affect the rearward amplification. A mechanism with a single connection point to the lead trailer, the most common type in the United States, is referred to as an "A-train" or "A" converter dolly. This type allows more rearward amplification than does the "B-train" or "C-train". Figure VII-3 illustrates and discusses these different connecting mechanisms.

Figure VII-4 shows that typical tractor-semitrailer combinations have a rearward amplification of 1.24. Currently -- designed STAA doubles (two 28-foot trailers) have rearward amplifications of 2.15. Also the RMD at 105,500 pounds with medium and light density commodities would be considered to have poor dynamic performance. The Triple-trailer A-train, at a value of 2.72, has the highest Rearward Amplification of all vehicles examined. When the Triple-trailer combination is fitted with C-dollies, dynamic activity is reduced by 39 percent and is in line with the remaining vehicles. The most stable vehicle examined is the B-train tanker at 117,000 pounds and a trailer width of 102" – it performs even better than the single-trailer combination.

[26] *Performance Based Standards for Heavy Vehicles in Australia*, 1999

## Figure VII-3 Major Types of Converter Dollies

In the case of multi-trailer combinations, roll coupling is a vehicle design feature that counters dynamic roll instability. It uses a coupling feature designed to take advantage of the fact that two adjacent units in a multi-trailer combination roll in different directions during a dynamic lane change maneuver. By making the coupling or hitch more rigid along the roll axis, each unit in the combination "helps" the other counteract excessive roll forces.

Roll coupling is a special attribute of "B-train" and "C-dolly" connections. A "B-train" connection between two trailers in a twin configuration essentially creates a semitrailer/semitrailer combination with two articulation points instead of three. A standard “fifth-wheel” connection is used to couple the two trailers together, thereby providing significant counter-roll forces between the two trailers.

A "C-dolly" connection also provides roll and coupling stiffness through the use of two drawbars between trailers. "A-dollies", which are used today, have one drawbar. Both B-train and C-dolly connections between two trailers effectively eliminate an articulation point and provide a large counter-roll force for each of the two trailers when dynamic forces act in opposing directions during an evasive lane change maneuver.

Some researchers believe the same effect can be accomplished through the use of such advanced technology as electronically controlled braking systems (currently the subject of a field operational test), which employ load and speed sensitive differential braking to maintain the direction of the individual units in combination vehicles making evasive maneuvers. This could reduce the crack-the-whip phenomenon and dynamic roll instability especially inherent in multi-trailer vehicles.



**Figure VII-4**
**Rearward Amplification: Current and Scenario Vehicles**




## Load Transfer Ratio

Load transfer ratio is the proportion of load transferred to one side of a vehicle in a transient evasive steering maneuver. When the load transfer ratio reaches 1, the entire vertical component of the load is being transferred through the wheels on one side of the vehicle and rollover is about to occur. The load transfer ratio directly expresses the proximity to rollover in rapid maneuvers and emergency avoidance situations. In important respects, the load transfer ratio combines the influence of steady-state rollover and rearward amplification in one performance index. The load transfer ratio is computed for a standard maneuver based on a standard steering input. Load transfer ratio is influenced by the center-of-gravity, axle group weights, vehicle width, lateral load shift, wheelbase dimensions, coupling types and locations, drawbar dimensions, suspension characteristics and tire characteristics.

The Canadian performance standards recommend when a loaded vehicle "negotiates an obstacle avoidance, or lane change maneuver at highway speeds, the load transfer ratio should not exceed 0.60."[27] This is the generally accepted standard for other jurisdictions that employ performance measures. Of the current double configurations, only the STAA double and 105,500 pound LCV were found to have sub-standard performance.

Among the Scenario vehicles, Figure VII-6 shows that the B-train fuel tanker has the most stable characteristics followed closely by the Triple C-train. The improved performance by the B- and C-train configuration is attributed to the elimination of one articulation point per trailer and the addition of roll coupling between trailers. The Load Transfer Ratio of the RMD fuel tanker with a GVW 117,000 pounds was 2.4 times greater than the B-train tanker at the same GVW. However, the RMD compared favorably with the other vehicle classes including the tractor semi-trailer. This underscores the superior characteristics of the B- and C-train configurations.

The Load Transfer Ratio performance of the Triple A-train and the STAA Doubles is very poor. In the simulation, the Triple A-train achieved the theoretical maximum of unity, which means that the vehicle would have rolled over given the standardized test maneuver.

The TPD at GVW 129,000 pounds with 48-foot trailers out-performed the tractor semi-trailer at a GVW 80,000 pounds. When the trailers of the TPD were shortened from 48 feet to 45 feet, the Load Transfer Ratio increased by approximately 7 percent. This finding indicates that the stability performance of the TPD improves with trailer length.

[27] *Recommended Regulatory Principles for Interprovincial Heavy Vehicle Weights and Dimensions*, Vehicle Weights and Dimensions Study Implementation Planning Subcommittee, final release September, 1987.

**Figure VII-5**
**Load Transfer Ratio Current and Scenario Vehicles**




## Crash Database Analysis

Many studies have attempted to identify how crash propensity varies with TS&W, with particular focus on doubles and/or LCVs. Some studies have reported that multiple-trailer trucks have lower crash rates than single-trailer trucks and other studies have reported the opposite. The disparity in findings is explained, in large part, by the difficulty in analyzing a relatively small population of vehicles and obtaining reliable accurate VMT and crash data for each vehicle type. To try to overcome these difficulties researchers have used various methodologies and data sets in different studies, resulting in different conclusions.

Prior studies are examined in an attempt to obtain indications of potential crash impacts associated with estimated changes under the Western Uniformity Scenario. Past studies do

differentiate between single-trailer combination trucks and multi-trailer combination trucks, but the multi-trailer group includes STAA doubles (tractor and two 28-foot trailers) along with RMDs, TPDs, and Triples. STAA doubles dominate the multi-trailer crash history since they are the most common multi-trailer combinations. Nevertheless, the multi-trailer/single-trailer distinction is still important since LCVs are configured similar to STAA doubles and have similar dynamic handling/stability performance characteristics. But as discussed in the previous section on stability and control, most longer LCVs are more stable than STAA doubles although they off-track to a much greater degree. The greater length of LCVs may also make passing maneuvers on two-lane highways, and merging and weaving maneuvers on freeways more difficult than for shorter STAA doubles.

There have been attempts to isolate LCVs' crash experience from STAA doubles through surveys, making assumptions about past and future operating environments, or analyzing the data from countries that allow wider use of LCVs. All these efforts have fallen under criticism. Studies using surveys have difficulty matching the survey respondents to the VMT estimates, or the sample set is not large enough, or the sampled population contains a self-selection bias. Several studies assume that relaxed LCV regulations would translate into LCVs operating on roadways similar to current single trailer combination trucks, even though most States that allow LCVs limit their use to certain highways. Although these State-permitted highways include some two-lane highways, all States that allow LCVs restrict them to a subset of the highway network that is available to single-trailer combination trucks. The assumption that LCVs could operate throughout a State's highway network increases estimated multi-trailer fatal crash rates, since fatal crash rates are higher on rural non-Interstate highways. Finally, there have been attempts to utilize Canadian or Australian data to predict the safety impacts associated with more widespread LCV use in the U.S., but those countries have very different enforcement mechanisms, road networks, and traffic densities, making it difficult to draw implications from their crash experience for the U.S.

The following section discusses the methodology, data, and results for seven recent statistical examinations of multi-trailer combination vehicle safety. Table VII-7 summarizes results from those studies applicable to the current Scenario. Although several of the studies present data on single-unit trucks, this summary does not include that information since the Scenario would not impact those vehicles.

**Previous Research**

(1) *Truck Safety: The Safety of Longer Combination Vehicles is Unknown*, GAO/RCED-92-66, March 1992, General Accounting Office

The General Accounting Office (GAO) reviewed nine LCV safety studies from 1978 through 1991 and found that they have disparate conclusions, including findings that multi-trailer vehicles are both more and less likely to be involved in crashes than other commercial vehicles. They found the reasons for the opposing conclusions rest with the different approaches used by the researchers, and the difficulty of collecting and interpreting the data used in the studies.

The GAO highlighted the problem of determining the safety of LCVs using crash data predominately based on the experience of twin 28-foot trailers. The GAO

recommended an improvement of "truck accident and travel data, especially as they relate to the reporting of nonfatal accidents, the estimates of truck travel, and the identification of truck configurations."

(2) *Larger Dimensioned Vehicle Study – Final Report*, September 1993, FHWA

The purpose of this study was to compare the crash experience of single-trailer combination trucks and the twin 28-foot STAA double following the 1982 Surface Transportation Assistance Act (STAA) in which States were required to allow twin 28-foot trailers on the National Network for Large Trucks (NN). Despite the study's title, it only analyzes the STAA double and not any other larger dimensioned vehicles. Thirteen States provided detailed truck data but only 4 States (Iowa, Kansas, Missouri, and Utah) provided data over the entire collection period from 1983 – 1991.

The study found that twin-trailer trucks had a lower fatal involvement rate than single trailer trucks given their current distribution of travel by functional class, but predicted a rate similar to single trailer trucks would result if they had the same distribution of travel.

(3) *Analysis of Accident Rates of Heavy-Duty Vehicles*, April, 1988, The University of Michigan Transportation Research Institute, Kenneth Campbell, Daniel Blower, R. Guy Gattis, and Arthur C. Wolfe.

This study focuses on the fatal crash involvement for single- and double-trailer combinations. Data on fatal truck crashes (1980 – 1984) and truck travel (1985) were used to estimate the effects of truck configurations, road class and operating environment on crash rates. Researchers reviewed the crash and travel data, conducting follow-up interviews to fill in gaps. The travel data was obtained from telephone surveys of about 5,000 trucks, sampled from the 1983 R.L. Polk vehicle registration file. The fatal crash data was from Trucks Involved In Fatal Accidents (TIFA). Table VII-2 shows the crash and travel data for two vehicle classes.

**Table VII-2**
**Overall Fatal Crash Rates of Single- and Double- Trailers from**
***Analysis of Accident Rates of Heavy-Duty Vehicles***

| Configuration | 1985 VMT (millions) | 1980 – 1984 Fatal Involvements | 1985 Fatal Involvement Rate (involvement/100 million VMT)[1] |
|---|---|---|---|
| **Single-Trailer** | 33,452 | 16,260 | 10.2 |
| **Double-Trailer** | 2,008 | 829 | 8.6 |

1. According to the National Highway Traffic Safety Administration's Fatal Accident Reporting System, the average number of fatal involvements by all heavy trucks was 4,294 per year during 1980 – 1984 period and 4,492 in 1985. To obtain 1985 fatal involvement rates for each of the three types of truck configurations, 4492/4294 multiplied average 1980 – 1984 fatal involvements.

Table VII-3 shows estimates of the fatal crash rates by vehicle group for the different road environments derived from data in the 1988 UMTRI study. This analysis highlights the importance of a truck's operating environment. Regardless of the number of trailers, limited access roads have much lower fatal involvements relative to the travel on those roads than do uncontrolled access highways. An examination of the single-trailer fatal crash record shows that 39 percent of the single-trailer VMT is on rural limited access but only 14 percent of the single-trailer fatalities occur on these roads. In this UMTRI study twin-trailer combinations were found to have somewhat lower crash rates than single-trailer combinations on all highways types except other rural highways on which their crash rates were substantially higher. Because twin trailers travel relatively less on other rural highways than single trailer combinations, their overall crash rates were found to be lower than those of single-trailer combinations. When researchers adjusted crash rates by assuming that travel characteristics by highway type would be the same for multi- and single-trailer combinations, the overall crash rate for multi-trailer combinations increased from 8.6 to 11.2 involvements per million VMT, a rate higher than the 10.2 involvements per million VMT for single-trailer combinations. These results highlight the issue that changes in fatal crashes will depend on the truck's operating environment.

**Table VII-3**
**Fatal Accident Rates of Tractor-Semitrailers and Doubles by Operating Environment from *Analysis of Accident Rates of Heavy-Duty Vehicles***

| Configuration | 1985 VMT (million) | 1980 – 1984 Fatal Involvements | 1985 Fatal Involvement Rate (per 100 million VMT) |
|---|---|---|---|
| **Single-Trailer** | | | |
| Limited Access Rural | 12,891 | 2,775 | 4.50 |
| Limited Access Urban | 6,602 | 1,829 | 5.80 |
| Other Rural | 9,881 | 8,865 | 18.77 |
| Other Urban | 4,078 | 2,791 | 14.32 |
| **subtotal** | **33,452** | **16,260** | **10.17** |
| **Double-Trailer** | | | |
| Limited Access Rural | 886 | 172 | 4.06 |
| Limited Access Urban | 569 | 117 | 4.30 |
| Other Rural | 366 | 415 | 23.72 |
| Other Urban | 187 | 125 | 13.98 |
| **subtotal** | **2,008** | **829** | **8.64** |

Computed using Campbell et al Appendix Table 15 *Normalized Fatal Accident Involvement Rates by 8 Travel Categories for 5 Truck Types or Configurations NTTIS and 1980 – 1984 TIFA Files.*
According to the National Highway Traffic Safety Administration's Fatal Accident Reporting System, the average number of fatal involvements by all heavy trucks was 4,294 per year during the 1980 – 1984 period and 4,492 in 1985. To obtain 1985 fatal involvement rates for each of the truck configurations, average 1980 – 1984 fatal involvements were multiplied by 4,492/4,294.
Limited Access includes Interstate and Other Freeways and Expressways.

*(4) Truck Weight Limits Issues and Options*, Special Report 225, 1990, Transportation Research Board.

The Transportation Research Board (TRB) utilized the fatal crash rates from Campbell et. al. (1988) adjusted assuming the same distribution of mileage by highway type for each type of vehicle. This assumed that double-trailer distribution of travel would become the same as the current usage of single-trailer tractor-semitrailers. TRB expanded the fatal crash rates using estimates of injury and property-damage-only crashes (Tables VII-4 and VII-5). In the TRB report there was no definitive statement regarding the relative safety of alternative LCV configurations. They did discuss the impact of increasing weights on a given vehicle, but many conclusions are difficult to interpret for this study because findings for combinations and straight trucks are grouped. For all combination vehicles TRB presented data showing that crash rates on limited access highways increase slightly up to a gross vehicle weight of about 60,000 pounds after which they generally level off. On other types of highways crash rates for combinations continue to increase up to about 75,000 pounds, but drop somewhat at higher weights.

**Table VII-4**
**Truck Crashes by Severity Class from *TRB 225***

| Crash | Severity Class ( percent) |
|---|---|
| Fatal | 1.2 |
| Injury | 28.8 |
| Property damage only | 70 |
| Total | 100 |

**Table VII-5**
**Base Crash Rates from *TRB 225***

| Vehicle | Type of Crash (per 100 million VMT) | | |
|---|---|---|---|
| | Fatal | Injury | Property Damage Only |
| Single Unit Trucks | 7.7 | 185 | 499 |
| Tractor Semitrailers | 10.2 | 245 | 595 |
| Doubles | 11.2 | 269 | 653 |

*(5) Accident Rates of Multi-Unit Combination Vehicles Derived from Large-Scale Databases*, September 1990, Roger Mingo, Joy Esterlitz and Bret Mingo.

This study focused on estimating fatal crash rates for a single year using large federal databases containing crash, fatalities, and travel data. The crash data are from Fatal Accident Reporting System (FARS) and Trucks Involved in Fatal Accidents Program (TIFA). The researchers derived the vehicle travel estimates using FHWA's State reported travel data and the Truck Inventory and Use Survey (TIUS, predecessor to the current Vehicle Inventory and Use Survey (VIUS)).

The study produced a multitude of crash rates for different years using different data sources. Using FARS and adjusted FHWA travel data the authors estimated

the 1988 fatal crash rates for tractor semi-trailers was 4.8 per 100 million VMT and for double-trailer combinations was 5.9 per 100 million VMT. Using TIFA and adjusted FHWA travel data the authors estimated the 1986 fatal crash rates were 4.33 per 100 million VMT for single-trailer combinations and 6.35 per 100 million VMT for multi-trailer combinations. Using TIFA and TIUS they estimated the 1986 fatal crash rates were 6.0 per 100 million VMT for single-trailers and 9.9 per 100 million VMT for multi-trailers. The authors stated that the TIFA and TIUS estimate is the best since TIUS is a sample.

(6) *Long Combination Vehicle Safety Performance in Alberta 1995 to 1998,* March 2001, John Woodrooffe.

This study reviewed the operations and crash rates for LCVs in Alberta, Canada for 1995 through 1998. The Canadian LCVs are similar to LCVs operating in the northwestern United States such as Montana and North Dakota. In Alberta a RMD consists of a 40 to 53 feet semi-trailer and a shorter 24 to 28 feet semi-trailer; a TPD consists of two trailers where both are between 40 and 53 feet; and a Triple trailer combination consists of three trailers all between 24 and 28 feet. Alberta requires selective routing, restrictions on vehicle speed, restricted time of day operation, enhanced driver qualification requirements and operating restrictions for adverse road and weather conditions. In general the operating network is restricted to multi-lane highways with four or more driving lanes except RMDs that may travel on a few two-lane highways.

During the study period there were 53 LCV crashes of which two were fatalities. The crash rates focus on the 37 rural crashes, but not on the 16 urban collisions due to difficulties computing the vehicle kilometers traveled in urban areas. This introduces a bias since the study only analyzes the best performing roads (4 lane rural). Table VII-6 shows the collision rates per 100 million kilometers and 100 million miles.

**Table VII-6**
**Collision Rates on the LCV Sub-Network* by Vehicle Type 1995-1998**
**from *LCV Performance in Alberta***

| Vehicle Type | Crash | Total Distance Traveled (100 million Km) | Total Distance Traveled (100 million miles) | Crash Rate (per 100 million Km) | Crash Rate (per 100 million Miles) |
|---|---|---|---|---|---|
| Tractor Semi | 918 | 11.54 | 7.17 | 79.55 | 128.10 |
| Multi Trailer | 418 | 4.03 | 2.50 | 103.72 | 167.02 |
| Rocky Mountain Doubles | 11 | 1.07 | 0.66 | 10.28 | 16.55 |
| Turnpike Double | 20 | 1.19 | 0.74 | 16.81 | 27.06 |
| LCV Doubles – all | 31 | 2.26 | 1.40 | 13.72 | 22.09 |
| Triples | 6 | 0.09 | 0.06 | 66.67 | 107.35 |

*Crashes for the LCV sub network only - no urban miles included
To convert to miles, kilometers was multiplied by 0.621.
Multi-Trailer includes RMDs, TPDs and Triples

The study period contains only two fatalities attributed to TPDs implying a doubles crash fatal crash rate of 0.88 per 100 million kilometers or 1.42 per 100 million miles.

(7) *Accident Rates for Longer Combination Vehicles*, October 1996, Publication No. FHWA-MC-97-003, Scientex Corporation, Joel Ticatch, Mustafa Kraishan, Gery Virostek, and Linda Montella.

Seventy-five commercial motor carriers participated in the study comparing crash rates of LCVs to Non-LCVs. All participants operated both LCV's and Non-LCVs. Crash and exposure data covered 1989 - 1994. This study focused on crashes that required the filing of a police crash report, an insurance crash report or recording of information in the motor carrier's crash register.

Among study participants, the mean crash rate was 887.25 crashes per million VMT for LCV's versus 1786.45 crashes per 100 million VMT for Non-LCVs. The difference in the mean crash rates was found to be statistically significant. The fatal crash rate for single-trailers was 24 per 100 million VMT while the LCV rate was 21 per 100 million VMT for the carriers in their study. Even though the crash rate was lower for LCVs, the researchers found that LCV crashes are more severe than non-LCVs: "the average number of fatalities per LCV crash was 90 percent higher than for each non-LCV crash."

The researchers discussed the possible foundations for the crash rate differential noting that LCV operators in their study predominately operated in rural areas on higher quality roads, possessed far better safety fitness records than the carrier population at-large, and tended to assign exceptionally experienced drivers to their vehicles, both LCV's and non-LCV's.

The findings of this study pertain only to the carrier population from which the sample was drawn. In this study, one cannot disregard the potential for self-reporting and selection biases.

**Summary of Prior Studies**

The previous studies noted above have estimated a wide range of crash rates due to different databases, time frames, methodologies, and biases. Table VII-7 summarizes all the non-fatal and fatal crash rates from these various studies.

**Table VII-7**
**Summary of Truck Crash Rates**
(per million VMT)

| Source | | Time Period Analyzed | Type of Crash: Non-Fatal Injury | Type of Crash: Fatal |
|---|---|---|---|---|
| **Longer Dimensioned Vehicle Study - FHWA** | | 1983 - 1991 | | |
| Single Trailers | | | 31.46 | 2.44 |
| | Rural Interstate | | 19.48 | 1.16 |
| | Rural Other | | 34.86 | 4.77 |
| | Urban Interstate | | 41.85 | 1.6 |
| | Urban Other | | 114.55 | 7.37 |
| Multi Trailers | | | 25.15 | 2.08 |
| | Rural Interstate | | 17.68 | 1.09 |
| | Rural Other | | 32.29 | 4.5 |
| | Urban Interstate | | 29.9 | 1.31 |
| | Urban Other | | 137.3 | 12.87 |
| **Analysis of Accident Rates of Heavy-Duty Vehicles - Campbell et al** | | 1980 - 1984 | | |
| Tractor plus single trailer | | | | |
| | Rural - Limited | | | 4.50 |
| | Rural - Other | | | 18.77 |
| | Urban - Limited | | | 5.80 |
| | Urban - Other | | | 14.32 |
| Tractor plus double trailers (includes STAA Doubles) | | | | |
| | Rural - Limited | | | 4.06 |
| | Rural - Other | | | 23.72 |
| | Urban - Limited | | | 4.30 |
| | Urban - Other | | | 13.98 |
| **Truck Weight Limits Issues and Options - TRB** | | 1980-1984, presented for 1985 | | |
| Tractor plus single trailer | | | 245 | 10.20 |
| Tractor plus double or Triple trailers (includes STAA Doubles) | | | 269 | 11.20 |
| **Accident Rates of Multi-Unit Combination Vehicles Derived from Large-Scale Databases - Mingo et al** | | 1986 | | |
| Tractor plus single trailer | | | | 6.02 |
| Tractor plus double or Triple trailers (includes STAA Doubles) | | | | 9.96 |
| **Long Combination Vehicle Safety Performance in Alberta – Woodrooffe** | | 1995 - 1998 | Collisions | |
| Tractor plus single trailer | | | 128.10 | |
| Rocky Mountain Doubles | | | 16.55 | |
| Turnpike Doubles | | | 27.06 | |
| Tractor plus double trailers | | | 22.09 | 1.42 |
| Tractor plus three trailers | | | 107.35 | |

*The reader should exercise care when comparing across studies since different data sources and definitions of variables were used in each study.

## Crash Database Analysis – Update

With the exception of the Woodrooffe study in Canada, the cited studies all rely on data that is many years old. The present study updates and focuses on the fatal involvement rates in the Scenario States by examining 1995 - 1999 fatal involvement and travel data. The data for number-of-crashes and number-of-trucks-involved came from the 1995 - 1999 Fatal Analysis Reporting System (FARS) final report. FARS provides data on the number of trailers for the combination vehicles involved in the crash and highway classification for all fatal crashes[28]. Where a crash involved an unknown truck configuration or highway functional class, the crash was proportioned among the population of known crashes. The fatal crash numbers exclude single unit trucks and trucks not hauling a trailer (i.e. bobtails).

The 13 State VMT estimate is from the *Highway Statistics* VM-2 Table that lists the VMT by State and highway functional class. The splits between combination trucks and also between single-trailer and multi-trailer units utilize the detailed 1999 estimates of VMT by highway functional class prepared for this study and shown in Table II-4.

Although this represents more recent data than the previous studies, the analysis has many of the same limitations found in previous statistical safety analyses that attempt to estimate the respective safety of LCVs compared to other truck configurations. These include: (1) examination of past safety data may be an inaccurate predictor of future roadway safety; and (2) the analysis is unable to isolate LCVs from STAA doubles. Despite these shortcomings, the analysis demonstrates the importance of operating environment and potential trends.

Table VII-8 summarizes the fatal crash and travel data for 1995 – 1999 for the 13 States in the Western Uniformity Scenario. The data include 5 years of data to remove any bias that would be present in only examining a single year of data.

**Table VII-8**
**Travel and Fatal Crashes for Scenario States 1995-1999**

| Functional Class | VMT (million) | | Fatal Crashes (number of Crashes)[2] | | Fatal Crashes (count of Trucks involved)[1] | |
|---|---|---|---|---|---|---|
| | Single Trailer | Multi Trailer | Single Trailer | Multi Trailer | Single Trailer | Multi Trailer |
| Interstate Rural | 28,699.86 | 2,897.88 | 387 | 51 | 434 | 53 |
| Other Rural | 25,059.63 | 1,948.69 | 1,148 | 121 | 1,180 | 123 |
| Interstate Urban | 7,017.00 | 876.10 | 130 | 9 | 140 | 12 |
| Other Urban | 7,548.32 | 990.15 | 212 | 21 | 215 | 21 |
| Total | 68,324.81 | 6,712.81 | 1,878 | 203 | 1,970 | 210 |

Sources: Fatality Analysis Reporting System (FARS), Highway Statistics VM-1 Table and 1999 expanded VMT prepared for this report.

1. Count of Trucks Involved contains all the trucks in a fatal crash. For example if two single-trailer trucks create a fatality then the entry for number of trucks involved is 2.
2. Number of Crashes contains the number of fatal crashes. For example if two single-trailer trucks create a fatality then the entry for the number of crashes is 1.

[28] FARS does not provide details on the trailer length(s) or other details to distinguish between STAA and other double-trailer combinations.

**Table VII-9**
**Fatal Crash Rates for Scenario States 1995-1999**
(per 100 million VMT)

| Functional Class | Fatal Crash Rate (Number of Crashes) | | Fatal Crash Rate (Number of Trucks Involved) | |
|---|---|---|---|---|
| | Single Trailer | Multi Trailer | Single Trailer | Multi Trailer |
| **Interstate Rural** | 1.35 | 1.78 | 1.50 | 1.83 |
| **Other Rural** | 4.58 | 6.22 | 4.73 | 6.36 |
| **Interstate Urban** | 1.85 | 1.03 | 2.01 | 1.39 |
| **Other Urban** | 2.81 | 2.12 | 2.84 | 2.13 |
| **Total** | 2.75 | 3.02 | 2.88 | 3.13 |

*National crash rates were created using the same methodology and differences were found to not be significant at the 95% confidence interval.

Table VII-9 shows the fatal involvement rates given the VMT and fatal involvements in Table VII-8. Among the 13 States, the fatal crash involvement was 2.88 per 100 million VMT for single trailer combinations and 3.13 per 100 million VMT for multi-trailer combinations.[29]

Table VII-10 further develops the crash involvement rates from Table VII-9 by showing upper and lower bounds based on the 95 percent confidence intervals for single- and multi-trailer combinations on the different highway classes. A 95 percent confidence interval means that there is a 95 percent likelihood that the crash rate for a given year between 1995 and 1999 does not deviate from the mean crash rate for all years by more than approximately 2.0 times the standard error. For example, while the mean (or average) crash rate for multi-trailer combinations was 3.13, it could be expected – with 95 percent confidence – that the multi-trailer rate for a given year would fall between 2.42 and 3.84 crashes per million VMT. Similarly, while the mean crash rate for single-trailers was 2.88, it could be expected – again with 95 percent confidence – that the single-trailer crash rate for a given year would fall between 2.81 and 2.95 crashes per million VMT.

[29] In this analysis, "the vehicle involved in the collision" is the primary investigative factor therefore focusing on the "total" number of vehicles involved in a collision. If there are 100 fatal collisions involving 200 single-trailer trucks then the number of vehicles involved in the fatal collisions will be counted as 200.

**Table VII-10**
**Bounded Fatal Involvement Rates for the Scenario States 1995-1999**
(per 100 million VMT)

| Functional Class | Single Trailer | | | Multi Trailer | | |
|---|---|---|---|---|---|---|
| | Lower Bound* | Fatal Crash Rate | Upper Bound* | Lower Bound* | Fatal Crash Rate | Upper Bound* |
| Interstate Rural | 1.35 | 1.50 | 1.64 | 1.48 | 1.83 | 2.17 |
| Other Rural | 4.53 | 4.73 | 4.95 | 4.50 | 6.36 | 8.25 |
| Interstate Urban | 1.81 | 2.01 | 2.22 | 0.71 | 1.39 | 2.07 |
| Other Urban | 2.53 | 2.84 | 3.16 | 1.28 | 2.13 | 3.02 |
| Total | 2.81 | 2.88 | 2.95 | 2.42 | 3.13 | 3.84 |

*Lower and Upper Bounds are set by the 95% confidence interval.

It is tempting to look at Table VII-10 and conclude, among other things, that multi-trailer combinations are less safe than single trailer combinations. Tests for statistical significance show that such a conclusion would be incorrect.

## Assessment of Scenario Impacts

This section discusses the data limitations that impede the prediction of fatal involvements under the Western Uniformity Scenario. Although quantitative estimates are not available, the Scenario may be judged in terms of the relative shifts that are projected to occur from: one configuration to another; the operating environments in which various types of LCVs would begin to operate; the relative stability and control characteristics of each configuration; the changes in truck travel miles that would result; the availability of qualified drivers; and the regulations that might be put in place to promote safe operations.

As noted above, the fatal crash and travel data do not allow a detailed examination of LCVs separately from multi-trailers. The multi-trailer classification largely contains data on twin 28-foot STAA doubles. According to an analysis of 1991-1996 data, LCVs comprise about 22 percent of the multi-trailer combination vehicles involved in fatal crashes,[30] but there is no method to accurately estimate a separate fatal involvement rate. The measurement problem is three fold; fatalities are rare occurrences, there are few LCVs currently operating and there is only limited travel data collected on LCVs. There is no federal requirement to collect data for specific types of multi-trailer combination vehicles. Only 2 of the 13 Scenario States actively collect separate VMT for different types of multi-trailers.[31]

Without the ability to breakout the different multi-trailer types, the fatal involvement rates in Table VII-10 are too broad for predicting the Scenario's multi-trailer fatal involvement rates.

[30] *Longer Combination Vehicles Involved in Fatal Crashes, 1991-1996*, Office of Motor Carrier and Highway Safety, FHWA-MCRT-99-018.

[31] The States are Idaho and Oregon.

No attempt was made in the *CTS&W Study* to estimate changes in the number or cost of crashes that might result from any of the Scenarios analyzed in that study. Among the reasons why such estimates could not be made were (1) the weights and dimensions of many of the vehicles analyzed in that study were substantially greater than vehicles currently operating even in the West, (2) the LCVs were assumed to operate nationwide, including on highways with poorer roadway geometry and higher traffic volumes than on highways they currently use, and (3) uncertainties about the number of experienced drivers that might be available to operate LCVs considering the large increase in the number of LCVs.

In this Scenario, many of those analytical uncertainties are reduced. The Scenario vehicles are typical of vehicles already being operated in the Western States and the highway environment is the same or comparable to the environment in which LCVs currently are being operated. Despite that improvement one is unable to apply the multi-trailer fatal involvement rate to the estimated Scenario VMT since there is limited data on those LCVs currently operating. In addition there could be some uncertainty about the availability of drivers who are experienced in operating multi-trailer combinations,[32] but not to the extent noted in the *CTS&W Study*.

## Triples

Triples analysis is conspicuously absent from most prior studies and databases. Obtaining data on Triples travel is difficult since data is collected on tractors and the same tractor can pull either one, two or three trailers depending upon the shipper's needs. Only two of the reviewed studies included a separate analysis of Triples, the Alberta Study and Scientex's *Accident Rates for Longer Combination Vehicles*. The Alberta Study found Triples were involved in 107 non-fatal crashes per 100 million miles traveled. This is roughly 4.8 times the involvement of doubles. The Scientex Study calculated 829 Triple-trailer non-fatal crashes per 100 million VMT. These estimates are different by nearly an order of magnitude because their data was drawn from a low number of observations.

Triples currently operate in all the 13 analyzed States except Washington and Wyoming where Triples are not permitted. Technically, Nebraska does permit Triples, but in practice there are no Triples operating since they can only operate empty. In the Scenario States there were 11 Triples involved in fatal crashes for 1995 – 1999 but since triples are so infrequently involved in fatal crashes the number varies greatly from year-to-year.[33] In 1995 there was only 1 triple-trailer combination involved in a fatal crash but in 1998 there were four.

The biggest challenge in triples fatal involvement analysis, similar to other multi-trailers, is estimating their travel. Since triples' VMT is so small relative to other truck configurations the exact numbers are difficult to derive from National or even State totals. As noted before,

[32] The WASHTO Guide requires LCV drivers to have a minimum of two years' "line-haul" driving experience driving double-trailer combinations before certification for a LCV license.

[33] TIFA narrows the incidents down to only 9 triples involved in fatal crashes in the Scenario States for 1995–1999.

the Highway Performance Monitoring System (HPMS) that provides the best national data on truck travel does not include a classification for triples. Also, triples tend to be operated by less-than-truckload shippers who regularly drop and pick-up trailers from their terminals so on a given 1,000 mile operation one-half could be as a triple and one-half as a double. (This is different than the typical resource hauling LCV that remains as one multi-trailer unit for most operations.) Elsewhere in this study the VMT for triple-trailer combinations is estimated and utilized for impact analysis but due to the problems sited above one is unable to have confidence in an estimate of triple-trailer fatal involvement rate.

One is able to conclude, based on the stability and control properties discussed earlier in this chapter, that triple-trailer combinations have relatively poor dynamic stability in the present configuration. Woodrooffe (2001) suggests that Triple's performance could be improved "if coupled in the B-train or C-train configuration."

## Conclusion

Safety is the primary factor when assessing potential changes in TS&W policy. Safety is the U. S. Department of Transportation's preeminent goal, State transportation agencies share this priority, and motorists who must share the road with large and heavy trucks would care strongly about the safety of those vehicles.

TS&W policy changes can affect safety in several ways. First, they can affect the total number of trucks on the road and thus the exposure of the overall truck fleet to crashes. Analyses of potential 2010 VMT changes for Scenario States indicate that the Scenario would reduce total heavy truck travel by between 9 and 25 percent. These figures include not only reductions in truck travel associated with shifts of freight from smaller to larger trucks that would be allowed in some States under this Scenario, but also increases in truck traffic caused by shifts of freight from railroads to trucks. Reductions in truck crashes would not be expected to be as large as reductions in travel for several reasons. First the greatest reductions in truck travel occur on the safest roads – rural Interstate highways. Since travel is not estimated to fall as much on other rural arterials that have much higher crash rates than rural Interstate Highways, the reduction in overall crashes would not be as great as the reduction in overall travel.

Most previous studies of potential safety impacts of changes in TS&W policy have relied primarily on studies that have compared crash rates of single- and multi-trailer combinations. As noted above the problem with this approach is that most multi-trailer combinations are short STAA doubles that are comparable in length and weight to single-trailer combinations. While these STAA doubles are less stable than standard single-trailer tractor-semitrailers when one looks at their rearward amplification and load transfer ratio, they perform better than tractor-semitrailers in terms of their static rollover threshold and offtracking. The various LCVs analyzed typically fall between the tractor-semitrailer and the STAA double in terms of stability and control properties. However, they are much longer and heavier than either of those standard vehicles and they have greater offtracking. These characteristics influence how easily a truck driver can maintain control should operating conditions become challenging or can regain control should it be lost in response to a precipitous event. These

factors all make it difficult to extrapolate overall multi-trailer combination crash rates to the fleet of LCVs.

It is also difficult to extrapolate the results from studies conducted outside the U.S. because the operating environment may not be representative of the U.S. environment. Not only may highway and traffic characteristics be different than those in the U.S., but regulatory policies may also differ. Such regulatory differences could be expected to have a significant impact on the safety of LCV operations.

Even without the ability to estimate the potential changes in the crash rates that might be associated with operations under the Western Uniformity Scenario, it is useful to update the crash analysis for the 1995-1999 period, the latest years for which crash data were available. This update was needed since during the 1980's when most of the past studies were conducted the use of double-trailers was still growing and had not reached a steady-state equilibrium. Also vehicle safety in general has drastically improved since the 1980's with the advent of seat-belt requirements, air bags and anti-lock brakes[34] – among many other things. From 1990 to 2000, the number of large trucks in fatal crashes per 100 million VMT declined from 3.3 to 2.4 – down 27 percent.[35]

The statistical analysis indicates the importance of operating environment. Among single trailer configurations the fatal involvements can range from 1.50 to 4.73 per 100 million VMT. Among multi-trailer configurations the fatal involvements can range from 1.39 to 6.36 per 100 million VMT. These numbers indicate that when estimating fatal involvements it is not just the magnitude of VMT change but on what road classes the VMT changes. In the Western Uniformity Scenario multi-trailer trucks operate 61 percent of their mileage on Interstate roads; if a larger portion of their mileage were to shift to non-interstate roads, one would expect the number of fatal crashes involving these vehicles to increase.

This chapter does not explore auto driver perceptions and reactions to LCVs.[36] In surveys and focus groups conducted for the *CTS&W Study*, most drivers expressed concern about the safety of sharing the road with larger and heavier trucks. Any attempt to increase the size of trucks would require a major public education campaign on how to operate around large trucks and the relative safety enhancements that would be required of any new larger truck.

[34] Three-point belts were required in trucks of 10,000 pounds gross-vehicle-weight manufactured beginning September 1, 1990. Antilock brake systems (ABS) have been required since March 1, 1997 for truck-tractors and since March 1, 1998 for trailers.
[35] 2000 Large Truck Crash Overview, Federal Motor Carrier Safety Administration, Publication number FMCSA-RI-02-002.

[36] The recent study "Identifying Unsafe Driver Actions that Lead to Fatal Car-Truck Crashes" discusses auto driver actions and reactions that might differ when interacting with a truck.

## References

Campbell, K.L., et al. 1988. *Analysis of Accident Rates of Heavy-Duty Vehicles*, Final Report. University of Michigan Transportation Research Institute, Ann Arbor.

Fancher, P.S., Ervin, R.D., Winkler, C.B., Gillespie, T.D. 1986. *A Factbook of the Mechanical Properties of the Components for Single-Unit and Articulated Heavy Trucks. Phase 1. Final Report.* Michigan University, Ann Arbour, Transportation Research Institute. 190 p. Sponsor: National Highway Traffic Safety Administration, Washington, D.C. Report No. UMTRI-86-12/DOT/HS 807 125. UMTRI-74246

FHWA. 1987. *An Interim Report on the Larger Dimensioned Vehicle Study*. U.S. Department of Transportation.

FHWA. 1996. *Accident Rates for Longer Combination Vehicles.* U.S. Department of Transportation.

FHWA. 2000. *Comprehensive Truck Size and Weight Study*. U.S. Department of Transportation.

FHWA. 2003. *Draft: Vehicle Performance Analysis.* U.S. Department of Transportation.

GAO. 1992. *Truck Safety: The Safety of Longer Combination Vehicles is Unknown*. U.S. General Accounting Office.

Kostyniuk, Linda, et al. April 2002. *Identifying Unsafe Driver Actions that Lead to Fatal Car-Truck Crashes*. University of Michigan Transportation Research Institute sponsored by the American Automobile Association.

TRB. 1990. *Special Report 225 Truck Weight Limits*. National Research Council, Washington, D.C.

Mingo, R. D., et al. 1990. *Safety of Multi-Unit Combination Vehicles.* Association of American Railroads, Washington, D.C.

Roaduser International. 1999. *Performance Based Standards for Heavy Vehicles in Australia*. National Road Transport Commission.

Woodrooffe, J. 2001. *Long Combination Vehicle Safety Performance in Alberta 1995 – 1998*. Woodrooffe & Associates.

Woodrooffe, J. 2003. *Vehicle Performance Analysis*. Woodrooffe & Associates.

# CHAPTER VIII

# Traffic Operations



## Introduction

Larger and heavier trucks affect traffic basically in two ways. Because of their size, weight and operating characteristics such trucks will reduce the "quality" of traffic flow and, in most cases, increase the number and severity of crashes. To describe the "quality" of highway traffic flow, transportation engineers developed the concept of *Level of Service* (LOS), with ratings from LOS A to LOS F, where LOS A reflects uninterrupted flow, that is, where the movements of any one vehicle does not effectively influence the travel of other vehicles. LOS E reflects that the highway is operating at capacity, while LOS F reflects unstable flow where there is "stop and go" operation. Because of their size, acceleration and braking characteristics larger trucks negatively affect the roadway's LOS.

Secondly, these truck effects on the traffic stream not only impinge on flow quality, but they also affect safety in several ways. In addition to the obvious impact on crash severity due to truck weight, research has shown that speed differential among the vehicles in the traffic stream increases the probability of crashes. Because of trucks' poorer acceleration capability (as compared to passenger cars and other smaller vehicles with lower weight-to-horsepower ratios) the effects of any posted differential speed limits are magnified. Generally, traffic operations degrade as the proportion of trucks in the traffic stream increases, and as the acceleration and stopping distance differentials between trucks and other vehicles increase.

This chapter presents qualitative assessments of the traffic operations impacts of the Western Uniformity Scenario trucks in the 13 analyzed States. Although traffic originating or terminating outside the region that shifts from a single-trailer combination vehicle to a "scenario LCV" may change its travel route outside the region to access the Western Uniformity Scenario network, these volume shifts will be negligible. This is because the Scenario network is comprehensive and connectivity to the outside-the-region network is pervasive. In addition to these minor route changes, traffic that originates or terminates outside the region and diverts from a 53-foot single-trailer vehicle in the Basecase Scenario to an LCV in the Western Uniformity Scenario may generate an increase in the number of truck trips outside the region. Under the Western Uniformity Scenario, no LCV configuration allows a 53-foot trailer and the analysis assumes that trailers conforming to the Uniformity length regulations are paired up at the region's border and not reloaded from non-conforming trailers. Such changes in truck travel outside the region affect only a very small amount of the overall truck travel.

## Vehicle Characteristics and Their Affect on Traffic Flow and Safety

### Acceleration and Speed Maintenance

Acceleration performance determines a truck's basic ability to blend well with other vehicles in traffic. Poor acceleration or speed maintenance is a concern as it results in large speed differentials between vehicles in traffic, and crash risks increase significantly with increasing speed differentials. The *Comprehensive Trucks Size and Weight Study* (*CTS&W*) Volume III showed that crash involvement might be 15 – 16 times more likely at a speed differential of

20 miles-per-hour than when there is no difference in speeds. Also poor acceleration performance increases vehicle interaction and subsequent delay, thereby degrading the LOS.

Engine manufacturers have responded to the needs of heavier trucks by building engines with up to 600 horsepower. These engines are sufficient to maintain a minimum speed of 20 mph for a 130,000 pound truck on a 6 percent grade. This provides sufficient power to allow these vehicles to operate in conformity with Federal policy standards for the Interstate System. For example, Federal policy states that highways with design speeds of 70 mph may not have grades exceeding 3 percent. However, gradients may be up to 2 percent steeper when in rugged terrain. Table VIII-1 shows the engine horsepower necessary to yield selected weight-to-horsepower ratios. This table provides a point of reference as to the horsepower required for vehicles operating at increased weights that maintains the weight-to-horsepower ratio of the lower weight vehicle. For examqle, to maintain the ratio of 250 an 80,000-pound 5-axle tractor-semitrailer combination needs a 320 horsepower engine, but an LCV loaded to the Western Uniformity Scenario maximum weight of 129,000 pounds would require a 516 horsepower engine. Although the 600 HP engine permits LCVs to operate in a similar fashion to most single trailer trucks, it is not sufficient for a fully loaded 18-wheeler with a 450+ HP engine, which is not uncommon among such trucks.

**Table VIII-1**
**Horsepower Requirements**
**Select Weight-to-Horsepower Ratios and Gross Vehicle Weights**

| Weight/ Horsepower Ratio (pounds) | Horsepower Required for Weight-to-Horsepower Ratio in Right Column | | | | | |
|---|---|---|---|---|---|---|
| | Typical 3S2* Tare Weight 30,000 lbs | Typical 3S2* Partial Load 60,000 lbs | Maximum 3S2* Load 80,000 lbs | Triples Uniformity Weight 110,000 lbs | Typical Uniformity 8-axle LCV 120,000 lbs | Maximum Uniformity LCV 129,000 lbs |
| **150** | 200 | 400 | 533 | 733 | 800 | 860 |
| **200** | 150 | 300 | 400 | 550 | 600 | 645 |
| **250** | 120 | 240 | 320 | 440 | 480 | 516 |

*3S2 is a 5-axle tractor semitrailer with 3-axles on the tractor and 2-axles on the semitrailer.

**Size and Acceleration Impacts on Congestion**

Trucks are larger and, more importantly, accelerate more slowly than passenger cars, and thus have greater impacts on traffic flow than passenger cars. In the *CTS&W Study* Volume III, the impact on traffic congestion was assessed in terms of changes in passenger car equivalents (PCE). A PCE represents the number of passenger cars that would use the same amount of highway capacity as the vehicle being considered under the prevailing roadway and traffic conditions.

A significant variable for acceleration and speed maintenance is the grade or steepness of the road. The mountainous western States in this study contain a preponderance of steeply graded rural Interstate. *CTS&W Study* Volume III reports that on level terrain and in uncongested conditions conventional trucks may be equivalent to about two passenger cars, but on hilly or mountainous terrain and in congested traffic, their effect on traffic flow is much greater and may be equivalent to 15 or more passenger cars. Table VIII-2 shows PCE values for trucks operating in rural and urban areas under different conditions. The Rural portion of Table VIII-2 indicates the marked effect that percent and length of grade have on truck climbing ability if the truck has a high weight-to-horsepower ratio. Likewise, the urban portion of the table indicates that congested traffic conditions increase PCEs relative to uncongested conditions.

**Table VIII-2**
**Truck Passenger Car Equivalents**

| Roadway Type | Operating Environment | | Weight/ Horsepower Ratio (pounds) | Truck Length (feet) | | |
|---|---|---|---|---|---|---|
| | | | | **40** | **80** | **120** |
| ***Rural*** | | | | | | |
| | **Grade** | | | | | |
| | **Percent** | **Miles** | | | | |
| Interstate | 0 | 0.50 | 150 | 2.2 | 2.6 | 3.0 |
| | | | 200 | 2.5 | 3.3 | 3.6 |
| | | | 250 | 3.1 | 3.4 | 4.0 |
| | 3 | 0.75 | 150 | 9.0 | 9.6 | 10.5 |
| | | | 200 | 11.3 | 11.8 | 12.4 |
| | | | 250 | 13.2 | 14.1 | 14.7 |
| Other Principal Arterial | 0 | 0.50 | 150 | 1.5 | 1.7 | Not Simulated |
| | | | 200 | 1.7 | 1.8 | Not Simulated |
| | | | 250 | 2.4 | 2.7 | Not Simulated |
| | 4 | 0.75 | 150 | 5.0 | 5.4 | Not Simulated |
| | | | 200 | 8.2 | 8.9 | Not Simulated |
| | | | 250 | 13.8 | 15.1 | Not Simulated |
| ***Urban*** | | | | | | |
| | **Traffic Flow** | | | | | |
| Interstate & Other Freeways, Expressways | Uncongested | | 150 | 2.2 | 2.6 | 3.0 |
| | | | 200 | 2.5 | 3.3 | 3.6 |
| | | | 250 | 3.1 | 3.4 | 4.0 |
| | Congested | | 150 | 9.0 | 9.6 | 10.5 |
| | | | 200 | 11.3 | 11.8 | 12.4 |
| | | | 250 | 13.2 | 14.1 | 14.7 |
| Other Principal Arterial | Average Conditions | | 150 | 1.9 | 2.2 | 2.4 |
| | | | 200 | 2.0 | 2.2 | 2.6 |
| | | | 250 | 2.4 | 2.7 | 3.2 |

**Intersections**

If a tractor with an engine of insufficient capacity is used to provide motive power for a longer and heavier truck operating under size and weight limits of the Western Uniformity Scenario, the vehicle could take more time to accelerate into the traffic stream from a complete stop at a stop sign or a signalized intersection than the alternative Status Quo vehicle. The Western Uniformity Scenario increases off-Interstate weight limits for RMDs in nine of the thirteen States studied. In addition, Scenario RMD length limits increase in two of the nine States with increased RMD weights. [37]

Off-Interstate intersections pose potential challenges for increased RMD weight and length. Heavier and longer trucks turning onto an intersecting roadway, or crossing an intersection from a stopped position, will take longer to get up to traffic-flow speed or to clear the intersection than a lighter, shorter vehicle unless the vehicle horsepower is increased proportionately to maintain acceleration rates. Any additional time spent accelerating to flow speed after a turn or crossing an intersection would increase the risk of collision for through vehicles approaching intersections where sight distances are limited by physical features such as curves, hills, signage and foliage. LCVs crossing intersections from a stopped position could increase the distance required for the driver of a vehicle in cross traffic to see the truck and bring the vehicle to a stop to avoid a collision by up to ten percent.

The Western Uniformity Scenario mitigates or completely eliminates traffic impacts, relative to vehicles in the current fleet, related to the braking capability of trucks. Scenario weight limits for individual axles and axle groups are restricted to Federal limits, the same as Status Quo limits. For freight shifts from one configuration to another – for example from a 5-axle tractor-semitrailer at 80,000 pounds to a 9-axle TPD at 129,000 pounds – the gross vehicle weight per braking axle will generally decrease, thereby reducing braking demand on individual axle groups.

**Passing on Two-Lane Roads**

Cars passing RMDs on two-lane roads need up to 8 percent longer passing sight distances compared to passing tractor-semitrailer combinations. The Western Uniformity Scenario significantly expands the off-Interstate RMD's network in only four of the thirteen states – Oklahoma, Kansas, Nebraska and Colorado.[38] No-passing zones for the expanded off-Interstate portions of the RMD network in these four States would need to be reengineered to maintain the current level of safety of passing single-trailer combinations for passing RMDs.

For their part, longer and heavier trucks would also require longer passing sight distances to safely pass cars on two-lane roads. Of the remaining nine states not adding significant RMD network mileage, five would increase RMD weight limits. These five states would also need to reengineer no-passing zones to accommodate any degradation in truck acceleration during passing to maintain the current level of safety.

[37] See Chapter II, Figures II-5 and II-6 for current weight and length limits in the study States.
[38] See Chapter II, Figures II-9 and II-14 for Rocky Mountain Double base case and scenario networks.

**Aerodynamic Effects**

Truck-generated splash and spray is sensitive to vehicle aerodynamics. Another aerodynamic effect is the buffeting of adjacent vehicles from air turbulence. Air turbulence around trucks is not increased with truck length or weight, but rather the front of the truck and gaps between the tractor and the semitrailer(s) it tows can be the source of a transient disturbance to adjacent vehicles, especially if they are operating in substantial crosswinds. Double-trailer combinations have two of these gaps, while triple-trailer combinations have three.

As previously discussed, the thrust of the Western Uniformity Scenario is to harmonize weight limits in the western States where LCVs are already allowed. The impacts of aerodynamic effects would not be as much from LCVs being allowed on additional roadways, as it would be from the increased VMT of LCVs and the increased exposure of other vehicles to LCVs. States might consider weather related restrictions on LCV operations, or examine existing ones for revision, if the Western States were to proceed with harmonization.

**Offtracking**

As with aerodynamic effects, most impacts related to offtracking will be due to increased LCV VMT and not to the introduction of new vehicles. Offtracking measures how well a vehicle “fits” the dimensions of the existing highway system. There are three different types of offtracking that measure the configuration/roadway fit. They are: (1) low-speed offtracking; (2) high-speed offtracking; and (3) dynamic high-speed offtracking. Low-speed offtracking occurs when a combination vehicle makes a low-speed turn – for example at a 90-degree intersection – the wheels of the rearmost trailer axle follow a path several feet inboard of the path of the steering axle. If excessive, this phenomenon may force the truck to swing wide into adjacent lanes to avoid climbing inside curbs or striking curbside objects. Excessive offtracking can disrupt traffic operations or result in shoulder or inside curb damage at intersections and interchange ramp terminals.

High-speed offtracking is the swing out of the rear combination vehicle going through a gentle curve at high speed. Dynamic high-speed offtracking is a swinging back and forth due to rapid steering inputs.

Although these measures relate to a vehicle’s operations with traffic, a full discussion of offtracking is presented in Chapter VI, Roadway Geometry, since the roadway curves and intersections dictate how well a vehicle performs.

## Assessment of Scenario Impacts

It is not possible to definitively estimate the impacts of the policy scenario on traffic, Level of Service, highway user delay, congestion costs and safety; however these issues can be qualitatively discussed. The *CTS&W Study* Volume III presented quantitative estimates for the congestion impact for each scenario, but unfortunately, the congestion model is not applicable to the Western Uniformity Scenario because the model does not allow for analysis at less than a national level. The model uses the aggregate national delay derived using PCE values, traffic counts and roadway capacity. The model then applies changes in VMT for the alternative configurations' PCE values to estimate the change in delay.

Also since the *CTS&W Study* Volume III, there have been changes to the FHWA congestion estimation technique. The new, more empirical approach measures the delay in 75 urbanized areas during peak travel periods as developed by the Texas Transportation Institute. To appropriately apply the urban delay data to changes in the scenario's VMT one would need to determine the number of trucks traveling through the urbanized areas during peak travel times. This is difficult since most long-haul trucks try to avoid city centers at peak travel periods and may entirely avoid urban areas enroute from origin to destination.

Table VIII-3 gives some estimates for the congestion among the analyzed States. Both the Seattle-Everett and Portland-Vancouver areas rank among the 10 most congested urban areas in the country.

**Table VIII-3**
**Percent of Congested Travel for 13 Analyzed States, Year 2000**

| Urban Area | Percent of Travel that is Congested in Peak Period | Percentage of Daily Travel that is Congested |
|---|---|---|
| Seattle-Everett, WA | 79 | 39 |
| Portland-Vancouver, OR, WA | 76 | 38 |
| Denver, CO | 75 | 38 |
| Las Vegas, NV | 65 | 32 |
| Tacoma, WA | 62 | 31 |
| Salt Lake City, UT | 51 | 26 |
| Colorado Springs, CO | 38 | 19 |
| Eugene-Springfield, OR | 33 | 16 |
| Kansas City, MO-KS | 30 | 15 |
| Salem, OR | 30 | 15 |
| Tulsa, OK | 29 | 14 |
| Spokane, WA | 26 | 13 |
| Boulder, CO | 24 | 12 |

Source: 2000 Urban Mobility Study, Texas Transportation Institute.

Figures VIII-1 and VIII-2 show that, without any change to truck size and weight, congestion is projected to grow for the Western Uniformity States. This is especially true in coastal Washington and Oregon, Denver and I-80 through Wyoming and Nebraska. It is noteworthy that in the Denver and Seattle/Tacoma areas long doubles are not presently allowed during peak travel times and the scenario assumes that those restrictions would continue. However, because of the shift of some freight to the more productive scenario trucks, thereby reducing total truck VMT, even with these exceptions, one would expect a slight decrease in delay for the 13 States under the Uniformity Scenario. In fact, it appears that the scenario is predicted to at least not degrade and perhaps even improve traffic operations in a small way across all impacts. However, for some of the impacts, this is based on the assumption that increased engine power is available for those configurations with increased gross vehicle weights. Table VIII-4 summarizes the results.

**Table VIII-4 Western Uniformity Scenario Traffic Impacts**

| Impact | 2000 (base case) | 2010 (scenario) |
|---|---|---|
| Traffic Delay (million vehicle-hours) | National Total 3,599* | Small decrease |
| Congestion Costs ($ million) | National Total $67 billion*** | Small decrease |
| Low-Speed Off-tracking | | Degradation (28 – 30 feet** for turnpike double versus 16 feet for semitrailer) |
| Passing | | Requires operating restrictions. |
| Acceleration (merging and hill climbing) | | Requires sufficient engine power. |
| Lane Changing | | Some degradation due to additional length. (This is counterbalanced by decrease in heavy truck VMT.) |
| Intersection Requirements | | Some degradation due to additional length. (This is counterbalanced by decrease in heavy truck VMT.) |

*Computed by Texas Transportation Institute as the aggregate for 68 urban areas (not comparable with Comprehensive Truck Size and Weight Volume III).
**28 feet off-tracking for twin 45-foot TPDs and 30 feet off-tracking for twin 48-foot TPDs.
***Estimated for 75 largest urban areas.

**Figure VIII-1 Truck Volumes, Estimated Congested Segments – 1998**




**Figure VIII-2 Truck Volumes, Estimated Congested Segments – 2020**
**No Change in Size and Weight Regulations**



# CHAPTER IX

# Energy & Environment



## Introduction

Changes in truck sizes and weights will impact energy consumption, air quality, global warming, and noise emissions. The magnitude of each of the four areas is influenced by the extent of truck travel, vehicle weight, speed, and other truck operational parameters. This chapter discusses how estimated changes in truck travel resulting from the Western Uniformity Scenario might affect each of these four areas. The overall reduction in VMT is expected to result in an overall reduction in energy consumption and emissions.

Noise emissions are very localized. They can be measured in terms of the impact of the noise on residential property values. To be affected, residences must be immediately adjacent to a high volume roadway; the denser the residential development, the greater the total impact. The cost of noise is estimated based on the estimated residential density adjacent to freeway sections, as reported in the Highway Performance Monitoring System (HPMS) database and on changes in noise levels caused by changes in truck VMT resulting from truck size and weight (TS&W) policy changes.

Air pollution impacts are highly dependent on meteorological conditions and to a lesser extent on geographic features that cause air stagnation. Air pollution tends to be regional with some long distance conveyance in the lower levels of the atmosphere. Air pollutant emissions are related to VMT, but the transformation of those emissions into secondary pollutants involves complex chemical processes that may vary considerably from area to area depending on other sources of pollution in the area, climatic factors, and other variables.

Estimating total nationwide economic costs of air pollution attributable to motor vehicles is complex. The Department collaborated with the Environmental Protection Agency (EPA) to develop a nationwide cost estimate in connection with the *1997 Highway Cost Allocation (HCA) Study*. Resource constraints prohibited development of such estimates for the illustrative scenarios in the *CTS&W Study*. In general, the reduction in truck VMT under the Western Uniformity Scenario would reduce air pollution costs, but changes are not proportional to changes in VMT, particularly at specific locations. However, changes in truck emissions would be largely proportional to changes in VMT.

## Analytical Approach

### Energy Consumption

Table IX-1 illustrates how fuel consumption varies with truck configuration and weight. It shows that a longer configuration at the same weight does not necessarily have a higher rate of fuel use. Inherent for each truck configuration is the selection of the most efficient engine for that configuration and use. Fuel use information developed for the *1997 HCA Study* provided the basis for the analysis of annual energy consumption associated with the introduction or elimination of particular vehicle configurations and weights. Although the fuel efficiency values used here do not reflect the more stringent 2004 EPA emissions regulations, it is expected that the differences in miles-per-gallon from one configuration to

another and from one weight to another for engines meeting those regulations will be similar to the differences shown here.

A configuration's impact on diesel fuel use depends on its miles of operation at its given weight, speed, and roadway grade. For this study, each configuration is assumed to operate at the same speed under the same conditions. It is important to note that fuel use does not increase on a one-to-one relationship with vehicle weight.

Base Case VMT for the Year 2010 by truck type and operating weight was multiplied by gallons-per-vehicle-mile-of-travel estimates to estimate total truck fuel consumption. The same was done for the Scenario's VMT estimates. The difference measures the fuel consumption impact of the Western Uniformity Scenario for the 13 analyzed States.

**Table IX-1**
**Miles per Gallon by Truck Configuration and Weight**

| Configurations | Gross Vehicle Weight (pounds) | | | | |
|---|---|---|---|---|---|
| | 60,000 | 80,000 | 100,000 | 120,000 | 140,000 |
| Five-Axle Semitrailer | 5.44 | 4.81 | 4.31 | | |
| Six-Axle Semitrailer | 5.39 | 4.76 | 4.27 | | |
| Five-Axle STAA Double | 5.95 | 5.29 | 4.79 | | |
| Seven-Axle Rocky Mountain Double | | 5.08 | 4.58 | 4.36 | 4.16 |
| Eight-Axle (or more) Double | | 5.08 | 4.82 | 4.58 | 4.36 |
| Triple-Trailer Combination | | 5.29 | 5.01 | 4.76 | 4.54 |

**Air Quality**

As noted above, relating changes in truck travel to changes in nationwide economic costs of air pollution is complex and resource intensive. Furthermore, effects in any specific location could be very different from effects estimated for the Nation as a whole. As indicated earlier, DOT is working with EPA to develop an air quality impact methodology based on the best and most current information available.

Important factors in estimating changes in air quality costs are the dollar values assigned to mortality (death), morbidity (illness), visibility impairment, soiling, materials damage, effects on plants and wildlife, and other impacts caused by air pollutants. These are extremely difficult to quantify in terms of their effects and wide ranges of costs have been estimated in previous studies. Furthermore, our understanding of the health effects of various pollutants continues to evolve, and thus estimates of motor vehicle related air pollution costs must be periodically updated to reflect the latest scientific knowledge. A key issue that will be the subject of future research is the relationship between vehicle weight and emissions. The EPA's models currently do not differentiate among the vehicle classes of interest in TS&W policy options.

### Noise Emissions

Truck noise comes from three sources—the engine (as a function of engine revolutions per minute), the exhaust pipe (particularly from the use of engine compression brakes), and tires (tire noise increases significantly with speed and begins to dominate other truck noise sources above 30 miles-per-hour). Truck noise begins to dominate noise from other traffic once trucks account for more than 3 percent of the traffic. For example, to produce a noticeable difference in highway noise, such as a decrease of 2.5 decibels, the percentage of trucks in the traffic stream would have to drop from 20 percent to 5 percent of all traffic. The cost per noise equivalent was estimated for each vehicle class based on a synthesis of research findings from other studies.

The DOT has developed models for evaluating impacts of traffic-related changes in noise levels. These models served as the basis for the noise emission cost calculations for the *HCA Study* and *CT&W Study*.[39] Using passenger cars as the base, noise equivalency factors were determined under differing operating circumstances for each vehicle class and weight group. Noise equivalency factors for trucks relative to passenger cars are shown in Table IX-2. These cost per noise equivalent were estimated for each vehicle class based on a synthesis of research findings from other studies.

**Table IX-2**
**Noise Passenger Car Equivalents for Trucks**

| Vehicle Type | Speed | | | | |
|---|---|---|---|---|---|
| | **20** | **30** | **40** | **50** | **60** |
| Passenger | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Truck | 84.85 | 43.82 | 27.42 | 19.06 | 14.16 |

Noise-related costs are only estimated for freeway travel. There are several reasons why the analysis was limited to freeway travel including: (1) virtually all studies used as background for the cost estimates were limited to freeway locations, and (2) except in commercial areas where there are many other sources of noise, truck volumes in urban areas are relatively low.

### Exhaust Emissions

There has been little past research on relationships between vehicle size and weight and emissions. Changes in overall truck volumes under the scenario are not likely to cause significant changes in speeds or other traffic characteristics that affect emissions rates. The primary factor that would cause emissions to change is the change in total truck volumes and the change in traffic composition with more LCVs and fewer conventional trucks. Since other environmental, technological, and geographical factors that might affect emissions are assumed to be the same for the base case and the scenario, it is assumed for purposes of this study that total emissions vary directly with changes in fuel consumption. This is consistent

[39] See those studies for further information and documentation of the noise emission model.

with methods used by the Environmental Protection Agency to estimate heavy truck emissions in its Mobile 6 model.

## Scenario Impacts

Table IX-3 shows the impact of the scenario, both high- and low-cube cases, for energy consumption, emissions and noise costs. As mentioned previously, air pollution costs for the scenario could not be estimated within the scope of this study, therefore the impact table shows that these costs are not available (NA).

**Table IX-3**
**Energy and Environment Impacts for 13 Analyzed States**

| Impact | Base Case | Low Cube – Change from Base Case | | High Cube – Change from Base Case | |
|---|---|---|---|---|---|
| | | Absolute | Percentage | Absolute | Percentage |
| Energy Consumption (million gallons) | 5,084 | 4,921 | - 3.20% | 4,471 | - 12.06% |
| Emissions | | | -3.20% | | -12.06% |
| Air Pollution Costs | NA | NA | NA | NA | NA |
| Noise Cost ($ millions) | $539 | $532 | - 1.43% | $487 | - 9.67% |

# CHAPTER X

# Rail



## Introduction

Railroads, motor carriers, barge, and pipeline are the major modes of transportation for moving intercity freight throughout the nation. Rail and motor carriage account for the greatest share of total freight tons and revenues, with motor carriers accounting for 90 percent of the combined rail and truck revenue share.[40] Railroads handle significantly more bulk traffic such as coal and chemicals than trucks, but compete with trucks for certain high value commodities, primarily through intermodal service offerings.

As discussed in the Department's *Comprehensive Truck Size and Weight (CTS&W) Study*, increases in truck sizes and weights change the economics of truck-rail competition by providing new opportunities for truck productivity improvements. Allowing heavier payloads reduces truck transportation and other logistics costs facing the shipper. To the extent that the trucking industry is able to offer shippers lower total logistics costs, shippers will tend to shift freight that currently moves by rail to the larger, heavier trucks. Because rail is a decreasing cost industry (See Figure X-1) with high fixed costs, loss of traffic will necessarily require spreading those costs across a smaller traffic base, increasing the rail unit cost for handling the remaining traffic. Consequently, shippers remaining on the railroad may face higher rail rates, and to the extent that is the case the net national shipper cost saving attributable to productivity improvements of larger trucks will be reduced.

**Figure X-1**
**Decreasing Cost Industry**

Railroads are a decreasing cost industry because they face high fixed and common costs to maintain an extensive network, including the costs of right-of-way acquisition, roadbed preparation, installation of track and signals, etc. This network must be in place before any freight can move.

Once an initial investment has been made to provide a given level of capacity, per-unit-costs decline as production increases up to capacity. As output increases to that point, per unit fixed costs and common costs decrease because they are spread over more and more units. Conversely, as railroad traffic shrinks, fixed and common costs are spread over a smaller traffic base, resulting in higher costs per unit.

The Western Uniformity Scenario studied in this report is analyzed in this chapter by estimating the effects on railroads' financial condition when new LCV configurations, TPDs, RMDs, and triples are more generally permitted in the identified Western States.[41] The analysis measures the financial impact on the nation's Class I rail industry as a whole, and separately on the two western carriers that would be affected the most – the Burlington Northern and Santa Fe Railway Company (BNSF) and the Union Pacific Railroad Company (UP). The analysis considers both the shorter doubles (low-cube case) and the longer doubles (high-cube case) - triples are permitted in both cases.

---

[40] Transportation in America: A Statistical Analysis of Transportation in the United States, 19th edition, p. 28.
[41] See Chapter II for a complete discussion of both cases and the states in which they are allowed to operate.

## Overview of the Class I Railroad Industry[42]

In 2000, the data year for this study, the freight railroad industry produced a record 1.47 trillion ton-miles that generated revenue of $34.1 billion, despite the fact that revenue yield fell to 2.26 cents per ton-mile - a level 15.1 percent lower in nominal dollars, and 30.7 percent lower in real dollars than in 1990.[43] Eight major railroad systems accounted for 91 percent of the industry's total revenue.

The Class I railroad industry is in comparatively better financial condition today than in previous decades, having addressed serious structural problems, upgraded plant and facilities, and taken advantage of technological improvements to better serve customers. Net revenues after operating expenses reached $5.1 billion in 2000, and net income, a measure of profitability, totaled $3.9 billion. The industry operating ratio (expense/revenue) was 85.2, providing an indicator of how efficiently costs were managed. Nevertheless, the industry's return on investment (ROI) was only 6.5 percent, reflecting a continuing decline in ROI since registering a high of 9.4 percent in 1996.

### Profile of Study Carriers

As noted above, the principal carriers affected by the Western Uniformity Scenario are the BNSF and the UP - the two Class I railroads that traverse the geographic region of the study. In 2000, these two rail systems accounted for 55 percent of total industry miles of railroad operated, originated over 51 percent of industry carloads, and generated 58 percent of industry revenues. Principal commodities handled by these carriers are coal, chemicals, grain, and intermodal traffic.

The UP is the larger of the two railroads, owning nearly 29,000 miles of road and operating over an additional 4,000 miles of road through trackage rights. The somewhat smaller BNSF owns close to 26,000 miles of road, but operates over a total of about 33,400 miles with trackage rights included. UP originated nearly 7.4 million carloads and BNSF originated 6.9 million carloads in 2000. This traffic generated more than $10.5 billion in operating revenue for UP, and $9.2 billion for BNSF. BNSF's ROI at 8.1 percent, topped UP's 6.6 percent ROI.

---

[42] In 2000, the Surface Transportation Board defined a Class I railroad as one having annual operating revenues greater than or equal to $261.9 million. The threshold is adjusted annually for inflation. The eight Class I railroads are BNSF, CSX Transportation, Grand Trunk Western Railroad, Illinois Central Railroad, Kansas City Southern Railway, Norfolk Southern Railroad, Soo Line Railroad, and UP.

[43] The major rail-carried commodities (in terms of ton-miles) included coal (35 percent), intermodal traffic (trailers and containers on flat cars or well cars) (15 percent), chemical products (10 percent), and farm products (predominantly grain and soybeans) (9 percent). The fastest growing segment of rail traffic has been intermodal traffic, with the number of trailers and containers increasing substantially from an average of 3.4 million loadings in the early 1980's, when doublestack container trains were introduced, to 9.2 million in 2000. The highest traffic corridor for intermodal traffic is between California and Illinois reflecting the land portion of container shipments between the U.S. and Asia's Pacific Rim. This traffic is handled by the BNSF and the UP, which are the subject railroads of the current analysis.

**Methodology**

This section describes the procedure for estimating financial impacts on the rail industry, and the two western carriers, due to diverted rail shipments, and carrier rate reductions to retain shippers' traffic on the railroad. The objective of the analysis is to compute revised industry and study railroads' balance sheets for the year 2010 and reflect the effects of the scenario's low-cube and high-cube cases. Measures of impacts on revenues, freight service expense (FSE), contribution to overhead and profit, and ROI are assessed.

The rail impact analysis employed two models - the DOT's Intermodal Transportation and Inventory Cost (ITIC) Model (discussed in Chapter III) and an Integrated Financial Model. Exercising these models required that data for the analysis be extrapolated from the year 2000 to the Study Year 2010. To accomplish this, rail traffic growth rates developed from the Freight Analysis Framework (FAF)[44] were applied to the following data sources: 1) Class I railroad financial and operating statistics in the *Analysis of Class I Railroads—2000*;[45] and 2) the 2000 Surface Transportation Board's (STB's) Carload Waybill Sample (CWS).

Traffic and revenue diversions used to assess rail impacts were derived from the ITIC Model. Using the forecast 2010 rail freight flows of the CWS as a base case, the ITIC Model estimates shipper transportation and inventory costs for moving the freight by rail and by the competing truck configurations. The ITIC model assumes that railroads respond to increased truck productivity by reducing their own rates - down to variable cost if necessary - to prevent diversion of rail freight traffic to trucks.[46] If motor carriers can offer shippers lower transportation and inventory carrying costs than rail variable cost plus inventory carrying costs, the model predicts that the railroad will lose the traffic and the shipments divert to truck. This assumption produces a conservative estimate of diverted rail traffic.

As truck transportation costs decrease, the rail industry will experience three separate but related post-diversion effects:

1. Fewer rail shipments will reduce rail revenue.
2. As the railroads offer discounted rail rates to shippers to compete with motor carriers, additional revenue will be lost.
3. As rail ton-miles decrease due to losses in traffic, the unit (ton-mile) costs of handling the remaining freight traffic will increase.

It is important to note that for diverted traffic, railroads lose revenue and some costs. When discounting rates to hold traffic, railroads lose revenue but all costs remain. The effects

[44] Growth rate estimates for traffic volumes, both rail and truck, for the Year 2010 were developed from the FAF. For rail, the growth rates from the FAF were applied to the 2000 rail waybills by corridor and commodity. To expand 2000 ton-miles, revenue, and FSE to the Year 2010, a traffic-weighted average of these rail growth rates was applied to the *Analysis of Class I Railroads—2000* base year data.

[45] As compiled by the Association of American Railroads (AAR) from R-1 reports submitted by the railroads to the STB.

[46] The rail rates used in the analysis were the actual, or unmasked, rates resident in the STB's "highly confidential" CWS file. To protect their confidentiality, the STB performed the analysis for DOT.

listed above were measured for both low- and high-cube cases using two key ITIC Model outputs: 1) the remaining rail revenues after accounting for losses in revenues from both diversion and from rate discounting to hold traffic; and 2) the remaining post-diversion rail ton-miles. Percent changes from the 2010 base case revenues and ton-miles were calculated using these outputs for each study scenario, and applied to the comparable financial and operating statistics in the Association of American Railroads' (AAR), *Analysis of Class I Railroad 2000* (grown to the Year 2010). The adjusted AAR data on revenues and ton-miles were subsequently used as inputs to an Integrated Financial Model. The financial model uses measured changes in income statement variables - revenues, expenses, income, and cash generated and expended to produce revised industry, and study railroad balance sheets that reveal the effect of the lost revenues and ton-miles on the railroads' financial condition.[47]

The revised Balance Sheets reflect a new rail cost resulting from traffic diversion (freight service expense (FSE) in the AAR data). To calculate the reduction in FSE, the model applies a cost elasticity coefficient that measures the change in cost associated with a change in ton-miles.[48] For the rail industry the cost elasticity used is 0.6264, reflecting that as railroads lose traffic, costs do not decrease in a one-to-one relationship with ton-miles. Rather, railroads shed costs much more slowly because of the high fixed and common cost components of total cost that characterize the industry. To illustrate, if there were a 10 percent decline in rail ton-miles, the application of the 0.6264 elasticity coefficient indicates that freight cost (FSE) would only decline by about 6.3 percent. As a consequence, the cost to handle the remaining traffic in terms of cost per ton-mile would increase in the post-diversion case. This increased cost for remaining rail traffic can be thought of as a partial offset to calculated shipper cost savings found for rail shippers shifting to trucks as a result of the two cases, yielding the net national change in shipper costs.

The cost elasticities applied in the analysis for the industry and the Study railroads are noted in the Table X-1.

**Table X-1**
**Industry and Railroad Cost Elasticities**

| Railroad | Elasticity |
|---|---|
| Industry | 0.6264 |
| Burlington Northern Santa Fe | 0.6632 |
| Union Pacific | 0.7113 |

[47] The Integrated Financial Model was also used to calculate the post-diversion railroad ROI. For a complete discussion and overview of the model see the *CTS&W Study*, Volume III, Scenario Analysis, Chapter XI.

[48] The cost elasticity coefficient(s) used for the industry, and the separate railroads, were derived by John Bitzan of the Upper Great Plains Transportation Institute under FRA sponsored research, and published in the 2000 report, *Railroad Cost Conditions — Implications for Policy.* The report is available at http://www.fra.dot.gov/downloads/policy/rr_costs.pdf.

## Study Caveats

The results of the rail impact analyses are generally plausible but some bias may have been introduced due to data restrictions and, more importantly, because of assumptions made concerning present and future conditions in freight transportation. These assumptions are reflected in the growth rates applied to rail traffic volume.

The railroad industry has experienced large productivity gains since its partial deregulation in 1980. For the purpose of this study, the issue is whether those gains will continue to 2010, and whether the analysis should take account of them. Our review found a consensus among observers of the rail industry that the railroads have virtually exhausted the efficiencies that can be wrung from their existing plant, and significant future productivity gains will require massive infusion of capital investment. Whether, and to what extent that capital investment will be made is highly uncertain, particularly if there is erosion of railroad financial viability. In any case, while stepped up investments will be made to accommodate 2010 traffic (and were included in the Financial Model), efficiency or productivity gain is expected to significantly lag the industry's performance in past decades. Therefore, it can be concluded that the effect on the rail impact results using a static productivity assumption are minor.

As previously noted, the cost elasticity applied to the Class I Railroad industry is 0.6264. It was developed, along with individual railroad elasticities, in an econometric analysis of the industry based on *Railroad R-1 Report* data from 1978 through 1998. The issue is whether the coefficient can be applied credibly to data for the Year 2010, *i.e.*, to what extent will the coefficient change in the intervening years? While the precise change in the elasticity coefficient is unknown, we believe any change in the Study's impact measurements would be insignificant. Table X-2 shows the results of eight studies stretching from 1974 - 2000, where different researchers calculated the elasticity of cost with respect to changes in rail output. In general, the elasticity coefficients have not changed significantly over a period of more than twenty-five years. Therefore, for the purpose of this Study, and calculation of rail financial impacts, use of the 1998 cost elasticity coefficient is unlikely to have a substantially misleading effect on the outcome.

**Table X-2 Railroad Cost Studies**

| Study | Returns to Density** | Cost Elasticity |
|---|---|---|
| Keeler (1974) | 1.79 | 0.5586 |
| Harris (1976) | 1.72 | 0.5813 |
| Harmatuck (1979) | 1.92 | 0.5208 |
| Friedlaender & Spady (1981)*** | 1.16 | 0.8620 |
| Caves, Christensen, Tretheway, & Windle 1985) | 1.76 | 0.5681 |
| Berndt, Friedlanender, Chiang, & Velturo (1993) | 1.57 | 0.6380 |
| McCullough (1993) | 1.64 | 0.6101 |
| Bitzan (2000) | 1.60 | 0.6264 |

* Gerard J. McCullough, *A Synthetic Translog Cost Function for Estimating Output Specific Railroad Marginal Costs*, p 4, October, 1993. (We have taken the liberty of expanding McCullough's original table by including the elasticities from his study and the most recent elasticities from Bitzan.

** Returns to density for all of the studies except Berndt et al. are reported in Caves et al. (1985). Elasticity of cost with respect to output is the inverse of returns to density.

*** McCullough notes that early work by Friedlanender & Spady (1981)was subsequently revised downward, which corresponds more closely with the other cost elasticities in the table.

## Results

### Base Case

Table X-3 illustrates the total freight revenues, FSE, contribution, and ROI for the industry and the two western carriers for the base case. The base case applies the 2000 revenue per ton-mile for CWS shipments to the estimated Year 2010 ton-miles, providing estimates in terms of constant 2000 dollars. For the industry, freight revenues would be $43.2 billion. FSE incurred for moving the traffic would be $37.8 billion. Contribution at less than $5.5 billion is the difference between revenue and freight service expense. It represents the amount available to cover fixed cost, income taxes, shareholder profits, and capital investment to improve and maintain the plant to continue to meet customers' demands. Because contribution is closely linked to ROI, changes in contribution are an important measure of the impact of the scenarios on railroads' financial condition. ROI is the bottom line measure of a railroad's financial health because it affects access to financial markets. An insufficient ROI generally means that a railroad will not be able to marshal sufficient financial resources to replace capital assets over the long run.

**Table X-3 Base Case**
**Revenues, Freight Service Expense, Contribution, and ROI**
($, millions)

| Railroad | Revenue | Freight Service Expense | Contribution | ROI (Percent) |
|---|---|---|---|---|
| Industry | $43,233.86 | $37,755.30 | $5,478.56 | 6.31% |
| Burlington Northern Santa Fe | $11,721.65 | $9,309.85 | $2,411.80 | 8.89% |
| Union Pacific | $13,182.53 | $11,237.39 | $1,945.15 | 6.67% |

### Low-Cube Case

Table X-4 illustrates, lost revenues, FSE, and contribution resulting from the analysis of the low-cube case. This case examines the effects on rail when twin 45-foot trailers, Rocky Mountain Doubles, and triple trailers are permitted on a larger continuous network. For the industry, the low-cube case would result in total lost revenues of $38 million, consisting of a $26 million loss from discounting as railroads reduced rail rates to retain traffic (if necessary to a variable cost floor), and $12.1 million lost revenue as traffic diverted to the truck configurations. Rail industry contribution would be depleted by nearly $35 million. Overall, the twin 45-foot trailer LCV accounted for nearly 70 percent of total revenue losses. On the other hand, none of the revenue losses were attributable to broader operation of the triples configuration.

**Table X-4 Low-Cube Case**
**Lost Revenue, Freight Service Expense, and Contribution**
($, millions)

| Railroad | Revenues Lost from Diversion | Revenues Lost from Rail Discounting | Total Lost Revenues | Lost Freight Service Expense | Lost Rail Contribution |
|---|---|---|---|---|---|
| Industry | $12.09 | $25.96 | $38.05 | $3.55 | $34.50 |
| Burlington Northern Santa Fe | $5.77 | $9.94 | $15.71 | $0.99 | $14.72 |
| Union Pacific | $6.12 | $15.51 | $21.62 | $2.16 | $19.46 |

For the industry, the $12.1 million revenue lost to diversion is associated with only a $3.5 million reduction in FSE, illustrating the fact that railroads do not shed costs proportionately as revenues are lost.

Table X-5 shows the losses in ton-miles, revenues, FSE, contribution, and resulting ROI in percentage terms. Clearly, losses are small in each of the categories. For example, contribution only declined by 0.006 percent, while ROI for the industry only fell from 6.31 percent in the base case to 6.27 percent.

As expected, the western railroads experience the bulk of the losses since the cases examined fall entirely within their operating territories. For the low-cube case, BNSF's and UP's revenue losses makeup 98 percent of the total industry loss. The remaining losses would be spread among the other interline carriers. For BNSF, revenue losses total $15.7 million while UP's are down $21.6 million. Reductions in freight service expense for the two carriers are $988,000 and $2.2 million, respectively. For BNSF, contribution declines by 0.006 percent and ROI falls from 8.89 in the base case to 8.83 in the low-cube case. UP's contribution falls 0.01 percent and ROI declines to 6.61 from 6.67 percent.

**Table X-5 Low-Cube Case**
**Ton-Miles, Freight Service Expense, Revenues from Operation, Contribution, and ROI**
(percent change)

| Railroad | Ton-miles | FSE | Revenues | Contribution | Post Diversion ROI |
|---|---|---|---|---|---|
| Industry | -0.015% | -0.009% | -0.088% | -0.006% | 6.27 |
| Burlington Northern Santa Fe | -0.016% | -0.011% | -0.134% | -0.006% | 8.83 |
| Union Pacific | -0.027% | -0.019% | -0.164% | -0.010% | 6.61 |

## High-Cube Case

Under this case, twin 48-foot LCVs, Rocky Mountain Doubles, and triple trailers are allowed to operate in the study region. Table X-6 shows the effects to the rail industry and the two western carriers resulting from the study vehicles.

**Table X-6 High-Cube Case**
**Lost Revenue, Freight Service Expense, and Contribution**
($, millions)

| Railroad | Revenues Lost from Diversion | Revenues Lost from Rail Discounting | Total Lost Revenues | Total Lost Freight Service Expense | Total Lost Rail Contribution |
|---|---|---|---|---|---|
| Industry | $18.30 | $47.85 | $66.15 | $5.20 | $60.94 |
| Burlington Northern Santa Fe | $7.42 | $18.60 | $26.02 | $1.24 | $24.79 |
| Union Pacific | $10.48 | $28.54 | $39.02 | $3.44 | $32.91 |

The inclusion of a longer LCV configuration attracts more traffic off of the railroad, forcing them to discount rates more deeply to retain their current traffic moving in and through the region. For the industry, revenue losses totaled $66 million, with the western carriers losses of $65 million comprising over 98 percent of the total. The twin 48-foot configuration accounts for 80 percent of total revenue losses. Freight service expense dropped by $5.2 million for the industry and $1.2 and $3.4 million for BNSF and UP, respectively. Again, none of the losses were attributable to triples operations.

Table X-7 illustrates the percentage changes in ton-miles, revenues, freight service expense, contribution, and ROI. For the industry and BNSF, contribution fell by 0.01 percent with UP's falling by 0.018 percent. ROI for the industry dropped to 6.25 from 6.31 in the base case. For BNSF, ROI fell from 8.89 to 8.80, and UP's to 6.56 from 6.67 in the base case.

**Table X-7 High-Cube Case**
**Ton-Miles, Freight Service Expense, Revenues from Operations, Contribution, and ROI**
(percent change)

| Railroad | Ton-miles Percent Change | FSE Percent Change | Revenues Percent Change | Contribution Percent Change | Post Diversion ROI |
|---|---|---|---|---|---|
| Industry | -0.022% | -0.014% | -0.153% | -0.011% | 6.25% |
| Burlington Northern Santa Fe | -0.020% | -0.013% | -0.222% | -0.010% | 8.80% |
| Union Pacific | -0.043% | -0.031% | -0.296% | -0.018% | 6.56% |

## Conclusion

The analysis above estimates the traffic and financial effects that the low-cube and high-cube cases would have on the financial condition of the railroad industry and the two study carriers. As expected, the industry changes in ROI and loss of contribution are small when compared with the effects of the nation-wide LCV scenario analyzed in the *CTS&W Study*—where ROI fell from 9.8 to 5.3 percent and contribution fell by $3.1 billion. Most significant, when compared with the *CTS&W Study*, is the loss in revenues from rail rate discounting to retain traffic, relative to revenue losses from traffic diversion. In the *CTS&W Study*, the loss in revenues from diversion consistently represented a larger share of the revenue losses—generally running 3.5 times greater than that from rate discounting. Here the results are reversed with revenue losses from rate discounting running over 2.5 times the losses from traffic diversion. While an analysis explaining the difference in these results is beyond the scope of this study, it is hypothesized that the geographic boundaries of the scenario studied are largely responsible. Most of the traffic the two western railroads carry originates, terminates, (or both) outside of the scenario States studied. Competing truck traffic, consequently, originates/terminates outside of the scenario States as well—requiring transloading of cargos at State borders to and from conventional configurations and LCVs. The transloading requirement clearly erodes some of the LCV productivity gains—enough that railroads are forced to discount rates, but not so deeply that a large proportion of the affected traffic is diverted to the LCVs.

Although losses to the carriers appear small, as with any business entity, railroads would attempt to make adjustments to return ROI and contribution to levels that were present in the base case. Most likely this would be accomplished through reduced investment and/or increases in the service adjusted rate to rail shippers, particularly those shippers on the BNSF and the UP.

# CHAPTER XI

# Conclusions



## Study Conclusions

Longer combination vehicles have been operating in 13 Western States for many years. Size and weight limits in those States vary as does the extent of the highway network on which LCVs can operate. Some of these differences are due to federal truck size and weight limits, especially grandfather rights under which States can allow vehicles exceeding 80,000 pounds to operate on Interstate Highways. But some of these differences also reflect differences among the States in the vehicle weights and dimensions they believe are appropriate for their highway systems. If States were given the flexibility to increase their truck size and weight limits to levels assumed in this scenario, some States immediately would take full advantage of this flexibility, others might change some but not all size and weight limits, and several might not change truck size and weight limits at all.

Like previous studies that have examined the potential impacts of changing truck size and weight limits, this study has estimated substantial shipper benefits from allowing more widespread use of LCVs. Other benefits from the changes in truck size and weight limits assumed in this scenario are reductions in fuel consumption, emissions, and noise-related costs. The full benefits estimated in this study likely would not be realized, however, because all States would not allow LCV to operate as widely as assumed in this study.

Infrastructure and related costs would not be as great as has been estimated in previous studies because LCVs already operate on at least some highways in each of the 13 States included in the analysis. Thus to a certain extent States have already considered LCV weights and dimensions in pavement, bridge, and geometric design. Nevertheless improvements costing several billion dollars were estimated to be needed to correct deficiencies in bridges, interchange ramps, and other highway elements just to accommodate existing truck operations. These deficiencies may not be severe enough to require immediate improvements, but in the long run would likely have to be corrected, especially if LCV volumes increased. If LCV operations expanded under assumptions in this scenario, added infrastructure costs could be from about $300 million to more than $2 billion. Several factors would affect the magnitude of these additional infrastructure costs including the extent to which States allowed larger LCVs to operate, the length limits imposed on double trailer combinations, and the extent to which bridges can be strengthened rather than replaced. Some States may continue to defer non-essential costs as they have done under current truck size and weight limits, but doing so ultimately may increase costs and could increase safety risks as well.

Few Western States charge fees that cover the infrastructure costs associated with LCV operations. The significant exception is Oregon that routinely conducts highway cost allocation studies to estimate the cost responsibility of various truck classes and adjusts truck-related fees according to results of those studies. When LCVs and other heavy trucks do not pay the full costs of their operations, other motorists must make up the difference. This is inequitable to the highway users who must subsidize LCV operations and contributes to an uneven playing field for railroads and other competitors. States already are experiencing budgetary problems as they look to improve the condition and performance of their transportation systems, and Federal Highway Trust Fund revenues to support the

Federal-aid highway program have been growing more slowly in recent years. Before any action is taken with respect to changes in truck size and weight limits that could increase highway improvement needs, plans for financing those improvements should be developed that include how the longer, heavier trucks responsible for additional costs would contribute to paying those costs. This is consistent with recommendations in the TRBs Special Report 267 in which it concluded, "federal legislation creating the (TRB's recommended) permit program should specify a quantitative test for the revenue adequacy of the permit fees imposed by states that wish to participate….Fees should at least cover estimated administrative and infrastructure costs for the program…"

Safety is always the issue of greatest concern when truck size and weight issues are considered. Data simply are not available upon which to develop reliable estimates of changes in the number of crashes or fatalities that might result from a change in truck size and weight limits such as the Western Uniformity Scenario. While some LCV operators claim the safety experience of LCVs is better than for the conventional vehicles they operate, these claims cannot be borne out for LCV operations as a whole. States in which LCVs operate have not noted particular safety problems with current LCV operations, but they have no formal processes in place to monitor safety. Since there are many uncertainties about the safety of substantially increased use of LCVs as might occur under the Western Uniformity Scenario, it would be prudent to require such processes before any substantial change in federal truck size and weight limits such as the Western Uniformity Scenario was implemented. In addition to monitoring the on-road safety of LCVs, processes might also be considered to ensure that the vehicles to be used meet some minimum thresholds for stability and control, and that companies operating these vehicles have good safety records and vehicle maintenance programs. One of the criticisms of TRB's recommended permit program was that it would involve conducting experiments with vehicles that were not known to be safe. To the maximum extent possible, assurances should be given that the vehicles to be used are at least as safe as vehicles on the road today and that the companies to be operating those vehicles have excellent safety records.

Nationwide, the Department believes that an appropriate balance has been struck on truck size and weight. Western States included in this scenario all can allow LCVs to operate at weights substantially above the 80,000-pound federal limit on Interstate Highways, and a number of other States can allow axle loads exceeding federal limits under grandfather rights. While the widely varying State laws appear to be inefficient, they are the result of political processes that have attempted to balance economic development concerns with concerns for safety and infrastructure protection. This balance has resulted in somewhat different size and weight limits from State to State, but these differences largely reflect factors unique to each State. The pattern of truck size and weight limits that has evolved over the years may not be optimal by any objective measure, but it does allow for some appropriate regional variation without compromising safety, which is the Department's highest priority.

Many proponents of change in truck size and weight limits point to TRB's recommendations in *Special Report 267* as a blueprint for a systematic process to more nearly optimize truck size and weight policy. However, aside from certain segments of the trucking industry and several States interested in truck size and weight increases, strong support for TRB's

recommendations has not been evident. The Department has not taken a formal position on the TRB study, in part because it does not favor change in federal truck size and weight policy, but if changes were to be made, the Department believes that the kind of strong monitoring and evaluation that TRB recommends would be essential. Without support for the kind of comprehensive approach to truck size and weight policy and permitting practices recommended by TRB, there would be no mechanism to quickly identify safety or other problems that might arise.

In recent years a number of ad hoc, State-specific exemptions from federal truck size and weight laws have been enacted. For instance, TEA-21 contained special exemptions from federal size and weight limits in four States, Colorado, Louisiana, Maine, and New Hampshire. The Department does not support this kind of piecemeal approach to truck size and weight policy. It makes enforcement and compliance with truck size and weight laws more difficult, it often contributes little to overall productivity, it may have unintended consequences for safety and highway infrastructure, and it reduces the willingness to work for more comprehensive solutions that would have much greater benefits. A regional approach such as the Western Uniformity Scenario could have greater benefits than a series of individual exemptions, but it also could have much more serious adverse consequences unless closely monitored. Unless there were very strong support from State elected officials for a carefully controlled and monitored evaluation of changes in truck size and weight limits such as those in the Western Uniformity Scenario, the risks of adverse impacts from the unmonitored use of LCVs, the divisiveness that might ensue as the current balance in truck size and weight policy is upset, and the further polarization of this very contentious issue would outweigh the benefits that might be realized. Strong support from elected officials of States within the region for a change in truck size and weight limits has not been evident to date, and there is no compelling Federal interest in promoting changes that are not strongly supported by the affected States.

# Appendix A

# Federal Bridge Formula



This appendix describes in detail why, for example, a simple maximum gross vehicle weight (GVW) limit would not sufficiently protect bridges. It also shows for which types of bridges the Federal Bridge Formula B (BFB) works and for which types it does not.

Consider the following table. This table presents the analysis of two trucks of equal weight; one is a 72,000 pound four axle dump truck with an 18-foot wheelbase and the second is a 72,000 pound 5-axle tractor semitrailer with a 64-foot wheelbase. The sample bridges are simple span steel girder bridges with spans of 40, 60, 80, 100 and 120 feet. The values shown are the ratios of the moments of the selected truck to the HS20 vehicle.

**Table A-1**
**Ratios of Moments of Selected Trucks Relative to the HS20 Vehicle**

| Span Length (feet) | 4 Axle Dump Truck 72,000 lbs. Wheel base = 18 feet | 5-axle Tractor Semitrailer 72,000 lbs. Wheel base = 64 feet |
|---|---|---|
| 20 | 1.210 | 0.790 |
| 40 | 1.123 | 0.778 |
| 60 | 1.086 | 0.791 |
| 80 | 1.066 | 0.843 |
| 100 | 1.053 | 0.891 |
| 120 | 1.044 | 0.922 |

This analysis shows that using a straightforward GVW standard will not adequately protect bridges. For short spans the dumb truck produces a moment, and therefore a stress, 21 percent **greater** than the HS20 design vehicle and 53 percent (1.21 ÷ 0.79) **greater** than that of the "eighteen wheeler," even though the GVWs are identical. As expected, as the span length becomes greater, the difference between the two trucks decreases. However, more than 50 percent of the bridges nationwide have span lengths less than 60 feet.

Consequently, a better and fairer standard was needed. Federal Bridge Formula B (BFB) is a formula with which one can calculate the maximum allowable weight on any group of axles. It is function of the number of axles and axle spacing:

$$W = \left[ \frac{LN}{N-1} + 12N + 36 \right] \tag{1}$$

where:

- W = the maximum weight in pounds that can be carried by a group of two or more axles to the nearest 500 pounds
- L = the distance between the outer axles of the group
- N = the number of axles in the considered group

The concept of a bridge formula evolved a half a century ago, and it went through several revisions. Even before the Federal formula was implemented, a number States adopted this or a similar formula in the 1960s and early 1970s. As significant numbers of trucks began to get heavier, Congress established the national implementation of Formula B for Interstate highways in 1974.[49] At the same time Congress raised the maximum allowable Gross Vehicle Weight (GVW) on the Interstate system to 80,000 pounds the maximum single axle load to 20,000 pounds, and maximum tandem axle load to 34,000 pounds. In 1982 Congress prohibited any State from establishing a maximum GVW less than the Federal 80,000 pound "cap". By the mid-1980s effectively all the States established the Federal BFB, but some States allowed trucks to exceed the 80,000 pound cap on the non-Interstate systems as long as the trucks met BFB. Furthermore, a few States were allowed "grandfather" rights to allow trucks greater than 80,000 pounds on the Interstate system, usually for a relatively nominal annual permit fee. Nonetheless, most all States require even the "grandfathered" combination trucks to comply with BFB.

The guideline followed by the developers of BFB was that a typical HS20 rated bridge would not be overstressed by more than 5 percent by the typical combination truck with one trailer. At the time it was implemented, Formula B worked quite well in protecting the bridges on the Interstate system. It also worked quite well in keeping single unit trucks and single trailer combination trucks from damaging bridges in those States that applied the formula to the non-Interstate systems.

Although the analyses conducted in developing Bridge Formula B considered only simply supported superstructures,[50] the resulting formula was generally applicable since the lengths and weights of most trucks in the then current fleet did not differ significantly from the HS20 design vehicle, and because the structural capacity of continuous bridges to accommodate

[49] FHWA only controls truck size and weight on the Interstate highway system and on Federal lands (national forests, national parks, etc.).

[50] A simply supported structure is one in which each beam between any two supports, in a structure with three or more supports, is independent, that is, not connected to successive beams. A continuous structure is one in which any one-beam spans, i.e. is *continuous*, over at least three supports.

typical single combination trucks is similar to that of simply supported structures subjected to these same loads. However, the moments caused by longer and heavier trucks on continuously supported bridges are much greater than the moments on simply supported bridges of equal rating and of equal span lengths.

To demonstrate this, consider the total (live load plus dead load) moments of seven different vehicles, assuming steel girder bridges, the single most common highway bridge type. The vehicles include the HS20 Short and HS20 Long design vehicles, a 73,280-pound 5-axle tractor semitrailer, an 80,000-pound 5-axle tractor semitailer, an 80,000-pound 5-axle tractor semitailer with a 53-foot trailer, a typical Rocky Mountain Double and a Turnpike Double, see Figure A-1. These vehicles were chosen because they represent typical single trailer trucks from both before and after the 1982 increase in the cap from 73,280 pounds to 80,000 pounds and before and after the increase in trailer length to 53-feet. Also included are two typical double trailer trucks, the Rocky Mountain Double and the Turnpike Double. All of these vehicles comply with Formula B.

Table A-2, presents the ratio of the moments of these selected vehicles to that of the HS20 (short) design vehicle for simply supported bridges and for 2-span and 3-span continuous bridges with spans lengths varying from 20 to 180 feet in 20 foot increments. The ratio in the fourth column is, of course, 1.0 because it is the ratio of the moments of the HS20 (short) design vehicle to itself (i.e., the inventory rating). Single trailer combination trucks do not overstress (i.e., the ratio is < 1.0) simply supported bridges for any span lengths. For continuously supported multi-span bridges, except as noted below, these conventional single trailer combinations weighing up to 80,000 pounds also cause no greater stresses than the HS20 design vehicle (i.e., the inventory rating). However, on continuous bridges with main spans in the 50-70 foot range, these combinations operating at 80,000 pounds have moments (and therefore produce stresses) up to 10 percent greater than the HS20 design vehicles. Since the Inventory Rating of the bridge is HS20, then the 10 percent is probably acceptable, because of the large factor of safety associated with the Inventory Rating.

Longer combination trucks overstress both simply supported and continuously supported bridges. Turnpike doubles are worse than Rocky Mountain doubles at the weights assumed in this analysis. On simply supported bridges Turnpike Doubles overstress the bridge up to 13 percent more than the HS20 design vehicle while Rocky Mountain Doubles overstress up to 8 percent greater. Even this level of overstress is usually acceptable. However, overstresses caused by LCVs are even greater on continuously supported bridges. Turnpike Doubles cause stresses up to 22 percent greater than the HS20 design vehicle and Rocky Mountain Doubles up to 15 percent greater.

Bridge Formula B thus does not provide the same protection against damaging overloads by LCVs as it does for single-trailer combinations, especially on continuously supported bridges. For most span lengths the overstress exceeds the inventory rating significantly and that, for the worst cases, e.g., Turnpike Doubles on 2 span continuous bridges with span lengths equal to 80-feet, this overstress reaches 25 percent. Although this level of overstress is less than the operating rating, the overall factor of safety designed into bridges would be substantially reduced with the continuous use of such LCVs.

# Table A-2
## Ratio of Total Load Moments of the Study Vehicles to the HS20 (Short) Design Vehicle

| Bridge Type | Length of Main Span (ft) | Total Length (ft) | HS20 (Short) | HS20 (Long) | 3S2 w/40' trailer 73,280 lbs | 3S2 w/45' trailer 80,000 lbs | 3S2 w/53' trailer 80,000 lbs | 3S2-2 Rocky Mtn Dbl 104,000 lbs | 3S2-4 Turnpike Dbl 128,000 lbs. |
|---|---|---|---|---|---|---|---|---|---|
| Simple | 20 | 20 | 1.00 | 1.00 | 0.85 | 0.89 | 0.89 | 0.89 | 0.83 |
| Simple | 30 | 30 | 1.00 | 0.95 | 0.88 | 0.89 | 0.89 | 0.95 | 0.95 |
| Simple | 40 | 40 | 1.00 | 0.84 | 0.80 | 0.82 | 0.82 | 0.86 | 0.90 |
| Simple | 50 | 50 | 1.00 | 0.80 | 0.78 | 0.80 | 0.80 | 0.83 | 0.88 |
| Simple | 60 | 60 | 1.00 | 0.82 | 0.77 | 0.80 | 0.80 | 0.82 | 0.87 |
| Simple | 70 | 70 | 1.00 | 0.86 | 0.82 | 0.80 | 0.80 | 0.85 | 0.87 |
| Simple | 80 | 80 | 1.00 | 0.88 | 0.85 | 0.84 | 0.81 | 0.87 | 0.88 |
| Simple | 90 | 90 | 1.00 | 0.91 | 0.88 | 0.88 | 0.82 | 0.89 | 0.90 |
| Simple | 100 | 100 | 1.00 | 0.92 | 0.90 | 0.90 | 0.86 | 0.93 | 0.93 |
| Simple | 110 | 110 | 1.00 | 0.93 | 0.92 | 0.92 | 0.88 | 0.96 | 0.97 |
| Simple | 120 | 120 | 1.00 | 0.94 | 0.93 | 0.94 | 0.91 | 0.99 | 1.00 |
| Simple | 130 | 130 | 1.00 | 0.95 | 0.94 | 0.95 | 0.92 | 1.01 | 1.03 |
| Simple | 140 | 140 | 1.00 | 0.96 | 0.95 | 0.96 | 0.94 | 1.03 | 1.06 |
| Simple | 150 | 150 | 1.00 | 0.96 | 0.96 | 0.97 | 0.95 | 1.04 | 1.07 |
| Simple | 160 | 160 | 1.00 | 0.96 | 0.96 | 0.98 | 0.96 | 1.05 | 1.09 |
| Simple | 170 | 170 | 1.00 | 0.97 | 0.96 | 0.98 | 0.96 | 1.06 | 1.10 |
| Simple | 180 | 180 | 1.00 | 0.97 | 0.97 | 0.99 | 0.97 | 1.06 | 1.11 |
| 2-span Cont | 20 | 40 | -1.00 | -1.05 | -0.93 | 0.92 | 0.92 | -0.92 | 0.91 |
| 2-span Cont | 30 | 60 | 1.00 | -1.02 | -0.96 | -0.93 | 0.86 | -0.92 | 0.91 |
| 2-span Cont | 40 | 80 | 1.00 | -0.99 | -1.00 | -1.01 | -0.94 | -1.03 | -1.03 |
| 2-span Cont | 50 | 100 | 1.00 | -0.98 | -1.01 | -1.08 | -1.07 | -1.16 | -1.19 |
| 2-span Cont | 60 | 120 | -1.00 | -0.95 | -0.99 | -1.07 | -1.10 | -1.25 | -1.23 |
| 2-span Cont | 70 | 140 | -1.00 | -0.92 | -0.94 | -1.03 | -1.07 | -1.24 | -1.22 |
| 2-span Cont | 80 | 160 | -1.00 | -0.94 | -0.92 | -0.99 | -1.03 | -1.21 | -1.25 |
| 2-span Cont | 90 | 180 | -1.00 | -0.95 | -0.94 | -0.95 | -1.00 | -1.18 | -1.25 |
| 2-span Cont | 100 | 200 | -1.00 | -0.96 | -0.95 | -0.96 | -0.97 | -1.15 | -1.24 |
| 2-span Cont | 110 | 220 | -1.00 | -0.97 | -0.96 | -0.98 | -0.95 | -1.12 | -1.23 |
| 2-span Cont | 120 | 240 | -1.00 | -0.98 | -0.97 | -0.99 | -0.97 | -1.09 | -1.21 |
| 2-span Cont | 130 | 260 | -1.00 | -0.98 | -0.98 | -1.00 | -0.98 | -1.09 | -1.19 |
| 2-span Cont | 140 | 280 | -1.00 | -0.98 | -0.98 | -1.01 | -0.99 | -1.11 | -1.17 |
| 2-span Cont | 150 | 300 | -1.00 | -0.98 | -0.99 | -1.01 | -1.00 | -1.12 | -1.15 |
| 2-span Cont | 160 | 320 | -1.00 | -0.99 | -0.99 | -1.02 | -1.00 | -1.13 | -1.17 |
| 2-span Cont | 170 | 340 | -1.00 | -0.99 | -0.99 | -1.02 | -1.01 | -1.14 | -1.18 |
| 2-span Cont | 180 | 360 | -1.00 | -0.99 | -0.99 | -1.02 | -1.01 | -1.14 | -1.20 |
| 3-span Cont | 20 | 60 | 1.00 | -1.02 | -0.96 | -0.92 | 0.86 | -0.95 | 0.92 |
| 3-span Cont | 30 | 90 | 1.00 | -1.00 | -0.99 | -1.00 | -0.92 | -1.01 | -1.03 |
| 3-span Cont | 40 | 120 | -1.00 | -0.98 | -1.00 | -1.06 | -1.04 | -1.12 | -1.16 |
| 3-span Cont | 50 | 150 | -1.00 | -0.92 | -0.96 | -1.03 | -1.04 | -1.16 | -1.16 |
| 3-span Cont | 60 | 180 | -1.00 | -0.91 | -0.92 | -0.99 | -1.02 | -1.16 | -1.14 |
| 3-span Cont | 70 | 210 | -1.00 | -0.94 | -0.91 | -0.96 | -0.99 | -1.15 | -1.18 |
| 3-span Cont | 80 | 240 | -1.00 | -0.95 | -0.94 | -0.94 | -0.97 | -1.13 | -1.19 |
| 3-span Cont | 90 | 270 | -1.00 | -0.96 | -0.95 | -0.96 | -0.95 | -1.11 | -1.19 |
| 3-span Cont | 100 | 300 | -1.00 | -0.97 | -0.96 | -0.98 | -0.94 | -1.08 | -1.18 |
| 3-span Cont | 110 | 330 | -1.00 | -0.98 | -0.97 | -0.99 | -0.96 | -1.06 | -1.17 |
| 3-span Cont | 120 | 360 | -1.00 | -0.98 | -0.98 | -1.00 | -0.98 | -1.09 | -1.16 |
| 3-span Cont | 130 | 390 | -1.00 | -0.98 | -0.98 | -1.01 | -0.99 | -1.11 | -1.15 |
| 3-span Cont | 140 | 420 | -1.00 | -0.98 | -0.98 | -1.01 | -1.00 | -1.12 | -1.15 |
| 3-span Cont | 150 | 450 | -1.00 | -0.99 | -0.99 | -1.02 | -1.00 | -1.13 | -1.16 |
| 3-span Cont | 160 | 480 | -1.00 | -0.99 | -0.99 | -1.02 | -1.01 | -1.14 | -1.18 |
| 3-span Cont | 170 | 510 | -1.00 | -0.99 | -0.99 | -1.02 | -1.01 | -1.14 | -1.19 |
| 3-span Cont | 180 | 540 | -1.00 | -0.99 | -0.99 | -1.02 | -1.01 | -1.14 | -1.20 |


HS-20 (Short) DESIGN VEHICLE
14 ft
14 ft
8
32
32
HS-20 (Long) DESIGN VEHICLE
14 ft
32 ft
8
32
32
WB=49'
GVW=73.28k
40 ft
13 ft
4 ft
28 ft
4 ft
9.28
16 16
16 16
WB=57'
GVW=80k
45 ft
16 ft
4 ft
33 ft
4 ft
12
17 17
17 17
WB=65'
GVW=80k
53 ft
16 ft
4 ft
41 ft
4 ft
12
17 17
17 17
WB=101'
GVW=104k
48 ft
28 ft
15 ft
4 ft
36 ft
4 ft
8 ft
24 ft
12
17 17
14 14
17
18
WB=112'
GVW=128k
48 ft
48 ft
16 ft
4 ft
36 ft
4 ft
8 ft
4 ft
36 ft
4 ft
12
15.5 15.5
13.5 13.5
13.5 13.5
15.5 15.5

Figure 1

# EXHIBIT PX0562

EXHIBIT
PENGAD 800-631-6989
Seale - 1

15 of 21 DOCUMENTS

Copyright 2004 FDCHeMedia, Inc. All Rights Reserved
Copyright 2004 CCBN, Inc. All Rights Reserved
FD (Fair Disclosure) Wire

July 28, 2004 Wednesday

Transcript 072804ag.780

**LENGTH:** 10341 words

**HEADLINE:** Q2 2004 Norfolk Southern Corp Earnings Conference Call - Final

**BODY:**

DAVID GOODE, CHAIRMAN, PRESIDENT AND CEO, NORFOLK SOUTHERN CORPORATION: Good morning, ladies and gentlemen. I'm David Goode, Chairman, President and Chief Executive Officer of Norfolk Southern and I'm pleased to welcome you to our second quarter 2004 analyst meeting.

I welcome the hearty souls that are here on kind of a tough day in New York and we appreciate those of you who came out to be with us. And I'd like to welcome those also who are listening by telephone conference and those who are otherwise participating on the Internet and, as usual, I remind everybody here to please use the microphones when the time comes so that everybody can hear.

And I also remind our listeners and Internet participants that the slides are available for your convenience on our website in the investor section. So, if you haven't already gotten to that, we urge you to do so. As usual, transcripts will be available from our public relations department and also will be posted on our Web site.

Now the lawyers have asked that I remind you that any forward-looking statements made during the course of this presentation represent our best good-faith judgment as to what may occur in the future, actual results may differ materially from those projected, and will depend on a number of variables, some of which may be outside the control of the company. And I'm asked to refer you to our annual Report and our quarterly Report filed with the SEC for a discussion of those variables.

Let me very quickly introduce those folks from Norfolk Southern who are here today. As always, we have our Vice Chairman in the front row who will be up later, Hank Wolf, Steve Tobias and Ike Prillaman, also present with us toady are Jim Hixon, our Senior Vice President of Legal and Government Affairs is here on the corner, Kathryn McQuade, Senior Vice President of Finance, over here with Mormon, our Senior Vice President of Corporate Planning and Services is with us somewhere, over here.

And we also have Bob Fort, our Vice President of Public Relations is with us, as is Bill Galanko, our Vice President of Taxation. Marta Stewart, our Vice President and Controller who I think most of you know and Lee Anne Marilli (ph). You will note the new last name for Lee Anne McGruder and she'll tell you about it later on if you ask her, Director of Investor Relations, but congratulations Lee Anne. We're happy to have you with us as always. And also Debbie Malvin, Hank Wolf's assistant is here in the back of the room if you need anything. Everybody has made the trip here to be available for questions and I hope you'll take the opportunity to do that.

When we last met in April, I indicated that we were ready for strong performance across the board in the second quarter. And you've seen the numbers and I am very pleased to report that, that turned out to be so and Norfolk Southern continued to set records again in the second quarter. Bottom line, our results reflect strong revenue growth and record income from operations with an improved operating ratio. This is a quarter that was marked by strong operational results for us.

Our board yesterday, you will undoubtedly have noted, increased our dividend by $0.2 or 25%, reflecting the strong improvement in our financial results. We intend to continue to strive as we have said to you before for continued

improvement in our shareholder returns, while at the same time, we paid down debt and improve our balance sheet and Hank will talk more about that in a minute.

Our railway operating revenues for the quarter of $1.8 billion were the highest in our history. They were up 11%. We posted our best-ever income from railway operations, that was up 43%.

And our net income of $213 million or $0.54 a share was up 55% year-over-year. Importantly, we've produced an operating ratio of 76.6%. That's a 5 percentage-point improvement over last year and 3 percentage points better than last quarter.

So, overall, I don't think there's any getting around the fact that this was a strong quarter for Norfolk Southern.

We were able this quarter to maintain our service levels, our net worth fluidity was good. We handled some 140,000 more carloads in the quarter, while the cars online remain stable and our other metrics either remain generally stable or improved.

Our Thoroughbred Operating Plan continues to demonstrate its capability of adapting to changing conditions and shifting business demands and our people executed very well in the quarter.

We continue to invest in hiring additional train and engine crews and they're helping Norfolk Southern absorb the strong business growth by consistently executing according to plan.

We continue to benefit from market-based pricing, as our service levels remain high and the demand for our service increases. Strength is broad and, most important, is driven largely by our core businesses.

In the second quarter, we handle an 8% increase in car loadings with just 4% in additional train starts. Now that's powerful leverage, as those who follow us know. Our service quality helped support the 11% increase in revenues in the second quarter. Simply put, the results you see today reflect our disciplined focus on continuous improvement in service. At the same time, Norfolk Southern employees improved our already award-winning safety record; our safety results are still leading the industry, and are better in 2004.

Intermodal revenues led our revenue growth. They grew 21% in the second quarter and 17% for the first half of the year, reflecting growth from truck competitive services, increased business with our trucking partners and strong international shipments. Coal revenues were up 9% in the second quarter and 11% for the first half. This growth was driven, in part, by an increased export coal, not only at Lamberts point, but also at Baltimore and further included strong utility demand and better revenue yields. General merchandise was up 9% in the second quarter, 7% for the first six months that was led by metals and construction and chemicals. Ike will give you considerable detail on these numbers shortly.

Now while our revenues increased $180 million or 11%, in the second quarter, our expenses were up only $53 million or 4% compared with last year. As a result, this kind of good leverage, income from railway operations set another new record up $127 million, an increase of 43% in the second quarter.

While fuel costs were up, despite our hedging program, and compensation increased as a result of higher train and engine employment and stock and incentive-based compensation, still we were able to control costs and posted a 76.6% operating ratio in second quarter. We're also pleased that, that improved over the first quarter, showing consistent improvement.

For the first six months, our railway-operating ratio of 78%, compared with 83.4% for the comparable period last year. All of you who follow Norfolk Southern on a regular basis know how pleased I am to be able to report that number. But I'm sure you also know that I think there's still room for improvement, even though the number starts with 7. We've been watching carefully to see if our record car loadings in the first half of the year continue into July. So far, there's been considerable traction on that.

As of -- as of yesterday, actually the day before yesterday, I guess, the overall car loadings for the month are up approximately 10% month -- July this year over July last year that's led primarily, again, by Intermodals, metals and coal.

And Norfolk Southern's exceptional second quarter and first half performance have given us one of the best foundations that we've seen in a long time from which to build in this company. We think our results validate our philosophy of providing higher-value transportation products and operating efficiencies.

As we move forward into peak season, although we believe we've already seen some of the peak and that peak season may not be as dramatic as it used to be, we will continue our commitment to value pricing that reflects the current market value of our rail service, particularly in today's strong market with its demand.

Our people are committed to maintaining and improving our service quality to give us a substantial competitive advantage and an increasingly valuable product going forward. We don't deny for a minute the difficulty of continuing to provide high service levels in today's transportation environment with surging demand. But we do believe our plan is showing its strength, improving it quarter after quarter and we have a lot of confidence in it.

In the first half of 2004, we've benefited by handling volume increases with a lesser percentage of train stocks. So, as I pointed out, that strong leverage, we still have room to add capacity. Obviously, as business volumes increase, our operating plan will have to be modified to handle the business and additional train starts will be required. However, we are going to be very careful about our business, to make sure we continue to operate efficiently in order to improve our margins. We want to grow aggressively and we have room to do so, but we'll be smart about it because we're mindful that our bottom line results still have a lot of improving to do.

As we move into the remainder of the year, I'm very confident that Norfolk Southern will continue its leverage. We'll continue to leverage our operational momentum, improving service equal and pursuing new business and margin improvement as we do that, reaffirming our position as a thoroughbred of transportation, which is our objective.

Now I'll ask Hank to review our numbers for the second quarter. Ike will then tell you about the specifics of our market. Steve does not have prepared remarks, but I'm sure in a quarter like this, he'll be more than happy to talk to you about operations and all that it supports. We'll take your questions in a minute.

HANK WOLF, VICE CHAIRMAN AND CFO, NORFOLK SOUTHERN CORPORATION: Thank you, David. Good morning. Let me begin by reminding you that our first quarter results last year included $114 million or $0.29 per share after tax benefit from the cumulative effects of two changes in accounting principles and a $10 million or $0.3 per share after tax gain from discontinued operations related to our 1998 sale of North American Vanlines. In order to provide you with the most meaningful comparisons this morning, I'll initially exclude these items from my remarks and then reconcile the totals to our reported 2003 results.

As David indicated, we're very pleased with our second quarter results. The strength that we saw in the economy and talked about earlier has continued. In the second quarter, we generated record railway operating revenues, which together with moderate increases and expenses, allowed us to produce record income from railway operations this quarter.

As a result of our strong financial performance, our board of directors increased our quarterly dividend by $0.2 per share or 25% from $0.8 to $0.10 per share. In addition, we have reduced our outstanding debt by more than $300 million in the first half of this year.

Now let me turn to our financial results for the quarter. Railway operating revenues for the second quarter were a record $1.8 billion, up $180 million or 11%, merchandise revenues increased 81 million. Intermodal revenues rose 64 million, and coal revenues were up 35 million. For the first six months, railway-operating revenues were a record 3.5 billion, an increase of 312 million or of 10%, with general merchandise revenues up 130 million, Intermodal revenues increased 103 million and coal revenues rose 79 million.

Second quarter volume increased by more than 139,000 carloads or 8% compared with last year, driven by a 100,000 unit or 17% gain in Intermodal units. In addition, our revenue per unit increased by 2.8%, resulting in a total increase in revenues of 11%. For the first six months, carloads were up approximately 248,000 units or 7.3%, largely driven by 170,000 unit or 14% increase in Intermodal volume.

Revenue per unit was up 2.2% and total operating railway revenues improved by 9.8%. And Ike Prillaman will give you the details of our revenues in just a moment.

Railway operating expenses for the second quarter were 1.4 billion, up 53 million or 4% compared with 2003. For the first six months, railway operating expense were 2.7 billion, 70 million or 3% higher than 2003.

As you can see from this graphic, the largest increase in railway operating expenses for the second quarter was in compensation of benefits expense. The increase in compensation of benefits was driven by higher incentive compensation of 19 million, including an increased bonus for locomotive engineers that added 9 million.

Higher stock-based compensation costs of 9 million, reflecting the $4.43 per share increase in our stock price during the quarter. And higher wage rates that rose 8 million and increased train and engine hours that added another 6 million. These increases were, in part, offset by reduced non-agreement head counts that saved $7 million and several other items, which collectively, net to 5 million.

The second largest increase in our operating expense in the second quarter was diesel fuel. As you can see, the average price per gallon of diesel fuel increased from $0.80 in the second quarter of 2003 to $0.86 this year.

Consumption of approximately 124 million gallons was up 6% in the quarter on an 8% increase in traffic volumes. In the second quarter, we hedged approximately 77% of our diesel fuel requirements. Those hedges produced $26 million in cost savings by offsetting the purchase cost of diesel fuel. The third and fourth quarters are 73 and 64% hedged, respectively.

During the second quarter, we hedged almost 96 million gallons of fuel at an average price per gallon of $0.79. We have approximately 86 and 78 million gallons hedged in the third and fourth quarters respectively. And the average price per gallon on those hedges is $0.82 in the third quarter and $0.84 in the fourth quarter.

I believe you all are familiar goal of our fuel-hedging strategy -- to reduce the volatility of our diesel fuel expense by averaging fuel prices over an extended period of time. As you can see from this graph, comparing our average quarterly hedged fuel prices, and the un-hedged price in red, the hedging program has increased the volatility of our diesel fuel expense.

However, with fuel prices near historic high and fuel surcharges being assessed under our recent contracts, we are not currently entering into additional hedges at today's market levels. Consequently, we're modifying our fuel-hedging strategy on a go-forward basis and our pattern of entering into regular monthly swaps may not be indicative of our future hedging activity. However, we will continue to advise you of our hedge position for each quarter and the balance of the year on a regular quarterly basis.

Materials, services, and rents increased by 12 million or 3% the second quarter. That increase was primarily due to an $11 million increase in materials costs, reflecting higher locomotive and freight car maintenance expenses.

Higher volume-related Intermodal purchase services were largely offset by lower equipment rent. Other expenses were 7 million higher than last year, which benefited from a favorable property tax settlement.

The most significant decline was in casualties and other claims, which was down $9 million or 19%, reflecting lower personal injury expense. As you may recall, the second quarter of last year included some unfavorable claims development.

For the first six months, railway operating expenses were up 70 million or 3%. As in the case of the second quarter, the largest increase for the year was in compensation and benefits expense.

In the first six months, we experienced a $49 million or 5% increase in compensation of benefits, compared with 2003, principally as a result of higher wage rates and increased lows for T&E employees that added $27 million. Increased management incentive compensation and B.L.E. bonus that each added $12 million to our expense. Increased stock-based compensation of 9 million that I related to you for the second quarter. And several other items that net to $4 million. These increases were partially offset by $15 million in savings from our reduced non-agreement workforce.

Materials, services, and rent was the second largest expense increase for the first six months at $17 million, an increase of 2%. As was the case for the quarter, this increase was driven by higher expenses for materials, principally for locomotive and car repairs, and higher volume-related purchase services driven by our increased Intermodal volumes. These increases were offset in part by lower equipment rent.

Diesel fuel expense was up $16 million or 8% higher, reflecting a 6% increase in consumption, combined with a small increase in the average price per gallon from $0.83 in 2003 to $0.84 in 2004.

Other expenses were up 11 million or 10%, again reflecting higher property and sales and use taxes this year than we had last year. Conrail rents and services increased 6 million or 3% because of lower-shared asset costs and casualties and other claims were $20 million lower in the first six months of 2004.

Last year's expenses again were burdened by unfavorable claims development, as well as some higher derailment costs that we experienced in the first quarter of 2003. The railway-operating ratio for the second quarter was 76.6%, compared with 81.8% last year. This was our best quarterly operating ratio since the Conrail integration.

For the first six months, the operating ratio was 78%, compared with 83.4% for the same period last year, which was an improvement of nearly 6.5% over last year. Second quarter income from railway operations was a records 425 million, up 127 million or 43% over the 298 million that we generated last year.

For the first six months, income from railway operations was also a record at 771 million, up 242 million or 46%. Total other income and expense for the second quarter was an expense of 121 million, compared with an expense of 99 million in 2003.

Gain on sales of property and investments was 5 million, compared with 7 million last year, a decrease of 2 million. Coal royalties of $11 million were up $1 million over last year. All other was an expense of 16 million, compared with income of 7 million last year.

The decline was primarily attributable to lower returns on corporate-owned life insurance, which were down $14 million and expenses related to a new investment in synthetic fuel facilities that generate tax credits under section 29 of the internal revenue code.

In May, we announced that we purchased an interest in a limited liability company that owns and operates facilities that produce synthetic fuel from coal.

The members of the L.L.C. are entitled to tax credits under section 29 of the internal revenue code for synthetic fuel produced through the year 2007.

Our investment will result in a pretax expense of our investment, which is reflected in other income net. But, it will also generate increased tax credit and other tax benefits that are recognized in the provision for us income taxes line.

As you may recall, the net effect of this investment will be to increase our net income and we now estimate that that increase in net income will be $12 million in the year 2004. Interest expense on debt was 121 million, which was 2 million lower than last year, due to less outstanding debt.

For the first six months, total other income and expense was an expense of 232 million, compared with an expense of 205 million in 2003. Gain on the sale of property and investments declined from 12 million last year to 6 million this year and coal royalties increased by $1 million.

All other was an expense of 16 million, compared with income of 14 million in 2003, primarily due to the reduced returns and corporate-owned life insurance and the expenses that are reflected for our synthetic fuel facilities investment.

Interest expense on debt for the first six months was 242 million, 8 million lower than last year, due to less outstanding debt.

Second quarter income before income taxes was 304 million, compared with 199 million last year, a 53% increase. And for the first six months, income before income taxes was 539 million, up 66% compared with 324 million in 2003.

The provision for income taxes for the second quarter was $91 million, compared with 62 million for the second quarter of 2003. And the effective tax rate for the second quarter was 29.9%, compared with 31.2% last year.

For the first six months, the provision for income taxes was 168 million, compared with 102 million last year and the effective tax rate was 31.2%, compared with 31.5% in 2003.

Our effective tax rate for the full year should be below 30% as a result of our recent investment in a synthetic fuel production facility.

Second quarter net income was 213 million, which is 76 million or 55% higher than the 137 million earned in 2003. And for the first six months, net income was 371 million compared with 222 million last year, an increase of 149 million or 67%.

This slide highlights the components of the change in net income for the second quarter. Railway operating revenues increased 180 million, while railway-operating expenses were only 53 million higher.

Other income net increased 24 million, interest expense on debt declined by 2 million and income taxes were $29 million higher, yielding a $76 million increase in net income. For the first six months, a $312 million increase in revenues was offset by $70 million more in expenses.

Other income net was $35 million lower, interest expense on debt was 8 million lower and the provision for income taxes was $66 million higher. Combined, these items generated $149 million more in net income.

Diluted earnings per share for the second quarter were $0.54, compared with $0.35 per share last year, a 54% increase. And for the first six months, diluted earnings per share were $0.94, which is 65% above the $0.57 per share that we earned a year ago.

This slide reconciles the net income and earnings per share for the first six months of 2003, excluding the effect of the accounting changes and income from discontinued operations to our reported 2003 net income of 346 million and earnings per share of $0.89 per share. This reconciliation is posted on our website.

Net income for the first six months of 2004 was 371 million or $0.94 per share, compared with the reported net income of 346 million or $0.89 per share that we reported last year. And that included the accounting changes and income from discontinued operations.

I want to thank you for your attention. Now I'll turn the program over to Ike Prillaman and give you an in depth report on our operating revenues.

IKE PRILLAMAN, VICE CHAIRMAN AND CHIEF MARKETING OFFICER, NORFOLK SOUTHERN CORPORATION: It's bright up here. Thanks, Hank. Good morning, everyone. Manufacturing has had 13 months of expansion that has not occurred since 1999-2000 and, accordingly, the freight market is booming.

As both David and Hank have indicated, second quarter revenue grew 180 million or 11% to a record 1.8 billion with the exception of automotive, all of our business groups achieved record quarterly revenues and as also -- as has been mentioned for the year-to-date, revenue increased to 312 million or 10%.

Volume for the period increased 8% while year-to-date was up 7 and this includes a 17% gain in Intermodal volume for three months and 14% gain for the six months, which our records Intermodal growth exceeded 100,000 loads for the first quarter while merchandise was up 32,000 loads or 5% and coal increased 2%.

Combined, our goal and merchandise volumes for the six months were up 78,000 carloads, which, as a footnote, we're still 95,000 carloads less than the corresponding six months of 2000 and my point being obviously we still have network capacity.

Excluding coke and iron ore, coal volumes increased 3% for the quarter and 4% for the year-to-date. Strong demand across all the markets drove higher coal production. Utility volume declined 1% for the period, but was up 1% for the six months.

During the quarter, the large increase in coal being shipped to Georgia Power plants here could not offset the decline of other utility coal markets, which principally were the shipments to the lake as well as some short haul shipments to the river and a lot of that was due to lack of availability.

Inventory stockpiles for the utility, the levels vary, but are generally on the low side. Higher prices for metallurgical coal, both domestic and export, have caused some diversions away from the utility market.

Export volume for us was up 50% from the quarter and 24% year-to-date, resulting from the increased demand for U.S. met coals. China has reduced the coke exports and has increased the importing of coal to meet its increasing domestic demand and this has caused the European steel makers to source or at least attempt to source more coal from the U.S.

Global growth in iron production, especially in India and Brazil, and I should add Japanese steel production as well is way up this year, also, along with the significant emerging demand in China for hard coking coals is projected to offset any increased metcoal production in Australia and Canada for the -- so the outlook, we believe, is bullish through 2006 for export volumes.

We are seeing multiple year contracts being signed with certain U.S. producers and one has been signed for up to five years, which is a real sea change in negotiations between the two parties.

Compared to last year, our met coal volumes are up and coke volumes are down due to the continued shortage of coke in the world market and its high price.

The metcoal availability is expected to improve as the Pinnacle Creek mine continues full production towards the end of July. It had been down for over a year and it has about four million tons of annual production capacity.

But due to the continued shortage and higher prices, I think an indication for the market going forward, we've -- there have been several coke batteries that have been constructed in the U.S. or announced and the market outlook, I believe, for domestic met coal for the future is positive.

And finally, the declines in iron ore volumes were primarily due to reduced production in steel. Merchandise revenue exceeded 1 billion as the industrial sectors produced solid increases across the board.

As David indicated, metals, construction and chemicals and paper volumes continue to benefit from overall manufacturing expansion and higher production. Metals and construction lead the merchandise gains with -- revenue growth for the quarter and 10% for year-to-date.

Even with reduced auto production demand, steel remains high. Low inventories and tight supply are keeping prices up. Our scrap and finished metals business grew 11,000 Conrail's and, but I would point out again that our demand, this demand or this business level is still 11% below the peak of 2000.

Chemicals revenue was up 13% for the quarter and 9% for the year-to-day. Plastics and petroleum or refinery products drove the increases with the industry benefiting from improved global demand led by China.

And the paper and forest industry has been experiencing stronger demand. Our revenue increases in track similarly and I might add that it was this eighth straight quarter that we have experienced year-over-year increases for our paper revenue.

Customers also, on outlook, are indicating strong orders into the second half of 2004. Ag revenue increased 4% for both the quarters and year-to-date. The 55% revenue increase in ethanol business more than offset the loss of the drought-related long haul corn business of 2003.

Looking ahead, we expect strong corn volume or grain volumes on NS for the second half as corn planning and production rates are currently running above a 10-year trend and yield is projected to reach - is expected to exceed 10.4 billion bushels and movement of fertilizer was also up with the increased plants.

Automotive revenue increased 252 million for the quarter and 500 million year-to-date, while carloads increased by 1% for both time periods, tracking the 17% to 21% increase in North American vehicle production.

Autocast projects a 2000 model year production of 16.5 million units and that compares with 15.8 million for 2004 model year. We expect to benefit from the full ramp up of Honda's second assembly plant at Lincoln, Alabama as well as Toyota's expansion at their Princeton, Indiana assembly plant and Ford is bringing two new models on to be produced at their Chicago plant and all of this will be occurring starting in September and going forward.

Serving 39 assembly plants, our automotive franchise, we believe is well positioned for the growth in 2005 and beyond and hopefully our pricing will also continue to improve as we certainly have plans for that.

Diversions from the highways have also added to merchandise revenues. A shortage of drivers and higher fuel prices created real opportunities in our metals market and construction as well as the paper markets.

Our Intermodal service product continues to attract truckload carriers as customers. Consistent service performance resulted in highway, the rail diversion for premium truckload business, the domestic IMC's as well as international volume.

Intermodal growth in the US reached 10.6% in the second quarter and this was the highest since 1994. As previously mentioned, our Intermodal business had both record volume and revenue for any quarter, which happens to be the second quarter and not the traditional third quarter.

Our sustained service and network investments and improved information technology has allowed us to market an overall truck-like product and make NS, we believe, a viable solution for truckload shippers and accordingly, our truckload business was up 34% for the quarter and 29% for the year-to-date.

International business grew 11% and was driven by increased consumer spending and international trade. I noticed this morning that consumer confidence is at a new high level and some of the volume increases that David mentioned certainly are being driven by that with Intermodal leading the way. The ship lines are reporting, they are booked to capacity through the end of the year.

There is debate on what specific factors are driving the growth, the Intermodal growth. Certainly the expanding economy is the primary factor.

However, shortage of drivers, fuel prices, equipment availability and the hours of service law have contributed and I would, again, add along with our service reliability.

Our challenge going forward is to appropriately manage demand, including pricing and capacity.

Looking forward, we anticipate record peak season volumes, which have already been surpassed during the second quarter.

Our revenue going -- looking at the revenue per unit, our revenue increase was a result of favorable changes in revenue per unit as well as volume. All of our business groups experienced revenue per load improvements for the quarter and year-to-date.

Our Ag, paper, chemicals and coal business reached the highest levels ever and, as you know, revenue per unit can increase because of traffics mixed changes, the long haul versus short haul business or increases due to higher prices or fuel surcharges.

Changes in mix impacted both automotive and Ag's revenue per unit. The Ag increase occurred in spite of the loss of longer hauled corn business, which was offset by significant increase in the new ethanol business.

Automotive benefited from longer hauls due to an ongoing redesign of our mixing center network and the extension of all of other businesses, this significantly as changed our mix.

As service improved for chemicals, metals and construction and paper revenues -- and we benefited from improved pricing as we continued to price to the market, particularly on truck diversions.

Obviously the large volume growth for metals and construction also changed the market mix. Intermodal gains resulted from yield improvement and mix, higher-rated trailer volumes increased by 44% for the quarter and 36% for the month.

We are pricing up our domestic transactional business to both market and capacity. The amount of revenue per unit increase was somewhat tempered by longer-term international contractual business, which is half of our volume.

New traffic mix of short haul business has been developed from the container ship lines, all water service to the east coast and obviously this is placed some downward pressure on the revenue per unit for Intermodal.

Coal's revenue per unit increase is the result of several factors. Export coal volumes increased while iron ore, coke, and coal shipments to the river have declined.

Mixed changes also impacted revenue per unit as greater volumes moved in longer haul service, such as spot moves of domestic metallurgical coal and increased Georgia powers plant share volume.

Coal traffic, with pricing over $900 increased by 27,000 carloads. This pricing from new contracts as well as last years rig cases working away through 2004. To conclude, we are having our best market results since the year 2000.

Our revenues are up $312 million for the first two quarters of year and $407 million over the last three running quarters. As David pointed out, our July volumes are up approximately 10%, including coal.

Our markets have all performed beyond expectation. The turnaround outlook for domestic integrated steel production and metallurgical coal is promising.

We believe that our automotive, Ag, Intermodal and utility coal franchises continue to have even more emerging opportunity and we welcome that opportunity and challenge to manage growth and have an the priced market and capacity. It's a good problem to have.

Thank you.

DAVID GOODE: Thank you, Ike. As a company, Norfolk Southern People are committed to continuous and systematic improvement and taking advantages of the opportunity the economy presents us and I think, in a way that's the story of this quarter.

So, I would be happy to take questions.

Yes?

UNIDENTIFIED SPEAKER: Thanks, Dave. I guess my first one really is for Hank on the ending of the fuel surcharge program and kind of your thought process in that because you've said for so long that the whole goal of it was to smooth out the volatility and now it seems like when prices are getting high, are you running for the hills and are you going to grab it if prices continue to go up?

HANK WOLF: Hank never runs for the hills.

UNIDENTIFIED SPEAKER: Or and then that the second thing is or have you changed your complete philosophy on fuel surcharges? And, if you have, what percentage would be pure pricing and what percentage would be from fuel within the quarter?

Thanks.

HANK WOLF: Well, as far as running to the hills, I probably include a parody that my mother told me when I was a small boy and that was he who fights and runs away lives to fight another day.

And I think that just looking at the overall market, what we see happening in the forward curve, what's happening in terms of fuel surcharges being applied to where we can apply, that we believe that a different strategy, rather than the mechanical placing of hedges is a judicious decision to make and that's the decision we've made.

UNIDENTIFIED SPEAKER: And then can you talk about the breakdown of that, which is fuel surcharge-related in that 2.8% increase?

HANK WOLF: No, because I would say that that really gets into our pricing and we'd rather not close there. But where we're able to institute fuel surcharges, we're doing it. The other railroads are doing it. The trucking companies are doing it. It makes sense in this environment and we do have the benefit of some significant hedges that are still in place as I indicated. We'll report that to you on a quarterly basis, what the numbers that you want to know?

UNIDENTIFIED SPEAKER: Percentage of revenues with fuel surcharges?

HANK WOLF: The percentage of --

UNIDENTIFIED SPEAKER: Revenues that have fuel surcharges attached to them?

HANK WOLF: I don't think we want to be that specific. I don't know that it would be helpful, either.

UNIDENTIFIED SPEAKER: OK. And while you're up there, just one quick one. On the losses that you had in the quarter from the synthetic fuel versus the tax gains, I know you said it was -- I think you gave a number for the year. Can you talk about the quarter-specific? Did it offset that negative $16 million contribution?

HANK WOLF: Yes. What's going to happen is the tax benefits in the bottom line will more than offset the expensing that's taking place in the other income net line, but in the past, there has been smaller transactions where we netted those transactions and there has been a change in -- or transition in the way folks who are accounting for these things and the way the SEC expects us to account for them and that's being reflected in our financial statement.

You're seeing it in a relatively larger transaction or larger investment in this synthetic fuel transaction than we've had in the past. That's why I say it's safe to assume, with that transaction only being reflected for approximately one month in the second quarter, that you're going to see our effective tax rate for the balance of the year staying under 30%.

UNIDENTIFIED SPEAKER: Thanks.

DAVID GOODE: Pass the microphone and start moving it around.

UNIDENTIFIED SPEAKER: We have two different lines of questions here. First on the Intermodal side, you saw great volume growth. The yields were accelerating as well. I'm wondering if you can give me a sense.

Did you see pretty significant expansion of the Intermodal margin or you really hitting the sweet spot on live ranting that network and how much more is there to go in terms of, you know, seeing that Intermodal margin expand significantly as the volumes and yields improve?

DAVID GOODE: Like volume getting up if you want to amplify. You saw from Ike's slides the answer is yes. Those margins are improving and, no, we don't think we've hit the sweet spot in that network yet. We're going to continue to try to find it. I think maybe it is a moving sweet spot.

But certainly we are very carefully considering, because there isn't obviously a lot of demand in the Intermodal business. We have a product that has very high value, and we're going to treat it accordingly.

STEVE TOBIAS, COO, NORFOLK SOUTHERN CORPORATION: Translating what he attempted to say was finding some of market and capacity, we are being very aggressive. We have the market, certain pieces of business based on that.

We will remain diligent, but I go back to what our product is with sustained, reliable service it's giving us, this leverage, and where it takes us. Its all part of the negotiating market process.

As long as we can continue to provide the high levels of service that the customers require, it gives us opportunities, obviously, in the market and we are working very closely with a lot of good partners, in the trucking business it gives us a good opportunity to pursue additional relation ships and help them grow their business. This is very -- this is really an emerging market still in a way, although it's become very large and important for us.

UNIDENTIFIED SPEAKER: OK. And then I have got one other question for you. On the capacity side, you saw some great leveraging in the quarter, the 8% unit growth, 4% train starts, at a certain point, does that begin to slow down where, you know, it becomes 8% unit growth and 7% train starts? Just give me a sense of overall capacity where you see things? Have you still got a lot of excess capacity?

DAVID GOODE: I'll ask Steve to amplify that. As I indicated, we continue to explore what our capacity is, because the more efficiently you run a train network, the better your capacity is in the existing -- with the existing infrastructure and the existing train.

We think that -- we think that we still have room to go. But naturally, at some point, you have additional trains.

And we're eager to do that and we've done some of that in the quarter and I hope we'll be doing more of it as it goes on. We think we've got some room to go.

STEVE TOBIAS: I'm not sure I can embellish a great deal more as David. Clearly we have more gain here, which will produce better utility and more capacity in and of itself. With that said, in the existing plan that we have in place, we build capacity into it.

We have not yet reached that capacity by several digits yet. So, in response to your question, there is a great deal more potential here on both sides of that coin.

UNIDENTIFIED SPEAKER: In that carload schedule plan, can you give us a rough capacity number? Are you at 85% utilization in that schedule or, you know, not a specific number, but any rough sense of where we are?

STEVE TOBIAS: Capacity is a very difficult thing to put your finger on. And I certainly wouldn't want to limit it because there are operational electives that we have at hand to address capacity.

The most prominent example I can give you is remote control or locomotive trains. Instead of running a train at full capacity, you run a train with additional locomotives and run a train at a half of capacity.

So as we increase our velocity, diminish our load time, there is double-digit improvement on both sides of this from the standpoint of performance and the standpoint of capacity that we have bill into the system.

DAVID GOODE: We improved the throughput of our hump yards Steve I think 6.17% is this quarter. Now that's building capacity without touching -- a piece of -- that's just people, systems, and efficiency.

The reason we resist giving you a percentage number on capacity is if we'd done that last year, we would have been wrong.

We discovered we have a lot more capacity than we might have told you last year. I fully expect that as we continue to -- as we continue to perfect and add systems and we're doing that -- we're doing that quarter after quarter, we're improving our operating systems, and as we do that, we're building train capacity and network capacity.

And we are excited about it and we're eager to see how far we can push that envelope.

UNIDENTIFIED SPEAKER: OK, thanks you for the time.

DAVID GOODE: Why don't you -- is that you, Tommy? All right. Next. You'll get your word in.

UNIDENTIFIED SPEAKER: Hi. Good morning.

DAVID GOODE: I can barely see people in this light. I apologize.

UNIDENTIFIED SPEAKER: Can you maybe address the potential or the ability you guys had, listening to your term, to gain some share relative to your eastern competitor who might be having more performance-related issues than yourselves?

And then assuming that has been the case, the sustainability of it or the philosophy you have towards it, share a gain on a longer-term basis?

DAVID GOODE: That is not our business philosophy. Our business philosophy is to go where the business is and the vast majority of the business is on the highway.

There is an enormous demand for that business right now to move off of the highway on to rail. That's our opportunity. That's the opportunity that we are pursuing eagerly and aggressively in marketing and that's the -- that's the philosophy in which we're selling and working.

We work very closely with other railroads in the east as we do with our partners in the west because the best thing for us, actually the best thing for the industry, is to have improved fluidity and efficiency in the entire rail system. When that -- when that clicks efficiently, then we're really going to see an acceleration in the business because that then speaks to the congestion of the highway, the high fuel costs, all the things you have heard me talk about many times that this produces this demand for our services.

So our principle interest is in doing everything we can to produce an overall efficiently operating rail network and like whomever it was that used to rob banks because that's where the money is.

We're interested in -- we're interested in looking at traffic that otherwise is moving on the highways because that's a huge piece of the pie.

UNIDENTIFIED SPEAKER: I guess sort of to that end with the network fluidity, can you maybe comment on the interchange connections and how those may be looking at this point?

DAVID GOODE: Sure, Steve. Why don't you do that?

STEVE TOBIAS: I think I answered it at the last session, interchange connections for us are going quite well. With these kinds of volumes, clearly our interchanges had to be opened. Now that's not to say that we can't improve.

The industry has launched, in the last five years, major efforts across the gateways of the country to improve our interchange arrangements among ourselves. We have in place interchange service agreements that stipulate what our format or pro forma is and then we each try to live up to those arrangements and there is a monitoring process that goes on internally within the industry, bilaterally, to ensure that those interchanges are not only maintained, but approved.

So it is not so say that we don't have problems in place, but we're -- we would not be producing the service levels that we're producing today without a consistent -- consistency in our interchange process.

UNIDENTIFIED SPEAKER: And just finally, then, Steve, obviously the network is running very well, given the numbers you produced. Care to venture out what sort of velocity targets you might be looking at?

DAVID GOODE: We're looking at velocity targets as high as we can get them. I'll refer to some of the commentary about mix. Certainly we can't change the laws of physics. We do, in fact, try to find opportunities maybe to bent it a little. But if your mix turns more to bulk commodities, it has an impact on velocity.

As we load trains up, if we don't adjust horsepower ratios for time, there tends to be a bit of slowing in the overall velocity, I.E.: Train speed. There is a balance we try to keep. Is there a sweet spot? It maybe we refer to certainly. But we will continue to try to drive performance from velocity, reduced well turn significant opportunities in the origin terminal to improve overall velocity and consistency.

Our ability to predict connections of traffic flows that impact the service portion of this to the customer is significant and that's one of things that we are driving very arduously now as we're able now with our systems to see the performance on a car-to-car basis, shipment-to-shipment basis, to produce those results.

As the microphone moves back -- go ahead.

GREG BURNS, ANALYST, JP MORGAN: Thank you, David.

DAVID GOODE: Let me -- I was going to point out that interestingly, when you look at the statistics, our train speeds declined slightly towards the end of the quarter. But our terminal well times improved rather significantly.

Our connection performance numbers improved significantly. So overall, the efficiency of the network and the effectiveness of the network improved as the quarter went on. So, be careful to look at the whole picture as you look at these statistics because it has a lot of moving parts.

GREG BURNS: Thanks, David. Specifically for -- I have two quick ones for Ike and a broader one probably for you or Hank. For Ike on Intermodal, just want to know how the hunt relationship is going on and why did the premium - - what is going on with the premium business and why did it only grow 13% when the rest of this grow so much more...

IKE PRILLAMAN: Only, Greg. I can't believe I heard you say that.

GREG BURNS: Never though I would ask a question like that. And basically for all you guys, right now, you're earning your cost-to-capital, whether you're willing to make a prediction on the year-end whether you're going to.

DAVID GOODE: I might let Hank respond to the last part of it, Ike. Our relationship with all of these carriers is good at the moment, I think.

IKE PRILLAMAN: It is. And we have a contract that is still in place to get us through '05. We see no problems after that. We are negotiating. We'll start negotiating soon. As far as the premium business, we somewhat have a mislabeling there as we bring more premium truckload business in and we put it under the caption "truckload" as opposed to premium.

Premium, essentially, is the express package business and obviously it reflects the UPS and downs that U.P.S. chooses between rail and truck and that volume has been fairly even. But even 9% is not a bad move. Did you have another --

I think we're thinking of relabeling some of our business because we're -- our philosophy is that our business -- all of our Intermodal business is premium business and we're going to treat it that. Yes, did you have followup question?

The cost of capital...

[AUDIO GAP]

HANK WOLF: We do. We talk about it in our company. Obviously we do not state that we view cost-to-capital or how we calculate cost-to-capital internally. I would say to you, generally, that the answer is no, we're not earning our cost-to-capital today, but I would remind you that we were one of the few railroads that earned cost-to-capital through most of 1990's and I think we can get that very clearly. I would also commend you in that question, not only with respect to Norfolk Southern, but with respect to others, to look at the numbers that the SEC produces on return on investments. In other words, the revenue numbers.

And there is an anomaly on average because the Conrail transactions, if you need to get into that, either Kathryn McQuade or Marta Stewart would be more than happy to help you with that. That represents a reasonable surrogate to look at overall.

IKE PRILLAMAN: I think you could take it as an article of faith that our board is looking hard and making sure that not only I, but everybody else in Norfolk Southern, focuses very hard on earning our cost of capital, exceeding our cost of capital, producing economic value added for our shareholders. We've got objective on that. We drive them.

We don't publicize them. We don't talk about it. You can take it as an article of faith that that is something is very much on the mind of our board of directors and, therefore, on management.

Yes, sir?

GREG BURNS: David, two quick questions. One, could you kind of explain your comment about peak shipping season?

Most of the carriers, both trucking and rail, have indicated that they are beginning to see what could be the best peak shipping season since potentially '99 and yet in your comments seem to indicate that you think it will be a little bit less in magnitude...

DAVID GOODE: What I meant to suggest was that we are -- we are planning very carefully for a peak season and a peak demand. What we find interesting is, and I've never seen July numbers in the Intermodal business or indeed in

business generally like we are seeing today. I think the economy is strong, but the numbers, we have not seen much -- nearly as much of a decline in July as we have historically seen over my career.

Therefore, we ask ourselves what's going on and we believe that there is some evidence that there is early shipping, there's more consistent shipping and that the peak season, while we do expect a significant run-up as fall goes on, and operationally we're preparing to handle that. And we expect to be in shape to handle as much business as the peak will bring us.

I'm just suggesting that we believe in some ways the business may have changed. The peak may be a longer duration and perhaps less peaks and valleys than it used to be and that would be good for the system as a whole if that can happen.

GREG BURNS: All right. Sure. OK.

DAVID GOODE: We, for example, understand that the ships are full, all the ships have been loaded, that they have been and that they're coming into the ports over the last couple of months full and that the flow of traffic into the ports has been at consistently high levels. You ask yourself how much higher can it get?

GREG BURNS: OK. Already. Your comments on planning for capacity is a, you know, a good segue to my next question. This may not be relevant given how well your network is impeaching. But the chairman Nobers latter told the CEOs about planning for peak shipping and what plans you have in place, your response to him. Is there any material deviation as to how you're running the network now or...

DAVID GOODE: No. We responded to him and we've told the -- in the letter and communications with Ford, we have reported how our planning is going. It's very much -- it's very much the kind of planning that we always do. We're trying to work it into our regular planning. And I don't know if those letters will be -- whether the chairman will choose to post those letters.

GREG BURNS: OK.

DAVID GOODE: No particular magic in our response to it, but rather it is a recitation of the way in which we systematically plan to handle the business. That's what we're doing. We think we've got it, think we got it now and we're hopeful that the business levels will definitely rise.

GREG BURNS: And then lastly, on your, you know, hiring plans, you know, a lot of the other rails are struggling with crew shortages and that type of thing. Can you elaborate a little bit on what's your hiring plans are, especially going into '05?

DAVID GOODE: As you notice we have more train and engine and other operating employees than we have and you also noticed we have tempered that by reduction in employment in other places. But we are carefully planning for continued strong and increasing volumes and commands and, Steve, I've forgotten the number of train, the train and engine employees we brought on. We have 1,300, 1,500, they're in the training pipeline.

We're continuing with that and we're also adding other operating employees that are required to and other employees required to do that. We are doing what we did last year and you will recall that we were early on that and I was standing before you one year ago today, some of you -- I'm sure not you -- but some of you were beating me up about our compensation line because we had gotten ahead of curve on that.

And we did that, but we planned ahead and we hope that we're continuing to plan accurately and do naturally. It's a challenge in the shipping targets, we've got it in our sight.

UNIDENTIFIED SPEAKER: Hello. Given your phenomenal quarter, especially on the revenue sides, just wanted to recheck your Capex budget, has that changed?

DAVID GOODE: No, it hasn't in any meaningful way, we always adjust it a little. I remind you that we did -- we did announce that we took -- that we were planning a predelivery of locomotives, which we otherwise were taking in 2005. We have moved that up to both to take advantage of the tax laws and that also will help us with increasing demand as the year goes forward.

So, I just remind you of that change but otherwise, Hank, I don't think there is any -- well, you would have seen that we did announce that we purchased building in Atlanta because for a long time we wanted to move our folks into a better building.

We had an opportunity there and that's not -- that is not an operating item. It is not a big increase in the budget what we do.

UNIDENTIFIED SPEAKER: OK. And the locomotives that you're purchasing a little bit early are out right purchases, they're not operating leases, OK?

DAVID GOODE: That's correct.

UNIDENTIFIED SPEAKER: And then another quickie, is can you give us an update on your '05 fuel hedging position?

DAVID GOODE: Hank, do you want to do that? Hank, just got through, quickly confirming that.

UNIDENTIFIED SPEAKER: I have one other question if you want to --

DAVID GOODE: Go ahead. You got it? Go ahead, ask your other question.

UNIDENTIFIED SPEAKER: The other question is on export coal. Our coal analyst seems to think that we, the US, won't start exporting a lot of coal until 2005. Clearly your numbers indicate differently.

DAVID GOODE: I would invite our investor's analyst to come to Lambert's Point or Baltimore --

UNIDENTIFIED ANALYSTS: But I guess my thought is I wonder if there is something to what he's saying in terms of the fact that a lot of it -- his theory is a lot of US coal has already been promised in '04 to domestic utilities. So, maybe we get an even bigger boost to export coal in '05 or is that just asking for the world kind of we're already seeing such enormous growth rates out of it?

DAVID GOODE: Are we prepared to speculate on that, Ike?

IKE PRILLAMAN: Some of your - I could get the line. On your fuel-hedging question, we're 38% hedged next year based on our projection. Now obviously that consumption may go up or down a bit and then 4% in 2006 projected so, very little for 2006 and a little under 40% for next year.

UNIDENTIFIED SPEAKER: Thanks.

DAVID GOODE: We prepared to predict the export coal next year? If you'd done that last year, you would have been wrong for this year.

HANK WOLF: But as I was pointing out there the European steel makers are turning to the US and there will be a question about availability. Exports were up 50% in the second quarter, which means there were metallurgical coals that were found and we see that and also interestingly are that investment is starting to occur, to bring back mines that used to operate.

We're seeing one produce in Pennsylvania that has been out for over a decade. So, there's all sources of coal coming in and it's almost a simple formula when it gets up around $104 to $120 a ton on the spot market, the coal is found somehow.

Ike is younger than I, but he and I both grew up in western Virginia and over a few years -- as did Steve Tobias for over a few years, we have learned never underestimate the coal business. And never give up on it.

Yes, Gary? How are you?

UNIDENTIFIED SPEAKER: How are you? Ike, one more for you on the export coal business. If I remember correctly, the -- some of your pricing is tied to the prices of export coal and could you talk to that a little bit? We're seeing prices in the world market that are absolutely crazy and how might that help your yields going forward?

IKE PRILLAMAN: Some of that is reflected in the financials and I guess it is publicly known that shipments to the Baltimore facility are attached to price where as the Lambert's point is not. So, we are starting to see some metallurgical move.

Now the Pennsylvania mines, which I just mentioned, is really unusual in recent history. We -- you know, the pricing is up because we're, again pricing to market and our prices are essentially insignificant to the price of coal.

UNIDENTIFIED SPEAKER: Would you share with us what percent of your export coal is Baltimore or is exposed there?

IKE PRILLAMAN: In the quarter, probably a 20% to 18% leverage point volume is involved.

UNIDENTIFIED SPEAKER: So not that much.

IKE PRILLAMAN: Not that much. Baltimore, historically, has been a steam export facility and steam is still -- I mentioned that -- I did mention Baltimore, however, because we are very pleased to see that, volume developing. That's important for us and it is -- and it is a good deal more than it is here.

UNIDENTIFIED SPEAKER: OK. Thank you.

DAVID GOODE: Another questions? I know you're a very patient group and I know that there is somebody else who is going to report shortly if you may have interest in that, any type of questions? If not, thank you all for coming.

We look forward to see you in next quarter, hopefully with equal or equally good or even better results.

Thank you.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** August 12, 2004

# EXHIBIT PX0563


Every day. Every hour. Every minute.
Burlington Northern Santa Fe Corporation
2004 Annual Report and Form 10-K

Seattle

shortest

Chicago

fastest

Los Angeles

CALIFORNIA ---------- one of the fastest ---------- THE SOUTHEAST

We operate several of the fastest single-line routes between major markets

keeping connected via

## state-of-the-art network

# 32,000

route miles



Sophisticated information and communication systems link BNSF's dispatchers with the 1,400-plus trains that operate across our 32,000-route-mile rail network each day. The transportation experts who work in the Network Operations Center (NOC) at BNSF's headquarters in Fort Worth, Texas, continually monitor and direct BNSF's operations to meet customer service requirements. In 2004, more than 9.5 million railcar shipments were monitored through the NOC.

**handling a weekly average of**

# 183,000

**railcar shipments**



## we connect supplier to seller and seller to buyer


steel
(including steel
used in construction)
13.7 million tons
printing paper
3.3 million tons
sand
(including sand
used in glass)
3.3 million tons
sugar
2 million tons
paperboard
3.3 million tons
clothing
6 million tons
perishables
3 million tons




## handling the everyday things

BNSF transports the products people use every day: coal that powers the electricity for our lights and appliances, grain for our bread, the vehicles we drive, and countless other items that enrich our lives, our homes, our families and the communities where we live. Providing safe, efficient and environmentally friendly transportation, BNSF plays an important role in our local and national economies, our environment and our quality of life.


productivity:
handles 26.9 million gross ton-miles
average years of experience
18+ years
38,000
team members
injury rate
15%
since 2003

# we're ready

Running a safe, efficient railroad calls for a team effort, from the 16,000 employees who maintain our track and equipment to the nearly 18,000 crew members who operate our trains. Our experienced team has the highest productivity rate of any in the U.S. rail industry, as measured in gross ton-miles handled per employee. We also have one of the lowest reportable injury-frequency ratios in the rail industry, and our employee safety record is better than that of most other industries. Every member of Team BNSF is focused on meeting customer expectations – and it shows in the service we provide.



working together as one


record all-time volumes
car/units, in thousands
00 — 04
2,300
2,000
coal
9.5% five-year growth
00 — 04
5,000
3,500
consumer
26.2% five-year growth
00 — 04
1,600
1,400
industrial
4% five-year growth
00 — 04
900
700
agricultural
13.5% five-year growth

# carrier of the year

**for Wal-Mart**

# $10.7B

**in freight revenue**

# +10%

**unit volume increase across all commodities**

Our customers could count on us to handle their traffic during a time of economic growth and great demand on the nation's transportation network. As a result, BNSF broke volume records in just about every category in 2004. We led the Class I railroads with unit volume growth of 10 percent and approached $11 billion in revenue, both historic achievements. As we handled these significant volumes and met our customers' transportation needs, the value of our company also increased for our shareholders.

## delivering results for customers and investors




we do whatever it takes




In 2004, BNSF handled more than 9.5 million shipments, including more than 4.5 million intermodal shipments (truck trailers or containers) transported for the long haul on BNSF rail lines instead of on the nation's congested highways. That's the equivalent of a truck trailer or container being loaded onto a BNSF intermodal train every seven seconds.

## today, tomorrow and every day



Matthew K. Rose
Chairman, President and Chief Executive Officer

# To our shareholders, customers and colleagues

By almost any measure, 2004 was our most successful year ever. We led the nation's Class I railroads with unit volume growth of more than 10 percent and approached $11 billion in freight revenues, both historic achievements. As we handled these significant volumes and met our customers' transportation needs, the value of our company increased for our shareholders. We also set several efficiency and safety records.

In previous letters, I said we were building a foundation for growth in anticipation of an improving economy. We demonstrated the strength of that foundation in 2004, as market conditions improved dramatically.

We moved a record 9.5 million units – 900,000 units above our previous record, or about 2,500 more units per day. Despite unprecedented volumes, the BNSF network remained fluid thanks to a team effort across our 32,000-route-mile system. As a result, our customers could count on us to handle their traffic during a time of great demand on the nation's transportation network.

We also worked more safely. For 2004, we achieved the lowest injury-frequency ratio in our history: 1.50 injuries per 200,000 hours worked. That's a nearly 50 percent improvement since merger and a 15 percent improvement over 2003. Our injury-severity ratio, reflecting lost and restricted workdays, was also the lowest in our history. Yet, despite the reduction in injuries, we had six employee fatalities, which underscores the importance of further improvements in safe work practices and behaviors. We will continue our strong focus on safety with the goal of eliminating all injuries and accidents.

**handling unprecedented volume** ➜ Our international intermodal business, a huge success in 2003, grew an additional 16 percent in volume in 2004 due to increased U.S. trade with China. Our domestic intermodal and perishables businesses also posted double-digit growth.

Coal volumes set all-time records, increasing 8 percent over 2004. Going forward, we continue to see strong utility demand and increased interest from Eastern utilities in using cleaner-burning, low-sulphur coal from the mines we serve in the Powder River Basin in Wyoming.

In Agricultural Products, grain volumes grew 9 percent, driven largely by a 37 percent increase in export wheat and corn. Our domestic agricultural franchise, a growing part of our business, comprised nearly 70 percent of our agricultural volume in 2004.

Our Industrial Products business unit continued its growth for the second year in a row. In 2004, we set annual volume records for most of our Industrial Product commodities.

**creating capacity** ➜ I am proud of our Leadership Team and our entire field organization for not only keeping up with the volume, but also finding smarter ways to squeeze more capacity out of the network.

For several years, we've improved efficiency with longer trains for coal, grain and other commodities. In 2004, we increased our focus on train length for our intermodal traffic by simplifying our service offerings and consolidating types of traffic. On our Southern Transcontinental main line, which links Southern California and Chicago, we handled about 16 percent more volume during the fourth quarter while running about the same number of trains as in 2003. This change improved capacity, velocity and locomotive utilization.

Another long-term strategy has been to double-track our Southern Transcon. By the end of 2004, all but 150 miles of this 2,200-mile route was double-track, and we'll double-track approximately 60 miles this year. Facility expansion in Southern California and Chicago paid similar dividends last year.

To support our grain network, we continued to expand our shuttle operation, and now serve more than 122 shuttle origins and 55 shuttle destinations. Our shuttles turn equipment 2.4 times faster than conventional grain service by using dedicated locomotives and railcars with strict volume and loading requirements. Currently, more than half of our grain business moves in shuttle trains.

To handle our record 250 million tons of coal, we added train sets and increased track capacity on the busy Orin Line in Wyoming. We also expanded our yard in Lincoln, Nebraska.

Three years into our journey to redesign the carload network, we've made many financial and operational advances. We've simplified our network to increase density at gathering and distribution points and have increased our focus on transload facilities for the loading and unloading of lumber, paper and other industrial products. As a result, we reduced our intermediate handling events by 3 percent in 2004, a huge achievement in reducing costs and speeding up the network.

Last year, we took delivery of 350 new locomotives, and we will receive another 200 during the first eight months of 2005. Our fleet is one of the newest in the industry, and we will continue to add locomotives as well as improve the use of our existing fleet through increased train length and other initiatives.

Capacity is more than track and equipment; it's also people. As in other U.S. industries, many of our Baby Boom–era employees are eligible to retire during the next five years, and we are ramping up efforts to fill those vacancies. In 2004, we hired about 3,600 employees, and we plan to hire another 3,400 in 2005. Many of those hired filled retirement vacancies, but we also increased overall employment in 2004 by 1,000 to handle the volume growth.

A creative recruitment campaign, including ads in movie theaters, is yielding great results. We've seen a tremendous turnout at BNSF job fairs at key points on our network. This enthusiastic response allows us to identify the best candidates interested in long-term careers at BNSF.

**controlling costs, improving pricing**

➜ Freight revenues increased 16 percent, and we once again achieved record productivity, handling an average of 26.9 million gross ton-miles per employee.

Operating expenses were up primarily due to a charge for a change in estimate of asbestos and environmental liabilities as well as our 10 percent unit volume increase. Our compensation and benefits costs increased, in part, because we expanded our employee base to handle volume growth. A 22 percent increase in fuel expense, due to high volumes and continued high fuel prices, was offset substantially by our hedging and fuel surcharge programs. We are making good progress on increasing our fuel surcharge coverage, so that fluctuating fuel prices become less of an issue to our bottom line.

We saw record demand, resulting in improved yields for our transportation services. Within the industry, BNSF brings tremendous capacity to the table at a time when that transportation capacity is really needed. More and more, customers are recognizing the crucial role railroads play in the new economy, as an efficient and safe part of their transportation supply chain.

As we continue our growth and efficiency efforts, our goal will be to further improve revenue-adequacy. For our customers, improved returns will enable us to continue to invest in the strength of our infrastructure and expand to meet their transportation needs. Our investors should also continue to benefit from our dividend, which increased 13 percent on an annualized basis.

**new brand identity**

In this annual report, you'll see a new BNSF brand and image. During the nearly 10 years since the BNSF merger, the railway has established itself as an innovative leader in the transportation industry. Looking forward, we need a company logo and identity that better express that image. Following a study of branding strategies at Fortune 500 companies and Class I railroads, we have developed a new corporate identity and logo that more effectively communicate the strengths of our brand.

In this study, we also determined it was time to update and simplify the name of our rail subsidiary to BNSF Railway Company. The new identity and logo reflect what we have identified as the four core attributes of BNSF's corporate culture: progressive, vital, approachable and resourceful.

**building toward the future**

This year, as we celebrate the 10th anniversary of the merger of the Burlington Northern and the Santa Fe, we are well-positioned for continued success. Here are some key initiatives going forward:

- To improve velocity and on-time performance to keep our network fluid and support our growth goals, our Operations and Marketing teams are working closely together to improve service, manage capacity and control costs while taking on continued volume.
- Our Marketing team, under Chief Marketing Officer John Lanigan, is focused on delivering consistent revenue growth and improved returns.
- Our Operations team, under Chief Operations Officer Carl Ice, is emphasizing continued safety improvements and is extending the capacity of our track network, locomotive fleet and workforce for increased productivity.

As a final note, Michael B. Yanney, a valued board member who has served with distinction for 15 years, is retiring and will not stand for re-election in April at our annual meeting. We deeply appreciate all the insight Mike has contributed as a member of our board, and we wish him and his family well in the future.

I am always proud of Team BNSF, but this past year our people performed better than ever while facing tremendous challenges. Through the commitment and hard work of every member of our great team, we have truly assumed a leadership role in the transportation industry. Let me thank you for your support of this company, its leaders, its board and the entire BNSF team of employees.

Matthew K. Rose

**Matthew K. Rose**
Chairman, President and Chief Executive Officer
February 14, 2005

2004 Form 10-K

## Consolidated Financial Highlights

Dollars in millions, except per share data

| December 31, | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| For the year ended: | | | | | |
| Revenues | **$10,946** | $ 9,413 | $ 8,979 | $ 9,208 | $ 9,207 |
| Operating income | **$ 1,686**[a] | $ 1,665 | $ 1,656 | $ 1,750 | $ 2,113 |
| Income before cumulative effect of accounting change | **$ 791**[a] | $ 777[b] | $ 760 | $ 731 | $ 980 |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 2.14**[a] | $ 2.10 | $ 2.01 | $ 1.89 | $ 2.38 |
| Average basic shares (in millions) | **370.0** | 369.1 | 378.0 | 387.3 | 412.1 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 2.10**[a] | $ 2.09[b] | $ 2.00 | $ 1.87 | $ 2.36 |
| Average diluted shares (in millions) | **376.6** | 372.3 | 380.8 | 390.7 | 415.2 |
| Dividends declared per common share | **$ 0.64** | $ 0.54 | $ 0.48 | $ 0.48 | $ 0.48 |
| At year end: | | | | | |
| Total assets | **$28,925** | $26,947 | $25,767 | $24,721 | $24,375 |
| Long-term debt and commercial paper, including current portion | **$ 6,516** | $ 6,684 | $ 6,814 | $ 6,651 | $ 6,846 |
| Stockholders' equity | **$ 9,311** | $ 8,495 | $ 7,932 | $ 7,849 | $ 7,480 |
| Net debt to total capitalization[c] | **39.9%** | 44.0% | 46.1% | 45.8% | 47.7% |
| For the year ended December 31: | | | | | |
| Total capital expenditures | **$ 1,527** | $ 1,726 | $ 1,358 | $ 1,459 | $ 1,399 |
| Depreciation and amortization | **$ 1,012** | $ 910 | $ 931 | $ 909 | $ 895 |

[a] 2004 operating income, net income, and earnings per share include a charge for a change in estimate of asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share, as described in Note 10 of the Consolidated Financial Statements.

[b] 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share, as described in Note 2 of the Consolidated Financial Statements.

[c] Net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

[**X**] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2004

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE TRANSITION PERIOD FROM __________TO __________

**COMMISSION FILE NUMBER: 1-11535**

**Exact name of registrant as specified in its charter**

## Burlington Northern Santa Fe Corporation

| **State of Incorporation** | **I.R.S. Employer Identification No.** |
|---|---|
| Delaware | 41-1804964 |
| **Address of principal executive offices, including zip code** | **Registrant's telephone number, including area code** |
| 2650 Lou Menk Drive<br>Fort Worth, Texas 76131-2830 | (800) 795-2673 |

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange<br>Chicago Stock Exchange<br>Pacific Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. **Yes [ x ] No [ ]**

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. **[ x ]**

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). **Yes [ x ] No [ ]**

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $12.908 billion on June 30, 2004. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.01 par value, 377,927,038 shares outstanding as of February 2, 2005.

**DOCUMENTS INCORPORATED BY REFERENCE**

LIST HEREUNDER THE DOCUMENTS FROM WHICH PARTS THEREOF HAVE BEEN INCORPORATED BY REFERENCE AND THE PART OF THE FORM 10-K INTO WHICH SUCH INFORMATION IS INCORPORATED:

Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report ........................................ Part III

## Table of Contents


**Part I**

Items 1 and 2. Business and Properties ... 1
Item 3. Legal Proceedings ... 8
Item 4. Submission of Matters to a Vote of Security Holders ... 9
Executive Officers of the Registrant ... 9

**Part II**

Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities ... 10
Item 6. Selected Financial Data ... 11
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations ... 12
Item 7A. Quantitative and Qualitative Disclosures About Market Risk ... 38
Item 8. Financial Statements and Supplementary Data ... 40
Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure ... 83
Item 9A. Controls and Procedures ... 83
Item 9B. Other Information ... 83

**Part III**

Item 10. Directors and Executive Officers of the Registrant ... 84
Item 11. Executive Compensation ... 84
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters ... 85
Item 13. Certain Relationships and Related Transactions ... 85
Item 14. Principal Accountant Fees and Services ... 85

**Part IV**

Item 15. Exhibits, Financial Statement Schedules ... 86
Signatures ... S-1
Index to Exhibits ... E-1

## Part 1

### Items 1 and 2. Business and Properties

Burlington Northern Santa Fe Corporation (BNSF or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the stockholders of Burlington Northern, Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, SFP merged with and into The Burlington Northern and Santa Fe Railway Company. On January 20, 2005, The Burlington Northern and Santa Fe Railway Company changed its name to BNSF Railway Company (BNSF Railway).

Through its subsidiaries, BNSF is engaged primarily in the rail transportation business. At December 31, 2004, BNSF and its subsidiaries had approximately 38,000 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America. BNSF Railway's business and operations are described below.

BNSF's Internet address is www.bnsf.com. Through this internet website (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, and all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission. The following documents are also made available on the Company's website and a copy will be mailed, without charge, upon request to Investor Relations:

- Code of Business Conduct and Ethics for Directors
- Code of Ethics for the Chief Executive Officer and Senior Financial Officers
- Code of Conduct for Salaried Employees
- Code of Business Conduct and Ethics for Scheduled Employees
- Corporate Governance Guidelines
- Charters of the Audit, Compensation and Development, and Directors and Corporate Governance Committees

**TRACK CONFIGURATION**

As of December 31, 2004, BNSF Railway operates over a railroad system consisting of approximately 32,000 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 24,000 miles of which are owned route miles, including easements, in 28 states and two Canadian provinces. Approximately 8,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over another railroad's tracks. BNSF Railway operates over other trackage through lease or other contractual arrangements.

As of December 31, 2004, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consists of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 9,000 route miles operated under trackage rights. At December 31, 2004, approximately 26,000 miles of BNSF Railway's track consists of 112-pound per yard or heavier rail, including approximately 19,000 track miles of 131-pound per yard or heavier rail.

## EQUIPMENT CONFIGURATION

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock and other equipment as of the dates shown below:

| At December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Locomotives | **5,715** | 5,377 | 5,226 |
| Freight Cars: | | | |
| Covered hopper | **35,066** | 36,255 | 37,609 |
| Gondola | **16,070** | 15,327 | 14,942 |
| Box-specially equipped | **9,625** | 10,021 | 9,612 |
| Open hopper | **11,257** | 10,866 | 10,848 |
| Flat | **8,132** | 7,854 | 7,946 |
| Refrigerator | **5,420** | 5,427 | 5,588 |
| Autorack | **894** | 827 | 843 |
| Tank | **612** | 639 | 501 |
| Box-general purpose | **27** | 31 | 559 |
| Other | **273** | 302 | 319 |
| Total freight cars | **87,376** | 87,549 | 88,767 |
| Domestic containers | **10,501** | 10,627 | 8,197 |
| Domestic chassis | **9,846** | 9,864 | 8,180 |
| Company service cars | **3,999** | 4,028 | 4,035 |
| Trailers | **2,152** | 2,152 | 2,163 |
| Commuter passenger cars | **166** | 163 | 160 |
| Average age from date of manufacture- locomotive fleet (years)[a] | **15** | 15 | 15 |
| Average age from date of manufacture- freight car fleet (years)[a] | **16** | 16 | 16 |

a These averages are not weighted to reflect the greater capacities of the newer equipment.

## CAPITAL EXPENDITURES AND MAINTENANCE

### CAPITAL EXPENDITURES

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2004, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the headings "Liquidity and Capital Resources, Investing Activities."

BNSF's planned 2005 cash capital expenditures are incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Introduction."

### MAINTENANCE

As of December 31, 2004, General Electric Company, Alstom Transportation Inc., OmniTRAX Locomotive Services, LLC and the Electro-Motive Division of General Motors Corporation performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 3,650 locomotives.

The extent of the BNSF Railway's maintenance and capacity program is outlined in the following table:

| Year Ended December 31, | 2005 Estimate | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Track miles of rail laid [a] | **630** | **695** | 749 | 685 |
| Cross ties inserted (thousands) [a] | **3,100** | **2,695** | 2,353 | 2,248 |
| Track resurfaced (miles) | **12,100** | **11,450** | 12,399 | 12,499 |

a Includes expenditures for both maintenance of existing route system and expansion projects. These expenditures are primarily capitalized.

## PROPERTY AND FACILITIES

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 35 major intermodal hubs located across the system. BNSF Railway's largest intermodal facilities in terms of 2004 volume were:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,318,000 |
| Corwith Yard (Chicago, Illinois) | 744,000 |
| Willow Springs (Illinois) | 724,000 |
| Alliance (Fort Worth, Texas) | 561,000 |
| San Bernardino (California) | 557,000 |
| Cicero (Illinois) | 502,000 |
| Argentine (Kansas City, Kansas) | 305,000 |
| Logistics Park Chicago (Illinois) | 275,000 |

BNSF Railway owns 23 automotive distribution facilities where automobiles are loaded or unloaded from multi-level rail cars and serves eight port facilities in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| Classification Yard | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas City, Kansas) | 1,812 |
| Galesburg (Illinois) | 1,562 |
| Barstow (California) | 1,344 |
| Pasco (Washington) | 1,293 |
| Memphis (Tennessee) | 740 |

As of December 31, 2004, certain BNSF Railway properties and other assets are subject to liens securing $388 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Notes 9 and 10 of the Consolidated Financial Statements.

**PRODUCTIVITY**

Productivity, as measured by thousand gross ton miles per employee, has risen steadily in the last three years as shown in the table below.

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Thousand gross ton miles divided by average number of employees | **26,898** | 24,875 | 23,368 |

Volumes as measured by gross ton miles increased 11 percent in 2004 over 2003 and 4 percent in 2003 over 2002. In turn the increase in volumes has led the Company to increase employee headcounts. A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Other Matters; Employee and Labor Relations."

**BUSINESS MIX**

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural, and natural resource industries. Approximately 70 percent of the freight revenue originated by the Company is covered by contractual agreements of varying duration, while the balance is subject to common carrier, published prices or quotations offered by the Company. BNSF's financial performance is influenced by, among other things, general and industry economic conditions at the international, national, and regional levels. The map below illustrates the Company's primary routes, including trackage rights, which allow BNSF Railway to access major cities and ports in the western United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF Railway efficiently serves many smaller markets by working closely with approximately 200 shortline partners. BNSF has also entered into marketing agreements with Canadian National Railway Company and Kansas City Southern Railway Company expanding the marketing reach for the organizations.



**CONSUMER PRODUCTS:**

The Consumer Products' freight business provided approximately 40 percent of freight revenues in 2004 and consisted of the following business sectors:

- **INTERNATIONAL.** International business consists primarily of container traffic from steamship companies and accounted for approximately 39 percent of total Consumer Products revenues.

- **DIRECT MARKETING.** Direct marketing generated approximately 18 percent of total Consumer Products revenues. This business centers around intermodal traffic contracted from parcel shippers such as United Parcel Service and service for nationwide and regional LTL (less-than-truckload) carriers such as Yellow-Roadway Corporation.

- **TRUCKLOAD.** Truckload traffic represented approximately 18 percent of total Consumer Products revenues. This traffic is comprised of business through a joint service arrangement with J.B. Hunt, as well as business from Schneider National and other truckload carriers.

- **INTERMODAL MARKETING COMPANIES.** Approximately 10 percent of total Consumer Products revenues was generated through intermodal marketing companies, primarily shipper agents and consolidators.

- **PERISHABLES AND DRY BOXCAR.** Perishables and Dry Boxcar represented approximately 8 percent of total Consumer Products revenue. This group consists of beverages, canned goods and perishable food items. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

- **AUTOMOTIVE.** The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 7 percent of 2004 total Consumer Products revenue.

**INDUSTRIAL PRODUCTS:**

Industrial Products' freight business provided approximately 23 percent of BNSF's freight revenues in 2004 and consisted of the following four business areas:

- **BUILDING PRODUCTS.** This sector generated approximately 37 percent of total 2004 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

- **CONSTRUCTION PRODUCTS.** The construction products sector represented approximately 35 percent of total Industrial Products revenue in 2004. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF Railway's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.

- **CHEMICALS AND PLASTICS.** The chemicals and plastics sector represents approximately 15 percent of total 2004 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- **PETROLEUM.** Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black, which made up 13 percent of total Industrial Products revenues for 2004. Product use varies based on commodity, and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery, and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

**COAL:**

In 2004, the transportation of coal contributed about 21 percent of freight revenues. BNSF Railway is the largest transporter of low-sulfur coal originating from the Powder River Basin of Wyoming and Montana, which accounted for approximately 90 percent of all BNSF Railway's coal tons during the three years ending December 31, 2004. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast and Mountain regions of the United States. BNSF Railway also transports coal from the Powder River Basin to markets in Canada and the eastern United States. Demand for Powder River Basin coal has increased substantially over the past 20 years due to environmental compliance issues, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants.

Other BNSF coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and to Mexico.

The Company has received a Civil Investigative Demand from the Antitrust Division of the Department of Justice requesting information concerning the Company's pricing activities relating to the shipment of coal from the southern Powder River Basin. The Company is responding to the request.

**AGRICULTURAL PRODUCTS:**

The transportation of Agricultural Products provided approximately 16 percent of 2004 total freight revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company is developing and operating a shuttle network for grain, grain products and fertilizer, which allows more efficient use of equipment and improved cycle times as a result of the shuttle process. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

**FREIGHT STATISTICS:**

The following table sets forth certain freight statistics relating to rail operations for the periods indicated:

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Revenue ton miles (millions) | **570,688** | 508,200 | 490,234 |
| Freight revenue per thousand revenue ton miles | **$ 18.82** | $ 18.27 | $ 18.10 |
| Average length of haul (miles) | **1,045** | 1,014 | 992 |

Revenue, cars/units and average revenue per car/unit information for the three years ended December 31, 2004, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Results of Operations; Revenue Table."

**GOVERNMENT REGULATION AND LEGISLATION**

The Company is subject to federal, state and local laws and regulations generally applicable to all businesses. Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of the DOT, the Occupational Safety and Health Administration (OSHA), as well as other federal and state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction, and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the profitability of BNSF's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations, including the transportation of hazardous materials. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are also subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances, and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject and will from time to time continue to be subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs, on current and former owners and operators of a site, without regard to fault or the legality of the original conduct. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to cleanup sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. Further discussion is incorporated by reference from Note 10 of the Consolidated Financial Statements.

**COMPETITION**

The business environment in which BNSF Railway operates is highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is the Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting to the Association of American Railroads, in 2004, BNSF's share of the western United States rail traffic was approximately 46.4 percent.

**Item 3. Legal Proceedings**

*Ray Ridgeway, et al. v. Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company*, No. 48-185170-00 (District Court of Tarrant County, Texas, 48th Judicial District) is a state court action filed on October 27, 2000. The plaintiffs' causes of action include alleged breach of contract, negligence, and breach of fiduciary duties with respect to a special dividend that was paid in 1988 by a Burlington Northern Santa Fe Corporation (BNSF) predecessor, Santa Fe Southern Pacific Corporation (SFSP). The complaint alleges that SFSP erroneously informed shareholders as to the tax treatment of the dividend—specifically, the apportionment of the dividend as either a distribution of earnings and profits or a return of capital—which allegedly caused some shareholders to overpay their income taxes. The plaintiffs assert, through their expert's report, that SFSP had essentially no accumulated earnings and profits and that the entire dividend distribution should have been treated as a return of capital, rather than the approximately 34 percent that SFSP determined was a return of capital. On December 15, 2004, the court issued a letter to the parties indicating that it intends to deny the plaintiffs' requests to certify a class action and will be issuing an order to that effect. BNSF believes these claims lack merit and that it has substantial defenses on both the merits of these claims and the attempted class action, as evidenced by the court's letter, and it is defending these claims vigorously.

Reference is made to Note 5 of the Consolidated Financial Statements for information concerning certain pending tax related administrative or adjudicative state proceedings or appeals and to Note 10 of the Consolidated Financial Statements for information concerning other claims and litigation.

**Item 4. Submission of Matters to a Vote of Security Holders**

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2004.

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Listed below are the names, ages, and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation, or removal.

**MATTHEW K. ROSE, 45**

Chairman, President and Chief Executive Officer of BNSF since March 2002. Previously President and Chief Executive Officer of BNSF from December 2000. Also, Chairman, President and Chief Executive Officer of BNSF Railway from December 2000. Previously, President and Chief Operating Officer of BNSF from June 1999 to December 2000.

**THOMAS N. HUND, 51**

Executive Vice President and Chief Financial Officer since January 2001. Prior to that, Senior Vice President and Chief Financial Officer and Treasurer from August 1999.

**CARL R. ICE, 48**

Executive Vice President and Chief Operations Officer since January 2001. Prior to that, Senior Vice President-Operations from June 1999.

**DENNIS R. JOHNSON, 43**

Vice President and Controller since August 1999.

**JOHN P. LANIGAN, JR., 49**

Executive Vice President and Chief Marketing Officer since January 2003. Prior to that, President and Chief Executive Officer of Logistics.com, Inc. (provider of ASP-based transportation procurement services to shippers and carriers) from May 2000, and President and Chief Operating Officer from March 2000; and Chief Operating Officer of Schneider National, Inc. (truckload freight hauler) from 1999 to 2000.

**JEFFREY R. MORELAND, 60**

Executive Vice President Law & Government Affairs and Secretary since December 2001. Prior to that, Executive Vice President-Law and Chief of Staff since January 2001, and Senior Vice President-Law and Chief of Staff since February 1998.

**PETER J. RICKERSHAUSER, 56**

Vice President-Network Development since May 1999.

## Part II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." The common stock is also listed on the Chicago Stock Exchange and Pacific Exchange. Information as to the high and low sales prices of such stock for the two years ending December 31, 2004, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 17 of the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 2, 2005, was 40,000.

#### COMMON STOCK REPURCHASES

The following table presents repurchases by the Company of its common stock for each of the three months for the quarter ended December 31, 2004 (shares in thousands):

Issuer Purchases of Equity Securities

| Period | Total Number of Shares Purchased (a) | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (b) | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1 – 31 | 965 | $ 40.18 | 950 | 17,601 |
| November 1 – 30 | 980 | 44.01 | 950 | 16,651 |
| December 1 – 31 | 848 | 45.85 | 816 | 15,835 |
| Total | 2,793 | $ 43.25 | 2,716 | |

(a) Total number of shares purchased includes approximately 77,000 shares where employees delivered already owned shares or used an attestation procedure to satisfy the exercise price of stock options or the withholding of tax payments. Total number of shares purchased does not include approximately 19,000 shares acquired from employees to satisfy tax withholding obligations that arose on the vesting of restricted stock.

(b) On July 17, 1997, the Board initially authorized and the Company announced the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. On December 9, 1999, April 20, 2000, September 21, 2000 and January 16, 2003, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date for a total of 150 million shares authorized. The share repurchase program does not have an expiration date.

## Item 6. Selected Financial Data

The following table presents, as of and for the dates indicated, selected historical financial information for the Company (dollars in millions, except per share data):

| December 31, | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | **$ 10,946** | $ 9,413 | $ 8,979 | $ 9,208 | $ 9,207 |
| Operating income | **$ 1,686**[a] | $ 1,665 | $ 1,656 | $ 1,750 | $ 2,113 |
| Income before cumulative effect of accounting change | **$ 791**[a] | $ 777[b] | $ 760 | $ 731 | $ 980 |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 2.14**[a] | $ 2.10 | $ 2.01 | $ 1.89 | $ 2.38 |
| Average basic shares (in millions) | **370.0** | 369.1 | 378.0 | 387.3 | 412.1 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 2.10**[a] | $ 2.09[b] | $ 2.00 | $ 1.87 | $ 2.36 |
| Average diluted shares (in millions) | **376.6** | 372.3 | 380.8 | 390.7 | 415.2 |
| Dividends declared per common share | **$ 0.64** | $ 0.54 | $ 0.48 | $ 0.48 | $ 0.48 |
| **At year end:** | | | | | |
| Total assets | **$ 28,925** | $ 26,947 | $ 25,767 | $ 24,721 | $ 24,375 |
| Long-term debt and commercial paper, including current portion | **$ 6,516** | $ 6,684 | $ 6,814 | $ 6,651 | $ 6,846 |
| Stockholders' equity | **$ 9,311** | $ 8,495 | $ 7,932 | $ 7,849 | $ 7,480 |
| Net debt to total capitalization [c] | **39.9%** | 44.0% | 46.1% | 45.8% | 47.7% |
| **For the year ended:** | | | | | |
| Total capital expenditures | **$ 1,527** | $ 1,726 | $ 1,358 | $ 1,459 | $ 1,399 |
| Depreciation and amortization | **$ 1,012** | $ 910 | $ 931 | $ 909 | $ 895 |

a 2004 operating income, net income and earnings per share include a charge for a change in estimate of asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share, as described in Note 10 of the Consolidated Financial Statements.

b 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share, as described in Note 2 of the Consolidated Financial Statements.

c Net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation, its majority-owned subsidiaries, and a variable interest entity for which Burlington Northern Santa Fe is the primary beneficiary, all of which are separate legal entities (collectively, BNSF or Company). The principal subsidiary of BNSF is BNSF Railway Company (BNSF Railway). All earnings per share information is stated on a diluted basis.

## INTRODUCTION

BNSF Railway continues to be one of the primary rail transporters in North America with one of the largest railroad networks consisting of 32,000 route miles in 28 states and two Canadian provinces. BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products. Based on weekly reporting to the Association of American Railroads, for 2004, BNSF's share of the western United States rail traffic was approximately 46.4 percent.

BNSF achieved 16 percent freight revenue growth in 2004 primarily due to double-digit volume increases which were driven by the continued economic expansion, growth from new and existing customers, and increased export demand for grain. Of the 16 percent increase in freight revenue, approximately 3 percent was driven by fuel surcharges and about 3 percent was attributable to price increases. Average revenue per car increased 5 percent in 2004 compared with 2003 also as a result of rate increases and increased fuel surcharges. For 2005, the Company anticipates continued revenue growth as both the global and U.S economies continue to expand. The following graph depicts the business mix of the Company:

**Year ended December 31, 2004**
**(in millions)**




2004 earnings per share were $2.10, which includes the impact of the charge discussed below. This compares to 2003 earnings per share of $2.19, which included the favorable cumulative effect of an accounting change of $0.10 per diluted share.

During the third quarter of 2004, BNSF recorded a $465 million pre-tax charge to reflect changes in its estimate of unasserted asbestos liabilities and environmental liabilities. Of this amount, $293 million and $172 million were related to asbestos and environmental liabilities, respectively. The $465 million pre-tax charge was recorded in materials and other expense and reduced net income by $288 million, or $0.77 per share, for the year ended December 31, 2004. Due to the change in estimate, the Company anticipates an ongoing decrease in operating expense favorably impacting quarterly earnings by about two cents per share. This amount could vary however, based on actual experience. Management does not expect the charge to have any impact on the timing of claim payments.

Operating expenses for 2004 increased 20 percent compared to 2003, primarily driven by the charge mentioned above. The increase in expenses was also the result of an 11 percent increase in gross ton-miles handled and significant fuel price increases.

Each year capital expenditures are a significant use of cash for BNSF. In 2004, BNSF decreased its capital expenditures to $1.5 billion from $1.7 billion in the prior year because locomotives were primarily acquired through operating leases in 2004 instead of being purchased as in 2003. In 2005, the Company plans to incur approximately $1.7 billion in capital expenditures. Approximately $1.2 billion of the total 2005 planned capital expenditures will be for maintenance of business activities, primarily consisting of expenditures to maintain BNSF's track, signals, bridges and tunnels. The remaining $0.5 billion is planned for terminal and line expansions, as well as other transportation-related projects.

## RESULTS OF OPERATIONS

### REVENUE TABLE

The following table presents BNSF's revenue information by commodity group for the years ended December 31, 2004, 2003 and 2002:

| | Revenues (in millions) | | | Cars / units (in thousands) | | | Average revenue per car / unit | | |
|---|---|---|---|---|---|---|---|---|---|
| **Year ended December 31,** | **2004** | **2003** | **2002** | **2004** | **2003** | **2002** | **2004** | **2003** | **2002** |
| Consumer Products | **$ 4,245** | $ 3,657 | $ 3,353 | **4,859** | 4,336 | 3,880 | **$ 874** | $ 843 | $ 864 |
| Industrial Products | **2,448** | 2,138 | 2,041 | **1,561** | 1,428 | 1,415 | **1,568** | 1,497 | 1,442 |
| Coal | **2,277** | 2,025 | 2,071 | **2,216** | 2,048 | 2,097 | **1,028** | 989 | 988 |
| Agricultural Products | **1,772** | 1,465 | 1,408 | **900** | 834 | 794 | **1,969** | 1,757 | 1,773 |
| Total freight revenues | **10,742** | 9,285 | 8,873 | **9,536** | 8,646 | 8,186 | **$ 1,126** | $ 1,074 | $ 1,084 |
| Other revenues | **204** | 128 | 106 | | | | | | |
| Total operating revenues | **$ 10,946** | $ 9,413 | $ 8,979 | | | | | | |

### EXPENSE TABLE

The following table presents BNSF's expense information for the years ended December 31, 2004, 2003, and 2002 (in millions):

| **Year Ended December 31,** | **2004** | **2003** | **2002** |
|---|---|---|---|
| Compensation and benefits | **$ 3,322** | $ 2,963 | $ 2,894 |
| Purchased services | **1,424** | 1,252 | 1,146 |
| Depreciation and amortization | **1,012** | 910 | 931 |
| Equipment rents | **790** | 705 | 698 |
| Fuel | **1,335** | 1,093 | 848 |
| Materials and other | **1,377**[a] | 825 | 806 |
| Total operating expenses | **$ 9,260** | $ 7,748 | $ 7,323 |
| Interest expense | **$ 409** | $ 420 | $ 428 |
| Other expense, net | **$ 4** | $ 14 | $ 12 |
| Income tax expense | **$ 482** | $ 454 | $ 456 |

a 2004 materials and other expense includes a $465 million pre-tax charge related to changes in estimates of the Company's asbestos and environmental liabilities (see Note 10 of the Consolidated Financial Statements).

**YEAR ENDED DECEMBER 31, 2004 COMPARED WITH YEAR ENDED DECEMBER 31, 2003**

BNSF recorded net income for 2004 of $791 million, or $2.10 per share. 2004 net income includes a $288 million, net of tax, or $0.77 per share charge for a change in the Company's estimate of unasserted asbestos liabilities and environmental liabilities (see Note 10 of the Consolidated Financial Statements). In comparison, net income for 2003 was $816 million, or $2.19 per share, which includes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.10 per share (see Note 2 of the Consolidated Financial Statements).

***REVENUES***

***FREIGHT***

Freight revenues of $10,742 million for 2004 were $1,457 million, or 16 percent, higher than 2003. Freight revenues in 2004 included fuel surcharges of $357 million compared with $110 million in the prior year. Average revenue per car/unit increased 5 percent in 2004 to $1,126 from $1,074 in 2003.

***CONSUMER PRODUCTS***

The Consumer Products' freight business includes a significant intermodal component and consists of the following business areas: international, direct marketing, truckload, intermodal marketing companies, automotive, and perishables and dry boxcar.

Consumer Products revenues of $4,245 million for 2004 were $588 million, or 16 percent, greater than 2003. The increase in Consumer Products revenue is primarily due to double digit volume growth in the international, truckload, and perishables sectors. The increase in average revenue per unit of 4 percent is primarily related to rate increases and increased fuel surcharges.

***INDUSTRIAL PRODUCTS***

Industrial Products' freight business consists of four business areas: building products, construction products, chemicals and plastics, and petroleum products.

Industrial Products revenues increased $310 million, or 15 percent, to $2,448 million for 2004. The revenue increase is primarily due to increased lumber, plywood, particle board and paper traffic in the building products sector and increased business in steel, taconite and clay in the construction products sector, as well as increased traffic in petroleum products and plastics. Rate increases along with increased fuel surcharges contributed to a 5 percent increase in average revenue per car.

***COAL***

BNSF is one of the largest transporters of low-sulfur coal in the United States. Approximately 90 percent of all BNSF Railway's coal tons originate from the Powder River Basin of Wyoming and Montana.

Coal revenues of $2,277 million for 2004 increased $252 million, or 12 percent, versus a year ago. The increase is primarily a result of new customer business volumes and higher demand from existing customers. Average revenue per car increased 4 percent primarily driven by contractual rate escalations and increased average length of haul.

***AGRICULTURAL PRODUCTS***

The Agricultural Products' freight business is the transportation of agricultural products including corn, wheat, soybeans, bulk foods, fertilizer, and other products.

Agricultural Products revenues of $1,772 million for 2004 were $307 million, or 21 percent, higher than revenues for 2003. This increase is primarily driven by strong corn and wheat exports out of the Pacific Northwest. The average revenue per car increased 12 percent primarily driven by the mix of commodity and destination price increases, increased fuel surcharges and increased average length of haul.

***OTHER REVENUES***

Other Revenues increased $76 million, or 59 percent, to $204 million for 2004 compared to 2003. This increase is primarily attributable to increased volumes related to BNSF Logistics, a wholly-owned subsidiary that specializes in providing third-party logistic services, and demurrage.

***EXPENSES***

Total operating expenses for 2004 were $9,260 million, an increase of $1,512 million, or 20 percent, over 2003. The increase was primarily due to a $465 million pre-tax charge to reflect changes in the Company's estimate of unasserted asbestos liabilities and environmental liabilities. The increase in operating expenses was also the result of an 11 percent increase in gross-ton miles handled and significant fuel price increases.

***COMPENSATION AND BENEFITS***

Compensation and benefits includes expenses for BNSF employee compensation and benefit programs. The primary factors influencing the expenses recorded are volume, headcount, utilization, wage rates, incentives earned during the period, benefit plan participation and pension expenses.

Compensation and benefits expenses of $3,322 million were $359 million, or 12 percent, higher than 2003. The increase is primarily related to the significant increase in volumes. These increases in traffic volume drove an approximate 3 percent increase in employee headcount as well as greater overtime and crew training costs. Improved financial performance has led to higher incentive expenses for the Company's salaried and scheduled workforce. Additionally, BNSF recognized increased pension costs of $17 million.

***PURCHASED SERVICES***

Purchased services expense includes ramping and drayage, maintenance of locomotive and freight car equipment and technology services outsourcing, and other services, such as vegetation control, provided to BNSF, as well as purchased transportation costs for BNSF Logistics. The expenses are driven by the rates established in the service contracts and the volume of services required.

Purchased services expenses of $1,424 million for 2004 were $172 million, or 14 percent, higher than 2003 primarily due to higher costs for locomotive contract maintenance expense of $50 million, haulage expense of $27 million and intermodal ramp costs of $20 million for contracted transportation over other railroads all of which were primarily driven by higher volume. Additionally, purchased transportation costs for BNSF Logistics increased $45 million as a result of increases in its business.

***DEPRECIATION AND AMORTIZATION***

Depreciation and amortization expenses for the period are determined by using the group method of depreciation, applying a single rate to the gross investment in a particular class of property. Due to the capital-intensive nature of BNSF's operations, depreciation expense is a significant component of the Company's operating expense. The full effect of inflation is not reflected in operating expenses since depreciation is based on historical cost.

Depreciation and amortization expenses of $1,012 million for 2004 were $102 million, or 11 percent, higher than 2003. The majority of the increase is due to ongoing capital expenditures. Additionally, about $40 million of this increase was due to the expiration of credits to depreciation expense resulting from the application of purchase accounting at the time of the merger in 1996. As a result of a depreciation rate study completed with the assistance of third-party consultants in 2004, BNSF adopted new depreciation rates applied to track structure. This change in rate caused a net decrease in annual depreciation expense of approximately $5 million for 2004 and approximately $16 million on an ongoing annual basis, as calculated using the asset base at the time of the rate change.

***EQUIPMENT RENTS***

Equipment rents expense includes long-term and short-term payments primarily for locomotives, freight cars, containers and trailers. Variances in expense are driven primarily by volume, rental rates, the results of lease negotiations, utilization of owned equipment versus leased equipment, and changes in business mix resulting in equipment usage variances.

Equipment rents expenses for 2004 of $790 million were $85 million, or 12 percent, higher than 2003. Expense increases of $68 million for freight car equipment and $17 million for locomotive leases are predominantly related to significant volume increases.

***FUEL***

Fuel expense is driven by the level of locomotive consumption, market price and the effects of hedging activities.

Fuel expenses of $1,335 million for 2004 were $242 million, or 22 percent, higher than 2003. The increase in fuel expense is due to an increase in the average all-in cost per gallon of diesel fuel, as well as an increase in consumption driven by higher volumes. The average all-in cost per gallon of diesel fuel increased by 9-cents, or $124 million, which is comprised of an increase in the average purchase price of 29 cents, or $394 million, partially offset by an increase in the hedge benefit of 20-cents, or $270 million (2004 benefit of $338 million less 2003 benefit of $68 million). Consumption in 2004 was 1,344 million gallons compared with 1,213 million gallons in 2003.

***MATERIALS AND OTHER***

Material expenses consist mainly of the costs involved to purchase mechanical and engineering materials and other items for construction and maintenance of property and equipment. Other expenses include personal injury claims, environmental remediation, and derailments as well as employee separation costs, utilities, and property and miscellaneous taxes. The total is offset by gains on land sales and other recoveries.

Materials and other expenses of $1,377 million for 2004, which consists of approximately $300 million of materials expense with the remainder consisting of other items, including a charge of $465 million related to a change in BNSF's estimates of unasserted asbestos liabilities and environmental liabilities, were $552 million higher than 2003. In addition to the charge, materials and other expenses increased due to higher material costs of $44 million primarily to maintain freight cars and locomotives due to higher volumes, increased environmental expenses of $28 million primarily related to developments at two former fueling facility sites, increased casualty costs of $32 million driven by two large derailments, and a $24 million decrease in the carrying value of certain assets (see Note 7 of the Consolidated Financial Statements) partially offset by decreases in property and other miscellaneous taxes of $9 million, and increased gains from land sales of $23 million.

***INTEREST EXPENSE***

Interest expense of $409 million for 2004 was $11 million, or 3 percent, lower than 2003. This decrease was primarily the result of lower average interest rates and lower average debt outstanding.

***OTHER EXPENSE, NET***

Other expense of $4 million for 2004 was $10 million lower than in 2003. The decrease in expense was due to the receipt of interest income on a settlement that occurred during the third quarter of 2004, partially offset by losses on company owned life insurance.

***INCOME TAXES***

The effective tax rate in 2004 was 37.9 percent compared with 36.9 percent for the prior-year. The increase in the effective tax rate primarily reflects a tax settlement attributable to prior years that was settled favorably in 2003.

**YEAR ENDED DECEMBER 31, 2003 COMPARED WITH YEAR ENDED DECEMBER 31, 2002**

BNSF recorded net income for 2003 of $816 million, or $2.19 per share, which includes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.10 per share (see Note 2 of the Consolidated Financial Statements), compared with net income for 2002 of $760 million, or $2.00 per share. Operating income of $1,665 million in 2003 was $9 million higher than 2002.

***REVENUES***

***FREIGHT***

Freight revenues of $9,285 million for 2003 were $412 million, or 5 percent, higher than 2002. Freight revenues in 2003 included fuel surcharges of $110 million compared with $26 million in the prior year. Average revenue per car/unit decreased 1 percent in 2003 to $1,074 from $1,084 in 2002.

***CONSUMER PRODUCTS***

Consumer Products revenues of $3,657 million for 2003 were $304 million, or 9 percent, greater than 2002. The increase in Consumer Products revenue is primarily due to increased volumes in the international and truckload sectors. The reduction in average revenue per unit of 2 percent is primarily related to the strong growth in the international sector, which has lower average revenue per unit.

***INDUSTRIAL PRODUCTS***

Industrial Products revenues increased $97 million, or 5 percent, to $2,138 million for 2003. The revenue increase is primarily due to increased business in steel, taconite, clay and minerals in the construction products sector and increased military, lumber, plywood, particle board and paper traffic in the building products sector, which were somewhat offset by lower plastics traffic. Rate increases along with increased fuel surcharges contributed to a 4 percent increase in average revenue per car.

***COAL***

Coal revenues of $2,025 million for 2003 decreased $46 million, or 2 percent, versus a year ago. The decrease is primarily a result of lower volumes from the first quarter draw-down of utility stockpiles, weaker demand due to milder weather, utility plant shutdowns and the conversion of a utility plant from coal to natural gas. The average revenue per car grew slightly.

***AGRICULTURAL PRODUCTS***

Agricultural Products revenues of $1,465 million for 2003 were $57 million, or 4 percent, higher than revenues for 2002. This increase is primarily due to more ethanol shipments from plants in the Midwest to California and higher shipments of ethanol by-products. Increased export shipments of soybeans also contributed to growth. The average revenue per car was down slightly due to a change in traffic mix partially offset by increased fuel surcharges.

***EXPENSES***

Total operating expenses for 2003 were $7,748 million, an increase of $425 million, or 6 percent, over 2002 primarily due to higher fuel expenses and greater volumes handled.

***COMPENSATION AND BENEFITS***

Compensation and benefits expenses of $2,963 million were $69 million, or 2 percent, higher than 2002 primarily due to higher volumes and the implementation of Statement of Financial Accounting Standards (SFAS) No. 143, *Accounting for Asset Retirement Obligations,* as described in Note 2 of the Consolidated Financial Statements, as well as wage inflation, higher pension costs and new hire crew training, partially offset by lower head counts and the favorable impact of railroad retirement reform on payroll tax costs.

***PURCHASED SERVICES***

Purchased services expenses of $1,252 million for 2003 were $106 million, or 9 percent, higher than 2002 primarily due to volume-related intermodal ramp and drayage costs and increased locomotive maintenance costs associated with maintaining more locomotives as well as higher service contracts expense related to an agreement to outsource the management of a large portion of BNSF's information technology infrastructure entered into during the third quarter of 2002 and the implementation of SFAS No. 143.

***DEPRECIATION AND AMORTIZATION***

Depreciation and amortization expenses of $910 million for 2003 were $21 million, or 2 percent, lower than 2002 primarily due to the implementation of SFAS No. 143, as well as new lower depreciation rates for locomotives partially offset by normal increases for capital expenditures.

***EQUIPMENT RENTS***

Equipment rents expenses for 2003 of $705 million were $7 million, or 1 percent, higher than 2002 primarily due to volume growth partially offset by decreases in intermodal and carload equipment rent expenses. Decreases in intermodal and carload equipment rent expenses are a result of greater use of private trailers and containers, as well as favorable lease renegotiations and short term lease rate incentives.

***FUEL***

Fuel expenses of $1,093 million for 2003 were $245 million, or 29 percent, higher than 2002. The increase in fuel expense was primarily the result of a 16-cent, or $194 million, increase in the average all-in cost per gallon of diesel fuel. The increase in the average all-in cost per gallon of diesel fuel is comprised of a 17-cent, or $212 million, increase in the average purchase price which is partially offset by an increase in the hedge benefit of 1-cent, or $18 million (2003 benefit of $68 million less 2002 benefit of $50 million). Consumption in 2003 was 1,213 million gallons compared with 1,149 million gallons in 2002.

***MATERIALS AND OTHER***

Materials and other expenses of $825 million for 2003 were $19 million, or 2 percent, higher than 2002 principally due to the implementation of SFAS No. 143, employee severance costs and lower gains from property sales substantially offset by decreased material costs and bad debt expense.

***INTEREST EXPENSE***

Interest expense of $420 million for 2003 was $8 million, or 2 percent, lower than 2002. This decrease was primarily the result of lower average interest rates and an increased benefit from interest rate hedges, partially offset by higher average debt outstanding.

**OTHER *EXPENSE*, NET**

Other expense of $14 million for 2003 was $2 million higher than in 2002.

***INCOME TAXES***

The effective tax rate in 2003 was 36.9 percent compared with 37.5 percent for the prior-year period. The decrease in the effective tax rate primarily reflects a tax settlement attributable to prior years that was settled favorably in the second quarter of 2003.

## LIQUIDITY AND CAPITAL RESOURCES

Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance including commercial paper, the leasing of assets and the sale of a portion of its accounts receivable.

**OPERATING ACTIVITIES**

***2004***

Net cash provided by operating activities was $2,377 million during 2004 compared with $2,285 million during 2003. The increase is primarily the result of an increase in earnings before the effect of the third quarter charge related to a change in BNSF's estimates of unasserted asbestos liabilities and environmental liabilities, which had a de minimis impact on the Company's cash flows.

***2003***

Net cash provided by operating activities was $2,285 million during 2003 compared with $2,106 million during 2002. The increase was primarily the result of changes in working capital and the Seattle Sound Transit transaction (see further discussion under the headings "Other Matters; Seattle Sound Transit").

**INVESTING ACTIVITIES**

***2004***

Net cash used for investing activities was $1,595 million during 2004 compared with $1,806 million during 2003. Investing activities for the year include $1,527 million of capital expenditures which were $199 million lower than 2003 primarily due to the fact that most of the locomotives acquired in 2004 were leased, whereas the majority of locomotives acquired in 2003 were purchased.

***2003***

Net cash used for investing activities was $1,806 million during 2003 compared with $1,517 million during 2002. Investing activities for the year included $1,726 million of capital expenditures which were $368 million higher than 2002 primarily related to the purchase, instead of lease, of locomotives as well as the advance construction of double track on a portion of BNSF Railway's transcontinental route.

A breakdown of cash capital expenditures during 2004, 2003 and 2002 is set forth in the following table (in millions):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Maintenance of way: | | | |
| Rail | **$ 219** | $ 202 | $ 193 |
| Ties | **257** | 227 | 222 |
| Surfacing | **159** | 160 | 161 |
| Other | **359** | 337 | 325 |
| Total maintenance of way | **994** | 926 | 901 |
| Mechanical | **114** | 133 | 168 |
| Information services | **73** | 63 | 79 |
| Other | **107** | 116 | 107 |
| Total maintenance of business | **1,288** | 1,238 | 1,255 |
| New locomotive acquisitions | **16** | 270 | – |
| Terminal and line expansion | **223** | 218 | 103 |
| Total | **$ 1,527** | $ 1,726 | $ 1,358 |

The above table does not include expenditures for equipment financed through operating leases (principally related to locomotives).

**FINANCING ACTIVITIES**

***2004***

Net cash used for financing activities during 2004 was $478 million primarily related to: (i) dividend payments of $231 million; (ii) net debt repayments of $292 million; and (iii) common stock repurchases of $376 million which were offset by proceeds from stock options exercised of $420 million.

Aggregate debt to mature in 2005 is $465 million. BNSF's ratio of net debt to total capitalization was 39.9 percent at December 31, 2004, compared with 44.0 percent at December 31, 2003. The Company's adjusted net debt to total capitalization, including operating lease commitments was 51.0 percent at December 31, 2004, compared to 54.3 percent at December 31, 2003. BNSF's adjusted net debt to total capitalization is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, the information prepared in accordance with GAAP. However, the information is included herein as management believes that adjusted net debt to total capitalization provides meaningful additional information about the ability of BNSF to service long-term debt and other fixed obligations and to fund future growth. The decrease in adjusted net debt to total capitalization reflects the improved financial performance of BNSF. The following table presents a reconciliation of the calculation of adjusted net debt to total capitalization percentage:

| Year Ended December 31, | 2004 | 2003 |
|---|---|---|
| Net debt to total capitalization [a] | **39.9%** | 44.0% |
| Adjustment for long-term operating leases | **9.3%** | 8.7% |
| Adjustment for other debt equivalents | **1.8%** | 1.6% |
| Adjusted net debt to total capitalization [b] | **51.0%** | 54.3% |

a Net debt to total capitalization is calculated as total debt less cash and cash equivalents divided by the sum of net debt and total stockholders' equity

b Adjusted net debt to total capitalization includes operating leases and other debt equivalents in the calculation of net debt

The Company issued $250 million of 4.88 percent notes due January 15, 2015. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

BNSF had $500 million of debt capacity available under its shelf registration at December 31, 2004.

***2003***

Net cash used for financing activities during 2003 was $489 million primarily related to common stock repurchases of $217 million, dividend payments of $191 million and net debt repayments of $151 million partially offset by proceeds from stock options exercised of $68 million.

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023. The bonds were called at a price of 103.02 percent of par and commercial paper was used to fund the call.

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

***2002***

Net cash used for financing activities during 2002 was $587 million primarily related to common stock repurchases of $353 million, a net reduction in borrowings of $90 million and dividend payments of $183 million, partially offset by proceeds of $40 million resulting from the exercise of 2.3 million stock options.

The Company constructed an intermodal facility built by a third party real estate developer and entered into an agreement to lease the intermodal facility for 20 years from a third party lessor. Under accounting guidance, the Company was considered the owner of the facility during the construction period. The transaction was evaluated and it was determined that sale-leaseback accounting did not apply due to the existence of a purchase option. Accordingly, the transaction was treated as a financing for which the Company recorded an asset in property and equipment, net and a liability in long-term debt and commercial paper of $138 million that represented the fair market value at lease inception.

BNSF issued $300 million of 5.90 percent notes due July 1, 2012. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

#### DIVIDENDS

Common stock dividends declared were $0.64 per share, $0.54 per share, and $0.48 per share annually for 2004, 2003 and 2002, respectively. Dividends paid on common stock were $231 million, $191 million and $183 million during 2004, 2003 and 2002, respectively.

#### COMMON STOCK REPURCHASE PROGRAM

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. In December 1999, April 2000, September 2000 and January 2003, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 150 million shares. During 2004, 2003 and 2002, the Company repurchased approximately 10 million, 8 million, and 13 million shares, respectively, of its common stock at average prices of $35.98 per share, $27.25 per share, and $27.85 per share, respectively. Total repurchases through December 31, 2004, were 134 million shares at a total average cost of $26.82 per share, leaving 16 million shares available for repurchase out of the 150 million shares presently authorized.

#### LONG-TERM DEBT AND OTHER OBLIGATIONS

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

BNSF has agreed to acquire 1,315 locomotives by 2009. As of December 31, 2004, BNSF has taken delivery of 615 of the 1,315 locomotives. During 2004, BNSF took delivery of 334 locomotives which were primarily financed through operating leases.

In the first quarter of 2004, BNSF entered into a contractual obligation to acquire 6,000 grain cars over the course of the next four years. Through December 31, 2004, BNSF has taken delivery of 1,493 of the hoppers which were primarily financed through operating leases.

The locomotives and grain cars under these agreements have been or are expected to be financed through one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at that time.

The Company utilizes a commercial paper program backed by bank revolving credit agreements to manage liquidity needs. The following table summarizes the more significant obligations of the Company at December 31, 2004. For 2005 and the foreseeable future, the Company expects that cash from operating activities, access to capital markets and bank revolving credit agreements will be sufficient to enable the Company to meet its obligations when due. The Company believes these sources of funds will also be sufficient to fund capital additions that are necessary to maintain its competitiveness and position the Company for future revenue growth.

The Company's ratio of earnings to fixed charges was 3.06 and 3.00 times for the years ended December 31, 2004 and 2003, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 35 percent and 33 percent for the years ended December 31, 2004 and 2003, respectively. The increase in the ratio of net cash provided by operating activities divided by total average debt is primarily due to increased revenue and lower average debt outstanding.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2004 (in millions):

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less than 1 year** | **1–3 years** | **3–5 years** | **More than 5 years** |
| Long-term debt [a] | $ 5,884 | $ 371 | $ 716 | $ 321 | $ 4,476 |
| Capital lease obligations | 632 | 94 | 194 | 166 | 178 |
| Operating lease obligations [b] | 5,412 | 492 | 861 | 779 | 3,280 |
| Purchase obligations [c] | 6,287 | 1,091 | 1,059 | 770 | 3,367 |
| Other long-term liabilities reflected on the balance sheet under GAAP [d] | 295 | 63 | 82 | 73 | 77 |
| Total Contractual Obligations | $ 18,510 | $ 2,111 | $ 2,912 | $ 2,109 | $ 11,378 |

a Excludes capital lease obligations.

b Gross payments due which include an interest component.

c Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.

d Consists of employee separation payments as discussed in Note 11 of the Consolidated Financial Statements, the 2005 required pension plan contribution and actuarially estimated payments expected to be made over the next five years for other post-retirement benefit plans as discussed in Note 13 of the Consolidated Financial Statements.

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

**CREDIT AGREEMENTS**

Commercial paper and the revolving credit agreements are discussed in Note 9 of the Consolidated Financial Statements. The revolving credit agreements include covenants and events of default typical for this type of facility, including a minimum consolidated tangible net worth test, a maximum debt-to-capital test, and a $75 million cross-default provision. At December 31, 2004, the Company was in compliance with its debt covenants. BNSF's tangible net worth is $4 billion greater than the minimum consolidated tangible net worth required under the agreement, and the maximum debt-to-capital test provides approximately $7 billion of debt capacity above BNSF's outstanding debt as of December 31, 2004, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreements. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

## OFF-BALANCE SHEET ARRANGEMENTS

### SALE OF ACCOUNTS RECEIVABLE

The accounts receivable sales program of Santa Fe Receivables Corporation (SFRC), as described in Note 6 of the Consolidated Financial Statements, includes various provisions that, if triggered, would allow the investors participating in this program, at their option, to cancel the program. These provisions include a minimum consolidated tangible net worth test and a maximum debt-to-capital test which are the same as in the BNSF revolving credit agreements described above. BNSF's tangible net worth is approximately $4 billion greater than the minimum consolidated tangible net worth required under the agreement, and the maximum debt-to-capital test provides approximately $7 billion of debt capacity above BNSF's outstanding debt as of December 31, 2004. At December 31, 2004, investor interests of $650 million were outstanding under the $700 million accounts receivable facility. SFRC renewed $350 million of the $700 million accounts receivables facility, effective June 2004, for an additional 364 days. In addition, SFRC entered into a separate $350 million accounts receivables facility, effective June 2003, with a five-year term. As a result of amendments to the facilities in October, 2004, the commitments of the investors to purchase undivided interests for the two facilities under the accounts receivable sales program are currently scheduled to expire in October 2005 and October 2008, respectively. Management expects to be able to either extend the commitment of the current investors under the accounts receivable sales program past October 2005 or to find additional investors in the accounts receivable sales program who will be committed to purchase undivided interests after October 2005.

The accounts receivable sales program provides efficient financing at a competitive interest rate to traditional borrowing arrangements. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables (see Note 6 of the Consolidated Financial Statements).

### GUARANTEES

The Company acts as guarantor for certain debt and lease obligations of others. During the year ended December 31, 2004 the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future (see Note 9 of the Consolidated Financial Statements).

## PENSION FUNDING

The Company will make required contributions of approximately $13 million to the qualified BNSF Retirement Plan in 2005.

## INFLATION

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

## OTHER MATTERS

### COMMERCIAL

In July 2004, BNSF Railway initiated an arbitration proceeding under a Joint Service Agreement (JSA) with J.B. Hunt Transportation (J.B. Hunt), a major truckload carrier with which BNSF Railway handles substantial joint intermodal movements. In the proceeding, BNSF Railway is seeking an increase in its divisions of joint revenue for intermodal movements. In the pending proceeding, J.B. Hunt is also challenging the divisions basis and raising other issues under the JSA. The result of this proceeding is not expected to have a material adverse effect on the Company's results of operations, financial position or liquidity.

## HEDGING ACTIVITIES

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities,* as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in Accumulated Other Comprehensive Income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

### *FUEL*

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties. BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance (see Note 3 of the Consolidated Financial Statements).

### *INTEREST RATE*

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy. BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements (see Note 3 of the Consolidated Financial Statements).

## EMPLOYEE AND LABOR RELATIONS

Approximately 88 percent of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various different labor organizations. A negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since a bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

### *2005 BARGAINING ROUND*

The current bargaining round for all unions with contracts that will come into effect after January 1, 2005, began on and after November 1, 2004, with the serving of Section 6 notices which are each side's initial proposals. BNSF will participate in coordinated national handling of these proposals. The current agreements, as discussed above, are in effect until new agreements are reached or until changes to the existing agreements are made.

### *UNIONS WITH AN AGREEMENT UNDER THE PREVIOUS BARGAINING ROUND*

In the previous bargaining round, the United Transportation Union, the Brotherhood of Maintenance of Way Employes, the Brotherhood of Locomotive Engineers and Trainmen, the Transportation Communications Union, the Brotherhood of Railroad Signalmen, the American Train Dispatchers Association, and the International Brotherhood of Electrical Workers representing approximately 91 percent, collectively, of BNSF's unionized workforce, have reached final agreements that cover periods through December 2004.

***UNIONS WHICH HAVE NOT SETTLED AN AGREEMENT UNDER THE PREVIOUS BARGAINING ROUND***

Through the National Carriers' Conference Committee, BNSF is continuing efforts to settle the previous bargaining round with the International Association of Machinists, Sheet Metal Workers' International Association, and National Conference of Firemen and Oilers, which together represent approximately 9 percent of the Company's unionized workforce.

**RAILROAD RETIREMENT REFORM**

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been approximately triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II), and other benefits. Investment of Tier II Railroad Retirement assets had, until 2001, been limited to special interest-bearing U.S. Treasury securities. The Railroad Retirement and Survivors' Improvement Act of 2001 (Act) creates a new National Railroad Retirement Investment Trust to hold Tier II Railroad Retirement assets and empowers the trustees to invest these assets in the same types of investments available to private sector retirement plans. In addition to liberalizing certain retirement benefit requirements for rail employees, the Act reduced Tier II Railroad Retirement tax rates on rail employers beginning in 2002 and eliminated a supplemental annuity tax. In 2002, the Company realized savings of approximately $20 million and realized incremental savings of approximately $30 million and $20 million in 2003 and 2004, respectively. Based on projected wage levels and number of employees, the Company expects to realize further incremental savings in 2005 of approximately $10 million due to an additional 0.5 percentage point reduction in the Tier II rate for 2005. Future adjustments in the Tier II Railroad Retirement tax rates assessed will depend on Railroad Retirement fund levels.

**SEATTLE SOUND TRANSIT**

In December 2003, the Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority, established by King, Pierce and Snohomish counties within the state of Washington. BNSF has agreed to sell to Sound Transit under the threat of condemnation a combination of (a) four easements enabling Sound Transit to offer commuter rail service over the existing BNSF track from Seattle to Everett and (b) 18 miles of railroad line from south of Tacoma to Nisqually, Washington.

Sound Transit will pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett, and entered into agreements for service on the commuter easements, and joint use of track for commuter and freight purposes. The Company received approximately $80 million of cash in 2003 upon the closing of the first easement and $80 million of cash in 2004 upon closing of the second easement. The sale proceeds will be recognized in income over the use of the associated track structure (approximately 37 years). Over the next three years, upon the subsequent closings subject to conditions in the sale agreement, BNSF will receive an additional $100 million for the remaining two easements.

Sound Transit will also pay BNSF to convey the 18 miles of railroad line and associated real estate from south of Tacoma to Nisqually in three separate sell transactions. First, the Company received approximately $8 million of cash in 2003 and reported a gain in income of $2 million, net of tax, as a result of the real estate sale for station-related parcels to Sound Transit. Second, the Company received $6 million of cash and a $6 million note receivable in the third quarter of 2004 associated with the sale of approximately half of the 18 miles. The gain on this sale was deferred due to certain continuing involvement in the property. This continuing involvement expired in November 2004 and the Company recognized a gain in income of $7 million, net of tax. The Company is expected to collect the $6 million note receivable over the next two years. Third, the Company expects to sell the remaining railroad line and real estate sale in 2005 for approximately $15 million. The Company expects to recognize a gain of approximately $8 million, net of tax, associated with that sale.

#### AMERICAN JOBS CREATION ACT OF 2004

In October 2004, the American Jobs Creation Act of 2004 was signed into law. Part of the legislation includes the repeal of a 4.3–cent tax per gallon of diesel fuel. The tax will be gradually phased out in 2005 and 2006 and will be completely phased out by 2007. Based on projected fuel consumption, the repeal of the tax is expected to result in incremental savings of approximately $20 million, $10 million, and $30 million for BNSF in 2005, 2006, and 2007, respectively.

## CRITICAL ACCOUNTING ESTIMATES

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors and the Audit Committee has reviewed the Company's disclosure relating to them in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

### LEGAL

BNSF's most significant legal claims relate to personal injury claims and environmental matters. These claims are discussed in more detail below.

During 2004, BNSF recorded a $465 million pre-tax charge to reflect changes in its estimate of unasserted asbestos liabilities and environmental liabilities. Of this amount, $293 million and $172 million were related to asbestos and environmental liabilities, respectively. The $465 million pre-tax charge was recorded in materials and other expense and reduced net income by $288 million, or $0.77 per share during 2004.

#### *PERSONAL INJURY*

Personal injury claims, including employee work-related injuries, asbestos claims and third party injuries, are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards, and the average costs to settle projected claims, actual costs may differ from amounts recorded.

#### *ASBESTOS*

The Company is party to a number of personal injury claims by employees who worked around asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967, until it was substantially eliminated by 1985.

Prior to 2000, claim filings against the Company for asbestos were not numerous and were sporadic. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. The Company believed, however, that the low end of the range of reasonably possible loss, as that term is used in FASB Interpretation No. 14 (FIN 14), *Reasonable Estimation of the Amount of a Loss*, was immaterial. Subsequent to this period, claim filings increased and when they continued into 2004, the Company concluded that the low end of the range of reasonably possible loss would be material and that an estimate for unasserted asbestos exposure liability needed to be recorded. BNSF then engaged a third party with extensive experience in performing asbestos studies to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated unasserted asbestos claims and the estimated average cost per claim. The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of unasserted claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data. Based on the assessment, the Company recorded an undiscounted $293 million pre-tax charge for unasserted asbestos claims. The $293 million pre-tax charge was recorded in materials and other expense and reduced net income by $182 million, or $0.49 per share, for the year ended December 31, 2004.

Key elements of the assessment included:

- Because BNSF did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using Company employee data from 1970 forward and estimated the BNSF employee base from 1938-1969 using railroad industry historical census data and estimating BNSF's representation of the total railroad population.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age, duration and intensity of exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for the period 2000-2003 (the years in which the number of claims were more significant).
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2002-2004.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2002-2004.

From these assumptions BNSF projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were then applied to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate BNSF's future liability for unasserted asbestos claims.

The most sensitive assumptions for this accrual are the estimated future filing rates and estimated average claim values. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, BNSF used a multi-year calibration period (i.e., the average historical filing rate for the period 2000-2003) because it believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against BNSF declines at a rate consistent with both mortality and age as there is a decreasing propensity to file a claim as the population ages. BNSF believes the average claim values by type of disease from the historical period 2002-2004 are most representative of future claim values. Non-malignant claims, which represent approximately 95 percent of the total number and 80 percent of the cost of estimated future asbestos claims, were priced by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10 percent increase or decrease in either the forecasted number of unasserted claims or the average claim values would result in an approximate $30 million increase or decrease in the liability recorded for unasserted asbestos claims.

BNSF anticipates obtaining annual updates of the study. On a quarterly basis, BNSF will monitor actual experience against the number of forecasted claims to be received and expected claim payments. Adjustments to the Company's estimates will be recorded quarterly if necessary. More periodic updates to the study will occur if trends necessitate a change.

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | **2004** | **2003** | **2002** |
|---|---|---|---|
| Beginning balance | **$ 60** | $ 55 | $ 41 |
| Accruals | **308** | 25 | 31 |
| Payments | **(23)** | (20) | (17) |
| Ending balance at December 31, | **$ 345** | $ 60 | $ 55 |

Of the December 31, 2004 obligation, $292 million is related to unasserted claims while $53 million is related to asserted claims. At both December 31, 2004 and 2003, $18 million is included in current liabilities. The recorded liability was not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding only asserted asbestos claims filed against BNSF:

| | **2004** | **2003** |
|---|---|---|
| Claims unresolved at January 1, | **1,985** | 1,719 |
| Claims filed | **712** | 1,023 |
| Claims settled, dismissed or otherwise resolved | **(771)** | (757) |
| Claims unresolved at December 31, | **1,926** | 1,985 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985) which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 50, 70, and 90 percent of the future unasserted asbestos claims will be incurred within the next 10, 15, and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $250 million to $450 million. However, BNSF believes that the $345 million recorded is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER PERSONAL INJURY***

BNSF uses a third party actuary to assist the Company in estimating its other personal injury liability claims and expense. These estimates are based on the covered population, activity levels and trends in frequency, and the costs of covered injuries. These actuarial estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FASB Interpretation No. 14 (FIN 14), *Reasonable Estimation of the Amount of a Loss,* is immaterial for these other occupational trauma claims.

Key elements of the actuarial assessment include:

- Size and demographics (employee age and craft) of the workforce.
- Activity levels (manhours by employee craft and carloadings).
- Expected claim frequency rates by type of claim (employee FELA or third party liability) based on historical claim frequency trends.
- Expected dismissal rates by type of claim based on historical dismissal rates.
- Expected average paid amounts by type of claim for open and incurred but not reported claims that eventually close with payment.

From these assumptions, BNSF estimates the number of open claims by accident year that will likely require payment by the Company. The projected number of open claims by accident year that will require payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for all asserted claims. Additionally, BNSF estimates the number of its incurred but not reported claims that will likely result in payment based upon historical emergence patterns by type of claim. The estimated number of projected claims by accident year requiring payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for incurred but not reported claims.

The most sensitive assumptions for this accrual are the expected average cost per claim and the projected frequency rates for the number of claims that will ultimately result in payment. A 10 percent increase or decrease in either the expected average cost per claim or the frequency rate for claims with payment would result in an approximate $45 million increase or decrease in BNSF's recorded other personal injury reserves.

BNSF obtains quarterly actuarial updates for other personal injury liabilities and monitors actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | **2004** | 2003 | 2002 |
|---|---|---|---|
| Beginning balance | **$ 453** | $ 441 | $ 417 |
| Accruals | **194** | 190 | 197 |
| Payments | **(188)** | (178) | (173) |
| Ending balance at December 31, | **$ 459** | $ 453 | $ 441 |

At December 31, 2004 and 2003, $170 million and $182 million were included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding personal injury claims, other than asbestos, filed against BNSF:

| | **2004** | 2003 |
|---|---|---|
| Claims unresolved at January 1, | **4,393** | 4,669 |
| Claims filed | **3,632** | 3,779 |
| Claims settled, dismissed or otherwise resolved | **(3,909)** | (4,055) |
| Claims unresolved at December 31, | **4,116** | 4,393 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $400 million to $550 million. However, BNSF believes that the $459 million recorded is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***ENVIRONMENTAL***

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated loss can be made. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

During the first half of 2004, the Company experienced a significant increase in expense relating to environmental remediation developments at known sites for which the majority of the contamination occurred decades ago. Because of these and other developments in recent periods, the Company performed an assessment to determine if it was feasible to better estimate developments at its known sites. The Company determined that a third party actuary had proprietary data that included information from the EPA and other governmental agencies as well as information accumulated from public sources and work performed for other clients. Because of its determination that a better estimate of future developments could be made with this data, BNSF engaged this third party actuary, which has extensive background in performing various studies for large companies, including environmental matters, to assist BNSF in determining its potential future environmental exposure at known sites. As a result of this study, the Company revised its estimate of its probable environmental losses and its accrued liabilities. Consequently, during 2004, BNSF recorded an undiscounted $172 million pre-tax charge related to its change in estimated environmental liabilities on a site by site basis. The $172 million pre-tax charge was recorded in materials and other expense and reduced net income by $106 million, or $0.28 per share, for 2004. The charge does not include (i) contaminated sites of which the Company is not aware, and (ii) additional amounts for third party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites. BNSF continues to estimate third party claims on a site by site basis when the liability for such claims is probable and a reasonable estimate of associated loss can be made. BNSF's recorded liability for third party claims as of December 31, 2004 is approximately $25 million.

The Company's estimate of ultimate cost for clean up efforts at its known environmental sites utilizes BNSF's historical payment patterns, its current estimated percentage to closure ratios, and the actuary's proprietary benchmark patterns developed from data accumulated from public sources and work performed by it for other clients, including the EPA and other governmental agencies. These factors incorporate experience gained from clean up efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. The most significant assumptions are: (i) historical payment patterns of site development, (ii) percentage to closure ratios, and (iii) variance from benchmark costs. A 10 percent change in any of these individual assumptions could result in an increase of up to $40 million or a decrease of up to $20 million in BNSF's estimated environmental liability. BNSF also conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in, and the ability to pay for, cleanup of other PRPs.

BNSF anticipates obtaining annual updates of the study. On a quarterly basis, BNSF will also monitor actual experience against the forecasted remediation and related payments made on existing sites. Additionally, BNSF will continue its existing, quarterly process to monitor developments to further benchmark actuarial results. Adjustments to the Company's estimates will continue to be recorded quarterly if necessary based upon developments in subsequent periods. More periodic updates to the study will occur if trends necessitate a change.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 384 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | **2004** | 2003 | 2002 |
|---|---|---|---|
| Beginning balance | **$ 199** | $ 196 | $ 202 |
| Accruals | **258** | 59 | 43 |
| Payments | **(72)** | (56) | (49) |
| Ending balance at December 31, | **$ 385** | $ 199 | $ 196 |

At December 31, 2004 and 2003, $60 million and $50 million were included in current liabilities, respectively. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2004 will be paid over the next ten years and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | BNSF sites | | Superfund sites | |
|---|---|---|---|---|
| | **2004** | 2003 | **2004** | 2003 |
| Number of sites at January 1, | **402** | 396 | **22** | 23 |
| Sites added during the period | **34** | 33 | **5** | 3 |
| Sites closed during the period | **(52)** | (27) | **(3)** | (4) |
| Number of sites at December 31, | **384** | 402 | **24** | 22 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $300 million to $600 million. However, BNSF believes that the $385 million recorded is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER CLAIMS AND LITIGATION***

In addition to asbestos, other personal injury, and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**INCOME TAXES**

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $482 million, $454 million and $456 million for the years ended December 31, 2004, 2003 and 2002, respectively. BNSF's Consolidated Balance Sheets reflect $308 million and $292 million of net current deferred tax assets at December 31, 2004 and 2003, respectively. Also included in BNSF's Consolidated Balance Sheets are $7,820 million and $7,481 million of net non-current deferred tax liabilities at December 31, 2004 and 2003, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date of September 1995, respectively. Internal Revenue Service examination of the years 1995 through 1999 for BNSF is completed and protests of the unagreed issues have been filed with IRS Appeals. BNSF is currently under examination for years 2000 through 2002. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2004.

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable law, current information and past experience with similar issues to make these judgments.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not materially changed its methodology for calculating income tax expense for the years presented and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

**PENSIONS AND OTHER POST-EMPLOYMENT BENEFITS**

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees and an unfunded, nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these plans are based on years of credited service and the highest five-year average compensation levels. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The amounts recorded in the Consolidated Statements of Income for pensions and other post-employment cost were as follows (in millions):

| Year Ended December 31, | 2005 Estimate | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Net pension cost (benefit) | **$ 38** | **$ 15** | $ (3) | $ (7) |
| Net other post-employment benefits cost | **$ 16** | **$ 24** | $ 32 | $ 30 |

The increased pension cost in 2004 and 2005 is primarily the result of recognition of previously unrecognized losses as well as a decrease in both the expected long-term rate of return on plan assets and discount rate assumptions. OPEB costs declined due to the recognition of Medicare Part D prescription drug benefit (see Note 13 of the Consolidated Financial Statements).

Pension and other post-employment benefit plan obligations were as follows (in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| Pension benefit obligations | **$ 1,710** | $ 1,678 |
| Other post-employment benefit obligations | **$ 299** | $ 366 |

BNSF uses a third party actuary to assist the Company in estimating liabilities and expenses for pension and OPEB. Estimated amounts are based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension or OPEB obligations include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate. These assumptions are critical to the Company's estimate of expenses and liabilities, and changes to these estimates could have a material impact on the Company's results of operations and financial position.

The discount rate is a component estimate of both pension and OPEB. The expected return on plan assets is a factor that only influences the funded pension plans. Health care cost trend rates only affect OPEB. BNSF uses a discount rate that reflects the current bond market and an expected rate of return on assets that reflects the expected long-term rates of return on plan assets.

From time to time, the Company will change pension and OPEB assumptions to better approximate current conditions and expected future experience. Assumptions for return on assets and the discount rate for the past three years are as follows:

| Assumptions used to determine net (benefit) cost for fiscal years ended December 31, | Pension Benefits | | | Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Discount rate | **6.00%** | 6.50% | 7.00% | **6.00%** | 6.50% | 7.00% |
| Expected long-term rate of return on plan assets | **8.25%** | 8.50% | 8.50% | – | – | – |
| Rate of compensation increase | **3.90%** | 3.90% | 4.00% | **3.90%** | 3.90% | 4.00% |

| Assumptions used to determine benefit obligations at September 30[a], | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Discount rate | **5.75%** | 6.00% | **5.75%** | 6.00% |
| Rate of compensation increase | **3.90%** | 3.90% | **3.90%** | 3.90% |

a The Company's pension and OPEB plans use a measurement date of September 30.

The discount rate and the expected rate of return used for the 2005 calculation of net benefit cost were lowered to 5.75 percent and 8.00 percent, respectively to reflect current market conditions. Unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years. The following table is an estimate of the impact to future net benefit cost that could result from hypothetical changes to the most sensitive assumptions, the discount rate or rate of return on plan assets:

**Sensitivity Analysis**

| Hypothetical discount rate change | Change in Net Benefit Cost | |
|---|---|---|
| | Pension | OPEB |
| 50 basis point decrease | $5 million increase | $4 million increase |
| 50 basis point increase | $5 million decrease | $4 million decrease |

| Hypothetical rate of return on plan assets change | Pension |
|---|---|
| 50 basis point decrease | $6 million increase |
| 50 basis point increase | $6 million decrease |

**DEPRECIATION**

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expenses of $1,012 million, $910 million and $931 million for the years ended December 31, 2004, 2003 and 2002, respectively. At December 31, 2004 and 2003, the Company had property and equipment, net balances of $25,814 million and $25,068 million, which include $6,518 million and $6,006 million, respectively, of accumulated depreciation.

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. As required by the Federal Surface Transportation Board (STB), the Company conducts studies of depreciation rates and the required accumulated depreciation balance at least every three years for equipment property and at least every six years for track structure and other roadway property. The Company uses external consultants to assist management with these studies. The consultants rely on statistical analysis, historical retirement data, industry knowledge and discussions with management to assess the impact of new technologies and maintenance practices. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average remaining service lives of the assets.

A study conducted in 2004 resulted in the Company adopting new depreciation rates for track structure that resulted in a net decrease in 2004 depreciation expense of $5 million and approximately $16 million on an ongoing annual basis, as calculated using the asset base at the time of the rate change. A study conducted in 2003 resulted in the Company adopting new depreciation rates for locomotives, other road assets, as well as hardware and software that resulted in a net decrease in annual depreciation expense of $9 million. There were no material changes in depreciation rates in 2002.

#### ACCOUNTING PRONOUNCEMENTS

See Note 16 of the Consolidated Financial Statements for information about recent accounting pronouncements.

**FORWARD-LOOKING INFORMATION**

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties, and actual results may differ materially. Important factors that could cause actual results to differ materially include, but are not limited to:

- **Economic and industry conditions:** material adverse changes in economic or industry conditions, both in the United States and globally, changes in customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, adverse economic conditions in BNSF's supplier base, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, changes in fuel prices and other key materials, changes in the securities and capital markets, and changes in crew availability, labor costs and labor difficulties, including stoppages affecting either BNSF's operations or our customers' abilities to deliver goods to BNSF for shipment;

- **Legal and regulatory factors:** developments and changes in laws and regulations, the ultimate outcome of shipper and rate claims subject to adjudication, developments in environmental investigations or proceedings with respect to rail operations or current or past ownership or control of real property, and developments in other types of claims and litigation, including those relating to personal injuries, occupational disease, the release of hazardous materials, and damage to property; and

- **Operating factors**: technical difficulties, changes in operating conditions and costs, commodity concentrations, the availability of equipment and human resources to meet changes in demand, the extent of the Company's ability to achieve its operational and financial initiatives and to contain costs, the effectiveness of steps taken to maintain and improve operations and network fluidity, including the management of the amount of traffic on the system to meet demand and the ability to acquire sufficient resources to meet that demand, congestion on other railroads, as well as natural events such as severe weather, floods and earthquakes or man-made or other disruptions of BNSF Railway's operating systems, structures, or equipment including the effects of acts of terrorism on the Company's system or other railroads' systems.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions may appear in the Company's public filings with the Securities and Exchange Commission, which are accessible at www.sec.gov, and on the Company's website at www.bnsf.com, and which investors are advised to consult.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The following table summarizes the impact of these hedging programs on the Company's results of operations (in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| Fuel hedge benefit (including ineffective portion of unexpired hedges) | **$ 338** | $ 68 |
| Interest rate hedge benefit | **36** | 35 |
| Total hedge benefit | **374** | 103 |
| Tax effect | **(144)** | (39) |
| Hedge benefit, net of tax | **$ 230** | $ 64 |

The Company's fuel hedge benefit is due to increases in fuel prices subsequent to the initiation of various hedges. Additionally, BNSF has expanded the percentage of fuel consumption covered by hedges which has further contributed to the hedge benefit. The interest rate hedge benefit is the result of the conversion of fixed-rate long-term debt to floating-rate debt coupled with lower interest rates. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 of the Consolidated Financial Statements describe significant aspects of BNSF's financial instrument programs which have a material market risk. Additionally, the Company has a fuel surcharge program (see further discussion under the freight revenue section of Item 7).

**COMMODITY PRICE SENSITIVITY**

BNSF has a program to hedge against fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2004, are based on the front month settlement prices of NYMEX #2 heating oil (HO), West Texas Intermediate crude oil (WTI), or the HO refining spread (HO-WTI) which is defined as the difference between HO and WTI. A WTI hedge combined with a HO-WTI hedge will result in the equivalent of a HO hedge. For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel, WTI, and HO.

At December 31, 2004, BNSF had recorded in the Consolidated Balance Sheet a fuel hedging asset of $369 million for fuel hedges covering 2005 through 2007.

The following table is an estimate of the impact to earnings that could result from hypothetical price changes during the twelve month period ending December 31, 2005 and the balance sheet impact from the hypothetical price changes, both based on hedge position at December 31, 2004:

| Sensitivity Analysis | | |
|---|---|---|
| **Hedged commodity price change** | **Fuel hedge annual pre-tax earnings impact** | **Balance Sheet impact of change in fuel hedge fair value** |
| 10% increase | $78 million increase | $115 million increase |
| 10% decrease | $78 million decrease | $105 million decrease |

Based on fuel consumption during the twelve month period ending December 31, 2004 of 1,344 million gallons and fuel prices during that same period, excluding the impact of the hedging program, a ten percent increase or decrease in the commodity price per gallon would result in an approximate $152 million increase or decrease, respectively in fuel expense (pre-tax) on an annual basis.

At December 31, 2004, BNSF maintained fuel inventories for use in normal operations which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure. Further information on fuel hedges is incorporated by reference from Note 3 of the Consolidated Financial Statements.

**INTEREST RATE SENSITIVITY**

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. These interest rate hedges are accounted for either as cash flow or fair value hedges. BNSF's measurement of the fair value of these hedges are based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

At December 31, 2004, the fair value of BNSF's debt was $6,628 million and the interest rate hedging asset was $35 million.

The following table is an estimate of the impact to earnings and the fair value of the total debt and interest rate hedges that could result from hypothetical interest rate changes during the twelve month period ending December 31, 2005 based on debt levels as of December 31, 2004:

**Sensitivity Analysis**

| Hypothetical change in interest rates | Floating rate debt - Annual pre-tax earnings impact | Change in fair value | |
|---|---|---|---|
| | | Total debt | Interest rate hedges |
| 1 percent decrease | $11 million increase | $588 million increase | $28.0 million increase |
| 1 percent increase | $11 million decrease | $511 million decrease | $28.5 million decrease |

Further information on interest rate hedges is incorporated by reference from Note 3 of the Consolidated Financial Statements. Information on the Company's debt which may be sensitive to interest rate fluctuations is incorporated by reference from Note 9 of the Consolidated Financial Statements.

**Item 8. Financial Statements and Supplementary Data**

The Consolidated Financial Statements of BNSF and subsidiary companies, together with the report of independent registered public accounting firm, are included as part of this filing.

The following documents are filed as a part of this report:

**Consolidated Financial Statements**

Management's Report on Internal Control Over Financial Reporting ........ 41
Report of Independent Registered Public Accounting Firm ........ 42
Consolidated Statements of Income for the three years ended December 31, 2004 ........ 44
Consolidated Balance Sheets as of December 31, 2004 and 2003 ........ 45
Consolidated Statements of Cash Flows for the three years ended December 31, 2004 ........ 46
Consolidated Statements of Changes in Stockholders' Equity for the three years ended December 31, 2004 ........ 47
Notes to Consolidated Financial Statements ........ 48–82

## Management's Report on Internal Control Over Financial Reporting

**To the Shareholders of Burlington Northern Santa Fe Corporation and Subsidiaries**

The management of Burlington Northern Santa Fe Corporation (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external reporting purposes in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework*. Based on our assessment we concluded that, as of December 31, 2004, the Company's internal control over financial reporting is effective based on those criteria.

Our management's assessment of the Company's internal control over financial reporting as of December 31, 2004 has been audited by PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, as stated in their report which appears on the following pages.

## Report of Independent Registered Public Accounting Firm

**To the Shareholders and Board of Directors of**
**Burlington Northern Santa Fe Corporation**

We have completed an integrated audit of Burlington Northern Santa Fe Corporation's 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and its subsidiaries (the Company) at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2003, the Company changed the manner in which it accounts for asset retirement costs.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 8, that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control - Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

PricewaterhouseCoopers LLP

Fort Worth, Texas
February 10, 2005

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## Consolidated Statements of Income

Dollars in millions, except per share data

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Revenues | **$ 10,946** | $ 9,413 | $ 8,979 |
| Operating expenses: | | | |
| Compensation and benefits | **3,322** | 2,963 | 2,894 |
| Purchased services | **1,424** | 1,252 | 1,146 |
| Depreciation and amortization | **1,012** | 910 | 931 |
| Equipment rents | **790** | 705 | 698 |
| Fuel | **1,335** | 1,093 | 848 |
| Materials and other | **1,377** | 825 | 806 |
| Total operating expenses | **9,260** | 7,748 | 7,323 |
| Operating income | **1,686** | 1,665 | 1,656 |
| Interest expense | **409** | 420 | 428 |
| Other expense, net | **4** | 14 | 12 |
| Income before income taxes and cumulative effect of accounting change | **1,273** | 1,231 | 1,216 |
| Income tax expense | **482** | 454 | 456 |
| Income before cumulative effect of accounting change | **791** | 777 | 760 |
| Cumulative effect of accounting change, net of tax | **–** | 39 | – |
| Net income | **$ 791** | $ 816 | $ 760 |
| Earnings per share: | | | |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 2.14** | $ 2.10 | $ 2.01 |
| Basic earnings per share (after cumulative effect of accounting change) | **$ 2.14** | $ 2.21 | $ 2.01 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 2.10** | $ 2.09 | $ 2.00 |
| Diluted earnings per share (after cumulative effect of accounting change) | **$ 2.10** | $ 2.19 | $ 2.00 |
| Average shares (in millions): | | | |
| Basic | **370.0** | 369.1 | 378.0 |
| Dilutive effect of stock awards | **6.6** | 3.2 | 2.8 |
| Diluted | **376.6** | 372.3 | 380.8 |

See accompanying Notes to Consolidated Financial Statements.

## Consolidated Balance Sheets

Dollars in millions, shares in thousands

| December 31, | 2004 | 2003 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 322 | $ 18 |
| Accounts receivable, net | 181 | 137 |
| Materials and supplies | 339 | 266 |
| Current portion of deferred income taxes | 308 | 292 |
| Other current assets | 465 | 157 |
| Total current assets | 1,615 | 870 |
| Property and equipment, net | 25,814 | 25,068 |
| Other assets | 1,496 | 1,009 |
| Total assets | $ 28,925 | $ 26,947 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | $ 2,251 | $ 2,110 |
| Long-term debt due within one year | 465 | 244 |
| Total current liabilities | 2,716 | 2,354 |
| Long-term debt and commercial paper | 6,051 | 6,440 |
| Deferred income taxes | 7,820 | 7,481 |
| Casualty and environmental liabilities | 941 | 462 |
| Minimum pension liability | 353 | 359 |
| Employee separation costs | 124 | 144 |
| Other liabilities | 1,609 | 1,212 |
| Total liabilities | 19,614 | 18,452 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value 600,000 shares authorized; 517,275 shares and 500,685 shares issued, respectively | 5 | 5 |
| Additional paid-in-capital | 6,299 | 5,766 |
| Retained earnings | 6,792 | 6,240 |
| Treasury stock, at cost, 140,463 shares and 129,225 shares, respectively | (3,741) | (3,340) |
| Unearned compensation | (43) | (36) |
| Accumulated other comprehensive income (loss) | (1) | (140) |
| Total stockholders' equity | 9,311 | 8,495 |
| Total liabilities and stockholders' equity | $ 28,925 | $ 26,947 |

See accompanying Notes to Consolidated Financial Statements.

## Consolidated Statements of Cash Flows

Dollars in millions

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Operating activities** | | | |
| Net income | **$ 791** | $ 816 | $ 760 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **1,012** | 910 | 931 |
| Deferred income taxes | **237** | 460 | 432 |
| Employee separation costs paid | **(33)** | (43) | (55) |
| Cumulative effect of accounting change, net of tax | **–** | (39) | – |
| Long-term casualty and environmental liabilities, net | **477** | 20 | 32 |
| Other, net | **(84)** | 28 | (41) |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **(40)** | 4 | 31 |
| Materials and supplies | **(73)** | (39) | (25) |
| Other current assets | **(144)** | 5 | (28) |
| Accounts payable and other current liabilities | **234** | 163 | 69 |
| Net cash provided by operating activities | **2,377** | 2,285 | 2,106 |
| **Investing activities** | | | |
| Capital expenditures | **(1,527)** | (1,726) | (1,358) |
| Other, net | **(68)** | (80) | (159) |
| Net cash used for investing activities | **(1,595)** | (1,806) | (1,517) |
| **Financing activities** | | | |
| Net decrease in commercial paper and bank borrowings | **(242)** | (77) | (96) |
| Proceeds from issuance of long-term debt | **250** | 265 | 300 |
| Payments on long-term debt | **(300)** | (339) | (294) |
| Dividends paid | **(231)** | (191) | (183) |
| Proceeds from stock options exercised | **420** | 68 | 40 |
| Purchase of BNSF common stock | **(376)** | (217) | (353) |
| Other, net | **1** | 2 | (1) |
| Net cash used for financing activities | **(478)** | (489) | (587) |
| Increase (decrease) in cash and cash equivalents | **304** | (10) | 2 |
| Cash and cash equivalents: | | | |
| Beginning of year | **18** | 28 | 26 |
| End of year | **$ 322** | $ 18 | $ 28 |
| **Supplemental cash flow information** | | | |
| Interest paid, net of amounts capitalized | **$ 476** | $ 458 | $ 463 |
| Income taxes paid, net of refunds | **$ 159** | $ 26 | $ 55 |
| Non-cash financing | **$ 104** | $ 24 | $ 166 |

See accompanying Notes to Consolidated Financial Statements.

## Consolidated Statements of Changes in Stockholders' Equity

Shares in thousands, dollars in millions, except per share data

| | Common Shares | Treasury Shares | Common Stock and Paid–in Capital | Retained Earnings | Treasury Stock | Unearned Compen-sation | Accumu-lated Other Compre-hensive Income (Loss) | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2001 | 492,818 | (107,041) | $ 5,589 | $ 5,048 | $ (2,745) | $ (34) | $ (9) | $ 7,849 |
| Comprehensive income: | | | | | | | | |
| Net income | | | – | 760 | – | – | – | 760 |
| Minimum pension liability adjustment, net of tax benefit of $136 | | | – | – | – | – | (220) | (220) |
| Fuel/ interest hedge mark-to-market, net of tax expense of $12 | | | – | – | – | – | 20 | 20 |
| Total comprehensive income | | | – | 760 | – | – | (200) | (560) |
| Common stock dividends, $0.48 per share | | | – | (183) | – | – | – | (183) |
| Adjustments associated with unearned compensation, restricted stock | 1,527 | (634) | 25 | – | – | (5) | – | 20 |
| Exercise of stock options and related tax benefit of $6 | 2,338 | (555) | 55 | – | (16) | – | – | 39 |
| Purchase of BNSF common stock | – | (12,675) | – | – | (353) | – | – | (353) |
| Balance at December 31, 2002 | 496,683 | (120,905) | 5,669 | 5,625 | (3,114) | (39) | (209) | 7,932 |
| Comprehensive income: | | | | | | | | |
| Net income | | | – | 816 | – | – | – | 816 |
| Minimum pension liability adjustment, net of tax expense of $3 | | | – | – | – | – | 6 | 6 |
| Fuel/ interest hedge mark-to-market, net of tax expense of $38 | | | – | – | – | – | 63 | 63 |
| Total comprehensive income | | | – | 816 | – | – | 69 | 885 |
| Common stock dividends, $0.54 per share | | | – | (201) | – | – | – | (201) |
| Adjustments associated with unearned compensation, restricted stock | 781 | (54) | 22 | – | – | 3 | – | 25 |
| Exercise of stock options and related tax benefit of $7 | 3,221 | (316) | 80 | – | (9) | – | – | 71 |
| Purchase of BNSF common stock | – | (7,950) | – | – | (217) | – | – | (217) |
| Balance at December 31, 2003 | 500,685 | (129,225) | 5,771 | 6,240 | (3,340) | (36) | (140) | 8,495 |
| Comprehensive income: | | | | | | | | |
| Net income | | | – | 791 | – | – | – | 791 |
| Minimum pension liability adjustment, net of tax expense of $3 | | | – | – | – | – | 3 | 3 |
| Fuel/ interest hedge mark-to-market, net of tax expense of $83 | | | – | – | – | – | 136 | 136 |
| Total comprehensive income | | | – | 791 | – | – | 139 | 930 |
| Common stock dividends, $0.64 per share | | | – | (239) | – | – | – | (239) |
| Adjustments associated with unearned compensation, restricted stock | 1,135 | (49) | 44 | – | – | (7) | – | 37 |
| Exercise of stock options and related tax benefit of $53 | 15,455 | (746) | 489 | – | (25) | – | – | 464 |
| Purchase of BNSF common stock | – | (10,443) | – | – | (376) | – | – | (376) |
| Balance at December 31, 2004 | 517,275 | (140,463) | $ 6,304 | $ 6,792 | $ (3,741) | $ (43) | $ (1) | $ 9,311 |

See accompanying Notes to Consolidated Financial Statements.

## Notes to Consolidated Financial Statements

### 1. The Company

Burlington Northern Santa Fe Corporation (BNSF) is a holding company that conducts no operating activities and owns no significant assets other than through its interests in its subsidiaries. BNSF, its majority-owned subsidiaries, and a variable interest entity for which BNSF is the primary beneficiary (see Note 2 of the Consolidated Financial Statements below), all of which are separate legal entities (collectively, the Company), is engaged primarily in management of its investment in its principal and wholly-owned subsidiary, BNSF Railway Company (BNSF Railway). BNSF Railway operates one of the largest railroad networks in North America with approximately 32,000 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 40 percent, 23 percent, 21 percent and 16 percent, respectively, of total freight revenues for the year ended December 31, 2004.

### 2. Significant Accounting Policies

**PRINCIPLES OF CONSOLIDATION**

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

**IMPLEMENTATION OF FIN 46R**

In 2001, BNSF Railway entered into the San Jacinto Rail Limited partnership (the Partnership) with subsidiaries of three chemical manufacturing companies. The original purpose of this Partnership was to construct and BNSF to operate a 13-mile rail line, to service these and other chemical and plastics manufacturing facilities in the Houston, Texas area. BNSF Railway owns a 48 percent limited partnership interest and a one percent general partnership interest in the Partnership and acts as the general partner and operator of this facility.

The Company determined that San Jacinto Rail Limited, a previously unconsolidated subsidiary, was required to be consolidated pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46R (FIN 46R), *Consolidation of Variable Interest Entities,* on March 31, 2004, as the Partnership qualifies as a variable interest entity and the Company is the primary beneficiary. This consolidation had a minimal impact to the Consolidated Statements of Income due to the fact that the Company accounted for this investment prior to the adoption of FIN 46R under the equity method of accounting and the Partnership's losses to date have been minimal. The consolidation resulted in an increase in assets of $54 million, which includes $26 million in cash and $23 million in land and related development costs, an increase in liabilities of $55 million, including $50 million of short-term debt, and a decrease in equity of $1 million (see Note 7 of the Consolidated Financial Statements for additional information regarding the Partnership).

**CUMULATIVE EFFECT OF ACCOUNTING CHANGE, NET OF TAX**

The Company adopted Statement of Financial Accounting Standards (SFAS) No. 143, *Accounting for Asset Retirement Obligations*, on January 1, 2003. This statement requires BNSF to recognize a liability for legally obligated asset retirement costs associated with tangible long-lived assets. SFAS No. 143 also disallows the accrual of retirement costs that are not legal obligations. As a result, BNSF and other railroads were required to change their accounting policies for certain track structure assets to exclude removal costs as a component of depreciation expense where the inclusion of such costs would result in accumulated depreciation balances exceeding the historical basis of the assets. This change results in lower depreciation and amortization expense primarily offset by higher compensation and benefits, purchased services and materials and other expenses in the period in which removal costs are incurred.

The following table presents the pro forma net income and earnings per share if SFAS No. 143 would have been applied retroactively (in millions, except per share data):

| Year ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net income as reported | **$ 791** | $ 816 | $ 760 |
| Pro forma net income | **$ 791** | $ 777 | $ 749 |
| Earnings per share | | | |
| Basic – as reported | **$ 2.14** | $ 2.21 | $ 2.01 |
| Basic – pro forma | **$ 2.14** | $ 2.10 | $ 1.98 |
| Diluted – as reported | **$ 2.10** | $ 2.19 | $ 2.00 |
| Diluted – pro forma | **$ 2.10** | $ 2.09 | $ 1.97 |

**USE OF ESTIMATES**

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. Actual results could differ from those estimates.

**REVENUE RECOGNITION**

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue on a pro-rata basis based on actual or projected future customer shipments. When using projected shipments, the Company relies on historic trends as well as economic and other indicators to estimate the liability for customer incentives.

**ACCOUNTS RECEIVABLE, NET**

Accounts receivable, net includes accounts receivable reduced by an allowance for bill adjustments and uncollectible accounts. The allowance for bill adjustments and uncollectible accounts is based on historical experience as well as any known trends or uncertainties related to customer billing and account collectibility.

**CASH AND CASH EQUIVALENTS**

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

**MATERIALS AND SUPPLIES**

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

**PROPERTY AND EQUIPMENT, NET**

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. Upon normal sale or retirement of certain depreciable railroad property, cost less net salvage value is charged to accumulated depreciation and no gain or loss is recognized. The disposals of land and non-rail property as well as significant premature retirements are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures which significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**ENVIRONMENTAL LIABILITIES**

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. BNSF utilizes a third party actuary to assist the Company in estimating substantially all of its environmental liabilities. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

**PERSONAL INJURY CLAIMS**

Liabilities for personal injury claims are initially recorded when the expected loss is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. The liability and ultimate expense projections are developed with the assistance of third parties. Liabilities recorded for unasserted personal injury claims, including those related to asbestos, are based on information currently available. Estimates of liabilities for personal injury claims are undiscounted.

**INCOME TAXES**

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized.

## STOCK-BASED COMPENSATION

At December 31, 2004, the Company had stock-based employee compensation plans. The Company applies Accounting Principles Board (APB) Opinion 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for its stock based plans. In accordance with APB Opinion 25, the Company records the intrinsic value of stock based compensation as expense. Accordingly, no compensation expense has been recognized for its fixed stock option plans as the exercise price equals the stock price on the date of grant. Stock-based compensation expense related to restricted stock has been recognized as compensation expense. The table below illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation (in millions, except per share data):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net income, as reported | **$ 791** | $ 816 | $ 760 |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | **19** | 11 | 10 |
| Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | **(41)** | (36) | (32) |
| Pro forma net income | **$ 769** | $ 791 | $ 738 |
| Earnings per share: | | | |
| Basic – as reported | **$ 2.14** | $ 2.21 | $ 2.01 |
| Basic – pro forma | **$ 2.08** | $ 2.14 | $ 1.95 |
| Diluted – as reported | **$ 2.10** | $ 2.19 | $ 2.00 |
| Diluted – pro forma | **$ 2.04** | $ 2.13 | $ 1.94 |

The pro forma amounts were estimated using the Black-Scholes option-pricing model with the following assumptions:

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Weighted average expected life (years) | **3.9** | 4.0 | 4.0 |
| Weighted average expected volatility | **26.1%** | 35.0% | 35.0% |
| Weighted average dividend per share | **$0.61** | $0.49 | $0.48 |
| Weighted average risk free interest rate | **3.45%** | 2.17% | 3.89% |
| Weighted average fair value of options granted per share | **$7.03** | $7.20 | $7.84 |

See Note 16 of the Consolidated Financial Statements for additional information regarding developments related to SFAS 123 and SFAS 123R.

## PENSION AND OTHER POST-EMPLOYMENT BENEFITS

BNSF uses a third party actuary to assist the Company in estimating liabilities and expenses for pensions and OPEB. Estimated amounts are based on historical information, current information and estimates regarding future events and circumstances. Significant assumptions used in the valuation of pension and/or OPEB liabilities include the expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

## RECLASSIFICATIONS

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income and net income.

### 3. Hedging Activities

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

#### FUEL

Fuel costs represented 14 percent of total operating expenses during 2004 and 2003 and 12 percent of total operating expenses during 2002. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The fuel-hedging program includes the use of derivatives that are accounted for as cash flow hedges. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2004 and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $13 million of additional fuel expense on an annual basis.

##### TOTAL FUEL HEDGING PROGRAM

As of December 31, 2004, BNSF's total fuel hedging program covered approximately 52 percent, 27 percent and 3 percent of estimated fuel purchases for 2005, 2006 and 2007, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel hedge transactions were as follows (in millions):

| **Year Ended December 31,** | **2004** | **2003** | **2002** |
|---|---|---|---|
| Hedge benefit | **$ 337** | $ 65 | $ 50 |
| Ineffective portion of unexpired hedges | **1** | 3 | – |
| Tax effect | **(130)** | (26) | (19) |
| Hedge benefit, net of tax | **$ 208** | $ 42 | $ 31 |

The amounts recorded in the Consolidated Balance Sheets for fuel hedge transactions were as follows (in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| Short-term fuel hedging asset | **$ 264** | $ 102 |
| Long-term fuel hedging asset | **105** | 43 |
| Ineffective portion of unexpired hedges | **(4)** | (3) |
| Tax effect | **(140)** | (55) |
| Amount included in AOCI, net of tax | **$ 225** | $ 87 |
| Settled fuel hedging contracts receivable | **$ 131** | $ 21 |

Amounts recorded in AOCI represent the fair value less the ineffective portion of unexpired hedges.

BNSF measures the fair value of hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties.

***NYMEX #2 HEATING OIL HEDGES***

As of December 31, 2004, BNSF had entered into fuel swap and costless collar agreements utilizing NYMEX #2 heating oil (HO). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur between the prices of HO and the purchase price of BNSF's diesel fuel. The sum of all such costs typically ranges between 7 and 17 cents per gallon.

During 2004, the Company entered into fuel swap agreements utilizing HO to hedge the equivalent of 85 million gallons of fuel at an average price of approximately $0.95 per gallon and costless collar agreements utilizing HO to hedge the equivalent of approximately 170 million gallons of fuel with an average cap price of $0.94 per gallon and an average floor price of $0.87 per gallon. The following table provides fuel hedge data based upon the quarter being hedged for all HO fuel hedges outstanding at December 31, 2004.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2005** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **HO Swaps** | | | | | |
| Gallons hedged (in millions) | 9.45 | 25.20 | 18.90 | 15.75 | 69.30 |
| Average swap price (per gallon) | $ 1.00 | $ 0.92 | $ 0.91 | $ 0.93 | $ 0.93 |
| Fair value (in millions) | $ 2 | $ 5 | $ 4 | $ 4 | $ 15 |
| **HO Collars** | | | | | |
| Gallons hedged (in millions) | – | 6.30 | 12.60 | 22.05 | 40.95 |
| Average cap price (per gallon) | $ – | $ 0.97 | $ 0.96 | $ 0.98 | $ 0.97 |
| Average floor price (per gallon) | $ – | $ 0.89 | $ 0.88 | $ 0.90 | $ 0.89 |
| Fair value (in millions) | $ – | $ 1 | $ 3 | $ 4 | $ 8 |

| 2006 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **HO Collars** | | | | | |
| Gallons hedged (in millions) | 15.75 | 22.05 | 28.35 | 31.50 | 97.65 |
| Average cap price (per gallon) | $ 0.97 | $ 0.92 | $ 0.91 | $ 0.94 | $ 0.93 |
| Average floor price (per gallon) | $ 0.90 | $ 0.84 | $ 0.84 | $ 0.87 | $ 0.86 |
| Fair value (in millions) | $ 3 | $ 4 | $ 5 | $ 5 | $ 17 |

| 2007 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **HO Collars** | | | | | |
| Gallons hedged (in millions) | 31.50 | – | – | – | 31.50 |
| Average cap price (per gallon) | $ 0.93 | $ – | $ – | $ – | $ 0.93 |
| Average floor price (per gallon) | $ 0.86 | $ – | $ – | $ – | $ 0.86 |
| Fair value (in millions) | $ 6 | $ – | $ – | $ – | $ 6 |

***WEST TEXAS INTERMEDIATE CRUDE OIL HEDGES***

In addition, BNSF enters into fuel swap and costless collar agreements utilizing WTI. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. The sum of all such costs typically ranges between 12 and 32 cents per gallon.

During 2004, the Company entered into costless collar agreements utilizing WTI to hedge the equivalent of approximately 154 million gallons of fuel with an average cap price of $32.61 per barrel and an average floor price of $28.31 per barrel. The following tables provide fuel hedge data based upon the quarter being hedged for all WTI fuel hedges outstanding at December 31, 2004.

| 2005 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 600 | 675 | 1,125 | 1,350 | 3,750 |
| Equivalent gallons hedged (in millions) | 25.20 | 28.35 | 47.25 | 56.70 | 157.50 |
| Average swap price (per barrel) | $ 24.26 | $ 24.67 | $ 24.55 | $ 24.54 | $ 24.52 |
| Fair value (in millions) | $ 12 | $ 12 | $ 20 | $ 22 | $ 66 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 3,750 | 3,225 | 2,325 | 1,650 | 10,950 |
| Equivalent gallons hedged (in millions) | 157.50 | 135.45 | 97.65 | 69.30 | 459.90 |
| Average cap price (per barrel) | $ 26.73 | $ 26.47 | $ 26.66 | $ 27.11 | $ 26.69 |
| Average floor price (per barrel) | $ 22.13 | $ 21.89 | $ 22.07 | $ 22.57 | $ 22.11 |
| Fair value (in millions) | $ 62 | $ 53 | $ 36 | $ 24 | $ 175 |

| 2006 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 1,350 | 675 | 375 | – | 2,400 |
| Equivalent gallons hedged (in millions) | 56.70 | 28.35 | 15.75 | – | 100.80 |
| Average swap price (per barrel) | $ 24.43 | $ 25.16 | $ 25.69 | $ – | $ 24.83 |
| Fair value (in millions) | $ 21 | $ 10 | $ 5 | $ – | $ 36 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 1,500 | 1,500 | 825 | 525 | 4,350 |
| Equivalent gallons hedged (in millions) | 63.00 | 63.00 | 34.65 | 22.05 | 182.70 |
| Average cap price (per barrel) | $ 30.05 | $ 30.20 | $ 30.81 | $ 31.93 | $ 30.47 |
| Average floor price (per barrel) | $ 25.66 | $ 25.79 | $ 26.32 | $ 27.42 | $ 26.04 |
| Fair value (in millions) | $ 17 | $ 16 | $ 8 | $ 4 | $ 45 |

| 2007 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 150 | – | – | – | 150 |
| Equivalent gallons hedged (in millions) | 6.30 | – | – | – | 6.30 |
| Average cap price (per barrel) | $ 33.00 | $ – | $ – | $ – | $ 33.00 |
| Average floor price (per barrel) | $ 29.00 | $ – | $ – | $ – | $ 29.00 |
| Fair value (in millions) | $ 1 | $ – | $ – | $ – | $ 1 |

***NYMEX #2 HEATING OIL REFINING SPREAD HEDGES***

In addition, BNSF has entered into fuel swap agreements utilizing the HO refining spread (HO-WTI). HO-WTI is the difference in price between HO and WTI; therefore a HO-WTI swap in combination with a WTI swap is equivalent to a HO swap. As of December 31, 2003, the Company was utilizing HO-WTI fuel hedges. However, the Company did not enter into any additional HO-WTI swaps during 2004 and there were no HO-WTI fuel hedges outstanding as of December 31, 2004.

***SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION***

The following table provides summarized comparative information for hedge transactions as of December 31, 2003.

| | December 31, 2003 | | |
|---|---|---|---|
| **Year ending,** | **2004** | **2005** | **2006** |
| **HO Swaps** | | | |
| Gallons hedged (in millions) | 696.15 | – | – |
| Average swap price (per gallon) | $ 0.71 | $ – | $ – |
| Fair value (in millions) | $ 79 | $ – | $ – |
| **WTI Swaps** | | | |
| Barrels hedged (in thousands) | 2,250 | 3,750 | 2,400 |
| Equivalent gallons hedged (in millions) | 94.50 | 157.50 | 100.8 |
| Weighted average swap price | $ 20.85 | $ 24.52 | $ 24.83 |
| Fair value (in millions) | $ 21 | $ 10 | $ 4 |
| **WTI Collars** | | | |
| Barrels hedged (in thousands) | 975 | 9,900 | 1,875 |
| Equivalent gallons hedged (in millions) | 40.95 | 415.8 | 78.75 |
| Weighted average cap price | $ 28.52 | $ 26.06 | $ 27.69 |
| Weighted average floor price | $ 24.10 | $ 21.46 | $ 23.06 |
| Fair value (in millions) | $ 2 | $ 27 | $ 2 |
| **HO-WTI Swaps** | | | |
| Barrels hedged (in thousands) | 2,250 | – | – |
| Equivalent gallons hedged (in millions) | 94.50 | – | – |
| Average swap price (per barrel) | $ 4.16 | $ – | $ – |
| Fair value (in millions) | $ – | $ – | $ – |

## INTEREST RATE

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

### TOTAL INTEREST RATE HEDGING PROGRAM

All interest rate hedging transactions outstanding with an interest rate component are reflected in the tables below.

| | December 31, 2004 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | **2005** | **2006** | **2007** | **2008** | **2009** | **Thereafter** | **Total** | **Fair Value** |
| **Fair value hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 300 | – | $ 300 | – | $ 200 | $ 250 | $ 1,050 | $ 35 |
| Average fixed rate | 6.38% | – | 7.88% | – | 6.13% | 7.13% | 6.93% | |
| Average floating rate | 3.95% | – | 4.67% | – | 2.97% | 5.36% | 4.31% | |

BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

***SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION***

| | December 31, 2003 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total | Fair Value |
| **Fair value hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 100 | $ 300 | — | $ 300 | — | $ 200 | $ 900 | $ 65 |
| Average fixed rate | 8.63% | 6.38% | — | 7.88% | — | 6.13% | 7.07% | |
| Average floating rate | 5.44% | 2.63% | — | 3.75% | — | 1.65% | 3.10% | |

***FAIR VALUE INTEREST RATE HEDGES***

The Company enters into interest rate swaps to convert fixed-rate debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of December 31, 2004 and 2003, BNSF had thirteen and nine separate swaps outstanding, respectively, on a notional amount of $1,050 million and $900 million, respectively, in which it pays an average floating rate, which fluctuates quarterly, based on London Interbank Offered Rate (LIBOR). The average floating rate to be paid by BNSF as of December 31, 2004, was 4.31 percent and the average fixed rate BNSF is to receive is 6.93 percent. These swaps will expire between 2005 and 2010.

The amounts recorded in the Consolidated Statements of Income, as a reduction of interest expense, for interest rate fair value hedge transactions were as follows (in millions):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Hedge benefit | **$ 36** | $ 35 | $ 26 |
| Tax effect | **(14)** | (13) | (10) |
| Hedge benefit, net of tax | **$ 22** | $ 22 | $ 16 |

The amounts recorded on the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of unexpired hedges, with a corresponding increase to debt or accrued interest, were as follows (in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| Short-term interest rate hedging asset | **$ 10** | $ 9 |
| Long-term interest rate hedging asset | **$ 25** | $ 56 |

***CASH FLOW INTEREST RATE HEDGES***

The Company uses interest rate swaps to fix the LIBOR component of commercial paper. These swaps are accounted for as cash flow hedges under SFAS No. 133 and qualify for the short cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of December 31, 2004 and 2003, BNSF had no interest rate swaps outstanding to fix the LIBOR component of commercial paper, but had interest rate swaps outstanding for a notional amount of $100 million at December 31, 2002 which expired in 2003. The Company recorded a Hedge loss of $1 million, net of a tax benefit of $1 million for the year ended December 31, 2002 related to this interest rate swap.

In anticipation of a future debt issuance, BNSF entered into three treasury lock transactions in August 2004, with a notional amount of $250 million to fix the treasury component on a future 10-year debt issuance. The weighted-average locked-in rate was 4.41 percent. The treasury locks were closed in November 2004 in connection with the issuance of $250 million of 4.88 percent notes due January 15, 2015. BNSF paid the counterparties $3.6 million on November 22, 2004, and this payment will be amortized over the life of the related notes.

In 2002, BNSF entered into three treasury lock transactions totaling $150 million to fix the treasury component on a future 10-year debt issuance. The average locked-in rate was 4.38 percent. These treasury locks were closed in May 2003 in connection with the issuance of $250 million of 4.30 percent notes due July 1, 2013. BNSF paid the counterparties $10 million on the closing date and this payment will be amortized over the life of the related notes.

## 4. Other Expense, Net

Other expense, net includes the following (in millions):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Accounts receivable sale fees | **$ 10** | $ 9 | $ 12 |
| Loss from participation in synthetic fuel partnership | **3** | – | – |
| Miscellaneous, net | **(9)** | 5 | – |
| Total | **$ 4** | $ 14 | $ 12 |

During the fourth quarter of 2004, BNSF indirectly purchased a 4.17 percent ownership of a synthetic fuel partnership through a 50 percent interest in a limited liability company with an unrelated entity. The synthetic fuel partnership generates Section 29 synthetic fuel tax credits which reduce the Company's effective tax rate (see Note 5 of the Consolidated Financial Statements for additional information). In 2004 BNSF received a tax benefit from its participation in the partnership of approximately $3.5 million related to the fuel tax credits and the deduction of partnership operating losses. The Company recorded approximately $3 million of other expense, net related to the Company's share of the partnership's losses under the equity method of accounting. The partnership does not qualify for consolidation under FIN 46R, as BNSF is not the primary beneficiary of the partnership. The Company's maximum future exposure to loss related to the activities of the synthetic fuel partnership is based upon the actual synthetic fuel produced by the partnership and is estimated to equal $36 million. However, the Company believes that any losses will be more than offset by the synthetic fuel tax credits.

## 5. Income Taxes

Income tax expense (benefit) was as follows (in millions):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Current: | | | |
| Federal | **$ 212** | $ (12) | $ 21 |
| State | **33** | 6 | 3 |
| Total current | **$ 245** | $ (6) | $ 24 |
| Deferred: | | | |
| Federal | **$ 211** | $ 408 | $ 378 |
| State | **26** | 52 | 54 |
| Total deferred | **$ 237** | $ 460 | $ 432 |
| Total | **$ 482** | $ 454 | $ 456 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Federal statutory income tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | **3.0** | 3.0 | 3.1 |
| Tax settlement | **–** | (1.0) | – |
| Synthetic fuel credits | **(0.2)** | – | – |
| Other, net | **0.1** | (0.1) | (0.6) |
| Effective tax rate | **37.9%** | 36.9% | 37.5% |

The lower effective tax rate in 2003 primarily reflects a tax settlement attributable to prior years that was settled favorably in 2003.

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | **$ (8,222)** | $ (7,806) |
| Hedging | **(139)** | (56) |
| Other | **(210)** | (190) |
| Total deferred tax liabilities | **(8,571)** | (8,052) |
| Deferred tax assets: | | |
| Casualty and environmental | **387** | 215 |
| Employee separation costs | **58** | 67 |
| Compensation and Benefits | **123** | 93 |
| Pension and post-retirement benefits | **227** | 233 |
| Other | **264** | 255 |
| Total deferred tax assets | **1,059** | 863 |
| Net deferred tax liability | **$ (7,512)** | $ (7,189) |
| Non-current deferred income tax liability | **$ (7,820)** | $ (7,481) |
| Current deferred income tax asset | **308** | 292 |
| Net deferred tax liability | **$ (7,512)** | $ (7,189) |

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 1995, respectively. Internal Revenue Service examination of the years 1995 through 1999 for BNSF is completed and protests of the unagreed issues have been filed with IRS Appeals. BNSF is currently under examination for years 2000 through 2002. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2004.

**6. Accounts Receivable, net**

BNSF Railway transfers most of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust, and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

SFRC renewed $350 million of its $700 million accounts receivable facility, effective June 2004, for an additional 364 days. In addition, SFRC entered into a separate $350 million accounts receivable facility with a five year term in June 2003. As a result of amendments to the facilities, the commitments of the investors are currently scheduled to expire in October 2005 and October 2008, respectively. The Company's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2004. Outstanding undivided interests held by investors under the A/R sales program were $650 million and $625 million at December 31, 2004 and 2003, respectively. These receivables were derecognized by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. The undivided interests were supported by $894 million and $808 million of receivables transferred by SFRC to the master trust at December 31, 2004 and December 31, 2003, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold. This retained interest is included in accounts receivable in the Company's financial statements. SFRC's retained interest in these receivables of $244 million and $183 million at December 31, 2004 and 2003, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivable transferred by SFRC to the master trust less $650 million and $625 million, at December 31, 2004 and 2003, respectively, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value and there was no gain or loss from the transaction.

The Company retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $11.6 billion, $9.8 billion and $9.5 billion in 2004, 2003 and 2002, respectively. No servicing asset or liability has been recorded because the fees the Company receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $10 million, $9 million and $12 million, for the years ended December 31, 2004, 2003 and 2002, respectively. These costs fluctuate monthly with changes in prevailing interest rates, and were based on weighted average interest rates of 1.4 percent, 1.1 percent and 2.0 percent for the years ended December 31, 2004, 2003 and 2002, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs, and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. BNSF Railway has historically experienced very low levels of default or dilution. If dilution or delinquency percentages were to increase by one percentage point, the value of BNSF Railway's retained interest would increase by approximately $8 million.

Receivables funded under the A/R sales program may not include, among other things, amounts over 90 days past due or concentrations over certain limits with any one customer. At December 31, 2004 and December 31, 2003, $77 million and $78 million, respectively, of accounts receivable were greater than 90 days old. The Company maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At December 31, 2004 and December 31, 2003, $59 million and $85 million, respectively, of such allowances had been recorded of which $52 million and $77 million, respectively, had been recorded as a reduction to accounts receivable, net. Additionally, at December 31, 2004 and December 31, 2003, approximately $7 million and $8 million, respectively, had been recorded as an allowance for bill adjustments and uncollectible accounts in accounts payable and other current liabilities because they relate to the $650 million and $625 million of outstanding undivided interests held by investors at December 31, 2004 and 2003, respectively. During the years ended December 31, 2004 and 2003, $8 million and $7 million, respectively, of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2004, BNSF Railway was in compliance with these provisions.

**7. Property and Equipment, Net**

Property and equipment, net (in millions), and the weighted average annual depreciation rates (%) were as follows:

| December 31, | 2004 | 2003 | 2004 Depreciation Rates |
|---|---|---|---|
| Land | **$ 1,554** | $ 1,519 | –% |
| Track structure | **14,427** | 13,818 | 3.4 |
| Other roadway | **10,670** | 10,199 | 2.5 |
| Locomotives | **3,492** | 3,468 | 4.9 |
| Freight cars and other equipment | **1,807** | 1,757 | 4.8 |
| Computer hardware and software | **382** | 313 | 11.8 |
| Total cost | **32,332** | 31,074 | |
| Less accumulated depreciation and amortization | **(6,518)** | (6,006) | |
| Property and equipment, net | **$ 25,814** | $ 25,068 | |

The Consolidated Balance Sheets at December 31, 2004 and 2003, included $978 million, net of $332 million of amortization, and $940 million, net of $281 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

The Company capitalized $10 million, $9 million, and $13 million of interest for the years ended December 31, 2004, 2003, and 2002, respectively.

**SAN JACINTO RAIL PARTNERSHIP**

As described in Note 2 of the Consolidated Financial Statements, the original purpose of the San Jacinto Limited Partnership was to construct and BNSF to operate a 13-mile rail line to service several chemical and plastics manufacturing facilities in the Houston, Texas area. In the fourth quarter of 2004, BNSF reached an agreement with another carrier for an alternative means of access to the facilities by using the other railroad's existing line. As consideration for the trackage rights and alternative access rights, BNSF agreed to compensate the other railroad, in lieu of rent, by a combination of cash and waiver of certain payment obligations of the other carrier for future payments related to prospective capital projects to be performed on jointly-operated facilities of BNSF and the other carrier. In January 2005, upon implementation of the terms of this agreement, the Company recorded an intangible asset of $92 million for the trackage rights, amortization of which is estimated to be approximately $3 million per year. In February 2005, the Surface Transportation Board announced its approval of the alternative access by means of trackage rights over the other carrier's existing lines.

The current fair market value of San Jacinto's assets, including land, is approximately $4 million, determined based on comparable sales and existing property listing information on other properties located near the subject properties. As a result of a plan to sell these assets in 2005, the Company recorded a pre-tax impairment charge of $24 million in materials and other expense which reduced net income by $15 million, or $0.04 per share for 2004. Additionally, the short-term debt that was recorded upon consolidation was repaid during the fourth quarter.

## 8. Accounts Payable and Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| Compensation and benefits payable | **$ 545** | $ 448 |
| Casualty and environmental liabilities | **248** | 250 |
| Accounts payable | **234** | 222 |
| Property tax liabilities | **134** | 132 |
| Income tax liabilities | **79** | 3 |
| Customer incentives | **141** | 107 |
| Rents and leases | **161** | 121 |
| Equipment purchases | **6** | 114 |
| Accrued interest | **99** | 111 |
| Employee separation costs | **30** | 35 |
| Other | **574** | 567 |
| Total | **$ 2,251** | $ 2,110 |

## 9. Debt

Debt outstanding was as follows (in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| Notes and debentures, weighted average rate of 6.2 percent, due 2005 to 2097 | **$ 4,909** | $ 4,790 |
| Equipment obligations, weighted average rate of 7.0 percent, due 2005 to 2016 | **476** | 537 |
| Capitalized lease obligations, weighted average rate of 7.5 percent, due 2005 to 2023 | **632** | 612 |
| Mortgage bonds, weighted average rate of 8.3 percent, due 2006 to 2047 | **388** | 391 |
| Financing obligations, weighted average rate of 6.3 percent, due 2012 to 2028 | **153** | 153 |
| Commercial paper | **–** | 242 |
| Unamortized discount and other, net | **(42)** | (41) |
| Total | **6,516** | 6,684 |
| Less current portion of long-term debt | **(465)** | (244) |
| Long-term debt | **$ 6,051** | $ 6,440 |

Notes and debentures include increases related to fair value adjustments for hedges of $31 million and $59 million at December 31, 2004 and 2003, respectively.

Certain BNSF Railway properties and other assets are subject to liens securing $388 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and capital leases.

The following tables provide fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2004. The fair values presented in the tables do not include the fair value of the swaps and treasury locks.

| | December 31, 2004 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | | |
| | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total including capital leases | Total excluding capital leases | Fair value excluding capital leases |
| Fixed-rate debt (in millions) | $ 160 | $ 448 | $ 151 | $ 150 | $ 123 | $ 4,404 | $ 5,436 | $ 4,804 | $ 5,455 |
| Average interest rate | 7.8% | 8.7% | 8.0% | 7.8% | 7.5% | 6.7% | 7.0% | | |
| Variable-rate debt (in millions) | $ 305 | $ – | $ 311 | $ – | $ 214 | $ 250 | $ 1,080 | $ 1,080 | $ 1,173 |
| Average interest rate | 4.5% | – | 6.0% | – | 4.3% | 7.0% | 5.5% | | |

| | December 31, 2003 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | | |
| | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total including capital leases | Total excluding capital leases | Fair value excluding capital leases |
| Fixed-rate debt (in millions) | $ 142 | $ 146 | $ 432 | $ 135 | $ 135 | $ 4,493 | $ 5,483 | $ 4,871 | $ 5,380 |
| Average interest rate | 7.1% | 7.1% | 8.4% | 6.9% | 6.9% | 6.8% | 7.0% | | |
| Variable-rate debt (in millions) | $ 102 | $ 316 | $ – | $ 322 | $ 242 | $ 219 | $ 1,201 | $ 1,201 | $ 1,276 |
| Average interest rate | 5.6% | 3.6% | – | 5.5% | 3.5% | 4.3% | 4.4% | | |

In the two tables above, maturities in 2008 exclude $200 million of 7.29 percent debentures which mature in 2036 but are redeemable in 2008 at the option of the debt holders. In addition, maturities in 2008 in the 2003 table above include $242 million of commercial paper.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. Capital leases have been excluded from the calculation of fair value for both 2003 and 2004. The carrying amount of commercial paper and bank debt approximates fair value because of the short maturity of these instruments.

## NOTES AND DEBENTURES

**2004**

The Company issued $250 million of 4.88 percent notes due January 15, 2015. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

BNSF had $500 million of debt capacity available under its shelf registration at December 31, 2004.

**2003**

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023 at a price of 103.02 percent of par. Commercial paper was used to fund the call.

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

**2002**

BNSF issued $300 million of 5.90 percent notes due July 1, 2012. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

**MORTGAGE BONDS**

**2003**

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

**COMMERCIAL PAPER**

BNSF issues commercial paper from time to time that is supported by bank revolving credit agreements. At December 31, 2004, there were no bank borrowings against the revolving credit agreements. Outstanding commercial paper balances are considered as reducing the amount of borrowings available under these agreements. In June 2004, the Company extended the expiration date of the Company's $700 million short-term facility to June 2005. The Company has the ability to have any amounts then outstanding mature as late as June 2006. The Company also has a long-term facility in the amount of $500 million which expires in June 2008. In total, the bank revolving credit agreements allow borrowings of up to $1.2 billion at December 31, 2004. Annual facility fees are currently 0.100 percent and 0.150 percent for the short-term and long-term facilities, respectively. Both rates are subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon: (i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, (ii) money market rates offered at the option of the lenders, or (iii) an alternate base rate. The Company classifies commercial paper as long-term to the extent of its borrowing capacity under these facilities. BNSF must maintain compliance with certain financial covenants under its revolving credit agreements. At December 31, 2004, the Company was in compliance.

Commercial paper outstanding as of December 31, 2004, is issued to a consolidated subsidiary of BNSF and is eliminated upon consolidation. However, the maturity value of commercial paper as of December 31, 2004, of $311 million, reduces the total capacity available under the revolving credit agreements to approximately $889 million.

**FINANCING OBLIGATIONS**

**2002**

The Company constructed an intermodal facility built by a third party real estate developer and entered into an agreement to lease the intermodal facility for 20 years from a third party lessor. Under accounting guidance, the Company was considered the owner of the facility during the construction period. The transaction was evaluated and it was determined that sale-leaseback accounting did not apply due to the existence of a purchase option. Accordingly, the transaction was treated as a financing for which the Company recorded an asset in property and equipment, net and a liability in long-term debt and commercial paper of $138 million that represented the fair market value at lease inception.

## GUARANTEES

Debt and other obligations of non-consolidated entities guaranteed by the Company as of December 31, 2004 are as follows (dollars in millions):

| | Guarantees | | | | | |
|---|---|---|---|---|---|---|
| | BNSF Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount [a] | Remaining Term (in years) | Capitalized Obligations [b] |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $ 190 | $ 190 | $ – | Termination of Ownership | – |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 65 | $ 104 | $ 104 | 14 | $ 37 |
| Westside Intermodal Transportation Corporation | 0.0% | $ 45 | $ 73 | $ – | 19 | $ 39 |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 14 | $ 23 | $ – | 19 | $ 12 |
| Various lessors (Residual value guarantees) | 0.0% | N/A | $ 298 | $ 298 | Various | $ – |
| All other | 0.0% | $ 10 | $ 11 | $ 5 | Various | $ – |

a Reflects the maximum amount the Company could recover from a third party other than the counterparty.

b Reflects capitalized obligations that are recorded on the Company's Consolidated Balance Sheets.

#### KINDER MORGAN ENERGY PARTNERS, L.P.

Santa Fe Pacific Pipelines, Inc (SFPP), an indirect, wholly-owned subsidiary of BNSF, has a guarantee in connection with its remaining special limited partnership interest in SFPP, L.P. All obligations with respect to the guarantee will cease upon termination of ownership rights which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP, L.P.

#### KANSAS CITY TERMINAL INTERMODAL TRANSPORTATION CORPORATION

BNSF Railway and another major railroad jointly and severally guarantee $65 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF has a 25 percent ownership in KCTRC and accounts for its interest using the equity method of accounting.

#### WESTSIDE INTERMODAL TRANSPORTATION CORPORATION AND THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS

BNSF Railway has guaranteed $59 million of debt, the proceeds of which were used to finance construction of a bridge that connects BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge is operated by KCTRC.

#### RESIDUAL VALUE GUARANTEES (RVG)

In the normal course of business, the Company enters into leases in which it guarantees the residual value of certain leased equipment. Some of these leases have renewal or purchase options, or both, that the Company may exercise at the end of the lease term. If the Company elects not to exercise these options it may be required to pay the lessor an amount not exceeding the RVG. The amount of any payment is contingent upon the actual residual value of the leased equipment. Some of these leases also require the lessor to pay the Company any surplus in the actual residual value of the leased equipment over the RVG. These guarantees will expire between 2005 and 2011.

The maximum future payments, as disclosed in the table above, represent the undiscounted maximum amount that BNSF could be required to pay in the event the Company did not exercise its renewal option and the fair market value of the equipment was zero. BNSF does not anticipate such a large reduction in the fair market value of the leased equipment. As of December 31, 2004, the Company has recorded a $68 million asset and corresponding liability for the fair value of the RVGs. This amount includes a $21 million asset and corresponding liability related to locomotives financed during the fourth quarter of 2004.

**ALL OTHER**

As of December 31, 2004, BNSF Railway guarantees $10 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $5 million of the $10 million of guarantees. These guarantees expire between 2005 and 2014.

Other than as discussed above, there is no collateral held by a third party which the Company could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than as discussed above, none of the guarantees are recorded in the Consolidated Financial Statements of the Company. The Company does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

**INDEMNITIES**

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether events which would trigger the indemnification obligations would ever occur, the Company does not believe that these indemnity agreements will have a material adverse effect on the Company's results of operations, financial position or liquidity. Additionally, the Company believes that due to lack of historical payment experience, the fair value of indemnities cannot be estimated with any amount of certainty and that the fair value of any such amount would be immaterial to the financial statements. Accordingly, no fair value liability related to indemnities has been recorded in the financial statements.

## 10. Commitments and Contingencies

### LEASE COMMITMENTS

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments (which reflect leases having non-cancelable lease terms in excess of one year) as of December 31, 2004, are summarized as follows (in millions):

| December 31, | Capital Leases | Operating Leases |
|---|---|---|
| 2005 | $ 134 | $ 492 |
| 2006 | 133 | 454 |
| 2007 | 120 | 407 |
| 2008 | 109 | 398 |
| 2009 | 82 | 381 |
| Thereafter | 199 | 3,280 |
| Total | 777 | $ 5,412 |
| Less amount representing interest | (145) | |
| Present value of minimum lease payments | $ 632 | |

Lease rental expense for all operating leases was $496 million, $462 million and $448 million for the years ended December 31, 2004, 2003 and 2002, respectively. Contingent rentals and sublease rentals were not significant.

### OTHER COMMITMENTS

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

### PERSONAL INJURY AND ENVIRONMENTAL COSTS

#### CHARGE FOR ASBESTOS AND ENVIRONMENTAL COSTS

During 2004, BNSF recorded a $465 million pre-tax charge to reflect changes in its estimate of unasserted asbestos liabilities and environmental liabilities. Of this amount, $293 million and $172 million were related to asbestos and environmental liabilities, respectively. The $465 million pre-tax charge was recorded in materials and other expense and reduced net income by $288 million, or $0.77 per share during 2004.

#### *PERSONAL INJURY*

Personal injury claims, including employee work-related injuries, asbestos claims and third party injuries, are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards, and the average costs to settle projected claims, actual costs may differ from amounts recorded.

***ASBESTOS***

The Company is party to a number of personal injury claims by employees who worked around asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967, until it was substantially eliminated by 1985.

Prior to 2000, claim filings against the Company for asbestos were not numerous and were sporadic. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. The Company believed, however, that the low end of the range of reasonably possible loss, as that term is used in FASB Interpretation No. 14 (FIN 14), *Reasonable Estimation of the Amount of a Loss,* was immaterial. Subsequent to this period, claim filings increased and when they continued into 2004, the Company concluded that the low end of the range of reasonably possible loss would be material and that an estimate for unasserted asbestos exposure liability needed to be recorded. BNSF then engaged a third party with extensive experience in performing asbestos studies to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated unasserted asbestos claims and the estimated average cost per claim. The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of unasserted claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data. Based on the assessment, the Company recorded an undiscounted $293 million pre-tax charge for unasserted asbestos claims. The $293 million pre-tax charge was recorded in materials and other expense and reduced net income by $182 million, or $0.49 per share, for the year ended December 31, 2004.

BNSF anticipates obtaining annual updates of the study. On a quarterly basis, BNSF will monitor actual experience against the number of forecasted claims to be received and expected claim payments. Adjustments to the Company's estimates will be recorded quarterly if necessary. More periodic updates to the study will occur if trends necessitate a change.

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Beginning balance | **$ 60** | $ 55 | $ 41 |
| Accruals | **308** | 25 | 31 |
| Payments | **(23)** | (20) | (17) |
| Ending balance at December 31, | **$ 345** | $ 60 | $ 55 |

Of the December 31, 2004, obligation, $292 million is related to unasserted claims while $53 million is related to asserted claims. At both December 31, 2004 and 2003, $18 million is included in current liabilities. The recorded liability was not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding only asserted asbestos claims filed against BNSF:

| | 2004 | 2003 |
|---|---|---|
| Claims unresolved at January 1, | **1,985** | 1,719 |
| Claims filed | **712** | 1,023 |
| Claims settled, dismissed or otherwise resolved | **(771)** | (757) |
| Claims unresolved at December 31, | **1,926** | 1,985 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985) which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 50, 70, and 90 percent of the future unasserted asbestos claims will be incurred within the next 10, 15, and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $250 million to $450 million. However, BNSF believes that the $345 million recorded is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER PERSONAL INJURY***

BNSF uses a third party actuary to assist the Company in estimating its other personal injury liability claims and expense. These estimates are based on the covered population, activity levels and trends in frequency, and the costs of covered injuries. These actuarial estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FASB Interpretation No. 14 (FIN 14), *Reasonable Estimation of the Amount of a Loss,* is immaterial.

BNSF obtains quarterly actuarial updates for other personal injury liabilities and monitors actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Beginning balance | **$ 453** | $ 441 | $ 417 |
| Accruals | **194** | 190 | 197 |
| Payments | **(188)** | (178) | (173) |
| Ending balance at December 31, | **$ 459** | $ 453 | $ 441 |

At December 31, 2004 and 2003, $170 million and $182 million were included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding personal injury claims, other than asbestos, filed against BNSF:

| | 2004 | 2003 |
|---|---|---|
| Claims unresolved at January 1, | **4,393** | 4,669 |
| Claims filed | **3,632** | 3,779 |
| Claims settled, dismissed or otherwise resolved | **(3,909)** | (4,055) |
| Claims unresolved at December 31, | **4,116** | 4,393 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $400 million to $550 million. However, BNSF believes that the $459 million recorded is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***BNSF INSURANCE COMPANY***

The Company has a consolidated, wholly owned subsidiary, Burlington Northern Santa Fe Insurance Company LTD. (BNSF IC) that provides insurance coverage for certain risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims incurred after January 1, 2002, and certain other claims which are subject to reinsurance. During the first quarter of 2004, BNSF IC entered into a reinsurance pooling agreement with several other companies. The pool insures workers compensation, general liability, auto liability, and FELA risk. In accordance with the agreement, BNSF IC cedes a portion of its FELA exposure to the pool and assumes a proportionate share of the entire pool's risk. The pooling agreement is subject to annual renewal. At December 31, 2004, BNSF IC had invested in commercial paper issued by BNSF and third party time deposits and money market accounts.

***ENVIRONMENTAL***

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated loss can be made. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

During the first half of 2004, the Company experienced a significant increase in expense relating to environmental remediation developments at known sites for which the majority of the contamination occurred decades ago. Because of these and other developments in recent periods, the Company performed an assessment to determine if it was feasible to better estimate developments at its known sites. The Company determined that a third party actuary had proprietary data that included information from the EPA and other governmental agencies as well as information accumulated from public sources and work performed for other clients. Because of its determination that a better estimate of future developments could be made with this data, BNSF engaged this third party actuary, which has extensive background in performing various studies for large companies, including environmental matters, to assist BNSF in determining its potential future environmental exposure at known sites. As a result of this study, the Company revised its estimate of its probable environmental losses and its accrued liabilities. Consequently, during 2004, BNSF recorded an undiscounted $172 million pre-tax charge related to its change in estimated environmental liabilities on a site by site basis. The $172 million pre-tax charge was recorded in materials and other expense and reduced net income by $106 million, or $0.28 per share, for 2004. The charge does not include (i) contaminated sites of which the Company is not aware, and (ii) additional amounts for third party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites. BNSF continues to estimate third party claims on a site by site basis when the liability for such claims is probable and a reasonable estimate of associated loss can be made. BNSF's recorded liability for third party claims as of December 31, 2004 is approximately $25 million.

The Company's estimate of ultimate cost for clean up efforts at its known environmental sites utilizes BNSF's historical payment patterns, its current estimated percentage to closure ratios, and the actuary's proprietary benchmark patterns developed from data accumulated from public sources and work performed by it for other clients, including the EPA and other governmental agencies. These factors incorporate experience gained from clean up efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. BNSF also conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in, and the ability to pay for, cleanup of other PRPs.

BNSF anticipates obtaining annual updates of the study. On a quarterly basis, BNSF will also monitor actual experience against the forecasted remediation and related payments made on existing sites. Additionally, BNSF will continue its existing, quarterly process to monitor developments to further benchmark actuarial results. Adjustments to the Company's estimates will continue to be recorded quarterly if necessary based upon developments in subsequent periods. More periodic updates to the study will occur if trends necessitate a change.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 384 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Beginning balance | **$ 199** | $ 196 | $ 202 |
| Accruals | **258** | 59 | 43 |
| Payments | **(72)** | (56) | (49) |
| Ending balance at December 31, | **$ 385** | $ 199 | $ 196 |

At December 31, 2004 and 2003, $60 million and $50 million were included in current liabilities, respectively. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2004 will be paid over the next ten years and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | BNSF sites | | Superfund sites | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Number of sites at January 1, | **402** | 396 | **22** | 23 |
| Sites added during the period | **34** | 33 | **5** | 3 |
| Sites closed during the period | **(52)** | (27) | **(3)** | (4) |
| Number of sites at December 31, | **384** | 402 | **24** | 22 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $300 million to $600 million. However, BNSF believes that the $385 million recorded is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER CLAIMS AND LITIGATION***

In addition to asbestos, other personal injury, and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**11. Employee Separation Costs**

Employee separation costs activity was as follows (in millions):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Beginning balance at January 1, | **$ 179** | $ 210 | $ 274 |
| Accruals | **8** | 15 | 1 |
| Payments | **(33)** | (43) | (55) |
| Other | **–** | (3) | (10) |
| Ending balance at December 31, | **$ 154** | $ 179 | $ 210 |

Employee separation liabilities of $154 million and $179 million are included in the Consolidated Balance Sheets at December 31, 2004 and 2003, respectively, and principally represent: (i) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; (ii) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; and (iii) certain non-union employee severance costs. Employee separation expenses are recorded in materials and other in the Consolidated Statements of Income. At December 31, 2004, $30 million of the remaining liabilities are included in current liabilities for anticipated costs to be paid in 2005.

**CONDUCTORS, TRAINMEN AND LOCOMOTIVE ENGINEERS**

Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $128 million and $144 million at December 31, 2004 and 2003, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the consummation of the business combination of BNSF's predecessor companies Burlington Northern, Inc. and Santa Fe Pacific Corporation (the Merger) which, among other things, reduced train crew sizes and allowed for more flexible work rules. The remaining costs will be paid between 2005 and approximately 2024. In 2004 and 2003, the Company updated its estimates and recorded an additional liability of $2 million and $3 million, respectively, related to deferred benefits.

**CONSOLIDATION OF CLERICAL FUNCTIONS**

Liabilities related to the consolidation of clerical functions were $15 million and $20 million at December 31, 2004 and 2003, respectively, and primarily provide for separation programs announced in July 2004 and July 2003 and severance costs associated with the clerical consolidation plan adopted in 1995 upon the Merger. The July 2004 separation program affected approximately 40 employees and resulted in accrued severance costs of approximately $4 million. Reductions related to the July 2004 separation program were substantially completed by December 31, 2004. The July 2003 separation program resulted in accrued severance cost of approximately $12 million, affected approximately 150 employees and was substantially completed in 2003. The 1995 consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially completed during 1999. The liability also includes costs related to the reduction of approximately 40 and 140 material handlers in 2001 and 2000, respectively.

In 2003 and 2002, the Company recorded $1 million and $10 million, respectively, of reversals for certain liabilities associated with the consolidation of clerical functions. These reversals primarily reflect accrued payments related to workforce reductions for positions under collective bargaining agreements where the Company was able to place affected individuals in alternate positions.

**OTHER EMPLOYEE SEPARATION COSTS**

Liabilities principally related to certain remaining non-union employee severances resulting from the fourth quarter 2001 workforce reduction and the Merger were $11 million and $15 million at December 31, 2004 and 2003, respectively. These costs will be paid over the next several years based on deferral elections made by the affected employees. In addition, BNSF recorded other liabilities of approximately $2 million in the second quarter of 2004 primarily related to a voluntary severance program for certain union employees. As of December 31, 2004, the remaining liability balance related to this voluntary severance program was insignificant as the program was substantially complete.

During 2001, the Company reduced 360 positions through severance. During 2003 and 2002, the Company recorded a $2 million reduction to its liability balance and accrued additional expenses of $1 million, respectively, due to changes in certain estimates related to fourth-quarter 2001 reductions.

**12. Earnings Per Share**

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 2.0 million, 23.6 million and 26.3 million for 2004, 2003 and 2002, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

**13. Retirement Plans and Other Post-Employment Benefit Plans**

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees and an unfunded, nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these BNSF plans are based on years of credited service and the highest five-year average compensation levels. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met certain age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

BNSF's accumulated post retirement benefit obligation (APBO) and net cost recognized for other post employment benefits (OPEB) reflect the effects of the recent Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Act). The provisions of the Act provide for a federal subsidy for plans that provide prescription drug benefits and meet certain qualifications.

Components of the net cost (benefit) for these plans were as follows (in millions):

| | Pension Benefits | | | Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Year Ended December 31,** | **2004** | **2003** | **2002** | **2004** | **2003** | **2002** |
| Service cost | **$ 19** | $ 17 | $ 15 | **$ 3** | $ 4 | $ 6 |
| Interest cost | **97** | 100 | 100 | **20** | 22 | 21 |
| Expected return on plan assets | **(113)** | (123) | (127) | **–** | – | – |
| Curtailments/settlements | **–** | – | – | **–** | – | – |
| Special termination benefits | **–** | – | 2 | **–** | – | – |
| Actuarial loss | **12** | 3 | 1 | **5** | 8 | 3 |
| Net amortization and deferred amounts | **–** | – | 2 | **(4)** | (2) | – |
| Net cost (benefit) recognized | **$ 15** | $ (3) | $ (7) | **$ 24** | $ 32 | $ 30 |

The following table shows the change in benefit obligation based on the September 30 measurement date (in millions):

| | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Benefit Obligation** | **2004** | **2003** | **2004** | **2003** |
| Benefit obligation at beginning of period | **$ 1,678** | $ 1,611 | **$ 366** | $ 363 |
| Service cost | **19** | 17 | **3** | 4 |
| Interest cost | **97** | 100 | **20** | 22 |
| Plan participants' contributions | **–** | – | **7** | 6 |
| Amendments | **–** | – | **(28)** | (9) |
| Actuarial loss (gain) | **41** | 75 | **(39)** | 7 |
| Curtailments/settlements | **–** | – | **–** | – |
| Special termination benefits | **–** | – | **–** | – |
| Benefits paid | **(125)** | (125) | **(30)** | (27) |
| Benefit obligation at end of period | **$ 1,710** | $ 1,678 | **$ 299** | $ 366 |
| Component representing future salary increases | **(112)** | (119) | | |
| Accumulated benefit obligation at end of period | **$ 1,598** | $ 1,559 | | |

Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had an accumulated benefit obligation in excess of plan assets at September 30, 2004 and 2003.

The following table shows the change in plan assets of the plans based on the September 30 measurement date (in millions):

| Change in Plan Assets | Pension Benefits 2004 | Pension Benefits 2003 | Health and Welfare Benefits 2004 | Health and Welfare Benefits 2003 |
|---|---|---|---|---|
| Fair value of plan assets at beginning of period | **$ 1,224** | $ 1,151 | **$ –** | $ – |
| Actual return on plan assets | **153** | 193 | **–** | – |
| Settlements | **–** | – | **–** | – |
| Employer contribution | **24** | 5 | **23** | 21 |
| Plan participants' contributions | **–** | – | **7** | 6 |
| Benefits paid | **(125)** | (125) | **(30)** | (27) |
| Fair value of plan assets at end of period | **$ 1,276** | $ 1,224 | **$ –** | $ – |

The following table shows the reconciliation of the funded status of the plans with amounts recorded in the Consolidated Balance Sheets (in millions):

| December 31, | Pension Benefits 2004 | Pension Benefits 2003 | Health and Welfare Benefits 2004 | Health and Welfare Benefits 2003 |
|---|---|---|---|---|
| Fair value of plan assets as of September 30 | **$ 1,276** | $ 1,224 | **$ –** | $ – |
| Benefit obligations as of September 30 | **1,710** | 1,678 | **299** | 366 |
| Funded status (plan assets less benefit obligations) | **(434)** | (454) | **(299)** | (366) |
| Amounts not recognized: | | | | |
| Unrecognized net loss | **467** | 480 | **66** | 111 |
| Unrecognized prior service cost | **(2)** | (2) | **(44)** | (20) |
| Adjustment for fourth quarter contribution | **4** | – | **–** | – |
| Net amount recognized as of December 31 | **$ 35** | $ 24 | **$ (277)** | $ (275) |

The following table shows the amounts recognized in the Consolidated Balance Sheets (in millions):

| December 31, | Pension Benefits 2004 | Pension Benefits 2003 | Health and Welfare Benefits 2004 | Health and Welfare Benefits 2003 |
|---|---|---|---|---|
| Prepaid benefit cost | **$ –** | $ – | **$ –** | $ – |
| Accrued benefit cost | **(318)** | (335) | **(277)** | (275) |
| Intangible assets | **–** | – | **–** | – |
| Accumulated other comprehensive income | **353** | 359 | **–** | – |
| Net amount recognized | **$ 35** | $ 24 | **$ (277)** | $ (275) |

| December 31, | Pension Benefits 2004 | Pension Benefits 2003 | Health and Welfare Benefits 2004 | Health and Welfare Benefits 2003 |
|---|---|---|---|---|
| Decrease in minimum liability included in other comprehensive income | **$ (6)** | $ (9) | **$ –** | $ – |

The expected long-term rate of return is the return to be earned, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered: 1) forward looking capital market forecasts, 2) historical returns for individual asset classes and 3) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

| Assumptions used to determine net cost (benefit) for fiscal years ended December 31, | Pension Benefits | | | Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Discount rate | **6.00%** | 6.50% | 7.00% | **6.00%** | 6.50% | 7.00% |
| Expected long-term rate of return on plan assets | **8.25%** | 8.50% | 8.50% | **–** | – | – |
| Rate of compensation increase | **3.90%** | 3.90% | 4.00% | **3.90%** | 3.90% | 4.00% |

| Assumptions used to determine benefit obligations at September 30, | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Discount rate | **5.75%** | 6.00% | **5.75%** | 6.00% |
| Rate of compensation increase | **3.90%** | 3.90% | **3.90%** | 3.90% |

The following table shows the expected health care rate increase and the future rate and time at which it is expected to remain constant.

| December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Assumed health care cost trend rate | **10%** | 11% | 11% |
| Rate to which health care cost trend rate is expected to decline and remain | **5%** | 5% | 5% |
| Year that the rate reaches the ultimate trend rate | **2010** | 2010 | 2009 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | One Percentage-Point Increase | One Percentage-Point Decrease |
|---|---|---|
| Effect on total service and interest cost | $ 3 | $ (2) |
| Effect on post retirement benefit obligation | $ 25 | $ (21) |

The qualified BNSF Retirement Plan asset allocation at September 30, 2004 and 2003 and the target allocation for 2004 by asset category are as follows:

| Plan Asset Allocation | Target Allocation | Percentage of Pension Plan Assets at September 30, | |
|---|---|---|---|
| | 2004 | 2004 | 2003 |
| Equity Securities | **45–75%** | 60% | 57% |
| Fixed Income Securities | **25–45** | 33 | 33 |
| Real Estate | **0–10** | 7 | 10 |
| Other | **0–5** | – | – |
| Total | **100%** | 100% | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the Plan assets in relation to the Plan liabilities while prudently managing the risk of a decrease in the Plan's assets relative to those liabilities. To meet this objective the Employee Benefits Committee has adopted the above asset allocation ranges. This allows flexibility to accommodate market changes in the asset classes within defined parameters.

In 2005, the Company expects to contribute approximately $13 million to its qualified defined benefit pension plan. Additionally, the Company expects to make benefit payments in 2005 of approximately $20 million and $5 million from its OPEB plan and non-qualified defined benefit plan, respectively. The following table shows expected benefit payments for the next five fiscal years and the aggregate five years thereafter from the defined benefit pension plans and OPEB (in millions):

| Fiscal Year | Expected Pension Plan Benefit Payments[a] | Expected OPEB Payments[b] |
|---|---|---|
| 2005 | $ 124 | $ 20 |
| 2006 | 123 | 19 |
| 2007 | 123 | 19 |
| 2008 | 124 | 19 |
| 2009 | 124 | 20 |
| 2010-2014 | 638 | 98 |

a Primarily consists of Qualified Defined Benefit Plan payments which are made from the Plan Trust and do not represent an immediate cash outflow to the Company.

b Net of estimated Medicare Part D subsidy.

**PRESCRIPTION DRUG COVERAGE**

BNSF sponsors a postretirement health care benefit plan that provides prescription drug coverage. The recent Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Act) provides for a federal subsidy for plans that provide prescription drug benefits that are actuarially equivalent to Medicare Part D.

BNSF adopted guidance pursuant to FASB Staff Position 106-2, *Accounting and Disclosure Requirements Related to the Drug, Improvement and Modernization Act of 2003,* as of April 1, 2004. The Company and its actuarial advisors have determined that the prescription drug coverage provided by BNSF's postretirement health care benefit plan is actuarially equivalent to Medicare Part D, and accordingly, the subsidy will provide some relief for BNSF's ongoing retiree medical costs.

BNSF measured the effects of the Act on the accumulated post-retirement benefit obligation (APBO) as of January 1, 2004, and as such, the APBO was reduced by $36 million which was accounted for as an actuarial experience gain. Periodic postretirement benefit cost for the year ended December 31, 2004 was reduced by approximately $5 million due to the effects of the Act.

**DEFINED CONTRIBUTION PLANS**

BNSF sponsors qualified 401(k) plans which cover substantially all employees and a non-qualified defined contribution plan which covers certain officers and other employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Non-union employees are eligible to receive an annual discretionary matching contribution of up to 30 percent of the first six percent of their contributions. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $17 million, $16 million and $15 million in 2004, 2003 and 2002, respectively.

**OTHER**

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans which provide certain post-retirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $33 million, $31 million and $20 million, in 2004, 2003 and 2002, respectively (see Note 11 of the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers).

**14. Stock Options and Other Incentive Plans**

On April 15, 1999, BNSF shareholders approved the BNSF 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001, April 17, 2002, and April 21, 2004, BNSF shareholders approved the amended BNSF 1999 Stock Incentive Plan, which authorized additional awards not to exceed 29 million, 35 million and 42 million shares, respectively, of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately seven million common shares were available for future grant at December 31, 2004.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee director's stock plan and authorized 900 thousand share of BNSF common stock to be issued in connection with this plan. Approximately 500 thousand common shares were available for future grant at December 31, 2004.

**STOCK OPTIONS**

Under BNSF's stock option plans, options may be granted to officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants awarded after April 2001 generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The Company applies APB Opinion 25 and related interpretations in accounting for its stock option plans (see Note 2 of the Consolidated Financial Statements for the Company's pro forma net income and earnings per share determined based on the fair value at grant dates consistent with SFAS No. 123).

A summary of the status of the stock option plans as of December 31, 2004, 2003 and 2002, and changes during the years then ended, is presented below (options in thousands):

| Year Ended December 31, | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|
| | Options | Weighted Average Exercise Prices | Options | Weighted Average Exercise Prices | Options | Weighted Average Exercise Prices |
| Balance at beginning of year | **38,320** | **$ 28.72** | 39,323 | $ 28.31 | 39,839 | $ 28.02 |
| Granted | **2,547** | **$ 33.20** | 2,957 | $ 27.88 | 2,867 | $ 27.76 |
| Exercised | **(15,455)** | **$ 28.29** | (3,222) | $ 22.68 | (2,338) | $ 21.58 |
| Cancelled | **(290)** | **$ 30.09** | (738) | $ 30.16 | (1,045) | $ 30.57 |
| Balance at end of year | **25,122** | **$ 29.42** | 38,320 | $ 28.72 | 39,323 | $ 28.31 |
| Options exercisable at year end | **20,164** | **$ 29.18** | 31,465 | $ 28.83 | 32,068 | $ 28.30 |

The following table summarizes information regarding stock options outstanding at December 31, 2004 (options in thousands):

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Prices | Number Exercisable | Weighted Average Exercise Prices |
| $18.32 to $24.83 | 864 | 1.88 Years | $ 23.72 | 863 | $ 23.74 |
| $25.66 to $28.49 | 7,666 | 6.63 Years | $ 26.86 | 5,110 | $ 26.47 |
| $28.76 to $31.00 | 9,241 | 4.31 Years | $ 29.16 | 9,233 | $ 29.16 |
| $31.10 to $46.59 | 7,351 | 5.59 Years | $ 33.00 | 4,958 | $ 32.97 |
| $18.32 to $46.59 | 25,122 | 5.31 Years | $ 29.42 | 20,164 | $ 29.18 |

**OTHER INCENTIVE PLANS**

BNSF has other long-term incentive programs in addition to stock options as shown in the following table:

| Other Incentive Plans | Vested | Shares Outstanding as of December 31, 2004 | Shares Granted For Year Ended December 31, 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| (shares in thousands except for vested) | in years | | | | |
| Restricted shares | | | | | |
| Time-based | 3–5 | **2,047** | **639** | 558 | 999 |
| Performance-based | 3 | **558** | **251** | – | 340 |
| BNSF Incentive Bonus Stock Program [a] | 3 | **704** | **227** | 329 | 176 |
| BNSF Discounted Stock Purchase Program [b] | N/A | **48** | **18** | 19 | 12 |

a Certain eligible employees may defer through the BNSF Incentive Bonus Stock Program (IBSP) the cash payment of their bonus for restricted stock.

b Salaried employees not eligible to participate in the IBSP may use their bonus to purchase BNSF common stock at a discount from the market price. These shares are restricted for a three-year period.

Shares awarded under the plans may not be sold or used as collateral and are generally not transferable by the holder until the shares awarded become free of restrictions. Compensation expense, net of tax, recorded under the BNSF Stock Incentive Plans in accordance with APB Opinion 25 was $19 million, $11 million and $10 million for the years ended 2004, 2003 and 2002, respectively.

### 15. Common Stock and Preferred Capital Stock

**COMMON STOCK**

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2004, there were 377 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of stockholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board of Directors (the Board) out of funds legally available and to share ratably in all assets available for distribution to stockholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

**PREFERRED CAPITAL STOCK**

At December 31, 2004, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights, and qualifications and restrictions of each series. As of December 31, 2004, no Class A Preferred Stock had been issued.

**SHARE REPURCHASE PROGRAM**

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. In December 1999, April 2000, September 2000 and January 2003, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 150 million shares. During 2004, 2003 and 2002, the Company repurchased approximately 10 million, 8 million and 13 million shares, respectively, of its common stock at average prices of $35.98 per share, $27.25 per share, and $27.85 per share, respectively. Total repurchases through December 31, 2004, were 134 million shares at a total average cost of $26.82 per share, leaving 16 million shares available for repurchase out of the 150 million shares presently authorized.

**16. Accounting Pronouncements**

The Financial Accounting Standards Board (FASB) issued SFAS No. 123R, *Share-Based Payment,* which is effective for reporting periods beginning after June 15, 2005 (third quarter 2005 for the Company). SFAS No. 123R requires the Company to recognize the cost of employee services received in exchange for the Company's equity instruments. Currently, in accordance with APB Opinion 25, the Company records the intrinsic value of stock based compensation as expense. Accordingly, no compensation expense is currently recognized for fixed stock option plans as the exercise price equals the stock price on the date of grant. Under FAS 123R, BNSF will be required to measure compensation expense over the options' vesting period based on the stock options' fair value at the date the options are granted. FAS 123R allows for the use of the Black-Scholes or a lattice option-pricing model to value such options. The Company has determined that it will use the Black-Scholes option-pricing model to calculate the fair value of its options. Based on a study performed by the Company's management, the fair values obtained from each of the two pricing models were not substantially different. As allowed by SFAS 123R, the Company can elect either Modified Prospective Application, which applies the Statement to new awards and modified awards after the effective date, and to any unvested awards as service is rendered on or after the effective date, or Modified Retrospective Application which can apply the statement to either all prior years for which SFAS 123 was effective or only to prior interim periods in the year of adoption. BNSF is currently evaluating which method of application will be used. Note 2 of the Consolidated Financial Statements illustrates the effects on net income and earnings per share if the Company had adopted SFAS No. 123, *Accounting for Stock-Based Compensation*, using the Black-Scholes option-pricing model.

## 17. Quarterly Financial Data—Unaudited

| Dollars in millions, except per share data | Fourth | Third [a] | Second | First |
|---|---|---|---|---|
| **2004** | | | | |
| Revenues | $ 2,978 | $ 2,793 | $ 2,685 | $ 2,490 |
| Operating income | $ 668 | $ 100 | $ 508 | $ 410 |
| Net income | $ 347 | $ 2 | $ 249 | $ 193 |
| Basic earnings per share | $ 0.93 | $ 0.01 | $ 0.68 | $ 0.52 |
| Diluted earnings per share | $ 0.91 | $ 0.01 | $ 0.67 | $ 0.52 |
| Dividends declared per share | $ 0.17 | $ 0.17 | $ 0.15 | $ 0.15 |
| Common stock price [b]: | | | | |
| High | $ 47.80 | $ 38.39 | $ 34.87 | $ 33.16 |
| Low | $ 38.54 | $ 33.97 | $ 31.44 | $ 30.02 |
| **2003** [c] | | | | |
| Revenues | $ 2,492 | $ 2,395 | $ 2,294 | $ 2,232 |
| Operating income | $ 477 | $ 430 | $ 412 | $ 346 |
| Income before cumulative effect of accounting change | $ 226 | $ 203 | $ 200 | $ 148 |
| Net income | $ 226 | $ 203 | $ 200 | $ 187 [c] |
| Basic earnings per share (before cumulative effect of accounting change) | $ 0.61 | $ 0.55 | $ 0.54 | $ 0.40 |
| Basic earnings per share (after cumulative effect of accounting change) | $ 0.61 | $ 0.55 | $ 0.54 | $ 0.50 |
| Diluted earnings per share (before cumulative effect of accounting change) | $ 0.61 | $ 0.55 | $ 0.54 | $ 0.40 |
| Diluted earnings per share (after cumulative effect of accounting change) | $ 0.61 | $ 0.55 | $ 0.54 | $ 0.50 |
| Dividends declared per share | $ 0.15 | $ 0.15 | $ 0.12 | $ 0.12 |
| Common stock price [b]: | | | | |
| High | $ 32.31 | $ 29.47 | $ 29.80 | $ 27.05 |
| Low | $ 27.65 | $ 26.78 | $ 24.89 | $ 23.48 |

a Third-quarter 2004 operating income, net income and earnings per share include a charge for a change in estimate of asbestos and environmental liabilities of $465 million pre-tax, or $288 million net of tax, and quarterly earnings per share impacts of $0.78 per basic share and $0.76 per diluted share (see Note 10 of the Consolidated Financial Statements).

b Average of high and low reported daily stock price

c 2003 net income includes the favorable cumulative effect of an accounting change of $39 million, net of tax, as described in Note 2 of the Consolidated Financial Statements.

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, BNSF's principal executive officer and principal financial officer have concluded that BNSF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to BNSF's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Additionally, as of the end of the period covered by this report, BNSF's principal executive officer and principal financial officer have concluded that there have been no changes in BNSF's internal control over financial reporting that occurred during BNSF's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, BNSF's internal control over financial reporting.

**Item 9B. Other Information**

None.

## Part III

### Item 10. Directors and Executive Officers of the Registrant

Information concerning the directors of BNSF will be provided under the heading "Nominees for Directors" in BNSF's proxy statement for its 2005 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information under the heading "Audit Committee" in BNSF's proxy statement for its 2005 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, is hereby incorporated by reference into the Form 10-K.

Information concerning the executive officers of BNSF is included in Part I of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be under the heading "Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2005 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

The Company has adopted a Code of Ethics for the Chief Executive Officer and Senior Financial Officers (Code of Ethics) applicable to the Chief Executive Officer, Chief Financial Officer, and Controller. A copy of the Code of Ethics is available on the Company's website at www.bnsf.com under the "Investors Link," and any waiver from the Code of Ethics will be timely disclosed on the Company's website as will any amendments to the Code of Ethics.

### Item 11. Executive Compensation

Information concerning the compensation of directors and executive officers of BNSF will be provided under the heading "Directors' Compensation" and under the headings "Summary Compensation Table," "Stock Option Grants in 2005," "Aggregated 2004 Stock Option Exercises and Year-End Option Values," "Pension Plans," "Employment Contracts and Other Arrangements," and "Trust Agreements," in BNSF's proxy statement for its 2005 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Certain information about BNSF's equity compensation plans is set forth in the table below (number of shares in thousands) as of December 31, 2004:

| Plan Category | Number of shares to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of shares available for future issuance |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 25,122 | $29.42 | 7,441 |
| Equity compensation plans not approved by shareholders | – | – | 37[a] |
| Total | 25,122 | $29.42 | 7,478 |

a Effective April 20, 2000, the Board of Directors of the Company adopted The Burlington Northern Santa Fe Achievement Award Program, pursuant to which awards of Company common stock may be made from time to time to select non-officer employees of The Burlington Northern and Santa Fe Railway Company. Shares are awarded under the Program to individuals who have through individual efforts demonstrated achievement beyond their normal job responsibilities or have engaged in extraordinary action on behalf of the Company. The total number of shares to be awarded under the Program, as amended April 17, 2003, may not exceed 50,000 shares. Approximately 37,000 shares remained available for future issuance at December 31, 2004.

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the headings "Certain Beneficial Owners" and "Ownership of Management" in BNSF's proxy statement for its 2005 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

**Item 13. Certain Relationships and Related Transactions**

Information concerning certain relationships and related transactions will be provided under the heading "Certain Relationships" of BNSF's proxy statement for its 2005 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

**Item 14. Principal Accountant Fees and Services**

Information concerning principal accounting fees and services will be provided under the heading "Independent Registered Public Accounting Firm" in BNSF's proxy statement for its 2005 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

## Part IV

**Item 15. Exhibits, Financial Statement Schedules**

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—See Item 8

   Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**BURLINGTON NORTHERN SANTA FE CORPORATION**

By: /s/ Matthew K. Rose

Dated: February 15, 2005

Matthew K. Rose
Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.

| SIGNATURE | TITLE |
|---|---|
| /s/ Matthew K. Rose<br>Matthew K. Rose | Chairman, President and Chief Executive Officer (Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ Dennis R. Johnson<br>Dennis R. Johnson | Vice President and Controller (Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>Alan L. Boeckmann | Director |
| /s/ Vilma S. Martinez*<br>Vilma S. Martinez | Director |
| /s/ Marc F. Racicot*<br>Marc F. Racicot | Director |
| /s/ Roy S. Roberts*<br>Roy S. Roberts | Director |
| /s/ Marc J. Shapiro*<br>Marc J. Shapiro | Director |

| | |
|---|---|
| /s/ J.C. Watts, Jr.*<br>J.C. Watts, Jr. | Director |
| /s/ Robert H. West*<br>Robert H. West | Director |
| /s/ J. Steven Whisler*<br>J. Steven Whisler | Director |
| /s/ Edward E. Whitacre Jr.*<br>Edward E. Whitacre, Jr. | Director |
| /s/ Michael B. Yanney*<br>Michael B. Yanney | Director |

Dated: February 15, 2005

*By: /s/ Jeffrey R. Moreland
Jeffrey R. Moreland
Executive Vice President Law &
Government Affairs and Secretary

| Exhibit Number | Description |
|---|---|
| **3.1** | Amended and Restated Certificate of Incorporation of BNSF (amended as of April 21, 1998). Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 1998. Certificate of Elimination of the Designation of the 6-1/4% Cumulative, Convertible Preferred Stock, Series A, $0.02 Par Value. Certificate of Designation, Prefe rences and Rights of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 4.1 of BNSF's Form 8-A 12B filed December 23, 1999. Certificate of Increase in the Number of Authorized Shares of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| **3.2** | By-Laws of Burlington Northern Santa Fe Corporation as amended and restated dated April 22, 2004. Incorporated by reference to Exhibit 3.1 of BNSF's Form 10-Q for the period ended March 31, 2004. |
| **4.1** | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. Incorporated by reference to Exhibit 4 to BNSF's Registration Statement on Form S-3 (No. 333-72013). |
| **4.2** | Form of BNSF's 6 1/8% Notes Due 2009. Incorporated by reference to Exhibit 4.2 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| **4.3** | Form of BNSF's 6 3/4% Debentures Due 2029. Incorporated by reference to Exhibit 4.3 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| **4.4** | Form of BNSF' 6.70% Debenture Due August 1, 2028. Incorporated by reference to Exhibit 4.4 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| **4.5** | Form of BNSF's 7.875% Note Due April 15, 2007. Incorporated by reference to Exhibit 4.5 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| **4.6** | Form of BNSF's 8.125% Debenture Due April 15, 2020. Incorporated by reference to Exhibit 4.6 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| **4.7** | Form of BNSF's 7.95% Debenture Due August 15, 2030. Incorporated by reference to Exhibit 4.7 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| **4.8** | Form of BNSF's 6.75% Note due July 15, 2011. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2001. |
| **4.9** | Officers' Certificates as to the terms of Form of BNSF's 5.90% Notes Due July 1, 2012 including the form of the Notes. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2002. |
| **4.10** | Officers' Certificate of Determination as to the terms of BNSF's 4.875% Notes Due January 15, 2015, including Exhibit A thereto, the form of the Notes. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 8-K (Date of earliest event reported: November 18, 2004). |
| | Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission. |
| **10.1*** | Burlington Northern Santa Fe Non-Employee Directors' Stock Plan as amended February 11, 2005. |

| Exhibit Number | Description |
|---|---|
| 10.2* | The Burlington Northern and Santa Fe Railway Company Incentive Compensation Plan as amended effective January 1, 2003, incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2003 |
| 10.3* | Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated effective December 9, 2004. Incorporated by reference to Exhibit 10.1 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.4* | Burlington Northern Inc. Senior Executive Survivor Benefit Plan as of April 1, 1986. Incorporated by reference to Amendment No. 1 to BNI's Report on Form 10-K for the fiscal year ended December 31, 1987. |
| 10.5* | Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan, as amended and restated effective December 9, 2004. Incorporated by reference to Exhibit 10.4 of BNSF's Report on Form 8-K dated December 31, 2004. |
| 10.6* | Burlington Northern Santa Fe Long Term Incentive Stock Plan. Incorporated by reference to Exhibit 4(c) to BNSF's Registration Statement on Form S-8 (File No. 33-63247). |
| 10.7* | Burlington Northern Santa Fe Corporation 1990 Directors Stock Option Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62825). |
| 10.8* | Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated November 22, 2004. |
| 10.9* | Burlington Northern Santa Fe Corporation 1992 Stock Option Incentive Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62839). |
| 10.10* | Burlington Northern Santa Fe 1996 Stock Incentive Plan. Incorporated by reference to Appendix B to BNSF's Proxy Statement dated March 5, 1996. Amendment of Burlington Northern Santa Fe 1996 Stock Incentive Plan dated January 15, 1998 is incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997. Amendment dated December 3, 1998. Incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. |
| 10.11* | Burlington Northern Santa Fe Supplemental Retirement Plan, as amended and restated effective December 9, 2004. Incorporated by reference to Exhibit 10.2 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.12* | Burlington Northern Santa Fe Estate Enhancement Program, as amended and restated effective October 1, 1996. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996. Amendment to Burlington Northern Santa Fe Estate Enhancement Program is incorporated by reference to Exhibit 10.2 to BNSF's Form 10-Q for the quarter ended June 30, 1999. |
| 10.13* | Form of BNSF Change-in-Control Agreement (applicable to Messrs. Ice, Hund, Moreland, and Lanigan, and two other executive officers). Incorporated by reference to Exhibit 10.17 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996. Amendment dated December 17, 1998. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.14* | Burlington Northern Santa Fe Deferred Compensation Plan for Directors as amended and restated effective December 9, 2004. Incorporated by reference to Exhibit 10.5 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.15* | Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan as amended and restated effective December 9, 2004. Incorporated by reference to Exhibit 10.3 of BNSF's report on Form 8-K dated December 9, 2004. |

| Exhibit Number | Description |
|---|---|
| 10.16* | Burlington Northern Inc. Form of Severance Agreement and amendments through September 18, 1995 (applicable to Mr. Rose). Incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. Amendment to Form of Severance Agreement dated December 3, 1997 is incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997. Amendment dated January 6, 1999 is incorporated by reference to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.17* | Burlington Northern Inc. Director's Charitable Award Program. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.18* | Burlington Northern Santa Fe Salary Exchange Option Program as amended and restated October 1, 2004. |
| 10.19* | Santa Fe Pacific Corporation Supplemental Retirement Plan (Supplemental Plan). Incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1984. Supplemental Plan as amended October 1, 1989, and Amendment to Supplemental Plan dated February 27, 1990, are incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1989. Amendment to Supplemental Plan dated March 22, 1994, and effective January 1, 1994, is incorporated by reference to Exhibit 10.24 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.20* | The Burlington Northern and Santa Fe Railway Company Severance Plan as amended and restated October 16, 2001. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.21* | Burlington Northern Santa Fe 1999 Stock Incentive Plan as amended and restated effective April 21, 2004. Incorporated by reference to Appendix II to BNSF's proxy statement dated March 15, 2004. |
| 10.22* | Benefits Protection Trust Agreement by and between Burlington Northern Santa Fe Corporation and Wachovia Bank, approved by the board of directors February 11, 2005. |
| 10.23* | Burlington Northern Santa Fe Directors' Retirement Plan. Incorporated by reference to exhibit 10.29 to BNSF's Report on Form 8-K for the fiscal year ended December 31, 1995. |
| 10.24* | Form of indemnification agreement dated as of September 17, 1998 between BNSF and directors. Incorporated by reference to Exhibit 10.37 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 10.25* | Form of indemnification agreement dated as of September 17, 1998 between BNSF and certain officers, including Matthew K. Rose, Thomas N. Hund, Carl R. Ice, John P. Lanigan, Jr., Jeffrey R. Moreland, Dennis R. Johnson, and Peter J. Rickershauser. Incorporated by reference to Exhibit 10.38 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 10.26* | Amendment to Burlington Northern Santa Fe Supplemental Retirement Plan (Matthew K. Rose) dated April 18, 2002. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |
| 10.27* | Retirement Benefit Agreement dated April 19, 2002 between BNSF and Matthew K. Rose. Incorporated by reference to Exhibit 10.3 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |
| 10.28* | Achievement Award Program of The Burlington Northern and Santa Fe Railway Company as amended and restated April 17, 2003. Incorporated by reference to Exhibit 10.4 to BNSF's Report on Form 10-Q for the period ended June 30, 2003. |

| Exhibit Number | Description |
|---|---|
| 10.29* | Retirement Benefit Agreement dated January 16, 2003 between BNSF and John P. Lanigan. Incorporated by reference to Exhibit 10.29 to BNSF's Report on Form 10-K for the year ended December 31, 2003. |
| 10.30* | Form of Notice of Grant of Incentive Stock Options and Non-Qualified Stock Options and Award Agreement. Incorporated by reference to Exhibit 99.1 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.31* | Form of Burlington Northern Santa Fe 1999 Stock Incentive Plan Stock Option Award Agreement Terms and Conditions. Incorporated by reference to Exhibit 99.2 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.32* | Form of 1999 Stock Incentive Plan Master Restricted Stock Award Agreement. Incorporated by reference to Exhibit 99.3 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.33* | Form of 1999 Stock Incentive Plan Reload Stock Option Agreement. Incorporated by reference to Exhibit 99.4 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.34* | Form of 1999 Stock Incentive Plan Exchange Option Grant Agreement. Incorporated by reference to Exhibit 99.5 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.35* | Form of 1999 Stock Incentive Plan Senior Management Stock Deferral Plan Award Agreement. Incorporated by reference to Exhibit 99.6 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.36* | Form of 1999 Stock Incentive Plan Individual Stock Award Agreement. Incorporated by reference to Exhibit 99.7 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.37* | Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Director's Restricted Stock Unit Award Agreement. Incorporated by reference to Exhibit 99.8 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.38* | Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Non-Qualified Stock Option Grant Agreement. Incorporated by reference to Exhibit 99.9 of BNSF's report on Form 8-K dated December 9, 2004. |
| 10.39* | Form of 1999 Stock Incentive Plan Incentive Bonus Stock Program Award Agreement. |
| 10.40* | Summary of Non-Employee Director's Compensation. |
| 10.41* | Summary of Executive Officer Compensation. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 21.1 | Subsidiaries of BNSF. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 24.1 | Powers of Attorney. |
| 31.1 | Principal Executive Officer's Certification Pursuant to 18 U.S.C. § 1350 (Section 302 of Sarbanes-Oxley Act of 2002). |
| 31.2 | Principal Financial Officer's Certification Pursuant to 18 U.S.C. § 1350 (Section 302 of Sarbanes-Oxley Act of 2002). |
| 32.1 | Certification Pursuant to 18 U.S.C. § 1350 (Section 906 of Sarbanes-Oxley Act of 2002). |
| 99.1 | Certification Pursuant to Section 303A.12 of the New York Stock Exchange Listed Company Manual. |
| * | Management contract or compensatory plan or arrangement. |

## Exhibit 12.1

### Burlington Northern Santa Fe Corporation and Subsidiaries
### Computation of Ratio of Earnings to Fixed Charges

(in millions, except ratio amounts)

(Unaudited)

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2004** | 2003 | 2002 | 2001 | 2000 |
| Earnings: | | | | | |
| Income before income taxes and cumulative effect of accounting change | **$ 1,273** | $ 1,231 | $ 1,216 | $ 1,173 | $ 1,585 |
| Add: | | | | | |
| Interest and fixed charges, excluding capitalized interest | **409** | 420 | 428 | 463 | 453 |
| Portion of rent under long-term operating leases representative of an interest factor | **195** | 182 | 178 | 173 | 167 |
| Distributed income of investees accounted for under the equity method | **4** | 3 | 3 | 5 | 46 |
| Amortization of capitalized interest | **8** | 8 | 8 | 7 | 6 |
| Less: | | | | | |
| Undistributed equity in earnings of investments accounted for under the equity method | **9** | 14 | 17 | 23 | 18 |
| Total earnings available for fixed charges | **$ 1,880** | $ 1,830 | $ 1,816 | $ 1,798 | $ 2,239 |
| Fixed charges: | | | | | |
| Interest and fixed charges | **$ 419** | $ 429 | $ 441 | $ 477 | $ 481 |
| Portion of rent under long-term operating leases representative of an interest factor | **195** | 182 | 178 | 173 | 167 |
| Total fixed charges | **$ 614** | $ 611 | $ 619 | $ 650 | $ 648 |
| Ratio of earnings to fixed charges | **3.06x** | 3.00x | 2.93x | 2.77x | 3.46x |

## Exhibit 31.1

**Principal Executive Officer's Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 15, 2005

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

## Exhibit 31.2

**Principal Financial Officer's Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure control and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 15, 2005

/s/ Thomas N. Hund
Thomas N. Hund
Executive Vice President and
Chief Financial Officer

# Exhibit 32.1

## Certification Pursuant to 18 U.S.C. § 1350

(Section 906 of Sarbanes-Oxley Act of 2002)

**Burlington Northern Santa Fe Corporation**

In connection with the Annual Report of Burlington Northern Santa Fe Corporation (the "Company") on Form 10-K for the year ended December 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Matthew K. Rose, Chairman, President and Chief Executive Officer of the Company, and Thomas N. Hund, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to his knowledge on the date hereof:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 15, 2005

| | |
|---|---|
| /s/ Matthew K. Rose | /s/ Thomas N. Hund |
| Matthew K. Rose | Thomas N. Hund |
| Chairman, President and Chief Executive Officer | Executive Vice President and Chief Financial Officer |

A signed original of this written statement required by Section 906 has been provided to Burlington Northern Santa Fe Corporation and will be retained by Burlington Northern Santa Fe Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## Exhibit 99.1

## Annual CEO Certification

(Section 303A.12 (a) of the New York Stock Exchange Listed Company Manual)

As the Chief Executive Officer of Burlington Northern Santa Fe Corporation, and as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, I hereby certify that as of the date hereof I am not aware of any violation by the Company of NYSE's Corporate Governance listing standards, other than has been notified to the Exchange pursuant to Section 303A.12(b) and disclosed as an attachment hereto.

/s/ Matthew K. Rose

Matthew K. Rose
Chairman, President and Chief Executive Officer
May 20, 2004

[No attachment accompanied this Annual CEO Certification.]

## Burlington Northern Santa Fe Corporation Directors*

**Alan L. Boeckmann** [3,4]
Chairman and Chief Executive Officer, Fluor Corporation (professional services holding company offering engineering, procurement, construction management and other services), Aliso Viejo, California.
BOARD MEMBER SINCE 2001.

**Vilma S. Martinez** [4]
Partner, Munger, Tolles and Olson LLP (law firm), Los Angeles, California.
BOARD MEMBER SINCE 1998.

**Marc F. Racicot** [1,4]
Partner, Bracewell & Patterson, L.L.P. (law firm), Washington, D.C.
Former Governor of Montana.
BOARD MEMBER SINCE 2001.

**Roy S. Roberts** [2,3]
Managing Director, Reliant Equity Investors, L.L.C. (private equity firm), Chicago, Illinois.
Retired Group Vice President, North American Vehicle Sales, Service and Marketing, General Motors Corporation (motor vehicle manufacturer), Detroit, Michigan.
BOARD MEMBER SINCE 1993.

**Matthew K. Rose** [1]
Chairman, President and Chief Executive Officer, Burlington Northern Santa Fe Corporation and BNSF Railway Company, Fort Worth, Texas.
BOARD MEMBER SINCE 2000.

**Marc J. Shapiro** [3,4]
Retired Vice Chairman for Finance, Risk Management and Administration, J.P. Morgan Chase & Co. (bank holding company), New York, New York.
BOARD MEMBER SINCE 1995.

**J.C. Watts, Jr.** [2]
Chairman, J.C. Watts Companies, Inc. and J.C. Watts Enterprises, LLC (communications and public affairs), Washington, D.C.
Former Congressman (R-4th Dist. Oklahoma) and Chairman, House Republican Conference.
BOARD MEMBER SINCE 2003.

**Robert H. West** [1,2,3]
Retired Chairman of the Board, Butler Manufacturing Company (manufacturer of pre-engineered building systems and specialty components), Kansas City, Missouri.
BOARD MEMBER SINCE 1980.

**J. Steven Whisler** [2,3]
Chairman and Chief Executive Officer, Phelps Dodge Corporation (mining and manufacturing), Phoenix, Arizona.
BOARD MEMBER SINCE 1995.

**Edward E. Whitacre, Jr.** [1,4]
Chairman and Chief Executive Officer, SBC Communications Inc. (diversified communications holding company), San Antonio, Texas.
BOARD MEMBER SINCE 1993.

**Michael B. Yanney** [1,2]
Chairman, America First Companies L.L.C. (investments), Omaha, Nebraska.
BOARD MEMBER SINCE 1989.

**Committee Assignments:**

1 Executive Committee
2 Compensation and Development Committee
3 Audit Committee
4 Directors and Corporate Governance Committee

* Years of Board service includes service on Boards of Burlington Northern Inc., Santa Fe Pacific Corporation and predecessor corporations.

## Corporate Officers[1]

**Matthew K. Rose** [2]
Chairman, President and Chief Executive Officer

**Thomas N. Hund** [2]
Executive Vice President and Chief Financial Officer

**Carl R. Ice** [2]
Executive Vice President and Chief Operations Officer

**John P. Lanigan, Jr.** [2]
Executive Vice President and Chief Marketing Officer

**Jeffrey R. Moreland** [2]
Executive Vice President Law & Government Affairs and Secretary

**Jeffrey J. Campbell**
Vice President – Technology Services and Chief Information Officer

**A. P. (Skip) Endres, Jr.**
Vice President – Government Affairs

**James H. Gallegos**
Vice President and Corporate General Counsel

**Paul R. Hoferer**
Vice President and General Counsel

**Linda J. Hurt**
Treasurer

**Dennis R. Johnson** [2]
Vice President and Controller

**Jeanne E. Michalski**
Vice President – Human Resources and Medical

**Marsha K. Morgan**
Vice President – Investor Relations

**Peter J. Rickershauser** [2]
Vice President – Network Development

**Richard A. Russack**
Vice President – Corporate Relations

**David W. Stropes**
Vice President – Corporate Audit Services

**Shelley J. Venick**
Vice President and General Tax Counsel

**Richard E. Weicher**
Vice President and Senior Regulatory Counsel

1 These officers hold similar positions with BNSF Railway Company.
2 Executive Officer of Burlington Northern Santa Fe Corporation.

## Operating Company Officers

**Stevan B. Bobb**
Vice President – Business Unit Operations and Support

**Stephen G. Branscum**
Group Vice President – Consumer Products

**Rollin D. Bredenberg**
Vice President – Service Design and Performance

**M. David Dealy**
Vice President – Transportation

**Frederick G. (Fritz) Draper**
Vice President – Business Development

**George T. Duggan**
Vice President – Industrial Products Sales

**John J. Fleps**
Vice President – Labor Relations

**Gregory C. Fox**
Vice President – Engineering

**David L. Garin**
Group Vice President – Industrial Products

**Steve A. Goodall**
Regional Vice President – North Operations

**John T. Hickerson**
Vice President – Domestic Intermodal Marketing

**Craig Hill**
Vice President – Mechanical and Value Engineering

**Kevin Kaufman**
Group Vice President – Agricultural Products

**Kenneth J. Kempker**
Vice President and Chief Sourcing Officer

**Mark A. Kotter**
Regional Vice President – Central Operations

**Thomas G. Kraemer**
Group Vice President – Coal

**Frederick R. Malesa**
Vice President – International Intermodal Marketing

**Chris A. Roberts**
Regional Vice President – South Operations

**Sami M. Shalah**
Vice President – Coal Marketing

**Denis Smith**
Vice President – Industrial Products Marketing

**Gregory W. Stengem**
Vice President – Safety, Training and Operations Support

## Shareholder Information

**Shares Listed**
New York Stock Exchange
Chicago Stock Exchange
Pacific Exchange
Ticker Symbol: BNI

**Principal Corporate Office**
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830
(800) 795-2673
www.bnsf.com

**Stock Transfer Agent and Registrar**
EquiServe Trust Company, N.A.
P.O. Box 2500
Jersey City, New Jersey 07303-2500
(800) 526-5678

**Shareholders**
As of February 2, 2005, there were approximately 40,000 shareholders of record.

**Shareholder Services**
You are encouraged to contact our Transfer Agent directly for the shareholder services listed below:

Change in Certificate Registration, Dividend Reinvestment Service, Change of Mailing Address, Lost or Stolen Certificates, Replacement of Dividend Checks, Direct Deposit of Dividends, Consolidation of Multiple Accounts, Elimination of Duplicate Report Mailings, Replacement of Form 1099-DIV.

**Dividend Reinvestment Plan**
A dividend reinvestment plan is provided for registered shareholders as a convenient way to purchase more shares through investment of dividends or voluntary cash payments. A booklet describing the plan is available from the Transfer Agent.

**Form 10-K**
The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) is posted on the Company's Web site, www.bnsf.com. A copy of the Annual Report on Form 10-K is also available to shareholders free of charge upon request to the Company's Investor Relations Department at 2500 Lou Menk Drive, Fort Worth, Texas 76131-2828. The Company's filings on Form 10-K, Form 10-Q and Form 8-K are posted on the Company's Web site as soon as reasonably practicable after the reports are electronically filed with the SEC. Reports on Forms 3, 4 and 5 by directors and Section 16 reporting officers are posted on the Company's Web site no later than the day following their filing with the SEC.

**Institutional Investors**
Inquiries from security analysts and investment professionals should be directed to the Company's investor relations contact:

Ms. Marsha K. Morgan
Vice President – Investor Relations
(817) 352-6452

**Annual Meeting**
The Annual Meeting of Shareholders will be held at The Fort Worth Club, 306 W. 7th Street, Fort Worth, Texas 76102, on Wednesday, April 20, 2005, at 4:00 p.m. CDT.

© 2005 Burlington Northern Santa Fe Corporation. All rights reserved.
Design: Methodologie, Inc. Photography: Tyler Boley Printing: ColorGraphics



BURLINGTON NORTHERN SANTA FE CORPORATION

2004 ANNUAL REPORT AND FORM 10-K

BNSF

BURLINGTON NORTHERN SANTA FE CORPORATION
2650 LOU MENK DRIVE
FORT WORTH, TX 76131-2830

# EXHIBIT PX0564

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

*(Mark One)*

[X] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2004

**OR**

[ ] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from ___________ to ___________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **UTAH** | **13-2626465** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1400 DOUGLAS STREET, OMAHA, NEBRASKA**
(Address of principal executive offices)
**68179**
(Zip Code)
**(402) 544-5000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| Common Stock (Par Value $2.50 per share) | New York Stock Exchange, Inc. |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X].

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).

Yes X No ___

As of June 30, 2004, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $15,116,771,158.

The number of shares outstanding of the registrant's Common Stock as of January 31, 2005, was 260,998,036.

**Continuing Operations** – UPRR is a Class I railroad that operates in the United States. We have approximately 33,000 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several north/south corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Railroad commodity revenue totaled $11.7 billion in 2004 and is comprised of the following six commodity groups:

*Agricultural* – The transportation of agricultural products, including whole grains (for animal and human consumption) and commodities produced from these grains, food and beverage products, and sweeteners, provided 14% of the Railroad's 2004 commodity revenue. With access to most major grain markets, the Railroad provides a critical link between the Midwest and western producing areas and the primary Pacific Northwest (PNW) and Gulf ports, as well as Mexico. UPRR also serves significant domestic markets, including grain processors and feeders and ethanol producers in the Midwest, West, South, and Rocky Mountain states. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products, and beverages that are moved to major U.S. population centers for consumption. Express Lane, our premium and perishables service that moves fruits and vegetables from the PNW and California to destinations in the East, continues to focus on drawing market share from the trucking industry. Frozen meat and poultry are also transported to the West Coast ports for export, while beverages are imported into the U.S. from Mexico. Sweeteners are primarily short-haul sugar beet movements from the fields to the refineries, both of which are located in Idaho.

*Automotive* – UPRR is the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. The Railroad serves 42 vehicle distribution centers that deliver vehicles to all major western U.S. cities. These centers serve as rail car-to-truck haul away operations for major domestic and international automotive manufacturers. In addition to transporting finished vehicles, UPRR currently provides expedited handling of automobile materials in both boxcars and containers to several assembly plants. Mexico continues to be an integral part of our automotive business. The Railroad carries automobile materials bound for assembly plants in Mexico, the U.S., and Canada to and from Mexican interchanges and transports finished vehicles from manufacturing facilities in Mexico. In 2004, transportation of finished vehicles and automobile materials accounted for 11% of the Railroad's total commodity revenue.

*Chemicals* – The transportation of chemicals provided 15% of UPRR's 2004 commodity revenue. The Railroad's franchise enables it to serve the large chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. More than two-thirds of the chemicals business consists of liquid and dry chemicals, plastics, and liquid petroleum products. In addition to transporting plastics, customers also leverage UPRR's industry leading storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California and are consumed primarily in glass producing markets in the East, the West, and abroad. Fertilizer movements originate primarily in the Gulf Coast region, as well as the West and Canada, bound for major agricultural end-users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 20% of UPRR's 2004 commodity revenue. The Railroad's geographic footprint positions it to transport coal destined for utilities and industrial facilities in 27 states, as well as to the Gulf and rail/barge/ship facilities on the Mississippi and Ohio Rivers and the Great Lakes. UPRR serves mines located in the Southern Powder River Basin of Wyoming, in addition to Colorado, Utah, southern Wyoming, and southern Illinois. Southern Powder River Basin coal represents the largest growth segment of the market, as utilities continue to favor its low cost and low-sulfur content. In addition, UPRR continues to penetrate markets in the East as electricity generation continues to grow in the face of declining eastern coal production. High-BTU, low-sulfur coal from Colorado and Utah is also transported for export to Mexico.

*Industrial Products* – The industrial products group includes a broad range of commodities, from bulk products like stone, cement, minerals, waste, and scrap to higher-value shipments like lumber, paper, government, and consumer goods. Bulk commodities often move in unit train service from origin to a distribution facility in major metropolitan areas. Other commodities move in manifest trains and rely on the Railroad's extensive network to move between thousands of shippers and customers across North America. In 2004, the transportation of industrial products provided 21% of the Railroad's total commodity revenue.

*Intermodal* – UPRR's intermodal business, which represents 19% of the Railroad's 2004 commodity revenues, is classified as international, domestic, or premium shipments. International business consists of international container traffic for steamship customers. It arrives at West Coast ports for destinations throughout the United States. Domestic business includes domestic container and trailer traffic handled by intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time-sensitive business requirements account for the majority of our premium service. Service performance and reliability are important in driving intermodal business growth.

**Working Capital** – We currently have, and historically have had, a working capital deficit, which is not uncommon in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Competition** – We are subject to competition from other railroads, motor carriers, and barge operators. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company, operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other competing railroads and by motor carriers. Motor carrier competition is particularly strong with respect to five of our six commodity groups (excluding energy) due to shorter delivery times offered by such carriers. Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly pronounced, especially for grain and bulk commodities. Competition can pressure both transit time requirements and pricing, as well as place a greater emphasis on the quality and reliability of the service provided. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation in the locations in which we operate, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity.

**Equipment Suppliers** – We are dependent on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment and its production, there are high barriers of entry to potential new suppliers. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and the potential for reduced availability of the locomotives that are necessary to our operations.

**Employees** – Approximately 87% of our more than 48,000 full-time equivalent employees are represented by 14 major rail unions. Under the collective bargaining round that began on November 1, 1999, 11 of the 14 unions reached new labor agreements with the railroads. We are currently negotiating new agreements with the remaining three unions. Existing agreements remain in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

On November 1, 2004, notices for the next round of negotiations were sent to all 14 unions by the National Railway Labor Conference on behalf of UPRR (and other carriers in the conference). These legal notices state our desire to modify the current collective bargaining agreements. Contract negotiations with the various unions usually take place over an extended period of time and generally have not resulted in work stoppages.

**Discontinued Operations** – In November 2003, we completed the sale of our entire trucking interest, and as a result, the operations of OTC and Motor Cargo are included in discontinued operations (see note 13 to the Consolidated Financial Statements, Item 8).

## GOVERNMENTAL AND ENVIRONMENTAL REGULATION

**Governmental Regulation** – Our operations are subject to a variety of federal, state, and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

## Item 6. Selected Financial Data

The following table presents as of, and for the years ended, December 31, our selected financial data for each of the last 10 years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Consolidated Financial Statements and notes thereto, Item 8. The information below is not necessarily indicative of the results of future operations.

*Millions of Dollars, Except Per Share Amounts, Ratios, and Employee Statistics*

| | *2004[b]* | *2003* | *2002[c]* | *2001* | *2000[d]* | *1999* | *1998[e]* | *1997* | *1996* | *1995* |
|---|---|---|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31[a]** | | | | | | | | | | |
| Operating revenues ..... | 12,215 | 11,551 | 11,159 | 10,830 | 10,765 | 10,175 | 9,480 | 10,133 | 7,825 | 6,510 |
| Operating income ...... | 1,295 | 2,133 | 2,253 | 2,018 | 1,850 | 1,784 | 337 | 1,134 | 1,499 | 1,291 |
| Income (loss) [f] ....... | 604 | 1,056 | 1,265 | 934 | 810 | 765 | (101) | 435 | 782 | 655 |
| Net income (loss) [g] ... | 604 | 1,585 | 1,341 | 966 | 842 | 810 | (633) | 432 | 904 | 946 |
| Per share – basic: | | | | | | | | | | |
| Income (loss) [f] ..... | 2.33 | 4.15 | 5.02 | 3.77 | 3.29 | 3.10 | (0.41) | 1.77 | 3.61 | 3.20 |
| Net income (loss) [g] ............. | 2.33 | 6.23 | 5.32 | 3.90 | 3.42 | 3.28 | (2.57) | 1.76 | 4.17 | 4.62 |
| Per share – diluted: | | | | | | | | | | |
| Income (loss) [f] ..... | 2.30 | 4.07 | 4.78 | 3.65 | 3.22 | 3.05 | (0.41) | 1.75 | 3.58 | 3.19 |
| Net income (loss) [g] ............. | 2.30 | 6.04 | 5.05 | 3.77 | 3.34 | 3.22 | (2.57) | 1.74 | 4.14 | 4.60 |
| Dividends per share .... | 1.20 | 0.99 | 0.83 | 0.80 | 0.80 | 0.80 | 0.80 | 1.72 | 1.72 | 1.72 |
| Operating cash flow .... | 2,237 | 2,422 | 2,199 | 1,865 | 2,021 | 1,823 | 507 | 1,568 | 1,653 | 1,405 |
| **At December 31[a]** | | | | | | | | | | |
| Total assets [g] ........ | 34,589 | 33,494 | 32,771 | 31,551 | 30,917 | 30,192 | 29,590 | 28,860 | 27,990 | 19,500 |
| Total debt ............ | 8,131 | 7,989 | 7,703 | 8,078 | 8,351 | 8,636 | 8,687 | 8,510 | 8,016 | 6,350 |
| Convertible preferred securities ........... | - | - | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | - | - | - |
| Common shareholders' equity .............. | 12,655 | 12,354 | 10,651 | 9,575 | 8,662 | 8,001 | 7,393 | 8,225 | 8,225 | 6,364 |
| Equity per common share .............. | 48.58 | 47.85 | 41.99 | 38.26 | 35.09 | 32.29 | 29.88 | 33.30 | 33.35 | 30.96 |
| **Additional Data[a]** | | | | | | | | | | |
| Commodity revenue .... | 11,692 | 11,041 | 10,663 | 10,391 | 10,270 | 9,851 | 9,072 | 9,712 | 7,419 | 6,105 |
| Carloads (000) ......... | 9,458 | 9,239 | 9,131 | 8,916 | 8,901 | 8,556 | 7,998 | 8,453 | 6,632 | 5,568 |
| Operating margin (%)[h] ............. | 10.6 | 18.5 | 20.2 | 18.6 | 17.2 | 17.5 | 3.6 | 11.2 | 19.2 | 19.8 |
| Operating ratio (%)[h] ............. | 89.4 | 81.5 | 79.8 | 81.4 | 82.8 | 82.5 | 96.4 | 88.8 | 80.8 | 80.2 |
| Average employees (000) .............. | 48.3 | 46.4 | 47.3 | 48.7 | 50.5 | 52.5 | 53.6 | 54.0 | 41.4 | 35.2 |
| Revenue per employee (000) .............. | 252.9 | 248.9 | 235.9 | 222.4 | 213.2 | 193.8 | 176.9 | 187.6 | 189.0 | 184.9 |
| **Financial Ratios (%)[a]** | | | | | | | | | | |
| Debt to capital employed [i] ................. | 39.1 | 39.3 | 38.8 | 42.2 | 45.1 | 47.6 | 49.4 | 50.9 | 49.4 | 49.9 |
| Return on equity [j] .... | 4.8 | 13.8 | 13.3 | 10.6 | 10.1 | 10.5 | (8.1) | 5.3 | 12.4 | 16.5 |

*[a] Data includes the effects of the acquisitions of Southern Pacific Rail Corporation as of October 1, 1996 and Chicago and North Western Transportation Company as of May 1, 1995.*

*[b] 2004 operating income and net income includes a $247 million pre-tax ($154 million after-tax) charge for unasserted asbestos-related claims.*
*[c] 2002 net income includes $214 million pre-tax ($133 million after-tax) gains on asset dispositions. In addition, net income includes a reduction of income tax expense of $67 million related to tax adjustments for prior years' income tax examinations.*
*[d] 2000 operating income and net income includes a $115 million pre-tax ($72 million after-tax) work force reduction charge.*
*[e] 1998 net loss includes a $547 million pre-and after-tax charge for the revaluation of OTC goodwill.*
*[f] Based on results from continuing operations.*
*[g] Net income and total assets includes the effects of the acquisitions of Motor Cargo as of November 30, 2002 and Skyway Freight Systems, Inc. as of May 31, 1993, and reflects the disposition of all of our trucking interests in 2003, logistics subsidiary in 1998, natural resources subsidiary in 1996 and waste management subsidiary in 1995.*
*[h] Operating margin is defined as operating income divided by operating revenues. Operating ratio is defined as operating expenses divided by operating revenues.*
*[i] Debt to capital employed is determined as follows: total debt divided by debt plus equity plus convertible preferred securities.*
*[j] Based on average common shareholders' equity.*

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Consolidated Financial Statements, Item 8, and other information in this report, including Critical Accounting Policies, Risk Factors, and Cautionary Information set forth at the end of this Item 7.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable business segment. The Consolidated Financial Statements in 2003 and 2002 also include discontinued trucking operations, consisting of OTC and Motor Cargo, which were subsidiaries of Overnite, Inc., formerly an indirect wholly owned subsidiary of UPC. In 2003, we reclassified our trucking operations as discontinued operations.

## EXECUTIVE SUMMARY

## 2004 Highlights

- **Safety** – During a year when we added many new crew personnel and moved record volumes, the number of new claims for lost work day cases declined by 9%, and incidents reportable to the FRA decreased by over 2%. The number of derailments for the year was flat compared to 2003, trespasser incidents declined 11%, while our grade crossing accidents were up slightly over 2003. As part of our continuing focus on public safety, we worked to reduce grade-crossing incidents by closing numerous crossings, upgrading many others, training law-enforcement officers, and educating the public about the risks associated with crossings. In an effort to reduce derailments, we increased track inspections, employed new technology to identify car defects before failure, and implemented operating practice improvements to accelerate skill development and promote situational awareness with our train crews and yard personnel.

- **Revenue Growth** – We increased operating revenues by 6% year-over-year to $12.2 billion, the highest level in our history, as vigorous economic growth led to unprecedented demand for our services. We achieved record revenue levels in four of our major commodity groups: agricultural, automotive, industrial products, and intermodal. The higher revenue was attributable primarily to additional fuel surcharges, better pricing yields, and increased carloads, and reflects our continued focus on our Yield Strategy. The key components of our Yield Strategy are providing service that meets customer needs at prices that reflect the value of our services and achieving a mix of business that maximizes profitability.

- **Resources** – We made substantial progress during 2004 to increase our train crews and locomotive resources. Through aggressive hiring and training programs, we placed into conductor service nearly 5,000 new trainmen, resulting in a 19% net increase in trainmen, and trained nearly 700 conductors to become engineers, a 3% net increase. In addition to hiring and training crews, we accelerated locomotive acquisitions to improve velocity, with almost 400 new locomotives entering our system during 2004, an increase of 6% in our locomotive road fleet.

- **Free Cash Flow** – We generated free cash flow of $215 million in 2004. Free cash flow is defined as cash provided by operating activities, less cash used in investing activities, dividends paid, and non-cash capital lease financings plus non-cash acquisitions.

Operating revenues increased $664 million (6%) to $12.2 billion in 2004, compared to an increase of $392 million (4%) in 2003. Commodity revenue increased $651 million (6%) in 2004 and $378 million (4%) in 2003. The increase in 2004 was driven by the industrial products, intermodal, and chemical commodity groups, while growth in 2003 was generated by gains in the industrial products, agricultural, intermodal, and energy commodity groups.

Average revenue per car (ARC) improved 3% to $1,236 in 2004 compared to a 2% increase in 2003, while revenue carloads increased 2% and 1% in 2004 and 2003, respectively. The increase in both periods was driven by fuel surcharges, price increases, and index-based contract escalators. We recognized $330 million and $112 million in commodity revenue from our fuel surcharge programs in 2004 and 2003, respectively.

Other revenue increased $13 million (3%) in 2004 driven by increased passenger and subsidiary revenue, partially offset by a decrease in accessorial revenues. In 2003, other revenue improved $14 million (3%) due to higher passenger, subsidiary, and accessorial revenues.

The following tables summarize the year-over-year changes in commodity revenue, revenue carloads, and average revenue per car by commodity type:

| *Commodity Revenue in Millions of Dollars* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Agricultural | $ 1,675 | $ 1,578 | $ 1,506 | 6% | 5% |
| Automotive | 1,235 | 1,216 | 1,209 | 2 | 1 |
| Chemicals | 1,719 | 1,589 | 1,575 | 8 | 1 |
| Energy | 2,404 | 2,412 | 2,343 | - | 3 |
| Industrial Products | 2,419 | 2,180 | 2,035 | 11 | 7 |
| Intermodal | 2,240 | 2,066 | 1,995 | 8 | 4 |
| Total | $11,692 | $11,041 | $10,663 | 6% | 4% |

| *Revenue Carloads in Thousands* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Agricultural | 883 | 883 | 875 | -% | 1% |
| Automotive | 826 | 820 | 818 | 1 | - |
| Chemicals | 935 | 888 | 904 | 5 | (2) |
| Energy | 2,172 | 2,187 | 2,164 | (1) | 1 |
| Industrial Products | 1,515 | 1,478 | 1,419 | 2 | 4 |
| Intermodal | 3,127 | 2,983 | 2,951 | 5 | 1 |
| Total | 9,458 | 9,239 | 9,131 | 2% | 1% |

| *Average Revenue per Car* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Agricultural | $ 1,896 | $ 1,787 | $ 1,722 | 6% | 4% |
| Automotive | 1,496 | 1,484 | 1,477 | 1 | - |
| Chemicals | 1,839 | 1,788 | 1,742 | 3 | 3 |
| Energy | 1,107 | 1,103 | 1,083 | - | 2 |
| Industrial Products | 1,597 | 1,475 | 1,434 | 8 | 3 |
| Intermodal | 716 | 693 | 676 | 3 | 3 |
| Total | $ 1,236 | $ 1,195 | $ 1,168 | 3% | 2% |

*Agricultural* – The 2004 improvement was driven by increased demand for dry feed ingredients and the positive ARC impact of longer average length of haul shipments. Corn and feed grain shipments also posted revenue gains as demand for these shipments to the Pacific Northwest improved. Revenue growth was also achieved through

Pacific Maritime Association (PMA), which occurred primarily in the fourth quarter of 2002. ARC in 2003 improved due to fuel surcharges and price increases.

*Mexico Business* – Included in the commodity revenue reported above is revenue from shipments to and from Mexico. This revenue grew 9% to $970 million in 2004 compared to a 2% increase to $893 million for 2003. Business gains in 2004 were led by increased volume in the industrial products, intermodal, chemical, and automotive business groups, particularly cement, newsprint and wood fiber, liquid and dry chemicals, soda ash, and automotive materials. Revenue growth was also driven by an increase in agricultural revenues resulting from both higher wheat exports and beer imports. A decline in export shipments of corn and feed grains, as well as a reduction in energy carloads, partially offset the increases. Growth in 2003 was led by market share gains in automotive materials shipments and increased revenue for agricultural products resulting from higher corn and meal exports, as well as increased beer imports.

**Operating Expenses**

| *Millions of Dollars* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Salaries, wages, and employee benefits .......... | $ 4,167 | $3,892 | $3,694 | 7% | 5% |
| Equipment and other rents .................... | 1,374 | 1,221 | 1,240 | 13 | (2) |
| Depreciation ............................ | 1,111 | 1,067 | 1,147 | 4 | (7) |
| Fuel and utilities ......................... | 1,816 | 1,341 | 1,065 | 35 | 26 |
| Materials and supplies ...................... | 488 | 414 | 476 | 18 | (13) |
| Casualty costs ........................... | 694 | 416 | 359 | 67 | 16 |
| Purchased services and other costs ............. | 1,270 | 1,067 | 925 | 19 | 15 |
| Total ................................. | $10,920 | $9,418 | $8,906 | 16% | 6% |

Operating expenses increased in 2004 due to higher fuel prices, an asbestos charge of $247 million (pre-tax), higher crew and asset utilization costs resulting from slower network velocity, and volume-related costs. Expenses in 2004 were also negatively impacted by wage and benefit inflation, additional training expenses associated with an increase in trainmen employment levels, increased depreciation expense, and higher casualty costs relating to a jury verdict upheld against the Railroad for a 1998 crossing accident and a derailment in San Antonio, Texas in 2004. Our service issues, including increased hiring and training efforts, added approximately $300 million in operating expenses during 2004.

Operating expenses in 2003 were higher due to increased fuel prices, wage and benefit inflation, and volume-related costs as well as higher operational costs resulting from a slower rail network in the third and fourth quarters of the year. These increases were mitigated somewhat by lower depreciation expense, a 2% reduction in employment levels, and cost control efforts. Cost control efforts are defined as focused actions to reduce discretionary spending and failure costs.

*Salaries, Wages, and Employee Benefits* – The increase in 2004 was driven by wages and training expenses associated with an increase in trainmen employment levels, increased crew costs due to slower network velocity, inflation, volume-related expenses, and severance costs associated with the relocation of various support functions to Omaha, Nebraska. Lower protection costs and performance-based compensation expense for management partially offset these increases. Protection cost represents the differential payment when the wage earned for active employment is lower than an employee's "protected" rate of pay. An individual's protected rate is imposed by the STB for employees adversely affected by a merger or is established by collective bargaining agreements. We also benefited from cost savings driven by a smaller non-transportation workforce during the year.

The increase in 2003 resulted from the adoption of FASB Statement No.143, *Accounting for Asset Retirement Obligations* (FAS 143), which accounted for $110 million of the increase. Other drivers included inflation, volume-related costs, protection costs, increased crew utilization costs due to a shortage of available crews in the third and fourth quarters, as well as higher pension expense.

*Equipment and Other Rents* – Equipment and other rents primarily includes rental expense the Railroad pays for freight cars owned by other railroads or private companies; freight car, intermodal, and locomotive leases; other

# EXHIBIT PX0565

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2004**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission file number 1-1070**

# OLIN CORPORATION

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| Virginia | 13-1872319 |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **190 Carondelet Plaza, Suite 1530, Clayton, MO** | **63105-3443** |
| **(Address of principal executive offices)** | **(Zip code)** |

**Registrant's telephone number, including area code: (314) 480-1400**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $1 per share | New York Stock Exchange<br>Chicago Stock Exchange<br>Pacific Exchange, Inc. |
| Series A Participating Cumulative Preferred Stock Purchase Rights | New York Stock Exchange<br>Chicago Stock Exchange<br>Pacific Exchange, Inc. |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒ No ☐

As of June 30, 2004, (the last business day of the registrant's most recently completed second fiscal quarter), the aggregate market value of registrant's common stock, par value $1 per share held by non-affiliates of registrant was approximately $1,221,529,800.

As of February 28, 2005, 70,930,731 shares of the registrant's common stock were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

**Portions of the following document are incorporated by reference in this Form 10-K as indicated herein:**

| Document | Part of 10-K into which incorporated |
|---|---|
| Proxy Statement relating to Olin's 2005 Annual Meeting of Shareholders | Part II, Part III |

Table of Contents

# PART I

## Item 1. BUSINESS

### GENERAL

Olin Corporation is a Virginia corporation, incorporated in 1892, having its principal executive offices in Clayton, MO. We are a manufacturer concentrated in three business segments: Chlor Alkali Products, Metals and Winchester®. Chlor Alkali Products manufactures and sells chlorine and caustic soda, sodium hydrosulfite, hydrochloric acid, hydrogen, bleach products and potassium hydroxide, which represent 22% of 2004 sales. Metals products, which represent 62% of 2004 sales, include copper and copper alloy sheet, strip, foil, rod, welded tube, fabricated parts and stainless steel and aluminum strip. Winchester products, which represent 16% of 2004 sales, include sporting ammunition, canister powder, reloading components, small caliber military ammunition and industrial cartridges. See our discussion of our segment disclosures contained in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### GOVERNANCE

We maintain an Internet website at http://www.olin.com. Our reports on Form 10-K, Form 10-Q, and Form 8-K, as well as amendments to those reports, are available free of charge on our website, as soon as reasonably practicable after we file the reports with the Securities and Exchange Commission (SEC). Our Principles of Corporate Governance, Committee Charters and Code of Business Conduct are available in the Corporate Governance section of the Investor section of our website at www.olin.com.

In May 2004, our Chief Executive Officer executed the annual Section 303A.12(a) CEO Certification required by the New York Stock Exchange (NYSE), certifying that he was not aware of any violation of the NYSE's corporate governance listing standards by Olin. Additionally, our Chief Executive Officer and Chief Financial Officer executed the required Sarbanes-Oxley Act of 2002 (SOX) Sections 302 and 906 certifications relating to this Annual Report on Form 10-K, which are filed with the SEC as exhibits to this Annual Report on Form 10-K.

### PRODUCTS, SERVICES AND STRATEGIES

## Chlor Alkali Products

#### Products and Services

We have been involved in the U.S. chlor alkali industry for more than 100 years and are a major participant in the U.S. chlor alkali market. Chlorine and caustic soda are co-produced commercially primarily by the electrolysis of salt. These co-products are produced simultaneously, and in a fixed ratio of 1.0 ton of chlorine to 1.1 tons of caustic soda. The industry refers to this as an Electrochemical Unit or ECU. With a demonstrated capacity as of the end of 2004 of 1.22 million ECUs per year, including 50% of the production from our partnership with PolyOne Corporation, which we refer to as our Sunbelt joint venture, we are the fourth largest chlor alkali producer in the United States, according to data from Chemical Market Associates, Inc. (CMAI). CMAI is a global petrochemical, plastics and fibers consulting firm established in 1979. According to CMAI data, we are the largest producer measured by production volume of chlorine and caustic soda in the eastern United States, with facilities located in McIntosh, AL, Charleston, TN, Augusta, GA, and Niagara Falls, NY. Since transportation costs can be a significant part of the final cost of the product to the customer, our close proximity to our caustic customers is an advantage. Approximately two-thirds of our caustic soda production is high purity membrane and rayon grade, which according to CMAI data, normally commands a premium selling price in the market.

Our manufacturing facilities in Augusta, McIntosh, Charleston, and a portion of our facility in Niagara Falls are ISO 9002 certified. ISO 9000 (which includes ISO 9001 and ISO 9002) and ISO 14000 (which includes ISO 14001) are sets of related international standards on quality assurance and environmental management developed by the International Organization for Standardization to help companies effectively document the quality and environmental management system elements to be implemented to maintain effective quality and environmental management systems. All four of these manufacturing facilities have also achieved Star status in the Voluntary Protection Program (VPP) of the Occupational Safety and Health Administration (OSHA). OSHA's VPP is a program in which companies voluntarily participate that recognizes facilities for their exemplary safety and health programs.

Table of Contents

Chlorine is used as a raw material in the production of thousands of products, but a significant portion of U.S. chlorine production is consumed in the manufacture of ethylene dichloride, or EDC, a precursor for polyvinyl chloride, or PVC. PVC is a plastic used in applications such as vinyl siding, plumbing and automotive parts. Other U.S. end-uses for chlorine include chlorinated intermediates, isocyanates and water treatment. While much of the chlorine produced in the U.S. is consumed by the producing company to make downstream products, we sell most of the chlorine we produce to third parties in the merchant market.

Caustic soda has a wide variety of end use applications, the largest of which is in the pulp and paper industry. Caustic soda is also used in the production of detergents and soaps, alumina and a variety of other inorganic and organic chemicals.

The chlor alkali industry is cyclical, both as a result of changes in demand for each of the co-products and as a result of the large increments in which new capacity is added. Because chlorine and caustic are produced in a fixed ratio, the supply of one product can be constrained both by the physical capacity of the production facilities and/or by the ability to sell the co-product. Prices for both products respond rapidly to changes in supply and demand. Our prices reached a low point in the second quarter of 2002 at approximately $200 per ECU and then increased through the third quarter of 2003. In the fourth quarter of 2003, our prices began to decrease. Prices remained flat through the first half of 2004 and increased throughout the third and fourth quarters, with the fourth quarter of 2004 price of approximately $410 per ECU.

Electricity and salt are the major purchased raw materials for our Chlor Alkali Products segment. Raw materials represent approximately 50% of the total cost of producing an ECU. Electricity is the single largest raw material component in the production of chlor alkali products. During 2004, we experienced an increase in the cost of electricity due to increased demand caused by higher levels of economic activity and higher energy cost. We are supplied by utilities that primarily utilize coal, hydroelectric and nuclear power and have relatively minor exposure to natural gas. The majority of the salt used in our Chlor Alkali Products segment is produced from internal resources but we do purchase salt in the merchant market. The commodity nature of this industry places an added emphasis on cost management and we believe that we have managed our manufacturing costs in a manner that makes us one of the low cost producers in the industry. In addition, as market demand grows in the future, we believe the design of the Sunbelt joint venture plant will enable us to expand capacity cost-effectively.

We also manufacture and sell a small volume of chlor alkali-related products and we recently invested in capacity and product upgrades in these areas. These products include chemically processed salt, hydrochloric acid, sodium hypochlorite, hydrogen, and potassium hydroxide. We also sell sodium hydrosulfite to paper, textile and clay bleaching customers.

The following table lists products of our Chlor Alkali Products business, with principal products on the basis of annual sales highlighted in bold face.

| *Products & Services* | *Major End Uses* | *Plants & Facilities* | *Major Raw Materials & Components for Products/Services* |
|---|---|---|---|
| **Chlorine/caustic soda** | Pulp & paper processing, chemical manufacturing, water purification, manufacture of vinyl chloride, bleach, swimming pool chemicals & urethane chemicals | Augusta, GA<br>Charleston, TN McIntosh, AL<br>Niagara Falls, NY | salt, electricity |
| Sodium hydrosulfite | Paper, textile & clay bleaching | Augusta, GA<br>Charleston, TN<br>Salto, Brazil | caustic soda, sulfur dioxide |
| Sodium hypochlorite | Household cleaners, laundry bleaching, swimming pool sanitizers, semiconductors, water treatment, textiles, pulp & paper and food processing | Augusta, GA<br>Charleston, TN McIntosh, AL<br>Niagara Falls, NY | chlorine, caustic soda |
| Hydrochloric acid | Steel, oil & gas, plastics, organic chemical synthesis, water and wastewater treatment, brine treatment, artificial sweeteners, pharmaceuticals, food processing and ore and mineral processing | Augusta, GA<br>Charleston, TN<br>Niagara Falls, NY | chlorine, hydrogen |
| Potassium hydroxide | Fertilizer manufacturing, soaps, detergents and cleaners, battery manufacturing, food processing chemicals and deicers | Charleston, TN | potassium chloride, electricity |

Table of Contents

##### Strategies

*Continued Role as a Preferred Supplier to Merchant Market Customers.* Based on our market research, we believe our Chlor Alkali Products business is viewed as a preferred supplier by our merchant market customers. We will continue to focus on providing quality customer service support and developing relationships with our valued customers.

*Pursue Incremental Expansion Opportunities.* We have invested in capacity and product upgrades in our chemically processed salt, hydrochloric acid, sodium hypochlorite, potassium hydroxide and hydrogen businesses. These expansions increase our captive use of chlorine while increasing the sales of these co-products. These niche businesses provide opportunities to upgrade chlorine and caustic to higher value-added applications. We also have the opportunity, when business conditions permit, to pursue incremental expansion through our Sunbelt joint venture.

### Metals

##### Products and Services

We have been in the Metals business for approximately 88 years. Based on Copper Development Association Inc. (CDA) data, we are a leading manufacturer of copper and copper alloy sheet, strip, plate, foil and brass rod in the United States. CDA acts as the central authoritative source of data and information pertaining to the U.S. copper and brass industry. While primarily processing copper and copper alloys, we also reroll and form other metals, such as aluminum and stainless steel. We believe we hold leading positions for premium priced, high performance alloys in the United States. We supply high performance alloys to non-U.S. customers through exports, technology licensing, joint ventures and local distribution. Participants in the copper and copper alloy sheet and strip industry include integrated mills, reroll mills and distributors, with many participants engaging in multiple roles. We believe that we are the largest U.S. participant in each of these categories. We believe that our status as the largest U.S. participant affords us a favorable industry position. We also believe we are one of the lowest cost producers, a quality and service leader and a specialty product innovator.

All of our copper and copper alloy sheet and strip mills are both QS 9000 and ISO 9000 certified. QS 9000 is an international automotive standard that was developed by General Motors, Ford Motor Company and Chrysler to harmonize the fundamental supplier quality systems as an assessment tool, and is based upon ISO 9000 standards. All sheet and strip locations are ISO certified. In September 2002, we completed our acquisition of Chase Industries Inc., which we refer to as Chase. Chase is a leading manufacturer and supplier of free-machining brass rod in the U.S. and Canada and is ISO 9002 certified.

We maintain many advantages over our competition through our patent-protected technologies. We believe our high performance alloys provide superior strength, conductivity and formability to customers in the automotive, electrical, electronic and telecommunications industries. We currently hold 31 U.S. patents associated with high performance alloys and 49 other U.S. patents related to various proprietary processing and technical capabilities, many of which are also registered in foreign jurisdictions. To further our global presence, we have established a joint venture with Yamaha Corporation in Japan to produce high performance alloys, formed a technical alliance with Wieland-Werke A.G. of Germany under which we jointly develop new high performance alloys and participate in an alloy licensing arrangement and formed a joint venture in 2002 with Luoyang Copper (Group) Ltd. in China to jointly construct and operate a metals service center to supply the growing Chinese demand, which became operational in the first quarter of 2004. These relationships provide us with greater global reach and enable us to provide high performance alloys in Asia and Europe.

In addition, through sales of our clad metal, produced by a proprietary cladding process, we believe we are a major supplier of coinage metal to the U.S. Mint. We also supply coinage metal to other world governments. Our Metals segment produces ammunition cartridge cups for use captively in the manufacture of our Winchester sporting ammunition, which constitutes a small portion of our total Metals segment output. We also sell cartridge brass to other ammunition makers. This relationship with Winchester, along with our growing fabrication business for select customers, provides us with a significant captive customer base.

Brass and other copper alloys are manufactured by melting copper together with various combinations of zinc, lead or other metals. The resulting product goes through a series of processes, including casting, hot rolling, milling,

Table of Contents

cold rolling, annealing, cleaning and slitting to produce sheet and strip and a similar process for the production of rod. The principal end-uses for sheet and strip products include: automotive (connectors and radiators); electronics (lead frames, connectors, wiring and telecommunications applications); ammunition; coinage; and other applications such as builder's hardware, plumbing supplies and welded tube for utility condensers and industrial heat exchangers. Brass rod is used to produce a variety of products, such as faucets, plumbing fittings, heating and air conditioning components, industrial valves, automotive parts and numerous hardware components.

The major raw materials used in our metals business are copper, zinc, other non-ferrous metals and brass scrap, purchased from merchants, dealers and customers at market prices.

Historically, demand for copper and copper alloy sheet and strip and rod has exhibited growth consistent with the growth in the U.S. gross domestic product. In the late 1990's and in 2000, demand expanded at a rapid pace principally due to the strength of the U.S. economy. From 1997 to 2000, sheet and strip demand grew at an annualized growth rate of approximately 8%. In 2001 through 2003, demand was lower primarily because of the economic downturn. Demand in 2004 improved over the 2001 through 2003 period, but remained below the levels experienced in the late 1990's and 2000.

The following table lists products and services of our Metals business, with principal products on the basis of annual sales highlighted in bold face.

| *Products and Services* | *Major End Uses* | *Plants & Facilities** | *Major Raw Materials & Components for Products/Services* |
|---|---|---|---|
| **Copper & copper alloy sheet & strip (standard & high performance)** | Electronic connectors, lead frames, electrical components, communications, automotive, builders' hardware, coinage, ammunition | Bryan, OH<br>East Alton, IL Seymour, CT<br>Waterbury, CT (two locations)<br>Iwata, Japan<br>(Yamaha-Olin<br>Metal Corporation) | copper, zinc & other nonferrous metals |
| Network of metals service centers | Electronic connectors, electrical components, communications, automotive, builders' hardware, household products | Allentown, PA Alliance, OH<br>Caguas, PR<br>Carol Stream, IL Suwanee, GA<br>Warwick, RI Watertown, CT<br>Yorba Linda, CA Guangzhou,<br>China Queretaro, Mexico | copper & copper alloy sheet, strip, rod, tube & steel & aluminum strip |
| **Posit-bond® clad metal** | Coinage strip & blanks | East Alton, IL | cupronickel, copper & aluminum |
| **Rolled copper foil, Copperbond® foil, stainless steel strip** | Printed circuit boards, electrical & electronic, automotive | Waterbury, CT | copper & copper alloy sheet, strip and foil and stainless steel strip |
| **Copper alloy welded tube** | Utility condensers, industrial heat exchangers, refrigeration & air conditioning, builders' hardware, automotive | Cuba, MO | copper alloy strip |
| **Fabricated products** | Builders' hardware, plumbing, automotive and ammunition components | East Alton, IL | copper and copper alloy, and stainless steel strip |
| **Shaped brass rod** | Plumbing, consumer durable goods, industrial machinery and equipment, and electrical and electronic parts | Montpelier, OH Los Angeles, CA (distribution center) | brass scrap |

* If site is not operated by Olin or a majority-owned, direct or indirect subsidiary, name of joint venture, affiliate or operator is indicated.

Table of Contents

**Strategies**

*Continue Profitable Growth Globally.* Our goal is to be a leading worldwide supplier of specialty copper-based products and related engineered materials. We intend to achieve this goal by building our high performance alloys business on a global basis. In 2004, we took a number of steps to continue to grow our global presence including the start-up of our joint venture service center in Guangzhou, China, the development of new business opportunities in Europe and the acquisition of the aluminum strip distribution assets of Metal Foils LLC in the United States.

*Maintain Premier Specialty Product Innovator Position.* We believe that we manufacture more high performance alloys than any other competitor, and we continue to allocate resources to maximize this product line. Our specialty products include proprietary high performance alloys and materials that meet strength, gauge, formability and conductivity requirements for applications in our customers' industries.

*Increase Cost Efficiencies.* We plan to continue to focus on achieving economies of scale, improved manufacturing processes and innovation in pursuit of cost reductions. We strive for profit improvements primarily through yield improvements, increased equipment utilization and capacity enhancements.

*Continue Our Quality Leadership.* We maintain ISO 9000, QS 9000, and ISO 14001 certifications. For example, our East Alton, IL mill carries the distinctive certifications of ISO 9001, due to its extensive design work, and ISO 14001, a prominent environmental standard. We believe that these certifications demonstrate a quality advantage not possessed by our key U.S. competitors. We also continue to maintain preferred supplier positions with some of the largest or most respected companies in segments where quality is essential, such as automotive and electronics.

*Leverage Our Service and Distribution Leadership for Growth.* We believe that we are a service and distribution leader in the copper-based metals industry. Our A.J. Oster distribution system extends throughout the United States and also includes facilities in Puerto Rico and Mexico. We sell directly from the mill to large volume customers, and to small and medium size customers through A.J. Oster and other licensed distributors. We intend to leverage our service leadership and our distribution network to improve our just-in-time delivery services and our customized order capabilities.

## Winchester

**Products and Services**

Winchester is in its 138th year of operation and its 74th year as part of Olin. Winchester is a premier developer and manufacturer of small caliber ammunition for sale to domestic and international retailers, law enforcement agencies and domestic and international militaries. We believe we are a leading U.S. producer of ammunition for recreational shooters, hunters, law enforcement agencies and the U.S. Armed Forces. Our legendary Winchester product line includes all major gauges and calibers of shotgun shells, rimfire and centerfire ammunition for pistols and rifles, canister powder, reloading components and industrial cartridges. We believe we are the leading U.S. supplier of small caliber commercial ammunition.

Winchester has strong relationships throughout the sales and distribution chain and strong ties to traditional dealers and distributors. Winchester has built its business with key high volume mass merchants and specialty sporting goods retailers. We have consistently developed industry-leading ammunition, and for nine of the last thirteen years, Winchester was recognized with the "Ammunition of the Year" award from the Shooting Industry Academy of Excellence for its technological and design leadership.

Winchester purchases raw materials such as lead from merchants, dealers and customers at market prices as posted on exchanges such as the Commodity Metals Exchange, or COMEX, and London Metals Exchange, or LME. Winchester also purchases copper-based strip and cups from our Metals segment. Winchester's other main raw material is propellant, which is purchased predominately from one of the United States' largest propellant suppliers.

Table of Contents

The following table lists products and services of our Winchester business, with principal products on the basis of annual sales highlighted in bold face.

| *Products & Services* | *Major End Uses* | *Plants & Facilities* | *Major Raw Materials & Components for Products/ Services* |
|---|---|---|---|
| **Winchester® sporting ammunition (shot-shells, small caliber centerfire & rimfire ammunition)** | Hunters & recreational shooters, law enforcement agencies | East Alton, IL<br>Oxford, MS (expected to become operational<br>in 2nd quarter 2005) Geelong, Australia | brass, lead, steel, plastic, propellant, explosives |
| Small caliber military ammunition | Infantry and mounted weapons | East Alton, IL | brass, lead, propellant, explosives |
| Industrial products (8 gauge loads & powder-actuated tool loads) | Maintenance applications in power & concrete industries, powder-actuated tools in construction industry | East Alton, IL<br>Geelong, Australia | brass, lead, plastic, propellant, explosives |

**Strategies**

*Leverage Existing Strengths.* Winchester plans to focus on seeking new opportunities to leverage the legendary Winchester brand name and will continue to offer a full line of ammunition products to the markets we serve, with specific focus on investments that lower our costs and that make Winchester ammunition the retail brand of choice.

*Focus on Product Line Growth.* With a long record of pioneering new product offerings, Winchester has built a strong reputation as an industry innovator. This includes the introduction of reduced-lead and non-lead products, which are growing in popularity for use in indoor shooting ranges and for outdoor hunting.

**INTERNATIONAL OPERATIONS**

We have sales offices and subsidiaries in various countries which support the worldwide export of products from the United States as well as overseas production facilities. In addition, we manufacture and distribute sodium hydrosulfite in Brazil.

Yamaha-Olin Metal Corporation, of which we are a 50% owner, manufactures high-performance copper alloys in Japan for sale to the electronics industry throughout the Far East. Our subsidiary, Olin Australia Limited, loads and packs sporting and industrial ammunition in Australia. We entered into an agreement with Luoyang Copper (Group) Ltd. to jointly construct and operate a metals service center in Guangzhou, China, which became operational in the first quarter of 2004. See the Note “Segment Information” of the Notes to Consolidated Financial Statements in Item 8, for geographic segment data. We are incorporating our segment information from that Note into this section of our Form 10-K.

**CUSTOMERS AND DISTRIBUTION**

During 2004, no single customer accounted for more than 5% of consolidated sales. Sales to all U.S. government agencies and sales under U.S. government contracting activities in total accounted for approximately 8% of consolidated sales in 2004. Products we sell to industrial or commercial users or distributors for use in the production of other products constitute a major part of our total sales. We sell some of our products, such as sporting ammunition and brass, to a large number of users or distributors, while we sell others, such as chlorine and caustic soda, in substantial quantities to a relatively small number of industrial users. We discuss the customers for each of our three businesses in more detail above under “Products and Services.”

We market most of our products and services primarily through our sales force and sell directly to various industrial customers, the U.S. Government and its prime contractors, to wholesalers and other distributors.

Because we engage in some government contracting activities and make sales to the U.S. Government, we are subject to extensive and complex U.S. Government procurement laws and regulations. These laws and regulations provide for ongoing government audits and reviews of contract procurement, performance and administration. Failure to comply, even inadvertently, with these laws and regulations and with laws governing the export of munitions and other controlled products and commodities could subject us or one or more of our businesses to civil and criminal penalties, and under certain circumstances, suspension and debarment from future government contracts and the exporting of products for a specified period of time.

Table of Contents

**COMPETITION**

We are in active competition with businesses producing the same or similar products, as well as, in some instances, with businesses producing different products designed for the same uses. We are among the largest manufacturers or distributors in the United States of ammunition, copper and copper alloys and certain chlor alkali products based on data provided by the Sporting Arms and Ammunition Manufacturers' Institute (SAAMI), CDA and CMAI, respectively. Founded in 1926, SAAMI is an association of the nation's leading manufacturers of sporting firearms, ammunition and components. Many factors influence our ability to compete successfully, including price, delivery, service, performance, product innovation and product recognition and quality, depending on the product involved.

**EMPLOYEES**

As of December 31, 2004, we had approximately 5,800 employees, with approximately 5,700 working in the United States and approximately 100 working in foreign countries. Various labor unions represent a majority of our hourly-paid employees for collective bargaining purposes. Although some labor contracts extend for as long as five years, others are for shorter periods.

A description of the labor contracts that are due to expire in the near future are listed below:

| *Location* | *Number of Employees* | *Expiration Date* |
|---|---|---|
| New Haven, CT (Metals) | 60 | November 2005 |
| East Alton, IL (Metals & Winchester) | 3,035 | December 2005/February 2006 |
| Alliance, OH (Metals) | 30 | January 2006 |

In January 2001, employees at our East Alton, IL facility, represented by the International Association of Machinists and Aerospace Workers (along with those represented by four other unions which had approved a contract in December 2000), agreed to a five-year labor contract, ending a strike that began on December 4, 2000. While we believe our relations with our employees and their various representatives are generally satisfactory, we cannot assure that we can conclude these labor contracts or any other labor agreements without work stoppages and cannot assure that any work stoppages will not have a material adverse effect on our business, financial condition or results of operations.

**RESEARCH ACTIVITIES; PATENTS**

Our research activities are conducted on a product-group basis at a number of facilities. Company-sponsored research expenditures were approximately $4 million in 2004 and $5 million in each of 2003 and 2002.

We own or license a number of patents, patent applications and trade secrets covering our products and processes, particularly for use in our Metals segment. We believe that, in the aggregate, the rights under our patents and licenses are important to our operations, but we do not consider any individual patent or license or group of patents and licenses related to a specific process or product to be of material importance to our total business.

**RAW MATERIALS AND ENERGY**

We purchase the major portion of our raw material requirements. The principal basic raw materials for our production of chlor alkali products are salt, electricity, sulfur dioxide, chlorine and hydrogen. The majority of the salt used in our Chlor Alkali Products segment is produced from internal resources. Copper, zinc, various other nonferrous metals and brass scrap are required for the Metals business. Lead, brass and propellant are the principal raw materials used in the Winchester business. We typically purchase our electricity, salt, sulfur dioxide and propellants pursuant to multiyear contracts. In the manufacture of ammunition, we use a substantial percentage of our own output of cartridge brass. We provide additional information with respect to specific raw materials in the tables above under "Products and Services."

Electricity is the predominant energy source for our manufacturing facilities. Most of our facilities are served by utilities which generate electricity principally from coal, hydroelectric and nuclear power.

Table of Contents

ENVIRONMENTAL AND TOXIC SUBSTANCES CONTROLS

The establishment and implementation of federal, state and local standards to regulate air, water and land quality have affected and will continue to affect substantially all of our manufacturing locations. Federal legislation providing for regulation of the manufacture, transportation, use and disposal of hazardous and toxic substances has imposed additional regulatory requirements on industry, particularly the chemicals industry. In addition, implementation of environmental laws, such as the Resource Conservation and Recovery Act and the Clean Air Act, has required and will continue to require new capital expenditures and will increase operating costs. We employ waste minimization and pollution prevention programs at our manufacturing sites and we are a party to various governmental and private environmental actions associated with waste disposal sites and manufacturing facilities. Charges to income for investigatory and remedial efforts were material to operating results in the past three years and may be material to net income in future years.

See our discussion of our environmental matters in Item 3, “Legal Proceedings” below, the Note “Environmental” of the Notes to Consolidated Financial Statements contained in Item 8, and Item 7, “Management’s Discussion and Analysis of Financial Condition and Results of Operations.”

ADDITIONAL FACTORS THAT MAY AFFECT FUTURE RESULTS

In addition to the other information in this Form 10-K, the following factors should be considered in evaluating Olin and our business. All of our forward-looking statements should be considered in light of these factors. Additional risks and uncertainties that we are unaware of or that we currently deem immaterial also may become important factors that affect us.

**Sensitivity to Global Economic Conditions and Cyclicality** Our operating results could be negatively affected during economic downturns.

The business of most of our customers, particularly our vinyl, urethanes, pulp and paper, automotive, coinage, electrical connectors, telecommunications and housing customers, are, to varying degrees, cyclical and have historically experienced periodic downturns. These economic and industry downturns have been characterized by diminished product demand, excess manufacturing capacity and, in some cases, lower average selling prices. Therefore, any significant downturn in our customers’ businesses or in global economic conditions could result in a reduction in demand for our products and could adversely affect our results of operations or financial condition. As a result of the depressed economic conditions beginning in the fourth quarter of 2000 and continuing through the first half of 2002, our vinyls, urethanes and pulp and paper customers had lower demand for our chlor alkali products. During the period 2000-2003, demand for Chlor Alkali products was low enough to lead to plant shutdowns within our industry and about 12% of capacity was removed from North American production. When demand improved in early 2004, the operating rates quickly increased to the mid to high 90% range, resulting in a tight supply/demand balance which has resulted in increasing pricing. We believe no new significant capacity is anticipated to come on stream until late 2006 or early 2007, and as a result, we believe supply/demand is expected to remain relatively tight and pricing is expected to remain above historical levels. Our coinage, electronic and telecommunications customers had lower demand for our Metals products beginning in the fourth quarter of 2000 and continuing through 2003. Lower demand in our Metals segment adversely affected our business and results of operations in 2001, 2002, and 2003, compared to 2000 and lower demand in our Chlor Alkali Products segment adversely affected our business and results of operations in 2001 and 2002, compared to 2000. The rod industry has been negatively affected by continued reductions in capital spending in the industrial machinery segment and reduced demand for building and household products as a result of declines in commercial construction. In 2004, Metals demand from most major market segments increased compared to 2003 due to the general improvement in the economy.

Although we do not generally sell a large percentage of our products directly to customers abroad, a large part of our financial performance is dependent upon a healthy economy beyond the United States. Our customers sell their products abroad. As a result, our business is affected by general economic conditions and other factors in Western Europe and most of East Asia, particularly China and Japan, including fluctuations in interest rates, customer demand, labor costs and other factors beyond our control. The demand for our customers’ products, and therefore, our products, is directly affected by such fluctuations. We cannot assure you that events having an adverse effect on the

Table of Contents

industries in which we operate will not occur or continue, such as a further downturn in the Western European, Asian or world economies, increases in interest rates, unfavorable currency fluctuations or a prolonged slowdown in the coinage, electronic or telecommunications industries.

The terrorist attacks of September 11th created many economic and political uncertainties and have had a negative impact on the global economy. The long-term effects of these attacks on our future operating results and financial condition are unknown. The national and international responses to terrorist attacks and the potential for additional terrorist attacks or similar events could have further material adverse effects on the economy in general, on our industry and on our operations. For example, war with one or more countries could have numerous consequences for us and our customers, one of which may be sustained high energy prices.

**Cyclical Pricing Pressure** Our profitability could be reduced by declines in average selling prices of our products, particularly declines in the ECU netback (gross price less freight and discounts) for chlorine and caustic.

Our historical operating results reflect the cyclical and sometimes volatile nature of the chemical, metals and ammunition industries. We experience cycles of fluctuating supply and demand in each of our business segments, particularly in Chlor Alkali Products which results in changes in selling prices. Periods of high demand, tight supply and increasing operating margins tend to result in increased capacity and production until supply exceeds demand, generally followed by periods of oversupply and declining prices. The industry build cycle, and its impact on industry pricing, has been most pronounced in our Chlor Alkali Products segment. For example, in 1995 and 1996, the chlor alkali industry was very profitable due to a tight supply/demand balance, which resulted in both higher operating rates and higher ECU prices. Higher profits led to reinvestment to expand capacity. This new capacity became operational in 1998 and 1999, resulting in industry over-capacity. This imbalance was exacerbated by falling demand as a result of the Asian financial crisis. The supply/demand imbalance resulted in both lower operating rates and lower ECU prices, and in 1999, many chlor alkali producers had operating losses. The supply/demand balance improved due to improved economic conditions in 2000 compared to 1999, and ECU prices increased in 2000 compared to 1999. As the U.S. and world economies deteriorated in 2001 and through the first half of 2002, the chlor alkali industry again experienced a period of oversupply because of lower industry demand for both chlorine and caustic. During the 2000-2003 timeframe about 12% of North American production was shut down which caused operating rates to improve without much improvement in demand. In late 2003 and early 2004, chlorine demand began to strengthen and operating rates increased to the mid to high 90% range. Caustic demand began to strengthen by mid year 2004 and both products have been tight since that time. This has resulted in numerous price increase initiatives over the last several months. We believe that with supply and demand in balance, and no new capacity anticipated to be available in the next couple of years, 2005/2006 may be the next cycle peak for the Chlor Alkali Industry. Another factor impacting demand for chlorine and caustic soda is the price of natural gas. Higher natural gas prices, which through 2004 have exceeded $5 per million British thermal units, increase our customers' manufacturing costs, and depending on the crude oil to gas ratio, could make them less competitive in world markets and, therefore, may result in reduced demand for our products.

Price in the chlor alkali industry is a major supplier selection criterion. We have little or no ability to influence prices in this large commodity market. Decreases in the average selling prices of our products could have a material adverse effect on our profitability. For example, assuming all other costs remain constant and internal consumption remains approximately the same, a $10 change in our ECU netback causes an approximate $11 million increase or decrease in our revenues and pretax profit when we are operating at full capacity. While we strive to maintain or increase our profitability by reducing costs through improving production efficiency, emphasizing higher margin products, and by controlling selling and administration expenses, we cannot assure you that these efforts will be sufficient to offset fully the effect of changes in pricing on operating results.

Because of the cyclical nature of our businesses, we cannot assure you that pricing or profitability in the future will be comparable to any particular historical period, including the most recent period shown in our operating results. We cannot assure you that the chlor alkali industry will not experience adverse trends in the future, or that our operating results and/or financial condition will not be adversely affected by them.

Our Metals and Winchester segments are also subject to changes in operating results as a result of cyclical pricing pressures, but to a lesser extent than the Chlor Alkali Products segment. We generally pass changes in prices for copper and other metals along to our customers as part of the negotiated price of the finished product in most of

Table of Contents

our Metals segment product lines. However, our Metals segment experiences manufacturing or pricing pressure with respect to its conversion charges, and we cannot assure you that adverse trends in pricing and margins will not affect operating results in the future. Changes in global supply/demand for copper and copper alloys may affect our ability to obtain raw materials under reasonable terms and conditions which may materially adversely affect our operating results. Similarly, selling prices of ammunition are affected by changes in raw material costs and availability and customer demand, and declines in average selling prices of our Winchester segment could adversely affect our profitability.

**Indebtedness** Our indebtedness could adversely affect our financial condition, limit our ability to grow and compete, which could prevent us from fulfilling our obligations under our indebtedness.

As of December 31, 2004, we had approximately $313 million of indebtedness outstanding, including $12 million representing the fair value related to $132 million of interest rate swaps in effect at December 31, 2004 and excluding our guarantee of $79 million of indebtedness of our Sunbelt joint venture. This does not include our $160 million senior credit facility on which we had $113 million available on that date because we issued $47 million of letters of credit. As of December 31, 2004, our indebtedness represented 47% of our total capitalization.

Our indebtedness could adversely affect our financial condition, limit our ability to grow and compete, which in turn could prevent us from fulfilling our obligations under our indebtedness. Despite our level of indebtedness, our senior credit facility and our existing indentures permit us to borrow additional money. If we borrow more money, the risks related to our indebtedness could be increased significantly.

**Debt Service** We may not be able to generate sufficient cash to service our debt, which may require us to refinance our indebtedness or default on our scheduled debt payments.

Our ability to generate sufficient cash flow from operations to make scheduled payments on our debt depends on a range of economic, competitive and business factors, many of which are outside our control. We cannot assure you that our business will generate sufficient cash flow from operations. If we are unable to meet our expenses and debt obligations, we may need to refinance all or a portion of our indebtedness on or before maturity, sell assets or raise equity. We cannot assure you that we would be able to refinance any of our indebtedness, sell assets or raise equity on commercially reasonable terms or at all, which could cause us to default on our obligations and impair our liquidity. Our inability to generate sufficient cash flow to satisfy our debt obligations, or to refinance our obligations on commercially reasonable terms, would have an adverse effect on our business, financial condition and results of operations, as well as on our ability to satisfy our debt obligations. See “Management’s Discussion and Analysis of Financial Condition and Results of Operations.”

At December 31, 2004, we had interest rate swaps of $132 million, which convert our fixed rate debt to a variable rate. As a result, approximately 44% of our indebtedness bears interest at variable rates that are linked to short-term interest rates. If interest rates rise, our costs relative to those obligations would also rise.

**Imbalance in Demand for Our Chlor Alkali Products** A loss of a substantial customer for our chlorine or caustic soda could cause an imbalance in demand for these products, which could have an adverse effect on our results of operations.

Chlorine and caustic soda are produced simultaneously and in a fixed ratio of 1.0 ton of chlorine to 1.1 tons of caustic soda. The loss of a substantial chlorine or caustic soda customer could cause an imbalance in demand for our chlorine and caustic soda products. An imbalance in demand may require us to reduce production of both chlorine and caustic soda or take other steps to correct the imbalance. Since we cannot store chlorine, we may not be able to respond to an imbalance in demand for these products as quickly or efficiently as some of our competitors. If a substantial imbalance occurred, we would need to reduce prices or take other actions that could have a negative impact on our results of operations and financial condition.

**Competition** We face competition from other chemical, metals and ammunition companies, including the migration by United States customers to low-cost foreign locations, which could adversely affect our revenues and financial condition.

Table of Contents

We are in active competition with companies producing the same or similar products, as well as, in some instances, with companies producing different products designed for the same uses. With respect to certain product groups, such as ammunition, copper alloys and brass rod, and with respect to certain chlor alkali products, we are among the largest manufacturers or distributors in the United States. We encounter competition in price, delivery, service, securing and maintaining customers, performance, technology, product innovation, and product recognition and quality, depending on the product involved. Our customers could decide to move some or all of their production to lower cost, offshore locations and this could reduce demand in the United States for our products. With respect to certain products, some of our competitors are larger, have greater financial resources and have less debt than we do. As a result, these competitors may be better able to withstand a change in conditions within the industries in which we operate and throughout the economy as a whole. If we do not compete successfully, our business, financial condition and results of operations could be adversely affected.

**Environmental Costs** We have ongoing environmental costs, which could materially adversely affect our financial position or results of operations.

The nature of our operations and products, including the raw materials we handle, exposes us to the risk of liabilities or claims with respect to environmental matters. We have incurred, and expect to incur, significant costs and capital expenditures in complying with environmental laws and regulations.

The ultimate costs and timing of environmental liabilities are difficult to predict. Liability under environmental laws relating to contaminated sites can be imposed retroactively and on a joint and several basis. One liable party could be held responsible for all costs at a site, regardless of fault, percentage of contribution to the site or the legality of the original disposal. We could incur significant costs, including cleanup costs, natural resources damages, civil or criminal fines and sanctions and third-party lawsuits claiming, for example, personal injury and/or property damage, as a result of past or future violations of, or liabilities under, environmental or other laws.

In addition, future events, such as changes to or more rigorous enforcement of environmental laws, could require us to make additional expenditures, modify or curtail our operations and/or install pollution control equipment.

Accordingly, it is possible that some of the matters in which we are involved or may become involved may be resolved unfavorably to us, which could materially adversely affect our financial position or results of operations. See “Management’s Discussion and Analysis of Financial Condition and Results of Operations-Environmental Matters.”

**Cost Control** Our profitability could be reduced if we experience higher-than-expected raw material, utility, transportation or logistics costs, or if we fail to achieve our targeted cost reductions.

Our operating results and profitability are dependent upon our continued ability to control, and in some cases further reduce, our costs. If we are unable to do so, or if costs outside of our control, particularly our costs of raw materials, utilities, transportation and similar costs increase beyond anticipated levels, our profitability will decline.

**Production Hazards** Our facilities are subject to operating hazards, which may disrupt our business.

We are dependent upon the continued safe operation of our production facilities. Our production facilities are subject to hazards associated with the manufacture, handling, storage and transportation of chemical materials and products and ammunition, including leaks and ruptures, explosions, fires, inclement weather and natural disasters, unexpected utility disruptions or outages, unscheduled downtime and environmental hazards. From time to time in the past, we have had incidents that have temporarily shut down or otherwise disrupted our manufacturing, causing production delays and resulting in liability for workplace injuries and fatalities. Some of our products involve the manufacture and/or handling of a variety of explosive and flammable materials. Use of these products by our customers could also result in liability if an explosion, fire, spill or other accident were to occur. We cannot assure you that we will not experience these types of incidents in the future or that these incidents will not result in production delays or otherwise have a material adverse effect on our business, financial condition or results of operations.

**Labor Matters** We cannot assure you that we can conclude future labor contracts or any other labor agreements without work stoppages.

Table of Contents

Various labor unions represent a majority of our hourly-paid employees for collective bargaining purposes. Although some labor contracts extend for as long as five years, others are for shorter periods. A description of the labor contracts that are due to expire in the near future are listed below:

| *Location* | *Number of Employees* | *Expiration Date* |
|---|---|---|
| New Haven, CT (Metals) | 60 | November 2005 |
| East Alton, IL (Metals & Winchester) | 3,035 | December 2005/February 2006 |
| Alliance, OH (Metals) | 30 | January 2006 |

In January 2001, employees at our East Alton, IL facility, represented by the International Association of Machinists and Aerospace Workers (along with those represented by four other unions which had approved a contract in December 2000), agreed to a five-year labor contract, ending a strike that began on December 4, 2000. While we believe our relations with our employees and their various representatives are generally satisfactory, we cannot assure that we can conclude future labor contracts or any other labor agreements without work stoppages and cannot assure that any work stoppages will not have a material adverse effect on our business, financial condition or results of operations.

**Tax Audits** We are currently subject to ongoing tax audits, which may result in additional tax payments.

We are currently subject to ongoing audits by the Internal Revenue Service (IRS) in connection with our Federal tax returns for the years 2001 and 2002 and have closed all tax years through 2000. However, we are currently contesting various issues before the Appeals Division of the IRS with respect to the years 1996 through 2000. Depending on the outcome of these audits, we may be required to pay additional taxes, and any additional taxes and related interest could be substantial. We have reserved amounts which we believe will be sufficient for any adverse outcome. The timing of any such payments is uncertain.

**Pension Plans** Declines in global equity markets on asset values and any declines in interest rates used to value the liabilities in our pension plan may result in higher pension costs and the need to fund the pension plan in future years in material amounts.

Under Statement of Financial Accounting Standards (SFAS) No. 87, we recorded non-cash after-tax charges of $20 million ($32 million pretax) and $24 million ($39 million pretax) to Shareholders' Equity as of December 31, 2003 and December 31, 2004, respectively. These charges reflect an accumulated benefit obligation in excess of the year-end market value of assets of our pension plan. In 2003 and 2004, the decline in interest rates more than offset increases in the value of the plan's assets, which necessitated the recording of these after-tax charges to shareholders' equity. These are non-cash charges and do not affect our ability to borrow under our revolving credit agreement.

**Security and Chemicals Transportation** New regulations on the transportation of hazardous chemicals and/or the security of chemical manufacturing facilities and public policy changes related to transportation safety could result in significantly higher operating costs.

The chemical industry, including the chlor alkali industry, has proactively responded to the issues surrounding the events of September 11, 2001 by starting new initiatives relating to the security of chemicals industry facilities and the transportation of hazardous chemicals in the United States. Simultaneously, government at the local, state and federal levels has begun the regulatory process which could lead to new regulations that would impact the security of chemical plant locations and the transportation of hazardous chemicals. Our Chlor Alkali business could be adversely impacted because of an incident at one of our facilities or an incident while transporting product or the cost of complying with new regulations. The extent of the impact would depend on the consequences of an incident and the nature and direction of future regulations, which are unknown at this time**.**

**Litigation and Claims** We are subject to litigation and other claims, which could cause us to incur significant expenses.

We are a defendant in a number of pending legal proceedings relating to our present and former operations. These include proceedings alleging injurious exposure of plaintiffs to various chemicals and other substances (including proceedings based on alleged exposures to asbestos and perchlorate). Frequently, such proceedings involve

Table of Contents

claims made by numerous plaintiffs against many defendants. We believe we have valid defenses to these proceedings and are defending them vigorously. However, because of the inherent uncertainties of litigation, we are unable to predict the outcome of these proceedings and therefore cannot determine whether the financial impact, if any, will be material to our financial position or results of operations.

**Changes in Laws and Regulations** We are subject to a variety of existing laws and regulations that affect our business.

We are unable to determine what effect, if any, the impact of changes in existing or new laws and regulations and the associated compliance costs may have on our operating results.

**Item 2. PROPERTIES**

We have manufacturing sites at 21 separate locations in 12 states and Puerto Rico and three manufacturing sites, and two metal service centers in five foreign countries, including the Yamaha-Olin Metal Corporation joint venture facility. The metals service center in China became operational in the first quarter of 2004. Most manufacturing sites are owned although a number of small sites are leased. We listed the locations at or from which our products and services are manufactured, distributed or marketed in the tables set forth under the caption "Products and Services."

We lease warehouses, terminals and distribution offices and space for executive and branch sales offices and service departments throughout the world.

**Item 3. LEGAL PROCEEDINGS**

(a) We completed the work of covering certain former waste ponds in 2003 in connection with remediation of mercury contamination at the site of our former mercury cell chlor alkali plant in Saltville, VA, and have now completed all remediation work required to date.

In mid-2003, the Trustees for natural resources in the North Fork Holston River, the Main Stem Holston River, and associated floodplains, located in Smyth and Washington Counties in Virginia, and in Sullivan and Hawkins Counties in Tennessee notified us of, and invited our participation in, an assessment of alleged injuries to natural resources resulting from the release of mercury. The Trustees also notified us that they have made a preliminary determination that we are potentially liable for natural resource damages in said rivers and floodplains. We have agreed to participate in the assessment. In light of the early stage, and inherent uncertainties, of the assessment, we cannot at this time determine whether the financial impact, if any, of this matter will be material to our financial position or results of operations. See "Environmental Matters" contained in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(b) As part of the continuing environmental investigation by federal, state and local governments of waste disposal sites, we have entered into a number of settlement agreements requiring us to participate in the investigation and cleanup of a number of sites. Under the terms of such settlements and related agreements, we may be required to manage or perform one or more elements of a site cleanup, or to manage the entire remediation activity for a number of parties, and subsequently seek recovery of some or all of such costs from other Potentially Responsible Parties (PRPs). In many cases, we do not know the ultimate costs of our settlement obligations at the time of entering into particular settlement agreements, and our liability accruals for our obligations under those agreements are often subject to significant management judgment on an ongoing basis. Those cost accruals are provided for in accordance with generally accepted accounting principles and our accounting policies set forth in the environmental matters section in Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations.

(c) As a result of an internal audit of our East Alton, IL facility, we disclosed, in February of 2002, to the United States Environmental Protection Agency (USEPA) and Illinois Environmental Protection Agency (IEPA), our uncertainty whether upgrades to certain operations were in compliance with all aspects of USEPA air emissions regulations. In June of that year, we submitted a report to IEPA analyzing the applicability of the regulations to the upgrades. We have been informed that USEPA has closed its file on this matter and that IEPA intends to take no enforcement action.

Table of Contents

(d) We and our subsidiaries are defendants in various other legal actions (including proceedings based on alleged exposures to asbestos and perchlorate) incidental to our past and current business activities. While we believe that none of these legal actions will materially impact our financial position, in light of the inherent uncertainties of the litigation concerning alleged exposures, we cannot at this time determine whether the financial impact, if any, of these matters will be material to our results of operations.

In particular, we have been named as defendant in a number of similar legal actions now pending in federal court in San Jose, CA relating to alleged groundwater contamination arising from perchlorate use between 1956 and 1996 by Olin and another, unrelated, defendant at an Olin facility in Morgan Hill, CA. We are vigorously defending these legal actions and are working with California state regulatory authorities to determine the scope of potential contamination.

**Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

We did not submit any matter to a vote of security holders during the three months ended December 31, 2004.

## Executive Officers as of February 28, 2005

| *Name and Age* | *Office* | *Served as an Olin Officer Since* |
|---|---|---|
| Joseph D. Rupp (54) | President and Chief Executive Officer | 1996 |
| Anthony W. Ruggiero (63) | Executive Vice President and Chief Financial Officer | 1995 |
| Stephen C. Curley (53) | Vice President and Treasurer | 2005 |
| John E. Fischer (49) | Vice President, Finance and Controller | 2004 |
| Jeffrey J. Haferkamp (50) | Vice President and President, Olin Brass | 2005 |
| Richard M. Hammett (58) | Vice President and President, Winchester Division | 2005 |
| Dennis R. McGough (56) | Vice President, Human Resources | 2005 |
| John L. McIntosh (50) | Vice President and President, Chlor Alkali Products Division | 1999 |
| George H. Pain (54) | Vice President, General Counsel and Secretary | 2002 |

No family relationship exists between any of the above named executive officers or between any of them and any of our directors. Such officers were elected to serve, subject to the By-laws, until their respective successors are chosen.

Each of the above-named officers except S. C. Curley, J. E. Fischer, J. J. Haferkamp, R. M. Hammett, D. R. McGough and G. H. Pain has served as an executive officer for not less than the past five years.

George H. Pain re-joined Olin on April 15, 2002 as Vice President, General Counsel and Secretary. Prior to the time, since 2001, he served as Vice President and General Counsel of General Dynamics Ordnance and Tactical Systems, Inc., an operating unit of General Dynamics Corporation. From 1997-2001, he served as Vice President, General Counsel and Secretary of Primex Technologies, Inc. (a manufacturer and provider of ordnance and aerospace products and services, which was spun off from Olin in 1996).

Stephen C. Curley re-joined Olin on August 18, 2003 as Chief Tax Counsel. He was elected Vice President and Treasurer effective January 1, 2005. From 1997-2001, he served as Vice President and Treasurer of Primex Technologies, Inc.

John E. Fischer re-joined Olin on January 2, 2004 as Vice President, Finance. On June 24, 2004, he was elected Vice President, Finance and Controller. From 1997-2001, he served as Vice President and Chief Financial Officer of Primex Technologies, Inc. During 2002 and 2003, Mr. Fischer did independent consulting for several companies including Olin.

Jeffrey J. Haferkamp was elected Vice President and President, Olin Brass effective January 1, 2005. Prior to that time and since October 2002, he served as President, Rolled Products. From April 2001 to September 2002, he served as Vice President, International for the Brass Division (currently part of the Metals Group). Prior to April 2001, he served as Vice President, Business Planning for the Brass Division.

Richard M. Hammett was elected Vice President and President, Winchester Division effective January 1, 2005. Prior to that time and since September 2002, he served as President, Winchester Division. From November 1998 until September 2002, he served as Vice President, Marketing and Sales for the Winchester Division.

Table of Contents

Dennis R. McGough was elected Vice President, Human Resources effective January 1, 2005. Prior to that time and since 1999, he served as Corporate Vice President, Human Resources.

## PART II

### Item 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

As of January 31, 2005, we had 6,363 record holders of our common stock.

Our common stock is traded on the New York Stock Exchange, Chicago Stock Exchange and Pacific Exchange, Inc.

The high and low sales prices of our common stock during each quarterly period in 2004 and 2003 are listed below. A dividend of $0.20 per common share was paid during each of the four quarters in 2004 and 2003.

| *2004* | *First Quarter* | *Second Quarter* | *Third Quarter* | *Fourth Quarter* |
|---|---|---|---|---|
| Market price of common stock per New York Stock Exchange composite transactions | | | | |
| High | $ 20.51 | 18.99 | 20.24 | 22.99 |
| Low | 16.37 | 15.20 | 15.93 | 18.18 |
| *2003* | | | | |
| Market price of common stock per New York Stock Exchange composite transactions | | | | |
| High | $ 20.00 | 19.70 | 19.00 | 20.53 |
| Low | 14.97 | 16.40 | 15.82 | 15.79 |

### Issuer Purchases of Equity Securities

| *Period* | *Total Number of Shares (or Units) Purchased* | *Average Price Paid per Share (or Unit)* | *Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs* | *Maximum Number of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs* |
|---|---|---|---|---|
| October 1-31, 2004 | | N/A | | |
| November 1-30, 2004 | | N/A | | |
| December 1-31, 2004 | | N/A | | |
| Total | | | | 154,076(1) |

(1) On April 30, 1998, we announced a share repurchase program approved by our board of directors for the purchase of up to 5 million shares of common stock. Through December 31, 2004, 4,845,924 shares had been repurchased, and 154,076 shares remain available for purchase under that program, which has no termination date.

### Equity Compensation Plan Information

We incorporate the information concerning our equity compensation plans under the heading "Equity Compensation Plan Information" in our Proxy Statement relating to our 2005 Annual Meeting of Shareholders by reference in this report.

Table of Contents

## Item 6. SELECTED FINANCIAL DATA

| ELEVEN-YEAR SUMMARY ($ and shares in millions, except per share data) | *2004* | *2003* | *2002* | *2001* | *2000* | *1999* | *1998* | *1997* | *1996* | *1995* | *1994* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operations** | | | | | | | | | | | |
| Sales | $1,997 | $1,557 | $1,272 | $1,232 | $1,496 | $1,395 | $1,504 | $ 1,572 | $ 1,817 | $ 1,886 | $ 1,686 |
| Cost of Goods Sold | 1,765 | 1,382 | 1,155 | 1,091 | 1,240 | 1,215 | 1,239 | 1,276 | 1,455 | 1,541 | 1,425 |
| Selling and Administration | 141 | 127 | 112 | 111 | 121 | 122 | 123 | 132 | 155 | 153 | 139 |
| Research and Development | 4 | 5 | 5 | 5 | 5 | 7 | 10 | 8 | 20 | 17 | 18 |
| Gain (Loss) on Sales and Restructuring of Businesses and Spin-off costs | (10) | (31) | | (39) | | | (63) | | 179 | | |
| Earnings (Loss) of Non-consolidated Affiliates | 10 | 8 | (7) | (8) | 2 | (11) | | 1 | 2 | 2 | (1) |
| Interest Expense | 20 | 20 | 26 | 17 | 16 | 16 | 17 | 24 | 27 | 33 | 27 |
| Interest and Other Income (Expense) | 12 | 4 | 6 | 23 | 5 | 3 | 7 | 14 | 11 | (7) | 1 |
| Income (Loss) before Taxes from Continuing Operations | 79 | 4 | (27) | (16) | 121 | 27 | 59 | 147 | 352 | 137 | 77 |
| Income Tax Provision (Benefit) | 28 | 4 | 4 | (5) | 46 | 10 | 21 | 50 | 125 | 47 | 26 |
| Income (Loss) from Continuing Operations | 51 | | (31) | (11) | 75 | 17 | 38 | 97 | 227 | 90 | 51 |
| Discontinued Operations, Net | 4 | 1 | | 2 | 6 | 4 | 40 | 56 | 53 | 50 | 40 |
| Cumulative Effect of Accounting Change, Net | | (25) | | | | | | | | | |
| Net Income (Loss) | $ 55 | $ (24) | $ (31) | $ (9) | $ 81 | $ 21 | $ 78 | $ 153 | $ 280 | $ 140 | $ 91 |
| **Financial Position** | | | | | | | | | | | |
| Cash and Cash Equivalents and Short-Term Investments | $ 147 | $ 190 | $ 136 | $ 202 | $ 82 | $ 46 | $ 75 | $ 185 | $ 605 | $ 2 | $ 2 |
| Working Capital(1) | 244 | 174 | 240 | 68 | 161 | 206 | 150 | 88 | (220) | 22 | 86 |
| Property, Plant and Equipment, Net | 478 | 495 | 545 | 469 | 475 | 468 | 475 | 517 | 400 | 580 | 540 |
| Total Assets | 1,618 | 1,432 | 1,413 | 1,207 | 1,107 | 1,063 | 1,589 | 1,707 | 2,118 | 1,963 | 1,749 |
| Capitalization: | | | | | | | | | | | |
| Short-Term Debt | 52 | 27 | 2 | 102 | 1 | 1 | 1 | 8 | 137 | 122 | 29 |
| Long-Term Debt | 261 | 314 | 346 | 330 | 228 | 229 | 230 | 262 | 271 | 406 | 418 |
| Shareholders' Equity | 356 | 176 | 231 | 271 | 329 | 309 | 790 | 879 | 946 | 841 | 749 |
| Total Capitalization | $ 669 | $ 517 | $ 579 | $ 703 | $ 558 | $ 539 | $1,021 | $ 1,149 | $ 1,354 | $ 1,369 | $ 1,196 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Per Share Data** | | | | | | | | | | | |
| Net Income (Loss) | | | | | | | | | | | |
| Basic: | | | | | | | | | | | |
| Continuing Operations[2] | $ 0.74 | $ 0.01 | $ (0.63) | $ (0.26) | $ 1.66 | $ 0.36 | $ 0.79 | $ 1.91 | $ 4.30 | $ 1.71 | $ 0.87 |
| Discontinued Operations, Net | 0.06 | 0.01 | | 0.04 | 0.14 | 0.09 | 0.85 | 1.11 | 1.04 | 1.04 | 0.96 |
| Accounting Change, Net | | (0.44) | | | | | | | | | |
| Net Income (Loss) | 0.80 | (0.42) | (0.63) | (0.22) | 1.80 | 0.45 | 1.64 | 3.02 | 5.34 | 2.75 | 1.83 |
| Diluted: | | | | | | | | | | | |
| Continuing Operations[2] | 0.74 | 0.01 | (0.63) | (0.26) | 1.66 | 0.36 | 0.79 | 1.90 | 4.26 | 1.70 | 0.87 |
| Discontinued Operations, Net | 0.06 | 0.01 | | 0.04 | 0.14 | 0.09 | 0.84 | 1.10 | 1.01 | 0.97 | 0.96 |
| Accounting Change, Net | | (0.44) | | | | | | | | | |
| Net Income (Loss) | 0.80 | (0.42) | (0.63) | (0.22) | 1.80 | 0.45 | 1.63 | 3.00 | 5.27 | 2.67 | 1.83 |
| Cash Dividends | | | | | | | | | | | |
| Common (historical) | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.90 | 1.20 | 1.20 | 1.20 | 1.20 | 1.10 |
| Common (continuing operations) | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.73 |
| ESOP Preferred (annual rate) | | | | | | | | | 5.97 | 5.97 | 5.97 |
| Series A Preferred (annual rate) | | | | | | | | | | 3.64 | 3.64 |
| Shareholders' Equity[3] | 5.03 | 2.99 | 4.01 | 6.24 | 7.48 | 6.87 | 17.25 | 17.98 | 18.13 | 17.03 | 15.43 |
| Market Price of Common Stock: | | | | | | | | | | | |
| High | 22.99 | 20.53 | 22.60 | 22.75 | 23.19 | 19.88 | 49.31 | 51.38 | 48.00 | 38.63 | 30.13 |
| Low | 15.20 | 14.97 | 13.85 | 12.05 | 14.19 | 9.50 | 23.88 | 35.38 | 34.88 | 24.25 | 23.00 |
| Year End | 22.02 | 20.06 | 15.55 | 16.14 | 22.13 | 19.81 | 28.31 | 46.88 | 37.63 | 37.13 | 25.75 |
| **Other** | | | | | | | | | | | |
| Capital Expenditures | $ 55 | $ 54 | $ 41 | $ 64 | $ 93 | $ 73 | $ 78 | $ 76 | $ 74 | $ 116 | $ 80 |
| Depreciation | 72 | 80 | 85 | 84 | 78 | 78 | 76 | 76 | 84 | 77 | 78 |
| Common Dividends Paid | 56 | 47 | 39 | 35 | 36 | 41 | 58 | 61 | 60 | 57 | 44 |
| Purchases of Common Stock | $ | $ | $ 3 | $ 14 | $ 20 | $ 11 | $ 112 | $ 163 | $ | $ | $ |
| Current Ratio | 2.2 | 2.2 | 2.5 | 1.8 | 1.9 | 2.0 | 1.8 | 1.8 | 1.6 | 1.0 | 1.2 |
| Total Debt to Total Capitalization[4] | 46.8% | 65.9% | 60.0% | 61.5% | 41.1% | 42.7% | 22.6% | 23.5% | 30.1% | 37.9% | 36.5% |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Effective Tax Rate | 35.8% | 76.5% | n/a | 30.9% | 38.1% | 37.0% | 35.6% | 34.0% | 35.5% | 34.3% | 33.2% |
| Average Common Shares Outstanding | 68.4 | 58.3 | 49.4 | 43.6 | 45.0 | 45.4 | 47.9 | 50.5 | 50.0 | 47.6 | 41.0 |
| Shareholders | 6,400 | 6,800 | 7,200 | 7,500 | 8,000 | 8,600 | 9,200 | 10,600 | 11,300 | 12,000 | 12,100 |
| Employees(5) | 5,800 | 5,500 | 5,900 | 5,600 | 6,300 | 6,700 | 6,400 | 6,600 | 6,200 | 7,200 | 7,500 |

In June 2004, we sold our Olin Aegis business. Our Selected Financial Data reflects the following businesses as discontinued operations: Olin Aegis, the spin off of Arch Chemicals, Inc. (our specialty chemicals business) in 1999 and Primex Technologies, Inc. (our Ordnance and Aerospace businesses) in 1996, and our isocyanates business (sold in December 1996 for $565 in cash).

(1) Working Capital excludes Cash and Cash Equivalents and Short-Term Investments.
(2) Includes gain of $2.20 on sale of the isocyanates business in 1996.
(3) In 1994, calculation is based on common shares and Series A Conversion Preferred Stock outstanding.
(4) Excluding reduction to equity for the Employee Stock Ownership Plan from 1994 through 1996.
(5) Employee data exclude employees who worked at government-owned/contractor-operated facilities.

Table of Contents

## Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### BUSINESS BACKGROUND

Our manufacturing operations are concentrated in three business segments: Chlor Alkali Products, Metals and Winchester. All three are capital intensive manufacturing businesses with growth rates closely tied to the general economy. Each segment has a commodity element to it, and therefore, our ability to influence pricing is quite limited on the portion of the segment's business that is strictly commodity. Our Chlor Alkali Products business is a commodity business where all supplier products are similar and price is the major supplier selection criterion. We have little or no ability to influence prices in this large, global commodity market. Cyclical price swings, driven by changes in supply/demand, can be abrupt and significant and, given capacity in our Chlor Alkali Products business, can lead to very significant changes in our overall profitability. While a majority of Metals sales are of a commodity nature, this business has a significant volume of specialty engineered products targeted for specific end-uses. In these applications, technical capability and performance differentiate the product and play a significant role in product selection and thus price is not the only selection criterion. Winchester also has a commodity element to its business, but a majority of Winchester ammunition is sold as a branded consumer product where there are opportunities to differentiate certain offerings through innovative new product development and enhanced product performance. While competitive pricing versus other branded ammunition products is important, it is not the only factor in product selection.

### RECENT DEVELOPMENTS AND HIGHLIGHTS

*2004 Year*

On January 29, 2004, we announced that our board of directors approved plans to relocate our corporate offices for organizational, strategic and economic reasons. By the end of the year, we had completed the relocation of a portion of our corporate services personnel from Norwalk, CT to our Main Office Building in East Alton, IL. We also established our new corporate headquarters in Clayton, which is in St. Louis County, MO, for logistical and other reasons. The relocation of the corporate offices was accompanied by a downsized corporate structure more appropriate for us in today's competitive business environment. The headquarters relocation was completed by the end of 2004. We expect the efficiencies of being substantially co-located with the Brass and Winchester businesses will result in corporate personnel being reduced by approximately forty percent, with total projected annual savings of approximately $6 million by 2006. As a result of the relocation, we incurred costs of approximately $10 million ($8.9 million, $0.5 million, and $0.7 million in the first quarter, third quarter and fourth quarter, respectively) in 2004. We expect to incur an additional $1 million of costs in 2005. This restructuring charge included primarily employee severance and related benefit costs, relocation expense, pension curtailment expense and the incurred cost for outplacement services for all affected employees. The sale of the Indianapolis facility in November 2004 resulted in a reduction of a previously established reserve related to our Indianapolis restructuring of $0.5 million, which reduced the fourth quarter restructuring charge to $0.2 million.

On February 3, 2004, we issued and sold 10 million shares of our common stock at a public offering price of $18.00 per share. Net proceeds from the sale were approximately $178 million and were used to make a voluntary contribution of $125 million to our pension plan. In March 2004, we used $18 million from the proceeds of the stock offering to repay the Illinois Industrial Pollution Control Revenue Bond, which became due in March of 2004. The remaining balance ($35 million) of the proceeds was used in April 2004 to pay a portion of Federal income taxes related to prior periods.

We disclosed in our 2003 Form 10-K that we were accepted to participate in the Internal Revenue Service (IRS) settlement initiative pertaining to tax issues related to our benefits liability management company. In addition, we disclosed a settlement with the IRS relative to our Company Owned Life Insurance (COLI) program. In the third quarter of 2004, a final settlement agreement was reached with the IRS on these and certain other outstanding issues related to tax audits covering the 1992 through 2000 tax years. In connection with these settlements we made payments in the second quarter of 2004 of approximately $40 million. These payments resolved all open issues regarding our benefits liability management company and our COLI program. As we disclosed previously, these tax

issues had been recorded as a liability prior to 2002. In the third quarter of 2004, the income tax provision included a $2 million reduction in income tax expense associated with the finalization, in the third quarter of 2004, of the settlement of certain issues related to income tax audits for the years 1992-2000.

In May 2004, we announced that a fire occurred in the electrical control room for the hot mill located in East Alton, IL on April 29, 2004. The hot mill was returned to full operation in mid May. The full-year costs relative to the fire were incurred by the Metals segment in the second quarter and were approximately $5 million pretax.

In June 2004, we sold our Olin Aegis business to HCC Industries Inc. Olin Aegis, headquartered in New Bedford, MA, is a manufacturer of high performance, high reliability, hermetic metal packages for the microelectronics industry. Olin Aegis employed approximately 250 people. The sale of our Olin Aegis business resulted in a pretax gain of $6 million and generated proceeds of $17 million. For Olin Aegis, the financial data is classified in our financial statements as discontinued operations for all periods presented.

On July 30, 2004, we entered into a new $160 million five-year senior revolving credit facility that replaced the $140 million senior revolving credit facility. The new credit facility expires on July 30, 2009. Borrowing options, restrictive covenants and the letter of credit subfacility are similar to or better than those of the $140 million senior revolving credit facility.

In September 2004, we were impacted by equipment problems and a hurricane at our McIntosh, AL chlor alkali facility. We invoked the force majeure clause in the chlorine contracts with our customers due to equipment problems and invoked the force majeure clause in the chlorine, caustic soda, hydrogen, salt and sodium hypochlorite contracts with our customers due to the effects of the hurricane. The negative impact of these issues was several million dollars. The plant returned to full operation in late September.

In September 2004, Winchester announced that it would relocate its East Alton rimfire manufacturing operation to Oxford, MS. The Oxford, MS location will allow Winchester Ammunition the ability to reduce costs, improve efficiencies, better utilize existing technology and achieve improved profitability in the product line. Winchester anticipates this move to be completed in the second quarter 2005. This relocation, which will affect about 150 salaried and hourly employees, does not impact the shotshell, centerfire rifle, and pistol manufacturing operations, which are located in East Alton, IL.

In November 2004, we purchased certain business assets of Metal Foils LLC for $3 million. Metal Foils LLC is a distributor of aluminum, stainless steel, and copper products located in Willoughby, OH. We relocated the purchased assets to our A.J. Oster facility in Alliance, OH in the fourth quarter of 2004.

Under SFAS No. 87, we recorded a $220 million after-tax charge ($360 million pretax) to Shareholders' Equity as of December 31, 2002, reflecting an accumulated benefit obligation in excess of the year-end market value of assets of our pension plan. In 2003, the decline in interest rates more than offset a significant rebound in the value of the plan's assets, which necessitated the recording of an additional after-tax charge of $20 million ($32 million pretax) in 2003. On February 6, 2004, we made a voluntary contribution of $125 million to the pension plan with the proceeds from the issuance of common stock (described above). In September 2004, we made a second voluntary contribution of $43 million to the pension plan. These 2004 voluntary contributions have improved the funded status of the pension plan. In addition, the 2004 contributions eliminated a Pension Benefit Guaranty Corporation premium of approximately $3 million that would have otherwise become payable from the pension plan assets in 2004. In 2004, the decline in interest rates due to a 25-basis point reduction more than offset the increases in the value of the plan's assets. Therefore, we recorded in December 2004 an additional after-tax charge of $24 million ($39 million pretax) as a result of an increase in the accumulated pension benefit obligation. These non-cash charges to Shareholders' Equity in each of the last three years do not affect our ability to borrow under our revolving credit agreement. In 2005, it is expected that the non-cash pretax pension expense will be approximately $16 million higher than in 2004 ($4 million per quarter). Based on revised assumptions and estimates taking into account the 2004 voluntary contributions, we now believe that no contributions will be required until 2008. We may elect to make selective voluntary contributions, when appropriate, between now and 2008.

Table of Contents

*2003 Year*

In the first quarter of 2003, we made a decision to close our manufacturing plant in Indianapolis, IN. The Indianapolis facility ceased operations on February 14, 2003. The plant manufactured copper and copper alloy sheet and strip products and employed approximately 200 people. Production at the Indianapolis strip mill has been consolidated within our East Alton, IL facility. While the Indianapolis strip mill had been an important part of the Metals segment since its acquisition in 1988, reduced domestic consumption of strip products combined with capacity additions at East Alton lessened the need to maintain the Indianapolis production base. As a result of this closure and certain other actions, we recorded in the first quarter of 2003 a pretax restructuring charge of $29 million. In addition, we recorded in the fourth quarter of 2003, a pretax restructuring charge of $2 million primarily for the write down of certain non-U.S. assets, netted with a reduction of a previously established reserve related to our Indianapolis restructuring.

The major portion of the first and fourth quarter charges was a non-cash charge ($25 million) related to the loss on disposal or write-off of equipment and facilities and goodwill. The balance of the restructuring charges related to severance and job-related benefit costs. At the Indianapolis facility, approximately 190 employees were terminated, while nine employees were transferred to the East Alton facility. In addition to the closing of the Indianapolis facility, the Metals segment had determined that further cost reductions were necessary due to continuing depressed economic conditions. Approximately 55 employees were terminated to reduce headcount through a combination of a reduction-in-force program in Metals and the relocation of the segment's New Haven, CT metals research laboratory activities to two existing manufacturing locations.

In the first quarter of 2003, we recorded an after-tax charge of $25 million in connection with the adoption of SFAS No. 143, "Accounting for Asset Retirement Obligations." We adopted this standard on January 1, 2003 and the impairment charge is to reflect the cost of retirement obligations related to our former operating facilities, certain hazardous waste units at our operating plant sites, and our Indianapolis facility which was shut down in the first quarter of 2003, as described above. The after-tax charge was recorded as the cumulative effect of an accounting change.

In the first quarter of 2003, we were accepted to participate in the IRS's settlement initiative pertaining to tax issues relating to our benefits liability management company. In addition, we reached a settlement with the IRS relative to our COLI program. These obligations had been recorded as a liability prior to 2002.

*2002 Year*

In March 2002, we issued and sold 3,302,914 shares of common stock at a public offering price of $17.50. The net proceeds from the sale were approximately $56 million.

In June 2002, we repaid the $100 million 8% notes from the proceeds from the sale of $200 million 9.125% notes in December 2001. In March 2002, we refinanced our variable rate tax-exempt debt issues, totaling $35 million.

In September 2002, we completed our acquisition of Chase with the issuance of approximately 9.8 million shares of our common stock for 100% of the outstanding stock of Chase. Our 2002 Metals segment's operating results include the sales and profits from Chase for the fourth quarter of 2002.

In November 2002, we announced that our Metals segment had entered into an agreement with Luoyang Copper to jointly construct and operate a metals service center in Guangzhou, Guangdong Province, China. The joint venture named Olin Luotang Metals (GZ) Ltd., Co., processes and distributes both our and Luoyang's copper alloy products to the growing Chinese marketplace. The joint venture allows us to supply specialty alloys targeted at the electronics, automotive and telecommunications industries, at competitive prices. This joint venture was operational in the first quarter of 2004.

Table of Contents

**CONSOLIDATED RESULTS OF OPERATIONS**

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | ($ in millions, except per share data) | | |
| Sales | $ 1,997 | $ 1,557 | $ 1,272 |
| Gross Margin | 232 | 175 | 117 |
| Selling and Administration | 141 | 127 | 112 |
| Restructuring Charges | 10 | 31 | |
| Earnings (Loss) of Non-consolidated Affiliates | 10 | 8 | (7) |
| Interest Expense, Net of Interest Income | 18 | 19 | 23 |
| Other Income | 10 | 3 | 3 |
| Income (Loss) from Continuing Operations before Taxes and Accounting Change | 79 | 4 | (27) |
| Income (Loss) from Continuing Operations before Accounting Change | 51 | | (31) |
| Discontinued Operations, Net | 4 | 1 | |
| Cumulative Effect of Accounting Change, Net | | (25) | |
| Net Income (Loss) | 55 | (24) | (31) |
| Diluted Income (Loss) Per Common Share: | | | |
| Income (Loss) from Continuing Operations before Accounting Change | $ 0.74 | $ 0.01 | $ (0.63) |
| Discontinued Operations, Net | 0.06 | 0.01 | |
| Accounting Change, Net | | (0.44) | |
| Net Income (Loss) | 0.80 | (0.42) | (0.63) |

*2004 Compared to 2003*

For the 2004 year, total company sales were $1,997 million compared with $1,557 million last year, an increase of $440 million, or 28%. Sales in the Metals segment increased $376 million. Metals volumes increased 11% over last year. The remaining increase in Metals segment sales was primarily a result of higher metal prices and changes in product mix. Average copper prices increased 59% during 2004. Chlor Alkali Products sales increased from last year by $48 million due to 10% higher volumes and higher Electrochemical Units (ECU) selling prices. Winchester sales were slightly above last year.

Gross margin increased $57 million, or 33%, in 2004 from 2003 primarily due to higher Metals volumes, improved Metals productivity and higher ECU selling prices for chlor alkali products, partially offset by higher pension and environmental expenses. The gross margin percentage increased to 12% in 2004 from 11% in 2003, because the higher sales, which resulted from increased metals values, largely offset the gross margin dollar increase of $57 million.

Selling and administration expenses as a percentage of sales were 7% in 2004 and 8% in 2003. Selling and administration expenses in 2004 were $14 million higher than in 2003 primarily due to increased legal fees and third-party settlement costs ($6 million), pension ($4 million), incentive and deferred compensation expense ($2 million), professional services ($2 million) and consulting expense ($1 million).

Restructuring charges for 2004 of $10 million were principally the result of the relocation of our corporate offices. This restructuring charge included primarily employee severance and related benefit costs, relocation expense, pension curtailment expense and the incurred cost for outplacement services. The restructuring charge in 2003 of $31 million was the result of the closure of our manufacturing plant in Indianapolis, IN and certain other actions. A major portion of this charge was a non-cash charge related to the loss on disposal or write off of equipment and facilities and goodwill. The balance of this charge related to severance and job-related benefit costs.

The earnings of non-consolidated affiliates were $10 million for 2004, up $2 million from 2003, primarily due to higher ECU pricing and higher volumes at the Sunbelt joint venture.

Interest expense, net of interest income, for 2004, decreased from 2003 by $1 million due to a lower level of outstanding net debt ($2 million) resulting from the repayment of the $18 million Illinois Industrial Pollution Control Revenue Bond in March 2004 and the $8 million Illinois Development Finance Authority Bond due June 1, 2004, and higher short-term investments offset in part by the effect of higher interest rates on variable-rate debt ($1 million).

Table of Contents

Other income increased from 2003 by $7 million primarily due to a $6 million non-recurring gain related to a settlement of a contract matter with an outside third party and a $2 million gain on the sale of our equity interest in an insurance investment, partially offset by lower miscellaneous income in 2004.

Excluding the $2 million reduction in income tax expense associated with the settlement of certain issues related to income tax audits for the years 1992 to 2000, the effective tax rate for the year ended December 31, 2004 was 39%. The 2004 effective tax rate was higher than the 35 percent U.S. federal statutory rate primarily due to state income taxes and income in certain foreign jurisdictions being taxed at higher rates. For 2003, we recorded a tax provision of $4 million on pretax income of $4 million. The 2003 effective tax rate was higher than the 35 percent U.S. federal statutory rate primarily due to our inability to utilize state and foreign net operating losses in certain jurisdictions and income in other foreign jurisdictions being taxed at higher rates. In addition, the 2003 restructuring charge included the write-off of goodwill, which is not deductible for tax purposes.

*2003 Compared to 2002*

For the 2003 year, total company sales were $1,557 million compared with $1,272 million in 2002, an increase of $285 million, or 22%. Sales in the Metals segment increased $186 million primarily due to the inclusion of the sales of Chase (full-year 2003 $222 million; fourth quarter 2002 $52 million). The remaining increase in Metals segment sales was primarily a result of higher metal prices. Chlor Alkali Products sales increased from the prior year by $79 million due to higher ECU selling prices because of the turnaround in the chlor alkali market. Winchester sales were slightly above the prior year.

Gross margin increased $58 million in 2003 from 2002 primarily due to higher ECU selling prices. The gross margin percentage increased to 11% in 2003 from 9% in 2002 primarily due to higher ECU selling prices for chlor alkali products.

Selling and administration expenses as a percentage of sales were 8% in 2003 and 9% in 2002. Selling and administration expenses in 2003 were $15 million higher than in 2002 primarily due to higher pension costs ($5 million), the inclusion of Chase's selling and administration expenses ($4 million), and other administration expenses such as consulting expenses ($2 million) and legal fees and third-party settlement costs ($2 million).

The earnings of non-consolidated affiliates were $8 million for 2003, up $15 million from 2002, primarily due to higher ECU pricing at the Sunbelt joint venture (2003 $7 million income; 2002 $8 million loss).

Interest expense, net of interest income, decreased from 2002 due to lower average debt levels in 2003 ($3 million) and lower interest rates on our debt portfolio ($2 million), offset in part by lower 2003 interest income resulting from lower interest income rates ($1 million). In June 2002, we repaid the $100 million 8% notes.

In 2003, we recorded a tax provision of $4 million on a pretax income of $4 million. The effective tax rate is higher than the 35 percent U.S. federal statutory tax rate primarily due to our inability to utilize state and foreign net operating losses in certain jurisdictions and income in other foreign jurisdictions being taxed at higher rates. In addition, the 2003 restructuring charge included the write-off of goodwill, which is not deductible for tax purposes. The tax benefits recorded on the losses in 2002 were less than the statutory rate because we recorded a tax provision of $10 million in connection with the surrender of life insurance policies purchased by us under the COLI program and were accruing interest on taxes which may become payable in the future.

**SEGMENT RESULTS**

We define segment results as income (loss) before interest expense, interest income, other income, and income taxes and include the results of non-consolidated affiliates. Consistent with the guidance in SFAS 131, we have determined it is appropriate to include the operating results of non-consolidated affiliates in the relevant segment financial results. Our management considers the Sunbelt Chlor Alkali Partnership to be an integral component of the Chlor Alkali Products segment and Yamaha-Olin Metal Corporation to be an integral component of the Metals segment. Each is engaged in the same business activity as the segment, including joint or overlapping marketing, management, manufacturing and technology development functions. Inter-segment sales of $37 million, $36 million

Table of Contents

and $30 million for the years 2004, 2003 and 2002, respectively, representing the sale of ammunition cartridge cups to Winchester from Metals have been eliminated from Metals segment sales.

| ($ in millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Sales: | | | |
| Metals | $1,230 | $ 854 | $ 668 |
| Chlor Alkali Products | 448 | 400 | 321 |
| Winchester | 319 | 303 | 283 |
| Total Sales | $1,997 | $1,557 | $1,272 |
| Income (Loss) from Continuing Operations before Taxes and Accounting Change: | | | |
| Metals(1) | $ 50 | $ 9 | $ 19 |
| Chlor Alkali Products(1) | 83 | 63 | (24) |
| Winchester | 22 | 22 | 16 |
| Corporate/Other: | | | |
| Pension(2) | 11 | 18 | 26 |
| Environmental | (23) | (20) | (15) |
| Other Corporate and Unallocated Costs | (46) | (41) | (29) |
| Restructuring Charges | (10) | (31) | |
| Interest Expense | 20 | 20 | 26 |
| Interest Income | 2 | 1 | 3 |
| Other Income | 10 | 3 | 3 |
| Income (Loss) from Continuing Operations before Taxes and Accounting Change | $ 79 | $ 4 | $ (27) |

(1) Earnings (loss) of non-consolidated affiliates are included in the segment results consistent with management's monitoring of the operating segments. The earnings (loss) from non-consolidated affiliates, by segment, are as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Metals | $ 1 | $ 1 | $ 1 |
| Chlor Alkali | 9 | 7 | (8) |
| Earnings (loss) of non-consolidated affiliates | $ 10 | $ 8 | $ (7) |

(2) The service cost and the amortization of prior service cost components of pension expense related to the employees of the operating segments are allocated to the operating segments based on their respective estimated census data. All other components of pension costs are included in Corporate/Other and include items such as the expected return on plan assets, interest cost and recognized actuarial gains and losses.

| | 2004 | 2003 | 2002 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Service cost and prior service cost | $ 22 | $ 23 | $ 23 |
| Other components of pension costs | (11) | (18) | (26) |
| Subtotal | 11 | 5 | (3) |
| Curtailment charge | 1 | | |
| Net periodic benefit cost (income) | $ 12 | $ 5 | $ (3) |

Table of Contents

## Chlor Alkali Products

*2004 Compared to 2003*

Chlor Alkali Products' sales for 2004 were $448 million compared to $400 million in 2003. The sales increase was due to approximately a 10% and a 4% increase in chlorine and caustic volumes and netbacks (gross selling price less freight and discounts), respectively. Chlorine and caustic demand increased 13% and 7% respectively, from 2003. In 2004, caustic prices declined through the second quarter. In the third quarter, caustic demand began to improve primarily due to an upturn in the general economy and the industry was able to pass through caustic price increases. Caustic demand was very strong in the fourth quarter and additional price increases were implemented and accepted. The chlor alkali industry produced at high operating rates to support continued strong chlorine demand, both in the U.S. and overseas. With operating rates at these high levels, average ECU pricing for 2004 improved over 2003, as demand remained strong and price-increase announcements were accepted as contract terms permit. Our ECU netbacks were approximately $335, excluding our Sunbelt joint venture, for 2004 compared to approximately $325 for 2003.

Chlor Alkali posted segment income of $83 million, compared to $63 million for 2003. Segment income was higher in 2004 because higher volumes ($20 million) and higher selling prices ($12 million) were partially offset by higher operating costs ($14 million). The favorable pricing and volumes were partially offset by higher manufacturing costs, primarily higher electricity prices, and administrative expenses, primarily salaries, incentive compensation, and legal expenses. In addition, maintenance-related expenses due to the equipment problems and a hurricane at our McIntosh, AL facility in the third quarter of 2004 negatively impacted income by several million dollars. Improved Sunbelt results of $2 million were over 2003 due to higher selling prices and higher volumes, resulting from the 2003 completion of a debottlenecking project. The operating results from the Sunbelt joint venture included interest expense of $6 million and $7 million in 2004 and 2003, respectively, on the Sunbelt Notes. Our operating rates for the full year 2004 were approximately 94% compared to 86% in 2003.

*2003 Compared to 2002*

Sales increased 25% from 2002 due primarily to higher ECU prices. The change in net sales reflects the pricing improvements since the netback low point in the second quarter of 2002. These sales results reflect a tremendous turnaround year over year as the chlor alkali industry pricing rebounded from the depressed levels of 2002. The year started out with aggressive price increases as the economy started to gain momentum. The pricing improvement continued until late in the third quarter when industry-wide caustic inventory and production exceeded demand. Excess caustic inventory and imports of off shore material forced U. S. producers to reduce pricing. Chlorine pricing remained steady during the year due to strong demand, primarily in the vinyls segment. Our ECU netbacks, excluding our Sunbelt joint venture, were approximately $325 in 2003, compared with approximately $235 in 2002, reflecting the impact of improved pricing. This pricing improvement was due to improving economic conditions and industry capacity rationalization. Our operating rates for the full year 2003 were approximately 86% compared to 87% in 2002.

Chlor Alkali posted segment income of $63 million, compared to an operating loss of $24 million in 2002. This increase was primarily due to higher selling prices ($78 million) and improved operating results from the Sunbelt joint venture ($15 million) because of higher selling prices. These two factors, along with the segment's cost reduction programs, more than offset higher manufacturing costs ($6 million) which resulted from increases in steam cost (natural gas price), increases in electricity cost and normal escalation. The operating results from the Sunbelt joint venture included interest expense of $7 million in 2003 and 2002, on the Sunbelt Notes. Also, in the second quarter of 2003, the Sunbelt joint venture completed a debottlenecking project. The impact of this project, in terms of capacity, was 40,000 ECU's on an annualized basis or 20,000 ECU increase for each partner.

Table of Contents

## Metals

*2004 Compared to 2003*

Sales for 2004 were $1,230 million compared to sales in 2003 of $854 million, an increase of 44%. Volumes increased 11% as most major market segments increased over the prior year. The remaining 33 percentage point increase in sales was due to higher metal prices and changes in product mix. During 2004, the average COMEX copper price was approximately $1.29 per pound, compared to $0.81 per pound in 2003, or an increase of 59%.

Shipments to the automotive segment increased in 2004 by 3% over 2003 as automotive production increased slightly over 2003. Shipments to the building products segment increased in 2004 by 3% over 2003 due to increased demand from the construction industry resulting from increased housing starts in 2004. Coinage shipments were up 37% from last year primarily due to the U.S. Mint's second quarter introduction of two new nickels commemorating the 200th anniversary of the Lewis and Clark Expedition and an improvement in the overall economy. Shipments to the ammunition segment increased 25% over last year primarily due to continued strong demand for military ordnance. Shipments to the electronics segment decreased 3% from last year as demand slowed in the last half of 2004.

The Metals segment income of $50 million in 2004 compared to $9 million in 2003, an increase of $41 million. The Metals segment improved operating results over last year were primarily the result of increased volumes, improved productivity, the shutdown of our Indianapolis facility in 2003 and reduced operating costs, offset in part by the costs relative to the fire at the hot mill of approximately $5 million.

*2003 Compared to 2002*

Sales for 2003 were $854 million and include sales of $222 million from Chase. Excluding Chase, sales were $632 million. Sales for 2002 (excluding fourth quarter Chase sales of $52 million) were $616 million. Shipment volumes (excluding Chase) were down 4% from 2002, mainly due to softer demand in the automotive and coinage segments with other segments being flat to slightly weaker, except for ammunition, which was stronger. However, reported sales (excluding Chase) increased 3% because of higher copper prices and a product mix containing a higher metal component.

Shipments to the automotive segment decreased in 2003 by 7% as automotive production declined versus 2002 levels. Coinage shipments were down 25% from the prior year due to reduced demand from the U.S. Mint primarily related to decreased demand for the state quarter program and the continued general softness in the overall economy. Shipments to the ammunition segment in 2003 increased from 2002 by 29% due to strong demand from the military.

Metals had segment income of $9 million (which included $8 million of Chase profits) in 2003 and segment income of $19 million (which included $2 million of fourth quarter profits at Chase) in 2002. The Metals segment operating results in 2003 (excluding Chase) decreased $16 million and were adversely impacted by a 4% decline in shipments, reduced product margins, higher natural gas costs of $4 million, and cost escalations in wages and fringe benefit costs approximating $4 million. The shutdown of the Indianapolis facility in the first quarter of 2003 increased profits over the 2002 period. Although the decline did not affect our 2003 results compared to 2002 results, as we acquired Chase in September 2002, Chase sales and profits for the total year 2003 were lower than the total year 2002 as a result of softer demand and lower margins.

## Winchester

*2004 Compared to 2003*

Sales were $319 million for 2004, compared to sales of $303 million for 2003. Commercial sales volumes accounted for the majority of the increase in 2004 from 2003. Segment income for 2004 was $22 million, equal to 2003's operating income. The favorable profit impact from the higher sales volumes was offset by higher commodity and other manufacturing costs.

*2003 Compared to 2002*

Sales were $303 for 2003 compared to sales of $283 for 2002. The increase in sales was primarily driven by higher domestic military demand. Segment income in 2003 increased to $22 million, from $16 million in 2002. This increase was primarily due to the higher sales resulting from increased domestic military demand, which more than offset higher wages and fringe benefit costs.

## Corporate/Other

*2004 Compared to 2003*

In 2004, we recorded total pension expense of $12 million compared to total pension expense of $5 million in 2003. The service costs and prior service cost components of pension expense, which are included in the operating segments and in other corporate and unallocated costs, were approximately equal in both years. For 2004, pension income included in Corporate/Other was $11 million compared with $18 million in 2003. The reduction in corporate pension income was due to the recognition of actuarial losses, which primarily relate to differences in assumed and actual asset returns, and lower interest rates, partially offset by higher expected investment income on a higher level of plan assets.

We have updated our pension-related projections based on the interest rate guidance provided by the Treasury Department as a result of the Pension Funding Equity Act of 2004, which was enacted on April 10, 2004. Its use causes differences in the timing of future contributions, not their magnitude, from what we had previously projected. On February 3, 2004, we issued and sold 10 million shares of our common stock at a public offering price of $18.00 per share. Net proceeds from the sale were $178 million and were used in part to make a voluntary contribution of $125 million to our pension plan. In September 2004, we made a second voluntary pension plan contribution of $43 million. We had previously stated that we were considering making a voluntary contribution in the $40 to $50 million range in 2005 but decided to accelerate the contribution in 2004. In addition, this contribution eliminated a Pension Benefit Guaranty Corporation insurance premium of approximately $3 million that would have otherwise become payable from the pension plan assets in 2004. Due to the $43 million pension plan contribution in September 2004, we currently project that no contributions will be required until 2008. Among other factors, changes in interest rates and pension fund investment performance could alter these forecasts. We may elect to make selective voluntary contributions, when appropriate, between now and 2008. We discuss our assumptions with respect to pension estimates under "Critical Accounting Policies and Estimates."

For 2004, charges to income for environmental investigatory and remedial activities were $23 million compared with $20 million in 2003. This provision related primarily to expected future remedial and investigatory activities associated with past manufacturing operations and former waste disposal sites. These charges are based on expectations regarding the potential resolution of investigations or remedial action at certain known sites. The increase in the 2004 annual environmental charges to income is primarily attributable to additional liabilities for alleged groundwater contamination at a former plant site. Environmental costs for ongoing plant operations, for example wastewater treatment, are included in the operating segments and are approximately equal year-over-year.

For 2004, other corporate and unallocated costs were $46 million compared with $41 million in 2003. This increase was primarily due to higher expenses such as higher legal fees and settlement costs ($4 million), professional services primarily associated with the Sarbanes Oxley Act ($2 million) and management compensation expenses ($1 million). In November 2004, we sold our Indianapolis facility, which alleviated our remaining asset retirement obligation, which we recorded in accordance with the adoption of SFAS No. 143 in 2003. This reduction decreased Corporate/Other expenses by $3 million in 2004.

*2003 Compared to 2002*

In 2003 we recorded total pension expense of $5 million and in 2002 total pension income of $3 million thereby resulting in an $8 million increase in total pension costs. The service cost and prior service cost components of pension expense, which are included in the operating segments and in other corporate and unallocated costs, were essentially equal in both years. The resulting decrease in the pension credit ($18 million in 2003, $26 million in 2002) recorded in Corporate/Other was due to the poor market returns on the pension assets in previous years and, to a lesser extent, the decline in interest rates.

Table of Contents

In 2003, charges to income for environmental investigatory and remedial activities were $20 million compared to $15 million in 2002. These charges relate primarily to remedial and investigatory activities associated with past manufacturing operations and former waste disposal sites.

Other corporate and unallocated costs increased from $29 million in 2002 to $41 million in 2003. The increase relates primarily to an insurance gain of $4 million recorded in 2002, and higher expenses in 2003 related to consulting fees ($2 million), various legal expenses ($2 million), higher incentive and deferred compensation costs ($2 million), and accretion expense ($1 million) associated with our asset retirement obligations recorded in accordance with Financial Accounting Standards No. 143, "Accounting for Asset Retirement Obligations," which we adopted on January 1, 2003.

**2005 OUTLOOK**

For Metals in the first quarter of 2005, we expect that strip shipment volumes will be down about 5% compared to the first quarter of 2004 in part due to weakness in the automotive and certain electronic market segments. However, strip volumes are expected to increase approximately 15% from the fourth quarter of 2004. We expect rod shipment volumes to be up about 5% from the first quarter of 2004 because of continued strength in the construction and industrial market segments, and up approximately 15% from the fourth quarter of 2004. As we look broadly at the strip and rod industries, we estimate that 2004 demand exceeded 2003 by 13% and 8%, respectively. Overall, demand in 2005 is expected to be slightly lower for strip because of early year softness in automotive and electronics, and slightly higher for rod because of continued strength in construction and industrial applications.

We expect higher Chlor Alkali results in the first quarter of 2005 primarily due to caustic pricing. We are expecting our ECU prices to increase significantly from the fourth quarter of 2004 to the first quarter of 2005 as our contracts reflect the impact of price increase announcements. We tend to see more improvement in overall results when caustic prices are increasing due to our customer mix and the volume of material available to sell. Both chlorine and caustic demand was very strong in the fourth quarter and with this trend continuing in 2005, anticipated price increases are expected to be supported.

In Winchester, higher commodity costs, particularly for lead and copper, are expected to be an issue for the entire ammunition industry in 2005. Price increase announcements have been made by various producers to try to recover as much of these commodity costs as possible. Also, we have said in the past that we expected the U.S. Army's supplemental procurement to be decided late in the first quarter of 2005. The Army has recently informed us that the award will be made at the end of the second quarter of 2005. In addition, Winchester anticipates that the relocation of its rimfire manufacturing operation to Oxford, MS, to be completed in the second quarter of 2005.

We now project that pension expense in 2005 will be approximately $16 million higher than 2004. This increase is higher than we have previously indicated because it reflects the impact of higher service costs, the lower discount rate and the higher amount of amortization of plan losses, primarily market losses on plan assets from prior periods. These are estimates based on historical plan experience and assumptions regarding the future. Also, in 2005, we estimate that charges to income for environmental investigatory and remedial activities may be in the $20 million range for the full year.

Our depreciation in 2005 will be in the $73 million range. Capital spending for 2004 was $55.1 million, and we expect that our capital spending in 2005 will be in line with our depreciation.

Table of Contents

**ENVIRONMENTAL MATTERS**

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | ($ in millions) | |
| Cash Outlays: | | | |
| Remedial and Investigatory Spending (Charged to Reserve) | $ 16 | $ 25 | $ 25 |
| Capital Spending | 3 | 2 | 3 |
| Plant Operations (Charged to Cost of Goods Sold) | 17 | 16 | 16 |
| Total Cash Outlays | $ 36 | $ 43 | $ 44 |
| Reserve for Environmental Liabilities: | | | |
| Beginning Balance | $ 93 | $ 98 | $100 |
| Charges to Income | 23 | 20 | 15 |
| Businesses Acquired | | | 8 |
| Remedial and Investigatory Spending | (16) | (25) | (25) |
| Ending Balance | $100 | $ 93 | $ 98 |

The establishment and implementation of federal, state and local standards to regulate air, water and land quality has affected and will continue to affect substantially all of our manufacturing locations. Federal legislation providing for regulation of the manufacture, transportation, use and disposal of hazardous and toxic substances, and remediation of contaminated sites, has imposed additional regulatory requirements on industry, particularly the chemicals industry. In addition, implementation of environmental laws, such as the Resource Conservation and Recovery Act and the Clean Air Act, has required and will continue to require new capital expenditures and will increase plant operating costs. We employ waste minimization and pollution prevention programs at our manufacturing sites.

We are party to various governmental and private environmental actions associated with past manufacturing facilities and former waste disposal sites. Associated costs of investigatory and remedial activities are provided for in accordance with generally accepted accounting principles governing probability and the ability to reasonably estimate future costs. Our ability to estimate future costs depends on whether our investigatory and remedial activities are in preliminary or advanced stages. With respect to unasserted claims, we accrue liabilities for costs that, in our experience, we may incur to protect our interests against those unasserted claims. Our accrued liabilities for unasserted claims amounted to $5 million at December 31, 2004. With respect to asserted claims, we accrue liabilities based on remedial investigation, feasibility study, remedial action and Operation, Maintenance and Monitoring (OM&M) expenses that, in our experience, we may incur in connection with the asserted claims. Required site OM&M expenses are estimated and accrued in their entirety for required periods not exceeding 30 years, which reasonably approximates the typical duration of long-term site OM&M. Charges to income for investigatory and remedial efforts were material to operating results in 2004, 2003, and 2002 and may be material to net income in future years. Such pretax charges to income were $23 million, $20 million and $15 million in 2004, 2003, and 2002 respectively. These charges relate primarily to remedial and investigatory activities associated with past manufacturing operations and former waste disposal sites. The 2004 increase in environmental charges to income was primarily attributable to additional liabilities for alleged groundwater contamination at a former plant site. The 2003 increase in environmental charges to income was primarily attributable to additional liabilities for alleged groundwater contamination at a former plant site and the cleanup of potential contaminants in the soil at an offsite disposal area.

Cash outlays for remedial and investigatory activities associated with former waste sites and past operations were not charged to income but instead were charged to reserves established for such costs identified and expensed to income in prior years. Cash outlays for normal plant operations for the disposal of waste and the operation and maintenance of pollution control equipment and facilities to ensure compliance with mandated and voluntarily imposed environmental quality standards were charged to income. Total environmental-related cash outlays for 2005 are estimated to be $48 million, of which $28 million is expected to be spent on investigatory and remedial efforts, $3 million on capital projects and $17 million on normal plant operations. Historically, we have funded our environmental capital expenditures through cash flow from operations and expect to do so in the future.

Table of Contents

Our estimated environmental liability at the end of 2004 was attributable to 60 sites, 15 of which were USEPA National Priority List (NPL) sites. Ten sites accounted for approximately 77% of such liability and, of the remaining 50 sites, no one site accounted for more than 2% of our environmental liability. One of these ten sites is in the investigatory stage of the remediation process. In this stage, remedial investigation and feasibility studies are being conducted by us and a Record of Decision (ROD) or its equivalent has not been issued. At one of the ten sites, a ROD or its equivalent has been issued by a responsible state agency and we are engaged in performing the remedial measures required by that ROD and part of that site is subject to a remedial investigation. At four of the ten sites, part of the site is subject to a remedial investigation and another part is in the long-term OM&M stage. The four remaining sites are in long-term OM&M. All ten sites are either associated with past manufacturing operations or former waste disposal sites. None of the ten largest sites represents more than 15% of the liabilities reserved on our consolidated balance sheet at December 31, 2004 for future environmental expenditures.

Our consolidated balance sheets included liabilities for future environmental expenditures to investigate and remediate known sites amounting to $100 million at December 31, 2004, and $93 million at December 31, 2003, of which $72 million and $67 million were classified as other noncurrent liabilities, respectively. Those amounts did not take into account any discounting of future expenditures or any consideration of insurance recoveries or advances in technology. Those liabilities are reassessed periodically to determine if environmental circumstances have changed and/or remediation efforts and our estimate of related costs have changed. As a result of these reassessments, future charges to income may be made for additional liabilities. Of the $100 million included on our consolidated balance sheet at December 31, 2004 for future environmental expenditures, we currently expect to utilize $68 million of the reserve for future environmental expenditures over the next 5 years, $14 million for expenditures 6 to 10 years in the future, and $18 million for expenditures beyond 10 years in the future. These estimates are subject to a number of risks and uncertainties, as described in "Additional Factors that may Affect Future Results    Environmental Costs."

Annual environmental-related cash outlays for site investigation and remediation, capital projects, and normal plant operations are expected to range between approximately $40 million to $50 million over the next several years, $25 million to $30 million of which is for investigatory and remedial efforts, which are expected to be charged against reserves recorded on our balance sheet. While we do not anticipate a material increase in the projected annual level of our environmental-related costs, there is always the possibility that such increases may occur in the future in view of the uncertainties associated with environmental exposures. Environmental exposures are difficult to assess for numerous reasons, including the identification of new sites, developments at sites resulting from investigatory studies, advances in technology, changes in environmental laws and regulations and their application, the scarcity of reliable data pertaining to identified sites, the difficulty in assessing the involvement and financial capability of other PRPs and our ability to obtain contributions from other parties and the lengthy time periods over which site remediation occurs. It is possible that some of these matters (the outcomes of which are subject to various uncertainties) may be resolved unfavorably to us, which could materially adversely affect our financial position or results of operations. At December 31, 2004, we estimate we may have additional contingent environmental liabilities of $50 million in addition to the amounts for which we have already recorded as a reserve.

**LEGAL MATTERS**

We and our subsidiaries are defendants in various legal actions (including proceedings based on alleged exposures to asbestos and perchlorate) incidental to our past and current business activities. We describe some of these matters in "Item 3    Legal Proceedings." While we believe that none of these legal actions will materially adversely impact our financial position, in light of the inherent uncertainties of the litigation concerning alleged exposures, we cannot at this time determine whether the financial impact, if any, of these matters will be material to our results of operations.

Table of Contents

**LIQUIDITY, INVESTMENT ACTIVITY AND OTHER FINANCIAL DATA**

***Cash Flow Data***

| *Provided By (Used For)* | *2004* | *2003* | *2002* |
|---|---|---|---|
| | | *($ in millions)* | |
| Qualified Pension Plan Contributions | $(169) | $ | $ |
| Net Operating Activities from Continuing Operations | (135) | 116 | 24 |
| Net Operating Activities | (137) | 118 | 31 |
| Capital Expenditures | (55) | (54) | (41) |
| Net Investing Activities | (27) | (11) | (13) |
| Net Financing Activities | 121 | (28) | (72) |

In 2004, income exclusive of non-cash charges, cash and cash equivalents on hand, proceeds from the common stock offering and proceeds from sales of businesses and investments were used to make voluntary contributions to our qualified pension plans, to finance our working capital requirements, capital and investment projects, dividends, to settle prior years' tax issues, and to repay long-term debt.

*Operating Activities*

In February 2004, we made a voluntary contribution of $125 million to our pension plan from the proceeds of our 2004 common stock offering and then, in September 2004 we made a second voluntary contribution of $43 million to our pension plan. In April 2004, we made tax payments of approximately $40 million pertaining to the settlement of certain issues related to income tax audits for the year 1992-2000. Excluding these pension contributions and tax payments, cash provided by operating activities decreased from the prior year due primarily to a higher investment in working capital, particularly higher accounts receivables and inventories. The investment in accounts receivable and inventories was higher in 2004 by $61 million and $18 million, respectively, primarily due to higher sales volumes in all segments and higher metal prices. The 50% increase in the 2004 fourth quarter average COMEX price of copper from 2003 was a major contributor to the increase in accounts receivable and inventories.

In 2003, the increase in cash provided by operating activities was primarily attributable to higher profits from operations and a lower investment in working capital, particularly in inventories, offset in part by higher accounts receivables. Our investment in inventories in 2003 was lower than 2002 primarily due to our efforts to reduce inventories in our Metal businesses consistent with market demand. The investment in accounts receivable was higher in 2003 due to higher sales in Chlor Alkali (higher ECU prices) and Metals (higher metal prices).

*Capital Expenditures*

Capital spending was $55 million in 2004 and $54 million in 2003. Capital spending in 2003 was $13 million higher than in 2002, as we returned to a more normalized level of spending in 2003. In 2002, we curtailed all non-essential capital spending in response to the weak operating results. Capital spending in 2004 was approximately 76% of depreciation compared to 69% in 2003.

In 2005, we plan to increase our capital spending to a level in line with our depreciation, or about $73 million, an increase of approximately 33% over the 2004 amount. The 2005 increase is primarily attributable to higher spending for capacity maintenance projects in the Chlor Alkali and Metals segments and the relocation of a product line in Winchester.

*Investing Activities*

In November 2004, we purchased certain business assets of Metal Foils LLC for $3 million. Metal Foils LLC is a distributor of aluminum, stainless steel, and copper products located in Willoughby, OH. We relocated the purchased assets to our A.J. Oster facility in Alliance, OH. The purchase price exceeded the fair value of the identifiable net assets acquired by $1 million. The acquisition has been accounted for using the purchase method of accounting. On September 27, 2002, we acquired 100% of the stock of Chase with the issuance of approximately 9.8 million shares of our common stock. The total consideration was approximately $178 million, which represented the fair value of Olin

Table of Contents

common stock issued. Chase is a leading manufacturer and supplier of brass rod in the U.S. and Canada. The purchase price exceeded the fair value of the identifiable net assets acquired by $40 million. The acquisition has been accounted for using the purchase method of accounting.

Proceeds from the sale of short-term investments of $25 million represented the equity value of the COLI program which we discontinued in the first quarter of 2003. We surrendered the life insurance policies that we purchased under this program, and received these proceeds in March 2003. In January 2002, we received $12 million for the sale of the stock of Prudential Insurance Company. We were awarded these shares of stock in 2001 as a result of Prudential's conversion from a mutual company to a stock company.

In April 2004, we sold our equity interest in an insurance investment. In June 2004, we sold our Aegis business to HCC Industries Inc. The proceeds from these sales approximated $20 million.

In our efforts to dispose of non-strategic, unproductive assets during a period of a soft economy and weak operating results, we sold the company-owned airplane in 2002. The disposition of property, plant and equipment in 2002 represents primarily the sale of the airplane at approximately book value.

The 2004 and 2003 decrease in investments and advances in affiliated companies, at equity, represents cash distributions in excess of Sunbelt's improved operating results which more than offset our share of Sunbelt's repayment of its Series O Notes and related interest expense. The increase in 2002 for investments and advances in affiliated companies, at equity, represents primarily our share of Sunbelt's repayment of debt and related interest obligations. In addition, we funded a portion of Sunbelt's operating losses in 2002.

*Financing Activities*

On July 30, 2004 we entered into a five-year senior revolving credit facility of $160 million, including a sublimit for letters of credit, which will expire on July 30, 2009. At December 31, 2004, we had $113 million available under this senior revolving credit facility. We issued $47 million of letters of credit under a subfacility for the purpose of supporting certain long-term debt, certain workers compensation insurance policies, and plant closure and post-closure obligations. Under the facility, we may select various floating rate borrowing options. It includes various customary restrictive covenants, including restrictions related to the ratio of debt to earnings before interest expense, taxes, depreciation and amortization (leverage ratio) and the ratio of earnings before interest expense, taxes, depreciation and amortization to interest expense (coverage ratio).

In March 2004, we used $18 million from the proceeds of our February 2004 stock offering to repay the Illinois Industrial Pollution Control Revenue Bond, which became due in March of 2004. In June 2004, we repaid the $8 million Illinois Environmental Improvement Bond, which became due in June 2004. In June 2002, we used $100 million from the proceeds of the December 2001 Note Offering to repay the $100 million 8% Notes.

In March 2002, we also refinanced $35 million of tax-exempt debt to create additional capacity under our revolving credit facility by eliminating the need for an equivalent amount of letters of credit.

In January 2003, we renegotiated our $11 million note due 2005. The maturity date was extended to 2013 and the interest rate was reduced from 7.75% to 6.5%, effective January 1, 2003.

During 2002, we used $3 million to repurchase 144,157 shares of our stock. Under programs previously approved by our board of directors, approximately 154,000 shares remained to be repurchased as of December 31, 2004.

On February 3, 2004, we issued and sold 10 million shares of our common stock at a public offering price of $18.00 per share. Net proceeds from the sale were $178 million. In March 2002, we issued and sold 3,302,914 shares of common stock at a public offering price of $17.50. Net proceeds from this sale were approximately $56 million.

During 2004, 2003 and 2002, we issued 793,778, 915,159 and 1,039,259 shares of common stock with a total value of $14 million, $16 million and $18 million, respectively, to the Contributing Employee Ownership Plan. These shares were issued to satisfy the investment in our common stock resulting from employee contributions, our matching contributions and re-invested dividends.

Table of Contents

The percent of total debt to total capitalization decreased to 47% at December 31, 2004, from 66% at year-end 2003 and was 60% at year-end 2002. The decrease from year-end 2003 was due primarily to the higher shareholders' equity resulting from the issuance of 10 million shares of our common stock in February 2004, along with the repayment of our long-term debt obligations, which became due primarily in March and June of 2004. The increase in 2003 from year-end 2002 was due primarily to the lower shareholders' equity resulting from the restructuring charge and the accounting change under SFAS No. 143.

Dividends per common share were $0.80 in 2004, 2003 and 2002. Total dividends paid on common stock amounted to $56 million in 2004, $47 million in 2003 and $39 million in 2002.

The payment of cash dividends is subject to the discretion of our board of directors and will be determined in light of then-current conditions, including our earnings, our operations, our financial conditions, our capital requirements and other factors deemed relevant by our board of directors. In the future, our board of directors may change our dividend policy, including the frequency or amount of any dividend, in light of then-existing conditions.

**LIQUIDITY AND OTHER FINANCING ARRANGEMENTS**

Our principal sources of liquidity are from cash and cash equivalents, short-term investments, cash flow from operations and short-term borrowings under our senior revolving credit facility. We also have access to the debt and equity markets.

Cash flow from operations is variable as a result of the cyclical nature of our operating results, which have been affected recently by economic cycles in many of the industries we serve, such as automotive, electronics and the telecommunications sectors. In addition, cash flow from operations is affected by changes in ECU selling prices caused by the changes in the supply/demand balance of chlorine and caustic, resulting in the chlor alkali business having significant leverage on our earnings. For example, assuming all other costs remain constant and internal consumption remains approximately the same, a $10 change in our ECU netback causes an approximate $11 million increase or decrease in our revenues and pretax profit when we are operating at full capacity

Our current debt structure is used to fund our business operations and commitments from banks under our revolving credit facility are a source of liquidity. As of December 31, 2004, we had long-term borrowings, including the current installment, of $313 million of which less than $1 million was at variable rates. We have entered into interest rate swaps on approximately $132 million of our underlying debt obligations whereby we agree to pay variable rates to a counterpart who, in turn, pays us fixed rates. The counter parties to these agreements are major financial institutions. We have designated the swap agreements as fair value hedges of the risk of changes in the value of fixed rate debt due to changes in interest rates for a portion of our fixed rate borrowings under SFAS 133. Accordingly, the swap agreements have been recorded at their fair market value of $12 million and are included in Other Assets on the accompanying Consolidated Balance Sheet, with a corresponding increase in the carrying amount of the related debt. No gain or loss has been recorded as the contracts met the criteria of SFAS 133 to qualify for hedge accounting treatment with no ineffectiveness. Annual maturities of long-term debt are $52 million in 2005; $1 million in 2006, $2 million in 2007; $8 million in 2008; none in 2009 and a total of $250 million thereafter.

We use operating leases for certain properties, such as railroad cars, distribution, warehousing and office space, data processing and office equipment. Virtually none of our lease agreements contain escalation clauses or step rent provisions. Future minimum rent payments under operating leases having initial or remaining non-cancelable lease terms in excess of one year at December 31, 2004 are as follows: $23 million in 2005; $22 million in 2006; $20 million in 2007; $16 million in 2008; $12 million in 2009; and a total of $57 million thereafter. Assets under capital leases are not significant.

On December 31, 1997, we entered into a long-term, sulfur dioxide supply agreement with Alliance Specialty Chemicals, Inc. (Alliance), formerly known as RFC $SO_2$, Inc. Alliance has the obligation to deliver annually 36,000 tons of sulfur dioxide. Alliance owns the sulfur dioxide plant, which is located at our Charleston, TN facility and is operated by us. The price for the sulfur dioxide is fixed over the life of the contract and, under the terms of the contract, we are obligated to make a monthly payment of approximately $0.2 million regardless of the amount of sulfur dioxide purchased. Commitments related to this agreement are approximately $2 million per year for each year of 2005 through 2011 and $1 million in 2012. This supply agreement expires in 2012.

We utilize a credit facility and standby letters of credit. In July 2004, we entered into a new five-year senior revolving credit facility with a group of banks. This credit facility is described above under the caption, "Financing Activities." As of December 31, 2004, we did not have any outstanding borrowings under this credit facility. At December 31, 2004, we had outstanding standby letters of credit of $47 million. These letters of credit were used to support certain long-term debt, certain workers compensation insurance policies, and plant closure and post-closure obligations.

In December 2002, we registered $400 million of securities with the Securities and Exchange Commission whereby from time to time, we may issue debt securities, preferred stock and/or common stock and associated warrants. After the issuance of 10 million shares of common stock in February 2004, $220 million was available for issuance at December 31, 2004.

On February 3, 2004, we issued and sold 10 million shares of our common stock at a public offering price of $18.00. Net proceeds from the sale were approximately $178 million and were used to make a $125 million voluntary contribution to our pension plan. In March 2004, we used $18 million from the proceeds of the stock offering to repay the Illinois Pollution Control Revenue Bond, which became due in March of 2004. The remaining balance ($35 million) of the proceeds was used in April 2004 to pay a portion of Federal income taxes related to prior periods.

We and our partner, PolyOne Corporation (PolyOne) own equally the Sunbelt joint venture. Oxy Vinyls (a joint venture between OxyChem and PolyOne) is required to purchase 250 thousand tons of chlorine based on a formula related to its market price. We market the excess chlorine and all of the caustic produced. The construction of this plant and equipment was financed by the issuance of $195 million of Guaranteed Senior Secured Notes due 2017. The Sunbelt joint venture sold $97.5 million of Guaranteed Senior Secured Notes due 2017, Series O, and $97.5 million of Guaranteed Senior Secured Notes due 2017, Series G. We refer to these notes as the Sunbelt Notes. The Sunbelt Notes bear interest at a rate of 7.23% per annum payable semiannually in arrears on each June 22 and December 22.

We have guaranteed the Series O Notes, and PolyOne has guaranteed the Series G Notes, in both cases pursuant to customary guaranty agreements. Our guarantee and PolyOne's guarantee are several, rather than joint. Therefore, we are not required to make any payments to satisfy the Series G Notes guaranteed by PolyOne. An insolvency or bankruptcy of PolyOne will not automatically trigger acceleration of the Sunbelt Notes or cause us to be required to make payments under our guarantee, even if PolyOne is required to make payments under its guarantee. However, if the Sunbelt joint venture does not make timely payments on the Sunbelt Notes, whether as a result of a failure to pay on a guarantee or otherwise, the holders of the Sunbelt Notes may proceed against the assets of the Sunbelt joint venture for repayment. If we were to make debt service payments under our guarantee, we would have a right to recover such payments from the Sunbelt joint venture.

Beginning on December 22, 2002 and each year thereafter until maturity of the Sunbelt Notes in 2017, our Sunbelt joint venture is required to repay approximately $12 million of the Notes, of which approximately $6 million is attributable to the Series O Notes. After the payment of $6 million on the Series O Notes in December 2004, our guarantee of these notes was $79 million. In the event our Sunbelt joint venture cannot make any of these payments, we would be required to fund our half of such payment. In certain other circumstances, we may also be required to repay the Sunbelt Notes prior to their maturity. We and PolyOne have agreed that, if we or PolyOne intend to transfer our respective interests in the Sunbelt joint venture and the transferring party is unable to obtain consent from holders of 80% of the aggregate principal amount of the indebtedness related to the guarantee being transferred after good faith negotiations, then we and PolyOne will be required to repay our respective portions of the Sunbelt Notes. In such event, any make whole or similar penalties or costs will be paid by the transferring party.

Table of Contents

Excluding our guarantee of the Sunbelt Notes described above, our long-term contractual commitments, including the on and off-balance sheet arrangements, consisted of the following:

| *Contractual Commitments* | *Payments Due by Year* | | | | |
|---|---|---|---|---|---|
| | *Total* | *Less than 1 Year* | *1-3 Years* | *3-5 Years* | *More than 5 Years* |
| | | | *($ in millions)* | | |
| Debt obligations | $313 | $ 52 | $ 3 | $ 8 | $ 250 |
| Interest payments under debt obligations and interest rate swap agreements [(a)] | 120 | 18 | 33 | 33 | 36 |
| Pension plan contributions [(b)] | | | | | |
| Postretirement benefit payments [(b)] | 18 | 9 | 9 | | |
| Off-Balance Sheet Commitments: | | | | | |
| Noncancelable operating leases | 150 | 23 | 42 | 28 | 57 |
| Purchasing commitments: | | | | | |
| Raw materials | 72 | 42 | 11 | 10 | 9 |
| Utilities | 27 | 13 | 12 | 2 | |
| Operating supplies | 1 | 1 | | | |
| Total | $701 | $ 158 | $ 110 | $ 81 | $ 352 |

(a) For the purposes of this table, we have assumed for all periods presented that there are no changes in the principal amount of any variable rate debt from the amounts outstanding on December 31, 2004 and that there are no changes in the rates from those in effect at December 31, 2004 which ranged from 2.34% to 9.125%.

(b) These amounts are only estimated payments assuming the continuation of postretirement benefits, a growth rate of 9% for 2005 and 8.25% for 2006 for estimated health care cost inflation, an annual expected rate of return on pension plan assets of 9%, and a discount rate on pension plan obligations of 6%. These estimated payments are subject to significant variation and the actual payments may be more or less than the amounts estimated. Given the inherent uncertainty as to actual minimum funding requirements for qualified pension plans and the uncertain level of postretirement benefit payments, no amounts are included in this table for any period beyond one year in the case of pensions and two years in the case of postretirement benefits. It is likely we will make cash payments in future periods.

The contractual commitments, shown above, except for our debt obligations, are not recorded on our Consolidated Balance Sheet. Non-cancelable operating leases and purchasing commitments are utilized in our normal course of business for our projected needs. For losses that we believe are probable and which are estimable we have accrued for such amounts in our consolidated balance sheets. In addition to the table above, we have various commitments and contingencies including: defined benefit and postretirement health care plans (as described below), environmental matters (see "Environmental Matters" included in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations"), tax exposures (see Item 1 "Additional Factors that May Affect Future Results" Tax Audits), and litigation claims (see Item 3 "Legal Proceedings").

We have several defined benefit and defined contribution pension plans, as described in the Pension and Other Postretirement Benefit Plans note in the Notes to Consolidated Financial Statements. We fund these plans based on the minimum amounts required by law plus such amounts we deem appropriate. We have postretirement health care plans that provide health and life insurance benefits to certain retired and active employees and their beneficiaries, as described in the Pension and Other Postretirement Benefit Plans note in the Notes to Consolidated Financial Statements. These plans are generally not pre-funded and expenses are paid by us as incurred.

We also have standby letters of credit of $47 million with various financial institutions. At December 31, 2004, we had $113 million available under our senior revolving credit facility.

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, sales and expenses, and related disclosure of contingent assets and liabilities. Significant estimates in our consolidated financial statements include goodwill recoverability, environmental, restructuring and other unusual items, litigation, income tax reserves including deferred tax asset valuation allowance,

Table of Contents

pension, postretirement and other benefits and allowance for doubtful accounts. We base our estimates on prior experience, facts and circumstances and other assumptions. Actual results may differ from these estimates.

We believe the following critical accounting policies affect the more significant judgments and estimates used in the preparation of the financial statements.

*Goodwill*

Effective January 1, 2002, we adopted the provisions of SFAS No. 142, "Goodwill and Other Intangible Assets," which requires that goodwill and intangible assets with indefinite useful lives be tested for impairment at least annually. Goodwill and other intangibles are reviewed annually in the fourth quarter and/or when circumstances or other events indicate that impairment may have occurred. The annual impairment test involves the comparison of the estimated fair value of a reporting unit to its carrying amount. The fair value is determined based on a variety of assumptions including estimated future cash flows of the reporting unit, discount rates, and comparable company trading multiples. Based on our evaluation prepared in the fourth quarter of 2004, no impairment charge was recorded.

*Environmental*

Accruals for environmental matters are recorded when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, based upon current law and existing technologies. These amounts, which are not discounted and are exclusive of claims against third parties, are adjusted periodically as assessments and remediation efforts progress or additional technical or legal information becomes available.

Environmental exposures are difficult to assess for numerous reasons, including the identification of new sites, developments at sites resulting from investigatory studies, advances in technology, changes in environmental laws and regulations and their application, the scarcity of reliable data pertaining to identified sites, the difficulty in assessing the involvement and financial capability of other potentially responsible parties and our ability to obtain contributions from other parties and the lengthy time periods over which site remediation occurs. It is possible that some of these matters (the outcomes of which are subject to various uncertainties) may be resolved unfavorably to us, which could materially adversely affect our financial position or results of operations.

*Pension and Postretirement Plans*

We account for our defined benefit pension plans and non-pension postretirement benefit plans using actuarial models required by SFAS No. 87, "Employers' Accounting for Pensions," and SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," respectively. These models use an attribution approach that generally spreads the financial impact of changes to the plan and actuarial assumptions over the average remaining service lives of the employees in the plan. Changes in liability due to changes in actuarial assumptions such as discount rate, rate of compensation increases and mortality, as well as annual deviations between what was assumed and what was experienced by the plan are treated as gains or losses. Gains and losses are amortized over the group's service lifetime, to the extent they fall outside of a corridor designed to dampen annual volatility. The principle underlying the required attribution approach is that employees render service over their average remaining service lives on a relatively smooth basis and, therefore, the accounting for benefits earned under the pension or non-pension postretirement benefits should follow the same relatively smooth pattern.

One of the key assumptions for the net periodic pension calculation is the expected long-term rate of return on plan assets, used to determine the "market-related value of assets." (The "market-related value of assets" recognizes differences between the plan's actual return and expected return over a five year period). The required use of an expected long-term rate of return on the market-related value of plan assets may result in a recognized pension income that is greater or less than the actual returns of those plan assets in any given year. Over time, however, the expected long-term returns are designed to approximate the actual long-term returns and, therefore, result in a pattern of income and expense recognition that more closely matches the pattern of the services provided by the employees. As differences between actual and expected returns are recognized over five years, they generate gains and losses that are subject to amortization over the average remaining service life of the group, as described in the preceding paragraph.

Table of Contents

We use long-term historical actual return information, the mix of investments that comprise plan assets, and future estimates of long-term investment returns by reference to external sources to develop the expected return on plan assets.

The discount rate assumptions used for pension and non-pension postretirement benefit plan accounting reflect the rates available on high-quality fixed-income debt instruments on December 31 of each year. The rate of compensation increase is another significant assumption used in the actuarial model for pension accounting which we determine based upon our long-term plans for such increases. For retiree medical plan accounting, we review external data and our own historical trends for health care costs to determine the health care cost trend rates.

Changes in pension costs may occur in the future due to changes in these assumptions resulting from economic events. For example, holding all other assumptions constant, a one hundred basis point decrease or increase in the assumed rate of return on plan assets would have increased or decreased, respectively, the 2004 pension cost by approximately $13 million. Holding all other assumptions constant, a 50 basis point decrease in the discount rate used to calculate pension costs for 2004 and the accumulated benefit obligation as of December 31, 2004 would have increased pension costs by $6 million and the accumulated benefit obligation by $88 million. A 50 basis point increase in the discount rate used to calculate pension costs for 2004 and the accumulated benefit obligation as of December 31, 2004 would have decreased pension costs by $6 million and the accumulated benefit obligation by $88 million. For additional information on long-term rates of return, discount rates and projected health care costs projections, see "Pension Plans and Retirement Benefits" in the Notes to the Consolidated Financial Statements.

**NEW ACCOUNTING STANDARDS**

In December 2004, the Financial Accounting Standards Board (FASB) issued SFAS No. 123 (Revised 2004) "Share-Based Payment," which is a revision of SFAS No. 123 "Accounting for Stock-Based Compensation." This pronouncement revises the accounting treatment for stock-based compensation. It establishes standards for the accounting transactions in which an entity exchanges its equity instruments for goods or services. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. This Statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions.

This Statement requires an entity to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award. That cost will be recognized over the period during which an employee is required to provide service in exchange for the award the requisite service period (usually the vesting period). It requires that we will initially measure the cost of employee services received in exchange for an award of liability instruments based on its current fair value; the fair value of that award will be remeasured subsequently at each reporting date through the settlement date. Changes in fair value during the requisite service period will be recognized as compensation cost over that period. This Statement is effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. Based upon the prospective adoption of SFAS No. 123 (Revised 2004), the pretax impact for the second half of 2005 is expected to approximate $2 million.

**DERIVATIVE FINANCIAL INSTRUMENTS**

SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" requires an entity to recognize all derivatives as either assets or liabilities in the statement of financial position and measure those instruments at fair value. We use hedge accounting treatment for substantially all of our business transactions whose risks are covered using derivative instruments. SFAS No. 133 requires that all derivative instruments be recorded on the balance sheet at their fair value. The accounting treatment of changes in fair value is dependent upon whether or not a derivative instrument is designated as a hedge and, if so, the type of hedge. For derivatives designated as a fair value hedge, the changes in the fair value of both the derivative and the hedged item are recognized in earnings. For derivatives designated as a cash flow hedge, the change in fair value of the derivative is recognized in other comprehensive income until the hedged item is recognized in earnings. Ineffective portions are recognized currently in earnings. Unrealized gains and losses on derivatives not qualifying for hedge accounting are recognized currently in earnings.

Table of Contents

We enter into forward sales and purchase contracts to manage currency risk resulting from purchase and sale commitments denominated in foreign currencies (principally Australian dollar and Canadian dollar). All of the currency derivatives expire within one year and are for United States dollar equivalents. At December 31, 2004 and 2003 we had forward contracts to buy foreign currencies with face value of $2 million and no forward contracts to sell foreign currencies. The fair market value of the forward contracts to buy at December 31, 2004 and 2003 approximated the carrying value. The counterparty to the forward contracts is a major financial institution. The risk of loss to us in the event of nonperformance by a counterparty would not be significant to our financial position or results of operations. Foreign currency exchange gains (losses), net of taxes, were less than $(1) million in 2002 and less than $1 million in 2004 and 2003. At December 31, 2004, we had open positions in futures contracts totaling $36 million (2003 $23 million). If the futures contracts had been settled on December 31, 2004, we would have recognized a gain of $3 million. Gains (losses) on futures contracts, net of taxes, were $8 million in 2004, $(1) million in 2003 and $1 million in 2002.

We use cash flow hedges of certain raw materials and energy costs such as copper, zinc, lead and natural gas to provide a measure of stability in managing our exposure to price fluctuations. We use interest rate swaps as a means of managing interest rates on our outstanding debt obligations. These interest rate swaps are treated as fair value hedges. The accounting for gains and losses associated with changes in fair value of the derivative and the effect on the consolidated financial statements will depend on the hedge designation and whether the hedge is effective in achieving offsetting changes in fair value of cash flows of the asset or liability being hedged.

At December 31, 2004 and 2003, Accumulated Other Comprehensive Loss included a pretax gain in fair value of $3 million and $8 million, respectively. In addition, the unfavorable ineffective portion of changes in fair value resulted in a less than $1 million, $2 million and $1 million charge to earnings for the years ended December 31, 2004, 2003 and 2002, respectively. Offsetting the above, there were in 2004 assets totaling $17 million (2003 $19 million) and liabilities of $14 million (2003 $13 million).

Our foreign currency forward contracts and certain commodity derivatives did not meet the criteria of SFAS No. 133 to qualify for hedge accounting. The cumulative effect of items not qualifying for hedge accounting for 2004 was not material to earnings.

**Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to market risk in the normal course of our business operations due to our operations in different foreign currencies, our purchases of certain commodities, and our ongoing investing and financing activities. The risk of loss can be assessed from the perspective of adverse changes in fair values, cash flows and future earnings. We have established policies and procedures governing our management of market risks and the use of financial instruments to manage exposure to such risks.

Energy costs including electricity used in our Chlor Alkali Products segment, and certain raw materials and energy costs, namely copper, lead, zinc and natural gas used primarily in our Metals and Winchester segments' products are subject to price volatility. Depending on market conditions, we may enter into futures contracts and put and call option contracts in order to reduce the impact of metal price fluctuations. As of December 31, 2004, we maintained open positions on futures contracts totaling $36 million ($23 million at December 31, 2003). Assuming a hypothetical 10% increase in commodity prices, which are currently hedged, we would experience a $4 million ($2 million at December 31, 2003) increase in our cost of inventory purchased, which would be offset by a corresponding increase in the value of related hedging instruments.

We are exposed to changes in interest rates primarily as a result of our investing and financing activities. Investing activity is not material to our consolidated financial position, results of operations, or cash flows. Our existing debt structure is used to fund business operations and commitments from banks under our revolving credit facility are a source of liquidity. As of December 31, 2004, we had long-term borrowings of $313 million ($341 million at December 31, 2003) of which less than $1 million ($1 million at December 31, 2003) was issued at variable rates. As a result of our fixed rate financings, we entered into floating interest rate swaps in order to manage interest expense and floating interest rate exposure to optimal levels. We have entered into approximately $132

million of such swaps, whereby we agree to pay variable rates to a counterparty who, in turn, pays us fixed rates. In all cases the underlying index for the variable rates is six-month London InterBank Offered Rate (LIBOR). Accordingly, payments are settled every six months and the term of the swap is the same as the underlying debt instrument.

In December 2001, we swapped interest payments on $50 million principal amount of our 9.125% Senior Notes to a floating rate (6.155% at December 31, 2004). In February and March 2002, we swapped interest payments on $30 million and $25 million principal amount, respectively, of our 9.125% Senior Notes to floating rates. Terms of these swaps set the floating rate at the end of each six-month reset period. Therefore, the interest rates for the current period will be set on June 15, 2005. We estimate that the rates will be between 6.0% and 7.0%.

In March 2002, we refinanced four variable-rate tax-exempt debt issues totaling $35 million, of which $8 million was repaid in June 2004. The purpose of the refinancings was to eliminate the need for letter of credit support that used our liquidity. In order to manage interest expense and floating interest rate exposure to optimal levels, we swapped the fixed rate debt of the newly refinanced bonds back to variable rate debt through interest rate swaps. At December 31, 2004 interest rates on the swaps of $21 million and $6 million were 2.429% and 2.569%, respectively.

These interest rate swaps reduced interest expense, resulting in an increase in pretax profit of $5 million and $6 million in 2004 and 2003, respectively, and a decrease in pretax loss of $5 million in 2002.

If the actual change in interest or commodities pricing is substantially different than expected, the net impact of interest rate risk or commodity risk on our cash flow may be materially different than that disclosed above.

We do not enter into any derivative financial instruments for speculative purposes.

**CAUTIONARY STATEMENT ABOUT FORWARD-LOOKING STATEMENTS:**

This report includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements relate to analyses and other information that are based on management's beliefs, certain assumptions made by management, forecasts of future results, and current expectations, estimates and projections about the markets and economy in which we and our various segments operate. The statements contained in this report that are not statements of historical fact may include forward-looking statements that involve a number of risks and uncertainties.

We have used the words "anticipate," "intend," "may," "expect," "believe," "should," "plan," "estimate," "project," and variations of such words and similar expressions in this report to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions, which are difficult to predict and many of which are beyond our control. Therefore, actual outcomes and results may differ materially from those matters expressed or implied in such forward-looking statements. We undertake no obligation to update publicly any forward-looking statements, whether as a result of future events, new information or otherwise.

The risks, uncertainties and assumptions involved in our forward-looking statements include those discussed under the caption "Additional Factors That May Affect Future Results." You should consider all of our forward-looking statements in light of these factors. In addition, other risks and uncertainties not presently known to us or that we consider immaterial could affect the accuracy of our forward-looking statements.

Table of Contents

**Item 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**MANAGEMENT REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

The management of Olin Corporation is responsible for establishing and maintaining adequate internal control over financial reporting. Olin's internal control system was designed to provide reasonable assurance to the company's management and board of directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation, and may not prevent or detect all misstatements.

The management of Olin Corporation has assessed the effectiveness of the company's internal control over financial reporting as of December 31, 2004. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control Integrated Framework* to guide our analysis and assessment. Based on our assessment we believe that, as of December 31, 2004, the company's internal control over financial reporting was effective at the reasonable assurance level under this framework.

Olin's independent auditors have issued an attestation report on our assessment of the company's internal control over financial reporting. This report appears on page 41.

Joseph D. Rupp
President and Chief Executive Officer

Anthony W. Ruggiero
Executive Vice President and
Chief Financial Officer

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders of Olin Corporation:

We have audited the accompanying consolidated balance sheets of Olin Corporation and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of operations, shareholders' equity and cash flows for each of the years in the three-year period ended December 31, 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Olin Corporation and subsidiaries as of December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Olin Corporation and subsidiaries internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 7, 2005 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

As discussed in note "Accounting Policies" to the consolidated financial statements, Olin Corporation adopted the provisions of the Financial Accounting Standards Board's Statement of Financial Accounting Standard No. 143, "Accounting for Asset Retirement Obligations" in 2003.

KPMG LLP
Stamford, CT
March 7, 2005

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Olin Corporation:

We have audited management's assessment, included in the accompanying Management Report on Internal Control Over Financial Reporting, that Olin Corporation and subsidiaries maintained effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("the COSO criteria"). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Olin Corporation and subsidiaries maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, Olin Corporation and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on the COSO criteria.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the accompanying consolidated balance sheets of Olin Corporation and subsidiaries as of December 31, 2004 and 2003 and the related consolidated statements of operations, shareholders' equity and cash flows for each of the years in the three-year period ended December 31, 2004, and our report dated March 7, 2005 expressed an unqualified opinion on those consolidated financial statements.

KPMG LLP
Stamford, CT
March 7, 2005

Table of Contents

CONSOLIDATED BALANCE SHEETS
**December 31**
($ in millions, except per share data)

| | 2004 | 2003 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash and Cash Equivalents | $ 147 | $ 190 |
| Receivables, Net: | | |
| Trade | 227 | 171 |
| Other | 16 | 11 |
| Inventories, Net | 257 | 239 |
| Current Deferred Income Taxes | 47 | 33 |
| Other Current Assets | 19 | 15 |
| Total Current Assets | 713 | 659 |
| Property, Plant and Equipment, Net | 478 | 495 |
| Prepaid Pension Costs | 258 | 101 |
| Deferred Income Taxes | 67 | 62 |
| Other Assets | 24 | 24 |
| Goodwill | 78 | 80 |
| Net Assets of Discontinued Operations | | 11 |
| **Total Assets** | $1,618 | $1,432 |
| **Liabilities and Shareholders' Equity** | | |
| Current Liabilities: | | |
| Current Installments of Long-Term Debt | $ 52 | $ 27 |
| Accounts Payable | 118 | 129 |
| Income Taxes Payable | | 11 |
| Accrued Liabilities | 152 | 128 |

| | | |
|---|---|---|
| Total Current Liabilities | 322 | 295 |
| Long-Term Debt | 261 | 314 |
| Accrued Pension Liability | 505 | 471 |
| Other Liabilities | 174 | 176 |
| Total Liabilities | 1,262 | 1,256 |
| Commitments and Contingencies | | |
| Shareholders' Equity: | | |
| Common Stock, Par Value $1 Per Share: | | |
| Authorized, 120,000,000 Shares Issued and Outstanding 70,566,902 Shares (59,015,087 in 2003) | 71 | 59 |
| Additional Paid-In Capital | 659 | 464 |
| Accumulated Other Comprehensive Loss | (273) | (247) |
| Accumulated Deficit | (101) | (100) |
| Total Shareholders' Equity | 356 | 176 |
| **Total Liabilities and Shareholders' Equity** | $1,618 | $1,432 |

The accompanying Notes to Consolidated Financial Statements are an integral part of the consolidated financial statements.

Table of Contents

The accompanying Notes to Consolidated Financial Statements are an integral part of the consolidated financial statements.

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**Years ended December 31**
($ in millions, except per share data)

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Sales | $ 1,997 | $ 1,557 | $ 1,272 |
| Operating Expenses: | | | |
| Cost of Goods Sold | 1,765 | 1,382 | 1,155 |
| Selling and Administration | 141 | 127 | 112 |
| Research and Development | 4 | 5 | 5 |
| Restructuring Charges | 10 | 31 | |
| Operating Income | 77 | 12 | |
| Earnings (Loss) of Non-consolidated Affiliates | 10 | 8 | (7) |
| Interest Expense | 20 | 20 | 26 |
| Interest Income | 2 | 1 | 3 |
| Other Income | 10 | 3 | 3 |
| Income (Loss) from Continuing Operations before Taxes and Accounting Change | 79 | 4 | (27) |
| Income Tax Provision | 28 | 4 | 4 |
| Income (Loss) from Continuing Operations before Accounting Change | 51 | | (31) |
| Discontinued Operations: | | | |
| Income from Discontinued Operations, Net | 1 | 1 | |
| Gain on Disposal of Discontinued Operations, Net | 3 | | |
| Income (Loss) before Accounting Change | 55 | 1 | (31) |
| Cumulative Effect of Accounting Change, Net | | (25) | |
| Net Income (Loss) | $ 55 | $ (24) | $ (31) |
| Basic and Diluted Income (Loss) per Common Share: | | | |
| Income (Loss) from Continuing Operations before Accounting Change | $ 0.74 | $ 0.01 | $ (0.63) |

| | | | |
|---|---|---|---|
| Income from Discontinued Operations, Net | 0.01 | 0.01 | |
| Gain on Disposal of Discontinued Operations, Net | 0.05 | | |
| Cumulative Effect of Accounting Change, Net | | (0.44) | |
| Net Income (Loss) | $ 0.80 | $ (0.42) | $ (0.63) |

Table of Contents

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
($ in millions, except per share data)

| | *Common Stock* | | | | | |
|---|---|---|---|---|---|---|
| | *Shares Issued* | *Par Value* | *Additional Paid-In Capital* | *Accumulated Other Comprehensive Loss* | *Retained Earnings (Accumulated Deficit)* | *Total Shareholders' Equity* |
| **Balance at January 1, 2002** | 43,440,223 | $ 43 | $ 205 | $ (18) | $ 41 | $ 271 |
| Comprehensive Loss: | | | | | | |
| Net Loss | | | | | (31) | (31) |
| Translation Adjustment | | | | (1) | | (1) |
| Minimum Pension Liability Adjustment, net | | | | (220) | | (220) |
| Comprehensive Loss | | | | | | (252) |
| Dividends Paid: | | | | | | |
| Common Stock ($0.80 per share) | | | | | (39) | (39) |
| Common Stock Issued for: | | | | | | |
| Stock Options Exercised | 174,069 | | 3 | | | 3 |
| Cash | 3,302,914 | 3 | 53 | | | 56 |
| Acquisition | 9,815,287 | 10 | 168 | | | 178 |
| Employee Benefit Plans | 1,039,259 | 1 | 17 | | | 18 |
| Stock Repurchase | (144,157) | | (3) | | | (3) |
| Other Transactions | (4,920) | | (1) | | | (1) |
| **Balance at December 31, 2002** | 57,622,675 | 57 | 442 | (239) | (29) | 231 |
| Comprehensive Loss: | | | | | | |
| Net Loss | | | | | (24) | (24) |
| Translation Adjustment | | | | 7 | | 7 |
| Net Unrealized Gains | | | | 5 | | 5 |
| Minimum Pension Liability Adjustment, net | | | | (20) | | (20) |
| Comprehensive Loss | | | | | | (32) |
| Dividends Paid: | | | | | | |
| Common Stock ($0.80 per share) | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | (47) | (47) |
| Common Stock Issued for: | | | | | | |
| Stock Options Exercised | 444,608 | 1 | 7 | | | 8 |
| Employee Benefit Plans | 915,159 | 1 | 15 | | | 16 |
| Other Transactions | 32,645 | | | | | |
| **Balance at December 31, 2003** | 59,015,087 | 59 | 464 | (247) | (100) | 176 |
| Comprehensive Income: | | | | | | |
| Net Income | | | | | 55 | 55 |
| Translation Adjustment | | | | 2 | | 2 |
| Net Unrealized Losses | | | | (4) | | (4) |
| Minimum Pension Liability Adjustment, net | | | | (24) | | (24) |
| Comprehensive Income | | | | | | 29 |
| Dividends Paid: | | | | | | |
| Common Stock ($0.80 per share) | | | | | (56) | (56) |
| Common Stock Issued for: | | | | | | |
| Stock Options Exercised | 744,121 | 1 | 14 | | | 15 |
| Cash | 10,000,000 | 10 | 168 | | | 178 |
| Employee Benefit Plans | 793,778 | 1 | 13 | | | 14 |
| Other Transactions | 13,916 | | | | | |
| **Balance at December 31, 2004** | 70,566,902 | $ 71 | $ 659 | $ (273) | $ (101) | $ 356 |

The accompanying Notes to Consolidated Financial Statements are an integral part of the consolidated financial statements.

Table of Contents

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**Years ended December 31**
($ in millions)

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Operating Activities** | | | |
| Income (Loss) from Continuing Operations and Cumulative Effect of Accounting Change | $ 51 | $ (25) | $ (31) |
| Adjustments to Reconcile Income (Loss) from Continuing Operations to Net Cash and Cash Equivalents Provided by Operating Activities: | | | |
| Loss (Earnings) of Non-consolidated Affiliates | (10) | (8) | 7 |
| Gain on Sale of Insurance Investment | (2) | | |
| Depreciation & Amortization | 73 | 81 | 87 |
| Deferred Taxes | (13) | (2) | 20 |
| Non-cash Portion of Restructuring Charges | | 25 | |
| Cumulative Effect of Accounting Change | | 25 | |
| Qualified Pension Plan Contributions | (169) | | |
| Qualified Pension Plan Expense (Income) | 5 | | (9) |
| Common Stock Issued under Employee Benefit Plans | 2 | 3 | 5 |
| Change in Assets and Liabilities Net of Purchases and Sales of Businesses: | | | |
| Receivables | (59) | (16) | (7) |
| Inventories | (17) | 8 | (19) |
| Other Current Assets | (3) | (3) | (16) |
| Accounts Payable and Accrued Liabilities | 9 | 12 | (7) |
| Income Taxes Payable | (1) | 20 | (2) |
| Other Noncurrent Liabilities | 4 | (13) | (12) |
| Other Assets | | 5 | 9 |
| Other Operating Activities | (5) | 4 | (1) |
| Cash (Used for) Provided by Continuing Operations | (135) | 116 | 24 |
| Discontinued Operations: | | | |
| Income from Discontinued Operations | 4 | 1 | |
| Gain on Disposal of Discontinued Operations | (6) | | |

| | | | |
|---|---|---|---|
| Cash Provided by Discontinued Operations | | 1 | 7 |
| Net Operating Activities | (137) | 118 | 31 |
| **Investing Activities** | | | |
| Capital Expenditures | (55) | (54) | (41) |
| Business Acquired in Purchase Transaction | (3) | | |
| Cash Acquired through Business Acquisition | | | 13 |
| Proceeds from Sale of Short-Term Investments | | 25 | 12 |
| Proceeds from Sales of a Business and an Insurance Investment | 20 | | |
| Disposition of Property, Plant and Equipment | | 5 | 15 |
| Investments and Advances Affiliated Companies at Equity | 9 | 8 | (11) |
| Other Investing Activities | 2 | 5 | (1) |
| Net Investing Activities | (27) | (11) | (13) |
| **Financing Activities** | | | |
| Long-Term Debt: | | | |
| Borrowings | | | 35 |
| Repayments | (27) | (2) | (136) |
| Issuance of Common Stock | 190 | 13 | 69 |
| Purchases of Olin Common Stock | | | (3) |
| Stock Options Exercised | 15 | 7 | 3 |
| Dividends Paid | (56) | (47) | (39) |
| Other Financing Activities | (1) | 1 | (1) |
| Net Financing Activities | 121 | (28) | (72) |
| Net (Decrease) Increase in Cash and Cash Equivalents | (43) | 79 | (54) |
| Cash and Cash Equivalents, Beginning of Year | 190 | 111 | 165 |
| Cash and Cash Equivalents, End of Year | $ 147 | $190 | $ 111 |
| Cash Paid (Received) for Interest and Income Taxes: | | | |

| | | | |
|---|---|---|---|
| Interest | $ 21 | $ 21 | $ 26 |
| Income Taxes, Net of Refunds | $ 43 | $ (11) | $ (15) |

The accompanying Notes to Consolidated Financial Statements are an integral part of the consolidated financial statements.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
($ in millions, except share data)

**DESCRIPTION OF BUSINESS**

Olin Corporation is a Virginia corporation, incorporated in 1892. We are a manufacturer concentrated in three business segments: Metals, Chlor Alkali Products and Winchester. Metals, with its principal manufacturing facilities in East Alton, IL and Montpelier, OH, produces and distributes copper and copper alloy sheet, strip, foil, rod, welded tube, fabricated parts, and stainless steel and aluminum strip. Chlor Alkali Products, with four U.S. manufacturing facilities, produces chlorine and caustic soda, sodium hydrosulfite, hydrochloric acid, hydrogen, bleach products and potassium hydroxide. Winchester, with its principal manufacturing facility in East Alton, IL, produces sporting ammunition, canister powder, reloading components, small caliber military ammunition and industrial cartridges.

**ACCOUNTING POLICIES**

The preparation of the consolidated financial statements requires estimates and assumptions that affect amounts reported and disclosed in the financial statements and related notes. Actual results could differ from those estimates.

*Basis of Presentation*

The consolidated financial statements include the accounts of Olin Corporation and all majority-owned subsidiaries. Investments in 20-50% owned affiliates are accounted for on the equity method. Accordingly, we include only our share of earnings or losses of these affiliates in consolidated net income. Certain reclassifications were made to prior year amounts to conform to the 2004 presentation. As a result of the sale of Olin Aegis which occurred in June 2004, the prior year financial statements have been reclassified to reflect Olin Aegis and the related gain on its disposition, as a discontinued operation.

*Revenue Recognition*

Revenues are recognized on sales of product at the time the goods are shipped and the risks of ownership have passed to the customer. Shipping and handling fees billed to customers are included in Sales and the costs incurred for shipping and handling are included in Cost of Goods Sold. A portion of the sales in the Metals segment are made on a "tolling" basis where the customer consigns non-ferrous metals to us and is only charged a fee for processing the non-ferrous metals into finished product. Tolling customers retain title to the metal consigned to us and bear the risk of loss. For tolling sales, the metal value is not included in Sales or Cost of Goods Sold. Allowances for estimated returns, discounts and rebates are recognized when sales are recorded and are based on various market data, historical trends and information from customers. Actual returns, discounts and rebates have not been materially different from estimates.

*Other Income*

Other income consists of non-recurring miscellaneous income items which are not related to our segments' primary business activities. Other income includes items such as gains (losses) on sale of non-productive assets such as excess real estate and dividends from miscellaneous investments. In 2004, other income included a $6 non-recurring gain related to the settlement of a contract matter with an outside third party and a $2 gain on the sale of our equity interest in an insurance investment.

*Research and Development*

Research and development expenses include wages, employee benefits and material costs used in the search, design and development of new products and processes and in the improvement and enhancements of existing products and processes. These costs are expensed as incurred.

*Foreign Currency Translation*

Foreign affiliates' balance sheet amounts are translated at the exchange rates in effect at year-end, and operations statement amounts are translated at the average rates of exchange prevailing during the year. Translation adjustments

are included in Accumulated Other Comprehensive Loss. Where foreign affiliates operate in highly inflationary economies, non-monetary amounts are translated at historical exchange rates while monetary assets and liabilities are translated at the current rate with the related adjustments reflected in the Consolidated Statements of Operations.

*Cash and Cash Equivalents*

All highly liquid investments, with a maturity of three months or less at the date of purchase, are considered to be cash equivalents.

*Short-Term Investments*

Marketable securities are accounted for in accordance with Statement of Financial Accounting Standards (SFAS) No. 115, "Accounting for Certain Investments in Debt and Equity Securities." We have classified our marketable equity securities as available-for-sale which are reported at fair market value with unrealized gains and losses included in Accumulated Other Comprehensive Loss net of applicable taxes. The fair value of marketable securities is determined by quoted market prices. Realized gains and losses on sales of investments, as determined on the specific identification method and declines in value of securities judged to be other-than-temporary are included in Other Income in the Consolidated Statements of Operations. Interest and dividends on all securities are included in Interest Income and Other Income, respectively.

*Inventories*

Inventories are valued at the lower of cost or market, with cost being determined principally by the dollar value last-in, first-out (LIFO) method of inventory accounting. Cost for other inventories has been determined principally by the average-cost (primarily operating supplies, spare parts and maintenance parts) and first-in, first-out (FIFO) (primarily inventory of foreign subsidiaries) methods. Elements of costs in inventories include raw materials, direct labor and manufacturing overhead.

*Property, Plant and Equipment*

Property, plant and equipment are recorded at cost. Depreciation is computed on a straight-line basis over the estimated useful lives of the related assets. Leasehold improvements are amortized over the term of the lease or the estimated useful life of the improvement, whichever is shorter. Start-up costs are expensed as incurred.

*Asset Retirement Obligations*

Effective January 1, 2003, we adopted SFAS No. 143, "Accounting for Asset Retirement Obligations", which addresses financial accounting requirements for retirement obligations associated with tangible long-lived assets. On January 1, 2003, we recorded an asset and a liability of $42 (of which $7 and $35 were in current liabilities and noncurrent liabilities, respectively) to reflect the cost of retirement obligations related to our former operating facilities ($22, pretax), certain hazardous waste units at operating plant sites ($15, pretax), and our Indianapolis facility ($5, pretax). Since these sites did not generate revenue as of January 1, 2003, we recorded the accumulated amortization of the associated asset retirement costs on these same assets, which resulted in an after-tax charge of $25 ($0.44 per share), upon the adoption of SFAS No. 143. Certain other asset retirement obligations associated with production technology and building materials have not been recorded because these retirement obligations have an indeterminate life, and accordingly, the retirement obligation cannot be reasonably estimated. The annual incremental expense resulting from the adoption of SFAS No. 143 amounted to $1 in 2004 and 2003. In the fourth quarter of 2004, we sold our Indianapolis facility which alleviated our remaining asset retirement obligation, which we recorded in accordance with the adoption of SFAS 143 in 2003. This reduction decreased operating expenses by $3 in 2004.

The balances of our asset retirement obligation as of December 31 are as follows:

| | 2004 | 2003 |
|---|---|---|
| Current liability | $ 3 | $ 7 |
| Non-current liability | 35 | 34 |
| | $38 | $41 |

Table of Contents

The pro forma effect of SFAS No. 143, as if it had been adopted for 2002, is as follows:

| | |
|---|---|
| Income Statement Adjustments: | |
| Net loss as reported | $ (31) |
| Effect of adoption | (1) |
| Net loss | $ (32) |
| Per share (diluted) as reported | $(0.63) |
| Effect of adoption | $(0.02) |
| Total | $(0.65) |
| Balance Sheet Adjustments: | |
| Asset retirement obligation liability | $ 38 |

*Comprehensive Income (Loss)*

We calculated comprehensive income (loss) in accordance with SFAS No. 130, "Reporting Comprehensive Income." Accumulated Other Comprehensive Loss at December 31, 2004 includes cumulative translation losses of $4 ($6 at December 31, 2003), minimum pension liability, net of tax of $268 ($245 at December 31, 2003) and other unrealized losses (gains), net of tax, of $1 ($(4) at December 31, 2003). We do not provide for U.S. income taxes on foreign currency translation adjustments since we do not provide for such taxes on undistributed earnings of foreign subsidiaries.

*Goodwill*

In accordance with SFAS 142, "Goodwill and Other Intangible Assets," goodwill and other intangibles are reviewed annually in the fourth quarter and/or when circumstances or other events indicate that impairment may have occurred. The annual impairment test involves the comparison of the estimated fair value of a reporting unit to its carrying amount. The fair value is determined based on a variety of assumptions including estimated future cash flows of the reporting unit, discount rates and comparable company trading multiples. An impairment would be recorded based on the estimated fair value. No impairment charges were recorded for 2004, 2003 or 2002.

*Other Assets*

Other assets at December 31, 2004 and 2003 included intangible assets of $11 and $12 and miscellaneous long-term assets of $13 and $12, respectively. Intangible assets at December 31, 2004 and 2003 included a trademark of $10, which is not subject to amortization, and other intangibles of $1 and $2, respectively, which are amortized over their respective useful lives (primarily 5 years) on a straight-line basis. Amortization expense was $1 in 2004, $1 in 2003 and $2 in 2002. The trademark is reviewed for impairment in accordance with SFAS No. 142. Miscellaneous long-term assets also includes investments in non-consolidated affiliates.

*Environmental Liabilities and Expenditures*

Accruals (charges to income) for environmental matters are recorded when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, based upon current law and existing technologies. These amounts, which are not discounted and are exclusive of claims against third parties, are adjusted periodically as assessment and remediation efforts progress or additional technical or legal information becomes available. Environmental costs are capitalized if the costs increase the value of the property and/or mitigate or prevent contamination from future operations.

*Income Taxes*

Deferred taxes are provided for differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. A valuation allowance is provided to offset deferred tax assets, if based on the available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

Table of Contents

*Derivative Financial Instruments*

As required by SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities," we use hedge accounting treatment for substantially all of our business transactions whose risks are covered using derivative instruments. The hedge accounting treatment provides for the deferral of gains or losses (reflected in Other Comprehensive Loss) on derivative instruments until such time as the related transactions occur.

We enter into forward sales and purchase contracts to manage currency risk resulting from purchase and sale commitments denominated in foreign currencies (principally Australian dollar and Canadian dollar). All of the currency derivatives expire within one year and are for United States dollar equivalents. At December 31, 2004 and 2003 we had forward contracts to buy foreign currencies with a face value of $2 and no forward contracts to sell foreign currencies. The fair market value of the forward contracts to buy at December 31, 2004 and 2003 approximated the carrying value. The counterparty to the forward contracts is a major financial institution. The risk of loss to us in the event of nonperformance by the counterparty would not be significant to our financial position or results of operations. Foreign currency exchange gains (losses), net of taxes, were less than $(1) in 2002 and less than $1 in 2004 and 2003. At December 31, 2004, we had open positions in futures contracts totaling $36 (2003 $23). If the futures contracts had been settled on December 31, 2004, we would have recognized a gain of $3. Gains (losses) on futures contracts, net of taxes, were $8 in 2004, $(1) in 2003 and $1 in 2002.

We use cash flow hedges of certain raw materials and energy costs such as copper, zinc, lead and natural gas to provide a measure of stability in managing our exposure to price fluctuations. We use interest rate swaps as a means of managing interest rates on our outstanding debt obligations. These interest rate swaps are treated as fair value hedges. The accounting for gains and losses associated with changes in fair value of the derivative and the effect on the consolidated financial statements will depend on the hedge designation and whether the hedge is effective in achieving offsetting changes in fair value of cash flows of the asset or liability being hedged.

At December 31, 2004 and 2003, Accumulated Other Comprehensive Loss included a pretax gain in fair value of $3 and $8 respectively. In addition, the unfavorable ineffective portion of changes in fair value resulted in a less than $1, $2 and $1 charge to earnings for the years ended December 31, 2004, 2003 and 2002, respectively. Offsetting the above, there were in 2004, assets totaling $17 (2003 $19) and liabilities of $14 (2003 $13).

Our foreign currency forward contracts and certain commodity derivatives did not meet the criteria of SFAS No. 133 to qualify for hedge accounting. The effect on operating results of items not qualifying for hedge accounting for the years 2004, 2003 and 2002 was not material to earnings.

*Concentration of Credit Risk*

Accounts receivable is the principal financial instrument, which subjects us to a concentration of credit risk. Credit is extended based upon the evaluation of a customer's financial condition and, generally, collateral is not required. Concentrations of credit risk with respect to receivables are somewhat limited due to our large number of customers, the diversity of these customers' businesses and the geographic dispersion of such customers. The majority of our accounts receivable are derived from sales denominated in U.S. dollars. We maintain an allowance for doubtful accounts based upon the expected collectibility of all trade receivables.

*Financial Instruments*

The carrying values of cash and cash equivalents, accounts receivable and accounts payable approximated fair values due to the short-term maturities of these instruments. The fair value of our long-term debt was determined based on current market rates for debt of the same risk and maturities. At December 31, 2004, the estimated fair value of debt was $364 (2003 $382), which compares to debt recorded on the balance sheet of $313 and $341 at December 31, 2004 and 2003, respectively. The estimated fair values of currency forward contracts are based on quoted market prices for contracts with similar terms.

Table of Contents

*Retirement-Related Benefits*

We account for our defined benefit pension plans and non-pension postretirement benefit plans using actuarial models required by SFAS No. 87, "Employers' Accounting for Pensions," and SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," respectively. These models use an attribution approach that generally spreads the financial impact of changes to the plan and actuarial assumptions over the average remaining service lives of the employees in the plan. Changes in liability due to changes in actuarial assumptions such as discount rate, rate of compensation increases and mortality, as well as annual deviations between what was assumed and what was experienced by the plan are treated as gains or losses. Gains and losses are amortized over the group's service lifetime, to the extent they fall outside of a corridor designed to dampen annual volatility. The principle underlying the required attribution approach is that employees render service over their average remaining service lives on a relatively smooth basis and, therefore, the operations statement effects of pensions or non-pension postretirement benefit plans are earned in, and should follow, the same pattern.

One of the key assumptions for the net periodic pension calculation is the expected long-term rate of return on plan assets, used to determine the "market-related value of assets." (The "market-related value of assets" recognizes differences between the plan's actual return and expected return over a five year period). The required use of an expected long-term rate of return on the market-related value of plan assets may result in a recognized pension income that is greater or less than the actual returns of those plan assets in any given year. Over time, however, the expected long-term returns are designed to approximate the actual long-term returns and, therefore, result in a pattern of income and expense recognition that more closely matches the pattern of the services provided by the employees. As differences between actual and expected returns are recognized over five years, they generate gains and losses that are subject to amortization over the average remaining service life of the group, as described in the preceding paragraph.

We use long-term historical actual return information, the mix of investments that comprise plan assets, and future estimates of long-term investment returns by reference to external sources to develop the expected return on plan assets.

The discount rate assumptions used for pension and non-pension postretirement benefit plan accounting reflect the rates available on high-quality fixed-income debt instruments on December 31 of each year. The rate of compensation increase is another significant assumption used in the actuarial model for pension accounting which we determine based upon our long-term plans for such increases. For retiree medical plan accounting, we review external data and our own historical trends for health care costs to determine the health care cost trend rates.

On December 8, 2003, President Bush signed the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (DIMA). The Act introduced a federal subsidy to sponsors of retiree health care benefit plans that provided a benefit that is at least the actuarial equivalent to Medicare Part D. We recognized the savings on the measure of the Accumulated Postretirement Benefit Obligation or net periodic benefit cost as a result of DIMA. The savings were de minimis. These financial statements and accompanying notes reflect the effects of the Act on our benefit plans.

*Stock-Based Compensation*

We account for stock-based compensation under SFAS No. 123, "Accounting for Stock-Based Compensation." As allowed under SFAS No. 123, we have chosen to continue to account for stock-based compensation cost in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees." Under this option, compensation cost is recorded when the fair market value of our stock at the date of grant for fixed options exceeds the exercise price of the stock option. Our policy is to grant stock options at the fair market value of our common stock on the date of the grant. Compensation cost for restricted stock awards is accrued over the life of the award based on the quoted market price of our stock at the date of the award. Compensation cost for performance shares is accounted for under variable plan accounting. The estimated fair value at the date of grant is amortized to operations over the vesting period. Each year the accrual is adjusted to reflect the performance relative to the respective target.

Pro forma net income (loss) and income (loss) per share were calculated based on the following assumptions as if we had recorded compensation expense for the stock options granted during the year. We had no compensation

Table of Contents

expense for stock options granted during each of the years from 2002 through 2004. The fair value of each option granted during 2004, 2003 and 2002 was estimated on the date of grant, using the Black-Scholes option-pricing model with the following weighted-average assumptions used: dividend yield of 4.32% in 2004, 5.21% in 2003 and 4.97% in 2002, risk-free interest rate of 3.70% in 2004, 3.05% in 2003 and 4.27% in 2002, expected volatility of 40% in 2004, 40% in 2003 and 31% in 2002 and an expected life of 7 years. The fair value of options granted during 2004, 2003, and 2002 was $5.37, $3.83 and $5.16, respectively. The following table shows the difference between reported and pro forma net income (loss) and income (loss) per share as if we had recorded compensation expense for the stock options granted during the year.

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net Income (Loss): | | | |
| As reported | $ 55 | $ (24) | $ (31) |
| Stock-based employee compensation expense, net of tax | 2 | 2 | 3 |
| Pro forma | $ 53 | $ (26) | $ (34) |
| Per Share Data: | | | |
| Basic and Diluted | | | |
| As Reported | $0.80 | $(0.42) | $(0.63) |
| Proforma | 0.77 | (0.45) | (0.68) |

In December 2004, the FASB issued SFAS No. 123 (Revised 2004) “Share-Based Payment,” which is a revision of SFAS No. 123 “Accounting for Stock-Based Compensation.” This pronouncement revises the accounting treatment for stock-based compensation. It establishes standards for the accounting transactions in which an entity exchanges its equity instruments for goods or services. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity’s equity instruments or that may be settled by the issuance of those equity instruments. This Statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions.

This Statement requires an entity to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award. That cost will be recognized over the period during which an employee is required to provide service in exchange for the award the requisite service period (usually the vesting period). It requires that we will initially measure the cost of employee services received in exchange for an award of liability instruments based on its current fair value; the fair value of that award will be remeasured subsequently at each reporting date through the settlement date. Changes in fair value during the requisite service period will be recognized as compensation cost over that period. This Statement is effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. Based upon the prospective adoption of SFAS No. 123 (Revised 2004), the pretax impact for the second half of 2005 is expected to approximate $2.

**RECENT ACCOUNTING PRONOUNCEMENTS**

In November 2004, the FASB issued SFAS No. 151 “Inventory Costs an amendment of ARB No. 43, Chapter 4”. This Statement amends the guidance in ARB No. 43, Chapter 4, “Inventory Pricing,” to clarify the accounting for abnormal amounts of idle facility expense, freight, handling costs, and wasted material (spoilage). This statement becomes effective for fiscal periods beginning after June 15, 2005. It is expected that this statement will not have a material effect on our financial statements.

In December 2004, the FASB issued SFAS No. 153 “Exchanges of Nonmonetary Assets an amendment of APB Opinion No. 29”. This Statement amends exceptions for nonmonetary exchanges of similar productive assets and replaces it with a general exception for exchanges of nonmonetary assets that do not have commercial substance as previously allowed under Accounting Principles Board Opinion No. 29. This statement becomes effective for the fiscal periods beginning after June 15, 2005. It is expected that this statement will not have a material effect on our financial statements.

**EARNINGS PER SHARE**

Basic and diluted income (loss) per share are computed by dividing net income (loss) by the weighted average number of common shares outstanding. Diluted earnings per share reflect the dilutive effect of stock options. The effect of stock options of 0.3 million in 2003 and 0.2 million in 2002 have not been included in the 2003 and the 2002 diluted loss per share as their effect would have been anti-dilutive.

Table of Contents

| *Computation of Income (Loss) per Share* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Income (loss) from continuing operations | $ 51 | $ | $ (31) |
| Discontinued Operations: | | | |
| Income from discontinued operations, net | 1 | 1 | |
| Gain on disposal of discontinued operations, net | 3 | | |
| Cumulative effect of accounting change, net | | (25) | |
| Net income (loss) | $ 55 | $ (24) | $ (31) |
| Basic shares | 68.2 | 58.3 | 49.4 |
| Basic Income (Loss) per Share: | | | |
| Income (loss) from continuing operations | $0.74 | $ 0.01 | $(0.63) |
| Income from discontinued operations, net | 0.01 | 0.01 | |
| Gain on disposal of discontinued operations | 0.05 | | |
| Accounting change, net | | (0.44) | |
| Net income (loss) | $0.80 | $(0.42) | $(0.63) |
| Diluted shares: | | | |
| Basic shares | 68.2 | 58.3 | 49.4 |
| Stock options | 0.2 | | |
| Diluted shares | 68.4 | 58.3 | 49.4 |
| Diluted Income (Loss) per Share: | | | |
| Income (loss) from continuing operations | $0.74 | $ 0.01 | $(0.63) |
| Income from discontinued operations, net | 0.01 | 0.01 | |
| Gain on disposal of discontinued operations, net | 0.05 | | |
| Accounting change, net | | (0.44) | |
| Net income (loss) | $0.80 | $(0.42) | $(0.63) |

**TRADE RECEIVABLES**

Allowance for doubtful accounts was $9 and $8 at December 31, 2004 and 2003, respectively. Provisions charged to operations were $1 in 2004, $4 in 2003 and $2 in 2002. Bad debt write-offs, net of recoveries, were none in 2004, $4 in 2003, and $1 in 2002.

**INVENTORIES**

| | *2004* | *2003* |
|---|---|---|
| Supplies | $ 34 | $ 35 |
| Raw materials | 134 | 82 |
| Work in process | 119 | 122 |
| Finished goods | 90 | 77 |
| | 377 | 316 |
| LIFO reserves | (120) | (77) |
| Inventory, net | $ 257 | $239 |

Inventories valued using the LIFO method comprised 80% and 81% of the total inventories at December 31, 2004 and 2003, respectively. If the FIFO method of inventory accounting had been used, inventories would have been approximately $120 and $77 higher than that reported at December 31, 2004 and 2003, respectively.

**PROPERTY, PLANT AND EQUIPMENT**

| | *Useful Lives* | *2004* | *2003* |
|---|---|---|---|
| Land and improvements to land | 10-20 Years | $ 60 | $ 58 |
| Buildings and building equipment | 10-25 Years | 220 | 218 |
| Machinery and equipment | 3-12 Years | 1,496 | 1,479 |
| Leasehold improvements | | 3 | 3 |
| Construction in progress | | 47 | 38 |
| Property, plant and equipment | | 1,826 | 1,796 |
| Less accumulated depreciation | | 1,348 | 1,301 |
| Property, plant and equipment, net | | $ 478 | $ 495 |

Leased assets capitalized and included above are not significant. Maintenance and repairs charged to operations amounted to $115 in 2004, $106 in 2003 and $105 in 2002.

INVESTMENTS AFFILIATED COMPANIES

We have a 50% ownership interest in Sunbelt Chlor Alkali Partnership and Yamaha-Olin Metal Corporation, both of which are accounted for using the equity method of accounting. Combined financial positions and results of operations of these two equity-basis affiliates in their entirety were as follows:

| | 100% Basis | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Condensed Balance Sheet Data: | | | |
| Current assets | $ 49 | $ 41 | |
| Noncurrent assets | 126 | 137 | |
| Current liabilities | 25 | 27 | |
| Noncurrent liabilities | 146 | 158 | |
| Condensed Income Statement Data: | | | |
| Net sales | 182 | 160 | 117 |
| Gross profit | 54 | 49 | 19 |
| Net income (loss) | 26 | 21 | (9) |

The amount of cumulative unremitted earnings of the joint ventures was $4 at December 31, 2004. In 2004, 2003 and 2002, there were no distributions from Yamaha-Olin Metal Corporation. We received distributions from Sunbelt Chlor Alkali Partnership totaling $7, $18 and $32 in 2004, 2003 and 2002, respectively. We did not make any contributions in 2004. We made contributions of $14 and $39 in 2003 and 2002, respectively.

In accounting for our ownership interest in the Sunbelt joint venture, we adjust the reported operating results for additional depreciation expense in order to conform the Sunbelt joint venture's plant and equipment useful lives to ours. The additional depreciation expense reduced our share of Sunbelt's operating results by approximately $3 in 2004, 2003 and 2002. Finally, we provide various administrative, management and logistical services to the Sunbelt joint venture for which we received fees totaling $7 in 2004 and $6 in 2003 and 2002.

Pursuant to a note purchase agreement dated December 22, 1997, the Sunbelt joint venture sold $97.5 of Guaranteed Senior Secured Notes Due 2017, Series O, and $97.5 of Guaranteed Senior Secured Notes Due 2017, Series G. We refer to these notes as the Sunbelt Notes. The Sunbelt Notes bear interest at a rate of 7.23% per annum, payable semiannually in arrears on each June 22 and December 22.

We have guaranteed the Series O Notes, and PolyOne, our partner in this venture, has guaranteed the Series G Notes, in both cases pursuant to customary guarantee agreements. Our guarantee and PolyOne's guarantee are several, rather than joint. Therefore, we are not required to make any payments to satisfy the Series G Notes guaranteed by PolyOne. An insolvency or bankruptcy of PolyOne will not automatically trigger acceleration of the Sunbelt Notes or cause us to be required to make payments under our guarantee, even if PolyOne is required to make payments under its guarantee. However, if the Sunbelt joint venture does not make timely payments on the Sunbelt Notes, whether as a result of failure to pay on a guarantee or otherwise, the holders of the Sunbelt Notes may proceed against the assets of the Sunbelt joint venture for repayment. If we were to make debt service payments under our guarantee, we would have a right to recover such payments from the Sunbelt joint venture.

Beginning on December 22, 2002 and each year thereafter until maturity of the Sunbelt Notes in 2017, our Sunbelt joint venture is required to repay approximately $12 of the Notes, of which approximately $6 is attributable to the Series O Notes. After the payment of $6 on the Series O Notes in December 2004, our guarantee of these notes was $79. In the event our Sunbelt joint venture cannot make any of these payments, we would be required to fund our half of such payment. In certain other circumstances, we may also be required to repay the Sunbelt Notes prior to their maturity. We and PolyOne have agreed that, if we or PolyOne intend to transfer our respective interests in the Sunbelt joint venture and the transferring party is unable to obtain consent from holders of 80% of the aggregate principal amount of the indebtedness related to the guarantee being transferred after good faith negotiations, then we and PolyOne will be required to repay our respective portions of the Sunbelt Notes. In such event, any make whole or similar penalties or costs will be paid by the transferring party.

Table of Contents

**DEBT**

*Credit Facility*

On July 30, 2004, we entered into a new five-year senior revolving credit facility of $160, including a sublimit for letters of credit, which will expire on July 30, 2009. At December 31, 2004, we had $113 available under this senior revolving credit facility. We issued $47 of letters of credit under a subfacility for the purpose of supporting certain long-term debt, certain workers compensation insurance policies, and plant closure and post-closure obligations. We may select various floating rate borrowing options. The senior credit facility includes various customary restrictive covenants including restrictions related to the ratio of debt to earnings before interest expense, taxes, depreciation and amortization (leverage ratio) and the ratio of earnings before interest expense, taxes, depreciation and amortization to interest expense (coverage ratio).

*Long-Term Debt*

| | 2004 | 2003 |
|---|---|---|
| Notes payable: | | |
| 6.5%, due 2013 | $ 11 | $ 11 |
| 7.11%, due 2005 | 50 | 50 |
| 7.3%, due 2006 | 1 | 1 |
| 9.125%, due 2011 | 209 | 210 |
| Industrial development and environmental improvement obligations: | | |
| Payable at variable interest rates of 2.34%, due 2005 | | 1 |
| Payable at fixed interest rates of 6.0% to 6.75%, due 2005-2017 | 42 | 68 |
| Total senior debt | 313 | 341 |
| Amounts due within one year | 52 | 27 |
| Total long-term debt | $261 | $314 |

As a result of our fixed-rate financings, we entered into floating interest rate swaps in order to manage interest expense and floating interest rate exposure to optimal levels. We have entered swaps valued at approximately $132 , as disclosed below, whereby we agree to pay variable rates to a counterparty who, in turn, pays us fixed rates. In all cases the underlying index for variable rates is the six-month London InterBank Offered Rate (LIBOR). Accordingly, payments are settled every six months and the terms of the swaps are the same as the underlying debt instruments.

The following table reflected the swap activity related to certain debt obligations as of December 31, 2004:

| Underlying Debt Instrument | Swap Amount | Date of Swap | December 31, 2004 Floating Rate |
|---|---|---|---|
| 9.125%, due 2011 | $ 50 | December 2001 | 6.155% |
| 9.125%, due 2011 | $ 30 | February 2002 | 6.0 - 7.0%(a) |
| 9.125%, due 2011 | $ 25 | March 2002 | 6.0 - 7.0%(a) |
| Industrial development and environmental improvement obligations at fixed rates of 6.0%-6.75% due 2005-2017 | $ 21 | March 2002 | 2.429% |
| | $ 6 | March 2002 | 2.569% |

(a) Actual rate is set in arrears. We project it will fall within the range shown.

We have designated the interest rate swaps as fair value hedges of the risk of changes in the value of our fixed rate debt due to changes in interest rates, for a portion of our fixed rate borrowings under SFAS No. 133. Accordingly, the interest rate swaps have been recorded at their fair market value of $12 at December 31, 2004 and are included in Other Assets on the accompanying Consolidated Balance Sheet, with a corresponding increase in the carrying amount of the 9.125% Notes ($9) and the Industrial Environmental Improvement Obligations ($3). No gain or loss has been recorded as the swaps meet the criteria of SFAS 133 to qualify for hedge accounting treatment with no ineffectiveness. These interest rate swaps reduced interest expense, resulting in an increase in pretax income of $5 in 2004 and $6 in 2003, respectively, and a decrease in pretax loss of $5 in 2002. The difference between interest paid and interest received is included as an adjustment to interest expense. A settlement of the fair market value of the interest rate swaps as of December 31, 2004 would result in a gain of $12. The counterparty to these interest rate swap contracts is a major financial institution. Our loss in the

Case 1:07-mc-00489-BAH Document 1229-5 Filed 11/22/24 Page 479 of 1065
event of nonperformance by the counterparty would not be significant to our financial position or results of operations.

Table of Contents

In January 2003, we renegotiated our $11 note due 2005. The maturity date was extended to 2013 and the interest rate was reduced from 7.75% to 6.5%, effective January 1, 2003.

Annual maturities of long-term debt are $52 in 2005, $1 in 2006, $2 in 2007, $8 in 2008, none in 2009 and a total of $250 thereafter.

**PENSION PLANS AND RETIREMENT BENEFITS**

Almost all of our domestic pension plans are non-contributory final-average-pay or flat-benefit plans and all domestic employees are covered by a pension plan. Our funding policy is consistent with the requirements of federal laws and regulations. Our foreign subsidiaries maintain pension and other benefit plans, which are consistent with statutory practices and are not significant. Our pension plan provides that if, within three years following a change of control of Olin, any corporate action is taken or filing made in contemplation of, among other things, a plan termination or merger or other transfer of assets or liabilities of the plan, and such termination, merger or transfer thereafter takes place, plan benefits would automatically be increased for affected participants (and retired participants) to absorb any plan surplus (subject to applicable collective bargaining requirements).

We also provide certain postretirement health care (medical) and life insurance benefits for eligible active and retired domestic employees. The health care plans are contributory with participants' contributions adjusted annually based on medical rates of inflation and plan experience. We use a measurement date of December 31 for the majority of our pension and postretirement plans.

***Obligations and Funded Status***

| | *Pension Benefits* | | *Other Postretirement Benefits* | |
|---|---|---|---|---|
| *Change in Benefit Obligation* | *2004* | *2003* | *2004* | *2003* |
| Benefit obligation at beginning of year | $1,534 | $1,393 | $ 82 | $ 82 |
| Service cost | 16 | 17 | 2 | 1 |
| Interest cost | 93 | 93 | 5 | 5 |
| Actuarial loss | 58 | 135 | 11 | 8 |
| Curtailment | 1 | | | |
| Benefits paid | (104) | (104) | (15) | (14) |
| Benefit obligation at end of year | $1,598 | $1,534 | $ 85 | $ 82 |

| | *Pension Benefits* | |
|---|---|---|
| *Change in Plan Assets* | *2004* | *2003* |
| Fair value of plans' assets at beginning of year | $1,077 | $ 967 |
| Actual return on plans' assets | 137 | 207 |
| Employer contributions | 173 | 7 |
| Benefits paid | (104) | (104) |
| Fair value of plans' assets at end of year | $1,283 | $1,077 |

Table of Contents

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Funded status | $(315) | $(457) | $ (85) | $ (82) |
| Unrecognized actuarial (gain) loss | 482 | 459 | 52 | 44 |
| Unrecognized prior service cost | 25 | 28 | (2) | (3) |
| Net amount recognized | $ 192 | $ 30 | $ (35) | $ (41) |

At December 31, 2004 and 2003, the benefit obligation of the qualified pension plans was $1,537 and $1,478, respectively; and the fair value of the assets of the qualified pension plans was $1,283 and $1,077, respectively. At December 31, 2004 and 2003, the benefit obligation of the non-qualified pension plans was $61 and $56, respectively. Benefit payments under current assumptions for the qualified plans are projected to be approximately $96 each year for the next five years. Benefit payments for the non-qualified pension plans are expected to be as follows: 2005 $6; 2006 $11; 2007 $3; 2008 $3; and 2009 $3.

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Amounts recognized in the consolidated balance sheet consist of: | | | | |
| Prepaid benefit cost | $ 231 | $ 70 | $ | $ |
| Intangible asset in prepaid pension cost | 27 | 31 | | |
| Accrued benefit liability in other liabilities | (505) | (471) | (35) | (41) |
| Accumulated other comprehensive income | 439 | 400 | | |
| Net amount recognized | $ 192 | $ 30 | $ (35) | $ (41) |

| | December 31, | |
|---|---|---|
| *Pension Plans with an Accumulated Benefit Obligation in Excess of Plan Assets* | 2004 | 2003 |
| Projected benefit obligation | $ 1,598 | $ 1,534 |
| Accumulated benefit obligation | $ 1,553 | 1,472 |
| Fair value of plan assets | $ 1,283 | 1,077 |

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| *Components of Net Periodic Benefit Cost (Income)* | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Service cost | $ 16 | $ 17 | $ 14 | $ 2 | $ 1 | $ 1 |
| Interest cost | 93 | 93 | 91 | 5 | 5 | 6 |
| Expected return on plans' assets | (118) | (112) | (115) | | | |
| Amortization of prior service cost | 6 | 5 | 6 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Recognized actuarial loss | 14 | 2 | 1 | 3 | 3 | 1 |
| Curtailment | 1 | | | | | |
| Net periodic benefit cost (income) | $ 12 | 5 | $ (3) | $ 10 | $ 9 | $ 8 |
| ***Additional Information*** | | | | | | |
| Increase in minimum liability included in other comprehensive loss (pretax) | $ 39 | $ 32 | $ 360 | | | |

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| ***Weighted-Average Assumptions Used to Determine Benefit Obligation*** | ***2004*** | ***2003*** | ***2004*** | ***2003*** |
| Discount rate | 6.00% | 6.25% | 6.00% | 6.25% |
| Rate of compensation increase | 3.3% | 4.5% | N/A | N/A |

Decreasing the discount rate by 0.25% from 2003 to 2004 resulted in an increase of approximately 3% in the Accumulated Benefit Obligation and the Projected Benefit Obligation under our pension plans.

Table of Contents

| *Weighted Average Assumptions Used to Determine Net Periodic Benefit Cost* | *Pension Benefits* | | *Other Postretirement Benefits* | |
|---|---|---|---|---|
| Discount rate | 6.25% | 6.75% | 6.25% | 6.75% |
| Expected return on assets | 9.0% | 9.0% | N/A | N/A |
| Rate of compensation increase | 3.3% | 4.5% | N/A | N/A |

| | *Other Postretirement Benefits* | |
|---|---|---|
| *Assumed Health Care Cost Trend Rates for Pre-65 Retirees* | *2004* | *2003* |
| Health care cost trend rate assumed for next year | 9.0% | 9.5% |
| Rate that the cost trend rate gradually declines to | 4.5% | 4.5% |
| Year that the rate reaches the ultimate rate | 2010 | 2010 |

For post-65 retirees, we provide a fixed dollar benefit, which is not subject to escalation.

Assumed health care cost trend rates have an effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | *One-Percentage Point Increase* | *One-Percentage Point Decrease* |
|---|---|---|
| Effect on total of service and interest costs | $ | $ |
| Effect on postretirement benefit obligation | 5 | (5) |

### *Plan Assets*

Our pension plan asset allocation at December 31, 2004 and 2003, by asset class is as follows:

| | *Percentage of Plan Assets* | |
|---|---|---|
| | *2004* | *2003* |
| *Asset Class* | | |
| U.S. Equities | 43% | 52% |
| Non-U.S. Equities | 18 | 18 |
| Total Equities | 61 | 70 |
| Fixed Income/Cash | 25 | 28 |
| Alternative Investments | 14 | 2 |
| Total | 100% | 100% |

The U.S. Equities asset class includes our common stock in the amounts of $15 (1% of total plan assets) at December 31, 2003. The Alternative Investments asset class includes real estate partnerships, strategic partnerships, private equity investments and commodities and absolute return funds. The Alternative Investment class has been increased to help minimize risk and increase returns by utilizing a broader group of assets.

A master trust was established by our pension plan to accumulate funds required to meet benefit payments of our plan and is administered solely in the interest of our plan's participants and their beneficiaries. The master trust's investment horizon is long term. Its assets are managed by professional investment managers or invested in professionally managed investment vehicles.

The master trust's investment objective is to maximize the long-term total rate of return on assets within the limits of applicable fiduciary standards dictated by the Employee Retirement Income Security Act of 1974, as amended. Risk is managed by diversifying assets across asset classes whose return patterns are not highly correlated, investing in passively and actively managed strategies and in value and growth styles, and by periodic rebalancing of asset classes, strategies and investment styles to objectively set targets.

Table of Contents

The following target allocation and ranges have been set for each asset class:

| *Asset Class* | *Target Allocation* | *Target Range* |
|---|---|---|
| U.S. Equities | 40% | 37 43% |
| Non-U.S. Equities | 17 | 15 19 |
| Total Equities | 57 | 52 62 |
| Fixed Income/Cash | 30 | 22 38 |
| Alternative Investments | 13 | 10 16 |

Ranges recognize the tendency of trends to persist and are designed to minimize transactions costs associated with rebalancing. Asset class target allocations are reviewed periodically and adjusted as appropriate.

For our qualified pension plans, we currently project that no contributions will be required until 2008. We may elect to make selective voluntary contributions, when appropriate, between now and 2008. We expect to make payments of $9 for each of the next five years under the provisions of our other postretirement benefit plans.

**INCOME TAXES**

| *Components of Pretax Income (Loss)* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Domestic | $ 75 | $ 2 | $ (30) |
| Foreign | 4 | 2 | 3 |
| Income (loss) before taxes and cumulative effect of accounting change | $ 79 | $ 4 | $ (27) |

| *Components of Income Tax Provision (Benefit)* | | | |
|---|---|---|---|
| Currently payable: | | | |
| Federal | $(27) | $ | $ (18) |
| State | (4) | 2 | |
| Foreign | 1 | 2 | 2 |
| | (30) | 4 | (16) |
| Deferred | 58 | | 20 |
| Income tax provision | $ 28 | $ 4 | $ 4 |

The following table accounts for the difference between the actual tax provision and the amounts obtained by applying the statutory U.S. federal income tax rate of 35% to the income from continuing operations before taxes.

| *Effective Tax Rate Reconciliation (Percent)* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Statutory federal tax rate | 35.0 | 35.0 | 35.0 |
| Foreign rate differential | | 34.1 | (2.0) |
| | | | |

| | | | |
|---|---|---|---|
| Export tax incentive | | (7.7) | 1.5 |
| Company-owned life insurance programs | | (4.2) | (37.6) |
| Dividends paid to ESOP | (1.5) | (18.2) | 7.4 |
| Provision for prior year taxes | | | (26.1) |
| State income taxes, net | 3.6 | 17.9 | 5.8 |
| Non-deductible portion of restructuring charge | | 15.4 | |
| Change in valuation allowance | | 8.2 | (2.3) |
| Equity income of foreign affiliates | (0.5) | (6.9) | 1.2 |
| Foreign dividend | 1.3 | | |
| Change in tax contingencies | (3.0) | | |
| Other, net | 0.9 | 2.9 | 1.5 |
| Effective tax rate | 35.8 | 76.5 | (15.6) |

Table of Contents

| *Components of Deferred Tax Assets and Liabilities* | *2004* | *2003* |
|---|---|---|
| Deferred tax assets: | | |
| Pension and postretirement benefits | $115 | $158 |
| Environmental reserves | 35 | 36 |
| Accrued liabilities | 58 | 49 |
| Minimum tax credits | 13 | 17 |
| Federal and state net operating losses | 61 | 31 |
| Other miscellaneous items | 14 | 12 |
| Total deferred tax assets | 296 | 303 |
| Valuation allowance | (9) | (5) |
| Net deferred tax assets | 287 | 298 |
| Deferred tax liabilities: | | |
| Property, plant and equipment | 96 | 83 |
| Capital loss | 68 | 87 |
| Other miscellaneous items | 9 | 33 |
| Total deferred tax liabilities | 173 | 203 |
| Net deferred tax asset | $114 | $ 95 |

As described under the accounting policy on asset retirement obligations, in 2003 we recorded a $25 after-tax charge for the adoption of SFAS No. 143. The pretax charge was $42 and the related tax benefit was $17. The after-tax charge was recorded as the cumulative effect of accounting change in the Consolidated Statements of Operations.

The deferred tax provision for 2004, 2003 and 2002 does not reflect the tax effect of $1 in 2004 and $3 in 2003 resulting from hedging activity under SFAS No. 133 and $18 in 2002 resulting from the acquisition of Chase. For the year 2004, 2003 and 2002, the deferred tax provision does not reflect $15, $12 and $140, respectively, resulting from additional minimum pension liability adjustment required by SFAS No. 87, "Employers Accounting for Pensions."

Realization of the net deferred tax assets is dependent on future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing temporary differences and carryforwards. Although realization is not assured, we believe that it is more likely than not that the net deferred tax assets will be realized.

At December 31, 2004, we had federal net operating loss (NOLs) carryforwards of approximately $113 that are available to offset future consolidated taxable income and expire from 2018 to 2024. We believe that it is more likely than not that these NOLs will be available to reduce future income tax liabilities based upon estimated future taxable income and the reversal of temporary differences in future periods.

At December 31, 2004, we had deferred tax benefits of $4 relating to capital loss carryforwards of approximately $10 remaining from our acquisition of Chase that are available to offset future consolidated capital gains and expire in 2005. We believe that it is likely that the related tax benefits of the capital loss carryforwards will not be realized. At December 31, 2004, there was a $4 valuation allowance against the deferred tax benefits. As the valuation allowance was established at acquisition through purchase accounting, any subsequent recognition of the tax benefit of such capital loss utilization will be a reduction to the goodwill associated with the Chase acquisition. In 2004, a portion of the gain on the sale of Olin Aegis was a capital gain, and the tax was offset by capital loss carryforwards acquired with the Chase business. The utilization of these loss carryforwards resulted in a $2 reduction in the goodwill recorded as part of the Chase acquisition.

We also have minimum tax credit carryforwards of approximately $10, which are available to reduce future federal regular income taxes, if any, over an indefinite period.

Case 1:07-mc-00489-BAH Document 1229-5 Filed 11/22/24 Page 488 of 1065

At December 31, 2004, we had federal tax benefits of $2 relating to foreign tax credits. We believe that it is more likely than not that the related tax benefits of the foreign tax credits will not be realized. At December 31, 2004, there was a valuation allowance of $2 against the deferred tax benefits.

Table of Contents

At December 31, 2004, we had deferred state tax benefits of $10 relating to state net operating loss carryforwards of approximately $247, which are available to offset future state taxable income through 2022. Due to uncertainties regarding realization of the tax benefits, a valuation allowance of $3 has been applied against the deferred state tax benefits at December 31, 2004.

At December 31, 2004, our share of the cumulative undistributed earnings of foreign subsidiaries was approximately $11. No provision has been made for U.S. or additional foreign taxes on the undistributed earnings of foreign subsidiaries since we intend to continue to reinvest indefinitely these earnings. Foreign tax credits would be available to substantially reduce or eliminate any amount of additional U.S. tax that might be payable on these foreign earnings in the event of distribution or sale.

We disclosed in our 2003 Form 10-K that we were accepted to participate in the IRS settlement initiative pertaining to tax issues related to our benefits liability management company. In addition, we disclosed a settlement with the IRS relative to our COLI program. In the third quarter of 2004, a final settlement agreement was reached with the IRS on these and certain other outstanding issues related to tax audits covering the 1992 through 2000 tax years. In connection with these settlements, we made payments in the second quarter of 2004 of approximately $40 million. These payments resolved all open issues regarding our benefits liability management company and our COLI program. As we disclosed previously, these tax issues had been recorded as a liability prior to 2002. In the third quarter of 2004, the income tax provision included a $2 million reduction in income tax expense associated with the finalization, in the third quarter of 2004, of the settlement of certain issues related to income tax audits for the years 1992-2000.

We are currently subject to an ongoing audit by the IRS in connection with our Federal tax return for the years 2001 and 2002 and have closed all tax years through 2000. However, we are currently contesting various issues before the Appeals Division of the IRS with respect to the years 1996 through 2000. Depending on the outcome of these audits, we may be required to pay additional taxes, and any additional taxes and related interest could be substantial. We have reserved amounts which we believe will be sufficient for any adverse outcome. The timing of any such payments is uncertain.

The American Jobs Creation Act (AJCA), signed into law in October 2004, makes a number of changes to the income tax laws which will affect us in future years. The most significant change for us is a new deduction for qualifying domestic production activity, which replaces the current extraterritorial income exclusion. As a result of AJCA, we expect a modest decline in our effective tax rate as the qualifying domestic production activity deduction is phased in over the next six years. The AJCA also provides for a special one-time dividends received deduction on the repatriation of certain foreign earnings to the United States. If certain conditions are met, a 5.25% effective tax rate would apply to eligible repatriations of certain foreign earnings. We are currently evaluating these provisions and are awaiting interpretive guidance relating to these regulations from the Treasury Department. At the current date, we have not determined that we will repatriate any unremitted foreign earnings under the special one-time provision of the AJCA.

**ACCRUED LIABILITIES**

Included in accrued liabilities are the following items:

| | *2004* | *2003* |
|---|---|---|
| Accrued compensation and payroll taxes | $ 38 | $ 30 |
| Environmental (current portion only) | 28 | 26 |
| Accrued employee benefits | 17 | 17 |
| Workers compensation | 19 | 15 |
| Other | 50 | 40 |
| | $152 | $128 |

**CONTRIBUTING EMPLOYEE OWNERSHIP PLAN**

The Contributing Employee Ownership Plan (CEOP) is a defined contribution plan available to essentially all domestic employees. Through October 16, 2003, we matched eligible employee contributions in the form of Olin

common stock. Effective October 17, 2003, company matching contributions are invested in the same investment allocation as the employee's contribution. Our matching contributions amounted to $3 in 2004 and 2003 and $5 in 2002. Effective January 1, 2003, we suspended the match on most salaried employees' contributions. The matching contributions were re-instated for salaried employees beginning January 2005, contingent upon our performance.

Employees become vested in the value of the contributions we make to the CEOP according to a schedule based on service. After two years of service, participants are 25% vested. They vest in increments of 25% for each additional year and after five years of service, they are 100% vested in the value of the contributions that we have made to their accounts.

Employees may transfer any or all of the value of the investments, including Olin common stock, to any one or combination of investments available in the CEOP. Employees may transfer balances daily and may elect to transfer any percentage of the balance in the fund from which the transfer is made. However, when transferring out of a fund, employees are prohibited from trading out of the fund to which the transfer was made for seven calendar days. This limitation does not apply to trades into the ACI Premium Money Market Fund or the Olin Common Stock Fund.

**STOCK OPTIONS**

Under the stock option and long-term incentive plans, options may be granted to purchase shares of our common stock at not less than fair market value at the date of grant, and are exercisable for a period not exceeding ten years from that date. Options granted under the 1996 Stock Option Plan and the 2003, 2000, and the 1991 Long Term Incentive Plans vest over three years. In 2004, two forms of long-term incentive awards were given, stock options representing one-half of the aggregate value of the long term incentive award opportunity, and performance share awards making up the other half. The option price was set at the fair market value of common stock on the date of the grant, and the options have a ten-year term. The other half of the individual long term incentive award takes the form of performance shares. At the end of a three-year performance cycle, participants receive a performance share award denominated in shares of our stock, paid half in shares and half in cash, based on Olin's average annual return on capital in relation to the average annual return on capital among the S&P MidCap 400 companies. In 2000, a one-time grant of Performance Accelerated Vesting Stock Options was granted with an exercise price of $18.97, which represented fair value. Options for 926,775 shares were outstanding at December 31, 2004. These options have a term of 120 months and vest in 119 months, and can vest early, but only if the stock price increases to $28 per share or more for 10 days in any 30 calendar day period.

In accordance with our Agreement and Plan of Merger with Chase dated May 7, 2002, each Chase stock option under the Chase 1994 Long Term Incentive Plan, the Chase 1997 Executive Deferred Compensation Stock Option Plan and the Chase 1997 Non-Employee Director Stock Option Plan was converted into a stock option to acquire a number of shares of our common stock equal to the number of shares of Chase common stock subject to the Chase stock option multiplied by 0.6400. The exercise price of each Chase stock option that was converted into an Olin stock option was equal to the exercise price of the applicable Chase stock option divided by 0.6400. The terms and conditions of the Olin options will otherwise be the same as were applicable under the stock option of Chase, as the case may be, but taking into account any changes, including acceleration, provided for in the applicable stock plan of Chase. In September 2002, approximately 918,000 stock options were issued to Chase employees and directors who owned options under the Chase stock option plans.

Table of Contents

Stock option transactions are as follows:

| | Shares | Option Price Per Share | Weighted Average Option Price Per Share | Exercisable Options | Exercisable Weighted Average Exercise Price |
|---|---|---|---|---|---|
| Outstanding at January 1, 2002 | 5,636,272 | $ 12.72 $27.17 | $ 20.68 | | |
| Granted | 706,700 | 16.10 18.39 | 16.17 | | |
| Chase Acquisition | 917,691 | 6.25 33.86 | 15.99 | | |
| Exercised | (174,069) | 10.42 18.97 | 15.76 | | |
| Canceled | (196,777) | 11.72 28.06 | 19.99 | | |
| Outstanding at December 31, 2002 | 6,889,817 | 6.25 33.86 | 19.73 | 4,857,457 | $ 20.47 |
| Granted | 761,000 | 15.35 17.35 | 15.36 | | |
| Exercised | (444,608) | 6.25 17.70 | 12.40 | | |
| Canceled | (120,881) | 13.34 28.06 | 23.02 | | |
| Outstanding at December 31, 2003 | 7,085,328 | 6.25 33.86 | 19.67 | 4,833,666 | $ 20.84 |
| Granted | 677,900 | 18.52 | 18.52 | | |
| Exercised | (744,121) | 6.25 18.97 | 14.42 | | |
| Canceled | (137,002) | 10.42 28.06 | 23.17 | | |
| Outstanding at December 31, 2004 | 6,882,105 | $ 6.25 $33.86 | $ 20.05 | 4,583,856 | $ 21.19 |

At December 31, 2004 and 2003, the average exercise period for all outstanding options was 60 months and 64 months, respectively. The following table provides certain information with respect to stock options exercisable at December 31, 2004:

| Range of Exercise Prices | Stock Options Exercisable | Weighted Average Exercise Price | Options Outstanding | Weighted Average Exercise Price |
|---|---|---|---|---|
| Under $18.00 | 1,201,750 | $15.78 | 1,919,232 | $15.71 |
| $18.00 $24.00 | 1,239,049 | $19.01 | 2,819,816 | $18.88 |
| Over $24.00 | 2,143,057 | $25.49 | 2,143,057 | $25.49 |
| | 4,583,856 | | 6,882,105 | |

At December 31, 2004, common shares reserved for issuance and available for grant or purchase under the following plans consisted of:

| Stock Option Plans | Number of Shares: Reserved for Issuance | Number of Shares: Available for Grant or Purchase |
|---|---|---|

| | | |
|---|---|---|
| 1996 Stock Option Plan | 3,131,797 | 142,719 |
| 2000 Long Term Incentive Plan | 2,083,545 | 406,423 |
| 2003 Long Term Incentive Plan | 1,700,000 | 871,528 |
| | 6,915,342 | 1,420,670(1) |
| 1988 Stock Option Plan (plan expired) | 325,966 | |
| 1991 Long Term Incentive Plan (plan expired) | 734,315 | |
| Chase Benefit Plans (assumed in acquisition) | 205,225 | |
| Options Available for only Arch Chemicals Employees | 598,160 | |
| | 1,863,666 | |
| Total under stock option plans | 8,779,008 | 1,420,670 |

Table of Contents

| Stock Purchase Plans | Number of Shares: Reserved for Issuance | Number of Shares: Available for Grant or Purchase |
|---|---|---|
| 1997 Stock Plan for Non-employee Directors | 192,696 | 69,058 |
| Employee Deferral Plan | 56,531 | 46,479 |
| Monarch Brass & Copper Corp. Deferral Plan | 500,000 | 500,000 |
| Total under stock purchase plans | 749,227 | 615,537 |

(1) consists of stock options of 669,288 shares and stock awards of 751,382 shares.

Under the stock purchase plans, our employees or non-employee directors may defer certain elements of their compensation, and former employees of Monarch may periodically transfer amounts of their compensation deferred at the time we acquired Monarch into shares of our common stock based on fair market value of the shares at the time of deferral. Non-employee directors annually receive stock grants as a portion of their director compensation. Of the shares reserved under the stock purchase plans at December 31, 2004, approximately 134,000 shares were committed.

**SHAREHOLDERS' EQUITY**

In February 2004, we issued and sold 10 million shares of common stock at a public offering price of $18.00 per share. Net proceeds from the sale were $178. In March 2002, we issued and sold 3,302,914 shares of common stock at a public offering price of $17.50. Net proceeds from this sale were approximately $56.

During 2004 and 2003, we issued 793,778 and 915,159 shares of common stock with a total value of $14 and $18, respectively, to the Contributing Employee Ownership Plan. These shares were issued to satisfy the investment in our common stock resulting from employee contributions, our matching contribution and re-invested dividends.

During 2002, we used $3 to repurchase 144,157 shares of our common stock, respectively. There were no share repurchases in 2004 and 2003. Under programs previously approved by our board of directors, approximately 154,000 shares remained to be repurchased as of December 31, 2004.

In December 2002, we registered $400 of securities with the Securities and Exchange Commission whereby from time to time, we may issue debt securities, preferred stock and/or common stock and associated warrants. After the issuance of 10 million shares of common stock in February 2004, $220 was available for issuance at December 31, 2004.

Other Comprehensive Income (Loss) included an unrealized loss on marketable securities in 2004 and unrealized gains and losses, net of tax on hedging transactions. The unrealized gains (losses) were reported in Other Comprehensive Loss, net of reclassification adjustments, and were not significant to our financial results or financial position for the periods presented. The following represents the reclassification adjustments included in Other Comprehensive Income (Loss).

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Unrealized gains (losses): | | | |
| Marketable securities | $ | $ | $ |
| Hedging transactions | | 4 | (1) |
| | | 4 | (1) |
| Reclassification adjustments: | | | |
| Marketable securities | | | (1) |
| Hedging transactions | (4) | 1 | 2 |
| | (4) | 1 | 1 |
| Net unrealized gain (loss) | $ (4) | $ 5 | $ |

Table of Contents

**SHAREHOLDERS' RIGHTS PLAN**

Pursuant to a Rights Agreement, dated as of February 27, 1996, one Right is associated with each share of our common stock. Each Right entitles a shareholder (other than the acquirer) to buy one-five-hundredth share of Series A Participating Cumulative Preferred Stock at an exercise price of $120. The Rights are exercisable only if a person or group acquires more than 15% of our common stock or, if and as of such date as our board of directors so determines, following the commencement of a tender or exchange offer to acquire more than 15% of our common stock. If any person or group acquires more than 15% of our common stock and in the event of a subsequent merger or combination or similar transaction with the acquirer or a related party, each Right will entitle the holder (other than the acquirer) to purchase stock or other property of the acquirer or such related party having a value of twice the exercise price. We can redeem the Rights at $0.005 per Right for a certain period of time. The Rights will expire on February 27, 2006, unless redeemed earlier by us.

**SEGMENT INFORMATION**

We define segment income as income (loss) before interest expense, interest income, other income, and income taxes, and include the results of non-consolidated affiliates. Consistent with the guidance in SFAS 131, we have determined it is appropriate to include the operating results of non-consolidated affiliates in the relevant segment financial results. Our management considers the Sunbelt Chlor Alkali Partnership to be an integral component of the Chlor Alkali Products segment and Yamaha-Olin Metal Corporation to be an integral component of the Metals segment. Each are engaged in the same business activity as the segment, including joint or overlapping marketing, management, manufacturing and technology development functions. Inter-segment sales of $37, $36 and $30 for the years 2004, 2003 and 2002, respectively representing the sale of ammunition cartridge cups to Winchester from Metals have been eliminated from Metals segment sales.

| | *2004* | *2003* | *2002* |
|---|---|---|---|
| **Sales:** | | | |
| Metals | $1,230 | $ 854 | $ 668 |
| Chlor Alkali Products | 448 | 400 | 321 |
| Winchester | 319 | 303 | 283 |
| Total sales | $1,997 | $1,557 | $1,272 |
| **Income (loss) before taxes from continuing operations:** | | | |
| Metals | $ 50 | $ 9 | $ 19 |
| Chlor Alkali Products | 83 | 63 | (24) |
| Winchester | 22 | 22 | 16 |
| Corporate/Other | (58) | (43) | (18) |
| Restructuring Charges | (10) | (31) | |
| Interest Expense | 20 | 20 | 26 |
| Interest Income | 2 | 1 | 3 |
| Other Income | 10 | 3 | 3 |
| Income (loss) before taxes from continuing operations | $ 79 | $ 4 | $ (27) |
| **Earnings (loss) of non-consolidated affiliates** | | | |
| Metals | $ 1 | $ 1 | $ 1 |
| Chlor Alkali Products | 9 | 7 | (8) |
| Total earnings (loss) of non-consolidated affiliates | | | |

| | | | |
|---|---|---|---|
| | $ [illegible] | $ 8 | $ (7) |
| **Depreciation and amortization expense:** | | | |
| Metals | $ 39 | $ 41 | $ 37 |
| Chlor Alkali Products | 24 | 29 | 37 |
| Winchester | 8 | 9 | 11 |
| Corporate/Other | 2 | 2 | 2 |
| Total depreciation and amortization expense | $ 73 | $ 81 | $ 87 |

Table of Contents

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Capital spending:** | | | |
| Metals | $ 17 | $ 21 | $ 17 |
| Chlor Alkali Products | 29 | 27 | 20 |
| Winchester | 8 | 5 | 4 |
| Corporate/Other | 1 | 1 | |
| Total capital spending | $ 55 | $ 54 | $ 41 |
| **Assets:** | | | |
| Metals | $ 711 | $ 679 | $ 720 |
| Chlor Alkali Products | 215 | 195 | 195 |
| Winchester | 154 | 140 | 135 |
| Corporate/Other | 538 | 418 | 360 |
| Total consolidated assets | $1,618 | $1,432 | $1,410 |
| **Investments & advances to (from) affiliated companies at equity:** | | | |
| Metals | $ 12 | $ 10 | $ 8 |
| Chlor Alkali Products | (21) | (21) | (19) |
| Total investments & advances (from) affiliated companies | $ (9) | $ (11) | $ (11) |

Segment assets include only those assets which are directly identifiable to an operating segment and do not include such items as cash, deferred taxes and other assets. All goodwill, which is associated with its acquisitions, is included in the assets of the Metals segment. Assets of the Corporate/Other segment includes primarily such items as cash and cash equivalents, deferred taxes, prepaid pension costs, other assets and the net assets of discontinued operations.

| *Geographic Data:* | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Sales** | | | |
| United States | $1,917 | $1,507 | $1,217 |
| Foreign | 80 | 50 | 55 |
| Transfers between areas | | | |
| United States | 33 | 26 | 21 |
| Foreign | | | |

| | | | |
|---|---|---|---|
| | | 1 | 1 |
| Eliminations | (34) | (27) | (22) |
| **Total sales** | $1,997 | $1,557 | $1,272 |
| **Assets** | | | |
| United States | $1,547 | $1,372 | $1,356 |
| Foreign | 59 | 50 | 50 |
| Investments | 12 | 10 | 8 |
| Eliminations | | | (4) |
| **Total assets** | $1,618 | $1,432 | $1,410 |

Transfers between geographic areas are priced generally at prevailing market prices. Export sales from the United States to unaffiliated customers were $72, $66, and $49 in 2004, 2003 and 2002, respectively.

**ACQUISITIONS**

In November 2004, we acquired certain assets of Metal Foils LLC for approximately $3. Metal Foils was a distributor of aluminum, stainless steel, and copper products and was located in Willoughby, OH. The acquisition has been accounted for using the purchase method of accounting and has been included in the Metals segment. As part of the agreement, we could have additional consideration payments through 2009, which are contingent on shipments of aluminum products to specifically identified customers and are not guaranteed.

On September 27, 2002, we completed our acquisition of Chase with the issuance of approximately 9.8 million shares of our common stock for 100% of the outstanding stock of Chase. The aggregate purchase price was approximately $178, representing an average price of $18.11 per share. The acquisition has been accounted for using

Table of Contents

the purchase method of accounting and for segment reporting purposes, was included in the Metals segment. The results of Chase, which have been included in the accompanying financial statements since the date of the acquisition, were approximately $15 in 2004 (twelve months), $8 in 2003 (twelve months) and $2 in 2002 (three months).

The following table includes the estimated fair value of the assets acquired and the liabilities assumed at the dates of acquisitions. Based on valuations done at the acquisition date of Metal Foils' assets, $1 was assigned to goodwill, which is not subject to amortization. Based on valuations prepared at the acquisition date of Chase's fixed assets and certain intangible assets (trademark), $40 was assigned to goodwill and $10 was assigned to trademark, which are not subject to amortization.

Supplemental cash flow information on the Metal Foils and Chase acquisitions is as follows:

| | 2004 | 2002 |
|---|---|---|
| Cash | $ | $ 13 |
| Working capital | 1 | 9 |
| Property, plant and equipment | 1 | 135 |
| Goodwill | 1 | 40 |
| Intangible asset (trademark) | | 10 |
| Other, net | | (29) |
| Net assets acquired | $ 3 | $178 |

The following unaudited pro forma condensed results of operations for the year ended December 31, 2002 reflect the Chase acquisition as if it had occurred on January 1, 2002, the beginning of the fiscal period presented.

| | 2002 |
|---|---|
| Sales | $1,481 |
| Net loss | (24) |
| Net loss per common share: | |
| Basic and diluted | $ (0.43) |

**RESTRUCTURING CHARGES**

On January 29, 2004, we announced that our board of directors approved plans to relocate our corporate offices for organizational, strategic and economic reasons. By the end of the year, we had completed the relocation of a portion of our corporate services personnel from Norwalk, CT to our Main Office Building in East Alton, IL. We also established our new corporate headquarters in nearby Clayton, which is in St. Louis County, MO, for logistical and other reasons. The relocation of the corporate offices was accompanied by a downsized corporate structure more appropriate for us in today's competitive business environment. The headquarters relocation was completed by the end of 2004. As a result, we expect the efficiencies of being substantially co-located with the Brass and Winchester businesses to result in corporate personnel being reduced by approximately forty percent, with total projected annual savings of approximately $6 million by 2006. As a result of the relocation, we incurred costs of approximately $10 ($8.9, $0.5, and $0.7 in the first quarter, third quarter, and fourth quarter, respectively) in 2004. We expect to incur an additional $1 of costs in 2005. This restructuring charge included primarily employee severance and related benefit costs, relocation expense, pension curtailment expense and the incurred cost for outplacement services for all effected employees. The sale of the Indianapolis facility in November 2004 resulted in a reduction of a previously established reserve related to our Indianapolis restructuring of $0.5, which reduced the fourth quarter restructuring charge to $0.2.

In the first quarter of 2003, we made a decision to close our manufacturing plant in Indianapolis, IN. The Indianapolis facility ceased operations on February 14, 2003. The plant manufactured copper and copper alloy sheet and strip products and employed approximately 200 people. Production at the Indianapolis strip mill has been consolidated within our East Alton, IL facility. While the Indianapolis strip mill had been an important part of the Metals segment since its acquisition in 1988, reduced domestic consumption of strip products combined with the capacity additions at East Alton lessened the need to maintain the Indianapolis production base. As a result of this closure and certain other actions, we recorded in the first quarter of 2003 a pretax restructuring charge of $29. In addition, we recorded in the fourth quarter of 2003, a pretax restructuring charge of $2 primarily for the write down of certain non-U.S. assets, netted with a reduction of a previously established reserve related to our Indianapolis restructuring. In November 2004, we sold the Indianapolis facility.

Table of Contents

The major portion of the 2003 restructuring charges was a non-cash charge ($25) related to the loss on disposal or write-off of equipment and facilities, and goodwill. The balance of the restructuring charges related to severance and job-related benefit costs. At the Indianapolis facility, approximately 190 employees were terminated, while nine employees were transferred to the East Alton facility. In addition to the closing of the Indianapolis facility, the Metals segment had determined that further cost reductions were necessary due to continuing depressed economic conditions. Approximately 55 employees were terminated to reduce headcount through a combination of a reduction-in-force program in Metals and the relocation of the segment's New Haven, Connecticut metals research laboratory activities to two existing manufacturing locations.

The following table summarizes the major components of the 2004 and 2003 charges and the remaining balances as of December 31, 2004:

| | 2004 Restructuring Charge | Amounts Utilized | Accrued Restructuring Costs |
|---|---|---|---|
| Employee severance and job related benefits | $ 8 | $ (1) | $ 7 |
| Pension curtailment | 1 | (1) | |
| Relocation and outplacement services | 1 | (1) | |
| | $ 10 | $ (3) | $ 7 |

| | 2003 Restructuring Charge | Amounts Utilized | Accrued Restructuring Costs |
|---|---|---|---|
| Write-off of assets (including $2 of goodwill) | $ 25 | $ (25) | $ |
| Employee severance and job related benefits | 6 | (6) | |
| | $ 31 | $ (31) | $ |

The majority of the remaining balance of $7 of the 2004 restructuring charge is expected to be paid out in 2005.

**DISCONTINUED OPERATIONS**

On June 11, 2004, we sold our Olin Aegis business to HCC Industries, Inc. The company received proceeds of $17, which resulted in a pretax gain on the sale of $6 (net of taxes of $3). The disposal of the assets and operations of Olin Aegis represented the disposal of a component of an entity within our Metals business segment. Consequently, the financial data related to Olin Aegis is classified in the consolidated financial statements as a discontinued operation for all periods presented.

The operating results of discontinued operations were as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net sales | $ 12 | $ 29 | $ 29 |
| Income (loss) from operations before taxes | 1 | 2 | |
| Gain on sale of discontinued operations | 6 | | |
| Income (loss) before taxes | 7 | 2 | |
| Income tax provision (benefit) | 3 | 1 | |
| Net income (loss) | $ 4 | $ 1 | $ |

The major classes of assets and liabilities classified as net assets of discontinued operations of our Olin Aegis business at December 31, 2003 were as follows:

| | 2003 |
|---|---|
| Accounts receivable, net | $ 3 |
| Inventory | 4 |
| Property, plant and equipment, net | |

| | |
|---|---|
| Total assets associated with assets held for sale | 12 |
| Accounts payable and accrued liabilities | 1 |
| Net assets of discontinued operations | $11 |

Table of Contents

ENVIRONMENTAL

The establishment and implementation of federal, state and local standards to regulate air, water and land quality has affected and will continue to affect substantially all of our manufacturing locations. Federal legislation providing for regulation of the manufacture, transportation, use and disposal of hazardous and toxic substances, and remediation of contaminated sites, has imposed additional regulatory requirements on industry, particularly the chemicals industry. In addition, implementation of environmental laws, such as the Resource Conservation and Recovery Act and the Clean Air Act, has required and will continue to require new capital expenditures and will increase plant operating costs. We employ waste minimization and pollution prevention programs at our manufacturing sites.

We are party to various governmental and private environmental actions associated with past manufacturing facilities and former waste disposal sites. Associated costs of investigatory and remedial activities are provided for in accordance with generally accepted accounting principles governing probability and the ability to reasonably estimate future costs. Our ability to estimate future costs depends on whether our investigatory and remedial activities are in preliminary or advanced stages. With respect to unasserted claims, we accrue liabilities for costs that, in our experience, we may incur to protect our interest against those unasserted claims. Our accrued liabilities for unasserted claims amounted to $5 at December 31, 2004. With respect to asserted claims, we accrue liabilities based on remedial investigation, feasibility study, remedial action and Operation, Maintenance and Monitoring (OM&M) expenses that, in our experience, we may incur in connection with the asserted claims. Required site OM&M expenses are estimated and accrued in their entirety for required periods not exceeding 30 years, which reasonably approximates the typical duration of long-term site OM&M. Charges to income for investigatory and remedial efforts were material to operating results in 2004, 2003, and 2002 and may be material to net income in future years. Such pretax charges to income were $23, $20 and $15 in 2004, 2003, and 2002 respectively. These charges relate primarily to remedial and investigatory activities associated with past manufacturing operations and former waste disposal sites. The 2004 increase in environmental charges to income was primarily attributable to additional liabilities for alleged groundwater contamination at a former plant site. The 2003 increase in environmental charges to income was primarily attributable to additional liabilities for alleged groundwater contamination at a former plant site and the cleanup of potential contaminants in the soil at an offsite disposal area.

Our estimated environmental liability at the end of 2004 was attributable to 60 sites, 15 of which were USEPA National Priority List (NPL) sites. Ten sites accounted for approximately 77% of such liability and, of the remaining 50 sites, no one site accounted for more than 2% of our environmental liability. One of these ten sites is in the investigatory stage of the remediation process. In this stage, remedial investigation and feasibility studies are being conducted by us and a Record of Decision (ROD) or its equivalent has not been issued. At one of the ten sites, a ROD or its equivalent has been issued by a responsible state agency and we are engaged in performing the remedial measures required by that ROD and part of that site is subject to a remedial investigation. At four of the ten sites, part of the site is subject to a remedial investigation and another part is in the long-term OM&M stage. The four remaining sites are in long-term OM&M. All ten sites are either associated with past manufacturing operations or former waste disposal sites. None of the ten largest sites represents more than 15% of the liabilities reserved on our consolidated balance sheet at December 31, 2004 for future environmental expenditures.

Our consolidated balance sheets included liabilities for future environmental expenditures to investigate and remediate known sites amounting to $100 at December 31, 2004, and $93 at December 31, 2003, of which $72 and $67 were classified as other noncurrent liabilities, respectively. Those amounts did not take into account any discounting of future expenditures or any consideration of insurance recoveries or advances in technology. Those liabilities are reassessed periodically to determine if environmental circumstances have changed and/or remediation efforts and our estimate of related costs have changed. As a result of these reassessments, future charges to income may be made for additional liabilities. Of the $100 included on our consolidated balance sheet at December 31, 2004 for future environmental expenditures, we currently expect to utilize $68 of the reserve for future environmental expenditures over the next 5 years, $14 for expenditures 6 to 10 years in the future, and $18 for expenditures beyond 10 years in the future.

Annual environmental-related cash outlays for site investigation and remediation are expected to range between approximately $25 to $30 over the next several years, which are expected to be charged against reserves recorded on

Table of Contents

our balance sheet. While we do not anticipate a material increase in the projected annual level of our environmental-related cash outlays, there is always the possibility that such increases may occur in the future in view of the uncertainties associated with environmental exposures. Environmental exposures are difficult to assess for numerous reasons, including the identification of new sites, developments at sites resulting from investigatory studies, advances in technology, changes in environmental laws and regulations and their application, the scarcity of reliable data pertaining to identified sites, the difficulty in assessing the involvement and financial capability of other PRPs and our ability to obtain contributions from other parties and the lengthy time periods over which site remediation occurs. It is possible that some of these matters (the outcomes of which are subject to various uncertainties) may be resolved unfavorably to us, which could materially adversely affect our financial position or results of operations. At December 31, 2004, we estimate we may have additional contingent environmental liabilities of $50 in addition to the amounts for which we have already recorded as a reserve.

**COMMITMENTS AND CONTINGENCIES**

We lease certain properties, such as railroad cars, distribution, warehousing and office space, data processing and office equipment. Virtually none of our lease agreements contain escalation clauses or step rent provisions. Total rent expense charged to operations amounted to $28 in 2004, $30 in 2003 and $29 in 2002 (sublease income is not significant). Future minimum rent payments under operating leases having initial or remaining non-cancelable lease terms in excess of one year at December 31, 2004 are as follows; $23 in 2005; $22 in 2006; $20 in 2007; $16 in 2008; $12 in 2009 and a total of $57 thereafter.

On December 31, 1997, we entered into a long-term, sulfur dioxide supply agreement with Alliance Specialty Chemicals, Inc. (Alliance), formerly known as RFC SO2, Inc. Alliance has the obligation to deliver annually 36,000 tons of sulfur dioxide. Alliance owns the sulfur dioxide plant, which is located at our Charleston, TN facility and is operated by us. The price for the sulfur dioxide is fixed over the life of the contract, and under the terms of the contract, we are obligated to make a monthly payment of approximately $0.2 regardless of the sulfur dioxide purchased. Commitments related to this agreement are approximately $2 per year for each year of 2005 through 2011 and $1 in 2012. This supply agreement expires in 2012.

We and our subsidiaries are defendants in various legal actions (including proceedings based on alleged exposures to asbestos and perchlorate) incidental to our past and current business activities. While we believe that none of these legal actions will materially adversely affect our financial position, in light of the inherent uncertainties of the litigation concerning alleged exposures, we cannot at this time determine whether the financial impact, if any of these matters will be material to our results of operations.

During the ordinary course of our business, contingencies arise resulting from an existing condition, situation, or set of circumstances involving an uncertainty as to the realization of a possible gain contingency. In certain instances such as environmental projects, we are responsible for managing the clean-up and remediation of an environmental site. There exists the possibility of recovering a portion of these costs from other parties. We account for gain contingencies in accordance with the provisions of SFAS No. 5, "Accounting for Contingencies" and therefore do not record a gain contingency and recognize revenue until it is earned and realizable. At December 31, 2004 and 2003, we have not recorded a gain contingency in the consolidated financial statements.

Table of Contents

OTHER FINANCIAL DATA

***Quarterly Data (Unaudited)***

| 2004 | First Quarter(1) | Second Quarter | Third Quarter(1) | Fourth Quarter(1) | Year(1) |
|---|---|---|---|---|---|
| Sales | $ 483 | $ 507 | $ 520 | $ 487 | $1,997 |
| Cost of goods sold | 432 | 465 | 458 | 410 | 1,765 |
| Income (loss) from continuing operations | 3 | 6 | 19 | 23 | 51 |
| Discontinued operations (2): | | | | | |
| Income from discontinued operations, net | | 1 | | | 1 |
| Gain on disposal of discontinued operations, net | | 3 | | | 3 |
| Net income | 3 | 10 | 19 | 23 | 55 |
| Basic and diluted income per common share: | | | | | |
| Income (loss) from continuing operations | 0.04 | 0.09 | 0.27 | 0.32 | 0.74 |
| Income from discontinued operations, net | | 0.01 | | | 0.01 |
| Gain on disposal of discontinued operations, net | | 0.05 | | | 0.05 |
| Net income (loss) | 0.04 | 0.15 | 0.27 | 0.32 | 0.80 |
| Common dividends per share | 0.20 | 0.20 | 0.20 | 0.20 | 0.80 |
| Market price of common stock(3) | | | | | |
| High | 20.51 | 18.99 | 20.24 | 22.99 | 22.99 |
| Low | 16.37 | 15.20 | 15.93 | 18.18 | 15.20 |
| **2003** | | | | | |
| Sales | $ 383 | $ 389 | $ 407 | $ 378 | $1,557 |
| Cost of goods sold | 339 | 343 | 360 | 340 | 1,382 |
| Income (loss) from continuing operations before accounting change | (14) | 8 | 6 | | |
| Income from discontinued operations, net (2) | | 1 | | | 1 |
| Cumulative effect of accounting change, net | (25) | | | | (25) |
| Net income (loss) | (39) | 9 | 6 | | (24) |
| Basic and diluted income (loss) per common share: | | | | | |
| Income (loss) from continuing operations before accounting change | (0.23) | 0.14 | 0.10 | | 0.01 |

| | | | | | |
|---|---|---|---|---|---|
| Income from discontinued operations, net | | 0.01 | | 0.01 | 0.01 |
| Cumulative effect of accounting change, net | (0.44) | | | | (0.44) |
| Net income (loss) | (0.67) | 0.15 | 0.10 | 0.01 | (0.42) |
| Common dividends per share | 0.20 | 0.20 | 0.20 | 0.20 | 0.80 |
| Market price of common stock (3) | | | | | |
| High | 20.00 | 19.70 | 19.00 | 20.53 | 20.53 |
| Low | 14.97 | 16.40 | 15.82 | 15.79 | 14.97 |

(1) Operating results for the 2004 first quarter, third quarter and fourth quarter included pretax Restructuring Charges of $8.9, $0.5 and $0.2, respectively, for the relocation of the corporate headquarters. Operating results for the 2003 first quarter and fourth quarter included pretax Restructuring Charges of $29 and $2, respectively, for the shutdown of our Indianapolis Brass mill and certain other actions. Operating results in the 2003 first quarter included an after-tax charge of $25 for the adoption of SFAS No. 143, "Accounting for Asset Retirement Obligations."

(2) In the second quarter of 2004, we sold Olin Aegis and recognized an after-tax gain on disposal of $3. The disposal of the assets and operations of Olin Aegis represented the disposal of a component of an entity within our Metals business segment. Consequently, the financial data related to Olin Aegis is classified in the consolidated financial statements as a discontinued operation for all periods presented. In our previously-filed Form 10-Q for the quarters ended June 30, 2004 and September 30, 2004, we did not report Olin Aegis as a discontinued operation. Olin Aegis is presented as a discontinued operation in the above quarterly data table and in our consolidated financial statements enclosed in this Form 10-K.

(3) New York Stock Exchange composite transactions.

Table of Contents

**Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

Not applicable.

**Item 9A. CONTROLS AND PROCEDURES**

We maintain a system of disclosure controls and procedures designed to provide reasonable assurance that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported, within the time periods specified in Securities and Exchange Commission rules and forms. Our management, with the participation of our chief executive officer and our chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2004. Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

There have been no significant changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2004 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, except that, during the quarter, our management implemented a procedure to test each of our non-consolidated affiliates, including Sunbelt Chlor Alkali Partnership, to determine whether any non-consolidated affiliate is significant enough to Olin that applicable SEC rules would require inclusion of certain separate financial statements of that affiliate in our SEC filings.

**Item 9B. OTHER INFORMATION**

Not applicable.

## PART III

**Item 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

We incorporate the biographical information relating to our Directors under the heading "Item 1-Election of Directors" in our Proxy Statement relating to our 2005 Annual Meeting of Shareholders (the "Proxy Statement") by reference in this Report. See also the list of executive officers following Item 4 of this Report. We incorporate the information regarding compliance with Section 16 of the Securities Exchange Act of 1934, as amended, contained in the paragraph entitled "Section 16(a) Beneficial Ownership Reporting Compliance" under the heading "Security Ownership of Directors and Officers" in our Proxy Statement by reference in this Report.

The information with respect to our audit committee, including the audit committee financial expert, is incorporated by reference in this Report to the information contained in the paragraph entitled "What are the committees of the Board" under the heading "Additional Information Regarding the Board of Directors" in our Proxy Statement. We incorporate information regarding procedures for shareholders to nominate a director for election, in the Proxy Statement under the headings "Miscellaneous-How can I directly nominate a Director for election to the Board at the 2006 Annual Meeting?" and "Additional Information Regarding the Board of Directors-What is Olin's Director Nomination Process?" by reference in this Report.

We have adopted a code of business conduct and ethics for directors, officers and employees, known as the Code of Business Conduct. The Code is available in the Corporate Governance section of the Investor section of our website at www.olin.com.

Table of Contents

**Item 11. EXECUTIVE COMPENSATION**

The information in the Proxy Statement under the headings "Executive Compensation" (but excluding the Report of the Compensation Committee on Executive Compensation and the Performance Graph), "Executive Agreements," "Voluntary Employment Separation Program (VSP)," "Retirement Benefits" and "Additional Information Regarding the Board of Directors How are the Directors compensated?" are incorporated by reference in this Report.

**Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

We incorporate the information concerning holdings of our common stock by certain beneficial owners contained under the heading "Certain Beneficial Owners" in our Proxy Statement and the information concerning beneficial ownership of our common stock by our directors and officers under the heading "Security Ownership of Directors and Officers" and the information concerning our equity compensation plans under the heading "Equity Compensation Plan Information" in our Proxy Statement by reference in this Report.

**Item 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

Not applicable.

**Item 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES.**

We incorporate the information concerning the accounting fees and services of our independent auditors, KPMG under the heading "Item 4 Proposal to Ratify Appointment of Independent Auditors" in our Proxy Statement by reference in this Report.

Table of Contents

## PART IV

**Item 15. EXHIBITS AND CONSOLIDATED FINANCIAL STATEMENT SCHEDULES**

(a) 1. **Consolidated Financial Statements**

Consolidated financial statements of the registrant are included in Item 8 above.

2. **Financial Statement Schedules**

Schedules containing separate financial statements of Sunbelt Chlor Alkali Partnership are set forth beginning on page S-1 immediately following the signature page in the copy of this annual report filed with the SEC. Separate consolidated financial statements of our other 50% or less owned subsidiaries accounted for by the equity method are not summarized herein and have been omitted because, in the aggregate, they would not constitute a significant subsidiary.

Schedules not included herein are omitted because they are inapplicable or not required or because the required information is given in the consolidated financial statements and notes thereto.

3. **Exhibits**

Management contracts and compensatory plans and arrangements are listed as Exhibits 10(a) through 10(z) below.

| | | |
|---|---|---|
| 3 | (a) | Olin's Restated Articles of Incorporation as amended effective May 8, 1997 Exhibit 3(a) to Olin's Form 10-Q for the quarter ended June 30, 2003.* |
| | (b) | By-laws of Olin as amended effective July 30, 2003 Exhibit 3(b) to Olin's Form 10-Q for the quarter ended June 30, 2003.* |
| 4 | (a) | Articles of Amendment designating Series A Participating Cumulative Preferred Stock, par value $1 per share Exhibit 2 to Olin's Form 8-A dated February 21, 1996, covering Series A Participating Cumulative Preferred Stock Purchase Rights.* |
| | (b) | Rights Agreement dated as of February 27, 1996 between Olin and Chemical Mellon Shareholder Services, LLP, Rights Agent Exhibit 1 to Olin's Form 8-A dated February 21, 1996, covering Series A Participating Cumulative Preferred Stock Purchase Rights.* |
| | (c) | Form of Senior Debt Indenture between Olin and Chemical Bank Exhibit 4(a) to Form 8-K dated June 15, 1992; Supplemental Indenture dated as of March 18, 1994 between Olin and Chemical Bank Exhibit 4(c) to Registration Statement No. 33-52771 and Second Supplemental Indenture dated as of December 11, 2001 between Olin and JPMorgan Chase Bank, formerly known as Chemical Bank Exhibit 4 to Form 8-K dated December 20, 2001.* |
| | (d) | Credit Agreement dated as of July 30, 2004 among Olin and the banks named therein Exhibit 4(d) to Olin's Form 10-Q for the quarter ended June 30, 2004.* |
| | (e) | 9.125% Senior Note Due 2011 Exhibit 4(f) to Olin's Form 10-K for 2001.* |
| | | We are party to a number of other instruments defining the rights of holders of long-term debt. No such instrument authorizes an amount of securities in excess of 10% of the total assets of Olin and its subsidiaries on a consolidated basis. Olin agrees to furnish a copy of each instrument to the Commission upon request. |
| 10 | (a) | 1988 Stock Option Plan for Key Employees of Olin Corporation and Subsidiaries as amended through January 30, 2003 Exhibit 10(a) to Olin's Form 10-K for 2002.* |
| | (b) | Employee Deferral Plan as amended and restated effective as of January 30, 2003 Exhibit 10(b) to Olin's Form 10-K for 2002.* |
| | (c) | Olin Senior Executive Pension Plan amended as of July 27, 2000 Exhibit 10(d) to Olin's Form 10-Q for the quarter ended September 30, 2000.* |
| | (d) | Olin Supplemental Contributing Employee Ownership Plan as amended through October 31, 2003-Exhibit 10(d) to Olin's Form 10-K for 2003.* |
| | (e) | Olin Corporation Key Executive Life Insurance Program Exhibit 10(e) to Olin's Form 10-K for 2002.* |
| | (f) | Form of executive agreement between Olin and certain executive officers dated November 1, 2002 Exhibit 10(f) to Olin's Form 10-K for 2002.* |
| | (g) | Form of executive agreement between Olin and certain executive officers-Exhibit 99.1 to Olin's Form 8-K dated January 28, 2005.* |
| | (h) | Form of executive change-in-control agreement between Olin and certain executive officers-Exhibit 99.2 to Olin's Form 8-K dated January 28, 2005.* |
| | (i) | Olin 1991 Long Term Incentive Plan, as amended through January 30, 2003 Exhibit 10(g) to Olin's Form 10-K for 2002.* |

Table of Contents

- (j) Amended and Restated 1997 Stock Plan for Non-Employee Directors as amended effective January 26, 2005 Exhibit 99.3 to Olin's Form 8-K dated January 28, 2005.*
- (k) Olin Senior Management Incentive Compensation Plan, as amended through January 26, 2005-Appendix B to Olin's 2005 Proxy Statement dated March 15, 2005.*
- (l) Description of Restricted Stock Unit Awards granted under the 2000 Long Term Incentive Plan Exhibit 10(m) to Olin's Form 10-K for 2001.*
- (m) Description of Restricted Stock Unit Awards granted under the 2003 Long Term Incentive Plan.
- (n) 1996 Stock Option Plan for Key Employees of Olin Corporation and Subsidiaries as amended as of January 30, 2003 Exhibit 10(l) to Olin's Form 10-K for 2002.*
- (o) Olin Supplementary and Deferral Benefit Pension Plan restated as of February 8, 1999 Exhibit 10(s) to Olin's Form l0-Q for the quarter ended March 31, 1999.*
- (p) Olin Corporation 2000 Long Term Incentive Plan as amended through January 30, 2003 Exhibit 10(n) to Olin's Form 10-K for 2002.*
- (q) Olin Corporation 2003 Long Term Incentive Plan Exhibit 10(o) to Olin's Form 10-K for 2002.*
- (r) 2001 Performance Share Program Exhibit 10(w) to Olin's Form 10-Q for quarter ended March 31, 2001.*
- (s) 2004 Performance Share Program.
- (t) 2005 Performance Share Program.
- (u) Chase Industries Inc. 1994 Long-Term Incentive Plan, as amended as of May 14, 1997 and First Amendment effective as of November 19, 1999 Exhibit 10.5 to Chase Industries Inc. Form 10-K for 1998 and Exhibit 10.7 to Chase Industries Inc. Form 10-K for 1999, respectively SEC file No. 1-13394.*
- (v) Chase Industries Inc. 1997 Non-Employee Director Stock Option Plan, as amended May 26, 1998 and First Amendment effective as of November 19, 1999 Exhibit 10.6 to Chase Industries Inc. Form 10-K for 1998 and Exhibit 10.9 to Chase Industries Inc. Form 10-K for 1999, respectively SEC file No. 1-13394.*
- (w) D. W. Griffin Letter Agreement dated January 31, 2003 Exhibit 10(t) to Olin's Form 10-K for 2002.*
- (x) Form of Voluntary Employment Separation Agreement and Release with certain executive officers-Exhibit 10(u) to Olin's Form 10-K for 2003.*
- (y) Letter Agreement with G. H. Pain dated January 29, 2004-Exhibit 10(v) to Olin's Form 10-K for 2003.*
- (z) Limited Waiver of Executive Agreement Provisions with G. H. Pain.
- (aa) Distribution Agreement between Olin Corporation and Arch Chemicals, Inc., dated as of February 1, 1999 Exhibit 2.1 to Olin's Form 8-K filed February 23, 1999.*
- (bb) Partnership Agreement between Olin Sunbelt, Inc. and 1997 Chloralkali Venture Inc. dated August 23, 1996 Exhibit 99.1 to Olin's Form 8-K dated December 3, 2001.*
- (cc) Amendment to Partnership Agreement between Olin Sunbelt, Inc. and 1997 Chloralkali Venture Inc. dated December 23, 1997 Exhibit 99.2 to Olin's Form 8-K dated December 3, 2001.*
- (dd) Amendment to Partnership Agreement between Olin Sunbelt, Inc. and 1997 Chloralkali Venture Inc. dated December 23, 1997 Exhibit 99.3 to Olin's Form 8-K dated December 3, 2001.*
- (ee) Amendment to Partnership Agreement between Olin Sunbelt, Inc. and 1997 Chloralkali Venture Inc. dated April 30, 1998 Exhibit 99.4 to Olin's Form 8-K dated December 3, 2001.*
- (ff) Amendment to Partnership Agreement between Olin Sunbelt, Inc. and 1997 Chloralkali Venture Inc. dated January 1, 2003 Exhibit 10(aa) to Olin's Form 10-K for 2002.*
- (gg) Note Purchase Agreement dated December 22, 1997 between the Sunbelt Chlor Alkali Partnership and the Purchasers named therein Exhibit 99.5 to Olin's Form 8-K dated December 3, 2001.*
- (hh) Guarantee Agreement dated December 22, 1997 between Olin and the Purchasers named therein Exhibit 99.6 to Olin's Form 8-K dated December 3, 2001.*
- (ii) Subordination Agreement dated December 22, 1997 between Olin and the Subordinated Parties named therein Exhibit 99.7 to Olin's Form 8-K dated December 3, 2001.*

| | |
|---|---|
| 11 | Computation of Per Share Earnings (included in the Note "Earnings Per Share" to Notes to Consolidated Financial Statements in Item 8.) |
| 12 | Computation of Ratio of Earnings to Fixed Charges (unaudited). |
| 21 | List of Subsidiaries. |
| 23.1 | Consent of KPMG LLP. |
| 23.2 | Consent of Ernst & Young. |
| 31.1 | Section 302 Certification Statement of Chief Executive Officer. |
| 31.2 | Section 302 Certification Statement of Chief Financial Officer. |
| 32 | Section 906 Certification Statement of Chief Executive Officer and Chief Financial Officer. |

* Previously filed as indicated and incorporated herein by reference. Exhibits incorporated by reference are located in SEC file No. 1-1070 unless otherwise indicated.

Any of the foregoing exhibits are available from the Company by writing to: Mr. George H. Pain, Vice President, General Counsel and Secretary, Olin Corporation, 190 Carondelet Plaza, Suite 1530, Clayton, MO 63105-3443.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: March 9, 2005

OLIN CORPORATION

By /S/ JOSEPH D. RUPP

**Joseph D. Rupp**
President and
Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ JOSEPH D. RUPP<br>**Joseph D. Rupp** | President and Chief Executive Officer and Director (Principal Executive Officer) | March 9, 2005 |
| /s/ DONALD W. GRIFFIN<br>**Donald W. Griffin** | Director | March 9, 2005 |
| /s/ JAMES G. HASCALL<br>**James G. Hascall** | Director | March 9, 2005 |
| /s/ WILLIAM W. HIGGINS<br>**William W. Higgins** | Director | March 9, 2005 |
| /s/ VIRGINIA A. KAMSKY<br>**Virginia A. Kamsky** | Director | March 9, 2005 |
| /s/ RANDALL W. LARRIMORE<br>**Randall W. Larrimore** | Director and Chairman of the Board | March 9, 2005 |
| /s/ RICHARD M. ROMPALA<br>**Richard M. Rompala** | Director | March 9, 2005 |
| /s/ PHILIP J. SCHULZ<br>**Philip J. Schulz** | Director | March 9, 2005 |
| /s/ ANTHONY W. RUGGIERO<br>**Anthony W. Ruggiero** | Executive Vice President and Chief Financial Officer and Director (Principal Financial Officer) | March 9, 2005 |
| /s/ JOHN E. FISCHER<br>**John E. Fischer** | Vice President, Finance and Controller (Principal Accounting Officer) | March 9, 2005 |

Table of Contents

**AUDITED FINANCIAL STATEMENTS**

**SUNBELT CHLOR ALKALI PARTNERSHIP**
**December 31, 2004**

[Table of Contents](#)

**SUNBELT CHLOR ALKALI PARTNERSHIP**

**AUDITED FINANCIAL STATEMENTS**
Years Ended December 31, 2004 and 2003

**Contents**


Audited Financial Statements

Report of Independent Registered Public Accounting Firm S-3

Balance Sheets S-4

Statements of Operations S-5

Statements of Partners' Deficit S-6

Statements of Cash Flows S-7

Notes to Financial Statements S-8

Table of Contents

ERNST & YOUNG

Ernst & Young LLP
Suite 1300
925 Euclid Avenue
Cleveland, Ohio 44115-1405

Phone: (216) 861-5000
www.ey.com

**Report of Independent Registered Public Accounting Firm**

The Partners
SunBelt Chlor Alkali Partnership

We have audited the accompanying balance sheets of SunBelt Chlor Alkali Partnership as of December 31, 2004 and 2003, and the related statements of operations, partners' deficit, and cash flows for each of the three years in the period ended December 31, 2004. These financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of SunBelt Chlor Alkali Partnership at December 31, 2004 and 2003, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

Ernst + Young LLP

February 11, 2005

A Member Practice of Ernst & Young Global

Table of Contents

**SUNBELT CHLOR ALKALI PARTNERSHIP**
**Balance Sheets**
December 31, 2004 and 2003

| | 2004 | 2003 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash | $ 22,609 | $ 11,600 |
| Receivable from Oxy Vinyls, LP | 7,261,416 | 3,427,331 |
| Receivables from partners | 8,429,290 | 6,388,811 |
| Inventories | 2,111,018 | 2,482,776 |
| Prepaids and other current assets | 1,116,377 | 959,720 |
| Total current assets | 18,940,710 | 13,270,238 |
| Property, plant, and equipment, net | 124,415,109 | 134,187,252 |
| Deferred financing costs, net | 1,041,922 | 1,122,069 |
| **Total assets** | $ 144,397,741 | $ 148,579,559 |
| **Liabilities and partners' deficit** | | |
| Current liabilities: | | |
| Amounts payable to partners | $ 5,811,337 | $ 6,557,559 |
| Current portion of long-term debt | 12,187,500 | 12,187,500 |
| Total current liabilities | 17,998,837 | 18,745,059 |
| Long-term debt | 146,250,000 | 158,437,500 |
| Partners' deficit | (19,851,096) | (28,603,000) |
| **Total liabilities and partners' deficit** | $ 144,397,741 | $ 148,579,559 |

See notes to financial statements.

Table of Contents

**SUNBELT CHLOR ALKALI PARTNERSHIP**
**Statements of Operations**
For the Years Ended December 31, 2004, 2003 and 2002

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Revenues | $ 105,764,129 | $ 97,021,661 | $ 65,158,183 |
| Operating costs and expenses: | | | |
| Cost of sales | 45,281,281 | 41,699,987 | 38,945,085 |
| Depreciation and amortization | 14,150,729 | 13,632,976 | 13,426,621 |
| Administrative and general | 10,701,137 | 9,744,589 | 9,688,129 |
| | 70,133,147 | 65,077,552 | 62,059,835 |
| Operating income | 35,630,982 | 31,944,109 | 3,098,348 |
| Interest expense | (12,336,188) | (13,217,344) | (14,098,500) |
| Interest income | 161,168 | 69,215 | |
| Net income (loss) | $ 23,455,962 | $ 18,795,980 | $ (11,000,152) |

See notes to financial statements.

Table of Contents

**SUNBELT CHLOR ALKALI PARTNERSHIP**
**Statements of Partners' Deficit**
For the Years Ended December 31, 2004, 2003 and 2002

| | Partners | | |
|---|---|---|---|
| | *Olin SunBelt Inc.* | *1997 Chlor Alkali Venture, Inc.* | *Total* |
| **Balance at December 31, 2001** | $ (21,122,607) | $ (21,122,607) | $ (42,245,214) |
| Cash contributions by partners | 38,682,831 | 38,682,831 | 77,365,662 |
| Cash distributions to partners | (31,833,245) | (31,833,245) | (63,666,490) |
| Net loss | (5,500,076) | (5,500,076) | (11,000,152) |
| **Balance at December 31, 2002** | (19,773,097) | (19,773,097) | (39,546,194) |
| Cash contributions by partners | 10,883,627 | 14,069,753 | 24,953,380 |
| Asset contributions by partner | 3,186,126 | | 3,186,126 |
| Cash distributions to partners | (17,996,146) | (17,996,146) | (35,992,292) |
| Net income | 9,397,990 | 9,397,990 | 18,795,980 |
| **Balance at December 31, 2003** | (14,301,500) | (14,301,500) | (28,603,000) |
| Cash distributions to partners | (7,352,029) | (7,352,029) | (14,704,058) |
| Net income | 11,727,981 | 11,727,981 | 23,455,962 |
| **Balance at December 31, 2004** | $ (9,925,548) | $ (9,925,548) | $ (19,851,096) |

See notes to financial statements.

Table of Contents

**SUNBELT CHLOR ALKALI PARTNERSHIP**
**Statements of Cash Flows**
For the Years Ended December 31, 2004, 2003 and 2002

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Operating activities** | | | |
| Net income (loss) | $ 23,455,962 | $ 18,795,980 | $ (11,000,152) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation | 14,070,581 | 13,552,828 | 13,346,472 |
| Amortization | 80,148 | 80,148 | 80,148 |
| Loss on disposal of assets | 289,883 | 134,897 | 520,924 |
| Changes in assets and liabilities: | | | |
| Receivable from Oxy Vinyls, LP | (3,834,085) | 1,477,074 | (4,360,275) |
| Receivables from partners | (2,040,479) | (156,701) | 3,143,046 |
| Inventories | 371,758 | 323,839 | (225,287) |
| Amounts payable to partners | (746,222) | 313,383 | (272,559) |
| Prepaid expenses and other current assets | (156,657) | (707,898) | (42,198) |
| Net cash provided by operating activities | 31,490,889 | 33,813,550 | 1,190,119 |
| **Investing activities** | | | |
| Purchases of property, plant, and equipment | (4,588,322) | (10,575,538) | (2,764,252) |
| Proceeds on sale of property, plant, and equipment | | | 62,146 |
| Net cash used in investing activities | (4,588,322) | (10,575,538) | (2,702,106) |
| **Financing activities** | | | |
| Cash contributions by partners | | 24,953,380 | 77,365,662 |
| Cash distributions to partners | (14,704,058) | (35,992,292) | (63,666,490) |
| Principal payments on long-term debt | (12,187,500) | (12,187,500) | (12,187,500) |
| Net cash (used in) provided by financing activities | (26,891,558) | (23,226,412) | 1,511,672 |
| Net increase (decrease) in cash | 11,009 | 11,600 | (315) |
| Cash at beginning of year | 11,600 | | 315 |
| Cash at end of year | $ 22,609 | $ 11,600 | $ |

See notes to financial statements.

Table of Contents

**SUNBELT CHLOR ALKALI PARTNERSHIP**
**Notes to Financial Statements**
December 31, 2004 and 2003

**1. Organization**

SunBelt Chlor Alkali Partnership (the Partnership) was formed on August 23, 1996 under a Partnership Agreement, between 1997 Chlor Alkali Venture, Inc. and Olin SunBelt Inc. (the Partners). 1997 Chlor Alkali Venture, Inc. is a wholly owned subsidiary of PolyOne Corporation (formerly The Geon Company) and Olin SunBelt Inc. is a wholly owned subsidiary of the Olin Corporation. Each of the Partners has a 50% interest in the Partnership. The Agreement provides that the capital investment of the Partners will be maintained and the Partnership's income or loss will be allocated to the Partners based on their ownership interest percentages.

The Partnership was formed for the purpose of construction and operation of a Chlor-Alkali facility. The facility, which is located in McIntosh, Alabama produces chlorine, caustic soda and hydrogen.

**2. Significant Accounting Policies**

*Cash and Cash Equivalent*

The Partnership considers all highly liquid investments purchased with an original maturity of three months or less to be cash equivalents.

*Inventories*

Inventories are valued at the lower of cost or market. Cost is determined by the first-in, first-out (FIFO) method.

*Property, Plant, and Equipment and Depreciation*

Property, plant, and equipment are carried at cost. Major renewals and betterments are capitalized. Maintenance and repair expenditures which do not improve or extend the life of the respective assets are expensed as incurred. Depreciation for all plant and equipment is computed using the straight-line method over their estimated useful lives. The ranges of estimated useful lives are as follows:

| | |
|---|---|
| Land improvements | 20 years |
| Buildings | 20 years |
| Machinery and equipment | 15 20 years |

Long-lived assets are assessed for impairment when operating profits for the related business or a significant change in the use of an asset indicate that their carrying value may not be recoverable.

*Deferred Financing Costs*

The costs incurred by the Partnership in obtaining its long-term debt have been capitalized and are being amortized over the term of the debt using the effective interest method.

*Financial Instruments*

The carrying amount of long-term debt approximates its fair value. The fair value of the debt is estimated based on the present value of the underlying cash flow discounted at the Partnership's estimated borrowing rate.

*Revenue Recognition*

The Partnership recognizes revenues at the point of passage of title which is based on shipping terms.

Table of Contents

*Shipping and Handling Costs*

Shipping and handling costs are reflected in costs of sales.

*Income Taxes*

No provision is made for income taxes as the Partnership's results of operations are includable in the tax returns of the Partners.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the financial statements and the accompanying notes. Actual results could differ from those estimates.

*Risks and Uncertainties*

Since the Partnership's major products are commodities, significant changes in the prices of chemical products could have a significant impact on the results of operations for any particular period. The Partnership had one major chlorine customer, OxyVinyls LP, during the periods presented, which accounted for 58.3%, 53.7%, and 47.3% of total sales for the years ended December 31, 2004, 2003, and 2002, respectively.

**3. Inventories**

Inventories are comprised as follows:

| | December 31 | |
|---|---|---|
| | 2004 | 2003 |
| Finished goods | $ 521,364 | $ 738,369 |
| Parts | 1,589,654 | 1,744,407 |
| | $ 2,111,018 | $ 2,482,776 |

**4. Property Plant, and Equipment**

Property, plant, and equipment is comprised as follows:

| | December 31 | |
|---|---|---|
| | 2004 | 2003 |
| Land and land improvements | $ 4,862,826 | $ 4,862,826 |
| Building | 3,507,389 | 3,242,600 |
| Machinery and equipment | 200,964,285 | 197,859,987 |
| Construction in process | 3,968,774 | 3,728,585 |
| | 213,303,274 | 209,693,998 |
| Less allowance for depreciation | 88,888,165 | 75,506,746 |
| | $ 124,415,109 | $ 134,187,252 |

**5. Transactions With Affiliates**

The Partnership has various management service agreements, dated August 23, 1996, with the Olin Corporation. These agreements, which include compensation for managing the facility, an asset utilization fee, a fleet fee and a distribution fee, have terms from five to ten years with five year price adjustment renewals. Charges for these services were approximately $7,199,412, $6,813,237 and $6,423,396 for 2004, 2003, and 2002, respectively, and have been included within administrative and general expenses in the statement of operations. The Partnership also received contributions from its partners totaling $28,139,506 and $77,365,662 in 2003 and 2002, respectively, which were used for working capital purposes and to pay for costs incurred in constructing the production facility. The cash policy was changed during 2003 to not make distributions to the partners until the cash balance

Table of Contents

was sufficient to cover both the principal payment and the interest expense for the year. Contributions from the partners were discontinued with this policy change and the manufacturing costs were paid from receipts. The Partnership made distributions to its partners totaling $14,704,058, $35,992,292 and $63,666,490 in 2004, 2003, and 2002, respectively.

In accordance with the Partnership Operating Agreement, the majority of chlorine produced by the Partnership is sold to Oxy Vinyls LP, which is 24% owned by PolyOne Corporation. The remaining chlorine and all of the caustic soda produced by the Partnership is marketed and distributed by the Olin Corporation.

**6. Long - Term Debt**

On December 23, 1997, the Partnership borrowed $195,000,000 in a private placement of debt. The debt is secured by the property, plant, equipment, and inventory of the Partnership. The term of the loan is 20 years at an interest rate of 7.23%. The first principal payment of $12,187,500 was paid on December 22, 2002 with equal annual payments due through December 22, 2017. Interest payments are payable semi-annually in arrears on each June 22 and December 22. Interest payments totaled $12,336,188, $13,217,344, and 14,098,500 in 2004, 2003, and 2002, respectively. The debt is guaranteed by the Partners.

**7. Leases**

The Partnership has operating leases for certain property, machinery, and equipment. At December 31, 2004, future minimum lease payments under noncancelable operating leases are as follows:

| | | |
|---|---|---|
| 2005 | $ | 633,845 |
| 2006 | | 622,345 |
| 2007 | | 588,220 |
| 2008 | | 305,280 |
| 2009 | | 251,460 |
| Thereafter | | |
| Total minimum future lease payments | $ | 2,401,150 |

Rent expense was approximately $599,720, $557,260, and 114,300 for the years ended December 31, 2004, 2003, and 2002 respectively.

**8. Commitments and Contingencies**

The Partnership is subject to legal proceedings and claims that arise in the ordinary course of its business. Management evaluates each claim and provides for any potential loss when the claim is probable to be paid and reasonably estimable. In the opinion of management, the ultimate liability with respect to these actions will not materially affect the financial condition, results of operations or cash flows of the Partnership.

**DESCRIPTION OF**
**RESTRICTED STOCK UNIT AWARD**
**GRANTED UNDER THE**
**OLIN 2003 LONG TERM INCENTIVE PLAN**

1. Terms

The terms and conditions of these Restricted Stock Units are contained in the Award Certificate evidencing the grant of such Award, this Award Description and in the Olin 2003 Long Term Incentive Plan (the "Plan").

2. Definitions

"Vesting Date" means with respect to a Restricted Stock Unit, the date on which you become entitled to receive the shares underlying the Restricted Stock Unit, as set forth in your Award Certificate.

Other capitalized terms used but not defined herein have the meanings specified in the Plan.

3. Vesting and Payment

(a) Except as otherwise provided in the Plan or in this Award Description, your interest in the Restricted Stock Units awarded to you will vest only at the close of business on the Vesting Date for such Restricted Stock Units, if you are employed by Olin from the grant date through the Vesting Date. Each Restricted Stock Unit not vested shall be forfeited.

(b) Each vested Restricted Stock Unit shall be payable by delivery of one share of Olin Common Stock (subject to adjustment as provided in the Plan), except as otherwise provided in the Plan.

(c) Each outstanding Restricted Stock Unit shall accrue Dividend Equivalents (amounts equivalent to the cash dividends payable in cash), deferred in the form of cash. Such Dividend Equivalents shall be paid only when and if the Restricted Stock Unit on which such Dividend Equivalents were accrued vests. Dividend Equivalents will accrue interest at an annual rate equal to Olin's before tax cost of borrowing as determined from time to time by the Chief Financial Officer, the Treasurer or the Controller of the Company (or in the event there is no such borrowing, the Federal Reserve A1/P1 Composite rate for 90 day commercial paper plus 10 basis points, as determined by any such officer) or such other rate as determined from time to time by the Board or the Committee, compounded quarterly, from the date accrued to the earlier of the date paid or forfeiture. To the extent a Restricted Stock Unit does not vest or is otherwise forfeited, any accrued and unpaid Dividend Equivalents (and any interest on such Dividend Equivalents) shall be forfeited.

(d) The total number of vested Restricted Stock Units (and Dividend Equivalents and related interest) at the end of a calendar year shall be paid on or before March 15 of the following year, except as otherwise specifically provided in the Plan.

(e) Restricted Stock Units shall carry no voting rights nor, except as specifically provided herein, be entitled to receive any dividends or other rights enjoyed by shareholders.

4. Termination of Employment

(a) Any Restricted Stock Units not yet vested shall be forfeited if your employment terminates either for cause or without Olin's written consent. If your employment should terminate before the applicable Vesting Date without cause and with Olin's written consent or by virtue of your death or total disability or retirement under an Olin benefit plan, the Committee shall determine, in its sole discretion, which outstanding Restricted Stock Units not yet vested (including Dividend Equivalents and related interest), if any, shall not be forfeited provided that you are not a Section 16 officer or director of Olin when your employment terminates, the Chief Executive Officer of Olin shall be authorized to make such determination.

(b) With respect to any non-forfeited Restricted Stock Units (and Dividend Equivalents and related interest) of a terminated Participant relating to incomplete Vesting Period, you will receive shares in payment of such Restricted Stock Units (and related Dividend Equivalents and interest, if any) as soon as practicable, subject to the provisions of the Plan.

5. Tax Withholding

Olin will withhold from the payout of the Restricted Stock Units (and related Dividend Equivalents) the amount necessary to satisfy your federal, state and local withholding tax requirements.

6. Miscellaneous

By accepting the Award of Restricted Stock Units, you agree that such Award is special compensation, and that any amount paid will not affect

(a) The amount of any pension under any pension or retirement plan in which you participate as an employee of Olin,

(b) The amount of coverage under any group life insurance plan in which you participate as an employee of Olin, or

(c) The benefits under any other benefit plan or any kind heretofore or hereafter in effect, under which the availability or amount of benefits is related to compensation.

(d) It is the intention of Olin and the Participant that all income tax liability on Restricted Stock Units be deferred in accordance with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, for nonqualified deferred compensation plans, until the Participant actually receives such payment. To the extent Section 409A applies to this award, this award and the Plan shall be deemed amended to comply with Section 409A to the extent permitted by law and the Restricted Stock Units award shall be construed in favor of meeting the requirements for deferral of compensation under Section 409A.

 Exhibit 10(s)

**2004 PERFORMANCE SHARE PROGRAM**

1. *Terms and Conditions*

The terms and conditions of the Performance Share Awards granted under this Program are contained in the Performance Share Certificate evidencing such Award, this Program and the 2003 LTIP.

2. *Definitions*

"2003 LTIP" means the Olin Corporation 2003 Long Term Incentive Plan.

"Common Stock" means the common stock of Olin, par value $1.00 per share.

"Final Share Number" has the meaning specified in Section 3 of this Program.

"Olin" means Olin Corporation.

"Program" means this 2004 Performance Share Program.

"Performance Cycle" means, with respect to a Performance Share Award, a period of three calendar years, beginning with the calendar year in which such Performance Share Award is granted.

"Performance Share Award" shall mean grants of "Performance Shares" and "Senior Performance Shares."

"Performance Share" and "Senior Performance Share" mean a unit granted under the 2003 LTIP and this Program, maintained on the books of the Company during the Performance Cycle, denominated as one phantom share of Common Stock, and paid in cash or Common Stock in accordance with this Program.

"S&P ROC" shall mean the average annual return on capital (calculated in the same manner as Olin's Return on Capital) of the Standard & Poor's MidCap 400 companies, broken out by quintiles.

Capitalized terms not otherwise defined in this Program shall have the meaning specified in the 2003 LTIP.

3. *Performance Share Awards*

a. Awards of Senior Performance Shares (category A) under this Program granted pursuant to the 2003 LTIP are intended to be "performance-based compensation" as that term is used in Section 162(m) of the Code. Each Performance Share Award shall establish a target number of Performance Shares or Senior Performance Shares awarded to the Participant named in such Award.

b. The target number of Performance Shares for each Participant shall be adjusted based upon a comparison of Olin's average annual Return on Capital during the Performance Cycle with the S&P ROC during the Performance Cycle, in accordance with the following chart:

| *If Olin's Return on Capital for a Performance Cycle is in the:* | *The % of the target number of Performance Shares paid will be:* |
|---|---|
| 5th Quintile of the S&P ROC | 150% |
| 4th Quintile of the S&P ROC | 125% |
| 3rd Quintile of the S&P ROC | 100% |
| 2nd Quintile of the S&P ROC | 50% |
| 1st Quintile of the S&P ROC | 25% |

c. The target number of Senior Performance Shares for each Participant shall be adjusted based upon a comparison of Olin's average annual Return on Capital during the Performance Cycle with the S&P ROC during the Performance Cycle, in accordance with the following chart:

| *If Olin's Return on Capital for a Performance Cycle is in the:* | *The % of the target number of Senior Performance Shares paid will be:* | |
|---|---|---|
| | **A Shares** | **B Shares** |
| 5th Quintile of the S&P ROC | 150% | 150% |
| 4th Quintile of the S&P ROC | 125% | 125% |
| 3rd Quintile of the S&P ROC | 100.0% | 100% |
| 2nd Quintile of the S&P ROC | 33.33% | 100% |
| 1st Quintile of the S&P ROC | 0% | 100% |

d. As soon as practicable after the end of a Performance Cycle, the Company shall calculate the appropriate adjustment, if any, to the target number of Performance Shares and Senior Performance Shares (the "Final Share Number") for all Participants whose Performance Share Awards have vested at the end of such Performance Cycle.

4. *Vesting and Forfeiture*

a. Except as otherwise provided by the Committee, the 2003 LTIP, this Program or the Performance Share Award certificate, an interest in a Performance Share Award shall vest only if the Participant is an employee of the Company or a subsidiary on the last day of the relevant Performance Cycle.

b. If a Participant's employment with the Company or a subsidiary terminates for cause or without the Company's consent (other than as the result of the Participant's death, disability or retirement) before a Performance Share Award has vested, his or her Performance Share Award shall terminate and all rights under such Award shall be forfeited.

c. If a Participant's employment with the Company or a subsidiary terminates as the result of his or her disability, (as that term is defined in Section 22(e)(3) of the Code or any successor provision), or retirement under any of the Company's retirement plans before a Performance Share Award has vested, the Participant shall be entitled to a pro rata Performance Share Award, payable solely in cash at the time that the Performance Share Award would otherwise be payable under Section 5. The cash payment shall be equal to the Final Share Number calculated in accordance with Sections 3 and 5 of this Program, multiplied by the Fair Market Value on the last day of the relevant Performance Cycle, multiplied by a fraction with a numerator equal to the number of months during the Performance Cycle the Participant was employed by the Company or a subsidiary (rounded up to the nearest whole month) and a denominator of 36.

d. If a Participant's employment with the Company or a subsidiary terminates as the result of his or her death before a Performance Share Award has vested, the Participant shall be entitled to a pro rata Performance Share Award, payable solely in cash, as soon as practicable after his or her death. The cash payment shall be equal to the Participant's target number of Performance Shares or Senior Performance Shares, as the case may be, multiplied by the Fair Market Value on the date of the Participant's death (or the next trading day, if the Common Stock was not traded on such date), multiplied by a fraction with a numerator equal to the number of months during the Performance Cycle the Participant was employed by the Company or a subsidiary (rounded up to the nearest whole month) and a denominator of 36.

e. If a Participant's employment with the Company or a subsidiary terminates for any other reason, the Company shall determine the portion, if any, of the Performance Share Award that shall not be forfeited, and the form of payment (cash or shares or a combination) that the Participant shall receive. That determination shall be made by the Committee in the case of any officer, and by the Chairman of the Board, President, Chief Executive Officer, any Vice President or the Vice President, Human Resources, in the case of any non-officer employee.

5. *Payment*

a. Within fifteen (15) days after the determination of the Final Share Number, the Company will (i) issue to each Participant a number of shares of the Common Stock equal to one-half of the Final Share Number, rounded down to the nearest whole share if such number is not a whole number, and (ii) pay the Participant an amount equal to the Fair Market Value of one-half of the Final Share Number of shares of Common Stock on the last day of the Performance Cycle, rounded up to the nearest whole share if such number is not a whole number.

b. No dividends or dividend equivalents shall be paid on any Performance Shares or Senior Performance Shares.

6. *Deferral*

A Participant may elect to defer payment of shares of Common Stock or cash pursuant to this Program in accordance with the terms of the Olin Corporation Employee Deferral Plan, provided that the Election, as defined in such plan shall be filed on or before December 31 of the last year of the Performance Cycle

7. *Miscellaneous*

a. By acceptance of the Performance Share Award, each Participant agrees that such Award is special compensation, and that any amount paid will not affect:

1. the amount of any pension under any pension or retirement plan in which he or she participates as an employee of Olin,

2. the amount of coverage under any group life insurance plan in which he or she participates as an employee of Olin, or

3. the benefits under any other benefit plan of any kind heretofore or hereafter in effect, under which the availability or amount of benefits is related to compensation.

b. The Company will withhold from the distribution of any cash pursuant to Performance Share Awards the amount necessary to satisfy the Participant's federal, state and local withholding tax requirements.

 Exhibit 10(t)

**2005 PERFORMANCE SHARE PROGRAM**

1. *Terms and Conditions*

The terms and conditions of the Performance Share Awards granted under this Program are contained in the Performance Share Certificate evidencing such Award, this Program and the 2003 LTIP.

2. *Definitions*

"2003 LTIP" means the Olin Corporation 2003 Long Term Incentive Plan.

"Common Stock" means the common stock of Olin, par value $1.00 per share.

"Final Share Number" has the meaning specified in Section 3 of this Program.

"Olin" means Olin Corporation.

"Performance Cycle" means, with respect to a Performance Share Award, a period of three calendar years, beginning with the calendar year in which such Performance Share Award is granted.

"Performance Share Award" shall mean grants of "Performance Shares" and "Senior Performance Shares."

"Performance Share" and "Senior Performance Share" mean a unit granted under the 2003 LTIP and this Program, maintained on the books of the Company during the Performance Cycle, denominated as one phantom share of Common Stock, and paid in cash or Common Stock in accordance with this Program.

"Program" means this 2005 Performance Share Program.

"S&P ROC" shall mean the average annual return on capital (calculated in the same manner as Olin's Return on Capital) of a group composed of the Standard & Poor's 1000 Materials companies plus Mueller Industries, Inc.; Wolverine Tube, Inc.; Occidental Petroleum Corporation; Alliant Techsystems Inc.; PPG Industries, Inc.; and The Dow Chemical Company, broken out by quintiles.

Capitalized terms not otherwise defined in this Program shall have the meaning specified in the 2003 LTIP.

3. *Performance Share Awards*

a. Awards of Senior Performance Shares (category A) under this Program granted pursuant to the 2003 LTIP are intended to be "performance-based compensation" as that term is used in Section 162(m) of the Code. Each Performance Share Award shall establish a target number of Performance Shares or Senior Performance Shares awarded to the Participant named in such Award.

b. The target number of Performance Shares for each Participant shall be adjusted based upon a comparison of Olin's average annual Return on Capital during the Performance Cycle with the S&P ROC during the Performance Cycle, in accordance with the following chart:

| ***If Olin's Return on Capital for a Performance Cycle is in the:*** | ***The % of the target number of Performance Shares paid will be:*** |
|---|---|
| 5th Quintile of the S&P ROC | 150% |
| 4th Quintile of the S&P ROC | 125% |
| 3rd Quintile of the S&P ROC | 100% |
| 2nd Quintile of the S&P ROC | 50% |
| 1st Quintile of the S&P ROC | 25% |

c. The target number of Senior Performance Shares for each Participant shall be adjusted based upon a comparison of Olin's average annual Return on Capital during the Performance Cycle with the S&P ROC during the Performance Cycle, in accordance with the following chart:

| ***If Olin's Return on Capital for a Performance Cycle is in the:*** | ***The % of the target number of Senior Performance Shares paid will be:*** | |
|---|---|---|
| | **A Shares** | **B Shares** |
| 5th Quintile of the S&P ROC | 150% | 150% |
| 4th Quintile of the S&P ROC | 125% | 125% |
| 3rd Quintile of the S&P ROC | 100.0% | 100% |
| 2nd Quintile of the S&P ROC | 33.33% | 100% |
| 1st Quintile of the S&P ROC | 0% | 100% |

d. As soon as practicable after the end of a Performance Cycle, the Company shall calculate the appropriate adjustment, if any, to the target number of Performance Shares and Senior Performance Shares (the "Final Share Number") for all Participants whose Performance Share Awards have vested at the end of such Performance Cycle.

4. *Vesting and Forfeiture*

a. Except as otherwise provided by the Committee, the 2003 LTIP, this Program or the Performance Share Award certificate, an interest in a Performance Share Award shall vest only if the Participant is an employee of the Company or a subsidiary on the last day of the relevant Performance Cycle.

b. If a Participant's employment with the Company or a subsidiary terminates for cause or without the Company's consent (other than as the result of the Participant's death, disability or retirement) before a Performance Share Award has vested, his or her Performance Share Award shall terminate and all rights under such Award shall be forfeited.

c. If a Participant's employment with the Company or a subsidiary terminates as the result of his or her disability, (as that term is defined in Section 409A of the Code or any successor provision), or retirement under any of the Company's retirement plans before a Performance Share Award has vested, the Participant shall be entitled to a pro rata Performance Share Award, payable solely in cash at the time that the Performance Share Award would otherwise be payable under Section 5. The cash payment shall be equal to the Final Share Number calculated in accordance with Sections 3 and 5 of this Program, multiplied by the Fair Market Value on the last day of the relevant Performance Cycle, multiplied by a fraction with a numerator equal to the number of months during the Performance Cycle the Participant was employed by the Company or a subsidiary (rounded up to the nearest whole month) and a denominator of 36.

d. If a Participant's employment with the Company or a subsidiary terminates as the result of his or her death before a Performance Share Award has vested, the Participant shall be entitled to a pro rata Performance Share Award, payable solely in cash, as soon as practicable after his or her death. The cash payment shall be equal to the Participant's target number of Performance Shares or Senior Performance Shares, as the case may be, multiplied by the Fair Market Value on the date of the Participant's death (or the next trading day, if the Common Stock was not traded on such date), multiplied by a fraction with a numerator equal to the number of months during the Performance Cycle the Participant was employed by the Company or a subsidiary (rounded up to the nearest whole month) and a denominator of 36.

e. If a Participant's employment with the Company or a subsidiary terminates for any other reason, the Company shall determine the portion, if any, of the Performance Share Award that shall not be forfeited, and the form of payment (cash or shares or a combination) that the Participant shall receive. That determination shall be made by the Committee in the case of any officer, and by the Chairman of the Board, President, Chief Executive Officer, or any Vice President, in the case of any non-officer employee.

5. *Payment*

a. Within fifteen (15) days after the determination of the Final Share Number, the Company will (i) issue to each Participant a number of shares of the Common Stock equal to one-half of the Final Share Number, rounded down to the nearest whole share if such number is not a whole number, and (ii) pay the Participant an amount equal to the Fair Market Value of one-half of the Final Share Number of shares of Common Stock on the last day of the Performance Cycle, rounded up to the nearest whole share if such number is not a whole number.

b. No dividends or dividend equivalents shall be paid on any Performance Shares or Senior Performance Shares.

6. *Deferral*

A Participant may elect to defer payment of shares of Common Stock or cash pursuant to this Program in accordance with the terms of the Olin Corporation Employee Deferral Plan, provided that the Election, as defined in such plan shall be filed on or before December 31 of the last year of the Performance Cycle, and further provided that such deferral election shall comply with all provisions under Section 409A of the Code.

7. *Miscellaneous*

a. By acceptance of the Performance Share Award, each Participant agrees that such Award is special compensation, and that any amount paid will not affect:

i. the amount of any pension under any pension or retirement plan in which he or she participates as an employee of Olin,

ii. the amount of coverage under any group life insurance plan in which he or she participates as an employee of Olin, or

iii. the benefits under any other benefit plan of any kind heretofore or hereafter in effect, under which the availability or amount of benefits is related to compensation.

b. The Company will withhold from the distribution of any cash pursuant to Performance Share Awards the amount necessary to satisfy the Participant's federal, state and local withholding tax requirements.

c. It is the Company's intention that all income tax liability on Performance Share Awards be deferred in accordance with the requirements of Section 409A of the Code for nonqualified deferred compensation plans, until the

participant actually receives such shares or payment therefore. To the extent Section 409A applies to this Program or the Performance Shares, the Performance Share Awards and this Program shall be deemed amended to comply with Section 409A, to the extent permitted by law, and the Performance Share Awards and this Program shall be construed in favor of meeting the requirements for deferral of compensation under Section 409A.

 Exhibit 10(z)

190 Carondelet Plaza
Suite 1530
Clayton, MO 63105-3443

February 17, 2005

George H. Pain
c/o Olin Corporation
190 Carondelet Plaza
Clayton, MO 63105

RE: Limited Waiver of Executive Agreement Provisions

Dear George:

Reference is hereby made to the Executive Agreement between Olin Corporation ("Olin") and you, dated as of November 1, 2002 (the "Executive Agreement"). Capitalized terms used but not defined herein shall have the meanings given such terms in the Executive Agreement.

As you know, the Executive Agreement provides that, under certain circumstances described in Section 1(f)(ii) of the Executive Agreement (a "Termination"), you may voluntarily terminate your employment and receive the Executive Severance and other payments and benefits described in the Executive Agreement.

You and Olin acknowledge that Olin has expanded your current duties and responsibilities to include responsibility for oversight of Olin's Environmental Remediation Program (the "Additional Responsibilities"). You and Olin agree that such expansion of, or the subsequent removal of such Additional Responsibilities from, your duties and responsibilities with Olin shall not be considered an event that could give rise to a Termination, and therefore you shall not be entitled to receive the Executive Severance or any other payments or benefits under the Executive Agreement if you voluntarily terminate your employment on the basis of the removal of such Additional Responsibilities from your duties and responsibilities with Olin; provided, however, that if such Additional Responsibilities are removed in anticipation of or after a Change in Control, such removal shall be deemed an event that shall be considered to be a Termination at your election.

Except as otherwise specifically provided above, the Executive Agreement shall continue unaffected and remain in full force and effect. For the avoidance of doubt, your letter agreement with Olin Corporation, dated as of January 29, 2004, relating to certain VSP and relocation matters, shall continue unaffected and remain in full force and effect. The validity, interpretation, construction and performance of this letter agreement shall be governed by the laws of the Commonwealth of Virginia (without giving effect to its principles of conflicts of law). This letter agreement may not be modified, waived or discharged unless such modification, waiver or discharge is agreed to in writing signed by you and Olin. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this letter agreement.

OLIN CORPORATION

/s/ JOSEPH D. RUPP
Joseph D. Rupp
President & C.E.O.

Accepted and agreed:

/s/ GEORGE H. PAIN
George H. Pain

 EXHIBIT 12

**OLIN CORPORATION AND CONSOLIDATED SUBSIDIARIES**
**Computation of Ratio of Earnings to Fixed Charges**
**(Unaudited)**

| (In millions) | Years Ended December 31, 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Earnings: | | | | | |
| Income (loss) before taxes and cumulative effect of accounting change | $ 86 | $ 5 | $ (27) | $ (13) | $131 |
| Add (deduct): | | | | | |
| Equity in income of non-consolidated affiliates | (10) | (8) | | | (2) |
| Dividends received from non-consolidated affiliates | | | | | 1 |
| Fixed charges as described below | 30 | 31 | 36 | 29 | 27 |
| Total | $106 | $ 28 | $ 9 | $ 16 | $157 |
| Fixed charges: | | | | | |
| Interest expensed and capitalized | $ 20 | $ 20 | $ 26 | $ 18 | $ 16 |
| Estimated interest factor in rent expense (1) | 10 | 11 | 10 | 11 | 11 |
| Total | $ 30 | $ 31 | $ 36 | $ 29 | $ 27 |
| Ratio of earnings to fixed charges (2) | 3.6 | | | | 5.8 |

(1) Amounts represent those portions of rent expense that are reasonable approximations of interest costs.

(2) Income (loss) before taxes and cumulative effect of accounting change was insufficient to cover fixed charges by approximately $3 million, $27 million and $13 million for the years ended December 31, 2003, 2002 and 2001, respectively.

 Exhibit 21

**SUBSIDIARIES OF OLIN CORPORATION[1]**
**(as of December 31, 2004)**

| Company | % Ownership (Direct/Indirect) | Jurisdiction |
|---|---|---|
| A.J. Oster Caribe, Inc. | 100 | DE |
| A J Oster Foils, Inc | 100 | DE |
| A.J. Oster West, Inc. | 100 | RI |
| Bridgeport Brass Corporation[2] | 100 | IN |
| Bryan Metals, Inc. [3] | 100 | OH |
| Chase Industries Inc. | 100 | DE |
| Chase Brass & Copper Company, Inc.[4] | 100 | DE |
| Hunt Trading Co. | 100 | MO |
| LTC Reserve Corp.[4] | 100 | DE |
| Monarch Brass & Copper Corp. | 100 | NY |
| Monarch Brass & Copper of New England Corp.[5] | 100 | RI |
| New Haven Copper Company[5] | 100 | CT |
| Olin Benefits Management, Inc.[6] | 90 | CA |
| Olin Engineered Systems, Inc. | 100 | DE |
| Olin Environmental Management, Inc.[6] | 90 | DE |
| Olin Far East, Limited | 100 | DE |
| Olin Financial Services Inc. | 100 | DE |
| Olin Sunbelt, Inc. | 100 | DE |
| Ravenna Arsenal, Inc. | 100 | OH |
| Sunbelt Chlor Alkali Partnership | 50 | DE |
| Waterbury Rolling Mills, Inc.[5] | 100 | CT |
| Nutmeg Insurance Limited | 100 | Bermuda |
| Olin Asia Pacific Pte. Ltd. | 100 | Singapore |
| Olin Australia Limited | 100 | Australia |
| Olin Brass Japan, Inc. | 100 | Japan |

| | | |
|---|---|---|
| Olin Canada Inc. | 100 | Canada |
| Olin Global Services Mexico | 100 | Mexico |
| Olin Hunt Specialty Products S.r.l. | 100 | Italy |
| Olin Industrial (Hong Kong) Limited | 100 | Hong Kong |
| Olin Luotong Metals (GZ) Co , Ltd | 80 | China |
| Olin Mexico S.A. de C.V. | 100 | Mexico |
| Olin (UK) Limited | 100 | United Kingdom |
| Reductone Brasil Ltda. | 100 | Brazil |
| Yamaha-Olin Metal Corporation | 50 | Japan |

1 Omitted from the following list are the names of certain subsidiaries which, if considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary.

2 d/b/a "Olin Brass, Indianapolis" and "Olin Brass, Indianapolis Facility" in CA, IL, IN, NJ, NC, OH, PA, RI and TX.

3 d/b/a "Bryan Metals of Ohio" in NJ.

4 Indirect subsidiary, wholly-owned by Olin's wholly-owned subsidiary, Chase Industries Inc.

5 Indirect subsidiary, wholly-owned by Olin's wholly-owned subsidiary, Monarch Brass & Copper Corp.

6 Class A shares, all of which are held directly and indirectly by Olin Corporation, have the right to elect 4 directors. Class B shares, none of which are held directly or indirectly by Olin Corporation, have the right to elect 1 director

 Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders of Olin Corporation:

We consent to incorporation by reference in the Registration Statements No. 333-101027 and No. 333-101029 on Form S-3 and Nos. 33-28593, 33-00159, 33-52681, 33-40346, 33-41202, 333-05097, 333-17629, 333-18619, 333-39305, 333-39303, 333-71693, 333-31098, 333-31096, 333-35818, 333-54308, 333-56690, 333-72244, 333-97759, 333-98193, 333-88990, 333-110135 and 333-110136 on Form S-8 of Olin Corporation of our reports dated March 7, 2005 with respect to the consolidated balance sheets of Olin Corporation and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2004, management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004 and the effectiveness of internal control over financial reporting as of December 31, 2004, which reports appear in the December 31, 2004 annual report on Form 10-K of Olin Corporation. Our report with respect to the consolidated financial statement refers to a change in the method of accounting for asset retirement obligations in 2003.

/s/ KPMG LLP

KPMG LLP

Stamford, CT
March 7, 2005

 Exhibit 23.2

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statements No. 333-101027 and No. 333-101029 on Form S-3 and Nos. 33-28593, 33-00159, 33-52681, 33-40346, 33-41202, 333-05097, 333-17629, 333-18619, 333-39305, 333-39303, 333-71693, 333-31098, 333-31096, 333-35818, 333-54308, 333-56690, 333-72244, 333-97759, 333-98193, 333-88990, 333-110135 and 333-110136 on Form S-8 of Olin Corporation of our report dated February 11, 2005, with respect to the financial statements of SunBelt Chlor Alkali Partnership included in the Annual Report (Form 10-K) of Olin Corporation for the year ended December 31, 2004.

/s/ ERNST & YOUNG LLP

Cleveland, Ohio
March 4, 2005

Exhibit 31.1

CERTIFICATIONS

I, Joseph D. Rupp, certify that:

1. I have reviewed this annual report on Form 10-K of Olin Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2005

/s/ JOSEPH D. RUPP
Joseph D. Rupp
President and Chief Executive Officer

 Exhibit 31.2

CERTIFICATIONS

I, Anthony W. Ruggiero, certify that:

1. I have reviewed this annual report on Form 10-K of Olin Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2005

/s/ ANTHONY W. RUGGIERO
Anthony W. Ruggiero
Executive Vice President and
Chief Financial Officer

Exhibit 32

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Olin Corporation (the "Company") on Form 10-K for the period ended December 31, 2004 as filed with the Securities and Exchange Commission (the "Report"), I, Joseph D. Rupp, President and Chief Executive Officer and I, Anthony W. Ruggiero, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to our knowledge: (1) the Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its Staff upon request.

/s/ JOSEPH D. RUPP
Joseph D. Rupp
President and Chief Executive Officer

Dated: March 9, 2005

/s/ ANTHONY W. RUGGIERO
Anthony W. Ruggiero
Executive Vice President and Chief Financial Officer

Dated: March 9, 2005

# Volume 9B
# PX0566–PX0583

# EXHIBIT PX0566

# NEWS DETAILS

NASDAQ GS: CSX

$31.83 ↑ +0.88 +2.84%

52 Week High$34.96

July 9, 2021



VIEW ALL NEWS

## INTERLINE PRICES NOW AVAILABLE ON CSX.COM

01/10/2005

CSX Transportation (CSXT) customers can now go to CSX.com to get interline prices for many general merchandise carload shipments, as part of an industry technology initiative focused on making that process more efficient and useful.

Currently, interline prices are available for general merchandise carload shipments originating on CSXT and some Shortline partners, with destinations on Canadian National (CN) and Burlington Northern Santa Fe (BNSF). Prices for destinations on the Norfolk Southern, Union Pacific and Canadian Pacific will be included over the next few months.

CSXT's on-line price look-up tool now offers prices for interline shipments (shipments that begin on CSXT and end on another railroad). This complements the local prices CSX.com has long made available to customers for local moves (shipments that begin and end on CSXT).

By simply entering the criteria for an interline shipment, customers receive interline prices made from a combination of each railroad's independently established price for its portion of the shipment.

Instantaneous interline pricing quickly gives customers the information needed to make sound transportation decisions. When a customer finds a price to use, the customer simply clicks to accept the price, which will then become valid for up to a year.

"Our customers have told us they need more timely price quotes for interline shipments," said Clarence Gooden, executive vice president and CSX chief commercial officer. "Working together on this important industry initiative, we have added interline prices to our expanding web-based menu that is designed to make us easier to do business with."

The price look-up tool is available on CSX.com, under Get a Price, and on CSX's secure transaction site, ShipCSX.

The process that delivers interline prices, A+B Pricing, was jointly developed by CSXT and CN to create prices in real time, eliminating delays in responding to customer inquiries for interline prices.

"This was not something that one railroad could accomplish alone," said John Couch, director of market strategy. "This is an example of what we as an industry can do to better meet our customers' needs and make railroads more competitive with other transportation modes."

For questions on how to use ShipCSX Price Look-Up for carload prices, please contact eBusiness at 1-877-ShipCSX (1-877-744-7279), option 2, option 1.

VIEW ALL NEWS

INVESTOR ALERTS

Press Releases

Events & Presentations

SEC Filings

End of Day Stock Quote

Your Email

Sign Up

QUICK LINKS

Contact

Quarterly Results

SEC Filings

Annual Report

Privacy Terms of Use Corporate Structure

© 2021 CSX Corporation

Powered By Q4 Inc. 5.56.0.1

# EXHIBIT PX0567

# WELFARE TRADEOFFS IN U.S. RAIL MERGERS

**MARC IVALDI**
*University of Toulouse (IDEI), EHESS and CEPR, France*

**GERARD McCULLOUGH**
*University of Minnesota, USA*

March 2005

***Abstract***
Since the publication by Williamson (1968) of his seminal paper on antitrust there has been a growing recognition by regulators of the need to assess tradeoffs between merger-related efficiency gains and merger-induced increases in market power. This paper addresses that need by presenting a structural econometric model of recent mergers in the U.S. rail industry. The paper extends the structural methodology by evaluating actual (as opposed to simulated) merger effects and by incorporating parametric estimates of merger efficiencies. The paper's empirical finding is that consumer surplus in U.S. rail freight markets increased by about 30 per cent between 1986 and 2001 despite dramatic industry consolidation.

***Keywords:*** merger analysis, differentiated product markets, logit models, railroads
***JEL Classification***: L11, L13, L41, L92

## I. Introduction

Since the publication by Williamson (1968) of his seminal paper on antitrust there has been a growing recognition by merger authorities of the need to assess tradeoffs between merger-related efficiency gains and merger-induced increases in market power. The U.S. Justice Department and the Federal Trade Commission describe these tradeoffs in some detail in the *Horizontal Merger Guidelines* jointly issued in 1992 (and revised in 1997). The *Guidelines* state:

> Competition usually spurs firms to achieve efficiencies internally. Nevertheless, mergers have the potential to generate significant efficiencies by permitting a better utilization of existing assets, enabling the combined firm to achieve lower costs in producing a given quantity and quality than either firm could have achieved without the proposed transaction. Indeed, the primary benefit of mergers to the economy is their potential to generate such efficiencies.
>
> [These]...can enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products.

The European Economic Commission makes a similar acknowledgement in its new 2004 *Merger Guidelines*.

> The Commission considers any substantial efficiency claim in the overall assessment of the merger. It may decide that, as a consequence of the efficiencies that the merger brings about, there is no ground for declaring the merger incompatible with the common market […]. This will be the case when the Commission is in a position to conclude on the basis of sufficient evidence that the efficiencies generated by the merger are likely to enhance the ability and incentive of the merged entity to act pro-competitively for the benefit of consumers, thereby counteracting the adverse effects on competition which the merger might otherwise have.

Concern with the assessment of merger effects extends also to more specialized agencies such as the Federal Communications Commission (FCC) and the Surface Transportation Board (STB) whose responsibility for economic regulation of particular industries includes merger oversight. In its recently published *Rules Governing Major Railroad Mergers and Consolidations* , for example, the STB states that 'mergers serve the public interest only when substantial and demonstrable gains in public benefits-improved service and safety, enhanced competition, and greater economic efficiency outweigh any anticompetitive

effects".[1] The STB describes flexible procedures for conducting merger evaluations which may include "econometric and other statistical analyses".[2]

This paper responds to the need for empirical tools for merger assessment by presenting the results of a structural econometric analysis of the welfare effects of U.S. rail mergers for the period 1986-2001. A structural analysis in this context is a system of equations which expresses 1) the demand conditions prevailing in a market (or set of interrelated markets), 2) cost (or supply) conditions in the market (or markets) under study, and 3) hypotheses regarding the strategic behavior of market participants usually in the form of pricing equations. Werden, Froeb and Scheffman (2004) stress the potential usefulness of such models for merger assessment, especially when these models are combined with standard evidentiary analyses of consumers, competitors and institutions. The model presented here builds on the work of Anderson, de Palma and Thisse (1992), Berry (1994), Shapiro (1996), Hausman and Leonard (1997), Nevo (2000), Ivaldi and Verboven (2000), and others who have developed the theory of differentiated product markets into a tool for merger analysis.

The basic assumptions in the paper are that railroads are multiproduct firms and that they compete as oligopolists with each other and with other modes in national freight markets. Freight services are differentiated by shipment types (bulk versus general freight) and by firm characteristics (especially network characteristics). The methodological innovation in the paper is to use a flexible cost function to incorporate parametric estimates of merger efficiencies into the structural model. Because there is good public data on U.S. freight railroads available the paper also evaluates actual (as opposed to simulated) merger effects. Werden, Froeb and Sheffman note that there are "surprisingly few" such studies and that these can help us to refine the tools for merger analysis.

The empirical finding of the paper is that between 1986 and 2001 consumer surplus in rail freight markets has increased by about 25 per cent despite the consolidation of 36 Class I railroad firms into nine. This finding is not inconsistent with results from other researchers who have studied the transformation of the U.S. railroad industry in the last quarter of the 20th Century. An earlier study by Berndt, Friedlaender, Wang Chiang and Vellturo (1993), based on data from 1974-1986, found that mergers contributed significantly to railroad cost savings. More recent studies by Breen (2004) and Wilson and Bitzan (2004) reach the same conclusion. What the current paper adds are the critical demand-related aspects of rail freight markets.

The remainder of this paper is organized as follows. Section II provides contextual background on the railroad merger phenomenon. Section III proposes the theoretical model of the U.S. freight market.

---

[1] STB Guidelines, p. 71.
[2] Ibid., p. 85.

Section IV describes the available data. Section V presents the regression results. Section VI states the paper's conclusions.

## II. Overview of U.S. Railroads and Railroad Mergers

Mergers have been a dominant aspect of U.S. railroading for almost the entire 175-year history of the industry. The first railroads, built in the 1830s and 1840s, were small, privately-owned enterprises, designed to provide short-haul passenger and freight services especially to agricultural producers.[3] During the second half of the 19th century and the early part of the 20th century these smaller railroads were cobbled together into much larger systems by a *first wave* of mergers and consolidations.[4] This expansionary first wave continued until the 1920s when it was inadvertently halted by government intervention. The Interstate Commerce Commission, formed in 1887 to regulate the industry, was originally tolerant of mergers but at Congress's direction in 1929 issued a Complete Plan of Consolidation which required that any proposed consolidation adhere to a national plan drafted by Harvard professor William Z. Ripley. This effectively halted the merger process until the Ripley Plan was repealed by the Transportation Act of 1940.

Mergers and consolidations resumed again after World War II as the railroads lost their intercity passenger markets to automobiles and planes, and faced increasing competition from trucks and barges in their freight markets.[5] The *second wave* of mergers, nearly all of these were defensive mergers proposed to cut costs and/or avert financial crises, continued until 1970. Between 1940 and 1970 railroad share of the intercity freight market (ton-miles) dropped from 61.3 percent to 39.8 percent, and the number of larger Class I railroads dropped from 131 to 71. The biggest merger of the period - the Penn Central merger - failed spectacularly in 1970 and this led, first, to a government-financed reorganization of Northeastern railroads (Conrail), and then to a softening and revision of the rail regulatory framework (the Staggers Act of 1980).

The Staggers Act gave railroads the commercial freedom to enter into contracts with major customers and to exit from markets where they could not compete with trucks. It also streamlined the merger process. The result was a dramatic degree of rationalization and a *third wave* of mergers and

[3] The first U.S. railroad, The Baltimore and Ohio, operated on 13 miles of track in 1830.

[4] Wilner (1996) reports that there were over 900 consolidations during the period between 1870 and 1920 as the U.S. system grew from about 20,000 route miles to over 300,000 route miles. Some 425 of these took place between 1880 and 1888.

[5] Railroads also suffered from changes in land use policies and in the composition of output in the U.S. This is a more complex story that goes well beyond the aims of this paper.

consolidations of increased size and scope. Between 1970 and 2001, a period in which rail share of the freight market stabilized, Class I railroads reduced their locomotive stocks by 30 percent, their network size by 40 percent, and their workforces by 60 percent. Mergers and consolidations reduced the number of Class I railroads from 71 to eight.[6] The major mergers that took place during this consolidation phase are summarized in Table 1.

[INSERT TABLE 1. RAILROAD MERGERS 1985-2000]

Customer response to the third wave of mergers and consolidations has been ambivalent. On the one hand, the rationalization of workforce and physical plant has led to a significant decrease in unit operating expenditures, and these appear, to some extent, to have been passed on to shippers in the form of lower rates. On the other hand, railroad customers, especially smaller customers, have felt increasingly threatened by a perceived lack of rail alternatives.[7] The increase in the Herfindahl index during the period is shown in Table 2.[8] In addition, the recent mergers of Burlington Northern/Santa Fe and Union Pacific/Southern Pacific brought with them significant merger-related service disruptions. These developments led to a decision by the STB in March, 2000 to impose a 15-month moratorium on rail mergers and to reevaluate the agency's merger policy. The moratorium ended in June, 2001 with issuance of the Railroad Consolidation Procedures cited above, but the policy discussion of railroad mergers - the debate over increased efficiency versus increased market power - continues.

[INSERT TABLE 2. HERFINDAHL INDICES 1985-2000 ]

## III. Theoretical Model

The methodological aim of this paper is to develop a structural econometric model for evaluating mergers in oligopoly markets where - as in the railroad case - there are significant cost complementarities

[6] The Railroad Passenger Act of 1970, which formed Amtrak, had relieved private railroads of the responsibility to provide passenger service.

[7] The mergers are not the full story. As Class I railroads have exited markets, smaller, short-line railroads have entered. However, these firms still account for only about seven percent of rail movements, according to AAR estimates.

[8] The Herfindahl index which we have calculated here is based on a railroads share of Class I industry-wide carloads for a given year. This measure probably understates the degree of concentration since it does not take into account the fact that rail traffic tends to be geographically concentrated on eastern versus western railroads. We have used a nationwide measure because many of the firms who use railroads operate in national markets which span the two regions.

across products. We model these markets as oligopolistic because we recognize that there are various factors besides freight rates which influence a shipper's decision to use a particular railroad or an alternative freight provider such as a barge or truck company. This means that each freight firm produces services which are differentiated from those of other firms.

The most obvious characteristic which differentiates a railroad's services is the placement of its track system relative to other transportation infrastructure and to the production and distribution activities of potential freight customers. The degree of market power that a particular railroad enjoys in a given market is largely a function of the relative advantage or disadvantage that its track system provides. These advantages vary considerably across firms and across markets, but our assumption is that on a dense network like the U.S. freight system with the possibility of truck or barge alternatives or alternative rail routings the degree of market power will never be absolute.[9]

*A. Demand*

We assume that there are three separate and independent freight transportation markets in which railroads compete among themselves and with other modes. The markets are bulk, intermodal and general freight. In each of these markets the shipper decides first the mode of transport – rail or other – and, if it has chosen rail, which particular railroad. We assume that there are h +1 service providers with $h = 0$ corresponding to the product "other transport modes." So there are $H$ railroads and $G$ markets corresponding to the $G$ types of commodities that can be shipped.

On the demand side, the customers of the railroad firms are freight shippers or receivers— whichever firm makes the shipment decision. Following the earlier work of McFadden (1981) and extensions by Anderson, de Palma and Thisse (1992), Berry (1994) and others, we assume that each shipper/receiver has a deterministic "utility function" consistent with its profit maximizing objectives. However, neither we nor the profit maximizing railroads can perfectly observe all of the characteristics influencing shipper/receiver decisions. Therefore, we decompose shipper/receiver utility into two components, one a function of known characteristics common to all shippers in a market, the other a random variable representing unobservable characteristics which influence the individual shipper/receiver decision.

[9] Grimm and Winston (2000) estimate in a recent Brookings study that about 15 percent of railroad freight movements are "captive" movements where origin and destination points are controlled by a single railroad. We have no reason to doubt this assessment which is based on a comprehensive survey of rail users. Our assumption though is that on the U.S. network there will always be routing or modal alternatives (however circuitous and expensive) even for shippers whose origin and/or destination points may be captive.

Formally, let $U^n_{gh}$ be the utility (profit) that shipper *n* receives when selecting railroad *h* (or another transport mode) in market *g* ($g = 1, 2, ..., G$), $V_{gh}$ the systematic component common to shippers in *g*, and $\nu^{n,g}_h$ the unobserved characteristics of *n*. We then have

$$U^n_{gh} = V_{gh} + \nu^n_{gh}. \tag{1}$$

The systematic utility that a shipper in market *g* receives from using railroad *h* can be further decomposed into a mean utility component ($\bar{V}_{gh}$) common to all shippers who use *h*, a price effect, and a random component () ($\xi_{gh}$) representing the unobserved components in $V_{gh}$. The expression for $V_{gh}$ then is

$$V_{gh} = \bar{V}_{gh} - \alpha_g p_{gh} + \xi_{gh}, \tag{2}$$

,

or, letting $X_g$ represent a matrix of demand-related variables in market g and $\beta_g$ a vector of parameters,

$$V_{gh} = X_g \beta_g - \alpha_g p_{gh} + \xi_{gh}. \tag{3}$$

Of course we do not observe shipper utility. The unobserved component of the utility, $\nu^n_{gh}$, is itself decomposed as

$$\nu^n_{gh} = \zeta^n_h + \left(1 - \sigma_g\right)\varepsilon^n_{gh}. \tag{4}$$

The second and the third term, $\zeta^n_h$ and $\varepsilon^n_{gh}$, are random variables reflecting shipper *n*'s deviation from the mean valuation. The term $\zeta^n_h$ is the unobserved part of shipper *n*'s utility that affects the choice of mode, whereas the term $\varepsilon^n_{gh}$ is the unobserved part of shipper *n*'s utility that affects the choice of railroad firm *h*. The parameter $\sigma_g$ lies between 0 and 1 and measures the correlation of the shippers' utility across firms. If $\sigma_g = 1$, there is a perfect correlation of preferences for firms within the choice of mode; so the railroads are perceived as perfect substitutes. As $\sigma_g$ decreases, the correlation of preferences across railroads decreases.

If $\sigma_g = 0$, there is no correlation of preferences: shippers are as likely to switch to other transport modes as to other railroads in response to a price increase. In this case, we have the standard logit model in which all railroads and all other transport modes compete symmetrically.

Each shipper *n* chooses the carrier *h* (a railroad or the other transport modes) that maximizes utility. To compute the probability that a shipper chooses product *h*, the nested logit model assumes that the random variables $\zeta_h^n$ and $\varepsilon_{gh}^n$ have distributions such that $\zeta_h^n$ and $\zeta_h^n + (1-\sigma_g)\varepsilon_{gh}^n$ have the extreme value distribution. Normalizing the mean utility level for the other transport modes to 0, i.e., $V_{g0}$, the probability $s_{gh}$ that a shipper chooses product *g* is given by the following formula:

$$s_{gh} = \frac{\exp\left(V_{gh}/(1-\sigma_g)\right)}{D_g} \frac{D_g^{1-\sigma_g}}{1+D_g^{1-\sigma_g}}, \tag{5}$$

where $D_g$ is defined by:

$$D_g = \sum_{h=1}^{H} \exp\left(V_{gh}/(1-\sigma_g)\right). \tag{6}$$

For the model to be consistent with (random) utility maximization, $\alpha$ has to be positive and $\sigma_g$ has to lie between 0 and 1. At the aggregate level, the choice probability $s_{gh}$ coincides with the market share of product *j*. The total quantity shipped by railroad *h*, $y_{gh}$, is simply given by the probability that a shipper chooses product *h* times the market size $Y_g$:

$$y_{gh} = s_{gh} Y_g . \tag{7}$$

Equation (5) can be restated as

$$\ln s_{gh} - \ln s_{g0} = X_g \beta_g - \alpha_g p_{gh} + \sigma_g \ln s_{gh|H} + \xi_{gh}^n . \tag{8}$$

where $s_{gh|H}$ is the market share of railroad *h* on the rail market *g* (i.e., without taking into account the other transport modes). It constitutes the *first element* of our structural model - a set of three separate demand equations for the markets in which railroads compete with each other and with other modes for market share.

*B. Cost*

As multiproduct network firms, railroads engage in a vertical production process in which, at one stage, quasi-fixed land and other inputs (labor, energy, materials, equipment) are converted into maintained infrastructure (infrastructure outputs), and, at another stage, infrastructure outputs and the other inputs are converted into multiple commercial freight services. The production process itself is represented in our theoretical model by a flexible cost function which allows for the possibility of complementarities (or anticomplementarities) across outputs.

Let $C(y,w,t)$ be a variable cost of doing business in a year, where $w$ be an $I$-dimensional vector of input prices, $t$ a $J$-dimensional vector of quasi-fixed technological factors, $y$ an $G'$-dimensional vector of outputs. The functional form we adopt is the multiproduct Generalized McFadden cost function applied to railroads by Ivaldi and McCullough (2003). This function is an extension of the single product functional form derived from McFadden (1978) and introduced by Diewert and Wales (1987).[11] The main feature of this function is to provide an approximation of the true cost function on a set which can arbitrarily defined by the analyst. It is a desirable property when the objective is to perform a historical study.

Formally, the cost function is

$$C = C(w,y,t) = a'w + 0.5\frac{w'\Delta w}{\theta' w}(b'y)^2 + w'\Lambda z + 0.5(\theta' w)z'\Gamma z\,, \qquad (9)$$

where $z$ is an $K$-dimensional vector ($K = G' + J$) that includes $y$ and $t$, $a$ is an unconstrained $I$-dimensional parameter vector, $\Delta$ is an $I$ by $I$ symmetric parameter matrix, $\Lambda$ is an $I$ by $K$ parameter matrix of nonnegative elements, $\Gamma$ is a $K$ by $K$ symmetric parameter matrix, and $b$ and $\theta$ are column vector of fixed parameters of dimension $G'$ and $I$.

To estimate this function we use a set of factor demand equations which contain all of the parameters of the cost function. In accordance with Shephard's lemma, these are derived by differentiating (10) with respect to each of the elements in the input price vector $w$. The result is

$$x = x(w,y,t) = \alpha + \left[\frac{\Delta w}{\theta' w} - 0.5\frac{w'\Delta w}{(\theta' w)^2}\right](\beta' y)^2 + \Lambda z + 0.5\theta(z'\Gamma z)\,, \qquad (10)$$

[11] Khumbakar (1994) proposes a different extension of the McFadden to the multiproduct case.

This defines the *second element* of our structural model - a set of $I$ input demand equations for factors of production. In our model we identify four such factors - fuel, labor, materials and equipment as described below.

*C. Infrastructure constraint*

Each railroad is active in each of the $G$ markets so that, at the equilibrium, $y_{gh}$ measures the amount of freight managed by railroad $h$ in market $g$. To perform its business the railroad uses rail infrastructure which is another product that the railroad has to produce or to buy from competitors. This is why we consider $G'$ products with $G' = G + 1$. If it is reasonable to assume that deregulated railroads are free to set the levels of such outputs, it is not reasonable to assume that they are unconstrained in their ability to transform operating outputs into infrastructure outputs. Here we assume that the amount of infrastructure $H$, $y_{Fh}$, used for operations is approximated by the simple linear relation

$$y_{Fh} = \eta_0 + \sum_{g=1}^{G} \eta_g y_{gh} + \sum_{g>G} \eta_g t_{gh} , \qquad (11)$$

in which we also account for the effect of technological factors. This equation can be interpreted as an engineering equation to dimension the size of infrastructure. It is the *third element* in our system of equations.

*D. Pricing*

We incorporate the oligopoly assumption into our theoretical model by adding a set of equilibrium conditions in which each railroad maximizes its profit with respect to prices (or quantities) conditional on the prices (or quantities) set by competitors in the various freight service markets. Letting the subscript $h$ represent firms competing in the markets for rail services $(h = 1, 2, ..., H)$, the objective of each firm is to solve

$$\underset{p_{gh} \text{ or } y_{gh}}{\text{Max}} \sum_{g=1}^{G} p_{gh} y_{gh} - C\left(y_{gh}, w_{gh}, t_{gh}\right) \qquad (12)$$

Whether the strategic interaction among firms is in prices or in quantities, on the assumption that the markets for rail services are independent, the first order condition for profit maximization is:

$$p_{gh} - c_{gh} = -y_{gh} \frac{\partial p_{gh}}{\partial y_{gh}}, \tag{13}$$

where $c_{gh}$ stands for the marginal cost effect of a change in output level for $y_{gh}$, which accounts for the effect on infrastructure as explained in the preceding section.

Given the specification of the demand function described above, under a multiproduct Bertrand-Nash equilibrium, the first order condition for profit maximization (13) yields the expression of price – cost margins as

$$p_{gh} - c_{gh} = \frac{1-\sigma_g}{\alpha_g\left(1-\sigma_g s_{gh|H} - \left(1-\sigma_g\right)s_{gh}\right)}. \tag{14}$$

If the market corresponds to a Cournot equilibrium, the expression of price – cost margins is now

$$p_{gh} - c_{gh} = \frac{1}{\alpha_g}\left(1+\frac{s_{gh|H}s_{gh}}{s_{gh|H}-s_{gh}} - \sigma_g\left(1-s_{gh|H}\right)\right). \tag{15}$$

The marginal costs in these expressions is derived by differentiating the cost function with respect to the relevant elements of the output vector *y* gives the *n* factor-specific resource requirements for a marginal unit of output. These requirements are monetized using

$$c = \frac{\partial C}{\partial y} == w'\left\{\left[\frac{\Delta w}{\theta' w} - 0.5\frac{w'\Delta w}{\left(\theta' w\right)^2}\right]\left(\beta' y\right)^2 + \Lambda' z + z'\Gamma z\right\}. \tag{16}$$

where the term in brackets is the projected factor demand vector. Because of the infrastructure constraint, the full marginal cost of an operating output *g* ( $g = 1, 2, ..., G$ ) for railroad *h* is given by

$$c_{gh} = \frac{\partial C}{\partial y_{gh}} + \eta_g \frac{\partial C}{\partial y_{Fh}}, \tag{17}$$

since it must include the direct operating effect of a change in output and an indirect effect though the change in the use of infrastructure.

Equations (15) or (16) constitute the *fourth* (and final) *element* of our structural model.

## IV. Data

We focus on a sample of 26 Class I rail companies that operated between 1986 and 2001 as shown in Table 3. The primary sources for the data are *Analysis of Class I Railroads* published annually by the AAR and the *AAR Railroad Cost Indexes*. The *Analysis* is based on regulatory accounting data that railroads submit to the government. The *Cost Indexes* are synopses of the indices that the AAR is required to file quarterly with the government. Construction of the railroad operating and cost data follows the procedures described in Ivaldi and McCullough (2001).

[INSERT TABLE 3. U.S CLASS I RAILROADS 1986-2001]

The measure of rail *variable costs* is based on freight services expenditures. The AAR *Analysis* (lines 250-259) contains various categories of expenditures for labor, materials and supplies, fuel and power, and others. These are grouped into three categories of expenditures directly interpreted as variable "costs" - labor (lines 250, 251), fuel (line 253) and materials and other (lines 252, 254, 257-9). Accounting depreciation is ignored; instead, a fourth component of variable cost defined as the economic cost of equipment use is calculated by the authors and added to the model. The cost of equipment is computed as $(\rho_{ht} + \delta) X_{E,t}$ where $\rho_{ht}$ is a bond rate that represents the opportunity cost of equipment capital for firm *h* in year *t*, $\delta$ is a depreciation rate for equipment, and $X_{E,t}$ is the real value ($82) of the railroad's equipment capital stock.

For *outputs*, we use detailed information in the *Analysis* on loaded car-miles by type and empty car-miles by type for 15 types of equipment: 40-foot box cars, 50-foot box cars, plain gondola, etc. The 15 car-type miles are aggregated (by addition) into BULK car-miles ($y_b$), GENERAL freight car-miles ($y_e$) and INTERMODAL freight car-miles ($y_v$). The $y_b$ category includes all open hopper (typically coal) and

closed hopper (typically grain) cars. The $y_e$ category includes all other car-types except intermodal. Use of the car-mile rather than the ton-mile as a unit of output allows us to take into account differences in the technological characteristics of rail operations. This aggregation does not force us to ignore the differential cost effects of weight since the cars in the $y_v$ and $y_e$ category typically range between 20 and 60 tons and those in the $y_b$ category range between 80 and 100 tons.

One important way in which our cost model differs from both earlier rail models and structural merger models in other industries is in its explicit treatment of infrastructure activity. We view the infrastructure-related activities of the firm as variable outputs which impose costs directly and which interact with other (operational) outputs.[13] The output measure for infrastructure is the annual number of TIES-LAID-IN-REPLACEMENT ($y_i$) by each railroad in our sample.[14] This allows us to account for the technological aspects of vertical as well as horizontal integration and to take into account the unique cost characteristics of network firms which are required to maintain their own infrastructure.

For *input prices*, we use annual input price indices for FUEL, LABOR and MATERIALS assembled by the AAR and based on surveys of prices paid by member firms. The EQUIPMENT price is the ex ante yield on bonds in a firm's debt category for a given year and a depreciation component. The depreciation component is calculated by solving for a rate that allows equipment to decay exponentially to a 10 per cent salvage value in 25 years.

The *technological variables* in our model are TIME, and length of haul (HAUL), miles of road (ROAD), and percent unit-train car-miles (UNIT) from the *Analysis*. We follow Vellturo (1989) in using a set of exogenous, demand-related variables, that can be constructed on a firm-specific basis. These variables--coal consumption (CCON), coal production (CPRO), new car deliveries (NEWCAR), state population (SPOP), and oil price (OILP)—are measured on a state-by-state basis and then aggregated across states by to be railroad-specific. The aggregations vary from year to year as railroad organizations restructure and add or discontinue route segments. They are based on annual data from the AAR., the U.S. Energy Information Administration, and the Statistical Abstract of the U.S.

Construction of a data series representing railroad pricing decisions in this period is not as straightforward as assembling the production and cost data. Pricing information is available in the *Official Waybill Sample* which the STB collects for regulatory purposes but the detailed records are confidential at

[13] In most rail cost studies such as Berndt *et al* (1993) infrastructure is treated as a quasi-fixed input and represented by a monetary measure of way and structures capital. Wilson (1997) is an exception.

[14] It is important to note in this respect that about 90 percent of the ties laid each year by Class I railroads are replacement ties. To see this, compare Line 350 of the *Analysis* (Ties Laid in Replacement) with Line 363 (Ties Laid in Addition).

the request of both railroads and their customers. Nor does the AAR make pricing information directly available in the *Analysis*. The Analysis reports revenues by commodity, tons by commodity, and carloads by commodity, but it does not report commodity specific information by ton-miles or car-miles. This means it is not possible to directly estimate proxies for rates (average revenues) which reflect commodity, weight, and distance.

Nevertheless, we feel it is possible to combine the information in the *Public Waybill* and the *Analysis* to build such series indirectly. The reason is that the car-mile outputs that we have identified ( $y_b$, $y_e$, and $y_v$ ) can be fairly closely linked to commodity groups. We first use the commodity-specific revenue and carload data in the *Analysis* to calculate the average revenue-per car-mile associated with certain sets of commodities (grain and coal, for example) and, by implication with certain car-types (closed-hopper and open-hopper). We then use the firm-level revenue data in the *Analysis* to allocate these average rates to the individual railroads using a Laspeyres index. To check these estimates we use an "official" set of aggregate (industry-wide) price estimates from STB (2000). The estimated average rates are as seen in Table 4.

[INSERT TABLE 4. ESTIMATED REVENUE PER CAR-MILE]

An adjustment to the rates is necessary. The rates that we calculate are for loaded car-miles. In fact, the railroad must absorb the costs of the loaded and empty portions of each movement. Also, the marginal costs to which these rates are compared are estimated by us on a total car-mile basis. To reflect these facts, we calculate for each car-type an "effective rate", i.e., an estimate of the distributed rate the railroad typically receives for moving a particular car-type one mile. We do this by calculating the ratio of loaded to empty miles by car-type from data in the Analysis. We then use this ratio to form a "payment factor" which converts the loaded car-mile rate into an effective (i.e., distributed) car-mile rate. The payment factor is simply the share of loaded car-miles in the sum of loaded and empty car-miles.

One final clarification is necessary. While, on the commercial side, the distinction between bulk, general and intermodal freight is apparent in the different rates charged for moving these commodities, on the production side general freight and intermodal operations are fairly similar on the production side. We account for this by using two operating output categories $y_b$ and $y_e + y_v$ in the cost-related equations and three outputs $y_b$, $y_e$ and $y_v$ in the demand and pricing equations.

## V. Estimation Results

The model established in Section III requires us to estimate alternative systems of equations, depending on whether we are assuming Bertrand competition in prices or Cournot competition in capacities. Each system is composed of 11 equations - four factor shares for labor, fuel, materials and equipment to establish marginal costs, three demand equations for bulk, general freight and intermodal rail services, behavioral equations (Bertrand or Cournot) for these three markets, and a transformation equation to constrain the technology. In fact, there are multiple systems to estimate since there is no reason to assume that firms will adopt uniform Bertrand or Cournot strategies in all three markets. It is equally likely a priori that they could adopt Bertrand strategies in one or two of the markets and Cournot in the other(s). This gives us the eight alternative strategies represented in Table 5 - Bertrand in bulk, general and intermodal (BBB), Bertrand in bulk and general but Cournot in intermodal (BBC), and so on. We evaluate these alternatives using a likelihood ratio test of Vuong (1989) to identify the best model or models. We then use the selected model or models to draw inferences about the effect of mergers in these markets.

Each equilibrium model is estimated by means of nonlinear three stage least squares (NL3SLS), which requires us to define a set of instruments. The set includes the factor prices for labor, fuel, equipment and materials, the technological variables , the demand-related variables, the variables CARB, CARE, AND CARV which express firm-level railroad capacities in cars, and the variables AGCAPB, AGCAPE, and AGCAPV, which express firm-level capacities in tons.

### *A. Vuong Test Results*

Let $f_j(y_i|x_i)$ be the predicted probability that a random variable Y is $y_i$ under the assumption that $f_j(y_i|x_i)$ generated the data. The Vuong statistic as described by Greene (2003) for testing the non-nested hypothesis of $f_1$ versus $f_2$ is

$$v = \frac{\sqrt{n}\left[\frac{1}{n}\sum m_i\right]}{\sqrt{\frac{1}{n}\sum\left(m_i - \overline{m}\right)^2}}, \tag{18}$$

where $m_i = \log\left(\frac{f_1(y_i|x_i)}{f_2(y_i|x_i)}\right)$. If $|v|$ is less than 2, the Vuong test does not favor one model or the other. Otherwise, positive values favor $f_1$ while negative values favor $f_2$. The results in Table 5 are not entirely conclusive since we cannot eliminate either the BCC alternative or the CCC alternative. Clearly behavior in the general freight and intermodal markets is Cournot, but the Vuong results suggest that behavior in the bulk market could be either Bertrand or Cournot.

[INSERT TABLE 5. VUONG TEST COMPARISONS]

This possibility is not surprising. Since passage of the Staggers Act the majority of bulk traffic has been moving under contract agreements between railroads and shippers. These contracts, which were prohibited as discriminatory before Staggers, are relatively short-term agreements negotiated between well-informed shipping executives for coal, grain and chemical companies (many of whom deal with multiple railroad carriers) and well-informed railroad executives. It is reasonable to expect that the outcome of these negotiations would be a “market price” that reflected both the valuable of the shipments to shippers and the cost to the railroads.[15] However considerations about available capacities in this market also play a role, which could explain why the market for bulk is not far from the Cournot solution.[16] It is also reasonable that the general freight and intermodal markets, where there are relatively large numbers of shippers and few railroads, would allow for strategic coordination among railroads *a la* Cournot. In what follows, we present the results of the BCC scenario but we also indicate where the CCC results are different. In all but a few cases the parameter results are very close.

*B. Parameter Estimates*

Estimates of the main parameters of interest are provided in Table 6a below while other parameters of interest are gathered in Table 6b.[17]

[INSERT TABLE 6a. NL3SLS ESTIMATES OF PARAMETERS OF INTEREST]

[INSERT TABLE 6b. PARAMETRIC ESTIMATES]

[15] The Nash equilibrium in the classic Bertrand pricing game is the point where price equals marginal cost. If railroads are natural monopolies (as our cost results suggest) then the Bertrand game with well-informed carriers and shippers will lead to prices above marginal cost which guarantee revenue adequacy. See Laffont and Tirole (1994).

[16] We believe that data on contracts between shippers and railroads are required to investigate the conduct in the bulk market in more detail.

[17] The full list of 137 parameter estimates and standard errors is presented in Table A of the supplemental document to this text.

These key structural parameters in Table 6a reflect shipper sensitivity to prices ($\alpha_b$, $\alpha_e$, and $\alpha_v$) and to differentiation between transport modes ($\sigma_b$, $\sigma_e$, and $\sigma_v$). They all are significant, the former having the proper positive sign and the latter being positive and less than one which guarantees that the model is consistent with utility maximization. They all are well identified by the set of instruments selected for the estimation. The first stage R-square statistics associated with these parameters are not lower than 98 percent.[18] The σ's values indicate that the preferences of shippers in the bulk and intermodal freight markets are more correlated across railroads than between railroads and other transport modes. Railroads appear to be more differentiated among themselves in the general freight market. As a consequence, bulk and intermodal movements are less sensitive to competition from other modes than general freight movements.

Moving to Table 6b, we first observe the relatively high values of demand elasticities. This is not surprising in this context since these elasticities do not bear on the market as a whole but apply to each railroad. These elasticities suggest that at the observed equilibrium competition is at work. The results also suggest that the overall demand for railroad freight services in each of the three markets we identify is primarily dependent on the size of the network on which the railroad operates and on the level of economic activity along that network. For the bulk and intermodal freight markets our model identifies new car deliveries as the most important variable and in the general freight market the relevant variable is state population. These results are consistent with earlier and more specialized studies that establish the derived nature of freight demand.

The parametric estimates of railroad costs and technology are extrapolated from the results of the McFadden Cost function. Use of this flexible functional form in a structural merger analysis is a key element of this paper. Earlier studies have used simpler functional forms such as constant marginal costs and thus have omitted the possibility of non-homothetic relationships across inputs or outputs. This is a serious limitation in econometric merger studies since economies of scope and/or scale are often an important component of the efficiency claims made by merger proponents.[19]

The most important results on the cost side are the marginal cost estimates which play a key role in the pricing equations and in the analysis of consumer surplus. Marginal cost estimates for $y_b$, $y_e$ and $y_v$ and $y_i$ are estimated by as the weighted sum of partial derivative of factor demands by input prices. The effects of technology and second-order output related effects are estimated using similar extrapolations.

The first point to notice is that the marginal costs of bulk services vary considerably from those of general freight and intermodal services. The average value for the marginal cost of bulk services is $0.45

[18] These first-stage R-square are also provided in Table A of the supplemental document.

[19] It is also interesting to note in this regard that a flexible functional form like the McFadden imposes more structure on the overall model. The lack of structure in earlier merger model may explain why many of these studies have had to utilize larger number of instrumental variables to get their models to converge.

while the value for general freight and intermodal services is $0.82. These estimates, which are independent of infrastructure costs, are consistent with expectations since general freight and intermodal services involve a higher degree of operational complexity - marshaling at yards, blocking strategies for cars, complex scheduling and repositioning of crews and locomotives. Unit train operations, on the other hand, involve regular, trolley-like movements between origins and destinations.[20] For all of these movements the estimated marginal costs are below ray average variable costs in this data which are $1.26 per car-mile.

A second point to notice is the marginal effect of the use of infrastructure in the course of operations. Our results imply that the cost basis for the fee which a railroad should charge another railroad to use its network for bulk carriage is $0.07 per car-mile, while the cost basis for a general freight access fees should be $0.017.[21] These fees are close to the fees actually charged by railroads that are filed with the STB.

A third point to notice about this technology is that there is evidence of efficiency gains from increases in length of haul. Railroads have argued that these are facilitated by end-to-end mergers and our calculations suggest that a ten percent increase in length of haul will lead to 0.9 percent reduction in variable costs. These gains are comparable to the 5.5 percent annual cost reduction attributable to technological change.

Finally, we note that estimated returns to density for operations are 1.94. From a regulatory and welfare perspective this means that in order to be revenue adequate railroads must charge prices that are above marginal costs, and [following Baumol (1982)] that the markups should be differentiated to reflect differences in marginal costs and elasticities of demand. The actual differences are seen below in our estimates of railroad Lerner indices and in the welfare effects which would be more crudely estimated had we used a simpler functional form for costs.[23]

*C. Monopoly Effects*

The primary aim of this research is to evaluate the welfare effects of the structural changes that have taken place in the U.S. railroad industry since the Staggers Act in 1980. Since that time, a handful of U.S. railroads have increased their market shares dramatically, but they have also reduced their labor forces and

---

[20] The higher infrastructure costs that these operations impose are identified in our model in the estimated marginal cost of infrastructure activities which we put at $285.90 per replacement tie.

[21] We use the term "cost basis" to reflect the fact that in order to guarantee revenue adequacy access fees should also reflect demand based markups over marginal cost.

[23] We also find evidence of cost complementarities *between* bulk and general freight operations. These are indicated by a negative second-order coefficient for $y_b$ and $y_e$ in the McFadden cost equation. Ivaldi and McCullough (2004) provide a detailed analysis of railroad economies of scope using the McFadden cost function.

their physical plants and there is evidence is that they have shared these efficiency gains to their customers in the form of lower real rates. The question then is what are the overall effects of these structural changes?

The measure we use is the change in overall consumer surplus in the markets for bulk, general freight and intermodal rail services, where net consumer surplus is given by the expected value of the maximum of utilities. Using the assumptions of the nested logit model developed in Section III this net consumer surplus measure is:

$$CS_g = \frac{1}{\alpha_g} \ln\left(1 + D_g^{1-\sigma_g}\right). \qquad (19)$$

This formula is derived in Anderson, de Palma and Thisse (1993).[24]

[INSERT TABLE 7. CONSUMER SURPLUS TRENDS ]

The results of these calculations are presented in Table 7. (See also Figures 1 and 2.) They show that during the period from 1986 to 2001 consumer surplus grew by 25 percent from $1.3 billion to $1.7 billion, and this despite a significant drop in welfare after 1999. There was steady, dramatic growth from 1986 to 1993 but the growth of consumer surplus became somewhat erratic after that. The BNSF and UPSP mega-mergers were accompanied by a drop in consumer surplus in 1996 but there was a recovery the following year. There was another drop in consumer surplus in 2000 following the division of Conrail between NSC and CSX and this downward trend continued in 2001. It is unclear whether these results are a temporary setback in consumer surplus or signal a downward trend that can be attributed to the mega-mergers. Nevertheless it does appear that the benefits in surplus from the large mergers of the late 1980s and early 1990s had a more positive effect on surplus than the controversial mega-mergers.

If we look at the results market-by-market we see that all three markets exhibit the same pattern of uneven growth. The most dramatic growth in surplus is in intermodal (32 percent), followed by general freight (29 percent) and bulk (19 percent).[25] One caveat about these results is that our data does not identify the relative size of the shippers. There is anecdotal evidence from regulatory and legislative proceedings that smaller shippers in all three categories do not benefit as much as large shippers (if at all).

---

[24] Since the markets served by freight railroad firms are factor markets, it is not necessarily the case that the surplus generated in these markets is completely passed on to consumers. This will depend on market structure and behavior in downstream markets. To fully model these effects would require a general equilibrium model that is beyond the scope of this paper and beyond the requirements of current merger practice.

[25] Note that bulk shippers are the ones who most strongly opposed the Staggers Act while a coalition of general freight shippers in the chemical and auto industry most effectively supported it.

Surplus trends exhibit the same basic growth pattern if we maintain the CCC hypothesis of Cournot behavior in the bulk market as well as in general freight and intermodal but (as expected) the magnitude of surplus is much lower in the bulk market. The initial level of surplus in bulk in 1986 under Cournot behavior is only $82.5 million (versus $625 million under Bertrand pricing). This reduces the overall level of surplus in 1986 to $818 million (versus $1.4 billion under Bertrand pricing). The 2001 level for bulk under Cournot behavior is $91.7 million and the overall level of surplus is $1.04 billion.

*D. Lerner Indices*

The focus of this paper is on the effects of structural changes in the market for rail freight services in the U.S. We have focused in Section *5c* on temporal movements in consumer surplus. Nevertheless, as we have noted above , the evidence from the cost function presented above as well as from many earlier studies of railroad technology suggests that if railroads were to charge rates equal to marginal cost they would fail to be revenue adequate. In multiproduct firms these markups should reflect differences in the marginal costs of services and well as in their elasticity of demand. Rail regulatory policy in the U.S. explicitly mandates that railroads should charge differentiated markups above marginal cost in order to remain viable.

The structural model that we present here allows us to provide proper estimates of these markups in the form of estimated Lerner indices which reflect the influences of both supply and demand. The estimates of these indices for the four largest railroad firms are presented in Table 8 To eliminate temporal bias they are averaged over the period 1992-2002 .

[INSERT TABLE 8. LERNER INDICES BY SEGMENT]

The relative magnitudes and distributions of these indices across firms and across service offerings are consistent with out expectations based on know market characteristics.

The smallest markups are in the intermodal markets for the two eastern carriers CSX (25 percent) and NSC (22 percent). These railroads are competing with truckers and with each other for the relatively short-hauls on higher value commodities in the populous eastern portion of the U.S. Intermodal markups are higher for ATSF (ATSF, 46 percent) and SP (39 percent) in the western U.S. where longer distances give rail intermodal movements a potential advantage over long distance truck movements.

Markups for eastern railroads also are lower in the market for general freight services but overall markups in this category are higher than those in intermodal. CSX margins are 69 percent and NSC margins are 67 percent. ATSF and SP have margins of 67 percent and 68 percent respectively. The major commodity groups represented here - primarily those that move in boxcars - are paper, food, lumber, automotive parts, and finished chemicals. There is significant competition from trucks in these markets , but

railroads have a significant technological advantage in cases where the usage rates are high enough to justify boxcar quantity shipments (and where the shipper has a readily available railroad siding).[26] Markups in the west and in the east are close, showing that the length of haul does not play much role in the competition with trucks and that Cournot competition among railroads is fierce.

It is of course no surprise that the margins on bulk movements are significantly higher than those for intermodal and general freight. Though there are barge (and even truck) alternatives for shippers of bulk commodities many bulk shippers must rely on one or two railroads to move their commodities to market. Our estimates show CSX enjoying the highest markups (85 percent), followed by NSC (77 percent), SP (72 percent), and ATSF (77 percent).

A *caveat* here is that differences in markups across railroads and across commodities might also reflect technological aspects which are not in our model such as quality of rail service and (in the case of coal or grain especially) the quality of the commodity.

## VI. Conclusion

The importance of mergers in defining the structure of the U.S. railroad industry can be illustrated by briefly recounting the history of the first U.S. railroad, the Baltimore and Ohio (B&O). During the first wave of rail mergers in the 19th century the B&O expanded west from Baltimore by merger and consolidation until it reached Chicago in 1874. It then operated as a separate entity until the post-World War II second wave, when it was acquired by the Chesapeake and Ohio in 1962. It was merged into the Chessie System in 1973 and in 1980, at the beginning of the third wave, the Chessie System was integrated into CSX. In 1998 CSX acquired half of Conrail and emerged as one of two dominant systems operating in the eastern half of the U.S.. The outstanding question now is whether CSX will merge with a rail system in the western U.S. to extend beyond Chicago to the Pacific Ocean.

The primary focus in this paper has been on the development and application of a structural econometric model for evaluating such rail mergers. We have presented a system of equations which express 1) the demand conditions prevailing in the bulk, general freight and intermodal markets, 2) cost conditions in these markets, and 3) hypotheses regarding the strategic behavior of railroad firms participating in the markets. We build on the work of Anderson, de Palma and Thisse (1992), Berry (1994), Shapiro (1996), Hausman and Leonard (1997), Nevo (2000), Ivaldi and Verboven (2000), and others who

[26] In rough terms, our results show that the average cost of a car-mile is $1.07 which is slightly more than the estimated cost of a truck-mile. A located box car hauls two to three times as much freight as a truckload.

have developed the theory of differentiated product markets into a tool for merger analysis and attempt to extend the work by using a flexible cost function to incorporate parametric estimates of merger efficiencies into the model. We also evaluate actual (as opposed to simulated) merger effects.

The empirical finding of the paper is that consumer surplus in rail freight markets has increased by about 25 per cent despite the consolidation of 36 Class I railroad firms into nine. This finding is not inconsistent with results from other researchers who have studied the transformation of the U.S. railroad industry in the last quarter of the 20th Century.

## References


Anderson, S., de Palma, A. and Thisse, J.F. (1992), "Discrete Choice Theory of Product Differentiation," Cambridge: MIT Press.

Burton, M. L. (1993), ""Railroad Deregulation, Carrier Behavior, and Shipper Response: A Disaggregated Analysis," Journal of Regulatory Economics, 23(3), 309-333.

Berndt, E, Friedlaender, A., Wang Chiang, J., and Vellturo, C. (1993) "Cost Effects of Mergers and Deregulation in the U.S. Rail Industry," The Journal of Productivity Analysis, 4, 127-144.

Berry, S.T. (1994), "Estimating Discrete-Choice Models of Oligopoly Product Differentiation," The Rand Journal of Economics, 25 (2), 242-262.

Breen, Dennis A. (2004), The Union Pacific/Southern Pacific Rail Merger: A Retrospective on Merger Benefits." FTC Working Paper.

European Commission (2004, "Guidelines on the Assessment of Horizontal Mergers under the Council Regulation on the Control of Concentrations between Undertakings, *Official Journal,* C 31, 05.02.2004, 5-18.

Gasmi, F. and Vuong, Q. H. (1991), "An Econometric Analysis of some Duopolistic Games in Prices and Advertising," Advanced in Econometrics, 9, 225-254.

Grimm, C. and Winston, C. (2000), "Competition in the Dergulated Railroad Industry: Sources, Effects, and Policy Issues," in Peltzman S. and Winston, C. *Deregulation of Network Industries* Brookings, 2000

Hausman, J. and Leonard, G. (1997), "Economic Analysis of Differentiated Product Mergers Using Real World Data," George Mason Law Review, 5(3), 312-346.

Ivaldi, M. and McCullough, G. (2001), "Density and Integration Effects on Class I U.S. Freight Railroads," Journal of Regulatory Economics, 19 (2), 161-182.

Ivaldi, M. and Verboven, F. (2000), "The European Heavy Trucks Market: An Econometric Analysis.", Working Paper, IDEI.

McFadden, D. (1981), "Econometric Models of Probabilistic Choice," in C.F. Manski and McFadden (eds.), Structural Analysis of Discrete Data with Econometric Applications, Cambridge: MIT Press, 198-272.

Nevo, A. (2000), "Mergers with Differentiated Products: The Case of Ready-to-Eat Cereal Industry," The Rand Journal of Economics, 31(3), 395-421.

Röller, L-H. and Sickles R.C. (2000), "Capacity and Product Market Competition: Measuring Market Power in a 'Puppy-dog" Industry," International Journal of Industrial Organization, 18, 845-865.

Shapiro, C. (1996), "Mergers with Differentiated Products," Antitrust, 23-30.

Surface Transportation Board (2003) *Rules Governing Major Railroad Mergers and Consolidations.* Washington, D.C.

Vellturo, C. A. (1989), "Achieving Cost Efficiencies Through Merger: Evidence from the U.S. Rail Industry," Cambridge, Mass.: MIT, Department of Economics, Unpublished Ph.D. dissertation.

Verboven, F. (1996), "International Price Discrimination in the European Car Market," Rand Journal of Economics, 27 (2), 240-268.
Vuong, Q. H. (1989), "Likelihood Ratio Tests for Model Selection and Non-nested Hypotheses," *Econometrica*, 57, 307-333.
Williamson, O. E. (1968), "Economies as an Antitrust Defense: Welfare Tradeoffs," The American Economic Review, 58(1), 18-36.
Wilson, W; W. (1997), "Cost Savings and Productivity in the Railroad Industry," Journal of Regulatory Economics, 11, 21-40.
Wilner, F. H. (1997). *Railroad Mergers*. Simmons-Boardman. Omaha, Nebraska
Winston, C. (1985), "Conceptual Developments in the Economics of Transportation: An Interpretative Survey," Journal of Economic Literature, 23, 57-94.

Table 1. Significant Railroad Unifications - 1986-2001

| Year | Merging Firms | Merged Firm | Combined Employees | Combined Route Miles | Combined Revenue $82 |
|---|---|---|---|---|---|
| 1986 | Chessie/Seaboard | CSX | 47,803 | 22,887 | 4.56 |
| 1986 | N&W/Southern | NSC | 34,857 | 17,520 | 3.36 |
| 1994 | UP/CNW | UP | 35,001 | 22,785 | 5.57 |
| 1995 | BN/Santa Fe | BNSF | 43,731 | 35,208 | 6.55 |
| 1996 | UP/SoPac | UPSP | 52,533 | 34,946 | 7.80 |
| 1999 | CSX/ConRail | CSX | 34,283 | 23,320 | 4.80 |
| 1999 | NSC/ConRail | CSX | 33,344 | 21,759 | 4.87 |

Table 2. Herfindahl Indices - 1985-2000

| Year | Number of Class I Railroads | Herfindahl Index |
|---|---|---|
| 1985 | 23 | 837.12 |
| 1986 | 18 | 1285.45 |
| 1990 | 14 | 1290.56 |
| 1995 | 11 | 1363.39 |
| 1996 | 10 | 1641.07 |
| 1997 | 9 | 1946.00 |
| 2000 | 8 | 2246.02 |

Table 3: U.S Class I Railroads 1985-2000

| Railroad (Abbreviation) | Years |
|---|---|
| Atchison, Topeka & Santa Fe (ATSF) | 1986-1995 |
| Burlington Northern (BN ) | 1986-1995 |
| Burlington Northern & Santa Fe (BNSF) | 1996-2001 |
| Chicago Northwestern (CNW) | 1986-1994 |
| Consolidated Rail Corporation (CRC) | 1986-1999 |
| CSX Corporation (CSX) | 1986-1997 |
| Delaware & Hudson (D&H) | 1986-1987 |
| Denver, Rio Grande Western DRGW) | 1986-1993 |
| Florida East Coast (FEC) | 1986-1991 |
| Illinois Central Gulf (ICG) | 1986-2001 |
| Kansas City Southern (KCS) | 1986-2001 |
| Missouri-Kansas-Texas (MKT) | 1986-1987 |
| Norfolk Southern Corporation (NSC) | 1986-1997 |
| SOO Line (SOO) | 1986-1995 |
| Southern Pacific (SP) | 1986-1996 |
| Union Pacific (UP) | 1986-1996 |
| Union Pacific Southern Pacific (UPSP) | 1997-2001 |

Table 4. Estimated Average Rail Rates Car-type /Car-mile

| Commodity | Car-Type | Revenue | Car-miles | Waybill Rates |
|---|---|---|---|---|
| Grain | Closed Hopper | 3,172,004,665 | 1,524,484,527 | 2.08 |
| Coal | Open Hopper | 9,488,758,723 | 5,523,055,208 | 1.72 |
| Lumber | Box Car | 2,242,360,766 | 930,938,180 | 2.41 |
| Food | Box Car | 3,182,308,909 | 1,530,824,235 | 2.08 |
| Paper | Box Car | 2,207,102,824 | 927,651,262 | 2.38 |
| Chemicals | Tank | 5,618,582,468 | 1,797,887,468 | 3.13 |
| Automotive | Boxcar/Multilevel | 5,021,832,896 | 2,051,719,778 | 2.45 |
| Intermodal | Intermodal Flat | 5,012,749,322 | 10,173,825,469 | 0.49 |

Table 5. Vuong Test Comparisons for Alternative Strategic Behaviors

| | BBB | BBC | BCB | BCC | CBB | CBC | CCB |
|---|---|---|---|---|---|---|---|
| BBC | -2.07 | | | | | | |
| BCB | 1.64 | 2.48 | | | | | |
| **BCC** | **-2.83** | **-1.27** | **-3.61** | | | | |
| CBB | 0.35 | 2.10 | -0.76 | **2.73** | | | |
| CBC | -1.48 | 0.86 | -1.89 | **1.51** | -1.84 | | |
| CCB | 1.42 | 2.50 | 0.33 | **3.51** | 1.47 | 2.19 | |
| **CCC** | **-2.66** | **-1.18** | **-3.33** | **-0.03** | **-3.00** | **-1.99** | **-3.78** |

Table 6a. NL3SLS Estimates of Parameters of Interest

| Market | Bulk | | General freight | | Intermodal freight | |
|---|---|---|---|---|---|---|
| Parameter | $\alpha_b$ | $\sigma_b$ | $\alpha_e$ | $\sigma_e$ | $\alpha_v$ | $\sigma_v$ |
| Estimate | 0.0924 | 0.8805 | 0.2301 | 0.6647 | 0.4304 | 0.9101 |
| *t-value* | *2.1* | *16.0* | *10.67* | *15.75* | *8.62* | *24.84* |

Table 6b. Parametric Estimates

| Equation | Product | Variable | Mean value[1] | St. Deviation[2] |
|---|---|---|---|---|
| Demand | Bulk | Marginal effect - system size | $7.06\text{x}10^{-6}$ | $8.99\text{x}10^{-6}$ |
| | | Marginal effect - Car deliveries | $1.13\text{x}10^{-7}$ | $7.22\text{x}10^{-8}$ |
| | | Own price elasticity | -1.3879 | 0.14 |
| | | Cross price elasticity | 0.0074 | 0.01 |
| | General freight | Marginal effect - System size | $1.70\text{x}10^{-5}$ | $7.01\text{x}10^{-6}$ |
| | | Marginal effect - Population | $6.74\text{x}10^{-6}$ | $2.50\text{x}10^{-6}$ |
| | | Own price elasticity | -1.6325 | 0.16 |
| | | Cross price elasticity | 0.0064 | 0.01 |
| | Intermodal freight | Marginal effect - System size | $1.20\text{x}10^{-5}$ | $8.11\text{x}10^{-6}$ |
| | | Marginal effect - Car deliveries | $8.87\text{x}10^{-8}$ | $6.91\text{x}10^{-8}$ |
| | | Own price elasticity | -5.6838 | 2.10 |
| | | Cross price elasticity | 0.0091 | 0.01 |
| Cost | Bulk | Marginal cost | 0.4486 | 0.45 |
| | General freight | | 0.8193 | 0.38 |
| | Intermodal freight | | 0.8193 | 0.38 |
| | Infrastructure | | 173.3974 | 482.57 |
| | Bulk | Access fee to infrastructure | 0.0722 | 0.20 |
| | General/Intermodal | | 0.0175 | 0.05 |
| | | Returns to length of haul | -0.0500 | 0.08 |
| | | Returns to technical progress | -0.0571 | 0.03 |
| | | Returns to scale | 1.9452 | 2.93 |

*Note*: We report the mean (1) and the standard deviations (2) of the empirical distributions of variables except when the parameters (in general the marginal effects) are directly estimated in which case we report the standard errors.

Table 7. Consumer Surplus Trends (Current Dollars )

| Year | Bulk | General freight | Intermodal freight | Total |
|---|---|---|---|---|
| 1986 | 625,843,921 | 595,537,201 | 150,970,245 | 1,372,351,369 |
| 1987 | 695,275,640 | 650,533,482 | 159,556,791 | 1,505,365,915 |
| 1988 | 706,084,459 | 682,498,413 | 161,092,684 | 1,549,675,558 |
| 1989 | 693,411,728 | 705,004,494 | 180,744,305 | 1,579,160,529 |
| 1990 | 731,683,472 | 719,346,860 | 178,244,316 | 1,629,274,649 |
| 1991 | 707,651,220 | 740,038,738 | 193,425,161 | 1,641,115,120 |
| 1992 | 780,032,187 | 771,371,801 | 198,509,335 | 1,749,913,324 |
| 1993 | 762,834,413 | 800,766,675 | 194,448,785 | 1,758,049,875 |
| 1994 | 697,726,737 | 811,321,905 | 214,225,352 | 1,723,273,994 |
| 1995 | 718,406,001 | 835,633,727 | 241,442,223 | 1,795,481,952 |
| 1996 | 724,342,827 | 862,799,011 | 191,261,897 | 1,778,403,736 |
| 1997 | 748,968,605 | 892,761,731 | 202,355,737 | 1,844,086,075 |
| 1998 | 846,856,565 | 737,760,182 | 201,584,603 | 1,786,201,352 |
| 1999 | 899,997,860 | 751,619,928 | 198,498,102 | 1,850,115,891 |
| 2000 | 855,986,396 | 781,935,928 | 185,278,585 | 1,823,200,910 |
| 2001 | 748,815,731 | 769,056,297 | 199,295,182 | 1,717,167,211 |

Table 8. Lerner indices by Market Segment for Major Firms (in %)

| Railroad<br>Market | ATSF | SP | CSX | NSC |
|---|---|---|---|---|
| Bulk | 70 | 72 | 85 | 77 |
| General freight | 67 | 68 | 69 | 67 |
| Intermodal freight | 46 | 39 | 25 | 22 |

Figure 1. Consumer Surplus on all Market Segments




Figure 2. Consumer Surplus by Market Segments



# EXHIBIT PX0568

(http://www.bnsf.com/index.html)

# News Release

## New Quicker Interline Pricing Method Available at BNSF.com

**FORT WORTH, Texas, March 22, 2005:**

BNSF Railway Company (BNSF) today announced a new instantaneous method for carload customers to obtain interline prices at BNSF.com.

From BNSF.com, customers can obtain prices for most general merchandise carload commodities from all BNSF origins to any destination served by CSX Transportation and some of its affiliated shortlines, and the Canadian National Railway Company.

"Our carload customers have long requested an easier and more efficient way to obtain prices for movements originating on our railroad and terminating on another," says Denis Smith, BNSF vice president, Industrial Products Marketing. "Previously to get an interline price, carload customers had to call the originating railroad, the originating railroad would have to call the destination railroad and then get back to the customer. With this new enhancement, customers can now visit bnsf.com and get a price from point A to point B on any participating destination railroad--instantly."

This enhancement is part of a freight rail industry technology initiative to make interline carload pricing easier to use, more efficient and timelier for customers.

"BNSF could not have done this alone," says Smith. "It took the collaboration of several Class 1 railroads to develop the technology to be able to provide an instantaneous and easy-to-use pricing tool."

To obtain a price, go to bnsf.com, click prices, and select price look up.

A subsidiary of Burlington Northern Santa Fe Corporation (NYSE:BNI), BNSF Railway operates one of the largest railroad networks in North America, with about 32,000 route miles in 28 states and two Canadian

provinces. The railway is among the world's top transporters of intermodal traffic, moves more grain than any other American railroad, transports the components of many of the products we depend on daily, and hauls enough low-sulphur coal to generate about ten percent of the electricity produced in the United States. BNSF Railway is an industry leader in Web-enabling a variety of customer transactions at **www.bnsf.com (http://www.bnsf.com/)** .

For more information on the company and its transportation solutions, visit the BNSF Web site at **www.bnsf.com (http://www.bnsf.com)**

**BNSF Headquarters**
BNSF Railway Company
2650 Lou Menk Dr. 2nd Floor
P.O. Box 961057
Fort Worth, TX 76161-0057
Phone: (817) 352-1000

**(http://www.bnsf.com/)**

**This website is best viewed in Chrome or Safari.**

- **About BNSF (http://www.bnsf.com/about-bnsf/index.page)**
- **Comments or Suggestions (http://www.bnsf.com/feedback.html)**
- **Contact Us (http://www.bnsf.com/about-bnsf/contact-us/index.html)**
- **Customer Notifications (http://www.bnsf.com/news-media/customer-notifications/library.page)**
- **Customer Tools (http://www.bnsf.com/ship-with-bnsf/pricing-and-tools/index.page)**
- **In the Community (http://www.bnsf.com/in-the-community/index.page)**
- **News and Media (http://www.bnsf.com/news-media/index.page)**
- **Retirees (http://www.bnsf.com/retirees/index.page)**
- **Ship With BNSF (http://www.bnsf.com/ship-with-bnsf/index.page)**
- **Suppliers (http://www.bnsf.com/suppliers/index.page)**
- **Support Services (http://www.bnsf.com/ship-with-bnsf/support-services/index.page)**
- **Work at BNSF (https://jobs.bnsf.com/)**

**(https://www.facebook.com/BNSFRailway/) (https://twitter.com/BNSFRailway) (https://www.instagram.com/bnsfrailway/) (https://www.linkedin.com/company/bnsf-railway) (https://www.youtube.com/user/bnsfrailway)**

Railroad Emergencies:
1-800-832-5452

**Terms Of Use (http://www.bnsf.com/site-terms-of-use.html)** | **Privacy (http://www.bnsf.com/privacy-policy.html)** | ©2021 BNSF Railway Company. All Rights Reserved.

**Back to Top (#)**
Connect
**(http://www.bnsf.com/about-bnsf/contact-us-form.html) (https://www.facebook.com/BNSFRailway/) (https://twitter.com/BNSFRailway) (https://www.instagram.com/bnsfrailway/) (https://www.linkedin.com/company/bnsf-railway) (https://www.youtube.com/user/bnsfrailway)**

## Contact by Email

Marked * fields are required

To:

This field is required.

Your Name:

This field is required.

Your E-mail Address:

This field is required.

This field is invalid.

Your Message: Please include your company name, if applicable.

Send Reset

## Form Submitted!

# EXHIBIT PX0569

NewsRoom

8/10/05 Fin. Disclosure Wire 15:08:19

FD Wire
Copyright © 2005 CCBN, Inc. and FDCH e-Media, Inc.

August 10, 2005

Q2 2005 **CSXEarningsConferenceCall** - Final

OPERATOR: Welcome to the **CSX** Corporation second quarter 2005 earningscall. [OPERATOR INSTRUCTIONS] As a reminder, this conference is beingrecorded Wednesday, July 27, 2005. I would now like to turn theconference over to David Baggs. Please go ahead, sir.

DAVID BAGGS, IR, **CSX**: Thank you very much and good morning andwelcome to **CSX's** second quarter earnings presentation. Before we getstarted this morning, let me remind everyone that this presentationcontains forward-looking statements and it is important to recognizethat these forward-looking statements are subject to a number ofrisks and uncertainties and that actual performance could differmaterially from the results anticipated by these forward-lookingstatements. And with that, it is my pleasure to turn things over to**CSX's** Chairman, Chief Executive Officer, and President, Michael Ward.

MICHAEL WARD, CHAIRMAN, CEO, PRESIDENT, **CSX**: Thank you, David. Goodmorning and thank you for joining our second quarter conference call.With me today are Tony Ingram, our Chief Operating Officer; ClarenceGooden our Chief Commercial Officer; and Oscar Munoz, our ChiefFinancial Officer. Tony will update you on operations; Clarence willdiscuss the top line results; and Oscar will review the financialperformance. Then I'll make some closing remarks and we'll take yourquestions.

We are pleased to report the sixth consecutive quarter of coreearnings growth for **CSX**. Surface transportation which includes ourrail and Intermodal businesses produced record operating income of$422 million, up $280 million from 2004. It is important to note thatlast year's quarter included a $15 million pretax managementrestructuring charge. So, on a more comparable basis, servicetransportation results were up 127 million, a 43% year-over-yearimprovement. This improvement was driven largely by higher revenueand our continued focus on productivity. From the top lineperspective, the second quarter was our 13th consecutive quarter ofsolid revenue growth. As reported in morning, surface transportationoperating revenue was $2.2 billion, an increase of 169 million or8.4% compared to the same quarter in 2004.

A strong pricing environment continued to play a key role in ourrevenue growth as our fuel surcharge program and yield managementinitiatives together drove better top line results. Revenue included$17 million from a coal rate case settlement. We expect favorablepricing environment to continue throughout 2005 as demand fortransportation services continues to exceed supply.

Turning to operations, **CSX** continued to make good progress on its keysafety measurements in the second quarter. Significantly reducingboth personal injuries and train accidents versus the prior year. Inaddition, as mentioned before, our productivity initiatives producedsolid results for the second quarter, helping to contain the totalexpense increase to just 2%. We're proud of the progress we've madebut we're not satisfied with the service levels we provide to ourcustomers in the second quarter. Reliable service is critical to ourlong-term success and we're absolutely committed to improvingoperations and becoming a high-performance organization.

Our second quarter results also included a number of favorabledevelopments. As you know, we successfully completed a $1 billionrepurchase of **CSX's** debt. This transaction strengthens our balancesheet, reduces interest expense going forward, and enhances ourcredit profile. In addition, the State of Ohio recently passed taxlegislation that phases out a corporate franchise tax on net incomeand replaces it with a gross receipts tax. And finally, as Imentioned before, we favorably settled a coal rate case. With that,I'll turn things over to Tony who will provide you with more detailon our key operating initiatives. Tony.

TONY INGRAM, COO, **CSX**: Thank you Michael, and good morning. Slidefive shows the key drivers in operations. These do not change. Wetalk about these in every meeting with our people. The first issafety. Safety is something that great companies do well. At **CSX**,safety is a foundation of everything we do and we are getting better.The next driver is service, the operating team is focused inimproving service. Since last quarter, we have added new processes tothe ONE Plan which I will talk to you in a minute. The third driveris productivity. As Michael told you, the cost of operation is goingdown year-over-year. The team is driving that improvement withproductivity. Just like safety, productivity is another part of thehigh performance culture we're building.

Now let's look closer at safety. On slide six, you'll see we'regetting better in injuries and accidents. The index on the left looksat the number of injuries for every 200,000 man hours worked. At **CSX**,we improved by 16% to a ratio of 1.86. Our train accidents alsoimproved 29%. To a ratio of 3.2. Again, all of this has been drivenby our people through safety programs and training and I have saidbefore, fewer injuries and accidents are not just about safety. Theyalso prove that with discipline and focus, we can perform at a higherlevel in service.

Looking at slide seven, which shows train velocity, velocity declinedin the first half of the quarter and then went up. You'll also seethat we had some traction going on in July. In the last week, we didsome maintenance on a major corridor which affected this velocity.One of the things that caused a slowdown in the second quarter wasthe fact that coal was up sharply. More coal shipments are good forearnings but at the same time coal trains run at a slower velocity.Having said that, I'll tell you that velocity will get better as weexecute better and I believe we're on that path.

As I said before, our team has made improvements to the ONE Plan. Ibelieve the ONE Plan is absolutely the right way to go. But to reallymake it work, we need clear rules of engagement on how to scheduleand manage our resources. We have done just that. Just as important,we need to communicate new rules in the clearest way possible andwe're doing that. We've been improving our processes and training ourpeople for several weeks and I believe we'll see the results.

So, in summary, our improvements in safety and productivity are goodsigns and we're putting new discipline behind our ONE Plan to makeservice excellence a reality at **CSX** We'll talk more about ourinitiatives in detail at our August 11, investors conference. Nowwith, that, I would like to introduce Clarence Gooden.

CLARENCE GOODEN, CHIEF COMMERCIAL OFFICER, **CSX**: Thank you, Tony. Goodmorning. Before I get into the results, let me give you a broadoutlook of our business. We continued to see a growing economy in2005. The institute of supply management index of manufacturingactivity was 53.8% for June. The 25th consecutive month of expansion.Also, the latest GDP growth forecast for the year is around 3.6%.Down slightly from the previous forecast but still depicting a veryhealthy economic outlook. 2006 GDP growth is also forecasted to bearound 3.1%.

Now, turning to slide nine, let's look at the results. During thesecond quarter, revenues of $2.2 billion exceeded the prior year by $169 million an 8.4% increase. Second quarter, 2005, was the 13thconsecutive quarter of year-over-year revenue improvement and revenuegrowth was again driven by continued emphasis on yield. Strong fuelsurcharge program and strong demand in coal.

Turning to slide ten, in the second quarter of 2005, we continued toachieve revenue yield improvement. Revenue per car grew 10.6% drivenby our continued focus on the yield and the fuel surcharge program.If you break down the revenue per car increase into its components,approximately 40% is coming from price. 40% from fuel surcharge. And20% from mix changes. Previously,

our breakdown was about a thirdeach for price, fuel surcharge, and mixed but with the higher fuelprices and the vibrancy of our pricing program, that mix has changedthis quarter. Revenue per car will continue to be susceptible toprice fluctuations in the fuel and into mix changes.

The environment continues to be favorable for increasing price andthe near record transportation demand, tight transportation supplyand a growing economy are helping this. Our fuel surcharge programhas continued to be crucial in helping to partially offset the risingfuel prices. Also, overall volume was down by 1.9% from the recordhigh of a year ago. Primarily as a result of the automotive volumeweakness due to decreased production levels continued intermodalweakness due to the network simplification in 2004 and the sheddingof low margin business and the strength in our coal which onlypartially offsets these declines. We continue to expect increasingvolume growth as the service delivery continues to improve.

Quarterly coal revenue of $541 million increased $99 million or 22.4%year-over-year. On a volume increase of 32,000 car loads or 7.4%.This represents a record revenue level at CSX for coal. Even withoutthe $17 million from the rate case settlement. Revenue per car of$1,179 increased $144 or almost 14%. Without the rate casesettlement, revenue per car increased a healthy 10.4%. This revenueper car level also represents a record at CSX for coal. The 459,000car loads of coal moved during the second quarter, represent one ofthe strongest quarters since the Conrail acquisition from a volumeperspective. Strong demand exists across all coal markets with only amild softening in steel-related traffic.

Looking forward, utility inventory remained below target levels andproducer intent during the second half of 2005 is expected to be verysimilar to the first half. As for the automotive sector, quarterlyautomotive revenue of $211 million decreased $9 million or 4.1%year-over-year. On a volume decrease of 11,000 car loads or 8.1%.While overall North American light vehicle production was unfavorableby 1% year-over-year in the second quarter, production for the bigthree domestic automobile producers was down 10%. And General Motorspermanently closed three plants served by CSX at Lansing, Michigan;Linden, New Jersey; and Baltimore, Maryland. Yet vehicle productionfor the new domestic producers was favorable year-over-year,(INAUDIBLE) rail shipments that CSX serve at Montgomery, Alabamaplant during May.

As of the end of the second quarter, field inventory levels were down14 days year-over-year to 58 days which is near target levels. In thethird quarter, the big three domestic production forecast isunfavorable 5% year-over-year. And finally, continued efforts toimprove yield in this market resulted in revenue per car of $1,702which increased $72 or 4.4%. This revenue per car level is aquarterly record at CSX for the automotive market.

Now, let's look at our intermodal results. Intermodal revenue of $330million increased $5 million or 1.5% year-over-year on a volumedecrease of 46,000 units or 7.8%. Volume decline was primarily drivenby a decline in domestic traffic of 16.4% largely due to the networksimplification earlier in 2004, as well as the shedding of a lowmargin traffic. Domestic revenue per unit increased 11.4% as a resultof the successful yield management efforts and overall revenue percar improved 10.1%, largely due to growth in our other revenue linewhich includes increased fuel surcharge, increased asset utilizationcharges and reductions in volume incentive refunds.

As a result of these yield management efforts turning to slide 14,CSX intermodal operating income increased $24 million or 77%. This isthe third consecutive quarter of year-over-year operating incomeimprovement. In addition to the yield management improvements,operating expenses were $19 million favorable. We're very pleasedwith the bottom line improvement that we're seeing in the intermodalcompany and that bottom line focus will improve and will continue inthe third quarter.

As for the merchandise results, quarterly merchandise revenue of$1.061 billion increased $70 billion or 7.1% year-over-year. On avolume decrease of 12,000 car loads or 1.6%. This represented a 13thconsecutive quarter of year-over-year merchandise quarterly revenuegrowth. Although the volume was down, the 743,000 car loads movedduring the quarter was among the strongest merchandise quarters everat CSX. Revenue per car of $1,428 increased $115 or 8.8%. Thisrepresents a record level at CSX for our merchandise traffic. Allmarkets experienced year-over-year revenue and revenue per car gainsas a result of the continued repricing of traffic and the fuelsurcharge program and we expect this trend to continue.

In summary, the economy continues to grow. We will continue to focuson aggressive yield management in all markets. Our yield environmentremains favorable and our momentum is strong and now let me introduceCSX's Chief Financial Officer, Oscar Munoz.

OSCAR MUNOZ, CFO, CSX: Thank you, Clarence. Good morning toeverybody. As Michael mentioned, our second quarter results marks thesixth consecutive quarter in which we have produced core earningsimprovement. We're very pleased with the progress we've made to dateand look forward to sharing the longer term direction of CSX in ourAugust 11, conference.

Now let's take a moment to look at the details of our second quarterresults on slide 18. Overall, CSX's consolidated net earnings were165 million. This resulted in an EPS of $0.73, an increase of $0.20or 38% from last year. Driving these results was our surfacetransportation operating income which increased 142 million from lastyear reflecting strong revenue gains and cost control. I'll get intothe details of our surface transportation results in a minute butfirst let me move down the rest of the chart of our consolidatedresults. All other income was up 24 million primarily due to higherreal estate sales at our resort properties and greater interestincome related to our higher cash position from our recent WorldTerminal sale.

Moving to the next line, as most are aware, we recently completed a$1 billion debt repurchase. The cost of this which primarily reflectsthe increase in current market value above the original issue valuewas expensed in the quarter. You see this as the 192 million pretaxdebt repurchase expense on this slide. This negatively impacted EPSby $0.54. The other large variance on this page is in the income taxline which is affected primarily by three factors, the higher surfacetransportation results, our debt repurchase expense, and a state taxlaw change that Michael mentioned. This change eliminated thecorporate franchise tax in Ohio which was being replaced by a grossreceipts tax. As a result, CSX was able to reduce certain deferredincome tax liabilities resulting in a lower income tax expense of $71million. This positively impacted EPS by $0.31. On an ongoing basisyou can expect our effective income tax rate to continue to beapproximately 38.5%.

Let's move on to slide 19 and the details of our second quartersurface transportation results. The continuing story for CSX isstrength in our top line as seen by our 8% revenue growth which, asyou heard, includes the rate case settlement of 17 million. Thiscombined with only a 2% increase in total expenses resulted inoperating income of 422 million, a 43% improvement year-over-year. Asyou can see, the primary expense drivers were in labor and fuel aswell as the various effects of the Conrail spin last fall. Thedetails of all our expenses can be found found in our flash document.I would like to take you to the next page where we can look at the 42million or 2% expense increase from more of an activity perspective.

On slide 20, the first bar on the left end of the chart shows theimpact of fuel price which continues to be a challenge for thetransportation sector. Our fuel cost increased 22 million net of thefavorable impact of our hedge position. The next bar shows the net 8million impact that volume and inflation had on our business. Thishas several components. Inflation on labor and materials was up 26million. That amount was partially offset by an $18 million favorableimpact from traffic mix and lower volume. In the next two bars, weshow the continued improvements in our core operations. We saw costfrom train operations decrease by 4 million due to improvements innetwork efficiencies relative to last year as well as a $7 millionimprovement in productivity, a key lever we're focusing on to reducecost to the Company. Finally, on the right hand of the chart -- onthe right side of the chart, we saw an increase of 23 million inother expenses. While there are a number of items in there, it isprimarily higher due to a percent of compensation and partiallyoffset by supplier cost recovery.

On the next slide, slide 21, let's take a moment and remind ourselveswhere we stand on our fuel hedging program. In the second quarter,we're 57% hedged at an average price of $0.87 a gallon. Our hedgeposition was declined to 49% in the third quarter and 38% in thefourth quarter of this year. This means that for the second half ofthis year, we'll have a combined 13% average lower hedge positionrelative to the first half of this year. In '06, our hedge positionswill continue to decline until our fuel hedging program is completelyphased out by year end.

Now, on slide 22, let's look forward to the rest of the year. First,as we mentioned earlier, we reduced our debt by 1 billion thisquarter. We're very, very pleased with the progress we've made on ourdebt reduction efforts and have now brought our leverage down totargeted levels. Second, as this quarter shows, we've remainedfocused on delivering consistent, continuous improvement across allareas of the business. Third, we're on track to achieve 450 millionin core free cash flow this year.

Lastly, on August 11, we'll be unveiling our longer term plans. As webegin to execute those plans, we anticipate some additional spendingsuch as increased hiring in the back half of this year. Even withthat, we still expect to beat the current full year EPS consensusestimate of $3.07 and are projecting to achieve a full year EPS of$3.15 to $3.25 a share when you adjust for our first quarter WorldTerminal's gains along with the debt reduction cost and the Ohio taxchange in the second quarter. Now, with that, I would like to turn itback to Michael for his closing remarks.

MICHAEL WARD: Thank you, Oscar. As you've heard this morning, anotherstrong quarter for **CSX** with the employees of **CSX** delivering solidrevenue growth and operating income improvements. We are encouragedby our financial progress over the past six quarters and believe thatwe're well-positioned to continue raising the bar going forward. Nearterm, we expect economy will continue to grow although at a slowerrate than the nation has seen in the past several quarters.Meanwhile, the pricing environment remains strong and our team willcontinue to drive yield improvements. The operations team remainsfocused on three key areas. Safety, productivity, and service. Insafety, the improvements are encouraging. We're confident thesetrends will continue.

In productivity, we continue to improve as well. Our overall costremains relatively flat for the second quarter and expensesassociated with operations declined on a year-over-year basis. Thatsaid, we continue to focus on improving service and creating a highperformance organization. Every member of the **CSX** team has a definedrole and accountability for meeting and exceeding customerexpectations. As we improve service, we will strengthen thefoundation needed to support long-term sustainable results.

With U.S. consumption increasing and more and more demand being metby imports, these must be carried long distances across the country.Our rail network is well positioned to make these deliveries intosome of the most heavily populated areas of the country. At the sametime, in the face of higher fuel price, greater congestion on thehighways, and driver shortages, the trucking industry is finding thatit makes sense for them to perform the short haul deliveries to andfrom the customer while the long haul deliveries are carried by rail.Bottom line, the long-term trends favor rail transportation. **CSX** iswell positioned to capture the benefits of the emerging railrenaissance and we'll discuss how **CSX** is positioned in thatenvironment in more detail at our investor conference on August 11.With that, at this point, we'll take your questions. We would askthat you please identify yourself and your affiliation for the otherlisteners on the call.

OPERATOR: [OPERATOR INSTRUCTIONS] Our first question comes from theline of Thomas Wadewitz from JP Morgan.

TOM WADEWITZ, ANALYST, JP MORGAN: It is Tom Wadewitz from JP Morgan.Congratulations, very strong results. I have got a few differentquestions here. First on the coal settlement that you had. You dididentify it's 17 million in revenue. Were there expenses that youwould identify with that as well so that we could parse it out on anoperating income and also a net income basis?

OSCAR MUNOZ: Tom, this is Oscar. No, we expensed all related issuesas incurred and that 17 million is the only impact on our quarterlyresult.

TOM WADEWITZ: Okay. All right. So, you're saying that the revenueincome just falls to the bottom line in terms of the impact onoperating income as well.

OSCAR MUNOZ: Exactly.

TOM WADEWITZ: Let's see. In terms of the head count comment, Oscar,since you responded to that one, would you expect head count to be upyear-over-year in second half, or you think there is still apossibility that it is down a touch or flat?

OSCAR MUNOZ: The predominance of the sort of prudent early investmentis in the -- our TNE, our running of locomotives area. And dependingon attrition and other areas in the overall head count number, youmay or may not see an increase in overall numbers but if you were tolook at the detail behind it to what we use to run trains, you wouldobviously see a marked increase, but overall, I don't expect it wouldbe a significantly higher number but again, I haven't looked at that.

TOM WADEWITZ: Then maybe one for Clarence. Clarence, you've beenquite bullish on coal for I think at least a year in terms of outlookfor coal volumes. That has played out pretty well. Wondering if youwould still think that you can see significant growth in coal volumeslooking at the coming year and also as comparisons do get a bit moredifficult in fourth quarter?

CLARENCE GOODEN: Well, Tom, as I mentioned in the presentation,looking forward, we expect the second half of this year to prettymuch reflect and mirror what happened in coal volumes in the firsthalf of the year. And then in 2006, we expect coal demand will stayfairly strong throughout the year, about the levels that you've seenin 2005.

TOM WADEWITZ: So, you're talking in absolute terms or are you sayingthe rate of year-over-year growth can continue?

CLARENCE GOODEN: I'm speaking in absolute terms.

TOM WADEWITZ: Fair enough. Any thought on the pricing story as well,whether the difficult comparisons you get maybe in fourth quarterwhere the pricing slows or you just think you can continue to workthrough the contracts and get that pricing momentum going throughthis year and next year?

CLARENCE GOODEN: We're pretty confident between now and the end ofthe year that as the contracts that come up for renewal will be ableto achieve some of the pricing on a percentage basis that we'vegotten with the contracts previous to this and unless somethingchanges, we expect 2006 to be still a very strong economy.

TOM WADEWITZ: Great. Thank you for the time.

OPERATOR: Our next question comes from the line of Ken Hoexter fromMerrill Lynch.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Good morning. I guess as we lookat the car loads quarter to date. We're still running a littlenegative. I just wanted to understand this a little bit because Ithought we had lacked particularly in the intermodal side where youhad shut off some of the unprofitable business a year ago. Is thissomething we should expect to see turnaround this quarter, nextquarter. What timing should we look for for some the volumes toreally start to increase after you've lapsed some of theeliminations.

CLARENCE GOODEN: Well, Ken, this is Clarence. If you look at ournumbers there, we had very strong coal quarter. Up in theneighborhood of 32,000 car loads above last year. We had ourmerchandise business although it was slightly down on theyear-over-year basis, it was 743,000 car loads which is the secondhighest that we've had and that's against last year's second quarter.The automotive volumes were down just a little bit. As we spokethere, the big three production was down 10%. We are heavily weightedtoward the business three production. The intermodal zone, the NSI,we're trying to focus as hard as we can on that bottom line. And asyou saw in December, the fourth quarter's numbers and in the firstand in the second quarter numbers, that profitability at thatintermodal company has gotten very strong. So, on the intermodalissues, we expect a slight rise on the year-over-year basis in thesecond half but continued focus on that bottom line.

KEN HOEXTER: Clarence, that's not what I was talking about. I'mtalking about quarter to date for the third quarter so far. Lookslike we're still running down I thought we had lapped a lot ofeliminations that occurred mid year last year. Is that not the case?

CLARENCE GOODEN: June the 28th was the date of NSI last year so youhave seen -- so we have lapped but some of the declines here you areseeing is where we have priced away some of the, as I mentionedearlier, shedding of some of the low margin business.

KEN HOEXTER: So, you're still working on it. It is not like you'vedone it all last June and you stopped. You're still working on someof the--?

CLARENCE GOODEN: That's correct.

MICHAEL WARD: We're primary focused on the profitability rather thannecessarily just pushing volume, is that right, Clarence?

CLARENCE GOODEN: That's correct.

KEN HOEXTER: Thanks, Michael. And then as you look at the velocitylevel, I think you said it was down, I think Tony mentioned it wasdown just because of some maintenance going on right now. Iunderstand there is velocity levels that are set for some incentiveprograms. Have you discussed what levels those velocity levels needto get to or is there a target that you've put forth?

TONY INGRAM: This is Tony, I don't know what you're talking aboutyour incentive for velocity. We have some goals out there but wedon't have our incentive that's tied to velocity.

KEN HOEXTER: I thought you had mentioned before that there wasincentives tied to velocity and cash flow levels.

MICHAEL WARD: It is part of our -- this is Michael. We have a numberof overall goals, Ken. Obviously earnings free cash flow, servicestatistics, safety statistics. There's a combination of goals we havein our bonus program. Velocity is one of those. So, we are focused onthat because we know it is important for the long-term.

KEN HOEXTER: Great. My last question is just on -- Tony, you hadtalked a little while about big locomotive adds coming in the secondhalf of the year which should get the locomotive plan aligned withthe ONE Plan and see how that's proceeding. Can you give us a bit ofan update so we can understand how well the ONE Plan is continuing?

TONY INGRAM: Yes. We're looking at taking delivery in the thirdquarter of 100GE top locomotive 4400 horsepower and that will add toour fleet and should improve our on-time performance and also ourother train delay performance and improve the integrity of our fleet.

MICHAEL WARD: Most those are coming late in the third quarterbasically.

TONY INGRAM: Yes, the delivery is pushed back a little bit, and it'llbe in September, most of them in late August, September.

KEN HOEXTER: Can you just clarify how that's blending with yourlocomotive plan with the ONE Plan?

TONY INGRAM: It will just supplement the numbers that we have nowthat would give us a greater availability there, Ken.

KEN HOEXTER: Great. Thanks for your time. Nice numbers.

TONY INGRAM: Thank you.

OPERATOR: Our next question comes from the line of John Barnes fromBB&T Capital Markets.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Thanks, good morning.Oscar, real quick, I'm a little slow sometimes. The current or theguidance for full year of 3.15 to 3.25 excluding or including the twocharges you took in the second quarter?

OSCAR MUNOZ: I think as I said in the script, it excludes the -- boththe big items in the second quarter as well as obviously the firstquarter number on the World Terminals gain.

JOHN BARNES: Very good. Michael or Tony, could you detail the type ofmaintenance that you're currently doing that resulted in the slowdownof the velocity? Is this a change or is this one of your normal largesummertime maintenance programs?

TONY INGRAM: Well, the one that we made reference to here in July isour one of the kind that we have where we go in the coal fields andtake down a segment of track for a whole week and move in five or sixgains when the coal is a little bit light or vacation and we go inthere and repair the track to keep from having maintenance crews inthat area and running slower for a long time. We jump in there in oneweek. So this causes us to reroute the coals on the other routes andslows down the trains during that time.

JOHN BARNES: Okay.

TONY INGRAM: We'll be back to our normal maintenance schedule after-- well, we're back on it as of today.

JOHN BARNES: Okay. As of today, okay. Oscar, on the second halfspending and the hiring, could you give us some idea of the magnitudewe're talking about in terms of head count increases. Is it a nethead count increase or is this battling attrition or could you justgive an idea of the magnitude we're talking about?

OSCAR MUNOZ: Yes. We are -- again, let me answer that in probably adifferent way because I'm not going to give an exact number becausewe don't know. We're building for the future. We're increasing. Wehave got this great training facility in Atlanta. We've been runninglots of people through there. We have good capacity there, it's justcontinued to do that. People are being trained in the **CSX** way ofdoing things, not whatever was learned 10, 15 years ago which is veryexciting for us. As we look forward to what we are calling the railrenaissance, we want to make sure we're ready. We'll put as manypeople through as we can. And so I don't want to quantify the numberspecifically because frankly, I don't want to be held to it justbecause it is pretty prudent spending for us. There's a couple ofother areas that we're going to be working on as well. Again, and theyear is working out pretty well for us. We certainly wouldn't want tobe short sighted because of calendars. I hope that helps.

JOHN BARNES: Yes, and this head count is primarily in the runningtrades, right? This is--.

OSCAR MUNOZ: This is fee and for sale.

JOHN BARNES: Are there other opportunities on head count reduction innon running trade type of jobs?

OSCAR MUNOZ: I think at this point in time, I think given our issueswe handled about a year and a half ago, with that holy eye thing thatwe don't talk about very much, I think we're pretty set as far asoverall head count but again, we want to make sure we invest in theright areas.

JOHN BARNES: All right. Very good. Lastly, Clarence, anything on therevenue front, the car load front that you're looking at that couldpotentially take away or continue to put downward pressure on theamount of exposure you have to the big three? I mean ex-autos, youguys had a pretty solid car load quarter. It just seems like autos iskind of sucking the life out of it. Is there anything you can do tojust get the less and less reliance on the big three?

CLARENCE GOODEN: Well, as we mentioned, John, we've got the new Hondaplant that's just opened up at Montgomery. That's in the process oframping up. It takes about six to nine months before that plant isrunning at 100% capacity. So, we're taking a look at that and we'relooking at some of the imports that are coming in through the Port ofWilmington, Delaware and through the Port of Brunswick to see if wecan diversify the portfolio there but that's about the extent of theefforts in the automotive side.

JOHN BARNES: All right. Thanks for your time.

OPERATOR: Our next question comes from the line of James Valentinefrom Morgan Stanley. Please go ahead.

JAMES VALENTINE, ANALYST, MORGAN STANLEY: Thanks. Just a fewquestions guys, in terms of pricing, first, I just want to make sureI understand this that your overall yields were up about 8%.Excluding the coal settlement and I think Clarence, you said about40% of that was pricing. I just want to make sure that the same storesales pricing, ex-fuel surcharge was up a little over 3%.

CLARENCE GOODEN: Well the revenue -- what we said was the revenue carwas up. That's about 40% of it was attributed to price. 40% to thefuel surcharge and 20% to the mix.

JAMES VALENTINE: I think the math does work out then. So it would beabout 3%. I mean well, let me ask this another way. Does 3% feel likethat's what you're getting across the board. I know some contractsopen up and you can get much bigger than that. But it just seems itis a little bit lower than we're seeing in some of the otherrailroads and yet it seems that **CSX** has been fairly aggressive ontaking up pricing.

CLARENCE GOODEN: Well, let me think about that a second. I hope youdon't get the implication that we're getting a 3% price increase on aper across the board deal. Some of these contracts as you're awareget very significant increases. It's just everything is not repricedin one year.

JAMES VALENTINE: Right. Well, actually first question was setting upmy second one. That is what portion of your revenue hasn't -- first,what portion has not had a chance to be repriced in this past, let'ssay, 18 months of the rail renaissance where we've had much betterpricing throughout the industry. What portion hasn't reopened yet.And then of that, how much of it do you think will reopen between nowand the end of 2006?

MICHAEL WARD: Let me make a comment before Clarence answers that. Onyour thing about the 3% overall, that's probably about right for thisquarter. But that's a combination of what rolled off this quarter andwhat was available for repricing. I think it is safe to say that theapproach we're taking to pricing to the market has not changed thisquarter versus what we've been doing in the last year and a half. So,there's been no change in our approach to the market place or thetarget increases we're going for, just what so happened to be in thisquarter.

CLARENCE GOODEN: That's correct. And Jim, I don't know what percenthas been repriced in the last 18 months but I would tell you that forthe remaining part of 2005, we've got about $2 billion worth ofrevenue that will be repriced and in 2006 that number is somewherebetween 3.5 and $4 billion that will be repriced.

JAMES VALENTINE: Is most of that not really -- you really haven't hada whack at it in terms of under this new era of better pricing?

CLARENCE GOODEN: That's right.

JAMES VALENTINE: Okay.

MICHAEL WARD: Some of that has already been repriced once, hasn't itClarence?

CLARENCE GOODEN: In the merchandise side it has. In the coal side, ithas not.

JAMES VALENTINE: Okay. I suspect on the 11, you're going to probablygo into that a little more detail and we'll catch up there. The lastquestion I had was probably for Oscar. Oscar, in terms of your secondhalf guidance, real estate sales for the railroads at times can bepretty volatile. Can you give us your implicit expectations here inthe second half of what you think will occur for real estate sales?

OSCAR MUNOZ: Yes. I think the best way to look at the guidance, Jim,would be that is a core operational income-driven guidance, not onethat is expecting any large impacts from below the line in thatsense. You're right. Realty deals are lumpy and we probably hit thelump just recently so, our guidance is expected to give you a senseof where the business is headed, not where the line items hit. Doesthat help?

JAMES VALENTINE: It is very helpful. Thanks so much, guys, appreciateit.

OPERATOR: Our next question comes from the line of Edward Wolfe fromBear Stearns.

EDWARD WOLFE, ANALYST, BEAR STEARNS: Just to start off, Oscar, justsome clarification again on the guidance. The understanding that Ijust heard is you're counting this quarter as the $0.95 and the firstquarter as $0.68, is that right?

OSCAR MUNOZ: That's probably a good order of magnitude. Give or takea penny I'd assume.

EDWARD WOLFE: Sure. But I mean if I add those together, I've got$1.63 for the first half of the year and 3.20 at the midpoint foryour guidance for the second half the year. So you just beat numbersby $0.14 and you're giving a number well below consensus for thethird and fourth quarter. Is there a disconnect there?

OSCAR MUNOZ: Well, no. I think there's no disconnect. I think as I'vesaid, a combination of a couple of things. I think as you look at thefuel hedge impact in the back half of the year, that's one area.Certainly we've talked about the incremental investment, prudentearly investment we're making to build for the long run. I think thatimpacts that number a little bit. It would be probably the two majordrivers there.

EDWARD WOLFE: Okay. I just wanted to make sure I was looking at thatright.

OSCAR MUNOZ: Yes, but again, our business remains very strong. As Isaid on an earlier question, it is a perfect time for us to lookahead and not let the calendar bother us. We're going to make theright investments in the business as we see the need to and thereforewatch what we're trying to drive the guidance to a more appropriatelevel, I suppose.

EDWARD WOLFE: Along those lines, can you talk a little bit about thesurcharge roughly what percentage you're getting now and what you'regetting a year ago?

CLARENCE GOODEN: Right now, this is Clarence, Ed. Right now, we'vegot coverage on fuel surcharge either through the surcharge or sometype of mechanism to recover fuel in the range of 75 to 80% of ourrevenue. A year ago, I think we told

you that that number was aroundthe 70% range. All new contracts Ed are, since late 2003, all of ournew contracts have been recovered -- have had fuel recovery in thereof some form either through surcharge or through other mechanisms.

EDWARD WOLFE: Clarence? Can you give us a sense of where you thinkthis thing might be a year from now? Can it get to 95, 100?

CLARENCE GOODEN: I don't know if it can get to 95 or 100 in a yearfrom now but as all those contracts that I've mentioned earlier arerenewed, they'll all have some type of fuel surcharge mechanism inthem.

EDWARD WOLFE: Okay. Just shifting gears. Now that the intermodal islapping itself in terms of the shedding of volumes, should we look atthis thing going forward in the second half of the year for volumegrowth and if so, what should we look at in the end of '05 and thebeginning of '06 for intermodal growth give or take the economy staysabout where it is?

CLARENCE GOODEN: Well, as I mentioned earlier, you can expect someslight intermodal growth in the second half. We're going to continueto focus on the yield management efforts to fill up the existingtrains with as high-priced revenue as we can and shed the lowermargin traffic on the low end. But you'll see the net operatingincome of that intermodal company continue to improve.

EDWARD WOLFE: Okay. On the coal side, are there constraints at somepoint with volume growing as fast as it is? Is there some level ofvolume growth that you can't get to or can we even see accelerationfrom your volume or are you kind of 100% at this point?

CLARENCE GOODEN: One of the things as you know that governs volume isproduction capability at the mines to mine the coal. And in the east,they've been going wide open. We've had some western coal growth. Wehave not been impacted by the Powder River Basin issues that we'vehad that some of the western carriers have had. They've continued,the western carriers have continued to deliver the coal to us at theinterchange points so we see the second half being about like whatthe first half was in terms of volume for this year.

EDWARD WOLFE: Is 7.5% as good as it can get or do you have to dosomething going forward? Is there something that you need to spendmoney on whether that's cars or infrastructure?

CLARENCE GOODEN: It is probably as good as you're going to see it.Production is going to have to be the key to improve and there aresome projects that are currently ongoing in the coal fields toimprove production and we'll know more about that towards our August11, meeting.

EDWARD WOLFE: So in other words if they could increase it, you couldincrease it.

CLARENCE GOODEN: That's right.

EDWARD WOLFE: When you look out at CapEx and I'm guessing some ofthis you want to save for the meeting but it you look out at theCapEx, what areas of infrastructure do you see going out a year ortwo the way things are progressing that you're going to need to focuson directionally?

OSCAR MUNOZ: Ed, this is Oscar again. Again, that is probably bestheld for the conversation in its totality when we talk on August 11,including your question with the first half, back half, sort of thingI think it is all tied together.

EDWARD WOLFE: Okay. One last area is on the labor. What should wethink in terms of head count going forward and cost per employeeswhich only raised less than 1% this quarter?

OSCAR MUNOZ: Again, we will be hiring some more people in the backhalf of the year. And that probably should uptick our overall headcount a tad but exactly how much, I don't exactly know. As far ascost per head, that should stay relatively stable.

CLARENCE GOODEN: There's a July 1, increase--.

OSCAR MUNOZ: I'm sorry, there's a July 1, increase though which Ithink the whole industry is having so you have a little uptick there.

EDWARD WOLFE: That's roughly all in around 4%?

CLARENCE GOODEN: I think it is 3.5, Ed.

EDWARD WOLFE: Okay. And 4% is what head count rose. Is that a goodnumber going forward year-over-year?

OSCAR MUNOZ: I don't know. I don't know. I don't think so though.

EDWARD WOLFE: Somewhat less than that, you think?

OSCAR MUNOZ: Again, Ed, that's a good question. I just, I haven'tfocused on that. I don't want to give you a number or an estimate.Why don't you check in with David and we'll get you a -- I can'timagine it is that high.

EDWARD WOLFE: Fair enough. I appreciate the time and look forward toyour meeting in a couple of weeks.

OSCAR MUNOZ: Thanks, Ed.

OPERATOR: Our next question comes from the line of Scott Flower.Please go ahead.

SCOTT FLOWER, ANALYST, SMITH BARNEY: Hi, gentlemen. Just wanted toget a couple of questions in. Wanted to get either between Michaeland Tony, when you are looking currently at the ONE Plan, what wouldyour current assessment be of what has gone extremely well, where areyou pleased, what things are you continuing to view in areas you needto re-emphasize or work on to get further products? I'm just tryingto get your sense of a mid quarter or mid report card update on whatyou think has gone extremely well and what areas you'rere-emphasizing to get further traction as we go forward.

TONY INGRAM: Yes, Scott, this is Tony. As you well know, we're almosta year into development of the ONE Plan and we keep refining that,we're finding that we have taken down some transit time in some offour areas on some of our cars. So, as that flowed, that's better.What we've got left to do is primarily tie the locomotive plan toimprove the locomotive plan with our train plan to reduce the numberof locomotives hopefully we can squeeze that a little bit more.Utilization out of our locomotive fleet. Those are the areas thatwe're working on at this point.

SCOTT FLOWER: Okay. And then the other question and I guess this isfor Oscar is you had mentioned being able to work with your suppliersand get cost recoveries. Is that a one off from a contract? Is thatsomething that we should expect going forward in working with yoursuppliers that you're able to get better terms? How should we thinkabout that?

OSCAR MUNOZ: As far as the event in the quarter, it was probably --that was probably one large item that was more of that. On an ongoingbasis, clearly, we worked toward purchasing efficiencies and such.But this was something that was probably more just for the quarter.

SCOTT FLOWER: And any order of magnitude is this 5 million or 10million or is it a net?

OSCAR MUNOZ: Well, the net effect across all of the expenses was anet but the actual number was probably closer to 10, yes.

SCOTT FLOWER: Okay. Thank you very much, all.

OPERATOR: Our next question comes from the line of Jordan Alligerfrom Deutsche Bank. Please go ahead.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANK: Just one quick question. Interms of the expectations for the second half of the year, whether itbe in terms of profitability or earnings, what sort of velocity orother -- I guess velocity because that's the one that gets focusedon, does it -- does your profit and earnings expectations contemplaterelative to where we are now? In other words, what do you feel youneed to see?

OSCAR MUNOZ: This is Oscar. I'll take this one. Just from a financialforecast perspective, the way we do this is we look at current runrates, we look at all of the initiatives that are going on. We seethat -- it's -- improvements are made in certain areas, and so on andso forth so I would say that there is no particular number tied toany particular metric but we see a moderate and continuousimprovement over the course of the back half of the year that's builtinto that but not anything overly dramatic. Again, that's a financialforecast outlook rather than what we're driving for from Tony'sperspective.

JORDAN ALLIGER: By continuous improvement, are we talking necessarilysequentially or versus a year ago?

OSCAR MUNOZ: Well, it depends on the metric. Clearly, sequentially,everything is most important. But getting above our prior years isalso. So it's a combination of both. We hit on some and not on othersbut we keep both those measures and in fact we go back to prior yearsbefore that as to what our records are. So Tony is all about puttingthe right metrics in front of his and his team to achieve the rightlevel of efficiency.

JORDAN ALLIGER: Thank you.

OPERATOR: Mr. Baggs, there are no further questions at this time.I'll turn the call back to you.

DAVID BAGGS: Okay. Great. Thank you all for joining us today.Appreciate your time and attention. Thank you.

OPERATOR: Ladies and gentlemen, that does conclude the conferencecall for today. We thank you for your participation and ask that youplease disconnect your lines.

[CCBN reserves the right to make changes to documents, content, orother information on this web site without obligation to notify anyperson of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON

THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS. Copyright 2005, CCBN, Inc. All RightsReserved.]

[Copyright: Content copyright 2005 CCBN, Inc. ALL RIGHTS RESERVED.Electronic format, layout and metadata, copyright 2005 FDCH e-Media,Inc. (f/k/a Federal Document Clearing House, Inc.) ALL RIGHTSRESERVED. No license is granted to the user of this material otherthan for research. User may not reproduce or redistribute thematerial except for user's personal or internal use and, in suchcase, only one copy may be printed, nor shall user use any materialfor commercial purposes or in any fashion that may infringe uponCCBN's or FDCH e-Media's copyright or other proprietary rights orinterests in the material; provided, however, that members of thenews media may redistribute limited portions (less than 250 words) ofthis material without a specific license from CCBN and FDCH e-Mediaso long as they provide conspicuous attribution to CCBN and FDCHe-Media as the originators and copyright holders of such material.This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: GENERAL MOTORS CORP; DEUTSCHE BANK AG; BEAR STEARNS COMPANIES INC; CSX CORP; CONRAIL INC; MORGAN STANLEY

News Subject: (Corporate Performance (1XO12); Corporate Financial Data (1XO59); Productivity (1PR67); Business Management (1BU42); Accidents & Injuries (1AC02); Major Corporations (1MA93); Company Profiles (1CO63); Health & Family (1HE30); Investment Banking (1IN86); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Enterprise Performance Management (1EN49); Theoretical Analysis (1TH79); Railroads (1RA98); Transportation (1TR48); Celebrities (1CE65); Financial Services (1FI37); Accounting, Consulting & Legal Services (1AC73); Consulting Services (1CO47); Entertainment (1EN08); Land Transportation (1LA43); Railroad Equipment (1RA68); Resorts (1RE44); Passenger Railroads (1PA89); Science & Engineering (1SC33); Yield Management (1YI26); Business Theory (1BU14))

Region: (Maryland (1MA47); North America (1NO39); Delaware (1DE13); Americas (1AM92); USA (1US73); Michigan (1MI45); Ohio (1OH35); Alabama (1AL90))

Language: EN

Other Indexing: (BEAR STEARNS; BRUNSWICK; CCBN; CCBN INC; CONRAIL; CSX; CSX CORP; CSX EARNINGS CONFERENCE; DEUTSCHE BANK; EPS; FEDERAL DOCUMENT CLEARING HOUSE; GENERAL MOTORS; JP; MERRILL LYNCH; MORGAN STANLEY; NSI; OPERATOR; OPERATOR: [OPERATOR; SITE; TRANSCRIPTION; TRANSCRIPTS; USERS) (Baggs; Clarence; Clarence Gooden; Congratulations; David; David Baggs; Ed; EDWARD; EDWARD WOLFE; FDCH e-Media; JAMES VALENTINE; Jim; John; John Barnes; Ken; Michael; Michael Ward; Nice; Oscar; Oscar Munoz; Realty; Reliable; Scott; SEC FILINGS; Tom; Tom Wadewitz; Tony; Tony Ingram)

Word Count: 9822

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0570

# THE U.S. PRODUCER PRICE INDEX FOR LINE-HAUL RAILROADS (NAICS 482111)

**Francetta Willet***

**U.S. Bureau of Labor Statistics**

**2 Massachusetts Avenue, NE**

**Washington, DC 20212**

**September 25, 2005**

*The views expressed are those of the author and do not reflect the policies of the U.S. Bureau of Labor Statistics (BLS) views of other BLS staff members.

## A. Industry Output

The U.S. Bureau of Labor Statistics (BLS) has been tracking the transaction prices of the domestic railroad industry since the initial publication of the Producer Price Index (PPI) for Railroads, Line-Haul Operating in 1969. Currently, BLS publishes an updated PPI for Line-Haul Railroads (NAICS 482111) according to the classification in the current *North American Industry Classification System*. By definition, it includes "…establishments known as line-haul railroads primarily engaged in operating railroads for the transport of passengers and/or cargo over a long distance within a rail network. These establishments provide for the intercity movement of trains between the terminals and stations on main and branch lines of a line-haul rail network, except for local switching services." Establishments operating short-line railroads, commuter rail systems, urban rapid transit, sightseeing trains and switching and terminal facilities as core businesses were classified in other related industries. The NAICS 482111 definition included only line-haul railroads that operated over a long distance. Therefore, this industry includes regional railroads, which operate a rail network within a specific contiguous geographical area (not less than 350 miles of road).

Today, most of the major domestic railroads are privately-owned and operated, with the exception of the intercity passenger railroad, which is wholly-owned and subsidized by the United States Government. For the most part, the industry has been economically de-regulated since 1980; however the U.S. Surface Transportation Board (STB) still has regulatory authority to determine price reasonableness on the rail transportation of certain commodities and to ensure market competitiveness. Despite the partial regulatory oversight, freight railroads, which are both capital and labor intensive, are vertically integrated. Also, for statistical purposes, the STB classifies railroads by their annual gross operating revenue: Class I railroads generate approximately $250 million or more per year; Class II $20 to $250 million; and Class III $20 million or less.

The primary service output of the domestic freight railroads is the transportation of a broad range of raw materials, intermediate and finished goods on demand over a rail network from origin to destination. Accessorial and secondary services may include drayage, detention, spotting, weighting, transloading, storage, and some switching and terminal operations. The accessorial and secondary service charges can be bundled and charged to the customer in a single transaction price or billed separately.

Typical buyers (shippers) of rail freight services are farmers, miners, foresters, public utility companies, local, state and federal governments, non-profit institutions and various other commercial entities. The service delivery process encompasses: (1) the formal notification of intent to hire a prospective railroad company; (2) the negotiation and acceptance of the terms and conditions of the rail freight move; (3) and the technical coordination and arrangements for the actual shipment and monitoring of the freight to destination. The agreed upon price authority, which can be in the form of a tariff, confidential contract or an exempt quote, specifies all the primary, secondary and accessorial charges associated with the freight move. Some rail freight transactions for

large volume, repetitive shipments such as coal and transportation equipment, are usually arranged well in advance.

The primary service output of the passenger railroads is the mass transportation of individuals or groups of individuals intercity for business and leisure travel via a rail network. Other related services and amenities include sleeping accommodations, dining facilities, conference tables, deluxe seating and video entertainment. Usually, these additional services are bundled in the ticket price. However, some services, such as the simultaneous transportation of an automobile (the auto train) are billed separately to the customer. The customer makes travel arrangements either directly or indirectly through a travel agent, by telephone or electronically via the internet. A ticket agent determines the service class, origin, destination, type of travel, train availability, amenities and special accommodations required. Once the travel terms and arrangements have been accepted by the customer, a "ticket", which is essentially an implied contract is provided to the customer as proof of the travel itinerary and the requisite fare.

**B. Index Methodology**

The PPI Index for line-haul railroads is an output index, which measures the changes in prices received by the producers (the sampled railroad companies) from month-to-month. The publication structure in the current NAICS 482111, Line-Haul Railroad index reflects the various market segments in the railroad industry.

It comprises three cell indexes representing **Rail transportation, freight** (**Carload**), **Rail transportation freight** (**Intermodal**) and **Rail transportation, passenger**. Prior to July 2005, the **Rail transportation, freight (Carload)** subaggregate index was disaggregated by thirteen different types of commodity groups. Additionally, the lower cells that aggregated to **Rail transportation, passenger** included the **First class, Coach and Coach, discount** service classes. For the current sample, it was determined that time series continuity could be achieved by collapsing all the lower cells of the **Rail transportation, freight** (**Carload**) and publishing only at the aggregate level. The **Rail transportation, passenger** cell index now has two lower cells including **Coach service class** and **All other service classes**. Following is the current PPI for this industry.

| PPIR NAICS CODE | NAICS TITLE |
|---|---|
| 482111 | Line-haul railroads |
| 482111P | Primary services |
| 4821111 | Rail transportation, freight (Carload) |
| 4821112 | Rail transportation, freight (Intermodal) |
| 4821113 | Rail transportation, passenger |
| 482111306 | Coach service class |
| 482111307 | All other service classes |
| 482111SM | Other receipts |

The railroad industry is segmented overall by rail freight and rail passenger transportation services. There are two major market segments on the rail freight side including carload and intermodal transportation, which are primarily distinguished by the number of types of commodities, the mode of transportation and the type of equipment (rolling stock) used in a single transport.

Carload freight moves involve the transportation of one type of commodity utilizing various types of railroad-owned/leased and privately-owned/leased equipment via a single mode of transportation (e.g. rail) from point of origin to point of destination. On the other hand, intermodal freight moves involve the transport of truck trailers and containers containing mixed shipments using two or more modes of transportation including rail plus trucks and/or ocean shipping. Carload and intermodal rail freight traffic and prices are tracked and calculated separately. Intermodal is currently the fastest growing market segment of the industry.

The net transaction prices, i.e., the base freight charge plus any accessorial charges, and surcharges, including fuel surcharges, minus discounts are used to measure the price changes over time for rail freight movements. Taxes and any fees that do not accrue to the producer's revenue are excluded. If a freight move is indirect, i.e., it involves more that one carrier or mode of transportation, we capture only the freight charges of the railroad that we are pricing for that particular freight move.

The price authority document used by the freight railroad companies provides a detailed account of all the base freight charges, surcharges, accessorial and fuel surcharges associated with a specific rail freight move. Typically, there are three types of price authorities, namely: the contract, the quote and the railroad tariff. The contract is a negotiated agreement between the carrier and the shipper, which includes all the terms and conditions of the rail freight movement. Contracts, which are strictly confidential, cover both the shipment of commodities regulated by the U.S. Surface Transportation Board and (exempt) non-regulated commodities. Quotes are pricing documents that cover only non-regulated commodities and they can be issued either as a confidential pricing and shipping agreement or a public pricing document. A tariff (price list) is a pricing document that exclusively covers regulated rail shipments. It includes all the terms and conditions associated with one or more rail freight moves.

The pricing factors, which are normally held constant, include the type of railroad/privately-owned and leased equipment (rolling stock) used in the freight move, the type of commodity shipped, the price authority, the number of carloads, shipment weight (if price determining), the unit of measure, the type of price, points of origin and destination and the route (i.e., direct or indirect). Historically, the price trends for rail freight contract prices and the prices listed in the tariffs do not move in tandem.

Both tariff and contract transaction prices are captured for the PPI for Line-Haul Railroads. For example, if the freight railroad is paid a contract rate for a freight move tracked in the PPI sample, then the contract rate is collected as the transaction price. Similarly, if the freight actually moves under a tariff, then the price listed in the tariff is

collected as the transaction price. Prices listed in the tariff are made available to the public while contracts and some quotes are strictly confidential. Currently, most of the domestic rail freight traffic moves under confidential contracts rather than tariffs.

The ticket price for an adult, one-way fare is used to track the price changes for passenger rail transportation. The pricing factors are the type of rail fare, the type of train, type of travel (i.e., business, leisure, frequent), reservation status; rail fare level (time of travel), point of origin and destination, type of accommodations plus any surcharges minus discounts. Where or how the ticket is purchased is not price determining. Peak and off-peak season pricing greatly affects the price movement. The charges for passenger rail transportation are publicly available in various formats including company brochures, travel agent publications and the internet. However, the transaction prices captured for this industry are collected directly from the passenger rail providers.

## C. Sampling and Weights

A randomized statistical sampling technique, i.e., probability proportional-to-size, was used to select the sample units (railroad companies) and the sample quotes (individual transactions) to be included in the updated PPI for Line-haul Railroads. The first challenge was identifying a useful frame. The frame that was selected included comprehensive and up-to-date employment and revenue data for the universe of railroad companies doing business in the United States. The frame refinement process involved electronically clustering the frame, culling frame units that were out-of-scope or out-of-business and ranking the major producers by either employment or revenue. Clustering was important because multiple frame records with the same name could be combined and sampled as a single unit. This ensured that the subsequent item allocation in the final sample was efficient, minimized reporter burden and ultimately favored a high response rate.

At first, there was an attempt to explicitly stratify the entire frame by revenue but this approach was discarded because some of the revenue variable data was stated in broad ranges for a few of the frame records. Implicit stratification by employment size wasn't feasible either because there was insufficient employment data for some of the railroads. Ultimately, the industry was explicitly stratified by type of railroad class resulting in two stratum; one for Class I railroads and the second for all other line-haul railroads. The Class I railroads were then randomly selected proportional to revenue and the other line-haul railroads were randomly selected based on employment size.

The next challenge was to allocate a representative mix of items for each sampled unit in a highly concentrated industry responsible for thousands of rail freight transactions, which transverse most major industries in the country, and hundreds of rail passenger transactions per month. The quotes were allocated among each sample unit based on revenue size. Because of the number of transactions involved, the item allocation was unusually high.

Normally, the industry weights for the PPI are based on the current made in industry turnover or revenue data published by the U.S. Census Bureau. Historically, the U.S. Census Bureau has never collected employment and revenue information on the domestic railroad industry. Consequently, the weights at the index level were calculated by aggregating the revenue data from various alternate established sources. The distribution of the weights between the freight and passenger cell indexes was based on their relative proportion of the aggregate's derived turnover from alternate sources as well. The turnover for the carload and intermodal cell indexes was calculated from the total freight revenue for each during a specified time period.

**D. Issues in Maintaining Constant Quality**

This industry is highly concentrated and is continuing to experience consolidation. Reporter burden issues arose as a result, which in turn, contributed to some deterioration in the index during the previous samples. A recurring issue is how do we accurately measure or factor out obscure changes in the service prices provided? Quality adjustments in this industry can be elusive since many of the changes in the service costs are blurred, not available or not quantifiable. For example, when the capacity of a freight carload changes or shipments are mixed but the price remains the same, the service is no longer directly comparable. If there is no price change and the service was directly compared, depending on which direction the carload capacity changes, it could create either an upward or downward bias in the index.

Additionally, when there is a change in a pricing factor and a substitute must be obtained, e.g., a freight move is discontinued and a replacement is selected, then the overlap method is used whenever possible. The explicit quality adjustment method is used, when there is a quantifiable change in the price basis such as a change in the unit of measure, from per "car" to per "net ton." If it is not possible to overlap and there is insufficient data for quality adjustment, then a price change is not shown for that item.

**E. Results and Price Measurement Challenges**

Sampling for the unique items to be collected was somewhat cumbersome and time consuming because of the high item allocation, the multiplicity of commodities and the innumerable number of transactions per respondent. An *Industry Specific Disaggregation Worksheet (ISDWS)* was used to spread items (using company-specific revenue weights) between carload, intermodal and passenger transactions. The next sampling step for both carload and intermodal services was to spread the items across the various commodity groups. This comprehensive and exhaustive sampling process resulted in a meaningful index that includes a representative mix of the raw materials and finished products normally shipped by the line-haul railroads.

Standard repricing procedures are used for capturing and tracking the transaction prices on a monthly basis for those regional freight railroads, which specialize in only one or two commodity groups. However the major producers, who are responsible for rail freight traffic in nineteen different commodity groups, presented a challenge in tracking

their base freight and ancillary charges. Subsequently, the measurement of the large volume of month-to-month price changes was facilitated by the use of alternate pricing transmission methods (i.e., via Excel spreadsheets, fax and e-mail) as stipulated by the major railroad companies.

As mentioned previously, confidential contract rates are prevalent in this industry. Probably, the greatest price measurement challenge was convincing the respondents to provide and continuously price confidential contracts and quotes. We have been successful in capturing and tracking the confidential transaction prices in domestic rail freight transportation because of the U.S. BLS' historically strict adherence to and enforcement of the *Confidential Information Protection and Statistical Efficiency Act*. A copy of this Act, which was provided to the respondent prior to data collection, contributed to the respondents' willingness to provide confidential data.

Both railroad freight and passenger transportation prices have been relatively stable over the last ten years with the fastest growth in prices occurring since 2003 in the railroad freight segment. There are several factors that have contributed to the increasing pricing power of the domestic freight railroads including: (1) partial deregulation of the industry, which limited the regulation of railroad rates; (2) the mergers and acquisitions of the Class I railroads during the 1990s, which provided some freight railroads monopolistic power in non-competitive lanes; (3) continuous innovations and capital investments, which are increasing efficiencies and improving rail services across market segments; (4) increased demand for intermodal transportation; (5), the ability to pass on the increased cost of diesel fuel and other surcharges to their customers; and (6) a robust economy.

The following graph illustrates the average annual price changes in this industry as reflected in the BLS Producer Price Index for the ten year period between 1995 and 2004. It indicates that the aggregate index increased on average one percent per year between 1995 through 2002. However, the index increased on average 4.2 percent between 2003 and 2004 driven primarily by the increased demand for rail freight transportation. The intermodal cell index increased on average 1.0 percent between 1997 and 2004 while passenger rail transportation appreciated on average 1.3 percent during this same period.




Series ID: PCU 482111
Not seasonally adjusted
Industry: Line-haul railroads
Base Date: December 1984
Source: United States Bureau of Labor Statistics, Washington DC, USA

# EXHIBIT PX0571

NewsRoom

10/27/05 Fin. Disclosure Wire 13:45:00

FD Wire
Copyright © 2005 CCBN, Inc. and FDCH e-Media, Inc.

October 27, 2005

Q3 2005 **Union Pacific Earnings Conference Call** - Final

OPERATOR: Thank you for your patience. Good morning ladies andgentlemen. Welcome to the **Union Pacific** third quarter **earningsconference call**. At this time all participants are in a listen-onlymode. A brief question and answer session will follow the formalpresentation. [Operator Instructions] As a reminder this conferenceis being recorded. It is now my pleasure to introduce your host, Mr.Dick Davidson, Chairman and CEO of **Union Pacific**. Thank you, Mr.Davidson, you may begin.

RICHARD DAVIDSON, CHAIRMAN & CEO, **UNION PACIFIC**: Thank you, Dan. Goodmorning and welcome to our third quarter **earnings conference call**.Here this morning are Jim Young, our President and Rob Knight, ourChief Financial Officer. Rob is here to discuss our financialperformance and Jim will provide an update on our network operationsas well as review our major business segments. After their remarks Iwill wrap up the program with our fourth quarter outlook and thentake your questions.

Looking back at the third quarter of 2005, we certainly faced somechallenges from extremely high fuel prices and hurricanes toconstrained loadings off southern Powder River Basin joint line.Fortunately, we also had opportunities in the quarter to move morefreight, improve our yields and reduce some of our failure costs.

For the quarter we're reporting earnings per share of $1.38. The$1.38 includes $0.44 per share for the tax reduction that weannounced a few weeks ago. Excluding that amount, our earnings wouldhave increased 22% to $0.94 versus $0.77 per share that we reportedlast year. That's a solid increase even in the face of the quarter'smany challenges.

The primary driver of our quarterly earnings growth was record thirdquarter revenue at $3.5 billion. Demand for rail service remains verystrong, creating an environment for solid yield improvement. Inaddition, fuel surcharges and volume growth which, as I mentioned,was con trained by the hurricanes contributed to the 13% quarterlyrevenue increase.

We converted this double digit revenue growth into a 15% increase inoperating income to $481 million. Growth in operating income can bedirectly correlated to improvements in operating efficiency. We areseeing gains although other factors combine to offset some of thatprogress.

Record diesel fuel prices were a rising head wind during the quarter.Costing us an average of $1.88 per gallon fortunately that's a 50%increase over last year's quarterly price of $1.25 per gallon and$0.08 a gallon above the high-end of our expected third quarter fuelprice range. Fuel surcharge programs have clearly reduced theearnings impact associated with the spike in fuel prices. Even withthe surcharges, our net fuel expense exceeded our benchmark costs bymore than $110 million.

With high diesel fuel prices continue to go impact our earnings, wehave an absolute mandate with our fuel surcharge program to take thathigher cost out of the equation as existing contracts are renewed.Quarterly earnings gains were also limited by the

two hurricanes thathammered the Gulf Coast region in August and September. Thankfully,our rail system escaped the Brunt of Hurricane Katrina's furry whichadded only $3 million to our quarterly operating costs.

Hurricane Rita, though, had a much bigger role in our quarterlyresults reducing operating income by roughly $28 million primarily inthe form of lost or hopefully deferred revenue. On a more personalnote, many of our employees in the region lost their homes andpersonal belongings. We've been working closely with these folks tohelp them get back to their feet and return to work as quickly asthey're able.

Although Rita's landfall occurred further east than originallypredicted, several days of car loadings in and around the Houstonarea were lost due to shut downs and embargoes. About two days beforethe landfall we, and more than 150 of our customers, began shuttingdown operations over roughly a 2500-mile territory in anticipation ofthe storm. Our rail system was again spared significant structuraldamage but the hurricane wiped out commercial electrical power acrosslarge parts of southeast Texas and western Louisiana.

After clearing more than 5,000 trees from our tracks and installinghundreds of portable generators, we were able to restore operationsacross the entire region within four days. We were left with littleopportunity, however, to make up lost business at the end of thequarter. Particularly since many of our customer facilities remainclosed. Even today a number of our customers in the region are stillnot operational and several have just recently restarted production.

Now, Jim will provide for details on this in a moment. ClearlyHurricane Rita left her mark on the quarter. Let me say, however,that I am pleased by the way our employees rose to the challenge ofgetting ready in advance of the storm and then restarting ourrailroad following the hurricanes as well as the other adverseweather conditions that we faced this year.

With each attack by mother nature, we quickly restored service to ourcustomers and continued the vital work of moving this nation'sfreight. With that let me turn it over to Rob to take you through thethird quarter financials. Rob.

ROBERT KNIGHT, JR., EVP OF FINANCE & CFO, **UNION PACIFIC**: Thanks,Dick, and good morning. I'll start off today by looking at somedetail behind our reported earnings per share. On the left side ofthe slide, we show last year's third quarter earnings of $0.77 pershare. The net impact of our business growth added $0.32 per share,but as Dick mentioned, fuel prices also came in above our originalestimate costing us about $0.08 per share.

Two hurricanes, primarily Rita, subtracted another $0.07 per sharefrom our earnings. If you add these numbers across from left toright, they total the $0.94 per share. Our reported GAAP earningswere $1.38 per share, which as Dick mentioned, includes the one timeincome tax reduction of $0.44.

Let's look more closely at the key drivers behind the results. Orcommodity revenue grew 12% in the quarter to a record $3.3 billionwith only 1% volume growth in the quarter, the driver was the 11%increase in average revenue per car. The components of the increasewere pretty evenly split between yield improvement and fuel recovery.Average revenue per car increased solidly across all six of ourcommodity groups ranging from 6% at the low end to 19% at thehigh-end.

The third quarter was our best ever quarterly average revenue per carat $1,357 per car. Jim will give more details on individual businesssegments, but the quarterly yield gains were a real positive storyfor us.

Turning to operating expense we had a 12% increase to just under $3billion for the quarter. As you can see, salary and benefits isclearly the largest piece of our expense pie at 37%. Fuel and utilityexpense is the fastest growing up 47% in the quarter. A few years agobefore fuel prices climbed to today's record levels, fuel andutilities made up only about 12% of our total operating expensecompared to the 22% today.

Let's take a few minutes to look at the did I tail in a couple ofthese expense categories. Starting out with salary and benefits,expenses were up 3% in the quarter on a 1% increase in work forcelevels consistent with our quarterly guidance. Wage inflation, volumeincreases, and higher work force levels were the main drivers of theincreased expense.

As you might recall, last year we paid $7 million for severance costsrelated to our headquarters consolidation. Better crew utilizationand lower training costs in the quarter also helped offset some ofthe cost pressures in this category. We would expect fourth quartersalaries and benefit expense to roughly equal third quarter levels asproductivity gains should offset inflation in higher crew costs.Consistent with previous guidance, we would expect our full year workforce levels to average about 2% higher than 2004 levels. The largerwork force is due in part, to second half hiring in advance ofanticipated 2006 volumes and attrition.

Turning now to the equipment and other rent line this category wasbasically flat year-over-year increasing just $2 million in the thirdquarter. We offset higher long-term locomotive lease payments withbetter car cycle productivity. This expense category also benefitedfrom fewer short-term locomotive leases and lower rental expenseassociated with the consolidation of office space into our newheadquarters. For the fourth quarter we would expect expenses to beroughly in line with third quarter levels in the 350 to $360 millionrange. Long-term locomotive leases and volume costs associated withthe intermodal peak season are expected to be higher year-over-year.We should however be able to offset some of these increases throughbetter car cycle times and fewer short-term locomotive leases.

Turning now to fuel, we continue to see a steady climb in quarterlydiesel fuel prices. As this chart illustrates, throughout last yearwe experienced more than 40% increase in diesel fuel prices.Unfortunately this trend is repeating itself as we are seeing another40% plus price increase in 2005. Year-over-year high fuel pricesadded $210 million to our third quarter costs. Even factoring ingreater fuel surcharge recovery, these prices reduced our quarterlyearnings by $0.08 per share.

Although we did improve our fuel recovery in the quarter, we onlyrecovered 70% of the costs above our benchmark rate. Said anotherway, if surcharges had recovered 100% of the higher costs above ourbenchmark, our operating income would have been $110 million higherthan it was. As we said before, our fuel surcharge programs haveroughly a two month lag. When fuel prices spike as they did followingHurricane Katrina, we can experience a disproportionate quarterlyearnings impact.

In addition to the lag, our cost recovery is also impacted by higherrefining spreads which are at unprecedented levels today. Currently,however, only about half of our surcharge programs cover the risingspreads. Looking at the bars on chart we see crude oil prices inorange. Refining spreads in blue and regional spreads and taxes ingreen. Between July and October, crude prices have been relativelyconstant averaging a little more than $60 per barrel and back in Julybefore the hurricanes and refining outages, we were paying $1.75 pergallon for diesel. But if you fast forward to October, refiningspreads are now at historic high levels and a delivered price ofdiesel fuel has risen to nearly $2.30 per gallon.

As Dick mentioned, high diesel fuel prices continue to negativelyimpact earnings. Our objective is to continue to put fuel surchargeson all of our business allowing us to recovery 100% of our costsabove the benchmark rate. For purchase services and other, we had a$36 million increase to $424 million. As I mentioned in July, we hada $25 million headwind in this category due to a couple of favorableitems last year.

This year on top of the headwind, we also had cost increases due tohigher volume and the effect of the hurricanes. The good news is wewere able to offset some of these higher expenses through failurecost reductions, lower joint facility costs, and fewer relocationpayments.

Looking ahead to the fourth quarter, you'll remember that last yearwe recorded a $247 million non-cash asbestos charge. On ayear-over-year basis a more comparable starting point is $440million. From that base, we expect a 1 to 2% cost increase dueprimarily to higher contract maintenance.

Looking at a summarized income statement for the quarter, totaloperating income was up 15% to $481 million. While we are clearly notsatisfied with this level of earnings, we are pleased to reportrevenues growing at a faster rate than expenses. Along with thegrowth in operating income, we had a slight improvement in our thirdquarter operating ratio, clearly this is a higher ratio than where wewant to be but we're moving in the right direction.

In fact, this slide takes our reported operating ratio shown on theleft in 2004 and 2005, and adjusts it for fuel shown on the right.You can see that since the first quarter we started to achieve realimprovement in our core operations, roughly two percentage pointsbetter year-over-year in the third quarter. This analysis does notmake any adjustments for the hurricanes or other quarterly ins andouts. It simply neutralizes the impact of fuel by adjusting dieselfuel prices to our benchmark price and eliminating fuel surchargerevenue altogether.

Looking ahead to the fourth quarter you'll remember last your ourreporting operating ratio was affected by the asbestos charge I justmentioned. Excluding that charge last year's operating ratio was 86%.For 2005 we expect an operating ratio around that same level. In thefourth quarter we would expect on a fuel adjusted basis to again seereal improvement in our core operating ratio.

Let's wrap up our third quarter discussion with a look at the fullincome statement. Other income increased by $12 million in thequarter to $42 million. This brings year-to-date other income up to$91 million and tracking above our full year guidance of 100 million.The real estate market has stayed strong in 2005 and we would nowexpect full year other income to be closer to $140 million.

Interest expense was down $8 million in the quarter to $124 million.This decline was driven by lower debt levels averaging 7.6 billion inthe third quarter of '05 versus 8.2 billion a year ago.

Income tax expense was only $30 million in the quarter versus $114million a year ago. Although our earnings were higher, the one timeincome tax reduction we announced a few weeks ago resulted in theyear-over-year decrease. Without the tax item, our third quarterincome tax rate would have been just over 37% compared with 36% ratein 2004.

We also expect a 37% tax rate in the fourth quarter. This all adds upto net income of $369 million or quarterly earnings per share of$1.38. That includes the $0.44 per share related to the one timereduction. Excluding the income tax item earnings would have been$0.94 per share versus $0.77 per share a year ago. A 22% increase. Weexperienced solid quarterly earnings growth despite the challenges ofhurricanes and high fuel prices.

Looking ahead to the end of the year, I would like to give you aquick update on our outlook for cash capital spending and free cashflow after dividends. From a capital standpoint, we are trackingslightly ahead of our $2.1 billion cash capital guidance. We wouldnow anticipate spending in the 2.15 to $2.2 billion range.

Through the course of the year we encountered several challenges thathave pressured our capital budget, events such as the hurricanes,wash outs and added southern Powder River Basin joint linemaintenance have each required extra capital work that was notoriginally anticipated. We could have cut spending in other areas butwe decided not to delay critical capital programs that we have underway.

You'll recall from earlier this year there will be some insurancedollars coming in related to the January west coast storm, but thetiming of any recovery is uncertain and may not occur until nextyear. Higher cash capital spending obviously impacts cash flows. Inaddition to the cash capital spending, the impact of weather eventsand higher diesel fuel prices has reduced our earnings somewhat.Therefore, free cash flow after dividends will likely be in the 200million to $250 million range. There is still two months left in theyear and our performance over that time will ultimately determinewhere these numbers actually come out.

Finally, just a quick look at our balance sheet. Through the end ofthe third quarter our least adjusted debt to cap ratio is showingslight improvement. Looking ahead to the December we expect tomaintain and perhaps improve somewhat our balance sheet strengthdespite some of the challenges we faced in 2005.

With that, I will turn it over to Jim.

JAMES YOUNG, PRESIDENT & COO, **UNION PACIFIC**: Thanks, Rob, and goodmorning, everyone. Let's start out today with a look at our quarterlyrevenue by business group. Ag products recorded its best everquarterly revenue converting a 7% volume increase into 27% revenuegrowth.

In addition to strong yield improvement, growth was driven by a 50%increase in revenues to and from Mexico. Ethanol revenues were alsoup 54% on a 22% increase in car loads. In addition, shipments ofwheat and food grains through the Gulf were up 7% year-over-year.Looking to the fourth quarter we're in the midst of the grain harvestand and we see strong demand continuing in this category.

Industrial products also had its best ever quarterly revenue up 16%on 2% fewer car loads. Impacted somewhat by the hurricanes, thisgroup had solid demand which enabled double digit yield improvement.Car loads of aggregates grew 11% in the quarter due to strong demandin Texas, Arkansas and Louisiana.

In addition, we saw strong demand for construction materials such aslumber and steel which is expected to continue in the fourth quarter.Along with best ever quarterly revenue, our intermodal group also hadrecord quarterly loadings.

In fact, August was our best month for intermodal loads in thequarter international volume continued its trend of double digitvolume increases for the year while domestic units were basicallyflat. Yields improved 6% in the quarter in part due to increased fuelsurcharges but clearly we have future upside in this area ascontracts expire. For the fourth quarter we would expect a strongfinish to peak season.

Although this segment was mostly impacted by Gulf Coast hurricanes,our chemicals business recorded its best ever quarterly revenue up 9%on 4% fewer car loads. To give you a feel for how Hurricane Ritaimpacted us, our September car loads had been tracking up 1%, butfinished the month down 8%. As it did in the first half of the year,demand for fertilizer continued strong in the quarter and ourchemical yields benefited from fewer shorter haul loads.

Solid demand is expected to continue in the fourth quarter butproduction is still impacted by the lingering effects of HurricaneRita. As of today we still have roughly 20 or so plants that have notresumed full production. Despite continued issues in the southernPowder River Basin energy posted its best third quarter revenue.Demand clearly exceeded supply as car loads were down 3% in thequarter but higher yields drove a 4% revenue increase similar tointermodal, we have a number of long-term energy contracts that arenot priced to market today and have good opportunity next year.

In addition to strong demand for Wyoming coal, demand is also verystrong for coal out of our Colorado and Utah franchise. Revenue grew12% to $167 million for the third quarter. Before I move onto autos,let me talk in a little more detail about the southern Powder RiverBasin.

We moved an average of 32.7 trains per day out of the basin in thethird quarter meeting roughly 87% of our customers demand. This isdown from a year ago, but up a train and a half from the secondquarter. We have been able to meet 100% of demand in this quarter wehave have loaded about 340 additional coal trains. A variety offactors caused loadings opportunities to be miss and had when youlook at the supply chain, mines, railroads and utilities, all of usshare some part of the responsibility for the misses, so we must allwork together to be part of the solution as well.

Starting out the fourth quarter, coal loadings have impacted -- havebeen impacted by the Kansas wash outs. In October we likely willaverage about 30 trains per day, the fewest loadings since the Mayjoint line derailment. For the balance of the quarter we look toaverage between 32 and 33 trains per day with some potential upside.

Our overriding goal is to do everything we can to sea the demands ofour customers and in 2005 alone we invested more than 50 million toincrease the capacity of our coal franchise. We also continue to workwith the BNSF to minimize the joint line maintenance impact onloadings.

In fact, the joint line maintenance plan has been revised recently toprovide additional loadings through the balance of the year. At thispoint with this means for 2006 maintenance and loadings is somewhatunclear, but we will continue to work with all members of the supplychain to optimized loadings in a safe, efficient manner.

To wrap up the commodity groups, we had a 4% revenue growth and 5%fewer car loadings in our auto group, third quarter best. Bothfinished vehicles and auto parts shipments were down in the quarterdue to lower vehicle production. In addition, shipments of auto partsto and from Mexico declined as productions south of the border wasalso lower.

Yield and fuel surcharge increases produced revenue growth. Overtime,this group also has a we will see a better yield as long-termcontracts expire. Our fourth quarter expectation is for continuedsoftness in this category due to lower finished vehicle production.

Turning now to operations, the slide lays out network velocityagainst the background -- backdrop of our seven day car loadings. Ournetwork management initiatives are having a positive affect onoperations we moved our highest seven-day car load volume, just under198,000 cars a week, in the second week of September. What I ampleased with is this was the same week the velocity hit its highestpoint in nearly a year.

A week later however, we had to shut down operations in Texas inpreparation for Hurricane Rita. Just as we were recovering from thatset back, our four main lines around the Topeka, Kansas area werewashed out by a very severe storm that dumped between 10 and 12"of rain over several hours. These are major corridors for UP servingas the primary correction to the east and south from the western partof our system.

As you seen in the weekly metrics and volumes the operating challengths resulted in a slower start to the fourth quarter. We didhowever, see nearly a half a mile per hour velocity gain and a 3%increase in car loadings last week. Importantly, we still expect tosee year-over-year operating improvements in the fourth quarter.

In July I mentioned that improvements in our Houston and Los Angelesterminals were critical to increasing our overall network velocity.We had been making progress in Houston prior to Hurricane Rita, butthat obviously set us back some. This slide shows the progress wemade in the Los Angeles area.

During the quarter we increased velocity by more than 30%, reducedterminal dwell at west Colton by 30% and completed the cutover of ourUnified Plan intermodal changes significantly increasing our ICTFfacility volumes. With peak season intermodal volumes running atrecord levels, we still have work ahead of us. This demonstrates weare focused on the right things to improve railroad operations.

We talked in the past about productivity and the need to producerevenue growth from existing assets. With freight cars, carutilization measures the loaded cycle time of a car. Lowerutilization times equate to more revenue per car loads per car. Carutilization is also a measure very visible to our customers. In theface of record volumes and hurricanes, we improve freight carutilization by 6% year-over-year. Again, we believe this is apositive sign of our operating progress.

Beyond our own methods for measuring operational efficiency theultimate measure is in the eyes of our customers. To assess how ourcustomers view our performance, we conduct monthly surveys of 200customers pulling the same group of customers in the same month eachyear. Beginning this summer, we started to see some improvementclearly our mark of 70 in September is well above last year's ratingbut still a long way off our best year of 78. We're certainly notdeclaring victory here, but it is encouraging since one of thequestions asked on the survey is about the value paid for the servicereceived.

Although we have been -- have seen improvement from the Unified Planand other network management initiatives, we clearly have more workin front of us. The final piece of Phase I of the Unified PlanChicago Intermodal Changes was completed in August. Phase II whichfocuses more on terminals and gateways is now under way. The goal ofPhase II is to create capacity through further networksimplification, reduce car and train handlings and morepoint-to-point trains.

Phase II also focuses on improving the process of matching ourtransportation plan to our marketing forecast and allocating assetsto maximize network velocity. We will also continue to implement leaninitiatives in the terminals, lean processes can help us createcapacity as we remove process bottlenecks and improve terminalfluidity.

The roll out of our new customer inventory management systems isongoing. As we discussed at our May analyst meetings, SIMS is acritical tool that we're using with our customers to pro activelymanage inventory. The process is cut over in Phoenix, Los Angeles,Las Vegas, and San Antonio with roll outs in Houston and Rosevillecurrently scheduled by year end.

Although it is early yet and we're still finalizing our plan for nextyear, I thought I would share some of our assumptions as we lookahead. First, we see demand continue to go out strip supply creatingcontinued yield opportunities. In fact, next year we have asubstantial number of long-term contracts available to reprice tomarket rates as well as add a full fuel surcharge recovery. We alsobelieve fuel prices are likely to remain high next year, but again wehave an opportunity here to further expand our surcharge coverage ascontracts renew.

The biggest opportunity we have is to improve productivity andtherefore improve our profitability by taking more of our strongrevenue growth to the bottom line. A key part of our focus here is inwork force productivity. We caught up on the hiring over the pastcouple of years and the future we're only hire as needed forattrition and growth.

We will continue to only make capital investments supported byreturns that significantly exceed our cost to capital. Theseinvestments provide an opportunity for us as we target productivitygains in business growth, particularly in our intermodal and energygroups.

At the end of the day, all the actions will result in a moresatisfied customer base. We believe we are taking the right steps toimprove our operations, improve our financial returns and provide avaluable service for our customers.

With that, I will turn it back over to Dick.

RICHARD DAVIDSON: Thank you. Looking to 2006 we clearly have somegreat opportunities in front of us especially the opportunity toimprove our returns and deliver better service for our customers. AsJim mentioned earlier, our operating folks took a 1-2 punch a coupleof weeks ago when the storm in Kansas dumped 10 to 12" of rainin a short period of time which was just after the Hurricane Rita hitthe Gulf Coast. I have often said that operating a railroad with33,000 miles is like long factory with no roof on it. With all of theattention that we've gotten from mother nature this year, it hasreally been brought home how true that is.

Wash outs in Kansas have clearly impacted our business levels inOctober. During the first two weeks of the month, car loads haveaveraged about 5% below forecast due to the directly due to the washouts. At this point we estimate that the Kansas wash outs could costus a nickel or so in the fourth quarter. Because that storm occurredat the very beginning of the quarter, we may have an opportunity tomake up some of the missed loadings, though this will clearly be achallenge in the face of peak season.

Additional fourth quarter drivers will include the amount of time ittakes for some of our Gulf Coast customers to reopen their productionfacilities following Hurricane Rita, and the direction of fuel priceswhich are likely to be a challenge again this quarter. One clearpositive is the continuing strong demand for our service. Ourcustomers want to do more business with us and we're working hard toprofitably accommodate their needs.

With all of that in mind, we are expecting to see fourth quarterrevenue growth in the 11 to 12% range. At that level, our full yearrevenue growth would also be about 11 or 12%. Fourth quarter dieselfuel prices are expected to range between 210 and 2.15 per gallon. AsRob showed you earlier, we're currently paying closer to 2.30 pergallon for our fuel.

The fourth quarter guidance has some risk if diesel fuel prices don'tmoderate the way that gasoline prices have. At the 2.10 to 2.15 pergallon level, our full year average fuel price for '05 would be about$1.80. That's 50% more than last year's record prices. Despite thefuel surcharge programs high diesel fuel prices remain a huge costinflate or. We won't rest until we have full coverage in place.

Taken together, we currently expect our fourth quarter earnings to bein the $0.95 to $1 per share range. This would bring full yearearnings excluding the tax item to the 3.25 to 3.30 per share range.

On a full year basis as Rob said, we're bumping up our cash capitalestimate and adjusting our free cash flow projections. Looking at theoverall state of the railroad today, we believe we should see bothfinancial and operational improvements in the fourth quarter despitethe slow start in October. As Jim showed you, we're already seeinggradual improvement.

Importantly, we believe our network is more resilient than it was ayear ago. Today our railroad is better resourced in terms of crewsand locomotives forming a solid foundation upon which we have beenimplementing the Unified Plan. Although record volumes will challengeour improvement efforts this quarter, we're dedicated to the task andtruly believe we're making progress. Our goal is to be a companywhere three stake holders, customers, employees and shareholders, areall benefiting from efficient operations, a safe working environmentand rates of return that exceed our cost of capital.

RICHARD DAVIDSON: With that, let's open it up for any questions thatyou might have.

OPERATOR: [OPERATOR INSTRUCTIONS] Our first question is from ScottFlower of Citigroup. Please proceed with your question.

SCOTT FLOWER, ANALYST, CITIGROUP: Good morning all. I wonder and Iknow you talked about it but I want to get some numbers around it.The fuel surcharge coverage issue, where are you, what proportion areyou covered now and I know that may be in different forms, RCAFversus different fuel surcharge, and given some of the opportunities,what is realistic as a percentage of your book-to-business that youthink may be covered by next year? I am trying to get a sense ofwhere you are now and where you think that can move to as we look at'06.

ROBERT KNIGHT, JR.: Scott, this is Rob. The coverage ratio if youinclude as you asked RCAF, is close to 90% of our revenue is touchedwith some sort of fuel surcharge recovery or another. As we indicatedin the numbers here, we're recovering only 70% above the benchmarkrate. What it implies is not only do we have 10% of the revenueuncovered, but the 90% that's covered isn't doing its job of covering100% of the costs.

We will make progress on that. I can't give you an absolute number.As each contract becomes available for us to re look at, we areeither putting a surcharge in if it doesn't have one or strengtheningit if it doesn't have a good enough one that gets full recovery.

SCOTT FLOWER: The potential improvement going to be from upgrade infuel surcharges in terms of what may already be covered but having abetter fuller coverage versus actually increasing the number ofcontracts that have some mechanism?

JAMES YOUNG: Scott, this is Jim. It is really a combination of both.You heard me mention that we've got next year about 15% of revenue,10 to 15% rolls over on the contract side, you know, both of thoseinclude we're going a lot of our contracts have fuel recoverymechanisms but we need to upgrade those. Our goal is 100% when youget long-term here. We made good progress every year. We willcontinue to make progress going forward.

SCOTT FLOWER: And then just a couple other ones. I know that it ishard to look at your data particularly because of the hurricaneimpact, but if I look at industrial and there may have been someimpact, and this is true across the industry, everybody's manifestbusiness is down this quarter and I keep hearing everyone saying howgood demand it is.

And I guess one of the questions I got is, where are we in terms ofbalancing price versus volume growth or the manifest business just abusiness that needs to shrink relative to getting yields up toadequate levels because every railroad is talking about how demand isgood yet everybody's manifest or industrial business is down and I'mjust wondering where are we in terms of balancing pricing versuswhere you want volume growth? I assume as one point you want abalance between the two.

RICHARD DAVIDSON: Jim?

JAMES YOUNG: Scott, we take a hard look at our total manifestnetwork. And as you know, we're the largest manifest railroad. Webelieve absolutely it is a great franchise for us. We are looking atwhat makes sense in our network, pricing is a big component ofgetting the returns up in this business. Look willing at fluidity.How it impacts network is important. The reinvestability in thebusiness.

We have lost some business in terms of pricing, but the demand isstill there. When we sit with our customers, so right now overall theeconomy still seems to be holding when we're talking with ourcustomers in the industrial sector. If the returns don't get to thepoint we need them, we're not going to handle the business. What weare really working on here is what makes most sense for us goingforward.

RICHARD DAVIDSON: I think, though, too, Jim, to address the thirdquarter specifically with what happened with industrial products inhurricane Rita had a huge negative impact on our aggregate businessin Texas as an example, because it essentially shut it down for thelast week and that's a business that runs about 1,000 cars a day, soit just had an enormous impact. As Jim said, our demand is justcouldn't be stronger.

SCOTT FLOWER: Then just a couple of other quick ones. One is is thereany potential insurance recovery from Rita? I know you talked aboutthe west coast storms earlier this year. Some level of insurancecoverage that at some juncture, whether in '06 or otherwise, may cometo you.

ROBERT KNIGHT, JR.: Scott, probably not at this level. That'ssomething we keep a very close eye on.

SCOTT FLOWER: Okay. Last quick question was on CapEx you noted thatyou're spending the money despite some of the short-term impacts.What do you think the shorter term weather impacts or otherwise,whether it's PRB or the west coast storms or Rita, have added to theCapEx budget this year versus what you would've assumed baselinewould have been this year?

ROBERT KNIGHT, JR.: Scott, that's the it's in the range of thatadditional guidance that we gave.

SCOTT FLOWER: Just refresh me. I looked at the chart and was it 100to 150 million.

RICHARD DAVIDSON: No, 50 to 100.

SCOTT FLOWER: Thanks. I will let someone else have at it.

RICHARD DAVIDSON: Okay.

OPERATOR: Our next question is coming from Jim Valentine of MorganStanley. Please proceed with your question.

JAMES VALENTINE, ANALYST, MORGAN STANLEY: Great. Thanks. Goodmorning.

RICHARD DAVIDSON: Good morning, Jim.

JAMES VALENTINE: It may be a little early in the process here. How doyou know if the Unified Plan is working or not? Did anything comeduring the quarter that where you could look at tangible savings andare you at a point now you can start to feel like you can see thetrajectory, the slope of the line going forward on the cost benefits?

RICHARD DAVIDSON: Jim, do you want to?

JAMES YOUNG: I will take a shot at that one, Jim. There are a lot ofdifferent measures you look at. There is no home run here. It is goodsteady progress. I will give you an example. The chart I had there onrecord loadings where we also hit our highest velocity level in ayear. I would attribute that to the things we've been doing onUnified Plan, particularly intermodal network and a lot of the leaninitiatives. You look at things like the car cycle time, utilizationtime, again, with record volumes, with the weather issues we've dealtwith, we still improved that. Not where we need to be.

If you look at the cost area when I sit back and look at it in year,we can point to things like training. We know our training numbersare in terms of number of employees a year ago we were -- about 2300TNY folks in training this quarter we had about 1500. Our trainingcosts have moved down. Part that is catch up, part of that is beinghealthier.

Your velocity numbers when we look at things like our terminal dwelltimes that come into play there, you can see that in again car cycletime was one and car hire and also things like our limos that arereoccur rates, equipment utilization, part of the progress obviouslyis masked with what's happened with the network. When we sort throughit, it is definitely there. And our ability to even recover quicker.When you're healthier with crews and power, we do get hit externally.It is going to snow this winter. We see our ability to recover asmuch better.

JAMES VALENTINE: Okay. Great. I asked two questions on coal. Thefirst one that Burlington Northern beliefs there is about 50 to 75million tons of incremental demands in the PRB for '06 and theyexpect to get about 25 million tons of this. I think they're being abit conservative or realistic given all that's going on out therewith both the railroads and the mines. Is UP prepared to pick up 25million tons? Do you think you could do above or below that number?

JAMES YOUNG: Jim, I'm not going to give you any specific numbershere. I will tell you the demand is very strong going forward here.We are working with -- on our network in terms of what do we need todo to handle it, a wild card is what will happen on the maintenanceup here in the joint line. Again we're working with BurlingtonNorthern and our customers. We've got some great opportunities fornext year.

JAMES VALENTINE: Okay. Good. Last question is also on coal. It is ourunderstanding the Kansas City Power and Light right now they're indispute with UP and I wouldn't expect you to get into the details ofthat. I understand it is sensitive for the Montrose plant. They'resuggesting the rate will go up almost 40% for their coaltransportation. I am asking the question more to say is a 40%increase for a plant, that indicative of the types of increases yousee are necessary out there to get transportation rates up to marketlevels for some of your contracts?

RICHARD DAVIDSON: I don't think it would be appropriate to discusswhat we're doing with our customers, Jim. Jim, do you see that?

JAMES YOUNG: We're not going to comment on the rate. What's importanthere in my mind we've got to get the return up in the coal business.If we're going to look at capacity and investment going forward andthe kind of capital that's needed, they absolutely have to go up andthey have to go up in my mind pretty substantially.

JAMES VALENTINE: Okay. Great. Thanks, guys.

OPERATOR: Our next question is coming from Jason Seidl of CreditSuisse First Boston. Please proceed with your question.

JASON SEIDL, ANALYST, CREDIT SUISSE FIRST BOSTON: Good morning,gentlemen.

RICHARD DAVIDSON: Good morning, Jason.

JASON SEIDL: A couple quick ones here if we can. What I am looking atthe quarter, when I am looking at the arc here on chemicals, that wasup about 14%, a lot hire than we expected. Anything specific going onthere?

ROBERT KNIGHT, JR.: Well, there is a couple of things. We are startto go get some fuel recovery in net fuel charge recovery, internetbusiness. We do have contracts that have rolled off so core pricingis starting to move up. You did have a little bit of positive becauseof less business going into STS this quarter, that's short-termstorage, and more of it going direct to producers. You know, it isthe market, the demand has been pretty strong there. I think that'san indication of what the potential is here pricing wise as we youtest the market.

JASON SEIDL: So as we model out going forward we should expect doubledigit gains in the ark.

ROBERT KNIGHT, JR.: It all depends on market demand. There are a lotof factors that come into play. If the demand stays very strong we'vegot good upside.

JASON SEIDL: And I understand you guys have been hit by mother naturepretty hard with a couple of body blows but if we can look at 2006,should we expect pretty much everything to be back up and running andmaybe get a little recovery freight?

RICHARD DAVIDSON: I think that's a fair statement depending onceagain, winter comes every year and you have hurricanes and unusualevents, but this year we've had more than we've ever experiencedbefore in history in a compressed period of time, but we do look forthe railroad to recover here in the fourth quarter, and you know, ifall things being equal, we ought to look for continuous improvementnext year.

JASON SEIDL: Okay. One more and I will let somebody else have at it.You mention that about 10 to 15% business is going to roll over in'06 but it sounds like there is a disproportional amount inintermodal and coal as well. Could you give us sort of a break downwhat percent of rolls over in each?

JAMES YOUNG: You know, I don't have the specific numbers. My pointwhen you look at it, you have energy is obviously where you have yourgreatest concentration of coal contracts, but it's also I look at theyields. You have intermodal, energy and auto, auto is also 90+% ofthat is in contracts. Those are the three areas that will have goodopportunities next year.

JASON SEIDL: Okay. Fair enough. Thanks, gentlemen.

RICHARD DAVIDSON: Thank you.

OPERATOR: Our next question is coming from Tom Wadewitz of J.P.Morgan. Please proceed with your question.

THOMAS WADEWITZ, ANALYST, J.P.MORGAN: Good morning. Two questions foryou. On the track capacity side, it seems to me like that's probablystill the area where the biggest constraint and I am wonderingwhether you think that's going to be a constraint looking to 2006 orwhether you think that if you get modest improvement in velocity thatwill no longer be an issue for you and you will be able to growwhatever a couple of percent on the unit side?

RICHARD DAVIDSON: Jim, do you want.

JAMES YOUNG: I will take that one. I don't see the capacity challengegoing away in the near term because demand is so strong. What'simportant for us is to look at how you manage the capacity which is acombination of putting capital in the right places if the returns arethere, the network initiatives we have going on operationally andmanaging flows. The last two are not capital solutions. They'reprocess solutions. I don't see again if you assume the economy isgoing to stay relatively strong next year, the whole industry haschallenges here as we're going forward.

RICHARD DAVIDSON: I think that's exactly right. This is Davidson. Icouldn't agree with more with what Jim said. We'll still be facingreal challenges.

THOMAS WADEWITZ: So with that in mind, what Duke is a realisticnumber if the demand was there? I know you have quite a bit of pentup coal demand, intermodal secular growth trend provides support. Isthere track capacity available to grow total units in the mid-singledigits or is that really not possible given some of the constraintsyou have, should is be more like a 1 to 2% number all in given whereyou're at on track capacity?

JAMES YOUNG: Tom, I think it is early for us to give you a number onvolume here. The commodities are substantial and I want to focus onthe financial returns and yield necklace terms of moving forward, andproductivity in terms of the network here.

THOMAS WADEWITZ: Okay. And then just I think two kind of technicalones for Rob. On the other income that's coming in a bit strongerthan you expected, did I understand it right 49 million of otherincome on fourth quarter and then on fuel surcharges, I don't know ifyou gave us the actual surcharge collection this quarter or not?

ROBERT KNIGHT, JR.: The other income, yes, we gave guidance of 140for the year and that implies a strong fourth quarter in that 40 plusrange for the fourth quarter, Tom. On the fuel recovery, I didn'tgive a number. I gave the 70% above the benchmark rate. Had werecovered 100% it would have added another 110 million or so to ourearnings.

JAMES YOUNG: There is a lag. We're continuing to chase that fuel aswe go up, so it potentially still is a negative if it keeps runningup.

THOMAS WADEWITZ: Is that, can you give us a sense of what that numbermight have been year-over-year?

ROBERT KNIGHT, JR.: No. I really can't, Tom.

THOMAS WADEWITZ: Okay. Fair enough. Thank you for the time.

OPERATOR: Our next question is coming from John Barnes of BB&TCapital Markets. Please proceed with your question.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Good morning, guys. Asyou look out into 2006, you indicated work force is up 2% or so, whatis your expectation for hiring into '06 and do you foresee being abit over staffed early in the year just to -- or are you trying toget a bit over staffed in order to make sure you don't run into ashortage of labor if demand stays this strong?

RICHARD DAVIDSON: John, I don't think we said next year that we'regoing to be up 2%.

JOHN BARNES: This year.

ROBERT KNIGHT, JR.: This year, '05 versus '04.

JAMES YOUNG: You know, John, when we look ahead to next year, again,as I had mentioned, the number of people we have in training thatrate and our hiring is going to be less than what you've seen in thelast couple of years. In fact, you go back '04 we hired in total inthe company 7700 new employees, '05 we're going to be about 5400 andthat rate will drop next year. We've got opportunities in theproductivity side to get healthier here.

Also we have good volume opportunities. What we're sorting throughright now is what is the right mix. As you add coal, you think aboutcoal demand, those are pure train starts, so any time you put coal inthe network you're going to do a little more hiring. I think we'vegot good opportunity to offset some of the volume with productactivity.

RICHARD DAVIDSON: You have to be a little careful too about thehiring numbers. That's Social Security numbers we're talking aboutand when we look at our people we're talking for the full year we'retalking full time equivalents as you know, so it gets confusing ifthe raw numbers don't equate to the full time equivalents.

JOHN BARNES: So you see just trained employees beginning to ebb downin terms of hiring numbers and training ebb down a little bit versuswhat we've seen in the last couple of years?

JAMES YOUNG: On the hiring that's true. You had one other questionabout surge capacity and having -- we committed two and a half yearsago when we were short here, we are going to keep some surge capacityin here to deal with issues like major storms, floods, to gethealthier here. We're doing -- fourth quarter hiring obviously peoplewe have in training is getting ready for next year's volume. Minimumit takes you about six months to hire an employee and get them on theground to where they're starting to become productive.

JOHN BARNES: Okay. All right. And then on the fuel surcharge, givenyour desire to increase obviously the level of recovery, are youlooking at modifying your surcharge program at all being they'regoing to go more of a mileage based surcharge mechanism to look moretruck-like and help on the recovery some? Anything you intend to doto be more aggressive in modifying that program?

ROBERT KNIGHT, JR.: Right now we believe our approach makes mostsense. We're always taking a hard look at it, the real goal here isto get to 100% recovery on our fuel. We'll keep watching. I am infront of a lot of our customers, and I think you have a real mixedview about how they see that fuel surcharge recovery, but we're goingto do what's best for **Union** **Pacific**.

RICHARD DAVIDSON: We just want to take it off the table as avariable.

ROBERT KNIGHT, JR.: Right.

RICHARD DAVIDSON: Period.

JOHN BARNES: Very good. Thanks for your time.

OPERATOR: Our next question is coming from Jordan Alliger of DeutscheBank. Please proceed with your question.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANC: You mentioned demand stillrunning greater than supply or train capacity and that would producecontinued favorable upward bias to yields going into next year. Youmention a couple times demand's importance which makes sense. Myquestion is sort of what level of economic growth does that balancestart to go the other way and you have less upward ability to pushhigher on yields?

RICHARD DAVIDSON: Fuel prices have a lot to do with that. Truckcapacity and the fact we're so much more efficient than trucks so itis a pretty complicated question, Jim, do you want to take a shot atit?

JAMES YOUNG: You can look at general economic demand next year rightnow it is relatively strong, but there are other factors that Dicksaid. What's happening on the truck sector in terms of costs, a lotof customers that want to put more business on the railroad. Highnatural gas prices drive it. Import business coming in, we've got along ways to go here to in terms of our financial returns. We've gotI think a lot of our business here we're going to get to cost capitalor higher we have to change substantially in terms of the returns.

JORDAN ALLIGER: Okay. How important is the service component as along-term driver of price?

JAMES YOUNG: We have to get service up, no question in our mind andwe're making progress. We again when we're in front of our customerswe are seeing some positive trends as I had shown in our customersurveys, and it is all about the value proposition, but none of usare satisfied where we're at, but we have a good plan to improve it.

JORDAN ALLIGER: Thank you.

OPERATOR: Our next question is coming from Ken Hoexter of MerrillLynch. Please proceed with your question.

KENNETH HOEXTER, ANALYST, MERRILL LYNCH: Good morning. Can you talk alittle bit about the Kansas floods for a minute. How much are youcompletely rebounded from that at this point or still working throughthe track issues? And when you think about CapEx for next year,you've had a lot of shocks to the system this year which haveimpacted whether it is the derailments or the hurricanes. Can youthink in general terms whether we should see some of that pull backor is based on your Unified Plan and kind of your track builds shouldwe see that maintain these levels or even increase them?

RICHARD DAVIDSON: The Kansas wash outs, as we speak we are redrivingor reconstructing the last two bridges right now. We've beenoperating on a temporary infrastructure there for the last couple ofweeks, and by sometime tomorrow we should have the -- we're workingtwenty four hours a day obviously. We should have the last twobridges completed on Friday.

The biggest impact actually, our guys reopened the track on atemporary basis in about 72 hours or a little over. They did a greatjob of doing it, but what really happened at one time we had about350 trains standing still. Which was consuming locomotive hours andreducing freight car utilization and it takes awhile in a big networkoperation like ours to get the those flows smoothed back out, andthat's just happening as we speak that we're starting to get ourflows leveled back out and get our locomotives being utilizedappropriately again.

So the answer to your question is we're just about to get the impactto Kansas behind us. As far as our capital spending for next year,you know we're not done with the planning effort yet, and as you wellknow the final decision is up to our Board of Directors. I would lookfor spending to certainly not exceed what we're investing this year.

KENNETH HOEXTER: Great. Second question. Jim or Rob, can you talkabout the break out of the yields, break it into what was price,fuel, surcharge and mix of the 11% gain?

ROBERT KNIGHT, JR.: Yes, the yield was about 5% of that. Fuelsurcharge was 6%. The balance was mix and volume.

KENNETH HOEXTER: Great. Last question quick one is you talked aboutthe Unified Plan. I guess you said you launched the second phase ofit. Does that mean the first one is kind of the first phase is done,everything has been implemented and we're on the fine tuning phase?Can you talk in more detail about what you ran over earlier.

JAMES YOUNG: I will. I think the first thing to keep in mind here,this is going to be an ongoing process. You know, we've broken thisthing up into phases here, because you're making some major changingin your network, but even Phase I, you've got now Phase II which Isaid is going to focus on the gateway, Mexico, the terminal, butwe're going back and even looking at Phase I what's happening withthe network, what's happening with business demand, if you're notcareful here you can look up a year from now and figure out theproducts you put into the market didn't support the network, so it isgoing to be ever green process here in managing the network andagain, I expect we'll continue to see improvement.

KENNETH HOEXTER: Great. Thanks a lot for your help.

OPERATOR: Our next question is from John Larkin of Legg Mason. Pleaseproceed with your question.

JOHN LARKIN, ANALYST, LEGG MASON: Good morning, gentlemen, thanks fortaking my call. I had a question on the grain business which wasstronger than we thought it might be. How much of that was a functionof grain being pulled off the river in the month of September and puton the rail?

JAMES YOUNG: We think very little right now.

JOHN LARKIN: Okay. So that is sustainable going forward, you think.

JAMES YOUNG: We see a strong fourth quarter. A lot of other factorscome into play when you think of next year.

JOHN LARKIN: Jim, I think I heard you say you were growing that froma volume point of view about 1% year-over-year up until the hurricanehit and then it dropped to minus 8%. Was that the correctinterpretation of your comments.

JAMES YOUNG: In September before we were hit with the hurricane, wewere up about 1%. If you look backwards is not too far off where wehave been, and then into the month of September down 8%, so it reallyhit us pretty hard.

JOHN LARKIN: The hurricane hit early in the month of September, sodoes that also reflect what was going on in July and August? It wasreally the second hurricane that hit us the most, Rita. I understand.

RICHARD DAVIDSON: Rita is the one at that impacted **Union** **Pacific** somuch.

JOHN LARKIN: Thank you. And one final question. With all of thevisits from mother nature that you've had this year and all of thetrials and tribulations that have been created, is there anything youcan do to change your maintenance program to perhaps in the futurebecome less vulnerable to these sorts of disruptions?

RICHARD DAVIDSON: We try to pay real attention to where we had trackwash outs and that sort of thing, you know, in years gone by in somecases people tended to fill bridges and put pipes in and maybe notconsider what's happened like with the construction of new roads andshopping centers, so we look at the run offs, the drainage and thatsort of thing and in most cases mother nature is telling yousomething that you need to increase your opening through the trackand that sort of thing to handle the flows, so we always try to learnfrom the bitter experiences.

JOHN LARKIN: Thank you very much.

RICHARD DAVIDSON: Thank you. One thing I want to mention about grain,you asked that question and you know that you asked that. It is hugecarry over stock pile generally speak the yields have turned out tobe far stronger than with a were anticipated particularly in thesoybean area. There is a lot of grain in this country so theopportunity is there to move it.

OPERATOR: Our next question is coming from Randy Cousins of BMONesbitt Burns. Please proceed with your question.

RANDY COUSINS, ANALYST, BMO NESBITT BURNS: I have two questions. Onesort of customer related and the other operational. With reference tothe customers you guys have gotten fairly decent in improvements inthe arc for your automotive business. Obviously the domesticautomotive industry is it struggling quite badly right now. I wonderif you can speak to the prospects for your automotive businesslooking to 2006 at your ability to improve returns in the automotivebusiness. And what's your position with the transplants and theimported product that's coming into the United States?

RICHARD DAVIDSON: Jim.

JAMES YOUNG: Randy, as you know we have the majority of the marketshare in the west, the domestic producers, the internationalproducers coming in. It is -- they've got tough times, but it reallyvaries among the individual customers here. You know, at the end ofthe day, when we look at the investment required that we have made inthis network that could be required to maintain it in the future, wehave to get the returns up on this business.

When you look at the growth opportunities, right now I think soproduction will be pretty much flat this year, vehicle sales comparedto last year. It is real wild card for next year in terms of where itwill end up. We're working with our customers in terms of how do weimprove utilization, load on load capabilities, back hauls, but we doneed to get the returns up in the business.

RANDY COUSINS: Is there an opportunity to sort of raise rates butgive the customer more value so you don't get a squeeze issue in theauto side? Clearly the auto companies with talking about gettingconcessions from their suppliers, major rationalization. I wonder howit will impact your auto business in 2006.

JAMES YOUNG: I think again I said our service numbers need toimprove. At the end of day for autos, we're doing better when youlook at where we have come from here. I still come back to when youhave demand across your other five business groups then strategicallyyou have to decide what businesses are going to put your limitedresources, and I tell you, if we can't get the returns up in some ofthese businesses we're not going to handle it.

RANDY COUSINS: Okay. Somewhat related fashion, a lot of the U.S.chemical industry is natural gas based. $14 in MCF is puttingpressure on those guys. When you talk to your sales force in terms oftalking to the chemical industry, what's the outlook for 2006? Haveyou got any concerns about volumes coming off?

JAMES YOUNG: Well, I think the volume opportunities limited in thatWisconsin when you look at it. It is a function of where they arecapacity-wise. There is not much if any new capacity going in otherthan maybe plastics, but I think the volume upside is going to bevery slow as we said in our strategic plan going forward here.

RICHARD DAVIDSON: One thing that could change is that I think in thechemical companies have been saying this, could be more importbusiness at some point as opposed to domestic production.

RANDY COUSINS: You guys think you will win on a shift from import todomestic or lose in a domestic import shift?

RICHARD DAVIDSON: I think the experience we've had thus far is kindof a break even. We have been witnessing that as you well knowchemicals used to be a huge export item for the U.S. and last year ortwo that's been the balance has been changing.

JAMES YOUNG: That implies in some ways when you think about yourimport you have lower margins there and again what we lookparticularly when you look at intermodal business, we have very goodupside in the margins on that business.

RANDY COUSINS: Okay. My final question has to do with the SunsetCorridor. That's kind of you identified that as kind of your criticalstrength. I think you've been adding sidings into it. What is thestatus on the Sunset Corridor? House it running? What is the capacitysituation there? Have you been please with the headway that you'vemade on that route.

RICHARD DAVIDSON: It has been a good news story for us. We will addalmost 70 miles of double track this year kind of our base plan isadd somewhere around 50 miles a year even though we have done betterthis year.

You know that the Sunset is really running pretty well, and althoughit may not have quite as much capacity as we'd like, we also had theprerogative of shifting some business coming out of southernCalifornia over our central corridor that runs on from L.A. to SaltLake City, we had some unused or additional capacity we could takeadvantage of there, so we tried to balance our business between thetwo lines and we're adding double track at a pretty healthy pace outthere.

RANDY COUSINS: And in terms of sort of the performance speeds are upon the Sunset, volumes are up on the Sunset.

RICHARD DAVIDSON: Yes, yes. Both. Service is also a lot better therein the Phoenix and Tucson area. In fact, Phoenix has been kind of aposter child for us. We put the inventory management system in andsome capital spending along with it and it really, really hasimproved things.

OPERATOR: Our next question is coming from David Broughton of AGEdwards. Please proceed with your question.

DONALD BROUGHTON, ANALYST, A.G. EDWARDS: Donald, David, just don'tcall me late for dinner. Dick, Richard, maybe you guys can give memaybe a minor pointed but I am missing something here. The gain onsales from real estate in the fourth quarter will be how much morethan they were last year?

ROBERT KNIGHT, JR.: Our guidance for the full year, Don, is in the140 million range and year-to-date we are in the other income linewhich is primarily real estate. In the year-to-date in the 90 millionrange, so that implies 45 to 50 million number.

DONALD BROUGHTON: And what was the gain on sale last year in.

ROBERT KNIGHT, JR.: Last year was for the quarter fourth quarter lastyear was more than 25 range. It is a stronger market for us as we seeat this point in time for the fourth quarter.

DONALD BROUGHTON: And your guidance $0.95 to the $1 includes thatgain; right.

ROBERT KNIGHT, JR.: That's correct.

DONALD BROUGHTON: So where am I going to stray by suggesting thatyou're really guiding us to 87 to 92?

JAMES YOUNG: I think, Don, this is Jim. I think there are otherfactors you have to look at. You do have the real estate side as wesaid though we're chasing the fuel numbers. We just don't -- youcan't keep up as quickly as they've gone going forward here. I thinkwhat's important if you remember Rob's slide, is we're going to showimprovement in our operating ratio where you take fuel out of itwhich and that excludes real estate. Real estate will be what it isgoing to be here. I really look at are we making core improvement inthe operations, and we will see that again in the fourth quarter.

DONALD BROUGHTON: But your guidance includes $0.06, $0.07 of realestate that is not core improvement?

ROBERT KNIGHT, JR.: Don, just a couple comments. This is Rob. Wealways have real estate sales in our numbers as you know. Year in andyear out it ebbs and flows. In years are stronger than others. Thisisn't unusual in that sense. Additionally you may recall we said thatwe anticipate this time that the fourth quarter will be negativelyimpacted as a result of the Kansas wash outs by about a nickel or so,so you may not be factoring that in either.

DONALD BROUGHTON: In your guidance there is a $0.06 more of realestate sales than there were last year?

ROBERT KNIGHT, JR.: Yes, Yes.

DONALD BROUGHTON: Good enough. Just wanted to make sure I got my mathright.

OPERATOR: Our last question today will be coming from Edward Wolfe ofBear Stearns. Please proceed with your question.

EDWARD WOLFE, ANALYST, BEAR STEARNS: A couple of follow ups and thena question or two. Don't want to pile in on that, but in the thirdquarter the 42 million of other, how much of that was real estategains versus year ago and the third quarter?

ROBERT KNIGHT, JR.: Last year's third quarter was comparable to lastyear's fourth quarter, about 25 million, so we were, rough numbersEd, about 15 million stronger third quarter than the previous year.

EDWARD WOLFE: Okay, and, Rob, the guidance you gave, I just want toclarify that I heard it right, was for an OR that was flat at around86 of the that was including fuel; correct.

ROBERT KNIGHT, JR.: That's correct.

EDWARD WOLFE: Just wanted to make sure I heard it right.

ROBERT KNIGHT, JR.: Including a higher priced fuel of course than inthat 2.10 to 2.15 per gallon range.

EDWARD WOLFE: Of course. When you look out at the issues you'rehaving the mother nature issues in Kansas, in Houston, the PRB, andyou look at what's impacted the network a little bit in theshort-term, how would you rank those issues in terms of the overallfluidity of the network and where do you think you're going to bethrough those issues completely if you look at those three?

RICHARD DAVIDSON: I think the answer is we don't know exactly becausewe haven't nailed down the maintenance plan on the PRB for 2006. Weare still clearly going to be carrying over some work to be done in'06.

As far as putting the impact of the two hurricanes and the Kansasfloods behind us, that's going to pretty well be taken care of.Although as you probably know, the CSX will not have their railroadtotally restored until sometime in '06 as well. We still aredetouring some traffic through Memphis rather than the New Orleans,so there will be some impact there that will go on for I don'texactly know how long it is going to take the CSX to restore theirbridges.

As you know they got really, really creamed with Katrina, but allthings being equal, we look for good improvement in our operation inthe months ahead. We look for continuous improvement and Unified Planand the lean initiatives kick in, they are kicking in and we see itevery day, we're looking for good improvement.

EDWARD WOLFE: I thought I had heard Jim say that some percentage ofthe chemical customers were not yet back online.

RICHARD DAVIDSON: That's true.

EDWARD WOLFE: Can you talk about what percentage of that business isnot back online in the timing for that?

RICHARD DAVIDSON: Of course we can't actually predict what whenthey're going to get back up it full production. They would have totell you that. They're coming back every week. Ramping up production.I don't know. Does anybody have a feel when we might be the 100%?

JAMES YOUNG: I don't. We'd be guessing. We had 100 -- over 100customers impacted. We're down to around 20 or so still not at fullproduction. I think it is going to -- they're picking up andexpanding but it is going to be through the fourth quarter until theend here until you get them back to full production.

EDWARD WOLFE: One last quick one. You talked about 10 to 15%customers rolling over in '06. What was the number like in '05 forsome reference?

JAMES YOUNG: You know, single digits, maybe around 8 or 9.

EDWARD WOLFE: Thanks, guy's, for the time. I appreciate it.

RICHARD DAVIDSON: Thank you. I think that wraps it up, so we'll lookforward to visiting with you again in three months.

OPERATOR: Ladies and gentlemen, this is it conclude today'steleconference. You may disconnect your lines at this time. Thank youfor your participation.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2005 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2005Morningside Partners, LLC. ALL RIGHTS RESERVED. No license is grantedto the user of this material other than for research. User may notreproduce or redistribute the material except for user's personal orinternal use and, in such case, only one copy may be printed, norshall user use any material for commercial purposes or in any fashionthat may infringe upon Thomson Financial's or Morningside Partners'copyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without

aspecific license from Thomson Financial and Morningside Partners solong as they provide conspicuous attribution to Thomson Financial andMorningside Partners as the originators and copyright holders of suchmaterial. This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: **UNION PACIFIC** CORP; CREDIT SUISSE GROUP; CITIGROUP INC; DEUTSCHE BANK AG; BEAR STEARNS COMPANIES INC; CREDIT SUISSE; CSX CORP; MORGAN STANLEY

News Subject: (Corporate Performance (1XO12); Corporate Financial Data (1XO59); Business Management (1BU42); Sales & Marketing (1MA51); Conventions, Conferences & Trade Shows (1CO42); Natural Disasters (1NA67); Contracts & Orders (1CO29); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Enterprise Performance Management (1EN49); Theoretical Analysis (1TH79); Freight Transportation (1FR88); Retail Banking Services (1RE38); Transportation (1TR48); Banking (1BA20); Financial Services (1FI37); Shopping Malls (1SH59); Science & Engineering (1SC33); Business Theory (1BU14); Consumer Finance (1CO55); Real Estate (1RE57))

Region: (North America (1NO39); Texas (1TE14); California (1CA98); Kansas (1KA13); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (AG; BB; BEAR STEARNS; BMO; BNSF; CAPEX; CITIGROUP; CREDIT SUISSE; CSX; DEUTSCHE BANK; FINANCIAL; INSTRUCTIONS; JR; KANSAS; MCF; MERRILL LYNCH; MONTROSE; MORGAN STANLEY; MORGAN STANLEY: GREAT; OPERATOR; PRB; RCAF; SCOTT; SCOTT FLOWER OF CITIGROUP; SIMS; SITE; SUNSET; SUNSET CORRIDOR; TNY; TRANSCRIPTION; TRANSCRIPTS; UNIFIED; UNIFIED PLAN; **UNION PACIFIC**; **UNION PACIFIC** EARNINGS CONFERENCE; USERS; WISCONSIN) (Ag; Burlington Northern; Chicago Intermodal; David Broughton; Davidson; Dick; Dick Davidson; EDWARD; EDWARD WOLFE; Ethanol; Hurricane Rita; Instructions; J.P. Morgan; J.P.MORGAN; JAMES VALENTINE; JAMES YOUNG; JAMES YOUNG: Scott; Jim; Jim Young; John; John Barnes; John Larkin; Louisiana; Minimum; Morningside Partners; Overtime; Ramping; Rita; Rob; Rob Knight; ROBERT; ROBERT KNIGHT; Scott; SEC FILINGS; Tom; Tom Wadewitz; Utah; Wage)

Word Count: 13894

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0572




# THE RIGHT PLACE. THE RIGHT TIME. THE RIGHT RAILROAD.

## 2005 ANNUAL REPORT AND FORM 10-K

COVER:

In 2005, we launched our new brand and logo to better express our image as an innovative leader. That new logo is featured on our cover, as one of the 288 locomotives we received in 2005 comes off the production line at General Electric's locomotive plant in Erie, Pennsylvania.

NYSE: BNI

## THE RIGHT PLACE. THE RIGHT TIME. THE RIGHT RAILROAD.

This year marks the tenth anniversary of BNSF and the 156th year since the founding of the railroads that became BNSF. While it's important to look back and feel proud of our accomplished history, it's also important to look toward the future. Building on our successes and experience, BNSF is ready to capture new business opportunities and develop new markets.



**TO OUR SHAREHOLDERS, CUSTOMERS, AND COLLEAGUES** We knew 2004 was a historic year. As it turned out, 2005 was even better. During a time of unprecedented demand for rail transportation, we delivered the capacity our customers required. And we did it safely and efficiently. Our volume growth of 5.1 percent again led the largest Class I railroads. We moved a record 10 million units – an increase of nearly 500,000 units over 2004.

For 2005, we also posted a record of nearly $13 billion in revenue. This 19 percent revenue increase was coupled with solid expense control. The result was operating income of nearly $3 billion in 2005, almost a 73 percent improvement over 2004. Our productivity, measured as 26.8 million gross ton-miles handled per employee, continues to be the highest among the largest Class I railroads.

2005 was our tenth year since the merger that created BNSF. As we review 2005 and the past decade, BNSF people are to be congratulated for exceeding many of the goals set at the time of the merger. Our 40,000 people demonstrated once again the tremendous value that our rail franchise brings to the entire U.S. supply chain.

## LEADING THE RAIL INDUSTRY

In addition to leading the industry in growth and productivity, BNSF again achieved significant safety improvements in 2005.

Our 2005 frequency ratio of 1.32 injuries per 200,000 hours worked was an all-time low for BNSF. Reflecting a joint effort by BNSF and union leaders and the commitment of every BNSF employee, this safety performance was a 12 percent improvement over 2004 and an even more impressive 52 percent reduction since 1995. Nevertheless, tragically, the four fatalities we experienced in 2005 demonstrate that we have more work to do toward our goal of an injury-free workplace.

To further improve safety and efficiency, we are working with Wabtec Railway Electronics on the Electronic Train Management System (ETMS). This innovative technology uses global positioning satellite (GPS) data and BNSF track and dispatching data to enforce track authority limits and speed limits and to confirm track integrity and switch position. In a pilot project on a 135-mile corridor in central Illinois, we have equipped 50 locomotives with ETMS. More than 1,600 revenue service trips have been logged since 2004 with no failures.

## We were ready with increased capacity—locomotives, freight cars, crews, and track—when demand for rail transportation reached historic levels during the economic recovery.



When the merger of the Burlington Northern and Santa Fe railroads was approved in August 1995, we set out to build a balanced portfolio of business and identify strategic capacity increases to handle volume growth.

We also focused on receiving adequate returns to cover the cost of providing service and to invest in the right asset at the right time to keep our network strong. Thanks to these strategies, we were ready with increased capacity – locomotives, freight cars, crews, and track – when demand for rail transportation reached historic levels during the economic recovery.

For 2005, each of our four business units achieved new revenue and volume records:

- Coal revenues increased 8 percent, as BNSF transported more than 259 million tons of coal.
- Agricultural Products revenues were up 20 percent for a total of more than 900,000 shipments, led by corn and soybean exports and growing domestic demand for ethanol.
- Industrial Products revenues grew 17 percent, driven by building products and petroleum.
- Consumer Products, which includes our domestic and international intermodal business, posted a 22 percent revenue increase and exceeded 5 million shipments for the first time.

To help handle these record volumes in 2005, we made capital commitments of almost $2.2 billion for expanded track, yards, and terminals; track renewal; new locomotives; and technology. We expect our capital commitments in 2006 to be about $2.4 billion.

Since the BNSF merger, we have hauled nearly 83 million units. In 2005, we handled more than 10 million units, which was 3 million units more than in 1995. Our intermodal business has led that volume growth and, more recently, our revenue growth. In that ten-year period, international intermodal accounted for 64 percent of our volume growth and domestic intermodal for 16 percent. The balance of our growth was distributed among our three other business units.

Increasingly, trucking firms have joined steamship lines in turning to BNSF as an intermodal partner. Domestically, this helps trucking firms cope with highway congestion, driver shortages, environmental concerns, and higher fuel costs. This trend is expected to continue, as this cooperation enables BNSF to efficiently and safely move the freight across the country, while trucks handle the shorter haul on either end.

### SERVING CUSTOMERS

Our record growth definitely challenges our franchise capacity. In 2006 we will focus on improving velocity with the additional business that the marketplace wants us to handle. Our incentive compensation and profit-sharing goals in 2006 will have a significant emphasis on velocity. We believe locomotive and equipment velocity truly drives on-time performance, as well as the efficiency and reliability of our service.

**Locomotive and equipment velocity truly drives on-time performance, as well as the efficiency and reliability of our service.**




All BNSF people are tailoring their goals for 2006 to focus on velocity improvements. These initiatives will include more efficient trains, reduced intermediate terminal handling, and increased use of shuttle trains. We are also working to improve maintenance planning and scheduling and to streamline loading and unloading processes with shippers.

As volumes increase, however, improved velocity can take us only so far. We must also expand capacity to ensure we have the right network to meet the nation's freight transportation needs.

Our investments in 2005 continued our double- and triple-track projects on our busiest routes to expand our network. This included more than 76 miles of added track on our transcontinental main line between Chicago and Los Angeles. By the end of 2005, all but 143 miles of this busy 2,200-mile route was double-track; and we plan to double- and triple-track another 56 miles in 2006. To serve our coal territory in Wyoming and Nebraska, we've added 275 miles of double- and triple-track since 1995, and we plan to add another 60 miles of double- and triple-track on this route in 2006.

We also expanded several freight and intermodal facilities in 2005. This included expansion at freight yards in Lincoln and Alliance, Nebraska; Edgemont, South Dakota; and Kansas City, serving our coal territory. We increased capacity at intermodal facilities in the Los Angeles and Chicago areas to serve our growing international business. And, on our northern transcontinental main line, where we saw a significant increase in international intermodal and agricultural traffic, we added and expanded sidings to increase track capacity.

In 2005, we took delivery of 288 new locomotives. Since 1995, we have acquired about 2,700 new high-horsepower units, representing nearly 60 percent of our locomotive road fleet. We expect to add another 310 units in 2006. To handle continuing volume increases in 2005, we also took delivery of about 400 centerbeam cars, 3,700 high-capacity covered hoppers, 1,300 rapid-discharge coal cars, and 650 intermodal flatcars with capacity to carry about 6,500 intermodal double-stack containers.

These investments make a tremendous difference in our ability to meet our customers' transportation needs, while also improving our fuel efficiency, network fluidity, and operating reliability. These investments also provide a positive value to the U.S. economy, as we commit more capital to efficiently handle increasing freight volumes.

In addition to meeting customers' expectations, we work to have a positive impact on the communities we serve. We have the lowest grade-crossing collision rate of any U.S. Class I railroad. This is due in part to our extensive driver education through Operation Lifesaver, our crossing closure program that has eliminated more than 2,900 unnecessary crossings since 2000, and other grade-crossing safety initiatives. Our community safety programs also include a comprehensive rail security plan and frequent emergency response drills with local law enforcement agencies.

**This past year our people once again stepped up to the challenge and handled record volumes safely and efficiently.**





## DELIVERING RESULTS

As we provided capacity to handle more volume, the value of our company increased for our shareholders. Earnings per share rose to $4.01, an increase of $1.91 over 2004. Our dividend increased to 80 cents per share on an annualized basis, after we approved our third consecutive double-digit dividend increase since 2002.

In a highly capital-intensive business such as a railroad, return on invested capital (ROIC) is one of the most important measures of the value of our company to our shareholders. In 2005, our ROIC was 10.1 percent, the highest level since merger. (For more information on ROIC, see the calculation following Item 6 in our attached Form 10-K.) This was achieved because of continuing significant revenue growth coupled with ongoing aggressive expense control. We have seen steady improvement in our ROIC since 2003, when it was at 6.6 percent. Our ability to continue to increase capacity depends on sustained and improved returns.

Our focus on increasing capacity while also improving profitability requires that we set the stage with a strong long-term strategy. Our 2006 initiatives will address each of the key strategic focus areas impacting our business: franchise, service, return, people, and community. As we develop these initiatives, we are optimistic about the demand for rail freight transportation this year and over the next five years.

In the following pages, we review a few highlights of the past decade since our merger. We also note key achievements of 2005 and some technology and capacity initiatives that position us for continued success.

Our hard work is paying off, and we continue to prove that we have the best team in the industry. This past year our people once again stepped up to the challenge and handled record volumes safely and efficiently. Thank you for your support of this company, its leaders, its board, and the entire BNSF team of employees.





**MATTHEW K. ROSE**
CHAIRMAN, PRESIDENT, AND CHIEF EXECUTIVE OFFICER
FEBRUARY 16, 2006




**Our success resulted from a lot of hard work from everyone at BNSF and a determined focus on the customer. Through this team effort, we continue to fulfill our vision, capture new business, and provide the capacity and reliability our customers require.**






"BNSF's most significant achievement since merger has been taking two railroads, two cultures, and successfully creating something entirely new. As we review the past ten years, we are becoming the company we wanted to be, building on our vision and strategy for capacity, reliability, and our people's safety, well-being, and development."

**CARL R. ICE**

**EXECUTIVE VICE PRESIDENT AND CHIEF OPERATIONS OFFICER**



# Performance. Dedication. Results.

From the start, we've had an excellent track record.

1995

Burlington Northern Inc. and Santa Fe Pacific Corp. merged to form the largest rail network in North America, with $6.1 billion in revenue and 31,000 route miles handling more than 7.1 million units.

1996

As a result of the Union Pacific-Southern Pacific (UP-SP) merger, BNSF gained access to 4,000 miles of new routes, customers, and connecting carriers.

1997

Network cutover to unified Transportation Support System completed midyear.

Argentine Yard in Kansas City redesign completed, becoming BNSF's largest and most modern freight-car sorting facility with a 60-track bowl in a 780-acre yard.

1998

Opened first joint BNSF/UP dispatch center near Houston to improve coordination in a high-volume region; later opened similar centers near Los Angeles and in Kansas City and a joint coal dispatch center in Fort Worth.

Removed the 1,970-foot single-track tunnel near Guernsey, Wyoming, and expanded the segment to an open-cut, double-track line.

1999

Began using distributed power (DP) on unit coal trains to allow for longer, more productive trains. DP places locomotives at the end of the train, remotely controlled from the lead locomotives. By the end of 2005, 65 percent of coal sets operated with DP.

COAL + GRAIN + INTERMODAL + INDUSTRIAL =

## balanced portfolio

## New routes

TO MEXICO, THE SOUTHEAST, GULF COAST, ROCKY MOUNTAIN STATES, AND I-5 CORRIDOR IN NORTHERN CALIFORNIA

BNSF HANDLES MORE

## intermodal traffic

THAN ANY OTHER RAIL SYSTEM IN THE WORLD

## 2,700

NEW LOCOMOTIVES RECEIVED BETWEEN 1995 AND 2005

2000

Implemented "Lean Processes" to improve efficiency and eliminate waste in more than 400 initiatives, from railcar inspections to signal installation to shop material inventories.

Closed 635 unnecessary grade crossings as part of focused grade crossing closure program; by 2005, had closed more than 2,900 crossings in this initiative.

2001

Stockton, California, intermodal facility opened, increasing lift capacity in Northern California by 41 percent.

2002

Logistics Park–Chicago opened, a 621-acre multi-modal facility with distribution and warehousing in one location.

Alameda Corridor opened, a 20-mile rail expressway in east Los Angeles, representing one of the largest public/private partnerships in the United States.

2003

More than 50 percent of whole-grain business was carried in dedicated unit shuttle trains.

2004

354 new locomotives received, one of our largest single-year deliveries; 2,700 new locomotives have been received between 1995 and 2005.

# It's the right time for rail.

Any time, day and night, we deliver.

## 2005

REVENUE
**$13B**

2005 INVESTMENTS
**$2.2B**

**105 miles**
OF ADDED TRACK

RECORD
**10M**
units

RECORD
**$2B**

New brand launched to better express image of BNSF as an innovative leader.

BNSF 2005 revenue grew 19 percent to nearly $13 billion, with revenue records for Coal, Agricultural, Consumer, Industrial.

2005 freight volume grew nearly 500,000 units over 2004.

2005 international intermodal business sets new records.

In 2005, we made capital commitments of almost $2.2 billion in expanded track, yards, and terminals; track renewal; new locomotives; and technology. This included 76 miles of added track on the southern transcontinental main line between Chicago and Los Angeles and 16 miles of added track serving our coal territory.



"In the past ten years, we've made the cultural shift from operating our company as a railroad to operating it like a business. We've become much more cost-effective and efficient as a result, which enables us to better utilize our existing capacity while also achieving great improvements in safety."

**BOB GOMEZ**

TERMINAL SUPERINTENDENT, LOS ANGELES










"Technology has been the most significant change. At the time of the merger, we were processing thousands of fax documents and answering even more telephone calls daily to initiate and report freight movement. New Web tools, voice technology, improved wayside and Wheel-Impact Load Detector technology, electronic industry transactions, and other automated processes have streamlined our operation."

**JOHN PADEN**

**PROJECT MANAGER, EBUSINESS, FORT WORTH**



# Looking back is good. But looking ahead is vital.

Through planning and innovation, we're ready to capture new opportunities.

FREIGHT REVENUES

↑ 200%

## GROWTH

BNSF freight revenues have more than doubled since 1995, and all four business units set records in 2005. BNSF is positioned for continued growth by expanding opportunities with existing customers and creating new products and services to capture new markets. We are also entering into partnerships and alliances to build our business, including a memorandum of understanding with China's Ministry of Railway signed in 2004.

## CAPACITY

Since 1995, we have invested almost $20 billion to maintain our physical plant and increase capacity through expanded track, yards, and terminals; new locomotives; and technology. To handle the growth of intermodal traffic on the transcontinental main line between Chicago and Los Angeles, we have added 410 miles of double- and triple-track since 1995. On coal territory serving Wyoming's Powder River Basin, we've added 275 miles of second and third main line. More than 2,700 new high-horsepower locomotives have been acquired since 1995, representing almost 60 percent of our road fleet.

$20B

INVESTED

## VELOCITY

Initiatives to improve velocity include longer trains, improved maintenance planning, and streamlined terminal handling as we reshape our carload network. To improve velocity of grain trains and strengthen our domestic grain franchise, a shuttle network was launched in 1996, with 110-car dedicated unit trains with strict loading requirements. By 2005, more than 60 percent of our whole-grain business moved in shuttle trains.

## CUSTOMER FOCUS

To make it easier for customers to do business with us, BNSF was the first railroad to offer customers a fully customizable and personalized Web interface. Our customer surveys, our customer symposiums, and our Customer Advisory Board also help ensure we understand our shippers' needs.

INJURY FREQUENCY RATE

↓ 50%

## SAFETY

Since 1995, we've lowered our employee injury frequency rate by more than 50 percent. To continue our safety improvements, especially in train operations, BNSF is testing Wabtec's Electronic Train Management System, a GPS-based safety technology that ensures trains adhere to authority limits, speed limits, and work zones and protects against the consequences of human error.

# SERVE

We do more than just go through communities, we connect with them. And we do more than serve markets, we serve people. We are part of every community we touch. That's why we support efforts, both on a corporate level and through the work of individual employees, to be environmentally responsible and to help make our world a better place.

# BNSF at work in communities.

HOME. FAMILY. COMMUNITY. ENVIRONMENT.









Contributing to the quality of life in our communities is a foundation of our corporate vision. We serve communities along our line in many ways — from our BNSF Foundation grants and corporate diversity and internship programs to initiatives that protect our environment and keep communities safe.

In 2005, the BNSF Foundation supported social service and arts organizations in hundreds of communities across the 28 states where we operate. This included $1.3 million in special donations for hurricane relief following the devastation of Hurricanes Katrina and Rita. Throughout the year, our people share their time and talent in volunteer work benefiting thousands of community organizations.

Our outreach includes our BNSF Special train trip, which operates several weeks each year on a different part of our rail network. The BNSF Special recognizes and celebrates the contributions of our employees and their families. The train also features fundraising trips for the Boys & Girls Clubs and special events for customers and local leaders.

We strive to protect the environment in our communities. The rail industry, in general, provides environmentally friendly transportation that's more fuel efficient and produces fewer emissions than other transportation modes. In the past decade, BNSF has improved its fuel efficiency another 9 percent with more efficient train handling, longer and more productive trains, new locomotives, and other initiatives. We are also testing locomotives using alternative fuels, including liquid natural gas and hybrid engines.

Since merger, BNSF has promoted an appreciation for diverse cultures and points of view in our work environment, hiring practices, internship programs, and employee development. Our Regional Diversity Councils and Affinity Groups sponsor speakers and events celebrating various cultural heritages and perspectives at BNSF and within the communities we serve.

## 40,000 employees delivering for our customers.

PROGRESSIVE. VITAL. RESOURCEFUL. APPROACHABLE.




Our people faced another challenging and demanding year, and met every challenge with superior teamwork and tireless dedication. Whether it's a dispatcher keeping trains moving efficiently or a track or signal employee keeping our network safe and reliable, everyone makes an essential contribution to serving the customer.

Railroading is a complex industry. We can't simply define ourselves with one single strategy or a catchy slogan. We look at the whole picture. Five focus areas will drive our strategies beginning in 2006 – franchise, service, return, people, and community. Looking forward, we will tie each employee's personal goals and objectives to these key strategies.

By franchise, we mean all the things we're doing to support and build our business, including our products, services, partnerships, and alliances. In our focus on service, we are concentrating on meeting customer expectations and maximizing velocity to increase capacity and improve customer service.

Our strategic focus on return ensures that we operate efficiently and that we're able to invest at the right time in the right asset to keep our core network strong and increase capacity. We are also taking a leadership role in promoting sound regulatory and public policy.

When we set our strategies for our people, safety is always at the top of the list. We also work to ensure our Leadership Model, training, compensation, benefits, diversity, and development programs make BNSF a great place to work. Closely tied to this is our interest in benefiting the communities where we operate by being good stewards of the environment and by promoting public safety and social outreach.

By working together with a strong strategic focus and by building on the Vision & Values we set at the time of the merger, every member of our team is making an important contribution every day for our customers, our shareholders, and the communities we serve.


DELIVER
FORM 10-K

NYSE: BNI

# Consolidated Financial Highlights

| December 31, | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| | Dollars in millions, except per share data | | | | |
| **For the year ended:** | | | | | |
| Revenues | $12,987 | $10,946 | $ 9,413 | $ 8,979 | $ 9,208 |
| Operating income | $ 2,922[a] | $ 1,686[b] | $ 1,665 | $ 1,656 | $ 1,750 |
| Income before cumulative effect of accounting change | $ 1,531[a] | $ 791[b] | $ 777[c] | $ 760 | $ 731 |
| Basic earnings per share (before cumulative effect of accounting change) | $ 4.12[a] | $ 2.14[b] | $ 2.10[c] | $ 2.01 | $ 1.89 |
| Average basic shares (in millions) | 371.8 | 370.0 | 369.1 | 378.0 | 387.3 |
| Diluted earnings per share (before cumulative effect of accounting change) | $ 4.01[a] | $ 2.10[b] | $ 2.09[c] | $ 2.00 | $ 1.87 |
| Average diluted shares (in millions) | 381.8 | 376.6 | 372.3 | 380.8 | 390.7 |
| Dividends declared per common share | $ 0.74 | $ 0.64 | $ 0.54 | $ 0.48 | $ 0.48 |
| **At year end:** | | | | | |
| Total assets | $30,304 | $28,925 | $26,947 | $25,767 | $24,721 |
| Long-term debt and commercial paper, including current portion | $ 7,154 | $ 6,516 | $ 6,684 | $ 6,814 | $ 6,651 |
| Stockholders' equity | $ 9,508 | $ 9,311 | $ 8,495 | $ 7,932 | $ 7,849 |
| Net debt to total capitalization[d] | 42.7% | 39.9% | 44.0% | 46.1% | 45.8% |
| **For the year ended:** | | | | | |
| Total capital expenditures | $ 1,750 | $ 1,527 | $ 1,726 | $ 1,358 | $ 1,459 |
| Depreciation and amortization | $ 1,075 | $ 1,012 | $ 910 | $ 931 | $ 909 |

[a] 2005 operating income, income before cumulative effect of accounting change and earnings per share include a loss related to an agreement to sell certain line segments to the state of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share.

[b] 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share, as described in Note 10 of the Consolidated Financial Statements.

[c] 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share, as described in Note 2 of the Consolidated Financial Statements.

[d] Net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE TRANSITION PERIOD FROM __________ TO __________

**COMMISSION FILE NUMBER: 1-11535**

**Exact name of registrant as specified in its charter**

## Burlington Northern Santa Fe Corporation

| **State of Incorporation** | **I.R.S. Employer Identification No.** |
|---|---|
| Delaware | 41-1804964 |
| **Address of principal executive offices, including zip code** | **Registrant's telephone number, including area code** |
| 2650 Lou Menk Drive<br>Fort Worth, Texas 76131-2830 | (800) 795-2673 |

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. **Yes [x] No [ ]**

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. **Yes [ ] No [x]**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. **Yes [x] No [ ]**

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. **[x]**

Indicate by check mark whether the registrant is a large accelerated filer, accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act). **Large accelerated filer [x] Accelerated filer [ ] Non-accelerated filer [ ]**

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). **Yes [ ] No [x]**

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $17.373 billion on June 30, 2005. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.01 par value, 372,960,559 shares outstanding as of February 2, 2006.

**DOCUMENTS INCORPORATED BY REFERENCE**

LIST HEREUNDER THE DOCUMENTS FROM WHICH PARTS THEREOF HAVE BEEN INCORPORATED BY REFERENCE AND THE PART OF THE FORM 10-K INTO WHICH SUCH INFORMATION IS INCORPORATED:

Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report.......... Part III

## Table of Contents

| | | | |
|---|---|---|---|
| **Part I** | Item 1. | Business | 3 |
| | Item 1A. | Risk Factors | 3 |
| | Item 1B. | Unresolved Staff Comments | 6 |
| | Item 2. | Properties | 7 |
| | Item 3. | Legal Proceedings | 13 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 14 |
| | Executive Officers of the Registrant | | 14 |
| **Part II** | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 15 |
| | Item 6. | Selected Financial Data | 16 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| | Item 8. | Financial Statements and Supplementary Data | 46 |
| | Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 86 |
| | Item 9A. | Controls and Procedures | 86 |
| | Item 9B. | Other Information | 86 |
| **Part III** | Item 10. | Directors and Executive Officers of the Registrant | 87 |
| | Item 11. | Executive Compensation | 87 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 88 |
| | Item 13. | Certain Relationships and Related Transactions | 88 |
| | Item 14. | Principal Accountant Fees and Services | 88 |
| **Part IV** | Item 15. | Exhibits and Financial Statement Schedules | 89 |
| | | Signatures | S-1 |
| | | Index to Exhibits | E-1 |

## Part 1

### Item 1. Business

Burlington Northern Santa Fe Corporation (BNSF or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the stockholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, SFP merged with and into The Burlington Northern and Santa Fe Railway Company. On January 20, 2005, The Burlington Northern and Santa Fe Railway Company changed its name to BNSF Railway Company (BNSF Railway).

Through its subsidiaries, BNSF is engaged primarily in the rail transportation business. At December 31, 2005, BNSF and its subsidiaries had approximately 40,000 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America. BNSF Railway's business and operations are described below.

BNSF's Internet address is www.bnsf.com. Through this internet website (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, as well as all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission (SEC). Filing on Forms 3, 4 and 5 are also available on this website within one day after filing. BNSF's annual CEO certification filed pursuant to the New York Stock Exchange's Corporate Governance Listing Standards is filed as an exhibit to this Form 10-K. BNSF also makes available on its website other previously filed SEC reports, registration statements and exhibits via a link to the SEC's website at www.sec.gov. The following documents are also made available on the Company's website, and a copy will be mailed, without charge, upon request to Investor Relations:

- Code of Business Conduct and Ethics for Directors
- Code of Ethics for the Chief Executive Officer and Senior Financial Officers
- Code of Conduct for Salaried Employees
- Code of Business Conduct and Ethics for Scheduled Employees
- Corporate Governance Guidelines
- Charters of the Audit, Compensation and Development, and Directors and Corporate Governance Committees

Further discussion of the Company's business, including equipment and business sectors, is incorporated by reference from Item 2, "Properties."

### Item 1A. Risk Factors

***The Company faces intense competition from rail carriers and other transportation providers, and its failure to compete effectively could adversely affect its results of operations, financial condition or liquidity.***

The Company operates in a highly competitive business environment. Depending on the specific market, the Company faces intermodal, intramodal, product and geographic competition. For example, the Company believes that high service truck lines, due to their ability to deliver non-bulk products on an expedited basis, have had and will continue to have an adverse effect on the Company's ability to compete for deliveries of non-bulk, time-sensitive freight. While the Company must build or acquire and maintain its rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any material increase in the scope and quality of these alternative methods or the passage of legislation granting greater latitude to motor carriers with respect to size and weight restrictions could have an adverse effect on the Company's results of operations, financial condition or liquidity.

***A downturn in the economy or change in government policy could negatively impact demand for the Company's services.***

Significant, extended negative changes in economic conditions that impact the producers and consumers of the commodities transported by the Company may have an adverse effect on the Company's operating results, financial condition or liquidity. In addition, changes in United States and foreign government policies could change the economic environment and affect demand for our services. For example, changes in clean air laws may impact demand for coal and United States and foreign government agriculture subsidies may impact the demand for grain.

***As part of its railroad operations, the Company frequently transports chemicals and other hazardous materials.***

The Company is required to transport these commodities to the extent of its common carrier obligation. An accidental release of these commodities could result in a significant loss of life and extensive property damage. The associated costs could have an adverse effect on the Company's operating results, financial condition or liquidity.

***Future acts of terrorism or war, as well as the threat of war, may cause significant disruptions in the Company's business operations.***

Terrorist attacks, such as those that occurred on September 11, 2001, as well as the more recent attacks on the transportation systems in Madrid and London, any government response to those types of attacks and war or risk of war may adversely affect the Company's results of operations, financial condition or liquidity. The Company's rail lines and facilities could be direct targets or indirect casualties of an act or acts of terror, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues, which could have an adverse effect on its operating results and financial condition. Such effects could be magnified where releases of hazardous materials are involved. Any act of terror, retaliatory strike, sustained military campaign or war or risk of war may have an adverse impact on the Company's operating results and financial condition by causing or resulting in unpredictable operating or financial conditions, including disruptions of rail lines, volatility or sustained increase of fuel prices, fuel shortages, general economic decline and instability or weakness of financial markets which could restrict its ability to raise capital. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or certain coverage may not be available to the Company in the future.

***The Company is subject to stringent environmental laws and regulations which may impose significant costs on its business operations.***

The Company's operations are subject to extensive federal, state and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; the generation, handling, storage, transportation and disposal of waste and hazardous materials; and the cleanup of hazardous material or petroleum releases. In addition, many of the Company's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. Environmental liability can extend to previously owned or operated properties, leased properties and properties owned by third parties, as well as to properties currently owned and used by the Company. Environmental liabilities have arisen and may continue to arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. The Company has been and may continue to be subject to allegations or findings to the effect that it has violated, or is strictly liable under, these laws or regulations. The Company's operating results, financial condition or liquidity could be adversely affected as a result of any of the foregoing, and it may be required to incur significant expenses to investigate and remediate environmental contamination. The Company records liabilities for environmental cleanup when the amount of its liability is both probable and reasonably estimable.

***The Company's future success depends on its ability to continue to comply with the significant federal, state and local governmental regulations to which it is subject.***

The Company is subject to a significant amount of governmental regulation with respect to its rates and practices, railroad operations and a variety of health, safety, labor, environmental and other matters. Failure to comply with applicable laws and regulations could have a material adverse effect on the Company. Governments may change the legislative framework within which the Company operates without providing the Company with any recourse for any adverse effects that the change may have on its business. Also, some of the regulations require the Company to obtain and maintain various licenses, permits and other authorizations, and it cannot assure that it will continue to be able to do so. Increased economic regulation of the rail industry could negatively impact the Company's ability to determine prices for rail services and to make capital improvements to its rail network, resulting in an adverse effect on the Company's results of operations, financial condition or liquidity.

***The availability of qualified personnel and an aging workforce may adversely affect the Company's operations.***

Changes in demographics, training requirements and the availability of qualified personnel, particularly train crew members, could negatively impact service levels. In addition, approximately 45 percent of the workforce will be eligible for retirement within the next 10 years. The Company's efforts to attract and retain qualified personnel may be hindered due to increased demand in the job market. Unpredictable increases in demand for rail services may exacerbate these risks and may have an adverse effect on the Company's operating results, financial condition or liquidity.

***Most of the Company's employees are represented by unions, and failure to successfully negotiate collective bargaining agreements may result in strikes, work stoppages, or substantially higher ongoing labor costs.***

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. A negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated on November 1, 2004. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention) are exhausted. While the negotiations have not yet resulted in any extended work stoppages, if the Company is unable to negotiate acceptable new agreements, it could result in strikes by the affected workers, loss of business and increased operating costs as a result of higher wages or benefits paid to union members, any of which could have an adverse effect on the Company's operating results, financial condition or liquidity.

***Severe weather and natural disasters could disrupt normal business operations, which would result in increased costs and liabilities and decreases in revenues.***

The Company's success is dependent on its ability to operate its railroad system efficiently. Severe weather and natural disasters, such as tornados, flooding and earthquakes, could cause significant business interruptions and result in increased costs and liabilities and decreased revenues. In addition, damages to or loss of use of significant aspects of the Company's infrastructure due to natural or man-made disruptions could have an adverse affect on the Company's operating results, financial condition or liquidity for an extended period of time until repairs or replacements could be made. Extreme swings in weather could also negatively affect the performance of locomotives and rolling stock.

***Fuel supply availability and fuel prices may adversely affect the Company's results of operations, financial condition or liquidity.***

Fuel supply availability could be impacted as a result of limitations in refining capacity, disruptions to the supply chain, or rising global demand. A significant reduction in fuel availability could impact the Company's ability to provide transportation services at current levels, increase fuel costs and impact the economy. Each of these factors could have an adverse effect on the Company's operating results, financial condition or liquidity. Additionally, the Company is expected to be able to offset a significant portion of the anticipated higher fuel costs through its fuel surcharge program and fuel hedging activities in 2006. However, to the extent that the Company is unable to maintain and expand its existing fuel surcharge program, increases in fuel prices could have an adverse effect on the Company's operating results, financial condition or liquidity.

***The Company depends on the stability and availability of its information technology systems.***

The Company relies on information technology in all aspects of its business. A significant disruption or failure of its information technology systems could result in service interruptions, safety failures, security violations, regulatory compliance failures, and the inability to protect corporate information assets against intruders or other operational difficulties. Although the Company has taken steps to mitigate these risks, including Business Continuity Planning, Disaster Recovery Planning and Business Impact Analysis, a significant disruption could adversely affect the Company's results of operations, financial condition or liquidity. Additionally, if the Company is unable to acquire or implement new technology, it may suffer a competitive disadvantage, which could also have an adverse effect on the Company's results of operations, financial condition or liquidity.

***Personal injury claims constitute a significant expense, and increases in the amount or severity of these claims could adversely affect the Company's operating results.***

The Company is subject to various personal injury claims by third parties and employees, including claims by employees who worked around asbestos until it was substantially eliminated by 1985. Personal injury claims by BNSF Railway employees are subject to the Federal Employees' Liability Act (FELA), rather than state workers' compensation laws. The Company believes that the FELA system, which includes unscheduled awards and a reliance on the jury system, has contributed to increased expenses in the past. Future events, such as increases in the number of claims that will be filed, developments in legislative and judicial standards and the costs of settling claims, could result in an adverse effect on the Company's operating results.

**Item 1B. Unresolved Staff Comments**

None

**Item 2. Properties**

## TRACK CONFIGURATION

BNSF Railway operates over a railroad system consisting of approximately 32,000 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 24,000 miles of which are owned route miles, including easements, in 28 states and two Canadian provinces as of December 31, 2005. Approximately 8,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over other railroads' tracks.

As of December 31, 2005, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consists of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 9,000 route miles operated under trackage rights. At December 31, 2005, approximately 26,000 miles of BNSF Railway's track consists of 112-pound per yard or heavier rail, including approximately 19,000 track miles of 131-pound per yard or heavier rail.

## EQUIPMENT CONFIGURATION

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock and other equipment as of the dates shown below:

| At December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Locomotives | **5,790** | 5,715 | 5,377 |
| Freight Cars: | | | |
| Covered hopper | **34,631** | 35,066 | 36,255 |
| Gondola | **12,579** | 16,070 | 15,327 |
| Open hopper | **10,973** | 11,257 | 10,866 |
| Box – specially equipped | **8,658** | 9,625 | 10,021 |
| Flat | **8,537** | 8,132 | 7,854 |
| Refrigerator | **4,983** | 5,420 | 5,427 |
| Autorack | **748** | 894 | 827 |
| Tank | **422** | 612 | 639 |
| Box – general purpose | **27** | 27 | 31 |
| Other | **323** | 273 | 302 |
| Total freight cars | **81,881** | 87,376 | 87,549 |
| Domestic chassis | **12,649** | 9,846 | 9,864 |
| Domestic containers | **10,412** | 10,501 | 10,627 |
| Company service cars | **4,091** | 3,999 | 4,028 |
| Trailers | **1,916** | 2,152 | 2,152 |
| Commuter passenger cars | **179** | 166 | 163 |
| Average age from date of manufacture – locomotive fleet (years)[a] | **15** | 15 | 15 |
| Average age from date of manufacture – freight car fleet (years)[a] | **15** | 16 | 16 |

[a] These averages are not weighted to reflect the greater capacities of the newer equipment.

## CAPITAL EXPENDITURES AND MAINTENANCE

### CAPITAL EXPENDITURES

The extent of the BNSF Railway's maintenance and capacity program is outlined in the following table:

| Year Ended December 31, | 2006 Estimate | 2005 | 2004 | 2003 |
|---|---|---|---|---|
| Track miles of rail laid[a] | **854** | **711** | 695 | 749 |
| Cross ties inserted (thousands)[a] | **3,314** | **3,171** | 2,695 | 2,353 |
| Track resurfaced (miles) | **14,528** | **12,790** | 11,450 | 12,399 |

a Includes both maintenance of existing route system and expansion projects. Expenditures for these maintenance programs are primarily capitalized.

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2005, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the headings "Liquidity and Capital Resources; Investing Activities."

BNSF's planned 2006 cash capital expenditures are incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the headings "Executive Summary; Business Outlook for 2006."

### MAINTENANCE

As of December 31, 2005, General Electric Company, Alstom Transportation Inc., OmniTRAX Locomotive Services, LLC and Electro-Motive Diesel, Inc. performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 4,080 locomotives.

## PROPERTY AND FACILITIES

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 33 major intermodal hubs located across the system. BNSF Railway's largest intermodal facilities in terms of 2005 volume were as follows:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,338,000 |
| Willow Springs (Illinois) | 770,000 |
| Corwith Yard (Chicago, Illinois) | 730,000 |
| Alliance (Fort Worth, Texas) | 573,000 |
| San Bernardino (California) | 555,000 |
| Cicero (Illinois) | 522,000 |
| Logistics Park Chicago (Illinois) | 454,000 |
| Argentine (Kansas City, Kansas) | 317,000 |

BNSF Railway owns 23 automotive distribution facilities and serves eight port facilities where automobiles are loaded or unloaded from multi-level rail cars in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| Classification Yards | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas City, Kansas) | 1,795 |
| Galesburg (Illinois) | 1,653 |
| Pasco (Washington) | 1,393 |
| Barstow (California) | 1,384 |
| Memphis (Tennessee) | 962 |

As of December 31, 2005, certain BNSF Railway properties and other assets are subject to liens securing $384 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Notes 9 and 10 of the Consolidated Financial Statements.

## PRODUCTIVITY

Productivity in 2005, as measured by thousand gross ton miles per employee, was relatively consistent with 2004 as shown in the table below. Gross ton miles is defined as the product of the number of loaded and empty miles traveled and the combined weight of the car and contents.

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Thousand gross ton miles divided by average number of employees | **26,847** | 26,898 | 24,875 |

Volumes as measured by gross ton miles increased 5 percent in 2005 over 2004 and 11 percent in 2004 over 2003. In turn, the increase in volumes has led the Company to increase employee headcounts. A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Other Matters; Employee and Labor Relations."

## BUSINESS MIX

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural and natural resource industries. Approximately 65 percent of the freight revenues originated by the Company is covered by contractual agreements of varying duration, while the balance is subject to common carrier, published prices or quotations offered by the Company. BNSF's financial performance is influenced by, among other things, general and industry economic conditions at the international, national and regional levels. The following map illustrates the Company's primary routes, including trackage rights, which allow BNSF Railway to access major cities and ports in the western United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF Railway efficiently serves many smaller markets by working closely with approximately 200 shortline partners. BNSF has also entered into marketing agreements with Canadian National Railway Company and Kansas City Southern Railway Company, expanding the marketing reach for each railroad and their customers.




**CONSUMER PRODUCTS:**

The Consumer Products' freight business provided approximately 41 percent of freight revenues in 2005 and consisted of the following business sectors:

- **INTERNATIONAL INTERMODAL** — International business consists primarily of container traffic from steamship companies such as Maersk, Evergreen and Hyundai. International Intermodal accounted for approximately 41 percent of total Consumer Products revenues.
- **DOMESTIC INTERMODAL** — Domestic Intermodal generated approximately 44 percent of total Consumer Products revenue. The Domestic Intermodal sector is comprised of the following business areas:
    - **TRUCKLOAD** — This business area is comprised of full truckload carriers such as J.B. Hunt Transportation, Schneider National, U.S. Xpress Enterprises and Swift.
    - **DIRECT** — This business area is comprised of less-than-truckload carriers and parcel carriers such as United Parcel Service and YRC Worldwide, Inc.
    - **INTERMODAL MARKETING COMPANIES** — This business area is comprised of shipper agents and consolidators such as the Hub Group.
- **AUTOMOTIVE** — The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 8 percent of total Consumer Products revenues.
- **PERISHABLES AND DRY BOXCAR** — Perishables and Dry Boxcar represented approximately 7 percent of total Consumer Products revenues. This group consists of beverages, canned goods and perishable food items. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

**INDUSTRIAL PRODUCTS:**

Industrial Products' freight business provided approximately 23 percent of BNSF's freight revenues in 2005 and consisted of the following four business areas:

- **BUILDING PRODUCTS** — This sector generated approximately 39 percent of total 2005 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

- **CONSTRUCTION PRODUCTS** — The construction products sector represented approximately 34 percent of total Industrial Products revenues in 2005. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF Railway's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.

- **CHEMICALS AND PLASTICS** — The chemicals and plastics sector represented approximately 14 percent of total 2005 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- **PETROLEUM** — Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black, which made up 13 percent of total Industrial Products revenues for 2005. Product use varies based on commodity, and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

**COAL:**

In 2005, the transportation of coal contributed about 19 percent of freight revenues. BNSF Railway is the largest transporter of low-sulfur coal originating from the Powder River Basin of Wyoming and Montana, which accounted for approximately 93 percent of all BNSF Railway's coal tons during the year ended December 31, 2005. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast and Mountain regions of the United States. BNSF Railway also transports coal from the Powder River Basin to markets in Canada and the eastern United States. Demand for Powder River Basin coal has increased substantially over the past 20 years due to environmental compliance issues, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants.

Other BNSF coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and to Mexico.

**AGRICULTURAL PRODUCTS:**

The transportation of Agricultural Products provided approximately 17 percent of 2005 total freight revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company is developing and operating a shuttle network for grain and grain products, which allows more efficient use of equipment and improved cycle times. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

## FREIGHT STATISTICS:

The following table sets forth certain freight statistics relating to rail operations for the periods indicated:

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Revenue ton miles (millions)* | **596,575** | 570,688 | 508,200 |
| Freight revenue per thousand revenue ton miles | **$ 21.13** | $ 18.82 | $ 18.27 |
| Average length of haul (miles) | **1,068** | 1,045 | 1,014 |

* Revenue ton miles is defined as the product of the number of loaded miles traveled and the weight of the contents.

Revenue, cars/units and average revenue per car/unit information for the three years ended December 31, 2005, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Results of Operations; Revenue Table."

## GOVERNMENT REGULATION AND LEGISLATION

The Company is subject to federal, state and local laws and regulations generally applicable to all businesses. Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of the DOT, the Occupational Safety and Health Administration (OSHA), as well as other federal and state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction, and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the profitability of BNSF's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations, including the transportation of hazardous materials. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are also subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances, and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject to, and will from time to time continue to be subject to, environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site, without regard to fault or the legality of the original conduct. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to clean up sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. Further discussion is incorporated by reference from Note 10 of the Consolidated Financial Statements.

## RAILROAD RETIREMENT

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been approximately triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II), and other benefits. For 2005, the Railroad Retirement System required up to a 20.25 percent contribution by railroad employers on eligible wages, while the Social Security and Medicare Acts only required a 7.65 percent contribution on similar wage bases.

## COMPETITION

The business environment in which BNSF Railway operates is highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time-sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is the Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting to the Association of American Railroads, BNSF's share of the western United States rail traffic in 2005 was approximately 48 percent.

### Item 3. Legal Proceedings

*Ray Ridgeway, et al. v. Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company*, No. 48-185170-00 (District Court of Tarrant County, Texas, 48th Judicial District) is a state court action filed on October 27, 2000. The plaintiffs' causes of action include alleged breach of contract, negligence, and breach of fiduciary duties with respect to a special dividend that was paid in 1988 by a BNSF predecessor, Santa Fe Southern Pacific Corporation (SFSP). The complaint alleges that SFSP erroneously informed shareholders as to the tax treatment of the dividend–specifically, the apportionment of the dividend as either a distribution of earnings and profits or a return of capital–which allegedly caused some shareholders to overpay their income taxes. The plaintiffs assert, through their expert's report, that SFSP had essentially no accumulated earnings and profits and that the entire dividend distribution should have been treated as a return of capital, rather than the approximately 34 percent that SFSP determined was a return of capital. On July 8, 2005, the court entered an order denying the plaintiffs' requests to certify a class action, and the plaintiffs subsequently filed an appeal of this ruling to the Texas Court of Appeals. BNSF believes these claims lack merit and that it has substantial defenses on both the merits of these claims and the attempted class action, and it is defending these claims vigorously.

BNSF Railway was notified by the Minnesota Pollution Control Agency (MPCA) of a proposed Stipulation Agreement to resolve alleged environmental violations with respect to BNSF Railway's Dilworth, Minnesota fueling facility. The MPCA alleges violations involving BNSF Railway's wastewater permit, tank regulations, and hazardous waste regulations. In October 2005, the MPCA presented BNSF Railway with proposed monetary sanctions. Although the parties are negotiating a settlement, it is possible that resolution of this matter could result in monetary sanctions exceeding $100,000.

Information concerning certain pending tax-related administrative or adjudicative state proceedings or appeals is incorporated by reference from Note 5 of the Consolidated Financial Statements, and information concerning other claims and litigation is incorporated by reference from Note 10 of the Consolidated Financial Statements.

**Item 4. Submission of Matters to a Vote of Security Holders**

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2005.

## EXECUTIVE OFFICERS OF THE REGISTRANT

Listed below are the names, ages, and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation, or removal.

**MATTHEW K. ROSE, 46**

Chairman, President and Chief Executive Officer of BNSF since March 2002. Previously President and Chief Executive Officer of BNSF from December 2000. Also, Chairman, President and Chief Executive Officer of BNSF Railway from December 2000.

**THOMAS N. HUND, 52**

Executive Vice President and Chief Financial Officer since January 2001. Prior to that, Senior Vice President and Chief Financial Officer and Treasurer from August 1999.

**CARL R. ICE, 49**

Executive Vice President and Chief Operations Officer since January 2001. Prior to that, Senior Vice President – Operations from June 1999.

**JOHN P. LANIGAN, JR., 50**

Executive Vice President and Chief Marketing Officer since January 2003. Prior to that, President and Chief Executive Officer of Logistics.com, Inc. (provider of ASP-based transportation procurement services to shippers and carriers) from May 2000.

**JEFFREY R. MORELAND, 61**

Executive Vice President – Law & Government Affairs and Secretary since December 2001. Prior to that, Executive Vice President – Law and Chief of Staff since January 2001, and Senior Vice President – Law and Chief of Staff since February 1998.

**PETER J. RICKERSHAUSER, 57**

Vice President – Network Development since May 1999.

# Part II

## Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." In 2005, the Company decided to de-list its common stock from the Chicago Stock Exchange and the Pacific Exchange, effective December 31, 2005, due to low trading volume and regulatory compliance costs. Information as to the high and low sales prices of such stock for the two years ending December 31, 2005, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 17 of the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 2, 2006, was 35,000.

### COMMON STOCK REPURCHASES

The following table presents repurchases by the Company of its common stock for each of the three months for the quarter ended December 31, 2005 (shares in thousands):

| Issuer Purchases of Equity Securities | | | | |
|---|---|---|---|---|
| Period | Total Number of Shares Purchased[a] | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[b] | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs[b] |
| October 1 – 31 | 37 | $ 60.12 | – | 5,160 |
| November 1 – 30 | 1,625 | 63.89 | 1,597 | 3,563 |
| December 1 – 31 | 1,840 | 66.38 | 1,800 | 31,763 |
| Total | 3,502 | $ 65.15 | 3,397 | |

a Total number of shares purchased includes approximately 105,000 shares where employees delivered already owned shares or used an attestation procedure to satisfy the exercise price of stock options or the withholding of tax payments. Total number of shares purchased does not include approximately 35,000 shares acquired from employees to satisfy tax withholding obligations that arose on the vesting of restricted stock or the exercise of stock options.

b On July 17, 1997, the Board initially authorized and the Company announced the repurchase of up to 30 million shares of the Company's common stock from time to time through open market transactions or otherwise. On December 9, 1999, April 20, 2000, September 21, 2000, January 16, 2003 and December 8, 2005, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date for a total of 180 million shares authorized. The share repurchase program does not have an expiration date.

**Item 6. Selected Financial Data**

The following table presents, as of and for the dates indicated, selected historical financial information for the Company (dollars in millions, except per share data):

| December 31, | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | **$ 12,987** | $ 10,946 | $ 9,413 | $ 8,979 | $ 9,208 |
| Operating income | **$ 2,922**[a] | $ 1,686[b] | $ 1,665 | $ 1,656 | $ 1,750 |
| Income before cumulative effect of accounting change | **$ 1,531**[a] | $ 791[b] | $ 777[c] | $ 760 | $ 731 |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 4.12**[a] | $ 2.14[b] | $ 2.10[c] | $ 2.01 | $ 1.89 |
| Average basic shares (in millions) | **371.8** | 370.0 | 369.1 | 378.0 | 387.3 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 4.01**[a] | $ 2.10[b] | $ 2.09[c] | $ 2.00 | $ 1.87 |
| Average diluted shares (in millions) | **381.8** | 376.6 | 372.3 | 380.8 | 390.7 |
| Dividends declared per common share | **$ 0.74** | $ 0.64 | $ 0.54 | $ 0.48 | $ 0.48 |
| **At year end:** | | | | | |
| Total assets | **$ 30,304** | $ 28,925 | $ 26,947 | $ 25,767 | $ 24,721 |
| Long-term debt and commercial paper, including current portion | **$ 7,154** | $ 6,516 | $ 6,684 | $ 6,814 | $ 6,651 |
| Stockholders' equity | **$ 9,508** | $ 9,311 | $ 8,495 | $ 7,932 | $ 7,849 |
| Net debt to total capitalization[d] | **42.7%** | 39.9% | 44.0% | 46.1% | 45.8% |
| **For the year ended:** | | | | | |
| Total capital expenditures | **$ 1,750** | $ 1,527 | $ 1,726 | $ 1,358 | $ 1,459 |
| Depreciation and amortization | **$ 1,075** | $ 1,012 | $ 910 | $ 931 | $ 909 |

a 2005 operating income, income before cumulative effect of accounting change and earnings per share include a loss related to an agreement to sell certain line segments to the state of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share.

b 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share, as described in Note 10 of the Consolidated Financial Statements.

c 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share, as described in Note 2 of the Consolidated Financial Statements.

d Net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

## CALCULATION OF RETURN ON INVESTED CAPITAL

BNSF's return on invested capital (ROIC), as discussed in the "Letter from the Chairman, President, and Chief Executive Officer" in the Company's 2005 Annual Report, is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, other information prepared in accordance with GAAP. However, the information is included herein as management believes that ROIC provides meaningful information that can be useful in assessing the long-term performance of the Company's business and in evaluating potential strategic transactions. Below is the calculation of ROIC for the years ended December 31, 2005, 2004 and 2003.

| Year ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Average capitalization[a] | **$ 19,831** | $ 19,069 | $ 18,409 |
| Operating income | **$ 2,922** | $ 1,686 | $ 1,665 |
| Other expense | **(37)** | (4) | (14) |
| Financing charges[b] | **305** | 274 | 262 |
| Exclude 2004 charge for change in estimate of unasserted asbestos and environmental liabilities | **–** | 465 | – |
| Taxes[c] | **(1,196)** | (917) | (707) |
| After-tax income excluding financing charges and 2004 charge | **$ 1,994** | $ 1,504 | $ 1,206 |
| Return on invested capital[d] | **10.1%** | 7.9% | 6.6% |

a Average capitalization is calculated as the average of the sum of stockholders' equity, net debt (total debt less cash and cash equivalents), the net present value of future operating lease commitments, and the receivables sold under the accounts receivable sales program for the most recent preceding 13 month ends.

b Financing charges represent the estimated interest expense included in operating lease payments and A/R sales fees.

c Taxes are calculated as the sum of monthly operating income, other expense, A/R sales, and an operating lease interest factor (estimated interest expense included in operating lease payments) multiplied by a federal tax rate respective to each month.

d Return on invested capital is calculated as the total after-tax income excluding financing charges and 2004 charge divided by average capitalization.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries (collectively BNSF, Registrant or Company). The principal operating subsidiary of BNSF is the BNSF Railway Company (BNSF Railway) through which BNSF derives substantially all of its revenues. All earnings per share information is stated on a diluted basis.

## COMPANY OVERVIEW

Through its subsidiaries, BNSF is engaged primarily in the rail transportation business. The rail operations of BNSF's primary operating subsidiary, BNSF Railway, comprise one of the largest railroad networks in North America, with 32,000 route miles in 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including Consumer Products, Industrial Products, Coal and Agricultural Products.

Additional operational information, including weekly intermodal and carload unit reports as submitted to the American Association of Railroads and annual reports submitted to the Surface Transportation Board, are available on the Company's website at www.bnsf.com/investors.

## EXECUTIVE SUMMARY

### FISCAL YEAR 2005 — FINANCIAL OVERVIEW

- The Company achieved record earnings of $4.01 per share, which included a $0.12 per share after tax loss related to an agreement to sell certain line segments to the state of New Mexico, compared with 2004 earnings of $2.10 per share, which included a third-quarter charge for a change in estimate of unasserted asbestos and environmental liabilities totaling $0.77 per share after tax.
- Freight revenues increased 17 percent compared with 2004, to $12.6 billion, a record for annual revenues.
  - The 17 percent increase in revenue is attributable to growth in unit volumes, rates and fuel surcharges, partially offset by a slight decrease due to business mix.
- Operating expenses for 2005 increased 9 percent compared with 2004, primarily due to an increase in volumes, higher fuel costs and a $71 million pre-tax loss related to an agreement to sell certain line segments to the state of New Mexico, partially offset by lower asbestos and environmental costs due to the $465 million pre-tax charge in 2004 related to a change in BNSF's estimates of unasserted asbestos and environmental liabilities.
- Operating income increased to nearly $3.0 billion, an all-time record for the Company.
- Each year capital expenditures are a significant use of cash for BNSF. In 2005, BNSF increased its cash capital expenditures to $1.75 billion from $1.53 billion in the prior year primarily due to additional expansion projects in 2005.
- Moody's Investors Service affirmed the ratings of BNSF's senior unsecured debt at Baa2 and changed the outlook to positive from stable in August of 2005.

### BUSINESS OUTLOOK FOR 2006

- BNSF expects to see strong revenue growth in the 10 to 13 percent range in freight revenues. Half of the revenue growth is anticipated to be driven by volume, and the remainder is expected from pricing and fuel surcharges.
  - Coal and intermodal are expected to lead the trend of strong unit growth.
- Combining projected revenue growth with an ongoing focus on productivity, earnings per share is anticipated to grow in the mid-teens despite operating income being negatively impacted by the combination of fuel prices, hedges and fuel surcharge recoveries.
- The Company anticipates that the operating ratio (calculated as operating expenses less other revenues divided by freight revenues) will be below 77 percent.

- The Company plans to increase its capital commitment program to approximately $2.4 billion in 2006, which includes both cash spent for capital and locomotive leases. Compared with 2005, this represents an increase of approximately 10 percent.
  - Capital commitments are increasing to meet projected future demand, while the Company anticipates improving its return on invested capital.
  - BNSF anticipates spending $1.4 billion to keep its infrastructure strong by replacing track, signal systems and structures; rebuilding rolling stock; and implementing new technology.
  - BNSF also plans to acquire 310 locomotives at a cost of approximately $550 million.
  - The Company anticipates investing approximately $400 million in track and facilities to expand capacity.

## RESULTS OF OPERATIONS

### REVENUE TABLE

The following table presents BNSF's revenue information by commodity group for the years ended December 31, 2005, 2004 and 2003:

| | Revenues (in millions) | | | Cars / units (in thousands) | | | Average revenue per car / unit | | |
|---|---|---|---|---|---|---|---|---|---|
| **Year ended December 31,** | **2005** | **2004** | **2003** | **2005** | **2004** | **2003** | **2005** | **2004** | **2003** |
| Consumer Products | **$ 5,156** | $ 4,245 | $ 3,657 | **5,306** | 4,859 | 4,336 | **$ 972** | $ 874 | $ 843 |
| Industrial Products | **2,871** | 2,448 | 2,138 | **1,564** | 1,561 | 1,428 | **1,836** | 1,568 | 1,497 |
| Coal | **2,448** | 2,277 | 2,025 | **2,238** | 2,216 | 2,048 | **1,094** | 1,028 | 989 |
| Agricultural Products | **2,131** | 1,772 | 1,465 | **916** | 900 | 834 | **2,326** | 1,969 | 1,757 |
| Total freight revenues | **12,606** | 10,742 | 9,285 | **10,024** | 9,536 | 8,646 | **$ 1,258** | $ 1,126 | $ 1,074 |
| Other revenues | **381** | 204 | 128 | | | | | | |
| Total operating revenues | **$ 12,987** | $ 10,946 | $ 9,413 | | | | | | |

### EXPENSE TABLE

The following table presents BNSF's expense information for the years ended December 31, 2005, 2004 and 2003 (in millions):

| **Year ended December 31,** | **2005** | **2004** | **2003** |
|---|---|---|---|
| Compensation and benefits | **$ 3,515** | $ 3,322 | $ 2,963 |
| Fuel | **1,959** | 1,335 | 1,093 |
| Purchased services | **1,714** | 1,424 | 1,252 |
| Depreciation and amortization | **1,075** | 1,012 | 910 |
| Equipment rents | **886** | 790 | 705 |
| Materials and other | **916** | 1,377[a] | 825 |
| Total operating expenses | **$ 10,065** | $ 9,260 | $ 7,748 |
| | | | |
| Interest expense | **$ 437** | $ 409 | $ 420 |
| Other expense, net | **$ 37** | $ 4 | $ 14 |
| Income tax expense | **$ 917** | $ 482 | $ 454 |

a 2004 materials and other expense includes a $465 million pre-tax charge related to changes in estimates of the Company's unasserted asbestos and environmental liabilities (see Note 10 of the Consolidated Financial Statements).

### YEAR ENDED DECEMBER 31, 2005 COMPARED WITH YEAR ENDED DECEMBER 31, 2004

BNSF recorded net income for 2005 of $1,531 million, or $4.01 per share, which included a $0.12 per share loss related to an agreement to sell certain line segments to the state of New Mexico (see Item 7, Management's Discussion and Analysis of Financial Position and Results of Operations under the heading "New Mexico Department of Transportation"). In comparison, net income for 2004 was $791 million, or $2.10 per share, which included a $288 million, net of tax, or $0.77 per share charge for a change in the Company's estimate of unasserted asbestos liabilities and environmental liabilities (see Note 10 of the Consolidated Financial Statements).

## REVENUES

### FREIGHT

Freight revenues of $12,606 million for 2005 were $1,864 million, or 17 percent, higher than 2004. Freight revenues were up due to a 5 percent increase in volumes, despite a decrease in car velocity from 199 miles per day in 2004 to approximately 190 miles per day in 2005. Freight revenues in 2005 included fuel surcharges of approximately $1.1 billion compared with approximately $350 million in the prior year. Growth in rates and fuel surcharges drove average revenue per car/unit up 12 percent in 2005 to $1,258 from $1,126 in 2004.

### CONSUMER PRODUCTS

The Consumer Products' freight business consists of the following business areas: international intermodal, domestic intermodal, automotive, and perishables and dry boxcar.

Consumer Products revenues of $5,156 million for 2005 were $911 million, or 22 percent, greater than 2004. The increase in Consumer Products revenues was strong in all sectors. The increase in average revenue per unit of 11 percent was primarily related to rate increases and increased fuel surcharges.




### INDUSTRIAL PRODUCTS

Industrial Products' freight business consists of four business areas: building products, construction products, chemicals and plastic products, and petroleum products.

Industrial Products revenues increased $423 million, or 17 percent, to $2,871 million for 2005. The revenue increase was primarily due to increased lumber, panel and paper traffic in the building products sector, as well as increased traffic in petroleum products, partially offset by decreased volumes in waste products in the building products sector as well as steel and taconite in the construction products sector. Rate increases along with increased fuel surcharges contributed to a 17 percent increase in average revenue per car.




### COAL

BNSF is one of the largest transporters of low-sulfur coal in the United States. Approximately 93 percent of all BNSF Railway's coal tons originate from the Powder River Basin of Wyoming and Montana.

Coal revenues of $2,448 million for 2005 increased $171 million, or 8 percent, versus a year ago. Coal volumes increased slightly as a result of new customer business and higher demand from existing customers, partially offset by weather-related operational and maintenance disruptions in the Powder River Basin. Average revenue per car increased 6 percent primarily driven by contractual rate escalations and increased average length of haul.

### AGRICULTURAL PRODUCTS

The Agricultural Products' freight business transports agricultural products including corn, wheat, soybeans, bulk foods, fertilizer and other products.

Agricultural Products revenues of $2,131 million for 2005 were $359 million, or 20 percent, higher than revenues for 2004. Average revenue per car increased 18 percent primarily driven by mix as a result of strong exports out of the Pacific Northwest, price increases and increased fuel surcharges.



***OTHER REVENUES***

Other Revenues increased $177 million, or 87 percent, to $381 million for 2005 compared to 2004. This increase was primarily attributable to increases in storage-related revenues and volume growth, in addition to the acquisitions and volume growth of BNSF Logistics, a wholly-owned non-rail subsidiary that specializes in providing third-party logistic services.

***EXPENSES***

Total operating expenses for 2005 were $10,065 million, an increase of $805 million, or 9 percent, over 2004. The increase in operating expenses was the result of significant fuel price increases, a 5-percent increase in gross-ton miles handled and a $71 million pre-tax loss related to an agreement to sell certain line segments to the state of New Mexico, offset by lower asbestos and environmental costs due to the $465 million pre-tax charge taken in 2004 to reflect changes in the Company's estimate of unasserted asbestos liabilities and environmental liabilities.

***COMPENSATION AND BENEFITS***

Compensation and benefits includes expenses for BNSF employee compensation and benefit programs. The primary factors influencing the expenses recorded are volume, headcount, utilization, wage rates, incentives earned during the period, benefit plan participation as well as pension-related expenses.

Compensation and benefits expenses of $3,515 million were $193 million, or 6 percent, higher than 2004. The increase was primarily related to the significant increase in freight volumes experienced in 2005. The increases in freight volumes drove an increase in crew training costs and an approximate 5 percent increase in employee headcount.

***FUEL***

Fuel expense is driven by market price, the level of locomotive consumption of diesel fuel and the effects of hedging activities.

Fuel expenses of $1,959 million for 2005 were $624 million, or 47 percent, higher than 2004. The increase in fuel expense is due to an increase in the average all-in cost per gallon of diesel fuel, as well as an increase in consumption driven by higher volumes. The average all-in cost per gallon of diesel fuel increased by 40 cents, or $566 million, which is comprised of an increase in the average purchase price of 53 cents, or $759 million, partially offset by an increase in the hedge benefit of 13 cents, or $193 million (2005 benefit of $531 million less 2004 benefit of $338 million). Consumption in 2005 was 1,402 million gallons compared with 1,344 million gallons in 2004, resulting in a $58 million increase in fuel expense.

In the future, benefits from hedging activities are expected to decrease as the Company increases its fuel surcharge program. When compared to 2005, operating income is expected to be negatively impacted by the combination of fuel prices, hedges and fuel surcharge recoveries.

***PURCHASED SERVICES***

Purchased services expense includes ramping (lifting of containers onto and off of cars); drayage (highway movements to and from railway facilities); maintenance of locomotives, freight cars and equipment; transportation costs over other railroads; technology services outsourcing; professional services; and other contract services provided to BNSF. Purchased services expense also includes purchased transportation costs for BNSF Logistics. The expenses are driven by the rates established in the related contracts and the volume of services required.

Purchased services expenses of $1,714 million for 2005 were $290 million, or 20 percent, higher than 2004. This increase was primarily due to increases in the following volume-related costs: approximately $75 million higher intermodal ramp costs; approximately $70 million higher locomotive, freight car and equipment maintenance expense; approximately $45 million higher purchased transportation costs for BNSF Logistics and approximately $30 million higher payments for transportation over other railroads.

***DEPRECIATION AND AMORTIZATION***

Depreciation and amortization expenses for the period are determined by using the group method of depreciation, applying a single rate to the gross investment in a particular class of property. Due to the capital-intensive nature of BNSF's operations, depreciation expense is a significant component of the Company's operating expense. The full effect of inflation is not reflected in operating expenses since depreciation is based on historical cost.

Depreciation and amortization expenses of $1,075 million for 2005 were $63 million, or 6 percent, higher than 2004. This increase was primarily due to ongoing capital expenditures.

***EQUIPMENT RENTS***

Equipment rents expense includes long-term and short-term payments primarily for locomotives, freight cars, containers and trailers. Variances in expense are driven primarily by volume, lease and rental rates, utilization of equipment and changes in business mix resulting in equipment usage variances.

Equipment rents expenses for 2005 of $886 million were $96 million, or 12 percent, higher than 2004. Expense increases of $70 million for freight car equipment and $26 million for locomotive leases were driven by increases in units resulting from significant volume increases as well as higher lease rates.

***MATERIALS AND OTHER***

Material expenses consist mainly of the costs involved to purchase mechanical and engineering materials and other items for construction and maintenance of property and equipment. Other expenses include personal injury claims, environmental remediation and derailments as well as employee separation costs, utilities, impairments of long-lived assets and property and miscellaneous taxes. The total is offset by gains on land sales and other recoveries.

Materials and other expenses of $916 million for 2005, which consists of approximately $360 million of materials expense with the remainder consisting of numerous other items, were $461 million, or 33 percent, lower than 2004. In 2005, materials and other expense was impacted by an impairment charge of $71 million related to the future sale of certain line segments as well as $70 million of increased material costs for locomotives, freight cars and track structure, partially offset by lower environmental and personal injury expense in 2005. However, the $465 million pre-tax charge recorded in 2004 to reflect a change in BNSF's estimates of unasserted asbestos and environmental liabilities more than offset these changes by a significant amount.

***INTEREST EXPENSE***

Interest expense of $437 million for 2005 was $28 million, or 7 percent, higher than 2004. This increase was primarily the result of higher average interest rates in 2005.

***OTHER EXPENSE, NET***

Other expense of $37 million for 2005 was $33 million higher than in 2004. The increase in other expense, net was predominantly due to the receipt of interest income on a settlement that occurred in 2004, losses on BNSF's participation in a synthetic fuel partnership for which tax credits are generated and higher accounts receivable sales fees driven primarily by higher interest rates.

**YEAR ENDED DECEMBER 31, 2004 COMPARED WITH YEAR ENDED DECEMBER 31, 2003**

BNSF recorded net income for 2004 of $791 million, or $2.10 per share. 2004 net income includes a $288 million, net of tax, or $0.77 per share charge for a change in the Company's estimate of unasserted asbestos liabilities and environmental liabilities (see Note 10 of the Consolidated Financial Statements). In comparison, net income for 2003 was $816 million, or $2.19 per share, which includes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.10 per share (see Note 2 of the Consolidated Financial Statements).

***REVENUES***

***FREIGHT***

Freight revenues of $10,742 million for 2004 were $1,457 million, or 16 percent, higher than 2003. Freight revenues in 2004 included fuel surcharges of approximately $350 million compared with approximately $100 million in the prior year. Average revenue per car/unit increased 5 percent in 2004 to $1,126 from $1,074 in 2003.

***CONSUMER PRODUCTS***

Consumer Products revenues of $4,245 million for 2004 were $588 million, or 16 percent, greater than 2003. The increase in Consumer Products revenues was primarily due to double-digit volume growth in the international and domestic intermodal sectors. The increase in average revenue per unit of 4 percent was primarily related to rate increases and increased fuel surcharges.




***INDUSTRIAL PRODUCTS***

Industrial Products revenues increased $310 million, or 15 percent, to $2,448 million for 2004. The revenue increase was primarily due to increased lumber, plywood, particleboard and paper traffic in the building products sector and increased business in steel, taconite and clay in the construction products sector, as well as increased traffic in petroleum products and plastics. Rate increases along with increased fuel surcharges contributed to a 5 percent increase in average revenue per car.




***COAL***

Coal revenues of $2,277 million for 2004 increased $252 million, or 12 percent, versus a year ago. The increase was primarily a result of new customer business volumes and higher demand from existing customers. Average revenue per car increased 4 percent primarily driven by contractual rate escalations and increased average length of haul.

***AGRICULTURAL PRODUCTS***

Agricultural Products revenues of $1,772 million for 2004 were $307 million, or 21 percent, higher than revenues for 2003. This increase was primarily driven by strong corn and wheat exports out of the Pacific Northwest. The average revenue per car increased 12 percent primarily driven by the mix of commodity and destination price increases, increased fuel surcharges and increased average length of haul.




***OTHER REVENUES***

Other Revenues increased $76 million, or 59 percent, to $204 million for 2004 compared to 2003. This increase was primarily attributable to increased volumes related to BNSF Logistics, a wholly-owned non-rail subsidiary that specializes in providing third-party logistic services, and demurrage.

***EXPENSES***

Total operating expenses for 2004 were $9,260 million, an increase of $1,512 million, or 20 percent, over 2003. The increase was primarily due to a $465 million pre-tax charge to reflect changes in the Company's estimate of unasserted asbestos liabilities and environmental liabilities. The increase in operating expenses was also the result of an 11 percent increase in gross-ton miles handled and significant fuel price increases.

***COMPENSATION AND BENEFITS***

Compensation and benefits expenses of $3,322 million were $359 million, or 12 percent, higher than 2003. The increase was primarily related to the significant increase in volumes. These increases in traffic volume drove an approximate 3 percent increase in employee headcount as well as greater overtime and crew training costs. Improved financial performance has led to higher incentive expenses for the Company's salaried and scheduled workforce. Additionally, BNSF recognized increased pension costs of $17 million.

***FUEL***

Fuel expenses of $1,335 million for 2004 were $242 million, or 22 percent, higher than 2003. The increase in fuel expense is due to an increase in the average all-in cost per gallon of diesel fuel, as well as an increase in consumption driven by higher volumes. The average all-in cost per gallon of diesel fuel increased by 9 cents, or $124 million, which is comprised of an increase in the average purchase price of 29 cents, or $394 million, partially offset by an increase in the hedge benefit of 20 cents, or $270 million (2004 benefit of $338 million less 2003 benefit of $68 million). Consumption in 2004 was 1,344 million gallons compared with 1,213 million gallons in 2003.

***PURCHASED SERVICES***

Purchased services expenses of $1,424 million for 2004 were $172 million, or 14 percent, higher than 2003 primarily due to higher costs for locomotive contract maintenance expense of $50 million, haulage expense of $27 million and intermodal ramp costs of $20 million for contracted transportation over other railroads, all of which were primarily driven by higher volume. Additionally, purchased transportation costs for BNSF Logistics increased $45 million as a result of increases in its business.

***DEPRECIATION AND AMORTIZATION***

Depreciation and amortization expenses of $1,012 million for 2004 were $102 million, or 11 percent, higher than 2003. The majority of the increase was due to ongoing capital expenditures. Additionally, about $40 million of this increase was due to the expiration of credits to depreciation expense resulting from the application of purchase accounting at the time of the merger in 1996. As a result of a depreciation rate study completed with the assistance of third-party consultants in 2004, BNSF adopted new depreciation rates applied to track structure. This change in rate caused a net decrease in annual depreciation expense of approximately $5 million for 2004 and approximately $16 million on an ongoing annual basis, as calculated using the asset base at the time of the rate change.

***EQUIPMENT RENTS***

Equipment rents expenses for 2004 of $790 million were $85 million, or 12 percent, higher than 2003. Expense increases of $68 million for freight car equipment and $17 million for locomotive leases are predominantly related to significant volume increases.

***MATERIALS AND OTHER***

Materials and other expenses of $1,377 million for 2004, which consists of approximately $300 million of materials expense with the remainder consisting of other items, including a charge of $465 million pre-tax related to a change in BNSF's estimates of unasserted asbestos liabilities and environmental liabilities, were $552 million higher than 2003. In addition to the charge, materials and other expenses increased due to higher material costs of $44 million primarily to maintain freight cars and locomotives due to higher volumes, increased environmental expenses of $28 million primarily related to developments at two former fueling facility sites, increased casualty costs of $32 million driven by two large derailments, and a $24 million decrease in the carrying value of certain assets (see Note 7 of the Consolidated Financial Statements) partially offset by decreases in property and other miscellaneous taxes of $9 million, and increased gains from land sales of $23 million.

***INTEREST EXPENSE***

Interest expense of $409 million for 2004 was $11 million, or 3 percent, lower than 2003. This decrease was primarily the result of lower average interest rates and lower average debt outstanding.

***OTHER EXPENSE, NET***

Other expense of $4 million for 2004 was $10 million lower than in 2003. The decrease in expense was due to the receipt of interest income on a settlement that occurred during the third quarter of 2004, partially offset by losses on company owned life insurance.

***INCOME TAXES***

The effective tax rate in 2004 was 37.9 percent compared with 36.9 percent for the prior year. The increase in the effective tax rate primarily reflects a tax settlement attributable to prior years that was settled favorably in 2003.

## LIQUIDITY AND CAPITAL RESOURCES

Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance including commercial paper, the leasing of assets and the sale of a portion of its accounts receivable.

### OPERATING ACTIVITIES

***2005***

Net cash provided by operating activities was $2,609 million during 2005 compared with $2,377 million during 2004. The increase was primarily the result of an increase in earnings before the effect of the 2004 third quarter charge related to a change in BNSF's estimates of unasserted asbestos liabilities and environmental liabilities, which had no impact on the Company's cash flows (see note 10 of the Consolidated Financial Statements) and a use of cash related to the $350 million decrease in the Company's accounts receivable sales program (see Note 6 of the Consolidated Financial Statements). The decrease in the Company's accounts receivable sales program resulted in higher commercial paper (see Note 9 of the Consolidated Financial Statements).

***2004***

Net cash provided by operating activities was $2,377 million during 2004 compared with $2,285 million during 2003. The increase was primarily the result of an increase in earnings before the effect of the aforementioned third quarter 2004 charge.

### INVESTING ACTIVITIES

***2005***

Net cash used for investing activities was $2,023 million during 2005 compared with $1,595 million during 2004. Investing activities for the year include $1,750 million of capital expenditures, which were $223 million higher than 2004 primarily due to an increase in capital expenditures for maintenance of BNSF's track structure and for terminal and line expansions. The increase in cash used for other investing activities primarily reflects the timing of equipment financing activities, consideration paid to another carrier for trackage rights and alternative access rights (see Note 7 of the Consolidated Financial Statements), line acquisitions and investment in Pace Synfuels as well as a $26 million cash source in the first quarter of 2004 related to the consolidation of San Jacinto Rail Limited (see Note 2 of the Consolidated Financial Statements).

***2004***

Net cash used for investing activities was $1,595 million during 2004 compared with $1,806 million during 2003. Investing activities for the year include $1,527 million of capital expenditures, which were $199 million lower than 2003 primarily due to the fact that most of the locomotives acquired in 2004 were leased, whereas the majority of locomotives acquired in 2003 were purchased.

A breakdown of cash capital expenditures during 2005, 2004 and 2003 is set forth in the following table (in millions):

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Maintenance of way: | | | |
| Rail | **$ 232** | $ 219 | $ 202 |
| Ties | **284** | 257 | 227 |
| Surfacing | **183** | 159 | 160 |
| Other | **354** | 359 | 337 |
| Total maintenance of way | **1,053** | 994 | 926 |
| Mechanical | **136** | 114 | 133 |
| Information services | **64** | 73 | 63 |
| Other | **108** | 107 | 116 |
| Total maintenance of business | **1,361** | 1,288 | 1,238 |
| New locomotive acquisitions | **–** | 16 | 270 |
| Terminal and line expansion | **389** | 223 | 218 |
| Total | **$ 1,750** | $ 1,527 | $ 1,726 |

The above table does not include expenditures for equipment financed through operating leases (principally related to locomotives).

**FINANCING ACTIVITIES**

***2005***

Net cash used for financing activities during 2005 was $833 million primarily related to the following: (i) common stock repurchases of $799 million, (ii) prepaid forward share repurchases of $600 million (see Note 15 of the Consolidated Financial Statements), and (iii) dividend payments of $267 million, which where partially offset by net debt borrowings of $599 million and proceeds from stock options exercised of $244 million.

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month LIBOR rate plus 2.35%, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company will not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company will be required to sell common stock, the proceeds of which will be used to pay any accrued and unpaid interest. At December 31, 2005, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance are being used to repurchase common stock, with the remainder used for general corporate purposes.

Aggregate debt to mature in 2006 is $456 million. BNSF's ratio of net debt to total capitalization was 42.7 percent at December 31, 2005, compared with 39.9 percent at December 31, 2004. The Company's adjusted net debt to total capitalization was 51.5 percent at December 31, 2005, compared to 51.0 percent at December 31, 2004. BNSF's adjusted net debt to total capitalization is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, the information prepared in accordance with GAAP. However, the information is included herein as management believes that adjusted net debt to total capitalization provides meaningful additional information about the ability of BNSF to service long-term debt and other fixed obligations and to fund future growth.

The following table presents a reconciliation of the calculation of adjusted net debt to total capitalization percentage:

| Year Ended December 31, | 2005 | 2004 |
|---|---|---|
| Net debt to total capitalization[a] | **42.7%** | 39.9% |
| Adjustment for long-term operating leases | **9.4%** | 9.3% |
| Adjustment for other debt equivalents[b] | **0.6%** | 1.8% |
| Adjustment for junior subordinated notes[c] | **(1.2)%** | –% |
| Adjusted net debt to total capitalization | **51.5%** | 51.0% |

a Net debt to total capitalization is calculated as total debt less cash and cash equivalents divided by the sum of net debt and total stockholders' equity.

b Adjustment for other debt equivalents principally includes accounts receivable financing. See Note 6 of the Consolidated Financial Statements.

c Junior subordinated notes are included in total debt on the respective Consolidated Balance Sheet; however, as they include certain equity characteristics as described above, they have been assigned 50% equity credit for purposes of this calculation.

Pursuant to existing Board authority, BNSF can issue up to an additional $1 billion of debt securities. The Company expects that it will file shelf registration statements for this additional $1 billion when it is ready to issue the debt.

***2004***

Net cash used for financing activities during 2004 was $478 million primarily related to the following: (i) dividend payments of $231 million; (ii) net debt repayments of $292 million; and (iii) common stock repurchases of $376 million, which were offset by proceeds from stock options exercised of $420 million.

The Company issued $250 million of 4.88 percent notes due January 15, 2015. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

***2003***

Net cash used for financing activities during 2003 was $489 million primarily related to common stock repurchases of $217 million, dividend payments of $191 million and net debt repayments of $151 million partially offset by proceeds from stock options exercised of $68 million.

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023. The bonds were called at a price of 103.02 percent of par, and commercial paper was used to fund the call.

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

**DIVIDENDS**

Common stock dividends declared were $0.74 per share, $0.64 per share, and $0.54 per share annually for 2005, 2004 and 2003, respectively. Dividends paid on common stock were $267 million, $231 million and $191 million during 2005, 2004 and 2003, respectively.

**COMMON STOCK REPURCHASE PROGRAM**

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time through open market transactions or otherwise. In December 1999, April 2000, September 2000, January 2003 and December 2005, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 180 million shares. During 2005, 2004 and 2003, the Company repurchased approximately 14 million, 10 million, and 8 million shares, respectively, of its common stock at average prices of $54.95 per share, $35.98 per share, and $27.25 per share, respectively. Total repurchases through December 31, 2005, were 148 million shares at a total average cost of $29.49 per share, leaving 32 million shares available for repurchase out of the 180 million shares presently authorized.

**LONG-TERM DEBT AND OTHER OBLIGATIONS**

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities, which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

BNSF has agreed to acquire 845 locomotives by 2009. As of December 31, 2005, BNSF has taken delivery of 403 of the 845 locomotives. During 2005, BNSF took delivery of 288 locomotives, which were primarily financed through operating leases.

In the first quarter of 2004, BNSF entered into a contractual obligation to acquire 6,000 grain cars over the course of the following four years. Through December 31, 2005, BNSF has taken delivery of 4,500 of the hoppers, which were primarily financed through operating leases.

The locomotives and grain cars under these agreements have been or are expected to be financed through one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at that time.

The Company also utilizes a commercial paper program backed by a bank revolving credit agreement to manage liquidity needs. For 2006 and the foreseeable future, the Company expects that cash from operating activities, access to capital markets, the accounts receivable sales program and the bank revolving credit agreement will be sufficient to enable the Company to meet its obligations when due. The Company believes these sources of funds will also be sufficient to fund capital additions that are necessary to maintain its competitiveness and position the Company for future revenue growth.

The Company's ratio of earnings to fixed charges was 4.62 and 3.06 times for the years ended December 31, 2005 and 2004, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 39 percent and 35 percent for the years ended December 31, 2005 and 2004, respectively. The increase in the ratio of net cash provided by operating activities divided by total average debt is primarily due to increased revenue and lower average debt outstanding.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2005 (in millions):

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less than 1 year** | **1–3 years** | **3–5 years** | **More than 5 years** |
| Long-term debt[a] | $ 6,550 | $ 348 | $ 415 | $ 1,155 | $ 4,632 |
| Capital lease obligations | 604 | 108 | 211 | 140 | 145 |
| Operating lease obligations[b] | 6,143 | 461 | 1,031 | 897 | 3,754 |
| Purchase obligations[c] | 9,353 | 1,370 | 1,433 | 1,256 | 5,294 |
| Other long-term liabilities reflected on the balance sheet under GAAP[d] | 268 | 44 | 76 | 67 | 81 |
| Total contractual obligations | $ 22,918 | $ 2,331 | $ 3,166 | $ 3,515 | $ 13,906 |

a Excludes capital lease obligations.

b Gross payments due which include an interest component.

c Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.

d Consists of employee separation payments as discussed in Note 11 of the Consolidated Financial Statements, the 2006 required pension plan contribution and actuarially estimated payments expected to be made over the next five years for other post-retirement benefit plans as discussed in Note 13 of the Consolidated Financial Statements.

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

**CREDIT AGREEMENT**

Commercial paper and the revolving credit agreement are discussed in Note 9 of the Consolidated Financial Statements. The revolving credit agreement includes covenants and events of default typical for this type of facility, including a minimum consolidated tangible net worth test, a maximum debt-to-capital test, and a $75 million cross-default provision. At December 31, 2005, the Company was in compliance with its debt covenants. BNSF's tangible net worth is $4 billion greater than the minimum consolidated tangible net worth required under the agreement, and the maximum debt-to-capital test provides approximately $6 billion of debt capacity above BNSF's outstanding debt as of December 31, 2005, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreement. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

## OFF-BALANCE SHEET ARRANGEMENTS

### SALE OF ACCOUNTS RECEIVABLE

The accounts receivable sales program of Santa Fe Receivables Corporation (SFRC), as described in Note 6 of the Consolidated Financial Statements, includes various provisions that, if triggered, would allow the investors participating in this program, at their option, to cancel the program. These provisions include a minimum consolidated tangible net worth test and a maximum debt-to-capital test, which are the same as in the BNSF revolving credit agreements described above. BNSF's tangible net worth is approximately $4 billion greater than the minimum consolidated tangible net worth required under the agreement, and the maximum debt-to-capital test provides approximately $6 billion of debt capacity above BNSF's outstanding debt as of December 31, 2005. The Company's capacity to sell undivided interests to investors under the accounts receivable sales program was $700 million at December 31, 2005, which was comprised of two $350 million, 364-day accounts receivable facilities. The Company amended these facilities on October 14, 2005, modifying their expiration dates to October 2006. Management expects to be able to either extend the commitment of the current investors under the accounts receivable sales program past October 2006 or to find additional investors in the accounts receivable sales program who will be committed to purchase undivided interests after October 2006.

The accounts receivable sales program provides efficient financing at a competitive interest rate as compared with traditional borrowing arrangements and provides diversification of funding sources. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables (see Note 6 of the Consolidated Financial Statements).

### GUARANTEES

The Company acts as guarantor for certain debt and lease obligations of others. During the past few years the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future (see Note 9 of the Consolidated Financial Statements).

## INFLATION

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

## OTHER MATTERS

### COMMERCIAL

In July 2004, BNSF Railway initiated an arbitration proceeding under a Joint Service Agreement (JSA) with a major truckload carrier (the "carrier") with which BNSF Railway handles substantial joint intermodal movements. In the proceeding, BNSF Railway sought an increase in its divisions of joint revenue for intermodal movements. Additionally, the carrier challenged the basis of the divisions and raised other issues under the JSA. An Interim Award decision was issued by the arbitration panel on September 16, 2005, increasing BNSF's revenue divisions, and favorably resolving other issues raised in the proceeding. Both parties accepted the Interim Award as the final and binding award in the arbitration on October 17, 2005. By agreement of the parties, on October 19 the panel entered an order terminating the proceeding. In the fourth quarter of 2005, BNSF recorded a gain of approximately $26 million pre-tax, $16 million, net of tax, or $0.04 per share, as a result of this retroactive award of compensation for the period of July 7, 2004 through September 30, 2005. Of this gain, $21 million was recorded as an increase in Consumer Products revenue, and the remaining $5 million was recorded in purchased services expense as a reimbursement of legal fees.

In February 2005, the Company received a Civil Investigative Demand from the Antitrust Division of the Department of Justice requesting information concerning the Company's pricing activities relating to the shipment of coal from the southern Powder River Basin. The Company continues to respond to requests for information.

**HEDGING ACTIVITIES**

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by Statement of Financial Accounting Standards (SFAS) No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

***FUEL***

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties. BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance (see Note 3 of the Consolidated Financial Statements).

Between January 1, 2006 and February 13, 2006, the Company converted approximately 66 million gallons of WTI collars into HO swaps at an average price of approximately $0.95 per gallon. Additionally, the Company entered into HO-WTI swap agreements for 1.5 million barrels at an average price of $10.18 per barrel. These hedges will expire during 2006.

***INTEREST RATE***

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy. BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements (see Note 3 of the Consolidated Financial Statements).

**EMPLOYEE AND LABOR RELATIONS**

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. A negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 2004. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of presidential intervention) are exhausted. Agreements undergoing renegotiation in the current bargaining round provide for periodic wage increases until new agreements are reached.

***UNIONS WITH AN AGREEMENT UNDER THE PREVIOUS BARGAINING ROUND***

In the previous bargaining round, which began on November 1, 1999, BNSF's entire unionized workforce, reached final agreements that cover periods through December 2004.

***2005 BARGAINING ROUND***

The current bargaining round for all unions with contracts that came into effect after January 1, 2005, began on and after November 1, 2004, with the serving of Section 6 notices, which are each side's initial proposals. BNSF is participating in coordinated national handling of these proposals. The current agreements remain in effect until new agreements are reached or until changes to the existing agreements are made.

#### SEATTLE SOUND TRANSIT

In December 2003, the Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority established by King, Pierce and Snohomish counties within the state of Washington. BNSF has agreed to sell to Sound Transit under the threat of condemnation a combination of (a) four easements enabling Sound Transit to offer commuter rail service over existing BNSF track from Seattle to Everett and (b) 18 miles of railroad line from south of Tacoma to Nisqually, Washington.

Sound Transit will pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett and entered into agreements both for service on the commuter easements and joint use of track for commuter and freight purposes. The Company received approximately $80 million of cash in 2003 upon the closing of the first easement and $80 million of cash in 2004 upon closing of the second easement. The sale proceeds will be recognized in income over the use of the associated track structure (approximately 37 years). Over the next two years, upon the subsequent closings subject to conditions in the sale agreement, BNSF will receive an additional $100 million for the remaining two easements.

Sound Transit will also pay BNSF to convey the 18 miles of railroad line and associated real estate from south of Tacoma to Nisqually in three separate transactions. First, the Company received approximately $8 million of cash in 2003 and reported a gain in income of $2 million, net of tax, as a result of the real estate sale for station-related parcels to Sound Transit. Second, the Company received $6 million of cash and a $6 million note receivable in the third quarter of 2004 associated with the sale of approximately half of the 18 miles. The gain on this sale was deferred due to certain continuing involvement in the property. This continuing involvement expired in November 2004, and the Company recognized a gain in income of $7 million, net of tax. The Company collected $3 million of the $6 million note receivable related to this sale in 2005, and the remaining $3 million is expected to be collected in 2006. Third, the Company received $3 million of cash and a $9 million note receivable in the fourth quarter of 2005 associated with the sale of the remaining railroad line and real estate. The Company recognized a gain of approximately $9 million, net of tax, associated with the sale. The Company is expected to collect the $9 million note receivable over the next two years.

#### NEW MEXICO DEPARTMENT OF TRANSPORTATION

In the fourth quarter of 2005, BNSF Railway Company entered into an agreement with the New Mexico Department of Transportation (NMDOT) to sell the Company's rail line and certain adjacent property between Belen, New Mexico and Trinidad, Colorado while maintaining freight easement rights on the line. Upon satisfaction of closing conditions, the sale is anticipated to close in segments over the next 3 years for a total purchase price of $76 million and will allow NMDOT to create a commuter rail line. The Company recognized an impairment charge of $71 million in the fourth quarter of 2005 related to this agreement and anticipates recording a gain of $21 million in the first quarter of 2006 upon the sale of one of the line segments. The Company received $9 million in 2005 related to this sale, and expects to receive cash payments of $45 million in 2006, $18 million in 2007, and $4 million in 2008. While this rail line has been a critical alternative route for the Company, it will become less significant over the next several years as the double-tracking of the main line transcontinental route is completed.

#### AMERICAN JOBS CREATION ACT OF 2004

In October 2004, the American Jobs Creation Act of 2004 was signed into law. Part of the legislation includes the repeal of a 4.3–cent tax per gallon of diesel fuel. The tax is being gradually phased out in 2005 and 2006 and will be completely phased out by 2007. Based on actual and projected fuel consumption, the repeal of the tax resulted in $21 million in incremental savings in 2005 and is expected to result in incremental savings of approximately $10 million and $30 million for BNSF in 2006 and 2007, respectively.

### CRITICAL ACCOUNTING ESTIMATES

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors, and the Audit Committee has reviewed the Company's disclosure relating to them in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

**LEGAL**

BNSF's most significant legal claims relate to personal injury claims and environmental matters. These claims are discussed in more detail below.

During 2004, BNSF recorded a $465 million pre-tax charge to reflect changes in its estimate of unasserted asbestos liabilities and environmental liabilities. Of this amount, $293 million and $172 million were related to unasserted asbestos and environmental liabilities, respectively. The $465 million pre-tax charge was recorded in materials and other expense and reduced net income by $288 million, or $0.77 per share during 2004.

***PERSONAL INJURY***

Personal injury claims, including asbestos claims and employee work-related injuries and third party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded.

***ASBESTOS***

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated by 1985.

Prior to 2000, claim filings against the Company for asbestos were not numerous and were sporadic. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. The Company believed, however, that the low end of the range of reasonably possible loss, as that term is used in Financial Accounting Standards Board (FASB) Interpretation No. 14 (FIN 14), *Reasonable Estimation of the Amount of a Loss*, was immaterial. Subsequent to this period, claim filings increased and, when they continued into 2004, the Company concluded that the low end of the range of reasonably possible loss would be material and that an estimate for unasserted asbestos exposure liability needed to be recorded. BNSF then engaged a third party with extensive experience in performing asbestos studies to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated unasserted asbestos claims and the estimated average cost per claim. The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of unasserted claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data.

Based on the assessment, the Company recorded an undiscounted $293 million pre-tax charge for unasserted asbestos claims in the third quarter of 2004. The $293 million pre-tax charge was recorded in materials and other expense and reduced net income by $182 million, or $0.49 per share, for the year ended December 31, 2004.

Key elements of the assessment included:

- Because BNSF did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using Company employee data from 1970 forward and estimated the BNSF employee base from 1938-1969 using railroad industry historical census data and estimating BNSF's representation in the total railroad population.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age, duration and intensity of exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for the period 2000-2003 (the years in which the number of claims were more significant).
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2002-2004.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2002-2004.

From these assumptions BNSF projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were then applied to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate BNSF's future liability for unasserted asbestos claims.

The most sensitive assumptions for this accrual are the estimated future filing rates and estimated average claim values. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, BNSF used a multi-year calibration period (i.e., the average historical filing rate for the period 2000-2003) because it believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against BNSF declines at a rate consistent with both mortality and age as there is a decreasing propensity to file a claim as the population ages. BNSF believes the average claim values by type of disease from the historical period 2002-2004 are most representative of future claim values. Non-malignant claims, which represent approximately 95 percent of the total number and 80 percent of the cost of estimated future asbestos claims, were priced by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10 percent increase or decrease in either the forecasted number of unasserted claims or the average claim values would result in an approximate $30 million increase or decrease in the liability recorded for unasserted asbestos claims.

During the third quarter of 2005, the Company obtained an update of this study, which concluded that the original September 2004 study continues to represent a reasonable estimate of BNSF's future asbestos exposure. Therefore, management recorded no additional expense as a result of this update. The Company plans to update the study in the third quarter of 2006. On a quarterly basis, BNSF monitors actual experience against the number of forecasted claims and expected claim payments. Adjustments to the Company's estimates will be recorded when necessary (see Note 10 of the Consolidated Financial Statements for additional information).

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | **2005** | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | **$ 345** | $ 60 | $ 55 |
| Accruals | **–** | 308 | 25 |
| Payments | **(19)** | (23) | (20) |
| Ending balance at December 31, | **$ 326** | $ 345 | $ 60 |

Of the obligations at December 31, 2005, $266 million is related to unasserted claims and $60 million is related to asserted claims. At December 31, 2005 and 2004, $21 and $18 million are included in current liabilities, respectively. The recorded liability is not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding the number of asserted asbestos claims filed against BNSF:

| | 2005 | 2004 |
|---|---|---|
| Claims unresolved at January 1, | **1,926** | 1,985 |
| Claims filed | **835** | 712 |
| Claims settled, dismissed or otherwise resolved | **(640)** | (771) |
| Claims unresolved at December 31, | **2,121** | 1,926 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985) which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 50, 70, and 90 percent of the future unasserted asbestos claims will be incurred within the next 10, 15 and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $225 million to $425 million. However, BNSF believes that the $326 million recorded at December 31, 2005, is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER PERSONAL INJURY***

BNSF uses a third party actuary to assist the Company in estimating its other personal injury liability claims and expense. These estimates are based on the covered population, activity levels and trends in frequency, and the costs of covered injuries. These actuarial estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, is immaterial for these other occupational trauma claims.

Key elements of the actuarial assessment include:

- Size and demographics (employee age and craft) of the workforce.
- Activity levels (manhours by employee craft and carloadings).
- Expected claim frequency rates by type of claim (employee FELA or third party liability) based on historical claim frequency trends.
- Expected dismissal rates by type of claim based on historical dismissal rates.
- Expected average paid amounts by type of claim for open and incurred but not reported claims that eventually close with payment.

From these assumptions, BNSF estimates the number of open claims by accident year that will likely require payment by the Company. The projected number of open claims by accident year that will require payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for all asserted claims. Additionally, BNSF estimates the number of its incurred but not reported claims that will likely result in payment based upon historical emergence patterns by type of claim. The estimated number of projected claims by accident year requiring payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for incurred but not reported claims.

The most sensitive assumptions for this accrual are the expected average cost per claim and the projected frequency rates for the number of claims that will ultimately result in payment. A 10 percent increase or decrease in either the expected average cost per claim or the frequency rate for claims with payment would result in an approximate $45 million increase or decrease in BNSF's recorded other personal injury reserves (see Note 10 of the Consolidated Financial Statements for additional information).

BNSF obtains quarterly actuarial updates for other personal injury liabilities and monitors actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | **$ 459** | $ 453 | $ 441 |
| Accruals | **181** | 194 | 190 |
| Payments | **(218)** | (188) | (178) |
| Ending balance at December 31, | **$ 422** | $ 459 | $ 453 |

At December 31, 2005 and 2004, $164 million and $170 million are included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding the number of personal injury claims, other than asbestos, filed against BNSF:

| | 2005 | 2004 |
|---|---|---|
| Claims unresolved at January 1, | **4,116** | 4,393 |
| Claims filed | **3,758** | 3,632 |
| Claims settled, dismissed or otherwise resolved | **(4,257)** | (3,909) |
| Claims unresolved at December 31, | **3,617** | 4,116 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $375 million to $525 million. However, BNSF believes that the $422 million recorded at December 31, 2005, is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***ENVIRONMENTAL***

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

During the first half of 2004, the Company experienced a significant increase in expense relating to environmental remediation developments at known sites for which the majority of the contamination occurred decades ago. Because of these and other developments, the Company performed an assessment in 2004 to determine if it was feasible to better estimate developments at its known sites. The Company determined that a third party actuary had proprietary data that included information from the Environmental Protection Agency (EPA) and other governmental agencies as well as information accumulated from public sources and work performed for other clients. Because of its determination that a better estimate of future development could be made with this data, BNSF engaged this third party actuary, which has an extensive background in performing various studies for large companies, including environmental matters, to assist BNSF in determining the Company's potential future environmental exposure at known sites. As a result of this study, the Company revised its estimate of its probable environmental losses and its accrued liabilities.

Consequently, during the third quarter of 2004, BNSF recorded an undiscounted $172 million pre-tax charge related to its change in estimated environmental liabilities on a site by site basis. The $172 million pre-tax charge was recorded in materials and other expense and reduced net income by $106 million, or $0.28 per share, for 2004. The charge did not include (i) contaminated sites of which the Company is not aware, or (ii) additional amounts for third party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites. BNSF continues to estimate third party claims on a site by site basis when the liability for such claims is probable and reasonably estimable. BNSF's recorded liability for third party claims as of December 31, 2005 is approximately $24 million.

During the third quarter of 2005, the Company obtained an update of this study. Based on the results of the study, management recorded additional expense of approximately $12 million. The Company plans to update the study in the third quarter of 2006. On a quarterly basis, BNSF monitors actual experience against the forecasted remediation and related payments made on existing sites. Adjustments to the Company's estimates will continue to be recorded when necessary based on developments in subsequent periods. Additionally, environmental accruals include amounts for newly identified sites or contaminants, third-party claims and legal fees incurred for defense of third-party claims and recovery efforts (see Note 10 of the Consolidated Financial Statements for additional information).

The Company's estimate of ultimate cost for cleanup efforts at its known environmental sites utilizes BNSF's historical payment patterns, its current estimated percentage to closure ratios, and the actuary's proprietary benchmark patterns developed from data accumulated from public sources and work performed by it for other clients, including the EPA and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. The most significant assumptions are as follows: (i) historical payment patterns of site development, and (ii) variance from benchmark costs. A 10 percent change in any of these individual assumptions could result in an increase of up to $50 million or a decrease of up to $40 million in BNSF's estimated environmental liability. BNSF also conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in, and the ability to pay for, cleanup of other PRPs.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 369 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination.

The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | **2005** | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | **$ 385** | $ 199 | $ 196 |
| Accruals | **33** | 258 | 59 |
| Payments | **(48)** | (72) | (56) |
| Ending balance at December 31, | **$ 370** | $ 385 | $ 199 |

At December 31, 2005 and 2004, $55 million and $60 million are included in current liabilities, respectively. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2005 will be paid over the next ten years and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | **BNSF sites** | | **Superfund sites** | |
|---|---|---|---|---|
| | **2005** | 2004 | **2005** | 2004 |
| Number of sites at January 1, | **384** | 402 | **24** | 22 |
| Sites added during the period | **24** | 34 | **–** | 5 |
| Sites closed during the period | **(39)** | (52) | **(4)** | (3) |
| Number of sites at December 31, | **369** | 384 | **20** | 24 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $300 million to $600 million. However, BNSF believes that the $370 million recorded at December 31, 2005, is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER CLAIMS AND LITIGATION***

In addition to asbestos, other personal injury, and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**INCOME TAXES**

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $917 million, $482 million and $454 million for the years ended December 31, 2005, 2004 and 2003, respectively. BNSF's Consolidated Balance Sheets reflect $218 million and $308 million of net current deferred tax assets at December 31, 2005 and 2004, respectively. Also included in BNSF's Consolidated Balance Sheets are $7,916 million and $7,820 million of net non-current deferred tax liabilities at December 31, 2005 and 2004, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date of September 22, 1995, respectively. Internal Revenue Service examination of the years 1995 through 1999 for BNSF is completed, and the unagreed issues are pending before Internal Revenue Service (IRS) Appeals. BNSF is currently under examination for years 2000 through 2002. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2005.

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable law, current information and past experience with similar issues to make these judgments.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not significantly changed its methodology for calculating income tax expense for the years presented, and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

**PENSIONS AND OTHER POST-EMPLOYMENT BENEFITS**

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees, and an unfunded BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The amounts recorded in the Consolidated Statements of Income for pensions and other post-employment benefits (OPEB) were as follows (in millions):

| **Year Ended December 31,** | **2006 Estimate** | **2005** | **2004** | **2003** |
|---|---|---|---|---|
| Net pension cost (benefit) | **$ 68** | **$ 38** | $ 15 | $ (3) |
| Net other post-employment benefits cost | **$ 14** | **$ 11** | $ 24 | $ 32 |

The increased pension cost in 2004, 2005, and 2006 is primarily the result of recognition of previously unrecognized losses as well as a decrease in both the expected long-term rate of return on plan assets and discount rate assumptions. Other post-employment benefits costs are expected to increase in 2006 due primarily to a decrease in the discount rate and an increase in the assumed cost of future health care benefits.

At December 31, 2005, BNSF had unrecognized net losses of $524 million and $61 million related to the pension and health and welfare benefits plans, respectively. These net losses are comprised of gains and losses from changes in discount rates, actuarial assumptions, and census data as well as market gains and losses. The Company will recognize the portion of these net losses that exceeds 10 percent of the benefit obligation as a component of compensation and benefits expense. The table below outlines the net losses expected to be recognized over the next 15 years.

| | **Deferred Losses to be Recognized (in millions)** | |
|---|---|---|
| **Fiscal Year** | **Pension** | **Health and Welfare Benefits** |
| 2006 | $ 46 | $ 3 |
| 2007 | 40 | 3 |
| 2008 | 30 | 4 |
| 2009 | 23 | 4 |
| 2010 | 18 | 4 |
| Thereafter | 161 | 16 |

BNSF uses a third party actuary to assist the Company in estimating liabilities and expenses for pension and OPEB. Estimated amounts are based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension or OPEB obligations include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

From time to time, the Company will change pension and OPEB assumptions to better approximate current conditions and expected future experience. Significant assumptions for the past three years are as follows:

| **Assumptions used to determine net (benefit) cost for fiscal years ended December 31,** | **Pension Benefits** | | | **Health and Welfare Benefits** | | |
|---|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2005** | **2004** | **2003** |
| Discount rate | **5.75%** | 6.00% | 6.50% | **5.75%** | 6.00% | 6.50% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.25% | 8.50% | **–** | – | –% |
| Assumed health care cost trend rate | **–** | – | – | **10.00%** | 11.00% | 11.00% |
| Rate of compensation increase[b] | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90% | 3.90% |

| **Assumptions used to determine benefit obligations at September 30[a],** | **Pension Benefits** | | **Health and Welfare Benefits** | |
|---|---|---|---|---|
| | **2005** | **2004** | **2005** | **2004** |
| Discount rate | **5.25%** | 5.75% | **5.25%** | 5.75% |
| Assumed health care cost trend rate | **–** | – | **10.50%** | 10.00% |
| Rate of compensation increase[b] | **3.90%** | 3.90% | **3.90%** | 3.90% |

a The Company's pension and OPEB plans use a measurement date of September 30.

b Determined based on historical experience

The discount rate is a key assumption used in the estimates of both the pension and OPEB expense and liability. BNSF determined the discount rate by adjusting the Moody's Aa Corporate bond yield to reflect the difference between the duration of the future estimated cash flows of the Company's pension and health and welfare plans and the duration of the Moody's Aa index. The expected return on plan assets, which reflects the expected long-term rates of return on those assets, is also a key assumption. Finally, the health care cost trend rates are also considered a significant assumption and only impact the OPEB-related estimates.

The discount rate used for the 2006 calculation of net benefit cost was lowered to 5.25 percent to reflect current market conditions. The expected rate of return on plan assets remained consistent from 2005 to 2006, and the Company does not expect any significant changes to the current investment allocation of assets. However, unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years.

The following table is an estimate of the impact on future net benefit cost that could result from hypothetical changes to the most sensitive assumptions, the discount rate and rate of return on plan assets:

**Sensitivity Analysis**

| | **Change in Net Benefit Cost** | |
|---|---|---|
| **Hypothetical discount rate change** | **Pension** | **OPEB** |
| 50 basis point decrease | $6 million increase | $2 million increase |
| 50 basis point increase | $6 million decrease | $2 million decrease |

| **Hypothetical rate of return on plan assets change** | **Pension** |
|---|---|
| 50 basis point decrease | $6 million increase |
| 50 basis point increase | $6 million decrease |

The Company contributed $40 million to the BNSF Retirement Plan in December 2005. The Company is not required to make any contributions to this plan in 2006. The Company determines this required funding by amortizing asset gains and losses over a period of five years. Additionally, the Company expects to make benefit payments in 2006 of approximately $21 million and $7 million to its OPEB plan and the BNSF Supplemental Retirement Plan, respectively. If the Company was required to fully fund the unfunded portion of its projected benefit obligation, which was $511 million at December 31, 2005 for the pension plans and $295 million for the health and welfare plan, the Company's management believes that it would have sufficient liquidity, and it could fund the balance without a significant impact to the Company's financial position.

Further information on pensions and other post-employment benefits is incorporated by reference from Note 13 of the Consolidated Financial Statements.

**DEPRECIATION**

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expenses of $1,075 million, $1,012 million and $910 million for the years ended December 31, 2005, 2004 and 2003, respectively. At December 31, 2005 and 2004, the Company had property and equipment, net balances of $26,551 million and $25,814 million, which include $7,210 million and $6,518 million, respectively, of accumulated depreciation.

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. The Company conducts studies of depreciation rates and the required accumulated depreciation balance as required by the Federal Surface Transportation Board (STB), which is generally every three years for equipment property and every six years for track structure and other roadway property. The Company uses external consultants to assist management with these studies. The consultants rely on statistical analysis, historical retirement data, industry knowledge and discussions with management to assess the impact of new technologies and maintenance practices. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively, and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average remaining service lives of the assets.

A study conducted in 2004 resulted in the Company adopting new depreciation rates for track structure that resulted in a net decrease in 2004 depreciation expense of $5 million and approximately $16 million on an ongoing annual basis, as calculated using the asset base at the time of the rate change. A study conducted in 2003 resulted in the Company adopting new depreciation rates for locomotives, other assets, as well as hardware and software that resulted in a net decrease in annual depreciation expense of $9 million.

**ACCOUNTING PRONOUNCEMENTS**

See Note 16 of the Consolidated Financial Statements for information about recent accounting pronouncements.

## FORWARD-LOOKING INFORMATION

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties, and actual performance or results may differ materially. Important factors that could cause actual performance or results to differ materially include, but are not limited to the following:

- **Economic and industry conditions:** material adverse changes in economic or industry conditions, both in the United States and globally, changes in customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, adverse economic conditions in BNSF's supplier base, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, changes in fuel prices and other key materials and disruptions in supply chains for these materials, changes in the securities and capital markets, and changes in crew availability, labor costs and labor difficulties, including stoppages affecting either BNSF's operations or customers' abilities to deliver goods to BNSF for shipment;

- **Legal and regulatory factors:** developments and changes in laws and regulations, including those affecting train operations or the marketing of services, the ultimate outcome of shipper and rate claims subject to adjudication, increased economic regulation of the rail industry, developments in environmental investigations or proceedings with respect to rail operations or current or past ownership or control of real property, and developments in other types of claims and litigation, including those relating to personal injuries, asbestos and other occupational disease, the release of hazardous materials, environmental contamination and damage to property, and rates or service; and

- **Operating factors:** technical difficulties, changes in operating conditions and costs, commodity concentrations, the availability of equipment and human resources to meet changes in demand, the extent of the Company's ability to achieve its operational and financial initiatives and to contain costs, the effectiveness of steps taken to maintain and improve operations and network fluidity, including the management of the amount of traffic on the system to meet demand and the ability to acquire sufficient resources to meet that demand, congestion on other railroads, disruptions to BNSF's technology network including computer systems and software, as well as natural events such as severe weather, fires, floods and earthquakes or man-made or other disruptions of BNSF Railway's operating systems, structures, or equipment including the effects of acts of terrorism on the Company's system or other railroads' systems.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions may appear in the Company's public filings with the Securities and Exchange Commission, which are accessible at www.sec.gov, and on the Company's website at www.bnsf.com, and which investors are advised to consult.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The following table summarizes the impact of these hedging activities on the Company's results of operations (in millions):

| December 31, | 2005 | 2004 |
|---|---|---|
| Fuel hedge benefit (including ineffective portion of unexpired hedges) | **$ 531** | $ 338 |
| Interest rate hedge benefit | **17** | 36 |
| Total hedge benefit | **548** | 374 |
| Tax effect | **(209)** | (144) |
| Hedge benefit, net of tax | **$ 339** | $ 230 |

The Company's fuel hedge benefit is due to increases in fuel prices subsequent to the initiation of various hedges. The interest rate hedge benefit is the result of the conversion of fixed-rate long-term debt to floating-rate debt coupled with lower interest rates. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 of the Consolidated Financial Statements describes significant aspects of BNSF's financial instrument activities, which have a material market risk. Additionally, the Company uses fuel surcharges to mitigate the risk of fuel price volatility.

### COMMODITY PRICE SENSITIVITY

BNSF engages in hedging activities to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2005, are based on the front month settlement prices of New York Mercantile Exchange (NYMEX) #2 heating oil (HO), West Texas Intermediate crude oil (WTI), or the HO refining spread (HO-WTI), which is defined as the difference between HO and WTI. A WTI hedge combined with a HO-WTI hedge will result in the equivalent of a HO hedge. For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel, WTI, and HO.

At December 31, 2005, BNSF had recorded in the Consolidated Balance Sheet a fuel hedging asset of $336 million for fuel hedges covering 2006 and 2007.

The following table is an estimate of the impact to earnings that could result from hypothetical price changes during the twelve-month period ending December 31, 2006 and the balance sheet impact from the hypothetical price changes, both based on hedge position at December 31, 2005:

| Sensitivity Analysis | | |
|---|---|---|
| **Hedged commodity price change** | **Fuel hedge annual pre-tax earnings impact** | **Balance Sheet impact of change in fuel hedge fair value** |
| 10 percent increase | $61 million increase | $70 million increase |
| 10 percent decrease | $61 million decrease | $64 million decrease |

Based on fuel consumption during the twelve-month period ending December 31, 2005 of 1,402 million gallons and fuel prices during that same period, excluding the impact of the Company's hedging activities, a ten percent increase or decrease in the commodity price per gallon would result in an approximate $231 million increase or decrease, respectively, in fuel expense (pre-tax) on an annual basis.

At December 31, 2005, BNSF maintained fuel inventories for use in normal operations, which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure. Further information on fuel hedges is incorporated by reference from Note 3 of the Consolidated Financial Statements.

## INTEREST RATE SENSITIVITY

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. These interest rate hedges are accounted for either as cash flow or fair value hedges. BNSF's measurement of the fair value of these hedges is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

At December 31, 2005, the fair value of BNSF's debt, excluding capital leases, was $7,195 million, and the interest rate hedging asset was less than $1 million for fair value hedges and $8 million for cash flow hedges.

The following table is an estimate of the impact to earnings and the fair value of the total debt and interest rate hedges that could result from hypothetical interest rate changes during the twelve-month period ending December 31, 2006 based on debt levels and outstanding hedges as of December 31, 2005:

**Sensitivity Analysis**

| Hypothetical change in interest rates | Floating rate debt — Annual pre-tax earnings impact | Change in fair value | |
|---|---|---|---|
| | | Total debt | Interest rate hedges |
| 1 percent decrease | $13 million increase | $645 million increase | $18 million decrease |
| 1 percent increase | $13 million decrease | $541 million decrease | $16 million increase |

Further information on interest rate hedges is incorporated by reference from Note 3 of the Consolidated Financial Statements. Information on the Company's debt, which may be sensitive to interest rate fluctuations, is incorporated by reference from Note 9 of the Consolidated Financial Statements.

**Item 8. Financial Statements and Supplementary Data**

The Consolidated Financial Statements of BNSF and subsidiary companies, together with the report of the Company's independent registered public accounting firm, are included as part of this filing.

The following documents are filed as a part of this report:

**Consolidated Financial Statements**

Management's Report on Internal Control Over Financial Reporting .......... 47
Report of Independent Registered Public Accounting Firm .......... 48
Consolidated Statements of Income for the three years ended December 31, 2005 .......... 50
Consolidated Balance Sheets as of December 31, 2005 and 2004 .......... 51
Consolidated Statements of Cash Flows for the three years ended December 31, 2005 .......... 52
Consolidated Statements of Changes in Stockholders' Equity for the three years ended December 31, 2005 .......... 53
Notes to Consolidated Financial Statements .......... 54–85

## Management's Report on Internal Control Over Financial Reporting

**To the Shareholders of Burlington Northern Santa Fe Corporation and Subsidiaries**

The management of Burlington Northern Santa Fe Corporation (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external reporting purposes in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2005. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework*. Based on our assessment we concluded that, as of December 31, 2005, the Company's internal control over financial reporting is effective based on those criteria.

Management's assessment of the Company's internal control over financial reporting as of December 31, 2005, has been audited by PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, as stated in their report, which appears on the following pages.

## Report of Independent Registered Public Accounting Firm

**To the Shareholders and Board of Directors of**
**Burlington Northern Santa Fe Corporation**

We have completed integrated audits of Burlington Northern Santa Fe Corporation's 2005 and 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2005 and an audit of its 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and its subsidiaries (the Company) at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2003, the Company changed the manner in which it accounts for asset retirement costs.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 8, that the Company maintained effective internal control over financial reporting as of December 31, 2005 based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control - Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

PricewaterhouseCoopers LLP

Fort Worth, Texas
February 13, 2006

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## Consolidated Statements of Income

Dollars in millions, except per share data

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Revenues | **$ 12,987** | $ 10,946 | $ 9,413 |
| Operating expenses: | | | |
| Compensation and benefits | **3,515** | 3,322 | 2,963 |
| Fuel | **1,959** | 1,335 | 1,093 |
| Purchased services | **1,714** | 1,424 | 1,252 |
| Depreciation and amortization | **1,075** | 1,012 | 910 |
| Equipment rents | **886** | 790 | 705 |
| Materials and other | **916** | 1,377 | 825 |
| Total operating expenses | **10,065** | 9,260 | 7,748 |
| Operating income | **2,922** | 1,686 | 1,665 |
| Interest expense | **437** | 409 | 420 |
| Other expense, net | **37** | 4 | 14 |
| Income before income taxes and cumulative effect of accounting change | **2,448** | 1,273 | 1,231 |
| Income tax expense | **917** | 482 | 454 |
| Income before cumulative effect of accounting change | **1,531** | 791 | 777 |
| Cumulative effect of accounting change, net of tax | **–** | – | 39 |
| Net income | **$ 1,531** | $ 791 | $ 816 |
| Earnings per share: | | | |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 4.12** | $ 2.14 | $ 2.10 |
| Basic earnings per share (after cumulative effect of accounting change) | **$ 4.12** | $ 2.14 | $ 2.21 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 4.01** | $ 2.10 | $ 2.09 |
| Diluted earnings per share (after cumulative effect of accounting change) | **$ 4.01** | $ 2.10 | $ 2.19 |
| Average shares (in millions): | | | |
| Basic | **371.8** | 370.0 | 369.1 |
| Dilutive effect of stock awards | **10.0** | 6.6 | 3.2 |
| Diluted | **381.8** | 376.6 | 372.3 |

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## Consolidated Balance Sheets

Dollars in millions, shares in thousands

| December 31, | 2005 | 2004 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 75** | $ 322 |
| Accounts receivable, net | **678** | 181 |
| Materials and supplies | **396** | 339 |
| Current portion of deferred income taxes | **218** | 308 |
| Current portion of fuel-hedging asset | **303** | 264 |
| Other current assets | **210** | 201 |
| Total current assets | **1,880** | 1,615 |
| Property and equipment, net | **26,551** | 25,814 |
| Other assets | **1,873** | 1,496 |
| Total assets | **$ 30,304** | $ 28,925 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | **$ 2,773** | $ 2,251 |
| Long-term debt due within one year | **456** | 465 |
| Total current liabilities | **3,229** | 2,716 |
| Long-term debt and commercial paper | **6,698** | 6,051 |
| Deferred income taxes | **7,916** | 7,820 |
| Casualty and environmental liabilities | **878** | 941 |
| Minimum pension liability | **417** | 353 |
| Employee separation costs | **107** | 124 |
| Other liabilities | **1,551** | 1,609 |
| Total liabilities | **20,796** | 19,614 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value 600,000 shares authorized; 527,289 shares and 517,275 shares issued, respectively | **5** | 5 |
| Additional paid-in-capital | **6,702** | 6,299 |
| Retained earnings | **8,045** | 6,792 |
| Treasury stock, at cost, 155,718 shares and 140,463 shares, respectively | **(4,569)** | (3,741) |
| Prepaid forward repurchase of treasury stock | **(600)** | – |
| Unearned compensation | **(22)** | (43) |
| Accumulated other comprehensive income (loss) | **(53)** | (1) |
| Total stockholders' equity | **9,508** | 9,311 |
| Total liabilities and stockholders' equity | **$ 30,304** | $ 28,925 |

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## Consolidated Statements of Cash Flows

Dollars in millions

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Operating activities** | | | |
| Net income | **$ 1,531** | $ 791 | $ 816 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **1,075** | 1,012 | 910 |
| Deferred income taxes | **217** | 237 | 460 |
| Employee separation costs paid | **(30)** | (33) | (43) |
| Cumulative effect of accounting change, net of tax | **–** | – | (39) |
| Long-term casualty and environmental liabilities, net | **(71)** | 477 | 20 |
| Other, net | **(54)** | (84) | 28 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **(138)** | (65) | (27) |
| Change in accounts receivable sales program | **(350)** | 25 | 31 |
| Materials and supplies | **(57)** | (73) | (39) |
| Other current assets | **(5)** | (144) | 5 |
| Accounts payable and other current liabilities | **491** | 234 | 163 |
| Net cash provided by operating activities | **2,609** | 2,377 | 2,285 |
| **Investing activities** | | | |
| Capital expenditures | **(1,750)** | (1,527) | (1,726) |
| Other, net | **(273)** | (68) | (80) |
| Net cash used for investing activities | **(2,023)** | (1,595) | (1,806) |
| **Financing activities** | | | |
| Net increase (decrease) in commercial paper and bank borrowings | **563** | (242) | (77) |
| Proceeds from issuance of long-term debt | **500** | 250 | 265 |
| Payments on long-term debt | **(464)** | (300) | (339) |
| Dividends paid | **(267)** | (231) | (191) |
| Proceeds from stock options exercised | **244** | 420 | 68 |
| Purchase of BNSF common stock | **(799)** | (376) | (217) |
| Prepaid forward repurchase of treasury stock | **(600)** | – | – |
| Other, net | **(10)** | 1 | 2 |
| Net cash used for financing activities | **(833)** | (478) | (489) |
| Increase (decrease) in cash and cash equivalents | **(247)** | 304 | (10) |
| Cash and cash equivalents: | | | |
| Beginning of year | **322** | 18 | 28 |
| End of year | **$ 75** | $ 322 | $ 18 |
| **Supplemental cash flow information** | | | |
| Interest paid, net of amounts capitalized | **$ 427** | $ 476 | $ 458 |
| Income taxes paid, net of refunds | **$ 545** | $ 159 | $ 26 |
| Non-cash asset financing | **$ 68** | $ 104 | $ 24 |

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## Consolidated Statements of Changes in Stockholders' Equity

Shares in thousands, dollars in millions, except per share data

| | Common Shares | Treasury Shares | Common Stock and Paid-in Capital | Retained Earnings | Treasury Stock | Prepaid Forward Repurchase of Treasury Stock | Unearned Compen-sation | Accumu-lated Other Compre-hensive Income (Loss) | Total Stock-holders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2002 | 496,683 | (120,905) | $ 5,669 | $ 5,625 | $ (3,114) | $ – | $ (39) | $ (209) | $ 7,932 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 816 | – | – | – | – | 816 |
| Minimum pension liability adjustment, net of tax expense of $3 | | | – | – | – | – | – | 6 | 6 |
| Fuel/interest hedge mark-to-market, net of tax expense of $38 | | | – | – | – | – | – | 63 | 63 |
| Total comprehensive income | | | – | 816 | – | – | – | 69 | 885 |
| Common stock dividends, $0.54 per share | | | – | (201) | – | – | – | – | (201) |
| Adjustments associated with unearned compensation, restricted stock | 781 | (54) | 22 | – | – | – | 3 | – | 25 |
| Exercise of stock options and related tax benefit of $7 | 3,221 | (316) | 80 | – | (9) | – | – | – | 71 |
| Purchase of BNSF common stock | – | (7,950) | – | – | (217) | – | – | – | (217) |
| Balance at December 31, 2003 | 500,685 | (129,225) | 5,771 | 6,240 | (3,340) | – | (36) | (140) | 8,495 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 791 | – | – | – | – | 791 |
| Minimum pension liability adjustment, net of tax expense of $3 | | | – | – | – | – | – | 3 | 3 |
| Fuel/interest hedge mark-to-market, net of tax expense of $83 | | | – | – | – | – | – | 136 | 136 |
| Total comprehensive income | | | – | 791 | – | – | – | 139 | 930 |
| Common stock dividends, $0.64 per share | | | – | (239) | – | – | – | – | (239) |
| Adjustments associated with unearned compensation, restricted stock | 1,135 | (49) | 44 | – | – | – | (7) | – | 37 |
| Exercise of stock options and related tax benefit of $53 | 15,455 | (746) | 489 | – | (25) | – | – | – | 464 |
| Purchase of BNSF common stock | – | (10,443) | – | – | (376) | – | – | – | (376) |
| Balance at December 31, 2004 | 517,275 | (140,463) | 6,304 | 6,792 | (3,741) | – | (43) | (1) | 9,311 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,531 | – | – | – | – | 1,531 |
| Minimum pension liability adjustment, net of tax benefit of $25 | | | – | – | – | – | – | (39) | (39) |
| Fuel/interest hedge mark-to-market, net of tax benefit of $8 | | | – | – | – | – | – | (13) | (13) |
| Other | | | – | – | – | – | – | – | – |
| Total comprehensive income | | | – | 1,531 | – | – | – | (52) | 1,479 |
| Common stock dividends, $0.74 per share | | | – | (278) | – | – | – | – | (278) |
| Adjustments associated with unearned compensation, restricted stock | 665 | (140) | 36 | – | – | – | 21 | – | 57 |
| Exercise of stock options and related tax benefit of $94 | 9,349 | (540) | 367 | – | (29) | – | – | – | 338 |
| Purchase of BNSF common stock | – | (14,575) | – | – | (799) | – | – | – | (799) |
| Prepaid forward repurchase of treasury stock | – | – | – | – | – | (600) | – | – | (600) |
| Balance at December 31, 2005 | 527,289 | (155,718) | $ 6,707 | $ 8,045 | $ (4,569) | $ (600) | $ (22) | $ (53) | $ 9,508 |

See accompanying Notes to Consolidated Financial Statements.

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES

## Notes to Consolidated Financial Statements

### 1. The Company

Burlington Northern Santa Fe Corporation (BNSF) is a holding company that conducts no operating activities and owns no significant assets other than through its interests in its subsidiaries. BNSF's principal, wholly-owned subsidiary is BNSF Railway Company (BNSF Railway), which operates one of the largest railroad networks in North America with approximately 32,000 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including Consumer Products, Industrial Products, Coal and Agricultural Products. These consolidated financial statements include BNSF, BNSF Railway, other majority-owned subsidiaries, and a variable interest entity for which BNSF is the primary beneficiary (see Note 2 of the Consolidated Financial Statements below), all of which are separate legal entities (collectively, the Company).

### 2. Significant Accounting Policies

#### PRINCIPLES OF CONSOLIDATION

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

##### IMPLEMENTATION OF FIN 46R

In 2001, BNSF Railway entered into the San Jacinto Rail Limited Partnership (the Partnership) with subsidiaries of three chemical manufacturing companies. The original purpose of this Partnership was to construct and BNSF to operate a 13-mile rail line to service these and other chemical and plastics manufacturing facilities in the Houston, Texas area. BNSF Railway owns a 48-percent limited partnership interest and a one-percent general partnership interest in the Partnership and acts as the general partner and operator of this facility.

The Company determined that the Partnership, a previously unconsolidated subsidiary, was required to be consolidated pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46R (FIN 46R), *Consolidation of Variable Interest Entities*, on March 31, 2004, as the Partnership qualifies as a variable interest entity and the Company is the primary beneficiary. This consolidation had a minimal impact to the Consolidated Statements of Income due to the fact that the Company accounted for this investment prior to the adoption of FIN 46R under the equity method of accounting and the Partnership's losses to date have been minimal. The consolidation of the Partnership in 2004 resulted in an increase in assets of $54 million, which includes $26 million in cash and $23 million in land and related development costs, an increase in liabilities of $55 million, including $50 million of short-term debt, and a decrease in equity of $1 million (see Note 7 of the Consolidated Financial Statements for additional information regarding the Partnership).

#### CUMULATIVE EFFECT OF ACCOUNTING CHANGE, NET OF TAX

The Company adopted Statement of Financial Accounting Standards (SFAS) No. 143, *Accounting for Asset Retirement Obligations*, on January 1, 2003. This statement requires BNSF to recognize a liability for legally obligated asset retirement costs associated with tangible long-lived assets. SFAS No. 143 also disallows the accrual of retirement costs that are not legal obligations. As a result, BNSF and other railroads were required to change their accounting policies for certain track structure assets to exclude removal costs as a component of depreciation expense where the inclusion of such costs would result in accumulated depreciation balances exceeding the historical basis of the assets. This change results in lower depreciation and amortization expense primarily offset by higher compensation and benefits, purchased services and materials and other expenses in the period in which removal costs are incurred.

The following table illustrates the effect on net income and earnings per share if the Company had applied SFAS No. 143, *Accounting for Asset Retirement Obligations* prior to its adoption by the Company in 2004 (in millions, except per share data):

| Year ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net income as reported | **$ 1,531** | $ 791 | $ 816 |
| Pro forma net income | **$ 1,531** | $ 791 | $ 777 |
| Earnings per share | | | |
| Basic – as reported | **$ 4.12** | $ 2.14 | $ 2.21 |
| Basic – pro forma | **$ 4.12** | $ 2.14 | $ 2.10 |
| Diluted – as reported | **$ 4.01** | $ 2.10 | $ 2.19 |
| Diluted – pro forma | **$ 4.01** | $ 2.10 | $ 2.09 |

## USE OF ESTIMATES

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. These estimates and assumptions are periodically reviewed by management. Actual results could differ from those estimates.

## REVENUE RECOGNITION

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue on a pro-rata basis based on actual or projected future customer shipments. When using projected shipments, the Company relies on historic trends as well as economic and other indicators to estimate the liability for customer incentives.

## ACCOUNTS RECEIVABLE, NET

Accounts receivable, net includes accounts receivable reduced by an allowance for bill adjustments and uncollectible accounts. The allowance for bill adjustments and uncollectible accounts is based on historical experience as well as any known trends or uncertainties related to customer billing and account collectibility.

## CASH AND CASH EQUIVALENTS

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

## MATERIALS AND SUPPLIES

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

## PROPERTY AND EQUIPMENT, NET

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. Upon normal sale or retirement of certain depreciable railroad property, cost less net salvage value is charged to accumulated depreciation, and no gain or loss is recognized. The disposals of land and non-rail property as well as significant premature retirements are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

## ENVIRONMENTAL LIABILITIES

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. BNSF utilizes a third party actuary to assist the Company in estimating substantially all of its environmental liabilities. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

## PERSONAL INJURY CLAIMS

Liabilities for personal injury claims are initially recorded when the expected loss is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. The liability and ultimate expense projections are developed with the assistance of third parties. Liabilities recorded for unasserted personal injury claims, including those related to asbestos, are based on information currently available. Estimates of liabilities for personal injury claims are undiscounted.

## INCOME TAXES

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized.

## STOCK-BASED COMPENSATION

At December 31, 2005, the Company had stock-based employee compensation plans. The Company applies Accounting Principles Board (APB) Opinion 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for its stock plans. In accordance with APB Opinion 25, the Company records the intrinsic value of stock-based compensation as expense. Accordingly, no compensation expense has been recognized for its fixed stock options as the exercise price equals the stock price on the date of grant. Stock-based compensation expense related to restricted stock and restricted stock units has been recognized as compensation expense.

The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation (in millions, except per share data):

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net income, as reported | **$ 1,531** | $ 791 | $ 816 |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | **23** | 19 | 11 |
| Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | **(42)** | (41) | (36) |
| Pro forma net income | **$ 1,512** | $ 769 | $ 791 |
| Earnings per share: | | | |
| Basic – as reported | **$ 4.12** | $ 2.14 | $ 2.21 |
| Basic – pro forma | **$ 4.07** | $ 2.08 | $ 2.14 |
| Diluted – as reported | **$ 4.01** | $ 2.10 | $ 2.19 |
| Diluted – pro forma | **$ 3.96** | $ 2.04 | $ 2.13 |

The pro forma amounts were estimated using the Black-Scholes option-pricing model with the following assumptions:

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Weighted average expected life (years) | **4.5** | 3.9 | 4.0 |
| Weighted average expected volatility | **24.0%** | 26.1% | 35.0% |
| Weighted average dividend per share | **$ 0.69** | $ 0.61 | $ 0.49 |
| Weighted average risk free interest rate | **3.75%** | 3.45% | 2.17% |
| Weighted average fair value of options granted per share | **$ 11.33** | $ 7.03 | $ 7.20 |

See Note 16 of the Consolidated Financial Statements for additional information regarding developments related to SFAS No. 123 and SFAS No. 123R, *Share-Based Payment*.

## PENSION AND OTHER POST-EMPLOYMENT BENEFITS

BNSF uses a third party actuary to assist the Company in estimating liabilities and expenses for pensions and other post-employment benefits (OPEB). Estimated amounts are based on historical information, current information and estimates regarding future events and circumstances. Significant assumptions used in the valuation of pension and/or OPEB liabilities include the expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

## RECLASSIFICATIONS

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income and net income.

### 3. Hedging Activities

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

#### FUEL

Fuel costs represented 19 percent of total operating expenses during 2005 and 14 percent of total operating expenses during 2004 and 2003. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company has entered into hedges to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. The fuel hedges include the use of derivatives that are accounted for as cash flow hedges. The hedging is intended to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2005 and excluding the impact of the hedges, each one-cent increase in the price of fuel would result in approximately $14 million of additional fuel expense on an annual basis.

#### TOTAL FUEL-HEDGING ACTIVITIES

As of December 31, 2005, BNSF's total fuel hedging activities covered approximately 26 percent and 3 percent of estimated fuel purchases for 2006 and 2007, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel-hedge transactions were as follows (in millions):

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Hedge benefit | **$ 535** | $ 337 | $ 65 |
| Ineffective portion of unexpired hedges | **(4)** | 1 | 3 |
| Tax effect | **(203)** | (130) | (26) |
| Hedge benefit, net of tax | **$ 328** | $ 208 | $ 42 |

The amounts recorded in the Consolidated Balance Sheets for fuel hedge transactions were as follows (in millions):

| December 31, | 2005 | 2004 |
|---|---|---|
| Short-term fuel-hedging asset | **$ 303** | $ 264 |
| Long-term fuel-hedging asset | **33** | 105 |
| Ineffective portion of unexpired hedges | **–** | (4) |
| Tax effect | **(129)** | (140) |
| Amount included in AOCI, net of tax | **$ 207** | $ 225 |
| Settled fuel-hedging contracts receivable | **$ 143** | $ 131 |

BNSF measures the fair value of hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties.

***NYMEX #2 HEATING OIL HEDGES***

As of December 31, 2005, BNSF had entered into fuel swap and costless collar agreements utilizing New York Mercantile Exchange (NYMEX) #2 heating oil (HO). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur between the prices of HO and the purchase price of BNSF's diesel fuel. Over the twelve months ended December 31, 2005, the sum of all such costs averaged approximately 16 cents per gallon.

During 2005, the Company converted approximately 19 million gallons of 2006 West Texas Intermediate (WTI) collars into HO swaps at an average price of $1.08 per gallon. The following table provides fuel hedge data based upon the quarter being hedged for all HO fuel hedges outstanding at December 31, 2005.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2006** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **HO Swaps** | | | | | |
| Gallons hedged (in millions) | 18.90 | – | – | – | 18.90 |
| Average swap price (per gallon) | 1.08 | – | – | – | 1.08 |
| Fair value (in millions) | $ 13 | $ – | $ – | $ – | $ 13 |
| **HO Collars** | | | | | |
| Gallons hedged (in millions) | 15.75 | 22.05 | 28.35 | 31.50 | 97.65 |
| Average cap price (per gallon) | $ 0.97 | $ 0.92 | $ 0.91 | $ 0.94 | $ 0.93 |
| Average floor price (per gallon) | $ 0.90 | $ 0.84 | $ 0.84 | $ 0.87 | $ 0.86 |
| Fair value (in millions) | $ 12 | $ 18 | $ 24 | $ 28 | $ 82 |

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2007** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **HO Collars** | | | | | |
| Gallons hedged (in millions) | 31.50 | – | – | – | 31.50 |
| Average cap price (per gallon) | $ 0.93 | $ – | $ – | $ – | $ 0.93 |
| Average floor price (per gallon) | $ 0.86 | $ – | $ – | $ – | $ 0.86 |
| Fair value (in millions) | $ 28 | $ – | $ – | $ – | $ 28 |

***WTI CRUDE OIL HEDGES***

In addition, BNSF enters into fuel swap and costless collar agreements utilizing WTI crude oil. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. Over the twelve months ended December 31, 2005, the sum of all such costs averaged approximately 45 cents per gallon.

No additional WTI hedges were entered into during 2005. However, the Company converted approximately 19 million gallons of WTI collars into HO swaps as stated in the NYMEX #2 Heating Oil Hedges section. The following tables provide fuel hedge data based upon the quarter being hedged for all WTI fuel hedges outstanding at December 31, 2005.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2006** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 1,350 | 675 | 375 | – | 2,400 |
| Equivalent gallons hedged (in millions) | 56.70 | 28.35 | 15.75 | – | 100.80 |
| Average swap price (per barrel) | $ 24.43 | $ 25.16 | $ 25.69 | $ – | $ 24.83 |
| Fair value (in millions) | $ 50 | $ 25 | $ 14 | $ – | $ 89 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 1,050 | 1,500 | 825 | 525 | 3,900 |
| Equivalent gallons hedged (in millions) | 44.10 | 63.00 | 34.65 | 22.05 | 163.80 |
| Average cap price (per barrel) | $ 29.23 | $ 30.20 | $ 30.81 | $ 31.93 | $ 30.30 |
| Average floor price (per barrel) | $ 24.73 | $ 25.79 | $ 26.32 | $ 27.42 | $ 25.84 |
| Fair value (in millions) | $ 34 | $ 47 | $ 26 | $ 16 | $ 123 |

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2007** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 150 | – | – | – | 150 |
| Equivalent gallons hedged (in millions) | 6.30 | – | – | – | 6.30 |
| Average cap price (per barrel) | $ 33.00 | $ – | $ – | $ – | $ 33.00 |
| Average floor price (per barrel) | $ 29.00 | $ – | $ – | $ – | $ 29.00 |
| Fair value (in millions) | $ 5 | $ – | $ – | $ – | $ 5 |

***NYMEX #2 HEATING OIL REFINING SPREAD HEDGES***

During 2005, the Company entered into fuel swap agreements utilizing the HO refining spread (HO-WTI) to hedge the equivalent of approximately 57 million gallons of fuel with an average swap price $15.69 per barrel. HO-WTI is the difference in price between HO and WTI; therefore, a HO-WTI swap in combination with a WTI swap is equivalent to a HO swap. The following table provides fuel hedge data based upon the quarter being hedged for all HO-WTI fuel hedges outstanding as of December 31, 2005.

| | Quarter Ending |
|---|---|
| **2006** | **March 31,** |
| **HO-WTI Swaps** | |
| Barrels hedged (in thousands) | 1,350 |
| Equivalent gallons hedged (in millions) | 56.70 |
| Average swap price (per barrel) | $ 15.69 |
| Fair value (in millions) | $ (4) |

***SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION***

The following table provides summarized comparative information for hedge transactions as of December 31, 2004.

| | December 31, | | |
|---|---|---|---|
| **Year ending,** | **2005** | **2006** | **2007** |
| **HO Swaps** | | | |
| Gallons hedged (in millions) | 69.30 | – | – |
| Average swap price (per gallon) | $ 0.93 | $ – | $ – |
| Fair value (in millions) | $ 15 | $ – | $ – |
| **HO Collars** | | | |
| Gallons hedged (in millions) | 40.95 | 97.65 | 31.50 |
| Average cap price (per gallon) | $ 0.97 | $ 0.93 | $ 0.93 |
| Average floor price (per gallon) | $ 0.89 | $ 0.86 | $ 0.86 |
| Fair value (in millions) | $ 8 | $ 17 | $ 6 |
| **WTI Swaps** | | | |
| Barrels hedged (in thousands) | 3,750 | 2,400 | – |
| Equivalent gallons hedged (in millions) | 157.50 | 100.80 | – |
| Average swap price (per barrel) | $ 24.52 | $ 24.83 | $ – |
| Fair value (in millions) | $ 66 | $ 36 | $ – |
| **WTI Collars** | | | |
| Barrels hedged (in thousands) | 10,950 | 4,350 | 150 |
| Equivalent gallons hedged (in millions) | 459.90 | 182.70 | 6.30 |
| Average cap price (per barrel) | $ 26.69 | $ 30.47 | $ 33.00 |
| Average floor price (per barrel) | $ 22.11 | $ 26.04 | $ 29.00 |
| Fair value (in millions) | $ 175 | $ 45 | $ 1 |

## INTEREST RATE

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

### TOTAL INTEREST RATE HEDGING PROGRAM

All interest rate derivative transactions outstanding are reflected in the following table:

| | December 31, 2005 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | **2006** | **2007** | **2008** | **2009** | **2010** | **Thereafter** | **Total** | **Fair Value** |
| **Fair value hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ – | $ 300 | $ – | $ 200 | $ 250 | $ – | $ 750 | $ – |
| Average fixed rate | – | 7.88% | – | 6.13% | 7.13% | – | 7.16% | |
| Average floating rate | – | 6.75% | – | 4.97% | 7.36% | – | 6.48% | |
| **Cash flow hedges** | | | | | | | | |
| Forward-starting swaps (in millions) | $ 250 | $ – | $ – | $ – | $ – | $ – | $ 250 | $ 8 |
| Average swap rate | 4.87% | – | – | – | – | – | 4.87% | |

BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

***SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION***

| | December 31, 2004 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total | Fair Value |
| **Fair value hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 300 | $ – | $ 300 | $ – | $ 200 | $ 250 | $1,050 | $ 35 |
| Average fixed rate | 6.38% | – | 7.88% | – | 6.13% | 7.13% | 6.93% | |
| Average floating rate | 3.95% | – | 4.67% | – | 2.97% | 5.36% | 4.31% | |

***FAIR VALUE INTEREST RATE HEDGES***

The Company enters into interest rate swaps to convert fixed-rate long-term debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short-cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of December 31, 2005 and 2004, BNSF had ten and thirteen separate swaps outstanding, respectively, with an aggregate notional amount of $750 million and $1,050 million, respectively, in which it pays an average floating rate, which fluctuates quarterly, based on London Interbank Offered Rate (LIBOR). The average floating rate to be paid by BNSF as of December 31, 2005, was 6.48 percent, and the average fixed rate BNSF is to receive is 7.16 percent. These swaps will expire between 2007 and 2010.

The amounts recorded in the Consolidated Statements of Income, as a reduction of interest expense, for interest rate fair value hedge transactions are as follows (in millions):

| December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Hedge benefit | **$ 17** | $ 36 | $ 35 |
| Tax effect | **(6)** | (14) | (13) |
| Hedge benefit, net of tax | **$ 11** | $ 22 | $ 22 |

The amounts recorded on the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of unexpired hedges, with a corresponding increase to debt or accrued interest, are as follows (in millions):

| December 31, | 2005 | 2004 |
|---|---|---|
| Short-term interest rate hedging asset | **$ 1** | $ 10 |
| Long-term interest rate hedging asset | **$ (1)** | $ 25 |

***CASH FLOW INTEREST RATE HEDGES***

In anticipation of a future debt issuance, the Company entered into five forward starting interest rate swaps in July and August 2005 having an aggregate notional amount of $250 million to fix a portion of the rate for a future 30-year unsecured debt issuance. The forward starting swaps have an average swap rate of 4.87 percent, which includes an average forward treasury rate of 4.41 percent and a swap spread of 0.46 percent. The forward starting date of the swaps is October 16, 2006, but the Company may terminate the swaps at any time prior to that date. The swaps must be terminated on or prior to February 28, 2007. The resulting locked-in rate on the debt to be issued (excluding the credit spread and issuance fees) will be 4.87 percent minus the swap spread received by BNSF on the termination date. Any gain or loss on these hedges will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

The amounts recorded in the Consolidated Balance Sheets for interest rate cash flow hedge transactions, which represent the fair value of unexpired hedges, are as follows (in millions):

| December 31, | 2005 | 2004 |
|---|---|---|
| Interest rate hedging asset | **$ 8** | $ – |
| Tax effect | **(3)** | – |
| Interest rate hedging asset in AOCI, net of tax | **$ 5** | $ – |

#### 4. Other Expense, Net

Other expense, net includes the following (in millions):

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Accounts receivable sale fees | **$ 15** | $ 10 | $ 9 |
| Loss from participation in synthetic fuel partnership | **14** | 3 | – |
| Miscellaneous, net | **8** | (9) | 5 |
| Total | **$ 37** | $ 4 | $ 14 |

The increase in other expense, net was predominantly due to higher accounts receivable sales fees driven primarily by higher interest rates, losses on BNSF's participation in a synthetic fuel partnership and the receipt of interest income on a settlement that occurred in 2004.

During the fourth quarter of 2004, BNSF indirectly purchased a 4.17 percent ownership of a synthetic fuel partnership through a 50 percent interest in a limited liability company with an unrelated entity. The synthetic fuel partnership generates Section 29 synthetic fuel tax credits, which reduce the Company's effective tax rate (see Note 5 of the Consolidated Financial Statements for additional information). In 2005 and 2004, BNSF received a tax benefit from its participation in the partnership of approximately $16.2 and $3.5 million, respectively, related to the fuel tax credits and the deduction of partnership operating losses. In 2005 and 2004, the Company recorded approximately $14 million and $3 million, respectively, of other expense, net related to the Company's share of the partnership's losses under the equity method of accounting. The partnership does not qualify for consolidation under FIN 46R, as BNSF is not the primary beneficiary of the partnership. The Company's maximum future exposure to loss related to the activities of the synthetic fuel partnership is based upon the actual synthetic fuel produced by the partnership and is estimated to equal $25 million. However, the Company believes that any losses will be more than offset by the synthetic fuel tax credits.

#### 5. Income Taxes

Income tax expense (benefit) was as follows (in millions):

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Current: | | | |
| Federal | **$ 620** | $ 212 | $ (12) |
| State | **80** | 33 | 6 |
| Total current | **700** | 245 | (6) |
| Deferred: | | | |
| Federal | **183** | 211 | 408 |
| State | **34** | 26 | 52 |
| Total deferred | **217** | 237 | 460 |
| Total | **$ 917** | $ 482 | $ 454 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Federal statutory income tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | **3.0** | 3.0 | 3.0 |
| Tax settlement | **–** | – | (1.0) |
| Synthetic fuel credits | **(0.4)** | (0.2) | – |
| Other, net | **(0.1)** | 0.1 | (0.1) |
| Effective tax rate | **37.5%** | 37.9% | 36.9% |

The lower effective tax rate in 2003 primarily reflects a tax settlement attributable to prior years that was settled favorably in 2003.

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2005 | 2004 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | **$ (8,406)** | $ (8,222) |
| Hedging | **(132)** | (139) |
| Other | **(221)** | (210) |
| Total deferred tax liabilities | **(8,759)** | (8,571) |
| Deferred tax assets: | | |
| Casualty and environmental | **360** | 387 |
| Pension and other post-employment benefits | **245** | 227 |
| Compensation and benefits | **125** | 123 |
| Employee separation costs | **49** | 58 |
| Other | **282** | 264 |
| Total deferred tax assets | **1,061** | 1,059 |
| Net deferred tax liability | **$ (7,698)** | $ (7,512) |
| | | |
| Non-current deferred income tax liability | **$ (7,916)** | $ (7,820) |
| Current portion of deferred income taxes | **218** | 308 |
| Net deferred tax liability | **$ (7,698)** | $ (7,512) |

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 22, 1995, respectively. Internal Revenue Service examination of the years 1995 through 1999 for BNSF is completed, and the unagreed issues are pending before Internal Revenue Service (IRS) Appeals. BNSF is currently under examination for years 2000 through 2002. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2005.

**6. Accounts Receivable, Net**

BNSF Railway transfers most of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust, and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

The Company's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2005, which was comprised of two $350 million, 364-day accounts receivable facilities. The Company amended these facilities on October 14, 2005, modifying their expiration dates to October 2006. Outstanding undivided interests held by investors under the A/R sales program were $300 million and $650 million at December 31, 2005 and 2004, respectively. These receivables were derecognized by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. The undivided interests were supported by $1,008 million and $864 million of receivables transferred by SFRC to the master trust at December 31, 2005 and December 31, 2004, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold. This retained interest is included in accounts receivable in the Company's financial statements. SFRC's retained interest in these receivables of $708 million and $214 million at December 31, 2005 and 2004, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivable transferred by SFRC to the master trust less $300 million and $650 million at December 31, 2005 and 2004, respectively, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value, and there was no gain or loss from the transaction.

The Company retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $13.6 billion, $11.6 billion and $9.8 billion in 2005, 2004 and 2003, respectively. No servicing asset or liability has been recorded because the fees the Company receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $15 million, $10 million and $9 million for the years ended December 31, 2005, 2004 and 2003, respectively. These costs fluctuate monthly with changes in prevailing interest rates and were based on weighted average interest rates of 3.3 percent, 1.4 percent and 1.1 percent for the years ended December 31, 2005, 2004 and 2003, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs, and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. BNSF Railway has historically experienced very low levels of default or dilution. If dilution or delinquency percentages were to increase by one percentage point, there would be no impact to the amount of receivables BNSF Railway could sell.

Receivables funded under the A/R sales program may not include amounts over 90 days past due or concentrations over certain limits with any one customer and certain other receivables. At December 31, 2005 and December 31, 2004, $36 million and $47 million, respectively, of accounts receivable were greater than 90 days old. The Company maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At December 31, 2005 and December 31, 2004, $45 million and $59 million, respectively, of such allowances had been recorded of which $42 million and $52 million, respectively, had been recorded as a reduction to accounts receivable, net. Additionally, at December 31, 2005 and December 31, 2004, approximately $3 million and $7 million, respectively, had been recorded as an allowance for bill adjustments and uncollectible accounts in accounts payable and other current liabilities because they relate to the undivided interests held by investors. During each of the years ended December 31, 2005 and 2004, $8 million of accounts receivable were written off.

The investors in the master trust have no recourse against BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2005, BNSF Railway is in compliance with these provisions.

**7. Property and Equipment, Net**

Property and equipment, net (in millions), and the weighted average annual depreciation rates (%) were as follows:

| December 31, | 2005 | 2004 | 2005 Depreciation Rates |
|---|---|---|---|
| Land | **$ 1,649** | $ 1,554 | –% |
| Track structure | **15,631** | 14,427 | 3.4 |
| Other roadway | **10,671** | 10,670 | 2.5 |
| Locomotives | **3,412** | 3,492 | 4.9 |
| Freight cars and other equipment | **1,949** | 1,807 | 4.9 |
| Computer hardware and software | **449** | 382 | 13.4 |
| Total cost | **33,761** | 32,332 | |
| Less accumulated depreciation and amortization | **(7,210)** | (6,518) | |
| Property and equipment, net | **$ 26,551** | $ 25,814 | |

The Consolidated Balance Sheets at December 31, 2005 and 2004, included $1,000 million, net of $372 million of amortization, and $978 million, net of $332 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

The Company capitalized $13 million, $10 million and $9 million of interest for the years ended December 31, 2005, 2004 and 2003, respectively.

**SAN JACINTO RAIL LIMITED PARTNERSHIP**

As described in Note 2 of the Consolidated Financial Statements, the original purpose of the San Jacinto Rail Limited Partnership was to construct and BNSF to operate a 13-mile rail line to service several chemical and plastics manufacturing facilities in the Houston, Texas area. In the fourth quarter of 2004, BNSF reached an agreement with another carrier for an alternative means of access to the facilities by using the other railroad's existing line. As consideration for the trackage rights and alternative access rights, BNSF agreed to compensate the other railroad, in lieu of rent, by a combination of cash and waiver of certain payment obligations of the other carrier for future payments related to prospective capital projects to be performed on jointly-operated facilities of BNSF and the other carrier. In January 2005, upon implementation of the terms of this agreement, the Company recorded an intangible asset of $92 million for the trackage rights, amortization of which is estimated to be approximately $3 million per year. In February 2005, the Surface Transportation Board announced its approval of the alternative access by means of trackage rights over the other carrier's existing lines.

The fair market value of San Jacinto's assets, including land, was approximately $4 million, determined based on comparable sales and existing property listing information on other properties located near the subject properties. As a result of a plan to sell these assets, the Company recorded a pre-tax impairment charge of $24 million in materials and other expense, which reduced net income by $15 million or $0.04 per share for 2004. Additionally, the short-term debt that was recorded upon consolidation was repaid during the fourth quarter of 2004.

**8. Accounts Payable and Other Current Liabilities**

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2005 | 2004 |
|---|---|---|
| Compensation and benefits payable | **$ 596** | $ 545 |
| Customer incentives | **297** | 281 |
| Accounts payable | **278** | 234 |
| Casualty and environmental liabilities | **240** | 248 |
| Income tax liabilities | **232** | 79 |
| Rents and leases | **210** | 161 |
| Property tax liabilities | **126** | 134 |
| Accrued interest | **115** | 99 |
| Dividends payable | **75** | 64 |
| Other | **604** | 406 |
| Total | **$ 2,773** | $ 2,251 |

**9. Debt**

Debt outstanding was as follows (in millions):

| December 31, | 2005 | 2004 |
|---|---|---|
| Notes and debentures, weighted average rate of 6.7 percent, due 2006 to 2097 | **$ 5,077** | $ 4,909 |
| Equipment obligations, weighted average rate of 6.8 percent, due 2006 to 2016 | **413** | 476 |
| Capitalized lease obligations, weighted average rate of 7.3 percent, due 2006 to 2023 | **604** | 632 |
| Mortgage bonds, weighted average rate of 8.3 percent, due 2006 to 2047 | **384** | 388 |
| Financing obligations, weighted average rate of 6.3 percent, due 2012 to 2028 | **153** | 153 |
| Commercial paper, weighted average rate of 4.3 percent | **563** | – |
| Unamortized discount and other, net | **(40)** | (42) |
| Total | **7,154** | 6,516 |
| Less current portion of long-term debt | **(456)** | (465) |
| Long-term debt | **$ 6,698** | $ 6,051 |

Notes and debentures include a fair value adjustment decrease for hedges of less than $1 million and an increase of $31 million at December 31, 2005 and 2004, respectively.

Certain BNSF Railway properties and other assets are subject to liens securing $384 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and capital leases.

The following tables provide fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2005.

| | December 31, 2005 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | Total including capital leases | Total excluding capital leases | Fair value excluding capital leases |
| | 2006 | 2007 | 2008 | 2009 | 2010 | Thereafter | | | |
| Fixed-rate debt (in millions) | $ 456 | $ 164 | $ 161 | $ 135 | $ 149 | $ 4,777 | $ 5,842 | $ 5,238 | $ 5,843 |
| Average interest rate | 8.6% | 7.9% | 7.6% | 7.4% | 7.2% | 6.7% | 6.9% | | |
| Variable-rate debt (in millions) | $ – | $ 301 | $ – | $ 205 | $ 806 | $ – | $ 1,312 | $ 1,312 | $ 1,352 |
| Average interest rate | –% | 7.3% | –% | 5.2% | 5.3% | –% | 5.8% | | |

BNSF has included maturities of $563 million of commercial paper in the 2010 column above.

| | December 31, 2004 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | Total including capital leases | Total excluding capital leases | Fair value excluding capital leases |
| | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | | | |
| Fixed-rate debt (in millions) | $ 160 | $ 448 | $ 151 | $ 150 | $ 123 | $ 4,404 | $ 5,436 | $ 4,804 | $ 5,455 |
| Average interest rate | 7.8% | 8.7% | 8.0% | 7.8% | 7.5% | 6.7% | 7.0% | | |
| Variable-rate debt (in millions) | $ 305 | $ – | $ 311 | $ – | $ 214 | $ 250 | $ 1,080 | $ 1,080 | $ 1,173 |
| Average interest rate | 4.5% | –% | 6.0% | –% | 4.3% | 7.0% | 5.5% | | |

In the two tables above, maturities in 2008 exclude $200 million of 7.29 percent debentures which mature in 2036 but are redeemable in 2008 at the option of the debt holders.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. Capital leases have been excluded from the calculation of fair value for both 2004 and 2005. The carrying amount of commercial paper and bank debt approximates fair value because of the short maturity of these instruments.

## NOTES AND DEBENTURES

**2005**

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month LIBOR rate plus 2.35%, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company will not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company will be required to sell common stock, the proceeds of which will be used to pay any accrued and unpaid interest. At December 31, 2005, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance are being used to repurchase common stock, with the remainder used for general corporate purposes.

Pursuant to existing Board authority, BNSF can issue up to an additional $1 billion of debt securities. The Company expects that it will file shelf registration statements for this additional $1 billion when it is ready to issue the debt.

**2004**

The Company issued $250 million of 4.88 percent notes due January 15, 2015. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

**2003**

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023 at a price of 103.02 percent of par. Commercial paper was used to fund the call.

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

## MORTGAGE BONDS

**2003**

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

## COMMERCIAL PAPER

BNSF issues commercial paper from time to time that is supported by a bank revolving credit agreement. At December 31, 2005, there were no bank borrowings against the revolving credit agreement. Outstanding commercial paper balances are considered as reducing the amount of borrowings available under this agreement. In June 2005, the Company let its $700 million 364-day facility expire. The Company amended its multi-year facility to increase the facility size to $1.2 billion and to extend the expiration date to June 2010. Annual facility fees are currently 0.100 percent for the long-term facility. This rate is subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon: (i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, (ii) money market rates offered at the option of the lenders, or (iii) an alternate base rate. The Company classifies commercial paper as long-term to the extent of its borrowing capacity under the facility. BNSF must maintain compliance with certain financial covenants under its revolving credit agreement. At December 31, 2005, the Company was in compliance with these covenants.

Commercial paper outstanding of $891 million as of December 31, 2005, includes $328 million issued to a consolidated subsidiary of BNSF and is eliminated upon consolidation. The maturity value of commercial paper as of December 31, 2005, of $891 million, reduces the total capacity available under the revolving credit agreements to approximately $309 million.

## GUARANTEES

Debt and other obligations of non-consolidated entities guaranteed by the Company as of December 31, 2005 are as follows (dollars in millions):

| | Guarantees | | | | | |
|---|---|---|---|---|---|---|
| | BNSF Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount[a] | Remaining Term (in years) | Capitalized Obligations[b] |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $ 190 | $ 190 | $ – | Termination of Ownership | $ – |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 62 | $ 96 | $ 96 | 13 | $ 34 |
| Westside Intermodal Transportation Corporation | 0.0% | $ 43 | $ 69 | $ – | 18 | $ 36 |
| The Unified Government of Wyandotte County/ Kansas City, Kansas | 0.0% | $ 14 | $ 21 | $ – | 18 | $ 11 |
| Various lessors (Residual value guarantees) | 0.0% | N/A | $ 298 | $ 298 | Various | $ 68[c] |
| All other | 0.0% | $ 8 | $ 9 | $ 4 | Various | $ – |

a Reflects the maximum amount the Company could recover from a third party other than the counterparty.

b Reflects capitalized obligations that are recorded on the Company's Consolidated Balance Sheets.

c Reflects the FIN 45 asset and corresponding liability for the fair value of the residual value guarantees on the Company's Consolidated Balance Sheet.

### KINDER MORGAN ENERGY PARTNERS, L.P.

Santa Fe Pacific Pipelines, Inc. (SFPP), an indirect, wholly owned subsidiary of BNSF, has a guarantee in connection with its remaining special limited partnership interest in SFPP, L.P., a subsidiary of Kinder Morgan Energy Partners, L.P. to be paid only upon default by the partnership. All obligations with respect to the guarantee will cease upon termination of ownership rights which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP, L.P.

### KANSAS CITY TERMINAL INTERMODAL TRANSPORTATION CORPORATION

BNSF and another major railroad jointly and severally guarantee $62 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF has a 25 percent ownership in KCTRC, accounts for its interest using the equity method of accounting, and will be required to fund a portion of the remaining obligation upon default by the original debtor.

### WESTSIDE INTERMODAL TRANSPORTATION CORPORATION AND THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS

BNSF has guaranteed $57 million of debt, the proceeds of which were used to finance construction of a bridge that connects BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge is operated by KCTRC, and payments related to BNSF's guarantee of this obligation will only be called for upon default by the original debtor.

### RESIDUAL VALUE GUARANTEES (RVG)

In the normal course of business, the Company enters into leases in which it guarantees the residual value of certain leased equipment. Some of these leases have renewal or purchase options, or both, that the Company may exercise at the end of the lease term. If the Company elects not to exercise these options, it may be required to pay the lessor an amount not exceeding the RVG. The amount of any payment is contingent upon the actual residual value of the leased equipment. Some of these leases also require the lessor to pay the Company any surplus in the actual residual value of the leased equipment over the RVG. These guarantees will expire between 2006 and 2011.

The maximum future payments, as disclosed in the Guarantees table above, represent the undiscounted maximum amount that BNSF could be required to pay in the event the Company did not exercise its renewal option and the fair market value of the equipment had significantly declined. BNSF does not anticipate such a large reduction in the fair market value of the leased equipment. As of December 31, 2005, the Company has recorded a $68 million asset and corresponding liability for the fair value of the RVGs.

**ALL OTHER**

As of December 31, 2005, BNSF Railway guarantees $8 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $4 million of the $8 million of guarantees. These guarantees expire between 2006 and 2014.

Other than as discussed above, there is no collateral held by a third party which the Company could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than as discussed above, none of the guarantees are recorded in the Consolidated Financial Statements of the Company. The Company does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

**INDEMNITIES**

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether events which would trigger the indemnification obligations would ever occur, the Company does not believe that these indemnity agreements will have a material adverse effect on the Company's results of operations, financial position or liquidity. Additionally, the Company believes that due to lack of historical payment experience, the fair value of indemnities cannot be estimated with any amount of certainty and that the fair value of any such amount would be immaterial to the financial statements. Accordingly, no fair value liability related to indemnities has been recorded in the financial statements.

## 10. Commitments and Contingencies

**LEASE COMMITMENTS**

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments as of December 31, 2005 are summarized as follows (in millions):

| December 31, | Capital Leases | Operating Leases[a] |
|---|---|---|
| 2006 | $ 145 | $ 461 |
| 2007 | 135 | 536 |
| 2008 | 123 | 495 |
| 2009 | 95 | 461 |
| 2010 | 61 | 436 |
| Thereafter | 161 | 3,754 |
| Total | 720 | $ 6,143 |
| Less amount representing interest | (116) | |
| Present value of minimum lease payments | $ 604 | |

a Excludes leases having non-cancelable lease terms of less than one year and per diem leases.

Lease rental expense for all operating leases was $565 million, $496 million and $462 million for the years ended December 31, 2005, 2004 and 2003, respectively. Contingent rentals and sublease rentals were not significant.

## OTHER COMMITMENTS

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

## PERSONAL INJURY AND ENVIRONMENTAL COSTS

### CHARGE FOR ASBESTOS AND ENVIRONMENTAL COSTS

During 2004, BNSF recorded a $465 million pre-tax charge to reflect changes in its estimate of unasserted asbestos liabilities and environmental liabilities. Of this amount, $293 million and $172 million were related to unasserted asbestos and environmental liabilities, respectively. The $465 million pre-tax charge was recorded in materials and other expense and reduced net income by $288 million, or $0.77 per share during 2004.

### *PERSONAL INJURY*

Personal injury claims, including asbestos claims and employee work-related injuries and third party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards, and the average costs to settle projected claims, actual costs may differ from amounts recorded.

### *ASBESTOS*

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated by 1985.

Prior to 2000, claim filings against the Company for asbestos were not numerous and were sporadic. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. The Company believed, however, that the low end of the range of reasonably possible loss, as that term is used in FASB Interpretation No. 14 (FIN 14), *Reasonable Estimation of the Amount of a Loss*, was immaterial. Subsequent to this period, claim filings increased and, when they continued into 2004, the Company concluded that the low end of the range of reasonably possible loss would be material and that an estimate for unasserted asbestos exposure liability needed to be recorded. BNSF then engaged a third party with extensive experience in performing asbestos studies to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated unasserted asbestos claims and the estimated average cost per claim. The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of unasserted claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data.

Based on the assessment, the Company recorded an undiscounted $293 million pre-tax charge for unasserted asbestos claims in the third quarter of 2004. The $293 million pre-tax charge was recorded in materials and other expense and reduced net income by $182 million, or $0.49 per share, for the year ended December 31, 2004.

During the third quarter of 2005, the Company obtained an update of this study which concluded that the original September 2004 study continues to represent a reasonable estimate of BNSF's future asbestos exposure. Therefore, management recorded no additional expense as a result of this update. The Company plans to update the study in the third quarter of 2006. On a quarterly basis, BNSF monitors actual experience against the number of forecasted claims and expected claim payments. Adjustments to the Company's estimates will be recorded when necessary.

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | **$ 345** | $ 60 | $ 55 |
| Accruals | **–** | 308 | 25 |
| Payments | **(19)** | (23) | (20) |
| Ending balance at December 31, | **$ 326** | $ 345 | $ 60 |

Of the obligations at December 31, 2005, $266 million is related to unasserted claims and $60 million is related to asserted claims. At December 31, 2005 and 2004, $21 and $18 million are included in current liabilities, respectively. The recorded liability is not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding the number of asserted asbestos claims filed against BNSF:

| | 2005 | 2004 |
|---|---|---|
| Claims unresolved at January 1, | **1,926** | 1,985 |
| Claims filed | **835** | 712 |
| Claims settled, dismissed or otherwise resolved | **(640)** | (771) |
| Claims unresolved at December 31, | **2,121** | 1,926 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985) which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 50, 70, and 90 percent of the future unasserted asbestos claims will be incurred within the next 10, 15 and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $225 million to $425 million. However, BNSF believes that the $326 million recorded at December 31, 2005, is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER PERSONAL INJURY***

BNSF uses a third party actuary to assist the Company in estimating its other personal injury liability claims and expense. These estimates are based on the covered population, activity levels and trends in frequency, and the costs of covered injuries. These actuarial estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, is immaterial for these other occupational trauma claims.

BNSF obtains quarterly actuarial updates for other personal injury liabilities and monitors actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | **$ 459** | $ 453 | $ 441 |
| Accruals | **181** | 194 | 190 |
| Payments | **(218)** | (188) | (178) |
| Ending balance at December 31, | **$ 422** | $ 459 | $ 453 |

At December 31, 2005 and 2004, $164 million and $170 million are included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, are not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding the number of personal injury claims, other than asbestos, filed against BNSF:

| | 2005 | 2004 |
|---|---|---|
| Claims unresolved at January 1, | **4,116** | 4,393 |
| Claims filed | **3,758** | 3,632 |
| Claims settled, dismissed or otherwise resolved | **(4,257)** | (3,909) |
| Claims unresolved at December 31, | **3,617** | 4,116 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $375 million to $525 million. However, BNSF believes that the $422 million recorded at December 31, 2005, is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***BNSF INSURANCE COMPANY***

The Company has a consolidated, wholly owned subsidiary, Burlington Northern Santa Fe Insurance Company LTD. (BNSF IC) that provides insurance coverage for certain risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims incurred after January 1, 2002, and certain other claims which are subject to reinsurance. Beginning in 2004, BNSF IC entered into annual reinsurance pooling agreements with several other companies. The pooling agreements insure workers compensation, general liability, auto liability, and FELA risk. In accordance with the agreements, BNSF IC cedes a portion of its FELA exposure to the pool and assumes a proportionate share of the entire pool's risk. Each year BNSF IC reviews the objectives and performance of the pool to determine its continued participation in the pool. At December 31, 2005, BNSF IC had invested in commercial paper issued by BNSF and third party time deposits and money market accounts.

***ENVIRONMENTAL***

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

During the first half of 2004, the Company experienced a significant increase in expense relating to environmental remediation developments at known sites for which the majority of the contamination occurred decades ago. Because of these and other developments, the Company performed an assessment in 2004 to determine if it was feasible to better estimate developments at its known sites. The Company determined that a third party actuary had proprietary data that included information from the Environmental Protection Agency (EPA) and other governmental agencies as well as information accumulated from public sources and work performed for other clients. Because of its determination that a better estimate of future development could be made with this data, BNSF engaged this third party actuary, which has an extensive background in performing various studies for large companies, including environmental matters, to assist BNSF in determining the Company's potential future environmental exposure at known sites. As a result of this study, the Company revised its estimate of its probable environmental losses and its accrued liabilities.

Consequently, during the third quarter of 2004, BNSF recorded an undiscounted $172 million pre-tax charge related to its change in estimated environmental liabilities on a site by site basis. The $172 million pre-tax charge was recorded in materials and other expense and reduced net income by $106 million, or $0.28 per share, for 2004. The charge did not include (i) contaminated sites of which the Company is not aware, or (ii) additional amounts for third party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites. BNSF continues to estimate third party claims on a site by site basis when the liability for such claims is probable and reasonably estimable. BNSF's recorded liability for third party claims as of December 31, 2005 is approximately $24 million.

During the third quarter of 2005, the Company obtained an update of this study. Based on the results of the study, management recorded additional expense of approximately $12 million. The Company plans to update the study in the third quarter of 2006. On a quarterly basis, BNSF monitors actual experience against the forecasted remediation and related payments made on existing sites. Adjustments to the Company's estimates will continue to be recorded when necessary based on developments in subsequent periods. Additionally, environmental accruals include amounts for newly identified sites or contaminants, third-party claims and legal fees incurred for defense of third-party claims and recovery efforts.

The Company's estimate of ultimate cost for cleanup efforts at its known environmental sites utilizes BNSF's historical payment patterns, its current estimated percentage to closure ratios, and the actuary's proprietary benchmark patterns developed from data accumulated from public sources and work performed by it for other clients, including the EPA and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. BNSF also conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in, and the ability to pay for, cleanup of other PRPs.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 369 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination.

The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | **2005** | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | **$ 385** | $ 199 | $ 196 |
| Accruals | **33** | 258 | 59 |
| Payments | **(48)** | (72) | (56) |
| Ending balance at December 31, | **$ 370** | $ 385 | $ 199 |

At December 31, 2005 and 2004, $55 million and $60 million are included in current liabilities, respectively. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2005 will be paid over the next ten years and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | **BNSF sites** | | **Superfund sites** | |
|---|---|---|---|---|
| | **2005** | 2004 | **2005** | 2004 |
| Number of sites at January 1, | **384** | 402 | **24** | 22 |
| Sites added during the period | **24** | 34 | **–** | 5 |
| Sites closed during the period | **(39)** | (52) | **(4)** | (3) |
| Number of sites at December 31, | **369** | 384 | **20** | 24 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $300 million to $600 million. However, BNSF believes that the $370 million recorded at December 31, 2005, is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER CLAIMS AND LITIGATION***

In addition to asbestos, other personal injury, and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

## 11. Employee Separation Costs

Employee separation costs activity was as follows (in millions):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Beginning balance at January 1, | **$ 154** | $ 179 | $ 210 |
| Accruals | **8** | 8 | 12 |
| Payments | **(30)** | (33) | (43) |
| Ending balance at December 31, | **$ 132** | $ 154 | $ 179 |

Employee separation liabilities of $132 million and $154 million are included in the Consolidated Balance Sheets at December 31, 2005 and 2004, respectively, and principally represent: (i) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; (ii) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; and (iii) certain non-union employee severance costs. Employee separation expenses are recorded in materials and other in the Consolidated Statements of Income. At December 31, 2005, $25 million of the remaining liabilities are included in current liabilities for anticipated costs to be paid in 2006.

**CONDUCTORS, TRAINMEN AND LOCOMOTIVE ENGINEERS**

Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $116 million and $128 million at December 31, 2005 and 2004, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the consummation of the business combination of BNSF's predecessor companies Burlington Northern, Inc. and Santa Fe Pacific Corporation (the Merger) which, among other things, reduced train crew sizes and allowed for more flexible work rules. The remaining costs will be paid between 2006 and approximately 2024. In 2005, 2004 and 2003, the Company updated its estimates and recorded additional liabilities of $2 million, $2 million and $3 million, respectively, related to deferred benefits.

## CONSOLIDATION OF CLERICAL FUNCTIONS

Liabilities related to the consolidation of clerical functions were $10 million and $15 million at December 31, 2005 and 2004, respectively, and primarily provide for separation programs announced in 2003, 2004 and 2005 and severance costs associated with the clerical consolidation plan adopted in 1995 upon the Merger. During 2005, BNSF recorded other liabilities of approximately $5 million primarily related to a voluntary severance program for certain union employees. The July 2004 separation program affected approximately 40 employees and resulted in accrued severance costs of approximately $4 million. Reductions related to the July 2004 separation program were substantially completed by December 31, 2004. The July 2003 separation program resulted in accrued severance cost of approximately $12 million, affected approximately 150 employees and was substantially completed in 2003. The 1995 consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially completed during 1999. The liability also includes costs related to the reduction of approximately 40 and 140 material handlers in 2001 and 2000, respectively.

In 2003, the Company recorded $1 million of reversals for certain liabilities associated with the consolidation of clerical functions. These reversals primarily reflect accrued payments related to workforce reductions for positions under collective bargaining agreements where the Company was able to place affected individuals in alternate positions.

## OTHER EMPLOYEE SEPARATION COSTS

At December 31, 2005 and 2004, other employee separation cost liabilities of $6 million and $11 million, respectively, principally related to certain remaining non-union employee severances resulting from fourth quarter 2001 workforce reduction and the Merger. These costs will be paid over the next several years based on deferral elections made by the affected employees. Also included in the other separation cost accrual is an estimate for the remaining payments to be made to other union employees as a result of a relocation program initiated in 2005 for which a $1 million accrual was recorded. As of December 31, 2005, the remaining liability balance related to this voluntary severance program was insignificant as the program was substantially complete.

During 2004, the Company recorded a liability of approximately $2 million primarily related to a voluntary severance program for certain union employees. Additionally, during 2003, the Company recorded a $2 million reduction to its liability balance due to changes in certain estimates related to fourth-quarter 2001 reductions.

### 12. Earnings Per Share

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 0.1 million, 2.0 million and 23.6 million for 2005, 2004 and 2003, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

### 13. Retirement Plans and Other Post-Employment Benefit Plans

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees, and an unfunded BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

Components of the net cost (benefit) for these plans were as follows (in millions):

| | Pension Benefits | | | Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Year Ended December 31,** | **2005** | **2004** | **2003** | **2005** | **2004** | **2003** |
| Service cost | **$ 20** | $ 19 | $ 17 | **$ 2** | $ 3 | $ 4 |
| Interest cost | **95** | 97 | 100 | **17** | 20 | 22 |
| Expected return on plan assets | **(102)** | (113) | (123) | **–** | – | – |
| Actuarial loss | **25** | 12 | 3 | **–** | 5 | 8 |
| Net amortization and deferred amounts | **–** | – | – | **(8)** | (4) | (2) |
| Net cost (benefit) recognized | **$ 38** | $ 15 | $ (3) | **$ 11** | $ 24 | $ 32 |

The following table shows the change in benefit obligation based on the September 30 measurement date (in millions):

| | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Benefit Obligation** | **2005** | **2004** | **2005** | **2004** |
| Benefit obligation at beginning of period | **$ 1,710** | $ 1,678 | **$ 299** | $ 366 |
| Service cost | **20** | 19 | **2** | 3 |
| Interest cost | **95** | 97 | **17** | 20 |
| Plan participants' contributions | **–** | – | **8** | 7 |
| Amendments | **–** | – | **–** | (28) |
| Actuarial loss (gain) | **156** | 41 | **(1)** | (39) |
| Benefits paid | **(123)** | (125) | **(30)** | (30) |
| Benefit obligation at end of period | **1,858** | 1,710 | **$ 295** | $ 299 |
| Component representing future salary increases | **(105)** | (112) | | |
| Accumulated benefit obligation at end of period | **$ 1,753** | $ 1,598 | | |

Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had an accumulated benefit obligation in excess of plan assets at September 30, 2005 and 2004.

The following table shows the change in plan assets of the plans based on the September 30 measurement date (in millions):

| | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Plan Assets** | **2005** | **2004** | **2005** | **2004** |
| Fair value of plan assets at beginning of period | **$ 1,276** | $ 1,224 | **$ –** | $ – |
| Actual return on plan assets | **176** | 153 | **–** | – |
| Employer contribution | **18** | 24 | **22** | 23 |
| Plan participants' contributions | **–** | – | **8** | 7 |
| Benefits paid | **(123)** | (125) | **(30)** | (30) |
| Fair value of plan assets at end of period | **$ 1,347** | $ 1,276 | **$ –** | $ – |

The following table shows the reconciliation of the funded status of the plans with amounts recorded in the Consolidated Balance Sheets (in millions):

| December 31, | Pension Benefits 2005 | Pension Benefits 2004 | Health and Welfare Benefits 2005 | Health and Welfare Benefits 2004 |
|---|---|---|---|---|
| Fair value of plan assets as of September 30 | **$ 1,347** | $ 1,276 | **$ –** | $ – |
| Benefit obligations as of September 30 | **1,858** | 1,710 | **295** | 299 |
| Funded status (plan assets less benefit obligations) | **(511)** | (434) | **(295)** | (299) |
| Amounts not recognized: | | | | |
| Unrecognized net loss | **524** | 467 | **61** | 66 |
| Unrecognized prior service cost | **(2)** | (2) | **(36)** | (44) |
| Adjustment for fourth quarter contribution | **45** | 4 | **5** | – |
| Net amount recognized as of December 31 | **$ 56** | $ 35 | **$ (265)** | $ (277) |

The following table shows the amounts recognized in the Consolidated Balance Sheets (in millions):

| December 31, | Pension Benefits 2005 | Pension Benefits 2004 | Health and Welfare Benefits 2005 | Health and Welfare Benefits 2004 |
|---|---|---|---|---|
| Accrued benefit cost | **$ (361)** | $ (318) | **$ (265)** | $ (277) |
| Accumulated other comprehensive income | **417** | 353 | **–** | – |
| Net amount recognized | **$ 56** | $ 35 | **$ (265)** | $ (277) |

| December 31, | Pension Benefits 2005 | Pension Benefits 2004 | Health and Welfare Benefits 2005 | Health and Welfare Benefits 2004 |
|---|---|---|---|---|
| Increase (decrease) in minimum liability included in other comprehensive income | **$ 64** | $ (6) | **$ –** | $ – |

The expected long-term rate of return is the return the Company anticipates earning, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered: 1) forward looking capital market forecasts, 2) historical returns for individual asset classes and 3) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

| Assumptions used to determine net cost (benefit) for fiscal years ended December 31, | Pension Benefits 2005 | Pension Benefits 2004 | Pension Benefits 2003 | Health and Welfare Benefits 2005 | Health and Welfare Benefits 2004 | Health and Welfare Benefits 2003 |
|---|---|---|---|---|---|---|
| Discount rate | **5.75%** | 6.00% | 6.50% | **5.75%** | 6.00% | 6.50% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.25% | 8.50% | **–** | – | – |
| Rate of compensation increase | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90% | 3.90% |

| Assumptions used to determine benefit obligations at September 30, | Pension Benefits 2005 | Pension Benefits 2004 | Health and Welfare Benefits 2005 | Health and Welfare Benefits 2004 |
|---|---|---|---|---|
| Discount rate | **5.25%** | 5.75% | **5.25%** | 5.75% |
| Rate of compensation increase | **3.90%** | 3.90% | **3.90%** | 3.90% |

The following table presents assumed health care cost trend rates:

| December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **10.50%** | 10.00% | 11.00% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **2012** | 2010 | 2010 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | One Percentage-Point Increase | One Percentage-Point Decrease |
|---|---|---|
| Effect on total service and interest cost | $ 2 | $ (2) |
| Effect on post retirement benefit obligation | $ 24 | $ (20) |

The qualified BNSF Retirement Plan asset allocation at September 30, 2005 and 2004 and the target allocation for 2005 by asset category are as follows:

| | Target Allocation | Percentage of Pension Plan Assets at September 30, | |
|---|---|---|---|
| Plan Asset Allocation | 2005 | 2005 | 2004 |
| Equity Securities | **45 – 75%** | **64%** | 60% |
| Fixed Income Securities | **20 – 40** | **28** | 33 |
| Real Estate | **5 – 15** | **8** | 7 |
| Total | | **100%** | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the Plan assets in relation to the Plan liabilities while prudently managing the risk of a decrease in the Plan's assets relative to those liabilities. To meet this objective, the Employee Benefits Committee has adopted the above asset allocation ranges. This allows flexibility to accommodate market changes in the asset classes within defined parameters.

The Company contributed $40 million to the BNSF Retirement Plan in December 2005. The Company is not required to make any contributions to this plan in 2006. Additionally, the Company expects to make benefit payments in 2006 of approximately $21 million and $7 million from its OPEB and non-qualified defined benefit plans, respectively. The following table shows expected benefit payments and Medicare Part D subsidy receipts for the next five fiscal years and the aggregate five years thereafter from the defined benefit pension plans and OPEB (in millions):

| Fiscal Year | Expected Pension Plan Benefit Payments[a] | Expected OPEB Payments | Expected Medicare Subsidy |
|---|---|---|---|
| 2006 | $ 126 | $ 21 | $ (3) |
| 2007 | 126 | 22 | (3) |
| 2008 | 127 | 23 | (3) |
| 2009 | 129 | 24 | (3) |
| 2010 | 130 | 24 | (3) |
| 2011–2015 | 674 | 131 | (20) |

a Primarily consists of Qualified Defined Benefit Plan payments which are made from the Plan Trust and do not represent an immediate cash outflow to the Company.

## DEFINED CONTRIBUTION PLANS

BNSF sponsors qualified 401(k) plans which cover substantially all employees and a non-qualified defined contribution plan which covers certain officers and other employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Non-union employees are eligible to receive an annual discretionary matching contribution of up to 30 percent of the first six percent of their contributions. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $20 million, $17 million and $16 million in 2005, 2004 and 2003, respectively.

## OTHER

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans which provide certain post-retirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $43 million, $33 million and $31 million, in 2005, 2004 and 2003, respectively (see Note 11 of the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers).

### 14. Stock Plans

On April 15, 1999, BNSF shareholders approved the BNSF 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001, April 17, 2002, and April 21, 2004, BNSF shareholders approved the amended BNSF 1999 Stock Incentive Plan, which authorized additional awards not to exceed 29 million, 35 million and 42 million shares, respectively, of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately three million common shares were available for future grant at December 31, 2005.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee director's stock plan and authorized 900,000 shares of BNSF common stock to be issued in connection with this plan. Approximately 500,000 common shares were available for future grant at December 31, 2005.

## STOCK OPTIONS

Under BNSF's stock plans, options may be granted to directors, officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants awarded after April 2001 generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The Company applies APB Opinion 25 and related interpretations in accounting for its stock options (see Note 2 of the Consolidated Financial Statements for the Company's pro forma net income and earnings per share determined based on the fair value at grant dates consistent with SFAS No. 123).

A summary of the status of stock options as of December 31, 2005, 2004 and 2003, and changes during the years then ended, is presented below (options in thousands):

| **Year Ended December 31,** | **2005** | | **2004** | | **2003** | |
|---|---|---|---|---|---|---|
| | **Options** | **Weighted Average Exercise Prices** | **Options** | **Weighted Average Exercise Prices** | **Options** | **Weighted Average Exercise Prices** |
| Balance at beginning of year | **25,122** | **$ 29.42** | 38,320 | $ 28.72 | 39,323 | $ 28.31 |
| Granted | **2,676** | **$ 50.08** | 2,547 | $ 33.20 | 2,957 | $ 27.88 |
| Exercised | **(9,349)** | **$ 29.30** | (15,455) | $ 28.29 | (3,222) | $ 22.68 |
| Cancelled | **(168)** | **$ 35.48** | (290) | $ 30.09 | (738) | $ 30.16 |
| Balance at end of year | **18,281** | **$ 32.45** | 25,122 | $ 29.42 | 38,320 | $ 28.72 |
| Options exercisable at year end | **13,718** | **$ 29.75** | 20,164 | $ 29.18 | 31,465 | $ 28.83 |

The following table summarizes information regarding stock options outstanding at December 31, 2005 (options in thousands):

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| **Range of Exercise Prices** | **Number Outstanding** | **Weighted Average Remaining Life** | **Weighted Average Exercise Prices** | **Number Exercisable** | **Weighted Average Exercise Prices** |
| $24.08 to $27.97 | 5,649 | 5.67 Years | $ 26.91 | 4,774 | $ 26.76 |
| $28.34 to $29.44 | 5,182 | 3.73 Years | $ 29.12 | 5,182 | $ 29.12 |
| $29.78 to $34.59 | 4,663 | 5.26 Years | $ 32.86 | 3,303 | $ 32.92 |
| $34.87 to $71.03 | 2,787 | 7.97 Years | $ 49.15 | 459 | $ 45.09 |
| $24.08 to $71.03 | 18,281 | 5.37 Years | $ 32.45 | 13,718 | $ 29.75 |

## OTHER INCENTIVE PROGRAMS

BNSF has other long-term incentive programs in addition to stock options as shown in the following table (shares in thousands):

| | | | Shares Granted For Year Ended December 31, | | |
|---|---|---|---|---|---|
| **Other Incentive Programs** | **Generally Vested (in years)** | **Shares Outstanding as of December 31, 2005** | **2005** | **2004** | **2003** |
| Restricted shares/units: | | | | | |
| Time-based | 3–5 | **1,464** | **346** | 639 | 558 |
| Performance-based | 3 | **550** | **316** | 251 | – |
| BNSF Incentive Bonus Stock Program | 3 | **1,127** | **601** | 227 | 329 |
| BNSF Discounted Stock Purchase Program | N/A | **70** | **33** | 18 | 19 |

Time-based awards are granted to senior managers within BNSF primarily as a retention tool and to encourage ownership in the Company and generally vest over three years and are contingent on continued salaried employment. The weighted-average grant date fair market values of time-based awards granted in 2005, 2004 and 2003 was $49.23, $32.72 and $27.88, respectively.

Performance-based awards are granted to senior managers within BNSF to encourage ownership in the Company and to align management's interest with those of shareholders. Performance-based awards generally vest over three years and are contingent on the achievement of certain predetermined corporate performance goals (e.g., return on invested capital (ROIC)) and continued salaried employment. The weighted-average grant date fair market values of performance-based awards granted in 2005 and 2004 was $49.21 and $32.72, respectively, with no performance-based awards granted in 2003.

Additionally, related to the 2005 performance-based grant, eligible employees may also earn performance stock that will be granted in 2008 contingent upon achievement of higher ROIC goals and continued salaried employment. The Company has committed to a maximum grant of approximately 316,000 shares.

Certain eligible employees may exchange through the BNSF Incentive Bonus Stock Program (IBSP) the cash payment of their bonus for restricted stock. The grant date fair market values of IBSP awards granted in 2005, 2004 and 2003 was $47.58, $31.97 and $25.52, respectively. In September 2005, the program was amended so that no awards will be granted after 2006.

Salaried employees not eligible to participate in the IBSP may participate in the BNSF Discounted Stock Purchase Program (DSPP) and use their bonus to purchase BNSF common stock at a discount from the market price. These shares immediately vest but are restricted for a three-year period. The grant date fair market values of DSPP awards granted in 2005, 2004 and 2003 was $46.91, $31.84 and $25.38, respectively.

Shares awarded under the plans may not be sold or used as collateral and are generally not transferable by the holder until the shares awarded become free of restrictions. Compensation expense, net of tax, recorded under the BNSF Stock Incentive Programs in accordance with APB Opinion 25 is shown in the following table (in millions):

| | **2005** | 2004 | 2003 |
|---|---|---|---|
| Awards vesting based on service conditions | **$ 15** | $ 12 | $ 11 |
| Awards vesting based on performance and service conditions | **8** | 7 | – |
| Total | **$ 23** | $ 19 | $ 11 |

### 15. Common Stock and Preferred Capital Stock

#### COMMON STOCK

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2005, there were 372 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of stockholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board of Directors (the Board) out of funds legally available and to share ratably in all assets available for distribution to stockholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

#### PREFERRED CAPITAL STOCK

At December 31, 2005, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights, and qualifications and restrictions of each series. As of December 31, 2005, no Class A Preferred Stock had been issued.

#### SHARE REPURCHASE PROGRAM

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time through open market transactions or otherwise. In December 1999, April 2000, September 2000, January 2003 and December 2005, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 180 million shares. During 2005, 2004 and 2003, the Company repurchased approximately 14 million, 10 million and 8 million shares, respectively, of its common stock at average prices of $54.95 per share, $35.98 per share, and $27.25 per share, respectively. Total repurchases through December 31, 2005, were 148 million shares at a total average cost of $29.49 per share, leaving 32 million shares available for repurchase out of the 180 million shares presently authorized. Additionally, during 2005, the Company repurchased shares from employees at a cost of $26 million to satisfy tax withholding obligations on the vesting of restricted stock or the exercise of stock options.

In December 2005, BNSF entered into prepaid forward transactions to purchase $600 million of the Company's common stock. Shares will be delivered upon final settlement in February 2006. The number of shares will be determined based on the volume weighted average price per share through the final purchase date less a discount. There will be a net settlement in shares. This transaction is accounted for in accordance with Emerging Issues Taskforce (EITF) 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock*, which requires the $600 million prepayment to be recorded as a reduction in equity. At the time that the final settlement is made, the reduction in equity will be reclassified from prepaid forward repurchase of treasury stock to treasury stock. These transactions did not reduce outstanding shares in the fourth quarter and correspondingly had no impact on earnings per share. The Company's management does not believe that the impacts of the net settlement will be material to the financial statements of the Company.

## 16. Accounting Pronouncements

### STOCK-BASED COMPENSATION

The FASB issued SFAS No. 123R, *Share-Based Payment*, which originally required implementation for interim or annual reporting periods beginning after June 15, 2005. However, in April 2005, the Securities and Exchange Commission adopted a new rule to amend the compliance date to the beginning of the Company's next fiscal year (January 1, 2006, for the Company). SFAS No. 123R requires the Company to recognize the cost of employee services received in exchange for the Company's equity instruments. Currently, in accordance with APB Opinion 25, the Company records the intrinsic value of stock based compensation as expense. Accordingly, no compensation expense is currently recognized for fixed stock option plans as the exercise price equals the stock price on the date of grant. Under SFAS No. 123R, BNSF will be required to measure compensation expense over the options' vesting period based on the stock options' fair value at the date the options are granted. SFAS No. 123R allows for the use of the Black-Scholes or a lattice option-pricing model to value such options. The Company has determined that it will use the Black-Scholes option-pricing model to calculate the fair value of its options. Based on a study performed by the Company's management, the fair values obtained from each of the two pricing models were not substantially different. Additionally, the Company has elected to adopt SFAS No. 123R on a modified prospective basis. Note 2 of the Consolidated Financial Statements illustrates the effects on net income and earnings per share if the Company had adopted SFAS No. 123 using the Black-Scholes option-pricing model.

## 17. Quarterly Financial Data—Unaudited

| Dollars in millions, except per share data | Fourth[a] | Third[b] | Second | First |
|---|---|---|---|---|
| **2005** | | | | |
| Revenues | $ 3,550 | $ 3,317 | $ 3,138 | $ 2,982 |
| Operating income | $ 800 | $ 778 | $ 710 | $ 634 |
| Net income | $ 430 | $ 414 | $ 366 | $ 321 |
| Basic earnings per share | $ 1.16 | $ 1.12 | $ 0.98 | $ 0.86 |
| Diluted earnings per share | $ 1.13 | $ 1.09 | $ 0.96 | $ 0.83 |
| Dividends declared per share | $ 0.20 | $ 0.20 | $ 0.17 | $ 0.17 |
| Common stock price[c]: | | | | |
| High | $ 71.33 | $ 59.32 | $ 53.99 | $ 55.66 |
| Low | $ 56.67 | $ 47.51 | $ 46.30 | $ 45.05 |
| **2004** | | | | |
| Revenues | $ 2,978 | $ 2,793 | $ 2,685 | $ 2,490 |
| Operating income | $ 668 | $ 100 | $ 508 | $ 410 |
| Net income | $ 347 | $ 2 | $ 249 | $ 193 |
| Basic earnings per share | $ 0.93 | $ 0.01 | $ 0.68 | $ 0.52 |
| Diluted earnings per share | $ 0.91 | $ 0.01 | $ 0.67 | $ 0.52 |
| Dividends declared per share | $ 0.17 | $ 0.17 | $ 0.15 | $ 0.15 |
| Common stock price[c]: | | | | |
| High | $ 47.80 | $ 38.39 | $ 34.87 | $ 33.16 |
| Low | $ 38.54 | $ 33.97 | $ 31.44 | $ 30.02 |

a 2005 operating income, income before cumulative effect of accounting change and earnings per share include a loss related to an agreement to sell certain line segments to the state of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per diluted and basic share.

b Third-quarter 2004 operating income, net income and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, or $288 million net of tax, and quarterly earnings per share impacts of $0.78 per basic share and $0.76 per diluted share (see Note 10 of the Consolidated Financial Statements).

c Average of high and low reported daily stock price

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, BNSF's principal executive officer and principal financial officer have concluded that BNSF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to BNSF's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Additionally, as of the end of the period covered by this report, BNSF's principal executive officer and principal financial officer have concluded that there have been no changes in BNSF's internal control over financial reporting that occurred during BNSF's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, BNSF's internal control over financial reporting.

**Item 9B. Other Information**

None.

## Part III

### Item 10. Directors and Executive Officers of the Registrant

Information concerning the directors of BNSF will be provided under the heading "Nominees for Directors" in BNSF's proxy statement for its 2006 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information under the heading "Audit Committee" in BNSF's proxy statement for its 2006 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, is hereby incorporated by reference into the Form 10-K.

Information concerning the executive officers of BNSF is included in Part I of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be under the heading "Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2006 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

The Company has adopted a Code of Ethics for the Chief Executive Officer and Senior Financial Officers (Code of Ethics) applicable to the Chief Executive Officer, Chief Financial Officer and Controller. A copy of the Code of Ethics is available on the Company's website at www.bnsf.com under the "Investors Link," and any waiver from the Code of Ethics will be timely disclosed on the Company's website as will any amendments to the Code of Ethics.

### Item 11. Executive Compensation

Information concerning the compensation of directors and executive officers of BNSF will be provided under the heading "Directors' Compensation" and under the headings "Summary Compensation Table," "Stock Option Grants in 2005," "Aggregated 2005 Stock Option Exercises and Year-End Option Values," "Pension Plans," "Employment Contracts and Other Arrangements," and "Trust Agreements," in BNSF's proxy statement for its 2006 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Certain information about BNSF's equity compensation plans is set forth in the table below (number of shares in thousands) as of December 31, 2005:

| Plan Category | Number of shares to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of shares available for future issuance |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 18,281 | $ 32.45 | 3,741 |
| Equity compensation plans not approved by shareholders[a] | – | – | – |
| Total | 18,281 | $ 32.45 | 3,741 |

a Effective September 15, 2005, the Board of Directors of the Company terminated The Burlington Northern and Santa Fe Railway Company Achievement Award Program, pursuant to which awards of Company common stock had been made from time to time to select non-officer employees of BNSF Railway Company.

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the headings "Certain Beneficial Owners" and "Ownership of Management" in BNSF's proxy statement for its 2006 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

### Item 13. Certain Relationships and Related Transactions

Information concerning certain relationships and related transactions will be provided under the heading "Certain Relationships" in BNSF's proxy statement for its 2006 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

### Item 14. Principal Accountant Fees and Services

Information concerning principal accounting fees and services will be provided under the heading "Independent Auditor Fees" in BNSF's proxy statement for its 2006 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

## Part IV

### Item 15. Exhibits and Financial Statement Schedules

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—see Item 8.

   Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**BURLINGTON NORTHERN SANTA FE CORPORATION**

By /s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and Chief Executive Officer

Dated: February 16, 2006

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.

| SIGNATURE | TITLE |
|---|---|
| /s/ Matthew K. Rose<br>Matthew K. Rose | Chairman, President and Chief Executive Officer<br>(Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Paul W. Bischler<br>Paul W. Bischler | Controller<br>(Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>Alan L. Boeckmann | Director |
| /s/ Donald G. Cook*<br>Donald G. Cook | Director |
| /s/ Vilma S. Martinez*<br>Vilma S. Martinez | Director |
| /s/ Marc F. Racicot*<br>Marc F. Racicot | Director |
| /s/ Roy S. Roberts*<br>Roy S. Roberts | Director |
| /s/ Marc J. Shapiro*<br>Marc J. Shapiro | Director |

/s/ J.C. Watts, Jr.* Director
J.C. Watts, Jr.

/s/ Robert H. West* Director
Robert H. West

/s/ J. Steven Whisler* Director
J. Steven Whisler

/s/ Edward E. Whitacre, Jr.* Director
Edward E. Whitacre, Jr.

*By: /s/ Jeffrey R. Moreland

Dated: February 16, 2006

Jeffrey R. Moreland
Executive Vice President Law &
Government Affairs and Secretary

## Burlington Northern Santa Fe Corporation and Subsidiaries – Index to Exhibits

| Exhibit Number | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of BNSF (amended as of April 21, 1998). Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 1998 (SEC File No. 1-11535). Certificate of Elimination of the Designation of the 6-¼% Cumulative, Convertible Preferred Stock, Series A, $0.02 Par Value. Certificate of Designation, Preferences and Rights of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 4.1 to BNSF's Form 8-A 12B filed December 23, 1999 (SEC File No. 1-11535). Certificate of Increase in the Number of Authorized Shares of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001 (SEC File No. 1-11535). |
| 3.2 | By-Laws of Burlington Northern Santa Fe Corporation, as amended and restated, dated December 8, 2005. Incorporated by reference to Exhibit 3.1 to BNSF's Form 8-K dated December 8, 2005. |
| 4.1 | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. Incorporated by reference to Exhibit 4 to BNSF's Registration Statement on Form S-3 (No. 333-72013). |
| 4.2 | Form of BNSF's 6⅛% Notes Due 2009. Incorporated by reference to Exhibit 4.2 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998 (SEC File No. 1-11535). |
| 4.3 | Form of BNSF's 6¾% Debentures Due 2029. Incorporated by reference to Exhibit 4.3 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998 (SEC File No. 1-11535). |
| 4.4 | Form of BNSF's 6.70% Debentures Due August 1, 2028. Incorporated by reference to Exhibit 4.4 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998 (SEC File No. 1-11535). |
| 4.5 | Form of BNSF's 7.875% Note Due April 15, 2007. Incorporated by reference to Exhibit 4.5 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000 (SEC File No. 1-11535). |
| 4.6 | Form of BNSF's 8.125% Debentures Due April 15, 2020. Incorporated by reference to Exhibit 4.6 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000 (SEC File No. 1-11535). |
| 4.7 | Form of BNSF's 7.95% Debentures Due August 15, 2030. Incorporated by reference to Exhibit 4.7 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000 (SEC File No. 1-11535). |
| 4.8 | Form of BNSF's 6.75% Note Due July 15, 2011. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2001. |
| 4.9 | Officers' Certificates as to the terms of Form of BNSF's 5.90% Notes Due July 1, 2012 including the form of the Notes. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2002. |
| 4.10 | Officers' Certificate of Determination as to the terms of BNSF's 4.875% Notes Due January 15, 2015, including Exhibit A thereto, the form of the Notes. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 8-K (Date of earliest event reported: November 18, 2004). |
| 4.11 | Indenture, dated as of December 8, 2005, between BNSF and U.S Bank Trust National Association, as Trustee. Incorporated by reference to Exhibit 4.1 to BNSF's Registration Statement on Form S-3 ASR (No. 333-130214). |
| 4.12 | Certificate of Trust of BNSF Funding Trust I, executed and filed by U.S. Bank Trust National Association, Linda Hurt and James Gallegos, as Trustees. Incorporated by reference to Exhibit 4.3 to BNSF's Registration Statement of Form S-3 (No. 333-130214). |

| Exhibit Number | Description |
|---|---|
| **4.13** | Amended and Restated Declaration of Trust of BNSF Funding Trust I, dated as of December 15, 2005. Incorporated by reference to Exhibit 4.4 to BNSF's Report on Form 8-K filed December 15, 2005. |
| **4.14** | Guarantee Agreement between BNSF and U.S. Bank Trust National Association, as Guarantee Trustee, dated as of December 15, 2005. Incorporated by reference to Exhibit 4.5 to BNSF's Report on Form 8-K filed December 15, 2005. |
| **4.15** | First Supplemental Indenture, dated as of December 15, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. Incorporated by reference to Exhibit 4.6 to BNSF's Report on Form 8-K filed December 15, 2005. |
| **4.16** | Agreement as to Expenses and Liabilities between BNSF and BNSF Funding Trust I. Incorporated by reference to Exhibit C to Exhibit 4.4 to BNSF's Report on Form 8-K filed December 15, 2005. |
| **4.17** | Trust Preferred Securities Certificate of BNSF Funding Trust I. Incorporated by reference to Exhibit D to Exhibit 4.4 to BNSF's Report on Form 8-K filed December 15, 2005. |
| | Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission. |
| **10.1*** | Burlington Northern Santa Fe Non-Employee Directors' Stock Plan as amended February 11, 2005. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2004. |
| **10.2*** | The BNSF Railway Company Incentive Compensation Plan, as amended and restated, effective January 1, 2006. |
| **10.3*** | Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated, effective December 9, 2004. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 8-K dated December 9, 2004. |
| **10.4*** | Burlington Northern Inc. Senior Executive Survivor Benefit Plan as of April 1, 1986. Incorporated by reference to Amendment No. 1 to BNI's Report on Form 10-K for the fiscal year ended December 31, 1987 (SEC File No. 1-8159). |
| **10.5*** | Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan, as amended and restated effective December 9, 2004. Incorporated by reference to Exhibit 10.4 to BNSF's Report on Form 8-K dated December 31, 2004. |
| **10.6*** | Burlington Northern Santa Fe Long Term Incentive Stock Plan. Incorporated by reference to Exhibit 4(c) to BNSF's Registration Statement on Form S-8 (File No. 33-63247). |
| **10.7*** | Burlington Northern Santa Fe Corporation 1990 Directors Stock Option Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62825). |
| **10.8*** | Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated September 14, 2005. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 8-K dated September 19, 2005. |
| **10.9*** | Burlington Northern Santa Fe Corporation 1992 Stock Option Incentive Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62839). |

| Exhibit Number | Description |
|---|---|
| 10.10* | Burlington Northern Santa Fe 1996 Stock Incentive Plan. Incorporated by reference to Appendix B to BNSF's Proxy Statement dated March 5, 1996 (SEC File No. 1-11535). Amendment of Burlington Northern Santa Fe 1996 Stock Incentive Plan dated January 15, 1998. Incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997 (SEC File No. 1-11535). Amendment dated December 3, 1998. Incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999 (SEC File No. 1-11535). |
| 10.11* | Burlington Northern Santa Fe Supplemental Retirement Plan, effective October 1, 1996, as amended through July 21, 2005. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 8-K dated July 21, 2005. |
| 10.12* | Burlington Northern Santa Fe Estate Enhancement Program, as amended and restated, effective October 1, 1996. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996 (SEC File No. 1-11535). Amendment to Burlington Northern Santa Fe Estate Enhancement Program. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-Q for the quarter ended June 30, 1999 (SEC File No. 1-11535). |
| 10.13* | Form of BNSF Change-in-Control Agreement (applicable to Messrs. Ice, Hund, Moreland, and Lanigan, and two other executive officers). Incorporated by reference to Exhibit 10.17 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996 (SEC File No. 1-11535). Amendment dated December 17, 1998. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.14* | Burlington Northern Santa Fe Deferred Compensation Plan for Directors, as amended and restated, effective December 9, 2004. Incorporated by reference to Exhibit 10.5 to BNSF's Report on Form 8-K dated December 9, 2004. |
| 10.15* | Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan, effective January 1, 1997, as amended through July 21, 2005. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 8-K dated July 21, 2005. |
| 10.16* | Burlington Northern Inc. Form of Severance Agreement and amendments through September 18, 1995 (applicable to Mr. Rose). Incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995 (SEC File No. 1-11535). Amendment to Form of Severance Agreement dated December 3, 1997 is incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997 (SEC File No. 1-11535). Amendment dated January 6, 1999 is incorporated by reference to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.17* | Burlington Northern Inc. Director's Charitable Award Program. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995 (SEC File No. 1-11535). |
| 10.18* | Burlington Northern Santa Fe Salary Exchange Option Program, as amended and restated, October 1, 2004. Incorporated by reference to Exhibit 10.18 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2004. |
| 10.19* | Santa Fe Pacific Corporation Supplemental Retirement Plan (Supplemental Plan). Incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1984 (SEC File No. 1-8627). Supplemental Plan as amended October 1, 1989, and Amendment to Supplemental Plan dated February 27, 1990, are incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1989 (SEC File No. 1-8627). Amendment to Supplemental Plan dated March 22, 1994, and effective January 1, 1994, is incorporated by reference to Exhibit 10.24 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995 (SEC File No. 1-11535). |

| Exhibit Number | Description |
|---|---|
| **10.20*** | The Burlington Northern and Santa Fe Railway Company Severance Plan as amended and restated October 16, 2001. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| **10.21*** | Burlington Northern Santa Fe 1999 Stock Incentive Plan, as amended and restated, effective December 8, 2005. |
| **10.22*** | Benefits Protection Trust Agreement by and between Burlington Northern Santa Fe Corporation and Wachovia Bank, approved by the board of directors February 11, 2005. Incorporated by reference to Exhibit 10.22 of BNSF's Report on Form 10-K for the fiscal year ended December 31, 2004. |
| **10.23*** | Burlington Northern Santa Fe Directors' Retirement Plan. Incorporated by reference to Exhibit 10.29 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995 (SEC File No. 1-11535). |
| **10.24*** | Form of indemnification agreement dated as of September 17, 1998 between BNSF and directors. Incorporated by reference to Exhibit 10.37 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998 (SEC File No. 1-11535). |
| **10.25*** | Form of indemnification agreement dated as of September 17, 1998 between BNSF and certain officers, including Matthew K. Rose, Thomas N. Hund, Carl R. Ice, John P. Lanigan, Jr., Jeffrey R. Moreland, Dennis R. Johnson, and Peter J. Rickershauser. Incorporated by reference to Exhibit 10.38 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998 (SEC File No. 1-11535). |
| **10.26*** | Amendment to Burlington Northern Santa Fe Supplemental Retirement Plan (Matthew K. Rose) dated April 18, 2002. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |
| **10.27*** | Retirement Benefit Agreement dated April 19, 2002 between BNSF and Matthew K. Rose. Incorporated by reference to Exhibit 10.3 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |
| **10.28*** | Retirement Benefit Agreement dated January 16, 2003 between BNSF and John P. Lanigan. Incorporated by reference to Exhibit 10.29 to BNSF's Report on Form 10-K for the year ended December 31, 2003. |
| **10.29*** | Form of Notice of Grant of Incentive Stock Options and Non-Qualified Stock Options and Award Agreement. Incorporated by reference to Exhibit 99.1 to BNSF's Report on Form 8-K dated December 9, 2004. |
| **10.30*** | Form of Burlington Northern Santa Fe 1999 Stock Incentive Plan Stock Option Award Agreement Terms and Conditions. Incorporated by reference to Exhibit 99.2 to BNSF's Report on Form 8-K dated December 9, 2004. |
| **10.31*** | Form of 1999 Stock Incentive Plan Master Restricted Stock Award Agreement. Incorporated by reference to Exhibit 99.3 to BNSF's Report on Form 8-K dated December 9, 2004. |
| **10.32*** | Form of 1999 Stock Incentive Plan Reload Stock Option Agreement. Incorporated by reference to Exhibit 99.4 to BNSF's Report on Form 8-K dated December 9, 2004. |
| **10.33*** | Form of 1999 Stock Incentive Plan Exchange Option Grant Agreement. Incorporated by reference to Exhibit 99.5 to BNSF's Report on Form 8-K dated December 9, 2004. |
| **10.34*** | Form of 1999 Stock Incentive Plan Senior Management Stock Deferral Plan Award Agreement. Incorporated by reference to Exhibit 99.6 to BNSF's Report on Form 8-K dated December 9, 2004. |
| **10.35*** | Form of 1999 Stock Incentive Plan Individual Stock Award Agreement. Incorporated by reference to Exhibit 99.7 to BNSF's Report on Form 8-K dated December 9, 2004. |

| Exhibit Number | Description |
|---|---|
| 10.36* | Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Director's Restricted Stock Unit Award Agreement. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 8-K dated May 17, 2005. |
| 10.37* | Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Non-Qualified Stock Option Grant Agreement. Incorporated by reference to Exhibit 99.9 to BNSF's Report on Form 8-K dated December 9, 2004. |
| 10.38* | Form of 1999 Stock Incentive Plan Incentive Bonus Stock Program Award Agreement. |
| 10.39* | Form of Burlington Northern Santa Fe 1999 Stock Incentive Plan Performance Stock Award Agreement. Incorporated by reference to Exhibit 10.4 to BNSF's Report on Form 8-K dated May 2, 2005. |
| 10.40* | Burlington Northern Santa Fe 2005 Deferred Compensation Plan for Non-Employee Directors, effective April 21, 2005. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 8-K dated April 21, 2005. |
| 10.41 | Replacement Capital Covenant, dated as of December 15, 2005, by BNSF in favor of and for the benefit of each Covered Debtholder (as defined therein). |
| 10.42* | Form of Award Agreement Including Notice of Grant and Master Stock Option Terms and Conditions, dated May 2, 2005 (Incentive Stock Options). Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 8-K dated May 2, 2005. |
| 10.43* | Form of Award Agreement Including Notice of Grant and Master Stock Option Terms and Conditions, dated May 2, 2005 (Incentive Stock Options and Non-qualified Stock Options). Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 8-K dated May 2, 2005. |
| 10.44* | Form of Award Agreement Including Notice of Grant and Master Restricted Stock Unit Terms and Conditions, dated May 2, 2005. Incorporated by reference to Exhibit 10.3 to BNSF's Report on Form 8-K dated May 2, 2005. |
| 10.45* | Summary of Non-Employee Director's Compensation. |
| 10.46* | Summary of Executive Officer Compensation. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 21.1 | Subsidiaries of BNSF. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 24.1 | Powers of Attorney. |
| 31.1 | Principal Executive Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002). |
| 31.2 | Principal Financial Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002). |
| 32.1 | Certification Pursuant to Rule 13a-14(b) and 18 U.S.C. § 1350 (Section 906 of the Sarbanes-Oxley Act of 2002). |
| 99.1 | Certification Pursuant to Section 303A.12 of the New York Stock Exchange Listed Company Manual. |
| * | Management contract or compensatory plan or arrangement. |

## Exhibit 12.1

## Burlington Northern Santa Fe Corporation and Subsidiaries
## Computation of Ratio of Earnings to Fixed Charges

Dollars in millions, except ratio amounts

(Unaudited)

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| Earnings: | | | | | |
| Income before income taxes and cumulative effect of accounting change | **$ 2,448** | $ 1,273 | $ 1,231 | $ 1,216 | $ 1,173 |
| Add: | | | | | |
| Interest and other fixed charges, excluding capitalized interest | **437** | 409 | 420 | 428 | 463 |
| Portion of rent under long-term operating leases representative of an interest factor | **221** | 195 | 182 | 178 | 173 |
| Distributed income of investees accounted for under the equity method | **4** | 4 | 3 | 3 | 5 |
| Amortization of capitalized interest | **8** | 8 | 8 | 8 | 7 |
| Less: | | | | | |
| Undistributed equity in earnings of investments accounted for under the equity method | **15** | 9 | 14 | 17 | 23 |
| Total earnings available for fixed charges | **$ 3,103** | $ 1,880 | $ 1,830 | $ 1,816 | $ 1,798 |
| Fixed charges: | | | | | |
| Interest and fixed charges | **$ 450** | $ 419 | $ 429 | $ 441 | $ 477 |
| Portion of rent under long-term operating leases representative of an interest factor | **221** | 195 | 182 | 178 | 173 |
| Total fixed charges | **$ 671** | $ 614 | $ 611 | $ 619 | $ 650 |
| Ratio of earnings to fixed charges | **4.62x** | 3.06x | 3.00x | 2.93x | 2.77x |

## Exhibit 31.1

## Principal Executive Officer's Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2006

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

## Exhibit 31.2

## Principal Financial Officer's Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2006

/s/ Thomas N. Hund
Thomas N. Hund
Executive Vice President and
Chief Financial Officer

## Exhibit 32.1

## Certification Pursuant to 18 U.S.C. § 1350

(Section 906 of Sarbanes-Oxley Act of 2002)

**Burlington Northern Santa Fe Corporation**

In connection with the Annual Report of Burlington Northern Santa Fe Corporation (the "Company") on Form 10-K for the year ended December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Matthew K. Rose, Chairman, President and Chief Executive Officer of the Company, and Thomas N. Hund, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to his knowledge on the date hereof:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 16, 2006

| | |
|---|---|
| /s/ Matthew K. Rose | /s/ Thomas N. Hund |
| Matthew K. Rose | Thomas N. Hund |
| Chairman, President and Chief Executive Officer | Executive Vice President and Chief Financial Officer |

A signed original of this written statement required by Section 906 has been provided to Burlington Northern Santa Fe Corporation and will be retained by Burlington Northern Santa Fe Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## Exhibit 99.1

## Annual CEO Certification

(Section 303A.12 (a) of the New York Stock Exchange Listed Company Manual)

As the Chief Executive Officer of Burlington Northern Santa Fe Corporation, and as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, I hereby certify that as of the date hereof I am not aware of any violation by the Company of NYSE's Corporate Governance listing standards, other than has been notified to the Exchange pursuant to Section 303A.12(b) and disclosed as an attachment hereto.

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and Chief Executive Officer
May 19, 2005

[No attachment accompanied this Annual CEO Certification.]

# Burlington Northern Santa Fe Corporation Directors*

**ALAN L. BOECKMANN**[3,4]
Chairman and Chief Executive Officer, Fluor Corporation (professional services holding company offering engineering, procurement, construction management and other services), Aliso Viejo, California.
BOARD MEMBER SINCE 2001.

**DONALD G. COOK**[2]
Retired General, United States Air Force, San Antonio, Texas.
BOARD MEMBER SINCE 2005.

**VILMA S. MARTINEZ**[1]
Partner, Munger, Tolles and Olson LLP (law firm), Los Angeles, California.
BOARD MEMBER SINCE 1998.

**MARC F. RACICOT**[1,4]
President, American Insurance Association (property-casualty insurer advocacy organization), Washington, D.C.
Former Governor of Montana.
BOARD MEMBER SINCE 2001.

**ROY S. ROBERTS**[1,2,3]
Retired Group Vice President, North American Vehicle Sales, Service and Marketing, General Motors Corporation (motor vehicle manufacturer), Detroit, Michigan.
BOARD MEMBER SINCE 1993.

**MATTHEW K. ROSE**[1]
Chairman, President and Chief Executive Officer, Burlington Northern Santa Fe Corporation and BNSF Railway Company, Fort Worth, Texas.
BOARD MEMBER SINCE 2000.

**MARC J. SHAPIRO**[3,4]
Retired Vice Chairman for Finance, Risk Management and Administration, J.P. Morgan Chase & Co. (bank holding company), New York, New York.
BOARD MEMBER SINCE 1995.

**J. C. WATTS, JR.**[2]
Chairman, J.C. Watts Companies, Inc. and J.C. Watts Enterprises, LLC (communications and public affairs), Washington, D.C.
Former Congressman (R-4th Dist. Oklahoma) and Chairman, House Republican Conference.
BOARD MEMBER SINCE 2003.

**ROBERT H. WEST**[1,2,3]
Retired Chairman of the Board, Butler Manufacturing Company (manufacturer of pre-engineered building systems and specialty components), Kansas City, Missouri.
BOARD MEMBER SINCE 1980.

**J. STEVEN WHISLER**[2,3]
Chairman and Chief Executive Officer, Phelps Dodge Corporation (mining and manufacturing), Phoenix, Arizona.
BOARD MEMBER SINCE 1995.

**EDWARD E. WHITACRE, JR.**[1,4]
Chairman and Chief Executive Officer, AT&T Inc. (diversified communications holding company), San Antonio, Texas.
BOARD MEMBER SINCE 1993.

**COMMITTEE ASSIGNMENTS:**
[1] *Executive Committee*
[2] *Compensation and Development Committee*
[3] *Audit Committee*
[4] *Directors and Corporate Governance Committee*

* YEARS OF BOARD SERVICE INCLUDES SERVICE ON BOARDS OF BURLINGTON NORTHERN INC., SANTA FE PACIFIC CORPORATION AND PREDECESSOR CORPORATIONS.

# Corporate Officers[1]

**MATTHEW K. ROSE**[2]
Chairman, President and Chief Executive Officer

**THOMAS N. HUND**[2]
Executive Vice President and Chief Financial Officer

**CARL R. ICE**[2]
Executive Vice President and Chief Operations Officer

**JOHN P. LANIGAN, JR.**[2]
Executive Vice President and Chief Marketing Officer

**JEFFREY R. MORELAND**[2]
Executive Vice President – Law & Government Affairs and Secretary

**PAUL W. BISCHLER**
Controller

**JEFFREY J. CAMPBELL**
Vice President – Technology Services and Chief Information Officer

**JAMES H. GALLEGOS**
Vice President and Corporate General Counsel

**AMY C. HAWKINS**
Vice President – Federal Government Affairs

**PAUL R. HOFERER**
Vice President and General Counsel

**LINDA J. HURT**
Assistant Vice President – Finance and Treasurer

**JEANNE E. MICHALSKI**
Vice President – Human Resources and Medical

**MARSHA K. MORGAN**
Vice President – Investor Relations

**PETER J. RICKERSHAUSER**[2]
Vice President – Network Development

**RICHARD A. RUSSACK**
Vice President – Corporate Relations

**DAVID W. STROPES**
Vice President – Corporate Audit Services

**SHELLEY J. VENICK**
Vice President and General Tax Counsel

**RICHARD E. WEICHER**
Vice President and Senior Regulatory Counsel

[1] THESE OFFICERS HOLD SIMILAR POSITIONS WITH BNSF RAILWAY COMPANY.
[2] EXECUTIVE OFFICER OF BURLINGTON NORTHERN SANTA FE CORPORATION.

# Operating Company Officers

**PAUL B. ANDERSON**
Vice President – Marketing Support

**STEPHEN G. BRANSCUM**
Group Vice President – Consumer Products

**ROLLIN D. BREDENBERG**
Vice President – Service Design and Performance

**M. DAVID DEALY**
Vice President – Transportation

**FREDERICK G. (FRITZ) DRAPER**
Vice President – Business Unit Operations

**GEORGE DUGGAN**
Vice President – Domestic Intermodal Marketing

**KATHRYN M. FARMER**
Vice President – Industrial Products Sales

**JOHN J. FLEPS**
Vice President – Labor Relations

**GREGORY C. FOX**
Vice President – Engineering

**DAVID L. GARIN**
Group Vice President – Industrial Products

**STEVE A. GOODALL**
Regional Vice President – Operations, North

**CRAIG HILL**
Vice President – Mechanical and Value Engineering

**DENNIS R. JOHNSON**
Vice President and Chief Sourcing Officer

**KEVIN KAUFMAN**
Group Vice President – Agricultural Products

**MARK A. KOTTER**
Regional Vice President – Operations, Central

**THOMAS G. KRAEMER**
Group Vice President – Coal

**FREDERICK R. MALESA**
Vice President – International Intermodal Marketing

**CHRIS A. ROBERTS**
Regional Vice President – Operations, South

**MARK A. SCHULZE**
Vice President – Safety, Training and Operations Support

**SAMI M. SHALAH**
Vice President – Coal Marketing

**DENIS SMITH**
Vice President – Industrial Products Marketing

# Shareholder Information

**SHARES LISTED**
New York Stock Exchange
Ticker Symbol: BNI

**PRINCIPAL CORPORATE OFFICE**
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830
(800) 795-2673
www.bnsf.com

**STOCK TRANSFER AGENT AND REGISTRAR**
Computershare Trust Company, N.A.

*Telephone:* (800) 526-5678

*E-mail:*
Equiserve@equiserve.com

*For account information, go to:*
www.computershare.com/equiserve

*Via first class/registered mail:*
P.O. 43069
Providence, Rhode Island
02940-3069
(800) 526-5678

*Via private mail carrier:*
250 Royall Street
Canton, MA 02021

**SHAREHOLDERS**
As of February 2, 2006, there were approximately 35,000 shareholders of record.

**SHAREHOLDER SERVICES**
You are encouraged to contact our Transfer Agent directly for the shareholder services listed below:
Change in Certificate Registration,
Dividend Reinvestment Service,
Change of Mailing Address,
Lost or Stolen Certificates,
Replacement of Dividend Checks,
Direct Deposit of Dividends,
Consolidation of Multiple Accounts, Elimination of Duplicate Report Mailings,
Replacement of Form 1099-DIV.

**DIVIDEND REINVESTMENT PLAN**
A dividend reinvestment plan is provided for registered shareholders as a convenient way to purchase more shares through investment of dividends or voluntary cash payments. A booklet describing the plan is available from the Transfer Agent.

**FORM 10-K**
The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) is posted on the Company's Web site, www.bnsf.com. A copy of the Annual Report on Form 10-K is also available to shareholders free of charge upon request to the Company's Investor Relations Department at 2500 Lou Menk Drive, Fort Worth, Texas 76131-2828. The Company's filings on Form 10-K, Form 10-Q, and Form 8-K are posted on the Company's Web site as soon as reasonably practicable after the reports are electronically filed with the SEC. Reports on Forms 3, 4, and 5 by directors and Section 16 reporting officers are posted on the Company's Web site no later than the day following their filing with the SEC.

**INSTITUTIONAL INVESTORS**
Inquiries from security analysts and investment professionals should be directed to the Company's investor relations contact:
Ms. Marsha K. Morgan
Vice President –
Investor Relations
(817) 352-6452

**ANNUAL MEETING**
The Annual Meeting of Shareholders will be held on Wednesday, April 19, 2006, at 4:00 p.m. CDT at The Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102.




BNSF

2650 LOU MENK DRIVE / FORT WORTH, TEXAS 76131-2830

# EXHIBIT PX0573

# UNION PACIFIC CORPORATION 2005 ANNUAL REPORT

UNION PACIFIC

BUILDING AMERICA®



## FINANCIAL HIGHLIGHTS

| *Millions of Dollars, Except Per Share Amounts and Ratios* | *2005* | *2004* | *2003* | *2002* | *2001* |
|---|---|---|---|---|---|
| **FOR THE YEAR** | | | | | |
| Operating Revenues | $13,578 | $12,215 | $11,551 | $11,159 | $10,830 |
| Operating Income | 1,795 | 1,295 | 2,133 | 2,253 | 2,018 |
| Income from Continuing Operations | 1,026 | 604 | 1,056 | 1,265 | 934 |
| Income from Discontinued Operations (a) | - | - | 255 | 76 | 32 |
| Cumulative Effect of Accounting Change, Net of Taxes | - | - | 274 | - | - |
| Net Income | 1,026 | 604 | 1,585 | 1,341 | 966 |
| Per Share — Basic: | | | | | |
| Income from Continuing Operations | 3.89 | 2.33 | 4.15 | 5.02 | 3.77 |
| Income from Discontinued Operations | - | - | 1.00 | 0.30 | 0.13 |
| Cumulative Effect of Accounting Change, Net of Taxes | - | - | 1.08 | - | - |
| Net Income | 3.89 | 2.33 | 6.23 | 5.32 | 3.90 |
| Per Share — Diluted: | | | | | |
| Income from Continuing Operations | 3.85 | 2.30 | 4.07 | 4.78 | 3.65 |
| Income from Discontinued Operations | - | - | 0.95 | 0.27 | 0.12 |
| Cumulative Effect of Accounting Change, Net of Taxes | - | - | 1.02 | - | - |
| Net Income | 3.85 | 2.30 | 6.04 | 5.05 | 3.77 |
| Dividends Declared Per Share | 1.20 | 1.20 | 0.99 | 0.83 | 0.80 |
| Capital Expenditures (b) | 2,169 | 1,876 | 1,940 | 1,820 | 1,696 |
| Operating Cash Flow | 2,595 | 2,257 | 2,443 | 2,237 | 1,886 |
| Free Cash Flow (c) | 234 | 215 | 712 | 662 | 285 |
| **AT YEAR-END** | | | | | |
| Total Assets | $35,620 | $34,596 | $33,496 | $32,772 | $31,552 |
| Total Debt | 7,416 | 8,131 | 7,989 | 7,703 | 8,078 |
| Common Shareholders' Equity | 13,707 | 12,655 | 12,354 | 10,651 | 9,575 |
| Equity Per Common Share (d) | 51.41 | 48.58 | 47.85 | 41.99 | 38.26 |
| **FINANCIAL RATIOS (%)** | | | | | |
| Operating Margin | 13.2 | 10.6 | 18.5 | 20.2 | 18.6 |
| Operating Ratio | 86.8 | 89.4 | 81.5 | 79.8 | 81.4 |
| Lease Adjusted Debt to Capital (e) | 43.6 | 45.1 | 44.8 | 51.7 | 55.0 |
| Return on Average Common Shareholders' Equity | 7.8 | 4.8 | 13.8 | 13.3 | 10.6 |

(a) *The Corporation's trucking segment is presented as discontinued operations. 2003 results include a $211 million gain on sale, which includes an income tax benefit of $126 million.*

(b) *Capital expenditures include non-cash capital lease financings of $188 million, $126 million, and $124 million in 2003, 2002 and 2001, respectively. There were no non-cash capital lease financings in 2005 and 2004.*

(c) *Free cash flow is defined as cash provided by operating activities, less cash used in investing activities, less dividends paid. 2003 results exclude proceeds from the Overnite IPO of $620 million. See reconciliation in Item 7 of Form 10-K.*

(d) *Equity per common share is calculated as follows: common shareholders' equity divided by common shares issued less treasury shares outstanding.*

(e) *Lease adjusted debt to capital is computed as follows: total debt plus convertible preferred securities plus net present value of leases divided by total debt plus equity plus convertible preferred securities plus net present value of leases.*

OPERATING REVENUES
In millions of dollars




OPERATING INCOME
In millions of dollars




LEASE ADJUSTED DEBT TO CAPITAL*
Percentage




*Refer to footnote (e) above

2005 STOCK PRICE COMPARISON
Percentage



## DEAR FELLOW SHAREHOLDERS:

The men and women of Union Pacific put forth an extraordinary effort in 2005, delivering solid results. Despite the unprecedented frequency and severity of major weather-related service disruptions, 2005 saw improved operating performance, record revenue, yield gains and improved financial results.

### 2005 RESULTS

Increasing operational efficiency was our key objective as we entered 2005. Progress toward that goal can be viewed in many ways, but by almost every measure, we did improve. Our network fluidity, in the form of lower terminal dwell times, improved 6 percent during 2005. The decline in average rail car inventories in 2005 and increased carloads also were indicators of greater operating efficiency.

We delivered improved financial performance this year against the backdrop of adverse weather and rising fuel prices. Demand for our services remained very strong and, as a result, we achieved several milestones:

- Commodity revenue grew 11 percent to a record $13 billion.
  - All six business groups attained "best ever" revenue levels.
  - Revenue for business moving into and out of Mexico totaled over $1.1 billion, a 15 percent increase versus 2004 and the first time Mexico revenue exceeded the $1 billion mark.
- Seven-day carloadings, a measure of our business strength, hit a record 198,416 carloads in the third week of November.
- Coal tonnage shipped out of the Southern Powder River Basin (SPRB) topped the 179 million ton mark. Despite setting a new record, SPRB Joint Line disruptions artificially constrained production.
- Operating income, excluding last year's asbestos charge, grew 16 percent and our fuel-adjusted operating ratio decreased by 1.5 points, both signs of improved operating efficiency.
- Net income grew 20 percent excluding the effects of the asbestos charge in 2004 and the tax reduction in 2005.
- Free cash flow after dividends totaled $234 million.
- UP's lease adjusted debt to capital measure improved 1.5 points to 43.6 percent, our strongest balance sheet since 1985.
- UP's stock price rose 20 percent to close at $80.51 per share for the year.

### CHALLENGING OPERATING ENVIRONMENT

Although we improved in 2005, the tremendous weather challenges we faced hindered our progress. A series of devastating events, starting in January with the West Coast storm and continuing through the year with Hurricanes Katrina and Rita and the Kansas washouts, severely damaged our Railroad. Our employees and the communities where we operate were impacted as well.

Weather issues and an expanded repair program caused operational problems on the SPRB Joint Line in Wyoming for much of the year. The additional resources and network initiatives we established to drive service improvement became the catalyst for our recovery efforts. This greater network resiliency and the tireless dedication of our employees allowed us to quickly restore service following each natural disaster.

These external challenges resulted in lost opportunities during the year. Our focus for the future is to continue the transition to operational excellence, and our momentum is building. There's clearly a great deal of work ahead of us, but we believe we're well positioned to make further progress.

## SAFETY FIRST

Union Pacific's approach to safety is one of zero tolerance. Although the rail industry is already one of the safest in America, we are working daily to improve. In 2005, our number of derailments improved 8 percent and the associated costs decreased 12 percent. We also enhanced grade crossing safety through the closure of 400 rail crossings and the installation of 750 locomotive video cameras. Cameras provide valuable evidence for accident investigations. In 2006, we will continue our focus on employee safety education and training, public awareness and derailment prevention.

## OPERATING INITIATIVES

Strong business demand and significant attrition in our aging workforce required additional resources to meet the needs of our customers. Last year, we continued efforts begun in 2004 to bolster the Railroad's critical assets - employees, locomotives and freight cars. We hired and trained nearly 2,100 conductors and 1,700 engineers and added 317 new fuel-efficient, emissions-compliant locomotives and 4,200 freight cars. We also increased our network capacity through targeted capital spending in some of our fastest growing corridors. Our Intermodal capacity increased with the opening of new facilities in Dallas and Salt Lake City, we installed 69 miles of double track on our Sunset Corridor and 14 miles of triple track to the SPRB Joint Line.

We began implementing our Unified Plan in April, instituting changes to our transportation plan. The Unified Plan is one of several network initiatives started in 2005 to redesign and simplify our operations. The goal is to increase velocity and improve customer service by reducing the workload on the network. Two areas targeted by the Unified Plan are main line train stops and terminal switching.

At the beginning of the year, only a third of UP's regularly scheduled trains moved from origin to destination without stopping. The average manifest car was switched three times before arriving at its destination. Through the Unified Plan, our rate of train stops declined 16 percent and our car switching rate decreased 12 percent. This work links directly to improved terminal dwell time and reduced rail car inventory we experienced in 2005. We have more hard work ahead of us to increase efficiency, but customers are starting to recognize our efforts and are working with us to make operational changes.

We are also improving terminal efficiency through a newly developed technology tool called our Customer Inventory Management System (CIMS). We use CIMS to proactively manage terminal inventory and increase asset utilization as well as help customers improve processing efficiency. The overall goal is to generate more terminal throughput with existing capacity. The initial CIMS pilot location was Phoenix. We subsequently rolled it out to major terminals in Las Vegas, Los Angeles, San Antonio and Houston, covering 40 percent of daily industry switching. In 2006, we plan to implement CIMS in additional terminals, including Salt Lake City, Roseville, Portland, Seattle, Fort Worth, Kansas City and Little Rock.

Velocity was relatively unchanged versus 2004, largely due to the many weather issues we faced. Increasing network velocity is a key objective for 2006, and a continued emphasis on Unified Plan compliance is vital to achieving that goal.

In conjunction with the Unified Plan, we are increasing capacity by employing industrial engineering strategies that require little or no capital investment. For example, we initiated projects to:

- improve system velocity by reducing terminal dwell time,
- increase locomotive availability by decreasing locomotive service time,
- conserve fuel by reducing locomotive fuel consumption through technology and training, and
- facilitate volume growth by de-bottlenecking constrained terminals, intermodal yards and key rail corridors.

Additionally, teams in Phoenix, Houston, Kansas City and Los Angeles have studied traffic flows, operating practices and processes to increase throughput in these capacity-constrained areas.

## ANOTHER YEAR OF RECORD FUEL PRICES

Following a more than 40 percent increase in diesel fuel prices in 2004, we experienced another huge increase in 2005. Our average diesel fuel price in the first quarter was $1.45 per gallon, but it increased to $2.08 per gallon by the fourth quarter. Two factors drove the increase: crude oil prices and refining spreads. After starting the year at about $40 per barrel, the price of crude oil topped out over $70 per barrel in September. In addition, refining spreads nearly tripled following the fall hurricanes.

Although somewhat mitigated by our fuel surcharge programs, rising fuel prices decreased our 2005 operating income. Our goal is 100 percent recovery of higher fuel costs to eliminate the earnings impact. Longer-term, high fuel prices create a competitive advantage for us, as rail transportation is three times more fuel efficient than trucking. We also increased our emphasis on fuel conservation through engineer training and improved locomotive technology. In 2005, our consumption rate improved by 2 percent, saving 35 million gallons of fuel.

## UP EMPLOYEES - A CRITICAL RESOURCE

As we continue to hire for growth and to offset attrition, our goal is to be the "Employer of Choice" for our 49,750 current employees as well as the many prospective candidates we interview each year. Over the past two years, Union Pacific hired more than 13,000 employees into a rewarding, diverse and healthy work environment:

- UP was named the nation's top Military Friendly Employer for 2005 by *GI Jobs* magazine.
- The Union Pacific Child Development Center opened in Omaha to provide care and an educational curriculum to young children of UP employees.
- *Working Mother* magazine honored us for the fourth year, and *LATINA Style* magazine for the third consecutive year, as a top employer.
- The Company also received numerous accolades for its employee health programs, including the prestigious C. Everett Koop National Health Award. Union Pacific is the only four-time recipient of this award and the only corporation honored in 2005.

The American Red Cross presented UP with its Circle of Humanitarians Award for donating so generously to its hurricane relief efforts. Employees contributed to the Red Cross, Salvation Army, America's Second Harvest and the Baton Rouge Area Foundation to aid hurricane victims. Employees also donated to UP's own Friend-to-Friend Network to help fellow employees who were affected by the hurricanes. In total, we donated more than $1 million to these worthwhile agencies.

UP has always maintained the highest standards of ethics, disclosure to investors and financial reporting. We have taken additional steps to comply with every aspect of the complex rules and regulations resulting from the Sarbanes-Oxley Act. Beyond that, we are implementing a risk-based compliance program to ensure a culture of compliance with laws and regulations in every aspect of our business.

## CORPORATE CHANGES

As we enter 2006, we are moving ahead with the succession plan we began a few years ago. As of January 1, Jim Young took on the added responsibilities of president and chief executive officer of the Corporation while I remain chairman of the board. Jim was elected to the Union Pacific board in February 2005. These changes ensure an orderly management transition process for our Company.

Our Board will see additional changes in 2006 when Spencer Eccles steps down in compliance with the Board's mandatory retirement age. Spence has been on the Board since 1976 and is currently serving on the Compensation and Benefits Committee and the Audit Committee. His great insight and wisdom over the years will certainly be missed. Dr. Ernesto Zedillo has decided not to stand for re-election due to his challenging workload as Director of the Yale Center for the Study of Globalization. Ernesto has been on the Board since 2001, serving on the Audit and Finance Committees. As the former President of Mexico, his assistance in understanding the NAFTA marketplace was invaluable.

I am pleased to welcome General Charles Krulak as our newest board member. General Krulak is a 35-year veteran of the U.S. Marine Corps, serving as their Commandant from 1995 to 1999. After retiring from the military, he joined MBNA, serving first as the chief executive officer of MBNA Europe and then as the executive vice chairman and chief administrative officer of MBNA Corporation.

## 2006 - CONTINUOUS IMPROVEMENT

Looking ahead, we believe that 2006 will be another year of record business levels as demand remains strong. In this business environment, we are focused on providing better service to our customers, improving the efficiency of our network and increasing the financial returns on our business. The process of improvement is "evergreen" as we continue to implement network and market strategies designed to increase profitability.

Beyond 2006, we will plan for the future of this great Railroad by making prudent capital investments. We will continue to devote resources for growth, supporting our long-term goal of earning a return that "meets and beats" our cost of capital.

The great value of the Union Pacific franchise is being recognized in today's marketplace. It is our responsibility to translate that value into better service for our customers, rewarding jobs for our employees and higher returns for our shareholders.

Dick Davidson
Chairman of the Board

Jim Young
President and Chief Executive Officer

# DIRECTORS AND EXECUTIVE OFFICERS

## BOARD OF DIRECTORS

**Philip F. Anschutz**
Chairman
Anschutz Company
*Board Committees: Executive (Chair), Finance, Corporate Governance and Nominating*

**Richard K. Davidson***
Chairman
Union Pacific Corporation and
Union Pacific Railroad Company
*Board Committee: Executive*

**Erroll B. Davis, Jr.**
Chancellor
University System of Georgia
*Board Committee: Finance*

**Thomas J. Donohue**
President and
Chief Executive Officer
U.S. Chamber of Commerce
*Board Committees: Executive, Compensation and Benefits (Chair), Corporate Governance and Nominating*

**Archie W. Dunham**
Retired Chairman
ConocoPhillips
*Board Committees: Executive, Finance (Chair), Corporate Governance and Nominating*

**Spencer F. Eccles**
Chairman Emeritus
Wells Fargo Intermountain
Banking Region
*Board Committees: Compensation and Benefits, Audit*

**Judith Richards Hope**
Distinguished Visitor from Practice
and Adjunct Professor of Law
Georgetown University Law Center
*Board Committees: Executive, Audit (Chair), Finance*

**Charles C. Krulak****
General, USMC, Ret.
Former Commandant of the United
States Marine Corps

**Michael W. McConnell**
Managing Partner
Brown Brothers Harriman & Co.
*Board Committees: Compensation and Benefits, Audit*

**Steven R. Rogel**
Chairman, President and
Chief Executive Officer
Weyerhaeuser Company
*Board Committees: Executive, Compensation and Benefits, Corporate Governance and Nominating (Chair)*

**James R. Young***
President and Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

**Ernesto Zedillo Ponce de Leon**
Director
Yale Center for the Study
of Globalization
*Board Committees: Audit, Finance*

## EXECUTIVE OFFICERS

**Richard K. Davidson***
Chairman
Union Pacific Corporation and
Union Pacific Railroad Company

**James R. Young***
President and Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

**Dennis J. Duffy**
Executive Vice President–Operations
Union Pacific Railroad Company

**Charles R. Eisele**
Senior Vice President–Strategic Planning
Union Pacific Corporation

**Bernard R. Gutschewski**
Vice President–Taxes
Union Pacific Corporation

**J. Michael Hemmer**
Senior Vice President–Law
and General Counsel
Union Pacific Corporation

**Mary Sanders Jones**
Vice President and Treasurer
Union Pacific Corporation

**Robert M. Knight, Jr.**
Executive Vice President–Finance
and Chief Financial Officer
Union Pacific Corporation

**John J. Koraleski**
Executive Vice President–
Marketing and Sales
Union Pacific Railroad Company

**Mary E. McAuliffe**
Vice President–External Relations
Union Pacific Corporation

**Richard J. Putz**
Vice President and Controller
Union Pacific Corporation

**Barbara W. Schaefer**
Senior Vice President–Human Resources
and Secretary
Union Pacific Corporation

**Lynden L. Tennison**
Senior Vice President and Chief
Information Officer
Union Pacific Corporation

**Robert W. Turner**
Senior Vice President–Corporate Relations
Union Pacific Corporation

**Effective January 1, 2006*
***Effective January 26, 2006*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

*(Mark One)*

[X] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2005

**OR**

[ ] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ____________ to ____________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION

(Exact name of registrant as specified in its charter)

| **UTAH** | **13-2626465** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1400 DOUGLAS STREET, OMAHA, NEBRASKA**

(Address of principal executive offices)

**68179**

(Zip Code)

**(402) 544-5000**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Common Stock (Par Value $2.50 per share)** | **New York Stock Exchange, Inc.** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes X No ___

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes ___ No X

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ___

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act).

Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

Yes ___ No X

As of June 30, 2005, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $16,786,219,745.

The number of shares outstanding of the registrant's Common Stock as of January 31, 2005, was 267,584,487.

Documents Incorporated by Reference – Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on May 4, 2006, are incorporated by reference into Part III of this report. The registrant's Proxy Statement will be filed with the Securities and Exchange Commission pursuant to Regulation 14A.

## TABLE OF CONTENTS
## UNION PACIFIC CORPORATION


**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 9 |
| Item 2. | Properties | 9 |
| Item 3. | Legal Proceedings | 10 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 13 |
| | Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries | 13 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Shareholder Matters, and Issuer Purchases of Equity Securities | 15 |
| Item 6. | Selected Financial Data | 16 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| | Critical Accounting Policies | 37 |
| | Cautionary Information | 40 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 42 |
| Item 8. | Financial Statements and Supplementary Data | 43 |
| | Report of Independent Registered Public Accounting Firm | 44 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 73 |
| Item 9A. | Controls and Procedures | 73 |
| | Management's Annual Report on Internal Control Over Financial Reporting | 74 |
| | Report of Independent Registered Public Accounting Firm | 75 |
| Item 9B. | Other Information | 76 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 77 |
| Item 11. | Executive Compensation | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 77 |
| Item 13. | Certain Relationships and Related Transactions | 78 |
| Item 14. | Principal Accounting Fees and Services | 78 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 79 |
| | Signatures | 80 |
| | Certifications | 89 |

# PART I

## Item 1. Business

## GENERAL

Union Pacific Corporation operates primarily as a rail transportation provider through Union Pacific Railroad Company, its principal operating company. The largest railroad in North America, Union Pacific Railroad Company, serves 23 states across the western two-thirds of the United States. Union Pacific Corporation was incorporated in Utah in 1969 and maintains its principal executive offices at 1400 Douglas Street, Omaha, NE 68179. The telephone number at that address is (402) 544-5000. The common stock of Union Pacific Corporation is listed on the New York Stock Exchange (NYSE) under the symbol "UNP".

For purposes of this report, unless the context otherwise requires, all references herein to "UPC", "Corporation", "we", "us", and "our" shall mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which we separately refer to as "UPRR" or the "Railroad".

Our operating results include Southern Pacific Rail Corporation, which we acquired in October 1996. During 1997, the Railroad acquired an ownership interest in a consortium that was granted a 50-year concession to operate the Pacific-North and Chihuahua Pacific lines in Mexico. The Railroad made an additional investment in the consortium in 1999 and currently holds a 26% ownership interest. In November 2003, we completed the sale of our entire trucking interest through an underwritten initial public offering of all the common stock of Overnite Corporation, leaving the Railroad as our only operating segment and the principal source of our revenues.

**Available Information** – Our Internet website is www.up.com. We make available free of charge on our website (under the "Investors" caption link) our annual reports on Form 10-K; our quarterly reports on Form 10-Q; our current reports on Form 8-K; our proxy statements; Forms 3, 4, and 5, filed on behalf of directors and executive officers; and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the Exchange Act), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our website previously filed SEC reports and exhibits via a link to EDGAR on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials, including Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers, and employees are on our website. From time to time, the corporate governance materials on our website may be updated as necessary to comply with rules issued by the SEC and the NYSE or as desirable to promote the effective and efficient governance of our company. Any security holder wishing to receive, without charge, a copy of any of our SEC filings or corporate governance materials should send a written request to: Secretary, Union Pacific Corporation, 1400 Douglas Street, Omaha, NE 68179.

We have included the CEO and CFO certifications regarding our public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31(a) and (b) to this report. Additionally, we filed with the NYSE the CEO's certification regarding our compliance with the NYSE's Corporate Governance Listing Standards (Listing Standards) pursuant to Section 303A.12(a) of the Listing Standards, which was dated May 23, 2005, and indicated that the CEO was not aware of any violations of the Listing Standards by the Corporation.

References to our website address in this report, including references in Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website. Therefore, such information should not be considered part of this report.

## OPERATIONS

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity, we analyze the net financial results of the Railroad as one segment due to the

integrated nature of the rail network. The Consolidated Financial Statements for 2003 also include our discontinued trucking operations, consisting of Overnite Transportation Company (OTC) and Motor Cargo Industries, Inc. (Motor Cargo). We reclassified our trucking segment as a discontinued operation in 2003, reflecting the disposition of these assets. Additional information regarding our operations is presented in Selected Financial Data, Item 6; Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7; and the Financial Statements and Supplementary Data, Item 8.

**Continuing Operations** – UPRR is a Class I railroad operating in the United States. We have 32,426 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers to move freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic moves through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. UPRR's freight traffic consists of bulk, manifest, and premium business. Bulk traffic is primarily coal, grain, rock, or soda ash in unit trains - trains transporting a single commodity from one source to one destination. Manifest traffic is individual carload or less than train-load business, including commodities such as lumber, steel, paper, and food. The transportation of finished vehicles and intermodal containers is part of the Railroad's premium business. In 2005, the Railroad generated commodity revenue totaling $13 billion from the following six commodity groups:

**2005 Commodity Revenue**




*Agricultural* – Transporting agricultural products, including whole grains, commodities produced from these grains, and food and beverage products, provided 15% of the Railroad's 2005 commodity revenue. With access to most major grain markets, the Railroad provides a critical link between the Midwest and western producing areas and export terminals in the Pacific Northwest (PNW) and Gulf ports, as well as Mexico. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. UPRR also serves significant domestic markets, including grain processors, animal feeders, and ethanol producers in the Midwest, West, South, and Rocky Mountain states. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products, and beverages, which are moved to major U.S. population centers for consumption. Express Lane, our premium perishables service that moves fruits and vegetables from the PNW and California with priority service to destinations in the East, competes with the trucking industry. We transport frozen meat and poultry to the West Coast ports for export, while beverages, primarily beer, enter the U.S. from Mexico.

*Automotive* – UPRR is the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. The Railroad off-loads finished vehicles at 38 vehicle distribution centers for delivery by truck to all major western U.S. cities. In addition to transporting finished vehicles, UPRR provides expedited handling of automobile parts in both boxcars and intermodal containers to several assembly plants, some of which are in Mexico. The Railroad carries automobile materials bound for assembly plants in Mexico, the U.S., and Canada and transports finished vehicles from manufacturing facilities in Mexico. In 2005, transportation of finished vehicles and automobile materials accounted for 10% of the Railroad's total commodity revenue.

*Chemicals* – Transporting chemicals provided 14% of UPRR's 2005 commodity revenue. The Railroad's franchise enables it to serve the chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. More than two-thirds of the chemicals business consists of liquid and dry chemicals, plastics, and liquid petroleum products. In addition to transporting plastics, customers also leverage UPRR's industry-leading storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California and are consumed primarily in glass producing markets in the East, the West, and abroad. Fertilizer movements originate primarily in the Gulf Coast region, as well as the West and Canada, bound for major agricultural users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 20% of UPRR's 2005 commodity revenue. The Railroad's geographic network allows it to transport coal destined for utilities and industrial facilities in 27 states, as well as to the Gulf and rail/barge/ship facilities on the Mississippi and Ohio Rivers and the Great Lakes. UPRR serves mines located in the Southern Powder River Basin of Wyoming (SPRB), Colorado, Utah, southern Wyoming, and southern Illinois. SPRB coal represents the largest growth segment of the market, as utilities continue to favor its lower cost and low-sulfur content. The Railroad also carries high-BTU, low-sulfur coal from Colorado and Utah for export to Mexico.

*Industrial Products* – The Railroad's extensive network enables the industrial products group to move numerous commodities between thousands of origin and destination points throughout North America. Lumber shipments originate primarily in the PNW and Canada for destinations throughout the United States for new home construction and repair and remodeling markets. Commercial and highway construction drive shipments of steel and construction products, consisting of rock, cement, and roofing. Paper and consumer goods, including furniture and appliances, are shipped to major metropolitan areas for consumers. Nonferrous metals and industrial minerals are moved for industrial manufacturing. In addition, the Railroad provides efficient and safe transportation for government entities and waste companies. In 2005, transporting industrial products provided 22% of the Railroad's total commodity revenue.

*Intermodal* – UPRR's intermodal business, which represents 19% of the Railroad's 2005 commodity revenue, comprises international, domestic, and premium shipments. International business consists of international container traffic that arrives at West Coast ports via steamship for destinations throughout the United States. Domestic business includes domestic container and trailer traffic for intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time-sensitive business requirements account for the majority of our premium service.

**Working Capital** – We currently have, and historically have had, a working capital deficit, which is common in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Competition** – We are subject to competition from other railroads, motor carriers, and barge operators. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company, operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other railroads and motor carriers. Motor carrier competition is particularly strong for five of our six commodity groups. Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly effective, especially for grain and bulk commodities. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity.

**Equipment Suppliers** – We depend on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment, high barriers to entry face potential new suppliers. Therefore, if one

of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

**Employees** – Approximately 87% of our 49,747 full-time-equivalent employees are represented by 14 major rail unions. Under the collective bargaining round that began on November 1, 1999, all unions reached new labor agreements with the railroads in 2005. In January 2005, we began the next round of negotiations with the unions. Existing agreements remain in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. Contract negotiations with the various unions generally take place over an extended period of time, and we rarely experience work stoppages during negotiations. The current agreements provide for periodic cost of living wage increases until new agreements are reached.

**Discontinued Operations** – In November 2003, we completed the sale of our entire trucking interest, and, as a result, included the operations of OTC and Motor Cargo in discontinued operations (see note 13 to the Financial Statements and Supplementary Data, Item 8).

## GOVERNMENTAL AND ENVIRONMENTAL REGULATION

**Governmental Regulation** – Our operations are subject to a variety of federal, state, and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

The operations of the Railroad are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT) and other federal and state agencies. The operations of the Railroad are also subject to the regulations of the Federal Railroad Administration (FRA) of the DOT. The STB has jurisdiction over rates charged on certain regulated rail traffic; freight car compensation; transfer, extension, or abandonment of rail lines; and acquisition of control of rail common carriers.

DOT and the Occupational Safety and Health Administration, along with other federal agencies, have jurisdiction over certain aspects of safety, movement of hazardous materials, movement and disposal of hazardous waste, emissions requirements, and equipment standards. Various state and local agencies have jurisdiction over disposal of hazardous waste and seek to regulate movement of hazardous materials in areas not otherwise preempted by federal law.

**Environmental Regulation** – We are subject to extensive federal and state environmental statutes and regulations pertaining to public health and the environment. The statutes and regulations are administered and monitored by the Environmental Protection Agency (EPA) and by various state environmental agencies. The primary laws affecting our operations are the Resource Conservation and Recovery Act, regulating the management and disposal of solid and hazardous wastes; the Comprehensive Environmental Response, Compensation, and Liability Act, regulating the cleanup of contaminated properties; the Clean Air Act, regulating air emissions; and the Clean Water Act, regulating waste water discharges.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Item 1A. Risk Factors

*We Must Manage Significant Demand for Our Services on Limited Network Capacity* – Due to continuing demand for rail service and capacity constraints, we may experience network difficulties, including congestion and reduced velocity, which may compromise the level of service we provide to our customers. This level of demand may compound the impact of weather and weather-related events on our operations and velocity. We recently experienced varying degrees of disruptions, congestion, and reduced velocity due to a variety of factors, including

significant demand and weather events, and the extensive maintenance and restoration program on the SPRB line that is jointly-owned with BNSF (SPRB Joint Line). The weather events affected both our operations and operations of certain of our customers. Although we have recovered from these events, further network improvement will be driven by the ongoing redesign of our transportation plan to better manage traffic on our system and adding more capacity. We cannot be sure that these measures will fully or adequately address any service shortcomings. We also cannot be sure that we will not experience other difficulties related to network capacity, dramatic and unplanned increases of demand for rail service in one or more of our commodity groups, or other events that could have a negative impact on our operational efficiency, any of which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Subject to Various Claims and Lawsuits That Could Result in Significant Expenditures* – The nature of our business exposes us to the potential for various claims and litigation related to labor and employment, personal injury, property damage, environmental liability, and other matters. Any material changes to litigation trends or a catastrophic rail accident involving property damage, personal injury, or environmental liability could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Governmental Regulation* – We are subject to governmental regulation by a significant number of federal, state, and local authorities covering a variety of health, safety, labor, environmental (as discussed below), and other matters. Our failure to comply with applicable laws and regulations could have a material adverse effect on us. Governments may change the legislative or regulatory frameworks within which we operate without providing us with any recourse for any adverse effects on our business. Economic re-regulation of the rail industry would negatively impact our ability to determine prices for rail services and reduce capital spending on our rail network, resulting in a material adverse effect on our results of operations, financial condition, and liquidity. Also, some laws and regulations require us to obtain and maintain various licenses, permits, and other authorizations, and we cannot guarantee that we will continue to be able to do so. In addition, one or more consolidations of Class I railroads could lead to future re-regulation of the rail industry.

*We Are Required to Transport Hazardous Materials* – Federal laws require railroads, including UPRR, to transport hazardous materials. Any rail accident involving the release of hazardous materials could involve significant costs and claims for personal injury, property damage, and environmental penalties and remediation, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Environmental Laws and Regulations* – Our operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; handling, storage, transportation, and disposal of waste and other materials; and hazardous material or petroleum releases. We generate and transport hazardous and non-hazardous waste in our operations, and we did so in our former operations. Environmental liability can extend to previously owned or operated properties, leased properties, and properties owned by third parties, as well as to properties we currently own. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. We have been and may be subject to allegations or findings that we have violated, or are strictly liable under, these laws or regulations. We could incur significant costs as a result of any of the foregoing, and we may be required to incur significant expenses to investigate and remediate known, unknown, or future environmental contamination, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Severe Weather Could Result in Significant Business Interruptions and Expenditures* – Severe weather conditions, events, and other natural phenomena, including earthquakes, hurricanes, fires, floods, extreme temperatures, and significant precipitation may cause business interruptions, including line outages on our rail network, that can adversely affect our entire rail network, and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on our results of operations, financial condition, and liquidity.

*Rising Fuel Costs Could Materially and Adversely Affect Our Business* – Fuel costs constitute a significant portion of our transportation expenses. Diesel fuel prices are subject to dramatic fluctuations. Significant price increases may

have a material adverse effect on our operating results. Additionally, international, political, and economic circumstances affect fuel prices and supplies. Weather can also affect fuel supplies and limit domestic refining capacity. If a fuel supply shortage were to arise from OPEC production curtailments, a disruption of oil imports, or other causes, higher fuel prices could, despite our fuel surcharge programs, have a material adverse effect on our results of operations, financial condition, and liquidity.

*The Majority of Our Employees Belong to Labor Unions, and Labor Agreements, Strikes, or Work Stoppages Could Adversely Affect Our Operations* – We are a party to collective bargaining agreements with various labor unions. Under the collective bargaining round that began on November 1, 1999, all unions reached new labor agreements with the railroads in 2005. In January 2005, we began the next round of negotiations with the unions. Disputes with regard to the terms of these agreements or our potential inability to negotiate acceptable contracts with these unions could result in, among other things, strikes, work stoppages, or other slowdowns by the affected workers. If unionized workers were to engage in a strike, work stoppage, or other slowdown, or other employees were to become unionized, we could experience a significant disruption of our operations or higher ongoing labor costs, either of which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could compromise our service reliability and significantly increase our costs for healthcare, wages, and other benefits, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*The Availability of Qualified Personnel Could Adversely Affect Our Operations* – Changes in demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could negatively impact our ability to meet demand for rail service. Unpredictable increases in demand for rail services and a lack of network fluidity may exacerbate such risks, which could have a negative impact on our operational efficiency and otherwise have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Face Competition from Other Railroads and Other Transportation Providers* – We face competition from other railroads, motor carriers and, to a lesser extent, ships, barges, and pipelines. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, any future consolidation of the rail industry could materially affect the competitive environment in which we operate.

*We Utilize Capital Markets* – We rely on the capital markets to provide some of our capital requirements, including the issuance of commercial paper from time to time and the sale of certain of our receivables. Market instability or deterioration of our financial condition due to internal or external factors could restrict or prohibit our access to commercial paper and reduce our credit ratings below investment grade, which would prohibit us from utilizing our sale of receivables program and significantly increase the cost of issuing debt.

*We May Be Affected by General Economic Conditions* – Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities carried by us may have an adverse effect on our results of operations, financial condition, and liquidity.

*We Are Dependent on Two Key Domestic Suppliers of Locomotives* – Due to the capital intensive nature and sophistication of locomotive equipment, high barriers to entry face potential new suppliers. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

*We Rely on Technology and Technology Improvements in our Business Operations* – We rely on information technology in all aspects of our business. If we do not have sufficient capital to acquire new technology or if we are

unable to implement new technology, we may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on our results of operations, financial position, and liquidity. Additionally, if we experience significant disruption or failure of one or more of our information technology systems, including computer hardware, software, and communications equipment, we could experience a service interruption, safety failure, or security breach, or other operational difficulties, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*We May Be Affected by Acts of Terrorism, War, or Risk of War* – Our rail lines, facilities, and equipment, including rail cars carrying hazardous materials, could be direct targets or indirect casualties of terrorist attacks. Terrorist attacks, or other similar events, any government response thereto, and war or risk of war may adversely affect our results of operations, financial condition, and liquidity. In addition, insurance premiums for some or all of our current coverages could increase dramatically, or certain coverages may not be available to us in the future.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

With operations in 23 states, we employ a variety of assets in the management and operation of our rail business. These assets include real estate, track and track structure, equipment, and facilities. We own and lease real estate that we use in our operations, and we also own real estate that is not required for our business, which we sell from time to time. Our equipment includes owned and leased locomotives and rail cars; heavy maintenance equipment and machinery; other equipment and tools in our shops, offices and facilities; and vehicles for maintenance, transportation of crews, and other activities. We operate numerous facilities, including terminals for intermodal and other freight; rail yards for train-building, switching, storage-in-transit (the temporary storage of customer goods in rail cars prior to shipment) and other activities; offices to administer and manage our operations; dispatch centers to direct traffic on our rail network; crew quarters to house train crews along our network; and shops and other facilities for fueling, maintenance, and repair of locomotives and repair and maintenance of rail cars and other equipment. We spent approximately $2.2 billion in cash capital during 2005 for, among other things, building and maintaining track, structures and infrastructure, upgrading and augmenting equipment, and implementing new technologies (see the capital expenditures table in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financial Condition, Item 7).

Certain of our properties are subject to federal, state, and local laws and regulations governing the protection of the environment (see discussion of environmental issues in Business – Governmental and Environmental Regulation, Item 1, and Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7).

**Track** – The Railroad operates on 32,426 main line and branch line route miles in 23 states in the western two-thirds of the United States. We own 26,586 route miles, with the remainder of route miles operated pursuant to trackage rights or leases. Route miles as of December 31, 2005, are as follows:

| *Route Miles* | |
|---|---|
| Main line | 27,301 |
| Branch line | 5,125 |
| Yards, sidings and other main lines | 20,241 |
| Total | 52,667 |

Rail and ties installed and replaced during the year ended December 31, 2005 are as follows:

| *Rails and Ties* | |
|---|---|
| Track miles of rail: | |
| New | 661 |
| Used | 312 |
| Ties (000) | 4,690 |

**Equipment** – Our primary rail equipment consisted of the following as of December 31, 2005:

| *Equipment* | |
|---|---|
| Owned or leased at year end: | |
| Locomotives | 8,226 |
| Freight cars: | |
| Covered hoppers | 38,553 |
| Boxcars | 16,505 |
| Open-top hoppers | 19,950 |
| Gondolas | 15,037 |
| Other | 16,698 |
| Work equipment and other | 5,041 |

## Item 3. Legal Proceedings

### Environmental Matters

As we reported in our Annual Report on Form 10-K for 2003, the United States Attorney for the Central District of California notified the Railroad that the office intended to pursue criminal charges against us for alleged violations of federal environmental laws, including the federal Clean Water Act, in connection with releases of oil contaminated wastewater from our Taylor Yard in 2001 and 2003. In April 2004, the Railroad settled the State of California's claims arising from these releases for $45,020.

As we reported in our Annual Report on Form 10-K for 2003, the California Department of Toxic Substances Control (DTSC) threatened civil prosecution against us in November 2003, after a series of protracted negotiations, relating to our failure to register as a hazardous waste transporter under California law from April 2000 to August 2001. We contend that we are exempt from the registration requirements due to federal preemption. The DTSC proposed civil penalties of $125,160 for the alleged violation. We settled this matter on September 14, 2005 for $55,000.

As we reported in our Annual Report on Form 10-K for 2001, on January 30, 2002, the Louisiana Department of Environmental Quality (LDEQ) issued to the Railroad a notice of a proposed penalty assessment in the amount of $195,700. The proposed penalty relates to the derailment of one of our trains carrying hazardous materials near Eunice, Louisiana, on May 27, 2000. We met with the LDEQ regarding this matter to demonstrate that no penalty should be assessed. On December 28, 2005, the LDEQ amended the proposed penalty to $47,113.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2003, the San Joaquin County District Attorney filed an action against the Railroad on February 3, 2003, in the San Joaquin County Superior Court alleging claims under the California Business and Professions Code section 17200 (unfair business practices), Fish and Game Code section 5650 and 5650.1, California Health and Safety Code section 25189(d), and Public Nuisance, California Civil Code section 3480. The claims arise from a February 16, 2000, derailment in Stockton, California, in which a locomotive struck an object on the tracks, puncturing a fuel tank.

The District Attorney alleged that diesel fuel from this spill entered waters of the State of California. The complaint also asserted claims under the above referenced statutes for any other diesel spill that may have occurred in the State of California between 2000 and 2003, in which diesel may have passed into waters of the State of California. It sought injunctive relief and civil penalties of $25,000 for the alleged February 16, 2000, diesel spill and total penalties of not less than $250,000 for all diesel spills that may have occurred since 2000. The District Attorney filed an amended complaint on April 10, 2003, which narrowed the claims to the incident of February 16, 2000. The amended complaint seeks both injunctive relief and daily penalties for each day that fuel was in the affected waterway, which could exceed $100,000.

As we reported in our Annual Report on Form 10-K for 2003, the District Attorneys of Merced, Madera, and Stanislaus Counties in California filed a criminal case against the Railroad relating to a series of alleged releases of calcium oxide (lime). The criminal case was dismissed in the last quarter of 2003 and was subsequently refiled as a civil action by several counties in the San Joaquin County Superior Court. The refiled suit sought civil penalties against the Railroad in connection with the release of lime from an unidentified rail car between Chowchilla and Sacramento, California, on December 27, 2001, and another incident in which lime leaked from a rail car between Chowchilla and Stockton, California, on February 21, 2002. The suit contended that regulatory violations occurred by virtue of the Railroad's alleged failure to timely report the release of a "hazardous material," its alleged disposal of hazardous waste, and the alleged release of material into the waters of the State of California. On September 20, 2004, the Court dismissed the suit with prejudice. The State appealed this decision and the appeal remains pending.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, the Illinois Attorney General's office filed an Agreed Order and Complaint and a Complaint for Injunctive and Other Relief on October 7, 2004, in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) against The Alton & Southern Railway Company, a wholly owned subsidiary of the Railroad, as a result of a collision and derailment on September 21, 2004. The state seeks to enjoin The Alton & Southern from further violations, as well as a monetary penalty. The amount of the proposed penalty is uncertain but could exceed $100,000.

In 2001 we received information indicating EPA considered the Railroad a potentially responsible party for the Omaha Lead Site. The Omaha Lead Site consists of approximately 12,800 acres of residential property in the eastern part of Omaha, Nebraska, allegedly impacted by air emissions from two former lead smelters/refineries. One refinery was operated by ASARCO. EPA identified the Railroad as a potentially responsible party, because more than 60 years ago, we owned land that was leased to ASARCO. The Railroad disputes both the legal and technical base for EPA's allegations. It has nonetheless engaged in extensive negotiations with EPA. These negotiations have reached an apparent impasse. EPA issued a Unilateral Administrative Order with an effective date of December 16, 2005, directing the Railroad to implement an interim remedy at the site at an estimated cost of $50 million. Failure to comply with the order without just cause could subject the Railroad to penalties of up to $32,500 per day and triple EPA's costs in performing the work. The Railroad believes it has just cause not to comply with the order, but it offered to perform some of the work specified in the order as a compromise. If EPA rejects the offer, the Railroad will vigorously contest liability and the imposition of any penalties.

On December 12, 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twenty-First Judicial Circuit (St. Clair County) seeking injunctive relief and civil penalties against the Railroad relating to a collision between UPRR and Norfolk Southern (NS) trains near Momence, Illinois, on November 24, 2005. The collision derailed approximately five locomotives and 30 railcars. Two of the UPRR locomotives and two of the NS locomotives caught fire and four of the locomotives released approximately 16,000 gallons of diesel fuel. Other cars carrying food products derailed and released an unknown amount of product. The Railroad promptly responded and remediation is ongoing. The State seeks a permanent injunction against the Railroad ordering UPRR to continue remediation. The State seeks to enjoin UPRR from further violations and a monetary penalty. The amount of the proposed penalty is uncertain.

The Illinois Attorney General's office filed a complaint in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) for injunctive and other relief on November 28, 2005, against the Railroad, alleging a diesel fuel

spill from an above-ground storage tank for storm water with a secondary containment area in a railyard in Dupo, St. Clair County, Illinois. The State seeks to enjoin UPRR from further violations and a monetary penalty. The amount of the proposed penalty is uncertain.

On October 25, 2005, the State of Washington Department of Ecology notified us that it had assessed a $106,000 penalty against the Railroad as a result of a November 15, 2003, incident near Kelso, Washington. In that incident, one of our trains collided with a BNSF train, derailing three of our locomotives. The Department of Ecology contends that diesel fuel and lube oil from the derailed locomotives entered waters of the State of Washington. We have asked the state to reconsider the penalty amount.

The South Coast Air Quality Management District (the District) issued a Notice of Violation (NOV) to UPRR on or about August 20, 2003, and November 2, 2003, asserting that we violated our air permit relating to locomotive diesel fueling at our Dolores Yard in Carson, California, by dispensing fuel in excess of permit limits over the course of 21 months. The District proposed that we pay $105,000 to settle this NOV. We settled this matter and others in July 2005 for $78,000 as part of a group of alleged violations.

We received notices from EPA and state environmental agencies alleging that we are or may be liable under federal or state environmental laws for remediation costs at various sites throughout the United States, including sites on the Superfund National Priorities List or state superfund lists. We cannot predict the ultimate impact of these proceedings and suits because of the number of potentially responsible parties involved, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Other Matters

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, we were notified that a *qui tam*, or private citizen, complaint was filed in the United States District Court for the Central District of California against, among other parties, the City of Long Beach, City of Long Beach Harbor Department, Port of Long Beach (the Port), Union Pacific Corporation, Union Pacific Railroad Company, and Union Pacific Resources Company, also known as Union Pacific Resources Group Inc. (Resources), a former subsidiary of UPC. A private citizen filed the action because the federal government and the State of California elected not to pursue the claims. The complaint alleges that the defendants violated the Federal Civil False Claims Act and the California False Claims Act by conspiring to use public funds to (1) shift environmental cleanup liability to the Port when Resources sold its Terminal Island oil field property to the Port in 1994 and (2) effect the acquisition by the Port of the Terminal Island property in which the Port (or the State of California) allegedly already held certain incidents of title. The complaint, which has not been served on us, seeks damages of $2.405 billion, unspecified costs for remediating groundwater contamination, and triple damages and civil penalties of $10,000 per day. The plaintiff's extended time to serve the complaint expired on April 4, 2005, and the Corporation filed a motion to dismiss for plaintiff's failure to make timely service. However, the Court extended the plaintiff's time to provide service. On December 7, 2005, we learned that a summons for service of the Complaint had been issued, but we have not been sued. We dispute the factual and legal bases of the complaint. We notified Anadarko Petroleum Corporation (Anadarko), as successor to Resources after its acquisition in 2000, that an indemnification agreement between Resources and the Corporation obligates Anadarko to indemnify us for all damages, costs, and expenses related to the complaint.

As we reported in a report on Form 8-K filed on April 12, 2005, we received a complaint in a purported shareholder derivative lawsuit, which names as defendants all the current directors and one former director of the Corporation. The complaint, filed in state court in Salt Lake County, Utah, on April 4, 2005, alleges that the director defendants breached their fiduciary duty to the Corporation and its shareholders by, among other things,

disregarding problems relating to railroad safety; compliance with governmental regulations, including reporting requirements with respect to rail accidents; and the handling of evidence in rail accident cases. The complaint contends that, as a consequence of such alleged breach of duty, the Corporation suffered substantial monetary losses and other injuries and seeks, among other things, an award of compensatory damages, other non-monetary remedies and relief, and the plaintiff's reasonable expenses and attorneys' fees.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of security holders during the fourth quarter of 2005.

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

Our executive officers generally are elected and designated annually by the Board of Directors at our first meeting held after the Annual Meeting of Shareholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year, as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 17, 2006 relating to the executive officers.

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| Richard K. Davidson | Chairman of UPC and the Railroad | 64 | (1) |
| James R. Young | President and Chief Executive Officer of UPC and the Railroad | 53 | (2) |
| Robert M. Knight, Jr. | Executive Vice President – Finance and Chief Financial Officer of UPC and the Railroad | 48 | (3) |
| Charles R. Eisele | Senior Vice President – Strategic Planning of UPC and the Railroad | 56 | (4) |
| J. Michael Hemmer | Senior Vice President – Law and General Counsel of UPC and the Railroad | 56 | (5) |
| Barbara W. Schaefer | Senior Vice President – Human Resources and Secretary of UPC and the Railroad | 52 | (6) |
| Lynden L. Tennison | Senior Vice President and Chief Information Officer of UPC and the Railroad | 46 | (7) |
| Robert W. Turner | Senior Vice President – Corporate Relations of UPC and the Railroad | 56 | Current Position |
| Bernard R. Gutschewski | Vice President – Taxes of UPC and Vice President and General Tax Counsel of the Railroad | 55 | Current Position |
| Mary E. McAuliffe | Vice President – External Relations of UPC | 59 | Current Position |
| Richard J. Putz | Vice President and Controller of UPC and Chief Accounting Officer and Controller of the Railroad | 58 | Current Position |
| Mary Sanders Jones | Vice President and Treasurer of UPC and Treasurer of the Railroad | 53 | Current Position |
| Dennis J. Duffy | Executive Vice President – Operations of the Railroad | 55 | Current Position |
| John J. Koraleski | Executive Vice President – Marketing and Sales of the Railroad | 55 | Current Position |

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

(Continued)

(1) Prior to January 1, 2006, Mr. Davidson was Chairman, President, and Chief Executive Officer of UPC and Chairman and Chief Executive Officer of the Railroad.
(2) Mr. Young was elected to his current position effective January 1, 2006. He was elected President and Chief Operating Officer of the Railroad, effective February 1, 2004, and he previously was Executive Vice President – Finance of UPC and Chief Financial Officer of the Railroad.
(3) Mr. Knight was elected to his current position effective February 1, 2004. He was elected Senior Vice President – Finance for UPC and the Railroad effective February 1, 2002, and he previously was Vice President and General Manager Automotive for the Railroad.
(4) Mr. Eisele was elected to his current position effective October 1, 2001. He previously was Vice President – Strategic Planning and Administration.
(5) Mr. Hemmer was elected to his current position effective June 1, 2004. Mr. Hemmer was elected Vice President – Law of the Railroad effective September 1, 2002, and previously was a partner at the law firm of Covington & Burling in Washington, D.C.
(6) Mrs. Schaefer has held the position of Senior Vice President – Human Resources for the past five years. In addition, she was elected Secretary of UPC and the Railroad effective June 1, 2004.
(7) Mr. Tennison was elected to his current position effective March 1, 2005. He previously was Vice President and Chief Technology Officer.

# PART II

## Item 5. Market for the Registrant's Common Equity, Related Shareholder Matters, and Issuer Purchases of Equity Securities

Our common stock is traded on the NYSE under the symbol "UNP". The following table presents the dividends declared and the high and low closing prices of our common stock for each of the indicated quarters.

| *2005 - Dollars Per Share* | *Q1* | *Q2* | *Q3* | *Q4* |
|---|---|---|---|---|
| Dividends | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Common stock price: | | | | |
| High | 70.10 | 70.19 | 72.20 | 81.26 |
| Low | 58.18 | 60.85 | 63.52 | 66.89 |
| *2004 - Dollars Per Share* | | | | |
| Dividends | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Common stock price: | | | | |
| High | 69.56 | 60.47 | 59.58 | 67.68 |
| Low | 59.38 | 55.66 | 54.80 | 58.68 |

At January 31, 2006, there were 267,584,487 shares of outstanding common stock and 29,173 common shareholders of record. At that date, the closing price of the common stock on the NYSE was $88.46. We have paid dividends to our common shareholders during each of the past 106 years. We declared dividends totaling $316 million in 2005 and $312 million in 2004, and we expect to continue paying comparable dividends in 2006. We are subject to certain restrictions regarding retained earnings with respect to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends increased to $6.2 billion at December 31, 2005, from $5.2 billion at December 31, 2004.

**Purchases of Equity Securities** – We do not currently have a formal publicly announced plan or program to repurchase shares of our common stock. The purchased shares presented below relate solely to our equity compensation plans described in note 7 to the Financial Statements and Supplementary Data, Item 8. During the first nine months of 2005, 2,283,918 shares of our common stock were repurchased at an average price per share of $68.24. The following table presents common stock repurchases during each month for the fourth quarter:

| *Period* | *Total Number of Shares Purchased* | *Average Price Paid per Share* | *Total Number of Shares Purchased as Part of a Publicly Announced Plan or Program* | *Maximum Number of Shares That May Yet Be Purchased Under the Plan or Program* |
|---|---|---|---|---|
| Oct. 1 through Oct. 31 Employee transactions [a] | 14,515 | $71.66 | N/A | N/A |
| Nov. 1 through Nov. 30 Employee transactions [a] | 856,724 | 75.90 | N/A | N/A |
| Dec. 1 through Dec. 31 Employee transactions [a] | 166,625 | 80.08 | N/A | N/A |
| Total | 1,037,864 | $76.51 | N/A | N/A |

[a] *Includes shares delivered or attested to UPC to pay stock option exercise prices or to satisfy tax withholding obligations for stock option exercises or vesting of restricted or retention shares.*

## Item 6. Selected Financial Data

The following table presents as of, and for the years ended, December 31, our selected financial data for each of the last five years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Financial Statements and Supplementary Data, Item 8. The information below is not necessarily indicative of the results of future operations. Certain prior year amounts have been reclassified to conform to the 2005 presentation. These reclassifications were not material, individually or in aggregate, with the exception of reclassifications made to appropriately reflect the discontinued operations as discussed in note 13 of Item 8.

| *Millions of Dollars, Except per Share Amounts, Ratios, and Employee Statistics* | *2005[a]* | *2004[b]* | *2003[c]* | *2002[d]* | *2001* |
|---|---|---|---|---|---|
| **For the Year Ended December 31** | | | | | |
| Operating revenues | $13,578 | $12,215 | $11,551 | $11,159 | $10,830 |
| Operating income | 1,795 | 1,295 | 2,133 | 2,253 | 2,018 |
| Income [e] | 1,026 | 604 | 1,056 | 1,265 | 934 |
| Net income | 1,026 | 604 | 1,585 | 1,341 | 966 |
| Per share – basic: | | | | | |
| Income [e] | 3.89 | 2.33 | 4.15 | 5.02 | 3.77 |
| Net income | 3.89 | 2.33 | 6.23 | 5.32 | 3.90 |
| Per share – diluted: | | | | | |
| Income [e] | 3.85 | 2.30 | 4.07 | 4.78 | 3.65 |
| Net income | 3.85 | 2.30 | 6.04 | 5.05 | 3.77 |
| Dividends declared per share | 1.20 | 1.20 | 0.99 | 0.83 | 0.80 |
| Operating cash flow | 2,595 | 2,257 | 2,443 | 2,237 | 1,886 |
| **At December 31** | | | | | |
| Total assets | $35,620 | $34,596 | $33,496 | $32,772 | $31,552 |
| Total debt | 7,416 | 8,131 | 7,989 | 7,703 | 8,078 |
| Convertible preferred securities | - | - | - | 1,500 | 1,500 |
| Common shareholders' equity | 13,707 | 12,655 | 12,354 | 10,651 | 9,575 |
| Equity per common share [f] | 51.41 | 48.58 | 47.85 | 41.99 | 38.26 |
| **Additional Data** | | | | | |
| Commodity revenue | $12,957 | $11,692 | $11,041 | $10,663 | $10,391 |
| Carloads (000) | 9,544 | 9,458 | 9,239 | 9,131 | 8,916 |
| Operating margin (%) [g] | 13.2 | 10.6 | 18.5 | 20.2 | 18.6 |
| Operating ratio (%) [g] | 86.8 | 89.4 | 81.5 | 79.8 | 81.4 |
| Average employees (000) | 49.7 | 48.3 | 46.4 | 47.3 | 48.7 |
| Operating revenue per employee (000) | $ 273.2 | $ 252.9 | $ 248.9 | $ 235.9 | $ 222.4 |
| **Financial Ratios (%)** | | | | | |
| Debt to capital [h] | 35.1 | 39.1 | 39.3 | 46.4 | 50.0 |
| Return on equity [i] | 7.8 | 4.8 | 13.8 | 13.3 | 10.6 |

*[a] 2005 net income includes a $118 million tax expense reduction to reflect a reduction in the estimated deferred income tax liability.*

*[b] 2004 operating income and net income includes a $247 million pre-tax ($154 million after-tax) charge for unasserted asbestos-related claims.*

*[c] Net income and total assets include the effects of the acquisitions of Motor Cargo as of November 30, 2002, and reflect the disposition of all of our trucking interests in 2003. See Item 8, note 13 regarding the reclassification of our trucking segment as a discontinued operation.*

*[d] 2002 net income includes $214 million pre-tax ($133 million after-tax) gains on asset dispositions. In addition, net income includes a reduction of income tax expense of $67 million related to tax adjustments for prior years' income tax examinations.*

*[e] Based on results from continuing operations.*

[f] *Equity per common share is calculated as follows: common shareholders' equity divided by common shares issued less treasury shares outstanding.*

[g] *Operating margin is defined as operating income divided by operating revenues. Operating ratio is defined as operating expenses divided by operating revenues.*

[h] *Debt to capital is determined as follows: total debt plus convertible preferred securities divided by total debt plus equity plus convertible preferred securities.*

[i] *Based on average common shareholders' equity.*

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Financial Statements and Supplementary Data, Item 8, and other information in this report, including Risk Factors set forth in Item 1A and Critical Accounting Policies and Cautionary Information at the end of this Item 7.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity, we analyze the net financial results of the Railroad as one segment due to the integrated nature of the rail network. The Consolidated Financial Statements in 2003 also include discontinued trucking operations, consisting of OTC and Motor Cargo, which were subsidiaries of Overnite, Inc., formerly an indirect wholly owned subsidiary of UPC. In 2003, we reclassified our trucking operations as discontinued operations.

## EXECUTIVE SUMMARY

### 2005 Results

- **Safety** – We experienced mixed safety results during 2005. While the overall employee injury incident rate per 200,000 man-hours decreased, the lost workday case rate increased by 1%. The number of derailments declined 8%, and associated costs declined 12%. These improvements reflect our use of technology such as train simulators and improved training and testing programs. In the area of public safety, we closed 400 grade crossings to reduce exposure and installed 750 video cameras in locomotives to better analyze grade crossing incidents. The number of grade crossing incidents, however, increased 9% during the year, driven in part by the combination of increasing highway and rail traffic.

- **Commodity Revenue Growth** – Our commodity revenues grew 11% year-over-year to $13 billion, the highest level in our history, as continued economic growth led to unprecedented demand for our services. We achieved record revenue levels in all of our six commodity groups, primarily driven by fuel surcharges and better pricing. By year-end, we repriced approximately 55% of our business in the current market of significant transportation demand. Although volume increased 1% to record levels in 2005, weather-related disruptions limited volume growth.

- **Network Improvement** – We continued to address the resource shortages that led to operational challenges throughout 2004 by aggressive hiring and training of train crews, along with the acquisition of locomotives and freight cars through both long- and short-term leasing programs. In 2005, network operations improved in spite of significant weather-related challenges. We handled record volumes and maintained velocity by strengthening our operational recoverability. We began implementing the Unified Plan in 2005, streamlining the automotive, manifest, and intermodal transportation plans by eliminating switching and work events. Through the year we reduced our rate of train stops by 16% and achieved a 12% reduction of our car switching rate. Productivity improved, as demonstrated by a 6% lower average terminal dwell time, a 2.5% improvement in car utilization, and a 2.4% decrease in the fuel consumption rate. Additionally, we piloted an operational productivity initiative called CIMS (Customer Inventory Management System). CIMS complements the Unified Plan by reducing the number of cars in our terminals. We also expanded capacity and continued to use industrial engineering techniques to further improve network fluidity, ease capacity constraints, and improve asset utilization.

- **Significant Weather Events** – In 2005, we faced a year filled with significant weather-related challenges:

In early January, a massive storm hit California and Nevada. Our rail system suffered significant damage, temporarily closing five of our six routes in and out of Los Angeles. We embargoed traffic to and from Southern California and the Las Vegas area until service could be restored, and we rerouted a number of trains.





In May, unprecedented rainfall and snow, combined with accumulated coal dust in the roadbed, created track instability on the SPRB Joint Line. The extensive and ongoing maintenance and restoration program disrupted and reduced shipments beginning mid-May and continuing throughout most of the year.

In August and September, Hurricanes Katrina and Rita hit the New Orleans and Houston areas. Hurricane Katrina caused minimal damage to our rail system. However, Hurricane Rita impacted 17 operating subdivisions, five classification yards, and the Houston terminal complex. More than 150 of our customers temporarily ceased operations resulting in lost revenue and higher operating expenses.





On October 1, a severe storm hit northeastern Kansas. The storm dropped 10 to 12 inches of rain in one day, causing track and bridge washouts as well as erosion damage to four main lines in this region. These major corridors serve as the primary connection to the East and South from the western part of our system. Average train speed and average terminal dwell time for October deteriorated 1 mph and 4%, respectively, from September levels.

- **Fuel Prices** – Fuel prices increased dramatically in 2005, raising our average system fuel price by 45% and adding $740 million of operating expenses compared to 2004. Fuel prices soared in the latter part of the year, as crude oil prices topped out over $70 per barrel in September, compounded by high diesel conversion spreads and large, regional spreads resulting from refinery shutdowns following Hurricanes Katrina and Rita. Prices decreased slightly in November and December, but to levels considerably higher than 2004. Although we had no fuel hedges in place in 2005, our fuel surcharge programs helped mitigate the impact of these higher fuel prices. Our fuel surcharge programs allow us to recover from customers a portion of the increase in fuel expense in the form of higher revenue. In addition, our fuel conservation efforts allowed us to handle a 1% increase in gross ton miles while burning 2% less fuel.

- **Free Cash Flow** – Cash generated by operating activities totaled a record $2.6 billion, yielding free cash flow of $234 million in 2005. Free cash flow is defined as cash provided by operating activities, less cash used in investing activities and dividends paid.

Free cash flow is a non-GAAP financial measure under SEC Regulation G. We believe free cash flow is important in evaluating our financial performance and measures our ability to generate cash without additional external financings. Free cash flow should be considered in addition to, rather than as a substitute for, cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| *Millions of Dollars* | *2005* | *2004* | *2003* | *2002* | *2001* |
|---|---|---|---|---|---|
| Cash provided by operating activities | $ 2,595 | $ 2,257 | $2,443 | $ 2,237 | $ 1,886 |
| Cash used in investing activities | (2,047) | (1,732) | (877) | (1,374) | (1,403) |
| Dividends paid | (314) | (310) | (234) | (201) | (198) |
| Free cash flow | 234 | 215 | 1,332 | 662 | 285 |
| Proceeds from sale of discontinued operations. | - | - | (620) | - | - |
| Net free cash flow | $ 234 | $ 215 | $ 712 | $ 662 | $ 285 |

## 2006 Outlook

- **Safety** – Operating a safe railroad benefits our employees, our customers, and the public. Our 2006 employee safety program addresses the key drivers of 2005 performance. The large number of new employees and managers will be trained, tested, and participate in quality assurance activities. We continue to apply technology to enhance safety. From a public safety standpoint, we will continue our efforts to upgrade and close crossings, install video cameras on locomotives, and educate the public on crossing safety, along with other activities. We will continue our derailment prevention efforts, emphasizing the use of key factor analysis.

- **Commodity Revenue Growth** – We expect record revenue levels to continue in 2006 based on current economic indicators, forecasted demand, and the opportunity to reprice 13% of our business. We have established a target for year-over-year commodity revenue growth over 10% percent. We are projecting yield increases in all of our major commodity groups and we intend to manage total volume growth to 3% in an effort to improve returns. Volume growth is expected to occur in the energy, intermodal, and industrial products commodity groups.

- **Transportation Plan** – In 2005, we continued to implement the Unified Plan, which streamlined segments of our transportation plan. In 2006, we will continue to evaluate traffic flows and network logistic patterns to identify additional opportunities to simplify operations and improve network efficiency. We plan to maintain adequate manpower and locomotives, improve productivity using industrial engineering techniques, and improve our operating margins.

- **Fuel Prices** – We expect that fuel prices will remain high, with crude oil prices hovering in the range of $60 to $65 per barrel throughout the year. To reduce the impact of fuel price on earnings, we will continue to increase the amount of traffic subject to fuel surcharge programs.

- **Capital Plan** – In 2006, we expect our cash capital expenditures to be approximately $2.2 billion and the net present value of additional long-term operating leases to be approximately $500 million. These expenditures will be used to maintain track and structures, continue capacity expansions on our main lines in constrained corridors, remove bottlenecks, upgrade and augment equipment to better meet customer needs, build and improve facilities and terminals, and develop and implement new technologies. Major capital projects in 2006 include expanding double track on the Sunset Corridor; continuing enhancements on the SPRB Joint Line; improving the freight car terminal infrastructure in San Antonio, Dallas/Fort Worth, and Houston; and continuing installation of centralized track control across Iowa. We expect to fund our 2006 cash capital expenditures through cash generated from operations, the sale or lease of various operating and

non-operating properties, and cash on hand at December 31, 2005. This focused capital plan will help us improve network velocity and facilitate revenue growth.

- **Financial Expectations** – We anticipate revenue growth and continued network improvement in 2006, and financial results should exceed 2005 levels. Our expectations include generating diluted earnings per share in the range of $4.60 to $4.80 and improving our operating ratio by 2.5 to 3.0 percentage points compared to 2005. Free cash flow for the year should exceed $300 million. Our free cash flow target reflects approximately $450 to $500 million of higher cash tax payments resulting from the impact of higher cash tax rates and higher expected earnings.

## RESULTS OF OPERATIONS

### Operating Revenue

| *Millions of Dollars* | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Commodity revenue | $12,957 | $11,692 | $11,041 | 11% | 6% |
| Other revenue | 621 | 523 | 510 | 19 | 3 |
| Total | $13,578 | $12,215 | $11,551 | 11% | 6% |

Operating revenue includes commodity revenue and other revenue. Other revenue consists primarily of revenue earned by our subsidiaries, revenue from our commuter rail operations, and accessorial revenue, which we earn when customers retain equipment owned or controlled by the Railroad. We recognize commodity revenue on a percentage-of-completion basis as freight moves from origin to destination. We allocate commodity revenue between reporting periods based on the relative transit time in each reporting period with expenses recognized as incurred. We recognize other revenue as service is performed or contractual obligations are met.

Commodity revenue improved in all six business groups during 2005, with double-digit growth in the agricultural, industrial products, and intermodal commodity groups. Fuel surcharges, price increases, and index-based contract escalators, which are formulas in our shipping contracts that correlate price adjustments to certain economic indexes, all contributed to higher average revenue per car (ARC). In 2005, our fuel surcharge programs generated $1 billion in commodity revenue, which represents approximately 74% of the additional expense incurred above the base fuel price for our fuel surcharge programs (currently, $0.75 per gallon). Although volume grew 1% for the year, the severe weather and maintenance and restoration on the SPRB Joint Line constrained volume growth.

The commodity revenue increase in 2004 was driven by growth in the industrial products, intermodal and chemical groups. Fuel surcharges, price increases, and index-based contract escalators contributed to the increase in ARC. In 2004, our fuel surcharge programs generated $330 million in commodity revenue, which represented 52% of the additional expense incurred above the base fuel price of $0.75 per gallon. ARC improved 3% to $1,236, while revenue carloads increased 2%.

Subsidiary and accessorial revenue increased other revenue in 2005, mainly driven by higher volumes. In addition, we generated higher subsidiary revenue due to the acquisition of our joint venture partner's interest in Bay Pacific Financial L.L.C. (Bay Pacific), an intermodal equipment leasing entity. Passenger and subsidiary revenue increased other revenue in 2004, although accessorial revenue declined.

The following tables summarize the year-over-year changes in commodity revenue, revenue carloads, and average revenue per car by commodity type.

| *Commodity Revenue in Millions of Dollars* | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Agricultural | $ 1,971 | $ 1,675 | $ 1,578 | 18% | 6% |
| Automotive | 1,273 | 1,235 | 1,216 | 3 | 2 |
| Chemicals | 1,850 | 1,719 | 1,589 | 8 | 8 |
| Energy | 2,578 | 2,404 | 2,412 | 7 | - |
| Industrial Products | 2,819 | 2,419 | 2,180 | 17 | 11 |
| Intermodal | 2,466 | 2,240 | 2,066 | 10 | 8 |
| Total | $12,957 | $11,692 | $11,041 | 11% | 6% |

| *Revenue Carloads in Thousands* | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Agricultural | 883 | 883 | 883 | -% | -% |
| Automotive | 797 | 826 | 820 | (4) | 1 |
| Chemicals | 913 | 935 | 888 | (2) | 5 |
| Energy | 2,178 | 2,172 | 2,187 | - | (1) |
| Industrial Products | 1,509 | 1,515 | 1,478 | - | 2 |
| Intermodal | 3,264 | 3,127 | 2,983 | 4 | 5 |
| Total | 9,544 | 9,458 | 9,239 | 1% | 2% |

| *Average Revenue per Car* | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Agricultural | $2,233 | $1,895 | $1,786 | 18% | 6% |
| Automotive | 1,598 | 1,496 | 1,484 | 7 | 1 |
| Chemicals | 2,026 | 1,839 | 1,788 | 10 | 3 |
| Energy | 1,184 | 1,107 | 1,103 | 7 | - |
| Industrial Products | 1,868 | 1,597 | 1,476 | 17 | 8 |
| Intermodal | 755 | 716 | 693 | 5 | 3 |
| Total | $1,358 | $1,236 | $1,195 | 10% | 3% |

*Agricultural* – Price increases and fuel surcharges increased agricultural commodity revenue in 2005. Total carloads did not increase from 2004. Carloads of grain products increased during 2005 as we shipped more dry feed ingredients to Mexico and more corn to ethanol producers. Higher demand for ethanol reflects the impact of energy demand, rising crude oil prices, and limited capacity of domestic refineries. Reduced carloadings of sugar beets partially offset the gains. Declining carloads of feed grain and reduced shipments of wheat both contributed to lower whole grain shipments. ARC improvement in 2005 resulted from price increases, fuel surcharges, and the positive impact of a larger percentage of carloads with longer average lengths of haul.

Increased demand for dry feed ingredients and domestic feed grains drove the improvement in 2004. Export corn and soybean shipments also posted revenue gains from rising demand for shipments to the PNW. Revenue also increased through additional shipments of export wheat to Mexico and Gulf ports. ARC grew due to a higher percentage of shipments with longer average lengths of haul, as well as price increases and fuel surcharges.

**2005 Agricultural Revenue**




**2005 Automotive Revenue**




*Automotive* – Revenue increased in 2005 primarily due to fuel surcharges and price increases, which also drove ARC improvement. Carloads decreased due to lower shipments of domestically manufactured finished vehicles and automobile parts and materials, reflecting continued weakness in this sector.

Increased volume of both finished vehicles, primarily from international shippers, and automotive materials shipments drove revenue growth in 2004. This growth was partially offset by a decline in shipments for domestic manufacturers due to lower production levels and weaker sales. ARC improved slightly in 2004 due to fuel surcharges and the favorable impact of more shipments with longer average lengths of haul.

*Chemicals* – Price increases, fuel surcharges, and higher shipments of potash from Canada to Portland via the Eastport, Idaho, gateway for overseas export drove revenue growth in 2005. Declines in liquid and dry chemicals, plastics, and petroleum shipments, in part due to the business interruptions caused by Hurricane Rita, reduced volume. In addition, liquid and dry chemical shipments and plastic shipments were lower due to a weak export market, plant closures for maintenance, and the impact of an agreement with the BNSF for access to certain facilities in the Bayport, Texas area. ARC improved for the year due to price increases and fuel surcharges.

In 2004, liquid and dry chemical shipments, led by intermediate chemicals and caustic soda, rose due to overall economic activity. Shipments of soda ash, or sodium carbonate, which is an important raw material for manufacturing, increased due to strong demand in domestic and export markets. An improved economy and a stronger export market led to volume and revenue growth for plastics. Overall, ARC improved due to longer average lengths of haul, increased shipments of high-ARC soda ash, and the positive effects of price increases and fuel surcharges.

**2005 Chemicals Revenue**




**2005 Energy Revenue**




*Energy* – Revenue growth in 2005 reflects higher prices, fuel surcharges, and index-based contract escalators. Although volume grew in the first quarter, carloads for the year were flat as a result of the maintenance and restoration work on the SPRB Joint Line during the second, third, and fourth quarters, the impact of Hurricane Rita, the Kansas washouts, and temporary outages at mines in Colorado and Utah during the fourth quarter. ARC was higher due to price increases, higher fuel surcharges, and index-based contract escalators.

In 2004, overall volume dropped slightly compared to record levels set in 2003; however, coal originating in Colorado increased 9% due to strong demand for this high-BTU coal. Price increases and fuel surcharges drove ARC improvements, which were offset by the impact of additional shorter lengths of haul shipments.

*Industrial Products* – Price increases and fuel surcharges generated revenue growth in 2005. In particular, lumber shipments contributed to this growth due to solid pricing gains and fuel surcharges. Revenue from stone shipments increased revenue from construction products due to strong construction demand, larger train sizes, and improved car cycle times. Car cycle time is defined as the amount of time that a car spends on our system measured from the origin of the loaded or empty move until arrival at final destination. Overall carloads were flat compared to 2004. Partially offsetting substantial volume growth of stone shipments were reduced paper moves, primarily newsprint and fiber, and fewer shipments of government materials, steel, and cement, resulting from softening markets, cement shortages in certain markets, and higher inventories. Price increases and fuel surcharges drove ARC increases.

**2005 Industrial Products Revenue**




Growth in lumber, steel, and non-metallic minerals led to higher revenue in 2004. Demand for lumber was driven by higher housing starts and low interest rates. Steel shipments increased as strong global demand limited imports and spurred demand for domestic steel. ARC improved due to price increases, fuel surcharges, and more high-ARC lumber moves.

**2005 Intermodal Revenue**




*Intermodal* – Revenue in 2005 improved due to strong imports, primarily from China and the rest of Asia. However, business interruptions during the first quarter of 2005 due to the West Coast storm limited full year revenue growth. ARC improved due to price increases, fuel surcharges, and index-based contract escalators.

Overall economic conditions and an increase in imports from the Far East improved revenue in 2004. Fuel surcharges and price increases contributed to ARC growth.

*Mexico Business* – Each commodity group discussed above includes revenue from shipments to and from Mexico, which increased 15% to $1.1 billion in 2005 compared to 2004. Revenue growth resulted primarily from price increases and fuel surcharges. Carloads were flat versus 2004, as fewer auto parts, energy, and intermodal shipments offset higher agricultural and industrial shipments.

In 2004, revenue grew 9% to $970 million, resulting from increased volume in the industrial products, intermodal, chemical, and automotive business groups, particularly cement, newsprint and wood fiber, liquid and dry chemicals, soda ash, and automotive materials. Revenue generated from agricultural shipments also improved due to higher wheat exports and beer imports. Lower export shipments of corn and feed grains, as well as reduced energy carloads, partially offset the increases.

**Operating Expenses**

| *Millions of Dollars* | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Salaries, wages, and employee benefits ......... | $ 4,375 | $ 4,167 | $3,892 | 5% | 7% |
| Fuel and utilities ........................... | 2,562 | 1,816 | 1,341 | 41 | 35 |
| Equipment and other rents .................. | 1,402 | 1,374 | 1,221 | 2 | 13 |
| Depreciation ............................. | 1,175 | 1,111 | 1,067 | 6 | 4 |
| Materials and supplies ...................... | 546 | 488 | 414 | 12 | 18 |
| Casualty costs ............................ | 411 | 694 | 416 | (41) | 67 |
| Purchased services and other costs ........... | 1,312 | 1,270 | 1,067 | 3 | 19 |
| Total .................................. | $11,783 | $10,920 | $9,418 | 8% | 16% |

Operating expenses increased $863 million in 2005 versus 2004. Excluding the asbestos charge of $247 million (pre-tax) in 2004, operating expenses increased $1.1 billion, or 10%. Significantly higher locomotive fuel prices accounted for $740 million of this increase (our fuel surcharge programs helped offset these expenses in the form of higher revenue). Inflation in wages, benefits, materials, and services, as well as a larger workforce, resulted in most of the additional increase. Also driving higher operating expenses were increased contract services and clean-up and restoration costs associated with the West Coast storm in January.

**Total Operating Expenses**




Higher fuel prices, the asbestos charge of $247 million (pre-tax), higher crew and asset utilization costs resulting from slower network velocity, and volume-related costs all contributed to higher operating expenses in 2004. Expenses were also negatively impacted by wage and benefit inflation, training expenses associated with hiring additional trainmen, increased depreciation expense, and higher casualty costs. A jury verdict upheld against the Railroad in 2004 for a 1998 crossing accident and a derailment in San Antonio, Texas, increased casualty costs. Slower network velocity and service difficulties, and increased hiring and training efforts added approximately $300 million in operating expenses during 2004.

*Salaries, Wages, and Employee Benefits* – Several factors drove higher employment expenses in 2005. General wage and benefit inflation continued to increase expenses, reflecting higher salaries and wages and the year-over-year impact of higher healthcare and other benefits costs. We also incurred higher expenses for management bonuses in 2005, as executive bonuses were not awarded for 2004 and bonuses for the professional workforce were significantly reduced. A 3% increase in our workforce and higher demand during the year also contributed to the increases. Additionally, labor expenses, in the form of higher train crew costs and labor incurred for repair and clean-up activities, increased due to the hurricanes in the third quarter and the West Coast storm in the first quarter. Reduced severance and relocation costs, increased network efficiency, and reduced training expenses

partially offset these increases. Transferring various support personnel to Omaha, Nebraska, resulted in higher severance and relocation costs in 2004.

The increase in 2004 also resulted from a number of factors, including higher wages and training expenses associated with hiring additional trainmen, increased crew costs due to slower network velocity, inflation, volume-related expenses, and severance and relocation costs. Because we did not award executive bonuses for 2004, lower performance-based compensation expense for management partially offset these increases. Lower protection costs also offset these increased expenses. Protection cost represents the differential payment when the wage earned for active employment is lower than an employee's "protected" rate of pay. The STB mandates protected rates for employees adversely affected by a merger, and collective bargaining agreements with our labor unions also establish these rates. Finally, a smaller non-transportation workforce yielded cost savings during the year.

*Fuel and Utilities*

| *Millions of Dollars* | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Locomotive fuel expense | $2,393 | $1,684 | $1,221 | 42% | 38% |
| Fuel surcharge revenue | 1,017 | 330 | 112 | 208 | 195 |

Fuel and utilities include locomotive fuel, utilities other than telephone, and gasoline and other fuels. Higher diesel fuel prices, which averaged $1.77 per gallon (including taxes and transportation costs) in 2005 compared to $1.22 per gallon in 2004, increased expenses by $740 million. A 1% increase in gross ton-miles resulted in $8 million of additional expenses. We offset $39 million of these increases with a 2% improvement in our consumption rate in 2005 versus 2004. The Railroad had no fuel hedges in place during 2005, and has none in place for 2006. Gasoline, utilities, and propane expenses increased $37 million in 2005 versus 2004 due to higher prices.

The increase in 2004 compared to 2003 was driven by higher diesel fuel prices, which averaged $1.22 per gallon and $0.92 per gallon in 2004 and 2003, respectively (including taxes and transportation costs), and higher gallons consumed. Higher fuel prices contributed $416 million to the increase; however, we recovered approximately 52% of these costs through our fuel surcharge programs, which were included in operating revenues. The increase in gross ton-miles in 2004 drove consumption higher, resulting in an additional $24 million in fuel expense for the year. The Railroad hedged approximately 9% of its fuel usage in 2004, which decreased fuel costs by $14 million. Gasoline, utilities, and propane expenses increased $13 million in 2004 due to higher prices.

*Equipment and Other Rents* – Equipment and other rents includes primarily rental expense the Railroad pays for freight cars owned by other railroads or private companies; freight car, intermodal, and locomotive leases; other specialty equipment leases; and office and other rentals. In 2005, the number of leased locomotives and freight cars increased, resulting in additional lease expenses. Higher carloads also increased 2005 expenses. Improved car-cycle times partially offset these increases reflecting increased network efficiency, which lowered our short-term freight car rental expense.

Expenses increased in 2004 due to carload volume growth and longer car cycle times, resulting in higher expenses for locomotive and car rentals. Higher locomotive expense included additional costs associated with leasing short-term, or surge, locomotive power, which is more costly than long-term locomotive leases, and the increased leasing of new locomotives.

*Depreciation* – The majority of depreciation relates to track structure, including rail, ties, and other track material. A higher depreciable asset base, reflecting higher capital spending in recent years, increased our depreciation expense in 2005 and 2004.

*Materials and Supplies* – Materials used to maintain the Railroad's lines, structures, and equipment are the principal components of materials and supplies expense. This expense item also includes small tools, office supplies, other materials, and the costs of freight services to ship Railroad supplies and materials. During 2005, materials and supplies expense increased, primarily due to locomotive and freight car maintenance. We used more repair materials to maintain a larger fleet of locomotives, including a growing number of units not covered by warranties. Additionally, we incurred higher costs for car wheel sets, traction motors, and lube oil. Conversely, we incurred lower freight charges for shipping Railroad materials and stationary and office supplies.

We incurred higher expenses in 2004 due to increased use of locomotive repair materials required to maintain a larger fleet that includes older units not covered by warranties. We also performed more freight car repairs, incurred higher materials costs, and experienced increased freight charges for shipment of Railroad material.

*Casualty Costs* – Personal injury expense, freight and property damage, insurance, and environmental costs are the primary components of casualty costs. Casualty costs in 2005 were lower than the previous year primarily due to higher expenses incurred in 2004 for an asbestos charge, a costly derailment near San Antonio, and a large jury verdict – affirmed in 2004 – for a 1998 crossing accident. Lower freight and property damage expense and lower costs for destruction of foreign or leased equipment also reduced casualty costs. Conversely, we incurred higher insurance costs and increased costs for third-party personal injuries related to long-term environmental exposures.

In 2004, costs rose due to the asbestos charge of $247 million (pre-tax), a costly derailment near San Antonio, and a large jury verdict – affirmed in 2004 – for a 1998 crossing accident. Partially offsetting these increases were lower insurance expenses and reduced personal injury expense, which resulted from lower than anticipated settlement costs and fewer employee injuries in 2004 than previously assumed.

*Purchased Services and Other Costs* – Purchased services and other costs include the costs of services purchased from outside contractors, state and local taxes, net costs of operating facilities jointly used by UPRR and other railroads, transportation and lodging for train crew employees, trucking and contracting costs for intermodal containers, leased automobile maintenance expenses, telephone and cellular phone expense, employee travel expense, and computer and other general expenses. Expenses decreased in 2005 versus 2004 because we incurred higher relocation costs associated with moving support personnel to Omaha, Nebraska during 2004. In 2005, we experienced higher volume-related costs for freight car and locomotive contract maintenance and crew transportation and lodging. Although our intermodal carloadings increased over 4% in 2005, costs for trucking services provided by intermodal carriers remained flat as we substantially reduced expenses associated with network inefficiencies. Higher diesel fuel prices increased sales and use taxes in 2005, which resulted in higher state and local taxes. Other contract services increased in 2005. The 2005 January West Coast storm and Hurricanes Katrina and Rita also contributed to higher expenses in 2005 (net of insurance reimbursements received).

In 2004, higher locomotive contract maintenance services, state and local taxes, and relocation costs drove expenses higher. In addition, we incurred increased trucking expenses for intermodal carriers and crew transportation costs due to slower network velocity and additional volume.

**Non-Operating Items**

| *Millions of Dollars* | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Other income | $ 145 | $ 88 | $ 78 | 65% | 13% |
| Interest expense | (504) | (527) | (574) | (4) | (8) |
| Income taxes | (410) | (252) | (581) | 63 | (57) |

*Other Income* – Other income increased in 2005 largely as a result of higher gains from real estate sales partially offset by higher expenses due to rising interest rates associated with our sale of receivables program. In addition, other income in 2004 included income recognized from the sale of a technology subsidiary's assets.

Other income improved in 2004 due to higher costs in 2003 associated with premium payments for early retirement of $1.5 billion of Convertible Preferred Securities (CPS) and income recognized in 2004 from the sale of assets of a technology subsidiary. These were partially offset by lower gains from real estate sales in 2004 compared to 2003.

*Interest Expense* – Lower interest expense in 2005 and 2004 was primarily due to declining weighted-average debt levels of $7.8 billion, $8.1 billion, and $8.9 billion in 2005, 2004, and 2003, respectively. Our effective interest rate was 6.5% in both 2005 and 2004, compared to 6.4% in 2003.

*Income Taxes* – Income taxes were greater in 2005 due to higher 2005 pre-tax income, which was partially offset by a previously reported reduction in income tax expense. In our quarterly report on Form 10-Q for the quarter ended June 30, 2005, we reported that the Corporation had undertaken an analysis of the impact that final settlements of tax liabilities for pre-1995 tax years with the Internal Revenue Service (IRS) had on previously recorded estimates of deferred tax assets and liabilities. The completed analysis of the final settlements for pre-1995 tax years, along with IRS Examination Reports for tax years 1995 through 2002 were considered, among other things, in a review and re-evaluation of the Corporation's estimated deferred tax assets and liabilities as of September 30, 2005, resulting in an income tax expense reduction of $118 million in 2005.

Income tax expense decreased in 2004, driven by lower pre-tax income, a reduction in the deferred state income tax liability primarily attributable to relocating support operations to Omaha, Nebraska, state income tax credits earned in connection with the new headquarters building in Omaha, and an increase in foreign tax credits resulting from the passage of the American Jobs Creation Act of 2004.

## DISCONTINUED OPERATIONS

On November 5, 2003, we completed the sale of our entire trucking interest. In 2003, revenue and income from discontinued operations were $1.2 billion and $255 million, respectively. Income from discontinued operations in 2003 included the net gain from the sale of our trucking interest of $211 million, including an income tax benefit of $126 million.

## OPERATING AND FINANCIAL STATISTICS

### Railroad Performance Measures

We report key Railroad performance measures weekly to the American Association of Railroads, including carloads, average daily inventory of rail cars on our system, average train speed, and average terminal dwell time. This operating data is available on our website at www.up.com/investors/reports/index.shtml.

### Operating Statistics

| | *2005* | *2004* | *2003* | *% Change 2005 v 2004* | *% Change 2004 v 2003* |
|---|---|---|---|---|---|
| Average train speed (miles per hour) | 21.1 | 21.4 | 23.6 | (1)% | (9)% |
| Average terminal dwell time (hours) | 28.7 | 30.5 | 26.8 | (6) | 14 |
| Gross ton-miles (billions) | 1,043.9 | 1,037.5 | 1,018.9 | 1 | 2 |
| Revenue ton-miles (billions) | 548.8 | 546.3 | 532.9 | - | 3 |
| Average full-time equivalent employees | 49,747 | 48,329 | 46,371 | 3 | 4 |

*Average Train Speed* – Average train speed is calculated by dividing train miles by hours operated on our main lines between terminals. In 2005, the West Coast storm, disruptions on the SPRB Joint Line, business interruptions caused by Hurricane Rita, and the Kansas washouts in October hampered efforts to improve our average train speed. In 2004, unprecedented demand for our services and crew and locomotive shortages negatively impacted operational efficiency and average train speed.

*Average Terminal Dwell Time* – Average terminal dwell time is the average time that a rail car spends at our terminals. Lower average terminal dwell time is favorable. The 6% improvement in dwell time in 2005 resulted from strategic network management initiatives and efforts to more timely deliver rail cars to our interchange partners and customers. Record demand levels and operational challenges experienced in 2004 affected network performance including average terminal dwell time.

*Gross and Revenue Ton-Miles* – Gross ton-miles are calculated by multiplying the weight of loaded or empty freight cars by the number of miles hauled. Revenue ton-miles are based on tariff miles and do not include the weight of freight cars. In 2005, gross and revenue ton-miles grew 1% and 0.5%, in relation to a 1% increase of carloadings. Gross and revenue ton-miles increased 2% and 3% respectively in 2004, with 2% growth of carloadings during the same period. The increase in gross and revenue ton-miles was also positively impacted by volume growth experienced in the higher density commodity groups of industrial products and chemicals, combined with a minimal increase in automotive carloads, which is a lower density commodity.

*Average Full-Time Equivalent Employees* – The 2005 increase includes the addition of employees needed to complete increased track repair and replacement programs, more train crew personnel both to handle the increased demand and to improve service, and the hiring of operations management personnel, including an expanded management training program. The 2004 average number of full-time equivalent employees increased as we added train crew personnel, who were hired to handle increased customer demand and improve service. These additions were partially offset by increased productivity in the non-transportation functions, employee attrition, and fewer employees at our technology subsidiaries.

**Other Financial Statistics**

| | *2005* | *2004* | *Change* |
|---|---|---|---|
| Debt to capital | 35.1% | 39.1% | (4.0) pt |
| Lease adjusted debt to capital | 43.6% | 45.1% | (1.5) pt |

*Debt to Capital/Lease Adjusted Debt to Capital* – Debt to capital is computed by dividing total debt by total debt plus equity. Lease adjusted debt to capital is derived by dividing total debt plus the net present value of operating leases by total debt plus equity plus the net present value of operating leases. We believe these measures are important in managing our capital structure to allow efficient access to the debt market while minimizing our cost of capital. In 2005, our debt to capital ratio improved due to a $715 million reduction in our debt level and an increase in equity resulting from earnings. Our lease adjusted debt to capital improved to a lesser extent due to an increase in the present value of operating leases, which were approximately $3.2 billion and $2.3 billion at December 31, 2005 and 2004, respectively, using a discount rate of 8%.

## LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2005, our principal sources of liquidity included cash, cash equivalents, the sale of receivables, and our revolving credit facilities, as well as the availability of commercial paper and other sources of financing through the capital markets. We had $2 billion of credit facilities available, of which there were no borrowings outstanding as of December 31, 2005. The sale of receivables program is subject to certain requirements, including the maintenance of an investment grade bond rating. If our bond rating were to deteriorate, it could have an adverse impact on our liquidity. The value of the outstanding undivided interest held by investors under the

program was $600 million as of December 31, 2005. Access to commercial paper is dependent on market conditions. Deterioration of our operating results or financial condition due to internal or external factors could negatively impact our ability to utilize commercial paper as a source of liquidity. Liquidity through the capital markets is also dependent on our financial stability.

At December 31, 2005 and 2004, we had a working capital deficit of $1,059 million and $226 million, respectively. A working capital deficit is common in our industry and does not indicate a lack of liquidity. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

## Financial Condition

| *Cash Flows*<br>*Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Cash provided by operating activities | $ 2,595 | $ 2,257 | $ 2,443 |
| Cash used in investing activities | (2,047) | (1,732) | (877) |
| Cash used in financing activities | (752) | (75) | (1,406) |
| Net change in cash and cash equivalents | $ (204) | $ 450 | $ 160 |

*Cash Provided by Operating Activities* – Higher income, lower management incentive payments in 2005 (executive bonuses, which would have been paid to individuals in 2005, were not awarded based on company performance in 2004 and bonuses for the professional workforce were significantly reduced), and working capital performance generated higher cash from operating activities in 2005. A voluntary pension contribution of $100 million in 2004 also augmented the positive year-over-year variance. This improvement was partially offset by cash received in 2004 for income tax refunds. Cash provided by operating activities decreased in 2004 driven by lower income from continuing operations, the pension contribution, and cash from discontinued operations recognized in 2003, which were partially offset by working capital performance.

*Cash Used in Investing Activities* – Increased capital spending, partially offset by higher proceeds from asset sales, increased the amount of cash used in investing activities in 2005. The comparative increase in 2004 primarily resulted from the beneficial impact of the $620 million received in 2003 for the sale of our trucking interest, which reduced cash used in investing activities in 2003. The permanent financing of locomotives and freight cars under long-term operating leases (as referenced in the Operating Lease Activities section in this Item 7) had no impact on investing cash flows during the period as all financings were completed in 2005.

*Cash Used in Financing Activities* – The increase in cash used in financing activities results from no cash inflows from the issuance of debt in 2005 (compared to $745 million in 2004) and higher debt repayments ($699 million in 2005 compared to $588 million in 2004), partially offset by higher net proceeds from equity compensation plans ($262 million in 2005 compared to $80 million in 2004). The decrease in 2004 resulted from lower debt repayments of $588 million in 2004 compared to $2.1 billion in 2003 (including $1.5 billion of CPS), partially offset by a decrease in net proceeds from equity compensation plans ($80 million in 2004 compared to $216 million in 2003) and higher dividend payments ($310 million in 2004 compared to $234 million in 2003) due to the increase of our dividend rate from $0.99 per share in 2003 to $1.20 per share in 2004.

The table below details cash capital expenditures for the years ended December 31, 2005, 2004, and 2003, including non-cash capital lease financings of $188 million in 2003. There were no non-cash capital lease financings in 2005 or 2004.

| *Capital Expenditures Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Track | $1,472 | $1,328 | $1,224 |
| Locomotives | 89 | 114 | 373 |
| Freight cars | 9 | 11 | 13 |
| Facilities and other | 599 | 423 | 330 |
| Total | $2,169 | $1,876 | $1,940 |

In 2006, we expect our cash capital expenditures to be approximately $2.2 billion. Additionally, we expect to enter into long-term operating leases for equipment with a net present value of approximately $500 million. These expenditures will be used to maintain track and structures, continue capacity expansions on our main lines in constrained corridors, remove bottlenecks, upgrade and augment equipment to better meet customer needs, build and improve facilities and terminals, and develop and implement new technologies. We expect to fund our 2006 cash capital expenditures through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2005. We expect that these sources will continue to provide sufficient funds to meet our expected capital requirements for 2006.

For the years ended December 31, 2005, 2004, and 2003, our ratio of earnings to fixed charges was 2.9, 2.1, and 3.2, respectively. The ratio of earnings to fixed charges was computed on a consolidated basis. Earnings represent income from continuing operations, less equity earnings net of distributions, plus fixed charges and income taxes. Fixed charges represent interest charges, amortization of debt discount, and the estimated amount representing the interest portion of rental charges.

## Financing Activities

**Credit Facilities** – On December 31, 2005, we had $2 billion in revolving credit facilities available, including $1 billion under a five-year facility expiring in March 2010 and $1 billion under a five-year facility expiring in March 2009 (collectively, the “facilities”). The facilities are designated for general corporate purposes and support the issuance of commercial paper. Neither of the facilities were drawn as of December 31, 2005. The five-year facility expiring in March 2010 replaced a $1 billion 364-day revolving credit facility that expired in March 2005, while the five-year facility expiring in March 2009 was put in place in 2004 to replace a five-year revolving credit facility that was due to expire in March 2005. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. These facilities allow for borrowings at floating London Interbank Offered Rates (LIBOR)-based rates, plus a spread, depending upon our senior unsecured debt ratings. The facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2005, we were in compliance with these covenants. The facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require the posting of collateral. In addition to our revolving credit facilities, we also had $150 million in uncommitted lines of credit that were unused at December 31, 2005. We established two $75 million uncommitted lines of credit in May and July 2005, which will expire in May and July 2006, respectively.

At December 31, 2004, approximately $440 million of short-term borrowings that we intended to refinance were reclassified as long-term debt. This reclassification reflected our ability and intent to refinance these short-term borrowings and current maturities of long-term debt on a long-term basis. At December 31, 2005, we did not reclassify any short-term debt to a long-term basis.

**Dividend Restrictions** – We are subject to certain restrictions related to the payment of cash dividends to our shareholders due to minimum net worth requirements under our credit facilities. Retained earnings available for

dividends increased to $6.2 billion at December 31, 2005, from $5.2 billion at December 31, 2004. We do not expect that these restrictions will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Shelf Registration Statement** – Under a current shelf registration statement, we may issue any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2005, we had $500 million remaining for issuance under the current shelf registration statement. We have no immediate plans to issue any securities; however, we routinely consider and evaluate opportunities to replace existing debt or access capital through issuances of debt securities under this shelf registration, and, therefore, we may issue debt securities at any time.

## Operating Lease Activities

As of December 31, 2005, our contractual obligations for operating leases totaled approximately $4.9 billion. Discounted at 8%, the present value of this obligation was approximately $3.2 billion. The Railroad entered into lease arrangements during 2005 to finance its new equipment acquisition program. In 2005, the Railroad, as lessee, entered into long-term operating lease arrangements covering 317 locomotives and approximately 2,900 freight cars. The lessors under these lease arrangements purchased the locomotives and freight cars from the Corporation through various financing transactions that totaled approximately $838 million, with a present value of $690 million. These new lease arrangements provide for minimum total rental payments of approximately $1.2 billion, which are reflected in the contractual obligations table as of December 31, 2005.

The lessors financed the purchase of the locomotives and freight cars, in part, by the issuance of equipment notes that are non-recourse to the Railroad and are secured by an assignment of the underlying leases and a security interest in the equipment. Neither the Railroad nor UPC guarantees payment of the equipment notes. The Railroad's obligations to make operating lease payments under the leases are recourse obligations and are not recorded in the Consolidated Statements of Financial Position.

The Railroad has certain renewal and purchase options with respect to the locomotives and freight cars. If the Railroad elects not to exercise any such options, the equipment will be returned to the lessors at the end of the lease term.

On July 8, 2005, the Railroad completed the acquisition of its partner's interest in Bay Pacific Financial L.L.C., a joint venture established to assist in the acquisition of containers and chassis for use by the Railroad in intermodal service, for a purchase price of $51 million. As a result of the acquisition, the Railroad owns 100% of the joint venture. Total minimum rental payments for operating leases acquired in the acquisition were $202 million at the time of acquisition.

## Off-Balance Sheet Arrangements, Contractual Obligations, and Commitments

As described in the notes to the Financial Statements and Supplementary Data, Item 8, and as referenced in the tables below, we have contractual obligations and commercial commitments that may affect our financial condition. However, based on our assessment of the underlying provisions and circumstances of our material contractual obligations and commercial commitments, including material sources of off-balance sheet and structured finance arrangements, there is no known trend, demand, commitment, event, or uncertainty that is reasonably likely to occur that would have a material adverse effect on our consolidated results of operations, financial condition, or liquidity. In addition, the commercial obligations, financings, and commitments made by us are customary transactions that are similar to those of other comparable corporations, particularly within the transportation industry.

The following tables identify material obligations and commitments as of December 31, 2005:

| *Contractual Obligations Millions of Dollars* | *Total* | *Payments Due by Period* 2006 | 2007 | 2008 | 2009 | 2010 | *After 2010* |
|---|---|---|---|---|---|---|---|
| Debt [a] | $10,082 | $ 931 | $1,034 | $ 892 | $ 694 | $ 608 | $ 5,923 |
| Operating leases | 4,934 | 615 | 517 | 450 | 405 | 359 | 2,588 |
| Capital lease obligations [b] | 2,100 | 199 | 179 | 172 | 167 | 147 | 1,236 |
| Purchase obligations [c] | 3,861 | 706 | 508 | 402 | 394 | 189 | 1,662 |
| Other post retirement benefits [d] | 479 | 42 | 45 | 46 | 48 | 49 | 249 |
| Total contractual obligations | $21,456 | $2,493 | $2,283 | $1,962 | $1,708 | $1,352 | $11,658 |

*[a] Excludes capital lease obligations of $1,318 million, unamortized discount of $142 million, and market value adjustments of $(16) million for debt with qualifying hedges that are recorded as assets on the Consolidated Statements of Financial Position. Includes an interest component of $3,826 million.*

*[b] Represents total obligations, including interest component of $782 million.*

*[c] Purchase obligations include locomotive maintenance contracts; purchase commitments for locomotives, ties, ballast, and track; and agreements to purchase other goods and services.*

*[d] Includes estimated other postretirement, medical, and life insurance payments and payments made under the unfunded pension plan for the next ten years. No amounts are included for funded pension as no contributions are currently required.*

| *Other Commercial Commitments Millions of Dollars* | *Total* | *Amount of Commitment Expiration per Period* 2006 | 2007 | 2008 | 2009 | 2010 | *After 2010* |
|---|---|---|---|---|---|---|---|
| Credit facilities [a] | $2,000 | $ - | $ - | $ - | $1,000 | $1,000 | $ - |
| Sale of receivables [b] | 600 | 600 | - | - | - | - | - |
| Guarantees [c] | 486 | 5 | 5 | 9 | 18 | 44 | 405 |
| Standby letters of credit [d] | 55 | 42 | 13 | - | - | - | - |
| Total commercial commitments | $3,141 | $647 | $18 | $9 | $1,018 | $1,044 | $405 |

*[a] None of the credit facilities were used as of December 31, 2005.*

*[b] $600 million of the facility was utilized at December 31, 2005.*

*[c] Includes guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations.*

*[d] None of the letters of credit were drawn upon as of December 31, 2005.*

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at December 31, 2005. The value of the outstanding undivided interest held by investors under the facility was $600 million and $590 million at December 31, 2005 and 2004, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,226 million and $1,089 million of accounts receivable held by UPRI at December 31, 2005 and 2004, respectively. At December 31, 2005 and 2004, the value of the interest retained by UPRI was $626 million and $499 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and

dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate the Railroad for its responsibilities. The Railroad collected approximately $13.4 billion and $12.2 billion during the years ended December 31, 2005 and 2004, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $23 million, $11 million, and $10 million for 2005, 2004, and 2003, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad have no recourse to the assets of UPRI. On August 11, 2005, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

**Guarantees** – At December 31, 2005, we were contingently liable for $486 million in guarantees. We recorded a liability of $7 million for the fair value of these obligations as of December 31, 2005. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

## OTHER MATTERS

**Inflation** – The cumulative effect of long periods of inflation significantly increases asset replacement costs for capital-intensive companies. As a result, assuming that we replace all operating assets at current price levels, depreciation charges (on an inflation-adjusted basis) would be substantially greater than historically reported amounts.

**Derivative Financial Instruments** – We use derivative financial instruments in limited instances for other than trading purposes to manage risk related to changes in fuel prices and to achieve our interest rate objectives. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. We may use swaps, collars, futures, and/or forward contracts to mitigate the downside risk of adverse price movements and to hedge the exposure to variable cash flows. The use of these instruments also limits future benefits from favorable movements. The purpose of these programs is to protect our operating margins and overall profitability from adverse fuel price changes or interest rate fluctuations.

*Market and Credit Risk* – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2005 and 2004, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

In addition, we enter into secured financings in which the debtor pledges collateral. The nature of the financing and the credit risk of the debtor determine the collateral. These arrangements generally prohibit us from selling or repledging the collateral unless the debtor defaults.

*Determination of Fair Value* – We determined the fair values of our derivative financial instrument positions at December 31, 2005 and 2004 based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, LIBOR, or swap spread.

*Sensitivity Analyses* – The sensitivity analyses that follow illustrate the economic effect that hypothetical changes in interest rates could have on our results of operations and financial condition. These hypothetical changes do not consider other factors that could impact actual results.

*Interest Rate Fair Value Hedges* – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

At December 31, 2005 and 2004, we had variable-rate debt representing approximately 10% and 9%, respectively, of our total debt. If variable interest rates average one percentage point higher in 2006 than our December 31, 2005 variable rate, which was approximately 7%, our interest expense would increase by approximately $7 million. If variable interest rates averaged one percentage point higher in 2005 than our December 31, 2004 variable rate, which was approximately 5%, our interest expense would have increased by approximately $8 million. These amounts were determined by considering the impact of the hypothetical interest rates on the balances of our variable-rate debt at December 31, 2005 and 2004, respectively.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in the benchmark interest rate (LIBOR). We accounted for the swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* therefore, we did not record any ineffectiveness within our Consolidated Financial Statements. As of December 31, 2005 and 2004, we had interest rate swaps hedging debt of $750 million.

Market risk for fixed-rate debt is estimated as the potential increase in fair value resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2005, and amounts to approximately $535 million at December 31, 2005. Market risk resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2004, amounted to approximately $599 million at December 31, 2004. We estimated the fair values of our fixed-rate debt by considering the impact of the hypothetical interest rates on quoted market prices and current borrowing rates.

*Interest Rate Cash Flow Hedges* – We report changes in the fair value of cash flow hedges in accumulated other comprehensive income until the hedged item affects earnings.

In 2004, we entered into treasury lock transactions, which are accounted for as cash flow hedges. These treasury lock transactions resulted in a payment of $11 million that is being amortized on a straight-line basis over 10 years, ending September 30, 2014. The unamortized portion of the payment is recorded as a $6 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss at December 31, 2005. As of December 31, 2005 and 2004, we had no interest rate cash flow hedges outstanding.

*Fuel Cash Flow Hedges* – Fuel costs are a significant portion of our total operating expenses. In 2005 and 2004, our primary means of mitigating the impact of adverse fuel price changes was our fuel surcharge programs. However, we may use swaps, collars, futures and/or forward contracts to further mitigate the impact of adverse fuel price changes. We hedged 120 million gallons of fuel during 2004 using collars with average cap, floor, and ceiling prices of $0.74, $0.64, and $0.86 per gallon, respectively. At December 31, 2004, there were no fuel hedges outstanding, and we did not have any fuel hedges in place during 2005.

**Accounting Pronouncements** – In December 2004, the FASB issued Statement No. 123(R), *Share-Based Payment.* The statement requires that we recognize compensation expense equal to the fair value of stock options or other share-based payments starting January 1, 2006. We adopted the statement on a modified prospective basis, using the Black-Scholes option-pricing model to calculate the fair value of stock options. We expect that the incremental, full-year compensation expense in 2006 related to the adoption of the statement will be approximately $13 million for new awards granted after January 1, 2006 and an additional $2 million for the unvested portion of awards granted in prior years. The expense for awards granted after implementation of the statement will be based upon their grant-date fair value. The expense for those awards will be based on the estimated number of awards that are expected to vest. That estimate will be revised if subsequent information indicates that the actual number of awards to vest will differ from the estimate. The estimate does not materially impact our calculation of compensation expense.

In March 2005, the FASB issued FASB Interpretation No. 47, *Accounting for Conditional Asset Retirement Obligations – an interpretation of FASB Statement No. 143* (FIN 47). This interpretation clarifies that the term conditional asset retirement obligations, as used in FASB Statement No. 143, refers to a legal obligation to perform an asset retirement activity in which the timing or method of settlement, or both, are conditional on a future event that may or may not be within the control of the entity. An entity must recognize a liability for the fair value of a conditional asset retirement obligation if the fair value of the liability can be reasonably estimated. We assessed the impact of the interpretation on our financial statements, determined that we have a legal obligation to properly dispose of asbestos-containing materials, and recorded a $5 million liability at December 31, 2005, for the fair value of this obligation.

In May 2005, the FASB issued FAS 154, *Accounting Changes and Error Corrections, a Replacement of APB Opinion No. 20 and FASB Statement No. 3.* This statement requires retrospective application to prior periods' financial statements of changes in accounting principle, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. It carries forward without change the previous guidance for reporting the correction of an error and a change in accounting estimate. FAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005.

In July 2005, the FASB issued an exposure draft, *Accounting for Uncertain Tax Positions, an Interpretation of FASB Statement No. 109*. As drafted, the interpretation would require companies to recognize the best estimate of the impact of a tax position only if that position is probable of being sustained during a tax audit. However, in November 2005 the FASB voted to replace the probable threshold with a more-likely-than-not criterion when determining if the impact of a tax position should be recorded. The FASB expects to issue a final interpretation in the first quarter of 2006. When it is available, we will review the final interpretation to determine the impact it may have on our Consolidated Financial Statements.

In September 2005, the FASB issued an exposure draft, *Earnings per Share, an Amendment of FASB Statement No. 128*. The draft clarifies guidance for the treasury stock method, contracts that may be settled in cash or shares, and contingently issuable shares. The FASB expects to issue a final statement in the first quarter of 2006. We are currently reviewing this proposed exposure draft to determine the impact it may have on our calculation of earnings per share.

In December 2005, the FASB deliberated issues relating to the limited-scope, first phase of its project to reconsider the accounting for postretirement benefits, including pensions. The FASB decided that the objectives and scope of this phase include, among other items, recognizing the overfunded or underfunded status of defined benefit postretirement plans as an asset or a liability in the statement of financial position. The FASB expects to issue an exposure draft for the initial phase in the first quarter of 2006. In the second multi-year phase of the project, the FASB expects to comprehensively consider a variety of issues related to the accounting for postretirement benefits, including expense recognition, obligation measurement, and whether postretirement benefit trusts should be consolidated by the plan sponsor. We will review the proposed standards when they are available to determine the impact they may have on our Consolidated Financial Statements.

**Commitments and Contingencies** – Various claims and lawsuits are pending against us and certain of our subsidiaries. We are also subject to various federal, state and local environmental laws and regulations, pursuant to which we are currently participating in the investigation and remediation of various sites. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity after taking into account liabilities previously recorded for these matters.

## CRITICAL ACCOUNTING POLICIES

Our Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires estimation and judgment that affect the reported amounts of revenues, expenses, assets, and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The following critical accounting policies are a subset of our significant accounting policies described in the notes to the Financial Statements and Supplementary Data, Item 8. These critical accounting policies affect significant areas of our financial statements and involve judgment and estimates. If these estimates differ significantly from actual results, the impact on our Consolidated Financial Statements may be material.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. A liability for resolving both asserted and unasserted asbestos-related claims through 2034 has been estimated and recorded. During 2004, we engaged a third-party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing our potential liability. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of claims received in 2005 will be consistent with average claims received between 2000 and 2003.
- The number of claims to be filed against us will decline each year after 2005.
- The average settlement values for asserted and unasserted claims will be equivalent to those experienced between 2002 and 2004.
- The percentage of claims dismissed between 2002 and 2004 will continue through 2034.

At December 31, 2005 and 2004, $311 million and $324 million, respectively, was classified as liabilities on the Consolidated Statement of Financial Position, of which $16 million and $17 million, respectively, was classified as current accrued casualty costs. Approximately 16% of the recorded liability related to asserted claims and approximately 84% related to unasserted claims. These claims are expected to be paid out over the next 29 years. We have insurance coverage for a portion of the costs incurred to resolve asbestos-related claims, and we have recognized an asset for estimated insurance recoveries.

Our asbestos-related claims activity was as follows:

| *Claims Activity* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Open claims, beginning balance | 2,316 | 2,560 | 1,541 |
| New claims | 741 | 474 | 1,612 |
| Settled or dismissed claims | (622) | (718) | (593) |
| Open claims, ending balance at December 31 | 2,435 | 2,316 | 2,560 |

We believe that our liability for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes in the litigation environment, federal and state law governing compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

Additionally, we have a legal obligation to properly dispose of asbestos-containing materials. The estimated fair value of this obligation is $5 million at December 31, 2005, which is recorded as a liability on the Consolidated Statements of Financial Position pursuant to FIN 47.

**Environmental** – We are subject to federal, state, and local environmental laws and regulations. We identified 370 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 43 sites that are the subject of actions taken by the U.S. government, 23 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When we identify an environmental issue with respect to property owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and we can reasonably estimate such costs. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

Environmental expenses for the years ended December 31, 2005, 2004, and 2003 were $45 million, $46 million, and $26 million, respectively. As of December 31, 2005 and 2004, we had a liability of $213 million and $201 million, respectively, accrued for future environmental costs, of which $46 million and $50 million, respectively, were recorded in current liabilities as accrued casualty costs. The liability includes future costs for remediation and restoration of sites, as well as ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. The ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Current obligations are not expected to have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us with measuring the expense and liability, including unasserted claims. The Federal Employers' Liability Act (FELA) governs compensation for work-related accidents. Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work. Annual expenses for personal injury-related events were $247 million in 2005, $288 million in 2004, and $250 million in 2003. As of December 31, 2005 and 2004, we had accrued liabilities of $619 million and $639 million for future personal injury costs, respectively, of which $274 million was recorded in current liabilities as accrued casualty costs in both years. Estimates can vary over time due to evolving trends in litigation.

Our personal injury claims activity was as follows:

| *Claims Activity* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Open claims, beginning balance | 4,028 | 4,085 | 4,116 |
| New claims | 4,584 | 4,366 | 4,494 |
| Settled or dismissed claims | (4,415) | (4,423) | (4,525) |
| Open claims, ending balance at December 31 | 4,197 | 4,028 | 4,085 |

**Depreciation** – The railroad industry is capital intensive. Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The lives are calculated using a separate composite annual percentage rate for each depreciable property group, based on the results of a depreciation study. We are required to submit a report on depreciation studies and proposed depreciation rates every three years for equipment property and every six years for road property to the STB for review and approval. The cost (net of salvage) of depreciable railroad property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of internally developed software is capitalized and amortized over a five-year period. An obsolescence review of capitalized software is performed on a periodic basis.

Capital spending in recent years has increased the total value of our depreciable assets. Cash capital spending totaled $2.2 billion for the year ended December 31, 2005. In 2003, we implemented depreciation studies, approved by the STB, resulting in lower depreciation expense of $50 million for the year ended December 31, 2003, due to a reduction in depreciation rates for certain track assets (effective January 1, 2003), partially offset by increased rates for locomotives and other assets (effective July 1, 2003). For the year ended December 31, 2005, depreciation expense was $1.2 billion. Various methods are used to estimate useful lives for each group of depreciable property. Due to the capital intensive nature of the business and the large base of depreciable assets, variances to those estimates could have a material effect on our Consolidated Financial Statements. If the estimated useful lives of all depreciable assets were increased by one year, annual depreciation expense would decrease by approximately $40 million. If the estimated useful lives of all assets to be depreciated were decreased by one year, annual depreciation expense would increase by approximately $43 million.

**Income Taxes** – As required under Financial Accounting Standards Board (FASB) Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations. For example, a 1% increase in the federal income tax rate would increase our deferred tax liability by approximately $240 million.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based in part on management's judgments regarding the best available evidence about future events. Based on that analysis, we have recorded a valuation allowance of $5 million and $11 million against certain deferred tax assets as of December 31, 2005 and 2004, respectively.

**Insurance Subsidiaries** – We have two consolidated, wholly-owned subsidiaries that provide insurance coverage for certain risks, including physical loss or property damage and certain other claims that are subject to reinsurance. At December 31, 2005, current accounts receivable and current accrued casualty costs included $65 million for reinsurance receivables and reinsured liability, respectively, held by one of our insurance subsidiaries

related to losses sustained during the West Coast storm in January 2005. This amount may change in the future as facts and circumstances surrounding the claim and the reinsurance are finalized and settled. We collected a partial recovery of our claim from reinsurance of $25 million during the fourth quarter of 2005.

**Pension and Other Postretirement Benefits** – We use third-party actuaries to assist us in properly measuring the liabilities and expenses associated with providing pension and defined contribution medical and life insurance benefits (OPEB) to eligible employees. In order to use actuarial methods to value the liabilities and expenses we must make several assumptions. The critical assumptions used to measure pension obligations and expenses are the discount rate and expected rate of return on pension assets. For other postretirement benefits, the critical assumptions are the discount rate and healthcare cost trend rate.

We evaluate our critical assumptions at least annually, and selected assumptions are based on the following factors:

- Discount rate is based on a hypothetical portfolio of high quality bonds with cash flows matching our plans' expected benefit payments.

- Expected return on plan assets is based on our asset allocation mix and our historical return, taking into consideration current and expected market conditions.

- Healthcare cost trend rate is based on our historical rates of inflation and expected market conditions.

The following tables present the key assumptions used to measure pension and OPEB expense for 2005 and the estimated impact on 2005 pension and OPEB expense relative to a change in those assumptions:

| *Assumptions* | *Pension* | *OPEB* |
|---|---|---|
| Discount rate | 6.00% | 6.00% |
| Expected return on plan assets | 8.00% | N/A |
| Healthcare cost trend rate: | | |
| Current | N/A | 11.00% |
| Level in 2010 | N/A | 5.00% |

| *Sensitivities* | *Increase in Expense* | |
|---|---|---|
| *Millions of Dollars* | *Pension* | *OPEB* |
| 0.25% decrease in discount rate | $5 | $ 1 |
| 0.25% decrease in expected return on plan assets | $4 | N/A |
| 1% increase in healthcare cost trend rate | N/A | $13 |

## CAUTIONARY INFORMATION

Certain statements in this report, and statements in other material filed or to be filed with the Securities and Exchange Commission (as well as information included in oral statements or other written statements made or to be made by us), are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, without limitation, statements regarding: expectations as to operational or service improvements; statements concerning expectations of the effectiveness of steps taken or to be taken to improve operations, service, or to stabilize the rail system, infrastructure improvements, transportation plan modifications, and management of customer traffic on the system to meet demand; expectations as to cost savings, revenue growth, and earnings; the time by which certain objectives will be achieved; statements or information concerning projections, predictions, expectations,

estimates, or forecasts as to our business, financial and operational results, future economic performance, and general economic conditions; statements of management's goals and objectives; proposed new products and services; estimates of costs relating to environmental remediation and restoration; expectations that claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated financial condition, results of operations, or liquidity and any other similar expressions concerning matters that are not historical facts.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved, including expectations as to improvement of operational, service, and network fluidity improvements. Forward-looking information is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

The following important factors, in addition to those discussed in Risk Factors in Item 1A, could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements:

- whether we are successful in implementing our financial and operational initiatives, including gaining new customers, retaining existing ones, increasing prices for our services, and containing operating costs;

- whether we are successful in improving network operations and service by improving infrastructure; reviewing, assessing, and, as necessary, redesigning our transportation plan; managing network volume, and undertaking other efficiency and productivity initiatives;

- claims and litigation, including those related to environmental contamination, personal injuries, and occupational illnesses arising from hearing loss, repetitive motion, and exposure to asbestos and diesel fumes;

- legislative and regulatory developments, including possible legislation to re-regulate the rail industry;

- any adverse economic or operational repercussions related to the transportation of hazardous materials, which we are required to transport under federal law;

- natural events such as severe weather, fire, hurricanes, floods, earthquakes, or other disruptions of our operating systems, structures, and equipment;

- the impact of ongoing track maintenance and restoration in the SPRB;

- changes in fuel prices, including price increases caused by the effects of severe weather, other events, or disruptions of domestic refining capacity;

- material adverse changes in economic and industry conditions, both within the United States and globally;

- adverse economic conditions affecting customer demand and the industries and geographic areas that produce and consume commodities we carry;

- transportation industry competition, conditions, performance, and consolidation;

- changes in labor costs, including healthcare cost increases, and labor difficulties, including stoppages affecting either our operations or our customers' abilities to deliver goods to us for shipment;

- legislative, regulatory, or legal developments involving taxation, including new federal or state income tax rates, revisions of controlling authority, and tax claims and litigation;
- changes in securities and capital markets; and
- terrorist activities, or other similar events, and any governmental response thereto; war or risk of war.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

### Item 7A. Quantitative and Qualitative Disclosures about Market Risk

Information concerning market risk sensitive instruments is set forth under Management's Discussion and Analysis of Financial Condition and Results of Operations – Other Matters, Item 7.

***************************************

## Item 8. Financial Statements and Supplementary Data

**Index to Consolidated Financial Statements** **Page**

Report of Independent Registered Public Accounting Firm . . . . . 44

Consolidated Statements of Income
For the Years Ended December 31, 2005, 2004, and 2003 . . . . . 45

Consolidated Statements of Financial Position
At December 31, 2005 and 2004 . . . . . 46

Consolidated Statements of Cash Flows
For the Years Ended December 31, 2005, 2004, and 2003 . . . . . 47

Consolidated Statements of Changes in Common Shareholders' Equity
For the Years Ended December 31, 2005, 2004, and 2003 . . . . . 48

Notes to the Consolidated Financial Statements . . . . . 49

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the accompanying consolidated statements of financial position of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2005 and 2004, and the related consolidated statements of income, changes in common shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2005. Our audits also included the consolidated financial statement schedule listed in the Table of Contents at Part IV, Item 15. These consolidated financial statements and consolidated financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the consolidated financial statements and consolidated financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Union Pacific Corporation and Subsidiary Companies at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such consolidated financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 12 to the consolidated financial statements, the Corporation changed its method of accounting for asset retirement obligations in 2003.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 17, 2006 expressed an unqualified opinion on management's assessment of the effectiveness of the Corporation's internal control over financial reporting and an unqualified opinion on the effectiveness of the Corporation's internal control over financial reporting.

Deloitte & Touche LLP

Omaha, Nebraska
February 17, 2006

## CONSOLIDATED STATEMENTS OF INCOME

*Union Pacific Corporation and Subsidiary Companies*

| *Millions, Except Per Share Amounts, for the Years Ended December 31,* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Operating revenues | $13,578 | $12,215 | $11,551 |
| Operating expenses: | | | |
| Salaries, wages, and employee benefits | 4,375 | 4,167 | 3,892 |
| Fuel and utilities | 2,562 | 1,816 | 1,341 |
| Equipment and other rents | 1,402 | 1,374 | 1,221 |
| Depreciation | 1,175 | 1,111 | 1,067 |
| Materials and supplies | 546 | 488 | 414 |
| Casualty costs | 411 | 694 | 416 |
| Purchased services and other costs | 1,312 | 1,270 | 1,067 |
| Total operating expenses | 11,783 | 10,920 | 9,418 |
| Operating income | 1,795 | 1,295 | 2,133 |
| Other income | 145 | 88 | 78 |
| Interest expense | (504) | (527) | (574) |
| Income before income taxes | 1,436 | 856 | 1,637 |
| Income taxes | (410) | (252) | (581) |
| Income from continuing operations | 1,026 | 604 | 1,056 |
| Income from discontinued operations, (including gain on sale of $211 in 2003) net of tax benefit of $96 in 2003 | - | - | 255 |
| Cumulative effect of accounting change, net of income tax expense of $167 | - | - | 274 |
| Net income | $ 1,026 | $ 604 | $ 1,585 |
| **Share and Per Share** | | | |
| Basic: | | | |
| Income from continuing operations | $ 3.89 | $ 2.33 | $ 4.15 |
| Income from discontinued operations | - | - | 1.00 |
| Cumulative effect of accounting change | - | - | 1.08 |
| Net income | $ 3.89 | $ 2.33 | $ 6.23 |
| Diluted: | | | |
| Income from continuing operations | $ 3.85 | $ 2.30 | $ 4.07 |
| Income from discontinued operations | - | - | 0.95 |
| Cumulative effect of accounting change | - | - | 1.02 |
| Net income | $ 3.85 | $ 2.30 | $ 6.04 |
| Weighted average number of shares (Basic) | 263.4 | 259.1 | 254.4 |
| Weighted average number of shares (Diluted) | 266.5 | 262.2 | 268.0 |
| Dividends declared | $ 1.20 | $ 1.20 | $ 0.99 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, as of December 31,* | *2005* | *2004* |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 773 | $ 977 |
| Accounts receivable, net | 747 | 545 |
| Materials and supplies | 331 | 309 |
| Current deferred income taxes | 304 | 288 |
| Other current assets | 170 | 178 |
| Total current assets | 2,325 | 2,297 |
| Investments: | | |
| Investments in and advances to affiliated companies | 789 | 742 |
| Other investments | 17 | 25 |
| Total investments | 806 | 767 |
| Properties: | | |
| Road | 33,812 | 31,948 |
| Equipment | 7,675 | 7,733 |
| Other | 210 | 226 |
| Total cost | 41,697 | 39,907 |
| Accumulated depreciation | (9,722) | (8,893) |
| Net properties | 31,975 | 31,014 |
| Other assets | 514 | 518 |
| Total assets | $35,620 | $34,596 |
| **Liabilities and Common Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 783 | $ 590 |
| Accrued wages and vacation | 415 | 384 |
| Accrued casualty costs | 478 | 419 |
| Income and other taxes | 212 | 208 |
| Dividends and interest | 252 | 256 |
| Debt due within one year | 656 | 150 |
| Equipment rents payable | 130 | 130 |
| Other current liabilities | 458 | 394 |
| Total current liabilities | 3,384 | 2,531 |
| Debt due after one year | 6,760 | 7,981 |
| Deferred income taxes | 9,482 | 9,180 |
| Accrued casualty costs | 876 | 884 |
| Retiree benefits obligation | 855 | 885 |
| Other long-term liabilities | 556 | 480 |
| Commitments and contingencies (note 9) | | |
| Total liabilities | 21,913 | 21,941 |
| Common shareholders' equity: | | |
| Common shares, par value $2.50 per share, 500,000,000 shares authorized; 275,798,611 and 275,694,761 shares issued, respectively | 689 | 689 |
| Paid-in-surplus | 3,915 | 3,917 |
| Retained earnings | 9,932 | 9,222 |
| Treasury stock | (599) | (936) |
| Accumulated other comprehensive loss | (230) | (237) |
| Total common shareholders' equity | 13,707 | 12,655 |
| Total liabilities and common shareholders' equity | $35,620 | $34,596 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | *2005* | *2004* | *2003* |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | $ 1,026 | $ 604 | $ 1,585 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Income from discontinued operations | - | - | (255) |
| Cumulative effect of accounting change | - | - | (274) |
| Depreciation | 1,175 | 1,111 | 1,067 |
| Deferred income taxes | 320 | 359 | 494 |
| Net gain from asset sales | (135) | (69) | (84) |
| Other, net | 58 | 156 | (120) |
| Changes in current assets and liabilities, net | 151 | 96 | 30 |
| Cash provided by operating activities | 2,595 | 2,257 | 2,443 |
| **Investing Activities** | | | |
| Capital investments | (2,169) | (1,876) | (1,752) |
| Proceeds from asset sales | 185 | 145 | 150 |
| Proceeds from sale of discontinued operations | - | - | 620 |
| Other investing activities, net | (63) | (1) | 105 |
| Cash used in investing activities | (2,047) | (1,732) | (877) |
| **Financing Activities** | | | |
| Dividends paid | (314) | (310) | (234) |
| Debt repaid | (699) | (588) | (2,117) |
| Debt issued | - | 745 | 746 |
| Net proceeds from equity compensation plans | 262 | 80 | 216 |
| Other financing activities, net | (1) | (2) | (17) |
| Cash used in financing activities | (752) | (75) | (1,406) |
| Net change in cash and cash equivalents | (204) | 450 | 160 |
| Cash and cash equivalents at beginning of year | 977 | 527 | 367 |
| Cash and cash equivalents at end of year | $ 773 | $ 977 | $ 527 |
| **Changes in Current Assets and Liabilities, Net of Acquisitions** | | | |
| Accounts receivable, net | $ (201) | $ (40) | $ 59 |
| Materials and supplies | (22) | (42) | 10 |
| Other current assets | 12 | 101 | (80) |
| Accounts, wages, and vacation payable | 224 | 100 | 79 |
| Other current liabilities | 138 | (23) | (38) |
| Total | $ 151 | $ 96 | $ 30 |
| **Supplemental cash flow information:** | | | |
| Non-cash investing activity, capital lease financings | $ - | $ - | $ 188 |
| Non-cash financing activity, cash dividends declared but not yet paid | 78 | 76 | 75 |
| Cash (paid) received during the year for: | | | |
| Interest | $ (510) | $ (517) | $ (587) |
| Income taxes, net | (29) | 187 | (51) |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

# CONSOLIDATED STATEMENTS OF CHANGES IN COMMON SHAREHOLDERS' EQUITY

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars / Thousands of Shares* | *Common Shares* | *Treasury Shares* | *Common Shares* | *Paid-in-Surplus* | *Retained Earnings* | *Treasury Stock* | *Accumulated Other Comprehensive Income/(Loss): Minimum Pension Liability Adj.* | *Foreign Currency Trans. Adj.* | *Derivative Adj.* | *Total* |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at Jan. 1, 2003 | 275,579 | (21,920) | $689 | $3,946 | $7,597 | $(1,347) | $(232) | $ (9) | $ 7 | $10,651 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 1,585 | - | - | - | - | 1,585 |
| Other comp. income/(loss) from continuing operations [a] | | | - | - | - | - | 39 | (9) | (4) | 26 |
| Other comp. income/(loss) from discontinued operations [b] | | | - | - | - | - | 84 | - | - | 84 |
| Total comprehensive income/(loss) | | | - | - | 1,585 | - | 123 | (9) | (4) | 1,695 |
| Conversion, exercises of stock options, forfeitures, and other | 114 | 4,388 | - | (10) | - | 270 | - | - | - | 260 |
| Dividends declared ($0.99 per share) | - | - | - | - | (252) | - | - | - | - | (252) |
| Balance at Dec. 31, 2003 | 275,693 | (17,532) | $689 | $3,936 | $8,930 | $(1,077) | $(109) | $(18) | $ 3 | $12,354 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 604 | - | - | - | - | 604 |
| Other comp. income/(loss) [a] | | | - | - | - | - | (103) | - | (10) | (113) |
| Total comprehensive income/(loss) | | | - | - | 604 | - | (103) | - | (10) | 491 |
| Conversion, exercises of stock options, forfeitures, and other | 2 | 2,357 | - | (19) | - | 141 | - | - | - | 122 |
| Dividends declared ($1.20 per share) | - | - | - | - | (312) | - | - | - | - | (312) |
| Balance at Dec. 31, 2004 | 275,695 | (15,175) | $689 | $3,917 | $9,222 | $ (936) | $(212) | $(18) | $ (7) | $12,655 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 1,026 | - | - | - | - | 1,026 |
| Other comp. income/(loss) [a] | | | - | - | - | - | 1 | 5 | 1 | 7 |
| Total comprehensive income/(loss) | | | - | - | 1,026 | - | 1 | 5 | 1 | 1,033 |
| Conversion, exercises of stock options, forfeitures, and other | 104 | 6,011 | - | (2) | - | 337 | - | - | - | 335 |
| Dividends declared ($1.20 per share) | - | - | - | - | (316) | - | - | - | - | (316) |
| Balance at Dec. 31, 2005 | 275,799 | (9,164) | $689 | $3,915 | $9,932 | $ (599) | $(211) | $(13) | $ (6) | $13,707 |

*[a] Net of tax of $5, $(69), and $16 in 2005, 2004, and 2003, respectively.*
*[b] Net of tax of $48 in 2003.*

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the "Corporation", "UPC", "we", "us", and "our" mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as "UPRR" or the "Railroad".

## Significant Accounting Policies

**Principles of Consolidation** – The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated. The Corporation evaluates its less than majority-owned investments for consolidation pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46 (Revised 2003), *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51* (FIN 46(R)). The Corporation adopted the provisions of FIN 46(R) in June of 2003. We currently have no less than majority owned investments that require consolidation under FIN 46(R).

**Cash and Cash Equivalents** – Cash equivalents consist of investments with original maturities of three months or less.

**Materials and Supplies** – Materials and supplies are carried at the lower of average cost or market.

**Property and Depreciation** – Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of internally developed software is capitalized and amortized over a five-year period. An obsolescence review of capitalized software is performed on a periodic basis.

**Impairment of Long-lived Assets** – We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition** – We recognize commodity revenues on a percentage-of-completion basis as freight moves from origin to destination. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period with expenses recognized as incurred. Other revenue is recognized as service is performed or contractual obligations are met.

**Translation of Foreign Currency** – Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenues and expenses are translated at the average rates of exchange prevailing during the year. Unrealized adjustments are reflected within shareholders' equity as accumulated other comprehensive income or loss.

**Financial Instruments** – The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, London Interbank Offered Rates (LIBOR), or swap spread.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation** – We have several stock-based employee compensation plans, which are described more fully in note 7 of the Consolidated Financial Statements. We have accounted for those plans under the recognition and measurement principles of Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations. No stock-based employee compensation expense related to stock option grants is reflected in net income, as all options granted under those plans had a grant price equal to the market value of our common stock on the date of grant. Stock-based compensation expense related to retention shares, stock units, and other incentive plans is reflected in net income. The following table illustrates the effect on net income and earnings per share if we had applied the fair value recognition provisions of FASB Statement No. 123, *Accounting for Stock-Based Compensation* (FAS 123), to stock-based employee compensation. See note 11 to the Consolidated Financial Statements for discussion of FASB Statement No. 123 (R), *Share-Based Payment* (FAS 123(R)), related to the treatment of stock options. See note 8 of the Consolidated Financial Statements for reconciliation between basic earnings per share and diluted earnings per share.

| | *Year Ended December 31,* | | |
|---|---|---|---|
| *Millions of Dollars, Except Per Share Amounts* | *2005* | *2004* | *2003* |
| Net income, as reported | $1,026 | $ 604 | $1,585 |
| Stock-based employee compensation expense included in reported net income, net of tax | 13 | 13 | 28 |
| Total stock-based employee compensation expense determined under fair value-based method for all awards, net of tax [a] | (50) | (35) | (50) |
| Pro forma net income | $ 989 | $ 582 | $1,563 |
| EPS – basic, as reported | $ 3.89 | $2.33 | $ 6.23 |
| EPS – basic, pro forma | $ 3.75 | $2.25 | $ 6.14 |
| EPS – diluted, as reported | $ 3.85 | $2.30 | $ 6.04 |
| EPS – diluted, pro forma | $ 3.71 | $2.22 | $ 5.96 |

[a] *Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $19 million of the pro forma expense noted above. There were no reload options exercised during 2004 or 2003 and no pro forma expense for reload option grants in 2004 or 2003. Stock options exercised after the January 1, 2006 effective date of FAS 123(R) will not be eligible for the reload feature.*

**Earnings Per Share** – Basic earnings per share (EPS) are calculated on the weighted-average number of common shares outstanding during each period. Diluted EPS include shares issuable upon exercise of outstanding stock options, stock-based awards, and the potential conversion of the preferred securities where the conversion of such instruments would be dilutive.

**Use of Estimates** – Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenues, and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes** – As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based in part on management's judgments regarding the best available evidence about future events.

**Pension and Postretirement Benefits** – We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various assumptions including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates, and expected future healthcare costs. The assumptions used by us are based on our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

**Personal Injury** – The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability. Legal fees are expensed as incurred.

**Environmental** – When environmental issues have been identified with respect to property currently or formerly owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. Legal fees are expensed as incurred.

**Asbestos** – We estimate a liability for asserted and unasserted asbestos-related claims based on an assessment of the number and value of those claims. We use an external consulting firm to assist us in properly measuring the expense and liability. Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Legal fees are expensed as incurred.

**Differences in Securities and Exchange Commission (SEC) and Surface Transportation Board (STB) Accounting** – STB accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued Statement No. 143, *Accounting for Asset Retirement Obligations* (FAS 143). This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and under generally accepted accounting principles we could not accrue the cost of removal in advance. As a result, reports filed with the SEC reflect the expense of removing these assets in the period in which they are removed.

**Change in Presentation** – Certain prior year amounts have been reclassified to conform to the 2005 Consolidated Financial Statement presentation. These reclassifications were not material, individually or in aggregate, with the exception of reclassifications made to appropriately reflect the discontinued operations as discussed in note 13.

## 1. Operations and Segmentation

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity, we analyze the net financial results of the Railroad as one segment due to the integrated nature of the rail network. The Consolidated Financial Statements for 2003 also include discontinued trucking operations, consisting of Overnite Transportation Company (OTC) and Motor Cargo Industries, Inc. (Motor Cargo) (see note 13 of the Consolidated Financial Statements regarding the reclassification of our trucking segment as a discontinued operation).

**Continuing Operations** – UPRR is a Class I railroad that operates in the United States. We have 32,426 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and

providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Railroad freight is comprised of six commodity groups (percent of total commodity revenues for the year ended December 31, 2005: agricultural (15%), automotive (10%), chemicals (14%), energy (20%), industrial products (22%), and intermodal (19%)).

**Discontinued Operations** – The discontinued operations represent the operations of OTC and Motor Cargo, which were sold through an initial public offering in 2003.

## 2. Financial Instruments

**Strategy and Risk** – We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing risk related to changes in fuel prices and to achieve our interest rate objectives. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. We may use swaps, collars, futures, and/or forward contracts to mitigate the downside risk of adverse price movements and to hedge the exposure to variable cash flows. The use of these instruments also limits future benefits from favorable movements.

The purpose of these programs is to assist in protecting our operating margins and overall profitability from adverse fuel price changes or interest rate fluctuations.

**Market and Credit Risk** – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2005 and 2004, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value** – We determined the fair values of our derivative financial instrument positions at December 31, 2005 and 2004 based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, LIBOR, or swap spread.

**Interest Rate Fair Value Hedges** – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in the benchmark interest rate (LIBOR). We accounted for the swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* therefore, we did not record any ineffectiveness within our Consolidated Financial Statements.

The following is a summary of our interest rate derivatives qualifying as fair value hedges:

| *Millions of Dollars, Except Percentages* | *2005* | *2004* |
|---|---|---|
| Interest rate fair value hedging: | | |
| Amount of debt hedged | $750 | $750 |
| Percentage of total debt portfolio | 10% | 9% |
| Gross fair value asset position | $ - | $ 8 |
| Gross fair value liability position | $(17) | $ (4) |

**Interest Rate Cash Flow Hedges** – We report changes in the fair value of cash flow hedges in accumulated other comprehensive income until the hedged item affects earnings.

In 2004, we entered into treasury lock transactions, which are accounted for as cash flow hedges. These treasury lock transactions resulted in a payment of $11 million that is being amortized on a straight-line basis over 10 years, ending September 30, 2014. The unamortized portion of the payment is recorded as a $6 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss at December 31, 2005. As of December 31, 2005 and 2004, we had no interest rate cash flow hedges outstanding.

**Fuel Cash Flow Hedges** – Fuel costs are a significant portion of our total operating expenses. In 2005 and 2004, our primary means of mitigating the impact of adverse fuel price changes was our fuel surcharge programs. However, we may use swaps, collars, futures and/or forward contracts to further mitigate the impact of adverse fuel price changes. We hedged 120 million gallons of fuel during 2004 using collars with average cap, floor, and ceiling prices of $0.74, $0.64, and $0.86 per gallon, respectively. At December 31, 2004, there were no fuel hedges outstanding, and we did not have any fuel hedges in place during 2005.

**Earnings Impact** – Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31:

| *Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Decrease in interest expense from interest rate hedging | $5 | $24 | $30 |
| Decrease in fuel expense from fuel hedging | - | 14 | 28 |
| Increase in other income from interest rate swap cancellation | - | - | 5 |
| Increase in pre-tax income | $5 | $38 | $63 |

**Fair Value of Debt Instruments** – The fair value of our short- and long-term debt was estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2005 and 2004, the fair value of total debt exceeded the carrying value by approximately $460 million and $673 million, respectively. At December 31, 2005 and 2004, approximately $169 million and $282 million, respectively, of fixed-rate debt securities contained call provisions that allowed us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at December 31, 2005. The value of the outstanding undivided interest held by investors under the facility was $600 million and $590 million at December 31, 2005 and 2004, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,226 million and $1,089 million of accounts receivable held by UPRI at December 31, 2005 and 2004, respectively. At December 31,

2005 and 2004, the value of the interest retained by UPRI was $626 million and $499 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad has been designated to service the sold receivables; however, no servicing asset or liability has been recognized as the servicing fees adequately compensate the Railroad for its responsibilities. The Railroad collected approximately $13.4 billion and $12.2 billion during the years ended December 31, 2005 and 2004, respectively. UPRI used such proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $23 million, $11 million, and $10 million for 2005, 2004, and 2003, respectively. The costs include interest, program fees paid to banks, commercial paper issuance costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad have no recourse to the assets of UPRI. In August 2005, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

## 3. Income Taxes

Components of income tax expense for continuing operations were as follows for the years ended December 31:

| *Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Current income tax expense (benefit): | | | |
| Federal | $ 57 | $ (99) | $ 55 |
| State | 33 | (8) | 32 |
| Total current income tax expense (benefit) | 90 | (107) | 87 |
| Deferred income tax expense (benefit): | | | |
| Federal | 293 | 407 | 508 |
| State | 27 | (48) | (14) |
| Total deferred income tax expense (benefit) | 320 | 359 | 494 |
| Total | $410 | $ 252 | $581 |

For the years ended December 31, reconciliation between statutory and effective tax rates for continuing operations is as follows:

| *Percentages* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Federal statutory tax rate | 35.0% | 35.0% | 35.0% |
| State statutory rates, net of federal benefits | 2.9 | 2.9 | 2.9 |
| Deferred tax adjustments | (8.2) | (2.9) | (0.8) |
| Tax credits | (1.2) | (5.6) | (1.7) |
| Other | 0.1 | - | - |
| Effective tax rate | 28.6% | 29.4% | 35.5% |

Deferred income tax liabilities (assets) were comprised of the following at December 31:

| *Millions of Dollars* | *2005* | *2004* |
|---|---|---|
| Net current deferred income tax asset | $ (304) | $ (288) |
| Property | 9,216 | 9,060 |
| State taxes, net | 592 | 581 |
| Other | (326) | (461) |
| Net long-term deferred income tax liability | 9,482 | 9,180 |
| Net deferred income tax liability | $9,178 | $8,892 |

All federal income tax years prior to 1995 are closed. Federal income tax liabilities for tax years 1986 through 1994 have been resolved. Interest calculations for these years are in process and may take several years to resolve with the Internal Revenue Service (IRS). The IRS has begun its examination of the Corporation's federal income tax returns for tax years 2003 and 2004, and has completed its examinations and issued notices of deficiency for tax years 1995 through 2002. As previously reported, among their proposed adjustments is the disallowance of tax deductions claimed in connection with certain donations of property. In the fourth quarter of 2005, the IRS National Office issued a Technical Advice Memorandum that left unresolved whether the deductions were proper, pending further factual development by the IRS Examination Team. We continue to dispute the donation issue, as well as many of the other proposed adjustments, and will contest the associated tax deficiencies through the IRS Appeals process, and, if necessary, litigation.

As reported in the Corporation's Forms 10-Q for quarters ended June 30, 2005, and September 30, 2005, the final settlements for pre-1995 tax years, along with the IRS Examination Reports for tax years 1995 through 2002, among other things, were considered in a review and re-evaluation of the Corporation's estimated deferred tax assets and liabilities. This review resulted in a reduction of deferred income tax liabilities and income tax expense of $118 million in the third quarter of 2005.

The Corporation believes it has adequately reserved for federal and state income taxes, and does not expect that resolution of these examinations will have a material adverse effect on its operating results, financial condition, or liquidity.

## 4. Debt

Total debt as of December 31, 2005 and 2004, including interest rate swaps designated as hedges, is summarized below:

| *Millions of Dollars* | *2005* | *2004* |
|---|---|---|
| Short-term borrowings, reclassified as long-term debt | $ - | $ 440 |
| Notes and debentures, 2.0% to 7.4% due through 2054 [a] | 5,303 | 5,435 |
| Capitalized leases, 4.7% to 9.3% due through 2026 | 1,318 | 1,416 |
| Medium-term notes, 6.8% to 10.0% due through 2020 | 372 | 372 |
| Equipment obligations, 6.5% to 10.2% due through 2019 | 270 | 313 |
| Mortgage bonds, 4.8% due through 2030 | 60 | 60 |
| Tax-exempt financings, 4.7% to 5.7% due through 2026 | 197 | 200 |
| Unamortized discount | (104) | (105) |
| Total debt | 7,416 | 8,131 |
| Less current portion | (656) | (150) |
| Total long-term debt | $6,760 | $7,981 |

*[a] 2005 and 2004 include a collective write-down of $16 million and write-up of $2 million, respectively, due to market value adjustments for debt with qualifying hedges that are recorded as liabilities and assets, respectively, on the Consolidated Statements of Financial Position.*

**Debt Maturities** – The following table presents aggregate debt maturities as of December 31, 2005, excluding market value adjustments.

| *Millions of Dollars* | |
|---|---|
| 2006 | $ 656 |
| 2007 | 783 |
| 2008 | 681 |
| 2009 | 531 |
| 2010 | 452 |
| Thereafter | 4,329 |
| Total debt | $7,432 |

**Debt Redemption** – In May 2005, we redeemed approximately $113 million of 8.35% debentures with a maturity date of May 1, 2025.

**Mortgaged Properties** – Equipment with a carrying value of approximately $3.0 billion and $3.3 billion at December 31, 2005 and 2004, respectively, serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms on the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities** – On December 31, 2005, we had $2 billion in revolving credit facilities available, including $1 billion under a five-year facility expiring in March 2010 and $1 billion under a five-year facility expiring in March 2009 (collectively, the "facilities"). The facilities are designated for general corporate purposes and support the issuance of commercial paper. Neither of the facilities were drawn as of December 31, 2005. The five-year facility expiring in March 2010 replaced a $1 billion 364-day revolving credit facility that expired in March 2005, while the five-year facility expiring in March 2009 was put in place in 2004 to replace a five-year revolving credit facility that was due to expire in March 2005. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. These facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. The facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2005, we were in compliance with these covenants. The facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require the posting of collateral.

In addition to our revolving credit facilities, we also had $150 million in uncommitted lines of credit that were unused at December 31, 2005. We established two $75 million uncommitted lines of credit in May and July 2005, which will expire in May and July 2006, respectively.

At December 31, 2004, approximately $440 million of short-term borrowings that we intended to refinance were reclassified as long-term debt. This reclassification reflected our ability and intent to refinance these short-term borrowings and current maturities of long-term debt on a long-term basis. At December 31, 2005, we did not reclassify any short-term debt to a long-term basis.

**Dividend Restrictions** – We are subject to certain restrictions related to the payment of cash dividends to our shareholders due to minimum net worth requirements under the credit facilities referred to above. The amount of

retained earnings available for dividends was $6.2 billion and $5.2 billion at December 31, 2005 and 2004, respectively. We do not expect that these restrictions will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity. We declared dividends of $316 million in 2005 and $312 million in 2004.

**Shelf Registration Statement** – Under a current shelf registration statement, we may issue any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2005, we had $500 million remaining for issuance under the current shelf registration statement. We have no immediate plans to issue any securities; however, we routinely consider and evaluate opportunities to replace existing debt or access capital through issuances of debt securities under this shelf registration, and, therefore, we may issue debt securities at any time.

## 5. Leases

We lease certain locomotives, freight cars, and other property. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2005 were as follows:

| *Millions of Dollars* | *Operating Leases* | *Capital Leases* |
|---|---|---|
| 2006 | $ 615 | $ 199 |
| 2007 | 517 | 179 |
| 2008 | 450 | 172 |
| 2009 | 405 | 167 |
| 2010 | 359 | 147 |
| Later Years | 2,588 | 1,236 |
| Total minimum lease payments | $4,934 | $2,100 |
| Amount representing interest | N/A | (782) |
| Present value of minimum lease payments | N/A | $1,318 |

Rent expense for operating leases with terms exceeding one month was $728 million in 2005, $651 million in 2004, and $586 million in 2003. When rental payments are not made on a straight-line basis, we recognize rental expense on a straight-line basis over the lease term. Contingent rentals and sub-rentals are not significant.

## 6. Retirement Plans

### Pension and Other Postretirement Benefits

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment, with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – We provide defined contribution medical and life insurance benefits for eligible retirees. These benefits are funded as medical claims and life insurance premiums are paid.

See note 11 to the Consolidated Financial Statements for discussion of the FASB's project to reconsider the accounting for postretirement benefits, including pensions.

### Funded Status

*Projected Benefit Obligation (PBO)* – The PBO of our pension plans is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of the OPEB plan is equal to

the accumulated benefit obligation, as the present value of OPEB liabilities is not affected by salary increases. Changes in our projected benefit obligation are as follows for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2005* | *2004* | *2005* | *2004* |
| Projected benefit obligation at beginning of year | $2,058 | $1,804 | $453 | $543 |
| Service cost | 28 | 30 | 4 | 5 |
| Interest cost | 115 | 120 | 25 | 31 |
| Plan amendments | - | - | (42) | (52) |
| Actuarial loss (gain) | (18) | 219 | 70 | (34) |
| Gross benefits paid | (118) | (115) | (34) | (40) |
| Projected benefit obligation at end of year | $2,065 | $2,058 | $476 | $453 |

*Assets* – Plan assets are measured at fair value. Changes in the fair value of our plan assets are as follows for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2005* | *2004* | *2005* | *2004* |
| Fair value of plan assets at beginning of year | $1,693 | $1,520 | $ - | $ - |
| Actual return on plan assets | 123 | 180 | - | - |
| Voluntary funded pension plan contributions | - | 100 | - | - |
| Unfunded plan benefit payments | 9 | 8 | 34 | 40 |
| Gross benefits paid | (118) | (115) | (34) | (40) |
| Fair value of plan assets at end of year | $1,707 | $1,693 | $ - | $ - |

*Funded Status* – The funded status represents the difference between the PBO and the fair value of the plan assets. Below is a reconciliation of the funded status of the benefit plans to the net amounts recognized for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2005* | *2004* | *2005* | *2004* |
| Funded status at end of year | $(358) | $(365) | $(476) | $(453) |
| Unrecognized net actuarial loss | 362 | 373 | 194 | 133 |
| Unrecognized prior service cost (credit) | 31 | 39 | (156) | (144) |
| Net amounts recognized at end of year | $ 35 | $ 47 | $(438) | $(464) |

*Amounts Recorded in Consolidated Statement of Financial Position* – The net amounts represent the amount previously accrued by us for pension and OPEB costs. The following table presents the amounts recognized in the Consolidated Statements of Financial Position at December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2005* | *2004* | *2005* | *2004* |
| Prepaid benefit cost | $ 122 | $ 127 | $ - | $ - |
| Accrued benefit cost | (86) | (80) | (438) | (464) |
| Additional minimum liability | (369) | (380) | - | - |
| Intangible assets | 31 | 38 | - | - |
| Accumulated other comprehensive income | 337 | 342 | - | - |
| Net amounts recognized at end of year | $ 35 | $ 47 | $(438) | $(464) |

At December 31, 2005 and 2004, $42 million and $43 million, respectively, of the total pension and other postretirement liabilities were classified as current.

*Underfunded Accumulated Benefit Obligation* – The accumulated benefit obligation is the present value of benefits earned to date, assuming no future salary growth. The underfunded accumulated benefit obligation represents the difference between the accumulated benefit obligation and the fair value of plan assets. The projected benefit obligation, accumulated benefit obligation, and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31:

| *Millions of Dollars* | *2005* | *2004* |
|---|---|---|
| Projected benefit obligation | $(2,044) | $(2,042) |
| Accumulated benefit obligation | $(2,026) | $(2,014) |
| Fair value of plan assets | 1,685 | 1,674 |
| Underfunded accumulated benefit obligation | $ (341) | $ (340) |

The accumulated benefit obligation for all defined benefit pension plans was $2 billion at both December 31, 2005 and 2004.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | *2005* | *2004* | *2003* | *2005* | *2004* | *2003* |
| Discount rate | 5.75% | 6.0% | 6.5% | 5.75% | 6.0% | 6.5% |
| Salary increase | 2.75 | 3.0 | 3.5 | N/A | N/A | N/A |
| Healthcare cost trend rate: | | | | | | |
| Current | N/A | N/A | N/A | 10.0 | 11.0 | 9.0 |
| Level in 2010 | N/A | N/A | N/A | 5.0 | 5.0 | 5.0 |

**Expense**

Both pension and OPEB expense are determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. The expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes

changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. The expected rate of return on assets was 8% for both 2005 and 2004. Differences in actual experience in relation to assumptions are not recognized immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and other postretirement costs were as follows for the years ended December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Millions of Dollars* | *2005* | *2004* | *2003* | *2005* | *2004* | *2003* |
| Service cost | $ 28 | $ 30 | $ 27 | $ 4 | $ 5 | $ 7 |
| Interest cost | 115 | 120 | 113 | 25 | 31 | 35 |
| Expected return on plan assets | (134) | (137) | (133) | - | - | - |
| Amortization of: | | | | | | |
| Transition obligation | - | (2) | (2) | - | - | - |
| Prior service cost (credit) | 7 | 8 | 9 | (30) | (24) | (15) |
| Actuarial loss | 5 | 3 | 1 | 14 | 18 | 16 |
| Total net periodic benefit cost | $ 21 | $ 22 | $ 15 | $ 13 | $ 30 | $ 43 |

*Assumptions* – The weighted-average actuarial assumptions used to determine expense were as follows for the years ended December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | *2005* | *2004* | *2003* | *2005* | *2004* | *2003* |
| Discount rate | 6.00% | 6.50% | 6.75% | 6.00% | 6.50% | 6.75% |
| Expected return on plan assets | 8.00 | 8.00 | 8.00 | N/A | N/A | N/A |
| Salary increase | 3.00 | 3.50 | 3.75 | N/A | N/A | N/A |
| Healthcare cost trend rate: | | | | | | |
| Current | N/A | N/A | N/A | 11.00 | 9.00 | 10.00 |
| Level in 2010 | N/A | N/A | N/A | 5.00 | 5.00 | 5.00 |

The discount rate is based on a hypothetical portfolio of high quality bonds with cash flows matching our plans' expected benefit payments. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return on pension plan assets, net of fees, was approximately 7% in 2005, compared to 12% in 2004. Our historical annualized ten-year rate of return on plan assets is approximately 9%.

Assumed healthcare cost trend rates have a significant effect on the expense and liabilities reported for healthcare plans. The healthcare cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the expected healthcare cost trend rates would have the following effects on OPEB:

| *Millions of Dollars* | *One % pt. Increase* | *One % pt. Decrease* |
|---|---|---|
| Effect on total service and interest cost components. | $ 6 | $ (5) |
| Effect on accumulated benefit obligation | 90 | (74) |

**Equity Adjustment**

An additional minimum pension liability adjustment is required when our accumulated benefit obligation exceeds the fair value of our plan assets, and that difference exceeds the net pension liability recognized in the Consolidated Statements of Financial Position. The liability was recorded as a $211 million and $212 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss in 2005 and 2004, respectively.

The equity reduction may be restored to the balance sheet in future periods if the fair value of plan assets exceeds the accumulated benefit obligations. This reduction to equity does not affect net income or cash flow and has no impact on compliance with debt covenants.

**Cash Contributions**

The following table details our cash contributions for the years ended December 31, 2005 and 2004, and the expected contributions for 2006:

| | *Pension* | | |
|---|---|---|---|
| *Millions of Dollars* | *Funded* | *Unfunded* | *OPEB* |
| 2004 | $100 | $ 8 | $40 |
| 2005 | - | 9 | 34 |
| 2006 | 50 | 10 | 32 |

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Employee Retirement Income Security Act of 1974, as amended, and not more than the maximum amount deductible for tax purposes. We do not currently have minimum funding requirements under applicable employee benefit and tax laws. All contributions made to the funded pension plans for 2004 were voluntary and were made with cash generated from operations. In January 2006, we made a $50 million voluntary contribution to the funded pension plan. No further contributions are expected during 2006.

All benefit payments for other postretirement benefits are voluntary, as the postretirement plans are not funded, and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2006 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2006 though 2015:

| *Millions of Dollars* | *Pension* | *OPEB* |
|---|---|---|
| 2006 | $117 | $ 32 |
| 2007 | 119 | 34 |
| 2008 | 121 | 35 |
| 2009 | 125 | 37 |
| 2010 | 129 | 38 |
| Years 2011 – 2015 | 724 | 192 |

**Asset Allocation Strategy**

Our pension plan asset allocation at December 31, 2005 and 2004, and target allocation for 2006, are as follows:

| | *Target Allocation* | *Percentage of Plan Assets December 31,* | |
|---|---|---|---|
| *Asset Category* | *2006* | *2005* | *2004* |
| Equity securities | 65% to 75% | 75% | 73% |
| Debt securities | 20% to 30% | 24 | 27 |
| Real estate | 2% to 8% | 1 | - |
| Total | 100% | 100% | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated between equity and debt securities in order to achieve a diversification level that mitigates wide swings in investment returns. To further improve diversification, a target allocation to real estate investments has been established for future time periods. Asset allocation target ranges for equity, debt, and other portfolios are evaluated at least every three years with the assistance of an external consulting firm. Actual asset allocations are monitored monthly, and rebalancing actions are executed at least quarterly, if needed.

The majority of the plan's assets are invested in equity securities, because equity portfolios have historically provided higher returns than debt and other asset classes over extended time horizons, and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than other investments. The risk of loss in the plan's equity portfolio is mitigated by investing in a broad range of equity types. Equity diversification includes large-capitalization and small-capitalization companies, growth-oriented and value-oriented investments, and U.S. and non-U.S. securities.

Equity risks are further balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2005 and 2004. The debt portfolio is also broadly diversified and invested primarily in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 6.5 years and 6.3 years at December 31, 2005 and 2004, respectively.

The investment of pension plan assets in our securities is specifically prohibited for both the equity and debt portfolios, other than through index fund holdings.

**Other Retirement Programs**

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first six percent of compensation contributed. Our thrift plan contributions were $12 million per year in 2005, 2004, and 2003.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). Contributions made to the System are expensed as incurred and amounted to approximately $595 million in 2005, $569 million in 2004, and $562 million in 2003.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we provide certain postretirement healthcare and life insurance benefits for eligible union employees. Premiums under the plans are expensed as incurred and amounted to $41 million in 2005, $30 million in 2004, and $27 million in 2003.

## 7. Stock Options and Other Stock Plans

We have 2,938,450 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 7,140 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation. We no longer grant options or awards of restricted stock or retention shares and units under these plans.

The UP Shares Stock Option Plan of Union Pacific Corporation (UP Shares Plan) was approved by our Board of Directors on April 30, 1998. The UP Shares Plan reserved 12,000,000 shares of our common stock for issuance. The UP Shares Plan was a broad-based option program that granted options to purchase 200 shares of our common stock at $55.00 per share to eligible active employees on April 30, 1998. All options granted were non-qualified options that became exercisable on May 1, 2001, and remain exercisable until April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan. As of December 31, 2005, there were 2,096,681 options outstanding under the UP Shares Plan.

We adopted the Executive Stock Purchase Incentive Plan (ESPIP), effective October 1, 1999, in order to encourage and facilitate ownership of our common stock by our officers and other key executives. Under the ESPIP, participants purchased a total of 1,008,000 shares of our common stock with the proceeds of 6.02% interest-bearing, full recourse loans from the Corporation. Loans totaled $47 million and had a final maturity date of January 31, 2006. Deferred cash payments were to be awarded to the participants to repay interest and the loan principal if certain performance and retention criteria were met within a 40-month period ending January 31, 2003. Following satisfaction of the various performance criteria during the term of the ESPIP and continued employment with the Corporation through January 31, 2003, participants received a deferred cash payment equal to two-thirds of the outstanding principal balance of their loan plus the net accrued interest on January 31, 2003. Such payments were applied against the participants' outstanding loan balance pursuant to the terms of the ESPIP. The remaining loan balances were repaid in three equal installments on January 31, 2004, January 31, 2005, and January 31, 2006. At December 31, 2005 and 2004, the total outstanding balance of the remaining loans was $0.4 million and $1 million, respectively. All remaining loan balances were repaid as of January 31, 2006.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 550,000 shares of our common stock were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 1,000 shares of restricted shares or restricted stock units. Additionally, each non-employee director receives annually an option to purchase at fair value a number of shares of our common stock, not to exceed 5,000 shares during any calendar year, determined by dividing 60,000 by 1/3 of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. As of December 31, 2005, 5,000 restricted shares were outstanding under the Directors Plan and 155,800 options were outstanding under the Directors Plan.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 12,000,000 shares of our common stock for issuance to eligible employees of the Corporation and its subsidiaries in the form of non-qualified options, incentive stock options, retention shares, stock units, and incentive bonus awards. Non-employee directors are not eligible for awards under the 2001 Plan. As of December 31, 2005, 5,007,628 options and 880,526 retention shares and stock units were outstanding under the 2001 Plan.

The Union Pacific Corporation 2004 Stock Incentive Plan (2004 Plan) was approved by shareholders in April 2004. The 2004 Plan reserved 21,000,000 shares of our common stock for issuance, plus any shares subject to awards made under the 2001 Plan and the 1993 Plan that were outstanding on April 16, 2004, and became available for regrant pursuant to the terms of the 2004 Plan. Under the 2004 Plan, non-qualified options, stock

appreciation rights, retention shares, stock units, and incentive bonus awards may be granted to eligible employees of the Corporation and its subsidiaries. Non-employee directors are not eligible for awards under the 2004 Plan. As of December 31, 2005, 2,237,650 options and 124,750 retention shares and stock units were outstanding under the 2004 Plan.

In January 2006, our Board of Directors approved a new Long Term Plan (LTP). Participants were awarded stock units subject to the attainment of certain performance targets and continued employment through January 31, 2009. The LTP performance criteria used to determine the number of stock units that will be earned during the 37-month performance period is annual return on invested capital (ROIC), calculated by the Compensation and Benefits Committee of the Board of Directors, which may be adjusted to reflect the effect of special transactions or events such as significant gains on the sale of real estate, tax adjustments, accounting changes or reclassifications. At the end of year one of the performance period, a participant may earn up to one-third of the target number of stock units granted to him or her based on the first year of ROIC performance achieved. At the end of year two, the participant may earn additional stock units up to a total of two-thirds of the target number of stock units granted to him or her based on the average of the first two years of ROIC performance achieved. During year three of the performance period, the participant may earn up to 200% of the target number of stock units granted to him or her based on the average of all three years of ROIC performance achieved. Stock units that are earned under the LTP will be paid out in shares of our common stock.

Pursuant to the above plans, 19,303,495; 21,571,309; and 6,899,211 shares of our common stock were available for grant at December 31, 2005, 2004, and 2003, respectively.

**Options** – Stock options are granted with an exercise price equal to the fair market value of our common stock as of the date of the grant. Options are granted with a 10-year term and are generally exercisable one to two years after the date of the grant. A summary of the stock options issued under the 1993 Plan, the UP Shares Plan, the Directors Plan, the 2001 Plan, and the 2004 Plan, and changes during the years ending December 31 are as follows:

| | *Year Ended December 31,* | | | | | |
|---|---|---|---|---|---|---|
| | *2005* | | *2004* | | *2003* | |
| | *Shares* | *Weighted-Average Exercise Price* | *Shares* | *Weighted-Average Exercise Price* | *Shares* | *Weighted-Average Exercise Price* |
| Outstanding, beginning of year | 17,522,133 | $56.17 | 18,515,231 | $53.75 | 21,352,105 | $53.00 |
| Granted | 4,462,260 | 64.71 | 2,220,450 | 65.04 | 2,398,300 | 55.98 |
| Exercised | (9,408,918) | 55.91 | (2,942,406) | 47.52 | (4,955,725) | 51.58 |
| Forfeited | (139,266) | 57.88 | (271,142) | 57.23 | (279,449) | 54.69 |
| Outstanding, end of year | 12,436,209 | $59.41 | 17,522,133 | $56.17 | 18,515,231 | $53.75 |
| Options exercisable at year end | 10,087,771 | $59.42 | 14,878,933 | $54.92 | 15,514,331 | $53.27 |
| Weighted-average fair value of options granted during the year | N/A | $12.92 | N/A | $16.38 | N/A | $14.30 |

The following table summarizes information about our outstanding stock options as of December 31, 2005:

| | *Options Outstanding* | | | *Options Exercisable* | |
|---|---|---|---|---|---|
| *Range of Exercise Prices* | *Number Outstanding* | *Weighted-Average Remaining Contractual Life* | *Weighted-Average Exercise Price* | *Number Exercisable* | *Weighted-Average Exercise Price* |
| $37.94 – $55.98 | 4,352,139 | 3.45 yrs. | $52.27 | 4,350,039 | $52.27 |
| $56.19 – $61.14 | 4,341,773 | 6.39 | 59.05 | 2,097,623 | 58.97 |
| $61.44 – $80.55 | 3,742,297 | 7.43 | 68.14 | 3,640,109 | 68.22 |
| $37.94 – $80.55 | 12,436,209 | 5.67 yrs. | $59.41 | 10,087,771 | $59.42 |

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model, with the following weighted-average assumptions for options granted in 2005, 2004, and 2003.

| | *2005* | *2004* | *2003* |
|---|---|---|---|
| Risk-free interest rates | 3.8% | 3.3% | 2.9% |
| Dividend yield | 1.9% | 1.7% | 1.5% |
| Expected lives (years) | 4.8 | 5.6 | 5.0 |
| Volatility | 20.6% | 25.9% | 28.4% |

**Restricted Stock and Other Stock Incentive Plans** – Our plans provide for awarding retention shares of common stock or stock units to eligible employees. These awards are subject to forfeiture if employment terminates during the prescribed retention period, generally three or four years. Restricted stock awards are issued to non-employee directors and are subject to forfeiture if certain service requirements are not met. During the year ended December 31, 2005, 115,600 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $59.35. During the year ended December 31, 2004, 276,575 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $64.75. During the year ended December 31, 2003, 380,786 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $55.99. The cost of retention and restricted awards is amortized to expense over the retention period.

During the years ended December 31, 2005, 2004, and 2003, we expensed $21 million, $21 million, and $46 million, respectively, related to the restricted stock and other incentive plans described above.

## 8. Earnings Per Share

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31:

| *Millions, Except Per Share Amounts* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Income statement data: | | | |
| Income from continuing operations | $1,026 | $ 604 | $1,056 |
| Income from discontinued operations | - | - | 255 |
| Cumulative effect of accounting change | - | - | 274 |
| Net income available to common shareholders – basic | $1,026 | $ 604 | $1,585 |
| Dilutive effect of interest associated with the Convertible Preferred Securities | - | - | 34 |
| Net income available to common shareholders – diluted | $1,026 | $ 604 | $1,619 |
| Weighted-average number of shares outstanding: | | | |
| Basic | 263.4 | 259.1 | 254.4 |
| Dilutive effect of stock options | 1.5 | 1.2 | 1.5 |
| Dilutive effect of retention shares, stock units and restricted shares | 1.6 | 1.9 | 1.8 |
| Dilutive effect of Convertible Preferred Securities | - | - | 10.3 |
| Diluted | 266.5 | 262.2 | 268.0 |
| Earnings per share – basic: | | | |
| Income from continuing operations | $ 3.89 | $ 2.33 | $ 4.15 |
| Income from discontinued operations | - | - | 1.00 |
| Cumulative effect of accounting change | - | - | 1.08 |
| Net income | $ 3.89 | $ 2.33 | $ 6.23 |
| Earnings per share – diluted: | | | |
| Income from continuing operations | $ 3.85 | $ 2.30 | $ 4.07 |
| Income from discontinued operations | - | - | 0.95 |
| Cumulative effect of accounting change | - | - | 1.02 |
| Net income | $ 3.85 | $ 2.30 | $ 6.04 |

Common stock options totaling 1.4 million and 3.3 million for 2005 and 2004, respectively, were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive. All stock options were dilutive for 2003.

## 9. Commitments and Contingencies

**Unasserted Claims** – Various claims and lawsuits are pending against us and certain of our subsidiaries. It is not possible at this time for us to determine fully the effect of all unasserted claims on our consolidated financial condition, results of operations or liquidity; however, to the extent possible, where unasserted claims can be estimated and where such claims are considered probable, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity after taking into account liabilities previously recorded for these matters.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries

to assist us in measuring the expense and liability, including unasserted claims. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements.

Our personal injury liability activity was as follows:

| *Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Beginning balance | $ 639 | $ 619 | $ 674 |
| Accruals | 247 | 288 | 250 |
| Payments | (267) | (268) | (305) |
| Ending balance at December 31 | $ 619 | $ 639 | $ 619 |
| Current portion, ending balance at December 31 | $ 274 | $ 274 | $ 276 |

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Personal injury accruals were higher in 2004 due to a 1998 crossing accident verdict upheld in 2004 and a 2004 derailment near San Antonio.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. The claims and lawsuits (collectively referred to as "claims") allege occupational illness resulting from exposure to asbestos-containing products. In most cases, the claimants do not have credible medical evidence of physical impairment resulting from the alleged exposures. Additionally, most claims filed against us do not specify an amount of alleged damages.

The greatest potential for asbestos exposure in the railroad industry existed while steam locomotives were used. The railroad industry, including UPRR and its predecessors, phased out steam locomotives between 1955 and 1960. The use of asbestos-containing products in the railroad industry was substantially reduced after steam locomotives were discontinued, although it was not completely eliminated. Some asbestos-containing products were still manufactured in the building trade industry and were used in isolated component parts on locomotives and railroad cars during the 1960s and 1970s. By the early 1980s, manufacturers of building materials and locomotive component parts developed non-asbestos alternatives for their products and ceased manufacturing asbestos-containing materials.

Prior to 2004, we concluded it was not possible to reasonably estimate the cost of disposing of asbestos-related claims that might be filed against us in the future, due to a lack of sufficient comparable history from which to reasonably estimate unasserted asbestos-related claims. As a result, we recorded a liability for asbestos-related claims only when the claims were asserted.

During 2004, we determined we could reasonably estimate our liability for unasserted asbestos-related claims because we had sufficient comparable loss data and there was no immediate legislative solution to asbestos litigation. During 2004, we engaged a third-party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing the number and value of these unasserted claims through 2034, based on our average claims experience over a multi-year period. As a result, we increased our liability for asbestos-related claims in the fourth quarter of 2004. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of claims received in 2005 will be consistent with average claims received between 2000 and 2003.
- The number of claims to be filed against us will decline each year after 2005.

- The average settlement values for asserted and unasserted claims will be equivalent to those experienced between 2002 and 2004.
- The percentage of claims dismissed between 2002 and 2004 will continue through 2034.

Our asbestos-related liability activity was as follows:

| *Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Beginning balance | $324 | $ 51 | $ 58 |
| Accruals | - | 287 | 7 |
| Payments | (13) | (14) | (14) |
| Ending balance at December 31 | $311 | $324 | $ 51 |
| Current portion, ending balance at December 31 | $ 16 | $ 17 | $ 9 |

Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Approximately 16% of the recorded liability related to asserted claims, and approximately 84% related to unasserted claims. These claims are expected to be paid out over the next 29 years. During the third quarter of 2005, our third-party consultants assisted us in reviewing our actual asbestos claim experience through the first half of 2005 compared to the assumptions used in the 2004 estimate, and we determined that no adjustment to our estimate was necessary at this time. We will continue to review actual experience and adjust our estimate as warranted.

Insurance coverage reimburses us for a portion of the costs incurred to resolve asbestos-related claims, and we have recognized an asset for estimated insurance recoveries.

We believe that our liability estimates for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes in the litigation environment, federal and state law governing compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

Additionally, we have a legal obligation to properly dispose of asbestos-containing materials. The estimated fair value of this obligation is $5 million at December 31, 2005, which is recorded as a liability on the Consolidated Statements of Financial Position pursuant to FIN 47.

**Environmental Costs** – We are subject to federal, state, and local environmental laws and regulations. We have identified approximately 370 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 43 sites that are the subject of actions taken by the U.S. government, 23 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When an environmental issue has been identified with respect to the property owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

Our environmental liability activity was as follows:

| *Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Beginning balance | $201 | $187 | $188 |
| Accruals | 45 | 46 | 26 |
| Payments | (33) | (32) | (27) |
| Ending balance at December 31 | $213 | $201 | $187 |
| Current portion, ending balance at December 31 | $ 46 | $ 50 | $ 57 |

The environmental liability includes costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates may also vary due to changes in federal, state, and local laws governing environmental remediation. We do not expect current obligations to have a material adverse effect on our results of operations or financial condition.

**Guarantees** – At December 31, 2005, we were contingently liable for $486 million in guarantees. We have recorded a liability of $7 million for the fair value of these obligations as of December 31, 2005. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Income Taxes** – As previously reported in our Form 10-Q for the quarter ended September 30, 2005, the IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2002. Among their proposed adjustments is the disallowance of tax deductions claimed in connection with certain donations of property. In the fourth quarter of 2005, the IRS National Office issued a Technical Advice Memorandum which left unresolved whether the deductions were proper, pending further factual development by the IRS Examination Team. We continue to dispute the donation issue, as well as many of the other proposed adjustments, and will contest the associated tax deficiencies through the IRS Appeals process, and, if necessary, litigation. We do not expect that the ultimate resolution of these examinations will have a material adverse effect on our operating results, financial condition, or liquidity. In addition, the IRS has begun its examination of tax years 2003 and 2004.

**Insurance Subsidiaries** – We have two consolidated, wholly-owned subsidiaries that provide insurance coverage for certain risks including physical loss or property damage and certain other claims that are subject to reinsurance. At December 31, 2005, current accounts receivable and current accrued casualty costs included $65 million for reinsurance receivables and reinsured liability, respectively, held by one of our insurance subsidiaries related to losses sustained during the West Coast storm in January 2005. This amount may change in the future as facts and circumstances surrounding the claim and the reinsurance are finalized and settled. We collected a partial recovery of our claim from reinsurance of $25 million during the fourth quarter of 2005.

## 10. Other Income

Other income included the following for the years ended December 31:

| *Millions of Dollars* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Net gain on non-operating asset dispositions | $135 | $ 69 | $ 84 |
| Rental income | 59 | 55 | 57 |
| Interest income | 17 | 10 | 8 |
| Sale of receivable fees | (23) | (11) | (10) |
| Non-operating environmental costs and other | (43) | (35) | (61) |
| Total | $145 | $ 88 | $ 78 |

## 11. Accounting Pronouncements

In December 2004, the FASB issued Statement No. 123(R). The statement requires that we recognize compensation expense equal to the fair value of stock options or other share-based payments starting January 1, 2006. We adopted the statement on a modified prospective basis, using the Black-Scholes option-pricing model to calculate the fair value of stock options. We expect that the incremental, full-year compensation expense in 2006 related to the adoption of the statement will be approximately $13 million for new awards granted after January 1, 2006 and an additional $2 million for the unvested portion of awards granted in prior years. The expense for awards granted after implementation of Statement No. 123(R) will be based upon their grant-date fair value. The expense for those awards will be based on the estimated number of awards that are expected to vest. That estimate will be revised if subsequent information indicates that the actual number of awards to vest will differ from the estimate. The estimate does not materially impact our calculation of compensation expense.

In March 2005, the FASB issued FIN 47. This interpretation clarifies that the term conditional asset retirement obligations, as used in FASB Statement No. 143, refers to a legal obligation to perform an asset retirement activity in which the timing or method of settlement, or both, are conditional on a future event that may or may not be within the control of the entity. An entity must recognize a liability for the fair value of a conditional asset retirement obligation if the fair value of the liability can be reasonably estimated. We assessed the impact of the interpretation on our financial statements, determined that we have a legal obligation to properly dispose of asbestos-containing materials, and recorded a $5 million liability at December 31, 2005, for the fair value of this obligation.

In May 2005, the FASB issued FAS 154, *Accounting Changes and Error Corrections, a Replacement of APB Opinion No. 20 and FASB Statement No. 3.* This statement requires retrospective application to prior periods' financial statements of changes in accounting principle, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. It carries forward without change the previous guidance for reporting the correction of an error and a change in accounting estimate. FAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005.

In July 2005, the FASB issued an exposure draft, *Accounting for Uncertain Tax Positions, an Interpretation of FASB Statement No. 109.* As drafted, the interpretation would require companies to recognize the best estimate of the impact of a tax position only if that position is probable of being sustained during a tax audit. However, in November 2005 the FASB voted to replace the probable threshold with a more-likely-than-not criterion when determining if the impact of a tax position should be recorded. The FASB expects to issue a final interpretation in the first quarter of 2006. When it is available, we will review the final interpretation to determine the impact it may have on our Consolidated Financial Statements.

In September 2005, the FASB issued an exposure draft, *Earnings per Share, an Amendment of FASB Statement No. 128*. The draft clarifies guidance for the treasury stock method, contracts that may be settled in cash or shares,

and contingently issuable shares. The FASB expects to issue a final statement in the first quarter of 2006. We are currently reviewing this proposed exposure draft to determine the impact it may have on our calculation of earnings per share.

In December 2005, the FASB deliberated issues relating to the limited-scope, first phase of its project to reconsider the accounting for postretirement benefits, including pensions. The FASB decided that the objectives and scope of this phase include, among other items, recognizing the overfunded or underfunded status of defined benefit postretirement plans as an asset or a liability in the statement of financial position. The FASB expects to issue an Exposure Draft for the initial phase in the first quarter of 2006. In the second multi-year phase of the project, the FASB expects to comprehensively consider a variety of issues related to the accounting for postretirement benefits, including expense recognition, obligation measurement, and whether postretirement benefit trusts should be consolidated by the plan sponsor. We will review the proposed standards when they are available to determine the impact they may have on our Consolidated Financial Statements.

## 12. Cumulative Effect of Accounting Change

STB accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued FAS 143. This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and, therefore, under generally accepted accounting principles, we could not accrue the cost of removal in advance. As a result, reports filed with the SEC will reflect the expense of removing these assets in the period in which they are removed. For STB reporting requirements only, we will continue to follow the historical method of accruing in advance, as prescribed by the STB. FAS 143 also requires us to record a liability for legally obligated asset retirement costs associated with tangible long-lived assets. In the first quarter of 2003, we recorded income from a cumulative effect of accounting change, related to the adoption of FAS 143, of $274 million, net of income tax expense of $167 million. The accounting change had no effect on our liquidity. Had the change been retroactively applied, the change would not have had a material impact on net income and earnings per share.

## 13. Discontinued Operations

On November 5, 2003, we completed the sale of our entire trucking interest through an initial public offering. As part of the offering, we received cash proceeds of $620 million, including a dividend from OTC of $128 million. As part of the transaction, OTC forgave our intercompany payable to them of $227 million, and we received a $1 million promissory note. We recorded a gain on the sale of $211 million, including an income tax benefit of $126 million in the fourth quarter of 2003. The tax benefit recognized in 2003 is associated with OTC goodwill written off in the fourth quarter of 1998. Revenue from discontinued operations was $1,241 million for the year ended December 31, 2003. Income before income taxes from discontinued operations was $74 million for the year ended December 31, 2003.

## 14. Selected Quarterly Data (Unaudited)

Selected unaudited quarterly data are as follows:

| *Millions of Dollars, Except Per Share Amounts* | | | | |
|---|---|---|---|---|
| *2005* | *Mar. 31* | *June 30* | *Sep. 30[a]* | *Dec. 31* |
| Operating revenues | $3,152 | $3,344 | $3,461 | $3,621 |
| Operating income | 313 | 468 | 481 | 533 |
| Net income | 128 | 233 | 369 | 296 |
| Net income per share | | | | |
| Basic | 0.49 | 0.89 | 1.40 | 1.11 |
| Diluted | 0.48 | 0.88 | 1.38 | 1.10 |
| *2004* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31[b]* |
| Operating revenues | $2,893 | $3,029 | $3,076 | $3,217 |
| Operating income | 314 | 359 | 418 | 204 |
| Net income | 165 | 158 | 202 | 79 |
| Net income per share | | | | |
| Basic | 0.64 | 0.61 | 0.78 | 0.30 |
| Diluted | 0.63 | 0.60 | 0.77 | 0.30 |

*[a] In the third quarter of 2005, we recorded an income tax expense reduction of $118 million.*
*[b] In the fourth quarter of 2004, we recognized a $154 million after-tax charge for unasserted asbestos-related claims.*

****************************************

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

Additionally, the CEO and CFO determined that there have been no significant changes to the Corporation's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Union Pacific Corporation and Subsidiary Companies (the Corporation) is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). The Corporation's internal control system was designed to provide reasonable assurance to the Corporation's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Corporation's management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2005. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework*. Based on our assessment management believes that, as of December 31, 2005, the Corporation's internal control over financial reporting is effective based on those criteria.

The Corporation's independent registered public accounting firm has issued an audit report on our assessment of the Corporation's internal control over financial reporting. This report appears on page 75.

February 8, 2006

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited management's assessment, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting, that Union Pacific Corporation and Subsidiary Companies (the Corporation) maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Corporation maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and consolidated financial statement schedule as of and for the year ended December 31, 2005 of the Corporation and our report dated February 17, 2006 expressed an unqualified opinion on those consolidated financial statements and consolidated financial statement schedule.

Deloitte & Touche LLP

Omaha, Nebraska
February 17, 2006

**Item 9B. Other Information**

None.

# PART III

## Item 10. Directors and Executive Officers of the Registrant

(a) Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b) Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c) Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d) Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the "Code"). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

## Item 11. Executive Compensation

Information concerning compensation received by our directors and certain executive officers is presented in the Compensation of Directors, Report on Executive Compensation, Summary Compensation Table, Security Ownership of Management, Option/SAR Grants Table, Aggregated Option/SAR Exercises in Last Fiscal Year and FY-End Option/SAR Values Table, Defined Benefit Plans and Change in Control Arrangements segments of the Proxy Statement and is incorporated herein by reference. Additional information regarding compensation of directors, including Board committee members, is set forth in the By-Laws of UPC and the Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, both of which are included as exhibits to this report.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Information as to the number of shares of our equity securities beneficially owned by each of our directors and nominees for director, our five most highly compensated executive officers, our directors and executive officers as a group, and certain beneficial owners is set forth in the Election of Directors and Security Ownership of Management segments of the Proxy Statement and is incorporated herein by reference.

The following table summarizes the equity compensation plans under which Union Pacific Corporation common stock may be issued as of December 31, 2005.

| *Plan Category* | *Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)* | *Weighted-average exercise price of outstanding options, warrants and rights (b)* | *Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)* |
|---|---|---|---|
| Equity compensation plans approved by security holders | 11,069,004[1] | $60.27[2] | 19,692,695 |
| Equity compensation plans not approved by security holders [3] | 2,096,681 | $55.00 | - |
| Total | 13,165,685 | $59.41 | 19,692,695 |

*[1] Includes 729,476 retention units that do not have an exercise price. Does not include 287,940 retention shares that are actually issued and outstanding.*

*[2] Does not include the retention units or retention shares described above in footnote [1].*

*[3] The UP Shares Stock Option Plan (UP Shares Plan) is the only equity compensation plan not approved by shareholders. The UP Shares Plan was approved by the Company's Board of Directors on April 30, 1998 and reserved 12,000,000 shares of Common Stock for issuance. The UP Shares Plan was a broad-based option program that granted each active employee on April 30, 1998 non-qualified options to purchase 200 shares of Common Stock at $55.00 per share. Options became exercisable on May 1, 2001 and expire on April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan.*

## Item 13. Certain Relationships and Related Transactions

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party which would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

## Item 14. Principal Accounting Fees and Services

Information concerning the fees billed by our independent registered public accounting firm and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit – related fees, (iii) tax fees, and (iv) all other fees, is set forth in the Audit Committee Report segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent registered public accounting firm is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

## PART IV

### Item 15. Exhibits, Financial Statement Schedules

(a) Financial Statements, Financial Statement Schedules, and Exhibits:

(1) Financial Statements

The financial statements filed as part of this filing are listed on the index to the Financial Statements and Supplementary Data, Item 8, on page 43.

(2) Financial Statement Schedules
Schedule II – Valuation and Qualifying Accounts

Schedules not listed above have been omitted because they are not applicable or not required or the information required to be set forth therein is included in the Financial Statements and Supplementary Data, Item 8, or notes thereto.

(3) Exhibits

Exhibits are listed in the exhibit index on page 82. The exhibits include management contracts, compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601 (10) (iii) of Regulation S-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 24th day of February, 2006.

UNION PACIFIC CORPORATION

By /s/ James R. Young

James R. Young
President, Chief Executive
Officer and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 24th day of February, 2006, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

/s/ James R. Young

James R. Young
President, Chief Executive
Officer and Director

PRINCIPAL FINANCIAL OFFICER:

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.,
Executive Vice President – Finance and
Chief Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

/s/ Richard J. Putz

Richard J. Putz,
Vice President and Controller

DIRECTORS:

Philip F. Anschutz*
Richard K. Davidson*
Erroll B. Davis, Jr.*
Thomas J. Donohue*
Archie W. Dunham*

Spencer F. Eccles*
Judith Richards Hope*
Michael W. McConnell*
Steven R. Rogel*
Ernesto Zedillo Ponce de Leon*

* By /s/ Thomas E. Whitaker

Thomas E. Whitaker, Attorney-in-fact

## SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | *2005* | *2004* | *2003* |
|---|---|---|---|
| Allowance for doubtful accounts: | | | |
| Balance, beginning of period | $ 107 | $ 101 | $ 108 |
| Charged to expense | 2 | 11 | 13 |
| Net recoveries / (write-offs) | 17 | (5) | (20) |
| Balance, end of period | $ 126 | $ 107 | $ 101 |
| Allowance for doubtful accounts are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | $ 16 | $ 19 | $ 17 |
| Long-term | 110 | 88 | 84 |
| Balance, end of period | $ 126 | $ 107 | $ 101 |
| Accrued casualty costs: | | | |
| Balance, beginning of period | $1,303 | $ 989 | $1,077 |
| Charged to expense | 409 | 683 | 403 |
| Cash payments and other reductions | (358) | (369) | (491) |
| Balance, end of period | $1,354 | $1,303 | $ 989 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | $ 478 | $ 419 | $ 394 |
| Long-term | 876 | 884 | 595 |
| Balance, end of period | $1,354 | $1,303 | $ 989 |

**Union Pacific Corporation**
**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| **Filed with this Statement** | |
| 10(a) | Form of 2006 Long Term Plan Stock Unit Agreement. |
| 10(b) | Form of Stock Unit Agreement for Executives. |
| 10(c) | Form of Non-Qualified Stock Option Agreement for Executives. |
| 10(d) | UPC Executive Incentive Plan, effective May 5, 2005. |
| 10(e) | Supplemental Thrift Plan of UPC, as amended December 21, 2005. |
| 10(f) | The Supplemental Pension Plan for Officers and Managers of UPC and Affiliates, as amended December 21, 2005. |
| 10(g) | Executive Incentive Plan (2005) – Deferred Compensation Program, dated December 21, 2005 |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Registered Public Accounting Firm's Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – James R. Young. |
| 31(b) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – Robert M. Knight, Jr. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 – James R. Young and Robert M. Knight, Jr. |
| **Incorporated by Reference** | |
| 3(a) | Revised Articles of Incorporation of UPC, as amended through April 25, 1996, are incorporated herein by reference to Exhibit 3 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996. |
| 3(b) | By-Laws of UPC, as amended, effective July 1, 2005, are incorporated herein by reference to Exhibit 3(b) of the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005. |

| | |
|---|---|
| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |
| 4(b) | Indenture, dated as of April 1, 1999, between UPC and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989). |
| 4(c) | Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323). |
| | Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission. |
| 10(h) | Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(i) | Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(j) | Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(k) | UPC 2001 Stock Incentive Plan, dated April 20, 2001, is incorporated herein by reference to Exhibit 99 to UPC's Current Report on Form 8-K dated March 8, 2001. |
| 10(l) | UPC 2004 Stock Incentive Plan, effective as of April 16, 2004, is incorporated herein by reference to Exhibit 10 to UPC's Current Report on Form 8-K dated March 10, 2004. |
| 10(m) | UP Shares Stock Option Plan of UPC, effective April 30, 1998, is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-8 (No. 333-57958). |
| 10(n) | The Executive Incentive Plan of UPC, as amended May 31, 2001, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10(o) | Written Description of Premium Exchange Program Pursuant to 1993 Stock Option and Retention Stock Plan of UPC is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999. |
| 10(p) | The 1993 Stock Option and Retention Stock Plan of UPC, as amended May 30, 2002, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002. |

| | |
|---|---|
| 10(q) | UPC 2000 Directors Stock Plan is incorporated herein by reference to Exhibit 99 to UPC's Current Report on Form 8-K filed March 9, 2000. |
| 10(r) | UPC Key Employee Continuity Plan dated November 16, 2000, is incorporated herein by reference to Exhibit 10(o) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| 10(s) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(t) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(u) | The UPC Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, as amended January 1, 2003, is incorporated herein by reference to Exhibit 10(a) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2004. |
| 10(v) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(w) | Written Description of Other Executive Compensation Arrangements of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(q) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10(x) | Form of Non-Qualified Stock Option Agreement for Executives is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(y) | Form of Stock Unit Agreement for Executives is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(z) | Form of Stock Unit Agreement for Executive Incentive Premium Exchange Program is incorporated herein by reference to Exhibit 10(c) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(aa) | Form of Non-Qualified Stock Option Agreement for Directors is incorporated herein by reference to Exhibit 10(d) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |

**Exhibit 12**

## RATIO OF EARNINGS TO FIXED CHARGES

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, Except for Ratios* | *2005* | *2004* | *2003* | *2002* | *2001* |
|---|---|---|---|---|---|
| Earnings: | | | | | |
| Income from continuing operations | $1,026 | $ 604 | $1,056 | $1,265 | $ 934 |
| Equity earnings net of distributions | (48) | (47) | 15 | (34) | (48) |
| Total earnings | 978 | 557 | 1,071 | 1,231 | 886 |
| Income taxes | 410 | 252 | 581 | 680 | 545 |
| Fixed charges: | | | | | |
| Interest expense including amortization of debt discount | 504 | 527 | 574 | 632 | 700 |
| Portion of rentals representing an interest factor | 220 | 206 | 169 | 172 | 177 |
| Total fixed charges | 724 | 733 | 743 | 804 | 877 |
| Earnings available for fixed charges | $2,112 | $1,542 | $2,395 | $2,715 | $2,308 |
| Ratio of earnings to fixed charges | 2.9 | 2.1 | 3.2 | 3.4 | 2.6 |

**Exhibit 21**

## SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION

| Name of Corporation | State of Incorporation |
|---|---|
| Union Pacific Railroad Company | Delaware |
| Southern Pacific Rail Corporation | Utah |

**Exhibit 23**

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714, Registration Statement No. 333-105715, and Registration Statement No. 333-116003 on Forms S-8 and Registration No. 333-88666, Amendment No. 1 to Registration Statement No. 333-88666, and Registration Statement No. 333-111185 on Forms S-3 of our reports dated February 17, 2006, relating to the consolidated financial statements and consolidated financial statement schedule of Union Pacific Corporation and Subsidiary Companies (which report expressed an unqualified opinion and included an explanatory paragraph relating to the change in method of accounting for asset retirement obligations in 2003) and management's report on the effectiveness of internal control over financial reporting, appearing in this Annual Report on Form 10-K of Union Pacific Corporation and Subsidiary Companies for the year ended December 31, 2005.

Deloitte & Touche LLP

Omaha, Nebraska
February 22, 2006

**Exhibit 24**

## UNION PACIFIC CORPORATION
## Powers of Attorney

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the "Company"), do hereby appoint each of James R. Young, Barbara W. Schaefer, and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2005, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of February 23, 2006.

| | |
|---|---|
| /s/ Phillip F. Anschutz | /s/ Spencer F. Eccles |
| Phillip F. Anschutz | Spencer F. Eccles |
| /s/ Richard K. Davidson | /s/ Judith Richards Hope |
| Richard K. Davidson | Judith Richards Hope |
| /s/ Erroll B. Davis, Jr. | /s/ Michael W. McConnell |
| Erroll B. Davis, Jr. | Michael W. McConnell |
| /s/ Thomas J. Donohue | /s/ Steven R. Rogel |
| Thomas J. Donohue | Steven R. Rogel |
| /s/ Archie W. Dunham | /s/ Ernesto Zedillo |
| Archie W. Dunham | Ernesto Zedillo |

**Exhibit 31(a)**

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER

I, James R. Young, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2006

/s/ James R. Young

James R. Young
President and
Chief Executive Officer

**Exhibit 31(b)**

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER

I, Robert M. Knight, Jr., certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2006

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President – Finance and
Chief Financial Officer

**Exhibit 32**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, James R. Young, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ James R. Young

James R. Young
President and
Chief Executive Officer
Union Pacific Corporation

February 24, 2006

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President – Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President – Finance and
Chief Financial Officer
Union Pacific Corporation

February 24, 2006

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# CORPORATE INFORMATION

## CORPORATE HEADQUARTERS

Union Pacific Corporation
1400 Douglas Street
Omaha, NE 68179
(402) 544-5000
**www.up.com**

Union Pacific Railroad Company
1400 Douglas Street
Omaha, NE 68179
**www.up.com**

## TRANSFER AGENT AND REGISTRAR OF STOCK

Computershare Investor Services, LLC

*For U.S. Mail:*
P.O. Box 1689
Chicago, IL 60690

*For Express Service Delivery:*
2 North LaSalle Street
Chicago, IL 60602

Most questions regarding your account may be answered by contacting the automated Computershare Investor Services Help Line at (800) 317-2512 from your touch-tone phone, 24 hours a day, 7 days a week. Service representatives are available on the Help Line from 8 a.m. to 5 p.m. Central Time, Monday through Friday. You may also write to Computershare at the appropriate address above, or you may contact Computershare online at **www.computershare.com**.

## STOCK LISTING

New York Stock Exchange (NYSE)
Ticker Symbol: UNP

## ANNUAL MEETING OF SHAREHOLDERS

May 4, 2006
Little America Hotel
500 South Main Street
Salt Lake City, UT

## INFORMATION SOURCES

The contact for media inquiries is Corporate Relations at (402) 544-3529. Institutional investors and financial analysts can contact Investor Relations at (402) 544-4227 or (877) 547-7261. Written inquiries for Corporate or Investor Relations can be directed to Union Pacific Corporation's address listed above.

Individual shareholder questions should be directed to the Corporation's Transfer Agent using the contact information above.

## SEC FILINGS AND OTHER CORPORATE INFORMATION

Union Pacific makes available free of charge on our Internet Web site at **www.up.com/investors** our annual reports on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statements, Forms 3, 4 and 5, filed on behalf of directors and executive officers, and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our Web site previously filed SEC reports and exhibits via a link to "EDGAR" on the SEC's Internet site at **www.sec.gov**. Additionally, our corporate governance materials (including Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers and employees), news releases, investor fact books and other general information about Union Pacific are available on our Web site. From time to time, the corporate governance materials on our Web site may be updated as necessary to comply with rules issued by the SEC and NYSE or as desirable to promote the effective and efficient governance of our company.

Copies of Union Pacific's 2005 Annual Report/Form 10-K and other corporate materials also are available, without charge, by writing to:

Secretary
Union Pacific Corporation
1400 Douglas Street, 19th Floor
Omaha, NE 68179

UNION PACIFIC
BUILDING AMERICA®




## UNION PACIFIC

Headquartered in Omaha, Nebraska, Union Pacific Railroad operates more than 32,400 route miles in the western two-thirds of the United States, making it North America's largest railroad. Supporting the nation's economy, Union Pacific links 23 states, every major West Coast and Gulf Coast port, and the fastest-growing U.S. population centers. The Railroad has one of the industry's most diversified commodity mixes and serves the East through four major gateways in Chicago, St. Louis, Memphis and New Orleans. Additionally, Union Pacific operates key north/south corridors, interchanging traffic with the Canadian rail systems, and it is the only railroad to serve six major gateways to Mexico. The Company's computer systems provide real-time information about customer shipments moving daily aboard more than 3,000 trains, many of which are controlled by Omaha's Harriman Dispatching Center. The Railroad operates more than 8,000 locomotives, most equipped with computerized control systems, and freight cars number nearly 107,000. Union Pacific has almost 50,000 employees.

BUILDING AMERICA®

UNION PACIFIC



1400 Douglas Street Omaha, Nebraska 68179 www.up.com

# EXHIBIT PX0574

1/19/06 Fin. Disclosure Wire **13:45:00**

FD Wire
Copyright 2006 CCBN, Inc. and FDCH e-Media, Inc.

**January 19, 2006**

Q4 2005 Union Pacific Earnings Conference Call - Final

UNIDENTIFIED SPEAKER, UNION PACIFIC CORP: Thank you for accessing the Union Pacific Corporation fourth quarter earnings conference call held at 7:45 am eastern time on January 19, 2006 in Omaha. This presentation and the accompanying materials may contain statements about future expectations or results of the Corporation that are not statements of historical fact. These statements are and will be forward-looking statements as defined by the federal securities laws and include, without limitation, expectations as to increased returns, revenue growth, cost savings and earnings, and similar projections. Estimates or forecasts relating to the Corporation's business, operations or performance, expectations as to continued or increasing demand for rail transportation in excess of supply, expectations regarding operational improvements including the network management initiatives that have been or will be implemented to improve system velocity, customer service and shareholder return, expectations regarding fuel price and the time by which certain objectives will be achieved.

Forward-looking statements should not be read as a guarantee of future performance or results and will not necessarily be accurate indications at the times that or by which such performance or results will be achieved. Forward-looking information is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statement. More detailed information regarding forward-looking information and such risks and uncertainties is contained in the materials accompanying this presentation and in the filings made by the Corporation with the Securities and Exchange Commission, which are available on the Corporation's website. Corporation assumes no duty to update any statements or information provided in this presentation or the accompanying materials. In addition, during the course of the presentation, the Corporation will refer to certain non-GAAP measures.

Management believes these measures provide an alternate presentation of results that more accurately reflects ongoing operation. These measures should be considered in addition to, not as a substitute for, the reported GAAP results. Please refer to our website for reconciliation of these measures to GAAP.

OPERATOR: Good morning, ladies and gentlemen, and thank you for holding. Welcome to the Union Pacific fourth quarter earnings release conference call. At this time, all participants are in a listen-only mode. A brief question and answer session will follow the formal presentation. If anyone should require operator assistance during the conference, please press star, zero on your telephone keypad. As a reminder, this conference is being recorded. It is now my pleasure to introduce your host, Mr. Dick Davidson, Chairman of Union Pacific. Thank you, Mr. Davidson. You may begin.

DICK DAVIDSON, CHAIRMAN, UNION PACIFIC CORP: Thank you, Dan. Good morning and welcome to our fourth quarter earnings conference call. Joining us today here in Omaha are Jim Young, our newly elected CEO and President of the Corporation; Rob Knight, our CFO; Jack Koraleski, Executive Vice President of Marketing and Sales; and Dennis Duffy, Executive Vice President of Operations. Before Jim walks you through the results, I wanted to take a moment to outline our new management structure. As of January 1st, Jim has taken over the reigns of CEO and President. He's now in charge of the Corporation's operations and I'll be Chairman of the Board. It's been a real pri-

DEPOSITION EXHIBIT 26 7-9-10 KH PENGAD 800-631-6989

vilege for me to serve as our Company's Chief Executive for the past nine years, but I know I'm leaving the Company in very capable hands with Jim and the senior management team. In fact, I believe that one of the legacies that I will leave here at Union Pacific is a solid team with great experience and depth. In my new role, I'll be available to the team at any time, in any way that I can be helpful.

Looking ahead, I've got great optimism for this Company. We expect strong demand to continue for the foreseeable future, which will challenge the capacity of the entire transportation industry. Learning to operate in this constrained environment has been a new experience for us, but our unified plan and lean management initiatives will enable us to handle that demand more efficiently and more profitably in the years ahead. My commitment to the Company's success has never been greater and I plan to spend my remaining time here supporting that effort. As we close the books on '05, it will certainly be one to remember, with the West Coast storm kicking off '05 and then followed by hurricanes and washouts. After battling such adversity, it's very encouraging to see us end the year on such a high note, with strong demand and improved profitability. So with that, I officially hand it over to Jim. Jim?

JIM YOUNG, CEO & PRESIDENT, UNION PACIFIC CORP: Thanks, Dick, and good morning, everyone. Before we jump into the results, I would like to echo Dick's comment about the year. We were challenged in every quarter by some type of catastrophe. But thanks to the dedicated men and women of Union Pacific, we persevered and finished strong. I'm going to start off today with a few comments on the fourth quarter and full year. Then I'll turn it over to Rob to provide the financial detail. Jack will give you the customer perspective and Dennis is here for an operating update. I'll wrap it up at the end with some thoughts on 2006. So with that, let's look at fourth quarter. Our earnings were $1.10 per share. Last year's reported earnings were $0.30 per share, but that included a pretax charge of $247 million for unasserted asbestos claims. For a more apples to apples comparison, we would add back the asbestos charge to get an adjusted earnings number of $0.88 per share a year ago versus today's $1.10 per share, a 25% increase.

As we told you in October, the Kansas washouts took about $0.05 per share out of our quarterly earnings. The impact of that event can be seen in our fourth quarter car loads. October loadings were down about a thousand cars compared to the prior year, but in both November and December we experienced solid growth. And as you know from looking at our weekly metrics, those months had challenges too, with the Thanksgiving blizzard and a record cold spell. We also had to battle another quarter of record high diesel fuel prices. On average, we paid $2.08 per gallon, a 42% increase from last year. Although we're doing a better job of offsetting fuel's negative impact through fuel surcharges, we still have work ahead of us to eliminate fuel as an earnings variable. The positive in the quarter was strong demand, which resulted in record car loadings and revenue. Just before Thanksgiving we had our highest ever weekly volume, moving more than 198,000 cars per week. Operating revenue of 3.6 billion was also a best. The key take-away is our conversion of revenue growth into an 18% increase in operating income.

We're continuing the positive trend started in the second quarter, operating more efficiently and improving profitability. Now, looking back for a minute at the full year, despite a number of significant challenges, we did have some success. At a high level, there are a few things that really define the year for us. The first one is record revenue. The demand for rail was strong all year and challenged our capacity. The second is yields. The value of a train slot on our network has increased substantially over the past 18 months. We clearly have more work to do here, but we made a very positive step in 2005. Third, we gained momentum operationally. If you look at the metrics alone, it's a little hard to see, but when you consider how we recovered from the various weather issues we faced and moved record volume across our system, we did see improvement. Finally, we were able to combine strong revenue, improve yields and better productivity into earnings per share growth.

Taken together, our 2005 results show a trend of improvement and building momentum. Last year's weather clearly impacted us, both financially and operationally. We know that every year we'll have some weather events, but we feel we're better positioned today to respond and recover. With that, let's start off with Rob to take you through the financials. Rob?

ROB KNIGHT, CFO, UNION PACIFIC CORP: Thanks, Jim, and good morning. I'll start off today by looking at the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

components of our commodity revenue growth, up nearly 13% to a record $3.5 billion. Jack's going to walk you through the individual commodity groups, but in total our volume grew 1% for the quarter. The majority of that growth came from our intermodal business, which is up 5%, resulting in a slightly negative mix for us overall in the quarter. The railroad's focused efforts to improve returns netted nearly a 6% yield improvement, our strongest of the year. And fuel cost recovery added 7% to the total growth. As Jim mentioned, it was a great quarterly revenue performance, especially when you consider some of the missed opportunities associated with the Kansas washouts and the Powder River Basin coal challenges. Now let's turn to operating expenses, up 12% in the quarter to just under $3.1 billion.

Before I get into the details, I need to remind you that the fourth quarter of 2004 had a 247 million pretax charge for unasserted asbestos claims recorded in the purchased services and other category. In order to provide a better year-over-year comparison, we have excluded that charge from the 2004 numbers. We have provided a non-GAAP reconciliation for these items on our investor relations website, which you can call up. Similar to the third quarter, salaries and benefits is our largest expense category, accounting for about 36% of our total operating expenses. But fuel and utilities expense is becoming a larger and larger percentage of the total, representing a full 24% of our fourth quarter expenses. I'll take a minute now to walk you through some of the key drivers of each expense line. Salaries and benefits expense totaled 1.1 billion in the quarter, up 5%. The good news in the quarter came in the form of better train crew productivity and lower training costs. Cost pressures came from labor inflation, up about 3% in the quarter. In addition, you'll recall that in the fourth quarter of 2004, we eliminated the provision for executive incentive compensation. Another driver of the increased expense was a 1% increase in our average fourth quarter work force. For the full year, our average work force levels were actually up 2.9% versus the 2% we had projected in October. During the quarter, we straightened out a minor system glitch, which had caused us to previously miss about 400 full-time equivalent train and engine employees in our calculations during the course of the year. Of course we were paying the people and reporting expenses correctly. The revised numbers are available on our investor website. From a workforce standpoint, we have caught up on the backlog of hiring that we faced in 2004 and 2005. So for 2006, we'd expect to see our workforce levels more closely linked to volume with some productivity offsets. From a cost perspective, we're forecasting labor inflation of around 3%.

I should also mention that we'll start expensing options this year. This should cost us about 10 to $15 million or reduce earnings by about $0.02 to $0.03 per share during the course of '06. For '06 we're targeting an increase in this category of between 4 and 6%. The drivers will be labor inflation, volume growth, and operating efficiencies. Fourth quarter rent expense came in at $353 million, up 7% versus 2004. Long-term locomotive leases, as well as other car and equipment lease expense, were higher year-over-year. We did offset some of these increases through better car cycle times and fewer short-term locomotive leases. Our outlook for 2006 would be for increases around 5% or so. The drivers are primarily increased locomotive and freight car leases and other volume-related costs, offset with productivity. Depreciation expense in the fourth quarter was up 18 million or 6%. As you know, this line moves in step with our capital spending, so looking out to 2006, we would expect some higher cost level increasing 5 to 6%, reflecting 2005's capital program.

Quarterly fuel and utilities expense increased $220 million, or 41%, driven primarily by higher diesel fuel prices. In the wake of the hurricanes, we paid our highest ever quarterly diesel fuel price, $2.08 per gallon in the quarter. Although crude oil prices actually declined a few dollars in the fourth quarter, refining and transportation spreads were at historically high rates. Our fourth quarter fuel consumption rate was a positive in the quarter, a 1% improvement, saving roughly $5 million. Better consumption can be attributed to our fuel conservation initiatives, which Dennis will talk in more detail about in a moment. Our outlook for 2006 assumes little change in crude prices from around the $60 per barrel range we see today. On a per gallon basis, and with spreads at more moderate levels, we're currently paying around $1.80 per gallon for diesel.

Although we have reduced our exposure to high fuel prices through our fuel cost recovery programs, we're not at 100% yet. Until we are, fuel will remain a wild card for us. Materials and supplies expense grew 11% in the quarter to $143 million. The drivers of the increase were maintenance costs associated with a larger locomotive fleet and higher material prices. Similar to 2005, we're expecting double-digit increases this year due to continued inflationary pres-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

sures on locomotive and freight car material prices, as well as stronger maintenance programs. In the category of purchase services and other, our cost performance was a little better than anticipated, down 2% year-over-year, to $431 million. Cost increases for such items as joint facilities, state and local taxes and contract services, were more than offset by an insurance reimbursement and better cost performance.

In December, we received a partial imbursement on the insurance related to last January's West Coast storm, offsetting a little more than $10 million in this category for the quarter. Our outlook for 2006 is for cost increases in the 4 to 5% range. This is an area where there's opportunity for better performance with increased productivity. Looking in total at how our revenue and expenses lined up, we reported just under a 1-point improvement in our reported operating ratio, as shown on the left, from 86% to 85.3%. We're not yet satisfied with where we are, but we are pleased with the improvement. Even in the face of weather challenges and rising fuel prices, we've made gains. This slide also illustrates our fuel adjusted operating ratio at 80.7% for the fourth quarter. And as you can see, we had an improving trend throughout the year.

Turning now to the full income statement, the net result of operating revenue and expenses is our operating income, which was up 18% to $533 million. As with our operating ratio, this is a solid indicator of our improved performance. Other income increased by $32 million in the quarter to $54 million, in line with our previous guidance. Consistent with prior quarters, strong real estate sales were a driver. Interest expense was down $10 million in the quarter to $120 million. This decline was driven by lower debt levels, averaging 7.4 billion in the fourth quarter of 2005, versus 8.1 billion in 2004. Income tax expense increased $61 million, driven primarily by higher income. Our effective tax rate for the quarter was 36.6%. The end result is net income of $296 million or quarterly earnings per share of $1.10. That's a 25% increase year-over-year and a strong close to the year.

So let me give you a quick wrap up of the full year. Strong revenue growth was a real plus for us, up 11% or $1.4 billion. We translated that growth into a 16% increase in our operating income to $1.8 billion. The transition to double-digit growth is especially significant when you consider that the year started with a decrease in first quarter operating income due to the West Coast storm. As I just mentioned, we experienced strong real estate sales throughout '05, driving other income to $145 million, in line with our guidance. For 2006, we would look to be in the 75 to $100 million range. Interest expense improved by $23 million on a full year basis due to lower average debt levels. For 2006 this should again improve some, although moderating. Our full year effective tax rate was 36.8 versus 31.3% in '04. Higher earnings and less tax credits, related to our 2004 headquarters consolidation, were the drivers of this change. I should mention that the 2005 taxes do not include the tax reduction we reported in the third quarter. The reconciliation for that change is also available on our website.

Going forward, we would anticipate a tax rate of between 37 and 38%. For the full year, net income was $908 million, up 20%. On an earnings per share basis, we increased from $2.89 per share in 2004 to $3.41 per share in 2005, a solid performance in a year filled with challenges. It's clearly not where we should or could be, but it's a good starting point as we head into 2006. Looking at our full year capital, we ended the year with total spending of 2.86 billion, about in the middle of the updated outlook we provided you in October. Cash capital totaled nearly $2.17 billion and the remainder, 691 million, is the cash equivalent of our locomotive and freight car lease programs. For 2006, we're looking at an all-in capital program of 2.7 billion or so. We haven't yet finalized the budget with our board. As we work through the year and firm up our plans, we will update you.

From the standpoint of free cash flow after dividends, we ended the year at $234 million, up about $20 million from 2004. Cash from operations increased $338 million in 2005. Much of that increase was used to fund cash capital spending and as we discussed back in October, our cash capital was higher due to the weather and Powder River Basin challenges. Our cash tax rate also increased in 2005. Over the past several years, we have used up our AMT and NOL credits with our earnings. And for 2006, our cash tax rate should take an even larger step up, as our higher expected earnings are likely to be accompanied by higher taxes. At this point, we're forecasting that cash taxes would reduce our 2006 free cash flow by an additional 450 to $500 million. Beyond this year, we should see cash tax rates staying in this neighborhood. So we did a bit of a one-time jump in 2006 with more normalized rates going forward.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Another factor will be cash generated from our core business. Expectations for 2006 are that we will see strong growth in our cash from operations, driven by higher revenue and overall improved efficiencies. Even with the higher taxes, we'll likely keep free cash flow after dividends in the 300 million plus range. So let me close the books on 2005 with a quick look at our balance sheet. We finished the year with our lease adjusted debt to cap ratio of 43.6%, a 1.5 point improvement over 2004 and the best we've seen in 20 years. Despite some of our challenges over the last couple of years, we've maintained and strengthened our overall balance sheet. Going forward, we would expect continued improvement driven by improved financial returns. With that, let me turn it over to Jack to talk about our record revenue growth. Jack?

JACK KORALESKI, EVP MARKETING & SALES, UNION PACIFIC RAILROAD: Thanks, Rob, and good morning. Well, our fourth quarter continued to show the strength of demand in today's transportation marketplace. And that strength has really bridged the holidays quite well and shows no signs of letting up in 2006. While overall volume grew just over 1%, five of our six business groups, the Ag products team, automotive, chemicals, industrial products and intermodal posted all time revenue records for any quarter. Four of those groups accomplished those records on the strength of all time record quarters for average revenue per car. And while our energy business didn't set an all time record, they did have their best fourth quarter ever for both revenue and average revenue per car. This strong performance was also reflected in our business to and from Mexico, where we finished the year with revenue of a little over $1.1 billion. That was up 15% on basically flat volume.

At the same time, customer satisfaction improved as the unified plan, our lean management projects and our business planning process brought improved fluidity to the network, even as we were handling record volumes in the wake of hurricanes and floods and blizzards. Ag products is a great place to start for us. Yield improvement helped us manage volume, which was down 1%, while driving revenue growth of 18% on a 19% improvement in average revenue per car. Demand was very strong for dry feed ingredients for meals and for ethanol. And in addition to dry feeds, we had very strong volume for beer. It was up 66% and contributed to our increase in Mexico business. In total, Ag took the lead in pushing Mexico revenues past the $1 billion mark, growing 31% for the year compared to 2004.

Looking ahead to 2006, our yield is going to continue to improve. Better service will allow us to reinvigorate our express lane product for perishables and roll out our new produce train, which will allow us to ship unit trains of perishables from a single origin in the Pacific Northwest to a single destination in the east with no intermediate switching or work events. These products will improve velocity, as well as provide costs efficiencies and that's an objective that we're pursuing across each of our businesses on the commercial side. Other opportunities in Ag will come from the expansion and improvement of our shuttle and unit train programs, but not just in our whole grain business. This year we'll also be implementing ethanol unit trains as well. Our automotive business represents one of our best long-term opportunities for yield improvement. As Legacy agreements come up for renewal, we will move those rates to levels that represent the realities of today's market.

Our fourth quarter results highlight that we're also taking advantage of opportunities to make some gains in the near-term. Our vehicle revenues were up 11% on just 1% volume growth, helped by end of year strength and production of the Ford Fusion at Hermosillo, which started in the third quarter and ramped up during the fourth. Lower production for some of our manufacturers led to a decline in parts volumes, but we were able to mitigate that impact with stronger yield. Looking ahead to 2006, the industry forecast is for production to be down slightly. However, we're expecting a relatively good year, driven by yield gains and the fact that we're well positioned with the fastest growing manufacturers. Chrysler's Belvedere plant came back online late last year with their new crossover vehicle. We also expect to see continued growth with Ford at Hermosillo and the startup of production at Toyota's new facility in San Antonio.

Although the chemicals market was softer this quarter than last year, yield improvement produced record revenues. Nowhere was this more evident than in our fertilizer markets. Our revenues grew 18%, even as softer potash exports helped produce a 12% volume decline. We saw weaker plastics volumes, driven by a number of factors, including the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

hurricanes and the softer export demand. Looking ahead, chemicals will hold its position as a key element of our franchise. We expect to see further revenue growth in 2006 and expect also that volumes are going to be held relatively flat for the year. Despite the repair work on the joint line, the Kansas washouts in early October, mine production issues in Colorado and Utah, and an early blast of winter that slowed operations from late November to early December, energy volumes still managed to grow 1% over last year.

Energy is another long-term yield opportunity that had some near-term success. Average revenue per car set a fourth quarter record and drove commodity revenue for our energy business to a fourth quarter record as well. Both of those were up 6% over 2004. Growth in electricity demand, supply constraints for eastern coal, and Powder River Basin makeup tonnage from 2005 will increase volumes, which, along with our continued yield improvements, will drive more record-setting performances for us in 2006. Industrial products held volume growth flat in the fourth quarter, but grew average revenue per car in revenue 19%. Even though overall volume growth was flat, we did have growth in some individual commodity lines. A few notable examples, for instance, are lumber, where growth in the housing market fueled demand.

Our rock business grew 12%, reflecting not only strong demand in Texas, Oklahoma and Louisiana, but also our success at increasing the train size and improving cycle times year-over-year by working with our customers. Steel volumes also showed relatively strong growth at the end of the year. We're off to a good start in 2006, as demand for lumber, steel, rock and construction products hasn't missed a beat. We expect this year to be similar to 2005. We'll be leveraging strong demand to drive our yield improvement. Last, but not least, is intermodal, where, again, long-term yield improvement is in the offing as Legacy contracts expire. October set a new record for loadings and continued strong demand through November and December made intermodal the real driver of our overall volume increase in the fourth quarter. The volumes were up 5%. At the same time, yield gains from fuel surcharges, the RCAP base contract escalators and some selective price increases produced our best ever average revenue per unit and revenue results.

Growth in international business drove both volumes and revenue gains, while our domestic volume declined slightly. The improved domestic revenue was entirely the result of our yield improvement efforts. We also made significant progress this year in our international east-west balance, now reaching up to about 84% with the implementation of our unified plan and the use of our new balanced surcharge. Looking to 2006, international growth will continue to be strong. We also expect moderate domestic growth, which, coupled with our efforts to drive our business towards reinvestable levels, will continue to increase revenues. We're encouraged by the increasing trend in our customer satisfaction results. This is perhaps our best indicator that customers are recognizing our efforts to improve our service, even as we handled record volumes, improved our yield under some very tough operating conditions.

We know service consistency isn't where we want it to be or our customers want it to be. But the steady improvement in satisfaction and that jump in the second half of the year points to the success of the unified plan, along with all of our other operating initiatives and the added resources to create fluidity, as well as our continued focus on our customer relationships. So I hit some of the highlights for 2006 as we went through the business groups. Here's how we see the year shaping up. Looks like the strong demand environment is going to continue. We expect our volumes are going to grow in the 3% range with a potential for higher growth actually driven by the strength of our network. All six of our commodity groups are going to grow their revenue, but we expect only three to see stronger car loadings, as we continue to manage volume across the railroad.

Most significant growth is going to be in our energy business. We anticipate another year of yield improvement, as we continue our efforts to bring all of our businesses to reinvestable levels. Pie chart on the left shows you that in 2006 we'll get a chance to touch another 13% of our business for the first time in this new demand environment. That opportunity, combined with continued yield gains on the 55% that we've already touched and extending our fuel surcharge coverage, should result in a revenue growth of 10% or higher, with that upside, again, driven by our network fluidity and our ability to take on more profitable growth. So with that, I'll turn it over to Dennis.

DENNIS DUFFY, EVP OPERATIONS, UNION PACIFIC RAILROAD: Thank you, Jack, and good morning. Today

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

I'd like to spend a few minutes going over our fourth quarter and our '05 operating performance and talk about our key capital projects in '06 and our operating initiatives for the year. Let me first start with velocity. This chart shows monthly velocity in 2005. As Jim and Rob have already said, we had several weather events hit us during the year. I don't want to dwell on the past, but looking back at the year, it was truly a challenge from January all the way through to December. But there are a few takeaways. Despite these unprecedented operating challenges, we managed to handle record volumes and at least maintain velocity. In fact, during much of the year, we actually ran at improved velocities over 2004. We did this by strengthening our operational recoverability. Although our network was clearly strained by these events, it didn't break. Our employees worked tirelessly to restore service, clear off the backlogs and minimize the impact felt by our customers. This highlights both the strength of our franchise and also the capacity we can unlock with velocity improvements.

Since about mid-December we have seen good improvement in our velocity. Yesterday we reported a seven-day average speed of 21.7 miles per hour. Our coal operations were similarly impacted by external events in the fourth quarter of '05, particularly in the Powder River Basin. We had some challenges at the start of the quarter with the Kansas storm, but as we put that event behind us, we increased November production by three trains per day. December started slow, with the weather Jack mentioned, but we strengthened in the second half of December to a 35 per day train rate. Through the first two weeks of January, we've had good winter operating conditions, but our loadings had been impacted by a conversion BNSF made to a new dispatching system. BNSF has temporarily restored the prior dispatching system and operations have returned to a more normal state. In fact, loading performance has improved the past few days, so absent any other significant issues, the daily average should increase through the balance of the month.

Looking ahead to 2006, we have another strong hiring and training program planned. As Rob mentioned, much of this year is to backfill the ongoing attrition that we have in our work force. As we discussed with you back in May, the attrition rate within our train and engine personnel has been around 7 to 10% and that's expected to continue. In terms of locomotives and freight cars, we have planned for a smaller program in 2006. Our emphasis is to improve the overall productivity of these acquisitions and existing assets. With the significant resource investment, it's critical we stay focused on productivity. The principals listed here are really a summary of the lessons we've learned over the past couple of years regarding our ability to increase productivity. This flag gives a couple of proof statements on our '05 progress. Freight car utilization, which measures the load/unload cycle time, had a 3% improvement. That might seem small, but it equates to 8000 fewer cars on our network, or 100 miles of additional capacity.

Fuel conservation has always been important to us, but with the record high diesel fuel prices, it's critical. Last year we consumed 1.35 billion gallons of diesel. So there is tremendous leverage on the bottom-line. Our improved consumption rate in 2005 saved more than 35 million gallons of fuel, or roughly $40 million plus. We will continue with our education efforts and use of technology to improve our efficiencies further in '06. The principle of design for achievability is epitomized by the unified plan that we began rolling out in the second quarter. The goal of the unified plan is to increase velocity and improve customer service by reducing the work load on the network. We achieved that by reducing 16% of the in-route work events and 12% of the connections cars made at intermediate terminals. That ties directly to the gains we saw throughout 2005, with our dwell, inventory, and car cycle time improvements.

The unified plan implementation really laid the foundational steps for continuous improvement in our network operations. It is an evergreen process that we will leverage in 2006 and beyond to ensure that we are managing our network more efficiently. Another operational productivity initiative is our customer inventory management system, or CIMS. CIMS combines three factors. First the inventory pipeline for individual customers, second, the local switching capability, and, third, the customer load/unload behaviors. The objective is to reduce inventory and create capacity in major industrial areas. CIMS was piloted in Phoenix and subsequently rolled out to the locations shown in white, representing 40% of daily industry switching. The results in those terminals fully cutover has been very encouraging. A 25 to 40% decrease in inventory, 12 times improved by 20 to 25% and our customer switching performance improved by 35 to 50%. In 2006 we will expand CIMS to cover 75% of our industry switching.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Here's a look at some of our major '06 capital projects. As noted on the map, our capital dollars are focused on the areas where we have experienced some of our greatest volume growth and operational challenges over the past few years. At the end of 2005 we had about 42% of the Sunset corridor double tracked. Our plan for 2006 is to add about 50 more miles, as well as improve or expand some of our terminal infrastructure on the corridor. In addition to increasing the Sunset capacity, we will also be adding siding capacity along our south central corridor from Los Angeles to Salt Lake City. This work facilitates the bidirectional running and provides further surge capacity for the Sunset. Along our southern tier, we are also improving our terminal infrastructure in San Antonio, Dallas-Fort Worth and Houston. In the central corridor, across the Midwest, we will continue to invest for coal growth and improved cycle times. The UP/BNSF joint line is being expanded again in 2006.

We're adding processing capacity at North Platte and through the Kansas City/St Louis corridor into southern Illinois. We will also add another 60 miles of centralized traffic control across Iowa. Finally, we're adding facilities to accommodate the fast-growing ethanol business in Iowa, Minnesota and Nebraska. So let me wrap things up with the four key drivers that our operating team is focused on for 2006. One, we must operate a safe railroad. This benefits our employees, our customers and the public. Although railroading is one of the safest industries in America, we take a zero tolerance approach to safety and believe that every incident can be prevented. Two, continue to simplify our operations and drive absolute plan compliance. Three, create capacity through productivity and move more volume with our existing assets. And four, invest our capital dollars wisely to de-bottleneck constrained parts of the network. Together this will translate into better customer service, increased asset utilization and improved financial returns. With that, let me turn it back to Jim.

JIM YOUNG: Thanks, Dennis. Now, let me take a minute to give you a little perspective on 2006. As we look ahead this year, there are several factors to consider. One driver is the economy and we're assuming continued strength. We expect demand will continue to be strong, particularly in areas such as intermodal and coal. We moved a record 179 million tons of coal last year out of the southern Powder River Basin. For 2006, we know our customer's demand is for double-digit growth. The challenge will be for every member of the supply chain to meet their commitments and maximize loadings. We have a solid plan to do our part and we're focused on executing it. We also expect good yield improvement, as we have an opportunity to reprice 13% of our revenue this year and improve our financial returns. Operational efficiency is at the core of our overall performance. We have substantial opportunity for improving our efficiency. Bottom-line, we will focus on providing better service to our customers, improving the efficiency of our network, and increasing the financial returns on our business.

With that in mind, our first quarter expectations include commodity revenue to grow 15% or more in the first quarter. About 3% of the growth should be from volume gains and the balance from yield improvements and fuel surcharge recovery. Last year at this time we were working to restore service in California and Nevada following the West Coast storm. So our comparison in the quarter is easier. That storm subtracted roughly 55 million in operating income or $0.13 per share from the quarter. Our operating ratio should also improve at least 3 points. Again, we have the storm comparison, but we would also expect better core operating efficiency. This combination of revenue growth and operating ratio improvement should result in first quarter earnings in the range of $0.80 to $0.90 per share, which is nearly double what we earned in the first quarter of 2005 following the West Coast storm. Now, if you adjust for the storm, it's really more in the order of a 30 to 45% increase, very strong.

This year weather has been cooperative so far, but we know there could still be challenges ahead. We have the majority of the first quarter ahead of us, but we are getting off to a strong start. On a full-year basis, we would expect revenue to grow at least 10%. As I just mentioned, this growth is closely tied to our coal operation, but also anticipates solid yield improvement. Our full year operating ratio should improve by 2.5 to 3 points through a combination of yield growth, more efficient operations, improved fuel surcharge recovery, and hopefully more normal weather. On an earnings basis, this should translate into a range of 4.60 to 4.80 per share. At this point, we're targeting the top end of the range, which would be about a 40% increase over 2005. With only 18 days of 2006 under our belt, we need to consider that a lot could happen over the course of the year. Although we haven't reviewed our capital plan or full year budget with the board of directors yet, we're currently looking at a total capital spend, including lease equivalent,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

around 2.7 billion.

The bottom-line on capital is that it must be supported by higher returns. Finally, we look for a minimum free cash flow after dividends of 300-plus million. As Rob just told you, our cash flow is being impacted by higher cash tax rates. The key here is we're absorbing 400 to $500 million of cash tax increase and still growing our free cash flow after dividends. To summarize, we're looking forward to very profitable 2006, with strong demand, more efficient operations, higher yields and improving returns for our shareholders. With that, let me open it up for your questions.

OPERATOR: Ladies and gentlemen, at this time, we will be conducting a question and answer session. [OPERATOR INSTRUCTIONS] Our first question is coming from John Barnes of BB&T Capital Markets. Please proceed with your question.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Hi, Jim, good morning. How are you?

JIM YOUNG: Good. Thank you.

JOHN BARNES: On the capital spend, could you break it down for me just a little bit in terms of the buckets? I just want to get a feel for how much you're allocating towards tracking infrastructure and then how much to rolling stock. And then the question I have along with that is giving all the difficulties you had during the '05, is the '06 budget being inflated some as catch up on some of that CapEx in '05 of repairing infrastructure and that type of thing? Or is the 2.7 kind of a consistent number we should be looking at going forward?

JIM YOUNG: Well, John, if you think of 2.7 billion, I always kind of start with what do you think is kind of maintenance capital, kind of the core spend. This would include where you have a locomotive that's worn out that we replace. Of that 2.7, you've got about 1.7 to 1.8 falls into what I would call maintenance capital. So the rest goes in the categories of technology improvement, productivity initiatives, our locomotive acquisitions above replacement for growth, and then capacity into the railroad. Overall, the capacity piece in track and infrastructure is going to probably be in that 300-plus range when you look at it next year. But we still have a long ways to go. The other part of your question, looking backwards, there really isn't any catch-up here from our issues last year. We spent over $100 million in '05 for issues with the weather. But right now that's -- we're in pretty good shape there.

JOHN BARNES: Okay, and then as I'm looking at fuel, the surcharge seems to be working. You're recouping some of that, but fuel is still up I guess, what, 40 something percent year-over-year. As you're looking at kind of a $60 a barrel range in your forecast going forward through '06, outside of the fuel recovery mechanisms, are you looking at anything else to try to mitigate? I know you talked a little bit about your fuel conservation plan, but are you looking at anything else to mitigate the impact of fuel? Are you re-evaluating hedging from here? What are you doing just on in terms of trying to get a grasp on fuel from here?

JIM YOUNG: Well, the key is, Dennis talked about, is our fuel conservation program. That really covers training. It's new investment in terms of your locomotives. We said a long time ago that major upgrade of our fleet, looking backward today, I'm very happy we did that. Those locomotives we replaced at a minimum had a 10 to 15% fuel efficiency compared to what we retired. So training. Track structure, having good, solid base for track is important and then technology. There's no magic here, solution in terms of solving the challenges all of us have with energy. But we feel pretty good about the programs we have going. In terms of hedging, our view here is we've got to continue to focus on our fuel surcharge program, getting it -- getting up to 100% over time here. If things dip significantly, we might take a shot at it here in terms of fuel, but right now the fuel surcharges are key.

JOHN BARNES: Okay. All right, very good. Guys, nice quarter and thanks for your time.

JIM YOUNG: Thanks, John.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

OPERATOR: Our next question is coming from James Valentine at Morgan Stanley. Please proceed with your question.

JAMES VALENTINE, ANALYST, MORGAN STANLEY: Great, thanks. Congrats on an impressive quarter here.

JIM YOUNG: Thanks, Jim.

JAMES VALENTINE: Can you give us some color on the types of revenue that are in that 13% of the long-term contracts you expect to reopen in '06? What I'm trying to understand is that coal, because it's dense, heavy weight, by not getting a fuel surcharge there, that's going to have more impact then not getting it in lighter commodities like merchandise or intermodal. Can you give us some feel for what that mix of 13% looks like?

JIM YOUNG: I'll let Jack take than one.

JACK KORALESKI: Jim, it actually is pretty dispersed across the commodity lines. It has some greater emphasis in intermodal. We have some Ag contracts. There is a little bit of everything in there and not very heavily weighted towards any one issue.

JAMES VALENTINE: Okay. That's helpful to know that probably won't change, the mix won't change much in '06. Then the second part of the question on that is for the 55% of the revenue that has been repriced, historically railroads didn't do a real good job of putting escalators in contracts. I know you and others have said you're doing a better job of that. Going forward, '06, potentially even '07, should we look for the standard rate escalator in those contracts to be something better than we've seen in the past, mainly nothing. Could we see something as high as 2 or even 3% across the overall mix of the 55% of the business?

JACK KORALESKI: I think, again, Jim, there are some, like for instance business that renews in circa 1/11 has a very specific escalator that is actually a fixed percentage over the life of the contract. So those things are pretty well defined. We're moving a lot more towards an escalation factor for contracts that is -- it's the RCAP excluding fuel and then using the full fuel surcharge. So it would be a full 100% cost escalation kind of a process going forward. We are not discounting -- in some of our contracts we would in the past do discounts of RCAPs and things like that. We are no longer doing any of those things. We are looking for fuel at complete fuel cost recovery and equally on our other escalating components as well. And that's really all baked into our 10% plus for next year.

JIM YOUNG: Jim, when you think about yield going forward here, I think it's important long-term we think two pieces. We know where the market is for the service we provide today. We've got a lot of upside there when you look at the contracts, but there's another component here that I think is very important. As our customer service improves, we know there's more price in the market. Again, that I think we've got very good upside. So you got two components, price for the market that the service you're providing today, which we know have upside. And then price opportunity for better service. And that's when we think long-term here, next three or four years, we think we've got upside in both areas.

JAMES VALENTINE: Okay, great. If I could ask one last question of Jim. The one that I get most often from investors is when we get to the end of 2006 and we look back, what do you think we'll see as the biggest changes as a result of you becoming the CEO?

JIM YOUNG: Well, we're going to continue to focus on the plan that we put in place couple years ago, Dick, myself, the team here. We knew we were in a new world. We challenged everything we're doing and we've had a plan we've focused on that -- what I'm real excited about is I think 2006 is going to really show the results of that plan. It was masked this year with all the challenges we had. I'm really excited about it, but every year we're rethinking where we

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

need to go. What was good this year, what do we have to do different next year. So we've got a great team here and I'm really looking forward to this year.

JAMES VALENTINE: Okay, great. Thanks, guys. Appreciate it.

JIM YOUNG: Thank you.

OPERATOR: Our next question is coming from Tom Wadewitz of JP Morgan. Please proceed with your question.

TOM WADEWITZ, ANALYST, JP MORGAN: Yes, good morning.

JIM YOUNG: Good morning, Tom.

TOM WADEWITZ: I have two questions for you. A little further follow-up on the pricing. You've got the buckets listed, I guess 13% in '06 and then 32% in '07. '07 and beyond, is there a specific number for how much comes up in '07?

JACK KORALESKI: Yes, there is. I think the number is somewhere in the neighborhood of like 7% in '07.

TOM WADEWITZ: Okay, and can you give us any thoughts in terms of the progression, the magnitude of price increases that you're getting? It seems that the rail pricing environment really picked up at the beginning of 2004, but there's been a further acceleration in '04-'05. Do you think that you are now getting about the most that you're going to get or is there room for that to further increase? And can you give us any kind of broad sense of what kind of rate increases you can get as you reprice some of these pieces of business you haven't touched for a while?

JIM YOUNG: Tom, this is Jim. Again, I think when you think of pricing, there's a wide range that we see. Part of it is a function of where the return is today and what we have to do to get those returns to what we believe is the minimum return level. Sometimes they can be pretty substantial. Even areas where you may have felt comfortable a year ago at pricing, the market has run away quite a bit in terms of demand. There's smaller upside there, but still price opportunity. I think the key for us is sorting through, as we have done, all of the different businesses we have, looking at what the required returns are, and continue to make certain we are in a return on capital going forward.

TOM WADEWITZ: So do you think it's possible that the pace of yield growth we see in '06 and '07 looks reasonably similar than to what we've seen in '05?

JIM YOUNG: Tom, I think we've got the best upside in the industry for pricing. And part of it is when you look, again, at our mix of business that's under contract, a lot of it depends on the strength of the economy, what's happening in the truck sector, what's happening in the energy market. All of those are variables. I think we've got very, very good opportunity on pricing for return and pricing for improved service.

TOM WADEWITZ: If I can move to a question on capacity. When you look at your Sunset line, are you able to -- you're making some investments in capacity. Is that giving you a meaningful increase, I mean in terms of peak trains per day are you moving from 50 to 55 trains a day, that type of thing? Or given that there's still a pretty significant stretch that is single track, is it really pretty marginal the increase in total capacity there? And then I was wondering if you can give a comment on the central corridor as well. Are you close to being tapped out on capacity on the central corridor or is there room for pretty meaningful growth in the trains running across that corridor?

JIM YOUNG: I'm going have Dennis take that one on.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

DENNIS DUFFY: Well, Tom, on the Sunset, first of all, we are making incremental improvements on our trains per day through there. It is marginal at this point, but capacity is that way until you reach a step level when you get the preponderance of it. We'll have over 50% of it double tracked at the end of this year and we're evaluating it every year. In fact, every month we look at do we need to accelerate that and we have a plan to do so, providing the returns are there. So we are making incremental step-- incremental improvements in some trains per day. On the central corridor, obviously with the coal growth up there, but we're continuing to make investments to stay with that, with that demand and we expect to be able to handle that demand coming through there. But the big thing that we're doing, too, along with the incremental capacity, is take out failure costs. And we think we have a huge opportunity on both those corridors to drive that to the bottom-line through failure cost reduction. So right with the investments in terms of growth, accommodating growth, we're looking for a significant contribution to the returns from failure cost reductions.

JIM YOUNG: Tom, I think when -- this is Jim -- when you think long-term here, for you Union Pacific how fast we go on the double track is a real key strategic question. You can -- we're running 50,60 miles a year. You do the math, that's a seven, eight-year kind of program to complete it. We know the demand today, in terms of trains we can run, exceeds the capability. What we're taking a hard look at here is our confidence and our ability to continue to improve the returns. And I think, again, strategically, some of the decisions we have to make is should we accelerate that? Right now we're kind of on the seven, eight-year plan. We're seeing returns improve in that business. But it to me is one of the biggest capacity strategic questions we have facing us here next couple of years.

OPERATOR: Our next question is coming from Jordan Alliger of Deutsche Bank. Please proceed with your question.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANK: Given the level of coal demand that is expected by the customers in part because inventories are continue to be well below normal, I guess my question is sort of that double-digit customer demand, given what you know about your network and how much progress you've made, is there any way to sort of translate that to what type of incremental coal demand or how much of that growth will translate to your network?

JIM YOUNG: Jordan, if you look at last year the joint line produced 325 million tons. It's substantial growth when you look historically from where we started. Customer demand out there, I think, is a minimum 40 to 50 million tons next year, between both UP and BN. We have made progress in terms of throughput on the joint line investment in our properties. You have really-- when you think about it, you have the core electricity demand that will drive it. You have makeup capability from this year that we have to look at. You have conversion from eastern coal that's moved out. We're well positioned. We expect double-digit growth. My concern, again, is the whole logistics change from the mine, railroad, utility on the capability there to deliver. You missed a slot today, you don't make it up, for whatever reason. And we're working very hard with all three of the parties there to make certain we get everything done. But it's going to be a very, very strong year.

JORDAN ALLIGER: So sort of translates to sort of 12 to 15% customer demand growth. I know a lot of it depends on the supply chain. But all things equal, we could see coal volumes -- I mean could it even track as high as that or would that be asking for too much?

JIM YOUNG: Well, that's the demand. The growth key will be if the whole chain executes perfectly, that's the potential.

JORDAN ALLIGER: Thank you.

OPERATOR: Our next question is coming from Jason Seidl of Credit Suisse. Please proceed with your question.

JASON SEIDL, ANALYST, CREDIT SUISSE: Good morning, gentlemen. If I could stay on the Powder River Basin a little bit. We've heard some news that one of your competitors is having a little bit of trouble here early in January. It

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

seems like you guys actually are improving some of the operations. Can you sort of give us an outlook in terms of 2006 for where you expect trains to be other than just the first part of January?

JIM YOUNG: Well, to, as we've said, to get double-digit growth in tonnage coming out for UP, we need to execute and we're off to a good start this year. Weather's been kind, but we still have a lot of winter left. We're healthier with resources in terms of crews, particularly you think of locomotive engineers come out of training locomotives. We completed capacity work from a year ago. When you think about our central corridor, business move to Chicago, or business moving to St. Louis. So we're feeling better about our capability to deliver a nice increase in tonnage and so far we're performing. But there's a lot of year left. I'm confident that we've got the right tools in place.

JASON SEIDL: And you mentioned that there's a demand for double-digit tonnage out of the PRB. You also before that some of this, however, is going to be makeup from some of the construction work in '05. If you stripped out the makeup, what do you think the demand, the core demand is?

JIM YOUNG: Jack, do you want to take that one?

JACK KORALESKI: I think that the core demand is probably in the 8, 9, 10% range.

JASON SEIDL: Okay. That's helpful, gentlemen. If we also look in terms of pricing, the comment I believe was made on the call that as you improve service, it should be easier to get pricing. How linked do you think your ability to price is to your service level?

JIM YOUNG: Well, we look at every -- again, what's important here is understanding your customers' markets and then also your competitive position in the route you're looking at. We know clearly in the intermodal area there is very good upside in terms of service. And that's the way they sell on cycle times. What we have to do is look at these markets in terms of what makes most sense in terms of our capabilities. Intermodal, the industrial products area, again, look at cycles there, how much business might be moving highway that might move on the railroad given consistent service. It's really a case by case basis in the markets. But being in front of customers quite a bit the last year, it's clearly there.

JASON SEIDL: Okay. Thank you for the time, gentlemen. Nice quarter.

JIM YOUNG: Thank you.

OPERATOR: Our next question is coming from Edward Wolfe of Bear Stearns. Please proceed with your question.

EDWARD WOLFE, ANALYST, BEAR STEARNS: Thanks, good morning. And, guys, sorry, I'm just looking for a little more clarifications on some of the questions. You gave guidance volume around 3%. What are you expecting for coal in that 3% of total volume growth, give or take?

JIM YOUNG: Well, Ed, we said coal is going to be double-digit. I know that's a wide range, but it's-- it will be our strongest growth.

EDWARD WOLFE: Okay. I had heard you say that was demand. I didn't realize that's what you were projecting to produce.

JIM YOUNG: Right.

EDWARD WOLFE: And in the PRB, do you expect that to be a double-digit as well?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JIM YOUNG: Yes. If you step back and look at the groups, as Jack had mentioned, you have coal will be your strongest growth. Intermodal will have good growth. Key for intermodal -- again, what you have to do here, we know we could grow faster if you had the capacity, if our service is there. But we've got to be very careful that we do what's best for our network. You look at our industrial products group, we see -- I think you could grow faster than what we have in our plan here. But we've got to make certain that we manage our network effectively, that we handle that revenue and have good operations and convert it to the bottom-line.

EDWARD WOLFE: What's the timing for the finish-up of the heavy maintenance on the joint line and how long does that take?

JIM YOUNG: Dennis, do you want to take that one?

DENNIS DUFFY: Well, what's going to happen here is that we will finalize the maintenance plan with the BNSF here later this month, but I think you can expect maintenance to go on continuously through the year here. The question's going to be is how effectively we and the BNSF manage the maintenance and still continue to get the loadings. That's the challenge and that's the objective and that's what we intend to do this year, is do the maintenance and still meet our demand in terms of moving the tonnage out of the basin.

EDWARD WOLFE: I was under the impression, though, there's some heavier than normal kind of maintenance, maybe another four to six weeks, something like that, that's left. Is that incorrect?

DENNIS DUFFY: Well, there is some heavy maintenance left, but it's going to be done -- almost all of it where there is triple track in existence today. And that that isn't in the triple track territory, as I mentioned, there's going to be about 20 more miles of triple track added up there. That maintenance for that particular territory will be performed when the triple track is finished.

EDWARD WOLFE: Okay. So pretty consistent through the year. It's not going to be greater in one part of the year or the other as you see it?

DENNIS DUFFY: That's the objective.

EDWARD WOLFE: Okay. Just switching gears for a second, you talked about the amount of revenue being repriced, that's about 13% in '06, and I think in Tom's question you said 7% in '07. What was the percentage, give or take, in '05 that was repriced?

JIM YOUNG: Jack?

JACK KORALESKI: It was about 8%.

EDWARD WOLFE: Okay. And when you look at pricing, the pricing you said in one of your slides was up about 5.9% in the quarter. If you had to guess, and I know there's a lot of variabilities and certainly no one's going to hold you to it, but if you had to look out a year from now and you looked at underlying price, do you think it's greater than 5.9, less than 5.9, flat with 5.9? Directionally, where do you see that going?

JACK KORALESKI: I would say my core yield is probably in that 5% range.

EDWARD WOLFE: Okay.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JACK KORALESKI: For '06.

EDWARD WOLFE: And then just one last final question, property gains for the year. I think your guidance was something like 75 to 100 million. Is that correct?

ROB KNIGHT: Ed, in other income, 75 to 100 range, yes.

EDWARD WOLFE: Anything for the first quarter in terms of guidance?

ROB KNIGHT: No, it's ratable generally.

EDWARD WOLFE: Okay. Thanks a lot, guys, for the time.

OPERATOR: Our next question is coming from John Larkin of Stifel Nicolaus. Please proceed with your question.

JOHN LARKIN, ANALYST, STIFEL NICOLAUS: Good morning, everyone.

JIM YOUNG: Good morning, John.

JOHN LARKIN: Just wanted to bore in a little bit on the agricultural and industrial products area, both of which had terrific revenue per car performance, up 19% each, I think, really extraordinary. Is that because those contracts come up for renewal more frequently or is there some sort of change in mix going on within those segments?

JIM YOUNG: Jack?

JACK KORALESKI: The majority of the business in those two commodity groups, John, are in either one-year letter quotes or tariffs. Those are two of the areas where we do not have a high preponderance of long-term contracts. We've moved a lot of that into a public pricing environment. So we have greater flexibility there. And it also happens to be places that when you look at the marketplace, that's what market pricing is like in those two areas.

JOHN LARKIN: Would you characterize any of that pricing as what I would refer to as kind of volume management or de-marketing?

JACK KORALESKI: We actually did manage volumes down. If you looked at it in both of those two areas, the preponderance of the revenue growth that we had there was yield improvement. And we were very careful as to how much business we added to the railroad, given the amount of work that we were performing.

JOHN LARKIN: And a question on the fuel surcharge, you may have already mentioned this and I may have missed it. But did you mention what percentage of the business is currently on a fuel surcharge?

JIM YOUNG: Rob, do you want to take that?

ROB KNIGHT: We did not mention that, John. But it's about 90% of our revenue base has some sort of a fuel recovery component or another.

JOHN LARKIN: Okay. What would you expect that to be, let's say, at the end of '06?

ROB KNIGHT: It continues to grow. We're not going to be satisfied till is gets to 100% coverage, which won't happen

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

at the end of '06. So we'd make some improvement as Jack reprices that business that he talked about. Some of that has a component already, some of it doesn't, so it should walk up.

JOHN LARKIN: And then just one final coal question. We understand that there's a lot of demand in the east for PRB coal. I would be interested in knowing what percentage of the growth that you see in '06 and perhaps beyond is going to be due to increased demand in the east.

JIM YOUNG: Our first challenge right now is to serve our existing customers. We've got substantial demand out here and that's our primary target right now. The eastern market is a great opportunity for us. I don't recall, Jack, unless you do, what that split is at this point. We could do more in the east. There's clearly more demand than we have in our plan for eastern coal. But our primary focus right now, the majority is going to be serving existing customers.

JACK KORALESKI: Yes, the majority of 2006 will go to all existing customers and we are really at this point in time not taking on additional test burns and things like that. We want to take care of the business that we have contractually committed right now. That's our first priority.

JOHN LARKIN: So the customer demand that you quoted, which I think was up in the 12, 13, 14% range, that really doesn't include any of this activity in the east?

JACK KORALESKI: Only to the extent that we have existing customers in the east.

JOHN LARKIN: Thank you very much.

OPERATOR: Our next question is coming from Scott Flower of Citigroup. Please proceed with your question.

SCOTT FLOWER, ANALYST, CITIGROUP: Yes, good morning, all.

JIM YOUNG: Good morning, Scott.

SCOTT FLOWER: Just a couple of questions to different folks. I know that, and these are rough numbers that you talked about, 3% volume growth and 10% plus revenue growth, which obviously implies the 7% RPU type of gain. Given that you expect fuel to more or less stay in the area it is, I would presume then most of that ARC improvement then is core price. Obviously there's somewhat further penetration, but it doesn't sound like there's huge further penetration relative to the fuel surcharge versus what coverage you currently got. Am I thinking about that correctly or am I missing something in the math?

JIM YOUNG: Scott, the majority of that increase is going to be in your core price.

SCOTT FLOWER: Right, right. So I mean that would sort of argue that Jack's 5% number may be conservative when you talked about core price earlier.

JACK KORALESKI: I said in the 5% range.

SCOTT FLOWER: And then a couple other things. I know that you had talked earlier about a question just to get a little more color about escalations and doing better on that. Order of magnitude, I'm not trying to get a precise number, but what is the range of what escalators are doing? Is it just totally RCAP based ex-fuel and then you lay a surcharge on it? Is that a reasonable number when I think about the book of business that isn't being repriced or are there some other nuance to that when I am thinking about a range of what -- what is the escalator actually giving you on your core business that isn't necessarily rolling over?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JIM YOUNG: That is very situational for us, Scott. It depends on the competitive marketplace, it depends on the business, the reinvestability of the existing business as we roll those contracts. And even to some extent, our decision as to whether we want to keep that business under a contract basis or move it to public pricing. So, again, as I said earlier, we're kind of focused on the RCAP index for a lot of our standard kind of contracts where we basically cut the fuel out and use a full fuel surcharge in addition to the non-fuel components of RCAP.

SCOTT FLOWER: So then you're getting a fairly substantial escalator on your normal book of business?

JIM YOUNG: We're getting a better escalator than what we've ever gotten in the past.

SCOTT FLOWER: And then one last quick one on the revenue side. How is the recovery going in the Gulf Coast terms of some of the chemical plants shutdowns and maintenance and et cetera from Katrina, Rita?

JIM YOUNG: Jack.

JACK KORALESKI: We're really in good shape there. At one point in time we had over 100 customers that were impacted by the hurricane. But we are, for all intents and purposes, got everybody back up and running now.

SCOTT FLOWER: Okay, and then just a couple other quick questions. I know that Rob had mentioned that there was some slight insurance recovery in this quarter. Do you anticipate, as we look through '06, that there's some further substantive recovery in the insurance side and if so, could you give us some order of magnitude, understanding the vagaries of dealing with an insurance company. But is there some order of magnitude of insurance recovery that's built into your thoughts as you look at '06?

JIM YOUNG: Do you want to take that one, Rob?

ROB KNIGHT: Yes, Scott, you're right. We will continue to work with the insurance carriers to recover the balance of the January '05 storm issue. Order of magnitude, probably comparable to what we saw this year in the $0.03 range kind of number on an earnings basis.

SCOTT FLOWER: Okay, and then just the last quick question that I had, and I know that Dennis gave us a lot of focus and detail on the different parts of the operating plan, but maybe stepping back, when we think about the unified plan, what fine tunings or additional things are you working on in terms of major conceptual changes in how you're running the network today? Or is it basically more or less in place and it's really trying to work through the implementation and fine tune it?

JIM YOUNG: Dennis will answer part of this here, but I just want to start out with unified plan. The key for us is starting with the overall forecast for demand and you work that from top to bottom here in terms of your detailed plans. So we're spending a lot of time every year here looking at what markets fit best, what products do you put into the market, what are the customer demands. You start with that, then, when you look at your network and, Duff, you can talk about the individual operating initiatives that are in there.

DENNIS DUFFY: I think the thing that you can see here, expect to see going forward, Scott, is more of what I showed you, and that is simplifying our network. We have a complex network and the key to us is to do what we have been doing. Do more of origin and destination trains, take out intermediate work events, take out intermediate switches and we're going to continue to do more of that. One other area that we are focusing on in the next, what we'll call, phase of the unified plan is the to and from industry piece. That CIMS chart that I showed you offers us an opportunity to totally redo the way we do industry switching.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

As you know, we have the largest industrial base in the industrial products and chemicals and Ag products of anybody and we want it to be a core competency in operational excellence. CIMS offers us that opportunity. So we are totally relooking at the way we do to and from industry piece and CIMS is the way we're going to go. By controlling in route inventory, on hand inventory, customer inventory, matching their capabilities to our capabilities and then increasing our dwell in our operational performance there. So we're very encouraged about it. I think you'll see more of those aspects going forward.

JIM YOUNG: Scott, I think there's one piece there, and this may seem overly simplified when you think about the network, but we are working with many of our customers where our customers recognize this is a new world. And just the concept of loading/unloading seven days a week or 24 hours a day, we've got a lot of our industry that it's Monday through Friday and so all of a sudden you're sitting there with capacity that's not used. And we've got some great examples with our customers where we sit down together, work through how do we get more throughput with existing assets and had some great success. I think fundamentally for us, for UP, when you think about our manifest network, that's a substantial piece of progress we can make going forward.

SCOTT FLOWER: Thank you.

OPERATOR: Our next question is coming from Ken Hoexter of Merrill Lynch. Please proceed with your question.

CHRIS WEATHERBY, ANALYST, MERRILL LYNCH: Good morning, it's Chris Weatherby in for Ken.

JIM YOUNG: Hi, Chris.

CHRIS WEATHERBY: Just wanted to touch on intermodal for a second. You had mentioned that could be the driver of volume increases next year and with 5% volumes in the quarter. Just wanted to get an idea of fluidity of the network and where you see any bottlenecks potentially occurring. I know you're making some capital improvements on the Sunset corridor, but can you maybe comment a little bit on port fluidity and see how that is tracking?

JIM YOUNG: Well, let me start with kind of the overall demand. As I said earlier, volume was up 5% in the fourth quarter. In fact, I think it was an all time record for us in our volumes when you look at it. You've got substantial demand if you just step back and look at the customer base and what they like to move. What we have to do, though, in my mind is what business makes sense, what business generates the financial return. This isn't to me a volume game here. It's a return game. We have sorted through what customers will get us where we need to go on the return piece and fit our network best. Dennis can cover, as he talked about some of the capacity investments that we're looking at on that map. That shows you some of the areas, but, Duff, is there any more you want -- ?

DENNIS DUFFY: I think the map is representative, Chris, on where we see those challenges and where we're putting our money, on the Sunset, the central corridor and our terminal infrastructure down in the south.

CHRIS WEATHERBY: And you mentioned 84% east-west balance and how that's improved. Do you have any -- can you give any clarity on where you see that going? Is there substantial improvement to that or do you think you've gotten a lot already?

JACK KORALESKI: We really want to keep moving that forward to -- on a continuous improvement track. We would like to see it get to 100%.

CHRIS WEATHERBY: Okay. And then switching gears a little bit, if you could-- I missed a little bit of the discussion earlier on the cash tax details, but if you could run through a little bit of what we should be expecting for '06 again.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JIM YOUNG: Rob?

ROB KNIGHT: Yes, what I mentioned there, Chris, is that '06, we've run through the AMTs and NOLs that we've had for the last several years and our cash tax rate we would anticipate being up about 450 to $500 million in '06 over '05. And that puts us at a cash tax rate of around 25%-ish and that's what we would expect a more normalized rate going forward.

CHRIS WEATHERBY: That's a go-forward rate?

ROB KNIGHT: Yes.

CHRIS WEATHERBY: And then just finally you had mentioned the substantial growth in Mexican opportunity you have from beer going north. Just wanted to see if you could elaborate a little bit further on what we can expect as far as growth there on a revenue perspective for 2006.

JIM YOUNG: I think it's substantial. The key for us, though, is sorting through the business, what business generates the return that we need, working with the partners in Mexico, both Ferromex and the TFM, and making certain that the growth fits our network.

DICK DAVIDSON: I don't think you'll see another 66%, though, year-over-year. It will be far, far lower than that. But we will still have good growth, as Jim said.

CHRIS WEATHERBY: Okay, great. Thank you very much, gentlemen.

OPERATOR: Due to time constraints, our last question today is coming from Randy Cousins of BMO Nesbitt Burns. Please proceed with your question.

RANDY COUSINS, ANALYST, BMO NESBIT BURNS: Rob, I think you mentioned that you gave guidance for salary and benefits of 4 to 6%. I guess what I'm trying to understand here is salary and benefits still the largest cost component that you've got? I think you suggested that headcount would kind of match volume. I would have thought with the productivity initiatives, the benefits of the unified plan that we would be looking at fairly significant labor productivity gains so that you would see a situation where conceivably headcount could come down.

ROB KNIGHT: The headcount will be tied more directly to volume. And with the strong volume plan of 3%-ish, we'll see -- we will have productivity, clearly, but we'll see how it plays out. I would anticipate that it will be flat to slightly up rather than down, based on the strong volume for '06.

JIM YOUNG: Randy, there is-- as I said earlier, for us to get to where we need to be, the productivity piece is really a big part of the equation. We know what we can do on the market with yields. We know the demand is there in terms of volume. And for our railroad efficiency is the key to really substantially growing our yield here. You'll see productivity when it comes to '06 when we look at labor. I will also tell you, though, there's a balance we look at when you look at resources in our Company. We don't want to be short here. We learned a lesson where you get behind on your manpower resources, it takes you so long to get caught up, the failure costs of that shortage is substantial. So we're being a little cautious there. I think that there's great opportunities going forward, but together, when you look at all the resources we have between manpower, locomotives, our terminal capacity, freight cars, that's your least costly investment in terms of when you think about failure costs out here. We'll see a good year in '06.

RANDY COUSINS: Okay, and then final thing, this is a big year for labor negotiations. Do you guys see a resolution

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to the negotiations of this year and how much is the negotiation process going to be a factor in terms of your ability to drive productivity growth on the labor front?

JIM YOUNG: Well, as you know, we're in negotiations right now. We've-- with the BLE coalition we've asked for release from negotiations. That's still pending at this point. We're still talking with UTU. I hope we get it resolved this year. That's our goal. We aren't -- in our plan here, we don't have a substantial change in our agreements in terms of looking at our financials going forward. But negotiations, this is an important year.

RANDY COUSINS: Okay, thank you.

JIM YOUNG: Okay.

OPERATOR: At this time, I would like to turn the floor back over to management for any further comments.

JIM YOUNG: Well, thank you for attending the call this morning. I hope you see we're feeling good about the year and we all know we have great opportunity here and we look forward to seeing you here with our first quarter release. Thanks.

OPERATOR: Ladies and gentlemen, this does conclude today's teleconference. You may disconnect your lines at this time. Thank you for your participation.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2006 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2006 Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or Voxant's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and Voxant so long as they provide conspicuous attribution to Thomson Financial and Voxant as the originators and copyright

holders of such material. This is not a legal transcript for purposes of litigation.]

---- INDEX REFERENCES ---

COMPANY: UNION PACIFIC CORP; CITIGROUP INC; DEUTSCHE BANK AG; BEAR STEARNS COMPANIES INC; MORGAN STANLEY; DAIMLERCHRYSLER AG; AMICA VERLAG GMBH AND CO KG

NEWS SUBJECT: (Corporate Performance (1XO12); Corporate Financial Data (1XO59); Business Management (1BU42); Management Tools & Methods (1MA50))

INDUSTRY: (Enterprise Performance Management (1EN49); Theoretical Analysis (1TH79); Freight Transportation (1FR88); Railroads (1RA98); Retail Banking Services (1RE38); Transportation (1TR48); Banking (1BA20); Freight Railroads (1FR84); Financial Services (1FI37); Accounting, Consulting & Legal Services (1AC73); Construction Financing (1CO12); Consulting Services (1CO47); Construction (1CO11); Land Transportation (1LA43); Insurance Liability (1IN26); Lead Paint & Asbestos (1LE49); Railroad Equipment (1RA68); Passenger Transportation (1PA35); Science & Engineering (1SC33); Passenger Railroads (1PA89); Insurance (1IN97); Business Theory (1BU14); Consumer Finance (1CO55))

REGION: (North America (1NO39); California (1CA98); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (ARC; BB; BEAR STEARNS; BLE; BMO; BNSF; CFO; CHRYSLER; CIMS; CITIGROUP; CORPORATION; DEUTSCHE BANK; FINANCIAL; FORD FUSION; GAAP; JACK; JACK KORALESKI; JP; KANSAS; MARKETING; MERRILL LYNCH; MORGAN STANLEY; OPERATOR; PRB; RCAP; ROB; ROB KNIGHT; SECURITIES AND EXCHANGE COMMISSION; SITE; TFM; TRANSCRIPTION; TRANSCRIPTS; UNION PACIFIC; UNION PACIFIC CORP; UNION PACIFIC EARNINGS CONFERENCE; USERS; VOXANT) (Ag; CHRIS; Chris Weatherby; Davidson; Dennis; Dennis Duffy; Depreciation; Dick; Dick Davidson; Duff; EDWARD; EDWARD WOLFE; Estimates; Ferromex; JAMES VALENTINE; Jim; Jim Young; John; John Barnes; John Larkin; Joining; Jordan; JORDAN ALLIGER; Legacy; Louisiana; Nebraska; Nevada; Pie; SEC FILINGS; Tom; Tom Wadewitz; Utah; Yesterday)

Word Count: 15842
1/19/06 FINDISCLOSURE **13:45:00**
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT PX0575

DEPOSITION EXHIBIT 3 8-4-10 KT
PENGAD 800-631-6989

4/20/06 Fin. Disclosure Wire 12:45:00

FD Wire
Copyright 2006 CCBN, Inc. and FDCH e-Media, Inc.

April 20, 2006

Q1 2006 Union Pacific Earnings Conference Call - Final

OPERATOR: Good day, ladies and gentlemen and thank you for holding. Welcome to the Union Pacific's first quarter earnings release conference call. At this time all participants are in a listen-only mode. A brief question-and-answer session will follow the formal presentation. (OPERATOR INSTRUCTIONS).

As a reminder this conference is being recorded. It is now my pleasure to introduce your host, Mr. Jim Young - President and CEO of Union Pacific. Thank you, Mr. Young; you may begin.

JIM YOUNG, PRESIDENT AND CEO, UNION PACIFIC: Good morning, everyone. Welcome to our first quarter earnings conference call. With me today to discuss the results are Rob Knight, our CFO; Jack Koraleski, Executive Vice President of Marketing and Sales; and Dennis Duffy, Executive Vice President of Operations.

When we spoke to you back in January, we were optimistic about starting 2006 with a solid first quarter and, to date, we've delivered just that. For the first quarter our earnings more than doubled to $1.15 per share versus last year's reported earnings of $0.48 per share. You'll recall that a year ago our numbers included the impact of the West Coast storm which was about $0.13 per share; but even adjusting for the storm, our growth was significant.

First quarter operating income grew 93% versus 2005 to 605 million. In fact our first quarter operating income, which is generally the slowest quarter of the year, was the second highest ever in the history of the railroad. We have been challenged over the last several quarters converting topline growth into bottom-line results so I am most pleased with our operating ratio improvement of 6.4 points. Operating ratio is a key efficiency measure and Rob will discuss the details in a moment.

We made great progress in the quarter but we have a long way to go to reach our long-term targets. If you step back and look at the quarter's key drivers, it really boils down to three things. First we moved record volume and achieved the best-ever quarterly operating revenue of 3.7 billion. This performance highlights the strength of our franchise as total volume and revenue growth more than offset a shortfall in coal loadings.

Second, our operations did improve in the quarter allowing us to exhibit better cost control while moving record volume. Our network management initiatives, mild winter weather and capacity investments all played a role in helping us provide better service to our customers and operate more efficiently.

And, third, while our coal volume declined 4%, the opportunity is still there going forward. The decline was entirely in our Colorado Utah coal franchise with a 20% year-over-year tonnage decrease. Jack will provide you with more information; but the good news are the mines are back in operation and there is upside with strong demand for Powder River Basin coal.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Overall, we again made progress with our first quarter results. There is still a great deal of work ahead for us to achieve our full potential but we believe we are moving in the right direction. So with that let me turn it over to Rob for the financial discussion. Rob.

ROB KNIGHT, CFO, UNION PACIFIC: Thanks, Jim, and good morning. Before I get started I'd like to let everyone know that our 2005 fact book is now available. As we have in the past the book is available online under the Investor Relations page of UP's website.

I will begin today with a quick look at our income statement.

The headline here is a 93% increase in operating income generated from an 18% increase in operating revenues and a 9% increase in operating expense. Looking at the components of our revenue growth, commodity revenue increased more than $500 million to 3.5 billion in the first quarter. Jack will take you through the individual commodity groups. But in total, volume grew 4% for the quarter with four groups - inter-modal, agricultural, automotive and industrial products, gaining year-over-year.

Our business mix added another point and a half of growth in the quarter due to strong ag and industrial products shipments which carry a higher average revenue per car. Yield improvement netted six points of growth - another solid quarterly gain and fuel cost recovery added 6.4 points to the total commodity revenue growth.

Overall, it was a record quarterly revenue performance and is an indication of both our franchise strength and the strong demand environment.

Turning now to operating expenses, we will start off with salaries and benefits up 3% in the quarter to $1.1 billion. As we discussed back in January, the drivers in this category are wage inflation, volume growth and operating efficiencies. In the first quarter we achieved a 4% volume increase with a 2% increase in our workforce, allowing us to offset a portion of wage inflation with greater productivity.

Primary drivers in the quarter were increased volume costs with some offset for lower training expense. We also had an increase of $4 million associated with the new stock options expensing requirements of FAS 123' and as you may recall last year we incurred $6 million in higher costs due to the West Coast storm.

Looking out to the second quarter, force level increases of about 2%, wage inflation, volume growth and stock option expense will likely push year-over-year quarterly costs up about 5%. Quarterly fuel and utilities expense increased $150 million or 28%. Diesel fuel prices averaged $1.87 per gallon compared to $1.45 a year ago.

In addition to higher crude prices we also experienced significant increases in refining and regional spread. As we've discussed before, the focus here is on fuel conservation and on our fuel surcharge recovery programs. We are doing a better job with our surcharges to mitigate the earnings impact but we are not at our objective of 100% recovery of the diesel fuel cost above our benchmark price of $0.75 per gallon. Volume costs added 8 million to the quarter but a 2% improvement in our consumption rate saved us roughly $7 million.

Looking out to the second quarter, prices have again increased dramatically. Today, we are currently paying close to $2.10 per gallon for diesel. There's quite a bit of volatility in the market today, making it difficult to predict where fuel could end up. This volatility also creates a timing issue for us as our surcharge mechanisms have roughly a two-month lag so we won't recover for April's high prices until the month of June. And if prices remain high our recovery gets pushed out to the second half of the year. Higher fuel prices could be a headwind to both our operating ratio and earnings improvement.

First quarter rent expense came in at $367 million, up 4% versus 2005. This growth is consistent with our expectations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

for the year. Volume costs increased due to our 4% quarterly carload growth; in addition, long-term locomotive and freight car lease expenses increased year-over-year. Productivity gains did offset a portion of this increase in the form of better car cycle time.

Looking to the second quarter we'd expect the drivers to the volume growth with some productivity offset. (technical difficulties) Excuse us. We've got an alarm going off here.

You might recall that a delay in deliveries last year pushed costs from the second to third quarter. So in 2006, we would expect greater second quarter increases with expenses up about 6 to 8%. On a full year basis, however increases are still likely to be around 5%. Quarterly depreciation expense grew $14 million or 5% to $303 million. Again this is in line with our expectations for the year and reflects our higher capital spending.

Materials and supplies expense increased 21% in the quarter to $164 million. Most of the cost increases in this category can be tied to three things. Each contributing about one-third of the higher expense. They are higher material costs, increased maintenance activity and a cost shift between expense categories. We moved some contract work in-house, shifting some expense from purchase services and other to this category. For the balance of the year we would expect further double-digit increases. Similar to the first quarter, inflation, volume and the shift in expense categories will be the drivers.

Our last expense category, purchase services and other, grew to $450 million in the quarter - a 6% increase. One driver was the 11% growth in inter-modal volumes and the related drayage expense. This category also includes higher state and local taxes and personal injury costs.

On the positive side this category experienced lower contract expense for equipment repairs, better freight claims experience as well as a $5 million year-over-year decrease from last year's West Coast storm comparison.

For the balance of the year we'd expect this category to be flat to up slightly as we gain further operating efficiency. That's a quick look at our operating expenses. Let's turn now to our operating ratio.

Jim gave you a preview of this slide in his opening comments illustrating our 6.4 point improvement in the quarter to 83.7 in '06. This is our best quarterly operating ratio in over two years. Although roughly a point and a half of the decline can be attributed to last year's West Coast storm, the remainder is evidence of our higher revenue and operational efficiencies. We are converting record revenue growth into bottom-line gains.

Looking now at the full income statement, Other Income declined 50% in the quarter to $10 million. First quarter real estate sales were lower year-over-year but we still anticipate full year Other Income in the $75 to $100 million range. Interest expense was down $12 million in the quarter to $120 million. Lowered quarterly debt levels drove the decline.

The one downside to higher earnings is a larger tax bill. Income tax expense more than doubled in the quarter to $184 million; our effective tax rate was 37.2%, about a point higher than last year's rate. Our expectation is for a 37 to 38% tax rate for the balance of the year.

First quarter net income totaled $311 million or $1.15 per share, more than double last year's $0.48 per share. Of course as Jim mentioned, last year's results included the $0.13 per share impact from the West Coast storm.

Turning now to capital. Dennis will provide you with the details in a minute. In terms of the amounts our plans call for an all-in budget of 2.75 billion. This amount is about $100 million less than last year's (technical difficulties). Which you will recall was increased due to weather and joint line charges. Cash capital is targeted at the 2.25 billion; and the remainder is equipment lease financing. We remain focused on improving the overall returns of the Company as we invest for future growth and efficiencies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Let me wrap up with a look at our balance sheet. This slide shows our debt to cap ratios both adjusted and unadjusted for leases. As you can see, we continue to strengthen our balance sheet as we grow our business and increase our profitability. The bottom line, we made great progress in the first quarter and are off to a good start. Our task going forward is to build on that and improve throughout the year.

With that let me turn it over to Jack to talk to you about our record revenue growth.

JIM YOUNG: Jack, hold on a minute. I want to apologize to everybody for the fire alarm. I want to assure you that the fire alarm or the false alarm has nothing to do with our first quarter results here.

So what we can do here is after we are done with the pitches here if we need to go back on a couple of these slides and let Rob walk through them, please ask and we will do that. How about it, Jack?

JACK KORALESKI, EVP - MARKETING AND SALES, UNION PACIFIC: Okay. Our first quarter volume increased 4% over last year, set a new record with significant increases in our inter-modal, automotive and ag products businesses leading the way. Our strong yield enabled us to translate those volumes into all-time record revenue and average revenue per car per any quarter.

Our total revenue grew 18% as five of our six business groups posted all-time revenue records; and our inter-modal business set a new first quarter record. We set new all-time average revenue per car records in chemicals and energy and industrial products, while our ag and inter-modal businesses set new first quarter records.

In addition to our improving yield, customer satisfaction reached a two-year high, posting its fourth consecutive quarter of improvements as our customers are seeing slow but steady progress in the health of our network.

In our ag products business, we were able to create some opportunities for our grain customers to move more freight to offset a significant shortfall that we were experiencing in our Colorado coal business. Two of our coal mines were basically shut down for most of the quarter so we redeployed the locomotives to grain to take advantage of a very strong demand we had for feed grain.

The market drove those shipments into Gulf exports which were up over 200% in the quarter. Domestic demand for [meals] and oils resulted in a 9% increase in volume while the ethanol market continued to expand with shipments up 22% over last year. Although the strength in Gulf export demand cut into our Mexico volume somewhat, import beer increased 30% over first quarter last year.

In addition increased volumes of cottonseed, and meals and (indiscernible) which is the ethanol byproduct pushed our grain products 37% higher year over year. When it was all said and done we offset a little negative mix in our ag business and the combination of yield improvement actions and fuel cost recovery resulted in a [60%] growth in average revenue per car.

Our automotive revenues were up 23% as a result of higher volumes combined with yield improvement and fuel surcharges. Finished vehicle volume was stronger than anticipated, up 12% as heavy ground comps at year-end translated into strong demand for transportation in the first quarter. The launch of GM's new 900 Series, the continued ramp up in production of the Ford Fusion (indiscernible), and higher import volumes for Toyota also contributed to the increase.

Our parts business increased volume 4% accompanied by an 11% improvement in average revenue per car.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

So looking ahead in our automobile business, we expect that the first two quarters of 2006 are going to be the strongest in terms of finished vehicle move and we expect volumes will probably soften a little bit from that pace during the second half of the year.

Our chemical revenues climbed 14% even as volume declined 4%. Softer than expected potash export demand and some trimming of low margin business drove a 15% decline in fertilizer volume. Plastics were also down with fewer moves to the export market. Those declines were partially offset by growth and petroleum products as mild weather allowed for more road construction. With a continued focus on yield improvement, the chemicals soon delivered a 19% improvement in average revenue per car. Despite a 4% decline in volume, a 9% improvement in average revenue per car allowed energy to grow revenue 5%.

We expected coal volumes to be the biggest growth driver in the first quarter but issues with the mines on the SPRB joint line kept that from panning out. The good news is that the diversity of our traffic mix - combined with strong demand across the board - allowed us to shift some resources out of the coal and into other opportunities that we have in the marketplace like I mentioned before in our ag products business.

Here's a look at how the mine and rail issues impacted first quarter volume.

The chart shows the sorts of missed volume for Colorado, Utah and the southern Powder River Basin. For example in Colorado Utah, the entire shortfall of 21% was attributable to problems in two of our Colorado mines that significantly impacted loading. One mine suffered a roof collapse and another encountered persistent heat and gas problems. Now while these problems originated late last year the impact continued through most of the first quarter; and the result was a 2.2 million ton shortfall versus last year in this business segment. The good news is both mines are now back in full operation.

In the Powder River Basin, tonnage was slightly ahead of the first quarter record we set last year. Unfortunately, we missed the 140 trains because of operational problems at the mines and 114 misses due to joint line issues and rail operations. So our performance for the quarter could have been much, much better.

What this data reinforces is that there's just very little slack in the Powder River basin supply chain. And if a trainload is missed, whether it's because of a rail or a mine or a utility issue,, it's almost impossible for us to make it up. That's why we're actively working with the BNSF, the mines and the utilities on a number of initiatives to ensure that we take advantage of every available train slot.

In addition we're continuing our capital investment as Dennis will show you because we're confident, with the progress we're making, the returns on our coal business will certainly justify those investments. So we're off to a little slower start than what we had expected but the demand is still there; and we think we can still achieve a 10% growth in our coal business for the full year and we're doing everything we can to move that coal.

A 20% improvement in the industrial (technical difficulty) per car coupled with a moderate increase in volume resulted in a 23% growth in revenue. Stone, sand, and gravel volumes grew 8% as increased train sizes and cycle time improvements allowed us to capitalize on the strong rock demand in Texas, Arkansas, and Louisiana. In addition the mild weather especially in January drove year-over-year growth in our lumber, cement and steel businesses. Average revenues per car improvement was driven by continued movement of prices to market levels and the opportunity to mix up substituting higher margin business in place of business that would not allow us to reinvest in the future.

Our largest volume growth for the quarter was in inter-modal which was up 11% with strong demand in all three segments - international domestic and premium. All three segments also saw double-digit average revenue per car improvement. The year-over-year comparison was helped somewhat by the flooding that occurred in the first quarter of 2005. We are making good progress in our inter-modal business; the balance in our network between L.A. and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

East has improved from 66% to 74% resulting in reducing empty positioning moves, improving asset utilization and lowering their costs. In light of a relatively high proportion of legacy contracts in our inter-modal business, we're pleased with the progress we're making in yield improvement as well.

It was a great quarter in terms of transporting strong demand and to yield and revenue growth and we are equally pleased with the improvement that we saw in our customer satisfaction. Customer satisfaction index increased to 70 with the highest level that we had seen in two years. To help put that in perspective our seven-day car loadings were up 7000 cars per week. So we are encouraged that the satisfaction improvements we're seeing reflect the customer's sense of the stronger network. Clearly these satisfaction scores aren't at an acceptable level and we are focused on driving further improvement in our performance to better meet customer requirements.

Dennis is going to take you through these things, the things that we're doing that we believe will help continue to drive improvement in customer satisfaction. But before he does let me just wrap up with one more slide on the commodity outlook.

For the second quarter we are looking for commodity revenue growth of 14 to 15% with about 3% coming from volume gains and the balance from continued yield improvement in fuel recovery. The chart on the left shows the core price improvement for the first quarter was 6%, reflecting a continued strong market demand. A key part of our second quarter revenue plan will be double-digit coal loading growth. Now you'll recall May of last year was when the joint line issues surfaced so the year-over-year comparison is a little easier.

However the 2006 joint line repair program began on April 3rd; and although we don't expect a significant impact on loadings that repair work does add variability to an already complex operation. On a full year basis, we have updated the revenue outlook we gave you back in January. We now expect our revenue growth to be in excess of 12%.

So with that I'll turn it over to Dennis.

DENNIS DUFFY, EVO - OPERATIONS, UNION PACIFIC: Thanks, Jack, and good morning. Today I will spend a few minutes discussing our first quarter operating performance and provide some additional Technicolor on our 2006 capital budget and share a few of our second quarter and full year initiatives.

Let me start out with a safety update. This chart shows the three-year safety trend for personal injuries and rail equipment incidents which are primarily derailments. As you can see we have shown improvement in both of these measures over the last couple of years. The bars on the left show our employee incident rate improving 7% versus last year and nearly 19% over the two-year period. On a reportable basis 2006 rates were slightly higher than 2005. We have maintained a rate, however, that is well below the 2005 industry average of nearly 2.3.

The chart on the right shows rail equipment incidents over the last three years. In both measures total incidents and reportables, we have seen year-over-year improvement. Our strategy is zero tolerance and we work in all facets - employee, customer and public safety - to drive performance improvement.

Turning to service. The story for the quarter is really volume leverage. You have heard both GM and Rob talk about it. This chart illustrates its impact. On a weekly basis we handle nearly 4% more volume. Our velocity increased 2/10 of a mile per hour over the same period. It illustrates that we have created capacity through our network initiatives; and we are generating more throughput across the systems. In addition to the velocity we have improved service consistency, which I will talk about more in a moment.

Our daily focus remains velocity improvement; driving greater asset utilization; and increasing our capacity. Let me update you on a couple of the initiatives.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

One of our goals has been to simplify our network by reducing car handlings and in route work events. The major initiative is the unified plan. We actually just passed the one-year mark since we began making some of our network adjustments. So comparing the first quarters of '05 and '06 really shows that the before and after impact of the unified plan.

A 12% reduction in the rate of car handlings or switches at intermediate terminals and a 16% reduction in the rate of in route work events. Over the next several weeks we will be concentrating our unified plan efforts in the Southern and Western regions where we have our greatest pieces of industrial business plus our Mexican gateways. The unified plan benefit can also be seen in other productivity measures.

It translates directly to our improved to our improvement in terminal drill time which decreased by half an hour in the first quarter of '05 versus '06 and while that decrease may seem small it results into less car higher expense, saving us nearly $9 million annually. The reduced dwell time drive improves car cycle that Rob mentioned.

We continue to make solid improvements in this measure shortening the cycle, reducing congestion and creating additional capacities. Rob also mentioned we continue to move more freight and burn less fuel. Our first quarter sheet rate was the best ever first quarter allowing us to move a 2% increase and goes 10 miles with virtually no increase in fuel consumption.

This slide shows you a few different ways of measuring deployed productivity by (indiscernible) mile, carloads or freight train miles per employee. We are not satisfied with where we stand today on productivity but we are seeing signs of improvement. Particularly in two of the measures.

As we worked through our training bubble over the last couple of years and moved employees into productive service, those new employees have given as the capacity to grow and we'll continue to focus our efforts on driving additional productivity, particularly in these areas. Bottom line is our velocity increases we will see continued improvement in these areas.

As Jack showed you, our customers are telling us that service is improving. Two measures that we look at internally to gauge our customer service are car connection performance and industry slot spots and pull. Our connections which improved two points in the quarter measures the percent of time outbound cars make their scheduled departure objectives. An increase in this measure correlates to more consistent service and on-time arrivals. In the 3 spot in full which jumped 10 points in the quarter measures of timeliness of our customer pickups and deliveries, this gain can be attributed at least in part to the roll out of our customer inventory management system or CIMS. Through better management of our terminal workload and inventory on hand. we are delivering a more reliable service product to our customers.

In January, I shared some of our high level capital projects for 2006. Taking a more granular look at the work plan for this year it breaks down as follows. We will spend roughly 1.5 billion for track maintenance - that is slightly more than the work we did in 2005. Our capacity spending will total nearly 305 million. A portion of this will go to additional mainline staff capacity such as another 52 miles of double track on the Sunset corridor, 18 miles of triple track in the Southern Powder River Basin with the BNSF and in an additional mainline through North Platte to accommodate run-through business such as coal.

Other capacity projects include new sightings and extensions as well as signal system enhancements to help drive velocity and productivity. An additional $180 million is being spent on commercial facilities. This includes such items as support track in the Midwest for our ongoing growing ethanol business as well as inter-modal and automotive facility upgrades.

We will also acquire 200 new high horsepower locomotives and roughly 2700 freight cars for both replacement of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

older equipment and business growth.

We are off to a good start on our 2006 capital plan, completing several projects in the first quarter. I will just highlight a couple. Our Sunset Corridor double track work is progressing nicely. We've already completed 20 miles and we are on track to complete another 22 miles by August.

In mid-February we completed our bypass project in Marysville, Kansas. This was a multiyear project and moved our double mainline out of downtown, added six passing tracks and closed 11 grade crossings. We are improving public safety and enabling a speed increase for our roughly 70 trains per day from 20 to 50 mph. We're continuing to make infrastructure enhancements at San Antonio in anticipation of the new Toyota plant opening this fall. And we also realize solid productivity with our maintenance capital taking advantage of the warm weather in California, Arizona and even the Midwest.

In the second quarter and for the balance of the year our capital programs will continue to positively influence our operating improvement initiatives.

Looking ahead to the remainder of '06, we remain focused on our core disciplines. Operating a safe railroad, simplifying operations, increasing productivity across our critical resources, and investing a critical part of our network for efficiency and capacity. The end result will be further network simplification, reduced car handlings, and overall service improvements for our customers. With that let me turn it back to Jim.

JIM YOUNG: Thanks Dennis. Let me close here with an outlook on the rest of the year. As Jack had mentioned, our second quarter revenue outlook is growth of about 14 to 15%. About three points of that growth should come from volume; the rest from yield. The real key here will be our coal business obviously going forward here. The strong operating revenue growth should combine with continued improvement in our operations, which should drive a three-point improvement in our operating ratio year-over-year.

All in, we would expect our second quarter to be in the range of $1.20 to $1.30 per share. That's an increase of 36 to 48%. Obviously the major wild-card in this estimate is the price of diesel fuel. While we have substantially improved our fuel surcharge recovery over the past several years, rise in crude oil prices can still impact our operating ratio in earnings especially in the short-term.

For the full year, we expect revenue growth to be at least 12%. Now when you think about a full year (indiscernible) outlook given we had an 18% growth in first quarter, we are predicting 14 to 15% in second quarter. That equates to a lower growth rate in the second half of the year.

Our outlook here for volume and yield continues to be very strong. That slow growth rate really falls in what we will see in the growth rate for fuel surcharge recovery. You'll recall last year we had a very strong run-up in our fuel surcharge recovery in second half. We obviously won't see that kind of run-up here in the second half this year.

The strong revenue growth for the year should combine with better operating efficiency to produce a 4 point improvement in the full year operating ratio; and and earnings basis, this translates into a range of $5.00 to $5.20 per share and we are also raising (technical difficulties) of free cash flow after dividends to the 350 to 400 million range.

So, to wrap it up we are off to a good start in 2006, but have a lot of year ahead of us. We are being somewhat cautious in our overall outlook but we continue to see solid demand which should support future volume and yield growth. Our challenge is to handle the growth more efficiently. We have a long way to go before we are satisfied with our service velocity and financial returns; but we are confident in our plans for improvement.

With that let me open it up to questions.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

OPERATOR: (OPERATOR INSTRUCTIONS) Jason Seidl with Credit Suisse.

JASON SEIDL, ANALYST, CREDIT SUISSE: Good morning, everybody. Impressive results for the quarter. I was wondering if you could -- you teased out on the OR a little bit in terms of what the West Coast washouts did last year and sort of the gains this year. In some of the slides when you give your productivity improvements could you tease out the West Coast from that as well and let us know where you stand?

JIM YOUNG: Well let me start here. On the operating ratio the storms last year cost us about 1.5 points. And on the operating income I think we said it was about $50 million of operating income, kind of split evenly between revenue and operating cost. It's tough in terms of looking at the overall productivity numbers. Clearly we had the impact last year. On the other hand okay, the way coal really didn't flow as well. It had really a kind of negative impact this year.

So I think it's all those as I said, earlier, the unified plant, mild weather this year really all helped.

JASON SEIDL: I guess what I'm trying to get at, if you said that like a half an hour improvement terminal dwells about $9 million on an annual basis, but if I just think about it conceptually, I would imagine that you probably were almost on par with last year given the washup. So there is a little bit of room to grow there the remainder of the year in terminal [dwell] time.

JIM YOUNG: Actually you're not hearing -- I hope you don't hear from this team here that we are doing a high five over our productivity right now. We are -- we've made I would call it some progress with 4% increase in volume but there's clearly a significant amount of upside here going forward.

JASON SEIDL: Fair enough. If we look out on the inter-modal segment, given where fuel is now, are you seeing an increased demand from a lot of customers given the spread between pure truckload and fuel just gone up due to the fuel surcharge recovers?

JACK KORALESKI: You know right now, international demand is very strong and the premium and domestic markets are a little softer but it's really just the seasonal demand kind of situation you see in the first quarter of every year. Now I'm going to say that on one hand; on the other hand they are both a little stronger than what we had thought they were going to be.

So yes, we are probably seeing some impact of the higher fuel prices but it's not pushing us to any extreme.

JASON SEIDL: I'll give one more here and I will turn it over to somebody else. If we look at your fuel surcharge recovery rate, you say it's improved but you think they're going to get better. Could you give us some numbers behind that and I apologize if I missed it. In terms of what percentage?

ROB KNIGHT: What we've always said is we are not at our objective of recovering 100% of the run-off in fuel. We've made progress on that year-over-year we are still not where we want to be but we are subsidizing the customers less this year than we did last year. We didn't give the exact percent but we made progress; and in our total revenue growth just over six points of that revenue growth was attributable this quarter to the fuel surcharge recoveries.

JASON SEIDL: Thanks for the time, everyone.

OPERATOR: Ken Hoexter of Merrill Lynch.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Good morning. Just want to talk to you about the salaries and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

benefits. Obviously showing up a bit better improvement than we anticipated. It's a very solid cost control. Is that something you've got specific initiatives or is it just an offshoot from the unified plan? I just want to kind of understand what is sustainable on an annual basis when we start looking at these ongoing improvements?

JIM YOUNG: I think there are a lot of things that apply here. Productivity, your unified plan, a lot of the industrial engineering work we're doing in the terminals, a reduction in some of the training bubble that Dennis had mentioned where we are getting caught up. All are really contributing to that. I don't -- going forward here I still believe that 3 to 5% productivity is very real for us when you look at going forward here.

KEN HOEXTER: So there's no time frame on that kind of productivity. You can see that for a couple more years?

JIM YOUNG: No time frame. My goals -- I'm -- we're going to have productivity this year and continue it going forward.

KEN HOEXTER: Secondly, the capacity issues. You talked about adding capacity in the PRB. How about the main-line surrounding it? Are there any congestion issues once you actually leave the ERP for the work around it?

DENNIS DUFFY: Ken, in the past we talked to you about three corridors that we focus on really to increase our capacity. Obviously the Sunset, you know what we are doing down there, continuing to add double track. The Central Corridor which would be basically from Granger, Wyoming through to Chicago and onto Kansas City. We are working on that. We've had a four-year progress or project there to add signal capacity and additional capacity.

I mentioned to you the additional mainline in and around North Platte. We continue to improve our infrastructure in there to increase velocity and throughput there. And then the north-south route where we are working on our terminal infrastructure - primarily Houston, Dallas-Fort Worth and San Antonio.

So those are the three key areas that we are focusing on from a capacity perspective.

KEN HOEXTER: Just a real quick one. In the quarter, wondering (indiscernible) announced that they've leased containers from you? Do you have anything left to lease out? Or is this a full commitment program?

JACK KORALESKI: We have a healthy fleet of VMP boxes that we have retained. Those are just some one-off deals that we thought were appropriate.

KEN HOEXTER: Did you want to give numbers around

JACK KORALESKI: You know it wasn't all that much.

KEN HOEXTER: Thanks a lot.

OPERATOR: James Valentine of Morgan Stanley.

JAMES VALENTINE, ANALYST, MORGAN STANLEY: Thank you. Great quarter. Can I just ask about the guidance here in the, sequentially if I go back a few years ago before we had fuel inflation you would see about a 30% step up from your first to second quarters. And if we did that this year, we made about $1.50. If we take out let's say a dime or $50 million in fuel inflation sequentially, we would be at $1.40. And I'm just trying to understand are you being just incredibly cautious here or is there something else out there that you see beyond fuel that is starting to creep back into the cost structure?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JIM YOUNG: I think most of it goes into kind of your outlook here on fuel. It's very tough. You look at where the numbers have been moving here quickly. There's a lag. There is a minimum 60-day lag in our fuel recovery so I -- and I did say we were being cautious. But that really kind of is an outlook for the whole year here.

So a lot of things have to go right here. I mean we are -- our outlook on coal. We should have a strong quarter but as Jack said, you know you've got maintenance work going on. We saw about half of the misses as Jack had mentioned go back to the mines points. So I think there's upside there; but a lot of things have to click for us.

JAMES VALENTINE: Can I just ask Rob, you may have given this, what is your fuel assumption for the second quarter and full year guidance?

ROB KNIGHT: We didn't give that, Jim. Really when we gave the guidance we take into consideration that fuel is very volatile here and if fuel stays where it is today, that gives us a headwind on our earnings and our operating ratios. If it moderates, that puts us probably at the higher end of that guidance. If it goes above where it is today, then that puts pressure on us and puts us (indiscernible) .

JAMES VALENTINE: Did you say you are paying $2.10 a gallon right now?

ROB KNIGHT: Currently we are paying $2.10 as we speak.

JAMES VALENTINE: And that means as of like today or yesterday that (MULTIPLE SPEAKERS)

ROB KNIGHT: Last few days. Right.

JAMES VALENTINE: Great. One other question I have and maybe, Denny, you want to think about this or help us with this. Relates to the whole schedule railroad program and what I've been starting to witness now or over the years is that would schedule railroad when they get implemented can take kind of 18, 24 months before they really start to kick in and generating earnings leverage and we saw that at Canadian National. We saw that at Norfolk Southern.

Now here, this quarter we are starting to see this in CSX. You guys are about, I guess while you said a year into your program, can you give us some kind of feel if you are starting to see I guess I'll call it a step function into that acceleration we've seen from other carriers, where it really starts to kick in and everything falls into place? Or do you think that is probably still late this year or even a 2007 event?

JIM YOUNG: I would expect to see certainly continuous improvement and I think there is that [step level] opportunities to be made here. Volume creates opportunities for us in terms of creating additional bypass trains, which we are trying to build and reduce our work event.

So I think the expectation would be obviously continuous improvement and in certain locations and certain quarters and volume level. Lot to play with that. But we will continue to drive productivity and continuous improvement. You'll see it in our terminals and our velocity and all of our metrics.

JAMES VALENTINE: Thanks so much.

OPERATOR: Tom Wadewitz of J.P. Morgan.

TOM WADEWITZ, ANALYST, J.P. MORGAN: Good morning and strong quarter; nice quarter. Let's see. Two questions for you - one on capacity, one on pricing. It seems like you are making a lot of good investments, smart investments in capacity. You are probably -- you know you are behind a bit. At the same time you've got some pent-up

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

demand in a couple of business units.

Is there a point where you think you actually catch up in terms of the pace of investments you're making? Or is it more likely that, if we still have good demand in the coal inter-modals, you don't see necessarily an inflection point where you've got the capacity added and you really get that strong improvement fluidity?

JIM YOUNG: You know there is some catch-ups you're doing here but I will also tell you when you look at the demand right now, you know, we've got some great opportunities out here. The key for me at the end of the day is our ability to continue to improve the returns where we have got a lot of business opportunities out here when you go forward. It's not clear to me whether all of those businesses are going to meet the kind of financial return we want; and I'm not going to invest in that line of business if it doesn't get there.

So you know I don't -- if you are asking the the question are we going to fall off to $2.2 billion of capital or two, three real quick I just don't see it right now. And the economy will play a role here in terms of the man but we are seeing pretty significant demand here across most of our business lines.

TOM WADEWITZ: So put another way, given the demand you see you invested a pace to keep things relatively tight. And that probably provide (technical difficulties) support on the pricing story as opposed to really kind of massively investing to get ahead of things?

JIM YOUNG: There is no quick fix here in terms of capacity. I think in the whole rail network that that is going to magically develop excess capacity here. I think, again, one of the nice things about railroad investment you can kind of put it in an inch at a time and you look at our investment in the Sunset quarter. Dennis has got a goal of 50 miles this year. We turn 20 miles over top rations in first quarter and we really can meet it.

TOM WADEWITZ: Then on the pricing side, there continues to be upside versus our expectations at what you're going to get on yield and price in general. Is it possible that when you look to '07 you can sustain kind of a all in price number which is 5, 6, 7%? Excluding fuel surcharge but just looking at affected price across the portfolio. You think that's possible? Or do you think that it's -- would be likely to have the pace of price fall off meaningfully in '07?

JIM YOUNG: You know I think, again, it is going to be a function of how long and sustainable you believe the demand is, the economy. Although I really do believe there is a structural shift here in demand in our business here. We are going to be aggressive. We have got a long ways to go when you look at it in terms of getting this business to where you can look at it's (indiscernible) and earn your cost of capital and I also have several businesses that (technical difficulties) really are a long ways off of reinvest ability. So we (technical difficulties) -- gressive. I'm not going to confirm the numbers for next year but right now pricing is pretty strong.

TOM WADEWITZ: Thank you for the time.

OPERATOR: Edward Wolfe of Bear Stearns.

EDWARD WOLFE, ANALYST, BEAR STEARNS: Good morning. Can you take us a little through the coal? When did the two Colorado mines open up again?

JACK KORALESKI: In mid to late March is when they opened up again.

EDWARD WOLFE: Both of them at about the same time?

JACK KORALESKI: Yes. Pretty much.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EDWARD WOLFE: And when you look at 10% volume for the year, how do we think about that as we go out sequentially? I'm guessing some of that is back-ended, given the heavy maintenance and the comps get easier later on, but how should we look at that kind of quarter-over-quarter as we go out?

JACK KORALESKI: As you recall second quarter is when the Powder River Basin joint line last year really struggled. And in fact, I think, for the second quarter we averaged about what was it 31, 32 trains off to PRB. We are running 35 or so right now. 35. 36. So you are going to have -- you should see a strong increase this year and in fact if you looked at the PRB challenges last year they went all away through I think September, October.

So you are going to see the stronger growth right now starting here, really, in May through probably September. And again though, you know, there is a challenge out here with the whole logistics chain. And we are working very hard with the mines, our customers the (indiscernible) to make certain we get every train stop we can off the -- out of the Basin.

EDWARD WOLFE: So we should be about 10% this quarter is what you're saying to get to 10% for the year?

JACK KORALESKI: That's right.

EDWARD WOLFE: And Jack you mentioned potash export, potash being soft. Can you talk a little bit about what you are seeing in trends there? And how much of that is negotiating price versus real softness that you see sustaining?

JACK KORALESKI: You know at this point in time, Ed, we are kind of looking at it that you've got kind of a lull right now. There is some probably pricing negotiations going on in the potash markets themselves. The exports, the Chinese markets haven't been quite so strong. But we actually think that over the course of the year we might have a shot of getting that back.

EDWARD WOLFE: In other words, recovery?

JACK KORALESKI: Yes.

EDWARD WOLFE: Okay and when do you get a sense for that? Is it a month from now, two months from now?

JACK KORALESKI: I wish I knew the answer to that question. But I would say, yes, over the next month to two months we should probably have a much better read on what is happening and whether it is going to be a sustained softness or whether things are going to perk up here.

EDWARD WOLFE: And, Jim, just one thought on fuel. We are starting to seek a little bit more publicity as fuel gets higher at the pump for everybody. And the STV holding hearings and all those kinds of things. Is there any thought of UP of changing the way you collect your surcharge?

JIM YOUNG: You know, Ed, we -- if you think about the surcharge, how it originally went in. That was based on a lot of conversations with customers. They wanted to **keep it ticket simple**. Ability to manage it. It followed -- if you really looked kind of a lot of the traditional fuel surcharge methodologies. The key point for me we are not at 100%. Our goal is to be 100%. No more than that.

We will always take a look at what makes most sense going forward here. I think when fuel surcharges went in most people believed it was kind of a one off deal. You had a blip in crude; it would come back down and we would go from there.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

And obviously I don't think anybody believed crude is going back to the $26 barrel we had when we put that fuel surcharge in so -- or is the base. So we will take a look at it going forward. Right now I don't have any plans to change it.

EDWARD WOLFE: Thanks a lot for the time.

OPERATOR: Jordan Alliger of Deutsche Bank.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANK: Good morning. What stood out to me was - and you talked about this a little - is that your fuel consumption, your gallons were basically flat even with the volume increase of 4%. I'm just curious if you could talk a little bit more about that and how you are doing that and how that might look after the future?

JIM YOUNG: Sure. I'm going to have Dennis take that one.

DENNIS DUFFY: It's a multifaceted approach to it. Obviously what we've done a lot with our simulator training on our engineers and that is really starting to pay dividends for us. Obviously our new locomotives that we purchased over the last few years are very efficient and have delivered us a substantial savings there. We -- our put had new technology on all of our locomotives. The automatic start stop that allows us to take advantage of idling time. Our fuel conservation policies that we have with our shutdowns.

And then the other thing that we have our employees started an initiative called Fuel Masters where they actually incent and compete with each other on good train handling and have just done an excellent job. And it's saved us literally millions of gallons a month by their good train handling and their great fuel conservation.

So it's a multifaceted approach which we are very serious about and continue to reinforce at all levels of our Company.

JORDAN ALLIGER: So generally would you say the pattern, even with increased volumes, could -- I mean, obviously, it will depend on what fuel cost per gallon does (technical difficulties) being equal sort of the general trend where gallons increase less than the volume should persist?

JIM YOUNG: I think within a reasonable range. We are -- again, our focus is fuel conservation efficiency. How business mix comes into play clearly can have an impact and so you have to be careful about kind of making it linear off of the first quarter. But my expectation every year is we are going to see better fuel efficiency.

JORDAN ALLIGER: Just a quick follow-up on the coal side of things. I guess just I'm sort of wondering, I know a few months ago before the coal production issues in Colorado, the thought was that coal demand could be up like 12 to 15%. And now it's looking at 10% and coal, obviously, is a critical commodity to you guys.

I am just wondering - I know we talked about fuel expense and the wildcard to earnings. I'm wondering on the coal volume side, how much can that play or not play in to the second quarter and full year earnings outlook you are relative to sort of that 10% bogey?

ROB KNIGHT: Our outlook on volume and demand are two different things here. The demand is higher right now when you look at the total demand for PRB. In fact, I think the numbers when you look backwards here are up near 15% year-over-year in terms of tonnage. The real question is the ability of the supply chain to deliver that kind of demand.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

So we, right now our outlook is what we think we can deliver. But I don't see demand falling off right now. It is going to continue and, again, I think that's why it's so important for us to focus on the whole logistics chain. Our capital investments we are making. Because I don't see that falling off in the near-term.

JORDAN ALLIGER: So the 10% though. Just to make sure, that is what you expect to be able to deliver?

ROB KNIGHT: That's right.

JORDAN ALLIGER: Thank you very much.

OPERATOR: Gary Chase of Lehman Brothers.

GARY CHASE, ANALYST, LEHMAN BROTHERS: Good morning. I admire your tenacity in reporting your results through the fire alarm there. Just a quick question. You've held coal out as something that's critical for the quarter. Obviously, you face your share of challenges along those lines. This quarter you had the flexibility to offset that elsewhere in the network.

In the event that you run into difficulties again in the second quarter, do you think you have the operational flexibility and the demand to do what you did this time and offset that impact elsewhere?

JIM YOUNG: Yes, I believe we do. You know we are -- you look across the six business groups that we have, there's good demand really across most of them right now. We do have some ability if production has fallen off on the mines that we can shift some resources. Grain is an example. Where you can put locomotives and so I don't -- you know, I want to handle the coal at the end of the day.

That's our goal is handle the coal and we meet our other commitments here to our other customers but we do have some flexibility on looking at mix.

GARY CHASE: But we should read that as you'll have an ability to offset some of that if -- for whatever reason?

JIM YOUNG: Right now, I'd say yes.

GARY CHASE: Great. Thanks a lot.

OPERATOR: Rick Paterson of UBS.

RICK PATERSON, ANALYST, UBS: Good morning. Jim, I would just like to get your latest thinking on the price of (technical difficulty) you are going to be doing this for years and by the time you get it done it's probably time to triple track it. Any interest in dramatically accelerating the program?

JIM YOUNG: As you know, we are 50 miles (indiscernible) put you on about an eight-year curve to finish it and with demand, you are right. You will be at capacity that is done. But what supports me right now is looking at the financial returns in the inter-modal business. That will drive any decisions to accelerate spending on that line.

And I tell you every time we cut it it looks like demand is going to stay very strong. But we've got to work in the financial returns side. I don't -- you know (indiscernible) assessing where we get the best capacity expansion here. We have got to protect our network. Double tracking Sunset, you have to look at the double networks here and demands on coal, landing spots etc.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

So we are sticking to our guns here in terms of what we've got our outlook for capital this year and (technical difficulties) how things go when we put our plan together for '07.

RICK PATERSON: And speaking with inter-modal, the (technical difficulties) 400 with a little bit of upside. Are you still committed to maintain those boxes in-house?

JIM YOUNG: Yes we are.

RICK PATERSON: Thank you.

OPERATOR: Randy Cousins of BMO Nesbitt Burns.

RANDY COUSINS, ANALYST, BMO NESBITT BURNS: Good morning. With reference to slides 12 and 13, Rob, wonder if you could give us a little bit more clarity in terms of this stuff that you've brought back into the firm and the context for the guidance you are giving for the balance of the year? In other words, how much of the guidance as in accounting is a swing in terms of allocation between the materials and supplies and purchase services?

ROB KNIGHT: About a third of that increase was a result of our decision to move locomotive overhauls that we had previously been contracting outside work to do in their different locomotives, etc. But for various good reasons we moved those overhauls into our in-house and, really, what that does is move it from purchased services expense category to our materials and supplies.

RANDY COUSINS: So if we were to rip out that reallocation, in terms of starting to think about Purchase Services and Other, it's actual organic escalation rate in terms of sort of cost would be what? And the same thing on material supplies, again, stripping out this reallocation issue?

ROB KNIGHT: That was in the guidance I gave. That's been taken into consideration, Randy.

RANDY COUSINS: Rob, but I'm just trying to think from our perspective in terms of sort of trying to understand underlying cost increases, both in Purchase Services and the material supplies. What would you say is sort of the organic rate of cost increase independent of this reallocation issue?

ROB KNIGHT: Rough numbers, material supplies. More like a 15 percent-ish rather than a 21 percent-ish.

JIM YOUNG: That includes, there are several components there that includes increased locomotive overhauls which you can attribute to volume and larger fleet going forward. Obviously you have core inflation going on in some of these categories here. So you know when you say organic it's not quite clear to me what you mean there. Because that also includes volume in some of these categories.

RANDY COUSINS: I was thinking about more in the context of both that sort of volume and sort of the inflation component because you give highlighted inflation as kind of one of the issues for materials and supplies.

ROB KNIGHT: Yes, again, I would say about a 15% kind of number instead of the 21 issue you saw here.

RANDY COUSINS: And then for purchase services, the kind of base rate increase would be what? Excluding this reallocation issue.

ROB KNIGHT: Would have been roughly 8 percent-ish.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

RANDY COUSINS: Great. Thank you. And the other thing I wanted to get into was just the issue of the fuel lag. Can you give us in terms of your surcharge, can you give us some sense as to sort of how we should model up a lag, so if we got higher fuel costs today then we had sort of on average for the first quarter through the fourth and that is going to cost some squeeze in Q2, how does that reverse itself in Q3? Can you give us kind of some sort of sensitivity measure that we could use?

ROB KNIGHT: That's kind of a tough one. I guess a rough rule of thumb may be that you've got almost a two-thirds lag and you'd think second quarter a run-up in fuel.

(MULTIPLE SPEAKERS)

JACK KORALESKI: An April price increase in fuel, our April cost will determine what our June surcharge is. So any run-up that you see in May or June will actually -- the recovery for that is moved into July and August.

RANDY COUSINS: So let's assume for argument's sake that you've got $100 million worth of fuel price increase; and you've got a 70% recovery rate. That is $70 million worth of increase. That kind of two-thirds of it falls under the following quarter. Is that a way to think about this?

JIM YOUNG: It's a two-month lag to implement the (MULTIPLE SPEAKERS).

JACK KORALESKI: That's not out of line.

RANDY COUSINS: Great. And then the last thing just (indiscernible) I want to get some sense of sort of what you guys actually think the real underlying organic demand is for your business? Because obviously you are constrained on network capabilities, on [positions] that you have to deal with in terms of sort of returns in certain businesses, but if the pricing was right and the system was there, the availability of the system was there. What do you actually think is the underlying growth and demand for your book -- for services from Union Pacific?

JACK KORALESKI: That's a tough one. It's more than what we are handling right now and, again, we are trying to be selective. We are trying to look at returns. We are looking at what makes most sense in the network. We are working with customers on improving throughput.

But I will tell you right now it's -- you know there are very few of my customers -- they all want to give us more business and we -- again I felt good about first quarter. We had 4% increase in volume and did a pretty good job of handling it. I'm concerned long-term. You know the question becomes you've got interest rates up, you've got fuel over $70 a barrel.

You know we will hit another cycle at some point, but you know I think it's, again, a function of what we can officially handle. We are not adding capacity fast enough that will guarantee 100% of the -- we are going to handle 100% of volume and we won't do that. We've got to really look at the returns and what business makes more sense.

RANDY COUSINS: Could you say, just shooting from the hip, that real underlying demand is actually probably 2 or 3% higher than you are actually capable of accommodating?

JIM YOUNG: I don't think that's unreasonable.

RANDY COUSINS: Great. Thank you.

OPERATOR: Jon Kress of European Investors.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JON KRESS, ANALYST, EUROPEAN INVESTORS: Unit three obviously is regulated. You hear a lot of noise about your customers complaining about the increases in the fuel charge and the regulators listen to the customers, I guess. What is your, what is the risk here and what is your strategy, with respect to dealing with the regulators and providing the customers with something other than lower prices basically that would make them basically happy? I mean, can you -- is there other service elements or capital spending that you could do to sort of switch the heat from prices to service performance?

JIM YOUNG: I spend a lot of time in front of our customers. You are never going to find a customer that is happy with the price increase. You can understand that; but I will tell you if every one of them that are concerned about, are we going to be there for the growth and are we putting capacity in to handle the business. The fuel surcharge, I think that will eventually be worked through. To me, it's kind of a secondary issue.

The fact of the matter is, with all the talk of re-regulation, the current business model is working. We have got the highest single capital spend in the industry in many, many years. We've started to see some real capacity going to ground for growth and you know we've already you had the regulated model. And we know what happened there. You would see capital investment - in my mind - dry up very quickly.

So service, we need to improve. I commit to that with our customers and in fact, you know one of my commitments is if they put price in, if I get price I get the returns up, I'm committed to service and I'm also committed to capacity growth. So the strategy in my mind is working with each customer and helping them understand what we need to do to continue to be successful in the industry.

JON KRESS: I think we would agree with that but do you think that the regulators see it that way? Or the regulator?

JIM YOUNG: You know, the question is what is the regulated solution? Where is the capacity and capital investment going to come from? It's not going to come from the shareholders at Union Pacific when you look at re-regulating this industry. So that the question is does it come from private industry or does it come from the government? I don't see that -- the latter as the solution.

JON KRESS: What do the think is the most -- this is the last question. What do you think would be the most important investment that the industry could make to improve service? What would have the biggest bang for the buck? Not that Union Pacific would make but that the union industry as a whole would make or its parts?

JIM YOUNG: The solution for service really covers a lot of different areas, but track infrastructure, track capacity - whether you're talking terminal - you are talking your mainlines is really the key. And those are the highways out there that we have to build and maintain and to me that's where you get the biggest bang for the buck. It's not the only solution, though.

We cannot buy our way or spend our way out of the challenges here. We have got to look at working with our customers, unified plan, working with customers to work more than Monday through Friday. Load. Unload. Really taking a hard look at really the whole processes here.

JON KRESS: Thank you.

OPERATOR: Due to time constraints our last question today will be coming from Scott Flower of Golden State Research.

SCOTT FLOWER, ANALYST, GOLDEN STATE RESEARCH: Good morning. A couple of quick questions. I

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

know, Jack, you've mentioned -- are you making any progress on some of the customers be it in inter-modal or automotive or as we may have legacy contracts that stretch out for several years working in advance of those deadlines to work with those customers to perhaps avoid a step function later? In other words working with them to say, real world prices are here and your prices are dramatically below market? Just wondering have you had any success in that kind of dialogue?

JIM YOUNG: Depending on the situation, the customer, the economics of the deal and where we are, we have worked with customers and we are working with customers on some of those deals and (technical difficulties)

SCOTT FLOWER: -- other operating line and I'm assuming the timing issue on working capital; otherwise I'm just wondering what that was because it was a big enough number to be meaningful? If you look at other, I guess net in terms of your operating cash flows? What is that?

ROB KNIGHT: You are exactly right. It is timing and it's pension, it's inventory payments. You know for the full year, we were expecting that other category to be, the change to be in the $50 to $100 million range rather than what you saw.

SCOTT FLOWER: You mean in terms of the deficit.

JACK KORALESKI: Yes.

SCOTT FLOWER: Thank you very much.

JIM YOUNG: Thank you, everyone, for being on the call this morning. We will see you here in about three months. Thanks.

OPERATOR: Ladies and gentlemen, this does conclude today's teleconference.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Copyright: Content copyright 2006 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2006 Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or Voxant's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and Voxant so long as they provide conspicuous attribution to Thomson Financial and Voxant as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

---- INDEX REFERENCES ---

COMPANY: UNION PACIFIC CORP; DEUTSCHE BANK AG; BEAR STEARNS COMPANIES INC; MORGAN STANLEY; STV

NEWS SUBJECT: (Corporate Performance (1XO12); Corporate Financial Data (1XO59); Business Management (1BU42); Corporate Strategy & Strategic Planning (1XO03); Business Strategy (1BU97); Conventions, Conferences & Trade Shows (1CO42); Prices (1PR65); Economics & Trade (1EC26); Economic Indicators (1EC19))

INDUSTRY: (Consulting Services (1CO47); Enterprise Performance Management (1EN49); Freight Transportation (1FR88); Theoretical Analysis (1TH79); Retail Banking Services (1RE38); Banking (1BA20); Transportation (1TR48); Science & Engineering (1SC33); Financial Services (1FI37); Accounting, Consulting & Legal Services (1AC73); Business Theory (1BU14); Consumer Finance (1CO55))

Language: EN

OTHER INDEXING: (BEAR STEARNS; BMO; BNSF; CFO; COLORADO; COLORADO UTAH; DEUTSCHE BANK; ERP; FINANCIAL; FORD FUSION; GM; GOLDEN STATE RESEARCH; HOEXTER; JACK; JACK KORALESKI; KEN HOEXTER; MARKETING; MERRILL LYNCH; MERRILL LYNCH KEN; MORGAN STANLEY; PRB; PURCHASE SERVICES; SITE; SPRB; STV; TRANSCRIPTION; TRANSCRIPTS; UNION PACIFIC; UNION PACIFIC EARNINGS CONFERENCE; USERS; UTAH; VOXANT) (ALLIGER; Dennis; Dennis Duffy; J.P. MORGAN; J.P. Morgan.; James Valentine; Jim; Jim Young; JORDAN; JORDAN ALLIGER; Primary; Rob; Rob Knight; SEC FILINGS; Similar; Stone; Sunset; Young)

Word Count: 13136
4/20/06 FINDISCLOSURE 12:45:00
END OF DOCUMENT

# EXHIBIT PX0576

216405

**THOMPSON HINE** ATLANTA BRUSSELS CINCINNATI CLEVELAND COLUMBUS DAYTON NEW YORK WASHINGTON, D.C.

April 27, 2006

APR 27 2006
RECEIVED

*Via Hand Delivery*

Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K Street, NW
Washington, DC 20423

**Re:** ***Ex Parte No. 661; Rail Fuel Surcharges***

Dear Secretary Williams:

Please find enclosed an orginal and ten (10) copies of the written testimony submitted on behalf of Mittal Steel in the above referenced proceeding. Also enclosed is a diskette with a copy of the filing in word format.

An extra copy of this filing is enclosed for stamping and returning to our offices.

If you have any questions or require additional information, please do not hesitate to contact me at (202) 331-8800.

Sincerely,

Jeffrey O. Moreno

ENTERED
Office of Proceedings

APR 27 2006

Part of
Public Record

Jeff.Moreno@ThompsonHine.com Phone 202.263.4107 Fax 202.331.8330

178633.1

BEFORE THE

SURFACE TRANSPORTATION BOARD

Ex Parte No. 661

RAIL FUEL SURCHARGES

APR 27 2006
RECEIVED
ENTERED
Office of Proceedings
APR 27 2006
Part of
Public Record

**Written Testimony**

submitted by

**MITTAL STEEL USA**

Mittal Steel USA ("Mittal Steel") hereby submits these written comments in response to the Notice of Public Hearing issued by the Surface Transportation Board ("Board") in STB Ex Parte No. 661, *Rail Fuel Surcharges* (served March 14, 2006). Mittal Steel commends the Board for holding this public hearing and hopes that the information presented will enable the Board to help shippers ensure that they are paying fair and reasonable rail fuel surcharges.

**Description and Interest of Mittal Steel**

Mittal Steel is the largest steelmaker in North America. It has operations in 12 states with the capacity to produce 31 million net tons of raw steel. Its integrated operations at Indiana Harbor, Indiana constitute the largest steel plant in North America with 10 million tons of steelmaking capacity. Mittal Steel's other major production facilities are located in Cleveland, Ohio; Burns Harbor, Indiana; and Baltimore, Maryland. These include assets of the former LTV Steel Co, Bethlehem Steel Corp., Weirton Steel Corp., Acme Steel Co., and Georgetown Steel Corp.

Mittal Steel serves a broad U.S. manufacturing base. Its principal products include a broad range of hot-rolled, cold-rolled and coated sheets, tin mill products, carbon and alloy plates, wire rod, rail products, bars and semi-finished shapes to serve the automotive, construction, pipe and tube, appliance, container and machinery markets. Mittal Steel is the nation's leading producer of flat-rolled steel used for automobile exteriors and is a leader in the development and use of advanced high-strength steels that are crucial to safety systems and weight reduction in today's vehicles. In addition, Mittal Steel is a leader in the production of tin-plated sheet, including armor plate used in critical military applications.

Mittal Steel is a heavy user of rail, truck, vessel and barge transportation. In 2005, Mittal Steel transported over 65 million net tons of finished steel, semi-finished steel, raw materials, coal and coke via these modes. At more than 22 million net tons, rail accounted for over a third of this volume. Mittal Steel paid over $257 million to rail carriers, including $33.5 million in fuel surcharges. While Mittal Steel ships via all US and Canadian trunk line railroads, Norfolk Southern, CSXT and Canadian National haul a majority of its rail traffic. Several Mittal Steel facilities are captive. All three of the above mentioned carriers assess fuel surcharges based on a percentage of the transportation rate.

**Comments**

The objective of a surcharge should be to recover cost inputs that are subject to highly volatile pricing because of market conditions over which the supplier has little to no influence, so that commercial relationships can be preserved. The base rate agreed upon by the parties to a transaction should factor in all known and reasonably anticipated costs, plus a profit margin. If a cost factor is particularly volatile, however, a surcharge to address significant increases in that cost above and beyond the level factored into the base rate can help preserve the economic

relationship established by the base rate, since volatility makes it difficult for parties to anticipate changes in such costs as part of their normal commercial relationship. Therefore, parties often agree upon a surcharge methodology that allows the party that incurs the volatile cost to pass through some or all of an unanticipated cost increase to the other party.

Mittal Steel agrees that a fuel surcharge is necessary in today's highly volatile oil market, where prices have increased by 50% or more in very short time periods and are highly sensitive to supply shocks, such as hurricanes and foreign political unrest. But the fuel surcharges established by the North American railroad industry have no logical connection to these cost changes and have resulted in a substantial over-recovery of fuel costs, thus converting the fuel surcharge into a profit center for the railroads.

All but one of the major North American railroads apply a fuel surcharge based on a percent of the transportation rate. There is no rational connection, however, between a shipper's rate level and the additional fuel costs incurred to move the freight. Indeed, two shippers can transport a commodity on the same train between the same two points and be charged vastly different transportation rates. Although the additional fuel cost for each movement would be identical, the shipper who pays the higher rate also pays a much higher fuel surcharge. As fuel costs continue to set new records, this discrepancy is only aggravated.

Several groups, including the National Industrial Transportation League ("NITL"), commissioned a study of rail surcharges in 2004 to examine the relationship of the various fuel surcharge methodologies used by Class I railroads to their costs and revenues. The study concluded that rail customers typically are paying substantially more in fuel surcharges than the railroads are incurring in higher fuel costs for each movement. For example, CN, one of Mittal

Steel's primary carriers[1], incurred a 12.5% increase in fuel costs per car from 4Q01 to 1Q04, while collecting a 49.1% increase in fuel surcharge revenue per car over the same time period. The Study also predicted that this trend would continue at an accelerated pace in 2005, which has turned out to be true. This excess recovery increases the railroads' profit margin on each movement.

Based on the limited data available to it, Mittal Steel has every reason to believe that it is overcompensating CN in fuel surcharge payments. For example, in January 2005, CN published a fuel surcharge of 12%. CN's Annual Report provides annual average fuel prices, annual gross ton miles per gallon of fuel consumed, and the ratio of fuel expense to total operating expenses. Comparing this data from 2004 to 2005, CN's fuel expenses increased by 32% and fuel represented 16% of CN's operating expense.[2] Thus, 32% of 16% suggests that only a 5% fuel surcharge was warranted in 2005 compared to CN's actual fuel surcharge of 12%. If CN's increased fuel cost for Mittal's movements truly was greater than 5%, the burden should be on CN to support this additional amount.

Indeed, recent CN actions strongly suggest that it is intentionally using its fuel surcharge to disguise rate increases. CN has published two tariffs with distinctly different fuel surcharges, a higher surcharge in CN 7400 and a lower surcharge in CN 7401-A. The only explanation given by CN for the different tariffs is that "customers with published contractual agreements related to the former fuel surcharge tariff 7400 will have no immediate change until those agreements expire...." There does not appear to be any traffic distinction, transportation characteristic, or other cost-based factor to otherwise distinguish the traffic to which each tariff

---

[1] The Canadian National Railroad provides a large percentage of Mittal Steel's raw material rail transportation needs by transporting taconite iron ore from Mittal Steel's Minorca Mine in Minnesota via the former Duluth, Missabe & Iron Range Railroad ("DMIR") and the Wisconsin Central Railroad ("WC") lines to lake vessels at the ports of Duluth, Minnesota, and Escanaba, Michigan.

[2] Canadian National 2005 Annual Report, pp. 44 and 70.

applies. While the CN's stated intent to eventually move all traffic to the lower CN 7401-A tariff is commendable, it is a tacit admission that there is no cost basis for the continued application of the higher CN 7400 fuel surcharge. If the CN 7401 surcharge is adequately compensating CN for changes in fuel costs, the higher CN 7400 surcharge is yielding wind-fall revenue to CN on traffic to which that tariff still applies.[3]

A surcharge is not, and should not be, a profit center. The base rate for the transaction agreed upon by the parties establishes the profitability of the transaction. A surcharge is intended to preserve that relationship by preventing significant increases in a volatile cost factor from eroding the economic benefits of the transaction to the party that incurs the cost. If a surcharge were to recover more than the change in cost, it would re-write the commercial relationship to the gain of the party that incurs the cost. Perversely, the surcharge then would undo the very same commercial relationship that it is intended to preserve.

This is of particular concern in the rail industry where the commercial relationship has become increasingly one-sided in favor of the railroads. A fuel surcharge that over-recovers the actual increase in fuel costs for a movement is actually a rate increase disguised as a surcharge. Due to the market leverage that railroads possess, particularly over bulk shippers such as Mittal Steel, these surcharges are presented as a "take it, or leave it" proposition. Since Mittal Steel is captive to rail for a large percentage of its rail tons, it has no real choice but to pay the surcharge even though it is apparent that Mittal Steel is paying more than the actual increase in fuel costs to

[3] Although contracts are not within the Board's jurisdiction, that fact does not alter the conclusion that the fuel surcharge lacks any basis in actual costs, since there is nothing to suggest that the cost characteristics of traffic under the CN 7400 tariff differ from traffic under the CN 7401-A tariff. The only difference appears to be whether the traffic is subject to a contract entered into prior to the CN 7401-A tariff. Since contracts are not within the Board's jurisdiction, CN apparently has concluded it can over-recover fuel surcharges from those customers without consequence.

move its traffic. Furthermore, even when Mittal Steel has a choice of rail carriers, the oligopolistic behavior of the industry precludes a truly competitive alternative.

In contrast, Mittal Steel regularly negotiates the fuel surcharges assessed by its motor carriers. The competitive structure of the motor carrier industry, and the relative ease of market entry, give Mittal Steel competitive options when a carrier's fuel surcharges get out of line with its actual costs.

In addition, motor carrier fuel surcharges are more transparent, which allows an over-recovery to be easily and accurately identified. This is because motor carriers are much more responsive with data to support their requests for fuel surcharge modifications. Typically, the motor carriers used by Mittal Steel have established a base fuel cost of $1.20/gallon of diesel, above which a fuel surcharge applies. They peg their fuel surcharge to changes published by the Department of Energy's Energy Information Administration. Assuming a specified fuel efficiency rating for a carrier or movement, Mittal Steel can analyze data to readily determine if it is adequately compensating motor carriers for their increased fuel costs.

Fuel surcharges in Mittal Steel's contracts with Great Lakes carriers also are transparent. They specify the base fuel cost assumed in the rate and provide a mechanism for recovering (or refunding) changes in the carriers' fuel costs. The fuel surcharge methodologies either identify a fixed dollar amount in the base rate that represents fuel and adjusts that amount by the ratio of actual fuel prices to the base fuel price, or they specify a ratio of a cents-per-ton change in the freight rate to a cents-per-gallon (or ton) change in fuel prices. Both methodologies can be related to the actual fuel use (and thus the cost change) for the movement in question.

With sufficient data from the railroads, there is no reason why similarly transparent methodologies could not be adapted for the rail industry. First, such data should include fuel

consumption in gallons per net ton of various commodity types. Because fuel consumption is likely to vary between heavy weight commodities (*e.g.*, coal, iron ore) and lighter weight commodities (*e.g.*, intermodal), distinctions in a fuel surcharge may be warranted. Other relevant factors could include train size and train type (*e.g.*, unit train, manifest).

Second, the railroads should establish a base cost of fuel in dollars per gallon and they should track the actual cost of fuel in dollars per gallon. The West Texas Intermediate Crude Oil prices, favored by the Eastern railroads, is not a diesel fuel price at all and it is quoted in dollars per barrel of oil. The On-Highway Diesel Fuel price, favored by the Western railroads, includes taxes and additional mark-ups that the railroads do not pay. A more appropriate measure is the U.S. diesel sold in wholesale markets to "commercial and institutional consumers," reported by the Energy Information Administration of the Department of Energy. These diesel prices more fairly reflect the actual spot market prices of the fuel that railroads are purchasing.

Respectfully submitted,

Jeffrey O. Moreno
Thompson Hine LLP
1920 N St. N.W.
Suite 800
Washington, D.C. 20036
(202) 263-4107

Dated: April 27, 2006

*Attorney for Mittal Steel USA*

# EXHIBIT PX0577

216400

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**Ex Parte No. 661**

---

# REVIEW OF RAIL FUEL SURCHARGES

---

---

## COMMENTS OF THE AES CORPORATION

---


**MARC Z. MICHAEL**
**COUNSEL**
**THE AES CORPORATION**
**4300 WILSON BOULEVARD**
**ARLINGTON, VIRGINIA**
**TEL: (703) 682-6684**

**Thomas W. Wilcox**
**Sandra L. Brown**
**David E. Benz**
**Erika D. Benson**
**TROUTMAN SANDERS LLP**
**401 9th Street, N.W.**
**Suite 1000**
**Washington, DC 20004**
**TEL: (202) 274-2913**
**FAX: (202) 654-5608**

***ATTORNEYS FOR THE AES CORPORATION***


**April 27, 2006**

# Table of Contents


I. INTRODUCTION ........ 3
- A. Identification and Interest of The AES Corporation ........ 3
- B. Summary of Comments ........ 4

II. STB AUTHORITY TO REVIEW RAILROAD FUEL SURCHARGES ........ 6
- A. Interstate Commerce Commission Treatment of Fuel Surcharges ........ 6
  - 1. The *Ex Parte No. 311* Proceeding ........ 6
  - 2. The Effect of the Adoption of the Rail Cost Adjustment Factor on Fuel Surcharges ........ 9
  - 3. The Recent Use of the All-Inclusive Index Less Fuel is a Circumvention of the RCAF and a Means to Justify the Use of Separate Fuel Surcharges That Over Recover Fuel Costs ........ 11
- B. The Lawfulness of Railroad Fuel Surcharges Should be Reviewed Pursuant to the Board's Authority under 49 USC § 10702(2) Governing Unreasonable Practices ........ 12
  - 1. Clarification from the Board is Needed ........ 12
  - 2. The Assessment of Fuel Surcharges is a Railroad Practice Subject to the Board's Jurisdiction over Unreasonable Practices ........ 13
  - 3. Shippers Should be able to Challenged Specific Fuel Surcharges without Using the Board's Rate Reasonableness Procedures ........ 15

III. THE FUEL SURCHARGES IMPOSED BY THE RAILROADS PROVIDING COAL TRANSPORTATION SERVICE TO AES ARE ALL UNREASONABLE PRACTICES BECAUSE THEY PROVIDE EACH RAILROAD WITH REVENUES THAT GREATLY EXCEED THE FUEL COSTS FOR AES'S TRANSPORTATION ........ 17
- A. The Surcharges do not Track the Railroads' Actual Fuel Costs ........ 17
  - 1. Rate Multiplier Methodologies ........ 18
  - 2. BNSF's Mileage-Based Fuel Surcharge ........ 22
- B. Fuel Surcharges Ignore the Fact that the Current Cost of Fuel is Already Factored Into New Rates ........ 23
- C. Application of the RCAF-U or another Index with a Fuel Component Obviates The Need for Fuel Surcharges ........ 23

IV. STANDARDS FOR FUEL SURCHARGES MUST BE ACCOMPANIED BY IMPROVEMENTS IN RATE CASE PROCESSES AND RULES ........ 24

V. THE BOARD SHOULD REQUIRE THE SUBMISSION OF REVENUE AND COST DATA JUSTIFYING THE IMPOSITION OF RAILROAD FUEL SURCHARGES ........ 25

VI. CONCLUSION ........ 27

# BEFORE THE
# SURFACE TRANSPORTATION BOARD

STB Ex Parte No. 661

**RAIL FUEL SURCHARGES**

## COMMENTS OF THE AES CORPORATION

## I. INTRODUCTION

On March 14, 2006, the Surface Transportation Board ("Board" of "STB") issued a notice of public hearing to be held on railroad fuel surcharges on May 11, 2006, and requested comments and testimony from interested parties ("Notice"). The AES Corporation ("AES") hereby submits these comments in response to the Board's invitation. The Board has also allotted AES ten minutes to speak at the May 11 hearing. AES's testimony will summarize the main points of these comments.

### A. Identification and Interest of The AES Corporation

The AES Corporation is a holding company with headquarters in Arlington, Virginia. It is a global power company with subsidiaries throughout the world. The AES Corporation, through its subsidiaries, operates approximately 20 electric generating facilities in the United States. Nine of these facilities are rail-served coal-fired generating stations.[1] Coal is delivered to these facilities in single line and joint-line service by the BNSF Railway Company ("BNSF"), Norfolk Southern Railway Company ("NS"), CSX Transportation Company ("CSXT"), and the

[1] For the sake of convenience, The AES Corporation and its US subsidiaries that own rail-served coal-fired generating stations are referred to herein as "AES."

Kansas City Southern Railroad ("KCS"). BNSF, NS, and CSXT assess AES fuel surcharges in addition to the base railroad rates and other charges set forth in transportation contracts. These fuel surcharges have been established in public pricing circulars and other documents setting forth the respective railroad's common carrier terms for providing coal transportation service.

B. Summary of Comments

Since 2001, as rail transportation contracts for AES's coal-fired plants have come up for renewal, AES has increasingly been assessed fuel surcharges by the Class I railroads serving these facilities, while at the same time enduring large increases in the level of base rates for transportation. AES does not object to railroads recovering the fuel costs associated with a particular movement as long as (1) the mechanism used for this purpose is expressly limited to recovering increases and refunding decreases in the fuel costs built into the transportation rate to which the mechanism applies; and (2) the mechanism and the fuel costs it uses are transparent and subject to regulatory oversight. Specifically, to the extent a movement does not utilize the RCAF, in which case no surcharge is appropriate, a surcharge that was fair to both parties would track the increases and decreases in an agreed upon or established price per gallon of diesel fuel at the time the rate went into effect, multiplied by the number of gallons consumed by the movement. As the price of diesel fuel increased or decreased over the term of the contract or common carrier movement, the shipper would be responsible for paying the increases, but the shipper would also be credited for decreases.

As explained in Section III of these comments, the revenues received by the Class I railroads pursuant to the fuel surcharge formulas they have established in various pricing circulars and other public documents, which have been incorporated into new transportation contracts by reference, have overcompensated the railroads for their actual fuel costs associated

with AES's individual movements. AES believes it can demonstrate this for each of its coal movements. However, since AES's coal movements are presently governed by confidential contracts, this analysis cannot be presented to the STB in this public forum. In fact, it is the railroads that hold the critical data the Board needs to fully evaluate the manner in which fuel surcharges are calculated and what correlation, if any, those calculations have to the railroads' actual costs. This is why transparency and STB oversight are so crucial. Hence, AES believes that the Board's review of the current rail fuel surcharge practices is crucial for all shippers.

The current fuel surcharges assessed by the railroads referenced above constitute unreasonable practices under 49 U.S.C. § 10702 because they are clearly rate increases as opposed to mechanisms to recover temporary spikes in fuel costs for particular movements, as claimed by the railroads. The Board should establish narrow, cost-based standards for permitting railroad fuel surcharges that permit a railroad to recover only significant, documented increases in fuel costs that are not accounted for by other means, such as the Rail Cost Adjustment Factor ("RCAF"), which already enables the carriers to fully recover changes in their costs of fuel for a particular movement. A fuel surcharge on top of the RCAF essentially allows a railroad to assess a shipper twice for the same fuel. The Board's predecessor previously considered this very issue and determined that fuel surcharges were not appropriate when rates were adjusted using the RCAF. Moreover, a permissible fuel surcharge should provide for both positive and negative fuel surcharges, *i.e.*, permit railroads to recover significant cost increases but also permit their customers to be refunded significant fuel cost decreases.

The Board should also recognize that the recent use by individual railroads of the All-Inclusive Index Less Fuel ("AIILF") developed by the Association of American Railroads ("AAR") in conjunction with a fuel surcharge in lieu of the RCAF is not an alternative or

industry practice arrived at via mutual agreement by shippers and railroads. Rather, the advent of the AIILF in recent years is more a reflection of the significant market power and negotiating leverage currently possessed by the Class I railroads. The use of the railroads' published fuel surcharges as a surrogate for a fuel price index results in significant over-recovery of fuel costs for a particular movement.

In this proceeding, the Board should (1) provide clarification that the lawfulness of a railroad fuel surcharge may be challenged separately from the level of a railroad rate under the Board's authority to regulate railroad practices; (2) clarify that railroad fuel surcharges may only be used for the purpose of recovering or refunding actual costs of fuel expended for a particular shipper's transportation that are not adjusted for by other means; (3) take appropriate action to modify the current publicly published railroad fuel surcharges of BNSF, NS, CSX, and other similarly imposed railroad surcharges to the extent they do not comport with the above standard; and (4) require each railroad to submit detailed data reflecting their actual cost of fuel and the revenues associated with fuel cost recovery associated with each individual movement for which the fuel surcharge is assessed.

## II. STB AUTHORITY TO REVIEW RAILROAD FUEL SURCHARGES

### A. Interstate Commerce Commission Treatment of Fuel Surcharges

#### 1. The *Ex Parte No. 311* Proceeding

This proceeding is not the first time fuel surcharges have come to the attention of federal regulators, or the first time railroad fuel surcharges have been questioned for over-recovering fuel costs. Prior to passage of the Staggers Rail Act of 1980[2] and the adoption of the RCAF discussed below, railroads had to seek prior approval of any rate increases, and approved

[2] Staggers Rail Act of 1980; 96 P.L. 448 (October 14, 1980).

increases could not go into effect for 30-45 days.[3] When fuel supplies were threatened by the Arab oil embargo in 1973, the Interstate Commerce Commission ("ICC") determined that the existing process for general rate increases, including the 30-45 day waiting period, "may not be adequate in the present circumstances to offset anticipated increases in fuel prices." 40 Fed. Reg. 5374 (1975). It commenced a proceeding in order to allow railroads and motor carriers to increase transportation rates more expeditiously. *Ex Parte No. 311, Effect of Modifying Proclamation No. 3279 and Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject to the Interstate Commerce Act*, 350 ICC 563, 564 (1975)("*Ex Parte No. 311*"). After a comment period, the ICC adopted expedited procedures providing interim relief from the regular 30-day notice required, but only if fuel prices were to escalate in the future as expected. *Id.* at 567.

In allowing this interim relief, the ICC declined to use fuel surcharges. Specifically, the ICC had permitted the imposition of fuel surcharges on an "experimental basis" in 1973-74, primarily for motor carriers. *Id.* at 566. In *Ex Parte No. 311* the ICC clarified that

> It has been the traditional view of this Commission that surcharges which add an element of confusion into tariff use should only be sanctioned in unusual situations. Generally, surcharges have only been considered as appropriate in situations where it is anticipated that their use will be of temporary duration or where in extenuating situations the service performed under the surcharge is considered local to the carrier assessing the charge.

*Id.* at 572 (emphasis added). Lastly, the ICC noted that while the price of fuel appeared as if it would remain higher for the foreseeable future, "the surcharge method of computing freight charges" was not an appropriate way to increase rates permanently. *Id.*

[3] See former 49 USC § 10762, as described in, e.g., *The Hanna Mining Company v. The Escanaba and Lake Superior Railroad Co.*, 498 F.Supp. 1267, 1269 (E.D. Mich. 1980).

Because the ICC did not implement the expedited procedures adopted in *Ex Parte No. 311* until 1979, and railroads did not begin recovering the high fuel costs of 1973-74 until June of 1979, the ICC in 1980 approved a 1.2% railroad fuel surcharge instituted as a general rate increase. ICC Docket No. 37423, *Temporary Fuel Shortfall Recovery Surcharge, April 11, 1980*, 364 ICC 336 (1980). In this decision, the ICC utilized the *Ex Parte No. 311* procedures ("even though…created for different purposes") because they represented the "best way to consider a fuel related surcharge." *Id.* at 337-338. The ICC initially declined to adjust the application of the surcharge on an individual shipper basis, but in response to a successful appeal by Central Power & Light Company, the ICC removed the 1.2% surcharge as applied to that shipper because it shipped no traffic during the period in question. ICC Docket. No. 37423, *Temporary Fuel Shortfall Recovery Surcharge, April 11, 1980*, 365 ICC 299 (1981). The ICC eventually permitted a total of 4.7% of such surcharges to account for the delay in implementing *Ex Parte No. 311*. ICC Docket No. 37316, *Rates on Coal, Decker and Kleenburn to Illinois and Indiana*, 364 ICC 158, 160 (1980) (describing ICC use of *Ex Parte No. 311* to authorize fuel surcharge of 4.7% in the first nine and a half months of 1979). In several instances, railroads tried to apply the 4.7% increase to individual movements that were already subject to existing rate escalation arrangements. In these cases, however, the criteria utilized by the ICC to determine whether application of the surcharge was appropriate included whether the revenue generated by the surcharge was justified by the actual fuel costs incurred by the railroad or railroads to provide the service to that particular shipper or shipper or group of shippers, and whether the railroad was recovering fuel costs by other means. *Id.*, 364 ICC 158 (1980); and ICC Docket No. 37315F, *Coal, Colstrip, Kuehn, and Decker, MT to Superior, WI*, 364 ICC 152 (1980). In the latter case, the ICC noted in particular that the railroad did not demonstrate that it

would be harmed by waiting until it recovered the additional fuel costs for that movement through operation of the rate adjustment provision that had been agreed upon by the parties. *Id.* at 156.

In summary, prior to the passage of the Staggers Rail Act of 1980 and the development of the RCAF, the ICC only permitted fuel surcharges in very narrowly prescribed circumstances to permit recovery of extraordinary and temporary increases in fuel costs prior to recovering such costs in rate increases or through a rate adjustment provision. Moreover, attempts to broadly apply surcharges to individual movements required some showing that the revenues generated by the surcharge did not exceed the actual fuel costs, particularly as parties developed rate adjustment indexes and formulas that would enable the eventual recovery of the costs of moving the shipper's traffic, including fuel costs.

2. The Effect of the Adoption of the Rail Cost Adjustment Factor on Fuel Surcharges

In part at the behest of Congress, the ICC proposed in 1980 to replace the procedures for filing general rate increases with a procedure based on an inflation index, the RCAF. *Advance Notice of Proposed Rulemaking*, 45 Fed. Reg. 29103 (May 1, 1980). In publishing the proposed rules, the ICC stated that "the procedures proposed in this notice will permit railroads to recover fuel cost increases along with other cost increases on a quarterly basis...We thus propose that our current Ex Parte 311 fuel surcharge mechanism be discontinued." Ex Parte 290 (Sub No. 2), *Railroad Cost Recovery Procedures* 45 Fed. Reg. 81217 (Dec. 10. 1980).

The ICC adopted the newly-created RCAF railroad index just a few months later in April of 1981. Ex Parte 290 (Sub-No. 2), *Railroad Cost Recovery Procedures*, 364 ICC 841 (1981). According to the ICC, adoption of this index "permit[s] railroads to recover fuel cost increases along with other cost increases on a quarterly basis." *Id.* at 852. Furthermore, the RCAF meant

that "[m]aintaining a separate surcharge mechanism for fuel would, in our view, serve no useful purpose once these rules are in place, and would, in fact, only complicate the operation of the new system." *Id.*

A few years later, the ICC adopted a revised methodology for the RCAF index based on data gathered and submitted by Association of American Railroads ("AAR"). Ex Parte No. 290 (Sub-No. 2), *Railroad Cost Recovery Procedures*, 1 ICC 2d 207 (1984). In stating again that the creation of RCAF was in response to the Staggers Act, the ICC noted that "[w]e believe it was the intent of that Act to simplify the procedures for increasing rail rates and that the application of the single RCAF to all base rates best accomplishes that intent." *Id.* at 208. For the fuel component of the RCAF, the ICC considered a variety of shipper proposals but eventually decided that a survey of actual prices paid by railroads, which was proposed by the AAR, is the best measure of the price of railroad diesel fuel. *Id.* at 217-218.

These statements from the ICC reveal that the RCAF was intended to not only replace the general rate increase method of adjusting rail rates with a simpler method, but also to supplant the need for fuel surcharges. Shippers and the AAR proposed competing methods of incorporating the price of fuel into the RCAF, but the ICC chose the AAR's method. In other words, in response to the ICC's request for rate adjustment methods that would replace the fuel surcharge mechanism, the railroads developed a method for incorporating fuel prices that was approved by the ICC. Any change to this railroad-proposed and ICC-approved mechanism for incorporating fuel prices in rates should only come in a regulatory rulemaking.

The RCAF index is based on quarterly filings made by the AAR. These filings include a forecasted railroad fuel cost for the next calendar quarter which is a mix of (1) actual diesel prices paid by railroads (for the weighting component) and (2) various projections by the major

railroads' fuel purchasing officers and others regarding the level of railroad diesel prices during the next quarter.[4] These quarterly filings reveal that the RCAF methodology takes into account the fluctuation of railroad diesel prices caused by events in the world oil markets. For example, the filing made on December 5, 2005 by the AAR described the damage done by hurricanes Katrina and Rita as largely responsible for the rise in the fuel component of the RCAF. Ex Parte 290 (Sub-No. 5) (2006-1), *Quarterly Rail Cost Adjustment Factor* AAR forecast, Appendix B (page 1), (filed Dec. 5, 2005). These are exactly the same reasons now cited by the railroads in justifying the use of their privately developed fuel surcharges. *See, e.g.*, CSX 2005 Annual Report at 21 and 24.

In adopting the methodology for calculating the RCAF, the ICC stated that "significant problems in the accuracy of fuel data" could warrant a change in the fuel component of the RCAF index. *Railroad Cost Recovery Procedures*, 1 ICC 2d at 218. Thus, there is a standing invitation to all parties to petition the Board for a change in the RCAF if they feel that it does not accurately reflect railroad fuel prices. This action is preferable to the railroads exerting their market power to adopt fuel surcharges that are clearly designed to enhance their overall revenues as opposed to enable the recovery of short term spikes in fuel costs for a particular movement.

3. <u>The Recent Use of the All-Inclusive Index Less Fuel is a Circumvention of the RCAF and a Means to Justify the Use of Separate Fuel Surcharges That Over Recover Fuel Costs</u>.

In recent years, some of the Class I railroads have sought to circumvent the application of the RCAF and the process by which their complaints about it could be rectified by the Board by demanding that their customers accept the AAR's AIILF into contracts and common carrier rate quotations, combined with the railroad's tariff fuel surcharge. Under this scenario, justification

[4] *See* generally "*Rail Cost Adjustment Factor*," a publication from the Association of American Railroads (November 2001).

for applying the fuel surcharge is based on the rationale that the AIILF does not contain a fuel component, so no double count of fuel costs occurs as would be the case if the RCAF applied. AES has not been exempted from this practice. Unlike the RCAF, however, the AIILF has not been formally approved by the Board, meaning the railroads, through the AAR, can change the index without seeking the Board's permission. Moreover, under this scenario, the "fuel surcharges" published by the railroads are not true "surcharges" for the purpose of recovering fuel cost spikes, but rather a separately established mechanism to purportedly reimburse the railroads for any increases (but not refund the shipper for decreases) in the railroads' fuel costs. AES maintains that if a tariff fuel surcharge formula is to be used as a surrogate for fuel cost recovery under the RCAF, then it must be based on a realistic and accurate unit price for fuel and be based on the volume of fuel used for a particular movement. In addition, such a mechanism should not only work one way; to the extent the railroads actual cost of fuel is below the unit price in the formula over the period it is used due to hedging or other factors, then the shipper should receive the benefit of this reduction through rate reductions or credits. However, as shown below, the actual formulas used in the current individual surcharges and their low thresholds for application virtually guarantee the railroads will receive additional revenue from the movement under the auspices of fuel cost recovery even if the cost of fuel for the movement does not increase over the term of the movement.

B. The Lawfulness of Railroad Fuel Surcharges Should be Reviewed Pursuant to the Board's Authority under 49 USC § 10702(2) Governing Unreasonable Practices.

1. Clarification from the Board is Needed

While the ICC decisions referenced above discuss the ICC's treatment of fuel surcharges, there is no clear Board precedent on this particular subject. Specifically, there is no precedent stating definitively whether the Board considers a fuel surcharge to be part of the rate for

transportation or a "rule" or charge whose reasonableness can be challenged independent of the transportation rate. This lack of clear guidance is evident from filings in recent cases. For example, in STB Docket 42072, *Carolina Power & Light v. Norfolk Southern Railway Company*, the parties disagreed over whether NS could assess a fuel surcharge on top of a maximum reasonable rate prescribed by the Board in a case brought under the *Coal Rate Guidelines Nationwide*, 1 ICC 2d 520 (1985). While CP&L had claimed that a fuel surcharge was inappropriate because all fuel costs had already been incorporated into the stand-alone cost ("SAC") analysis and prescribed rates over the DCF period, NS claimed the surcharge was a separate "rule" that had not been separately challenged by CP&L and, therefore, was not at issue in the case. CP&L Statement of Position at 8-9 (filed June 4, 2004); NS Statement of Position at 2 (filed June 4, 2004). The Board did not resolve this question in *CP&L*. Docket No. 42072, *CP&L v. NS*, at 6 (served Oct. 20, 2004). The same general question has been posed to the STB in other SAC cases, but no answers have been provided. *See, e.g., Western Fuels Association v. Burlington Northern Santa Fe Railway Company*, Docket 42088 (complaint filed October 1, 2004); *Kansas City Power & Light Company v. Union Pacific Railroad*, Docket No. 42095 (complaint filed October 12, 2005). AES believes that the lack of Board guidance on fuel surcharges is one reason shippers have not formally challenged fuel surcharges outside of the SAC context.

2. <u>The Assessment of Fuel Surcharges is a Railroad Practice Subject to the Board's Jurisdiction over Unreasonable Practices</u>.

Under 49 U.S.C. §§ 10702(2) and 10704(a)(1), the Board has authority over railroad practices. If a railroad practice is found to be unreasonable, the Board can order the railroad to cease engaging in it or the Board can prescribe the "practice to be followed." 49 U.S.C. § 10704(a)(1). Whether or not a particular railroad practice is unreasonable requires the Board to

engage in a "fact-specific inquiry" to be conducted on a "case-by-case" basis. *WTL Rail Corporation – Petition for Declaratory Order and Interim Relief*, Docket No. 42092 at 6 (served February 17, 2006).

The fact that a railroad's public fuel surcharge is incorporated by reference into a transportation contract should be irrelevant for the purposes of this proceeding. Specifically, in AES's experience, the incorporation by reference of a carrier's "public" fuel surcharges into a new contract is typically made with no modifications, over the strong objection of the shipper, and such inclusion is mandated on a "take it or leave it basis." For this reason, the Board's determination of whether an individual railroad's publicly implemented tariff fuel surcharge is improper should be made by utilizing cost and revenue data from contract movements, consistent with any confidentiality provisions contained in the contracts.

In any event, surcharges are universal rules or charges subject to Board jurisdiction as "transportation-related" practices such as demurrage. STB Docket No. 42068, *Capitol Materials Incorporated – Petition for Declaratory Order – Certain Rates and Practices of Norfolk Southern Railway Company*, at 2 (served April 12, 2004). The manner in which the railroads calculate and assess their individual fuel surcharges is subject to a determination of reasonableness under 49 U.S.C. § 10702(2). In order to ensure that railroad practices are reasonable, the Board has previously used its authority under 49 U.S.C. § 10702(2) to assert jurisdiction over various other railroad rules and surcharges. The Board has evaluated the specific demurrage charges assessed against a shipper under the unreasonable practice standard. *Capitol Materials* at 6. The Board has found a light-density line surcharge to be an unreasonable practice when used in conjunction with contract service. STB Docket No. 42031, *Parrish & Heimbecker, Inc. – Petition for Declaratory Order* at 10 (served May 26, 2000). The Board has

begun a proceeding to evaluate whether BNSF's imposition of storage and demurrage charges on all types of empty private cars awaiting loading is an unreasonable practice. STB Docket No. 42060 (Sub-No. 1), *North America Freight Car Association – Protest and Petition for Investigation – Tariff Publications of the Burlington Northern and Santa Fe Railway Company*, at 9 (served August 13, 2004). The Board has also evaluated whether it was unreasonable for a railroad to limit the hours its track could be used by a second railroad under a trackage rights agreement. STB Docket No. 42083 *Granite State Concrete Co., Inc. and Milford-Bennington Railroad Company, Inc. v. Boston and Maine Corporation and Springfield Terminal Railway Company*, at 1 (served September 24, 2004).

3. Shippers Should be able to Challenge Specific Fuel Surcharges without Using the Board's Rate Reasonableness Procedures.

As Section II.B.1 shows, the Board can evaluate the Class I railroads' general fuel surcharges under the unreasonable practice standard of 49 U.S.C. § 10702(2). There is no need to evaluate a specific fuel surcharge level only in conjunction with assessing the reasonableness of the rate for transportation. As an initial matter, such a requirement would insulate surcharges on rates to dual-served locations from any regulatory scrutiny, since current law would dictate that the Board has no jurisdiction due to a lack of market dominance. 49 U.S.C. § 10707. Moreover, requiring a captive coal shipper to file a rate case under the *Coal Rate Guidelines* to challenge whether a railroad's fuel surcharge is reasonable would also virtually insulate such surcharges from Board scrutiny. AES believes Board's current rate reasonableness standards and procedures present coal shippers with very few opportunities for meaningful relief from railroad monopoly pricing practices, and that this has provided the railroads with considerable leverage over the rates and other terms for transportation to captive facilities as contracts come up for renewal. Accordingly, railroads are able to use the spectre of extraordinarily high

common carrier rates and the high cost, commitment of resources and uncertainty of a rate complaint case to force their captive customers to incorporate the tariff fuel surcharges by reference into a new transportation contract that also contains significant base rate increases. Once the contract is signed, the shipper's ability to object to the fuel surcharge becomes severely limited due to the fact that the Board does not have jurisdiction over rail transportation contracts. In short, a shipper must either pursue difficult contract claims, such as a claim that the inclusion of the surcharge is an unlawful "contract of adhesion," or agreed to under duress, or hope either (1) that the railroad unilaterally reduces the fuel surcharge and that the successor surcharge applies to the contract service, or (2) that an action by the STB requires the railroad to reduce or eliminate the surcharge and that this action also applies to the contract service.

In any event, a fuel surcharge is a universally applicable tariff item that exists independently of the rate. As the Board recognized in the Notice, whether a fuel surcharge is a reasonable practice can be determined by examining whether a mechanism developed by the individual railroad for the stated purpose of recovering fuel cost increases that are not recovered by other means "fairly reflect[s] the increasing fuel costs of the particular movements to which [it is] applied." Notice at 2. There is no need for a stand-alone cost or other rate analysis to make this determination. For example, the Board has previously determined the reasonableness of a particular demurrage charge without resort to rate reasonableness standards. *Capitol Materials* at 4 (finding a $60 per day demurrage charge to be reasonable without resort to the rate reasonableness standards). The determination of whether a purported fuel surcharge fulfills its cost recovery purpose can be aided by the submission of fuel cost and revenue data by the railroad(s) seeking to assess the fuel surcharge.

## III. The Fuel Surcharges Imposed by The Railroads Providing Coal Transportation Service to AES are All Unreasonable Practices Because they Provide Each Railroad With Revenues that Greatly Exceed the Fuel Costs for AES's Transportation

The fuel surcharges implemented by NS, CSXT, and BNSF are substantially similar conceptually and accordingly each has substantially the same deficiencies. These can be summarized as follows:

1. The surcharges do not measure actual fuel cost changes.
2. The surcharges ignore the fact that the railroads' current cost of fuel is included in the rate for transportation, so there is no need to apply the surcharge on top of the rate.
3. To the extent the RCAF-U is used to adjust transportation rate levels, the surcharge is unnecessary and overcompensates the railroad for increased fuel costs.

### A. The Surcharges do not Track the Railroads' Actual Fuel Costs

The consistent rationale for the current standard fuel surcharges instituted by the Class I railroads serving AES's facilities is that they are necessary to counteract the price volatility in the diesel fuel market. NS has stated that its fuel surcharge allows NS to adjust rail rates when diesel fuel prices change, allowing NS to "more accurately reflect the actual costs of service." [5] Moreover, according to NS, "the fuel surcharge rule established in the NS Conditions of Carriage is intended to reflect temporary spikes in the price of one specific input, diesel fuel….the fuel surcharge rule applies only as long as the benchmark fuel price exceeds the stated level, and is eliminated as soon as fuel prices <u>return to normal levels</u>."[6] (emphasis added). NS further stated

[5] STB Docket No. 42072, *Carolina Power and Light Company v. Norfolk Southern Railway Company*, Defendant Norfolk Southern Railway Company's Statement of Position Regarding Fuel Surcharges, at 1 (filed June 4, 2004) *citing* STB Finance Docket No. 33388 (Sub. No. 90), *CSX Corporation and CSX Transportation, Inc. Norfolk Southern Corporation and Norfolk Southern Railway Company—Control and Operating Leases/Agreements—Conrail Inc. and Consolidated Rail Corporation* , Decision No. 7 at 5 (n.12), 8 (n.16) (served December 17, 2001).
[6] *Id.* at 9.

that "[t]his fuel surcharge is not movement-specific, but is rather a system-wide cost recovery mechanism intended to address short-term diesel market fluctuations."[7]

NS's justifications are echoed by BNSF:

> "[T]he reason that BNSF implemented a fuel surcharge in the first place was the unpredictability of fuel prices. For that reason, BNSF implemented a retroactive mechanism for the fuel surcharge in its common carrier pricing authorities and contracts. BNSF has concluded that the best way to reflect the effect of the fuel surcharge...is to use a comparable index forecast for both operating costs affected by fuel price changes and projected revenues to compensate for those changes. In this way, revenues and costs will change on parallel tracks, which is the basic concept underlying the fuel surcharge."[8]

1. <u>Rate Multiplier Methodologies</u>

The surcharges of the Class I railroads that transport AES's coal are calculated pursuant to two general methods that entail applying a percentage increase to the transportation rate (BNSF also has a mileage based fuel surcharge, as discussed below). Neither of these methods measures the individual railroad's actual fuel costs or reimburses the railroads solely for short term spikes in the cost of diesel fuel for transporting AES's coal. The first method is to assess a revenue-based fuel surcharge on each shipment when the average monthly price of West Texas Intermediate Crude Oil ("WTI"), based on daily prices published in the Wall Street Journal, exceeds a certain threshold. As examples, this threshold is currently $23.00 per barrel in Condition 55.4 – Fuel Surcharge (W) of NS's Conditions of Carriage #2F (applicable to coal, coke and iron ore). On April 24, 2006, NS announced that it intended to "revise its fuel surcharge program for local and joint-line non-intermodal traffic originating and moving on Norfolk Southern-issued tariff and public quotes issued on or after July 1, 2006."[9] Such revisions would have no effect on AES. The WTI threshold in CSXT's tariff CSXT 8200, Item

---

[7] STB Docket No. 42072, *Carolina Power and Light Company v. Norfolk Southern Railway Company*, Defendant Norfolk Southern Railway Company's Statement of Position Regarding Fuel Surcharges, at 3-4 (filed June 4, 2004).

[8] STB Docket No. 42088, *Western Fuels Assoc. Inc. and Basin Elec. Coop. Inc., v. BNSF Railway Co.*, Reply Evidence and Argument, p. III.A-28 and 29 (filed July 20, 2005).

[9] The announced revisions include rebasing the WTI average price threshold to $64.

12000-A is also $23.00 per barrel. Once the threshold is reached, the current rate for transportation is multiplied by a percentage triggered by the WTI average. Again using NS Condition 55.4 as an example, the fuel surcharge is 0.4% of the line-haul freight charge for every $1.00 per barrel or portion thereof, that the WTI exceeds $23.00. Each surcharge using the WTI methodology utilizes this same general approach.

The other primary methodology for calculating fuel surcharges is exemplified by Item 3380 of BNSF rules book 6100, which imposes a revenue-based fuel surcharge on individual coal shipments pursuant to a formula based on the U.S. Average Price of Retail On-Highway Diesel Fuel ("HDF") when the HDF equals or exceeds $1.24 per gallon. For example, when the Time Period's Average Price of HDF is between $1.96 and $1.999 the applicable surcharge rate would be 9.5% of the total freight charges. BNSF specifies the Applicable Fuel Surcharge rate for HDF up to $3.039 per gallon; when the U.S. National Average Fuel Index exceeds $3.039 per gallon, the fuel surcharge rate will increase by 0.5% for every $0.04 per gallon increase. BNSF provides the example of a fuel surcharge applied to shipments during the month of July. This example assumes the prior time period's (May) average monthly price of HDF was $1.338 per gallon, therefore calculating the July's fuel surcharge as 1.5%. "Thus, for each $10.00 of freight charges applicable to a shipment, the Fuel Surcharge would be $0.15." *Id.*

Both of these methods are flawed on their face because they do not measure actual fuel costs but merely apply a multiplier to the transportation rate. Therefore, they bear no relation to the amount or cost of fuel used for the movement being assessed the charge. Clearly, if there is no evaluation of the amount or cost of fuel used, then the surcharge is not "used only to recover the increased cost of fuel for the particular movements to which the surcharge is applied." Notice at 2. Moreover, railroads do not pay highway retail prices for railroad diesel or pay WTI

crude oil prices. Railroads consume huge quantities of railroad diesel fuel annually, can be expected to get volume discounts, and often engage in price hedging activities. To the extent a railroad engages in fuel hedging, a revenue-based surcharge overcompensates the railroad for fuel cost spikes and becomes a revenue generator. *See Fuel Hedge and Surcharge Impacts: Not all Rails Created Equally, Citigroup*, Smith Barney, Airfreight and Surface Transportation, Jan. 5, 2005, at 1. ("Norfolk Southern experienced a substantive boost or tailwind to last year's results through a combination of its extremely effective fuel hedge combined with a very robust approach to fuel surcharge usage. Illustrating our point, we estimate that roughly 20-30% of 2004's earnings growth at Norfolk Southern has been driven by fuel surcharge revenues above fuel expense variances at the operations."). Additionally, BNSF and CSX reported $328 million and $249 million of fuel hedging benefit, respectively in 2005. *See* BNSF 2005 Annual Report at 58; CSXT 2005 Annual Report at 15.

These methods are also flawed because they do not factor in distance. For example, the actual fuel cost incurred by the railroad for two shipments of equal distance may actually be the same, but the shipper with the higher rate will pay a higher fuel surcharge. Accordingly, two shippers may both be 1000 miles away from the origin mine and have identical operating characteristics, but if one of the shipper's rate is $15 and the other's is $10, and assuming a 10% fuel surcharge multiplier, the first shipper will pay surcharges of $1.50 per ton while the second will pay only $1.00 per ton.

To the extent that the formula used in a railroad surcharge utilizes a fuel-cost threshold that is lower than the relevant fuel-cost index, e.g., a threshold of $23 per barrel of WTI when the actual cost per barrel is in the $60-plus range, the railroads' profits will increase out of proportion to the increase in actual fuel costs. For example, under Condition 55.4, a fuel surcharge is

imposed on coal shippers when the WTI average is above $23.00 per barrel. According to NS, this price is a "normal level" of fuel price that would cause its surcharge to be eliminated. However, according to the EIA, the WTI annual average price per barrel has been over $23.00 for every year this decade.[10] This very low threshold virtually ensures that a rate multiplier will be assessed indefinitely, even though NS has recovered its actual cost of fuel through application of the RCAF or other rate adjustment provisions with a fuel component, or through rate increases that reflect, in part, increases in NS's cost of service. The WTI monthly average price per barrel for March 2006 as published in the Wall Street Journal was $62.90.[11] This means that the March 2006 WTI price was $39.90 over the Condition 55.4 threshold. The May 2006 fuel surcharge multiplier imposed on coal shippers under the Condition 55.4 formula (*i.e.,* based on the March 2006 WTI) increases the transportation rate by 16.0%, even if that rate was implemented on January 1, 2006. Between January 2006 and March 2006, the WTI monthly average price decreased by 4%.[12]

Surcharges using the HDF produce a similar result. For example BNSF's item 3380 is applied when the HDF monthly average, as opposed to the average fuel costs actually paid by BNSF, equals or exceeds $1.24 per gallon.[13] However, the HDF has not been at or below that level since March, 2002.[14] BNSF buys diesel fuel in bulk and pays wholesale prices, not retail prices for its fuel.[15] The HDF is not an accurate estimate of the price BNSF pays for fuel. BNSF's actual fuel costs rarely match the HDF price, nor is the change in prices paid by BNSF reflected in the change in the HDF. For example, BNSF's average cost for diesel fuel in 3rd

[10] See EIA website: http://tonto.eia.doe.gov/dnav/pet/hist/ddroolm.htm
[11] *See* NS's website www.nscorp.com.
[12] March WTI of $62.90 per barrel ÷January WTI of $65.51 per barrel.
[13] *Id.*, U. S. Department of Energy's, EIA Retail On-Highway Diesel Prices Report, whose weekly average price is available on their WebPages at: http://www.eia.doe.gov is used to determine the mileage-based fuel surcharge.
[14] *See* http://tonto.eia.doe.gov/oog/ftparea/wogirs/xls/psw/8vwall,xls.
[15] STB Docket No. 42088, *Western Fuels v. BNSF*, Western Fuels Rebuttal Exhibit III-A-3, Pg. 1.

Quarter 2003 was \$0.864 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was \$0.988 per gallon.[16] BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004, whereas the HDF 3rd Quarter 2003 price was \$1.46 per gallon and \$1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. Therefore, due to the greater increase of the HDF, BNSF shippers paid nearly 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004 because Item 3380 is tied to the HDF threshold, not actual fuel costs.

2. <u>BNSF's Mileage Based Fuel Surcharge</u>

Beginning on January 1, 2006, BNSF adopted a fuel surcharge on certain agricultural and coal traffic that is assessed by multiplying the fuel surcharge amount per mile times the number of loaded car-miles per shipment.[17] The mileage-based fuel surcharge is also determined by using a higher HDF threshold of \$1.25 per gallon compared to the HDF threshold of \$1.24 per gallon used in Item 3380. "Mileage calculations will be based on BNSF Railway Miles between shipments' billed origin and destination as published in BNSF web page: *BNSF Coal Unit Train and Trainload Mileage Table*."[18] According to BNSF, a fuel surcharge based on percentage of revenue has and will continue to create significant disparities between the fuel surcharge assessed and the actual incremental fuel costs.[19] The mileage-based fuel surcharge program is BNSF's attempt to "better align the fuel surcharge assessed…with the actual incremental fuel cost of transporting...goods."[20] Distance may be a better proxy for the amount of fuel used in a movement than the transportation rate, but it still is unnecessarily imprecise. The use of distance ignores a variety of factors that affect fuel usage, such as topography, train weight, train speed,

---

[16] *See* BNSF Investors Reports available at www.bnsf.com.
[17] Coal Mileage-Based Fuel Surcharge: http://www.bnsf.com/tools/prices/fuelsurcharge/pdf/coal_mileage.pdf
[18] The BNSF Railway Miles is the calculation of miles a carload is transported is the loaded direction. This calculation can be performed in the BNSF website. Also, <u>see</u> BNSF Coal Unit Train and Trainload Mileage Table as attachment.
[19] Frequently asked questions: BNSF Mileage Based Surcharge (www//:http.bnsf.com/tools/prices/fuelsurcharge/faqs.html)
[20] *Id.*

frequency of stops, and the time required for the movement. The mileage-based surcharge also suffers from the same basic deficiency as Item 3380 in that it uses as a baseline a fuel price that (a) has no relation to BNSF's actual fuel costs; and (b) is not reflective of the current cost of diesel fuel, thereby guaranteeing the surcharge will be assessed.

These fuel surcharge practices therefore do much more than provide recovery of fuel costs during temporary price spikes. They provide significant additional revenue to the railroads.

B. Fuel Surcharges Ignore the Fact that the Current Cost of Fuel is Already Factored Into New Rates.

As stated above, the application of the railroad's fuel surcharges to new transportation rates is particularly problematic because, when a new transportation contract is executed, it must be presumed the railroad's current price of fuel is factored into the new transportation rate. To the extent that either actual fuel costs do not subsequently "spike" or fuel cost increases are covered by a rate adjustment provision with a fuel component, there is no justification for assessing the fuel surcharge multiplier to the transportation rate because the rate will reimburse the railroad for all of the fuel costs it incurs to provide the issue transportation.

C. Application of the RCAF or another Index with a Fuel Component Obviates the Need for Fuel Surcharges

To the extent a railroad fuel surcharge is combined with the use of the RCAF, this is clearly an unreasonable practice because the ICC clearly established that upon adoption of the RCAF, "[m]aintaining a separate surcharge mechanism for fuel would, in our view, serve no useful purpose once these rules are in place, and would, in fact, only complicate the operation of the new system." 364 ICC at 852. As explained above in Section II, the RCAF contains a fuel component. Accordingly, application of any fuel surcharge in conjunction with the RCAF, let

alone the current revenue-enhancing fuel surcharges, results in an additional over recovery of fuel costs for each affected movement.

## IV. Standards for Fuel Surcharges Must be Accompanied by Improvements in Rate Case Processes and Rules

As stated above, the current fuel surcharge practices of the Class I railroads directly result from the extraordinarily high level of market power they have achieved. They also result from the ineffectiveness, perceived or real, of the STB's maximum reasonable rate procedures and standards to provide any semblance of a meaningful regulatory constraint on such behavior. AES shares the view of many shippers that the Board's recent decisions in coal rate reasonableness cases have thrown into doubt the ability of all but a very small group of rail shippers on very high density sections of a railroad's system to obtain any relief for railroad monopoly pricing. This perception of futility is reinforced by the extraordinary cost of pursuing a complaint case to conclusion and the uncertainty of whether standards applied in one case will be applied in another case, as well as the time it takes to reach a decision. AES is concerned that Board action that results in the reduction of Class I railroad fuel surcharges may in turn result in the railroads simply shifting that revenue source from a "surcharge" to increases in the rates for transportation offered during a contract negotiation or established via common carrier pricing authority. Unless the Board's rate reasonableness standards and procedures provide relief for such increases in transportation rates, then the Board's salutary efforts to review the appropriateness of the railroads' fuel surcharge practices will be undermined. AES is aware of the fact that the Board has commenced a rulemaking in Ex Parte No. 657 (Sub No. 1) to examine certain aspects of the Board's "stand alone cost" means of testing the reasonableness of rail rates. However, AES submits a broader and deeper review of the STB's rate setting policies and standards is required to improve the current state of affairs.

## V. THE BOARD SHOULD REQUIRE THE SUBMISSION OF REVENUE AND COST DATA JUSTIFYING THE IMPOSITION RAILROAD FUEL SURCHARGES

To the extent the Board believes that neither current railroad reporting requirements nor data received in this proceeding enable it to determine whether a particular fuel surcharge provides a railroad with more revenue than it needs to recover its fuel costs for a particular movement, the STB should adopt procedures to govern the submission of the additional data necessary. The STB has clear authority to obtain the data it needs under 49 U.S.C. § 721(b).[21] Railroads already provide certain fuel cost data to the AAR on a quarterly basis through the RCAF process. 49 U.S.C. § 10708.[22] In addition, the Board also requires railroads to submit certain cost and revenue data under 49 CFR Parts 1200 through 1300. Furthermore, railroads are required to report certain information regarding carrier rates and service terms pursuant to 49 CFR Parts 1300 through 1332. AES asserts that the data requirements should include information on revenues from fuel surcharges under contracts, since in nearly all cases the contract incorporates the public fuel surcharge by reference without any modifications. Thus, AES believes the Board has the requisite power to use existing regulations or add regulations to obtain any additional information needed to substantiate that "railroad fuel surcharges are being set in such a manner as to insure that they are used only to recover the increased cost of fuel for the particular movements to which the surcharge is applied." Notice at 2.

[21] 49 U.S.C. § 721 (b) (2006). "Inquiries, Reports, and Orders. - The Board may - (1) inquire into and report on the management of the business of carriers providing transportation and services subject to subtitle IV; (2) inquire into and report on the management of the business of a person controlling, controlled by, or under common control with those carriers to the extent that the business of that person is related to the management of the business of that carrier; (3) obtain from those carriers and persons information the Board decides is necessary to carry out subtitle IV; and (4) when necessary to prevent irreparable harm, issue an appropriate order without regard to subchapter II of chapter 5 of title 5."

[22] 49 U.S.C. § 10708 (a) (2006). "Rail cost adjustment factor: (a) The Board shall, as often as practicable, but in no event less often than quarterly, publish a rail cost adjustment factor which shall be a fraction, the numerator of which is the latest published Index of Railroad Costs (which index shall be compiled or verified by the Board, with appropriate adjustments to reflect the change in composition of railroad costs, including the quality and mix of material and labor)...."

Finally, high fuel surcharges coupled with increasingly poor service have caused public confidence in the rail system to deteriorate. Rail transportation has become increasingly vital to shippers, particularly coal shippers. Rail service failures and reliability problems have hindered utilities' coal supplies. A mild winter and utility coal conservation measures have averted coal inventory problems thus far. However, rail service needs improvement in order to return coal stockpiles to acceptable levels. One part of restoring public confidence in railroad service and reliability is for the railroads to actively participate with the Board and shippers to alleviate the fuel surcharge discrepancy.

## VI. CONCLUSION

AES applauds the Board for taking action on the fuel surcharge issue and holding a public hearing. The Board must now take definitive steps to rectify the problem. The Board should (1) provide clarification that the lawfulness of a railroad fuel surcharge may be challenged separately from the level of a railroad rate under the Board's authority to regulate railroad practices; (2) clarify that railroad fuel surcharges may only be used for the purpose of recovering actual costs of fuel expended for a particular shipper's transportation that are not recouped by other means (3) take appropriate action to correct the current publicly published railroad fuel surcharges of BNSF, NS, CSX, and other similarly imposed railroad surcharges to the extent they do not comport with the above standard; and (4) require each railroad to submit

detailed data reflecting their actual cost of fuel and the revenues associated with fuel cost recovery for each movement to which the fuel surcharge is assessed.

Respectfully submitted,

Thomas W. Wilcox
Sandra L. Brown
David E. Benz
Erika Benson
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 274-2913

*Attorneys for The AES Corporation*

Marc Z. Michael
Counsel
The AES Corporation
4300 Wilson Boulevard
Arlington, VA 22203
(703) 682-6684

April 27, 2006

# EXHIBIT PX0578

5/8/06 CEO Wire (Pg. Unavail. Online)
2006 WLNR 7922596

CEO Wire
Copyright 2006 Voxant

May 8, 2006

UnionPacific - Pres. & CEO Interview

Becky Quick, Carl Quintanilla

xfdce CNBC/DOW-JONES-BUSINE-01

Show: CNBC/DOW JONES BUSINESS VIDEO

Date: May 8, 2006

Time: 00:00:00

Tran: 050801cb.y58

Type: INTERVIEW

Head: Union Pacific - Pres. & CEO Interview

Sect: Business

Byline: Becky Quick, Carl Quintanilla

Guest: Jim Young

Spec: Business; Railroad Industry; UNP (NYSE) SIC: 4011

Time: 08:25:00

BECKY QUICK, CNBC ANCHOR: Welcome back to a special edition of SQUAWK BOX. We are live in Omaha, Nebraska. We have been here all weekend for the Berkshire Hathaway (BRK) meeting, but there is a lot of business, many industries that are centered and headquartered right here in Omaha. One of those companies is Union Pacific. And this morning we are joined by the CEO and president, Jim Young.Jim, thanks for being here today.

JIM YOUNG, PRES. CEO, UNION PACIFIC: Good morning, Becky. Welcome to Omaha.

QUICK: Thank you. It`s great it see you. You know, one of the things we have been keeping an eye on is transports, we have been watching them real closely. Transports are sitting at an all-time high right now. Are you seeing the demand in your business to justify those types of stock prices?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

DEPOSITION EXHIBIT 4 8-4-10 LG
PENGAD 800-631-6989

YOUNG: Well, they are using the words growth now with this industry, which it has been a long time. And we had a good strong first quarter, volume up 4 percent. We saw a little bit of weakness in April. But May is going very strong. So right now we are feeling pretty good.

QUICK: Why are they talking about growth again when it come to the railroads? What happened?

YOUNG: Well, really, across the board when you look at coal business, it`s very strong, our intermodal business, international business coming into the country over the ports in the West Coast. High energy prices actually are a competitive advantage for the railroads. So it right now is -- we have got good demand.

QUICK: High energy prices because it makes it more expensive for the truckers to haul and your costs don`t go up by as much?

YOUNG: Railroads are about three times more fuel-efficient than are truckers. And we have got a lot of trucking companies that want to put more business on the railroads.

QUICK: OK. You know, we have been hearing an awful lot about the fuel surcharges because your costs do go up, correct? You have got to pass on fuel surcharges?

YOUNG: Absolutely (ph).

QUICK: So we have been hearing an awful lot about that. What kind of fuel surcharges do you have right now and are you getting push back from your customers?

YOUNG: Well, there is no customer that is ever going to agree and be happy with a price increase, but we are the largest consumer, Union Pacific, of diesel fuel in North America, burning (ph) 1.4 billion gallons a year. So every penny is about $14 million. And our goal right now is to recover 100 percent of our fuel and improve the returns and put more growth into this growth capital in this business. That is what customers really are interested in.

QUICK: But have you been getting more push back? Because we have seen articles out there saying customers are starting to get a little concerned about the fuel surcharges from the railroads in particular.

YOUNG: Well, we have. And I think many of our customers -- in fact, we worked with our customers in putting original fuel surcharges in. It has only been the recent couple years that they have been in place. And I think most of our customers believe high energy costs were kind of a one- time deal, they would come back down. And now they are starting to question whether they are ever coming back down. And, again, it puts pressure on our customers. We are sensitive to that. But this is an industry that really needs to improve its financial returns if we are going to put any kind of capital back into the business.

QUICK: You know, let`s talk a little bit just about the economy. You have got a real good finger on the pulse of the economy. The demand that you are seeing, how much of is it is coming because people are switching off trucks, and how much of it is coming is just that we are looking at a strong national economy?

YOUNG: Well, I think it is a combination of both. I know the -- there is some concern right now maybe with housing. But really most of our businesses are pretty strong right now, which is due both to the national economy and also international. We -- as I said, our intermodal business is growing very, very nicely. And right now we are feeling pretty good about the strength of the economy.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

QUICK: If you have got to look out there and think about concerns, what are the -- what is the one thing you really do worry about?

YOUNG: Well, I worry -- high energy prices. You know, while it's a competitive advantage for my business, I am concerned about the impact on the consumer and eventually there is a risk they are going to quit spending money and that can have an impact on our business.

QUICK: OK. You are based in Omaha. What does that mean for your company?

YOUNG: Well, about 150 years ago, not too far from here, Abraham Lincoln stood across the Missouri River right over here with General Dodge and said, build it right here. And this is the start of the western expansion of the rail network. We have been here 150 years. It is a great place to have a business.

QUICK: OK. Jim, thank you very much for joining us this morning. We appreciate it.

YOUNG: You bet, thank you.

QUICK: Jim Young again is the CEO and president of Union Pacific. And, Carl, we will send it back to you.

CARL QUINTANILLA, CNBC ANCHOR: OK. Thank you very much, Beck. Union Pacific, by the way, a member of the Dow Transports. And the stock has helped the index reach that all-time high that Becky was talking b. Union Pacific up 16 percent year-to-date while the transports are up 18 percent in 2006. That index closed at an all-time high on Friday, up nearly 300 points or 6.3 percent for the week, to stand at $49.57.

END

Content and programming copyright 2006 CNBC/Dow Jones Business Video, a division of CNBC/Dow Jones Desktop Video, LLC. Transcription copyright 2006 Voxant, Inc. (www.voxant.com) No portions of the materials contained herein may be used in any media without attribution to CNBC/Dow Jones Business Video, a division of CNBC/Dow Jones Desktop Video, LLC. This transcript may not be copied or resold in any media.

---- INDEX REFERENCES ---

COMPANY: UNIONPACIFIC CORP; QUICK CORP; BERKSHIRE HATHAWAY INC

INDUSTRY: (Transportation (1TR48); Freight Transportation (1FR88); Railroads (1RA98); Land Transportation (1LA43); Trucking (1TR88); Freight Railroads (1FR84))

REGION: (USA (1US73); Americas (1AM92); North America (1NO39); Nebraska (1NE88))

Language: EN

OTHER INDEXING: (BERKSHIRE HATHAWAY; DOW TRANSPORTS; END; QUICK; UNION PACIFIC; UNION PACIFIC PRES) (Becky; Carl; Carl Quintanilla; CEO; Content; Dodge; Guest: Jim Young; Interview; Jim; JIM YOUNG; Jim Young.; Show; YOUNG)

KEYWORDS: (CNBC/DOW-JONES-BUSINE-01); (w)

Word Count: 1259
5/8/06 CEOWIRE (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT PX0579

Alliance OF AUTOMOBILE MANUFACTURERS

216390

APR 27 2006 RECEIVED

Office of Proceedings

Part of Public Record

# STATEMENT

## OF

## *THE ALLIANCE OF AUTOMOBILE MANUFACTURERS*

**BEFORE THE:**

**SURFACE TRANSPORTATION BOARD**

**MAY 11, 2006**

**PRESENTED BY:**

George Telfer
Senior Manager, DaimlerChrysler

My name is George Telfer, Senior Manager for DaimlerChrysler, testifying on behalf of the Alliance of Automobile Manufacturers (Alliance). I am pleased to be afforded the opportunity to offer the views of the Alliance at this important Surface Transportation Board (STB) public hearing. The Alliance is a trade association of nine car and light truck manufacturers including BMW Group, DaimlerChrysler, Ford Motor Company, General Motors, Mazda, Mitsubishi Motors, Porsche, Toyota and Volkswagen. One out of every 10 jobs in the U.S. is dependent on the automotive industry.

The automotive industry depends heavily on efficient and cost-effective rail transportation in order to sustain its manufacturing operations. A vast majority of finished vehicles are shipped by rail to distribution points, as well as a high percentage of materials shipped into the plants. Shipping by any other means would not only be cost prohibitive but would be impossible given the lack of capacity to move such large volumes of bulky freight. Shipping finished vehicles without rail, for example, would require a tenfold increase in specialized truck equipment and drivers. Given the nature of its shipping needs, the automotive industry is in fact captive to this mode of transport.

Over the past several years, the railroads have been able to mandate fuel surcharges covering most of the Alliance Member Company contracts. When first implemented, the surcharges were relatively small and an analysis indicated that they were relatively equitable. Over the past two years, as fuel prices have increased, surcharges have risen dramatically, causing the Alliance to re-examine whether the methodologies used to calculate the surcharges are reasonable.

Before I get into the detail of our concerns, I would like to state that the Alliance is a strong believer in markets and their ability to set a fair price. While we have concerns with how railroads calculate their fuel surcharges, it in no way changes our position on the underlying regulatory structure of the rail industry. We remain opposed to any proposal that would substitute governmentally imposed competition for the market-based approach of current law for the rail industry.

As an industry, we know first hand how rising fuel price impacts costs. Higher fuel prices put pressure on our industry in many areas – through our use of more expensive resins to higher prices for tires. And we recognize that fuel surcharges used by the rail industry are a necessary product of higher fuel prices. What we are asking for is that these fuel surcharges also be subject to the same free market forces and be transparent. We must work cooperatively with the rail industry to share in the burden of higher fuel costs.

To date, the railroads have not provided an analysis to demonstrate that their surcharge practices are reasonable and market driven. Therefore, the Alliance's position on the railroads' surcharges is based on an analysis of the railroads' own financial data, confirmed by similar analyses of prominent, respected industry trade groups and independent consulting firms.

The analysis of the financial reports issued by the railroads indicates that current fuel surcharges do not coincide with the relationship to the railroad's actual fuel expense. As one example of the inequity of the fuel surcharge structures, there have been time periods when fuel

surcharges have risen, but certain railroads have reported to investors that their actual fuel costs have fallen. The analysis indicates that some railroads' surcharges have resulted in their being grossly over-compensated for fuel, well beyond their actual fuel expenses.

The Alliance believes that some of the various surcharge mechanisms are flawed and unbalanced, and work to the financial advantage of the railroads. As a result, we believe the ability to mandate fuel surcharges has become a new profit center for the railroads. The analysis indicates that, in recent quarters, over-recovery of fuel expenses may account for half of the net income being reported to investors. Surcharges have become the latest form of rate increase, avoiding much attention because everyone knows that fuel prices have increased and therefore, the railroads argue, the surcharges must be warranted.

The Alliance has several specific issues with the prevailing practices relative to fuel surcharges:

1. The current revenue-based surcharges (where the surcharge is a percentage of the rate) do not correlate with the actual fuel costs incurred by the railroads. Rail movements with higher rates pay more surcharge than rail movements with lower rates, even if the amount of fuel used for the two moves is the same. Revenue-based surcharges are even more inequitable in today's pricing environment where the fuel surcharge percentage is tacked onto any rate increase the railroad receives, despite the fact that there is no correlation between the rate increase and the amount of fuel used. In recognition of the inequities of revenue-based surcharges, shippers and carriers in other transportation modes are moving to consumption–based surcharges and it is time for the railroads to follow suit.

2. Using West Texas Intermediate (WTI) Crude as the index to establish the surcharge does not correlate with the actual fuel purchases made by the railroads. The railroads do not use WTI Crude to power their locomotives, so changes in the cost of WTI bear no direct relation to changes in the cost of the fuel the railroads are using. Since changes in the price of WTI have increased much more than the price of diesel fuel, the railroads' use of WTI as the basis for their surcharges adds to their being grossly overcompensated. Between the end of 2001 and the first week of April 2006, the price of WTI increased by 239%, where the cost of diesel fuel increased by only 124%. Since the railroads are actually buying diesel fuel and not WTI Crude, the surcharge structure should be based on diesel fuel prices.

3. In their paper entitled "Overview of U.S. Freight Railroads" dated January, 2006 The Association of American Railroads repeated an often-cited statistic that "On average, railroads are three times more fuel efficient than trucks, and railroad fuel efficiency is improving all the time." Our experience however is that, despite using one-third less fuel, on a percent of revenue basis, railroad surcharges have generally exceeded those paid to trucking companies. In addition, while "railroad fuel efficiency is improving all the time," this fact has not been reflected in the railroads' surcharge programs.

The Alliance finds that some of the railroads' unwillingness to justify their surcharge methodologies is frustrating. Our attempts to obtain supporting documentation have been rebuffed. Surcharges have become "non-negotiable," enacted by unilateral decree.

The Alliance believes the STB should press the railroads to fully disclose both cost and revenue data related to fuel and fuel surcharges. This should include the base fuel cost included in all of their rates, the actual fuel cost incurred and the incremental revenue generated by their surcharges.

In summary, the Alliance is requesting STB support for the following:

- Surcharges should cover the incremental cost of fuel and not be a new source of profit.
- Railroads should provide data to their customers demonstrating that the level of surcharge is revenue-neutral.
- Surcharges must be based on the price of locomotive diesel fuel that the railroads actually purchase.

Thank you.

###

# EXHIBIT PX0580

UNITED STATES OF AMERICA

+ + + + +

SURFACE TRANSPORTATION BOARD

PUBLIC HEARING

RAIL FUEL SURCHARGES

EX PARTE 661

+ + + + +

THURSDAY, MAY 11, 2006

+ + + + +

The Public Hearing convened in Hearing Suite 760, 1925 K Street, N.W., Washington, D.C. 20423-0001, pursuant to notice at 9:00 a.m., Chairman Douglas Buttrey presiding.

SURFACE TRANSPORTATION MEMBERS PRESENT:

DOUGLAS BUTTREY Chairman
FRANCIS MULVEY Vice Chairman

PANELISTS:

GOVERNOR BRIAN SCHWEITZERA

| | |
|---|---|
| TERRY WHITESIDE, | WHEAT & BARLEY COMMISSIONS |
| STEVEN STREGE | NORTH DAKOTA GRAIN DEALERS ASSOCIATION |
| DAN MACK | NATIONAL GRAIN & FEED ASSOCIATION |
| JUDY GILLIES | THE FERTILIZER INSTITUTE |
| ERIC WILKEY | TRANSPORTATION, ELEVATOR, & GRAIN MERCHANTS ASSOCIATION |
| TERRY VOSS | AG PROCESSING |
| GEORGE TELFER | ALLIANCE OF AUTOMOBILE MANUFACTURERS/DAIMLER CHRYSLER |

EXHIBIT 1
Rose
KBB 7/16/10

| | |
|---|---|
| ROBERT NEFF | AMEREN ENERGY FUELS & SERVICES |
| JAY ROMAN | AMEREN ENERGY FUELS & SERVICES/ESCALATION CONSULTANTS |
| THOMAS CROWLEY | WESTERN COAL TRAFFIC LEAGUE |
| PETER PFOHL | WESTERN COAL TRAFFIC LEAGUE |
| BILL MOHL | ENTERGY CORPORATION |
| THOMAS WILCOX | THE AES CORPORATION |
| AMES HELLER | CONCERNED CAPTIVE COAL SHIPPERS |
| MICHAEL LOFTUS | CONCERNED CAPTIVE COAL SHIPPERS |
| STEPHEN POCSIK | TOTAL PETROCHEMICALS USA, INC. |
| MICHAEL MCBRIDE | TOTAL PETROCHEMICALS USA, INC./EDISON ELECTRIC INSTITUTE |
| STEVE SHARP | ARKANSAS ELECTRIC COOPERATIVE CORP. |
| DIANE ELHAKIM | DEGUSSA CORPORATION |
| DAVID WEISEL | POTLATCH FOREST PRODUCT CORP. |
| JAMES CONWAY | GRIFFIN INDUSTRIES |
| DANIEL SLAVIN | GRANITEROCK |
| JOHN FICKER | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| CURT WARFEL | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| THOMAS SCHICK | AMERICAN CHEMISTRY COUNCIL |
| CHARLES LINDERMAN | EDISON ELECTRIC INSTITUTE |
| TOM HUNT | BNSF RAILWAY COMPANY |
| JAMES FOOTE | CANADIAN NATIONAL RAILWAY CO. |
| MARCELLA SZEL | CANADIAN PACIFIC RAILWAY |
| CHRISTOPHER JENKINS | CSX TRANSPORTATION |
| DONALD SEALE | NORFOLK SOUTHERN RAILWAY CO. |
| ROBERT KNIGHT | UNION PACIFIC RAILROAD CO. |
| ROBERT DINGMAN | OIL CREEK & TITUSVILLE LINES |
| TOM O'CONNOR | SNAVELY KING MAJOROS O'CONNOR & LEE, INC. |
| MAZHAR ALI AWAN | TRANSPORTATION ECONOMICS, INC. |
| SANDRA DEARDEN | HIGHROAD CONSULTING, LTD. |
| MICHAEL BEHE | FREIGHT RESOURCES NETWORK, LLC. |

A G E N D A


Opening Remarks - Chairman Buttrey . . . . . . . . 5

Opening Remarks - Vice Chairman Mulvey . . . . . 11

PANEL I - GOVERNMENT

The Honorable Brian Schweitzer, Gov. Of Montana . 12

PANEL II A - WITNESSES

Eric Wilkey, Arizona Grain . . . . . . . . . . . . 33
Terry Voss, Ag Processing . . . . . . . . . . . . . 36
Dan Mack, Transportation for Feed . . . . . . . . . 40
Steven Strege, North Dakota Grain Dealers Assoc . 49
Terry Whiteside, Wheat and Barley Commission . . 57
Judy Gillies, J.R. Simplot Company . . . . . . . . 62

PANEL II B - WITNESSES

Peter Pfohl, Western Coal Traffic League . . . . . 83
Thomas Crowley, Western Coal Traffic League . . . 88
Bill Mohl, Entergy Corporation . . . . . . . . . . 91
Thomas Wilcox, AES Corporation . . . . . . . . . 101
George Telfer, Daimler Chrysler . . . . . . . . . 111
Robert Neff, Ameren Energy . . . . . . . . . . . 121
Jay Roman, Ameren Energy . . . . . . . . . . . . . 126

PANEL II C - WITNESSES

Michael Loftus, Concerned Captive Coal Shippers 148
James Heller, Concerned Captive Coal Shippers . 151
Daniel V. Slavin, Graniterock . . . . . . . . . . 168
Steve Sharp, Arkansas Electric Cooperative Corp 174
Diane Elhakim, Degussa Corporation . . . . . . . 180
James Conway, Griffin Industries . . . . . . . . 186
David Weisel, Potlatch Forest Product Corp . . 192
Stephen Pocsik, Total Petrochemicals USA, Inc . 201
Michael McBride, Total Petrochemicals USA, Inc. 206

Panel III: Trade Associations

John Ficker, The National Industrial
Transportation League . . . . . . . . . . . 227
Curt Warfel, The National Industrial
Transportation League . . . . . . . . . . . 227
Michael McBride, Edison Electric Institute . . 236
Thomas Schick, American Chemistry Council . . . 242

Railroads

Tom Hunt, BNSF Railway Company . . . . . . . . . 269
James Foote, Canadian National Railway Company 287
Marcella Szel, Canadian Pacific Railway . . . . 296
Christopher Jenkins, CSX Transportation, Inc. . 314
Donald Seale, Norfolk Southern Railway Company 326
Robert Knight,Union Pacific Railroad Company . 334
Robert Dingman, Jr., Oil Creek and Titusville Lines . . . . . . . . . . . . . . . . . . . 349

Panel IV: Consultants

Jay Roman, Escalation Consultants, Inc. . . . . 357
Tom O'Connor, Snavely King Majoros O'Connor & Lee, Inc. . . . . . . . . . . . . . . . . . 372
Mazhar Ali Awan, Transportation Economics, Inc. 383
Sandra Dearden, Highroad Consulting, Ltd. . . . 396
Michael Behe, Freight Resources Network, LLC . 400

that there should be any double counting here at all. Actually, we believe the best model should be a mileage-based fuel surcharge coupled with an index that describes an all inclusive less fuel index which would be RCAF absent fuel and we think that's the best model and that would address the concerns of most of the parties that spoke on that topic today.

So, that's the extent of my prepared comments. I'd be ready to answer to questions unless you want to ask questions as a panel.

CHAIRMAN BUTTREY: We're not going to do a panel.

MR. HUNT: Okay.

CHAIRMAN BUTTREY: We'll just ask the questions individually.

MR. HUNT: That would be just fine.

CHAIRMAN BUTTREY: There's been a lot made about who's paying this and who's not paying this and we've heard a little bit of everything really.

Do you have any idea what percentage of your traffic is not paying the fuel charge because there's a contract or for some other reason?

MR. HUNT: We disclose our effectiveness rate and we did it on the last analyst call at around 75 percent expecting we do about 80 percent by the end of this year.

As I indicated through 2005, the business units that clearly had fairly high recovery were coal, or I'm sorry, ag, industrial and consumer products. Coal is the one that clearly is significantly under recovery.

MR. HUNT: And that's because of contracts.

CHAIRMAN BUTTREY: And you can unequivocally state for us today that the fuel increase that you're trying to recover is not the fuel increase that you're losing under contract?

MR. HUNT: Are you saying a cross subsidy between the two?

CHAIRMAN BUTTREY: Right.

MR. HUNT: No, each of the business units and again, from my perspective, you know, we're looking at this on a business unit by business unit basis, each one of them under recovered last year.

fuel surcharge I talked about, a 75 percent effectiveness, that the vast majority of that 25 percent difference exists within the coal business group. So, I think we are absorbing that.

VICE CHAIRMAN MULVEY: In one of your charts, the bar chart, titled Cumulative Under Recovery. Fuel expense above threshold. What is a threshold?

MR. HUNT: Well, I'll give you the exact answer.

VICE CHAIRMAN MULVEY: Is that yes.

MR. HUNT: Seventy-three cents BNSF or it's about $1.25 highway diesel fuel.

VICE CHAIRMAN MULVEY: And that's 2001 based?

MR. HUNT: Yes, it's --

VICE CHAIRMAN MULVEY: I was trying to figure out, why the word threshold was used instead of a particular time or a particular number.

MR. HUNT: Our surcharge program is the same for all customers and it's highway diesel fuel and then it starts at $1.25 and ratchets up from

there.

VICE CHAIRMAN MULVEY: But, that suggests that an off-highway diesel fuel would be better because it doesn't take into account a lot of the other charges that are put in highway diesel fuel. How do you feel about that?

MR. HUNT: Back to the question earlier, I think as long as we find an index that has a high correlation to what we burn and is publicly available and agreeable to all parties, I have no problem with that.

VICE CHAIRMAN MULVEY: Thank you.

MR. HUNT: Yes.

VICE CHAIRMAN MULVEY: Doug.

CHAIRMAN BUTTREY: I don't have anything else.

VICE CHAIRMAN MULVEY: Thank you very much.

MR. HUNT: Thank you.

CHAIRMAN BUTTREY: Our next witness is Canadian National. Good afternoon.

MR. FOOTE: Good afternoon, Mr. Chairman,

# EXHIBIT PX0581

UNITED STATES OF AMERICA

+ + + + +

SURFACE TRANSPORTATION BOARD

PUBLIC HEARING

RAIL FUEL SURCHARGES

EX PARTE 661

+ + + + +

THURSDAY, MAY 11, 2006

+ + + + +

The Public Hearing convened in Hearing Suite 760, 1925 K Street, N.W., Washington, D.C. 20423-0001, pursuant to notice at 9:00 a.m., Chairman Douglas Buttrey presiding.

SURFACE TRANSPORTATION MEMBERS PRESENT:

DOUGLAS BUTTREY Chairman
FRANCIS MULVEY Vice Chairman

PANELISTS:

GOVERNOR BRIAN SCHWEITZERA
TERRY WHITESIDE, WHEAT & BARLEY COMMISSIONS
STEVEN STREGE NORTH DAKOTA GRAIN DEALERS ASSOCIATION
DAN MACK NATIONAL GRAIN & FEED ASSOCIATION
JUDY GILLIES THE FERTILIZER INSTITUTE
ERIC WILKEY TRANSPORTATION, ELEVATOR, & GRAIN MERCHANTS ASSOCIATION
TERRY VOSS AG PROCESSING
GEORGE TELFER ALLIANCE OF AUTOMOBILE MANUFACTURERS/DAIMLER CHRYSLER

| | |
|---|---|
| ROBERT NEFF | AMEREN ENERGY FUELS & SERVICES |
| JAY ROMAN | AMEREN ENERGY FUELS & SERVICES/ESCALATION CONSULTANTS |
| THOMAS CROWLEY | WESTERN COAL TRAFFIC LEAGUE |
| PETER PFOHL | WESTERN COAL TRAFFIC LEAGUE |
| BILL MOHL | ENTERGY CORPORATION |
| THOMAS WILCOX | THE AES CORPORATION |
| AMES HELLER | CONCERNED CAPTIVE COAL SHIPPERS |
| MICHAEL LOFTUS | CONCERNED CAPTIVE COAL SHIPPERS |
| STEPHEN POCSIK | TOTAL PETROCHEMICALS USA, INC. |
| MICHAEL MCBRIDE | TOTAL PETROCHEMICALS USA, INC./EDISON ELECTRIC INSTITUTE |
| STEVE SHARP | ARKANSAS ELECTRIC COOPERATIVE CORP. |
| DIANE ELHAKIM | DEGUSSA CORPORATION |
| DAVID WEISEL | POTLATCH FOREST PRODUCT CORP. |
| JAMES CONWAY | GRIFFIN INDUSTRIES |
| DANIEL SLAVIN | GRANITEROCK |
| JOHN FICKER | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| CURT WARFEL | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| THOMAS SCHICK | AMERICAN CHEMISTRY COUNCIL |
| CHARLES LINDERMAN | EDISON ELECTRIC INSTITUTE |
| TOM HUNT | BNSF RAILWAY COMPANY |
| JAMES FOOTE | CANADIAN NATIONAL RAILWAY CO. |
| MARCELLA SZEL | CANADIAN PACIFIC RAILWAY |
| CHRISTOPHER JENKINS | CSX TRANSPORTATION |
| DONALD SEALE | NORFOLK SOUTHERN RAILWAY CO. |
| ROBERT KNIGHT | UNION PACIFIC RAILROAD CO. |
| ROBERT DINGMAN | OIL CREEK & TITUSVILLE LINES |
| TOM O'CONNOR | SNAVELY KING MAJOROS O'CONNOR & LEE, INC. |
| MAZHAR ALI AWAN | TRANSPORTATION ECONOMICS, INC. |
| SANDRA DEARDEN | HIGHROAD CONSULTING, LTD. |
| MICHAEL BEHE | FREIGHT RESOURCES NETWORK, LLC. |

A G E N D A

Opening Remarks - Chairman Buttrey . . . . . . . . 5

Opening Remarks - Vice Chairman Mulvey . . . . . . 11

PANEL I - GOVERNMENT
The Honorable Brian Schweitzer, Gov. Of Montana . 12

PANEL II A - WITNESSES
Eric Wilkey, Arizona Grain . . . . . . . . . . . . 33
Terry Voss, Ag Processing . . . . . . . . . . . . . 36
Dan Mack, Transportation for Feed . . . . . . . . . 40
Steven Strege, North Dakota Grain Dealers Assoc . 49
Terry Whiteside, Wheat and Barley Commission . . 57
Judy Gillies, J.R. Simplot Company . . . . . . . . 62

PANEL II B - WITNESSES
Peter Pfohl, Western Coal Traffic League . . . . . 83
Thomas Crowley, Western Coal Traffic League . . . 88
Bill Mohl, Entergy Corporation . . . . . . . . . . 91
Thomas Wilcox, AES Corporation . . . . . . . . . 101
George Telfer, Daimler Chrysler . . . . . . . . . 111
Robert Neff, Ameren Energy . . . . . . . . . . . 121
Jay Roman, Ameren Energy . . . . . . . . . . . . 126

PANEL II C - WITNESSES
Michael Loftus, Concerned Captive Coal Shippers 148
James Heller, Concerned Captive Coal Shippers . 151
Daniel V. Slavin, Graniterock . . . . . . . . . 168
Steve Sharp, Arkansas Electric Cooperative Corp 174
Diane Elhakim, Degussa Corporation . . . . . . . 180
James Conway, Griffin Industries . . . . . . . . 186
David Weisel, Potlatch Forest Product Corp . . 192
Stephen Pocsik, Total Petrochemicals USA, Inc . 201
Michael McBride, Total Petrochemicals USA, Inc. 206

Panel III: Trade Associations
John Ficker, The National Industrial
Transportation League . . . . . . . . . . 227
Curt Warfel, The National Industrial
Transportation League . . . . . . . . . . 227
Michael McBride, Edison Electric Institute . . 236
Thomas Schick, American Chemistry Council . . . 242

Railroads

Tom Hunt, BNSF Railway Company . . . . . . . . . 269
James Foote, Canadian National Railway Company 287
Marcella Szel, Canadian Pacific Railway . . . . 296
Christopher Jenkins, CSX Transportation, Inc. . 314
Donald Seale, Norfolk Southern Railway Company 326
Robert Knight,Union Pacific Railroad Company . 334
Robert Dingman, Jr., Oil Creek and Titusville Lines . . . . . . . . . . . . . . . . . . 349

Panel IV: Consultants

Jay Roman, Escalation Consultants, Inc. . . . . 357
Tom O'Connor, Snavely King Majoros O'Connor & Lee, Inc. . . . . . . . . . . . . . . . . 372
Mazhar Ali Awan, Transportation Economics, Inc. 383
Sandra Dearden, Highroad Consulting, Ltd. . . . 396
Michael Behe, Freight Resources Network, LLC . 400

the railroads should fully recover the costs of diesel fuel needed to provide service to the AES utilities.

However, as discussed in the written comments in more detail, AES is convinced that the current fuel surcharge as imposed by the class one railroads, although represented as a means to recover spikes in diesel fuel costs, in fact, substantially overcompensate the railroads for their fuel costs, are in fact an increase in the overall rate for transportation.

The fuel surcharges have been imposed in addition to significant base-rated increase as AES' rail transportation contracts have come up for renewal in the past several years. In some cases, the combination of a double digit rate increase in the tariff fuel surcharge mechanism has resulted in the overall cost of transportation in certain facilities increasing 35 percent in the first month of a new contract.

Acceptance of the tariff fuel surcharge is presented on a take it or leave it basis, non-negotiable. All efforts by AES to modify or reduce

the information from the railroads to justify the surcharge methodologies.

The requests for supporting documentation basically are rebuffed and the surcharges have become non-negotiable. It's just fuel went up, here's your charge.

So, in summary, there are four things that we're basically requesting from the Board.

(1) Surcharges should cover only the increased cost of fuel and not be a new source of profit for the railroads.

(2) Railroads should fully disclose both cost and revenue data related to fuel purchases and fuel surcharges. So, in other words, you'd see both sides of the ledger.

(3) Surcharges must be based on the price of locomotive diesel fuel used by the railroads and not some other index.

(4) And then finally, number four, railroads move from a rate-based surcharge to a consumption- based surcharge. And that would be something along the line of the 10 miles or something

they're using to rely on for their fuel surcharges compensates them in an accurate manner for their fuel costs.

CHAIRMAN BUTTREY: Mr. Ficker, you look like you had something you might want to say.

MR. FICKER: Well, I think there's an important point that Mike just made in this. I'm not near as articulate as Mr. McBride and his fine legal talent that he displays here in front of this agency, but there's a couple of things that have gone on.

We, as you know, have sat with you and explained the proposals that we took. We believe the proper solution to this is for the railroads and the shippers to come down and work something out, but we've tried.

We spent a year and a half talking to the rail carriers, showing them our proposal and our proposal dealt with off-highway diesel price that's published every week by the same energy information agency that publishes the on-highway diesel and it's clearly much more aligned with the cost of the fuel that the railroads consume. So, we believe that's an

appropriate approach as well.

We stand ready and willing to sit down and work with the railroads today, right now to come up with a more equitable, transparent, fair, reasonable approach to fuel surcharges. We don't object to the concept.

Most of the rates today from the majority of our members are market-based rates that are probably not subject to your jurisdiction because they've been exempted over the last many years. So, the reality that we're facing is the need for shippers to be able to say I can see how this cost happens. I can justify it for my organization and I accept it as it is.

Because there's no negotiation on fuel surcharges today. It's a take it or leave it thing. You want this -- you want to move your goods. Here's the price and oh, by the way, you will pay a fuel surcharge and we'll publish that arbitrarily without any discussion with you whatsoever.

CHAIRMAN BUTTREY: Any rebuttal?

MR. MCBRIDE: No rebuttal. I just want to

say that if you think about it this way you might just put the question to the railroads very simply, how could it be unfair to you if we said that you can take RCAF increases and those would be presumptively reasonable, but that anything else is subject to challenge before the Board?

VICE CHAIRMAN MULVEY: Mr. Ficker, historically, fuel surcharges were allowed to be implemented carefully, infrequently, without constant change and only temporarily in response to emergencies. Which of these factors would you say are present today?

MR. FICKER: All of the above.

VICE CHAIRMAN MULVEY: All are present?

MR. FICKER: Many of the above are present. Vice Chairman Mulvey, would you go through that list again? Because you went through it pretty quick.

VICE CHAIRMAN MULVEY: Yes.

MR. FICKER: You've got it written down and I don't.

VICE CHAIRMAN MULVEY: Well, what I said

measuring the change over time and unless the spread between the two prices widens significantly which it's clearly not doing on that graph, there's no over recovery occurring.

And let's talk about our hedging program because that's come up through a number of people's discussion today and as it says in the headline of this slide, hedging is independent of fuel surcharge.

Hedging is a cost containment strategy, a risk containment strategy where you lock in a future price or a future range of prices. It's like purchasing insurance and deciding what your deductible should be and what you're limits should be on your property insurance policy. But, there is no free lunch and as shown on the bullets up there, if prices rise, you win. If prices fall, you lose and in 2005, our fuel expense was reduced by 21 percent due to hedging. However, in 1998 when fuel prices were low, our fuel expense was actually increased by 13 percent due to hedging and we, in 1998, did not receive any compensation from our customers for that increase in fuel expense and, therefore, shortfall in

BNSF's perspective and these numbers you can actually tie back to our 10K filed with the SEC. The question is are we over recovering and the answer no, not in any year from 2001 to 2005 nor for the five-year period and if you see the number up in sort of the upper left-hand corner, you can see that we have under recovered over that five-year period by $1.1 billion. Now, this is BNSF fuel expense absent the hedge compared to the recoveries from fuel surcharges.

Also, some assert that we over recover in one line of business and in effect, subsidize others and for the five-year period and for the year 2005, all four of our business units fell short of recovering their cost of fuel.

Three of the business units in 2005 recovered a significant amount, i.e., 75 percent or more of the increase in fuel above base while coal, the other business unit, recovered well under 50 percent above its base.

So, fuel surcharge is clearly not a profit center at BNSF.

But, as I stated earlier, we will continue

Well, here are the numbers. This is our total fuel cost 2002 through 2005. You can see we spent about $2.8 billion in fuel and about a third of that or 1.1 billion has been due to the increase in cost of fuel from 2001.

Well, so, what do we do? You know, our view has been that we need to do exactly what other businesses are doing whether they're airlines, steamship companies, florists. We need a fuel recovery charge and that really we needed to ask our customers to cover the incremental cost of fuel.

Now, I only wish our program was as efficient as has been suggested. It has not been a profit center for us. In fact, we have under recovered $319 million in fuel over the last four years.

Stated differently, our incremental cost of fuel exceeded what we recovered in the fuel surcharge by $319 million. All of our figures excluding gains or losses from hedging. We're talking here about pure fuel costs. So, $319 million that we have been unable to recover.

to enhance the capacity to meet the demand that we're seeing. Our capital budget this year is $1,146,000,000. At the end of this year and in a four-year hiring period we will have hired 8,000 employees. A 2,000 employee net gain to the company to handle additional business. We will have spent over $600 million on new locomotives.

All of that is to provide service and these six components are the crux of our fuel surcharge application in the market and we will continue to assess that going forward and do the best we possibly can to make sure that we're matching up total service with value.

Thank you very much.

CHAIRMAN BUTTREY: Thank you, sir.

Maybe you said this in so many words, but I'm asking every single witness that comes here if you could unequivocally state for the record that you're not over recovering your fuel costs.

MR. SEALE: Looking over the last six years since we've had a fuel surcharge, I can state that we have not over recovered over that period of

that time. We continue to work on that. We've got 85 percent of our revenues now covered by some form of fuel surcharge.

The negotiation process is very prevalent in this area. There's a lot of variety to what has been put into place and over that period of time on direct diesel fuel, we have under recovered and then if we look at diesel fuel lubricants and gasoline, that number is larger with respect to the under recovery.

CHAIRMAN BUTTREY: Do you put a number on the under recovery?

MR. SEALE: Only on the direct diesel fuel expense starting at our $23 base.

CHAIRMAN BUTTREY: All fuel.

MR. SEALE: Yes, in 2000, it's $87 million and then if you take in gasoline, lubricants and diesel fuel combined and we all operate huge fleets of wheeled vehicles to support train service. That number climbs to $233 million.

VICE CHAIRMAN MULVEY: Getting back to this rate versus practice debate, is it accurate to

their growth.

By the end of this year, Union Pacific will have invested nearly $26 billion in its rail network since 1996. This includes nearly 2.8 billion in, excuse me, in 2006 and we expect to continue investing in the future, but we are relying on private investments in private right-of-way and we can only do that if our returns exceed the cost of that invested capital.

In recent years, Union Pacific has not earned a sufficient return to meet let alone exceed its cost of capital as our shareholders and our investors require. In fact, our return on investment in 2005 was only 6.3 percent using the STB methodology as indicated on the chart here which is well below the STB estimated cost of capital at around 10 percent.

Unrecovered fuel costs put additional pressure on those financial returns and impairs our ability to meet the increased demands for rail transportation in the years ahead.

The bottom line, Union Pacific isn't in the business of trying to make money from our fuel

surcharge program. We're in the business of making a fair return by offering valued railroad services to our customers. In order to do this, to stay viable as a company and to reinvest for the long term, it is absolutely essential that our revenues cover our costs of doing business and that includes the unpredictable cost of fuel.

Thank you.

CHAIRMAN BUTTREY: The claim has certainly been made all morning that your company and others are making up their loss on their contract business, on their tariff business. What is your response to that claim?

MR. KNIGHT: I respond by saying that for Union Pacific in the first quarter and we expect for 2006 in total, our recovery above that threshold we expect to be about 90 percent and the total revenue base that will contribute towards that recovery also is 90 percent. So, there's still some business out there that we need to tap into as those contracts come to term and every new price document we put in place will have a fuel recovery, but our 90 percent recovery

# EXHIBIT PX0582

# TESTIMONY BEFORE SURFACE TRANSPORTATION BOARD
## MAY 11, 2006
## WASHINGTON, D.C.

216399

## RE: STB EX PARTE 661

## RAIL FUEL SURCHARGES

**Submitted by: James L. Conway, Vice President of Sales and Marketing**
**Griffin Industries, Inc.**
**4221 Alexandria Pike**
**Cold Spring, Ky. 41016**
**859-572-2582**
**jconway@griffinind.com**

Griffin Industries of Cold Spring, Ky. would like to thank the Surface Transportation Board for holding this important hearing regarding the practice of fuel surcharges being added to the base cost of transporting cars by the nation's railroads. We would also like to express our thanks to the board for allowing our representative, Mr. James L. Conway – Vice President of Sales and Marketing, to enter these comments as testimony in this matter.

Griffin Industries is a 63 year old family owned company that is involved in an Agri business enterprise. We recycle all types of food wastes into usable commodities that are used by a variety of customers in many industries. We currently operate some 23 production plants in the SE United States with over 1500 employees. We distribute our finished products from the East Coast to the West Coast and from Canada to Mexico on both rail and highway. We ship both liquid fats and dry feed commodities in our fleet of over 500 rail cars.

Griffin Industries understands that the cost of fuel has escalated at an increasing rate over the past few years. We also understand, as a large truck fleet operator, that these costs must be met in the course of doing business. Certainly we appreciate the fact that the rail road companies in this country are a vital link in our transportation infrastructure and deserve to make a suitable return on both their asset investment and service provided.

We view the rail service providers as companies without traditional competitors. Many rail customers like Griffin usually have only one, or at the most two, provider of rail service at their individual plant locations. Thus, we have no recourse to access competitive bids or alternative suppliers for our transportation needs on the rail. In the case of rail fuel surcharges this issue might not be too significant since all of the roads have nearly identical methods of determining and levying fuel surcharges.

I personally have presented my concern over the past three years to rail road representatives who call on our company that their method of assessing fuel surcharges is

unfair and somewhat arbitrary. At the same time we have experienced these recent escalating fuel prices we have also been subjected to aggressive base rate increases from all rail carriers. Most have even discontinued the practice of negotiating two to three year contracts and leave us with only tariff rates that are subject to change with little notice. This practice has forced us to change our method of doing business with our customers who typically bought on a delivered basis with two to six months contracts at a time. These significant increases in rail costs have resulted in losing some of our long time customers.

These increased rates are justified by the railroads based on the RCAF (RAIL COST ADJUSTMENT FACTOR). This calculation is done by AAR (Association of American Railroads) and then is submitted to the STB for approval. One of the major components, but not the only one, of the RCAF is fuel. Any increase/decrease in the quarterly price of fuel paid by rail roads is factored into the equation and leads to the appropriate change in the factor.

At the prescribed time this RCAF factor is used to adjust the contracted or tariff rates that a customer must pay the carrier. Clearly, increased fuel costs have already been accounted for in this adjustment and the rail roads have passed it through in the form of higher base rates.

Now comes the rub of "fuel surcharges". This **surcharge** is added to the total of the new rate to supposedly cover the increased fuel cost. It is supposedly measured by the increase in cost of #2 diesel fuel since Feb. of 1991. Obviously, this becomes a duplicate action to recover these increased fuel costs.

The other exacerbating factor of this fuel surcharge is that it is applied to the entire rate. In other words, the surcharge is applied not only on fuel costs but applied against labor costs, asset purchases and all other cost inputs as well as an acceptable profit margin. As base rates go up, as they clearly have over the past couple of years, this surcharge becomes a revenue enhancer rather than cost recovery. It represents a classic example of "double dipping" in an effort to recover supposed increased fuel costs.

As support to this effect I present these actual numbers from our operations:

| | **2004** | **2005** | |
|---|---|---|---|
| number of RR car moves | 3733 | 3195 | |
| rail billings | $5,005,151.98 | $5,333,915.58 | |
| fuel surcharges paid | $248,241.58 | $549,895.88 | |
| % of total | 4.95 | 10.31 | |
| | | | |
| price per move w/o surcharge | $1274.28 | $1497.35 | +$223.07 |
| fuel surcharge per move | 66.50 | 172.11 | + 84.11 |
| total cost/move | $1340.78 | $1669.46 | $307.18 |

What all of this means is the Griffin Industries paid $307.18 or 22.9% more to pay for each trip that it engaged the various rail companies to haul for us during 2005 vs. 2004. This is represented by a 17.5% increase in the base rate in just one year and then an additional 126% increase in the fuel surcharge is added. I might add that we have had comparable increases in base rates in '04 or even '03.

An additional issue we offer about this system is the fact that it is using "old" data, i.e. 1991, as the baseline. With the substantial increases in base rates that we have sustained over the past few years, as evidenced by the 17.5% last year, the increases in fuel cost have already been factored into those rates. The need for a fuel surcharge should **only** be necessary for the change in base fuel prices since the last contract price was agreed to or since the last tariff rate was established and not based on a 1991 fuel price.

We are pleased to see that the railroads are all reporting substantially higher, even record, profits from recent operations. What we object to is that part of that record is coming from an unfair levy on customers based on duplicate fuel recovery. This issue is only one of several that we have had with our rail service providers in recent months. The "take it or leave it" attitude we have seen has made this situation even more unacceptable. We have also seen increases in the price for other services that the rail companies offer to their customers. All of this has made for a sense that the rail roads really don't care about customers like Griffin Industries anymore. They would most likely prefer to haul unit trains of coal or containers rather than to serve American Agriculture and its typically smaller moves. They have been given a unique situation in American Business as an important element in American transportation with little or no competition for the customers they serve. As such, they should bear a more reasonable responsibility to work with customers and to provide legitimate service at profitable yet reasonable prices. At this time we do not feel that we are getting this type of attitude from the American Rail Road companies.

In summary, our complaints about the current system of rail fuel surcharges can be itemized as follows.

1. We have already been subjected to significantly higher base rates that use the RCAF which includes the increased cost of fuel.

2. The fuel surcharge is calculated on all components of the base rate, not just the extra cost of fuel in that rate calculation.

3. The surcharge is based on 1991 prices which gives an artificially high percentage rate that makes issues 1 and 2 above even more unrealistic.

4. If a surcharge is to be added it should only apply to the change in fuel costs since the last base rate change.

Griffin Industries would again like to thank the Surface Transportation Board for holding these hearings and their efforts to investigate the practice of fuel surcharges. Should you require any additional information from us, please feel free to contact James Conway at 859-572-2582 or jconway@griffinind.com .

Respectfully Submitted,

Griffin Industries Inc.
Cold Spring, Ky.

# EXHIBIT PX0583

United States Government Accountability Office

GAO

Report to Congressional Requesters

October 2006

# FREIGHT RAILROADS

# Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed

GAO
Accountability * Integrity * Reliability

GAO-07-94

GAO Accountability·Integrity·Reliability
# Highlights

Highlights of GAO-07-94, a report to congressional requesters

October 2006

# FREIGHT RAILROADS

## Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed

### Why GAO Did This Study

The Staggers Rail Act deregulated the freight rail industry, relying on competition to set rates, and allowed for differential pricing (charging higher rates to those more dependent on rail). The act gave the Surface Transportation Board (STB) authority to develop remedies for shippers"captive" to one railroad and set a threshold for shippers to apply for rate relief. GAO was asked to review (1) changes in the railroad industry since the Staggers Rail Act, including rates and competition; (2) STB actions to address competition and captivity concerns and alternatives that could be considered; and (3) freight demand and capacity projections and potential federal policy responses. GAO examined STB data, conducted interviews, and held an expert panel.

### What GAO Recommends

GAO recommends that STB analyze the state of competition and consider appropriate actions. GAO also recommends that DOT consider strategies to level the playing field for all freight modes to maximize public benefits from federal investment. STB disagreed with our recommendation because it would take resources from efforts it believes will address GAO concerns, among other reasons. We recognize STB's efforts, but believe further analysis is needed. STB should seek more resources from Congress if needed. DOT took no position on our recommendation.

www.gao.gov/cgi-bin/getrpt?GAO-07-94.

To view the full product, including the scope and methodology, click on the link above. For more information, contact JayEtta Z. Hecker at (202) 512-2834 or heckerj@gao.gov.

### What GAO Found

Changes in the railroad industry since the Staggers Rail Act are widely viewed as positive, as the industry's financial health has improved and most rates have declined; however, concerns over competition and captivity remain. Rail rates generally declined between 1985 and 2000, then increased slightly from 2001 through 2004. Concerns about competition and captivity remain as traffic is concentrated in fewer railroads. It is difficult to determine the number of "captive" shippers as proxy measures can overstate or understate captivity. Nevertheless, GAO's analysis of limited available measures indicates that the extent of captivity appears to be dropping, but the percentage of traffic traveling at rates substantially over the threshold for rate relief has increased. Also, some areas with access to only one major railroad have higher percentages of traffic traveling at rates above the threshold. These findings may reflect reasonable economic practices by the railroads or a possible abuse of market power. GAO's analysis is limited by available data and proxy measures but suggests that shippers in selected markets may be paying excessive rates, meriting further inquiry and analysis.

While STB has taken action, further efforts to improve its rate relief processes and assess competition could help address competition and captivity concerns and inform the merits of proposed alternative approaches. STB's rate relief processes are largely inaccessible and rarely used. STB recognizes this and is taking steps to improve its processes. STB has broad statutory authority to inquire into and report on railroad industry practices and, given a reasonable possibility that some shippers may be paying excessive rates, an assessment of competition could determine whether there is sufficient evidence that market power is being abused in specific markets. While competition between railroads may not always be feasible, alternative approaches have costs and benefits that should be carefully considered to ensure the balance envisioned in the Staggers Rail Act—including the railroads' need for adequate revenues.

Significant increases in freight traffic are forecast, and the industry's ability to meet them is largely uncertain. Investments in rail projects can produce public benefits, such as reducing highway congestion. As a result, federal and state governments have increasingly participated in freight rail projects. In 2005, for example, Congress provided $100 million for rail improvements in the Chicago area. Congress faces additional decisions about potential federal policy responses in years ahead. Responses should recognize that the freight transportation system includes many modes that are treated differently by the federal government and functions in a competitive marketplace and a constrained federal funding environment. In developing a National Freight Policy, the Department of Transportation (DOT) has made a good start by providing context for those decisions and DOT can help sustain the role of the competitive marketplace through strategies that promote a level playing field for freight transportation decision making and acknowledge the constrained federal fiscal environment by focusing federal involvement where demonstrable, wide-ranging public benefits exist.

# Contents


**Letter** 1

Results in Brief 3
Background 6
Railroad Industry Increasingly Healthy and Rates Generally Down Since Enactment of the Staggers Rail Act, but Concerns about Competition and Captivity Remain 9
Despite STB's Actions, Analysis of Competitive Markets Is Needed to Address Lack of Effective Relief for Captive Shippers 38
Uncertainty about Future Freight Rail Demand and Capacity Points to Opportunities for a More Strategic Federal Approach to Rail Infrastructure 53
Conclusions 64
Recommendations for Executive Action 66
Agency Comments and Our Evaluation 67

**Appendix I** **Participants in GAO's Expert Panel** 72

**Appendix II** **Objectives, Scope, and Methodology** 74

**Appendix III** **Comments from the Surface Transportation Board** 77

GAO Comments 83

**Appendix IV** **GAO Contact and Staff Acknowledgments** 87

**Related GAO Products** 88

**Tables**

Table 1: Changes in Percentage of Industry Revenue and Tonnage on Origin and Destination Routes with Access to One Class I Railroad 28
Table 2: Possible Changes in R/VC Ratios 30
Table 3: Potential Public Benefits of Rail Transportation Investments 58

## Figures

Figure 1: Railroads' Tax-Adjusted Return on Investment, 1980-2004 10
Figure 2: Trends in Industry Rail Rates, 1985-2004 12
Figure 3: Commodity Rate Changes, 1985-1989, 1990-1999, and 2000-2004 13
Figure 4: Rate Changes for Coal, Grain, Miscellaneous Mixed Shipments, and Motor Vehicles, 1985-2004 14
Figure 5: Rail Rate Increases and Decreases across 604 Routes, and for Long-, Medium-, and Short-distance Routes, 2000 through 2004 15
Figure 6: Tonnage Carried by Railcar Ownership, 1987-2004 17
Figure 7: Miscellaneous Revenue Tracked in Carload Waybill Sample, 2000-2004 18
Figure 8: Percentage of Railroad Market Represented by Four Largest Class I Railroads, 1985-2004 20
Figure 9: Comparison of Rates Charged on Long-distance Grain Routes, 1997-2004 22
Figure 10: Rate Changes after the Introduction of a Second Carrier 23
Figure 11: Comparison of Rate Changes from Champaign, Illinois, Economic Area to New Orleans, Louisiana, Economic Area and Champaign, Illinois, Economic Area to Atlanta, Georgia, Economic Area, 1990-2004 24
Figure 12: Number of Class I Railroads Serving Economic Areas, 2004 26
Figure 13: Percentage of All Industry Tonnage Originating in Economic with Access to One Class I Railroad, 2004 27
Figure 14: Changes in Percentage of All Industry Traffic Tonnage with Access to One Class I Railroad Originating in Economic Areas, 1994 through 2004 29
Figure 15: Percentage of Industry Tonnage and Revenue Generated from Traffic Traveling at Rates Equal to or Greater Than 180 Percent R/VC, 1985-2004 31
Figure 16: Tonnage Traveling at Rates over 300 Percent R/VC, 1985-2004 32
Figure 17: Percentage of Tonnage by R/VC, 1985 and 2004 33
Figure 18: Changes in Percentage of Tonnage Traveling at Rates over 300 Percent R/VC, by Originating Economic Area, 1985 through 2004 34
Figure 19: Long-distance Grain Route Changes in Percentage of Tonnage Traveling at Rates over 300 Percent R/VC, 1985-2004 35

Figure 20: Overlap between Percentage of Tonnage over Threshold for Rate Relief and Access to Only One Class I Railroad 37
Figure 21: Reciprocal Switching 45
Figure 22: Terminal Agreements 47
Figure 23: Trackage Rights 48
Figure 24: Bottleneck Rates 50
Figure 25: Paper Barriers 51

**Abbreviations**

| | |
|---|---|
| AASHTO | American Association of State Highway and Transportation Officials |
| ATA | American Trucking Association |
| BEA | Bureau of Economic Analysis |
| CBO | Congressional Budget Office |
| CDOT | Colorado Department of Transportation |
| CREATE | Chicago Region Environmental and Transportation Efficiency program |
| DOT | Department of Transportation |
| FAF | Freight Analysis Framework |
| FHWA | Federal Highway Administration |
| FOA | Final Offer Arbitration |
| GDP | gross domestic product |
| ICC | Interstate Commerce Commission |
| RRIF | Railroad Rehabilitation and Improvement Financing |
| R/VC | revenue to variable cost |
| RRIF | Railroad Rehabilitation and Improvement Financing program |
| SAFETEA-LU | Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users |
| STB | Surface Transportation Board |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

GAO
Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

October 6, 2006

Congressional Requesters:

Over 25 years ago, Congress transformed federal regulation of the railroad industry. After almost 100 years of economic regulation, the railroad industry was in serious economic trouble in the 1970s, with rising costs, losses, and bankruptcies. In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980. Together, these pieces of legislation substantially deregulated the railroad industry. In particular, the 1980 act encouraged greater reliance on competition to set rates and gave railroads increased freedom to price their services according to market conditions, including the freedom to use differential pricing—that is, to recover a greater proportion of their costs from rates charged to shippers with a greater dependency on rail transportation. At the same time, the 1980 act anticipated that some shippers might not have competitive alternatives—commonly referred to as "captive shippers"—and gave the Interstate Commerce Commission (ICC), and later the Surface Transportation Board (STB), the authority to establish a process so that shippers could obtain relief from unreasonably high rates. However, only a rate that produces revenue equal to at least 180 percent of the variable cost of transporting the shipment can be challenged. Since the passage of the Staggers Rail Act in 1980, we have issued several reports on the freight railroad industry.[1] These reports described the significant changes that have taken place in the railroad industry and reported that rates have generally decreased, but shippers and others have found the rate relief process long, complex, and expensive.

Policymakers continue to believe that the federal government should provide a viable process to protect shippers against unreasonably high rates, as well as address competition issues, while still balancing the interests of both railroads and shippers. Over the past 10 years, significant consolidation has taken place in the freight railroad industry, while railroads—particularly Class I railroads[2]— have seen their productivity and financial health improve. Railroad officials worry that any attempt to

[1]See the list of related GAO products at the end of this report.

[2]As of 2004, a Class I railroad is any railroad with operating revenue above $277.7 million.

increase economic regulation will reduce carriers' ability to earn sufficient revenues and limit future infrastructure investment. At the same time, a number of academic and government studies are predicting a significant increase in the demand for freight rail over the next 10 to 15 years. In light of these concerns, we reviewed

- the changes that have occurred in the freight railroad industry since the enactment of the Staggers Rail Act, including changes in rail rates and competition in the industry;
- the actions STB has taken to address concerns about competition and captivity and any alternative approaches that could be considered to address remaining concerns; and
- the projections for freight traffic demand over the next 15 to 25 years, the freight railroad industry's projected ability to meet that demand, and potential federal policy responses.

To fulfill our objectives, we examined STB's *Carload Waybill Sample* from 1985 through 2004 (the latest data available at the time of our review).[3] This database includes information on rail rates, tonnage, federal regulation, and other statistics but disguises some revenues to avoid disclosing confidential business information to the public. We obtained a version of the *Carload Waybill Sample* that did not disguise revenues. We held an expert panel consisting of 11 individuals with expertise in the freight railroad industry and the economics of transportation deregulation. Those individuals are listed in appendix I. We also interviewed, and reviewed information from, representatives of each Class I railroad in North America, shipper groups, economists, and experts in the rail industry. In addition, we reviewed pending legislation, transportation planning literature, and forecasts of future freight rail demand and capacity, including syntheses of such forecasts; and interviewed federal and state transportation officials, financial market analysts, national association representatives, and transportation experts. We determined that the data used in this report were sufficiently reliable for the purpose of our review. We conducted our review from June 2005 to August 2006 in accordance with generally accepted government auditing standards. Details of our objectives, scope, and methodology appear in appendix II.

[3]The *Carload Waybill Sample* is a sample of railroad waybills (in general, documents prepared from bills of lading that authorize railroads to move shipments and collect freight charges); the sample contains information on rail rates.

## Results in Brief

The changes that have occurred in the railroad industry since the enactment of the Staggers Rail Act are widely viewed as positive, since the financial health of the industry has improved and most rates have declined since 1985. However, concerns about competition and captivity in the industry remain. The freight railroad industry's financial health improved substantially as railroads cut costs through productivity improvements; streamlined and right-sized their rail networks; implemented new technologies; and expanded business into new markets, such as the intermodal market.[4] Between 1985 and 2000, rail rates generally declined, but then increased slightly from 2001 through 2004.[5] Although rates have declined since 1985, they have not done so uniformly, and rates for some commodities are significantly higher than rates for others. Several factors could have contributed to recent rate increases, including broad changes in the domestic and world economy, the emergence of a capacity-constrained environment in which demand exceeds supply, and consolidation in the 1990s in the industry leading to changes in competition. Other costs, such as fuel surcharges, have also shifted to shippers, and STB has not clearly tracked the revenues the railroads have raised from some of these charges. Some concerns about competition and captivity in the industry remain because traffic is concentrated in fewer railroads. It is difficult to determine precisely how many shippers are captive because available proxy measures can overstate or understate captivity. In addition, STB does not accurately collect railroad revenue data. Nevertheless, our analysis of available measures indicates that the extent of captivity appears to be dropping, but the percentage of industry traffic traveling at rates substantially over the statutory threshold for rate relief has increased. For example, the amount of traffic traveling at rates over 300 percent of the railroad's variable cost increased from 4 percent in 1985 to 6 percent in 2004. Furthermore, some areas with access to one Class I railroad have higher percentages of traffic traveling at rates that exceed the statutory threshold for rate relief. These findings may reflect reasonable economic practices by the railroads in an environment of excess demand, or they may indicate a possible abuse of market power. We are recommending that STB conduct a rigorous analysis of the state of competition nationwide and, where appropriate, consider the range of

[4]The intermodal market consists of containers and trailers that can be carried on ships, trucks, or rail.

[5]While rate data are not available for 2005 and 2006, shippers, railroads, and financial analysts with whom we spoke told us that rates have generally increased during those years.

actions available to address problems associated with the potential abuse of market power. In addition, we are recommending that STB review its method of data collection to ensure consistent and accurate reporting of railroad revenues, including fuel surcharges.

STB has taken a number of actions to improve the rate relief process and assess competition, but further actions could help address remaining competition and captivity concerns. The Staggers Rail Act and the ICC Termination Act encouraged competition as the preferred method to protect shippers from unreasonable rates and granted STB broad legislative authority to monitor the performance of the railroad industry. Under this authority, STB established both a standard and a simplified rate relief process so that captive shippers could obtain relief from unreasonable rates. However, these processes have proven to be largely inaccessible because the standard process is expensive, time consuming, and complex, and the simplified process has not been used. During our review, STB took steps to refine its processes, including issuing a proposed rule making to clarify eligibility for the simplified process. Ultimately, our analysis suggests a reasonable possibility that shippers in selected markets may be paying excessive rates, and an assessment of competition would determine if this situation reflects reasonable economic practices by the railroads in an environment of excess demand or an abuse of market power. This assessment could also provide further information about the extent of captivity and the merits of proposed approaches to enhance the competitive options available to shippers. These approaches—such as providing trackage rights to allow a railroad to run on another railroad's track for a fee— have been suggested by shipper groups, economists, and others. Each of these approaches has costs and benefits and should be carefully considered to ensure that the approach is designed to achieve the balance set out in the Staggers Rail Act, including consideration of the revenue adequacy of the railroads. However, not all markets may have the demand needed to support competition among railroads, and so some areas where shippers are captive are likely to persist. In this regard, there are also a number of proposals to make the rate relief process more accessible, such as the increased use of arbitration to settle disputes, and each of these proposals has advantages and drawbacks.

Significant increases in freight traffic over the next 10 to 15 years are forecasted, and the railroad industry's ability to meet future demand is largely uncertain. Investments in rail projects can produce benefits for the public—for example, shifting truck freight traffic to railroads can reduce highway congestion. To obtain such benefits, governments have

increasingly been participating in freight rail improvement projects. For example, Missouri state and local governments supported two major rail-bridge projects to reduce delays in Kansas City. At the federal level, Congress, in 2005, provided $100 million for rail infrastructure improvements in the Chicago area. In the years ahead, Congress is likely to receive further requests for funding and face additional decisions about potential federal policy responses and the federal role in the nation's freight railroad infrastructure. Such policy responses need to recognize that the freight transportation system encompasses many modes that are treated differently by the federal government and are on systems owned, funded, and operated by both the public and private sectors. Furthermore, the freight transportation system functions in a competitive marketplace, and the federal fiscal funding environment is highly constrained. As a result, policy and decision makers are challenged to ensure that federal involvement is consistent with competition in the freight marketplace and that federal funding decisions reflect widespread public priorities. In developing a draft National Freight Policy, the Department of Transportation (DOT) has made a good start by providing a context for decisions about how to apply a more strategic, systemwide approach, in general, and how to craft a federal policy response to freight rail investment needs in particular. We are recommending that DOT, as it continues to draft a National Freight Policy, consider strategies to sustain the role of competitive market forces by creating a level playing field for all freight modes and recognize the highly constrained federal fiscal environment by developing mechanisms to assess and maximize public benefits from federally financed freight transportation investments.

We provided a draft of this report to DOT and STB. In oral comments, DOT took no position on our recommendation related to the National Freight Policy. In written comments, STB stated that it has already responded to our recommendation on its method of data collection through a proposed rule making on collecting fuel surcharge data. While we commend STB for its proposed rule making, STB has not yet implemented this change, and other revenues may still not be accurately tracked. STB also disagreed with our recommendation to conduct a rigorous analysis of competitive markets to identify the state of competition nationwide, inquire into pricing practices in specific markets, and consider appropriate actions available to address problems associated with the potential abuse of market power. STB commented that this recommendation was based on inconclusive findings and would divert resources away from current initiatives. We disagree that our recommendation was based on inconclusive findings. Our analysis of multiple sources suggests a reasonable possibility that shippers in some markets may be paying

excessive rates. We believe that such a possibility merits further inquiry and analysis. We recognize that STB has limited resources and modified our draft to recommend that STB request additional resources from Congress if it determines that it needs more resources to conduct an analysis of competition. STB also stated that it has several rule makings under way that are designed to improve the rate relief process and would address many of our concerns. STB stated that it would be far more practical for STB to finish these reforms to ensure that captive shippers have an effective forum to seek rate relief. While we commend STB for recognizing and taking action to address problems with the rate relief process, we believe action beyond improvements to the rate relief process is needed. In particular, these STB rule makings are designed to improve processes available to shippers after they have been charged a rate they consider to be unreasonable. In contrast, we believe that an analysis of the state of competition and the possible abuse of market power, along with the range of options STB has to address competition issues, could more directly further the legislatively defined goal of ensuring effective competition among rail carriers. STB's comments are in appendix III.

## Background

In the past, the ICC regulated almost all of the rates that railroads charged shippers. The Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980 greatly increased reliance on competition to set rates in the railroad industry. Specifically, these acts allowed railroads and shippers to enter into confidential contracts that set rates and prohibited ICC from regulating rates where railroads had either effective competition or rates negotiated between the railroad and the shipper. Furthermore, the ICC Termination Act of 1995 abolished ICC and transferred its regulatory functions to STB. Taken together, these acts anchor the federal government's role in the freight rail industry by establishing numerous goals for regulating the industry, including to

- allow, to the maximum extent possible, competition and demand for services to establish reasonable rates for transportation by rail;
- minimize the need for federal regulatory control over the rail transportation system and require fair and expeditious regulatory decisions when regulation is required;
- promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by STB;

- ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes to meet the needs of the public and the national defense;
- foster sound economic conditions in transportation and ensure effective competition and coordination between rail carriers and other modes:
- maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues that exceed the amount necessary to maintain the rail system and attract capital;
- prohibit predatory pricing and practices to avoid undue concentrations of market power; and
- provide for the expeditious handling and resolution of all proceedings.

While the Staggers Rail and ICC Termination Acts reduced regulation in the railroad industry, they maintained STB's role as the economic regulator of the industry. The federal courts have upheld STB's general powers to monitor the rail industry, including its ability to subpoena witnesses and records and to depose witnesses. In addition, STB can revisit its past decisions if it discovers a material error, or new evidence, or if circumstances have substantially changed.

Two important components of the current regulatory structure for the railroad industry are the concepts of revenue adequacy and demand-based differential pricing. Congress established the concept of revenue adequacy as an indicator of the financial health of the industry. STB determines the revenue adequacy of a railroad by comparing the railroad's return on investment with the industrywide cost of capital. For instance, if a railroad's return on investment is greater than the industrywide cost of capital, STB determines that railroad to be revenue adequate. Historically, ICC and STB have rarely found railroads to be revenue adequate—a result that many observers relate to characteristics of the industry's cost structure. Railroads incur large fixed costs to build and operate networks that jointly serve many different shippers. Some fixed costs can be attributed to serving particular shippers, and some costs vary with particular movements, but other costs are not attributable to particular shippers or movements. Nonetheless, a railroad must recover these costs if the railroad is to continue to provide service over the long run. To the extent that railroads have not been revenue adequate, they may not have been fully recovering these costs.

The Staggers Rail Act recognized the need for railroads to use demand-based differential pricing to promote a healthy rail industry and enable it to raise sufficient revenues to operate, maintain and, if necessary, expand the system in a deregulated environment. Demand-based differential pricing, in theory, permits a railroad to recover its joint and common costs—those costs that exist no matter how many shipments are transported, such as the cost of maintaining track— across its entire traffic base by setting higher rates for traffic with fewer transportation alternatives than for traffic with more alternatives. Differential pricing recognizes that some customers may use rail if rates are low—and have other options if rail rates are too high or service is poor. Therefore, rail rates on these shipments generally cover the directly attributable (variable) costs, plus a relatively low contribution to fixed costs. In contrast, customers with little or no practical alternative to rail—"captive" shippers—generally pay a much larger portion of fixed costs. Moreover, even though a railroad might incur similar incremental costs while providing service to two different shippers that move similar volumes in similar car types traveling over similar distances, the railroad might charge the shippers different rates. Furthermore, if the railroad is able to offer lower rates to the shipper with more transportation alternatives, that shipper still pays some of the joint and common costs. By paying even a small part of total fixed cost, competitive traffic reduces the share of those costs that captive shippers would have to pay if the competitive traffic switched to truck or some other alternative. Consequently, while the shipper with fewer alternatives makes a greater contribution toward the railroad's joint and common costs, the contribution is less than if the shipper with more alternatives did not ship via rail.

The Staggers Rail Act further requires that the railroads' need to obtain adequate revenues to be balanced with the rights of shippers to be free from, and to seek redress from, unreasonable rates. Railroads incur variable costs—that is, the costs of moving particular shipments—in providing service. The Staggers Rail Act stated that any rate that was found to be below 180 percent of a railroad's variable cost for a particular shipment could not be challenged as unreasonable and authorized ICC, and later STB, to establish a rate relief process for shippers to challenge the reasonableness of a rate. STB may consider the reasonableness of a rate only if it finds that the carrier has market dominance over the traffic at issue—that is, if (1) the railroad's revenue is equal to or above 180 percent of the railroad's variable cost (R/VC) and (2) the railroad does not face effective competition from other rail carriers or other modes of transportation.

## Railroad Industry Increasingly Healthy and Rates Generally Down Since Enactment of the Staggers Rail Act, but Concerns about Competition and Captivity Remain

The changes that have occurred in the railroad industry since the enactment of the Staggers Rail Act are widely viewed as positive. The railroad industry's financial health improved substantially as it cut costs, boosted productivity, and right-sized its networks. Rail rates generally declined between 1985 and 2000 but increased slightly from 2001 through 2004. Likewise, rail rates have declined since 1985 for certain commodity groups and routes despite some increases since 2001, but rates have not declined uniformly, and some commodities are paying significantly higher rates than others. For example, from 1985 through 2004, coal rates declined 35 percent while grain rates increased 9 percent.[6] Concerns about competition and captivity in the industry remain because traffic is concentrated in fewer railroads. It is difficult to determine precisely how many shippers are captive to one railroad. Nevertheless, our analysis indicates that the extent of potential captivity appears to be dropping, but that the percentage of all industry traffic running at rates substantially over the statutory threshold for rate relief—traffic traveling at rates over 180 percent R/VC—has increased. Furthermore, some areas with access to only one Class I railroad have higher percentages of traffic traveling at rates that exceed the statutory threshold for rate relief. This situation may reflect reasonable economic practices by the railroads in an environment of excess demand, or it may represent an abuse of market power.

### Railroad Industry's Financial Health Has Improved Substantially

There is widespread consensus that the freight rail industry has benefited from the Staggers Rail Act. Ten of the 11 members of our expert panel believed that the Staggers Rail Act has had a strongly positive overall effect on freight railroad companies, while 8 believed the Staggers Rail Act had a strongly positive effect on shipping companies. In addition, various measures indicate an increasingly strong freight railroad industry. Freight railroads' improved financial health is illustrated by a general increase in return on investment since 1980, as shown in figure 1.[7] Freight railroads have also cut costs by streamlining their workforces; right-sizing their rail

[6] All of our rate changes—increases and decreases—are presented in nominal terms.

[7] Return on investment measures the profit made on assets used to provide transportation services. Return on investment is based on STB's methodology for determining revenue adequacy.

networks; and reducing track miles, equipment, and facilities to more closely match demand.[8]

**Figure 1: Railroads' Tax-Adjusted Return on Investment, 1980-2004**




Source: STB.

Freight railroads have also expanded their business into new markets—such as the intermodal market—and implemented new technologies, including larger cars, and are currently developing new scheduling and train control systems. Some observers believe that the competition faced by railroads from other modes of transportation has created incentives for innovative practices, and that the ability to enter into confidential contracts with shippers has permitted railroads to make specific investments and to develop service arrangements tailored to the requirements of different shippers.[9]

[8]Clifford Winston, *Deregulation of Network Industries – What's Next?* (Washington: AEI-Brookings Joint Center for Regulatory Studies: 2000), pp. 43-44.

[9]Gallamore, pp. 511-515.

Freight rail is an important component of our nation's economy. Approximately 42 percent of all intercity freight in the United States, measured in ton-miles,[10] moves on rail lines. Freight rail is particularly important to producers and users of certain commodities. For example, about 70 percent of automobiles manufactured domestically and about 70 percent of coal delivered to power plants moves on freight rail.

## Industrywide Rates Declined from 1985 through 2000 and Rose Slightly from 2001 through 2004

Rail rates across the freight railroad industry have generally declined since the enactment of the Staggers Rail Act. Because changes in traffic patterns over time (for example, hauls over longer distances) can result in a decrease in the average revenue per ton-mile, purely relying on cents per ton-mile can present misleading industrywide rate trends. Therefore, we developed a set of rail rate indexes[11] to examine trends in rail rates over the 1985 through 2004 period. These indexes account for changes in traffic patterns over time that could affect revenue statistics but do not account for inflation. To provide a measure for inflation, we also included the price index for the gross domestic product (GDP) in figure 2.

From 1985 through 1987, rail rates dropped by 10 percent and then continued to decline, although not as steeply, through 1998. Rates increased in 1999, then dropped again in 2000. In 2001 and 2002 rates rose again. Rates were nearly flat in 2003 and 2004, finishing approximately 3 percent above rates in 2000, but were 20 percent below 1985 rates (These trends are shown in figure 2). While our rail rate index does not reflect the general effects of inflation, the continuous increases in the GDP price index over this period indicate that real rates decreased by more than 20

[10]A ton-mile is a standard industry measure that represents 1 ton of freight transported 1 mile.

[11]We constructed rate indexes to examine trends in rail rates over the 1985 to 2004 period. These indexes define traffic patterns for a given commodity in terms of census region to census region flows of that commodity, and we calculated the average revenue per ton-mile for each of these traffic flows. The index is calculated as the weighted average of these traffic flows in each year, expressed as a percentage of the value for 1985, where the weights reflect the traffic patterns in 2004. By fixing the weights as of one period of time, we attempted to measure pure price changes rather than calculating the average revenue per ton-mile in each year. Over time, changes in traffic patterns could result in a substitution of lower priced traffic for higher priced traffic, or vice versa, so that a decrease in average revenue per ton-mile might partly reflect this change in traffic patterns. The rate index for the overall industry was defined similarly, except that the traffic pattern bundle was defined in terms of broad commodity, census region of origin, and mileage block categories. For comparison purposes, we also present the price index for gross domestic product over this period.

percent from 1985 through 2004. Rate data are not available for 2005 and 2006, but shippers, railroad officials, and financial analysts with whom we spoke told us that rates have generally increased during those years.

**Figure 2: Trends in Industry Rail Rates, 1985-2004**




Source: GAO analysis of STB data.

## For Many Commodities and Particular Routes, Rates Have Also Declined Since 1985, but Declines Are Not Uniform

Similar to industrywide changes in rail rates, the rates for many commodities have declined since 1985 and have recently increased. In 2004, four commodities each made up 5 percent or more of freight railroad revenue—grain, coal, motor vehicles, and miscellaneous mixed shipments. In both the 1985 through 1989 and the 1990 through 1999 intervals, the rates for most of these commodities declined, while in 2000 through 2004, the rates increased for two commodities and decreased for two (see fig. 3).

**Figure 3: Commodity Rate Changes, 1985-1989, 1990-1999, and 2000-2004**




Source: GAO analysis of STB data.

Note: From 2000 to 2004, the rate index for coal was largely unchanged.

Although many rates have decreased, rates have not declined uniformly, and rates for some commodities are significantly higher than for others. Figure 4 compares commodity rates for coal, grain, miscellaneous mixed shipments, and motor vehicles from 1985 through 2004 using our rail rate index. Over the 20-year period most rates declined, with coal rates dropping the most sharply by 35 percent. Miscellaneous mixed shipments and motor vehicle rates also declined, although to a lesser extent than coal rates. Grain rates initially declined from 1985 through 1987, but then

diverged from the other commodity trends and increased, resulting in a net 9 percent increase by 2004.

**Figure 4: Rate Changes for Coal, Grain, Miscellaneous Mixed Shipments, and Motor Vehicles, 1985-2004**




Source: GAO analysis of STB data.

We examined rate changes for commodities traveling along hundreds of particular routes and found that the rates on a majority of the routes we analyzed decreased from 2000 through 2004. Figure 5 shows that from 2000 through 2004 rail rates decreased on about 55 percent of the routes in our analysis[12] (334 of 604 routes). More specifically, the rates for most long-distance (over 1,000 miles) and medium-distance (501 to 1,000 miles) routes decreased. In one distance category, short-distance routes (up to 500 miles), there were more routes with increases (103) than decreases

[12]Our initial route universe consisted of 932 commodity routes, but we removed 328 routes that did not have large enough samples in some years to be valid, or they were not collected in the *Carload Waybill Sample* in either 2000 or 2004.

(94), from 2000 through 2004. While figure 5 shows that, for the long-distance routes we examined, the number of routes with rate decreases was nearly twice the number of routes with rate increases. Many of the largest rate increases were on long-distance routes carrying miscellaneous mixed shipments—which include intermodal goods—that originated in the Los Angeles-Long Beach-Riverside, California, economic area and terminated at various destinations across the country. Several shipper groups reported that many rate increases occurred after 2004; however, data are not available for 2005 and 2006.

**Figure 5: Rail Rate Increases and Decreases across 604 Routes, and for Long-, Medium-, and Short-distance Routes, 2000 through 2004**




Source: GAO analysis of STB data.

## Many Factors May Have Contributed to Recent Rate Increases

Several factors could have contributed to recent rate increases. Ongoing industry and economic changes have influenced how railroads have set their rates. Since the Staggers Rail Act was enacted, the railroad industry and the economic environment in which it operates have changed considerably. After years of reducing the size of its workforce and shedding track capacity, the industry is increasingly operating in a

capacity-constrained environment in which the demand for its services exceeds its capacity in some areas. In addition, the industry has more recently increased employment and invested in increased capacity in key traffic corridors. Additionally, changes in broader domestic and world economic conditions have led to changes in the mix and profitability of traffic carried by railroads. For example, railroads have developed high-volume traffic by shipping import and export containers, leading them to price these shipments differently. According to DOT officials, some shippers—such as those in the automobile and chemical industries—may pay higher rates in order to secure higher quality service or due to liability issues. Lastly, the rail industry has continued to consolidate, potentially increasing the market power of the largest railroads. Our analysis included rate data through 2004,[13] and according to freight railroad officials, shippers, and financial analysts, since 2004, rates have continued to increase as the demand for freight rail service has increased, and rail capacity has not kept pace with demand.

## Other Costs Have Shifted to Shippers, and Some Charges Are Not Accurately Tracked

While rates have generally decreased since 1985, other costs have been passed on to shippers, some of which STB has not accurately tracked. Several shippers with whom we spoke agreed that rates have dropped over the long-term, but they also said that rates do not reflect the total cost of shipping by rail. According to some shippers, costs have shifted from the railroads to shipping companies, including the costs of railcar ownership. Figure 6 shows that tons carried by railcar ownership has shifted nearly 20 percent since 1985, indicating less tonnage shipped on railcars owned by freight railroad companies.

[13]According to STB officials, the 2005 waybill data will become available in Fall 2006.

**Figure 6: Tonnage Carried by Railcar Ownership, 1987-2004**




Source: GAO analysis of STB data.

Besides rates, other costs that shippers reported were infrastructure upgrade costs, fuel surcharges,[14] and congestion fees. Conversely, one Class I railroad told us that some rates in the *Carload Waybill Sample* do not account for rebates or incentives that may change the actual rate paid by the shipper. We are unable to report on the full extent of all costs because STB has not accurately tracked the railroad revenues associated with some of these charges. For example, freight railroad companies do not consistently report revenues raised from fuel surcharges for use in the *Carload Waybill Sample*. Some railroads report fuel surcharges as part of their general revenues, while others categorize the surcharges separately under a miscellaneous revenue category, and still other railroads may not report revenue collected from fuel surcharges at all. Shippers have expressed deep concerns over how fuel surcharges relate to actual fuel costs. Other railroad revenues, such as those generated at railcar

[14]Fuel surcharges are charges associated with recouping the cost of fuel. How fuel surcharges are calculated varies among Class I railroads because some use a mileage-based system while others use a percentage of the base rate.

auctions[15] and through congestion fees, may not be included in the waybill sample either. Understanding what railroads do and do not report as miscellaneous revenue in the waybill sample may be of increasing importance because fuel surcharges have become more prevalent, and railroad revenue reported as miscellaneous revenue has substantially risen in recent years. From 2000 through 2004, the miscellaneous revenue reported in the waybill sample has more than quadrupled in value, from $141 million to $614 million (see fig. 7). Although an increase in value, $614 million still represents less than 1.5 percent of the approximately $42 billion in freight railroad revenue reported for 2004. Since 2004, miscellaneous revenue may have further increased as railroad and shipper groups with whom we spoke said that many fuel surcharge increases took effect in 2005. During our review, STB proposed to more closely track and otherwise monitor revenues associated with fuel surcharges.

**Figure 7: Miscellaneous Revenue Tracked in Carload Waybill Sample, 2000-2004**




Source: GAO analysis of STB data.

[15]At railcar auctions, railroad companies auction to the highest bidder the guaranteed delivery of a set number of railcars at specified future delivery dates. If railroads fail to deliver the railcars at the specified time, the railroads may pay a penalty to the shippers; if shippers find they cannot use the railcars at the time delivered then the shipper may pay a penalty to the railroad.

## Competition and Captivity Concerns Remain

Concerns about competition and captivity in the railroad industry remain because traffic is concentrated in fewer railroads, although there is disagreement on the state of competition in the industry. It is difficult to determine the number of captive shippers, because proxy measures can overstate or understate captivity, but our analysis of available measures indicates that the extent of captivity is dropping. At the same time, the percentage of all industry traffic running substantially over the statutory threshold for rate relief has increased from about 4 percent of tonnage in 1985 to about 6 percent of tonnage in 2004. Furthermore, some economic areas with access to one Class I railroad have higher percentages of traffic traveling at rates that exceed the statutory threshold for rate relief.

### The Freight Railroad Industry Has Become More Concentrated

During the past 30 years, the freight railroad industry has become more concentrated. In 1976, there were 30 independent Class I railroad systems, consisting of 63 Class I railroads operating in the United States. Currently there are seven railroad systems, consisting of seven Class I railroads. Nearly half of that reduction was attributable to consolidations.[16] The railroad industry is dominated by four Class I railroads—two in the East and two in the West. As figure 8 shows, the market share of these four Class I railroads has been increasing and accounted for over 89 percent of the industry's revenues in 2004.

[16]Other reasons for the reduction in the number of Class I railroads include carrier bankruptcies and a series of changes in the threshold for qualifying as a Class I railroad (from $5 million in annual revenue in 1976 to $250 million in 1992).

**Figure 8: Percentage of Railroad Market Represented by Four Largest Class I Railroads, 1985-2004**




Source: GAO analysis of STB data.

There is significant disagreement on the state of competition in the rail industry and on whether or not federal regulation—resulting from legislation such as the Staggers Rail Act—has ensured effective competition among railroads. This disagreement was represented on our panel of 11 experts, 6 of whom indicated that rail-to-rail competition has been achieved (either "greatly" or "somewhat") and 4 of whom maintained that effective competition had not been achieved.[17] One member of our panel viewed less competition among rail carriers as a negative development because it can result in less efficient railroad companies and fewer options for shipping companies. Another member of our panel said that industry consolidation was essential to achieving an efficient and complete rail network under fewer, but ultimately stronger, railroad companies. Other experts also pointed to the hundreds of short-line

[17] One participant did not respond to this question.

railroads[18] that have come into being since the enactment of the Staggers Rail Act, as well as increases in other competitive options for shippers from other modes such as trucks and barges.

A reduction in competitive options can have a significant impact on the rates railroads charge shippers. There are a variety of contexts that affect how railroads compete with each other and with other modes, such as when route origins and destinations can both be reached by more than one railroad, or by multiple modes of transportation.[19] Comparing two routes for shipping the same commodity, but using a different number of rail carriers, can illustrate this effect. Figure 9 shows two long-distance grain routes that both terminate in the Portland, Oregon, economic area from different origin points. Both routes carry comparable tonnage, but the route originating in the economic area in and around Sioux Falls, South Dakota, is served by two Class I railroads, whereas the route from the Minot, North Dakota, economic area is served by one Class I railroad. The rates for the Minot route are roughly double the rates for the Sioux Falls route.

[18]A short-line railroad is an independent railroad company that operates over a short distance.

[19]Winston, pp. 54-57.

**Figure 9: Comparison of Rates Charged on Long-distance Grain Routes, 1997-2004**




Source: GAO analysis of STB data.

Note: For some years, data have been removed due to insufficient sample size.

The ability to build out to another railroad can also create competition and improve railroad rates for some shippers. For example, following a build-out,[20] a shipper gained access to a second railroad at an origin point that had previously been served by one Class I railroad.[21] Figure 10 shows that within a few years after the introduction of service by the second railroad, the rates had dropped significantly. Because even a short segment build-out can be quite costly, shippers are unlikely to pursue build-out options without a substantial traffic base. Some experts with whom we spoke said that situations like the one depicted in figure 9 reflect the reality of differential pricing in the freight railroad industry, or they suggest that other factors such as differences in the length of two different routes may be the cause of rate discrepancies. Others believe that a significant rate

[20]A build-out is a shipper's option to build (or have some other party build) a track connection to a competing railroad.

[21]We do not provide information identifying the location or the shipper involved because doing so could reveal proprietary information.

decrease after the introduction of competition is evidence that railroads are extracting monopoly rates from captive shippers.

**Figure 10: Rate Changes after the Introduction of a Second Carrier**




Source: GAO analysis of STB data.

While competition between rail carriers is particularly important in some cases, in other cases, competition between rail and other transportation modes, such as trucks and barges, may be more important. Particularly for bulk commodities (i.e., grain), when shipper locations can be served by barge transportation, rail rates will be lower relative to rail costs than on routes that are not conducive to barge competition. Figure 11 depicts costs and revenues for two routes, one (from the Champaign, Illinois economic area to the New Orleans, Louisiana economic area) with rail and barge options, and the other (from the Champaign, Illinois economic area to the Atlanta, Georgia economic area) with just a rail option. Although both routes have the same origin, for shipping the same commodity over a comparable distance, the route with the barge option has consistently lower rates than the route with just rail service.

**Figure 11: Comparison of Rate Changes from Champaign, Illinois, Economic Area to New Orleans, Louisiana, Economic Area and Champaign, Illinois, Economic Area to Atlanta, Georgia, Economic Area, 1990-2004**




Source: GAO analysis of STB data.

Besides the number of rail carriers serving a location, the use of contracts for rail service can affect the competitive landscape. The Staggers Rail Act allowed railroad and shipping companies to enter into confidential contracts for rail service and also placed all traffic running under contract outside the remaining rate regulations. According to railroad and shipper groups, the duration of contracts has declined, in part because of the railroads' desire to quickly react to shifting market demand, which can result in charging higher rates. Other shippers were concerned that moving away from confidential contracts to public pricing could represent price signaling and further reduce competition between railroads. In 2004, 70 percent of tonnage and 71 percent of industry revenue moved under contract.

## Captive Shippers Are Difficult to Identify, but Available Measures Indicate Captivity Dropping in the Railroad Industry

It is difficult to determine precisely how many shippers are "captive" to one railroad because the proxy measures that provide the best indication can overstate or understate captivity.[22] One way of determining potential captivity is to identify which Bureau of Economic Analysis (BEA) economic areas were served by only one Class I railroad.[23] In 2004, 27 of the 177 BEA economic areas were served by only one Class I railroad.[24] As shown in figure 12, these areas include parts of Montana, North Dakota, New Mexico, Maine, and smaller areas in several states.

[22]Jerry Ellig, "Railroad Deregulation and Consumer Welfare," *Journal of Regulatory Economics* (The Netherlands: Klower Academic Publishers: 2002), p. 156.

[23]Economic areas are those areas defined by BEA, which defines the relevant regional economic markets in the United States.

[24]The number of carriers serving a given location is not indicated in the *Carload Waybill Sample*. We obtained this additional information from DOT.

**Figure 12: Number of Class I Railroads Serving Economic Areas, 2004**




Source: GAO analysis of BEA and GIS data.

Another way of looking at potential captivity is to calculate how much route tonnage originating in a given economic area has access to only one Class I railroad. Figure 13 shows the percentage in 2004 of all industry tonnage originating in economic areas with access to only one Class I railroad. In particular, economic areas with more than 75 percent of tonnage shipped on one railroad appear most prevalent in states such as Montana, Idaho, North Dakota, and Texas. Tonnage originating in these economic areas varies widely, from a little over 55,000 tons to over 36 million tons.

**Figure 13: Percentage of All Industry Tonnage Originating in Economic with Access to One Class I Railroad, 2004**




Source: GAO analysis of BEA, DOT, and STB data.

According to our analysis of available measures, the overall extent of captivity appears to be dropping in the freight railroad industry. We examined tonnage, revenue, and access statistics for all routes—originating and terminating in economic areas—captured in the *Carload Waybill Sample* and other DOT data. In 2004, origin and destination routes with access to only one Class I railroad carried 12 percent of industry revenue and 10 percent of industry tonnage, which represents a decline

from 1994, when 22 percent of industry revenue and 21 percent of industry tonnage moved on routes served by one Class I railroad (see table 1).[25]

**Table 1: Changes in Percentage of Industry Revenue and Tonnage on Origin and Destination Routes with Access to One Class I Railroad**

| Year | Percentage of revenue | Percentage of tonnage |
|---|---|---|
| 1994 | 22.87 | 20.59 |
| 2004 | 12.29 | 10.43 |

Source: GAO analysis of BEA, DOT, and STB data.

This decline suggests that more railroad traffic is traveling on routes with access to more than one Class I railroad. While overall industry tonnage with access to more than one Class I railroad appears to have increased, some economic areas have a higher percentage of all industry traffic tonnage shipping on one Class I railroad. From 1994 through 2004, parts of states such as Texas, Tennessee, and Montana experienced increases of 25 percent or more in tonnage with access to one Class I railroad while parts of other states such as Oregon, New York, and Florida saw their percentages of tonnage with access to one Class I railroad drop by more than 25 percent (see fig. 14).

[25]For our analysis of access to one or more Class I railroads, we examined data for 1994 and 2004, the earliest and latest years for which such data were available.

**Figure 14: Changes in Percentage of All Industry Traffic Tonnage with Access to One Class I Railroad Originating in Economic Areas, 1994 through 2004**




Source: GAO analysis of BEA, DOT, and STB data.

While examining BEA areas provides a proxy measure for captivity, a number of factors may understate or overstate whether shippers are actually captive. The first three factors may work to understate the extent of captivity among shippers. First, routes originating within economic areas served by multiple Class I railroads may still be captive if only one Class I railroad serves their destination, and a shipper must use that one railroad for that particular route. Second, some BEA areas are quite large, so a shipper within the area may have access to only one railroad, even

though there are two or more railroads within the broader area. Third, an origin may only be served by one Class I railroad, but one Class I railroad does not serve the entire route, meaning the route may be partially captive, although more than one Class I railroad provides service between its origin and destination. Two additional limitations may work to overstate the number of locations captive to one railroad. First, this analysis accounts for Class I railroads only and does not account for competitive rail options that might be offered by Class II or III railroads[26] such as the Guilford Rail System, which operates in northern New England. Second, this analysis considers only competition among rail carriers and does not examine competitive options offered by rail and other transportation alternatives such as trucks and barges.

## Amount of Potentially Captive Traffic Traveling at Rates at Levels Substantially above the Threshold for Rate Relief Has Increased

To determine potential captivity, we applied another measure— traffic traveling at rates equal to or greater than 180 percent R/VC, which is part of the statutory threshold for bringing a rate relief case before STB. STB regards traffic at or above this threshold as “potentially captive.” As with BEA areas, examining R/VC levels as a proxy measure for captivity can also understate or overstate captivity. For example, it is possible for the R/VC ratio to increase while the rate paid by a shipper is declining. Assume that in Year 1, a shipper is paying a rate of $20 and the railroad’s variable cost is $12; the R/VC ratio—a division of the rate and the variable cost—would be 167 percent. If in Year 2, the variable costs decline by $2 from $12 to $10 and the railroad passes this cost savings directly on to the shipper in the form of a reduced rate, the shipper would pay $18 instead of $20. However, as shown in table 2, because both revenue and variable cost decline, the R/VC ratio increases to 180 percent.

**Table 2: Possible Changes in R/VC Ratios**

| Year | Revenue collected | Variable costs | R/VC |
|---|---|---|---|
| Year 1 | $20.00 | $12.00 | 167% |
| Year 2 | $18.00 | $10.00 | 180% |

Source: GAO.

[26]STB classifies railroads according to operating revenues. Class II railroads had revenues of $20 million to $250 million, and class III railroads had revenues of less than $20 million in 1991 dollars.

Since 1985, and as a percentage of all traffic, the amount of potentially captive traffic traveling at rates over 180 percent R/VC and the revenue generated from that traffic have both declined. Revenue generated from traffic traveling at rates over 180 percent R/VC decreased from 41 percent of all industry revenue in 1985 to 29 percent in 2004 (see fig. 15).

**Figure 15: Percentage of Industry Tonnage and Revenue Generated from Traffic Traveling at Rates Equal to or Greater Than 180 Percent R/VC, 1985-2004**




Source: GAO analysis of STB data.

However, since 1985, tonnage from traffic traveling at rates substantially over the threshold for rate relief has increased. Total industry tonnage has increased significantly (from 1.37 billion tons in 1985 to 2.14 billion tons in 2004), with the tonnage traveling at rates above 300 percent R/VC more than doubling—from about 53 million tons in 1985 to over 130 million tons in 2004 (see fig. 16).

**Figure 16: Tonnage Traveling at Rates over 300 Percent R/VC, 1985-2004**




Source: GAO analysis of STB data.

As a percentage of all industry traffic, traffic traveling at rates between 180 and 300 percent R/VC decreased from 36 percent in 1985 to 25 percent in 2004. In contrast, the percentage of all industry traffic traveling at rates above 300 percent R/VC increased from 4 percent in 1985 to 6 percent in 2004 (see fig. 17).

**Figure 17: Percentage of Tonnage by R/VC, 1985 and 2004**




Source: GAO analysis of STB data.

Increases in traffic traveling at rates over 300 percent R/VC appear widely distributed throughout the country, although in some areas increases have been higher than in others. Four economic areas located in parts of Montana, New Mexico, North Dakota, and West Virginia had the largest increases in traffic traveling at rates over 300 percent R/VC, with an increase of more than 25 percent from 1985 through 2004 (see fig. 18).

**Figure 18: Changes in Percentage of Tonnage Traveling at Rates over 300 Percent R/VC, by Originating Economic Area, 1985 through 2004**




Source: GAO analysis of BEA, DOT, and STB data.

In addition to national changes, significant increases in traffic traveling at rates over 300 percent R/VC can be seen in certain states, for certain commodities, and for certain routes. For example, in 1985 virtually no coal originating in Ohio traveled at rates over 300 percent R/VC. In 2004, nearly half of coal traffic originating in Ohio traveled at rates over 300 percent R/VC. Increases in traffic traveling at rates over 300 percent R/VC can also be seen at the route level. Figure 19 shows the amount of traffic traveling at rates over 300 percent R/VC on long-distance grain routes from the Minot, North Dakota, and Billings, Montana, economic areas to the

Portland-Vancouver-Beaver Falls, Oregon, economic area. Of the routes we examined, these two had the highest percentage of traffic traveling at rates over 300 percent R/VC for 2004, and on both routes, this traffic had substantially increased over 1985 levels.[27]

**Figure 19: Long-distance Grain Route Changes in Percentage of Tonnage Traveling at Rates over 300 Percent R/VC, 1985-2004**




Source: GAO analysis of STB data.

For both the Minot and Billings routes, increases in R/VC from 1985 through 2004 were driven more by increases in revenue than by changes in variable cost. From 1985 through 2004, revenue from all grain traffic—not just traffic traveling at rates above the statutory threshold for rate relief—on the Minot, North Dakota, to the Portland-Vancouver-Beaver Falls, Oregon, economic area increased from approximately $18.4 million to approximately $30.8 million. Variable cost increased at a much slower

[27]By contrast, the long-distance grain route shown in figure 9 (from the Sioux Falls, South Dakota, economic area to the Portland, Oregon, economic area) had no traffic traveling at rates over 300 percent R/VC for 2004.

pace, rising from approximately $12.2 million to approximately $12.4 million. For the route from the Billings, Montana, economic area to the Portland-Vancouver-Beaver Falls, Oregon, economic area, grain revenue more than tripled, from approximately $11.2 million in 1985 to approximately $42.7 million in 2004. Variable cost also increased substantially—although still not as much as revenue—rising from approximately $5.5 million to approximately $15.1 million.

## Some Areas with Access to One Railroad Have Higher Percentages of Traffic Traveling at Rates That Exceed the Threshold for Rate Relief

Some economic areas with access to one Class I railroad also have more than half of their traffic traveling at rates that exceed the statutory threshold for rate relief. For example, parts of New Mexico and Idaho with access to one Class I railroad have more than half of all traffic originating in those same areas traveling at rates over 180 percent R/VC (see fig. 20). However, there are instances in which an economic area may have access to two or more Class I railroads and still have more than 75 percent of its traffic traveling at rates over 180 percent R/VC, as well as other instances in which an economic area may have access to one Class I railroad and have less than 25 percent of its traffic traveling at rates over 180 percent R/VC. Yet there are parts of the country with access to one Class I railroad that also have higher percentages of traffic traveling at rates over the statutory threshold for rate relief.

Figure 20: Overlap between Percentage of Tonnage over Threshold for Rate Relief and Access to Only One Class I Railroad




Source: GAO analysis of BEA, DOT, and STB data.

Our analysis shows that some areas of the country with access to only one Class I railroad have higher levels of traffic traveling at rates over the statutory threshold for rate relief. This situation may reflect reasonable economic practices by railroads in an environment of excess demand, or it may represent an abuse of market power. Our analysis provides an important first step in assessing competitive markets nationally, but it is imperfect given the inherent limitations of the *Carload Waybill Sample* and of the proxy measures available for weighing captivity. When

combined with comments from participants on our expert panel and interviews with shipper and railroad groups, the results of our analysis suggest that shippers in selected markets may be paying excessive rates, meriting further inquiry and analysis.

## Despite STB's Actions, Analysis of Competitive Markets Is Needed to Address Lack of Effective Relief for Captive Shippers

The Staggers Rail and ICC Termination Acts promoted greater reliance on competition as the preferred method to protect shippers from unreasonable rates and granted STB broad authority to monitor the performance of the railroad industry. STB has taken a number of actions to provide protections for captive shippers from unreasonable rates in the absence of effective competition, including establishing a process for captive shippers to obtain relief from unreasonable rates. Despite STB's actions, there is little effective relief for captive shippers because STB's standard rate relief process is largely inaccessible. While STB continues to refine its practices, an assessment of competitive markets would provide further information about the extent of captivity among shippers and the merits of a range of proposed actions to enhance competitive options available to shippers. In addition, changes to the rate relief process could provide greater protection from unreasonable rates.

### STB Has Broad Authority to Monitor the Railroad Industry

The Staggers Rail and ICC Termination Acts encourage competition as the preferred way to protect shippers and to promote the financial health of the railroad industry. At the same time, the acts give STB the authority to

- *adjudicate rate cases* to resolve disputes between captive shippers and railroads upon receiving a complaint from a shipper;
- *approve rail transactions*, such as mergers, consolidations, acquisitions, and trackage rights;
- *prescribe new regulations*, such as rules for competitive access and merger approvals; and
- *inquire into and report on rail industry practices*, including obtaining information from railroads on its own initiative and holding hearings to inquire into areas of concern, such as competition.

The federal courts have upheld STB's general powers to monitor the rail industry, including its ability to subpoena witnesses and records and depose witnesses.

STB has the authority and ability to inquire into and report on railroad practices, and it also has authority to take a number of actions based on the results of that inquiry. First, STB could issue a general rule making that would alter the administrative rules for the industry. For example, STB has the authority to require a railroad to make their terminal facilities available to another railroad under certain circumstances. Second, STB could reopen a past decision if it found a material error in the case, new evidence emerged, or circumstances affecting the case substantially changed. Finally, if STB received a complaint from a shipper, it could then launch a formal investigation and prescribe specific remedies to address the complaint.

## STB Has Taken Actions to Protect Captive Shippers

Under its adjudicatory authority, STB has taken a number of actions to provide protection for captive shippers. STB determines the reasonableness of challenged rates in the absence of competition upon receiving a complaint from a shipper. The rate relief process is the principal method by which shippers seek relief from unreasonable rates. STB developed standard rate case guidelines, under which captive shippers can challenge a rail rate and appeal to STB for rate relief. Under the standard rate relief process, STB assesses whether the railroad dominates the shipper's transportation market and, if it finds market dominance, proceeds with further assessments to determine whether the actual rate the railroad charges the shipper is reasonable. STB requires that the shipper demonstrate how much an optimally efficient railroad would need to charge the shipper and construct a hypothetical, perfectly efficient railroad that would replace the shipper's current carrier. As part of the rate relief process, both the railroad and the shipper have the opportunity to present their facts and views to STB, as well as to present new evidence. In 1999,[28] we reported that shippers and shippers' associations indicated that constructing a hypothetical railroad is difficult, particularly for small shippers, because the time and cost associated with the model's development may outweigh the compensation afforded the shipper should STB determine that the challenged rate was unreasonable. Since we reported on the process in 1999, STB has taken several actions to reduce potential barriers for filing a complaint. For example, STB now conducts mediation to begin cases, has added staff to process cases, and

[28]GAO, *Railroad Regulation: Current Issues Associated with the Rate Relief Process*, GAO/RCED-99-46 (Washington, D.C.: Feb. 26, 1999).

has eliminated certain criteria for assessing whether a railroad dominates a shipper's market.[29]

STB also created alternatives to the standard rate relief process, developing simplified guidelines, as Congress required, for cases in which the standard rate guidelines would be too costly or infeasible given the value of the cases. Under these simplified guidelines, captive shippers who believe that their rate is unreasonable can appeal to STB for rate relief, even if the value of the disputed traffic makes it too costly or infeasible to apply the standard guidelines. In addition, STB created a voluntary arbitration option that parties can use to resolve disputes over rates.

Under its authority to approve rail transactions, STB has approved railroad mergers that it finds consistent with the public interest. STB has also taken action to ensure that any potential merger-related harm to competition is mitigated. STB's mitigation efforts have focused on preserving competition where it could be lost at 2-to-1 points,[30] for example, by imposing conditions that allow one railroad to operate over the tracks of another railroad (called trackage rights). STB has historically not taken action to introduce service where shippers have service by only one carrier.

Under its authority to prescribe new regulations, STB established a process by which shippers can file a complaint if they are captive to one railroad and believe that the railroad is engaged in anticompetitive behavior. Under this process, if the shipper proves that the railroad is engaged in anticompetitive behavior, STB can prescribe remedies such as trackage rights that would give the shipper access to another railroad.

[29]In December 1998 and July 1999, STB excluded product and geographic competition as factors to be considered in market dominance proceedings, finding that the applicable law did not require consideration of those factors; that consideration of those factors unduly burdened shippers attempting to bring rate cases; and that the exclusion of those factors would not have any substantial effect on the rates that the railroads could charge in the marketplace (See Surface Transportation Board "News" releases Nos. 99-32, issued on Jul. 2, 1999, and 98-82, issued on Dec. 21, 1998). The railroad industry sought judicial review of the Board's decisions, and in *Association of Am. Railroads v. STB, 237 F.3d 676* (D.C. Cir. 2001), the United States Court of Appeals for the District of Columbia Circuit (Court) remanded (returned) the matter for the Board's further consideration. On remand, STB provided additional analysis to support its earlier decision, and the court then affirmed (upheld) STB's action, in *Association of Am. Railroads v. STB, 306 F.3d 1108* (D.C. Cir. 2002).

[30]2-to-1 points are where shippers currently have access to two carriers but could lose access to one of them through a merger or acquisition.

Finally, under its authority to inquire into and report on the rail industry, STB instituted proceedings to review rail access and competition issues. For example, in April 1998, at the request of Congress, STB commenced a review of access and competitive service in the rail industry. In April 1998, STB decided to consider revising its competitive access rules. However, in its December 1998 report to Congress, STB declined to take further action on this issue because it had adopted new rules giving shippers temporary access to alternative routing options during periods of poor service. In addition, STB observed that the competitive access issue raises basic policy questions that are more appropriately resolved by Congress. In 2001, STB adopted new regulations for rail mergers that require the applicant to demonstrate that the merger would enhance, not just preserve, competition.

## Efforts Have Led to Little Effective Relief

Despite STB's efforts, there is widespread agreement that STB's standard rate relief process is inaccessible to most shippers and does not provide for expeditious handling and resolution of complaints. The process remains expensive, time consuming, and complex. While STB does not keep records of the cost of a rate case, shippers we interviewed agreed that the process can cost approximately $3 million per litigant. Shippers told us that, to initiate a case, the case would need to involve several million dollars so that it would be worthwhile to spend $3 million on a case that they could possibly lose. Thus, shippers noted that only large-volume shippers, such as coal shippers, with set origins and destinations have the money to be able to afford the STB rate relief process. In addition, shippers said that they do not use the process because it takes so long for STB to reach a decision. Lastly, shippers continue to state that the process is both time consuming and difficult because it calls for them to develop a hypothetical competing railroad to show what the rate should be and to demonstrate that the existing rate is unreasonable. Since 2001, only 10 cases have been filed, and these cases took between 2.6 and 3.6 years—an average of 3.3 years per case—to complete. Of those 10 cases, 9 were filed by coal shippers.

The simplified guidelines also have not effectively provided relief for captive shippers. Although these simplified guidelines have been in place since 1997, a rate case has not been decided under the process set out by the guidelines. STB held public hearings in April 2003 and July 2004 to examine why shippers have not used the guidelines and to explore ways to improve them. At these hearings, numerous organizations provided comments to STB on measures that could clarify the simplified guidelines, but no action was taken. STB observed that parties urged changes to make

the process more workable, but disagreed on what those changes should be. Several shipper organizations told us that shippers are concerned about using the simplified guidelines because they believe the guidelines will be challenged in court, resulting in lengthy litigation. STB officials told us that they—not the shippers—would be responsible for defending the guidelines in court. STB officials also said that if a shipper won a small rate case, STB could order reparations to the shipper before the case was appealed to the courts.

STB's arbitration option has never been used. Under this approach, an arbitrator would decide the rate, using a "give and take" approach—that is, the arbitrator would determine the rate without being required to pick one of the two offers. According to STB officials, this option has not been used, in part, because the cases that go before STB are contentious, with high monetary stakes. As a result, there is less willingness from either side to arbitrate.

Shippers have not obtained relief through STB's "competitive access" rules. Under these rules, shippers can file a complaint to request that one railroad obtain access to another railroad's tracks when necessary to remedy anticompetitive behavior by the owning railroad. Shippers who file a complaint must show that the owning railroad has engaged in anticompetitive behavior. To date, STB has found that all complaints have failed to prove that the owning railroad has engaged in anticompetitive behavior.

## STB Continues to Refine the Process

During our review, STB has continued to refine its processes for shippers to obtain relief from unreasonable rates and competitive access. For example, STB recently proposed a rule making to make changes to the simplified guidelines in order to respond to comments gathered at the STB hearings held in April 2003 and July 2004 to examine why those guidelines have not been used by shippers and to explore ways to improve the guidelines. In addition, STB is seeking public comment on several measures it has proposed to adopt regarding railroad practices involving fuel surcharges. The proposals follow STB's May 2006 public hearing on how railroads calculate and charge fuel surcharges and respond to extensive testimony on these charges submitted to STB by the rail industry, the public, and railroad customers. STB announced its intent to hold a public hearing on certain issues related to rail transportation rates for grain. Lastly, STB recently requested written comments and held a public hearing in response to a petition filed by a shipper group to prevent, or put a time limit on, paper barriers, which are contractual agreements

that may be made when a Class I railroad either sells or leases some of its track to another railroad (typically a short line railroad or regional railroad), but stipulates that virtually all traffic that originates on that line must interchange with the Class I railroad that sold the tracks or pay a penalty.

## Assessment of Competitive Markets and Changes to Rate Relief Process Could Provide More Relief

The results of our analysis suggest a reasonable possibility that shippers in selected markets may be paying excessive rates related to a lack of competition in these markets. While our analysis of available measures shows that the extent of captivity appears to be dropping in the freight railroad industry, shippers that may be captive are paying substantially over the statutory threshold for initiating a rate relief case. This situation may simply reflect reasonable economic practices by railroads in an increasingly constrained environment in which demand for rail services increasingly exceeds supply, or it may represent an abuse of market power. Our analysis provides an important first step in assessing competitive markets nationally, but it is imperfect given the inherent limitations of the *Carload Waybill Sample* and the proxy measures available for weighing captivity. A more rigorous analysis of competitive markets nationally is needed—one that identifies the state of competition nationwide and inquires into pricing practices in specific markets. If this assessment determines that market power is being abused or the goals of the Staggers Rail Act are not being met, STB could consider several methods to ease competition concerns, such as initiating a generally applicable rule making; or, if a complaint is filed, providing specific remedies to increase competition.

Shipper groups, economists, and other experts in the rail industry have suggested several alternative approaches as remedies that could provide more competitive options to shippers in areas of inadequate competition or excessive market power. These groups view these approaches as more effective than the rate relief process in promoting a greater reliance on competition to protect shippers against unreasonable rates. Some

proposals would require legislative change, or a reopening of past STB decisions.[31]

These approaches each have potential costs and benefits. On the one hand, they could expand competitive options, reduce rail rates, and decrease the number of captive shippers as well as reduce the need for both federal regulation and a rate relief process. On the other hand, reductions in rail rates could affect railroad revenues and limit the railroads' ability and potential willingness to invest in their infrastructure. In addition, some markets may not have the level of demand needed to support competition among railroads. However, in markets that do, the targeted approaches frequently proposed by shipper groups and others include the following:

- *Reciprocal switching:* This approach would allow STB to require railroads serving shippers that are close to another railroad to transport cars of a competing railroad for a fee. The shippers would then have access to railroads that do not reach their facilities. This approach is similar to the mandatory interswitching in Canada, which enables a shipper to request a second railroad's service if that second railroad is within approximately 18 miles. Some Class I railroads already interchange traffic using these agreements, but they oppose being required to do so. Under this approach, STB would oversee the pricing of switching agreements. This approach could also reduce the number of captive shippers by providing a competitive option to shippers with access to a proximate but previously inaccessible railroad and thereby reduce traffic eligible for the rate relief process (see fig. 21).

[31]Another proposal, articulated by economists Curtis Grimm and Cliff Winston, calls for the elimination of STB. This proposal recognizes that captive shippers have likely been hurt by a lack of competition, but it states that allowing the Department of Justice to review rail mergers instead of STB and ending the potential for reregulation of the industry could lead railroad officials and shippers to negotiate an agreement to address remaining rail competition concerns. Curtis Grimm and Clifford Winston, "Competition in the Deregulated Railroad Industry: Sources, Effects, and Policy Issues," (AEI – Brooking Institution. Washington, D.C.: 2000).

**Figure 21: Reciprocal Switching**




Source: GAO.

- *Terminal agreements:* This approach would require one railroad to grant access to its terminal facilities or tracks to another railroad, enabling both railroads to interchange traffic or gain access to traffic coming from shippers off the other railroad's lines for a fee. Current regulation requires a shipper to demonstrate anticompetitive conduct by a railroad before STB will grant access to a terminal by a nonowning railroad unless there is an emergency or when a shipper can demonstrate poor service and a second railroad is willing and able to provide the service requested. This

approach would require revisiting the current requirement that railroads or shippers demonstrate anticompetitive conduct in making a case to gain access to a railroad terminal in areas where there is inadequate competition. The approach would also make it easier for competing railroads to gain access to the terminal areas of other railroads and could increase competition between railroads. However, it could also reduce revenues to all railroads involved and adversely affect the financial condition of the rail industry. Also, shippers could benefit from increased competition but might see service decline (see fig. 22).

**Figure 22: Terminal Agreements**




Source: GAO.

- *Trackage rights:* This approach would require one railroad to grant access to its tracks to another railroad, enabling railroads to interchange traffic beyond terminal facilities for a fee. In the past, STB has imposed conditions requiring that a merging railroad must grant another railroad trackage rights to preserve competition when a merger would reduce a shipper's access to railroads from two to one. While this approach could potentially increase rail competition and decrease rail rates, it could also discourage owning railroads from maintaining the track or providing high-quality service, since the value of lost use of track may not be

compensated by the user fee and may decrease return on investment (see fig. 23).

**Figure 23: Trackage Rights**




Source: GAO.

*"Bottleneck" rates:* This approach would require a railroad to establish a rate, and thereby offer to provide service, for any two points on the railroad's system where traffic originates, terminates, or can be interchanged. Some shippers have more than one railroad that serves them at their origin and/or destination points, but have at least one portion of a

rail movement for which no alternative rail route is available. This portion is referred to as the "bottleneck segment." STB's decision that a railroad is not required to quote a rate for the bottleneck segment has been upheld in federal court.[32] STB's rationale was that statute and case law precluded it from requiring a railroad to provide service on a portion of its route when the railroad serves both the origin and destination points and provides a rate for such movement. STB requires a railroad to provide service for the bottleneck segment only if the shipper had prior arrangements or a contract for the remaining portion of the shipment route. On the one hand, requiring railroads to establish bottleneck rates would force short-distance routes on railroads when they served an entire route and could result in loss of business and potentially subject the bottleneck segment to a rate complaint. On the other hand, this approach would give shippers access to a second railroad, even if a single railroad was the only railroad that served the shipper at its origin and/or destination points, and could potentially reduce rates (see fig. 24).

[32]The U.S. Court of Appeals for the Eighth Circuit affirmed STB decision that a bottleneck carrier generally need not quote a separate rate for the bottleneck portion of the route. *Mid-American Energy Co. v. Surface Transportation Board*, 169 F. 3d 1099 (8th Cir.: Feb. 10, 1999). The D.C. Circuit affirmed STB holding that separately challengeable bottleneck rates can be required whenever a shipper has a contract over the nonbottleneck segment of a through movement. *Union Pacific Railroad v. Surface Transportation Board*, 202 F. 3d 337 (D.C. Cir.: 2000).

**Figure 24: Bottleneck Rates**




Source: GAO.

*Paper barriers:* This approach would prevent or, put a time limit on, paper barriers, which are contractual agreements that can occur when a Class I railroad either sells or leases long term some of its track to other railroads (typically a short-line railroad and/or regional railroad). These agreements stipulate that virtually all traffic that originates on that line must interchange with the Class I railroad that originally leased the tracks or pay a penalty. Since the 1980s, approximately 500 short lines have been created by Class I railroads selling a portion of their lines; however, the extent to which paper barriers are a standard practice is unknown because they are part of confidential contracts. When this type of agreement exists, it can inhibit smaller railroads that connect with or cross two or more Class I rail systems from providing rail customers access to competitive service. Eliminating paper barriers could affect the railroad industry's overall capacity since Class I railroads may abandon lines instead of selling them to smaller railroads and thereby increase the cost of entering

a market for a would-be competitor. In addition, an official from a railroad association told us that it is unclear if a federal agency could invalidate privately negotiated contracts (see fig. 25).

**Figure 25: Paper Barriers**




Source: GAO.

It will be important for policymakers, in evaluating these alternative approaches, to carefully consider the impact of each approach on the balance set out in the Staggers Rail Act. One significant consideration is the revenue adequacy of the railroads. The Staggers Rail Act established revenue adequacy as a goal for the industry and allowed the railroads to use differential pricing to increase their revenues. While the specific method for determining revenue adequacy has been controversial, the overall trend in revenue adequacy may be more important. In its last

report for 2004, STB determined that one railroad is revenue adequate and that others are approaching revenue adequacy. It is too early to determine that the industry as a whole is achieving revenue adequacy. Nevertheless, this improvement in the railroads' financial condition represents a significant shift in the rail industry because for decades after the enactment of the Staggers Rail Act, the railroads were all considered revenue inadequate. The railroads need sufficient revenue for infrastructure investment to keep pace with increased demand. However, each of these changes could decrease the amount of revenue the railroads receive. Yet, as the railroad's revenue adequacy improves, the question arises as to what degree the railroads should continue to rely, for their investment needs, on obtaining significantly higher prices from those with greater reliance on rail transportation.

To prevent problems with unreasonable rates, some shipper groups propose targeted approaches that would provide them with more competitive options. A number of different approaches have also been suggested to make the rate relief process less expensive, more expeditious, and therefore potentially more accessible. Each of the proposed approaches has both advantages and drawbacks. These approaches include the following:

- *Increase the use of simplified guidelines:* The simplified guidelines use standard industry average figures for revenue data instead of requiring the shipper to create a hypothetical railroad. This approach would reduce the time and complexity of the process; however, it may not provide such an accurate and precise a measure as the standard process. Both shippers and railroad officials with whom we spoke agree that it is confusing to determine who is eligible to use the process and how it would work. STB recently issued a proposed rule making to pursue changes to the simplified guidelines to provide captive shippers greater access to regulatory remedies for unreasonable rail rates.

- *Increase the use of arbitration:* Under arbitration, two parties present their case before an arbitrator, who determines the rate. This process replaces the shipper's requirement to create a hypothetical railroad. Proponents of arbitration argue that the threat of arbitration can induce railroads and shippers to resolve their own problems and limit the need for federal regulation. In addition, the process is quicker and cheaper than the standard rate relief process. For example, Canada offers an arbitration process known as Final Offer Arbitration (FOA), under which both parties submit their best and final offers, and the arbitrator considers the argument from both sides and picks one rate offer from either the railroad

or the shipper. FOA is quicker—statutorily, once the process begins it has to be completed within 60 days, or 30 days for disputes involving freight charges of less than $750,000, unless the parties agree to a different time frame. In addition, FOA is cheaper—estimates ranged up to $1 million Canadian dollars, for both parties. On the other hand, the decisions are good for only 1 year, so the process could in theory be revisited annually. Critics of this approach suggest that arbitration decisions may not be based on economic principles, such as the revenue and cost structure of the railroad, and arbitrators may not be knowledgeable about the railroad industry. Furthermore, opinions differ significantly about which types of disputes should be covered and what standards (if any) should apply.

- *Develop an alternative cost methodology:* STB could develop an alternative to the cost methodology used under the standard process in which a shipper must demonstrate how much an optimally efficient railroad would need to charge a shipper by constructing a hypothetical, perfectly efficient railroad that would replace its current carrier. For example, STB could use a long-run incremental cost approach to evaluate and decide rate cases. This process, which is used by the Federal Energy Regulatory Commission for regulating rates charged by pipeline companies, bases rates on the actual incremental cost of moving a particular shipment, plus a reasonable rate of return. This approach allows for a quick, standard method for setting prices, but does not take into account the need for differential pricing or the railroad's need to charge higher rates in order to become revenue adequate. Structuring rate regulation around actual costs can also create potential disincentives for the regulated entity to control its costs.

## Uncertainty about Future Freight Rail Demand and Capacity Points to Opportunities for a More Strategic Federal Approach to Rail Infrastructure

Recent forecasts predict that the demand for freight and freight rail transport will grow significantly in the future. While forecasts have limitations as guides to investing in new transportation infrastructure, they can present a plausible picture of future freight demand and capacity. Whether private rail companies will be able and willing to invest in new infrastructure capacity to meet projected future demand is uncertain. New rail capacity not only benefits each private rail company network, but it also has the potential to benefit the public by improving traffic flow, air quality, and safety at the national, state, and local levels. As a result, the public sector has increasingly been investing in freight rail projects. Federal involvement in the freight system should be consistent with the competitive marketplace and ensure that funding decisions reflect widespread public priorities.

## Forecasts of Significant Freight Rail Traffic Growth Provide a Plausible Outlook for the Future

The demand for freight transportation in general and freight rail specifically is forecasted to increase, according to recent studies.[33] Several of these studies also quantify their projections of the volume and value of future freight demand. The Freight Analysis Framework (FAF) is a comprehensive database and policy analysis tool maintained by DOT to help identify needed freight capacity improvements. In 2002, DOT projected, using this tool, that overall domestic and international freight demand would increase by more than 65 percent and 84 percent, respectively, by 2020. In 2003, the American Association of State Highway and Transportation Officials (AASHTO) released the *Freight Rail Bottom Line Report*, prepared by a consulting firm. This report describes the industry and its benefits to the nation, estimates the industry's investment needs and capacity to meet these needs, and quantifies the consequences of underinvestment, including highway deterioration and congestion. The AASHTO study projected that, by 2020, overall domestic freight demand by ton would increase by 57 percent and international demand would increase by 99 percent. In 2005, the American Trucking Association's (ATA) report *U.S. Freight Transportation Forecast to 2016* projected tonnage and revenues for all freight modes. The report predicted that overall freight volume would increase by about 32 percent between 2004 and 2016.

Freight rail demand is projected to increase less than overall freight demand and to grow at a slower rate than demand for other modes—such as truck and air freight. FAF projects that freight rail tonnage will grow about 55 percent by 2020, but this growth will not be as dramatic as for truck and air, and will account for a much smaller share of the market when measured on the basis of shipment value. AASHTO predicts that freight rail tonnage will increase 44 percent by 2020. However, it notes that this forecast actually indicates that rail will lose some market share. This estimate also assumes that considerable investment will be required—up to about $4 billion annually—to meet future demand. According to ATA's forecast, freight rail tonnage will grow annually by 2.4 percent to 2010 and by 2.1 percent to 2016. While rail intermodal traffic is forecast to grow rapidly, the study anticipates that rail's overall share of total freight

[33]Studies by the AASHTO, DOT, and American Trucking Association made specific freight and freight rail forecasts. Studies by the Transportation Research Board (TRB), the National Cooperative Research Program (NCHRP 20-24(33)) administered by TRB, and a consortium of Midwestern states and universities (Upper Midwest Freight Corridor Study) also assessed future freight demand and capacity issues.

tonnage will decrease slightly from about 15.6 percent in 2004 to about 15.4 percent in 2016.

However, ow many factors can affect the accuracy of these predictions. Freight markets are volatile and unpredictable, and thus freight demand forecasts may prove to be off the mark. Similarly, much freight traffic is determined by trade that originates outside the United States. Moreover, since the data and models used to develop these freight demand forecasts are largely proprietary,[34] we could not assess the validity or reasonableness of the assumptions used to develop the predictions.[35] Nevertheless, forecasts of freight and freight rail demand are useful as one plausible scenario for the future. As the Congressional Budget Office (CBO) observed in a January 2006 report, forecasts of demand are best viewed as illustrative rather than quantitatively accurate.[36]

## Railroads' Investments in Capacity to Meet Potential Demand Are Uncertain

If demand does develop as forecasted, it is uncertain how able and willing railroads will be to invest in new capacity. Railroads do not prepare long-term capacity plans because of concern about the potential for significant economic changes—for example, officials at one Class I railroad stated that they prepare capacity improvements plans and demand projections for 3 to 5 years into the future, with frequent revisions. In addition, the railroads we interviewed were generally unwilling to discuss their future investment plans with us in any detail because this is business proprietary information. It is therefore difficult to comment on how railroads are likely to choose among their competing investment priorities for the future compared with various demand scenarios.

Railroads' ability and willingness to invest in new capacity to meet demand reflects a number of key considerations. For privately owned rail companies, a key business consideration is maximizing returns for shareholders. To do so, realizing the greatest return on investment from

[34]The 2002 FAF used proprietary models to describe domestic and international commodity flows for rail, water, air, and highways and forecasted freight flows for 2010 and 2020. A second generation DOT FAF (being published in 2006) does not use proprietary models and covers commodity flows for 2002 to 2035.

[35]We were able to interview some of the consultants who authored these reports and other rail experts. We also independently corroborated information in these reports through our expert panel.

[36]Congressional Budget Office, *Freight Rail Transportation: Long Term Issues* (Washington, D.C.: January 2006).

each investment decision is essential and is reinforced by pressure from shareholders. Rail investment involves private companies taking a substantial risk which becomes a fixed cost on their balance sheets, one on which they are accountable to stockholders and for which they must make capital charges year in and year out for the life of the investment. A railroad contemplating such an investment must be confident that the market demand for that infrastructure will hold up for 30 to 50 years. This is in sharp contrast to other modes such as highway infrastructure, which is paid for largely by public funds. Maximizing a rail company's competitive position in key markets is important in deciding on investments in the company network's size and facilities. For example, the growth of intermodal transport is a major development for freight rail because it stands to be the largest revenue generator for the Class I railroads. As a result, there is intense competition for this business, although intermodal business also means that freight rail both competes and cooperates with other freight modes. However, intermodal growth depends on the railroads' ability to invest in the new capacity needed to meet this demand.

Investment considerations are complicated by the current status of rail infrastructure. Although the rail network has been downsized, the infrastructure remains extensive but aging. Replacing, maintaining, and upgrading this infrastructure is extremely costly, as the Transportation Research Board emphasized in its analysis of critical transportation issues.[37] Predicting the extent to which future rail investments will keep pace with projected freight rail demand is complicated by the extent of current rail needs. For example, an annual assessment of America's infrastructure[38] conducted by the American Society of Civil Engineering gave rail infrastructure a "C-" grade and noted that, for the first time in 90 years, limited capacity has created significant bottlenecks in the national rail network. However, railroads must invest in new infrastructure, new equipment, and substantial new capacity to handle additional traffic in order to remain viable and effective, a rail industry representative told our expert panel.

[37]Transportation Research Board, *Critical Issues in Transportation* (Washington, D.C.: Jan. 2006).

[38]American Society of Civil Engineering, *2005 Report Card for America's Infrastructure* (Washington, D.C.: 2005).

Today, freight railroads are sufficiently profitable to be investing at record levels. Major freight railroads have reported[39] that they expect to invest about $8 billion in infrastructure during 2006—a 21 percent increase over 2005—and have told us that they plan to continue making infrastructure investments. However, not all of this investment is planned for capital or new capacity. Although we requested additional detail about how the rail industry's $8 billion estimated investment was divided between new capacity and maintenance or renewal of existing capacity, the Association of American Railroads indicated that this information is not currently available but will be part of a special study on railroad spending trends.

## Rail Capacity Investments Can Produce Private and Public Sector Benefits

While private rail networks obtain benefits and improve their profitability from investments in their capacity, these investments also can benefit the public. In fact, some public benefits can be large in comparison to anticipated benefits to the private rail network, as the CBO report pointed out. For example, shifting truck freight traffic to railroads can reduce highway congestion for passenger and commercial vehicles, potentially reducing or avoiding public expenditures that otherwise would be needed to build additional highway capacity or provide additional maintenance to accommodate growing truck traffic. Depending on the rail infrastructure project, the public could realize several types of benefits, as described in table 3.

[39]Association of American Railroads (AAR), (Washington, D.C.: Mar. 16, 2006).

**Table 3: Potential Public Benefits of Rail Transportation Investments**

| Category | Potential public benefit |
| --- | --- |
| Economic | • Lower transportation costs through higher productivity, making it cheaper to produce and distribute goods/services<br>• Improve global competitiveness through increased efficiency<br>• Strengthen local, regional, state economies<br>• Expand industry, employment, tax base |
| Transportation system | • Capture each mode's advantages in moving passengers/freight<br>• Improve overall system performance<br>• Strengthen intermodal connections<br>• Improve transportation network efficiency for the future<br>• Improve passenger/freight rail interactions |
| Mobility/Congestion | • Relieve highway congestion by shifting highway freight to rails<br>• Reduce public investment to prevent highway deterioration by preventing diversion of heavy rail freight to roads<br>• Give passengers/freight access to more modes<br>• Decrease travel time, increase reliability |
| Environmental/Air quality | • Reduce emissions/improve air quality by reducing congestion<br>• Consume about one-fourth to one-third less fuel than trucks |
| Safety and security | • Reduce crashes through redesigned/eliminated highway-rail crossings<br>• Provide redundant capacity to respond to operational/congestion, national security, and weather problems |

Source: GAO analysis.

Rail projects can vary widely in the extent to which they may generate public as well as private benefits; whether benefits are realized by the private or public sector at the national, state, and local levels; and how the benefits are quantified for the purpose of fairly apportioning project financing. Determining what benefits and costs are associated with a rail infrastructure project and who benefits is important in deciding whether public funds for public benefits are justified—but this is a difficult determination.[40] For example, one rail infrastructure project that reduces system bottlenecks may generate benefits to the national economy by lowering the costs of producing and distributing goods. Another rail project that eliminates or improves highway-rail crossings may primarily produce local benefits by reducing accidents, time lost waiting for trains to pass, pollution and noise from idling trains, and delays of emergency

[40]GAO, *Highway and Transit Investments: Options for Improving Information on Projects' Benefits and Costs and Increasing Accountability for Results*, GAO-05-172 (Washington, D.C.: Jan. 24, 2005).

vehicles at crossings. The same project also may produce national benefits by reducing the impact of train delays on the system.

## Public Sector's Growing Freight Rail Investments Focus on Securing Public Benefits

Increasingly, governments at all levels have been investing in freight rail improvement projects that offer potential public benefits. At the state and local levels, government involvement has ranged from planning and coordination to collaboration and investment with freight rail companies and other stakeholders. Some states have been investing to help short-line railroads maintain track in their states for almost 20 years. Other states—such as Florida, Virginia, New York, and Pennsylvania—are creating significant new programs to invest in rail projects. Over 30 states have published freight plans that describe their goals and approach to freight and freight rail.

The scope of state and local freight rail investments continues to expand. For example, Missouri state and local governments, in partnership with railroads and other stakeholders, supported two major rail bridge flyover[41] projects to reduce rail delays in Kansas City. These projects—totaling $134 million—were expected to provide economic benefits and reduce rail transit time through the city by about 2 hours. The project also used an innovative institutional arrangement that created a special type of corporation to facilitate its funding. Colorado's Department of Transportation (CDOT), other public entities, and two Class I railroads are exploring an ambitious partnership to relocate freight train facilities away from the heavily populated Front Range area of the state, as the two railroads proposed. CDOT initiated a benefit-cost study[42] that found sufficient public transportation, economic development, land use, safety, environmental, and passenger rail facilitation benefits to warrant investing public dollars in the project—estimated to cost about $1.17 billion.

The federal government also has been involved in freight rail projects. In 1997, DOT provided a $400 million loan for the $2.4 billion Alameda Corridor project to leverage funds from ports, railroads, and local governments. As a result, a 20-mile trench for trains was constructed to

[41]Railroad flyover bridges separate one set of tracks from another—such as freight and passenger trains.

[42]DMJM+Harris and HDR (the Consultant Team), *Final Report Project No. C SWOO-242 Public Benefits & Costs Study of the Proposed BNSF/UP Front Range Railroad Infrastructure Rationalization Project* (May 18, 2005).

eliminate numerous rail-highway crossings and reduce rail transport time to and from the ports of Los Angeles and Long Beach—a significant gateway for freight imported from Asia and distributed throughout the United States. In 2005, Congress provided $100 million to the $1.5 billion Chicago Region Environmental and Transportation Efficiency (CREATE) program. Its objective is to cut train delays and congestion and improve passenger rail service by separating 25 rail-highway crossings, building 6 passenger/freight train flyovers, and upgrading tracks and controls to improve service for the one-third of the nation's rail traffic that comes through Chicago each day. Railroads and state and local governments are contributing to the program's financing. In 2005, Congress also passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), which increased the authorized level of funds available under the Railroad Rehabilitation and Improvement Financing (RRIF) program from $3.5 billion to $35 billion over a 5-year period. This program provides loans or loan guarantees that are available to states or railroads for projects to acquire, improve, or rehabilitate rail infrastructure.

A number of proposals before Congress would increase federal funding for freight railroad projects. One proposal calls for the creation of a Railroad Trust Fund that would be similar to the Highway Trust Fund, which is used to pay for highway construction and improvements. Another proposal calls for a railroad investment tax credit. Under this proposal, railroads or shippers would receive a 25 percent tax credit for money spent to expand rail infrastructure.

## Federal Response to Freight Investments Should Reflect a National Policy That Is Impartial Toward All Modes and Produces Maximum Public Benefits from Public Investments

Federal decision makers face considerable uncertainty about the future of freight transportation coupled with considerable certainty that the federal deficit will be a long-term constraint on federal investment. At the same time, Congress will continue to face policy and funding decisions that will affect all freight modes and have a critical impact in shaping the nation's rail system and infrastructure. As we have noted in our past work,[43] a strategic systemwide approach to transportation planning and funding that focuses on all modes is increasingly important to meet expectations for more efficient freight transport, growing freight demand, and more connections between modes.

Federal funding constraints enhance the need for a strategic federal approach to freight infrastructure investment, and the implications of these constraints are a critical feature of a national freight policy. Given major projected demographic shifts and future federal health and retirement commitments, federal revenues may barely cover interest on the federal debt by 2040—leaving no money for either mandatory or discretionary programs. According to our simulations, balancing the budget could require cutting federal spending by as much as 60 percent, raising taxes by up to 2-1/2 times their current level, or some combination of the two.[44] We have concluded that the impending federal fiscal crisis will require a fundamental reexamination of all federal programs.[45] For example, our assessment of the federal highway grant program raised significant issues, such as the absence of a clear federal mission and role since the completion of the interstate highway system and the absence of a link between federal funding and goals or outcome measures.

DOT has taken an important step toward a more comprehensive freight strategy by publishing a draft *Framework for a National Freight Policy*[46] for comment. It is a step for which we found considerable support among

[43]GAO, *21st Century Challenges*, GAO-05-325SP (Washington, D.C.: Feb. 1, 2005), GAO, *Freight Transportation: Short Sea Shipping Option Shows Importance of Systematic Approach to Public Investment Decisions*, GAO-05-768 (Washington, D.C.: July 29, 2005), and GAO, *Freight Transportation: Strategies Needed to Address Planning and Financing Limitations*, GAO-04-165 (Washington, D.C.: Dec. 19, 2003).

[44]GAO, *Highway Finance: States' Expanding Use of Tolling Illustrates Diverse Challenges and Strategies*, GAO-06-554 (Washington, D.C.: Jun. 28, 2006).

[45]GAO-05-325SP.

[46]DOT, *(Draft) A Framework for a National Freight Policy*, (Washington, D.C.: Apr. 10, 2006).

public and private freight stakeholders. A systemwide, rather than a modal, perspective is critical to a national freight policy. As the AASHTO study emphasized, investments at the freight system level are needed to respond to nationally significant corridor choke points, intermodal connections, and urban rail interchanges.

With federal fiscal constraints as the backdrop, two major policy principles will need to be considered as DOT continues to develop this national policy. These principles are, first, to adopt a mode-neutral approach—one that takes a consistent policy and funding approach to all modes and establishes a level playing field for competition in the freight marketplace—and, second, to maximize public benefits—particularly benefits to the national transportation system—from public transportation investments.

### Adopting a Mode-Neutral Approach

Under a mode-neutral approach, each mode would pay the full costs for the infrastructure facilities and services that it used as well as the costs that its use imposed on others—such as added air pollution, congestion, and accident risks[47]—through taxes and user fees. No single mode would be at a competitive disadvantage. A mode-neutral federal freight policy and investment strategy would be consistent with the competitive market's central role in the freight system. Encouraging a market-based approach and competition that fosters economic efficiency and innovation is a key consideration in dealing with the privately owned freight rail industry, as we have reported.[48]

Currently, as we have pointed out, federal programs treat different freight modes differently. For example, trucks and barges use infrastructure that is owned and maintained by the government, while rail companies use infrastructure that they pay to own and maintain. The trucking and barge industries pay fees and taxes to use this government-funded infrastructure, but their payments generally do not cover the costs they impose on highways and waterways, thereby giving the trucking and barge industries a competitive price advantage over railroads.[49] The most recent Federal

[47]Transportation Research Board/National Research Council, *Paying Our Way: Estimating Marginal Social Costs of Freight Transportation*, National Academy Press (Washington, D.C.: 1996).

[48]GAO, *Physical Infrastructure: Crosscutting Issues Planning Conference Report*, GAO-02-139 (Washington, D.C.: Oct. 1, 2001).

[49]GAO, *Railroad Competitiveness: Federal Laws and Policies Affect Railroad Competitiveness*, GAO/RCED-92-16 (Washington, D.C.: Nov. 5, 1991).

Highway Administration (FHWA) highway cost allocation study[50] evaluates highway costs attributable to different vehicle classes and the extent to which their user fees cover their responsibility for highway costs. According to the study, combination unit trucks[51] paid 80 percent of their cost responsibility and the heaviest combinations paid half of their cost responsibility. The study concluded that only the very lightest combination trucks pay their share of federal highway cost responsibility. A recent CBO report[52] also concluded that trucks and barges do not pay their full share of highway costs and reported that rail may be at a competitive disadvantage, since other modes are effectively being subsidized. CBO also observed that if all modes do not pay their full costs, the result is inefficient use of roads and waterways and greater government spending than otherwise would be necessary if capacity investments are made in anticipation of demand that does not occur.

## Maximizing Public Benefits from Public Transportation Investments

As DOT develops and applies a national freight policy, our second critical principle will be an important consideration—public investments should depend on clearly defined public benefits.[53] Benefit-cost analysis can be a useful tool to define benefits, as our expert panel on this subject concluded.[54] Because this analysis identifies the greatest net benefits by comparing the monetary value of each project's benefits and costs, it can help public and private stakeholders evaluate project alternatives.

States have had experience in evaluating whether rail projects could yield sufficient public benefits to warrant investments of public dollars in the projects, and their experience can inform a national freight policy. For

[50]DOT/Federal Highway Administration. Office of Transportation Policy Studies, *Addendum to the 1997 Federal Highway Cost Allocation Study Final Report* (Washington, D.C.: May 2000).

[51]Combination unit trucks are trucks that weigh 50,000-100,000 pounds.

[52]CBO, *Freight Rail Transportation: Long-Term Issues*, p. 22.

[53]This observation parallels the conclusion and recommendations by the Transportation Research Board (TRB), which called for the development of a national policy to promote better management and investment decisions to maintain and improve freight capacity. TRB described detailed principles to guide future decisions about using, enlarging, funding or regulating the freight transportation system. TRB, *Freight Capacity for the 21st Century*, (Washington, D.C.: 2003) pp. 5-13.

[54]GAO, *Highlights of an Expert Panel: The Benefits and Costs of Highway and Transit Investments*, GAO-05-423SP (Washington, D.C.: May 6, 2005).

example, the state of Washington's Freight Mobility Strategic Investment Board leverages transportation dollars by working with public and private stakeholders to fund projects that deliver public benefits. The board's project scoring criteria reflect anticipated benefits, such as freight mobility for the project area; freight mobility for the region, state, and nation; general mobility; safety; freight and economic value; environment; project partnership; consistency with regional and state plans; location on a Strategic Freight Corridor; and cost benefit.

However, federal decision makers have no such criteria to use in considering potential freight rail investments. As we have pointed out, the federal funding structure for surface transportation and federal program incentives tend to focus decision makers' attention on highway and transit projects, rather than on freight or freight rail concerns. And, although state and local transportation decision makers consider benefit-cost analyses, these analyses often do not have a decisive impact on investment decisions.[55] As DOT has noted, a fair, balanced approach to allocating public and private funding is a prerequisite for public-private partnerships.[56] We have also raised concerns about federal tax policies. For railroads, some industry groups have proposed freight rail tax credits to encourage investment. However, our work has shown that it is difficult to target tax credits to the desired activities and outcomes and ensure that tax credits generate the desired new investments, as opposed to substituting for investment that would have occurred anyway.[57]

## Conclusions

The Staggers Rail Act achieved far-ranging benefits in helping to create and sustain a healthy and vibrant freight railroad industry, as well as an efficient rail transportation system that supports the important role freight plays in the nation's economy. Critical to the Staggers Rail Act was the concept of balance—on one hand, the act sought to allow rail carriers to earn adequate revenues so that they could meet their current and future capital needs. On the other hand, the act recognized the need for a

[55]GAO, *Surface Transportation: Many Factors Affect Investment Decisions*, GAO-04-744 (Washington, D.C.: Jun. 30, 2004).

[56]U.S. Department of Transportation, *Report to Congress on Public-Private Partnerships* (Washington, D.C.: December 2004).

[57]GAO, *Government Performance and Accountability: Tax Expenditures Represent a Substantial Federal Commitment and Need to be Reexamined*, GAO-05-690 (Washington, D.C.: Sept. 23, 2005).

remnant regulatory regime that would maintain reasonable rates and prohibit undue concentrations of market power in areas where no effective competition existed. The act recognized that it was vital for the federal government to promote competition and rely on it to set rates. Without a doubt, rates have decreased for most shippers, and most shippers are better off in the post-Staggers environment than they were previously. This outcome suggests that widespread and fundamental changes to the relationship between the railroads and their customers are not needed. Nevertheless, the evidence also suggests some basis for believing that—more than 25 years after the act's passage—the balance it envisioned has not been fully achieved.

The continued existence of pockets of potential captivity, together with the increase in traffic at higher thresholds, at a time when the railroads are, for the first time in decades, experiencing increasing economic health, raises the question whether rail rates in selected markets reflect justified and reasonable pricing practices, or an abuse of market power by the railroads. Answering this question requires a rigorous, national analysis of competitive markets. Our analysis provides an important first step; however, we are constrained by the inherent limitations of the *Carload Waybill Sample* and the available proxy measures for assessing captivity. In contrast, STB has the statutory authority to inquire into and report on railroad practices and could conduct a rigorous analysis of competition in the freight rail industry that would rely on more than sample data and could determine whether the inappropriate exercise of market power is occuring in specific markets. Should STB find evidence of abuse, it could consider several methods for creating the balance envisioned by the Staggers Rail Act. For example, STB could consider initiating a generally applicable rule making to address competition issues or prescribe specific remedies in response to a complaint.

In assessing competition within the freight rail industry, STB needs accurate data on railroad revenues. The data that STB currently collects—in particular, the use of the *Carload Waybill Sample* to report on the railroads' finances—are not always captured consistently, making it difficult to accurately track railroad revenues. Specifically, while we determined that, in general, the data in the Waybill were suitably reliable for our reporting purposes, we also found that some data, including data on fuel surcharges, were not accurately captured. Accurate data would provide for more accurate tracking of railroad revenues and railroad charges to potentially captive shippers and other shippers. This information would help STB to obtain a clearer picture of the actual fees paid by shippers.

STB is also responsible for ensuring the expeditious handling and resolution of rate disputes, but the current process for settling these disputes is ineffective. There are a number of potential alternatives to the current process, and STB has recognized the limits of the process and taken further action to improve it. These actions are commendable and need to be pursued; absent further action, the promise of the Staggers Rail Act and the balance it envisioned may never be fully realized.

These are difficult issues that require careful balancing of the railroads' need to earn adequate revenues with shippers' need for competition and reasonable rates during a time of uncertainty about the capacity of freight railroads to meet future demand for freight rail service. While predictions and scenarios for the future of freight rail vary, it is likely that multiple levels of government will continue to be involved in the nation's freight system. Additional investment in freight rail infrastructure can produce public benefits, and many state and local governments are involved in freight rail infrastructure projects. Congress has provided federal assistance as well, and further requests for and decisions about federal assistance to rail infrastructure are likely. Decision makers will be challenged to ensure that federal involvement is consistent with competition in the freight marketplace, reflects widespread public priorities, and offers benefits that warrant the commitment of federal funds. DOT's draft National Freight Policy represents a good start in this direction.

## Recommendations for Executive Action

To ensure an appropriate balance between the interests of railroads and shippers, we recommend that the Chairman of the Surface Transportation Board take the following two actions:

- Undertake a rigorous analysis of competitive markets to identify the state of competition nationwide; in specific markets, determine whether the inappropriate exercise of market power is occuring; and, where appropriate, consider the range of actions available to address problems associated with the potential abuse of market power. If the Chairman determines that STB requires more resources to conduct this analysis, then STB should request additional resources from Congress.
- Review STB's method of data collection to ensure that all freight railroads are consistently and accurately reporting all revenues collected from shippers, including fuel surcharges and other costs not explicitly captured in all railroad rate structures.

To ensure the efficiency and effectiveness of our nation's freight system, we are making the following recommendation to the Secretary of Transportation:

- As DOT continues to develop a national freight policy and a possible federal policy response, consider strategies to (1) sustain the role of competitive market forces by creating a level playing field for all freight modes and (2) recognize the fiscally constrained federal funding environment by developing mechanisms to assess and maximize public benefits from federally financed freight transportation investments.

## Agency Comments and Our Evaluation

STB provided written comments on a draft of this report. These comments are presented and evaluated in appendix III. STB generally agreed with our assessment of the improving financial health of the freight railroad industry and potential public benefits for freight rail infrastructure projects. However, STB disagreed with our recommendation to undertake a rigorous analysis of competitive markets in the rail industry because it believed the findings underlying the recommendation were inconclusive, their on-going efforts will address many of our concerns, and a rigorous analysis would divert resources from other efforts. Specifically, STB stated that our recommendation was based on two findings—first, that rail rates have increased for some shippers and, second, that the amount of traffic with rates reflecting high R/VC ratios has increased in some areas. STB stated that recent increases in rail rates are not surprising and that R/VC ratios can increase when rates and costs are falling and that these findings do not suggest market abuses. STB also noted that it has several rule makings under way related to the standard rate relief process and the simplified rate relief process. STB suggested that, given the limitations on its resources and the aggressive agenda already under way, rather than undertake this competitive markets analysis, a more practical approach would be for STB to finish its reforms to ensure that captive shippers have an effective forum to seek rate relief if a railroad is charging unreasonable rates. Concerning our recommendation that STB review its method of data collection to ensure that all freight railroads are consistently and accurately reporting all revenues collected from shippers, STB stated that the revenue in question represents a small portion of all revenues and that revenue data submitted by freight railroads are audited and otherwise checked to ensure quality. Furthermore, STB has initiated a rule making to improve the tracking of fuel surcharges.

While STB's efforts have been helpful, we continue to believe that STB should undertake a rigorous analysis of competitive markets to identify

the state of competition nationwide; in specific markets, determine whether the inappropriate exercise of market power is occuring; and, where appropriate, consider the range of actions available to address problems associated with the potential abuse of market power. STB's comments do not accurately characterize the underlying support for our recommendation. We did not base this recommendation on an increase in rail rates or suggest that rate increases alone suggest increased captivity. On the contrary, we recognize that rates have declined and that available measures suggest that the extent of captivity has dropped. Furthermore, STB's response suggests that rail rates and the amount of traffic with high R/VC ratios were the only data we examined—they were not. We examined several factors, including data on the amount of tonnage originating in economic areas that have access to only one Class I railroad, data on the amount of tonnage traveling over 300 percent R/VC, and the amount of tonnage that originates in areas with access to only one Class I railroad and travels at rates that exceed the statutory threshold for rate relief. Our report explicitly acknowledges the limitations in the *Carload Waybill Sample* and of the proxy measures available for weighing captivity, including R/VC levels. At the same time, our analyses, when combined with comments from participants on our expert panel and interviews with shipper and railroad groups, suggest a reasonable possibility that shippers in selective markets may be paying excessive rates related to a lack of competition. This provides the impetus for STB—which has the statutory authority to inquire into and report on railroad practices—to analyze competitive markets in the rail industry and, where appropriate, consider the range of actions to address problems associated with the potential abuse of market power. Also, this analysis would rely on more than sample data and could analyze the exercise of market power in specific markets.

Regarding STB's position that it has several rule makings under way that address many of our concerns, we commend STB for recognizing and taking action to address problems with the rate relief process, but we believe action is needed beyond improvements to the rate relief process. These rule makings, if implemented, are designed to improve the processes available to shippers, after shippers have been charged a rate that they consider to be unreasonable. In contrast, we believe that an analysis of the state of competition and the possible abuse of market power, along with the range of options STB has to address competition issues, could more directly further legislatively defined goals to ensure effective competition among rail carriers as the preferred means to both promoting a sound rail transportation system and maintaining reasonable rates. Regarding STB's assertion that conducting a rigorous analysis of

competition would divert resources away from its on-going initiatives, we modified our draft to recommend that STB request additional resources from Congress if it determines it needs more resources to conduct an analysis of competition. We also believe that STB should review its method of data collection to ensure that all freight railroads are consistently and accurately reporting all revenues. STB commented that it had already responded to this concern by proposing a standardized report for fuel surcharges; however, while we commend STB for its efforts to capture these data, we also note STB has not yet implemented standardized reporting of fuel surcharges and that other revenues besides fuel surcharges may not be included in the Waybill. STB also provided technical comments that we incorporated in this report, as appropriate.

We requested comments on a draft of this report from the Acting Secretary of Transportation or her representative. On September 21, 2006, DOT officials, including the Deputy Associate Administrator for Policy, Federal Railroad Administration, and the Chief Economist, Office of Transportation Policy, Office of the Secretary, provided us with oral comments on the draft. In its comments, DOT emphasized the need for the report to clearly recognize the rationale and importance of differential pricing; the nature and relatively small extent of potentially unreasonable pricing in the rail freight marketplace; and the impact of capacity constraints on rail pricing and services. DOT also suggested that our report should recognize certain factors, including that competition between railroads is not possible in all markets because the level of demand may not support more than one railroad, and that investment in freight rail infrastructure entails substantial private risk. In contrast, highway investment has been largely publicly financed. DOT did not take a position on our recommendation concerning the draft National Freight Policy, but stated that efforts are under way to develop more effective tools for gauging the extent to which proposed freight investments provide public benefits. DOT also endorsed the views contained in STB's September 15, 2006, letter (see app. III). We made changes to this report to reflect DOT's comments, as appropriate. DOT also provided a number of technical corrections, which we incorporated as appropriate.

We will send copies to the appropriate congressional committees, the Chair and Vice-Chairs of the Surface Transportation Board, and the Secretary of Transportation. We will also make copies available to others on request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff has any questions, please contact me at (202) 512-2834 or heckerj@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. See appendix V for a list of major contributors to this report.

JayEtta Z. Hecker
Director, Physical Infrastructure Issues

*List of Congressional Requesters*

The Honorable Daniel K. Inouye
Co-Chairman, Committee on Commerce, Science, and Transportation
United States Senate

The Honorable Conrad Burns
United States Senate

The Honorable Byron Dorgan
United States Senate

The Honorable Frank Lautenberg
United States Senate

The Honorable Trent Lott
United States Senate

The Honorable John McCain
United States Senate

The Honorable Mark Pryor
United States Senate

The Honorable Gordon Smith
United States Senate

# Appendix I: Participants in GAO's Expert Panel

Louis S. Thompson (Moderator)
Principal
Thompson, Galenson and Associates, LLC

Paul Bingham
Global Insights

George Borts
Department of Economics
Brown University

George Eads
Vice President
CRA International

Robert Gallamore
Director
Transportation Center
Northwestern University

Darius Gaskins
Founding Partner
Norbridge, Inc.

Carl Martland
Senior Research Associate
Massachusetts Institute of Technology
Department of Civil and Environmental Engineering

Michael F. McBride
Partner
LeBouef, Lamb, Greene & MacRae, LLP

Gerard McCullough
Department of Applied Economics
University of Minnesota

Linda Morgan
Chair of the Transportation Practice Group
Covington & Burling, LLP

John V. Wells
Chief Economist
U.S. Department of Transportation

# Appendix II: Objectives, Scope, and Methodology

We used the Surface Transportation Board's (STB) *Carload Waybill Sample* to identify railroad rates from 1985 through 2004 (the latest rate data available at the time of our review), which we then analyzed to determine rate changes. The *Carload Waybill Sample* is a sample of railroad waybills (in general, documents prepared from bills of lading authorizing railroads to move shipments and collect freight charges) submitted by railroads annually. We used these data to obtain information on rail rates across the industry, for certain commodities and for certain routes by shipment size and length of haul. According to STB officials, revenues derived from the *Carload Waybill Sample* are not adjusted for such things as year-end rebates and refunds that may be provided by railroads to shippers that exceed certain volume commitments.

Some railroad movements contained in the *Carload Waybill Sample* are governed by contracts between shippers and railroads. To avoid disclosure of confidential business information, STB disguises the revenues associated with these movements before making this information available to the public. Consistent with our statutory authority to obtain agency records, we obtained a version of the *Carload Waybill Sample* that did not disguise revenues associated with railroad movements made under contract. Therefore, the rate analysis presented in this report presents a truer picture of rail rate trends than analyses that may be based solely on publicly available information. Since much of the information contained in the *Carload Waybill Sample* is confidential, rail rates and other data contained in this report that were derived from this database have been aggregated at a level sufficient to protect this confidentiality.

We used rate indexes and average rates to measure rate changes over time. A rate index attempts to measure price changes over time by holding constant the underlying collection of items that are consumed (in the context of this report, items shipped). This approach differs from comparing average rates in each year because, over time, higher- or lower-priced items can constitute different shares of the items consumed. Comparing average rates can confuse changes in prices with changes in the composition of the goods consumed. In the context of railroad transportation, rail rates and revenues per ton-mile are influenced, among other things, by the average length of haul. Therefore, comparisons of average rates over time can be influenced by changes in the mix of long- and short-haul traffic. Our rate indexes attempted to control for the distance factor by defining the underlying traffic as 2004 commodity flows between pairs of census regions. To examine the rate trends on specific traffic corridors, we first chose a level of geographic aggregation for corridor end points. We defined end points as the regional economic areas

defined by the Department of Commerce's Bureau of Economic Analysis. An economic area is a collection of counties in and about a metropolitan area (or other center of economic activity); there are 179 economic areas[1] in the United States, and each of the nation's 3,141 counties is included in an economic area.[2] We placed each corridor in one of three distance-related categories: 0 to 500 miles, 501 to 1,000 miles, and more than 1,000 miles. Although these distance categories are somewhat arbitrary, they represent reasonable proxies for short-, medium-, and long-distance shipments by rail.

To determine the areas with access to one or more Class I railroads, we obtained railroad systems data from the Department of Transportation, which accounted for trackage rights, mergers, and other industry developments affecting access. For issues related to revenue-to-variable cost ratios, we used data from the *Carload Waybill Sample* to identify the specific revenues and variable costs and to compute R/VC ratios for the commodities and markets we examined. Using this information, we then identified those commodities and areas whose R/VC ratios were above or below the 180 percent R/VC level, as well as those areas above the 300 percent R/VC level.

To identify the actions STB has taken to address competition and captivity concerns, we interviewed officials and reviewed information from all seven North American Class I railroads, several shipper groups and associations and STB officials; and we met with experts in the railroad industry. We reviewed characteristics of STB's current rate relief process, as well as changes STB has made to the process, and conducted a comprehensive analysis of STB cases since 2000. We also held an expert panel through the National Academy of Sciences, consisting of 11 individuals with expertise in the freight railroad industry and the economics of transportation deregulation. Moreover, we conducted a legal analysis of current statutes related to STB's authority. To discern potential alternatives, we reviewed pending legislation, testimonies before Congress, previous GAO reports, STB decisions, rule makings, and proposed rule makings, and conducted a summary analysis of interviews.

[1]Our analysis included 177 economic areas because we did not include the two economic areas in Alaska and Hawaii.

[2]The Bureau of Economic Analysis updated definitions of each economic area in November 2004.

To assess future freight demand and the freight railroad industry's ability to meet such demand, we reviewed transportation planning literature and forecasts of future freight rail demand and capacity in the United States. This review also included state freight plans and major freight rail projects. We synthesized information on freight and freight rail, as well as various forecasts to identify similar and dissimilar themes. We also reviewed involvement by the federal government in freight railroad projects, including related legislation and funding decisions. We interviewed several state and federal transportation officials to gather further information on public-private partnerships, freight railroad projects, and DOT's draft National Freight Policy. We also interviewed freight railroad representatives, financial market analysts, national association representatives, and transportation experts. For selected public-private partnerships, we analyzed the genesis of such projects, motivations for involvement from the public and private sectors, and benefit-cost analyses that were conducted to support project funding decisions.

We determined that the data used in this report were sufficiently reliable for the purpose of our review. We conducted our review from June 2005 to August 2006 in accordance with generally accepted government auditing standards.

# Appendix III: Comments from the Surface Transportation Board

Note: GAO comments supplementing those in the report text appear at the end of this appendix.

**Surface Transportation Board**
**Washington, D.C. 20423-0001**

Office of the Chairman

September 15, 2006

Ms. JayEtta Z. Hecker
Director
Physical Infrastructure Issues
Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Ms. Hecker:

The Surface Transportation Board has received the draft version of the Government Accountability Office (GAO) report entitled "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Captivity Should Be Addressed" (GAO-06-1057).

We have reviewed the draft and are submitting the agency's formal comments which are attached. If you have any questions, please contact William Huneke, Chief Economist and Associate Director, at 202-565-1538.

We appreciate the opportunity to work with you on this matter.

Sincerely,

Charles D. Nottingham

Enclosure

cc: Steve Cohen, Assistant Director, GAO
Vice Chairman Mulvey
Commissioner Buttrey
William Huneke

**Comments of the Surface Transportation Board**

**"Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Captivity Should be Addressed" (GAO-06-1057)**

**September 15, 2006**

The STB appreciates the opportunity to comment on this report and commends the GAO staff for their efforts in studying these complex issues. We are pleased with the report's finding that the changes in the rail industry since the Staggers Act have been positive. As the report shows, railroads have seen their productivity and financial health improve, and inflation-adjusted rail rates have fallen as carriers have passed cost savings back to their customers. We share GAO's concern that further rail investment is needed to meet the significant rise in demand predicted over the next 10 to 15 years, and that further investment would provide broad public benefits by improving highway traffic flow, air quality, and safety at the national, state and local levels. We also agree with GAO's ultimate finding that "widespread and fundamental changes to the relationship between the railroads and their customers are not needed."

See comment 1.

Based on its national study into the state of competition, GAO offers two recommendations for Board action. One recommendation is that the Board review its data collection methods to ensure that all freight revenues are consistently and accurately reported. For example, the report highlights the current inconsistent treatment by railroads of their fuel surcharge revenues. The agency has already responded to this industry concern by proposing standardized monthly reports of Class I railroads' fuel surcharges. Moreover, as GAO notes, the amount of revenues reported as "miscellaneous revenue" represents less than 1.5% of the total freight rail revenue reported for 2004.

See comment 2.

The Board will continue its ongoing efforts to ensure the accuracy and reliability of the data collected from railroads. Each year, the Class I railroads submit to the STB reports containing extensive financial and operational data needed to assist the agency in fulfilling its regulatory responsibilities. This information is audited and reviewed by the Board and by independent accounting firms. Railroads also submit waybill data for a sample of individual movements. The waybill data are carefully reviewed for accuracy each year by two contractors, and the Board conducts its own series of checks on the waybill data as well. If at any of these stages there appears to be inconsistent or questionable data, the reporting railroad is immediately contacted for clarification or correction. And where a significant recurring problem is detected, the STB will take the steps necessary to ensure it has the information it needs to carry out its statutory responsibilities.

See comment 3.

The other recommendation for the Board is that the STB conduct its own rigorous analysis of competitive markets to identify the state of competition nationwide; inquire into railroad pricing practices in specific markets where it finds evidence of an inappropriate exercise of market power; and consider actions to address any potential market abuses. This recommendation is based on two findings in the report: (1) that rail rates have increased in nominal terms since 1980 for some shippers; and (2) that, even though the overall extent of shipper captivity has dropped, the amount of traffic with rates reflecting high revenue-to-variable cost (R/VC) ratios has increased in some areas.

See comment 4.

These observations, however, do not suggest market abuses. The rate changes shown in this report have not been adjusted for inflation. The reported 9% increase in rates for grain shipments (from 1985 to 2004) has not kept pace with inflation over that

same time period. And the modest increase in rates from 2000 to 2004 is not surprising, given the escalation in costs during that time period.

See comment 5 and 6.

The analysis of R/VC ratios is also inconclusive. For example, in Figure 19, it is reported that the amount of grain traffic transported from Minot to Portland at rates with an R/VC ratio above 300% increased from 1985-2004. But as shown in Figure 9, even without accounting for inflation, grain rates per ton-mile from Minot to Portland had fallen. Thus, the change in R/VC ratios must be due to a drop in costs per ton-mile, as more grain is shipped in lower-cost shuttle trains or the railroad has implemented other cost-saving measures. R/VC ratios do not provide a reliable measure of changes in captivity over time, because they can increase even when rates are falling where a carrier's costs are also falling. For example, as GAO has previously observed, if rail revenues are $2 and variable costs are $1, the R/VC ratio would be 200%. However, if revenues decreased to $1.50 and variable costs decreased to $0.50, the ratio becomes 300%. Under this scenario, "although railroads have passed all cost reductions along to shippers in terms of lower rates, the increased R/VC ratio makes it appear as though the shipper is worse off." GAO/RCED-99-93, *Railroad Regulation* at 65 (April 1999).

See comment 7.

It is noteworthy that the STB has several important rulemakings underway which bear directly on most of GAO's concerns. Specifically, GAO reports widespread belief that the STB's standard rate relief process is inaccessible to most shippers because it is too expensive, time consuming, and complex. Earlier this year, the agency instituted a rulemaking intended to resolve contentious issues in its standard rate relief process. If implemented, these changes should reduce the complexity of those cases and

See comment 8.

dramatically reduce the cost by simplifying the evidentiary inquiry. Final rules will be issued this fall.

GAO also concludes that the agency's simplified guidelines – which were defended vigorously by the STB and the shipper community when challenged by the railroad community in federal court – have not proven effective because no captive shipper has used them. However, earlier this year the STB launched a major rulemaking to reform and modernize its simplified rate relief guidelines to ensure that all shippers have an effective forum to bring rate complaints. The proposed revisions are the culmination of public hearings and considerable internal study by STB staff. Comments from over 65 parties are expected by the end of this year, with final rules to follow early next year. These important reforms will be pursued concurrently with the agency's regular docket of cases requiring Board adjudication.

See comment 8.

Given the aggressive agenda already underway at the Board, we are hesitant to divert resources and attention away from these pending initiatives to undertake another prolonged national study. GAO has already used its full resources to carefully review the only comprehensive dataset for railroad pricing; interviewed and reviewed information from the railroads, shippers, economists, and experts in the rail industry; and heard from a panel of experts in the freight rail industry and in the economics of freight rail transportation. Finding nothing conclusive, GAO recommends that this far-smaller agency conduct yet another analysis. Because most of GAO's concerns involve the possibility that some shippers may be paying excessive rates, we believe that a far more practical approach is for the STB to finish the important reforms to its rate complaint

See comment 9.

See comment 6.

See comment 10.

procedures to ensure that captive shippers have an effective forum to seek rate relief if a railroad is charging unreasonably high rates.

The STB will remain vigilant in monitoring the rail industry and will initiate inquiries, regulatory proceedings, and recommendations to Congress as future facts and circumstances require.

The following are GAO's comments on the Surface Transportation Board's letter dated September 15, 2006.

## GAO Comments

1. STB commented that we conducted a national study into the state of competition. We did not conduct such a study. Our study included a broad focus on changes in the freight railroad industry since the Staggers Rail Act, the actions STB has taken to address concerns about competition and captivity, and future freight demand and capacity. The data we collected and analysis we performed—such as a review of rate changes over 20 years—were too broad to represent a national study of the state of competition. It is the limitations in the scope of our analysis of competition, along with limitations in the data available to us and a reasonable possibility that shippers in selected markets may be paying excessive rates, which led us to recommend that STB conduct a more rigorous analysis of competition.

2. STB commented that it has already addressed our recommendation to improve data collection by proposing standardized monthly reports of fuel surcharges and also described its efforts to ensure the accuracy and reliability of data in the Waybill. We commend STB for its recent action on fuel surcharges, which occurred during our review, but we also note STB has not yet implemented standardized reporting of fuel surcharges. In addition, other revenues besides fuel surcharges may not be included in the Waybill. Specifically, revenues generated through railcar auctions and congestion fees may not be included. While the reported miscellaneous revenue is a small percentage of all revenue, it is not known how much miscellaneous revenue is not reported. Complete data would provide for more accurate tracking of railroad revenues and would help STB to obtain a clearer picture of actual fees paid by shippers. While we commend STB for its actions to audit and review Waybill data, these accuracy checks do not address our concern that STB is not collecting the full range of revenue data.

3. STB commented that our recommendation for STB to conduct an analysis of competition is based on two findings—that rail rates have increased since 1980 and that the amount of traffic with high R/VC ratios has increased in some areas. Our recommendation is not based on these two findings, but on an analysis of multiple sources, such as data on the amount of tonnage originating in economic areas that have access to only one Class I railroad, data on the amount of tonnage traveling over 300 percent R/VC, and the amount of tonnage that originates in areas with access to only one Class I railroad and travels at rates that exceed the statutory threshold for rate relief. This analysis

provides an important first step in assessing competitive markets nationally; but it is imperfect, given the limitations of measures used to weigh captivity and limitations in the *Carload Waybill Sample*. The results of our analysis, when combined with comments from participants on our expert panel and interviews with shipper and railroad groups, suggest a reasonable possibility that shippers in selective markets may be paying excessive rates related to a lack of competition in these markets. It is precisely the inconclusiveness of the available data—and STB's authority and responsibility to monitor and ensure effective competition in the freight rail industry—that led us to recommend a rigorous analysis of competition by STB. Also, we examined rates since 1985, not 1980.

4. STB commented that an increase in rates does not suggest market abuses and that the rate changes in our report were not adjusted for inflation. We agree that a change in a rate does not necessarily suggest the exercise of market power. While our rates were not adjusted for inflation, we constructed rate indexes, which account for changes in traffic patterns over time that could affect revenue statistics. We also included the price index for the GDP to provide a measure for inflation. However, our recommendation is not based on recent rate increases. Our recommendation is based on our analyses of multiple sources, such as data on the amount of tonnage originating in economic areas that have access to only one Class I railroad, data on the amount of tonnage traveling over 300 percent R/VC, and the amount of tonnage that originates in areas with access to only one Class I railroad and travels at rates that exceed the statutory threshold for rate relief.

5. STB commented that figure 19 shows an increase in grain traffic which traveled at rates above 300 percent R/VC and figure 9 shows that grain rates per ton-mile had fallen along that same route, so the change in R/VC must be due to a drop in costs per ton-mile. We disagree that the change in R/VC in figure 19 must be due to a drop in costs per ton-mile. Figure 19 shows only the amount of traffic on the route that traveled at rates above 300 percent R/VC, while figure 9 shows the cents per ton-mile for all traffic along that route (not just traffic that traveled at rates above 300 percent R/VC). Therefore, the decrease in cents per ton mile shown in figure 9 may reflect a decrease in rates for traffic along that route that traveled at rates below 300 percent R/VC.

6. STB commented that the measures used in our analysis are not conclusive. The fact that our analysis is inherently limited by available data and proxy measures lends more weight to our recommendation.

Specifically, our analysis provides an important first step in assessing competitive markets nationally, but it is imperfect given the limitations of measures used to weigh captivity and limitations in the *Carload Waybill Sample*. We do not conclusively state that there are shippers who are captive to one railroad and paying rates that reflect an abuse of market power. However, the results of our analysis, when combined with comments from participants on our expert panel and interviews with shipper and railroad groups, suggest a reasonable possibility that shippers in selective markets may be paying excessive rates related to a lack of competition in these markets. We believe that STB is the agency that has the authority and responsibility to conduct an inquiry into the potential abuse of market power and utilize its range of options to address competition issues.

7. STB commented that R/VC levels do not provide a reliable measure of changes in captivity because they can increase when rates are falling. We agree that an analysis of R/VC levels is not a conclusive measure of the use of market power. However, the use of R/VC as an indicator of railroad pricing power is well-documented both by Congress in the Staggers Rail Act and by STB, which uses R/VC levels in its process for determining unreasonable rates. While we acknowledge the limitations of the ratio in our report, and even include an example like the one cited above, we believe that R/VC ratios can be used as one of several proxy measure to determine potential captivity. In fact, STB refers to traffic traveling at or above 180 percent R/VC as "potentially captive."

8. STB commented that they have several important rule makings under way which bear directly on our concerns, including changes to the standard and simplified rate relief processes. While we commend STB for taking action to improve its rate relief processes, we note that these rule makings are designed to make changes to the standard and simplified rate relief processes and are not designed to analyze the state of competition or the possible abuse of market power. In contrast, we believe that an analysis of the state of competition or the possible abuse of market power, along with the range of options STB has to address competition issues, could more directly further legislatively defined goals to ensure effective competition among rail carriers as the preferred means to both promoting a sound rail transportation system and maintaining reasonable rates.

9. STB commented that it is hesitant to divert resources away from its pending initiatives to respond to our recommendation. We have modified our draft to recommend that, if STB determined that it needs more resources to undertake a rigorous analysis of competitive

markets to identify the state of competition nationwide, it should request additional resources from Congress.

10. STB commented that, as a small agency, a more practical approach to addressing concerns about captive shippers would be for STB to continue reforming its rate complaint procedures, rather than conduct another analysis. While we commend STB for continuing its efforts to improve its standard and simplified rate relief processes, these rule makings will not address our concerns. Specifically, these rule makings are designed to improve processes available to shippers *after* they have been charged a rate they consider to be unreasonable; these rule makings are not designed to analyze the state of competition or the possible abuse of market power. In contrast, we believe that an analysis of the state of competition or the possible abuse of market power, along with the range of options STB has to address competition issues, could more directly further legislatively defined goals to ensure effective competition among rail carriers as the preferred means to both promoting a sound rail transportation system and maintaining reasonable rates. We believe that STB is the agency that is uniquely positioned to inquire into and report on railroad practices and could conduct an analysis of competition that would rely on more than sample data and could determine whether the inappropriate exercise of market power is occuring in specific markets. STB has the authority to subpoena witnesses and records. Following its inquiry, STB could also consider initiating a generally applicable rule making to address competition issues or prescribe specific remedies in response to a complaint. We recognize that STB has limited resources, and we have modified our draft to recommend that, if STB determines that it needs more resources to conduct an analysis of competition, it should request additional resources from Congress.

# Appendix IV: GAO Contact and Staff Acknowledgments

## GAO Contact

JayEtta Z. Hecker, (202) 512-2834

## Staff Acknowledgments

In addition to those named above, individuals making key contributions to this report include Ashley Alley, Steve Brown, Matthew T. Cail, Sheranda S. Campbell, Steve Cohen, Elizabeth Eisenstadt, Libby Halperin, Richard Jorgenson, Tom McCool, John Mingus, Josh Ormond, and John W. Shumann.

# Related GAO Products


*Freight Railroads: Preliminary Observations on Rates, Competition, and Capacity Issues*. GAO-06-898T. Washington, D.C.: June 21, 2006.

*Freight Transportation: Short Sea Shipping Option Shows Importance of Systematic Approach to Public Investment Decisions*. GAO-05-768. Washington, D.C.: July 29, 2005.

*Freight Transportation: Strategies Needed to Address Planning and Financing Limitations*. GAO-04-165. Washington, D.C.: December 19, 2003.

*Railroad Regulation: Changes in Freight Railroad Rates from 1997 through 2000*. GAO-02-524. Washington, D.C.: June 7, 2002.

*Freight Railroad Regulation: Surface Transportation Board's Oversight Could Benefit from Evidence Better Identifying How Mergers Affect Rates*. GAO-01-689. Washington, D.C.: July 5, 2001.

*Railroad Regulation: Current Issues Associated with the Rate Relief Process*. GAO/RCED-99-46. Washington, D.C.: April 29, 1999.

*Railroad Regulation: Changes in Railroad Rates and Service Quality Since 1990*. GAO/RCED-99-93. Washington, D.C.: April 6, 1999.

*Interstate Commerce Commission: Key Issues Need to Be Addressed in Determining Future of ICC's Regulatory Functions*. GAO-T-RCED-94-261 Washington, D.C.: July 12, 1994.

*Railroad Competitiveness: Federal Laws and Policies Affect Railroad Competitiveness*. GAO/RCED-92-16. Washington, D.C.: November 5, 1991.

*Railroad Regulation: Economic and Financial Impacts of the Staggers Rail Act of 1980*. GAO/RCED-90-80. Washington, D.C.: May 16, 1990.

*Railroad Regulation: Shipper Experiences and Current Issues in ICC Regulation of Rail Rates*. GAO/RCED-87-119. Washington, D.C.: September 9, 1987.

*Railroad Regulation: Competitive Access and Its Effects on Selected Railroads and Shippers*. GAO/RCED-87-109, Washington, D.C.: June 18, 1987.

*Railroad Revenues: Analysis of Alternative Methods to Measure Revenue Adequacy*. GAO/RCED-87-15BR. Washington, D.C.: October 2, 1986.

*Shipper Rail Rates: Interstate Commerce Commission's Handling of Complaints*. GAO/RCED-86-54FS. Washington, D.C.: January 30, 1986.

## GAO's Mission

The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates."

### Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, D.C. 20548

| | | |
|---|---|---|
| To order by Phone: | Voice: | (202) 512-6000 |
| | TDD: | (202) 512-2537 |
| | Fax: | (202) 512-6061 |

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Congressional Relations

Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, D.C. 20548

## Public Affairs

Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, D.C. 20548

PRINTED ON RECYCLED PAPER