# EXHIBIT PX0584




2006 ANNUAL REPORT
AND FORM 10-K

# Burlington Northern Santa Fe Corporation



## Industrial Products in 2006

Industrial Products represented about 25 percent of BNSF's freight revenue. Overall, BNSF's Industrial Products, including building products, construction products, petroleum products, chemicals and plastics products, and food and beverages revenue grew 15 percent in 2006. Petroleum products showed the most dramatic growth at 22 percent, due in part to the success of our Fuel By Rail program. We also saw double-digit revenue growth for food and beverages, chemicals and plastics, and construction products.




BNSF
BNSF



## Agricultural Products in 2006

Agricultural Products provided about 17 percent of BNSF's freight revenues. Total Agricultural Products volume for 2006 was up just over 6 percent, to nearly 973,000 units, with records every quarter for volume and revenue. The growth was primarily driven by a more than 23 percent increase in corn shipments, and increases in bulk foods, ethanol, and soybeans. The efficiency of the agricultural domestic and export network also improved, including a record number of shuttle unit trains.



## Coal in 2006

Coal contributed about 20 percent of BNSF freight revenues. BNSF moved an annual record 287.2 million tons of coal in 2006, up 10.8 percent from the previous annual record of 259.2 million tons set in 2005. BNSF also responded to the rising value of Powder River Basin coal in global energy markets. Capacity expansion projects included 19 miles of new second main track and 18 miles of new third main track on key coal routes.







## Consumer Products in 2006

Consumer Products represented about 38 percent of BNSF freight revenues. Our 6 percent volume growth in Consumer Products was driven primarily by double-digit increases in our international intermodal business arriving on steamship at West Coast ports. We also experienced 17 percent revenue growth in assembled motor vehicles and shipments of vehicle parts for import automotive companies. Domestic intermodal business also continued to grow, due to demand from our trucking partners and increases in long-haul trailer and container traffic.

# Providing Capacity for Growth

For nearly two centuries, railroads have helped shape the American landscape and economy. Today, as our nation has moved from the industrial age to the global age, rail transportation is more vital than ever. Railroads offer freight transportation that is lower cost, more fuel efficient, more environmentally friendly, and safer than other surface transportation modes. Increased use of rail can help relieve congestion on the nation's highways. BNSF is responding to this demand by providing the necessary capacity to handle more of the nation's freight today and in the future.



## TO OUR SHAREHOLDERS, CUSTOMERS AND COLLEAGUES

The demand for rail transportation has increased dramatically. In 2006, BNSF continued to set historic records in volume and revenue. We earned nearly $15 billion in revenue for 2006, and the 10.6 million units we handled in 2006 represented a 6 percent increase over 2005. Our volume has increased by 30 percent since 2001 and by more than 50 percent since 1996. Although we are growing at a faster rate than most railroads, the entire industry is participating in this surging rail demand.

Several factors have contributed to our growth. These include the increase in transpacific container shipments arriving at West Coast ports and the increase in intermodal partnerships with trucking firms that are turning to railroads to help them cope with highway congestion, driver shortages, environmental concerns, and higher fuel costs.

We are also seeing increased demand for cleaner-burning, low-sulfur coal from the Powder River Basin, as an inexpensive alternative to natural gas and an environmentally friendly alternative to Eastern coal sources. Grain demand is also increasing as the popularity of ethanol rises and grain exports increase to China, India and other Asian Pacific countries.

### INCREASING DEMAND FOR RAIL TRANSPORTATION

A comprehensive Department of Transportation (DOT) study, released in 2003, identified key advantages of freight rail in meeting the nation's freight transportation needs:

- Railroads reduce pressure on the nation's highways. In 2000, railroads handled 28 percent of the nation's freight mile tonnage. If that same volume moved by truck, truck traffic on our already crowded highways would increase nearly 50 percent. Intercity truck traffic would more than double. Expanded use of rail opens more highway capacity for automobiles and reduces wear and tear on the roadways.
- Freight rail is a critical link in the nation's intermodal network, serving the trucking and maritime shipping industries and supporting our global competitiveness. At the nation's



largest ports in the Los Angeles basin, rail handles about 50 percent of the imports destined for inland locations.

- Railroads can benefit the environment. According to the U.S. Environmental Protection Agency, a truck emits about three times more nitrogen oxides and particulates than a locomotive per ton-mile. Railroads are also testing alternative fuels — including liquefied natural gas, fuel cells, biodiesel, and hybrid locomotives — that could further reduce emissions.
- On average, railroads are at least three times more fuel efficient than trucks. If 10 percent of the freight on the highways were diverted to rail, the nation could save up to 200 million gallons of fuel annually.

The same DOT study anticipates that the demand for freight transportation will increase by nearly 70 percent between 2000 and 2020. This means significantly more freight traffic for all transportation modes, including railroads.

In 2006, BNSF saw clear evidence of that growth, with more than 10 percent growth in coal volumes; 6 percent growth in agricultural commodities; 2 percent growth in industrial products; and 6 percent growth in consumer products, including our domestic and international intermodal business. Volume growth has been steady for these business units since 2003.

Despite all of the year's achievements, however, we were very disappointed in our employee safety performance. Our reportable injury frequency ratio of 1.41 per 200,000 work hours was slightly higher than our 2005 ratio and was the first time in many years that we have not seen a year-over-year improvement. Of even greater concern, we had three employee fatalities in 2006. Although BNSF has one of the lowest employee injury rates in the transportation industry and in U.S. industry overall, we clearly have more work to do toward our goal of an injury-free and accident-free workplace.

We were encouraged, however, that the safety of our train operations improved 11 percent over 2005, as measured in incidents per million train miles. We also continue to have the lowest highway-rail grade crossing incident rate among U.S. Class I railroads. BNSF continues to provide one of the safest options for movement of freight across the nation.

BNSF spent more than $2.7 billion on fuel in 2006, making it one of our largest expenses. In response to high fuel costs and price volatility, BNSF established a fuel surcharge program, which recovers most of BNSF's increased fuel expense. In early 2006, BNSF was the first railroad to implement a mileage-based fuel surcharge for coal and agricultural products customers rather than a revenue-based program. This approach better aligns the surcharge with fuel consumption based on weight, distance, and fuel intensity.

## KEEPING THE RAILROAD STRONG

Our ability to handle growing demand can be summed up in one word: capacity. We must provide capacity to handle increasing volumes and consistently meet customers' service expectations.

Our capacity starts with a strong railroad. In 2006, we kept our rail assets strong by investing approximately $1.2 billion on capital maintenance, including rail, tie, ballast, bridge, and signal renewal. As a percentage of revenue, the rail industry spends far more than most industries on maintenance and renewal to ensure the reliability and safety of its physical plant.

We also strengthened our operation by increasing the velocity of our locomotives and railcars. This means much more than increased average train speed. Our aim is to reduce the time that freight is stationary and the number of times it is handled. We scrutinize every element of our operation — from loading and unloading processes with shippers, to the scheduling of our track and signal maintenance, to the impact of train makeup on intermediate switching and terminal handling — so that we eliminate inefficiencies and gain more productive use of our track, terminals, and equipment.

With the focused effort of thousands of BNSF people across our network, we improved locomotive velocity by more than 2 percent, measured in average miles per day comparing the fourth quarter of 2006 with 2005. This improved efficiency was the equivalent of adding about 125 locomotives to our fleet. And we improved overall railcar velocity by nearly 9 percent during the same period, measured in car miles per day — the equivalent of adding 7,600 railcars to our car supply. The result was improved capacity to meet the needs of our customers with existing assets and improved service to our customers.

Increasing capacity includes our strategic agreements to expand our network and open new markets for customers. In October 2006, we announced a joint agreement with CSX Corporation for an intermodal rail corridor connecting California with Atlanta, Charlotte, and the rest of the Southeast. This seamless, single-line service rolled out in February 2007

Employees at the Network Operations Center (NOC) in Fort Worth manage train operations across the BNSF system using tools like the Train Management and Dispatch System (TMDS). Developed by BNSF and installed in 2006, TMDS is a state-of-the art train dispatching and freight management software that enhances safety and productivity. TMDS replaces legacy dispatching systems and allows BNSF to integrate technology that ensures operational safety, including the Electronic Train Management System currently under development.

with new double-stack intermodal trains daily between the West Coast and Southeast in each direction. Corridor volume is expected to expand quickly, increasing our presence in Atlanta and other fast-growing Southeast markets.

Capacity also encompasses people. We must have the right people in the right place at the right time to manage our record volumes, especially as baby boomers retire. We hired more than 4,700 employees in 2006, many as an offset to attrition. Over the past five years, more than 16,000 new employees have joined BNSF, and we have increased the size of our workforce by 9 percent.

Many of our new employees have been recruited from the military. We hired about 750 veterans in 2005 and about 1,000 in 2006. In fact, BNSF was named among the "Top 25 Most Military Friendly Employers" by *G.I. Jobs*, a national magazine that helps military members and veterans search for civilian employment. The Department of Defense also recognized BNSF with one of its highest honors, the 2006 Employer Support Freedom Award, for our support of the National Guard and Reserve over the past several years.

We also increase capacity through technology. Our Network Operations Center in Fort Worth, where we dispatch and oversee the movement of nearly 1,500 trains a day, provides state-of-the-art technology that enables us to tightly manage our network and assets, improve service and safety, and maximize capacity.

In 2006, BNSF's leadership in technology was affirmed with broad national and international recognition — including awards for our customer service technology, our wireless telecommunications applications, our budgeting and forecasting technology, and the quality of our business intelligence and data warehousing.

To further enhance safety and efficiency, we continued working with Wabtec Railway Electronics on the Electronic Train Management System (ETMS). This technology uses global positioning satellite (GPS) data and BNSF track and dispatching data to prevent train collisions and over-speed accidents, meeting key criteria identified by the National Transportation Safety Board. The Federal Railroad Administration recently approved our Product



Safety Plan for ETMS, which allows us to more broadly implement this leading-edge technology on portions of our network.

## BALANCING EXPANSION WITH RETURNS ON INVESTMENT

In our capital program, we have continued strategic investments in expanded track, yards, and terminals; track renewal; new locomotives; and technology. Over the last three years, we have spent more than $1.75 billion in expansion capital. So we were ready with the needed physical capacity as customer demand and volumes rose.

We have increased our capital commitments to meet the current demand for freight rail transportation as well as forecasted volume growth because of continuous improvement in our returns. For 2006, our return on invested capital (ROIC) was a record 11.4 percent, a significant improvement from 10.1 percent in 2005 and 7.9 percent in 2004. (For more information on ROIC, see the calculation following Item 6 in our attached Form 10-K.)

Improved returns allow us to increase capacity, enabling us to handle more freight and further relieve the pressure on our highway system. The result is a stronger transportation infrastructure for our nation and a more reliable supply chain for our customers. At BNSF, we have strategically identified the most important opportunities for capital expansion in line with improving returns, by prioritizing routes and facilities requiring more capacity to handle growth.

In 2006, our $2.67 billion in capital improvements included acquisition of 362 new high-horsepower, high-efficiency locomotives. By the end of 2006, nearly 60 percent of our 5,000 road locomotives were less than 10 years old.

We also added about 33 miles of second main track on our main line between Chicago and Los Angeles. All but 51 miles of this high-volume 2,200-mile route were double track, as of the end of 2006. Last year, we ran 100 trains per day on this expanded main line, compared with 60 per day in 2000.

In addition, we built 18 miles of third main track and 19 miles of second main track on the coal line in Wyoming and Nebraska and expanded



our yard at Lincoln, Nebraska, to support record coal volumes. Our coal train numbers have also grown, from an average of 48 trains loaded per day in 2000 to 55 per day in 2006.

At our Logistics Park-Chicago, we added track and 97 more acres of parking and storage. This facility's intermodal lift capacity has increased from 400,000 when it opened in 2002 to nearly 1 million units annually. To further increase capacity, we plan to develop a 1,000-acre logistics park near Gardner, Kansas, which should be ready by late 2008. We are exploring similar expansion at other locations, including a Memorandum of Understanding to explore a rail intermodal project with the City of Victorville, California.

## LOOKING TO THE FUTURE

All of our investments in capital, asset utilization, people, and technology help ensure we have the capacity to meet our customers' transportation needs, while also improving our network fluidity, operating reliability, and fuel efficiency. These investments also benefit the U.S. economy, as we commit more capital to efficiently handle increasing freight volumes.

We'll address capacity constraints again with our planned $2.75 billion capital expenditures in 2007. This will include $750 million in track and facility expansion to meet unprecedented demand for rail transportation and more than $1.6 billion to keep our infrastructure strong by refreshing track, signal systems, and structures. But we must continue to have sustainable adequate returns on investment as well as sound public policy to support continued investment and expansion. We've made it clear to public policy leaders on the state and federal level that we need help if our nation's leaders want sufficient infrastructure to handle growing demand for rail transportation and relieve highway congestion.

I strongly support a Senate bill that would provide a 25 percent federal tax credit over five years for companies that invest in rail expansion projects. If passed, this bill would enable railroads to substantially increase capital expenditures and expand the nation's

Across our network, our employees regularly contribute to the communities where they live and work. They show their generosity daily through blood drives, mentoring for Junior Achievement, volunteering with the Boys & Girls Clubs, collecting toys for the Salvation Army Angel Tree program, donating money and time to local United Way agencies, and more. In addition, the BNSF Foundation has distributed more than $25 million since 2001 to help these organizations and hundreds of others in communities across our network.

transportation infrastructure with minimal impact on our customers' rates.

As a final note, Jeff Moreland, a valued member of our Executive Team with more than 28 years of dedicated service to our company, announced that he will retire in 2007. We thank Jeff for his wise counsel and leadership, most recently of our Law, Government Affairs, and Corporate Relations teams. Roger Nober, who served several years as Chairman of the Surface Transportation Board, has taken over as Executive Vice President Law and Secretary.

As I review our accomplishments in 2006, I am most proud of the contributions our 41,000 employees made to each of our strategic focus areas — franchise, service, return, people, and community. The initiatives we've built around each of these focus areas were a significant reason for our progress in many parts of our business. At the same time, we have some challenges ahead, including a critical focus on our employee safety performance as well as continued improvements in velocity.

BNSF and our predecessor railroads have been an essential fixture of the U.S. economy and landscape since 1849, and the economic value of our industry is expanding every year. Given what I believe is the best team in the industry, we definitely have a lot to celebrate. More importantly, we are laying the foundation for an even better year in 2007.

Matthew K Rose

MATTHEW K. ROSE
CHAIRMAN, PRESIDENT, AND CHIEF EXECUTIVE OFFICER
FEBRUARY 16, 2007

# Consolidated Financial Highlights

DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA

| DECEMBER 31, | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| For the year ended: | | | | | |
| Revenues | $ 14,985 | $ 12,987 | $ 10,946 | $ 9,413 | $ 8,979 |
| Operating income | $ 3,517 | $ 2,922[a] | $ 1,686[b] | $ 1,665 | $ 1,656 |
| Income before cumulative effect of accounting change | $ 1,887 | $ 1,531[a] | $ 791[b] | $ 777[c] | $ 760 |
| Basic earnings per share (before cumulative effect of accounting change) | $ 5.23 | $ 4.12[a] | $ 2.14[b] | $ 2.10[c] | $ 2.01 |
| Average basic shares | 361.0 | 371.8 | 370.0 | 369.1 | 378.0 |
| Diluted earnings per share (before cumulative effect of accounting change) | $ 5.10 | $ 4.01[a] | $ 2.10[b] | $ 2.09[c] | $ 2.00 |
| Average diluted shares | 369.8 | 381.8 | 376.6 | 372.3 | 380.8 |
| Dividends declared per common share | $ 0.90 | $ 0.74 | $ 0.64 | $ 0.54 | $ 0.48 |
| At year end: | | | | | |
| Total assets | $ 31,643 | $ 30,304 | $ 28,925 | $ 26,947 | $ 25,767 |
| Long-term debt and commercial paper, including current portion | $ 7,385 | $ 7,154 | $ 6,516 | $ 6,684 | $ 6,814 |
| Stockholders' equity | $ 10,396 | $ 9,508 | $ 9,311 | $ 8,495 | $ 7,932 |
| Net debt to total capitalization[d] | 40.3% | 42.7% | 39.9% | 44.0% | 46.1% |
| For the year ended: | | | | | |
| Total capital expenditures | $ 2,014 | $ 1,750 | $ 1,527 | $ 1,726 | $ 1,358 |
| Depreciation and amortization | $ 1,130 | $ 1,075 | $ 1,012 | $ 910 | $ 931 |

[a] 2005 operating income, income before cumulative effect of accounting change and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share.

[b] 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share, as described in Note 10 to the Consolidated Financial Statements.

[c] 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share.

[d] Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

2006 FORM 10-K

Burlington Northern Santa Fe Corporation

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

[**X**] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE TRANSITION PERIOD FROM __________TO __________

**COMMISSION FILE NUMBER: 1-11535**

**Exact name of registrant as specified in its charter**

## Burlington Northern Santa Fe Corporation

| **State of Incorporation** | **I.R.S. Employer Identification No.** |
|---|---|
| Delaware | 41-1804964 |
| **Address of principal executive offices, including zip code** | **Registrant's telephone number, including area code** |
| 2650 Lou Menk Drive<br>Fort Worth, Texas 76131-2830 | (800) 795-2673 |

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. **Yes [x] No [ ]**

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. **Yes [ ] No [x]**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. **Yes [x] No [ ]**

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. **[ ]**

Indicate by check mark whether the registrant is a large accelerated filer, accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act). **Large accelerated filer [x]** **Accelerated filer [ ]** **Non-accelerated filer [ ]**

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). **Yes [ ] No [x]**

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $28.419 billion on June 30, 2006. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.01 par value, 358,958,852 shares outstanding as of February 2, 2007.

**DOCUMENTS INCORPORATED BY REFERENCE**

LIST HEREUNDER THE DOCUMENTS FROM WHICH PARTS THEREOF HAVE BEEN INCORPORATED BY REFERENCE AND THE PART OF THE FORM 10-K INTO WHICH SUCH INFORMATION IS INCORPORATED:

Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report......................................................................Part III

## Table of Contents

**Part I**

Item 1. Business ... 1
Item 1A. Risk Factors ... 1
Item 1B. Unresolved Staff Comments ... 4
Item 2. Properties ... 5
Item 3. Legal Proceedings ... 11
Item 4. Submission of Matters to a Vote of Security Holders ... 12
Executive Officers of the Registrant ... 12

**Part II**

Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities ... 13
Item 6. Selected Financial Data ... 14
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations ... 16
Item 7A. Quantitative and Qualitative Disclosures About Market Risk ... 42
Item 8. Financial Statements and Supplementary Data ... 44
Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure ... 86
Item 9A. Controls and Procedures ... 86
Item 9B. Other Information ... 86

**Part III**

Item 10. Directors, Executive Officers and Corporate Governance ... 87
Item 11. Executive Compensation ... 87
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters ... 88
Item 13. Certain Relationships and Related Transactions, and Director Independence ... 88
Item 14. Principal Accountant Fees and Services ... 88

**Part IV**

Item 15. Exhibits, Financial Statement Schedules ... 89
Signatures ... S-1
Index to Exhibits ... E-1

# Part I

## Item 1. Business

Burlington Northern Santa Fe Corporation (BNSF, Registrant or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the shareholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the shareholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, SFP merged with and into The Burlington Northern and Santa Fe Railway Company. On January 20, 2005, The Burlington Northern and Santa Fe Railway Company changed its name to BNSF Railway Company (BNSF Railway).

Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. At December 31, 2006, BNSF and its subsidiaries had approximately 41,000 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America. BNSF Railway's business and operations are described below.

BNSF's internet address is www.bnsf.com. Through this internet website (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission (SEC). Filing on Forms 3, 4 and 5 are also available on this website within one day after filing with the SEC. BNSF's annual CEO certification filed pursuant to the New York Stock Exchange's Corporate Governance Listing Standards is filed as an exhibit to this Form 10-K. BNSF also makes available on its website other previously filed SEC reports, registration statements and exhibits via a link to the SEC's website at www.sec.gov. The following documents are also made available on the Company's website, and a copy will be mailed to shareholders, without charge, upon request to Investor Relations:

- Code of Business Conduct and Ethics for Directors
- Code of Ethics for the Chief Executive Officer and Senior Financial Officers
- Code of Conduct for Salaried Employees
- Code of Business Conduct and Ethics for Scheduled Employees
- Corporate Governance Guidelines
- Charters of the Audit, Compensation and Development and Directors and Corporate Governance Committees

Further discussion of the Company's business, including equipment and business sectors, is incorporated by reference from Item 2, "Properties."

## Item 1A. Risk Factors

***The Company faces intense competition from rail carriers and other transportation providers, and its failure to compete effectively could adversely affect its results of operations, financial condition or liquidity.***

The Company operates in a highly competitive business environment. Depending on the specific market, the Company faces intermodal, intramodal, product and geographic competition. For example, the Company believes that high service truck lines, due to their ability to deliver non-bulk products on an expedited basis, have had and will continue to have an adverse effect on the Company's ability to compete for deliveries of non-bulk, time-sensitive freight. While the Company must build or acquire and maintain its rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any material increase in the scope and quality of these alternative methods or the passage of legislation granting greater latitude to motor carriers with respect to size and weight restrictions could have an adverse effect on the Company's results of operations, financial condition or liquidity.

***A downturn in the economy or change in government policy could negatively impact demand for the Company's services.***

Significant, extended negative changes in economic conditions that impact the producers and consumers of the commodities transported by the Company may have an adverse effect on the Company's operating results, financial condition or liquidity. In addition, changes in United States and foreign government policies could change the economic environment and affect demand for the Company's services. For example, changes in clean air laws may impact demand for coal, and United States and foreign government agriculture subsidies may impact the demand for grain.

***As part of its railroad operations, the Company frequently transports chemicals and other hazardous materials.***

The Company is required to transport these commodities to the extent of its common carrier obligation. An accidental release of these commodities could result in a significant loss of life and extensive property damage. The associated costs could have an adverse effect on the Company's operating results, financial condition or liquidity.

***Future acts of terrorism or war, as well as the threat of war, may cause significant disruptions in the Company's business operations.***

Terrorist attacks, such as those that occurred on September 11, 2001, as well as the more recent attacks on the transportation systems in Madrid and London, any government response to those types of attacks and war or risk of war may adversely affect the Company's results of operations, financial condition or liquidity. The Company's rail lines and facilities could be direct targets or indirect casualties of an act or acts of terror, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues, which could have an adverse effect on its operating results and financial condition. Such effects could be magnified if releases of hazardous materials are involved. Any act of terror, retaliatory strike, sustained military campaign or war or risk of war may have an adverse impact on the Company's operating results and financial condition by causing or resulting in unpredictable operating or financial conditions, including disruptions of rail lines, volatility or sustained increase of fuel prices, fuel shortages, general economic decline and instability or weakness of financial markets, which could restrict the Company's ability to raise capital. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or certain coverage may not be available to the Company in the future.

***The Company is subject to stringent environmental laws and regulations, which may impose significant costs on its business operations.***

The Company's operations are subject to extensive federal, state and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; the generation, handling, storage, transportation and disposal of waste and hazardous materials; and the cleanup of hazardous material or petroleum releases. In addition, many of the Company's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. Environmental liability can extend to previously owned or operated properties, leased properties and properties owned by third parties, as well as to properties currently owned and used by the Company. Environmental liabilities have arisen and may continue to arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. The Company has been and may continue to be subject to allegations or findings to the effect that it has violated, or is strictly liable under, these laws or regulations. The Company's operating results, financial condition or liquidity could be adversely affected as a result of any of the foregoing, and it may be required to incur significant expenses to investigate and remediate environmental contamination. The Company records liabilities for environmental cleanup when the amount of its liability is both probable and reasonably estimable.

***The Company's future success depends on its ability to continue to comply with the significant federal, state and local governmental regulations to which it is subject.***

The Company is subject to a significant amount of governmental regulation with respect to its rates and practices, railroad operations and a variety of health, safety, labor, environmental and other matters. Failure to comply with applicable laws and regulations could have a material adverse effect on the Company. Governments may change the legislative framework within which the Company operates without providing the Company with any recourse for any adverse effects that the change may have on its business. Also, some of the regulations require the Company to obtain and maintain various licenses, permits and other authorizations, and it cannot assure that it will continue to be able to do so. Increased economic regulation of the rail industry could negatively impact the Company's ability to determine prices for rail services and to make capital improvements to its rail network, resulting in an adverse effect on the Company's results of operations, financial condition or liquidity.

***The availability of qualified personnel and an aging workforce may adversely affect the Company's operations.***

Changes in demographics, training requirements and the availability of qualified personnel, particularly train crew members, could negatively impact service levels. In addition, approximately 40 percent of the workforce will be eligible for retirement within the next 10 years. The Company's efforts to attract and retain qualified personnel may be hindered due to increased demand in the job market. Unpredictable increases in demand for rail services may exacerbate these risks and may have an adverse effect on the Company's operating results, financial condition or liquidity.

***Most of the Company's employees are represented by unions, and failure to successfully negotiate collective bargaining agreements may result in strikes, work stoppages, or substantially higher ongoing labor costs.***

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. A negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated on November 1, 2004. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention) are exhausted. While the negotiations have not yet resulted in any extended work stoppages, if the Company is unable to negotiate acceptable new agreements, it could result in strikes by the affected workers, loss of business and increased operating costs as a result of higher wages or benefits paid to union members, any of which could have an adverse effect on the Company's operating results, financial condition or liquidity.

***Severe weather and natural disasters could disrupt normal business operations, which would result in increased costs and liabilities and decreases in revenues.***

The Company's success is dependent on its ability to operate its railroad system efficiently. Severe weather and natural disasters, such as tornados, flooding and earthquakes, could cause significant business interruptions and result in increased costs and liabilities and decreased revenues. In addition, damages to or loss of use of significant aspects of the Company's infrastructure due to natural or man-made disruptions could have an adverse affect on the Company's operating results, financial condition or liquidity for an extended period of time until repairs or replacements could be made. Additionally, during natural disasters, the Company's workforce may be unavailable, which could result in further delays. Extreme swings in weather could also negatively affect the performance of locomotives and rolling stock.

***Fuel supply availability and fuel prices may adversely affect the Company's results of operations, financial condition or liquidity.***

Fuel supply availability could be impacted as a result of limitations in refining capacity, disruptions to the supply chain, or rising global demand. A significant reduction in fuel availability could impact the Company's ability to provide transportation services at current levels, increase fuel costs and impact the economy. Each of these factors could have an adverse effect on the Company's operating results, financial condition or liquidity. Additionally, the Company is expected to be able to offset a significant portion of the anticipated higher fuel costs through its fuel surcharge program in 2007. However, to the extent that the Company is unable to maintain and expand its existing fuel surcharge program, increases in fuel prices could have an adverse effect on the Company's operating results, financial condition or liquidity.

***The Company depends on the stability and availability of its information technology systems.***

The Company relies on information technology in all aspects of its business. A significant disruption or failure of its information technology systems could result in service interruptions, safety failures, security violations, regulatory compliance failures and the inability to protect corporate information assets against intruders or other operational difficulties. Although the Company has taken steps to mitigate these risks, including Business Continuity Planning, Disaster Recovery Planning and Business Impact Analysis, a significant disruption could adversely affect the Company's results of operations, financial condition or liquidity. Additionally, if the Company is unable to acquire or implement new technology, it may suffer a competitive disadvantage, which could also have an adverse effect on the Company's results of operations, financial condition or liquidity.

***Personal injury claims constitute a significant expense, and increases in the amount or severity of these claims could adversely affect the Company's operating results.***

The Company is subject to various personal injury claims by third parties and employees, including claims by employees who worked around asbestos until 1985, when its use at BNSF was substantially eliminated. Personal injury claims by BNSF Railway employees are subject to the Federal Employees' Liability Act (FELA), rather than state workers' compensation laws. The Company believes that the FELA system, which includes unscheduled awards and a reliance on the jury system, has contributed to increased expenses in the past. Future events, such as increases in the number of claims that are filed, developments in legislative and judicial standards and the costs of settling claims, could result in an adverse effect on the Company's operating results.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

**TRACK CONFIGURATION**

BNSF Railway operates over a railroad system consisting of approximately 32,000 route miles of track (excluding multiple main tracks, yard tracks and sidings), approximately 23,000 miles of which are owned route miles, including easements, in 28 states and two Canadian provinces as of December 31, 2006. Approximately 9,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over other railroads' tracks.

As of December 31, 2006, the total BNSF Railway system, including single and multiple main tracks, yard tracks and sidings, consisted of approximately 49,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 10,000 route miles operated under trackage rights. At December 31, 2006, approximately 26,000 miles of BNSF Railway's track consisted of 112-pound per yard or heavier rail, including approximately 20,000 track miles of 131-pound per yard or heavier rail.

**EQUIPMENT CONFIGURATION**

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock and other equipment as of the dates shown below:

| At December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Locomotives | **6,330** | 5,790 | 5,715 |
| Freight cars: | | | |
| Covered hopper | **33,488** | 34,631 | 35,066 |
| Gondola | **13,998** | 12,579 | 16,070 |
| Open hopper | **11,277** | 10,973 | 11,257 |
| Flat | **11,382** | 8,537 | 8,132 |
| Box | **8,937** | 8,685 | 9,652 |
| Refrigerator | **4,631** | 4,983 | 5,420 |
| Autorack | **641** | 748 | 894 |
| Tank | **426** | 422 | 612 |
| Other | **341** | 323 | 273 |
| Total freight cars | **85,121** | 81,881 | 87,376 |
| Domestic chassis | **12,849** | 12,649 | 9,846 |
| Company service cars | **3,982** | 4,091 | 3,999 |
| Domestic containers | **3,275** | 10,412 | 10,501 |
| Trailers | **1,209** | 1,916 | 2,152 |
| Commuter passenger cars | **165** | 179 | 166 |
| Average age from date of manufacture–locomotive fleet (years)[a] | **15** | 15 | 15 |
| Average age from date of manufacture–freight car fleet (years)[a] | **14** | 15 | 16 |

a These averages are not weighted to reflect the greater capacities of the newer equipment.

## CAPITAL EXPENDITURES AND MAINTENANCE

### CAPITAL EXPENDITURES

The extent of the BNSF Railway's maintenance and capacity program is outlined in the following table:

| Year ended December 31, | 2007 Estimate | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| Track miles of rail laid[a] | **1,056** | **854** | 711 | 695 |
| Cross ties inserted (thousands)[a] | **3,552** | **2,957** | 3,171 | 2,695 |
| Track resurfaced (miles) | **13,824** | **12,588** | 12,790 | 11,450 |

a Includes both maintenance of existing route system and expansion projects. Expenditures for these maintenance programs are primarily capitalized.

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2006, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Liquidity and Capital Resources; Investing Activities."

BNSF's planned 2007 capital commitments are incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Executive Summary; Business Outlook for 2007."

### MAINTENANCE

As of December 31, 2006, General Electric Company, Alstom Transportation, Inc. and Electro-Motive Diesel, Inc. performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 4,150 locomotives.

## PROPERTY AND FACILITIES

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 33 major intermodal hubs located across the system. BNSF Railway's largest intermodal facilities in terms of 2006 volume were as follows:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,240,000 |
| Corwith Yard (Chicago, Illinois) | 757,000 |
| Logistics Park (Chicago, Illinois) | 727,000 |
| Willow Springs (Illinois) | 698,000 |
| Alliance (Fort Worth, Texas) | 587,000 |
| San Bernardino (California) | 569,000 |
| Cicero (Illinois) | 533,000 |
| Argentine (Kansas City, Kansas) | 372,000 |
| Memphis (Tennessee) | 318,000 |
| Seattle International Gateway (Seattle, Washington) | 307,000 |

BNSF Railway owns 23 automotive distribution facilities and serves eight port facilities where automobiles are loaded on or unloaded from multi-level rail cars in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| Classification Yards | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas City, Kansas) | 1,845 |
| Galesburg (Illinois) | 1,634 |
| Barstow (California) | 1,357 |
| Pasco (Washington) | 1,306 |
| Tulsa (Oklahoma) | 1,218 |

As of December 31, 2006, certain BNSF Railway properties and other assets were subject to liens securing $106 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway were subject to equipment obligations and leases, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

**PRODUCTIVITY**

Productivity in 2006, as measured by thousand gross ton miles per employee, improved slightly from 2005 as shown in the table below. Gross ton miles is defined as the product of the number of loaded and empty miles traveled and the combined weight of the car and contents.

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Thousand gross ton miles divided by average number of employees | **26,965** | 26,847 | 26,898 |

Volumes as measured by gross ton miles increased 6 percent in 2006 over 2005 and 5 percent in 2005 over 2004. As a result, the Company has increased employee headcounts to handle the additional volume. A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Other Matters; Employee and Labor Relations."

**BUSINESS MIX**

In serving the Midwest, Pacific Northwest and the Western, Southwestern and Southeastern regions and ports of the country, BNSF transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural and natural resource industries. Approximately 60 percent of the freight revenues originated by the Company is covered by contractual agreements of varying duration, while the balance is subject to common carrier, published prices or quotations offered by the Company. BNSF's financial performance is influenced by, among other things, general and industry economic conditions at the international, national and regional levels. The following map illustrates the Company's primary routes, including trackage rights, which allow BNSF to access major cities and ports in the western and southern United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF efficiently serves many smaller markets by working closely with approximately 200 shortline partners. BNSF has also entered into marketing agreements with CSX Transportation, Canadian National Railway Company and Kansas City Southern Railway Company, expanding the marketing reach for each railroad and their customers.




**CONSUMER PRODUCTS:**

The Consumer Products' freight business provided approximately 38 percent of freight revenues in 2006 and consisted of the following business sectors:

- **INTERNATIONAL INTERMODAL** — International business consists primarily of container traffic from steamship companies such as Maersk, Evergreen and Hyundai. International Intermodal accounted for approximately 46 percent of total Consumer Products revenues.

- **DOMESTIC INTERMODAL** — Domestic Intermodal generated approximately 46 percent of total Consumer Products revenue. The Domestic Intermodal sector is comprised of the following business areas:

  - ✓ **TRUCKLOAD/INTERMODAL MARKETING COMPANIES** — The Truckload business area is comprised of full truckload carriers such as J.B. Hunt Transportation, Schneider National and Swift Transportation. The Intermodal Marketing Companies business area is comprised of shippers' agents and consolidators such as the Hub Group.

  - ✓ **EXPEDITED TRUCKLOAD/LESS-THAN-TRUCKLOAD** — This business area is comprised of less-than-truckload carriers and parcel carriers such as United Parcel Service and YRC Worldwide. It also includes expedited truckload carriers such as Werner Enterprises, Stevens Transport and U.S. Xpress Enterprises.

- **AUTOMOTIVE** — The transportation of both assembled motor vehicles, primarily those manufactured outside of the United States, and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 8 percent of total Consumer Products revenues.

**INDUSTRIAL PRODUCTS:**

The Industrial Products' freight business provided approximately 25 percent of BNSF's freight revenues in 2006 and consisted of the following five business areas:

- **BUILDING PRODUCTS** — This sector generated approximately 33 percent of total 2006 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

- **CONSTRUCTION PRODUCTS** — The construction products sector represented approximately 32 percent of total Industrial Products revenues in 2006. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.

- **PETROLEUM PRODUCTS** — Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black. This group made up 14 percent of total Industrial Products revenues for 2006. Product use varies based on commodity and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

- **CHEMICALS AND PLASTICS PRODUCTS** — The chemicals and plastics sector represented approximately 13 percent of total 2006 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- **FOOD AND BEVERAGES** — Food and Beverages represented approximately 8 percent of total 2006 Industrial Products revenues. This group consists of beverages, canned goods and perishable food items. Other consumer goods such as cotton, salt, rubber and tires and miscellaneous boxcar shipments are also included in this business area.

**COAL:**

In 2006, the transportation of coal contributed about 20 percent of freight revenues. BNSF is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originate from the Powder River Basin of Wyoming and Montana. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast, Mountain and Pacific Northwest regions of the United States. BNSF also transports coal from the Powder River Basin to markets in Canada and the eastern United States. Demand for Powder River Basin coal has increased substantially over the past 20 years due to its relatively low sulfur content, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants.

Other BNSF coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and to Mexico.

**AGRICULTURAL PRODUCTS:**

The transportation of Agricultural Products provided approximately 17 percent of 2006 freight revenues. These products include wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company is developing and operating a shuttle network for grain and grain products, which allows more efficient use of equipment and improved cycle times. In addition to serving most grain-producing areas, BNSF serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

## FREIGHT STATISTICS

The following table sets forth certain freight statistics relating to rail operations for the periods indicated:

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Revenue ton miles (millions)* | **642,417** | 596,575 | 570,688 |
| Freight revenue per thousand revenue ton miles | **$ 22.64** | $ 21.13 | $ 18.82 |
| Average length of haul (miles) | **1,067** | 1,068 | 1,045 |

* Revenue ton miles is defined as the product of the number of loaded miles traveled and the weight of the contents.

Revenue, cars/units and average revenue per car/unit information for the three years ended December 31, 2006, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Results of Operations; Revenue Table."

## GOVERNMENT REGULATION AND LEGISLATION

The Company is subject to federal, state and local laws and regulations generally applicable to all businesses. Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of the DOT, the Occupational Safety and Health Administration (OSHA), as well as other federal and state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the profitability of BNSF's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations, including the transportation of hazardous materials. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are also subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject to, and will from time to time continue to be subject to, environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site, without regard to fault or the legality of the original conduct. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to clean up sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. Further discussion is incorporated by reference from Note 10 to the Consolidated Financial Statements.

**RAILROAD RETIREMENT**

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been almost triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II) and other benefits. For 2006, the Railroad Retirement System required up to a 20.25 percent contribution by railroad employers on eligible wages, while the Social Security and Medicare Acts only required a 7.65 percent contribution on similar wage bases.

**COMPETITION**

The business environment in which BNSF Railway operates is highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time-sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the Western region of the United States is the Union Pacific Railroad Company. Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting by the Association of American Railroads, BNSF's share of the western United States rail traffic in 2006 was approximately 49 percent.

**Item 3. Legal Proceedings**

*Ray Ridgeway, et al. v. Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company*, No. 48-185170-00 (District Court of Tarrant County, Texas, 48th Judicial District) is a state court action filed on October 27, 2000. The plaintiffs' causes of action include alleged breach of contract, negligence and breach of fiduciary duties with respect to a special dividend that was paid in 1988 by a BNSF predecessor, Santa Fe Southern Pacific Corporation (SFSP). The complaint alleges that SFSP erroneously informed shareholders as to the tax treatment of the dividend–specifically, the apportionment of the dividend as either a distribution of earnings and profits or a return of capital–which allegedly caused some shareholders to overpay their income taxes. The plaintiffs assert, through their expert's report, that SFSP had essentially no accumulated earnings and profits and that the entire dividend distribution should have been treated as a return of capital, rather than the approximately 34 percent that SFSP determined was a return of capital. Plaintiffs seek monetary damages based on a variety of theories. On July 8, 2005, the court entered an order denying the plaintiffs' requests to certify a class action. The order denying certification was affirmed by the Texas Court of Appeals on August 24, 2006, and plaintiffs' motion for rehearing of the order of the Texas Court of Appeals was denied. Plaintiffs have sought review by the Supreme Court of Texas and the Court has not yet ruled on that petition. BNSF believes these claims lack merit and that it has substantial defenses on both the merits of these claims and the attempted class action, and it is defending these claims vigorously.

Information concerning certain pending tax-related administrative or adjudicative state proceedings or appeals is incorporated by reference from Note 5 to the Consolidated Financial Statements, and information concerning other claims and litigation is incorporated by reference from Note 10 to the Consolidated Financial Statements.

**Item 4. Submission of Matters to a Vote of Security Holders**

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2006.

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Listed below are the names, ages and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation, or removal.

**MATTHEW K. ROSE, 47**

Chairman, President and Chief Executive Officer of BNSF since March 2002. Prior to that, President and Chief Executive Officer of BNSF from December 2000. Also, Chairman, President and Chief Executive Officer of BNSF Railway from December 2000.

**THOMAS N. HUND, 53**

Executive Vice President and Chief Financial Officer since January 2001. Prior to that, Senior Vice President and Chief Financial Officer and Treasurer from August 1999.

**CARL R. ICE, 50**

Executive Vice President and Chief Operations Officer since January 2001. Prior to that, Senior Vice President–Operations from June 1999.

**JOHN P. LANIGAN, JR., 51**

Executive Vice President and Chief Marketing Officer since January 2003. Prior to that, President and Chief Executive Officer of Logistics.com, Inc. (provider of ASP-based transportation procurement services to shippers and carriers) from May 2000.

**JEFFREY R. MORELAND, 62**

Executive Vice President Public Affairs since January 2007. Prior to that, Executive Vice President–Law & Government Affairs and Secretary since December 2001.

**ROGER NOBER, 42**

Executive Vice President Law and Secretary since January 2007. Prior to that, partner of Steptoe & Johnson LLP, Washington, DC (law firm) from March 2006; Chairman of the United States Surface Transportation Board from November 2002 – January 2006; and the counselor to the Deputy Secretary of Transportation of the United States Department of Transportation from May 2001 – November 2002.

**PETER J. RICKERSHAUSER, 58**

Vice President–Network Development since May 1999.

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." Information as to the high and low sales prices of such stock for the two years ending December 31, 2006, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 17 to the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 2, 2007, was 34,000.

**COMMON STOCK REPURCHASES**

The following table presents repurchases by the Company of its common stock for each of the three months for the quarter ended December 31, 2006, (shares in thousands):

**Issuer Purchases of Equity Securities**

| Period | Total Number of Shares Purchased[a] | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[b] | Maximum Number of Shares that May Yet be Purchased Under the Plans or Programs[b] |
|---|---|---|---|---|
| October 1 – 31 | 101 | $ 78.71 | 60 | 15,799 |
| November 1 – 30 | 1,294 | 76.84 | 1,271 | 14,528 |
| December 1 – 31 | 484 | 75.70 | 469 | 14,059 |
| Total | 1,879 | $ 76.65 | 1,800 | |

a Total number of shares purchased includes approximately 79 thousand shares where employees delivered already owned shares or used an attestation procedure to satisfy the exercise price of stock options or the withholding of tax payments. Total number of shares purchased does not include approximately 29 thousand shares acquired from employees to satisfy tax withholding obligations that arose on the vesting of restricted stock or the exercise of stock options.

b On July 17, 1997, the Board of Directors (the Board) initially authorized and the Company announced the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. On December 9, 1999, April 20, 2000, September 21, 2000, January 16, 2003 and December 8, 2005, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date for a total of 180 million shares authorized. The table above does not reflect 30 million shares authorized by the Board in February 2007. The share repurchase program does not have an expiration date.

**Item 6. Selected Financial Data**

The following table presents, as of and for the dates indicated, selected historical financial information for the Company (in millions, except per share data):

| December 31, | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | **$ 14,985** | $ 12,987 | $ 10,946 | $ 9,413 | $ 8,979 |
| Operating income | **$ 3,517** | $ 2,922[a] | $ 1,686[b] | $ 1,665 | $ 1,656 |
| Income before cumulative effect of accounting change | **$ 1,887** | $ 1,531[a] | $ 791[b] | $ 777[c] | $ 760 |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 5.23** | $ 4.12[a] | $ 2.14[b] | $ 2.10[c] | $ 2.01 |
| Average basic shares | **361.0** | 371.8 | 370.0 | 369.1 | 378.0 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 5.10** | $ 4.01[a] | $ 2.10[b] | $ 2.09[c] | $ 2.00 |
| Average diluted shares | **369.8** | 381.8 | 376.6 | 372.3 | 380.8 |
| Dividends declared per common share | **$ 0.90** | $ 0.74 | $ 0.64 | $ 0.54 | $ 0.48 |
| **At year end:** | | | | | |
| Total assets | **$ 31,643** | $ 30,304 | $ 28,925 | $ 26,947 | $ 25,767 |
| Long-term debt and commercial paper, including current portion | **$ 7,385** | $ 7,154 | $ 6,516 | $ 6,684 | $ 6,814 |
| Stockholders' equity | **$ 10,396** | $ 9,508 | $ 9,311 | $ 8,495 | $ 7,932 |
| Net debt to total capitalization[d] | **40.3%** | 42.7% | 39.9% | 44.0% | 46.1% |
| **For the year ended:** | | | | | |
| Total capital expenditures | **$ 2,014** | $ 1,750 | $ 1,527 | $ 1,726 | $ 1,358 |
| Depreciation and amortization | **$ 1,130** | $ 1,075 | $ 1,012 | $ 910 | $ 931 |

a 2005 operating income, income before cumulative effect of accounting change and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share.

b 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share, as described in Note 10 to the Consolidated Financial Statements.

c 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change for asset retirement obligations of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share.

d Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

**CALCULATION OF RETURN ON INVESTED CAPITAL**

BNSF's return on invested capital (ROIC), as discussed in the "Letter from the Chairman, President and Chief Executive Officer" in the Company's 2006 Annual Report, is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, other information prepared in accordance with GAAP. However, the information is included herein as management believes that ROIC provides meaningful information that can be useful in assessing the long-term performance of the Company's business and in evaluating potential strategic transactions. Below is the calculation of ROIC for the years ended December 31, 2006, 2005 and 2004 (dollars in millions).

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Average capitalization[a] | $ 21,200 | $ 19,831 | $ 19,069 |
| Operating income | $ 3,517 | $ 2,922 | $ 1,686 |
| Other expense | (40) | (37) | (4) |
| Financing charges[b] | 370 | 305 | 274 |
| 2004 charge for change in estimate of unasserted asbestos and environmental liabilities | – | – | 465 |
| Taxes[c] | (1,438) | (1,196) | (917) |
| After-tax income excluding financing charges and 2004 charge | $ 2,409 | $ 1,994 | $ 1,504 |
| Return on invested capital[d] | 11.4% | 10.1% | 7.9% |

a Average capitalization is calculated as the average of the sum of stockholders' equity, net debt (long-term debt and commercial paper plus long-term debt due within one year less cash and cash equivalents), the net present value of future long-term operating lease commitments and the receivables sold under the accounts receivable sales program for the most recent preceding 13 month ends.

b Financing charges represent the estimated interest expense included in operating lease payments and A/R sales fees.

c Taxes are calculated as the sum of monthly operating income, other expense and financing charges, multiplied by an effective tax rate respective to each month.

d Return on invested capital is calculated as the total after-tax income excluding financing charges and 2004 charge divided by average capitalization.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries (collectively BNSF, Registrant or Company). The principal operating subsidiary of BNSF is the BNSF Railway Company (BNSF Railway) through which BNSF derives substantially all of its revenues. All earnings per share information is stated on a diluted basis.

**COMPANY OVERVIEW**

Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. BNSF's primary operating subsidiary, BNSF Railway, operates one of the largest North American rail networks with about 32,000 route miles in 28 states and two Canadian provinces. Through its one operating transportation segment, BNSF Railway transports a wide range of products and commodities including Consumer Products, Industrial Products, Coal and Agricultural Products.

Additional operational information, including weekly intermodal and carload unit reports as submitted to the Association of American Railroads and annual reports submitted to the STB, are available on the Company's website at www.bnsf.com/investors.

**EXECUTIVE SUMMARY**

**FISCAL YEAR 2006 — FINANCIAL OVERVIEW**

- The Company achieved record earnings of $5.10 per share compared with 2005 earnings of $4.01 per share, which included a $0.12 per share after tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico.

- Freight revenues increased 15 percent to a record high of $14.5 billion on double-digit increases in each of our four business units.

  - ✓ Of the 15-percent increase in freight revenue, 6 percent, 6 percent and 5 percent was attributable to unit growth, price and fuel surcharges, respectively. These were partially offset by a decrease due to changes in business mix.

- Operating expenses for 2006 increased 14 percent compared with 2005, primarily due to an increase in volumes and higher fuel costs.

- Operating income increased to over $3.5 billion, an all-time record for the Company.

- Each year capital expenditures are a significant use of cash for BNSF. In 2006, BNSF increased its cash capital expenditures to $2.01 billion from $1.75 billion in the prior year primarily due to both maintenance of BNSF's track structure and additional expansion projects undertaken in 2006.

- On October 12, 2006, BNSF entered into an agreement with CSX Transportation (CSX) to create a high-volume rail corridor for reliable intermodal services on the lines connecting California, Atlanta and the rest of the fast-growing Southeast Region. The new service is expected to begin in early 2007. Additionally, based on demand, the agreement provides the opportunity for BNSF to establish an Atlanta-area intermodal facility on CSX property to provide BNSF's customers more options for their Southeast growth. This agreement is not expected to have a material impact on BNSF's results of operations in the near term.

- In January 2007, the STB issued a decision finding that the application of fuel surcharges that are not closely linked to actual fuel costs would be unreasonable. Surcharges applied to STB-regulated traffic arbitrarily calculated as a percentage of the base rate were expressly prohibited. Except with respect to certain exempt contract movements, where fuel surcharges may or may not be applicable, the Company already utilizes a mileage-based fuel surcharge program, which complies with the STB's decision in two of its four business areas, Coal and Agricultural Products. In accordance with the STB's decision, the Company plans to implement a compliant fuel surcharge program on all other applicable STB regulated traffic in the near future. The STB's decision does not apply to any movements made pursuant to existing or future private contracts or to transportation of any commodities that are exempt from regulation (e.g., intermodal traffic). The Company is currently assessing the impact of this decision and anticipates it will not likely have a material impact.

**BUSINESS OUTLOOK FOR 2007**

- BNSF expects to see revenue growth in the 7 to 8 percent range.

- Combining projected revenue growth with an ongoing focus on productivity, earnings per share is anticipated to grow in the low-teens (11 to 13 percent) despite being negatively impacted by a year-over-year $150 million headwind resulting principally from a reduction in fuel hedges.

- The Company anticipates that the operating ratio (calculated as operating expenses less other revenues divided by freight revenues) will be approximately 75 percent.

- The Company plans to increase its capital commitment program, which includes both cash spent for capital and locomotive leases, to approximately $2.75 billion in 2007 from $2.67 billion in 2006.

  - ✓ Capital commitments are increasing to meet projected future demand, while the Company anticipates improving its return on invested capital.

  - ✓ BNSF anticipates spending $1.6 billion to keep its infrastructure strong by refreshing track, signal systems, structures, rebuilding rolling stock and implementing new technologies.

  - ✓ BNSF also plans to acquire 200 locomotives at a cost of approximately $350 million.

  - ✓ The Company anticipates investing approximately $750 million in capacity expansion programs.

## RESULTS OF OPERATIONS

### REVENUE TABLE

The following table presents BNSF's revenue information by business group for the years ended December 31, 2006, 2005 and 2004. Certain comparative prior year revenue amounts have been reclassified between the business groups to conform to the current year presentation. There was no impact to total freight revenues as a result of these reclassifications.

| | Revenues (in millions) | | | Cars / Units (in thousands) | | | Average Revenue Per Car / Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| Year ended December 31, | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Consumer products | **$ 5,613** | $ 4,898 | $ 4,025 | **5,520** | 5,215 | 4,770 | **$ 1,017** | $ 939 | $ 844 |
| Industrial products | **3,589** | 3,128 | 2,670 | **1,686** | 1,655 | 1,650 | **2,129** | 1,890 | 1,618 |
| Coal | **2,916** | 2,448 | 2,277 | **2,458** | 2,238 | 2,216 | **1,186** | 1,094 | 1,028 |
| Agricultural products | **2,427** | 2,132 | 1,770 | **973** | 916 | 900 | **2,494** | 2,328 | 1,967 |
| Total freight revenues | **14,545** | 12,606 | 10,742 | **10,637** | 10,024 | 9,536 | **$ 1,367** | $ 1,258 | $ 1,126 |
| Other revenues | **440** | 381 | 204 | | | | | | |
| Total operating revenues | **$ 14,985** | $ 12,987 | $ 10,946 | | | | | | |

### EXPENSE TABLE

The following table presents BNSF's expense information for the years ended December 31, 2006, 2005 and 2004 (in millions):

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Compensation and benefits | **$ 3,816** | $ 3,515 | $ 3,322 |
| Fuel | **2,734** | 1,959 | 1,335 |
| Purchased services | **1,906** | 1,713 | 1,424 |
| Depreciation and amortization | **1,130** | 1,075 | 1,012 |
| Equipment rents | **930** | 886 | 790 |
| Materials and other | **952** | 917 | 1,377[a] |
| Total operating expenses | **$ 11,468** | $ 10,065 | $ 9,260 |
| Interest expense | **$ 485** | $ 437 | $ 409 |
| Other expense, net | **$ 40** | $ 37 | $ 4 |
| Income tax expense | **$ 1,105** | $ 917 | $ 482 |

a 2004 materials and other expense includes a $465 million pre-tax charge related to changes in estimates of the Company's unasserted asbestos and environmental liabilities (see Note 10 to the Consolidated Financial Statements for additional information).

### YEAR ENDED DECEMBER 31, 2006, COMPARED WITH YEAR ENDED DECEMBER 31, 2005

BNSF recorded net income for 2006 of $1,887 million, or $5.10 per share. In comparison, net income for 2005 was $1,531 million, or $4.01 per share, which included a $0.12 per share impairment charge related to an agreement to sell certain line segments to the State of New Mexico (see Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "New Mexico Department of Transportation").

***REVENUES***

***FREIGHT***

Freight revenues of $14,545 million for 2006 were $1,939 million, or 15 percent higher than 2005. Freight revenues reflected a 6-percent increase in volumes. Freight revenues include approximately $1.7 billion in fuel surcharges compared with approximately $1.1 billion in the prior year. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005.

***CONSUMER PRODUCTS***

The Consumer Products' freight business includes a significant intermodal component and consists of the following three business areas: international intermodal, domestic intermodal and automotive.




Consumer Products revenues of $5,613 million for 2006 were $715 million, or 15 percent greater than 2005. The increase in average revenue per unit of 8 percent was primarily related to price increases and increased fuel surcharges. Additionally, cars/units increased by 6 percent due primarily to growth in international intermodal.

***INDUSTRIAL PRODUCTS***

Industrial Products' freight business consists of five business areas: building products, construction products, petroleum products, chemicals and plastics products and food and beverages.




Industrial Products revenues increased $461 million, or 15 percent, to $3,589 million for 2006. The revenue increase was driven by double-digit growth in four of the five business areas. The 13-percent increase in average revenue per car was the result of price increases and increased fuel surcharges. Units increased 2 percent driven by demand for plastics, petroleum products and steel, partially offset by softness in demand for building products.

***COAL***

BNSF is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originate from the Powder River Basin of Wyoming and Montana.

Coal revenues of $2,916 million for 2006 increased $468 million, or 19 percent, versus a year ago. The revenue increase was primarily driven by a 10-percent increase in volumes resulting from significant customer demand and greater line throughput due to increased network fluidity. Average revenue per car increased 8 percent driven by contractual price escalations, increased length of haul and fuel surcharges.

***AGRICULTURAL PRODUCTS***

The Agricultural Products' freight business transports agricultural products including corn, wheat, soybeans, bulk foods, fertilizer and other products.




Agricultural Products revenues of $2,427 million for 2006 were $295 million, or 14 percent higher than revenues for 2005. This increase was primarily due to a 7-percent increase in average revenue per car, which was driven by both price increases and increased fuel surcharges associated with higher fuel prices, and a 6-percent increase in volume driven primarily by an increase in demand for corn.

***OTHER REVENUES***

Other revenues increased $59 million, or 15 percent, to $440 million for 2006 compared to 2005. This increase was primarily due to increases in demurrage charges and volume growth of BNSF Logistics, an indirect, wholly-owned non-rail subsidiary that specializes in providing third-party logistics and transportation services.

***EXPENSES***

Total operating expenses for 2006 were $11,468 million, an increase of $1,403 million, or 14 percent over 2005. The increase in operating expenses was primarily the result of significant fuel price increases and a 6-percent increase in gross-ton miles handled. Operating expenses for 2005 were impacted by a $71 million pre-tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico.

***COMPENSATION AND BENEFITS***

Compensation and benefits includes expenses for BNSF employee compensation and benefit programs. The primary factors influencing the expenses recorded are volume, headcount, utilization, wage rates, incentives earned during the period, benefit plan participation and pension expenses.

Compensation and benefits expenses of $3,816 million were $301 million, or 9 percent higher than 2005. The increase was primarily related to 6 percent higher unit volumes, which resulted in a 5-percent increase in the average headcount. Additionally, increased stock-based compensation expense of approximately $30 million, due largely to the adoption of Statement of Financial Accounting Standards (SFAS) No. 123R, *Share-Based Payment*, and increased pension expense of approximately $30 million contributed to the overall increase in compensation and benefits expense as compared with the prior year.

***FUEL***

Fuel expense is driven by market price, the level of locomotive consumption of diesel fuel and the effects of hedging activities.

Fuel expenses of $2,734 million for 2006 were $775 million, or 40 percent, higher than 2005. The increase in fuel expense is due to an increase in the average all-in cost per gallon of diesel fuel, as well as an increase in consumption driven by higher volumes. The average all-in cost per gallon of diesel fuel increased by 45 cents to $1.85, or $661 million, which is comprised of an increase in the average purchase price of 32 cents, or $471 million, and a decrease in the hedge benefit of 13 cents, or $190 million (2006 benefit of $341 million less 2005 benefit of $531 million). Consumption in 2006 was 1,478 million gallons compared with 1,402 million gallons in 2005, resulting in a $114 million increase in fuel expense.

***PURCHASED SERVICES***

Purchased services expense includes ramping (lifting of containers onto and off of cars); drayage (highway movements to and from railway facilities); maintenance of locomotives, freight cars and equipment; transportation costs over other railroads; technology services outsourcing; professional services; and other contract services provided to BNSF. Purchased services expense also includes purchased transportation costs for BNSF Logistics. The expenses are driven by the rates established in the related contracts and the volume of services required.

Purchased services expenses of $1,906 million for 2006 were $193 million, or 11 percent higher than 2005. This increase was primarily due to increases in the following volume-related costs of approximately (i) $50 million in intermodal ramp costs; (ii) $40 million in haulage payments for transportation over other railroads; (iii) $35 million in locomotive, freight car and equipment maintenance expense; and (iv) $25 million in purchased transportation costs for BNSF Logistics.

***DEPRECIATION AND AMORTIZATION***

Depreciation and amortization expenses for the period are determined by using the group method of depreciation, applying a single rate to the gross investment in a particular class of property. Due to the capital-intensive nature of BNSF's operations, depreciation expense is a significant component of the Company's operating expense. The full effect of inflation is not reflected in operating expenses since depreciation is based on historical cost.

Depreciation and amortization expenses of $1,130 million for 2006 were $55 million, or 5 percent higher than 2005. This increase was primarily due to ongoing capital expenditures.

***EQUIPMENT RENTS***

Equipment rents expense includes long-term and short-term payments primarily for locomotives, freight cars, containers and trailers. The expense is driven primarily by volume, lease and rental rates, utilization of equipment and changes in business mix resulting in equipment usage variances.

Equipment rents expenses for 2006 of $930 million were $44 million, or 5 percent higher than 2005 driven by an increase of approximately $45 million in locomotive rents, which was largely the result of an increase in the number of locomotives under operating leases. Freight car equipment was essentially flat year-over-year due to the impact of increasing volumes being offset by the impact of the Company's privatization efforts, velocity improvements and an increase in off-line receipts.

***MATERIALS AND OTHER***

Material expenses consist mainly of the costs involved to purchase mechanical and engineering materials and other items for construction and maintenance of property and equipment. Other expenses include personal injury claims, environmental remediation and derailments as well as utilities, impairments of long-lived assets, locomotive overhauls, property and miscellaneous taxes and employee separation costs. The total is offset by gains on land sales and insurance recoveries.

Materials and other expenses of $952 million for 2006, which consisted of approximately $425 million of materials expense with the remainder consisting of numerous other items, were $35 million, or 4 percent higher than 2005. The increase was primarily due to increases of approximately (i) $65 million in materials costs for locomotives, freight cars and track structure; (ii) $35 million in crew transportation and lodging expense; (iii) $20 million in property taxes; and (iv) $20 million in expense related to derailments. These increases were offset by a $22 million gain from a line sale to the State of New Mexico recorded in 2006. Expenses for 2005 were impacted by a $71 million pre-tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico.

***INTEREST EXPENSE***

Interest expense of $485 million for 2006 was $48 million, or 11 percent higher than 2005. This increase was primarily the result of a higher average debt balance.

***INCOME TAXES***

The effective rate in 2006 was 36.9 percent compared with 37.5 percent for the prior year. The decrease in the effective tax rate primarily reflects income tax adjustments, which favorably impacted income tax expense in 2006 by $22 million as compared with 2005.

**YEAR ENDED DECEMBER 31, 2005, COMPARED WITH YEAR ENDED DECEMBER 31, 2004**

BNSF recorded net income for 2005 of $1,531 million, or $4.01 per share, which included a $0.12 per share impairment charge related to an agreement to sell certain line segments to the State of New Mexico (see Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "New Mexico Department of Transportation"). In comparison, net income for 2004 was $791 million, or $2.10 per share, which included a $288 million, net of tax, or $0.77 per share charge for a change in the Company's estimate of unasserted asbestos liabilities and environmental liabilities (see Note 10 to the Consolidated Financial Statements for additional information).

***REVENUES***

***FREIGHT***

Freight revenues of $12,606 million for 2005 were $1,864 million, or 17 percent, higher than 2004. Freight revenues were up due to a 5-percent increase in volume. Freight revenues in 2005 included fuel surcharges of approximately $1.1 billion compared with approximately $350 million in the prior year. Growth in prices and fuel surcharges drove average revenue per car/unit up 12 percent in 2005 to $1,258 from $1,126 in 2004.

***CONSUMER PRODUCTS***

Consumer Products revenues of $4,898 million for 2005 were $873 million, or 22 percent, greater than 2004. The increase in Consumer Products revenues was strong in all sectors. The increase in average revenue per unit of 11 percent was primarily related to price increases and increased fuel surcharges.



***INDUSTRIAL PRODUCTS***

Industrial Products revenues increased $458 million, or 17 percent, to $3,128 million for 2005. The revenue increase was primarily due to increased lumber and panel traffic in the building products sector, as well as increased traffic in petroleum products, partially offset by decreased volumes in waste products in the building products sector as well as steel and taconite in the construction products sector. Price increases along with increased fuel surcharges contributed to a 17 percent increase in average revenue per car.




***COAL***

Coal revenues of $2,448 million for 2005 increased $171 million, or 8 percent, versus the preceding year. Coal volumes increased slightly as a result of new customer business volumes and higher demand from existing customers, partially offset by weather-related operational and maintenance disruptions in the Powder River Basin. Average revenue per car increased 6 percent primarily driven by contractual price escalations and increased average length of haul.

***AGRICULTURAL PRODUCTS***

Agricultural Products revenues of $2,132 million for 2005 were $362 million, or 20 percent, higher than revenues for 2004. Average revenue per car increased 18 percent primarily driven by mix as a result of strong exports out of the Pacific Northwest, price increases and increased fuel charges.




***OTHER REVENUES***

Other revenues increased $177 million, or 87 percent, to $381 million for 2005 compared to 2004. This increase was primarily attributable to increases in storage-related revenues and volume growth, in addition to the acquisitions by and volume growth of BNSF Logistics.

***<u>EXPENSES</u>***

Total operating expenses for 2005 were $10,065 million, an increase of $805 million, or 9 percent, over 2004. The increase in operating expenses was the result of significant fuel price increases, a 5-percent increase in gross-ton miles handled and a $71 million pre-tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico, offset by lower asbestos and environmental costs due to the $465 million pre-tax charge taken in 2004 to reflect changes in the Company's estimate of unasserted asbestos liabilities and environmental liabilities.

***COMPENSATION AND BENEFITS***

Compensation and benefits expenses of $3,515 million were $193 million, or 6 percent, higher than 2004. The increase was primarily related to the significant increase in freight volumes experienced in 2005. The increases in freight volumes drove an increase in crew training costs and an approximate 5 percent increase in employee headcount.

***FUEL***

Fuel expenses of $1,959 million for 2005 were $624 million, or 47 percent, higher than 2004. The increase in fuel expense is due to an increase in the average all-in cost per gallon of diesel fuel, as well as an increase in consumption driven by higher volumes. The average all-in cost per gallon of diesel fuel increased by 40 cents, or $566 million, which is comprised of an increase in the average purchase price of 53 cents, or $759 million, partially offset by an increase in the hedge benefit of 13 cents, or $193 million (2005 benefit of $531 million less 2004 benefit of $338 million). Consumption in 2005 was 1,402 million gallons compared with 1,344 million gallons in 2004, resulting in a $58 million increase in fuel expense.

***PURCHASED SERVICES***

Purchased services expenses of $1,713 million for 2005 were $289 million, or 20 percent, higher than 2004. This increase was primarily due to increases in the following volume-related costs of approximately (i) $75 million in intermodal ramp costs; (ii) $70 million in locomotive, freight car and equipment maintenance expense; (iii) $45 million in purchased transportation costs for BNSF Logistics; and (iv) $30 million in payments for transportation over other railroads.

***DEPRECIATION AND AMORTIZATION***

Depreciation and amortization expenses of $1,075 million for 2005 were $63 million, or 6 percent, higher than 2004. This increase was primarily due to ongoing capital expenditures.

***EQUIPMENT RENTS***

Equipment rents expenses for 2005 of $886 million were $96 million, or 12 percent, higher than 2004. Expense increases of $70 million for freight car equipment and $26 million for locomotive leases were driven by increases in units resulting from significant volume increases as well as higher lease rates.

***MATERIALS AND OTHER***

Materials and other expenses of $917 million for 2005, which consists of approximately $359 million of materials expense with the remainder consisting of numerous other items, were $460 million, or 33 percent, lower than 2004. In 2005, materials and other expense was impacted by an impairment charge of $71 million related to the future sale of certain line segments as well as $70 million of increased material costs for locomotives, freight cars and track structure, partially offset by lower environmental and personal injury expense in 2005. However, the $465 million pre-tax charge recorded in 2004 to reflect a change in BNSF's estimates of unasserted asbestos and environmental liabilities more than offset these changes by a significant amount.

***INTEREST EXPENSE***

Interest expense of $437 million for 2005 was $28 million, or 7 percent, higher than 2004. This increase was primarily the result of higher average interest rates in 2005.

***OTHER EXPENSE, NET***

Other expense of $37 million for 2005 was $33 million higher than in 2004. The increase in other expense, net was predominantly due to the receipt of interest income on a settlement that occurred in 2004, losses on BNSF's participation in a synthetic fuel partnership for which tax credits are generated and higher accounts receivable sales fees driven primarily by higher interest rates.

## LIQUIDITY AND CAPITAL RESOURCES

Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance, including commercial paper, through leasing of assets and through the sale of a portion of its accounts receivable.

**OPERATING ACTIVITIES**

***2006***

Net cash provided by operating activities was $3,108 million during 2006 compared with $2,609 million during 2005. The increase was primarily the result of an increase in earnings before depreciation and amortization expense.

***2005***

Net cash provided by operating activities was $2,609 million during 2005 compared with $2,377 million during 2004. The increase was primarily the result of an increase in earnings before the effect of the 2004 third quarter charge related to a change in BNSF's estimates of unasserted asbestos liabilities and environmental liabilities, which had no impact on the Company's cash flows (see note 10 to the Consolidated Financial Statements for additional information) partially offset by a use of cash related to the $350 million decrease in the Company's accounts receivable sales program (see Note 6 to the Consolidated Financial Statements for additional information). The decrease in the Company's accounts receivable sales program resulted in higher commercial paper (see Note 9 to the Consolidated Financial Statements for additional information).

**INVESTING ACTIVITIES**

***2006***

Net cash used for investing activities was $2,086 million during 2006 compared with $2,023 million during 2005. Investing activities for the year included $2,014 million of capital expenditures, which were $264 million higher than 2005 primarily due to an increase in capital expenditures for maintenance of BNSF's track structure and for terminal and line expansions as illustrated in the table below. The decrease in cash used for other investing activities primarily reflects timing of equipment financing activities, $50 million in consideration received for the third easement sale to Seattle Sound Transit and $45 million in consideration received for the New Mexico line sale as discussed in the "Other Matters" section. Additionally, 2005 included consideration paid to another carrier for trackage rights and alternative access rights (see Note 7 to the Consolidated Financial Statements for additional information) and an investment in Pace Synfuels.

***2005***

Net cash used for investing activities was $2,023 million during 2005 compared with $1,595 million during 2004. Investing activities for the year included $1,750 million of capital expenditures, which were $223 million higher than 2004 primarily due to an increase in capital expenditures for maintenance of BNSF's track structure and for terminal and line expansions. The increase in cash used for other investing activities primarily reflects the timing of equipment financing activities, consideration paid to another carrier for trackage rights and alternative access rights (see Note 7 to the Consolidated Financial Statements for additional information), line acquisitions and an investment in Pace Synfuels as well as a $26 million cash source in the first quarter of 2004 related to the consolidation of San Jacinto Rail Limited (see Note 7 to the Consolidated Financial Statements for additional information).

A breakdown of cash capital expenditures during 2006, 2005 and 2004 is set forth in the following table (in millions):

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Maintenance of way: | | | |
| Rail | **$ 304** | $ 232 | $ 219 |
| Ties | **311** | 284 | 257 |
| Surfacing | **214** | 183 | 159 |
| Other | **397** | 354 | 359 |
| Total maintenance of way | **1,226** | 1,053 | 994 |
| Mechanical | **152** | 136 | 114 |
| Information services | **65** | 64 | 73 |
| Other | **121** | 108 | 107 |
| Total maintenance of business | **1,564** | 1,361 | 1,288 |
| New locomotive acquisitions | **–** | – | 16 |
| Terminal and line expansion | **450** | 389 | 223 |
| Total | **$ 2,014** | $ 1,750 | $ 1,527 |

The table above does not include expenditures for equipment financed through operating leases (principally related to locomotives).

**FINANCING ACTIVITIES**

***2006***

Net cash used for financing activities during 2006 was $722 million, primarily related to common stock repurchases of $730 million and dividend payments of $310 million, which where partially offset by net debt borrowings of $116 million, proceeds from stock options exercised of $116 million and excess tax benefits from equity compensation plans of $95 million. Upon adoption of SFAS No. 123R, the excess tax benefits from equity compensation plans were classified in financing activities. However, as the Company adopted SFAS No. 123R prospectively, financial statements prior to January 1, 2006, include excess tax benefits as an operating activity.

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper. See Note 3 to the Consolidated Financial Statements for information related to the hedges unwound as part of this debt issuance.

Aggregate debt to mature in 2007 is $473 million. BNSF's ratio of net debt to total capitalization was 40.3 percent at December 31, 2006, compared with 42.7 percent at December 31, 2005. The Company's adjusted net debt to total capitalization was 51.1 percent at December 31, 2006, compared with 51.5 percent at December 31, 2005. BNSF's adjusted net debt to total capitalization is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, the information prepared in accordance with GAAP. However, management believes that adjusted net debt to total capitalization provides meaningful additional information about the ability of BNSF to service long-term debt and other fixed obligations and to fund future growth.

The following table presents a reconciliation of the calculation of adjusted net debt to total capitalization percentage:

| **Year ended December 31,** | **2006** | **2005** |
|---|---|---|
| Net debt to total capitalization [a] | **40.3 %** | 42.7 % |
| Adjustment for long-term operating leases [b] | **11.4** | 9.4 |
| Adjustment for other debt equivalents [c] | **0.6** | 0.6 |
| Adjustment for junior subordinated notes [d] | **(1.2)** | (1.2) |
| Adjusted net debt to total capitalization | **51.1 %** | 51.5 % |

a Net debt to total capitalization is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents divided by the sum of net debt and total stockholders' equity.

b Represents the net present value of future operating lease commitments.

c Adjustment for other debt equivalents principally includes accounts receivable financing (see Note 6 to the Consolidated Financial Statements for additional information).

d Junior subordinated notes are included in total debt on the respective Consolidated Balance Sheets; however, as they include certain equity characteristics as described below, they have been assigned 50 percent equity credit for purposes of this calculation.

Pursuant to existing Board authority as of December 31, 2006, BNSF could issue up to an additional $700 million of debt securities through the SEC debt shelf registration process. In February 2007, the Board authorized an additional $1.4 billion of debt securities that may be issued through the SEC debt shelf registration process, for a total of $2.1 billion of debt securities now authorized to be issued.

***2005***

Net cash used for financing activities during 2005 was $833 million primarily related to common stock repurchases of $799 million, prepaid forward share repurchases of $600 million and dividend payments of $267 million, which where partially offset by net debt borrowings of $599 million and proceeds from stock options exercised of $244 million.

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month London Interbank Offered Rate (LIBOR) rate plus 2.35 percent, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company would not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company would be required to sell common stock, the proceeds of which would be used to pay any accrued and unpaid interest. At December 31, 2006, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance were used to repurchase common stock, with the remainder used for general corporate purposes.

***2004***

Net cash used for financing activities during 2004 was $478 million primarily related to the following: (i) dividend payments of $231 million; (ii) net debt repayments of $292 million; and (iii) common stock repurchases of $376 million, which were offset by proceeds from stock options exercised of $420 million.

The Company issued $250 million of 4.88 percent notes due January 15, 2015. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

#### DIVIDENDS

Common stock dividends declared were $0.90, $0.74 and $0.64 per share annually for 2006, 2005 and 2004, respectively. Dividends paid on common stock were $310 million, $267 million and $231 million during 2006, 2005 and 2004, respectively. On October 19, 2006, the Board declared a quarterly dividend of $0.25 per share on outstanding shares of common stock, payable January 2, 2007, to shareholders of record on December 12, 2006. On February 14, 2007, the Board declared a quarterly dividend of $0.25 per share on outstanding shares of common stock, payable April 2, 2007, to shareholders of record on March 12, 2007.

#### COMMON STOCK REPURCHASE PROGRAM

During 2006, 2005 and 2004, the Company repurchased approximately 18 million, 14 million and 10 million shares, respectively, of its common stock at average prices of $73.43 per share, $54.95 per share and $35.98 per share, respectively. Further information on this repurchase program is incorporated by reference from Note 15 to the Consolidated Financial Statements.

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized in equal amounts in July 1997, December 1999, April 2000, September 2000, January 2003 and December 2005.

Since 2001, BNSF has primarily utilized free cash flow to repurchase its shares. In February 2007, BNSF announced it will modify its share repurchase approach based on improved credit statistics over the past few years, including interest coverage, debt-to-cash flow and debt-to-capital ratios. These credit statistics have improved sufficiently that BNSF now intends to devote additional financial capacity to share repurchases. This difference in approach is expected to result in a moderately higher level of debt.

#### LONG-TERM DEBT AND OTHER OBLIGATIONS

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities, which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

During 2006, BNSF agreed to acquire an additional 120 locomotives, bringing its total commitment to acquire 965 new locomotives by 2009. As of December 31, 2006, BNSF had taken delivery of 765 of the 965 locomotives, including 362 during 2006.

During 2006, BNSF agreed to acquire 4,000 covered hoppers, 1,400 double-stack cars and 600 centerbeams by 2010. As of December 31, 2006, BNSF had taken delivery of the 600 centerbeams and 100 of the double-stacked cars.

The locomotives and freight cars under these agreements have been or are expected to be financed from one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at that time.

The Company also utilizes a commercial paper program backed by a bank revolving credit agreement to manage liquidity needs. For 2007 and the foreseeable future, the Company expects that cash from operating activities, access to capital markets, the accounts receivable sales program and the bank revolving credit agreement will be sufficient to enable the Company to meet its obligations when due. The Company believes these sources of funds will also be sufficient to fund capital additions that are necessary to maintain its competitiveness and position the Company for future revenue growth.

The Company's ratio of earnings to fixed charges was 4.89 and 4.62 times for the years ended December 31, 2006 and 2005, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 43 percent and 39 percent for the years ended December 31, 2006 and 2005, respectively. The increase in the ratio of net cash provided by operating activities divided by total average debt is primarily due to increased earnings.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2006, (in millions):

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less than 1 year** | **1–3 years** | **3–5 years** | **More than 5 years** |
| Long-term debt [a] | $ 6,776 | $ 352 | $ 309 | $ 1,623 | $ 4,492 |
| Capital lease obligations | 609 | 121 | 223 | 109 | 156 |
| Interest payments [b] | 7,050 | 413 | 779 | 700 | 5,158 |
| Operating lease obligations [c] | 7,496 | 640 | 1,307 | 1,099 | 4,450 |
| Purchase obligations [d] | 10,875 | 2,968 | 1,470 | 1,253 | 5,184 |
| Other long-term liabilities reflected on the balance sheet under GAAP [e] | 453 | 48 | 101 | 259 | 45 |
| Total contractual obligations | $ 33,259 | $ 4,542 | $ 4,189 | $ 5,043 | $ 19,485 |

a Excludes capital lease obligations.

b Interest payments relate to fixed-rate long-term debt and capital lease obligations and exclude the impact of any interest-rate hedging activities (see Note 3 to the Consolidated Financial Statements for additional information). Additionally, the Company's only variable-rate debt is commercial paper, which expires within 90 days; therefore, the related interest has been excluded from the table above.

c Gross payments due, which include an interest component.

d Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.

e Consists of employee separation payments as discussed in Note 11 to the Consolidated Financial Statements and actuarially estimated payments expected to be made over the next five years for the pension plans and the retiree health and welfare plan as discussed in Note 13 to the Consolidated Financial Statements.

In the normal course of business, the Company enters into long-term contracts for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

#### CREDIT AGREEMENT

Commercial paper and the revolving credit agreement are discussed in Note 9 to the Consolidated Financial Statements. The revolving credit agreement includes covenants and events of default typical for this type of facility, including a maximum debt-to-capital test and a $75 million cross-default provision. At December 31, 2006, the Company was in compliance with its debt covenants. BNSF's maximum debt-to-capital test provides approximately $8 billion of debt capacity above BNSF's outstanding debt as of December 31, 2006, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreement. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

### OFF-BALANCE SHEET ARRANGEMENTS

#### SALE OF ACCOUNTS RECEIVABLE

The accounts receivable sales program of Santa Fe Receivables Corporation, as described in Note 6 to the Consolidated Financial Statements, includes various provisions that, if triggered, would allow the investors participating in this program, at their option, to cancel the program. These provisions include a maximum debt-to-capital test, which is the same as in the BNSF revolving credit agreements described above. BNSF's maximum debt-to-capital test provides approximately $8 billion of debt capacity above BNSF's outstanding debt as of December 31, 2006. At December 31, 2006, the Company's capacity to sell undivided interests to investors under the accounts receivable sales program was $700 million, which was comprised of two $350 million, 364-day accounts receivable facilities. The Company amended these facilities in November 2006, modifying their maturities to November 2007. Management expects to be able to either extend the commitment of the current investors under the accounts receivable sales program past November 2007 or to find additional investors in the accounts receivable sales program who will commit to purchase undivided interests after November 2007.

The accounts receivable sales program provides efficient financing at a competitive interest rate as compared with traditional borrowing arrangements and provides diversification of funding sources. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables (see Note 6 to the Consolidated Financial Statements for additional information).

#### GUARANTEES

The Company acts as guarantor for certain debt and lease obligations of others. During the past few years, the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future (see Note 9 to the Consolidated Financial Statements for additional information).

### INFLATION

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

### OTHER MATTERS

#### COMMERCIAL

In July 2004, BNSF Railway initiated an arbitration proceeding under a Joint Service Agreement (JSA) with a major truckload carrier (the "carrier") with which BNSF Railway handles substantial joint intermodal movements. In the proceeding, BNSF Railway sought an increase in its divisions of joint revenue for intermodal movements. Additionally, the carrier challenged the basis of the divisions and raised other issues under the JSA. An Interim Award decision was issued by the arbitration panel on September 16, 2005, increasing BNSF's revenue divisions, and favorably resolving other issues raised in the proceeding. Both parties accepted the Interim Award as the final and binding award in the arbitration on October 17, 2005. By agreement of the parties, on October 19, 2005, the panel entered an order terminating the proceeding. In the fourth quarter of 2005, BNSF recorded a gain of approximately $26 million pre-tax, $16 million, net of tax, or $0.04 per share, as a result of this retroactive award of compensation for the period of July 7, 2004 through September 30, 2005. Of this gain, $21 million was recorded as an increase in Consumer Products revenue, and the remaining $5 million was recorded in purchased services expense as a reimbursement of legal fees.

In February 2005, the Company received a Civil Investigative Demand from the Antitrust Division of the Department of Justice requesting information concerning the Company's pricing activities relating to the shipment of coal from the southern Powder River Basin. The Company continues to respond to requests for information.

#### HEDGING ACTIVITIES

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended*, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

##### *FUEL*

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties. BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance (see Note 3 to the Consolidated Financial Statements for additional information).

***INTEREST RATE***

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates, establishing rates in anticipation of future debt issuances and converting a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy. BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements (see Note 3 to the Consolidated Financial Statements for additional information).

In anticipation of a future debt issuance, BNSF entered into six treasury locks between January 1, 2007, and February 6, 2007, totaling $250 million to fix the treasury component of the expected debt issuance. The treasury locks are expected to be unwound during the second quarter of 2007. Any gain or loss on the treasury locks will be amortized to interest expense over the life of the issued debt.

**EMPLOYEE AND LABOR RELATIONS**

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. A negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 2004. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention) are exhausted. Agreements undergoing renegotiation in the current bargaining round provide for periodic wage increases until new agreements are reached.

The current bargaining round for all unions with contracts that came into effect after January 1, 2005, began on and after November 1, 2004, with the serving of Section 6 notices, which are each side's initial proposals. BNSF Railway is participating in coordinated national handling of these proposals. The current agreements remain in effect until new agreements are reached or until changes to the existing agreements are made.

**SEATTLE SOUND TRANSIT**

In December 2003, the Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority established by King, Pierce and Snohomish counties within the State of Washington. BNSF has agreed to sell to Sound Transit under the threat of condemnation a combination of (a) four easements enabling Sound Transit to offer commuter rail service over existing BNSF track from Seattle to Everett and (b) 18 miles of railroad line from south of Tacoma to Nisqually, Washington.

Sound Transit agreed to pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett and entered into agreements both for service on the commuter easements and joint use of track for commuter and freight purposes. The Company received approximately $80 million of cash in 2003 upon the closing of the first easement, $80 million of cash in 2004 upon closing of the second easement and $50 million of cash in 2006 upon closing of the third easement. The sale proceeds will be recognized in income over the use of the associated track structure (approximately 37 years). In 2007, upon the final closing subject to conditions in the sale agreement, BNSF will receive an additional $50 million for the remaining easement.

Additionally, the Company sold 18 miles of railroad line and associated real estate from south of Tacoma to Nisqually in several separate transactions. The Company recognized gains associated with the sale of $9 million and $7 million, net of tax, in 2005 and 2004, respectively.

#### NEW MEXICO DEPARTMENT OF TRANSPORTATION

In the fourth quarter of 2005, BNSF Railway Company entered into agreements with the New Mexico Department of Transportation to sell the Company's rail line and certain adjacent property between Belen, New Mexico and Trinidad, Colorado, through a series of sales agreements, while maintaining freight easement rights on the line. The Company recognized an impairment charge in 2005 related to this agreement of $71 million. During the first quarter of 2006, upon the closing of the sale of the first of the line segments, the Company recognized a gain of $22 million and received a cash payment of $45 million. Upon satisfaction of closing conditions, the remaining agreements are expected to close over the next two years. BNSF expects to receive cash payments of $18 million in 2007 and $4 million in 2008 related to these transactions. The impairment charge and the gain were recorded as a component of materials and other expense.

#### AMERICAN JOBS CREATION ACT OF 2004

In October 2004, the American Jobs Creation Act of 2004 was signed into law. Part of the legislation includes the repeal of a 4.3–cent tax per gallon of diesel fuel. The tax is being gradually phased out in 2005 and 2006 and will be completely phased out by 2007. Based on actual and projected fuel consumption, the repeal of the tax resulted in approximately $21 million and $8 million in incremental savings in 2005 and 2006, respectively, and is expected to result in incremental savings of approximately $34 million for BNSF in 2007.

### CRITICAL ACCOUNTING ESTIMATES

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors, and the Audit Committee has reviewed the Company's disclosure relating to them in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

#### LEGAL

BNSF's most significant legal claims relate to personal injury claims and environmental matters. These claims are discussed in more detail below.

During 2004, BNSF recorded a $465 million pre-tax charge to reflect changes in its estimate of unasserted asbestos liabilities and environmental liabilities. Of this amount, $293 million and $172 million were related to unasserted asbestos and environmental liabilities, respectively. The $465 million pre-tax charge was recorded in materials and other expense and reduced net income by $288 million, or $0.77 per share during 2004.

##### *PERSONAL INJURY*

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded.

***ASBESTOS***

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967, until they were substantially eliminated at BNSF by 1985.

Prior to 2000, claim filings against the Company for asbestos were not numerous and were sporadic. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. The Company believed, however, that the low end of the range of reasonably possible loss, as that term is used in Financial Accounting Standards Board (FASB) Interpretation No. (FIN) 14, *Reasonable Estimation of the Amount of a Loss,* was immaterial. Subsequent to this period, claim filings increased and, when they continued into 2004, the Company concluded that the low end of the range of reasonably possible loss would be material and that an estimate for unasserted asbestos exposure liability needed to be recorded. BNSF then engaged a third-party with extensive experience in performing asbestos studies to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated unasserted asbestos claims and the estimated average cost per claim. The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of unasserted claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data.

Based on the assessment, the Company recorded an undiscounted $293 million pre-tax charge for unasserted asbestos claims in the third quarter of 2004. The $293 million pre-tax charge was recorded in materials and other expense and reduced net income by $182 million, or $0.49 per share, for the year ended December 31, 2004.

Key elements of the assessment included:

- Because BNSF did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using Company employee data from 1970 forward and estimated the BNSF employee base from 1938-1969 using railroad industry historical census data and estimating BNSF's representation in the total railroad population.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age, duration and intensity of exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for the period 2000-2003 (the years in which the number of claims were more significant).
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2002-2004.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2002-2004.

From these assumptions, BNSF projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were then applied to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate BNSF's future liability for unasserted asbestos claims.

The most sensitive assumptions for this accrual are the estimated future filing rates and estimated average claim values. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, BNSF used a multi-year calibration period (i.e., the average historical filing rate for the period 2000-2003) because it believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against BNSF declines at a rate consistent with both mortality and age as there is a decreasing propensity to file a claim as the population ages. BNSF believes the average claim values by type of disease from the historical period 2002-2004 are most representative of future claim values. Non-malignant claims, which represent approximately 95 percent of the total number and 80 percent of the cost of estimated future asbestos claims, were priced by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10 percent increase or decrease in either the forecasted number of unasserted claims or the average claim values would result in an approximate $25 million increase or decrease in the liability recorded for unasserted asbestos claims.

During each of the third quarters of 2006 and 2005, the Company had the third party analyze recent trends to ensure the assumptions utilized in the original September 2004 study were still valid. Based on these reviews, the original study continues to represent a reasonable estimate of BNSF's future asbestos exposure. Therefore, management recorded no additional expense as a result of these updates. The Company plans to update the study again in the third quarter of 2007. In addition, throughout the year, BNSF monitors actual experience against the number of forecasted claims and expected claim payments and records adjustments to the Company's estimates as necessary (see Note 10 to the Consolidated Financial Statements for additional information).

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | **2006** | 2005 | 2004 |
|---|---|---|---|
| Beginning balance | **$ 326** | $ 345 | $ 60 |
| Accruals | **–** | – | 308 |
| Payments | **(20)** | (19) | (23) |
| Ending balance at December 31, | **$ 306** | $ 326 | $ 345 |

Of the obligations at December 31, 2006, $251 million was related to unasserted claims and $55 million was related to asserted claims. At December 31, 2006 and 2005, $22 and $21 million were included in current liabilities, respectively. The recorded liability was not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding the number of asserted asbestos claims filed against BNSF:

| | **2006** | 2005 |
|---|---|---|
| Claims unresolved at January 1, | **2,121** | 1,926 |
| Claims filed | **530** | 835 |
| Claims settled, dismissed or otherwise resolved | **(676)** | (640) |
| Claims unresolved at December 31, | **1,975** | 2,121 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985), which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 55, 75 and 95 percent of the future unasserted asbestos claims will be incurred within the next 10, 15 and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $200 million to $400 million. However, BNSF believes that the $306 million recorded at December 31, 2006, is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period, could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER PERSONAL INJURY***

BNSF uses a third-party actuary to assist the Company in estimating its other personal injury liability claims and expense. These estimates are based on the covered population, activity levels and trends in frequency and the costs of covered injuries. These actuarial estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, is immaterial for these other occupational trauma claims.

Key elements of the actuarial assessment include:

- Size and demographics (employee age and craft) of the workforce.
- Activity levels (manhours by employee craft and carloadings).
- Expected claim frequency rates by type of claim (employee FELA or third-party liability) based on historical claim frequency trends.
- Expected dismissal rates by type of claim based on historical dismissal rates.
- Expected average paid amounts by type of claim for open and incurred but not reported claims that eventually close with payment.

From these assumptions, BNSF estimates the number of open claims by accident year that will likely require payment by the Company. The projected number of open claims by accident year that will require payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for all asserted claims. Additionally, BNSF estimates the number of its incurred but not reported claims that will likely result in payment based upon historical emergence patterns by type of claim. The estimated number of projected claims by accident year requiring payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for incurred but not reported claims.

The most sensitive assumptions for this accrual are the expected average cost per claim and the projected frequency rates for the number of claims that will ultimately result in payment. A 10 percent increase or decrease in either the expected average cost per claim or the frequency rate for claims with payment would result in an approximate $45 million increase or decrease in BNSF's recorded other personal injury reserves (see Note 10 to the Consolidated Financial Statements for additional information).

BNSF obtains quarterly actuarial updates for other personal injury liabilities and monitors actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | **2006** | 2005 | 2004 |
|---|---|---|---|
| Beginning balance | **$ 422** | $ 459 | $ 453 |
| Accruals | **188** | 181 | 194 |
| Payments | **(171)** | (218) | (188) |
| Ending balance at December 31, | **$ 439** | $ 422 | $ 459 |

At December 31, 2006 and 2005, $153 million and $164 million were included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding the number of personal injury claims, other than asbestos, filed against BNSF:

| | 2006 | 2005 |
|---|---|---|
| Claims unresolved at January 1, | **3,617** | 4,116 |
| Claims filed | **3,516** | 3,758 |
| Claims settled, dismissed or otherwise resolved | **(4,003)** | (4,257) |
| Claims unresolved at December 31, | **3,130** | 3,617 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $375 million to $550 million. However, BNSF believes that the $439 million recorded at December 31, 2006, is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***ENVIRONMENTAL***

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

During the first half of 2004, the Company experienced a significant increase in expense relating to environmental remediation developments at known sites for which the majority of the contamination occurred decades ago. Because of these and other developments, the Company performed an assessment in 2004 to determine if it was feasible to better estimate developments at its known sites. The Company determined that a third-party actuary had proprietary data that included information from the Environmental Protection Agency (EPA) and other governmental agencies as well as information accumulated from public sources and work performed for other clients. Because of its determination that a better estimate of future development could be made with this data, BNSF engaged this third-party actuary, which has an extensive background in performing various studies for large companies, including environmental matters, to assist BNSF in determining the Company's potential future environmental exposure at known sites. As a result of this study, the Company revised its estimate of its probable environmental losses and its accrued liabilities.

Consequently, during the third quarter of 2004, BNSF recorded an undiscounted $172 million pre-tax charge related to its change in estimated environmental liabilities on a site-by-site basis. The $172 million pre-tax charge was recorded in materials and other expense and reduced net income by $106 million, or $0.28 per share, for 2004. The charge did not include (i) contaminated sites of which the Company is not aware, or (ii) additional amounts for third-party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites. BNSF continues to estimate third-party claims on a site-by-site basis when the liability for such claims is probable and reasonably estimable. BNSF's recorded liability for third-party claims as of December 31, 2006, was approximately $12 million.

During the third quarter of 2006, the Company obtained an update of this study. Based on the work performed by the third-party actuary during each of the third quarters of 2006 and 2005, management recorded additional expense of approximately $5 million and $12 million, respectively. The Company plans to update the study again in the third quarter of 2007. However, on a quarterly basis, BNSF monitors actual experience against the forecasted remediation and related payments made on existing sites and conducts ongoing environmental contingency analyses, which consider a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in and the ability to pay for, cleanup of other PRPs. Adjustments to the Company's estimates will continue to be recorded as necessary based on developments in subsequent periods. Additionally, environmental accruals include amounts for newly identified sites or contaminants, third-party claims and legal fees incurred for defense of third-party claims and recovery efforts (see Note 10 to the Consolidated Financial Statements for additional information).

The Company's estimate of the ultimate cost for cleanup efforts at its known environmental sites utilizes BNSF's historical payment patterns, its current estimated percentage to closure ratios and the actuary's proprietary benchmark patterns developed from data accumulated from public sources and work performed by it for other clients, including the EPA and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. The most significant assumptions are as follows: (i) historical payment patterns of site development and (ii) variance from benchmark costs. A 10 percent change in any of these individual assumptions could result in an increase or decrease of up to $20 million in BNSF's estimated environmental liability.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 375 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination.

The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | **2006** | 2005 | 2004 |
|---|---|---|---|
| Beginning balance | **$ 370** | $ 385 | $ 199 |
| Accruals | **20** | 33 | 258 |
| Payments | **(72)** | (48) | (72) |
| Ending balance at December 31, | **$ 318** | $ 370 | $ 385 |

At December 31, 2006 and 2005, $58 million and $55 million was included in current liabilities, respectively. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2006, will be paid over the next ten years, and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | BNSF Sites | | Superfund Sites | |
|---|---|---|---|---|
| | **2006** | **2005** | **2006** | **2005** |
| Number of sites at January 1, | **369** | 384 | **20** | 24 |
| Sites added during the period | **23** | 24 | **–** | – |
| Sites closed during the period | **(17)** | (39) | **–** | (4) |
| Number of sites at December 31, | **375** | 369 | **20** | 20 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $250 million to $475 million. However, BNSF believes that the $318 million recorded at December 31, 2006, is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER CLAIMS AND LITIGATION***

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**INCOME TAXES**

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $1,105 million, $917 million and $482 million for the years ended December 31, 2006, 2005 and 2004, respectively. BNSF's Consolidated Balance Sheets reflect $345 million and $218 million of net current deferred tax assets at December 31, 2006 and 2005, respectively. Also included in BNSF's Consolidated Balance Sheets are $8,216 million and $7,916 million of net non-current deferred tax liabilities at December 31, 2006 and 2005, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 1995, respectively. Internal Revenue Service (IRS) examination of the years 1995 through 2002 for BNSF is completed and the protests of the un-agreed issues have been filed and are pending before IRS Appeals. BNSF is currently under examination for the years 2003 through 2005. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2006.

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable tax laws and regulations, current information and past experience with similar issues to make these judgments.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not significantly changed its methodology for calculating income tax expense for the years presented, and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above. Further information on uncertain tax positions is incorporated by reference from Note 16 to the Consolidated Financial Statements.

**EMPLOYEE BENEFIT PLANS**

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees, and an unfunded BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The amounts recorded in the Consolidated Statements of Income for pensions and the retiree health and welfare were as follows (in millions):

| Year ended December 31, | 2007 Estimate | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| Net pension cost | **$ 56** | **$ 68** | $ 38 | $ 15 |
| Net retiree health and welfare cost | **$ 17** | **$ 14** | $ 11 | $ 24 |

The increased pension cost in 2006 and 2005 is primarily the result of recognition of previously unrecognized losses as well as a decrease in both the expected long-term rate of return on plan assets and discount rate assumptions.

At December 31, 2006, BNSF had net losses, excluding prior service costs, of $430 million and $77 million related to the pension and retiree health and welfare benefits plans, respectively, which had been recognized as a component of AOCL under SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132(R)*, as described in Note 13 to the Consolidated Financial Statements. These losses were comprised of gains and losses from changes in discount rates, actuarial assumptions and census data as well as market gains and losses and will be recognized as a component of net pension cost over the next 15 years as follows:

| | Deferred Losses to be Recognized (in millions) | |
|---|---|---|
| **Fiscal year** | **Pension** | **Retiree Health and Welfare Benefits** |
| 2007 | $ 38 | $ 6 |
| 2008 | 27 | 5 |
| 2009 | 20 | 5 |
| 2010 | 15 | 4 |
| 2011 | 13 | 4 |
| Thereafter | 117 | 23 |

BNSF uses a third-party actuary to assist the Company in estimating liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of the pension or retiree health and welfare obligations include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

From time to time, the Company will change pension and retiree health and welfare assumptions in response to current conditions and expected future experience. Significant assumptions for the past three years are as follows:

| **Assumptions used to determine net cost for fiscal years ended December 31,** | **Pension Benefits** | | | **Retiree Health and Welfare Benefits** | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2006** | **2005** | **2004** |
| Discount rate | **5.25%** | 5.75% | 6.00% | **5.25%** | 5.75% | 6.00% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.25% | **– %** | – % | – % |
| Assumed health care cost trend rate | **–%** | –% | –% | **10.50%** | 10.00% | 11.00% |
| Rate of compensation increase[b] | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90% | 3.90% |

| **Assumptions used to determine benefit obligations at September 30[a],** | **Pension Benefits** | | **Retiree Health and Welfare Benefits** | |
|---|---|---|---|---|
| | **2006** | **2005** | **2006** | **2005** |
| Discount rate | **5.50%** | 5.25% | **5.50%** | 5.25% |
| Assumed health care cost trend rate | **–%** | –% | **10.00%** | 10.50% |
| Rate of compensation increase[b] | **3.90%** | 3.90% | **3.90%** | 3.90% |

a The Company's pension and retiree health and welfare plans use a measurement date of September 30.

b Determined based on historical experience

The discount rate is a key assumption used in the estimates of both the pension and retiree health and welfare expense and liability. BNSF determined the discount rate by adjusting the Moody's Aa Corporate bond yield to reflect the difference between the duration of the future estimated cash flows of the Company's pension and retiree health and welfare plans and the duration of the Moody's Aa index. The expected return on plan assets, which reflects the expected long-term rates of return on those assets, is also a key assumption. Finally, the health care cost trend rates are also considered a significant assumption and only impact the retiree health and welfare-related estimates.

The discount rate used for the 2007 calculation of net benefit cost was increased to 5.50 percent to reflect current market conditions. The expected rate of return on plan assets remained consistent from 2006 to 2007, and the Company does not expect any significant changes to the current investment allocation of assets. However, unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years.

The following table is an estimate of the impact on future net benefit cost that could result from hypothetical changes to the most sensitive assumptions, the discount rate and rate of return on plan assets:

| Sensitivity Analysis | | |
|---|---|---|
| | Change in Net Benefit Cost | |
| Hypothetical discount rate change | Pension | Retiree Health and Welfare |
| 50 basis point decrease | $7 million increase | $2 million increase |
| 50 basis point increase | $7 million decrease | $2 million decrease |
| **Hypothetical rate of return on plan assets change** | **Pension** | |
| 50 basis point decrease | $6 million increase | |
| 50 basis point increase | $6 million decrease | |

The Company voluntarily contributed $109 million to the BNSF Retirement Plan in the fourth quarter of 2006. The Company is not required to make any contributions to this plan in 2007. The Company determines this required funding by amortizing asset gains and losses over a period of five years. If the Company was required to fully fund the unfunded portion of its projected benefit obligation, which was $325 million at December 31, 2006, for these pension plans and $305 million for the retiree health and welfare plan, the Company's management believes that it would have sufficient liquidity, and it could fund the balance without a significant impact to the Company's financial position. Additionally, the Company expects to make benefit payments in 2007 of approximately $6 million and $23 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

In August of 2006, the President signed the Pension Protection Act of 2006 into law. While the Act will have some effect on specific plan provisions in the Company's retirement program, its primary effect will be to change the minimum funding requirements. The Company expects that the Act will accelerate the required funding of future contributions for the Company's pension plans beginning with the 2009 fiscal year. Anticipated payments, including the impact of the PPA, over the next five years are included in the Contractual Obligations table under the heading "Long-Term Debt and Other Obligations" in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations. The Company does not anticipate that this legislation will significantly impact its results of operations, financial condition, or liquidity.

Further information on employee benefits is incorporated by reference from Note 13 to the Consolidated Financial Statements.

#### DEPRECIATION

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expenses of $1,130 million, $1,075 million and $1,012 million for the years ended December 31, 2006, 2005 and 2004, respectively. At December 31, 2006 and 2005, the Company had property and equipment, net balances of $27,676 million and $26,551 million, which included $8,499 million and $7,982 million, respectively, of accumulated depreciation.

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. The Company conducts studies of depreciation rates and the required accumulated depreciation balance as required by the STB, which is generally every three years for equipment property and every six years for track structure and other roadway property. The Company uses external consultants to assist management with these studies. The consultants rely on statistical analysis, historical retirement data, industry knowledge and discussions with management to assess the impact of new technologies and maintenance practices. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively, and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average remaining service lives of the assets.

In 2006, the Company conducted a depreciation rate study of its equipment (excluding locomotives). The results of this study will not materially impact the Company's current or future results of operations. All other rate studies are current under the STB's requirements.

**ACCOUNTING PRONOUNCEMENTS**

See Note 16 to the Consolidated Financial Statements for information about recent accounting pronouncements.

**FORWARD-LOOKING INFORMATION**

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. These forward-looking statements include, but are not limited to, statements regarding:

- Expectations as to operating results, such as revenue growth and earnings per share;
- Plans and goals for future operational improvements and capital commitments; and
- Future market conditions or economic performance.

Forward-looking statements involve a number of risks and uncertainties, and actual performance or results may differ materially. For a discussion of material risks and uncertainties that the Company faces, see the discussion in Item 1A, "Risk Factors," of this Annual Report on Form 10-K. Important factors that could cause actual results to differ materially include, but are not limited to, the following:

• **Economic and industry conditions:** material adverse changes in economic or industry conditions, both in the United States and globally, changes in customer demand, effects of adverse economic conditions affecting shippers or BNSF's supplier base, adverse economic conditions in the industries and geographic areas that produce and consume freight, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, changes in fuel prices and other key materials and disruptions in supply chains for these materials, changes in the securities and capital markets and changes in crew availability, labor costs and labor difficulties, including stoppages affecting either BNSF's operations or customers' abilities to deliver goods to BNSF for shipment;

• **Legal and regulatory factors:** developments and changes in laws and regulations, including those affecting train operations or the marketing of services, the ultimate outcome of shipper and rate claims subject to adjudication, increased economic regulation of the rail industry, developments in environmental investigations or proceedings with respect to rail operations or current or past ownership or control of real property, and developments in and losses resulting from other types of claims and litigation, including those relating to personal injuries, asbestos and other occupational disease, the release of hazardous materials, environmental contamination and damage to property, or relating to rates and services; and

• **Operating factors:** technical difficulties, changes in operating conditions and costs, changes in business mix, the availability of equipment and human resources to meet changes in demand, the extent of the Company's ability to achieve its operational and financial initiatives and to contain costs, the effectiveness of steps taken to maintain and improve operations and velocity and network fluidity, including the management of the amount of traffic on the system to meet demand and the ability to acquire sufficient resources to meet that demand, the ability to expand the capacity of the system, congestion on other railroads and capacity constraints affecting all links in the transportation chain that feed traffic and goods to BNSF's systems, disruptions to BNSF's technology network including computer systems and software, as well as natural events such as severe weather, fires, floods and earthquakes or man-made or other disruptions of BNSF Railway's operating systems, structures, or equipment including the effects of acts of terrorism on the Company's system or other railroads' systems.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions may appear in the Company's public filings with the Securities and Exchange Commission, which are accessible at www.sec.gov, and on the Company's website at www.bnsf.com, and which investors are advised to consult.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The following table summarizes the impact of these hedging activities on the Company's results of operations (in millions):

| December 31, | 2006 | 2005 |
|---|---|---|
| Fuel-hedge benefit (including ineffective portion of unexpired hedges) | **$ 341** | $ 531 |
| Interest rate hedge benefit (loss) | **(1)** | 17 |
| Total hedge benefit | **340** | 548 |
| Tax effect | **(131)** | (209) |
| Hedge benefit, net of tax | **$ 209** | $ 339 |

The Company's fuel-hedge benefit is due to increases in fuel prices subsequent to the initiation of various hedges. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 to the Consolidated Financial Statements describe significant aspects of BNSF's financial instrument activities that have a material market risk. Additionally, the Company uses fuel surcharges, which substantially mitigate the risk of fuel price volatility.

**COMMODITY PRICE SENSITIVITY**

BNSF engages in hedging activities to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2006, are based on the front month settlement prices of New York Mercantile Exchange (NYMEX) #2 heating oil (HO), West Texas Intermediate crude oil (WTI), or the HO refining spread (HO-WTI), which is defined as the difference between HO and WTI. A WTI hedge combined with a HO-WTI hedge will result in the equivalent of a HO hedge. For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel, WTI and HO.

At December 31, 2006, BNSF had recorded in the Consolidated Balance Sheet a short-term fuel-hedging asset of $13 million and a short-term hedging liability of $2 million for fuel hedges covering 2007. There was no long-term fuel-hedging asset or liability in the Consolidated Balance Sheet as of December 31, 2006.

The following table is an estimate of the impact to earnings that could result from hypothetical price changes during the twelve-month period ending December 31, 2007, and the balance sheet impact from the hypothetical price changes, both based on the Company's hedge position at December 31, 2006:

| Sensitivity Analysis | | |
|---|---|---|
| **Hedged Commodity Price Change** | **Fuel-Hedge Annual Pre-Tax Earnings Impact** | **Balance Sheet Impact of Change in Fuel-Hedge Fair Value** |
| 10 percent increase | $16 million increase | $16 million increase |
| 10 percent decrease | $17 million decrease | $18 million decrease |

Based on fuel consumption during the twelve-month period ending December 31, 2006, of 1,478 million gallons and fuel prices during that same period, excluding the impact of the Company's hedging activities, a ten percent increase or decrease in the commodity price per gallon would result in an approximate $272 million increase or decrease, respectively, in fuel expense (pre-tax) on an annual basis.

At December 31, 2006, BNSF maintained fuel inventories for use in normal operations, which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure. Further information on fuel hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

**INTEREST RATE SENSITIVITY**

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate debt to floating-rate debt. These interest rate hedges are accounted for as cash flow or fair value hedges. BNSF's measurement of the fair value of these hedges is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

At December 31, 2006, the fair value of BNSF's debt, excluding capital leases, was $7,177 million. Additionally, the Company had recorded an interest rate hedging liability of less than $1 million and $6 million for cash flow and fair value hedges, respectively.

The following table is an estimate of the impact to earnings and the fair value of the total debt and interest rate hedges that could result from hypothetical interest rate changes during the twelve-month period ending December 31, 2007, based on debt levels and outstanding hedges as of December 31, 2006:

**Sensitivity Analysis**

| Hypothetical Change in Interest Rates | Floating Rate Debt - Annual Pre-Tax Earnings Impact | Change in Fair Value | |
|---|---|---|---|
| | | Total Debt | Interest Rate Hedges |
| 1 percent decrease | $16 million increase | $615 million increase | $9 million increase |
| 1 percent increase | $16 million decrease | $517 million decrease | $7 million decrease |

Further information on interest rate hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements. Information on the Company's debt, which may be sensitive to interest rate fluctuations, is incorporated by reference from Note 9 to the Consolidated Financial Statements.

**Item 8. Financial Statements and Supplementary Data**

The Consolidated Financial Statements of BNSF and subsidiary companies, together with the report of the Company's independent registered public accounting firm, are included as part of this filing.

The following documents are filed as a part of this report:

**Consolidated Financial Statements**

Management's Report on Internal Control Over Financial Reporting .......... 45
Report of Independent Registered Public Accounting Firm .......... 46
Consolidated Statements of Income for the three years ended December 31, 2006 .......... 48
Consolidated Balance Sheets as of December 31, 2006 and 2005 .......... 49
Consolidated Statements of Cash Flows for the three years ended December 31, 2006 .......... 50
Consolidated Statements of Changes in Stockholders' Equity for the three years ended December 31, 2006 .......... 51
Notes to Consolidated Financial Statements .......... 52-85

## Management's Report on Internal Control Over Financial Reporting

**To the Shareholders of Burlington Northern Santa Fe Corporation and Subsidiaries**

The management of Burlington Northern Santa Fe Corporation (the Company) is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external reporting purposes in accordance with generally accepted accounting principles in the United States of America.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2006. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control – Integrated Framework*. Based on management's assessment, the Company concluded that as of December 31, 2006, the Company's internal control over financial reporting is effective based on those criteria.

Management's assessment of the Company's internal control over financial reporting as of December 31, 2006, has been audited by PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, as stated in their report, which appears on the following pages.

## Report of Independent Registered Public Accounting Firm

**To the Shareholders and Board of Directors of**
**Burlington Northern Santa Fe Corporation**

We have completed integrated audits of Burlington Northern Santa Fe Corporation's consolidated financial statements and of its internal control over financial reporting as of December 31, 2006, in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and its subsidiaries (the Company) at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that the Company maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control - Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Fort Worth, Texas
February 13, 2007

## Consolidated Statements of Income

In millions, except per share data

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Revenues | **$ 14,985** | $ 12,987 | $ 10,946 |
| Operating expenses: | | | |
| Compensation and benefits | **3,816** | 3,515 | 3,322 |
| Fuel | **2,734** | 1,959 | 1,335 |
| Purchased services | **1,906** | 1,713 | 1,424 |
| Depreciation and amortization | **1,130** | 1,075 | 1,012 |
| Equipment rents | **930** | 886 | 790 |
| Materials and other | **952** | 917 | 1,377 |
| Total operating expenses | **11,468** | 10,065 | 9,260 |
| Operating income | **3,517** | 2,922 | 1,686 |
| Interest expense | **485** | 437 | 409 |
| Other expense, net | **40** | 37 | 4 |
| Income before income taxes | **2,992** | 2,448 | 1,273 |
| Income tax expense | **1,105** | 917 | 482 |
| Net income | **$ 1,887** | $ 1,531 | $ 791 |
| Earnings per share: | | | |
| Basic earnings per share | **$ 5.23** | $ 4.12 | $ 2.14 |
| Diluted earnings per share | **$ 5.10** | $ 4.01 | $ 2.10 |
| Average shares: | | | |
| Basic | **361.0** | 371.8 | 370.0 |
| Dilutive effect of stock awards | **8.8** | 10.0 | 6.6 |
| Diluted | **369.8** | 381.8 | 376.6 |

See accompanying Notes to Consolidated Financial Statements.

## Consolidated Balance Sheets

Dollars in millions, shares in thousands

| December 31, | 2006 | 2005 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 375** | $ 75 |
| Accounts receivable, net | **805** | 678 |
| Materials and supplies | **488** | 396 |
| Current portion of deferred income taxes | **345** | 218 |
| Current portion of fuel-hedging asset | **13** | 303 |
| Other current assets | **155** | 210 |
| Total current assets | **2,181** | 1,880 |
| Property and equipment, net | **27,676** | 26,551 |
| Other assets | **1,786** | 1,873 |
| Total assets | **$ 31,643** | $ 30,304 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | **$ 2,853** | $ 2,773 |
| Long-term debt due within one year | **473** | 456 |
| Total current liabilities | **3,326** | 3,229 |
| Long-term debt and commercial paper | **6,912** | 6,698 |
| Deferred income taxes | **8,216** | 7,916 |
| Casualty and environmental liabilities | **830** | 878 |
| Minimum pension liability | **–** | 417 |
| Pension and retiree health and welfare liability | **604** | – |
| Employee separation costs | **86** | 107 |
| Other liabilities | **1,273** | 1,551 |
| Total liabilities | **21,247** | 20,796 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value, 600,000 shares authorized; 532,080 shares and 527,289 shares issued, respectively | **5** | 5 |
| Additional paid-in-capital | **6,990** | 6,702 |
| Retained earnings | **9,607** | 8,045 |
| Treasury stock, at cost, 174,205 shares and 155,718 shares, respectively | **(5,929)** | (4,569) |
| Prepaid forward repurchase of treasury stock | **–** | (600) |
| Unearned compensation | **–** | (22) |
| Accumulated other comprehensive loss | **(277)** | (53) |
| Total stockholders' equity | **10,396** | 9,508 |
| Total liabilities and stockholders' equity | **$ 31,643** | $ 30,304 |

See accompanying Notes to Consolidated Financial Statements.

## Consolidated Statements of Cash Flows

In millions

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 1,887** | $ 1,531 | $ 791 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **1,130** | 1,075 | 1,012 |
| Deferred income taxes | **314** | 217 | 237 |
| Employee separation costs paid | **(27)** | (30) | (33) |
| Long-term casualty and environmental liabilities, net | **(55)** | (71) | 477 |
| Other, net | **(118)** | (54) | (84) |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **(127)** | (138) | (65) |
| Change in accounts receivable sales program | **–** | (350) | 25 |
| Materials and supplies | **(92)** | (57) | (73) |
| Other current assets | **46** | (5) | (144) |
| Accounts payable and other current liabilities | **150** | 491 | 234 |
| Net cash provided by operating activities | **3,108** | 2,609 | 2,377 |
| **Investing Activities** | | | |
| Capital expenditures | **(2,014)** | (1,750) | (1,527) |
| Other, net | **(72)** | (273) | (68) |
| Net cash used for investing activities | **(2,086)** | (2,023) | (1,595) |
| **Financing Activities** | | | |
| Net increase (decrease) in commercial paper and bank borrowings | **283** | 563 | (242) |
| Proceeds from issuance of long-term debt | **300** | 500 | 250 |
| Payments on long-term debt | **(467)** | (464) | (300) |
| Dividends paid | **(310)** | (267) | (231) |
| Proceeds from stock options exercised | **116** | 244 | 420 |
| Purchase of BNSF common stock | **(730)** | (799) | (376) |
| Prepaid forward repurchase of treasury stock | **–** | (600) | – |
| Excess tax benefits from equity compensation plans | **95** | – | – |
| Other, net | **(9)** | (10) | 1 |
| Net cash used for financing activities | **(722)** | (833) | (478) |
| Increase (decrease) in cash and cash equivalents | **300** | (247) | 304 |
| Cash and cash equivalents: | | | |
| Beginning of year | **75** | 322 | 18 |
| End of year | **$ 375** | $ 75 | $ 322 |
| **Supplemental Cash Flow Information** | | | |
| Interest paid, net of amounts capitalized | **$ 462** | $ 427 | $ 476 |
| Income taxes paid, net of refunds | **$ 779** | $ 545 | $ 159 |
| Non-cash asset financing | **$ 109** | $ 68 | $ 104 |

See accompanying Notes to Consolidated Financial Statements.

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES

## Consolidated Statements of Changes in Stockholders' Equity

Dollars in millions, shares in thousands, except per share data

| | Common Shares | Treasury Shares | Common Stock and Paid–in Capital | Retained Earnings | Treasury Stock | Prepaid Forward Repurchase of Treasury Stock | Unearned Compen-sation | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2003 | 500,685 | (129,225) | $ 5,771 | $ 6,240 | $ (3,340) | $ – | $ (36) | $ (140) | $ 8,495 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 791 | – | – | – | – | 791 |
| Minimum pension liability adjustment, net of tax expense of $3 | | | – | – | – | – | – | 3 | 3 |
| Fuel/interest hedge mark-to-market, net of tax expense of $83 | | | – | – | – | – | – | 136 | 136 |
| Total comprehensive income | | | – | 791 | – | – | – | 139 | 930 |
| Common stock dividends, $0.64 per share | | | – | (239) | – | – | – | – | (239) |
| Restricted stock expense | | | – | – | – | – | 31 | – | 31 |
| Restricted stock activity and related tax benefit of $1 | 1,135 | (49) | 45 | – | – | – | (38) | – | 7 |
| Exercise of stock options and related tax benefit of $52 | 15,455 | (746) | 488 | – | (25) | – | – | – | 463 |
| Purchase of BNSF common stock | – | (10,443) | – | – | (376) | – | – | – | (376) |
| Balance at December 31, 2004 | 517,275 | (140,463) | 6,304 | 6,792 | (3,741) | – | (43) | (1) | 9,311 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,531 | – | – | – | – | 1,531 |
| Minimum pension liability adjustment, net of tax benefit of $25 | | | – | – | – | – | – | (39) | (39) |
| Fuel/interest hedge mark-to-market, net of tax benefit of $8 | | | – | – | – | – | – | (13) | (13) |
| Total comprehensive income | | | – | 1,531 | – | – | – | (52) | 1,479 |
| Common stock dividends, $0.74 per share | | | – | (278) | – | – | – | – | (278) |
| Restricted stock expense | | | – | – | – | – | 37 | – | 37 |
| Restricted stock activity and related tax benefit of $10 | 665 | (140) | 46 | – | – | – | (16) | – | 30 |
| Exercise of stock options and related tax benefit of $84 | 9,349 | (540) | 357 | – | (29) | – | – | – | 328 |
| Purchase of BNSF common stock | – | (14,575) | – | – | (799) | – | – | – | (799) |
| Prepaid forward repurchase of treasury stock | – | – | – | – | – | (600) | – | – | (600) |
| Balance at December 31, 2005 | 527,289 | (155,718) | 6,707 | 8,045 | (4,569) | (600) | (22) | (53) | 9,508 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,887 | – | – | – | – | 1,887 |
| Minimum pension liability adjustment, net of tax expense of $24 | | | – | – | – | – | – | 40 | 40 |
| Fuel/interest hedge mark-to-market, net of tax benefit of $117 | | | – | – | – | – | – | (188) | (188) |
| Total comprehensive income | | | – | 1,887 | – | – | – | (148) | 1,739 |
| Adjustment to initially apply SFAS No. 158, net of tax benefit of $48 | | | – | – | – | – | – | (76) | (76) |
| Common stock dividends, $0.90 per share | | | – | (325) | – | – | – | – | (325) |
| Restricted stock and stock options expense | | | 72 | – | – | – | – | – | 72 |
| Restricted stock activity and related tax benefit of $15 | 28 | (33) | 16 | – | (1) | – | – | – | 15 |
| Exercise of stock options and related tax benefit of $80 | 4,763 | (376) | 225 | – | (29) | – | – | – | 196 |
| Adjustment upon adoption of SFAS No. 123R | – | – | (25) | – | – | – | 22 | – | (3) |
| Purchase of BNSF common stock | – | (9,860) | – | – | (730) | – | – | – | (730) |
| Prepaid forward repurchase of treasury stock | – | (8,218) | – | – | (600) | 600 | – | – | – |
| Balance at December 31, 2006 | 532,080 | (174,205) | $ 6,995 | $ 9,607 | $ (5,929) | $ – | $ – | $ (277) | $ 10,396 |

See accompanying Notes to Consolidated Financial Statements.

## Notes to Consolidated Financial Statements

### 1. The Company

Burlington Northern Santa Fe Corporation (BNSF) is a holding company that conducts no operating activities and owns no significant assets other than through its interests in its subsidiaries. BNSF's principal, wholly-owned subsidiary is BNSF Railway Company (BNSF Railway), which operates one of the largest railroad networks in North America with approximately 32,000 route miles in 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 38 percent, 25 percent, 20 percent and 17 percent, respectively, of total freight revenues for the year ended December 31, 2006. These Consolidated Financial Statements include BNSF, BNSF Railway, other majority-owned subsidiaries and a variable interest entity for which BNSF is the primary beneficiary (see Note 2 to the Consolidated Financial Statements for additional information), all of which are separate legal entities (collectively, the Company).

### 2. Significant Accounting Policies

**PRINCIPLES OF CONSOLIDATION**

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated. The Company evaluates its less than majority-owned investments for consolidation pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46R (FIN 46R), *Consolidation of Variable Interest Entities*. Since the effective date of FIN 46R of March 31, 2004, the Company has had one minor investment, San Jacinto Rail Limited Partnership, that has been consolidated under FIN 46R (see Note 7 to the Consolidated Financial Statements for additional information regarding the Partnership).

**USE OF ESTIMATES**

The preparation of financial statements in accordance with generally accepted accounting principles in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. These estimates and assumptions are periodically reviewed by management. Actual results could differ from those estimates.

**REVENUE RECOGNITION**

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue on a pro-rata basis based on actual or projected future customer shipments. When using projected shipments, the Company relies on historic trends as well as economic and other indicators to estimate the liability for customer incentives.

**ACCOUNTS RECEIVABLE, NET**

Accounts receivable, net includes accounts receivable reduced by an allowance for bill adjustments and uncollectible accounts. The allowance for bill adjustments and uncollectible accounts is based on historical experience as well as any known trends or uncertainties related to customer billing and account collectibility.

**CASH AND CASH EQUIVALENTS**

All short-term investments with original maturities of 90 days or less are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

**MATERIALS AND SUPPLIES**

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

**PROPERTY AND EQUIPMENT, NET**

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. Upon normal sale or retirement of certain depreciable railroad property, cost less net salvage value is charged to accumulated depreciation, and no gain or loss is recognized. The disposals of land and non-rail property as well as significant premature retirements are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**ENVIRONMENTAL LIABILITIES**

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. BNSF utilizes a third-party actuary to assist the Company in estimating substantially all of its environmental liabilities. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

**PERSONAL INJURY CLAIMS**

Liabilities for personal injury claims are initially recorded when the expected loss is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. The liability and ultimate expense projections are developed with the assistance of third parties. Liabilities recorded for unasserted personal injury claims, including those related to asbestos, are based on information currently available. Estimates of liabilities for personal injury claims are undiscounted.

**INCOME TAXES**

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized.

**STOCK-BASED COMPENSATION**

The Company adopted Statement of Financial Accounting Standards (SFAS) No. 123R, *Share-Based Payment*, on January 1, 2006. This statement requires BNSF to recognize the cost of employee services received in exchange for the Company's equity instruments. Under SFAS No. 123R, BNSF is required to record compensation expense over an award's vesting period based on the award's fair value at the date of grant. BNSF has elected to adopt SFAS No. 123R on a modified prospective basis; accordingly, the financial statements for periods prior to January 1, 2006, do not include compensation cost calculated under the fair value method. Since the adoption of this new guidance, there have been no significant changes in the quantity or types of instruments used in stock-based compensation programs, nor have there been any significant changes in the terms of existing stock-based compensation arrangements. The Company did, however, record a favorable cumulative adjustment for estimated forfeitures of $3 million, which, due to its immateriality, was included as a reduction to compensation expense in the first quarter of 2006.

Prior to January 1, 2006, the Company applied Accounting Principles Board Opinion 25, *Accounting for Stock Issued to Employees*, and, therefore, recorded the intrinsic value of stock-based compensation as expense. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation (in millions, except per share data) prior to January 1, 2006:

| Year ended December 31, | 2005 | 2004 |
|---|---|---|
| Net income, as reported | $ 1,531 | $ 791 |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | 23 | 19 |
| Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | (42) | (41) |
| Pro forma net income | $ 1,512 | $ 769 |
| Earnings per share: | | |
| Basic – as reported | $ 4.12 | $ 2.14 |
| Basic – pro forma | $ 4.07 | $ 2.08 |
| Diluted – as reported | $ 4.01 | $ 2.10 |
| Diluted – pro forma | $ 3.96 | $ 2.04 |

**EMPLOYEE BENEFIT PLANS**

BNSF uses a third-party actuary to assist the Company in estimating liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates regarding future events and circumstances. Significant assumptions used in the valuation of pension and/or retiree health and welfare liabilities include the expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

**RECLASSIFICATIONS**

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income or net income.

### 3. Hedging Activities

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, *as amended*, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

**FUEL**

Fuel costs represented 24 percent, 19 percent and 14 percent of total operating expenses during 2006, 2005 and 2004, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company has entered into hedges to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. The fuel hedges include the use of derivatives that are accounted for as cash flow hedges. The hedging is intended to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2006 and excluding the impact of the hedges, each one-cent increase in the price of fuel per gallon would result in approximately $15 million of additional fuel expense on an annual basis.

**TOTAL FUEL-HEDGING ACTIVITIES**

As of December 31, 2006, BNSF's total fuel hedging positions covered approximately 7 percent of estimated fuel purchases for 2007. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel-hedge transactions were as follows (in millions):

| **Year ended December 31,** | **2006** | **2005** | **2004** |
|---|---|---|---|
| Hedge benefit | **$ 342** | $ 535 | $ 337 |
| Ineffective portion of unexpired hedges | **(1)** | (4) | 1 |
| Tax effect | **(131)** | (203) | (130) |
| Hedge benefit, net of tax | **$ 210** | $ 328 | $ 208 |

The amounts recorded in the Consolidated Balance Sheets for fuel-hedge transactions were as follows (in millions):

| **December 31,** | **2006** | **2005** |
|---|---|---|
| Short-term fuel-hedging asset | **$ 13** | $ 303 |
| Long-term fuel-hedging asset | **–** | 33 |
| Short-term fuel-hedging liability | **(2)** | – |
| Ineffective portion of unexpired hedges | **1** | – |
| Tax effect | **(4)** | (129) |
| Amount included in AOCL, net of tax | **$ 8** | $ 207 |
| | | |
| Settled fuel-hedging contracts receivable | **$ 37** | $ 143 |

BNSF measures the fair value of hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties.

***NEW YORK MERCANTILE EXCHANGE (NYMEX) #2 HEATING OIL (HO) HEDGES***

As of December 31, 2006, BNSF had entered into fuel swaps and costless collar agreements utilizing NYMEX #2 HO. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences that may occur between the prices of HO and the purchase price of BNSF's diesel fuel. Over the twelve months ended December 31, 2006, the sum of all such costs averaged approximately 25 cents per gallon.

During 2006, the Company converted approximately 129 million gallons of West Texas Intermediate (WTI) collars into HO swaps at an average price of approximately $0.97 per gallon, all of which expired during 2006. Additionally, during 2006, the Company entered into fuel swap agreements for 2007 utilizing HO to hedge the equivalent of approximately 56 million gallons of fuel at an average price of approximately $2.11 per gallon. During the year, the Company also entered into fuel collar agreements for 2007 utilizing HO to hedge the equivalent of approximately 9 million gallons of fuel at an average floor price of $1.79 per gallon and an average ceiling price of $1.95 per gallon.

The following table provides fuel-hedge data based on the quarter being hedged for all HO fuel hedges outstanding at December 31, 2006. As of December 31, 2006, there were no HO hedge positions beyond the fourth quarter of 2007.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2007** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **HO Swaps** | | | | | |
| Gallons hedged (in millions) | – | 17.85 | 18.90 | 18.90 | 55.65 |
| Average swap price (per gallon) | $ – | $ 2.06 | $ 2.11 | $ 2.17 | $ 2.11 |
| Fair value (in millions) | $ – | $ (6) | $ (5) | $ (5) | $ (16) |
| **HO Collars** | | | | | |
| Gallons hedged (in millions) | 31.50 | 9.45 | – | – | 40.95 |
| Average cap price (per gallon) | $ 0.93 | $ 1.95 | $ – | $ – | $ 1.17 |
| Average floor price (per gallon) | $ 0.86 | $ 1.79 | $ – | $ – | $ 1.07 |
| Fair value (in millions) | $ 23 | $ – | $ – | $ – | $ 23 |

***WTI CRUDE OIL HEDGES***

In addition, BNSF enters into fuel costless collar agreements utilizing WTI crude oil. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences that may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. Over the twelve months ended December 31, 2006, the sum of all such costs averaged approximately 51 cents per gallon.

No additional WTI hedges were entered into during 2006. However, the Company converted approximately 129 million gallons of WTI collars into HO swaps as discussed in the NYMEX #2 HO Hedges section. All of the converted swaps had expired by December 31, 2006.

The following table provides fuel-hedge data based on the quarter being hedged for all WTI fuel hedges outstanding at December 31, 2006. There are no WTI positions beyond the first quarter of 2007.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2007** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 150 | – | – | – | 150 |
| Equivalent gallons hedged (in millions) | 6.30 | – | – | – | 6.30 |
| Average cap price (per barrel) | $ 33.00 | $ – | $ – | $ – | $ 33.00 |
| Average floor price (per barrel) | $ 29.00 | $ – | $ – | $ – | $ 29.00 |
| Fair value (in millions) | $ 4 | $ – | $ – | $ – | $ 4 |

***NYMEX #2 HO REFINING SPREAD HEDGES (HO-WTI)***

During 2006, the Company entered into fuel swap agreements utilizing the HO-WTI to hedge the equivalent of approximately 66 million gallons of fuel with an average swap price $10.20 per barrel. HO-WTI is the difference in price between HO and WTI; therefore, a HO-WTI swap in combination with a WTI swap is equivalent to a HO swap. No HO-WTI fuel hedges were outstanding as of December 31, 2006.

***SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION***

The following table provides summarized comparative information for hedge transactions outstanding as of December 31, 2005.

| | December 31, | |
|---|---|---|
| **Year ending,** | **2006** | **2007** |
| **HO Swaps** | | |
| Gallons hedged (in millions) | 18.90 | – |
| Average swap price (per gallon) | $ 1.08 | $ – |
| Fair value (in millions) | $ 13 | $ – |
| **HO Collars** | | |
| Gallons hedged (in millions) | 97.65 | 31.50 |
| Average cap price (per gallon) | $ 0.93 | $ 0.93 |
| Average floor price (per gallon) | $ 0.86 | $ 0.86 |
| Fair value (in millions) | $ 82 | $ 28 |
| **WTI Swaps** | | |
| Barrels hedged (in thousands) | 2,400 | – |
| Equivalent gallons hedged (in millions) | 100.80 | – |
| Average swap price (per barrel) | $ 24.83 | $ – |
| Fair value (in millions) | $ 89 | $ – |
| **WTI Collars** | | |
| Barrels hedged (in thousands) | 3,900 | 150 |
| Equivalent gallons hedged (in millions) | 163.80 | 6.30 |
| Average cap price (per barrel) | $ 30.30 | $ 33.00 |
| Average floor price (per barrel) | $ 25.84 | $ 29.00 |
| Fair value (in millions) | $ 123 | $ 5 |
| **HO-WTI Swaps** | | |
| Barrels hedged (in thousands) | 1,350 | – |
| Equivalent gallons hedged (in millions) | 56.70 | – |
| Average swap price (per barrel) | $ 15.69 | $ – |
| Fair value (in millions) | $ (4) | $ – |

**INTEREST RATE**

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as converting a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

**TOTAL INTEREST RATE HEDGING PROGRAM**

All interest rate derivative transactions outstanding are reflected in the following table:

| | December 31, 2006 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter | Total | Fair Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 300 | $ – | $ 200 | $ 250 | $ – | $ – | $ 750 | $ (6) |
| Average fixed rate | 7.88% | –% | 6.13% | 7.13% | –% | –% | 7.16% | |
| Average floating rate | 7.98% | –% | 5.84% | 8.23% | –% | –% | 7.49% | |
| **Cash Flow Hedges** | | | | | | | | |
| Treasury locks (in millions) | $ 130 | $ – | $ – | $ – | $ – | $ – | $ 130 | $ – |
| Average rate | 4.69% | –% | –% | –% | –% | –% | 4.69% | |

BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

***SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION***

| | December 31, 2005 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2006 | 2007 | 2008 | 2009 | 2010 | Thereafter | Total | Fair Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ – | $ 300 | $ – | $ 200 | $ 250 | $ – | $ 750 | $ – |
| Average fixed rate | –% | 7.88% | –% | 6.13% | 7.13% | –% | 7.16% | |
| Average floating rate | –% | 6.75% | –% | 4.97% | 7.36% | –% | 6.48% | |
| **Cash Flow Hedges** | | | | | | | | |
| Forward-starting swaps (in millions) | $ 250 | $ – | $ – | $ – | $ – | $ – | $ 250 | $ 8 |
| Average rate | 4.87% | –% | –% | –% | –% | –% | 4.87% | |

***FAIR VALUE INTEREST RATE HEDGES***

The Company enters into interest rate swaps to convert fixed-rate long-term debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short-cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of each of the years ended December 31, 2006 and 2005, BNSF had entered into ten separate swaps, with an aggregate notional amount of $750 million, in which it pays an average floating rate, which fluctuates quarterly, based on London Interbank Offered Rate (LIBOR). The average floating rate to be paid by BNSF as of December 31, 2006, was 7.49 percent, and the average fixed rate BNSF is to receive is 7.16 percent. These swaps will expire between 2007 and 2010.

The amounts recorded in the Consolidated Statements of Income, as an increase to interest expense, for interest rate fair value hedge transactions were as follows (in millions):

| December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Hedge benefit (loss) | **$ (1)** | $ 17 | $ 36 |
| Tax effect | **–** | (6) | (14) |
| Hedge benefit (loss), net of tax | **$ (1)** | $ 11 | $ 22 |

The amounts recorded in the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of unexpired hedges, with a corresponding adjustment to debt or accrued interest, are as follows (in millions):

| December 31, | 2006 | 2005 |
|---|---|---|
| Short-term interest rate hedging asset | **$ –** | $ 1 |
| Long-term interest rate hedging liability | **$ (6)** | $ (1) |

***CASH FLOW INTEREST RATE HEDGES***

In anticipation of a future debt issuance, the Company entered into five forward starting interest rate swaps in July and August 2005 having an aggregate notional amount of $250 million to fix a portion of the rate for a future 30-year unsecured debt issuance. The swaps were terminated in August 2006 in connection with the issuance of $300 million of 6.20 percent debentures due August 15, 2036. Upon termination, BNSF received $28 million from the counterparties, which will be amortized to interest expense over the life of the related debentures. As of December 31, 2006, $17 million of unamortized gain, net of tax, remained in AOCL.

In anticipation of a future refinancing of several leveraged leases, the Company entered into five treasury locks during 2006 totaling $130 million to fix the interest rate inherent in the operating lease payments. These treasury locks are expected to be unwound during 2007, and any gain or loss on the hedges will be amortized to equipment rents over the remaining life of the refinanced operating leases.

The amounts recorded in the Consolidated Balance Sheets for interest rate cash flow hedge transactions, which represent the fair value of expired and unexpired hedges, were as follows (in millions):

| December 31, | 2006 | 2005 |
|---|---|---|
| Interest rate hedging asset – unexpired hedges | **$ –** | $ 8 |
| Unrecognized gain (loss) on expired hedges | **15** | (12) |
| Tax effect | **(6)** | 2 |
| Amount included in AOCL, net of tax | **$ 9** | $ (2) |

**4. Other Expense, Net**

Other expense, net includes the following (in millions):

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Accounts receivable sale fees | **$ 23** | $ 15 | $ 10 |
| Loss from participation in synthetic fuel partnership | **9** | 14 | 3 |
| Miscellaneous, net | **8** | 8 | (9) |
| Total | **$ 40** | $ 37 | $ 4 |

The increase in other expense, net was predominantly due to higher accounts receivable sales fees driven primarily by higher interest rates, partially offset by a decrease in losses on BNSF Railway's participation in a synthetic fuel partnership.

During the fourth quarter of 2004, BNSF Railway indirectly purchased a 4.17 percent ownership of a synthetic fuel partnership through a 50 percent interest in a limited liability company with an unrelated entity. The synthetic fuel partnership generates Section 29 synthetic fuel tax credits, which reduce the Company's effective tax rate (see Note 5 to the Consolidated Financial Statements for additional information). In 2006, 2005 and 2004, BNSF Railway received a tax benefit from its participation in the partnership of approximately $11 million, $16 million and $4 million, respectively, related to the fuel tax credits and the deduction of partnership operating losses. In 2006, 2005 and 2004, the Company recorded approximately $9 million, $14 million and $3 million, respectively, of other expense, net related to the Company's share of the partnership's losses under the equity method of accounting. The partnership does not qualify for consolidation under FIN 46R, as BNSF Railway is not the primary beneficiary of the partnership. The Company's maximum future exposure to loss related to the activities of the synthetic fuel partnership is based upon the actual synthetic fuel produced by the partnership and is estimated to equal approximately $16 million. However, the Company believes that any losses will be more than offset by the synthetic fuel tax credits.

## 5. Income Taxes

Income tax expense was as follows (in millions):

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Current: | | | |
| Federal | **$ 697** | $ 620 | $ 212 |
| State | **94** | 80 | 33 |
| Total current | **791** | 700 | 245 |
| Deferred: | | | |
| Federal | **298** | 183 | 211 |
| State | **16** | 34 | 26 |
| Total deferred | **314** | 217 | 237 |
| Total | **$ 1,105** | $ 917 | $ 482 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Federal statutory income tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | **2.6** | 3.0 | 3.0 |
| Tax law change | **(0.2)** | – | – |
| Synthetic fuel credits | **(0.3)** | (0.4) | (0.2) |
| Other, net | **(0.2)** | (0.1) | 0.1 |
| Effective tax rate | **36.9%** | 37.5% | 37.9% |

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2006 | 2005 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | **$ (8,656)** | $ (8,406) |
| Hedging | **(15)** | (132) |
| Other | **(208)** | (221) |
| Total deferred tax liabilities | **(8,879)** | (8,759) |
| Deferred tax assets: | | |
| Casualty and environmental | **332** | 360 |
| Pension and retiree health and welfare benefits | **247** | 245 |
| Compensation and benefits | **158** | 125 |
| Employee separation costs | **39** | 49 |
| Other | **232** | 282 |
| Total deferred tax assets | **1,008** | 1,061 |
| Net deferred tax liability | **$ (7,871)** | $ (7,698) |
| Non-current deferred income tax liability | **$ (8,216)** | $ (7,916) |
| Current portion of deferred income taxes | **345** | 218 |
| Net deferred tax liability | **$ (7,871)** | $ (7,698) |

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 22, 1995, respectively. Internal Revenue Service (IRS) examination of the years 1995 through 2002 for BNSF is completed, and protests of the un-agreed issues have been filed and are pending before IRS Appeals. BNSF is currently under examination for years 2003 through 2005. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2006.

**6. Accounts Receivable, Net**

BNSF Railway transfers a portion of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust, and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

BNSF Railway's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2006, which was comprised of two $350 million, 364-day accounts receivable facilities. BNSF Railway amended these facilities in November 2006, modifying their maturities to November 2007. Outstanding undivided interests held by investors under the A/R sales program were $300 million at December 31, 2006 and 2005. These receivables are excluded from accounts receivable by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. The undivided interests were supported by $1,030 million and $1,008 million of receivables transferred by SFRC to the master trust at December 31, 2006 and 2005, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold, which is included in accounts receivable in the Company's financial statements. The interest that continues to be held by SFRC of $730 million and $708 million at December 31, 2006 and 2005, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivable transferred by SFRC to the master trust less $300 million at December 31, 2006 and 2005 of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value, and there was no gain or loss from the transaction.

BNSF Railway retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $15.8 billion, $13.6 billion and $11.6 billion in 2006, 2005 and 2004, respectively. No servicing asset or liability has been recorded because the fees BNSF Railway receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $23 million, $15 million and $10 million for the years ended December 31, 2006, 2005 and 2004, respectively. These costs fluctuate monthly with changes in prevailing interest rates and were based on weighted average interest rates of 5.3 percent, 3.3 percent and 1.4 percent for the years ended December 31, 2006, 2005 and 2004, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. In order for there to be an impact on the amount of receivables BNSF Railway could sell, the combined dilution and delinquency percentages would have to exceed an established threshold for the combined dilution and delinquency percentages. BNSF Railway has historically experienced very low levels of default or dilution and was well below the established rate at December 31, 2006. Based on the current levels, if dilution or delinquency percentages were to increase by one percentage point, there would be no impact to the amount of receivables BNSF Railway could sell.

Receivables funded under the A/R sales program may not include amounts over 90 days past due or concentrations over certain limits with any one customer and certain other receivables. At December 31, 2006 and 2005, $26 million and $36 million, respectively, of accounts receivable were greater than 90 days old. BNSF Railway maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At December 31, 2006 and 2005, $36 million and $45 million, respectively, of such allowances had been recorded, of which $34 million and $42 million, respectively, had been recorded as a reduction to accounts receivable, net. The remaining $2 million and $3 million at December 31, 2006 and 2005, respectively, had been recorded in accounts payable and other current liabilities because they relate to the outstanding undivided interests held by investors. During the years ended December 31, 2006 and 2005, $8 million of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2006, BNSF Railway was in compliance with these provisions.

**7. Property and Equipment, Net**

Property and equipment, net (in millions), and the weighted average annual depreciation rates (%) were as follows:

| December 31, | 2006 | 2005 | 2006 Depreciation Rates |
|---|---|---|---|
| Land | **$ 1,693** | $ 1,649 | –% |
| Track structure | **17,103** | 16,122 | 3.3% |
| Other roadway | **11,637** | 10,947 | 2.5% |
| Locomotives | **3,341** | 3,412 | 5.1% |
| Freight cars and other equipment | **1,941** | 1,954 | 5.1% |
| Computer hardware and software | **460** | 449 | 13.7% |
| Total cost | **36,175** | 34,533 | |
| Less accumulated depreciation and amortization | **(8,499)** | (7,982) | |
| Property and equipment, net | **$ 27,676** | $ 26,551 | |

The Consolidated Balance Sheets at December 31, 2006 and 2005, included $1,039 million, net of $409 million of amortization and $1,000 million, net of $372 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

The Company capitalized $14 million, $13 million and $10 million of interest for the years ended December 31, 2006, 2005 and 2004, respectively.

**SAN JACINTO RAIL LIMITED PARTNERSHIP**

In 2001, BNSF Railway entered into the San Jacinto Rail Limited Partnership (the Partnership) with subsidiaries of three chemical manufacturing companies. The original purpose of the Partnership was to construct and BNSF Railway to operate a 13-mile rail line to service several chemical and plastics manufacturing facilities in the Houston, Texas area. In the fourth quarter of 2004, BNSF Railway reached an agreement with another carrier for an alternative means of access to the facilities by using the other railroad's existing line. As consideration for the trackage rights and alternative access rights, BNSF Railway agreed to compensate the other railroad, in lieu of rent, by a combination of cash and waiver of certain payment obligations of the other carrier for future payments related to prospective capital projects to be performed on jointly-operated facilities of BNSF Railway and the other carrier. In January 2005, upon implementation of the terms of this agreement, the Company recorded an intangible asset of $92 million for the trackage rights, amortization of which is estimated to be approximately $3 million per year. In February 2005, the Surface Transportation Board announced its approval of the alternative access by means of trackage rights over the other carrier's existing lines.

The fair market value of the Partnership's assets, including land, was approximately $4 million, determined based on comparable sales and existing property listing information on other properties located near the subject properties. As a result of a plan to sell these assets, the Company recorded a pre-tax impairment charge of $24 million in materials and other expense, which reduced net income by $15 million or $0.04 per share for 2004. Additionally, the short-term debt that was recorded upon consolidation was repaid during the fourth quarter of 2004.

### 8. Accounts Payable and Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2006 | 2005 |
|---|---|---|
| Compensation and benefits payable | $ 699 | $ 596 |
| Rents and leases | 350 | 210 |
| Customer incentives | 319 | 297 |
| Accounts payable | 282 | 278 |
| Casualty and environmental liabilities | 233 | 240 |
| Property tax liabilities | 132 | 126 |
| Accrued interest | 127 | 115 |
| Dividends payable | 90 | 75 |
| Income tax liabilities | 86 | 232 |
| Other | 535 | 604 |
| Total | $ 2,853 | $ 2,773 |

**9. Debt**

Debt outstanding was as follows (in millions):

| December 31, | 2006 | 2005 |
|---|---|---|
| Notes and debentures, weighted average rate of 6.8 percent, due 2007 to 2097 | **$ 5,364** | $ 5,077 |
| Equipment obligations, weighted average rate of 6.7 percent, due 2007 to 2016 | **347** | 413 |
| Capitalized lease obligations, weighted average rate of 6.9 percent, due 2007 to 2023 | **609** | 604 |
| Mortgage bonds, weighted average rate of 5.7 percent, due 2007 to 2047 | **106** | 384 |
| Financing obligations, weighted average rate of 6.3 percent, due 2013 to 2028 | **153** | 153 |
| Commercial paper, weighted average rate of 5.4 percent | **846** | 563 |
| Unamortized discount and other, net | **(40)** | (40) |
| Total | **7,385** | 7,154 |
| Less current portion of long-term debt | **(473)** | (456) |
| Long-term debt | **$ 6,912** | $ 6,698 |

Notes and debentures include a fair value adjustment decrease for hedges of $6 million and a decrease of less than $1 million at December 31, 2006 and 2005, respectively.

As of December 31, 2006, certain BNSF Railway properties and other assets were subject to liens securing $106 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway were subject to equipment obligations and capital leases.

The following tables provide fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2006.

| | December 31, 2006 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | | |
| | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter | Total Including Capital Leases | Total Excluding Capital Leases | Fair Value Excluding Capital Leases |
| Fixed-rate debt (in millions) | $ 173 | $ 179 | $ 151 | $ 167 | $ 477 | $ 4,648 | $ 5,795 | $ 5,186 | $ 5,567 |
| Average interest rate | 7.4% | 7.6% | 7.2% | 7.0% | 6.7% | 6.6% | 6.7% | | |
| Variable-rate debt (in millions) | $ 300 | $ – | $ 202 | $ 242 | $ 846 | $ – | $ 1,590 | $ 1,590 | $ 1,610 |
| Average interest rate | 8.0% | –% | 5.5% | 7.9% | 5.4% | –% | 6.3% | | |

BNSF has included maturities of $846 million of commercial paper in the 2011 column above.

| | December 31, 2005 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | | |
| | 2006 | 2007 | 2008 | 2009 | 2010 | Thereafter | Total Including Capital Leases | Total Excluding Capital Leases | Fair Value Excluding Capital Leases |
| Fixed-rate debt (in millions) | $ 456 | $ 164 | $ 161 | $ 135 | $ 149 | $ 4,777 | $ 5,842 | $ 5,238 | $ 5,843 |
| Average interest rate | 8.6% | 7.9% | 7.6% | 7.4% | 7.2% | 6.7% | 6.9% | | |
| Variable-rate debt (in millions) | $ – | $ 301 | $ – | $ 205 | $ 806 | $ – | $ 1,312 | $ 1,312 | $ 1,352 |
| Average interest rate | –% | 7.3% | –% | 5.2% | 5.3% | –% | 5.8% | | |

BNSF has included maturities of $563 million of commercial paper in the 2010 column above. In the two tables above, maturities in 2008 exclude $200 million of 7.29 percent debentures, which mature in 2036 but have a one-day redemption feature in 2008 at the option of the debt holders.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. Capital leases have been excluded from the calculation of fair value for both 2006 and 2005. The carrying amount of commercial paper and bank debt approximates fair value, and the average interest rate equals the current rate because of the short maturity of these instruments.

## NOTES AND DEBENTURES

**2006**

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper.

Pursuant to existing Board authority as of December 31, 2006, BNSF could issue up to an additional $700 million of debt securities through the SEC debt shelf registration process. In February 2007, the Board authorized an additional $1.4 billion of debt securities that may be issued through the SEC debt shelf registration process, for a total of $2.1 billion of debt securities now authorized to be issued.

**2005**

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month LIBOR rate plus 2.35 percent, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company would not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company would be required to sell common stock, the proceeds of which would be used to pay any accrued and unpaid interest. At December 31, 2006, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance were used to repurchase common stock, with the remainder used for general corporate purposes.

**2004**

The Company issued $250 million of 4.88 percent notes due January 15, 2015. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

**REVOLVING CREDIT FACILITY AND COMMERCIAL PAPER**

In September 2006, the Company extended the expiration date of the Company's $1.2 billion long-term bank credit facility to September 2011. Annual facility fees are currently 0.08 percent for the facility. The rate is subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon: (i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, (ii) money market rates offered at the option of the lenders, or (iii) an alternate base rate. BNSF must maintain compliance with certain financial covenants under its revolving credit agreement. At December 31, 2006, the Company was in compliance with these covenants.

At December 31, 2006, there were no bank borrowings against the revolving credit agreement.

BNSF issues commercial paper from time to time that is supported by the bank revolving credit agreement. Outstanding commercial paper balances reduce the amount of borrowings available under this agreement.

The maturity value of commercial paper as of December 31, 2006, of $916 million reduces the total capacity available under the revolving credit agreements to approximately $284 million. Commercial paper outstanding included $64 million issued to a consolidated subsidiary of BNSF that was eliminated upon consolidation. Consolidated commercial paper outstanding, which had a maturity value of $852 million, was classified as long-term debt in the Company's Consolidated Balance Sheet.

**GUARANTEES**

Debt and other obligations of non-consolidated entities guaranteed by the Company as of December 31, 2006, were as follows (dollars in millions):

| | | Guarantees | | | | |
|---|---|---|---|---|---|---|
| | BNSF Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount [a] | Remaining Term (in years) | Capitalized Obligations [b] |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $ 190 | $ 190 | $ – | Termination of Ownership | $ – |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 59 | $ 89 | $ 89 | 12 | $ 32 |
| Westside Intermodal Transportation Corporation | 0.0% | $ 42 | $ 65 | $ – | 17 | $ 35 |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 13 | $ 20 | $ – | 17 | $ 11 |
| Various lessors (Residual value guarantees) | 0.0% | N/A | $ 271 | $ 271 | Various | $ 68[c] |
| All other | 0.0% | $ 7 | $ 8 | $ 3 | Various | $ – |

a Reflects the maximum amount the Company could recover from a third party other than the counterparty.

b Reflects capitalized obligations that are recorded on the Company's Consolidated Balance Sheets.

c Reflects the FASB Interpretation No. (FIN) 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees,* asset and corresponding liability for the fair value of the residual value guarantees on the Company's Consolidated Balance Sheets.

**KINDER MORGAN ENERGY PARTNERS, L.P.**

Santa Fe Pacific Pipelines, Inc., an indirect, wholly-owned subsidiary of BNSF, has a guarantee in connection with its remaining special limited partnership interest in Santa Fe Pacific Pipelines Partners, L.P. (SFPP), a subsidiary of Kinder Morgan Energy Partners, L.P., to be paid only upon default by the partnership. All obligations with respect to the guarantee will cease upon termination of ownership rights, which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP.

**KANSAS CITY TERMINAL INTERMODAL TRANSPORTATION CORPORATION**

BNSF Railway and another major railroad jointly and severally guarantee $59 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF Railway has a 25 percent ownership in KCTRC, accounts for its interest using the equity method of accounting and would be required to fund a portion of the remaining obligation upon default by the original debtor.

**WESTSIDE INTERMODAL TRANSPORTATION CORPORATION AND THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS**

BNSF Railway has outstanding guarantees of $55 million of debt, the proceeds of which were used to finance construction of a bridge that connects BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge is operated by KCTRC, and payments related to BNSF's guarantee of this obligation would only be called for upon default by the original debtor.

**RESIDUAL VALUE GUARANTEES (RVG)**

In the normal course of business, the Company enters into leases in which it guarantees the residual value of certain leased equipment. Some of these leases have renewal or purchase options, or both, that the Company may exercise at the end of the lease term. If the Company elects not to exercise these options, it may be required to pay the lessor an amount not exceeding the RVG. The amount of any payment is contingent upon the actual residual value of the leased equipment. Some of these leases also require the lessor to pay the Company any surplus if the actual residual value of the leased equipment is over the RVG. These guarantees will expire between 2007 and 2011.

The maximum future payments, as disclosed in the Guarantees table above, represent the undiscounted maximum amount that BNSF could be required to pay in the event the Company did not exercise its renewal option and the fair market value of the equipment had significantly declined. BNSF does not anticipate such a large reduction in the fair market value of the leased equipment. As of December 31, 2006, the Company had recorded a $68 million asset and corresponding liability for the fair value of the RVG.

**ALL OTHER**

As of December 31, 2006, BNSF guaranteed $7 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $3 million of the $7 million of guarantees. These guarantees expire between 2007 and 2013.

Other than as discussed above, there is no collateral held by a third party that the Company could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than as discussed above, none of the guarantees are recorded in the Consolidated Financial Statements of the Company. The Company does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

**INDEMNITIES**

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether events, which would trigger the indemnification obligations would ever occur, the Company does not believe that these indemnity agreements will have a material adverse effect on the Company's results of operations, financial position or liquidity. Additionally, the Company believes that, due to lack of historical payment experience, the fair value of indemnities cannot be estimated with any amount of certainty and that the fair value of any such amount would be immaterial to the financial statements. Accordingly, no fair value liability related to indemnities has been recorded in the financial statements.

## 10. Commitments and Contingencies

### LEASE COMMITMENTS

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings, operating facilities and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments as of December 31, 2006, are summarized as follows (in millions):

| December 31, | Capital Leases | Operating Leases[a] |
|---|---|---|
| 2007 | $ 154 | $ 640 |
| 2008 | 146 | 686 |
| 2009 | 116 | 621 |
| 2010 | 81 | 569 |
| 2011 | 41 | 530 |
| Thereafter | 170 | 4,450 |
| Total | 708 | $ 7,496 |
| Less amount representing interest | (99) | |
| Present value of minimum lease payments | $ 609 | |

a Excludes leases having non-cancelable lease terms of less than one year and per diem leases.

Lease rental expense for all operating leases, excluding per diem leases, was $665 million, $565 million and $496 million for the years ended December 31, 2006, 2005 and 2004, respectively. When rental payments are not made on a straight-line basis, the Company recognizes rental expense on a straight-line basis over the lease term. Contingent rentals and sublease rentals were not significant.

### OTHER COMMITMENTS

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

### PERSONAL INJURY AND ENVIRONMENTAL COSTS

#### CHARGE FOR ASBESTOS AND ENVIRONMENTAL COSTS

During 2004, BNSF recorded a $465 million pre-tax charge to reflect changes in its estimate of unasserted asbestos liabilities and environmental liabilities. Of this amount, $293 million and $172 million were related to unasserted asbestos and environmental liabilities, respectively. The $465 million pre-tax charge was recorded in materials and other expense and reduced net income by $288 million, or $0.77 per share during 2004.

#### *PERSONAL INJURY*

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded.

***ASBESTOS***

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated at BNSF by 1985.

Prior to 2000, claim filings against the Company for asbestos were not numerous and were sporadic. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. The Company believed, however, that the low end of the range of reasonably possible loss, as that term is used in Financial Accounting Standards Board (FASB) Interpretation No. (FIN) 14, *Reasonable Estimation of the Amount of a Loss,* was immaterial. Subsequent to this period, claim filings increased and, when they continued into 2004, the Company concluded that the low end of the range of reasonably possible loss would be material and that an estimate for unasserted asbestos exposure liability needed to be recorded. BNSF then engaged a third party with extensive experience in performing asbestos studies to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated unasserted asbestos claims and the estimated average cost per claim. The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of unasserted claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data.

Based on the assessment, the Company recorded an undiscounted $293 million pre-tax charge for unasserted asbestos claims in the third quarter of 2004. The $293 million pre-tax charge was recorded in materials and other expense and reduced net income by $182 million, or $0.49 per share, for the year ended December 31, 2004.

During each of the third quarters of 2006 and 2005, the Company had the third party analyze recent trends to ensure the assumptions utilized in the original September 2004 study were still valid. Based on these reviews, the original study continues to represent a reasonable estimate of BNSF's future asbestos exposure. Therefore, management recorded no additional expense as a result of these updates. The Company plans to update the study again in the third quarter of 2007. In addition, throughout the year, BNSF monitors actual experience against the number of forecasted claims and expected claim payments and records adjustments to the Company's estimates as necessary.

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Beginning balance | **$ 326** | $ 345 | $ 60 |
| Accruals | – | – | 308 |
| Payments | **(20)** | (19) | (23) |
| Ending balance at December 31, | **$ 306** | $ 326 | $ 345 |

Of the December 31, 2006 obligation, $251 million was related to unasserted claims while $55 million was related to asserted claims. At December 31, 2006 and 2005, $22 million and $21 million were included in current liabilities, respectively. The recorded liability was not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding the number of asserted asbestos claims filed against BNSF:

| | 2006 | 2005 |
|---|---|---|
| Claims unresolved at January 1, | **2,121** | 1,926 |
| Claims filed | **530** | 835 |
| Claims settled, dismissed or otherwise resolved | **(676)** | (640) |
| Claims unresolved at December 31, | **1,975** | 2,121 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985), which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 55, 75 and 95 percent of the future unasserted asbestos claims will be incurred within the next 10, 15 and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $200 million to $400 million. However, BNSF believes that the $306 million recorded, is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER PERSONAL INJURY***

BNSF uses a third-party actuary to assist the Company in estimating its other personal injury liability claims and expense. These estimates are based on the covered population, activity levels and trends in frequency and the costs of covered injuries. These actuarial estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, is immaterial for these other occupational trauma claims.

BNSF obtains quarterly actuarial updates for other personal injury liabilities and monitors actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Beginning balance | **$ 422** | $ 459 | $ 453 |
| Accruals | **188** | 181 | 194 |
| Payments | **(171)** | (218) | (188) |
| Ending balance at December 31, | **$ 439** | $ 422 | $ 459 |

At December 31, 2006 and 2005, $153 million and $164 million were included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding the number of personal injury claims, other than asbestos, filed against BNSF:

| | 2006 | 2005 |
|---|---|---|
| Claims unresolved at January 1, | **3,617** | 4,116 |
| Claims filed | **3,516** | 3,758 |
| Claims settled, dismissed or otherwise resolved | **(4,003)** | (4,257) |
| Claims unresolved at December 31, | **3,130** | 3,617 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $375 million to $550 million. However, BNSF believes that the $439 million recorded at December 31, 2006, is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***BNSF INSURANCE COMPANY***

The Company has a consolidated, wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC) that provides insurance coverage for certain risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims incurred after January 1, 2002 and certain other claims, which are subject to reinsurance. Beginning in 2004, BNSF IC entered into annual reinsurance pooling agreements with several other companies. The pooling agreements insure workers compensation, general liability, auto liability and FELA risk. In accordance with the agreements, BNSF IC cedes a portion of its FELA exposure to the pool and assumes a proportionate share of the entire pool's risk. Each year BNSF IC reviews the objectives and performance of the pool to determine its continued participation in the pool. At December 31, 2006, BNSF IC had invested in third-party commercial paper, time deposits and money market accounts as well as in commercial paper issued by BNSF. All of the third-party investments are classified as cash and cash equivalents on the Company's Consolidated Balance Sheet. At December 31, 2006, there was approximately $350 million related to these third-party investments, which were classified as cash and cash equivalents on the Company's Consolidated Balance Sheet, as compared with approximately $50 million at December 31, 2005.

***ENVIRONMENTAL***

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes,

BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

During the first half of 2004, the Company experienced a significant increase in expense relating to environmental remediation developments at known sites for which the majority of the contamination occurred decades ago. Because of these and other developments, the Company performed an assessment in 2004 to determine if it was feasible to better estimate developments at its known sites. The Company determined that a third-party actuary had proprietary data that included information from the Environmental Protection Agency (EPA) and other governmental agencies as well as information accumulated from public sources and work performed for other clients. Because of its determination that a better estimate of future development could be made with this data, BNSF engaged this third-party actuary, which has an extensive background in performing various studies for large companies, including environmental matters, to assist BNSF in determining the Company's potential future environmental exposure at known sites. As a result of this study, the Company revised its estimate of its probable environmental losses and its accrued liabilities.

Consequently, during the third quarter of 2004, BNSF recorded an undiscounted $172 million pre-tax charge related to its change in estimated environmental liabilities on a site-by-site basis. The $172 million pre-tax charge was recorded in materials and other expense and reduced net income by $106 million, or $0.28 per share, for 2004. The charge did not include (i) contaminated sites of which the Company is not aware, or (ii) additional amounts for third-party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites. BNSF continues to estimate third-party claims on a site-by-site basis when the liability for such claims is probable and reasonably estimable. BNSF's recorded liability for third-party claims as of December 31, 2006, is approximately $12 million.

During the third quarter of 2006, the Company obtained an update of this study. Based on the work performed by the third-party actuary during each of the third quarters of 2006 and 2005, management recorded additional expense of approximately $5 million and $12 million, respectively. The Company plans to update the study again in the third quarter of 2007. However, on a quarterly basis, BNSF monitors actual experience against the forecasted remediation and related payments made on existing sites and conducts ongoing environmental contingency analyses, which consider a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in and the ability to pay for, cleanup of other PRPs. Adjustments to the Company's estimates will continue to be recorded as necessary based on developments in subsequent periods. Additionally, environmental accruals include amounts for newly identified sites or contaminants, third-party claims and legal fees incurred for defense of third-party claims and recovery efforts.

The Company's estimate of ultimate cost for cleanup efforts at its known environmental sites utilizes BNSF's historical payment patterns, its current estimated percentage to closure ratios and the actuary's proprietary benchmark patterns developed from data accumulated from public sources and work performed by it for other clients, including the EPA and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 375 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination.

The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Beginning balance | **$ 370** | $ 385 | $ 199 |
| Accruals | **20** | 33 | 258 |
| Payments | **(72)** | (48) | (72) |
| Ending balance at December 31, | **$ 318** | $ 370 | $ 385 |

At December 31, 2006 and 2005, $58 million and $55 million were included in current liabilities, respectively. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2006, will be paid over the next ten years, and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | BNSF Sites | | Superfund Sites | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Number of sites at January 1, | **369** | 384 | **20** | 24 |
| Sites added during the period | **23** | 24 | **–** | – |
| Sites closed during the period | **(17)** | (39) | **–** | (4) |
| Number of sites at December 31, | **375** | 369 | **20** | 20 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $250 million to $475 million. However, BNSF believes that the $318 million recorded at December 31, 2006, is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***OTHER CLAIMS AND LITIGATION***

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**11. Employee Separation Costs**

Employee separation costs activity was as follows (in millions):

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Beginning balance at January 1, | **$ 132** | $ 154 | $ 179 |
| Accruals | **2** | 8 | 8 |
| Payments | **(27)** | (30) | (33) |
| Ending balance at December 31, | **$ 107** | $ 132 | $ 154 |

Employee separation liabilities of $107 million and $132 million were included in the Consolidated Balance Sheets at December 31, 2006 and 2005, respectively, and principally represent the following: (i) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; (ii) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; and (iii) certain non-union employee severance costs. Employee separation expenses were recorded in materials and other in the Consolidated Statements of Income. At December 31, 2006, $21 million of the remaining liabilities were included in current liabilities.

**CONDUCTORS, TRAINMEN AND LOCOMOTIVE ENGINEERS**

Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $98 million and $116 million at December 31, 2006 and 2005, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the business combination of BNSF's predecessor companies Burlington Northern Inc. and Santa Fe Pacific Corporation (the Merger). These agreements, among other things, reduced train crew sizes and allowed for more flexible work rules. The remaining costs will be paid between 2007 and approximately 2024. In 2006, 2005 and 2004, the Company updated its estimates and recorded additional liabilities of $2 million during each year related to deferred benefits.

**CONSOLIDATION OF CLERICAL FUNCTIONS**

Liabilities related to the consolidation of clerical functions were $4 million and $10 million at December 31, 2006 and 2005, respectively, and primarily provide for separation programs announced in 2003, 2004 and 2005 and severance costs associated with the clerical consolidation plan adopted in 1995 upon the Merger. During 2005, BNSF recorded other liabilities of approximately $5 million primarily related to a voluntary severance program for certain union employees. The July 2004 separation program affected approximately 40 employees and resulted in accrued severance costs of approximately $4 million. Reductions related to the July 2004 separation program were substantially completed by December 31, 2004.

**OTHER EMPLOYEE SEPARATION COSTS**

Other employee separation cost liabilities were $5 million and $6 million at December 31, 2006 and 2005, respectively, and principally relate to certain remaining non-union employee severances resulting from the fourth quarter 2001 workforce reduction and the Merger. These costs will be paid over the next several years based on deferral elections made by the affected employees. Also included in the other separation cost accrual is an estimate for the remaining payments to be made to other union employees as a result of a relocation program initiated in 2005 for which a $1 million accrual was recorded. As of December 31, 2006, the remaining liability balance related to this relocation program was insignificant as the program is substantially complete. Additionally, during 2004, the Company recorded a liability of approximately $2 million primarily related to a voluntary severance program for certain union employees.

**12. Earnings Per Share**

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 1.1 million, 0.1 million and 2.0 million for 2006, 2005 and 2004, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

**13. Employee Benefit Plans**

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees, and an unfunded BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132(R)*, which requires the recognition of the overfunded or underfunded status of a defined benefit postretirement plan in the Company's balance sheet. As a result, effective December 31, 2006, the Company began recognizing actuarial gains and losses and prior service costs, for which recognition had been deferred under the previous guidance as a component of other comprehensive loss, net of tax, until these costs are included in net cost. Additionally, the pronouncement eliminates the option for the Company to use a measurement date prior to the Company's fiscal year-end effective December 31, 2008. SFAS No. 158 provides two approaches to transition to a fiscal year-end measurement date, both of which are to be applied prospectively. Under the first approach, plan assets are measured on September 30, 2007, and then remeasured on January 1, 2008. Under the alternative approach, a 15-month measurement will be determined on September 30, 2007, that will cover the period until the fiscal year-end measurement is required on December 31, 2008. As the Company currently uses a measurement date of September 30, it is currently evaluating which measurement transition alternative it will use.

The following tables show the incremental effect of applying SFAS No. 158 to both the Company's pension and retiree health and welfare plans on individual line items in the Consolidated Balance Sheet as of December 31, 2006 (in millions):

| | Pension and Retiree Health and Welfare Benefits | | | | |
|---|---|---|---|---|---|
| | **Balances Prior to Adoption of SFAS No. 158 and the Minimum Liability Adjustment** | **Minimum Liability Adjustment** | **Balances Prior to Adoption of SFAS No. 158** | **SFAS No. 158 Adoption Adjustments** | **Ending Balances After Adoption of SFAS No. 158** |
| Pension asset | $ 156 | $ – | $ 156 | $ (156) | $ – |
| Total assets | $ 31,799 | $ – | $ 31,799 | $ (156) | $ 31,643 |
| | | | | | |
| Pension liability | $ 52 | $ – | $ 52 | $ (52) | $ – |
| Additional minimum pension liability | $ 417 | (64) | $ 353 | (353) | $ – |
| Liability for retiree health and welfare benefits | $ 257 | – | $ 257 | (257) | $ – |
| Pension and retiree health and welfare liability | $ – | – | $ – | 630 | $ 630 |
| Deferred income taxes | $ 8,240 | 24 | $ 8,264 | (48) | $ 8,216 |
| Total liabilities | $ 21,367 | $ (40) | $ 21,327 | $ (80) | $ 21,247 |
| | | | | | |
| AOCL | $ (241) | $ 40 | $ (201) | $ (76) | $ (277) |
| Total stockholders' equity | $ 10,432 | $ 40 | $ 10,472 | $ (76) | $ 10,396 |

Components of the net cost for these plans were as follows (in millions):

| | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Year ended December 31,** | **2006** | **2005** | **2004** | **2006** | **2005** | **2004** |
| Service cost | **$ 25** | $ 20 | $ 19 | **$ 3** | $ 2 | $ 3 |
| Interest cost | **94** | 95 | 97 | **15** | 17 | 20 |
| Expected return on plan assets | **(97)** | (102) | (113) | **–** | – | – |
| Actuarial loss | **46** | 25 | 12 | **3** | – | 5 |
| Net amortization and deferred amounts | **–** | – | – | **(7)** | (8) | (4) |
| Net cost recognized | **$ 68** | $ 38 | $ 15 | **$ 14** | $ 11 | $ 24 |

The projected benefit obligation is the present value of benefit earned to date by plan participants, including the effect of assumed future salary increases and expected healthcare cost trend rate increases. The following table shows the change in projected benefit obligation based on the September 30 measurement date (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Benefit Obligation** | **2006** | **2005** | **2006** | **2005** |
| Benefit obligation at beginning of period | **$ 1,858** | $ 1,710 | **$ 295** | $ 299 |
| Service cost | **25** | 20 | **3** | 2 |
| Interest cost | **94** | 95 | **15** | 17 |
| Plan participants' contributions | **–** | – | **8** | 8 |
| Actuarial loss (gain) | **(18)** | 156 | **19** | (1) |
| Medicare subsidy | **–** | – | **1** | – |
| Benefits paid | **(129)** | (123) | **(30)** | (30) |
| Projected benefit obligation at end of period | **1,830** | 1,858 | **311** | 295 |
| Component representing future salary increases | **(76)** | (105) | **–** | – |
| Accumulated benefit obligation at end of period | **$ 1,754** | $ 1,753 | **$ 311** | $ 295 |

Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had accumulated and projected benefit obligations in excess of plan assets at September 30, 2006 and 2005.

The following table shows the change in plan assets of the plans based on the September 30 measurement date (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Plan Assets** | **2006** | **2005** | **2006** | **2005** |
| Fair value of plan assets at beginning of period | **$ 1,347** | $ 1,276 | **$ –** | $ – |
| Actual return on plan assets | **126** | 176 | **–** | – |
| Employer contribution | **50** | 18 | **21** | 22 |
| Plan participants' contributions | **–** | – | **8** | 8 |
| Medicare subsidy | **–** | – | **1** | – |
| Benefits paid | **(129)** | (123) | **(30)** | (30) |
| Fair value of plan assets at measurement date | **$ 1,394** | $ 1,347 | **$ –** | $ – |
| Adjustment for fourth quarter contribution | **$ 111** | $ 45 | **$ 6** | $ 5 |

The following table shows the funded status, defined as plan assets less the projected benefit obligation, as of December 31 (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2006** | **2005** | **2006** | **2005** |
| Funded status (plan assets less projected benefit obligations) | **$ (325)** | $ (466) | **$ (305)** | $ (290) |

Of the combined pension and retiree health and welfare benefits liability of $630 million recognized as of December 31, 2006, $26 million was included in other current liabilities.

Prior to December 31, 2006, actuarial gains and losses and prior service costs were not recognized in the Company's Consolidated Balance Sheets, but were only included in the footnote disclosures. Beginning on December 31, 2006, upon adoption of SFAS No. 158, the Company began recognizing these costs in the Consolidated Balance Sheet through an adjustment to AOCL. Beginning in 2007, the Company will recognize actuarial gains and losses and prior service costs in AOCL as they arise. The following table shows the pre-tax change in AOCL attributable to the components of the net cost and the change in benefit obligation (in millions):

| | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Change in AOCL** | **2006** | **2005** | **2004** | **2006** | **2005** | **2004** |
| Balance at January 1, | **$ 417** | $ 353 | $ 359 | **$ –** | $ – | $ – |
| Increase (decrease) in minimum liability included in other comprehensive loss prior to adoption of SFAS No. 158 | **(64)** | 64 | (6) | **–** | – | – |
| SFAS No. 158 adoption adjustment | **76** | – | – | **48** | – | – |
| Balance at December 31, | **$ 429** | $ 417 | $ 353 | **$ 48** | $ – | $ – |

The estimated net actuarial loss and prior service credit for these defined benefit pension plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $38 million and less than $1 million, respectively. The estimated net actuarial loss and prior service credit for the retiree health and welfare benefit plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $6 million and $8 million, respectively. Pre-tax amounts currently recognized in AOCL consist of the following (in millions):

| | Pension Benefits | Retiree Health and Welfare Benefits |
|---|---|---|
| | **2006** | **2006** |
| Net actuarial loss | **$ 430** | **$ 77** |
| Prior service cost | **(1)** | **(29)** |
| Pre-tax amount recognized in AOCL at December 31, | **429** | **48** |
| After-tax amount recognized in AOCL at December 31, | **$ 264** | **$ 29** |

The following tables show the amounts recognized in the Consolidated Balance Sheet and a reconciliation of the funded status of the plans with amounts recorded in the Consolidated Balance Sheets for periods prior to the adoption of SFAS No. 158 (in millions):

| December 31, | Pension Benefits 2005 | Retiree Health and Welfare Benefits 2005 |
|---|---|---|
| Accrued benefit cost | $ (361) | $ (265) |
| AOCL | 417 | – |
| Net amount recognized | $ 56 | $ (265) |

| December 31, | Pension Benefits 2005 | Retiree Health and Welfare Benefits 2005 |
|---|---|---|
| Fair value of plan assets as of September 30 | $ 1,347 | $ – |
| Benefit obligations as of September 30 | 1,858 | 295 |
| Funded status (plan assets less benefit obligations) | (511) | (295) |
| Amounts not recognized: | | |
| Unrecognized net loss | 524 | 61 |
| Unrecognized prior service cost | (2) | (36) |
| Adjustment for fourth quarter contribution | 45 | 5 |
| Net amount recognized as of December 31, | $ 56 | $ (265) |

The expected long-term rate of return is the return the Company anticipates earning, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered the following: (i) forward looking capital market forecasts; (ii) historical returns for individual asset classes; and (iii) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

| Assumptions used to determine net cost for fiscal years ended December 31, | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| | **2006** | 2005 | 2004 | **2006** | 2005 | 2004 |
| Discount rate | **5.25%** | 5.75% | 6.00% | **5.25%** | 5.75% | 6.00% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.25% | **–%** | –% | –% |
| Rate of compensation increase | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90% | 3.90% |

| Assumptions used to determine benefit obligations at September 30, | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2006** | 2005 | **2006** | 2005 |
| Discount rate | **5.50%** | 5.25% | **5.50%** | 5.25% |
| Rate of compensation increase | **3.90%** | 3.90% | **3.90%** | 3.90% |

The following table presents assumed health care cost trend rates:

| December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **10.00%** | 10.50% | 10.00% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **2012** | 2012 | 2010 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one percentage point change in assumed health care cost trend rates would have the following effects:

| | One Percentage-Point Increase | One Percentage-Point Decrease |
|---|---|---|
| Effect on total service and interest cost | $ 2 | $ (1) |
| Effect on post retirement benefit obligation | $ 25 | $ (21) |

The qualified BNSF Retirement Plan asset allocation at September 30, 2006 and 2005 and the target allocation for 2006 by asset category are as follows:

| | Target Allocation | Percentage of Pension Plan Assets at September 30, | |
|---|---|---|---|
| Plan Asset Allocation | 2006 | 2006 | 2005 |
| Equity Securities | **45 – 75%** | **63%** | 64% |
| Fixed Income Securities | **20 – 40%** | **28** | 28 |
| Real Estate | **5 – 15%** | **9** | 8 |
| Total | | **100%** | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the plan assets in relation to the plan liabilities while prudently managing the risk of a decrease in the plan's assets relative to those liabilities. To meet this objective, the Company's management has adopted the above asset allocation ranges. This allows flexibility to accommodate market changes in the asset classes within defined parameters.

In the fourth quarter of 2006, the Company made a required contribution of $2 million to the BNSF Supplemental Retirement Plan and a voluntarily contribution of $109 million to the BNSF Retirement Plan. The Company is not required to make any contributions to the BNSF Retirement Plan in 2007. Additionally, the Company expects to make benefit payments in 2007 of approximately $6 million and $23 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

The following table shows expected benefit payments from these defined benefit pension plans and expected claim payments and Medicare Part D subsidy receipts for the retiree health and welfare plan for the next five fiscal years and the aggregate five years thereafter (in millions):

| Fiscal year | Expected Pension Plan Benefit Payments [a] | Expected Retiree Health and Welfare Payments | Expected Medicare Subsidy |
|---|---|---|---|
| 2007 | $ 128 | $ 23 | $ (2) |
| 2008 | 129 | 24 | (2) |
| 2009 | 131 | 25 | (2) |
| 2010 | 133 | 25 | (3) |
| 2011 | 134 | 26 | (3) |
| 2012-2016 | 688 | 134 | (15) |

a Primarily consists of Qualified Defined Benefit Plan payments, which are made from the plan trust and do not represent an immediate cash outflow to the Company.

**DEFINED CONTRIBUTION PLANS**

BNSF sponsors qualified 401(k) plans that cover substantially all employees and a non-qualified defined contribution plan that covers certain officers and other employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Non-union employees are eligible to receive an annual discretionary matching contribution of up to 30 percent of the first six percent of their contributions. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $28 million, $20 million and $17 million in 2006, 2005 and 2004, respectively.

**OTHER**

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans that provide certain post-retirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $44 million, $43 million and $33 million, in 2006, 2005 and 2004, respectively (see Note 11 to the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers).

### 14. Stock-Based Compensation

On April 15, 1999, BNSF shareholders approved the Burlington Northern Santa Fe 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001, April 17, 2002, April 21, 2004 and April 19, 2006, BNSF shareholders approved the amendments to the Burlington Northern Santa Fe 1999 Stock Incentive Plan, which authorized additional awards of 9 million, 6 million, 7 million and 11 million shares, respectively, of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately 12 million common shares were available for future grant at December 31, 2006.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee directors' stock plan and authorized 900,000 shares of BNSF common stock to be issued in connection with this plan. Approximately 500,000 common shares were available for future grant at December 31, 2006.

**STOCK OPTIONS**

Under BNSF's stock plans, options may be granted to directors, officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The fair value of each option award is estimated on the date of grant using the Black-Scholes option-pricing model. The following assumptions apply to the options granted for the periods presented:

| Year ended December 31, | 2006 | 2005 | 2004 |
|---|---|---|---|
| Weighted average expected life (years) | **4.5** | 4.5 | 3.9 |
| Weighted average expected volatility | **24.0%** | 24.0% | 26.1% |
| Weighted average dividend per share | **$ 0.81** | $ 0.69 | $ 0.61 |
| Weighted average risk free interest rate | **4.76%** | 3.75% | 3.45% |
| Weighted average fair value of options granted per share | **$ 20.51** | $ 11.33 | $ 7.03 |

Expected volatilities are based on historical volatility of the Company's stock, implied volatilities from traded options on the Company's stock and other factors. The Company uses historical experience with exercise and post-vesting employment termination behavior to determine the options' expected life. The expected life represents the period of time that options granted are expected to be outstanding. The risk-free rate is based on the U.S. Treasury rate with a maturity date corresponding to the options' expected life.

A summary of the status of stock options as of, and for the year ended December 31, 2006, is presented below (options in thousands, aggregate intrinsic value in millions):

| Year ended December 31, 2006 | Options | Weighted Average Exercise Prices | Weighted Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balance at beginning of year | 18,281 | $ 32.45 | | |
| Granted | 1,719 | 79.83 | | |
| Exercised | (4,763) | 30.49 | | |
| Cancelled | (177) | 41.27 | | |
| Balance at end of year | 15,060 | $ 38.37 | 5.15 | $ 535 |
| Options exercisable at year end | 11,629 | $ 32.30 | 4.19 | $ 484 |

The total intrinsic value of options exercised was $222 million, $232 million and $140 million for the years ended December 31, 2006, 2005 and 2004, respectively.

## OTHER INCENTIVE PROGRAMS

BNSF has other long-term incentive programs that utilize restricted shares/units. A summary of the status of restricted shares/units and the weighted average grant date fair values as of, and for the year ended December 31, 2006, is presented below (shares in thousands):

| Year ended December 31, 2006 | Time Based | | Performance Based | | BNSF Incentive Bonus Stock Program | | BNSF Discounted Stock Purchase Program | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at beginning of year | 1,464 | $ 34.80 | 550 | $ 41.99 | 1,127 | $ 38.47 | 70 | $ 37.27 | 3,211 | $ 37.38 |
| Granted | 319 | 79.88 | 235 | 80.17 | 66 | 81.31 | 13 | 81.31 | 633 | 80.16 |
| Vested | (490) | 28.44 | (2) | 40.89 | (313) | 25.74 | (19) | 25.38 | (824) | 27.37 |
| Cancelled | (26) | 45.64 | (18) | 50.34 | (19) | 47.70 | – | – | (63) | 47.65 |
| Balance at end of year | 1,267 | $ 48.40 | 765 | $ 53.50 | 861 | $ 46.19 | 64 | $ 49.79 | 2,957 | $ 49.10 |

A summary of the weighted average grant date fair market values of the restricted share/units as of, and for the years ended December 31, 2005 and 2004, is presented below:

| Grant Date Fair Market Value of Awards Granted | Time Based | Performance Based | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program |
|---|---|---|---|---|
| Year ended December 31, 2005 | $ 49.23 | $ 49.21 | $ 47.58 | $ 46.91 |
| Year ended December 31, 2004 | $ 32.72 | $ 32.72 | $ 31.97 | $ 31.84 |

A summary of the fair value of the restricted share/units vested during the years ended December 31, 2006, 2005 and 2004 is presented below:

| Total Fair Value of Shares Vested (in millions) | Time Based | Performance Based | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program | Total |
|---|---|---|---|---|---|
| Year ended December 31, 2006 | $ 42 | $ – | $ 25 | $ 1 | $ 68 |
| Year ended December 31, 2005 | $ 44 | $ 11 | $ 8 | $ 1 | $ 64 |
| Year ended December 31, 2004 | $ 22 | $ – | $ 5 | $ – | $ 27 |

Time-based awards are granted to senior managers within BNSF primarily as a retention tool and to encourage ownership in the Company. They generally vest over three years, although in some cases up to five years, and are contingent on continued salaried employment.

Performance-based awards are granted to senior managers within BNSF to encourage ownership in the Company and to align management's interest with those of its shareholders. Performance-based awards generally vest over three years and are contingent on the achievement of certain predetermined corporate performance goals (e.g., return on invested capital (ROIC)) and continued salaried employment.

Additionally, related to the 2006 and 2005 performance-based grant, eligible employees may also earn performance stock that will be granted in 2009 and 2008 contingent upon achievement of higher ROIC goals and continued salaried employment. The Company has committed to a maximum grant of approximately 235,000 and 316,000 shares, respectively.

Certain employees were eligible to exchange through the Burlington Northern Santa Fe Incentive Bonus Stock Program the cash payment of their bonus for grants of restricted stock. In September 2005, the program was amended so that exchanges of cash bonus payments for awards of restricted stock were no longer permitted after February 2006.

Certain other salaried employees may participate in the BNSF Discounted Stock Purchase Program and use their bonus to purchase BNSF common stock at a discount from the market price. These shares immediately vest but are restricted for a three-year period.

Shares awarded under each of the plans may not be sold or used as collateral and are generally not transferable by the holder until the shares awarded become free of restrictions. Compensation cost, net of tax, recorded under the BNSF Stock Incentive Plans is shown in the following table (in millions):

| | **2006** | 2005 | 2004 |
|---|---|---|---|
| Compensation cost | **$ 72** | $ 37 | $ 31 |
| Income tax benefit | **(25)** | (14) | (12) |
| Total | **$ 47** | $ 23 | $ 19 |
| Compensation cost capitalized | **$ 6** | $ 3 | $ 2 |

At December 31, 2006, there was $109 million of total unrecognized compensation cost related to unvested share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.38 years.

**15. Common Stock and Preferred Capital Stock**

**COMMON STOCK**

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2006, there were 358 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of shareholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board of Directors (the Board) out of funds legally available and to share ratably in all assets available for distribution to shareholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

**PREFERRED CAPITAL STOCK**

At December 31, 2006, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights and qualifications and restrictions of each series. As of December 31, 2006, no Class A Preferred Stock had been issued.

**SHARE REPURCHASE PROGRAM**

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time through open market transactions or otherwise. In December 1999, April 2000, September 2000, January 2003 and December 2005, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 180 million shares. During 2006, 2005 and 2004, the Company repurchased approximately 18 million, 14 million and 10 million, respectively, of its common stock at average prices of $73.43 per share, $54.95 per share and $35.98 per share, respectively. Total repurchases through December 31, 2006, were 166 million shares at a total average cost of $34.18 per share, leaving 14 million shares available for repurchase out of the 180 million shares presently authorized. Additionally, during 2006, the Company repurchased shares from employees at a cost of $30 million to satisfy tax withholding obligations on the vesting of restricted stock or the exercise of stock options.

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized.

In December 2005, the Company entered into prepaid forward transactions to purchase $600 million of the Company's common stock whereby a net settlement in shares would occur upon settlement of the transactions. In February 2006, these transactions were settled, and approximately 8 million shares were delivered. While the transactions had no impact on the shares outstanding at the end of 2005, outstanding shares used in the calculation of 2006 earnings per share were reduced by approximately 8 million shares when the transactions were settled in late February. The Company accounted for the transactions in accordance with Emerging Issues Taskforce (EITF) 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock*, which required that the $600 million prepayment be recorded as a reduction in equity in 2005. When the final settlement was made in February, this reduction in equity was reclassified from prepaid forward repurchase of treasury stock to treasury stock.

**16. Accounting Pronouncements**

In September 2006, the FASB issued FASB Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. Under the previous guidance, four alternative methods of accounting for planned major maintenance activities were permitted. However, with the issuance of this FSP, the accrue-in-advance method of accounting for planned major maintenance activities will no longer be allowed, effective the first fiscal year beginning after December 15, 2006. The Company currently uses the accrue-in-advance method of accounting for leased locomotive overhauls, which includes the refurbishment of the engine and related components. Beginning on January 1, 2007, the Company will transition to the deferral method and will apply this change retrospectively for all financial statements presented. Correspondingly, BNSF will eliminate the liability recorded from the accrue-in-advance methodology and establish an asset for overhauls that have been performed. Prospectively, the asset will be amortized to expense until the next overhaul or the end of the lease, whichever is first, typically between 6 and 8 years. The offset will result in an increase of approximately $125 million to the 2005 opening retained earnings balance. Net income for the years ended December 31, 2006 and 2005 is expected to increase as compared with amounts currently presented by approximately $2 million and $3 million, respectively.

In June 2006, the FASB issued FIN 48, Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109, Accounting for Income Taxes. The Interpretation addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FIN 48, the Company may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties on income taxes, accounting in interim periods and requires increased disclosures. The provisions of FIN 48 are effective beginning January 1, 2007. The impact of the Company's reassessment of its tax positions in accordance with the requirements of FIN 48 is expected to be immaterial; however, the Company is awaiting additional guidance expected to be issued in March 2007.

See also Note 13 to the Consolidated Financial Statements for information regarding the adoption of SFAS No. 158.

### 17. Quarterly Financial Data—Unaudited

| Dollars in millions, except per share data | Fourth[a] | Third | Second | First |
|---|---|---|---|---|
| **2006** | | | | |
| Revenues | $ 3,882 | $ 3,939 | $ 3,701 | $ 3,463 |
| Operating income | $ 942 | $ 920 | $ 863 | $ 792 |
| Net income | $ 519 | $ 488 | $ 470 | $ 410 |
| Basic earnings per share | $ 1.45 | $ 1.36 | $ 1.30 | $ 1.12 |
| Diluted earnings per share | $ 1.42 | $ 1.33 | $ 1.27 | $ 1.09 |
| Dividends declared per share | $ 0.25 | $ 0.25 | $ 0.20 | $ 0.20 |
| Common stock price[b]: | | | | |
| High | $ 80.35 | $ 79.20 | $ 86.62 | $ 83.38 |
| Low | $ 72.77 | $ 64.82 | $ 71.96 | $ 68.32 |
| **2005** | | | | |
| Revenues | $ 3,550 | $ 3,317 | $ 3,138 | $ 2,982 |
| Operating income | $ 800 | $ 778 | $ 710 | $ 634 |
| Net income | $ 430 | $ 414 | $ 366 | $ 321 |
| Basic earnings per share | $ 1.16 | $ 1.12 | $ 0.98 | $ 0.86 |
| Diluted earnings per share | $ 1.13 | $ 1.09 | $ 0.96 | $ 0.83 |
| Dividends declared per share | $ 0.20 | $ 0.20 | $ 0.17 | $ 0.17 |
| Common stock price[b]: | | | | |
| High | $ 71.33 | $ 59.32 | $ 53.99 | $ 55.66 |
| Low | $ 56.67 | $ 47.51 | $ 46.30 | $ 45.05 |

a 2005 operating income, net income and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share.

b Average of high and low reported daily stock price

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, BNSF’s principal executive officer and principal financial officer have concluded that BNSF’s disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to BNSF’s management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Additionally, as of the end of the period covered by this report, BNSF's principal executive officer and principal financial officer have concluded that there have been no changes in BNSF's internal control over financial reporting that occurred during BNSF's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, BNSF's internal control over financial reporting.

**Item 9B. Other Information**

None.

## Part III

### Item 10. Directors, Executive Officers and Corporate Governance

Information concerning the directors of BNSF will be provided under the heading "Item 1: Election of Directors; Nominees for Directors" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the executive officers of BNSF is included in Part 1 of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be provided under the heading "Communications and Other Matters; Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Directors and Governance Committee's policy with regard to consideration of any director candidates recommended by shareholders will be provided under the heading "Communications and Other Matters; Procedures for Recommending Director Candidates" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Audit Committee and the Audit Committee Financial Expert will be provided under the heading "Governance of the Committee; Board Committees; Audit Committee" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference into the Form 10-K.

The Company has adopted a Code of Ethics for the Chief Executive Officer and Senior Financial Officers (Code of Ethics) applicable to the Chief Executive Officer, Chief Financial Officer and Controller. A copy of the Code of Ethics is available on the Company's website at www.bnsf.com under the "Investors Link," and any waiver from the Code of Ethics will be timely disclosed on the Company's website as will any amendments to the Code of Ethics.

### Item 11. Executive Compensation

Information concerning the compensation of directors and executive officers of BNSF will be provided under the headings "Directors' Compensation," "Compensation Discussion and Analysis" and "Executive Compensation" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Certain information about BNSF's equity compensation plans is set forth in the table below (number of shares in thousands) as of December 31, 2006:

| Plan Category | Number of shares to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of shares available for future issuance |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 15,060 | $ 38.37 | 12,417 |
| Equity compensation plans not approved by shareholders | – | – | – |
| Total | 15,060 | $ 38.37 | 12,417 |

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the heading "Stock Ownership in the Company; Certain Beneficial Owners and Ownership of Management" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Information concerning certain relationships and related transactions will be provided under the heading "Governance of the Company; Director Independence and Review of Related Party Transactions" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

### Item 14. Principal Accountant Fees and Services

Information concerning principal accounting fees and services will be provided under the heading "Item 2: Appointment of Independent Auditor; Independent Auditor Fees" in BNSF's proxy statement for its 2007 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

## Part IV

**Item 15. Exhibits, Financial Statement Schedules**

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—see Item 8.

   Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**BURLINGTON NORTHERN SANTA FE CORPORATION**

Dated: February 16, 2007

By: /s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.

| SIGNATURE | TITLE |
|---|---|
| /s/ Matthew K. Rose<br>Matthew K. Rose | Chairman, President and Chief Executive Officer (Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ Paul W. Bischler<br>Paul W. Bischler | Vice President and Controller (Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>Alan L. Boeckmann | Director |
| /s/ Donald G. Cook*<br>Donald G. Cook | Director |
| /s/ Vilma S. Martinez*<br>Vilma S. Martinez | Director |
| /s/ Marc F. Racicot*<br>Marc F. Racicot | Director |
| /s/ Roy S. Roberts*<br>Roy S. Roberts | Director |
| /s/ Marc J. Shapiro*<br>Marc J. Shapiro | Director |

| | |
|---|---|
| /s/ J.C. Watts, Jr.* <br> J.C. Watts, Jr. | Director |
| /s/ Robert H. West* <br> Robert H. West | Director |
| /s/ J. Steven Whisler* <br> J. Steven Whisler | Director |
| /s/ Edward E. Whitacre, Jr.* <br> Edward E. Whitacre, Jr. | Director |

Dated: February 16, 2007

*By: /s/ Roger Nober
Roger Nober
Executive Vice President Law and Secretary

## BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
## EXHIBIT INDEX

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| (3) | Articles of Incorporation and Bylaws | | | | |
| 3.1 | Amended and Restated Certificate of Incorporation of BNSF, dated December 21, 1994, as amended. | 10-Q | 8/13/1998 | 1-11535 | 3.1 |
| 3.2 | By-Laws of Burlington Northern Santa Fe Corporation, as amended and restated, dated December 7, 2006. ** | | | | |
| (4) | Instruments defining the rights of security holders, including indentures | | | | |
| 4.1 | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. | S-3 | 2/8/1999 | 333-72013 | 4 |
| 4.2 | Form of BNSF's 6 1/8% Notes Due March 15, 2009. | 10-K | 3/31/1999 | 1-11535 | 4.2 |
| 4.3 | Form of BNSF's 6 3/4% Debentures Due March 15, 2029. | 10-K | 3/31/1999 | 1-11535 | 4.3 |
| 4.4 | Form of BNSF's 6.70% Debentures Due August 1, 2028. | 10-K | 3/31/1999 | 1-11535 | 4.4 |
| 4.5 | Form of BNSF's 7.875% Notes Due April 15, 2007. | 10-K | 2/12/2001 | 1-11535 | 4.5 |
| 4.6 | Form of BNSF's 8.125% Debentures Due April 15, 2020. | 10-K | 2/12/2001 | 1-11535 | 4.6 |
| 4.7 | Form of BNSF's 7.95% Debentures Due August 15, 2030. | 10-K | 2/12/2001 | 1-11535 | 4.7 |
| 4.8 | Form of BNSF's 6.75% Notes Due July 15, 2011. | 10-Q | 8/3/2001 | 1-11535 | 4.1 |
| 4.9 | Form of BNSF's 5.90% Notes Due July 1, 2012. | 10-Q | 8/9/2002 | 1-11535 | 4.1 |
| 4.10 | Officers' Certificate of Determination as to the terms of BNSF's 4.875% Notes Due January 15, 2015, including Exhibit A thereto, the form of the Notes. | 8-K | 12/9/2004 | 1-11535 | 4.1 |
| 4.11 | Indenture, dated as of December 8, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | S-3 ASR | 12/8/2005 | 333-130214 | 4.1 |
| 4.12 | Certificate of Trust of BNSF Funding Trust I, executed and filed by U.S. Bank Trust National Association, Linda Hurt and James Gallegos, as Trustees. | S-3 ASR | 12/8/2005 | 333-130214 | 4.3 |
| 4.13 | Amended and Restated Declaration of Trust of BNSF Funding Trust I, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.4 |
| 4.14 | Guarantee Agreement between BNSF and U.S. Bank Trust National Association, as Guarantee Trustee, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.5 |
| 4.15 | First Supplemental Indenture, dated as of December 15, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | 8-K | 12/15/2005 | 1-11535 | 4.6 |
| 4.16 | Agreement as to Expenses and Liabilities dated as of December 15, 2005, between BNSF and BNSF Funding Trust I. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit C) |
| 4.17 | Form of BNSF Funding Trust I's 6.613% Trust Preferred Securities. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit D) |
| 4.18 | Officer's Certificate of Determination as to the terms of BNSF's 6.20% Debentures Due August 15, 2036, including the form of the Debentures. | 10-Q | 10/24/2006 | 1-11535 | 4.1 |

Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission.

| Exhibit Number and Description | Incorporated by Reference (if applicable) Form | File Date | File No. | Exhibit |
|---|---|---|---|---|
| (10) Material Contracts | | | | |
| 10.1 Burlington Northern Santa Fe Non-Employee Directors' Stock Plan, as amended and restated September 21, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.1 |
| 10.2 Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Director's Restricted Stock Unit Award Agreement.* | 8-K | 5/23/2005 | 1-11535 | 10.1 |
| 10.3 Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Non-Qualified Stock Option Grant Agreement.* | 8-K | 12/15/2004 | 1-11535 | 99.9 |
| 10.4 BNSF Railway Company Incentive Compensation Plan, as amended and restated April 19, 2006.* | 8-K | 4/24/2006 | 1-11535 | 10.2 |
| 10.5 Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated effective December 9, 2004.* ** | | | | |
| 10.6 Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan, as amended and restated effective December 9, 2004.* ** | | | | |
| 10.7 Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated effective September 14, 2005.* | 8-K | 9/19/2005 | 1-11535 | 10.1 |
| 10.8 Burlington Northern Santa Fe 1996 Stock Incentive Plan, as amended and restated September 21, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.3 |
| 10.9 Burlington Northern Santa Fe Supplemental Retirement Plan, effective October 1, 1996, as amended through July 21, 2005.* | 8-K | 7/27/2005 | 1-11535 | 10.1 |
| 10.10 Retirement Benefit Agreement between BNSF and Matthew K. Rose, as amended and restated September 21, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.5 |
| 10.11 Retirement Benefit Agreement, dated January 16, 2003, between BNSF and John P. Lanigan.* | 10-K | 2/13/2004 | 1-11535 | 10.29 |
| 10.12 Burlington Northern Santa Fe Estate Enhancement Program, as amended and restated, effective November 1, 1996.* | 10-K 405 | 3/31/1997 | 1-11535 | 10.15 |
| 10.12.1 Amendment of Burlington Northern Santa Fe Estate Enhancement Program, dated December 3, 1998.* | 10-Q | 8/11/1999 | 1-11535 | 10.2 |
| 10.12.2 Termination of Burlington Northern Santa Fe Estate Enhancement Program, dated September 17, 2003.* ** | | | | |
| 10.13 Form of BNSF Change-in-Control Agreement, as amended and restated September 21, 2006 (applicable to Messrs. Rose, Hund, Ice, Lanigan, Moreland and Nober and one other executive officer).* | 10-Q | 10/24/2006 | 1-11535 | 10.4 |
| 10.14 Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan, as amended September 12, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.6 |
| 10.15 Burlington Northern Inc. Director's Charitable Award Program.* | 10-K | 4/1/1996 | 1-11535 | 10.22 |
| 10.16 Burlington Northern Santa Fe Salary Exchange Option Program, as amended and restated October 1, 2004.* | 10-K | 2/15/2005 | 1-11535 | 10.18 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| 10.17 | Burlington Northern Santa Fe 1999 Stock Incentive Plan, as amended and restated September 21, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.2 |
| 10.18 | Form of 1999 Stock Incentive Plan Stock Option Award Agreement Terms and Conditions.* | 8-K | 12/15/2004 | 1-11535 | 99.2 |
| 10.19 | Form of 1999 Stock Incentive Plan Master Restricted Stock Award Agreement.* | 8-K | 12/15/2004 | 1-11535 | 99.3 |
| 10.20 | Form of 1999 Stock Incentive Plan Reload Stock Option Agreement.* | 8-K | 12/15/2004 | 1-11535 | 99.4 |
| 10.21 | Form of 1999 Stock Incentive Plan Exchange Option Grant Agreement.* | 8-K | 12/15/2004 | 1-11535 | 99.5 |
| 10.22 | Form of 1999 Stock Incentive Plan Senior Management Stock Deferral Plan Award Agreement.* | 8-K | 12/15/2004 | 1-11535 | 99.6 |
| 10.23 | Form of 1999 Stock Incentive Plan Executive Agreement.* | 8-K | 12/15/2004 | 1-11535 | 99.7 |
| 10.24 | Form of 1999 Stock Incentive Plan Performance Stock Award Agreement.* | 8-K | 5/6/2005 | 1-11535 | 10.4 |
| 10.25 | Form of 1999 Stock Incentive Plan Award Agreement Including Notice of Grant and Master Stock Option Terms and Conditions, dated May 2, 2005 (Incentive Stock Options).* | 8-K | 5/6/2005 | 1-11535 | 10.1 |
| 10.26 | Form of 1999 Stock Incentive Plan Award Agreement Including Notice of Grant and Master Stock Option Terms and Conditions, dated May 2, 2005 (Incentive Stock Options and Non-qualified Stock Options).* | 8-K | 5/6/2005 | 1-11535 | 10.2 |
| 10.27 | Form of 1999 Stock Incentive Plan Award Agreement Including Notice of Grant and Master Restricted Stock Unit Terms and Conditions, dated May 2, 2005.* | 8-K | 5/6/2005 | 1-11535 | 10.3 |
| 10.28 | Form of 1999 Stock Incentive Plan Notice of Grant of Incentive Stock Options and Non-Qualified Stock Options and Award Agreement.* | 8-K | 12/15/2004 | 1-11535 | 99.1 |
| 10.29 | Form of 1999 Stock Incentive Plan Incentive Bonus Stock Program Award Agreement.* | 10-K | 2/17/2006 | 1/11535 | 10.38 |
| 10.30 | Amended and Restated Benefits Protection Trust Agreement by and between Burlington Northern Santa Fe Corporation and Wachovia Bank, dated January 16, 2005.* | 10-K | 2/15/2005 | 1-11535 | 10.22 |
| 10.31 | Burlington Northern Santa Fe Directors' Retirement Plan.* | 10-K | 4/1/1996 | 1-11535 | 10.27 |
| 10.31.1 | Termination of Burlington Northern Santa Fe Directors' Retirement Plan, dated July 17, 2003.* ** | | | | |
| 10.32 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and directors.* | 10-K | 3/31/1999 | 1-11535 | 10.37 |
| 10.33 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and certain officers, including Matthew K. Rose, Thomas N. Hund, Carl R. Ice, John P. Lanigan, Jr., Jeffrey R. Moreland, Roger Nober and Peter J. Rickershauser.* | 10-K | 3/31/1999 | 1-11535 | 10.38 |
| 10.34 | Burlington Northern Santa Fe 2005 Deferred Compensation Plan for Non-Employee Directors, effective April 21, 2005.* | 8-K | 4/26/2005 | 1-11535 | 10.1 |
| 10.35 | Burlington Northern Santa Fe Deferred Compensation Plan for Directors, as amended and restated December 9, 2004.* ** | | | | |

| Exhibit Number and Description | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|
| | Form | File Date | File No. | Exhibit |
| 10.36 Replacement Capital Covenant, dated as of December 15, 2005, by BNSF in favor of and for the benefit of each Covered Debtholder (as defined therein). | 10-K | 2/17/2006 | 1-11535 | 10.41 |
| 10.37 Summary of Executive Officer Compensation for 2007.* ** | | | | |
| 10.38 Summary of Non-Employee Directors' Compensation for 2007.* ** | | | | |
| (12) Statements re: Computation of Ratios | | | | |
| 12.1 Computation of Ratio Earnings to Fixed Charges.** | | | | |
| (21) Subsidiaries of the registrant | | | | |
| 21.1 Subsidiaries of BNSF.** | | | | |
| (23) Consents of experts and counsel | | | | |
| 23.1 Consent of PricewaterhouseCoopers LLP.** | | | | |
| (24) Power of Attorney | | | | |
| 24.1 Power of Attorney.** | | | | |
| (31) Rule 13a-14(a)/15d-14(a) Certifications | | | | |
| 31.1 Principal Executive Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002).** | | | | |
| 31.2 Principal Financial Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002).** | | | | |
| (32) Section 1350 Certifications | | | | |
| 32.1 Certification Pursuant to Rule 13a-14(b) and 18 U.S.C. § 1350 (Section 906 of the Sarbanes-Oxley Act of 2002).** | | | | |
| (99) Additional Exhibits | | | | |
| 99.1 Certification Pursuant to Section 303A.12 of the New York Stock Exchange Listed Company Manual.** | | | | |

___

* Management contract or compensatory plan

** Filed herewith

**Exhibit 12.1**

## Burlington Northern Santa Fe Corporation and Subsidiaries
## Computation of Ratio of Earnings to Fixed Charges

In millions, except ratio amounts

(Unaudited)

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2003** | **2002** |
| Earnings: | | | | | |
| Income before income taxes and cumulative effect of accounting change | **$ 2,992** | $ 2,448 | $ 1,273 | $ 1,231 | $ 1,216 |
| Add: | | | | | |
| Interest and other fixed charges, excluding capitalized interest | **485** | 437 | 409 | 420 | 428 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **261** | 221 | 195 | 182 | 178 |
| Distributed income of investees accounted for under the equity method | **3** | 4 | 4 | 3 | 3 |
| Amortization of capitalized interest | **4** | 8 | 8 | 8 | 8 |
| Less: | | | | | |
| Equity in earnings of investments accounted for under the equity method | **27** | 15 | 9 | 14 | 17 |
| Total earnings available for fixed charges | **$ 3,718** | $ 3,103 | $ 1,880 | $ 1,830 | $ 1,816 |
| Fixed charges: | | | | | |
| Interest and fixed charges | **$ 499** | $ 450 | $ 419 | $ 429 | $ 441 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **261** | 221 | 195 | 182 | 178 |
| Total fixed charges | **$ 760** | $ 671 | $ 614 | $ 611 | $ 619 |
| Ratio of earnings to fixed charges | **4.89x** | 4.62x | 3.06x | 3.00x | 2.93x |

## Exhibit 31.1

**Principal Executive Officer's Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2007

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

## Exhibit 31.2

**Principal Financial Officer's Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2007

/s/ Thomas N. Hund
Thomas N. Hund
Executive Vice President and
Chief Financial Officer

## Exhibit 32.1

# Certification Pursuant to Rule 18 U.S.C. § 1350

(Section 906 of Sarbanes-Oxley Act of 2002)

**Burlington Northern Santa Fe Corporation**

In connection with the Annual Report of Burlington Northern Santa Fe Corporation (the "Company") on Form 10-K for the year ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Matthew K. Rose, Chairman, President and Chief Executive Officer of the Company, and Thomas N. Hund, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to his knowledge on the date hereof:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 16, 2007

| /s/ Matthew K. Rose | /s/ Thomas N. Hund |
|---|---|
| Matthew K. Rose | Thomas N. Hund |
| Chairman, President and Chief Executive Officer | Executive Vice President and Chief Financial Officer |

A signed original of this written statement required by Section 906 has been provided to Burlington Northern Santa Fe Corporation and will be retained by Burlington Northern Santa Fe Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## Exhibit 99.1

### Annual CEO Certification

(Section 303A.12 (a) of the New York Stock Exchange Listed Company Manual)

As the Chief Executive Officer of Burlington Northern Santa Fe Corporation and as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, I hereby certify that as of the date hereof I am not aware of any violation by the Company of NYSE's Corporate Governance listing standards, other than has been notified to the Exchange pursuant to Section 303A.12(b) and disclosed on Exhibit H to the Company's Domestic Company Section 303A Annual Written Affirmation.

/s/ Matthew K. Rose

Matthew K. Rose
Chairman, President and Chief Executive Officer
May 18, 2006

[This certification is without qualification.]

## Burlington Northern Santa Fe Corporation Directors*

**EDWARD E. WHITACRE, JR., LEAD DIRECTOR**[1,2,4]
Chairman and Chief Executive Officer, AT&T Inc. (diversified communications holding company), San Antonio, Texas.
BOARD MEMBER SINCE 1993.

**ALAN L. BOECKMANN**[3,4]
Chairman and Chief Executive Officer, Fluor Corporation (professional services holding company offering engineering, procurement, construction management and other services), Irving, Texas.
BOARD MEMBER SINCE 2001.

**DONALD G. COOK**[2]
Retired General, United States Air Force, San Antonio, Texas.
BOARD MEMBER SINCE 2005.

**VILMA S. MARTINEZ**[1]
Partner, Munger, Tolles & Olson LLP (law firm), Los Angeles, California.
BOARD MEMBER SINCE 1998.

**MARC F. RACICOT**[4]
President, American Insurance Association (property-casualty insurer advocacy organization), Washington, D.C. Former Governor of Montana.
BOARD MEMBER SINCE 2001.

**ROY S. ROBERTS**[1,2]
Managing Director of Reliant Equity Investors, L.L.C., Chicago, Illinois.
BOARD MEMBER SINCE 1993.

**MATTHEW K. ROSE**[1]
Chairman, President and Chief Executive Officer, Burlington Northern Santa Fe Corporation and BNSF Railway Company, Fort Worth, Texas.
BOARD MEMBER SINCE 2000.

**MARC J. SHAPIRO**[3,4]
Retired Vice Chairman for Finance, Risk Management and Administration, J.P. Morgan Chase & Co. (bank holding company), New York, New York.
BOARD MEMBER SINCE 1995.

**J.C. WATTS, JR.**[2]
Chairman, J.C. Watts Companies, Inc. and J.C. Watts Enterprises, LLC (communications and public affairs), Washington, D.C. Former Congressman (R-4th Dist. Oklahoma) and Chairman, House Republican Conference.
BOARD MEMBER SINCE 2003.

**ROBERT H. WEST**[1,3]
Retired Chairman of the Board, Butler Manufacturing Company (manufacturer of pre-engineered building systems and specialty components), Kansas City, Missouri.
BOARD MEMBER SINCE 1980.

**J. STEVEN WHISLER**[3]
Chairman and Chief Executive Officer, Phelps Dodge Corporation (mining and manufacturing), Phoenix, Arizona.
BOARD MEMBER SINCE 1995.

**COMMITTEE ASSIGNMENTS:**
1 *Executive Committee*
2 *Compensation and Development Committee*
3 *Audit Committee*
4 *Directors and Corporate Governance Committee*

*YEARS OF BOARD SERVICE INCLUDES SERVICE ON BOARDS OF BURLINGTON NORTHERN INC., SANTA FE PACIFIC CORPORATION AND PREDECESSOR CORPORATIONS.

## Corporate Officers[1]

**MATTHEW K. ROSE**[2]
Chairman, President and Chief Executive Officer

**THOMAS N. HUND**[2]
Executive Vice President and Chief Financial Officer

**CARL R. ICE**[2]
Executive Vice President and Chief Operations Officer

**JOHN P. LANIGAN, JR.**[2]
Executive Vice President and Chief Marketing Officer

**JEFFREY R. MORELAND**[2]
Executive Vice President Public Affairs

**ROGER NOBER**[2]
Executive Vice President Law and Secretary

**PAUL W. BISCHLER**
Vice President and Controller

**JEFFREY J. CAMPBELL**
Vice President – Technology Services and Chief Information Officer

**JAMES H. GALLEGOS**
Vice President and Corporate General Counsel

**AMY C. HAWKINS**
Vice President – Government Affairs

**PAUL R. HOFERER**
Vice President and General Counsel

**LINDA J. HURT**
Assistant Vice President – Finance and Treasurer

**MARY JO KEATING**
Vice President – Corporate Relations
EFFECTIVE JANUARY 2007

**JEANNE E. MICHALSKI**
Vice President – Human Resources and Medical

**MARSHA K. MORGAN**
Vice President – Investor Relations

**PETER J. RICKERSHAUSER**[2]
Vice President – Network Development

**RICHARD A. RUSSACK**
Vice President – Corporate Relations

**DAVID W. STROPES**
Vice President – Corporate Audit Services

**SHELLEY J. VENICK**
Vice President and General Tax Counsel

**RICHARD E. WEICHER**
Vice President and General Counsel – Regulatory

1 *These officers hold similar positions with BNSF Railway Company.*
2 *Executive Officer of Burlington Northern Santa Fe Corporation.*

## Operating Company Officers

**PAUL B. ANDERSON**
Vice President – Marketing Support

**STEVAN B. BOBB**
Group Vice President – Coal

**STEPHEN G. BRANSCUM**
Group Vice President – Consumer Products

**ROLLIN D. BREDENBERG**
Vice President – Service Design and Performance

**M. DAVID DEALY**
Vice President – Transportation

**FREDERICK G. (FRITZ) DRAPER**
Vice President – Business Unit Operations and Support

**GEORGE DUGGAN**
Vice President – Domestic Intermodal Marketing

**KATHRYN M. FARMER**
Vice President – Industrial Products Sales

**JOHN J. FLEPS**
Vice President – Labor Relations

**GREGORY C. FOX**
Vice President – Engineering

**DAVID L. FREEMAN**
Regional Vice President – Operations

**DAVID L. GARIN**
Group Vice President – Industrial Products

**CRAIG HILL**
Vice President – Mechanical and Value Engineering

**DENNIS R. JOHNSON**
Vice President and Chief Sourcing Officer

**KEVIN KAUFMAN**
Group Vice President – Agricultural Products

**MARK A. KOTTER**
Vice President – Customer Integration

**ROBERT W. LEASE**
Regional Vice President – Operations

**FREDERICK R. MALESA**
Vice President – International Intermodal Marketing

**JULIE A. PIGGOTT**
Vice President – Finance

**CHRIS A. ROBERTS**
Regional Vice President – Operations

**SAMI M. SHALAH**
Vice President – Coal Marketing

**DENIS SMITH**
Vice President – Industrial Products Marketing

**MARK A. SCHULZE**
Vice President – Safety, Training and Operations Support

# Shareholder Information

**SHARES LISTED**
New York Stock Exchange,
Ticker Symbol: BNI

**PRINCIPAL CORPORATE OFFICE**
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830
(800) 795-2673
www.bnsf.com

**STOCK TRANSFER AGENT AND REGISTRAR**
*Stock Transfer Agent and Registrar*
Computershare Trust Company, N.A.
250 Royall Street
Canton, MA 02021

*Telephone:* (800) 526-5678

*For account information, go to:* www.computershare.com

**SHAREHOLDERS**
As of February 2, 2007, there were approximately 34,000 shareholders of record.

**SHAREHOLDER SERVICES**

*You are encouraged to contact our Transfer Agent directly for the shareholder services listed below:*
Change in Certificate Registration, Dividend Reinvestment Service, Change of Mailing Address, Lost or Stolen Certificates, Replacement of Dividend Checks, Direct Deposit of Dividends, Consolidation of Multiple Accounts, Elimination of Duplicate Report Mailings, Replacement of Form 1099-DIV.

**DIVIDEND REINVESTMENT PLAN**
A dividend reinvestment plan is provided for registered shareholders through the Transfer Agent as a convenient way to purchase more shares through investment of dividends or voluntary cash payments. A booklet describing the plan is available from the Transfer Agent.

**FORM 10-K**
The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) is posted on the Company's Web site, www.bnsf.com. A copy of the Annual Report on Form 10-K is also available to shareholders free of charge upon request to the Company's Investor Relations Department at 2500 Lou Menk Drive, Fort Worth, Texas 76131-2828. The Company's filings on Form 10-K, Form 10-Q and Form 8-K are posted on the Company's Web site as soon as reasonably practicable after the reports are electronically filed with the SEC. Reports on Forms 3, 4 and 5 by directors and Section 16 reporting officers are posted on the Company's Web site no later than the day following their filing with the SEC.

**INSTITUTIONAL INVESTORS**
*Inquiries from security analysts and investment professionals should be directed to the Company's investor relations contact:*
Ms. Marsha K. Morgan
Vice President – Investor Relations
(817) 352-6452

**ANNUAL MEETING**
The Annual Meeting of Shareholders will be held on Thursday, April 19, 2007, at 8:00 a.m. CDT, at The Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102.

**PERFORMANCE GRAPH**
The following graph depicts a five-year comparison of cumulative total shareholder returns for the Company, the Standard & Poor's 500 Stock Index (S&P 500), and the Dow Jones U.S. Transportation Average Index (Dow Jones). The Dow Jones index consists of 20 railroad, airline, trucking, and marine transport companies. The Company is included within the S&P 500 and Dow Jones indices. The graph assumes an investment of $100 for the five-year period commencing December 31, 2001, and ending December 31, 2006, in the Company's common stock and the S&P 500 and the Dow Jones indices, and the reinvestment of dividends.




© 2007 Burlington Northern Santa Fe Corporation. All rights reserved.
Design: Methodologie, Inc.; Photography: Tyler Boley, Wyatt McSpadden (CEO portrait); Printing: ColorGraphics


BNSF
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830

# EXHIBIT PX0585

UNION PACIFIC

®

**UNION PACIFIC CORPORATION** 2006 ANNUAL REPORT

## FINANCIAL HIGHLIGHTS

| *Millions of Dollars, Except Per Share Amounts and Ratios* | *2006* | *2005* | *2004* |
|---|---|---|---|
| **FOR THE YEAR** | | | |
| Operating Revenue | $15,578 | $13,578 | $12,215 |
| Operating Income | 2,884 | 1,795 | 1,295 |
| Net Income | 1,606 | 1,026 | 604 |
| Per Share — Basic: | 5.96 | 3.89 | 2.33 |
| Per Share — Diluted: | 5.91 | 3.85 | 2.30 |
| Dividends Declared Per Share | 1.20 | 1.20 | 1.20 |
| Capital Investments | 2,242 | 2,169 | 1,876 |
| Cash Provided by Operating Activities | 2,880 | 2,595 | 2,257 |
| Free Cash Flow (a) | 516 | 234 | 215 |
| **AT YEAR-END** | | | |
| Total Assets | $36,515 | $35,620 | $34,596 |
| Total Debt | 6,780 | 7,416 | 8,131 |
| Common Shareholders' Equity | 15,312 | 13,707 | 12,655 |
| Equity Per Common Share (b) | 56.68 | 51.41 | 48.58 |
| **FINANCIAL RATIOS (%)** | | | |
| Operating Margin | 18.5 | 13.2 | 10.6 |
| Operating Ratio | 81.5 | 86.8 | 89.4 |
| Lease Adjusted Debt to Capital (c) | 40.2 | 43.6 | 45.1 |
| Return on Average Common Shareholders' Equity | 11.1 | 7.8 | 4.8 |
| Return on Invested Capital (d) | 8.2 | 6.4 | 4.7 |

(a) *Free cash flow is defined as cash provided by operating activities less cash used in investing activities less dividends paid. Free cash flow is not considered a financial measure under accounting principles generally accepted in the United States (GAAP) by SEC Regulation G and Item 10 of SEC Regulation S-K. For a reconciliation to GAAP, please see Item 7 of the 2006 Annual Report on Form 10-K.*

(b) *Equity per common share is calculated as follows: common shareholders' equity divided by common shares issued less treasury shares outstanding.*

(c) *Lease adjusted debt to capital is computed as follows: total debt plus net present value of operating leases divided by total debt plus equity plus net present value of operating leases. Lease adjusted debt to capital is considered a non-GAAP financial measure by SEC Regulation G and Item 10 of SEC Regulation S-K. For a reconciliation to GAAP, please see Item 7 of the 2006 Annual Report on Form 10-K.*

(d) *Union Pacific Corporation defines return on invested capital as follows: net income plus interest expense plus sale of receivables fees plus interest on present value of operating leases less taxes on interest and fees divided by average equity plus average debt plus average value of sold receivables plus average present value of operating leases. Return on invested capital is considered a non-GAAP financial measure by SEC Regulation G and Item 10 of SEC Regulation S-K. For a reconciliation to GAAP, please see Item 7 of the 2006 Annual Report on Form 10-K.*



**Fellow Shareholders:**

Union Pacific today is a company that is committed to improving safety, strengthening financial returns, increasing value to our customers, and providing critical benefits to the economy of our country and the communities where we operate. We achieved a number of milestones in 2006, highlighting the value of our franchise and the dedication of our employees.

### Union Pacfic's Growth Strategy

Our Company is growing. The records we set in 2006 created a platform to continue rewarding our shareholders in 2007 and beyond. Looking ahead, we see even greater growth opportunities. Customers need our investment in additional rail capacity so they can grow. We move the food, vehicles, plastics, coal, lumber and consumer goods that people use every day. Our communities are increasingly aware that UP's rail network strengthens their local economies and connects them to the rest of the world.

Our strategy is to enhance the long-term value of our company by serving the nation's growing need for quality transportation. We will achieve this strategy by providing valued service to our customers, improving the efficiency of our operations, leveraging our franchise diversity and making growth investments in corridors where we have a strategic advantage.

### Strong 2006 Business Volumes Lead Record Year

Our 2006 business volumes started out strong, growing 4 percent in the first quarter. Seven-day carloadings, a measure of our business volume, topped the 200,000 mark for the first time ever in June. Our busiest months generally are August through October, so setting the carloading record in June was significant. With such an early surge in our business, the normal fall peak shipping season was expected to be even stronger. However, reduced housing starts, cuts in auto production and softness in the domestic intermodal market slowed the pace of our growth at year's end.

Total carloads in 2006 were a record 9.9 million, up 3 percent versus 2005. This growth helped each of our six business groups set revenue records for the second straight year. Our Energy, Intermodal and Automotive groups also set individual volume records:

- Coal-fired plants are the single largest generator of electricity in America today. We shipped 194 million tons of coal from the Southern Powder River Basin, an 8 percent increase, to support growing electrical demand.
- Intermodal volumes grew 6 percent, driven by double-digit growth in the movement of steamship containers carrying consumer goods that Americans need in their daily lives.
- UP's automotive shipments grew 5 percent to a record 834,000 carloads. With U.S. light vehicle sales declining 3 percent in the year, growth in automotive is a testament to the strength of UP's auto franchise.

We also experienced record growth in two emerging Agricultural markets. Ethanol and dried distiller grain soluables (DDGS), an ethanol co-product used for livestock feed, grew nearly 50 percent during 2006. In total, we moved more than 1.1 billion gallons of ethanol and 1.6 million tons of DDGS.

## Increasing Customer Value

Operating initiatives aimed at network simplification, technology and capital investments drove better service reliability and efficiency throughout 2006. Network fluidity, as measured by velocity, terminal dwell times and rail car inventory, improved across the board while we moved record volumes. Our customers recognized the service gains, rating us 8 points higher on their satisfaction surveys in 2006.

Customers also saw the benefits of improved service from our Customer Inventory Management System (CIMS). This technology solution increases terminal throughput without adding physical capacity, prevents congestion and enhances service reliability. By the end of 2006, CIMS monitored nearly 80 percent of our daily industry volumes. Final rollouts will occur in 2007, achieving 100 percent coverage.

We are increasing customer value through our capacity programs as well. Our investments are designed to promote safety, service, growth and efficiency. In 2007, we are planning a $3.2 billion capital program that primarily is targeted at growth. We are committed to grow with our customers if the investment is justified by the financial returns.

## Safety

Freight railroads are one of the safest industries in America, and we're committed to becoming even safer. During 2006, we made progress toward that goal.

One of the challenges the rail industry faces is the growth in both train and highway vehicle traffic, which in recent years has contributed to a nationwide increase in crossing accidents. We are working to reverse that trend with improved crossing visibility, technology and education. Both our new and current employees use locomotive simulators to help instill safe operating practices. We are addressing driver behavior through more than 7,000 public education classes, reaching over 425,000 citizens to promote greater crossing safety.

During 2006, rail shipments moved across our network more safely as we reduced the frequency of derailments 17 percent and the associated expense fell 13 percent. At the core of all these efforts is the safety of our employees, which improved 15 percent.

In 2007, we are continuing our partnership with Dow Chemical, Union Tank Car and the Federal Railroad Administration (FRA) on the "Next Generation Tank Car Project" to further improve the safety of chemical transportation through better tank car designs. We also are working with the FRA to conduct two pilot projects using Communications-Based Train Control. This technology enhances train safety and fuel efficiency through the use of GPS and onboard computers.

## UP and the Environment

In addition to being one of the safest forms of transportation, rail is one of the most environmentally friendly. For example, railroads are generally three times more fuel efficient than trucks, and one intermodal train can take up to 280 trucks off our congested highways.

At UP, we are continually improving our fuel efficiency through better locomotive technology, engineer training and employee involvement programs, such as Fuel Masters. In 2006, we moved, on average, one ton of freight over 780 miles on a single gallon of diesel fuel – a nearly 30-mile improvement over the past two years. This improved fuel efficiency saved more than 50 million gallons of diesel in 2006.

In addition to promoting fuel conservation, greater fuel efficiency also reduces emissions. Today, we are teaming up with other rails, locomotive manufacturers and governmental authorities to develop low-emission technologies for application in new and existing models. This technology has the potential to reduce emissions in new switch locomotives by up to 80 percent.

## Record Financial Results

Record demand, improved operational efficiency and enhanced network safety drove a financial performance in 2006 that, by nearly every key financial measure, was a "best ever" year:

- Operating revenue increased nearly 15 percent to $15.6 billion. Core price improvement, fuel surcharges and record volume gains all contributed to the growth.
- Operating income totaled $2.9 billion, up more than 60 percent.

- Net income increased 57 percent to $1.6 billion.
- Operating ratio improved 5.3 points to 81.5 percent.
- Free cash flow totaled $516 million after paying $322 million in dividends to our shareholders and voluntarily adding $150 million to fully fund our employee retirement plan.*

### 2007 Outlook

In January, we took additional steps to create value for our shareholders with an increased dividend and share repurchase program. Our Board of Directors approved a 17 percent quarterly dividend increase to $0.35 per share. The Board also authorized a repurchase of up to 20 million common shares to be completed by year-end 2009.

While we are somewhat cautious about the economic outlook at the start of 2007, we remain very optimistic about the long-term potential for our Company. We expect very strong demand for coal, international intermodal and ethanol, but slower housing and auto markets could offset some of the growth. Operationally, we expect to move increased tonnage across our network with greater efficiency.

Capacity expansion programs are needed to carry the record growth our customers are projecting. Our investments are targeted in corridors that support strong growth opportunities, primarily in coal and intermodal. They also allow us to enhance overall network fluidity and efficiency. Customers value the increased service reliability that results from more efficient operations. At the same time, they understand that today's transportation rates must support investments for future growth.

We are confident that our business returns will support these investments. Our return on invested capital improved 2.5 points in 2006, to 8.2 percent, and we are focused on further improvement.*

### Employees – A Strength of UP

UP's employees are at the heart of our efforts to provide quality service, improve financial returns and support the communities in which we operate. This will continue to be true as our workforce changes over the next several years.

Roughly 25 percent of UP's current employees are new to the Company since 2003. An ongoing priority for 2007 is recruiting top candidates with a diversity of experience, cultural backgrounds and interests to UP. Through efforts such as UP's Operations Management Training program, the U.S. Army's PaYS (Partnership for Youth Success), the Marine Civilian Development Program and college recruiting, we hired more than 6,400 new employees in 2006, and expect to hire another 4,500 in 2007. Recognition as a top employer by magazines such as *G.I. Jobs*, *Working Mother* and *LATINA Style* provides evidence that UP is an "Employer of Choice."

Although many long-service employees retired from Union Pacific over the past year, most noteworthy was our Chairman, Dick Davidson. Dick began his career in 1960 as a brakeman working his way through college. His retirement from Union Pacific in January 2007 marks the end of a long and successful chapter in the Company's history. We all owe Dick a huge debt of gratitude for his leadership and vision in helping create today's Union Pacific. We wish him a long, healthy and happy retirement, which is well deserved.

I am pleased to welcome two new board members, Andrew Card and Thomas (Mack) McLarty. Their varied backgrounds and diverse experience will be valued additions to our board, and I look forward to working with them in the years ahead.

Coming off a record-setting year in 2006, expectations for 2007 are high. We will measure success by how well we increase shareholder returns, deliver customer value, enhance our reputation in the communities where we operate and instill employee pride. Our safety initiatives, growth strategy, capital investments, environmental initiatives and training programs all are directed at achieving these goals. Union Pacific has a great history, and we're looking forward to a great future.

Jim Young
Chairman, President and Chief Executive Officer



* *For reconciliations to GAAP for our 2005 income tax adjusted return on invested capital and free cash flow calculations, please refer to the Union Pacific Web site under Investor Relations.*

# DIRECTORS AND EXECUTIVE OFFICERS

## BOARD OF DIRECTORS

**Andrew H. Card, Jr.**
Former White House Chief of Staff
*Board Committees: Corporate Governance and Nominating, Finance*

**Erroll B. Davis, Jr.**
Chancellor
University System of Georgia
*Board Committees: Audit, Compensation and Benefits*

**Thomas J. Donohue**
President and
Chief Executive Officer
U.S. Chamber of Commerce
*Board Committees: Compensation and Benefits (Chair), Corporate Governance and Nominating*

**Archie W. Dunham**
Retired Chairman
ConocoPhillips
*Board Committees: Finance (Chair), Corporate Governance and Nominating*

**Judith Richards Hope**
Distinguished Visitor from Practice
and Professor of Law
Georgetown University Law Center
*Board Committees: Audit (Chair), Finance*

**Charles C. Krulak**
General, USMC, Ret.
Former Commandant of the
United States Marine Corps
*Board Committees: Audit, Finance*

**Michael W. McConnell**
Managing Partner
Brown Brothers Harriman & Co.
*Board Committees: Audit, Compensation and Benefits*

**Thomas F. McLarty III**
President
Kissinger McLarty Associates
*Board Committee: Finance*

**Steven R. Rogel**
Chairman, President and
Chief Executive Officer
Weyerhaeuser Company
*Board Committees: Corporate Governance and Nominating (Chair), Compensation and Benefits*

**James R. Young***
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

## EXECUTIVE OFFICERS

**James R. Young***
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

**Dennis J. Duffy**
Executive Vice President–Operations
Union Pacific Railroad Company

**Charles R. Eisele**
Senior Vice President–Strategic Planning
Union Pacific Corporation

**Bernard R. Gutschewski**
Vice President–Taxes
Union Pacific Corporation

**J. Michael Hemmer**
Senior Vice President–Law
and General Counsel
Union Pacific Corporation

**Mary Sanders Jones**
Vice President and Treasurer
Union Pacific Corporation

**Robert M. Knight, Jr.**
Executive Vice President–Finance
and Chief Financial Officer
Union Pacific Corporation

**John J. Koraleski**
Executive Vice President–
Marketing and Sales
Union Pacific Railroad Company

**Mary E. McAuliffe**
Vice President–External Relations
Union Pacific Corporation

**Richard J. Putz**
Vice President and Controller
Union Pacific Corporation

**Barbara W. Schaefer**
Senior Vice President–Human Resources
and Secretary
Union Pacific Corporation

**Lynden L. Tennison**
Senior Vice President and
Chief Information Officer
Union Pacific Corporation

**Robert W. Turner**
Senior Vice President–Corporate Relations
Union Pacific Corporation

*Elected Chairman effective February 1, 2007*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

*(Mark One)*

[X] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2006

**OR**

[ ] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ______________ to ______________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION

(Exact name of registrant as specified in its charter)

| **UTAH** | **13-2626465** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1400 DOUGLAS STREET, OMAHA, NEBRASKA**
(Address of principal executive offices)

**68179**
(Zip Code)

**(402) 544-5000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Common Stock (Par Value $2.50 per share)** | **New York Stock Exchange, Inc.** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes X No ___

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ___ No X

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. X

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act):

Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).
Yes ___ No X

As of June 30, 2006, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $24.9 billion.

The number of shares outstanding of the registrant's Common Stock as of January 31, 2007, was 270,752,306.

Documents Incorporated by Reference – Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on May 3, 2007, are incorporated by reference into Part III of this report. The registrant's Proxy Statement will be filed with the Securities and Exchange Commission pursuant to Regulation 14A.

## TABLE OF CONTENTS
## UNION PACIFIC CORPORATION


**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 9 |
| Item 2. | Properties | 9 |
| Item 3. | Legal Proceedings | 10 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 12 |
| | Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries | 13 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 14 |
| Item 6. | Selected Financial Data | 16 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| | Critical Accounting Policies | 37 |
| | Cautionary Information | 41 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 41 |
| Item 8. | Financial Statements and Supplementary Data | 42 |
| | Report of Independent Registered Public Accounting Firm | 43 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 71 |
| Item 9A. | Controls and Procedures | 71 |
| | Management's Annual Report on Internal Control Over Financial Reporting | 72 |
| | Report of Independent Registered Public Accounting Firm | 73 |
| Item 9B. | Other Information | 74 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers, and Corporate Governance | 75 |
| Item 11. | Executive Compensation | 75 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 75 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 76 |
| Item 14. | Principal Accounting Fees and Services | 76 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 77 |
| | Signatures | 78 |
| | Certifications | 88 |

# PART I

## Item 1. Business

## GENERAL

Union Pacific Corporation owns one of America's leading transportation companies. Its principal operating company, Union Pacific Railroad Company, links 23 states in the western two-thirds of the country and serves the fastest-growing U.S. population centers. Union Pacific Railroad Company's diversified business mix includes agricultural products, automotive, chemicals, energy, industrial products, and intermodal. It offers competitive long-haul routes from all major West Coast and Gulf Coast ports to eastern gateways. Union Pacific Railroad Company connects with Canada's rail systems and is the only railroad serving all six major gateways to Mexico, making it North America's premier rail franchise.

Union Pacific Corporation was incorporated in Utah in 1969 and maintains its principal executive offices at 1400 Douglas Street, Omaha, NE 68179. The telephone number at that address is (402) 544-5000. The common stock of Union Pacific Corporation is listed on the New York Stock Exchange (NYSE) under the symbol "UNP".

For purposes of this report, unless the context otherwise requires, all references herein to "UPC", "Corporation", "we", "us", and "our" shall mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which we separately refer to as "UPRR" or the "Railroad".

**Available Information** – Our Internet website is www.up.com. We make available free of charge on our website (under the "Investors" caption link) our annual reports on Form 10-K; our quarterly reports on Form 10-Q; our current reports on Form 8-K; our proxy statements; Forms 3, 4, and 5, filed on behalf of directors and executive officers; and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the Exchange Act), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our website previously filed SEC reports and exhibits via a link to EDGAR on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials, including By-Laws, Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers, and employees are on our website. From time to time, the corporate governance materials on our website may be updated as necessary to comply with rules issued by the SEC and the NYSE or as desirable to promote the effective and efficient governance of our company. Any security holder wishing to receive, without charge, a copy of any of our SEC filings or corporate governance materials should send a written request to: Secretary, Union Pacific Corporation, 1400 Douglas Street, Omaha, NE 68179.

We have included the CEO and CFO certifications regarding our public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31(a) and (b) to this report. Additionally, we filed with the NYSE the CEO's certification regarding our compliance with the NYSE's Corporate Governance Listing Standards (Listing Standards) pursuant to Section 303A.12(a) of the Listing Standards, which was dated May 23, 2006, and indicated that the CEO was not aware of any violations of the Listing Standards by the Corporation.

References to our website address in this report, including references in Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website. Therefore, such information should not be considered part of this report.

## OPERATIONS

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network. Additional information regarding our operations is presented in Selected Financial Data, Item 6; Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7; and the Financial Statements and Supplementary Data, Item 8.

**Operations** – UPRR is a Class I railroad operating in the United States. We have 32,339 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers to move freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic moves through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. UPRR's freight traffic consists of bulk, manifest, and premium business. Bulk traffic is primarily coal, grain, rock, or soda ash in unit trains – trains transporting a single commodity from one source to one destination. Manifest traffic is individual carload or less than train-load business, including commodities such as lumber, steel, paper, and food. The transportation of finished vehicles and intermodal containers is part of the Railroad's premium business. In 2006, the Railroad generated commodity revenue totaling $14.9 billion from the following six commodity groups:

**2006 Commodity Revenue**




*Agricultural* – Transporting agricultural products, including whole grains, commodities produced from these grains, and food and beverage products, provided 16% of the Railroad's 2006 commodity revenue. With access to most major grain markets, the Railroad provides a critical link between the Midwest and western producing areas and export terminals in the Pacific Northwest (PNW) and Gulf ports, as well as Mexico. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. UPRR also serves significant domestic markets, including grain processors, animal feeders, and ethanol producers in the Midwest, West, South, and Rocky Mountain states. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products, and beverages, which are moved to major U.S. population centers for consumption. Express Lane and our recently inaugurated Produce Unit Train, our premium perishables services that move fruits and vegetables from the PNW and California with priority service to destinations in the East, compete with the trucking industry. We transport frozen meat and poultry to the West Coast ports for export, while beverages, primarily beer, enter the U.S. from Mexico.

*Automotive* – UPRR is the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. The Railroad off-loads finished vehicles at 38 vehicle distribution centers for delivery by truck to all major western U.S. cities. In addition to transporting finished vehicles, UPRR provides expedited handling of automotive parts in both boxcars and intermodal containers to several assembly plants. The Railroad carries automotive materials bound for assembly plants in Mexico, the U.S., and Canada and transports finished vehicles from manufacturing facilities in Mexico. In 2006, transportation of finished vehicles and automotive materials accounted for 10% of the Railroad's commodity revenue.

*Chemicals* – Transporting chemicals provided 14% of the Railroad's commodity revenue in 2006. The Railroad's franchise enables it to serve the chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. Two-thirds of the chemicals business consists of liquid and dry chemicals, plastics, and liquid petroleum products. In addition to transporting plastics, customers also leverage UPRR's storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California destined primarily for glass producing markets in the East, the West, and abroad. Fertilizer movements originate

primarily in the Gulf Coast region, as well as the West and Canada, bound for major agricultural users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 20% of the Railroad's 2006 commodity revenue. The Railroad's geographic network allows it to transport coal destined for utilities and industrial facilities in 27 states, as well as to the Gulf and rail/barge/ship facilities on the Mississippi and Ohio Rivers and the Great Lakes. UPRR serves mines located in the Southern Powder River Basin of Wyoming (SPRB), Colorado, Utah, southern Wyoming, and southern Illinois. SPRB coal represents the largest growth segment of the market, as utilities continue to favor its lower cost and low-sulfur content.

*Industrial Products* – The Railroad's extensive network enables the industrial products group to move numerous commodities between thousands of origin and destination points throughout North America. Lumber shipments originate primarily in the PNW and Canada for destinations throughout the United States for new home construction and repair and remodeling. Commercial and highway construction drives shipments of steel and construction products, consisting of rock, cement, and roofing materials. Paper and consumer goods, including furniture and appliances, are shipped to major metropolitan areas for consumers. Nonferrous metals and industrial minerals are moved for industrial manufacturing. In addition, the Railroad provides efficient and safe transportation for government entities and waste companies. In 2006, transporting industrial products provided 21% of the Railroad's commodity revenue.

*Intermodal* – UPRR's intermodal business, which represented 19% of the Railroad's 2006 commodity revenue, includes international, domestic, and premium shipments. International business consists of imported container traffic that arrives at West Coast ports via steamship for destinations throughout the United States. Domestic business includes domestic container and trailer traffic for intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time-sensitive business requirements account for the majority of our premium service.

**Working Capital** – We currently have, and historically have had, a working capital deficit, which is common in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Competition** – We are subject to competition from other railroads, motor carriers, and barge operators. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company (BNSF), operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other railroads and motor carriers. Motor carrier competition is particularly strong for five of our six commodity groups. Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly effective, especially for grain and bulk commodities. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity.

**Equipment Suppliers** – We depend on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment, high barriers to entry face potential new suppliers. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

**Employees** – Approximately 87% of our 50,739 full-time-equivalent employees are represented by 14 major rail unions. In January 2005, we began the current round of negotiations with the unions. Existing agreements remain in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's

procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. Contract negotiations with the various unions generally take place over an extended period of time, and we rarely experience work stoppages during negotiations. The current agreements provide for periodic cost of living wage increases until new agreements are reached.

## GOVERNMENTAL AND ENVIRONMENTAL REGULATION

**Governmental Regulation** – Our operations are subject to a variety of federal, state, and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

The operations of the Railroad are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT). The operations of the Railroad are also subject to the regulations of the Federal Railroad Administration (FRA) of the DOT and other federal and state agencies. The STB has jurisdiction over rates charged on certain regulated rail traffic; freight car compensation; transfer, extension, or abandonment of rail lines; and acquisition of control of rail common carriers. On January 26, 2007, the STB issued a decision limiting the manner in which U.S. railroads can calculate fuel surcharges on traffic regulated by the STB.

DOT and the Occupational Safety and Health Administration, along with other federal agencies, have jurisdiction over certain aspects of safety, movement of hazardous materials, movement and disposal of hazardous waste, emissions requirements, and equipment standards. Various state and local agencies have jurisdiction over disposal of hazardous waste and seek to regulate movement of hazardous materials in areas not otherwise preempted by federal law.

**Environmental Regulation** – We are subject to extensive federal and state environmental statutes and regulations pertaining to public health and the environment. The statutes and regulations are administered and monitored by the Environmental Protection Agency (EPA) and by various state environmental agencies. The primary laws affecting our operations are the Resource Conservation and Recovery Act, regulating the management and disposal of solid and hazardous wastes; the Comprehensive Environmental Response, Compensation, and Liability Act, regulating the cleanup of contaminated properties; the Clean Air Act, regulating air emissions; and the Clean Water Act, regulating waste water discharges.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Item 1A. Risk Factors

The information set forth in this Item 1A should be read in conjunction with the rest of the information included in this report, including Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, and Item 8, Financial Statements and Supplementary Data.

*We Must Manage Both Significant Demand for Our Services and Network Capacity* – Due to continuing demand for rail service and capacity constraints, we may experience network difficulties, including congestion and reduced velocity, which may compromise the level of service we provide to our customers. This level of demand may compound the impact of weather and weather-related events on our operations and velocity. Although we continue to improve our transportation plan, add capacity, and improve operations at our yards and other facilities, we cannot be sure that these measures will fully or adequately address any service shortcomings. Additionally, ongoing maintenance, restoration, and improvements in the SPRB could adversely affect coal shipments during the year. We also cannot be sure that we will not experience other difficulties related to

network capacity, dramatic and unplanned increases of demand for rail service in one or more of our commodity groups, or other events that could have a negative impact on our operational efficiency, any of which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Subject to Various Claims and Lawsuits That Could Result in Significant Expenditures* – The nature of our business exposes us to the potential for various claims and litigation related to labor and employment, personal injury, property damage, environmental liability, and other matters. Any material changes to litigation trends or a catastrophic rail accident or series of accidents involving any or all of property damage, personal injury, and environmental liability could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Required to Transport Hazardous Materials* – Federal laws require railroads, including UPRR, to transport hazardous materials. Any rail accident involving the release of hazardous materials could involve significant costs and claims for personal injury, property damage, and environmental penalties and remediation, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*The Availability of Qualified Personnel Could Adversely Affect Our Operations* – Changes in demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could negatively impact our ability to meet demand for rail service. Unpredictable increases in demand for rail services and a lack of network fluidity may exacerbate such risks, which could have a negative impact on our operational efficiency and otherwise have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Governmental Regulation* – We are subject to governmental regulation by a significant number of federal, state, and local authorities covering a variety of health, safety, labor, environmental (as discussed below), and other matters. Our failure to comply with applicable laws and regulations could have a material adverse effect on us. Governments may change the legislative or regulatory frameworks within which we operate without providing us with any recourse for any adverse effects on our business. Economic re-regulation of the rail industry would negatively impact our ability to determine prices for rail services and reduce capital spending on our rail network, resulting in a material adverse effect on our results of operations, financial condition, and liquidity. Also, some laws and regulations require us to obtain and maintain various licenses, permits, and other authorizations, and we cannot guarantee that we will continue to be able to do so. In addition, one or more consolidations of Class I railroads could lead to future re-regulation of the rail industry.

*Severe Weather Could Result in Significant Business Interruptions and Expenditures* – Severe weather conditions, events, and other natural phenomena, including earthquakes, hurricanes, fires, floods, extreme temperatures, and significant precipitation may cause business interruptions, including line outages on our rail network that can adversely affect our entire rail network, and result in increased costs, increased liabilities, and decreased revenue, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Strikes or Work Stoppages Could Adversely Affect Our Operations as the Majority of Our Employees Belong to Labor Unions and Labor Agreements* – We are a party to collective bargaining agreements with various labor unions. In January 2005, we began the current round of negotiations with the unions. Disputes with regard to the terms of these agreements or our potential inability to negotiate acceptable contracts with these unions could result in, among other things, strikes, work stoppages, or other slowdowns by the affected workers. If unionized workers were to engage in a strike, work stoppage, or other slowdown, or other employees were to become unionized, we could experience a significant disruption of our operations or higher ongoing labor costs, either of which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could compromise our service reliability and significantly increase our costs for healthcare, wages, and other benefits, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*We Rely on Technology and Technology Improvements in Our Business Operations* – We rely on information technology in all aspects of our business. If we do not have sufficient capital to acquire new technology or if we are unable to implement new technology, we may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, if we experience significant disruption or failure of one or more of our information technology systems, including computer hardware, software, and communications equipment, we could experience a service interruption, safety failure, security breach, or other operational difficulties, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Environmental Laws and Regulations* – Our operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; handling, storage, transportation, and disposal of waste and other materials; and hazardous material or petroleum releases. We generate and transport hazardous and non-hazardous waste in our operations, and we did so in our former operations. Environmental liability can extend to previously owned or operated properties, leased properties, and properties owned by third parties, as well as to properties we currently own. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. We have been and may be subject to allegations or findings that we have violated, or are strictly liable under, these laws or regulations. We could incur significant costs as a result of any of the foregoing, and we may be required to incur significant expenses to investigate and remediate known, unknown, or future environmental contamination, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Rising or Elevated Fuel Costs and Whether We Are Able to Mitigate These Costs with Fuel Surcharges Could Materially and Adversely Affect Our Business* – Fuel costs constitute a significant portion of our transportation expenses. Diesel fuel prices are subject to dramatic fluctuations, and significant price increases could have a material adverse effect on our operating results. Although we currently are able to recover a significant amount of our increased fuel expenses through revenue from fuel surcharges, we cannot be certain that we will always be able to mitigate rising or elevated fuel costs through surcharges. Future market conditions or legislative or regulatory activities could adversely affect our ability to apply fuel surcharges or adequately recover increased fuel costs through fuel surcharges. International, political, and economic circumstances affect fuel prices and supplies. Weather can also affect fuel supplies and limit domestic refining capacity. If a fuel supply shortage were to arise from OPEC production curtailments, a disruption of oil imports, or other causes, higher fuel prices could, despite our fuel surcharge programs, have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Face Competition from Other Railroads and Other Transportation Providers* – We face competition from other railroads, motor carriers and, to a lesser extent, ships, barges, and pipelines. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, any future consolidation of the rail industry could materially affect the competitive environment in which we operate.

*We May Be Affected by General Economic Conditions* – Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities carried by us may have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Utilize Capital Markets* – We rely on the capital markets to provide some of our capital requirements, including the issuance of commercial paper from time to time and the sale of certain of our receivables. Market instability or deterioration of our financial condition due to internal or external factors could restrict or prohibit

our access to commercial paper and reduce our credit ratings below investment grade, which would prohibit us from utilizing our sale of receivables program and significantly increase the cost of issuing debt.

*We Are Dependent on Two Key Domestic Suppliers of Locomotives* – Due to the capital intensive nature and sophistication of locomotive equipment, high barriers to entry face potential new suppliers. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

*We May Be Affected by Acts of Terrorism, War, or Risk of War* – Our rail lines, facilities, and equipment, including rail cars carrying hazardous materials, could be direct targets or indirect casualties of terrorist attacks. Terrorist attacks, or other similar events, any government response thereto, and war or risk of war may adversely affect our results of operations, financial condition, and liquidity. In addition, insurance premiums for some or all of our current coverages could increase dramatically, or certain coverages may not be available to us in the future.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

With operations in 23 states, we employ a variety of assets in the management and operation of our rail business. These assets include real estate, track and track structure, equipment, and facilities. We own and lease real estate that we use in our operations, and we also own real estate that is not required for our business, which we sell from time to time. Our equipment includes owned and leased locomotives and rail cars; heavy maintenance equipment and machinery; other equipment and tools in our shops, offices and facilities; and vehicles for maintenance, transportation of crews, and other activities. We operate numerous facilities, including terminals for intermodal and other freight; rail yards for train-building, switching, storage-in-transit (the temporary storage of customer goods in rail cars prior to shipment) and other activities; offices to administer and manage our operations; dispatch centers to direct traffic on our rail network; crew quarters to house train crews along our network; and shops and other facilities for fueling, maintenance, and repair of locomotives and repair and maintenance of rail cars and other equipment. We spent approximately $2.2 billion in cash capital during 2006 for, among other things, building and maintaining track, structures and infrastructure; upgrading and augmenting equipment; and implementing new technologies (see the capital investments table in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financial Condition, Item 7).

Certain of our properties are subject to federal, state, and local laws and regulations governing the protection of the environment (see discussion of environmental issues in Business – Governmental and Environmental Regulation, Item 1, and Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7).

**Track** – The Railroad operates on 32,339 main line and branch line route miles in 23 states in the western two-thirds of the United States. We own 26,466 route miles, with the remainder of route miles operated pursuant to trackage rights or leases. Route miles as of December 31, 2006 and 2005, were as follows:

| | ***2006*** | *2005* |
|---|---|---|
| Main line | **27,318** | 27,301 |
| Branch line | **5,021** | 5,125 |
| Yards, sidings and other lines | **19,257** | 20,241 |
| Total | **51,596** | 52,667 |

Rail and ties installed and replaced during the years ended December 31, 2006 and 2005 were as follows:

| | *2006* | *2005* |
|---|---|---|
| Track miles of rail: | | |
| New | **632** | 661 |
| Used | **361** | 312 |
| Ties (000) | **4,669** | 4,690 |

**Equipment** – Our primary rail equipment consisted of the following as of December 31, 2006 and 2005:

| | *2006* | *2005* |
|---|---|---|
| Owned or leased at year-end: | | |
| Locomotives | **8,475** | 8,226 |
| Freight cars: | | |
| Covered hoppers | **38,785** | 38,553 |
| Boxcars | **24,342** | 26,770 |
| Open-top hoppers | **19,012** | 19,950 |
| Gondolas | **14,884** | 15,037 |
| Other | **7,702** | 6,433 |
| Work equipment and other | **5,263** | 5,041 |

## Item 3. Legal Proceedings

From time to time, the Corporation is involved in legal proceedings, claims, and litigation that occur in connection with the Corporation's business. Management routinely assesses the Corporation's liabilities and contingencies in connection with these matters based upon the latest information available. Consistent with SEC rules and requirements, the Corporation describes below material pending legal proceedings (other than ordinary routine litigation incidental to the business of the Corporation), material proceedings known to be contemplated by governmental authorities, other proceedings arising under federal, state, or local environmental laws and regulations (including governmental proceedings involving potential fines, penalties, or other monetary sanctions in excess of $100,000) and such other pending matters that the Corporation may determine to be appropriate.

## Environmental Matters

As we reported in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2003, the San Joaquin County District Attorney filed an action against the Railroad on February 3, 2003, in the San Joaquin County Superior Court alleging claims under the California Business and Professions Code section 17200 (unfair business practices), Fish and Game Code section 5650 and 5650.1, California Health and Safety Code section 25189(d), and Public Nuisance, California Civil Code section 3480. The claims arise from a February 16, 2000, derailment in Stockton, California, in which a locomotive struck an object on the tracks, puncturing a fuel tank. The District Attorney alleged that diesel fuel from this spill entered waters of the State of California. The complaint also asserted claims under the above referenced statutes for any other diesel spill that may have occurred in the State of California between 2000 and 2003, in which diesel may have passed into waters of the State of California. It sought injunctive relief and civil penalties of $25,000 for the alleged February 16, 2000 diesel spill and total penalties of not less than $250,000 for all diesel spills that may have occurred since 2000. The District Attorney filed an amended complaint on April 10, 2003, which narrowed the claims to the incident of February 16, 2000. The amended complaint seeks both injunctive relief and daily penalties for each day that fuel was in the affected waterway, which could exceed $100,000.

As we reported in our Annual Report on Form 10-K for 2003, the District Attorneys of Merced, Madera, and Stanislaus Counties in California filed a criminal case against the Railroad relating to a series of alleged releases of

calcium oxide (lime). The criminal case was dismissed in the last quarter of 2003 and was subsequently refiled as a civil action by several counties in the San Joaquin County Superior Court. The refiled suit sought civil penalties against the Railroad in connection with the release of lime from an unidentified rail car between Chowchilla and Sacramento, California, on December 27, 2001, and another incident in which lime leaked from a rail car between Chowchilla and Stockton, California, on February 21, 2002. The suit contended that regulatory violations occurred by virtue of the Railroad's alleged failure to timely report the release of a "hazardous material," its alleged disposal of hazardous waste, and the alleged release of material into the waters of the State of California. On September 20, 2004, the Court dismissed the suit with prejudice. The State of California appealed this decision. On August 2, 2006, the Court of Appeals issued its decision, reversing the judgment and remanding the case for further proceedings consistent with its opinion. The Court of Appeals held that the State of California's claims against the Railroad for civil penalties were preempted by the Hazardous Materials Transportation Act (HMTA), with the exception of those claims that were based upon the Railroad's alleged failure to timely report the releases of calcium oxide to state and local authorities. With respect to these claims, the Court held that while they were not preempted by the HMTA on their face, it remained possible that those claims might ultimately be preempted once the trial court developed a record. The Railroad and the State of California requested that the California Supreme Court review the decision of the Court of Appeals. The California Supreme Court denied review, and the case has been remanded to the Superior Court.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, the Illinois Attorney General's office filed an Agreed Order and Complaint and a Complaint for Injunctive and Other Relief on October 7, 2004, in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) against The Alton & Southern Railway Company, a wholly-owned subsidiary of the Railroad, as a result of a collision and derailment on September 21, 2004. The State of Illinois seeks to enjoin The Alton & Southern Railway Company from further violations, as well as a monetary penalty. The amount of the proposed penalty is uncertain but could exceed $100,000.

As we reported in our Annual Report on Form 10-K for 2005, we received information in 2001 indicating EPA considered the Railroad a potentially responsible party for the Omaha Lead Site. The Omaha Lead Site consists of approximately 12,800 acres of residential property in the eastern part of Omaha, Nebraska, allegedly impacted by air emissions from two former lead smelters/refineries. One refinery was operated by ASARCO. EPA identified the Railroad as a potentially responsible party because more than 60 years ago the Railroad owned land that was leased to ASARCO. The Railroad disputes both the legal and technical base for EPA's allegations. It has nonetheless engaged in extensive negotiations with EPA. These negotiations have reached an apparent impasse. EPA issued a Unilateral Administrative Order with an effective date of December 16, 2005, directing the Railroad to implement an interim remedy at the site at an estimated cost of $50 million. Failure to comply with the order without just cause could subject the Railroad to penalties of up to $32,500 per day and triple EPA's costs in performing the work. The Railroad believes it has just cause not to comply with the order, but it offered to perform some of the work specified in the order as a compromise. EPA rejected this offer. The Railroad will vigorously contest liability and the imposition of any penalties.

As we reported in our Annual Report on Form 10-K for 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twenty-First Judicial Circuit (St. Clair County) seeking injunctive relief and civil penalties against the Railroad relating to a collision between UPRR and Norfolk Southern Railway Company (NS) trains near Momence, Illinois, on November 24, 2005. The collision derailed approximately five locomotives and 30 railcars. Two of the UPRR locomotives and two of the NS locomotives caught fire and four of the locomotives released approximately 16,000 gallons of diesel fuel. Other cars carrying food products derailed and released an unknown amount of product. The Railroad promptly responded and remediation is ongoing. The State of Illinois seeks a permanent injunction against the Railroad ordering UPRR to continue remediation. The State of Illinois seeks to enjoin UPRR from further violations and a monetary penalty. The amount of the proposed penalty is uncertain.

As we reported in our Annual Report on Form 10-K for 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) for injunctive and other relief

on November 28, 2005, against the Railroad, alleging a diesel fuel spill from an above-ground storage tank in a rail yard in Dupo, St. Clair County, Illinois. The State of Illinois seeks to enjoin UPRR from further violations and a monetary penalty. The amount of the proposed penalty is uncertain.

As we reported in our Annual Report on Form 10-K for 2003, the United States Attorney for the Central District of California notified the Railroad that the office intended to pursue criminal charges against the Railroad for alleged violations of federal environmental laws, including the federal Clean Water Act, in connection with releases of oil contaminated wastewater from our Taylor Yard in 2001 and 2003. On July 31, 2006, the United States Attorney filed criminal misdemeanor charges against us for these releases in the United States District Court for the Central District of California, and we received the Summons from the Court on August 8, 2006. We will vigorously defend the charges.

On October 23, 2006, the California Air Resources Board (ARB) notified the Railroad of its intent to impose civil penalties as a result of the Railroad's failure to perform and document annual opacity (smoke) testing for its heavy duty diesel vehicle fleet. The ARB proposed that the Railroad pay $135,000 and agree to other non-monetary conditions to settle these violations. Discussions between the Railroad and the ARB are continuing, and the ultimate amount of any penalty remains uncertain.

We received notices from EPA and state environmental agencies alleging that we are or may be liable under federal or state environmental laws for remediation costs at various sites throughout the United States, including sites on the Superfund National Priorities List or state superfund lists. We cannot predict the ultimate impact of these proceedings and suits because of the number of potentially responsible parties involved, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Other Matters

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, we were notified that a *qui tam*, or private citizen, complaint was filed in the United States District Court for the Central District of California against, among other parties, the City of Long Beach, City of Long Beach Harbor Department, Port of Long Beach (the Port), Union Pacific Corporation, Union Pacific Railroad Company, and Union Pacific Resources Company, also known as Union Pacific Resources Group Inc. (Resources), a former subsidiary of UPC. A private citizen filed the action because the federal government and the State of California elected not to pursue the claims. The complaint alleges that the defendants violated the Federal Civil False Claims Act and the California False Claims Act by conspiring to use public funds to (1) shift environmental cleanup liability to the Port when Resources sold its Terminal Island oil field property to the Port in 1994 and (2) effect the acquisition by the Port of the Terminal Island property in which the Port (or the State of California) allegedly already held certain incidents of title. The complaint, which has not been served on us, seeks damages of $2.4 billion, unspecified costs for remediating groundwater contamination, and triple damages and civil penalties of $10,000 per day. The plaintiff's extended time to serve the complaint expired on April 4, 2005, and the Corporation filed a motion to dismiss for plaintiff's failure to make timely service. However, the Court extended the plaintiff's time to provide service. On December 7, 2005, we learned that a summons for service of the complaint had been issued, and we were served with the complaint during the fourth quarter of 2006. We dispute the factual and legal bases of the complaint. We notified Anadarko Petroleum Corporation (Anadarko), as successor to Resources after its acquisition in 2000, that an indemnification agreement between Resources and the Corporation obligates Anadarko to indemnify us for all damages, costs, and expenses related to the complaint.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of security holders during the fourth quarter of 2006.

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

Our executive officers generally are elected and designated annually by the Board of Directors at our first meeting held after the Annual Meeting of Shareholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year, as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 16, 2007, relating to the executive officers.

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| James R. Young | Chairman, President and Chief Executive Officer of UPC and the Railroad | 54 | (1) |
| Robert M. Knight, Jr. | Executive Vice President – Finance and Chief Financial Officer of UPC and the Railroad | 49 | (2) |
| Charles R. Eisele | Senior Vice President – Strategic Planning of UPC and the Railroad | 57 | Current Position |
| J. Michael Hemmer | Senior Vice President – Law and General Counsel of UPC and the Railroad | 57 | (3) |
| Barbara W. Schaefer | Senior Vice President – Human Resources and Secretary of UPC and the Railroad | 53 | (4) |
| Lynden L. Tennison | Senior Vice President and Chief Information Officer of UPC and the Railroad | 47 | (5) |
| Robert W. Turner | Senior Vice President – Corporate Relations of UPC and the Railroad | 57 | Current Position |
| Bernard R. Gutschewski | Vice President – Taxes of UPC and Vice President and General Tax Counsel of the Railroad | 56 | Current Position |
| Mary E. McAuliffe | Vice President – External Relations of UPC | 60 | Current Position |
| Richard J. Putz | Vice President and Controller of UPC and Chief Accounting Officer and Controller of the Railroad | 59 | Current Position |
| Mary Sanders Jones | Vice President and Treasurer of UPC and Treasurer of the Railroad | 54 | Current Position |
| Dennis J. Duffy | Executive Vice President – Operations of the Railroad | 56 | Current Position |
| John J. Koraleski | Executive Vice President – Marketing and Sales of the Railroad | 56 | Current Position |

*(1) Mr. Young was elected Chief Executive Officer and President of UPC and the Railroad effective January 1, 2006. He was elected to the additional position of Chairman effective February 1, 2007. He was elected President and Chief Operating Officer of the Railroad, effective February 1, 2004, and he previously was Executive Vice President – Finance of UPC and Chief Financial Officer of the Railroad.*

*(2) Mr. Knight was elected to his current position effective February 1, 2004. He was elected Senior Vice President – Finance for UPC and the Railroad effective February 1, 2002, and he previously was Vice President and General Manager Automotive for the Railroad.*

*(3) Mr. Hemmer was elected to his current position effective June 1, 2004. Mr. Hemmer was elected Vice President – Law of the Railroad effective September 1, 2002, and previously was a partner at the law firm of Covington & Burling in Washington, D.C.*

*(4) Mrs. Schaefer has held the position of Senior Vice President – Human Resources for the past five years. In addition, she was elected Secretary of UPC and the Railroad effective June 1, 2004.*

*(5) Mr. Tennison was elected to his current position effective March 1, 2005. He previously was Vice President and Chief Technology Officer.*

# PART II

## Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities

Our common stock is traded on the NYSE under the symbol "UNP". The following table presents the dividends declared and the high and low closing prices of our common stock for each of the indicated quarters.

| *2006 - Dollars Per Share* | *Q1* | *Q2* | *Q3* | *Q4* |
|---|---|---|---|---|
| Dividends | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Common stock price: | | | | |
| High | 93.73 | 97.49 | 92.96 | 96.16 |
| Low | 77.62 | 83.83 | 78.65 | 86.27 |
| *2005 - Dollars Per Share* | | | | |
| Dividends | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Common stock price: | | | | |
| High | 70.10 | 70.19 | 72.20 | 81.26 |
| Low | 58.18 | 60.85 | 63.52 | 66.89 |

At January 31, 2007, there were 270,752,306 shares of outstanding common stock and 34,937 common shareholders of record. At that date, the closing price of the common stock on the NYSE was $101.00. We have paid dividends to our common shareholders during each of the past 107 years. We declared dividends totaling $323 million in 2006 and $316 million in 2005. On January 30, 2007, we increased the quarterly dividend to $0.35 per share, payable beginning on April 2, 2007, to shareholders of record on February 28, 2007. We are subject to certain restrictions regarding retained earnings with respect to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends increased to $7.8 billion at December 31, 2006, from $6.2 billion at December 31, 2005.

**Five-Year Performance Comparison** – The following graph provides an indicator of cumulative total shareholder returns for the Corporation as compared to a peer group index, comprised of Burlington Northern Sante Fe Corporation, CSX Corporation, and Norfolk Southern Corporation; the Dow Jones Transportation Index (Dow Jones); and the Standard & Poor's 500 Stock Index (S&P 500). The graph assumes that the value of the investment in Union Pacific Corporation's common stock and each index was $100 on December 31, 2001, and that all dividends were reinvested.



**Comparison Over One- and Three-Year Periods** – The following table presents the cumulative total shareholder returns, assuming reinvested dividends, over one- and three-year periods for the Corporation, a peer group index (as described above), the Dow Jones, and the S&P 500.

| *Period* | *UPC* | *Peer Group* | *Dow Jones* | *S&P 500* |
|---|---|---|---|---|
| 1 Year | 15.9% | 10.8% | 9.7% | 15.8% |
| 3 Year | 39.4 | 125.8 | 56.5 | 34.8 |

**Purchases of Equity Securities –** The purchased shares presented below relate solely to our equity compensation plans described in note 8 to the Financial Statements and Supplementary Data, Item 8. During the first nine months of 2006, 307,867 shares of our common stock were repurchased at an average price per share of $89.21. The following table presents common stock repurchases during each month for the fourth quarter of 2006:

| *Period* | *Total Number of Shares Purchased* | *Average Price Paid per Share* | *Total Number of Shares Purchased as Part of a Publicly Announced Plan or Program* | *Maximum Number of Shares That May Yet Be Purchased Under the Plan or Program* |
|---|---|---|---|---|
| Oct. 1 through Oct. 31 | | | | |
| Employee transactions [a] | 72,599 | $90.31 | N/A | N/A |
| Nov. 1 through Nov. 30 | | | | |
| Employee transactions [a] | 34,921 | 91.87 | N/A | N/A |
| Dec. 1 through Dec. 31 | | | | |
| Employee transactions [a] | 12,699 | 95.38 | N/A | N/A |
| Total | 120,219 | $91.30 | N/A | N/A |

*[a] Includes shares delivered or attested to UPC to pay stock option exercise prices or to satisfy tax withholding obligations for stock option exercises or vesting of retention shares or units.*

On January 30, 2007, our Board of Directors authorized us to repurchase up to 20 million shares of our common stock through December 31, 2009. We may make these repurchases on the open market or through other transactions. Our management will have sole discretion with respect to determining the timing and amount of these transactions (subject to the restrictions described above).

## Item 6. Selected Financial Data

The following table presents as of, and for the years ended, December 31, our selected financial data for each of the last five years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Financial Statements and Supplementary Data, Item 8. The information below is not necessarily indicative of the results of future operations.

| *Millions of Dollars, Except per Share Amounts, Carloads, Employee Statistics, and Ratios* | *2006* | *2005[a]* | *2004[b]* | *2003[c]* | *2002[d]* |
|---|---|---|---|---|---|
| **For the Year Ended December 31** | | | | | |
| Operating revenue [e] | **$15,578** | $13,578 | $12,215 | $11,551 | $11,159 |
| Operating income | **2,884** | 1,795 | 1,295 | 2,133 | 2,253 |
| Income from continuing operations | **1,606** | 1,026 | 604 | 1,056 | 1,265 |
| Net income | **1,606** | 1,026 | 604 | 1,585 | 1,341 |
| Per share – basic: | | | | | |
| Income from continuing operations | **5.96** | 3.89 | 2.33 | 4.15 | 5.02 |
| Net income | **5.96** | 3.89 | 2.33 | 6.23 | 5.32 |
| Per share – diluted: | | | | | |
| Income from continuing operations | **5.91** | 3.85 | 2.30 | 4.07 | 4.78 |
| Net income | **5.91** | 3.85 | 2.30 | 6.04 | 5.05 |
| Dividends declared per share | **1.20** | 1.20 | 1.20 | 0.99 | 0.83 |
| Cash provided by operating activities | **2,880** | 2,595 | 2,257 | 2,443 | 2,237 |
| **At December 31** | | | | | |
| Total assets | **$36,515** | $35,620 | $34,596 | $33,496 | $32,772 |
| Debt due after one year | **6,000** | 6,760 | 7,981 | 7,822 | 7,428 |
| Convertible preferred securities | **-** | - | - | - | 1,500 |
| Common shareholders' equity | **15,312** | 13,707 | 12,655 | 12,354 | 10,651 |
| Equity per common share [f] | **56.68** | 51.41 | 48.58 | 47.85 | 41.99 |
| **Additional Data** | | | | | |
| Commodity revenue [e] | **$14,862** | $12,957 | $11,692 | $11,041 | $10,663 |
| Carloads (000) | **9,852** | 9,544 | 9,458 | 9,239 | 9,131 |
| Operating margin (%) [g] | **18.5** | 13.2 | 10.6 | 18.5 | 20.2 |
| Operating ratio (%) [g] | **81.5** | 86.8 | 89.4 | 81.5 | 79.8 |
| Average employees (000) | **50.7** | 49.7 | 48.3 | 46.4 | 47.3 |
| Operating revenue per employee (000) | **$ 307.2** | $ 273.2 | $ 252.9 | $ 248.9 | $ 235.9 |
| **Financial Ratios (%)** | | | | | |
| Debt to capital [h] | **30.7** | 35.1 | 39.1 | 39.3 | 46.4 |
| Return on average common shareholders' equity | **11.1** | 7.8 | 4.8 | 13.8 | 13.3 |

*[a] 2005 net income includes a $118 million tax expense reduction to reflect a reduction in the estimated deferred income tax liability.*

*[b] 2004 operating income and net income includes a $247 million pre-tax ($154 million after-tax) charge for unasserted asbestos-related claims.*

*[c] Net income and total assets include the effects of the acquisitions of Motor Cargo as of November 30, 2002, and reflect the disposition of all of our trucking interests in 2003.*

*[d] 2002 net income includes $214 million pre-tax ($133 million after-tax) gains on asset dispositions. In addition, net income includes a reduction of income tax expense of $67 million related to tax adjustments for prior years' income tax examinations.*

*[e] Includes fuel surcharge revenue of $1,619 million, $963 million, $292 million, $93 million, and $7 million for 2006, 2005, 2004, 2003, and 2002, respectively.*

*[f] Equity per common share is calculated as follows: common shareholders' equity divided by common shares issued less treasury shares outstanding.*

*[g] Operating margin is defined as operating income divided by operating revenue. Operating ratio is defined as operating expenses divided by operating revenue.*

*[h] Debt to capital is determined as follows: total debt plus convertible preferred securities divided by total debt plus convertible preferred securities plus equity.*

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Financial Statements and Supplementary Data, Item 8, and other information in this report, including Risk Factors set forth in Item 1A and Critical Accounting Policies and Cautionary Information at the end of this Item 7.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network.

## EXECUTIVE SUMMARY

### 2006 Results

- **Safety** – Overall, safety results improved during 2006. The employee injury incident rate per 200,000 man-hours dropped to its lowest level, which also reduced the number of lost workdays. A continued focus on derailment prevention in 2006 resulted in a 17% reduction in incidents with associated costs declining 13%. In the area of public safety, we closed 410 grade crossings to reduce exposure and have video cameras in approximately 1,900, or 30%, of our road locomotive fleet to better analyze grade crossing incidents, thereby increasing safety for our employees and the public. The number of grade crossing incidents, however, increased 5% during the year, driven in part by the combination of increasing highway and rail traffic and urban expansion.

- **Financial Performance** – In 2006, we generated record operating income of $2.9 billion. Solid demand, yield increases, and improved operational efficiency drove the 61% increase in operating income. Our operating ratio was 81.5% for the year, a 5 point improvement compared to 2005. Net income of $1.6 billion also topped our previous milestone, translating into $5.91 diluted earnings per share.

- **Commodity Revenue Growth** – Our commodity revenue grew 15% year-over-year to $14.9 billion, the highest level in our history. We achieved record revenue levels in all of our six commodity groups, primarily driven by better pricing and fuel surcharges. Since 2004, we repriced approximately two-thirds of our business. Volume increased 3% to record levels in 2006, despite softening markets in some sectors in the second half of 2006.

- **Network Improvement** – In 2006, the fluidity and efficiency of our transportation network improved substantially, which allowed us to handle record volume levels. Continued focus on increasing velocity, eliminating work events, improving asset utilization, and expanding capacity were key drivers of our operational improvement. With ongoing enhancements to our Unified Plan and implementation of terminal processing initiatives, productivity improved, as demonstrated by 5% lower average terminal dwell time, a 4% improvement in car utilization, and a 1% increase in average train speed. We continued implementation of an operational productivity initiative called CIMS (Customer Inventory Management System), which complements the Unified Plan by reducing the number of cars in our terminals without adding capacity. By the end of 2006, CIMS managed the flow of almost 80% of the daily interchange of both loaded and empty railcars with our customers. We also expanded capacity and continued to use industrial engineering techniques to further improve network fluidity, ease capacity constraints, and improve asset utilization. Our customers rated us higher on their satisfaction surveys during 2006, an indication that efforts to improve network operations translated into better customer service.

- **Fuel Prices** – Fuel prices increased again in 2006 for the fourth consecutive year, raising our average system fuel price by 16% and adding $393 million of operating expenses compared to 2005. After a fairly stable first quarter, fuel prices increased dramatically during the spring and summer months, as crude oil prices averaged over $70 per barrel during the second and third quarters. July and August fuel prices were also affected by high diesel conversion spreads and large, regional spreads mainly driven by new government

regulations that imposed certain usage restrictions on high sulfur diesel fuel. Many refineries ceased producing high sulfur diesel fuel and many pipelines stopped transporting high sulfur diesel fuel in our operating areas, which drove up the conversion and regional spreads. Despite some moderation during the fourth quarter, fuel prices were still higher than the beginning of the year. Our fuel surcharge programs helped offset the impact of these higher fuel prices in the form of higher revenue, recovering approximately 90% of the additional expense incurred above our base fuel price of $0.75 per gallon for the year. In addition, our fuel conservation efforts allowed us to handle a 3% increase in gross ton-miles while improving our consumption rate by 2%. Simulator training, operating practices, and technology are all driving this improvement, saving us roughly 17 million gallons in 2006.

- **Free Cash Flow** – Cash generated by operating activities totaled a record $2.9 billion, yielding free cash flow of $516 million in 2006. Free cash flow is defined as cash provided by operating activities, less cash used in investing activities and dividends paid.

Free cash flow is not considered a financial measure under accounting principles generally accepted in the United States (GAAP) by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe free cash flow is important in evaluating our financial performance and measures our ability to generate cash without additional external financings. Free cash flow should be considered in addition to, rather than as a substitute for, cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Cash provided by operating activities | **$ 2,880** | $ 2,595 | $ 2,257 |
| Cash used in investing activities | **(2,042)** | (2,047) | (1,732) |
| Dividends paid | **(322)** | (314) | (310) |
| Free cash flow | **$ 516** | $ 234 | $ 215 |

## 2007 Outlook

- **Safety** – Operating a safe railroad benefits our employees, our customers, our shareholders, and the public. We will continue using a multi-faceted approach to safety, using technology, risk assessment, quality control, and training and education for our new and existing employees. From a public safety standpoint, we will continue our efforts to upgrade and close crossings, install video cameras on locomotives, and educate the public about crossing safety through various internal and industry programs, along with other activities. Additionally, we are working with private and public partners to develop better tank cars for transportation of chemicals.

- **Commodity Revenue Growth** – We expect record revenue levels to continue in 2007 based on current economic indicators, forecasted demand, and additional repricing opportunities. We established a target for year-over-year commodity revenue growth of 6% to 7%. We are projecting yield increases in all of our major commodity groups and volume growth ranging from 2% to 3%. We expect volume growth primarily from the energy and intermodal commodity groups. We will continue to monitor the market for changing conditions and adjust our plan accordingly.

- **Transportation Plan** – In 2007, we will continue to evaluate traffic flows and network logistic patterns to identify additional opportunities to simplify operations and improve network efficiency. We plan to maintain adequate manpower and locomotives, improve productivity using industrial engineering techniques, and improve our operating margins.

- **Fuel Prices** – We expect that fuel prices will remain volatile, with crude oil prices and conversion and regional spreads fluctuating throughout the year. To reduce the impact of fuel price on earnings, we will continue to seek recovery from our customers through our fuel surcharge programs and expand our fuel conservation efforts. As indicated in Item 1 of this report, the STB issued a decision limiting the manner in

which U.S. railroads can calculate fuel surcharges on traffic regulated by the STB. Currently, we do not believe this decision will prevent us from using fuel surcharges or adversely affect our ability to use fuel surcharges to mitigate the impact of rising or elevated fuel prices on most or all of our traffic.

- **Capital Plan** – In 2007, we expect to make capital investments of approximately $3.2 billion, which may include long-term leases. These investments will be used to maintain track and structures; continue capacity expansions on our main lines in constrained corridors; remove bottlenecks; upgrade and augment equipment, including locomotives and railcars, to better meet customer needs; build and improve facilities and terminals; and develop and implement new technologies. We designed these investments to maintain infrastructure for safety, enhance customer service, promote growth, and improve operational fluidity. Major capital projects in 2007 include adding more double track on the Sunset Corridor and related line capacity; investing in new and existing facilities and terminals in Phoenix, Tucson, the LA Basin, San Antonio, Dallas/Fort Worth, and Houston; continuing improvements of the SPRB Joint Line; and continuing installation of centralized track control across Iowa and Nebraska, which enables us to increase productivity on these rail lines. We expect to fund our 2007 cash capital investments through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2006. This focused capital plan is designed to help us improve network velocity and facilitate revenue growth.
- **Financial Expectations** – We are somewhat cautious about the economic environment; however, we anticipate revenue growth and continued network improvement in 2007, with financial results exceeding 2006 levels. Our expectations include generating earnings growth of 10% to 15% and an operating ratio below 80%.

## RESULTS OF OPERATIONS

### Operating Revenue

| *Millions of Dollars* | ***2006*** | *2005* | *2004* | ***% Change 2006 v 2005*** | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Commodity revenue | **$14,862** | $12,957 | $11,692 | **15%** | 11% |
| Other revenue | **716** | 621 | 523 | **15** | 19 |
| Total | **$15,578** | $13,578 | $12,215 | **15%** | 11% |

Operating revenue includes commodity revenue and other revenue. Other revenue consists primarily of revenue earned by our subsidiaries, revenue from our commuter rail operations, and accessorial revenue, which we earn when customers retain equipment owned or controlled by us. We recognize commodity revenue on a percentage-of-completion basis as freight moves from origin to destination. We allocate commodity revenue between reporting periods based on the relative transit time in each reporting period and recognize expenses as we incur them. We recognize other revenue as service is performed or contractual obligations are met. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue based on actual or projected future customer shipments.

All six commodity groups experienced double digit revenue growth during 2006, with particularly strong growth of over 20% in agricultural commodity revenue. Price increases, fuel surcharges, and index-based contract escalators, which are formulas in our shipping contracts that correlate price adjustments to certain economic indices, all contributed to higher average revenue per car (ARC). Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated an additional $656 million in commodity revenue compared to 2005, contributing 5% to commodity revenue growth. Volume increased 3% during the year led by solid growth in intermodal and energy shipments, which was partially offset by lower shipments of industrial products and chemicals. The year-over-year growth was also partially attributable to lower volume in 2005 due to the January West Coast storm, SPRB Joint Line disruptions, Hurricane Rita, and the Kansas washouts.

Commodity revenue improved in all six business groups during 2005, with double-digit growth in the agricultural, industrial products, and intermodal commodity groups. Fuel surcharges, price increases, and index-based contract escalators all contributed to higher ARC. Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated an additional $671 million in commodity revenue compared to 2004, which represents approximately 70% of the additional expense incurred above the base fuel price for our fuel surcharge programs (currently, $0.75 per gallon). Although volume grew 1% for the year, the severe weather and maintenance and restoration on the SPRB Joint Line constrained volume growth.

Other revenue increased in 2006, mainly driven by higher volumes. In addition, we generated higher subsidiary revenue from Bay Pacific Financial L.L.C. (Bay Pacific), an intermodal leasing entity, following the acquisition of our joint venture partner's interest in Bay Pacific during the third quarter of 2005. Subsidiary and accessorial revenue increased other revenue in 2005, mainly driven by higher volumes and the acquisition of Bay Pacific.

The following tables summarize the year-over-year changes in commodity revenue, revenue carloads, and average revenue per car by commodity group.

| *Commodity Revenue Millions of Dollars* | ***2006*** | *2005* | *2004* | ***% Change 2006 v 2005*** | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Agricultural | **$ 2,395** | $ 1,971 | $ 1,675 | **22%** | 18% |
| Automotive | **1,438** | 1,273 | 1,235 | **13** | 3 |
| Chemicals | **2,098** | 1,848 | 1,719 | **13** | 8 |
| Energy | **2,953** | 2,578 | 2,404 | **15** | 7 |
| Industrial Products | **3,173** | 2,819 | 2,419 | **13** | 17 |
| Intermodal | **2,805** | 2,468 | 2,240 | **14** | 10 |
| Total | **$14,862** | $12,957 | $11,692 | **15%** | 11% |

| *Revenue Carloads Thousands* | ***2006*** | *2005* | *2004* | ***% Change 2006 v 2005*** | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Agricultural | **923** | 883 | 883 | **5%** | -% |
| Automotive | **834** | 797 | 826 | **5** | (4) |
| Chemicals | **896** | 912 | 935 | **(2)** | (2) |
| Energy | **2,296** | 2,178 | 2,172 | **5** | - |
| Industrial Products | **1,451** | 1,508 | 1,515 | **(4)** | - |
| Intermodal | **3,452** | 3,266 | 3,127 | **6** | 4 |
| Total | **9,852** | 9,544 | 9,458 | **3%** | 1% |

| *Average Revenue per Car* | ***2006*** | *2005* | *2004* | ***% Change 2006 v 2005*** | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Agricultural | **$2,595** | $2,233 | $1,895 | **16%** | 18% |
| Automotive | **1,724** | 1,598 | 1,496 | **8** | 7 |
| Chemicals | **2,342** | 2,026 | 1,839 | **16** | 10 |
| Energy | **1,286** | 1,184 | 1,107 | **9** | 7 |
| Industrial Products | **2,187** | 1,868 | 1,597 | **17** | 17 |
| Intermodal | **813** | 755 | 716 | **8** | 5 |
| Total | **$1,509** | $1,358 | $1,236 | **11%** | 10% |

*Agricultural* – Price increases, volume growth, and fuel surcharges increased agricultural commodity revenue in 2006 versus 2005. Whole grains increased as strong gulf exports and higher freight charges for barge traffic shifted feed grain shipments to rails. Shipments of ethanol, a grain product used as an alternative fuel and fuel additive, and its co-products (primarily livestock feed) also experienced strong growth, reflecting continued demand in this growing industry. Conversely, wheat shipments declined due to extremely low crop production levels in 2006 primarily due to drought conditions in wheat producing states. Price and fuel surcharge increases improved ARC in 2006.

Price increases and fuel surcharges increased agricultural commodity revenue in 2005 compared to 2004. Total carloads were flat compared to 2004. Carloads of grain products increased during 2005 as we shipped more dry feed ingredients to Mexico and more ethanol. Higher demand for ethanol reflected the impact of energy demand, crude oil prices, and limited capacity of domestic refineries. Reduced carloadings of sugar beets partially offset the gains. Declining carloads of feed grain and reduced shipments of wheat both contributed to lower whole grain shipments. ARC improvement in 2005 resulted from price increases, fuel surcharges, and the positive impact of a larger percentage of carloads with longer average lengths of haul.

**2006 Agricultural Revenue**




**2006 Automotive Revenue**




*Automotive* – Price increases, volume growth, and fuel surcharges increased automotive commodity revenue in 2006 over 2005. Shipments of finished vehicles grew as higher manufacturer inventories at the end of 2005 translated into record volume growth for transportation in 2006. Shipments remained relatively strong through the second quarter due to the production ramp-up of new models at plants served by us. Automotive parts shipments also grew due to conversion of traffic from trucks, new business growth, and production increases at several UPRR-served assembly plants. Fuel surcharges and price increases drove the ARC improvement.

Revenue increased in 2005 over 2004 primarily due to fuel surcharges and price increases, which also drove ARC improvement. Carloads decreased due to lower shipments of domestically manufactured finished vehicles and automotive parts and materials, reflecting industry weakness during 2005.

*Chemicals* – Price increases, fuel surcharges, and index-based contract escalators drove the increase in revenue and ARC in 2006 versus 2005. Fewer fertilizer shipments largely drove the volume decrease. Wet weather conditions in the Midwest led to weak demand during the fall fertilizer season. In addition, softer export markets for potash, a fertilizer product, also led to reduced volumes. Business interruptions in the third quarter of 2005, primarily attributable to Hurricane Rita, reduced chemicals shipments leading to favorable volume comparisons in 2006.

Price increases, fuel surcharges, and higher shipments of potash from Canada to Portland via the Eastport, Idaho gateway for overseas export all drove revenue growth in 2005 versus 2004. Declines in liquid and dry chemicals, plastics, and petroleum shipments, in part due to the business interruptions caused by Hurricane Rita, reduced volume. In addition, liquid and dry chemical shipments and plastic shipments were lower due to a weak export market, plant closures for maintenance, and the impact of an agreement with the BNSF for access to certain facilities in the Bayport, Texas area. ARC improved in 2005 due to price increases and fuel surcharges.

**2006 Chemicals Revenue**




**2006 Energy Revenue**




*Energy* – Price increases, fuel surcharges, and index-based contract escalators primarily drove the increases in revenue and ARC in 2006 over 2005. Volume increases also contributed to revenue growth as coal shipments from the SPRB mines improved 8% during the year. These increases in 2006 partially reflect lower volume levels in 2005, as SPRB Joint Line disruptions, network disruptions resulting from Hurricane Rita, and the October Kansas washouts hampered coal shipments in 2005. Conversely, shipments from the Colorado and Utah mines declined 6% in 2006 due to mine shutdowns during the first quarter of 2006, along with the impact of mining production problems and network maintenance throughout the third quarter of 2006.

Revenue growth in 2005 over 2004 reflects higher prices, fuel surcharges, and index-based contract escalators. Although volume grew in the first quarter, carloads for 2005 were flat as a result of the extensive maintenance and restoration work on the SPRB Joint Line during the second, third, and fourth quarters, the impact of Hurricane Rita, the Kansas washouts, and temporary outages at mines in Colorado and Utah during the fourth quarter of 2005. ARC was higher due to price increases, higher fuel surcharges, and index-based contract escalators.

*Industrial Products* – Price increases and fuel surcharges improved revenue and ARC in 2006 over 2005. Volume levels declined due to lower lumber, paper, and newsprint shipments, which were partially offset by higher steel shipments. The softening of the housing market, lower production levels, and general market uncertainty drove the reduction in lumber shipments. Conversely, strong domestic markets throughout most of the year drove the increase in construction-related steel material and pipe, particularly those materials used in oil and gas drilling. Hurricane Rita reduced shipment volumes of industrial products in 2005, which favorably affected volume comparisons with 2006.

**2006 Industrial Products Revenue**




Price increases and fuel surcharges generated revenue growth in 2005 versus 2004. In particular, lumber shipments contributed to this growth due to solid pricing gains and fuel surcharges. Revenue from stone shipments increased revenue from construction products due to strong construction demand, larger train sizes, and improved car cycle times. Car cycle time is defined as the amount of time that a car spends on our system measured from the origin of the loaded or empty move until arrival at final destination. Overall carloads were flat compared to 2004. Partially offsetting substantial volume growth of stone shipments were reduced paper moves, primarily newsprint and fiber, and fewer shipments of government materials, steel, and cement, resulting from softening markets, cement shortages in certain markets, and higher inventories. Price increases and fuel surcharges drove ARC increases.

**2006 Intermodal Revenue**




*Intermodal* – Record volume growth, fuel surcharges, price increases, and index-based contract escalators combined to improve revenue in 2006 over 2005 in addition to the favorable impact from weaker intermodal revenue during 2005 due to the January West Coast storm. Carloadings grew due to strong imports, primarily from Asia, partially offset by decreased domestic traffic. ARC improved due to price increases, fuel surcharges, and contract escalators.

Revenue in 2005 improved over 2004 due to strong imports, primarily from China and the rest of Asia. However, business interruptions during the first quarter of 2005 due to the January West Coast storm limited full-year revenue growth. ARC improved due to price increases, fuel surcharges, and contract escalators.

*Mexico Business* – Each commodity group discussed above includes revenue from shipments to and from Mexico. Revenue from Mexico business increased 23% to $1.4 billion in 2006 compared to 2005. Price increases, fuel surcharges, and shipments of finished vehicles, automotive parts, import beer, dry feed ingredients, and

intermodal drove revenue growth in 2006. Volume declines in coal, newsprint, and sulfur shipments partially offset the increases.

In 2005, revenue from Mexico grew 15% to $1.1 billion, resulting primarily from price increases and fuel surcharges. Carloads were flat versus 2004, as fewer automotive parts, energy, and intermodal shipments offset higher agricultural and industrial shipments.

**Operating Expenses**

| *Millions of Dollars* | *2006* | *2005* | *2004* | *% Change 2006 v 2005* | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Salaries, wages, and employee benefits | $ 4,599 | $ 4,375 | $ 4,167 | 5% | 5% |
| Fuel and utilities | 3,012 | 2,562 | 1,816 | 18 | 41 |
| Equipment and other rents | 1,455 | 1,402 | 1,374 | 4 | 2 |
| Depreciation | 1,237 | 1,175 | 1,111 | 5 | 6 |
| Materials and supplies | 691 | 546 | 488 | 27 | 12 |
| Casualty costs | 410 | 411 | 694 | - | (41) |
| Purchased services and other costs | 1,290 | 1,312 | 1,270 | (2) | 3 |
| Total | $12,694 | $11,783 | $10,920 | 8% | 8% |

Operating expenses increased $911 million in 2006. Higher fuel prices, which rose 16% during the period, accounted for $393 million of the increase. Our fuel surcharge programs helped offset these expenses in the form of higher revenue, recovering approximately 90% of the additional expense incurred above our base fuel price of $0.75 per gallon for the year. We base a majority of our fuel surcharges on the average U.S. diesel fuel price effective two months prior. Our recovery percentage improved from the first part of 2006 due to the timing impact of our surcharges. Surcharge revenue began to recover higher fuel costs earlier in the year, and the two-month price lag caught up with declining fuel prices during the fourth quarter of 2006. Conversely, fuel surcharge revenue during the first quarter of 2007 will decline as lower fourth quarter fuel prices will reduce most of our surcharges.

**2006 Operating Expenses**




Wages, benefits, and materials and supplies inflation; a larger workforce; volume-related expenses; and higher locomotive and freight car maintenance and lease expenses accounted for most of the additional increase in 2006. Settlement of all remaining insurance claims related to the 2005 January West Coast storm, an improved fuel consumption rate, and improved car cycle times (which reduced freight car rental expense) partially offset the cost increases. Additional clean-up and restoration costs for the 2005 January West Coast storm favorably affects comparison of 2005 operating expenses with those in 2006.

Operating expenses increased $863 million in 2005 versus 2004. Excluding the asbestos charge of $247 million (pre-tax) in 2004, operating expenses increased $1.1 billion, or 10%. Significantly higher locomotive fuel prices accounted for $740 million of this increase (our fuel surcharge programs helped offset these expenses in the form of higher revenue). Inflation in wages, benefits, materials, and services, as well as a larger workforce, resulted in most of the additional increase. Also driving higher operating expenses were increased contract services and clean-up and restoration costs associated with the 2005 January West Coast storm.

*Salaries, Wages, and Employee Benefits* – General wage and benefit inflation increased expenses in 2006, reflecting higher salaries and wages and the impact of higher healthcare costs and other benefit costs. A larger workforce, driven by higher volume levels, and stock option expense required by new accounting rules also contributed to higher expenses. Conversely, reduced protection costs and operational improvements, boosted by network management initiatives and investment in capacity, partially offset these increases. Protection costs represent the differential payment when the wage earned for active employment is lower than an employee's protected rate of pay. An individual's protected rate is imposed by the STB for employees adversely affected by a merger or is established by collective bargaining agreements with our labor unions in certain cases. Additionally, we incurred higher labor expenses in 2005 for clean-up and restoration of property damaged by the January West Coast storm.

Several factors drove higher employment expenses in 2005. General wage and benefit inflation increased expenses, reflecting higher salaries and wages and the year-over-year impact of higher healthcare and other benefits costs. We also incurred higher expenses for management bonuses in 2005, as executive bonuses were not awarded for 2004 and bonuses for the professional workforce were significantly reduced in 2004. A 3% increase in our workforce and higher demand during 2005 also contributed to the increases. Additionally, labor expenses, in the form of higher train crew costs and labor incurred for repair and clean-up activities, increased due to the hurricanes in the third quarter and the West Coast storm in the first quarter. Reduced severance and relocation costs, increased network efficiency, and reduced training expenses partially offset these increases. Transferring various support personnel to Omaha, Nebraska, resulted in higher severance and relocation costs in 2004.

*Fuel and Utilities*

| *Millions of Dollars* | ***2006*** | *2005* | *2004* | ***% Change 2006 v 2005*** | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Locomotive fuel expense | **$2,821** | $2,393 | $1,684 | **18%** | 42% |
| Fuel surcharge revenue | **1,619** | 963 | 292 | **68** | 230 |

Fuel and utilities include locomotive fuel, utilities other than telephone, and gasoline and other fuels. Higher diesel fuel prices, which averaged $2.06 per gallon (including taxes and transportation costs) in 2006 compared to $1.77 per gallon in 2005, increased expenses by $393 million. A 3% increase in gross ton-miles resulted in $63 million of additional expenses, which was partially offset by a 2% improvement in our fuel consumption rate due to the use of newer, more fuel-efficient locomotives and our fuel conservation programs. As noted above (and described in this Item 7), we offset a significant portion of increased locomotive fuel expenses through revenue from fuel surcharges. Gasoline, utilities, and propane and other fuel expenses increased $20 million in 2006 due to higher prices and increased usage.

In 2005, diesel fuel prices averaged $1.77 per gallon compared to $1.22 per gallon in 2004, increasing expenses by $740 million. A 1% increase in gross ton-miles resulted in $8 million of additional expenses. We offset $39 million of these increases with a 2% improvement in our consumption rate in 2005 versus 2004. The Railroad had no fuel hedges in place during 2005, whereas we hedged 120 million gallons of fuel in 2004. Gasoline, utilities, and propane expenses increased $37 million in 2005 versus 2004 due to higher prices.

*Equipment and Other Rents* – Equipment and other rents primarily includes rental expense the Railroad pays for freight cars owned by other railroads or private companies; freight car, intermodal, and locomotive leases; other

specialty equipment leases; and office and other rentals. Lease expense increased in 2006 compared to 2005 as we leased more locomotives and freight cars. Growth in automotive and intermodal shipments also increased our short-term freight car rental expense. Improved car-cycle times driven by network management initiatives partially offset this increase.

In 2005, the number of leased locomotives and freight cars increased, resulting in higher lease expense. Carload volume growth also increased 2005 expenses. Improved car-cycle times partially offset these increases which lowered our short-term freight car rental expense.

*Depreciation* – The majority of depreciation relates to track structure, including rail, ties, and other track material. A higher depreciable asset base, reflecting higher capital spending in recent years, and increased usage of our assets combined for higher depreciation expense in 2006 and 2005.

*Materials and Supplies* – Materials used to maintain the Railroad's lines, structures, and equipment are the principal components of materials and supplies expense. This expense item also includes small tools, office supplies, other materials, and the costs of freight services to ship Railroad supplies and materials. We used more repair materials at higher component costs to repair and maintain freight cars and our fleet of locomotives in 2006, including a growing number of units not covered by warranties. In addition, we performed more maintenance on locomotives that were maintained internally and not subject to maintenance contracts with third-party contractors compared to 2005.

During 2005, materials and supplies expense increased, primarily due to locomotive and freight car maintenance. We used more repair materials to maintain a larger fleet of locomotives, including a growing number of units not covered by warranties. Additionally, we incurred higher costs for car wheel sets, traction motors, and lube oil. Conversely, we incurred lower freight charges for shipping Railroad materials, and stationery and office supplies.

*Casualty Costs* – Personal injury costs, freight and property damage, insurance, and environmental expense are the primary components of casualty costs. Costs were flat in 2006 compared to 2005 as lower bad debt expenses, lower freight damage expenses, and lower expenses for destruction of foreign or leased equipment all offset personal injury costs and higher settlement expenses.

In 2005, casualty costs were lower than the previous year primarily due to higher expenses incurred in 2004 for an asbestos charge, a costly derailment near San Antonio, and a large jury verdict – affirmed in 2004 – for a 1998 crossing accident. Lower freight and property damage expense and lower costs for destruction of foreign or leased equipment also reduced casualty costs. Conversely, we incurred higher insurance costs and increased costs for third-party personal injuries and damages related to environmental exposures.

*Purchased Services and Other Costs* – Purchased services and other costs include the costs of services purchased from outside contractors, state and local taxes, net costs of operating facilities jointly used by UPRR and other railroads, transportation and lodging for train crew employees, trucking and contracting costs for intermodal containers, leased automobile maintenance expenses, telephone and cellular expense, employee travel expense, and computer and other general expenses. Volume-related expenses, including crew transportation and lodging costs, increased in 2006 driven by 3% growth of carloads. Higher state and local taxes (primarily sales and use taxes related to higher diesel fuel prices) also increased expenses in 2006 compared to 2005. Conversely, lower locomotive contract maintenance costs and lower expenses associated with jointly-owned operating facilities reduced expenses in 2006 compared to 2005. Settlement of all remaining insurance claims related to the 2005 January West Coast storm and the gain from the sale of two airplanes also reduced expenses in 2006. Finally, clean-up and restoration costs related to the January West Coast storm increased expenses in 2005, which also contributed to lower year-over-year expenses in 2006.

Expenses increased in 2005 versus 2004 because we experienced higher volume-related costs for freight car and locomotive contract maintenance and crew transportation and lodging. Although our intermodal carloadings

increased over 4% in 2005, costs for trucking services provided by intermodal carriers remained flat as we substantially reduced expenses associated with network inefficiencies. Higher diesel fuel prices increased sales and use taxes in 2005, which resulted in higher state and local taxes. Other contract expenses for equipment maintenance and other services increased in 2005. The 2005 January West Coast storm and Hurricanes Katrina and Rita also contributed to higher expenses in 2005 (net of insurance settlements received). Partially offsetting these increases was a reduction in relocation expenses as we incurred higher relocation costs associated with moving support personnel to Omaha, Nebraska during 2004.

**Non-Operating Items**

| *Millions of Dollars* | ***2006*** | *2005* | *2004* | ***% Change 2006 v 2005*** | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Other income | **$ 118** | $ 145 | $ 88 | **(19)%** | 65% |
| Interest expense | **(477)** | (504) | (527) | **(5)** | (4) |
| Income taxes | **(919)** | (410) | (252) | **124** | 63 |

*Other Income* – Lower net gains from non-operating asset sales and higher expenses due to rising interest rates associated with our sale of receivables program resulted in a reduction in other income in 2006, which was partially offset by higher rental income for the use of our right-of-way (including 2006 settlements of rate disputes from prior years) and cash investment returns due to higher interest rates.

In 2005, other income increased largely as a result of higher gains from real estate sales partially offset by higher expenses due to rising interest rates associated with our sale of receivables program.

*Interest Expense* – Lower interest expense in 2006 and 2005 was primarily due to declining weighted-average debt levels of $7.1 billion, $7.8 billion, and $8.1 billion in 2006, 2005, and 2004, respectively. A higher effective interest rate of 6.7% in 2006, compared to 6.5% in both 2005 and 2004, partially offset the effects of the declining debt level.

*Income Taxes* – Income tax expense was $509 million higher in 2006 than 2005. Higher pre-tax income resulted in additional taxes of $414 million and $118 million of the increase resulted from the one-time reduction in 2005 described below. Our effective tax rate was 36.4% and 28.6% in 2006 and 2005, respectively.

Income taxes were greater in 2005 than 2004 due to higher pre-tax income partially offset by a previously reported reduction in income tax expense. In our Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, we reported that the Corporation analyzed the impact that final settlements of pre-1995 tax years had on previously recorded estimates of deferred tax assets and liabilities. The completed analysis of the final settlements for pre-1995 tax years, along with Internal Revenue Service Examination Reports for tax years 1995 through 2002 were considered, among other things, in a review and re-evaluation of the Corporation's estimated deferred tax assets and liabilities as of September 30, 2005, resulting in an income tax expense reduction of $118 million in 2005.

## OPERATING AND FINANCIAL STATISTICS

### Railroad Performance Measures

We report key Railroad performance measures weekly to the Association of American Railroads, including carloads, average daily inventory of rail cars on our system, average train speed, and average terminal dwell time. This operating data is available on our website at www.up.com/investors/reports/index.shtml.

### Operating Statistics

| | ***2006*** | *2005* | *2004* | ***% Change 2006 v 2005*** | *% Change 2005 v 2004* |
|---|---|---|---|---|---|
| Average train speed (miles per hour) | **21.4** | 21.1 | 21.4 | **1%** | (1)% |
| Average terminal dwell time (hours) | **27.2** | 28.7 | 30.5 | **(5)** | (6) |
| Gross ton-miles (billions) | **1,072.5** | 1,043.9 | 1,037.5 | **3** | 1 |
| Revenue ton-miles (billions) | **565.2** | 548.8 | 546.3 | **3** | - |
| Average full-time equivalent employees | **50,739** | 49,747 | 48,329 | **2** | 3 |

*Average Train Speed* – Average train speed is calculated by dividing train miles by hours operated on our main lines between terminals. Ongoing network management initiatives and capacity expansion allowed us to move 3% more carloads in 2006 and improve average train speed 1%. In 2005, the January West Coast storm, disruptions on the SPRB Joint Line, business interruptions caused by Hurricane Rita, and the Kansas washouts in October hampered efforts to improve our average train speed.

*Average Terminal Dwell Time* – Average terminal dwell time is the average time that a rail car spends at our terminals. Lower average terminal dwell time is favorable. Average terminal dwell improved 5% and 6% in 2006 and 2005, respectively, as a result of ongoing management initiatives and directed efforts to more timely deliver rail cars offline to our interchange partners and customers.

*Gross and Revenue Ton-Miles* – Gross ton-miles are calculated by multiplying the weight of loaded or empty freight cars by the number of miles hauled. Revenue ton-miles are calculated by multiplying the weight of freight by the number of tariff miles. In 2006, gross and revenue ton-miles grew 3% in relation to the 3% increase in carloadings as volume was balanced between the higher and lower density commodities. In 2005, gross ton-miles grew 1%, in relation to a 1% increase of carloadings. Revenue ton-miles were flat in 2005.

*Average Full-Time Equivalent Employees* – Higher employee levels in 2006 and 2005 included more people to maintain our larger locomotive and freight car fleet, the addition of employees needed to complete increased track repair and replacement programs, the hiring of operations management personnel, including an expanded management training program, and train and engine personnel to manage current demand.

**Return on Invested Capital**

| *Millions of Dollars, Except Percentages* | *2006* | *2005* | *2004* |
|---|---|---|---|
| Net income | **$ 1,606** | $ 1,026 | $ 604 |
| Add: Interest expense | **477** | 504 | 527 |
| Add: Sale of receivables fees | **33** | 23 | 11 |
| Add: Interest on present value of operating leases | **268** | 218 | 172 |
| Less: Taxes on interest and fees | **(283)** | (213) | (209) |
| Net operating profit after taxes as adjusted (a) | **$ 2,101** | $ 1,558 | $ 1,105 |
| Average equity | **$14,510** | $13,181 | $12,505 |
| Add: Average debt | **7,098** | 7,774 | 8,060 |
| Add: Average value of sold receivables | **600** | 595 | 590 |
| Add: Average present value of operating leases | **3,349** | 2,729 | 2,147 |
| Average invested capital as adjusted (b) | **$25,557** | $24,279 | $23,302 |
| Return on invested capital as adjusted (a/b) | **8.2%** | 6.4% | 4.7% |

Return on invested capital (ROIC) is considered a non-GAAP financial measure by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe this measure is important in evaluating the efficiency and effectiveness of the Corporation's long-term capital investments, and we currently use ROIC as a performance criteria in determining certain elements of compensation for our executive officers and senior management. ROIC should be considered in addition to, rather than as a substitute for, other information provided in accordance with GAAP. A comparable GAAP measure is Return on Equity, which is included in Selected Financial Data, Item 6.

**Debt to Capital/Lease Adjusted Debt to Capital**

| *Millions of Dollars, Except Percentages* | *2006* | *2005* | *2004* |
|---|---|---|---|
| Debt (a) | **$ 6,780** | $ 7,416 | $ 8,131 |
| Equity | **15,312** | 13,707 | 12,655 |
| Capital (b) | **$22,092** | $21,123 | $20,786 |
| Debt to capital (a/b) | **30.7%** | 35.1% | 39.1% |

| *Millions of Dollars, Except Percentages* | *2006* | *2005* | *2004* |
|---|---|---|---|
| Debt | **$ 6,780** | $ 7,416 | $ 8,131 |
| Net present value of operating leases | **3,513** | 3,185 | 2,273 |
| Lease adjusted debt (a) | **$10,293** | $10,601 | $10,404 |
| Equity | **15,312** | 13,707 | 12,655 |
| Lease adjusted capital (b) | **$25,605** | $24,308 | $23,059 |
| Lease adjusted debt to capital (a/b) | **40.2%** | 43.6% | 45.1% |

Lease adjusted debt to capital is considered a non-GAAP financial measure by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe this measure is important in evaluating the total amount of leverage in our capital structure including off-balance sheet lease obligations. We monitor the ratio of lease adjusted debt to capital as we manage our capital structure to balance cost effective and efficient access to the capital markets with the Corporation's overall cost of capital. Lease adjusted debt to capital should be considered in addition to, rather than as a substitute for, debt to capital. The table above provides support for the lease adjusted debt to capital calculation. Our debt to capital ratios improved as a result of a $636 million reduction in debt from December 31, 2005, and an increase in retained earnings due to higher net income in 2006.

## LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2006, our principal sources of liquidity included cash, cash equivalents, the sale of receivables, and our revolving credit facilities, as well as the availability of commercial paper and other sources of financing through the capital markets. We had $2 billion of committed credit facilities available, of which there were no borrowings outstanding as of December 31, 2006, and we did not make any short-term borrowings under these facilities during the year. The value of the outstanding undivided interest held by investors under the sale of receivables program was $600 million as of December 31, 2006. The sale of receivables program is subject to certain requirements, including the maintenance of an investment grade bond rating. If our bond rating were to deteriorate, it could have an adverse impact on our liquidity. Access to commercial paper is dependent on market conditions. Deterioration of our operating results or financial condition due to internal or external factors could negatively impact our ability to utilize commercial paper as a source of liquidity. Liquidity through the capital markets is also dependent on our financial stability.

At both December 31, 2006 and 2005, we had a working capital deficit of approximately $1.1 billion. A working capital deficit is common in our industry and does not indicate a lack of liquidity. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

### Financial Condition

| *Cash Flows*<br>*Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Cash provided by operating activities | **$ 2,880** | $ 2,595 | $ 2,257 |
| Cash used in investing activities | **(2,042)** | (2,047) | (1,732) |
| Cash used in financing activities | **(784)** | (752) | (75) |
| Net change in cash and cash equivalents | **$ 54** | $ (204) | $ 450 |

*Cash Provided by Operating Activities* – Higher income in 2006 generated the increased cash provided by operating activities, which was partially offset by higher income tax payments, $150 million in voluntary pension contributions, higher material and supply inventories, and higher management incentive payments in 2006. Higher income, lower management incentive payments in 2005 (executive bonuses, which would have been paid to individuals in 2005, were not awarded based on company performance in 2004 and bonuses for the professional workforce that were paid out in 2005 were significantly reduced), and working capital performance generated higher cash from operating activities in 2005. A voluntary pension contribution of $100 million in 2004 also augmented the positive year-over-year variance in 2005 as no pension contribution was made in 2005. This improvement was partially offset by cash received in 2004 for income tax refunds.

*Cash Used in Investing Activities* – An insurance settlement for the 2005 January West Coast storm and lower balances for work in process decreased the amount of cash used in investing activities in 2006. Higher capital investments and lower proceeds from asset sales partially offset this decrease. Increased capital spending, partially offset by higher proceeds from asset sales, increased the amount of cash used in investing activities in 2005 compared to 2004.

*Cash Used in Financing Activities* – The increase in cash used in financing activities primarily resulted from lower net proceeds from equity compensation plans ($189 million in 2006 compared to $262 million in 2005). The increase in 2005 results from debt issuances in 2004 and higher debt repayments in 2005. We did not issue debt in 2005 versus $745 million of debt issuances in 2004, and we repaid $699 million of debt in 2005 compared to $588 million in 2004. The higher outflows in 2005 were partially offset by higher net proceeds from equity compensation plans ($262 million in 2005 compared to $80 million in 2004).

The table below details cash capital investments for the years ended December 31, 2006, 2005, and 2004.

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Track | **$1,487** | $1,472 | $1,328 |
| Capacity and commercial facilities | **510** | 509 | 347 |
| Locomotives and freight cars | **135** | 98 | 125 |
| Other | **110** | 90 | 76 |
| Total | **$2,242** | $2,169 | $1,876 |

In 2007, we expect our total capital investments to be approximately $3.2 billion, which may include long-term leases. These investments will be used to maintain track and structures, continue capacity expansions on our main lines in constrained corridors, remove bottlenecks, upgrade and augment equipment to better meet customer needs, build and improve facilities and terminals, and develop and implement new technologies. We designed these investments to maintain infrastructure for safety, enhance customer service, promote growth, and improve operational fluidity. We expect to fund our 2007 cash capital investments through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2006. We expect that these sources will continue to provide sufficient funds to meet our expected capital requirements for 2007.

For the years ended December 31, 2006, 2005, and 2004, our ratio of earnings to fixed charges was 4.4, 2.9, and 2.1, respectively. The increases in 2006 and 2005 were driven by higher net income. The ratio of earnings to fixed charges was computed on a consolidated basis. Earnings represent income from continuing operations, less equity earnings net of distributions, plus fixed charges and income taxes. Fixed charges represent interest charges, amortization of debt discount, and the estimated amount representing the interest portion of rental charges. See Exhibit 12 for the calculation of the ratio of earnings to fixed charges.

## Financing Activities

**Credit Facilities** – On December 31, 2006, we had $2 billion in revolving credit facilities available, including $1 billion under a five-year facility expiring in March 2009 and $1 billion under a five-year facility expiring in March 2010 (collectively, the "facilities"). The facilities are designated for general corporate purposes and support the issuance of commercial paper. Neither of the facilities were drawn on in 2006. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. These facilities allow for borrowings at floating rates based on London Interbank Offered Rates, plus a spread, depending upon our senior unsecured debt ratings. The facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2006, we were in compliance with these covenants. The facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require the posting of collateral.

In addition to our revolving credit facilities, we had $150 million in uncommitted lines of credit available, including $75 million that expires in March 2007 and $75 million expiring in May 2007. Neither of these lines of credit were used as of December 31, 2006. We must have equivalent credit available under our five-year facilities to draw on these $75 million lines.

**Dividends** – On January 30, 2007, we increased the quarterly dividend to $0.35 per share, payable beginning on April 2, 2007, to shareholders of record on February 28, 2007. We expect to fund the increase in the quarterly dividend through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2006.

**Dividend Restrictions** – We are subject to certain restrictions related to the payment of cash dividends to our shareholders due to minimum net worth requirements under our credit facilities. Retained earnings available

for dividends increased to $7.8 billion at December 31, 2006, from $6.2 billion at December 31, 2005. We do not expect that these restrictions will have a material adverse effect on our consolidated results of operations, financial condition, or liquidity.

**Common Stock Repurchases** – On January 30, 2007, our Board of Directors authorized us to repurchase up to 20 million shares of our common stock through December 31, 2009. We may make these repurchases on the open market or through other transactions. Our management will have sole discretion with respect to determining the timing and amount of these transactions. We expect to fund our common stock repurchases through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2006.

**Shelf Registration Statement** – Under a current shelf registration statement, we may issue any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2006, we had $500 million remaining for issuance under the current shelf registration statement. We have no immediate plans to issue any securities; however, we routinely consider and evaluate opportunities to replace existing debt or access capital through issuances of debt securities under this shelf registration, and, therefore, we may issue debt securities at any time.

## Operating Lease Activities

As of December 31, 2006, our contractual obligations for operating leases totaled approximately $5.5 billion. Discounted at 8%, the present value of this obligation was approximately $3.5 billion. The Railroad, as lessee, entered into long-term operating lease arrangements during 2006 to finance the majority of its new equipment acquisitions. In 2006, the lessors under these lease arrangements purchased 200 locomotives and 2,100 freight cars from the Corporation through various financing transactions with a total equipment cost of approximately $523 million and a present value of $427 million. These new lease arrangements provide for minimum total rental payments of approximately $777 million and are reflected in the contractual obligations table as of December 31, 2006.

The lessors financed the purchase of the locomotives and freight cars, in part, by the issuance of equipment notes that are non-recourse to the Railroad and are secured by an assignment of the underlying leases and a security interest in the various types of equipment. Neither the Railroad nor UPC guarantees payment of the equipment notes. The Railroad's obligations to make operating lease payments under the leases are recourse obligations and are not recorded in the Consolidated Statements of Financial Position.

The Railroad has certain renewal and purchase options with respect to the locomotives and freight cars. If the Railroad does not exercise any such options, the equipment will be returned to the lessors at the end of the lease term.

## Contractual Obligations and Commitments

As described in the notes to the Financial Statements and Supplementary Data, Item 8, and as referenced in the tables below, we have contractual obligations and commercial commitments that may affect our financial condition. However, based on our assessment of the underlying provisions and circumstances of our contractual obligations and commercial commitments, including material sources of off-balance sheet and structured finance arrangements, there is no known trend, demand, commitment, event, or uncertainty that is reasonably likely to occur that would have a material adverse effect on our consolidated results of operations, financial condition, or liquidity. In addition, the commercial obligations, financings, and commitments made by us are customary transactions that are similar to those of other comparable corporations, particularly within the transportation industry.

The following tables identify material obligations and commitments as of December 31, 2006:

| | | Payments Due by Period | | | | | |
|---|---|---|---|---|---|---|---|
| ***Contractual Obligations*** *Millions of Dollars* | *Total* | *2007* | *2008* | *2009* | *2010* | *2011* | *After 2011* |
| Debt [a] | $ 9,102 | $1,035 | $ 880 | $ 693 | $ 606 | $ 656 | $ 5,232 |
| Operating leases | 5,457 | 624 | 546 | 498 | 456 | 419 | 2,914 |
| Capital lease obligations [b] | 1,916 | 180 | 173 | 168 | 148 | 157 | 1,090 |
| Purchase obligations [c] | 4,516 | 1,362 | 573 | 502 | 248 | 199 | 1,632 |
| Other post retirement benefits [d] | 298 | 27 | 28 | 29 | 31 | 31 | 152 |
| Total contractual obligations | $21,289 | $3,228 | $2,200 | $1,890 | $1,489 | $1,462 | $11,020 |

*[a] Excludes capital lease obligations of $1,236 million, unamortized discount of $103 million, and market value adjustments of $14 million for debt with qualifying hedges that are recorded as liabilities on the Consolidated Statements of Financial Position. Includes an interest component of $3,441 million.*

*[b] Represents total obligations, including interest component of $680 million.*

*[c] Purchase obligations include locomotive maintenance contracts; purchase commitments for locomotives, ties, ballast, and track; and agreements to purchase other goods and services.*

*[d] Includes estimated other postretirement, medical, and life insurance payments and payments made under the unfunded pension plan for the next ten years. No amounts are included for funded pension as no contributions are currently required.*

| | | Amount of Commitment Expiration per Period | | | | | |
|---|---|---|---|---|---|---|---|
| ***Other Commercial Commitments*** *Millions of Dollars* | *Total* | *2007* | *2008* | *2009* | *2010* | *2011* | *After 2011* |
| Credit facilities [a] | $2,000 | $ - | $ - | $1,000 | $1,000 | $ - | $ - |
| Sale of receivables [b] | 600 | 600 | - | - | - | - | - |
| Guarantees [c] | 464 | 5 | 6 | 18 | 45 | 75 | 315 |
| Standby letters of credit [d] | 37 | 12 | 25 | - | - | - | - |
| Total commercial commitments | $3,101 | $617 | $31 | $1,018 | $1,045 | $75 | $315 |

*[a] None of the credit facilities were used as of December 31, 2006.*

*[b] $600 million of the sale of receivables program was utilized at December 31, 2006.*

*[c] Includes guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations.*

*[d] None of the letters of credit were drawn upon as of December 31, 2006.*

## Off-Balance Sheet Arrangements

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at both December 31, 2006 and 2005. The value of the outstanding undivided interest held by investors under the facility was $600 million at both December 31, 2006 and 2005, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,158 million and $1,226 million of accounts receivable held by UPRI at December 31, 2006 and 2005, respectively. At December 31, 2006 and 2005, the value of the interest retained by UPRI was $558 million and $626 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate the Railroad for its responsibilities. The Railroad collected approximately $15.5 billion and $13.4 billion during the years ended December 31, 2006 and 2005, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $33 million, $23 million, and $11 million for 2006, 2005, and 2004, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad have no recourse to the assets of UPRI. In August 2006, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

**Guarantees** – At December 31, 2006, we were contingently liable for $464 million in guarantees. We have recognized a $6 million liability for the fair value of these obligations as of December 31, 2006. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

## OTHER MATTERS

**Inflation** – The cumulative effect of long periods of inflation significantly increases asset replacement costs for capital-intensive companies. As a result, assuming that we replace all operating assets at current price levels, depreciation charges (on an inflation-adjusted basis) would be substantially greater than historically reported amounts.

**Derivative Financial Instruments** – We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

*Market and Credit Risk* – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2006 and 2005, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

*Determination of Fair Value* – We determined the fair values of our derivative financial instrument positions at December 31, 2006 and 2005 based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows.

*Sensitivity Analyses* – The sensitivity analyses that follow illustrate the economic effect that hypothetical changes in interest rates could have on our results of operations and financial condition. These hypothetical changes do not consider other factors that could impact actual results.

*Interest Rate Fair Value Hedges* – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to Financial Accounting Standards Board (FASB) Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements. As of December 31, 2006 and 2005, we had interest rate swaps hedging debt of $500 million and $750 million, respectively.

At December 31, 2006 and 2005, we had variable-rate debt representing approximately 7% and 10%, respectively, of our total debt. If variable interest rates average one percentage point higher in 2007 than our December 31, 2006 variable rate, which was approximately 8%, our interest expense would increase by approximately $5 million. If variable interest rates averaged one percentage point higher in 2006 than our December 31, 2005 variable rate, which was approximately 7%, our interest expense would have increased by approximately $7 million. These amounts were determined by considering the impact of the hypothetical interest rates on the balances of our variable-rate debt at December 31, 2006 and 2005, respectively.

Market risk for fixed-rate debt is estimated as the potential increase in fair value resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2006, and amounts to approximately $462 million at December 31, 2006. Market risk resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2005, amounted to approximately $535 million at December 31, 2005. We estimated the fair values of our fixed-rate debt by considering the impact of the hypothetical interest rates on quoted market prices and current borrowing rates.

*Interest Rate Cash Flow Hedges* – We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At December 31, 2006, we had a reduction of $5 million recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2006 and 2005, we had no interest rate cash flow hedges outstanding.

*Fuel Cash Flow Hedges* – Fuel costs are a significant portion of our total operating expenses. In 2006 and 2005, our primary means of mitigating the impact of adverse fuel price changes was our fuel surcharge programs. However, we may use swaps, collars, futures and/or forward contracts to further mitigate the impact of adverse fuel price changes. We did not have any fuel hedges in place during 2006 or 2005. We hedged 120 million gallons of fuel during 2004 using collars with average cap, floor, and ceiling prices of $0.74, $0.64, and $0.86 per gallon, respectively.

*Fuel Swaps* – We entered into two fuel basis swaps for the period August 2006 through July 2008, which cover a total of 151 million gallons of diesel fuel. These commodity basis swaps require us to make payments to,

or receive payments from, the counterparty based on the difference between certain price indices. Changes in the fair value of these swaps are reflected in fuel expense. We reported a derivative asset of approximately $2 million at December 31, 2006, which represents the fair value of the swaps. The swaps reduced fuel expense for 2006 by $3 million, which included monthly net settlements with the counterparty and the fair value recognition at December 31, 2006.

**Accounting Pronouncements** – In June 2006, the FASB issued Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109* (FIN 48). Under the interpretation, we will recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized will be measured as the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. The interpretation is effective for us beginning in the first quarter of 2007. The cumulative effect of adopting FIN 48 will be a one-time reduction in the January 1, 2007 balance of retained earnings. Future changes in uncertain tax positions will be included in income tax expense. We do not expect that the cumulative effect of adopting FIN 48 will have a material impact on our Consolidated Financial Statements.

In September 2006, the FASB issued Statement No. 157, *Fair Value Measurement* (FAS 157). While this statement does not require new fair value measurements, it provides guidance on applying fair value and expands required disclosures. FAS 157 is effective for us beginning in the first quarter of 2008. We are currently assessing the impact FAS 157 may have on our Consolidated Financial Statements.

In September 2006, the FASB issued Statement No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* (FAS 158). FAS 158 required us to recognize the funded status of our pension and postretirement plans in the balance sheet, along with a corresponding noncash, after-tax adjustment to shareholders' equity. Funded status is determined as the difference between the fair value of plan assets and the benefit obligation. Changes in the funded status will be recognized in other comprehensive loss. We adopted FAS 158 at the end of 2006 and have disclosed the impact of the adoption in note 7 of the Financial Statements and Supplementary Data, Item 8.

In September 2006, the SEC issued Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* (SAB 108). SAB 108 provides interpretive guidance on how the effects of prior-year uncorrected misstatements should be considered when quantifying misstatements in the current-year financial statements. SAB 108 requires registrants to quantify misstatements using both an income statement and balance sheet approach and then evaluate whether either approach results in a misstatement that, when all relevant quantitative and qualitative factors are considered, is material. If prior-year errors that had been previously considered immaterial are now considered material based on either approach, no restatement is required so long as management properly applied its previous approach and all relevant facts and circumstances were considered. If prior-year's financial statements are not restated, the cumulative effect adjustment is recorded in opening accumulated earnings (deficit) as of the beginning of the fiscal year of adoption. SAB 108 was effective for us at the end of 2006. The adoption of SAB 108 did not have any impact on our Consolidated Financial Statements.

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* (FAS 159). This statement, which is expected to expand fair value measurement, permits entities to choose to measure many financial instruments and certain other items at fair value. FAS 159 is effective for us beginning in the first quarter of 2008. We are currently assessing the impact FAS 159 may have on our Consolidated Financial Statements.

**Asserted and Unasserted Claims** – Various claims and lawsuits are pending against us and certain of our subsidiaries. It is not possible at this time for us to determine fully the effect of all unasserted claims on our consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded

a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated results of operations, financial condition, or liquidity after taking into account liabilities previously recorded for these matters.

**Indemnities** – Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**Insurance Subsidiaries** – We have two consolidated, wholly-owned subsidiaries that provide insurance coverage for certain risks, including physical loss or property damage and certain other claims that are subject to reinsurance.

## CRITICAL ACCOUNTING POLICIES

Our Consolidated Financial Statements have been prepared in accordance with GAAP. The preparation of these financial statements requires estimation and judgment that affect the reported amounts of revenue, expenses, assets, and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The following critical accounting policies are a subset of our significant accounting policies described in note 1 to the Financial Statements and Supplementary Data, Item 8. These critical accounting policies affect significant areas of our financial statements and involve judgment and estimates. If these estimates differ significantly from actual results, the impact on our Consolidated Financial Statements may be material.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. During 2004, we engaged a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing our potential liability. As a result of this assessment, we increased our liability in 2004 for resolving both asserted and unasserted asbestos-related claims through 2034. This liability excludes future defense and processing costs. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of future claims received would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

Our asbestos-related liabilities were $302 million and $311 million at December 31, 2006 and 2005, respectively. The current portion of asbestos-related liabilities was $13 million and $16 million, respectively. Approximately 16% of the recorded liability related to asserted claims and approximately 84% related to unasserted claims. These claims are expected to be paid out over the next 28 years. We have insurance coverage for a portion of the costs incurred to resolve asbestos-related claims, and, as a result of the 2004 assessment, we increased our receivable for insurance recoveries related to asbestos during 2004. We have recognized an asset for estimated insurance recoveries at December 31, 2006 and 2005.

Our asbestos-related claims activity was as follows:

| *Claims Activity* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Open claims, beginning balance | **2,435** | 2,316 | 2,560 |
| New claims | **316** | 741 | 474 |
| Settled or dismissed claims | **(474)** | (622) | (718) |
| Open claims, ending balance at December 31 | **2,277** | 2,435 | 2,316 |

During 2006 and 2005 our third-party consultants assisted us in reviewing our actual asbestos claim experience compared to the assumptions used in the 2004 estimate, and we determined that no adjustment was necessary. We will continue to review actual experience and adjust our estimate as warranted.

We believe that our liability for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes to strategies, activities, and outcomes of asbestos litigation, federal and state law governing litigation and compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

**Environmental** – We are subject to federal, state, and local environmental laws and regulations. We identified 367 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 44 sites that are the subject of actions taken by the U.S. government, 25 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

Our environmental site activity was as follows:

| *Site Activity* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Open sites, beginning balance | **370** | 384 | 417 |
| New sites | **50** | 56 | 59 |
| Closed sites | **(53)** | (70) | (92) |
| Open sites, ending balance at December 31 | **367** | 370 | 384 |

When we identify an environmental issue with respect to property owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and we can reasonably estimate such costs. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

Environmental expense for the years ended December 31, 2006, 2005, and 2004 were $39 million, $45 million, and $46 million, respectively. As of December 31, 2006 and 2005, we had a liability of $210 million and $213 million, respectively, accrued for future environmental costs, of which $54 million and $46 million, respectively, were recorded in current liabilities as accrued casualty costs. The liability includes future costs for remediation and restoration of sites, as well as ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other

potentially responsible parties, and existing technology, laws, and regulations. The ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Current obligations are not expected to have a material adverse effect on our consolidated results of operations, financial condition, or liquidity.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us with measuring the expense and liability, including unasserted claims. The Federal Employers' Liability Act (FELA) governs compensation for work-related accidents. Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work. Annual expenses for personal injury-related events were $240 million in 2006, $247 million in 2005, and $288 million in 2004. As of December 31, 2006 and 2005, we had accrued liabilities of $631 million and $619 million for future personal injury costs, respectively, of which $233 million and $274 million was recorded in current liabilities as accrued casualty costs, respectively. Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Approximately 87% of the recorded liability related to asserted claims, and approximately 13% related to unasserted claims. Estimates can vary over time due to evolving trends in litigation.

Our personal injury claims activity was as follows:

| *Claims Activity* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Open claims, beginning balance | **4,197** | 4,028 | 4,085 |
| New claims | **4,190** | 4,584 | 4,366 |
| Settled or dismissed claims | **(4,261)** | (4,415) | (4,423) |
| Open claims, ending balance at December 31 | **4,126** | 4,197 | 4,028 |

**Depreciation** – The railroad industry is capital intensive. Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The lives are calculated using a separate composite annual percentage rate for each depreciable property group, based on the results of internal depreciation studies. We are required to submit a report on depreciation studies and proposed depreciation rates to the STB for review and approval every three years for equipment property and every six years for road property. The cost (net of salvage) of depreciable railroad property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of internally developed software is capitalized and amortized over a five-year period.

Significant capital spending in recent years increased the total value of our depreciable assets. Cash capital spending totaled $2.2 billion for the year ended December 31, 2006. For the year ended December 31, 2006, depreciation expense was $1.2 billion. We use various methods to estimate useful lives for each group of depreciable property. Due to the capital intensive nature of the business and the large base of depreciable assets, variances to those estimates could have a material effect on our Consolidated Financial Statements. If the estimated useful lives of all depreciable assets were increased by one year, annual depreciation expense would decrease by approximately $43 million. If the estimated useful lives of all assets to be depreciated were decreased by one year, annual depreciation expense would increase by approximately $45 million.

**Income Taxes** – As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns. These

expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations. For example, a 1% increase in the federal income tax rate would increase our deferred tax liability by approximately $245 million.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based in part on management's judgments regarding the best available evidence about future events. Based on that analysis, we recorded a valuation allowance of $5 million against certain deferred tax assets as of December 31, 2005. There was no valuation allowance as of December 31, 2006.

**Pension and Other Postretirement Benefits –** We use third-party actuaries to assist us in properly measuring the liabilities and expenses associated with providing pension and defined contribution medical and life insurance benefits (OPEB) to eligible employees. In order to use actuarial methods to value the liabilities and expenses we must make several assumptions. The critical assumptions used to measure pension obligations and expenses are the discount rate and expected rate of return on pension assets. For OPEB, the critical assumptions are the discount rate and healthcare cost trend rate.

We evaluate our critical assumptions at least annually, and selected assumptions are based on the following factors:

- Discount rate is based on a hypothetical portfolio of high quality corporate bonds (rated AA by a recognized rating agency) for which the timing and amount of cash flows matches our plan's expected benefit payments.

- Expected return on plan assets is based on our asset allocation mix and our historical return, taking into consideration current and expected market conditions.

- Healthcare cost trend rate is based on our historical rates of inflation and expected market conditions.

The following tables present the key assumptions used to measure pension and OPEB expense for 2006 and the estimated impact on 2006 pension and OPEB expense relative to a change in those assumptions:

| *Assumptions* | *Pension* | *OPEB* |
|---|---|---|
| Discount rate | 5.75% | 5.75% |
| Salary increase | 2.75% | N/A |
| Expected return on plan assets | 8.00% | N/A |
| Healthcare cost trend rate: | | |
| Current | N/A | 9.00% |
| Level in 2010 | N/A | 5.00% |

| *Sensitivities* | *Increase in Expense* | |
|---|---|---|
| *Millions of Dollars* | *Pension* | *OPEB* |
| 0.25% decrease in discount rate | $ 6 | $ — |
| 0.25% increase in salary scale | $ 1 | N/A |
| 0.25% decrease in expected return on plan assets | $ 4 | N/A |
| 1% increase in healthcare cost trend rate | N/A | $ 5 |

## CAUTIONARY INFORMATION

Certain statements in this report, and statements in other reports or information filed or to be filed with the SEC (as well as information included in oral statements or other written statements made or to be made by us), are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, without limitation, statements and information set forth under the caption "2007 Outlook" in this Item 7, and any other statements or information in this report (including information incorporated herein by reference) regarding: expectations as to operational or service improvements; expectations regarding the effectiveness of steps taken or to be taken to improve operations, service, infrastructure improvements, transportation plan modifications, and management of customer traffic on the system to meet demand; expectations as to cost savings, revenue growth, and earnings; the time by which goals, targets, or objectives will be achieved; projections, predictions, expectations, estimates, or forecasts as to our business, financial and operational results, future economic performance, and general economic conditions; proposed new products and services; estimates of costs relating to environmental remediation and restoration; expectations that claims, litigation, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated results of operations, financial condition, or liquidity and any other similar expressions concerning matters that are not historical facts.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking information is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

Forward-looking statements and information reflect the good faith consideration by management of currently available information, and may be based on underlying assumptions believed to be reasonable under the circumstances. However, such information and assumptions (and, therefore, such forward-looking statements and information) are or may be subject to variables or unknown or unforeseeable events or circumstances over which management has little or no influence or control. The Risk Factors in Item 1A of this report could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

## Item 7A. *Quantitative and Qualitative Disclosures about Market Risk*

Information concerning market risk sensitive instruments is set forth under Management's Discussion and Analysis of Financial Condition and Results of Operations — Other Matters, Item 7.

****************************************

## Item 8. Financial Statements and Supplementary Data

### Index to Consolidated Financial Statements


| Index to Consolidated Financial Statements | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 43 |
| Consolidated Statements of Income<br>For the Years Ended December 31, 2006, 2005, and 2004 | 44 |
| Consolidated Statements of Financial Position<br>At December 31, 2006 and 2005 | 45 |
| Consolidated Statements of Cash Flows<br>For the Years Ended December 31, 2006, 2005, and 2004 | 46 |
| Consolidated Statements of Changes in Common Shareholders' Equity<br>For the Years Ended December 31, 2006, 2005, and 2004 | 47 |
| Notes to the Consolidated Financial Statements | 48 |

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the accompanying consolidated statements of financial position of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2006 and 2005, and the related consolidated statements of income, changes in common shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2006. Our audits also included the financial statement schedule listed in the Table of Contents at Part IV, Item 15. These consolidated financial statements and financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Union Pacific Corporation and Subsidiary Companies as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 7 to the consolidated financial statements, in 2006 the Corporation adopted Statement of Financial Accounting Standard No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 16, 2007 expressed an unqualified opinion on management's assessment of the effectiveness of the Corporation's internal control over financial reporting and an unqualified opinion on the effectiveness of the Corporation's internal control over financial reporting.




Omaha, Nebraska
February 16, 2007

## CONSOLIDATED STATEMENTS OF INCOME

*Union Pacific Corporation and Subsidiary Companies*

| *Millions, Except Per Share Amounts, for the Years Ended December 31,* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Operating revenue | **$15,578** | $13,578 | $12,215 |
| Operating expenses: | | | |
| Salaries, wages, and employee benefits | **4,599** | 4,375 | 4,167 |
| Fuel and utilities | **3,012** | 2,562 | 1,816 |
| Equipment and other rents | **1,455** | 1,402 | 1,374 |
| Depreciation | **1,237** | 1,175 | 1,111 |
| Materials and supplies | **691** | 546 | 488 |
| Casualty costs | **410** | 411 | 694 |
| Purchased services and other costs | **1,290** | 1,312 | 1,270 |
| Total operating expenses | **12,694** | 11,783 | 10,920 |
| Operating income | **2,884** | 1,795 | 1,295 |
| Other income | **118** | 145 | 88 |
| Interest expense | **(477)** | (504) | (527) |
| Income before income taxes | **2,525** | 1,436 | 856 |
| Income taxes | **(919)** | (410) | (252) |
| Net income | **$ 1,606** | $ 1,026 | $ 604 |
| **Share and Per Share:** | | | |
| Earnings per share – basic | **$ 5.96** | $ 3.89 | $ 2.33 |
| Earnings per share – diluted | **$ 5.91** | $ 3.85 | $ 2.30 |
| Weighted average number of shares – basic | **269.4** | 263.4 | 259.1 |
| Weighted average number of shares – diluted | **272.0** | 266.5 | 262.2 |
| Dividends declared per share | **$ 1.20** | $ 1.20 | $ 1.20 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, as of December 31,* | *2006* | *2005* |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 827** | $ 773 |
| Accounts receivable, net | **679** | 747 |
| Materials and supplies | **395** | 331 |
| Current deferred income taxes | **319** | 304 |
| Other current assets | **191** | 170 |
| Total current assets | **2,411** | 2,325 |
| Investments: | | |
| Investments in and advances to affiliated companies | **865** | 789 |
| Other investments | **12** | 17 |
| Total investments | **877** | 806 |
| Properties: | | |
| Road | **35,634** | 33,812 |
| Equipment | **7,637** | 7,675 |
| Other | **177** | 210 |
| Total cost | **43,448** | 41,697 |
| Accumulated depreciation | **(10,575)** | (9,722) |
| Net properties | **32,873** | 31,975 |
| Other assets | **354** | 514 |
| Total assets | **$ 36,515** | $35,620 |
| **Liabilities and Common Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | **$ 684** | $ 783 |
| Accrued wages and vacation | **412** | 415 |
| Accrued casualty costs | **409** | 478 |
| Income and other taxes | **279** | 212 |
| Dividends and interest | **238** | 252 |
| Debt due within one year | **780** | 656 |
| Equipment rents payable | **108** | 130 |
| Other current liabilities | **629** | 458 |
| Total current liabilities | **3,539** | 3,384 |
| Debt due after one year | **6,000** | 6,760 |
| Deferred income taxes | **9,696** | 9,482 |
| Accrued casualty costs | **868** | 876 |
| Retiree benefits obligation | **504** | 855 |
| Other long-term liabilities | **596** | 556 |
| Commitments and contingencies (note 10) | | |
| Total liabilities | **21,203** | 21,913 |
| Common shareholders' equity: | | |
| Common shares, par value $2.50 per share, 500,000,000 shares authorized; 275,962,411 and 275,798,611 shares issued, respectively | **690** | 689 |
| Paid-in-surplus | **3,943** | 3,915 |
| Retained earnings | **11,215** | 9,932 |
| Treasury stock | **(394)** | (599) |
| Accumulated other comprehensive loss | **(142)** | (230) |
| Total common shareholders' equity | **15,312** | 13,707 |
| Total liabilities and common shareholders' equity | **$ 36,515** | $35,620 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | *2006* | *2005* | *2004* |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 1,606** | $ 1,026 | $ 604 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation | **1,237** | 1,175 | 1,111 |
| Deferred income taxes | **235** | 320 | 359 |
| Stock-based compensation expense | **35** | 21 | 21 |
| Net gain from asset sales | **(72)** | (135) | (69) |
| Other operating activities, net | **(175)** | 37 | 135 |
| Changes in current assets and liabilities, net | **14** | 151 | 96 |
| Cash provided by operating activities | **2,880** | 2,595 | 2,257 |
| **Investing Activities** | | | |
| Capital investments | **(2,242)** | (2,169) | (1,876) |
| Proceeds from asset sales | **133** | 185 | 145 |
| Acquisition of equipment pending financing | **(536)** | (872) | (674) |
| Proceeds from completed equipment financings | **536** | 872 | 674 |
| Other investing activities, net | **67** | (63) | (1) |
| Cash used in investing activities | **(2,042)** | (2,047) | (1,732) |
| **Financing Activities** | | | |
| Dividends paid | **(322)** | (314) | (310) |
| Debt repaid | **(657)** | (699) | (588) |
| Debt issued | **-** | - | 745 |
| Net proceeds from equity compensation plans | **160** | 262 | 80 |
| Excess tax benefits from equity compensation plans | **29** | - | - |
| Other financing activities, net | **6** | (1) | (2) |
| Cash used in financing activities | **(784)** | (752) | (75) |
| Net change in cash and cash equivalents | **54** | (204) | 450 |
| Cash and cash equivalents at beginning of year | **773** | 977 | 527 |
| Cash and cash equivalents at end of year | **$ 827** | $ 773 | $ 977 |
| **Changes in Current Assets and Liabilities, Net of Acquisitions** | | | |
| Accounts receivable, net | **$ 68** | $ (201) | $ (40) |
| Materials and supplies | **(64)** | (22) | (42) |
| Other current assets | **(21)** | 12 | 101 |
| Accounts, wages, and vacation payable | **(102)** | 224 | 100 |
| Other current liabilities | **133** | 138 | (23) |
| Total | **$ 14** | $ 151 | $ 96 |
| **Supplemental Cash Flow Information** | | | |
| Non-cash investing activities: | | | |
| Capital investments accrued but not yet paid | **$ 106** | $ 103 | $ 82 |
| Non-cash financing activity, cash dividends declared but not yet paid | **80** | 78 | 76 |
| Cash (paid) received during the year for: | | | |
| Interest | **(492)** | (510) | (517) |
| Income taxes, net | **(549)** | (29) | 187 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

# CONSOLIDATED STATEMENTS OF CHANGES IN COMMON SHAREHOLDERS' EQUITY

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars Thousands of Shares* | *Common Shares* | *Treasury Shares* | *Common Shares* | *Paid-in-Surplus* | *Retained Earnings* | *Treasury Stock* | *Accumulated Other Comp Income/(Loss): Defined Benefit Plans* | *Accumulated Other Comp Income/(Loss): Foreign Curr. Trans.* | *Accumulated Other Comp Income/(Loss): FAS 133* | *Total* |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at Jan. 1, 2004 | 275,693 | (17,532) | $689 | $3,936 | $ 8,930 | $(1,077) | $(109) | $(18) | $ 3 | $12,354 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 604 | - | - | - | - | 604 |
| Other comp. income/(loss) [a] | | | - | - | - | - | (103) | - | (10) | (113) |
| Total comprehensive income/(loss) | | | - | - | 604 | - | (103) | - | (10) | 491 |
| Conversion, exercises of stock options, forfeitures, and other | 2 | 2,357 | - | (19) | - | 141 | - | - | - | 122 |
| Dividends declared ($1.20 per share) | - | - | - | - | (312) | - | - | - | - | (312) |
| Balance at Dec. 31, 2004 | 275,695 | (15,175) | $689 | $3,917 | $ 9,222 | $ (936) | $(212) | $(18) | $ (7) | $12,655 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 1,026 | - | - | - | - | 1,026 |
| Other comp. income/(loss) [a] | | | - | - | - | - | 1 | 5 | 1 | 7 |
| Total comprehensive income/(loss) | | | - | - | 1,026 | - | 1 | 5 | 1 | 1,033 |
| Conversion, exercises of stock options, forfeitures, and other | 104 | 6,011 | - | (2) | - | 337 | - | - | - | 335 |
| Dividends declared ($1.20 per share) | - | - | - | - | (316) | - | - | - | - | (316) |
| Balance at Dec. 31, 2005 | 275,799 | (9,164) | $689 | $3,915 | $ 9,932 | $ (599) | $(211) | $(13) | $ (6) | $13,707 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 1,606 | - | - | - | - | 1,606 |
| Other comp. income/(loss) [a] | | | - | - | - | - | 170 | (4) | 1 | 167 |
| Total comprehensive income/(loss) | | | - | - | 1,606 | - | 170 | (4) | 1 | 1,773 |
| FAS 158 adoption (note 7) [b] | | | - | - | - | - | (79) | - | - | (79) |
| Conversion, exercises of stock options, forfeitures, and other | 163 | 3,374 | 1 | 28 | - | 205 | - | - | - | 234 |
| Dividends declared ($1.20 per share) | - | - | - | - | (323) | - | - | - | - | (323) |
| **Balance at Dec. 31, 2006** | **275,962** | **(5,790)** | **$690** | **$3,943** | **$11,215** | **$ (394)** | **$(120)** | **$(17)** | **$ (5)** | **$15,312** |

*[a] Net of deferred taxes of $102, $5, and $(69) in 2006, 2005, and 2004, respectively.*
*[b] Net of deferred taxes of $(94).*

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the “Corporation”, “UPC”, “we”, “us”, and “our” mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as “UPRR” or the “Railroad”.

## 1. Significant Accounting Policies

**Principles of Consolidation –** The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated. The Corporation evaluates its less than majority-owned investments for consolidation pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46 (Revised 2003), *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51* (FIN 46(R)). We currently have no less than majority-owned investments that require consolidation under FIN 46(R).

**Cash and Cash Equivalents –** Cash equivalents consist of investments with original maturities of three months or less.

**Materials and Supplies –** Materials and supplies are carried at the lower of average cost or market.

**Property and Depreciation –** Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of internally developed software is capitalized and amortized over a five-year period.

**Impairment of Long-lived Assets –** We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition –** We recognize commodity revenue on a percentage-of-completion basis as freight moves from origin to destination. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period with expenses recognized as incurred. Other revenue is recognized as service is performed or contractual obligations are met. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue based on actual or projected future customer shipments.

**Translation of Foreign Currency –** Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenue and expenses are translated at the average rates of exchange prevailing during the year. Unrealized adjustments are reflected within common shareholders’ equity as accumulated other comprehensive income or loss.

**Financial Instruments –** The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation –** We have several stock-based compensation plans under which employees and non-employee directors receive stock options, nonvested retention shares, and nonvested stock units. We refer to the nonvested shares and stock units collectively as "retention awards". We issue treasury shares to cover option exercises and stock unit vestings, while new shares are issued when retention shares vest.

We adopted FASB Statement No. 123(R), *Share-Based Payment* (FAS 123(R)), on January 1, 2006. FAS 123(R) requires us to measure and recognize compensation expense for all stock-based awards made to employees and directors, including stock options. Compensation expense is based on the calculated fair value of the awards as measured at the grant date and is expensed ratably over the service period of the awards (generally the vesting period). The fair value of retention awards is the stock price on the date of grant, while the fair value of stock options is determined by using the Black-Scholes option pricing model. We elected to use the modified prospective transition method as permitted by FAS 123(R) and did not restate financial results for prior periods. We did not make an adjustment for the cumulative effect of these estimated forfeitures, as the impact was not material.

As a result of the adoption of FAS 123(R), we recognized expense for stock options in 2006, in addition to retention awards, which were expensed prior to 2006. Stock-based compensation expense for the year ended December 31, 2006 was $22 million, after tax, or $0.08 per basic and diluted share. This includes $9 million for stock options and $13 million for retention awards for 2006. Before taxes, stock-based compensation expense included $14 million for stock options and $21 million for retention awards for 2006. We recorded $29 million of excess tax benefits as an inflow of financing activities in the Consolidated Statement of Cash Flows for the year ended December 31, 2006.

Prior to the adoption of FAS 123(R), we applied the recognition and measurement principles of Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations. No stock-based employee compensation expense related to stock option grants was reflected in net income, as all options granted under those plans had a grant price equal to the market value of our common stock on the date of grant. Stock-based compensation expense related to retention shares, stock units, and other incentive plans was reflected in net income. The following table details the effect on net income and earnings per share had compensation expense for all of our stock-based awards, including stock options, been recorded in the years ended December 31, 2005 and 2004 based on the fair value method under FASB Statement No. 123, *Accounting for Stock-Based Compensation*.

| *Pro Forma Stock-Based Compensation Expense* | *Year Ended December 31,* | |
|---|---|---|
| *Millions of Dollars, Except Per Share Amounts* | *2005* | *2004* |
| Net income, as reported | $1,026 | $ 604 |
| Stock-based employee compensation expense, reported in net income, net of tax | 13 | 13 |
| Total stock-based employee compensation expense determined under fair value–based method for all awards, net of tax [a] | (50) | (35) |
| Pro forma net income | $ 989 | $ 582 |
| Earnings per share – basic, as reported | $ 3.89 | $2.33 |
| Earnings per share – basic, pro forma | $ 3.75 | $2.25 |
| Earnings per share – diluted, as reported | $ 3.85 | $2.30 |
| Earnings per share – diluted, pro forma | $ 3.71 | $2.22 |

*[a] Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the*

*price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $19 million of the pro forma expense noted above. There were no reload options exercised during 2004 and no pro forma expense for reload option grants in 2004. There were no reload option grants during 2006 as stock options exercised after January 1, 2006 are not eligible for the reload feature.*

**Earnings Per Share –** Basic earnings per share are calculated on the weighted-average number of common shares outstanding during each period. Diluted earnings per share include shares issuable upon exercise of outstanding stock options and stock-based awards where the conversion of such instruments would be dilutive.

**Use of Estimates –** Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenue, and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes –** As required under FASB Statement No. 109, *Accounting for Income Taxes,* we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based in part on management's judgments regarding the best available evidence about future events.

**Pension and Postretirement Benefits –** We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various assumptions including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates, and expected future healthcare costs. The assumptions used by us are based on our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

**Personal Injury –** The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability. Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Legal fees and incidental costs are expensed as incurred.

**Environmental –** When environmental issues have been identified with respect to property currently or formerly owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. Legal fees and incidental costs are expensed as incurred.

**Asbestos –** We estimate a liability for asserted and unasserted asbestos-related claims based on an assessment of the number and value of those claims. We use an external consulting firm to assist us in properly measuring the expense and liability. Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Legal fees and incidental costs are expensed as incurred.

## 2. Operations and Segmentation

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network.

UPRR is a Class I railroad that operates in the United States. We have 32,339 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders.

## 3. Financial Instruments

**Strategy and Risk –** We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

**Market and Credit Risk –** We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2006 and 2005, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value –** We determined the fair values of our derivative financial instrument positions at December 31, 2006 and 2005 based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows.

**Interest Rate Fair Value Hedges –** We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements. As of December 31, 2006 and 2005, we had interest rate swaps hedging debt of $500 million and $750 million, respectively.

The following is a summary of our interest rate derivatives qualifying as fair value hedges:

| *Interest Rate Fair Value Hedges*<br>*Millions of Dollars, Except Percentages* | ***2006*** | *2005* |
|---|---|---|
| Amount of debt hedged | **$500** | $750 |
| Percentage of total debt portfolio | **7%** | 10% |
| Gross fair value liability position | **$ (16)** | $ (17) |

**Interest Rate Cash Flow Hedges** – We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At December 31, 2006, we had a reduction of $5 million recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2006 and 2005, we had no interest rate cash flow hedges outstanding.

**Fuel Cash Flow Hedges** – Fuel costs are a significant portion of our total operating expenses. In 2006 and 2005, our primary means of mitigating the impact of adverse fuel price changes were our fuel surcharge programs. However, we may use swaps, collars, futures and/or forward contracts to further mitigate the impact of adverse fuel price changes. We did not have any fuel hedges in place during 2006 or 2005. We hedged 120 million gallons of fuel during 2004 using collars with average cap, floor, and ceiling prices of $0.74, $0.64, and $0.86 per gallon, respectively.

**Fuel Swaps** – We entered into two fuel basis swaps for the period August 2006 through July 2008, which cover a total of 151 million gallons of diesel fuel. These commodity basis swaps require us to make payments to, or receive payments from, the counterparty based on the difference between certain price indices. Changes in the fair value of these swaps are reflected in fuel expense. We reported a derivative asset of approximately $2 million at December 31, 2006, which represents the fair value of the swaps. The swaps reduced fuel expense for 2006 by $3 million, which included monthly net settlements with the counterparty and the fair value recognition at December 31, 2006.

**Earnings Impact** – Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31:

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| (Increase)/decrease in interest expense from interest rate hedging | **$(8)** | $5 | $24 |
| Decrease in fuel expense from fuel derivatives | **3** | - | 14 |
| Increase/(decrease) in pre-tax income | **$(5)** | $5 | $38 |

**Fair Value of Debt Instruments** – The fair value of our short- and long-term debt was estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2006 and 2005, the fair value of total debt exceeded the carrying value by approximately $273 million and $460 million, respectively. At December 31, 2006 and 2005, approximately $165 million and $169 million, respectively, of fixed-rate debt securities contained call provisions that allowed us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at both December 31, 2006 and 2005. The value of the outstanding undivided interest held by investors under the facility was $600 million at both

December 31, 2006 and 2005, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,158 million and $1,226 million of accounts receivable held by UPRI at December 31, 2006 and 2005, respectively. At December 31, 2006 and 2005, the value of the interest retained by UPRI was $558 million and $626 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate the Railroad for its responsibilities. The Railroad collected approximately $15.5 billion and $13.4 billion during the years ended December 31, 2006 and 2005, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $33 million, $23 million, and $11 million for 2006, 2005, and 2004, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad have no recourse to the assets of UPRI. In August 2006, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

## 4. Income Taxes

Components of income tax expense were as follows for the years ended December 31:

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Current income tax expense (benefit): | | | |
| Federal | **$630** | $ 57 | $ (99) |
| State | **54** | 33 | (8) |
| Total current income tax expense (benefit) | **684** | 90 | (107) |
| Deferred income tax expense (benefit): | | | |
| Federal | **205** | 293 | 407 |
| State | **30** | 27 | (48) |
| Total deferred income tax expense | **235** | 320 | 359 |
| Total | **$919** | $410 | $ 252 |

For the years ended December 31, reconciliation between statutory and effective tax rates is as follows:

| *Tax Rate Percentages* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Federal statutory tax rate | **35.0%** | 35.0% | 35.0% |
| State statutory rates, net of federal benefits | **2.9** | 2.9 | 2.9 |
| Deferred tax adjustments | **(0.5)** | (8.2) | (2.9) |
| Tax credits | **(1.0)** | (1.2) | (5.6) |
| Other | - | 0.1 | - |
| Effective tax rate | **36.4%** | 28.6% | 29.4% |

Deferred income tax liabilities (assets) were comprised of the following at December 31:

| *Millions of Dollars* | ***2006*** | *2005* |
|---|---|---|
| Net current deferred income tax asset | **$ (319)** | $ (304) |
| Property | **9,356** | 9,216 |
| State taxes, net | **617** | 592 |
| Other | **(277)** | (326) |
| Net long-term deferred income tax liability | **9,696** | 9,482 |
| Net deferred income tax liability | **$9,377** | $9,178 |

All federal income tax years prior to 1995 are closed. Federal income tax liabilities for tax years 1986 through 1994 have been resolved. Interest calculations for these years are in process and may take several years to resolve with the Internal Revenue Service (IRS). The IRS is examining the Corporation's federal income tax returns for tax years 2003 and 2004 and should complete their exam in 2007. The IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2002, and we are in the IRS Appeals process for these years. As previously reported, among their proposed adjustments is the disallowance of tax deductions claimed in connection with certain donations of property. In the fourth quarter of 2005, the IRS National Office issued a Technical Advice Memorandum that left unresolved whether the deductions were proper, pending further factual development. We continue to dispute the donation issue, as well as many of the other proposed adjustments, and will contest the associated tax deficiencies through the IRS Appeals process, and, if necessary, litigation. We do not expect that the ultimate resolution of these examinations will have a material adverse effect on our Consolidated Financial Statements.

As reported in the Corporation's Forms 10-Q for the quarters ended June 30, 2005, and September 30, 2005, the final settlements for pre-1995 tax years, along with the IRS Examination Reports for tax years 1995 through 2002, among other things, were considered in a review and re-evaluation of the Corporation's estimated deferred tax assets and liabilities. This review resulted in a reduction of deferred income tax liabilities and income tax expense of $118 million in the third quarter of 2005.

## 5. Debt

Total debt as of December 31, 2006 and 2005, including interest rate swaps designated as hedges, is summarized below:

| *Millions of Dollars* | ***2006*** | *2005* |
|---|---|---|
| Notes and debentures, 3.0% to 7.4% due through 2054 [a] | **$4,803** | $5,303 |
| Capitalized leases, 4.7% to 9.3% due through 2026 | **1,236** | 1,318 |
| Medium-term notes, 6.8% to 10.0% due through 2020 | **362** | 372 |
| Equipment obligations, 6.6% to 10.2% due through 2019 | **232** | 270 |
| Mortgage bonds, 4.8% due through 2030 | **59** | 60 |
| Tax-exempt financings, 4.4% to 5.7% due through 2026 | **191** | 197 |
| Unamortized discount | **(103)** | (104) |
| Total debt [a] | **6,780** | 7,416 |
| Less current portion [b] | **(780)** | (656) |
| Total long-term debt | **$6,000** | $6,760 |

*[a] 2006 and 2005 include a collective write-down of $14 million and $16 million, respectively, due to market value adjustments for debt with qualifying hedges that are recorded on the Consolidated Statements of Financial Position.*

*[b] 2006 includes a write-down of $4 million due to short-term market value adjustments for debt with qualifying hedges that are recorded on the Consolidated Statements of Financial Position.*

**Debt Maturities** – The following table presents aggregate debt maturities as of December 31, 2006, excluding market value adjustments.

| *Millions of Dollars* | |
|---|---|
| 2007 | $ 784 |
| 2008 | 683 |
| 2009 | 532 |
| 2010 | 453 |
| 2011 | 542 |
| Thereafter | 3,800 |
| Total debt | $6,794 |

**Mortgaged Properties** – Equipment with a carrying value of approximately $2.8 billion and $3.0 billion at December 31, 2006 and 2005, respectively, serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms of the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities** – On December 31, 2006, we had $2 billion in revolving credit facilities available, including $1 billion under a five-year facility expiring in March 2009 and $1 billion under a five-year facility expiring in March 2010 (collectively, the "facilities"). The facilities are designated for general corporate purposes and support the issuance of commercial paper. Neither of the facilities were drawn on in 2006. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. These facilities allow for borrowings at floating rates based on London Interbank Offered Rates, plus a spread,

depending upon our senior unsecured debt ratings. The facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2006, we were in compliance with these covenants. The facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require the posting of collateral.

In addition to our revolving credit facilities, we had $150 million in uncommitted lines of credit available, including $75 million that expires in March 2007 and $75 million expiring in May 2007. Neither of these lines of credit were used as of December 31, 2006. We must have equivalent credit available under our five-year facilities to draw on these $75 million lines.

**Dividend Restrictions** – We are subject to certain restrictions related to the payment of cash dividends to our shareholders due to minimum net worth requirements under the credit facilities referred to above. The amount of retained earnings available for dividends was $7.8 billion and $6.2 billion at December 31, 2006 and 2005, respectively. We do not expect that these restrictions will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity. We declared dividends of $323 million in 2006 and $316 million in 2005.

**Shelf Registration Statement** – Under a current shelf registration statement, we may issue any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2006, we had $500 million remaining for issuance under the current shelf registration statement. We have no immediate plans to issue any securities; however, we routinely consider and evaluate opportunities to replace existing debt or access capital through issuances of debt securities under this shelf registration, and, therefore, we may issue debt securities at any time.

## 6. Leases

We lease certain locomotives, freight cars, and other property. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2006 were as follows:

| *Millions of Dollars* | *Operating Leases* | *Capital Leases* |
|---|---|---|
| 2007 | $ 624 | $ 180 |
| 2008 | 546 | 173 |
| 2009 | 498 | 168 |
| 2010 | 456 | 148 |
| 2011 | 419 | 157 |
| Later Years | 2,914 | 1,090 |
| Total minimum lease payments | $5,457 | $1,916 |
| Amount representing interest | N/A | (680) |
| Present value of minimum lease payments | N/A | $1,236 |

Rent expense for operating leases with terms exceeding one month was $798 million in 2006, $728 million in 2005, and $651 million in 2004. When cash rental payments are not made on a straight-line basis, we recognize variable rental expense on a straight-line basis over the lease term. Contingent rentals and sub-rentals are not significant.

## 7. Retirement Plans

### Pension and Other Postretirement Benefits

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment, with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – We provide defined contribution medical and life insurance benefits for eligible retirees. These benefits are funded as medical claims and life insurance premiums are paid.

### New Accounting Standard

We adopted FASB Statement No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* (FAS 158), at the end of 2006, which required us to separately recognize the overfunded or underfunded status of our pension and OPEB plans as an asset or liability. The funded status is measured as the difference between the fair value of plan assets and our projected benefit obligations to current and retired employees.

The adoption of FAS 158 at December 31, 2006 decreased other assets and total assets by $207 million, decreased retiree benefits obligation by $34 million, decreased deferred income tax liabilities by $94 million, decreased total liabilities by $128 million, and resulted in an accumulated other comprehensive loss and reduction in total common shareholders' equity of $79 million. These changes to our financial statements were non-cash and will have no impact on existing debt covenants, credit ratings, or financial flexibility.

The adoption of FAS 158 had no impact on years prior to 2006, as retrospective application was not allowed. This new standard does not change how pension or OPEB expense is computed, nor does it have any impact on cash funding requirements. The impact of the adoption of FAS 158 noted above does not include our equity method investees, which are not required to adopt FAS 158 until 2007 because they do not have publicly traded securities. The impact of this adoption in 2007 by our equity method investees is not expected to be significant.

### Funded Status

The funded status represents the difference between the projected benefit obligation (PBO) and the fair value of the plan assets. The PBO is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of the OPEB plan is equal to the accumulated benefit obligation, as the present value of the OPEB liabilities is not affected by salary increases. Plan assets are measured at fair value. We use a December 31 measurement date for plan assets and obligations for all our retirement plans.

Changes in our PBO and plan assets are as follows for the years ended December 31:

| | Pension | | OPEB | |
|---|---|---|---|---|
| *Millions of Dollars* | ***2006*** | *2005* | ***2006*** | *2005* |
| Projected Benefit Obligation | | | | |
| Projected benefit obligation at beginning of year | **$2,065** | $2,058 | **$ 476** | $ 453 |
| Service cost | **35** | 28 | **4** | 4 |
| Interest cost | **117** | 115 | **21** | 25 |
| Plan amendments | **-** | - | **(38)** | (42) |
| Actuarial loss (gain) | **16** | (18) | **(58)** | 70 |
| Gross benefits paid | **(120)** | (118) | **(31)** | (34) |
| Projected benefit obligation at end of year | **$2,113** | $2,065 | **$ 374** | $ 476 |
| Plan Assets | | | | |
| Fair value of plan assets at beginning of year | **$1,707** | $1,693 | **$ -** | $ - |
| Actual return on plan assets | **243** | 123 | **-** | - |
| Voluntary funded pension plan contributions | **150** | - | **-** | - |
| Non-qualified plan benefit payments | **9** | 9 | **31** | 34 |
| Gross benefits paid | **(120)** | (118) | **(31)** | (34) |
| Fair value of plan assets at end of year | **$1,989** | $1,707 | **$ -** | $ - |
| Funded status at end of year | **$ (124)** | $ (358) | **$(374)** | $(476) |
| Unrecognized net actuarial losses | **N/A** | 362 | **N/A** | 194 |
| Unrecognized prior service cost (credit) | **N/A** | 31 | **N/A** | (156) |
| Net amounts recognized at end of year | **$ (124)** | $ 35 | **$(374)** | $(438) |

Amounts recognized in the statement of financial position as of December 31, 2006 and 2005 consist of:

| *Amounts Recognized at December 31, 2006* | Pension | | OPEB | |
|---|---|---|---|---|
| *Millions of Dollars* | ***2006*** | *2005* | ***2006*** | *2005* |
| Other assets | **$ 45** | N/A | **$ -** | N/A |
| Other current liabilities | **(12)** | N/A | **(27)** | N/A |
| Retiree benefits obligation | **(157)** | N/A | **(347)** | N/A |
| Net amounts recognized at end of year | **$(124)** | N/A | **$(374)** | N/A |
| *Amounts Recognized at December 31, 2005* | | | | |
| Prepaid benefit cost | **N/A** | $ 122 | **N/A** | $ - |
| Accrued benefit cost | **N/A** | (86) | **N/A** | (438) |
| Additional minimum liability | **N/A** | (369) | **N/A** | - |
| Intangible assets | **N/A** | 31 | **N/A** | - |
| Accumulated other comprehensive income | **N/A** | 337 | **N/A** | - |
| Net amounts recognized at end of year | **N/A** | $ 35 | **N/A** | $(438) |

After-tax amounts recognized in accumulated other comprehensive income (loss) as of December 31, 2006 consist of:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service (cost) credit | $ (15) | $ 99 | $ 84 |
| Net actuarial (loss) | (154) | (50) | (204) |
| Total | $(169) | $ 49 | $(120) |

*Underfunded Accumulated Benefit Obligation* – The accumulated benefit obligation (ABO) is the present value of benefits earned to date, assuming no future salary growth. The underfunded accumulated benefit obligation represents the difference between the ABO and the fair value of plan assets. At December 31, 2006, the only pension plan that was underfunded was our non-qualified (supplemental) plan, which is not funded by design. The non-qualified (supplemental) plan is funded with cash from operations as benefits are paid to plan participants. Each of our qualified plans was fully funded at December 31, 2006. The PBO, ABO, and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31:

| *Underfunded Accumulated Benefit Obligation*<br>*Millions of Dollars* | ***2006*** | *2005* |
|---|---|---|
| Projected benefit obligation | **$(169)** | $(2,044) |
| Accumulated benefit obligation | **$(168)** | $(2,026) |
| Fair value of plan assets | **-** | 1,685 |
| Underfunded accumulated benefit obligation | **$(168)** | $ (341) |

The ABO for all defined benefit pension plans was $2.1 billion at December 31, 2006 and $2.0 billion at December 31, 2005.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | ***2006*** | *2005* | *2004* | ***2006*** | *2005* | *2004* |
| Discount rate | **6.00%** | 5.75% | 6.00% | **6.00%** | 5.75% | 6.00% |
| Salary increase | **3.00** | 2.75 | 3.00 | **N/A** | N/A | N/A |

The following table presents assumed health care cost trend rates used to determine benefit obligations and OPEB expense:

| *Percentages* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **8.0%** | 9.0% | 10.0% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.0%** | 5.0% | 5.0% |
| Year that the rate reaches the ultimate trend rate | **2010** | 2010 | 2010 |

**Expense**

Both pension and OPEB expense are determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. The expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. Differences in actual experience in relation to assumptions are not recognized in net income immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and OPEB costs were as follows for the years ended December 31:

| | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| *Millions of Dollars* | ***2006*** | *2005* | *2004* | ***2006*** | *2005* | *2004* |
| Net Periodic Benefit Cost: | | | | | | |
| Service cost | **$ 35** | $ 28 | $ 30 | **$ 4** | $ 4 | $ 5 |
| Interest cost | **117** | 115 | 120 | **21** | 25 | 31 |
| Expected return on plan assets | **(134)** | (134) | (137) | **-** | - | - |
| Amortization of: | | | | | | |
| Transition obligation | **-** | - | (2) | **-** | - | - |
| Prior service cost (credit) | **7** | 7 | 8 | **(33)** | (30) | (24) |
| Actuarial loss | **21** | 5 | 3 | **13** | 14 | 18 |
| Net periodic benefit cost | **$ 46** | $ 21 | $ 22 | **$ 5** | $ 13 | $ 30 |

The estimated actuarial loss and prior service cost for the pension plans that will be amortized, on a pre-tax basis, from accumulated other comprehensive loss into net periodic benefit cost during 2007 will be $17 million and $6 million, respectively. The estimated actuarial loss and prior service credit for the OPEB plans that will be amortized, on a pre-tax basis, from accumulated other comprehensive loss into net periodic benefit cost during 2007 will be $10 million and $32 million, respectively.

*Assumptions* – The weighted-average actuarial assumptions used to determine expense were as follows for the years ended December 31:

| | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| *Percentages* | ***2006*** | *2005* | *2004* | ***2006*** | *2005* | *2004* |
| Discount rate | **5.75%** | 6.00% | 6.50% | **5.75%** | 6.00% | 6.50% |
| Expected return on plan assets | **8.00** | 8.00 | 8.00 | **N/A** | N/A | N/A |
| Salary increase | **2.75** | 3.00 | 3.50 | **N/A** | N/A | N/A |

The discount rate is based on a hypothetical portfolio of high quality corporate bonds with cash flows matching our plans' expected benefit payments. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return on pension plan assets, net of fees, was approximately 14% in 2006, 7% in 2005, and 12% in 2004. Our historical annualized ten-year rate of return on plan assets is approximately 9%.

Assumed healthcare cost trend rates have a significant effect on the expense and liabilities reported for healthcare plans. The assumed healthcare cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the assumed healthcare cost trend rates would have the following effects on OPEB:

| *Millions of Dollars* | *One % pt. Increase* | *One % pt. Decrease* |
|---|---|---|
| Effect on total service and interest cost components | $ 3 | $ (2) |
| Effect on accumulated benefit obligation | 31 | (26) |

**Cash Contributions**

The following table details our cash contributions for the years ended December 31, 2006 and 2005, and the expected contributions for 2007:

| | *Pension* | | |
|---|---|---|---|
| *Millions of Dollars* | *Qualified* | *Non-qualified* | *OPEB* |
| 2005 | $ - | $ 9 | $34 |
| 2006 | 150 | 9 | 31 |
| 2007 | - | 12 | 27 |

In 2006, the Pension Protection Act of 2006 (the Act) was signed into law. The Act changes the method of valuing assets and liabilities for funding purposes, as well as the timing of required contributions. Our pension plans continue to meet all funding requirements and we do not expect the Act to significantly impact our results of operations, financial condition, or liquidity.

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Act and not more than the maximum amount deductible for tax purposes. All contributions made to the qualified pension plans in 2006 were voluntary and were made with cash generated from operations. In 2006, we voluntarily contributed $50 million in January and $100 million in December to the qualified pension plan. At December 31, 2006, our qualified pension plans were fully funded. No required contributions are expected in 2007.

The OPEB plans are not funded and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2007 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2007 though 2016:

| *Millions of Dollars* | *Pension* | *OPEB* |
|---|---|---|
| 2007 | $124 | $ 27 |
| 2008 | 126 | 28 |
| 2009 | 129 | 29 |
| 2010 | 133 | 30 |
| 2011 | 139 | 31 |
| Years 2012 – 2016 | 776 | 152 |

**Asset Allocation Strategy**

Our pension plan asset allocation at December 31, 2006 and 2005, and target allocation for 2007, are as follows:

| | *Target Allocation 2007* | *Percentage of Plan Assets December 31,* | |
|---|---|---|---|
| | | ***2006*** | *2005* |
| Equity securities | 60% to 70% | **70%** | 75% |
| Debt securities | 20% to 30% | **26** | 24 |
| Real estate | 4% to 6% | **2** | 1 |
| Commodities | 4% to 6% | **2** | - |
| Total | | **100%** | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated among equity, debt, and other instruments in order to achieve a diversification level that mitigates wide swings in investment returns. Asset allocation target ranges for equity, debt, and other portfolios are evaluated at least every three years with the assistance of an independent external consulting firm. Actual asset allocations are monitored monthly, and rebalancing actions are executed at least quarterly, if needed.

The majority of the plan's assets are invested in equity securities, because equity portfolios have historically provided higher returns than debt and other asset classes over extended time horizons, and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than other investments. The risk of loss in the plan's equity portfolio is mitigated by investing in a broad range of equity types. Equity diversification includes large-capitalization and small-capitalization companies, growth-oriented and value-oriented investments, and U.S. and non-U.S. securities.

Equity risks are further balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2006 and 2005. The debt portfolio is also broadly diversified and invested primarily in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 6.4 years and 6.5 years at December 31, 2006 and 2005, respectively.

The investment of pension plan assets in our securities is specifically prohibited for both the equity and debt portfolios, other than through index fund holdings.

**Other Retirement Programs**

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first six percent of compensation contributed. Our thrift plan contributions were $13 million in 2006, and $12 million in both 2005 and 2004.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). Contributions made to the System are expensed as incurred and amounted to approximately $615 million in 2006, $595 million in 2005, and $569 million in 2004.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we provide certain postretirement healthcare and life insurance benefits for eligible union employees. Premiums under the plans are expensed as incurred and amounted to $40 million in 2006, $41 million in 2005, and $30 million in 2004.

## 8. Stock Options and Other Stock Plans

We have 1,254,304 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 3,570 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation. We no longer grant options or awards of retention shares and units under these plans.

The UP Shares Stock Option Plan of Union Pacific Corporation (UP Shares Plan) was approved by our Board of Directors on April 30, 1998. The UP Shares Plan reserved 12,000,000 shares of our common stock for issuance. The UP Shares Plan was a broad-based option program that granted options to purchase 200 shares of our common stock at $55.00 per share to eligible active employees on April 30, 1998. All options granted were

non-qualified options that became exercisable on May 1, 2001, and remain exercisable until April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan. As of December 31, 2006, there were 1,119,910 options outstanding under the UP Shares Plan.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 550,000 shares of our common stock were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 1,000 shares of retention shares or retention stock units. Additionally, each non-employee director receives annually an option to purchase at fair value a number of shares of our common stock, not to exceed 5,000 shares during any calendar year, determined by dividing 60,000 by 1/3 of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. As of December 31, 2006, 7,000 restricted shares were outstanding under the Directors Plan and 159,450 options were outstanding under the Directors Plan.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 12,000,000 shares of our common stock for issuance to eligible employees of the Corporation and its subsidiaries in the form of non-qualified options, incentive stock options, retention shares, stock units, and incentive bonus awards. Non-employee directors were not eligible for awards under the 2001 Plan. As of December 31, 2006, 4,224,402 options and 339,537 retention shares and stock units were outstanding under the 2001 Plan. We no longer grant any stock options or other stock or unit awards under this plan.

The Union Pacific Corporation 2004 Stock Incentive Plan (2004 Plan) was approved by shareholders in April 2004. The 2004 Plan reserved 21,000,000 shares of our common stock for issuance, plus any shares subject to awards made under the 2001 Plan and the 1993 Plan that were outstanding on April 16, 2004, and became available for regrant pursuant to the terms of the 2004 Plan. Under the 2004 Plan, non-qualified options, stock appreciation rights, retention shares, stock units, and incentive bonus awards may be granted to eligible employees of the Corporation and its subsidiaries. Non-employee directors are not eligible for awards under the 2004 Plan. As of December 31, 2006, 3,286,461 options and 561,875 retention shares and stock units were outstanding under the 2004 Plan.

Pursuant to the above plans, 19,544,245; 20,695,817; and 21,571,309 shares of our common stock were authorized and available for grant at December 31, 2006, 2005, and 2004, respectively.

**Stock Options** – We estimate the fair value of our stock option awards using the Black-Scholes option pricing model. Groups of employees and non-employee directors that have similar historical and expected exercise behavior are considered separately for valuation purposes. The table below shows the year-to-date weighted-average of the assumptions used when valuing these separate groups:

| *Weighted-Average Assumptions* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Risk-free interest rate | **4.5%** | 3.8% | 3.3% |
| Dividend yield | **1.4%** | 1.9% | 1.7% |
| Expected life (years) | **6.0** | 4.8 | 5.6 |
| Volatility | **25.3%** | 20.6% | 25.9% |
| Weighted-average grant-date fair value of options granted | **$24.97** | $12.92 | $16.38 |

The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant; the dividend yield is calculated as the ratio of dividends paid per share of common stock to the stock price on the date of grant; the

expected life is based on historical and expected exercise behavior; and volatility is based on the historical volatility of our stock price, over a time period that is consistent with the expected life of the option.

A summary of stock option activity during 2006 is presented below:

| | *Shares* | *Weighted-Average Exercise Price* | *Weighted-Average Remaining Contractual Term* | *Aggregate Intrinsic Value (millions)* |
|---|---|---|---|---|
| Outstanding at January 1, 2006 | 12,436,209 | $59.41 | N/A | N/A |
| Granted | 1,402,200 | 86.04 | N/A | N/A |
| Exercised | (3,740,732) | 56.39 | N/A | N/A |
| Forfeited or expired | (53,150) | 65.64 | N/A | N/A |
| Outstanding at December 31, 2006 | 10,044,527 | $64.22 | 6.0 yrs. | $279 |
| Vested or expected to vest at December 31, 2006 | 10,001,242 | $64.13 | 6.0 yrs. | $279 |
| Options exercisable at December 31, 2006 | 8,601,677 | $60.75 | 5.5 yrs. | $269 |

Stock options are granted at market price on the date of grant, have ten-year contractual terms, and vest no later than three years from the date of grant. None of the stock options outstanding at December 31, 2006 are subject to performance or market-based vesting conditions.

At December 31, 2006, there was $22 million of unrecognized compensation expense related to nonvested stock options, which is expected to be recognized over a weighted-average period of 1.8 years. Additional information regarding stock option exercises appears in the table below:

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Aggregate grant-date fair value of stock options vested [a] | **$ 26** | $ 62 | $ 36 |
| Intrinsic value of stock options exercised | **124** | 142 | 51 |
| Cash received from option exercises | **177** | 296 | 102 |
| Tax benefit realized from option exercises | **44** | 55 | 17 |

*[a] Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options with immediate vesting in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $31 million of the aggregate grant-date fair value of stock options vested. There were no reload options exercised during 2004. There were no reload option grants during 2006 as stock options exercised after January 1, 2006 are not eligible for the reload feature.*

**Retention Awards** – The fair value of retention awards is based on the market price of the stock at the grant date.

Changes in our retention awards during 2006 were as follows:

| | *Shares* | *Weighted-Average Grant-Date Fair Value* |
|---|---|---|
| Nonvested at January 1, 2006 | 1,005,276 | $58.88 |
| Granted | 328,150 | 86.04 |
| Vested | (539,453) | 56.53 |
| Forfeited | (16,199) | 71.21 |
| Nonvested at December 31, 2006 | 777,774 | $71.72 |

Retention awards, which we grant at no cost to the employee or non-employee director, vest over periods lasting up to four years. At December 31, 2006, there was $26 million of total unrecognized compensation expense related to nonvested retention awards, which is expected to be recognized over a weighted-average period of 1.6 years.

**Performance Retention Awards** – In January 2006, our Board of Directors approved a new long-term plan (LTP). Under the LTP, selected employees were awarded stock units subject to continued employment through January 2009 and the attainment of certain levels of return on invested capital (ROIC) as defined in the LTP. We will expense the fair value (grant-date stock price) of the units that are probable of being earned based on our forecasted ROIC over the 3-year performance period.

Changes in our performance retention awards during 2006 were as follows:

| | *Shares* | *Weighted-Average Grant-Date Fair Value* |
|---|---|---|
| Nonvested at January 1, 2006 | - | $ - |
| Granted | 122,400 | 86.05 |
| Vested | - | - |
| Forfeited | - | - |
| Nonvested at December 31, 2006 | 122,400 | $86.05 |

At December 31, 2006, there was $7 million of total unrecognized compensation expense related to nonvested performance retention awards, which is expected to be recognized over a weighted-average period of 2 years. A portion of this expense is subject to achievement of the performance criteria under the LTP.

## 9. Earnings Per Share

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31:

| *Millions of Dollars, Except Per Share Amounts* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Net income | **$1,606** | $1,026 | $ 604 |
| Weighted-average number of shares outstanding: | | | |
| Basic | **269.4** | 263.4 | 259.1 |
| Dilutive effect of stock options | **2.1** | 1.5 | 1.2 |
| Dilutive effect of retention shares and units | **0.5** | 1.6 | 1.9 |
| Diluted | **272.0** | 266.5 | 262.2 |
| Earnings per share – basic | **$ 5.96** | $ 3.89 | $ 2.33 |
| Earnings per share – diluted | **$ 5.91** | $ 3.85 | $ 2.30 |

Common stock options totaling 1.4 million, 1.4 million, and 3.3 million for 2006, 2005, and 2004, respectively, were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive.

## 10. Commitments and Contingencies

**Asserted and Unasserted Claims** – Various claims and lawsuits are pending against us and certain of our subsidiaries. It is not possible at this time for us to determine fully the effect of all unasserted claims on our

consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated results of operations, financial condition, or liquidity after taking into account liabilities previously recorded for these matters.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in measuring the expense and liability, including unasserted claims. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements.

Our personal injury liability activity was as follows:

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Beginning balance | **$ 619** | $ 639 | $ 619 |
| Accruals | **240** | 247 | 288 |
| Payments | **(228)** | (267) | (268) |
| Ending balance at December 31 | **$ 631** | $ 619 | $ 639 |
| Current portion, ending balance at December 31 | **$ 233** | $ 274 | $ 274 |

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Approximately 87% of the recorded liability related to asserted claims, and approximately 13% related to unasserted claims. Personal injury accruals were higher in 2004 due to a 1998 crossing accident verdict upheld in 2004 and a 2004 derailment near San Antonio.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. The claims and lawsuits (collectively referred to as "claims") allege occupational illness resulting from exposure to asbestos-containing products. In most cases, the claimants do not have credible medical evidence of physical impairment resulting from the alleged exposures. Additionally, most claims filed against us do not specify an amount of alleged damages.

During 2004, we engaged a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing the number and value of these unasserted claims through 2034, based on our average claims experience over a multi-year period. As a result, we increased our liability in 2004 for asbestos-related claims in the fourth quarter of 2004. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of future claims received would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

Our asbestos-related liability activity was as follows:

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Beginning balance | **$311** | $324 | $ 51 |
| Accruals | **-** | - | 287 |
| Payments | **(9)** | (13) | (14) |
| Ending balance at December 31 | **$302** | $311 | $324 |
| Current portion, ending balance at December 31 | **$ 13** | $ 16 | $ 17 |

Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Approximately 16% of the recorded liability related to asserted claims, and approximately 84% related to unasserted claims. These claims are expected to be paid out over the next 28 years. During 2006 and 2005, our third-party consultants assisted us in reviewing our actual asbestos claim experience compared to the assumptions used in the 2004 estimate, and we determined that no adjustment to our estimate was necessary. We will continue to review actual experience and adjust our estimate as warranted.

We have insurance coverage for a portion of the costs incurred to resolve asbestos-related claims, and, as a result of the 2004 assessment, we increased our receivable for insurance recoveries related to asbestos during 2004. We have recognized an asset for estimated insurance recoveries at December 31, 2006 and 2005.

We believe that our liability estimates for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues, could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes in the litigation environment, federal and state law governing compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

**Environmental Costs –** We are subject to federal, state, and local environmental laws and regulations. We have identified approximately 367 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 44 sites that are the subject of actions taken by the U.S. government, 25 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When an environmental issue has been identified with respect to the property owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

Our environmental liability activity was as follows:

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Beginning balance | **$213** | $201 | $187 |
| Accruals | **39** | 45 | 46 |
| Payments | **(42)** | (33) | (32) |
| Ending balance at December 31 | **$210** | $213 | $201 |
| Current portion, ending balance at December 31 | **$ 54** | $ 46 | $ 50 |

The environmental liability includes costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates may also vary due to changes in federal, state, and local laws governing environmental remediation. We do not expect current obligations to have a material adverse effect on our results of operations or financial condition.

**Guarantees** – At December 31, 2006, we were contingently liable for $464 million in guarantees. We have recorded a liability of $6 million for the fair value of these obligations as of December 31, 2006. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Indemnities** – Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**Income Taxes** – As previously reported in our Form 10-Q for the quarter ended September 30, 2005, the IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2002. Among their proposed adjustments is the disallowance of tax deductions claimed in connection with certain donations of property. In the fourth quarter of 2005, the IRS National Office issued a Technical Advice Memorandum which left unresolved whether the deductions were proper, pending further factual development. We continue to dispute the donation issue, as well as many of the other proposed adjustments, and will contest the associated tax deficiencies through the IRS Appeals process, and, if necessary, litigation. In addition, the IRS is examining the Corporation's federal income tax returns for tax years 2003 and 2004 and should complete their exam in 2007. We do not expect that the ultimate resolution of these examinations will have a material adverse effect on our Consolidated Financial Statements.

## 11. Other Income

Other income included the following for the years ended December 31:

| *Millions of Dollars* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Rental income | **$ 83** | $ 59 | $ 55 |
| Net gain on non-operating asset dispositions | **72** | 135 | 69 |
| Interest income | **29** | 17 | 10 |
| Sale of receivables fees | **(33)** | (23) | (11) |
| Non-operating environmental costs and other | **(33)** | (43) | (35) |
| Total | **$118** | $145 | $ 88 |

## 12. Accounting Pronouncements

In June 2006, the FASB issued Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109* (FIN 48). Under FIN 48, we will recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized will be measured as the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. The interpretation is effective for us beginning in the first quarter of 2007. The cumulative effect of adopting FIN 48 will be a one-time reduction in the January 1, 2007 balance of retained earnings. Future changes in uncertain tax positions will be included in income tax expense. We do not expect that the cumulative effect of adopting FIN 48 will have a material impact on our Consolidated Financial Statements.

In September 2006, the FASB issued Statement No. 157, *Fair Value Measurement* (FAS 157). While this statement does not require new fair value measurements, it provides guidance on applying fair value and expands required disclosures. FAS 157 is effective for us beginning in the first quarter of 2008. We are currently assessing the impact FAS 157 may have on our Consolidated Financial Statements.

In September 2006, the FASB issued FAS 158. FAS 158 required us to recognize the funded status of our pension and postretirement plans in the balance sheet, along with a corresponding noncash, after-tax adjustment to shareholders' equity. Funded status is determined as the difference between the fair value of plan assets and the benefit obligation. Changes in the funded status will be recognized in other comprehensive loss. We adopted FAS 158 at the end of 2006 and have disclosed the impact of the adoption in note 7.

In September 2006, the Securities and Exchange Commission (SEC) issued Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* (SAB 108), which provides interpretive guidance on how the effects of prior-year uncorrected misstatements should be considered when quantifying misstatements in the current-year financial statements. SAB 108 requires registrants to quantify misstatements using both an income statement and balance sheet approach and then evaluate whether either approach results in a misstatement that, when all relevant quantitative and qualitative factors are considered, is material. If prior-year errors that had been previously considered immaterial are now considered material based on either approach, no restatement is required so long as management properly applied its previous approach and all relevant facts and circumstances were considered. If prior-year's financial statements are not restated, the cumulative effect adjustment is recorded in opening accumulated earnings (deficit) as of the beginning of the fiscal year of adoption. SAB 108 was effective for us at the end of 2006. The adoption of SAB 108 did not have any impact on our Consolidated Financial Statements.

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* (FAS 159). This statement, which is expected to expand fair value measurement, permits entities to choose to measure many financial instruments and certain other items at fair value. FAS 159 is effective for us beginning in the first quarter of 2008. We are currently assessing the impact FAS 159 may have on our Consolidated Financial Statements.

## 13. Selected Quarterly Data (Unaudited)

*Millions of Dollars, Except Per Share Amounts*

| *2006* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
|---|---|---|---|---|
| Operating revenue | $3,710 | $3,923 | $3,983 | $3,962 |
| Operating income | 605 | 717 | 752 | 810 |
| Net income | 311 | 390 | 420 | 485 |
| Net income per share | | | | |
| Basic | 1.16 | 1.45 | 1.56 | 1.79 |
| Diluted | 1.15 | 1.44 | 1.54 | 1.78 |
| *2005* | *Mar. 31* | *June 30* | *Sep. 30*[a] | *Dec. 31* |
| Operating revenue | $3,152 | $3,344 | $3,461 | $3,621 |
| Operating income | 313 | 468 | 481 | 533 |
| Net income | 128 | 233 | 369 | 296 |
| Net income per share | | | | |
| Basic | 0.49 | 0.89 | 1.40 | 1.11 |
| Diluted | 0.48 | 0.88 | 1.38 | 1.10 |

*[a] Net income includes a $118 million tax expense reduction to reflect a reduction in the estimated deferred income tax liability.*

****************************************

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

Additionally, the CEO and CFO determined that there have been no changes to the Corporation's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Union Pacific Corporation and Subsidiary Companies (the Corporation) is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). The Corporation's internal control system was designed to provide reasonable assurance to the Corporation's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Corporation's management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2006. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework*. Based on our assessment management believes that, as of December 31, 2006, the Corporation's internal control over financial reporting is effective based on those criteria.

The Corporation's independent registered public accounting firm has issued an attestation report on our assessment of the Corporation's internal control over financial reporting. This report appears on page 73.

February 15, 2007

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited management's assessment, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting, that Union Pacific Corporation and Subsidiary Companies (the Corporation) maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Corporation maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2006 of the Corporation and our report dated February 16, 2007 expressed an unqualified opinion on those consolidated financial statements and financial statement schedule and included an explanatory paragraph regarding the Corporation's adoption, in 2006, of Statement of Financial Accounting Standard No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*.

Deloitte & Touche LLP

Omaha, Nebraska
February 16, 2007

**Item 9B. Other Information**

None.

# PART III

## Item 10. Directors, Executive Officers, and Corporate Governance

(a) Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b) Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c) Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d) Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the Code). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

## Item 11. Executive Compensation

Information concerning compensation received by our directors and our named executive officers is presented in the Compensation Discussion and Analysis, Summary Compensation Table, Grants of Plan-Based Awards in Fiscal Year 2006, Outstanding Equity Awards at 2006 Fiscal Year-End, Option Exercises and Stock Vested in Fiscal Year 2006, Pension Benefits at 2006 Fiscal Year-End, Nonqualified Deferred Compensation at 2006 Fiscal Year-End, Potential Payments Upon Termination or Change in Control and Director Compensation in Fiscal Year 2006 segments of the Proxy Statement and is incorporated herein by reference. Additional information regarding compensation of directors, including Board committee members, is set forth in the By-Laws of UPC and the Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, both of which are included as exhibits to this report. Information regarding the Compensation Committee is set forth in the Compensation Committee Interlocks and Insider Participation and Compensation Committee Report segments of the Proxy Statement and is incorporated herein by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Information as to the number of shares of our equity securities beneficially owned by each of our directors and nominees for director, our named executive officers, our directors and executive officers as a group, and certain

beneficial owners is set forth in the Security Ownership of Certain Beneficial Owners and Management segment of the Proxy Statement and is incorporated herein by reference.

The following table summarizes the equity compensation plans under which Union Pacific Corporation common stock may be issued as of December 31, 2006.

| *Plan Category* | *Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)* | *Weighted-average exercise price of outstanding options, warrants and rights (b)* | *Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)* |
|---|---|---|---|
| Equity compensation plans approved by security holders ............. | 9,389,429[1] | $65.37[2] | 18,096,434 |
| Equity compensation plans not approved by security holders [3] .. | 1,119,910 | 55.00 | - |
| Total .......................... | 10,509,339 | $64.22 | 18,096,434 |

*[1] Includes 464,812 retention units that do not have an exercise price. Does not include 447,170 retention shares that are actually issued and outstanding.*

*[2] Does not include the retention units or retention shares described above in footnote [1].*

*[3] The UP Shares Stock Option Plan (UP Shares Plan) is the only equity compensation plan not approved by shareholders. The UP Shares Plan was approved by the Company's Board of Directors on April 30, 1998 and reserved 12,000,000 shares of common stock for issuance. The UP Shares Plan was a broad-based option program that granted each active employee on April 30, 1998 non-qualified options to purchase 200 shares of common stock at $55.00 per share. Options became exercisable on May 1, 2001 and expire on April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan.*

## Item 13. Certain Relationships and Related Transactions, and Director Independence

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party that would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

Information regarding the independence of our directors is set forth in the Director Independence segment of the Proxy Statement and is incorporated herein by reference.

## Item 14. Principal Accounting Fees and Services

Information concerning the fees billed by our independent registered public accounting firm and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit—related fees, (iii) tax fees, and (iv) all other fees, is set forth in the Independent Registered Public Accounting Firm's Fees and Services segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent registered public accounting firm is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

## PART IV

### Item 15. Exhibits, Financial Statement Schedules

(a) Financial Statements, Financial Statement Schedules, and Exhibits:

(1) Financial Statements

The financial statements filed as part of this filing are listed on the index to the Financial Statements and Supplementary Data, Item 8, on page 42.

(2) Financial Statement Schedules

Schedule II—Valuation and Qualifying Accounts

Schedules not listed above have been omitted because they are not applicable or not required or the information required to be set forth therein is included in the Financial Statements and Supplementary Data, Item 8, or notes thereto.

(3) Exhibits

Exhibits are listed in the exhibit index beginning on page 80. The exhibits include management contracts, compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601 (10) (iii) of Regulation S-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 23rd day of February, 2007.

UNION PACIFIC CORPORATION

By /s/ James R. Young

James R. Young,
Chairman, President,
Chief Executive Officer, and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 23rd day of February, 2007, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

/s/ James R. Young

James R. Young,
Chairman, President,
Chief Executive Officer, and Director

PRINCIPAL FINANCIAL OFFICER:

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.,
Executive Vice President—Finance and Chief
Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

/s/ Richard J. Putz

Richard J. Putz,
Vice President and Controller

*DIRECTORS:*

Andrew H. Card, Jr.*
Erroll B. Davis, Jr.*
Thomas J. Donohue*
Archie W. Dunham*
Judith Richards Hope*
Charles C. Krulak*
Michael W. McConnell*
Steven R. Rogel*

* By /s/ Thomas E. Whitaker

Thomas E. Whitaker, Attorney-in-fact

## SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | ***2006*** | *2005* | *2004* |
|---|---|---|---|
| Allowance for doubtful accounts: | | | |
| Balance, beginning of period | **$ 126** | $ 107 | $ 101 |
| Charges/(reduction) to expense | **(7)** | 2 | 11 |
| Net recoveries / (write-offs) | **(20)** | 17 | (5) |
| Balance, end of period | **$ 99** | $ 126 | $ 107 |
| Allowance for doubtful accounts are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 6** | $ 16 | $ 19 |
| Long-term | **93** | 110 | 88 |
| Balance, end of period | **$ 99** | $ 126 | $ 107 |
| Accrued casualty costs: | | | |
| Balance, beginning of period | **$1,354** | $1,303 | $ 989 |
| Charges to expense | **417** | 409 | 683 |
| Cash payments and other reductions | **(494)** | (358) | (369) |
| Balance, end of period | **$1,277** | $1,354 | $1,303 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 409** | $ 478 | $ 419 |
| Long-term | **868** | 876 | 884 |
| Balance, end of period | **$1,277** | $1,354 | $1,303 |

## Union Pacific Corporation
## Exhibit Index

| Exhibit No. | Description |
|---|---|
| Filed with this Statement | |
| 3(a) | By-Laws of UPC, as amended, effective October 1, 2006. |
| 10(a) | Form of 2007 Long Term Plan Stock Unit Agreement. |
| 10(b) | UPC 2000 Directors Stock Plan, as amended November 16, 2006 and January 30, 2007. |
| 10(c) | UP Shares Stock Option Plan of UPC, as amended November 16, 2006. |
| 10(d) | The 1993 Stock Option and Retention Stock Plan of UPC, as amended November 16, 2006. |
| 10(e) | UPC 2001 Stock Incentive Plan, as amended November 16, 2006. |
| 10(f) | UPC 2004 Stock Incentive Plan, as amended November 16, 2006. |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Registered Public Accounting Firm's Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certification Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – James R. Young. |
| 31(b) | Certification Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – Robert M. Knight, Jr. |
| 32(a) | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 – James R. Young. |
| 32(b) | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 – Robert M. Knight, Jr. |

Incorporated by Reference

| | |
|---|---|
| 3(b) | Revised Articles of Incorporation of UPC, as amended through April 25, 1996, are incorporated herein by reference to Exhibit 3 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996. |
| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |
| 4(b) | Indenture, dated as of April 1, 1999, between UPC and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989). |
| 4(c) | Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323). Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission. |
| 10(g) | Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(h) | Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(i) | Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(j) | The Executive Incentive Plan of UPC, as amended May 31, 2001, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10(k) | Written Description of Premium Exchange Program Pursuant to 1993 Stock Option and Retention Stock Plan of UPC is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999. |

| | |
|---|---|
| 10(l) | UPC Key Employee Continuity Plan dated November 16, 2000, is incorporated herein by reference to Exhibit 10(o) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| 10(m) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(n) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(o) | The UPC Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, as amended January 1, 2003, is incorporated herein by reference to Exhibit 10(a) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2004. |
| 10(p) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(q) | Written Description of Other Executive Compensation Arrangements of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(q) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10(r) | Form of Non-Qualified Stock Option Agreement for Executives is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(s) | Form of Stock Unit Agreement for Executives is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(t) | Form of Stock Unit Agreement for Executive Incentive Premium Exchange Program is incorporated herein by reference to Exhibit 10(c) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(u) | Form of Non-Qualified Stock Option Agreement for Directors is incorporated herein by reference to Exhibit 10(d) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(v) | Form of Stock Unit Agreement for Executives, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(w) | Form of Non-Qualified Stock Option Agreement for Executives, is incorporated herein by reference to Exhibit 10(c) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |

| | |
|---|---|
| 10(x) | UPC Executive Incentive Plan, effective May 5, 2005, is incorporated herein by reference to Exhibit 10(d) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(y) | Supplemental Thrift Plan of UPC, as amended December 21, 2005, is incorporated herein by reference to Exhibit 10(e) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(z) | The Supplemental Pension Plan for Officers and Managers of UPC and Affiliates, as amended December 21, 2005, is incorporated herein by reference to Exhibit 10(f) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(aa) | Executive Incentive Plan (2005) – Deferred Compensation Program, dated December 21, 2005, is incorporated herein by reference to Exhibit 10(g) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |

**Exhibit 12**

## RATIO OF EARNINGS TO FIXED CHARGES

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, Except for Ratios* | ***2006*** | *2005* | *2004* | *2003* | *2002* |
|---|---|---|---|---|---|
| Earnings: | | | | | |
| Net income | **$1,606** | $1,026 | $ 604 | $1,056 | $1,265 |
| Equity earnings net of distributions | **(59)** | (48) | (47) | 15 | (34) |
| Total earnings | **1,547** | 978 | 557 | 1,071 | 1,231 |
| Income taxes | **919** | 410 | 252 | 581 | 680 |
| Fixed charges: | | | | | |
| Interest expense including amortization of debt discount | **477** | 504 | 527 | 574 | 632 |
| Portion of rentals representing an interest factor | **243** | 220 | 206 | 169 | 172 |
| Total fixed charges | **720** | 724 | 733 | 743 | 804 |
| Earnings available for fixed charges | **$3,186** | $2,112 | $1,542 | $2,395 | $2,715 |
| Ratio of earnings to fixed charges | **4.4** | 2.9 | 2.1 | 3.2 | 3.4 |

**Exhibit 21**

## SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION

| Name of Corporation | State of Incorporation |
|---|---|
| Union Pacific Railroad Company | Delaware |
| Southern Pacific Rail Corporation | Utah |

**Exhibit 23**

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714, Registration Statement No. 333-105715, Registration Statement No. 333-116003, and Registration Statement 333-132324 on Forms S-8 and Registration No. 333-88666, Amendment No. 1 to Registration Statement No. 333-88666, and Registration Statement No. 333-111185 on Forms S-3 of our reports dated February 16, 2007, relating to the consolidated financial statements and financial statement schedule of Union Pacific Corporation and Subsidiary Companies (which report expressed an unqualified opinion and included an explanatory paragraph relating to the Corporation's adoption, in 2006, of Statement of Financial Accounting Standard No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*) and management's report on the effectiveness of internal control over financial reporting, appearing in this Annual Report on Form 10-K of Union Pacific Corporation and Subsidiary Companies for the year ended December 31, 2006.

Deloitte & Touche LLP

Omaha, Nebraska
February 22, 2007

**Exhibit 24**

**UNION PACIFIC CORPORATION**
**Powers of Attorney**

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the "Company”), do hereby appoint each of James R. Young, Barbara W. Schaefer, and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company’s Annual Report on Form 10-K, for the year ended December 31, 2006, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of February 22, 2007.

/s/ Andrew H. Card, Jr.
Andrew H. Card, Jr.

/s/ Judith Richards Hope
Judith Richards Hope

/s/ Erroll B. Davis, Jr.
Erroll B. Davis, Jr.

/s/ Charles C. Krulak
Charles C. Krulak

/s/ Thomas J. Donohue
Thomas J. Donohue

/s/ Michael W. McConnell
Michael W. McConnell

/s/ Archie W. Dunham
Archie W. Dunham

/s/ Steven R. Rogel
Steven R. Rogel

**Exhibit 31(a)**

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER

I, James R. Young, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 23, 2007

/s/ James R. Young

James R. Young
Chairman, President and
Chief Executive Officer

**Exhibit 31(b)**

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER

I, Robert M. Knight, Jr., certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 23, 2007

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President – Finance and
Chief Financial Officer

**Exhibit 32(a)**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, James R. Young, Chairman, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ James R. Young

James R. Young
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

February 23, 2007

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

**Exhibit 32(b)**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President—Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President – Finance and
Chief Financial Officer
Union Pacific Corporation

February 23, 2007

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# CORPORATE INFORMATION

## CORPORATE HEADQUARTERS

Union Pacific Corporation
1400 Douglas Street
Omaha, NE 68179
(402) 544-5000
**www.up.com**

Union Pacific Railroad Company
1400 Douglas Street
Omaha, NE 68179
**www.up.com**

## TRANSFER AGENT AND REGISTRAR OF STOCK

Computershare Investor Services, LLC

*For U.S. Mail:*
P.O. Box 43036
Providence, RI 02940

*For Express Service Delivery:*
250 Royall Street, Mail Stop 1A
Canton, MA 02021

Most questions regarding your account may be answered by contacting the automated Computershare Investor Services Help Line at (800) 317-2512 from your touch-tone phone, 24 hours a day, 7 days a week. Service representatives are available on the Help Line from 8 a.m. to 5 p.m. Central Time, Monday through Friday. You may also write to Computershare at the appropriate address above, or you may contact Computershare online at **www.computershare.com**.

## STOCK LISTING

New York Stock Exchange (NYSE)
Ticker Symbol: UNP

## ANNUAL MEETING OF SHAREHOLDERS

May 3, 2007
Little America Hotel
500 South Main Street
Salt Lake City, UT

## INFORMATION SOURCES

The contact for media inquiries is Corporate Relations at (402) 544-3529. Institutional investors and financial analysts can contact Investor Relations at (402) 544-4227 or (877) 547-7261. Written inquiries for Corporate or Investor Relations can be directed to Union Pacific Corporation's address listed above.

Individual shareholder questions should be directed to the Corporation's Transfer Agent using the contact information above.

## SEC FILINGS AND OTHER CORPORATE INFORMATION

Union Pacific makes available free of charge on our Internet Web site at **www.up.com/investors** our annual reports on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statements, Forms 3, 4 and 5, filed on behalf of directors and executive officers, and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our Web site previously filed SEC reports and exhibits via a link to "EDGAR" on the SEC's Internet site at **www.sec.gov**. Additionally, our corporate governance materials (including By-Laws, Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers and employees), news releases, investor fact books and other general information about Union Pacific are available on our Web site. From time to time, the corporate governance materials on our Web site may be updated as necessary to comply with rules issued by the SEC and NYSE or as desirable to promote the effective and efficient governance of our Company.

Copies of Union Pacific's 2006 Annual Report/Form 10-K and other corporate materials also are available, without charge, by writing to:

Secretary
Union Pacific Corporation
1400 Douglas Street, 19th Floor
Omaha, NE 68179

UNION PACIFIC
BUILDING AMERICA®




## UNION PACIFIC

Headquartered in Omaha, Nebraska, Union Pacific Railroad operates more than 32,300 route miles in the western two-thirds of the United States. Supporting the nation's economy, Union Pacific links 23 states, every major West Coast and Gulf Coast port, and the fastest-growing U.S. population centers. The Railroad has one of the industry's most diversified commodity mixes and serves the East through four major gateways in Chicago, St. Louis, Memphis and New Orleans. Additionally, Union Pacific connects with Canada's rail systems and is the only railroad serving all six major gateways to Mexico. The Company's computer systems provide real-time information about customer shipments moving daily aboard more than 3,300 trains, many of which are controlled by Omaha's Harriman Dispatching Center. The Railroad operates almost 8,500 locomotives, most equipped with computerized control systems, and freight cars total over 104,700. Union Pacific has more than 50,000 employees.

BUILDING AMERICA®

1400 Douglas Street Omaha, Nebraska 68179 www.up.com

# EXHIBIT PX0586

LEBOEUF, LAMB, GREENE & MACRAE LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

1875 CONNECTICUT AVE., N.W.
SUITE 1200
WASHINGTON, D.C. 20009-5728
(202) 986-8000
FACSIMILE: (202) 986-8102

E-MAIL ADDRESS: MICHAEL.MCBRIDE@LLGM.COM
WRITER'S DIRECT DIAL: (202) 986-8050

LONDON
A MULTINATIONAL PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

April 2, 2007

**VIA ELECTRONIC FILING**

Mr. Vernon A. Williams, Secretary
Surface Transportation Board
395 E Street, S.W.
Washington, DC 20423-0001

Re: STB Ex Parte No. 661 – Rail Fuel Surcharges

Dear Mr. Williams:

In accordance with the Board's Decision served January 26, 2007, in the above-referenced proceeding, enclosed for filing is "Comments Edison Electric Institute."

Respectfully submitted,

Michael F. McBride

*Attorney for Edison Electric Institute*

Enclosure

SURFACE TRANSPORTATION BOARD

Ex Parte No. 661

# RAIL FUEL SURCHARGES

## COMMENTS OF EDISON ELECTRIC INSTITUTE

Pursuant to the Board's Decision served January 26, 2007, in the above-referenced proceeding, Edison Electric Institute ("EEI") hereby submits its comments. EEI is the association of U.S. shareholder-owned electric companies. Our members serve 95% of the ultimate customers in the shareholder-owned segment of the industry, and represent approximately 70% of the U.S. electric power industry. We also have as Affiliate members more than 65 International electric companies, and as Associate members more than 170 industry suppliers and related organizations. Coal provides more than 50 percent of the current fuel used for the production of electricity and is expected to do so for the foreseeable future. Most of that coal moves from mine to power plant in whole or in part by rail.

EEI takes this opportunity to commend the Board for its decision, as far as it went. Specifically, the Board should be commended for finding that (a) railroads have overcharged for fuel, (b) it is "double-dipping" to charge for fuel via both the adjustment mechanism applied to a rate, and via a fuel surcharge, (c) that a fuel surcharge, if appropriate, must be mileage-based, and (d) railroads must file information monthly with the Board about the price of the fuel used, the volume of fuel used, and the total cost of fuel.

However, the Board should have gone further. The Board should have directed use of a single index, so that there would be both (a) clarity (for the benefit of all parties, to avoid further disputes or litigation) and (b) consistency between and among railroads participating in joint hauls (so as to prevent disputes between the carriers concerning recovery of the total costs of fuel

consumed in the haul). In this respect, EEI endorses the dissent of Vice Chairman Buttrey, and urges the other two Commissioners to reconsider their votes and endorse a single index, for the reasons stated herein and by Vice Chairman Buttrey.[1]

Moreover, the Board should require that a single, objective source of railroad route miles be published, so that there is not confusion over such seemingly uncomplicated matters.[2]

EEI also believes that the Board should require the railroads to report their *total* recovery of fuel costs, whether by (1) adjustments to base rates, (2) RCAF or other rate-adjustment mechanisms, or (3) fuel surcharges. In 2006, for example, Norfolk Southern Railway Company ("NS") "rebased" its existing rates to adjust for fuel costs as if crude oil cost $64/barrel, and announced that it would impose a fuel surcharge if the price of oil were above $64/barrel. When NS did so, that seemingly meant that "rebased" rates charged by NS included the entire cost of diesel fuel, because crude oil is now, and has been for several months, below $64/barrel.

In any event, whether NS did or did not recover *all* of its fuel costs through "rebasing" of existing rates in 2006, NS and each other railroad should be obliged to report, as part of the total revenues associated with recovery of fuel costs at each such railroad, not only its revenues associated with *direct* recovery of fuel costs, but also its *indirect* recovery of those costs through "rebasing" of its existing rates. Otherwise, the Board would effectively be permitting "double-dipping" through yet another means.[3]

---

[1] EEI does not claim to know which single index is best, and therefore would endorse the use of any single index that the Board deems appropriate, such as the DOE EIA Index discussed by Vice Chairman Buttrey. The point is less about achieving perfection (which may be unattainable, in any event) and more so about achieving clarity, consistency, and a resolution of the acrimony that has developed between and among carriers and shippers over this issue.)

[2] Among the reasons that disputes arise over route miles is the fact that railroads, for their own reasons, often route cars or trains over a longer route than is necessary. Accordingly, it may be necessary, in the interests of resolving matters without undue cost or complexity, to adopt a single, objective, system of determining route miles, such as the use of the ALK system that is part of the Board's Waybill Sample.

[3] This would not constitute a challenge to the lawfulness of existing rebased rates on NS, but rather a means of assuring the Board that NS is not "double-dipping." Accordingly, there would be no issue under the Interstate Commerce Act whether the Board could take this action, because the Board would not be making a determination about the lawfulness of rebased rates without the filing of a rate complaint and a determination of market dominance (as the statute requires)..

Also, the Board should have provided a simplified and expedited mechanism for parties to seek relief for over-recovery of fuel costs, under tariff movements. Lest any party wonder why EEI would advocate that railroads should not over-recover for their fuel costs, and that there should be a mechanism for recovering overcharges on tariff movements, EEI and its members believe that recovery of fuel costs, but not over-recovery, is appropriate for any American business, especially one such as the railroads, with their enormous market power.

The last point cannot be stressed enough. There is a widespread perception that large companies such as utilities or other rail shippers are fully capable of protecting their interests with the railroads, because the firms are all large and have the resources to do so. That is completely flawed logic. If one entity has unrestrained market power over the other, there is no way that the party without the market power can protect itself; that is the very reason that the Congress retained protection for shippers in the Staggers Rail Act of 1980, and in the Interstate Commerce Commission Termination Act of 1995. Accordingly, there is no substitute for the Board to regulate the railroads in circumstances such as those that led to this proceeding. The very fact that railroads could systematically, and substantially, over-recover for their fuel costs is vivid proof of their market power, and the abuses of it that the railroads have committed.

## Conclusion

EEI commends the Board for the steps it has taken thus far in this proceeding, except that it urges the Board to reconsider its decision not to require use of a single index by all railroads, to provide a simple means by which the mileage on any given route is determined to avoid controversies, to require railroads to report the recovery of their total fuel costs by whatever means (including rebasing of existing rates) so as to ensure that the railroads are not overrecovering for the costs of their fuel, and to create a simplified and expedited mechanism for recovery of amounts by which shippers were overcharged for tariff movements.

Respectfully submitted,

Michael F. McBride

Michael F. McBride
Ahren S. Tryon
LeBoeuf, Lamb, Greene & MacRae LLP
1875 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20009-5726
(202) 986-8000 (Telephone)
(202) 986-8102 (Facsimile)

April 2, 2007

*Attorneys for Edison Electric Institute*

# EXHIBIT PX0587

**Testimony**
**of**
**James R. Young**
**Chairman, CEO, and President**
**Union Pacific Corporation**
**And Chairman**
**Association of American Railroads**
**1400 Douglas Street**
**Omaha, Nebraska 68179**

**January 28, 2009**

**Before the**
**United States House of Representatives**
**Committee on Transportation and Infrastructure**
**Subcommittee on Railroads, Pipelines, and Hazardous Materials**

**Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs**

Chairwoman Brown, Ranking Member Shuster, and Members of the Subcommittee, my name is Jim Young, and I am Chairman, CEO, and President of Union Pacific Corporation. I appreciate the opportunity to testify today on behalf of the rail industry. My testimony will be in two parts. The first will look at the role of the freight rail industry in the economy and the benefits associated with freight railroads. The second will discuss how we are faring in today's economy and the future needs of the freight railroads.

America's freight rail system provides the most efficient, cost-effective freight rail network in the world; it is vital to the economic health of U.S. industry, and it keeps American companies competitive in the world market. America's freight rail network is also the safest, most environmentally friendly, and energy efficient mode of surface transportation. Freight railroads are the backbone of the United State's transportation network, moving more than 41% of the freight ton miles. This is more than any other mode of transportation.

What does 41% of the freight ton miles mean? Let me give you a glance behind this number. Railroads move 70% of all automobiles produced in the U.S. We move 30% of the entire nation's grain harvest – enough wheat to provide every man, woman, and child a fresh loaf of bread six days a week. We move 70% of the coal in this country, which provides more than



DEPOSITION EXHIBIT 15 8-4-10 KT
PENGAD 800-631-6989

half the nation's electricity needs. During normal economic times, we move enough lumber to build almost three houses every minute of every day and enough cement to build 45 miles of new highway every day. Our intermodal business, which provides the door-to-door convenience of trucks with the long-haul economy of freight railroads, brings a vast array of products to U.S. consumers. Everything that we touch in our daily lives – from orange juice, to the clothes we wear, to toys, bicycles, computers, DVDs – all have had some part of their journey on a train. In fact, over the past 25 years, we have gone from moving 3 million trailers and containers a year to more than 12 million a year. We also carry steel, the wind turbines that create renewable electricity, and chemical products that are used to make the medicines we take, protect the water we drink, help grow the food we eat, and produce the products that make our lives more comfortable. In short, 41% of the freight ton miles mean just about anything that touches our lives.

Freight railroads also directly employ approximately 187,000 people, and the vast majority of these are union jobs. These are good U.S. jobs where the average total compensation is roughly $95,000. This makes freight railroads one of America's highest-paying industries. In addition, railroads and their employees pay for and are covered by the Railroad Retirement System, which provides benefits considerably more generous than Social Security. Roughly 550,000 retired railroad workers and family members receive more than $8 billion in retirement and survivor benefits each year.

In addition, all of the large, and the vast majority of smaller freight railroads, are privately owned. This means that we must build and maintain our own tracks and rights-of-way. We must also purchase the equipment that operates on these tracks as well as the signal control systems, and we do this with virtually no governmental assistance. (In fact, in 2007, we paid almost $600 million in state and local property taxes on this same infrastructure and equipment.) From 1980 through 2007, freight railroads invested approximately $420 billion in both operating expense and capital investment – more than 40 cents out of every revenue dollar – to maintain, renew, and expand track and equipment. This investment generates billions of dollars in economic activity to the rail supplier community through the purchase of locomotives, cars, steel, timber and concrete for ties, rock and aggregate for ballast, circuits for our train control

and communications systems, and much, much more. In fact, we estimate that for every billion dollars in increased rail investment, 20,000 jobs are created.

So, as you can see, freight railroads play a vital role in the U.S. economy, but this is really only part of the story. An even more exciting story concerns the benefits we provide – and they are many.

First and foremost, we move all this freight safely. Nothing is more important to railroads than the safety of our employees, our customers, and the communities we serve, and our safety record is excellent. From 1980 to 2007, the last full year for which data is available, railroads have reduced the overall train accident rate by 71% and our employee casualties by 80%, with 2007 being a record year in terms of overall safety. Today, railroads have lower employee injury rates than other modes of transportation and most other major industry groups – including agriculture, construction, manufacturing, and even some types of retail activity.

As the nation's only privately funded transportation system operating a 140,000-mile network, railroads require vast amounts of private investment to meet the large capital demands necessary to support our infrastructure. In fact, the two largest railroads each spent more to operate, maintain and expand their infrastructure than did the State of New York on its highway system and almost as much as California. Other modes of transportation rely on government funding to support their infrastructure. Our ability to facilitate this private investment is a tremendous asset and benefit to our country. If we were not able to attract this investment, the government would have to find the billions of dollars necessary to fund our network in addition to those of our competitors (trucks and the inland waterways for barges), or alternatively would have to spend vastly more on highways to handle the business we carry, thereby forcing an even heavier burden on taxpayers.

Moreover, railroads are also a cost-effective mode of transportation. Based on revenue per ton mile, on average it cost 54% less (in inflation adjusted terms) to move freight by rail in 2007 than it did in 1981. These reductions have saved our economy countless billions of dollars over the years.

Then, of course, there are the major energy efficiency and environmental benefits rail offers. Railroads are more fuel efficient than other modes of transportation. On average, railroads are three times more fuel efficient than trucks, and our fuel efficiency is improving all the time. In 1980, railroads, on average, moved a ton of freight 235 miles per gallon of fuel. Today, that figure is 436 miles per gallon.

If just 10% of the freight that moves by highways moved by rail instead, our country's annual fuel savings would exceed one billion gallons. In addition, due to our fuel efficiency, freight that moves by rail instead of truck reduces greenhouse gas emissions by two-thirds or more per ton mile. In fact, the EPA estimates that for every ton-mile, the typical truck emits roughly three times more nitrogen oxides and particulates than a locomotive. The EPA also found that while railroads accounted for over 40% of the nation's freight ton miles, they produce only 9% of total transportation related nitrogen oxide emissions and 4% of transportation related particulate emissions.

Freight railroads also help reduce highway gridlock. A typical train takes the equivalent of several hundred trucks off the highways. Overcrowded highways act as an inefficiency tax that seriously constrains economic growth, and costs commuters days per year in lost time. Freight railroads help relieve this tax by reducing congestion, enhancing personal mobility, reducing the cost of maintaining existing roads and reducing the pressure to build costly new ones.

I would be remiss if I did not mention our relationship with passenger rail as a public benefit. Virtually all passenger rail operations outside the Northeast Corridor (including Amtrak) run on track owned by the freight railroads. We have a very healthy and robust relationship with passenger rail operators, and we often partner with them to take hundreds of thousands of commuters out of their cars and onto trains. The one thing we must guard against in these arrangements is to avoid robbing Peter to pay Paul. Taking rail capacity from freight to provide rail capacity for passengers is not the answer to America's urban congestion problems, as it will only shift thousands of trucks onto the highways. The real answer is to grow capacity

for both freight and passenger. This concept was recognized in the recently passed Amtrak Reauthorization legislation, which provides additional funds for new capacity.

To sum up the freight railroads' benefits and role in the economy, when one considers the amount of freight we carry, our investment in American jobs and infrastructure, the safe and efficient manner in which we operate, and our benefits to energy consumption, the environment, and congestion relief, the industry provides enormous benefits to the country. When comparing those benefits to the total cost to shippers and taxpayers, we have the world's best, most cost-effective, environmentally friendly freight system in the world – one that keeps American industries competitive in the world marketplace.

Now, let me turn to how we are faring in today's tough economy and what the needs will be in the future.

To insure that this presentation is fully compliant with the antitrust laws, I think it would be appropriate for me to talk about how Union Pacific is faring in today's economy rather than talk about other railroads. Having said that, I fully believe the other Class I railroads share the same economic hurdles as do we.

Just last week we reported our earnings for the fourth quarter and full year of 2008. Frankly, we had a good year in 2008 as we reported record returns as well as record investments. However, we began to see the impact of the weakening economy in the second half of the year as rail traffic dropped sharply in the fall, and that weakness is clearly continuing into 2009. In the fourth quarter of 2008, our car loadings dropped 12%. So far in January, car loadings have dropped further, and we have not seen anything that makes us believe the first quarter of this year will bring anything different. The one piece of positive news has been the falling cost of fuel. Because we (Union Pacific) use 1.3 billion gallons of diesel fuel a year (41 gallons per second) to carry our customers' goods, the falling price of oil has benefited both our company and our customers in the form of lower fuel charges.

This year will clearly be a year that challenges our company, our customers, and our employees. During our peak periods, we have handled up to 205,000 car loads a week, and in 2006 and 2007 we averaged over 190,000 car loads per week for the entire year. Just last week, our car loads were below 150,000, and in prior weeks, the number was much lower. These are numbers we have not seen since the 1990s, and the reduction in car loadings cuts across every commodity group we carry. This drop in business translates into a reduction in earnings. With volumes running well below last year's levels, it is unlikely that we will be able to reach last year's First Quarter earnings of .85 cents per share.

How are we dealing with this reduction in car loadings and revenue? First, I am confident that the long-term fundamentals of our industry are sound. These reductions are a symptom of a worldwide decline in manufacturing and consumption. We clearly feel its effects as do our customers. We will act carefully to avoid making short-term decisions that could impact the strong, long-term opportunities we see for the future. Nevertheless, we will take aggressive steps to ensure we remain viable during this severe recession.

Today, we have unused assets all over the railroad. We have over 1,200 locomotives and 48,000 cars in storage. We expect these numbers to grow. These are assets we must maintain in place for the long-term and continue to absorb in our cost structure, notwithstanding the fact that they are not now producing revenue. We must also spend significant amounts of money to maintain our railroad. As you know, we are one of the most capital intensive industries in the country. We cannot afford – both from a safety standpoint and a customer service standpoint – to defer maintenance on our system, and we are not doing that. However, we will need to cut back on our capital for growth. We simply cannot afford to spend money we don't have to continue with our aggressive capital growth strategy. As I reported last week, our projected 2009 capital budget will be $2.8 billion. This is down from the past two years, which were both over $3 billion. Our reduction in spending also hurts the thousands of rail suppliers who support our industry as our orders shrink.

We are also implementing other forms of cost control across our system in an attempt to make sure the money we do spend is spent in an efficient manner. In fact, these cost

containment efforts have lead to a significant reduction in our operating ratio, which is one of the things that helped us deal with the business reductions in 2008's fourth quarter and will continue to help us in 2009.

Unfortunately, we must also reduce the number of active employees. Over the last five years, we have hired over 27,000 people to accommodate growth and replace retired workers. Today, Union Pacific has roughly 3,150 employees out on furlough or in a part-time work program. I can tell you, as Chairman, that this is a very painful but necessary step to protect the rest of our workforce. However, the majority of those furloughed are in a program we call Alternative Work and Training Service (AWTS). Under this program, we guarantee an employee 8 days of paid service per month. This can be in the form of work or training. We usually designate the weekends as paid service days to cover weekend vacancies and to allow the employee to get another job during the week. We also continue to provide health care coverage and pay railroad retirement taxes for the employees in this program. We started AWTS as a mechanism to keep otherwise furloughed, well trained employees available to return to service when we see an uptick in demand.

Retaining excess assets (locomotives and cars) and ensuring a readily available pool of trained employees – while expensive – is a deliberate strategy that we have undertaken to insure the long-term health and responsiveness of our company. We want to be ready to meet increased demand for rail transportation should the economy respond to the stimulus proposals currently before Congress.

At this point it isn't at all clear what will happen throughout the remainder of 2009. However, one thing is certain – Union Pacific will be required to take the cost containment steps necessary to reflect economic reality. If the economy grows, we will make the much needed investments for the future. If not, we will contain spending, reduce costs, and reduce capital to reflect the weaker economy.

Earlier in my testimony, I described the role freight railroads play in the economy and the enormous public benefits we provide to society – both of which are significant. Today, we are in

a major economic downturn, but we all know, from a historical perspective, this will not last forever. To capture all the benefits rail can provide to our economy and our society, the industry must continue to invest for the future.

A recent Department of Transportation study projects total freight transportation demand will increase 92% from 2002 to 2035, with an 88% increase in demand for rail service during that same time period. Other studies conclude the same thing. Moreover, a September 2007 study (The National Rail Freight Infrastructure Capacity and Investment Study) found that Class I railroads need $135 billion in investment to expand their network capacity by 2035 to keep pace with DOT's forecasted demand. This equates to over $4.5 billion annually for capacity expansion for the next 27 years. Several times that amount will also be needed to maintain and renew existing infrastructure. Today, on an annual basis, our industry is spending less than 40% of this amount for new infrastructure capacity. We all know that studies that project growth this far into the future may not be 100% accurate, but let's assume, for the sake of argument, these studies are off by 50%. We are still not now able to invest in infrastructure to the level the nation needs us to invest.

Another area that will bring huge costs to the rail industry is replacing existing assets that have come to the end of their useful life and replacing assets that are destroyed by natural events such as fire, floods, and earthquakes. Let me give you a few examples of these costs because they are staggering.

Union Pacific owns a bridge over the Mississippi River that is nearing the end of its useful life. This single bridge will cost hundreds of millions of dollars to replace. Last year, we started construction to replace another bridge in Boone, Iowa, that will ultimately cost over $50 million.

Because we operate outdoors, we are constantly battered by Mother Nature, and these costs can be astounding. For instance, in 2005, our Salt Lake City to Los Angeles line in Nevada was destroyed by a flood. The book value on that line at the time was $4 million. However, to rebuild the asset, it cost us $87 million. Similarly, a fire destroyed a bridge in Sacramento in

2007 whose book value was $0, yet we had to spend $14 million to replace it. Most recently, we had a mud slide on a line in Oregon that wiped out a significant portion of our railroad. The slide was as wide as a football field and the equivalent height of the Sears Tower. This took months to repair at a cost of over $100 million. All of this must be done using private dollars.

These are some big numbers associated with some big projects. Equally staggering are the day-to-day numbers. For example, Union Pacific wears out two miles of track every day – 365 days a year. At a cost of $450,000 to $600,000 per mile for replacement rail, this adds up very quickly. It costs on average $2.5 million per mile to build new track, and this figure does not include the cost of acquiring land or environmental issues that may need to be addressed.

These are the challenges we have before us, and we at Union Pacific are prepared to meet them head on. What can the government do to assist in this effort? While the government could be helpful in a number of areas, I will only make three recommendations today.

First, government must embrace policies that enhance the ability of the freight railroads to attract private investment dollars. As mentioned earlier, our ability to attract private investment in rail infrastructure literally frees up billions of dollars in public money that can be used to support other modes of transportation in this country. In fact, one could argue that the less we utilize rail in this country, the more the taxpayer must pay to subsidize other modes of transportation. We must be able to earn an adequate rate of return to attract private dollars. As returns improve to market levels, additional investment will follow.

Second, Congress should enact an investment tax credit for new rail capacity. We have endorsed a proposal that has been introduced in this Congress that would provide for a 25% investment tax credit for new rail construction that expands freight capacity. This credit will allow us to increase our return and make additional investments in rail – investments that are critical if we are going to meet the future, projected demands for rail transportation. In today's economic environment, where we must conserve our cash, this would enable us to spend more than we could otherwise. Moreover, it would have a stimulative effect on the economy.

According to U.S. Department of Commerce data, for every $1 of rail investment that would be stimulated by the tax incentive, $3 in total economic output would be generated.

Third, Congress should enact and fund programs that allow states to partner with freight railroads to move forward with projects that benefit both the freight railroad and the public. The best example of this type of project is the CREATE project in Chicago. This project will improve the fluidity of the freight railroads, enhance passenger rail service in the City, and reduce congestion on the highways. The freight railroads are willing to put up money consistent with the benefits we would receive, while the local, state, and federal governments put up the resources commensurate with the public benefits. These types of projects allow both sides – private and public – to develop and implement projects that would not otherwise move forward.

Madame Chairwoman and Members of the Committee, freight rail is vital to the overall health of our economy. We offer huge societal benefits that need to be maximized, and while we are currently dealing with the economic downturn, we have a great future. I look forward to working with you to fully develop a vibrant rail system in this country.

# EXHIBIT PX0588

Morningstar® Document Research℠

# FORM 10-K

## CSX CORP - csx

**Filed: February 22, 2008 (period: December 28, 2007)**

Annual report which provides a comprehensive overview of the company for the past year

Powered by Morningstar® Document Research℠

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 28, 2007

OR

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from __________ to __________

Commission File Number 1-8022

# CSX CORPORATION

(*Exact name of registrant as specified in its charter*)

| | |
|---|---|
| **Virginia** | **62-1051971** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

| | | |
|---|---|---|
| **500 Water Street, 15th Floor, Jacksonville, FL** | **32202** | **(904) 359-3200** |
| *(Address of principal executive offices)* | *(Zip Code)* | *(Telephone number, including area code)* |

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of exchange on which registered |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act).
Yes (X) No ( )

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ( ) No (X)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer (as defined in Exchange Act Rule 12b-2).
Large Accelerated Filer (X) Accelerated Filer ( ) Non-accelerated Filer ( )

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).
Yes ( ) No (X)

On June 29, 2007 (which is the last day of the second quarter and the required date to use), the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $19.7 billion (based on the New York Stock Exchange closing price on such date).

There were 403,363,273 shares of Common Stock outstanding on February 15, 2008 (the latest practicable date that is closest to the filing date).

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement (the "Proxy Statement") to be filed not later than April 25, 2008 with respect to its 2008 annual meeting of shareholders.

 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**FORM 10-K**
**TABLE OF CONTENTS**


| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business by Segment | 3 |
| | 1A. Risk Factors | 8 |
| | 1B. Unresolved Staff Comments | 12 |
| 2. | Properties by Segment | 12 |
| 3. | Legal Proceedings | 17 |
| 4. | Submission of Matters to a Vote of Security Holders | 18 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| 6. | Selected Financial Data | 24 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| | • Strategic Overview | 26 |
| | • 2007 CSX Highlights | 27 |
| | • Expectations | 30 |
| | • Forward-Looking Statements | 33 |
| | • Financial Results of Operations | 35 |
| | • Liquidity and Capital Resources | 48 |
| | • Schedule of Contractual Obligations and Commercial Commitments | 50 |
| | • Off-Balance Sheet Arrangements | 51 |
| | • Critical Accounting Estimates | 51 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 61 |
| 8. | Financial Statements and Supplementary Data | 64 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 131 |
| 9A. | Controls and Procedures | 131 |
| 9B. | Other Information | 134 |
| | **PART III** | |
| 10. | Directors and Executive Officers of the Registrant | 135 |
| 11. | Executive Compensation | 135 |
| 12. | Security Ownership of Certain Beneficial Owners and Management | 135 |
| 13. | Certain Relationships and Related Transactions | 135 |
| 14. | Principal Accounting Fees and Services | 135 |
| | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 136 |
| Signatures | | 142 |




Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 1. Business by Segment**

CSX Corporation ("CSX" and together with its subsidiaries, the "Company"), based in Jacksonville, Florida, is one of the nation's leading transportation companies. Surface Transportation, which includes the Company's rail and intermodal businesses, provides rail-based transportation services including traditional rail service and the transport of intermodal containers and trailers.

**Rail**

CSX's principal operating company, CSX Transportation, Inc. ("CSXT"), provides a crucial link to the transportation supply chain through its approximately 21,000 route mile rail network, which serves every major population center in 23 states east of the Mississippi River, the District of Columbia, and the Canadian provinces of Ontario and Quebec. It serves 70 ocean, river and lake ports along the Atlantic and Gulf Coasts, the Mississippi River, the Great Lakes and the St. Lawrence Seaway. CSXT also serves thousands of production and distribution facilities through track connections to more than 230 short-line and regional railroads.

*Other Entities*

In addition to CSXT, the rail segment includes Total Distribution Services, Inc. ("TDSI"), Transflo Terminal Services, Inc. ("Transflo"), CSX Technology, Inc. ("CSX Technology") and other subsidiaries. TDSI serves the automotive industry with distribution centers and storage locations, while Transflo provides logistical solutions for transferring products from rail to trucks. Technology and other support services are provided by CSX Technology and other subsidiaries.

**Intermodal**

CSX Intermodal, Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company linking customers to railroads via trucks and terminals. Containers and trailers are loaded and unloaded from trains, and trucks provide the link between intermodal terminals and the customer.

**Surface Transportation Businesses**

The rail and intermodal segments are designated by the Company on a combined basis as Surface Transportation businesses. Together, they generated $10 billion of revenue during 2007 and served four primary lines of business:

- The merchandise business is the most diverse market with nearly 2.7 million carloads per year of aggregates, which includes crushed stone, sand and gravel, metal, phosphate, fertilizer, food, consumer, agricultural, paper and chemical products. The merchandise business generated approximately 50% of the Company's revenue in 2007 and 38% of volume.

- Coal, which delivered approximately 1.9 million carloads of coal, coke and iron ore to electricity generating power plants, ocean, river and lake piers and terminals, steel makers and industrial plants, accounted for approximately 26% of the Company's revenue and volume in 2007. The Company transports almost one-third of every ton of coal used for generating electricity in the areas served by CSX.

- Automotive, which delivers both finished vehicles and auto parts, generated 8% of the Company's revenue and 6% of the Company's volume in 2007. The Company delivers approximately one-third of North America's light vehicles, serving both traditional manufacturers and the increasing number of global manufacturers.

- Intermodal offers a competitive cost advantage over long-haul trucking by combining the superior economics of rail transportation with the short-haul flexibility of trucks. Through its network of more than 50 terminals, Intermodal serves all major markets east of the Mississippi River and transports mainly manufactured consumer goods in containers, providing customers with truck-like service for longer shipments. For 2007, Intermodal accounted for approximately 14% of the Company's total revenue and 30% of volume.

Other revenue, which includes revenue from regional railroads (that are partially owned by CSX), demurrage, switching and other incidental charges, accounted for 2% of the Company's total 2007 revenue. Revenue from regional railroads includes shipments by railroads that CSX does not directly operate. Demurrage represents charges assessed by railroads when shippers or receivers of freight hold railcars beyond a specified period of time. Switching revenue is generated when CSXT switches cars between trains for a customer or another railroad.

**Other Businesses**

CSX's other holdings include CSX Real Property, Inc., a subsidiary responsible for the Company's real estate sales, leasing, acquisition and management and development activities, and CSX Hotels, Inc., a resort doing business as The Greenbrier, located in White Sulphur Springs, West Virginia. Pretax earnings of $42 million, $24 million and $85 million for 2007, 2006 and 2005, respectively, from these activities are classified as a component of other income. These items are classified in other income because they are not considered by the Company to be operating activities and may fluctuate with the timing of real estate sales and resort seasonality.

The Company also has certain residual activities from formerly owned companies that include leasing of equipment and vessels. These results are included in consolidated operating income and totaled $5 million, $12 million and $1 million in 2007, 2006 and 2005, respectively.

**Financial Information about Operating Segments**

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for operating revenue, operating income and total assets by segment for each of the last three fiscal years.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Company History**

A leader in freight rail transportation for 180 years, the Company's roots date back to the early nineteenth century when the Baltimore and Ohio Railroad ("B&O") – the nation's first common carrier – was chartered in 1827. Since that time, CSX has built on the foundation laid by early pioneers who had a vision to create a railroad that safely and reliably services the ever-increasing demands of a growing nation.

In those 180 years, numerous railroads have combined with the former B&O through merger and consolidation to create what has become CSX. Each of the railroads that combined into the CSX family brought to CSX unique and valuable geographical reach to new markets, gateways, cities, ports and transportation corridors.

CSX was incorporated in 1978, under the laws of the Commonwealth of Virginia. In 1980, the Company completed the merger of the Chessie System ("Chessie") and Seaboard Coast Line Industries ("Seaboard") into CSX. The merger allowed CSX to connect northern population centers and Appalachian coal fields to growing southeastern markets. In 1986, the Chessie and Seaboard operating entities were transferred to the rail entity CSXT, which was created through the merger. Intermodal was originally formed in 1986 in order to provide nationwide, door-to-door intermodal service.

In 1997, CSXT and Norfolk Southern jointly acquired the rights to operate Conrail, Inc. ("Conrail") and then in 2004, CSXT acquired an allocated portion of Conrail's assets, which CSXT operated. Conrail was formed in 1976 from several financially troubled northeast railroads to restructure and revive the region's railroads. CSX's acquisition of key portions of Conrail allowed CSXT to link the northeast, including New England and the New York metropolitan area, with Chicago, Midwest markets and the growing areas in the southeast that were already served by CSXT. This current rail network allows the Company to directly serve every major market in the eastern United States with dependable, environmentally friendly and fuel efficient freight transportation and intermodal service.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Regulatory Environment**

The Company's operations are subject to a variety of federal, state and local laws and regulations, generally applicable to many businesses in the United States. The railroad operations conducted by the Company's subsidiaries, including CSXT, are subject in many respects to the regulatory jurisdiction of the Surface Transportation Board ("STB") and the Federal Railroad Administration ("FRA"), which are both part of the Department of Transportation ("DOT"). Additionally, the Transportation Security Administration ("TSA"), a component of the Department of Homeland Security ("DHS"), has the authority to issue regulations and other directives that may also affect railroad operations. In some cases, state and local laws and regulations can be preempted in their application to railroads by the operation of these and other federal authorities.

Although the Staggers Act of 1980 significantly deregulated rail rates and much of the rail traffic of the Company's subsidiaries is currently exempt from rate regulation by agency decision, the STB has broad jurisdiction over railroad commercial practices. This includes jurisdiction over freight car rent, the transfer, extension or abandonment of rail lines, rates charged on certain regulated rail traffic and any acquisition of control over rail common carriers. In 2007, for example, the STB issued decisions changing its long-standing policy on fuel surcharges, its rules for large freight rate cases and a new process for rate cases where smaller amounts are at issue.

The FRA and its sister agency within the DOT, the Pipeline and Hazardous Materials Administration, have broad jurisdiction over railroad operating standards and practices, including track, freight cars and locomotives, and hazardous materials requirements. The TSA has broad authority over railroad operating practices that may have homeland security implications. The TSA has proposed regulations that would apply to the transportation of certain kinds of highly hazardous materials. Decisions of these and other agencies can affect the profitability of the Company's business. For further discussion on regulatory risks to the Company, see Item 1A. Risk Factors beginning on page 8.

**Competition**

The business environment in which the Company operates is highly competitive. Shippers typically select transportation providers that offer the most compelling combination of service and price. Service requirements, both in terms of transit time and reliability, vary by shipper and commodity. As a result, the Company's primary competition varies by commodity, geographic location and mode of available transportation.

CSX's primary rail competitor is the Norfolk Southern, which operates throughout much of CSX's territory. Other railroads also operate in parts of the territory. Depending on the specific market, competing railroads and deregulated motor carriers may exert pressure on price and service levels. For further discussion on the risk of competition to the Company, see Item 1A. Risk Factors beginning on page 8.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Other Information**

CSX makes available on its website www.csx.com, free of charge, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to those reports as soon as reasonably practicable after such reports are filed with or furnished to the Securities and Exchange Commission ("SEC"). Additionally, the Company has posted its code of ethics on its website, which is also available to any shareholder who requests it. This Form 10-K and other SEC filings are also accessible through the SEC's website at www.sec.gov.

CSX has included the certifications of its Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO") regarding the Company's public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 ("the Act") as Exhibits 31.1 and 31.2, as well as Section 906 of the Act as Exhibits 32.1 and 32.2 to this Form 10-K report. Additionally, on May 31, 2007, CSX filed its annual CEO certification with the New York Stock Exchange ("NYSE") confirming the Company's compliance with the NYSE Corporate Governance Listing Standards. The CEO was not aware of any violations of these standards by the Company as of January 31, 2008 (the latest practicable date that is closest to the filing of this Form 10-K).

The Company's annual average number of employees was approximately 35,000 in 2007, which includes approximately 29,000 union employees. Most of the Company's employees provide or support transportation services. The information set forth in Item 6. Selected Financial Data is incorporated herein by reference.

For additional information concerning business conducted by the Company during 2007, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 8. Financial Statements and Supplementary Data - Note 15, Business Segments.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 1A. Risk Factors**

The following risk factors could have a materially adverse effect on the Company's results of operations, financial condition and liquidity, and could cause those results to differ materially from those expressed or implied in the Company's forward-looking statements. Although the risks described below are those that management believes are the most significant, these are not the only risks facing the Company. Additional risks and uncertainties not currently known to the Company or that the Company currently does not deem to be material also may materially impact the Company's financial position, results of operations and liquidity.

***New legislation or regulatory changes could impact the Company's earnings or regulate its ability to independently negotiate prices.***

The Company is subject to the jurisdiction of various regulatory agencies, including the STB, the FRA and other state and federal regulatory agencies for a variety of economic, health, safety, labor, environmental, tax, legal and other matters. Legislation passed by Congress or regulations issued by these agencies can significantly affect the revenues, costs and profitability of the Company's business. For example, regulations imposing price constraints or affecting rail-to-rail competition could adversely affect the Company's profitability. Also, additional regulations related to environmental matters such as greenhouse gas emissions or legislative changes impacting hours of service requirements could adversely affect the Company's financial position, results of operations and liquidity.

***CSXT, as a common carrier by rail, is required by law to transport hazardous materials, which could expose the Company to significant costs and claims.***

Under federal regulations, CSXT is required to transport hazardous materials under its common carrier obligation. A train accident involving the transport of hazardous materials could result in significant claims arising from personal injury, property damage, and environmental penalties and remediation. CSXT is also required to comply with regulations regarding the handling of hazardous materials. Failure to comply with these regulations can subject the Company to significant penalties and could be a factor in litigation arising out of a train accident. Finally, legislation preventing the transport of hazardous materials through certain cities could result in network congestion and increase the length of haul for hazardous substances.

***The Company is subject to environmental laws and regulations that may result in significant costs.***

The Company's operations are subject to wide-ranging federal, state and local environmental laws and regulations concerning, among other things, emissions into the air, discharges into water, the handling, storage, transportation and disposal of waste and other materials and clean-up of hazardous material or petroleum releases. In certain circumstances, environmental liability can extend to formerly owned or operated properties, leased properties, adjacent properties and properties owned by third parties or Company predecessors, as well as to properties currently owned and used by the Company.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

The Company has been, and may be subject to, allegations or findings to the effect that it has violated, or is strictly liable under, environmental laws or regulations, and such violations can result in the Company's incurring fines, penalties or costs relating to the clean-up of environmental contamination. Although the Company believes it has appropriately recorded current and long-term liabilities for known future environmental costs, it could incur significant costs as a result of any of the foregoing and may be required to incur significant expenses to investigate and remediate known, unknown or future environmental contamination.

***General economic, geo-political and compliance risks may affect the Company's operations and financial results.***

Changes in general economic conditions that affect demand for rail or intermodal services could adversely affect the Company's financial position, results of operations and liquidity. In addition, abrupt political change or terrorist activity poses a risk of general economic disruption and could require changes in the operations and security arrangements, thus increasing the operating costs. These conditions may lend additional uncertainty to the timing and purchasing decisions by the Company's customers.

Fuel prices and supply are influenced by international political and economic circumstances. Although a fuel recovery program is in place with a considerable number of customers, the Company could be negatively impacted if it were unable to realize fuel surcharges. Additionally, if a fuel supply shortage were to arise, whether due to the Organization of the Petroleum Exporting Countries (OPEC) or other production restrictions, lower refinery outputs, a disruption of oil imports or otherwise, the Company would be negatively impacted.

The FRA regulates several of the Company's core operations including track and mechanical equipment standards, signaling systems, inspection of grade crossing warning devices, locomotive engineer certifications and employee injury reporting, among other areas. The Company's unintentional failure to comply with applicable laws or regulations could erode public confidence in CSX. In addition, a change in these regulations could have a material adverse effect on the Company's financial position, results of operations and liquidity.

***Network congestion, caused by unanticipated increases in freight or passenger activity, could have a negative impact on service and operating efficiency.***

The Company may experience rail network difficulties related to network capacity, unplanned increases in demand for rail service, increased passenger activities in capacity-constrained areas or regulatory changes impacting when CSXT can transport freight or its service routes that could have a negative effect on the Company's operational fluidity, leading to deterioration of service, asset utilization and overall efficiency. In addition, the Company may face external factors such as severe weather and other natural occurrences, including floods, fires, hurricanes and earthquakes, which may disrupt the Company's operations.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

***Increases in the number and magnitude of property damage and personal injury claims could adversely affect the Company's operating results.***

The Company faces inherent business risk from exposure to property damage, occupational injury claims, and personal injury claims resulting from train accidents, worker injury claims under FELA and claims from outside parties resulting from the Company's operations. Although the Company is working diligently to enhance its safety programs and to continue to raise the awareness levels of its employees concerning safety, the Company could experience material property damage, personal injury or occupational claims in the future and it may incur significant costs to defend such claims.

Existing claims may suffer adverse developments not currently reflected in reserve estimates, as the ultimate outcome of existing claims is subject to numerous factors outside of the Company's control. The Company establishes reserves to cover all of these types of claims. However, final amounts determined to be due on any outstanding matters may differ materially from the recorded reserves.

***The Company may be subject to various claims and lawsuits that could result in significant expenditures.***

The Company is subject to various existing lawsuits and potential unknown litigation. The Company may experience material judgments or incur significant costs to defend any such lawsuits. Additionally, existing litigation may suffer adverse development not currently reflected in the Company's reserve estimates as the ultimate outcome of existing litigation is subject to numerous factors outside of the Company's control. While the Company uses its best efforts to evaluate existing litigation, the final judgments may differ materially from the recorded reserves.

***Future acts of terrorism, war or regulatory changes to combat the risk of terrorism may cause significant disruptions in the Company's operations.***

Terrorist attacks, such as those that occurred in the United States in September 2001, in Spain in March 2004, in England in July 2005, and in India in July 2006, along with any government response to those attacks, may adversely affect the Company's financial position, results of operations and liquidity. CSXT's rail lines or other key infrastructure may be direct targets or indirect casualties of acts of terror or war. This could cause significant business interruption and result in increased costs and liabilities and decreased revenues. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or the coverage may no longer be available.

Furthermore, in response to the heightened risk of terrorism, federal, state and local governmental bodies are proposing and beginning to adopt various legislation and regulations relating to security issues that impact the transportation industry. For example, the DHS proposed regulations that would require freight railroads to implement additional security protocols when transporting hazardous materials.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

***Failure to complete negotiations on collective bargaining agreements could result in strikes and/or work stoppages.***

Most of CSXT's employees are represented by labor unions and are covered by collective bargaining agreements. Generally speaking, these agreements are bargained nationally by the National Carriers Committee. In the rail industry, negotiations have generally taken place over a number of years and previously have not resulted in any extended work stoppages. Over the last 30 years, there were only six days of work stoppage related to labor disputes over national handling. If the Company is unable to negotiate acceptable agreements, it could result in strikes by the affected workers, loss of business and increased operating costs as a result of higher wages or benefits paid to union members, any of which could have an adverse effect on the Company's financial position, results of operations and liquidity. Under the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention), neither party may exercise self-help until the procedures are exhausted.

***The Company relies on the stability and availability of its technology systems to operate its business.***

The Company relies on information technology in all aspects of its business. A significant disruption or failure of our information technology systems, including computer hardware, software and communications equipment, could result in a service interruption, safety failure, security breach or other operational difficulties. While the Company has taken steps to mitigate these risks, the performance and reliability of its technology systems are critical to its ability to compete effectively.

***The Company faces competition from rail carriers and other transportation providers.***

The Company experiences competition in the form of pricing, service, reliability and other factors from other transportation providers including railroads and motor carriers that operate similar routes across its service area and, to a less significant extent, barges, ships and pipelines. Transportation providers such as motor carriers and barges utilize public rights-of-way that are built and maintained by governmental entities while CSXT and other railroads must build and maintain rail networks using largely internal resources. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation, or legislation providing for less stringent size or weight restrictions on trucks, could negatively impact the Company's financial position, results of operations and liquidity.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties by Segment**

**Rail Property**

CSXT's properties primarily consist of track and its related infrastructure, locomotives and freight cars. These categories and the geography of the network are described below.

***Track and Infrastructure***

Serving 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec, the CSXT rail network serves, among other markets, New York, Philadelphia and Boston in the northeast and mid-Atlantic, the southeast markets of Atlanta, Miami and New Orleans, and the Midwestern cities of St. Louis, Memphis and Chicago.

CSXT's track structure includes main thoroughfares connecting terminals and yards (known as mainline track); track within terminals and switching yards; track adjacent to the mainlines used for passing trains; track connecting the mainline track to customer locations; and track that diverts trains from one track to another known as turnouts. Total track miles are greater than the Company's approximately 21,000 route miles, which reflect the size of CSX's rail network that connects markets, customers and western railroads. At December 2007, the breakdown of track miles was as follows:

| | Track Miles |
|---|---|
| Mainline track | 26,712 |
| Terminals and switching yards | 9,626 |
| Passing sidings and turnouts | 1,037 |
| Total | 37,375 |

In addition to its physical track structure, CSXT operates numerous yards and terminals. These serve as the hubs between CSXT and its local customers and as sorting facilities where rail cars often are received, re-sorted and placed onto new outbound trains.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Table of Contents



The following 36 yards are identified as key to the CSXT system (listed in alphabetical order by state):

**Rail Yards or Terminals**

| | |
|---|---|
| Birmingham, AL | Detroit, MI |
| Mobile, AL | Hamlet, NC |
| Montgomery, AL | Rocky Mount, NC |
| Baldwin, FL | Buffalo, NY |
| Moncrief (Jacksonville), FL | Selkirk, NY |
| Tampa, FL | Syracuse, NY |
| Atlanta, GA | Cincinnati, OH |
| East Savannah, GA | Cleveland, OH |
| Waycross, GA | Columbus, OH |
| Avon (Indianapolis), IN | Stanley (Toledo), OH |
| Chicago, IL | Walbridge (Toledo), OH |
| Evansville, IN | Willard, OH |
| Louisville, KY | Greenwich (Philadelphia), PA |
| Russell, KY | Charleston, SC |
| New Orleans, LA | Florence, SC |
| Cumberland, MD | Erwin, TN |
| Curtis Bay (Baltimore), MD | Nashville, TN |
| Locust Point (Baltimore), MD | Richmond, VA |

For a list of Intermodal's terminals, see page 16.

***Network Geography***

CSXT's train operations are primarily focused around the following four major transportation networks, which are defined geographically or by line of business and are described below.

Coal Network – Coal is used to generate more than half of the electricity in the United States. The CSXT coal network connects mining operations in nine states with industrial areas in the northeast and mid-Atlantic, as well as many river, lake and seaport facilities. This network also supports the strong, growing utility market in the southeast.

Southeastern Corridor – This section of the network runs from the western gateways of Chicago, Memphis and St. Louis through the growing cities of Nashville, Birmingham and Atlanta and into the expanding markets in the southeast. CSXT's capacity investment in this corridor clearly strengthens this route and makes it the premier rail route connecting these key cities and gateways with the growing southeast. The corridor extends through the coal reserves of the southern Illinois basin and provides direct rail service between these coal sources and the increasing demand for coal in the southeast. The increase in capacity on this corridor positions CSXT well to handle the projected traffic volumes of intermodal, coal, automotive and general merchandise traffic.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Interstate 90 (I-90) Corridor – Chicago and metropolitan areas in New York and New England are linked by CSXT's I-90 Corridor. Much of this route has two lanes of track side-by-side (referred to as double mainline track) supporting high-speed intermodal and automotive services. The I-90 Corridor is also a primary route for import traffic moving across the country, through Chicago and into the population centers in the northeast. Continued growth in consumption in the east and northeast makes this corridor a critical element in the Company's overall system.

Interstate 95 (I-95) Corridor – Charleston, Jacksonville, Miami and many other cities throughout the growing southeast are connected to the heavily populated northeastern cities of Baltimore, Philadelphia and New York along CSXT's I-95 Corridor. This route is primarily used to ship food and consumer products, as well as metals and chemicals. It is the only rail corridor along the east coast south of Washington, D.C., and provides access to all the major eastern ports.

***Locomotives***

CSXT focuses on maximum use of its fleet and prudent investment in new units to drive the rail network. Better locomotive management helps CSXT move freight more efficiently, while continued investment in CSXT's power source means CSXT is operating more locomotives better.

CSXT operates more than 4,000 locomotives, of which over 95% are owned by CSXT. Freight locomotives are the power source used primarily to pull rail cars. Switching locomotives are used in yards to sort railcars so that the right railcar gets attached to the right train in order to get it to its final destination. Auxiliary units are typically used to provide extra traction for heavy trains in hilly terrain. At December 2007, CSXT's owned and long-term leased locomotives consisted of the following:

| | Locomotives | % |
|---|---|---|
| Freight | 3,495 | 87% |
| Switching | 324 | 8% |
| Auxiliary Units | 188 | 5% |
| Total | 4,007 | 100% |

***Freight Car Fleet***

The average daily fleet of cars-on-line consists of approximately 222,000 cars, but at any point in time, over half of the railcars on the CSXT system are not owned or leased by CSXT. Examples of these are: railcars owned by other railroads (which are utilized by CSXT), shipper-furnished or private cars (which are generally used only in that shipper's service) and multi-level railcars.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

CSXT's freight car fleet consists of six main types of cars:

Gondolas – Support CSXT's metals markets and provide transport for woodchips and other bulk commodities. Some gondolas are equipped with special hoods for protecting products like coil and sheet steel.

Open-top hoppers – Transport heavy dry bulk commodities such as coal, coke, stone, sand, ores and gravel that are resistant to weather conditions.

Box cars – Include a variety of tonnages, sizes, door configurations and heights to accommodate a wide range of finished products, including paper, auto parts, appliances and building materials. Insulated box cars deliver food products, canned goods, beer and wine.

Covered hoppers – Have a permanent roof and are segregated based upon commodity density. Lighter bulk commodities such as grain, fertilizer, flour, salt, sugar, clay and lime are shipped in large cars called jumbo covered hoppers. Heavier commodities like cement, ground limestone and glass sand are shipped in small cube covered hoppers.

Multi-level flat cars – Transport finished automobiles and are differentiated by the number of levels: bi-levels for large vehicles such as pickup trucks and SUVs and tri-levels for sedans and smaller automobiles.

Flat cars – Used for shipping intermodal containers and trailers or bulk and finished goods, such as lumber, pipe, plywood, drywall and pulpwood.

Other cars owned or leased on the network include, but are not limited to, center beam cars for transporting lumber and building products.

CSXT owns more than 60% of its freight cars. At December 2007, CSXT's owned and long-term leased freight car fleet consisted of the following:

| | Freight Cars | % |
|---|---|---|
| Gondolas | 26,490 | 28% |
| Open-top hoppers | 19,604 | 21% |
| Box cars | 13,911 | 15% |
| Covered hoppers | 13,555 | 14% |
| Multi-level flat cars | 12,340 | 13% |
| Flat cars | 7,189 | 8% |
| Other cars | 1,275 | 1% |
| Total | 94,364 | 100% |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Intermodal Property**

***Infrastructure***

Intermodal serves 51 terminals in 22 states. These terminals serve as a transfer point between rail and trucks. If the city has more than one terminal, it is indicated by the number next to it.

**Intermodal Terminals**

| | |
|---|---|
| Mobile, AL | Kansas City, MO |
| Lathrop, CA | Charlotte, NC |
| Los Angeles/Long Beach, CA (3) | North Bergen, NJ |
| Oakland, CA | Blasdell, NY |
| Jacksonville, FL (2) | Syracuse, NY |
| Orlando, FL | New York, NY/NJ (5) |
| Tampa, FL | Cincinnati, OH |
| Atlanta, GA (2) | Cleveland, OH |
| Savannah, GA (2) | Columbus, OH (2) |
| Chicago, IL (2) | Marion, OH |
| East St. Louis, IL | Portland, OR |
| Avon, IN | Chambersburg, PA |
| Evansville, IN | Philadelphia, PA |
| New Orleans, LA | Charleston, SC |
| Boston, MA | Memphis, TN |
| Springfield, MA | Nashville, TN |
| Worcester, MA (3) | Mesquite, TX |
| Baltimore, MD | Portsmouth, VA |
| Detroit, MI | Seattle, WA |

***Equipment***

Intermodal equipment consists primarily of containers, chassis and other equipment (such as lift equipment). Containers are weather-proof boxes used for bulk shipment of freight, and chassis are the wheeled support framework for a container that allows it to be attached to a tractor. All of Intermodal's chassis are leased. Intermodal also has other types of equipment such as doublestack railcars, which are railcars that allow for two containers to be mounted one above the other.

At December 28, 2007, Intermodal owned or long-term leased equipment consisted of the following:

| | Equipment | % |
|---|---|---|
| Chassis | 25,980 | 67% |
| Containers | 12,503 | 32% |
| Other | 433 | 1% |
| Total | 38,916 | 100% |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 3. Legal Proceedings**

The Company is subject to various legal proceedings and claims that arise in the ordinary course of business. For more information on legal proceedings, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Critical Accounting Estimates – Casualty, Environmental and Legal Reserves" and Item 8. Financial Statements and Supplementary Data - Note 7, Commitments and Contingencies under the caption "Other Legal Proceedings."



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 4. Submission of Matters to a Vote of Security Holders**

There were no matters submitted to a vote of security holders in the fourth quarter of 2007.

**Executive Officers of the Registrant**

Executive officers of CSX are elected by the CSX Board of Directors and generally hold office until the next annual election of officers. There are no family relationships or any arrangement or understanding between any officer and any other person pursuant to which such officer was elected. As of December 2007, the executive officers are:

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Michael J. Ward, 57<br>*Chairman, President and Chief Executive Officer* | A 30-year veteran of the Company, Ward has served as Chairman, President and Chief Executive Officer since January 2003. In 2000, he was named President of CSXT, and he was later appointed President of CSX and elected to the Board of Directors in 2002.<br><br>His distinguished railroad career has included key executive positions in nearly all aspects of the Company's business, including sales and marketing, operations and finance. |
| Oscar Munoz, 48<br>*Executive Vice President and Chief Financial Officer* | Munoz has served as Executive Vice President and Chief Financial Officer of CSX and CSXT since May 2003 and is responsible for management and oversight of all financial, strategic planning, information technology, purchasing and real estate activities of CSX.<br><br>He brings to the Company years of experience from a variety of industries. Before joining CSX in 2003, Munoz served as Chief Financial Officer and Vice President of AT&T Consumer Services. He has also held key executive positions within the telecommunication and beverage industries. |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Tony L. Ingram, 61<br>*Executive Vice President and Chief Operating Officer* | Ingram has served as Executive Vice President and Chief Operating Officer of CSXT since March 2004 and manages all aspects of the Company's operations across its 21,000-mile network, including transportation, service design, customer service, engineering and mechanical.<br><br>Prior to joining CSX in 2004, Ingram spent more than 30 years at Norfolk Southern where he served as Senior Vice President – Transportation, Network and Mechanical from February 2003 to March 2004 and Vice President, Transportation – Operations from March 2000 to February 2003. |
| Clarence W. Gooden, 56<br>*Executive Vice President of Sales and Marketing*<br>*and Chief Commercial Officer* | Gooden has been the Executive Vice President and Chief Commercial Officer of CSX and CSXT since April 2004 and is responsible for generating customer revenue, forecasting business trends and developing CSX's model for future revenue growth.<br><br>A member of the CSX family for more than 35 years, Gooden has held key executive positions in both operations and sales and marketing, including being appointed President of CSX Intermodal in 2001 and Senior Vice President of the Merchandise Service Group in 2002. |
| Ellen M. Fitzsimmons, 47<br>*Senior Vice President of Law and Public Affairs,*<br>*General Counsel and Corporate Secretary* | Fitzsimmons has been the Senior Vice President of Law and Public Affairs, General Counsel, and Corporate Secretary since December 2003. She serves as the Company's chief legal officer and oversees all government relations and public affairs activities.<br><br>During her 16-year tenure with the Company, her broad responsibilities have included key roles in major risk and corporate governance-related areas such as Senior Vice President – Law and Corporate Secretary from May to December 2003 and as Senior Vice President – Law from February 2001 to May 2003. |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Robert J. Haulter, 54<br>*Senior Vice President of Human Resources and Labor Relations* | Haulter has served as Senior Vice President – Human Resources and Labor Relations of CSX and CSXT since December 2003 and is responsible for employee compensation and benefits, labor relations, organizational development and transformation, recruitment, training and various administrative activities.<br><br>His 30-year career with the Company has included key executive positions in operations, finance and human resources before being appointed Vice President of Human Resources in 2000. |
| Carolyn T. Sizemore, 44<br>*Vice President and Controller* | Sizemore has served as Vice President and Controller of CSX and CSXT since April 2002 and is responsible for financial and regulatory reporting, paying the Company's 35,000 employees, accounts payable and billing and collections for outside party expenditures along with various other accounting processes.<br><br>Her responsibilities during her 18-year tenure with the Company have included roles in finance and audit-related areas including a variety of positions in accounting, finance strategies, budgets and performance analysis. |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

CSX's common stock is listed on the NYSE, which is its principal trading market, and is traded over-the-counter and on exchanges nationwide. The official trading symbol is "CSX."

**Description of Common and Preferred Stock**

A total of 600 million shares of common stock is authorized, of which 407,864,394 shares were outstanding as of December 28, 2007. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre-emptive rights. At January 31, 2008, the latest practicable date, there were 46,749 common stock shareholders of record. The weighted average of common shares outstanding, which was used in the calculation of diluted earnings per share, was approximately 448 million as of December 28, 2007. (See Note 2, Earnings Per Share.)

A total of 25 million shares of preferred stock is authorized, none of which is currently outstanding.

The following table sets forth, for the quarters indicated, the dividends declared and the high and low share prices of CSX common stock as required by SEC Regulation S-K.

| | Quarter | | | | |
|---|---|---|---|---|---|
| | **1st** | **2nd** | **3rd** | **4th** | **Year** |
| **2007** | | | | | |
| Dividends | $0.12 | $0.12 | $0.15 | $0.15 | $0.54 |
| Common Stock Price | | | | | |
| High | $42.53 | $47.38 | $51.88 | $46.49 | $51.88 |
| Low | $33.50 | $39.36 | $38.09 | $40.17 | $33.50 |
| | | | | | |
| **2006** | | | | | |
| Dividends | $0.065 | $0.065 | $0.10 | $0.10 | $0.33 |
| Common Stock Price | | | | | |
| High | $30.20 | $37.33 | $35.58 | $38.30 | $38.30 |
| Low | $24.29 | $30.05 | $28.60 | $32.51 | $24.29 |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**Stock Performance Graph**

The cumulative shareholder returns, assuming reinvestment of dividends, on $100 invested at December 31, 2002 is illustrated on the graph below. The Company references the Standard & Poor 500 Stock Index ("S&P 500") and the Dow Jones U.S. Transportation Average Index, which provide comparisons to a broad-based market index and other companies in the transportation industry. As shown in the graph, CSX's five-year stock returns significantly outpaced those of the S&P 500. Additionally the Company's stock has increased 120% over the past three years under the direction of the current management team.




| | Dec 2002 | Dec 2003 | Dec 2004 | Dec 2005 | Dec 2006 | Dec 2007 |
|---|---|---|---|---|---|---|
| CSX CORPORATION | $100 | $129 | $145 | $186 | $255 | $329 |
| S & P 500* | $100 | $129 | $143 | $150 | $173 | $183 |
| DJ US TRANSPORTATION AVG | $100 | $132 | $168 | $188 | $206 | $209 |

** The S&P 500 is a registered trademark of the McGraw-Hill Companies, Inc.*

**CSX Purchases of Equity Securities**

CSX is required to disclose any purchases of its own common stock for the most recent quarter. CSX purchases its own shares for two primary reasons: to further the goals under its share repurchase program and to fund the Company's contribution required to be paid in CSX common stock under 401(k) plans which cover certain union employees.

Currently, CSX has purchased $2.1 billion of its outstanding common stock, which represents 50 million shares or about 70% of the $3 billion share repurchase program that was authorized in 2007. CSX intends to complete this repurchase program during 2008. The timing, method, amount of repurchase transactions and the sources of funds to affect any repurchases will be determined by the Company's management based on their evaluation of market conditions, share price and other factors. While it is not management's intention, the program could be suspended or discontinued at any time.

Share repurchase activity for fourth quarter 2007 was as follows:

| | CSX Purchases of Equity Securities for the Quarter | | | |
|---|---|---|---|---|
| **Fourth Quarter** | **Total Number of Shares Purchased** | **Average Price Paid per Share** | **Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs** | **Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs** |
| Beginning Fourth Quarter Balance | | | | $ 1,439,716,780 |
| October | | | | |
| (September 29, 2007 - October 26, 2007) | 5,724,300 | $ 43.11 | 5,724,300 | $ 1,192,930,945 |
| November | | | | |
| (October 27, 2007 - November 23, 2007) | 4,933,700 | $ 43.60 | 4,933,700 | $ 977,804,729 |
| December | | | | |
| (November 24, 2007 - December 28, 2007) | 2,510,900 | $ 41.20 | 2,510,900 | $ 874,363,982 |
| Total/Ending Balance | 13,168,900 | $ 42.93 | 13,168,900 | $ 874,363,982 |

Including previous share repurchase programs, CSX has purchased over $2.6 billion of its outstanding common stock over the past two years.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

## Item 6. Selected Financial Data

Selected financial data and significant events related to the Company's financial results for the last five fiscal years are listed below.

| *(Dollars in Millions, Except Per Share Amounts)* | Fiscal Years | | | | |
|---|---|---|---|---|---|
| | **2007** | 2006 | 2005 | 2004 | 2003 |
| **Earnings From Continuing Operations** | | | | | |
| Operating Revenue | **$ 10,030** | $ 9,566 | $ 8,618 | $ 8,040 | $ 7,573 |
| Operating Expense | **7,774** | 7,428 | 7,068 | 7,040 | 7,053 |
| Operating Income | **$ 2,256** | $ 2,138 | $ 1,550 | $ 1,000 | $ 520 |
| Earnings from Continuing Operations | **$ 1,226** | $ 1,310 | $ 720 | $ 418 | $ 137 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | **$ 2.85** | $ 2.98 | $ 1.67 | $ 0.97 | $ 0.32 |
| From Continuing Operations, Assuming Dilution | **2.74** | 2.82 | 1.59 | 0.94 | 0.31 |
| **Financial Position** | | | | | |
| Cash, Cash Equivalents and Short-term Investments | **$ 714** | $ 900 | $ 602 | $ 859 | $ 368 |
| Total Assets | **25,534** | 25,129 | 24,232 | 24,605 | 21,760 |
| Long-term Debt | **6,470** | 5,362 | 5,093 | 6,248 | 6,886 |
| Shareholders' Equity | **8,685** | 8,942 | 7,954 | 6,811 | 6,448 |
| **Other Data Per Common Share** | | | | | |
| Dividend Per Share | **$ .54** | $ 0.33 | $ 0.215 | $ 0.20 | $ 0.20 |
| **Employees -- Annual Averages** | | | | | |
| Rail | **32,477** | 32,987 | 32,033 | 32,074 | 32,892 |
| Other | **2,966** | 3,018 | 3,076 | 3,833 | 4,624 |
| Total | **35,443** | 36,005 | 35,109 | 35,907 | 37,516 |

Significant Events

2007-- Recognized gains of $27 million before tax, or $17 million after tax, on insurance recoveries from claims related to Hurricane Katrina. (See Note 5, Hurricane Katrina.)

2006-- Two-for-one split of the Company's common stock effective 2006. All periods have been retroactively restated to reflect the stock split.

-- Recognized gains of $168 million before tax, or $104 million after tax, on insurance recoveries from claims related to Hurricane Katrina. (See Note 5, Hurricane Katrina.)

-- Recognized an income tax benefit of $151 million primarily related to the resolution of certain tax matters, including resolution of ordinary course federal income tax audits for 1994 – 1998.

-- Recognized a $26 million after-tax non-cash gain on additional Conrail property received.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Significant events, continued:

2005-- Recognized a charge of $192 million pretax, $123 million after tax, to repurchase $1.0 billion of outstanding debt, for costs of the increase in current market value above original issue value. (See Note 9, Debt and Credit Agreements.)

-- Recognized an income tax benefit of $71 million for the Ohio legislative change to gradually eliminate its corporate franchise tax.

2004-- Recognized a charge of $71 million pretax, $44 million after tax, for separation expenses related to management restructuring.

-- Recognized a $16 million after-tax non-cash gain on the Conrail spin-off transaction.

-- Completed a corporate reorganization of Conrail that resulted in the direct ownership of certain Conrail assets by CSXT and caused a significant increase in total assets.

2003-- Recognized a charge of $232 million pretax, $145 million after tax, in conjunction with the change in estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years.

-- Recognized a charge of $108 million pretax, $67 million after tax, for two settlement agreements with Maersk that resolved all material disputes pending between the companies arising out of the 1999 sale of the international container-shipping assets.

-- Recognized a net charge of $22 million pretax, $13 million after tax. This includes a charge of $44 million pretax, $26 million after tax, which is comprised of the initial charge for separation expenses related to the management restructuring announced in 2003 of $34 million pretax and an additional separation charge of $10 million pretax included in the Company’s third quarter results. These amounts were offset by a net credit of $22 million pretax, $13 million after tax, related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the 1991 and 1992 separation plans.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

## STRATEGIC OVERVIEW

The Company provides customers access to a modern transportation network that connects ports, production and distribution centers to markets in the Northeast, Midwest and the rapidly growing southern states. The Company transports a diversified portfolio of products, from domestically abundant coal to new energy sources such as ethanol, from automobiles produced by traditional American manufacturers to "new domestic" factories owned by European, Japanese and Korean companies, and from life-essential chemicals to life-enriching consumer electronics. Additionally, the Company serves every major market in the eastern United States and has direct access to all Atlantic and Gulf Coast ports, as well as the Mississippi River, The Great Lakes and the St. Lawrence Seaway. Furthermore, the Company has access to Pacific ports through alliances with western railroads. Overall, the Company's transportation network encompasses approximately 21,000 route miles of track in 23 states, the District of Columbia and the Canadian provinces of Ontario and Quebec.

As the nation consumes increasingly higher quantities of imported goods, those products must be transported across the country in a way that minimizes the impact on the environment, takes traffic off an already congested highway system and minimizes fuel consumption and transportation costs. The Company's transportation network, located in the largest and fastest-growing population centers in the nation, is well-positioned to capitalize on consumption growth trends. In this regard, more than two-thirds of Americans live within the Company's service territory, accounting for about three-quarters of the nation's consumption.

The Company has made substantial strides in operating performance in order to capitalize on these consumption growth trends. In 2004, the Company implemented the ONE Plan, which continues to focus on optimizing the train network and utilizing rail assets more efficiently. Anchored by the ONE Plan and a variety of other initiatives implemented after the ONE Plan was introduced, the Company has achieved significant operational improvements that have enhanced safety, service reliability and productivity. These strong results include the highest customer satisfaction scores ever achieved by the Company as measured by independent surveys of its customers.

In addition to the ONE Plan, the Company recently embarked on a new initiative called Total Service Integration ("TSI"), which aims to better align the Company's capabilities with customer demands. TSI aims to optimize train size and increase asset utilization while delivering more reliable service to customers.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

These initiatives delivered strong results for shareholders while higher levels of customer service have led to improved pricing. These efforts combined with operational efficiencies have resulted in substantial improvements in CSX's operating income and operating ratio.

In addition to driving better financial results to create value for shareholders, CSX also employs a balanced approach in deploying its capital for the benefit of shareholders. This approach includes investments in the future, share repurchases and dividends. Through this balanced use of financial resources, CSX will continue to capitalize on an economic environment that is increasingly favoring rail transportation.

**2007 CSX HIGHLIGHTS**

**SURFACE TRANSPORTATION**

- Revenue grew $464 million or 5% to over $10 billion.
- Expenses increased $339 million or 5% to $7.8 billion, which included $141 million of higher prior year gains on insurance recoveries (which reduced operating expenses) and $98 million of higher fuel costs.
- Surface Transportation Operating Income, which excludes other operating income, increased $125 million to $2.3 billion.
- Service and safety measurements improved in all categories.

Leadership, discipline and execution resulted in excellent 2007 results, which included the lowest Surface Transportation operating ratio in a decade. Revenue and revenue per unit increased 5% and 8%, respectively, from a year ago reflecting the improving value CSX provides its customers through better service. The Company was able to achieve substantial pricing gains predominantly due to CSXT service improvements and the overall cost advantages that the Company's rail-based solutions provide to customers versus other modes of transportation.

The strong results in revenue were achieved despite volume declines in all of the Company's four major lines of business. The overall 3% volume decrease versus last year was primarily driven by continued weakness in the merchandise market relating to housing construction and associated markets, as well as lower automotive production.

Expenses were higher due to the effects of rising fuel prices and higher prior year gains on insurance recoveries, which were recorded as a reduction to operating expenses. Lower 2007 volume and better productivity from improved operations partially offset the effects of inflation for certain expense categories.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

For additional information, refer to Rail and Intermodal Results of Operations discussed on pages 40 through 43.

The Company's continued focus on safety and operating plan execution helped all service measurements improve compared to last year. Within the service measures, CSX achieved record performance on both of its key safety measures (FRA Personal Injuries Frequency Index and FRA Train Accident Rate) in 2007 despite some costly train accidents. Improved safety is the result of the safety leadership and train accident prevention processes. Both of these use training, awareness, compliance measurement and root cause analysis to prevent incidents and create a safer work environment.

In addition, CSX continues to improve its train operations with gains of 4% and 12% in On-Time Train Originations and On-Time Destination Arrivals, respectively. Velocity, a measure of overall network fluidity, increased 5% in 2007. More important was the consistent week-to-week velocity, which indicates more reliable service to customers. Improved network operations also drove increased asset utilization, including an improvement of 8% in Dwell, which is the average time cars spend in terminals when being switched. The table below shows these key measurements and resources.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

| RAIL OPERATING STATISTICS (Estimated) | | Fiscal Years | | |
|---|---|---|---|---|
| | | **2007** | 2006 | ***Improvement*** % |
| **Service Measurements** | FRA Personal Injuries Frequency Index | **1.21** | 1.46 | *17* % |
| | FRA Train Accident Rate | **2.83** | 3.54 | *20* |
| | On-Time Train Originations | **79.3%** | 76.0% | *4* |
| | On-Time Destination Arrivals | **70.4%** | 62.7% | *12* |
| | Dwell (hours) | **23.2** | 25.1 | *8* |
| | Cars-On-Line | **221,943** | 224,680 | *1* |
| | System Train Velocity (miles per hour) | **20.8** | 19.9 | *5* |
| | Recrews (per day) | **57** | 59 | *3* % |
| | | | | ***Increase/ (Decrease)*** |
| **Resources** | Route Miles | **21,166** | 21,114 | -% |
| | Locomotives (owned and long-term leased) | **4,007** | 3,851 | *4* |
| | Freight Cars (owned and long-term leased) | **94,364** | 101,602 | *(7)*% |

*Key Performance Measures Definitions*

FRA Personal Injuries Frequency Index – Number of FRA-reportable injuries per 200,000 man-hours

FRA Train Accident Rate – Number of FRA-reportable train accidents per million train-miles

On-Time Train Originations – Percent of scheduled road trains that depart the origin yard on-time or ahead of schedule per the ONE Plan

On-Time Destination Arrivals – Percent of scheduled trains that arrive at the destination yard on-time to two hours late (30 minutes for intermodal trains) per the ONE Plan

Dwell – Measures the time (in hours) cars spend in each yard (does not include cars moving through the yard on the same train)

Cars-On-Line – A count of all cars on the CSX network, including those at customer locations (does not include locomotives, cabooses, trailers, containers or maintenance equipment)

System Train Velocity – Average train speed between terminals in miles per hour (does not include locals, yard jobs, work trains or passenger trains)

Recrews – Number of relief crews called, a measure of line of road efficiency in the use of crews



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**OTHER HIGHLIGHTS**

While operating activities generated higher cash, free cash flow, which includes dividend payments, declined $216 million to $145 million during 2007. The decline was primarily due to higher capital expenditures and dividends, along with lower insurance recoveries from claims related to Hurricane Katrina. See page 32 for further details on the changes in free cash flow during 2007.

Surface Transportation capital expenditures, which exclude The Greenbrier, were $1.7 billion in 2007. This level of investment highlights the Company's commitment to maintain and improve its existing infrastructure and to position itself for long-term growth through expanding network and terminal capacity. The increase compared to prior year was largely due to refinancing a portion of its locomotive capacity by replacing 150 leased units with newly owned locomotives.

CSX also announced three significant financial events in 2007. First, CSX increased its quarterly dividend from $0.10 to $0.12 during the first quarter of 2007. It then increased the dividend again during the third quarter of 2007 to $0.15, which represented a 50% increase from the quarterly dividend level at fourth quarter 2006. Finally, CSX announced a total of $3 billion in share repurchase programs during 2007 and has completed about 70% of the repurchases. See Note 1, Nature of Operations and Significant Accounting Policies.

## EXPECTATIONS

**Long-term Transportation Demand**

Transportation demand is based on increases in population and higher consumption levels, which in turn drive the production of goods domestically and abroad that must be transported from factories and ports to the markets where they will be consumed.

Recent census projections estimate that today's population of 301 million people will grow to more than 330 million by 2020. Major metropolitan areas in the southeast, where CSX has a strong presence, are projected to grow at significantly faster rates. Even in slower-growing areas over the remainder of the Company's territory, consumption levels are projected to increase.

Freight tonnage – domestic and international – is expected to increase nearly 50% by 2020, according to the American Association of State Highway and Transportation Officials (AASHTO), placing further strain on the transportation system of America and requiring reliable solutions for shippers worldwide.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Impact on CSX**

The Company is well positioned to meet the nation's growing transportation demand. For example, due to factors such as highway congestion, new regulations on hours of service and driver shortages in the trucking industry, trucking companies are beginning to partner with the Company to outsource their long-haul services and reduce their cost of shipping due to the superior cost structure of the railroads for long-haul shipments.

Additionally, the need for environmentally sensitive transportation solutions also favors CSX because railroads are three times more fuel efficient than highway transportation. A single train can carry the load of more than 280 trucks, reducing highway congestion and pollution while moving goods more efficiently.

Industry analysts predict that the pricing environment will reflect the increasing importance of railroads in serving America's growing transportation needs and the cost of the infrastructure investments needed to maintain the safety and security of these networks and to expand them. This will drive revenue growth as volumes increase. Furthermore, while the market for transportation services remains competitive, tighter capacity and improved service levels through initiatives such as the ONE Plan and TSI are expected to sustain this favorable pricing environment, reflecting the overall value that CSX provides to its customers.

**Forecasts**

The Company bases its performance expectations on external forecasts of economic indicators such as gross domestic product, industrial production and overall import levels. Although certain markets will remain weak, such as those that are impacted by the housing and automotive sectors, the indicators that influence CSX's businesses are expected to be favorable in 2008. Considering these and other factors, the Company believes that its business environment remains strong and will support consistent, continuous financial improvements for the next several years.

Considering the Company's solid overall business environment, along with momentum in its underlying business performance, CSX expects that its financial performance in 2008 will be consistent with its long-term financial targets, which include compounded annual growth rates ("CAGR") as shown below:

| Long-term Financial Targets | 2008-2010 Targets |
|---|---|
| • Operating Income Growth | 10% - 12% CAGR |
| • Earnings Per Share Growth | 15% - 17% CAGR |
| • Operating Ratio | Mid- to low- 70s by 2010 |
| • Free Cash Flow (before the payment of dividends) | $800 million to $1 billion in 2010 |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

To reinforce its long-term vision, the Company's Surface Transportation capital budget is expected to be nearly $5 billion between 2008 and 2010. These investments come at a time when the return on investment in the railroad industry is improving. Approximately 60% of the Company's capital is targeted for infrastructure investment to improve network reliability and recoverability and to drive even better performance in safety. Another 20% of the Company's capital will be invested in its locomotive and freight car fleets. The remaining 20% of CSX's capital spending will further expand network terminal capacity, improve technology and position the Company for long-term growth.

**Free Cash Flow**

Free cash flow is considered a non-GAAP financial measure under SEC Regulation G, *Disclosure of Non-GAAP Measures.* Management believes, however, that free cash flow is important in evaluating the Company's financial performance and measures an ability to generate cash without incurring additional external financing. Free cash flow should be considered in addition to, rather than a substitute for, cash provided by operating activities.

Free cash flow is calculated by using net cash from operations and adjusting for property additions, dividends and certain other investing activities such as insurance proceeds. Also, added to free cash flow is the Company's 42% economic interest in Conrail's free cash flow which is not consolidated in CSX amounts. Other deposits, which are included in cash provided by operating activities, are not included in the Company's free cash flow because these deposits represent assets that were set aside for specific debt payments.

The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure).

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | *Change* |
| Net cash provided by operating activities | **$ 2,184** | $ 2,058 | *$ 126* |
| Property additions | **(1,773)** | (1,639) | *(134)* |
| Insurance proceeds within investing activities | **16** | 147 | *(131)* |
| Other investing activities | **(57)** | 4 | *(61)* |
| Dividends | **(231)** | (145) | *(86)* |
| Other deposits and Conrail free cash flow | **6** | (64) | *70* |
| Free Cash Flow (after payment of dividends) | **$ 145** | $ 361 | *$ (216)* |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**FORWARD-LOOKING STATEMENTS**

Certain statements in this report and in other materials filed with the SEC, as well as information included in oral statements or other written statements made by the Company, are forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, among others, statements regarding:

- Expectations as to results of operations and operational improvements;
- Expectations as to the effect of claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements on the Company's financial condition;
- Management's plans, goals, strategies and objectives for future operations and other similar expressions concerning matters that are not historical facts, and management's expectations as to future performance and operations and the time by which objectives will be achieved; and
- Future economic, industry or market conditions or performance, including, but not limited to, the discussion regarding Expectations on page 30.

Forward-looking statements are typically identified by words or phrases such as "believe," "expect," "anticipate," "project," "estimate" and similar expressions. The Company cautions against placing undue reliance on forward-looking statements, which reflect its good faith beliefs with respect to future events and are based on information currently available to it as of the date the forward-looking statement is made. Forward-looking statements should not be read as a guarantee of future performance or results and will not necessarily be accurate indications of the timing when, or by which, such performance or results will be achieved.

Forward-looking statements are subject to a number of risks and uncertainties and actual performance or results could differ materially from those anticipated by these forward-looking statements. The Company undertakes no obligation to update or revise any forward-looking statement. If the Company does update any forward-looking statement, no inference should be drawn that the Company will make additional updates with respect to that statement or any other forward-looking statements. The following important factors, in addition to those discussed elsewhere, may cause actual results to differ materially from those contemplated by these forward-looking statements:



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

- Legislative, regulatory or legal developments involving transportation, including rail or intermodal transportation, the environment, hazardous materials, taxation, including the outcome of tax claims and litigation, the potential enactment of initiatives to re-regulate the rail industry and the ultimate outcome of shipper and rate claims subject to adjudication;

- The outcome of litigation and claims, including, but not limited to, those related to fuel surcharge, environmental contamination, personal injuries and occupational illnesses;

- Material changes in domestic or international economic or business conditions, including those affecting the transportation industry such as access to capital markets, ability to revise debt arrangements as contemplated, customer demand, customer acceptance of price increases, effects of adverse economic conditions affecting shippers and adverse economic conditions in the industries and geographic areas that consume and produce freight;

- Changes in fuel prices, surcharges for fuel and the availability of fuel;

- The impact of increased passenger activities in capacity-constrained areas or regulatory changes affecting when CSXT can transport freight or service routes;

- Natural events such as severe weather conditions, including floods, fire, hurricanes and earthquakes, a pandemic crisis affecting the health of the Company's employees, its shippers or the consumers of goods, or other unforeseen disruptions of the Company's operations, systems, property or equipment;

- An unintentional failure to comply with applicable laws or regulations;

- The inherent risks associated with safety and security, including the availability and cost of insurance, the availability and vulnerability of information technology, adverse economic or operational effects from actual or threatened war or terrorist activities and any governmental response;

- Labor costs and labor difficulties, including stoppages affecting either the Company's operations or the customers' ability to deliver goods to the Company for shipment;

- Competition from other modes of freight transportation, such as trucking and competition and consolidation within the transportation industry generally;



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

- The Company's success in implementing its strategic plans and operational objectives and improving Surface Transportation operating efficiency; and

- Changes in operating conditions and costs or commodity concentrations.

Other important assumptions and factors that could cause actual results to differ materially from those in the forward-looking statements are specified elsewhere in this report and in CSX's other SEC reports, accessible on the SEC's website at www.sec.gov and the Company's website at www.csx.com.

## FINANCIAL RESULTS OF OPERATIONS

### *2007 vs. 2006 Consolidated Results of Operations*

| | **CONSOLIDATED***(a)* *Includes Surface Transportation and Other Operating Income* | | | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | *$ Change* | *% Change* |
| Operating Revenue | **$ 10,030** | $ 9,566 | *$ 464* | *5%* |
| Operating Expense | **7,774** | 7,428 | *346* | *5* |
| **Operating Income** | **2,256** | 2,138 | *118* | *6* |
| Other Income | **93** | 95 | *(2)* | *(2)* |
| Interest Expense | **(417)** | (392) | *(25)* | *6* |
| Income Tax Expense | **(706)** | (531) | *(175)* | *33* |
| **Earnings from Continuing Operations** | **1,226** | 1,310 | *(84)* | *(6)* |
| Discontinued Operations | **110** | - | *110* | *NM* |
| **Net Earnings** | **$ 1,336** | $ 1,310 | *$ 26* | *2%* |
| **Earnings Per Diluted Share** | | | | |
| From Continuing Operations | **$ 2 .74** | $ 2.82 | *$ (0.08)* | *(3)%* |
| Discontinued Operations | **0.25** | - | *0.25* | *NM* |
| **Net Earnings** | **$ 2.99** | $ 2.82 | *$ 0.17* | *6%* |

*Prior periods have been reclassified to conform to the current presentation.*

*NM - not meaningful*

*(a) Other operating income was $5 million and $12 million for 2007 and 2006, respectively.*

*Operating Revenue*

Operating revenue increased $464 million to over $10 billion in 2007 due to continued pricing efforts and service improvements. These gains were partially offset by lower volume due to weakness in housing construction, domestic automobile production and related markets.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

*Operating Income*

Operating income increased $118 million to $2.3 billion in 2007. Improvements in revenue and productivity from improved operations were partially offset by lower gains on insurance recoveries and increased fuel costs.

*Other Income*

Other income of $93 million in 2007 was relatively flat compared to the prior year.

*Interest Expense*

Interest expense increased $25 million to $417 million in 2007 primarily due to higher average debt balances.

*Income Tax Expense*

Income tax expense increased $175 million to $706 million. This change is primarily due to higher earnings in 2007 and a prior year income tax benefit of $151 million related to the resolution of certain tax matters that were not repeated.

*Net Earnings*

Consolidated net earnings increased $26 million and totaled $1.3 billion, and earnings per diluted share increased $0.17 to $2.99. The principal elements of these increases are:

- Operating income increased $118 million driven by strong Surface Transportation results. These strong results were more than offset by $151 million of prior year income tax benefits that were not repeated. The net of these and other items decreased earnings from continuing operations by $84 million or $.08 per diluted share.

- The $110 million or $.25 per diluted share gain in discontinued operations on the Company's consolidated income statement in 2007 related to the resolution of certain tax matters associated with previously discontinued operations.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Table of Contents


***2006 vs. 2005 Consolidated Results of Operations***

| | CONSOLIDATED(a) Includes Surface Transportation and Other Operating Income | | | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | *$ Change* | *% Change* |
| Operating Revenue | **$ 9,566** | $ 8,618 | *$ 948* | *11%* |
| Operating Expense | **7,428** | 7,068 | *360* | *5* |
| **Operating Income** | **2,138** | 1,550 | *588* | *38* |
| Other Income | **95** | 101 | *(6)* | *(6)* |
| Debt Repurchase | **-** | (192) | *192* | *(100)* |
| Interest Expense | **(392)** | (423) | *31* | *(7)* |
| Income Tax Expense | **(531)** | (316) | *(215)* | *68* |
| **Earnings from Continuing Operations** | **1,310** | 720 | *590* | *82* |
| Discontinued Operations - Net of Tax | **-** | 425 | *(425)* | *(100)* |
| **Net Earnings** | **$ 1,310** | $ 1,145 | *$ 165* | *14%* |
| **Earnings Per Diluted Share** | | | | |
| From Continuing Operations | **$ 2.82** | $ 1.59 | *$ 1.23* | *77%* |
| Discontinued Operations | **-** | 0.93 | *(0.93)* | *(100)* |
| **Net Earnings** | **$ 2.82** | $ 2.52 | *$ 0.30* | *12%* |

*Prior periods have been reclassified to conform to the current presentation.*

*(a) Other operating income was $12 million and $1 million in 2006 and 2005, respectively.*

*Operating Revenue*

Operating revenue increased $948 million in 2006 to $9.6 billion, compared to $8.6 billion for the prior year. The primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets.

*Operating Income*

Operating income increased $588 million to $2.1 billion in 2006, which was driven by increased operating revenues. These revenue gains and gains on insurance proceeds from Hurricane Katrina were partially offset by increases in fuel expense caused by higher fuel prices and lower hedge benefits.

*Other Income*

Other income decreased $6 million to $95 million in 2006. This change was driven primarily by lower real estate sales, which was partially offset by an after-tax non-cash gain on additional Conrail property value received in connection with the 2004 Conrail spin-off transaction.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

*Interest Expense*

Interest expense decreased $31 million to $392 million in 2006 compared to the prior year. There was lower interest expense from lower average debt balances for 2006 (due to a $1.0 billion debt repurchase in mid-2005). However, this savings was partially offset by higher variable interest rates.

*Income Tax Expense*

Income tax expense increased $215 million to $531 million in 2006 as a result of higher earnings. This increase was partially offset by the net impact of favorable resolutions of certain tax matters in 2006 that were higher than benefits in 2005.

*Net Earnings*

Net earnings for 2006 increased $165 million to $1.3 billion, with earnings per share up $.30 to $2.82 per diluted share from the prior year. This increase was primarily due to the following factors:

- Driven by Surface Transportation results, earnings from continuing operations were up $590 million, or $1.23 per diluted share;
- Offsetting this increase was income from discontinued operations, net of tax, of $425 million, or $.93 per diluted share, as a result of the sale of CSX's International Terminals business in 2005.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**

***2007 vs. 2006 Surface Transportation Results of Operations***

**SURFACE TRANSPORTATION DETAIL** *(Unaudited)*
*(Dollars in Millions)*
*Fiscal Year*

| | Rail | | Intermodal | | Surface Transportation | | |
|---|---|---|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 | **2007** | 2006 | *$ Change* |
| **Revenue** | **$ 8,674** | $ 8,154 | **$ 1,356** | $ 1,412 | **$ 10,030** | $ 9,566 | *$ 464* |
| **Operating Expense:** | | | | | | | |
| Labor and Fringe | **2,897** | 2,840 | **81** | 82 | **2,978** | 2,922 | *(56)* |
| Materials, Supplies and Other | **1,857** | 1,772 | **183** | 192 | **2,040** | 1,964 | *(76)* |
| Fuel | **1,210** | 1,112 | **-** | - | **1,210** | 1,112 | *(98)* |
| Depreciation | **848** | 818 | **34** | 38 | **882** | 856 | *(26)* |
| Equipment and Other Rents | **346** | 382 | **110** | 130 | **456** | 512 | *56* |
| Inland Transportation | **(448)** | (462) | **688** | 704 | **240** | 242 | *2* |
| Gain on Insurance Recoveries | **(27)** | (166) | - | (2) | **(27)** | (168) | *(141)* |
| **Total Expense** | **6,683** | 6,296 | **1,096** | 1,144 | **7,779** | 7,440 | (339) |
| **Operating Income** | **$ 1,991** | $ 1,858 | **$ 260** | $ 268 | **$ 2,251** | $ 2,126 | *$ 125* |
| | | | | | | | |
| **Operating Ratio** | **77.0%** | 77.2% | **80.8%** | 81.0% | **77.6%** | 77.8% | |
| **Total Assets** | **$ 24,179** | $ 24,077 | **$ 283** | $ 276 | | | |

**SURFACE TRANSPORTATION VOLUME AND REVENUE** *(Unaudited)*
*Volume (Thousands); Revenue (Dollars in Millions); Revenue Per Unit (Dollars)*
*Fiscal Year*

| | Volume | | | Revenue | | | Revenue Per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2007** | 2006 | *% Change* | **2007** | 2006 | *% Change* | **2007** | 2006 | *% Change* |
| Chemicals | **522** | 528 | *(1) %* | **$ 1,313** | $ 1,210 | *9 %* | **$ 2,515** | $ 2,292 | *10%* |
| Emerging Markets | **491** | 524 | *(6)* | **605** | 580 | *4* | **1,232** | 1,107 | *11* |
| Forest Products | **352** | 404 | *(13)* | **722** | 773 | *(7)* | **2,051** | 1,913 | *7* |
| Agricultural Products | **410** | 397 | *3* | **786** | 681 | *15* | **1,917** | 1,715 | *12* |
| Metals | **355** | 364 | *(2)* | **702** | 673 | *4* | **1,977** | 1,849 | *7* |
| Phosphates and Fertilizers | **362** | 362 | - | **421** | 354 | *19* | **1,163** | 978 | *19* |
| Food and Consumer | **212** | 245 | *(13)* | **441** | 477 | *(8)* | **2,080** | 1,947 | *7* |
| **Total Merchandise** | **2,704** | 2,824 | *(4)* | **4,990** | 4,748 | *5* | **1,845** | 1,681 | *10* |
| | | | | | | | | | |
| Coal | **1,771** | 1,798 | *(2)* | **2,483** | 2,259 | *10* | **1,402** | 1,256 | *12* |
| Coke and Iron Ore | **91** | 94 | *(3)* | **120** | 119 | *1* | **1,319** | 1,266 | *4* |
| **Total Coal** | **1,862** | 1,892 | *(2)* | **2,603** | 2,378 | *9* | **1,398** | 1,257 | *11* |
| | | | | | | | | | |
| **Automotive** | **439** | 463 | *(5)* | **839** | 847 | *(1)* | **1,911** | 1,829 | *4* |
| | | | | | | | | | |
| **Other** | **-** | - | - | **242** | 181 | *34* | **-** | - | - |
| **Total Rail** | **5,005** | 5,179 | *(3)* | **8,674** | 8,154 | *6* | **1,733** | 1,574 | *10* |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| International | **1,132** | 1,281 | *(12)* | **525** | 580 | *(9)* | **464** | 453 | *2* |
| Domestic | **979** | 898 | *9* | **807** | 786 | *3* | **824** | 875 | *(6)* |
| Other | **-** | - | - | **24** | 46 | *(48)* | **-** | - | - |
| **Total Intermodal** | **2,111** | 2,179 | *(3)* | **1,356** | 1,412 | *(4)* | **642** | 648 | *(1)* |
| | | | | | | | | | |
| **Total Surface Transportation** | **7,116** | 7,358 | *(3)* % | **$ 10,030** | $ 9,566 | *5 %* | **$ 1,409** | $ 1,300 | *8 %* |

*For both tables, prior periods have been reclassified to conform to the current presentation.*



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

***2007 vs. 2006 Rail Results of Operations***

Rail Operating Revenue

Rail revenue is categorized by three main lines of business: merchandise, coal and automotive. Revenue increased $520 million, or 6%, to $8.7 billion in 2007 as compared to prior year. CSXT was able to achieve continued pricing gains predominantly due to the overall cost and service advantages that the Company's rail based solutions provide to customers versus other modes of transportation. These pricing gains more than offset volume weakness in housing construction, domestic automobile production and related markets.

*Merchandise*

Chemicals – Revenue and revenue per unit improved due to a continued favorable pricing environment. Overall volume declined slightly driven by reduced chlorine shipments and weakness in propane demand due to a milder winter in 2007.

Emerging Markets – Revenue and revenue per unit grew due to continued yield management efforts. Volume was down as a result of declines in aggregate shipments, such as crushed stone, sand and gravel, caused by a continued weakness in residential construction.

Forest Products – Revenue and volume declined as shipments of building products and paper slowed due to the decline in residential housing starts and electronic media substitution.

Agriculture Products – Strong domestic demand in feed ingredients and soybean shipments supported growth in volume and revenue. Ethanol volumes also increased as a result of expanded use in the Northeast. Revenue per unit grew as a result of continued focus on yield management.

Metals – Revenue and revenue per unit increased due to continued pricing actions. Lower demand for steel due to weakness in housing construction and domestic automobile production resulted in volume declines.

Phosphates and Fertilizers – Volume was flat as higher domestic demand was offset by a decrease in export shipments. Favorable mix driven by these volume changes coupled with price increases resulted in significantly improved revenue and revenue per unit.

Food and Consumer – Revenue and volume declines were driven by decreased demand for building products, appliances and roofing granules, which are used to make shingles.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

*Coal*

Favorable pricing positively influenced revenue and revenue per unit. Overall tonnage was flat even though carloads slightly declined due to the use of higher capacity cars allowing the movement of more tons with fewer cars. Strength in the export market was offset by weakness in utility shipments as stockpiles remain at record high levels.

*Automotive*

Volume declined due to a reduction in light vehicle production, several plant closures, and lower vehicle sales driven by the slowing economy and tight credit environment. Consistent with the overall automotive market, volumes continued to shift to foreign brands produced domestically.

*Other Rail Revenue*

The change is primarily due to increased shipments by the Company's regional railroads and more transloading activities associated with ethanol shipments.

Rail Operating Expense

Total rail operating expenses for 2007 increased $387 million to $6.7 billion compared to the prior year. The description of what is included in each category as well as significant year over year changes is described below.

Labor and Fringe expenses include employee compensation and benefit programs. These expenses are primarily affected by inflation, headcount, wage rates, incentives earned, healthcare plan costs, and pension and other post-retirement plan expenses. These expenses increased $57 million primarily due to wage and benefit inflation, which was partially offset by improved productivity and reduced staffing levels.

Materials, Supplies and Other expenses consist primarily of materials and contracted services to maintain infrastructure and equipment and for terminal services at intermodal and automotive facilities. This category also includes costs related to personal injury claims, environmental remediation, train accidents, utilities, non-locomotive fuel, property and sales taxes and professional services. Overall, materials, supplies and other expenses increased by $85 million in 2007 primarily due to inflation, higher train accident related costs and higher environmental costs. These costs were partially offset by $99 million of favorable personal injury reserve adjustments during the year, which were based on management's review of the actuarial analyses performed by an independent actuarial firm. This was due to a trend of significant decreases in the number and severity of work-related injuries for CSXT employees since 2003.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

Depreciation expense primarily relates to recognizing the cost of a capital asset, such as locomotives, railcars and track structure, over its useful life. This expense is impacted primarily by the capital expenditures made each year. This expense increased $30 million primarily due to a larger asset base as a result of higher capital spending partially offset by lower depreciation rates resulting from periodic asset life studies.

Fuel expense includes locomotive diesel fuel. This expense is driven by the market price and locomotive consumption of diesel fuel offset by the effects of any hedging activities. This expense increased $98 million primarily due to higher fuel prices and prior year hedge benefits that were not repeated during 2007 due to the expiration of the fuel hedge program.

Equipment and Other Rents primarily includes rent paid for freight cars owned by other railroads or private companies, net of rents received by CSXT for use of CSXT equipment. This category of expenses also includes lease expenses primarily for locomotives, railcars, containers and trailers, office and other rentals. These expenses decreased $36 million due mainly to lower volume and fewer locomotive leases.

Inland Transportation expense included in the rail segment is for amounts paid to CSXT from Intermodal for shipments on CSXT's network. These intercompany charges are eliminated in consolidated results.

Gain on Insurance Recoveries includes gains on insurance recoveries related to Hurricane Katrina. While gains were recognized in both years, the $139 million decrease for 2007 was due to higher cash receipts for lost profits and replacement value of property compared to the value of the property that was damaged in 2006 versus 2007.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

***2007 vs. 2006 Intermodal Results of Operations***

Intermodal operating income declined 3% or $8 million versus last year on 4% lower revenue, partially offset by volume related cost savings. Revenue and volume decreases reflect losses of several International customers, the slowing of Asian imports throughout the year and mix impact related to growth in new short-haul domestic traffic. Other revenue declined $22 million from the termination of an agreement relating to the storage of containers as well as lower general business levels. Revenue per unit declined slightly with yield gains in the international market being offset by mix changes related to the new short-haul domestic traffic.

Despite rising fuel costs, Intermodal operating expense declined $48 million or 4% driven by lower car hire expense related to volume and improved operational efficiency. Additionally, depreciation decreased based on the results of a periodic review of asset useful lives.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**

### *2006 vs. 2005 Surface Transportation Results of Operations*

**SURFACE TRANSPORTATION DETAIL** *(Unaudited)*
*(Dollars in Millions)*
*Fiscal Year*

| | Rail | | Intermodal | | Surface Transportation | | |
|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 | *$ Change* |
| **Revenue** | $ 8,154 | $ 7,256 | $ 1,412 | $ 1,362 | $ 9,566 | $ 8,618 | *$ 948* |
| **Operating Expense:** | | | | | | | |
| Labor and Fringe | 2,840 | 2,777 | 82 | 79 | 2,922 | 2,856 | *(66)* |
| Materials, Supplies and Other | 1,772 | 1,649 | 192 | 200 | 1,964 | 1,849 | *(115)* |
| Fuel | 1,112 | 783 | - | - | 1,112 | 783 | *(329)* |
| Depreciation | 818 | 779 | 38 | 39 | 856 | 818 | *(38)* |
| Equipment and Other Rents | 382 | 400 | 130 | 133 | 512 | 533 | *21* |
| Inland Transportation | (462) | (433) | 704 | 663 | 242 | 230 | *(12)* |
| Gain on Insurance Recoveries | (166) | - | (2) | - | (168) | - | *168* |
| **Total Expense** | 6,296 | 5,955 | 1,144 | 1,114 | 7,440 | 7,069 | (371) |
| **Operating Income** | $ 1,858 | $ 1,301 | $ 268 | $ 248 | $ 2,126 | $ 1,549 | *$ 577* |
| | | | | | | | |
| **Operating Ratio** | 77.2% | 82.1% | 81.0% | 81.8% | 77.8% | 82.0% | |
| **Total Assets** | $ 24,077 | $ 23,182 | $ 276 | $ 305 | | | |

**SURFACE TRANSPORTATION VOLUME AND REVENUE** *(Unaudited)*
*Volume (Thousands); Revenue (Dollars in Millions); Revenue Per Unit (Dollars)*
*Fiscal Year*

| | Volume | | | Revenue | | | Revenue Per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | *% Change* | 2006 | 2005 | *% Change* | 2006 | 2005 | *% Change* |
| Chemicals | 528 | 533 | *(1)%* | $ 1,210 | $ 1,089 | *11 %* | $ 2,292 | $ 2,043 | *12%* |
| Emerging Markets | 524 | 505 | *4* | 580 | 513 | *13* | 1,107 | 1,016 | *9* |
| Forest Products | 404 | 439 | *(8)* | 773 | 717 | *8* | 1,913 | 1,633 | *17* |
| Agricultural Products | 397 | 357 | *11* | 681 | 550 | *24* | 1,715 | 1,541 | *11* |
| Metals | 364 | 361 | *1* | 673 | 570 | *18* | 1,849 | 1,579 | *17* |
| Phosphates and Fertilizers | 362 | 444 | *(18)* | 354 | 351 | *1* | 978 | 791 | *24* |
| Food and Consumer | 245 | 249 | *(2)* | 477 | 438 | *9* | 1,947 | 1,759 | *11* |
| **Total Merchandise** | 2,824 | 2,888 | *(2)* | 4,748 | 4,228 | *12* | 1,681 | 1,464 | *15* |
| | | | | | | | | | |
| Coal | 1,798 | 1,726 | *4* | 2,259 | 1,992 | *13* | 1,256 | 1,154 | *9* |
| Coke and Iron Ore | 94 | 83 | *13* | 119 | 88 | *35* | 1,266 | 1,060 | *19* |
| **Total Coal** | 1,892 | 1,809 | *5* | 2,378 | 2,080 | *14* | 1,257 | 1,150 | *9* |
| | | | | | | | | | |
| **Automotive** | 463 | 488 | *(5)* | 847 | 844 | - | 1,829 | 1,730 | *6* |
| | | | | | | | | | |
| **Other** | - | - | - | 181 | 104 | *74* | - | - | - |
| **Total Rail** | 5,179 | 5,185 | - | 8,154 | 7,256 | *12* | 1,574 | 1,399 | *13* |
| | | | | | | | | | |
| International | 1,281 | 1,274 | *1* | 580 | 545 | *6* | 453 | 428 | *6* |
| Domestic | 898 | 891 | *1* | 786 | 766 | *3* | 875 | 860 | *2* |
| Other | - | - | - | 46 | 51 | *(10)* | - | - | - |
| **Total Intermodal** | 2,179 | 2,165 | *1* | 1,412 | 1,362 | *4* | 648 | 629 | *3* |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Total Surface Transportation** | 7,358 | 7,350 | - % | $ 9,566 | $ 8,618 | *11 %* | $ 1,300 | $ 1,173 | *11 %* |

*For both tables, prior periods have been reclassified to conform to the current presentation.*



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

***2006 vs. 2005 Rail Results of Operations***

Rail Operating Revenue

CSXT categorizes rail revenue in three main lines of business: merchandise, coal and automotive. Revenue for CSXT increased $898 million, or 12%, to $8.2 billion in 2006 from a year ago. Continued yield management and fuel surcharge were the primary drivers of revenue per unit gains.

*Merchandise*

Chemicals – Revenue and revenue per unit improved by capitalizing on a continued strong pricing environment. Overall volume was down slightly because high raw material costs continued to negatively affect the U.S. chemical industry's competitiveness and in turn, CSXT volumes.

Emerging Markets – Growth was driven by increased shipments of municipal waste, military, and aggregate products (which include rocks and sand). Revenue per unit also improved due to strong pricing actions.

Forest Products – Shipment of building products and printing paper slowed due to the decline in residential housing starts and electronic media conversion. However, revenue and revenue per unit improved due to a favorable pricing environment.

Agriculture Products – Strong domestic demand in feed grain, soybean, ethanol, and export shipments supported volume and revenue per unit. In addition, strong export demand for grain and increased shipments of beans helped volume growth.

Metals – Revenue and revenue per unit increased due to continued pricing gains and fuel surcharge coverage. Volume increased slightly driven by strong steel demand in the energy and non-residential construction end-markets. These gains were partially offset by lower demand for steel in the automotive sector.

Phosphates and Fertilizers – Volume declined from lower export shipments due to increased international phosphate production which caused several domestic phosphate plants to close. Favorable mix coupled with price increases resulted in significantly improved revenue per unit.

Food and Consumer – Volume growth in alcoholic beverages, canned goods, and rice and beans was offset by softness in building products, perishables, and the appliance markets. Strong pricing actions, and a focus on longer, more profitable shipments increased revenue and revenue per unit.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

*Coal*

Revenue and volume improvements were due to increased shipments of utility and export coal. Utility companies built up their inventories which was a major contributor to CSX's volume growth. Revenue per unit increased due to the continued favorable pricing environment and increased fuel surcharge coverage.

*Automotive*

Volume declined due to a reduction in North American light vehicle production. Consistent with the overall automotive market, CSXT's volumes continued to shift from the Big 3 to foreign brands produced domestically. Revenue per unit was favorable due to price increases and fuel surcharge.

Rail Operating Expense

Total rail operating expenses for 2006 increased $341 million, or 6%, to $6.3 billion compared to the prior year. The description of what is included in each category as well as significant year over year changes is described below.

Labor and Fringe increased $63 million primarily due to wage and benefit inflation and increased staffing in rail operations.

Materials, Supplies and Other expenses increased by $113 million in 2006 primarily due to materials inflation, along with prior year casualty favorable adjustments and supplier reimbursements that were not repeated. These costs were partially offset by productivity gains from improved operations, such as efficient use of locomotives.

Depreciation expense increased $39 million due to a larger asset base related to higher capital spending.

Fuel expense increased $329 million primarily due to reduced hedge benefit from the expiration of the fuel hedge program as well as higher fuel prices.

Equipment and Other Rents expense decreased $18 million due mainly to improvement in operational fluidity, which drove improvements in asset utilization.

Gain on Insurance Recoveries was $166 million for 2006, which represented cash received for lost profits and higher replacement value of property compared to the value of the property that was damaged, after consideration of the Company's insurance deductible expensed in 2005.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

*2006 vs. 2005 Intermodal Results of Operations*

Intermodal operating income increased 8% or $20 million versus last year driven by revenue gains of $50 million along with expense containment. The increase in revenue and revenue per unit was driven by the continued yield management emphasis which was partially offset by mix of traffic. Volume increased slightly due to continued growth of imported consumer goods from Asia as well as the strength in the truckload market offset by weaker demand in services sold to transportation brokers (known as wholesale markets).

Intermodal operating expense increased $30 million primarily driven by an increase in fuel costs that are reflected in inland transportation expense. Fuel costs were higher due to rising market prices. Partially offsetting the increase in fuel were efficiency gains related to equipment utilization.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

## LIQUIDITY AND CAPITAL RESOURCES

Liquidity is a company's ability to generate adequate amounts of cash to meet both current and future needs for obligations as they mature and to provide for planned operational growth. In order to have a complete picture of a company's liquidity, its balance sheet, sources and uses of cash flow and external factors should be reviewed.

***Material Changes in the Consolidated Balance Sheets***

CSX's balance sheet reflects its strong capital base and the impact of CSX's balanced approach in deploying its capital for the benefit of its shareholders, which includes reinvestment in the Company's existing infrastructure, investments in the future, share repurchases and dividends.

Long-term debt increased $1.1 billion to $6.5 billion due to debt issuances in 2007 of $2.4 billion partially offset by the conversion of a portion of convertible debt into CSX common stock and the reclassification of debt from long-term to current. See the Schedule of Contractual Obligations and Commercial Commitments on page 50 and Note 9, Debt and Credit Agreements, for additional details.

Other capital decreased $1.4 billion to $37 million as a result of significant share repurchase activity partially offset by stock option exercises and the conversion of a portion of convertible debt into CSX common stock. For additional information on the Company's share repurchase activity, see Note 1, Nature of Operations and Significant Accounting Policies.

***Sources and Uses of Cash***

CSX has multiple sources of cash. First, the Company generates cash from operations. In 2007, CSX generated $2.2 billion of cash from operating activities, which represented a $126 million increase from the prior year. Second, CSX has numerous financing sources including access to the capital markets and a $1.25 billion five-year unsecured revolving credit facility that expires in May 2012. This facility can be increased by an additional $500 million to $1.75 billion with the approval of the lending banks. See Note 9, Debt and Credit Agreements for more information.

CSX also has an effective shelf registration statement on file with the SEC that is unlimited as to amount and may be used, subject to market conditions and CSX Board authorization, to issue debt or equity securities at CSX's discretion. While CSX seeks to give itself flexibility with respect to cash requirements, there can be no assurance that market conditions would permit CSX to sell such debt securities on acceptable terms at any given time, or at all.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Among other things, CSX uses cash for significant annual reinvestment in infrastructure and equipment, share repurchases and scheduled payments of debt and leases with manageable near-term maturities. The Company's cash requirements also include dividends to shareholders.

During 2007, net cash used by investing activities was $1.7 billion. This use of funds was predominately driven by property additions and capital expansion projects made by the Company. Net cash used in financing activities was $584 million due to over $2 billion of cash used for share repurchases during 2007, largely offset by a net increase in long-term debt issued versus long-term debt repaid.

Dividend payments are another use of cash. The Company paid dividends of $231 million in 2007, which was $86 million more than prior year. The increase in 2007 was primarily due to the Company increasing quarterly dividends to $0.15 per share.

***Working Capital***

Working capital can be considered a measure of a company's ability to meet its short-term needs. CSX had a working capital deficit at December 2007 of $180 million compared to a surplus of $150 million last year driven by lower cash and higher current debt balances in 2007. The larger current debt balance includes a reclassification of outstanding convertible debt with a face value of $174 million from long-term to current during 2007. This reflects bondholders' rights under the convertible debt to require CSX to purchase the debentures in October 2008 in lieu of the later maturity date.

A working capital deficit is not unusual for CSX or other companies in the industry and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due. CSX has sufficient financial capacity, including the revolving line of credit and shelf registration, to manage its day-to-day cash requirements and any anticipated obligations.

***Credit Ratings***

Credit ratings reflect an independent agency's judgment on the likelihood that a borrower will repay a debt obligation at maturity. The ratings reflect many considerations, such as the nature of the borrower's industry and its competitive position, the size of the company, its liquidity and access to capital and the sensitivity of a company's cash flows to changes in the economy. The two largest rating agencies, Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), use alphanumeric codes to designate their ratings. The highest quality rating for long-term credit obligations is AAA+ and Aaa1 for S&P and Moody's, respectively.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Long-term ratings of BBB- and Baa3 or better by S&P and Moody's, respectively, reflect ratings on debt obligations that fall within a band of credit quality considered to be "investment grade." Currently, the long-term ratings for CSX's obligations, along with the other large U.S. Class 1 freight railroads, fall within the investment grade band of credit quality.

In 2007, S&P and Moody's both lowered their ratings of CSX's long-term unsecured debt obligations from BBB and Baa2, respectively, to BBB- and Baa3, respectively. This was due to the Company's announcement in second quarter 2007 of a plan to repurchase an additional $1 billion of CSX stock in addition to the $2 billion repurchase plan announced earlier in 2007. Both of these agencies indicate their outlook is "Stable" and these ratings continue to be investment grade. CSX maintained these credit ratings through December 2007 and does not expect that this reduction in credit ratings will materially increase its borrowing costs or materially affect its liquidity. If CSX's credit ratings were to decline to lower levels, the Company could experience more significant increases in its interest cost for new debt. In addition, the market's demand, and thus the Company's ability to readily issue new debt, could become further influenced by the economic and credit market environment.

**SCHEDULE OF CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS**

The following tables set forth maturities of the Company's contractual obligations and other commitments:

| **Type of Obligation** | **2008** | **2009** | **2010** | **2011** | **2012** | **Thereafter** | **Total** |
|---|---|---|---|---|---|---|---|
| *(Dollars in Millions) (Unaudited)* | | | | | | | |
| **Contractual Obligations:** | | | | | | | |
| Long-term Debt (See Note 9) | $ 785 | $ 305 | $ 92 | $ 591 | $ 493 | $ 4,989 | $ 7,255 |
| Operating Leases - Net (See Note 7) | 98 | 90 | 79 | 69 | 51 | 181 | 568 |
| Agreements with Conrail *(a)* | 14 | 13 | 9 | 4 | 3 | 9 | 52 |
| Purchase Obligations (See Note 7) | 621 | 549 | 326 | 285 | 288 | 4,773 | 6,842 |
| Total Contractual Obligations | $ 1,518 | $ 957 | $ 506 | $ 949 | $ 835 | $ 9,952 | $ 14,717 |
| **Other Commitments:** | | | | | | | |
| Guarantees (See Note 7) | 15 | 16 | 16 | 13 | 12 | - | 72 |
| Other | 53 | 2 | - | - | - | 41 | 96 |
| Total Other Commitments | $ 68 | $ 18 | $ 16 | $ 13 | $ 12 | $ 41 | $ 168 |

*(a) Represents minimum future lease payments for freight cars and locomotives and is included in total lease commitments disclosed in Note 7, Commitments and Contingencies.*



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

## OFF-BALANCE SHEET ARRANGEMENTS

For detailed information about the Company's guarantees, operating leases and purchase obligations, see Note 7, Commitments and Contingencies.

There are no off-balance sheet arrangements that are reasonably likely to have a material effect on the Company's results of operations, financial condition and liquidity.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and certain revenues and expenses during the reporting period. Actual results may differ from those estimates. These estimates and assumptions are discussed with the Audit Committee of the Board of Directors on a regular basis. Consistent with the prior year, significant estimates using management judgment are made for the following areas:

- casualty, environmental and legal reserves;
- pension and post-retirement medical plan accounting;
- depreciation policies for assets under the group-life method; and
- income taxes

**Casualty, Environmental and Legal Reserves**

***Casualty***

Casualty reserves represent accruals for personal injury and occupational injury claims. Currently, no individual claim is expected to exceed the Company's self-insured retention amount. To the extent the value of an individual claim exceeds the self-insured retention amount, CSX would present the liability on a gross basis with a corresponding receivable for insurance recoveries. Personal injury and occupational claims are presented on a gross basis and in accordance with SFAS 5, *Accounting for Contingencies* ("SFAS 5"). These reserves fluctuate with estimates provided by independent third parties reviewed by management, and are offset by the timing of payments. Most of the claims were related to CSXT unless otherwise noted.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

Defense and processing costs, which historically have been insignificant and are anticipated to be insignificant in the future, are not included in the recorded liabilities. The Company is presently self-insured for personal injury and occupational-related claims.

*Personal Injury*

Personal injury reserves represent liabilities for employee work-related and third-party injuries. Work-related injuries for CSXT employees are primarily subject to the Federal Employers' Liability Act ("FELA"). In addition to FELA liabilities, employees of other CSX subsidiaries are covered by various state workers' compensation laws, the Federal Longshore and Harbor Worker's Compensation Program or the Maritime Jones Act.

CSXT retains an independent actuarial firm to assist management in assessing the value of personal injury claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The methodology used by the actuary includes a development factor to reflect growth or reduction in the value of these personal injury claims. It is based largely on CSXT's historical claims and settlement experience. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments and uncertainties in litigation.

Based on management's review of the actuarial analyses performed by an independent actuarial firm, the Company reduced personal injury reserves by $99 million during 2007. This reduction is due to a trend of significant decreases in the number and severity of work-related injuries for CSXT employees since 2003. The analyses further indicated an absence of large catastrophic claims since 2003, which also was determined to be a trend. These reductions were included in materials, supplies and other in the consolidated income statements.

*Occupational*

Occupational claims arise from allegations of exposures to certain materials in the workplace, such as asbestos, solvents (which include soaps and chemicals) and diesel fuels or allegations of chronic physical injuries resulting from work conditions, such as repetitive stress injuries, carpal tunnel syndrome and hearing loss.

*Asbestos*

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were largely phased out beginning around the 1950s. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985. Additionally, the Company has retained liability for asbestos claims filed against the previously owned international container shipping business.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

The Company retains a third party specialist with extensive experience in performing asbestos and other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. The objective of the analysis is to determine the number of estimated incurred but not reported ("IBNR") claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party specialist, determines its potentially exposed population and it is then able to derive the estimated number of IBNR claims. The estimated average cost per claim is then determined utilizing recent actual average cost per claim data and national industry data. Key elements of the assessment include the following:

- An estimate is computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company uses railroad industry historical census data because it does not have detailed employment records in order to compute the population of potentially exposed employees.

- The projected incidence of disease is estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed. Epidemiology is the medical science that deals with the incidence, distribution and control of diseases in a population.

- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) is computed using the Company's average historical claim filing rates for a three-year calibration period, excluding a surge in claims originating in West Virginia. In 2006, the Company received 852 asbestos claims in West Virginia in which the claimants were neither exposed in West Virginia nor residents of the state. CSX believes these claims will not have merit as no medical evidence has been provided to substantiate the claims and therefore CSX has excluded them from the calibration period. Claim levels in 2007 returned to expected levels and management feels this calibration period represents the best estimate of future filing rates.

- An estimate of the future anticipated dismissal rate by type of claim is computed using the Company's historical average dismissal rates observed during the current calibration period noted above.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

- An estimate of the future anticipated settlement by type of disease is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during the current calibration period noted above.

From these assumptions, the Company projects the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates are applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represented claims that were closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted asbestos claims.

*Other Occupational*

The Company retains a third party specialist with extensive experience in performing other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. Similar to the asbestos liability estimation process, the key elements of the assessment include the following:

- An estimate of the potentially exposed population for other occupational diseases is calculated by projecting active versus retired workforce from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.

- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee is computed using the Company's average historical claim filing rates for the calibration periods management felt were representative of future filing rates. For carpal tunnel and repetitive stress injuries, the current calibration period is a 1-year average of claim filings. Hearing loss uses a 3-year calibration period, and all other diseases or injuries use a 2-year calibration period. An estimate is made to forecast future claims by using the filing rates by disease and the active and retired CSX population each year.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

- An estimate of the future anticipated settlement by type of injury is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a period that management feels is representative of future settlement amounts.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would not result in a material increase or decrease in the liability recorded for unasserted other occupational claims.

***Environmental***

The Company is a party to various proceedings related to environmental issues, including administrative and judicial proceedings, involving private parties and regulatory agencies. The Company has been identified as a potentially responsible party ("PRP") at approximately 247 environmentally impaired sites, many of which were, or may be, subject to remedial action under the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, or CERCLA, also known as the Superfund law, or similar state statutes. Most of these proceedings arose from environmental conditions on properties used for ongoing or discontinued railroad operations. However, a number of these proceedings are based on allegations that the Company, or its predecessors, sent hazardous substances to facilities owned or operated by others for treatment or disposal. In addition, some of the Company's land holdings were leased to others for commercial or industrial uses that may have resulted in releases of hazardous substances or other regulated materials onto the property and could give rise to proceedings against the Company.

In any such proceedings, the Company is subject to environmental clean-up and enforcement actions under the Superfund Law, as well as similar state laws that may impose joint and several liability for clean-up and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. These costs could be substantial.

In accordance with Statement of Position 96-1, *Environmental Remediation Liabilities*, the Company reviews its role with respect to each site identified at least once a quarter, giving consideration to a number of factors such as:

- type of clean-up required;

- nature of the Company's alleged connection to the location (e.g. generator of waste sent to the site or owner or operator of the site);



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

- extent of the Company's alleged connection (e.g. volume of waste sent to the location and other relevant factors); and
- number, connection and financial viability of other named and unnamed PRPs at the location.

Based on the review process, the Company has recorded amounts to cover contingent future environmental remediation costs with respect to each site to the extent such costs are estimable and probable. The recorded liabilities for estimated future environmental costs are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries.

Currently, the Company does not possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, conditions that are currently unknown could, at any given location, result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to fund remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations, financial condition and liquidity.

***Legal***

In accordance with SFAS 5, an accrual for a loss contingency is established if information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and the amount of loss can be reasonably estimated. If no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.

The Company evaluates all exposures relating to legal liabilities at least quarterly and adjusts reserves when appropriate under the guidance noted above. The amount of a particular reserve may be influenced by factors that include official rulings, newly discovered or developed evidence, or changes in laws, regulations, and evidentiary standards.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Pension and Post-retirement Medical Plan Accounting**

The Company sponsors defined benefit pension plans principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. For employees hired after December 31, 2002, benefits are determined based on a cash balance formula, which provides benefits by utilizing interest and pay credits based upon age, service and compensation. CSX made pension plan contributions of $266 million to its qualified defined benefit pension plans in 2007.

In addition to these plans, CSX sponsors a post-retirement medical plan and one life insurance plan that provide benefits to full-time, salaried, management employees hired prior to January 1, 2003, upon their retirement if certain eligibility requirements are met. The post-retirement medical plan is contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

The accounting for these plans is subject to the guidance provided in SFAS 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106, and 132 (R) ("* SFAS 158*"),* SFAS 87, *Employers Accounting for Pensions* ("SFAS 87"), and SFAS 106, *Employers' Accounting for Postretirement Benefits Other than Pension* ("SFAS 106").

SFAS 87 requires that management make certain assumptions relating to the following:

- long-term rate of return on plan assets;
- discount rates used to measure future obligations and interest expense;
- salary scale inflation rates;
- health care cost trend rates; and
- other assumptions.

These assumptions are determined as of the beginning of the year. As permitted by SFAS 87, the Company has elected to use a plan measurement date of September 30 to actuarially value its pension and post-retirement plans. As required by SFAS 158, CSX will change its measurement date to the fiscal year end in 2008 and does not expect the impact to be material. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects. The Company reviews the long-term rate of return, discount, salary scale inflation and health care cost trend rates on an annual basis and makes modifications to the assumptions based on current rates and trends as appropriate.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

*Long-term Rate of Return on Plan Assets*

The expected long-term average rate of return on plan assets reflects the average rate of earnings expected on the funds invested, or to be invested, to provide for benefits included in the projected benefit obligation. In estimating that rate, the Company gives appropriate consideration to the returns being earned by the plan assets in the funds and the rates of return expected to be available for reinvestment.

The Company's expected long-term average rate of return on assets considers the current and projected asset mix of the funds. Management balances market expectations obtained from various investment managers and economists with both market and actual plan historical returns to develop a reasonable estimate of the expected long-term rate of return on assets. As this assumption is long-term, it is adjusted less frequently than other assumptions used in pension accounting. The long-term rate of return on plan assets used by the Company to value its 2007 pension obligation was 8.5%.

*Discount Rates*

Discount rates affect the amount of liability recorded and the interest expense component of pension and post-retirement expense. Discount rates reflect the rates at which pension and other post-retirement benefits could be effectively settled, or in other words, how much it would cost the Company to buy enough high quality bonds to generate cash flow equal to the Company's expected future benefit payments. The Company determines the discount rate based on a hypothetical portfolio of high quality bonds with cash flows matching the plans' expected benefit payments.

The discount rates used by the Company to value its 2007 pension and post-retirement obligations are 6% and 5.75%, respectively. The Company uses a different discount rate for pension and post-retirement benefits due to the different time horizons of future payments for each of the plans. For pensions, the time horizon is approximately 12 years, while for post-retirement, the time horizon is approximately 8 years.

Each year these discount rates are reevaluated and adjusted to reflect the best estimate of the current effective settlement rates. If interest rates generally decline or rise, the assumed discount rates will change.

*Salary Scale Inflation Rates*

Salary scale inflation rates are based on current trends and historical data accumulated by the Company. The Company reviews recent wage increases and management incentive compensation payments over the past five years in its assessment of salary scale inflation rates. The Company used a salary scale rate of 4.1% to value its 2007 pension obligation.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

*Health Care Cost Trend Rates*

Health care cost trend rates are based on recent plan experience and industry trends. The Company uses actuarial data to substantiate the inflation assumption for health care costs, representing increases in total plan costs (which include claims and administrative fee cost components). The current assumed health care cost trend rate is 10% for Medicare-eligible participants and 9% for non-Medicare-eligible participants and is expected to decrease gradually until reaching 4.75% in 2014, based upon current actuarial projections.

*Other Assumptions*

The calculations made by the actuaries also include assumptions relating to mortality rates, turnover and retirement age. These assumptions are based upon historical data and are approved by management.

*2007 Estimated Pension and Post-retirement Expense*

Net periodic pension and post-retirement benefits expense for 2008 is expected to be approximately $34 million and $28 million, respectively, compared to $64 million and $25 million, respectively in 2007.

The following sensitivity analysis illustrates the effect of changes in certain assumptions like discount rates, salaries and health care costs on the 2008 estimated pension and post-retirement expense:

| *(Dollars in Millions)* | Pension | OPEB |
|---|---|---|
| Discount Rate 0.25% change | $ 4 | $ 1 |
| Salary Inflation 0.25% change | 2 | - |
| Health Care Cost 1% change | N/A | 2 |

**Depreciation Policies for Assets Under the Group-Life Method**

CSXT accounts for its rail assets, including main-line track, locomotives and freight cars, using the group-life method. The group-life method pools similar assets by type and then depreciates each group as a whole. Under the group-life method, the service lives for each group of rail assets are determined by completing periodic life studies and applying management's assumptions concerning the service lives of its properties. These life studies are conducted by a third party expert, analyzed by the Company's management and approved by the STB. Life studies for equipment assets are required every three years, whereas road and track life studies are required every six years by the STB.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Changes in asset lives due to the results of the life studies could significantly impact future periods' depreciation expense, and thus, the Company's results of operations. Factors taken into account during the life study include:

- Statistical analysis of historical retirements for each group of property;
- Evaluation of current operations;
- Evaluation of technological advances and maintenance schedules;
- Previous assessment of the condition of the assets and outlook for their continued use;
- Expected net salvage to be received upon retirement; and
- Comparison of assets to the same asset groups with other companies.

The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the appropriate amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

In 2007, CSXT completed life studies for all of its equipment, road and track assets and also completed an analysis of the assets received in the Conrail reorganization, which resulted in a reduction in depreciation expense for equipment and road assets and an increase in depreciation expense for track assets. The combination of these adjustments reduced depreciation expense by $21 million in 2007. Also in 2007, the Company reviewed the useful lives of Intermodal terminal assets, as well as lift equipment and containers. A $4 million reduction in depreciation expense was recognized as a result of this periodic review.

Assets depreciated under the group-life method comprise 91% of CSXT's total fixed assets of $21 billion on a net basis at December 28, 2007. The Company's depreciation expense for the year ended December 28, 2007 amounted to $883 million. A one percent change in the average life of all group-life assets would result in an $8 million change to the Company's annual depreciation expense.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Income Taxes**

In 2006, the Financial Accounting Standards Board issued FIN 48, which became effective for CSX beginning in 2007. FIN 48 addressed the determination of how tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FIN 48, the Company must recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate resolution. The Company's reassessment of its tax positions in accordance with FIN 48 did not have a material impact on the Company's results of operations, financial condition and liquidity.

CSX files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 2003. Federal income tax returns for 2004 through 2007 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed. While the final outcome of these matters cannot be predicted with certainty, it is the opinion of CSX management that none of these items will have a materially adverse effect on the results of operations, financial condition and liquidity of CSX. An unexpected adverse resolution of one or more of these items, however, could have a materially adverse effect on the results of operations, financial condition and liquidity in a particular fiscal quarter or fiscal year. Also, the Company is party to a number of legal and administrative proceedings, the resolution of which could result in gain realization in amounts that could be material to results of operations, financial condition and liquidity in a particular fiscal quarter or fiscal year.

**New Accounting Pronouncements and Change in Accounting Policy**

See Note 1, Nature of Operations and Significant Accounting Policies under the caption, "New Accounting Pronouncements and Changes in Accounting Policy."

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

CSX does not hold or issue derivative financial instruments for trading purposes. Historically, the Company has used derivative financial instruments to address market risk exposure to fluctuations in interest rates and the risk of volatility in its fuel costs, but as of December 2007, the Company did not have a significant position in derivative financial instruments.

At December 2007, CSX had $106 million of outstanding floating rate debt obligations outstanding. A 1% fluctuation in interest rates on these notes would cause a $1 million change in interest expense.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 63 |
| **CSX Corporation** | |
| Consolidated Financial Statements and Notes to Consolidated Financial Statements | |
| Herewith: | |
| Consolidated Income Statements for the Fiscal Years Ended: | 64 |
| December 28, 2007 | |
| December 29, 2006 | |
| December 30, 2005 | |
| Consolidated Balance Sheets as of: | 65 |
| December 28, 2007 | |
| December 29, 2006 | |
| Consolidated Cash Flow Statements for Fiscal Years Ended: | 66 |
| December 28, 2007 | |
| December 29, 2006 | |
| December 30, 2005 | |
| Consolidated Statements of Changes in Shareholders' Equity: | 67 |
| December 28, 2007 | |
| December 29, 2006 | |
| December 30, 2005 | |
| Notes to Consolidated Financial Statements | 68 |




Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Board of Directors of CSX Corporation

We have audited the accompanying consolidated balance sheets of CSX Corporation and subsidiaries as of December 28, 2007 and December 29, 2006, and the related consolidated statements of income, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 28, 2007. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 28, 2007 and December 29, 2006, and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 28, 2007, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), CSX Corporation’s internal control over financial reporting as of December 28, 2007, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 15, 2008 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
February 15, 2008



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

## CONSOLIDATED INCOME STATEMENTS

*(Dollars in Millions, Except Per Share Amounts)*

| | Fiscal Years | | |
|---|---|---|---|
| | **2007** | 2006 | 2005 |
| **Operating Revenue** | **$ 10,030** | $ 9,566 | $ 8,618 |
| **Operating Expense** | | | |
| Labor and Fringe | **2,986** | 2,930 | 2,864 |
| Materials, Supplies and Other | **2,031** | 1,948 | 1,855 |
| Fuel | **1,210** | 1,112 | 783 |
| Depreciation | **883** | 857 | 826 |
| Equipment and Other Rents | **451** | 507 | 510 |
| Inland Transportation | **240** | 242 | 230 |
| Gain on Insurance Recoveries (Note 5) | **(27)** | (168) | - |
| Total Operating Expense | **7,774** | 7,428 | 7,068 |
| | | | |
| **Operating Income** | **2,256** | 2,138 | 1,550 |
| | | | |
| **Other Income and Expense** | | | |
| Other Income - Net (Note 10) | **93** | 95 | 101 |
| Debt Repurchase Expense (Note 9) | **-** | - | (192) |
| Interest Expense | **(417)** | (392) | (423) |
| **Earnings From Continuing Operations before Income Taxes** | **1,932** | 1,841 | 1,036 |
| | | | |
| Income Tax Expense (Note 13) | **(706)** | (531) | (316) |
| **Earnings From Continuing Operations** | **1,226** | 1,310 | 720 |
| Discontinued Operations (Note 17) | **110** | - | 425 |
| **Net Earnings** | **$ 1,336** | $ 1,310 | $ 1,145 |
| | | | |
| **Per Common Share (Note 2)** | | | |
| **Basic Earnings Per Share** | | | |
| From Continuing Operations | **$ 2.85** | $ 2.98 | $ 1.67 |
| Discontinued Operations | **0.26** | - | 0.98 |
| **Net Earnings** | **$ 3.11** | $ 2.98 | $ 2.65 |
| | | | |
| **Earnings Per Common Share, Assuming Dilution** | | | |
| From Continuing Operations | **$ 2.74** | $ 2.82 | $ 1.59 |
| Discontinued Operations | **0.25** | - | 0.93 |
| **Net Earnings** | **$ 2.99** | $ 2.82 | $ 2.52 |
| | | | |
| **Average Common Shares Outstanding (Thousands)** | **430,270** | 440,084 | 432,851 |
| | | | |
| **Average Common Shares Outstanding, Assuming Dilution (Thousands)** | **448,280** | 465,934 | 456,047 |
| | | | |
| **Cash Dividends Paid Per Common Share** | **$ 0.54** | $ 0.33 | $ 0.215 |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

# CONSOLIDATED BALANCE SHEETS

*(Dollars in Millions)*

| | December 28, 2007 | December 29, 2006 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and Cash Equivalents (Note 1) | **$ 368** | $ 461 |
| Short-term Investments | **346** | 439 |
| Accounts Receivable, net of allowance for doubtful accounts of $74 and $82, respectively | **1,174** | 1,174 |
| Materials and Supplies | **240** | 204 |
| Deferred Income Taxes | **254** | 251 |
| Other Current Assets | **109** | 143 |
| **Total Current Assets** | **2,491** | 2,672 |
| | | |
| Properties | **28,999** | 27,715 |
| Accumulated Depreciation | **(7,219)** | (6,792) |
| **Properties - Net (Note 11)** | **21,780** | 20,923 |
| | | |
| Investment in Conrail (Note 16) | **639** | 607 |
| Affiliates and Other Companies | **365** | 336 |
| Other Long-term Assets (Note 12) | **259** | 591 |
| **Total Assets** | **$ 25,534** | $ 25,129 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current Liabilities:** | | |
| Accounts Payable | **$ 976** | $ 974 |
| Labor and Fringe Benefits Payable | **461** | 495 |
| Casualty, Environmental and Other Reserves (Note 6) | **247** | 253 |
| Current Maturities of Long-term Debt (Note 9) | **785** | 592 |
| Short-term Debt (Note 9) | **2** | 8 |
| Income and Other Taxes Payable | **113** | 114 |
| Other Current Liabilities | **87** | 86 |
| **Total Current Liabilities** | **2,671** | 2,522 |
| | | |
| Casualty, Environmental and Other Reserves (Note 6) | **624** | 668 |
| Long-term Debt (Note 9) | **6,470** | 5,362 |
| Deferred Income Taxes | **6,096** | 6,110 |
| Other Long-term Liabilities (Note 12) | **988** | 1,525 |
| **Total Liabilities** | **16,849** | 16,187 |
| | | |
| **Shareholders' Equity:** | | |
| Common Stock, $1 Par Value (Note 3) | **408** | 438 |
| Other Capital | **37** | 1,469 |
| Retained Earnings (Note 13) | **8,565** | 7,427 |
| Accumulated Other Comprehensive Loss | **(325)** | (392) |
| **Total Shareholders' Equity** | **8,685** | 8,942 |
| **Total Liabilities and Shareholders' Equity** | **$ 25,534** | $ 25,129 |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

## CONSOLIDATED CASH FLOW STATEMENTS

*(Dollars in Millions)*

| | Fiscal Years | | |
|---|---|---|---|
| | **2007** | 2006 | 2005 |
| **OPERATING ACTIVITIES** | | | |
| Net Earnings | $ **1,336** | $ 1,310 | $ 1,145 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided by Operating Activities: | | | |
| Depreciation | **890** | 867 | 833 |
| Deferred Income Taxes | **272** | 42 | (46) |
| Gain on Sale of International Terminals - Net of Tax (Note 17) | **-** | - | (428) |
| Non-cash Discontinued Operations (Note 17) | **(110)** | - | - |
| Gain on Insurance Recoveries (Note 5) | **(27)** | (168) | - |
| Insurance Proceeds (Note 5) | **13** | 121 | 29 |
| Net Gain on Conrail spin-off - after tax | **-** | (26) | - |
| Contributions to Qualified Pension Plans (Note 8) | **(266)** | (28) | (3) |
| Other Operating Activities | **(77)** | 33 | (138) |
| Changes in Operating Assets and Liabilities: | | | |
| Accounts Receivable | **(50)** | (33) | (44) |
| Other Current Assets | **(41)** | 96 | (29) |
| Accounts Payable | **48** | 51 | 54 |
| Income and Other Taxes Payable | **234** | (103) | (402) |
| Other Current Liabilities | **(38)** | (104) | 139 |
| **Net Cash Provided by Operating Activities** | **2,184** | 2,058 | 1,110 |
| **INVESTING ACTIVITIES** | | | |
| Property Additions | **(1,773)** | (1,639) | (1,136) |
| Insurance Proceeds (Note 5) | **16** | 147 | 41 |
| Net Proceeds from Sale of International Terminals (Note 17) | **-** | - | 1,108 |
| Purchase of Minority Interest in an International Terminals' Subsidiary (Note 17) | **-** | - | (110) |
| Purchases of Short-term Investments | **(2,338)** | (1,412) | (2,601) |
| Proceeds from Sales of Short-term Investments | **2,459** | 1,290 | 2,634 |
| Other Investing Activities | **(57)** | 4 | 28 |
| **Net Cash Used in Investing Activities** | **(1,693)** | (1,610) | (36) |
| **FINANCING ACTIVITIES** | | | |
| Short-term Debt - Net | **(6)** | 7 | (99) |
| Long-term Debt Issued (Note 9) | **2,381** | 471 | 105 |
| Long-term Debt Repaid (Note 9) | **(785)** | (546) | (1,283) |
| Dividends Paid | **(231)** | (145) | (93) |
| Stock Options Exercised (Note 4) | **153** | 319 | 98 |
| Shares Repurchased (Note 1) | **(2,174)** | (465) | - |
| Other Financing Activities | **78** | 63 | (15) |
| **Net Cash Used in Financing Activities** | **(584)** | (296) | (1,287) |
| Net (Decrease) Increase in Cash and Cash Equivalents | **(93)** | 152 | (213) |
| **CASH AND CASH EQUIVALENTS** | | | |
| Cash and Cash Equivalents at Beginning of Period | **461** | 309 | 522 |
| **Cash and Cash Equivalents at End of Period** | $ **368** | $ 461 | $ 309 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | | |
| Interest Paid - Net of Amounts Capitalized | $ **411** | $ 387 | $ 444 |
| Income Taxes Paid | $ **235** | $ 531 | $ 798 |

See accompanying Notes to Consolidated Financial Statements



 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

# CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

*(Dollars in Millions)*

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) Pension and OPEB Adjustments(a) | Fuel Hedge(b) | Other | Total |
|---|---|---|---|---|---|---|---|---|
| **Balance December 31, 2004** | 431,058 | $ 431 | $ 1,390 | $ 5,210 | $ (292) | $ 72 | $ - | $ 6,811 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | - | - | - | 1,145 | - | - | - | 1,145 |
| Other Comprehensive Income (Loss) | - | - | - | - | (15) | (42) | - | (57) |
| Comprehensive Earnings | | | | | | | | 1,088 |
| Dividends | - | - | - | (93) | - | - | - | (93) |
| Stock Option Exercises and Other | 5,348 | 5 | 143 | - | - | - | - | 148 |
| **Balance December 30, 2005** | 436,406 | 436 | 1,533 | 6,262 | (307) | 30 | - | 7,954 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | - | - | - | 1,310 | - | - | - | 1,310 |
| Other Comprehensive Income (Loss) | - | - | - | - | (2) | (30) | - | (32) |
| Comprehensive Earnings | | | | | | | | 1,278 |
| Adjustment for Initial Adoption of SFAS 158, net of tax(c) | - | - | - | - | (83) | - | - | (83) |
| Dividends | - | - | - | (145) | - | - | - | (145) |
| Share Repurchases | (14,533) | (14) | (451) | - | - | - | - | (465) |
| Stock Option Exercises and Other | 15,891 | 16 | 387 | - | - | - | - | 403 |
| **Balance December 29, 2006** | 437,764 | 438 | 1,469 | 7,427 | (392) | - | - | 8,942 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | - | - | - | 1,336 | - | - | - | 1,336 |
| Other Comprehensive Income (Loss) | - | - | - | - | 63 | - | 4 | 67 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Comprehensive Earnings | | | | | | | | 1,403 |
| Adjustment for Initial Adoption of FIN 48*(d)* | - | - | - | 33 | - | - | - | 33 |
| Dividends | - | - | - | (231) | - | - | - | (231) |
| Share Repurchases *(e)* | (50,917) | (51) | (2,123) | - | - | - | - | (2,174) |
| Bond Conversions*(f)* | 13,296 | 13 | 339 | - | - | - | - | 352 |
| Subsidiary Equity Restructuring*(g)* | - | - | 72 | - | - | - | - | 72 |
| Stock Option Exercises and Other | 7,721 | 8 | 280 | - | - | - | - | 288 |
| **Balance December 28, 2007** | 407,864 | $ 408 | $ 37 | $ 8,565 | $ (329) | $ - | $ 4 | $ 8,685 |

*(a) Pension and Other Postretirement Benefits balances are net of taxes of $146 million, $197 million and $166 million for 2005, 2006 and 2007, respectively.*

*(b) Fuel hedge activity is net of taxes of $21 million for 2005 and 2006.*

*(c) See Note 1, Nature of Operations and Significant Accounting Policies under caption New Accounting Pronouncements and Changes in Accounting Policy.*

*(d) See Note 13, Income Taxes.*

*(e) See Note 1, Nature of Operations and Significant Accounting Policies under caption Other Items – Share Repurchases.*

*(f) See Note 2, Earnings Per Share and Note 9, Debt and Credit Agreements.*

*(g) See Note 12, Other Long-term Assets and Other Long-term Liabilities.*

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1. Nature of Operations and Significant Accounting Policies

*Nature of Operations*

CSX Corporation ("CSX" and together with its subsidiaries, the "Company"), based in Jacksonville, Florida, is one of the nation's leading transportation companies. Surface Transportation, which includes the Company's rail and intermodal businesses, provides rail-based transportation services including traditional rail service and the transport of intermodal containers and trailers.

**Rail**

CSX's principal operating company, CSX Transportation, Inc. ("CSXT"), provides a crucial link to the transportation supply chain through its approximately 21,000 route mile rail network, which serves every major population center in 23 states east of the Mississippi River, the District of Columbia and the Canadian provinces of Ontario and Quebec. It serves 70 ocean, river and lake ports along the Atlantic and Gulf Coasts, the Mississippi River, the Great Lakes and the St. Lawrence Seaway. CSXT also serves thousands of production and distribution facilities through track connections to more than 230 short-line and regional railroads.

*Other Entities*

In addition to CSXT, the rail segment includes Total Distribution Services, Inc. ("TDSI"), Transflo Terminal Services, Inc. ("Transflo"), CSX Technology, Inc. ("CSX Technology") and other subsidiaries. TDSI serves the automotive industry with distribution centers and storage locations, while Transflo provides logistical solutions for transferring products from rail to trucks. Technology and other support services are provided by CSX Technology and other subsidiaries.

**Intermodal**

CSX Intermodal, Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company linking customers to railroads via trucks and terminals. Containers and trailers are loaded and unloaded from trains, and trucks provide the link between intermodal terminals and the customer.

**Surface Transportation Businesses**

The rail and intermodal segments are designated by the Company on a combined basis as Surface Transportation businesses. Together, they generated $10 billion of revenue during 2007 and served four primary lines of business, which are as follows:



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

- The merchandise business is the most diverse market with nearly 2.7 million carloads per year of aggregate, which includes crushed stone, sand and gravel, metal, phosphate, fertilizer, food, consumer, agricultural, paper and chemical products. The merchandise business generated approximately 50% of the Company's revenue in 2007 and 38% of volume.

- Coal, which delivered approximately 1.9 million carloads of coal, coke and iron ore to electricity generating power plants, ocean, river and lake piers and terminals, steel makers and industrial plants, accounted for approximately 26% of the Company's revenue and volume in 2007. The Company transports almost one-third of every ton of coal used for generating electricity in the areas served by CSX.

- Automotive, which delivers both finished vehicles and auto parts, generated 8% of the Company's revenue in 2007 and 6% of the Company's volume. The Company delivers approximately one-third of North America's light vehicles, serving both traditional manufacturers and the increasing number of global manufacturers.

- Intermodal offers a competitive cost advantage over long-haul trucking by combining the superior economics of rail transportation with the short-haul flexibility of trucks. Through its network of more than 50 terminals, Intermodal serves all major markets east of the Mississippi and transports mainly manufactured consumer goods in containers, providing customers with truck-like service for longer shipments. For 2007, Intermodal accounted for approximately 14% of the Company's total revenue and 30% of volume.

Other revenue, which includes revenue from regional railroads (that are partially owned by CSX), demurrage, switching and other incidental charges, accounted for 2% of the Company's total 2007 revenue. Revenue from regional railroads includes shipments by railroads that CSX does not directly operate. Demurrage represents charges assessed by railroads when shippers or receivers of freight hold railcars beyond a specified period of time. Switching revenue is generated when CSXT switches cars between trains for a customer or another railroad.

**Other Businesses**

CSX's other holdings include CSX Real Property, Inc., a subsidiary responsible for the Company's real estate sales, leasing, acquisition and management and development activities, and CSX Hotels, Inc., a resort doing business as The Greenbrier, located in White Sulphur Springs, West Virginia. Pretax earnings of $42 million, $24 million and $85 million for 2007, 2006 and 2005, respectively, from these activities are classified as a component of other income. These items are classified in other income because they are not considered by the Company to be operating activities and may fluctuate with the timing of real estate sales and resort seasonality.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

The Company also has certain residual activities from formerly owned companies that include leasing of equipment and vessels. These results are included in consolidated operating income and totaled $5 million, $12 million and $1 million in 2007, 2006 and 2005, respectively.

***Basis of Presentation***

In the opinion of management, the accompanying consolidated financial statements contain all normal, recurring adjustments necessary to fairly present the financial position of CSX and its subsidiaries at December 2007 and December 2006, and the Consolidated Statements of Income, Cash Flows and Changes in Shareholders' Equity for fiscal years 2007, 2006 and 2005. Certain prior-year data have been reclassified to conform to the 2007 presentation.

***Fiscal Year***

CSX follows a 52/53 week fiscal reporting calendar. This fiscal calendar allows every quarter to consistently end on a Friday and to be of equal duration (13 weeks). However, to maintain this type of reporting calendar, every sixth or seventh year (depending on the Gregorian calendar and when leap year falls), an extra week will be included in one quarter (a 14-week fiscal quarter) and, therefore, the full fiscal year will have 53 weeks.

Fiscal years 2007, 2006 and 2005 each consisted of 52 weeks ending on December 28, 2007, December 29, 2006 and December 30, 2005, respectively. Except as otherwise specified, references to full year indicate CSX's fiscal periods ended on these dates.

***Principles of Consolidation***

The consolidated financial statements include results of operations of CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Most investments in companies that were not majority-owned were carried at cost (if less than 20% owned and the Company has no significant influence) or equity (if the Company has significant influence).

***Cash, Cash Equivalents and Short-term Investments***

On a daily basis, cash in excess of current operating requirements is invested in various highly liquid investments having a typical maturity date of three months or less at the date of acquisition. These investments were carried at cost, which approximated market value, and were classified as cash equivalents. Investments in instruments with maturities greater than three months but less than one year were classified as short-term investments.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

CSX holds $270 million and $391 million of auction rate securities and classifies these investments as available for sale as of December 2007 and 2006, respectively. Accordingly, these investments were included in current assets as Short-term Investments on the Consolidated Balance Sheets. On the Consolidated Cash Flow Statements, purchases and sales of these assets were classified within Investing Activities.

***Allowance for Doubtful Accounts***

The Company maintains an allowance for doubtful accounts for the estimated probable losses on uncollectible accounts and other receivables. The allowance is based upon the credit worthiness of customers, historical experience, the age of the receivable and current market and economic conditions, as well as any known trends or uncertainties related to customer billing and account collectibility. Uncollectible amounts were charged against the allowance account. The allowance for doubtful accounts is netted against accounts receivable.

***Materials and Supplies***

Materials and Supplies in the Consolidated Balance Sheets were carried at average costs and consist primarily of fuel and parts used in the repair and maintenance of CSXT's freight car and locomotive fleets, equipment and track structure.

***Properties***

All properties were stated at historical cost less an allowance for accumulated depreciation. Rail assets, including main-line track, locomotives and freight cars, were depreciated using the group-life method. Under this method, CSXT pools similar assets by road and equipment type and then depreciates each group as a whole. Regulations enforced by the Surface Transportation Board ("STB") of the U.S. Department of Transportation require periodic formal studies of ultimate service lives ("life studies") for all railroad assets. Factors taken into account during a life study include:

- statistical analysis of historical retirements for each group of property;
- evaluation of current operations;
- evaluation of technological advances and maintenance schedules;
- previous assessment of the condition of the assets and outlook for their continued use;
- net salvage expected to be received upon retirement; and
- comparison of assets to the same asset groups with other companies.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

The results of the life study process determine the service lives for each asset group under the group-life method. These studies are conducted by a third party expert and are analyzed by the Company's management. Resulting changes in service life estimates are subject to review and approval by the STB. Road assets, including main-line track, have estimated service lives ranging from six years for system roadway machinery to 80 years for grading. Equipment assets, including locomotives and freight cars, have estimated service lives ranging from six years for motor vehicles to 35 years for work equipment.

Changes in asset lives due to the results of the life studies are applied at the completion of the life study and continue until the next required life study. The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) amount is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

The majority of non-rail property is depreciated using the straight-line method on a per asset basis. The depreciable lives of non-rail property is periodically reviewed by the Company and any changes are applied on a prospective basis. Amortization expense recorded under capital leases is included in depreciation expense on the Consolidated Income Statements.

For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) is charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of non-rail depreciable assets, infrequent disposal of rail assets outside the normal course of business and all dispositions of land, the resulting gains or losses are recognized at the time of disposal. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with Statement of Financial Accounting Standards ("SFAS") 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. Where impairment is indicated, the assets are evaluated and their carrying amount is reduced to fair value based on undiscounted net cash flows or other estimates of fair value.

***Revenue and Expense Recognition***

The Company recognizes freight revenue using Free-On-Board ("FOB") Origin pursuant to Emerging Issues Task Force ("EITF") 91-9, *Revenue and Expense Recognition for Freight Services in Process*. The Company uses method (5) in the EITF, which provides for the allocation of revenue between reporting periods based on relative transit time in each reporting period. Expenses are recognized as incurred.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

The certain key estimates included in the recognition and measurement of revenue and related accounts receivable under the policies described above are as follows:

- revenue associated with shipments in transit, which are based on historical freight car movement data as well as average cycle times to move commodities from their origin to their final destination or interchange;
- future adjustments to revenue or accounts receivable for billing corrections, billing discounts, bad debts and allowances for doubtful accounts;
- future adjustments to revenue for overcharge claims filed by customers, which are based on historical cash paid to customers for rate overcharges as a percentage of total billing; and
- incentive-based refunds to customers, which are primarily based on customers achieving certain volume thresholds and are recorded as a reduction to revenue on the basis of management's best estimate of the projected liability. This estimate is based on historical activity, current volume levels and a forecast of future volume.

The Company regularly updates the estimates described above based on historical experience. All other revenue, such as demurrage, switching and other incidental charges are recorded upon completion of the service.

***Comprehensive Earnings***

CSX reports comprehensive earnings (loss) in accordance with SFAS 130, *Reporting Comprehensive Income*, in the Consolidated Statement of Changes in Shareholders' Equity. Comprehensive earnings is defined as all changes in shareholders' equity during a period, other than those resulting from investments by and distributions to shareholders (i.e. issuance of equity securities and dividends). At December 2007 and 2006, Accumulated Other Comprehensive Loss consisted primarily of adjustments for pension and other post-retirement liabilities. (See Note 8, Employee Benefit Plans.)

***Derivative Financial Instruments***

CSX recognizes all derivatives as either assets or liabilities in the Consolidated Balance Sheets and measures those instruments at fair value. (See Note 14, Derivative Financial Instruments.)



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

***New Accounting Pronouncements and Changes in Accounting Policy***

CSX adopted FASB Interpretation 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"), at the beginning of fiscal year 2007. FIN 48 addressed the determination of how tax benefits claimed or expected to be claimed on an income tax return should be recorded in the financial statements. Under FIN 48, the Company must recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by the taxing authorities, based on the technical merits of the position. These tax benefits recognized in the financial statements are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate resolution. The impact of the Company's reassessment of its tax positions in accordance with FIN 48 did not have a material impact on the results of operations, financial condition and liquidity. (See Note 13, Income Taxes.)

In September 2006, the Financial Accounting Standards Board ("FASB") issued SFAS 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an Amendment of FASB Statements No. 87, 88, 106, and 132 (R)* ("SFAS 158"), which changed the accounting rules for reporting and disclosures related to pensions and other post-retirement benefit plans. Companies were required to reflect the funded status of retirement and other post-retirement benefit plans on the balance sheet. This change was effective for the Company for fiscal year end 2006. The decrease in equity did not have any significant impact on the Company's credit ratios or financing covenants. Pursuant to SFAS 158, the Company will be required to change its September measurement date for the Company's pension and other postretirement benefit plans' assets and obligations to its fiscal year end effective in 2008.

Effective fiscal year 2006, the Company adopted the fair value recognition provisions of SFAS 123(R), *Share-Based Payment* ("SFAS 123(R)") using the modified-prospective-transition method. Under this method, compensation costs recognized in 2006 and forward include all unvested share-based payments as of the beginning of 2006. Share-based compensation at CSX may include stock options, restricted stock awards, stock issued to CSX directors and CSX's Long-term Incentive Plans. The amount of compensation costs recognized is based upon the estimated grant date fair value method under the Black-Scholes-Merton formula and resulted in the recognition of additional compensation cost from the unvested portion of stock options granted prior to 2003.

The adoption of SFAS 123(R) did not result in a material impact to the Company's Consolidated Income Statement or earnings per share. The Company recorded $3 million in 2006 of additional compensation expense for unvested stock options granted prior to 2003. Compensation costs for all other types of share-based payments were consistently reported for all periods presented.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

In 2007, the FASB issued SFAS No. 157, *Fair Value Measurements* ("SFAS 157"), and the Statement of Financial Accounting Standards No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("SFAS 159"). These statements define fair value, provide guidance on fair value measurement and give companies the option to report financial instruments and certain other items at fair value. CSX does not expect to be materially impacted by these statements.

In 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements- An amendment of ARB No. 51 ("SFAS 160")*. This statement clarifies that minority interest should be reported as equity on the balance sheet. Additionally, it requires disclosure of consolidated net income attributable to the parent and to the noncontrolling interest on the face of the income statement. For CSX, SFAS 160 is effective beginning fiscal year 2009 and the Company does not expect to be materially impacted by this statement.

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Critical accounting estimates using management judgment are made for the following areas:

- casualty, environmental and legal reserves (see Note 6, Casualty, Environmental and Other Reserves);
- pension and post-retirement medical plan accounting (see Note 8, Employee Benefit Plans);
- depreciation policies for assets under the group-life method (see "Properties" in this note); and
- income taxes (see Note 13, Income Taxes).

***Other Items – Share Repurchases***

Currently, CSX has purchased $2.1 billion of its outstanding common stock, which represents 50 million shares or about 70% of the $3 billion share repurchase program that was authorized in 2007. CSX intends to complete this repurchase program during 2008. The timing, method, amount of repurchase transactions and the sources of funds to affect any repurchases will be determined by the Company's management based on their evaluation of market conditions, share price and other factors. While it is not management's intention, the program could be suspended or discontinued at any time.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

Total share repurchases under all publicly announced plans was as follows:

| *(In Millions)* | **2007** | 2006 |
|---|---|---|
| Number of Shares Repurchased | **51** | 15 |
| Value of Shares Repurchased | **$ 2,174** | $ 465 |

**NOTE 2. Earnings Per Share**

The following table sets forth the computation of basic earnings per share and earnings per share, assuming dilution:

| | **Fiscal Years** | | |
|---|---|---|---|
| | **2007** | 2006 | 2005 |
| Numerator (Millions): | | | |
| Earnings from Continuing Operations | **$ 1,226** | $ 1,310 | $ 720 |
| Interest Expense on Convertible Debt - Net of Tax | **2** | 4 | 4 |
| Net Earnings from Continuing Operations, If-Converted | **1,228** | 1,314 | 724 |
| | | | |
| Discontinued Operations - Net of Tax | **110** | - | 425 |
| Net Earnings, If-Converted | **1,338** | 1,314 | 1,149 |
| Interest Expense on Convertible Debt - Net of Tax | **(2)** | (4) | (4) |
| Net Earnings | **$ 1,336** | $ 1,310 | $ 1,145 |
| | | | |
| Denominator (Thousands): | | | |
| Average Common Shares Outstanding | **430,270** | 440,084 | 432,851 |
| Convertible Debt | **11,469** | 19,456 | 19,456 |
| Stock Options *(a)* | **5,010** | 6,057 | 2,811 |
| Other Potentially Dilutive Common Shares | **1,531** | 337 | 929 |
| Average Common Shares Outstanding, Assuming Dilution | **448,280** | 465,934 | 456,047 |
| | | | |
| Earnings Per Share: | | | |
| Income from Continuing Operations | **$ 2.85** | $ 2.98 | $ 1.67 |
| Discontinued Operations | **0.26** | - | 0.98 |
| Net Earnings | **$ 3.11** | $ 2.98 | $ 2.65 |
| | | | |
| Earnings Per Share, Assuming Dilution: | | | |
| Income from Continuing Operations | **$ 2.74** | $ 2.82 | $ 1.59 |
| Discontinued Operations | **0.25** | - | 0.93 |
| Net Earnings | **$ 2.99** | $ 2.82 | $ 2.52 |

*(a) In calculating diluted earnings per share, SFAS 128, Earnings Per Share requires the Company to include the potential shares that would be outstanding if all outstanding stock options were exercised. This is offset by shares the Company could repurchase using the proceeds from these hypothetical exercises. This number is different from outstanding stock options, which is included in Note 4, Stock Plans and Share-Based Compensation.*



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 2. Earnings Per Share, continued**

Basic earnings per share was based on the weighted-average number of common shares outstanding. Earnings per share, assuming dilution, was based on the weighted-average number of common shares outstanding adjusted for the effect of the following types of potentially dilutive common shares:

- convertible debt;
- employee stock options; and
- other equity awards, which include unvested restricted stock and long-term incentive awards.

EITF 04-8, *The Effect of Contingently Convertible Debt on Diluted Earnings Per Share*, required CSX to include additional shares in the computation of earnings per share, assuming dilution. The amount included in diluted earnings per share represents the number of shares that would be issued if all of CSX's convertible debentures were converted into CSX common stock.

When convertible debentures are converted into CSX common stock, the newly-issued shares are included in the calculation of both basic and diluted earnings per share on a weighted average basis. During 2007, $375 million of face value convertible debentures were converted into 13 million shares of CSX common stock. No material conversions occurred during 2006. At December 2007, $174 million face value remained outstanding, convertible into 6 million shares.

In 2005, 4.4 million stock options with an average exercise price of $26.55 were excluded from the computation of earnings per share, assuming dilution, since their related option exercise prices were greater than the average market price of the common shares during the period. In 2006 and 2007, no stock options were excluded from the calculation as all stock options were dilutive at that time.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 3. Shareholders' Equity**

Common and Preferred Stock consists of the following:

| **Common Stock, $1 Par Value** | **December 28, 2007** |
|---|---|
| | *(in Thousands)* |
| Common shares authorized | 600,000 |
| Common shares issued and outstanding | 407,864 |
| | |
| **Preferred Stock** | |
| Preferred shares authorized | 25,000 |
| Preferred shares issued and outstanding | - |

Holders of common stock are entitled to one vote on all matters requiring a vote for each share held. Preferred stock is senior to common stock with respect to dividends and upon liquidation of CSX.

**NOTE 4. Stock Plans and Share-Based Compensation**

CSX share-based compensation plans primarily include long-term incentive plans, restricted stock awards, stock options and stock plans for directors. CSX has not granted stock options since 2003. Awards granted under the various plans are determined and approved by the Compensation Committee of the Board of Directors or, in certain circumstances, by the Chief Executive Officer for awards to management employees other than senior executives. The Governance Committee of the Board of Directors approves awards granted to the Company's non-management directors.

As of December 2007, there were 2,393 current or former employees with stock option grants outstanding under the various plans. Most new stock awards were granted under the authorization provided in the CSX Omnibus Incentive Plan. As of December 2007, an additional 12 million shares of stock could be issued under this plan.

SFAS 123(R) requires the cash flows resulting from income tax deductions in excess of compensation costs to be classified as financing cash flows. This requirement resulted in reduced net operating cash flows and increased net financing cash flows of approximately $60 million and $59 million for fiscal years 2007 and 2006, respectively. Prior to the adoption of SFAS 123(R), CSX presented all income tax benefits from deductions resulting from compensation costs as operating cash flows in the Consolidated Cash Flow Statements.

Total pre-tax expense associated with share-based compensation and its related income tax benefit is as follows:

| | **Fiscal Years** | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | 2005 |
| Share-Based Compensation Expense | **$ 73** | $ 45 | $ 39 |
| Income Tax Benefit | **27** | 17 | 14 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

The following table illustrates the pro forma effect on net earnings and earnings per share prior to the adoption of SFAS 123(R). This table only shows 2005 pro forma amounts since the Company adopted the fair value recognition provisions of SFAS 123(R) in the first quarter of 2006. Therefore, expenses were recognized in the Consolidated Income Statement for all unvested share-based compensation in 2006 and 2007.

| *(Dollars in Millions, Except Per Share Amounts)* | Fiscal Year 2005 |
|---|---|
| Net Earnings - As Reported | $ 1,145 |
| Add: Stock-Based Employee Compensation Expense | |
| Included in Reported Net Income - Net of Tax | 25 |
| Deduct: Total Stock-Based Employee Compensation | |
| Expense Determined under the Fair Value Based Method | |
| for all Awards - Net of Tax | (29) |
| Pro Forma Net Earnings | $ 1,141 |
| Interest Expense on Convertible Debt - Net of Tax | 4 |
| Pro Forma Net Earnings, If-Converted | $ 1,145 |
| Earnings Per Share: | |
| Basic - As Reported | $ 2.65 |
| Basic - Pro Forma | $ 2.64 |
| Diluted - As Reported | $ 2.52 |
| Diluted - Pro Forma | $ 2.51 |

***Stock Options***

Stock options were granted with 10-year terms. Options outstanding at December 2007 are generally exercisable three to ten years after date of grant. The exercise price for options granted equals the market price of the underlying stock on the grant date. A summary of CSX's stock option activity and related information for the fiscal years 2007, 2006 and 2005 is as follows:

| | **Fiscal Years** | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | | 2006 | | 2005 | |
| | **Options Outstanding (000s)** | **Weighted-Average Exercise Price** | Options Outstanding (000s) | Weighted-Average Exercise Price | Options Outstanding (000s) | Weighted-Average Exercise Price |
| Outstanding at Beginning of Year | **19,420** | **$ 18.96** | 34,151 | $ 20.13 | 41,445 | $ 19.81 |
| Granted | **-** | **$ -** | - | $ - | - | $ - |
| Expired or Canceled | **(44)** | **$ 18.05** | (101) | $ 21.71 | (1,766) | $ 19.99 |
| Exercised | **(7,605)** | **$ 20.08** | (14,630) | $ 21.76 | (5,528) | $ 17.78 |
| Outstanding at End of Year | **11,771** | **$ 18.25** | 19,420 | $ 18.96 | 34,151 | $ 20.13 |
| Exercisable at End of Year | **9,612** | **$ 18.73** | 12,670 | $ 19.78 | 15,746 | $ 21.00 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

The following table summarizes information about stock options outstanding at December 2007:

| Exercise Price | Number Outstanding (000s) | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Aggregate Intrinsic Value(a) (Millions) |
|---|---|---|---|---|
| **Options Outstanding:** | | | | |
| $10 to $15 | 526 | 2.31 | $ 12.47 | $ 16 |
| $15 to $20(b) | 9,359 | 4.54 | $ 17.78 | $ 240 |
| $20 to $25 | 1,789 | 1.26 | $ 21.92 | $ 38 |
| $25 to $30 | 97 | 0.33 | $ 26.33 | $ 2 |
| Total | 11,771 | 3.90 | $ 18.25 | $ 296 |
| **Options Exercisable:** | | | | |
| $10 to $15 | 526 | 2.31 | $ 12.47 | $ 16 |
| $15 to $20(b) | 7,200 | 4.29 | $ 18.30 | $ 181 |
| $20 to $25 | 1,789 | 1.26 | $ 21.92 | $ 38 |
| $25 to $30 | 97 | 0.33 | $ 26.33 | $ 2 |
| Total | 9,612 | 3.58 | $ 18.73 | $ 237 |

*(a) Aggregate intrinsic value represents the amount employees would have received if the options were exercised as of December 2007.*

*(b) The difference between options outstanding and options exercisable is that a portion of options granted in 2003 have not yet vested.*

The total intrinsic value of options exercised, which represents the value paid to current and former employees who exercised options for fiscal years ended 2007, 2006 and 2005, was $163 million, $147 million and $24 million, respectively.

***Restricted Stock Awards***

Restricted stock awards vest over an employment period of up to five years. The following table provides information about outstanding restricted stock awards.

| | Fiscal Years | | |
|---|---|---|---|
| | **2007** | 2006 | 2005 |
| Number of Restricted Stock Awards Outstanding *(Thousands)* | **92** | 220 | 550 |
| Weighted Average Fair Value at Grant Date | **$ 24.26** | $ 19.44 | $ 16.36 |
| Restricted Stock Award Expense *(Millions)* | **$ 1** | $ 2 | $ 2 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

***Long-term Incentive Plans***

The CSX Long-term Incentive Plans were adopted under the CSX Omnibus Incentive Plan. The objective of these long-term incentive plans is to motivate and reward key members of management and executives for achieving and exceeding certain strategic initiatives.

In 2007, performance units were granted to certain layers of management under a new long-term incentive plan adopted under the CSX Omnibus Incentive Plan. This plan provides for a three-year cycle ending in fiscal year 2009. The key financial target is Surface Transportation operating ratio, which is defined as annual operating expenses divided by revenue of the Company's rail and intermodal businesses and is calculated excluding certain non-recurring items. Grants were made in performance units and are payable in CSX common stock. The payout range for the majority of participants will be between 0% and 200% of the original grant, with each unit being equivalent to one share of CSX stock. The payout for certain senior executive officers is subject to a 20% increase or decrease based upon certain additional pre-established financial targets. This could result in a maximum payout of 240% of the original grant. However, any payout to certain senior executive officers is also subject to a reduction of up to 30% at the discretion of the Compensation Committee of the Board of Directors based upon Company performance against certain CSX strategic initiatives. Units in the plan have a weighted average grant date fair value of $43.33, which includes the value of both the initial grant and subsequent, smaller grants issued at different prices based on grant date fair value to new or promoted employees not previously included.

In 2006, grants under two long-term incentive plans were made in the form of performance units. One of the plans provided for a two-year cycle ending in fiscal year 2007 and the other plan provided for a three-year cycle ending in fiscal year 2008. The terms for these plans are substantially similar to the 2007 plan. Units in the plans have a weighted average grant date fair value of $36.86, which includes the value of both the initial grant and subsequent, smaller grants at different prices to new or promoted employees not previously included. One of the 2006 plans ended on December 28, 2007, and CSX issued 1.4 million net shares in 2008 as a result of the achievement of performance targets for the two preceding fiscal years, which had a net market value of $58 million.

CSX also issued 1.5 million shares in 2006 related to the expiration of the 2004/2005 long-term incentive plan. The objective of the 2004/2005 plan was to motivate and reward key members of management and executives for achieving and exceeding a two-year modified free cash flow goal, and the award was paid in cash and CSX common stock.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

Total expense incurred due to long-term incentive plans was as follows:

| | Fiscal Years | | |
|---|---|---|---|
| | **2007** | 2006 | 2005 |
| Long-term Incentive Plan Compensation Expense | **$ 67** | $ 35 | $ 75 |

As of December 2007, there was $29 million of total unrecognized compensation cost related to these plans that is expected to be recognized over a weighted-average period of approximately 1.5 years. The activity related to each of the outstanding long-term incentive plans is summarized as follows:

| | **2006 - 2008 Plan Units Outstanding (000s)** | **2007 - 2009 Plan Units Outstanding (000s)** |
|---|---|---|
| Unvested at December 30, 2005 | - | - |
| Granted in 2006 | 697 | - |
| Forfeited in 2006 | (7) | - |
| Unvested at December 29, 2006 | 690 | - |
| Granted in 2007 | 26 | 526 |
| Forfeited in 2007 | (25) | (11) |
| Unvested at December 28, 2007 | 691 | 515 |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

***Stock Plan for Directors***

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers were paid. At the end of 2007, the minimum retainer to be paid in CSX common stock was 50% of the annual retainer, but each director may elect to receive the entire retainer and fees in CSX common stock. In addition, each director receives an annual payment made entirely in CSX common stock. The following table provides information about shares issued to directors.

| | Fiscal Years | | |
|---|---|---|---|
| | **2007** | 2006 | 2005 |
| Shares Issued to Directors *(Thousands)* | **68** | 70 | 74 |
| Expense *(Millions)* | **$ 3** | $ 3 | $ 2 |

The Plan permits each director, in accordance with Internal Revenue Code Section 409A, to defer receipt of fees. Deferred cash amounts were credited to an account and invested in a choice of eight investment selections, including a CSX common stock equivalent fund. Distributions were made in accordance with elections made by the directors, consistent with the terms of the Plan. At December 2007, there were 1 million shares of common stock reserved for issuance under this Plan.

***Shareholder Dividend Reinvestment Plan***

CSX maintains the Shareholder Dividend Reinvestment Plan under which shareholders may use dividends paid on CSX common stock held in the plan to purchase additional shares of stock. The following table provides information about shares available for issuance under this plan at the end of fiscal years 2007, 2006 and 2005.

| | Fiscal Years | | |
|---|---|---|---|
| | **2007** | 2006 | 2005 |
| Number of Shares Available for Issuance *(Thousands)* | **10,906** | 10,642 | 10,295 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 5. Hurricane Katrina**

In August 2005, Hurricane Katrina caused extensive damage to Company assets on the Gulf Coast including damage to track infrastructure and bridges. Operations were returned to pre-hurricane conditions by the end of the first quarter of 2006.

In order to determine the proper accounting treatment for the damage, the Company reviewed EITF 01-10, *Accounting for the Impact of the Terrorist Attacks of September 11, 2001* , specifically Issue 3, of that consensus, in which the Task Force concluded that insurance recoveries in connection with property and casualty losses should be recognized when realization of the claim for recovery of a loss recognized in the financial statements is deemed probable. Information regarding the Company's insurance coverage at that time, damage estimates and the allocation of the insurance deductible is as follows:

***Insurance Coverage***

In 2005, the Company had insurance coverage of $535 million, after a $25 million deductible (per occurrence), for the following types of losses:

- Fixed Assets Damages - CSX is entitled to the current replacement cost of the damaged assets. The Company's bridges and track damaged by Hurricane Katrina comprised the majority of these types of losses.
- Business Interruption - The Company is entitled to recover the increased costs incurred to allow the Company to continue operations and to minimize the overall business impact to the Company during the period of indemnity. These increased costs include rerouting and other costs.
- Lost Profit - The Company is entitled to recover lost profits, net of associated expenses, during the period of indemnity. The period of indemnity is defined in the relevant policies of insurance and extends not only through the date upon which the railroad network was restored to its original operations, but for such additional time as may be required to restore revenue to the same level as would have existed had no loss occurred.

The Company's insurance policies do not prioritize coverage based on types of losses. As claims were submitted to the insurance companies, they were reviewed and preliminary payments were received until all losses were incurred and documented. A final payment will be received once the Company and its insurers agree on the total value of the claim.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 5. Hurricane Katrina, continued**

***Damage Estimates***

Management's current loss estimate is approximately $450 million. Damages are categorized as follows:

- Fixed Asset Damages - The cost estimate was based on the replacement value of approximately 39 miles of continuous track, six major bridges, numerous small bridges, signal and communication damage, locomotive repair and facilities damaged throughout the region.

- Incremental Expenses - The Company's incremental expenses relate primarily to rerouting and other costs. Rerouting costs are costs to move traffic either through alternative locations on the Company's network or on other railroad lines. Other costs include debris removal, maintenance on equipment damaged by water, supplies, environmental expenses, maintenance labor and other various items.

- Lost Profit - The Company estimated the impact on revenue at a location and customer-specific level.

***Allocation of Deductible***

The Company's insurance policies required its participation in the first $25 million of each loss event, without regard to the category of the covered losses. Because the Company's insurance policies do not specifically apply the deductible by the types of losses covered, CSX believes it is inconsistent with the form and economic substance of the Company's policies to attribute the entire deductible to a single component of covered losses. Therefore, the Company allocated the $25 million self-insured deductible among the above three categories of losses in proportion to the best estimate of the total ultimate losses eligible for recovery under the Company's insurance policies.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 5. Hurricane Katrina, continued**

***Gain on Insurance Recoveries***

As of December 2007, the Company has collected $367 million of insurance proceeds and recognized $195 million of pre-tax gains for claims related to Hurricane Katrina. The gains were attributable to recovering amounts in excess of the net book value of damaged fixed assets and to recording recoveries related to lost profits. Additional cash proceeds are expected and will result in future gain recognition.

Details of how the gain was calculated are as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | 2005 |
| **Total Insurance Proceeds** | **$ 29** | $ 268 | $ 70 |
| Less Recoverable Losses: | | | |
| Net book value of fixed asset damage | **-** | 1 | 41 |
| Incremental expense | **2** | 56 | 72 |
| Prior year receivable | **-** | 43 | - |
| **Gain/(Receivable)** | **$ 27** | $ 168 | $ (43) |

Gain contingencies subject to FIN 30, *Accounting for Involuntary Conversions of Nonmonetary Assets to Monetary Assets* and SFAS 5, *Accounting for Contingencies* ("SFAS 5"), were not recognized until the period in which all contingencies were resolved or cash proceeds were received. The insurance recovery for the replacement cost of property damage in excess of book value and the recovery of lost profits were considered to be gain contingencies. Therefore the net gain (after applying the insurance deductible) was deferred until the cash proceeds are/were received.

In measuring the losses incurred in 2005 attributed to Hurricane Katrina, the Company considered the actual losses reflected in the financial statements and the allocable deductible (based on expected total recoveries from insured losses), and recorded a receivable for the difference based on probable insurance recoveries at December 30, 2005. No receivables were recorded at the end of fiscal year 2007 or 2006 because cash proceeds exceeded the net book value of fixed asset damage and incremental expenses that were paid.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 5. Hurricane Katrina, continued**

***Cash Flows***

Cash proceeds from the insurers are not specific to the types of losses and so, for cash flow presentation, the Company allocated the proceeds ratably among the three types of losses mentioned above. Allocated cash proceeds for lost profits and incremental expenses were classified as operating activities since they related directly to revenue and expenses from operations and were $13 million, $121 million and $29 million for 2007, 2006 and 2005, respectively. Allocated cash proceeds for fixed asset damage were classified as investing activities since these proceeds had a direct relationship to money the Company spent on property additions to repair the hurricane-damaged assets that were recorded in the same category. Cash proceeds for fixed asset damage were $16 million, $147 million and $41 million for 2007, 2006 and 2005, respectively.

**NOTE 6. Casualty, Environmental and Other Reserves**

Activity related to casualty, environmental and other reserves is as follows:

| *(Dollars in Millions)* | Casualty Reserves | Separation Liabilities | Environmental Reserves | Other Reserves | Total |
|---|---|---|---|---|---|
| Balance December 31, 2004 | $ 705 | $ 155 | $ 59 | $ 128 | $ 1,047 |
| Charged to Expense | 181 | - | 32 | 47 | 260 |
| Change in Estimate | (38) | - | - | - | (38) |
| Payments | (173) | (34) | (20) | (78) | (305) |
| | | | | | |
| Balance December 30, 2005 | $ 675 | $ 121 | $ 71 | $ 97 | $ 964 |
| Charged to Expense | 143 | - | 20 | 48 | 211 |
| Payments | (181) | (16) | (20) | (52) | (269) |
| Reclassifications*(a)* | - | 15 | - | - | 15 |
| | | | | | |
| Balance December 29, 2006 | $ 637 | $ 120 | $ 71 | $ 93 | $ 921 |
| Charged to Expense*(b)* | 141 | - | 76 | 79 | 296 |
| Change in Estimate | (99) | - | - | - | (99) |
| Payments*(b)* | (133) | (17) | (47) | (50) | (247) |
| | | | | | |
| Balance December 28, 2007 | $ 546 | $ 103 | $ 100 | $ 122 | $ 871 |

*(a) The reclassifications in 2006 were reclassified from Labor and Fringe Benefits Payable.*

*(b) Charges to expense and payments for environmental reserves were higher in 2007 primarily due to clean-up costs associated with an increase in significant train accidents.*



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

Casualty, environmental and other reserves were determined to be critical accounting estimates due to the need for significant management judgments. They are provided for in the Consolidated Balance Sheets as follows:

| | **December 28, 2007** | | | December 29, 2006 | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | **Current** | **Long-term** | **Total** | Current | Long-term | Total |
| Casualty | **$ 157** | **$ 389** | **$ 546** | $ 172 | $ 465 | $ 637 |
| Separation | **16** | **87** | **103** | 20 | 100 | 120 |
| Environmental | **42** | **58** | **100** | 26 | 45 | 71 |
| Other | **32** | **90** | **122** | 35 | 58 | 93 |
| Total | **$ 247** | **$ 624** | **$ 871** | $ 253 | $ 668 | $ 921 |

Details with respect to each type of reserve are described below. Actual settlements and claims received could differ. The final outcome of these matters cannot be predicted with certainty. Considering the legal defenses available, the liabilities that have been recorded and other factors, it is the opinion of management that none of these items, when finally resolved, will have a material effect on the Company's results of operations, financial condition and liquidity. However, should a number of these items occur in the same period, they could have a material effect on the results of operations, financial condition and liquidity in a particular quarter or fiscal year.

***Casualty***

Casualty reserves represent accruals for personal injury and occupational injury claims. Currently, no individual claim is expected to exceed the Company's self-insured retention amount of $25 million. To the extent the value of an individual claim exceeds the self-insured retention amount, CSX would present the liability on a gross basis with a corresponding receivable for insurance recoveries. Personal injury and occupational claims are presented on a gross basis and in accordance with SFAS 5. These reserves fluctuate with independent third party estimates, which are reviewed by management, and the timing of payments. Most of the claims were related to CSXT unless otherwise noted.

Defense and processing costs, which historically have been insignificant and are anticipated to be insignificant in the future, are not included in the recorded liabilities. The Company is presently self-insured for personal injury and occupational-related claims.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

*Personal Injury*

Personal injury reserves represent liabilities for employee work-related and third-party injuries. Work-related injuries for CSXT employees are primarily subject to the Federal Employers' Liability Act ("FELA"). In addition to FELA liabilities, employees of other CSX subsidiaries are covered by various state workers' compensation laws, the Federal Longshore and Harbor Workers' Compensation Program or the Maritime Jones Act.

CSXT retains an independent actuarial firm to assist management in assessing the value of personal injury claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The methodology used by the actuary includes a development factor to reflect growth or reduction in the value of these personal injury claims. It is based largely on CSXT's historical claims and settlement experience. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments and uncertainties in litigation. Reserves for personal injury claims were $338 million and $424 million at December 2007 and December 2006, respectively.

During 2007, the Company reduced personal injury reserves by $99 million based on management's review of the actuarial analyses performed by an independent actuarial firm. This reduction is due to a trend of significant decreases in the number and severity of work-related injuries for CSXT employees since 2003. The analyses further indicated a reduction of large catastrophic claims since 2003, which also was determined to be a trend. These reductions were included in materials, supplies and other in the Consolidated Income Statements.

*Occupational*

Occupational claims arise from allegations of exposures to certain materials in the workplace, such as asbestos, solvents (which include soaps and chemicals) and diesel fuels or allegations of chronic physical injuries resulting from work conditions, such as repetitive stress injuries, carpal tunnel syndrome and hearing loss.

Reserves for asbestos related claims were $129 million and $121 million at December 2007 and December 2006, respectively. Reserves for all other occupational claims were $79 million and $92 million at December 2007 and December 2006, respectively.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

*Asbestos*

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were largely phased out beginning around the 1950s. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985. Additionally, the Company has retained liability for asbestos claims filed against its previously owned international container shipping business.

The Company retains a third party specialist with extensive experience in performing asbestos and other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. The objective of the analysis is to determine the number of estimated incurred but not reported ("IBNR") claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party specialist, determines its potentially exposed population and is then able to calculate the estimated number of IBNR claims. The estimated average cost per claim is then determined utilizing recent actual average cost per claim data and national industry data. Key elements of the assessment include the following:

- An estimate is computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company uses railroad industry historical census data because it does not have detailed employment records in order to compute the population of potentially exposed employees.

- The projected incidence of disease is estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed. Epidemiology is the medical science that deals with the incidence, distribution and control of diseases in a population.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) is computed using the Company's average historical claim filing rates for a three-year calibration period, excluding a surge in claims originating in West Virginia. In 2006, the Company received 852 asbestos claims in West Virginia in which the claimants were neither exposed in West Virginia nor residents of the state. CSX believes these claims will not have merit as no medical evidence has been provided to substantiate the claims and therefore CSX has excluded them from the calibration period. Claim levels in 2007 returned to expected levels and management feels this calibration period represents the best estimate of future filing rates.

- An estimate of the future anticipated dismissal rate by type of claim is computed using the Company's historical average dismissal rates observed during the current calibration period noted above.

- An estimate of the future anticipated settlement by type of disease is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during the current calibration period noted above.

From these assumptions, the Company projects the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represented claims that were closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.

The estimated future filing rates and estimated average claim values were the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted asbestos claims.

Undiscounted liabilities recorded related to asbestos claims were as follows:

| *(Dollars in Millions)* | **December 28, 2007** | December 29, 2006 |
|---|---|---|
| Asbestos: | | |
| Incurred but not reported claims | **54** | 52 |
| Asserted claims | **75** | 69 |
| Total liability | **129** | 121 |
| Current liability | **15** | 30 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

In 2005, management updated its estimate of the IBNR liability exposure with the assistance of the third party specialists, which resulted in recognition of a $48 million favorable change associated with asbestos liabilities (a net $38 million favorable change for all occupational liabilities). During 2004 and 2005, asbestos related disease claims filed against the Company dropped substantially, particularly bulk claims filed by certain law firms. In 2003, the Company received a significant number of filings. The Company believes the high 2003 number was attributable to an attempt to file before a new, more restrictive venue law took effect in West Virginia in mid-2003. As a result, management reassessed the calibration period from a four-year average to a three-year average in 2005, excluding the surge in claims originating in West Virginia. Management believes this calibration period represents the best estimate of future filing rates. There have been no changes to the number of years used in the calibration period since 2005.

*Other Occupational*

The Company retains a third party specialist with extensive experience in performing other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. Similar to the asbestos liability estimation process, the key elements of the assessment include the following:

- An estimate of the potentially exposed population for other occupational diseases is calculated by projecting active versus retired workforce from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.

- An estimate of the future anticipated claims filing rate by type of injury, employee type and active versus retired employee is computed using the Company's average historical claim filing rates for the calibration periods management felt were representative of future filing rates. For carpal tunnel and repetitive stress injuries, the current calibration period is a 1-year average of claim filings. Hearing loss uses a 3-year calibration period, and all other diseases or injuries use a 2-year calibration period. An estimate is made to forecast future claims by using the filing rates by disease and the active and retired Company population each year.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

- An estimate of the future anticipated settlement by type of injury is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a period that management feels is representative of future settlement amounts.

The estimated future filing rates and estimated average claim values were the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would not result in a material increase or decrease in the liability recorded for unasserted other occupational claims.

Undiscounted recorded liabilities related to other occupational claims were as follows:

| *(Dollars in Millions)* | **December 28, 2007** | December 29, 2006 |
|---|---|---|
| Other Occupational: | | |
| Incurred but not reported claims | **47** | 53 |
| Asserted claims | **32** | 39 |
| Total liability | **79** | 92 |
| Current liability | **29** | 30 |

*Summary*

A summary of asbestos and other occupational claims activity is as follows:

| | **Fiscal Years** | |
|---|---|---|
| | **2007** | 2006 |
| **Asserted Claims** | | |
| Open Claims - Beginning of Year | **11,116** | 10,639 |
| New Claims Filed | **930** | 1,504 |
| Claims Settled | **(553)** | (767) |
| Claims Dismissed | **(505)** | (260) |
| Open Claims - End of Year | **10,988** | 11,116 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

Approximately 6,000 of the open claims at December 2007 were asbestos claims against CSX's previously owned international container shipping business. Because these claims were against multiple vessel owners, the Company's reserves reflect its portion of those claims. The Company had approximately $9 million reserved for these shipping business claims at December 2007 and 2006. The remaining open claims were asserted against CSXT.

***Separation***

Separation liabilities provide for the estimated costs of implementing workforce reductions, improvements in productivity and certain other cost reductions at the Company's major transportation units since 1991. These liabilities are expected to be paid out over the next 15 to 20 years from general corporate funds and may fluctuate depending on the timing of payments and associated taxes.

***Environmental***

The Company is a party to various proceedings related to environmental issues, including administrative and judicial proceedings, involving private parties and regulatory agencies. The Company has been identified as a potentially responsible party at approximately 247 environmentally impaired sites, many of which were, or may be, subject to remedial action under the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, or CERCLA, also known as the Superfund law, or similar state statutes. Most of these proceedings arose from environmental conditions on properties used for ongoing or discontinued railroad operations. However, a number of these proceedings are based on allegations that the Company, or its predecessors, sent hazardous substances to facilities owned or operated by others for treatment or disposal. In addition, some of the Company's land holdings were leased to others for commercial or industrial uses that may have resulted in releases of hazardous substances or other regulated materials onto the property and could give rise to proceedings against the Company.

In any such proceedings, the Company is subject to environmental clean-up and enforcement actions under the Superfund Law, as well as similar state laws that may impose joint and several liability for clean-up and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. These costs could be substantial.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

In accordance with Statement of Position 96-1, *Environmental Remediation Liabilities*, the Company reviews its role with respect to each site identified at least once a quarter. Based on the review process, the Company has recorded amounts to cover contingent future environmental remediation costs with respect to each site to the extent such costs are estimable and probable. The recorded liabilities for estimated future environmental costs are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. Payments related to these liabilities are expected to be made over the next several years.

Currently, the Company does not possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, conditions that are currently unknown could, at any given location, result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to fund remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations, financial condition and liquidity.

***Other***

Other reserves of $122 million and $93 million for 2007 and 2006, respectively, include liabilities for various claims, such as longshoremen disability claims, freight claims and claims for property, automobile and general liability. These liabilities are accrued at the estimable and probable amount in accordance with SFAS 5.

Longshoremen disability claims represent liability for assessments under Section 8f of the United States Longshore and Harbor Workers' Compensation Program. These reserves have amounts accrued for second injury fund liabilities, which represent the non-medical portion of employee claims which are paid by the United States Department of Labor and are attributed to an earlier injury to the same employee.

Freight claims represent claims for both freight loss and damage and freight rate disputes. Freight loss and damage claims are liabilities that resulted from the loss or damage of customer freight while being handled by the Company's transportation services. Freight rate disputes represent liabilities for customer claims regarding the rate charged by the Company for its transportation services. Liabilities for freight rate disputes are recorded as a reduction of revenue.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 6. Casualty, Environmental and Other Reserves, continued**

The Company accrues for claims related to property, automobile and general liability as noted above. The Company is also required to maintain primary and state mandated coverage for Company property and vehicle fleets. General liability is coverage for liability arising from operations of non-rail CSX subsidiaries.

**NOTE 7. Commitments and Contingencies**

***Lease Commitments***

The Company has various lease agreements with other parties with terms up to 30 years. Non-cancelable, long-term leases generally include provisions for maintenance, options to purchase and options to extend the terms.

At December 2007, minimum building and equipment rentals and commitments for vessels under these operating leases were as follows:

*(Dollars in millions)*

| Years | Operating Leases | Sublease Income | Net Lease Commitments |
|---|---|---|---|
| 2008 | $ 160 | $ 48 | $ 112 |
| 2009 | 140 | 37 | 103 |
| 2010 | 119 | 31 | 88 |
| 2011 | 90 | 17 | 73 |
| 2012 | 75 | 21 | 54 |
| Thereafter | 264 | 74 | 190 |
| Total | $ 848 | $ 228 | $ 620 |

Operating leases and an equal portion of sublease income include approximately $171 million relating to ongoing operating lease commitments for vessels and equipment, which have been subleased to Horizon Lines, Inc. ("Horizon"), a former subsidiary previously named CSX Lines. CSX believes Horizon will fulfill its contractual commitments with respect to such leases and CSX will have no further liability for those obligations.

In addition to the commitments in the table, the Company also has agreements covering equipment leased from Conrail Inc. ("Conrail").

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | 2005 |
| Rent Expense on Operating Leases | **$ 451** | $ 514 | $ 523 |

Rent expense on operating leases included $310 million, $355 million and $384 million of net daily rental charges on railroad operating equipment in 2007, 2006 and 2005, respectively, which are not long-term commitments. The Company uses the straight-line method to recognize rent expense associated with operating leases that include escalations over their terms.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 7. Commitments and Contingencies, continued**

***Purchase Commitments***

CSXT has a commitment under a long-term maintenance program that currently covers 43% of CSXT's fleet of locomotives. The agreement is based on the maintenance cycle for each locomotive. Under CSXT's current obligations, the agreement will expire no earlier than 2028 and may last until 2031 depending upon when certain locomotives are placed in service. The costs expected to be incurred throughout the duration of the agreement fluctuate as locomotives are placed into, or removed from, service or as required maintenance schedules are revised. CSXT may terminate the agreement at its option after 2012, though such action would trigger certain liquidated damages provisions.

The following table summarizes CSXT's payments under the long-term maintenance program:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | 2005 |
| Amounts Paid | **$ 217** | $ 183 | $ 170 |

As a result of agreements executed in August 2005 and February 2006, CSXT has purchase obligations related to a multi-year plan to acquire additional locomotives between 2006 and 2011. The amount of the ultimate purchase commitment depends upon the model of locomotive acquired and the timing of delivery. Annual payments related to the locomotive purchase obligations, including amounts that would be payable under the long-term maintenance program were estimated as follows:

| *(Dollars in Millions)* | **Payments** |
|---|---|
| 2008 | 446 |
| 2009 | 423 |
| 2010 | 258 |
| 2011 | 266 |
| 2012 | 275 |
| Thereafter | 4,773 |
| Total | $ 6,441 |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 7. Commitments and Contingencies, continued**

Additionally, the Company has various other commitments to purchase technology, communications, railcar maintenance and other services from various suppliers. Total annual payments under all of these additional purchase commitments were estimated as follows:

| *(Dollars in Millions)* | Payments |
|---|---|
| 2008 | $ 175 |
| 2009 | 126 |
| 2010 | 68 |
| 2011 | 19 |
| 2012 | 13 |
| 2013 - 2031 | - |
| Total | $ 401 |

***Insurance***

The Company maintains numerous insurance programs, most notably for third-party casualty liability and for Company property damage and business interruption, with substantial limits. A specific amount of risk is retained by the Company on each of the casualty and property programs. Specifically, the Company has a $25 million deductible for each of the casualty and non-catastrophic property programs and a $50 million deductible for the catastrophic property program. This deductible only applies to the first event. If an event occurs in excess of the Company's deductible and the Company does not elect to purchase additional insurance coverage, then the deductible for the second covered event will equal the amount of the claim in the first event.

***Guarantees***

CSX and certain of its subsidiaries are contingently liable, individually and jointly with others, as guarantors of approximately $72 million in obligations principally relating to leased equipment, vessels and joint facilities used by the Company in its current and former business operations. Utilizing the Company's guarantee for these obligations allows the obligor to take advantage of lower interest rates and to obtain other favorable terms. Guarantees are contingent commitments issued by the Company that could require CSX or one of its affiliates to make payment to or to perform certain actions for the beneficiary of the guarantee based on another entity's failure to perform.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 7. Commitments and Contingencies, continued**

At December 2007, the Company's guarantees primarily related to the following:

- Guarantee of approximately $61 million of obligations of a former subsidiary, CSX Energy, in connection with a sale-leaseback transaction. CSX is, in turn, indemnified by several subsequent owners of the subsidiary against payments made with respect to this guarantee. Management does not expect that the Company will be required to make any payments under this guarantee for which CSX will not be reimbursed. CSX's obligation for this guarantee will be completed in 2012.

- Guarantee of approximately $11 million of lease commitments assumed by A.P. Moller-Maersk ("Maersk") for which CSX is contingently liable. CSX believes Maersk will fulfill its contractual commitments with respect to such lease commitments and CSX will have no further liability for those obligations. CSX's obligation under this guarantee will be completed in 2011.

As of December 2007, the Company had not recognized any liabilities in its financial statements in connection with any guarantee arrangements. The maximum amount of future payments the Company could be required to make under these guarantees is the amount of the guarantees themselves.

***Fuel Surcharge Antitrust Litigation***

Since May 2007, at least 28 putative class action suits were filed in various federal district courts against CSXT and the four other U.S.-based Class I railroads. The lawsuits contain substantially similar allegations to the effect that the defendants' fuel surcharge practices relating to contract and unregulated traffic resulted from an illegal conspiracy in violation of antitrust laws. The suits seek unquantified treble damages (three times the amount of actual damages) allegedly sustained by purported class members, attorneys' fees and other relief. All but three of the lawsuits purport to be filed on behalf of a class of shippers that allegedly purchased rail freight transportation services from the defendants through the use of contracts or through other means exempt from rate regulation during defined periods commencing as early as June 2003 and that were assessed fuel surcharges. Three of the lawsuits purport to be on behalf of indirect purchasers of rail services.

In July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate investigations into similar matters.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 7. Commitments and Contingencies, continued**

CSXT believes that its fuel surcharge practices are lawful. Accordingly, CSXT intends to vigorously defend itself against the purported class actions, which it believes are without merit. CSXT cannot predict the outcome of the putative class action lawsuits, which are in their preliminary stages, or of any government investigations, charges or additional litigation that may be filed in the future. Penalties for violating antitrust laws can be severe, involving both potential criminal and civil liability. CSXT is unable to assess at this time the possible financial impact of this litigation. CSXT has not accrued any liability for an adverse outcome in the litigation. If a material adverse outcome were to occur and be sustained, it could have a material adverse impact on the Company's results of operations, financial condition and liquidity.

***Other Legal Proceedings***

In addition to the matter described above, the Company is involved in litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including, but not limited to, those related to environmental matters, FELA claims by employees, other personal injury claims and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for compensatory as well as punitive damages and others are, or are purported to be, class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is currently the opinion of CSX management that none of these items will have a material adverse effect on the Company's results of operations, financial condition and liquidity. An unexpected adverse resolution of one or more of these items, however, could have a material adverse effect on the Company's results of operations, financial condition and liquidity in a particular quarter or fiscal year.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans**

***General***

The Company sponsors defined benefit pension plans principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. For employees hired after December 31, 2002, benefits are determined based on a cash balance formula, which provides benefits by utilizing interest and pay credits based upon age, service and compensation.

In addition to these plans, CSX sponsors a post-retirement medical plan and a life insurance plan that provide benefits to full-time, salaried, management employees hired on or before December 31, 2002 upon their retirement if certain eligibility requirements are met. The post-retirement medical plan is contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

| | Summary of Participants as of January 1, 2007 | |
|---|---|---|
| | Pension Plans | Post-retirement Medical Plan |
| Active Employees | 7,228 | 3,675 |
| Retirees and Beneficiaries | 10,943 | 10,412 |
| Other*(a)* | 5,182 | 270 |
| Total | 23,353 | 14,357 |

*(a) For pension plans, the other category consists of terminated but vested former employees. For post-retirement plans, the other category consists of employees on long-term disability that have not yet retired.*

As currently permitted by SFAS 87, *Employers Accounting for Pensions*, the Company has elected to use a plan measurement date of September 30 to actuarially value its pension and post-retirement plans. Effective fiscal year 2008, under the provisions of SFAS 158, CSX will be required to change the measurement date for pension and post-retirement benefit plans from September 30 to the last day of the Company's fiscal year.

The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans, continued**

The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

- service cost (benefits attributed to employee service during the period);
- interest cost (interest on the liability due to the passage of time);
- actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions); and
- benefits paid to participants.

***Cash Flows***

Plan assets are amounts that have been segregated and restricted to provide benefits and include amounts contributed by the Company and amounts earned from invested contributions, net of benefits paid. The Company funds the cost of the post-retirement medical and life insurance benefits on a pay-as-you go basis. CSX does not expect to make cash contributions to its qualified defined benefit pension plans in 2008.

Future expected benefit payments are as follows:

| | Expected Cash Flows | |
|---|---|---|
| *(Dollars in Millions)* | **Pension Benefits** | **Post-retirement Benefits*(a)*** |
| 2008 | $ 146 | $ 45 |
| 2009 | 145 | 44 |
| 2010 | 148 | 42 |
| 2011 | 150 | 41 |
| 2012 | 152 | 39 |
| Thereafter | 789 | 169 |
| Total | $ 1,530 | $ 380 |

*(a) The post-retirement benefit payments include an estimated annual reduction of $6 million due to the Medicare Part D Subsidy.*



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans, continued**

***Plan Assets***

The CSX Investment Committee ("the Investment Committee"), whose members were selected by the CFO and approved by the CEO, is responsible for managing pension plan assets. The Investment Committee utilizes an asset allocation strategy that was developed using asset return simulation in conjunction with projected plan liabilities. The allocation seeks maximization of returns within the constraints of acceptable risks considering the long-term investment horizon. A target allocation of 60% equity and 40% fixed income investments was established.

The distribution of pension plan assets as of the measurement date is as follows:

| | **September 30, 2007** | | September 30, 2006 | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **Amount** | **Percent of Total Assets** | Amount | Percent of Total Assets |
| Common Stocks | **$ 964** | **60%** | $ 900 | 60% |
| Fixed Income | **626** | **39** | 598 | 39 |
| Cash and Cash Equivalents | **17** | **1** | 13 | 1 |
| Total | **$ 1,607** | **100%** | $ 1,511 | 100% |

The Investment Committee provides investment guidelines to both the plan's fixed income and equity fund managers. Within the broad asset classes that comprise the plan's investments, common stocks were diversified based on allocations to domestic and foreign stocks. Allocations were maintained within 3% of targets. The U.S. stock segment includes style diversification among managers of large and small capitalization stocks. The Investment Committee limits investment by industry sectors, outlines individual stock issuer concentration and monitors the use of derivatives and CSX securities.

Fixed income securities were diversified across fund managers with differing investment styles and were benchmarked to a long duration index. The Investment Committee specifies the types of allowable investments, such as government, corporate and asset-backed bonds, and limits diversification between domestic and foreign investments and the use of derivatives. Additionally, it stipulates minimum credit quality constraints and any prohibited securities.

Individual investments or fund managers were selected in accordance with standards of prudence applicable to asset diversification and investment suitability. Fund investment performance is continuously monitored. Acceptable performance is determined in the context of the long-term return objectives of the fund and appropriate asset class benchmarks.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans, continued**

***Benefit Obligation, Plan Assets and Funded Status***

Changes in benefit obligation and the fair value of plan assets for the plan year (October 1, 2006 through September 30, 2007) are as follows:

| | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **Plan Year 2007** | Plan Year 2006 | **Plan Year 2007** | Plan Year 2006 |
| **Actuarial Present Value of Benefit Obligation** | | | | |
| Accumulated Benefit Obligation | **$ 1,935** | $ 1,946 | **N/A** | N/A |
| Projected Benefit Obligation | **2,067** | 2,078 | **$ 404** | $ 398 |
| **Change in Projected Benefit Obligation** | | | | |
| Projected Benefit Obligation at Beginning of the Plan Year | $ **2078** | $ 2082 | $ **398** | $ 444 |
| Service Cost | **33** | 36 | **6** | 7 |
| Interest Cost | **115** | 105 | **21** | 21 |
| Plan Participants' Contributions | **-** | - | **16** | 16 |
| Actuarial (Gain)/Loss | **(13)** | 1 | **22** | (35) |
| Benefits Paid | **(146)** | (146) | **(59)** | (55) |
| Benefit Obligation at End of Plan Year | **$ 2,067** | $ 2,078 | **$ 404** | $ 398 |
| **Change in Plan Assets:** | | | | |
| Fair Value of Plan Assets at Beginning of the Plan Year | $ **1,511** | $ 1,536 | $ - | $ - |
| Actual Return on Plan Assets | **186** | 99 | **-** | - |
| Qualified Employer Contributions | **42** | 9 | **-** | - |
| Non-qualified Employer Contributions | **14** | 13 | **43** | 39 |
| Plan Participants' Contributions | **-** | - | **16** | 16 |
| Benefits Paid | **(146)** | (146) | **(59)** | (55) |
| Fair Value of Plan Assets at End of Plan Year | **$ 1,607** | $ 1,511 | **$ -** | $ - |
| **Funded Status at September 30, 2007** | **$ (460)** | $ (567) | **$ (404)** | $ (398) |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans, continued**

Employer contributions and net post-retirement benefits paid during the fourth quarter to arrive at the net funded status of qualified and non-qualified benefit plans as of the end of the Company's fiscal year are as follows:

| *(Dollars in Millions)* | Pension Benefits December 28, 2007 | Pension Benefits December 29, 2006 | Post-retirement Benefits December 28, 2007 | Post-retirement Benefits December 29, 2006 |
|---|---|---|---|---|
| **Funded Status at September 30, 2007** | **$ (460)** | $ (567) | **$ (404)** | $ (398) |
| **Fourth Quarter Activity:** | | | | |
| Qualified Employer Contributions *(a)* | **245** | 21 | **-** | - |
| Non-qualified Employer Contributions | **4** | 3 | **-** | - |
| Net Post-retirement Benefits Paid | **-** | - | **10** | 10 |
| Ending Net Funded Status | **$ (211)** | $ (543) | **$ (394)** | $ (388) |

*(a) During fiscal 2007, CSX made contributions of $266 million to its qualified defined benefit pension plans. The components of this include the $245 million of contributions made in fourth quarter 2007 plus $42 million of contributions made during the 2007 plan year (October 1, 2006 through September 30, 2007) as noted on page 104 less $21 million of contributions made during fourth quarter 2006.*

Amounts related to pension and post-retirement benefits are recorded on the balance sheet are as follows:

| *(Dollars in Millions)* | Pension Benefits December 28, 2007 | Pension Benefits December 29, 2006 | Post-retirement Benefits December 28, 2007 | Post-retirement Benefits December 29, 2006 |
|---|---|---|---|---|
| **Amounts Recorded in Consolidated Balance Sheets:** | | | | |
| Pension Assets | **$ 4** | $ - | **$ -** | $ - |
| Current Liability | **(12)** | (14) | **(45)** | (43) |
| Long-term Liability | **(203)** | (529) | **(349)** | (345) |
| Net Amount Recognized in Consolidated Balance Sheet | **$ (211)** | $ (543) | **$ (394)** | $ (388) |

The funded status, or amount by which the benefit obligation exceeds the fair value of plan assets, represents a liability. At December 2007, the status of CSX plans was as follows:

| **Benefit Obligations in Excess of Plan Assets** | **Aggregate Fair Value of Plan Assets** | **Aggregate Projected Benefit Obligation** |
|---|---|---|
| Projected benefit obligation | $1.8 billion | ($2 billion) |
| Accumulated benefit obligation | $51 million | ($219 million) |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans, continued**

***Net Periodic Benefit Expense***

The following table describes the components of net periodic benefit expense.

| *(Dollars in Millions)* | Pension Benefits Fiscal Years 2007 | 2006 | 2005 | Post-retirement Benefits Fiscal Years 2007 | 2006 | 2005 |
|---|---|---|---|---|---|---|
| Service Cost | **$ 33** | $ 36 | $ 34 | **$ 6** | $ 7 | $ 8 |
| Interest Cost | **115** | 105 | 107 | **21** | 21 | 24 |
| Expected Return on Plan Assets | **(118)** | (117) | (120) | **-** | - | - |
| Amortization of Prior Service Cost | **3** | 4 | 4 | **(5)** | (5) | (5) |
| Amortization of Net Loss | **31** | 34 | 21 | **3** | 7 | 13 |
| Net Periodic Benefit Expense | **$ 64** | $ 62 | $ 46 | **$ 25** | $ 30 | $ 40 |

***Pension and Other Post-Employment Benefits Adjustments***

The following table shows the pre-tax change in other comprehensive income (loss) attributable to the components of net expense and the change in benefit obligation for CSX for pension and other post-employment benefits.

| **Components of Other Comprehensive Income (Loss)** *(Dollars in Millions)* | Pension Benefits December 2007 | December 2006 | Post-retirement Benefits December 2007 | December 2006 |
|---|---|---|---|---|
| Recognized in the balance sheet | | | | |
| Gains (Losses) *(a)* | **$ 111** | $ (62) | **$ (18)** | $ (71) |
| Prior service costs | **4** | 19 | **5** | (8) |
| | | | | |
| (Income) Expense recognized in the income statement | | | | |
| Amortization of net loss *(b)* | **31** | 34 | **3** | 7 |
| Amortization of prior service cost *(c)* | **3** | 4 | **(5)** | (5) |

*(a) Prior year losses are primarily due to the adoption of SFAS 158. For additional information, see Note 1, Nature of Operations and Significant Accounting Policies.*

*(b) The estimated amount to be expensed for 2008 is $23 million and $6 million for pension benefits and post- retirement benefits, respectively.*

*(c) The estimated amount to be expensed for prior service costs for 2008 is $3 million and $(3) million for pension benefits and post-retirement benefits, respectively.*



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans, continued**

At December 2007, the balances of pre-tax amounts to be amortized that are included in accumulated other comprehensive income (a component of shareholders' Equity) are as follows:

| | Pension Benefits | Post-retirement Benefits |
|---|---|---|
| (Gains)/Losses | $ 351 | $ 89 |
| Prior Service Costs | 16 | (3) |
| Total | $ 367 | $ 86 |

***Assumptions***

Weighted-average assumptions used in accounting for the plans were as follows:

| | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | **8.50%** | 8.50% | **N/A** | N/A |
| Benefit Obligation at End of Plan Year | **8.50%** | 8.50% | **N/A** | N/A |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | **5.75%** | 5.25% | **5.50%** | 5.00% |
| Benefit Obligation at End of Plan Year | **6.00%** | 5.75% | **5.75%** | 5.50% |
| Salary Scale Inflation | **4.10%** | 4.10% | **4.10%** | 4.10% |

The net post-retirement benefit obligation was determined using the following assumptions for the health care cost trend rate for medical plans. The rate is assumed to gradually decrease to 4.75% by 2014. Additionally, there are cost differentials between Medicare and Non-Medicare eligible individuals which are reflected below.

| | Post-retirement Benefits | |
|---|---|---|
| | **2007** | 2006 |
| Health Care Cost Trend Rate | | |
| Components of Benefit Cost: Non-Medicare Eligible | **10%** | 11% |
| Components of Benefit Cost: Medicare Eligible | **11%** | 12% |
| Benefit Obligations: Non-Medicare Eligible | **9%** | 10% |
| Benefit Obligations: Medicare Eligible | **10%** | 11% |

For every 1% change in the assumed health care cost trend rate, service and interest cost will change $1 million (consolidated income statement impact). For every 1% increase in the health care cost trend rate the Company's benefit obligation will increase by $15 million, and for every 1% decrease the Company's benefit obligation will decrease by $13 million (consolidated balance sheet impact). An increase in rates has a greater effect on the Company's benefit obligation due to the impact of compounding on future years.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 8. Employee Benefit Plans, continued**

***Medicare Prescription Drug, Improvement and Modernization Act of 2003***

As required by the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the "Act"), CSX has determined that its medical plan's prescription drug benefit qualifies as actuarially equivalent to the benefit that would be paid under the Act. CSX has received $4 million in tax free federal reimbursement for prescription drug claims in both 2007 and 2006.

***Other Plans***

Under collective bargaining agreements, the Company participates in a multi-employer benefit plan, which provides certain post-retirement health care and life insurance benefits to eligible contract employees. Premiums under this plan are expensed as incurred and amounted to $31 million, $30 million and $30 million in 2007, 2006 and 2005, respectively.

The Company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $24 million, $18 million and $19 million for 2007, 2006 and 2005, respectively. The increase in 2007 is primarily driven by new labor agreements that increased the Company's 401(k) match for certain plans.

**NOTE 9. Debt and Credit Agreements**

Debt was as follows:

| *(Dollars in Millions)* | **Maturity** | **Average Interest Rates at December 28, 2007** | **December 28, 2007** | December 29, 2006 |
|---|---|---|---|---|
| Notes | 2008-2043 | 6.5% | **$ 6,291** | $ 4,924 |
| Convertible Debentures, net of $23 and $75 discount, respectively | 2021 | 2.1% | **151** | 473 |
| Equipment Obligations | 2008-2023 | 6.6% | **738** | 446 |
| Other Obligations, Including Capital Leases | 2008-2015 | 6.4% | **75** | 111 |
| Total Long-term Debt (including current portion) | | | **7,255** | 5,954 |
| Less Debt Due within One Year | | | **(785)** | (592) |
| Total Long-term Debt (excluding current portion) | | | **$ 6,470** | $ 5,362 |

***Early Redemption of Long-term Debt***

In 2007, CSX called $150 million of notes due in 2032. CSX recognized a $10 million reduction to Other Income for an early redemption premium and the write-off of debt issuance costs related to the $150 million of note repayments.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 9. Debt and Credit Agreements, continued**

In 2005, CSX repurchased $1.0 billion of its publicly-traded notes. The consideration paid for these notes totaled $1.2 billion, including a pre-tax charge of $192 million for costs to repurchase the debt which primarily reflects the market value above original issue value. CSX used net cash proceeds from the disposition of its International Terminals business in 2005, along with cash on hand, to finance this repurchase.

***Debt Issuance***

CSX issued a total of $2.4 billion in debt during 2007 as follows:

| Notes | Principal Amount Issued |
|---|---|
| *(Dollars in Millions)* | |
| CSXT 6.251% Notes due 2023 (See Note 19) *(a)* | $ 381 |
| CSX 5.75% Notes due 2013 | 400 |
| CSX 6.25% Notes due 2018 | 600 |
| CSX 5.60% Notes due 2017 | 300 |
| CSX 6.15% Notes due 2037 | 700 |
| | $ 2,381 |

*(a) The CSXT notes are secured by a security interest in certain railroad equipment.*

These notes were included in the Consolidated Balance Sheets under Long-term Debt and may be redeemed by the Company at any time. The net proceeds from the sale of the notes will be used for general corporate purposes, which may include repurchases of CSX common stock, capital expenditures, working capital requirements, improvements in productivity and other cost reductions at the Company's major transportation units.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due October 30, 2021 for an initial offering price of approximately $462 million. The carrying value of outstanding debentures was $174 million and $473 million, at December 2007 and December 2006, respectively. From their date of issuance, these debentures had accreted (increased) in value at a yield to maturity of 1% per year. On October 30, 2007, the accretion rate was reset to 2.1%. The accretion rate may be reset again in October 2011 and October 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 9. Debt and Credit Agreements, continued**

The debentures allow holders to require CSX to purchase their debentures in October 2008, October 2011 and October 2016, at a purchase price equal to the accreted value of the debentures at the time. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures. Therefore, at December 2007, the debentures were classified in current maturities of long-term debt in the Consolidated Balance Sheets.

Holders currently may convert their debentures into shares of CSX common stock at a conversion rate of 35.49 common shares per $1,000 principal amount at maturity of debentures. During 2007, $375 million face value of debentures were converted into 13 million shares of CSX common stock. No material conversions occurred during 2006. At December 2007, $174 million face value debentures remained outstanding convertible into 6 million shares.

***Short-term Debt Balances and Rates***

| *(Dollars in Millions)* | **December 2007** | December 2006 |
|---|---|---|
| Short-term Debt | **$ 2** | $ 8 |
| Weighted Average Interest Rates | **5.57%** | 6.07% |

***Long-term Debt Maturities***

| *(Dollars in Millions)* **Fiscal Years Ending** | **Maturities as of December 2007** |
|---|---|
| 2008 | $ 785 |
| 2009 | 305 |
| 2010 | 92 |
| 2011 | 591 |
| 2012 | 493 |
| 2013 and Thereafter | 4,989 |
| Total Long-term Debt Maturities (including current portion) | $ 7,255 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 9. Debt and Credit Agreements, continued**

***Credit Facilities***

In 2006, the Company entered into a $1.25 billion five-year unsecured revolving credit facility and a $15 million secured revolving credit facility expiring in 2011. In 2007, with the consent of the lenders and in accordance with the facility's terms, CSX extended the maturity date of the $1.25 billion facility an additional year, to 2012. CSX also has an $18.5 million 364-day unsecured revolving credit facility expiring in August 2008.

Additionally, with the approval of the lending banks, CSX may increase its total borrowing capacity under the $1.25 billion facility by $500 million, from $1.25 billion to up to $1.75 billion. The facility was not drawn on as of December 2007. Commitment fees and interest rates payable under the facility were similar to fees and rates available to comparably rated investment-grade borrowers.

In 2007, CSX paid approximately $2 million in total fees associated with the undrawn facilities. These credit facilities allow for borrowings at floating (LIBOR-based) interest rates, plus a spread, depending upon CSX's senior unsecured debt ratings. LIBOR is the London Interbank Offered Rate which is a daily reference rate based on the interest rates at which banks offer to lend unsecured funds. At December 2007, CSX was in compliance with all covenant requirements under the facilities.

***Fair Value of Financial Instruments***

Fair values of CSX's financial instruments were estimated by reference to quoted prices from market sources and financial institutions as well as other valuation techniques. Long-term debt is the only financial instrument of CSX with fair values significantly different from their carrying amounts. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon CSX's current incremental borrowing rates for similar types of financing arrangements.

| *(Dollars in Billions)* | **December 28, 2007** | December 29, 2006 |
|---|---|---|
| Long-term Debt Including Current Maturities: | | |
| Fair Value | **$ 7.4** | $ 6.6 |
| Carrying Value | **$ 7.3** | $ 6.0 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 10. Other Income - Net and Supplemental Data**

Other Income - Net consists of the following:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | 2005 |
| Interest Income *(a)* | **$ 55** | $ 41 | $ 38 |
| Income from Real Estate and Resort Operations *(b)* | **42** | 24 | 85 |
| Gain on Conrail Property (After Tax) *(c)* | **-** | 26 | - |
| Miscellaneous *(d)* | **(4)** | 4 | (22) |
| Total Other Income - Net | **$ 93** | $ 95 | $ 101 |
| Gross revenue from Real Estate and Resort Operations included above | **$ 211** | $ 193 | $ 262 |

*(a) Interest income includes amounts earned from CSX's cash, cash equivalents and short-term investments.*

*(b) Income from real estate and resort operations includes the results of operations of the Company's real estate sales, leasing, acquisition and management and development activities as well as the results of operations from CSX Hotels, Inc., a resort doing business as The Greenbrier, located in White Sulphur Springs, West Virginia. Results of these operations may fluctuate as a function of timing of real estate sales and resort seasonality.*

*(c) Gain on Conrail property represents a non-cash gain on additional Conrail property value received in 2006.*

*(d) Miscellaneous income is comprised of equity earnings, minority interest, investment gains and losses and other non-operating activities.*

Supplemental data consists of the following:

Operating expense of $7.8 billion, $7.4 billion and $7.1 billion included selling, general & administrative expenses of $585 million, $547 million and $552 million for fiscal years 2007, 2006 and 2005, respectively.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 11. Properties**

The Company's properties were as follows:

| | December 28, 2007 | | | December 29, 2006 | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | **Cost** | **Accumulated Depreciation** | **Net** | Cost | Accumulated Depreciation | Net |
| Road | **$ 20,522** | **$ 3,564** | **$ 16,958** | $ 19,741 | $ 3,342 | $ 16,399 |
| Equipment | **6,951** | **2,829** | **4,122** | 6,567 | 2,666 | 3,901 |
| Intermodal | **612** | **349** | **263** | 559 | 321 | 238 |
| Other | **914** | **477** | **437** | 848 | 463 | 385 |
| **Total Properties** | **$ 28,999** | **$ 7,219** | **$ 21,780** | $ 27,715 | $ 6,792 | $ 20,923 |

**NOTE 12. Other Long-term Assets and Other Long-term Liabilities**

***Other Long-term Assets***

Other Long-term Assets consisted of the following:

| *(Dollars in Millions)* | **December 28, 2007** | **December 29, 2006** |
|---|---|---|
| Available for Sale Securities (a) | **$ 75** | $ 44 |
| Goodwill (b) | **64** | 73 |
| Real Estate Development Costs | **42** | 39 |
| Other Long-term Assets | **39** | 54 |
| Debt Issuance Costs | **34** | 30 |
| Pension Plan Assets | **4** | - |
| Deposits | **1** | 3 |
| Income Taxes Receivable (c) | **-** | 348 |
| Total Other Long-term Assets | **$ 259** | $ 591 |

(a) *Available for Sale Securities include investments in marketable securities.*

(b) *Goodwill represents the purchase price in excess of fair value of identifiable tangible and intangible assets.*

(c) *Income Taxes Receivable in 2006 included amounts on deposit with the Internal Revenue Service ("IRS"), bonds and other unpaid claims of income taxes. In 2007, the decrease was due to the Company applying its amounts on deposit with the IRS towards its 2007 tax obligations.*



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 12. Other Long-term Assets and Other Long-term Liabilities, continued**

***Other Long-term Liabilities***

Other Long-term Liabilities consisted of the following:

| *(Dollars in Millions)* | **December 28, 2007** | December 29, 2006 |
|---|---|---|
| Post-retirement Benefit Liability *(a)* | **$ 349** | $ 345 |
| Pension Plan Liability *(a)* | **203** | 529 |
| Deferred Gains | **181** | 200 |
| Accrued Deferred Compensation | **90** | 90 |
| Other Long-term Liabilities | **81** | 95 |
| Deferred Lease Payments | **40** | 53 |
| Minority Interest *(b)* | **21** | 89 |
| Accrued Sick Leave | **16** | 19 |
| Income Taxes Payable *(c)* | **7** | 105 |
| Total Other Long-term Liabilities | **$ 988** | $ 1,525 |

*(a) See Note 8, Employee Benefit Plans, for a discussion on changes in pension and post-retirement benefit liabilities.*

*(b) Minority Interest decreased as a result of a change to a shareholder agreement at one of CSXT's partially owned subsidiaries. CSXT now has greater participation in the subsidiary's earnings resulting in a decrease to the minority interest liability and an increase in additional paid in capital.*

*(c) Income taxes payable decreased primarily due to amounts being reclassified to current.*

**NOTE 13. Income Taxes**

Earnings from continuing operations before income taxes of $1.9 billion, $1.8 billion and $1.0 billion for fiscal years 2007, 2006, and 2005, respectively represent earnings from domestic operations.

The significant components of deferred tax assets and liabilities include:

| | **2007** | | 2006 | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **Assets** | **Liabilities** | Assets | Liabilities |
| Employee Benefit Plans | **$ 404** | **$ -** | $ 498 | $ - |
| Accelerated Depreciation | **-** | **6,541** | - | 6,464 |
| Other | **447** | **152** | 580 | 473 |
| Total | **$ 851** | **$ 6,693** | $ 1,078 | $ 6,937 |
| Net Deferred Tax Liabilities | | **$ 5,842** | | $ 5,859 |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 13. Income Taxes, continued**

The primary factors in the change in year-end net deferred income tax liability balances include:

- Annual provision for deferred income tax expense;
- Accumulated other comprehensive loss and other capital adjustments; and
- The reclassification of income taxes payable balances as required by FIN 48.

The breakdown of income tax expense (benefit) between current and deferred is as follows:

| *(Dollars in Millions)* | Fiscal Years | | |
|---|---|---|---|
| Current: | **2007** | 2006 | 2005 |
| Federal | **$ 388** | $ 458 | $ 350 |
| State | **46** | 31 | 12 |
| Total Current | **434** | 489 | 362 |
| Deferred: | | | |
| Federal | **237** | 15 | 33 |
| State | **35** | 27 | (79) |
| Total Current | **272** | 42 | (46) |
| Total | **$ 706** | $ 531 | $ 316 |

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|
| *(Dollars In Millions)* | **2007** | | 2006 | | 2005 | |
| Federal Income Taxes | **$ 676** | **35%** | $ 644 | 35% | $ 362 | 35% |
| State Income Taxes | **50** | **3** | 37 | 2 | (44) | (4) |
| Prior Year Audit Resolutions | **5** | **-** | (132) | (7) | (1) | - |
| Other Items *(a)* | **(25)** | **( 1)** | (18) | (1) | (1) | (1) |
| Income Tax Expense/Rate | **$ 706** | **37%** | $ 531 | 29% | $ 316 | 30% |

*(a) Other items primarily include tax impacts from equity in Conrail and other partially owned subsidiaries' earnings.*

The change in the 2007 effective income tax rate compared to the prior year is primarily attributed to prior year audit resolutions favorably impacting the 2006 effective rate. The net state income tax impact of the 2006 resolutions of federal income tax audits of $15 million is included on the 2006 state income taxes line above. The state income tax benefit in 2005 is largely due to the recognition of an income tax benefit of $71 million for the Ohio legislative change to gradually eliminate its corporate franchise tax.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 13. Income Taxes, continued**

CSX adopted FIN 48, at the beginning of fiscal year 2007. As a result of the implementation, the Company recognized a $31 million decrease to reserves for uncertain tax positions. This decrease, along with a $2 million reduction for unconsolidated subsidiaries accounted for under the equity method of accounting, was recorded as a cumulative effect adjustment to the beginning balance of retained earnings on the balance sheet.

The change to the total gross unrecognized tax benefits of the Company during the fiscal year ended December 28, 2007 is reconciled as follows:

| **Uncertain Tax Positions:** *(Dollars in Millions)* | **Fiscal Year 2007** |
|---|---|
| Beginning Balance | $ 207 |
| Additions based on tax positions related to current year | 1 |
| Settlements with IRS | (148) |
| Lapse of statute of limitations | (2) |
| **Balance at December 28, 2007** | $ 58 |

Of the total gross reserve for uncertain tax positions listed above, $197 million (of the beginning balance) and $50 million (of the ending balance) net of federal benefit on state issues could favorably affect the effective tax rate. The annual decrease in unrecognized tax benefits primarily related to settlements with the IRS that resulted in a $110 million discontinued operations benefit (See Note 17, Discontinued Operations). The Company estimates that approximately $17 million of the unrecognized tax benefits as of December 2007 for various state and federal income tax matters will be resolved over the next 12 months. The final outcome of these uncertain tax positions, however, is not yet determinable.

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. CSX and its subsidiaries are subject to U.S. federal income tax as well as income tax of multiple state jurisdictions. The Company has substantially concluded all U.S. federal income tax examinations for years through 2003 and substantially all other income tax matters have been concluded for years through 1998. Federal income tax returns for 2004 through 2006 are currently under examination.

CSX's continuing practice is to recognize net interest and penalties related to income tax matters in income tax expense. Included in the consolidated income statements are $(8) million, $(79) million, and $43 million for fiscal years 2007, 2006, and 2005, respectively, of interest and penalties expense/(benefit) for all prior year tax positions. Benefits for interest and penalties are due to favorable tax settlements of prior period tax audits where the Company had previously accrued a liability for interest and penalties. The Company had $4 million and $52 million accrued for interest and penalties for 2007 and 2006 respectively, for all prior year tax positions. The decrease for interest and penalties during both 2007 and 2006 is primarily related to the resolution of federal income tax audits and payments made to the IRS by the Company.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 14. Derivative Financial Instruments**

CSX uses derivative financial instruments to manage its overall exposure to fluctuations in interest rates and has previously used such instruments to manage exposure to fluctuations in fuel costs.

***Interest Rate Swaps***

During 2007, CSX repaid $450 million of debentures that matured and called $150 million of debentures due in 2032 (See Note 9, Debt and Credit Agreements). As a result, CSX also settled the interest rate swaps related to these debentures. CSX had $35 million and $640 million of outstanding interest rate swaps that impacted interest expense by $2 million for 2007 and 2006. The interest rate swap agreements were designated and qualified as fair value hedges, and the gain or loss on the derivative instrument, as well as the offsetting gain or loss on the fixed rate note attributed to the hedged risk, were recognized in current earnings during the period of change in fair values. CSX's interest rate swaps qualified as perfectly effective fair value hedges, as defined by SFAS 133. As such, there was no ineffective portion to the hedge recognized in earnings during the current or prior year periods.

***Fuel Hedging***

In 2003, CSX began a program to hedge a portion of CSXT's future locomotive fuel purchases. This program was established to manage exposure to fuel price fluctuations. To minimize this risk, CSX entered into a series of swaps. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, was immaterial. CSX suspended entering into new swaps in its fuel hedge program in 2004 and there are currently no outstanding contracts.

Fuel hedging activity offset increased fuel expense for the fiscal years 2006 and 2005 by $55 million and $249 million, respectively. Since the end of third quarter 2006, there has been no impact on fuel expense as all contracts expired prior to that time.

**NOTE 15. Business Segments**

The Company operates primarily in two business segments: rail and intermodal. The rail segment provides rail freight transportation over a network of approximately 21,000 route miles in 23 states, the District of Columbia and the Canadian provinces of Ontario and Quebec. The intermodal segment provides integrated rail and truck transportation services and operates a network of dedicated intermodal facilities across North America. These segments are strategic business units that offer different services and are managed separately. Performance is evaluated and resources are allocated based on several factors, of which the principal financial measures are business segment operating income and operating ratio. The accounting policies of the segments are the same as those described in Note 1, Nature of Operations and Significant Accounting Policies.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 15. Business Segments, continued**

Consolidated operating income includes the results of operations of Surface Transportation and other operating income. Other operating income includes the gain amortization on the conveyance of CSX Lines, net sublease income from assets formerly included in the Company's marine services segment and other items.

Business segment information for the fiscal years 2007, 2006 and 2005 was as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | 2005 |
| **Revenue from External Customers:** | | | |
| Rail | **$ 8,674** | $ 8,154 | $ 7,256 |
| Intermodal | **1,356** | 1,412 | 1,362 |
| **Consolidated** | **$ 10,030** | $ 9,566 | $ 8,618 |
| **Operating Income:** | | | |
| Rail | **$ 1,991** | $ 1,858 | $ 1,301 |
| Intermodal | **260** | 268 | 248 |
| Other | **5** | 12 | 1 |
| **Consolidated** | **$ 2,256** | $ 2,138 | $ 1,550 |
| **Assets:** | | | |
| Rail | **$ 24,179** | $ 24,077 | $ 23,182 |
| Intermodal | **283** | 276 | 305 |
| Other | **25** | 43 | 123 |
| Investment in Conrail | **639** | 607 | 603 |
| Elimination of Intersegment Payables (Receivables) | **(62)** | (78) | (77) |
| Non-segment Assets | **470** | 204 | 96 |
| **Consolidated** | **$ 25,534** | $ 25,129 | $ 24,232 |
| **Depreciation Expense:** | | | |
| Rail | **$ 848** | $ 818 | $ 779 |
| Intermodal | **34** | 38 | 39 |
| Other | **1** | 1 | 8 |
| **Consolidated** | **$ 883** | $ 857 | $ 826 |
| **Property Additions:** | | | |
| Rail | **$ 1,678** | $ 1,592 | $ 1,091 |
| Intermodal | **60** | 28 | 25 |
| Other | **-** | - | 5 |
| Non-Segment | **35** | 19 | 15 |
| **Consolidated** | **$ 1,773** | $ 1,639 | $ 1,136 |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 16. Related Party Transactions**

Through a limited liability company, CSX and Norfolk Southern Corporation ("NS") jointly own Conrail. CSX has a 42% economic interest and 50% voting interest in the jointly owned entity and NS has the remainder of the economic and voting interests. Pursuant to the Accounting Principle Board ("APB") Opinion 18, *The Equity Method of Accounting for Investments in Common Stock,* CSX applies the equity method of accounting to its investment in Conrail.

Conrail owns and operates rail infrastructure for the joint benefit of CSX and NS. This is known as the shared asset area ("shared asset area"). Conrail charges fees for right-of way usage, equipment rentals and transportation, switching and terminal service charges in the shared asset area. Historically, these expenses were included as an expense category, Conrail rents, fees and services, in the consolidated income statements. Beginning in 2007, these amounts have been included in materials, supplies and other on the consolidated income statements.

Also included in materials, supplies and other are CSX's 42% share of Conrail's income and its amortization of the fair value write-up arising from the acquisition of Conrail and certain other adjustments. The amortization primarily represents the additional after tax depreciation expense related to the write-up of Conrail's fixed assets when the original purchase price, from the 1997 acquisition of Conrail, was allocated based on fair value.

The following table details the related Conrail amounts included in materials, supplies and other in the Company's consolidated income statements:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2007** | 2006 | 2005 |
| Rents, Fees and Services | **$ 97** | $ 91 | $ 97 |
| Purchase Price Amortization and Other | **4** | 4 | 4 |
| Equity in Income of Conrail | **(35)** | (20) | (36) |
| Total Conrail Rents, Fees and Services | **$ 66** | $ 75 | $ 65 |



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 16. Related Party Transactions, continued**

As required by SFAS 57, *Related Party Disclosures,* the Company has identified below amounts owed to Conrail, or its affiliates, representing liabilities under the operating, equipment and shared area agreements with Conrail. The Company also executed two promissory notes with a subsidiary of Conrail which were included in long-term debt on the consolidated balance sheets.

| | | | | |
|---|---|---|---|---|
| [redacted] | | | | |
| CSX Payable to Conrail*(a)* | **$** | **49** | $ | 48 |
| Promissory Notes Payable to Conrail Subsidiary | | | | |
| 4.40% CSX Promissory Note due October 2035 *(b)* | **$** | **73** | $ | 73 |
| 4.52% CSXT Promissory Note due March 2035 *(b)* | **$** | **23** | $ | 23 |

*(a) Included on the consolidated balance sheet of CSX as accounts payable*
*(b) Included on the consolidated balance sheet and Schedule of Contractual Obligations of CSX as long-term debt*

| | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | | **2007** | | 2006 | | 2005 |
| **Income Statement Information:** | | | | | | |
| Interest Expense Related to Conrail Notes Payable | **$** | **4** | $ | 4 | $ | 1 |

**NOTE 17. Discontinued Operations**

In 2005, CSX sold its International Terminals business, which included the capital stock of SL Services, Inc. ("SLSI") to Dubai Ports International FZE ("DPI") for gross cash consideration of $1.142 billion. Of the gross proceeds, approximately $110 million was paid for the purchase of a minority interest in an International Terminals' subsidiary, which the Company acquired during the first quarter of 2005 and divested as part of the sale to DPI. Other related cash transaction costs amounted to approximately $34 million, including resolution of working capital and long-term debt adjustments.

CSX recognized a gain of $683 million pre-tax, $428 million after tax, in fiscal year 2005 as a result of the sale. Consequently, amounts related to this gain and the business were reported as discontinued operations on the Consolidated Income Statement.

SLSI also holds certain residual assets and liabilities as a result of prior divestitures and discontinuances. A wholly-owned subsidiary of CSX retains the rights to those assets and indemnifies DPI, SLSI and related entities against those liabilities pursuant to a separate agreement. CSX guarantees the obligations of its subsidiary under this separate agreement.



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**NOTE 17. Discontinued Operations, continued**

The following table represents the results of operations of the Company's International Terminals Business.

| *(Dollars in Millions)* | | Fiscal Year 2005 |
|---|---|---|
| **Income Statement Information:** | | |
| Revenues | $ | 14 |
| Expenses | | 21 |
| Operating Income (Loss) | $ | (7) |
| Income Tax Benefit | | 4 |
| Net Income | $ | (3) |

In 2007, the Internal Revenue Service completed its review of the Company's pre-filing agreement, which is an early review of specific transactions. The Company recorded an income tax benefit of $110 million, primarily associated with the resolution of income tax matters related to former activities of the marine service businesses, including the International Terminals business described above. This 2007 benefit was recorded as discontinued operations as the Company no longer operates in these businesses. This benefit was associated with tax basis adjustments, foreign dividends and foreign tax credits from operations over a multi-year period.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 18. Quarterly Financial Data (Unaudited)**

Pursuant to Article 3 of the SEC's Regulation S-X, the following are selected quarterly financial data:

| | 2007 | | | | |
|---|---|---|---|---|---|
| | Quarters | | | | |
| *(Dollars in Millions, Except Per Share Amounts)* | **1st** *(a)* | **2nd** | **3rd** *(b)* | **4th** *(c)* | **Full Year** |
| Operating Revenue | **$ 2,422** | **$ 2,530** | **$ 2,501** | **$ 2,577** | **$ 10,030** |
| Operating Income | **488** | **604** | **555** | **609** | **2,256** |
| Earnings from Continuing Operations | **240** | **324** | **297** | **365** | **1,226** |
| Discontinued Operations | **-** | **-** | **110** | **-** | **110** |
| Net Earnings | **$ 240** | **$ 324** | **$ 407** | **$ 365** | **$ 1,336** |
| Earnings Per Share: | | | | | |
| From Continuing Operations | **$ 0.55** | **$ 0.74** | **$ 0.69** | **$ 0.89** | **$ 2.85** |
| Discontinued Operations | **-** | **-** | **0.25** | **-** | **0.26** |
| Net Earnings | **$ 0.55** | **$ 0.74** | **$ 0.94** | **$ 0.89** | **$ 3.11** |
| Earnings Per Share Assuming Dilution: | | | | | |
| From Continuing Operations | **$ 0.52** | **$ 0.71** | **$ 0.67** | **$ 0.86** | **$ 2.74** |
| Discontinued Operations | **-** | **-** | **0.24** | **-** | **0.25** |
| Net Earnings | **$ 0.52** | **$ 0.71** | **$ 0.91** | **$ 0.86** | **$ 2.99** |
| Dividend Per Share | **$ 0.12** | **$ 0.12** | **$ 0.15** | **$ 0.15** | **$ 0.54** |

| | 2006 | | | | |
|---|---|---|---|---|---|
| | Quarters | | | | |
| *(Dollars in Millions, Except Per Share Amounts)* | 1st | 2nd *(d)* | 3rd *(e)* | 4th *(f)* | Full Year |
| Operating Revenue | $ 2,331 | $ 2,421 | $ 2,418 | $ 2,396 | $ 9,566 |
| Operating Income | 496 | 646 | 489 | 507 | 2,138 |
| Net Earnings | $ 245 | $ 390 | $ 328 | $ 347 | $ 1,310 |
| Earnings Per Share: | | | | | |
| Net Earnings | $ 0.56 | $ 0.88 | $ 0.75 | $ 0.79 | $ 2.98 |
| Earnings Per Share Assuming Dilution: | | | | | |
| Net Earnings | $ 0.53 | $ 0.83 | $ 0.71 | $ 0.75 | $ 2.82 |
| Dividend Per Share | $ 0.065 | $ 0.065 | $ 0.10 | $ 0.10 | $ 0.33 |

*(a)* *CSX recognized an $18 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina (See Note 5, Hurricane Katrina).*

*(b)* *CSX recognized an income tax benefit of $110 million principally associated with the resolution of certain tax matters related to former activities of the container shipping and marine service businesses (See Note 17, Discontinued Operations). Additionally, CSX recognized a $1 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*

*(c)* *CSX recognized an $8 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*

*(d)* *CSX recognized an income tax benefit of $41 million principally related to the resolution of certain tax matters. Additionally, CSX recognized a $126 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*

*(e)* *CSX recognized an income tax benefit of $69 million, principally related to the resolution of federal income tax audits for 1994 – 1996. Additionally, CSX recognized a $15 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*

*(f)* *CSX recognized an income tax benefit of $41 million, principally related to the resolution of federal income tax audits for 1997 - 1998. Additionally, CSX recognized a $27 million pre-tax benefit on insurance recoveries from gains related to Hurricane*

*Katrina and a $26 million after-tax non-cash gain on additional Conrail property received.*



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data**

In 2007, CSX announced that CSXT offered $381 million of Secured Equipment Notes due 2023 in a registered public offering pursuant to CSX's existing automatic shelf registration statement. CSX will fully and unconditionally guarantee the notes. In connection with this offering, the Company is providing the following condensed consolidating financial information in accordance with SEC disclosure requirements. Each entity in the consolidating financial information follows the same accounting policies as described in the consolidated financial statements, except for the use of the equity method of accounting to reflect ownership interests in subsidiaries which are eliminated upon consolidation and the allocation of certain expenses of CSX incurred for the benefit of its subsidiaries.

The condensed consolidating balance sheets as of December 28, 2007 and December 29, 2006, and the statements of income and cash flows for each of the three fiscal years in the period ended December 28, 2007, for the parent and obligor are as follows:



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data**

**Consolidating Income Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 28, 2007 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ - | $ 8,591 | $ 1,546 | $ (107) | $ 10,030 |
| Operating Expense | (203) | 6,894 | 1,180 | (97) | 7,774 |
| Operating Income | 203 | 1,697 | 366 | (10) | 2,256 |
| Equity in Earnings of Subsidiaries | 1,363 | - | - | (1,363) | - |
| Other Income (Expense) | 166 | 154 | 198 | (425) | 93 |
| Interest Expense | (568) | (238) | (46) | 435 | (417) |
| Earnings from Continuing Operations before Income Taxes | 1,164 | 1,613 | 518 | (1,363) | 1,932 |
| Income Tax Benefit (Expense) | 62 | (614) | (154) | - | (706) |
| Earnings from Continuing Operations | 1,226 | 999 | 364 | (1,363) | 1,226 |
| Discontinued Operations - Net of Tax | 110 | - | - | - | 110 |
| **Net Earnings** | $ 1,336 | $ 999 | $ 364 | $ (1,363) | $ 1,336 |

| Fiscal Year Ended December 29, 2006 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ - | $ 8,140 | $ 1,426 | $ - | $ 9,566 |
| Operating Expense | (195) | 6,542 | 1,081 | - | 7,428 |
| Operating Income | 195 | 1,598 | 345 | - | 2,138 |
| Equity in Earnings of Subsidiaries | 1,281 | - | - | (1,281) | - |
| Other Income (Expense) | 283 | 87 | 142 | (417) | 95 |
| Interest Expense | (536) | (217) | (56) | 417 | (392) |
| Earnings from Continuing Operations before Income Taxes | 1,223 | 1,468 | 431 | (1,281) | 1,841 |
| Income Tax Benefit (Expense) | 87 | (489) | (129) | - | (531) |
| **Net Earnings** | $ 1,310 | $ 979 | $ 302 | $ (1,281) | $ 1,310 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Income Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 30, 2005 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ - | $ 7,256 | $ 1,362 | $ - | $ 8,618 |
| Operating Expense | (125) | 6,170 | 1,023 | - | 7,068 |
| Operating Income | 125 | 1,086 | 339 | - | 1,550 |
| Equity in Earnings of Subsidiaries | 946 | - | - | (946) | - |
| Other Income (Expense) | 141 | 56 | 112 | (208) | 101 |
| Debt Repurchase Expense | (192) | - | - | - | (192) |
| Interest Expense | (430) | (166) | (35) | 208 | (423) |
| Earnings from Continuing Operations before Income Taxes | 590 | 976 | 416 | (946) | 1,036 |
| Income Tax Benefit (Expense) | 127 | (289) | (154) | - | (316) |
| Earnings from Continuing Operations | 717 | 687 | 262 | (946) | 720 |
| Discontinued Operations - Net of Tax | 428 | - | (3) | - | 425 |
| **Net Earnings** | $ 1,145 | $ 687 | $ 259 | $ (946) | $ 1,145 |



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Balance Sheets**
*(Dollars in Millions)*

| December 28, 2007 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and Cash Equivalents | $ (594) | $ 12 | $ 950 | $ - | $ 368 |
| Short-term Investments | 270 | - | 76 | - | 346 |
| Accounts Receivable - Net | 155 | 1,069 | (25) | (25) | 1,174 |
| Materials and Supplies | - | 230 | 10 | - | 240 |
| Deferred Income Taxes | 23 | 232 | (1) | - | 254 |
| Other Current Assets | 25 | 103 | 53 | (72) | 109 |
| Total Current Assets | (121) | 1,646 | 1,063 | (97) | 2,491 |
| | | | | | |
| Properties | 6 | 27,606 | 1,387 | - | 28,999 |
| Accumulated Depreciation | (9) | (6,400) | (810) | - | (7,219) |
| Properties - Net | (3) | 21,206 | 577 | - | 21,780 |
| | | | | | |
| Investment in Conrail | - | - | 639 | - | 639 |
| Affiliates and Other Companies | - | 470 | (105) | - | 365 |
| Investment in Consolidated Subsidiaries | 14,524 | - | 34 | (14,558) | - |
| Other Long-term Assets | (330) | 203 | 442 | (56) | 259 |
| Total Assets | $ 14,070 | $ 23,525 | $ 2,650 | $ (14,711) | $ 25,534 |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $ 90 | $ 799 | $ 112 | $ (25) | $ 976 |
| Labor and Fringe Benefits Payable | 36 | 374 | 51 | - | 461 |
| Payable to Affiliates | - | 1,325 | (1,253) | (72) | - |
| Casualty, Environmental and Other Reserves | - | 226 | 21 | - | 247 |
| Current Maturities of Long-term Debt | 669 | 111 | 5 | - | 785 |
| Short-term Debt | - | 2 | - | - | 2 |
| Income and Other Taxes Payable | (761) | 572 | 302 | - | 113 |
| Other Current Liabilities | 8 | 72 | 7 | - | 87 |
| Total Current Liabilities | 42 | 3,481 | (755) | (97) | 2,671 |
| | | | | | |
| Casualty, Environmental and Other Reserves | - | 540 | 84 | - | 624 |
| Long-term Debt | 5,229 | 1,230 | 11 | - | 6,470 |
| Deferred Income Taxes | (176) | 6,291 | (19) | - | 6,096 |
| Long-term Payable to Affiliates | - | - | 56 | (56) | - |
| Other Long-term Liabilities | 290 | 541 | 195 | (38) | 988 |
| Total Liabilities | 5,385 | 12,083 | (428) | (191) | 16,849 |


Powered by Morningstar® Document Research℠

| | | | | | |
|---|---|---|---|---|---|
| Shareholders' Equity: | | | | | |
| Common Stock | 408 | 181 | - | (181) | 408 |
| Other Capital | 37 | 5,525 | 2,705 | (8,230) | 37 |
| Retained Earnings | 8,565 | 5,768 | 421 | (6,189) | 8,565 |
| Accumulated Other Comprehensive Loss | (325) | (32) | (48) | 80 | (325) |
| Total Shareholders' Equity | 8,685 | 11,442 | 3,078 | (14,520) | 8,685 |
| Total Liabilities and Shareholders' Equity | $ 14,070 | $ 23,525 | $ 2,650 | $ (14,711) | $ 25,534 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Balance Sheets**
*(Dollars in Millions)*

| December 29, 2006 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and Cash Equivalents | $ 419 | $ 17 | $ 25 | $ - | $ 461 |
| Short-term Investments | 391 | - | 48 | - | 439 |
| Accounts Receivable - Net | 121 | 1,058 | 27 | (32) | 1,174 |
| Materials and Supplies | - | 195 | 9 | - | 204 |
| Deferred Income Taxes | (103) | 225 | 129 | - | 251 |
| Other Current Assets | 1 | 50 | 204 | (112) | 143 |
| Total Current Assets | 829 | 1,545 | 442 | (144) | 2,672 |
| Properties | 19 | 26,447 | 1,249 | - | 27,715 |
| Accumulated Depreciation | (24) | (6,032) | (736) | - | (6,792) |
| Properties - Net | (5) | 20,415 | 513 | - | 20,923 |
| Investment in Conrail | - | - | 607 | - | 607 |
| Affiliates and Other Companies | - | 434 | (71) | (27) | 336 |
| Investment in Consolidated Subsidiaries | 13,199 | - | - | (13,199) | - |
| Other Long-term Assets | 2,023 | 415 | (1,776) | (71) | 591 |
| Total Assets | $ 16,046 | $ 22,809 | $ (285) | $ (13,441) | $ 25,129 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $ 78 | $ 770 | $ 157 | $ (31) | $ 974 |
| Labor and Fringe Benefits Payable | 44 | 396 | 55 | - | 495 |
| Payable to Affiliates | - | 2,019 | (1,907) | (112) | - |
| Casualty, Environmental and Other Reserves | - | 226 | 27 | - | 253 |
| Current Maturities of Long-term Debt | 467 | 120 | 5 | - | 592 |
| Short-term Debt | - | 8 | - | - | 8 |
| Income and Other Taxes Payable | 1,308 | 245 | (1,439) | - | 114 |
| Other Current Liabilities | 16 | 62 | 9 | (1) | 86 |
| Total Current Liabilities | 1,913 | 3,846 | (3,093) | (144) | 2,522 |
| Casualty, Environmental and Other Reserves | - | 599 | 69 | - | 668 |
| Long-term Debt | 4,377 | 970 | 15 | - | 5,362 |
| Deferred Income Taxes | (255) | 6,297 | 68 | - | 6,110 |
| | - | - | 72 | (72) | - |

 Powered by Morningstar® Document Research℠

| | | | | | |
|---|---|---|---|---|---|
| Long-term Payable to Affiliates | | | | | |
| Other Long-term Liabilities | 1,069 | 636 | (150) | (30) | 1,525 |
| Total Liabilities | $ 7,104 | $ 12,348 | $ (3,019) | $ (246) | $ 16,187 |
| | | | | | |
| Shareholders' Equity: | | | | | |
| Common Stock | 438 | 181 | - | (181) | 438 |
| Other Capital | 1,469 | 5,420 | 2,696 | (8,116) | 1,469 |
| Retained Earnings | 7,427 | 4,879 | 93 | (4,972) | 7,427 |
| Accumulated Other Comprehensive Loss | (392) | (19) | (55) | 74 | (392) |
| Total Shareholders' Equity | 8,942 | 10,461 | 2,734 | (13,195) | 8,942 |
| Total Liabilities and Shareholders' Equity | $ 16,046 | $ 22,809 | $ (285) | $ (13,441) | $ 25,129 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Cash Flow Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 28, 2007 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| *Net Cash (Used in) Provided by Operating Activities* | $ (871) | $ 2,278 | $ 930 | $ (153) | $ 2,184 |
| **Investing Activities** | | | | | |
| Property Additions | - | (1,632) | (141) | - | (1,773) |
| Insurance Proceeds | - | 16 | - | - | 16 |
| Purchases of Short-term Investments | (2,338) | - | - | - | (2,338) |
| Proceeds from Sales of Short-term Investments | 2,459 | - | - | - | 2,459 |
| Other Investing Activities | 512 | 219 | (780) | (8) | (57) |
| *Net Cash Provided by (Used in) Investing Activities* | 633 | (1,397) | (921) | (8) | (1,693) |
| **Financing Activities** | | | | | |
| Short-term Debt - Net | - | (6) | - | - | (6) |
| Long-term Debt Issued | 2,000 | 381 | - | - | 2,381 |
| Long-term Debt Repaid | (617) | (142) | (26) | - | (785) |
| Dividends Paid | (236) | (120) | (27) | 152 | (231) |
| Stock Options Exercised | 153 | - | - | - | 153 |
| Shares Repurchased | (2,174) | | - | | (2,174) |
| Other Financing Activities | 99 | (999) | 969 | 9 | 78 |
| *Net Cash (Used in) Provided by Financing Activities* | (775) | (886) | 916 | 161 | (584) |
| Net (Decrease) Increase in Cash and Cash Equivalents | (1,013) | (5) | 925 | - | (93) |
| Cash and Cash Equivalents at Beginning of Period | 419 | 17 | 25 | - | 461 |
| Cash and Cash Equivalents at End of Period | $ (594) | $ 12 | $ 950 | $ - | $ 368 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Cash Flow Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 29, 2006 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| *Net Cash Provided by (Used in) Operating Activities* | $ 789 | $ 1,794 | $ 213 | $ (738) | $ 2,058 |
| **Investing Activities** | | | | | |
| Property Additions | - | (1,554) | (85) | - | (1,639) |
| Insurance Proceeds | - | 144 | 3 | - | 147 |
| Purchases of Short-term Investments | (1,412) | - | - | - | (1,412) |
| Proceeds from Sales of Short-term Investments | 1,290 | - | - | - | 1,290 |
| Other Investing Activities | (38) | (16) | 45 | 13 | 4 |
| *Net Cash (Used in) Provided by Investing Activities* | (160) | (1,426) | (37) | 13 | (1,610) |
| **Financing Activities** | | | | | |
| Short-term Debt - Net | - | 8 | (1) | - | 7 |
| Long-term Debt Issued | 400 | 73 | (2) | - | 471 |
| Long-term Debt Repaid | (351) | (128) | (67) | - | (546) |
| Dividends Paid | (148) | (130) | (30) | 163 | (145) |
| Stock Options Exercised | 319 | - | - | - | 319 |
| Shares Repurchased | (465) | - | - | - | (465) |
| Other Financing Activities | 11 | (174) | (336) | 562 | 63 |
| *Net Cash (Used in) Provided by Financing Activities* | (234) | (351) | (436) | 725 | (296) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 395 | 17 | (260) | - | 152 |
| Cash and Cash Equivalents at Beginning of Period | 24 | - | 285 | - | 309 |
| Cash and Cash Equivalents at End of Period | $ 419 | $ 17 | $ 25 | $ - | $ 461 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Cash Flow Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 30, 2005 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| *Net Cash (Used in) Provided by Operating Activities* | $ (637) | $ 1,509 | $ 474 | $ (236) | $ 1,110 |
| **Investing Activities** | | | | | |
| Property Additions | - | (1,066) | (70) | - | (1,136) |
| Insurance Proceeds | - | 40 | 1 | - | 41 |
| Net Proceeds from Sale of International Terminals | - | - | 1,108 | - | 1,108 |
| Purchase of Minority Interest in an International Terminals' Subsidiary | - | - | (110) | - | (110) |
| Purchases of Short-term Investments | (2,601) | - | - | - | (2,601) |
| Proceeds from Sales of Short-term Investments | 2,634 | - | - | - | 2,634 |
| Other Investing Activities | 1,066 | (19) | (684) | (335) | 28 |
| *Net Cash Provided by (Used in) Investing Activities* | 1,099 | (1,045) | 245 | (335) | (36) |
| **Financing Activities** | | | | | |
| Short-term Debt - Net | (100) | - | 1 | - | (99) |
| Long-term Debt Issued | 73 | 32 | - | - | 105 |
| Long-term Debt Repaid | (1,125) | (135) | (23) | - | (1,283) |
| Dividends Paid | (95) | (200) | (33) | 235 | (93) |
| Stock Options Exercised | 98 | - | - | - | 98 |
| Other Financing Activities | (105) | (180) | (66) | 336 | (15) |
| *Net Cash (Used in) Provided by Financing Activities* | (1,254) | (483) | (121) | 571 | (1,287) |
| Net Increase (Decrease) in Cash and Cash Equivalents | (792) | (19) | 598 | - | (213) |
| Cash and Cash Equivalents at Beginning of Period | 816 | 19 | (313) | - | 522 |
| Cash and Cash Equivalents at End of Period | $ 24 | $ - | $ 285 | $ - | $ 309 |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

As of December 28, 2007, under the supervision and with the participation of CSX's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), management has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on that evaluation, the CEO and CFO concluded that, as of December 28, 2007, the Company's disclosure controls and procedures were effective at the reasonable assurance level in timely alerting them to material information required to be included in CSX's periodic SEC reports. There were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2007 that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

***Management's Report on Internal Control over Financial Reporting***

CSX's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of the management of CSX, including CSX's CEO and CFO, CSX conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 28, 2007 based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission which is also referred to as COSO. Based on that evaluation, management of CSX concluded that the Company's internal control over financial reporting was effective as of December 28, 2007. Management's assessment of the effectiveness of internal control over financial reporting is expressed at the level of reasonable assurance because a control system, no matter how well designed and operated, can provide only reasonable, but not absolute, assurance that the control system's objectives will be met.

The Company's internal control over financial reporting as of December 28, 2007 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

***Report of Independent Registered Public Accounting Firm***

The Board of Directors and Shareholders of CSX Corporation

We have audited CSX Corporation's internal control over financial reporting as of December 28, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). CSX Corporation's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

In our opinion, CSX Corporation maintained, in all material respects, effective internal control over financial reporting as of December 28, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2007 consolidated financial statements of CSX Corporation and our report dated February 15, 2008 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
February 15, 2008



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

***Changes in Internal Control over Financial Reporting***

There were no material changes in the Company's internal control over financial reporting.

**Item 9B. Other Information**

On January 24, 2008, CSX received notices from Icahn Masters Fund LP, Icahn Partners LP, Carl C. Icahn and Icahn Masters Fund II LP stating their intention to file notifications under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR"). The HSR notifications state a collective intent to acquire at least $418.6 million of CSX common stock and not more than $1.6 billion. The Company is voluntarily furnishing this information.



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-6 Filed 11/22/24 Page 389 of 1523

**CSX CORPORATION**
**PART III**

**Item 10. Directors and Executive Officers of the Registrant**

In accordance with Instruction G(3) of Form 10-K, the information required by this item is incorporated herein by reference to the Proxy Statement. The Proxy Statement will be filed not later than April 25, 2008 with respect to its 2008 annual meeting of shareholders, except for the information regarding the executive officers of the Company. Information regarding executive officers is included in Part I of this report under the caption "Executive Officers of the Registrant."

**Item 11. Executive Compensation**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

**Item 12. Security Ownership of Certain Beneficial Owners and Management**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

**Item 13. Certain Relationships and Related Transactions**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

**Item 14. Principal Accounting Fees and Services**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

*(a)(1) Financial Statements*

See Index to Consolidated Financial Statements on page 62.

*(2) Financial Statement Schedules*

The information required by Schedule II, *Valuation and Qualifying Accounts*, is included in Note 6 to the Consolidated Financial Statements, Casualty, Environmental and Other Reserves. All other financial statement schedules are not applicable.

*(3) Exhibits*

2.1 Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holding Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc. (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004)

3.1 Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004)

3.1(a) Articles of Amendment to CSX Corporation's Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 5.03 to the Registrant's Current Report on Form 8-K filed with the Commission on July 18, 2006)

3.2 Bylaws of the Registrant, amended effective as of February 4, 2008 (incorporated herein by reference to Exhibit 3.2 of the Registrant's Current Report on Form 8-K filed with the Commission on February 6, 2008)

4.1(a) Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant's Form SE, dated September 7, 1990, filed with the Commission)

4.1(b) First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant's Form SE, dated May 28, 1992, filed with the Commission)



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

4.1(c) Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form S-4 (Registration No. 333-28523) filed with the Commission on June 5, 1997)

4.1(d) Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Commission on May 12, 1998)

4.1(e) Fourth Supplemental Indenture, dated as of October 30, 2001, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001)

4.1(f) Fifth Supplemental Indenture, dated as of October 27, 2003 between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 8-K filed with the Commission on October 27, 2003)

4.1(g) Sixth Supplemental Indenture, dated as of September 23, 2004 between the Registrant and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 3, 2004)

4.1(h) Seventh Supplemental Indenture, dated as of April 25, 2007, between the Registrant and The Bank of New York (as successor to JP Morgan Chase Bank), as Trustee (incorporated herein by reference to Exhibit 4.4 to the Registrant's Report on Form 8-K filed with the Commission on April 26, 2007).

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant's long-term debt securities, where the long-term debt securities authorized under each such instrument do not exceed 10% of the Registrant's total assets, have been omitted and will be furnished to the Commission upon request.

10.1** CSX Stock Plan for Directors (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)

10.2* ** CSX Directors' Pre-2005 Deferred Compensation Plan (as amended through January 8, 2008)

10.3* ** CSX Directors' Deferred Compensation Plan effective January 1, 2005



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

| | |
|---|---|
| 10.4** | CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 4, 1994) |
| 10.5** | CSX Directors' Matching Gift Plan (as amended through December 31, 2003) (incorporated herein by reference to Exhibit 10.5 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.6** | Railroad Retirement Benefits Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.13 to the Registrant's Report on Form 10-K filed with the Commission on February 26, 2003) |
| 10.7** | Employment Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003) |
| 10.8** | Form of Employment Agreement with executive officers (incorporated herein by reference to Exhibit 10.1 of the Registrant's Current Report on Form 8-K filed with the Commission on January 6, 2005) |
| 10.9** | Form of Stock Option Agreement (incorporated herein by reference to Exhibit 10.17 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |
| 10.10** | 1987 Long-term Performance Stock Plan, as Amended and Restated effective April 25, 1996 (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.11** | Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies (as amended through January 1, 1998) (incorporated herein by reference to Exhibit 10.25 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.12** | 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Corporations (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

10.13** Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (as Amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)

10.14** Special Retirement Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.23 to the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)

10.15** Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.24 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)

10.16** Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement filed with the Commission on March 17, 2000)

10.17* ** CSX Omnibus Incentive Plan (as Amended through December 12, 2007)

10.18** 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as amended through September 8, 1999) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 7, 2000)

10.19 Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto (incorporated herein by reference to Exhibit 10 to the Registrant’s Current Report on Form 8-K filed with the Commission on July 8, 1997)

10.20 Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999)



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

10.21 Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings, LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999)

10.22 Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999)

10.23 Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999)

10.24 Tax Allocation Agreement, dated as of August 27, 2004, by and among CSX Corporation, Norfolk Southern Corporation, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004)

10.25** Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on April 30, 2004)

10.26** Restricted Stock Award Agreement with T. L. Ingram (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 29, 2004)

10.27** Amendment No. 1, dated as of December 13, 2004, to Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004)

10.28** Restricted Stock Award Agreement with Ellen M. Fitzsimmons (incorporated herein by reference to Exhibit 10.41 of the Registrant's Annual Report on Form 10-K filed with the Commission on February 24, 2006)



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

| | |
|---|---|
| 10.29 | Revolving Credit Agreement, dated May 4, 2006 (incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed with the Commission on May 9, 2006) |
| 10.30 | Underwriting agreement, dated April 20, 2007 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on April 26, 2007) |
| 10.31** | Long-term Incentive Plan, dated May 1, 2007 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on May 7, 2007) |
| 10.32 | Underwriting agreement dated September 4, 2007 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 10, 2007) |
| 10.33 | Underwriting agreement dated December 10, 2007 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 17, 2007) |
| 21* | Subsidiaries of the Registrant |
| 23* | Consent of Ernst & Young LLP |
| 24* | Powers of Attorney |
| 31.1* | Rule 13a-14(a) Certification of Principal Executive Officer |
| 31.2* | Rule 13a-14(a) Certification of Principal Financial Officer |
| 32.1* | Rule 13a-14(b) Certification of Principal Executive Officer |
| 32.2* | Rule 13a-14(b) Certification of Principal Financial Officer |

* Filed herewith
** Management Contract or Compensatory Plan or Arrangement



Source: CSX CORP, 10-K, February 22, 2008
Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CSX CORPORATION
(Registrant)

By: /s/ CAROLYN T. SIZEMORE
Carolyn T. Sizemore
Vice President and Controller
(Principal Accounting Officer)

Dated: February 19, 2008

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on February 22, 2008.

| Signature | Title |
| --- | --- |
| /s/ MICHAEL J. WARD<br>Michael J. Ward | Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ OSCAR MUNOZ<br>Oscar Munoz | Executive Vice President and Chief Financial Officer (Principle Financial Officer) |
| /s/ CAROLYN T. SIZEMORE<br>Carolyn T. Sizemore | Vice President and Controller (Principle Accounting Officer) |
| *By: /s/ ELLEN M. FITZSIMMONS<br>Ellen M. Fitzsimmons | Senior Vice President - Law and Public Affairs<br><br>*Attorney-in-Fact |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

| Signature | Title |
|---|---|
| *<br>Donna M. Alvarado | Director |
| *<br>Elizabeth E. Bailey | Director |
| *<br>John B. Breaux | Director |
| *<br>Steven T. Halverson | Director |
| *<br>Edward J. Kelly III | Director |
| *<br>Robert D. Kunisch | Director |
| *<br>Southwood J. Morcott | Director |
| *<br>David M. Ratcliffe | Director |
| *<br>William C. Richardson | Director |
| *<br>Frank S. Royal M.D. | Director |
| *<br>Donald J. Shepard | Director |



Source: CSX CORP, 10-K, February 22, 2008 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 10.2

**CSX DIRECTORS' PRE-2005 DEFERRED COMPENSATION PLAN**
**(As Amended Through January 8, 2008)**

The purpose of this Plan was to permit members of the Board of Directors of CSX Corporation to elect deferred receipt of director's fees and to allow CSX Corporation to make other deferred awards to directors. This Plan is intended to constitute a deferred compensation plan for corporate directors.

1. Definitions

The following words or terms used herein shall have the following meanings:

(a) "Account" or "Accounts" -- means the bookkeeping account(s) maintained for each Participant to record the amount of Director's fees he has elected to defer and other deferrals, as adjusted pursuant to Section 3.

(b) "Administrator" -- means the Senior Human Resources Officer of CSX Corporation or such Officer's designee.

(i) The Administrator shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms of the Plan.

(ii) The Administrator shall have sole and absolute discretion to interpret the Plan and determine eligibility for and benefits hereunder. Decisions of the Administrator regarding participation in and the calculation of benefits under the Plan shall at all times be binding and conclusive on Participants, their beneficiaries, heirs and assigns.

(c) "Average Price" -- means the average of the high and low price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date of the applicable deferral or dividend payment.

(d) "Board" -- means the Board of Directors of CSX.

(e) "Change of Control" -- means any of the following:

(i) Stock Acquisition. The acquisition, by any individual, entity or group within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")(a "Person") of beneficial ownership (within the meaning of Rule 13d(3) promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (B) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change of Control: (A) any acquisition directly from the Corporation; (B) any acquisition by the Corporation; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 1(e); or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to such date whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(iii) Business Combination. Consummation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the


Powered by Morningstar® Document Research℠

"Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(iv) Regulated Business Combination. Consummation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 1(e); or

(v) Liquidation or Dissolution. Consummation of a complete liquidation or dissolution of the Corporation or its principal subsidiary approved by the Corporation's shareholders.

(f) "Closing Price"-- means the closing price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date of the applicable deferral or dividend payment.

(g) "CSX" or "Corporation" -- means CSX Corporation

(h) "Independent Advisor" -- means an independent accountant, actuary, benefits consulting firm or other entity engaged by CSX to provide Participant accounting and other services on behalf of the Plan.

(i) "Distribution Event" -- means the occurrence of any event listed in Section 1(e), "Change of Control"; provided that for purposes of Sections 1(e)(iii), 1(e)(iv) and 1(e)(v), "Consummation" means an actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Securities, and/or assets of the Corporation or its principal subsidiary.

(j) "Effective Date" -- means initially January 1, 2003. Subsequent amendments shall be effective as of the indicated effective dates.

(k) "Form of Payment Election" -- means the election by the Participant of the form of distribution (lump sum or installments) he will receive from his Account pursuant to Section 5.

(l) "Member" -- means any person duly elected to the Board.

(m) "Partial Distribution Election" -- means a Distribution Election for a portion of a Participant's Account under Section 4.

(n) "Participant" -- means any Member who elected to participate in the Plan so long as he or she is entitled to a benefit under the Plan.

(o) "Plan" -- means the CSX Directors' Pre-2005 Deferred Compensation Plan.

 Powered by Morningstar® Document Research℠

(p) "Trust" -- means a grantor trust or trusts established by CSX which will substantially conform to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422. CSX is not obligated to make any contribution a Trust.

(q) "Valuation Date" -- means each June and December 31 and such other dates as the Administrator deems necessary or appropriate to value Participants' benefits under this Plan.

In any instance in which the male gender is used herein, it shall, in appropriate circumstances, also include persons of the female gender and visa versa.

2. Participation

No Member may become a Participant in the Plan or make further deferrals pursuant to the Plan for periods after December 31, 2004.

3. Participant's Accounts

(a) So long as he or she is a Member, a Participant may elect, pursuant to forms provided by the Administrator, to have all or any portion of his or her elective and other deferrals, not required to be credited or actually credited to the affected Participant's stock account pursuant to the terms of the CSX Corporation Stock Plan for Directors ("Stock Account"), credited as follows:

Through December 31, 2005:

To an interest-accruing account ("Interest Account") or a CSX Phantom Stock Account ("Phantom Stock Account").

After December 31, 2005:

To an Account or Accounts related to and accounted for in the same manner as the earnings benchmarks used in conjunction with the CSX Executives' Deferred Compensation Plan (the "EDC Plan") (a "Benchmark Account") approved from time to time by the Administrator.

(b) Deferrals of Director's fees in CSX common stock pursuant to the CSX Corporation Stock Plan for Directors and other CSX deferred common stock awards were credited to the affected Participant's Stock Account.

(c) Through December 31, 2005, interest accrued on a Participant's Interest Account from the first day of the month following the date the deferred director's fee would otherwise have been paid to the Participant until it is actually paid, such interest to be credited to an affected Participant's Account and compounded quarterly at the end of each calendar quarter. Interest will be credited quarterly based on the annual rate of 10-year U.S. Treasury bonds as published by the *Wall Street Journal* as of the first business day of October in the preceding calendar year. The value of a Participant's Interest Account shall be the sum of amounts deferred and all interest accrued thereon. Interest Accounts ceased to exist as of December 31, 2005. All undistributed amounts credited to such accounts were credited to a Benchmark Account, effective January 1, 2006.

(d) Credits (including both deferrals of directors' fees and dividends) to and the value of Phantom Stock Accounts were based upon Average Price. Credits to and the value of Stock Accounts (other than deferred CSX common stock share awards declared by the Company), are based upon Average Price through December 31, 2007, and Closing Price thereafter. Notwithstanding the preceding, full and fractional shares credited to Stock Accounts pertaining to dividends on CSX common stock held by the trustee of the Directors' Stock Trust or a successor trust shall be credited based on the actual purchase price of the CSX common stock acquired by the trustee with such dividends.

(e) Through December 31, 2005, a Participant, while a Member, could elect at any time to transfer all or any portion of amounts deferred, including all earnings thereon, between his or her Interest Account and Phantom Stock Account. After December 31, 2005, a Participant may elect, on forms provided by and pursuant to rules established by the Administrator, to transfer all or any portion of amounts held in a Benchmark Account among such accounts. No transfers may be made into the Stock Account. Transfers out of the Stock Account may only be made when a Participant is no longer a Member.

(f) Notwithstanding Sections 3(a), (c), and (e) to the contrary, with respect to Participants in pay status on December 31, 2004, the undistributed portion of their Accounts shall continue to be credited with earnings in accordance with the provisions of the Plan as an Interest Account, Phantom Stock Account or Stock Account, as applicable (assuming such provisions had continued in effect), until the affected Participant's distribution is complete.

4. Distribution of Accounts

(a) Amounts deferred under the Plan and credited to an Account shall be distributed to a Participant from such Account in a lump sum one year following the date in which a Participant ceases to be a Member, unless he shall file a Distribution Election as provided in this Section 4 or a Form of Payment Election as provided in Section 5.

(b) A Participant may file with the Administrator a Distribution Election for the distribution from an Account upon:

(i) attainment of a designated age, however, he shall not elect an age that he will attain less than one year subsequent to his Distribution Election; or

(ii) retirement from the Board.

(c) A Participant may file a Distribution Election or change a Distribution Election at any time prior to:

(i) a date that is 30 days subsequent to the date of his retirement from the Board in the case of his initial Distribution Election; or

(ii) one year prior to the date distribution is to commence under his Distribution Election then in effect,

after which time no Distribution Election shall be filed.

(d) A Participant may make a Partial Distribution Election with respect to any portion of a Participant's Account, provided no Distribution Election shall be made for a portion of an Account less than $2,000, as determined as of the date the election is made. No Participant shall have more than two Distribution Elections in effect for an Account at any time.

(e) Except in the event of retirement from the Board, a distribution made pursuant to a Distribution Election shall not commence prior to a date that is three years subsequent to the date the Participant first makes a Deferral under either this Plan or a predecessor plan which provides for the deferral of director's fees

(f) Any Distribution Election made in proper form by a Participant shall be effective and distribution shall commence pursuant to such Distribution Election. Any Distribution Election not made in proper form shall be void. Distributions from a Participant's Stock Account shall be made only in shares of CSX common stock.

(g) A Participant may request and receive a withdrawal from his Account at any time without filing a Distribution Election under this Section 4. Any such withdrawal shall result in the forfeiture of an amount equal to the portion of the Participant's Account that is withdrawn, multiplied by the Mid-term Applicable Federal Rate determined as of the Valuation Date upon which the withdrawal is effective.

(h) A Participant may make one additional election to defer (but not accelerate) commencement of payment under the Plan at any time six months before payments are to have commenced ("Re-deferral Election"). Such Re-deferral Election shall be made in a form prescribed by the Administrator. If such Re-deferral Election is to a designated age the re-deferral shall be for a period not less than one year from the date the Re-deferral Election is made.

5. Form of Payment

The Form of Payment Elections provided in this Section 6 shall be made in writing and may be changed at any time prior to a date that is six months prior to the date distribution is to commence, after which time the Form of Payment Election shall be irrevocable. If installment payments are elected for an Account, payments shall be made, as the Participant may elect, for either five, ten, or fifteen years. Installments shall be made as soon as practicable after each June 30 and December 31. The amount of each installment shall be determined by multiplying the value of the Participant's account as of the last business day of June or December immediately preceding the installment date by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the number of installment payments over which payment of such amount is to be made, less the number of installment payments previously made. In the case of installments from a Stock Account, fractional share amounts shall be rounded up to the next highest whole share amount, except in the case of the final installment, in which case a cash payment will be made for any fractional shares.

6. Death of a Participant

(a) In the event a Participant dies while a Member, the balance of his Accounts shall be paid in either a lump sum or installments (consistent with the Form of Payment Elections made by the Participant as described in Section 5) to his Designated Beneficiary. Each Participant may file with the Administrator a Designation

of Beneficiary for this purpose.

(b) In the event a Participant shall die after he ceases to be a Member and before he has received complete distribution from his Account, the balance credited to his Account shall be paid to his Designated Beneficiary consistent with the Form of Payment Elections made by the Participant as described in Section 5.

(c) In the event a Participant shall not file a Designation of Beneficiary, or his Designated Beneficiary is not living at the Participant's death, the balance credited to his Accounts shall be paid in full to his estate not later than the tenth day of the calendar year following his date of death.

7. Obligation of CSX

This Plan shall be unfunded and credits to the Accounts of each Participant shall not be set apart for him nor otherwise made available so that he may draw upon them at any time, except as provided in this Plan. Neither any Participant nor his Designated Beneficiary shall have any right, title, or interest in such credits or any claim against them. Payments may only be made at such times and in the manner expressly provided in this Plan. CSX's contractual obligation is to make the payments when due. No notes or security for the payment of any Participant's account shall be issued by CSX.

8. Change of Control

(a) Within 45 days of a Distribution Event, each Participant not making an election under 8(c) below, shall be paid a lump sum payment equal to the amount the Participant would have been entitled to receive determined under Section 5 had he ceased to be a Member and selected an immediate lump sum payment. The amount of each Participant's lump sum payment shall be determined by the Independent Advisor.

(b) A Participant who elected, within 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of the Plan as if a Distribution Event had not occurred, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Distribution Event shall be invalid.

(c) Notwithstanding anything in the Plan to the contrary, each Participant who made an election under Section 8(b), may elect within 90 days following a Distribution Event, in a time and manner determined by the Administrator, to receive a lump sum payment calculated under the provisions of Section 8(a), determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to CSX by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this Section 8(c) shall be made not later than 7 days following receipt by CSX of the Participant's election. The Administrator shall, no later than 7 days after a Distribution Event has occurred, give written notification to each Participant eligible to make an election under this Section 8(c), that a Distribution Event has occurred and informing such Participant of the availability of the election.

9. Claims Against Participant's Account

No credits to the account of any Participant under this Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to do so shall be void. Nor shall any credit be subject to attachment or legal process for debts or other obligations. Nothing contained in this Plan shall give any Participant any interest, lien, or claim against any specific asset of CSX or any Trust. No Participant or his Designated Beneficiary shall have any rights other than as a general creditor of CSX.

10. Competition by Participant

In the event a Participant ceases to be a Member and becomes a proprietor, officer, partner, employee, director, or otherwise becomes affiliated with any business that is in competition with the Corporation, his Accounts may, if directed by the Board in its sole discretion, be paid immediately to him in a lump sum.

11. Payment of Credit Balance to Participant's Account

Notwithstanding anything herein to the contrary, the Board may, in its sole discretion, direct payment in a lump sum, of any or all of the credit balance appearing at the time in the Accounts of a Participant.

Further, the obligations of CSX and the benefit due any Participant or Designated Beneficiary under the Plan shall be reduced by any amount received in regard thereto under any Trust or any similar trust or other vehicle.

12. Amendment or Termination

 Powered by Morningstar® Document Research℠

This Plan may be altered, amended, suspended, or terminated at any time by the Board, on the recommendation of the Compensation Committee of the Board, provided, however, that no alteration, amendment, suspension, or termination shall be made to this Plan which would result in the distribution of amounts credited to the accounts of all Participants in any manner other than is provided in this Plan without the consent of all Participants. Further, the Board may delegate its authority to take such actions by charter or otherwise.

13. Impact of Future Legislation or Regulation

(a) This Section 13 shall become operative upon the enactment of any change in applicable statutory law or the promulgation by the Internal Revenue Service of a final regulation or other pronouncement having the force of law, which statutory law, as changed, or final regulation or pronouncement, as promulgated, would cause any Participant to include in his federal gross income amounts accrued by the Participant under the Plan on a date (an "Early Taxation Event") prior to the date on which such amounts are made available to him or her hereunder.

(b) Notwithstanding any other Section of this Plan to the contrary (but subject to subsection (c), below), as of an Early Taxation Event, the feature or features of this Plan, or the election by a Participant that would cause the Early Taxation Event shall be null and void, to the extent, and only to the extent, required to prevent the Participant from being required to include in his federal gross income amounts accrued by the Participant under the Plan prior to the date on which such amounts are made available to him hereunder. By way of example, but not by way of limiting the generality of the foregoing, if a statute is enacted that would require a Participant to include in his or her federal gross income amounts accrued by the Participant under the Plan prior to the date on which such amounts are made available to him or her because of the Participant's right to receive a distribution of a portion of his Account under Section 4(h), the right of all Participants to receive distributions under Section 4(h) shall be null and void as of the effective date of that statute. If only a portion of a Participant's Account is impacted by the change in the law, then only such portion shall be subject to this Section, with the remainder of the Account not so affected being subject to such rights and features as if the law were not changed. If the law only impacts Participants who have a certain status with respect to the Company, then only such Participants shall be subject to this Section.

(c) Notwithstanding Section 13(b) above, if an Early Taxation Event occurs (e.g., if a change in law is retroactive), the amounts that become taxable on the Early Taxation Event shall be distributed to each Participant as soon as practicable following such Early Taxation Event or, if later, the date of enactment or promulgation.

34253.000052 RICHMOND 986338v7

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 10.3

**CSX Directors' Deferred Compensation Plan**
**Effective January 1, 2005**

The purpose of the Plan is to permit members of the Board of Directors of CSX Corporation to defer the receipt of director's fees and to allow CSX Corporation to make other deferred awards to directors. The Plan is intended to be fully compliant with Section 409A of the Internal Revenue Code of 1986, as amended, and the final regulations promulgated thereunder.

1. Definitions

The following words or terms used herein shall have the indicated meanings:

(a) "Account" or "Accounts" -- means the bookkeeping account(s) maintained for each Participant to record the amount of Director's Fees the Member has elected to defer and other deferrals, as adjusted pursuant to Section 4.

(b) "Administrator" -- means the Senior Human Resources Officer of CSX Corporation or such officer's designee.

(i) The Administrator shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms of the Plan.

(ii) The Administrator shall have sole and absolute discretion to interpret the Plan and determine eligibility for and benefits hereunder. Decisions of the Administrator regarding participation in and the calculation of benefits under the Plan shall at all times be binding and conclusive on Participants, their beneficiaries, heirs and assigns.

(c) "Average Price" -- means the average of the high and low price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date of the applicable deferral or dividend payment.

(d) "Board" -- means the Board of Directors of CSX.

(e) "Change of Control" -- means any of the following:

(i) Stock Acquisition. One or more acquisitions, by any individual, entity or group (within the meanings of Treas. Reg. §§ 1.409A-3(i)(5)(v)(B) and (vi)(D)) (a "Person"), of (A) 30% or more of the then outstanding voting securities of the Corporation (the "Outstanding Voting Securities"), during any 12-month period ending on the date of the most recent acquisition; or (B) an acquisition that results in ownership by a Person of more than 50% of either (a) shares representing more than 50% of the total fair market value of the Corporation's then outstanding stock (the "Outstanding Stock") or (b) the then Outstanding Voting Securities; provided, however, that for purposes of this subsection (i), the following acquisitions of shares of the Corporation shall not be taken into account in the determination of whether a Change of Control has occurred: (A) any acquisition directly from the Corporation; (B) any cash acquisition by the Corporation; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (D) an acquisition by a Person that prior to the acquisition had already acquired more shares than necessary to satisfy the applicable 30% or 50% threshold. Notwithstanding the foregoing, an acquisition of its stock by the Corporation in exchange for property which increases the percentage of stock owned by a Person shall be treated as an acquisition for purposes of this subsection; or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease, within a 12-month period, for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to such date whose appointment, election, or nomination for election by the Corporation's shareholders, was endorsed by at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board; or

(iii) Business Combination. Consummation of a reorganization, merger or consolidation of the Corporation (a "Business Combination"), in each case, that results in either a change in ownership contemplated in subsection (i)(B) of this Section 1(e) or a change in the Incumbent Board contemplated by subsection (ii) of Section 1(e); or

(iv) Sale or Disposition of Assets. One or more Persons acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such Persons) assets from the Corporation that have a total gross fair market value equal to more than 40 percent of the total gross fair market value of all of the assets of the Corporation (without regard to liabilities of the Corporation or associated with such assets) immediately before such acquisition or acquisitions; provided that such sale or disposition is not to:

(A) a shareholder of the Corporation (immediately before the asset transfer) in exchange for or with respect to the Corporation's Outstanding Stock;

(B) an entity, 50% or more of the total value or voting power of which is owned, directly or indirectly, by the Corporation;

(C) a Person that owns, directly or indirectly, 50% or more of the total value or voting power of all the outstanding stock of the Corporation; or

(D) an entity, at least 50% of the total value or voting power of which is owned, directly or indirectly, by a Person described in subsection (iv)(C).

Except as otherwise specifically provided in subsection (iv)(A) of this Section 1(e), a Person's status is determined immediately after the transfer.

(f) "Closing Price"-- means the closing price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date of the applicable deferral or dividend payment.

(g) "Code" -- means the Internal Revenue Code of 1986, as amended.

(h) "CSX" or "Corporation" -- means CSX Corporation

(i) "Deferral Agreement" -- means an agreement between a Participant and CSX under which the Participant agrees to defer Director's Fees under the Plan. The Deferral Agreement shall be on a form prescribed by the Administrator and shall include any amendments, attachments or appendices.

(j) "Designated Beneficiary" -- means the person or persons entitled to receive the balance of a Participant's Accounts upon the Participant's death. The Participant may file with the Administrator a written Designation of Beneficiary for this purpose. Such designation may name one or more individuals, trusts and/or organizations as the primary or contingent beneficiary(ies) to receive all or a specified portion of the balance of the Participant's Accounts remaining at the Participant's death. Unless otherwise specifically directed in the Participant's Designation of Beneficiary form, in the event a designated primary beneficiary is not living or existing at the Participant's death or declines to accept any distribution from the Accounts, the share otherwise distributable to such beneficiary shall be distributed, first, to the other designated primary beneficiaries, if any, in accordance with their relative designated shares of the Accounts; and second, to the contingent beneficiary(ies), if any.

(k) "Director's Fees" -- means any compensation, whether a retainer, or a fee for meeting attendance, membership on a committee, chairing a committee, or otherwise, payable either in cash or in stock, earned by a Member for services rendered as a Member.

(l) "Effective Date" -- means January 1, 2005.

(m) "Fiscal Year" -- means the Corporation's taxable year ending on the last Friday in December.

(n) "Form of Payment Election" -- means the election by the Participant of the form of distribution (lump sum or installments) he or she will receive from his or her Account pursuant to Section 6.

(o) "Independent Advisor" -- means an independent accountant, actuary, benefits consulting firm or other entity engaged by CSX to provide Participant accounting or other services on behalf of the Plan.

(p) "Member" -- means any person duly elected to the Board.

(q) "Participant" -- means any Member who elects to participate in the Plan so long as he or she is entitled to a benefit under the Plan.

(r) "Plan" -- means the CSX Directors Deferred Compensation Plan.

(s)


Powered by Morningstar® Document Research℠

"Trust" -- means a grantor trust or trusts established by CSX which substantially conforms to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422. CSX is not obligated to make any contribution to the Trust.

In any instance in which the male gender is used herein, it shall also include persons of the female gender in appropriate circumstances.

2. Participation

Any Member who filed a Deferral Agreement in 2004 under and in accordance with the CSX Corporation 2002 Corporate Director Deferred Compensation Plan with respect to Directors Fees earned in 2005, shall be deemed to have filed such Deferral Agreement under this Plan and shall be a Participant in this Plan.

A Member may elect to become a Participant and defer Director's Fees earned and payable in any subsequent calendar year by entering into a Deferral Agreement with the Administrator no later than the last non-holiday business day of the Fiscal Year ending immediately prior to the calendar year in question or such earlier date as may be specified by the Administrator. Such Deferral Agreement shall be effective for purposes of deferring Director's Fees earned in the calendar year following the date the Deferral Agreement is executed. Any election made pursuant to a Deferral Agreement shall remain in effect with respect to future calendar years until changed or rescinded by the Participant in accordance with the Plan.

3. Deferral of Directors' Fees

(a) CSX shall, during any calendar year with respect to which a Participant has made a timely Deferral Election, withhold and defer payment of all or any specified part of Participant's Director's Fees in accordance with the Director's Deferral Election. A Participant may elect to change the amount of Director's Fees he or she elects to defer, modify a Deferral Agreement or revoke a Deferral Agreement by filing a new Deferral Agreement pursuant to procedures established by the Administrator with the Administrator not later than the last day of the Fiscal Year immediately prior to the calendar year in which Director's Fees are to be earned and paid, and such revised Deferral Agreement shall be effective with respect to Director's Fees earned for all future calendar years until changed or rescinded in accordance with the Plan.

(b) Notwithstanding Sections 2 and 3(a), when any person first becomes a Member, he or she may file an initial Deferral Agreement during the first thirty (30) days he or she is a Member, and such Deferral Agreement shall be effective solely with respect to Director's Fees paid for services to be performed after such election. For Director's Fees that are earned based upon a specified performance period (for example, an annual bonus), where a Member's Deferral Election is made in the first year of eligibility but after the beginning of the performance period, the Deferral Election must apply only to the Director's Fees paid for services performed after such election. For this purpose, a Deferral Election will be deemed to apply to Director's Fees paid for services performed after the election if the Deferral Election applies to no more than an amount equal to the total amount of the Director's Fees for the performance period multiplied by the ratio of the number of days remaining in the performance period after the Deferral Election over the total number of days in the performance period.

(c) Notwithstanding any provision of the Plan to the contrary, on or prior to December 31, 2005, a Participant may cancel his or her participation in the Plan, may cancel an existing Deferral Agreement, or may reduce the amount of Directors' Fees deferred under an existing Deferral Agreement.

4. Participants' Accounts

(a) So long as he or she is a Member, a Participant may elect pursuant to a Deferral Agreement or other forms or procedures provided or established by the Administrator to have all or any portion of his or her eligible Director's Fees, not required to be credited or actually credited to his or her Stock Account under the Plan pursuant to the terms of the CSX Corporation Stock Plan for Directors or otherwise, credited as follows:

Through December 31, 2005:

To an interest-accruing account ("Interest Account") or a CSX Phantom Stock Account ("Phantom Stock Account").

After December 31, 2005:

To an Account or Accounts related to and accounted for in the same manner as the earnings benchmarks used in conjunction with the CSX Executives' Deferred Compensation Plan (the "EDC Plan") (a "Benchmark Account") approved from time to time by the Administrator.

(b) Elective Deferrals of CSX common stock shall be effected pursuant to Deferral Agreements filed with the Administrator. A Participant's Stock Account ("Stock Account") will be credited with such deferrals.

(c) Through December 31, 2005, interest shall accrue on a Participant's Interest Account from the first day of the month following the date the deferred Director's Fee would otherwise have been paid to the Participant until it is actually paid, such interest to be credited to an affected Participant's Account and compounded quarterly at the end of each calendar quarter. Interest will be credited quarterly based on the annual rate of 10-year U.S. Treasury bonds as published by the *Wall Street Journal* as of the first business day of October in the preceding calendar year. The value of a Participant's Interest Account shall be the sum of amounts deferred and all interest accrued thereon. Interest Accounts ceased to exist as of December 31, 2005. All undistributed amounts credited to such accounts were credited to a Benchmark Account, effective January 1, 2006.

(d) Credits (including both deferrals of Directors' Fees and dividends) to and the value of Phantom Stock Accounts are based upon Average Price. Credits to and the value of Stock Accounts (other than deferred CSX common stock share awards declared by the Company), are based upon Average Price through December 31, 2007, and Closing Price thereafter. Notwithstanding the preceding, full and fractional shares credited to Stock Accounts pertaining to dividends on CSX common stock held by the trustee of the Directors' Stock Trust or a successor trust shall be credited based on the actual purchase price of the CSX common stock acquired by the trustee with such dividends.

(e) Through December 31, 2005, a Participant, while a Member, could elect at any time to transfer all or any portion of amounts deferred, including all earnings thereon, between his or her Interest Account and Phantom Stock Account. After December 31, 2005, a participant may elect, on forms provided by and pursuant to rules established by the Administrator, to transfer all or any portion of amounts held in a Benchmark Account among such Accounts. No transfers may be made into the Stock Account. Transfers out of the Stock Account may only be made when a Participant is no longer a Member.

5. <u>Distribution of Deferred Directors' Fees</u>

(a) Amounts deferred under the Plan and/or credited to an Account shall be distributed to a Participant from such Account in a lump sum one year following the date in which a Participant ceases to be a Member, unless he or she shall file a Distribution and Form of Payment Election as provided in Sections 5 and 6.

(b) A Participant may file with the Administrator a Distribution Election, in accordance with Section 5(c), for the distribution from an Account upon:

(i) attainment of a designated age; or

(ii) separation from the Board.

For this purpose, a separation from the Board will not be deemed to have occurred if the Member continues to provide services to CSX at a level greater than 20% of the average number of hours of services provided by the Member over the 36 (or, if less, the full term of employment) months preceding his or her date of separation from the Board.

(c) A Participant shall file a Distribution Election with respect to Director's Fees deferred pursuant to a Deferral Agreement and other deferrals at the same time that such Deferral Agreement is filed as provided in Sections 2 or 3. A Participant may change a Distribution Election with respect to future elective deferrals at any time on or prior to the date by which any new or revised Deferral Agreement would have to be filed under Section 3(a). Such revised Distribution Election shall be effective only with respect to Director's Fees earned and deferred in calendar years commencing subsequent to such revised Distribution Election.

(d) Notwithstanding the foregoing, on or prior to December 31, 2005, a Participant may file a new Distribution Election with respect to amounts deferred under the Plan prior to such new Distribution Election.

(e) Any Distribution Election made in proper form and at the proper time by a Participant shall be effective and distribution shall commence pursuant to such Distribution Election. Any Distribution Election not made in proper form or at the proper time shall be void. Distributions from a Participant's Stock Account shall be made only in shares of CSX common stock.

(f) Non-elective deferred cash or stock awards declared by the Corporation shall be credited to a Participant's Benchmark or Stock Account as applicable. Unless a Participant has made a different timely election, any such award shall be distributed at the same time and in the same form as the Participant's last effective election prior to each such declaration or, if none, pursuant to Sections 5(a) and (e).

(g) A Participant may make additional elections to defer (but not accelerate) commencement of a payment elected pursuant to a prior Distribution Election (including a default election) under the Plan (a "Re-deferral Election"), provided that (A) such Re-deferral Election may not be effective for at least 12 months after the date on which it is filed; (B) the additional deferral with respect to which such Re-deferral Election is made may not be less than five years from the date such distribution would otherwise have been made, except in the case of elections relating to distributions on account of death; and (C) if such Re-deferral Election is to a designated age, such Re-deferral Election may not be made less than 12 months prior to the date of the first scheduled payment under the Distribution Election then in effect. Such Re-deferral Election shall be made on forms prescribed by the Administrator.

(h) Notwithstanding any provision of the Plan to the contrary, the Administrator shall, in a manner compliant with Code § 409A, make a lump sum distribution to a Participant to the extent necessary to comply with a certificate of divestiture, as defined in Code § 1043(b)(2), or, to the extent amounts deferred hereunder have become taxable as a result of Code § 409A.

(i) A Participant may elect with respect to any elective deferral to have the deferral paid in a lump sum within 45 days of a Change of Control.

6. Form of Payment

A Form of Payment Election provided in this Section 6, with respect to a Deferral Agreement, shall be made in writing at the same time as the Distribution Election filed with respect to such Deferral Agreement, and may be changed at the same time and to the same extent as a Distribution Election may be changed, as provided in Section 5, regardless of whether the Distribution Election is changed.

Notwithstanding the foregoing, on or prior to December 31, 2005, a Participant may file a new Form of Payment Election with respect to amounts deferred prior to such new Form of Payment Election.

A Participant may elect either a lump sum payment, or semi-annual installments. Lump sum payments are made as soon as practicable after the end of the month following the event triggering the distribution. If installment payments are elected, payments shall be made, for either five, ten, fifteen, or twenty years. Installment payments shall be made as soon as practicable after each June 30 and December 31. The amount of each installment shall be determined by multiplying the value of the Participant's account as of the last business day of June or December immediately preceding the installment distribution date by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the number of installment payments over which payment of such amount is to be made, less the number of installment payments previously made. In the case of installments from a Stock Account, fractional share amounts shall be rounded up to the next highest whole share amount, except in the case of the final installment, in which case a cash payment will be made for any fractional shares. Installment payments shall be treated as one payment for purposes of Code § 409A.

7. Death of a Participant

(a) In the event a Participant shall die while he or she is a Member, the balance of his or her Accounts shall be paid in either a lump sum or installments (consistent with the Form of Payment Elections made by the Participant as described in Section 6) to his or her Designated Beneficiary.

(b) In the event a Participant shall die after he or she ceases to be a Member and before he or she has received complete distribution from his or her Account, the balance credited to his or her Account shall be paid to his or her Designated Beneficiary consistent with the Form of Payment Elections made by the Participant as described in Section 6.

(c) In the event a Participant shall not file a Designation of Beneficiary, or no Designated Beneficiary is living or existing at the Participant's death, the balance credited to the Participant's Accounts shall be paid in full to the Participant's estate not later than the tenth day of the calendar year following his or her date of death.

8. Obligation of CSX

This Plan shall be unfunded and credits to the Accounts of each Participant shall not be set apart for the Participant nor otherwise made available so that the Participant may draw upon them at any time, except as provided in this Plan. Neither any Participant nor his or her Designated Beneficiary shall have any right, title, or interest in such credits or any claim against them. Payments may be made only at such times and in the manner expressly provided in this Plan. CSX's contractual obligation is to make the payments when due. No notes or security for the payment of any Participant's account shall be issued by CSX.

9. Funding of Trusts

CSX may, in its sole discretion, fund one or more Trusts to assist it in discharging its obligations hereunder.

10. Claims Against Participant's Account

No credits to the account of any Participant under this Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to do so shall be void. Nor shall any credit be subject to attachment or legal process for debts or other obligations. Nothing contained in this Plan shall give any Participant any interest, lien, or claim against any specific asset of CSX. No Participant or his or her Designated Beneficiary shall have any rights other than as a general creditor of CSX.

11. Co-ordination with Payments from Trust or Similar Vehicle

The obligations of CSX and the benefit due any Participant or Designated Beneficiary under the Plan shall be reduced by any amount received in regard thereto under the Trust or any similar trust or other vehicle.

12. Amendment or Termination

This Plan may be altered, amended, suspended, or terminated at any time by the Board, provided, however, that no alteration, amendment, suspension, or termination shall be made to this Plan which would result in a reduction in benefits accrued through the date of such action. Further, the Board may delegate its authority to take such actions by charter or otherwise.

13. Impact of Future Legislation or Regulation

(a) This Section 14 shall become operative upon the enactment of any change in applicable statutory law or the promulgation by the Internal Revenue Service of a final regulation or other pronouncement having the force of law, which statutory law, as changed, or final regulation or pronouncement, as promulgated, would cause any Participant to include in his or her federal gross income amounts accrued by the Participant under the Plan on a date (an "Early Taxation Event") prior to the date on which such amounts are made available to him or her hereunder.

(b) Notwithstanding any other Section of this Plan to the contrary (but subject to Section 14(c), below), as of an Early Taxation Event, the feature or features of this Plan, or the election by a Participant that would cause the Early Taxation Event shall be null and void, to the extent, and only to the extent, required to prevent the Participant from being required to include in his or her federal gross income amounts accrued by the Participant under the Plan prior to the date on which such amounts are made available to him or her hereunder. If only a portion of a Participant's Account is impacted by the change in the law, then only such portion shall be subject to this Section, with the remainder of the Account not so affected being subject to such rights and features as if the law were not changed. If the law impacts only Participants who have a certain status with respect to the Company, then only such Participants shall be subject to this Section.

(c) Notwithstanding Section 14(b) above, if an Early Taxation Event occurs, the amount that is required to be included in income as a result of a compliance failure under Code § 409A and the regulations promulgated thereunder, shall be distributed to the affected Participant as soon as practicable following such Early Taxation Event.

(d) Notwithstanding Section 14(b) above, if an Early Taxation Event occurs, to the extent an amount is includable in income as a result of a compliance failure under Code § 409A or otherwise before such amount is distributable under the Plan, an amount equal to the total employment taxes on the Early Taxation Event and any applicable federal, state, local or foreign income tax withholding attributable to the payment of such amounts required to be withheld or paid and the income taxes required to be withheld thereon, shall be distributed to the affected Participant or paid to the appropriate taxing authority as soon as practicable following such Early Taxation Event in accordance with Code § 409A.

34253.000052 RICHMOND 1368524v14

Powered by Morningstar® Document Research℠

Exhibit 10.17

**CSX Omnibus Incentive Plan**
**Effective May 3, 2006**
**(As Amended through December 12, 2007)**

1. *Purpose*. The purpose of this CSX Omnibus Incentive Plan (the "Plan") is to further the long term stability and financial success of CSX, its Subsidiaries, Foreign Affiliates and Affiliates by rewarding selected meritorious employees. The Board of Directors believes that such awards will provide incentives for employees to remain with CSX, will encourage continued work of superior quality and will further the identification of those employees' interests with those of CSX's shareholders.

2. *Definitions*. As used in the Plan, the following terms have the meanings indicated:

   (a) "Affiliate" means a corporation, partnership or other entity other than a Subsidiary or Foreign Affiliate in which CSX or a Subsidiary owns, directly or indirectly, a substantial interest. The employees of an Affiliate shall be eligible to participate in the Plan only if the Board or the Committee approves the participation of the Affiliate in the Plan.

   (b) "Applicable Withholding Taxes" means the aggregate minimum amount of federal, state, local and foreign income, payroll and other taxes that an Employer is required to withhold in connection with any Incentive Award.

   (c) "Beneficiary" means the person or entity designated by the Participant, in a form approved by CSX, to exercise the Participant's rights with respect to an Incentive Award after the Participant's death.

   (d) Board" means the Board of Directors of CSX Corporation.

   (e) "Cause" means: (i) an act or acts of personal dishonesty of a Participant intended to result in substantial personal enrichment of the Participant at the expense of the Company or any of its Subsidiaries, Foreign Affiliates or Affiliates; (ii) a violation of the management responsibilities by the Participant which is demonstrably willful and deliberate on the Participant's part and which is not remedied in a reasonable period of time after receipt of written notice from the Employer; or, (iii) the conviction of the Participant of a felony involving moral turpitude.

   (f) "Change in Control" means the occurrence of any of the following events:

      (i) Stock Acquisition. The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20 percent or more of either (A) the then outstanding shares of common stock of CSX (the "Outstanding Company Common Stock"), or (B) the combined voting power of the then outstanding voting securities of CSX entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a change in control: (A) any acquisition directly from CSX; (B) any acquisition by CSX; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by CSX or any corporation controlled by CSX; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(f); or

      (ii) Board Composition. Individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to such date whose election or nomination for election by CSX's shareholders was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individuals whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

      (iii) Business Combination. Approval by the shareholders of CSX of a reorganization, merger, consolidation, or sale or other disposition of all or substantially all of the assets of CSX or its principal Subsidiary that is not subject, as a matter of law or contract, to approval by the Surface Transportation Board or any successor agency or regulatory body having jurisdiction over such transactions (the "STB") (a "Business Combination"), in each case, unless, following such Business Combination:

         (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50 percent of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of

 Powered by Morningstar® Document Research℠

directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns CSX or its principal Subsidiary or all or substantially all of the assets of CSX or its principal Subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of CSX or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20 percent or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of CSX of a Business Combination that is subject, as a matter of law or contract, to approval by the STB (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(f); or

(v) Liquidation or Dissolution. Approval by the shareholders of CSX of a complete liquidation or dissolution of CSX or its principal Subsidiary.

(g) "Code" means the Internal Revenue Code of 1986, as amended.

(h) "Committee" means the Compensation Committee of the Board or its successor, provided that, if any member of the Compensation Committee does not qualify as both an outside director for purposes of Code Section 162(m) and a non-employee director for purposes of Rule 16b-3, the remaining members of the Compensation Committee (but not less than two members) shall be constituted as a subcommittee of the Compensation Committee to act as the Committee for purposes of the Plan.

(i) "Company Stock" means common stock, $1.00 par value, of CSX. In the event of a change in the capital structure of CSX affecting the common stock (as provided in Section 18), the shares resulting from such a change in the common stock shall be deemed to be Company Stock within the meaning of the Plan.

(j) "Covered Employee" means a Participant who the Committee determines is or may become a covered employee within the meaning of Code Section 162(m) during the performance period for a Performance Grant.

(k) "CSX" means CSX Corporation.

(l) "Date of Grant" means the date on which the Committee grants an Incentive Award.

(m) "Disability" or "Disabled" means, as to an Incentive Stock Option, a Disability within the meaning of Code Section 22(e)(3). As to all other Incentive Awards, a Disability shall occur when the Participant is eligible for benefits under the CSX Salary Continuance and Long-Term Disability Plan or another long-term disability plan of CSX applicable to the Participant.

(n) "Divisive Transaction" means a transaction in which the Participant's Employer ceases to be a Subsidiary, Foreign Affiliate or Affiliate or a sale of substantially all of the assets of a Subsidiary, Foreign Affiliate or Affiliate.

(o) "Employer" means CSX and each Subsidiary, Foreign Affiliate or Affiliate that employs one or more Participants.

(p) "Fair Market Value" means the mean between the highest and lowest registered sales prices of a share of Company Stock on the New York Stock Exchange, as reported in the Wall Street Journal (or other authoritative source approved by the Committee) on the day of reference.

(q) "Foreign Affiliate" means an entity that is not organized under the laws of the United States, or any state thereof or any political subdivision of any state, and in which CSX has, directly or indirectly, a substantial interest.

(r) "Good Reason," as to any Participant, means (i) the Participant's compensation or employment related benefits are reduced (other than across-the-board reductions that affect management employees generally); (ii) the Participant's status, title(s), office(s), working conditions, or management responsibilities are diminished (other than changes in reporting or management responsibilities required by applicable federal or state law); or (iii) the location of

Participant's place of employment is changed by more than 30 miles without the Participant's consent.

(s) "Incentive Award" means, collectively, a Performance Grant or the award of Restricted Stock, an Option, a Restricted Stock Unit, a Stock Appreciation Right, or a Dividend Right under the Plan.

(t) "Incentive Stock Option" means an Option that qualifies for favorable federal income tax treatment under Code Section 422.

(u) "Mature Shares" means shares of Company Stock for which the holder has good title, free and clear of all liens and encumbrances and which the holder either (i) has held for at least six months or (ii) has purchased on the open market.

(v) "Nonqualified Stock Option" means an Option that is not an Incentive Stock Option.

(w) "Option" means a right to purchase Company Stock granted under the Plan, at a price determined in accordance with the Plan.

(x) "Participant" means any employee of CSX, a Subsidiary, a Foreign Affiliate or an Affiliate who receives an Incentive Award under the Plan.

(y) "Performance Criteria" means any of the following areas of performance of CSX, any Subsidiary, any Foreign Affiliate, or any Affiliate:

return on invested capital (ROIC); free cash flow; value added (ROIC less cost of capital multiplied by capital); total shareholder return; economic value added (net operating profit after tax less cost of capital); operating ratio; cost reduction (or limits on cost increases); debt to capitalization; debt to equity; earnings; earnings before interest and taxes; earnings before interest, taxes, depreciation and amortization; earnings per share (including or excluding nonrecurring items); earnings per share before extraordinary items; income from operations (including or excluding nonrecurring items); income from operations compared to capital spending; net income (including or excluding nonrecurring items, extraordinary items and/or the accumulative effect of accounting changes); net sales; price per share of Company Stock; return on assets; return on capital employed; return on equity; return on investment; return on sales; and sales volume.

Any Performance Criteria may be used to measure the performance of CSX as a whole or any Subsidiary, Foreign Affiliate, Affiliate or business unit of CSX. As determined by the Committee, Performance Criteria shall be derived from the financial statements of CSX, its Subsidiaries or affiliated entities prepared in accordance with generally accepted accounting principles applied on a consistent basis, or, for Performance Criteria that cannot be so derived, under a methodology established by the Committee prior to the issuance of a Performance Grant that is consistently applied.

(z) "Performance Goal" means an objectively determinable performance goal established by the Committee with respect to a given Performance Grant that relates to one or more Performance Criteria.

(aa) "Performance Grant" means an Incentive Award payable in Company Stock, cash, or a combination of Company Stock and cash that is made pursuant to Section 8.

(bb) "Restricted Stock" means Company Stock awarded under Section 6.

(cc) "Restricted Stock Unit" means a right granted to a Participant to receive Company Stock or cash awarded under Section 7.

(dd) "Retirement" means attainment of retirement under the CSX Pension Plan or Special Retirement Plan for CSX Corp. and Affiliated Corporations (nonqualified retirement plan) and immediately commencing your retirement benefits.

(ee) "Rule 16b-3" means Rule 16b-3 of the Securities and Exchange Commission promulgated under the Securities Exchange Act of 1934, as amended. A reference in the Plan to Rule 16b-3 shall include a reference to any corresponding rule (or number redesignation) of any amendments to Rule 16b-3 enacted after the effective date of the Plan's adoption.

(ff) "Senior Executive Incentive Award" means an award made to a Participant under the terms of the Senior Executive Incentive Plan.

(gg) "Senior Executive Incentive Plan" means the CSX Senior Executive Incentive Plan.

(hh) "Stock Appreciation Right" means a right to receive amounts awarded under Section 10.

(ii) "Subsidiary" means any corporation in which CSX owns stock possessing more than 50 percent of the combined voting power of all classes of stock or which is in a chain of corporations with CSX in which stock possessing more than 50 percent of the combined voting power of all classes of stock is owned by one or more other corporations in the chain.

(jj) "Vesting Event" means the occurrence of any event listed in Section 2(f), with the following modification: the words, "Approval by the shareholders of CSX of," in the first line of Sections 2(f)(iii) and 2(f)(iv) are replaced for purposes of this Section 2(jj) with the words, "Consummation of, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary by reason of ,".

3. *Stock.*

(a) Subject to Section 18 of the Plan, there shall be reserved for issuance under the Plan an aggregate of 6 million (6,000,000) shares of Company Stock, which shall be authorized, but unissued shares, plus any shares of Company Stock that are represented by awards granted under any prior plan of the Company, which are forfeited, expire or are cancelled without the delivery of shares or which result in the forfeiture of shares back to CSX. Shares allocable to Incentive Awards granted under the Plan that expire, are forfeited, otherwise terminate unexercised, or are settled in cash may again be subjected to an Incentive Award under the Plan. For purposes of determining the number of shares that are available for Incentive Awards under the Plan, the number shall include the number of shares surrendered by a Participant actually or by attestation or retained by CSX in payment of Applicable Withholding Taxes and any Mature Shares surrendered by a Participant upon exercise of an Option or in payment of Applicable Withholding Taxes. Shares issued under the Plan through the settlement, assumption of substitution of outstanding awards or obligations to grant future awards as a condition of an Employer acquiring another entity shall not reduce the maximum number of shares available for delivery under the Plan. Shares issued under the Senior Executive Incentive Plan shall reduce the maximum number of shares available for delivery under the Plan.

(b) No more than 1,200,000 shares may be allocated to the Incentive Awards, including the maximum amounts payable under a Performance Grant, that are granted to any individual Participant during any 36-month period. The maximum number of shares that may be issued as Restricted Stock, Restricted Stock Units, Dividend Equivalents and under Performance Grants, Stock Awards or Senior Executive Incentive Plan Grants shall be 1,200,000 shares, provided that any shares of Restricted Stock, Restricted Stock Units, Dividend Equivalents, Performance Grants or Stock Awards that are forfeited shall not count against this limit. The maximum cash payment that can be made for all Incentive Awards granted to any one individual shall be $3,000,000 times the number of 12-month periods in any performance cycle for any single or combined performance goals. Any amount that is deferred by a Participant shall be subject to the previous limit on the maximum cash payment in the year in which the deferral is made and not in any later year in which payment is made.

4. *Eligibility.*

(a) All present and future employees of CSX, a Subsidiary, or a Foreign Affiliate at the time of grant shall be eligible to receive Incentive Awards under the Plan. If an Affiliate is approved to participate in the Plan, all present and future employees of an Affiliate at the time of grant shall be eligible to receive Incentive Awards under the Plan. The Committee shall have the power and complete discretion, as provided in Section 19, to select eligible employees to receive Incentive Awards and to determine for each employee the nature of the award and the terms and conditions of each Incentive Award.

(b) The grant of an Incentive Award shall not obligate an Employer to pay an employee any particular amount of remuneration, to continue the employment of the employee after the grant or to make further grants to the employee at any time thereafter.

5. *Stock Options.*

(a) The Committee may make grants of Options to Participants. The Committee shall determine the number of shares for which Options are granted, the Option exercise price per share, whether the Options are Incentive Stock Options or Nonqualified Stock Options, and any other terms and conditions to which the Options are subject.

(b) The exercise price of shares of Company Stock covered by an Option shall be not less than 100 percent of the Fair Market Value of the Company Stock on the Date of Grant. Except as provided in Section 18, the exercise price of an Option may not be decreased after the Date of Grant. Except as provided in Section 18, a Participant may not surrender an Option in consideration for the grant of a new Option with a lower exercise price. If a Participant's Option is cancelled before its termination date, the Participant may not receive another Option within 6 months of the cancellation unless the exercise price of such Option is no less than the exercise price of the cancelled Option.

(c) An Option shall not be exercisable more than 10 years after the Date of Grant. The aggregate Fair Market Value, determined at the Date of Grant, of shares for which Incentive Stock Options become exercisable by a Participant during any calendar year shall not exceed $100,000.

6. *Restricted Stock Awards*.

(a) The Committee may make grants of Restricted Stock to Participants. The Committee shall establish as to each award of Restricted Stock the terms and conditions to which the Restricted Stock is subject, including the period of time before which all restrictions shall lapse and the Participant shall have full ownership of the Company Stock (the "Restriction Period"). The Committee in its discretion may award Restricted Stock without cash consideration.

(b) Except as provided below in Section 6(c), the minimum Restriction Period applicable to any award of Restricted Stock that is not subject to performance standards restricting transfer shall be three years from the Date of Grant. Except as provided below in Section 6(c), the minimum Restriction Period applicable to any award of Restricted Stock that is subject to performance standards shall be one year from the Date of Grant.

(c) Restriction Periods of shorter duration than provided in Section 6(b) and Section 7(b) may be approved for awards of Restricted Stock or Restricted Stock Units combined with respect to up to 600,000 shares of Company Stock under the Plan.

(d) Restricted Stock may not be sold, assigned, transferred, pledged, hypothecated, or otherwise encumbered or disposed of until the restrictions have lapsed or been removed. Certificates representing Restricted Stock shall be held by CSX until the restrictions lapse and the Participant shall provide CSX with appropriate stock powers endorsed in blank.

7. *Restricted Stock Units.*

(a) The Committee may make grants of Restricted Stock Units to Participants. The Committee shall establish as to each award of Restricted Stock Units the terms and conditions to which the Restricted Stock Units are subject. Upon lapse of the restrictions, a Restricted Stock Unit shall entitle the Participant to receive from CSX a share of Company Stock or a cash amount equal to the Fair Market Value of the Company Stock on the date that the restrictions lapse.

(b) Except as provided in Section 6(c), the minimum Restriction Period applicable to any award of Restricted Stock Units that is not subject to performance standards restricting transfer shall be three years from the Date of Grant. Except as provided in Section 6(c), the minimum Restriction Period applicable to any award of Restricted Stock Units that is subject to performance standards shall be one year from the Date of Grant.

8. *Performance Grants.*

(a) The Committee may make Performance Grants to any Participant. Each Performance Grant shall contain the Performance Goals for the award, including the Performance Criteria, the target and maximum amounts payable and such other terms and conditions of the Performance Grant. As to each Covered Employee, each Performance Grant shall be granted and administered to comply with the requirements of Code Section 162(m).

(b) The Committee shall establish the Performance Goals for Performance Grants. The Committee shall determine the extent to which any Performance Criteria shall be used and weighted in determining Performance Grants. The Committee may increase, but not decrease, any Performance Goal during a performance period for a Covered Employee. The Performance Goals for any Performance Grant for a Covered Employee shall be made not later than 90 days after the start of the period for which the Performance Grant relates and shall be made prior to the completion of 25 percent of such period.

(c) The Committee shall establish for each Performance Grant the amount of Company Stock or cash payable at specified levels of performance, based on the Performance Goal for each Performance Criteria. The Committee shall make all determinations regarding the achievement of any Performance Goals. The Committee may not increase the amount of cash or Common Stock that would otherwise be payable upon achievement of the Performance Goal or Goals but may reduce or eliminate the payments except as provided in a Performance Grant.

(d) The actual payments to a Participant under a Performance Grant will be calculated by applying the achievement of Performance Criteria to the Performance Goal. The Committee shall make all calculations of actual payments and shall certify in writing the extent, if any, to which the Performance Goals have been met.

9. *Stock Awards*. The Committee may make Stock Awards to any Participant. The Committee shall establish the number of shares of Common Stock to be awarded and the terms and conditions applicable to each Stock Award. The Committee will make all determinations regarding the achievement of any performance restrictions on a Stock Award. The Common Stock under a Stock Award shall be issued by CSX upon the satisfaction of the terms and conditions of a Stock Award. No more than 1,200,000 shares of Company Stock (reduced by shares issued under Restricted Stock or Restricted Stock Units subject to Section 6(c)) may be granted under Stock Awards without performance restrictions.

10.


Powered by Morningstar® Document Research℠

*Stock Appreciation Rights*. The Committee may make grants of Stock Appreciation Rights to Participants. The Committee shall establish as to each award of Stock Appreciation Rights the terms and conditions to which the Stock Appreciation Rights are subject. The following provisions apply to all Stock Appreciation Rights:

(a) A Stock Appreciation Right shall entitle the Participant, upon exercise of the Stock Appreciation Right, to receive in exchange an amount equal to the excess of (x) the Fair Market Value on the date of exercise of the Company Stock covered by the surrendered Stock Appreciation Right over (y) an amount not less than 100 percent of the Fair Market Value of the Company Stock on the Date of Grant of the Stock Appreciation Right. The Committee may limit the amount that the Participant will be entitled to receive upon exercise of Stock Appreciation Rights.

(b) A Stock Appreciation Right may not be exercisable more than 10 years after the Date of Grant. A Stock Appreciation Right may only be exercised at a time when the Fair Market Value of the Company Stock covered by the Stock Appreciation Right exceeds the Fair Market Value of the Company Stock on the Date of Grant of the Stock Appreciation Right. The Stock Appreciation Right may provide for payment in Company Stock or cash, or a fixed combination of Company Stock or cash, or the Committee may reserve the right to determine the manner of payment at the time the Stock Appreciation Right is exercised.

11. *Dividend Equivalents*. The Committee may make grants of Dividend Equivalents to any Participant. The Committee shall establish the terms and conditions to which the Dividend Equivalents are subject. Dividend Equivalents may be granted in connection with any other Incentive Award or separately. Under a Dividend Equivalent, a Participant shall be entitled to receive currently or in the future payments equivalent to the amount of dividends paid by CSX to holders of Company Stock with respect to the number of Dividend Equivalents held by the Participant. The Dividend Equivalent may provide for payment in Company Stock or cash, or a fixed combination of Company Stock or cash, or the Committee may reserve the right to determine the manner of payment at the time the Dividend Equivalent is payable.

12. *Method of Exercise of Options.* Options may be exercised by the Participant (or his guardian or personal representative) giving notice to the Corporate Secretary of CSX or his delegate pursuant to procedures established by CSX of the exercise stating the number of shares the Participant has elected to purchase under the Option. The exercise price may be paid in cash; or if the terms of an Option permit, (i) delivery or attestation of Mature Shares (valued at their Fair Market Value) in satisfaction of all or any part of the exercise price, (ii) delivery of a properly executed exercise notice with irrevocable instructions to a broker to deliver to CSX the amount necessary to pay the exercise price from the sale or proceeds of a loan from the broker with respect to the sale of Company Stock or a broker loan secured by Company Stock, or (iii) a combination of (i) and (ii).

13. *Tax Withholding*. Whenever payment under an Incentive Award is made in cash, the Employer will withhold an amount sufficient to satisfy any Applicable Withholding Taxes. Each Participant shall agree as a condition of receiving an Incentive Award payable in the form of Company Stock, to pay to the Employer, or make arrangements satisfactory to the Employer regarding the payment to the Employer of, Applicable Withholding Taxes. To satisfy Applicable Withholding Taxes and under procedures established by the Committee or its delegate, a Participant may elect to (i) make a cash payment or authorize additional withholding from cash compensation, (ii) deliver Mature Shares (valued at their Fair Market Value) or (iii) have CSX retain that number of shares of Company Stock (valued at their Fair Market Value) that would satisfy all or a specified portion of the Applicable Withholding Taxes.

14. *Transferability of Incentive Awards.* Incentive Awards other than Incentive Stock Options shall not be transferable by a Participant and exercisable by a person other than the Participant, except as expressly provided in the Incentive Award. Incentive Stock Options, by their terms, shall not be transferable except by will or by the laws of descent and distribution and shall be exercisable, during the Participant's lifetime, only by the Participant.

15. *Deferral Elections*. Effective January 1, 2005, the Committee may permit Participants to elect to defer any gains realized or the issuance or right to Company Stock relating to Incentive Awards, other than Options or Stock Appreciation Rights, vested, earned or granted after December 31, 2004, under the CSX Executives' Deferred Compensation Plan or any successor plan.

16. *Effective Date of the Plan.* The effective date of the Plan is April 27, 2000. The Plan shall be submitted to the shareholders of CSX for approval. Until (i) the Plan has been approved by CSX's shareholders, and (ii) the requirements of any applicable federal or state securities laws have been met, no Restricted Stock shall be awarded that is not contingent on these events and no Option granted shall be exercisable.

17. *Termination, Modification, Change.* If not sooner terminated by the Board, this Plan shall terminate at the close of business on April 26, 2010. No Incentive Awards shall be made under the Plan after its termination. The Board may amend or terminate the Plan as it shall deem advisable; provided that no change shall be made that increases the total number of shares of Company Stock reserved for issuance pursuant to Incentive Awards granted under the Plan (except pursuant to Section 18), or reduces the minimum exercise price for Options unless such change is authorized by the shareholders of CSX. A termination or amendment of the Plan shall not, without the consent of the Participant, adversely affect a Participant's rights under an Incentive Award previously granted to him or her.

18. *Change in Capital Structure*.

 Powered by Morningstar® Document Research℠

(a) In the event of a stock dividend, stock split or combination of shares, share exchange, recapitalization or merger in which CSX is the surviving corporation or other change in CSX capital stock (including, but not limited to, the creation or issuance to shareholders generally of rights, options or warrants for the purchase of common stock or preferred stock of CSX), the number and kind of shares of stock or securities of CSX to be subject to the Plan and to Incentive Awards then outstanding or to be granted, the maximum number of shares or securities which may be delivered under the Plan under Sections 3(a), 3(b), 6(b) or 9, the exercise price, the terms of Incentive Awards and other relevant provisions shall be adjusted by the Committee in its discretion, whose determination shall be binding on all persons. If the adjustment would produce fractional shares with respect to any unexercised Option, the Committee may adjust appropriately the number of shares covered by the Option so as to eliminate the fractional shares.

(b) If CSX is a party to a consolidation or a merger in which CSX is not the surviving corporation, a transaction that results in the acquisition of substantially all of CSR's outstanding stock by a single person or entity, or a sale or transfer of substantially all of CSX's assets, the Committee may take such actions with respect to outstanding Incentive Awards as the Committee deems appropriate.

(c) Notwithstanding anything in the Plan to the contrary, the Committee may take the foregoing actions without the consent of any Participant, and the Committee's determination shall be conclusive and binding on all persons for all purposes.

19. *Administration of the Plan.*

(a) Prior to a Change in Control, the Committee shall administer the Plan. The Committee shall have general authority to impose any term, limitation or condition upon an Incentive Award that the Committee deems appropriate to achieve the objectives of the Incentive Award. The Committee may adopt rules and regulations for carrying out the Plan with respect to Participants. The interpretation and construction of any provision of the Plan by the Committee shall be final and conclusive as to any Participant.

(b) Except as provided in Section 5(b), the Committee shall have the power to amend the terms of previously granted Incentive Awards that were granted by that Committee so long as the terms as amended are consistent with the terms of the Plan and provided that the consent of the Participant is obtained with respect to any amendment that would be detrimental to him or her, except that such consent will not be required if such amendment is for the purpose of complying with Rule 16b-3 or any requirement of the Code applicable to the Incentive Award.

(c) The Committee shall have the power and complete discretion (i) to delegate to any individual, or to any group of individuals employed by the Company or any Subsidiary, the authority to grant Stock Awards under the Plan and (ii) to determine the terms and limitations of any delegation of authority; provided that no individual Stock Award granted under a delegation by the Committee may exceed a Fair Market Value of $100,000 on the Date of Grant.

(d) If the Participant's Employer is involved in a Divisive Transaction, the Committee may take such actions with respect to outstanding Incentive Awards as the Committee deems appropriate.

(e) If a Participant or former Participant (1) becomes associated with, recruits or solicits customers or other employees of an Employer, is employed by, renders services to, or owns any interest in (other than any nonsubstantial interest, as determined by the Committee) any business that is in competition with CSX, its Subsidiaries, Foreign Affiliates or Affiliates, (2) has his employment terminated by his Employer on account of actions by the Participant which are detrimental to the interests of CSX, its Subsidiaries, Foreign Affiliates or Affiliates, or (3) engages in, or has engaged in, conduct which the Committee determines to be detrimental to the interests of CSX, the Committee may, in its sole discretion, cancel all outstanding Incentive Awards, including immediately terminating any options held by the Participant, regardless of whether then exercisable.

(f) In the event of the death of a Participant, any outstanding Incentive Awards that are otherwise exercisable may be exercised by the Participant's Beneficiary or, if no Beneficiary is designated, by the personal representative of the Participant's estate or by the person to whom rights under the Incentive Award shall pass by will or the laws of descent and distribution.

(g) In the event of the death of a Participant, any outstanding Incentive Awards that are otherwise exercisable may be exercised by the Participant's Beneficiary. If no Beneficiary is designated and the Participant dies testate, any outstanding Incentive Awards that are otherwise exercisable may be exercised by the person to whom such rights under an Incentive Award or such Incentive Awards are specifically bequeathed, or if there is no such specific bequest, by the personal representative of the Participant's estate. If no Beneficiary is designated and the Participant dies intestate, any outstanding Incentive Award that is otherwise exercisable may be exercised by the persons to whom such rights pass under the laws of descent and distribution of the state in which the Participant was domiciled at his or her death.

20. *Change in Control*.


Powered by Morningstar® Document Research℠

(a) Notwithstanding any provision of the Plan or any Incentive Award to the contrary:

(i) upon the occurrence of the date of a Change in Control, (i) all Options and Stock Appreciation Rights granted before February 13, 2001 shall become fully exercisable, (ii) all terms and conditions on Restricted Stock and Restricted Stock Units granted before February 13, 2001 shall be deemed satisfied, and (iii) all Performance Grants, Stock Awards and Dividend Equivalents granted before February 13, 2001 shall be deemed to be fully earned and be immediately payable in cash;

(ii) upon the occurrence of the date of a Vesting Event, (i) all Options and Stock Appreciation Rights granted on or after February 13, 2001 shall become fully exercisable, (ii) all terms and conditions on Restricted Stock and Restricted Stock Units granted on or after February 13, 2001 shall be deemed satisfied, and (iii) all Performance Grants, Stock Awards and Dividend Equivalents granted on or after February 13, 2001 shall be deemed to be fully earned and be immediately payable in cash;

(iii) all Options and Stock Appreciation Rights held by a Participant (A) who resigns within three months after an event constituting Good Reason or (B) whose employment is terminated without Cause by the Company or an Affiliate, in either case upon or after an event described in Section 2(f)(iii) or 2(f)(iv) and prior to the earlier of (x) the consummation of such event, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary and (y) the determination by the Board of Directors that such event has been unwound or reversed or is no longer expected to be consummated, which Options and Stock Appreciation Rights were not fully exercisable at the time of such termination of employment, shall become fully exercisable upon the consummation of the event described in Section 2(f)(iii) or 2(f)(iv), as applicable. Such Options and Stock Appreciation Rights shall be exercisable following the consummation of such event for the period specified in the Incentive Award for exercise following termination of employment other than due to death or Disability or until the expiration of the original option term, if sooner; provided, that prior to consummation of such event or a Board of Directors determination, as referenced above, such Options and Stock Appreciation Rights shall remain outstanding and be exercisable only at the time and to the extent set forth in the Incentive Award;

(iv) any terms and conditions of all Restricted Stock and Restricted Stock Units held by a Participant (A) who resigns within three months if an event constituting Good Reason or (B) whose employment is terminated without Cause by the Company or an Affiliate, in either case upon or after an event described in Section 2(f)(iii) or 2(f)(iv) and prior to the earlier of (x) the consummation of such event, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary and (y) the determination by the Board of Directors that such event has been unwound or reversed or is no longer expected to be consummated, which terms and conditions had not been satisfied at the time of such termination of employment, shall be deemed satisfied upon the consummation of the event described in Section 2(f)(iii) or 2(f)(iv), as applicable; provided, that prior to the consummation of such event or a Board of Directors determination, as referenced above, such Restricted Stock and Restricted Stock Units shall remain outstanding and be subject to the terms and conditions set forth in the Incentive Award; and

(v) all Performance Grants, Stock Awards and Dividend Equivalents held by a Participant (A) who resigns within three months of an event constituting Good Reason or (B) whose employment is terminated without Cause by the Company or an Affiliate, in either case upon or after an event described in Section 2(f)(iii) or 2(f)(iv) and prior to a the earlier of (x) the consummation of such event, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary and (y) the determination by the Board of Directors that such event has been unwound, reversed, or is no longer expected to be consummated, which had not been fully earned at the time of such termination of employment, shall be deemed to be fully earned and immediately payable in cash upon the consummation of the event described in Section 2(f)(iii) or 2(f)(iv), as applicable; provided, that prior to the consummation of such event or a Board of Directors determination, as referenced above, such Performance Grants, Stock Awards and Dividend Equivalents shall remain outstanding and be subject to the terms and conditions set forth in the Incentive Award.

21. *Interpretation.* The terms of this Plan shall be governed by the laws of the Commonwealth of Virginia without regard to its conflict of laws rules.

34253.000052 RICHMOND 1218135v4

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 21

**Subsidiaries of the Registrant**

As of December 28, 2007, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation, Inc. (a Virginia corporation)
CSX Intermodal, Inc. (a Delaware corporation)

As of December 28, 2007, none of the other subsidiaries included in the Registrant's consolidated financial statements constitute a significant subsidiary.


Powered by Morningstar® Document Research℠

Exhibit 23

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

- Registration Statement (Form S-3 No. 33-2084)
- Registration Statement (Form S-3 No. 333-113637)
- Registration Statement (Form S-3ASR. 333-132051)
- Registration Statement (Form S-8 No. 33-16230)
- Registration Statement (Form S-8 No. 33-25537)
- Registration Statement (Form S-8 No. 33-29136)
- Registration Statement (Form S-8 No. 33-33853)
- Registration Statement (Form S-8 No. 33-33854)
- Registration Statement (Form S-8 No. 33-37449)
- Registration Statement (Form S-8 No. 33-41498)
- Registration Statement (Form S-8 No. 33-41499)
- Registration Statement (Form S-8 No. 33-41735)
- Registration Statement (Form S-8 No. 33-47655)
- Registration Statement (Form S-8 No. 33-57029)
- Registration Statement (Form S-8 No. 333-09213)
- Registration Statement (Form S-8 No. 333-73429)
- Registration Statement (Form S-8 No. 333-32008)
- Registration Statement (Form S-8 No. 333-43382)
- Registration Statement (Form S-8 No. 333-48896)
- Registration Statement (Form S-8 No. 333-66604)
- Registration Statement (Form S-8 No. 333-110589)

of our reports dated February 15, 2008, with respect to the consolidated financial statements of CSX Corporation and the effectiveness of internal control over financial reporting of CSX Corporation included in this Annual Report (Form 10-K) for CSX Corporation.

/s/ Ernst & Young LLP
Jacksonville, Florida
February 19, 2008


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

EX-24 4 dex24.htm POWER OF ATTORNEY

Exhibit 24

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D. C., a Form 10-K (Annual Report), hereby constitutes and appoints Carolyn T. Sizemore and Ellen M. Fitzsimmons his true and lawful attorneys-in-fact and agents, for him and in his name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this 22nd day of February 2008.

| | |
|---|---|
| /s/ Donna M. Alvarado<br>Donna M. Alvarado | /s/ Southwood J. Morcott<br>Southwood J. Morcott |
| /s/ Elizabeth E. Bailey<br>Elizabeth E. Bailey | /s/ David M. Ratcliffe<br>David M. Ratcliffe |
| /s/ John B. Breaux<br>John B. Breaux | /s/ William C. Richardson<br>William C. Richardson |
| /s/ Steven T. Halverson<br>Steven T. Halverson | /s/ Frank S. Royal<br>Frank S. Royal |
| /s/ Edward J. Kelly III<br>Edward J. Kelly III | /s/ Donald J. Shepard<br>Donald J. Shepard |
| /s/ Robert D. Kunisch<br>Robert D. Kunisch | |


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 31.1

**CERTIFICATE OF CHIEF EXECUTIVE OFFICER**

I, Michael J. Ward, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 13, 2008

/s/ MICHAEL J. WARD
Michael J. Ward
Chairman, President and Chief Executive Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 31.2

**CERTIFICATE OF CHIEF FINANCIAL OFFICER**

I, Oscar Munoz, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 19, 2008

/s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the fiscal year ended December 28, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Ward, Chief Executive Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: February 13, 2008

/s/ MICHAEL J. WARD
Michael J. Ward
Chairman, President and Chief Executive Officer



Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the period ending December 28, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Oscar Munoz, Chief Financial Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

Date: February 19, 2008

/s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer

 Powered by Morningstar® Document Research℠

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

 Powered by Morningstar® Document Research℠

# EXHIBIT PX0589

**Burlington Northern Santa Fe Corporation**
2007 Annual Report and Form 10-K

# Our **railroad** connects



**people** and **products**, here and everywhere.






## Our impact

**BNSF's impact is much broader than America's borders; we are a critical link connecting consumers to the global marketplace.** For more than 150 years, BNSF has played a vital role in building and sustaining this nation's economy: delivering grain for the food we eat, hauling materials to build our homes, transporting products to stock our shelves, and moving the coal that generates more than 10 percent of the country's electricity.


Our **trains** work hard
for our country.

# 10.3M

**Total freight volume (in units)**

**It all starts on our rails.** Last year, our trains handled more than 10 million shipments of coal, industrial, agricultural and consumer products. We continually look for innovative technologies to enhance the efficiency and safety of our operations and expand our capacity to meet increasing market demands.


Our **team** is the most producti
and dedication, our people deli



# 40,000+

**Experienced professionals**

ve in the business. With focus
ver reliable, efficient service.


Our **economy** runs on rail.

# $24B

**Invested in 10 years**

**America gets a return on our investment.** Each year we handle about 10 percent of the nation's freight ton-miles on our BNSF network, across 32,000 route miles in 28 states and two Canadian provinces. To better serve our customers and handle growing volume, we have invested more than $7 billion in locomotives and expansion projects since 1998. As we maintain and expand our "rail highway," our trains serve as a vital link between producers and the marketplace.


Our **world** is the global marketplace.
交通银行
大光明钟表商店
茂昌眼镜公司

# 11%

**10-year international compound annual growth rate***

**Our track may serve America, but our impact spans the globe.** As one of the nation's largest railroads, we are a critical part of the global supply chain. We take that responsibility very seriously. At BNSF, we are working to align our business decisions and our environmental, social and economic commitments to create value for customers and all stakeholders today and in the future.

* International intermodal units

**The future is riding on rail.**
economy today and will be incr
tomorrow. BNSF will always co
here and everywhere.

Rail is integral to our nation's
easingly important to the world
nnect people and products,

**Our rail lines helped build this nation starting more than 150 years ago, and today our role is more important than ever. We play an essential role not only in meeting today's freight transportation needs, but in providing and building a transportation network that will meet the needs of future generations.**

**To our shareholders, customers and colleagues,**

The year 2007 was a year of challenges and successes. In a difficult economic environment, the strength of BNSF was evident as our dedicated employees once again delivered reliable service, captured market opportunities and controlled costs.

While we faced many challenges, including a soft economy and record fuel prices, we produced solid returns for our shareholders because of the diverse nature of our business portfolio. We generated record free cash flow in excess of $1 billion before dividends, which allowed us to increase our dividend for the fifth consecutive year; continue our share repurchase program, which began in 1998; and invest in capital to maintain our infrastructure and selectively add capacity for long-term growth.

Despite these successes, however, 2007 was a disappointing year for safety. Sadly, we lost four colleagues to fatal injuries in 2007. And, after about a decade of year-over-year improvement, our employee injury frequency rate increased in 2006 and again in 2007. These results are especially frustrating because we are a leader in most other areas of safety, including highway-rail grade crossing safety. We clearly have more work to do toward our goal of an injury-free and accident-free workplace. We are increasing our focus on safety performance across the railroad with determination to improve. We believe that we have an excellent employee safety framework in place; our challenge is to ensure that these programs are consistently implemented and that we better disseminate best practices within these areas.

As I review the year in more detail, I will outline how the diversity of our business portfolio helped our results and how we adjusted our costs and capital investments in response to the soft business conditions. I will also review our ability to provide reliable service and a strong network to meet customer needs, our focus on capital investment to support long-term growth, and our commitment to corporate citizenship.

**Maintaining a balanced portfolio**

Our 2007 revenues increased approximately $800 million, or 5 percent, to an all-time record of $15.8 billion. Our results were helped by our diverse portfolio of business. The wide variety of commodities we handle gives our company the ability to weather cyclical downturns. Even though consumer products volumes and commodities related to housing were down, we had strong demand in agricultural products. The diversity of our portfolio makes us less vulnerable to changing market demand than many other industries, and our 2007 results underscored that strength.

Our biggest success in 2007 was our agricultural business, which set an all-time revenue record at $2.7 billion. Our volume increased 6 percent in this area, as we handled record levels of wheat, ethanol and bulk foods. A strong domestic harvest, high global demand for wheat, and significant growth in ethanol volume combined for a very successful year for this business segment.

For coal, we also had record volumes and record revenues of $3.3 billion. Although mine production issues during part of the year impacted our volume, we were able to improve service delivery year-over-year. We are optimistic that demand will remain strong for the low-sulfur coal we transport from the Powder River Basin in Wyoming and Montana.



**Matthew K. Rose,** Chairman, President and Chief Executive Officer

Industrial products volumes decreased slightly; however, revenues increased 3 percent to $3.7 billion. Continued strong demand for petroleum products helped to offset the decline in the housing market, which had a negative impact on all of our building products, including lumber, panel products and other building materials.

Our consumer products revenues increased to a record $5.7 billion. Our unit volumes for consumer products, however, decreased due to softening demand for imported consumer goods and a shift in strategy by one of our largest international intermodal customers. We are optimistic that the long-term demand for Asian goods will rebound as the economy improves.

During a year of mixed demand, we worked hard to control costs. With regard to our largest expense category, compensation and benefits, year-over-year expense was down 1 percent on flat employee headcount. Wages and benefits increases were offset by lower variable compensation costs and other cost-control measures.

Our second-largest expense area, fuel, was up 17 percent, due to higher prices and reduced hedge benefits. We were able to recover a portion of the additional expense through our fuel surcharge program. Additionally, we were able to achieve record fuel efficiency with a nearly 3 percent improvement over 2006, avoiding the purchase of more than 38 million gallons of fuel, saving $90 million, and benefiting the environment by burning less fuel per ton-mile.

## Focusing on velocity and service

We recognize that providing reliable service is the best way to ensure our continued growth, especially when the economy begins to recover. We must continue to realize our vision by "providing transportation services that consistently meet our customers' expectations."

In 2007, we continued our companywide focus on velocity. This initiative, which started in 2005, is increasing our on-time performance and asset utilization. Velocity is much more than the speed at which trains travel. It includes the number of times that equipment is handled and how long freight remains stationary. Our people examine every process to eliminate inefficiencies and gain more productive use of our track, equipment, terminals and other assets.

**We were able to achieve record fuel efficiency with a nearly 3 percent improvement over 2006, avoiding the purchase of more than 38 million gallons of fuel, saving $90 million.**

Efforts throughout the company helped us improve our performance for all six of the velocity measures we track. I am proud of our team, who achieved this while coping with severe flooding midyear in the Southeast and Upper Midwest, wildfires in October in Southern California, and record flooding in December in the Puget Sound region. In 2008, our continued focus on velocity will further improve our efficiency and increase the capacity of our existing assets, while helping us better serve new and existing customers.

# Our 2007 revenues increased approximately $800 million, or 5 percent, to an all-time record of $15.8 billion.

I am also proud of our team for achieving a perfect peak season for United Parcel Service (UPS). We handled 34,366 UPS loads with zero service failures between Thanksgiving and December 23 in 2007, and the streak of failure-free service continued for 53 days through mid-January 2008. This was our fourth UPS peak season with perfect performance since 1999.

### Planning for long-term growth

Over the long term, I am very optimistic about the future of rail transportation. My perspective comes, in part, from my work as a member of the National Surface Transportation Policy and Revenue Study Commission. Formed by Congress in 2005, this commission included some of our nation's top transportation experts and leaders in business, government and academics. We were asked to consider the future needs of the nation's surface transportation system and to recommend funding options; the results of our two-year study were released in January 2008.

This independent commission found that a strong freight railroad industry is vital to the future of our country. Today, the U.S. rail industry transports about 40 percent of the nation's goods, in terms of tons handled and distance moved, for only 13 percent of the overall transportation cost. And the value of rail continues to rise. The U.S. Department of Transportation projects that demand for rail freight transportation, measured in tonnage, will increase 88 percent by 2035.

Unlike other modes of transportation, U.S. railroads, including BNSF, own and maintain their transportation rights of way. Simply put, we fund the building, maintenance and repair of a private "rail highway" that delivers tremendous value for our customers and the nation. Our transportation network is critical to the movement of goods and our nation's economic growth, global competitiveness, environmental sustainability, safety and overall quality of life.

In the 10 years that ended in 2007, BNSF spent nearly $24 billion to improve our infrastructure. That includes maintaining a strong infrastructure through strategic investments in expanded track, yards and terminals; track renewal; technology; and acquiring more than 2,700 new, high-efficiency locomotives. All of our investments in infrastructure, equipment, asset utilization, people and technology help ensure we have the capacity to meet current and future freight transportation needs, while also improving our operating reliability and efficiency.

In 2007, we added a total of 183 miles of new track, focusing on expanding capacity of our transcontinental main line linking California to Chicago and our track serving coal territory in Wyoming and Nebraska. These two freight rail corridors are some of the busiest stretches of track in the world. We also acquired another 200 high-horsepower, high-efficiency locomotives. Our newest locomotives are 15 percent more fuel efficient than the units they replaced, which also reduces emissions and benefits the environment. Our investments help ensure that we have the capacity we need to meet our customers' and our nation's transportation needs today and in the future.

But we were also careful to calibrate our capital spending in response to market conditions. In all, our 2007 capital commitments totaled about $2.6 billion. This number was down from 2006, as we reduced our projected spending during the year in response to the softer demand. We are committed to expanding

our capacity to handle growth over the long term, but we always balance those investments with short-term market conditions and demand.

Over the past several years, the public policy debate around economic regulation of the railroad industry has heated up. The outcome of this debate has a direct impact on our ability to continue to invest to meet the projected future demand. Changes in economic regulation have implications for our customers as well as the national highway network.

The Commission found that our nation will require significant increases in rail capacity to encourage economic growth and help meet energy efficiency and environmental goals. Any change to public policy needs to be measured against whether it will expand or shrink rail capacity. Public policy should support the expansion of rail capacity.

## Demonstrating responsible corporate citizenship

We recognize that, as one of our nation's largest railroads, we are a critical part of the global supply chain. We take that responsibility very seriously. We add value by providing freight capacity that, in most cases, is lower cost, more fuel-efficient, more environmentally friendly and safer than other modes of surface transportation. At BNSF, we are working to align our business decisions and our environmental, social and economic commitments to create value for customers and all stakeholders today and in the future.

To raise awareness of the contributions we are making today and what we are working to achieve, we have issued our first Corporate Citizenship Report. You can find this Corporate Citizenship Report on our website at www.bnsf.com. This report provides significant insight into four key areas — our Environmental Leadership, our Safety Commitment, our People and Communities, and our Economic Impact.

## Investing in our people

While our hiring has slowed down to reflect market conditions, we are proud of our efforts to replace retiring workers with military veterans who possess experience and technical knowledge that we need. In 2007, nearly one-third of our new hires were veterans. In recognition of our commitment, *GI Jobs* magazine put us at the top of their 2007 list of America's 50 Most Military Friendly Employers. After ranking high on this list for several years, we are proud of achieving this first-place position in 2007.

Ultimately, our success rests on the quality of our people and our sensitivity to the needs and concerns of our shippers, our investors and our communities. We believe that we made significant progress in 2007, despite a soft economy and other challenges, and we are well-positioned for the future. As always, I credit the dedication, focus and resilience of our people, and I thank all of our stakeholders for their interest and support. Together, we can look forward to the continued growth and strength of our rail franchise in 2008.

Matthew K. Rose
Chairman, President and Chief Executive Officer
February 14, 2008

# Consolidated Financial Highlights

Dollars in millions, except per share data

| December 31, | 2007 | 2006[a] | 2005[a] | 2004[a] | 2003[a] |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | **$ 15,802** | $ 14,985 | $ 12,987 | $ 10,946 | $ 9,413 |
| Operating income | **$ 3,486** | $ 3,521 | $ 2,927[b] | $ 1,709[c] | $ 1,675 |
| Income before cumulative effect of accounting change | **$ 1,829** | $ 1,889 | $ 1,534[b] | $ 805[c] | $ 783[d] |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 5.19** | $ 5.23 | $ 4.13[b] | $ 2.18[c] | $ 2.12[d] |
| Average basic shares | **352.5** | 361.0 | 371.8 | 370.0 | 369.1 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 5.10** | $ 5.11 | $ 4.02[b] | $ 2.14[c] | $ 2.10[d] |
| Average diluted shares | **358.9** | 369.8 | 381.8 | 376.6 | 372.3 |
| Dividends declared per common share | **$ 1.14** | $ 0.90 | $ 0.74 | $ 0.64 | $ 0.54 |
| **At year end:** | | | | | |
| Total assets | **$ 33,583** | $ 31,797 | $ 30,436 | $ 29,023 | $ 27,050 |
| Long-term debt and commercial paper, including current portion | **$ 8,146** | $ 7,385 | $ 7,154 | $ 6,516 | $ 6,684 |
| Stockholders' equity | **$ 11,144** | $ 10,528 | $ 9,638 | $ 9,438 | $ 8,608 |
| Net debt to total capitalization[e] | **41.2%** | 40.0% | 42.3% | 39.6% | 43.6% |
| **For the year ended:** | | | | | |
| Total capital expenditures | **$ 2,248** | $ 2,014 | $ 1,750 | $ 1,527 | $ 1,726 |
| Depreciation and amortization | **$ 1,293** | $ 1,176 | $ 1,111 | $ 1,035 | $ 927 |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities.*

b 2005 operating income, income before cumulative effect of accounting change and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share.

c 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share.

d 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change for asset retirement obligations of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share.

e Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

BNSF's free cash flow, as discussed in the preceding shareholders letter, is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, other information prepared in accordance with GAAP. Below is the calculation of free cash flow before dividends for 2007.

| Free Cash Flow Calculation (in millions) | 2007 |
|---|---|
| Net cash provided by operating activities | **$ 3,492** |
| Net cash used for investing activities | **(2,415)** |
| Proceeds from facility financing obligation | **41** |
| Free cash flow before dividends | **$ 1,118** |

# 2007 Form 10-K

## Burlington Northern Santa Fe Corporation

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

**[x] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE TRANSITION PERIOD FROM __________ TO __________

**COMMISSION FILE NUMBER: 1-11535**

---

**Exact name of registrant as specified in its charter**

## Burlington Northern Santa Fe Corporation

| State of Incorporation | I.R.S. Employer Identification No. |
|---|---|
| **Delaware** | **41-1804964** |

Address of principal executive offices, including zip code
**2650 Lou Menk Drive**
**Fort Worth, Texas 76131-2830**

Registrant's telephone number, including area code
**(800) 795-2673**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $0.01 par value** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. **Yes [x] No [ ]**

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. **Yes [ ] No [x]**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. **Yes [x] No [ ]**

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. **[ ]**

Indicate by check mark whether the registrant is a large accelerated filer, accelerated filer, non-accelerated filer, or smaller reporting company (as defined in Rule 12b-2 of the Act).
**Large accelerated filer [x]** **Accelerated filer [ ]** **Non-accelerated filer [ ]** **Smaller reporting company [ ]**

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). **Yes [ ] No [x]**

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $29.822 billion on June 30, 2007. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.01 par value, 348,201,513 shares outstanding as of February 4, 2008.

### DOCUMENTS INCORPORATED BY REFERENCE

**List hereunder the documents from which parts thereof have been incorporated by reference and the Part of the Form 10-K into which such information is incorporated:**

Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Part III

# Table of Contents


| | | | |
|---|---|---|---|
| **Part I** | Item 1. | Business | 1 |
| | Item 1A. | Risk Factors | 1 |
| | Item 1B. | Unresolved Staff Comments | 4 |
| | Item 2. | Properties | 5 |
| | Item 3. | Legal Proceedings | 10 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 11 |
| | Executive Officers of the Registrant | | 11 |
| **Part II** | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
| | Item 6. | Selected Financial Data | 13 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 35 |
| | Item 8. | Financial Statements and Supplementary Data | 37 |
| | Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 74 |
| | Item 9A. | Controls and Procedures | 74 |
| | Item 9B. | Other Information | 74 |
| **Part III** | Item 10. | Directors, Executive Officers and Corporate Governance | 75 |
| | Item 11. | Executive Compensation | 75 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 75 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 76 |
| | Item 14. | Principal Accountant Fees and Services | 76 |
| **Part IV** | Item 15. | Exhibits and Financial Statement Schedules | 77 |
| | Signatures | | S-1 |
| | Exhibit Index | | E-1 |

# Part I

## Item 1. Business

Burlington Northern Santa Fe Corporation (BNSF, Registrant or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the shareholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the shareholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, SFP merged with and into The Burlington Northern and Santa Fe Railway Company. On January 20, 2005, The Burlington Northern and Santa Fe Railway Company changed its name to BNSF Railway Company (BNSF Railway).

Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. At December 31, 2007, BNSF and its subsidiaries had approximately 40,000 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America.

BNSF's internet address is www.bnsf.com. Through this internet website (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission (SEC). Filings on Forms 3, 4 and 5 are also available on this website within one day after filing with the SEC. BNSF's annual CEO certification filed pursuant to the New York Stock Exchange's Corporate Governance Listing Standards is filed as an exhibit to this Form 10-K. BNSF makes available on its website other previously filed SEC reports, registration statements and exhibits via a link to the SEC's website at www.sec.gov. The following documents are also made available on the Company's website:

- Code of Conduct
- Code of Business Conduct and Ethics for Scheduled Employees
- Corporate Governance Guidelines; and
- Charters of the Audit, Compensation and Development and Directors and Corporate Governance Committees

Further discussion of the Company's business, including equipment and business sectors, is incorporated by reference from Item 2, "Properties."

## Item 1A. Risk Factors

**The Company faces intense competition from rail carriers and other transportation providers, and its failure to compete effectively could adversely affect its results of operations, financial condition or liquidity.**

The Company operates in a highly competitive business environment. Depending on the specific market, the Company faces intermodal, intramodal, product and geographic competition. For example, the Company believes that high service truck lines, due to their ability to deliver non-bulk products on an expedited basis, have had and will continue to have an adverse effect on the Company's ability to compete for deliveries of non-bulk, time-sensitive freight. While the Company must build or acquire and maintain its rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any material increase in the capacity and quality of these alternative methods or the passage of legislation granting greater latitude to motor carriers with respect to size and weight restrictions could have an adverse effect on the Company's results of operations, financial condition or liquidity. In addition, a failure to provide the level of service required by the Company's customers could result in loss of business to competitors.

**A downturn in the economy or change in government policy could negatively impact demand for the Company's services.**

Significant, extended negative changes in economic conditions that impact the producers and consumers of the commodities transported by the Company may have an adverse effect on the Company's operating results, financial condition or liquidity. In addition, changes in United States and foreign government policies could change the economic environment and affect demand for the Company's services. For example, changes in clean air laws or regulation of carbon dioxide emissions could reduce the demand for coal. Also, United States and foreign government agriculture tariffs or subsidies could affect the demand for grain.

**As part of its railroad operations, the Company frequently transports chemicals and other hazardous materials.**

The Company is required to transport these commodities to the extent of its common carrier obligation. An accidental release of these commodities could result in a significant loss of life and extensive property damage as well as environmental remediation obligations. The associated costs could have an adverse effect on the Company's operating results, financial condition or liquidity.

**Future acts of terrorism or war, as well as the threat of war, may cause significant disruptions in the Company's business operations.**

Terrorist attacks, such as those that occurred on September 11, 2001, as well as the more recent attacks on the transportation systems in Madrid, London and in India, and any government response to those types of attacks and war or risk of war may adversely affect the Company's results of operations, financial condition or liquidity. The Company's rail lines and facilities could be direct targets or indirect casualties of an act or acts of terror, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues, which could have an adverse effect on its operating results and financial condition. Such effects could be magnified if releases of hazardous materials are involved. Any act of terror, retaliatory strike, sustained military campaign or war or risk of war may have an adverse impact on the Company's operating results and financial condition by causing or resulting in unpredictable operating or financial conditions, including disruptions of rail lines, volatility or sustained increase of fuel prices, fuel shortages, general economic decline and instability or weakness of financial markets. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or certain coverage may not be available to the Company in the future.

**The Company is subject to stringent environmental laws and regulations, which may impose significant costs on its business operations.**

The Company's operations are subject to extensive federal, state and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; the generation, handling, storage, transportation and disposal of waste and hazardous materials; and the cleanup of hazardous material or petroleum releases. Changes to or limits on carbon dioxide emissions could result in significant capital expenditures to comply with these regulations. Further, local concerns on emissions and other forms of pollution could inhibit the Company's ability to build facilities in strategic locations to facilitate growth and efficient operations. In addition, many of the Company's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. Environmental liability can extend to previously owned or operated properties, leased properties and properties owned by third parties, as well as to properties currently owned and used by the Company. Environmental liabilities have arisen and may continue to arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. The Company has been and may continue to be subject to allegations or findings to the effect that it has violated, or is strictly liable under, these laws or regulations. The Company's operating results, financial condition or liquidity could be adversely affected as a result of any of the foregoing, and it may be required to incur significant expenses to investigate and remediate environmental contamination. The Company records liabilities for environmental cleanup when the amount of its liability is both probable and reasonably estimable.

**The Company's future success depends on its ability to continue to comply with the significant federal, state and local governmental regulations to which it is subject.**

The Company is subject to a significant amount of governmental regulation with respect to its rates and practices, railroad operations and a variety of health, safety, labor, environmental and other matters. Failure to comply with applicable laws and regulations could have a material adverse effect on the Company. Governments may change the legislative framework within which the Company operates without providing the Company with any recourse for any adverse effects that the change may have on its business. Also, some of the regulations require the Company to obtain and maintain various licenses, permits and other authorizations, and it cannot assure that it will continue to be able to do so. Increased economic regulation of the rail industry could negatively impact the Company's ability to determine prices for rail services and to make capital improvements to its rail network, resulting in an adverse effect on the Company's results of operations, financial condition or liquidity.

**The availability of qualified personnel could adversely affect the Company's operations.**

Changes in demographics, training requirements and the availability of qualified personnel, particularly engineers and trainmen, could negatively impact the Company's ability to meet demand for rail service. Recruiting and retaining qualified personnel, particularly those with expertise in the railroad industry, are vital to operations. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on operational efficiency and otherwise have a material adverse effect on the Company's operating results, financial condition or liquidity.

**Most of the Company's employees are represented by unions, and failure to successfully negotiate collective bargaining agreements may result in strikes, work stoppages, or substantially higher ongoing labor costs.**

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention) are exhausted. While the negotiations have not yet resulted in any extended work stoppages, if the Company is unable to negotiate acceptable new agreements, it could result in strikes by the affected workers, loss of business and increased operating costs as a result of higher wages or benefits paid to union members, any of which could have an adverse effect on the Company's operating results, financial condition or liquidity.

**Severe weather and natural disasters could disrupt normal business operations, which would result in increased costs and liabilities and decreases in revenues.**

The Company's success is dependent on its ability to operate its railroad system efficiently. Severe weather and natural disasters, such as tornados, flooding and earthquakes, could cause significant business interruptions and result in increased costs and liabilities and decreased revenues. In addition, damages to or loss of use of significant aspects of the Company's infrastructure due to natural or man-made disruptions could have an adverse affect on the Company's operating results, financial condition or liquidity for an extended period of time until repairs or replacements could be made. Additionally, during natural disasters, the Company's workforce may be unavailable, which could result in further delays. Extreme swings in weather could also negatively affect the performance of locomotives and rolling stock.

**Fuel supply availability and fuel prices may adversely affect the Company's results of operations, financial condition or liquidity.**

Fuel supply availability could be impacted as a result of limitations in refining capacity, disruptions to the supply chain, or rising global demand. A significant reduction in fuel availability could impact the Company's ability to provide transportation services at current levels, increase fuel costs and impact the economy. Each of these factors could have an adverse effect on the Company's operating results, financial condition or liquidity. Additionally, the Company is expected to be able to offset a significant portion of the anticipated higher fuel costs through its fuel surcharge program in 2008. However, to the extent that the Company is unable to maintain and expand its existing fuel surcharge program, increases in fuel prices could have an adverse effect on the Company's operating results, financial condition or liquidity.

**The Company depends on the stability and availability of its information technology systems.**

The Company relies on information technology in all aspects of its business. A significant disruption or failure of its information technology systems could result in service interruptions, safety failures, security violations, regulatory compliance failures and the inability to protect corporate information assets against intruders or other operational difficulties. Although the Company has taken steps to mitigate these risks, including Business Continuity Planning, Disaster Recovery Planning and Business Impact Analysis, a significant disruption could adversely affect the Company's results of operations, financial condition or liquidity. Additionally, if the Company is unable to acquire or implement new technology, it may suffer a competitive disadvantage, which could also have an adverse effect on the Company's results of operations, financial condition or liquidity.

**The Company's operational dependencies may adversely affect results of operations, financial condition or liquidity.**

Due to the integrated nature of the United States' freight transportation infrastructure, the Company's operations may be negatively affected by service disruptions of other entities such as ports and other railroads which interchange with the Company. A significant prolonged service disruption of one or more of these entities could have an adverse effect on the Company's results of operations, financial condition or liquidity.

**Personal injury claims constitute a significant expense, and increases in the amount or severity of these claims could adversely affect the Company's operating results.**

The Company is subject to various personal injury claims by third parties and employees, including claims by employees who worked around asbestos until 1985, when its use at BNSF was substantially eliminated. Personal injury claims by BNSF Railway employees are subject to the Federal Employees' Liability Act (FELA), rather than state workers' compensation laws. The Company believes that the FELA system, which includes unscheduled awards and a reliance on the jury system, has contributed to increased expenses in the past. Future events, such as increases in the number of claims that are filed, developments in legislative and judicial standards and the costs of settling claims, could result in an adverse effect on the Company's operating results.

## Item 1B. Unresolved Staff Comments

None.

# Item 2. Properties

## Track Configuration

BNSF Railway operates over a railroad system consisting of approximately 32,000 route miles of track, excluding multiple main tracks, yard tracks and sidings, approximately 23,000 miles of which are owned route miles, including easements, in 28 states and two Canadian provinces as of December 31, 2007. Approximately 9,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over other railroads' tracks.

As of December 31, 2007, the total BNSF Railway system, including single and multiple main tracks, yard tracks and sidings, consisted of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 10,000 route miles operated under trackage rights. At December 31, 2007, approximately 26,000 miles of BNSF Railway's track consisted of 112-pound per yard or heavier rail, including approximately 20,000 track miles of 131-pound per yard or heavier rail.

## Equipment Configuration

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock and other equipment as of the dates shown below.

| At December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Locomotives | **6,400** | 6,330 | 5,790 |
| Freight cars: | | | |
| Covered hopper | **36,439** | 33,488 | 34,631 |
| Gondola | **13,690** | 13,998 | 12,579 |
| Open hopper | **11,428** | 11,277 | 10,973 |
| Flat | **10,470** | 11,382 | 8,537 |
| Box | **7,948** | 8,937 | 8,685 |
| Refrigerator | **4,196** | 4,631 | 4,983 |
| Tank | **427** | 426 | 422 |
| Autorack | **416** | 641 | 748 |
| Other | **324** | 341 | 323 |
| Total freight cars | **85,338** | 85,121 | 81,881 |
| Domestic chassis | **11,714** | 12,849 | 12,649 |
| Company service cars | **4,070** | 3,982 | 4,091 |
| Domestic containers | **3,253** | 3,275 | 10,412 |
| Trailers | **1,200** | 1,209 | 1,916 |
| Commuter passenger cars | **163** | 165 | 179 |
| Average age from date of manufacture–locomotive fleet (years)[a] | **15** | 15 | 15 |
| Average age from date of manufacture–freight car fleet (years)[a] | **14** | 14 | 15 |

a These averages are not weighted to reflect the greater capacities of the newer equipment.

## Capital Expenditures and Maintenance

### Capital Expenditures

The extent of the BNSF Railway's maintenance and capacity program is outlined in the following table:

| Year ended December 31, | 2008 Estimate | 2007 | 2006 | 2005 |
|---|---|---|---|---|
| Track miles of rail laid[a] | **908** | **994** | 854 | 711 |
| Cross ties inserted (thousands)[a] | **3,237** | **3,126** | 2,957 | 3,171 |
| Track resurfaced (miles) | **13,075** | **11,687** | 12,588 | 12,790 |

a Includes both maintenance of existing route system and expansion projects. Expenditures for these maintenance programs are primarily capitalized.

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2007, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Liquidity and Capital Resources; Investing Activities."

BNSF's planned 2008 capital commitments are incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Executive Summary; Business Outlook for 2008."

**Maintenance**

As of December 31, 2007, General Electric Company, Alstom Transportation, Inc. and Electro-Motive Diesel, Inc. performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 4,240 locomotives.

## Property and Facilities

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including containers, chassis and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 33 major intermodal hubs located across the system. BNSF Railway's largest intermodal facilities in terms of 2007 volume were as follows:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,243,000 |
| Logistics Park (Chicago, Illinois) | 755,000 |
| Corwith Yard (Chicago, Illinois) | 739,000 |
| Willow Springs (Illinois) | 636,000 |
| Alliance (Fort Worth, Texas) | 567,000 |
| Cicero (Illinois) | 517,000 |
| San Bernardino (California) | 500,000 |
| Argentine (Kansas City, Kansas) | 369,000 |
| Seattle International Gateway (Seattle, Washington) | 305,000 |
| Memphis (Tennessee) | 284,000 |

BNSF Railway owns 23 automotive distribution facilities and serves eight port facilities where automobiles are loaded on or unloaded from multi-level rail cars in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal, intermodal and coal cars) are shown below:

| Classification Yards | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas City, Kansas) | 1,807 |
| Galesburg (Illinois) | 1,642 |
| Barstow (California) | 1,349 |
| Pasco (Washington) | 1,274 |
| Tulsa (Oklahoma) | 1,198 |

As of December 31, 2007, certain BNSF Railway properties and other assets were subject to liens securing $102 million of mortgage debt. Certain locomotives, rolling stock and facilities of BNSF Railway were subject to equipment leases and financing obligations, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

## Productivity

Productivity, as measured by thousand gross ton miles per employee, is shown in the table below. Gross ton miles is defined as the product of the number of loaded and empty miles traveled and the combined weight of the car and contents. Certain prior period amounts have been adjusted to conform to current year presentation.

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Thousand gross ton miles divided by average number of employees | **27,222** | 27,092 | 26,964 |

A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Other Matters; Employee and Labor Relations."

## Business Mix

In serving the Midwest, Pacific Northwest and the Western, Southwestern and Southeastern regions and ports of the country, BNSF transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural and natural resource industries. Approximately 65 percent of the freight revenues originated by the Company is covered by contractual agreements of varying duration, while the balance is subject to common carrier, published prices or quotations offered by the Company. BNSF's financial performance is influenced by, among other things, general and industry economic conditions at the international, national and regional levels. The following map illustrates the Company's primary routes, including trackage rights, which allow BNSF to access major cities and ports in the western and southern United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF efficiently serves many smaller markets by working closely with approximately 200 shortline partners. BNSF has also entered into marketing agreements with CSX Transportation, Canadian National Railway Company and Kansas City Southern Railway Company, expanding the marketing reach for each railroad and their customers.




**Consumer Products:**

The Consumer Products' freight business provided approximately 37 percent of freight revenues in 2007 and consisted of the following business sectors:

- **International Intermodal** — International business consists primarily of container traffic from steamship companies such as Maersk, Hyundai and Yang Ming. International Intermodal accounted for approximately 46 percent of total Consumer Products revenues.
- **Domestic Intermodal** — Domestic Intermodal generated approximately 45 percent of total Consumer Products revenue. The Domestic Intermodal sector is comprised of the following business areas:
  - **Truckload/Intermodal Marketing Companies** — The Truckload business area is comprised of full truckload carriers such as J.B. Hunt Transportation, Schneider National and Swift Transportation. The Intermodal Marketing Companies business area is comprised of shippers' agents and consolidators such as the Hub Group.

  - **Expedited Truckload/Less-than-Truckload** — This business area is comprised of less-than-truckload carriers and parcel carriers such as United Parcel Service and YRC Worldwide. It also includes expedited truckload carriers such as Werner Enterprises, Stevens Transport and U.S. Xpress Enterprises.

- **Automotive** — The transportation of both assembled motor vehicles, primarily those manufactured outside of the United States, and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 9 percent of total Consumer Products revenues.

**Industrial Products:**
The Industrial Products' freight business provided approximately 24 percent of BNSF's freight revenues in 2007 and consisted of the following five business areas:

- **Construction Products** — The Construction Products sector represented approximately 33 percent of total Industrial Products revenues in 2007. This sector serves virtually all of the commodities included in, or resulting from, the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.

- **Building Products** — This sector generated approximately 29 percent of total 2007 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

- **Petroleum Products** — Commodities included in the Petroleum Products sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black. This group made up 16 percent of total Industrial Products revenues for 2007. Product use varies based on commodity and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

- **Chemicals and Plastic Products** — The Chemicals and Plastic Products sector represented approximately 14 percent of total 2007 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing and packaging industries, as well as for feedstocks, to produce other chemicals and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- **Food and Beverages** — Food and Beverages represented approximately 8 percent of total 2007 Industrial Products revenues. This group consists of beverages, canned goods and perishable food items. Other consumer goods such as cotton, salt, rubber and tires and miscellaneous boxcar shipments are also included in this business area.

**Coal:**

In 2007, the transportation of coal contributed about 21 percent of freight revenues. BNSF is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originated from the Powder River Basin of Wyoming and Montana. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast, Mountain and Pacific Northwest regions of the United States. BNSF also transports coal from the Powder River Basin to markets in Canada and the eastern United States. Demand for Powder River Basin coal has increased substantially over the past 20 years due to its relatively low sulfur content, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants.

Other BNSF coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and to Mexico.

**Agricultural Products:**

The transportation of Agricultural Products provided approximately 18 percent of 2007 freight revenues. These products include wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company continues to develop and operate a shuttle network for grain and grain products, which allows more efficient use of equipment and improved cycle times. In addition to serving most grain-producing areas, BNSF serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

## Freight Statistics

The following table sets forth certain freight statistics relating to rail operations for the periods indicated. Certain prior period amounts have been adjusted to conform to current year presentation.

| **Year ended December 31,** | **2007** | **2006** | **2005** |
|---|---|---|---|
| Revenue ton miles (millions)[a] | **657,572** | 647,857 | 604,656 |
| Freight revenue per thousand revenue ton miles | **$ 23.34** | $ 22.45 | $ 20.85 |
| Average length of haul (miles) | **1,079** | 1,067 | 1,068 |

a Revenue ton miles is defined as the product of the number of loaded miles traveled and the weight of the contents.

Revenue, cars/units and average revenue per car/unit information for the three years ended December 31, 2007, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Results of Operations; Revenue Table."

## Government Regulation and Legislation

The Company is subject to federal, state and local laws and regulations generally applicable to all businesses. Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of the DOT, the Occupational Safety and Health Administration (OSHA), as well as other federal and state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the profitability of BNSF's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations, including the transportation of hazardous materials. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are also subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject to, and will from time to time continue to be subject to, environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site, without regard to fault or the legality of the original conduct. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to clean up sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. Further discussion is incorporated by reference from Note 10 to the Consolidated Financial Statements.

### Railroad Retirement

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been almost triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II) and other benefits. For 2007, the Railroad Retirement System required up to a 19.75 percent contribution by railroad employers on eligible wages, while the Social Security and Medicare Acts only required a 7.65 percent contribution on similar wage bases.

### Competition

The business environment in which BNSF Railway operates is highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time-sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the Western region of the United States is the Union Pacific Railroad Company. Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting by the Association of American Railroads, BNSF's share of the western United States rail traffic in 2007 was approximately 49 percent.

## Item 3. Legal Proceedings

Beginning May 14, 2007, 27 similar class action complaints were filed in six federal district courts around the country against BNSF and four other Class I railroads (and, in some cases, the Association of American Railroads) alleging that they have conspired to fix fuel surcharges with respect to unregulated freight transportation services in violation of the antitrust laws and seeking injunctive relief and unspecified treble damages. On November 6, 2007, the Judicial Panel on Multidistrict Litigation entered an order to consolidate cases in the federal district court of the District of Columbia for coordinated or consolidated pretrial proceedings. (In re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL No. 1869). The Company believes that these claims are without merit and intends to defend against the allegations vigorously. The Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges. The Company does not believe that the outcome of any of these proceedings will have a material effect on its financial condition, results of operations or liquidity.

Information concerning certain pending tax-related administrative or adjudicative state proceedings or appeals is incorporated by reference from Note 5 to the Consolidated Financial Statements, and information concerning other claims and litigation is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2007.

### Executive Officers of the Registrant

Listed below are the names, ages and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation or removal.

**Matthew K. Rose, 48**
Chairman, President and Chief Executive Officer of BNSF since March 2002.

**Thomas N. Hund, 54**
Executive Vice President and Chief Financial Officer since January 2001.

**Carl R. Ice, 51**
Executive Vice President and Chief Operations Officer since January 2001.

**John P. Lanigan, Jr., 52**
Executive Vice President and Chief Marketing Officer since January 2003.

**Roger Nober, 43**
Executive Vice President Law and Secretary since January 2007. Prior to that, partner of Steptoe & Johnson LLP, Washington, DC (law firm) from March 2006 and Chairman of the United States Surface Transportation Board from November 2002 – January 2006.

**Peter J. Rickershauser, 59**
Vice President–Network Development since May 1999.

# Part II

## Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." Information as to the high and low sales prices of such stock for the two years ended December 31, 2007, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 16 to the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 4, 2008, was 32,000.

### Common Stock Repurchases

The following table presents repurchases by the Company of its common stock for each of the three months for the quarter ended December 31, 2007, (shares in thousands):

| Issuer Purchases of Equity Securities | | | | |
|---|---|---|---|---|
| Period | Total Number of Shares Purchased[a] | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[b] | Maximum Number of Shares That May Yet be Purchased Under the Plans or Programs[b] |
| October 1 – 31 | 272 | $ 85.22 | 270 | 32,643 |
| November 1 – 30 | 1,987 | 85.51 | 1,967 | 30,676 |
| December 1 – 31 | 1,262 | 85.23 | 1,175 | 29,501 |
| Total | 3,521 | $ 85.39 | 3,412 | |

a Total number of shares purchased includes approximately 109 thousand shares where employees delivered already owned shares or used an attestation procedure to satisfy the exercise price of stock options or the withholding of tax payments. Total number of shares purchased does not include approximately 117 thousand shares acquired from employees to satisfy tax withholding obligations that arose on the vesting of restricted stock or the exercise of stock options.

b On July 17, 1997, the Board initially authorized and the Company announced the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. On December 9, 1999, April 20, 2000, September 21, 2000, January 16, 2003, December 8, 2005 and February 14, 2007, the Board authorized and the Company announced extensions of the BNSF share repurchase program, adding 30 million shares at each date for a total of 210 million shares authorized. The share repurchase program does not have an expiration date.

## Item 6. Selected Financial Data

The following table presents, as of and for the dates indicated, selected historical financial information for the Company (in millions, except per share data):

| December 31, | 2007 | 2006[a] | 2005[a] | 2004[a] | 2003[a] |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | **$ 15,802** | $ 14,985 | $ 12,987 | $ 10,946 | $ 9,413 |
| Operating income | **$ 3,486** | $ 3,521 | $ 2,927[b] | $ 1,709[c] | $ 1,675 |
| Income before cumulative effect of accounting change | **$ 1,829** | $ 1,889 | $ 1,534[b] | $ 805[c] | $ 783[d] |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 5.19** | $ 5.23 | $ 4.13[b] | $ 2.18[c] | $ 2.12[d] |
| Average basic shares | **352.5** | 361.0 | 371.8 | 370.0 | 369.1 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 5.10** | $ 5.11 | $ 4.02[b] | $ 2.14[c] | $ 2.10[d] |
| Average diluted shares | **358.9** | 369.8 | 381.8 | 376.6 | 372.3 |
| Dividends declared per common share | **$ 1.14** | $ 0.90 | $ 0.74 | $ 0.64 | $ 0.54 |
| **At year end:** | | | | | |
| Total assets | **$ 33,583** | $ 31,797 | $ 30,436 | $ 29,023 | $ 27,050 |
| Long-term debt and commercial paper, including current portion | **$ 8,146** | $ 7,385 | $ 7,154 | $ 6,516 | $ 6,684 |
| Stockholders' equity | **$ 11,144** | $ 10,528 | $ 9,638 | $ 9,438 | $ 8,608 |
| Net debt to total capitalization[e] | **41.2%** | 40.0% | 42.3% | 39.6% | 43.6% |
| **For the year ended:** | | | | | |
| Total capital expenditures | **$ 2,248** | $ 2,014 | $ 1,750 | $ 1,527 | $ 1,726 |
| Depreciation and amortization | **$ 1,293** | $ 1,176 | $ 1,111 | $ 1,035 | $ 927 |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

b 2005 operating income, income before cumulative effect of accounting change and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share. See discussion under Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "New Mexico Department of Transportation."

c 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share.

d 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change for asset retirement obligations of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share.

e Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

# Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries (collectively BNSF, Registrant or Company). The principal operating subsidiary of BNSF is the BNSF Railway Company (BNSF Railway) through which BNSF derives substantially all of its revenues. All earnings per share information is stated on a diluted basis.

## Company Overview

Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. BNSF's primary operating subsidiary, BNSF Railway, operates one of the largest North American rail networks with about 32,000 route miles in 28 states and two Canadian provinces. Through its one operating transportation segment, BNSF Railway transports a wide range of products and commodities including Consumer Products, Industrial Products, Coal and Agricultural Products.

Additional operational information, including weekly intermodal and carload unit reports as submitted to the Association of American Railroads (AAR) and annual reports submitted to the Surface Transportation Board (STB), are available on the Company's website at www.bnsf.com/investors.

## Executive Summary

**Fiscal Year 2007 — Financial Overview**

- The Company achieved earnings of $5.10 per share compared with 2006 earnings of $5.11 per share.
- Freight revenues increased 6 percent to $15.3 billion, which included revenue increases in each of the Company's four business groups.
  - Of the 6-percent increase in freight revenue, 6 percent, 1 percent and 1 percent was attributable to price, unit growth and fuel surcharges, respectively. These were partially offset by a decrease due to changes in business mix.
- Operating expenses for 2007 increased 7 percent compared with 2006, largely driven by a $463 million increase in fuel expense primarily reflecting increased fuel prices and a reduced fuel-hedge benefit.
- Operating income of $3.5 billion for 2007 decreased $35 million from 2006 despite a $310 million reduction in fuel-hedge benefit.
- Each year capital expenditures are a significant use of cash for BNSF. In 2007, BNSF increased its cash capital expenditures to $2.25 billion from $2.01 billion in the prior year primarily due to both maintenance of BNSF's track structure and additional expansion projects undertaken in 2007. Despite the increase in capital expenditures, BNSF's capital commitments, which includes both cash spent for capital and locomotive leases, decreased approximately $80 million to $2.59 billion in 2007 due to fewer locomotive leases entered into in 2007 as compared to 2006.

**Business Outlook for 2008**

- BNSF expects to see revenue growth in the high single digits on about flat unit volumes.
- Combining projected revenue growth with an ongoing focus on productivity, low double-digit growth in earnings per share is achievable.
- The Company's planned capital commitment program for 2008 is approximately $2.45 billion as compared to $2.59 billion in 2007. The decrease in the capital commitment program versus prior year is principally related to lower expansion capital driven by lower anticipated demand.
  - BNSF anticipates leasing 200 locomotives with a cost of about $400 million and investing over $200 million in track and facilities to expand capacity to continue to meet demand for consistent freight rail service. The 2008 capacity expansion program is expected to be approximately $350 million lower than 2007.
  - The Company expects to spend more than $1.8 billion to keep its infrastructure strong by refreshing track, signal systems, structures, freight cars and implementing new technologies.

## Results of Operations

### Revenue Table

The following table presents BNSF's revenue information by business group for the years ended December 31, 2007, 2006 and 2005.

| Year ended December 31, | Revenues (in millions) | | | Cars / Units (in thousands) | | | Average Revenue Per Car / Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Consumer products | $ 5,664 | $ 5,613 | $ 4,898 | 5,149 | 5,520 | 5,215 | $ 1,100 | $ 1,017 | $ 939 |
| Industrial products | 3,684 | 3,589 | 3,128 | 1,664 | 1,686 | 1,655 | 2,214 | 2,129 | 1,890 |
| Coal | 3,279 | 2,916 | 2,448 | 2,472 | 2,458 | 2,238 | 1,326 | 1,186 | 1,094 |
| Agricultural products | 2,722 | 2,427 | 2,132 | 1,033 | 973 | 916 | 2,635 | 2,494 | 2,328 |
| Total freight revenues | 15,349 | 14,545 | 12,606 | 10,318 | 10,637 | 10,024 | $ 1,488 | $ 1,367 | $ 1,258 |
| Other revenues | 453 | 440 | 381 | | | | | | |
| Total operating revenues | $ 15,802 | $ 14,985 | $ 12,987 | | | | | | |

### Expense Table

The following table presents BNSF's expense information for the years ended December 31, 2007, 2006 and 2005 (in millions):

| Year ended December 31, | 2007 | 2006[a] | 2005[a] |
|---|---|---|---|
| Compensation and benefits | $ 3,773 | $ 3,816 | $ 3,515 |
| Fuel | 3,197 | 2,734 | 1,959 |
| Purchased services | 2,023 | 1,906 | 1,713 |
| Depreciation and amortization | 1,293 | 1,176 | 1,111 |
| Equipment rents | 942 | 930 | 886 |
| Materials and other | 1,088 | 902 | 876 |
| Total operating expenses | $ 12,316 | $ 11,464 | $ 10,060 |
| Interest expense | $ 511 | $ 485 | $ 437 |
| Other expense, net | $ 18 | $ 40 | $ 37 |
| Income tax expense | $ 1,128 | $ 1,107 | $ 919 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

### Year Ended December 31, 2007, Compared with Year Ended December 31, 2006

BNSF recorded net income for 2007 of $1,829 million, or $5.10 per share. In comparison, net income for 2006 was $1,889 million, or $5.11 per share.

### Revenues

*Freight*

Freight revenues of $15,349 million for 2007 were $804 million, or 6 percent higher than 2006. Freight revenues reflected a 3-percent decrease in unit volumes. Freight revenues included an increase of approximately $150 million in fuel surcharges compared with the same 2006 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2007 to $1,488 from $1,367 in 2006.

*Consumer Products*

The Consumer Products' freight business includes a significant intermodal component and consists of the following three business areas: international intermodal, domestic intermodal and automotive.



Consumer Products revenues of $5,664 million for 2007 were $51 million, or 1 percent, higher than 2006. Higher revenue per unit due to improved yields and fuel surcharges was partially offset by lower volumes related to economic softness as well as reduced transpacific service of a large international customer.

*Industrial Products*

Industrial Products' freight business consists of five business areas: construction products, building products, petroleum products, chemicals and plastic products and food and beverages.

Industrial Products revenues increased $95 million, or 3 percent, to $3,684 million for 2007, while unit volumes declined 1 percent. The 4-percent increase in average revenue per car was mainly the result of price increases. Strong demand for petroleum products, chemicals and plastics was offset by a decline in building products as a result of weakness in the housing market.




*Coal*

BNSF is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originate from the Powder River Basin of Wyoming and Montana.

Coal revenues of $3,279 million for 2007 increased $363 million, or 12 percent, versus a year ago due to improved yields, contractual inflation escalators, increased tons per unit and fuel surcharges. Coal unit volumes increased 1 percent despite mine production and weather-related issues.

*Agricultural Products*

The Agricultural Products' freight business transports agricultural products including corn, wheat, soybeans, bulk foods, ethanol, fertilizer and other products.

Agricultural Products revenues of $2,722 million for 2007 were $295 million, or 12 percent higher than revenues for 2006. This increase was primarily due to strong volume growth, favorable mix of business and price increases with the strongest revenue growth in wheat, soybeans, bulk foods, ethanol and fertilizer.




*Other Revenues*

Other revenues increased $13 million, or 3 percent, to $453 million for 2007 compared to 2006. This increase was primarily due to volume growth of BNSF Logistics, an indirect, wholly-owned non-rail subsidiary that specializes in providing third-party logistics and transportation services.

## Expenses

Total operating expenses for 2007 were $12,316 million, an increase of $852 million, or 7 percent over 2006.

*Compensation and Benefits*

Compensation and benefits includes expenses for BNSF employee wages, health and welfare, payroll taxes and other related items. The primary factors influencing the expenses recorded are volume, headcount, utilization, wage rates, incentives earned during the period, benefit plan participation and pension expenses.

Compensation and benefits expenses of $3,773 million were $43 million, or 1 percent lower than 2006, on flat employee headcount. Wages and benefit increases were offset by lower variable compensation costs and other cost controls.

*Fuel*

Fuel expense is driven by market price, the level of locomotive consumption of diesel fuel and the effects of hedging activities.

Fuel expenses of $3,197 million for 2007 were $463 million, or 17 percent, higher than 2006. The increase in fuel expense was due to an increase in the average all-in cost per gallon of diesel fuel, partially offset by a decline in consumption related to improved fuel efficiency. The average all-in cost per gallon of diesel fuel increased by 37 cents to $2.22, or $538 million, which is comprised of an increase in the average purchase price of 16 cents, or $228 million, and a decrease in the hedge benefit of 21 cents, or $310 million (2007 benefit of $31 million less 2006 benefit of $341 million). Consumption in 2007 decreased 36 million gallons to 1,442 million gallons when compared with consumption in the same 2006 period, resulting in a $75 million decrease in fuel expense.

*Purchased Services*

Purchased services expense includes ramping (lifting of containers onto and off of cars); drayage (highway movements to and from railway facilities); maintenance of locomotives, freight cars and equipment; transportation costs over other railroads; technology services outsourcing; professional services; and other contract services provided to BNSF. Purchased services expense also includes purchased transportation costs for BNSF Logistics, an indirect, non-rail subsidiary of BNSF that specializes in providing third-party logistics and transportation services. The expenses are driven by the rates established in the related contracts and the volume of services required.

Purchased services expenses of $2,023 million for 2007 were $117 million, or 6 percent higher than 2006. Beyond general inflation, the largest drivers of this increase were (i) $25 million in haulage payments for transportation over other railroads, principally due to a new southeast intermodal agreement; (ii) $20 million in purchased transportation costs for BNSF Logistics; (iii) $10 million in locomotive maintenance costs; and (iv) $10 million in ramping costs (lifting of containers onto and off of cars).

*Depreciation and Amortization*

Depreciation and amortization expenses for the period are determined by using the group method of depreciation, applying a single rate to the gross investment in a particular class of property. Due to the capital-intensive nature of BNSF's operations, depreciation expense is a significant component of the Company's operating expense. The full effect of inflation is not reflected in operating expenses since depreciation is based on historical cost.

Depreciation and amortization expenses of $1,293 million for 2007 were $117 million, or 10 percent higher than 2006. This increase was primarily due to continuing capital expenditures as well as updated depreciation rates for locomotives (see discussion under the heading "Critical Accounting Estimates; Depreciation").

*Equipment Rents*

Equipment rents expense includes long-term and short-term payments primarily for locomotives, freight cars, containers and trailers. The expense is driven primarily by volume, lease and rental rates, utilization of equipment and changes in business mix resulting in equipment usage variances.

Equipment rents expenses for 2007 of $942 million were $12 million, or 1 percent, higher than 2006, on a 3-percent decline in unit volumes. The variance represents an increase in locomotive lease expense, partially offset by a decrease in freight car equipment expense due to the impact of the Company's privatization efforts, lower volumes and velocity improvements for freight car equipment.

*Materials and Other*

Material expenses consist mainly of the costs involved to purchase mechanical and engineering materials, in addition to other items for construction and maintenance of property and equipment. Other expenses include personal injury claims, environmental remediation and derailments as well as utilities, impairments of long-lived assets, locomotive overhauls, property and miscellaneous taxes and employee separation costs. The total is offset by gains on land sales and insurance recoveries.

Materials and other expenses of $1,088 million for 2007, which consisted of approximately $450 million of materials expense with the remainder consisting of numerous other items, were $186 million, or 21 percent higher than 2006. The increase was primarily due to increases of approximately (i) $65 million and $16 million first quarter environmental and technology charge, respectively (see discussion under the heading "Other Matters; Charge for Environmental Costs and Technology System Write-Off"); (ii) $40 million in environmental remediation developments; (iii) $25 million due largely to rising costs for materials for locomotives, freight cars and track structure; and (iv) $20 million in crew transportation costs principally due to increased fuel and insurance-related costs as well as increased usage due to adverse weather. In addition, a $22 million gain from a line sale to the State of New Mexico was recorded in 2006 (see discussion under the heading "Other Matters; New Mexico Department of Transportation").

*Interest Expense*

Interest expense of $511 million for 2007 was $26 million, or 5 percent higher than 2006. This increase was primarily the result of a higher average debt balance, partially offset by lower average rates.

*Income Taxes*

The effective rate in 2007 was 38.2 percent compared with 36.9 percent for the prior year. The increase in the effective tax rate primarily reflects income tax adjustments that favorably impacted income tax expense in 2006 as compared with 2007.

**Year Ended December 31, 2006, Compared with Year Ended December 31, 2005**

BNSF recorded net income for 2006 of $1,889 million, or $5.11 per share. In comparison, net income for 2005 was $1,534 million, or $4.02 per share, which included a $0.12 per share impairment charge related to an agreement to sell certain line segments to the State of New Mexico (see discussion under heading "Other Matters; New Mexico Department of Transportation").

## Revenues

### *Freight*

Freight revenues of $14,545 million for 2006 were $1,939 million, or 15 percent higher than 2005. Freight revenues reflected a 6-percent increase in volumes. Freight revenues include an increase of approximately $600 million in fuel surcharges compared with the same 2005 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005.

### *Consumer Products*

Consumer Products revenues of $5,613 million for 2006 were $715 million, or 15 percent greater than 2005. The increase in average revenue per unit of 8 percent was primarily related to price increases and increased fuel surcharges. Additionally, cars/units increased by 6 percent due primarily to growth in international intermodal.




### *Industrial Products*

Industrial Products revenues increased $461 million, or 15 percent, to $3,589 million for 2006. The revenue increase was driven by double-digit growth in four of the five business areas. The 13-percent increase in average revenue per car was the result of price increases and increased fuel surcharges. Units increased 2 percent driven by demand for plastics, petroleum products and steel, partially offset by softness in demand for building products.




### *Coal*

Coal revenues of $2,916 million for 2006 increased $468 million, or 19 percent, versus 2005. The revenue increase was primarily driven by a 10-percent increase in volumes resulting from significant customer demand and greater line throughput due to increased network fluidity. Average revenue per car increased 8 percent driven by contractual price escalations, increased length of haul and fuel surcharges.

### *Agricultural Products*

Agricultural Products revenues of $2,427 million for 2006 were $295 million, or 14 percent higher than revenues for 2005. This increase was primarily due to a 7-percent increase in average revenue per car, which was driven by both price increases and increased fuel surcharges associated with higher fuel prices, and a 6-percent increase in volume driven primarily by an increase in demand for corn.




### *Other Revenues*

Other revenues increased $59 million, or 15 percent, to $440 million for 2006 compared to 2005. This increase was primarily due to increases in demurrage charges and volume growth of BNSF Logistics, an indirect, wholly-owned non-rail subsidiary that specializes in providing third-party logistics and transportation services.

## Expenses

Total operating expenses for 2006 were $11,464 million, an increase of $1,404 million, or 14 percent over 2005. The increase in operating expenses was primarily the result of significant fuel price increases and a 6-percent increase in gross-ton miles handled. Operating expenses for 2005 were impacted by a $71 million pre-tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico.

### *Compensation and Benefits*

Compensation and benefits expenses of $3,816 million were $301 million, or 9 percent higher than 2005. The increase was primarily related to 6 percent higher unit volumes, which resulted in a 5-percent increase in the average headcount. Additionally, increased stock-based compensation expense of approximately $30 million, due largely to the adoption of Statement of Financial Accounting Standards (SFAS) No. 123R, *Share-Based Payment*, and increased pension expense of approximately $30 million contributed to the overall increase in compensation and benefits expense as compared with the prior year.

*Fuel*

Fuel expenses of $2,734 million for 2006 were $775 million, or 40 percent, higher than 2005. The increase in fuel expense is due to an increase in the average all-in cost per gallon of diesel fuel, as well as an increase in consumption driven by higher volumes. The average all-in cost per gallon of diesel fuel increased by 45 cents to $1.85, or $661 million, which is comprised of an increase in the average purchase price of 32 cents, or $471 million, and a decrease in the hedge benefit of 13 cents, or $190 million (2006 benefit of $341 million less 2005 benefit of $531 million). Consumption in 2006 was 1,478 million gallons compared with 1,402 million gallons in 2005, resulting in a $114 million increase in fuel expense.

*Purchased Services*

Purchased services expenses of $1,906 million for 2006 were $193 million, or 11 percent higher than 2005. This increase was primarily due to increases in the following volume-related costs of approximately (i) $50 million in intermodal ramp costs; (ii) $40 million in haulage payments for transportation over other railroads; (iii) $35 million in locomotive, freight car and equipment maintenance expense; and (iv) $25 million in purchased transportation costs for BNSF Logistics.

*Depreciation and Amortization*

Depreciation and amortization expenses of $1,176 million for 2006 were $65 million, or 6 percent higher than 2005. This increase was primarily due to ongoing capital expenditures.

*Equipment Rents*

Equipment rents expenses for 2006 of $930 million were $44 million, or 5 percent higher than 2005 driven by an increase of approximately $45 million in locomotive rents, which was largely the result of an increase in the number of locomotives under operating leases. Freight car equipment was essentially flat year-over-year due to the impact of increasing volumes being offset by the impact of the Company's privatization efforts, velocity improvements and an increase in off-line receipts.

*Materials and Other*

Materials and other expenses of $902 million for 2006, which consisted of approximately $425 million of materials expense with the remainder consisting of numerous other items, were $26 million, or 3 percent higher than 2005. The increase was primarily due to increases of approximately (i) $65 million in materials costs for locomotives, freight cars and track structure; (ii) $35 million in crew transportation and lodging expense; (iii) $20 million in property taxes; and (iv) $20 million in expense related to derailments. These increases were offset by a $22 million gain from a line sale to the State of New Mexico recorded in 2006. Expenses for 2005 were impacted by a $71 million pre-tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico (see discussion under the heading "Other Matters; New Mexico Department of Transportation").

*Interest Expense*

Interest expense of $485 million for 2006 was $48 million, or 11 percent higher than 2005. This increase was primarily the result of a higher average debt balance.

*Income Taxes*

The effective rate in 2006 was 36.9 percent compared with 37.5 percent for the prior year. The decrease in the effective tax rate primarily reflects income tax adjustments that favorably impacted income tax expense in 2006 as compared with 2005.

## Liquidity and Capital Resources

Liquidity is a company's ability to generate cash flows to satisfy current and future obligations. Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance, including commercial paper, through leasing of assets and through the sale of a portion of its accounts receivable.

### Operating Activities

2007

Net cash provided by operating activities was $3,492 million during 2007 compared with $3,189 million during 2006. The increase was primarily the result of an increase in earnings before depreciation and amortization expense, higher environmental accruals in 2007 and higher contributions to the pension plan in 2006.

2006

Net cash provided by operating activities was $3,189 million during 2006 compared with $2,706 million during 2005. The increase was primarily the result of an increase in earnings before depreciation and amortization expense.

### Investing Activities

2007

Net cash used for investing activities was $2,415 million during 2007 compared with $2,167 million during 2006. Investing activities for the year included $2,248 million of capital expenditures, which were $234 million higher than 2006 primarily due to an increase in capital expenditures for maintenance of BNSF's track structure and for terminal and line expansions as illustrated in the table below.

2006

Net cash used for investing activities was $2,167 million during 2006 compared with $2,120 million during 2005. Investing activities for the year included $2,014 million of capital expenditures, which were $264 million higher than 2005 primarily due to an increase in capital expenditures for maintenance of BNSF's track structure and for terminal and line expansions as illustrated in the table below. The decrease in cash used for other investing activities primarily reflects timing of equipment financing activities, $50 million in consideration received for the third easement sale to Seattle Sound Transit and $45 million in consideration received for the New Mexico line sale as discussed in the "Other Matters" section. Additionally, 2005 included consideration paid to another carrier for trackage rights and alternative access rights and an investment in Pace Synfuels.

A breakdown of cash capital expenditures during 2007, 2006 and 2005 is set forth in the following table (in millions):

| **Year ended December 31,** | **2007** | **2006** | **2005** |
|---|---|---|---|
| Maintenance of way: | | | |
| Rail | **$ 376** | $ 304 | $ 232 |
| Ties | **316** | 311 | 284 |
| Surfacing | **235** | 214 | 183 |
| Other | **432** | 397 | 354 |
| Total maintenance of way | **1,359** | 1,226 | 1,053 |
| Mechanical | **141** | 152 | 136 |
| Information services | **75** | 65 | 64 |
| Other | **105** | 121 | 108 |
| Total maintenance of business | **1,680** | 1,564 | 1,361 |
| Terminal and line expansion | **568** | 450 | 389 |
| Total | **$ 2,248** | $ 2,014 | $ 1,750 |

The table above does not include expenditures for equipment financed through operating leases (principally related to locomotives).

### Financing Activities

2007

Net cash used for financing activities during 2007 was $1,122 million, primarily related to common stock repurchases of $1,265 million, including $43 million to satisfy tax withholding obligations for stock option exercises, and dividend payments of $380 million, which were partially offset by net debt borrowings of $234 million, proceeds from stock options exercised of $142 million, excess tax benefits from equity compensation plans of $121 million and proceeds from a facility financing obligation of $41 million.

Aggregate debt to mature in 2008 is $411 million. BNSF's ratio of net debt to total capitalization was 41.2 percent at December 31, 2007, compared with 40.0 percent at December 31, 2006. The Company's adjusted net debt to total capitalization was 51.8 percent at December 31, 2007, compared with 51.7 percent at December 31, 2006. BNSF's adjusted net debt to total capitalization is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, the information prepared in accordance with GAAP. However, management believes that adjusted net debt to total capitalization provides meaningful additional information about the ability of BNSF to service long-term debt and other fixed obligations and to fund future growth.

The following table presents a reconciliation of the calculation of adjusted net debt to total capitalization percentage:

| December 31, | 2007 | 2006[a] |
|---|---|---|
| Net debt to total capitalization[b] | **41.2%** | 40.0% |
| Adjustment for long-term operating leases[c] | **10.5** | 11.2 |
| Adjustment for other debt equivalents[d] | **0.5** | 0.5 |
| Adjustment for unfunded pension and retiree health and welfare liability | **0.7** | 1.1 |
| Adjustment for junior subordinated notes[e] | **(1.1)** | (1.1) |
| Adjusted net debt to total capitalization | **51.8%** | 51.7% |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

b Net debt to total capitalization is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents divided by the sum of net debt and total stockholders' equity.

c Represents the net present value of future operating lease commitments.

d Adjustment for other debt equivalents principally includes accounts receivable financing (see Note 6 to the Consolidated Financial Statements for additional information).

e Junior subordinated notes are included in total debt on the respective Consolidated Balance Sheets; however, as they include certain equity characteristics, they have been assigned 50 percent equity credit for purposes of this calculation.

In February 2007, the Board of Directors (the Board) authorized an additional $1.4 billion of debt securities that may be issued through the Securities and Exchange Commission (SEC) debt shelf registration process, for a total of $2.1 billion authorized to be issued.

In April 2007, BNSF issued $650 million of 5.65 percent debentures and $650 million of 6.15 percent debentures due May 1, 2017 and May 1, 2037, respectively. The net proceeds from the sale of the debentures are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding the maturity of debt which matured in 2007, the repayment of commercial paper and the repurchase of common stock. The issuance of these debentures reduced the amount of debt authorized to be issued by the Board through the SEC debt shelf registration process to $800 million.

In 2007, BNSF entered into several capital leases totaling approximately $325 million to finance locomotives and freight cars. The terms of the leases are between 15 and 20 years.

In 2005, the Company commenced the construction of an intermodal facility that it intends to sell to a third party and subsequently lease back. Once construction of the facility is complete and all improvements have been sold to the third party, BNSF will lease the facility from the third party for 20 years. Construction is expected to be completed by early 2009 with an approximate cost of $160 million. As of December 31, 2007, BNSF has sold $41 million of completed improvements. This sale leaseback transaction is being accounted for as a financing obligation due to continuing involvement. The outflows from the construction of the facility are classified as investing activities, and the inflows from the associated financing proceeds are classified as financing activities in the Company's Consolidated Statements of Cash Flows.

### 2006

Net cash used for financing activities during 2006 was $722 million, primarily related to common stock repurchases of $730 million and dividend payments of $310 million, which were partially offset by net debt borrowings of $116 million, proceeds from stock options exercised of $116 million and excess tax benefits from equity compensation plans of $95 million. Upon adoption of SFAS No. 123R, the excess tax benefits from equity compensation plans were classified in financing activities. However, as the Company adopted SFAS No. 123R prospectively, financial statements prior to January 1, 2006, include excess tax benefits as an operating activity.

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper. See Note 3 to the Consolidated Financial Statements for information related to the hedges unwound as part of this debt issuance.

### 2005

Net cash used for financing activities during 2005 was $833 million primarily related to common stock repurchases of $799 million, prepaid forward share repurchases of $600 million and dividend payments of $267 million, which where partially offset by net debt borrowings of $599 million and proceeds from stock options exercised of $244 million.

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month London Interbank Offered Rate (LIBOR) plus 2.35 percent, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company would not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company would be required to sell common stock, the proceeds of which would be used to pay any accrued and unpaid interest. At December 31, 2007, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance were used to repurchase common stock, with the remainder used for general corporate purposes.

**Dividends**

Common stock dividends declared were $1.14, $0.90 and $0.74 per share annually for 2007, 2006 and 2005, respectively. Dividends paid on common stock were $380 million, $310 million and $267 million during 2007, 2006 and 2005, respectively. On October 18, 2007, the Board declared a quarterly dividend of $0.32 per share on outstanding shares of common stock, payable January 2, 2008 to shareholders of record on December 12, 2007. On February 13, 2008, the Board declared a quarterly dividend of $0.32 per share on outstanding shares of common stock, payable April 1, 2008, to shareholders of record on March 11, 2008.

**Common Stock Repurchase Program**

During 2007, 2006 and 2005, the Company repurchased approximately 15 million, 18 million and 14 million shares, respectively, of its common stock at average prices of $83.96 per share, $73.43 per share and $54.95 per share, respectively. Further information on this repurchase program is incorporated by reference from Note 15 to the Consolidated Financial Statements.

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized in equal amounts in July 1997, December 1999, April 2000, September 2000, January 2003 and December 2005.

Since 2001, BNSF has primarily utilized free cash flow to repurchase its shares. In February 2007, BNSF announced it would modify its share repurchase approach based on improved credit statistics over the past few years, including interest coverage, debt-to-cash flow and debt-to-capital ratios. These credit statistics have improved sufficiently that BNSF is now devoting additional financial capacity to share repurchases. This difference in approach is expected to result in a moderately higher level of debt.

**Long-Term Debt and Other Obligations**

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities, which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

During 2007, BNSF agreed to acquire an additional 1,025 locomotives, bringing its total commitment to acquire 1,505 new locomotives by 2013. As of December 31, 2007, BNSF had taken delivery of 480 of the 1,505 locomotives, including 200 during 2007.

During 2006, BNSF agreed to acquire 4,000 covered hoppers and 1,400 double-stack cars by 2010. As of December 31, 2007, BNSF had taken delivery of 1,998 of the covered hoppers and 350 of the double-stack cars.

The locomotives and freight cars under these agreements have been or are expected to be financed from one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at that time.

The Company also utilizes a commercial paper program backed by a bank revolving credit agreement to manage liquidity needs. For 2008 and the foreseeable future, the Company expects that cash from operating activities, access to capital markets, the accounts receivable sales program and the bank revolving credit agreement will be sufficient to enable the Company to meet its obligations when due. The Company believes these sources of funds will also be sufficient to fund capital additions that are necessary to maintain its competitiveness and position the Company for future revenue growth.

The Company's ratio of earnings to fixed charges was 4.62 and 4.90 times for the years ended December 31, 2007 and 2006, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 44 percent for the years ended December 31, 2007 and 2006, respectively.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2007 (in millions):

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less than 1 year** | **1–3 years** | **3–5 years** | **More than 5 years** |
| Long-term debt[a] | $ 7,208 | $ 258 | $ 605 | $ 1,037 | $ 5,308 |
| Capital lease obligations | 938 | 153 | 245 | 132 | 408 |
| Interest payments[b] | 7,751 | 280 | 913 | 800 | 5,758 |
| Operating lease obligations[c] | 7,498 | 699 | 1,310 | 1,107 | 4,382 |
| Purchase obligations[d] | 14,304 | 5,126 | 2,463 | 1,831 | 4,884 |
| Other long-term liabilities reflected on the balance sheet under GAAP[e] | 575 | 98 | 196 | 157 | 124 |
| Total contractual obligations | $ 38,274 | $ 6,614 | $ 5,732 | $ 5,064 | $ 20,864 |

a Excludes capital lease obligations.

b Interest payments relate to fixed-rate long-term debt and capital lease obligations and exclude the impact of any interest-rate hedging activities (see Note 3 to the Consolidated Financial Statements for additional information). Additionally, the Company's only variable-rate debt is commercial paper, which expires within 90 days; therefore, the related interest has been excluded from the table above.

c Gross payments due, which include an interest component.

d Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.

e Consists of employee separation payments as discussed in Note 11 to the Consolidated Financial Statements, actuarially estimated payments from BNSF expected to be made over the next five years for the pension plans and the retiree health and welfare plan as discussed in Note 13 to the Consolidated Financial Statements and estimated future cash flows for income tax liabilities and interest accrued related to unrecognized tax benefits as discussed in Note 5 to the Consolidated Financial Statements.

In the normal course of business, the Company enters into long-term contracts for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

**Credit Agreement**

Commercial paper and the revolving credit agreement are discussed in Note 9 to the Consolidated Financial Statements. The $1.2 billion revolving credit agreement includes covenants and events of default typical for this type of facility, including a maximum debt-to-capital test and a $75 million cross-default provision. At December 31, 2007, there were no bank borrowings against the revolving credit agreements, and the Company was in compliance with its debt covenants. BNSF's maximum debt-to-capital test provides approximately $8 billion of debt capacity above BNSF's outstanding debt as of December 31, 2007, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreement. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

**Market Conditions**

In spite of recent credit market conditions resulting from issues within the sub-prime mortgage market, BNSF has not experienced significant impacts to liquidity or cost of debt. The market conditions have not affected BNSF's ability to issue commercial paper, secure necessary debt financings or obtain funding through its accounts receivable sales program.

## Off-Balance Sheet Arrangements

### Sale of Accounts Receivable

The accounts receivable sales program of Santa Fe Receivables Corporation, as described in Note 6 to the Consolidated Financial Statements, includes various provisions that, if triggered, would allow the investors participating in this program, at their option, to cancel the program. These provisions include a maximum debt-to-capital test, which is the same as in the BNSF revolving credit agreements described above. BNSF's maximum debt-to-capital test provides approximately $8 billion of debt capacity above BNSF's outstanding debt as of December 31, 2007. At December 31, 2007, the Company's capacity to sell undivided interests to investors under the accounts receivable sales program was $700 million, which was comprised of two $175 million, 364-day accounts receivable sales facilities and two $175 million, 3-year accounts receivable sales facilities. The Company amended the two 364-day facilities in November 2007, reducing the committed amounts to $175 million each and modifying their maturities to November 2008. The two 3-year facilities were entered into in November 2007 concurrently with the amendment and extension of the 364-day facilities and will mature in November 2010. Outstanding undivided interests held by investors under the A/R sales program were $300 million at December 31, 2007 and December 31, 2006, respectively. Management expects to be able to either extend the commitment of the current investors under the 364-day facilities past November 2008 or to find additional investors in the accounts receivable sales program who will commit to purchase undivided interests after November 2008.

The accounts receivable sales program provides efficient financing at a competitive interest rate as compared with traditional borrowing arrangements and provides diversification of funding sources. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables (see Note 6 to the Consolidated Financial Statements for additional information).

### Guarantees

The Company acts as guarantor for certain debt and lease obligations of others. During the past few years, the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future (see Note 9 to the Consolidated Financial Statements for additional information).

## Inflation

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

## Other Matters

### Charge for Environmental Costs and Technology System Write-Off

In the first quarter of 2007, the Company recorded a pre-tax charge of $81 million, or $0.14 after-tax per share. This charge reflected an approximate $65 million increase in environmental costs primarily related to a final resolution with the State of Washington and its Department of Ecology on clean-up of an existing environmental site at Skykomish and an adverse reversal of a trial court decision on appeal regarding a site at Arvin, California. In addition, the Company recorded a non-cash charge of $16 million to write-off a technology system that has been replaced.

### Planned Major Maintenance Activities

Effective January 1, 2007, the Company transitioned to the deferral method of accounting for leased locomotive overhauls under the Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities,* issued in September 2006. Additional information concerning the adoption of this accounting principle is incorporated by reference from Note 2 to the Consolidated Financial Statements.

### Uncertain Tax Positions

Effective January 1, 2007, the Company adopted the provisions of FASB Interpretation No. (FIN) 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109, Accounting for Income Taxes*. Additional information concerning the Company's uncertain tax positions is incorporated by reference from Notes 2 and 5 to the Consolidated Financial Statements.

### Commercial

In February 2005, the Company received a Civil Investigative Demand from the Antitrust Division of the Department of Justice requesting information concerning the Company's pricing activities relating to the shipment of coal from the southern Powder River Basin. The Company has responded to all requests for information, and the matter remains pending.

**Hedging Activities**

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company does not hold or issue derivative financial instruments for trading or speculative purposes. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended,* is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings. Cash flows related to fuel and interest rate hedges are classified as operating activities in the Consolidated Statements of Cash Flows.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance. As of December 31, 2007, BNSF's counterparties have an investment grade credit rating.

Fuel

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged (see Note 3 to the Consolidated Financial Statements for additional information).

Subsequent to December 31, 2007, the Company entered into fuel swap agreements utilizing New York Mercantile Exchange #2 Heating Oil. The following table provides additional fuel-hedge data through February 4, 2008 based on the quarter being hedged.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2008** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **HO Swaps** | | | | | |
| Gallons hedged (in millions) | – | 6.80 | 6.80 | 6.06 | 19.66 |
| Average swap price (per gallon) | $ – | $ 2.42 | $ 2.43 | $ 2.48 | $ 2.44 |

Interest Rate

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as converting a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy. BNSF's measurement of the fair value of interest rate derivatives is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements (see Note 3 to the Consolidated Financial Statements for additional information).

In anticipation of a future debt issuance, the Company entered into treasury locks in January 2008, having an aggregate notional amount of $75 million to fix a portion of the rate for a future 10-year unsecured debt issuance. Including the seven treasury locks that were executed in 2007 for the same expected debt issuance, the total amount hedged is $250 million with an average locked-in rate of 4.24 percent. The treasury locks are expected to be unwound during 2008, and any gain or loss on the hedges will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

**Employee and Labor Relations**

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. A negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 2004. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of U.S. Presidential intervention) are exhausted. Agreements undergoing renegotiation in the current bargaining round provide for periodic wage increases until new agreements are reached.

The current bargaining round for all unions with contracts that came into effect after January 1, 2005, began on and after November 1, 2004, with the serving of Section 6 notices, which are each side's initial proposals. BNSF is participating in a coordinated national handling of these proposals. The current agreements remain in effect until new agreements are reached or until changes to the existing agreements are made.

Final agreements have been reached under the current bargaining round, covering about 65 percent of BNSF's unionized workforce. These agreements resolve all wage, work rule, and benefit issues through December 31, 2009. A tentative agreement (subject to membership ratification—a process which will take from 45 to 90 days) was reached with the United Transportation Union ("UTU") on January 28, 2008. The UTU represents just under 30 percent of BNSF's scheduled employees. BNSF remains in national bargaining with the International Association of Machinists and Aerospace Workers.

**Seattle Sound Transit**

In December 2003, BNSF Railway Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority established by King, Pierce and Snohomish counties within the State of Washington. BNSF has agreed to sell to Sound Transit under the threat of condemnation a combination of (i) four easements enabling Sound Transit to offer commuter rail service over existing BNSF track from Seattle to Everett and (ii) 18 miles of railroad line from south of Tacoma to Nisqually, Washington.

Sound Transit agreed to pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett and entered into agreements both for service on the commuter easements and joint use of track for commuter and freight purposes. The Company received approximately $80 million of cash in 2003 upon the closing of the first easement, $80 million of cash in 2004 upon closing of the second easement, $50 million of cash in 2006 upon closing of the third easement and $50 million in cash in 2007 upon closing of the fourth and final easement. The sale proceeds will be recognized in income over the average life of the associated track structure (approximately 37 years).

Additionally, the Company sold 18 miles of railroad line and associated real estate from south of Tacoma to Nisqually in several separate transactions. The Company recognized gains associated with the sale of $9 million and $7 million, net of tax, in 2005 and 2004, respectively.

**New Mexico Department of Transportation**

In the fourth quarter of 2005, BNSF Railway Company entered into agreements with the New Mexico Department of Transportation to sell the Company's rail line and certain adjacent property between Belen, New Mexico and Trinidad, Colorado, through a series of sales agreements, while retaining freight easement rights on the line. The Company recognized an impairment charge in 2005 related to this agreement of $71 million. During the first quarter of 2006, upon closing the sale of the first line segment, the Company recognized a gain of $22 million and received a cash payment of $45 million. During the first quarter of 2007, upon closing the sale of the second line segment, the Company recognized a gain of $2 million and received cash of $18 million. Upon satisfaction of closing conditions, the remaining line sales are expected to close in 2008. BNSF expects to receive a cash payment of $4 million in 2008 related to this transaction and any related gain is immaterial. The impairment charge and the gains were recorded as a component of materials and other expense.

**American Jobs Creation Act of 2004**

In October 2004, the American Jobs Creation Act of 2004 was signed into law. Part of the legislation includes the repeal of a 4.3–cent tax per gallon of diesel fuel. The tax was gradually phased out in 2005 and 2006 and was completely phased out January 1, 2007. Based on actual fuel consumption, the repeal of the tax resulted in $32 million, $8 million and $21 million in incremental savings for the years ended December 31, 2007, 2006 and 2005, respectively.

## Critical Accounting Estimates

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors, and the Audit Committee has reviewed the Company's disclosure relating to them in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

**Legal**

BNSF's most significant legal claims relate to personal injury claims and environmental matters. These claims are discussed in more detail below.

## Personal Injury

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded. Expense accruals and any required adjustments are classified as materials and other in the Consolidated Statements of Income.

### *Asbestos*

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated at BNSF by 1985.

BNSF assesses its unasserted liability exposure on an annual basis during the third quarter. BNSF determines its asbestos liability by estimating its exposed population, the number of claims likely to be filed, the number of claims that will likely require payment, and the estimated cost per claim. Estimated filing and dismissal rates and average cost per claim are determined utilizing recent claim data and trends.

Key elements of the assessment include:

- Because BNSF did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using Company employee data from 1970 forward and estimated the BNSF employee base from 1938-1969 using railroad industry historical census data and estimating BNSF's representation in the total railroad population.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age, duration and intensity of exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for the period 2004-2006.
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2005-2007.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2005-2007.

From these assumptions, BNSF projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were then applied to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate BNSF's future liability for unasserted asbestos claims.

The most sensitive assumptions for this accrual are the estimated future filing rates and estimated average claim values. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, BNSF used a multi-year calibration period (i.e., the average historical filing rate for the period 2004-2006) because it believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against BNSF declines at a rate consistent with both mortality and age as there is a decreasing propensity to file a claim as the population ages. BNSF believes the average claim values by type of disease from the historical period 2005-2007 are most representative of future claim values. Non-malignant claims, which represent approximately 90 percent of the total number and 75 percent of the cost of estimated future asbestos claims, were priced by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10-percent increase or decrease in either the forecasted number of unasserted claims or the average claim values would result in an approximate $25 million increase or decrease in the liability recorded for unasserted asbestos claims.

Further discussion on asbestos is incorporated by reference from Note 10 to the Consolidated Financial Statements.

*Other Personal Injury*

BNSF estimates its other personal injury liability claims and expense quarterly based on the covered population, activity levels and trends in frequency and the costs of covered injuries. Estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, *Reasonable Estimation of the Amount of a Loss*, is immaterial for these repetitive stress and other occupational trauma claims.

Key elements of the actuarial assessment include:

- Size and demographics (employee age and craft) of the workforce.
- Activity levels (manhours by employee craft and carloadings).
- Expected claim frequency rates by type of claim (employee FELA or third-party liability) based on historical claim frequency trends.
- Expected dismissal rates by type of claim based on historical dismissal rates.
- Expected average paid amounts by type of claim for open and incurred but not reported claims that eventually close with payment.

From these assumptions, BNSF estimates the number of open claims by accident year that will likely require payment by the Company. The projected number of open claims by accident year that will require payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for all asserted claims. Additionally, BNSF estimates the number of its incurred but not reported claims that will likely result in payment based upon historical emergence patterns by type of claim. The estimated number of projected claims by accident year requiring payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for incurred but not reported claims.

The most sensitive assumptions for this accrual are the expected average cost per claim and the projected frequency rates for the number of claims that will ultimately result in payment. A 10-percent increase or decrease in either the expected average cost per claim or the frequency rate for claims with payment would result in an approximate $45 million increase or decrease in BNSF's recorded other personal injury reserves.

Further discussion on other personal injury is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## Environmental

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

BNSF estimates the ultimate cost of cleanup efforts at its known environmental sites on an annual basis during the third quarter. Ultimate cost estimates for environmental sites are based on historical payment patterns, current estimated percentage to closure ratios and benchmark patterns developed from data accumulated from industry and public sources, including the Environmental Protection Agency and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. The most significant assumptions are as follows: (i) historical payment patterns of site development and (ii) variance from benchmark costs. A 10 percent change in any of these individual assumptions could result in an increase or decrease of up to $20 million in BNSF's estimated environmental liability.

Further discussion on environmental is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## Other Claims and Litigation

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

### *Income Taxes*

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $1,128 million, $1,107 million and $919 million for the years ended December 31, 2007, 2006 and 2005, respectively. BNSF's Consolidated Balance Sheets reflect $290 million and $345 million of net current deferred tax assets at December 31, 2007 and 2006, respectively. Also included in BNSF's Consolidated Balance Sheets are $8,484 million and $8,298 million of net non-current deferred tax liabilities at December 31, 2007 and 2006, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 22, 1995, respectively. Internal Revenue Service (IRS) examination of the years 1995 through 1999 for BNSF is completed, and the un-agreed issues are pending before IRS Appeals. It is anticipated that a settlement with the IRS for the years 1995 through 1999 may be reached within the next twelve months. Examination of the years 2000 through 2002 and 2003 through 2005 for BNSF are completed and protests of the un-agreed issues are pending before IRS Appeals. BNSF is currently under examination for year 2006.

BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. State income tax returns are generally subject to examination for a period of three to five years after filing of the respective return. The state impact of any federal changes remains subject to examination by various states for a period of up to one year after formal notification to the states.

Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2007.

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable tax laws and regulations, current information and past experience with similar issues to make these judgments.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not significantly changed its methodology for calculating income tax expense for the years presented, and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above. Further information on uncertain tax positions is incorporated by reference from Notes 2 and 5 to the Consolidated Financial Statements.

**Employment Benefit Plans**

BNSF sponsors a funded, noncontributory qualified pension plan, the BNSF Retirement Plan, which covers most non-union employees, and an unfunded non-tax-qualified pension plan, the BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The amounts recorded in the Consolidated Statements of Income for the pension and the retiree health and welfare plans were as follows (in millions):

| **Year ended December 31,** | **2008 Estimate** | **2007** | **2006** | **2005** |
|---|---|---|---|---|
| Net pension cost | **$ 30** | **$ 52** | $ 68 | $ 38 |
| Net retiree health and welfare cost | **$ 17** | **$ 17** | $ 14 | $ 11 |

The decrease in the 2008 net pension cost as compared to 2007 primarily reflects higher than expected returns on plan assets over the past several years as well as a 50 basis point increase in the discount rate.

At December 31, 2007, BNSF had net losses, excluding prior service costs, of $234 million and $67 million related to the pension and retiree health and welfare benefits plans, respectively, which had been recognized as a component of AOCL under SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R*, as described in Note 13 to the Consolidated Financial Statements. These losses were comprised of gains and losses from changes in discount rates, actuarial assumptions and census data as well as market gains and losses and will be recognized as a component of net pension and retiree health and welfare costs over the next 17 and 8 years, respectively, as follows:

| | Deferred Losses to be Recognized (in millions) | |
|---|---|---|
| **Fiscal year** | **Pension** | **Retiree Health and Welfare Benefits** |
| 2008[a] | $ 16 | $ 4 |
| 2009 | 10 | 4 |
| 2010 | 5 | 4 |
| 2011 | 2 | 3 |
| 2012 | 2 | 3 |
| Thereafter | 21 | 21 |

a Excludes a $5 million pre-tax component of the $7 million net of tax decrease to retained earnings recorded in January 2008 related to the change in measurement date under SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment of FASB Statements No. 87, 88, 106 and 132R*. See Note 13 to the Consolidated Financial Statements.

The Company estimates liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of the pension or retiree health and welfare obligations include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

From time to time, the Company will change pension and retiree health and welfare assumptions in response to current conditions and expected future experience. Significant assumptions for the past three years are as follows:

| **Assumptions Used to Determine Net Cost for Fiscal Years Ended December 31,** | **Pension Benefits** | | | **Retiree Health and Welfare Benefits** | | |
|---|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Discount rate | **5.50%** | 5.25% | 5.75% | **5.50%** | 5.25% | 5.75% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.00% | **–%** | –% | –% |
| Assumed health care cost trend rate | **–%** | –% | –% | **10.00%** | 10.50% | 10.00% |
| Rate to which health care cost trend rate is expected to decline and remain | **–%** | –% | –% | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **–** | – | – | **2012** | 2012 | 2010 |
| Rate of compensation increase | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90% | 3.90% |

| Assumptions Used to Determine Benefit Obligations at September 30[a], | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Discount rate | **6.00%** | 5.50% | **6.00%** | 5.50% |
| Assumed health care cost trend rate | **–%** | –% | **10.50%** | 10.00% |
| Rate to which health care cost trend rate is expected to decline and remain | **–%** | –% | **5.00%** | 5.00% |
| Year that the rate reaches the ultimate trend rate | **–** | – | **2016** | 2012 |
| Rate of compensation increase | **3.80%** | 3.90% | **3.80%** | 3.90% |

a The Company's pension and retiree health and welfare plans used a measurement date of September 30 through 2007. However, BNSF is changing its measurement date and has elected to apply the transition option under which a 15-month measurement was determined as of September 30, 2007 that covers the period until the fiscal year-end measurement is required on December 31, 2008. See Note 13 to the Consolidated Financial Statements.

BNSF determined the discount rate by adjusting the Moody's Aa Corporate bond yield to reflect the difference between the duration of the future estimated cash flows of the Company's pension and retiree health and welfare plans and the duration of the Moody's Aa index. The expected return on plan assets reflects the expected long-term rates of return on those assets. The rate of compensation increase is determined based on historical experience. Finally, the health care cost trend rates reflect the expected future increases in health care costs.

The discount rate used for the 2008 calculation of net benefit cost was increased to 6.00 percent to reflect market conditions at the September 30, 2007 measurement date. The expected rate of return on plan assets remained consistent from 2007 to 2008, and the Company does not expect any near-term significant changes to the current investment allocation of assets. However, unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years.

The following table is an estimate of the impact on future net benefit cost that could result from hypothetical changes to the most sensitive assumptions, the discount rate and rate of return on plan assets:

**Sensitivity Analysis**

| | Change in Net Benefit Cost | |
|---|---|---|
| **Hypothetical Discount Rate Change** | **Pension** | **Retiree Health and Welfare** |
| 50 basis point decrease | $6 million increase | $1 million increase |
| 50 basis point increase | $6 million decrease | $1 million decrease |
| **Hypothetical Rate of Return on Plan Assets Change** | **Pension** | |
| 50 basis point decrease | $7 million increase | |
| 50 basis point increase | $7 million decrease | |

Based on its current assumptions and funding methodology, the Company is expected to be required to make contributions of $34 million to the BNSF Retirement Plan in 2008. The Company currently determines required funding by amortizing asset gains and losses over a period of five years. If the Company was required to fully fund the unfunded portion of its projected benefit obligation, which was $173 million at December 31, 2007, for these pension plans and $299 million for the retiree health and welfare plan, the Company's management believes that it would have sufficient liquidity, and it could fund the balance without a significant impact to the Company's financial position. Additionally, the Company expects to make benefit payments in 2008 of approximately $7 million and $25 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

In August of 2006, the President signed the Pension Protection Act of 2006 (PPA) into law. While the Act will have some effect on specific plan provisions in the Company's retirement program, its primary effect will be to change the minimum funding requirements. The Company expects that the Act will accelerate the required funding of future contributions for the Company's pension plans beginning with the 2009 fiscal year. Anticipated payments, including the impact of the PPA, over the next five years are included in the Contractual Obligations table under the heading "Long-Term Debt and Other Obligations" in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations. The Company does not anticipate that this legislation will significantly impact its results of operations, financial condition or liquidity.

Further information on employee benefits is incorporated by reference from Note 13 to the Consolidated Financial Statements.

**Depreciation**

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expenses of $1,293 million, $1,176 million and $1,111 million for the years ended December 31, 2007, 2006 and 2005, respectively. At December 31, 2007 and 2006, the Company had property and equipment, net balances of $29,567 million and $27,921 million, which included $9,177 million and $8,617 million, respectively, of accumulated depreciation.

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. The Company conducts studies of depreciation rates and the required accumulated depreciation balance as required by the STB, which is generally every three years for equipment property and every six years for track structure and other roadway property. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively, and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average remaining service lives of the assets.

See Note 2 to the Consolidated Financial Statements for additional information related to the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*.

A study conducted in 2007 resulted in the Company adopting new depreciation rates for locomotives that resulted in a net increase in 2007 depreciation expense of $17 million and approximately $22 million on an ongoing annual basis, as calculated using the asset base at the time of the rate change. In 2006, the Company conducted a depreciation rate study of its equipment (excluding locomotives). The results of this study did not materially impact the Company's current or future results of operations. All other rate studies are current under the STB's requirements.

## Forward-Looking Information

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. These forward-looking statements include, but are not limited to, statements regarding:

- Expectations as to operating results, such as revenue growth and earnings per share;
- Expectations as to the effect of claims, litigation, environmental and personal injury costs, commitments, contingent liabilities, and governmental and regulatory investigations and proceedings on the Company's financial condition;
- Plans and goals for future operational improvements and capital commitments; and
- Future market conditions or economic performance.

Forward-looking statements involve a number of risks and uncertainties, and actual performance or results may differ materially. For a discussion of material risks and uncertainties that the Company faces, see the discussion in Item 1A, "Risk Factors," of this Annual Report on Form 10-K. Important factors that could cause actual results to differ materially include, but are not limited to, the following:

- **Economic and industry conditions:** material adverse changes in economic or industry conditions, both in the United States and globally, changes in customer demand, effects of adverse economic conditions affecting shippers or BNSF's supplier base, adverse economic conditions in the industries and geographic areas that produce and consume freight, changes in demand due to more stringent regulatory policies such as the regulation of carbon dioxide emissions that could reduce the demand for coal, governmental tariffs or subsidies that could affect the demand for grain, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, level of service failures that could lead customers to use competitors' services, changes in fuel prices and other key materials and disruptions in supply chains for these materials, changes in the securities and capital markets and changes in crew availability, labor costs and labor difficulties, including stoppages affecting either BNSF's operations or customers' abilities to deliver goods to BNSF for shipment;

- **Legal, legislative and regulatory factors:** developments and changes in laws and regulations, including those affecting train operations or the marketing of services, the ultimate outcome of shipper and rate claims subject to adjudication or claims, investigations or litigation alleging violations of the antitrust laws, increased economic regulation of the rail industry through legislative action and revised rules and standards applied by the U.S. Surface Transportation Board in various areas including rates and services, developments in environmental investigations or proceedings with respect to rail operations or current or past ownership or control of real property, and developments in and losses resulting from other types of claims and litigation, including those relating to personal injuries, asbestos and other occupational diseases, the release of hazardous materials, environmental contamination and damage to property; and
- **Operating factors:** technical difficulties, changes in operating conditions and costs, changes in business mix, the availability of equipment and human resources to meet changes in demand, the extent of the Company's ability to achieve its operational and financial initiatives and to contain costs, the effectiveness of steps taken to maintain and improve operations and velocity and network fluidity, including the management of the amount of traffic on the system to meet demand and the ability to acquire sufficient resources to meet that demand, the ability to expand the capacity of the system, congestion on other railroads and capacity constraints affecting all links in the transportation chain that feed traffic and goods to BNSF's systems, restrictions on development and expansion plans due to environmental concerns, disruptions to BNSF's technology network including computer systems and software, as well as natural events such as severe weather, fires, floods and earthquakes or man-made or other disruptions of BNSF Railway's operating systems, structures, or equipment including the effects of acts of terrorism on the Company's system or other railroads' systems.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions and other important assumptions and factors that could cause actual results to differ materially from forward-looking statements made by the Company may appear in the Company's public filings with the SEC, which are accessible at www.sec.gov, and on the Company's website at www.bnsf.com, and which investors are advised to consult.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The following table summarizes the impact of these hedging activities on the Company's results of operations (in millions):

| Year ended December 31, | 2007 | 2006 |
|---|---|---|
| Fuel-hedge benefit (including ineffective portion of unexpired hedges) | **$ 31** | $ 341 |
| Interest rate hedge loss | **(3)** | (1) |
| Total hedge benefit | **28** | 340 |
| Tax effect | **(11)** | (131) |
| Hedge benefit, net of tax | **$ 17** | $ 209 |

The Company's fuel-hedge benefit is due to increases in fuel prices subsequent to the initiation of various hedges. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 to the Consolidated Financial Statements describe significant aspects of BNSF's financial instrument activities that have a material market risk. Additionally, the Company uses fuel surcharges, which it believes substantially mitigates the risk of fuel price volatility.

### Commodity Price Sensitivity

BNSF engages in hedging activities to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2007, are based on the front month settlement prices of West Texas Intermediate crude oil (WTI). For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel and WTI.

At December 31, 2007, BNSF had recorded a net fuel-hedging asset of $39 million for fuel hedges covering 2008 through 2010.

The following table is an estimate of the impact to earnings that could result from hypothetical price changes during the twelve-month period ending December 31, 2008, and the balance sheet impact from the hypothetical price changes, both based on the Company's hedge position at December 31, 2007:

| Sensitivity Analysis | | |
|---|---|---|
| Hedged Commodity Price Change | Fuel-Hedge Annual Pre-Tax Earnings Impact | Balance Sheet Impact of Change in Fuel-Hedge Fair Value |
| 10 percent increase | $9 million increase | $13 million increase |
| 10 percent decrease | $9 million decrease | $13 million decrease |

Based on fuel consumption during the twelve-month period ending December 31, 2007, of 1,442 million gallons and fuel prices during that same period, excluding the impact of the Company's hedging activities, a 10-percent increase or decrease in the commodity price per gallon would result in an approximate $295 million increase or decrease, respectively, in fuel expense (pre-tax) on an annual basis.

At December 31, 2007, BNSF maintained fuel inventories for use in normal operations, which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure. Further information on fuel hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

### Interest Rate Sensitivity

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. These interest rate hedges are accounted for as cash flow or fair value hedges. BNSF's measurement of the fair value of these hedges is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

At December 31, 2007, the fair value of BNSF's debt, excluding capital leases, was $7,475 million, which includes a fair value interest rate hedge benefit of $6 million. Additionally, the Company had recorded an interest rate hedging liability of $5 million for cash flow hedges.

The following table is an estimate of the impact to earnings and the fair value of the total debt, excluding capital leases, and interest rate hedges that could result from hypothetical interest rate changes during the twelve-month period ending December 31, 2008, based on debt levels and outstanding hedges as of December 31, 2007:

**Sensitivity Analysis**

| Hypothetical Change in Interest Rates | Floating Rate Debt - Annual Pre-Tax Earnings Impact | Change in Fair Value | |
|---|---|---|---|
| | | Total Debt[a] | Interest Rate Hedges |
| 1 percent decrease | $7 million increase | $718 million increase | $8 million decrease |
| 1 percent increase | $7 million decrease | $602 million decrease | $5 million increase |

a Excludes impact of interest rate hedges.

Further information on interest rate hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements. Information on the Company's debt, which may be sensitive to interest rate fluctuations, is incorporated by reference from Note 9 to the Consolidated Financial Statements.

## Item 8. Financial Statements and Supplementary Data

The Consolidated Financial Statements and Management's Report on Internal Control Over Financial Reporting of BNSF and subsidiary companies, together with the report of the Company's independent registered public accounting firm, are included as part of this filing.

The following documents are filed as a part of this report:

## Consolidated Financial Statements

Management's Report on Internal Control Over Financial Reporting ....38
Report of Independent Registered Public Accounting Firm....39
Consolidated Statements of Income for each of the three years in the period ended December 31, 2007 ....40
Consolidated Balance Sheets as of December 31, 2007 and 2006....41
Consolidated Statements of Cash Flows for each of the three years in the period ended December 31, 2007 ....42
Consolidated Statements of Changes in Stockholders' Equity for each of the three years in the period ended December 31, 2007....43
Notes to Consolidated Financial Statements.... 44–73

# Management's Report on Internal Control Over Financial Reporting

## To the Shareholders of Burlington Northern Santa Fe Corporation and Subsidiaries

The management of Burlington Northern Santa Fe Corporation (the Company) is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external reporting purposes in accordance with generally accepted accounting principles in the United States of America.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2007. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control – Integrated Framework*. Based on management's assessment, the Company concluded that as of December 31, 2007, the Company's internal control over financial reporting was effective based on those criteria.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2007, has been audited by PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, as stated in their report, which appears on the following page.

# Report of Independent Registered Public Accounting Firm

## To the Shareholders and Board of Directors of Burlington Northern Santa Fe Corporation

In our opinion, the accompanying consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and its subsidiaries (the Company) at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2007, the Company changed the manner in which it accounts for planned major maintenance activities and the manner in which it accounts for uncertain tax positions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.




Fort Worth, Texas
February 12, 2008

## Consolidated Statements of Income

In millions, except per share data

| Year ended December 31, | 2007 | 2006 (As Adjusted)[a] | 2005 (As Adjusted)[a] |
|---|---|---|---|
| Revenues | **$ 15,802** | $ 14,985 | $ 12,987 |
| Operating expenses: | | | |
| Compensation and benefits | **3,773** | 3,816 | 3,515 |
| Fuel | **3,197** | 2,734 | 1,959 |
| Purchased services | **2,023** | 1,906 | 1,713 |
| Depreciation and amortization | **1,293** | 1,176 | 1,111 |
| Equipment rents | **942** | 930 | 886 |
| Materials and other | **1,088** | 902 | 876 |
| Total operating expenses | **12,316** | 11,464 | 10,060 |
| Operating income | **3,486** | 3,521 | 2,927 |
| Interest expense | **511** | 485 | 437 |
| Other expense, net | **18** | 40 | 37 |
| Income before income taxes | **2,957** | 2,996 | 2,453 |
| Income tax expense | **1,128** | 1,107 | 919 |
| Net income | **$ 1,829** | $ 1,889 | $ 1,534 |
| Earnings per share: | | | |
| Basic earnings per share | **$ 5.19** | $ 5.23 | $ 4.13 |
| Diluted earnings per share | **$ 5.10** | $ 5.11 | $ 4.02 |
| Average shares: | | | |
| Basic | **352.5** | 361.0 | 371.8 |
| Dilutive effect of stock awards | **6.4** | 8.8 | 10.0 |
| Diluted | **358.9** | 369.8 | 381.8 |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

# Consolidated Balance Sheets

Dollars in millions, shares in thousands

| December 31, | 2007 | 2006 (As Adjusted)[a] |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 330** | $ 375 |
| Accounts receivable, net | **790** | 805 |
| Materials and supplies | **579** | 488 |
| Current portion of deferred income taxes | **290** | 345 |
| Other current assets | **192** | 168 |
| Total current assets | **2,181** | 2,181 |
| Property and equipment, net | **29,567** | 27,921 |
| Other assets | **1,835** | 1,695 |
| Total assets | **$ 33,583** | $ 31,797 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | **$ 2,824** | $ 2,853 |
| Long-term debt due within one year | **411** | 473 |
| Total current liabilities | **3,235** | 3,326 |
| Long-term debt and commercial paper | **7,735** | 6,912 |
| Deferred income taxes | **8,484** | 8,298 |
| Casualty and environmental liabilities | **843** | 830 |
| Pension and retiree health and welfare liability | **444** | 604 |
| Employee separation costs | **77** | 86 |
| Other liabilities | **1,621** | 1,213 |
| Total liabilities | **22,439** | 21,269 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value, 600,000 shares authorized; 537,330 shares and 532,080 shares issued, respectively | **5** | 5 |
| Additional paid-in-capital | **7,348** | 6,990 |
| Retained earnings | **11,152** | 9,739 |
| Treasury stock, at cost, 189,626 shares and 174,205 shares, respectively | **(7,222)** | (5,929) |
| Accumulated other comprehensive loss | **(139)** | (277) |
| Total stockholders' equity | **11,144** | 10,528 |
| Total liabilities and stockholders' equity | **$ 33,583** | $ 31,797 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

# Consolidated Statements of Cash Flows

In millions

| Year ended December 31, | 2007 | 2006 (As Adjusted)[a] | 2005 (As Adjusted)[a] |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 1,829** | $ 1,889 | $ 1,534 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **1,293** | 1,176 | 1,111 |
| Deferred income taxes | **280** | 316 | 219 |
| Employee separation costs paid | **(21)** | (27) | (30) |
| Long-term casualty and environmental liabilities, net | **26** | (55) | (71) |
| Other, net | **183** | (43) | 2 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **20** | (127) | (138) |
| Change in accounts receivable sales program | **–** | – | (350) |
| Materials and supplies | **(91)** | (92) | (57) |
| Other current assets | **12** | 99 | (5) |
| Accounts payable and other current liabilities | **(39)** | 53 | 491 |
| Net cash provided by operating activities | **3,492** | 3,189 | 2,706 |
| **Investing Activities** | | | |
| Capital expenditures | **(2,248)** | (2,014) | (1,750) |
| Construction costs for facility financing obligation | **(37)** | (14) | (4) |
| Other, net | **(130)** | (139) | (366) |
| Net cash used for investing activities | **(2,415)** | (2,167) | (2,120) |
| **Financing Activities** | | | |
| Net (decrease) increase in commercial paper and bank borrowings | **(584)** | 283 | 563 |
| Proceeds from issuance of long-term debt | **1,300** | 300 | 500 |
| Payments on long-term debt | **(482)** | (467) | (464) |
| Dividends paid | **(380)** | (310) | (267) |
| Proceeds from stock options exercised | **142** | 116 | 244 |
| Purchase of BNSF common stock | **(1,265)** | (730) | (799) |
| Prepaid forward repurchase of treasury stock | **–** | – | (600) |
| Excess tax benefits from equity compensation plans | **121** | 95 | – |
| Proceeds from facility financing obligation | **41** | – | – |
| Other, net | **(15)** | (9) | (10) |
| Net cash used for financing activities | **(1,122)** | (722) | (833) |
| (Decrease) increase in cash and cash equivalents | **(45)** | 300 | (247) |
| Cash and cash equivalents: | | | |
| Beginning of year | **375** | 75 | 322 |
| End of year | **$ 330** | $ 375 | $ 75 |
| **Supplemental Cash Flow Information** | | | |
| Interest paid, net of amounts capitalized | **$ 494** | $ 462 | $ 427 |
| Income taxes paid, net of refunds | **$ 680** | $ 779 | $ 545 |
| Non-cash asset financing | **$ 461** | $ 109 | $ 68 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## Consolidated Statements of Changes in Stockholders' Equity

Dollars in millions, shares in thousands, except per share data

| | Common Shares | Treasury Shares | Common Stock and Paid-in Capital | Retained Earnings[a] | Treasury Stock | Prepaid Forward Repurchase of Treasury Stock | Unearned Compensation | Accumulated Other Comprehensive Loss | Total Stockholders' Equity[a] |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2004, as reported | 517,275 | (140,463) | $ 6,304 | $ 6,792 | $ (3,741) | $ – | $ (43) | $ (1) | $ 9,311 |
| Cumulative effect retrospective application, net of tax expense of $78[a] | | | – | 127 | – | – | – | – | 127 |
| Balance at December 31, 2004, as adjusted | | | 6,304 | 6,919 | (3,741) | – | (43) | (1) | 9,438 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,534 | – | – | – | – | 1,534 |
| Minimum pension liability adjustment, net of tax benefit of $25 | | | – | – | – | – | – | (39) | (39) |
| Fuel/interest hedge mark-to-market, net of tax benefit of $8 | | | – | – | – | – | – | (13) | (13) |
| Total comprehensive income | | | – | 1,534 | – | – | – | (52) | 1,482 |
| Common stock dividends, $0.74 per share | | | – | (278) | – | – | – | – | (278) |
| Restricted stock expense | | | – | – | – | – | 37 | – | 37 |
| Restricted stock activity and related tax benefit of $10 | 665 | (140) | 46 | – | – | – | (16) | – | 30 |
| Exercise of stock options and related tax benefit of $84 | 9,349 | (540) | 357 | – | (29) | – | – | – | 328 |
| Purchase of BNSF common stock | – | (14,575) | – | – | (799) | – | – | – | (799) |
| Prepaid forward repurchase of treasury stock | – | – | – | – | – | (600) | – | – | (600) |
| Balance at December 31, 2005, as adjusted | 527,289 | (155,718) | 6,707 | 8,175 | (4,569) | (600) | (22) | (53) | 9,638 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,889 | – | – | – | – | 1,889 |
| Minimum pension liability adjustment, net of tax expense of $24 | | | – | – | – | – | – | 40 | 40 |
| Fuel/interest hedge mark-to-market, net of tax benefit of $117 | | | – | – | – | – | – | (188) | (188) |
| Total comprehensive income | | | – | 1,889 | – | – | – | (148) | 1,741 |
| Adjustment to initially apply Statement of Financial Accounting Standard (SFAS) No. 158, net of tax benefit of $48 | | | – | – | – | – | – | (76) | (76) |
| Common stock dividends, $0.90 per share | | | – | (325) | – | – | – | – | (325) |
| Restricted stock and stock options expense | | | 72 | – | – | – | – | – | 72 |
| Restricted stock activity and related tax benefit of $15 | 28 | (33) | 16 | – | (1) | – | – | – | 15 |
| Exercise of stock options and related tax benefit of $80 | 4,763 | (376) | 225 | – | (29) | – | – | – | 196 |
| Adjustment upon adoption of SFAS No. 123R | – | – | (25) | – | – | – | 22 | – | (3) |
| Purchase of BNSF common stock | – | (9,860) | – | – | (730) | – | – | – | (730) |
| Prepaid forward repurchase of treasury stock | – | (8,218) | – | – | (600) | 600 | – | – | – |
| Balance at December 31, 2006, as adjusted | 532,080 | (174,205) | 6,995 | 9,739 | (5,929) | – | – | (277) | 10,528 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,829 | – | – | – | – | 1,829 |
| Change in unrecognized prior service cost and actuarial losses, net of tax expense of $76 | | | – | – | – | – | – | 122 | 122 |
| Fuel/interest hedge mark-to-market, net of tax expense of $10 | | | – | – | – | – | – | 16 | 16 |
| Total comprehensive income | | | – | 1,829 | – | – | – | 138 | 1,967 |
| Adjustment for the adoption of FASB Interpretation No. (FIN) 48 | | | – | (13) | – | – | – | – | (13) |
| Common stock dividends, $1.14 per share | | | – | (403) | – | – | – | – | (403) |
| Restricted stock and stock options expense | | | 66 | – | – | – | – | – | 66 |
| Restricted stock activity and related tax benefit of $23 | 1 | (48) | 24 | – | – | – | – | – | 24 |
| Exercise of stock options and related tax benefit of $98 | 5,249 | (319) | 268 | – | (28) | – | – | – | 240 |
| Purchase of BNSF common stock | – | (15,054) | – | – | (1,265) | – | – | – | (1,265) |
| Balance at December 31, 2007 | 537,330 | (189,626) | $ 7,353 | $ 11,152 | $ (7,222) | $ – | $ – | $ (139) | $ 11,144 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

# Notes to Consolidated Financial Statements

## 1. The Company

Burlington Northern Santa Fe Corporation (BNSF) is a holding company that conducts no operating activities and owns no significant assets other than through its interests in its subsidiaries. BNSF's principal, wholly-owned subsidiary is BNSF Railway Company (BNSF Railway), which operates one of the largest railroad networks in North America with approximately 32,000 route miles in 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 37 percent, 24 percent, 21 percent and 18 percent, respectively, of total freight revenues for the year ended December 31, 2007. These Consolidated Financial Statements include BNSF, BNSF Railway and other majority-owned subsidiaries, all of which are separate legal entities (collectively, the Company).

## 2. Significant Accounting Policies

### Principles of Consolidation

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated. The Company evaluates its less than majority-owned investments for consolidation pursuant to FIN 46R, *Consolidation of Variable Interest Entities.*

### Use of Estimates

The preparation of financial statements in accordance with generally accepted accounting principles in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. These estimates and assumptions are periodically reviewed by management. Actual results could differ from those estimates.

### Revenue Recognition

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue on a pro-rata basis based on actual or projected future customer shipments. When using projected shipments, the Company relies on historic trends as well as economic and other indicators to estimate the liability for customer incentives.

### Accounts Receivable, Net

Accounts receivable, net includes accounts receivable reduced by an allowance for bill adjustments and uncollectible accounts. The allowance for bill adjustments and uncollectible accounts is based on historical experience as well as any known trends or uncertainties related to customer billing and account collectibility.

### Cash and Cash Equivalents

All short-term investments with original maturities of 90 days or less are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

### Materials and Supplies

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

## Property and Equipment, Net

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. Upon normal sale or retirement of certain depreciable railroad property, cost less net salvage value is charged to accumulated depreciation, and no gain or loss is recognized. The disposals of land and non-rail property as well as significant premature retirements are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

Leasehold improvements that meet capitalization criteria are capitalized and amortized on a straight-line basis over the lesser of their estimated useful lives or the remaining lease term. Cash flows for capitalized leasehold improvements are reported in the investing activities other, net line of the Consolidated Statements of Cash Flows.

## Planned Major Maintenance Activities

Effective January 1, 2007, the Company transitioned to the deferral method of accounting for leased locomotive overhauls, which includes the refurbishment of the engine and related components. Previously, the Company used the accrue-in-advance method of accounting for these planned major maintenance activities; however, under FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*, issued in September 2006, this method is no longer allowed. This change was applied retrospectively for all periods presented. Accordingly, BNSF has eliminated the asset and liability recorded from the accrue-in-advance methodology and established an asset for overhauls that have been performed. This asset of $245 million, which is included in property and equipment, net in the December 31, 2006 Consolidated Balance Sheets, will be amortized to expense using the straight-line method until the next overhaul is performed or the end of the lease, whichever comes first, typically between six and eight years. The effects of these adjustments were as follows (in millions):

**Consolidated Statements of Income**

| Year ended December 31, | 2006 | | 2005 | |
|---|---|---|---|---|
| | As Reported | As Adjusted | As Reported | As Adjusted |
| Depreciation and amortization | $ 1,130 | $ 1,176 | $ 1,075 | $ 1,111 |
| Materials and other | 952 | 902 | 917 | 876 |
| Total operating expenses | 11,468 | 11,464 | 10,065 | 10,060 |
| Operating income | 3,517 | 3,521 | 2,922 | 2,927 |
| Income before income taxes | 2,992 | 2,996 | 2,448 | 2,453 |
| Income tax expense | 1,105 | 1,107 | 917 | 919 |
| Net income | $ 1,887 | $ 1,889 | $ 1,531 | $ 1,534 |
| Basic earnings per share | $ 5.23 | $ 5.23 | $ 4.12 | $ 4.13 |
| Diluted earnings per share | $ 5.10 | $ 5.11 | $ 4.01 | $ 4.02 |

**Consolidated Balance Sheets**

| December 31, | 2006 | |
|---|---|---|
| | As Reported | As Adjusted |
| Property and equipment, net | $ 27,676 | $ 27,921 |
| Other assets | 1,786 | 1,695 |
| Total assets | 31,643 | 31,797 |
| Deferred income taxes | 8,216 | 8,298 |
| Other liabilities | 1,273 | 1,213 |
| Total liabilities | 21,247 | 21,269 |
| Retained earnings | 9,607 | 9,739 |
| Total stockholders' equity | 10,396 | 10,528 |
| Total liabilities and stockholders' equity | $ 31,643 | $ 31,797 |

**Consolidated Statements of Cash Flows**

| Year ended December 31, | 2006 | | 2005 | |
|---|---|---|---|---|
| | As Reported | As Adjusted | As Reported | As Adjusted |
| Net income | $ 1,887 | $ 1,889 | $ 1,531 | $ 1,534 |
| Depreciation and amortization | 1,130 | 1,176 | 1,075 | 1,111 |
| Deferred income taxes | 314 | 316 | 217 | 219 |
| Operating activities other, net | (74) | (43) | (54) | 2 |
| Net cash provided by operating activities | 3,108 | 3,189 | 2,609 | 2,706 |
| Investing activities other, net | (58) | (139) | (269) | (366) |
| Net cash used for investing activities | $ (2,086) | $ (2,167) | $ (2,023) | $ (2,120) |

The effects of the adjustments on years prior to fiscal 2005 resulted in an adjustment to increase stockholders' equity as of January 1, 2005 by $127 million.

## Environmental Liabilities

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

## Personal Injury Claims

Liabilities for personal injury claims are initially recorded when the expected loss is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Liabilities recorded for unasserted personal injury claims, including those related to asbestos, are based on information currently available. Estimates of liabilities for personal injury claims are undiscounted.

## Income Taxes

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. Investment tax credits are accounted for using the flow-through method.

## Uncertain Tax Positions

In June 2006, the FASB issued FIN 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109, Accounting for Income Taxes.* This interpretation addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FIN 48, the Company may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties on income taxes, accounting in interim periods and requires increased disclosures. The Company adopted the provisions of FIN 48 on January 1, 2007. As a result of the implementation of FIN 48, the Company recorded an $83 million increase in the liability for unrecognized tax benefits, which is offset by a reduction of the deferred tax liability of $70 million, resulting in a decrease to the January 1, 2007, retained earnings balance of $13 million (for additional information see Note 5 to the Consolidated Financial Statements).

## Stock-Based Compensation

The Company adopted SFAS No. 123R, *Share-Based Payment,* on January 1, 2006. This statement requires BNSF to recognize the cost of employee services received in exchange for the Company's equity instruments. Under SFAS No. 123R, BNSF is required to record compensation expense over an award's vesting period based on the award's fair value at the date of grant. BNSF has elected to adopt SFAS No. 123R on a modified prospective basis; accordingly, the financial statements for periods prior to January 1, 2006, do not include compensation cost calculated under the fair value method. Since the adoption of this new guidance, there have been no significant changes in the quantity or types of instruments used in stock-based compensation programs, nor have there been any significant changes in the terms of existing stock-based compensation arrangements. The Company did, however, record a favorable cumulative adjustment for estimated forfeitures of $3 million, which, due to its immateriality, was included as a reduction to compensation expense in the first quarter of 2006.

Prior to January 1, 2006, the Company applied Accounting Principles Board Opinion 25, *Accounting for Stock Issued to Employees,* and, therefore, recorded the intrinsic value of stock-based compensation as expense. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation,* to stock-based employee compensation (in millions, except per share data) prior to January 1, 2006:

| **Year ended December 31,** | **2005[a]** |
|---|---|
| Net income, as reported | $ 1,534 |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | 23 |
| Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | (42) |
| Pro forma net income | $ 1,515 |
| Earnings per share: | |
| Basic – as reported | $ 4.13 |
| Basic – pro forma | $ 4.07 |
| Diluted – as reported | $ 4.02 |
| Diluted – pro forma | $ 3.97 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See "Planned Major Maintenance Activities" within this footnote for additional information.

## Employment Benefit Plans

The Company estimates liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates regarding future events and circumstances. Significant assumptions used in the valuation of pension and/or retiree health and welfare liabilities include the expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

## Reclassifications

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income or net income.

## 3. Hedging Activities

The Company uses derivative financial instruments to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company does not hold or issue derivative financial instruments for trading or speculative purposes. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended,* is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings. Cash flows related to fuel and interest rate hedges are classified as operating activities in the Consolidated Statements of Cash Flows.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate any losses due to counterparty nonperformance.

### Fuel

Fuel costs represented 26 percent, 24 percent and 19 percent of total operating expenses during 2007, 2006 and 2005, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company has entered into hedges to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. The fuel hedges include the use of derivatives that are accounted for as cash flow hedges. The hedging is intended to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2007 and excluding the impact of the hedges, each one-cent increase in the price of fuel per gallon would result in approximately $14 million of additional fuel expense on an annual basis. However, BNSF believes any fuel price increase would be substantially offset by the Company's fuel surcharge program.

#### Total Fuel-Hedging Activities

As of December 31, 2007, BNSF's total fuel-hedging positions covered approximately 3 percent, 1 percent and less than 1 percent of estimated fuel purchases for 2008, 2009 and 2010, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel-hedge transactions were as follows (in millions):

| **Year ended December 31,** | **2007** | **2006** | **2005** |
|---|---|---|---|
| Hedge benefit | **$ 30** | $ 342 | $ 535 |
| Ineffective portion of open hedges | **1** | (1) | (4) |
| Tax effect | **(12)** | (131) | (203) |
| Hedge benefit, net of tax | **$ 19** | $ 210 | $ 328 |

The amounts recorded in the Consolidated Balance Sheets for fuel-hedge transactions were as follows (in millions):

| **December 31,** | **2007** | **2006** |
|---|---|---|
| Short-term fuel-hedging asset | **$ 29** | $ 13 |
| Long-term fuel-hedging asset | **10** | – |
| Short-term fuel-hedging liability | **–** | (2) |
| Ineffective portion of open hedges | **–** | 1 |
| Tax effect | **(15)** | (4) |
| Amount included in AOCL, net of tax | **$ 24** | $ 8 |
| Settled fuel-hedging contracts receivable | **$ 6** | $ 37 |

BNSF measures the fair value of hedges based upon data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged.

## New York Mercantile Exchange (NYMEX) #2 Heating Oil (HO) Hedges

As of December 31, 2006, BNSF had outstanding fuel swap agreements utilizing NYMEX #2 HO. No additional HO hedges were entered into during 2007. As of December 31, 2007, there were no HO hedge positions outstanding.

## West Texas Intermediate (WTI) Crude Oil Hedges

At December 31, 2007, BNSF had outstanding fuel swap agreements utilizing WTI crude oil. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. Over the twelve months ended December 31, 2007, the sum of all such costs averaged approximately 55 cents per gallon.

During 2007, the Company entered into fuel swap agreements utilizing WTI to hedge the equivalent of approximately 1.5 million barrels of fuel with an average swap price of $64.12 per barrel. The following tables provide fuel-hedge data based on the quarter being hedged for all WTI fuel hedges outstanding as of December 31, 2007.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2008** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 290 | 260 | 230 | 230 | 1,010 |
| Equivalent gallons hedged (in millions) | 12.18 | 10.92 | 9.66 | 9.66 | 42.42 |
| Average swap price (per barrel) | $ 63.69 | $ 63.77 | $ 63.70 | $ 63.70 | $ 63.72 |
| Fair value (in millions) | $ 9 | $ 8 | $ 6 | $ 6 | $ 29 |

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2009** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 100 | 100 | 100 | 70 | 370 |
| Equivalent gallons hedged (in millions) | 4.20 | 4.20 | 4.20 | 2.94 | 15.54 |
| Average swap price (per barrel) | $ 65.10 | $ 65.10 | $ 65.10 | $ 65.00 | $ 65.08 |
| Fair value (in millions) | $ 2 | $ 2 | $ 2 | $ 2 | $ 8 |

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2010** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 70 | – | – | – | 70 |
| Equivalent gallons hedged (in millions) | 2.94 | – | – | – | 2.94 |
| Average swap price (per barrel) | $ 64.80 | $ – | $ – | $ – | $ 64.80 |
| Fair value (in millions) | $ 2 | $ – | $ – | $ – | $ 2 |

### Summarized Comparative Prior Year Information

The following table provides summarized comparative information for hedge transactions outstanding as of December 31, 2006.

| **Year ended December 31,** | **2007** |
|---|---|
| **HO Swaps** | |
| Gallons hedged (in millions) | 55.65 |
| Average swap price (per gallon) | $ 2.11 |
| Fair value (in millions) | $ (16) |
| **HO Collars** | |
| Gallons hedged (in millions) | 40.95 |
| Average cap price (per gallon) | $ 1.17 |
| Average floor price (per gallon) | $ 1.07 |
| Fair value (in millions) | $ 23 |
| **WTI Collars** | |
| Barrels hedged (in thousands) | 150 |
| Equivalent gallons hedged (in millions) | 6.30 |
| Average cap price (per barrel) | $ 33.00 |
| Average floor price (per barrel) | $ 29.00 |
| Fair value (in millions) | $ 4 |

## Interest Rate

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as converting a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

### Total Interest Rate Hedging Program

All interest rate derivative transactions outstanding are reflected in the following table:

| | **December 31, 2007** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Maturity Date** | | | | | | | **Fair** |
| | **2008** | **2009** | **2010** | **2011** | **2012** | **Thereafter** | **Total** | **Value** |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ – | $ 200 | $ 250 | $ – | $ – | $ – | $ 450 | $ 6 |
| Average fixed rate | –% | 6.13% | 7.13% | –% | –% | –% | 6.68% | |
| Average floating rate | –% | 5.47% | 7.86% | –% | –% | –% | 6.80% | |
| **Cash Flow Hedges** | | | | | | | | |
| Treasury locks (in millions) | $ 175 | $ – | $ – | $ – | $ – | $ – | $ 175 | $ (5) |
| Average rate | 4.41% | –% | –% | –% | –% | –% | 4.41% | |

BNSF's measurement of the fair value of interest rate derivatives is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

## Summarized Comparative Prior Year Information

| | December 31, 2006 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | Fair |
| | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter | Total | Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 300 | $ – | $ 200 | $ 250 | $ – | $ – | $ 750 | $ (6) |
| Average fixed rate | 7.88% | –% | 6.13% | 7.13% | –% | –% | 7.16% | |
| Average floating rate | 7.98% | –% | 5.84% | 8.23% | –% | –% | 7.49% | |
| **Cash Flow Hedges** | | | | | | | | |
| Treasury locks (in millions) | $ 130 | $ – | $ – | $ – | $ – | $ – | 130 | $ – |
| Average rate | 4.69% | –% | –% | –% | –% | –% | 4.69% | |

## Fair Value Interest Rate Hedges

The Company enters into interest rate swaps to convert fixed-rate long-term debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short-cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of each of the years ended December 31, 2007 and 2006, BNSF had outstanding seven and ten separate swaps, respectively, with an aggregate notional amount of $450 million and $750 million, respectively, in which it pays an average floating rate, which fluctuates quarterly, based on London Interbank Offered Rate (LIBOR). The average floating rate to be paid by BNSF as of December 31, 2007, was 6.80 percent, and the average fixed rate BNSF is to receive is 6.68 percent.

The amounts recorded in the Consolidated Statements of Income, as an increase to or reduction of interest expense, for interest rate fair value hedge transactions were as follows (in millions):

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Hedge (loss) benefit | **$ (3)** | $ (1) | $ 17 |
| Tax effect | **1** | – | (6) |
| Hedge (loss) benefit, net of tax | **$ (2)** | $ (1) | $ 11 |

The amounts recorded in the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of open hedges, with a corresponding adjustment to debt or accrued interest, were as follows (in millions):

| December 31, | 2007 | 2006 |
|---|---|---|
| Long-term interest rate hedging asset | **$ 6** | $ – |
| Long-term interest rate hedging liability | **$ –** | $ (6) |

## Cash Flow Interest Rate Hedges

In anticipation of a future debt issuance, the Company entered into seven treasury locks in September, October and November 2007, having an aggregate notional amount of $175 million, and an average locked-in rate of 4.41 percent, to fix a portion of the rate for a future 10-year unsecured debt issuance. The treasury locks are expected to be unwound during 2008, and any gain or loss on the hedges will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

In anticipation of a future refinancing of several leveraged leases, the Company had entered into six treasury locks having an aggregate notional amount of $147 million to fix the interest rate inherent in the operating lease payments. The treasury locks were terminated in May 2007 in connection with the refinancing of the leveraged leases, and the resulting $0.5 million gain on these hedges will be amortized to equipment rents over the remaining life of the leases. These transactions are also accounted for as cash flow hedges.

In anticipation of future debt issuances, the Company had entered into fourteen treasury locks having an aggregate notional amount of $450 million to fix a portion of the rate for a future 10-year unsecured debt issuance and a future 30-year unsecured debt issuance. The treasury locks were terminated in April 2007 in connection with the issuance of $650 million 10-year and $650 million 30-year unsecured debt. Upon termination, BNSF received $6 million from the counterparties, which will be amortized to interest expense over the life of the issued debt. These transactions are also accounted for as cash flow hedges.

The amounts recorded in the Consolidated Balance Sheets for interest rate cash flow hedge transactions, which represent the fair value of open and closed hedges, were as follows (in millions):

| December 31, | 2007 | 2006 |
|---|---|---|
| Interest rate hedging liability – open hedges | **$ (5)** | $ – |
| Unrecognized gain on closed hedges | **19** | 15 |
| Tax effect | **(5)** | (6) |
| Unrecognized gain in AOCL, net of tax | **$ 9** | $ 9 |

## 4. Other Expense, Net

Other expense, net includes the following (in millions):

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Accounts receivable sales fees | **$ 19** | $ 23 | $ 15 |
| Loss from participation in synthetic fuel partnership | **5** | 9 | 14 |
| Miscellaneous, net | **(6)** | 8 | 8 |
| Total | **$ 18** | $ 40 | $ 37 |

The decrease in other expense, net was predominantly due to lower accounts receivable sales fees, a decrease in losses on BNSF Railway's participation in a synthetic fuel partnership and an increase in interest income.

During the fourth quarter of 2004, BNSF Railway indirectly purchased a 4.17 percent ownership of a synthetic fuel partnership through a 50 percent interest in a limited liability company with an unrelated entity. The synthetic fuel partnership generates Section 29 synthetic fuel tax credits, which reduce the Company's effective tax rate (see Note 5 to the Consolidated Financial Statements for additional information). In 2007, 2006 and 2005, BNSF Railway received a tax benefit from its participation in the partnership of approximately $7 million, $11 million and $16 million, respectively, related to the fuel tax credits and the deduction of partnership operating losses. In 2007, 2006 and 2005, the Company recorded approximately $5 million, $9 million and $14 million, respectively, of other expense, net related to the Company's share of the partnership's losses under the equity method of accounting. The partnership does not qualify for consolidation under FIN 46R, as BNSF Railway is not the primary beneficiary of the partnership. The partnership's activities terminated on December 31, 2007; therefore, the Company will not have any additional exposure to loss from the synthetic fuel partnership.

## 5. Income Taxes

Income tax expense was as follows (in millions):

| Year ended December 31, | 2007 | 2006[a] | 2005[a] |
|---|---|---|---|
| Current: | | | |
| Federal | **$ 741** | $ 697 | $ 620 |
| State | **107** | 94 | 80 |
| Total current | **848** | 791 | 700 |
| Deferred: | | | |
| Federal | **245** | 300 | 185 |
| State | **35** | 16 | 34 |
| Total deferred | **280** | 316 | 219 |
| Total | **$ 1,128** | $ 1,107 | $ 919 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Federal statutory income tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | **3.1** | 2.6 | 3.0 |
| Tax law change | **–** | (0.2) | – |
| Synthetic fuel credits | **(0.2)** | (0.3) | (0.4) |
| Other, net | **0.3** | (0.2) | (0.1) |
| Effective tax rate | **38.2%** | 36.9% | 37.5% |

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2007 | 2006[a] |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | **$ (8,977)** | $ (8,738) |
| Hedging | **(26)** | (15) |
| Other | **(170)** | (208) |
| Total deferred tax liabilities | **(9,173)** | (8,961) |
| Deferred tax assets: | | |
| Casualty and environmental | **348** | 332 |
| Pension and retiree health and welfare benefits | **184** | 247 |
| Compensation and benefits | **145** | 158 |
| Employee separation costs | **35** | 39 |
| Other | **267** | 232 |
| Total deferred tax assets | **979** | 1,008 |
| Net deferred tax liability | **$ (8,194)** | $ (7,953) |
| Non-current deferred income tax liability | **$ (8,484)** | $ (8,298) |
| Current portion of deferred income taxes | **290** | 345 |
| Net deferred tax liability | **$ (8,194)** | $ (7,953) |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 22, 1995, respectively. Internal Revenue Service (IRS) examination of the years 1995 through 1999 for BNSF is completed, and the un-agreed issues are pending before IRS Appeals. It is anticipated that a settlement with the IRS for the years 1995 through 1999 may be reached within the next twelve months. Examination of the years 2000 through 2002 and 2003 through 2005 for BNSF are completed and protests of the un-agreed issues are pending before IRS Appeals. BNSF is currently under examination for year 2006.

BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. State income tax returns are generally subject to examination for a period of three to five years after filing of the respective return. The state impact of any federal changes remains subject to examination by various states for a period of up to one year after formal notification to the states.

Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2007.

### Uncertain Tax Positions

The Company adopted the provisions of FIN 48 on January 1, 2007. As a result of the implementation of FIN 48, the Company recorded an $83 million increase in the liability for unrecognized tax benefits, which is offset by a reduction of the deferred tax liability of $70 million, resulting in a decrease to the January 1, 2007, retained earnings balance of $13 million. The amount of unrecognized tax benefits at December 31, 2007 was $125 million, of which $91 million would impact the Company's effective tax rate if recognized. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in millions):

| | |
|---|---|
| Balance at January 1, 2007 | $ 87 |
| Additions for tax positions related to current year | 29 |
| Additions/reductions for tax positions taken in prior years | 12 |
| Reductions for tax positions as a result of: | |
| Settlements | – |
| Lapse of statute of limitations | (3) |
| Balance at December 31, 2007 | $ 125 |

It is expected that the amount of unrecognized tax benefits will change in the next twelve months; however, BNSF does not expect the change to have a significant impact on the results of operations or the financial position of the Company.

The Company recognizes interest accrued related to unrecognized tax benefits in interest expense and penalties in income tax expense in the Consolidated Statements of Income, which is consistent with the recognition of these items in prior reporting periods. The Company had recorded a liability of approximately $41 million and $65 million for the payment of interest and penalties for the years ending December 31, 2007, and 2006, respectively. For the year ended December 31, 2007, the Company recognized a reduction of approximately $7 million in interest and penalty expense. For the years ended December 31, 2006, and 2005, the Company recognized approximately $5 million and $9 million in interest and penalty expense, respectively.

## 6. Accounts Receivable, Net

BNSF Railway transfers a portion of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

BNSF Railway's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2007, which was comprised of two $175 million, 364-day accounts receivable facilities and two $175 million, 3-year accounts receivable facilities. BNSF Railway amended the two 364-day facilities in November 2007, reducing the committed amounts to $175 million each and modifying their maturities to November 2008. The two 3-year facilities were entered into in November 2007 concurrently with the amendment and extension of the two 364-day facilities and will mature in November 2010. Outstanding undivided interests held by investors under the A/R sales program were $300 million at December 31, 2007 and 2006, respectively, with $75 million in each facility. These undivided interests in receivables are excluded from accounts receivable by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. These undivided interests were supported by $1,105 million and $1,030 million of receivables transferred by SFRC to the master trust at December 31, 2007 and 2006, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold, which is included in accounts receivable in the Company's Consolidated Financial Statements. The interest that continues to be held by SFRC of $805 million and $730 million at December 31, 2007 and 2006, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivable transferred by SFRC to the master trust less $300 million at both December 31, 2007 and 2006, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value, and there was no gain or loss from the transaction.

BNSF Railway retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $16.8 billion, $15.8 billion and $13.6 billion in 2007, 2006 and 2005, respectively. No servicing asset or liability has been recorded because the fees BNSF Railway receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $19 million, $23 million and $15 million for the years ended December 31, 2007, 2006 and 2005, respectively. These costs fluctuate monthly with changes in prevailing interest rates and were based on weighted average interest rates of 5.6 percent, 5.3 percent and 3.3 percent for the years ended December 31, 2007, 2006 and 2005, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. In order for there to be an impact on the amount of receivables BNSF Railway could sell, the combined dilution and delinquency percentages would have to exceed an established threshold for the combined dilution and delinquency percentages. BNSF Railway has historically experienced very low levels of default or dilution and was well below the established rate at December 31, 2007. Based on the current levels, if dilution or delinquency percentages were to increase by one percentage point, there would be no impact to the amount of receivables BNSF Railway could sell.

Receivables funded under the A/R sales program may not include amounts over 90 days past due or concentrations over certain limits with any one customer and certain other receivables. At December 31, 2007 and 2006, $11 million and $26 million, respectively, of accounts receivable were greater than 90 days old.

BNSF Railway maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At both December 31, 2007 and 2006, $36 million of such allowances had been recorded, of which $34 million had been recorded as a reduction to accounts receivable, net. The remaining $2 million at December 31, 2007 and 2006, respectively, had been recorded in accounts payable and other current liabilities because they relate to the outstanding undivided interests held by investors. During the years ended December 31, 2007 and 2006, $4 million and $8 million, respectively, of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2007, BNSF Railway was in compliance with these provisions.

## 7. Property and Equipment, Net

Property and equipment, net (in millions), and the weighted average annual depreciation rates (%) were as follows:

| **December 31,** | **2007** | **2006[a]** | **2007 Depreciation Rates** |
|---|---|---|---|
| Land | **$ 1,718** | $ 1,693 | –% |
| Track structure | **18,037** | 17,101 | 3.2% |
| Other roadway | **12,370** | 11,608 | 2.4% |
| Locomotives | **4,003** | 3,705 | 6.4% |
| Freight cars and other equipment | **2,034** | 1,939 | 5.2% |
| Computer hardware and software | **582** | 492 | 14.0% |
| Total cost | **38,744** | 36,538 | |
| Less accumulated depreciation and amortization | **(9,177)** | (8,617) | |
| Property and equipment, net | **$ 29,567** | $ 27,921 | |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

The Consolidated Balance Sheets at December 31, 2007 and 2006, included $1,507 million, net of $469 million of amortization and $1,039 million, net of $409 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

The Company capitalized $17 million, $14 million and $13 million of interest for the years ended December 31, 2007, 2006 and 2005, respectively.

## 8. Accounts Payable and Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2007 | 2006 |
|---|---|---|
| Compensation and benefits payable | **$ 568** | $ 699 |
| Rents and leases | **303** | 350 |
| Accounts payable | **296** | 282 |
| Casualty and environmental liabilities | **246** | 233 |
| Customer incentives | **145** | 163 |
| Property tax liabilities | **141** | 132 |
| Accrued interest | **138** | 127 |
| Dividends payable | **112** | 90 |
| Income tax liabilities | **82** | 68 |
| Other | **793** | 709 |
| Total | **$ 2,824** | $ 2,853 |

## 9. Debt

Debt outstanding was as follows (in millions):

| December 31, | 2007[a] | | 2006[a] | |
|---|---|---|---|---|
| Notes and debentures, due 2008 to 2097 | **$ 6,376** | **6.6%** | $ 5,364 | 6.8% |
| Equipment obligations, due 2008 to 2016 | **297** | **6.6** | 347 | 6.7 |
| Capitalized lease obligations, due 2008 to 2027 | **938** | **6.3** | 609 | 6.9 |
| Mortgage bonds, due 2008 to 2047 | **102** | **5.6** | 106 | 5.7 |
| Financing obligations, due 2008 to 2028 | **211** | **6.3** | 153 | 6.3 |
| Commercial paper | **261** | **5.5** | 846 | 5.4 |
| Unamortized discount and other, net | **(39)** | | (40) | |
| Total | **8,146** | | 7,385 | |
| Less current portion of long-term debt | **(411)** | **7.2%** | (473) | 7.7% |
| Long-term debt | **$ 7,735** | | $ 6,912 | |

a Amounts represent debt outstanding and weighted average interest rates for 2007 and 2006, respectively. Maturities are as of December 31, 2007.

Notes and debentures include a fair value adjustment increase for hedges of $6 million and a decrease of $6 million at December 31, 2007 and 2006, respectively.

As of December 31, 2007, certain BNSF Railway properties and other assets were subject to liens securing $102 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway were subject to equipment obligations and capital leases.

The following table provides fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rate for commercial paper is the current rate at December 31, 2007. The remaining weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2007.

| | December 31, 2007 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | Total Including Capital Leases | Total Excluding Capital Leases | Fair Value Excluding Capital Leases |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter | | | |
| Fixed-rate debt (in millions) | $ 411 | $ 188 | $ 206 | $ 515 | $ 393 | $ 5,716 | $ 7,429 | $ 6,491 | $ 6,752 |
| Average interest rate | 7.2% | 6.9% | 6.8% | 6.7% | 6.0% | 6.5 % | 6.5% | | |
| Variable-rate debt (in millions) | $ – | $ 204 | $ 252 | $ – | $ 261 | $ – | $ 717 | $ 717 | $ 723 |
| Average interest rate | –% | 4.4% | 6.7% | –% | 5.5% | – % | 5.6% | | |

BNSF has included maturities of $261 million of commercial paper in the 2012 column above.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. Capital leases have been excluded from the calculation of fair value for both 2007 and 2006. The carrying amount of commercial paper and bank debt approximates fair value, and the average interest rate equals the current rate because of the short maturity of these instruments.

## Notes and Debentures

**2007**

In February 2007, the Board of Directors (the Board) authorized an additional $1.4 billion of debt securities that may be issued pursuant to a debt shelf registration statement that has been filed with the Securities and Exchange Commission, for a total of $2.1 billion of debt securities authorized to be issued.

In April 2007, BNSF issued $650 million of 5.65 percent debentures and $650 million of 6.15 percent debentures due May 1, 2017 and May 1, 2037, respectively. The net proceeds from the sale of the debentures are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding debt which matured in 2007, the repayment of commercial paper and the repurchase of common stock. The issuance of these debentures reduced the amount of debt authorized to be issued by the Board through its registration statement to $800 million.

**2006**

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper.

**2005**

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month LIBOR plus 2.35 percent, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company would not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company would be required to sell common stock, the proceeds of which would be used to pay any accrued and unpaid interest. At December 31, 2007, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance was used to repurchase common stock, with the remainder used for general corporate purposes.

**Capital Leases**

In 2007, BNSF entered into several capital leases totaling approximately $325 million to finance locomotives and freight cars. The terms of the leases are between 15 and 20 years.

**Financing Obligation**

In 2005, the Company commenced the construction of an intermodal facility that it intends to sell to a third party and subsequently lease back. Once construction of the facility is complete and all improvements have been sold to the third party, BNSF will lease the facility from the third party for 20 years. Construction is expected to be completed by early 2009 with an approximate cost of $160 million. As of December 31, 2007, BNSF has sold $41 million of completed improvements. This sale leaseback transaction is being accounted for as a financing obligation due to continuing involvement. The outflows from the construction of the facility are classified as investing activities, and the inflows from the associated financing proceeds are classified as financing activities in the Company's Consolidated Statements of Cash Flows.

## Revolving Credit Facility and Commercial Paper

In the fourth quarter, the Company extended the expiration date of its $1.2 billion long-term bank credit facility to September 2012. Annual facility fees are currently 0.08 percent for the facility. The rate is subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon (i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, (ii) money market rates offered at the option of the lenders, or (iii) an alternate base rate. BNSF must maintain compliance with certain financial covenants under its revolving credit agreement. At December 31, 2007, the Company was in compliance with these covenants.

At December 31, 2007, there were no bank borrowings against the revolving credit agreement.

BNSF issues commercial paper from time to time that is supported by the bank revolving credit agreement. Outstanding commercial paper balances reduce the amount of borrowings available under this agreement.

The maturity value of commercial paper as of December 31, 2007, of $391 million reduced the total capacity available under the revolving credit agreements to $809 million. Commercial paper outstanding included $129 million issued to a consolidated subsidiary of BNSF that was eliminated upon consolidation. Consolidated commercial paper outstanding, which had a maturity value of $262 million, was classified as long-term debt in the Company's Consolidated Balance Sheet.

## Guarantees

Debt and other obligations of non-consolidated entities guaranteed by the Company as of December 31, 2007, were as follows (dollars in millions):

| | | Guarantees | | | | |
|---|---|---|---|---|---|---|
| | BNSF Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount[a] | Remaining Term (in years) | Capitalized Obligations |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $ 190 | $ 190 | $ – | Termination of Ownership | $ – |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 56 | $ 81 | $ 81 | 11 | $ 31[b] |
| Westside Intermodal Transportation Corporation | 0.0% | $ 40 | $ 61 | $ – | 16 | $ 34[b] |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 13 | $ 19 | $ – | 16 | $ 10[b] |
| Chevron Phillips Chemical Company, LP | 0.0% | N/A[d] | N/A[d] | N/A[d] | 10 | $ 14[c] |
| Various lessors (Residual value guarantees) | 0.0% | N/A | $ 271 | $ 271 | Various | $ 68[c] |
| All other | 0.0% | $ 6 | $ 7 | $ 3 | Various | $ – |

a Reflects the maximum amount the Company could recover from a third party other than the counterparty.

b Reflects capitalized obligations that are recorded on the Company's Consolidated Balance Sheets.

c Reflects the FIN 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees*, asset and corresponding liability for the fair value of these guarantees.

d There is no cap to the liability that can be sought from BNSF for BNSF's negligence or the negligence of the indemnified party. However, BNSF could receive reimbursement from certain insurance policies if the liability exceeds a certain amount.

**Kinder Morgan Energy Partners, L.P.**

Santa Fe Pacific Pipelines, Inc., an indirect, wholly-owned subsidiary of BNSF Railway, has a guarantee in connection with its remaining special limited partnership interest in Santa Fe Pacific Pipelines Partners, L.P. (SFPP), a subsidiary of Kinder Morgan Energy Partners, L.P., to be paid only upon default by the partnership. All obligations with respect to the guarantee will cease upon termination of ownership rights, which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP.

**Kansas City Terminal Intermodal Transportation Corporation**

BNSF Railway and another major railroad jointly and severally guarantee $56 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF Railway has a 25 percent ownership in KCTRC, accounts for its interest using the equity method of accounting and would be required to fund a portion of the remaining obligation upon default by the original debtor.

**Westside Intermodal Transportation Corporation and The Unified Government of Wyandotte County/Kansas City, Kansas**

BNSF Railway has outstanding guarantees of $53 million of debt, the proceeds of which were used to finance construction of a bridge that connects BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge is operated by KCTRC, and payments related to BNSF Railway's guarantee of this obligation would only be called for upon default by the original debtor.

**Chevron Phillips Chemical Company, LP**

In the third quarter of 2007, BNSF Railway entered into an indemnity agreement with Chevron Phillips Chemical Company, LP (Chevron Phillips), granting certain rights of indemnity from BNSF Railway, in order to facilitate access to a new storage facility. Under certain circumstances, payment under this obligation may be required in the event Chevron Phillips were to incur certain liabilities or other incremental costs resulting from trackage access.

**Residual Value Guarantees (RVG)**

In the normal course of business, the Company enters into leases in which it guarantees the residual value of certain leased equipment. Some of these leases have renewal or purchase options, or both, that the Company may exercise at the end of the lease term. If the Company elects not to exercise these options, it may be required to pay the lessor an amount not exceeding the RVG. The amount of any payment is contingent upon the actual residual value of the leased equipment. Some of these leases also require the lessor to pay the Company any surplus if the actual residual value of the leased equipment is over the RVG. These guarantees will expire between 2008 and 2011.

The maximum future payments, as disclosed in the Guarantees table above, represent the undiscounted maximum amount that the Company could be required to pay in the event the Company did not exercise its renewal option and the fair market value of the equipment had significantly declined. BNSF does not anticipate such a large reduction in the fair market value of the leased equipment. As of December 31, 2007, the Company had recorded a $68 million asset and corresponding liability for the fair value of the RVG.

**All Other**

As of December 31, 2007, BNSF guaranteed $6 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $3 million of the $6 million of guarantees. These guarantees expire between 2008 and 2013.

Other than as discussed above, there is no collateral held by a third party that the Company could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than as discussed above, none of the guarantees are recorded in the Consolidated Financial Statements of the Company. The Company does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

**Indemnities**

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether events which would trigger the indemnification obligations would ever occur, the Company does not believe that these indemnity agreements will have a material adverse effect on the Company's results of operations, financial position or liquidity. Additionally, the Company believes that, due to lack of historical payment experience, the fair value of indemnities cannot be estimated with any amount of certainty and that the fair value of any such amount would be immaterial to the Consolidated Financial Statements. Agreements that contain unique circumstances, particularly agreements that contain guarantees that indemnify another party's acts are disclosed separately if appropriate. Unless separately disclosed above, no fair value liability related to indemnities has been recorded in the Consolidated Financial Statements.

# 10. Commitments and Contingencies

## Lease Commitments

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings, operating facilities and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments as of December 31, 2007, are summarized as follows (in millions):

| December 31, | Capital Leases | Operating Leases[a] |
|---|---|---|
| 2008 | $ 204 | $ 699 |
| 2009 | 175 | 681 |
| 2010 | 138 | 629 |
| 2011 | 96 | 582 |
| 2012 | 78 | 525 |
| Thereafter | 518 | 4,382 |
| Total | 1,209 | $ 7,498 |
| Less amount representing interest | (271) | |
| Present value of minimum lease payments | $ 938 | |

a Excludes leases having non-cancelable lease terms of less than one year and per diem leases.

Lease rental expense for all operating leases, excluding per diem leases, was $706 million, $665 million and $565 million for the years ended December 31, 2007, 2006 and 2005, respectively. When rental payments are not made on a straight-line basis, the Company recognizes rental expense on a straight-line basis over the lease term. Contingent rentals and sublease rentals were not significant.

## Other Commitments

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

## Personal Injury and Environmental Costs

### Personal Injury

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded. Expense accruals and any required adjustments are classified as materials and other in the Consolidated Statements of Income.

#### Asbestos

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated at BNSF by 1985.

BNSF assesses its unasserted liability exposure on an annual basis during the third quarter. BNSF determines its asbestos liability by estimating its exposed population, the number of claims likely to be filed, the number of claims that will likely require payment, and the estimated cost per claim. Estimated filing and dismissal rates and average cost per claim are determined utilizing recent claim data and trends.

During the third quarters of 2007, 2006 and 2005, the Company analyzed recent filing and payment trends to ensure the assumptions used by BNSF to estimate its future asbestos liability were reasonable. In 2007, management recorded a decrease in expense of $17 million due to a statistically significant reduction in filing rate experience for non-malignant claims. In 2006 and 2005, management recorded no additional expense. The Company plans to update its study again in the third quarter of 2008.

Throughout the year, BNSF monitors actual experience against the number of forecasted claims and expected claim payments and will record adjustments to the Company's estimates as necessary.

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | **$ 306** | $ 326 | $ 345 |
| Accruals | **(17)** | – | – |
| Payments | **(19)** | (20) | (19) |
| Ending balance at December 31, | **$ 270** | $ 306 | $ 326 |

Of the obligation at December 31, 2007, $226 million was related to unasserted claims while $44 million was related to asserted claims. At December 31, 2007 and 2006, $17 million and $22 million were included in current liabilities, respectively. The recorded liability was not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding the number of asserted asbestos claims filed against BNSF:

| | 2007 | 2006 |
|---|---|---|
| Claims unresolved at January 1, | **1,975** | 2,121 |
| Claims filed | **376** | 530 |
| Claims settled, dismissed or otherwise resolved | **(570)** | (676) |
| Claims unresolved at December 31, | **1,781** | 1,975 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985), which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 55, 70 and 90 percent of the future unasserted asbestos claims will be filed within the next 10, 15 and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $245 million to $295 million. However, BNSF believes that the $270 million recorded at December 31, 2007, is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Other Personal Injury

BNSF estimates its other personal injury liability claims and expense quarterly based on the covered population, activity levels and trends in frequency and the costs of covered injuries. Estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, *Reasonable Estimation of the Amount of a Loss,* is immaterial for these repetitive stress and other occupational trauma claims.

BNSF monitors quarterly actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | **$ 439** | $ 422 | $ 459 |
| Accruals | **190** | 188 | 181 |
| Payments | **(190)** | (171) | (218) |
| Ending balance at December 31, | **$ 439** | $ 439 | $ 422 |

At December 31, 2007 and 2006, $163 million and $153 million were included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding the number of personal injury claims, other than asbestos, filed against BNSF:

| | 2007 | 2006 |
|---|---|---|
| Claims unresolved at January 1, | **3,130** | 3,617 |
| Claims filed | **3,894** | 3,516 |
| Claims settled, dismissed or otherwise resolved | **(3,702)** | (4,003) |
| Claims unresolved at December 31, | **3,322** | 3,130 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $380 million to $530 million. However, BNSF believes that the $439 million recorded at December 31, 2007, is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

BNSF Insurance Company

The Company has a consolidated, wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC) that provides insurance coverage for certain risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims and certain excess general liability coverage incurred after January 1, 2002, and certain other claims which are subject to reinsurance. Beginning in 2004, BNSF IC entered into annual reinsurance pooling agreements with several other companies. The pooling agreements insure workers compensation, general liability, auto liability and FELA risk. In accordance with the agreements, BNSF IC cedes a portion of its FELA exposure to the pool and assumes a proportionate share of the entire pool's risk. Each year BNSF IC reviews the objectives and performance of the pool to determine its continued participation in the pool. At December 31, 2007, BNSF IC had invested in third-party commercial paper, time deposits and money market accounts as well as in commercial paper issued by BNSF. All of the third-party investments are classified as cash and cash equivalents on the Company's Consolidated Balance Sheet. At December 31, 2007, there was approximately $300 million related to these third-party investments, which were classified as cash and cash equivalents on the Company's Consolidated Balance Sheet, as compared with approximately $350 million at December 31, 2006.

**Environmental**

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

BNSF estimates the ultimate cost of cleanup efforts at its known environmental sites on an annual basis during the third quarter. Ultimate cost estimates for environmental sites are based on historical payment patterns, current estimated percentage to closure ratios and benchmark patterns developed from data accumulated from industry and public sources, including the Environmental Protection Agency and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress.

During the third quarter of 2007, 2006 and 2005, the Company analyzed recent data and trends to ensure the assumptions used by BNSF to estimate its future environmental liability were reasonable. As a result of this study, in the third quarter of 2007, 2006 and 2005, management recorded additional expense of approximately $20 million, $5 million and $12 million as of the June 30 measurement date, respectively. The Company plans to update its study again in the third quarter of 2008.

On a quarterly basis, BNSF monitors actual experience against the forecasted remediation and related payments made on existing sites and conducts ongoing environmental contingency analyses, which consider a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in, and the ability to pay for, cleanup of other PRPs. Adjustments to the Company's estimates will continue to be recorded as necessary based on developments in subsequent periods. Additionally, environmental accruals, which are classified as materials and other in the Consolidated Statements of Income, include amounts for newly identified sites or contaminants, third-party claims and legal fees incurred for defense of third-party claims and recovery efforts.

Annual studies do not include (i) contaminated sites of which the Company is not aware; (ii) additional amounts for third-party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites; or (iii) natural resource damage claims. BNSF continues to estimate third-party claims on a site by site basis when the liability for such claims is probable and reasonably estimable. BNSF's recorded liability for third-party claims as of December 31, 2007, is approximately $21 million.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 346 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination.

The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | **2007** | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | **$ 318** | $ 370 | $ 385 |
| Accruals | **126** | 20 | 33 |
| Payments | **(64)** | (72) | (48) |
| Ending balance at December 31, | **$ 380** | $ 318 | $ 370 |

At December 31, 2007 and 2006, $66 million and $58 million was included in current liabilities, respectively. In the first quarter of 2007, the Company recorded a $65 million pre-tax charge, or $0.11 per share, due to an increase in environmental costs primarily related to a final resolution with the State of Washington and its Department of Ecology on clean-up of an existing environmental site at Skykomish and an adverse reversal of a trial court decision on appeal regarding a site at Arvin, California.

BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2007, will be paid over the next ten years, and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | BNSF Sites | | Superfund Sites | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| Number of sites at January 1, | **375** | 369 | **20** | 20 |
| Sites added during the period | **16** | 23 | **–** | – |
| Sites closed during the period | **(45)** | (17) | **–** | – |
| Number of sites at December 31, | **346** | 375 | **20** | 20 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $300 million to $525 million. However, BNSF believes that the $380 million recorded at December 31, 2007, is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**Other Claims and Litigation**

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

## 11. Employee Separation Costs

Employee separation costs activity was as follows (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance at January 1, | **$ 107** | $ 132 | $ 154 |
| Accruals | **5** | 2 | 8 |
| Payments | **(21)** | (27) | (30) |
| Ending balance at December 31, | **$ 91** | $ 107 | $ 132 |

Employee separation liabilities of $91 million were included in the Consolidated Balance Sheet at December 31, 2007, and principally represent the following: (i) $86 million for deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; (ii) $1 million for employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; and (iii) $4 million for certain non-union employee severance costs. Employee separation expenses are recorded in materials and other in the Consolidated Statements of Income. At December 31, 2007, $14 million of the remaining liabilities were included in current liabilities.

The deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were primarily incurred in connection with labor agreements reached prior to the business combination of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation (the Merger). These agreements, among other things, reduced train crew sizes and allowed for more flexible work rules. The majority of the remaining costs will be paid between 2008 and 2020. As of December 31, 2007, the Company had updated its estimate and recorded an additional liability of $4 million related to deferred benefits (see (i) above) and a liability of $1 million related to non-union severance costs (see (iii) above). The remaining costs for (ii) above are expected to be paid out between 2008 and approximately 2011, and the costs for (iii) above will be paid over the next several years based on deferral elections made by the affected employees.

## 12. Earnings Per Share

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 2.2 million, 1.1 million and 0.1 million for 2007, 2006 and 2005, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

## 13. Employment Benefit Plans

BNSF sponsors a funded, noncontributory qualified pension plan, the BNSF Retirement Plan, which covers most non-union employees, and an unfunded non-tax-qualified pension plan, the BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R,* which requires the recognition of the overfunded or underfunded status of a defined benefit postretirement plan in the Company's balance sheet. This portion of the new guidance was adopted by the Company on December 31, 2006. Additionally, the pronouncement eliminates the option for the Company to use a measurement date prior to the Company's fiscal year-end effective December 31, 2008. SFAS No. 158 provides two approaches to transition to a fiscal year-end measurement date, both of which are to be applied prospectively. BNSF has elected to apply the transition option under which a 15-month measurement was determined as of September 30, 2007 that covers the period until the fiscal year-end measurement is required on December 31, 2008. As a result, the Company recorded a $7 million decrease to retained earnings in January 2008.

The following table shows the incremental effect of applying SFAS No. 158 to both the Company's pension and retiree health and welfare plans on individual line items in the Consolidated Balance Sheet as of December 31, 2006 (in millions):

| | Pension and Retiree Health and Welfare Benefits | | | | |
|---|---|---|---|---|---|
| | Balances Prior to Adoption of SFAS No. 158 and the Minimum Liability Adjustment | Minimum Liability Adjustment | Balances Prior to Adoption of SFAS No. 158 | SFAS No. 158 Adoption Adjustments | Ending Balances After Adoption of SFAS No. 158 |
| Pension asset | $ 156 | $ – | $ 156 | $ (156) | $ – |
| Total assets | $ 31,953 | $ – | $ 31,953 | $ (156) | $ 31,797 |
| Pension liability | $ 52 | $ – | $ 52 | $ (52) | $ – |
| Additional minimum pension liability | $ 417 | (64) | $ 353 | (353) | $ – |
| Liability for retiree health and welfare benefits | $ 257 | – | $ 257 | (257) | $ – |
| Pension and retiree health and welfare liability | $ – | – | $ – | 630 | $ 630 |
| Deferred income taxes | $ 8,322 | 24 | $ 8,346 | (48) | $ 8,298 |
| Total liabilities | $ 21,389 | $ (40) | $ 21,349 | $ (80) | $ 21,269 |
| AOCL | $ (241) | $ 40 | $ (201) | $ (76) | $ (277) |
| Total stockholders' equity | $ 10,564 | $ 40 | $ 10,604 | $ (76) | $ 10,528 |

Components of the net cost for these plans were as follows (in millions):

| | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Year ended December 31,** | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Service cost | **$ 25** | $ 25 | $ 20 | **$ 2** | $ 3 | $ 2 |
| Interest cost | **97** | 94 | 95 | **17** | 15 | 17 |
| Expected return on plan assets | **(105)** | (97) | (102) | **–** | – | – |
| Amortization of net loss | **35** | 46 | 25 | **6** | 3 | – |
| Amortization of prior service cost | **–** | – | – | **(8)** | (7) | (8) |
| Net cost recognized | **$ 52** | $ 68 | $ 38 | **$ 17** | $ 14 | $ 11 |

The projected benefit obligation is the present value of benefit earned to date by plan participants, including the effect of assumed future salary increases and expected healthcare cost trend rate increases. The following table shows the change in projected benefit obligation based on the September 30 measurement date (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Benefit Obligation** | **2007** | **2006** | **2007** | **2006** |
| Benefit obligation at beginning of period | **$ 1,830** | $ 1,858 | **$ 311** | $ 295 |
| Service cost | **25** | 25 | **2** | 3 |
| Interest cost | **97** | 94 | **17** | 15 |
| Plan participants' contributions | **–** | – | **8** | 8 |
| Actuarial (gain) loss | **(59)** | (18) | **(3)** | 19 |
| Medicare subsidy | **–** | – | **2** | 1 |
| Benefits paid | **(130)** | (129) | **(33)** | (30) |
| Projected benefit obligation at end of period | **1,763** | 1,830 | **304** | 311 |
| Component representing future salary increases | **(57)** | (76) | **–** | – |
| Accumulated benefit obligation at end of period | **$ 1,706** | $ 1,754 | **$ 304** | $ 311 |

Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had accumulated and projected benefit obligations in excess of plan assets at September 30, 2007 and 2006.

The following table shows the change in plan assets of the plans based on the September 30 measurement date (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Plan Assets** | **2007** | **2006** | **2007** | **2006** |
| Fair value of plan assets at beginning of period | **$ 1,394** | $ 1,347 | **$ –** | $ – |
| Actual return on plan assets | **208** | 126 | **–** | – |
| Employer contribution | **116** | 50 | **23** | 21 |
| Plan participants' contributions | **–** | – | **8** | 8 |
| Medicare subsidy | **–** | – | **2** | 1 |
| Benefits paid | **(130)** | (129) | **(33)** | (30) |
| Fair value of plan assets at measurement date | **$ 1,588** | $ 1,394 | **$ –** | $ – |
| Adjustment for fourth quarter contribution | **$ 2** | $ 111 | **$ 5** | $ 6 |

The following table shows the funded status, defined as plan assets less the projected benefit obligation, as of December 31 (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| Funded status (plan assets less projected benefit obligations) | **$ (173)** | $ (325) | **$ (299)** | $ (305) |

Of the combined pension and retiree health and welfare benefits liability of $472 million recognized as of December 31, 2007, $28 million was included in other current liabilities.

Prior to December 31, 2006, actuarial gains and losses and prior service costs were not recognized in the Company's Consolidated Balance Sheets, but were only included in the footnote disclosures. Beginning on December 31, 2006, upon adoption of SFAS No. 158, the Company began recognizing these costs in the Consolidated Balance Sheets through an adjustment to AOCL. Beginning in 2007, the Company recognized actuarial gains and losses and prior service costs in AOCL as they arose. The following table shows the pre-tax change in AOCL attributable to the components of the net cost and the change in benefit obligation (in millions):

| | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Change in AOCL** | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Balance at January 1, | **$ 429** | $ 417 | $ 353 | **$ 48** | $ – | $ – |
| Increase (decrease) in minimum liability included in other comprehensive loss prior to adoption of SFAS No. 158 | **–** | (64) | 64 | **–** | – | – |
| SFAS No. 158 adoption adjustment | **–** | 76 | – | **–** | 48 | – |
| Amortization of actuarial loss | **(35)** | – | – | **(6)** | – | – |
| Amortization of prior service costs | **–** | – | – | **8** | – | – |
| Actuarial gain | **(161)** | – | – | **(4)** | – | – |
| Balance at December 31, | **$ 233** | $ 429 | $ 417 | **$ 46** | $ 48 | $ – |

The estimated net actuarial loss and prior service credit for these defined benefit pension plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $16 million and less than $1 million, respectively. The estimated net actuarial loss and prior service credit for the retiree health and welfare benefit plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $4 million and $8 million, respectively. Pre-tax amounts currently recognized in AOCL consist of the following (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| Net actuarial loss | **$ 234** | $ 430 | **$ 67** | $ 77 |
| Prior service cost | **(1)** | (1) | **(21)** | (29) |
| Pre-tax amount recognized in AOCL at December 31, | **233** | 429 | **46** | 48 |
| After-tax amount recognized in AOCL at December 31, | **$ 143** | $ 264 | **$ 28** | $ 29 |

The expected long-term rate of return is the return the Company anticipates earning, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered the following: (i) forward looking capital market forecasts; (ii) historical returns for individual asset classes; and (iii) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

| **Assumptions Used to Determine Net Cost for Fiscal Years Ended December 31,** | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Discount rate | **5.50%** | 5.25% | 5.75% | **5.50%** | 5.25% | 5.75% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.00% | **–%** | –% | –% |
| Rate of compensation increase | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90 % | 3.90% |

| **Assumptions Used to Determine Benefit Obligations at September 30,** | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| Discount rate | **6.00%** | 5.50% | **6.00%** | 5.50% |
| Rate of compensation increase | **3.80%** | 3.90% | **3.80%** | 3.90% |

The following table presents assumed health care cost trend rates:

| December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **10.50%** | 10.00% | 10.50% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **2016** | 2012 | 2012 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one percentage point change in assumed health care cost trend rates would have the following effects (in millions):

| | One Percentage-Point Increase | One Percentage-Point Decrease |
|---|---|---|
| Effect on total service and interest cost | $ 2 | $ (2) |
| Effect on postretirement benefit obligation | $ 23 | $ (20) |

The qualified BNSF Retirement Plan asset allocation at September 30, 2007 and 2006 and the target allocation for 2007 by asset category are as follows:

| | Target Allocation | Percentage of Pension Plan Assets at September 30, | |
|---|---|---|---|
| Plan Asset Allocation | 2007 | 2007 | 2006 |
| Equity Securities | **45 – 75%** | **63%** | 63% |
| Fixed Income Securities | **20 – 40%** | **27** | 28 |
| Real Estate | **5 – 15%** | **10** | 9 |
| Total | | **100%** | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the plan assets in relation to the plan liabilities while prudently managing the risk of a decrease in the plan's assets relative to those liabilities. To meet this objective, the Company's management has adopted the above asset allocation ranges. This allows flexibility to accommodate market changes in the asset classes within defined parameters.

Based on its current assumptions and funding methodology, the Company is expected to be required to make contributions of $34 million to the BNSF Retirement Plan in 2008. The Company expects to make benefit payments in 2008 of approximately $7 million and $25 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

The following table shows expected benefit payments from its defined benefit pension plans and expected claim payments and Medicare Part D subsidy receipts for the retiree health and welfare plan for the next five fiscal years and the aggregate five years thereafter (in millions):

| Fiscal year | Expected Pension Plan Benefit Payments[a] | Expected Retiree Health and Welfare Payments | Expected Medicare Subsidy |
|---|---|---|---|
| 2008 | $ 131 | $ 25 | $ (3) |
| 2009 | 133 | 26 | (3) |
| 2010 | 134 | 27 | (3) |
| 2011 | 135 | 28 | (3) |
| 2012 | 136 | 28 | (3) |
| 2013–2017 | 691 | 144 | (20) |

a Primarily consists of Qualified Defined Benefit Plan payments, which are made from the plan trust and do not represent an immediate cash outflow to the Company.

### Defined Contribution Plans

BNSF sponsors qualified 401(k) plans that cover substantially all employees and a non-qualified defined contribution plan that covers certain officers and other employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Non-union employees are eligible to receive an annual discretionary matching contribution of up to 30 percent of the first six percent of their contributions. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $21 million, $28 million and $20 million in 2007, 2006 and 2005, respectively.

### Other

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans that provide certain postretirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $46 million, $44 million and $43 million, in 2007, 2006 and 2005, respectively (see Note 11 to the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers).

## 14. Stock-Based Compensation

On April 15, 1999, BNSF shareholders approved the Burlington Northern Santa Fe 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001, April 17, 2002, April 21, 2004 and April 19, 2006, BNSF shareholders approved the amendments to the Burlington Northern Santa Fe 1999 Stock Incentive Plan, which authorized additional awards of 9 million, 6 million, 7 million and 11 million shares, respectively, of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately 10 million common shares were available for future grant at December 31, 2007.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee directors' stock plan and authorized 900,000 shares of BNSF common stock to be issued in connection with this plan. Approximately 450,000 common shares were available for future grant at December 31, 2007.

### Stock Options

Under BNSF's stock plans, options may be granted to directors, officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The fair value of each option award is estimated on the date of grant using the Black-Scholes option-pricing model. The following assumptions apply to the options granted for the periods presented:

| **Year ended December 31,** | **2007** | **2006** | **2005** |
|---|---|---|---|
| Weighted average expected life (years) | **4.6** | 4.5 | 4.5 |
| Weighted average expected volatility | **24.0%** | 24.0% | 24.0% |
| Weighted average dividend per share | **$ 1.02** | $ 0.81 | $ 0.69 |
| Weighted average risk free interest rate | **4.31%** | 4.76% | 3.75% |
| Weighted average fair value of options granted per share | **$ 21.91** | $ 20.51 | $ 11.33 |

Expected volatilities are based on historical volatility of the Company's stock, implied volatilities from traded options on the Company's stock and other factors. The Company uses historical experience with exercise and post-vesting employment termination behavior to determine the options' expected life. The expected life represents the period of time that options granted are expected to be outstanding. The risk-free rate is based on the U.S. Treasury rate with a maturity date corresponding to the options' expected life.

A summary of the status of stock options as of, and for the year ended December 31, 2007, is presented below (options in thousands, aggregate intrinsic value in millions):

| Year ended December 31, 2007 | Options | Weighted Average Exercise Prices | Weighted Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balance at beginning of year | 15,060 | $ 38.37 | | |
| Granted | 1,777 | 88.33 | | |
| Exercised | (5,249) | 32.34 | | |
| Cancelled | (244) | 73.95 | | |
| Balance at end of year | 11,344 | $ 48.22 | 5.32 | $ 407 |
| Options exercisable at year end | 8,459 | $ 38.04 | 4.26 | $ 384 |

The total intrinsic value of options exercised was $281 million, $222 million and $232 million for the years ended December 31, 2007, 2006 and 2005, respectively.

## Other Incentive Programs

BNSF has other long-term incentive programs that utilize restricted shares/units. A summary of the status of restricted shares/units and the weighted average grant date fair values as of, and for the year ended December 31, 2007, is presented below (shares in thousands):

| Year ended December 31, 2007 | Time Based | | Performance Based | | BNSF Incentive Bonus Stock Program | | BNSF Discounted Stock Purchase Program | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at beginning of year | 1,267 | $ 48.40 | 765 | $ 53.50 | 861 | $ 46.19 | 64 | $ 49.79 | 2,957 | $ 49.10 |
| Granted | 59 | 86.38 | 560 | 88.80 | – | – | 7 | 79.28 | 626 | 88.47 |
| Vested | (557) | 33.96 | (235) | 32.72 | (219) | 32.16 | (20) | 34.62 | (1,031) | 33.31 |
| Cancelled | (51) | 60.73 | (74) | 78.33 | (3) | 50.83 | – | – | (128) | 70.64 |
| Balance at end of year | 718 | $ 61.83 | 1,016 | $ 75.97 | 639 | $ 50.98 | 51 | $ 59.73 | 2,424 | $ 64.85 |

A summary of the weighted average grant date fair market values of the restricted share/units as of, and for the years ended December 31, 2006 and 2005, is presented below:

| Grant Date Fair Market Value of Awards Granted | Time Based | Performance Based | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program |
|---|---|---|---|---|
| Year ended December 31, 2006 | $ 79.88 | $ 80.17 | $ 81.31 | $ 81.31 |
| Year ended December 31, 2005 | $ 49.23 | $ 49.21 | $ 47.58 | $ 46.91 |

A summary of the fair value of the restricted share/units vested during the years ended December 31, 2007, 2006 and 2005 is presented below:

| Total Fair Value of Shares Vested (in millions) | Time Based | Performance Based | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program | Total |
|---|---|---|---|---|---|
| Year ended December 31, 2007 | $ 49 | $ 21 | $ 18 | $ 1 | $ 89 |
| Year ended December 31, 2006 | $ 42 | $ – | $ 25 | $ 1 | $ 68 |
| Year ended December 31, 2005 | $ 44 | $ 11 | $ 8 | $ 1 | $ 64 |

Time-based awards are granted to senior managers within BNSF primarily as a retention tool and to encourage ownership in the Company. They generally vest over three years, although in some cases up to five years, and are contingent on continued salaried employment.

Performance-based awards are granted to senior managers within BNSF to encourage ownership in the Company and to align management's interest with those of its shareholders. Performance-based awards generally vest over three years and are contingent on the achievement of certain predetermined corporate performance goals (e.g., return on invested capital (ROIC)) and continued salaried employment.

Additionally, related to the 2007, 2006 and 2005 performance-based grant, eligible employees may also earn performance stock that will be granted in 2010, 2009 and 2008, respectively, contingent upon achievement of higher ROIC goals and continued salaried employment. The Company has committed to a maximum grant of approximately 279,000, 235,000 and 316,000 shares, respectively.

Certain employees were eligible to exchange through the Burlington Northern Santa Fe Incentive Bonus Stock Program the cash payment of their bonus for grants of restricted stock. In September 2005, the program was amended so that exchanges of cash bonus payments for awards of restricted stock were no longer permitted after February 2006.

Certain other salaried employees may participate in the BNSF Discounted Stock Purchase Program and use their bonus to purchase BNSF common stock at a discount from the market price. These shares immediately vest but are restricted for a three-year period.

Shares awarded under each of the plans may not be sold or used as collateral and are generally not transferable by the holder until the shares awarded become free of restrictions. Compensation cost, net of tax, recorded under the BNSF Stock Incentive Plans is shown in the following table (in millions):

| | **2007** | 2006 | 2005 |
|---|---|---|---|
| Compensation cost | **$ 66** | $ 72 | $ 37 |
| Income tax benefit | **(23)** | (25) | (14) |
| Total | **$ 43** | $ 47 | $ 23 |
| Compensation cost capitalized | **$ 7** | $ 6 | $ 3 |

At December 31, 2007, there was $105 million of total unrecognized compensation cost related to unvested share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.19 years.

## 15. Common Stock and Preferred Capital Stock

### Common Stock

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2007, there were 348 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of shareholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board out of funds legally available and to share ratably in all assets available for distribution to shareholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

### Preferred Capital Stock

At December 31, 2007, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights and qualifications and restrictions of each series. As of December 31, 2007, no Class A Preferred Stock had been issued.

### Share Repurchase Program

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized in equal amounts in July 1997, December 1999, April 2000, September 2000, January 2003 and December 2005. During 2007, 2006 and 2005, the Company repurchased approximately 15 million, 18 million and 14 million, respectively, of its common stock at average prices of $83.96 per share, $73.43 per share and $54.95 per share, respectively. Total repurchases through December 31, 2007, were 180 million shares at a total average cost of $38.20 per share, leaving 30 million shares available for repurchase out of the 210 million shares presently authorized. Additionally, during 2007, the Company repurchased shares from employees at a cost of $43 million to satisfy tax withholding obligations on the vesting of restricted stock or the exercise of stock options.

In December 2005, the Company entered into prepaid forward transactions to purchase $600 million of the Company's common stock whereby a net settlement in shares would occur upon settlement of the transactions. In late February 2006, these transactions were settled, and approximately 8 million shares were delivered. While the transactions had no impact on the shares outstanding at the end of 2005, outstanding shares used in the calculation of 2006 earnings per share were reduced by approximately 8 million shares when the transactions were settled. The Company accounted for the transactions in accordance with Emerging Issues Task Force (EITF) 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock,* which required that the $600 million prepayment be recorded as a reduction in equity in 2005. When the final settlement was made in 2006, this reduction in equity was reclassified from prepaid forward repurchase of treasury stock to treasury stock.

## 16. Quarterly Financial Data—Unaudited

| Dollars in millions, except per share data | Fourth | Third | Second | First |
|---|---|---|---|---|
| **2007** | | | | |
| Revenues | $ 4,245 | $ 4,069 | $ 3,843 | $ 3,645 |
| Operating income | $ 950 | $ 1,001 | $ 841 | $ 694 |
| Net income | $ 517 | $ 530 | $ 433 | $ 349 |
| Basic earnings per share | $ 1.48 | $ 1.51 | $ 1.22 | $ 0.98 |
| Diluted earnings per share | $ 1.46 | $ 1.48 | $ 1.20 | $ 0.96 |
| Dividends declared per share | $ 0.32 | $ 0.32 | $ 0.25 | $ 0.25 |
| Common stock price[a]: | | | | |
| High | $ 88.03 | $ 93.04 | $ 94.43 | $ 85.05 |
| Low | $ 81.54 | $ 76.64 | $ 80.41 | $ 72.45 |
| **2006[b]** | | | | |
| Revenues | $ 3,882 | $ 3,939 | $ 3,701 | $ 3,463 |
| Operating income | $ 943 | $ 921 | $ 864 | $ 793 |
| Net income | $ 519 | $ 489 | $ 471 | $ 410 |
| Basic earnings per share | $ 1.45 | $ 1.36 | $ 1.30 | $ 1.12 |
| Diluted earnings per share | $ 1.42 | $ 1.33 | $ 1.27 | $ 1.09 |
| Dividends declared per share | $ 0.25 | $ 0.25 | $ 0.20 | $ 0.20 |
| Common stock price[a]: | | | | |
| High | $ 80.35 | $ 79.20 | $ 86.62 | $ 83.38 |
| Low | $ 72.77 | $ 64.82 | $ 71.96 | $ 68.32 |

a Average of high and low reported daily stock price

b Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

# Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

None.

# Item 9A. Controls and Procedures

## Disclosure Controls and Procedures

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, the Company's principal executive officer and principal financial officer have concluded that BNSF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to BNSF's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

## Internal Control Over Financial Reporting

The report of management on the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15(d)-15(f) of the Securities Exchange Act of 1934) is included in "Management's Report on Internal Control Over Financial Reporting" in Item 8.

PricewaterhouseCoopers LLP, the independent registered public accounting firm that audited the Company's financial statements contained herein, has issued an attestation report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2007. The attestation report is included in Item 8.

## Changes in Internal Control Over Financial Reporting

As of the end of the period covered by this report, the Company has concluded that there have been no changes in BNSF's internal control over financial reporting that occurred during BNSF's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, BNSF's internal control over financial reporting.

# Item 9B. Other Information

None.

# Part III

## Item 10. Directors, Executive Officers and Corporate Governance

Information concerning the directors of BNSF will be provided under the heading "Item 1: Election of Directors; Nominees for Director" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the executive officers of BNSF is included in Part 1 of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be provided under the heading "Communications and Other Matters; Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Directors and Governance Committee's policy with regard to consideration of any director candidates recommended by shareholders will be provided under the heading "Communications and Other Matters; Procedures for Recommending Director Candidates" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Audit Committee and the Audit Committee Financial Expert will be provided under the heading "Governance of the Company; Board Committees; Audit Committee" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference into the Form 10-K.

The Company has a Code of Conduct that applies to members of the Board of Directors, officers, and all salaried employees of BNSF and its subsidiaries. Only the Board of Directors may waive the application of the Code of Conduct to a director, executive officer, or the principal accounting officer or controller, and any such waiver will be promptly disclosed on the Company's website. A copy of the Code of Conduct is available on the Company's website at www.bnsf.com under the "Investors" link and then "Corporate Governance."

## Item 11. Executive Compensation

Information concerning the compensation of directors and executive officers of BNSF will be provided under the headings "Directors' Compensation," "Compensation Discussion and Analysis" and "Executive Compensation" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Certain information about BNSF's equity compensation plans is set forth in the table below (number of shares in thousands) as of December 31, 2007:

| Plan Category | Number of Shares to Be Issued upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Shares Available for Future Issuance |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 11,344 | $ 48.22 | 10,190 |
| Equity compensation plans not approved by shareholders | – | – | – |
| Total | 11,344 | $ 48.22 | 10,190 |

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the headings "Stock Ownership in the Company; Certain Beneficial Owners" and "Stock Ownership in the Company; Ownership of Management" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

## Item 13. Certain Relationships and Related Transactions, and Director Independence

Information concerning certain relationships and related transactions will be provided under the headings "Governance of the Company; Director Independence" and "Governance of the Company; Certain Relationships and Related Person Transactions" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

## Item 14. Principal Accountant Fees and Services

Information concerning principal accounting fees and services will be provided under the heading "Item 2: Appointment of Independent Auditor; Independent Auditor Fees" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

# Part IV

## Item 15. Exhibits and Financial Statement Schedules

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—see Item 8.

   Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Burlington Northern Santa Fe Corporation**

Dated: February 14, 2008

By: /s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.

| Signature | Title |
|---|---|
| /s/ Matthew K. Rose<br>Matthew K. Rose | Chairman, President and Chief Executive Officer<br>(Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Paul W. Bischler<br>Paul W. Bischler | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>Alan L. Boeckmann | Director |
| /s/ Donald G. Cook*<br>Donald G. Cook | Director |
| /s/ Vilma S. Martinez*<br>Vilma S. Martinez | Director |
| /s/ Marc F. Racicot*<br>Marc F. Racicot | Director |
| /s/ Roy S. Roberts*<br>Roy S. Roberts | Director |
| /s/ Marc J. Shapiro*<br>Marc J. Shapiro | Director |
| /s/ J.C. Watts, Jr.*<br>J.C. Watts, Jr. | Director |

| Signature | Title |
|---|---|
| Robert H. West | Director |
| /s/ J. Steven Whisler* <br> J. Steven Whisler | Director |
| /s/ Edward E. Whitacre, Jr.* <br> Edward E. Whitacre, Jr. | Director |

Dated: February 14, 2008

*By: /s/ Roger Nober

Roger Nober
Executive Vice President Law
and Secretary

# Exhibit Index

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| (3) | Articles of Incorporation and Bylaws | | | | |
| 3.1 | Amended and Restated Certificate of Incorporation of Burlington Northern Santa Fe Corporation, dated December 21, 1994, as amended. | 10-Q | 8/13/1998 | 1-11535 | 3.1 |
| 3.2 | By-Laws of Burlington Northern Santa Fe Corporation, as amended and restated, dated December 6, 2007.‡ | | | | |
| (4) | Instruments defining the rights of security holders, including indentures | | | | |
| 4.1 | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. | S-3 | 2/8/1999 | 333-72013 | 4 |
| 4.2 | Form of BNSF's 6 1/8% Notes Due March 15, 2009. | 10-K | 3/31/1999 | 1-11535 | 4.2 |
| 4.3 | Form of BNSF's 6 3/4% Debentures Due March 15, 2029. | 10-K | 3/31/1999 | 1-11535 | 4.3 |
| 4.4 | Form of BNSF's 6.70% Debentures Due August 1, 2028. | 10-K | 3/31/1999 | 1-11535 | 4.4 |
| 4.5 | Form of BNSF's 8.125% Debentures Due April 15, 2020. | 10-K | 2/12/2001 | 1-11535 | 4.5 |
| 4.6 | Form of BNSF's 7.95% Debentures Due August 15, 2030. | 10-K | 2/12/2001 | 1-11535 | 4.6 |
| 4.7 | Form of BNSF's 6.75% Notes Due July 15, 2011. | 10-Q | 8/3/2001 | 1-11535 | 4.1 |
| 4.8 | Form of BNSF's 5.90% Notes Due July 1, 2012. | 10-Q | 8/9/2002 | 1-11535 | 4.1 |
| 4.9 | Officers' Certificate of Determination as to the terms of BNSF's 4.875% Notes Due January 15, 2015, including Exhibit A thereto, the form of the Notes. | 8-K | 12/9/2004 | 1-11535 | 4.1 |
| 4.10 | Indenture, dated as of December 8, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | S-3 ASR | 12/8/2005 | 333-130214 | 4.1 |
| 4.11 | Certificate of Trust of BNSF Funding Trust I, executed and filed by U.S. Bank Trust National Association, Linda Hurt and James Gallegos, as Trustees. | S-3 ASR | 12/8/2005 | 333-130214 | 4.3 |
| 4.12 | Amended and Restated Declaration of Trust of BNSF Funding Trust I, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.4 |
| 4.13 | Guarantee Agreement between BNSF and U.S. Bank Trust National Association, as Guarantee Trustee, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.5 |
| 4.14 | First Supplemental Indenture, dated as of December 15, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | 8-K | 12/15/2005 | 1-11535 | 4.6 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) Form | File Date | File No. | Exhibit |
|---|---|---|---|---|---|
| 4.15 | Agreement as to Expenses and Liabilities dated as of December 15, 2005, between BNSF and BNSF Funding Trust I. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit C) |
| 4.16 | Form of BNSF Funding Trust I's 6.613% Trust Preferred Securities. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit D) |
| 4.17 | Officer's Certificate of Determination as to the terms of BNSF's 6.20% Debentures Due August 15, 2036, including the form of the Debentures. | 10-Q | 10/24/2006 | 1-11535 | 4.1 |
| 4.18 | First Supplemental Indenture, dated as of April 13, 2007, to Indenture dated as of December 1, 1995, between Burlington Northern Santa Fe Corporation and Bank of New York Trust Company, N.A., as Trustee. | 8-K | 4/13/2007 | 1-11535 | 4.1 |
| 4.19 | Officer's Certificate of Determination as to the terms of BNSF's 5.65% Debentures due May 1, 2017 and 6.15% Debentures Due May 1, 2037, including the forms of the Debentures. | 8-K | 4/13/2007 | 1-11535 | 4.2 |

Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission.

(10) Material Contracts

| Exhibit Number and Description | | Form | File Date | File No. | Exhibit |
|---|---|---|---|---|---|
| 10.1 | Burlington Northern Santa Fe Non-Employee Directors' Stock Plan, as amended and restated February 13, 2008.*‡ | | | | |
| 10.2 | Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Director's Restricted Stock Unit Award Agreement.* | 8-K | 5/23/2005 | 1-11535 | 10.1 |
| 10.3 | BNSF Railway Company Incentive Compensation Plan, as amended and restated December 17, 2007.*‡ | | | | |
| 10.4 | Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated effective December 9, 2004.* | 10-K | 2/16/2007 | 1-11535 | 10.5 |
| 10.5 | Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan, as amended and restated effective January 1, 2008.*‡ | | | | |
| 10.6 | Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated effective September 14, 2005.* | 8-K | 9/19/2005 | 1-11535 | 10.1 |
| 10.7 | Burlington Northern Santa Fe 1996 Stock Incentive Plan, as amended and restated December 6, 2007.*‡ | | | | |
| 10.8 | Burlington Northern Santa Fe Supplemental Retirement Plan, effective October 1, 1996, as amended through July 21, 2005.* | 8-K | 7/27/2005 | 1-11535 | 10.1 |
| 10.9 | Retirement Benefit Agreement between BNSF and Matthew K. Rose, as amended and restated September 21, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.5 |
| 10.10 | Retirement Benefit Agreement, dated January 16, 2003, between BNSF and John P. Lanigan.* | 10-K | 2/13/2004 | 1-11535 | 10.29 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) Form | File Date | File No. | Exhibit |
|---|---|---|---|---|---|
| 10.11 | Burlington Northern Santa Fe Estate Enhancement Program, as amended and restated, effective November 1, 1996.* | 10-K 405 | 3/31/1997 | 1-11535 | 10.15 |
| 10.11.1 | Amendment of Burlington Northern Santa Fe Estate Enhancement Program, dated December 3, 1998.* | 10-Q | 8/11/1999 | 1-11535 | 10.2 |
| 10.11.2 | Termination of Burlington Northern Santa Fe Estate Enhancement Program, dated September 17, 2003.* | 10-K | 2/16/2007 | 1-11535 | 10.12.2 |
| 10.12 | Form of BNSF Change-in-Control Agreement, as amended and restated December 6, 2007 and effective December 31, 2007 (applicable to Messrs. Rose, Hund, Ice, Lanigan, and Nober and one other executive officer).*‡ | | | | |
| 10.13 | Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan, as amended September 12, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.6 |
| 10.14 | Burlington Northern Inc. Director's Charitable Award Program.* | 10-K | 4/1/1996 | 1-11535 | 10.22 |
| 10.15 | Burlington Northern Santa Fe Salary Exchange Option Program, as amended and restated October 1, 2004.* | 10-K | 2/15/2005 | 1-11535 | 10.18 |
| 10.16 | Burlington Northern Santa Fe 1999 Stock Incentive Plan, as amended and restated February 13, 2008.*‡ | | | | |
| 10.17 | Form of 1999 Stock Incentive Plan Stock Option Award Agreement.*‡ | | | | |
| 10.18 | Form of 1999 Stock Incentive Plan Restricted Stock Unit Award Agreement.*‡ | | | | |
| 10.19 | Form of 1999 Stock Incentive Plan Reload Stock Option Agreement.*‡ | | | | |
| 10.20 | Form of 1999 Stock Incentive Plan Special Retention Restricted Stock Unit Award Agreement.*‡ | | | | |
| 10.21 | Form of 1999 Stock Incentive Plan Performance-Based Restricted Stock Unit Award Agreement.*‡ | | | | |
| 10.22 | Form of 1999 Stock Incentive Plan Performance Stock Award Agreement.*‡ | | | | |
| 10.23 | Amended and Restated Benefits Protection Trust Agreement by and between Burlington Northern Santa Fe Corporation and Wachovia Bank, dated January 8, 2008.*‡ | | | | |
| 10.24 | Burlington Northern Santa Fe Directors' Retirement Plan.* | 10-K | 4/1/1996 | 1-11535 | 10.27 |
| 10.24.1 | Termination of Burlington Northern Santa Fe Directors' Retirement Plan, dated July 17, 2003.* | 10-K | 2/16/2007 | 1-11535 | 10.31.1 |
| 10.25 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and directors.* | 10-K | 3/31/1999 | 1-11535 | 10.37 |
| 10.26 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and certain officers, including Messrs. Rose, Hund, Ice, Lanigan, Nober and Rickershauser.* | 10-K | 3/31/1999 | 1-11535 | 10.38 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| 10.27 | Burlington Northern Santa Fe 2005 Deferred Compensation Plan for Non-Employee Directors, amended and restated as of February 13, 2008.*‡ | | | | |
| 10.28 | Burlington Northern Santa Fe Deferred Compensation Plan for Directors, as amended and restated December 9, 2004.* | 10-K | 2/16/2007 | 1-11535 | 10.35 |
| 10.29 | Replacement Capital Covenant, dated as of December 15, 2005, by BNSF in favor of and for the benefit of each Covered Debtholder (as defined therein). | 10-K | 2/17/2006 | 1-11535 | 10.41 |
| (12) | Statements re: Computation of Ratios | | | | |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.‡ | | | | |
| (21) | Subsidiaries of the registrant | | | | |
| 21.1 | Subsidiaries of BNSF.‡ | | | | |
| (23) | Consents of experts and counsel | | | | |
| 23.1 | Consent of PricewaterhouseCoopers LLP.‡ | | | | |
| (24) | Power of Attorney | | | | |
| 24.1 | Power of Attorney.‡ | | | | |
| (31) | Rule 13a-14(a)/15d-14(a) Certifications | | | | |
| 31.1 | Principal Executive Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002).‡ | | | | |
| 31.2 | Principal Financial Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002).‡ | | | | |
| (32) | Section 1350 Certifications | | | | |
| 32.1 | Certification Pursuant to Rule 13a-14(b) and 18 U.S.C. § 1350 (Section 906 of the Sarbanes-Oxley Act of 2002).‡ | | | | |
| (99) | Additional Exhibits | | | | |
| 99.1 | Certification Pursuant to Section 303A.12 of the New York Stock Exchange Listed Company Manual.‡ | | | | |

* Management contract or compensatory plan

‡ Filed herewith

# Exhibit 12.1

## Burlington Northern Santa Fe Corporation and Subsidiaries
## Computation of Ratio of Earnings to Fixed Charges

In millions, except ratio amounts
(Unaudited)

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2004** | **2003** |
| | | (As Adjusted)[a] | (As Adjusted)[a] | (As Adjusted)[a] | (As Adjusted)[a] |
| Earnings: | | | | | |
| Income before income taxes and cumulative effect of accounting change[a] | **$ 2,957** | $ 2,996 | $ 2,453 | $ 1,296 | $ 1,241 |
| Add: | | | | | |
| Interest and other fixed charges, excluding capitalized interest | **511** | 485 | 437 | 409 | 420 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **282** | 261 | 221 | 195 | 182 |
| Distributed income of investees accounted for under the equity method | **4** | 3 | 4 | 4 | 3 |
| Amortization of capitalized interest | **4** | 4 | 8 | 8 | 8 |
| Less: | | | | | |
| Equity in earnings of investments accounted for under the equity method | **19** | 27 | 15 | 9 | 14 |
| Total earnings available for fixed charges | **$ 3,739** | $ 3,722 | $ 3,108 | $ 1,903 | $ 1,840 |
| Fixed charges: | | | | | |
| Interest and fixed charges | **$ 528** | $ 499 | $ 450 | $ 419 | $ 429 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **282** | 261 | 221 | 195 | 182 |
| Total fixed charges | **$ 810** | $ 760 | $ 671 | $ 614 | $ 611 |
| Ratio of earnings to fixed charges | **4.62x** | 4.90x | 4.63x | 3.10x | 3.01x |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

# Exhibit 31.1

## Principal Executive Officer's Certifications

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 14, 2008

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

# Exhibit 31.2

## Principal Financial Officer's Certifications

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Thomas N. Hund

Date: February 14, 2008

Thomas N. Hund
Executive Vice President and
Chief Financial Officer

# Exhibit 32.1

## Certification Pursuant to 18 U.S.C. § 1350

**(Section 906 of Sarbanes-Oxley Act of 2002)**

### Burlington Northern Santa Fe Corporation

In connection with the Annual Report of Burlington Northern Santa Fe Corporation (the "Company") on Form 10-K for the year ended December 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Matthew K. Rose, Chairman, President and Chief Executive Officer of the Company, and Thomas N. Hund, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to his knowledge on the date hereof:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 14, 2008

| | |
|---|---|
| /s/ Matthew K. Rose | /s/ Thomas N. Hund |
| Matthew K. Rose | Thomas N. Hund |
| Chairman, President and | Executive Vice President and |
| Chief Executive Officer | Chief Financial Officer |

A signed original of this written statement required by Section 906 has been provided to Burlington Northern Santa Fe Corporation and will be retained by Burlington Northern Santa Fe Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# Exhibit 99.1

## Annual CEO Certification

**(Section 303A.12(a) of the New York Stock Exchange Listed Company Manual)**

As the Chief Executive Officer of Burlington Northern Santa Fe Corporation and as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, I hereby certify that as of the date hereof I am not aware of any violation by the Company of NYSE's Corporate Governance listing standards, other than has been notified to the Exchange pursuant to Section 303A.12(b) and disclosed on Exhibit H to the Company's Domestic Company Section 303A Annual Written Affirmation.

/s/ Matthew K. Rose

Matthew K. Rose
Chairman, President and
Chief Executive Officer
May 18, 2007

[This certification is without qualification.]

## Burlington Northern Santa Fe Corporation Directors*

**Alan L. Boeckmann**[3,4]
Chairman and Chief Executive Officer, Fluor Corporation (professional services holding company offering engineering, construction management and other services), Irving, Texas.
Board member since 2001.

**Donald G. Cook**[2]
Retired General, United States Air Force, San Antonio, Texas.
Board member since 2005.

**Vilma S. Martinez**[4]
Partner, Munger, Tolles & Olson LLP (law firm), Los Angeles, California.
Board member since 1998.

**Marc F. Racicot**[4]
President and Chief Executive Officer, American Insurance Association (property-casualty insurance trade organization), Washington, D.C.
Former Governor of Montana.
Board member since 2001.

**Roy S. Roberts**[1,2]
Managing Director of Reliant Equity Investors, L.L.C. (private equity firm), Chicago, Illinois.
Board member since 1993.

**Matthew K. Rose**[1]
Chairman, President and Chief Executive Officer, Burlington Northern Santa Fe Corporation and BNSF Railway Company, Fort Worth, Texas.
Board member since 2000.

**Marc J. Shapiro**[3,4]
Retired Vice Chairman for Finance, Risk Management and Administration, J.P. Morgan Chase & Co. (bank holding company), New York, New York.
Board member since 1995.

**J.C. Watts, Jr.**[2]
Senior Partner of Oakcrest Capital Partners, L.L.C. (private equity firm) and Chairman, J.C. Watts Companies, L.L.C./Watts Consulting Group, Inc. (public affairs and corporate consulting business), Washington, D.C.
Former Congressman (R-4th Dist. Oklahoma) and Chairman, House Republican Conference.
Board member since 2003.

**Robert H. West**[1,3]
Retired Chairman of the Board, Butler Manufacturing Company (manufacturer of pre-engineered building systems and specialty components), Kansas City, Missouri.
Board member since 1980.

**J. Steven Whisler**[3]
Retired Chairman and Chief Executive Officer, Phelps Dodge Corporation (mining and manufacturing company), Phoenix, Arizona.
Board member since 1995.

**Edward E. Whitacre, Jr., Lead Director**[1,2,4]
Chairman Emeritus
AT&T Inc. (communications holding company), San Antonio, Texas.
Board member since 1993.

**Committee Assignments:**
1 *Executive Committee*
2 *Compensation and Development Committee*
3 *Audit Committee*
4 *Directors and Corporate Governance Committee*

* Years of Board service includes service on Boards of Burlington Northern Inc., Santa Fe Pacific Corporation and predecessor corporations.

## Corporate Officers[1]

**Matthew K. Rose**[2]
Chairman, President and Chief Executive Officer

**Thomas N. Hund**[2]
Executive Vice President and Chief Financial Officer

**Carl R. Ice**[2]
Executive Vice President and Chief Operations Officer

**John P. Lanigan, Jr.**[2]
Executive Vice President and Chief Marketing Officer

**Roger Nober**[2]
Executive Vice President Law and Secretary

**Paul W. Bischler**
Vice President and Controller

**Jeffrey J. Campbell**
Vice President – Technology Services and Chief Information Officer

**James H. Gallegos**
Vice President and Corporate General Counsel

**Amy C. Hawkins**
Vice President – Government Affairs

**Paul R. Hoferer**
Vice President and General Counsel

**Linda J. Hurt**
Assistant Vice President – Finance and Treasurer through April 2008
Vice President – Investor Relations effective May 2008

**Mary Jo Keating**
Vice President – Corporate Relations

**Linda Longo-Kazanova**
Vice President – Human Resources and Medical

**Marsha K. Morgan**
Vice President – Investor Relations

**Jo-ann M. Olsovsky**
Vice President – Technology Services and Chief Information Officer effective April 2008

**Peter J. Rickershauser**[2]
Vice President – Network Development

**Charles W. Shewmake**
Vice President and General Counsel effective May 2008

**David W. Stropes**
Vice President – Corporate Audit Services

**Shelley J. Venick**
Vice President and General Tax Counsel

**Richard E. Weicher**
Vice President and General Counsel – Regulatory

1 *These officers hold similar positions with BNSF Railway Company.*
2 *Executive Officer of Burlington Northern Santa Fe Corporation.*

## Operating Company Officers

**Paul B. Anderson**
Vice President – Marketing Support

**Stevan B. Bobb**
Group Vice President – Coal

**Stephen G. Branscum**
Group Vice President – Consumer Products

**Rollin D. Bredenberg**
Vice President – Service Design and Performance

**Frederick G. (Fritz) Draper**
Vice President – Business Unit Operations

**George Duggan**
Vice President – Domestic Intermodal Marketing

**Kathryn M. Farmer**
Vice President – Industrial Products Sales

**John J. Fleps**
Vice President – Labor Relations

**Gregory C. Fox**
Vice President – Transportation

**David L. Freeman**
Vice President – Engineering

**David L. Garin**
Group Vice President – Industrial Products

**Craig Hill**
Vice President – Mechanical and Value Engineering

**Dennis R. Johnson**
Vice President and Chief Sourcing Officer

**Kevin Kaufman**
Group Vice President – Agricultural Products

**Mark A. Kotter**
Vice President – Customer Integration

**Robert W. Lease**
Regional Vice President – Operations

**Frederick R. Malesa**
Vice President – International Intermodal Marketing

**Julie A. Piggott**
Vice President – Finance

**Chris A. Roberts**
Regional Vice President – Operations

**Sami M. Shalah**
Vice President – Coal Marketing

**Denis Smith**
Vice President – Industrial Products Marketing

**Mark A. Schulze**
Vice President – Safety, Training and Operations Support

**Jeffrey B. Wright**
Regional Vice President – Operations

## Shareholder Information

**SHARES LISTED**
New York Stock Exchange,
Ticker Symbol: BNI

**PRINCIPAL CORPORATE OFFICE**
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830
(800) 795-2673
www.bnsf.com

**STOCK TRANSFER AGENT AND REGISTRAR**
Stock Transfer Agent
and Registrar
Computershare Trust
Company, N.A.
250 Royall Street
Canton, MA 02021

Telephone: (800) 526-5678

For account information, go to:
www.computershare.com

**SHAREHOLDERS**
As of February 4, 2008, there were approximately 32,000 shareholders of record.

**SHAREHOLDER SERVICES**
*You are encouraged to contact our Transfer Agent directly for the shareholder services listed below:* Change in Certificate Registration, Dividend Reinvestment Service, Change of Mailing Address, Lost or Stolen Certificates, Replacement of Dividend Checks, Direct Deposit of Dividends, Consolidation of Multiple Accounts, Elimination of Duplicate Report Mailings, Replacement of Form 1099-DIV.

**DIVIDEND REINVESTMENT PLAN**
A dividend reinvestment plan is provided for registered shareholders through the Transfer Agent as a convenient way to purchase more shares through investment of dividends or voluntary cash payments. A booklet describing the plan is available from the Transfer Agent.

**FORM 10-K**
The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) is posted on the Company's website, www.bnsf.com. A copy of the Annual Report on Form 10-K is also available to shareholders free of charge upon request to the Company's Investor Relations Department at 2500 Lou Menk Drive, Fort Worth, Texas 76131-2828. The Company's filings on Form 10-K, Form 10-Q and Form 8-K are posted on the Company's website as soon as reasonably practicable after the reports are electronically filed with the SEC. Reports on Forms 3, 4 and 5 by directors and Section 16 reporting officers are posted on the Company's website no later than the day following their filing with the SEC.

**INSTITUTIONAL INVESTORS**
*Inquiries from security analysts and investment professionals should be directed to the Company's investor relations contact:*
Ms. Marsha K. Morgan
Vice President – Investor Relations
(817) 352-6452

**ANNUAL MEETING**
The Annual Meeting of Shareholders will be held on Thursday, April 24, 2008, at 8:00 a.m. CDT at The Fort Worth Club, 306 W. 7th Street, Fort Worth, Texas 76102.

**PERFORMANCE GRAPH**
The following graph depicts a five-year comparison of cumulative total shareholder returns for the Company, the Standard & Poor's 500 Stock Index (S&P 500), and the Dow Jones U.S. Transportation Average Index (Dow Jones). The Dow Jones index consists of 20 railroad, airline, trucking and marine transport companies. The Company is included within the S&P 500 and Dow Jones indices. The graph assumes an investment of $100 for the five-year period commencing December 31, 2002, and ending December 31, 2007, in the Company's common stock and the S&P 500 and the Dow Jones indices, and the reinvestment of dividends.




© 2008 Burlington Northern Santa Fe Corporation. All rights reserved.
Design: Methodologie; Photography: Tyler Boley, Jeff Corwin, Wyatt McSpadden (CEO portrait); Printing: ColorGraphics

2650 Lou Menk Drive
Fort Worth, Texas 76131-2830



# EXHIBIT PX0590

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DEC. 31, 2007**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _________ to _________

Commission file number 1-8339

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

**No Change**
(Former name, former address and former fiscal year, if changed since last report.)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by checkmark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes (X) No ( )

Indicate by checkmark if the registrant is not required to file such reports pursuant to Section 13 or 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.
Large accelerated filer (X) Accelerated filer ( ) Non-accelerated filer ( )

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ( ) No (X)

The aggregate market value of the voting common equity held by nonaffiliates as of June 29, 2007 was $20,633,804,749 (based on the closing price as quoted on the New York Stock Exchange on that date).

The number of shares outstanding of each of the registrant's classes of common stock, as of Jan. 31, 2008: 376,332,668 (excluding 20,672,924 shares held by the registrant's consolidated subsidiaries).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

## TABLE OF CONTENTS

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)


| | | | Page |
|---|---|---|---|
| Part I. | Items 1 and 2. | Business and Properties | K3 |
| | Item 1A. | Risk Factors | K13 |
| | Item 1B. | Unresolved Staff Comments | K15 |
| | Item 3. | Legal Proceedings | K16 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | K16 |
| | | Executive Officers of the Registrant | K17 |
| Part II. | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | K19 |
| | Item 6. | Selected Financial Data | K20 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K22 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | K39 |
| | Item 8. | Financial Statements and Supplementary Data | K40 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K77 |
| | Item 9A. | Controls and Procedures | K77 |
| | Item 9B. | Other Information | K77 |
| Part III. | Item 10. | Directors, Executive Officers and Corporate Governance | K78 |
| | Item 11. | Executive Compensation | K78 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K78 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | K81 |
| | Item 14. | Principal Accountant Fees and Services | K81 |
| Part IV. | Item 15. | Exhibits and Financial Statement Schedules | K82 |
| | | Power of Attorney | K92 |
| | | Signatures | K92 |

# PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 1. Business. and Item 2. Properties.

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) is a Norfolk, Virginia based company that controls a major freight railroad, Norfolk Southern Railway Company. Norfolk Southern Railway Company is primarily engaged in the rail transportation of raw materials, intermediate products and finished goods primarily in the Southeast, East and Midwest and, via interchange with rail carriers, to and from the rest of the United States. Norfolk Southern also transports overseas freight through several Atlantic and Gulf Coast ports. Norfolk Southern provides comprehensive logistics services and offers the most extensive intermodal network in the eastern half of the United States. The common stock of Norfolk Southern is listed on the New York Stock Exchange (NYSE) under the symbol "NSC."

Norfolk Southern was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (now the Surface Transportation Board [STB]). Effective Dec. 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective Sept. 1, 1998, NW was merged with and into Norfolk Southern Railway. As of Dec. 31, 2007, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation Inc. (CSXT) (see Note 4 to the Consolidated Financial Statements).

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). In addition, the following documents are available on the company's website and in print to any shareholder who requests them:

- Corporate Governance Guidelines
- Charters of the Committees of the Board of Directors
- The Thoroughbred Code of Ethics for employees
- Code of Ethical Conduct for Senior Financial Officers
- Categorical Independence Standards for Directors

Unless otherwise indicated, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**RAILROAD OPERATIONS –** As of Dec. 31, 2007, NS' railroads operated approximately 21,000 miles of road in 22 eastern states and the District of Columbia.

The system's lines reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia and western Pennsylvania), distribution centers, transload facilities and other businesses located in smaller communities in its service area.




Corridors with heaviest freight volume:

- New York City area to Chicago (via Allentown and Pittsburgh)
- Chicago to Macon (via Cincinnati, Chattanooga and Atlanta)
- Appalachian coal fields of Virginia, West Virginia and Kentucky to Norfolk and Sandusky, OH
- Cleveland to Kansas City
- Birmingham to Meridian
- Memphis to Chattanooga

The miles operated, which include major leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and trackage rights over property owned by North Carolina Railway Company, were as follows:

**Mileage Operated as of Dec. 31, 2007**

| | Miles of Road | Second and Other Main Track | Passing Track, Crossovers and Turnouts | Way and Yard Switching | Total |
|---|---|---|---|---|---|
| Owned | 15,943 | 2,808 | 2,045 | 8,492 | 29,288 |
| Operated under lease, contract or trackage rights | 4,948 | 1,977 | 417 | 970 | 8,312 |
| Total | 20,891 | 4,785 | 2,462 | 9,462 | 37,600 |

**Triple Crown Operations** – Triple Crown Services Company (TCSC), NS' subsidiary, offers door-to-door intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. TCSC provides intermodal service in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast, and the Midwest and Texas.

The following table sets forth certain statistics relating to NS railroads' operations for the past 5 years:

**Rail Operating Statistics**

| | Years Ended Dec. 31, 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Revenue ton miles (billions) | 196 | 204 | 203 | 198 | 183 |
| Freight train miles traveled (millions) | 81.9 | 84.2 | 81.2 | 77.7 | 73.9 |
| Revenue per ton mile | $0.0481 | $0.0462 | $0.0421 | $0.0369 | $0.0353 |
| Revenue ton miles per man-hour worked | 3,066 | 3,196 | 3,146 | 3,347 | 3,111 |
| Percentage ratio of railway operating expenses to railway operating revenues | 72.6% | 72.8% | 75.2% | 76.7% | 83.5%[1] |

[1]Includes $107 million of costs for a voluntary separation program, which added 1.6 percentage points to the ratio.

**RAILWAY OPERATING REVENUES --** NS' total railway operating revenues were $9.4 billion in 2007. See the financial information by traffic segment in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**COAL TRAFFIC --** Coal, coke and iron ore -- most of which is bituminous coal -- is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 186.0 million tons in 2007, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania and Kentucky. Revenues from coal, coke and iron ore accounted for about 25% of NS' total railway operating revenues in 2007.

Total coal handled through all system ports in 2007 was 34.1 million tons. Of this total, 13.4 million tons (including coastwise traffic) moved through Norfolk, Virginia, 2.9 million tons moved through the Baltimore Terminal, 10.9 million tons moved to various docks on the Ohio River, and 6.9 million tons moved to various

Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, Chrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks and minerals. The agriculture, consumer products and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol and items for the military. The paper, clay and forest products group includes lumber and wood products, pulp board and paper products, wood fibers, wood pulp, scrap paper and clay.

In 2007, 142 million tons of general merchandise freight, or approximately 67% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis and Louisville. General merchandise carloads handled in 2007 were 2.8 million, the revenue from which accounted for 55% of NS' total railway operating revenues in 2007.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers and other shippers. Intermodal units handled in 2007 were 3.1 million, the revenues from which accounted for 20% of NS' total railway operating revenues for the year.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**FREIGHT RATES -** In 2007, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices.

In 2006, NS' railroads were found by the STB to be "revenue adequate" based on results for the year 2005. The STB has not made its revenue adequacy determination for the year 2006. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement.

**PASSENGER OPERATIONS**

- Regularly scheduled passenger trains are operated by Amtrak on NS' lines between the following locations:
  - Alexandria, Virginia, and New Orleans, Louisiana
  - Raleigh and Charlotte, North Carolina
  - Selma and Charlotte, North Carolina
  - Chicago, Illinois, and Porter, Indiana
  - Chicago, Illinois, and Battle Creek, Michigan
  - Chicago, Illinois, and Pittsburgh, Pennsylvania
  - Chicago, Illinois, and Detroit, Michigan
  - Pittsburgh and Harrisburg, Pennsylvania
- Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia
- NS leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois
- NS operates freight service over lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over trackage owned by:
  - Amtrak
  - New Jersey Transit
  - Southeastern Pennsylvania Transportation Authority
  - Metro-North Commuter Railroad Company
  - Maryland Department of Transportation
- Passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2007, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in Statement of Financial Accounting Standards No. 131.

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states and the District of Columbia. The railroad infrastructure makes the company capital intensive with total property of approximately $22 billion.

**Capital Expenditures -** Capital expenditures for road, equipment and other property for the past five years were as follows (including capitalized leases):

**Capital Expenditures**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road and other property | $ 894 | $ 756 | $ 741 | $ 612 | $ 502 |
| Equipment | 447 | 422 | 284 | 429 | 218 |
| Total | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2008, NS has budgeted $1.43 billion of capital expenditures. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture (MSLLC) pursuant to which NS intends to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. Through Dec. 31, 2007, NS has contributed $240 million, see the discussion following "Cash used for investing activities," in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Equipment -** As of Dec. 31, 2007, NS owned or leased the following units of equipment:

| | | **Number of Units** | | **Capacity** |
|---|---|---|---|---|
| | **Owned*** | **Leased**** | **Total** | **Of Equipment** |
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 3,593 | 132 | 3,725 | 12,888,500 |
| Switching | 149 | -- | 149 | 216,700 |
| Auxiliary units | 74 | -- | 74 | -- |
| Total locomotives | 3,816 | 132 | 3,948 | 13,105,200 |
| Freight cars: | | | | (Tons) |
| Hopper | 17,153 | 808 | 17,961 | 1,916,374 |
| Box | 16,145 | 2,078 | 18,223 | 1,465,342 |
| Covered hopper | 8,830 | 2,805 | 11,635 | 1,274,667 |
| Gondola | 31,335 | 7,959 | 39,294 | 4,231,932 |
| Flat | 2,656 | 1,335 | 3,991 | 313,570 |
| Caboose | 177 | -- | 177 | -- |
| Other | 4,236 | 20 | 4,256 | 212,311 |
| Total freight cars | 80,532 | 15,005 | 95,537 | 9,414,196 |
| Other: | | | | |
| Work equipment | 5,274 | 3 | 5,277 | |
| Vehicles | 4,164 | -- | 4,164 | |
| Highway trailers and containers | 171 | 11,413 | 11,584 | |
| RoadRailer® | 7,035 | 193 | 7,228 | |
| Miscellaneous | 1,314 | 15,826 | 17,140 | |
| Total other | 17,958 | 27,435 | 45,393 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements and capitalized leases.

** Includes 60 locomotives and 5,776 freight cars leased from CRC.

The following table indicates the number and year built for locomotives and freight cars owned at Dec. 31, 2007.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 | 2003 | 1996-2002 | 1991-1995 | 1990 & Before | Total |
| Locomotives: | | | | | | | | | |
| No. of units | 90 | 143 | 89 | 207 | 100 | 906 | 487 | 1,794 | 3,816 |
| % of fleet | 2% | 4% | 2% | 5% | 3% | 24% | 13% | 47% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | 1,200 | 404 | 89 | -- | -- | 5,620 | 5,008 | 68,211 | 80,532 |
| % of fleet | 1% | 1% | --% | --% | --% | 7% | 6% | 85% | 100% |

The following table shows the average age of NS' locomotive and freight car fleets at Dec. 31, 2007, and the number of retirements in 2007:

| | Locomotives | Freight Cars |
|---|---|---|
| Average age – in service | 18.1 years | 30.1 years |
| Retirements | 64 units | 3,598 units |
| Average age – retired | 30.0 years | 38.9 years |

Between 1988 and 2000, about 29,000 coal cars were rebodied. As a result, the remaining serviceability of the freight car fleet is greater than may be inferred from the high percentage of freight cars built in earlier years.

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction and equipment marketability. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls.

| | Annual Average Bad Order Ratio | | | | |
|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| Freight cars | 4.9% | 6.4% | 6.3% | 7.4% | 7.4% |
| Locomotives | 5.7% | 5.7% | 6.2% | 6.3% | 6.2% |

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $389 million as of Dec. 31, 2007, and $534 million as of Dec. 31, 2006.

**Track Maintenance -** Of the approximately 38,000 total miles of track operated, NS had responsibility for maintaining about 29,300 miles of track with the remainder being operated under trackage rights.

Over 75% of the main line trackage (including first, second, third and branch main tracks, all excluding trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 136 pounds per yard. Approximately 45% of NS lines carried 20 million or more gross tons per track mile during 2007.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Track miles of rail installed | 401 | 327 | 302 | 246 | 233 |
| Miles of track surfaced | 5,014 | 4,871 | 4,663 | 5,055 | 5,105 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.5 | 2.5 | 2.8 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 424 core stations, 14 secondary stations and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations and AEI data transmissions.

**Traffic Control -** Of the approximately 15,900 route miles owned by NS, about 11,000 miles are signalized, including 8,000 miles of centralized traffic control (CTC) and 3,000 miles of automatic block signals. Of the 8,000 miles of CTC, approximately 3,000 miles are controlled by data radio originating at 258 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**ENVIRONMENTAL MATTERS -** Compliance with federal, state and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity or competitive position. See “Legal Proceedings,” Part I, Item 3; “Personal Injury, Environmental and Legal Liabilities” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations;” and Note 17 to the Consolidated Financial Statements.

**EMPLOYEES –** The following table shows the average number of employees and the average cost per employee for wages and benefits:

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Average number of employees | 30,806 | 30,541 | 30,294 | 28,475 | 28,753 |
| Average wage cost per employee | $62,000 | $62,000 | $61,000 | $59,000 | $58,000 |
| Average benefit cost per employee | $30,000 | $32,000 | $29,000 | $28,000 | $28,000 |

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions. See the discussion of “Labor Agreements” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has

jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. The Federal Railroad Administration regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, includes exemptions of intermodal business (trailer-on-flat-car, container-on-flat-car), rail boxcar traffic, lumber, manufactured steel, automobiles and certain bulk commodities such as sand, gravel, pulpwood and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well for the duration of the contract. About 87% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts were made in 2007 to re-subject the rail industry to unwarranted federal economic regulation and such efforts are expected to continue in 2008. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will continue to oppose efforts to reimpose unwarranted economic regulation.

**COMPETITION -** There is continuing strong competition among rail, water and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery and consumer products. Even for raw materials, semifinished goods and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

**SECURITY OF OPERATIONS -** NS has taken significant steps to provide enhanced security for the NS rail system. In particular, NS has developed and implemented a comprehensive security plan that is modeled on and was developed in conjunction with the security plan prepared by the Association of American Railroads (AAR) post September 11, 2001. The AAR Security Plan defines four Alert Levels and details the actions and countermeasures that are being applied across the railroad industry, as the terrorist threat increases or decreases. The Alert Level actions include countermeasures that will be applied in three general areas: (1) operations (including transportation, engineering, and mechanical); (2) information technology and communications; and (3) railroad police. Although security concerns preclude public disclosure of its contents, the NS Departmental Security Plan outlines the protocol within NS for all concerned to be notified of AAR Alert Level changes. All NS Operations Division employees are advised by their supervisors or train dispatchers, as appropriate, of any change in Alert Level and any additional responsibilities they may incur due to such change.

The NS plan also effectively addresses and complies with Department of Transportation security regulations pertaining to training and security plans with respect to the transportation of hazardous materials. Among more focused elements of the plan, security awareness training is given to all railroad employees who directly affect hazardous material transportation safety, and this training is integrated into recurring hazardous material training and re-certification programs. Toward that end, NS, working closely with the National Transit Institute at Rutgers University, developed a four-module uniform national training program. More in-depth security training has been given to those select NS employees who have been given specific security responsibilities, and additional,

location-specific security plans have been developed for certain metropolitan areas and each of six port facilities served by NS. With respect to the ports, each facility plan has been approved by the applicable Captain of the Port and subject to inspection by the U.S. Coast Guard.

Additionally, NS engages in close and regular coordination with numerous federal and state agencies, including the U.S. Department of Homeland Security (DHS), the Transportation Security Administration (TSA), the Federal Bureau of Investigation (FBI), the Federal Railroad Administration (FRA), the U.S. Coast Guard, U.S. Customs and Border Protection and various state Homeland Security offices. As one notable example, an NS Police Special Agent, under the auspices of the AAR, has been assigned to the National Joint Terrorism Task Force (NJTTF) operating out of FBI Headquarters in Washington, D.C. to represent and serve as liaison to the North American rail industry. This arrangement improves logistical flow of vital security and law enforcement information with respect to the rail industry as a whole, while having the post filled by an NS Special Agent has served to foster a strong working relationship between NS and the FBI. NS also has become a member of the Customs-Trade Partnership Against Terrorism (C-TPAT) program sponsored by U.S. Customs. C-TPAT allows NS to work closely with U.S. Customs and its customers to develop measures that will help ensure the integrity of freight shipments moving on NS, particularly those moving to or from a foreign country. Based on participation in C-TPAT, NS has ensured that its plan meets all current applicable security recommendations made by U.S. Customs.

Similarly, NS is guided in its operations by various supplemental security action items issued by DHS and U.S. Department of Transportation (DOT), U.S. Coast Guard Maritime Security requirements, as well as voluntary security action items developed in collaboration with TSA, DOT, and the freight railroads in 2006. Many of the action items are based on lessons learned from DHS and DOT security assessments of rail corridors in High Threat Urban Areas (HTUA) begun in 2004. Particular attention is paid to: (1) the establishment of secure storage areas for rail cars carrying toxic-by-inhalation (TIH) materials; (2) the expedited movement of trains transporting rail cars carrying TIH materials; (3) the minimization of unattended loaded tank cars carrying TIH materials; and (4) cooperation with federal, state, local and tribal governments to identify, through risk assessments, those locations where security risks are the highest. These action items and NS' compliance initiatives are outlined in the various departmental sections of the NS Departmental Security Plan.

In 2007, through participation in the Transportation Community Awareness and Emergency Response (TRANSCAER) Program, NS provided rail accident response training to approximately 5,000 emergency responders, such as local police and fire personnel, representing over 22,000 man-hours of emergency response training. NS' other training efforts throughout 2007 included participation in a major security drill with Amtrak and the State of Delaware in New Castle County, as well as coordinating table-top exercises involving the "staged" release of TIH shipments with various local, state, and federal agencies. NS also has ongoing programs to sponsor local emergency responders at tank car emergency response training programs conducted at the AAR Transportation Technology Center in Pueblo, Colorado, and its annual TRANSCAER Whistle-Stop train makes stops in numerous cities, its special training cars serving as a resource to an audience of nearly 1,000 emergency responders annually.

Improvements in equipment design also are expected to play a role in enhancing rail security. The AAR has developed new tank car specifications for chlorine and anhydrous ammonia which are scheduled to become effective on March 31, 2008. In the near future, the FRA is also expected to issue a proposed regulation addressing the redesign of pressurized tank cars used for the transportation of TIH gases and liquids. A consortium of chemical companies is also studying improvements in tank car head, shell, fittings, and thermal protection in order to improve the survivability of current tank cars.

**Item 1A. Risk Factors.**

**NS is subject to significant governmental regulation and legislation over commercial, environmental and operating matters.**

Railroads are subject to commercial regulation by the STB, which has jurisdiction over some routes, fuel surcharges, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. In addition, Congress could enact re-regulation legislation. Economic re-regulation of the rail industry by Congress could have a significant negative impact on NS' ability to determine prices for rail services, reduce capital spending on its rail network, and result in a material adverse effect in the future on NS' financial position, results of operations or liquidity in a particular year or quarter.

Railroads are subject to safety and security regulation by the DOT and the DHS, which regulate most aspects of NS' operations. Proposed amendments to federal rail safety statutes, if enacted, could add significantly to operating costs and increase the number of employees NS and other railroads employ. In addition, NS' failure to comply with applicable laws and regulations could have a material adverse effect on NS.

NS' operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to water ways or ground water supplies; handling, storage, transportation, and disposal of waste and other materials; and the cleanup of hazardous material or petroleum releases. The risk of incurring environmental liability – for acts and omissions, past, present and future – is inherent in the railroad business. Several of NS' subsidiaries own, or have owned, land used as operating property or held for sale, or which is leased or may have been leased and operated by others. Environmental problems that are latent or undisclosed may exist on these properties, and NS could incur environmental liabilities or costs, the amount and materiality of which cannot be estimated reliably at this time, with respect to one or more of these properties. Moreover, lawsuits and claims involving other unidentified environmental sites and matters are likely to arise from time to time, and the resulting liabilities could have a significant effect on financial position, results of operations or liquidity in a particular year or quarter.

**NS, as a common carrier by rail, must offer to transport hazardous materials, regardless of risk.** Transportation of certain hazardous materials could create catastrophic losses in terms of personal injury and property damage costs, and compromise critical parts of our rail network. Legislation introduced in Congress would give federal regulators increased authority to conduct investigations and levy substantial fines and penalties in connection with railroad accidents. Under provisions enacted in August 2007, federal regulators are required to prescribe new regulations governing railroads' transportation of hazardous materials, including annual routing analyses, security risk assessments and employee security training. Regulations proposed in late 2006 by DHS mandating chain of custody and security measures likely will cause service degradation and higher costs for the transportation of toxic inhalation hazard materials. Further, certain local governments have sought to enact ordinances banning hazardous materials moving by rail within their borders. Some legislators have contemplated pre-notification requirements for hazardous materials shipments. If promulgated such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies.

**NS may be affected by terrorism or war.** Any terrorist attack, or other similar event, any government response thereto, and war or risk of war could cause significant business interruption and may adversely affect NS' results of operations, financial position, and liquidity in a particular year or quarter. Because NS plays a critical role in the nation's transportation system, it could become the target of such an attack or have a significant role in the government's preemptive approach or response to an attack or war.

Although NS currently maintains insurance coverage for third-party liability arising out of war and acts of terrorism, it maintains only limited insurance coverage for first-party property damage and damage to property in NS' care, custody or control caused by certain acts of terrorism. In addition, premiums for some or all of NS' current insurance programs covering these losses could increase dramatically, or insurance coverage for certain losses may not be available to NS in the future.

**NS may be affected by general economic conditions.** Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities NS carries may have an adverse effect on its operating results, financial position, and liquidity. Economic conditions resulting in bankruptcies of one or more large customers could have a significant impact on NS' financial position, results of operations or liquidity in a particular year or quarter.

**NS faces competition from other transportation providers.** NS is subject to competition from motor carriers, railroads, and to a lesser extent, ships, barges, and pipelines, on the basis of transit time, pricing, and the quality and reliability of service. While NS has used primarily internal resources to build or acquire and maintain its rail system, trucks and barges have been able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation in the regions in which NS operates, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**The operations of carriers with which NS interchanges may adversely affect its operations.** NS' ability to provide rail service to customers in the U.S. and Canada depends in large part upon its ability to maintain cooperative relationships with connecting carriers with respect to, among other matters, freight rates, revenue divisions, car supply and locomotive availability, data exchange and communications, reciprocal switching, interchange and trackage rights. Deterioration in the operations of, or service provided by connecting carriers, or in our relationship with those connecting carriers, could result in NS' inability to meet its customers' demands or require NS to use alternate train routes, which could result in significant additional costs and network inefficiencies.

**NS relies on technology and technology improvements in its business operations.** If NS experiences significant disruption or failure of one or more of its information technology systems, including computer hardware, software, and communications equipment, NS could experience a service interruption, security breach, or other operational difficulties, which could have a material adverse impact on its results of operations, financial condition, and liquidity in a particular year or quarter. Additionally, if NS does not have sufficient capital to acquire new technology or if it is unable to implement new technology, NS may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**The vast majority of NS employees belong to labor unions, and labor agreements, strikes, or work stoppages could adversely affect its operations.** Approximately 26,000, or about 85%, of NS railroad employees are covered by collective bargaining agreements with various labor unions. If unionized workers were to engage in a strike, work stoppage, or other slowdown, NS could experience a significant disruption of its operations. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could significantly increase NS' costs for healthcare, wages, and other benefits. Any of these factors could have a material adverse impact on NS' financial position, results of operations or liquidity in a particular year or quarter.

**NS may be subject to various claims and lawsuits that could result in significant expenditures.** The nature of NS' business exposes it to the potential for various claims and litigation related to labor and employment, personal injury, commercial disputes, freight loss and other property damage, and other matters. Job-related

personal injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded.

Any material changes to current litigation trends or a catastrophic rail accident involving any or all of freight loss or property damage, personal injury, and environmental liability could have a material adverse effect on NS' operating results, financial condition, and liquidity to the extent not covered by insurance. NS has obtained insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (currently up to $25 million and above $1 billion per occurrence for bodily injury and property damage to third parties and $25 million and above $175 million per occurrence for property owned by NS or in its care, custody or control). Insurance is available from a limited number of insurers and may not continue to be available or, if available, may not be obtainable on terms acceptable to NS.

**Severe weather could result in significant business interruptions and expenditures.** Severe weather conditions and other natural phenomena, including hurricanes and floods, may cause significant business interruptions and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on NS' financial position, results of operations or liquidity in a particular year or quarter.

**Unpredictability of demand for rail services resulting in the unavailability of qualified personnel could adversely affect NS' operational efficiency and ability to meet demand.** Workforce demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could each have a negative impact on NS' ability to meet demand for rail service. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on NS' operational efficiency and otherwise have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**NS may be affected by supply constraints resulting from disruptions in the fuel markets or the nature of some of its supplier markets.** NS consumes about 500 million gallons of diesel fuel each year. Fuel availability could be affected by any limitation in the fuel supply or by any imposition of mandatory allocation or rationing regulations. If a severe fuel supply shortage arose from production curtailments, disruption of oil imports, disruption of domestic refinery production, damage to refinery or pipeline infrastructure, political unrest, war or otherwise, NS' financial position, results of operations or liquidity in a particular year or quarter could be adversely affected. Also, such an event would impact NS as well as its customers and other transportation companies.

Due to the capital intensive nature and industry-specific requirements of the rail industry, there are high barriers of entry for potential new suppliers of core railroad items, such as locomotives and rolling stock equipment. Additionally, NS competes with other industries for available capacity and raw materials used in the production of certain track materials, such as rail and ties. Changes in the competitive landscapes of these limited-supplier markets could result in increased prices or material shortages that could materially affect NS' financial position, results of operations or liquidity in a particular year or quarter.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 3. Legal Proceedings.**

As of Feb. 14, 2008, 28 antitrust class actions have been filed against NS and other Class 1 railroads in various Federal district courts regarding fuel surcharges. On November 6, 2007, these actions were consolidated in the District of Columbia by the Judicial Panel on Multidistrict Litigation. NS believes the allegations in the complaints are without merit and intends to vigorously defend the cases. In addition, NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

On November 30, 2007, NS received notice from the United States Department of Justice (DOJ) that the DOJ is prepared to bring an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the Jan. 6, 2005 derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. The notice further indicates that the State of South Carolina may also join in any action against NS. NS is in discussions with the DOJ in an effort to settle the DOJ's claims. NS does not believe that the resolution of these claims will have a material adverse effect on its financial position, results of operations or liquidity.

On Oct. 19, 2006, the Pennsylvania Department of Environmental Protection (PDEP) issued an assessment of civil penalties against NS and filed a complaint for civil penalties with the Pennsylvania Environmental Hearing Board (EHB) requesting that the EHB impose civil penalties upon NS for alleged violations of state environmental laws and regulations resulting from a discharge of sodium hydroxide that occurred as a result of the derailment of a NS train in Norwich Township, Pennsylvania, on June 30, 2006. PDEP’s actions sought to impose combined penalties of $8,890,000 for alleged past violations and $46,420 per day for alleged continuing violations of state environmental laws and regulations. NS appealed the fines to the EHB. The Pennsylvania Fish and Boat Commission sought financial restitution for damages alleged to have been caused by this accident. In addition, the Pennsylvania Attorney General and the McKean County District Attorney filed three misdemeanor charges for alleged violations of state environmental and aquatic resource protection laws and regulations. NS has entered into a settlement agreement with all Commonwealth of Pennsylvania parties, pursuant to which all claims by the Commonwealth for civil liability resulting from the derailment and spill were resolved, with NS agreeing to pay approximately $7.35 million in restitution to compensate for all natural resource damages and the agencies’ response costs caused by the derailment and spill. NS has also pled no contest to the three misdemeanor charges and has paid fines in the amount of $250,000 to resolve them.

**Item 4. Submission of Matters to a Vote of Security Holders.**

There were no matters submitted to a vote of security holders during the fourth quarter of 2007.

**Executive Officers of the Registrant.**

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of Feb. 1, 2008, relating to the executive officers.

| Name, Age, Present Position | Business Experience During Past Five Years |
|---|---|
| Charles W. Moorman, 55, Chairman, President and Chief Executive Officer | Present position since Feb. 1, 2006. Served as President and Chief Executive Officer from Nov. 1, 2005 to Feb. 1, 2006; as President from Oct. 1, 2004 to Nov. 1, 2005; as Senior Vice President – Corporate Planning and Services from Dec. 1, 2003 to Oct. 1, 2004; Senior Vice President – Corporate Services from Feb. 1, 2003 to Dec. 1, 2003 and prior thereto served as President – Thoroughbred Technology and Telecommunications, Inc. |
| Stephen C. Tobias, 63, Vice Chairman and Chief Operating Officer | Present position since Aug. 1, 1998. |
| Deborah H. Butler, 54, Executive Vice President – Planning and Chief Information Officer | Present position since June 1, 2007. Prior thereto served as Vice President – Customer Service. |
| James A. Hixon, 54, Executive Vice President – Law and Corporate Relations | Present position since Oct. 1, 2005. Served as Executive Vice President – Finance and Public Affairs From Oct. 1, 2004, to Oct. 1, 2005; Senior Vice President – Legal and Government Affairs from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto served as Senior Vice President – Administration. |
| Mark D. Manion, 55, Executive Vice President – Operations | Present position since Oct. 1, 2004. Served as Senior Vice President – Transportation Operations from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto served as Vice President – Transportation Services and Mechanical. |
| John P. Rathbone, 55, Executive Vice President – Administration | Present position since Oct. 1, 2004. Served as Senior Vice President – Administration from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto served as Senior Vice President and Controller. |
| Donald W. Seale, 55, Executive Vice President and Chief Marketing Officer | Present position since April 1, 2006. Served as Executive Vice President – Sales and Marketing from Oct. 1, 2004 to April 1, 2006; as Senior Vice President – Marketing Services from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto was Senior Vice President – Merchandise Marketing. |

| | |
|---|---|
| James A. Squires, 46,<br>Executive Vice President –<br>Finance and Chief Financial<br>Officer | Present position since July 1, 2007.<br>Served as Executive Vice President – Finance from April 1, 2007 to July 1, 2007, Senior Vice President – Financial Planning from April 1, 2006 to April 1, 2007, Senior Vice President – Law from Oct. 1, 2004 to April 1, 2006, as Vice President – Law from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto was Senior General Counsel. |
| Daniel D. Smith, 55,<br>Senior Vice President –<br>Energy and Properties | Present position since Dec. 1, 2003.<br>Prior thereto served as President- NS Development. |
| Marta R. Stewart, 50,<br>Vice President and Controller | Present position since Dec. 1, 2003.<br>Prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
### STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 36,955 stockholders of record as of Dec. 31, 2007, is traded on the New York Stock Exchange under the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2007 and 2006.

| | Quarter | | | |
|---|---|---|---|---|
| **2007** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 53.84 | $ 59.19 | $ 59.77 | $ 54.58 |
| Low | 45.38 | 49.70 | 46.42 | 48.03 |
| Dividends per share | $ 0.22 | $ 0.22 | $ 0.26 | $ 0.26 |
| **2006** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 54.93 | $ 57.71 | $ 54.00 | $ 55.07 |
| Low | 41.22 | 46.17 | 39.10 | 42.80 |
| Dividends per share | $ 0.16 | $ 0.16 | $ 0.18 | $ 0.18 |

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased [1] | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs[2] | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that may yet be Purchased Under the Plans or Programs[2] |
|---|---|---|---|---|
| Oct. 1-31, 2007 | 1,497,874 | 52.16 | 1,496,000 | 36,603,355 |
| Nov. 1-30, 2007 | 3,877,808 | 50.16 | 3,868,000 | 32,735,355 |
| Dec. 1-31, 2007 | 3,064,884 | 50.82 | 3,063,000 | 29,672,355 |
| Total | 8,440,566 | | 8,427,000 | |

(1) Of this amount 13,566 represent shares tendered by employees in connection with the exercise of stock options under the Long-Term Incentive Plan.

(2) On Nov. 22, 2005, the Board of Directors authorized a share repurchase program, pursuant to which up to 50 million shares of Common Stock could be purchased through Dec. 31, 2015. On March 27, 2007, the Board of Directors amended the program and increased the number of shares that may be repurchased to 75 million, and shortened the repurchase term by five years to Dec. 31, 2010.

**Item 6. Selected Financial Data.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**FIVE-YEAR FINANCIAL REVIEW**

| | 2007 | 2006 | 2005[1] | 2004[2] | 2003[3] |
|---|---|---|---|---|---|
| | *($ in millions, except per share amounts)* | | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 9,432 | $ 9,407 | $ 8,527 | $ 7,312 | $ 6,468 |
| Railway operating expenses | 6,847 | 6,850 | 6,410 | 5,610 | 5,404 |
| Income from railway operations | 2,585 | 2,557 | 2,117 | 1,702 | 1,064 |
| Other income – net | 93 | 149 | 74 | 76 | 19 |
| Interest expense on debt | 441 | 476 | 494 | 489 | 497 |
| Income from continuing operations before income taxes and accounting changes | 2,237 | 2,230 | 1,697 | 1,289 | 586 |
| Provision for income taxes | 773 | 749 | 416 | 379 | 175 |
| Income from continuing operations before accounting changes | 1,464 | 1,481 | 1,281 | 910 | 411 |
| Discontinued operations[4] | -- | -- | -- | -- | 10 |
| Cumulative effect of changes in accounting principles, net of taxes[5] | -- | -- | -- | -- | 114 |
| Net income | $ 1,464 | $ 1,481 | $ 1,281 | $ 910 | $ 535 |
| **PER SHARE DATA** | | | | | |
| Income from continuing operations before accounting changes – basic | $ 3.74 | $ 3.63 | $ 3.17 | $ 2.31 | $ 1.05 |
| – diluted | $ 3.68 | $ 3.57 | $ 3.11 | $ 2.28 | $ 1.05 |
| Net income – basic | $ 3.74 | $ 3.63 | $ 3.17 | $ 2.31 | $ 1.37 |
| – diluted | $ 3.68 | $ 3.57 | $ 3.11 | $ 2.28 | $ 1.37 |
| Dividends | $ 0.96 | $ 0.68 | $ 0.48 | $ 0.36 | $ 0.30 |
| Stockholders' equity at year end | $ 25.64 | $ 24.19 | $ 22.63 | $ 19.92 | $ 17.83 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 26,144 | $ 26,028 | $ 25,859 | $ 24,748 | $ 20,596 |
| Total long-term debt, including current maturities[6] | $ 6,368 | $ 6,600 | $ 6,930 | $ 7,525 | $ 7,160 |
| Stockholders' equity | $ 9,727 | $ 9,615 | $ 9,276 | $ 7,977 | $ 6,976 |
| **OTHER** | | | | | |
| Capital expenditures | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 |
| Average number of shares outstanding (thousands) | 389,626 | 405,988 | 404,170 | 394,201 | 389,788 |
| Number of stockholders at year end | 36,955 | 38,900 | 48,180 | 51,032 | 52,091 |
| Average number of employees: | | | | | |
| Rail | 30,336 | 30,079 | 29,851 | 28,057 | 28,363 |
| Nonrail | 470 | 462 | 443 | 418 | 390 |
| Total | 30,806 | 30,541 | 30,294 | 28,475 | 28,753 |

1 2005 provision for income taxes includes a $96 million benefit related to the reduction of NS' deferred income tax liabilities resulting from tax legislation enacted by Ohio. This benefit increased net income by $96 million, or 23 cents per diluted share.

2 2004 other income – net includes a $40 million net gain from the Conrail Corporate Reorganization. This gain increased net income by $40 million or 10 cents per diluted share.

3 2003 operating expenses include a $107 million charge for a voluntary separation program. Other income – net includes an $84 million charge to recognize the impaired value of certain telecommunications assets. These charges reduced net income by $119 million, or 30 cents per diluted share.

4 2003 discontinued operations relate to the 1998 sale of the common stock of motor carrier subsidiary, North American Van Lines, Inc. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per diluted share, resulting from resolution of tax issues related to the transaction.

5 2003 net income reflects two accounting changes, the cumulative effect of which increased net income by $114 million, or 29 cents per diluted share: a change in accounting for the cost to remove railroad crossties, which increased net income by $110 million, and a change in accounting related to a special-purpose entity that leases certain locomotives to NS, which increased net income by $4 million.

6 2003 long-term debt excludes notes payable to Conrail of $716 million.

See accompanying Consolidated Financial Statements and notes thereto.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Norfolk Southern Corporation and Subsidiaries**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Selected Financial Data.

## OVERVIEW

NS' 2007 results reflected softness in the overall economy that resulted in reduced traffic volumes. Despite this, railway operating revenues increased slightly as improved average revenue per unit offset the volume declines. Railway operating expenses were about even, resulting in a railway operating ratio (a measure of the amount of revenues consumed by operating expenses) of 72.6%, which improved modestly from 2006.

Cash provided by operating activities exceeded $2 billion for the third consecutive year and, along with a reduction in cash and short-term investment balances, provided funding for increased capital expenditures, significant share repurchases and higher dividends.

Looking ahead, NS expects revenues to continue to grow, reflecting higher average revenue per unit and modestly higher traffic volume, particularly later in 2008 provided the overall economy improves. NS plans to continue to improve service and maintain a market-based approach to pricing.

During 2007, NS purchased and retired 23.6 million shares of NS common stock at a total cost of $1.2 billion under the share repurchase program approved by the Board of Directors on Nov. 22, 2005. The Board of Directors amended the program in March 2007 and authorized the repurchase of up to 75 million shares of NS common stock through Dec. 31, 2010. In total, NS has purchased and retired 45.3 million shares under this program at a total cost of $2.2 billion.

## SUMMARIZED RESULTS OF OPERATIONS

### 2007 Compared with 2006

Net income in 2007 was $1.5 billion, down $17 million, or 1%, compared with 2006. Diluted earnings per share were $3.68, up $0.11, or 3%, reflecting fewer shares outstanding as a result of NS' share repurchase program (see Note 13). The decrease in net income was primarily due to higher income taxes and lower non-operating items that offset higher income from railway operations. Railway operating revenues increased $25 million, as higher average revenue per unit overshadowed lower traffic volumes. Railway operating expenses decreased $3 million, principally due to lower volume-related expenses that offset higher fuel expense.

### 2006 Compared with 2005

Net income in 2006 was $1.5 billion, or $3.57 per diluted share, up $200 million, or 16%, compared with $1.3 billion, or $3.11 per diluted share, in 2005. The increase in net income was primarily due to higher income from railway operations, offset in part by the absence of the $96 million income tax benefit recorded in 2005 because of Ohio tax law changes (see Note 3). Railway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase, and modestly higher traffic volume. Railway operating expenses rose $440 million, or 7%, principally due to higher fuel prices and increased compensation and benefit costs.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $9.4 billion in 2007 and 2006, and $8.5 billion in 2005. The following table presents a three-year comparison of revenues, volume and average revenue per unit by market group.

| | Revenues | | | Units | | | Revenue per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| | ($ in millions) | | | (in thousands) | | | ($ per unit) | | |
| Coal | $ 2,315 | $ 2,330 | $ 2,115 | 1,699.4 | 1,760.0 | 1,735.4 | $ 1,363 | $ 1,324 | $ 1,219 |
| General merchandise: | | | | | | | | | |
| Chemicals | 1,166 | 1,079 | 978 | 426.7 | 426.4 | 442.1 | 2,732 | 2,530 | 2,212 |
| Metals/construction | 1,149 | 1,168 | 978 | 783.6 | 835.3 | 794.2 | 1,467 | 1,398 | 1,231 |
| Agr./cons. prod./govt. | 1,047 | 994 | 832 | 601.5 | 594.1 | 571.8 | 1,740 | 1,673 | 1,454 |
| Automotive | 974 | 974 | 997 | 533.0 | 561.9 | 615.9 | 1,827 | 1,734 | 1,620 |
| Paper/clay/forest | 860 | 891 | 801 | 428.1 | 466.7 | 472.2 | 2,010 | 1,909 | 1,697 |
| General merchandise | 5,196 | 5,106 | 4,586 | 2,772.9 | 2,884.4 | 2,896.2 | 1,874 | 1,770 | 1,583 |
| Intermodal | 1,921 | 1,971 | 1,826 | 3,120.7 | 3,256.5 | 3,154.9 | 615 | 605 | 579 |
| Total | $ 9,432 | $ 9,407 | $ 8,527 | 7,593.0 | 7,900.9 | 7,786.5 | $ 1,242 | $ 1,191 | $ 1,095 |

Revenues increased $25 million in 2007 and $880 million in 2006. Automotive revenue in 2007 included $26 million related to a contract volume settlement. As shown in the following table, the increase in 2007 was due to higher average revenue per unit that more than offset decreased traffic volumes, whereas the improvement in 2006 was the result of increased average revenue per unit and higher traffic volumes.

**Revenue Variance Analysis**
Increases

| | 2007 vs. 2006 | 2006 vs. 2005 |
|---|---|---|
| | ($ in millions) | |
| Revenue per unit/mix | $ 392 | $ 755 |
| Traffic volume (units) | (367) | 125 |
| Total | $ 25 | $ 880 |

Both comparisons reflect large increases in average revenue per unit, a result of higher rates. In 2006 about 40% of the revenue increase was attributable to higher fuel surcharges. Traffic volume decreased in 2007, reflecting declines in all commodity groups except agriculture/consumer products/government, and chemicals. In 2006, traffic volume rose 1%, principally due to higher intermodal and metals/construction shipments.

On January 26, 2007, the Surface Transportation Board (STB) issued a decision that the type of fuel surcharge imposed by NS and most other large railroads – a fuel surcharge based on a percentage of line haul revenue – would no longer be permitted for regulated traffic that moves under public (tariff) rates. The STB gave the railroads a 90-day transition period to adjust their fuel surcharge programs. During the second quarter, NS discontinued assessing fuel surcharges on its published (non-intermodal) public rates. Future adjustments to public prices will reflect ongoing market conditions. NS does not expect that compliance with the new STB regulations will have a material effect on its financial condition, results of operations or liquidity. The traffic moving under these tariffs and public quotes comprised less than 10% of Norfolk Southern's total revenue base.

**COAL** revenues decreased $15 million, or 1%, compared with 2006, as a 2% reduction in tonnage handled more than offset a 3% increase in average revenue per unit. Carloads declined 3%, a higher percentage than the change in tonnage handled because of increased average tonnage per car. Coal represented 25% of NS' revenues in 2007, and 78% of shipments handled originated on NS' lines. As shown in the following table, decreased shipments of utility and domestic metallurgical coal more than offset higher export and industrial shipments.

**Total Coal, Coke and Iron Ore Tonnage**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *(Tons in thousands)* | |
| Utility | 142,734 | 148,078 | 142,522 |
| Domestic metallurgical | 17,873 | 20,878 | 20,076 |
| Export | 15,564 | 12,409 | 14,531 |
| Industrial | 9,794 | 9,202 | 9,524 |
| Total | 185,965 | 190,567 | 186,653 |

Coal revenues in 2006 increased $215 million, or 10%, compared with 2005, which reflected higher average revenue per unit and slightly higher traffic volume. Coal average revenue per unit was up 9% compared with 2005, reflecting increased fuel surcharges and higher rates, tempered by the absence of a $55 million benefit from coal rate settlements in the second quarter of 2005. Coal represented 25% of NS' revenues in 2006, and 79% of shipments handled originated on NS' lines. Traffic volumes rose 1%, primarily because of increased shipments of utility and domestic metallurgical coal that offset lower export and iron ore shipments.

NS is currently involved in litigation with Virginia Electric and Power Company/Old Dominion Electric Cooperative (Virginia Power) regarding rate adjustment provisions in a transportation contract between them. During the second quarter of 2007, the Virginia Supreme Court issued a decision that remanded the case to the trial court on the grounds that neither of its prior decisions constituted a final order. Future developments and the ultimate resolution of this matter could result in NS recognizing additional revenues related to this dispute, which could have a favorable impact on results of operations in a particular year or quarter.

**Utility coal** tonnage decreased 4%, compared with 2006, reflecting high stockpile levels (particularly in the Southeast) that led to reduced shipments, despite fairly strong electric generation (up 4%) in the NS service region. In addition, the temporary closure of a major coal mine as well as the loss of business to barge transportation contributed to the decline.

In 2006, utility coal tonnage increased 4%, compared with 2005, reflecting the rebuilding of stockpiles by customers, more shipments from the Powder River Basin in the West and higher shipments of import coal through Charleston, SC.

A number of evolving environmental issues could affect the utility coal market. These include potential regional programs aimed at capping and reducing power plant $CO_2$ emissions, and ongoing efforts at addressing climate change. In response to changes in environmental regulations, certain utilities have begun adding or are planning to add emissions control technologies to their electric generating units, allowing them to utilize their existing coal-fired power plants.

In 2008, demand for utility coal is expected to be mixed, with declining utility inventories in the Northeast stimulating growth but above normal stockpiles in the Southeast mitigating the growth.

**Domestic metallurgical** coal, coke and iron ore tonnage decreased 14% in 2007 compared with 2006. The decrease was primarily due to coke furnace outages, mine production outages and reduced spot iron ore traffic.

Domestic metallurgical coal, coke and iron ore tonnage increased 4% in 2006 compared with 2005. The increase was driven by higher domestic metallurgical coal and coke shipments in the first half of the year in response to steel-making demand, which more than offset a decline in iron ore volume caused by the shutdown of a blast furnace at a major customer location.

In 2008, domestic metallurgical coal, coke and iron ore demand is expected to be comparable to 2007 for the first half of the year; however, demand is expected to increase in the second half due to plant expansions.

**Export coal** tonnage in 2007 increased 25% compared to 2006, primarily due to increased demand reflecting a lower valued dollar as well as loading delays at Australian ports. Norfolk volume increased by approximately 26,000 cars, or 25%, and Baltimore volume was up approximately 4,500 cars, or 19%.

In 2006, export coal tonnage decreased 15% compared to 2005, reflecting weaker demand for U.S. coal as Europe and Asia continued to increase purchases from other countries. Baltimore volume was down approximately 13,500 cars, or 37%, and Norfolk volume declined by approximately 3,000 cars, or 3%.

In 2008, export coal tonnage is expected to increase, reflecting increased global demand.

**Other coal** tonnage (principally steam coal shipped to industrial plants) increased 6% versus 2006, primarily due to new business and stronger demand. In 2006, other coal tonnage decreased 3% versus 2005, primarily due to plant closures and mine production problems.

**GENERAL MERCHANDISE** revenues increased $90 million, or 2%, in 2007 compared with 2006, as a 6% increase in average revenue per unit, reflecting continued market-based pricing in all groups, more than offset a 4% decline in traffic volume. Revenue in 2007 included $26 million related to a volume-related contract settlement with an automotive customer.

In 2006, general merchandise revenues increased $520 million, or 11%, compared with 2005, as all market groups posted higher average revenue per unit driven by increased rates and fuel surcharges. Traffic volume declined slightly as improved metals and construction and agriculture volumes were offset by declines in the other business groups.

**Chemicals** revenue increased 8% compared with 2006, reflecting higher rates in all groups. Traffic volume rose modestly as more shipments of industrial intermediates offset fewer shipments in the petroleum, miscellaneous chemicals and plastics markets, which continued to reflect weakness in housing-related demand.

In 2006, chemicals revenues increased 10%, despite a 4% drop in traffic volume, reflecting increased rates and fuel surcharges. Petroleum, industrial and plastics traffic volumes were down as a result of lower inventories arising from post-Katrina conditions, the closure of several plants on NS lines and the weaker housing and automotive markets.

In 2008, chemicals revenue is expected to improve, principally due to increased average revenue per unit as volumes are expected to be comparable to 2007.

**Metals and construction** revenue decreased 2% in 2007 as a 5% increase in average revenue per unit that resulted from higher rates was more than offset by the effects of a 6% decrease in traffic volume. The decline in volume was principally due to lower iron, steel and coil shipments and reduced demand for construction materials, both reflecting the soft automotive and housing sectors.

In 2006, metals and construction revenue increased 19% and traffic volume increased 5% compared with 2005 as declines in the fourth quarter were offset by higher volumes through the rest of the year. Revenue per unit rose

14% because of increased rates and fuel surcharges. The increase in traffic volume was driven primarily by higher import slab business to NS-served steel mills, more scrap metal shipments and higher sand, gravel and cement traffic for commercial and highway construction projects.

In 2008, metals and construction revenues are expected to grow as a result of higher traffic volumes, principally due to new business, and improved average revenue per unit. However, growth could be somewhat dampened by the continued softness of the automotive and housing markets.

**Agriculture, consumer products and government** revenue increased 5% in 2007 compared with 2006. The revenue improvement resulted from higher average revenue per unit, which reflected higher rates. Traffic volume rose modestly as more corn, fertilizer and ethanol shipments were mitigated by less government and consumer product volume.

In 2006, agriculture, consumer products and government revenue increased 19% and traffic volume increased 4% compared with 2005. Average revenue per unit rose 15%, a result of higher rates and fuel surcharges. Traffic volume growth resulted from increased ethanol, military and corn shipments. Military traffic growth was primarily due to the continued support of military operations in Iraq.

Agriculture revenue is expected to continue to grow in 2008, benefiting from increasing demand for biofuel products including corn, soybeans and ethanol, as well as higher rates. However, lower volumes in consumer products are expected to partially offset this growth.

**Automotive** revenues were flat in 2007 compared with 2006 as lower traffic volumes offset higher average revenue per unit. Revenue in 2007 included a $26 million volume-related contract settlement. Volume decreased 5%, reflecting softness in demand for vehicles as well as parts, and the closure in June 2007 of an NS-served plant.

In 2006, automotive revenues declined 2% compared with 2005 as lower volumes offset increased average revenue per unit, including fuel surcharges. Volume decreased 9% primarily due to substantial production cuts at Ford, General Motors and Daimler-Chrysler assembly plants, including two NS-served plant closures at Ford and one at General Motors during 2006. Reduced production at Honda and BMW also contributed to the volume decrease.

For 2008, automotive revenues are expected to be lower, reflecting continued production cutbacks and weak demand.

**Paper, clay and forest products** revenue decreased 3% in 2007 compared with 2006 as the effects of higher average revenue per unit were more than offset by an 8% decrease in traffic volume reflecting the continued housing slowdown and decline in conventional paper markets.

In 2006, paper, clay and forest products revenue increased 11% compared with 2005 due to higher average revenue per unit, including fuel surcharges, despite a 1% decrease in traffic volume. Higher solid waste and debris traffic, and growth in traffic from the import of printing paper, partially offset reduced pulp and pulp board shipments.

In 2008, paper, clay and forest products revenues are expected to be about even as growth in waste and debris transportation and higher revenue per unit are expected to be tempered by continued weakness in housing-related markets.

**INTERMODAL** revenues decreased $50 million, or 3%, compared with 2006, as a 4% reduction in traffic volumes offset a 2% increase in average revenue per unit. Truckload volume decreased 10% compared with

2006 and domestic intermodal marketing companies (IMC) volume declined 4%. Traffic volume for Triple Crown Services Company (Triple Crown), a service with rail-to-highway trailers, dropped 3%. The declines for truckload, IMC and Triple Crown were primarily due to lower national demand for dry van shipments resulting from continued weakness in the housing and automotive markets and increased over-the-road competition. International traffic volume decreased 4% reflecting reduced shipments of empty containers and less inland rail transportation of West Coast port traffic, which offset volume growth from East Coast port traffic. Premium business, which includes parcel and LTL (less-than-truckload) carriers, was up 2% reflecting gains in parcel shipments that offset modest declines in LTL shipper traffic.

In 2006, intermodal revenues increased $145 million, or 8%, compared with 2005, largely because of higher fuel surcharges, increased rates and improved traffic volume. Traffic volume for the year rose 3% notwithstanding a 3% decline in the fourth quarter. Truckload volume increased 8% reflecting continued expansion of business with traditional truckload companies. IMC volume declined 9%, a result of declines in the housing, construction and automotive markets. Triple Crown Services Company had flat volume compared with 2005 as higher consumer product shipments were offset by weaker automotive-related shipments. International traffic volume rose 9% reflecting growth in imported goods from Asia and exported goods through NS-served East Coast ports, as well as West Coast ports. Premium business was down 3% as lower LTL shipper traffic offset modest gains in parcel shipments. Intermodal revenue per unit increased 4%, principally a result of higher fuel surcharges as well as increased rates and longer-haul international traffic, which was offset in part by the ongoing shift of shipments from higher revenue per unit, rail-provided assets (trailers and containers) to lower revenue per unit shipments in shipper-provided equipment.

For 2008, intermodal revenue is expected to show improvement bolstered by higher average revenue per unit and modest improvement in volumes.

**Railway Operating Expenses**

Railway operating expenses in 2007 were $6.8 billion, about even with expenses in 2006, which were up $440 million compared to 2005. The 2007 comparison reflected volume-related decreases offset by higher fuel expense. The increase in 2006 was due to higher fuel prices and increased compensation and benefits.

The railway operating ratio, which measures the percentage of railway operating revenues consumed by railway operating expenses, improved to 72.6% in 2007, compared with 72.8% in 2006 and 75.2% in 2005.

The following table shows the changes in railway operating expenses summarized by major classifications (prior year amounts have been reclassified to conform to the current year presentation).

**Operating Expense Variances**
Increases (Decreases)

| | 2007 vs. 2006 | 2006 vs. 2005 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits | $ (85) | $ 144 |
| Purchased services and rents | (27) | 31 |
| Fuel | 74 | 274 |
| Depreciation | 37 | (36) |
| Materials and other | (2) | 27 |
| Total | $ (3) | $ 440 |

**Compensation and benefits**, which represents 37% of total railway operating expenses, decreased $85 million, or 3%, compared with 2006, primarily due to lower incentive compensation (down $48 million), lower volume-related payroll (down $37 million), the absence of the prior year retirement and waiver agreements with former executives as well as the cost of the regular stock-based grant to the former Chief Executive Officer ($24 million), lower stock-based compensation (down $13 million), and lower payroll taxes (down $12 million), that were partially offset by increased wage rates (up $27 million) and higher medical costs (up $27 million).

In 2006, compensation and benefits increased $144 million, or 6%, compared with 2005. Expenses in 2006 included the effect of the implementation of Statement of Accounting Standards No. 123(R) "Share-Based Payment," which increased stock-based compensation expense by $27 million. Most of the increase was reflected in the first quarter which included the effect of accelerated recognition of costs related to grants to retirement-eligible employees. The remaining increase was attributable to increased salaries and wages (up $44 million), higher health and welfare benefit costs (up $29 million), retirement and waiver agreements entered into in the first quarter as well as the cost of the regular stock-based grant to the former chief executive officer who retired (up $24 million), and higher payroll taxes (up $17 million).

NS employment averaged 30,806 in 2007 compared with 30,541 in 2006 and 30,294 in 2005. The increased number of employees was almost exclusively in operating department personnel to meet service needs, as well as to prepare for expected retirements. NS continues to hire and train additional workers in order to meet the requirements of forecasted volumes in light of the demographics of its work force.

**Purchased services and rents** includes the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads and the net cost of equipment rentals. This category of expenses decreased $27 million, or 2%, in 2007 compared to 2006, but increased $31 million, or 2%, in 2006 compared to 2005. The decline in 2007 was principally due to lower equipment rents, while the 2006 increase reflected increased maintenance activities.

Purchased services costs were $1,172 million in 2007, $1,165 million in 2006 and $1,142 million in 2005. In 2007, higher expenses for maintenance activities were largely offset by volume-related declines. The increase in 2006 reflected higher intermodal volume-related expenses.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners less the rent paid to NS for the use of its equipment, amounted to $379 million, $413 million and $405 million for 2007, 2006 and 2005, respectively. The decrease in 2007 was principally due to lower shipment volumes. The increase in 2006 was primarily due to a reduction in rents received on automotive equipment as a result of decreased shipments.

**Fuel** expense, which includes the cost of locomotive fuel as well as other fuel used in railway operations, increased $74 million, or 7%, in 2007 compared with 2006, and increased $274 million, or 33%, in 2006 compared with 2005. Fuel expense is recorded net of hedge benefits, although there have been no such benefits since May 2006 when the program wound down (see "Market Risks and Hedging Activities," below and Note 16). The increase in 2007 reflected a 9% increase in the price per gallon of locomotive fuel as well as the absence of hedge benefits offset in part by a 4% decline in consumption. Expense in 2006 included hedge benefits of $20 million compared with benefits of $148 million in 2005, and reflected a 13% rise in the average price per gallon with a 1% increase in consumption.

Legislation enacted in the first quarter of 2005 repealed the 4.3 cents per gallon excise tax on railroad diesel fuel for 2007, with the following phased reductions in 2005 and 2006: 1 cent per gallon from Jan. 1, 2005 through June 30, 2005; 2 cents per gallon from July 1, 2005 through Dec. 31, 2006; and by the full 4.3 cents thereafter. NS consumes about 500 million gallons of locomotive diesel fuel per year.

**Depreciation** expense increased $37 million, or 5%, in 2007 compared to 2006, but decreased $36 million, or 5%, in 2006 compared with 2005. In both years, substantial capital investments and improvements resulted in higher depreciation expense. The net decrease in 2006 reflected the results of an equipment depreciation study and an analysis of the assets received in the Conrail Corporation Reorganization completed in 2006.

**Materials and other** expenses (including the estimates of costs related to personal injury, property damage and environmental matters) decreased $2 million in 2007 compared with 2006, but increased $27 million, or 3%, in 2006 compared to 2005, as shown in the following table.

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Materials | $ 359 | $ 346 | $ 315 |
| Casualties and other claims | 171 | 220 | 224 |
| Other | 270 | 236 | 236 |
| | $ 800 | $ 802 | $ 775 |

The decline in 2007 was primarily due to lower derailment and personal injury costs, offset in part by higher property and other taxes, and increased materials costs for maintenance activities.

The increase in 2006 reflected increased locomotive and freight car repair costs due to more maintenance activity related to higher usage from increased traffic volumes coupled with the age of the fleet, as well as higher expenses arising from derailments and insurance costs. These increases were partially offset by the absence of $38 million of costs associated with the 2005 derailment in Graniteville, South Carolina, and an unfavorable jury verdict in an employee injury case.

In 2005, NS recorded a liability related to the Jan. 6, 2005 derailment in Graniteville, SC. The liability, which includes a current and long-term portion, represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheets reflect a current and long-term receivable for estimated recoveries from NS' insurance carriers. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss previously recorded. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention.

The largest component of casualties and other claims expense is personal injury costs. Cases involving occupational injuries comprised about 60% of total employee injury cases resolved and about 40% of total payments made. With its long-established commitment to safety, NS continues to work actively to eliminate all employee injuries and to reduce the associated costs. With respect to occupational injuries, which are not caused by a specific accident or event but result from a claimed exposure over time, the benefits of any existing safety initiatives may not be realized immediately. These types of claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades.
The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS maintains substantial amounts of insurance for potential third-party liability and property damage claims. It also retains reasonable levels of risk through self-insurance (see Note 17). NS expects insurance costs to be slightly higher in 2008.

**Other Income – Net**

Other income – net was $93 million in 2007, $149 million in 2006 and $74 million in 2005 (see Note 2). The decrease in 2007 reflected lower interest income ($31 million), higher expenses associated with synthetic fuel-related tax credit investments ($15 million) and lower returns from corporate-owned life insurance ($15 million) that combined to offset higher equity in earnings of Conrail ($20 million).

NS has membership interests representing ownership in companies that owned and operated facilities that produced synthetic fuel from coal. In addition, NS purchased two facilities that produced synthetic fuel from coal in 2007. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are recorded as a component of "Other income – net," and the tax credits, as well as tax benefits related to the expenses, are reflected in "Provision for income taxes" (see discussion below).

Results in 2006 reflected lower expense associated with tax credit investments primarily due to synthetic fuel related investments, greater interest income, and higher returns from corporate-owned life insurance, that were partially offset by lower equity in Conrail earnings.

**Income Taxes**

Income tax expense in 2007 was $773 million for an effective rate of 35%, compared with effective rates of 34% in 2006 and 25% in 2005. The increase in the rate for 2007 largely resulted from Illinois tax legislation which increased deferred taxes by $19 million (see Note 3). The increase in the rate for 2006 was primarily due to the absence of an Ohio tax law change that lowered the effective rate in 2005 as well as fewer tax credits from synthetic fuel-related investments. Synthetic fuel tax credits were available through the end of 2007.

Synthetic fuel credits are subject to reduction if the Reference Price of a barrel of oil for the year falls within an inflation-adjusted phase-out range specified by the tax code. The Reference Price for a year is the annual average wellhead price per barrel of unregulated domestic crude oil as determined by the Secretary of the Treasury by April 1 of the following year. In 2006, the phase-out range was $55.06 to $69.12, and the phase-out range is adjusted annually for inflation. While NS cannot predict with certainty the Reference Price for the year, NS estimated a 66% phase-out of synthetic fuel credits in 2007 based on actual oil prices during the year.

Net income in 2007 reflects $5 million less in net benefits from these credits, as compared with the same period of 2006, as shown below:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Effect in "Other income – net:" | | | |
| Expenses on synthetic fuel related investments | $ 77 | $ 62 | $ 102 |
| Effect in "Provision for income taxes:" | | | |
| Tax credits | 60 | 56 | 98 |
| Tax benefit of expenses on synthetic fuel related investments | 30 | 24 | 40 |
| Total reduction of income tax expense | 90 | 80 | 138 |
| Effect in "Net income:" | | | |
| Net benefit from synthetic fuel related investments | $ 13 | $ 18 | $ 36 |

The tax credits generated by NS' synthetic fuel related investments, which reduced the effective tax rate by 3% in 2007 and 2006, and 6% in 2005, expired at the end of 2007 and, accordingly, the effective tax rate is expected to increase in 2008 (see Note 3).

NS' consolidated federal income tax returns for 2004 and 2005 are being audited by the Internal Revenue Service (IRS). The IRS completed its examination of the 2002 and 2003 consolidated federal income tax returns during the third quarter of 2006 and NS has appealed certain adjustments proposed by the IRS. The results of the examination had a negligible effect on the effective tax rate.

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

**Cash provided by operating activities,** NS' principal source of liquidity, was $2.3 billion in 2007, compared with $2.2 billion in 2006 and $2.1 billion in 2005. The improvement in 2007 resulted from favorable changes in working capital as well as the modest improvement in income from railway operations. In 2006, higher income from railway operations was partially offset by higher income tax payments. NS had a working capital deficit of $273 million at Dec. 31, 2007, compared with working capital of $307 million at Dec. 31, 2006. The change was largely the result of reduced cash and short-term investments that were used to repurchase stock. NS expects that cash on hand combined with cash flow provided by operating activities will be sufficient to meet its ongoing obligations. NS' cash, cash equivalents and short-term investment balances totaled $206 million and $918 million at Dec. 31, 2007 and 2006, respectively.

**Contractual obligations** at Dec. 31, 2007, comprised of NS' long-term debt (including capital leases) (see Note 7), operating leases (see Note 8), agreements with CRC (see Note 4), unconditional purchase obligations (see Note 17), long-term advances from Conrail (see Note 4) and unrecognized tax benefits (see Note 3) were as follows:

| | | | Payments Due By Period | | | |
|---|---|---|---|---|---|---|
| | **Total** | **2008** | **2009-2010** | **2011-2012** | **2013 and Subsequent** | **Other** |
| | | | *($ in millions)* | | | |
| Long-term debt and capital lease principal | $ 6,368 | $ 369 | $ 817 | $ 369 | $ 4,813 | $ -- |
| Operating leases | 937 | 138 | 243 | 151 | 405 | -- |
| Agreements with CRC | 457 | 28 | 56 | 56 | 317 | -- |
| Unconditional purchase obligations | 298 | 201 | 97 | -- | -- | -- |
| Unrecognized tax benefits* | 167 | 36 | -- | -- | -- | 131 |
| Long-term advances from Conrail | 133 | -- | -- | -- | 133 | -- |
| Total | $ 8,360 | $ 772 | $ 1,213 | $ 576 | $ 5,668 | $ 131 |

* When the amount and timing of liabilities for unrecognized tax benefits can be reasonably estimated, the amount is shown in the table under the appropriate period. When the year of settlement cannot be reasonably estimated, the amount is shown in the Other column.

**Off balance sheet arrangements** consist of obligations related to operating leases, which are included in the table of contractual obligations above and disclosed in Note 8.

**Cash used for investing activities** was $1 billion in 2007, compared with $684 million in 2006 and $1.8 billion in 2005. The increase in 2007 primarily reflected lower net proceeds from short-term investment sales and purchases and increased property additions. The decrease in 2006 reflected higher proceeds from short-term investment sales, principally to fund share repurchases reflected in financing activities, offset in part by the $100 million investment in Meridian Speedway LLC (MSLLC) (see discussion below) and increased property additions.

Property additions account for most of the recurring spending in this category. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road and other property | $ 894 | $ 756 | $ 741 | $ 612 | $ 502 |
| Equipment | 447 | 422 | 284 | 429 | 218 |
| Total | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 |

**Track Structure Statistics (Capital and Maintenance)**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Track miles of rail installed | 401 | 327 | 302 | 246 | 233 |
| Miles of track surfaced | 5,014 | 4,871 | 4,663 | 5,055 | 5,105 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.5 | 2.5 | 2.8 |

**Average Age of Owned Railway Equipment**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | | | *(years)* | | |
| Freight cars | 30.1 | 30.0 | 29.4 | 28.6 | 27.8 |
| Locomotives | 18.1 | 17.7 | 17.4 | 16.9 | 15.3 |
| Retired locomotives | 30.0 | 35.0 | 27.4 | 22.9 | 28.7 |

For 2008, NS has budgeted $1.43 billion for capital expenditures. The anticipated spending includes $613 million for rail, crosstie, ballast and bridge programs, and $339 million is provided for infrastructure and expansion investments, including increased mainline capacity, track upgrades and expansions to accommodate new customers or traffic and large network public/private partnership investments such as the Heartland Corridor and Chicago CREATE programs (see discussion below). Norfolk Southern expects to spend approximately $143 million on intermodal terminals and equipment to add capacity to the intermodal network, increased access and capacity for coal and merchandise traffic, and bulk transfer facilities. Planned equipment spending of $264 million provides $119 million for locomotives, including the purchase of 15 new units and continued spending on improvements to the locomotive fleet. Approximately $145 million will be spent on freight cars, including the acquisition of 1,330 new higher capacity coal cars as part of a multi-year program to replace the existing coal car fleet, the purchase of 321 freight cars upon their lease expiration, 163 multi-level automobile racks and improvements to multi-level racks. Norfolk Southern also expects to spend $66 million related to computers, systems and information technology. NS expects to make all of its capital expenditures with internally generated funds.

The Meridian Speedway is a 320 mile rail line between Meridian, Mississippi and Shreveport, Louisiana. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture (MSLLC) pursuant to which NS expects to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. To date, NS has contributed $240 million. At the formation of MSLLC, KCS contributed the Meridian Speedway. NS is recognizing its pro rata share of the joint venture's earnings or loss as required under the equity method of accounting. NS' total investment in MSLLC is supported by the fair value of the rail line as well as intangible assets obtained through the transaction. The joint venture is expected to increase capacity and improve service over the Meridian Speedway into the Southeast.

The Heartland Corridor is a package of proposed clearance improvements and other facilities that will create a seamless high-capacity intermodal route across Virginia and West Virginia to Midwest markets. During 2006, with respect to the tunnel clearance component of the Heartland Corridor, NS and the states of Ohio, West Virginia and Virginia each entered into a Memorandum of Agreement with the Federal Highway Administration that governs the release of up to $95 million in authorized federal funding. In 2006, NS also entered into agreements with two states governing the use of up to $11 million in state funding for the Heartland Corridor rail double-stack clearance project. NS expects to spend about $60 million in connection with this project. NS began work on the Heartland Corridor tunnel clearances in October 2007 and the entire project is expected to be completed by 2010.

The Chicago Region Environmental and Transportation Efficiency (CREATE) project is a public-private partnership to reduce rail and highway congestion and add freight and passenger capacity in the metropolitan Chicago area. NS and other railroads have agreed to participate in CREATE. A portion of the public funding has been approved and the parties have developed a list of projects to be included in Phase I of the project. A total of $100 million in public funding has been secured for Phase I and the railroads have contributed an additional $100 million. The railroads expect to complete Phase I over the next three years. As currently planned, the total project is estimated to cost $1.5 billion with city, state and federal support. If additional public funding is secured, the railroads are expected to contribute a total of $232 million towards the entire project with NS' share slated to be $34 million.

**Cash used for financing activities** was $1.6 billion in 2007, compared with $1.3 billion in 2006 and $456 million in 2005. The increases reflected higher share repurchases as a part of NS' ongoing share repurchase program (see Note 13), as well as higher debt repayments and increased dividend payments. Financing activities in 2007 include $250 million of proceeds from NS' receivable securitization facility (see Note 7).

Share repurchases totaled $1.2 billion in 2007 and $964 million in 2006 for the purchase and retirement of 23.6 million shares and 21.7 million shares, respectively, of common stock as part of NS' ongoing share repurchase program. In March 2007, NS' Board of Directors amended NS' share repurchase program by increasing the authorized amount of share repurchases from 50 million to 75 million shares and shortening the authorized period from 2015 to 2010. The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. To date, almost all of the purchases under the program have been made with internally generated cash. However, future funding sources are expected to include proceeds from the issuance of debt, including the use of the receivable securitization program (see Note 7). Dependent on economic and market conditions, NS expects to purchase and retire a similar amount of shares in 2008.

NS has in place and available a $1 billion, five-year credit agreement expiring in 2012, which provides for borrowings at prevailing rates and includes financial covenants. There were no amounts outstanding under this facility at Dec. 31, 2007, and NS is in compliance with all of the financial covenants. NS also has in place two shelf registration statements on Form S-3 filed with the SEC in March 2001 and September 2004 under which up to $700 million of additional debt or equity securities could be issued (see Note 7).

Looking forward, NS expects to refinance maturing debt over the next several years and modestly increase current debt levels. Overall, NS' goal is to maintain a capital structure with appropriate leverage to support NS' business strategy and provide flexibility through business cycles.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to change them. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment and other factors that management believes to be reasonable under the circumstances. Management regularly discusses the development, selection and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors. There have been no significant changes to the Application of Critical Accounting Estimates disclosure contained in NS' Form 10-K as of Dec. 31, 2007, with the exception of the adoption of Financial Accounting Standards Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes," which is discussed below in "New Accounting Pronouncements" and in Note 3.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 10). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market performance). Management utilizes an independent consulting actuarial firm's studies to assist it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Statements of Income, was $40 million for the year ended Dec. 31, 2007. In recording this amount, NS assumed a long-term investment rate of return of 9%. Investment experience of the pension fund over the past 10-, 15- and 20-year periods has been a rate of return in excess of 10% and supports the current rate of return assumption. A one percentage point change to this rate of return assumption would result in a $19 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings and mortality would not be expected to have a material effect on NS' net pension benefit or net pension asset in the future. The net pension asset is recorded at its net present value using a discount rate that is based on the current interest rate environment in light of the timing of expected benefit payments. In 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. Previously, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $76 million for the year ended Dec. 31, 2007. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other postretirement benefits" as disclosed in Note 10,

management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 10.

**Properties and Depreciation**

Most of NS' total assets are comprised of long-lived railway properties (see Note 5). As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. In developing these assumptions, NS' management utilizes periodic depreciation studies that are performed by an outside firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' depreciation expense for the year ended Dec. 31, 2007, amounted to $775 million. NS' weighted-average depreciation rates for 2007 are disclosed in Note 5; a one-tenth percentage point increase (or decrease) in these rates would have resulted in a $27 million increase (or decrease) to NS' depreciation expense.

**Personal Injury, Environmental and Legal Liabilities**

NS' expense for casualties and other claims, included in "Materials and other," amounted to $171 million for the year ended Dec. 31, 2007. Most of this expense was composed of NS' accrual related to personal injury liabilities. Job-related personal injury and occupational claims are subject to FELA, which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

To aid in valuing its personal injury liability and determining the amount to accrue during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. For employee personal injury cases, the actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. An estimate of the ultimate amount of the liability, which includes amounts for incurred but unasserted claims, is based on the results of this analysis. For occupational injury claims, the actuarial firm studies NS' history of claim filings, severity, payments and other relevant facts. Additionally, the estimate of the ultimate loss for occupational injuries includes a provision for those claims that have been incurred but not reported by projecting NS' experience into the future as far as can be reasonably determined. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study, completed in the fourth quarter of 2007, resulted in a decrease to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the ultimate liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 17). Claims, if any, against third parties for recovery of cleanup costs incurred by NS, are reflected as receivables (when collection is probable) in the Consolidated Balance Sheets and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $16 million in 2007, $19 million in 2006 and $16 million in 2005, and capital expenditures totaled approximately $7 million in 2007, $6 million in 2006 and $9 million in 2005. Capital expenditures in 2008 are expected to be comparable to those in 2007.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $46 million at Dec. 31, 2007, and $54 million at Dec. 31, 2006 (of which $12 million was accounted for as a current liability at Dec. 31, 2007 and 2006). At Dec. 31, 2007, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 155 identified locations. On that date, 13 sites accounted for $25 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 32 locations, one or more NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

Based on an assessment of known facts and circumstances, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net long-term deferred tax liability totaled $6.4 billion at Dec. 31, 2007 (see Note 3). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS had a $10 million valuation allowance on $685 million of deferred tax assets as of Dec. 31, 2007, reflecting the expectation that most of these assets will be realized.

In addition, NS has a recorded liability for its estimate of uncertain tax positions taken or expected to be taken in a tax return. Judgment is required in evaluating the application of federal and state tax laws and assessing whether it is more likely than not that a tax position will be sustained on examination and, if so, judgment is also required as to the measurement of the amount of tax benefit that will realized upon settlement with the taxing authority. Management believes this liability for uncertain tax positions to be adequate. Income tax expense is adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amounts recorded. For every one half percent change in the 2007 effective rate net income would have changed by $11 million.

**OTHER MATTERS**

**Labor Agreements**

Approximately 26,000, or about 85%, of NS' railroad employees are covered by labor agreements with various labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act (RLA). NS largely bargains in concert with other major railroads. Moratorium provisions in the labor agreements govern when the railroads and the unions may propose changes. The most recent bargaining round began in late 2004. Since that time, the railroads have finalized agreements that extend through 2009 with all of the major rail unions except the United Transportation Union (UTU) and the International Association of Machinists (IAM). A tentative agreement has been reached with the UTU that is subject to ratification by employees.

NS previously reached separate agreements with the Brotherhood of Locomotive Engineers and Trainmen (BLET) and the American Train Dispatchers Association (ATDA) through 2009. Thus, only the health and welfare provisions from the national agreements will apply to NS' locomotive engineers and ATDA-represented dispatchers. NS recently reached a tentative agreement with BLET that would have further extended its contract with that union through 2014. However, that agreement was not ratified by employees.

A tentative national agreement with IAM was not ratified by employees. Negotiations with IAM are being mediated by the National Mediation Board (NMB), a federal agency. The status quo is preserved during mediation (that is, the union may not strike and management may not change the labor agreements) while the NMB assists the parties in their efforts to reach agreement. If the NMB were to terminate mediation, it would, at that time, propose that the parties arbitrate their differences. A strike could occur 30 days thereafter if the parties did not accept arbitration. However, the President of the United States of America could then appoint an Emergency Board which would delay any strike for a further 60 days while the Board made recommendations and the parties engaged in further negotiations. The outcome of the negotiations cannot be determined at this time.

**Market Risks and Hedging Activities**

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. No new hedges have been entered into since May of 2004, and the last remaining contracts were settled in the second quarter of 2006, bringing an end to the benefits from the program. Locomotive diesel fuel costs represented 14% of NS' operating expenses for 2006 and 11% for 2005.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At Dec. 31, 2007, NS' debt subject to interest rate fluctuations totaled $413 million. A 1% point increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $4 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On Dec. 31, 2007, the average pay rate under these agreements was 5%, and the average receive rate was 7%. During 2007 and 2006, the effect of the swaps was to reduce interest expense by $1 million and $1 million, respectively. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

In September 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 157, Fair Value Measurements. This statement, effective for interim or annual reporting periods beginning after Nov. 15, 2007, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosures about fair value measurements. NS will adopt the statement in the first quarter of 2008 and expects it will not have a material effect on NS’ consolidated financial statements.

FASB Interpretation No. (FIN) 48, “Accounting for Uncertainty in Income Taxes,” issued in June 2006, clarifies accounting for uncertainty in income taxes recognized in an enterprise’s financial statements in accordance with SFAS No. 109, “Accounting for Income Taxes.” FIN 48 prescribes a recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under the guidelines of FIN 48, an entity should recognize the financial statement benefit of a tax position if it determines that it is more likely than not that the position will be sustained on examination. NS adopted this Interpretation in the first quarter of 2007 (see Notes 1 and 3).

**Inflation**

In preparing financial statements, U.S. generally accepted accounting principles require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has

most of its capital invested in such assets. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**Proposed Legislation and Regulations on Safety and Transportation of Hazardous Materials**

Regulations proposed by the Department of Homeland Security in late 2006 would mandate that railroads adopt chain of custody and security measures. If enacted, such regulations could cause service degradation and higher costs for the transportation of toxic inhalation hazard materials. In addition, certain local governments have sought to enact ordinances banning hazardous materials moving by rail within their borders. Some legislators have contemplated pre-notification requirements for hazardous material shipments. If promulgated, such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies. Accordingly, NS will oppose efforts to impose unwarranted regulation in this area.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like "believe," "expect," "anticipate" and "project." Forward-looking statements reflect management's good-faith evaluation of information currently available. However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: domestic and international economic conditions; interest rates; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; the operations of carriers with which NS interchanges; acts of terrorism or war; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; results of litigation; changes in securities and capital markets; disruptions to NS' technology infrastructure, including computer systems; and natural events such as severe weather, hurricanes and floods. For a discussion of significant risk factors applicable to NS, see Part I, Item 1A "Risk Factors." Forward-looking statements are not, and should not be relied upon as, a guarantee of future performance or results, nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. NS undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risks and Hedging Activities."

**Item 8. Financial Statements and Supplementary Data.**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K41 |
| Reports of Independent Registered Public Accounting Firm | K42 |
| Consolidated Statements of Income<br>Years ended Dec. 31, 2007, 2006 and 2005 | K44 |
| Consolidated Balance Sheets<br>As of Dec. 31, 2007 and 2006 | K45 |
| Consolidated Statements of Cash Flows<br>Years ended Dec. 31, 2007, 2006 and 2005 | K46 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended Dec. 31, 2007, 2006 and 2005 | K47 |
| Notes to Consolidated Financial Statements | K48 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K82 |

## Report of Management

Feb. 15, 2008

To the Stockholders
Norfolk Southern Corporation

Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of Dec. 31, 2007. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of Dec. 31, 2007.

KPMG LLP, independent registered public accounting firm, has audited the Corporation's financial statements and issued an attestation report on the Corporation's internal control over financial reporting as of Dec. 31, 2007.

/s/ Charles W. Moorman
Charles W. Moorman
Chairman, President and
Chief Executive Officer

/s/ James A. Squires
James A. Squires
Executive Vice President Finance and
Chief Financial Officer

/s/ Marta R. Stewart
Marta R. Stewart
Vice President and
Controller

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Norfolk Southern Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Norfolk Southern Corporation as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2007, and our report dated February 15, 2008 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP
Norfolk, Virginia
February 15, 2008

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2007. In connection with our audits of the consolidated financial statements, we also have audited the financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 1 to the consolidated financial statements, Norfolk Southern Corporation adopted Financial Accounting Standards Board Interpretation No. 48, *Accounting for Uncertainty in Income Taxes*, effective January 1, 2007, Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment*, effective January 1, 2006, and Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*, effective December 31, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 15, 2008 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP
Norfolk, Virginia
February 15, 2008

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Income**

| | Years ended Dec. 31, 2007 | 2006 | 2005 |
|---|---|---|---|
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 9,432 | $ 9,407 | $ 8,527 |
| **Railway operating expenses:** | | | |
| Compensation and benefits | 2,552 | 2,637 | 2,493 |
| Purchased services and rents | 1,551 | 1,578 | 1,547 |
| Fuel | 1,169 | 1,095 | 821 |
| Depreciation | 775 | 738 | 774 |
| Materials and other | 800 | 802 | 775 |
| Total railway operating expenses | 6,847 | 6,850 | 6,410 |
| **Income from railway operations** | 2,585 | 2,557 | 2,117 |
| Other income – net | 93 | 149 | 74 |
| Interest expense on debt | 441 | 476 | 494 |
| Income before income taxes | 2,237 | 2,230 | 1,697 |
| Provision for income taxes | 773 | 749 | 416 |
| **Net income** | $ 1,464 | $ 1,481 | $ 1,281 |
| **Per share amounts:** | | | |
| Net income | | | |
| Basic | $ 3.74 | $ 3.63 | $ 3.17 |
| Diluted | $ 3.68 | $ 3.57 | $ 3.11 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Balance Sheets**

| | As of Dec. 31, | |
|---|---|---|
| | **2007** | **2006** |
| | *($ in millions)* | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 206 | $ 527 |
| Short-term investments | -- | 391 |
| Accounts receivable – net | 942 | 992 |
| Materials and supplies | 176 | 151 |
| Deferred income taxes | 190 | 186 |
| Other current assets | 161 | 153 |
| Total current assets | 1,675 | 2,400 |
| Investments | 1,974 | 1,755 |
| Properties less accumulated depreciation | 21,583 | 21,098 |
| Other assets | 912 | 775 |
| **Total assets** | $ 26,144 | $ 26,028 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,139 | $ 1,181 |
| Income and other taxes | 203 | 205 |
| Other current liabilities | 237 | 216 |
| Current maturities of long-term debt | 369 | 491 |
| Total current liabilities | 1,948 | 2,093 |
| Long-term debt | 5,999 | 6,109 |
| Other liabilities | 2,039 | 1,767 |
| Deferred income taxes | 6,431 | 6,444 |
| **Total liabilities** | 16,417 | 16,413 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; outstanding 379,297,891 and 397,419,601 shares, respectively, net of treasury shares | 380 | 398 |
| Additional paid-in capital | 1,466 | 1,303 |
| Accumulated other comprehensive loss | (399) | (369) |
| Retained income | 8,280 | 8,283 |
| **Total stockholders' equity** | 9,727 | 9,615 |
| **Total liabilities and stockholders' equity** | $ 26,144 | $ 26,028 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended Dec. 31, 2007 | 2006 | 2005 |
|---|---|---|---|
| | | ($ in millions) | |
| **Cash flows from operating activities** | | | |
| Net income | $ 1,464 | $ 1,481 | $ 1,281 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Depreciation | 786 | 750 | 787 |
| Deferred income taxes | 125 | (8) | 80 |
| Gains and losses on properties and investments | (51) | (54) | (51) |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable | 30 | (60) | (94) |
| Materials and supplies | (25) | (19) | (28) |
| Other current assets | (17) | (11) | 20 |
| Current liabilities other than debt | 38 | 38 | 55 |
| Other – net | (17) | 89 | 55 |
| Net cash provided by operating activities | 2,333 | 2,206 | 2,105 |
| **Cash flows from investing activities** | | | |
| Property additions | (1,341) | (1,178) | (1,025) |
| Property sales and other transactions | 124 | 119 | 110 |
| Investments, including short-term | (635) | (1,804) | (1,822) |
| Investment sales and other transactions | 827 | 2,179 | 910 |
| Net cash used for investing activities | (1,025) | (684) | (1,827) |
| **Cash flows from financing activities** | | | |
| Dividends | (377) | (278) | (194) |
| Common stock issued – net | 183 | 297 | 194 |
| Purchase and retirement of common stock | (1,196) | (964) | -- |
| Proceeds from borrowings | 250 | -- | 433 |
| Debt repayments | (489) | (339) | (889) |
| Net cash used for financing activities | (1,629) | (1,284) | (456) |
| Net increase (decrease) in cash and cash equivalents | (321) | 238 | (178) |
| **Cash and cash equivalents** | | | |
| At beginning of year | 527 | 289 | 467 |
| At end of year | $ 206 | $ 527 | $ 289 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 441 | $ 473 | $ 485 |
| Income taxes (net of refunds) | $ 603 | $ 692 | $ 271 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**

| | Common Stock | Additional Paid-in Capital | Unearned Restricted Stock | Accum. Other Compre-hensive Loss | Retained Income | Total |
|---|---|---|---|---|---|---|
| | *($ in millions, except per share amounts)* | | | | | |
| **Balance Dec. 31, 2004** | $ 401 | $ 728 | $ (8) | $ (24) | $ 6,880 | $ 7,977 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,281 | 1,281 |
| Other comprehensive loss | | | | (53) | | (53) |
| Total comprehensive income | | | | | | 1,228 |
| Dividends on Common Stock, $0.48 per share | | | | | (194) | (194) |
| Stock-based compensation, including tax benefit of $47 | 10 | 260 | (9) | | | 261 |
| Other | | 4 | | | | 4 |
| **Balance Dec. 31, 2005** | 411 | 992 | (17) | (77) | 7,967 | 9,276 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,481 | 1,481 |
| Other comprehensive income | | | | 2 | | 2 |
| Total comprehensive income | | | | | | 1,483 |
| Adoption of SFAS 158, net of tax | | | | (294) | | (294) |
| Dividends on Common Stock, $0.68 per share | | | | | (278) | (278) |
| Share repurchases | (22) | (63) | | | (879) | (964) |
| Stock-based compensation, including tax benefit of $85 | 9 | 372 | 17 | | (8) | 390 |
| Other | | 2 | | | | 2 |
| **Balance Dec. 31, 2006** | $ 398 | $ 1,303 | $ -- | $ (369) | $ 8,283 | $ 9,615 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,464 | 1,464 |
| Other comprehensive loss | | | | (30) | | (30) |
| Total comprehensive income | | | | | | 1,434 |
| Adoption of FIN 48, net of tax | | | | | 10 | 10 |
| Dividends on Common Stock, $0.96 per share | | | | | (377) | (377) |
| Share repurchases | (24) | (81) | | | (1,091) | (1,196) |
| Stock-based compensation, including tax benefit of $57 | 6 | 238 | | | (9) | 235 |
| Other | | 6 | | | | 6 |
| **Balance Dec. 31, 2007** | $ 380 | $ 1,466 | $ -- | $ (399) | $ 8,280 | $ 9,727 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,000 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

NSR and its railroad subsidiaries transport raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2007): coal (25%); intermodal (20%); chemicals (13%); metals/construction (12%); agriculture/consumer products/government (11%); automotive (10%); and paper/clay/forest products (9%). Although most of NS' customers are domestic, ultimate points of origination or destination for some of the products transported (particularly coal bound for export and some intermodal containers) may be outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions.

### Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management periodically reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and other postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Revenue Recognition

Transportation revenue is recognized proportionally as a shipment moves from origin to destination and related expenses are recognized as incurred. Refunds (which are primarily volume-based incentives) are recorded as a reduction to revenues on the basis of management's best estimate of projected liability, which is based on historical activity, current traffic counts and the expectation of future activity. NS regularly monitors its contract refund liability, and historically, the estimates have not differed significantly from the amounts ultimately refunded. Switching, demurrage and other incidental service revenues are recognized when the services are performed.

### Derivatives

NS does not engage in the trading of derivatives. NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging

transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements (see Note 16).

**Stock-Based Compensation**

NS has stock-based employee compensation plans, which are more fully described in Note 11. Through Dec. 31, 2005, NS applied the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion 25), and related interpretations in accounting for these plans (See "Required Accounting Changes," below).

The following table illustrates the effect on net income and earnings per share if NS had applied the fair value recognition provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123), to stock-based employee compensation:

| | | 2005<br>*($ in millions, except per share)* |
|---|---|---|
| Net income, as reported | $ | 1,281 |
| Add: Stock-based employee compensation expense as reported | | 46 |
| Deduct: Stock-based employee compensation expense determined under fair value method | | (45) |
| Pro forma net income | $ | 1,282 |
| Earnings per share: | | |
| As reported | | |
| Basic | $ | 3.17 |
| Diluted | $ | 3.11 |
| Pro forma | | |
| Basic | $ | 3.17 |
| Diluted | $ | 3.10 |

**Required Accounting Changes**

Effective Jan. 1, 2007, NS adopted Financial Accounting Standards Board Interpretation No. 48 (FIN 48), "Accounting for Uncertainty in Income Taxes," which clarifies accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under the guidelines of FIN 48, an entity should recognize the financial statement benefit of a tax position if it determines that it is more likely than not that the position will be sustained on examination (see Note 3).

Effective Dec. 31, 2006, NS adopted Statement of Financial Accounting Standards (SFAS) No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (see Note 10).

Effective January 1, 2006, NS adopted Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment," [SFAS 123(R)]. This statement applies to awards granted, modified, repurchased or cancelled after the

effective date as well as awards that are unvested at the effective date and includes, among other things, the requirement to expense the fair value of stock options. The standard also requires that awards to be settled in cash be measured at fair value at each reporting date until ultimate settlement. NS adopted SFAS 123(R) using the modified prospective method, which requires application of the standard to all awards granted, modified, repurchased or cancelled on or after January 1, 2006, and to all awards for which the requisite service has not been rendered as of such date. In accordance with the modified prospective approach, prior period financial statements have not been restated to reflect the impact of SFAS 123(R). As compared to amounts that would have been recognized under APB Opinion 25, the adoption of SFAS 123(R) resulted in $27 million of additional compensation expense for 2006, including the immediate expensing of 2006 grants made to retirement-eligible employees, which reduced net income by $20 million, or 5 cents per basic and diluted share. Under SFAS 123(R), all new awards granted to retirement eligible employees must be expensed immediately. Under APB Opinion No. 25 and related interpretations, such awards were amortized over the stated service period. Such awards were treated similarly under SFAS 123 in the pro forma amounts disclosed in the preceding table.

**Cash Equivalents**

“Cash equivalents” are highly liquid investments purchased three months or less from maturity.

**Allowance for Doubtful Accounts**

NS' allowance for doubtful accounts was $5 million at Dec. 31, 2007 and 2006. To determine its allowance for doubtful accounts, NS evaluates historical loss experience (which has not been significant), the characteristics of current accounts, as well as general economic conditions and trends.

**Materials and Supplies**

“Materials and supplies,” consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in “Properties.”

**Investments**

Debt securities classified as “held-to-maturity” are reported at amortized cost and marketable equity and debt securities classified as “trading” or “available-for-sale” are recorded at fair value. Unrealized after-tax gains and losses for investments designated as “available-for-sale,” are recognized in “Accumulated other comprehensive loss.”

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, “The Equity Method of Accounting for Investments in Common Stock.”

**Properties**

“Properties” are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. Depletion of natural resources (see Note 2) is based on units of production. Depreciation in the Consolidated Statements of Cash Flows includes depreciation and depletion. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Costs related to repairs and maintenance activities that do not extend an asset’s useful life or increase its utility are expensed when such repairs are performed. When properties other than land and nonrail assets are

sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation, and no gain or loss is recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 2) since such income is not a product of NS' railroad operations.

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value.

**Reclassifications**

Certain comparative prior year amounts presented in "Railway operating expenses" have been reclassified to conform to the current year presentation. Amounts previously presented as "Diesel fuel" (used in locomotives) have been combined with other fuel and related costs and are now presented as "Fuel." Additionally, certain other groupings of costs within "Railway operating expenses" have been changed.

## 2. Other Income - Net

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Income from natural resources: | | | |
| Royalties from coal | $ 52 | $ 55 | $ 54 |
| Nonoperating depletion and depreciation | (11) | (12) | (13) |
| Subtotal | 41 | 43 | 41 |
| Gains and losses from sale of properties and investments | 51 | 54 | 49 |
| Rental income | 46 | 45 | 42 |
| Equity in earnings of Conrail (Note 4) | 45 | 25 | 37 |
| Interest income | 45 | 76 | 41 |
| Corporate-owned life insurance – net | 9 | 24 | 4 |
| Expenses related to synthetic fuel investments | (77) | (62) | (102) |
| Other interest expense | (27) | (17) | (6) |
| Taxes on nonoperating property | (10) | (9) | (9) |
| Other | (30) | (30) | (23) |
| Total | $ 93 | $ 149 | $ 74 |

"Other income - net" includes income and costs not part of rail operations and the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations. NS has a 40.5% interest in a limited liability company that owned and operated facilities that produced synthetic fuel from coal. In addition, in 2007 NS purchased two facilities that produced synthetic fuel from coal. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are included in "Expenses related to synthetic fuel investments" above.

"Other current assets" in the Consolidated Balance Sheets includes prepaid interest of $58 million at Dec. 31, 2007, and $50 million at Dec. 31, 2006, arising from corporate-owned life insurance borrowings.

### 3. Income Taxes

**Provision for Income Taxes**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | ($ in millions) | |
| Current: | | | |
| Federal | $ 570 | $ 666 | $ 283 |
| State | 78 | 91 | 53 |
| Total current taxes | 648 | 757 | 336 |
| Deferred: | | | |
| Federal | 77 | 3 | 220 |
| State | 48 | (11) | (140) |
| Total deferred taxes | 125 | (8) | 80 |
| Provision for income taxes | $ 773 | $ 749 | $ 416 |

**Reconciliation of Statutory Rate to Effective Rate**

The "Provision for income taxes" in the Consolidated Statements of Income differs from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | | | ($ in millions) | | | |
| Federal income tax at statutory rate | $ 783 | 35 | $ 780 | 35 | $ 594 | 35 |
| State income taxes, net of Federal tax effect | 63 | 3 | 52 | 2 | 40 | 2 |
| Tax credits | (65) | (3) | (62) | (3) | (104) | (6) |
| Ohio rate change, net of Federal tax effect | -- | -- | -- | -- | (96) | (6) |
| Illinois tax law change, net of Federal tax effect | 19 | 1 | -- | -- | -- | -- |
| Other – net | (27) | (1) | (21) | -- | (18) | -- |
| Provision for income taxes | $ 773 | 35 | $ 749 | 34 | $ 416 | 25 |

In August 2007, Illinois enacted tax legislation that modifies the way in which transportation companies apportion their taxable income to the state. The change resulted in an increase in NS' deferred income tax liability in the third quarter, as required by Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," which increased deferred tax expense by $19 million.

In June 2005, Ohio enacted tax legislation that phases out its Corporate Franchise Tax, which was generally based on federal taxable income, and phases in a new gross receipts tax called the Commercial Activity Tax, which is based on current year sales and rentals. The phased elimination of the Corporate Franchise Tax resulted in a reduction in NS' deferred income tax liability, as required by Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," which, as noted above, decreased deferred tax expense by $96 million.

**Deferred Tax Assets and Liabilities**

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences. The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Deferred tax assets: | | |
| Compensation and benefits, including post-retirement | $ 417 | $ 382 |
| Accruals, including casualty and other claims | 219 | 211 |
| Other | 49 | 44 |
| Total gross deferred tax assets | 685 | 637 |
| Less valuation allowance | (10) | (9) |
| Net deferred tax asset | 675 | 628 |
| Deferred tax liabilities: | | |
| Property | (6,683) | (6,659) |
| Other | (233) | (227) |
| Total gross deferred tax liabilities | (6,916) | (6,886) |
| Net deferred tax liability | (6,241) | (6,258) |
| Net current deferred tax asset | 190 | 186 |
| Net long-term deferred tax liability | $ (6,431) | $ (6,444) |

Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred tax assets. The valuation allowance at the end of each year relates to subsidiary state income tax net operating losses that may not be utilized prior to their expiration. The total valuation allowance increased $1 million in 2007, and decreased $1 million in 2006 and $3 million in 2005.

**Uncertain Tax Positions**

As a result of the implementation of FIN 48 on Jan. 1, 2007 (see Note 1), NS recognized a $10 million increase to stockholders' equity, $2 million of which related to investments accounted for under the equity method of accounting. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows ($ in millions):

| | |
|---|---|
| Balance at January 1, 2007 | $179 |
| Additions based on tax positions related to the current year | 65 |
| Additions for tax positions of prior years | 9 |
| Reductions for tax positions of prior years | (84) |
| Settlements with taxing authorities | -- |
| Lapse of statutes of limitations | (2) |
| Balance at December 31, 2007 | $167 |

Included in the balance of unrecognized tax benefits at December 31, 2007, are potential benefits of $56 million that would affect the effective tax rate if recognized. Unrecognized tax benefits are adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amount recorded.

NS expects that the total amount of unrecognized tax benefits at Dec. 31, 2007, will decrease by between $30 million and $35 million in 2008 due to tax positions for which there was an uncertainty about the timing of deductibility in earlier years but deductibility may become certain by the close of 2008. NS' consolidated federal income tax returns for 2004 and 2005 are being audited by the Internal Revenue Service (IRS). NS anticipates that the IRS will complete its examination of the 2004 and 2005 years within the next twelve months. It is reasonably possible that the amount of unrecognized tax benefits will change due to the completion of the IRS examination of the 2004 and 2005 years, but an estimate of the change cannot be made. The IRS completed its examination of the 2002 and 2003 consolidated federal income tax returns during the third quarter of 2006 and NS appealed certain adjustments proposed by the IRS. State income tax returns generally are subject to examination for a period of three to four years after filing of the return. In addition, NS is generally obligated to report changes in taxable income arising from federal income tax examinations to the states within a period of up to two years from the date the federal examination is final. NS has various state income tax returns either under examination, administrative appeals, or litigation. It is reasonably possible that the amount of unrecognized tax benefits will decrease in 2008 as a result of the lapse of state statutes of limitations, but the amount is not expected to be significant. NS does not expect that any of the above potential changes in unrecognized tax benefits will have a material effect on NS' financial position, results of operations or liquidity.

Interest related to unrecognized tax benefits, which is included in "Other income – net," amounted to $12 million of expense in 2007 and income of $2 million in 2006 and $12 million in 2005. Penalties related to tax matters are included in "Provision for income taxes" and totaled zero in each of 2007, 2006 and 2005. NS has recorded a liability of $28 million at Dec. 31, 2007, and $17 million at Jan. 1, 2007, for the payment of interest on unrecognized tax benefits. NS has no liability recorded at Dec. 31, 2007, and Jan. 1, 2007, for the payment of penalties on unrecognized tax benefits.

**4. Investments**

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Short-term investments with average maturities: | | |
| Federal government notes, 5 months | $ -- | $ 124 |
| Corporate notes, 4 months | -- | 117 |
| Commercial paper, 2 months | -- | 74 |
| Municipal debt, 1 month | -- | 22 |
| Other short-term investments, less than one month | -- | 54 |
| Total short-term investments | $ -- | $ 391 |
| Long-term investments: | | |
| Investment in Conrail Inc. | $ 899 | $ 849 |
| Other equity method investments | 594 | 451 |
| Company-owned life insurance at net cash surrender value | 327 | 310 |
| Other investments | 154 | 145 |
| Total long-term investments | $ 1,974 | $ 1,755 |

Other equity method investments includes $240 million at Dec. 31, 2007, and $100 million at Dec. 31, 2006, related to NS' investment in Meridian Speedway LLC, a joint venture formed with Kansas City Southern in 2006.

**Investment in Conrail**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. NS is applying the equity method of accounting to its remaining investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax accounting bases for such assets, as all of the purchase price at acquisition was allocable to Conrail's tangible assets and liabilities. At Dec. 31, 2007, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $555 million.

CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation, Inc. (CSXT). The costs of operating the Shared Assets Areas are borne by NSR and CSXT based on usage. In addition, NSR and CSXT pay CRC a fee for access to the Shared Assets Areas. "Purchased services and rents" includes expenses for amounts due to CRC for operation of the Shared Assets Areas of $126 million in 2007 and 2006, and $129 million in 2005. Future minimum lease payments due to CRC under the Shared Assets Areas agreements are as follows: $28 million in each of 2008 through 2012 and $317 million thereafter. NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and amount to approximately $7 million annually.

"Accounts payable" includes $78 million at Dec. 31, 2007, and $68 million at Dec. 31, 2006, due to Conrail for the operation of the Shared Assets Areas. In addition, "Other liabilities" includes $133 million at Dec. 31, 2007 and 2006 for long-term advances from Conrail, maturing 2035, entered into in 2005 that bear interest at an average rate of 4.4%.

**5. Properties**

| | Dec. 31, 2007 | Dec. 31, 2006 | Depreciation Rate for 2007 |
|---|---|---|---|
| | *($ in millions)* | | |
| Land | $ 2,085 | $ 2,082 | |
| Railway property: | | | |
| Road | 19,420 | 18,725 | 2.7% |
| Equipment | 7,413 | 7,085 | 3.7% |
| Other property | 471 | 471 | 2.3% |
| | 29,389 | 28,363 | |
| Less accumulated depreciation | (7,806) | (7,265) | |
| Net properties | $ 21,583 | $ 21,098 | |

Railway property includes $504 million at Dec. 31, 2007, and $602 million at Dec. 31, 2006, of assets recorded pursuant to capital leases with accumulated amortization of $175 million and $192 million at Dec. 31, 2007 and 2006, respectively. Other property includes the costs of obtaining rights to natural resources of $337 million at

Dec. 31, 2007 and 2006, with accumulated depletion of $172 million and $165 million at Dec. 31, 2007 and 2006, respectively.

**Capitalized Interest**

Total interest cost incurred on debt in 2007, 2006 and 2005 was $455 million, $489 million and $505 million, respectively, of which $14 million, $13 million and $11 million was capitalized.

**6. Current Liabilities**

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Accounts payable: | | |
| Accounts and wages payable | $ 568 | $ 569 |
| Casualty and other claims (Note 17) | 259 | 301 |
| Vacation liability | 123 | 120 |
| Equipment rents payable – net | 87 | 96 |
| Due to Conrail (Note 4) | 78 | 68 |
| Other | 24 | 27 |
| Total | $ 1,139 | $ 1,181 |
| | | |
| Other current liabilities: | | |
| Interest payable | $ 90 | $ 88 |
| Retiree benefit obligations (Note 10) | 57 | 53 |
| Liabilities for forwarded traffic | 53 | 50 |
| Other | 37 | 25 |
| Total | $ 237 | $ 216 |

**7. Long-term Debt**

Long-term debt as of Dec. 31, 2007, with weighted average interest rates and maturities is presented below:

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Notes and debentures: | | |
| 6.91%, maturing to 2011 | $ 1,200 | $ 1,540 |
| 6.66%, maturing 2014 and 2017 | 981 | 981 |
| 8.23%, maturing 2020 to 2025 | 764 | 764 |
| 7.12%, maturing 2027 to 2031 | 1,290 | 1,290 |
| 7.21%, maturing 2037 and 2043 | 855 | 855 |
| 7.02%, maturing 2097 and 2105 | 650 | 650 |
| Securitization borrowings, 5.57% | 250 | -- |
| Equipment obligations, 6.13%, maturing to 2014 | 226 | 306 |
| Capitalized leases, 4.84%, maturing to 2024 | 165 | 231 |
| Other debt, 7.18%, maturing to 2019 | 113 | 113 |
| Discounts and premiums, net | (126) | (130) |
| Total long-term debt | 6,368 | 6,600 |
| Less current maturities | (369) | (491) |
| Long-term debt excluding current maturities | $ 5,999 | $ 6,109 |

| | |
|---|---|
| Long-term debt maturities subsequent to 2008 are as follows: | |
| 2009 | $ 477 |
| 2010 | 340 |
| 2011 | 338 |
| 2012 | 31 |
| 2013 and subsequent years | 4,813 |
| Total | $ 5,999 |

In November 2007, NS entered into a $500 million receivables securitization facility under which NSR sells substantially all of its eligible third-party receivables to an NS subsidiary, which in turn may transfer beneficial interests in the receivables to various commercial paper vehicles. Amounts received under the facility are accounted for as borrowings. The facility has a 364-day term; however, NS intends to refinance these borrowings by issuing long-term debt, which is supported by its $1 billion credit agreement (see below). Accordingly, amounts outstanding are included in the line item “Long-term debt” in the Consolidated Balance Sheet. At Dec. 31, 2007, the amount of receivables included in “Accounts receivable – net” serving as collateral for these borrowings was $778 million.

In May 2005, NS issued $717 million of unsecured notes ($350 million at 5.64% due 2029 and $367 million at 5.59% due 2025) and paid $218 million of premium in exchange for $717 million of its previously issued unsecured notes ($350 million at 7.8% due 2027, $200 million at 7.25% due 2031, and $167 million at 9.0% due 2021). The $218 million cash premium payment is reflected as a reduction of debt in the Consolidated Balance Sheet and Statement of Cash Flows and is included in “Discounts and premiums, net.” The premium is being amortized as additional interest expense over the terms of the new debt, resulting in effective interest rates of 8.7% for the 2029 notes and 9.0% for the 2025 notes.

“Discounts and premiums, net” at Dec. 31, 2007 and 2006, includes $126 million and $130 million, respectively, related to $314 million face amount of 9.75% notes due in 2020 and $138 million face amount of 7.875% notes due 2043, which is being amortized as a reduction of interest expense over the terms of the notes, resulting in effective interest rates of 6.0% and 6.2%, respectively.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment. Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to satisfy yen-denominated lease payments. These deposits are included in "Other assets" on the balance sheet and totaled $80 million at Dec. 31, 2007, and $85 million at Dec. 31, 2006.

**Shelf Registration**

NS has on file with the Securities and Exchange Commission two Form S-3 shelf registration statements, under which up to $700 million of additional debt or equity securities could be issued.

**Credit Agreement, Debt Covenants and Commercial Paper**

NS has in place a five-year $1 billion credit facility expiring in 2012. Any borrowings under the credit agreement are contingent on the continuing effectiveness of certain representations and warranties made at the inception of the agreement. NS is subject to various financial covenants with respect to its debt and under its credit agreement, including a maximum leverage ratio restriction, certain restrictions on the issuance of further debt by NS or its subsidiaries and the consolidation, merger or sale of substantially all of NS' assets. At Dec. 31, 2007, NS was in compliance with all financial covenants.

NS has the ability to issue commercial paper supported by its $1 billion credit agreement. At Dec. 31, 2007, and Dec. 31, 2006, NS had no outstanding commercial paper or borrowings under the credit agreement.

**8. Lease Commitments**

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to CRC under the Shared Assets Areas agreements (see Note 4). Future minimum lease payments and operating lease expense are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2008 | $ 138 | $ 46 |
| 2009 | 130 | 60 |
| 2010 | 113 | 25 |
| 2011 | 81 | 22 |
| 2012 | 70 | 15 |
| 2013 and subsequent years | 405 | 8 |
| Total | $ 937 | $ 176 |
| Less imputed interest on capital leases at an average rate of 5.4% | | (11) |
| Present value of minimum lease payments included in debt | | $ 165 |

**Operating Lease Expense**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Minimum rents | $ 191 | $ 197 | $ 190 |
| Contingent rents | 79 | 79 | 75 |
| Total | $ 270 | $ 276 | $ 265 |

Contingent rents is primarily comprised of usage-based rent paid to other railroads for joint facility operations.

**9. Other Liabilities**

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Retiree health and death benefit obligations (Note 10) | $ 635 | $ 621 |
| Casualty and other claims (Note 17) | 588 | 471 |
| Net pension obligations (Note 10) | 150 | 144 |
| Deferred compensation | 148 | 149 |
| Long-term advances from Conrail (Note 4) | 133 | 133 |
| Federal and state income taxes | 131 | -- |
| Other | 254 | 249 |
| Total | $ 2,039 | $ 1,767 |

**10. Pensions and Other Postretirement Benefits**

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, co-payments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Required Accounting Change**

As of Dec. 31, 2006, NS adopted SFAS No. 158, “Employers’ Accounting for Defined Benefit Pension and Other Postretirement Plans” (SFAS 158). This statement requires an employer to recognize in its statement of financial position the overfunded or underfunded status of defined benefit pension and postretirement plans measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs, credits and transition costs that arise during the period. As a result of adopting this standard, NS reduced its pension asset by $217 million and increased its pension and postretirement liabilities by $258 million in its Consolidated Balance Sheet, with a corresponding reduction to stockholders’ equity of $292 million (net of tax) reflected as an increase to accumulated other comprehensive loss. In addition, NS recognized a $2 million reduction to stockholders’ equity related to its proportionate share of Conrail’s adoption of SFAS 158. The adoption of SFAS 158 has no impact on years prior to 2006 and has no effect on the calculation of expenses for pensions and post-retirement benefits.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,650 | $ 1,642 | $ 785 | $ 754 |
| Service cost | 24 | 27 | 21 | 19 |
| Interest cost | 92 | 88 | 46 | 42 |
| Actuarial (gains) losses | (12) | 6 | 53 | 14 |
| Benefits paid | (110) | (113) | (46) | (44) |
| Benefit obligation at end of year | 1,644 | 1,650 | 859 | 785 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,939 | 1,824 | 119 | 108 |
| Actual return on plan assets | 125 | 220 | 6 | 11 |
| Employer contribution | 9 | 8 | 97 | 44 |
| Benefits paid | (110) | (113) | (46) | (44) |
| Fair value of plan assets at end of year | 1,963 | 1,939 | 176 | 119 |
| **Funded status at end of year** | $ 319 | $ 289 | $ (683) | $ (666) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Noncurrent assets | $ 478 | $ 441 | $ -- | $ -- |
| Current liabilities | (9) | (8) | (48) | (45) |
| Noncurrent liabilities | (150) | (144) | (635) | (621) |
| **Net amount recognized** | $ 319 | $ 289 | $ (683) | $ (666) |
| Amounts recognized in accumulated other comprehensive loss (pretax) consist of: | | | | |
| Net loss | $ 290 | $ -- | $ 279 | $ -- |
| Prior service cost (benefit) | 9 | -- | (10) | -- |
| Impact of implementation of SFAS 158 | -- | 244 | -- | 231 |

NS' unfunded pension plans, included above, which in all cases have no assets and therefore have an accumulated benefit obligation in excess of plan assets, had projected benefit obligations of $159 million at Dec. 31, 2007, and $152 million at Dec. 31, 2006, and had accumulated benefit obligations of $137 million at Dec. 31, 2007, and $125 million at Dec. 31, 2006.

**Pension and Other Postretirement Benefit Cost Components**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| ***Pension benefits*** | | | |
| Service cost | $ 24 | $ 27 | $ 23 |
| Interest cost | 92 | 88 | 87 |
| Expected return on plan assets | (167) | (159) | (149) |
| Amortization of prior service cost | 2 | 2 | 2 |
| Amortization of net losses | 9 | 13 | 14 |
| Net benefit | $ (40) | $ (29) | $ (23) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 21 | $ 19 | $ 17 |
| Interest cost | 46 | 42 | 40 |
| Expected return on plan assets | (11) | (10) | (9) |
| Amortization of prior service benefit | (8) | (8) | (8) |
| Amortization of net losses | 28 | 27 | 22 |
| Net cost | $ 76 | $ 70 | $ 62 |

**Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive Loss**

| | 2007 | |
|---|---|---|
| | Pension Benefits | Other Postretirement Benefits |
| | *($ in millions)* | |
| Net loss arising during the year | $ 30 | $ 58 |
| Amortization of prior service cost | (2) | 8 |
| Amortization of net loss | (9) | (28) |
| Total recognized in other comprehensive loss | $ 19 | $ 38 |
| Total recognized in net periodic (benefit) cost and other comprehensive loss | $ (21) | $ 114 |

The estimated net loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $7 million and $3 million, respectively. The estimated net loss and prior service benefit for the other defined benefit postretirement plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $30 million and $8 million, respectively.

**Pension Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 6.25% | 5.75% | 5.50% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Pension cost:*** | | | |
| Discount rate | 5.75% | 5.50% | 5.75% |
| Return on assets in plans | 9% | 9% | 9% |
| Future salary increases | 4.5% | 4.5% | 4.5% |

To determine the discount rate in 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. Previously, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

**Health Care Cost Trend Assumptions**

For measurement purposes at Dec. 31, 2007, increases in the per capita cost of covered health care benefits were assumed to be 9% for 2007 and 8.5% for 2008. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2012 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point Increase | |
|---|---|---|
| | **Increase** | **Decrease** |
| | *($ in millions)* | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 9 | $ (7) |
| Postretirement benefit obligation | $ 100 | $ (84) |

**Asset Management**

Eleven investment firms manage NS' defined benefit pension plan's assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, international fixed income securities, domestic and international equity investments and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. The target asset allocation for equity is 75% of the pension plan's assets. Fixed income investments must have an average rating of "AA" or better and all fixed income securities must be rated "A" or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers' returns are expected to meet or exceed selected market indices by prescribed margins.

NS' pension plan weighted-average asset allocations at Dec. 31, 2007 and 2006, by asset category, were as follows:

| | Percentage of plan assets at Dec. 31, | |
|---|---|---|
| **Asset Category** | **2007** | **2006** |
| Equity securities | 75% | 77% |
| Debt securities | 25% | 23% |
| Total | 100% | 100% |
| International equity securities included in equity securities above | 10% | 10% |

The postretirement benefit plan assets consist primarily of trust-owned variable life insurance policies with an asset allocation at Dec. 31, 2007, of 65% in equity securities and 35% in debt securities compared with 67% in equity securities and 33% in debt securities at Dec. 31, 2006. The target asset allocation for equity is between 50% and 75% of the plan's assets.

The plans' assumed future returns are based principally on the asset allocation and on the historic returns for the plans' asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes.

**Contributions and Estimated Future Benefit Payments**

In 2008, NS expects to contribute approximately $9 million to its unfunded pension plans for payments to pensioners and $48 million to its other postretirement benefit plans for retiree health benefits.

Benefit payments, which reflect expected future service, as appropriate, are expected to be paid as follows:

| | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| | *($ in millions)* | |
| 2008 | $ 111 | $ 48 |
| 2009 | 112 | 51 |
| 2010 | 114 | 54 |
| 2011 | 117 | 57 |
| 2012 | 120 | 59 |
| Years 2013-2017 | 636 | 322 |

The other postretirement benefit payments include an estimated annual reduction due to the Medicare Part D Subsidy of about $6 million.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $27 million in 2007 and $26 million in 2006 and 2005.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. NS' expenses under these plans were $14 million in 2007 and 2006, and $13 million in 2005.

**11. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board or the chief executive officer (if delegated such authority by the committee) may grant stock options, stock appreciation rights (SARs), restricted shares, restricted stock units, performance shares and performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broad-based issuance, stockholder approval was not required. In May 2005, the stockholders approved an amended LTIP which provided that 8,500,000 shares of stock previously approved for issuance under LTIP could be granted as restricted shares, restricted stock unit shares or performance shares. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock; as a broad-based stock option plan, stockholder approval of TSOP was not required. NS uses newly issued shares to satisfy any exercises and awards under LTIP and TSOP.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options, PSUs or restricted stock units in an amount commensurate with dividends paid on Common Stock. Tax absorption payments also are authorized for any awards under LTIP in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

During the first quarter of 2007, a committee of nonemployee directors of NS' Board granted stock options, restricted stock units and PSUs pursuant to the LTIP and granted stock options pursuant to the TSOP. Receipt of an award under LTIP was made contingent upon the awardee's execution of a non-compete agreement, and all awards under LTIP were made subject to forfeiture in the event the awardee "engages in competing employment" for a period of time following retirement.

**Accounting Method**

As disclosed in Note 1, prior to the adoption of SFAS 123(R), NS applied APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted shares, restricted share units, dividend equivalents, tax absorption payments and SARs resulted in charges to net income, while grants of stock options had no effect on net income. Under SFAS 123(R), all awards will result in charges to net income while dividend equivalents are charged to retained earnings. Related compensation costs were $96 million in 2007, $129 million in 2006 and $75 million in 2005. The total tax effect recognized in income in relation to stock-based compensation was a benefit of $32 million in 2007, $44 million in 2006 and $27 million in 2005.

**Stock Options**

Options may be granted for a term not to exceed 10 years and are subject to a vesting period of at least one year. Option exercise prices are at not less than the fair market value of Common Stock on the effective date of the grant. In the first quarter of 2007, 1,203,300 options were granted under the LTIP and 251,000 options were granted under the TSOP. In each case, the grant price was $49.555, which was the fair market value of Common Stock on the date of grant, and the options have a term of ten years but may not be exercised prior to the third

anniversary of the date of grant. Holders of the options granted under LTIP who remain employed by NS receive cash dividend equivalent payments for five years commensurate with dividends paid on Common Stock.

In the first quarter of 2006, 1,188,700 options were granted under the LTIP and 238,000 options were granted under the TSOP. In each case, the grant price was $49.425, which was the fair market value of Common Stock on the date of grant, and the options have a term of ten years but may not be exercised prior to the first anniversary of the date of grant.

The fair value of each option award in 2007 and 2006 was measured on the date of grant using a lattice-based option valuation model. Expected volatilities are based on implied volatilities from traded options on Common Stock and historical volatility of Common Stock. NS uses historical data to estimate option exercises and employee terminations within the valuation model. The average expected option life is derived from the output of the valuation model and represents the period of time that options granted are expected to be outstanding. The average risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. For options granted that include dividend equivalent payments, a dividend yield of zero was used. For purposes of pro forma information required under SFAS 123, the fair value of the option awards in 2005 was determined using the Black-Scholes option-pricing model. The assumptions for 2007, 2006 and 2005 are shown in the following table:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Expected volatility range | 26.1% - 33.3% | 23.5% - 34.5% | n/a |
| Average expected volatility | 33% | 27% | 33% |
| Average expected option term | 5.6 years | 3.7 years | 5 years |
| Average risk-free interest rate | 4.9% | 4.5% | 3.7% |
| Per-share grant-date fair value | $19.82 | $13.47 | $12.19 |
| Options granted (LTIP and TSOP) | 1,454,300 | 1,427,400 | 1,353,600 |

The grant date fair value of the 2007 TSOP grant was $17.88 using the same assumptions as the 2007 LTIP grant, except a dividend yield of 1.5% was used because no dividend equivalents are paid on these options and the average expected option term was 6.5 years.

A summary of options outstanding as of Dec. 31, 2007, and changes during the twelve months then ended is presented below:

| | Option Shares | Weighted Avg. Exercise Price |
|---|---|---|
| Outstanding at Dec. 31, 2006 | 22,276,526 | $ 25.68 |
| Granted | 1,454,300 | 49.56 |
| Exercised | (5,110,334) | 25.65 |
| Forfeited | (40,600) | 49.55 |
| Outstanding at Dec. 31, 2007 | 18,579,892 | 27.51 |
| Exercisable at Dec. 31, 2007 | 17,165,692 | 25.69 |

The aggregate intrinsic value of options outstanding at Dec. 31, 2007, was $426 million and had a weighted-average remaining contractural term of 4.7 years. Of these options outstanding, 17,165,692 were exercisable and had an aggregate intrinsic value of $425 million with a weighted average remaining contractual term of 4.4 years.

The following table provides information related to options exercised as of Dec. 31 for the respective years:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | ($ in millions) | |
| Total intrinsic value | $ 145 | $ 226 | $ 139 |
| Cash received upon exercise of options | $ 126 | $ 212 | $ 194 |
| Related tax benefit realized | $ 52 | $ 79 | $ 47 |

Prior to the adoption of SFAS 123(R), NS presented tax benefits generated from tax deductions in excess of compensation costs recognized for share-based awards (excess tax benefits) as operating cash flows in the Consolidated Statements of Cash Flows. Beginning in 2006, SFAS 123(R) requires excess tax benefits to be classified as financing cash flows. Accordingly, "Common stock issued – net" in the Consolidated Statements of Cash Flows for the years ended Dec. 31, 2007 and 2006, included $57 million and $85 million of such tax benefits, respectively.

In November of 2005, the Board of Directors of NS changed the vesting periods on options granted in January 2005 from three years to one year in order to reduce future compensation expense. At the time, each of these options had an intrinsic value of approximately $9 and the modification resulted in less than $1 million of compensation expense.

**Restricted Shares and Restricted Stock Units**

Restricted share and restricted stock unit grants were zero and 321,450, respectively, in 2007, with a grant-date fair value of $50.01 and a 5-year restriction period, and were 332,150 and 332,150, respectively, in 2006, with a grant-date fair value of $49.60 and a three-year restriction period, and were 576,240 and 384,160, respectively, in 2005, with a grant-date fair value of $34.10 and a five-year restriction period. Restricted stock units granted in 2007 will be settled through issuance of shares of Common Stock. The restricted stock unit grants include cash dividend equivalent payments during the restriction period commensurate with dividends paid on Common Stock.

A summary of the status of restricted shares and restricted stock units as of Dec. 31, 2007, and changes during the twelve months then ended is presented below:

| | Shares | Units | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|
| Nonvested at Dec. 31, 2006 | 1,118,682 | 851,956 | $ 36.78 |
| Granted | -- | 321,450 | 50.01 |
| Vested | (272,482) | (181,654) | 23.18 |
| Forfeited | (34,600) | (34,400) | 35.96 |
| Nonvested at Dec. 31, 2007 | 811,600 | 957,352 | $ 42.53 |

At Dec. 31, 2007, there was $16 million of total unrecognized compensation related to restricted shares and restricted stock units. That cost is expected to be recognized over a weighted-average period of approximately 2.1 years. The total fair value of the restricted shares vested and restricted stock units paid in cash during the twelve months ended Dec. 31, 2007, 2006 and 2005 was $22 million, $40 million and $2 million, respectively. The total related tax benefit realized was $3 million in 2007 and $6 million in 2006.

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals (total shareholder return, return on average invested capital and operating ratio) at the end of a three-year cycle. PSU

grants and average grant-date fair values were 1,203,300 and $49.555 in 2007; 1,163,600 and $49.425 in 2006; and 1,344,400 and $34.10 in 2005. One-half of any PSUs earned will be paid in the form of shares of Common Stock with the other half to be paid in cash.

A summary of the status of PSUs as of Dec. 31, 2007, and changes during the twelve months then ended is presented below:

| | Performance Share Units | | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|
| Balance Dec. 31, 2006 | 3,301,800 | $ | 36.46 |
| Granted | 1,203,300 | | 49.56 |
| Earned | (358,764) | | 22.02 |
| Paid in cash | (358,790) | | 22.02 |
| Unearned | (103,446) | | 22.02 |
| Forfeited | (81,000) | | 45.89 |
| Balance Dec. 31, 2007 | 3,603,100 | | 43.91 |

As of Dec. 31, 2007, there was $19 million of total unrecognized compensation related to PSUs granted under the LTIP which is expected to be recognized over a weighted-average period of 1.0 year. The total fair value of PSUs earned and paid in cash during the twelve months ended Dec. 31, 2007, 2006 and 2005 was $18 million, $34 million and $18 million, respectively. The total related tax benefit realized was $2 million in 2007 and zero in 2006.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP as of Dec. 31, were as follows:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Available for future grants: | | | |
| LTIP | 8,937,651 | 9,288,283 | 11,321,573 |
| TSOP | 2,290,700 | 2,538,700 | 2,771,400 |
| Shares of Common Stock issued: | | | |
| LTIP | 5,199,060 | 8,517,911 | 9,078,717 |
| TSOP | 540,877 | 836,783 | 410,750 |

## 12. Stockholders' Equity

### Common Stock

Common stock is reported net of shares held by consolidated subsidiaries (Treasury Shares) of Norfolk Southern. Treasury Shares at Dec. 31, 2007 and 2006, amounted to 20,683,686 and 20,780,638 shares, respectively, with a cost of $20 million in both years.

### Accumulated Other Comprehensive Loss

"Accumulated other comprehensive loss" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | | *($ in millions)* | | |
| Dec. 31, 2007 | | | | |
| Pension and other postretirement liabilities | $ (315) | $ (54) | $ 20 | $ (349) |
| Other comprehensive loss of equity investees | (55) | 5 | -- | (50) |
| Unrealized gains on securities | 1 | -- | (1) | -- |
| Accumulated other comprehensive loss | $ (369) | $ (49) | $ 19 | $ (399) |
| Dec. 31, 2006 | | | | |
| Pension and other postretirement liabilities | $ -- | $ (315) | $ -- | $ (315) |
| Other comprehensive loss of equity investees | (72) | 17 | -- | (55) |
| Unrealized gains on securities | -- | 1 | -- | 1 |
| Cash flow hedges | 12 | -- | (12) | -- |
| Minimum pension liability | (17) | 17 | -- | -- |
| Accumulated other comprehensive loss | $ (77) | $ (280) | $ (12) | $ (369) |

**Other Comprehensive Income (Loss)**

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | *($ in millions)* | |
| ***Year ended Dec. 31, 2007*** | | | |
| Net gain (loss) arising during the year: | | | |
| Pensions and other postretirement benefits | $ (88) | $ 34 | $ (54) |
| Reclassification adjustments for costs included in net income | 31 | (11) | 20 |
| Subtotal | (57) | 23 | (34) |
| Other comprehensive income of equity investees | 5 | -- | 5 |
| Reclassification adjustment for unrealized gains on securities included in net income | (2) | 1 | (1) |
| Other comprehensive income (loss) | $ (54) | $ 24 | $ (30) |
| ***Year ended Dec. 31, 2006*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ (1) | $ 1 | $ -- |
| Reclassification adjustments for gains included in net income | (20) | 8 | (12) |
| Subtotal | (21) | 9 | (12) |
| Unrealized gains on securities | 1 | -- | 1 |
| Minimum pension liability | (10) | 4 | (6) |
| Other comprehensive income of equity investees | 15 | 4 | 19 |
| Other comprehensive income (loss) | $ (15) | $ 17 | $ 2 |
| ***Year ended Dec. 31, 2005*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 92 | $ (37) | $ 55 |
| Reclassification adjustments for gains included in net income | (148) | 58 | (90) |
| Subtotal | (56) | 21 | (35) |
| Unrealized losses on securities | (1) | -- | (1) |
| Minimum pension liability | (6) | 2 | (4) |
| Other comprehensive loss of equity investees | (13) | -- | (13) |
| Other comprehensive income (loss) | $ (76) | $ 23 | $ (53) |

**13. Stock Purchase Program**

In March 2007, NS' Board of Directors amended NS' share repurchase program and increased the authorized amount of share repurchases from 50 million to 75 million shares and shortened the authorized period from 2015 to 2010. The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. Near-term purchases under the program are expected to be made with internally generated cash; however, future funding sources could include proceeds from the sale of commercial paper notes or the increase of long-term debt. NS purchased and retired 23.6 million shares and 21.7 million shares of its common stock under this program in 2007 and 2006, respectively, at a cost of $1.2 billion and $964 million, respectively.

**14. Earnings Per Share**

The following tables set forth the calculation of basic and diluted earnings per share:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Basic earnings per share: | | | |
| Income available to common stockholders | $ 1,459 | $ 1,475 | $ 1,281 |
| Weighted-average shares outstanding | 389.6 | 406.0 | 404.2 |
| Basic earnings per share | $ 3.74 | $ 3.63 | $ 3.17 |

Income available to common stockholders for 2007 and 2006 reflects a $5 million and $6 million reduction, respectively, for the after-tax effect of dividend equivalent payments made to holders of vested stock options.

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Diluted earnings per share: | | | |
| Income available to common stockholders | $ 1,464 | $ 1,481 | $ 1,281 |
| Weighted-average shares outstanding per above | 389.6 | 406.0 | 404.2 |
| Dilutive effect of outstanding options and share-settled awards (as determined by the application of the treasury stock method) | 8.2 | 8.7 | 8.1 |
| Adjusted weighted-average shares outstanding | 397.8 | 414.7 | 412.3 |
| Diluted earnings per share | $ 3.68 | $ 3.57 | $ 3.11 |

The diluted calculations exclude options whose exercise price exceeded the average market price of Common Stock as follows: zero in 2007, 1 million in 2006 and 1 million in 2005.

**15. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Short-term investments," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at Dec. 31:

| | 2007 | | 2006 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 154 | $ 173 | $ 145 | $ 166 |
| Long-term debt | $ (6,368) | $ (6,935) | $ (6,600) | $ (7,370) |

Underlying net assets were used to estimate the fair value of investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of zero on Dec. 31, 2007, and $1 million on Dec. 31, 2006. Sales of "available-for-sale" securities were immaterial for the years ended Dec. 31, 2007, 2006 and 2005; most short-term investments were redeemed at maturity.

**16. Derivative Financial Instruments**

All derivatives are recognized in the financial statements as either assets or liabilities and are measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive loss," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge.

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Diesel Fuel Hedging**

From 2001 until May 2004, NS entered into contracts that hedged a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. The goal of this hedging strategy was to reduce the variability of fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provided that NS would not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption would be hedged for any month within any 36-month period. After taking into account the effect of the hedging, diesel fuel costs represented 14% and 11% of NS' operating expenses for the years ended Dec. 31, 2006 and 2005, respectively. The last remaining contracts were settled in the second quarter of 2006, bringing an end to this program. NS' fuel hedging activity resulted in decreases in diesel fuel expenses

of $20 million in 2006 and $148 million in 2005. Ineffectiveness, or the extent to which changes in the fair value of the heating oil contracts do not offset changes in the fair values of the expected diesel fuel transactions, was a $1 million expense in 2006 and a $5 million expense in 2005.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed and floating-rate debt instruments, and by entering into interest rate hedging transactions to achieve an appropriate mix within its debt portfolio. NS had $59 million and $83 million, or about 1%, of its fixed rate debt portfolio hedged as of Dec. 31, 2007, and Dec. 31, 2006, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. NS' interest rate hedging activity resulted in decreases in interest expenses of $1 million for 2007 and 2006, and $2 million for 2005. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

Fair values of interest rate swaps at Dec. 31, 2007, and Dec. 31, 2006, were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statements of Cash Flows. The total net asset position of NS' outstanding derivative financial instruments was comprised of a gross fair value asset position of $1 million at both Dec. 31, 2007, and Dec. 31, 2006.

## 17. Commitments and Contingencies

**Lawsuits**

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to earnings. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in earnings in the periods in which such adjustments are known.

**Casualty Claims**

Casualty claims include employee personal injury and occupational claims as well as third-party claims, all exclusive of legal costs. To aid in valuing its personal injury liability and determining the amount to accrue during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. Job-related accidental injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims and is supported by the most recent actuarial study. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

In 2005, NS recorded a liability related to the Jan. 6, 2005 derailment in Graniteville, SC. The liability, which includes a current and long-term portion, represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheets reflect a current and long-term receivable for estimated recoveries from NS' insurance carriers. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss recorded in 2005. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention. Expenses in 2005 included $41 million related to this incident, representing NS' retention under its insurance policies and other uninsured costs.

**Employee personal injury claims** – The largest component of casualties and other claims expense is employee personal injury costs. The actuarial firm engaged by NS provides quarterly studies to aid in valuing its employee personal injury liability and estimating its employee personal injury expense. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. The actuary uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS adjusts its liability quarterly based upon management's assessment and the results of the study. The estimate of loss liabilities is subject to inherent limitation given the difficulty of predicting future events such as jury decisions, court interpretations or legislative changes and as such the actual loss may vary from the amount recorded.

**Occupational claims** – Occupational claims (including asbestosis and other respiratory diseases, as well as repetitive motion) are often not caused by a specific accident or event but rather result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been employed in the rail industry for decades. The actuarial firm provides an estimate of the occupational claims liability based upon NS' history of claim filings, severity, payments and other pertinent facts. The liability is dependent upon management's judgments made as to the specific case reserves as well as judgments of the consulting actuarial firm in the periodic studies. The actuarial firm's estimate of ultimate loss includes a provision for those claims that have been incurred but not reported. This provision is derived by analyzing industry data and projecting NS' experience into the future as far as can be reasonably determined. NS adjusts its liability quarterly based upon management's assessment and the results of the study. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability are reflected in operating expenses in the periods in which such adjustments become known.

**Third-party claims** – NS records a liability for third-party claims including those for highway crossing accidents, trespasser and other injuries, automobile liability, property damage and lading damage. The actuarial firm assists with the calculation of potential liability for third-party claims, except lading damage, based upon NS' experience including number and timing of incidents, amount of payments, settlement rates, number of open claims and legal defenses. The actuarial estimate includes a provision for claims that have been incurred but have not yet been reported. Each quarter NS adjusts its liability based upon management's assessment and the results of the study. Given the inherent uncertainty in regard to the ultimate outcome of third-party claims, it is possible that future settlement costs may differ from the estimated liability recorded.

**Environmental Matters**

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against

third parties for recovery of cleanup costs incurred by NS are reflected as receivables (when collection is probable) on the balance sheet and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $46 million at Dec. 31, 2007, and $54 million at Dec. 31, 2006 (of which $12 million was accounted for as a current liability at Dec. 31, 2007 and 2006). At Dec. 31, 2007, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 155 known locations compared with 172 locations at Dec. 31, 2006. On that date, 13 sites accounted for $25 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 32 locations, one or more NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future - is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmental liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial position, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which NS is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

**Insurance**

NS obtains on behalf of itself and its subsidiaries insurance for potential losses for third-party liability and first-party property damages. NS is currently self-insured up to $25 million and above $1 billion per occurrence for bodily injury and property damage to third parties and up to $25 million and above $175 million per occurrence for property owned by NS or in NS' care, custody or control.

**Purchase Commitments**

At Dec. 31, 2007, NSR had outstanding purchase commitments of approximately $298 million primarily for coal hoppers, locomotives, RoadRailer® trailers, and track material in connection with its capital programs through 2009.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of Norfolk Southern, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, NS and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material adverse effect on NS' financial position, results of operations or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

As of Dec. 31, 2007, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis, due in 2019. Four other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

*** * * * ***

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | March 31 | June 30 | Sept. 30 | Dec. 31 |
| | *($ in millions, except per share amounts)* | | | |
| **2007** | | | | |
| Railway operating revenues | $ 2,247 | $ 2,378 | $ 2,353 | $ 2,454 |
| Income from railway operations | 528 | 690 | 681 | 686 |
| Net income | 285 | 394 | 386 | 399 |
| Earnings per share: | | | | |
| Basic | $ 0.72 | $ 1.00 | $ 0.99 | $ 1.04 |
| Diluted | $ 0.71 | $ 0.98 | $ 0.97 | $ 1.02 |
| **2006** | | | | |
| Railway operating revenues | $ 2,303 | $ 2,392 | $ 2,393 | $ 2,319 |
| Income from railway operations | 551 | 677 | 715 | 614 |
| Net income | 305 | 375 | 416 | 385 |
| Earnings per share: | | | | |
| Basic | $ 0.74 | $ 0.91 | $ 1.04 | $ 0.97 |
| Diluted | $ 0.72 | $ 0.89 | $ 1.02 | $ 0.95 |

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Norfolk Southern's Chief Executive Officer and Chief Financial Officer, with the assistance of management, evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of Dec. 31, 2007. Based on such evaluation, such officers have concluded that, as of Dec. 31, 2007, NS' disclosure controls and procedures were effective to ensure that information required to be disclosed in NS' reports under the Exchange Act is recorded, processed, summarized and reported, within the time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

**Internal Control Over Financial Reporting**

The management of Norfolk Southern is responsible for establishing and maintaining adequate internal control over financial reporting. Norfolk Southern's internal control over financial reporting includes those policies and procedures that pertain to its ability to record, process, summarize and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that Norfolk Southern's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of Dec. 31, 2007. This assessment was based on criteria for effective internal control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on our assessment, management has concluded that Norfolk Southern maintained effective internal control over financial reporting as of Dec. 31, 2007.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of Norfolk Southern's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Norfolk Southern's management has issued a report of its assessment of internal control over financial reporting, and Norfolk Southern's independent registered public accounting firm has issued an attestation report on Norfolk Southern's internal controls over financial reporting as of Dec. 31, 2007. These reports appear in Part II, Item 8 of this report on Form 10-K.

During the fourth quarter of 2007, management has not identified any changes in internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal control over financial reporting.

**Item 9B. Other Information.**

None.

# PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 10. Directors, Executive Officers and Corporate Governance.**

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption “Election of Directors,” under the caption “Section 16(a) Beneficial Ownership Reporting Compliance,” under the caption “Corporate Governance,” and under the caption “Committees” in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Securities and Exchange Commission (Commission) pursuant to Regulation 14A. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under “Executive Officers of the Registrant.”

**Item 11. Executive Compensation.**

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information:

- appearing under the subcaption “Compensation” under the caption “Board of Directors” for directors, including the “2007 Non-Employee Director Compensation Table” and the “Narrative to Non-Employee Director Compensation Table;”
- appearing under the caption “Executive Compensation” for executives, including the “Compensation Discussion and Analysis,” the information appearing in the “Summary Compensation Table” and the “2007 Grants of Plan-Based Awards” table, including the narrative to such tables, the “Outstanding Equity Awards at Fiscal Year-End 2007” and “Option Exercises and Stock Vested in 2007” tables and the tabular and narrative information appearing under the subcaptions “Retirement Benefits,” “Deferred Compensation,” and “Potential Payments Upon a Change in Control or Other Termination of Employment;” and
- appearing under the captions “Compensation Committee Interlocks and Insider Participation” and “Compensation Committee Report,”

in each case included in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

In accordance with General Instruction G(3), information on security ownership of certain beneficial owners and management called for by Item 12, Part III, Item 403 of Regulation S-K, is incorporated herein by reference from the information appearing under the caption “Beneficial Ownership of Stock” in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Equity Compensation Plan Information (as of Dec. 31, 2007)**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | | Weighted-average Exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders[1] | 18,782,702[(3)] | $ | 25.71[(5)] | 8,937,651[(6)] |
| Equity compensation plans not approved by security holders[2] | 2,567,775[(4)] | $ | 32.10 | 2,326,700[(7)] |
| Total | 21,350,477 | | | 11,264,351 |

1 The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.

2 The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan and the Directors' Restricted Stock Plan.

3 Includes options, restricted stock units and performance share units granted under the Long-Term Incentive Plan that may be settled in shares of stock.

4 Includes options granted under the Long-Term Incentive Plan on 655,585 shares for non-officers and options granted under the Thoroughbred Stock Option Plan.

5 Calculated without regard to 2,115,000 outstanding restricted stock units and performance share units at Dec. 31, 2007.

6 Of the shares remaining available for grant under plans approved by stockholders, 6,703,196 are available for grant as restricted shares, performance shares or restricted stock unit shares under the Long-Term Incentive Plan.

7 Of the shares remaining available for grant under plans not approved by stockholders, 36,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by stockholders at their Annual Meeting held on May 10, 1984, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for non-employee directors, officers and other key employees to acquire a proprietary interest in the Corporation. On Jan. 23, 2001, the Board of Directors further amended LTIP and approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. Also on Jan. 23, 2001, the Board amended LTIP, which amendment was approved by shareholders on May 10, 2001, that included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock.

Pursuant to another amendment approved by stockholders on May 12, 2005, not more than 8,500,000 of the shares remaining available for issuance under LTIP may be awarded as restricted shares, performance shares or restricted stock unit shares. Cash payments of restricted stock units, stock appreciation rights and performance share units will not be applied against the maximum number of shares issuable under LTIP. Any shares of

Common Stock subject to options, performance share units or restricted stock units which are not issued as Common Stock will again be available for award under LTIP after the expiration or forfeiture of an award.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares, restricted stock units and performance share units. In addition, dividend equivalents may be awarded for options, restricted stock units and performance share units. The Committee may make awards under LTIP subject to forfeiture under certain circumstances and may establish such other terms and conditions for the awards as provided in LTIP.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units entitle a recipient to receive performance-based compensation at the end of a three-year performance cycle based on Norfolk Southern's performance during that three-year period. For the 2007 performance share unit awards, corporate performance will be measured using three equally weighted standards established by the Committee: (1) three-year average return on average capital invested, (2) three-year average operating ratio and (3) three-year total return to stockholders as compared with the average total return on all stocks comprising the S&P 500 composite stock price index. Performance share units may be payable in either shares of Norfolk Southern Common Stock or cash.

Restricted stock units are payable in cash or in shares of Norfolk Southern Common Stock at the end of a restriction period of not less than 36 months and not more than 60 months. During the restriction period, the holder of the restricted stock units has no beneficial ownership interest in the Norfolk Southern Common Stock represented by the restricted stock units and has no right to vote the shares represented by the units or to receive dividends (except for dividend equivalent rights that may be awarded with respect to the restricted stock units). The Committee at its discretion may waive the restriction period.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan ("TSOP") on Jan. 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. TSOP has not been and is not required to have been approved by stockholders. There are 6,000,000 shares of authorized but unissued Common Stock reserved for issuance under TSOP.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Committee may grant nonqualified stock options subject to such terms and conditions as provided in TSOP.

The option price will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the options are granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. Options awarded in 2007 are subject to a three-year vesting period. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on Jan. 1, 1994, and is designed to increase ownership of Norfolk Southern Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been and is not required to have been approved by stockholders. Currently, a maximum of 66,000 shares of Norfolk Southern Common Stock may be granted under the Plan. To make grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Norfolk Southern Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors who are not and never have been employees of Norfolk Southern are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period applicable to restricted shares granted under the Plan begins on the date of the grant and ends on the earlier of the recipient's death or six months after the recipient ceases to be a director by reason of disability or retirement. During the restriction period shares may not be sold, pledged or otherwise encumbered. Directors will forfeit the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement or death.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

In accordance with General Instruction G(3), information called for by Item 13, Part III, is incorporated herein by reference from the information appearing under the caption "Transactions with Related Persons" and under the caption "Director Independence" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 14. Principal Accountant Fees and Services.**

In accordance with General Instruction G(3), information called for by Item 14, Part III is incorporated herein by reference from the information appearing under the caption "Ratification of Appointment of Independent Registered Public Accounting Firm" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A.

# PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 15. Exhibits and Financial Statement Schedules.**

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements


| | |
|---|---|
| Report of Management | K41 |
| Reports of Independent Registered Public Accounting Firm | K42 |
| Consolidated Statements of Income, Years ended Dec. 31, 2007, 2006 and 2005 | K44 |
| Consolidated Balance Sheets as of Dec. 31, 2007 and 2006 | K45 |
| Consolidated Statements of Cash Flows, Years ended Dec. 31, 2007, 2006 and 2005 | K46 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended Dec. 31, 2007, 2006 and 2005 | K47 |
| Notes to Consolidated Financial Statements | K48 |


2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:


| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K94 |


Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated by reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended effective Feb. 1, 2008, are incorporated by reference to Exhibit 3 to Norfolk Southern Corporation’s Form 8-K filed on Jan. 25, 2008. |

4 Instruments Defining the Rights of Security Holders, Including Indentures:

(a) Indenture, dated as of Jan. 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, is incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595).

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation’s Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation’s Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of Feb. 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on Feb. 7, 2001.

(f) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(g) Eighth Supplemental Indenture, dated as of Sept. 17, 2004, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of 5.257% Notes due 2014 (“Securities”) in the aggregate principal amount of $441.5 million in connection with Norfolk Southern Corporation’s offer to exchange the Securities and cash for up to $400 million of its outstanding 7.350% Notes due 2007, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation’s Form 8-K filed on Sept. 23, 2004.

(h) Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, is incorporated herein by reference to Exhibit 4(l) to Norfolk Southern Corporation’s Form 10-Q filed on Oct. 28, 2004.

(i) First Supplemental Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, related to the issuance of notes in the principal amount of approximately $451.8 million, is incorporated herein by reference to Exhibit 4(m) to Norfolk Southern Corporation’s Form 10-Q filed on Oct. 28, 2004.

(j) Ninth Supplemental Indenture, dated as of March 11, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $300 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on March 15, 2005.

(k) Tenth Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $366.6 million, is incorporated herein by reference to Exhibit 99.1 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(l) Eleventh Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $350 million, is incorporated herein by reference to Exhibit 99.2 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

(b) Amendment No. 1, dated as of Aug. 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(d) Amendment No. 3, dated as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10(dd) to Norfolk Southern Corporation's Form 10-Q filed on July 30, 2004.

(e) Amendment No. 5 to the Transaction Agreement, dated as of Aug. 27, 2004, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(f) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(g) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(h) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(i) Amendment No. 2, dated as Jan. 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

(j) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

(k) Amendment No. 4, dated as of June 1, 2005, and executed in late June 2005, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibits thereto, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on July 1, 2005.

(l) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(m) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(n) First Amendment dated March 19, 2007, to the Master Agreement dated July 27, 1999, by and between North Carolina Railroad Company and Norfolk Southern Railway Company is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation’s Form 10-Q filed on July 27, 2007.

(o) The Supplementary Agreement, entered into as of Jan. 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) - extending and amending a Lease, dated as of Oct. 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(p) The Norfolk Southern Corporation Executive Management Incentive Plan, effective Jan. 25, 2005, is incorporated by reference herein from Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on May 13, 2005.

*(q) The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(r) The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective Jan. 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(s) The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective Jan. 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(t) The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective Jan. 1, 1994, as restated Nov. 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

*(u) Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as “named executive officers” and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders), is incorporated herein by reference to Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

*,**(v) Norfolk Southern Corporation Supplemental (formerly, Excess) Benefit Plan, as amended effective as of May 2, 2005.

*(w) The Norfolk Southern Corporation Directors' Charitable Award Program, as amended effective July 2007, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

*(x) The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective Jan. 22, 2008, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(y) Form of Agreement, dated as of Oct. 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on Nov. 9, 2001. The agreement was entered into with L. Ike Prillaman, former Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, former Vice Chairman and Chief Financial Officer.

(z) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(aa) The Norfolk Southern Corporation Restricted Stock Unit Plan, effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(bb) The Norfolk Southern Corporation Executive Life Insurance Plan, as amended, effective Oct. 1, 2003, is incorporated herein by reference to Exhibit 10 to Norfolk Southern Corporation's Form 10-Q filed on Oct. 31, 2003.

(cc) Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holdings Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc., is incorporated herein by reference to Exhibit 2.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(dd) Tax Allocation Agreement, dated as of Aug. 27, 2004, by and among Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(ee) Amended and Restated Credit Agreement dated as of June 26, 2007, with respect to the Registrant's $1 billion unsecured revolving credit facility, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on June 27, 2007.

*(ff) The description of Norfolk Southern Corporation's executive physical reimbursement for non-employee directors and certain executives is incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on July 28, 2005.

*(gg) Form of 2006 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(hh) Form of 2006 Restricted Share and Restricted Stock Unit Agreement under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(ii) Form of 2005 Performance Share Unit Award under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

(jj) The Transaction Agreement, dated as of Dec. 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and The Kansas City Southern Railway Company (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request).

(kk) Amendment No. 1, dated as of Jan. 17, 2006, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and the Kansas City Southern Railroad.

(ll) Amendment No. 2, dated as of May 1, 2006, to the Transaction Agreement, dated as of Dec. 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and The Kansas City Southern Railway Company is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

*(mm) The retirement agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(nn) The waiver agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(oo) Revised fees for outside directors are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(pp) The retirement agreement, dated Mar. 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Mar. 31, 2006.

*(qq) The waiver agreement, dated Mar. 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Mar. 31, 2006.

(rr) Limited Liability Company Agreement of Meridian Speedway, LLC, dated as of May 1, 2006, by and among The Alabama Great Southern Railroad Company and Kansas City Southern is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

*(ss) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective July 25, 2006, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 28, 2006.

*(tt) Form of Norfolk Southern Corporation Long-Term Incentive Plan, 2007 Award Agreement is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 11, 2007.

*,**(uu) Retirement Plan of Norfolk Southern Corporation and Participating Subsidiary Companies effective June 1, 1982, amended effective Dec. 31, 2007.

*(vv) The retirement agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007.

*(ww) The waiver agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007.

(xx) Transfer and Administration Agreement dated as of Nov. 8, 2007, with respect to the Registrant's $500 million receivables securitization facility is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on Nov. 14, 2007.

* (yy) Form of Norfolk Southern Corporation Long-Term Incentive Plan 2008 Award Agreement is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on Nov. 20, 2007.

(zz) Dealer Agreement dated as of Jan. 23, 2008, between the Registrant and J. P. Morgan Securities Inc. is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

(aaa) Dealer Agreement dated as of Jan. 23, 2008, between the Registrant and Goldman, Sachs & Co. is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(bbb) 2008 Award Agreement between Norfolk Southern Corporation and Gerald L. Baliles, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(ccc) 2008 Award Agreement between Norfolk Southern Corporation and Daniel A. Carp, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

| | |
|---|---|
| *(ddd) | 2008 Award Agreement between Norfolk Southern Corporation and Gene R. Carter, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.4 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008. |
| *(eee) | 2008 Award Agreement between Norfolk Southern Corporation and Alston D. Correll, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008. |
| *(fff) | 2008 Award Agreement between Norfolk Southern Corporation and Landon Hilliard, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008. |
| *(ggg) | 2008 Award Agreement between Norfolk Southern Corporation and Burton M. Joyce, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.7 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008. |
| *(hhh) | 2008 Award Agreement between Norfolk Southern Corporation and Steven F. Leer, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.8 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008. |
| *(iii) | 2008 Award Agreement between Norfolk Southern Corporation and Jane M. O'Brien, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.9 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008. |
| *(jjj) | 2008 Award Agreement between Norfolk Southern Corporation and J. Paul Reason, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.10 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008. |
| **12 | Statement re: Computation of Ratio of Earnings to Fixed Charges. |
| **21 | Subsidiaries of the Registrant. |
| **23 | Consent of Independent Registered Public Accounting Firm. |
| **31 | Rule 13a-14(a)/15d-14(a) Certifications. |
| **32 | Section 1350 Certifications. |
| **99 | Annual CEO Certification pursuant to NYSE Rule 303A.12(a). |

* *Management contract or compensatory arrangement.*
** *Filed herewith.*

(B) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(C) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

Exhibits 23, 31, 32 and 99 are included in copies assembled for public dissemination. All exhibits are included in the 2007 Form 10-K posted on our website at www.nscorp.com under "Investors" and "SEC Filings" or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

## POWER OF ATTORNEY

Each person whose signature appears below under “SIGNATURES” hereby authorizes James A. Hixon and James A. Squires or one of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints James A. Hixon and James A. Squires or any one of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 15th day of February 2008.

**NORFOLK SOUTHERN CORPORATION**

By: Charles W. Moorman
(Chairman, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 15th day of February 2008, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ Charles W. Moorman<br>(Charles W. Moorman) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ James A. Squires<br>(James A. Squires) | Executive Vice President Finance and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Daniel A. Carp<br>(Daniel A. Carp) | Director |
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |

/s/ Alston D. Correll Director
(Alston D. Correll)

/s/ Landon Hilliard Director
(Landon Hilliard)

/s/ Burton M. Joyce Director
(Burton M. Joyce)

/s/ Steven F. Leer Director
(Steven F. Leer)

/s/ J. Paul Reason Director
(J. Paul Reason)

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2005, 2006 and 2007**
**($ in millions)**

| | | Additions charged to: | | | |
|---|---|---|---|---|---|
| | Beginning Balance | Expenses | Other Accounts | Deductions | Ending Balance |
| ***Year ended December 31, 2005*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 13 | $ -- | $ -- | $ 3 [2] | $ 10 |
| Casualty and other claims included in other liabilities | $ 315 | $ 311 | $ -- | $ 205 [3] | $ 421 |
| Current portion of casualty and other claims included in accounts payable | $ 222 | $ 92 | $ 114 [1] | $ 137 [4] | $ 291 |
| ***Year ended December 31, 2006*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 10 | $ -- | $ -- | $ 1 [2] | $ 9 |
| Casualty and other claims included in other liabilities | $ 421 | $ 217 | $ -- | $ 167 [3] | $ 471 |
| Current portion of casualty and other claims included in accounts payable | $ 291 | $ 40 | $ 124 [1] | $ 154 [4] | $ 301 |
| ***Year ended December 31, 2007*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 9 | $ 1 | $ -- | $ -- | $ 10 |
| Casualty and other claims included in other liabilities | $ 471 | $ 113 | $ 162 [3,4] | $ 158 [3] | $ 588 |
| Current portion of casualty and other claims included in accounts payable | $ 301 | $ 17 | $ 122 [1] | $ 181 [4] | $ 259 |

[1]Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2]Reclassifications to/from other assets.

[3]Payments and reclassifications to/from accounts payable.

[4]Payments and reclassifications to/from other liabilities.

# EXHIBIT PX0591

UNION PACIFIC

BUILDING AMERICA®

**UNION PACIFIC CORPORATION**
2007 ANNUAL REPORT

Fellow Shareholders:

By nearly every measure, 2007 was one of the best years in our Company's history. We achieved this success by fulfilling our commitments to customers, communities, employees and our shareholders.

- We operated a safer railroad for our customers, employees and communities.
- We overcame the challenges of a weaker economy and record-high diesel fuel prices to set numerous financial records.
- We increased our value to customers through improved service. Customers recognized these efforts, rewarding us with their highest satisfaction survey marks since our merger with the Southern Pacific.
- We contributed to the communities where we operate by offering good jobs and supporting economic development and community organizations.

The progress we made in these areas enabled us to deliver strong shareholder returns. During 2007, Union Pacific's stock price appreciated nearly 37 percent, dividends increased 47 percent, and shareholders received $1.5 billion through share repurchases.

We expect 2008 will be another record year. Although we will be challenged by economic softness and volatile diesel fuel prices, we expect to offset these issues as the long-term initiatives we began a few years ago continue to pay off.

America's transportation infrastructure needs capacity investment. Union Pacific has pledged to do its part by investing for growth as we improve our financial returns. The "proof statement" can be seen in our actions. We invested a record $3.1 billion during 2007, as we earned record profits and improved our return on invested capital. Our plans for 2008 are similar - generate record profits, increase returns and invest an additional $3.1 billion for safety, service, growth and efficiency.

Union Pacific plays a critical role in our nation's pursuit of energy independence and environmental responsibility. Railroads are the most fuel efficient, environmentally friendly mode of ground freight transportation, moving one ton more than 790 miles on a gallon of diesel fuel. In addition, our numerous technology and process innovations are driving even greater conservation, already having saved nearly 21 million gallons of diesel fuel in 2007. One example is a new switch locomotive that reduces emissions as much as 80 percent and is at least 15 percent more fuel efficient.

The men and women of Union Pacific are the driving force behind our success as a company. They are prepared to handle the challenges ahead as we recruit, train and develop one of the nation's most productive workforces. The Union Pacific team is dedicated to continuing the strong tradition built over the past 146 years, and we look forward to a very successful future.



Chairman, President and
Chief Executive Officer

# DIRECTORS AND SENIOR MANAGEMENT

## BOARD OF DIRECTORS

**Andrew H. Card, Jr.**
Former White House Chief of Staff
*Board Committees: Audit, Finance*

**Erroll B. Davis, Jr.**
Chancellor
University System of Georgia
*Board Committees: Compensation and Benefits, Corporate Governance and Nominating*

**Thomas J. Donohue**
President and
Chief Executive Officer
U.S. Chamber of Commerce
*Board Committees: Compensation and Benefits (Chair), Corporate Governance and Nominating*

**Archie W. Dunham**
Retired Chairman
ConocoPhillips
*Board Committees: Finance (Chair), Corporate Governance and Nominating*

**Judith Richards Hope**
Distinguished Visitor from Practice
and Professor of Law
Georgetown University Law Center
*Board Committees: Audit (Chair), Finance*

**Charles C. Krulak**
General, USMC, Ret.
Former Commandant of the
United States Marine Corps
*Board Committees: Audit, Finance*

**Michael W. McConnell**
General Partner
Brown Brothers Harriman & Co.
*Board Committees: Audit, Compensation and Benefits*

**Thomas F. McLarty III**
President
McLarty Associates
*Board Committees: Compensation and Benefits, Corporate Governance and Nominating*

**Steven R. Rogel**
Chairman and
Chief Executive Officer
Weyerhaeuser Company
*Board Committees: Corporate Governance and Nominating (Chair), Compensation and Benefits*

**James R. Young**
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

## SENIOR MANAGEMENT

**James R. Young**
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

**Dennis J. Duffy**
Executive Vice President–Operations
Union Pacific Railroad Company

**Charles R. Eisele**
Senior Vice President–Strategic Planning
Union Pacific Corporation

**Bernard R. Gutschewski**
Vice President–Taxes
Union Pacific Corporation

**J. Michael Hemmer**
Senior Vice President–Law
and General Counsel
Union Pacific Corporation

**Mary Sanders Jones**
Vice President and Treasurer
Union Pacific Corporation

**Robert M. Knight, Jr.**
Executive Vice President–Finance
and Chief Financial Officer
Union Pacific Corporation

**John J. Koraleski**
Executive Vice President–
Marketing and Sales
Union Pacific Railroad Company

**John J. Marchant**
Vice President–Labor Relations
Union Pacific Railroad Company

**Richard R. McClish**
Vice President–
Continuous Improvement
Union Pacific Railroad Company

**Joseph E. O'Connor, Jr.**
Vice President–Purchasing
Union Pacific Railroad Company

**Michael A. Rock**
Vice President–External Relations
Union Pacific Corporation

**Barbara W. Schaefer**
Senior Vice President–Human
Resources and Secretary
Union Pacific Corporation

**Lynden L. Tennison**
Senior Vice President and
Chief Information Officer
Union Pacific Corporation

**Jeffrey P. Totusek**
Vice President and Controller
Union Pacific Corporation

**Robert W. Turner**
Senior Vice President–
Corporate Relations
Union Pacific Corporation

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

*(Mark One)*

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2007

**OR**

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from __________ to ____________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **UTAH** | **13-2626465** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1400 DOUGLAS STREET, OMAHA, NEBRASKA**
(Address of principal executive offices)
**68179**
(Zip Code)
**(402) 544-5000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| Common Stock (Par Value $2.50 per share) | New York Stock Exchange, Inc. |

- Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
  ☑ Yes ☐ No
- Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
  ☐ Yes ☑ No
- Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
  ☑ Yes ☐ No
- Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.
  ☑
- Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act):
  Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐
- Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).
  ☐ Yes ☑ No

As of June 29, 2007, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $31.7 billion.

The number of shares outstanding of the registrant's Common Stock as of January 31, 2008 was 260,700,527.

**Documents Incorporated by Reference –** Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on May 1, 2008, are incorporated by reference into Part III of this report. The registrant's Proxy Statement will be filed with the Securities and Exchange Commission pursuant to Regulation 14A.

## TABLE OF CONTENTS
## UNION PACIFIC CORPORATION


PART I

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 7 |
| Item 1B. | Unresolved Staff Comments | 10 |
| Item 2. | Properties | 10 |
| Item 3. | Legal Proceedings | 13 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 15 |
| | Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries | 16 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 17 |
| Item 6. | Selected Financial Data | 19 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| | Critical Accounting Policies | 40 |
| | Cautionary Information | 44 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 8. | Financial Statements and Supplementary Data | 46 |
| | Report of Independent Registered Public Accounting Firm | 47 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 78 |
| Item 9A. | Controls and Procedures | 78 |
| Item 9B. | Other Information | 78 |
| | Management's Annual Report on Internal Control Over Financial Reporting | 79 |
| | Report of Independent Registered Public Accounting Firm | 80 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers, and Corporate Governance | 81 |
| Item 11. | Executive Compensation | 81 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 81 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 82 |
| Item 14. | Principal Accountant Fees and Services | 82 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 83 |
| | Signatures | 84 |
| | Certifications | 94 |

# PART I

## Item 1. Business

### GENERAL

Union Pacific Corporation owns one of America's leading transportation companies. Its principal operating company, Union Pacific Railroad Company, links 23 states in the western two-thirds of the country and serves the fastest-growing U.S. population centers. Union Pacific Railroad Company's diversified business mix includes agricultural products, automotive, chemicals, energy, industrial products, and intermodal. It offers competitive long-haul routes from all major West Coast and Gulf Coast ports to eastern gateways. Union Pacific Railroad Company connects with Canada's rail systems and is the only railroad serving all six major gateways to Mexico, making it North America's premier rail franchise.

Union Pacific Corporation was incorporated in Utah in 1969 and maintains its principal executive offices at 1400 Douglas Street, Omaha, NE 68179. The telephone number at that address is (402) 544-5000. The common stock of Union Pacific Corporation is listed on the New York Stock Exchange (NYSE) under the symbol "UNP".

For purposes of this report, unless the context otherwise requires, all references herein to "UPC", "Corporation", "we", "us", and "our" shall mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which we separately refer to as "UPRR" or the "Railroad".

**Available Information –** Our Internet website is www.up.com. We make available free of charge on our website (under the "Investors" caption link) our Annual Reports on Form 10-K; our Quarterly Reports on Form 10-Q; our current reports on Form 8-K; our proxy statements; Forms 3, 4, and 5, filed on behalf of directors and executive officers; and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the Exchange Act), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our website previously filed SEC reports and exhibits via a link to EDGAR on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials, including By-Laws, Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers, and employees are available on our website. From time to time, the corporate governance materials on our website may be updated as necessary to comply with rules issued by the SEC and the NYSE or as desirable to promote the effective and efficient governance of our company. Any security holder wishing to receive, without charge, a copy of any of our SEC filings or corporate governance materials should send a written request to: Secretary, Union Pacific Corporation, 1400 Douglas Street, Omaha, NE 68179.

We have included the Chief Executive Officer (CEO) and Chief Financial Officer certifications regarding our public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31(a) and (b) to this report. Additionally, we filed with the NYSE the CEO's certification regarding our compliance with the NYSE's Corporate Governance Listing Standards (Listing Standards) pursuant to Section 303A.12(a) of the Listing Standards, which was dated May 9, 2007, and indicated that the CEO was not aware of any violations of the Listing Standards by the Corporation.

References to our website address in this report, including references in Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website. Therefore, such information should not be considered part of this report.

## OPERATIONS

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network. Additional information regarding our business and operations, including revenue and financial information and data and other information regarding environmental matters, is presented in Selected Financial Data, Item 6; Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7; and the Financial Statements and Supplementary Data, Item 8.

**Operations –** UPRR is a Class I railroad operating in the United States. We have 32,205 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers to move freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic moves through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Our freight traffic consists of bulk, manifest, and premium business. Bulk traffic is primarily coal, grain, rock, or soda ash in unit trains – trains transporting a single commodity from one source to one destination. Manifest traffic is individual carload or less than train-load business, including commodities such as lumber, steel, paper, and food. The transportation of finished vehicles and intermodal containers is part of our premium business. In 2007, we generated commodity revenue totaling $15.5 billion from the following six commodity groups:




*Agricultural* – Transporting agricultural products, including whole grains, commodities produced from these grains, and food and beverage products, provided 17% of our 2007 commodity revenue. With access to most major grain markets, we provide a critical link between the Midwest and western producing areas and export terminals in the Pacific Northwest (PNW) and Gulf ports, as well as Mexico. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. We also serve significant domestic markets, including grain processors, animal feeders, and ethanol producers in the Midwest, West, South, and Rocky Mountain states. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products, and beverages, which are moved to major U.S. population centers for consumption. Express Lane and our Produce Unit Train, our premium perishables services that move fruits and vegetables from the PNW and California with priority service to destinations in the East, compete with the trucking industry. We transport frozen meat and poultry to the West Coast ports for export, while beverages, primarily beer, enter the U.S. from Mexico.

*Automotive* – We are the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. We off-load finished vehicles at 38 vehicle distribution centers for delivery by truck to all major western U.S. cities. In addition to transporting finished vehicles, we provide expedited handling of automotive parts in both boxcars and intermodal containers to several assembly plants. We carry automotive materials bound for assembly plants in Mexico, the U.S., and Canada, and we also transport finished vehicles from manufacturing facilities in Mexico. In 2007, transportation of finished vehicles and automotive materials accounted for 9% of our commodity revenue.

*Chemicals* – Transporting chemicals provided 15% of our commodity revenue in 2007. Our franchise enables us to serve the chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. Two-

thirds of the chemicals business consists of liquid and dry chemicals, plastics, and liquid petroleum products. In addition to transporting plastics, customers also leverage our storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California destined primarily for glass producing markets in the East, the West, and abroad. Fertilizer movements originate primarily in the Gulf Coast region, as well as the West and Canada, bound for major agricultural users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 20% of our 2007 commodity revenue. Our geographic network allows us to transport coal destined for utilities and industrial facilities in 27 states, as well as to the Gulf and rail/barge/ship facilities on the Mississippi and Ohio Rivers and the Great Lakes. We serve mines located in the Southern Powder River Basin of Wyoming (SPRB), Colorado, Utah, southern Wyoming, and southern Illinois. SPRB coal represents the largest growth segment of the market, as utilities continue to favor its lower cost and low-sulfur content.

*Industrial Products* – Our extensive network enables our industrial products group to move numerous commodities between thousands of origin and destination points throughout North America. Lumber shipments originate primarily in the PNW and Canada for destinations throughout the United States for new home construction and repair and remodeling. Commercial and highway construction drives shipments of steel and construction products, consisting of rock, cement, and roofing materials. Paper and consumer goods, including furniture and appliances, are shipped to major metropolitan areas for consumers. Nonferrous metals and industrial minerals are moved for industrial manufacturing. In addition, we provide efficient and safe transportation for government entities and waste companies. In 2007, transporting industrial products provided 20% of our commodity revenue.

*Intermodal* – Our intermodal business, which represented 19% of our 2007 commodity revenue, includes international, domestic, and premium shipments. International business consists of imported container traffic that arrives at West Coast ports via steamship for destinations throughout the United States. Domestic business includes domestic container and trailer traffic for intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time-sensitive business requirements account for the majority of our premium service.

**Seasonality** – Some of the commodities we carry have peak shipping seasons, reflecting either or both the nature of the commodity, such as certain agricultural and food products that have specific growing and harvesting seasons, and the demand cycle for the commodity, such as intermodal traffic, which generally has a peak shipping season during the third quarter to meet holiday-related demand for consumer goods during the fourth quarter. The peak shipping seasons for these commodities can vary considerably from year to year depending upon various factors, including the strength of domestic and international economies and currencies and the strength of harvests and market prices of agricultural products. In response to an annual request delivered by the Surface Transportation Board (STB) to all of the Class I railroads operating in the U.S., we issue a letter during the third quarter detailing our plans for handling traffic during the third and fourth quarters and providing other information requested by the STB.

**Working Capital** – We currently have, and historically have had, a working capital deficit, which is common in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Competition** – We are subject to competition from other railroads, motor carriers, ship and barge operators, and pipelines. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company (BNSF), operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other railroads and motor carriers. Motor carrier competition is particularly strong for five of our six commodity groups (excluding energy). Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly effective, especially for grain and bulk commodities. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and

barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our business.

**Equipment Suppliers –** We depend on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment, potential new suppliers face high barriers to entry with respect to this industry. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

**Employees –** Approximately 86% of our 50,089 full-time-equivalent employees are represented by 14 major rail unions. In January 2005, the U.S. railroads began the current round of negotiations with the unions. In June 2007, the Brotherhood of Locomotive Engineers and Trainmen, the Brotherhood of Maintenance of Way Employees, the Brotherhood of Railway Signalmen, the National Conference of Firemen and Oilers, the International Brotherhood of Boilermakers and Blacksmiths, and the Sheet Metal Workers ratified a five-year agreement that provides for wage increases and increased employee health and welfare cost sharing. The annual wage increases (including retroactive increases) are as follows: July 2005 2.5%; July 2006 3.0%; July 2007 3.0%; July 2008 4.0%; July 2009 4.5%. A second bargaining group consisting of the Transportation Communications International Union, the Brotherhood of Railway Carman, and the International Brotherhood of Electrical Workers ratified the same agreement in September of 2007. However, the International Association of Machinists (IAM) failed to ratify this agreement in September. We also settled with the American Railway and Airway Supervisors Association in September. We reached a tentative agreement with the United Transportation Union in January of 2008. Therefore, we remain in negotiations with the IAM and United Supervisors Council of America (Yardmasters). Existing agreements with these two unions continue in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. Contract negotiations with the various unions generally take place over an extended period of time, and we rarely experience work stoppages during negotiations. The current agreements provide for periodic cost of living increases until new agreements are reached.

## GOVERNMENTAL AND ENVIRONMENTAL REGULATION

**Governmental Regulation –** Our operations are subject to a variety of federal, state, and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

The operations of the Railroad are subject to the regulatory jurisdiction of the STB of the United States Department of Transportation (DOT). The operations of the Railroad are also subject to the regulations of the Federal Railroad Administration of the DOT and other federal and state agencies. The STB has jurisdiction over rates charged on certain regulated rail traffic; freight car compensation; transfer, extension, or abandonment of rail lines; and acquisition of control of rail common carriers. On January 26, 2007, the STB issued a decision limiting the manner in which U.S. railroads can calculate fuel surcharges on traffic regulated by the STB, and we have complied with this regulation. The STB also has adopted new mechanisms for regulating some of our rates, adopted a new methodology for calculating the cost of capital for railroads, and expanded its review of line sales and leases. Various appeals may affect these regulations prior to final implementation.

DOT, the Occupational Safety and Health Administration, and the Department of Homeland Security, along with other federal agencies, have jurisdiction over certain aspects of safety, movement of hazardous materials, movement and disposal of hazardous waste, emissions requirements, and equipment standards. Various state and local agencies have jurisdiction over disposal of hazardous waste and seek to regulate movement of hazardous materials in areas not otherwise preempted by federal law.

**Environmental Regulation** – We are subject to extensive federal and state environmental statutes and regulations pertaining to public health and the environment. The statutes and regulations are administered and monitored by the Environmental Protection Agency (EPA) and by various state environmental agencies. The primary laws affecting our operations are the Resource Conservation and Recovery Act, regulating the management and disposal of solid and hazardous wastes; the Comprehensive Environmental Response, Compensation, and Liability Act, regulating the cleanup of contaminated properties; the Clean Air Act, regulating air emissions; and the Clean Water Act, regulating waste water discharges.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Item 1A. Risk Factors

The information set forth in this Item 1A should be read in conjunction with the rest of the information included in this report, including Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, and Item 8, Financial Statements and Supplementary Data.

*We Are Subject to Significant Governmental Regulation* – We are subject to governmental regulation by a significant number of federal, state, and local authorities covering a variety of health, safety, labor, environmental (as discussed below), and other matters. Many laws and regulations require us to obtain and maintain various licenses, permits, and other authorizations, and we cannot guarantee that we will continue to be able to do so. Our failure to comply with applicable laws and regulations could have a material adverse effect on us. Governments may change the legislative or regulatory frameworks within which we operate without providing us any recourse to address any adverse effects on our business, including, without limitation, regulatory determinations or rules regarding dispute resolution, business relationships with other railroads, calculation of our cost of capital or other inputs relevant to determining or estimating our revenue adequacy, and costs and expenses. Increased regulation of the rail industry likely would restrict our ability to determine prices for certain rail services, affect our ability to control traffic volume, and reduce capital spending on our rail network, facilities and equipment, resulting in a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, one or more consolidations of Class I railroads could lead to increased regulation of the rail industry.

*We May Be Affected by General Economic Conditions* – Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities we carry may have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Subject to Various Claims and Lawsuits That Could Result in Significant Expenditures* – The nature of our business exposes us to the potential for various claims and litigation related to labor and employment, personal injury, property damage, environmental liability, and other matters. Any material changes to litigation trends or a catastrophic rail accident or series of accidents involving any or all of property damage, personal injury, and environmental liability could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Required to Transport Hazardous Materials* – Federal laws require railroads, including us, to transport hazardous materials regardless of risk or potential exposure of loss. Any rail accident or other incident or accident on our network, at our facilities, or at the facilities of our customers involving the release of hazardous materials, including toxic inhalation hazard (or TIH) materials such as certain chlorine compounds, could involve significant costs and claims for personal injury, property damage, and environmental penalties and remediation, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Must Manage Both Significant Demand for Our Services and Network Capacity* – We may experience network difficulties, including congestion and reduced velocity, which may compromise the level of service we

provide to our customers. This level of demand may compound the impact of weather and weather-related events on our operations and velocity. Although we continue to improve our transportation plan, add capacity, and improve operations at our yards and other facilities, we cannot be sure that these measures will fully or adequately address any service shortcomings. We may experience other difficulties related to network capacity, dramatic and unplanned increases or decreases of demand for rail service with respect to one or more of our commodity groups, or other events that could have a negative impact on our operational efficiency, any of which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Severe Weather Could Result in Significant Business Interruptions and Expenditures* – Severe weather conditions, events, and other natural phenomena, including earthquakes, hurricanes, fires, floods, mudslides or landslides, extreme temperatures, and significant precipitation may cause business interruptions, including line outages on our rail network that can adversely affect our entire rail network and result in increased costs, increased liabilities, and decreased revenue, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Strikes or Work Stoppages Could Adversely Affect Our Operations as the Majority of Our Employees Belong to Labor Unions and Labor Agreements* – We are a party to collective bargaining agreements with various labor unions. Disputes with regard to the terms of these agreements or our potential inability to negotiate acceptable contracts with these unions could result in, among other things, strikes, work stoppages, or other slowdowns by the affected workers. If unionized workers were to engage in a strike, work stoppage, or other slowdown, or other employees were to become unionized, we could experience a significant disruption of our operations or higher ongoing labor costs, either of which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could compromise our service reliability and significantly increase our costs for healthcare, wages, and other benefits, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*The Availability of Qualified Personnel Could Adversely Affect Our Operations* – Changes in demographics, training requirements, and the availability of qualified personnel could negatively affect our ability to meet demand for rail service. Unpredictable increases in demand for rail services and a lack of network fluidity may exacerbate such risks, which could have a negative impact on our operational efficiency and otherwise have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Rely on Technology and Technology Improvements in Our Business Operations* – We rely on information technology in all aspects of our business. If we do not have sufficient capital to acquire new technology or if we are unable to implement new technology, we may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, if we experience significant disruption or failure of one or more of our information technology systems, including computer hardware, software, and communications equipment, we could experience a service interruption, safety failure, security breach, or other operational difficulties, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Environmental Laws and Regulations* – Our operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; handling, storage, transportation, and disposal of waste and other materials; and hazardous material or petroleum releases. We generate and transport hazardous and non-hazardous waste in our operations, and we did so in our former operations. Environmental liability can extend to previously owned or operated properties, leased properties, and properties owned by third parties, as well as to properties we currently own. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. We have been and may be subject to allegations or findings that we have violated, or are strictly liable under, these laws or regulations. We could incur significant costs as a result of any of the foregoing, and we may be required to incur significant expenses to investigate

and remediate known, unknown, or future environmental contamination, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Affected by Climate Change and Market or Regulatory Responses to Climate Change* – Climate change, including the impact of global warming, could have a material adverse effect on our results of operations, financial condition, and liquidity. Restrictions, caps, taxes, or other controls on emissions of greenhouse gasses, including diesel exhaust, could significantly increase our operating costs. Restrictions on emissions could also affect our customers that (a) use commodities that we carry to produce energy, (b) use significant amounts of energy in producing or delivering the commodities we carry, or (c) manufacture or produce goods that consume significant amounts of energy or burn fossil fuels, including chemical producers, farmers and food producers, and automakers and other manufacturers. Significant cost increases, government regulation, or changes of consumer preferences for goods or services relating to alternative sources of energy or emissions reductions could materially affect the markets for the commodities we carry, which in turn could have a material adverse effect on our results of operations, financial condition, and liquidity. Government incentives encouraging the use of alternative sources of energy could also affect certain of our customers and the markets for certain of the commodities we carry in an unpredictable manner that could alter our traffic patterns, including, for example, the impacts of ethanol incentives on farming and ethanol producers. Finally, we could face increased costs related to defending and resolving legal claims and other litigation related to climate change and the alleged impact of our operations on climate change. Any of these factors, individually or in operation with one or more of the other factors, or other unforeseen impacts of climate change could reduce the amount of traffic we handle and have a material adverse effect on our results of operations, financial condition, and liquidity.

*Rising or Elevated Fuel Costs and Whether We Are Able to Mitigate These Costs with Fuel Surcharges Could Materially and Adversely Affect Our Business* – Fuel costs constitute a significant portion of our transportation expenses. Diesel fuel prices are subject to dramatic fluctuations, and significant price increases could have a material adverse effect on our operating results. Although we currently are able to recover a significant amount of our increased fuel expenses through revenue from fuel surcharges, we cannot be certain that we will always be able to mitigate rising or elevated fuel costs through surcharges. Future market conditions or legislative or regulatory activities could adversely affect our ability to apply fuel surcharges or adequately recover increased fuel costs through fuel surcharges. International, political, and economic circumstances affect fuel prices and supplies. Weather can also affect fuel supplies and limit domestic refining capacity. If a fuel supply shortage were to arise higher fuel prices could, despite our fuel surcharge programs, have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Face Competition from Other Railroads and Other Transportation Providers* – We face competition from other railroads, motor carriers, ships, barges, and pipelines. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, any future consolidation of the rail industry could materially affect the competitive environment in which we operate.

*We Are Subject to Legislative, Regulatory, and Legal Developments Involving Taxes* – Taxes are a significant part of our expenses. We are subject to federal and state income, payroll, property, sales and use, fuel, and other types of taxes. Any or all changes in tax rates, enactment of new tax laws, revisions of tax regulations, and claims or litigation with taxing authorities could result in substantially higher taxes and, therefore, could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Utilize Capital Markets* – We rely on the capital markets to provide some of our capital requirements, including the issuance of long-term debt instruments and commercial paper from time to time, as well as the sale of certain of our receivables. Significant instability of the capital markets or deterioration of our financial condition due to internal or external factors could restrict or prohibit our access to commercial paper and

other financing sources and reduce our credit ratings below investment grade, which would prohibit us from utilizing our sale of receivables program and significantly increase the costs associated with issuing both commercial paper and long-term debt.

*We Are Dependent on Two Key Domestic Suppliers of Locomotives* – Due to the capital intensive nature and sophistication of locomotive equipment, potential new suppliers face high barriers to entry with respect to this industry. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

*We May Be Affected by Acts of Terrorism, War, or Risk of War* – Our rail lines, facilities, and equipment, including rail cars carrying hazardous materials, could be direct targets or indirect casualties of terrorist attacks. Terrorist attacks, or other similar events, any government response thereto, and war or risk of war may adversely affect our results of operations, financial condition, and liquidity. In addition, insurance premiums for some or all of our current coverages could increase dramatically, or certain coverages may not be available to us in the future.

## Item 1B. <u>Unresolved Staff Comments</u>

None.

## Item 2. <u>Properties</u>

We employ a variety of assets in the management and operation of our rail business. Our rail network links 23 states in the western two-thirds of the U.S.



**Track –** Our rail network includes 32,205 route miles. We own 26,354 miles and operate on the remainder pursuant to trackage rights or leases. The following table describes track miles at December 31, 2007 and 2006.

| | *2007* | *2006* |
|---|---|---|
| Route miles | **32,205** | 32,339 |
| Other main line | **6,404** | 6,295 |
| Passing lines and turnouts | **3,021** | 2,962 |
| Switching and classification yard lines | **9,270** | 10,000 |
| Total | **50,900** | 51,596 |

**Harriman Dispatching Center –** The Harriman Dispatching Center (HDC), located in Omaha, Nebraska, is our primary dispatching facility. It is linked to regional dispatching and locomotive management facilities at various locations along our network. The HDC moves locomotives and trains, manages traffic on our network, and coordinates interchanges with other railroads. Over 700 employees currently work on-site in the facility.

**Rail Facilities –** In addition to our track structure, we operate numerous facilities, including terminals for intermodal and other freight; rail yards for train-building, switching, storage-in-transit (the temporary storage of customer goods in rail cars prior to shipment) and other activities; offices to administer and manage our operations; dispatch centers to direct traffic on our rail network; crew quarters to house train crews along our network; and shops and other facilities for fueling, maintenance, and repair of locomotives and repair and maintenance of rail cars and other equipment. The following tables include the major yards and terminals on our system:

| | *Avg. Daily Car Volume* | |
|---|---|---|
| *Top 10 Classification Yards* | *2007* | *2006* |
| North Platte, Nebraska | **2,700** | 2,900 |
| North Little Rock, Arkansas | **1,600** | 1,600 |
| Proviso (Chicago), Illinois | **1,600** | 1,700 |
| Roseville, California | **1,400** | 1,400 |
| Englewood (Houston), Texas | **1,300** | 1,400 |
| West Colton, California | **1,300** | 1,300 |
| Livonia, Louisiana | **1,300** | 1,400 |
| Pine Bluff, Arkansas | **1,300** | 1,300 |
| Fort Worth, Texas | **1,200** | 1,300 |
| Neff (Kansas City), Missouri | **1,000** | 1,000 |

| *Top 10 Intermodal Terminals* | *Annual Lifts* **2007** | *2006* |
|---|---|---|
| ICTF (Los Angeles), California | **719,000** | 725,000 |
| Marion (Memphis), Tennessee | **414,000** | 406,000 |
| East Los Angeles, California | **360,000** | 329,000 |
| Global II (Chicago), Illinois | **353,000** | 297,000 |
| Global I (Chicago), Illinois | **310,000** | 321,000 |
| Dallas, Texas | **292,000** | 284,000 |
| Seattle, Washington | **250,000** | 238,000 |
| Yard Center (Chicago), Illinois | **238,000** | 248,000 |
| Oakland, California | **236,000** | 268,000 |
| Englewood (Houston), Texas | **214,000** | 206,000 |

**Rail Equipment –** Our equipment includes owned and leased locomotives and rail cars; heavy maintenance equipment and machinery; other equipment and tools in our shops, offices, and facilities; and vehicles for maintenance, transportation of crews, and other activities. As of December 31, 2007, we owned or leased the following units of equipment:

| *Locomotives* | *Owned* | *Leased* | *Total* | *Average Age (yrs.)* |
|---|---|---|---|---|
| Road | 4,330 | 3,704 | 8,034 | 14.8 |
| Switching | 488 | 32 | 520 | 30.5 |
| Other | 112 | 55 | 167 | 20.6 |
| Total locomotives | 4,930 | 3,791 | 8,721 | N/A |

| *Freight cars* | *Owned* | *Leased* | *Total* | *Average Age (yrs.)* |
|---|---|---|---|---|
| Covered hopper | 13,864 | 21,573 | 35,437 | 28.7 |
| Open hoppers | 13,431 | 5,216 | 18,647 | 28.6 |
| Gondolas | 7,639 | 6,141 | 13,780 | 26.6 |
| Boxcars | 8,132 | 4,140 | 12,272 | 27.1 |
| Mechanical refrigerated | 3,309 | 5,291 | 8,600 | 22.3 |
| Flat cars | 3,687 | 1,149 | 4,836 | 30.2 |
| Other | 127 | 585 | 712 | N/A |
| Total freight cars | 50,189 | 44,095 | 94,284 | N/A |

**Capital Expenditures –** Our rail network requires significant annual capital investments for maintenance, improvement, and expansion. These investments maintain and enhance safe operations, support the transportation needs of our customers, and improve our operational efficiency. Additionally, we add new locomotives and freight cars to our fleet to replace older, less efficient equipment, to support growth and customer demand, and to reduce our impact on the environment through the acquisition of more fuel efficient and low emission locomotives, including yard engines that use new hybrid technology.

**2007 Capital Expenditures –** During 2007, we made capital investments totaling $3.1 billion, which included cash spending of $2.5 billion (see the capital expenditures table in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financial Condition, Item 7). We also acquired 259 locomotives and 150 freight cars under long-term operating leases with an aggregate net present value of $434 million. We procured an additional 56 locomotives and other equipment through capital lease financings valued at $82 million.

**Sunset Corridor Expansion –** One of our critical routes is the Sunset Corridor, a 760-mile route running between Los Angeles and El Paso, Texas. This heavily traveled corridor carries about 20 percent of our traffic, including a significant amount of intermodal traffic. In 2007, we added 33 miles of double track to the corridor, which now includes nearly 410 miles of double track (approximately 54% of the route).

**SPRB Joint-Line Expansion –** An important part of our franchise is our access to the coal-producing SPRB through a joint line, which we own with BNSF (the Joint Line). In addition to the significant annual maintenance required on the Joint Line (due to the volume of trains, the weight of loaded coal cars, and the impact of coal dust on rail beds), a capacity expansion project is underway. During 2007, we completed the installation of additional main line track so the entire Joint Line now has triple track.

**2008 Capital Expenditures –** In 2008, we expect to make capital investments of approximately $3.1 billion (which may be revised if revenue, tax, and business conditions require changing, or new laws or regulations affect our ability to generate sufficient returns on, these investments). See discussion of our 2008 capital plan in Management's Discussion and Analysis of Financial Condition and Results of Operations – 2008 Outlook, Item 7.

**Equipment Encumbrance –** Equipment with a carrying value of approximately $2.8 billion at both December 31, 2007 and 2006 serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms of the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

Certain of our properties are subject to federal, state, and local laws and regulations governing the protection of the environment (see discussion of environmental issues in Business – Governmental and Environmental Regulation, Item 1, and Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7).

## Item 3. Legal Proceedings

From time to time, we are involved in legal proceedings, claims, and litigation that occur in connection with our business. Management routinely assesses our liabilities and contingencies in connection with these matters based upon the latest available information. Consistent with SEC rules and requirements, we describe below material pending legal proceedings (other than ordinary routine litigation incidental to our business), material proceedings known to be contemplated by governmental authorities, other proceedings arising under federal, state, or local environmental laws and regulations (including governmental proceedings involving potential fines, penalties, or other monetary sanctions in excess of $100,000) and such other pending matters that we may determine to be appropriate.

**Environmental Matters**

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, the Railroad received notice from the Army Corps of Engineers (the Corps) that, during its construction efforts to restore service to the Caliente Subdivision after severe flooding in January 2005, the Railroad may have exceeded its authority under emergency authorizations and permits issued by the Corps. Subsequently, the Corps referred the matter to the EPA, which has demanded that the Railroad repair claimed impacts to the adjacent waterway, perform compensatory mitigation, and pay a civil penalty in connection with this project and related storm water issues. The Railroad and the EPA have discussed the scope of additional work to be performed by the Railroad to address alleged impacts of its construction activities, as well as compensatory

mitigation and potential penalties. To date, we have not reached an agreement with the EPA, and, therefore, the ultimate amount of the civil penalty cannot be determined. However, the penalty component of the settlement will exceed $100,000.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, the Illinois Attorney General's office filed an Agreed Order and Complaint and a Complaint for Injunctive and Other Relief on October 7, 2004, in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) against The Alton & Southern Railway Company, a wholly-owned subsidiary of the Railroad, as a result of a collision and derailment on September 21, 2004. The State of Illinois seeks to enjoin The Alton & Southern Railway Company from further violations, as well as a monetary penalty. The Railroad reached a tentative agreement with the State of Illinois that will require the payment of a penalty in the amount of $48,000. The agreement should be executed in the first quarter of 2008.

As we reported in our Annual Report on Form 10-K for 2005, the EPA considers the Railroad a potentially responsible party for the Omaha Lead Site. The Omaha Lead Site consists of approximately 12,800 acres of residential property in the eastern part of Omaha, Nebraska, allegedly impacted by air emissions from two former lead smelters/refineries. One refinery was operated by ASARCO. The EPA identified the Railroad as a potentially responsible party because more than 60 years ago the Railroad owned land that was leased to ASARCO. The Railroad disputes both the legal and technical basis of the EPA's allegations. It has nonetheless engaged in extensive negotiations with the EPA. These negotiations reached an apparent impasse. The EPA issued a Unilateral Administrative Order with an effective date of December 16, 2005, directing the Railroad to implement an interim remedy at the site at an estimated cost of $50 million. Failure to comply with the order without just cause could subject the Railroad to penalties of up to $32,500 per day and triple the EPA's costs in performing the work. The Railroad believes it has just cause not to comply with the order, but it offered to perform some of the work specified in the order as a compromise. To date, the EPA has rejected all of the Railroad's offers to settle or resolve this matter. The Railroad will vigorously contest liability and the imposition of any penalties.

As we reported in our Annual Report on Form 10-K for 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twenty-First Judicial Circuit (St. Clair County) seeking injunctive relief and civil penalties against the Railroad relating to a collision between UPRR and Norfolk Southern Railway Company (NS) trains near Momence, Illinois, on November 24, 2005. The collision derailed approximately five locomotives and 30 railcars. Two of the UPRR locomotives and two of the NS locomotives caught fire, and four of the locomotives released approximately 16,000 gallons of diesel fuel. Other cars carrying food products derailed and released an unknown amount of product. The State of Illinois seeks a permanent injunction against the Railroad ordering UPRR to continue remediation. The State of Illinois seeks to enjoin UPRR from further violations and payment of a monetary penalty. Union Pacific reached a tentative agreement with the State of Illinois that will require payment of $60,000, which includes a penalty payment and the amount of the State's response costs. The agreement should be executed in the first quarter of 2008.

As we reported in our Annual Report on Form 10-K for 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) for injunctive and other relief on November 28, 2005, against the Railroad, alleging a diesel fuel spill from an above-ground storage tank in a rail yard in Dupo, St. Clair County, Illinois. The State of Illinois seeks to enjoin UPRR from further violations and a monetary penalty. The amount of the proposed penalty is uncertain.

As we reported in our Annual Report on Form 10-K for 2003, the United States Attorney for the Central District of California notified the Railroad that the office intended to pursue criminal charges against the Railroad for alleged violations of federal environmental laws, including the federal Clean Water Act, in connection with releases of oil contaminated wastewater from our Taylor Yard in 2001 and 2003. On July 31, 2006, the United States Attorney filed criminal misdemeanor charges against us for these releases in the United States District Court for the Central District of California, and we received the Summons from the Court on August 8, 2006. We will vigorously defend the charges.

We received notices from the EPA and state environmental agencies alleging that we are or may be liable under federal or state environmental laws for remediation costs at various sites throughout the United States, including sites on the Superfund National Priorities List or state superfund lists. We cannot predict the ultimate impact of these proceedings and suits because of the number of potentially responsible parties involved, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

**Other Matters**

As we reported in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2007, 20 small rail shippers (many of whom are represented by the same law firms) filed virtually identical antitrust lawsuits in various federal district courts against us and four other Class I railroads in the U.S. The original plaintiff filed the first of these claims in the U.S. District Court in New Jersey on May 14, 2007, and the additional plaintiffs filed claims in district courts in various states, including Florida, Illinois, Alabama, Pennsylvania, and the District of Columbia. These suits allege that the railroads engaged in price-fixing by establishing common fuel surcharges for certain rail traffic.

We received additional complaints during the third and fourth quarters of 2007, increasing the total number of complaints to 30. A few of these suits involve plaintiffs alleging that they are or were indirect purchasers of rail transportation and seeking to represent the class of indirect purchasers of rail transportation that paid fuel surcharges. These complaints have added allegations under state antitrust and consumer protection laws. All of these "copycat" lawsuits (whether filed by direct or indirect purchasers of rail transportation) are being filed by various groups of plaintiffs' lawyers seeking to become lead counsel in a nationwide class action against the railroads. Each of the plaintiffs requests certification of its complaint as a class-action. On November 6, 2007, the Judicial Panel on Multidistrict Litigation ordered that all of the rail fuel surcharge cases be transferred to the U.S. District Court in D.C. for coordinated or consolidated pretrial proceedings.

Additionally, the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter.

We deny the allegations that our fuel surcharge program violates the antitrust laws or any other laws. We believe that these lawsuits are without merit, and we will vigorously defend our actions. Therefore, we currently believe that these matters will not have a material adverse effect on any of our results of operations, financial condition, and liquidity.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of security holders during the fourth quarter of 2007.

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

The Board of Directors typically elects and designates our executive officers on an annual basis at the board meeting held in conjunction with the Annual Meeting of Shareholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year, as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 15, 2008, relating to the executive officers.

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| James R. Young | Chairman, President and Chief Executive Officer of UPC and the Railroad | 55 | (1) |
| Robert M. Knight, Jr. | Executive Vice President – Finance and Chief Financial Officer of UPC and the Railroad | 50 | (2) |
| J. Michael Hemmer | Senior Vice President – Law and General Counsel of UPC and the Railroad | 58 | (3) |
| Barbara W. Schaefer | Senior Vice President – Human Resources and Secretary of UPC and the Railroad | 54 | (4) |
| Jeffrey P. Totusek | Vice President and Controller of UPC and Chief Accounting Officer and Controller of the Railroad | 49 | (5) |
| Dennis J. Duffy | Executive Vice President – Operations of the Railroad | 57 | Current Position |
| John J. Koraleski | Executive Vice President – Marketing and Sales of the Railroad | 57 | Current Position |

(1) *Mr. Young was elected Chief Executive Officer and President of UPC and the Railroad effective January 1, 2006. He was elected to the additional position of Chairman effective February 1, 2007. He was elected President and Chief Operating Officer of the Railroad, effective February 1, 2004, and he previously was Executive Vice President – Finance of UPC and Chief Financial Officer of the Railroad.*

(2) *Mr. Knight was elected to his current position effective February 1, 2004. He previously was Senior Vice President – Finance for UPC and the Railroad.*

(3) *Mr. Hemmer was elected to his current position effective June 1, 2004. Mr. Hemmer previously was Vice President – Law of the Railroad.*

(4) *Mrs. Schaefer has held the position of Senior Vice President – Human Resources for the past five years. In addition, she was elected Secretary of UPC and the Railroad effective June 1, 2004.*

(5) *Mr. Totusek was elected to his current position effective January 1, 2008. He previously was Assistant Vice President – Financial Analysis of the Railroad.*

# PART II

## Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities

Our common stock is traded on the NYSE under the symbol "UNP". The following table presents the dividends declared and the high and low closing prices of our common stock for each of the indicated quarters.

| *2007 - Dollars Per Share* | *Q1* | *Q2* | *Q3* | *Q4* |
|---|---|---|---|---|
| Dividends | $ 0.35 | $ 0.35 | $ 0.35 | $ 0.44 |
| Common stock price: | | | | |
| High | 105.84 | 122.79 | 129.36 | 137.56 |
| Low | 89.58 | 100.41 | 99.38 | 110.07 |
| *2006 - Dollars Per Share* | | | | |
| Dividends | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Common stock price: | | | | |
| High | 93.73 | 97.49 | 92.96 | 96.16 |
| Low | 77.62 | 83.83 | 78.65 | 86.27 |

At January 31, 2008, there were 260,700,527 shares of outstanding common stock and 35,295 common shareholders of record. At that date, the closing price of the common stock on the NYSE was $124.76. We have paid dividends to our common shareholders during each of the past 108 years. We declared dividends totaling $396 million in 2007 and $323 million in 2006. On November 15, 2007, we increased the quarterly dividend to $0.44 per share, payable beginning on January 2, 2008, to shareholders of record on November 29, 2007. We are subject to certain restrictions regarding retained earnings with respect to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends increased to $11.5 billion at December 31, 2007, from $7.8 billion at December 31, 2006. See discussion of this restriction in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources, Item 7. We do not believe the restriction on retained earnings will affect our ability to pay dividends, and we currently expect to pay dividends in 2008 comparable to 2007.

**Comparison Over One- and Three-Year Periods –** The following table presents the cumulative total shareholder returns, assuming reinvested dividends, over one- and three-year periods for the Corporation, a peer group index (comprised of Burlington Northern Santa Fe Corporation, CSX Corporation, and Norfolk Southern Corporation), the Dow Jones Transportation Index (Dow Jones), and the Standard & Poor's 500 Stock Index (S&P 500).

| *Period* | *UPC* | *Peer Group* | *Dow Jones* | *S&P 500* |
|---|---|---|---|---|
| 1 Year (2007) | 37.9% | 12.6% | 1.4% | 5.5% |
| 3 Year (2005-2007) | 94.6 | 74.7 | 24.2 | 28.2 |

Five-Year Performance Comparison – The following graph provides an indicator of cumulative total shareholder returns for the Corporation as compared to the peer group index (described above), the Dow Jones, and the S&P 500. The graph assumes that the value of the investment in the common stock of Union Pacific Corporation and each index was $100 on December 31, 2002, and that all dividends were reinvested.




Purchases of Equity Securities – During 2007, we repurchased 13,266,070 shares of our common stock at an average price of $115.66. During the first nine months of 2007, we repurchased 10,639,916 shares of our common stock at an average price per share of $112.68. The following table presents common stock repurchases during each month for the fourth quarter of 2007:

| *Period* | *Total Number of Shares Purchased [a]* | *Average Price Paid per Share* | *Total Number of Shares Purchased as Part of a Publicly Announced Plan or Program* | *Maximum Number of Shares That May Yet Be Purchased Under the Plan or Program [b]* |
|---|---|---|---|---|
| Oct. 1 through Oct. 31 ......... | 99,782 | $128.78 | - | 9,774,279 |
| Nov. 1 through Nov. 30 ....... | 540,294 | 124.70 | 528,000 | 9,246,279 |
| Dec. 1 through Dec. 31 ........ | 1,986,078 | 128.53 | 1,869,800 | 7,376,479 |
| Total...................................... | 2,626,154 | $127.75 | 2,397,800 | N/A |

*[a] Total number of shares purchased during the quarter includes 228,354 shares delivered or attested to UPC by employees to pay stock option exercise prices, satisfy excess tax withholding obligations for stock option exercises or vesting of retention units, and pay withholding obligations for vesting of retention shares.*

*[b] On January 30, 2007, our Board of Directors authorized us to repurchase up to 20 million shares of our common stock through December 31, 2009. We may make these repurchases on the open market or through other transactions. Our management has sole discretion with respect to determining the timing and amount of these transactions.*

## Item 6. Selected Financial Data

The following table presents as of, and for the years ended, December 31, our selected financial data for each of the last five years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Financial Statements and Supplementary Data, Item 8. The information below is not necessarily indicative of the results of future operations.

| *Millions of Dollars, Except per Share Amounts, Carloads, Employee Statistics, and Ratios* | ***2007*** | *2006* | *2005 [a]* | *2004 [b]* | *2003 [c]* |
|---|---|---|---|---|---|
| **For the Year Ended December 31** | | | | | |
| Operating revenue [d] | **$16,283** | $15,578 | $13,578 | $12,215 | $11,551 |
| Operating income | **3,375** | 2,884 | 1,795 | 1,295 | 2,133 |
| Income from continuing operations | **1,855** | 1,606 | 1,026 | 604 | 1,056 |
| Net income | **1,855** | 1,606 | 1,026 | 604 | 1,585 |
| Per share – basic: | | | | | |
| Income from continuing operations | **6.97** | 5.96 | 3.89 | 2.33 | 4.15 |
| Net income | **6.97** | 5.96 | 3.89 | 2.33 | 6.23 |
| Per share – diluted: | | | | | |
| Income from continuing operations | **6.91** | 5.91 | 3.85 | 2.30 | 4.07 |
| Net income | **6.91** | 5.91 | 3.85 | 2.30 | 6.04 |
| Dividends declared per share | **1.49** | 1.20 | 1.20 | 1.20 | 0.99 |
| Cash provided by operating activities | **3,277** | 2,880 | 2,595 | 2,257 | 2,443 |
| **At December 31** | | | | | |
| Total assets | **$38,033** | $36,515 | $35,620 | $34,596 | $33,496 |
| Debt due after one year | **7,543** | 6,000 | 6,760 | 7,981 | 7,822 |
| Common shareholders' equity | **15,585** | 15,312 | 13,707 | 12,655 | 12,354 |
| Equity per common share [e] | **59.74** | 56.68 | 51.41 | 48.58 | 47.85 |
| **Additional Data** | | | | | |
| Commodity revenue [d] | **$15,516** | $14,862 | $12,957 | $11,692 | $11,041 |
| Carloads (000) | **9,733** | 9,852 | 9,544 | 9,458 | 9,239 |
| Operating margin (%) [f] | **20.7** | 18.5 | 13.2 | 10.6 | 18.5 |
| Operating ratio (%) [f] | **79.3** | 81.5 | 86.8 | 89.4 | 81.5 |
| Average employees (000) | **50.1** | 50.7 | 49.7 | 48.3 | 46.4 |
| Operating revenue per employee (000) | **$ 325.0** | $ 307.2 | $ 273.2 | $ 252.9 | $ 248.9 |
| **Financial Ratios (%)** | | | | | |
| Debt to capital [g] | **33.0** | 30.7 | 35.1 | 39.1 | 39.3 |
| Return on average common shareholders' equity | **12.0** | 11.1 | 7.8 | 4.8 | 13.8 |

*[a] 2005 net income includes a $118 million tax expense reduction to reflect a reduction in the estimated deferred income tax liability.*

*[b] 2004 operating income and net income includes a $247 million pre-tax ($154 million after-tax) charge for unasserted asbestos-related claims.*

*[c] Net income and total assets include the effects of the disposition of all of our trucking interests in 2003.*

*[d] Includes fuel surcharge revenue of $1,478 million, $1,619 million, $963 million, $292 million, and $93 million for 2007, 2006, 2005, 2004, and 2003, respectively, which partially offsets increased operating expenses for fuel. 2007 fuel surcharge revenue is not comparable to prior periods due to implementation of new mileage-based fuel surcharge programs. See further discussion in Management's Discussion and Analysis of Financial Condition and Results of Operations – Results of Operations – Operating Revenue, Item 7.*

*[e] Equity per common share is calculated as follows: common shareholders' equity divided by common shares issued less treasury shares outstanding.*

*[f] Operating margin is defined as operating income divided by operating revenue. Operating ratio is defined as operating expenses divided by operating revenue.*

*[g] Debt to capital is determined as follows: total debt divided by total debt plus equity.*

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Financial Statements and Supplementary Data, Item 8, and other information in this report, including Risk Factors set forth in Item 1A and Critical Accounting Policies and Cautionary Information at the end of this Item 7.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although we analyze revenue by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network.

### EXECUTIVE SUMMARY

### 2007 Results

- **Safety –** We operated a safer railroad in 2007, improving safety for our employees, customers, and the public. The employee injury incident rate per 200,000 man-hours declined to its lowest level. A continued focus on derailment prevention in 2007 resulted in a 14% reduction in incidents, with associated costs declining 13%. In the area of public safety, we closed 482 grade crossings to reduce our exposure incidents, and we installed additional video cameras in our road locomotives. As a result of this installation work, we now have camera-equipped locomotives in the lead position of over 85% of our road trains. These video cameras allow us to better analyze grade crossing incidents, thereby increasing safety for our employees and the public. The number of grade crossing incidents decreased 9% during the year, despite the combination of increasing highway traffic and urban expansion. Also, through extensive trespass reduction programs, we were able to reduce trespasser incidents by 21%. All of these improvements are the result of comprehensive efforts to enhance employee training, increase public education, make capital investments, and take proactive steps to reduce safety risks.

- **Financial Performance –** In 2007, we generated record operating income of $3.4 billion despite lower volume. Yield increases, network management initiatives, and improved productivity drove the 17% increase in operating income. Our operating ratio was 79.3% for the year, a 2.2 point improvement compared to 2006. Net income of $1.86 billion also exceeded our previous milestone, translating into earnings of $6.91 per diluted share.

- **Commodity Revenue –** Our commodity revenue grew 4% year-over-year to $15.5 billion, the highest level in our history. We achieved record revenue levels in five of our six commodity groups, driven primarily by better pricing and fuel surcharges. Since 2004, we have repriced approximately 75% of our business. Volume decreased 1% in 2007 due to softening markets for some of our commodities and adverse weather conditions.

- **Network Operations –** In 2007, we significantly improved the fluidity and efficiency of our transportation network. Continued focus on increasing velocity, eliminating work events, improving asset utilization, and expanding capacity were key drivers of our operational improvement. We reduced average terminal dwell time by 8%, improved car utilization by 7%, and increased average train speed by 2% with ongoing enhancements to our Unified Plan (an ongoing program that streamlines segments of our transportation plan) and implementation of initiatives to make train processing at our terminals more efficient. We completed implementation of Customer Inventory Management System, an operational productivity initiative that complements the Unified Plan by reducing the number of rail cars in our terminals without adding capacity. We also expanded capacity and continued to use industrial engineering techniques to further improve network fluidity, ease capacity constraints, and improve asset utilization. Our customer satisfaction improved during 2007, an indication that efforts to improve network operations translated into better customer service.

- **Fuel Prices –** Crude oil prices increased at a steady rate in 2007, rising from a low of $56.58 per barrel in January to close at nearly $96.00 per barrel at the end of December. Our 2007 average fuel price increased by 9% and added $242 million of operating expenses compared to 2006. Our fuel surcharge programs are designed to help offset the impact of higher fuel prices. In addition, our fuel conservation efforts allowed us to improve our consumption rate by 2%. Locomotive simulator training, operating practices, and technology all contributed to this improvement, saving approximately 21 million gallons of fuel in 2007.

- **Free Cash Flow –** Cash generated by operating activities totaled a record $3.3 billion, yielding free cash flow of $487 million in 2007. Free cash flow is defined as cash provided by operating activities, less cash used in investing activities and dividends paid.

Free cash flow is not considered a financial measure under accounting principles generally accepted in the United States (GAAP) by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe free cash flow is important in evaluating our financial performance and measures our ability to generate cash without additional external financings. Free cash flow should be considered in addition to, rather than as a substitute for, cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Cash provided by operating activities | **$ 3,277** | $ 2,880 | $ 2,595 |
| Cash used in investing activities | **(2,426)** | (2,042) | (2,047) |
| Dividends paid | **(364)** | (322) | (314) |
| Free cash flow | **$ 487** | $ 516 | $ 234 |

**2008 Outlook**

- **Safety –** Operating a safe railroad benefits our employees, our customers, our shareholders, and the public. We will continue using a multi-faceted approach to safety, utilizing technology, risk assessment, quality control, and training for, and engaging with our employees. We plan to implement Total Safety Culture (TSC) throughout our operations. TSC, an employee-focused initiative that has helped improve safety, is a process designed to establish, maintain, and promote safety among co-workers. With respect to public safety, we will continue our efforts to maintain, upgrade, and close crossings, install video cameras on locomotives, and educate the public about crossing safety through various internal and industry programs, along with other activities.

- **Commodity Revenue –** Despite uncertainty regarding the U.S. economy, we expect record revenue in 2008 based on current economic indicators, forecasted demand, improved customer service, and additional opportunities to reprice certain of our business. Yield increases and fuel surcharges will be the primary drivers of commodity revenue growth in 2008. We expect that overall volume will fall within a range of 1% higher to 1% lower than 2007, with continued softness in some market sectors.

- **Transportation Plan –** In 2008, we will continue to evaluate traffic flows and network logistic patterns to identify additional opportunities to simplify operations and improve network efficiency and asset utilization. We plan to maintain adequate manpower and locomotives, improve productivity using industrial engineering techniques, and improve our operating margins.

- **Fuel Prices –** Fuel prices should remain volatile, with crude oil prices and conversion and regional spreads fluctuating throughout the year. On average, we expect fuel prices to increase 15% to 20% above the average price in 2007. To reduce the impact of fuel price on earnings, we will continue to seek recovery from our customers through our fuel surcharge programs and expand our fuel conservation efforts.

- **Capital Plan –** In 2008, we expect to make capital investments of approximately $3.1 billion (which may be revised if revenue, tax, or business conditions require changing, or new laws or regulations affect our ability to generate sufficient returns on, these investments). Major investment categories include $1.6 billion to maintain and improve track infrastructure; $840 million to increase network and terminal capacity; $490 million to upgrade our locomotive and freight car fleet, including the acquisition of 175 high-horsepower locomotives and new covered hoppers; and $170 million primarily to upgrade information technology systems, including the testing of positive train control, and other capital projects. We expect to fund our 2008 cash capital investments through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007. Our annual capital plan is a critical component of our long-term strategic plan, which we designed to enhance the long-term value of the Corporation for our shareholders by providing sufficient resources to (i) maintain and improve our existing track infrastructure to provide safe and fluid operations, (ii) increase network efficiency by adding or improving facilities and track, and (iii) make investments that meet customer demand and take advantage of opportunities for long-term growth.

- **Financial Expectations –** We are cautious about the economic environment; however, we anticipate revenue growth and continued network improvement in 2008, which should produce financial results that exceed 2007. We expect to generate earnings of $7.75 to $8.25 per diluted share and improve our operating ratio and return on invested capital.

## RESULTS OF OPERATIONS

### Operating Revenue

| *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Commodity revenue | **$15,516** | $14,862 | $12,957 | **4%** | 15% |
| Other revenue | **767** | 716 | 621 | **7** | 15 |
| Total | **$16,283** | $15,578 | $13,578 | **5%** | 15% |

Operating revenue includes commodity revenue and other revenue. The primary drivers of commodity revenue are volume (carloads) and average revenue per car (ARC). ARC varies with changes in price, commodity mix, and fuel surcharges. Other revenue consists primarily of revenue earned by our subsidiaries, revenue from our commuter rail operations, and accessorial revenue, which we earn when customers retain equipment owned or controlled by us or when we perform additional services such as switching or storage.

We recognize commodity revenue on a percentage-of-completion basis as freight moves from origin to destination. We allocate revenue between reporting periods based on the relative transit time in each reporting period and recognize expenses as we incur them. We recognize other revenue as service is performed or contractual obligations are met. We provide incentives to our customers for meeting or exceeding specified cumulative volumes or shipping to and from specific locations, which we record as a reduction to revenue based on the actual or projected future shipments.

Revenue from five of our six commodity groups increased during 2007, while revenue generated from industrial products shipments declined. ARC increased 6% during 2007 driven by core price improvement. Lower shipments of industrial and agricultural products drove volume down 1% in 2007, more than offsetting an increase in chemical shipments. Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated $1.5 billion in commodity revenue in 2007. Fuel surcharge revenue is not comparable to prior periods due to implementation of new mileage-based fuel surcharge programs for certain traffic. As previously disclosed in our 2006 Annual Report on Form 10-K, the STB issued a decision limiting the manner in which U.S. railroads can calculate fuel surcharges on traffic regulated by the

STB. Effective April 26, 2007, we implemented new fuel surcharge programs covering this regulated traffic, which represents approximately 19% of our current revenue base. These new programs use mileage (as opposed to percent of revenue) as the basis for calculating fuel surcharges, and they use the On-Highway Diesel Price index – published by the Energy Information Administration – for purposes of determining fuel costs. The new programs affect fuel surcharges assessed for certain shipments of agricultural, chemical, and industrial products, and, to a lesser extent, coal. In addition, we reset the effective base fuel price at which our new mileage-based fuel surcharge programs take effect, resulting in a higher starting point of $2.30 per gallon versus $1.35 per gallon.

All six commodity groups produced double-digit revenue growth in 2006, including over 20% growth of revenue from agricultural commodities. Price increases, fuel surcharges, and index-based contract escalators, which are formulas in our shipping contracts that correlate price adjustments to certain economic indices, all contributed to higher ARC. Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated an additional $656 million in commodity revenue compared to 2005, contributing 5% to commodity revenue growth. Volume increased 3% during the year, led by solid growth of intermodal and energy shipments, which were partially offset by lower shipments of industrial products and chemicals. Lower volume in 2005 due to the January West Coast storm, SPRB Joint Line disruptions, Hurricane Rita and the Kansas washouts also contributed to this year-over-year growth.

The following tables summarize the year-over-year changes in commodity revenue, revenue carloads, and ARC by commodity type:

| ***Commodity Revenue*** *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Agricultural | **$ 2,597** | $ 2,395 | $ 1,971 | **8%** | 22% |
| Automotive | **1,469** | 1,438 | 1,273 | **2** | 13 |
| Chemicals | **2,293** | 2,098 | 1,848 | **9** | 13 |
| Energy | **3,136** | 2,953 | 2,578 | **6** | 15 |
| Industrial Products | **3,110** | 3,168 | 2,814 | **(2)** | 13 |
| Intermodal | **2,911** | 2,810 | 2,473 | **4** | 14 |
| Total | **$15,516** | $14,862 | $12,957 | **4%** | 15% |

| ***Revenue Carloads*** *Thousands* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Agricultural | **902** | 923 | 883 | **(2)%** | 5% |
| Automotive | **826** | 834 | 797 | **(1)** | 5 |
| Chemicals | **928** | 896 | 912 | **4** | (2) |
| Energy | **2,299** | 2,296 | 2,178 | **-** | 5 |
| Industrial Products | **1,325** | 1,446 | 1,503 | **(8)** | (4) |
| Intermodal | **3,453** | 3,457 | 3,271 | **-** | 6 |
| Total | **9,733** | 9,852 | 9,544 | **(1)%** | 3% |

| ***Average Revenue per Car*** | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Agricultural | **$ 2,880** | $ 2,595 | $ 2,233 | **11%** | 16% |
| Automotive | **1,779** | 1,724 | 1,598 | **3** | 8 |
| Chemicals | **2,471** | 2,342 | 2,026 | **6** | 16 |
| Energy | **1,364** | 1,286 | 1,184 | **6** | 9 |
| Industrial Products | **2,347** | 2,190 | 1,871 | **7** | 17 |
| Intermodal | **843** | 813 | 756 | **4** | 8 |
| Average | **$ 1,594** | $ 1,509 | $ 1,358 | **6%** | 11% |

*Agricultural* – Price increases were the primary drivers of agricultural commodity revenue in 2007, partially offset by a decline in volume levels. Shipments of whole grains used in feed declined as barge operators captured more shipments destined for export from the Gulf Coast due to both favorable barge rates and improved navigation conditions on the Mississippi River. Conversely, wheat and food grain shipments improved as a strong wheat crop generated record shipments to the Gulf Coast for export. Shipments of ethanol, a grain product used as an alternative fuel and fuel additive, and its co-products (primarily livestock feed) also increased substantially.




Price increases, volume growth, and fuel surcharges increased agricultural commodity revenue in 2006 versus 2005. Whole grains increased as strong gulf exports and higher freight charges for barge traffic shifted feed grain shipments to rails. Shipments of ethanol and its co-products (primarily livestock feed) also experienced strong growth, reflecting continued demand in this growing industry. Conversely, wheat shipments declined due to extremely low crop production levels in 2006 primarily due to drought conditions in wheat producing states. Price and fuel surcharge increases improved ARC in 2006.

*Automotive* – Price increases drove the growth in automotive revenue, partially offset by lower finished vehicle shipments. A decline in vehicle production levels primarily drove the volume decline. Conversely, automotive parts shipments grew due to increased volumes from domestic manufacturers, new business acquired in the middle of 2006, and our new intermodal train service between Mexico and Michigan.




Price increases, volume growth, and fuel surcharges increased automotive commodity revenue in 2006 over 2005. Shipments of finished vehicles grew as higher manufacturer inventories at the end of 2005 translated into record volume growth in 2006. Shipments remained relatively strong through the second quarter due to the production ramp-up of new models at plants served by us. Automotive parts shipments also grew due to conversion of traffic from trucks, new business growth, and production increases at several assembly plants served by us. Fuel surcharges and price increases drove the ARC improvement.

*Chemicals* – Price increases and volume growth drove the increase in revenue in 2007 versus 2006. Strong demand for potash exports through Pacific Northwest ports and a robust planting season for corn to supply ethanol producers increased demand for fertilizer shipments in 2007. New business acquired in June 2007 contributed to more shipments of plastics. Soda ash volume increased as export demand grew in the Gulf area and Mexico. Lower production at Canadian locations during the year boosted shipments of liquid and dry chemicals from U.S. sources.




Price increases, fuel surcharges, and index-based contract escalators drove the increase in revenue and ARC in 2006 versus 2005. Fewer fertilizer shipments largely drove the volume decrease. Wet weather conditions in the Midwest led to weak demand during the fall planting season. In addition, softer export markets for potash, a fertilizer product, also led to reduced volumes. Business interruptions in the third quarter of 2005, primarily attributable to Hurricane Rita, reduced chemicals shipments leading to favorable volume comparisons in 2006.

*Energy* – Price increases during 2007 improved both revenue and ARC over 2006 levels. Volume was flat, however, as severe storms in the first quarter and heavy rains in May flooded coal pits in the SPRB, which closed several rail lines and reduced volume levels. Shipments from the Colorado and Utah mines were down 1% due to lower mine production, predominately in the fourth quarter of 2007.




Price increases, fuel surcharges, and index-based contract escalators primarily drove the increases in revenue and ARC in 2006 over 2005. Volume increases also contributed to revenue growth as coal shipments from the SPRB mines improved 8% during the year. These increases in 2006 partially reflect lower volume levels in 2005, as SPRB Joint Line disruptions, network disruptions resulting from Hurricane Rita, and the October Kansas washouts hampered coal shipments in 2005. Conversely, shipments from the Colorado and Utah mines declined 6% in 2006 due to mine shutdowns during the first quarter of 2006, along with the impact of mining production problems and network maintenance throughout the third quarter of 2006.

*Industrial Products* – Volume declines more than offset price increases, driving industrial products revenue lower in 2007 compared to 2006. Continued softening of the housing construction market, surplus inventories, and general market uncertainty resulted in lower lumber shipments. Delays of rail expansion projects, customer production problems, unfavorable weather, and the ongoing impact of a weak residential construction market reduced stone shipments during the year.




Price increases and fuel surcharges improved revenue and ARC in 2006 over 2005. Volume levels declined due to lower lumber, paper, and newsprint shipments, which were partially offset by higher steel shipments. The softening of the housing construction market, lower production levels, and general market uncertainty drove the reduction in lumber shipments. Conversely, strong domestic markets throughout most of the year drove the increase in construction-related steel material and pipe, particularly those materials used in oil and gas drilling. Hurricane Rita reduced shipment volumes of industrial products in 2005, which favorably affected volume comparisons with 2006.

*Intermodal* – Price increases improved intermodal revenue in 2007 compared to 2006. Volume was flat versus 2006 as increased domestic traffic due to new service offerings and increased business under some of our older, long-term contracts were offset by a decrease of premium shipments. International traffic was flat in 2007 compared to 2006 due to general softening of imports from Asia.




Record volume growth, fuel surcharges, price increases, and index-based contract escalators combined to improve revenue in 2006 over 2005, in addition to the favorable impact from weaker intermodal revenue during 2005 due to the January West Coast storm. Carloadings grew due to strong imports, primarily from Asia, partially offset by decreased domestic traffic. ARC improved due to price increases, fuel surcharges, and contract escalators.

*Mexico Business* – Each of our commodity groups includes revenue from shipments to and from Mexico. Revenue from Mexico business increased 5% to $1.44 billion in 2007 compared to 2006. Price increases and more shipments of automotive parts and intermodal containers drove revenue growth in 2007. Volume declines in cement, some agricultural products, and newsprint shipments partially offset the increases.

Revenue from Mexico business increased 23% to $1.37 billion in 2006 compared to 2005. Price increases, fuel surcharges, and increased shipments of finished vehicles, automotive parts, import beer, dry feed ingredients, and intermodal drove revenue growth in 2006. Volume declines in coal, newsprint, and sulfur shipments partially offset the increases.

**Operating Expenses**

| *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Salaries, wages, and employee benefits.. | **$ 4,591** | $ 4,599 | $ 4,375 | **-%** | 5% |
| Fuel and utilities | **3,164** | 3,012 | 2,562 | **5** | 18 |
| Equipment and other rents | **1,423** | 1,455 | 1,402 | **(2)** | 4 |
| Depreciation | **1,321** | 1,237 | 1,175 | **7** | 5 |
| Materials and supplies | **714** | 691 | 546 | **3** | 27 |
| Casualty costs | **321** | 410 | 411 | **(22)** | - |
| Purchased services and other costs | **1,374** | 1,290 | 1,312 | **7** | (2) |
| Total | **$12,908** | $12,694 | $11,783 | **2%** | 8% |




Operating expenses increased $214 million in 2007. Higher fuel prices, which rose 9% during the period, increased operating expenses by $242 million. Wage, benefit and materials inflation and higher depreciation expense also increased expenses during the year. Productivity improvements, better resource utilization, and a lower fuel consumption rate helped offset these increases.

Operating expenses increased $911 million in 2006. Higher fuel prices, which rose 16% during the period, accounted for $393 million of the increase. Our fuel surcharge programs helped offset these expenses in the form of higher revenue. Wages, benefits, and materials and supplies inflation; a larger workforce; volume-related expenses; and higher locomotive and freight car maintenance and lease expenses accounted for most of the additional increase in 2006. Settlement of all remaining insurance claims related to the January 2005 West Coast storm, an improved fuel consumption rate, and improved car cycle times (which reduced freight car rental expense) partially offset the cost increases. Additional clean-up and restoration costs for the January 2005 West Coast storm favorably affects comparison of 2006 operating expenses with those in 2005.

*Salaries, Wages, and Employee Benefits* – Operational improvements and lower volume levels led to a 1% decline in our workforce, saving $79 million in 2007. A smaller workforce and less need for new train personnel reduced training costs during the year, which contributed to the improvement. General wage and benefit inflation mostly offset the reductions, reflecting higher salaries and wages and the impact of higher healthcare and other benefit costs.

General wage and benefit inflation increased expenses in 2006, reflecting higher salaries and wages and the impact of higher healthcare and other benefit costs. A larger workforce, driven by higher volume levels, and stock option expense required by new accounting rules also contributed to higher expenses. Conversely, reduced protection costs and operational improvements, boosted by network management initiatives and investment in capacity, partially offset these increases. Protection costs represent the differential payment when the wage earned for active employment is lower than an employee's protected rate of pay. An individual's protected rate is imposed by the STB for employees adversely affected by a merger or is established by collective bargaining agreements with our labor unions in certain cases. Additionally, we incurred higher labor expenses in 2005 for clean-up and restoration of property damaged by the January West Coast storm.

*Fuel and Utilities* – Fuel and utilities include locomotive fuel, utilities other than telephone, and gasoline and other fuels. Higher diesel fuel prices, which averaged $2.24 per gallon (including taxes and transportation

costs) in 2007 compared to $2.06 per gallon in 2006, increased expenses by $242 million. A 2% improvement of our fuel consumption rate resulting from the use of newer, more fuel-efficient locomotives and our fuel conservation programs reduced fuel expense by $43 million, and a 2% decrease of gross ton miles reduced fuel expense by an additional $53 million.

Higher diesel fuel prices, which averaged $2.06 per gallon (including taxes and transportation costs) in 2006 compared to $1.77 per gallon in 2005, increased expenses by $393 million during 2006. A 3% increase in gross ton-miles resulted in $63 million of additional expenses, which was partially offset by a 2% improvement in our fuel consumption rate due to the use of newer, more fuel-efficient locomotives and our fuel conservation programs. As noted above (and described in this Item 7), we offset a significant portion of increased locomotive fuel expenses through revenue from fuel surcharges. Gasoline, utilities, and propane and other fuel expenses increased $20 million in 2006 due to higher prices and increased usage.

*Equipment and Other Rents* – Equipment and other rents includes primarily rental expense we pay for freight cars owned by other railroads or private companies; freight car, intermodal, and locomotive leases; other specialty equipment leases; and office and other rentals. Fewer shipments of industrial products, combined with improved car-cycle times, which reflect operational improvement and better asset utilization, reduced our short-term freight car rental expense by $46 million in 2007 compared to 2006. Lower lease expenses for freight cars, intermodal containers, and fleet vehicles and equipment decreased costs by $20 million in 2007. Conversely, higher locomotive lease expense resulted in a $33 million increase in costs during the year.

Lease expense increased in 2006 compared to 2005 as we leased more locomotives and freight cars. Growth in automotive and intermodal shipments also increased our short-term freight car rental expense. Improved car-cycle times driven by network management initiatives partially offset this increase.

*Depreciation* – The majority of depreciation relates to track structure, including rail, ties, and other track material. A higher depreciable asset base, reflecting higher capital spending in recent years, increased depreciation expense in 2007 and 2006.

*Materials and Supplies* – Materials used to maintain our lines, structures, and equipment are the principal components of materials and supplies expense. This expense item also includes small tools, office supplies, other materials, and the costs of freight services to ship supplies and materials. Increased use of higher cost components to repair and maintain our fleet of locomotives (including a growing number of units not covered by warranties) added $32 million to materials and supplies expense during 2007. Conversely, we used fewer parts for freight car repairs due to program maintenance scheduling, which lowered costs by $11 million and partially offset the increase for 2007.

We used more repair materials at higher component costs to repair and maintain freight cars and locomotives in 2006, including a growing number of units not covered by warranties. In addition, we performed more maintenance on locomotives that were maintained internally and not subject to maintenance contracts with third-party contractors compared to 2005.

*Casualty Costs* – Personal injury costs, freight and property damage, insurance, and environmental expense are the primary components of casualty costs. Casualty costs were lower in 2007 compared to 2006 driven primarily by a reduction in personal injury expense. Actuarial studies completed during 2007 resulted in a reduction in personal injury expense of approximately $80 million, which was partially offset by an adverse development with respect to one claim.

Costs were flat in 2006 compared to 2005 as lower bad debt expenses, lower freight damage expenses, and lower expenses for destruction of foreign or leased equipment all offset increased personal injury costs and higher settlement expenses.

*Purchased Services and Other Costs* – Purchased services and other costs include expenses associated with outside contractors, state and local taxes, net costs of operating facilities jointly used with other railroads,

transportation and lodging for train crew employees, trucking and contracting costs for intermodal containers, leased automobile maintenance expenses, telephone and cellular expense, employee travel expense, and computer and other general expenses. Higher consulting fees and higher contract expenses (including equipment maintenance) increased costs by $58 million. In addition, crew transportation and lodging costs increased $17 million in 2007 due to higher gas prices and rate inflation. Conversely, lower drayage expense of $13 million, settlement of insurance claims in 2007 related to Hurricane Rita, and higher equity income partially offset these increases. In addition, the year-over-year comparison was affected by the settlement of insurance claims totaling $23 million in 2006 related to the January 2005 West Coast storm and a $9 million gain in 2006 from the sale of two Company-owned airplanes.

Volume-related expenses, including crew transportation and lodging costs, increased in 2006 driven by 3% growth in carloads. Higher state and local taxes (primarily sales and use taxes related to higher diesel fuel prices) also increased expenses in 2006 compared to 2005. Conversely, lower locomotive contract maintenance costs and lower expenses associated with jointly-owned operating facilities reduced expenses in 2006 compared to 2005. Settlement of all remaining insurance claims related to the January 2005 West Coast storm and the gain from the sale of two airplanes also reduced expenses in 2006. Finally, clean-up and restoration costs related to the January West Coast storm increased expenses in 2005.

**Non-Operating Items**

| *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Other income | **$ 116** | $ 118 | $ 145 | **(2)%** | (19)% |
| Interest expense | **(482)** | (477) | (504) | **1** | (5) |
| Income taxes | **(1,154)** | (919) | (410) | **26** | 124 |

*Other Income* – Lower net gains from non-operating asset sales (primarily real estate) drove the reduction in other income in 2007. Recognition of rental income in 2006 from the settlement of a rent dispute also contributed to the year-over-year decrease in other income. Cash investment returns increased $21 million due to larger cash balances and higher interest rates.

Lower net gains from non-operating asset sales (primarily real estate) and higher expenses due to rising interest rates associated with our sale of receivables program resulted in a reduction in other income in 2006, which was partially offset by higher rental income for the use of our right-of-way (including 2006 settlements of rate disputes from prior years) and cash investment returns due to higher interest rates.

*Interest Expense* – Higher interest expense in 2007 was driven by an increase in the weighted-average debt levels of $7.3 billion, compared to $7.1 billion in 2006. A lower effective interest rate of 6.6% in 2007, compared to 6.7% in 2006, partially offset the effects of the higher debt level.

Lower interest expense in 2006 was due to a decline in the weighted-average debt level from $7.8 billion in 2005 to $7.1 billion in 2006. A higher effective interest rate of 6.7% in 2006, compared to 6.5% in 2005, partially offset the effects of the declining debt level.

*Income Taxes* – Income taxes were $235 million higher in 2007, due primarily to higher pre-tax income and the effect of new tax legislation in the State of Illinois that changed how we determine the amount of our income subject to Illinois tax. The Illinois legislation increased our deferred tax expense by $27 million in 2007. Our effective tax rates were 38.4% and 36.4% in 2007 and 2006, respectively.

Income tax expense was $509 million higher in 2006 than 2005. Higher pre-tax income resulted in additional taxes of $414 million and $118 million of the increase resulted from a reduction of deferred tax expense in 2005. Final settlements of pre-1995 tax years and Internal Revenue Service Examination Reports for 1995

through 2002, among other things, resulted in the $118 million reduction in 2005. Our effective tax rate was 36.4% and 28.6% in 2006 and 2005, respectively.

## OTHER OPERATING/PERFORMANCE AND FINANCIAL STATISTICS

We report key Railroad performance measures weekly to the Association of American Railroads (AAR), including carloads, average daily inventory of rail cars on our system, average train speed, and average terminal dwell time. We provide this data on our website at www.up.com/investors/reports/index.shtml.

### Operating/Performance Statistics

Railroad performance measures reported to the AAR, as well as other performance measures, are included in the table below:

| | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Avg. train speed (miles per hour) | **21.8** | 21.4 | 21.1 | **2 %** | 1 % |
| Avg. terminal dwell time (hours) | **25.1** | 27.2 | 28.7 | **(8) %** | (5) % |
| Gross ton-miles (billions) | **1,052.3** | 1,072.5 | 1,043.9 | **(2) %** | 3 % |
| Revenue ton-miles (billions) | **561.8** | 565.2 | 548.8 | **(1) %** | 3 % |
| Operating ratio | **79.3** | 81.5 | 86.8 | **2.2 pt** | 5.3 pt |
| Avg. full-time-equivalent employees | **50,089** | 50,739 | 49,747 | **(1) %** | 2 % |
| Customer satisfaction index | **79** | 72 | 64 | **7 pt** | 8 pt |

*Average Train Speed* – Average train speed is calculated by dividing train miles by hours operated on our main lines between terminals. Ongoing network management initiatives and capacity expansion contributed to 2% and 1% improvements of average train speed during 2007 and 2006, respectively.

*Average Terminal Dwell Time* – Average terminal dwell time is the average time that a rail car spends at our terminals. Lower average terminal dwell time is favorable. Average terminal dwell improved 8% and 5% in 2007 and 2006, respectively, as a result of ongoing management initiatives and directed efforts to more timely deliver rail cars to our interchange partners and customers. Average terminal dwell time was also impacted by 1% lower volume levels in 2007 and a 3% increase in volume levels during 2006.

*Gross and Revenue Ton-Miles* – Gross ton-miles are calculated by multiplying the weight of loaded or empty freight cars by the number of miles hauled. Revenue ton-miles are calculated by multiplying the weight of freight by the number of tariff miles. Revenue ton-miles declined 1% in relation to the 1% reduction in carloadings in 2007 compared to 2006. Gross ton-miles decreased 2% in 2007 driven by a mix shift in freight shipments. In 2006, gross and revenue-ton miles grew 3% in relation to the 3% increase in carloadings as volume was balanced between the higher and lower density commodities.

*Operating Ratio* – Operating ratio is defined as our operating expenses as a percentage of revenue. Our operating ratio improved 2.2 points to 79.3% in 2007 as a result of yield increases, network management initiatives, and improved productivity. In 2006, our operating ratio improved 5.3 points to 81.5% as a result of solid demand, yield increases, and improved operational efficiency.

*Average Full-Time-Equivalent Employees* – Lower employee levels in 2007 versus 2006 resulted from fewer train and engine personnel due to improved network productivity and 1% lower volume levels, partially offset by more employees maintaining our larger locomotive fleet. The larger full-time-equivalent number in 2006, included more people to maintain our larger locomotive and freight car fleet, more employees needed for increased track repair and maintenance programs, more operations management personnel (including an expanded management training program), and more train and engine personnel to meet demand levels.

*Customer Satisfaction Index* – The customer satisfaction survey asks customers to rate how satisfied they are with our performance over the last 12 months on a variety of attributes. A higher score indicates higher customer satisfaction. The improvement in survey results in 2007 and 2006 generally reflects customer recognition of our improving service.

**Return on Average Common Shareholders' Equity**

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Average equity | **$15,448** | $14,510 | $13,181 |
| Return on average common shareholders' equity | **12.0%** | 11.1% | 7.8% |

**Return on Invested Capital as Adjusted (ROIC)**

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Add: Interest expense | **482** | 477 | 504 |
| Add: Sale of receivables fees | **35** | 33 | 23 |
| Add: Interest on present value of operating leases | **292** | 268 | 218 |
| Less: Taxes on interest and fees | **(310)** | (283) | (213) |
| Net operating profit after taxes as adjusted (a) | **$ 2,354** | $ 2,101 | $ 1,558 |
| Average equity | **$15,448** | $14,510 | $13,181 |
| Add: Average debt | **7,232** | 7,098 | 7,774 |
| Add: Average value of sold receivables | **600** | 600 | 595 |
| Add: Average present value of operating leases | **3,648** | 3,349 | 2,729 |
| Average invested capital as adjusted (b) | **$26,928** | $25,557 | $24,279 |
| Return on invested capital as adjusted (a/b) | **8.7%** | 8.2% | 6.4% |

ROIC is considered a non-GAAP financial measure by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe this measure is important in evaluating the efficiency and effectiveness of the Corporation's long-term capital investments, and we currently use ROIC as a performance criteria in determining certain elements of equity compensation for our executives. ROIC should be considered in addition to, rather than as a substitute for, other information provided in accordance with GAAP. A comparable GAAP measure is Return on Average Common Shareholders' Equity. The tables above provide a reconciliation from return on average common shareholders' equity to ROIC.

**Debt to Capital / Adjusted Debt to Capital**

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Debt (a) | **$ 7,682** | $ 6,780 | $ 7,416 |
| Equity | **15,585** | 15,312 | 13,707 |
| Capital (b) | **$23,267** | $22,092 | $21,123 |
| Debt to capital (a/b) | **33.0%** | 30.7% | 35.1% |

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Debt | **$ 7,682** | $ 6,780 | $ 7,416 |
| Value of sold receivables | **600** | 600 | 600 |
| Net present value of operating leases | **3,783** | 3,513 | 3,185 |
| Adjusted debt (a) | **$12,065** | $10,893 | $11,201 |
| Equity | **15,585** | 15,312 | 13,707 |
| Adjusted capital (b) | **$27,650** | $26,205 | $24,908 |
| Adjusted debt to capital (a/b) | **43.6%** | 41.6% | 45.0% |

Adjusted debt to capital is a non-GAAP financial measure under SEC Regulation G and Item 10 of SEC Regulation S-K. We believe this measure is important to management and investors in evaluating the total amount of leverage in our capital structure, including off-balance sheet lease obligations, which we generally incur in connection with financing the acquisition of locomotives and freight cars and certain facilities. We monitor the ratio of adjusted debt to capital as we manage our capital structure to balance cost-effective and efficient access to the capital markets with the Corporation's overall cost of capital. Adjusted debt to capital should be considered in addition to, rather than as a substitute for, debt to capital. The tables above provide a reconciliation from debt to capital to adjusted debt to capital. Our December 31, 2007, debt to capital ratios increased as a result of a $902 million increase in debt from December 31, 2006, and purchases of our common stock under our share repurchase program, partially offset by an increase in retained earnings due to higher earnings in 2007.

## LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2007, our principal sources of liquidity included cash, cash equivalents, the sale of certain receivables, an uncommitted line of credit, and our revolving credit facility, as well as the availability of commercial paper and other sources of financing through the capital markets. We had $1.9 billion of committed credit available under our credit facility, with no borrowings outstanding as of December 31, 2007. We did not make any short-term borrowings under this facility during the year. We also had a $75 million uncommitted line of credit available, which was not used during the year. The value of the outstanding undivided interest held by investors under the sale of receivables program was $600 million as of December 31, 2007. The sale of receivables program is subject to certain requirements, including maintenance of an investment grade bond rating. If our bond rating were to deteriorate, it could have an adverse impact on our liquidity. Access to commercial paper as well as other capital market financings is dependent on market conditions. Deterioration of our operating results or financial condition due to internal or external factors could negatively impact our ability to utilize commercial paper as a source of liquidity. Liquidity through the capital markets is also dependent on our financial stability.

At December 31, 2007, and December 31, 2006, we had working capital deficits of approximately $0.4 billion and $1.1 billion, respectively. A working capital deficit is common in our industry and does not indicate a lack of liquidity. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Financial Condition**

| *Cash Flows* *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Cash provided by operating activities | **$ 3,277** | $ 2,880 | $ 2,595 |
| Cash used in investing activities | **(2,426)** | (2,042) | (2,047) |
| Cash used in financing activities | **(800)** | (784) | (752) |
| Net change in cash and cash equivalents | **$ 51** | $ 54 | $ (204) |

*Cash Provided by Operating Activities* – We generated higher income in 2007, which was the primary driver of the increase of cash provided by operating activities. Pension contributions in 2006 totaling $150 million also contributed to the year-over-year increase. These increases were partially offset by cash payments representing prior period wage increases in accordance with recent union contract ratifications and higher income tax payments.

Higher income in 2006 generated the increased cash provided by operating activities, which was partially offset by higher income tax payments, $150 million in voluntary pension contributions, higher material and supply inventories, and higher management incentive payments.

*Cash Used in Investing Activities* – Higher capital investments and work in process balances drove the increase in cash used in investing in 2007. The third quarter of 2006 included insurance settlement proceeds for property damages resulting from the 2005 West Coast storm.

An insurance settlement for the January 2005 West Coast storm and lower balances for work in process decreased the amount of cash used in investing activities in 2006. Higher capital investments and lower proceeds from asset sales partially offset this decrease.

*Cash Used in Financing Activities* – The increase in cash used in financing activities resulted primarily from the use of $1.4 billion to repurchase common shares, payment of higher dividends, and lower net proceeds from equity compensation plans ($71 million in 2007 compared to $160 million in 2006). These increases were mostly offset by debt issuances of $1.6 billion in 2007 compared to no issuances in 2006. The increase in cash used in financing activities in 2006 resulted primarily from lower net proceeds from equity compensation plans ($160 million in 2006 compared to $262 million in 2005).

The table below details cash capital investments for the years ended December 31, 2007, 2006, and 2005.

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Track | **$1,593** | $1,487 | $1,472 |
| Capacity and commercial facilities | **534** | 510 | 509 |
| Locomotives and freight cars | **263** | 135 | 98 |
| Other | **106** | 110 | 90 |
| Total | **$2,496** | $2,242 | $2,169 |

In 2008, we expect our total capital investments to be approximately $3.1 billion (which may be revised if revenue, tax, or business conditions require changing, or new laws or regulations affect our ability to generate sufficient returns on, these investments). Major investment categories include $1.6 billion to maintain and improve track infrastructure; $840 million to increase network and terminal capacity; $490 million to upgrade our locomotive and freight car fleet, including the acquisition of 175 high-horsepower locomotives and new covered hoppers; and $170 million primarily to upgrade information technology systems, including the testing of positive train control, and other capital projects. We expect to fund our 2008 cash capital investments

through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007. Our annual capital plan is a critical component of our long-term strategic plan, which we designed to enhance the long-term value of the Corporation for our shareholders by providing sufficient resources to (i) maintain and improve our existing track infrastructure to provide safe and fluid operations, (ii) increase network efficiency by adding or improving facilities and track, and (iii) make investments that meet customer demand and take advantage of opportunities for long-term growth.

For each of the years ended December 31, 2007, 2006, and 2005, our ratio of earnings to fixed charges was 5.1, 4.4, and 2.9, respectively. The increases in 2007 and 2006 were driven by higher net income. The ratio of earnings to fixed charges was computed on a consolidated basis. Earnings represent income from continuing operations, less equity earnings net of distributions, plus fixed charges and income taxes. Fixed charges represent interest charges, amortization of debt discount, and the estimated amount representing the interest portion of rental charges. See Exhibit 12 for the calculation of the ratio of earnings to fixed charges.

**Financing Activities**

**Credit Facilities –** On December 31, 2007, $1.9 billion of credit was available under our revolving credit facility (the facility), which we entered into on April 20, 2007. The facility is designated for general corporate purposes and supports the issuance of commercial paper. We did not draw on the facility during 2007. Commitment fees and interest rates payable under the facility are similar to fees and rates available to comparably rated, investment-grade borrowers. The facility allows for borrowings at floating rates based on London Interbank Offered Rates, plus a spread, depending upon our senior unsecured debt ratings. The facility requires the maintenance of a debt to net worth coverage ratio. At December 31, 2007, we were in compliance with this covenant. The facility does not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require us to post collateral. The facility, which expires in April 2012, replaced two $1 billion, 5-year facilities with terms ending in March 2009 and March 2010. The facility includes terms that are comparable with those of the prior facilities, although the minimum net worth requirement of $7.5 billion in prior facilities was removed, and the facility includes a change-of-control provision.

In addition to our revolving credit facility, a $75 million uncommitted line of credit was available. The line of credit expires in April 2008, and was not used in 2007. We must have equivalent credit available under our five-year facility to draw on this $75 million line.

At December 31, 2007, we reclassified as long-term debt approximately $550 million of debt due within one year that we intend to refinance. This reclassification reflected our ability and intent to refinance any short-term borrowings and certain current maturities of long-term debt on a long-term basis. At December 31, 2006, we did not reclassify any short-term debt as long-term debt as we did not intend to refinance at that time.

**Dividends –** On November 15, 2007, we increased the quarterly dividend to $0.44 per share, payable beginning on January 2, 2008, to shareholders of record on November 29, 2007. We expect to fund the increase in the quarterly dividend through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2007.

**Dividend Restrictions –** Our revolving credit facility includes a debt-to-net worth covenant that, under certain circumstances, restricts the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends was $11.5 billion and $7.8 billion at December 31, 2007 and December 31, 2006, respectively. This facility replaced two credit facilities that had minimum net worth covenants that were more restrictive with respect to the amount of retained earnings available for dividends at December 31, 2006.

**Share Repurchase Program –** On January 30, 2007, our Board of Directors authorized the repurchase of up to 20 million shares of Union Pacific Corporation common stock through the end of 2009. Management's

assessments of market conditions and other pertinent facts guide the timing and volume of all repurchases. We expect to fund our common stock repurchases through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007.

During 2007, we repurchased approximately 13 million shares under this program at an aggregate purchase price of approximately $1.5 billion. These shares were recorded in treasury stock at cost, which includes any applicable commissions and fees.

**Shelf Registration Statement and Significant New Borrowings –** Our Board of Directors authorized the issuance of up to $3 billion of debt securities pursuant to a new shelf registration statement, which became effective on March 6, 2007, replacing the $500 million of authority remaining under our shelf registration filed in December 2003. Under the current shelf registration, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings.

We have issued the following unsecured, fixed-rate debt securities under our current shelf registration:

| *Date* | *Description of Securities* |
|---|---|
| Issued during 2007: | |
| April 18, 2007 | $250 million of 5.65% Notes due May 1, 2017 |
| April 18, 2007 | $250 million of 6.15% Debentures due May 1, 2037 |
| August 24, 2007 | $500 million of 5.45% Notes due January 31, 2013 |
| October 30, 2007 | $500 million of 5.75% Notes due November 15, 2017 |
| Issued subsequent to 2007: | |
| February 5, 2008 | $750 million of 5.70% Notes due August 15, 2018 |

The net proceeds from these offerings are for general corporate purposes, including the repurchase of common stock pursuant to our share repurchase program. These debt securities include change-of-control provisions. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under our shelf registration, and, therefore, we may issue additional debt securities at any time.

**Operating Lease Activities**

During 2007, the Railroad, as lessee, entered into long-term operating lease arrangements covering 259 locomotives and 150 rail cars, with a total equipment cost of approximately $538 million. In total, these new lease arrangements will provide for minimum rental payments of approximately $831 million, with a present value of approximately $434 million.

The lessors financed the purchase of the locomotives and freight cars, in part, by issuing equipment notes that are non-recourse to the Railroad and are secured by assignments of the underlying leases and security interests in the equipment. The Corporation and the Railroad do not guaranty payment of the equipment notes. The Railroad's obligations to make operating lease payments under the leases are recourse obligations and are not recorded in the Consolidated Statements of Financial Position.

The Railroad has certain renewal and purchase options with respect to the locomotives and freight cars. If the Railroad does not exercise these options, the equipment will be returned to the lessors at the end of the lease term.

**Contractual Obligations and Commitments**

As described in the notes to the Consolidated Financial Statements and as referenced in the tables below, we have contractual obligations and commercial commitments that may affect our financial condition. However, based on our assessment of the underlying provisions and circumstances of our contractual obligations and commercial commitments, including material sources of off-balance sheet and structured finance arrangements, there is no known trend, demand, commitment, event, or uncertainty that is reasonably likely to occur that would have a material adverse effect on our consolidated results of operations, financial condition, or liquidity. In addition, our commercial obligations, financings, and commitments are customary transactions that are similar to those of other comparable corporations, particularly within the transportation industry.

The following tables identify material obligations and commitments as of December 31, 2007:

| ***Contractual Obligations*** *Millions of Dollars* | *Total* | *Payments Due by December 31,* 2008 | 2009 | 2010 | 2011 | 2012 | After 2012 | Other |
|---|---|---|---|---|---|---|---|---|
| Debt [a] | $10,747 | $ 974 | $ 789 | $ 701 | $ 750 | $ 944 | $ 6,589 | $ - |
| Operating leases | 6,021 | 639 | 600 | 554 | 522 | 417 | 3,289 | - |
| Capital lease obligations [b] | 1,845 | 181 | 179 | 160 | 165 | 106 | 1,054 | - |
| Purchase obligations [c] | 3,927 | 991 | 649 | 279 | 244 | 223 | 1,541 | - |
| Other post retirement benefits [d] | 396 | 39 | 40 | 41 | 41 | 41 | 194 | - |
| Income tax contingencies [e] | 161 | 140 | - | - | - | - | - | 21 |
| Total contractual obligations | $23,097 | $2,964 | $2,257 | $1,735 | $1,722 | $1,731 | $12,667 | $21 |

*[a] Excludes capital lease obligations of $1,219 million, unamortized discount of $(104) million, and market value adjustments of $2 million for debt with qualifying hedges that are recorded as liabilities on the Consolidated Statements of Financial Position. Includes an interest component of $4,182 million.*

*[b] Represents total obligations, including interest component of $626 million.*

*[c] Purchase obligations include locomotive maintenance contracts; purchase commitments for locomotives, ties, ballast, and track; and agreements to purchase other goods and services.*

*[d] Includes estimated other postretirement, medical, and life insurance payments and payments made under the unfunded pension plan for the next ten years. No amounts are included for funded pension as no contributions are currently required.*

*[e] Future cash flows for income tax contingencies reflect the recorded liability, including interest and penalties, in accordance with FIN 48 as of December 31, 2007. Where we can reasonably estimate the years in which these liabilities may be settled, this is shown in the table. For amounts where we can not reasonably estimate the year of settlement, they are reflected in the Other column.*

| ***Other Commercial Commitments*** *Millions of Dollars* | *Total* | *Amount of Commitment Expiration per Period* 2008 | 2009 | 2010 | 2011 | 2012 | After 2012 |
|---|---|---|---|---|---|---|---|
| Credit facilities [a] | $1,975 | $ 75 | $ - | $ - | $ - | $1,900 | $ - |
| Sale of receivables [b] | 600 | 600 | - | - | - | - | - |
| Guarantees [c] | 465 | 15 | 19 | 46 | 76 | 22 | 287 |
| Standby letters of credit [d] | 27 | 10 | 17 | - | - | - | - |
| Total commercial commitments | $3,067 | $700 | $36 | $46 | $76 | $1,922 | $287 |

*[a] The $75 million line of credit requires equivalent credit available under the revolving credit facility. None of the credit facilities were used as of December 31, 2007.*

*[b] $600 million of the sale of receivables program was utilized at December 31, 2007.*

*[c] Includes guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations.*

*[d] None of the letters of credit were drawn upon as of December 31, 2007.*

**Off-Balance Sheet Arrangements**

**Sale of Receivables –** The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at both December 31, 2007 and 2006. The value of the outstanding undivided interest held by investors under the facility was $600 million at both December 31, 2007 and 2006, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,071 million and $1,158 million of accounts receivable held by UPRI at December 31, 2007 and 2006, respectively. At December 31, 2007 and 2006, the value of the interest retained by UPRI was $471 million and $558 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate us for these responsibilities. The Railroad collected approximately $16.1 billion and $15.5 billion during the years ended December 31, 2007 and 2006, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $35 million, $33 million, and $23 million for 2007, 2006, and 2005, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad do not have recourse to the assets of UPRI. In August 2007, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

**Guarantees –** At December 31, 2007, we were contingently liable for $465 million in guarantees. We have recorded a liability of $5 million and $6 million for the fair value of these obligations as of December 31, 2007 and 2006, respectively. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**OTHER MATTERS**

**Inflation –** The cumulative effect of long periods of inflation significantly increases asset replacement costs for capital-intensive companies. As a result, assuming that we replace all operating assets at current price levels, depreciation charges (on an inflation-adjusted basis) would be substantially greater than historically reported amounts.

**Derivative Financial Instruments –** We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a

specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items at inception, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

**Market and Credit Risk –** We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. We manage credit risk related to derivative financial instruments, which is minimal, by requiring high credit standards for counterparties and periodic settlements. At December 31, 2007 and 2006, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value –** We determine the fair values of our derivative financial instrument positions based upon current fair values as quoted by recognized dealers or the present value of expected future cash flows.

**Sensitivity Analyses –** The sensitivity analyses that follow illustrate the economic effect that hypothetical changes in interest rates could have on our results of operations and financial condition. These hypothetical changes do not consider other factors that could impact actual results.

At December 31, 2007, we had variable-rate debt representing approximately 3% of our total debt. If variable interest rates average one percentage point higher in 2008 than our December 31, 2007 variable rate, which was approximately 7%, our interest expense would increase by approximately $3 million. This amount was determined by considering the impact of the hypothetical interest rate on the balances of our variable-rate debt at December 31, 2007.

Market risk for fixed-rate debt is estimated as the potential increase in fair value resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2007, and amounts to an increase of approximately $524 million to the fair value of our debt at December 31, 2007. We estimated the fair values of our fixed-rate debt by considering the impact of the hypothetical interest rates on quoted market prices and current borrowing rates.

**Interest Rate Fair Value Hedges –** We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to Financial Accounting Standards Board (FASB) Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements.

**Interest Rate Cash Flow Hedges –** We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At December 31, 2007 and 2006, we had reductions of $4 million and $5 million, respectively, recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2007 and 2006, we had no interest rate cash flow hedges outstanding.

**Fuel Swaps –** Two fuel basis swaps cover a total of 151 million gallons of diesel fuel for the period August 2006 through July 2008. These commodity basis swaps require us to make payments to, or receive payments from, the counterparty based on the difference between certain price indices. Changes in the fair value of these swaps are reflected in fuel expense. We reported a derivative asset of approximately $1 million and $2 million at December 31, 2007 and 2006, respectively, which represents the fair value of the swaps. The swaps increased fuel expense for 2007 by $1 million and reduced fuel expense for 2006 by $3 million. The recognition of the swaps in fuel expense included monthly net settlements with the counterparty and the change in fair value.

**Accounting Pronouncements –** In September 2006, the FASB issued Statement No. 157, *Fair Value Measurements* (FAS 157). FAS 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles and expands disclosures about fair value measurements. This statement does not require any new fair value measurements; rather, it applies under other accounting pronouncements that require or permit fair value measurements. The provisions of FAS 157 are effective for us beginning in 2008. We expect this new standard will result in increased disclosures but will not have a significant impact on our financial position or results of operations.

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* (FAS 159). The fair value option established by FAS 159 permits, but does not require, all entities to choose to measure eligible items at fair value at specified election dates. An entity would report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. FAS 159 is effective for us beginning in 2008. We do not currently intend to elect the fair value option for any eligible items and do not expect this standard to have a significant impact on our financial position or results of operations.

In December 2007, the FASB issued Statement No. 141 (Revised 2007), *Business Combinations* (FAS 141R). FAS 141R will change the accounting for business combinations. Under FAS 141R, an acquiring entity will be required to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. FAS 141R will also change the accounting treatment and disclosures with respect to certain specific items in a business combination. FAS 141R applies to us prospectively for business combinations occurring on or after January 1, 2009. Accordingly, any business combinations we engage in will be recorded and disclosed following existing GAAP until January 1, 2009. We expect FAS 141R will have an impact on accounting for business combinations, but the effect will be dependent upon any potential future acquisitions.

In December 2007, the FASB issued Statement No. 160, *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51* (FAS 160). FAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FAS 160 is effective for us beginning in 2009. We are still assessing the potential impact, if any, of the adoption of FAS 160 on our consolidated financial position, results of operations and cash flows.

In December 2007, the FASB ratified the consensus reached on Emerging Issues Task Force (EITF) Issue No. 07-1, *Collaborative Arrangements* (EITF 07-1), which defines collaborative arrangements and establishes reporting and disclosure requirements for transactions between participants in a collaborative arrangement. The requirements of this EITF will be applied to collaborative arrangements in existence on or after January 1, 2009. We are still assessing the potential impact, if any, of the adoption of EITF 07-1 on our consolidated financial position, results of operations and cash flows.

**Asserted and Unasserted Claims –** Various claims and lawsuits are pending against us and certain of our subsidiaries. We cannot fully determine the effect of all asserted and unasserted claims on our consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where asserted and unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated results of

operations, financial condition, or liquidity after taking into account liabilities previously recorded for these matters.

**Indemnities –** Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**Climate Change –** Although climate change could have an adverse impact on our operations and financial performance in the future (see Risk Factors under Item 1A), we are currently unable to predict the manner or severity of such impact. However, we continue to take steps and explore opportunities to reduce the impact of our operations on the environment, including investments in new technologies, using training programs to reduce fuel consumption, and changing our operations to increase fuel efficiency.

## CRITICAL ACCOUNTING POLICIES

Our Consolidated Financial Statements have been prepared in accordance with GAAP. The preparation of these financial statements requires estimation and judgment that affect the reported amounts of revenue, expenses, assets, and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The following critical accounting policies are a subset of our significant accounting policies described in note 1 to the Financial Statements and Supplementary Data, Item 8. These critical accounting policies affect significant areas of our financial statements and involve judgment and estimates. If these estimates differ significantly from actual results, the impact on our Consolidated Financial Statements may be material.

**Asbestos –** We are a defendant in a number of lawsuits in which current and former employees and other parties allege exposure to asbestos. During 2004, we engaged a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing our potential liability. During 2007, we updated our potential liability to include actual claim experience since 2004. As a result of this reassessment, we decreased our liability by $20 million in 2007 for both asserted and unasserted asbestos-related claims through 2034. This liability excludes future defense and processing costs. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of future claims received would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

Our asbestos-related liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$302** | $311 | $324 |
| Accruals/(credits) | **(20)** | - | - |
| Payments | **(17)** | (9) | (13) |
| Ending balance at December 31 | **$265** | $302 | $311 |
| Current portion, ending balance at December 31 | **$ 11** | $ 13 | $ 16 |

Approximately 13% of the recorded liability related to asserted claims and approximately 87% related to unasserted claims. These claims are expected to be paid out over the next 27 years. In conjunction with the liability update performed in 2007, we also reassessed estimated insurance recoveries. We have recognized an asset for estimated insurance recoveries at December 31, 2007 and 2006. We will continue to review actual experience and adjust our estimate as warranted.

Our asbestos-related claims activity was as follows:

| | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Open claims, beginning balance | **2,277** | 2,435 | 2,316 |
| New claims | **269** | 316 | 741 |
| Settled or dismissed claims | **(460)** | (474) | (622) |
| Open claims, ending balance at December 31 | **2,086** | 2,277 | 2,435 |

We believe that our estimates of liability for asbestos-related claims and insurance recoveries are reasonable and probable. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates also may vary in the future if: strategies, activities, and outcomes of asbestos litigation materially change; federal and state laws governing asbestos litigation increase or decrease the probability or amount of compensation of claimants; and there are material changes with respect to payments made to claimants by other defendants.

**Environmental** – We are subject to federal, state, and local environmental laws and regulations. We identified 339 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 41 sites that are the subject of actions taken by the U.S. government, 22 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site. Our environmental liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$210** | $213 | $201 |
| Accruals | **41** | 39 | 45 |
| Payments | **(42)** | (42) | (33) |
| Ending balance at December 31 | **$209** | $210 | $213 |
| Current portion, ending balance at December 31 | **$ 63** | $ 54 | $ 46 |

Our environmental site activity was as follows:

| | *2007* | *2006* | *2005* |
|---|---|---|---|
| Open sites, beginning balance | **367** | 370 | 384 |
| New sites | **72** | 50 | 56 |
| Closed sites | **(100)** | (53) | (70) |
| Open sites, ending balance at December 31 | **339** | 367 | 370 |

When we identify an environmental issue with respect to property owned, leased, or otherwise used in our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and we can reasonably estimate such costs. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

The liability includes future costs for remediation and restoration of sites, as well as ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. The ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates of liability may vary over time due to changes in federal, state, and local laws governing environmental remediation. Current obligations are not expected to have a material adverse effect on our consolidated results of operations, financial condition, or liquidity.

**Personal Injury –** The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in measuring the expense and liability, including unasserted claims. The Federal Employers' Liability Act (FELA) governs compensation for work-related accidents. Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work.

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Approximately 89% of the recorded liability related to asserted claims, and approximately 11% related to unasserted claims. Estimates can vary over time due to evolving trends in litigation. Our personal injury liability activity was as follows:

| *Millions of Dollars* | *2007* | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$ 631** | $ 619 | $ 639 |
| Accruals | **165** | 240 | 247 |
| Payments | **(203)** | (228) | (267) |
| Ending balance at December 31 | **$ 593** | $ 631 | $ 619 |
| Current portion, ending balance at December 31 | **$ 204** | $ 233 | $ 274 |

Our personal injury claims activity was as follows:

| | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Open claims, beginning balance | **4,126** | 4,197 | 4,028 |
| New claims | **4,133** | 4,190 | 4,584 |
| Settled or dismissed claims | **(4,175)** | (4,261) | (4,415) |
| Open claims, ending balance at December 31 | **4,084** | 4,126 | 4,197 |

**Depreciation –** The railroad industry is capital intensive. Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The lives are calculated using a separate composite annual percentage rate for each depreciable property group, based on the results of internal depreciation studies. We are required to submit a report on depreciation studies and proposed depreciation rates to the STB for review and approval every three years for equipment property and every six years for road property. The cost (net of salvage) of depreciable railroad property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of internally developed software is capitalized and amortized based on estimated service lives of the software.

Significant capital spending in recent years increased the total value of our depreciable assets. Cash capital spending totaled $2.5 billion for the year ended December 31, 2007. For the year ended December 31, 2007, depreciation expense was $1.3 billion. We use various methods to estimate useful lives for each group of depreciable property. Due to the capital intensive nature of the business and the large base of depreciable assets, variances to those estimates could have a material effect on our Consolidated Financial Statements. If the estimated useful lives of all depreciable assets were increased by one year, annual depreciation expense would decrease by approximately $47 million. If the estimated useful lives of all assets to be depreciated were decreased by one year, annual depreciation expense would increase by approximately $50 million.

**Income Taxes –** As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax law are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations. For example, a 1% increase in the federal income tax rate would increase our deferred tax liability by approximately $250 million.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based on management's judgments regarding the best available evidence about future events. Based on that analysis, there was no valuation allowance at December 31, 2007 or 2006.

When we have claimed tax benefits that may be challenged by a tax authority, these uncertain tax benefits are accounted for under FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* (FIN 48). We adopted FIN 48 beginning January 1, 2007. Prior to 2007, income tax contingencies were accounted for under FASB Statement No. 5, *Accounting for Contingencies*.

Under FIN 48, we recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. A liability for "unrecognized tax benefits" is recorded for any tax benefits claimed in our tax returns that do not meet these recognition and measurement

standards. For additional information on the adoption of FIN 48, see note 4 to the Consolidated Financial Statements.

**Pension and Other Postretirement Benefits –** We use third-party actuaries to assist us in properly measuring the liabilities and expenses associated with providing pension and defined contribution medical and life insurance benefits (OPEB) to eligible employees. In order to use actuarial methods to value the liabilities and expenses we must make several assumptions. The critical assumptions used to measure pension obligations and expenses are the discount rate and expected rate of return on pension assets. For OPEB, the critical assumptions are the discount rate and healthcare cost trend rate.

We evaluate our critical assumptions at least annually, and selected assumptions are based on the following factors:

- Discount rate is based on a hypothetical portfolio of high quality corporate bonds (rated AA by a recognized rating agency) for which the timing and amount of cash flows matches our plan's expected benefit payments.

- Expected return on plan assets is based on our asset allocation mix and our historical return, taking into consideration current and expected market conditions.

- Healthcare cost trend rate is based on our historical rates of inflation and expected market conditions.

The following tables present the key assumptions used to measure pension and OPEB expense for 2007 and the estimated impact on 2007 pension and OPEB expense relative to a change in those assumptions:

| *Assumptions* | *Pension* | *OPEB* |
|---|---|---|
| Discount rate | 6.00% | 6.00% |
| Salary increase | 3.00% | N/A |
| Expected return on plan assets | 8.00% | N/A |
| Healthcare cost trend rate: | | |
| Pre-65 current | N/A | 9.00% |
| Pre-65 level in 2011 | N/A | 5.00% |
| Post-65 current | N/A | 11.00% |
| Post-65 level in 2013 | N/A | 5.00% |

| *Sensitivities* | *Increase in Expense* | |
|---|---|---|
| *Millions of Dollars* | *Pension* | *OPEB* |
| 0.25% decrease in discount rate | $ 6 | $ 2 |
| 0.25% increase in salary scale | $ 2 | N/A |
| 0.25% decrease in expected return on plan assets | $ 4 | N/A |
| 1% increase in healthcare cost trend rate | N/A | $ 5 |

## CAUTIONARY INFORMATION

Certain statements in this report, and statements in other reports or information filed or to be filed with the SEC (as well as information included in oral statements or other written statements made or to be made by us), are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, without limitation, statements regarding dividends in Item 5 and statements and information set forth under the caption "2008 Outlook" in this Item 7, and any other statements or information in this report (including information incorporated herein by reference) regarding: expectations as to operational or service improvements; expectations regarding the effectiveness of steps taken or to be taken to improve operations, service, infrastructure improvements,

transportation plan modifications, and management of customer traffic on the system to meet demand (including statements set forth in Item 2 regarding expectations related to our capital expenditures); expectations as to cost savings, revenue growth, and earnings; the time by which goals, targets, or objectives will be achieved; projections, predictions, expectations, estimates, or forecasts as to our business, financial and operational results, future economic performance, and general economic conditions; proposed new products and services; estimates of costs relating to environmental remediation and restoration; expectations that claims, litigation, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated results of operations, financial condition, or liquidity and any other similar expressions concerning matters that are not historical facts.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking information is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

Forward-looking statements and information reflect the good faith consideration by management of currently available information, and may be based on underlying assumptions believed to be reasonable under the circumstances. However, such information and assumptions (and, therefore, such forward-looking statements and information) are or may be subject to variables or unknown or unforeseeable events or circumstances over which management has little or no influence or control. The Risk Factors in Item 1A of this report could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

Information concerning market risk sensitive instruments is set forth under Management's Discussion and Analysis of Financial Condition and Results of Operations — Other Matters, Item 7.

****************************************

**Item 8.** **Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements** **Page**


Report of Independent Registered Public Accounting Firm .... 47

Consolidated Statements of Income
For the Years Ended December 31, 2007, 2006, and 2005 .... 48

Consolidated Statements of Financial Position
At December 31, 2007 and 2006 .... 49

Consolidated Statements of Cash Flows
For the Years Ended December 31, 2007, 2006, and 2005 .... 50

Consolidated Statements of Changes in Common Shareholders' Equity
For the Years Ended December 31, 2007, 2006, and 2005 .... 51

Notes to the Consolidated Financial Statements .... 52

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the accompanying consolidated statements of financial position of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in common shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. Our audits also included the financial statement schedule listed in the Table of Contents at Part IV, Item 15. These financial statements and financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Union Pacific Corporation and Subsidiary Companies as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 7 to the consolidated financial statements, in 2006 the Corporation adopted Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans.*

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Corporation's internal control over financial reporting as of December 31, 2007, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 15, 2008 expressed an unqualified opinion on the Corporation's internal control over financial reporting.

Deloitte & Touche LLP

Omaha, Nebraska
February 15, 2008

## CONSOLIDATED STATEMENTS OF INCOME

*Union Pacific Corporation and Subsidiary Companies*

| *Millions, Except Per Share Amounts, for the Years Ended December 31,* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Operating revenue | **$16,283** | $15,578 | $13,578 |
| Operating expenses: | | | |
| Salaries, wages, and employee benefits | **4,591** | 4,599 | 4,375 |
| Fuel and utilities | **3,164** | 3,012 | 2,562 |
| Equipment and other rents | **1,423** | 1,455 | 1,402 |
| Depreciation | **1,321** | 1,237 | 1,175 |
| Materials and supplies | **714** | 691 | 546 |
| Casualty costs | **321** | 410 | 411 |
| Purchased services and other costs | **1,374** | 1,290 | 1,312 |
| Total operating expenses | **12,908** | 12,694 | 11,783 |
| Operating income | **3,375** | 2,884 | 1,795 |
| Other income | **116** | 118 | 145 |
| Interest expense | **(482)** | (477) | (504) |
| Income before income taxes | **3,009** | 2,525 | 1,436 |
| Income taxes | **(1,154)** | (919) | (410) |
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Share and Per Share (note 9): | | | |
| Earnings per share – basic | **$ 6.97** | $ 5.96 | $ 3.89 |
| Earnings per share – diluted | **$ 6.91** | $ 5.91 | $ 3.85 |
| Weighted average number of shares – basic | **265.9** | 269.4 | 263.4 |
| Weighted average number of shares – diluted | **268.4** | 272.0 | 266.5 |
| Dividends declared per share | **$ 1.49** | $ 1.20 | $ 1.20 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, as of December 31,* | *2007* | *2006* |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 878** | $ 827 |
| Accounts receivable, net | **632** | 679 |
| Materials and supplies | **453** | 395 |
| Current deferred income taxes | **336** | 319 |
| Other current assets | **295** | 191 |
| Total current assets | **2,594** | 2,411 |
| Investments: | | |
| Investments in and advances to affiliated companies | **912** | 865 |
| Other investments | **11** | 12 |
| Total investments | **923** | 877 |
| Properties: | | |
| Road | **37,661** | 35,634 |
| Equipment | **7,818** | 7,637 |
| Other | **175** | 177 |
| Total cost | **45,654** | 43,448 |
| Accumulated depreciation | **(11,496)** | (10,575) |
| Net properties | **34,158** | 32,873 |
| Other assets | **358** | 354 |
| Total assets | **$38,033** | $36,515 |
| **Liabilities and Common Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | **$ 732** | $ 684 |
| Accrued wages and vacation | **394** | 412 |
| Accrued casualty costs | **371** | 409 |
| Income and other taxes | **343** | 279 |
| Dividends and interest | **284** | 238 |
| Debt due within one year | **139** | 780 |
| Equipment rents payable | **103** | 108 |
| Other current liabilities | **675** | 629 |
| Total current liabilities | **3,041** | 3,539 |
| Debt due after one year | **7,543** | 6,000 |
| Deferred income taxes | **10,050** | 9,696 |
| Accrued casualty costs | **799** | 868 |
| Retiree benefits obligation | **462** | 504 |
| Other long-term liabilities | **553** | 596 |
| Commitments and contingencies (note 10) | | |
| Total liabilities | **22,448** | 21,203 |
| Common shareholders' equity: | | |
| Common shares, $2.50 par value, 500,000,000 authorized; 276,162,141 and 275,962,411 issued; 260,869,647 and 270,172,290 outstanding, respectively | **690** | 690 |
| Paid-in-surplus | **3,926** | 3,943 |
| Retained earnings | **12,667** | 11,215 |
| Treasury stock | **(1,624)** | (394) |
| Accumulated other comprehensive loss | **(74)** | (142) |
| Total common shareholders' equity | **15,585** | 15,312 |
| Total liabilities and common shareholders' equity | **$38,033** | $36,515 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation | **1,321** | 1,237 | 1,175 |
| Deferred income taxes and unrecognized tax benefits | **332** | 235 | 320 |
| Stock-based compensation expense | **44** | 35 | 21 |
| Net gain from asset sales | **(52)** | (72) | (135) |
| Other operating activities, net | **(251)** | (175) | 37 |
| Changes in current assets and liabilities, net | **28** | 14 | 151 |
| Cash provided by operating activities | **3,277** | 2,880 | 2,595 |
| **Investing Activities** | | | |
| Capital investments | **(2,496)** | (2,242) | (2,169) |
| Proceeds from asset sales | **122** | 133 | 185 |
| Acquisition of equipment pending financing | **(621)** | (536) | (872) |
| Proceeds from completed equipment financings | **621** | 536 | 872 |
| Other investing activities | **(52)** | 67 | (63) |
| Cash used in investing activities | **(2,426)** | (2,042) | (2,047) |
| **Financing Activities** | | | |
| Common share repurchases (note 12) | **(1,375)** | - | - |
| Dividends paid | **(364)** | (322) | (314) |
| Debt repaid | **(792)** | (657) | (699) |
| Debt issued | **1,581** | - | - |
| Net proceeds from equity compensation plans | **71** | 160 | 262 |
| Excess tax benefits from equity compensation plans | **76** | 29 | - |
| Other financing activities | **3** | 6 | (1) |
| Cash used in financing activities | **(800)** | (784) | (752) |
| Net change in cash and cash equivalents | **51** | 54 | (204) |
| Cash and cash equivalents at beginning of year | **827** | 773 | 977 |
| Cash and cash equivalents at end of year | **$ 878** | $ 827 | $ 773 |
| **Changes in Current Assets and Liabilities, Net of Acquisitions** | | | |
| Accounts receivable, net | **$ 47** | $ 68 | $ (201) |
| Materials and supplies | **(58)** | (64) | (22) |
| Other current assets | **(104)** | (21) | 12 |
| Accounts, wages, and vacation payable | **30** | (102) | 224 |
| Other current liabilities | **113** | 133 | 138 |
| Total | **$ 28** | $ 14 | $ 151 |
| **Supplemental Cash Flow Information** | | | |
| Non-cash activity: | | | |
| Capital investments accrued but not yet paid | **$ 126** | $ 106 | $ 103 |
| Capital lease financings | **82** | 16 | - |
| Common shares repurchased but not yet paid | **82** | - | - |
| Cash dividends declared but not yet paid | **112** | 80 | 78 |
| Cash paid during the year for: | | | |
| Interest, net of amounts capitalized | **$ (467)** | $ (492) | $ (510) |
| Income taxes, net of refunds | **(839)** | (549) | (29) |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CHANGES IN COMMON SHAREHOLDERS' EQUITY

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars* *Thousands of Shares* | *Common Shares* | *Treasury Shares* | *Common Shares* | *Paid-in-Surplus* | *Retained Earnings* | *Treasury Stock* | *Accumulated Other Comprehensive Income/(Loss) (note 13)* | *Total* |
|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2005 | 275,695 | (15,175) | $689 | $3,917 | $9,222 | $ (936) | $(237) | $12,655 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,026 | - | - | 1,026 |
| Other comp. income | | | - | - | - | - | 7 | 7 |
| Total comp. income (note 13) | | | - | - | 1,026 | - | 7 | 1,033 |
| Conversion, stock option exercises, forfeitures, and other | 104 | 6,011 | - | (2) | - | 337 | - | 335 |
| Dividends declared ($1.20 per share) | - | - | - | - | (316) | - | - | (316) |
| Balance at December 31, 2005 | 275,799 | (9,164) | $689 | $3,915 | $9,932 | $ (599) | $(230) | $13,707 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,606 | - | - | 1,606 |
| Other comp. income | | | - | - | - | - | 167 | 167 |
| Total comp. income (note 13) | | | - | - | 1,606 | - | 167 | 1,773 |
| FAS 158 adoption (note 7) | - | - | - | - | - | - | (79) | (79) |
| Conversion, stock option exercises, forfeitures, and other | 163 | 3,374 | 1 | 28 | - | 205 | - | 234 |
| Dividends declared ($1.20 per share) | - | - | - | - | (323) | - | - | (323) |
| Balance at December 31, 2006 | 275,962 | (5,790) | $690 | $3,943 | $11,215 | $ (394) | $(142) | $15,312 |
| Cumulative effect of adoption of FIN 48 (note 4) | - | - | - | - | (7) | - | - | (7) |
| Balance at January 1, 2007 | 275,962 | (5,790) | $690 | $3,943 | $11,208 | $ (394) | $(142) | $15,305 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,855 | - | - | 1,855 |
| Other comp. income | | | - | - | - | - | 68 | 68 |
| Total comp. income (note 13) | | | - | - | 1,855 | - | 68 | 1,923 |
| Conversion, stock option exercises, forfeitures, and other | 200 | 3,122 | - | (17) | - | 227 | - | 210 |
| Share repurchases (note 12) | - | (12,624) | - | - | - | (1,457) | - | (1,457) |
| Dividends declared ($1.49 per share) | - | - | - | - | (396) | - | - | (396) |
| **Balance at December 31, 2007** | **276,162** | **(15,292)** | **$690** | **$3,926** | **$12,667** | **$(1,624)** | **$ (74)** | **$15,585** |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the "Corporation", "UPC", "we", "us", and "our" mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as "UPRR" or the "Railroad".

## 1. Significant Accounting Policies

**Principles of Consolidation –** The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated. The Corporation evaluates its less than majority-owned investments for consolidation pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46 (Revised 2003), *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51* (FIN 46(R)). We currently have no less than majority-owned investments that require consolidation under FIN 46(R).

**Cash and Cash Equivalents –** Cash equivalents consist of investments with original maturities of three months or less.

**Materials and Supplies –** Materials and supplies are carried at the lower of average cost or market.

**Property and Depreciation –** Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of purchased and internally developed software is capitalized and amortized based on estimated service lives of the software.

**Impairment of Long-lived Assets –** We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition –** We recognize commodity revenue on a percentage-of-completion basis as freight moves from origin to destination. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period with expenses recognized as incurred. Other revenue is recognized as service is performed or contractual obligations are met. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to operating revenue based on actual or projected future customer shipments.

**Translation of Foreign Currency –** Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenue and expenses are translated at the average rates of exchange prevailing during the year. Unrealized adjustments are reflected within common shareholders' equity as accumulated other comprehensive income or loss.

**Financial Instruments –** The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation –** We have several stock-based compensation plans under which employees and non-employee directors receive stock options, nonvested retention shares, and nonvested stock units. We refer to the nonvested shares and stock units collectively as "retention awards". We issue treasury shares to cover option exercises and stock unit vestings, while new shares are issued when retention shares vest.

We adopted FASB Statement No. 123(R), *Share-Based Payment* (FAS 123(R)), on January 1, 2006. FAS 123(R) requires us to measure and recognize compensation expense for all stock-based awards made to employees and directors, including stock options. Compensation expense is based on the calculated fair value of the awards as measured at the grant date and is expensed ratably over the service period of the awards (generally the vesting period). The fair value of retention awards is the closing stock price on the date of grant, while the fair value of stock options is determined by using the Black-Scholes option pricing model. We elected to use the modified prospective transition method as permitted by FAS 123(R) and did not restate financial results for prior periods. We did not make an adjustment for the cumulative effect of estimated forfeitures, as the impact was not material.

As a result of the adoption of FAS 123(R), we recognized expense for stock options in 2007 and 2006, in addition to retention awards, which were expensed prior to 2006. Information regarding stock-based compensation appears in the table below:

| *Millions of Dollars* | *2007* | *2006* |
|---|---|---|
| Stock-based compensation, before tax: | | |
| Stock options | **$21** | $14 |
| Retention awards | **23** | 21 |
| Total stock-based compensation, before tax | **$44** | $35 |
| Total stock-based compensation, after tax | **$27** | $22 |

Prior to the adoption of FAS 123(R), we applied the recognition and measurement principles of Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations. No stock-based employee compensation expense related to stock option grants was reflected in net income, as all options granted under those plans had a grant price equal to the market value of our common stock on the date of grant. Stock-based compensation expense related to retention shares, stock units, and other incentive plans was reflected in net income.

The following table details the effect on net income and earnings per share had compensation expense for all of our stock-based awards, including stock options, been recorded in the year ended December 31, 2005 based on the fair value method under FASB Statement No. 123, *Accounting for Stock-Based Compensation.*

| ***Pro Forma Stock-Based Compensation Expense*** *Millions of Dollars, Except Per Share Amounts* | *2005* |
|---|---|
| Net income, as reported | $1,026 |
| Stock-based employee compensation expense, reported in net income, net of tax | 13 |
| Total stock-based employee compensation expense determined under fair value–based method for all awards, net of tax [a] | (50) |
| Pro forma net income | $ 989 |
| Earnings per share – basic, as reported | $ 3.89 |
| Earnings per share – basic, pro forma | $ 3.75 |
| Earnings per share – diluted, as reported | $ 3.85 |
| Earnings per share – diluted, pro forma | $ 3.71 |

[a] *Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $19 million of the pro forma expense noted above. There were no reload option grants during 2007 and 2006 as stock options exercised after January 1, 2006 are not eligible for the reload feature.*

**Earnings Per Share –** Basic earnings per share are calculated on the weighted-average number of common shares outstanding during each period. Diluted earnings per share include shares issuable upon exercise of outstanding stock options and stock-based awards where the conversion of such instruments would be dilutive.

**Use of Estimates –** Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenue, and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes –** As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based on management's judgments regarding the best available evidence about future events.

When we have claimed tax benefits that may be challenged by a tax authority, these uncertain tax positions are accounted for under FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* (FIN 48). We adopted FIN 48 beginning January 1, 2007. Prior to 2007, income tax contingencies were accounted for under FASB Statement No. 5, *Accounting for Contingencies.*

Under FIN 48, we recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. A liability for "unrecognized tax benefits" is

recorded for any tax benefits claimed in our tax returns that do not meet these recognition and measurement criteria. For additional information on the adoption of FIN 48, see note 4 to the Consolidated Financial Statements.

**Pension and Postretirement Benefits –** We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various assumptions including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates, and expected future healthcare costs. The assumptions used by us are based on our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

**Personal Injury –** The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability. Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Legal fees and incidental costs are expensed as incurred.

**Environmental –** When environmental issues have been identified with respect to property currently or formerly owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. Legal fees and incidental costs are expensed as incurred.

**Asbestos –** We estimate a liability for asserted and unasserted asbestos-related claims based on an assessment of the number and value of those claims. We use an external consulting firm to assist us in properly measuring the expense and liability. Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Legal fees and incidental costs are expensed as incurred.

## 2. Operations and Segmentation

We are a Class I railroad that operates in the United States. We have 32,205 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network. The following table provides revenue by commodity group:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Agricultural | **$ 2,597** | $ 2,395 | $ 1,971 |
| Automotive | **1,469** | 1,438 | 1,273 |
| Chemicals | **2,293** | 2,098 | 1,848 |
| Energy | **3,136** | 2,953 | 2,578 |
| Industrial Products | **3,110** | 3,168 | 2,814 |
| Intermodal | **2,911** | 2,810 | 2,473 |
| Total commodity revenue | **$15,516** | $14,862 | $12,957 |
| Other revenue | **767** | 716 | 621 |
| Total operating revenue | **$16,283** | $15,578 | $13,578 |

### 3. Financial Instruments

**Strategy and Risk –** We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items at inception, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

**Market and Credit Risk –** We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. We manage credit risk related to derivative financial instruments, which is minimal, by requiring high credit standards for counterparties and periodic settlements. At December 31, 2007 and 2006, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value –** We determine the fair values of our derivative financial instrument positions based upon current fair values as quoted by recognized dealers or the present value of expected future cash flows.

**Interest Rate Fair Value Hedges –** We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements.

The following is a summary of our interest rate derivatives qualifying as fair value hedges:

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* |
|---|---|---|
| Amount of debt hedged | **$250** | $500 |
| Percentage of total debt portfolio | **3%** | 7% |
| Gross fair value asset/(liability) position | **$ 2** | $(14) |

**Interest Rate Cash Flow Hedges –** We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At December 31, 2007 and 2006, we had reductions of $4 million and $5 million, respectively, recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2007 and 2006, we had no interest rate cash flow hedges outstanding.

**Fuel Swaps –** Two fuel basis swaps cover a total of 151 million gallons of diesel fuel for the period August 2006 through July 2008. These commodity basis swaps require us to make payments to, or receive payments from, the counterparty based on the difference between certain price indices. Changes in the fair value of these swaps are reflected in fuel expense. We reported a derivative asset of approximately $1 million and $2 million at December 31, 2007 and 2006, respectively, which represents the fair value of the swaps. The swaps increased fuel expense for 2007 by $1 million and reduced fuel expense for 2006 by $3 million. The recognition of the swaps in fuel expense included monthly net settlements with the counterparty and the change in fair value.

**Earnings Impact –** Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| (Increase)/decrease in interest expense from interest rate hedging | **$(8)** | $(8) | $5 |
| (Increase)/decrease in fuel expense from fuel derivatives | **(1)** | 3 | - |
| Increase/(decrease) in pre-tax income | **$(9)** | $(5) | $5 |

**Fair Value of Debt Instruments –** The fair value of our short- and long-term debt was estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2007 and 2006, the fair value of total debt exceeded the carrying value by approximately $96 million and $273 million, respectively. At December 31, 2007 and 2006, approximately $164 million and $165 million, respectively, of fixed-rate debt securities contained call provisions that allowed us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables –** The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at both December 31, 2007 and 2006. The value of the outstanding undivided interest held by investors under the facility was $600 million at both December 31, 2007 and 2006, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,071 million and $1,158 million of accounts receivable held by UPRI at December 31, 2007 and 2006, respectively. At December 31, 2007 and 2006, the value of the interest retained by UPRI was $471 million and $558 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate us for these responsibilities. The Railroad collected approximately $16.1 billion and $15.5 billion during the years ended December 31, 2007 and 2006, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $35 million, $33 million, and $23 million for 2007, 2006, and 2005, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad do not have recourse to the assets of UPRI. In August 2007, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

### 4. Income Taxes

Components of income tax expense/(benefit) were as follows for the years ended December 31:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Current | **$ 822** | $ 684 | $ 90 |
| Deferred | **354** | 235 | 320 |
| Unrecognized tax benefits | **(22)** | N/A | N/A |
| Total income tax expense | **$1,154** | $ 919 | $ 410 |

For the years ended December 31, reconciliation between statutory and effective tax rates is as follows:

| *Tax Rate Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Federal statutory tax rate | **35.0%** | 35.0% | 35.0% |
| State statutory rates, net of federal benefits | **2.9** | 2.9 | 2.9 |
| Deferred tax adjustments | **1.0** | (0.5) | (8.2) |
| Tax credits | **(0.6)** | (1.0) | (1.2) |
| Other | **0.1** | - | 0.1 |
| Effective tax rate | **38.4%** | 36.4% | 28.6% |

As reported in our Forms 10-Q for the quarters ended June 30, 2005 and September 30, 2005, the final settlements of income tax examinations for pre-1995 tax years, along with the Internal Revenue Service (IRS) Examination Reports for tax years 1995 through 2002, among other things, were considered in a re-evaluation of our estimated deferred tax assets and liabilities. This resulted in a reduction of deferred tax liabilities and income tax expense of $118 million in the third quarter of 2005.

Deferred income tax liabilities/(assets) were comprised of the following at December 31:

| *Millions of Dollars* | ***2007*** | *2006* |
|---|---|---|
| Net current deferred income tax asset | **$ (336)** | $ (319) |
| Property | **$ 9,467** | $9,356 |
| State taxes, net of federal benefits | **691** | 617 |
| Other | **(108)** | (277) |
| Net long-term deferred income tax liability | **$10,050** | $9,696 |
| Net deferred income tax liability | **$ 9,714** | $9,377 |

In June 2006, the FASB issued FIN 48. We adopted FIN 48 on January 1, 2007. Under FIN 48, tax benefits are recognized only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. Unrecognized tax benefits are tax benefits claimed in our tax returns that do not meet these recognition and measurement standards.

At adoption, our total liabilities for unrecognized tax benefits were $227 million pre-tax, or $173 million after including tax benefits for the deductibility of interest and state taxes. Of this amount, $7 million was recorded as a decrease to beginning retained earnings for the cumulative effect of adopting FIN 48. The remaining $166 million had been previously accrued under either FASB Statement No. 5, *Accounting for Contingencies*, or FASB Statement No. 109, *Accounting for Income Taxes.* The entire $173 million was classified as non-current in the Consolidated Statement of Financial Position.

A reconciliation of changes in pre-tax unrecognized tax benefits liabilities/(assets) from the beginning to the end of the reporting period is as follows:

| *Millions of Dollars* | ***2007*** |
|---|---|
| Unrecognized Tax Benefits at adoption on January 1, 2007 | **$227** |
| Increases for positions taken in current year | **15** |
| Increases for positions taken in prior years | **7** |
| Decreases for positions taken in prior years | **(45)** |
| Decreases for positions expected to be taken in future years | **(41)** |
| Settlements with taxing authorities | **(1)** |
| Increases (decreases) for interest and penalties | **3** |
| Other increases (decreases) | **(4)** |
| Unrecognized tax benefits at December 31, 2007 | **$161** |

Included in the $161 million balance at December 31, 2007 and the $227 million balance at adoption were $142 million and $182 million, respectively, of unrecognized tax benefits that, if recognized, would reduce our effective tax rate. The remaining unrecognized tax benefits related to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty about the timing of such deductibility. Recognition of these tax benefits would reduce our effective tax rate only through a reduction of accrued interest and penalties.

We recognize interest and penalties as part of income tax expense. Total accrued pre-tax liabilities for interest and penalties were $78 million ($47 million after-tax) at December 31, 2007 and $75 million ($45 million after-tax) at adoption.

For all federal income tax years prior to 1995, the IRS examinations have been completed and the statute of limitations bars any additional assessments by the IRS. We have filed interest refund claims for years 1986

through 1994, which may be disputed by the IRS. The IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2004, and we are in different stages of the IRS appeals process for these years. The IRS is examining our tax returns for tax years 2005 and 2006. In the third quarter of 2007, we believe that we reached an agreement in principle with the IRS to resolve all of the issues, except interest, related to tax years 1995 through 1998, including the previously reported dispute over certain donations of property. We anticipate signing a closing agreement in 2008. Once formalized, we anticipate that this agreement will result in an immaterial reduction of income tax expense.

Upon resolution of the federal income tax examinations described above, we will report any changes to our taxable income to state and local taxing authorities in compliance with state and local requirements. Additionally, several state taxing authorities are currently examining our state income tax returns for tax years 2001 through 2005.

In the third quarter of 2007, the State of Illinois enacted new tax legislation that changed how we determine the amount of our income subject to Illinois tax. This legislation caused an increase to our deferred tax expense by $27 million in the third quarter. In addition, because the legislation reduced uncertainty about determining future income subject to Illinois tax, $41 million pre-tax ($26 million after-tax) of deferred taxes are no longer considered part of unrecognized tax benefits. In January of 2008, Illinois enacted technical corrections legislation that made additional changes in how we determine the amount of our income subject to Illinois tax. This technical corrections legislation will result in a reduction of deferred tax expense of approximately $14 million in the first quarter of 2008.

We expect that the amount of unrecognized tax benefits will change significantly during the next 12 months. Of the $161 million balance at December 31, 2007, $140 million is classified as current in the Consolidated Statement of Financial Position, primarily due to the anticipated settlement for tax years 1995 through 1998 described above. It is also reasonably possible that we may resolve the interest claims for 1986 through 1994 described above, which would likely result in an immaterial change to unrecognized tax benefits.

**5. Debt**

Total debt as of December 31, 2007 and 2006, net of interest rate swaps designated as hedges, is summarized below:

| *Millions of Dollars* | ***2007*** | *2006* |
|---|---|---|
| Notes and debentures, 3.0% to 7.4% due through 2054 [a] | **$5,968** | $4,803 |
| Capitalized leases, 4.7% to 9.3% due through 2026 | **1,219** | 1,236 |
| Medium-term notes, 9.2% to 10.0% due through 2020 | **61** | 362 |
| Equipment obligations, 6.2% to 8.1% due through 2031 | **291** | 232 |
| Mortgage bonds, 4.8% due through 2030 | **59** | 59 |
| Tax-exempt financings, 5.0% to 5.7% due through 2026 | **188** | 191 |
| Unamortized discount | **(104)** | (103) |
| Total debt [a] | **$7,682** | $6,780 |
| Less current portion [b] | **(139)** | (780) |
| Total long-term debt | **$7,543** | $6,000 |

*[a] 2007 included a write-up of $2 million while 2006 included a collective write-down of $14 million due to market value adjustments for debt with qualifying hedges that are recorded on the Consolidated Statements of Financial Position.*

*[b] 2006 included a write-down of $4 million due to short-term market value adjustments for debt with qualifying hedges that are recorded on the Consolidated Statements of Financial Position.*

**Debt Maturities –** The following table presents aggregate debt maturities as of December 31, 2007, excluding market value adjustments.

| *Millions of Dollars* | |
|---|---|
| 2008 | $ 689 |
| 2009 | 542 |
| 2010 | 462 |
| 2011 | 550 |
| 2012 | 720 |
| Thereafter | 4,717 |
| Total debt | $7,680 |

At December 31, 2007, we reclassified as long-term debt approximately $550 million of debt due within one year that we intend to refinance. This reclassification reflected our ability and intent to refinance any short-term borrowings and certain current maturities of long-term debt on a long-term basis. At December 31, 2006, we did not reclassify any short-term debt as long-term debt as we did not intend to refinance at that time.

**Mortgaged Properties –** Equipment with a carrying value of approximately $2.8 billion at both December 31, 2007 and 2006 serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms of the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities –** On December 31, 2007, $1.9 billion of credit was available under our revolving credit facility (the facility), which we entered into on April 20, 2007. The facility is designated for general corporate purposes and supports the issuance of commercial paper. We did not draw on the facility during 2007. Commitment fees and interest rates payable under the facility are similar to fees and rates available to comparably rated, investment-grade borrowers. The facility allows for borrowings at floating rates based on London Interbank Offered Rates, plus a spread, depending upon our senior unsecured debt ratings. The facility requires the maintenance of a debt to net worth coverage ratio. At December 31, 2007, we were in compliance with this covenant. The facility does not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require us to post collateral. The facility, which expires in April 2012, replaced two $1 billion, 5-year facilities with terms ending in March 2009 and March 2010. The facility includes terms that are comparable with those of the prior facilities, although the minimum net worth requirement of $7.5 billion in prior facilities was removed, and the facility includes a change-of-control provision.

In addition to our revolving credit facility, a $75 million uncommitted line of credit was available. The line of credit expires in April 2008, and was not used in 2007. We must have equivalent credit available under our five-year facility to draw on this $75 million line.

**Dividend Restrictions –** Our revolving credit facility includes a debt-to-net worth covenant that, under certain circumstances, would restrict the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends was $11.5 billion and $7.8 billion at December 31, 2007 and December 31, 2006, respectively. This facility replaced two credit facilities that had minimum net worth covenants that were more restrictive with respect to the amount of retained earnings available for dividends at December 31, 2006.

**Shelf Registration Statement and Significant New Borrowings** – Our Board of Directors authorized the issuance of up to $3 billion of debt securities pursuant to a new shelf registration statement, which became effective on March 6, 2007, replacing the $500 million of authority remaining under our shelf registration filed in December 2003. Under the current shelf registration, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings.

We have issued the following unsecured, fixed-rate debt securities under our current shelf registration:

| *Date* | *Description of Securities* |
|---|---|
| Issued during 2007: | |
| April 18, 2007 | $250 million of 5.65% Notes due May 1, 2017 |
| April 18, 2007 | $250 million of 6.15% Debentures due May 1, 2037 |
| August 24, 2007 | $500 million of 5.45% Notes due January 31, 2013 |
| October 30, 2007 | $500 million of 5.75% Notes due November 15, 2017 |
| Issued subsequent to 2007: | |
| February 5, 2008 | $750 million of 5.70% Notes due August 15, 2018 |

The net proceeds from these offerings are for general corporate purposes, including the repurchase of common stock pursuant to our share repurchase program. These debt securities include change-of-control provisions. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under our shelf registration, and, therefore, we may issue additional debt securities at any time.

## 6. Leases

We lease certain locomotives, freight cars, and other property. The Consolidated Statement of Financial Position as of December 31, 2007 and 2006 included $2,062 million, net of $887 million of amortization, and $1,982 million, net of $800 million of amortization, respectively, for properties under capital leases. A charge to income resulting from the amortization of assets recorded under capital leases is included within depreciation expense in our Consolidated Statements of Income. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2007 were as follows:

| *Millions of Dollars* | *Operating Leases* | *Capital Leases* |
|---|---|---|
| 2008 | $ 639 | $ 181 |
| 2009 | 600 | 179 |
| 2010 | 554 | 160 |
| 2011 | 522 | 165 |
| 2012 | 417 | 106 |
| Later Years | 3,289 | 1,054 |
| Total minimum lease payments | $6,021 | $1,845 |
| Amount representing interest | N/A | (626) |
| Present value of minimum lease payments | N/A | $1,219 |

Rent expense for operating leases with terms exceeding one month was $810 million in 2007, $798 million in 2006, and $728 million in 2005. When cash rental payments are not made on a straight-line basis, we

recognize variable rental expense on a straight-line basis over the lease term. Contingent rentals and subrentals are not significant.

## 7. Retirement Plans

### Pension and Other Postretirement Benefits

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment, with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – We provide defined contribution medical and life insurance benefits for eligible retirees. These benefits are funded as medical claims and life insurance premiums are paid.

### Funded Status

We adopted FASB Statement No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* (FAS 158), at the end of 2006, which required us to separately recognize the overfunded or underfunded status of our pension and OPEB plans as an asset or liability. The funded status represents the difference between the projected benefit obligation (PBO) and the fair value of the plan assets. The PBO is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of the OPEB plan is equal to the accumulated benefit obligation, as the present value of the OPEB liabilities is not affected by salary increases. Plan assets are measured at fair value. We use a December 31 measurement date for plan assets and obligations for all our retirement plans.

Changes in our PBO and plan assets are as follows for the years ended December 31:

| ***Funded Status*** | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | ***2007*** | *2006* | ***2007*** | *2006* |
| Projected Benefit Obligation | | | | |
| Projected benefit obligation at beginning of year | **$2,113** | $2,065 | **$ 374** | $ 476 |
| Service cost | **34** | 35 | **3** | 4 |
| Interest cost | **124** | 117 | **20** | 21 |
| Plan amendments | **-** | - | **(10)** | (38) |
| Actuarial loss (gain) | **(33)** | 16 | **(34)** | (58) |
| Gross benefits paid | **(126)** | (120) | **(27)** | (31) |
| Projected benefit obligation at end of year | **$2,112** | $2,113 | **$ 326** | $ 374 |
| Plan Assets | | | | |
| Fair value of plan assets at beginning of year | **$1,989** | $1,707 | **$ -** | $ - |
| Actual return on plan assets | **183** | 243 | **-** | - |
| Voluntary funded pension plan contributions | **-** | 150 | **-** | - |
| Non-qualified plan benefit contributions | **12** | 9 | **27** | 31 |
| Gross benefits paid | **(126)** | (120) | **(27)** | (31) |
| Fair value of plan assets at end of year | **$2,058** | $1,989 | **$ -** | $ - |
| Funded status at end of year | **$ (54)** | $ (124) | **$(326)** | $(374) |

Amounts recognized in the statement of financial position as of December 31, 2007 and 2006 consist of:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | **2007** | 2006 | **2007** | 2006 |
| Noncurrent assets | **$ 120** | $ 45 | **$ -** | $ - |
| Current liabilities | **(11)** | (12) | **(27)** | (27) |
| Noncurrent liabilities | **(163)** | (157) | **(299)** | (347) |
| Net amounts recognized at end of year | **$ (54)** | $(124) | **$(326)** | $(374) |

Pre-tax amounts recognized in accumulated other comprehensive income/(loss) as of December 31, 2007 consist of:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service (cost)/credit | $ (18) | $137 | $ 119 |
| Net actuarial loss | (158) | (85) | (243) |
| Total | $(176) | $ 52 | $(124) |

Pre-tax amounts recognized in accumulated other comprehensive income/(loss) as of December 31, 2006 consist of:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service (cost)/credit | $ (24) | $ 161 | $ 137 |
| Net actuarial loss | (249) | (126) | (375) |
| Total | $(273) | $ 35 | $(238) |

Other pre-tax changes recognized in other comprehensive income during 2007 were as follows:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service credit arising during the year | $ - | $(10) | $ (10) |
| Net actuarial (gain)/loss arising during the year | (73) | (32) | (105) |
| Amortization of prior service (cost)/credit | (6) | 33 | 27 |
| Amortization of actuarial gain/(loss) | (18) | (8) | (26) |
| Total | $(97) | $(17) | $(114) |

Amounts included in accumulated other comprehensive income expected to be amortized into net periodic cost (benefit) during 2008:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service cost (credit) | $ 6 | $(33) | $(27) |
| Net actuarial loss | 5 | 6 | 11 |
| Total | $11 | $(27) | $(16) |

*Underfunded Accumulated Benefit Obligation* – The accumulated benefit obligation (ABO) is the present value of benefits earned to date, assuming no future salary growth. The underfunded accumulated benefit obligation represents the difference between the ABO and the fair value of plan assets. At December 31, 2007, the only pension plan that was underfunded was our non-qualified (supplemental) plan, which is not funded by

design. The non-qualified (supplemental) plan is funded with cash from operations as benefits are paid to plan participants. Each of our qualified plans was fully funded at December 31, 2007. The PBO, ABO, and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31:

| ***Underfunded Accumulated Benefit Obligation***<br>*Millions of Dollars* | ***2007*** | *2006* |
|---|---|---|
| Projected benefit obligation | **$(175)** | $(169) |
| Accumulated benefit obligation | **$(172)** | $(168) |
| Fair value of plan assets | **-** | - |
| Underfunded accumulated benefit obligation | **$(172)** | $(168) |

The ABO for all defined benefit pension plans was $2.0 billion and $2.1 billion at December 31, 2007 and 2006, respectively.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | ***2007*** | *2006* | *2005* | ***2007*** | *2006* | *2005* |
| Discount rate | **6.50%** | 6.00% | 5.75% | **6.50%** | 6.00% | 5.75% |
| Salary increase | **3.50** | 3.00 | 2.75 | **N/A** | N/A | N/A |

The following table presents assumed health care cost trend rates used to determine benefit obligations and OPEB expense:

| *Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **9.0%** | 8.0% | 9.0% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.0%** | 5.0% | 5.0% |
| Year that the rate reaches the ultimate trend rate | **2011** | 2010 | 2010 |

**Expense**

Both pension and OPEB expense are determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. The expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. Differences in actual experience in relation to assumptions are not recognized in net income immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and OPEB cost/(benefit) were as follows for the years ended December 31:

| *Millions of Dollars* | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| | ***2007*** | *2006* | *2005* | ***2007*** | *2006* | *2005* |
| Net Periodic Benefit Cost: | | | | | | |
| Service cost | **$ 34** | $ 35 | $ 28 | **$ 3** | $ 4 | $ 4 |
| Interest cost | **124** | 117 | 115 | **20** | 21 | 25 |
| Expected return on plan assets | **(144)** | (134) | (134) | **-** | - | - |
| Amortization of: | | | | | | |
| Prior service cost/(credit) | **6** | 7 | 7 | **(33)** | (33) | (30) |
| Actuarial loss | **18** | 21 | 5 | **8** | 13 | 14 |
| Net periodic benefit cost/(benefit) | **$ 38** | $ 46 | $ 21 | **$ (2)** | $ 5 | $ 13 |

*Assumptions* – The weighted-average actuarial assumptions used to determine expense were as follows for the years ended December 31:

| *Percentages* | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| | ***2007*** | *2006* | *2005* | ***2007*** | *2006* | *2005* |
| Discount rate | **6.00%** | 5.75% | 6.00% | **6.00%** | 5.75% | 6.00% |
| Expected return on plan assets | **8.00** | 8.00 | 8.00 | **N/A** | N/A | N/A |
| Salary increase | **3.00** | 2.75 | 3.00 | **N/A** | N/A | N/A |

The discount rate is based on a hypothetical portfolio of high quality corporate bonds with cash flows matching our plans' expected benefit payments. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return on pension plan assets, net of fees, was approximately 9% in 2007, 14% in 2006, and 7% in 2005. Our historical annualized ten-year rate of return on plan assets is approximately 8%.

Assumed healthcare cost trend rates have a significant effect on the expense and liabilities reported for healthcare plans. The assumed healthcare cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the assumed healthcare cost trend rates would have the following effects on OPEB:

| *Millions of Dollars* | *One % pt. Increase* | *One % pt. Decrease* |
|---|---|---|
| Effect on total service and interest cost components | $ 2 | $ (2) |
| Effect on accumulated benefit obligation | 25 | (21) |

**Cash Contributions**

The following table details our cash contributions for the years ended December 31, 2007 and 2006, and the expected contributions for 2008:

| *Millions of Dollars* | *Pension* | | |
|---|---|---|---|
| | *Qualified* | *Non-qualified* | *OPEB* |
| 2006 | $150 | $ 9 | $31 |
| 2007 | - | 12 | 27 |
| 2008 | - | 12 | 27 |

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Pension Protection Act of 2006 and not more than the maximum amount deductible for tax purposes. All contributions made to the qualified pension plans in 2006 were voluntary and were made with cash generated from operations. At December 31, 2007, our qualified pension plans were fully funded. No required contributions are expected in 2008.

The OPEB plans are not funded and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2008 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2008 though 2017:

| *Millions of Dollars* | *Pension* | *OPEB* |
|---|---|---|
| 2008 | $ 125 | $ 27 |
| 2009 | 128 | 28 |
| 2010 | 131 | 29 |
| 2011 | 137 | 29 |
| 2012 | 142 | 29 |
| Years 2013 – 2017 | 795 | 139 |

**Asset Allocation Strategy**

Our pension plan asset allocation at December 31, 2007 and 2006, and target allocation for 2008, are as follows:

| | *Target Allocation* | *Percentage of Plan Assets December 31,* | |
|---|---|---|---|
| | *2008* | ***2007*** | *2006* |
| Equity securities | 60% to 70% | **68%** | 70% |
| Debt securities | 20% to 30% | **23** | 26 |
| Real estate | 2% to 8% | **4** | 2 |
| Commodities | 4% to 6% | **5** | 2 |
| Total | | **100%** | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated among equity, debt, and other instruments in order to achieve a diversification level that mitigates wide swings in investment returns. Asset allocation target ranges for equity, debt, and other portfolios are evaluated at least every three years with the assistance of an independent external consulting firm. Actual asset allocations are monitored monthly, and rebalancing actions are executed at least quarterly, if needed.

Plan assets are valued at fair value. Investments in securities traded on national security exchanges are valued at their closing market prices on the valuation date; where no sale was made on the valuation date, the security is valued at its bid price. Securities traded in the over-the-counter market are valued at their last sale or bid price. Investments in mortgage-backed securities are carried at estimated fair value based on the characteristics of the underlying mortgages. Certain short-term investments are carried at cost, which approximates fair

value. Venture capital funds, where no quoted market prices are available, are valued at their estimated fair values as determined by the investment manager. Investments in limited partnerships are valued at estimated fair value based on their proportionate share of the partnerships' fair value. The partnerships invest primarily in readily marketable securities.

The majority of the plan's assets are invested in equity securities, because equity portfolios have historically provided higher returns than debt and other asset classes over extended time horizons, and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than other investments. The risk of loss in the plan's equity portfolio is mitigated by investing in a broad range of equity types. Equity diversification includes large-capitalization and small-capitalization companies, growth-oriented and value-oriented investments, and U.S. and non-U.S. securities.

Equity risks are further balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2007 and 2006. The debt portfolio is also broadly diversified and invested primarily in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 6.4 years at both December 31, 2007 and 2006, respectively.

The investment of pension plan assets in our securities is specifically prohibited for both the equity and debt portfolios, other than through index fund holdings.

**Other Retirement Programs**

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first six percent of compensation contributed. Our thrift plan contributions were $14 million in 2007, $13 million in 2006, and $12 million in 2005.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). Contributions made to the System are expensed as incurred and amounted to approximately $616 million in 2007, $615 million in 2006, and $595 million in 2005.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we provide certain postretirement healthcare and life insurance benefits for eligible union employees. Premiums under the plans are expensed as incurred and amounted to $40 million in both 2007 and 2006, and $41 million in 2005.

**8. Stock Options and Other Stock Plans**

We have 600,793 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 3,570 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation. We no longer grant options or awards of retention shares and units under these plans.

The UP Shares Stock Option Plan of Union Pacific Corporation (UP Shares Plan) was approved by our Board of Directors on April 30, 1998. The UP Shares Plan reserved 12,000,000 shares of our common stock for issuance. The UP Shares Plan was a broad-based option program that granted options to purchase 200 shares of our common stock at $55.00 per share to eligible active employees on April 30, 1998. All options granted were non-qualified options that became exercisable on May 1, 2001, and remain exercisable until April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan. As of December 31, 2007, there were 432,689 options outstanding under the UP Shares Plan.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 550,000 shares of our common stock were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 1,000 shares of retention shares or retention stock units. Additionally, each non-employee director receives annually an option to purchase at fair value a number of shares of our common stock, not to exceed 5,000 shares during any calendar year, determined by dividing 60,000 by 1/3 of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. After December 31, 2007, non-employee directors will not receive these annual options. As of December 31, 2007, 7,000 restricted shares were outstanding under the Directors Plan and 155,500 options were outstanding under the Directors Plan.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 12,000,000 shares of our common stock for issuance to eligible employees of the Corporation and its subsidiaries in the form of non-qualified options, incentive stock options, retention shares, stock units, and incentive bonus awards. Non-employee directors were not eligible for awards under the 2001 Plan. As of December 31, 2007, 2,963,203 options and 86,250 retention shares and stock units were outstanding under the 2001 Plan. We no longer grant any stock options or other stock or unit awards under this plan.

The Union Pacific Corporation 2004 Stock Incentive Plan (2004 Plan) was approved by shareholders in April 2004. The 2004 Plan reserved 21,000,000 shares of our common stock for issuance, plus any shares subject to awards made under the 2001 Plan and the 1993 Plan that were outstanding on April 16, 2004, and became available for regrant pursuant to the terms of the 2004 Plan. Under the 2004 Plan, non-qualified options, stock appreciation rights, retention shares, stock units, and incentive bonus awards may be granted to eligible employees of the Corporation and its subsidiaries. Non-employee directors are not eligible for awards under the 2004 Plan. As of December 31, 2007, 3,471,156 options and 1,020,420 retention shares and stock units were outstanding under the 2004 Plan.

Pursuant to the above plans, 19,300,864; 19,544,245; and 20,695,817 shares of our common stock were authorized and available for grant at December 31, 2007, 2006, and 2005, respectively.

**Stock Options –** We estimate the fair value of our stock option awards using the Black-Scholes option pricing model. Groups of employees and non-employee directors that have similar historical and expected exercise behavior are considered separately for valuation purposes. The table below shows the annual weighted-average assumptions used for valuation purposes:

| *Weighted-Average Assumptions* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Risk-free interest rate | **4.9%** | 4.5% | 3.8% |
| Dividend yield | **1.4%** | 1.4% | 1.9% |
| Expected life (years) | **4.7** | 6.0 | 4.8 |
| Volatility | **20.9%** | 25.3% | 20.6% |
| Weighted-average grant-date fair value of options granted | **$22.38** | $24.97 | $12.92 |

The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant; the dividend yield is calculated as the ratio of dividends paid per share of common stock to the stock price on the date of grant; the expected life is based on historical and expected exercise behavior; and volatility is based on the historical volatility of our stock price over the expected life of the option.

A summary of stock option activity during 2007 is presented below:

| | *Shares (thous.)* | *Weighted-Average Exercise Price* | *Weighted-Average Remaining Contractual Term* | *Aggregate Intrinsic Value (millions)* |
|---|---|---|---|---|
| Outstanding at January 1, 2007 | 10,044 | $64.22 | 6.0 yrs. | $279 |
| Granted | 1,103 | 96.94 | N/A | N/A |
| Exercised | (3,542) | 58.61 | N/A | N/A |
| Forfeited or expired | (42) | 79.18 | N/A | N/A |
| Outstanding at December 31, 2007 | 7,563 | $71.53 | 6.0 yrs. | $409 |
| Vested or expected to vest at December 31, 2007 | 7,501 | $71.36 | 6.0 yrs. | $407 |
| Options exercisable at December 31, 2007 | 5,487 | $63.88 | 5.0 yrs. | $339 |

Stock options are granted at the closing price on the date of grant, have ten-year contractual terms, and vest no later than three years from the date of grant. None of the stock options outstanding at December 31, 2007 are subject to performance or market-based vesting conditions.

At December 31, 2007, there was $26 million of unrecognized compensation expense related to nonvested stock options, which is expected to be recognized over a weighted-average period of 1.3 years. Additional information regarding stock option exercises appears in the table below:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Intrinsic value of stock options exercised | **$208** | $124 | $142 |
| Cash received from option exercises | **132** | 177 | 296 |
| Tax benefit realized from option exercises | **78** | 44 | 55 |
| Aggregate grant-date fair value of stock options vested [a] | **11** | 26 | 62 |

*[a] Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options with immediate vesting in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $31 million of the aggregate grant-date fair value of stock options vested. There were no reload option grants during 2007 and 2006 as stock options exercised after January 1, 2006 are not eligible for the reload feature.*

**Retention Awards –** The fair value of retention awards is based on the closing price of the stock at the grant date. Dividend equivalents are paid to participants during the vesting periods.

Changes in our retention awards during 2007 were as follows:

| | *Shares (thous.)* | *Weighted-Average Grant-Date Fair Value* |
|---|---|---|
| Nonvested at January 1, 2007 | 778 | $71.72 |
| Granted | 306 | 97.01 |
| Vested | (253) | 61.66 |
| Forfeited | (19) | 81.80 |
| Nonvested at December 31, 2007 | 812 | $84.09 |

Retention awards are granted at no cost to the employee or non-employee director and vest over periods lasting up to four years. At December 31, 2007, there was $38 million of total unrecognized compensation expense related to nonvested retention awards, which is expected to be recognized over a weighted-average period of 2.1 years.

**Performance Retention Awards –** In January 2007, our Board of Directors approved performance stock unit grants. Other than raising the performance targets, the basic terms of these performance stock units are identical to those granted in January 2006, including annual return on invested capital (ROIC) as the performance measure. Stock units awarded to selected employees under these grants are subject to continued employment for 37 months and the attainment of certain levels of ROIC. We will expense the fair value of the units that are probable of being earned based on our forecasted ROIC over the 3-year performance period. We measure the fair value of these performance stock units based upon the closing price of the underlying common stock as of the date of grant, reduced by the present value of estimated future dividends. Dividend equivalents are paid to participants only after the units are earned.

The assumptions used to calculate the present value of estimated future dividends are as follows:

| | *2007* |
|---|---|
| Dividend per share per quarter | $0.35 |
| Risk-free interest rate at date of grant | 4.9% |

Changes in our performance retention awards during 2007 were as follows:

| | *Shares (thous.)* | *Weighted-Average Grant-Date Fair Value* |
|---|---|---|
| Nonvested at January 1, 2007 | 122 | $86.05 |
| Granted | 173 | 93.72 |
| Vested | - | - |
| Forfeited | (1) | 93.72 |
| Nonvested at December 31, 2007 | 294 | $90.53 |

At December 31, 2007, there was $15 million of total unrecognized compensation expense related to nonvested performance retention awards, which is expected to be recognized over a weighted-average period of 1.7 years. A portion of this expense is subject to achievement of the ROIC levels established for the performance stock unit grants.

## 9. Earnings Per Share

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31:

| *Millions of Dollars, Except Per Share Amounts* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$1,855** | $1,606 | $1,026 |
| Weighted-average number of shares outstanding: | | | |
| Basic | **265.9** | 269.4 | 263.4 |
| Dilutive effect of stock options | **2.1** | 2.1 | 1.5 |
| Dilutive effect of retention shares and units | **0.4** | 0.5 | 1.6 |
| Diluted | **268.4** | 272.0 | 266.5 |
| Earnings per share – basic | **$ 6.97** | $ 5.96 | $ 3.89 |
| Earnings per share – diluted | **$ 6.91** | $ 5.91 | $ 3.85 |

Common stock options totaling 0.4 million, 1.4 million, and 1.4 million for 2007, 2006, and 2005, respectively, were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive.

## 10. Commitments and Contingencies

**Asserted and Unasserted Claims –** Various claims and lawsuits are pending against us and certain of our subsidiaries. We cannot fully determine the effect of all asserted and unasserted claims on our consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where asserted and unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated results of operations, financial condition, or liquidity after taking into account liabilities previously recorded for these matters.

**Personal Injury –** The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in measuring the expense and liability, including unasserted claims, on a semi-annual basis. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements.

As a result of improvements in our safety experience, lower estimated ultimate settlement costs, and the completion of actuarial studies, we reduced personal injury expense by approximately $80 million in 2007. These adjustments were partially offset by adverse development with respect to one claim. Our personal injury liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$ 631** | $ 619 | $ 639 |
| Accruals | **165** | 240 | 247 |
| Payments | **(203)** | (228) | (267) |
| Ending balance at December 31 | **$ 593** | $ 631 | $ 619 |
| Current portion, ending balance at December 31 | **$ 204** | $ 233 | $ 274 |

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Because of the uncertainty surrounding the ultimate outcome of personal injury claims, it is reasonably possible that future costs to settle these claims may range from approximately $593 million to $641 million. We believe that the $593 million liability recorded at December 31, 2007, is the best estimate of the present value of the future settlement costs of personal injury claims.

**Asbestos –** We are a defendant in a number of lawsuits in which current and former employees and other parties allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. The claims and lawsuits (collectively referred to as "claims") allege occupational illness resulting from exposure to asbestos-containing products. In most cases, the claimants do not have credible medical evidence of physical impairment resulting from the alleged exposures. Additionally, most claims filed against us do not specify an amount of alleged damages.

During 2004, we engaged a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing the number and value of these unasserted claims through 2034, based on our average claims experience over a multi-year period. During 2007, we updated our potential liability to include actual claim experience since 2004. As a result, we decreased our liability by $20 million in 2007 for asbestos-related claims. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of future claims received would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

Our asbestos-related liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$302** | $311 | $324 |
| Accruals/(credits) | **(20)** | - | - |
| Payments | **(17)** | (9) | (13) |
| Ending balance at December 31 | **$265** | $302 | $311 |
| Current portion, ending balance at December 31 | **$ 11** | $ 13 | $ 16 |

Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Approximately 13% of the recorded liability related to asserted claims, and approximately 87% related to unasserted claims. These claims are expected to be paid out over the next 27 years. We will continue to review actual experience and adjust our estimate as warranted.

We have insurance coverage for a portion of the costs incurred to resolve asbestos-related claims, and, as a result of the 2004 assessment, we increased our receivable for insurance recoveries related to asbestos during 2004. In conjunction with the liability update performed in 2007, we also reassessed estimated insurance recoveries. We have recognized an asset for estimated insurance recoveries at December 31, 2007 and 2006.

We believe that our estimates of liability for asbestos-related claims and insurance recoveries are reasonable and probable. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims filed each year, average settlement costs, and insurance coverage issues, could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates also may vary in the future if: strategies, activities,

and outcomes of asbestos litigation materially change; federal and state laws governing asbestos litigation increase or decrease the probability or amount of compensation of claimants; and there are material changes with respect to payments made to claimants by other defendants.

**Environmental Costs –** We are subject to federal, state, and local environmental laws and regulations. We have 339 projects with which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 41 projects that are the subject of actions taken by the U.S. government, 22 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified projects; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities with each project.

When an environmental issue has been identified with respect to property owned, leased, or otherwise used in our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. At December 31, 2007, approximately 13% of our environmental liability was discounted at 4.15%, while approximately 14% of our environmental liability was discounted at 5.34% at December 31, 2006.

Our environmental liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$210** | $213 | $201 |
| Accruals | **41** | 39 | 45 |
| Payments | **(42)** | (42) | (33) |
| Ending balance at December 31 | **$209** | $210 | $213 |
| Current portion, ending balance at December 31 | **$ 63** | $ 54 | $ 46 |

The environmental liability includes costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each project, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates of liability may vary over time due to changes in federal, state, and local laws governing environmental remediation. We do not expect current obligations to have a material adverse effect on our results of operations or financial condition.

**Guarantees –** At December 31, 2007, we were contingently liable for $465 million in guarantees. We have recorded a liability of $5 million and $6 million for the fair value of these obligations as of December 31, 2007 and 2006, respectively. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Indemnities –** Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will

be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**Income Taxes –** As discussed in note 4, the IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2004, and we are in different stages of the IRS appeals process for these years. The IRS is examining our tax returns for tax years 2005 and 2006. In the third quarter of 2007, we believe that we reached an agreement in principle with the IRS to resolve all of the issues, except interest, related to tax years 1995 through 1998, including the previously reported dispute over certain donations of property. We anticipate signing a closing agreement in 2008. At December 31, 2007, we have recorded a current liability of $140 million for tax payments in 2008 related to federal and state income tax examinations. We do not expect that the ultimate resolution of these examinations will have a material adverse effect on our Consolidated Financial Statements.

## 11. Other Income

Other income included the following for the years ended December 31:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Rental income | **$ 68** | $ 83 | $ 59 |
| Net gain on non-operating asset dispositions | **52** | 72 | 135 |
| Interest income | **50** | 29 | 17 |
| Sale of receivables fees | **(35)** | (33) | (23) |
| Non-operating environmental costs and other | **(19)** | (33) | (43) |
| Total | **$116** | $118 | $145 |

## 12. Share Repurchase Program

On January 30, 2007, our Board of Directors authorized the repurchase of up to 20 million shares of Union Pacific Corporation common stock through the end of 2009. Management's assessments of market conditions and other pertinent facts guide the timing and volume of all repurchases. We expect to fund our common stock repurchases through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007.

During 2007, we repurchased approximately 13 million shares under this program at an aggregate purchase price of approximately $1.5 billion. These shares were recorded in treasury stock at cost, which includes any applicable commissions and fees.

## 13. Comprehensive Income/(Loss)

Comprehensive income/(loss) was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$1,855** | $1,606 | $1,026 |
| Other comprehensive income: | | | |
| Defined benefit plans | **65** | 170 | 1 |
| Foreign currency translation | **2** | (4) | 5 |
| Derivatives | **1** | 1 | 1 |
| Total other comprehensive income/(loss) [a] | **68** | 167 | 7 |
| Total comprehensive income | **$1,923** | $1,773 | $1,033 |

*[a] Net of deferred taxes of $52 million, $102 million, and $5 million during 2007, 2006, and 2005, respectively.*

The after-tax components of accumulated other comprehensive loss were as follows:

| *Millions of Dollars* | ***Dec. 31, 2007*** | *Dec. 31, 2006* |
|---|---|---|
| Defined benefit plans | **$(55)** | $(120) |
| Foreign currency translation | **(15)** | (17) |
| Derivatives | **(4)** | (5) |
| Total | **$(74)** | $(142) |

## 14. Accounting Pronouncements

In September 2006, the FASB issued Statement No. 157, *Fair Value Measurements* (FAS 157). FAS 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles and expands disclosures about fair value measurements. This statement does not require any new fair value measurements; rather, it applies under other accounting pronouncements that require or permit fair value measurements. The provisions of FAS 157 are effective for us beginning in 2008. We expect this new standard will result in increased disclosures but will not have a significant impact on our financial position or results of operations.

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* (FAS 159). The fair value option established by FAS 159 permits, but does not require, all entities to choose to measure eligible items at fair value at specified election dates. An entity would report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. FAS 159 is effective for us beginning in 2008. We do not currently intend to elect the fair value option for any eligible items and do not expect this standard to have a significant impact on our financial position or results of operations.

In December 2007, the FASB issued Statement No. 141 (Revised 2007), *Business Combinations* (FAS 141R). FAS 141R will change the accounting for business combinations. Under FAS 141R, an acquiring entity will be required to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. FAS 141R will also change the accounting treatment and disclosures with respect to certain specific items in a business combination. FAS 141R applies to us prospectively for business combinations occurring on or after January 1, 2009. Accordingly, any business combinations we engage in will be recorded and disclosed following existing GAAP until January 1, 2009. We expect FAS 141R will have an impact on accounting for business combinations, but the effect will be dependent upon any potential future acquisitions.

In December 2007, the FASB issued Statement No. 160, *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51* (FAS 160). FAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FAS 160 is effective for us beginning in 2009. We are still assessing the potential impact, if any, of the adoption of FAS 160 on our consolidated financial position, results of operations and cash flows.

In December 2007, the FASB ratified the consensus reached on Emerging Issues Task Force (EITF) Issue No. 07-1, *Collaborative Arrangements* (EITF 07-1), which defines collaborative arrangements and establishes reporting and disclosure requirements for transactions between participants in a collaborative arrangement. The requirements of this EITF will be applied to collaborative arrangements in existence on or after January 1, 2009. We are still assessing the potential impact, if any, of the adoption of EITF 07-1 on our consolidated financial position, results of operations and cash flows.

**15. Selected Quarterly Data (Unaudited)**

| *Millions of Dollars, Except Per Share Amounts* | | | | |
|---|---|---|---|---|
| *2007* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
| Operating revenue | $3,849 | $4,046 | $4,191 | $4,197 |
| Operating income | 719 | 787 | 1,005 | 864 |
| Net income | 386 | 446 | 532 | 491 |
| Net income per share | | | | |
| Basic | 1.43 | 1.66 | 2.02 | 1.88 |
| Diluted | 1.41 | 1.65 | 2.00 | 1.86 |
| *2006* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
| Operating revenue | $3,710 | $3,923 | $3,983 | $3,962 |
| Operating income | 605 | 717 | 752 | 810 |
| Net income | 311 | 390 | 420 | 485 |
| Net income per share | | | | |
| Basic | 1.16 | 1.45 | 1.56 | 1.79 |
| Diluted | 1.15 | 1.44 | 1.54 | 1.78 |

****************************************

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

Additionally, the CEO and CFO determined that there have been no changes to the Corporation's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

**Item 9B. Other Information**

None.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Union Pacific Corporation and Subsidiary Companies (the Corporation) is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). The Corporation's internal control system was designed to provide reasonable assurance to the Corporation's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Corporation's management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2007. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework*. Based on our assessment management believes that, as of December 31, 2007, the Corporation's internal control over financial reporting is effective based on those criteria.

The Company's independent registered public accounting firm has issued an attestation report on the effectiveness of the Company's internal control over financial reporting. This report appears on page 80.

February 14, 2008

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the internal control over financial reporting of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2007, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2007 of the Corporation and our report dated February 15, 2008 expressed an unqualified opinion on those consolidated financial statements and financial statement schedule and included an explanatory paragraph regarding the Corporation's adoption, in 2006, of Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans.*

Deloitte & Touche LLP

Omaha, Nebraska
February 15, 2008

## PART III

### Item 10. Directors, Executive Officers, and Corporate Governance

(a) Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b) Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c) Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d) Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the Code). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

### Item 11. Executive Compensation

Information concerning compensation received by our directors and our named executive officers is presented in the Compensation Discussion and Analysis, Summary Compensation Table, Grants of Plan-Based Awards in Fiscal Year 2007, Outstanding Equity Awards at 2007 Fiscal Year-End, Option Exercises and Stock Vested in Fiscal Year 2007, Pension Benefits at 2007 Fiscal Year-End, Nonqualified Deferred Compensation at 2007 Fiscal Year-End, Potential Payments Upon Termination or Change in Control and Director Compensation in Fiscal Year 2007 segments of the Proxy Statement and is incorporated herein by reference. Additional information regarding compensation of directors, including Board committee members, is set forth in the By-Laws of UPC and the Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, both of which are included as exhibits to this report. Information regarding the Compensation Committee is set forth in the Compensation Committee Interlocks and Insider Participation and Compensation Committee Report segments of the Proxy Statement and is incorporated herein by reference.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Information as to the number of shares of our equity securities beneficially owned by each of our directors and nominees for director, our named executive officers, our directors and executive officers as a group, and

certain beneficial owners is set forth in the Security Ownership of Certain Beneficial Owners and Management segment of the Proxy Statement and is incorporated herein by reference.

The following table summarizes the equity compensation plans under which Union Pacific Corporation common stock may be issued as of December 31, 2007.

| *Plan Category* | *Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)* | *Weighted-average exercise price of outstanding options, warrants and rights (b)* | *Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)* |
|---|---|---|---|
| Equity compensation plans approved by security holders | 7,670,459[1] | $72.54[2] | 19,300,864 |
| Equity compensation plans not approved by security holders [3] | 432,689 | 55.00 | - |
| Total | 8,103,148 | $71.53 | 19,300,864 |

*[1] Includes 539,678 retention units that do not have an exercise price. Does not include 577,562 retention shares that are actually issued and outstanding.*

*[2] Does not include the retention units or retention shares described above in footnote [1].*

*[3] The UP Shares Stock Option Plan (UP Shares Plan) is the only equity compensation plan not approved by shareholders. The UP Shares Plan was approved by our Board of Directors on April 30, 1998 and reserved 12,000,000 shares of common stock for issuance. The UP Shares Plan was a broad-based option program that granted each active employee on April 30, 1998 non-qualified options to purchase 200 shares of common stock at $55.00 per share. Options became exercisable on May 1, 2001 and expire on April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan.*

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party that would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

Information regarding the independence of our directors is set forth in the Director Independence segment of the Proxy Statement and is incorporated herein by reference.

### Item 14. Principal Accountant Fees and Services

Information concerning the fees billed by our independent registered public accounting firm and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit—related fees, (iii) tax fees, and (iv) all other fees, is set forth in the Independent Registered Public Accounting Firm's Fees and Services segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent registered public accounting firm is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

# PART IV

## Item 15. Exhibits, Financial Statement Schedules

(a) Financial Statements, Financial Statement Schedules, and Exhibits:

(1) Financial Statements

The financial statements filed as part of this filing are listed on the index to the Financial Statements and Supplementary Data, Item 8, on page 46.

(2) Financial Statement Schedules

Schedule II—Valuation and Qualifying Accounts

Schedules not listed above have been omitted because they are not applicable or not required or the information required to be set forth therein is included in the Financial Statements and Supplementary Data, Item 8, or notes thereto.

(3) Exhibits

Exhibits are listed in the exhibit index beginning on page 86. The exhibits include management contracts, compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601 (10) (iii) of Regulation S-K.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 28th day of February, 2008.

UNION PACIFIC CORPORATION

By /s/ James R. Young
James R. Young,
Chairman, President, Chief
Executive Officer, and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 28th day of February, 2008, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

/s/ James R. Young
James R. Young,
Chairman, President, Chief
Executive Officer, and Director

PRINCIPAL FINANCIAL OFFICER:

/s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.,
Executive Vice President - Finance
and Chief Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

/s/ Jeffrey P. Totusek
Jeffrey P. Totusek,
Vice President and Controller

DIRECTORS:

Andrew H. Card, Jr.*
Erroll B. Davis, Jr.*
Thomas J. Donohue*
Archie W. Dunham*
Judith Richards Hope*
Charles C. Krulak*
Michael W. McConnell*
Thomas F. McLarty III*
Steven R. Rogel*

* By /s/ Thomas E. Whitaker
Thomas E. Whitaker, Attorney-in-fact

## SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| **Allowance for doubtful accounts:** | | | |
| Balance, beginning of period | **$ 99** | $ 126 | $ 107 |
| Charges/(reduction) to expense | **(7)** | (7) | 2 |
| Net recoveries/(write-offs) | **(17)** | (20) | 17 |
| Balance, end of period | **$ 75** | $ 99 | $ 126 |
| Allowance for doubtful accounts are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 3** | $ 6 | $ 16 |
| Long-term | **72** | 93 | 110 |
| Balance, end of period | **$ 75** | $ 99 | $ 126 |
| **Accrued casualty costs:** | | | |
| Balance, beginning of period | **$1,277** | $1,354 | $1,303 |
| Charges to expense | **328** | 417 | 409 |
| Cash payments and other reductions | **(435)** | (494) | (358) |
| Balance, end of period | **$1,170** | $1,277 | $1,354 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 371** | $ 409 | $ 478 |
| Long-term | **799** | 868 | 876 |
| Balance, end of period | **$1,170** | $1,277 | $1,354 |

**Union Pacific Corporation**
**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| Filed with this Statement | |
| 10(a) | Form of 2008 Long Term Plan Stock Unit Agreement. |
| 10(b) | The UPC Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, as amended January 1, 2008. |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Registered Public Accounting Firm's Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - James R. Young. |
| 31(b) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - Robert M. Knight, Jr. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 - James R. Young and Robert M. Knight, Jr. |
| Incorporated by Reference | |
| 3(a) | By-Laws of UPC, as amended, effective October 1, 2007, are incorporated herein by reference to Exhibit 3 to the Corporation's Current Report on Form 8-K dated October 2, 2007. |
| 3(b) | Revised Articles of Incorporation of UPC, as amended through April 25, 1996, are incorporated herein by reference to Exhibit 3 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996. |
| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Wells Fargo Bank, National Association, as successor to Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |
| 4(b) | Indenture, dated as of April 1, 1999, between UPC and The Bank of New York, as successor to JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989). |
| 4(c) | Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323). |

4(d) Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to UPC's Current Report of Form 8-K, dated April 18, 2007.

4(e) Form of Debt Security (Debenture) is incorporated by reference to Exhibit 4.2 to the Corporation's Current Report of Form 8-K, dated April 18, 2007.

4(f) Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to the Corporation's Current Report of Form 8-K, dated August 24, 2007.

4(g) Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to the Corporation's Current Report of Form 8-K, dated October 30, 2007.

4(h) Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to the Corporation's Current Report of Form 8-K, dated February 5, 2008.

Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission.

10(c) UPC 2000 Directors Stock Plan, as amended November 16, 2006 and January 30, 2007, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006.

10(d) UP Shares Stock Option Plan of UPC, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10(c) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006.

10(e) The 1993 Stock Option and Retention Stock Plan of UPC, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.

10(f) UPC 2001 Stock Incentive Plan, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10(e) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006.

10(g) UPC 2004 Stock Incentive Plan, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10(f) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006.

10(h) Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707).

10(i) Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by

| | |
|---|---|
| | reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(j) | Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(k) | The Executive Incentive Plan of UPC, as amended May 31, 2001, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10(l) | Written Description of Premium Exchange Program Pursuant to 1993 Stock Option and Retention Stock Plan of UPC is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999. |
| 10(m) | UPC Key Employee Continuity Plan dated November 16, 2000, is incorporated herein by reference to Exhibit 10(o) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| 10(n) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(o) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(p) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(q) | Written Description of Other Executive Compensation Arrangements of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(q) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10(r) | Form of Non-Qualified Stock Option Agreement for Executives is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(s) | Form of Stock Unit Agreement for Executives is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(t) | Form of Stock Unit Agreement for Executive Incentive Premium Exchange Program is incorporated herein by reference to Exhibit 10(c) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(u) | Form of Non-Qualified Stock Option Agreement for Directors is incorporated herein by reference to Exhibit 10(d) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |

| | |
|---|---|
| 10(v) | Form of Stock Unit Agreement for Executives, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(w) | Form of Non-Qualified Stock Option Agreement for Executives, is incorporated herein by reference to Exhibit 10(c) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(x) | Form of 2006 Long Term Plan Stock Unit Agreement is incorporated herein by reference to Exhibit 10(a) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(y) | Form of 2007 Long Term Plan Stock Unit Agreement is incorporated herein by reference to Exhibit 10(a) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006. |
| 10(z) | UPC Executive Incentive Plan, effective May 5, 2005, is incorporated herein by reference to Exhibit 10(d) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(aa) | Supplemental Thrift Plan of UPC, as amended December 21, 2005, is incorporated herein by reference to Exhibit 10(e) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(bb) | The Supplemental Pension Plan for Officers and Managers of UPC and Affiliates, as amended December 21, 2005, is incorporated herein by reference to Exhibit 10(f) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(cc) | Executive Incentive Plan (2005) – Deferred Compensation Program, dated December 21, 2005, is incorporated herein by reference to Exhibit 10(g) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |

**Exhibit 12**

## RATIO OF EARNINGS TO FIXED CHARGES

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, Except for Ratios* | ***2007*** | *2006* | *2005* | *2004* | *2003* |
|---|---|---|---|---|---|
| Fixed charges: | | | | | |
| Interest expense including amortization of debt discount | **$ 482** | $ 477 | $ 504 | $ 527 | $ 574 |
| Portion of rentals representing an interest factor | **237** | 243 | 220 | 206 | 169 |
| Total fixed charges | **$ 719** | $ 720 | $ 724 | $ 733 | $ 743 |
| Earnings available for fixed charges: | | | | | |
| Net income | **$1,855** | $1,606 | $1,026 | $ 604 | $1,056 |
| Equity earnings net of distributions | **(69)** | (59) | (48) | (47) | 15 |
| Income taxes | **1,154** | 919 | 410 | 252 | 581 |
| Fixed charges | **719** | 720 | 724 | 733 | 743 |
| Earnings available for fixed charges | **$3,659** | $3,186 | $2,112 | $1,542 | $2,395 |
| Ratio of earnings to fixed charges | **5.1** | 4.4 | 2.9 | 2.1 | 3.2 |

**Exhibit 21**

**SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION**

| Name of Corporation | State of Incorporation |
| --- | --- |
| Union Pacific Railroad Company........................................................................ | Delaware |
| Southern Pacific Rail Corporation ..................................................................... | Utah |

**Exhibit 23**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714, Registration Statement No. 333-105715, Registration Statement No. 333-116003 and Registration Statement No. 333-132324 on Forms S-8 and Registration Statement No. 333-88666, Amendment No. 1 to Registration Statement No. 333-88666, Registration Statement No. 333-111185, and Registration Statement No. 333-141084 on Forms S-3 of our reports dated February 15, 2008, relating to the consolidated financial statements and financial statement schedule of Union Pacific Corporation and Subsidiary Companies (the Corporation) (which report expressed an unqualified opinion and included an explanatory paragraph relating to the Corporation's adoption, in 2006, of Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*) and the effectiveness of the Corporation's internal control over financial reporting, appearing in this Annual Report on Form 10-K of Union Pacific Corporation and Subsidiary Companies for the year ended December 31, 2007.

Deloitte & Touche LLP

Omaha, Nebraska
February 26, 2008

**Exhibit 24**

**UNION PACIFIC CORPORATION**
**Powers of Attorney**

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the Company), do hereby appoint each of James R. Young, Barbara W. Schaefer, and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2007, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of February 28, 2008.

/s/ Andrew H. Card, Jr.
Andrew H. Card, Jr.

/s/ Erroll B. Davis, Jr.
Erroll B. Davis, Jr.

/s/ Thomas J. Donohue
Thomas J. Donohue

/s/ Archie W. Dunham
Archie W. Dunham

/s/ Judith Richards Hope
Judith Richards Hope

/s/ Charles C. Krulak
Charles C. Krulak

/s/ Michael W. McConnell
Michael W. McConnell

/s/ Thomas F. McLarty III
Thomas F. McLarty III

/s/ Steven R. Rogel
Steven R. Rogel

**Exhibit 31(a)**

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER

I, James R. Young, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2008

/s/ James R. Young
James R. Young
Chairman, President and
Chief Executive Officer

**Exhibit 31(b)**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**

I, Robert M. Knight, Jr., certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2008

/s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.
Executive Vice President - Finance and
Chief Financial Officer

**Exhibit 32**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, James R. Young, Chairman, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ James R. Young
James R. Young
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

February 28, 2008

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President - Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.
Executive Vice President - Finance and
Chief Financial Officer
Union Pacific Corporation

February 28, 2008

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT PX0592

# Interchange Between Shortlines and Major Carriers in U.S

By Terry Whiteside, Whiteside & Associates, Billings, Montana – January 2009

There are over 450 shortline railroads which interchange rail cars with the Class I railroads. Class I have obligations imposed by federal law and enforced by the Surface Transportation Board to provide facilities for interchanging rail cars with connecting lines, including shortlines.

There are several different types of business relationships that can exist between major carriers and shortline railroads. These include handling carrier arrangements, junction settlement arrangements, switch carrier arrangements, interline carrier arrangements, and Rule 11 arrangements,

Evidence from the American Shortline and Regional Railroad Association shows that most of the shortlines, especially the newer ones, have handling carrier arrangements (described as Interchange Agreements), with lesser numbers of shortlines utilizing junction settlements and switch carrier arrangements. Relatively few use the Rule 11 procedure. Some shortlines actually have various combinations of the arrangement listed above.

It is important to note that a written negotiated agreement between a connecting carrier and a shortline is needed to establish a handling carrier arrangement or a junction settlement arrangement – generally known as Interchange Agreements. These generally set out where, how and at what division cars will be interchanged and any other particulars to facilitate the interchange of cars between two carriers.

In the absence of such an arrangement, traffic can be moved pursuant to (a) interline settlement, (b) switch carrier, or (c) Rule 11.

- Under an “Interline Settlement Carrier” arrangement, the shortline negotiates its own division as part of a joint-line tariff, quote or contract. That is, the shortline and its connecting carrier (s) determine how much will be charged for moving railcars between any given points.
- When rail cars move between the shortline and the connecting carrier, the customer/shipper pays one rate ----a line haul rate---to the “settling carrier”(i.e. the railroad responsible for issuing the freight bill). If Class I issues and collects the freight bill then its responsible for paying the shortline its share of the rate. If the shortline issues and collects the freight bill then it is responsible for paying the Class I its share of the rate.

Another business relationship available to rail carriers is called a “Switch Carrier” arrangement.

- Under this arrangement, the shortline publishes a switch tariff for each station on its own line. When rail cars are interchanged between the shortline and connecting carrier, the customer/shipper pays one rate --- a line haul rate ----to Class I. Class I then keeps a share of the customer’s payment, pays the shortline its switch fee, and bills the customer for any unabsorbed balance.

A sometimes utilized business relationship is called a “Rule 11” arrangement. Rule 11 is an accounting rule published by the Association of American Railroads (AAR). Under a Rule 11 arrangement, Class I (connecting carrier) and the shortline separately set and publish their own shipping rates and the separately bill the customer for that rate. When rail cars are interchanges between the shortline and connecting carrier, the customer / shipper make two payments ----one to the shortline and one to Class I. In this way, any two carriers can establish rates for a contemplated movement.

Each of the business relationships described above (Interchange Agreement, Interline settlement, switch carrier, and Rule 11) have been part of the railroad industry for decades.

# EXHIBIT PX0593

# *Surface Transportation Board*

*Office of Economics, Environmental Analysis & Administration*
*Section of Economics*

*January 16, 2009*

# Study of Railroad Rates: 1985-2007

The Surface Transportation Board (STB or Board) monitors freight railroad rates in the United States. Periodically, the STB's Section of Economics distills its data and analysis of freight rail rates into formal reports that are shared with the Board and the public. This updated report summarizes our latest findings on trends in freight railroad rates and brings our measurement of the rail rate index up through 2007.[1]

The data used to prepare this report come from the STB's Carload Waybill Sample (Waybill Sample). Certain limitations exist with this information that will be discussed in detail later; however, we find that the data present a useful way to monitor rates. In addition, we have significantly improved our rate index so it does a better job accounting for changes in service type and car ownership.

## Rail Rates Increase

### *Overview of Rail Rate Trends*

The Section of Economics finds that inflation-adjusted rail rates increased in 2005, 2006, and 2007. This represents a significant change from prior years, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004. Since 2004, however, rail rates have increased. In fact, adjusting for the purchasing power of the dollar, shippers spent $7.8 billion more in 2007 than they would have if the rate levels of 2004 had remained in place.

[1] Our previous reports can be found on the internet at **http://www.stb.dot.gov/stb/industry/econ_rateindex.html**.

EXHIBIT
PENGAD 800-631-6989
Seale - 4

While a number of factors account for the increase in rail rates through 2007, it would appear that rising railroad input prices and declining productivity growth – not enhanced railroad market power – accounts for the bulk of the rate increases.[2]

Although many input prices increased between 2004 and 2007, the rise in fuel prices was extraordinary. For the Class I railroads, fuel costs rose $4.6 billion in nominal terms and $4.1 billion in real (inflation-adjusted terms) between 2004 and 2007. For the shipments covered by this study, the increase in fuel costs would have been even larger, because our data covers not only the Class I carriers, but also the Class II and Class III railroads. Thus, well over half of the increase in rail rates experienced by shippers between 2004 and 2007 can be attributed to higher fuel costs. Nevertheless, even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades.

**Figure 1. STB Rail Rate Index 1985 to 2007**
**Real Revenue Per Ton-Mile (1985=100)**




**Figure 1** shows that rates declined steadily from 1985 to 2000, flattened out thereafter, before turning sharply upwards in 2005 and 2006, followed by a smaller increase in 2007. Even so, our index value of 65.5 for 2007 implies that rail rates remain 34.5% *below* the level of rates as they existed in 1985.

---

[2] This is the conclusion of Christensen Associates, a prominent economic consulting firm. Recently, Christensen completed a comprehensive examination of competition in the freight railroad industry. See our website, www.stb.dot.gov, for a link to this study, *A Study of Competition in the U.S. Freight Railroad Industry and an Analysis of Proposals that Might Enhance Competition.* Although this study was commissioned by the STB, it was conducted on a completely independent basis by Christensen Associates.

### *Details of Analytic Approach*

In pursuing this analysis, the Section of Economics kept two principles in mind: (1) the study should account for the effects of inflation; and (2) the study should not allow a change in the mix of commodities to bias the index. To ensure that inflation plays no part in the index measure created, we use real or inflation-adjusted dollars. To ensure that the commodity mix does not bias the index, we employ what is known as a Tornqvist Index.

In developing our Tornqvist index, we first assigned each railroad movement to one of 67 separate categories based on its commodity and service characteristics. An ideal selection of groups would place nearly identical railroad products within the same output category. Then, any differences in the amount being charged could be interpreted as a change in price rather than a change in what is being supplied. Of course, we cannot define traffic categories too narrowly. If all origin-destination pairs and all seven-digit Standard Transportation Commodity Codes represented unique products, there would be many thousands of categories, most of which would have no transactions in them at all, making comparisons of price changes impossible.

The Tornqvist index measures the change in prices within each category and assigns a percentage weight to each category based on its share of total revenues. The total index is essentially the weighted average of price changes within the various categories. A key feature of the Tornqvist index is that its permits both the prices within the various categories and the weights assigned to each category to vary over time. This ensures that the index is not biased by a shift in traffic from one category to another.

Our concern that changes in the railroad product mix might have a meaningful effect on railroad rates is well founded. For example, it is possible for a revenue-per-ton-mile measure to show a decline in rates even if all shippers are experiencing rate increases. This would occur if the effect of rising rates on all traffic categories were masked by an increase in the market share of low-priced movements. Indeed, we have a specific reason to control for this effect. The past 22 years railroads have seen large increases in unit train operations. In particular, the amount of Powder River Basin (PRB) coal has increased tremendously. On a revenue-per-ton-mile basis, PRB traffic is among the lowest priced traffic moving on the railroad system. As a result, simply reporting revenue per ton-mile overstates the actual decline in railroad rates. Our Tornqvist index, by controlling for the change in commodity mix, ensures that our results are not biased in this manner.

The previous Section of Economics study on this issue divided railroad output into 30 groups—one for each region of the country in which the shipment originated (East or West) and one for each of 15 different commodity groups. The Board has historically treated Eastern and Western carriers somewhat differently and there are, of course, significant differences between the Eastern and Western carriers. Nonetheless, the territories of the Eastern and Western carriers overlap one another and many movements originate in one region only to be terminated in another. In this study, Section of Economics has eliminated the distinction between Eastern and

Western railroads and instead included movement information and car ownership characteristics. We believe that these changes substantially improve our index. The new categories include:

1. **Length of Haul (LOH)**. Our previous studies accounted for LOH indirectly by looking at the region where the shipment originated. Although Western movements tend to be longer than Eastern movements, even within regions there are significant differences between long-haul and short-haul rates. Using LOH directly is superior than relying on a rough proxy based on region.

2. **Car Ownership**. Rates differ between railroad supplied and privately owned cars. Unless car ownership is factored in, we might confuse lower rates with greater shipper investment in cars.

3. **Train Type**. Consistent with our Carload Waybill Sample, we identified three specific train types: *single car* movements (5 or fewer cars in a shipment); *multi-car* movements (6 to 49 cars in a movement); and *unit train* movements (50 or more cars in a movement). There is great benefit in controlling for train type. For example, some grain shippers claim that railroads will offer substantial discounts when the shipper loads out 110-car unit trains at large elevators, rather than shipping grain in smaller lots from local elevators. While such a lower rate may be attractive to grain shippers, it also may require them to carry the cargo for a longer distance by highway to reach the more-remote consolidated elevator. Accounting for train type thus presents a more accurate picture of the cost of shipping by rail.

4. **Intermodal Shipments**. This study improves on our previous rate study methodology by examining whether a shipment is intermodal movement. Such shipments have entirely different cost characteristics from those that are railroad-only. In recent years, this segment of railroad output has increased substantially relative to the rest of railroad output, so placing these shipments into a separate category presents a more complete picture of rate-setting trends.[3]

[3] In order to distinguish intermodal shipments from all others, only two variables on each record of the Waybill file need to be examined. The first variable examined is called "TOFC_Serv_Code". This variable provides an indication of the type of intermodal service that is to be provided by the railroad on an intermodal move. Where that variable is not null or blank, the movement was intermodal. The next variable examined, called "Int_Eq_Flag" indicates whether the commodity is being moved in intermodal equipment. When the value of this variable is greater than zero, then intermodal equipment had been used to move the commodity shipped and the move is classified as intermodal.

Table 1 lists the categories we selected for this rate study. There are 67 categories in all.

**Table 1. Categories of Railroad Output**

| COMMODITY | STCC | LOH | Car Own | Train Type |
|---|---|---|---|---|
| Intermodal | NA | S, M, L, VL | Not Used | Not Used |
| Farm Products (not Grain) | 01 | Not Used | Not Used | Not Used |
| Grain | 0113-0114 | S, M, L | P, R | S, M, U |
| Metallic Ores | 10 | S, M, L* | Not Used | Not Used |
| Coal | 11 | S, M, L, VL | P, R | Not Used |
| Non-Metallic Minerals | 14 | S, M, L* | Not Used | Not Used |
| Food and Kindred | 20 | S, M, L | Not Used | Not Used |
| Lumber and Wood Products | 24 | S, M, L | Not Used | Not Used |
| Pulp, Paper and Allied | 26 | S, M, L | Not Used | Not Used |
| Chemical | 28 | S, M, L | Not Used | Not Used |
| Petroleum | 29 | S, M, L | Not Used | Not Used |
| Stone, Clay and Glass | 32 | S, M, L | Not Used | Not Used |
| Primary Metal Products | 33 | S, M, L | Not Used | Not Used |
| Transportation Equipment | 37 | S, M, L | Not Used | Not Used |
| Waste and Scrap | 40 | S, M, L | Not Used | Not Used |
| All Other | NA | S, M, L | Not Used | Not Used |

**Definitions:**

| Item | Meaning |
|---|---|
| STCC | Standard Transportation Commodity Code |
| LOH | *Length of Haul Category* |
| S | Short (<500 miles) |
| M | Medium (from 500 but <1000 miles) |
| L | Long (from 1000 but <1500 miles) |
| VL | Very Long (1500 miles or more) |
| Car Own | *Car Ownership Category* |
| P | Privately Owned |
| R | Railroad Owned |
| Train Type | *Train Type Category* |
| S | Single (<6 cars) |
| M | Multicar (6-49 cars) |
| U | Unit (>49 cars) |
| Not Used | Indicates that the dimension represented by that cell is not used to calculate rate trends. For example, "Farm Products (not Grain)" is not separated by distance groups. |

**Notes**

*For these cases, a short distance is less than 100 miles, a medium distance is from 100 miles to less than 250 miles, and a long distance is 250 miles or more.

The primary source of information on freight rail shipments terminated in the United States is our Waybill Sample. Using the Waybill Sample, we calculated revenue per ton-mile and used this measure as our proxy for rail rates. This is consistent with our previous rate studies, but developing revenues per ton-mile was somewhat more challenging in this study because of the increase in railroad fuel surcharges in recent years.

In the past, the Waybill Sample's freight revenue field contained all of the funds received by the railroads for the purpose of moving the freight and these revenues were used to develop our rate index. Thus our index ignored certain other revenues, such as port charges and third-party charges which we did not consider part of the rate. Revenues of this sort were reported in a separate field called "miscellaneous charges."

Starting in 2003, however, some railroads began collecting fuel surcharges and reporting those amounts as miscellaneous charges rather than as freight revenue. We now require railroads to present fuel surcharge revenue in a separate Waybill field, but for the years 2003-2007 if a carrier reported its fuel surcharge revenues as a miscellaneous charge we included all of its miscellaneous charges as revenue for the purposes of this study. We understand including the entire miscellaneous revenue field slightly overstates railroad revenues, but this effect is very small and does not, by itself, account for the recent increase in railroad rates. We would also note that in some cases, carriers reported figures in the miscellaneous charges field that were precisely equal to amounts reported in the freight revenue field. After verifying that these reports were the result of clerical error, we excluded them.

We recognize that our rail rate index is not perfect. On the one hand, whenever shippers must bear the costs of services that were previously the province of railroads, our index overstates the actual decline in rail rates. This has occurred, for example, in cases where shippers are paying for third-parties to load or unload trains that were previously handled by the railroad. Any resulting drop in freight rates is not fully attributable to railroad productivity improvements being passed along to the shippers. On the other hand, our index can understate rate reductions in certain cases. For example, since 1985, the percentage of revenue from movements under contract has grown (though the rate of increase in this category of business arrangement has recently slowed, it is still continuing to increase). The revenues from these contracts as reported in the Waybill Sample will not always account for volume discounts. Overall, however, we are confident that our index captures the real savings in railroad rates that shippers have enjoyed over the past 20 years, while also recognizing that in the most recent three years rates have increased.

## *Additional Analysis of Grain and Coal Rates*

The experience of grain and coal shippers has attracted substantial attention from the shipping public and other interests. We focus on these commodities for additional analysis for several reasons. With respect to coal, we note that most of the formal rate complaints handled by the Board have been brought by coal shippers. In addition, many of the applications for railroad construction filed with the Board are for new coal movements, either from mines or to coal-fired utilities.

The Board is also interested in rail transportation of grain. For example, in November 2006 we held a hearing dedicated to this subject. (See the Board's website, www.stb.dot.gov, for video or audio recordings of this hearing). We also note that the recent Christensen Associates study of competition in the railroad industry found that grain movements are subject to greater captivity, on balance, than most other railroad traffic.

While our additional analysis is limited here to grain and coal, in future studies we plan to expand our analysis to other commodities.

### *Grain Rates*

Grain shippers have been particularly concerned about rates in recent years. Many of these shippers believe that railroads have increasingly relied upon them to provide rolling stock. They also believe that railroads have increasingly attempted to "de-market" single-car and multi-car service by increasing prices on those segments of the market. Grain shippers have also alleged that certain longer-haul shipments are charged a lower rate than shipments that move a shorter distance on the railroad. For these reasons, we have used the data created in this study to prepare a thorough analysis of the rates paid by grain shippers relative to rolling stock ownership, type of train, and length of haul.

**Figure 2** shows the trend in the real revenue per ton-mile for grain shipments depending on equipment ownership. Since the car ownership variable was not available in 1985 or 1986, the starting year on this chart is 1987. The top line shows the revenue received by railroads when they supply the car. The bottom line shows the revenue received by railroads for shipments in privately-owned cars. Based on that graph, it would appear that substantial savings were originally made available to shippers that provided their own rolling stock. Since 2000, however, that advantage of using privately-owned rolling stock appears to have disappeared. Railroad revenue per ton-mile is about the same, regardless of who supplies the equipment.

**Figure 2. Grain Rates and Car Ownership**



**Figure 3** looks at grain rates with respect to train type, showing how the rates vary depending on the number of cars tendered to the railroad in each shipment. Figure 3 tells an interesting story. The data would indicate that the real revenue per ton-mile for grain in unit trains has followed a pattern of rising and falling over the entire period. Rates on single-car and multi-car shipments, on the other hand, fell almost continuously from 1985 through 2003, before seeing an increase. In addition, rates on single-car shipments are at this time only a bit more than half of their level in 1985. Rates on unit-train shipments, on the other hand, are only slightly lower than those charged back in 1985. This observation runs counter to concerns that have been expressed that premiums for non-unit train shipments may be excessive. On the average, those premiums appear to be falling, although this may not be the case for all individual railroad-customer arrangements.

**Figure 3. Grain Rates and Train Type**




In addition, Figure 3 suggests that the discount offered for multi-car shipments has all but disappeared over the years. And, while the discount for unit trains continues, its relative size has significantly declined over the years. The chart shows us that in 1985, when grain shipped in single carloads was charged 5.7 cents per ton-mile, grain could be shipped in unit trains for only 2.4 cents. This represented a discount of 57 percent. In 2007, grain in single carload lots would cost the shipper 3.3 cents per ton-mile, while grain in unit trains carried a charge of 2.3 cents per ton-mile. So by 2007, the discount for shipping by unit train rather than single carload had fallen from 57% to 29%.

A third category of interest to grain shippers is distance. Generally, railroads will charge less per ton-mile for shipments moving a longer distance. **Figure** 4 shows how much distance has actually affected the rates over the last few years. This chart clearly shows that rates on longer-distance shipments are, in general, lower per ton-mile than rates on shorter-distance shipments.



## *Coal Rates*

As with grain, many shippers are concerned about the service they receive and the amounts they must pay to ship coal by rail. The choices of car ownership and length of haul also play important roles with coal shippers.

**Figure 5** presents the trend in real rates per ton-mile for coal from 1987 through 2007 (again, 1985 and 1986 are not shown due to lack of car ownership data in those years). Figure 5 shows a relatively continuous decline in rates for both privately-owned equipment and railroad-owned equipment until 2004. The rates then showed a slight uptick from 2004 through 2007. The discount available for the privately-owned equipment is reasonably constant in percentage terms for the entire period. However, the discount was about 40% in 1987, fell gradually to a low of 34% in 1994 and then rose gradually to 40% again in 2006. In 2007, the discount fell to 35%.

**Figure 5. Coal Rates and Car Ownership**



**Figure 6** presents the trends in coal rates per ton-mile for four distance categories. The figure shows that rates declined in all four categories from 1988 through 2001. Rates in the short-distance category rose continuously from 2001 through 2007, with 2007 rates exceeding those in 2001 by 32%. The longer-distance services did not see as dramatic a shift. Their rates became fairly stable in 2001 and did not rise until after 2004. For medium-distance hauls, rates fell 0.9% when comparing 2007 to 2001; for long-distance hauls, this decrease was 1.9% (notwithstanding the slight uptick in 2005, 2006, and 2007. For very long-distance hauls, rates actually increased by 10.7 percent over that six-year period. In sum, recent trends show increases in short-distance hauls and relative stability in long-distance ones.



**Technical Notes**

The data used in preparing this study come from the Waybill Sample information collected each year from the railroads by the Section of Economics. There are two versions of this database—a confidential version and a public-use version. The public-use version does not contain all of the information available in the confidential version. In particular, the revenues received by the railroad for each move are disguised in the public-use version. For this study, actual revenues are needed and come from the confidential version of the Waybill Sample. As this study aggregates data from 500,000 to 700,000 records into 67 categories, the information presented in this report cannot be used to obtain confidential data on a single movement.

**Contributors**

The following personnel from the Office of Economics, Environmental Analysis and Administration contributed to this report:

Dr. William F. Huneke, Chief Economist
Mr. Michael J. Boyles, Transportation Industry Analyst
Dr. William J. Brennan, Economist
Mr. Michael E. Smith, Economist

If there are any questions, please contact Mr. Michael E. Smith at 202-245-0322

# PX0594-PX0640

# Filed Under Seal

# EXHIBIT PX0641

United States Government Accountability Office

GAO

Report to Congressional Committees

December 2016

# FREIGHT RAIL PRICING

# Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers

GAO-17-166

# GAO Highlights

Highlights of GAO-17-166, a report to congressional committees

December 2016

# FREIGHT RAIL PRICING

## Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers

## Why GAO Did This Study

The nation's freight rail network is vital to the economy, moving about 40 percent of U.S. freight and generating over $73 billion in revenue in 2013. Railroads charge various rates for moving freight from a particular origin to a particular destination. A rate may be set by the railroad in a public pricing document—known as a tariff—or negotiated through a private contract with a shipper. While most freight ships under contract, some shippers have raised concerns with how railroads negotiate contracts that contain multiple origin-to-destination routes. Though shippers that use rail to transport freight under tariff may seek relief from STB for rates they view as unreasonable, STB has authority to review tariff rates, but not contract rates.

The Surface Transportation Board Reauthorization Act of 2015 included a provision for GAO to review rail transportation contract proposals containing multiple origin-to-destination routes. This report addresses (1) similarities and differences in shipping freight under a tariff versus a contract, and the potential benefits to using each, and (2) views of selected stakeholders on the implications of shipping freight under a tariff versus a contract. GAO analyzed STB data from 2005 to 2014, reviewed documents provided by and interviewed representatives of the four largest freight railroads, the Association of American Railroads, STB officials, and representatives of nine shippers selected to represent a mix of commodities transported by rail.

View GAO-17-166. For more information, contact Susan Fleming at (202) 512-2834 or flemings@gao.gov.

## What GAO Found

While rail contracts and tariffs are similar, contracts offer the flexibility to customize rates and terms to a specific shipper, according to selected stakeholders GAO interviewed. Both contract and tariff rates are based on market factors, such as competition, according to representatives from the four largest U.S. freight railroads. However, they noted that in developing contract rates, a railroad will also examine factors specific to each shipper and may negotiate discounts in exchange for the shipper committing to provide a specified volume over the contract's duration. According to railroad representatives, the volume commitments negotiated in a contract allow the railroad to more efficiently allocate its resources and ensure consistent revenues. Also, selected shippers told GAO that they can more efficiently manage multiple shipping routes under one contract because of the stability in rates over the duration of the contract. In contrast, tariffs may be preferred for smaller shipments.

Despite the volume discounts contracts can offer, some selected shippers said that contracts that include rates for multiple origin-to-destination routes can contain high rates on some routes. This is particularly an issue for shippers that are "captive"—that is, shippers served by a single railroad without an economically viable transportation alternative.

**Captive versus Non-Captive Routes for Freight Rail**




Source: GAO. | GAO-17-166

Representatives of the four largest freight railroads said they charge what shippers are willing to pay to cover infrastructure costs for the entire rail network. However, according to selected shippers GAO interviewed, combining captive and non-captive routes together in one contract can compel shippers to accept some unreasonable rates. Shippers subject to contract rates they view as unreasonable cannot challenge those rates at the Surface Transportation Board (STB) because contracts are not subject to STB oversight. A railroad official said that a shipper may ask the railroad to switch rates the shipper views as unreasonable to a tariff. However, selected shippers said that tariff rates are generally higher than contract rates, so they are reluctant to forgo a contract with a mix of rates in favor of using a tariff. While the STB process for reviewing tariff rates was designed, in part, to protect captive shippers from unreasonably high rates, selected shippers said the process is complicated, time-consuming, and expensive. In 2016, STB began to reform the tariff review process with the goal of improving its efficiency.

# Contents

Letter 1

Background 4
Contracts Provide Certain Advantages, and Their Use by Certain Shippers Has Increased 8
Some Selected Shippers with Fewer Shipping Options Said They Have High Rates for Some Contract Routes and Limited Recourse for Rate Relief for Tariffs 17
Agency Comments 21

Appendix I Contact and Staff Acknowledgments 23

Figures

Figure 1: Contracts for Shipment of Freight by Rail Can Contain Multiple Origin-to-Destination (O-D) Routes 6
Figure 2: Similarities and Differences between Rail Contracts and Tariffs, according to Selected Railroads and Shippers 9
Figure 3: Annual Percentage (by Ton-Mile) of Selected Commodities Shipped under Contract, 2005 through 2014 15
Figure 4: Captive versus Non-Captive Routes for Freight Rail 18

**Abbreviations**

| | |
|---|---|
| ICC | Interstate Commerce Commission |
| O-D | origin-to-destination (route) |
| SAC | Stand-Alone Cost |
| STB | Surface Transportation Board |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC 20548**

December 7, 2016

The Honorable John Thune
Chairman
The Honorable Bill Nelson
Ranking Member
Committee on Commerce, Science, and Transportation
United States Senate

The Honorable Bill Shuster
Chairman
The Honorable Peter DeFazio
Ranking Member
Committee on Transportation and Infrastructure
House of Representatives

The nation's freight transportation network is vital to the functioning of the national economy. The national rail network accounts for the movement of about 40 percent of U.S. freight.[1] U.S. railroads reported over $73 billion in revenue in 2013.[2] Shippers have two options for arranging transport with railroads: a contract—which is a private agreement of terms, conditions, and rates for moving freight—or a tariff, which is a published rate railroads are required to provide to shippers when requested. Most freight ships under contract, but some freight-rail shippers have raised concerns about how railroads negotiate certain contracts. Specifically, these shippers claim that railroads package a mix of reasonable and unreasonable rates in contracts that contain multiple routes between multiple origins and destinations. The Surface Transportation Board (STB) is the economic regulator of the railroads and resolves rate and service disputes between shippers and railroads for regulated goods shipped under tariff, but does not have authority to address rate and service disputes for freight shipped by contract.

The Surface Transportation Board Reauthorization Act of 2015 included a provision for us to review the effects of railroad freight contracts that

[1]U.S. intercity freight as measured in ton-miles. Federal Railroad Administration, *National Rail Plan Progress Report*, (September 2010).

[2]Federal Railroad Administration, Office of Rail Policy and Development, *Freight Railroads Background*, (April 2015).

contain multiple origin-to-destination (O-D) routes.[3] This report presents information on: (1) known similarities and differences in shipping freight under a tariff versus a contract, and the potential benefits to using each; and (2) views of selected stakeholders on the implications of shipping freight under a tariff versus a contract.

To address the similarities and differences in shipping freight under a tariff versus a contract, and the potential benefits to using each, we reviewed our past reports and other academic and governmental studies on the economics of rail rates. We also reviewed sample tariffs provided by the four largest Class I railroads (BNSF Railway, CSX, Norfolk Southern, and Union Pacific), as well as redacted sample contract templates provided by some of these railroads.[4] We interviewed representatives from these four railroads and the Association of American Railroads. As contracts between railroads and shippers are private, we were not able to analyze specific contract language, including specific rates and terms for a particular shipper. We also initially selected 20 shippers or shipper associations to interview. We selected these shippers to represent five commodities: agriculture, chemicals, coal, food, and nonmetallic minerals. We chose these commodities because they were the five commodities with the largest shipments by weight in 2014 that are either wholly or partially subject to rate regulation by STB.[5] To select shippers and associations, we reviewed comments filed by shippers in a 2011 STB proceeding “Competition in the Railroad Industry” that discuss terms and rates of contracts as compared to tariffs.[6] About half of the shippers and associations we contacted either did not respond to our requests or declined to meet with us. Some of these shippers stated that they or their members have no views on these issues. However, we interviewed representatives from nine shipper associations and companies and reviewed documents they provided. As a result, we are

[3]Pub. L. No. 114-110, § 14, 129 Stat. 2228, 2238 (2015).

[4]Freight railroads are categorized by class on the basis of their revenue, with Class I railroads generating annual operating revenue of $475.5 million or more in 2014 operating in the United States. Class II and III railroads, which generate less revenue, are outside the scope of this report. There are seven Class I railroads operating in the United States. For this report, we interviewed the four largest Class I railroads.

[5]Commodity-weights were measured in tonnage and based on STB’s 2014 Carload Waybill Sample.

[6]Surface Transportation Board, COMPETITION IN THE RAILROAD INDUSTRY, Docket Number Ex Parte 705, June 22, 2011.

reporting aggregate statements from the nine shippers across commodities.[7] Further, these interviews are not generalizable to all shippers or all railroads.

To identify the views of selected stakeholders on the implications of shipping freight under a tariff versus a contract, we analyzed relevant economic literature on freight rail contracts and shipping rates to provide additional context for evaluating what we heard in interviews with railroads and shippers. We also interviewed representatives of the four Class I railroads and shippers selected as described above about their views. Finally, we reviewed documents filed in the 2011 STB proceeding that discuss terms and rates of contracts as compared to tariffs.[8] We also interviewed STB staff about the agency's rate-relief process for addressing unreasonable rates in tariffs and their efforts to improve it.

In addition, to provide contextual information on shippers using contracts and tariffs, we analyzed STB's Carload Waybill Sample, from 2005 to 2014 (the most recent year available) to determine the total volume and trends of freight moved under contract and tariff, by commodity, in ton-miles, which is a measurement of weight and distance. STB requires the railroads to compile a random sample of their waybills (a document that accompanies a shipment and describes its characteristics). The Carload Waybill Sample consists of over 600,000 records and contains information on various characteristics of the freight being shipped, including tonnage, revenue, and miles, among others. The sample is statistically weighted to be nationally representative of all rail freight movements that occur in the United States each year. We used agency technical documentation for the Carload Waybill Sample and guidance from STB to estimate the sampling error associated with our estimates derived from the waybill data. We express our confidence in the precision of estimates derived from the Carload Waybill Sample as 95 percent confidence intervals. This is the interval that would contain the actual population values for 95 percent of the waybill samples that STB could have drawn. We determined that STB's Carload Waybill Sample data were sufficiently reliable for our purposes of our reporting objectives by

[7]Specifically, the nine shippers we interviewed included an association representing multiple types of shippers and between one and three shippers of each commodity type except nonmetallic minerals, since shippers of that commodity we contacted declined to be interviewed or did not respond to our requests.

[8]Surface Transportation Board, COMPETITION IN THE RAILROAD INDUSTRY, Docket Number Ex Parte 705, June 22, 2011.

comparing our analysis with published STB figures and by interviewing STB staff and STB's contractor about their data collection and validation efforts.

We conducted this performance audit from February 2016 to December 2016 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

Freight shipped by rail travels over an extensive network that consists of 140,000 route-miles across the United States. Freight railroads are generally privately owned and rely on their revenues to invest in maintenance and operations that support safe and efficient transportation services. During the last 40 years, the freight railroad industry has consolidated. Currently, the U.S. railroad industry includes seven major Class I freight railroads. Railroads carry a variety of commodities and may compete with each other and other shipping modes such as trucks and barges for business.

The Interstate Commerce Commission (ICC) was established in 1887, originally to regulate almost all of the rates that railroads charged shippers to ensure that the rates were reasonable and just. The Railroad Revitalization and Regulatory Reform act of 1976[9] and the Staggers Rail Act of 1980[10] were enacted in response to economic slowdown in the 1970s, with rising costs, losses in traffic and revenues to motor carriers, and bankruptcies affecting the railroad industry. These laws substantially reduced federal regulation and encouraged greater reliance on competition to set rates. In particular, the Staggers Rail Act gave railroads increased freedom to price their services according to market conditions, including the freedom to use differential pricing, a practice in which railroads can charge higher rates to shippers of commodities such as coal and chemicals, which are more dependent on the rail network. The ICC Termination Act of 1995 transferred the ICC's regulatory functions to the

[9]Pub. L. No. 94-210, 90 Stat. 31 (1976).

[10]Pub. L. No. 96-448, 94 Stat. 1895 (1980).

Surface Transportation Board (STB), an independent adjudicatory body.[11] The STB now serves as the industry's economic regulator, resolving rate and service disputes between shippers and railroads for regulated goods shipped under tariff. The acts also allowed railroads and shippers to enter into confidential contracts to set terms and rates. STB has no authority to review the terms or rates for freight shipped by contract.[12] To protect shippers served by only one railroad with no competitive shipping alternatives—known as "captive" shippers—from unreasonably high rates, STB established a process in which shippers that transport their freight by tariff could potentially challenge the reasonableness of a rail rate and seek financial relief from the railroads, a process that we refer to as a "rate-relief" process.

Some commodities were later exempted from STB's jurisdiction, primarily commodities that could be shipped by boxcar or intermodal containers, in part because these goods can also be transported by other competitive alternatives such as barge or truck and are therefore unlikely to be captive. According to a Department of Agriculture report, these exemptions, in addition to contracts, effectively freed about 75 to 85 percent of freight traffic from economic regulation by STB.[13] Currently, the most frequently transported commodities that could be subject to STB rate regulation, by tons shipped, are agricultural, specifically, grain soybeans, and sunflower seeds; assorted food items; coal; chemicals; and nonmetallic minerals.

Railroads are required, upon request, to offer tariff terms and rates to shippers, but railroads are not required to offer a contract. Contracts are confidential, mutually agreed upon, and may contain rates for specific routes and other service terms for a specific shipper. According to the selected railroads and shippers we spoke to, contracts generally contain multiple, shipper-specific O-D routes—agreements on terms and rates for specific shipments over specific shipping routes—because a shipper may have multiple routes. For example, according to a Class I railroad representative, a chemical production facility may receive its raw materials from multiple origins, with each route having agreed upon terms and rates, as shown in figure 1.

[11] Pub. L. No. 104-88, 109 Stat. 803 (1995).

[12] 49 U.S.C. § 10709(c).

[13] Department of Agriculture, Agricultural Marketing Service, *Study of Rural Transportation Issues* (Washington, D.C.: April 2010).

**Figure 1: Contracts for Shipment of Freight by Rail Can Contain Multiple Origin-to-Destination (O-D) Routes**




Source: GAO. | GAO-17-166

STB has the authority to review the reasonableness of rates and service terms for regulated commodities if shipped by tariff. Tariffs are a pricing document issued by the railroads showing rates that are usually not customer-specific. Tariffs also spell out the standard terms of the railroad. These standard terms differ by commodity, covering everything from loading specifications to billing procedures.

Under STB's rate-relief process, in which it resolves disputes regarding the terms or rates in a tariff, in order for STB to review a rate as potentially unreasonable, the rate must not be under contract and the commodity must not be exempt from STB rate regulation. STB may then consider the reasonableness of a rate only if it also finds that the railroad has market dominance over the shipment at issue—that is, if (1) the rate is equal to or exceeds 180 percent of the railroad's variable costs for providing specific services to the shipper and (2) the railroad does not

face effective competition from other railroads or other modes of transportation. If STB decides the rate is unreasonable, it can order the railroad to pay reparations to the shipper for past shipments and decide the maximum rate the railroad is permitted to charge for future shipments.

Under its authority, STB considers the reasonableness of a challenged rate using one of its three tests, as chosen by the shipper. There is a financial limit imposed on the relief available depending on the test chosen:

- Stand-Alone Cost (SAC): The most commonly used test is the Stand-Alone Cost test, which requires the shipper to design a hypothetical railroad, tailored to serve the specific route(s), to simulate the competitive rate that would exist in a perfectly efficient network. STB then compares the challenged rate to the hypothetical rate. During the rate relief process, both the railroad and the shipper have the opportunity to present their views to STB.
- Simplified SAC: The simplified SAC seeks to create a cost-effective alternative to the SAC test. The simplified test eliminates or restricts the evidence parties can submit to the actual operations and services provided by the railroad.
- Three Benchmark: The Three Benchmark test is faster and less rigorous, but limits the potential return for a successful rate challenge. STB determines the reasonableness of a challenged rate by examining three benchmarks, or tests, that assess rate markups.

Between 1996 and 2016, STB reviewed 50 rate reasonableness cases.[14] Of these cases, 36 used the SAC rate case process, 5 used the simplified SAC, 5 used the three benchmark process, and 4 used a different methodology.[15] To date, most of the 50 STB rate cases have been for coal (32) or chemical (16) shippers. Among the 50 cases brought before STB since 1996, about half (26) were settled without an STB decision, while those that were decided by STB were split fairly evenly in favor of the shippers (11) or the railroads (10).[16]

[14]The timespan includes all cases with final outcomes since STB's inception in 1996.

[15]The fourth methodology was used in cases between 2001 and 2009 where the railroad did not wish to undergo a SAC test, and therefore the railroad and shipper agreed to use a different methodology instead.

[16]Rates were prescribed for 1 case and 2 other cases were withdrawn.

## Contracts Provide Certain Advantages, and Their Use by Certain Shippers Has Increased

### Contracts Are Private and Include Negotiable Terms

According to representatives of the four Class I railroads we spoke to, while contracts' and tariffs' terms and rates are developed using similar methodologies, they may contain key differences. For example, selected stakeholders said that contracts are often customized to a specific shipper and may reflect the railroad's and shipper's preferences for a given route or shipment. Figure 2 describes the similarities and differences between contracts and tariffs, based on our interviews with representatives from the four largest Class I railroads and selected shippers, pertinent laws, as well as sample contract language and tariffs provided by the railroads.

**Figure 2: Similarities and Differences between Rail Contracts and Tariffs, according to Selected Railroads and Shippers**

| | Contracts | Tariffs |
|---|---|---|
| **Structure** | A private, negotiated agreement between the railroad and shipper that covers agreed-upon terms and rates, and can cover shipping from one origin to one destination or multiple origins and destinations. According to selected shippers, negotiations may take up to a year. | A document issued by the railroad that covers the rate and terms the shipper must abide by to ship from any specified origin to any included destination and the standard terms that govern the shipment. |
| **Terms** | Contracts may include additional negotiable terms to the railroad's standard terms, such as volume commitments and service standards. According to sample contract language provided by Class I railroads, contracts may contain language that states any provisions not found within the contract are governed by the standard terms. | Tariffs rely on the railroad's publicly available standard terms for a given commodity that govern the shipment. |
| **Rates** | According to representatives from the four largest Class I railroads, a railroad proposes negotiable rates by examining market factors, considering factors particular to the shipper. These factors include the rates of competing transportation methods and determining how much shippers are willing to pay. In addition, railroad representatives and selected shippers said railroads may offer discounts based on the shipper's volume. | According to representatives from the four largest Class I railroads, a railroad sets rates by examining market factors. These factors include the rates of competing transportation methods and determining how much shippers are willing to pay. |
| **Procurement** | The Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980 allowed railroads and shippers to enter into contracts to set terms and rates. Railroad representatives told us, typically, a shipper initiates the negotiation process by submitting a formal request outlining the services it may require, though the process may be less formal in some instances. Railroads are not required to offer a contract to a shipper and shippers do not need to accept a contract. | For shippers of Surface Transportation Board (STB)-regulated rates for certain commodities, railroads are required by their common carrier obligation to offer a tariff rate upon request. |
| **Duration** | The railroad and shipper mutually agree to the length of the contract. Railroad representatives and selected shippers told us most contracts are no longer than about 1 to 5 years, and contracts that span multiple years generally include periodic rate adjustments. | Railroads can adjust tariffs at any time; however, increases in rates or changes to terms require 20 days' notice (rate decreases require no advance notice). |
| **Disputes** | Railroads and shippers generally must settle contractual disputes in court or through arbitration; according to a sample contract provided by Class I railroad, a contract may contain language concerning the process for dispute resolutions. STB is not involved. | STB maintains authority to resolve railroad rate and service disputes for rates for certain commodities shipped by tariff and has authority to review the reasonableness of the rates and rules that govern the tariff. |

Sources: GAO analysis of interviews with Class I railroads and selected shippers, pertinent laws, and provided documentation. | GAO-17-166

Railroad representatives said they rely on publicly available standard terms to govern shipments over their network, regardless of whether the shipments are moving under contract or tariff. These terms are unique to each railroad and potentially negotiable for shipments under contract—as are all aspects of a contract. A railroad's standard terms cover all aspects of a shipment, from loading specifications to billing procedures, and may be contained in multiple documents. As a result, according to one railroad representative, contracts typically incorporate or reference all of the

railroad's applicable standard terms unless certain terms are specifically negotiated by the shipper.

Sample contract language provided by three Class I railroads show contracts may also include negotiable terms not typically found in tariffs, such as volume commitments, discounts, and service standards. However, according to two shipping associations representing coal shippers, in recent years, contracts have become more standardized and often reference other governing documents that spell out additional rules and conditions. More specifically, a representative from one of these shipper associations said that some contract features have become more difficult to negotiate, in part, because of the increased standardization. For example, they told us most contract negotiations now are generally limited to rates, fuel surcharges, train size, loading and unloading timeframes, and volume commitments.

According to three of the selected Class I railroads and a representative from a shipper association, to start a contract negotiation, typically a shipper may issue a request for proposal outlining its needs or informally contact the railroad. Railroad representatives said the railroad will typically respond with a standard contract. One railroad representative told us the railroad may administer thousands of contracts at any given time, so maintaining standard terms across their contracts allows the railroad to manage its business portfolio and operations more efficiently. For example, a representative from another Class I railroad said its standard terms allow it to efficiently handle different shippers' cars on the same train.

## Contract and Tariff Rates Are Based on Similar Market Factors

According to representatives from the four Class I railroads we interviewed, they individually determine contract and tariff rates based on a number of similar market factors associated with the supply and demand for the commodity the shipper plans to transport. Because railroads must offer a tariff rate upon request, railroad representatives said they consider more general market factors in determining tariff rates. Selected shippers told us that tariff rates are usually, but not always, higher than contract rates, and sometimes are the same, in part, because contract rates, according to a railroad representative, can be negotiated and reflect market factors specific to the shipper as well as discounts for

volume commitments.[17] In our discussions with the four Class I railroads, they said they look at the extent of competition when determining contract and tariff rates. According to one railroad representative, this includes considering customer feedback, past experience, and market research to determine the level of three types of competition:

- Competition from other forms of transportation: Generally, a railroad can charge more if it does not have to compete with another railroad or other transportation forms, such as barge, pipeline, or truck. As a result, a shipper served by more than one railroad or competitive alternative can create more leverage during contract negotiations. For example, representatives of the selected railroads told us if they are competing with the trucking industry for business, they may offer lower rates to obtain the shipper's business.
- Competition from other freight being shipped to the same market: A chemical shipper, as part of its comments to STB's 2011 competition proceeding, stated that rail rates may impact a shipper's ability to compete nationally and globally. According to railroad representatives we spoke to, they examine commodity markets to ensure they are pricing rates to allow shippers to be competitive. For example, a railroad representative told us it examines the rates it charges domestic crude oil shippers to ensure it remains competitive with imported crude oil. Representatives from the railroad industry also said understanding the extent of geographic competition within a market ensures the railroad maintains volume over their network. If rates are priced too high, a shipper may lose business and transport less freight. However, according to coal and grain shippers we interviewed, tariff rates may not always reflect current commodity market conditions.
- Competition through substitution: Some shippers may be able to obtain a commodity it needs from a different location, or it may use an alternative commodity. For example, a railroad told us a power plant

[17]Depending on their duration, contracts may also include agreed upon rate adjustments, which according to railroad representatives we spoke to, may adjust the rate on a periodic basis and consider changes in the market over time. These representatives also said tariffs do not need similar adjustment factors because railroads can increase tariff-rates with 20 days' notice (decreases require no advance notice), thereby eliminating the need to consider market changes over time. Rate adjustments agreed upon in contracts are not uniformly applied and typically take into account various market factors, including inflation. Fuel costs often are not included as an adjustment factor because railroads often use a separate charge to take into account fuel costs, which are also adjustable. According to railroad representatives, rate adjustments can be negotiated by the shipper.

may choose to obtain its coal from another mine or switch from coal to natural gas if prices make doing so advantageous and the plant is able and configured to do so.

Contract and tariff rates also reflect the characteristics of a given shipment. More specifically, representatives from the four Class I railroads we interviewed said the rates reflect the characteristics of the commodity being shipped and its particular origin and destination. For example, a shipper association representing chemical shippers and a railroad representative said that commodities such as toxic inhalation hazards are more expensive to ship under contract and tariff because of their hazardous nature and liability concerns. In addition, railroad representatives also told us rates may vary by distance, and longer routes may be more expensive.

Railroads rely on selling freight transportation services at a particular rate to recover their operating and infrastructure costs. However, while representatives from all four Class I railroads we spoke to told us they do not develop their rates to provide transportation based on these costs, they also said they will not typically set rates below the cost of providing rail transportation. According to a Department of Agriculture report,[18] the costs associated with providing rail transportation for each shipment, such as maintenance and rail crew costs, serve only as a floor below which rates should not go and bears little relationship to individual rail rates, which are closer to what the shippers are willing and able to pay. According to a representative from one Class I railroad, competitive factors may sometimes require the railroad to charge less than its costs to ship. However, railroads can also charge higher rates where its network is highly valuable to its shippers.

## Volume Commitments and Other Contract Features Provide Advantages to Shippers and Railroads

Selected shippers and railroad representatives also said contracts generally provide key advantages by allowing for increased financial and logistical certainty for both parties. According to selected shippers we spoke to, they prefer to maintain the minimal number of contracts to meet their transportation needs. A shipper association said shippers can more efficiently manage multiple routes under one contract because of the stability in rates over the duration of the contract. As a result, according to the railroad representatives, shippers often request contracts covering

[18]Department of Agriculture, Agricultural Marketing Service, *Study of Rural Transportation Issues,* (Washington, D.C.: April 2010).

multiple routes—potentially up to thousands of routes, according to one railroad representative—because managing each route under a separate contract, or by tariff, would be too complex to administer. For example, one chemical shipper told us it may move one or two carloads per day across 1,000 separate routes over a year. In addition, contracts allow shippers and railroads to customize terms to better fit their shipping needs, such as offering guaranteed pickup and delivery times or specific services. For example, according to one railroad representative, in a contract with multiple routes, a railroad may offer a lower rate on some routes, while increasing rates on others, to allow a shipper to break into a new market. Another railroad representative said the railroad can also provide additional logistics services at a lower cost within a contract that contains multiple routes because the economy of scale offered by a large contract allows the railroad to provide services at a lower rate due to gains in efficiency.

Furthermore, according to representatives from three Class I railroads, a contract's overall volume commitment and certainty helps the railroads better plan future investments. Specifically, one railroad representative said a contract allows the railroad to allocate locomotives and rail crews more efficiently and ensure a consistent source of revenue. As a result, contracts generally include agreements on the amount of volume a shipper is willing to commit. Railroad representatives and selected shippers told us that the guaranteed volume from a contract may also create additional leverage for the shipper during contract negotiations. To gain additional volume guarantees, railroads and shippers said railroads typically offer discounted rates to shippers in exchange for volume commitments. Railroad representatives also said these discounts may be for one, multiple, or all of the routes in contract, and they said the more volume a shipper is willing to commit, the better deal it can expect to receive. However, if the shippers fail to meet their expected volume commitment, they may be subject to financial penalties. Moreover, according to one railroad representative, higher-volume shippers are also more likely to request custom terms.

However, some selected shippers said tariffs may provide advantages in certain situations. For example, they said contract negotiations may be too long and costly for shippers with infrequent or small volume shipments. Furthermore, according to coal shippers, in some instances, the tariff rate may be the same as the contract rate, and shippers incur potential penalties associated with failing to meet contractual volume commitments.

## Freight by Contract Has Increased, and Shippers Said Some Contract Features Have Changed

Contract usage across the most frequently transported commodities regulated by STB has generally increased or stayed relatively the same in recent years.[19] Specifically, from 2005 through 2014, the ton-miles shipped under contract for these commodities have increased by 6 percent, from about 705,000 ton-miles to about 800,000 ton-miles, a measurement that combines weight and mileage. In 2014, about 76 percent of regulated freight was shipped by contract.[20] However, according to railroad representatives, each railroad's business differs. Figure 3 shows the percent of selected commodities with regulated rates by ton-miles shipped under contract from 2005 through 2014.

[19]We chose these commodities because they were the five commodities with the largest shipments by tons in 2014 that are either wholly or partially subject to STB rate regulation.

[20]As part of our analysis of the Carload Waybill Sample, we excluded boxcar and intermodal shipments, both of which are exempt from STB rate regulation. Shipments moving by equipment not classified as boxcar or intermodal, based on STB guidance, are included in our analysis.

**Figure 3: Annual Percentage (by Ton-Mile) of Selected Commodities Shipped under Contract, 2005 through 2014**




Source: GAO analysis of Surface Transportation Board data. | GAO-17-166

Note: The data are estimates from a sample and have a margin of error no greater than plus or minus 1.5 percentage points at the 95 percent level of confidence.

From 2005 to 2014, the percentage of coal and chemicals shipped under contract has increased when measured on a ton-mile basis. Specifically, in 2005, 55 percent of all chemical shipments, measured in ton-miles, were shipped by contract; by 2014, that percentage had increased to 85 percent. Similarly, over the same time period, the ton-miles of coal shipped increased from 86 percent to 94 percent. A representative of a shipper association said chemical shipments under contract increased, in part, because the potential for improved negotiated terms may provide additional certainty and lower rates. Both coal and chemicals are also heavily dependent on the railroad's network.

We were unable to obtain contract duration data from selected railroads and shippers, but selected coal and grain shippers as well as a railroad representative told us that the duration of contracts has generally

decreased during the last 10 years. According to another rail representative, contract duration depends on the commodity and the market; for example, this official said shippers in markets that change frequently may prefer shorter contracts. Additionally, representatives from two selected shipper associations that represent various commodities told us the duration of contracts has decreased over the years, with longer contracts becoming increasingly uncommon, though they prefer longer contracts because of their rate stability. A coal-shipper association representative also told us current coal contracts are typically for about 3 to 5 years, in part because a shorter contract would result in more frequent contract renegotiation. Another coal shipper association representative said the duration of contracts to transport coal has gotten shorter, mostly because of the increased uncertainty in the energy market. In the past, we have reported that the duration of contracts has declined, in part, because of the railroads' desire to quickly react to shifting market demand.[21] One railroad representative we spoke to said as markets become more dynamic, shippers can continue to expect to receive shorter contracts.

In addition, selected shippers told us the railroads may also be shifting certain costs to shippers. More specifically, according to a grain shipper, railroad service commitments that used to be common are no longer included in contracts. Further, one coal shipper said the railroad previously supplied its own personnel to load the coal, but now, with no reduction in rates, the shipper is required to do so.

[21]GAO, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, (Washington, D.C.: Oct. 6, 2006).

## Some Selected Shippers with Fewer Shipping Options Said They Have High Rates for Some Contract Routes and Limited Recourse for Rate Relief for Tariffs

### Selected Shippers with Fewer Options Said They May Have High Rates for Some Routes in Contracts

Despite the volume discounts and other advantages to contracts with multiple O-D routes, some shippers said that contracts effectively constrain them into paying higher rates on some routes, because railroads will propose contracts with multiple O-D routes where some of the routes are priced unreasonably high, in the shippers' view. This is particularly an issue for shippers that are "captive"—that is, shippers served by a single railroad without an economically viable transportation alternative because a trucking or barge route either does not exist or would be too costly.[22] Figure 4 below illustrates the ways in which a shipper can be captive on all routes or just some routes.

[22]Captive shippers can either be entirely captive or captive only on specific routes.

**Figure 4: Captive versus Non-Captive Routes for Freight Rail**




Source: GAO. | GAO-17-166

Eight of the nine shippers we interviewed stated that captive shippers have no other options than the one railroad that serves them, which can result in higher freight rail rates. Further, according to our analysis of a 2011 STB proceeding on rail competition, 6 of the 11 shippers that provided comments to the proceeding about being a captive shipper said that captive shippers have no other options than the railroad that serves

them, which can result in higher rates.[23] Additionally, a 2010 study commissioned by the STB concluded that captive shippers tend to pay higher shipping rates than otherwise similar shippers with access to additional railroad or water competition.[24]

As previously discussed, the selected railroads we interviewed said they develop prices based on market forces and the railroad's supply of available equipment and rail lines. This is the basis for differential pricing, a pricing strategy where railroads charge shippers with few or no other options more than shippers with more options for their freight. Differential pricing is permitted and encouraged in the rail freight market by design. The Staggers Rail Act of 1980, which reduced the economic regulation of railroads, provided that rail rates should be set by the competitive market forces to the maximum extent possible. According to railroad officials, railroads make up for lower revenues from highly competitive routes by charging higher rates in less competitive routes where they have market dominance. All four railroads and the Association of American Railroads also said that railroads use differential pricing to charge the highest rate shippers are willing to pay so railroads can cover infrastructure costs.

Although shippers have the option of challenging a tariff rate before the STB, they do not have this option for challenging rates they view as unfair if agreed to in a contract, since the STB has authority to review tariff rates but not contract rates. Although contracts are negotiated between railroads and shippers, some shippers told us that because contracts often contain rates for multiple routes, they may be pressured to accept higher rates they view as unfair as part of the package of rates they agree to, particularly if some of the shipper's routes are captive. Specifically, three selected shippers said this situation can arise when faced with a contract containing multiple O-D routes where they view some routes as priced too high by the railroads. In this situation, they have two choices: 1) accept the contract and pay higher rates for some routes, or 2) reject the contract and opt instead to move their freight by tariff, which could result in higher prices for all the routes since, as previously discussed, shippers and railroads said that tariff rates are generally higher than contract rates. According to two of the shippers we interviewed,

[23]Surface Transportation Board, COMPETITION IN THE RAILROAD INDUSTRY, Docket Number Ex Parte 705, June 22, 2011.

[24]Christensen Associates, *An Update to the Study of Competition in the U.S. Freight Railroad Industry*, Final Report. Prepared for the Surface Transportation Board, (January 2010).

combining captive and competitive routes together in one large contract can create high rates on captive routes. In contrast, officials from one railroad said that the STB tariff rate-relief process prevents railroads from forcing shippers to pay unreasonable rates, even in contracts. The railroad representatives said this occurs because railroads do not want to have a rail rate case before the STB and a shipper that thought a contract rate was unreasonable could always ask for the tariff in place of the contract to be able to file a rate case.

## The STB Tariff Rate-Relief Process Can Be Complicated and Expensive

When an STB rate case is an option, six of the interviewed shippers said that STB tariff rate-relief cases are complicated, time consuming, and expensive, in part, due to the challenges in determining reasonable and unreasonable rates. Consequently, these shippers said they are deterred from pursuing cases or from requesting tariff rates from railroads in order to pursue a rate case. An STB staff member said that when a rate case involves hundreds of O-D pairs, resolving the case can take substantial resources and time for STB, the railroads, and the shippers involved in the litigation. This STB staff member also stated that cases can take up to 3 years and be so costly that some shippers may think it is not worth bringing a case.

The STB rate-relief process was designed, in part, to maintain reasonable rates for captive shippers. However, determining reasonable versus unreasonable rates can be challenging given the market forces involved. Once a rate case is filed, STB must determine whether the rate is reasonable because it allows a railroad to earn adequate revenue for its fixed costs, or whether the rate is unreasonable because it allows the railroad to earn more than adequate revenue from its market dominance. According to economic literature, differential pricing allows railroads to collect adequate revenue to cover all costs and earn a reasonable return on their investments. Railroads not earning adequate revenue to remain in business and to adapt their network to meet future shipper demands would be problematic for both railroads and the shippers that rely on them. However, some research shows that railroads may be recovering from the rising costs, losses, and bankruptcies in the 1970s. For example, according to two economic studies of railroad economics, the Class I railroads may now be earning adequate returns on investment, and perhaps sometimes in excess of adequate returns, so measures to reduce the amount contributed by captive shippers to railroad returns may

be appropriate.[25] More recently, in September 2016, STB determined that four Class I railroads were revenue-adequate for the year 2015, specifically that these railroads achieved a rate of return equal to or greater than STB's calculation of the average cost of capital to the freight rail industry.[26]

STB is currently reviewing its rate relief process as required in the Surface Transportation Board Reauthorization Act of 2015. In June 2016, STB released an Advance Notice of Proposed Rulemaking outlining measures to expedite its handling of SAC rate cases.[27] Comments were due in August 2016. STB staff said that measures such as standardizing evidence submissions would expedite SAC cases for purposes of fairness to litigants and improving overall agency efficiency. They also said that since the current proceeding on expediting SAC rate cases had just begun, it was too soon to know how changes might affect the SAC process.

## Agency Comments

We provided a draft of this product to STB for comment prior to finalizing this report. We received technical comments from STB which we incorporated as appropriate.

We will send copies of this report to appropriate congressional committees. In addition, we will make copies available to others upon request, and the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-2834 or Flemings@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on

[25] Christensen Associates, *An Update to the Study of Competition in the U.S. Freight Railroad Industry*, Final Report. Prepared for the Surface Transportation Board, (November 2010). & Pittman, Russell; *The Economics of Railroad "Captive Shipper" Legislation*; EAG 10-1 (January 2010).

[26] Surface Transportation Board, RAILROAD REVENUE ADEQUACY—2015 DETERMINATION, Docket No. EP 552 (Sub-No. 20), September 6, 2016.

[27] Surface Transportation Board, EXPEDITING RATE CASES, Docket Number Ex Parte 733, June 15, 2016.

the last page of this report. GAO staff who made key contributions to this report are listed in appendix I.



Susan A. Fleming
Director,
Physical Infrastructure

# Appendix I: Contact and Staff Acknowledgments

## GAO Contact

Susan A. Fleming, (202) 512-2834, Flemings@gao.gov

## Staff Acknowledgments

In addition to the individual named above, other key contributors to this report were Andrew Huddleston, Assistant Director; Sarah R. Jones, Analyst-in-Charge; Namita Bhatia Sabharwal; Herbert J. Bowsher; Stephen M Brown; Russell C. Burnett; Ross A. Gauthier; Richard A. Jorgenson; Grant M. Mallie; Cheryl M. Peterson; Malika Rice; Kelly L. Rubin; Amelia (Michelle) Weathers; Alwynne Wilbur; and William T. Woods.

## GAO's Mission

The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates."

### Order by Phone

The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm.

Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.

Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information.

## Connect with GAO

Connect with GAO on Facebook, Flickr, Twitter, and YouTube.
Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts.
Visit GAO on the web at www.gao.gov.

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Website: http://www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Congressional Relations

Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548

## Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548

## Strategic Planning and External Liaison

James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707
U.S. Government Accountability Office, 441 G Street NW, Room 7814,
Washington, DC 20548

Please Print on Recycled Paper.

# EXHIBIT PX0642

# US Railroad Efficiency: A Brief Economic Overview

By

Gerard J. McCullough, Ph.D.
Department of Applied Economics
University of Minnesota

The focus of U.S. transportation policy in the 19th and 20th centuries was on extending the benefits of transportation to more locales and to more citizens. The focus of policy in the 21st century must also be on reducing the costs of transportation. Current transportation costs associated with safety, congestion, sprawl, and pollution are large. Future costs associated with scarcity of petroleum could be cataclysmic.

The railroad network is a national asset that could be used to reduce the costs of transportation. This paper has two aims consistent with that possibility. The first is to describe the efficiency improvements that the railroad industry itself has made in the past few decades. The second is to describe the role that rail network could play in a more efficient overall national transportation system.

## I. Economic Efficiency in Transportation

After the 1974 and 1978 oil shocks Congress explicitly recognized the importance of an efficient transportation system. The *Staggers Rail Act* of 1980, for example, was designed to promote "a safe and efficient rail transportation system." (PL 96-448). Similarly, the *Intermodal Surface Transportation Efficiency Act* of 1991 had as its goal "a National Intermodal Transportation System that is economically efficient." (PL 102-240).

There was less emphasis on efficiency in the 1990s. The *Transportation Equity Act* of 1998, for example, stressed fairness over efficiency (PL 105-178). With recent increases in oil prices, however, efficiency is back on the national agenda and is named in the title of the *Safe, Accountable, Flexible, Efficient Transportation Equity Act* of 2005 (PL 109-59).

There are two formal economic aspects of efficiency.

> **Productive efficiency** occurs when an economy cannot produce more of one good or service without producing less of another. This generally occurs when firms produce at minimum average total cost.

> **Allocative efficiency** occurs when the economy cannot raise one consumer's satisfaction without lowering another's. This occurs when price signals to consumers are based on marginal costs.

The focus of this conference is on techniques of improving rail network performance. We are concerned with the *productive efficiency* of railroad firms. We are asking what needs to be done to enable railroads to provide service at the minimum average cost that is technologically possible?

At the same time, however, everyone--including the manufacturers and distributors of most goods and services produced in our economy--consumes transportation services. The *allocative efficiency* of the transportation system within which railroads operate is also important. We must at least raise the question of whether the rail network is playing its proper role within our overall transportation system? Are we realizing the rail network's potential?[1]

## II. Productive Efficiency of US Railroads

The Staggers Rail Act gave railroad managers discretion to use pricing and service levels (often reached through contract negotiations with shippers) to affect the composition of rail output. Changes in output composition, along with line abandonments and a significant degree of industry consolidation, have led to higher traffic densities, longer lengths of haul, and a significant shift in the train operations.[2]

The changes in the composition of rail output are illustrated in Figure 1. [The data are from the Association of American Railroads *Analysis of Class I Railroads* published annually.] In 1978 the Class I industry generated about 13.5 billion loaded and empty general car-miles (defining "general" here as boxcar, gondola, reefer, general purpose flat car-miles), but by 2004 the number had dropped to 10.8 billion. In the high-value market, on the other hand, intermodal and multi-level auto carrier car-miles grew from 3.9 billion in 1978 to 6.4 billion in 2004. Loaded and empty bulk car-miles (open hopper, closed hopper and tank), meanwhile, grew from 9.7 billion to 12.3 billion.[3]

---

[1] It is also likely that an increase in the *allocative efficiency* of the transportation system will increase the *productive efficiency* of railroads. Econometric studies have shown that railroads exhibit increasing returns to density. This means that as the railroad share of the freight transportation market increases (*allocative efficiency*) railroads themselves will be able to produce at lower marginal cost (*productive efficiency*). See, for example, Ivaldi and McCullough (2001).

[2] Abandonments and consolidations were also facilitated by the Staggers Rail Act.

[3] The capacity of these bulk cars increased significantly as well.

**Figure 1. Car-miles by Car-type**




The operational changes have been dramatic. The AAR *Analyses* show that between 1978 and 2004 revenue ton-miles per mile of road have grown from 4.5 million to 12.2 million, average lengths of haul have increased from 617 miles to 902 miles, and the percent of train-miles completed in unit trains has expanded from 7 percent to 37 percent.

Operational changes have been accompanied by various technological improvements including higher adhesion locomotives, re-engineered rails and cars, better maintenance of way equipment, and automated inspection techniques. The overall effect has been a much higher level of *productive efficiency* in the rail industry. Labor output (Figure 2) has grown from 1.8 million revenue ton-miles per employee in 1978 to 10.5 million in 2004.

**Figure 2. Revenue Ton-miles per Employee**




Fuel productivity (Figure 3) has increased from 216.4 revenue ton-miles per gallon to 408.5 revenue ton-miles per gallon.

**Figure 3. Revenue Ton-miles per Gallon**



Equipment productivity (Figure 4) has increased as well: revenue ton-miles per locomotive increased by about 250 percent, and revenue ton-miles per freight car has increased by about 450 per cent.[4] [All of the data are from the *Analyses of Class I Railroads*.]

**Figure 4. Revenue Ton-miles per Unit of Equipment**




The economic effect of these changes has been a significant reduction in railroad operating costs. These are illustrated by the bottom line in Figure 5--operating expenses per revenue ton-mile--which dropped from 2.46 cents (current) in 1978 to 2.11 cents (current) in 2004. (Operating revenue per revenue ton-mile, the top line in Figure 5, is treated below as a dimension of allocative efficiency.)

---

[4] What we have reported here are "partial" productivity measures in which outputs (e.g. revenue ton-miles) are divided by a specific input (e.g. labor hours). Other "total factor" productivity measures are available which take into account not only the relative increases of outputs and inputs but the residual effect of "technological progress" i.e. more efficient combinations of factors such as capital and labor. Most recent econometric studies of rail costs show total factor productivity gains in the rail industry of about three to four percent annually. See, for example, Ivaldi and McCullough (2004).

**Figure 5. Revenue and Expenses per Revenue Ton-mile**




## III. US Railroads and Allocative Efficiency

The role of transportation in fostering economic growth may have been exaggerated by highway builders and others who benefit directly from transportation spending. It is analytically difficult to disentangle the extent to which transportation investment generates economic activity or economic activity spurs transportation investment.

Nevertheless, there is a close connection between transportation activity and economic activity. Figure 6 based on the U.S. Department of Transportation's *National Transportation Statistics* illustrates how activity in national passenger and freight transportation markets (measured by VMT) are correlated to real GDP and population. Clearly, transportation is an important constituent of economic activity.

**Figure 6. Transportation and Economic Activity**




Various independent studies have shown that railroads have a definite *allocative efficiency* advantage over other modes in providing some transportation services. When all costs are taken into consideration—internal costs absorbed by firms and external costs such as pollution and congestion--railroads often generate lower marginal costs than the other modes. An efficient economy would favor railroads in these cases. One reason this may not happen is that it is difficult for political authorities to impose these external costs on truckers and shippers in the form of user fees for congestion/pollution/safety.

*TRB Special Report 246* compares the full marginal cost of freight transportation by truck and rail in representative corridors. Table 1 (from *Special Report 246*, p. 90) compares the marginal cost of a truckload movement of grain some 215 miles from Walnut Grove, MN to Winona, MN. The rail movement has significantly lower overall costs when the external effects are taken into account.[5]

[5] One calculation missing in the TRB report is the total logistics cost that the shipper faces when he or she uses rail versus truck. Truck transit times are usually better and this lowers time-related total logistics costs.

**Table 1. Freight Marginal Costs**

| Category | Truck | Rail |
|---|---|---|
| Congestion | 6.25 | 0.00 |
| Accident | 26.11 | 9.19 |
| Pollution | 6.75 | 1.43 |
| Energy Security | 3.63 | 0.39 |
| Noise | 0.00 | 0.78 |
| Public Infrastructure | 61.02 | 0.00 |
| Carrier Cost | 427.94 | 113.00 |
| TOTAL | 531.70 | 124.87 |

One allocative concern is that rail industry consolidation has not only helped to increase traffic densities and lengths of haul; it has also increased rail market power. The Herfindahl-Hirschman Index (HHI) is the standard measure that the U.S. Department of Justice uses to measure market concentration.[6] As the number of Class I railroads dropped from 36 firms in 1978 to 7 in 2004, the HHI (Figure 7)--calculated here from the AAR *Analyses* on the basis of carloads originated grew--from 589 to 2263 . This is well above 1000 HHI trigger-point at which the Justice Department begins to carefully scrutinize mergers.

**Figure 7. Herfindahl Index**




[6] Let $S_i$ be the percent of output that a firm provides in a given market. The HHI is given by the formula

$$H = \sum_i S_i$$

Until recently, however, railroads have to some extent shared the cost reductions brought about by efficiency increases with shippers.[7] Figure 5 shows that despite increases in market power operating revenue per ton-mile declined from 2.54 cents (current) per revenue ton-mile in 1978 to 2.44 cents (current) per revenue ton-mile in 2004.[8] The pricing discipline enabled railroads to maintain a significant share of the freight market Table 2, based on data from the *National Transportation Statistics*) shows that railroads now carry about 40 percent of U.S. freight ton-miles--intercity and intracity.

| **Table 2. Freight Market Shares (ton-miles x $10^9$)** | | | | |
|---|---|---|---|---|
| **Mode** | **1993** | **1997** | **2002** | **Percent Δ** |
| Truck | 869.5 | 1023.5 | 1311.1 | 50.8 |
| Rail | 942.6 | 1022.5 | 1199.4 | 27.2 |
| Water | 272.0 | 261.7 | 323.1 | 18.8 |
| Air | 4.0 | 6.2 | 5.6 | 38.7 |

Railroads may also have an allocative efficiency advantage in some passenger markets as well though this is influenced by ridership levels as well as vehicle performance. Table 3 based on the Oak Ridge National Laboratory's *2000 Transportation Energy Data Book* (Table 2.12) compares the fuel intensity of competing intercity passenger modes. Both Amtrak intercity service and rail transit have energy efficiency advantages over intercity auto, transit buses and air but not over intercity bus. The report does not evaluate commuter rail services where railroads probably perform even better in energy efficiency terms.

| **Table 3. Energy Efficiency (Passenger Modes 1998)** | |
|---|---|
| **Mode** | **Btu / Pass-mi** |
| Auto | 3,671 |
| Transit bus | 4,238 |
| Intercity bus | 713 |
| Air carriers | 3,999 |
| Intercity rail | 2,460 |
| Rail transit | 3,216 |

[7] The dynamics of railroad pricing behavior are beyond the scope of this brief paper. Intermodal, intramodal, product and geographic competition, the bargaining power of large shippers, and potential intervention by the Surface Transportation Board (STB), are all possible elements which affect prices.

[8] The operating revenue per ton-mile measure is only a proxy for average prices. It does not measure the degree to which railroads charge different prices to different customers.

# IV. Conclusions

We still lack the data necessary to define the proper role of rail passenger service in the U.S., but it is clear that freight railroads have an *allocative efficiency* advantage in various markets. Though freight railroads have made significant gains in *productive efficiency*, rail freight is still one of the slowest growing modes of transportation in the U.S. Figure 8, based on National Transportation Statistics from BTS, shows that since 1980 rail freight vehicle-miles-traveled (VMT) has actually grown less rapidly than highway freight VMT or even rail passenger VMT.

**Figure 8. VMT Growth by Mode**



One interesting outcome, shown in Figure 9 based on the *National Transportation Statistics*, is that the freight system has become more labor efficient since 1978 but not more energy efficient. This should lead to a serious consideration of whether our national transportation policies are moving us away from allocative efficiency.

**Figure 9. Surface Freight System Efficiency**



# References

Association of American Railroads. *Analysis of Class I Railroads.* Annual 1978-2004. Association of American Railroads. Washington, DC.

Davis, S., *Transportation Energy Data Book: Edition 22* (Oak Ridge, TN: Oak Ridge National Laboratory, September 2002)

Ivaldi, Marc and McCullough, Gerard. 2001. "Density and Integration Effects on Class I U.S. Freight Railroads." *Journal of Regulatory Economics* 19:2. 161-182.

Ivaldi, Marc and McCullough, Gerard. 2004. "Subadditivity Tests for Network Separation Using a Generalized McFadden Cost Function." Center for Economic Policy Research (CEPR) *CEPR Discussion Paper 4392* London, England. May, 2004.

U.S. Department of Transportation. National Transportation Statistics. Annual Publication. http://www.bts.gov/publications/national_transportation_statistics

Wilson, Wesley W. 1997. "Cost Savings and Productivity in the Railroad Industry." *Journal of Regulatory Economics* 11: 21-40

Transportation Research Board Special report 246. Paying Our Way: Estimating Marginal Social Costs of Freight Transportation http://trb.org/news/blurb_detail.asp?id=2677

# EXHIBIT PX0643

Case 1:07-mc-00489-BAH Document 1229-6 Filed 11/22/24 Page 815 of 1523

Get freight rail industry news right to your inbox, from important policy updates to fun facts about America's private, nearly 140,000-mile network.

FULL NAME

EMAIL ADDRESS

ORGANIZATION

SUBSCRIBE

We use cookies to create a better user experience, analyze site traffic, personalize content and serve targeted ads. By using this site, you conse[...] ore in Privacy Policy in the footer below. If you are a California resident, [...] otice, which explains your CA privacy rights and how you can exercis[...]

ACCEP

Privacy - Terms



# About Us

MENU

America's freight railroads operate the safest, most efficient and cost-effective freight transportation system in the world. The Association of American Railroads helps keep it that way.

Founded in 1934, AAR is the world's leading railroad policy, research, standard setting and technology organization that focuses on the safety and productivity of the U.S. freight rail industry. AAR full members include the seven Class I freight railroads in the United States, Canada and Mexico, as well as Amtrak. Affiliates and Associates include non-Class I and commuter railroads, rail supply companies, engineering firms, signal and communications firms and railcar owners.

- **Policy Making**: Working with elected officials and leaders in Washington, DC, AAR advances sound public policy that supports the interests of the freight rail industry. These policies help ensure railroads will continue to meet America's transportation needs today and tomorrow.

- **Standard Setting:** AAR is the standard setting organization for North America's railroads. AAR establishes safety, security and operating standards that provide seamless and safe operations across America's private 140,000-mile freight rail network.

We use cookies to create a better user experience, analyze site traffic, personalize content and serve targeted ads. By using this site, you consent to cookie use. Learn more in Privacy Policy in the footer below. If you are a California resident, refer to our CA Privacy Notice, which explains your CA privacy rights and how you can exercise them.

ACCEPT

Case 1:07-mc-00489-BAH Document 1229-6 Filed 11/22/24 Page 817 of 1523

data, information technology and information services, and uses one of the world's largest data networks to track customer shipments. AAR also supports the Railroad Research Foundation, a world-class policy research organization dedicated to sustaining a safe, secure and technologically advanced rail network.

## Become a Member

AAR advocates for sound public policy with federal legislators and administrators. We facilitate the operations, safety, security and research initiatives that allow railroads to meet the needs of their customers and help America achieve economic prosperity.

JOIN US

Get freight rail industry news right to your inbox, from important policy updates to fun facts about America's private

We use cookies to create a better user experience, analyze site traffic, personalize content and serve targeted ads. By using this site, you consent to cookie use. Learn more in Privacy Policy in the footer below. If you are a California resident, refer to our CA Privacy Notice, which explains your CA privacy rights and how you can exercise them.

ACCEPT

THE SIGNAL NEWSLETTER

425 3rd Street SW Washington, DC 20024

Get freight rail industry news right to your inbox, from important policy updates to fun facts about America's private, nearly 140,000-mile network.

We use cookies to create a better user experience, analyze site traffic, personalize content and serve targeted ads. By using this site, you consent to cookie use. Learn more in Privacy Policy in the footer below. If you are a California resident, refer to our CA Privacy Notice, which explains your CA privacy rights and how you can exercise them.

ACCEPT

# PX0644-PX0652

# Filed Under Seal

# EXHIBIT PX0653

37341
EB

SERVICE DATE – JANUARY 26, 2007

SURFACE TRANSPORTATION BOARD

DECISION

STB Ex Parte No. 661

RAIL FUEL SURCHARGES

Decided: January 25, 2007

The Board instituted this proceeding to inquire into rail carrier practices related to fuel surcharges. A fuel surcharge is a separately identified component of the total rate that is charged for the transportation involved, purportedly to recoup increases in the carrier's fuel costs. The Board first held a hearing in May 2006, and in August 2006 it sought comments on several proposed measures to address the Board's concerns about these practices. After considering all of the comments received, we conclude that computing rail fuel surcharges as a percentage of a base rate is an unreasonable practice, and we direct carriers to change this practice. We also conclude that the practice of "double dipping," i.e., applying to the same traffic both a fuel surcharge and a rate increase that is based on a cost index that includes a fuel cost component, such as the Railroad Cost Adjustment Factor (RCAF), is an unreasonable practice, and we direct carriers to change this practice as well. We will proceed with a proposal to impose mandatory reporting requirements for all Class I railroads regarding their fuel surcharges, in STB Ex Parte No. 661 (Sub-No. 1). We will not, however, prescribe the index to be used for measuring increases in fuel costs, nor will we partially revoke existing class exemptions to apply the measures set forth here to currently exempted traffic.

BACKGROUND

At the Board hearing conducted May 11, 2006, the shipper community expressed deep dissatisfaction with the railroad industry's methods of assessing fuel surcharges. Shippers acknowledged that railroads are entitled to recover the increased costs they incur from the rising price of fuel. But because rail rates are not cost based – railroads price their services differentially (e.g., based on the differing elasticities of demand for rail transportation of different shippers) – shippers argued that calculating a fuel surcharge as a percent of the base rate results in collecting from captive shippers more than the increased fuel costs associated with their particular traffic. Many shippers also alleged that railroads are double dipping. Shippers argued nearly unanimously that transparency is needed for rail fuel surcharges and asked us to require the railroads to regularly report their fuel costs and revenue from fuel surcharges.

The railroads largely concede that their fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. However, they claim that, because they cannot apply fuel surcharges to every customer, especially those

whose rates are fixed by contract, they do not recover their full increased cost of fuel.[1] The railroads defended their methods of calculating fuel surcharges as fair, equitable, and easy to administer.

In a decision served August 3, 2006, the Board proposed to adopt several measures to address rail fuel surcharge practices. First, carriers would be required to develop a means of computing the surcharge that is more closely linked to the portion of its fuel costs attributable to the movement involved. Second, "double dipping" would be prohibited. Third, railroads would be required to use a single, uniform index for measuring increases in their fuel costs – the "U.S. No. 2 Diesel Retail Sales by All Sellers (Cents per Gallon)" published by the Energy Information Agency, an independent arm of the Department of Energy (EIA Index). Fourth, class exemptions would be partially revoked to apply these measures to exempted traffic as well. Finally, each Class I railroad would be required to submit a monthly report to the Board showing its actual total fuel costs, total fuel consumption and total fuel surcharge revenues, as well as how much of its total fuel surcharge revenues are shared with its shortline connections.

We received 73 comments on these proposals. Some fully support these proposals without any additional suggestions.[2] Others either object to one or more of the proposed measures or suggest additional or alternative measures, as summarized below.

Linkage.

Shippers generally support a requirement that fuel surcharges be linked to attributes of a movement that directly affect the amount of fuel consumed, such as mileage or weight. Some further suggest that fuel surcharges be limited to the changes in fuel prices from a defined starting point (such as when a new rate is negotiated), and that shippers be able to separately challenge surcharges that exceed the change in fuel costs for their particular movement.[3] Many shippers also suggest that the base fuel price to which a surcharge may be applied should be limited (to the fuel price component incorporated into the last increase in the base rate or the fuel

---

[1] At least one railroad, Union Pacific Railroad Company (UP), concedes that some customers may pay more than the actual incremental cost of fuel used to handle their particular movement, due to long-term transportation contracts with other shippers. UP Comments filed April 27, 2006 at 15-16.

[2] U.S. Clay Producers Traffic Association, Inc.; UPS; North Dakota Department of Agriculture; The Canadian Wheat Board; Degussa Corporation; National Corn Growers Association; E.I. du Pont de Nemours and Company (DuPont); and Agricultural Retailers Association (ARA).

[3] Corn Products International, Inc.; Huntsman LLC; Afton Chemical Corporation; Reagent Chemical & Research, Inc.; Compass Minerals; San Joaquin Refining Co., Inc.; Stora Enso North America Corp.; Goodyear Tire & Rubber Company; CRI/Criterion; Barilla America, Inc.; Illinois Brick Company; and Highroad Consulting, Ltd.

price not more than 1 year prior),[4] and that refunds or credits be required to be issued if fuel prices drop below that base level.[5] Additionally, certain shippers ask us to require railroads to separately identify the fuel cost component in their base rates, or adopt a presumption that the prevailing cost of fuel is fully reflected in any newly-established base rates.[6]

A few shippers argue that fuel surcharges should be based on mileage alone, and not the weight of a movement, so as not to unduly complicate the calculation.[7] And several shippers further suggest that a mileage-based surcharge should be based on the shortest possible mileage, because the actual miles can be circuitous.[8]

While a few railroads offered some positive comments about requiring fuel surcharges to be more closely linked to fuel costs,[9] most oppose such a requirement, which they claim would be unduly costly and difficult to implement. Some argue that a mileage-based fuel surcharge would not be more precise than the present surcharge calculation.[10] The Association of American Railroads (AAR) asserts that a mileage-based approach would not be workable. Several railroads suggest that, if we require a mileage-based calculation, we compile a master rail mileage database containing mileage data for all origin and destination pairs in North America, to facilitate compliance with such a rule.[11]

---

[4] Cargill Incorporated (Cargill); American Chemistry Council (ACC); Electric Power Supply Association; the Dow Chemical Company (Dow Chemical); The Fertilizer Institute (TFI); Potlatch Forest Products Corporation (Potlatch); Occidental Chemical Corporation (OCC); Shell Chemical LP (Shell Chemical); Idaho Power Company (Idaho Power); Sierra Pacific Power Company (Sierra Power); Nevada Power Company (Nevada Power); CEMEX, Inc. (CEMEX); Concerned Captive Coal Shippers (Concerned Coal Shippers); AES Corporation (AES); Kennecott Utah Copper Corporation (Kennecott); and Western Coal Traffic League (WCTL).

[5] Cargill; ACC; Bayer MaterialScience LLC (Bayer); Dow Chemical; TFI; ASHTA Chemicals Inc. (ASHTA); National Grain and Feed Association (NGFA); Potlatch; Ag Processing Inc. (Ag Processing); Ameren Energy Fuels & Services (Ameren); Entergy Corporation (Entergy); Idaho Power; Sierra Power; Nevada Power; CEMEX; AES; Concerned Coal Shippers; OCC; National Industrial Transportation League (NITL); and WCTL.

[6] Entergy; Ameren; Idaho Power; Sierra Power; Nevada Power; CEMEX; South Carolina Electric; NGFA; and AES.

[7] ACC; Bayer; NDGDA; NITL; OCC; TFI; and AAM.

[8] Cargill; NITL; AECC; and TFI.

[9] CSX Transportation, Inc. (CSXT); Kansas City Southern Railway Company (KCSR); and BNSF Railway Company (BNSF).

[10] UP; Canadian National Railway (CN); and Canadian Pacific Railway Company (CP).

[11] CSXT; KCSR; UP; and CP.

The U.S. Department of Transportation (DOT) notes that many factors other than mileage influence fuel consumption. DOT argues that carriers should be free to take other factors into account, as long as their overall approach is reasonable.

The American Short Line and Regional Railroad Association (ASLRRA) asserts that a mileage-based system would adversely affect Class II and Class III railroads, whose proportion of the route miles on a movement is not as large as their proportion of the revenues for the move.

Double Dipping.

Shippers generally support the prohibition against double dipping.[12] Some argue that only the RCAF should be used to adjust for changes in costs, including fuel, and that the RCAF should be modified as needed to address the carriers' time lag concern (which arises from the fact that the RCAF is adjusted only quarterly).[13] DOT fully supports the proposal to prohibit double dipping. No railroad expressed opposition to a prohibition against double dipping. However, Norfolk Southern Railway Company (NS) suggests that having escalation clauses in a tariff that also includes a fuel surcharge should not be considered double dipping.

Uniform Fuel Cost Index.

Shippers have argued that use of a uniform fuel index would ensure accuracy, transparency and accountability.[14] While most parties agree that the EIA index accurately reflects changes in fuel costs in the railroad industry, some parties propose alternate indices,[15] and some parties object to the imposition of a uniform index.[16] For example, DOT argues that an individual carrier should be allowed to use any index that closely correlates with its own fuel costs.

---

[12] AES; Edison Electric Institute (Edison Electric); Ameren; Entergy; CEMEX; South Carolina Electric and Gas Co. (South Carolina Electric); WCTL; Concerned Coal Shippers; NITL; Arkansas Electric Cooperative Corporation (AECC); NGFA; Potlatch; Idaho Power; Sierra Power; and Nevada Power.

[13] WCTL; Entergy; Ameren; Nevada Power; and AES.

[14] ARA; TFI; DuPont; ACC; Cargill; NGFA; Kennecott; NITL; Steel Manufacturers Association; and ASHTA.

[15] Cargill; NDGDA; NITL; AECC; Argus Media Inc. (Argus); Ag Processing; Kennecott; and NGFA.

[16] BNSF; KCSR; Small Railroad Business Owners of America/Minnesota Commercial Railway Company (SRBOA); and DOT.

Revocation of Exemptions.

Railroads vigorously object to the proposal in the August decision that the Board partially revoke the existing class exemptions at 49 CFR part 1039 so as to extend any measures adopted here to the various categories of rail traffic for which the agency has previously found regulation to be unnecessary. They argue that there is no record here for taking such action,[17] and that partially revoking the exemption for intermodal traffic in particular would upset the competitive balance between railroads and trucks in that marketplace.[18] DOT also opposes partial revocation of existing exemptions.

Reporting.

Shippers generally support the proposal for monthly fuel surcharge reports, as does DOT. Many shippers would have us expand the monthly report to include industry- or commodity-specific information or to reflect costs for individual movements,[19] and they would have us require reports from Class II and Class III carriers as well.[20] Some shippers also suggest that we change the reporting requirement for the Waybill Sample to add data fields to monitor fuel surcharge revenues.[21]

Railroads generally oppose additional reporting requirements and anticipate difficulties in complying with them. Most state that their information systems are not presently capable of capturing all of the information necessary and that they would need to develop new information technology systems to produce the proposed report.[22] Additionally, some suggest that any new report should be quarterly, rather than monthly.[23]

In response to the Board's request for immediate voluntary reporting of fuel surcharges, only NS, CP, and KCSR submitted an initial report. CP and KCSR submitted data regarding fuel costs and consumption, but not revenues. BNSF, CSXT, CN, and UP did not submit any data.

---

[17] BNSF; NS; CSXT; UP; CP; and AAR.

[18] NS; CSXT; UP; and CP. J.B. Hunt Transport, Inc. and Hub Group, Inc. also submitted comments opposing revocation of the intermodal exemption.

[19] North Dakota Grain Dealers Association (NDGDA); NGFA; Westlake Chemical Corporation (Westlake); Potlatch; NITL; and Entergy.

[20] NITL; Westlake; and Ag Processing.

[21] NITL; Freight Resources Network, LLC; Wheat & Barley Commissions; Potlatch; and CEMEX.

[22] KCSR; CSXT; CP; and UP.

[23] BNSF; CSXT; UP; and CP.

Implementation.

Railroads ask that they be provided ample time to implement new surcharge systems to comply with any requirements that we adopt.[24] They also ask us to confirm that the requirements would apply only prospectively and only to common carrier traffic, not to contract traffic.

Shippers ask that we set a clear deadline for when railroads would be required to implement new fuel surcharge systems.[25] Some ask that we apply our unreasonable practice findings retroactively and provide for an across-the-board remedy for past overcharges.[26] Finally, some shippers suggest that we establish a compliance process that would encourage dispute resolution between railroads and shippers.[27]

## DISCUSSION AND CONCLUSIONS

Linkage.

After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

Alone among the railroads, CSXT maintains that its fuel surcharge program does not constitute mislabeling. CSXT contends that its fuel surcharge program "is designed to recoup CSXT's increased overall fuel expenses to ensure adequate revenues. Moreover, CSXT's program is fully explained on its website and its tariffs, and has been clearly understood in the market."[28]

---

[24] NS; KCSR; CSXT; UP; CN; and CP.

[25] Shell Chemical; Ag Processing Inc.; and Concerned Coal Shippers.

[26] Dow Chemical and Total Petrochemicals, USA, Inc.

[27] Dow Chemical and Shell Chemical.

[28] CSXT Comment at 18.

However, the term "fuel surcharge" most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled. This sort of mislabeling appears designed to avoid the type of response a carrier would likely receive if it were to honestly inform a shipper that a higher rate was being imposed to recover not only the increased fuel cost of serving that shipper, but also the increased cost of fuel for another shipper's traffic – which is what would often occur under rate-based fuel surcharges. But the fact that a railroad may not be able to recover its increased fuel costs from some of its traffic (for example, traffic covered by a contract lacking a provision to pass through such costs) does not provide a reasonable basis for shifting those costs onto other traffic in this manner. We believe that imposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice.

Several railroads challenge our authority to regulate fuel surcharge programs as an unreasonable practice. They argue that, because a fuel surcharge is a component of the total rate, it cannot be subjected to Board regulation except where we first find that the carrier has market dominance over the particular movement involved. We disagree. As explained in the August decision, we are not limiting the total amount that a rail carrier can charge for providing rail transportation through some combination of base rates and surcharges. Rather, we are only addressing the manner in which railroads apply what they label a fuel surcharge.

BNSF argues that Congress could not have intended for us to regulate an individual component of a rate based solely upon the label given to it by the railroad as a fuel surcharge.[29] But Congress, in the rail transportation policy at 49 U.S.C. 10101(9), explicitly stated that it is the policy of the United States Government "to encourage honest and efficient management of railroads." Moreover, Congress exempted the rail carriers from the consumer protection requirements of the Federal Trade Commission Act,[30] presumably not because Congress intended to permit carriers to mislead their customers, but because our authority to proscribe unreasonable practices embraces misrepresentations or misleading conduct by the carriers. And the record in this proceeding provides extensive testimony by shippers who have expressed concern about carriers raising their rates on the pretext of recovering increased fuel costs. If the railroads wish to raise their rates they may do so, subject to the rate reasonableness requirement of the statute, but they may not impose those increases on their customers on the basis of a misrepresentation.

BNSF also argues that the Board cannot declare an action an unreasonable practice unless it is acting on a specific complaint.[31] This argument overstates our action here. We are not

---

[29] BNSF Comment at 11.

[30] See 15 U.S.C. 45(a)(2); FTC v. Miller, 549 F.2d 452 (7th Cir. 1977).

[31] BNSF Comment at 8-10.

addressing any individual railroad's fuel surcharge program, and we are not awarding any remedies for rate-based fuel surcharges that may have been used in the past. We are instead making a finding that promulgating rate-based fuel surcharges is an unreasonable practice. This finding could be used to support future complaints challenging individual rate-based surcharges, but we are not adjudicating a specific complaint here.

We recognize that our authority to determine whether any particular fuel surcharge applied by a specific railroad is an unreasonable practice, and to award damages on that basis, is limited to proceedings begun on complaint.[32] 49 U.S.C. 10704(b), 11701(a). But as the Board stated in the August decision, we may adopt rules of general applicability for future conduct to address an unreasonable practice, even though our authority to award shipper-specific remedies is limited to a formal complaint proceeding. Cf. Mr. Sprout, Inc. v. United States, 8 F.3d 118, 128-29 (3d Cir. 1993) (citing with approval ICC rules governing carrier processing of claims for loss or damage to cargo, even though such claims could only be resolved in another forum).

The railroads question the practicality of alternatives to rate-based fuel surcharge programs. Many assert that a fuel surcharge based on mileage would be difficult, time consuming, and expensive to implement and administer. But these assertions are largely unsupported. The record shows that BNSF was able to successfully implement a mileage-based fuel surcharge (for coal and agricultural movements) in a matter of months. Moreover, several railroads have expressed some willingness to develop a fuel surcharge program linked to mileage, which further indicates that such a task is feasible.[33] There will, of course, be costs incurred in changing from one method to another (for example, costs associated with reprogramming information systems, retraining personnel, and coordinating with other carriers on interline movements). But we do not believe that converting to a new fuel surcharge methodology would impose an unreasonable burden on carriers. Moreover, the railroads have not asserted, much less demonstrated, that – once having made the change – it would cost more to maintain fuel surcharge programs that are tailored to fuel costs for the movement involved.

Some carriers question the benefits to be gained by moving away from rate-based fuel surcharges. CP and CN argue that a mileage-based (or a weight-and-mileage-based) fuel surcharge would not be any more precise or fair in allocating fuel costs among shippers than a rate-based fuel surcharge. They point out that there are many other factors in addition to mileage and weight that can affect fuel costs, including speed, intensity of local switching, empty return ratio, track conditions, geography, grade, curvature, drag and resistance, weather conditions, and overall operating conditions.

[32] We note that the Board received numerous informal complaints from shippers about the freight rail industry's fuel surcharge practices and heard many shippers complain at the Board's May 2006 hearing.

[33] CSXT, KCSR, and BNSF.

We are not persuaded by these arguments. First, even a mileage-based fuel surcharge, although not perfect, more closely tracks changes in fuel costs for an individual shipment than does a rate-based fuel surcharge. Mileage is one of the primary factors that affects fuel consumption. In contrast, the base rate often does not closely correlate with fuel consumption, as it routinely reflects demand (and to the extent it reflects costs, fuel costs are less than 20% of a railroad's operating costs). Second, we are not precluding railroads from incorporating as many factors that affect fuel consumption as they wish in calculating fuel surcharges. Nor are we requiring them to incorporate every conceivable such factor, as we agree that would be impracticable. But if a carrier chooses to use a fuel surcharge program, it must be based upon attributes of a movement that directly affect the amount of fuel consumed. In other words, there must be a reasonable nexus to fuel consumption.

A fuel surcharge program keyed to the base rate has one primary benefit – ease of application.[34] Although clearly easy to implement, a fuel surcharge program keyed to the base rate almost guarantees that some shippers will be forced to pay the increased fuel costs of other shippers. For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate – when practical alternatives are available – would permit them to continue to mislead their customers and would be unfair.

ASLRRA argues that a mileage-based fuel surcharge system would adversely affect Class II and Class III railroads, which often receive a portion of the connecting Class I carrier's fuel surcharges. However, the revenue decisions are based on negotiated agreements between the carriers involved,[35] and indeed such agreements often provide for a fixed per-car handling fee.[36] Carriers may continue to agree to divide revenues on through movements in any reasonable manner.

Of course, when a shortline railroad itself establishes a fuel surcharge (rather than merely sharing in the revenues of a fuel surcharge established by a Class I railroad), it must comport with the findings and requirements of this decision. If mileage is not the best indicator of the fuel consumption associated with the movements a shortline handles, it may choose to base its fuel surcharges on other factors that are better correlated to the amount of fuel consumed. But

[34] Several carriers introduced evidence that many of their customers favor the continued use of a fuel surcharge program that is tied to the base rate. Given that such a program shifts greater responsibility for fuel recovery to shippers with higher rates, it is not surprising that a subset of customers (presumably those with lower base rates) favor retaining a percentage-of-the-base-rate approach. We note that such shippers are free to enter into contractual arrangements with carriers that incorporate into those contracts any escalation provision for fuel cost recovery that the parties wish.

[35] ASLRRA Comment at 4, 6.

[36] Id. at 6, 8.

even for shortlines, we doubt that the level of the base rates would be an appropriate indicator of the fuel costs associated with individual movements.

Numerous shippers have asked us to make our findings here retroactive, so as to allow them to obtain a remedy for what they perceive to be past overcharges. In contrast, railroads have asked us to clarify that our findings here apply prospectively only. In view of the long history of rate-based fuel surcharges in the rail industry, we do not believe that railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible. Indeed, in the mid-1970s, the ICC specifically declined to require carriers to tie their fuel surcharges to mileage.[37] Although conditions have changed since the mid-1970s, railroads may have reasonably relied on that precedent in formulating their fuel surcharge programs. (That history underscores the need for, and propriety of, this proceeding to address, on an industry-wide basis, whether this well-established practice continues to be a reasonable practice going into the future.)

Railroads will have a 90-day transition period to adjust their fuel surcharge programs. Should an individual railroad need additional time to change its fuel surcharge system, it should request an extension from the Board and be prepared to demonstrate why it is necessary.

We do not believe that it is necessary or appropriate at this time to adopt any of the other linkage suggestions made by the commenters, as summarized above, such as requiring railroads to separately identify the fuel cost component in their base rates. We seek to minimize the degree of Federal regulatory control here, see 49 U.S.C. 10101(2), and to afford individual carriers the flexibility to devise fuel surcharge practices that work best for them, within the limits described herein. Once carriers have had an opportunity to adjust their fuel surcharge programs, should any shipper have concerns that any particular revised fuel surcharge program is being administered in a manner that constitutes an unreasonable practice, it may file a complaint with the Board. Additional rules of general applicability do not appear needed at this time.

Double Dipping.

Nearly every commenter supports a prohibition against "double dipping," i.e., double recovery for the same fuel cost increase. This can occur when a carrier both escalates a base rate using an index (such as the RCAF) that includes changes in the cost of fuel and applies a fuel surcharge to the same movement covering the same time period.

NS suggests that use of a widely accepted index as a rate escalator should not constitute "double dipping" if included in a common carrier tariff that also includes a fuel surcharge. However, the only circumstance in which the use of both a fuel surcharge along with a rate escalator would not constitute "double dipping" is when the fuel component has been subtracted

---

[37] See Expedited Procedures for the Recovery of Fuel Costs, 350 I.C.C. 563, 570-71 (1975).

out of the index. Absent such an adjustment, we find that application of both an index that includes a fuel component and a fuel surcharge for the same movement to cover the same time period is an unreasonable practice.

Fuel Index.

Strong support has been expressed in the record for the proposal that railroads apply a single, uniform index to measure changes in fuel prices. Shippers argue that it would better ensure accuracy, transparency and accountability, and thereby enhance the credibility of fuel surcharges in the eyes of those who pay them. Moreover, there is general agreement – even among those carriers that object to Board imposition of a uniform index – that the EIA Index accurately reflects changes in fuel costs in the rail industry. Indeed, the EIA Index closely correlates with other fuel cost indices, including the indices currently used by most carriers. Moreover, the AAR has developed an index for carriers that is virtually identical to the EIA Index.

Because the EIA Index has been the subject of notice and comment and has withstood scrutiny on this record as discussed above, we conclude that it is a reasonable index to apply to measure changes in fuel costs for purposes of a fuel surcharge program. Thus, it provides a "safe harbor" upon which carriers can rely for an index. Use of an alternative index may be subject to challenge.

While we encourage carriers to use the EIA Index, we will not mandate its use. We are concerned that we not hinder the Board's ability to respond nimbly should a superior index be identified. Indeed, some parties have advanced arguments here for the selection of a different index in place of the EIA Index proposed by the Board.[38] And DOT has argued that the fact that carriers buy fuel at different times and places supports the use of different indices. On the record that is before us here, we cannot strike down these alternative indices as unreasonable, nor can we find that is it an unreasonable practice for carriers to use different indices to measure changes in fuel costs. However, any alternative index used may be challenged as unreasonable on a case-by-case basis, and should meet or exceed the standards of accuracy, transparency, availability, and neutrality of the EIA Index, should closely correlate with other indices, and should reflect fuel price changes quickly.

---

[38] NITL and Kennecott suggest use of the EIA's U.S. Diesel Fuel Industrial Price by All Sellers (Cents Per Gallon). NITL Comment at 9, Kennecott Comment at 5. NGFA and AECC recommend use of the wholesale, rather than retail, price of diesel. NGFA Comment at 7, AECC Comment at 11. Argus recommends its own bulk spot market price for Off-Road diesel, and Cargill suggests use of a third party index such as Argus' index. Argus Comment at 2, Cargill Comment at 4-5.

Reporting.

We continue to believe that obtaining a monthly report from each Class I railroad regarding its fuel expenditures and consumption will enable the Board to better monitor the industry's fuel surcharge practices. However, to minimize the regulatory burden, we will narrow the information to be included in the report. In August, the Board proposed including ton-mile revenue information, but because we will not mandate that railroads use a fuel surcharge mechanism based on ton-miles, we conclude that we do not need to collect that information. Likewise, the Board proposed in August to require revenue sharing information based on concerns about the amount of fuel surcharge revenues shared with Class II and Class III railroads. But because the comments make clear that railroads are free to divide fuel surcharge revenues according to negotiated agreements, we conclude that it is not necessary to collect this information either.

Before adopting the proposed reporting requirement (as narrowed here), we need to first obtain additional comments on the costs and burdens of the proposed report to comport with the Paperwork Reduction Act. We will do that in a separate proceeding, STB Ex Parte No. 661 (Sub-No. 1), Rail Fuel Surcharges, which we are instituting by a separate decision also served today.

Exempted Traffic.

Under 49 U.S.C. 10502(a), the Board (like the ICC before it) has been directed to exempt entire categories of traffic from the regulatory provisions of the Interstate Commerce Act, to the maximum extent consistent with the Act. That authority has been used to exempt various broad categories of traffic from such regulation. See 49 CFR part 1039. The Board can revoke an exemption to the extent it finds necessary to achieve the regulatory objectives of the statute. 49 U.S.C. 10502(d). In considering whether to revoke an exemption:

> [T]he first thing we look at . . . is whether the carrier possesses substantial market power. If it does not, then there is generally no basis for revoking an exemption. If it does, then we focus on whether regulation is necessary to protect against carrier abuse of shippers as a result of such market power. Finally, in assessing whether regulation is necessary or appropriate, we address whether regulation or exemption would, on balance, better advance the objectives of the []RTP and the interest of the shipping public overall.

Rail Exemption Misc. Agricultural Commodities, 8 I.C.C.2d 674, 682 (1992).

Here, while several shippers have expressed support for partially revoking the class exemption to apply the measures adopted here, that proposal is uniformly opposed by the railroad community. J.B. Hunt Transport, Inc., Hub Group, Inc., and SRBOA also submitted

separate comments opposing the revocation of the exemption for intermodal traffic in particular. And DOT "strongly opposes" the partial revocation of previously granted exemptions from regulation.[39]

We are persuaded by the comments that we should not implement this aspect of the August proposal. The exemptions are based on prior findings that there is a sufficiently competitive market for the transportation involved that regulatory protections are not needed. The exemptions permit the traffic involved (including intermodal traffic) to benefit from a competitive marketplace free of regulatory interference. Under the exemption, trucks and railroads compete on an equal footing for intermodal traffic, for example, with each competitor capable of adapting readily to changes in the marketplace. If we revoke the exemption, even partially, the railroads would be restricted in how they can respond to changes, while trucking companies would not. This kind of imbalance could have unintended consequences and upset the competitive balance between railroads and trucks.

Although in August we noted that certain of the regulatory objectives of the statute supported the extension of our decision to exempted traffic, we are reminded that another regulatory objective is "to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. 10101(2). The record developed in this proceeding offers no evidence that the marketplace has materially changed for any of the exempted categories of traffic since the findings were made to exempt that traffic from regulation. Without such evidence, we have no basis to reimpose regulation over traffic that has been exempted from regulation for almost two decades. Accordingly, we will not move forward with the proposal to apply these measures to exempted traffic. Although we decline to revoke the class exemptions across-the-board here, shippers are not precluded from filing individual petitions to revoke an exemption where there is no longer adequate competition.

Contract Traffic.

Many shippers argue that these rules should apply to traffic handled under transportation contracts. Under 49 U.S.C. 10709, we have no authority to regulate rail rates and services that are governed by a contract. Therefore, our findings and actions here apply only to regulated common carrier traffic. We do note, however, that if a railroad enters into a contract that ignores the potential for significant increases in fuel costs, it cannot remedy that situation by engaging in an unreasonable practice as to other traffic over which we do have regulatory authority. Railroads would be well-advised to focus on improving their contracts to clearly allocate the costs of contingencies such as fluctuating fuel costs, rather than attempting to pass on the costs of ineffective contract drafting to non-contract customers.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

---

[39] DOT Comment at 4.

It is ordered:

1. Railroads are directed to conform their practices to the findings contained in this decision.

2. This decision is effective on its service date.

By the Board, Chairman Nottingham, Vice Chairman Buttrey, and Commissioner Mulvey. Commissioner Buttrey concurred in part and dissented in part with a separate expression.

Vernon A. Williams
Secretary

---

VICE CHAIRMAN BUTTREY, concurring in part and dissenting in part:

I respectfully dissent from the portion of this decision pertaining to fuel indices, while concurring with the other aspects of the decision.

In the notice served August 3, 2006, in this proceeding, the Board proposed to require all Class I railroads to use a single index to measure increases in fuel costs, and suggested a particular EIA highway diesel price index as best-suited for that purpose. However, the majority's decision here, while encouraging railroads to adopt the EIA index, stops short of mandating its use.

I believe that mandating a single, well-recognized index that carriers must use in calculation of their fuel surcharges would make rail fuel surcharges more transparent to the shipping community, to the public, and to this Board; and is essential to insure comparability between the surcharges of different carriers. Indeed, it seems to me that to impose reporting requirements without mandating a specific index, as the majority's decision does here, seriously undercuts the effectiveness of that reporting. I believe that the record compiled in this proceeding demonstrates widespread support for a specific index, and convinces me that use of different indices will detract from the credibility of fuel surcharge programs in the eyes of the shipping public. The record also demonstrates the legitimacy of the EIA index, which correlates closely to other fuel indices including those currently in use by some carriers. I believe that the Board has the statutory power to mandate use of a specific fuel index, both as part of its broad unreasonable practice jurisdiction, and as part of its power to require meaningful reporting by

carriers as needed to carry out its regulatory responsibilities. Therefore, I dissent from the fuel index outcome, while fully supporting the other aspects of this decision.

# PX0654

# Filed Under Seal

# EXHIBIT PX0655

NewsRoom

8/11/05 Fin. Disclosure Wire 23:26:48

FD Wire
Copyright © 2005 CCBN, Inc. and FDCH e-Media, Inc.

August 11, 2005

Q2 2005 **Burlington Northern Santa Fe** Corporation **Earnings Conference Call** - Final

OPERATOR: Ladies and gentleman, good day and thank you for standingby. Welcome to the BNSF Corporation conference call, hosted by MattRose. [OPERATOR INSTRUCTIONS]. As a reminder, this conference isbeing recorded. I would now like to turn the conference over to BNSFChairman, President and Chief Executive Officer, Mr. Matt Rose.Please go ahead, sir.

MATT ROSE, CHAIRMAN, PRESIDENT, CEO, **BURLINGTON NORTHERN SANTA FE**CORPORATION: Thank you, Barb. Good morning everybody and welcome toour second quarter financial presentation. With me here in Fort Worththis morning is Tom Hund, EVP and Chief Financial Officer, Carl Ice,EVP, Chief Operations Officer and John Lanigan, EVP and ChiefMarketing Officer. Our presentation this morning is available bywebcast. I'll start by directing everyone's attention to our firstslide, regarding forward-looking statements. This statement basicallycautions everyone that any forward-looking information presented heretoday could be affected by number of factors including weather,economic conditions, and of course fuel prices. Any of these couldcause actual results to differ materially from our forecastinformation that we provide today.

We will take a look at our results. We are very pleased to reportrecord quarterly earnings per share of $0.96, which is an increase of43% over a very good year second quarter last year. Freight revenuesincreased 15% to a record quarterly high of $3 billion. Of the 15%increase in revenue, 4% was unit growth and 6% was attributable toprice. John will give you a report on all the components by businesssegment in his review. We had double-digit revenue increases in threeof our major business segments-- agricultural, consumer, andindustrial products. For our coal segment, even with slightly lowervolumes, we realized revenue growth of 7%.

As many of you have heard, the lower coal volumes were the result ofweather and track related challenges in the Powder River Basin, whichwe believe cost us $0.02 to $0.03 in the quarter. That aside, wecontinue to see demand for rail transportation in all of our businesssegments. Combining this demand with our focus on running the networkmore efficiently to maximize capacity and controlling costs, we'reseeing continued improvements in our leverage. That was clearlyevident in the 400 basis point improvement in operating ratio to76.7%. Carl will provide an overview of our key productivitymeasurements and the fluidity of our network, as well as a summary ofthe issues and the ongoing remediation in the Powder River Basin. NowI'm going to turn it over to Tom for a detailed review of ourfinancial results.

TOM HUND, EVP, CFO, **BURLINGTON NORTHERN SANTA FE** CORPORATION: Thanks,Matt. Earnings per share in the second quarter, as Matt said, was anall-time quarterly record of $0.96, 43% higher than 2004. Operatingincome in the second quarter was also an all-time quarterly record of$710 million, an increase of $202 million or about 40% highercompared to 2004. And the increase in operating income was driven byfreight revenue growth of 15% and continued strong cost control. Thesecond quarter operating ratio of 76.7% decreased 4 percentage pointsfrom 80.7 last year. Now as always, John will cover revenue and I'llgive the detail on expenses.

Operating expense was $2,428,000,000 for the quarter, or 11.5% higherthan 2004. Excluding fuel, operating expenses were up 6% on volumeincreases of 4% with freight revenues-I'm sorry, on volume increasesof 4% with freight revenues, excluding fuel surcharges, increasing9%. The composition of our expenses is generally in line with whatyou've seen before with the exception of fuel, which has increasedseveral percentage points, while compensation and benefits andmaterial and other has decreased a similar amount versus the prioryear.

Compensation and benefits expense was $849 million, up $31million or4%. Employment increased 5% from 2004 to 2005,with the increaseprimarily in transportation, while compensation and benefits peremployee was down 1%. In the third quarter of 2005, we expectcompensation and benefits to be about 3% higher than the thirdquarter of last year.

Purchased services were $424 million for the quarter. And similar towhat was mentioned last quarter, there were two items that impact thecomparison to the second quarter of 2004. First BNSF logistics, whichcontinues to show significant growth, impacted our purchasedtransportation costs by $8 million which is offset by a similarincrease in other revenue. And second, income generated primarilyfrom customer storage at our intermodal facilities is now classifiedin other revenue. This negatively impacted the purchased servicescomparison to 2004 by approximately $22 million and will continue forthe remainder of the year.

So when you exclude these items, purchased services was up about 12%.This increase is primarily due to higher volume related costs forramping services, locomotive and equipment contract maintenance andhaulage. In the third quarter of 2005, we expect purchased servicesto be about $430 million. Depreciation expense was $268 million andin line with our prior guidance. We expect third quarter depreciationexpense to be about $275million.

Second quarter equipment rents, which includes both locomotives andfreight cars, was $218 million, an increase of $21 million due to thestronger volumes we experienced and higher lease rates. In the thirdquarter, we expect equipment rents to be about 10% higher than thethird quarter of 2004 for similar reasons. Material and other expensewas $208 million, a decrease of $26 million from the prior year,principally the result of lower environmental and asbestos expense.In the third quarter, we expect petroleum and other expense to beabout $200 million.

Fuel expense of 461 million was 41% higher due to record high fuelprices and traffic volumes. We expect third quarter fuel expense tobe about $500 million. Looking a little closer at fuel, in the secondquarter average fuel price per gallon was $1.68 before hedge, or$1.33 after hedge. And turning to our hedge position, we are about48% hedged for the remainder of 2005, using collars and swaps aboutevenly. As we look forward to 2006, we're about 27% hedged and alsohave a small amount hedged in 2007.

As you can see, we anticipate capital commitments for 2005 to be aslight increase from last quarter. The $50 million increase is bothfor expansion and, to a lesser degree, Powder River Basinremediation. Carl will describe the situation in the PRB in moredetail in his section. Other expense for the second quarter was $8million and we expect third quarter to be about $10 million. Thesecond quarter tax rate remained at 38%. And finally, we anticipatefree cash flow to exceed $500 million. Also for 2005, we anticipateour return on invested capital will exceed 9%.

Turning to our share repurchases, we bought back about 3.9 millionshares in the second quarter. Outstanding shares are about 20% lowersince the share repurchase program began in 1998. Now I will turn itover to John for a detailed review of freight revenues by businesssegment.

JOHN LANIGAN, EVP, CMO, **BURLINGTON NORTHERN SANTA FE** CORPORATION:Thanks, Tom. As Matt mentioned, this was a record revenue quarter forus. Two of our business groups, investoral products and consumerproducts, had all-time quarterly revenue records ,while ag and coalhad record second quarter revenues. Our revenue growth is due toseveral major factors. First, revenue ton mile growth of 3%, whichwas driven by the continued economic expansion, record containerimports, the continuing impact of last year's record grain crops,particularly in soybean traffic, and strong utility

demand. Second,ongoing success with price increases, which is reflective of theoverall tightness in serviced transportation capacity and higherRCAF. And third, fuel price recovery. We build about $170 millionmore in fuel surcharge than a year ago, driven by record fuel pricesduring the quarter as well as increased participation rates.

Total freight revenue grew 15% on unit increase of over 4%, led byconsumer products with 9% volume growth. Fuel surcharges for thesecond quarter showed a year-over-year increase of about $170million. Currently over 65% of our revenue is subject our direct fuelsurcharge program. The increase in fuel surcharge revenue is areflection of higher fuel prices and higher volumes. Turning to theindividual business units, coal had a record second quarter withrevenues of $591 million. Conditions on the joint line and the PRBcontributed to the slight volume decline. And Carl will discuss thisin greater detail in a few moments.

We continue to receive inquiries into work with Eastern utilitiesregarding the transportation of PRB coal to their facilities. In ourag products business division, revenues were up 16%. Soybean exportsto the PNW were up by about 300% compared to the prior year. Wheatgulf exports were down 23%, due to an increase in worldwide wheatproduction, which is creating competition for U.S. wheat. Anotherdriver of revenue growth was corn shipments to Mexico, which were up67%. Continuing strong growth, industrial products revenues were upalmost 16%, with an all-time revenue record for any quarter. In fact,nine of our 17 commodity sectors had double-digit growth in thesecond quarter.

Building products continues to lead the way with 23% growth as thestill-hot housing market drives lumber and panel products.Manufactured products also had a strong quarter with 58% growth. Inconstruction products, steel aggregates, clay and cement drove the12% growth. And petroleum products continued double-digit growth,driven by strong LPG, asphalt and fuel-by-rail traffic.

Consumer products had a record all-time quarter with double-digitgrowth of nearly 20% on 9% volume growth. International, perishables,and dry boxcar experienced record all-time quarters, and ourtruckload segment had a record second quarter. International grew 24%as we continue to see strong import demand in the trans-Pacific tradelane. Our domestic intermodal segments continue to benefit from tighttruck capacity. Our truckload segment grew over 30% for the quarterand our perishable segment grew at 24%.

The non-intermodal segments had significant growth, led byautomotive's 30% gain. Our auto franchise is benefiting from a newHonda plant in Lincoln, Alabama, and used vehicle business that westarted handling in October of last year.

Finally, looking forward, we expect to see continued growth duringthe third quarter of 2005. Coal demand is very strong and clearlyexceeds current capacity. The impact of the escalated maintenanceprogram will be modest. We expect to move at least as many tons asthe third quarter of 2004. In ag, we expect PNW in Gulf exports toremain strong. Industrial products should continue to see increasedrevenue growth across all sectors, although volume growth will alignmore closely with current GDP trends, reflecting some softness in afew of the industrial markets. And in consumer, we should continue toexperience solid growth driven by continued strong demand forinternational and domestic truckload services.

We expect trade growth via the West Coast to be exponential to GDPgrowth and truckload growth will continue as a result of the tighttruck capacity I mentioned earlier. We believe the West Coast portsare in good shape to handle the peak season demand this year.Overall, we expect another positive quarter with revenue growtharound 12% to 15%. Carl?

CARL ICE, EVP, COO, **BURLINGTON NORTHERN SANTA FE** CORPORATION: Thanks,John. Good morning, everyone. Once again, the key areas we will bediscussing are service and productivity, highlighting our successfulfocus on maintaining a fluid network while we expand network capacitywith various productivity initiatives. It is important to put ourprogress in context by describing the volume increases we arehandling across our network. GPMs (ph) and unit miles increased 3.7%and 5.8% respectively. It is worth noting that versus 2002, GPMs areup 22% and unit miles are up 27%.

We continue to enjoy record volumes. Although these increases havemade incremental improvement to service more challenging, the sameinitiatives we have under way to create capacity will also continueto improve service to our customers. This slide shows that positiveimpact. You can see that ag and industrial were both up over prioryear and the big story is in consumer, with a 5% increase. In June,consumer on-time performance reached 81%, which was an absolute 14%improvement over June last year.

Car velocity did decline in the second quarter. However, if youexclude coal, velocity is basically flat versus second quarter '04.You can see that we continue to keep our record fluid, as we addinventory at a slower rate than we have units.

One of our key focus areas in keeping our network fluid is drivingbetter utilization of our existing capacity. One of the key ways wedo that, and one of our most important initiatives, is train size.You can see that we had 122.2 units per train in the second quarterof '05, which compared to 116.8 in '04. We're at an all-time high inunits per train, which has enhanced our ability to drive more volumethroughout the network.

For several years, we have reported improvement in our keyproductivity measures of unit miles and gross ton miles per employee.In the current quarter, you can see that while we had about a 5%increase in employees, GTMs and unit miles did not keep pace. And asa result, productivity improvements were mixed for the quarter. Weexpect this situation to be temporary, however. As you are aware,we've hired a significant number of operating employees in the last18 months. As growth continues, we will return to our long-runningtrends of productivity improvement. And of course, we can alwaysadjust by reducing our hiring plans and letting the work forcenaturally attrit if necessary.

Now turning to the Powder River Basin. As Matt and Tom and John havealready mentioned, weather and track related challenges had an impacton our coal volumes during the second half of the quarter. This wasdriven by a confluence of events. When the winter thaw was followedby unusually heavy rain and a major snowstorm the second week of May.The combination contributed to back-to-back to derailmentsexperienced by UP and us on our joint line. A further complicationwas the impact of years of coal dust settling in the ballast, whichprevented water from draining and weakened the underlying trackstructure.

We have reevaluated our original extensive maintenance plan andexpanded it to remedy this situation. Essentially, there are twophases of the plan. The first phase involves tie replacement on thedouble track segment of the joint line. That means we're managing thevolumes on a single track during this work. This is certainly themost challenging period.

We've been working with UP at the operations level and all thenecessary BNSF resources are in place to manage our way through thisphase. Of course the level of loadings will also depend-I'm sorry,excuse me -- I need to mention we also will finish this phase bymid-August. As we told our customers, that's when we should expectvelocity in service to further prove. Of course, this level ofloadings will also depend on the ability of the mines to recover fromtheir issues related to the extensive precipitation this spring.While much has been written about rail issues, the mines have missedopportunities as well. And it's very clear that mines that have madeinvestments in capacity and infrastructure have fared much betterduring this recovery period.

In Phase II, which will continue throughout the remainder of theyear, we'll be working on our triple-track segments, where we willhave the advantage of continuing to have double-track available atall times. While all this is going on, we will continue to focus onoptimizing loading patterns as well as finishing out this year'splanned maintenance program. We always work closely with the mines,utilities and UPs to plan outages when we are scheduling our annualmaintenance and we certainly focused on that process for thisinitiative, including regular and frequent communications.

Regarding our longer-term outlook, it is important that we reduce theamount of coal dust that settles onto the track bed. In fact, we metwith the mines again yesterday to discuss various ways to mitigatethis problem.

Finally, in spite of the work I have outlined, it is worth notingthat UP and BNSF have moved 4% more tons year-to-date on the jointline than last year and 6% more month-to-date in July. Looking at thesecond half of the year, we will be better able to

handle coalvolumes as locomotives should be getting back to the committeddelivery schedule and expansion work we've been doing in locationssuch as Lincoln come on line.

In summary, as we move forward in the third and fourth quarter, wewill continue our focus on the network and velocity and we'll workhard to drive better utilization of our assets and improveproductivity.

MATT ROSE: Thanks, Carl. Turning to our outlook for the third quarterwe expect freight revenue growth of 12% to 15%. And that is on top ofrecord third quarter freight revenue last year. As Carl indicated,we're taking all the necessary steps to keep our network fluid, andthat includes a significant effort in the Powder River Basin.

We've put a plan in place to address the issue and our people aredoing a great job of executing the plan. Regarding coal volumes onthe joint line month-to-date, in July UP and BNSF loadings arerunning about, a little over 61 trains per day or about 6% more thanin the comparable period last year. We expect the joint line to add acouple of trains per day for the third quarter overall and by thefourth quarter, we expect the joint line to exceed the first quarterrun rate this year, assuming strong continued demand and mineproduction.

We began talking with the mines about various long-term alternativesto prevent that future accumulation of coal dust and we are confidentthat the mines will work diligently with both railroads to implementa long-term solution to prevent this from happening. The mines,utilities, and rails should have objectives which are perfectlyaligned. We continue to be optimistic about the future prospects forthe Powder River Basin coal, but our ability to realize thetremendous value of this resource will clearly require that we earnreturns on invested capital will justify adding capacity andcontinuing to keep the railroad infrastructure strong. In themeantime, for the third quarter, we are focused on balancingprofitable growth and continuous improvement in our operations tomaximize overall network capacity, which should result in improvementin our operating ratio of about 200 basis points for the thirdquarter and an increase in earnings per share in the 25% to 30%range.

Regarding our outlook for the full year, we expect freight revenuegrowth in the range of 13% to 15%. We've maintained our operationratio target of below 78%. With more than half of the year behind us,we've increased our target earnings per share to a range of $3.80 to$3.90 per share. We continue to expect return on invested capital toexceed 9% for the year, and we remain optimistic about our futureprospects, our ability to realize increased value for our franchiseand provide superior returns for our shareholders.

At our board meeting last week, we increased our dividends by 18%,which follows dividend increases of 13% last year and 25% in 2003.Finally, we currently anticipate free cash flow, after dividends,will exceed $500 million after adjusting for slightly lowerexpectations for coal, the modest increase to our capital spendingplans, and the recent dividend increase. So Barb, with that, I thinkwe're now ready to open it up for questions.

OPERATOR: [OPERATOR INSTRUCTIONS]. First question is from Ken Hoexterfrom Merrill Lynch. Please go ahead.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Great Congratulations on a nicejob, even in the face of the PRB. But let me ask a couple ofquestions on the PRB there. How many trains are you running on adaily basis now on the joint line versus what were doing before theaccident?

MATT ROSE: As we said, the joint line is producing a little over 61trains per day. Ken, there is a lot of numbers floating around here,so let me make sure we get real clear. We're talking about joint lineproduction, we're talking about July month-to-date, we are averaginga little over 61 trains per day right now. And again, that is rightat 6% more than 2004.

KEN HOEXTER: And what were you running before?

MATT ROSE: Last year, July, 2004, month-to-date was a little over 57trains per day.

KEN HOEXTER: No, what were you running in the early May time frame?

CARL ICE: Year-to-date through April, we were at 63.6.

KEN HOEXTER: Okay.

CARL ICE: As Matt said earlier, once we move out of the first phaseof maintenance, we expect to add a couple of trains and be able to beat approximately that level.

KEN HOEXTER: And that's combined on the joint line or is that justBurlington?

CARL ICE: That is joint line numbers.

KEN HOEXTER: That's combined. So how many are you running shy of wereyou were a couple of months ago? Is it still two to three per day? Oris that number-- it looks you're only, right now, running two tothree down on a complete joint line versus what you were doing beforethe derailment?

MATT ROSE: We are seeing a couple of train impact, as we've said allalong. We have characterized this as a modest decrease. We expect tobe, once the phase two gets completed and going into the thirdquarter, we expect to ramp that back up.

KEN HOEXTER: Right. And I understand the White House has startedasking about the impacts of the PRB. Can you-any commentary that youhave given them?

MATT ROSE: Ken, would you repeat the question?

KEN HOEXTER: I understand the White House has started askingrailroads about the impacts on the PRB as well as the coal companiesto make sure we're not going to see brownouts throughout the rest ofthe summer. Can you give any update on that?

CARL ICE: We haven't heard any inquiries whatsoever. We've not hadany inquiries.

KEN HOEXTER: Thanks a lot.

OPERATOR: Our next question from the line of Scott Flower from SmithBarney. Please go ahead.

SCOTT FLOWER, ANALYST, SMITH BARNEY: Yes, good morning, all. Yes --not to go after a topic that is going to be topical, but just on thePRB, in your fall peak plan and obviously your comments today, youseem fairly sanguine about getting back, excuse the pun, on trackrelative to the trains per day. UP's commentary, as well as theirfall plan, was a little bit more cautious about whether there mightbe some degree of tailover on the maintenance into next year. And I'mjust trying to get a sense if you see or believe there is adifference between your perspectives or is that just semantics interms of is there a possibility that this maintenance work, to anysignificant degree, carries into next year beyond your normalmaintenance plans in the PRB?

TOM HUND: Yes Scott, I think you hit it right. We're going to have amaintenance plan in 2006, like we had one in 2005 and every yearbefore. The way I think about 2006, we're going to expect to beefficient, fluid, and growing demand and making expansions wherethose expansions are warranted.

SCOTT FLOWER: So, I mean, basically you think the short termremediation work beyond some of the long-term issues you talked aboutwill largely be completed this year?

TOM HUND: I do. Again, that is only dependent on the mines and therailroads-- and utilities to some degree-- jointly agreeing upon aplan to prevent this from occurring again over the long term.

SCOTT FLOWER: Okay. Maybe this is a question for John Lanigan. Isthis pushing out some of your test burns? Obviously, understandingstockpile management and doing triage, is pushing out some of thedemand for test burns that you might have had? Do you sense that thisis really more just a deferral on a timing issue or does this causeany of the utilities to think more broadly about risks versus supplyversus how they think about their portfolio, coal-sourcing,longer-term?

JOHN LANIGAN: Yes Scott, I think clearly we have deferred some of thetest burns but we continue to have very active discussions andconversations. We do not see any cessation in the interest in PRBcoal in the east and it is really going to be more of a deferral thananything else in our opinion.

SCOTT FLOWER: Just sticking on bulk for a second, what have oceanspreads done on the grain side? I'm curious whether-I know you talkedabout soybean. But I'm curious about corn and wheat and whatever maybe going out to PNW and how spreads have behaved and what your sensemay be as we look, going forward? My sense has been that thosespreads have narrowed somewhat. And I just want to get your sense aswe look at them today as well as what you think might happen as welook toward 3Q, 4Q?

JOHN LANIGAN: They have narrowed just a little bit from the earlierspring levels. But they're still very favorable, favoring the PNW.

SCOTT FLOWER: What's the order magnitude?

JOHN LANIGAN: About 22 or so.

SCOTT FLOWER: Okay. All right, I'll let someone else have at it.Thank you.

JOHN LANIGAN: Thanks Scott.

OPERATOR: Our next question is from the line of Edward Wolfe fromBear Stearns. Please go ahead.

EDWARD WOLFE, ANALYST, BEAR STERNS: Good morning, guys. A couple ofdifferent things. First on the labor side, we have seen the averagecost per employee go down and I wanted to understand if you talk alittle bit about those drivers and if that is an ongoing expectation?

MATT ROSE: Tom?

TOM HUND: Sure, Ed. We do expect that's probably a continuing trendfor the remainder of this year. We will probably have headcount up inthe 5%-ish range, like we've had the last two quarters. And on a compand benefit per employee, probably be down very modestly. The maindrivers there, first of all, we're more productive in our use ofpeople, so therefore it's reduction of overtime. As we broughtadditional resources on, then additionally we got modestly lowerincentives and some compensation accrual, that's probably to a lesserdegree than the first one. Those are probably the main drivers now.

EDWARD WOLFE: I'm guessing those are drivers, not just the VNI. Butwe've seen it with so many other rails. Is that something as anindustry you see going forward, is better use of labor? Orproductivity a head or is this a one year event as you see it?

TOM HUND: I don't think we can talk about the whole industry, butcertainly at us, it's a phenomenon I think we've seen this year. Aswe go forward, it's all a matter of right sizing your labor force. Imean, eventually I think that you get to the point where you hit amore stable situation, so your year-over-year cops are more normal, Iguess, is what I'd say.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

EDWARD WOLFE: Okay. Going back to PRB for a second, can you talkabout a year ago third and fourth quarter, what the average trainswere?

CARL ICE: Third quarter 2004 on the PRB was 61 trains per day andfourth quarter was 60.6 trains per day.

EDWARD WOLFE: Okay. And as you look out, assuming that you get theseproblems behind you, what do you see at the capacity for '06? Howmany trains per day, as you look out, assuming again that you solvethis issue by the end of the year?

CARL ICE: Ed, we don't forecast the capacity on the joint line. Ithink it's safe to say that we've got fifteen miles of triple trackthat's coming on this year and we've got some more planned for nextyear. As we said all along, as long as the returns warrant, we'regoing to add track capacity to handle the increase in tons. I amvery, very firm in staying by what I've said in the past, and I donot believe that there will be a capacity issue on the joint lineitself. That is, of course, continued upon the mines continuing tomake their investment in terms of both production as well as loadouts.

EDWARD WOLFE: But making that assumption, and maybe that's not a fairone to make, but putting that off the table that the mines areefficient, you were doing 63.6 on average the first four months. I'mguessing on some days you were up in the higher 60s. Is that fair tosay?

CARL ICE: Yes. On some days, sure.

EDWARD WOLFE: Just a question for John. On intermodal growth, as youlook out, we're starting to see shippers diversify from particularlyL.A. and Long Beach a bit. How do you think about that longer term assome stuff goes up Northwest, some stuff goes to the Gulf and soforth, or to Bay Port, for instance?

JOHN LANIGAN: I think a couple thoughts on that, Ed. One is, we serveall the PNW ports and all the ports along the West coast. So from thestandpoint of our balance and our mix, that is a good thing for us.As far as diversions through the Panama Canal to the Gulf Coast orthe East Coast, that trend really started well over year ago. Itstarted shortly after the lockout, which is going on two years agonow. Just with the increased trade with Asia, there is only so manydifferent places that that trade can go and we think that a number ofimprovements have been made in southern California.

And as I mentioned in my remarks earlier, we believe that thesouthern California ports are well-positioned to handle this year'speak. So we think that the growth opportunities on the West coastcontinue to remain strong and over time, we'll continue to monitorthat. And as these bigger and bigger ships continue to come on line,they can't go through the Panama Canal. They can only go to the Westcoast, and that obviously is also in our favor, as well.

EDWARD WOLFE: Okay. And Tom, I don't want to leave you out. On thecash flow side, you talk about generating free cash over $500million. We haven't seen it so far to date. Can you talk a little bitother than the $472 million of CapEx, there's this other net of 205million? What is that?

TOM HUND: Two things are the big drivers there. One is just thetiming of equipment, financings, that get hung up on the statement ofcash flow-those will all be cleared up by the end of the year. Thesecond thing is as fuel prices have run up, the receivables we haveat each quarter end go through, and so you see that at the end of thequarter. Now that will probably be there at the end of the year,assuming fuel prices stay high. We will still have the fourth quarterfuel hedges received in the first quarter next year.

EDWARD WOLFE: Okay. But that other net, what is that in yourinvestment activities on the cash flow?

TOM HUND: That is principally the timing of the equipment financing.

EDWARD WOLFE: Okay. And in the slide 13, where you give $2.15 billionfor '05 capital commitments, what percentage of that are leases?

TOM HUND: I think we've got - Carl, it's about $1.750 is cash,something like that. So the difference is in the 400 range.

EDWARD WOLFE: Okay. And just getting back on the PRB for a second. UPannounced an embargo a couple of weeks ago. Does that changeanything? Is there some potential there for BN as a result of thatembargo? Have you seen any customers start to talk to you as a resultof that?

JOHN LANIGAN: We have not, Ed. We're focused on our eastern testburns and there's been nothing else. We have been focused on servingour customers and making sure that they have adequate supply of coal.As far as the actual embargo, we have not seen any impact for us.

EDWARD WOLFE: Okay. And the eastern test that you refer, doespossibly next year, having to recover with some of the westernutilities, impact the timing of that?

CARL ICE: It possibly could, Ed. It all depends on what the actualdemand is going into next year. We do believe there will be somecarry out from this year on inventory replenishment with western coalcustomers. And we'll have to see how that plays out.

EDWARD WOLFE: A good problem to have, I suppose. Thanks guys for thetime.

CARL ICE: It's a good problem to have.

OPERATOR: Next question is from Randy Cousins from BMO Nesbitt Burns.Please go ahead.

RANDY COUSINS, ANALYST, BMO NESBITT BURNS: Gentlemen, I wonder if youcould speak to your slide 18, which is a deconstruction of yourrevenue growth. Loop back for us, in terms of the guidance that youhave given. How do you see that revenue growth that you got for theyear, I guess for the third quarter-- 13% to 15% for the year and 12%to 15% for the third quarter, breaking down in terms of volume priceand fuel recovery, just notionally?

JOHN LANIGAN: We don't really make those kinds of predictions goingforward because of some of the play in the various numbers. So wereally just try to aggregate on a going-forward basis. So I wouldrather not comment on breaking that down, going-forward.

RANDY COUSINS: Let me ask another question. How long do you think youcan you sustain, given what is in your order book? You mentionedr-calf (ph). How long you think you can sustain sort of same-storesales price increases of 6% or should we start modeling somedeceleration of that or can we actually model something that's alittle higher?

JOHN LANIGAN: Again, that is predicting the future, which is verydifficult. It depends on a lot of factors, one of which is thecontinuing shortage of truck drivers which has had a clear positiveimpact on a number of our businesses. Depending upon how the economycontinues to shape up, obviously GDP growth has slowed this yearversus last year. But the last couple of readings have been that ithas settled out a bit. It is really a combination of things. But ifthe economy feels a constraint in overall service transportationcapacity, then that bodes well for the pricing environment.

RANDY COUSINS: If I can read between the lines then, are youessentially saying that this 6% is not long-term, viable, go-forwardrate, but at least in the short run is kind of a sustainable number?

CARL ICE: Well, it's difficult to say that you could sustain anythinginto the future because you just don't know all the inputs and theimpacts of various world events and activities. But it certainlyfeels like a strong pricing environment right now.

RANDY COUSINS: Okay. Second question. I just want to make sure that Iunderstood this. I think you indicated that the PRB cost you $0.02 to$0.03 in the second quarter. If I understood what you were saying,are you basically saying that as far as the PRB's impact in thesecond- half, we're not going to see that sort of $0.02 to $0.03 dragor is that $0.02 to $0.03 drag still going to carry on? And thereforewhen we look at 2006, we should actually add that back into the 2006numbers?

TOM HUND: I think we'll see a-it'll have some impact for the thirdquarter. We're not going to tell you what we think it is at thispoint in time. We're not going to forecast out in the future. It willhave less measured impact for fourth quarter. It will still be withus in the third quarter, and we expect by the fourth quarter to beloading a lot of coal. I guess that's the perspective that is reallygetting mischaracterized, is the amount of coal that is being loadedup there with the amount of maintenance that is actually takingplace.

RANDY COUSINS: Final question for me. I guess to Carl, you move coalin a lot of different places as well as out of the Powder RiverBasin. Have you gone in and taken a look at the coal beds or thesituation roadbeds that you're sort of seeing from other mine areas,like again, from the PRB North? Do you see any issues, potentialissues there in terms of this coal dust factor?

CARL ICE: No, not to the same extent. We have maintenance plans, ofcourse, on all those lines. And we believe they're sufficient.

RANDY COUSINS: Thank you.

OPERATOR: Next question from John Larkin from Legg Mason. Please goahead.

JOHN LARKIN, ANALYST, LEGG MASON: Good morning, everyone. LastDecember we had heard that CapEx for 2005 would probably not be awhole lot different than $2 billion over the last couple of quarters.That has been inching up a bit. I'm wondering if that is a trend orwhether Carl is going to be able to, in the future, absorb somethingon the order of 5%, 6%, 7% tonnage growth with that large increasesin CapEx in '06 and '07.

CARL ICE: We're not going to disclose our 2006, 2007 capital plansbecause we do not know what they are yet because we're just nowputting through our business unit plans. What we have done withcapital this year is, we have accelerated, modestly though. And Ithink where we think there is sustainable demand and sustainableimproving returns, we have made those appropriate commitments. One ofthe major areas has been in locomotives, which we think are really asafe bet. At the end of the day, you always have to balance in numberof these issues. What we're deeply committed to is improvingshareholder value and sustainable improvements in pre-cash flow thatwill allow us options to do things with. If you look at just what ishappening with our returns on this business, I would make an argumentthat any improvement or any increase we make in capital is beingrewarded back to the shareholders in our improvement in our returns.

JOHN LARKIN: Fair enough. I have another question for John Laniganregarding your decision to move away from rail on boxes and theintermodal business. What type of feedback have you gotten from someof the IMCs and perhaps others that have become reliant on railequipment? Are they going to be able to make the conversion intoowning the equipment themselves?

JOHN LANIGAN: I think you nailed it, that it's the IMCs that have hada concern. Obviously, the other asset owners have their own equipmentand it really does not impact them much at all. Also, John, we have aphase out of this program. It is not a light switch, so we will stillhave this equipment through the peak of this year and into the middleof next year, as well. So it's an early phase out. We're not cuttingthe legs out of the program or anything along those lines. Soobviously, the IMCs have to seek other forms of capacity. Thiscapacity is all not going to exit the market place. It will show upin different areas. And IMCs will

work with other parties, could beother asset owners to acquire capacity or over time, they will decideto lease required capacity themselves like HUB Group has over thelast number of years.

JOHN LARKIN: Then one final one for John. Your truckload partnershipprogram has shown great growth here over the last couple of years.Where do you feel like you are with respect to penetration of thatmarket opportunity? How much do we have to look forward to in thefuture?

JOHN LANIGAN: I think we will continue to see steady growth for acouple of reasons. One, there are still in number of substantialtruckload carriers that are either just scratching the surface ofintermodal programs or not really involved at all. Obviously, wecontinue to talk to those players and anticipate that over time, theywill come into the program. Secondly, with the driver shortagesituation, I think that a lot of the truckload carriers that haveentered this program in the last couple of years have realized what awonderful component to their business that it is, not to having torely to the drivers for the line haul. We just see those carrierscontinuing to try to find new avenues of intermodal opportunitiesthat probably went over the road before. We certainly think thatgrowth over time is sustainable in the sector. .

JOHN LARKIN: Thank you very much.

OPERATOR: Our next question is from the line of John Barnes fromBB&T Capital Markets. Please go ahead.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Good morning, guys. Realquick, John, could you give us an idea that if your fuel surchargethis quarter had been based on the mileage that you're converting toat the beginning of the year, on a mileage mechanism, we still belooking at a similar rate of coverage on the higher fuel cost orwould you actually have come out a little bit better from a mileageperspective?

JOHN LANIGAN: Well, we didn't run absolute comps on the quarter. Butour intent in models that we have run as we go into next year wouldindicate that it would be relatively neutral from an overall impactstandpoint.

JOHN BARNES: Okay, so it would be neutral to the customer and neutralto B&I (ph)?

JOHN LANIGAN: Well, neutral to the overall customer base and neutralto B&I. There will be puts and takes by individual customers.

JOHN BARNES: Okay. Matt, could you give us an idea-- how many milesof triple track rail do you expect in the PRB by the end of thisyear? What would you expect by the end of '06?

MATT ROSE: Well, you are making me do a little math here. The actualjoint line is, what Carl? 88 miles? We've got 280-- we've got abouthalf and half right now. Half is triple track, half is double trackand we're adding 15 miles this year.

JOHN BARNES: Fifteen miles this year? Would you expect to completethe rest of it next year?

MATT ROSE: No. John, what we do, we look at a rolling five-yearforecast of coal demand and then make those investments prior to theyear. We won't add capacity prior to the need to have that.

JOHN BARNES: Very good. In terms of the coal dust issue, given thatthat seems to be part a mine problem and part a rail problem, isthere any discussion with the mines themselves about splitting thecost of that remediation since it is going to be an ongoing problemfor them?

MATT ROSE: We have not gone into the cost side. Our first formalmeeting was yesterday. It went very well. We're still doing a lot oftesting. We've got several different tests that are going to go on inthe next couple of weeks. Several of the mines stepped

up to theplate and agreed to participate in those tests. As far as the cost,we really have not gone there. We know that we should be in perfectalignment with mines, utilities, and railroads on preventing this.This is not something that crept up overnight, it is an issue that isout there and we do not think it is a significant cost issue. Webelieve that once we articulate the damage that it's done and thelack of productivity it has caused, like in the month of May, thatthe marketplace will find a way to absorb that. Again, it is not amaterial amount. We feel like so far we have gotten good support fromthe mines and at the end of the day, this is a long-term issue. Wewould hope to have it resolved during 2006.

JOHN BARNES: Lastly, in terms of the CapEx numbers, is there any areaof your CapEx spend that is being diverted to the remediation effortsin the PRB or is it just the incremental CapEx increase that we'reseeing? Is that just the dollars being used on the PRB?

MATT ROSE: A portion of the incremental dollars is going to PRB. Iwould characterize the-- you have to build into these things becausewe had a pretty significant maintenance plan in the PRB and we haveincreased that because of this work. It is an increase in CapEx.Again, I would not classified as material change in our CapEx.

JOHN BARNES: Okay. So no deviation from the double track efforts outof the L.A. basin or anything like that?

MATT ROSE: No, not all.

JOHN BARNES: Okay. Very good. Thanks for your time, guys.

OPERATOR: We have a question from James Valentine from MorganStanley. Please go ahead.

JAMES VALENTINE, ANALYST, MORGAN STANLEY DEAN WITTER: Thanks.Congrats on a great quarter.

TOM HUND: Thanks, Jim.

JAMES VALENTINE: The first question is the industrial yields were upa very impressive 13% and that compares to about a 9.6% run rate inthe first quarter. I guess I'm specifically trying to figure out, isthis new run rate sustainable, taking out the impact from fuelsurcharge?

TOM HUND: Jim, you're asking about the same store prices?

JAMES VALENTINE: The yields and the industrial segments were up about9.6% in the first quarter year-over- year and they're up 13% in thesecond quarter. Year-over-year fuel surcharge is about the same inboth quarters. So you see the nice big step up here in industrialyields and I'm just trying to figure out if this is possibly due tosomething going on where you want some business from UP or somethingthat's temporary? Or is it realistic that this is going to continueinto the future?

TOM HUND: It is an outcome of longer-term strategy and push thatwe've made on price that we've been talking about for the last twoyears. Obviously, when you only have a portion of your contractscoming due on an annual basis, it takes a while for things to catchup and to start to sustain. Part of this is just bearing the fruit ofa lot of hard work of the last couple of years.

JAMES VALENTINE: Okay, so we'll assume that that can keep at a fasterrun rate going forward. The second question goes back to the wholecoal dust issue. Somebody I talked to that's pretty familiar withwhat goes on up there is saying that part of the reason why you haveall the coal dust on the rails is because of the railroad's efforts-- noble efforts -- over the years to try to put more coal in each ofthe cars. I've watched that over the last 10 years as railroadsbecome more productive. Unfortunately, what I guess it does, itcreate a higher profile of coal, but then it blows off as the trainsare leaving the basin. Someone was saying to go in and coat the coalwould be something on the order of magnitude of about $0.15 a ton,which would be about $30 million for year for BN. And Matt, to yourpoint, that's not a big number. Does that sound like it may be one ofthe solutions or would

it be something more dramatic, where you havemight have to actually take tons out of the cars? Does that $30million sound at least somewhere in the ballpark of magnitude?

TOM HUND: Jim, I think the first half of your statement is all spoton. I think the railroad industry collectively, BNSF, we all havebeen focused on productivity and one way is to get more tons per car.And that's led to some pretty creative loading alternatives in lostof things, but specifically in the Powder River Basin. But it's alsobeen in ag and other things. As far as cost, again, to imply that atleast BNSF would be financially responsible for this, I am not goingthere at all.

What the cost would be, we don't know. We think we can make, quitefrankly, a lot of change in the loading profiles without anyadditional costs. There are lots of ways to reduce this coal dustproblem. One of those is profiling of the car itself. That is oneaspect that we are looking into that will be in the test. The otheraspect is to put up some sort of a dust control, if you will, on thecoal itself. We're looking into that, as well. We're going to look atboth ways. Again, it's just too early to say. But I think at the endthe day, if you look at the value of PRB coal, this is not somethingthat is going to change the market of PRB coal whatsoever.

JAMES VALENTINE: I'm fully with you. Fully agree. I just wanted tomake sure that it was not a major issue. If I could ask John aquestion here about freight spreads. At least the way we're lookingat spreads, and maybe we have different OD pairs (ph) here, but itlooks like the ocean spreads went from about $25 a ton at their peakdown to about $16.50 right now. And if I've got that right, how muchlower could they go before you start to have to rethink your currentpricing strategy in terms of impacting fourth quarter in '06 eitherfor grains, or either yields over even volumes?

TOM HUND: Directionally, you're correct Jim. Our numbers are a littledifferent, but again, you may be at looking different OD pairs or atleast different mix of OD pairs than we have experience. It wouldhave to go, I think, a number of dollars lower before there would beany impact on the direction in which the grain would be pulled. As wecome into the fall season, depending on the harvest and other bulkcommodity issues around the world, it could firm up and who knowswhat direction it might go in.

JAMES VALENTINE: Okay, Great. The last question, either for Tom orCarl. Carl, you did mention that there wasn't labor productivity inthe quarter in your hiring about at the same rate as your car loadgrowth. I wasn't clear what is causing this, because I thought a yearago you were also higher in anticipation of better growth. I'm tryingto figure out what would cause this, now we are lapping this, andeven Tom's point about 5% headcount growth in the second half of theyear. It just seems like maybe we would see more productivity or doyou have more retirees right now, more training? If you could give ussome color on that.

CARL ICE: Sure. We did hire last year, but we did not hire reallyquite as fast as growth. If you remember, there were a few times wewere concerned about resources, although I believe we did a very goodjob of managing through that. So part of what's happened here iswe're using, what Tom described as better, we have people with lessovertime, we have people that are turning less on their rests and soforth. So it puts us in a little better position to handle things.But most importantly, I think this is just a lead and we areexpecting, as we said, the third and fourth quarter, as they usuallyare, are bigger. So we are getting people into position. As we growinto that, we will be perfectly fine. You will see us go back to ourlonger run productivity improvements. If for some reason all thatdoes not happen, all we've got to do is adjust our hiring plan,because as we've told you several times, attrition could be largeover the next few years and we can pretty quickly mitigate anyissues.

JAMES VALENTINE: Okay, great. Thanks.

OPERATOR: Our next question is from Christine Kubaki (ph) from A.G.Edwards. Please go ahead.

DONALD BROUGHTON, ANALYST, A.G. EDWARDS: Actually it's DonaldBroughton. This is a question really for Carl. I know last fall, theslow orders in the Powder River Basin had fallen to a three year lowafter the April snow storms and the May rains, that really came to anend. Slow orders-you had slow orders on what about, 50% of the trackimmediately thereafter?

CARL ICE: Something in that range, yes.

DONALD BROUGHTON: And that's fallen-- I know you've got the problemconcentrated really north of Bill (ph), south of Gillette (ph). Thequestion is, how many of the track miles are the slow orders still ineffect?

CARL ICE: We are down in the 10% range, something like that.

DONALD BROUGHTON: That low now?

CARL ICE: Our plan was to get the slow orders back down and get to alow level before we started the maintenance plan. We pretty wellaccomplished that. We did that by going and attacking the problemimmediately, but that was not a long-term fix. So that got us into aposition to be able to operate as we have been and then we followedback up with the bigger capital programs that put us in the long-termsituation.

DONALD BROUGHTON: I know you've got 18 mines, nine of them are on thejoint line, nine of them are north of Gillette. I'm looking at notessaying that historically, you've got about 20% of your PRB volumenorth of Gillette. Has that changed? Have you ended up pulling morefrom the northern mines, mines north of Gillette, the ones that thatare not on the joint line?

MATT ROSE: We tried to. Quite frankly, it's a little confusing whymore of the utilities haven't been willing to source more north. Itcan be one of a couple different options. As we know, we have hadproblems on the south end of the mine -- on the joint line, we'vetried to move more north and we have moved modestly more, but not asignificant change.

CARL ICE: 20% is a little low, though.

DONALD BROUGHTON: Okay.

MATT ROSE: It's more like 2%.

DONALD BROUGHTON: Appreciate the clarification. Good luck, gentlemen.

OPERATOR: Next question is from Thomas Wadewitz from J.P. Morgan.Please go ahead.

THOMAS WADEWITZ, ANALYST, J. P. MORGAN: Good morning and nice, strongresults. I've got two different questions for you. They're probably alittle bit of a different angle on some things that have already beenasked. It would appear pretty reasonable to think that there would besome pent-up demand for coal transport looking into 2006, and I'mwondering if you can give us a sense of what your view on that wouldbe. Do you think that there will be a pretty significant carry overor do you think there will be still very strong interest in testburns and so forth? Is it possible you could have coal volumes up 10%next year or is that just beyond what you'd like to think about interms of your capacity and any amount of pent-up demand?

MATT ROSE: It is not beyond our capacity, Tom. But we're not going togive a forecast on 2006. I think we would say a couple of things. Oneis we believe that there will definitely be a carryover out of 2005into 2006. That's point one. Point two, which I think is probablyeven more relevant, is that over the years, utilities have reallyfocused on narrowing down their stockpiles. They've done a prettygood job with it. I think that this will probably have somewhat of areverse effect. If utility had gone from 30 days to 20 days, theyprobably may go to 25 days, or something like that. I don't thinkthat there will be a downward movement of inventory levels in theutilities overall. Which is fine, I mean, that's demand either wayyou cut it. We definitely think there will be some carryover, whatthat will be, we don't know. Do we have the capacity to handle it?Absolutely. So it's kind of that order and magnitude.

CARL ICE: Tom, on the test burns, we clearly think that those willcontinue to move forward and that the interest will be maintained. Wehaven't had any indication whatsoever that any of the easternutilities that have been interested in the test burns are going toback off of them.

THOMAS WADEWITZ: Okay. Great. In terms of the pricing store, I knowyou've been asked a number of questions about this, but I'm wonderingif you could give us as sense of the contracts that you renewed insecond quarter. Any kind of flavor on the type of rate increasesyou're getting and how that might have compared to what you weregetting in first quarter or even second half of last year? Justdirectionally, are you getting more or has that level of priceincrease been reasonably stable the last few quarters?

CARL ICE: Tom, I think as you well know, nobody lives at average anddepending upon the commodity and the business unit and the businesssector, price increases are different just because of the differentdynamics within those sectors. The pricing environment has beenstrong for the last three or four quarters, and hopefully willcontinue on with tight capacity overall in the marketplace.

THOMAS WADEWITZ: Is your sense that it's, what you're getting isaccelerating somewhat? Clearly we see the yield numbers continue toshow some acceleration, even in second quarter versus what you'regetting in first quarter.

CARL ICE: I think it's really more the sequential accumulation overthe last several quarters.

THOMAS WADEWITZ: Okay. And then just one last one for you on thetruck load side of intermodal. What does it look like in terms of newcustomers that are testing that? Have you seen a significant amountof truckload customers really ramp that up? Or what is it that isreally driving that very significant growth that you're still seeingat truckload intermodal?

CARL ICE: We have had some new customers, but not of the names thatyou guys necessarily follow because a lot of them are smaller,private guys. There are still a few bigger, public guys that are justgetting into intermodal and we continue to work with them. Butoverall, it's our core base of intermodal customers that continue toshift business to intermodal and probably more importantly, a coregroup of shippers who are specifying intermodal as the mode that theywant to use from both a cost and overall service perspective.

THOMAS WADEWITZ: Do you think there is much sensitivity to truckcapacity in the growth you're seeing in that truckload segment or doyou think that's more a function of high fuel prices and otherfactors that will continue to drive that?

CARL ICE: I think historically there has been some sensitivity. Ithink they'll be less going forward for a couple of reasons. There'sa number of the truckload carriers have made intermodal a much biggerpart of their portfolio, quite frankly they could not turn on a dimeand shift a lot of that business back to the road because they havetoo much of their business and their infrastructure designed aroundintermodal. And when they think about the pain and suffering of goingthrough the driver situation, I just don't think they're going toshift back quickly, even if drivers freed up in the near term.

THOMAS WADEWITZ: Great. Okay, thank you for the time.

OPERATOR: The next question is from Jordan Alliger from DeutscheBank. Please go ahead.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANK: Yes, hi. Morning. Just aquick question again on price and I know it's tough to forecast. Butfrom a sensitivity standpoint, care to venture some sense for whatthe break point would be needed on the rate of economic growth orindustrial production growth, where it did become more difficult tosustain those mid-single digit type price increases?

CARL ICE: I think that's too tough to predict because you have got tocompare the available capacity in the various modes, along with thegeneral economic growth of the economy. You could put together aspreadsheet that has lots of columns to try to figure out differentpoints on that puzzle.

JORDAN ALLIGER: Any sense from your intermodal related business thatpeople are or have been or will look to ship in advance of the timingthey did in past years?

CARL ICE: I'm not sure which to me by shift in advance?

MATT ROSE: Do you mean for fall peak?

JORDAN ALLIGER: Correct.

CARL ICE: I think we see a normal progression coming up this year.The peak looks to be very manageable this year from a number ofstandpoints. One is the improvements in the Southern Californiaports. Also, just what's going on in the economy in general and justthe ability of all the parties involved to handle intermodal becausewe've got a number of intermodal customers who came into the foldwithin the last year to 18 months. They're going to be entering theirsecond peak as an intermodal player and they're going to be better atit. It just feels like everything is lining up for a smoother peakthis year.

JORDAN ALLIGER: Just final question. When do you have to startthinking about or making decisions on fuel hedge activity, if notthis year, but into 2006.

JOHN LANIGAN: Ongoing basis.

JORDAN ALLIGER: Ongoing.

JOHN LANIGAN: Yes.

JORDAN ALLIGER: Okay, thank you very much.

JOHN LANIGAN: You bet.

OPERATOR: You have a question from the line of Jason Seidl from CSFB.Please go ahead.

JASON SEIDL, ANALYST, CREDIT SUISSE FIRST BOSTON: Morning, gentlemen.One quick question for you. You had some very good pricing gains inthe quarter and I was wondering what percentage of your business isgoing to roll over in new contracts in the second half of this yearand what percentage rolls over in '06.

CARL ICE: Somewhere between 20% to 25% rolls over annually, Jason,and so by average, probably 10% to 12% in the second half of theyear.

JASON SEIDL: 10 to 12%, second half of the year?

CARL ICE: 10 to 12%, somewhere in that range.

JASON SEIDL: Okay. Fair enough. Thank you so much.

CARL ICE: You bet.

OPERATOR: You have a follow-up question from Scott Flower from SmithBarney.

SCOTT FLOWER: Yes, thanks very much. I just wanted to get a sense,and I know there's some moving parts and pieces in your expenses, butobviously unit volumes, depending on how you look at them, are 3% to4%, and ex-fuel expenses were up 6. And I know we sort of broachedaround different topics on labor productivity, but yet with theaverage comp for employees being down, but that didn't necessarilydegrade the relationship between those two variables. I'm justwondering, understanding productivity versus unit growth, is this adigestion issue, is this some of the catch-up issues we talked aboutthat you had pulled the operation so tightly with the surge of unitbombs last year that this is a little bit of slackening to catch upfor this year's sort of move to the peak in the third and fourthquarter. I'm just trying to understand the relationships betweenexpensive versus unit volume variables and how I might be thinkingabout them going forward.

JOHN LANIGAN: I'm little unclear as to the question. You are sayingthat absent fuel, expenses are up 6%.

SCOTT FLOWER: Right. Unit volumes are up 3% to 4%, and I wouldtypically view unit volumes or physical activity as being what shoulddrive your costs. So if costs are going up 6% and units are up 3% to4%, that's not a relationship, typically, I would expect you allwould want to see for very long. I'm trying to understand why thathappened? Where do we go? Does that get better?

JOHN LANIGAN: First of all, our cost units are up 4.4%. It is not 3%to 4%. RTMs are up 3 but you also have to then look at GTMs. I'd sayit's probably safer to say it's closer to 4. We've got two things,one is inflation, obviously, and the cost structure. And in certainareas that has been a little higher than one might ordinarily think.As we talked about when I gave the comments on equipment rents -- youget into, it's a combination of both the increased volume but alsothe additional rents that you are having to pay because of thetightness in capacity. That is a little bit. You've got inflationgoing on and then offset by productivity.

And those are really the levers you're pulling. So I think you'vecovered them all. It is volume, it is inflation, offset byproductivity and what we've got, I guess, is then, for the quarteralone, a 2% spread. And yes, I guess, we prefer to see more of theproductivity offset some of the inflation, but it's not out of therealm of reasonableness here, I guess is what I'd say.

SCOTT FLOWER: Do you expect as we look towards second half that itwe'll still have an unfavorable spread of expenses verses unitvolumes? Or as you get toward seasonal peak will that reverse?

JOHN LANIGAN: I'm not sure that we're going to be able to offset. Iwould not call it an unfavorable spread, let's start out with that.And I would say that if we are not able to offset 100% of inflationand other changes in our cost structure with productivity. I thinkprobably in the back half of the year, that's probably still going tobe somewhat of case. It should be modest.

SCOTT FLOWER: Alright. Thank you.

OPERATOR: Follow-up question from Edward Wolfe from Bear Stearns.Please go ahead.

EDWARD WOLFE: Just a question on the fuel side. My best guess backingin is that you guys are recovering a little over 50% on the fuelsurcharge. Is that a fair guess?

CARL ICE: No, we have over 65% coverage on our fuel surcharge, Ed.

EDWARD WOLFE: I will go over that with you offline. But UP isreporting over 70% at this point. Is some of it that you've relied alittle bit on the hedge or is it a difference in terms of whencontracts come up? Where do you think this can be a year from now?Two years from now?

CARL ICE: It is all about timing, Ed. We have a zero tolerancepolicy. Any contract it comes due will be renewed with a fuelsurcharge and we have been in that mode for a year-and-a-half andhave been very successful in implementing fuel surcharge. So it's allabout timing. Our longer-term goal is to get to well over 90% fuelsurcharge coverage, and that will take several years because we havea number of coal contracts that are very lengthy in nature and tendto be high dollar contracts. So that will take several years to getthere, but we will make steady progress every year.

EDWARD WOLFE: If you're at 65% now, a year from now, over 70somewhere? Is that a fair guess?

CARL ICE: Yes, that is fair.

EDWARD WOLFE: Okay, thanks guys.

OPERATOR: Thank you . You have no further questions in queue. Pleasecontinue.

MATT ROSE: One follow-up comment, on the expense change, too. Onpurchased services, as I described in the comments, we've got thisreclassification and also logistics costs. Those are gross ups inrevenues. But the combination of those two are $30 million. That's a1% difference right there. Does that make sense? Okay, you'reprobably not queued in. But anyway, there is a 1% difference that'snothing more than classification. Okay, with that, I think we'redone. We appreciate your interest. We feel really good about thequarter and we will look forward to talking to you next quarter.Thanks very much.

OPERATOR: Ladies and gentlemen, that concludes your conference fortoday. Thank you for your participation and using AT&T ExecutiveTeleconference. You may now disconnect.

[CCBN reserves the right to make changes to documents, content, orother information on this web site without obligation to notify anyperson of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS. Copyright 2005, CCBN, Inc. All RightsReserved.]

[Copyright: Content copyright 2005 CCBN, Inc. ALL RIGHTS RESERVED.Electronic format, layout and metadata, copyright 2005 FDCH e-Media,Inc. (f/k/a Federal Document Clearing House, Inc.) ALL RIGHTSRESERVED. No license is granted to the user of this material otherthan for research. User may not reproduce or redistribute thematerial except for user's personal or internal use and, in suchcase, only one copy may be printed, nor shall user use any materialfor commercial purposes or in any fashion that may infringe uponCCBN's or FDCH e-Media's copyright or other proprietary rights orinterests in the material; provided, however, that members of thenews media may redistribute limited portions (less than 250 words) ofthis material

without a specific license from CCBN and FDCH e-Mediaso long as they provide conspicuous attribution to CCBN and FDCHe-Media as the originators and copyright holders of such material.This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: **BURLINGTON NORTHERN SANTA FE** CORP; DEUTSCHE BANK AG; BEAR STEARNS COMPANIES INC; LEGG MASON INC; MORGAN STANLEY; GILLETTE CO (THE)

News Subject: (Corporate Financial Data (1XO59); HR & Labor Management (1HR87); Productivity (1PR67); Business Management (1BU42); Compensation (1CO80); Sales (1SA20); Major Corporations (1MA93); Company Profiles (1CO63); Joint Ventures (1JO05); Contracts & Orders (1CO29); Profit Warnings (1PR33); Investment Banking (1IN86); Economics & Trade (1EC26); Economic Indicators (1EC19); Corporate Groups & Ownership (1XO09))

Industry: (Financial Services Networking (1FI57); Freight Transportation (1FR88); Railroads (1RA98); I.T. in Investment Banking (1IT47); Networking Administration (1NE06); Transportation (1TR48); Enhanced Services (1EN42); Freight Railroads (1FR84); Financial Services (1FI37); I.T. in Financial Services (1IT24); Telecom Services (1TE09); I.T. (1IT96); Land Transportation (1LA43); Railroad Equipment (1RA68); I.T. in Telecom (1IT42); Network Benchmarking & Measurement (1NE97); Passenger Railroads (1PA89); Networking (1NE45); Telecom (1TE27); I.T. in Transportation (1IT48); Agriculture (1AG63); Agriculture, Food & Beverage (1AG53))

Region: (Panama (1PA92); North America (1NO39); Central America (1CE62); Latin America (1LA15); California (1CA98); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (BARB; BEAR STEARNS; BMO; BNSF; BNSF CORP; BURLINGTON; BURLINGTON NORTHERN; CCBN; CCBN INC; CORPORATION; DEUTSCHE BANK; EVP; GDP; GILLETTE; HOUSE INC; IMCS; INSTRUCTIONS; JOHN LANIGAN; JOHN LARKIN; LEGG MASON; LOOP; LPG; MERRILL LYNCH; MORGAN STANLEY; MORGAN STANLEY DEAN WITTER; NORTHERN; NORTHWEST; OD; OPERATOR; PNW; PRB; PRB NORTH; RCAF; SANTA FE CORP; SITE; TRANSCRIPTION; TRANSCRIPTS; USERS; VNI; WHITE HOUSE) (A.G. Edwards; Building; Carl; Carl Ice; Donald Broughton; EDWARD; EDWARD WOLFE; Employment; FDCH e-Media; GPMs; J. P. MORGAN; J.P. Morgan; JAMES VALENTINE; Jason; Jim; John; John Barnes; John Lanigan; JOHN LARKIN; Ken; Manufactured; Matt; Matt Rose; Outstanding; RTMs; Scott; SEC FILINGS; Thomas Wadewitz; Tom; Tom Hund; Total)

Word Count: 13338

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0656









# Study of Rural Transportation Issues

The United States Department of Agriculture

The United States Department of Transportation

Published April 2010

## Rail Rates

The passage of the Staggers Act in 1980 enabled railroads to increase their return on investment, in part by allowing differential pricing in which different rates can be charged to different shippers and therefore some shippers bear a greater share of fixed costs than others. Agricultural commodities have historically carried higher rates than traffic more subject to competition from other modes. When selling their products farmers have little control over the prices they receive, so higher transportation costs result in lower net prices to farmers. This not only can affect the economic vitality of U.S. agriculture but also the competitiveness of U.S. agricultural exports in world markets.

Nationally, not only are rail rates for grain and oilseeds higher than those for other commodities, but the rates have increased more rapidly during the four years since 2003. Rail rates for grain and oilseeds rose 46 percent from 2003 to 2007; rates for all other commodities increased 32 percent in the same period.

Railroads have structured their rates to favor larger movements. There is a significant rate advantage for the largest trainload shipments of grain and oilseeds. Many costs that were once included in railroad rates have been shifted to shippers, such as car ownership. Railroads have also paid billions in merger premiums, which causes higher rates for shippers.

Railroad rates have increased significantly since 2004, increasing railroad profitability. In part, this has resulted from a lack of rail capacity and a need for additional investment in locomotives, freight cars, and fixed plant. In part, the increase in rates has been a response to rising costs, as pointed out in a report by Christensen Associates in 2007.

There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001 to 2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel.

Bottleneck rate situations constrain the options available to shippers, decreasing routing efficiency, increasing rates, and increasing the market power of railroads.

## Rail Service

The railroad share of the grain transportation market has been shrinking in recent years, in part because of changes in the way grain is marketed and in part because of increases in rail rates. The closure of many rail branch lines and a shift to “shuttle train” service by railroads has resulted in the closure of many country grain elevators, resulting in the movement of grain for longer distances on rural roads to shuttle train terminals.

The U.S. railroad system is a network. The unrestricted interchange of traffic among railroads could allow shippers to achieve higher efficiency and better access to markets. In many cases, however, railroads restrict network interchange—restricting shipper choices of markets in the process—in an effort to increase profitability.

**Figure 7-17: Railroad fuel surcharges for grain by quarter***




* For the 7 Class I railroads operating in the United States. Weighted average fuel surcharges per carload were estimated by multiplying the average length of haul for grain by the quarterly weighted average fuel surcharge per carload mile. Weighted average fuel surcharge per carload mile prior to 2Q '06 was estimated using mileage-based fuel surcharge formulas for individual railroads.

**Source: Class I Railroad quarterly filings to the Security and Exchange Commission**

Shippers bear increasing responsibility for car supply and other functions historically provided by the railroads. Car ownership by Class I railroads has decreased from 56 percent in 1981 to 27 percent in 2007.

Rail rates have increased rapidly since 2004 resulting in a surge of railroad profitability. The increase reflects not only increased rail costs, but aggressive pricing and over-recovery of fuel costs. Fuel surcharges seemingly should reimburse railroads for the increase in fuel costs, not be sources of additional revenue. Fuel surcharges per grain carload in 2007 were 55 percent higher than the incremental increase in the cost of fuel.

Billions of dollars in premiums paid as part of mergers are included in the determination of railroad revenue adequacy, resulting in higher rail rates for shippers than otherwise would be the case.

Bottleneck rates place an artificial limit on options open to shippers, increasing the number of captive shippers and increasing railroads' monopoly power. Economic efficiency is sacrificed, shipper costs are increased and fuel consumption is increased under bottleneck situations. Mandating that rates for bottleneck segments be provided and subjecting them to appeal would make the market more competitive.

However, despite the cost increases and shifting of costs to shippers, the rail share of grain and oilseed exports has risen over the last 2 decades.

## Excessive Fuel Surcharges

Fuel surcharges are designed to allow railroad firms to recover the costs caused by abnormally high fuel prices; normal fuel costs have always been included in the rail rate determination. Fuel surcharges, however, have become profit centers for railroads. During September 2008, when fuel surcharges peaked, they varied from 46.58 cents per car mile to 87 cents, a difference of 87 percent. USDA has shown (in Chapter 7: Rail Rates) that the fuel surcharges railroads have collected exceed the additional cost of the fuel by 55 percent.

**Figure 15-9: A locomotive refueling**




**Source: ©R. Franz**

## Increasing Awareness of Regulatory Costs

Regulations dealing with homeland security, environmental mitigation, and safety help the agricultural sector's long-term sustainability, but increase operating costs for carriers, adding to the transportation costs ultimately borne by agricultural producers. Increased awareness of the added costs these programs bring could help with the coordination of regulatory policy-making and raise awareness of the impacts on transportation options for rural America.

# EXHIBIT PX0657

# Intentionally Omitted

# EXHIBIT PX0658

# Intentionally Omitted

# EXHIBIT PX0659

# Intentionally Omitted

# PX0660

# Filed Under Seal

# EXHIBIT PX0661

# STB EX PARTE NO. 582 (SUB-NO. 1)

# MAJOR RAIL CONSOLIDATION PROCEDURES

*Decided June 7, 2001*

AGENCY: Surface Transportation Board, DOT.
ACTION: Final rules.

SUMMARY: The Surface Transportation Board (STB or Board) adopts final regulations governing proposals for major rail consolidations. These new rules substantially increase the burden on applicants to demonstrate that a proposed transaction would be in the public interest, by requiring them, among other things, to demonstrate that the transaction would enhance competition where necessary to offset negative effects of the merger, such as competitive harm or service disruptions.

EFFECTIVE DATE: These rules are effective July 11, 2001.

FOR FURTHER INFORMATION CONTACT: Julia M. Farr, (202) 565-1613. [TDD for the hearing impaired: 1-800-877-8339.]

SUPPLEMENTARY INFORMATION:

TABLE OF CONTENTS

BACKGROUND . . . . . 545

OVERVIEW . . . . . 546

REVISIONS TO § 1180.1 General policy statement . . . . . 551
§ 1180.1(a): General . . . . . 551
§ 1180.1(b): Consolidation criteria . . . . . 552
Size of carriers subject to these rules . . . . . 552
Alliances and joint ventures . . . . . 553
§ 1180.1(c): Public interest considerations . . . . . 553
Responses to railroad arguments about our "presumptions." . . . . . 555
1. Public benefits may be limited . . . . . 555
2. Some competitive harms are increasingly difficult to remedy . . . . . 555
3. Transitional service disruptions are likely . . . . . 557
Benefits obtainable by other means . . . . . 558
Financially unsound applicants . . . . . 559

§ 1180.1(c)(1): Potential benefits . . . . . 559
Benefits not realized. . . . . . 560
§ 1180.1(c)(2): Potential harm . . . . . 561
(i) Reduction of competition . . . . . 561
(ii) Harm to essential services . . . . . 562
(iii) Transitional service problems . . . . . 562
(iv) Enhanced competition . . . . . 562
Preserving major gateways . . . . . 562
Preserving bottleneck rate relief . . . . . 564
Preserving essential services . . . . . 564
Shortline and regional railroads and ports . . . . . 565
Financial issues . . . . . 566
Voting trusts . . . . . 566
Lumber issues . . . . . 568
§ 1180.1(d): Conditions . . . . . 569
Conditions are still primarily remedial . . . . . 569
Conditions are not appropriate for carriers that are not applicants or controlled by applicants. . . . . . 570
§ 1180.1(e): Employee protection . . . . . 571
CBAs . . . . . 571
Moving . . . . . 572
§ 1180.1(f): Environment and safety . . . . . 573
§ 1180.1(g): Oversight . . . . . 577
§ 1180.1(h): Service assurance and operational monitoring . . . . . 578
§ 1180.1(i): Cumulative impacts and crossover effects . . . . . 581
Downstream effects . . . . . 582
Upstream effects . . . . . 583
§ 1180.1(j): Inclusion of other carriers . . . . . 584
§ 1180.1(k): Transnational and other informational issues . . . . . 584
§ 1180.1(l): National defense . . . . . 585
§ 1180.1(m): Public participation . . . . . 586

TECHNICAL and INFORMATIONAL REVISIONS . . . . . 586
§ 1180.0 Scope and purpose. . . . . . 587
§ 1180.0(a): General . . . . . 587
§ 1180.0(b): Waiver . . . . . 587

§ 1180.3 Definitions. . . . . . 587
§ 1180.3(a): Applicant . . . . . 587
§ 1180.3(b): Applicant carriers . . . . . 588

§ 1180.4 Procedures. . . . . . 588
§ 1180.4(a)(1): General . . . . . 588
§ 1180.4(a)(4): Service Lists . . . . . 589
§ 1180.4(b)(4): Prefiling notification . . . . . 589
(i) A proposed procedural schedule . . . . . 589
(ii) A proposed draft protective order . . . . . 589
(iii) A statement of waybill availability for major transactions . . . . . 589

Case 1:07-mc-00489-BAH Document 1229-6 Filed 11/22/24 Page 870 of 1523



(iv) Applicants may also propose the use of a voting trust at this stage, or at a later stage, if that becomes necessary . . . 589
Procedural schedule . . . 589
Protective order . . . 590
Traffic tapes . . . 591
§ 1180.4(c)(6): Application format . . . 591
§ 1180.4(d): Responsive applications . . . 591
§ 1180.4(e): Evidentiary proceeding . . . 592
§ 1180.4(e)(2). The evidentiary proceeding . . . 592
§ 1180.4(e)(3). A final decision . . . 592
§ 1180.4(f): Waiver or clarification. . . . 592

§ 1180.6 Supporting information. . . . 592
§ 1180.6(b)(1): Form 10-K (exhibit 6) . . . 592
§ 1180.6(b)(2): Form S-4 (exhibit 7) . . . 593
§ 1180.6(b)(3): Change in control (exhibit 8) . . . 593
§ 1180.6(b)(4): Annual reports (exhibit 9) . . . 593
§ 1180.6(b)(6): Corporate chart (exhibit 11) . . . 594
§ 1180.6(b)(8): Intercorporate or financial relationships . . . 594
§ 1180.6(b)(9): Employee impact exhibit . . . 595
§ 1180.6(b)(10): Conditions to mitigate and offset merger-related harms . . . 596
§ 1180.6(b)(11): Calculating public benefits . . . 596
§ 1180.6(b)(12): Downstream merger applications . . . 597
§ 1180.6(b)(13): Purpose of the proposed transaction . . . 597

§ 1180.7 Market analyses. . . . 597
§ 1180.7(a): For MAJOR and SIGNIFICANT transactions . . . 597
§ 1180.7(b): For MAJOR transactions . . . 597
§ 1180.7(c): For SIGNIFICANT transactions . . . 598

§ 1180.8 Operational data. . . . 599
Renumbering prior § 1180.8(a) and (b) . . . 600

§ 1180.10 Service assurance plans. . . . 600
For MAJOR transactions . . . 600
(a) Integration of operations. . . . 600
(b) Coordination of freight and passenger operations . . . 600
(c) Yard and terminal operations . . . 601
(d) Infrastructure improvements . . . 601
(e) Information technology systems . . . 601
(f) Customer service . . . 601
(g) Labor . . . 601
(h) Training . . . 601
(i) Contingency plans for merger-related service disruptions . . . 601
(j) Timetable . . . 601
(k) Benchmarking . . . 601
(1) Corridor performance benchmarking . . . 602
(2) Yard and terminal benchmarking . . . 602
(3) System benchmarking . . . 602

§ 1180.11 Transnational and other informational requirements . . . 602

CHAIRMAN MORGAN, commenting and dissenting in part: ........ 603
VICE CHAIRMAN CLYBURN, commenting ........ 606
COMMISSIONER BURKES, commenting ........ 606

APPENDIX A: Abbreviations ........ 621

APPENDIX B: "Short Form" Citations ........ 625

APPENDIX C: Class I Railroads and Related Interests ........ 628
Association of American Railroads ........ 628
National Railway Labor Conference ........ 634
Burlington Northern and Santa Fe ........ 637
Canadian National ........ 647
Canadian Pacific ........ 655
CSX ........ 662
Kansas City Southern ........ 674
Norfolk Southern ........ 679
Union Pacific ........ 688

APPENDIX D: Regional and Shortline Railroads ........ 694
American Short Line and Regional Railroad Association ........ 694
Eastern Shore Railroad ........ 696
Farmrail System ........ 696
Finger Lakes Railway ........ 698
Housatonic Railroad Company ........ 698
Texas Mexican Railway Company ........ 700
Wisconsin Central System ........ 701

APPENDIX E: Passenger Railroads and Related Interests ........ 702
National Railroad Passenger Corporation (Amtrak) ........ 702
American Public Transportation Association ........ 705
MARC AND SCRRA ........ 708
Regional Transportation Authority of Northeast Illinois (Metra) ........ 711
New Jersey Transit Corporation ........ 713
United Rail Passenger Alliance ........ 714

APPENDIX F: Rail Labor Interests ........ 715
Rail Labor Division of the Transportation Trades Department AFL-CIO ........ 715
Allied Rail Unions (BRS, IBB, NCFO, SMW, and TWU) ........ 719
TCIU, IAM, IBEW, and ATDD ........ 721
Amalgamated Transit Union ........ 721
Brotherhood of Railroad Signalmen ........ 722
United Transportation Union ........ 722
John D. Fitzgerald ........ 723

APPENDIX F-1: Supplemental Submission Regarding Labor ........ 726
Joint Supplemental Submission by Certain Carriers
And Labor Organizations ........ 726

APPENDIX G: Federal and Foreign Agencies ........ 727
U.S. Department of Agriculture ........ 727
U.S. Department of Defense ........ 730
U.S. Department of Transportation ........ 732
Canadian Government ........ 733

APPENDIX H: Regional and Local Interests ........ 734
California Public Utilities Commission ........ 734
Kansas Department of Transportation and Corporation
Commission ........ 735
Maryland Department of Transportation ........ 735
Michigan Department of Transportation ........ 736
New York ........ 736
North Dakota ........ 738
Ohio Rail Development Commission ........ 740
Oklahoma Department of Transportation ........ 744
Oregon Department of Transportation ........ 746
Pennsylvania House Transportation Committee ........ 746
The City of Mankato, Minnesota ........ 747
The City of Owatonna, Minnesota ........ 748
The New York City Economic Development Corporation ........ 750
The Greater Houston Partnership ........ 752

APPENDIX I: Port Interests ........ 753
Port of Seattle, WA ........ 753
Port of Portland, OR; Port of Corpus Christi Authority
Of Nueces County, TX ........ 753
Port of Houston Authority ........ 754
Port of Pascagoula, MS ........ 754
Port Authority of New York and New Jersey ........ 757

APPENDIX J: Members of Congress ........ 758
U.S. Representative Jerrold Nadler ........ 758

APPENDIX K: NITL, CURE, & ARC ........ 759
National Industrial Transportation League ........ 759
Consumers United for Rail Equity ........ 766
Alliance for Rail Competition ........ 768

APPENDIX L: Coal Interests ........ 769
The "Subscribing Coal Shippers" Group ........ 769
The "Certain Coal Shippers" Group ........ 772
The Committee to Improve American Coal Transportation ........ 777
Edison Electric Institute ........ 782
Ameren Services Company ........ 786
PPL (PPL Generation AND PPL Montana) ........ 787

APPENDIX M: Chemicals, Plastics, and Related Interests . . . . . 791
American Chemistry Council and American Plastics Council . . . . . 791
BASF Corporation and Williams Energy Services . . . . . 795
Dow Chemical Company . . . . . 801
E. I. Du Pont De Nemours and Company . . . . . 806
Enterprise Products Operating L.P. . . . . . 808
PPG Industries . . . . . 809
Procter & Gamble Company . . . . . 810
Reagent Chemical & Research . . . . . 812
Shell Oil Company and Shell Chemical Company . . . . . 813

APPENDIX N: Agricultural Interests . . . . . 814
American Farm Bureau Federation . . . . . 814
The Fertilizer Institute and the Canadian Fertilizer Institute . . . . . 815
National Grain and Feed Association . . . . . 817
The "Wheat, Barley & Grains Commissions" Group . . . . . 820
Ag Processing Inc. . . . . . 823
Bunge Corporation . . . . . 825
IMC Global . . . . . 826

APPENDIX O: Minerals and Related Interests . . . . . 828
National Mining Association . . . . . 828
U.S. Clay Producers Traffic Association . . . . . 829
Martin Marietta Materials . . . . . 830
Texas Crushed Stone Company and Georgetown
Railroad Company . . . . . 831

APPENDIX P: Forest Products, Lumber, and Paper Interests . . . . . 833
American Forest & Paper Association . . . . . 833
American Forest Resource Council . . . . . 834
Lumber Fair Trade Group . . . . . 835
Weyerhaeuser Company . . . . . 835

APPENDIX Q: Canadian Shipper Interests . . . . . 837
CPPA, COFI, and WCSC . . . . . 837

APPENDIX R: Transportation Intermediaries . . . . . 838
Transportation Intermediaries Association . . . . . 838
Crossroad Carriers Intermodal Co. . . . . . 839
Twin Modal, Inc. . . . . . 840

APPENDIX S: Miscellaneous Parties . . . . . 840
Enron Corporation . . . . . 840
Mayo Foundation D/B/A Mayo Clinic . . . . . 841
North America Freight Car Association . . . . . 841

As we noted in the NPR, shippers that are served by a single rail carrier may nevertheless benefit from the indirect competition that results from having another carrier nearby. In this regard, they may have the possibility of constructing (or proposing to construct) a connection to a second carrier, or of transloading freight by truck to a second carrier. They also may benefit from the opportunity to negotiate a long-term contract before choosing to locate a new plant along either of two carriers' lines or to adjust production levels at plants already located along those lines. A quick glance at a rail map confirms that the eastern and western railroads do not simply meet end-to-end at Chicago and the Mississippi River crossings; there is a fair degree of overlap. This situation seems to exist with regard to many of the connections of large U.S. and Canadian systems as well. Thus, a merger between any two U.S. Class I rail carriers or between major U.S. and Canadian rail carriers would surely threaten certain shippers with a loss of some indirect competition.

In *UP/SP*, our condition requiring BNSF trackage rights remedied the competitive harm that would have arisen from the loss, through the merger, of a nearby carrier, because BNSF was permitted to serve new facilities, as well as handle "build-out" and "transload" traffic. Yet these provisions only worked because the traffic base BNSF started from — movements originating or terminating at 2-to-1 points — was sufficient to generate traffic densities that enabled BNSF to offer a competitive service. With fewer 2-to-1 points likely to arise from any additional rail consolidation, we cannot generalize from BNSF's success and assume that trackage rights could always be structured to remedy future merger-related competitive harms.

Moreover, significant losses in geographic competition could occur even where carriers truly are "end-to-end," because there are many commodities (such as phosphate and soda ash) that have a limited number of sources. Similarly, a merger between BNSF and a Canadian carrier, even if largely end-to-end, could raise potential competitive concerns in western export wheat markets. End-to-end carriers that compete with each other geographically would stand to gain market power if we were to approve their merger without imposing effective conditions, which, as discussed above, could be difficult.

# PX0662-PX0664

# Filed Under Seal

# EXHIBIT PX0665

Morningstar® Document Research℠

# FORM 10-K

## CSX CORP - csx

**Filed: March 10, 2004 (period: December 26, 2003)**

Annual report which provides a comprehensive overview of the company for the past year

Powered by Morningstar® Document Research℠

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 26, 2003**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 1-8022**

# CSX Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Virginia**<br>*(State or other jurisdiction of incorporation or organization)* | **62-1051971**<br>*(I.R.S. Employer Identification No.)* |
| **500 Water Street, 15th Floor, Jacksonville, Florida**<br>*(Address of principal executive offices)* | **32202**<br>*(Zip Code)* |

**(904) 359-3200**

*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of exchange on which registered |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐

On June 27, 2003, the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $5.3 billion (based on the New York Stock Exchange closing price on such date).

On March 5, 2004, there were 215,036,069 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement to be filed with respect to its annual meeting of shareholders scheduled to be held on May 5, 2004 ("Proxy Statement")

 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**FORM 10-K**

**TABLE OF CONTENTS**


| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 3 |
| 2. | Properties | 4 |
| 3. | Legal Proceedings | 4 |
| 4. | Submission of Matters to a Vote of Security Holders | 5 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 6 |
| 6. | Selected Financial Data | 8 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 9 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 38 |
| 8. | Financial Statements and Supplementary Data | 39 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 92 |
| 9A. | Controls and Procedures | 93 |
| | **PART III** | |
| 10. | Directors and Executive Officers of the Registrant | 93 |
| 11. | Executive Compensation | 93 |
| 12. | Security Ownership of Certain Beneficial Owners and Management | 93 |
| 13. | Certain Relationships and Related Transactions | 93 |
| 14. | Principal Accounting Fees and Services | 93 |
| | **PART IV** | |
| 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 94 |

Signatures 99




Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**FORM 10-K**

**PART I**

**Item 1.** ***Business***

CSX Corporation ("CSX" or the "Company") operates one of the largest rail networks in the United States and also arranges for and provides integrated rail and truck ("intermodal") transportation services across the United States and key markets in Canada and Mexico. Its marine operations include an international terminal services company, which operates and develops container terminals, distribution facilities and related terminal activities.

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC ("CSX Lines"), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs and $60 million of securities).

**Operating Segments**

Following are the operating revenue and operating income by segment at December 26, 2003 (see Management's Discussion and Analysis for prior year data):

| | Rail | Intermodal | Surface Transportation | International Terminals | Eliminations/ Other(2) | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in Millions) (Unaudited)(1) | | | |
| **Operating Revenue** | **$ 6,182** | **$ 1,257** | **$ 7,439** | **$ 226** | **$ 128** | **$ 7,793** |
| | 79% | 16% | 95% | 3% | 2% | 100% |
| **Operating Income (Loss)** | **$ 541** | **$ 110** | **$ 651** | **$ 69** | **$ (94)** | **$ 626** |
| | 86% | 18% | 104% | 11% | (15)% | 100% |

(1) Prior periods have been reclassified to conform to the current presentation.

(2) Eliminations/ Other consists of the following:
- Charge incurred upon entering into settlement agreements with Maersk
- Reclassification of International Terminals minority interest expense
- Operations of CSX Lines and gain amortization
- Expenses related to the 2003 retirement of the Company's former Chairman and Chief Executive Officer
- Other items

***Surface Transportation***

*CSX Transportation Inc.*

CSX Transportation Inc. ("CSXT") is the largest rail network in the eastern United States, providing rail freight transportation over a network of more than 23,000 route miles in 23 states, the District of Columbia and two Canadian provinces. Headquartered in Jacksonville, Florida, CSXT accounted for 79% of CSX's operating revenue and 86% of operating income in 2003.

*CSX Intermodal Inc.*

CSX Intermodal Inc. ("CSXI") is the nation's only transcontinental intermodal transportation service provider, operating a network of dedicated intermodal facilities across North America. The CSXI network runs approximately 450 dedicated trains between its 45 terminals weekly. CSXI accounted for 16% of CSX's operating revenue and 18% of operating income in 2003. Its headquarters are located in Jacksonville, Florida.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***International Terminals***

CSX World Terminals LLC ("CSX World Terminals") operates container-freight terminal facilities in Asia, Europe, Australia, Latin America and the United States. CSX World Terminals accounted for 3% of CSX's operating revenues and 11% of operating income in 2003. CSX World Terminals is headquartered in Charlotte, North Carolina.

***Non-transportation***

The Greenbrier is a AAA Five-Diamond resort located in White Sulphur Springs, West Virginia. CSX Real Property Inc. is responsible for sales, leasing and development of CSX-owned properties, and is headquartered in Jacksonville, Florida.

**General**

CSX employed an average of 37,516 employees during 2003. The Company considers employee relations to be good. Most of CSX's employees are represented by labor unions and are covered by collective bargaining agreements. Some of these agreements are scheduled to expire in 2004. CSX is in the process of renegotiating most of these agreements, but the outcome of these negotiations is uncertain at this time. For rail employees negotiations have generally taken place over a number of years and previously have not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted.

The Company makes available free of charge through its website at www.csx.com, its annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto, as soon as reasonably practicable after such reports are filed with or furnished to the Securities and Exchange Commission.

For additional information concerning business conducted by CSX during 2003, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 19 to the Financial Statements under the caption "Business Segments."

**Item 2.** ***Properties***

In response to this Item, see the information set forth on page 32 under the caption "Depreciation Policies Under the Group Life Method," in Note 1 to the Financial Statements under the caption "Nature of Operations and Significant Accounting Policies," and in Note 9 to the Financial Statements under the caption "Properties."

**Item 3.** ***Legal Proceedings***

CSX is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters. Federal Employers' Liability Act claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for punitive as well as compensatory damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year. The company is also party to a number of actions, the resolution



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

of which could result in gain realization in amounts that could be material to results of operations in the quarters received.

In further response to this Item, see the information set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations," of this document under the caption "Casualty, Legal and Environmental Reserves" and under the caption "Commitments and Contingencies."

**Item 4.** ***Submission of Matters to a Vote of Security Holders***

There were no matters submitted to a vote of security holders in the fourth quarter of 2003.

**Executive Officers of the Registrant**

Executive officers of CSX Corporation are elected by the CSX Board of Directors and generally hold office until the next annual election of officers. Officers of CSX business units are elected annually by the respective Boards of Directors of the business units. There are no family relationships or any arrangement or understanding between any officer and any other person pursuant to which such officer was selected. Effective March 31, 2004 our executive officers will be as follows:

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Michael J. Ward, 53 | Chairman of the Board, President and Chief Executive Officer of CSX, having been elected as Chairman and Chief Executive Officer in January 2003 and as President in July 2002. He has served CSX Transportation, Inc., the Company's rail subsidiary, as President since November 2000 and as President and Chief Executive Officer since October 2002. Previously, Mr. Ward served CSX Transportation as Executive Vice President — Operations from April through November 2000, as Executive Vice President — Coal Service Group from August 1999 to April 2000, and prior to that as Executive Vice President — Coal and Merger Planning from October 1998 to August 1999. |
| Andrew B. Fogarty, 58 | President and Chief Executive Officer, CSX World Terminals, LLC, since January 2004. Before January 2004, Mr. Fogarty served as Senior Vice President — Corporate Services of CSX since May 2003 and as Executive Vice President — Corporate Services of CSX from July 2001 to May 2003. Before that, he served as Senior Vice President — Corporate Services. |
| Ellen M. Fitzsimmons, 43 | Senior Vice President — Law and Public Affairs since December 2003. Before December 2003, Ms. Fitzsimmons served as Senior Vice President — Law and Corporate Secretary since May 2003 and as Senior Vice President — Law from February 2001 to May 2003. Prior thereto, she served as General Counsel — Corporate. |
| Clarence W. Gooden, 52 | Senior Vice President — Merchandise Service Group, CSX Transportation since 2002. Prior to 2002, Mr. Gooden served as President of CSX Intermodal from 2001 to 2002; Senior Vice President — Coal Service Group from 2000 to 2001; Vice President — System Transportation from 1999 to 2000; Vice President — Transportation Field Operations from 1998 to 1999. |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Robert J. Haulter, 50 | Senior Vice President — Human Resources and Labor Relations since December 2003. Before December 2003, Mr. Haulter served as CSX Senior Vice President — Human Resources since July 2002. Before July 2002, he served CSX Transportation, Inc., as Senior Vice President — Human Resources from May 2002 to July 2002; as Vice President — Human Resources from December 2000 to May 2002; as Assistant Vice President of Operations Support from September 2000 to December 2000; as Assistant Vice President — Strategic Development from November 1999 to September 2000; and as Assistant Vice President — Integration Planning before November 1999. |
| Oscar Munoz, 44 | Executive Vice President and Chief Financial Officer since May 2003. Before May 2003, Mr. Munoz served as Chief Financial Officer and Vice President, Consumer Services, AT&T Corporation, from January 2001 to May 2003; as Senior Vice President — Finance & Administration, Qwest Communications International, Inc. from June to December 2000; as Chief Financial Officer & Vice President, U.S. West Retail Markets from April 1999 to May 2000; and before April 1999 as Controller and Vice President, USWEST Communications, Inc. |
| Carolyn T. Sizemore, 41 | Vice President and Controller of CSX since April 2002. Prior to April 2002, Ms. Sizemore served as Assistant Vice President and Assistant Controller from July 2001 to April 2002; Assistant Vice President Financial Planning from June 1999 to July 2001; and prior to June 1999, as Senior Director — Financial and Strategic Measurement. |

## PART II

### Item 5. *Market for Registrant's Common Equity and Related Stockholder Matters*

**Market Information**

CSX's common stock is listed on the New York, London and Swiss stock exchanges and trades with unlisted privileges on the Midwest, Boston, Cincinnati, Pacific and Philadelphia stock exchanges. The official trading symbol is "CSX."

**Description of Common and Preferred Stocks**

A total of 300 million shares of common stock are authorized, of which 215,071,005 shares were outstanding as of December 26, 2003. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre-emptive rights. At December 26, 2003, there were 56,331 registered common stock shareholders.

A total of 25 million shares of preferred stock are authorized, none of which are currently outstanding. CSX previously issued Series A preferred stock consisting of 250,000 shares of $7 Cumulative Convertible Preferred Stock. All outstanding shares of Series A Preferred Stock were redeemed as of July 31, 1992. Prior to October 2003, 3,000,000 shares of preferred stock had been designated as Series B Preferred Stock in conjunction with the Company's Shareholder Rights Plan. In October 2003, the expiration date of the shareholder rights under the Shareholder Rights Plan was accelerated, resulting in the effective termination of the Plan. The Company's Articles of Incorporation were amended to eliminate the designation of shares for Series B Preferred.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Equity Compensation Plan Information**

The following table summarizes the equity compensation plans under which CSX Corporation common stock may be issued as of December 26, 2003.

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights (000's) | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (000's) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 22,633 | $ 39.11 | 7,060(1) |
| Equity compensation plans not approved by security holders(2) | 664 | $ 44.89 | — |
| Total | 23,297 | | 7,060(1) |

(1) The number of shares remaining available for future issuance under plans approved by shareholders includes 59,038 shares available for employee purchase pursuant to the 2002 Employee Stock Purchase Plan; 642,192 shares available for stock option grants, payment of director compensation, and stock grants pursuant to the CSX Stock Plan for Directors; and 6,358,934 shares available for grant in the form of stock options, performance units, restricted stock, stock appreciation rights, and stock awards pursuant to the CSX Omnibus Incentive Plan.

(2) The 1990 Stock Award Plan ("1990 Plan") is the only CSX equity compensation plan that has not been approved by shareholders. Upon approval of the CSX Omnibus Incentive Plan by shareholders in 2000, the plan was closed to further grants. No options have been granted under the 1990 Plan since 1999.

The following table sets forth, for the quarters indicated, the dividends declared and the high and low sales prices of the Company's common stock:

| | Quarter | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| **2003** | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Common Stock Price: | | | | |
| High | $30.85 | $33.16 | $32.99 | $36.29 |
| Low | $25.50 | $28.20 | $28.92 | $29.07 |
| **2002** | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Common Stock Price: | | | | |
| High | $41.40 | $37.90 | $36.77 | $30.12 |
| Low | $34.81 | $32.41 | $25.75 | $25.09 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Item 6.** ***Selected Financial Data***

| | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| | (Dollars in Millions, Except Per Share Amounts) | | | | |
| **Earnings from Continuing Operations** | | | | | |
| Operating Revenue | $ 7,793 | $ 8,152 | $ 8,110 | $ 8,191 | $ 10,375 |
| Operating Expense | 7,167 | 7,025 | 7,153 | 7,386 | 9,802 |
| Operating Income | $ 626 | $ 1,127 | $ 957 | $ 805 | $ 573 |
| Net Earnings from Continuing Operations | $ 246 | $ 424 | $ 293 | $ 186 | $ 32 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | $ 1.14 | $ 2.00 | $ 1.39 | $ 0.88 | $ 0.15 |
| From Continuing Operations, Assuming Dilution | $ 1.14 | $ 1.99 | $ 1.38 | $ 0.88 | $ 0.15 |
| **Financial Position** | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 368 | $ 264 | $ 618 | $ 686 | $ 974 |
| Working Capital Deficit | $ (307) | $ (665) | $ (1,023) | $ (1,231) | $ (910) |
| Total Assets | $ 21,745 | $ 20,951 | $ 20,801 | $ 20,548 | $ 20,828 |
| Long-term Debt | $ 6,886 | $ 6,519 | $ 5,839 | $ 5,896 | $ 6,304 |
| Shareholders' Equity | $ 6,453 | $ 6,241 | $ 6,120 | $ 6,017 | $ 5,756 |
| **Other Data Per Common Share** | | | | | |
| Cash Dividends | $ 0.40 | $ 0.40 | $ 0.80 | $ 1.20 | $ 1.20 |
| Book Value | $ 30.01 | $ 29.07 | $ 28.64 | $ 28.28 | $ 26.35 |
| Market Price | | | | | |
| High | $ 36.29 | $ 41.40 | $ 41.30 | $ 33.44 | $ 53.94 |
| Low | $ 25.50 | $ 25.09 | $ 24.81 | $ 19.50 | $ 28.81 |
| **Employees — Annual Averages** | | | | | |
| Rail | 32,892 | 33,468 | 35,014 | 35,496 | 31,952 |
| Other | 4,624 | 6,471 | 6,446 | 9,955 | 16,998 |
| Total | 37,516 | 39,939 | 41,460 | 45,451 | 48,950 |

See accompanying Consolidated Financial Statements



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Significant events include the following:

| | | |
|---|---|---|
| 2003 | — | Pretax income of $93 million, $57 million after tax, or 26 cents per share, as a cumulative effect of accounting change, representing the reversal of the accrued liability for crosstie removal costs in conjunction with the adoption of SFAS 143, “Accounting for Asset Retirement Obligations.” (See Note 1, Nature of Operations and Significant Accounting Policies) |
| | — | A charge of $232 million pretax, $145 million after tax in conjunction with the change in estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. (See Note 10, Casualty, Environmental, and Other Reserves) |
| | — | A charge of $108 million pretax, $67 after tax to account for the Company entering into two settlement agreements with Maersk that resolved all material disputes pending between the companies arising out of the 1999 sale of the international container-shipping assets. (See Note 18, Commitments and Contingencies). |
| | — | A charge of $34 million pretax, $21 million after tax as the initial charge for separation expenses related to the management restructuring announced in November 2003. In addition, the Company recorded a credit of $22 million pretax, $13 million after tax related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the $1.3 billion charges for separation plans initially recorded in 1991 and 1992. For the year, the Company has recorded a net restructuring charge of $22 million, $13 million after tax that includes these items and additional separation charges that were included in the third quarter results. (See Note 4, Restructuring) |
| 2002 | — | A charge to write-down indefinite lived intangible assets as a cumulative effect of accounting change, which reduced earnings $83 million pretax, $43 million after tax and consideration of minority interest, 20 cents per share (See Note 1, Nature of Operations and Significant Accounting Policies). |
| 2001 | — | A charge of $60 million pretax, $37 million after tax to account for the settlement of the 1987 New Orleans tank car fire litigation. |
| 1999 | — | A loss on the sale of international container-shipping assets net of a related benefit from discontinuing depreciation of those assets from the date they were classified as “held for disposition.” The net effect of the loss and the depreciation benefit reduced earnings by $360 million pretax, $271 million after tax. |
| | — | A charge of $55 million pretax, $34 million after tax to recognize the cost of a workforce reduction program at the Company’s rail and intermodal units. |
| | — | A gain of $27 million pretax, $17 million after tax on the sale of the Company’s Grand Teton Lodge resort subsidiary. |

## Item 7. *Management’s Discussion and Analysis of Financial Condition and Results of Operations*

### Overview

#### *General*

CSX Corporation (“CSX” or the “Company”) operates one of the largest rail networks in the United States and also arranges for and provides integrated rail and truck (“intermodal”) transportation services across the United States and key markets in Canada and Mexico. Surface Transportation, which includes CSX’s rail and intermodal units, generated revenue of $7.4 billion in 2003 compared to $7.2 billion in 2002. Operating income for Surface Transportation was $651 million in 2003 compared to $995 million in 2002. CSX’s marine operations include an international terminal services company, which operates and develops container terminals,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

distribution facilities and related terminal activities. In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines, to a new venture formed with the Carlyle Group. CSX also owns and operates the Greenbrier, a AAA Five-Diamond resort located in White Sulphur Springs, West Virginia.

In 2003, revenue and volume grew in response to strategies to persuade new customers to ship via a combination of rail and truck, the introduction of new customer services, and the economic recovery. However, as discussed below increased costs and operating inefficiency in the rail network decreased CSX's overall profitability.

***Surface Transportation***

CSX's rail system is a network, defined by its more than 23,000 route miles, through which goods and services flow. The inefficiency of any one element in that network can have an effect on other components, and ultimately affect the operating efficiency of the entire network. The decline in CSX's operating efficiency, coupled with the increased price of fuel and other higher costs, reduced CSX's profit in 2003.

In addition to reviewing various financial measures, CSX management uses non-financial indicators to monitor performance and operating efficiency of its network. Those include:

| Key Non-Financial Performance Indicators | 2003 | 2002 | % Improvement (Decline) |
|---|---|---|---|
| Personal Injury Frequency Index (Per 100 Employees) | 2.20 | 1.98 | (11)% |
| FRA Train Accidents Frequency (Per Million Train Miles) | 4.37 | 3.34 | (31) |
| Average Velocity, All Trains (Miles Per Hour) | 21.1 | 22.5 | (6) |
| Average System Dwell Time (Hours) | 25.3 | 23.2 | (9) |
| Average Total Cars-On-Line | 229,926 | 229,609 | — |
| On-Time Originations | 62.0% | 76.4% | (19) |
| On-Time Arrivals | 56.9% | 76.9% | (26) |
| Average Recrews (Per Day) | 50 | 26 | (92)% |

The decline in these non-financial performance measures contributed to higher operating expenses and resulted in a higher operating ratio for Surface Transportation, which increased to 91.2% in 2003 from 86.1% in 2002. The number of injuries per 100 employees increased by 11%, while the number of FRA-reportable train accidents per million train miles showed a 31% increase from 2002 to 2003. Average train velocity, which is a measure of efficiency, decreased 6% from 22.5 miles per hour in 2002 to 21.1 miles per hour in 2003. The average system dwell time, which measures the amount of time between car arrival and departure from yards, increased 9% from 2002 to 2003. The percent of scheduled trains departing the origin station at or prior to the scheduled departure time and the percent of scheduled trains arriving at the destination station within two hours of the scheduled arrival time both showed year-over-year declines. The number of relief crews called per day on average, which is an indicator of efficiency in the use of crews, showed the largest percent decline, increasing from 26 to 50.

CSX management is taking steps to identify the source of operating inefficiencies and reduce operating expenses. Management also is evaluating ways to restore the network operating efficiency, while maintaining volume. This includes reducing both gross ton-miles and the number of times a railcar is handled, or switched, en route to its final destination. Because American industry has changed significantly in recent years. Management believes there are portions of CSX's non-core network that could be more efficiently used by third parties. The Company is currently evaluating the lease or sale of up to 3,000 miles of its non-core network. This would allow CSX to return approximately 50 locomotives to the core network, reduce capital outlays and decrease operating expenses.

These changes will allow for and require organizational improvements. CSX is undertaking a major management restructuring that began in November 2003 and is expected to conclude near the end of the first quarter of 2004. Management believes that the conveyance of CSX Lines in February of 2003 and the resolution of the disputes with Maersk relating to the 1999 sale of the international container shipping assets will allow management to focus on its core surface transportation segment.

***International Terminals***

CSX World Terminals' ("CSXWT") Hong Kong terminal accounted for approximately 67% of CSXWT's revenues and 62% of operating income in 2003. The Hong Kong terminal showed a year-over-year volume decrease of 7.2%, which corresponded with a 5.8% decrease in revenue versus 2002. Competitive pressures are rising as customers are shifting their traffic from facilities in Hong Kong to newly opened terminals in South China's Guangdong region. This shift will also translate into reduced volumes and revenue. A significant customer of CSXWT announced that it would terminate its marine terminal services contract during the first quarter of 2004. This is expected to negatively impact CSXWT's 2004 operating income by approximately $29 million and cash flow by approximately $21 million. In December 2004, another contract is scheduled to expire. Negotiations are in process to maintain this contract, but if negotiations are unsuccessful, 2005 operating income may be negatively impacted by $20 million. CSXWT expects that it will be able to replace all or substantially all of the lost volume with new customers representing long and short-term commercial commitments. However, due to the increased competitive pressures, it is possible that the profit margins achieved in the past will not be realized in the near term.

Recognizing its need to diversify beyond the Hong Kong terminal, CSXWT has been expanding its capacity and market reach. During 2003, CSX's minority owned terminal operation located in the Shandong Province of the People's Republic of China commenced operations. CSXWT has also completed the first phase of its terminal construction in Caucedo, which is located in the Dominican Republic. The Caucedo terminal company is an unconsolidated entity of CSXWT that began operations in December 2003. In response to competition in the South China Guangdong region, CSXWT has initiatives in process to maintain and improve its productivity standards.

In addition to volume, CSXWT monitors terminal productivity or lifts per hour. For the years ended December 26, 2003 and December 27, 2002, lifts per hour for some of the main terminals was as follows:

| | | Lifts Per Hour | | |
|---|---|---|---|---|
| **Terminal** | **Port's % of CSXWT Operating Income** | **2003** | **2002** | **% Improvement (Decline)** |
| Hong Kong, China | 62% | 40.4 | 39.1 | 3% |
| Adelaide, Australia | 5% | 22.3 | 21.6 | 3% |
| Germershiem, Germany | 5% | 23.7 | 25.2 | (6)% |
| Rio Haina, Dominican Republic | 5% | 25.8 | 26.1 | (1)% |

Overall, terminal productivity remained relatively stable in 2003 compared to 2002.

**Financial Results of Operations**

***Consolidated Results***

CSX follows a 52/53-week fiscal reporting calendar. Fiscal years 2003 and 2002 consisted of 52 weeks ending on December 26, 2003 and December 27, 2002, respectively.

***2003 vs. 2002***

*Operating Revenue*

Operating revenue decreased $359 million for the year ended December 26, 2003 to $7.8 billion, compared to $8.2 billion for the prior year. A $627 million decline in consolidated revenue resulted from a reduction of revenue in the domestic container-shipping segment as a majority of CSX's interest in CSX Lines was conveyed during the first quarter of 2003 (See Note 3, Divestitures). Excluding revenue from this conveyance, revenue increased $268 million primarily due to an increase in Surface Transportation revenue.

*Operating Income*

Operating income for the year ended December 26, 2003 was down $501 million to $626 million, compared to $1.1 billion in the prior year. The prior year included $38 million of operating income of CSX Lines, which was conveyed to a new venture formed with the Carlyle Group in the first quarter of 2003. Excluding operating income from this conveyance, 2003 operating income decreased $463 million.

The decrease in operating income is primarily the result of two charges taken during 2003 totaling $340 million. The Company recorded a $232 million charge in conjunction with the change in estimate for casualty reserves, which is reflected in operating expense as "Provision for Casualty Claims" (See Note 10, Casualty, Environmental and Other Reserves). Also, CSX entered into two settlement agreements, which together resolve all material outstanding disputes with Maersk. This decreased the Company's operating income by $108 million, and is reflected in operating expense as the additional loss on sale of international container-shipping assets (See Note 18, Commitments and Contingencies).

The Company also recorded $34 million pretax as the initial charge for separation expenses related to the management restructuring announced in November 2003. In addition, the Company recorded a credit of $22 million pretax related to revised estimates for railroad retirement taxes and the amount of benefits that will ultimately be paid to individuals under the $1.3 billion charges for separation plans initially recorded in 1991 and 1992. For the year, the Company has recorded a net restructuring charge of $22 million that includes these items and additional separation charges that were included in the third quarter results. (See Note 4, Restructuring).

Materials, supplies and other expenses decreased $62 million, or 4%, year-over-year, as a result of the conveyance of most of the Company's interest in its domestic container-shipping subsidiary, CSX Lines. Excluding the $244 million of expenses of CSX Lines, materials, supplies and other increased $193 million year-over-year. Approximately $80 million of this increase relates to increased costs for personal injuries and safety issues. An additional $20 million of the expense deterioration is due to increased cost of derailments. The remaining increase results from volume increases, inflationary effects and general operational inefficiencies, as reflected by the decline in the non-financial performance indicators.

Fuel expense for Surface Transportation operations increased $117 million in 2003, as compared to the prior year. The expense increase is primarily due to $102 million in fuel price increases, while increased volumes were also a factor. The average price per gallon of fuel was 96 cents per gallon for 2003 compared to 78 cents per gallon for 2002. In order to minimize future exposure to fuel price fluctuation risk, during 2003 the Company entered into a series of swaps in order to fix the price on a portion of its estimated future fuel purchases. As of December 26, 2003, 18% and 21% of 2004 and 2005, respectively, estimated fuel purchases were hedged. Fuel swaps did not have an effect on fuel expense for the year ended December 26, 2003.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Favorably impacting expense was the absence of a management bonus at its Surface Transportation companies in 2003, as approximately $45 million of such expense was recorded in 2002.

*Other Income*

Other income increased $16 million to $57 million for the year ended December 26, 2003, compared to $41 million for the prior year. A decrease in discounts on sales of accounts receivable due to the discontinuance of this program and a loss on sale in 2002 that did not recur in 2003 had a favorable impact, but were partially offset by lower interest income and reduced real estate gains.

*Interest Expense*

Interest expense decreased $27 million for the year ended December 26, 2003 as compared to the prior year. Lower interest rates on floating rate debt and the favorable impact of interest rate swaps (see Note 12, Derivative Financial Instruments) continued to benefit the Company.

*Net Earnings*

Net earnings were $246 million, or $1.14 per share, for the year ended December 26, 2003, compared to $424 million, or $1.99 per share for the prior year.

The year ended December 26, 2003 included an after-tax cumulative effect of accounting change benefit of $57 million, 26 cents per share, related to the adoption of Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations," while the year ended December 27, 2002 included an after-tax cumulative effect of accounting change charge of $43 million, 20 cents per share, related to the adoption of SFAS 142, "Goodwill and Other Intangible Assets."

Earnings before the cumulative effect of accounting changes were $189 million and $467 million for the years ended December 26, 2003 and December 27, 2002, respectively. The $278 million year-over-year decrease in net earnings primarily results from a $145 million after-tax charge to increase the Company's provision for casualty reserves, a $67 million after-tax charge to record the loss on sale of international container-shipping assets and a $21 million after-tax charge to record amounts associated with the management restructuring.

The remaining decrease results from the decline in operating income as discussed above, somewhat offset by the favorable impact of decreased interest expenses and income taxes.

***2002 vs. 2001***

*Operating Revenue*

Fiscal year 2001 consisted of 52 weeks ending on December 28, 2001. Operating revenue of $8.2 billion in 2002 was slightly higher than 2001, resulting mainly from an increase in revenues at the Company's domestic container-shipping unit, CSX Lines, which offset a small decrease at the Company's Surface Transportation units.

*Operating Income*

Operating expense of $7.0 billion in 2002 was 2% lower due mainly to lower fuel and labor costs at the Company's Surface Transportation business. The effect on 2001 of the $60 million New Orleans litigation settlement contributed to the favorable year-to-year comparison.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*Other Income*

Other income was up $32 million in 2002 as compared to 2001, due mainly to reduced losses relating to equity investments and other favorable miscellaneous items, offset by lower interest income.

*Interest Expense*

Interest expense was reduced by $73 million in 2002 as compared to 2001, due to refinancing fixed-rate maturities at lower interest rates, and to a greater percentage of outstanding debt during 2002 bearing a floating rate of interest through the use of interest rate swap agreements.

*Net Earnings*

The Company reported net earnings for 2002 of $424 million, $1.99 per share, compared to $293 million, $1.38 per share in 2001. Results for 2002 include the write-down of indefinite lived intangible assets as a cumulative effect of accounting change, which reduced net earnings $43 million after tax. Results for 2001 include a provision to account for the settlement of the New Orleans tank car fire litigation, which reduced net earnings by $37 million after tax. Excluding the cumulative effect of the accounting change and the New Orleans litigation provision, net earnings were $467 million for 2002, compared with $330 million for 2001. This increase is the result of increased operating income on a consolidated basis of $110 million (excluding the pretax charge of $60 million in 2001 for the New Orleans litigation provision), higher other income of $32 million and lower interest expense of $73 million.

The following tables provide a detail of operating revenue and expense by segment:

| | Rail | Intermodal | Surface Transportation | International Terminals | Eliminations/ Other(2) | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in Millions) (Unaudited)(1) | | | |
| ***Fiscal Year Ended December 26, 2003*** | | | | | | |
| **Operating Revenue** | $ 6,182 | $ 1,257 | $ 7,439 | $ 226 | $ 128 | $ 7,793 |
| **Operating Expense** | | | | | | |
| Labor and Fringe | 2,555 | 73 | 2,628 | 51 | 61 | 2,740 |
| Materials, Supplies and Other | 1,329 | 201 | 1,530 | 76 | 56 | 1,662 |
| Conrail Rents, Fees & Services | 342 | — | 342 | — | — | 342 |
| Building and Equipment Rent | 418 | 144 | 562 | 8 | (4) | 566 |
| Inland Transportation | (399) | 697 | 298 | 6 | 16 | 320 |
| Depreciation | 579 | 32 | 611 | 9 | 9 | 629 |
| Fuel | 566 | — | 566 | — | 15 | 581 |
| Miscellaneous | — | — | — | 7 | (42) | (35) |
| Provision for Casualty Claims(3) | 229 | — | 229 | — | 3 | 232 |
| Additional Loss on Sale(4) | — | — | — | — | 108 | 108 |
| Restructuring Charge — Net(5) | 22 | — | 22 | — | — | 22 |
| **Total Operating Expense** | **5,641** | **1,147** | **6,788** | **157** | **222** | **7,167** |
| **Operating Income (Loss)** | **$ 541** | **$ 110** | **$ 651** | **$ 69** | **$ (94)** | **$ 626** |
| **Operating Ratio** | 91.2% | 91.2% | 91.2% | 69.5% | | |
| **Employment — Annual Averages** | 32,892 | 1,119 | 34,011 | 1,016 | | |
| **Property Additions** | 974 | 47 | 1,021 | 9 | | |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | Rail | Intermodal | Surface Transportation | International Terminals | Eliminations/ Other(2) | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in Millions) (Unaudited)(1) | | | |
| ***Fiscal Year Ended December 27, 2002*** | | | | | | |
| **Operating Revenue** | **$ 6,003** | **$ 1,180** | **$ 7,183** | **$ 236** | **$ 733** | **$ 8,152** |
| **Operating Expense** | | | | | | |
| Labor and Fringe | 2,530 | 67 | 2,597 | 57 | 232 | 2,886 |
| Materials, Supplies and Other | 1,212 | 179 | 1,391 | 77 | 256 | 1,724 |
| Conrail Rents, Fees & Services | 322 | — | 322 | — | — | 322 |
| Building and Equipment Rent | 425 | 131 | 556 | 9 | 36 | 601 |
| Inland Transportation | (365) | 633 | 268 | 7 | 95 | 370 |
| Depreciation | 576 | 29 | 605 | 9 | 24 | 638 |
| Fuel | 449 | — | 449 | — | 66 | 515 |
| Miscellaneous | — | — | — | 8 | (39) | (31) |
| **Total Operating Expense** | **5,149** | **1,039** | **6,188** | **167** | **670** | **7,025** |
| **Operating Income** | **$ 854** | **$ 141** | **$ 995** | **$ 69** | **$ 63** | **$ 1,127** |
| **Operating Ratio** | 85.8% | 88.1% | 86.1% | 70.8% | | |
| **Employment — Annual Averages** | 33,468 | 1,091 | 34,559 | 1,261 | | |
| **Property Additions** | 981 | 29 | 1,010 | 11 | | |
| ***Fiscal Year Ended December 28, 2001*** | | | | | | |
| **Operating Revenue** | **$ 6,082** | **$ 1,112** | **$ 7,194** | **$ 236** | **$ 680** | **$ 8,110** |
| **Operating Expense** | | | | | | |
| Labor and Fringe | 2,585 | 65 | 2,650 | 62 | 222 | 2,934 |
| Materials, Supplies and Other | 1,212 | 173 | 1,385 | 70 | 234 | 1,689 |
| Conrail Rents, Fees & Services | 336 | — | 336 | — | — | 336 |
| Building and Equipment Rent | 442 | 123 | 565 | 9 | 52 | 626 |
| Inland Transportation | (371) | 616 | 245 | 7 | 85 | 337 |
| Depreciation | 550 | 31 | 581 | 8 | 24 | 613 |
| Fuel | 525 | — | 525 | — | 60 | 585 |
| New Orleans Litigation Provision(6) | 60 | — | 60 | — | — | 60 |
| Miscellaneous | — | — | — | 9 | (36) | (27) |
| **Total Operating Expense** | **5,339** | **1,008** | **6,347** | **165** | **641** | **7,153** |
| **Operating Income** | **$ 743** | **$ 104** | **$ 847** | **$ 71** | **$ 39** | **$ 957** |
| **Operating Ratio** | 87.8% | 90.6% | 88.2% | 69.9% | | |
| **Employment — Annual Averages** | 35,014 | 1,116 | 36,130 | 1,305 | | |
| **Property Additions** | 848 | 12 | 860 | 19 | | |

(1) Prior periods have been reclassified to conform to the current presentation.

(2) Eliminations/Other consists of the following:

- Charge incurred upon entering into settlement agreements with Maersk
- Reclassification of International Terminals minority interest expense
- Operations of CSX Lines and gain amortization
- Expenses related to the 2003 retirement of the Company's former Chairman and Chief Executive Officer
- Other items



 Powered by Morningstar® Document Research℠

(3) Represents 2003 charges recorded in connection with the Company's change in estimating casualty reserves, which impacted Surface Transportation operating income by $229 million. (See Note 10, Casualty, Environmental and Other Reserves.)

(4) Represents 2003 charges incurred upon entering into settlement agreements with Maersk. (See Note 18, Commitments and Contingencies.)

(5) Includes the 2003 restructuring charge recorded in connection with the management restructuring and the favorable change in estimate of benefits to be paid under 1991 and 1992 separation plans. (See Note 4, Restructuring.)

(6) Represents a 2001 charge to account for the settlement of the 1987 New Orleans tank car fire litigation. This charge reduced operating income by $60 million.

***Surface Transportation Results***

The following tables provide Surface Transportation carload and revenue data by service group and commodity:

***Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001***

| | Carloads | | | Revenue | | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| | | (Thousands) | | | (Dollars in Millions) | |
| Merchandise | | | | | | |
| Phosphates and Fertilizer | 460 | 463 | 441 | $ 329 | $ 324 | $ 306 |
| Metals | 348 | 319 | 320 | 435 | 401 | 395 |
| Forest and Industrial | 604 | 590 | 596 | 806 | 771 | 777 |
| Agricultural and Food | 457 | 452 | 467 | 660 | 648 | 661 |
| Chemicals | 544 | 542 | 540 | 993 | 964 | 937 |
| Emerging Markets | 476 | 424 | 435 | 471 | 398 | 384 |
| Total Merchandise | 2,889 | 2,790 | 2,799 | 3,694 | 3,506 | 3,460 |
| Automotive | 529 | 538 | 516 | 853 | 845 | 794 |
| Coal, Coke and Iron Ore | | | | | | |
| Coal | 1,570 | 1,574 | 1,722 | 1,543 | 1,529 | 1,671 |
| Coke and Iron Ore | 65 | 70 | 77 | 57 | 69 | 68 |
| Total Coal, Coke and Iron Ore | 1,635 | 1,644 | 1,799 | 1,600 | 1,598 | 1,739 |
| Other | — | — | — | 35 | 54 | 89 |
| Total Rail | 5,053 | 4,972 | 5,114 | 6,182 | 6,003 | 6,082 |
| Intermodal | | | | | | |
| Domestic | 1,060 | 982 | 901 | 784 | 696 | 625 |
| International | 1,170 | 1,137 | 1,103 | 469 | 476 | 470 |
| Other | — | — | — | 4 | 8 | 17 |
| Total Intermodal | 2,230 | 2,119 | 2,004 | 1,257 | 1,180 | 1,112 |
| Total Surface Transportation | 7,283 | 7,091 | 7,118 | $ 7,439 | $ 7,183 | $ 7,194 |




Powered by Morningstar® Document Research℠

*Rail*

***2003 vs. 2002***

*Operating Revenue*

CSX categorizes rail revenues in three main areas:

1. Merchandise, which includes the following markets:

- Phosphates and Fertilizers
- Metals
- Forest and Industrial
- Agricultural and Food
- Chemicals
- Emerging Markets

2. Automotive

3. Coal, Coke and Iron Ore

*Merchandise Revenue*

Merchandise showed strength during 2003 with revenue up 5% on 4% volume growth. All markets showed year-over-year revenue improvement, and all except phosphates and fertilizers experienced increased volumes. Emerging markets realized the most improvement, with 18% revenue growth on 12% volume growth. Aggregates and cement traffic grew faster than average industry growth rates due to new industrial development and increased conversion of truck traffic to rail. Ammunition volumes increased throughout the year and strength continued in waste markets. The metals sector also showed strength in 2003. Revenue improved 8% on 9% volume growth, driven by strong global steel demand, particularly for scrap and sheet steel. Other factors contributing to improvement include strength in semi-finish metals and continued increases in modal conversions. Demand for building products, lumber and paper products resulted in an increase in forest and industrial revenue of 5% on 2% volume growth. The agricultural and food and chemical sectors also realized revenue increases, while volumes remained consistent with 2002. Phosphates and fertilizers revenues increased slightly year-over-year despite decreased volume, due to domestic phosphates and ammonia strength.

*Automotive Revenue*

Volume declined largely due to a 200,000 unit year-over-year decrease in North American light vehicle production. Haul extensions and price increases drove improvements in revenue per car.

*Coal, Coke and Iron Ore Revenue*

Coal, coke and iron ore volumes and revenue remained consistent with results in the prior year. Export moves were strong due to high European steam coal demand for electricity generation. Steel related traffic was weak throughout the year, but showed renewed strength during the fourth quarter due to consolidation in the steel industry and shifts in scrap metal demands that resulted in increased traffic and revenue for CSX. Utility revenue was favorable due to pricing initiatives and higher average length of haul. Improvements in these areas were offset by abnormally harsh winter weather during the first quarter which adversely affected lake loadings, as lakes were frozen.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*Operating Expense*

Total rail operating expenses increased $492 million, or 10% in 2003 as compared to 2002. Increases in most expense categories were somewhat offset by decreases in building and equipment rent.

The primary component of the expense increase was a charge of $229 million recorded in conjunction with the Company's change in estimate for its casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries that could be received over the next seven years. This charge is reflected as "Provision for Casualty Claims" in the financial statements. (See Note 10, Casualty, Environmental and Other Reserves.)

Labor and fringe expense remained relatively consistent year-over-year. The cost of labor inflation was offset by December-over-December reductions in staff of approximately 1,200 and the favorable impact of the absence of a management bonus in 2003, as approximately $45 million of such expense was recorded in 2002.

Materials, supplies and other expenses increased $117 million, or 10%, year-over-year. One of the primary drivers was approximately $80 million of increased cost for personal injury and related safety issues. An additional $20 million of the expense deterioration is due to increased cost of derailments. Additionally, due to the adoption of Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations," as discussed below, depreciation expense has been decreased and materials, supplies and other increased to account for the discontinuation of the accrual of cross-tie removal as a component of depreciation expense. The remaining increase results from volume increases, inflationary effects and general operational inefficiencies.

Conrail rents, fees & services expense increased $20 million in 2003, as compared to the prior year, as a result of increased usage of Shared Asset Areas, a contractual increase in the rental fee for Shared Area facilities, and a favorable tax adjustment in the prior year. (See Note 2, Investment In and Integrated Rail Operations With Conrail.)

Building and equipment rent decreased $7 million in 2003 compared to the prior year principally as a result of reduced car rentals from other railroads.

Inland transportation, which represents CSXI's use of the CSXT rail networks, remained relatively consistent year-over-year. The offsetting expense associated with this amount is reflected in CSXI's operating expense, and thus eliminates on a Surface Transportation level.

Depreciation remained consistent year-over-year. The rail segment had capital additions of approximately $1 billion, but the additional depreciation was offset by the reduction in depreciation associated with the adoption of SFAS 143, "Accounting for Asset Retirement Obligations." In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. The effect is to decrease depreciation expense and increase material, supplies and other expense.

Fuel expense increased $117 million in 2003, as compared to the prior year. The expense increase is primarily due to $102 million in fuel price increases, while increased volumes were also a factor. The average price per gallon of fuel was 96 cents per gallon for 2003 compared to 78 cents per gallon for 2002. In order to minimize future exposure to fuel price fluctuation risk, during 2003 the Company entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases. As of December 26, 2003, 18% and 21% of 2004 and 2005, respectively, estimated fuel purchases were hedged. Fuel swaps did not have an effect on fuel expense for the year ended December 26, 2003.

The net $22 million restructuring charge in 2003 represents the cost of CSX's reorganization charges offset by reductions in 1991/1992 separation reserves. (See Note 4, Restructuring.)



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*Operating Income*

Operating income decreased $313 million to $541 million in 2003, compared to $854 million in 2002 primarily due to the $229 million provision for casualty claims, the $22 million net restructuring charge and other expense increases as previously discussed. Excluding the provision for casualty claims and net restructuring charge, operating income would have been $792 million.

***2002 vs. 2001***

*Operating Revenue*

Overall rail revenues were down $79 million to $6.0 billion in 2002, with increases in merchandise and automotive revenues being offset by lower coal revenues. CSX's pricing programs and product mix helped overcome a 3% decrease in carloads in 2002.

*Merchandise Revenue*

Overall merchandise revenues were up 1%, or $47 million in 2002 over 2001. Improvements in phosphates and fertilizers, chemicals, emerging markets, metals and paper and forest products more than offset decreases in minerals, agricultural products and food and consumer products. Pricing programs and favorable mix helped the Company offset the effect of a small decrease in merchandise carloads in 2002 as compared to 2001.

*Automotive Revenue*

Automotive revenues improved 6%, or $51 million in 2002 as a result of yield improvement driven by favorable mix and extended linehauls. Year-over-year volume increases were driven by higher light truck production levels and aggressive manufacturer incentives that stimulated automobile sales during 2002.

*Coal, Coke and Iron Ore Revenue*

Coal revenues had a significant impact on the rail segment's 2002 financial results. Coal revenue was down 9%, or $143 million from 2001's strong performance due to reduced volumes. Export carloads were down significantly as a result of the reduced competitive standing of U.S. coal in the international market, while metallurgical and industrial markets were down in the second half of 2002.

*Other Revenue*

Other revenue decreased $35 million in 2002 as compared to 2001 primarily because there were lower fuel surcharges billed to customers.

*Operating Expense*

Total rail operating expenses decreased $190 million, or 4% in 2002 as compared to 2001. Reductions in most expense categories were somewhat offset by increases in depreciation and reduced intercompany volume with CSX Intermodal. Also, 2001 included $60 million relating to the New Orleans litigation settlement. Fuel costs decreased $76 million in 2002, of which $69 million is attributable to lower fuel prices. The net impact on operating income of reduced fuel price was $44 million since $25 million of fuel surcharge revenue was discontinued.

Labor and fringe costs decreased $44 million year-over-year including savings from reductions in overall employment. These savings were offset by increased labor costs relating to cost of living wage increases. Employee count was approximately 950 lower at the end of 2002 as compared to 2001.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Building and equipment costs were down $17 million mainly due to continued reduction in car hire as the railroad took cars offline and ran more efficiently.

Conrail operating fees, rents and services decreased $14 million in 2002 as compared to 2001. Decreased costs in operating the shared asset areas, tax settlements, efficiency improvements and adjustments to reflect lower reserve requirements for car hire, overcharges, interline and other claims all reduced this expense.

Materials, supplies and other costs at the rail unit were down $11 million in 2002, as compared to 2001, due to reduced transportation costs, fewer accidents and adjustments to estimated state and local tax liabilities to reflect actual assessments. These decreases were offset by higher legal fees and maintenance costs, and $40 million in favorable insurance settlements received in 2001 that were not repeated in 2002.

Depreciation expense increased $26 million as compared to 2001, as a result of a higher depreciable asset base.

*Operating Income*

Rail operating income increased by $111 million to $854 million in 2002 as compared to 2001, due to operating expense decreases noted previously and the New Orleans litigation provision. Excluding the 2001 charge for the New Orleans litigation provision, operating income was up $51 million or 6% for the year.

*Intermodal*

***2003 vs. 2002***

CSX Intermodal domestic revenue improved 13% on 8% volume increase due to increased unloading and loading ("transloading") of international containers into domestic containers and new programs. Strength in truck brokerage continued due to the rollout of the new Pegasus information management system, which provides real-time information regarding driver availability and location, service quality tracking and financial performance. The parcel sector also showed year-over-year strength. International strength in general import growth was partially offset by continued international import/export diversions of freight carried entirely via water routes from west coast ports to east coast ports. These diversions have resulted in volume declines, shorter hauls and lower per-unit revenue.

Intermodal operating expense increased $108 million compared to the prior year. The increase is due primarily to traffic mix and inflationary factors. Additionally, the Company recognized a $15 million positive contract settlement in 2002. Operating income decreased to $110 million in 2003, compared to $141 million in the prior year.

***2002 vs. 2001***

CSXI reported operating revenue of $1.2 billion in 2002, as compared to $1.1 billion in 2001. The increase was primarily due to continued success in efforts to convert truck traffic onto the intermodal network.

CSXI operating expense increased $31 million in 2002. This increase was the result of $32 million in higher inland transportation costs due to increased volumes handled during 2002. Also, due to volume increases, building and equipment rent increased $8 million, and materials, supplies and other increased $6 million. The increase was partially offset by a $15 million positive contract settlement. Other costs were relatively flat year-over-year.

CSXI operating income was up $37 million in 2002 as compared to 2001, due to the $68 million increase in revenues, offset by a $31 million increase in operating expenses. These results were also impacted by the $15 million positive contract settlement noted above.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*International Terminals*

***2003 vs. 2002***

CSXWT's revenue decreased $10 million, or 4% to $226 million for 2003, compared to $236 million in the prior year, primarily due to weakness in the Hong Kong market. Expense decreased to $157 million for the year, compared to $167 million for 2002, partially attributable to reduced labor and fringe costs associated with reduced volume at its Hong Kong operations and a $6 million gain related to the divestiture of a portion of the Caucedo terminal ownership interest, which offset other miscellaneous expenses in 2002. Operating income remained consistent at $69 million in 2003 and 2002.

During 2003, a significant customer of CSXWT announced that it would terminate its marine terminal services contract during the first quarter of 2004. This is expected to negatively impact CSXWT's 2004 operating income by approximately $29 million and cash flow by approximately $21 million. In December 2004, another contract is scheduled to expire. Negotiations are in process to maintain this contract, but if negotiations are unsuccessful, 2005 operating income may be negatively impacted by $20 million. CSXWT expects that it will be able to replace all or substantially all of the lost volume with new customers representing long and short-term commercial commitments. However, due to the increased competitive pressures, it is possible that the profit margins achieved in the past will not be realized in the near term. Under the provisions of FASB Statement No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," companies are required to review their assets for potential impairment losses if there are certain impairment indicators present. Given these indicators, the Company evaluated the undiscounted cash flows estimated to be generated by this terminal, whose long-lived assets are recorded at $59 million, and concluded that the forecasted future undiscounted cash flows exceeded the book value of the assets; therefore no impairment write-down is necessary at this time.

***2002 vs. 2001***

CSX World Terminals' operating revenues were flat at $236 million in 2002 and 2001. Operating expenses were up $2 million in 2002 over 2001 due to lower earnings from equity investments. Miscellaneous operating expenses in 2002 and 2001 include $6 million and $3 million gains, respectively, from transactions relating to equity investments. Operating income was $69 million for 2002, a $2 million decrease from $71 million in 2001.

**Liquidity and Capital Resources**

*Operating Activities*

Cash provided by operations for 2003 was $804 million, compared to $1.1 billion for 2002, and $827 million in 2001. The $323 million decrease in 2003, as compared to the prior year, reflects the $380 million termination of the accounts receivable facility. (See Note 8, Accounts Receivable). Excluding that, cash provided by operating activities was slightly higher than 2002, at $1.2 billion. Real estate activities contributed $122 million to operating cash flow, as compared to $137 million provided in 2002.

In 2002 cash provided from operations was $1.1 billion, a $300 million increase over 2001. Higher operating income, lower interest expense and significant cash flow relating to real estate activities contributed to the increase, while there was a $85 million negative effect attributable to the New Orleans tank car fire settlement payment.

*Investing Activities*

Net cash used by investing activities was $807 million in 2003 compared to $775 million in 2002 and $965 million in 2001. While 2003 capital expenditures approximated 2002 levels,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

reduced proceeds from maturities of short-term investments led to the increase in cash used for investing activities. Proceeds of $214 million from the sale of CSX Lines in the first quarter of 2003 (See Note 3, Divestitures) helped to offset the impact of reduced short-term investment proceeds.

Property additions totaled $1.1 billion in 2003 and 2002 and $930 million in 2001. The 2003 and 2002 increases over 2001 were related to replacement of cars and locomotives. Of Surface Transportation's $1 billion in 2003 capital expenditures, substantially all related to replacing track, locomotives and other costs necessary to maintain the Company's rail system. 2004 capital expenditures are expected to be approximately $1 billion.

*Financing Activities*

Financing activities provided cash of $172 million during 2003 and $15 million in 2001, compared to a $362 million use of cash during 2002. In 2003, net issuances of $419 million in long-term debt were principally used to repay short-term obligations incurred as a result of the termination of the Company's accounts receivable sales program.

***Debt Issuances and Credit Facilities***

In December 2003, CSX executed a $75 million revolving loan facility that matures in 2005. Borrowings under the facility will bear interest at a rate that fluctuates with LIBOR. In addition, the Company pays an annual commitment fee of 0.15% for the period the facility is not drawn. This debt may be redeemed at any time after May 2004, with additional borrowings allowed through the maturity of the facility. As of December 26, 2003, the Company had $75 million in aggregate principal amount outstanding under this borrowing.

In November 2003, CSX issued $200 million aggregate principal amount of the Company's Notes due 2014 and $200 million aggregate principal amount of the Company's Notes due 2006. The 2014 Notes bear interest at the rate of 5.30% per year and mature on February 15, 2014. The 2006 Notes bear interest at the rate of 2.75% per year and mature on February 15, 2006. The 2014 Notes may be redeemed by the Company at any time, but the 2006 Notes cannot be redeemed before maturity.

In August 2003, the Company issued $300 million aggregate principal amount Notes due 2013. These Notes bear interest at the rate of 5.50% and mature on August 1, 2013. The Notes may be redeemed by the Company at any time.

CSX increased its borrowings from Conrail by approximately $144 million year-over-year in 2003 in addition to the $146 million increase in 2002. Also, during 2002 the Conrail note was extended to a five year term.

During 2002, CSX issued $200 million of 4.88% notes due in 2009 and $400 million of 6.30% notes due in 2012.

The Company has a $1 billion five-year revolving credit facility and a $345 million 364-day revolving credit facility. Generally, these facilities may be used to support the Company's commercial paper, working capital and other general corporate purposes. Under the 364-day facility, the Company pays an annual fee to the participating banks of .125% of total commitment. Under the five-year facility, the Company pays annual fees to the participating banks that may range from 0.08% to 0.23% of total commitment, depending on the Company's credit rating. As of December 26, 2003, the Company had no borrowings outstanding under these facilities and there were no commercial paper borrowings outstanding. CSX had commercial paper borrowings supported by these credit facilities of approximately $140 million at the end of 2002.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Debt Repayments***

CSX repaid long-term debt of $500 million in 2003, $1.2 billion in 2002, and $266 million in 2001. The Company also paid a net $141 million in short-term debt during 2003. The primary sources of 2003 repayments were the $214 million of proceeds from the conveyance of CSX Lines (see Note 3, Divestitures) and the issuance of new debt.

Long-term and short-term debt at December 26, 2003 and December 27, 2002, totaled $7.3 billion and $7.1 billion, respectively. The ratio of debt to total capitalization was 51% at the end of 2003, and 52% at the end of 2002 and 2001.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the “debentures”) due October 30, 2021 for an initial offering price of approximately $462 million. At December 26, 2003 and December 27, 2002, outstanding debentures are included in long-term debt, at a carrying value of $447 million and $467 million, respectively. These debentures accrete (increase) in value at a yield to maturity of 1% per year. The accretion rate may be reset on October 30, 2007, October 30, 2011, and October 30, 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.

Under the terms of the debentures, holders had the option to require the Company to purchase their debentures at a purchase price equal to the accreted value of the debentures in October 2003. CSX purchased $15 million aggregate principal amount at maturity of the debentures at an aggregate cost of $13 million. In November 2003, the Company made a one-time cash payment of $23.00 per $1,000 aggregate principal amount at maturity to holders who did not require the Company to purchase their debentures. This resulted in a $13 million cash payment, which will be amortized over the remaining term of the debentures. In addition, the terms of the debentures were amended to permit holders to cause the Company to purchase the debentures on October 30, 2005, at their accreted value of $852.48 per $1,000 principal amount at maturity, in addition to the purchase dates provided under the terms of the debentures. Similarly, the debentures allow holders to require the Company to purchase their debentures in October 2006, October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures. In 2005, 2006 and 2008, CSX may elect to pay the purchase price in cash and/or shares of common stock, while CSX may pay the purchase price only in cash on the last two purchase dates. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures.

Holders may convert debentures into CSX common stock if certain requirements defined in the debentures and the related indenture are met. Holders may convert if the closing sale price of CSX common stock for at least 20 of the 30 preceding trading days is more than the applicable percentage (which is initially 120% and will decline over the life of the debentures to 110%) of the accreted conversion price per share of the Company’s common stock. The “accreted conversion price” per share of common stock is the quotient of the accreted value of a debenture divided by the number of shares of common stock issuable upon conversion of that debenture. Holders may also convert if the Company’s senior long-term unsecured credit ratings are downgraded by Moody’s Investors Service Inc. to below Ba1 and by Standard & Poor’s Rating Services to below BB+, if the debentures have been called for redemption, if the Company makes specified distributions to holders of CSX common stock, or if the company is a party to specified consolidations, mergers, or transfers or leases of all or substantially all of the Company’s assets. For each debenture surrendered for conversion, a holder will initially receive 17.75 shares of CSX common stock, which is equivalent to an initial conversion price of $46.16



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

per share. The initial conversion rate will be adjusted for reasons specified in the indenture, but will not be adjusted for accretion. Instead, accretion on the debentures will be deemed paid by the common stock received by the holder on conversion.

***Shelf Registration Statements***

CSX has $600 million of remaining capacity under a shelf registration that may be used, subject to market conditions, to issue debt or other securities at the Company's discretion. The Company presently intends to use the proceeds from the sale of any securities issued under its shelf registration statements to finance cash requirements, including refinancing existing debt as it matures. While the Company seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit the Company to sell such securities on acceptable terms at any given time, or at all.

***Dividends***

In mid-year 2001, the board of directors announced that the regular quarterly dividend payable would be reduced to 10 cents per share. CSX had paid a regular quarterly dividend of 30 cents per share since the fourth quarter of 1997 and did so through June of 2001. Dividends paid in 2003, 2002 and 2001 were as follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Dividend Per Share | $ 0.40 | $ 0.40 | $ 0.80 |
| Total Cash Paid for Dividends (In Millions) | $ 86 | $ 86 | $ 171 |

***Working Capital***

The Company's working capital deficit at December 26, 2003, was $307 million, as compared to $665 million at December 27, 2002. A working capital deficit is not unusual for the Company and other companies in the industry and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due and has sufficient financial capacity to manage its day-to-day cash requirements and any obligations arising from legal, tax and other regulatory rulings.

***Credit Ratings***

As of December 26, 2003, CSX Corporation's long-term unsecured debt obligations were rated BBB and Baa2 by Standard and Poor's and by Moody's Investor Service, respectively. In the event CSX's long-term unsecured bond ratings were reduced to BBB- and Baa3, the Company's drawn and undrawn borrowing costs under the $1.0 billion and $345 million revolving credit facilities would not materially increase. However, at year-end 2003, the Company had no borrowings outstanding under these credit facilities. The Company's short-term commercial paper program is rated A-2 and P-2 by Standard and Poor's and Moody's Investor Service, respectively. Should these ratings decline to A-3 and P-3, the company's cost and access to the commercial paper markets could be adversely affected. At year-end 2003, the Company had no commercial paper borrowings outstanding.

**Schedule of Contractual Obligations and Commercial Commitments**

The following table sets forth maturities of the Company's contractual obligations:

| Type of Obligation | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | | (Millions of Dollars) | | | |
| Long-term Debt (see Note 11)(a) | $426 | $247 | $ 598 | $1,080 | $ 615 | $4,291 | $ 7,257 |
| Operating Leases — Net (see Note 18)(b) | 150 | 138 | 112 | 117 | 98 | 516 | 1,131 |
| Agreements with Conrail (see Note 2)(c) | 260 | 247 | 236 | 229 | 224 | 3,118 | 4,314 |
| Purchase Obligations (see Note 18)(d) | 132 | 138 | 166 | 171 | 171 | 1,866 | 2,644 |
| Total Contractual Obligations | $968 | $770 | $1,112 | $1,597 | $1,108 | $9,791 | $15,346 |

The following table sets forth the maturities of the Company's other commitments:

| Type of Commitment | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Unused Lines of Credit (see Note 11) | $345 | $ — | $1,000 | $ — | $ — | $ — | $1,345 |
| Guarantees (see Note 18)(e) | 140 | 122 | 98 | 140 | 102 | 240 | 842 |
| Other | 99 | 14 | 8 | — | — | 36 | 157 |
| Total Other Commitments | $584 | $136 | $1,106 | $140 | $102 | $276 | $2,344 |

(a) The fair market value of the interest rate swap agreements of $55 million, which is included in long-term debt on the balance sheet, is not included on the debt maturity schedule. Capital leases of $206 million are included in long-term debt.

(b) CSX has entered into various operating lease agreements primarily for rail transportation equipment.

(c) Agreements with Conrail represents commitments to pay Conrail per various agreements.

(d) Commercial commitments consists of a $2.6 billion maintenance program which expires in 2026 relating to CSX's fleet of locomotives. This program replaced an internal maintenance program.

(e) Approximately $440 million of these guarantees relate to certain lease obligations that CSX remains contingently liable for that were assumed by Maersk. Accordingly, CSX has collateral liens on the assets relating to these leases and indemnities provided by Maersk that it will fulfill the commitments. CSX believes that Maersk will fulfill its contractual commitments with respect to such leases and that CSX will have no further liabilities relating to these obligations. Approximately $97 million relates to construction and cash deficiency support guarantees at one of the Company's equity investments. CSX guarantees approximately $300 million relating to leases assumed as part of CSX's conveyance of its interest in CSX Lines.

**Off-Balance Sheet Arrangements**

There are no off-balance sheet arrangements, except as noted above, that are reasonably likely to have an effect on our financial condition or results of operations.

**Market Risk**

CSX addresses market risk exposure to fluctuations in interest rates and the risk of volatility in its fuel costs through the use of derivative financial instruments. The Company does not hold or issue derivative financial instruments for trading purposes.

The Company addresses its exposure to interest rate market risk through a controlled program of risk management that includes the use of interest rate swap agreements. As of December 26, 2003, the Company had various interest rate swap agreements on $1.3 billion of its outstanding notes payable. In the event of a 1% increase or decrease in the LIBOR interest rate, the interest expense related to these agreements would increase or decrease approximately $13 million on an annual basis.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

During 2003, the Company began a program to hedge its exposure to fuel price volatility through swap transactions. As of December 26, 2003, CSX has hedged approximately 18% and 21% of expected requirements for 2004 and 2005, respectively. The Company expects that by the end of 2004 the programs will result in an increase in the amount of fuel hedged to approximately 76% of 2005 annual purchases. At December 26, 2003, a 1% change in fuel prices would result in an increase or decrease in the asset related to the swaps of approximately $1 million. The Company is subject to risk relating to changes in the price of diesel fuel. At the end of 2003, the Company had not entered into any long-term commitments for forward fuel purchases. The Company's rail unit average annual fuel consumption is approximately 570 million gallons. A one-cent change in the price per gallon of fuel would impact fuel expense by approximately $6 million.

The Company is exposed to loss in the event of non-performance by any counter-party to the interest rate swap or fuel hedging agreements. The Company does not anticipate non-performance by such counter-parties, and no material loss would be expected from non-performance.

Exclusive of derivative contracts that swap fixed rate notes to floating interest rates, at December 26, 2003 and December 27, 2002, CSX had approximately $714 million and $709 million, respectively, of floating rate debt outstanding. A 1% variance in interest rates would on average effect annual interest expense by approximately $7 million.

While the Company's international terminals segment does business in several foreign countries, a substantial portion of its revenue and expenses are transacted in U.S. dollars, or currencies with little fluctuation against the U.S. dollar. For this reason, CSX does not believe its foreign currency market risk is significant.

A substantial increase in the fair market value of the Company's stock price could negatively impact earnings per share due to the dilutive effect of stock options and convertible debt.

**Investment In and Integrated Rail Operations with Conrail**

See background, accounting and financial reporting effects and summary financial information in Note 2, Investment In and Integrated Rail Operations with Conrail.

***Conrail's Results of Operations***

***2003 vs. 2002***

Conrail Inc. ("Conrail") reported net income of $203 million in 2003, which included a cumulative effect of accounting change benefit of $40 million. Excluding the cumulative effect of accounting change, net income was $163 million, as compared with $180 million in 2002. Operating revenues were up $25 million to $918 million from the prior year. However, operating expenses were up 6% to $659 million.

In June 2003, CSX, Norfolk Southern Corporation ("NS") and Conrail jointly filed a petition with the Surface Transportation Board ("STB") to establish direct ownership and control by CSX's and NS' respective subsidiaries, CSX Transportation Inc. ("CSXT") and Norfolk Southern Railway ("NSR") of their portions of the Conrail system already operated by them separately and independently under various agreements. These portions of the Conrail system are currently owned by Conrail's subsidiaries, New York Central Lines LLC ("NYC") and Pennsylvania Lines LLC ("PRR"). The ownership of NYC and PRR would be transferred ("spun off") to CSXT and NSR, respectively. Conrail would continue to own, manage and operate the Shared Asset Areas as previously approved by the STB. STB approval to proceed with the spin-off transaction and a favorable ruling from the IRS qualifying the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

transaction as a non-taxable disposition were received in November 2003. The transaction remains subject to a number of other conditions.

If all necessary conditions are satisfied, unsecured debt securities of newly formed subsidiaries of CSXT and NSR would be offered in a 42%/58% ratio in exchange for Conrail's unsecured debentures. The debt securities issued by its respective subsidiary would be fully and unconditionally guaranteed by CSXT or NSR. Upon completion of the proposed transaction, the subsidiaries would be merged into CSXT and NSR, respectively, and the new debt securities thus would become direct unsecured obligations of CSXT or NSR. Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations, also on a 42%/58% ratio, of CSXT and NSR. CSX will record the proposed transaction at fair value based on the results of an independent valuation of NYC, with any difference from carrying value resulting in a gain or loss. The Company can not predict the outcome of the valuation and the impact on the Company's financial statements.

CSX, NS and Conrail are working to complete the spin-off transaction in 2004. Upon consummation of the proposed transaction, CSX's investment in Conrail will no longer include the amounts related to NYC and PRR. Instead the assets and liabilities of NYC will be reflected in their respective line items in CSX's consolidated balance sheet. Conrail will continue to own, manage and operate the Shared Asset Areas.

***2002 vs. 2001***

Conrail reported net income of $180 million in 2002, compared with $174 million in 2001. Operating revenues were down $10 million to $893 million in 2002, while operating expenses were favorable $16 million year-over-year. Lower costs in the Shared Asset Areas, tax settlements and lower reserve requirements for car hire, overcharges, interline and other claims helped improve 2002 results.

***Financial Condition and Liquidity***

Conrail's operating activities provided cash of $412 million in 2003, compared with $423 million in 2002 and $502 million in 2001. The decrease in cash provided by operations in 2003 is a result of decreased operating income. The decrease in cash provided by operations in 2002 compared to 2001 reflected large payments of casualty claims. Cash generated from operations is the principal source of liquidity and is primarily used for debt repayments and capital expenditures.

Debt repayments totaled $57 million, $59 million and $61 million in 2003, 2002 and 2001, respectively. Capital expenditures were $35 million, $23 million and $47 million in 2003, 2002 and 2001, respectively. Total cash used for financing activities was $360 million, most of which results from an increase in the amount receivable from CSX and Norfolk Southern under their respective notes (See Note 2, Investment In and Integrated Rail Operations with Conrail).

Conrail had working capital deficits of $22 million and $29 million at December 26, 2003 and December 27, 2002, respectively. A working capital deficit is not unusual for the Company and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due and has sufficient financial capacity to manage its day-to-day cash requirements and any obligations arising from legal, tax and other regulatory rulings.

**Divestitures**

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC ("CSX Lines"), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs, and $60 million of securities). CSX Lines was subsequently renamed



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Horizon Lines LLC (“Horizon”). Horizon has subleased equipment and/or assigned vessel leases from certain affiliates of CSX covering the primary financial obligations related to $300 million of leases under which CSX or one of its affiliates will remain a lessee/ sublessor or guarantor. A deferred pretax gain of approximately $127 million as a result of the transaction will be recognized over the 12-year sub-lease term. Approximately $9 million of this gain was recognized during 2003. The securities have a term of 7 years and a preferred return feature. During the third quarter, CSX received a $15 million payment from Horizon Lines, which included $3 million of interest, in return of a portion of its investment in Horizon and now holds $48 million of securities.

**Other Matters**

***Matters Arising out of Sale of International Container-Shipping Assets***

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The first dispute involved a post-closing working capital adjustment to the sale price for which the Company had recorded a receivable of approximately $70 million. The second dispute involved a claim of 425 million Dutch Guilders (approximately $180 million at then prevailing currency exchange rates) plus interest by Europe Container Terminals BV (“ECT”) alleging breaches of contract by the Company at the Rotterdam container terminal facility owned by ECT.

Also in 2003, CSX entered into a final settlement agreement with Maersk allocating responsibility between the two companies for third party claims and litigation relating to the assets acquired by Maersk.

The two settlements reduced the Company’s 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in the financial statements as an additional loss on the sale of the international container-shipping assets. Neither settlement has a material impact on cash flows.

***Restructuring***

In November 2003, the Company announced a management restructuring plan to streamline the structure at a number of its companies, eliminate organizational layers and realign certain functions. The initiative will reduce the non-union workforce by 800 to 1,000 positions over the last quarter of 2003 and the first half of 2004. As of December 26, 2003, 20 employees have been terminated under this program. The Company recorded an initial charge related to this reduction of $34 million pretax, in 2003, to record the lowest amount of expense to be incurred under this program. The total estimated cost of the program is expected to be in the range of $60 million to $80 million. The majority of separation benefits will be paid from CSX’s qualified pension plans, with the remainder being paid from general corporate funds.

Also in 2003, the Company recorded a $10 million restructuring charge related to another workforce reduction program. Substantially all of this amount had been paid out at December 27, 2003.

In 2003, the Company recorded a $22 million pretax credit related to a favorable change in estimate related to the 1991 and 1992 separation plans. These plans provided for workforce reductions, improvements in productivity and other cost reductions. The reduction in estimate for these plans results from lower railroad retirement taxes and other benefits than had been built into the initial $1.3 billion charge.

A net $22 million restructuring charge was recorded representing the cost of the restructuring initiatives offset by reductions in 1991/1992 separation reserves. The associated expense is included in operating expense on the Income Statement as “Restructuring Charge — Net.”



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Critical Accounting Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Significant estimates using management judgment are made for the following areas:

1. Casualty, legal and environmental reserves

2. Pension and postretirement medical plan accounting

3. Depreciation policies for its assets under the group-life method

These estimates and assumptions are discussed with the Audit Committee of the Board of Directors on a regular basis.

***1. Casualty, Legal and Environmental Reserves***

*Casualty Reserve Management*

Casualty reserves represent accruals for the uninsured portion of occupational injury and personal injury claims. These reserves are recorded upon the first reporting of a claim, and estimates are updated as information develops. The amount of liability accrued is based on the type and severity of the claim, and an estimate of future claims development based on current trends and historical data. The Company believes it has recorded liabilities in sufficient amounts to cover all identified claims and estimates of incurred but not reported personal injury claims for the next seven years. During 2003, the Company retained third party professionals to work with it to project the number of asbestos and other occupational injury claims to be received over the next seven years and the related costs. Based on this analysis the Company established reserves for the probable and reasonably estimable asbestos and other occupational injury liabilities. Other occupational claims include allegations of exposure to certain materials in the work place, such as solvents and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss. In conjunction with the change in estimate, in 2003 the Company recorded a charge of $206 million to increase its provision for these claims. Approximately $141 million of this amount relates to asbestos claims. Additionally, the provision for personal injury claims was increased by $26 million as a result of a change in estimate.

Estimates for all of these claims are subject to significant uncertainty relating to the outcomes of negotiated settlements and other developments and are not suited to subjecting to a sensitivity analysis. As facts and circumstances change, the Company may have to change its estimates, and changes could have a material impact on the Company's financial results. Events such as adverse verdicts, catastrophic accidents and legal settlements will cause the Company to revise its estimated liabilities, which the Company reviews and appropriately adjusts quarterly. Personal and occupational injury liabilities amount to $864 million and $605 million at December 26, 2003 and December 27, 2002, respectively. (See Note 10, Casualty, Environmental and Other Reserves).

*Legal Reserves*

In accordance with SFAS 5, "Accounting for Contingencies," an accrual for a loss contingency is established if information available prior to issuance of the financial statements indicates that it is (1) probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and (2) the amount of loss can be reasonably estimated. If no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The Company evaluates all exposures relating to legal liabilities on an ongoing basis and records reserves when appropriate under the guidance noted above.

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The two settlements reduced the Company's 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in the financial statements as an additional loss on the sale of the international container-shipping assets. Neither settlement has a material impact on cash flows.

In 2001 Duke Energy Corporation ("Duke") filed a complaint before the U.S. Surface Transportation Board alleging that certain CSXT common carrier coal rates are unreasonably high. In February 2004, the STB issued a decision finding that the CSXT common carrier rates were reasonable. While approving the rate levels, the STB also invited Duke to request a phase-in of rate increases over some time period. The nature and amount of any such phase-in is uncertain, and would only apply to billings subsequent to December 2001. CSXT will continue to consider and pursue all available legal defenses in this matter. Administrative and legal appeals are possible, and could take several years to resolve. An unfavorable outcome to this complaint would not have a material effect on the Company.

The Company increased a reserve in 2001 to account for the impact of the negotiated settlement of the New Orleans tank car fire. This negotiation resulted in the Company recording an additional charge of $60 million pretax, $37 million after tax in 2001.

*Environmental Management*

CSXT is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. CSXT has been identified as a potentially responsible party ("PRP") at approximately 260 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Superfund statute ("Superfund") or similar state statutes. A number of these proceedings are based on allegations that CSXT, or its railroad predecessors, sent hazardous substances to the facilities in question for disposal. Some of the proceedings involve property formerly or currently owned by CSXT or its railroad predecessors. Proceedings arising under Superfund or similar state statutes can involve numerous other companies who generated the waste or owned or operated the property and involve the allocation of liability for costs associated with site investigation and cleanup, which could be substantial.

At least once each quarter, CSXT reviews its role with respect to each such location, giving consideration to a number of factors, including:

- the type of cleanup required,
- the nature of CSXT's alleged connection to the location (e.g., generator of waste sent to the site, or owner or operator of the site),
- the extent of CSXT's alleged connection (e.g., volume of waste sent to the location and other relevant factors),
- the accuracy and strength of evidence connecting CSXT to the location,
- and the number, connection, and financial viability of other named and unnamed PRP's at the location.

Based on the review process, CSXT has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. The recorded liabilities for estimated future environmental costs at December 26, 2003, and December 27, 2002 were $45 million and



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

$35 million, respectively. These liabilities, which are undiscounted, include amounts representing CSXT's estimate of unasserted claims, which CSXT believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable and (2) can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. During 2003, the Company increased its estimate for environmental liabilities by a net $10 million due to continuing evaluation of the adequacy of the reserve. The majority of the December 26, 2003 environmental liability is expected to be paid out over the next seven years.

The Company does not currently possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. Also, changes in federal and state laws and regulations may impact, favorably or unfavorably, the effort required to remediate sites. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations and financial condition.

***2. Pension and Postretirement Medical Plan Accounting***

The Company sponsors defined benefit pension plans, principally for salaried personnel. The plans provide eligible employees with retirement benefits based principally on years of service and compensation rates near retirement. In addition to the defined benefit pension plans, the Company sponsors three plans that provide medical and life insurance benefits to most full-time salaried employees upon their retirement. The postretirement medical plans are contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory. The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

1. Service cost (benefits attributed to employee service during the period)

2. Interest cost (interest on the liability due to the passage of time)

3. Actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions)

4. Benefits paid to participants

Plan assets are amounts that have been segregated and restricted to provide benefits, and include amounts contributed by the Company and amounts earned from investing contributions, less benefits paid. The pension plans are funded at not less than the minimum funding standards set forth in the Employee Retirement Income Security Act of 1974. Plan assets consist primarily of common stocks, corporate bonds and cash and cash equivalents. The Company funds the cost of the postretirement medical and life insurance benefits on a pay-as-you-go basis. The accounting for these plans is subject to the guidance provided in SFAS No. 87, "Employers Accounting for Pensions," and SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other than Pensions." Both of these statements require that management make certain assumptions relating to the following:

1. Long-term rate of return of plan assets

2. Discount rates used to measure future obligations and interest expense

3. Salary scale inflation rates

4. Health care cost trend rates and other assumptions



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

All of these assumptions and estimates can have a significant impact on the Company's accounting for these plans and the amount of expense recorded in a reporting period. These assumptions are made as of the beginning of the year. The Company uses a plan year of Oct. 1 through Sept. 30 to value its pension and postretirement plans on an actuarial basis. As permitted by SFAS 87, the Company has elected to use this fiscal year as it provides for more timely analysis. The Company engages third-party actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects for its plans. The Company reviews its actuarial assumptions on an annual basis and makes modifications to the assumptions based on current rates and trends when appropriate. Additionally, as CSX expects a curtailment (event that impacts the future service, and therefore benefits, to be earned by employees under the plan), to occur in the first quarter of 2004 as a result of the Management Restructuring, and accordingly, will review actuarial assumptions as required by SFAS 88 and SFAS 106. The impact of the curtailment is expected to be immaterial. Currently, the Company does not expect any significant changes to its assumptions.

*Long-term Rate of Return on Plan Assets*

The expected return on the Company's pension plan assets is based on the Company's expectation of the long-term average rate of return on assets in the pension funds (based on a composite yield of AA-rated corporate bonds), which is reflective of the current and projected asset mix of the funds. As this estimate is long-term, it is not adjusted as frequently as other assumptions used in pension accounting. However, the impact of the last few years' overall market returns did cause CSX to reevaluate the rate used in calculating its liability at September 30, 2002 (the end of the measurement period for 2002) and adjust it from 9.5% to 8.9%. This change will increase the amount of pension expense reported in future periods. The Company evaluated the investment performance during 2003 as well as future expectations and determined that an adjustment to the long-term rate of return is not warranted. CSX will continue to evaluate its performance on an ongoing basis and if appropriate will adjust the long-term rate of return. A 1% change in the rate of return assumption would change pension expense by $15 million.

*Discount Rates*

Discount rates are based on comparable rates for long-term liabilities that reflect a similar time horizon to payments that the Company will make for pension and postretirement medical payments. These rates are analyzed every year and adjusted accordingly. As such, management has minimal discretion with respect to the discount rates used. The discount rate impacts the amount of liability recorded and also the amount of the interest expense component of pension and postretirement expense. CSX's assumed discount rates used in calculating the liability at September 30, 2003 and September 30, 2002, respectively, were 6.0% and 6.5% for the pension liabilities and 5.0% and 5.5% for postretirement medical benefits. The difference between the rate used for pension vs. postretirement is due to the different time horizon of future payments.

*Salary Scale Inflation*

Salary scale inflation rates are based on current trends and historical data accumulated by the Company. The Company reviews this assumption on a regular basis and makes adjustments when appropriate. CSX lowered this rate from 4.5% in 2001 to 3.3% for 2002 and 2003.

*Health Care Cost Trend Rates*

The health care cost trend rate is based on current trends and historical data. Due to the increasing costs of providing health care benefits, the Company increased the inflation assumption for health care costs for the 2002 year. No changes were deemed necessary to the health care cost trend rate in 2003. The current assumed rate is 11% decreasing gradually until



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

reaching 4.5% in 2012. A 1% change in the health care cost trend rate assumption would effect expense by $2 million.

*Summary Pension Assumptions*

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | 8.90% | 9.50% | n/a | n/a |
| Benefit Obligation at End of Plan Year | 8.90% | 8.90% | n/a | n/a |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | 6.50% | 7.25% | 5.50% | 7.25% |
| Benefit Obligation at End of Plan Year | 6.00% | 6.50% | 5.00% | 5.50% |
| Salary Scale Inflation | 3.30% | 3.30% | 3.30% | 3.30% |

*Other Assumptions Relating to Pensions and Postretirement Benefits*

The calculations made by the actuaries also include assumptions relating to mortality rates, turnover, and retirement age. These assumptions are based on historical data and are approved by management. As a result of changes in assumptions for fiscal year 2004, net periodic pension benefit cost and postretirement benefit costs for 2004 are expected to increase approximately $7 million.

In December 2003, the President of the United States signed into law the “Medicare Prescription Drug, Improvement and Modernization Act of 2003” (“the Act”), which introduces a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is actuarially equivalent to Medicare Part D. SFAS 106 requires that changes in the law that take effect in the future and affect future benefit coverage shall be considered in current-period benefit measurements. However, as significant uncertainties exist for how to account for the subsidy a plan sponsor may not have sufficient information available to measure effects of the Act, prepare related actuarial valuations, and ensure proper accounting. Therefore, FASB has issued staff position No. FAS 106-1 which allows a plan sponsor to elect to defer recognizing the effects of the Act until authoritative guidance on the accounting for the federal subsidy is issued, or until certain other events occur. When the guidance is issued, it may cause CSX to revise previously reported information. CSX is currently evaluating how this legislation may impact its postretirement benefit plans. (See Note 17, “Employee Benefit Plans.”)

***3. Depreciation Policies Under the Group-Life Method***

The Company accounts for its rail assets, including main-line track, locomotives and freight cars, using the group-life method. This method pools similar assets by road and equipment type and then depreciates each group as a whole. These assets represent 94% of the Company’s total fixed assets and amounted to $12.9 billion on a net basis at December 26, 2003. Under the group-life method, the useful lives of rail assets are determined by the performance of a life-study which includes:

- statistical analysis of historical retirements for each group of property
- evaluation of the current operations
- previous assessment of the condition of the assets and outlook for their continued use
- comparison of assets to the same asset groups with other companies.

The results of the life study process determine the service lives for each asset group. These studies are conducted by a third party expert and analyzed by the Company's management. Changes in asset lives due to the results of the life studies could significantly impact future periods depreciation expense and thus the Company's results of operations. Events that could cause the Company to change its estimates relating to the lives of its asset groups could be changes in historical results, technological improvements and changes in specific assets. In 2003, the Company completed life studies for all of its rail assets. The effect of theses studies was to increase the average useful lives on its equipment and track assets, while decreasing the average useful lives on many of the roadway assets. These changes in average useful lives of the assets will have minimal net reduction on depreciation expense in the future. As a result, the net increase in depreciation expense was $1 million in 2003, while the impact will be a decrease of approximately $13 million in 2004 and thereafter.

Additionally, with the adoption of Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations" in 2003, CSX recorded pretax income of $93 million, $57 million after tax as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million annually.

In 2003, the Accounting Standards Executive Committee (AcSEC) of the American Institute of Certified Public Accountants voted to approve the Statement of Position (SOP) Accounting for Certain Costs and Activities related to Property, Plant and Equipment and presented it to the Financial Accounting Standards Board (FASB) for approval. If the FASB causes the SOP to be applicable, certain costs and activities that are currently capitalized may require immediate recognition and alternatively, some costs and activities that are currently expensed may require capitalization. In addition, the SOP will require additional refinement in asset componentization, potentially altering the amount of depreciation expense recognized. While the Company is evaluating the proposal, it has not yet determined what effect it may have if passed by the FASB. However, the effect could be material.

**New Accounting Pronouncements and Change In Accounting Policy**

SFAS 143, "Accounting for Asset Retirement Obligations" was issued in 2001. This statement addresses financial accounting and reporting for legal obligations associated with the retirement of tangible long-lived assets and the associated retirement costs. In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. As noted above, with the adoption of SFAS 143 in fiscal year 2003, CSX recorded pretax income of $93 million, $57 million after tax as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. The adoption of SFAS 143 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million annually.

SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" was issued in December 2002. SFAS 148 amends SFAS 123, "Accounting for Stock-Based Compensation," to provide alternative methods of transition to Statement 123's fair value method of accounting for stock-based employee compensation and require disclosure of the effects of an entity's accounting policy with respect to stock-based employee compensation. Effective beginning with fiscal year 2003, CSX has voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." In accordance with the prospective method of



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

adoption permitted under SFAS 148, stock-based awards issued subsequent to fiscal year 2002 are accounted for under the fair value recognition provisions of SFAS 123 utilizing the Black-Scholes valuation method and, accordingly, are expensed. (See Note 15, Stock Plans.)

In 2003, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which requires a variable interest entity ("VIE") to be consolidated by a company that is subject to a majority of the risk of loss from the variable interest entity's activities or is entitled to receive a majority of the entity's residual returns, or both. Interpretation No. 46 also requires disclosures about VIEs that the company is not required to consolidate but in which it has a significant variable interest. Also in 2003, Interpretation 46 ("46R"), a revision to FASB Interpretation No. 46 was issued, to clarify some of the provisions of, and to exempt certain entities from Interpretation 46 requirements. Under the new guidance, CSX will consolidate Four Rivers Transportation, Inc. ("FRT"), a shortline railroad, into its financial statements at the beginning of fiscal 2004. Presently, FRT is accounted for under the equity method of accounting. The adoption of Interpretation No. 46 will not have a material impact on results of operations in future reporting periods.

In 2002, the FASB issued Financial Accounting Standard Interpretation ("FASI") No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." This statement requires that certain guarantees be recorded at fair value on the statement of financial position and additional disclosures be made about guarantees. CSX did not realize a financial statement impact with the adoption of the accounting provisions of this statement in fiscal year 2003 and does not anticipate a future impact. (See Note 18, Commitments and Contingencies.)

In 2001, SFAS 142, "Goodwill and Other Intangible Assets", was issued. Under the provisions of SFAS 142, goodwill and other indefinite lived intangible assets are no longer amortized, but are reviewed for impairment on a periodic basis. The Company adopted this standard for fiscal 2002, and incurred a pretax charge of $83 million, $43 million after tax and minority interest as a cumulative effect of an accounting change, which represents the difference between book value and the fair value of indefinite lived intangible assets. These indefinite lived intangible assets are permits and licenses that the Company holds relating to a proposed pipeline to transfer natural gas from Alaska's North Slope to the port in Valdez, Alaska. The fair value was determined using a discount method of projected future cash flows relating to these assets. The carrying value of these assets is now approximately $3 million. The adoption of SFAS 142 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. The Company does not have any other significant indefinite lived intangible assets.

In 2002, SFAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," was issued. This statement requires that long-lived assets to be disposed of by sale are no longer measured on a net realizable value basis, and future operating losses are no longer recognized before they occur. In addition, this statement modifies the reporting requirements for discontinued operations. Long-lived assets, whether to be held for disposition or held and used, should be measured at the lower of its carrying amount or fair value less cost to dispose. The Company applied the provisions of this statement relating to the accounting for the conveyance of its wholly-owned subsidiary, CSX Lines, to a third party in 2003 (See Note 3, Divestitures). In addition, another of the Company's subsidiaries, CSX World Terminals, was notified of a significant customer loss for 2004 and possible customer loss for 2005. Given these indicators, the Company evaluated the undiscounted cash flows estimated to be generated by this terminal, whose long-lived assets are recorded at $59 million and concluded that the forecasted future undiscounted cash flows exceeded the book value of its long-lived assets, therefore no impairment write-down is necessary at this time.



 Powered by Morningstar® Document Research℠

**Regulation and Legislation**

Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board ("STB") of the United States Department of Transportation ("DOT"), the Federal Railroad Administration of DOT and other state and regulatory agencies. The regulation and legislation passed by these organization can significantly affect the costs and profitability of the Company's business.

In response to the heightened threat of terrorism in the wake of the September 2001 attacks on the World Trade Center, Pentagon and airline infrastructure, federal, state and local regulatory agencies are evaluating various proposals with respect to the transportation industry. Some of these proposals relate to the transport of hazardous material. Certain metropolitan areas considered at high risk for a terrorist attack may be the subject of future regulation. The ultimate legislation passed by federal, state and local regulators related to issues of security has the potential to severely affect CSX's operations and costs.

**Factors Expected to Influence 2004**

During the upcoming year, there are several key areas which continue to affect the operations and profitability of CSX. Management believes that the Company must remain focused on improving the efficiency of its rail network, reducing its operating expense and restoring higher service levels. General economic factors, including the cost of fuel, may also influence 2004 operating results.

Improving operating efficiency in Surface Transportation while maintaining volume is critical to success in lowering the operating ratio, and in turn improving financial performance. To do so, management believes that CSX must optimize its network routing, including a reduction in both gross ton miles and the number of times a car is handled or switched en route to the final destination. CSX is utilizing internal and external consultants to assist with the network optimization effort.

Fuel represents a significant expense of CSX Surface Transportation operations and was a factor in 2003 expense increases. Fuel prices can vary significantly from period to period and significantly impact future results. Although CSX has implemented a fuel price hedging program, it will remain subject to fuel price fluctuations for the majority of 2004 fuel purchases. Approximately 18% of 2004 fuel purchases are currently hedged at an average cost of 70 cents per gallon, exclusive of taxes and transportation costs. Each month, the Company is systematically increasing its hedged amount so that in July of 2005, 76% of the estimated fuel purchases should be hedged for a 24 month period.

CSX faces inherent business risk of exposure to property damage and personal injury claims in the event of train accidents, including derailments. The Company is also subject to exposure to occupational injury claims. While CSX is working diligently to enhance its safety programs and to continue to raise the awareness levels of its employees concerning safety, the Company cannot ensure that it will not experience any material property damage, personal or occupational claims in the future or that we will not incur significant costs to defend such claims. Additionally, the Company cannot ensure that existing claims will not suffer adverse development not currently reflected in reserve estimates, as the ultimate outcome of existing claims is subject to numerous factors which are outside of CSX's control. CSX engages outside parties to assist with the evaluation of certain of the occupational and personal injury claims, and believes that it is adequately reserved to cover all potential claims. However, final amounts determined to be due to any outstanding matters may differ materially from the recorded reserves.

The ability of the Company to effectively implement the management restructuring will be an important factor in future success. Once complete, the organization of the Company should be conducive to enhanced accountability, faster, more reliable communication, better decision



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

making and a more competitive cost structure. Executing the restructuring while minimizing the impact of the possible disruption associated with the elimination of a significant portion of the Company's existing management will be critical to the Company's short-term success.

The ability of the Company to replace, in both the long and short-term, the business lost due to competitive pressures in the Hong Kong terminals market will have a direct impact on the profitability of the Company's International Terminals segment. While management is diligently working to attract new customers, there can be no guarantee that new customers will be gained. Also, it is likely that the margins experienced in the past at the Company's Hong Kong terminal operations will not continue for the near term, even if the lost volume is replaced. The International Terminals segment's revenue and operating income represented approximately 3% and 11% of the Company's consolidated revenues and operating income, respectively for 2003.

**Forward-Looking Statements**

This Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act with respect to, among other items:

- projections and estimates of earnings, revenues, cost-savings, expenses, or other financial items;
- statements of management's plans, strategies and objectives for future operations, and management's expectations as to future performance and operations and the time by which objectives will be achieved;
- statements concerning proposed new products and services; and
- statements regarding future economic, industry or market conditions or performance.

Forward-looking statements are typically identified by words or phrases such as "believe", "expect", "anticipate", "project", and similar expressions. The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date the forward-looking statement is made. The Company undertakes no obligation to update or revise any forward-looking statement. If the Company does update any forward-looking statement, no inference should be drawn that the Company will make additional updates with respect to that statement or any other forward-looking statements.

Forward-looking statements are subject to a number of risks and uncertainties, and actual performance or results could differ materially from that anticipated by these forward-looking statements. Factors that may cause actual results to differ materially from those contemplated by these forward-looking statements include, among others:

- Operating factors — the Company's success in implementing its financial and operational initiatives, the extent to which the Company is successful in gaining long-term relationships with new customers or retaining existing relationships with current customers, changes in operating conditions and costs, competition, commodity concentrations, computer viruses, changes in labor costs and labor difficulties including stoppages affecting either the Company's operations or our customers' ability to deliver goods to the Company for shipment, loss of essential services such as electricity, and natural occurrences such as extreme weather conditions, floods and earthquakes or other disruptions of the Company's operations, systems, property or equipment;
- General economic and industry factors — material changes in domestic or international economic or business conditions, including those affecting the rail industry such as customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that consume and produce freight, competition from other modes of freight transportation such as trucking,

competition and consolidation within the transportation industry generally, changes in fuel prices and changes in securities and capital markets;

- Legal and regulatory factors — developments and changes in laws and regulations, the ultimate outcome of shipper and rate claims subject to adjudication, environmental investigations or proceedings and the outcome of other types of claims and litigation involving or affecting the Company.

Other important assumptions and factors that could cause actual results to differ materially from those in the forward-looking statements are specified elsewhere in this Annual Report and in the Company's other SEC reports, accessible on the SEC's website at www.sec.gov and the Company's website at www.csx.com.

**Item 7A.** ***Quantitative and Qualitative Disclosures about Market Risk***

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risk."



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Item 8.** ***Financial Statements and Supplementary Data***

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Report of Independent Certified Public Accountants | 40 |
| CSX Corporation | |
| Consolidated Financial Statements and Notes to Consolidated Financial Statements Submitted Herewith: | |
| Consolidated Income Statement — Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001 | 41 |
| Consolidated Balance Sheet — December 26, 2003 and December 27, 2002 | 42 |
| Consolidated Cash Flow Statement — Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001 | 43 |
| Consolidated Statement of Changes in Shareholders' Equity — Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001 | 44 |
| Notes to Consolidated Financial Statements | 45 |




Source: CSX CORP, 10-K, March 10, 2004

Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**REPORT OF ERNST & YOUNG LLP, INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS**

To the Shareholders and Board of Directors of CSX Corporation

We have audited the accompanying consolidated balance sheet of CSX Corporation and subsidiaries as of December 26, 2003 and December 27, 2002, and the related consolidated statements of income, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 26, 2003. These consolidated financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 26, 2003 and December 27, 2002, and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 26, 2003, in conformity with accounting principles generally accepted in the United States.

As discussed in Note 1 to the consolidated financial statements, in 2003 the Company changed its method of accounting for railroad tie removal costs and stock-based compensation, and in 2002 the Company changed its method of accounting for indefinite lived intangible assets.

Jacksonville, Florida

February 10, 2004



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED INCOME STATEMENT**

| | For Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 26, 2003 | Dec. 27, 2002 | Dec. 28, 2001 |
| | | (Dollars in Millions, Except Per Share Amounts) | |
| **Operating Income** | | | |
| Operating Revenue | $ 7,793 | $ 8,152 | $ 8,110 |
| Operating Expense | 7,167 | 7,025 | 7,153 |
| Operating Income | 626 | 1,127 | 957 |
| **Other Income and Expense** | | | |
| Other Income | 57 | 41 | 9 |
| Interest Expense | 418 | 445 | 518 |
| **Earnings** | | | |
| Earnings Before Income Taxes | 265 | 723 | 448 |
| Income Tax Expense | 76 | 256 | 155 |
| Earnings before Cumulative Effect of Accounting Change | 189 | 467 | 293 |
| Cumulative Effect of Accounting Change, Net of Taxes | 57 | (43) | — |
| Net Earnings | $ 246 | $ 424 | $ 293 |
| **Per Common Share** | | | |
| Earnings Per Share: | | | |
| Before Cumulative Effect of Accounting Change | $ 0.88 | $ 2.20 | $ 1.39 |
| Cumulative Effect of Accounting Change | 0.26 | (0.20) | — |
| Including Cumulative Effect of Accounting Change | $ 1.14 | $ 2.00 | $ 1.39 |
| Earnings Per Share, Assuming Dilution: | | | |
| Before Cumulative Effect of Accounting Change | $ 0.88 | $ 2.19 | $ 1.38 |
| Cumulative Effect of Accounting Change | 0.26 | (0.20) | — |
| Including Cumulative Effect of Accounting Change | $ 1.14 | $ 1.99 | $ 1.38 |
| Average Common Shares Outstanding (Thousands) | 213,964 | 212,729 | 211,668 |
| Average Common Shares Outstanding, Assuming Dilution (Thousands) | 214,396 | 213,512 | 212,409 |
| Cash Dividends Paid Per Common Share | $ 0.40 | $ 0.40 | $ 0.80 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED BALANCE SHEET**

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| **ASSETS** | | |
| Current Assets | | |
| Cash, Cash Equivalents and Short-term Investments | $ 368 | $ 264 |
| Accounts Receivable — Net | 1,163 | 799 |
| Materials and Supplies | 170 | 180 |
| Deferred Income Taxes | 136 | 128 |
| Assets Held for Disposition | — | 263 |
| Other Current Assets | 66 | 155 |
| Total Current Assets | 1,903 | 1,789 |
| Properties | 19,267 | 18,560 |
| Accumulated Depreciation | 5,537 | 5,274 |
| Properties — Net | 13,730 | 13,286 |
| Investment in Conrail | 4,678 | 4,653 |
| Affiliates and Other Companies | 515 | 381 |
| Other Long-term Assets | 934 | 842 |
| Total Assets | $21,760 | $20,951 |
| **LIABILITIES** | | |
| Current Liabilities | | |
| Accounts Payable | $ 827 | $ 802 |
| Labor and Fringe Benefits Payable | 397 | 457 |
| Casualty, Environmental and Other Reserves | 280 | 246 |
| Current Maturities of Long-term Debt | 426 | 391 |
| Short-term Debt | 2 | 143 |
| Income and Other Taxes Payable | 123 | 144 |
| Liabilities Held for Disposition | — | 104 |
| Other Current Liabilities | 155 | 167 |
| Total Current Liabilities | 2,210 | 2,454 |
| Casualty, Environmental and Other Reserves | 836 | 604 |
| Long-term Debt | 6,886 | 6,519 |
| Deferred Income Taxes | 3,752 | 3,567 |
| Other Long-term Liabilities | 1,623 | 1,566 |
| Total Liabilities | 15,307 | 14,710 |
| **Shareholders' Equity** | | |
| Common Stock, $1 Par Value | 215 | 215 |
| Other Capital | 1,579 | 1,547 |
| Retained Earnings | 4,957 | 4,797 |
| Accumulated Other Comprehensive Loss | (298) | (318) |
| Total Shareholders' Equity | 6,453 | 6,241 |
| Total Liabilities and Shareholders' Equity | $21,760 | $20,951 |

See accompanying Notes to Consolidated Financial Statements.

**CSX CORPORATION**

**CONSOLIDATED CASH FLOW STATEMENT**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 26, 2003 | Dec. 27, 2002 | Dec. 28, 2001 |
| | (Dollars in Millions) | | |
| **Operating Activities** | | | |
| Net Earnings | $ 246 | $ 424 | $ 293 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided: | | | |
| Depreciation | 643 | 649 | 622 |
| Deferred Income Taxes | 119 | 172 | 197 |
| Cumulative Effect of Accounting Change, Net of Tax | (57) | 43 | — |
| Additional Loss on Sale | 108 | — | — |
| Provision for Casualty Reserves | 232 | — | — |
| Restructuring — Net | 22 | — | — |
| Other Operating Activities | (108) | (108) | (13) |
| Changes in Operating Assets and Liabilities: | | | |
| Termination of Sale of Receivables | (380) | — | — |
| Accounts Receivable | 19 | 30 | 7 |
| Other Current Assets | 40 | 23 | (17) |
| Accounts Payable | 49 | (83) | (51) |
| Other Current Liabilities | (129) | (23) | (211) |
| Net Cash Provided by Operating Activities | 804 | 1,127 | 827 |
| **Investing Activities** | | | |
| Property Additions | (1,059) | (1,080) | (930) |
| Net Proceeds from Divestitures and Sale of Assets | 214 | — | — |
| Short-term Investments — Net | 68 | 350 | (51) |
| Other Investing Activities | (30) | (45) | 16 |
| Net Cash Used by Investing Activities | (807) | (775) | (965) |
| **Financing Activities** | | | |
| Short-term Debt — Net | (141) | 140 | (524) |
| Long-term Debt Issued | 919 | 748 | 962 |
| Long-term Debt Repaid | (500) | (1,159) | (266) |
| Dividends Paid | (86) | (86) | (171) |
| Other Financing Activities | (20) | (5) | 14 |
| Net Cash Provided (Used) by Financing Activities | 172 | (362) | 15 |
| Net Decrease in Cash and Cash Equivalents | 169 | (10) | (123) |
| **Cash, Cash Equivalents and Short-term Investments** | | | |
| Cash and Cash Equivalents at Beginning of Year | 127 | 137 | 260 |
| Cash and Cash Equivalents at End of Year | 296 | 127 | 137 |
| Short-term Investments at End of Year | 72 | 137 | 481 |
| Cash, Cash Equivalents and Short-term Investments at End of Year | $ 368 | $ 264 | $ 618 |
| **Supplemental Cash Flow Information** | | | |
| Interest Paid — Net of Amounts Capitalized | $ 415 | $ 448 | $ 509 |
| Income Taxes Paid | $ 134 | $ 44 | $ 250 |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY**

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | | |
| Balance Dec. 29, 2000 | 212,738 | $213 | $1,467 | $4,337 | $ — | $6,017 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 293 | — | 293 |
| Other Comprehensive Income (See Note 13) | — | — | — | — | (45) | (45) |
| Comprehensive Earnings | | | | | | 248 |
| Dividends | — | — | — | (171) | — | (171) |
| Common Stock Issued (Repurchased) — Net | 950 | 1 | 25 | — | — | 26 |
| Balance Dec. 28, 2001 | 213,688 | 214 | 1,492 | 4,459 | (45) | 6,120 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 424 | — | 424 |
| Other Comprehensive Income (See Note 13) | — | — | — | — | (273) | (273) |
| Comprehensive Earnings | | | | | | 151 |
| Dividends | — | — | — | (86) | — | (86) |
| Common Stock Issued (Repurchased) — Net | 999 | 1 | 55 | — | — | 56 |
| Balance Dec. 27, 2002 | 214,687 | 215 | 1,547 | 4,797 | (318) | 6,241 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 246 | — | 246 |
| Other Comprehensive Income (See Note 13) | — | — | — | — | 20 | 20 |
| Comprehensive Earnings | | | | | | 266 |
| Dividends | — | — | — | (86) | — | (86) |
| Common Stock Issued (Repurchased) — Net | 384 | — | 32 | — | — | 32 |
| Balance Dec. 26, 2003 | 215,071 | $215 | $1,579 | $4,957 | $(298) | $6,453 |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Operations and Significant Accounting Policies**

***Nature of Operations***

CSX Corporation, including its majority-owned subsidiaries (collectively, "CSX" or "Company"), is a freight transportation company with principal business units providing rail, intermodal and international terminal services.

- Rail transportation services are provided principally throughout the Eastern United States and accounted for 79% of the Company's 2003 operating revenue.
- Intermodal services are provided through a dedicated network of terminals and facilities across North America and accounted for 16% of operating revenue in 2003.
- International terminal operations are located in Asia, Europe, Australia and Latin America and accounted for 3% of operating revenues in 2003.

In 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC ("CSX Lines"), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs and $60 million of securities). (See Note 3, Divestitures.)

Rail shipments include merchandise, automotive products and coal, coke and iron ore. Service groups as a percent of rail revenue are as follows:

| | Fiscal Years Ended | |
|---|---|---|
| | 2003 | 2002 |
| Merchandise | 60% | 58% |
| Automotive | 14% | 14% |
| Coal, Coke and Iron Ore | 26% | 27% |
| Other | — | 1% |
| Total | 100% | 100% |

Merchandise traffic includes the following markets:

| | |
|---|---|
| • Phosphates and Fertilizer | • Agricultural and Food |
| • Metals | • Chemicals |
| • Forest and Industrial | • Emerging Markets |

Coal shipments originate mainly from mining locations in the Eastern United States and primarily supply domestic utility and export markets.

***Principles of Consolidation***

The consolidated financial statements include CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Investments in companies that are not majority-owned are carried at cost (if less than 20% owned and the Company has no significant influence) or equity (if the Company has significant influence).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Fiscal Year***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal years 2003, 2002 and 2001 consisted of 52 weeks. A 52-week fiscal year has four 13-week quarters. A 53-week year occurs periodically with the next one occurring in 2004. Fiscal years 2003, 2002 and 2001 ended on:

- December 26, 2003
- December 27, 2002
- December 28, 2001

***Earnings Per Share***

Basic earnings per share is calculated by dividing income available to common stockholders by the weighted-average number of common shares outstanding during the period. Earnings per share, assuming dilution, starts with the basic calculation described above and adjusts the denominator for the effect of potential dilution of common shares during the period, mainly from employee stock options. This difference increases the denominator for the additional common shares that would have been outstanding if these shares had been issued. Potentially dilutive common shares at CSX include stock options and awards, and shares that would be issued relating to convertible long-term debt. References to earnings per share in the Notes to Consolidated Financial Statements assume dilution.

***Cash, Cash Equivalents and Short-term Investments***

On a daily basis, cash in excess of current operating requirements is invested in various highly liquid investments having a maturity of three months or less at the date of acquisition. These investments are carried at cost, which approximates market value, and are classified as cash equivalents.

***Materials and Supplies***

Materials and supplies consist primarily of fuel and items for replacement and maintenance of track and equipment, and are carried at average cost.

***Properties***

All properties are stated at cost less an allowance for accumulated depreciation. Rail assets, including main-line track, locomotives and freight cars are depreciated using the group-life method. This method pools similar assets by road and equipment type and then depreciates each group as a whole. These assets represent approximately 94% of the Company’s total fixed assets and amounted to $12.9 billion on a net basis at December 26, 2003. The majority of other property is depreciated using the straight-line method on a per asset basis.

Regulations enforced by the Surface Transportation Board (“STB”) of the U.S. Department of Transportation require periodic formal studies of ultimate service lives for all railroad assets, which include:

- statistical analysis of historical retirements for each group of property
- evaluation of the current operations
- previous assessment of the condition of the assets and outlook for their continued use
- comparison of assets to the same asset groups with other companies.



 Powered by Morningstar® Document Research℠

The results of the life study process determine the service lives for each asset group under the group-life method. These studies are conducted by a third party expert and analyzed by the Company's management. Resulting service life estimates are subject to review and approval by the STB. Road assets, including main-line track, have estimated service lives ranging from 5 (system roadway machinery) to 80 (grading) years. Equipment assets, including locomotives and freight cars, have estimated service lives ranging from 6 (vehicles) to 29 (work equipment) years.

Changes in asset lives due to the results of the life studies could significantly impact future periods depreciation expense and thus the Company's results of operations. Events that could cause the Company to change its estimates relating to the lives of its asset groups could be changes in historical results, technological improvements and changes in specific assets. The Company completed life studies on road, track and equipment in 2003 and has partially reflected the results in its 2003 financial statements. As a result, the net increase in depreciation expense was $1 million in 2003, while the impact will be a decrease of approximately $13 million in 2004 and thereafter.

For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) is charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of non-rail depreciable assets, infrequent disposal of rail assets outside the normal course of business and for all dispositions of land, the resulting gains or losses are recognized at the time of disposal. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with SFAS 144. Where impairment is indicated, the assets are evaluated, and their carrying amount is reduced to fair value based on undiscounted net cash flows or other estimates of fair value.

The FASB is currently considering the proposed Statement of Position (SOP), "Accounting for Certain Costs and Activities related to Property, Plant and Equipment" If this SOP is issued, certain costs and activities that are currently capitalized may require immediate expense recognition and alternatively, some costs and activities that are currently expensed may require capitalization. In addition, the SOP would require additional refinement in asset componentization. potentially altering the amount of depreciation expense recognized. The Company is currently evaluating the potential impact on the financial statements, but is not yet in a position to determine what effect it may have if passed by the FASB. However, the effect could be material.

***Revenue and Expense Recognition***

Surface Transportation (rail and intermodal) revenue and expense are recognized proportionately as freight moves from origin to destination. Prior to the conveyance of CSX Lines in 2003, container-shipping revenue, and a corresponding accrual for the estimated cost to complete delivery, was recorded when cargo first sailed from its port of origin. International Terminals revenue and expense are recognized when vessels depart from the terminal. All other revenue is recorded upon completion of service.



 Powered by Morningstar® Document Research℠

***Casualty Reserves***

Casualty reserves represent accruals for the uninsured portion of occupational injury and personal injury claims. These reserves are recorded upon the first reporting of a claim, and estimates are updated as information develops. The amount of liability accrued is based on the type and severity of the claim and an estimate of future claims development based on current trends and historical data. The Company believes it has recorded liabilities in sufficient amounts to cover all identified claims and estimates of incurred but not reported personal injury and accident claims. In 2003, the Company changed its estimate of casualty reserves to also include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. Other occupational claims include allegations of exposure to certain materials in the work place, such as solvents and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss. In conjunction with the change in estimate, in 2003 the Company recorded a charge of $206 million to increase its provision for these claims. Approximately $141 million of this amount relates to asbestos claims. Additionally, the provision for personal injury claims was increased by $26 million as a result of a change in estimate.

Personal and occupational injury liabilities amount to $864 million and $605 million at December 26, 2003 and December 27, 2002, respectively.

***Environmental Costs***

The Company incurs costs for environmental corrective efforts, such as the study and clean-up of environmental contamination. Environmental costs are charged to expense when they relate to an existing condition caused by past operations and do not contribute to current or future revenue generation. Liabilities for environmental corrective efforts are recorded when CSX's responsibility is (1) deemed probable and (2) the amount can be reasonably estimated. Generally, the timing of these accruals coincides with the completion of a feasibility study or the Company's commitment to a formal plan of action. Environmental reserves at December 26, 2003 and December 27, 2002 were $45 million and $35 million, respectively.

***Stock-Based Compensation***

Effective beginning with fiscal year 2003, CSX voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." In accordance with the prospective method of adoption permitted under SFAS 148, the Company has adopted the fair value recognition provisions on a prospective basis and accordingly, expense of $5 million was recognized in the year ended December 26, 2003 for stock options granted in May 2003. Additionally, $3 million of other stock-based compensation was recorded pursuant to other stock compensation arrangements, but was offset by an expense reversal related to a retirement. The following table sets forth net earnings and the pro-forma computation of basic earnings per share and earnings per



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

share, assuming dilution had stock compensation expense been determined based on the fair values of stock awards at the date of grant:

| | December 26, 2003 | December 27, 2002 | December 28, 2001 |
|---|---|---|---|
| | (Dollars in Millions, Except Per Share Amounts) | | |
| Net Earnings (Loss) — As Reported | $ 246 | $ 424 | $ 293 |
| Add: Stock Based Employee Compensation Expense Included in Reported Net Income — Net of Related Tax Effects | 3 | 4 | 6 |
| Deduct: Total Stock Based Employee Compensation Expense Determined under the Fair Value Based Method for all Awards — Net of Related Tax Effects | (34) | (29) | (19) |
| Pro Forma Net Earnings | $ 215 | $ 399 | $ 280 |
| Earnings (Loss) Per Share: | | | |
| Basic — As Reported | $ 1.14 | $ 2.00 | $ 1.39 |
| Basic — Pro Forma | $ 1.00 | $ 1.87 | $ 1.32 |
| Diluted — As Reported | $ 1.14 | $ 1.99 | $ 1.38 |
| Diluted — Pro Forma | $ 1.00 | $ 1.86 | $ 1.32 |

***Comprehensive Earnings***

CSX reports comprehensive earnings (loss) in accordance with SFAS 130, "Reporting Comprehensive Income," in the Consolidated Statement of Changes in Shareholders' Equity. Comprehensive earnings is defined as all changes in shareholders' equity during a period, other than those resulting from investments by and distributions to shareholders (i.e. issuance of equity securities and dividends). Accumulated other comprehensive loss at December 26, 2003 and December 27, 2002 consists primarily of minimum pension liabilities.

***Derivative Financial Instruments***

The Company recognizes all derivatives as either assets or liabilities in the statement of financial position and measures those instruments at fair value.

*Interest Rate Swaps*

The Company has entered into several interest rate swaps as part of its program to address interest rate market risk exposure. CSX's interest rate swaps are designated and qualify as fair value hedges under SFAS 133, "Accounting for Derivative Instruments and Hedging Activities." For derivative instruments that are designated and qualify as a fair value hedge, the gains and losses on the derivative instrument, as well as the offsetting gain or loss on the hedged item attributable to the hedged risk, are recognized in current earnings during the period of change in fair values. If the change in the value of the hedging instrument offsets the change in the value of the hedged item, the hedge is considered perfectly effective. The accounting for hedge effectiveness is measured at least quarterly based on the relative change in fair value between the derivative contract and the hedged item over time. Any change in fair value resulting from ineffectiveness, the amount by which the change in the value of the hedge does not exactly offset the change in the value of the hedged item, is recognized immediately in earnings. The Company's interest rate swaps qualify as perfectly effective fair value hedges. As such, there is



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

no ineffective portion to the hedge recognized in earnings. Adjustments to the fair value of the interest rate swap agreements are recorded in other assets and other liabilities.

The differential to be paid or received under these agreements is accrued consistently with the terms of the agreements and is recognized in interest expense over the term of the related debt. The related amounts payable to or receivable from counterparties are included in other liabilities or assets. Cash flows related to interest rate swap agreements are classified as “Operating activities” in the Cash Flow Statement.

*Fuel Hedging*

In 2003, CSX began a program to hedge a portion of its 2004 and 2005 locomotive fuel purchases. In order to minimize exposure to fuel price fluctuation risk, the Company has entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases.

The program limits fuel hedges to a 24-month duration and a maximum of 80% of CSX’s average monthly fuel purchased for any month within the 24-month period, and places the hedges among selected counterparties. Fuel hedging activity did not have an effect on fuel expense for the year ended December 26, 2003. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, is recorded in fuel expense and is immaterial.

These instruments qualify, and are designated by management, as cash-flow hedges of variability in expected future cash flows attributable to fluctuations in fuel prices. The fair values of fuel derivative instruments are determined based upon quoted market prices and are recorded on the balance sheet with offsetting adjustments to Accumulated Other Comprehensive Income, a component of Shareholders’ Equity. This amount was approximately $6 million as of December 26, 2003. Fair value adjustments are noncash transactions, and accordingly, are excluded from the Cash Flow Statement.

The Company is exposed to credit loss in the event of nonperformance by other parties to interest rate swap and fuel hedge agreements. However, the Company does not anticipate nonperformance by the counterparties.

***New Accounting Pronouncements***

Statement of Financial Accounting Standard (“SFAS”) 143, “Accounting for Asset Retirement Obligations” was issued in 2001. This statement addresses financial accounting and reporting for legal obligations associated with the retirement of tangible long-lived assets and the associated retirement costs. In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. With the adoption of SFAS 143 in fiscal year 2003, CSX recorded pretax income of $93 million, $57 million after tax as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. The adoption of SFAS 143 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million annually.

SFAS 148, “Accounting for Stock-Based Compensation — Transition and Disclosure” was issued in December 2002. SFAS 148 amends SFAS 123, “Accounting for Stock-Based Compensation,” to provide alternative methods of transition to Statement 123’s fair value method of accounting for stock-based employee compensation and require disclosure of the effects of an



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

entity's accounting policy with respect to stock-based employee compensation. Effective beginning with fiscal year 2003, CSX has voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." In accordance with the prospective method of adoption permitted under SFAS 148, stock-based awards issued subsequent to fiscal year 2002 are accounted for under the fair value recognition provisions of SFAS 123 utilizing the Black-Scholes valuation method and, accordingly, are expensed. (See Note 15, Stock Plans.)

In 2003, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 46, "Consolidation of Variable Interest Entities," requires a variable interest entity ("VIE") to be consolidated by a company that is subject to a majority of the risk of loss from the variable interest entity's activities or is entitled to receive a majority of the entity's residual returns, or both. Interpretation No. 46 also requires disclosures about VIEs that the company is not required to consolidate but in which it has a significant variable interest. Also in 2003, Interpretation 46 ("46R"), a revision to FASB Interpretation No. 46, to clarify some of the provisions of, and to exempt certain entities from Interpretation 46 requirements. Under the new guidance, CSX will consolidate Four Rivers Transportation, Inc. ("FRT"), a short-line railroad, into its financial statements beginning December 27, 2003. Presently, FRT is accounted for under the equity method of accounting. The adoption of Interpretation No. 46 will not have a material impact on future reporting periods.

In 2002, the FASB issued Financial Accounting Standard Interpretation ("FASI") No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." This statement requires that certain guarantees be recorded at fair value on the statement of financial position and additional disclosures be made about guarantees. CSX adopted the accounting provisions of this statement in fiscal year 2003. (See Note 18, Commitments and Contingencies.)

In 2001, SFAS 142, "Goodwill and Other Intangible Assets", was issued. Under the provisions of SFAS 142, goodwill and other indefinite lived intangible assets are no longer amortized, but are reviewed for impairment on a periodic basis. The Company adopted this standard for fiscal 2002, and incurred a pretax charge of $83 million, $43 million after tax and minority interest as a cumulative effect of an accounting change, which represents the difference between book value and the fair value of indefinite lived intangible assets. These indefinite lived intangible assets are permits and licenses that the Company holds relating to a proposed pipeline to transfer natural gas from Alaska's North Slope to the port in Valdez, Alaska. The fair value was determined using a discount method of projected future cash flows relating to these assets. The carrying value of these assets is now approximately $3 million. The adoption of SFAS 142 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. The Company does not have any other significant indefinite lived intangible assets.

In 2002, SFAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," was issued. This statement requires that long-lived assets to be disposed of by sale are no longer measured on a net realizable value basis, and future operating losses are no longer recognized before they occur. In addition, this statement modifies the reporting requirements for discontinued operations. Long-lived assets, whether to be held for disposition or held and used, should be measured at the lower of its carrying amount or fair value less cost to dispose. The Company applied the provisions of this statement relating to the accounting for the conveyance of its wholly-owned subsidiary, CSX Lines, to a third party in 2003 (See Note 3, Divestitures). In



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

addition, another of the Company's subsidiaries, CSX World Terminals, was notified of a significant customer loss for 2004 and possible customer loss for 2005. Given these indicators, the Company evaluated the undiscounted cash flows estimated to be generated by this terminal, whose long-lived assets are recorded at $59 million and concluded that the forecasted future undiscounted cash flows exceeded the book value of its long-lived assets, therefore no impairment write-down is necessary at this time.

***Prior-year Data***

Certain prior-year data has been reclassified to conform to the 2003 presentation.

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Critical accounting estimates using management judgment are made for the following areas:

1. Casualty, legal and environmental reserves

2. Pension and postretirement medical plan accounting

3. Depreciation polices for its assets under the group-life method

**Note 2. Investment In and Integrated Rail Operations with Conrail**

***Background***

CSX and Norfolk Southern Corporation ("Norfolk Southern") acquired Conrail Inc. ("Conrail") in May 1997. Conrail owns the primary freight railroad system serving the Northeastern United States, and its rail network extends throughout several Midwestern states and into Canada. CSX and Norfolk Southern, through a jointly owned acquisition entity, hold economic interests in Conrail of 42% and 58%, respectively, and voting interests of 50% each. CSX and Norfolk Southern operate over allocated portions of the Conrail lines.

The rail subsidiaries of CSX and Norfolk Southern each operate separate portions of the Conrail system pursuant to various operating agreements. Under these agreements, the railroads pay operating fees to Conrail for the use of right-of-way and rent for the use of equipment. Conrail continues to provide rail services in certain shared geographic areas ("Shared Asset Areas") for the joint benefit of CSX and Norfolk Southern, for which it is compensated on the basis of usage by the respective railroads.

In June 2003, CSX, Norfolk Southern Corporation ("NS") and Conrail jointly filed a petition with the Surface Transportation Board ("STB") to establish direct ownership and control by CSX's and NS' respective subsidiaries, CSX Transportation Inc. ("CSXT") and Norfolk Southern Railway ("NSR") of their portions of the Conrail system already operated by them separately and independently under various agreements. These portions of the Conrail system are currently owned by Conrail's subsidiaries, New York Central Lines ("NYC") and Pennsylvania Lines LLC ("PRR"). The ownership of NYC and PRR would be transferred ("spun off") to CSXT and NSR, respectively. Conrail would continue to own, manage and operate the Shared Asset Areas as previously approved by the STB. STB approval to proceed with the spin-off transaction and a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

favorable ruling from the IRS qualifying the transaction as a non-taxable disposition were received in November 2003. The transaction remains subject to a number of other conditions.

If all necessary conditions are satisfied, unsecured debt securities of newly formed subsidiaries of CSXT and NSR would be offered in a 42%/58% ratio in exchange for Conrail's unsecured debentures. The debt securities issued by its respective subsidiary would be fully and unconditionally guaranteed by CSXT or NSR. Upon completion of the proposed transaction, the subsidiaries would be merged into CSXT and NSR, respectively, and the new debt securities thus would become direct unsecured obligations of CSXT or NSR. Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations, also on a 42%/58% ratio, of CSXT and NSR. CSX will record the proposed transaction at fair value based on the results of an independent valuation of NYC, with any difference from carrying value resulting in a gain or loss. The Company can not predict the outcome of the valuation and the impact on the Company's financial statements.

CSX, NSR and Conrail are working to complete all necessary steps to consummate the spin-off transaction in 2004. Upon consummation of the proposed transaction, CSX's investment in Conrail will no longer include the amounts related to NYC and PRR. Instead the assets and liabilities or NYC will be reflected in their respective line items in CSX's consolidated balance sheet. Conrail will continue to own, manage and operate the Shared Asset Areas.

***Accounting and Financial Reporting Effects***

CSX's rail and intermodal operating revenue includes revenue from traffic previously moving on Conrail. Operating expenses include costs incurred to handle that traffic and operate the former Conrail lines. Rail operating expense includes an expense category, "Conrail Fees, Rents and Services," which reflects:

1. Right of way usage fees and equipment rental payments to Conrail

2. Transportation, switching, and terminal service charges provided by Conrail in the Shared Asset Areas that Conrail operates for the joint benefit of CSX and Norfolk Southern

3. Amortization of the fair value write-up arising from the acquisition of Conrail

4. CSX's 42% share of Conrail's net income recognized under the equity method of accounting

***Detail of Conrail Operating Fees, Rents and Services***

| | Fiscal Years Ended | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| | | **(Dollars in Millions)** | |
| Rents and Services | $ 357 | $ 346 | $ 353 |
| Purchase Price Amortization and Other | 54 | 52 | 56 |
| Equity in Income of Conrail | (69) | (76) | (73) |
| Total | $ 342 | $ 322 | $ 336 |

***Conrail Financial Information***

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Income Statement Information: | | | |
| Revenues | $918 | $893 | $903 |
| Expenses | 659 | 623 | 639 |
| Operating Income | $259 | $270 | $264 |
| Net Income Before Cumulative Effect of Accounting Change | $163 | $180 | $174 |
| Cumulative Effect of Accounting Change | 40 | — | — |
| Net Income | $203 | $180 | $174 |

| | Dec. 31, | |
|---|---|---|
| | 2003 | 2002 |
| | (Dollars in Millions) | |
| Balance Sheet Information: | | |
| Current Assets | $ 257 | $ 300 |
| Property and Equipment and Other Assets | 7,959 | 7,857 |
| Total Assets | $8,216 | $8,157 |
| Current Liabilities | $ 279 | $ 329 |
| Long-term Debt | 1,067 | 1,123 |
| Other Liabilities | 2,416 | 2,479 |
| Total Liabilities | 3,762 | 3,931 |
| Stockholders' Equity | 4,454 | 4,226 |
| Total Liabilities and Stockholders' Equity | $8,216 | $8,157 |

***Transactions with Conrail***

As listed below, CSX has amounts payable to Conrail, representing expenses incurred under the operating, equipment and shared area agreements with Conrail. Also, Conrail advances its available cash balances to CSX and Norfolk Southern under variable-rate notes, with CSX's note maturing on March 28, 2007.

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| CSX Payable to Conrail | $ 71 | $ 69 |
| Conrail Advances to CSX | $ 515 | $ 371 |
| Interest Rates on Conrail Advances to CSX | 1.66% | 1.82% |

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Interest Expense Related To Conrail Advances | $ 7 | $ 8 | $ 5 |

The agreement under which CSXT operates its allocated portion of the Conrail route system has an initial term of 25 years and may be renewed at CSXT's option for two five-year terms.



 Powered by Morningstar® Document Research℠

Operating fees paid to Conrail under the agreement are subject to adjustment every six years based on the fair value of the underlying system. Lease agreements for the Conrail equipment operated by CSXT cover varying terms. CSXT is responsible for all costs of operating, maintaining, and improving the routes and equipment under these agreements.

On December 26, 2003, future minimum payments to Conrail under the operating, equipment and shared area agreements were as follows:

| | Future Minimum Payments |
|---|---|
| | (Dollars in Millions) |
| 2004 | $ 260 |
| 2005 | 247 |
| 2006 | 236 |
| 2007 | 229 |
| 2008 | 224 |
| Thereafter | 3,118 |
| Total | $ 4,314 |

In the event of the consummation of the spin-off transaction, the future minimum payments will be reduced.

**Note 3. Divestitures**

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC ("CSX Lines"), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs and $60 million of securities). CSX Lines was subsequently renamed Horizon Lines LLC ("Horizon"). Horizon has subleased vessel and equipment from certain affiliates of CSX covering the primary financial obligations related to $300 million of leases under which CSX or one of its affiliates will remain a lessee/ sublessor or guarantor. A deferred pretax gain of approximately $127 million as a result of the transaction will be recognized over the 12-year sub-lease term. Approximately $9 million of this gain was recognized in 2003. The securities have a term of 7 years and a preferred return feature. During the third quarter, CSX received a $15 million payment from Horizon Lines, which included $3 million of interest, in return of a portion of its investment in Horizon and now holds $48 million of securities.

**Note 4. Restructuring**

In November 2003, the Company announced a management restructuring plan to streamline the structure at a number of its companies, eliminate organizational layers and realign certain functions. The initiative will reduce the non-union workforce by 800 to 1,000 positions over the last quarter of 2003 and the first half of 2004. As of December 26, 2003, 20 employees have been terminated under this program. The Company recorded an initial charge related to this reduction of $34 million pretax, in 2003, to record the lowest amount of expense to be incurred under this program. The total estimated cost of the program is expected to be in the range of $60 million to $80 million. The majority of separation benefits will be paid from CSX's qualified pension plans, with the remainder being paid from general corporate funds.

Also in 2003, the Company recorded a $10 million restructuring charge related to another workforce reduction program. Substantially all of this amount had been paid out at December 26, 2003.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

In 2003, the Company recorded a $22 million pretax credit related to a favorable change in estimate related to the 1991 and 1992 separation plans. These plans provided for workforce reductions, improvements in productivity and other cost reductions. The reduction in estimate for these plans results from lower railroad retirement taxes and other benefits than had been built into the initial $1.3 billion charge.

A net $22 million restructuring charge was recorded representing the cost of the restructuring initiatives offset by reductions in 1991/1992 separation reserves. The associated expense is included in operating expense on the Income Statement as "Restructuring Charge — Net."

**Note 5. Operating Expense**

Operating expense consists of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Labor and Fringe | $2,740 | $2,886 | $2,934 |
| Materials, Supplies and Other | 1,627 | 1,693 | 1,662 |
| Conrail Rents, Fees and Services | 342 | 322 | 336 |
| Building and Equipment Rent | 566 | 601 | 626 |
| Inland Transportation | 320 | 370 | 337 |
| Depreciation | 629 | 638 | 613 |
| Fuel | 581 | 515 | 585 |
| Provision for Casualty Claims (See Note 10) | 232 | — | — |
| Additional Loss on Sale (See Note 18) | 108 | — | — |
| Restructuring Charge — Net | 22 | — | — |
| New Orleans Litigation Provision | — | — | 60 |
| Total | $7,167 | $7,025 | $7,153 |
| Selling, General and Administrative Expenses included in above categories | $ 651 | $ 657 | $ 708 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 6. Other Income**

Other income consists of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Interest Income | $ 21 | $ 27 | $ 47 |
| Income from Real Estate and Resort Operations | 95 | 108 | 101 |
| Discounts on Sales of Accounts Receivable | (10) | (26) | (34) |
| Minority Interest | (42) | (42) | (39) |
| Equity Income (Loss) of Other Affiliates | 2 | (3) | (27) |
| Miscellaneous | (9) | (23) | (39) |
| Total | $ 57 | $ 41 | $ 9 |
| Gross Revenue from Real Estate and Resort Operations Included in Other Income | $274 | $261 | $254 |

**Note 7. Income Taxes**

Earnings from domestic and foreign operations and related income tax expense are as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Net Earnings from Continuing Operations Before Income Taxes: | | | |
| Domestic | $186 | $648 | $379 |
| Foreign | 79 | 75 | 69 |
| Net Earnings from Continuing Operations Before Income Taxes: | $265 | $723 | $448 |

The significant components of deferred tax assets and liabilities include:

| | Dec. 26, 2003 | | Dec. 27, 2002 | |
|---|---|---|---|---|
| | Assets | Liabilities | Assets | Liabilities |
| | (Dollars in Millions) | | | |
| Productivity/Restructuring Charges | $ 79 | $ — | $ 80 | $ — |
| Employee Benefit Plans | 336 | — | 445 | — |
| Accelerated Depreciation | — | 4,047 | — | 3,812 |
| Other | 917 | 901 | 741 | 893 |
| Total | $1,332 | $4,948 | $1,266 | $4,705 |
| Net Deferred Tax Liabilities | | $3,616 | | $3,439 |

The primary factors in the change in year-end net deferred income tax liability balances include:

- Annual provision for deferred income tax expense
- Minimum pension liability
- Cumulative effects of accounting changes



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The Company has not recorded domestic deferred or additional foreign income taxes related to undistributed earnings of foreign subsidiaries that are considered to be indefinitely reinvested. These earnings amounted to $387 million, $341 million and $291 million at December 26, 2003, December 27, 2002 and December 28, 2001, respectively. These amounts may become taxable upon their remittance as dividends or upon the sale or liquidation of these foreign subsidiaries. It is not practical to determine the amount of net additional income tax that may be payable if such earnings were repatriated.

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1993. Tax returns for 1994 through 2002 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed.

The breakdown of income tax expense (benefit) between current and deferred is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Current: | | | |
| Federal | $ (68) | $ 50 | $ (64) |
| Foreign | 18 | 16 | 15 |
| State | 7 | 17 | 3 |
| Total Current | $ (43) | $ 83 | $ (46) |
| Deferred: | | | |
| Federal | $ 125 | $ 154 | $ 176 |
| Foreign | 2 | — | 10 |
| State | (8) | 19 | 15 |
| Total Deferred | $ 119 | $ 173 | $ 201 |
| Total | $ 76 | $ 256 | $ 155 |

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | | 2002 | | 2001 | |
| | (Dollars in Millions) | | | | | |
| Tax at Statutory Rates | $ 93 | 35% | $ 253 | 35% | $ 157 | 35% |
| State Income Taxes | — | — | 23 | 3% | 12 | 3% |
| Equity in Conrail Earnings | (9) | (3)% | (12) | (2)% | (10) | (2)% |
| Foreign Operations | (6) | (2)% | (9) | (1)% | (1) | — |
| Other Items | (2) | (1)% | 1 | — | (3) | (1)% |
| Income Tax Expense/Rate | $ 76 | 29% | $ 256 | 35% | $ 155 | 35% |

The decrease in the effective income tax rate is attributable to a larger portion of the Company's earnings being earned in foreign jurisdictions with statutory income tax rates below the U.S. statutory income tax rate and the cumulative impact of adjustments to the deferred effective state income tax rate due to favorable state tax regulations.



 Powered by Morningstar® Document Research℠

**Note 8. Accounts Receivable**

***Sale of Accounts Receivable***

During 2003, CSXT discontinued the sale of accounts receivable, which resulted in a $380 million increase in accounts receivable. Previously, CSXT sold, without recourse, a revolving pool of accounts receivable to CSX Trade Receivables Corporation ("CTRC"), a bankruptcy-remote entity wholly-owned by CSX Corporation. CTRC transferred the accounts receivable to a master trust and caused the trust to issue multiple series of certificates representing undivided interests in the receivables. The certificates issued by the master trust were sold to investors, and the proceeds from those sales were paid to CSXT.

Two series of certificates were outstanding as of December 27, 2002. One series in the amount of $300 million was sold to investors in 1998 and matured in June 2003. A second series of $200 million was sold to a private entity in 2000 and matured in June 2003 as well. As of December 27, 2002, the amounts sold under the private and public series were $80 million and $300 million respectively. The amount retained in the master trust at December 27, 2002 was $534 million. The fair value of retained interests approximated book value as the receivables were collected in approximately one month.

Net losses associated with the sale of receivables are as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Discounts on Sales of Accounts Receivable | $ 10 | $ 26 | $ 34 |

CSXT retained responsibility for servicing accounts receivables held by the master trust. The average servicing period was approximately one month. No servicing asset or liability was recorded since the fees CSXT received approximated its related costs.

***Allowance for Doubtful Accounts***

The Company maintains an allowance for doubtful accounts based on the expected collectibility of all accounts receivable. The allowance for doubtful accounts is included in the balance sheet as follows:

| | Fiscal Years Ended | |
|---|---|---|
| | Dec. 26, 2003 | Dec. 27, 2002 |
| | (Dollars in Millions) | |
| Allowance for Doubtful Accounts | $ 71 | $ 90 |

The decrease in the allowance for doubtful accounts is due to the write-off of uncollectible receivables during 2003.



 Powered by Morningstar® Document Research℠

**Note 9. Properties**

Properties consist of the following:

| | Dec. 26, 2003 | | | Dec. 27, 2002 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Depreciation | Net | Cost | Accumulated Depreciation | Net |
| | (Dollars in Millions) | | | | | |
| Rail: | | | | | | |
| Road | $12,147 | $2,683 | $ 9,464 | $11,541 | $2,498 | $ 9,043 |
| Equipment | 5,686 | 2,225 | 3,461 | 5,671 | 2,225 | 3,446 |
| Total Rail | 17,833 | 4,908 | 12,925 | 17,212 | 4,723 | 12,489 |
| Intermodal | 488 | 209 | 279 | 442 | 173 | 269 |
| Total Surface Transportation | 18,321 | 5,117 | 13,204 | 17,654 | 4,896 | 12,758 |
| Other | 946 | 420 | 526 | 906 | 378 | 528 |
| Total Properties | $19,267 | $5,537 | $13,730 | $18,560 | $5,274 | $13,286 |

**Note 10. Casualty, Environmental and Other Reserves**

Activity related to casualty, environmental and other reserves is as follows:

| | Casualty and Other Reserves | Separation Liabilities | Environmental Reserves | Total |
|---|---|---|---|---|
| | (Dollars in Millions) | | | |
| Balance Dec. 29, 2000 | $ 698 | $256 | $ 41 | $ 995 |
| Charged to Expense | 234 | — | 1 | 235 |
| Payments | (271) | (14) | (10) | (295) |
| Balance Dec. 28, 2001 | 661 | 242 | 32 | 935 |
| Charged to Expense | 231 | — | 17 | 248 |
| Payments | (287) | (32) | (14) | (333) |
| Balance Dec. 27, 2002 | 605 | 210 | 35 | 850 |
| Charged to Expense | 307 | 44 | 23 | 374 |
| Changes in Estimate | 232 | (22) | — | 210 |
| Payments | (280) | (25) | (13) | (318) |
| Balance Dec. 26, 2003 | $ 864 | $207 | $ 45 | $1,116 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Reserve balances are as follows:

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| Current Reserves | | |
| Casualty and Other | $ 198 | $ 216 |
| Separation | 52 | 15 |
| Environmental | 30 | 15 |
| Total Current Reserves | 280 | 246 |
| Long-term Casualty, Environmental and Other Reserves | 836 | 604 |
| Total Casualty, Environmental and Other Reserves | $ 1,116 | $ 850 |

***Casualty Reserves***

Casualty reserves represent accruals for the uninsured portion of occupational injury and personal injury claims. In the third quarter of 2003, the Company changed its estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. Other occupational claims include allegations of exposure to certain materials in the work place, such as solvents and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss.

In conjunction with the 2003 change in estimate, the Company recorded a charge of $232 million to increase its provision for casualty reserves. Approximately $141 million relates to asbestos claims.

*Asbestos and Other Occupational Injuries*

During 2003, the Company retained third party professionals to work with it to project the number of asbestos and other occupational injury claims to be received over the next seven years and the related costs. Based on this analysis the Company established reserves for the probable and reasonably estimable asbestos and other occupational injury liabilities.

The methodology used by the third party to project future occupational injury claims was based largely on CSX's recent experience, including claim-filing and settlement rates, injury and disease mix, open claims and claim settlement costs. However, projecting future occupational injury claims and settlements costs is subject to numerous variables that are difficult to predict. In addition to the significant uncertainties surrounding the number of claims that might be received, other variables, including the type and severity of the injury or disease alleged by each claimant, the long latency period associated with exposure, dismissal rates, costs of medical treatment, uncertainties surrounding the litigation process from jurisdiction to jurisdiction and from case to case and the impact of changes in legislative or judicial standards, may cause actual results to differ significantly from estimates. Furthermore, predictions with respect to these variables are subject to greater uncertainty as the projection period lengthens. In light of these uncertainties, CSX believes that seven years is the most reasonable period for estimating future claims, and that claims received after that period are not reasonably estimable.

CSX increased its reserve for asbestos and other occupational claims by a net $206 million to cover the estimate of incurred but not reported claims to be filed during the next seven years. Reflecting the additional provisions, CSX's reserve for asbestos and other occupational claims on



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

an undiscounted basis amounted to $345 million at December 26, 2003, compared to $171 million at December 27, 2002.

A summary of existing claims activity is as follows:

| | Fiscal Year Ended | |
|---|---|---|
| | Dec. 26, 2003 | Dec. 27, 2002 |
| Asserted Claims: | | |
| Open Claims — Beginning of Period | 14,278 | 15,365 |
| New Claims Filed | 2,368 | 2,095 |
| Claims Settled | (3,382) | (2,877) |
| Claims Dismissed | (360) | (305) |
| Open Claims — End of Period | 12,904 | 14,278 |

Approximately 5,500 of the open claims above are asbestos claims against the Company's previously owned international container-shipping business, Sea-Land. Because the Sea-Land claims are claims against multiple vessel owners, the Company's reserves reflect its portion of those claims. The remaining open claims have been asserted against CSX Transportation. At December 26, 2003 and December 27, 2002, the Company had approximately $13 million and $10 million reserved for the Sea-Land claims.

Estimates for these claims are subject to significant uncertainty relating to the outcomes of negotiated settlements and other developments. As facts and circumstances change, the Company may have to change its estimates, and changes could have a material impact on the Company's financial results. Such events as adverse verdicts, catastrophic accidents and legal settlements will cause the Company to revise its estimated liabilities, which the Company reviews and appropriately adjusts quarterly.

*Personal Injury*

During 2003, CSX retained an independent actuarial firm to assess the value of CSX's personal injury portfolio. This firm's methods and procedures yielded a slightly higher valuation for personal injury claims than previously recognized by CSX due to a higher estimated cost for adverse development. Utilizing the analysis provided, CSX increased its reserves for alleged personal injury claims by $26 million.

***Separation Liability***

Separation liabilities at December 26, 2003, include productivity charges recorded in 1991 and 1992 to provide for the estimated costs of implementing workforce reductions, improvements in productivity and other cost reductions at the Company's major transportation units. The remaining separation liabilities are expected to be paid out over the next 15 to 20 years.

In 2003, the Company recorded a $22 million pretax credit related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the $1.3 billion charges initially recorded in 1991 and 1992. This amount is netted with separation expenses related to the 2003 Management Restructuring, as discussed in Note 4.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Environmental Reserves***

CSXT is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. CSXT has been identified as a potentially responsible party ("PRP") at approximately 260 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Superfund statute ("Superfund") or similar state statutes. A number of these proceedings are based on allegations that CSXT, or its railroad predecessors, sent hazardous substances to the facilities in question for disposal. Some of the proceedings involve property formerly or currently owned by CSXT or its railroad predecessors. Proceedings arising under Superfund or similar state statutes can involve numerous other companies who generated the waste or owned or operated the property and involve the allocation of liability for costs associated with site investigation and cleanup, which could be substantial.

At least once each quarter, CSXT reviews its role with respect to each such location, giving consideration to a number of factors, including the type of cleanup required, the nature of CSXT's alleged connection to the location (e.g., generator of waste sent to the site, or owner or operator of the site), the extent of CSXT's alleged connection (e.g., volume of waste sent to the location and other relevant factors), the accuracy and strength of evidence connecting CSXT to the location, and the number, connection, and financial viability of other named and unnamed PRP's at the location.

Based on the review process, CSXT has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. The recorded liabilities for estimated future environmental costs at December 26, 2003, and December 27, 2002 were $45 million and $35 million, respectively. These liabilities, which are undiscounted, include amounts representing CSXT's estimate of unasserted claims, which CSXT believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable and (2) where such costs can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. The majority of the December 26, 2003 environmental liability is expected to be paid out over the next seven years.

The Company does not currently possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations and financial condition.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 11. Debt and Credit Agreements**

Debt is as follows:

| | Maturity | Average Interest Rates at December 26, 2003 | December 26, 2003 | December 27, 2002 |
|---|---|---|---|---|
| | | (Dollars in Millions) | | |
| Convertible Debentures, net of $91 and $97 discount, respectively | 2021 | 1.0% | $ 447 | $ 467 |
| Notes | 2004–2032 | 6.8% | 5,956 | 5,285 |
| Equipment Obligations | 2004–2015 | 7.0% | 703 | 855 |
| Mortgage Bonds | N/A | N/A | — | 55 |
| Other Obligations, Including Capital Leases | 2004–2010 | 2.9% | 206 | 248 |
| Total | | | 7,312 | 6,910 |
| Less Debt Due Within One Year | | | 426 | 391 |
| Total Long-Term Debt | | | $6,886 | $6,519 |

***Debt Issuances***

In December 2003, CSX executed a $75 million revolving loan that matures in 2005. Borrowings under the facility will bear interest at a rate that fluctuates with LIBOR. In addition, the Company pays an annual commitment fee of 0.15% for the period the facility is not drawn. This debt may be redeemed at any time after May 2004, with additional borrowings allowed through the maturity of the facility. As of December 26, 2003, the Company had $75 million in aggregate principal amount outstanding under this borrowing.

In November 2003, CSX issued $200 million aggregate principal amount of the Company's Notes due 2014 and $200 million aggregate principal amount of the Company's Notes due 2006. The 2014 Notes bear interest at the rate of 5.30% per year and mature on February 15, 2014. The 2006 Notes bear interest at the rate of 2.75% per year and will mature on February 15, 2006. The 2014 Notes may be redeemed by the Company at any time, but the 2006 Notes cannot be redeemed before maturity.

CSX increased its borrowings from Conrail by approximately $144 million year-over-year in 2003 in addition to the $146 million increase in 2002. Also, during 2002 the Conrail note was extended to a five year term.

In August 2003, the Company issued $300 million aggregate principal amount Notes due in 2013. These Notes bear interest at the rate of 5.5% and mature on August 1, 2013. The Notes may be redeemed by the Company at any time.

During 2002, CSX issued $200 million of 4.88% notes due in 2009 and $400 million of 6.30% notes due in 2012.

***Credit Facilities***

The Company has a $1 billion five-year revolving credit facility and a $345 million 364-day revolving credit facility. Generally these facilities may be used to support the Company's



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

commercial paper, working capital and other general corporate purposes. Under the 364-day facility, the Company pays an annual fee to the participating banks of .125% of total commitment. Under the five-year facility, the Company pays annual fees to the participating banks that may range from 0.08% to 0.23% of total commitment, depending on the Company's credit rating. As of December 26, 2003, the Company had no borrowings outstanding under these facilities. CSX had commercial paper borrowings supported by these credit facilities of $140 million at the end of 2002.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due October 30, 2021 for an initial offering price of approximately $462 million. At December 26, 2003 and December 27, 2002, outstanding debentures are included in long-term debt, at a carrying value of $447 million and $467 million, respectively. These debentures accrete in value at a yield to maturity of 1% per year. The accretion rate may be reset on October 30, 2007, October 30, 2011, and October 30, 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.

Under the terms of the debentures, holders had the option to require the Company to purchase their debentures at a purchase price equal to the accreted value of the debentures in October 2003. CSX purchased $15 million aggregate principal amount at maturity of the debentures at an aggregate cost of $13 million. In November 2003, the Company made a one-time cash payment of $23.00 per $1,000 aggregate principal amount at maturity to holders who did not require the Company to purchase their debentures. This resulted in a $13 million cash payment, which will be amortized over the remaining term of the debentures. In addition, the terms of the debentures were amended to permit holders to cause the Company to purchase the debentures on October 30, 2005, at their accreted value of $852.48 per $1,000 principal amount at maturity, in addition to the purchase dates provided under the terms of the debentures. Similarly, the debentures allow holders to require the Company to purchase their debentures in October 2006, October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures. In 2005, 2006 and 2008, CSX may elect to pay the purchase price in cash and/or shares of common stock, while CSX may pay the purchase price only in cash on the last two purchase dates. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures.

Holders may convert debentures into CSX common stock if certain requirements defined in the debentures and the related indenture are met. Holders may convert if the closing sale price of CSX common stock for at least 20 of the 30 preceding trading days is more than the applicable percentage (which is initially 120% and will decline over the life of the debentures to 110%) of the accreted conversion price per share of the Company's common stock. The "accreted conversion price" per share of common stock is the quotient of the accreted value of a debenture divided by the number of shares of common stock issuable upon conversion of that debenture. Holders may also convert if the Company's senior long-term unsecured credit ratings are downgraded by Moody's Investors Service Inc. to below Ba1 and by Standard & Poor's Rating Services to below BB+, if the debentures have been called for redemption, if the Company makes specified distributions to holders of CSX common stock, or if the company is a party to specified consolidations, mergers, or transfers or leases of all or substantially all of the Company's assets. For each debenture surrendered for conversion, a holder will initially receive 17.75 shares of CSX common stock, which is equivalent to an initial conversion price of $46.16



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

per share. The initial conversion rate will be adjusted for reasons specified in the indenture, but will not be adjusted for accretion. Instead, accretion on the debentures will be deemed paid by the common stock received by the holder on conversion.

***Shelf Registration Statements***

CSX has $600 million of remaining capacity under a shelf registration that may be used, subject to market conditions, to issue debt or other securities at the Company's discretion. The Company presently intends to use the proceeds from the sale of any securities issued under its shelf registration statements to finance cash requirements, including refinancing existing debt as it matures. While the Company seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit the Company to sell such securities on acceptable terms at any given time, or at all.

***Short-term Debt Balance and Rates***

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| Short-term Debt | $2 | $143 |
| Weighted Average Interest Rates | 1.21% | 1.46% |

***Long-term Debt Maturities***

| | (Dollars in Millions) |
|---|---|
| 2004 | $ 426 |
| 2005 | 247 |
| 2006 | 598 |
| 2007 | 1,080 |
| 2008 | 615 |
| 2009 and Thereafter | 4,291 |
| Total | $ 7,257(a) |

(a) The fair market value of the interest rate swap agreements of $55 million, which is included in long-term debt on the balance sheet, is not included on the debt maturity schedule.

Certain of CSX's rail unit properties are pledged as security for various rail-related long-term debt issues. In addition, the Company has approximately $111 million in assets which are specifically designated to fund an equal amount of long-term debt.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

## Note 12. Derivative Financial Instruments

***Interest Rate Swaps***

CSX has entered into various interest rate swap agreements to hedge the fair value of the following fixed rate notes:

| Maturity Date | Notional Amount (Millions) | Fixed Interest Rate | Variable Rate at December 26, 2003 |
|---|---|---|---|
| May 1, 2007 | $ 450 | 7.45% | 4.42% |
| May 4, 2004 | 300 | 7.25% | 3.91% |
| August 15, 2006 | 300 | 9.00% | 6.09% |
| May 1, 2032 | 150 | 8.30% | 2.76% |
| June 22, 2005 | 50 | 6.46% | 2.66% |
| Total/Average | $ 1,250 | 7.00% | 3.95% |

Under these agreements, the Company will pay variable interest based on LIBOR in exchange for a fixed rate, effectively transforming the notes to floating rate obligations. The instruments qualify, and are designated, as fair value hedges.

The interest rate swap agreements are designated and qualify as fair value hedges and the gain or loss on the derivative instrument, as well as the offsetting gain or loss on the fixed rate note attributable to the hedged risk, are recognized in current earnings during the period of change in fair values. Hedge effectiveness is measured at least quarterly based on the relative change in fair value of the derivative contract in comparison with changes over time in the fair value of the fixed rate notes. Any change in fair value resulting from ineffectiveness, as defined by SFAS 133, "Accounting For Derivative Instruments and Hedging Activities," is recognized immediately in earnings. The Company's interest rate swaps qualify as perfectly effective fair value hedges, as defined by SFAS 133. As such, there was no ineffective portion to the hedge recognized in earnings during the current or prior year periods. Long-term debt has been increased by $55 million and $78 million for the fair market value of the interest rate swap agreements at December 26, 2003 and December 27, 2002, respectively.

The differential to be paid or received under these agreements is accrued based on the terms of the agreements and is recognized in interest expense over the term of the related debt. The related amounts payable to, or receivable from, counterparties are included in other current liabilities or assets. Cash flows related to interest rate swap agreements are classified as "Operating Activities" in the Consolidated Cash Flow Statement. For the years ended December 26, 2003 and December 27, 2002, the Company reduced interest expense by approximately $44 million and $34 million, respectively, as a result of the interest rate swap agreements that were in place during that year.

The Company is exposed to credit loss in the event of nonperformance by the other parties to the interest rate swap agreements. However, the Company does not anticipate nonperformance by the counterparties.

***Fuel Hedging***

In 2003, CSX began a program to hedge a portion of its 2004 and 2005 locomotive fuel purchases. This program was established to manage exposure to fuel price fluctuations. In order



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

to minimize this risk, CSX has entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases.

Following is a summary of fuel swaps executed during the year:

| | Dec. 26, 2003 |
|---|---|
| Approximate Gallons Hedged (Millions) | 236 |
| Average Price Per Gallon | $0.70 |
| Swap Maturities | Feb. 2004 – Dec. 2005 |

| | 2004 | 2005 |
|---|---|---|
| Estimated % of Future Fuel Consumption Hedged at December 26, 2003 | 18% | 21% |

The program limits fuel hedges to a 24-month duration and a maximum of 80% of CSX's average monthly fuel purchased for any month within the 24-month period, and places the hedges among selected counterparties. Fuel hedging activity did not have an effect on fuel expense for the year ended December 26, 2003. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, is recorded in fuel expense and is immaterial.

These instruments qualify, and are designated by management, as cash-flow hedges of variability in expected future cash flows attributable to fluctuations in fuel prices. The fair values of fuel derivative instruments are determined based upon quoted marked prices and are recorded on the balance sheet with offsetting adjustments to Accumulated Other Comprehensive Income, a component of Shareholders' Equity. As of December 26, 2003 this component was $6 million after tax. The amounts recorded in accumulated other comprehensive income will be recorded in earnings in the period in which the hedged fuel is consumed. Fair value adjustments are noncash transactions, and accordingly, are excluded from the Cash Flow Statement.

The Company is exposed to credit loss in the event of nonperformance by other parties to fuel swap agreements. However, the Company does not anticipate nonperformance by the counterparties.

## Note 13. Shareholders Equity

***Common and Preferred Stocks***

Common and Preferred Stock consists of (in thousands):

| Common Stock, $1 Par Value | Dec. 26, 2003 |
|---|---|
| Common Shares Authorized | 300,000 |
| Common Shares Issued and Outstanding | 215,071 |
| Additional Potential Shares: | |
| Stock Options | 23,297 |
| Convertible Debt | 9,924 |

| Preferred Stock | Dec. 26, 2003 |
|---|---|
| Preferred Shares Authorized | 25,000 |
| Preferred Shares Outstanding | — |

Holders of Common Stock are entitled to one vote on all matters requiring a vote for each share held. Preferred Stock is senior to common stock with respect to dividends and upon liquidation of the Company.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Prior to October 2003, 3,000,000 shares had been designated as Series B Preferred Stock in conjunction with the Company's Shareholder Rights Plan. In October 2003, the expiration date of the shareholder rights under the Shareholder Rights Plan was accelerated, resulting in the effective termination of the Plan, and the Company's Articles of Incorporation were amended to eliminate the designation of shares for Series B Preferred.

***Accumulated Other Comprehensive Loss***

Accumulated other comprehensive loss in the Consolidated Statement of Changes in Shareholders' Equity consists of the following:

| | Balance December 27, 2002 | Net Gain (Loss) | Balance December 26, 2003 |
|---|---|---|---|
| | | (Dollars in Millions) | |
| Minimum Pension Liability (Net of $160 and $153 of taxes as of December 27, 2002 and December 26, 2003, respectively) | $ (318) | $ 8 | $ (310) |
| Fuel Hedging Adjustment (Net of $3 taxes) | — | 6 | 6 |
| Other (Net of $3 taxes) | — | 6 | 6 |
| | $ (318) | $ 20 | $ (298) |

Other comprehensive income in 2002 and 2001 represented adjustments to the minimum pension liability, net of taxes of $152 million and $10 million, respectively.

**Note 14. Earnings Per Share**

The following table sets forth the computation of basic earnings per share and earnings per share, assuming dilution:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Numerator (Millions): | | | |
| Net Earnings Before Cumulative Effect of Accounting Change | $ 189 | $ 467 | $ 293 |
| Denominator (Thousands): | | | |
| Average Common Shares Outstanding | 213,964 | 212,729 | 211,668 |
| Effect of Potentially Dilutive Common Shares | 432 | 783 | 741 |
| Average Common Shares Outstanding, Assuming Dilution | 214,396 | 213,512 | 212,409 |
| Earnings Per Share: | | | |
| Before Cumulative Effect of Accounting Change | $ 0.88 | $ 2.20 | $ 1.39 |
| Assuming Dilution, Before Cumulative Effect of Accounting Change | $ 1.14 | $ 2.19 | $ 1.38 |

Earnings per share are based on the weighted average number of common shares outstanding. Earnings per share, assuming dilution, are based on the weighted average number of common shares outstanding adjusted for the effect of potential common shares outstanding during the period, mainly arising from the exercise of employee stock options. Potential common shares at CSX include stock options and awards and shares that would be issued relating to convertible long-term debt.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Certain potential common shares (convertible debt and stock options) for all three years shown were not included in the computation of earnings per share, assuming dilution, since their exercise or conversion prices were greater than the average market price of the common shares during the period and, therefore, their effect is antidilutive. These potential common shares were as follows:

| | Fiscal Year | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Number of Shares (thousands) | 28,421 | 33,800 | 29,900 |
| Average Exercise/ Conversion Price | $ 46.94 | $ 46.31 | $ 47.26 |

A substantial increase in the fair market value of the Company's stock price could negatively impact earnings per share due to the dilutive effect of stock options and convertible debt.

**Note 15. Stock Plans**

The Company maintains several stock option and award plans designed to encourage ownership of its stock and provide incentives for employees to contribute to its success.

Effective beginning with fiscal year 2003, CSX voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." Under SFAS 123, all stock based awards will be expensed at fair value. In accordance with the prospective method of adoption permitted under SFAS 148, the Company has adopted the fair value recognition provisions on a prospective basis. Previously, the Company accounted for stock-based compensation under the intrinsic-value method of Accounting Principles Board Opinion (APB) No. 25, "Accounting to Stock Issued to Employees." Under APB 25, CSX expensed amounts associated with stock-based awards and disclosures were required for any stock option awards.

Total compensation expense associated with stock based compensation was $5 million, $6 million and $9 million in 2003, 2002 and 2001, respectively.

***Stock Options and Awards***

CSX stock option and award plans provide primarily (1) stock options and (2) restricted stock awards ("RSAs") to eligible officers and employees. Awards granted under the various plans are determined by the board of directors.

At December 26, 2003, there were 3,554 current or former employees with grants outstanding under the various plans. A total of approximately 39 million shares were reserved for issuance under the plans of which 9 million were available for new grants. The remaining shares are assigned to outstanding stock options and stock awards.

The fair value of options granted in 2003, 2002 and 2001 was estimated as of the dates of grant using the Black-Scholes option model.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | Fiscal Year | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Black-Scholes Assumptions: | | | |
| Expected Dividend Yield | 1.10% | 1.10% | 2.30% |
| Risk-free Interest Rate | 2.53% | 4.30% | 5.00% |
| Expected Stock Volatility | 28% | 27% | 27% |
| Expected Term Until Exercise | 6 years | 6 years | 6 years |
| Average Fair Value of Stock Options Granted | $8.93 | $ 11.76 | $ 10.71 |

*1. Stock Options*

The majority of stock options have been granted with 10-year terms. Options outstanding at December 26, 2003, are generally exercisable three to ten years after date of grant. The exercise price for options granted equals the market price of the underlying stock on the date of grant. A summary of the Company's stock option activity and related information for the fiscal years ended December 26, 2003, December 27, 2002 and December 28, 2001 follows:

| | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| | Weighted-Average Shares (000s) | Average Exercise Price | Weighted-Average Shares (000s) | Average Exercise Price | Weighted-Average Shares (000s) | Average Exercise Price |
| Outstanding at Beginning of Year | 26,022 | $ 40.45 | 23,650 | $ 39.49 | 20,126 | $ 38.69 |
| Granted | 3,477 | $ 38.14 | 3,438 | $ 38.14 | 5,041 | $ 39.42 |
| Exchanged, Canceled or Expired | (5,909) | $ 39.91 | (46) | $ 44.89 | (737) | $ 40.25 |
| Exercised | (293) | $ 22.42 | (1,020) | $ 31.45 | (780) | $ 25.16 |
| Outstanding at End of Year | 23,297 | $ 39.35 | 26,022 | $ 40.45 | 23,650 | $ 39.49 |
| Exercisable at End of Year | 7,104 | $ 41.13 | 8,513 | $ 41.58 | 8,426 | $ 40.00 |

The following table summarizes information about stock options outstanding at December 26, 2003:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price | Number Outstanding (000s) | Weighted-average Remaining Contractual Life (Years) | Weighted-average Exercise Price | Number Outstanding (000s) | Weighted-average Exercise Price |
| $20 to $29 | 2,050 | 6.3 | $ 23.85 | 614 | $ 24.09 |
| $30 to $39 | 12,167 | 7.4 | $ 36.87 | 1,386 | $ 37.75 |
| $40 to $49 | 6,805 | 4.2 | $ 43.60 | 4,628 | $ 43.34 |
| $50 to $59 | 2,275 | 2.9 | $ 53.07 | 476 | $ 51.43 |
| Total | 23,297 | 5.9 | $ 39.27 | 7,104 | $ 41.13 |

During the years ended December 26, 2003 and December 27, 2002, 0.3 million and 1.0 million options, respectively, were exercised.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

2. *Restricted Stock Awards ("RSAs")*

At December 26, 2003 and December 27, 2002, 248,500 and 469,500 RSAs, respectively were outstanding. The RSA's outstanding at December 26, 2003, vest over a three- to five-year employment period. The weighted-average fair value of RSAs was $30.97 as of the date of grant. Approximately $2 million, $6 million and $9 million was expensed in 2003, 2002 and 2001, respectively, in connection with restricted stock awards.

***Stock Purchase and Loan Plan***

The Stock Purchase and Loan Plan ("SPLP") provided for the purchase of common stock and related rights by eligible officers and key employees of the Company and entitled them to obtain loans with respect to the shares purchased. There were no shares issued, withdrawn, exchanged or cancelled under the SPLP in 2003, 2002 or 2001. The Plan expired in 2003. There were approximately 70,000 shares outstanding in 2002 and 2001, respectively, under this program.

***Stock Purchase and Dividend Reinvestment Plans***

1. *Stock Purchase Plan*

The 2001 Employee Stock Purchase Plan ("ESPP") allows eligible employees to purchase CSX common stock at a discount. Specifically, participating employees were able to purchase CSX stock at the lower of 85% of fair market value on December 1 (beginning of the annual offering period) or 85% of fair market value on November 30 of the following year (end of the annual offering period). In effect, employees received a 12-month stock option to purchase Company stock. Once purchased, the shares were unrestricted and could generally be sold or transferred at any time. Approximately 540,000 shares and 570,000 shares were purchased by employees under this plan during 2003 and 2002, respectively. This plan was not extended for 2004.

The predecessor to the 2001 ESPP was the 1991 Employee Stock Purchase and Dividend Reinvestment Plan. Employees purchased 25,565 shares under the plan in 2001 at a weighted-average market price of $30.43.

2. *Dividend Reinvestment Plan*

The Company maintains the Shareholder Dividend Reinvestment Plan under which shareholders may purchase additional shares of stock. At December 26, 2003, there were 4,626,035 shares available for issuance under this plan.

***Stock Plan for Directors***

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers are paid. A minimum of 40% of the retainers must be paid in common stock of the Company. In 2004, the minimum retainer to be paid in stock increases to 50%. In addition, each director may elect to receive up to 100% of the remaining retainer and fees in the form of common stock of the Company. In 1997, shareholders approved amendments to the Plan that would permit additional awards of stock or stock options. In 2003, 36,219 shares of stock were issued to the directors, resulting in $1 million of expense. In 2002, 45,195 shares of stock were issued to the directors, resulting in $1 million of expense. In 2001, 52,000 stock options were granted with an exercise price of $35.08. The Plan permits each director to elect to transfer stock into a trust that will hold the shares until the participant's death,



 Powered by Morningstar® Document Research℠

disability, retirement as a director, other cessation of services as a director, or change in control of the Company. At December 26, 2003, there were 0.6 million shares of common stock reserved for issuance under this Plan.

**Note 16. Fair Value of Financial Instruments**

Fair values of the Company's financial instruments are estimated by reference to quoted prices from market sources and financial institutions, as well as other valuation techniques. Long-term debt is the only financial instrument of the Company with fair values significantly different from their carrying amounts. At December 26, 2003, the fair value of long-term debt, including current maturities, was $7.8 billion, compared with a carrying amount of $7.3 billion. At December 27, 2002, the fair value of long-term debt, including current maturities, was $7.4 billion, compared with a carrying amount of $6.9 billion. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon the Company's current incremental borrowing rates for similar types of financing arrangements. The Company's interest rate swap agreements at December 26, 2003 and December 27, 2002 had a positive value of $55 and $78 million, respectively. The Company's fuel hedging agreements at December 26, 2003 had a positive value of $9 million. CSX had no fuel hedge agreements at December 27, 2002.

**Note 17. Employee Benefit Plans**

The Company sponsors defined benefit pension plans, principally for salaried personnel. The plans provide eligible employees with retirement benefits based principally on years of service and compensation rates near retirement.

In addition to the defined benefit pension plans, the Company sponsors three plans that provide medical and life insurance benefits to most full-time salaried employees upon their retirement. The postretirement medical plans are contributory (partially funded by retiree), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

1. Service cost (benefits attributed to employee service during the period)

2. Interest cost (interest on the liability due to the passage of time)

3. Actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions)

4. Benefits paid to participants

Plan assets are amounts that have been segregated and restricted to provide benefits, and include amounts contributed by the Company and amounts earned from investing contributions, less benefits paid. The Company uses a plan year of October 1 through September 30 to value its pension and postretirement plans on an actuarial basis. The Company funds the cost of the postretirement medical and life insurance benefits on a pay-as-you go basis. The pension plans are funded at not less than the minimum funding standards set forth in the Employee Retirement



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Income Security Act of 1974. The distribution of pension plan assets as of the September 30, 2003 measurement date is as follows:

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | Amount | Percent of Total Assets | Amount | Percent of Total Assets |
| | (Dollars in Millions) | | | |
| Common Stocks | $ 863 | 60% | $ 732 | 55% |
| Fixed Income | 557 | 38% | 590 | 45% |
| Cash and Cash Equivalents | 31 | 2% | 2 | — |
| Total | $ 1,451 | 100% | $ 1,324 | 100% |

CSX has established a target allocation of 60% equity and 40% fixed income investments. Further diversification and risk control is achieved by policy allocations to various equity styles and investment managers. Allocations are maintained at within 3% of targets. No leverage or investment in CSX securities is allowed. The goal is to maintain assets at or above benefit obligations (long-term liabilities) without corporate contributions.

CSX expects to make cash contributions of $14 million to its pension plan in 2004.

Benefit obligation and plan asset information is as follows:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| **Actuarial Present Value of Benefit Obligation** | | | | |
| Accumulated Benefit Obligation | $ 1,785 | $ 1,688 | N/A | N/A |
| Projected Benefit Obligation | $ 1,916 | $ 1,806 | $ 513 | $ 499 |
| **Change in Projected Benefit Obligation:** | | | | |
| Projected Benefit Obligation at Beginning of Plan Year | $ 1,806 | $ 1,700 | $ 499 | $ 420 |
| Service Cost | 38 | 40 | 11 | 11 |
| Interest Cost | 113 | 119 | 25 | 29 |
| Impact of Plan Changes(1)/ Business Dispositions | (7) | — | (32) | — |
| Plan Participants' Contributions | — | — | 12 | 10 |
| Actuarial Loss | 135 | 84 | 46 | 70 |
| Benefits Paid | (169) | (137) | (48) | (41) |
| Benefit Obligation at End of Plan Year | $ 1,916 | $ 1,806 | $ 513 | $ 499 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| **Change in Plan Assets:** | | | | |
| Fair Value of Plan Assets at Beginning of Plan Year | $ 1,324 | $ 1,493 | $ — | $ — |
| Actual Return on Plan Assets | 241 | (48) | — | — |
| Employer Contributions | 55 | 16 | 36 | 31 |
| Plan Participants' Contributions | — | — | 12 | 10 |
| Benefits Paid | (169) | (137) | (48) | (41) |
| Fair Value of Plan Assets at End of Plan Year | $ 1,451 | $ 1,324 | $ — | $ — |
| **Funded Status** | $ (465) | $ (482) | $ (513) | $ (499) |

(1) Postretirement benefits reflects the impact of changing the plan benefit for individuals retiring after February 2003 which caps the employer cost at $8,000 (plus $7,000 for spouses).

The funded status, or amount by which the benefit obligation exceeds the fair value of plan assets, represents a liability. At December 26, 2003, the status of CSX plans is as follows:

| | Aggregate Projected Benefit Obligation | Aggregate Fair Value of Plan Assets |
|---|---|---|
| For plans with a projected benefit obligation in excess of plan assets | $ 1.9 billion | $ 1.5 billion |
| For plans with an accumulated benefit obligation in excess of plan assets | $ 1.8 million | $ 1.5 million |

The following table shows the reconciliation of the funded status of the plan with the amount recorded in the statement of financial position:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| Funded Status | $ (465) | $ (482) | $ (513) | $ (499) |
| Unrecognized Actuarial Loss | 487 | 474 | 222 | 190 |
| Unrecognized Prior Service Cost | 34 | 40 | (27) | — |
| Fourth Quarter Activity: | | | | |
| Employer Contributions to Pension Plans | 3 | 3 | — | — |
| Net Postretirement Benefits Paid | — | — | 10 | 8 |
| Net Amount Recognized in Consolidated Balance Sheet | $ 59 | $ 35 | $ (308) | $ (301) |

A liability is recognized if net periodic pension cost (cost of a pension plan for a period, including service cost, interest cost, actual return on plan assets, gain or loss, amortization of unrecognized prior service cost) recognized exceeds amounts the employer has contributed to the plan. An asset is recognized if net periodic pension cost is less than amounts the employer has contributed to the plan.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The amount recognized in the statement of financial position consists of:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| Accrued Benefit Liability | $ (393) | $ (430) | $ (308) | $ (301) |
| Intangible Asset | 34 | 40 | — | — |
| Accumulated Other Comprehensive Loss | 418 | 425 | — | — |
| Net Amount Recognized in Consolidated Balance Sheet | $ 59 | $ 35 | $ (308) | $ (301) |

Components of net periodic pension cost are as follows:

| | Pension Benefits | | | Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | | | | |
| Service Cost | $ 38 | $ 40 | $ 41 | $ 11 | $ 11 | $ 9 |
| Interest Cost | 113 | 119 | 121 | 25 | 29 | 26 |
| Expected Return on Plan Assets | (137) | (152) | (150) | — | — | — |
| Amortization of Prior Service Cost | 4 | 5 | 3 | (5) | — | (1) |
| Recognized Net Actuarial (Gain) Loss | — | (9) | (11) | 14 | 8 | 3 |
| Net Periodic Benefit Cost | 18 | 3 | 4 | 45 | 48 | 37 |
| Special Termination Benefits — Workforce Reduction Program/ Curtailments | 13 | — | 10 | — | — | — |
| Net Periodic Benefit Cost Including Special Termination Benefits | $ 31 | $ 3 | $ 14 | $ 45 | $ 48 | $ 37 |

The $13 million termination charge in 2003 represents a curtailments charge associated with the retirement of the Company's former Chairman and Chief Executive Officer. The $10 million charge was the result of a workforce reduction program that occurred in 2001.

During 2003 and 2002, CSX recorded changes in its minimum pension liability. These changes did not affect net earnings, but are a component of accumulated other comprehensive loss on an after-tax basis. In 2003, the minimum pension liability increased by $6 million, reducing accumulated other comprehensive income by $3 million after tax. In 2002, the minimum pension liability increased by $398 million, reducing accumulated other comprehensive income by $248 million after tax. The Company also recorded $10 million and $25 million after tax effect of accumulated other comprehensive income, relating to Conrail's minimum pension liability for December 26, 2003 and December 27, 2002, respectively.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Weighted-average assumptions used in accounting for the plans are as follows:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | 8.90% | 9.50% | n/a | n/a |
| Benefit Obligation at End of Plan Year | 8.90% | 8.90% | n/a | n/a |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | 6.50% | 7.25% | 5.50% | 7.25% |
| Benefit Obligation at End of Plan Year | 6.00% | 6.50% | 5.00% | 5.50% |
| Salary Scale Inflation | 3.30% | 3.30% | 3.30% | 3.30% |

The net postretirement benefit obligation was determined using the assumption that the health care cost trend rate for medical plans was 11% for 2003 and 2002, decreasing gradually to 4.5% by 2012 and remaining at that level thereafter. A 1% change in the assumed health care cost trend rate would have the following effects:

| | 1% Increase | 1% Decrease |
|---|---|---|
| | (Dollars in Millions) | |
| Effect on postretirement benefits service and interest cost | $ 2 | $ (2) |
| Effect on postretirement benefit obligation | $ 27 | $ (28) |

In December 2003, the President of the United States signed into law the “Medicare Prescription Drug, Improvement and Modernization Act of 2003” (“the Act”), which introduces a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is actuarially equivalent to Medicare Part D. SFAS 106 requires that changes in the law that take effect in the future and affect future benefit coverage shall be considered in current-period benefit measurements. However, as significant uncertainties exist for how to account for the subsidy a plan sponsor may not have sufficient information available to measure effects of the Act, prepare related actuarial valuations, and ensure proper accounting. Therefore, FASB has issued staff position No. FAS 106-1 which allows a plan sponsor to elect to defer recognizing the effects of the Act until authoritative guidance on the accounting for the federal subsidy is issued, or until certain other events occur. When the guidance is issued, it may cause CSX to revise previously reported information. CSX is currently evaluating how this legislation may impact its postretirement benefit plans.

***Other Plans***

The Company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $15 million, $15 million and $16 million for 2003, 2002 and 2001, respectively.

Under collective bargaining agreements, the Company participates in a number of union-sponsored, multi-employer benefit plans. Payments to these plans are made as part of aggregate assessments generally based on number of employees covered, hours worked, tonnage moved or a combination thereof. Total contributions of $360 million, $315 million and $292 million were made to these plans in 2003, 2002 and 2001, respectively.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 18. Commitments and Contingencies**

***Lease Commitments***

The Company has various lease agreements with other parties with terms up to 42 years. Non-cancelable, long-term leases generally include provisions for maintenance, options to purchase and options to extend the terms.

At December 26, 2003, minimum building and equipment rentals under these operating leases are as follows:

| | Operating Leases | Sublease Income | Net Lease Commitments |
|---|---|---|---|
| | | (Dollars in Millions) | |
| 2004 | $ 210 | $ 60 | $ 150 |
| 2005 | 190 | 52 | 138 |
| 2006 | 163 | 51 | 112 |
| 2007 | 177 | 60 | 117 |
| 2008 | 141 | 43 | 98 |
| Thereafter | 678 | 162 | 516 |
| Total | $ 1,559 | $ 428 | $ 1,131 |

Rent expense on operating leases totaled $564 million in 2003, $605 million in 2002 and $629 million in 2001. These amounts include net daily rental charges on railroad operating equipment aggregating $297 million, $295 million, and $289 million in 2003, 2002 and 2001, respectively which are not long-term commitments. In addition to these commitments, the Company also has agreements covering routes and equipment leased from Conrail. See Note 2, Investment In and Integrated Rail Operations with Conrail, for a description of these commitments.

***Purchase Commitments***

The Company has a commitment under a long-term maintenance program for approximately 40% of CSXT's fleet of locomotives. The agreement expires in 2026 and totals $2.6 billion. Minimum payments under this agreement are as follows:

| | Minimum Payments |
|---|---|
| | (Dollars in Millions) |
| 2004 | $ 132 |
| 2005 | 138 |
| 2006 | 166 |
| 2007 | 171 |
| 2008 | 171 |
| Thereafter | 1,866 |
| Total | $ 2,644 |

The long-term maintenance program assures CSX access to efficient, high-quality locomotive maintenance services at settled price levels through the term of the program. Under the program, CSX paid $130 million, $124 million and $126 million in fiscal years 2003, 2002 and 2001, respectively.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Guarantees***

The Company and its subsidiaries are contingently liable individually and jointly with others as guarantors of obligations principally relating to leased equipment, joint ventures and joint facilities used by CSX in its business operations. Utilizing a CSX guarantee for these obligations allows CSX to take advantage of lower interest rates and obtain other favorable terms when negotiating leases or financing debt. Guarantees are contingent commitments issued by the Company that could require CSX or one of its affiliates to make payment to or to perform certain actions for the guaranteed party based on another entity's failure to perform. Upon the adoption of FIN 45 in 2003, the Company's evaluation of its guarantees did not result in any amounts for guarantees being recorded on the balance sheet. CSX's guarantees can be segregated into three main categories:

1. Guarantees of approximately $440 million of lease commitments assumed by A.P. Moller-Maersk ("Maersk") for which the Company is contingently liable. CSX believes that Maersk will fulfill its contractual commitments with respect to such leases and that CSX will have no further liabilities for those obligations.

2. Guarantees of approximately $97 million relating to construction and cash deficiency support guarantees at several of the Company's international terminal locations under development. The non-performance of one of its partners, cost overruns or non-compliance with financing loan covenants could cause the Company to have to perform under these guarantees.

3. CSX guarantees of approximately $300 million relating to leases assumed as part of CSX's conveyance of its interest in CSX Lines in February 2003, as discussed in Note 3, Divestitures.

The maximum amount of future payments the Company could be required to make under these guarantees is the amount of the guarantees themselves.

***Self-Insurance***

The Company obtains substantial amounts of commercial insurance for potential losses for third-party liability and property damages. Specified levels of risk (up to $35 million for property and $25 million for liability per occurrence) are retained on a self-insurance basis. The Company uses a combination of third-party and self-insurance to realize savings on insurance premium costs.

***Matters Arising Out of Sale of International Container-Shipping Assets***

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The first dispute involved a post-closing working capital adjustment to the sale price for which the Company had recorded a receivable of approximately $70 million. The second dispute involved a claim of 425 million Dutch Guilders (approximately $180 million at then prevailing currency exchange rates) plus interest by Europe Container Terminals BV ("ECT") alleging breaches of contract by the Company at the Rotterdam container terminal facility owned by ECT.

Also in 2003, CSX entered into a final settlement agreement with Maersk allocating responsibility between the two companies for third party claims and litigation relating to the assets acquired by Maersk.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The two settlements reduced the Company's 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in the financial statements as an additional loss on the sale of the international container-shipping assets. Neither settlement has a material impact on cash flows.

***STB Proceeding***

In 2001 Duke Energy Corporation ("Duke") filed a complaint before the U.S. Surface Transportation Board ("STB") alleging that certain CSXT common carrier coal rates are unreasonably high. In February 2004, the STB issued a decision finding that the CSXT common carrier rates were reasonable. While approving the rate levels, the STB also invited Duke to request a phase-in of rate increases over some time period. The nature and amount of any such phase-in is uncertain, and would only apply to billings subsequent to December 2001. CSXT will continue to consider and pursue all available legal defenses in this matter. Administrative and legal appeals are possible, and could take several years to resolve. An unfavorable outcome to this complaint would not have a material effect on the Company.

***Contract Settlement***

In 2002, the Company received $44 million as the first of two payments to settle a contract dispute. During 2002, the Company recognized approximately $7 million of the first payment in other income as this amount related to prior periods. The remaining $37 million will be recognized over the contract period, which ends in 2020. The second payment of $23 million was received in 2003 and will be recognized over the contract period which ends in 2020. The results of this settlement will provide approximately $3 million in annual pretax earnings through 2020.

***Other Legal Proceedings***

CSX is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters. Federal Employers' Liability Act claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for punitive as well as compensatory damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year. The company is also party to a number of actions, the resolution of which could result in gain realization in amounts that could be material to results of operations in the quarters received.

**Note 19. Business Segments**

The Company operates in three business segments: rail, intermodal, and international terminals. The rail segment provides rail freight transportation over a network of more than 23,000 route miles in 23 states, the District of Columbia and two Canadian provinces. The intermodal segment provides transcontinental intermodal transportation services and operates a network of dedicated intermodal facilities across North America. The international terminals segment operates container freight terminal facilities and related businesses in Asia, Europe,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Australia, Latin America and the United States. The Company's segments are strategic business units that offer different services and are managed separately based on the differences in these services. Because of their close interrelationship, the rail and intermodal segments are viewed on a combined basis as Surface Transportation operations.

The Company evaluates performance and allocates resources based on several factors, of which the primary financial measure is business segment operating income, defined as income from operations excluding the effects of non-recurring charges and gains. The accounting policies of the segments are the same as those described in the summary of significant accounting policies (Note 1), except that for segment reporting purposes, CSX includes minority interest expense on the international terminals segment's joint venture businesses in operating expense. These amounts are reclassified through eliminations in CSX's consolidated financial statements to other income. Intersegment sales and transfers are generally accounted for as if the sales or transfers were to third parties, at current market prices.

Business segment information for the years ended December 26, 2003, December 27, 2002 and December 28, 2001 is as follows:

| | Surface Transportation | | | International Terminals | Other(1) | Total |
|---|---|---|---|---|---|---|
| | Rail | Intermodal | Total | | | |
| | (Dollars in Millions) | | | | | |
| **2003** | | | | | | |
| Revenues from External Customers | $ 6,182 | $ 1,257 | $ 7,439 | $ 226 | $ 128 | $ 7,793 |
| Intersegment Revenues | — | 4 | 4 | — | — | 4 |
| Segment Operating Income | 541 | 110 | 651 | 69 | 1 | 721 |
| Assets | 12,923 | 611 | 13,534 | 1,020 | — | 14,554 |
| Depreciation Expense | 579 | 32 | 611 | 9 | — | 620 |
| Property Additions | 974 | 47 | 1,021 | 9 | 12 | 1,042 |
| **2002** | | | | | | |
| Revenues from External Customers | $ 6,003 | $ 1,156 | $ 7,159 | $ 235 | $ 758 | $ 8,152 |
| Intersegment Revenues | — | 24 | 24 | 1 | — | 25 |
| Segment Operating Income | 854 | 141 | 995 | 69 | 38 | 1,102 |
| Assets | 12,738 | 537 | 13,275 | 959 | 309 | 14,543 |
| Depreciation Expense | 576 | 29 | 605 | 9 | 17 | 631 |
| Property Additions | 981 | 29 | 1,010 | 11 | 19 | 1,040 |
| **2001** | | | | | | |
| Revenues from External Customers | $ 6,082 | $ 1,092 | $ 7,174 | $ 234 | $ 681 | $ 8,089 |
| Intersegment Revenues | — | 20 | 20 | 2 | — | 22 |
| Segment Operating Income | 803 | 104 | 907 | 71 | 32 | 1,010 |
| Assets | 12,948 | 432 | 13,380 | 880 | 504 | 14,764 |
| Depreciation Expense | 550 | 31 | 581 | 8 | 24 | 613 |
| Property Additions | 848 | 12 | 860 | 19 | 11 | 890 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(1) Prior to the conveyance of CSX Lines, it was a segment of CSX and was presented with international terminals on a combined basis, as the Marine Services operations of the Company. Results for CSX Lines are now presented in the other column.

A reconciliation of the totals reported for the business segments to the applicable line items in the consolidated financial statements is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Revenues: | | | |
| Total External Revenues for Business Segments | $7,793 | $8,152 | $8,089 |
| Intersegment Revenues for Business Segments | 4 | 25 | 22 |
| Elimination of Intersegment Revenues | (4) | (25) | (22) |
| Other | — | — | 21 |
| Total Consolidated Revenues | $7,793 | $8,152 | $8,110 |
| Operating Income: | | | |
| Total Operating Income for Business Segments | $ 721 | $1,102 | $1,010 |
| Reclassification of Minority Interest Expense for International Terminals Segment(a) | 36 | 39 | 36 |
| Unallocated Corporate Expenses | (23) | (14) | (29) |
| New Orleans Litigation Provision | — | — | (60) |
| Additional Loss on Sale (See Note 13) | (108) | — | — |
| Total Consolidated Operating Income (Loss) | $ 626 | $1,127 | $ 957 |

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| **Assets:** | | | |
| Assets for Business Segments | $14,554 | $14,543 | $14,764 |
| Investment in Conrail | 4,678 | 4,653 | 4,655 |
| Elimination of Intersegment Receivables | (17) | (128) | (185) |
| Non-segment Assets(b) | 2,545 | 1,883 | 1,567 |
| Total Consolidated Assets | $21,760 | $20,951 | $20,801 |
| **Depreciation Expense** | | | |
| Depreciation for Business Segments | 620 | 631 | 613 |
| Non-segment Depreciation(b) | 9 | 18 | 9 |
| Total Consolidated Depreciation Expense | $ 629 | $ 649 | $ 622 |
| **Property Additions** | | | |
| Property Additions for Business Segments | 1,042 | 1,040 | 890 |
| Non-segment Property Additions(b) | 17 | 40 | 40 |
| Total Consolidated Property Additions | $ 1,059 | $ 1,080 | $ 930 |

---

(a) International Terminals minority interest expense which is reclassified to other income in consolidation.

(b) Non-segment assets include corporate cash and cash equivalents and assets of non-transportation businesses and discontinued operations. Non-segment depreciation and property additions are primarily attributable to non-transportation businesses and discontinued operations. Principal non-transportation businesses include real estate and resort operations.

Revenues in the United States comprise more than 95% of total consolidated revenues. Approximately 95% of the Company's long-lived assets are located in the United States. The Company does not have a single external customer that represents 10% or more of its consolidated revenue.

**Note 20. Summarized Consolidating Financial Data — CSX Vessel Leasing (formerly Sea-Land)**

During 1987, Sea-Land entered into agreements to sell and lease back, by charter, three new U.S.-built , U.S.-flag, D-7 class container ships. The ships were not included in the sale of international liner assets to Maersk in December 1999 and the related debt remains an obligation of CSX Lines. CSX has guaranteed the obligations of CSX Lines pursuant to the related charters which, along with the container ships, serve as collateral for debt securities registered with the Securities and Exchange Commission (SEC). As noted in Note 3 of the Annual Report, Divestitures, CSX agreed to convey certain assets of CSX Lines to Horizon Lines LLC. These obligations are not part of this transaction and another CSX entity became the obligor in 2003. In accordance with SEC disclosure requirements, consolidating summarized financial information for



 Powered by Morningstar® Document Research℠

the parent and obligor are as follows (certain prior year amounts have been reclassified to conform to the 2003 presentation):

**Consolidating Income Statement**

| Fiscal Year Ended December 26, 2003 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| Operating Revenue | $ — | $ — | $7,866 | $ (73) | $7,793 |
| Operating Expense | (152) | — | 7,383 | (64) | 7,167 |
| Operating Income (Loss) | 152 | — | 483 | (9) | 626 |
| Equity in Earnings of Subsidiaries | 414 | — | — | (414) | — |
| Other Income (Expense) | (23) | 4 | 100 | (24) | 57 |
| Interest Expense | 373 | — | 78 | (33) | 418 |
| Earnings Before Income Taxes and Cumulative Effect of Accounting Change | 170 | 4 | 505 | (414) | 265 |
| Income Tax Expense (Benefit) | (76) | — | 152 | — | 76 |
| Earnings Before Cumulative Effect of Accounting Change | 246 | 4 | 353 | (414) | 189 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | 57 | — | 57 |
| **Net Earnings** | $ 246 | $ 4 | $ 410 | $(414) | $ 246 |

| Fiscal Year Ended December 27, 2002 | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| Operating Revenue | $ — | $758 | $7,485 | $ (91) | $8,152 |
| Operating Expense | (241) | 720 | 6,628 | (82) | 7,025 |
| Operating Income(Loss) | 241 | 38 | 857 | (9) | 1,127 |
| Equity in Earnings of Subsidiaries | 549 | — | — | (549) | — |
| Other Income (Expense) | (24) | 5 | 103 | (43) | 41 |
| Interest Expense | 394 | 7 | 96 | (52) | 445 |
| Earnings Before Income Taxes | 372 | 36 | 864 | (549) | 723 |
| Income Tax Expense (Benefit) | (52) | 14 | 294 | — | 256 |
| Earnings Before Cumulative Effect of Accounting Change | 424 | 22 | 570 | (549) | 467 |
| Cumulative Effect on Prior Years of Accounting Change | — | — | (43) | — | (43) |
| **Net Earnings** | $ 424 | $ 22 | $ 527 | $(549) | $ 424 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Consolidating Income Statement**

| Fiscal Year Ended December 28, 2001 | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| Operating Revenue | $ — | $ 681 | $ 7,862 | $ (433) | $ 8,110 |
| Operating Expense | (199) | 649 | 7,128 | (425) | 7,153 |
| Operating Income(Loss) | 199 | 32 | 734 | (8) | 957 |
| Equity in Earnings of Subsidiaries | 480 | — | — | (480) | — |
| Other Income | (11) | 9 | 88 | (77) | 9 |
| Interest Expense | 469 | 13 | 121 | (85) | 518 |
| Earnings before Income Taxes | 199 | 28 | 701 | (480) | 448 |
| Income Tax Expense (Benefit) | (94) | 11 | 238 | — | 155 |
| **Net Earnings** | $ 293 | $ 17 | $ 463 | $ (480) | $ 293 |



 Powered by Morningstar® Document Research℠

CSX CORPORATION

CONSOLIDATING BALANCE SHEET

| December 26, 2003 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 1,210 | $ 45 | $ (887) | $ — | $ 368 |
| Accounts Receivable — Net | 45 | 15 | 1,126 | (23) | 1,163 |
| Materials and Supplies | — | — | 170 | — | 170 |
| Deferred Income Taxes | — | — | 136 | — | 136 |
| Other Current Assets | 6 | — | 197 | (137) | 66 |
| Total Current Assets | 1,261 | 60 | 742 | (160) | 1,903 |
| Properties | 25 | — | 19,242 | — | 19,267 |
| Accumulated Depreciation | 24 | — | 5,513 | — | 5,537 |
| Properties — Net | 1 | — | 13,729 | — | 13,730 |
| Investment in Conrail | 331 | — | 4,347 | — | 4,678 |
| Affiliates and Other Companies | 12,638 | — | 944 | (13,067) | 515 |
| Investment in Consolidated Subsidiaries | — | — | — | — | — |
| Other Long-term Assets | 1,299 | — | 269 | (634) | 934 |
| Total Assets | $ 15,530 | $ 60 | $ 20,031 | $ (13,861) | $ 21,760 |
| **LIABILITIES** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $ 88 | $ — | $ 761 | $ (22) | $ 827 |
| Labor and Fringe Benefits Payable | 6 | — | 391 | — | 397 |
| Payable to Affiliates | — | — | 137 | (137) | — |
| Casualty, Environmental and Other Reserves | 5 | — | 275 | — | 280 |
| Current Maturities of Long-term Debt | 300 | — | 126 | — | 426 |
| Short-term Debt | — | — | 2 | — | 2 |
| Income and Other Taxes Payable | 1,464 | — | (1,340) | (1) | 123 |
| Other Current Liabilities | 21 | 20 | 114 | — | 155 |
| Total Current Liabilities | 1,884 | 20 | 466 | (160) | 2,210 |
| Long-term Debt | 6,085 | — | 801 | — | 6,886 |
| Deferred Income Taxes | (12) | — | 3,764 | — | 3,752 |
| Casualty, Environmental and Other reserves | — | — | 836 | — | 836 |
| Long-term Payable to Affiliates | 396 | — | 128 | (524) | — |
| Other Long-term Liabilities | 748 | 36 | 957 | (118) | 1,623 |
| Total Liabilities | 9,101 | 56 | 6,952 | (802) | 15,307 |
| **Shareholder's Equity** | | | | | |
| Preferred Stock | — | — | 396 | (396) | — |
| Common Stock | 215 | — | 209 | (209) | 215 |
| Other Capital | 1,579 | 1 | 8,052 | (8,053) | 1,579 |
| Retained Earnings | 4,957 | 3 | 4,398 | (4,401) | 4,957 |
| Accumulated Other Comprehensive Loss | (322) | — | 24 | — | (298) |
| Total Shareholders' Equity | 6,429 | 4 | 13,079 | (13,059) | 6,453 |
| Total Liabilities and Shareholders' Equity | $ 15,530 | $ 60 | $ 20,031 | $ (13,861) | $ 21,760 |



Source: CSX CORP, 10-K, March 10, 2004

Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

CSX CORPORATION

CONSOLIDATING BALANCE SHEET

| December 27, 2002 | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | (Dollars in Millions) | | | | |
| **ASSETS** | | | | | |
| Cash, Cash Equivalents & Short-term Investments | $ 379 | $ 37 | $ (152) | $ — | $ 264 |
| Accounts Receivable — Net | 43 | — | 902 | (146) | 799 |
| Materials and Supplies | — | — | 180 | — | 180 |
| Deferred Income Taxes | — | — | 128 | — | 128 |
| Assets Held for Disposition | — | 263 | — | — | 263 |
| Other Current Assets | 5 | — | 287 | (137) | 155 |
| Total Current Assets | 427 | 300 | 1,345 | (283) | 1,789 |
| Properties | 33 | 11 | 18,516 | — | 18,560 |
| Accumulated Depreciation | (29) | (2) | (5,243) | — | (5,274) |
| Properties, Net | 4 | 9 | 13,273 | — | 13,286 |
| Investment in Conrail | 342 | — | 4,311 | — | 4,653 |
| Affiliates and Other Companies | — | — | 414 | (33) | 381 |
| Investment in Consolidated Subsidiaries | 12,761 | — | 396 | (13,157) | — |
| Other Long-term Assets | 1,192 | — | 273 | (623) | 842 |
| Total Assets | $ 14,726 | $ 309 | $ 20,012 | $ (14,096) | $ 20,951 |
| **LIABILITIES** | | | | | |
| Accounts Payable | $ 77 | $ 20 | $ 848 | $ (143) | $ 802 |
| Labor and Fringe Benefits Payable | 49 | 11 | 397 | — | 457 |
| Payable to Affiliates | — | — | 137 | (137) | — |
| Casualty, Environmental and Other Reserves | 1 | — | 245 | — | 246 |
| Current Maturities of Long-term Debt | 150 | — | 241 | — | 391 |
| Short-term Debt | 140 | — | 3 | — | 143 |
| Liabilities Held for Disposition | — | 104 | — | — | 104 |
| Income and Other Taxes Payable | 1,458 | 9 | (1,284) | (39) | 144 |
| Other Current Liabilities | 28 | 4 | 99 | 36 | 167 |
| Total Current Liabilities | 1,903 | 148 | 686 | (283) | 2,454 |
| Casualty, Environmental and Other Reserves | 4 | 1 | 599 | — | 604 |
| Long-term Debt | 5,510 | — | 1,009 | — | 6,519 |
| Deferred Income Taxes | — | 3 | 3,564 | — | 3,567 |
| Long Term Payable to Affiliates | 396 | — | 148 | (544) | — |
| Other Long-term Liabilities | 685 | 49 | 925 | (93) | 1,566 |
| Total Liabilities | 8,498 | 201 | 6,931 | (920) | 14,710 |
| **Shareholders' Equity** | | | | | |
| Preferred Stock | — | — | 396 | (396) | — |
| Common Stock | 215 | — | 209 | (209) | 215 |
| Other Capital | 1,547 | 73 | 8,238 | (8,311) | 1,547 |
| Retained Earnings | 4,797 | 35 | 4,225 | (4,260) | 4,797 |
| Accumulated Other Comprehensive Loss | (331) | — | 13 | — | (318) |
| Total Shareholders' Equity | 6,228 | 108 | 13,081 | (13,176) | 6,241 |
| Total Liabilities and Shareholders' Equity | $ 14,726 | $ 309 | $ 20,012 | $ (14,096) | $ 20,951 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Consolidating Cash Flow Statements

Fiscal Year Ended December 26, 2003

| | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **Operating Activities** | | | | | |
| **Net Cash Provided (Used) by Operating Activities** | $ 41 | $ — | $ 1,004 | $ (241) | $ 804 |
| **Investing Activities** | | | | | |
| Property Additions | — | — | (1,059) | — | (1,059) |
| Net Proceeds from Divestitures | 214 | — | — | — | 214 |
| Short-term Investments | 69 | — | (1) | — | 68 |
| Other Investing Activities | 29 | — | 220 | (279) | (30) |
| **Net Cash Provided (Used) by Investing Activities** | 312 | — | (840) | (279) | (807) |
| **Financing Activities** | | | | | |
| Short-term Debt-Net | (140) | — | (1) | — | (141) |
| Long-term Debt Issued | 919 | — | — | — | 919 |
| Long-term Debt Repaid | (175) | — | (325) | — | (500) |
| Cash Dividends Paid | (86) | — | (239) | 239 | (86) |
| Other Financing Activities | 29 | 45 | (375) | 281 | (20) |
| **Net Cash Provided (Used) by Financing Activities** | 547 | 45 | (940) | 520 | 172 |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 900 | 45 | (776) | — | 169 |
| **Cash and Cash Equivalents at Beginning of Period** | 263 | — | (136) | — | 127 |
| **Cash and Cash Equivalents at End of Period** | $ 1,163 | $ 45 | $ (912) | $ — | $ 296 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Consolidating Cash Flow Statements**

**Fiscal Year Ended December 27, 2002**

| | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **Operating Activities** | | | | | |
| **Net Cash Provided (Used) by Operating Activities** | $ 288 | $ 15 | $ 1,041 | $(217) | $ 1,127 |
| **Investing Activities** | | | | | |
| Property Additions | (4) | (19) | (1,057) | — | (1,080) |
| Short-term Investments-Net | 135 | (26) | 241 | — | 350 |
| Other Investing Activities | (10) | 14 | (29) | (20) | (45) |
| **Net Cash Provided (Used) by Investing Activities** | 121 | (31) | (845) | (20) | (775) |
| **Financing Activities** | | | | | |
| Short-term Debt-Net | 140 | — | — | — | 140 |
| Long-term Debt Issued | 746 | — | 2 | — | 748 |
| Long-term Debt Repaid | (950) | — | (209) | — | (1,159) |
| Dividends Paid | (86) | — | (209) | 209 | (86) |
| Other Financing Activities | 32 | — | (65) | 28 | (5) |
| **Net Cash Provided (Used) by Financing Activities** | (118) | — | (481) | 237 | (362) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 291 | (16) | (285) | — | (10) |
| **Cash and Cash Equivalents at Beginning of Period** | 156 | — | (19) | — | 137 |
| **Cash and Cash Equivalents at End of Period** | $ 447 | $(16) | $ (304) | $ — | $ 127 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Consolidating Cash Flow Statements

Fiscal Year Ended December 28, 2001

| | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **Operating Activities** | | | | | |
| **Net Cash Provided (Used) by Operating Activities** | $ (85) | $ 80 | $ 1,090 | $ (258) | $ 827 |
| **Investing Activities** | | | | | |
| Property Additions | — | (11) | (919) | — | (930) |
| Short-term Investments-Net | 169 | — | (220) | — | (51) |
| Other Investing Activities | (191) | 1 | 1,369 | (1,163) | 16 |
| **Net Cash Provided (Used) by Investing Activities** | (22) | (10) | 230 | (1,163) | (965) |
| **Financing Activities** | | | | | |
| Short-term Debt-Net | (524) | — | — | — | (524) |
| Long-term Debt Issued | 962 | — | — | — | 962 |
| Long-term Debt Repaid | (60) | (21) | (185) | — | (266) |
| Cash Dividends Paid | (174) | — | (222) | 225 | (171) |
| Common Stock Issued | 26 | — | (160) | 134 | — |
| Common Stock Retired | (1) | — | 1 | — | — |
| Other Financing Activities | (13) | (49) | (986) | 1,062 | 14 |
| **Net Cash Provided (Used) by Financing Activities** | 216 | (70) | (1,552) | 1,421 | 15 |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 109 | — | (232) | — | (123) |
| **Cash and Cash Equivalents at Beginning of Period** | 47 | — | 213 | — | 260 |
| **Cash and Cash Equivalents at End of Period** | $ 156 | $ — | $ (19) | $ — | $ 137 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 21. Quarterly Financial Data (unaudited)(a)**

| Year | 2003 | | | | 2002 | | | |
|---|---|---|---|---|---|---|---|---|
| Quarter | 1st(b) | 2nd | 3rd(c) | 4th(d) | 1st(e) | 2nd | 3rd | 4th |
| | (Dollars in Millions, Except Per Share Amounts) | | | | | | | |
| Operating Revenue | $2,016 | $1,942 | $1,882 | $1,953 | $1,964 | $2,073 | $2,055 | $2,060 |
| Operating Expense | 1,839 | 1,657 | 1,980 | 1,691 | 1,752 | 1,752 | 1,779 | 1,742 |
| Operating Income | 177 | 285 | (98) | 262 | 212 | 321 | 276 | 318 |
| Other Income (Expense) | (10) | 19 | 21 | 27 | 9 | 4 | 28 | — |
| Interest Expense | 103 | 105 | 103 | 107 | 114 | 116 | 108 | 107 |
| Earnings Before Income Taxes And Cumulative Effect of Accounting Change | 64 | 199 | (180) | 182 | 107 | 209 | 196 | 211 |
| Income Tax Expense | 22 | 72 | (77) | 59 | 39 | 74 | 69 | 74 |
| Earnings before Cumulative Effect of Accounting Change | 42 | 127 | (103) | 123 | 68 | 135 | 127 | 137 |
| Cumulative Effect of Accounting Change — Net of Tax | 57 | — | — | — | (43) | — | — | — |
| Net Earnings | $ 99 | $ 127 | $ (103) | $ 123 | $ 25 | $ 135 | $ 127 | $ 137 |
| **Per Common Share** | | | | | | | | |
| Earnings Per Share: | | | | | | | | |
| Before Cumulative Effect of Accounting Change | $ 0.20 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.32 | $ 0.63 | $ 0.60 | $ 0.64 |
| Cumulative Effect of Accounting Change | 0.26 | — | — | — | (0.20) | — | — | — |
| Including Cumulative Effect of Accounting Change | $ 0.46 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.12 | $ 0.63 | $ 0.60 | $ 0.64 |
| Earnings Per Share, Assuming Dilution: | | | | | | | | |
| Before Cumulative Effect of Accounting Change | $ 0.20 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.32 | $ 0.63 | $ 0.60 | $ 0.64 |
| Cumulative Effect of Accounting Change | 0.26 | — | — | — | (0.20) | — | — | — |
| Including Cumulative Effect of Accounting Change | $ 0.46 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.12 | $ 0.63 | $ 0.60 | $ 0.64 |
| Dividend Per Share | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Market Price | | | | | | | | |
| High | $30.85 | $33.16 | $32.99 | $36.29 | $41.40 | $37.90 | $36.77 | $30.12 |
| Low | $25.50 | $28.20 | $28.92 | $29.07 | $34.81 | $32.41 | $25.75 | $25.09 |

(a) Periods presented are 13 week quarters.
(b) Included in the first quarter of 2003 is a credit of $57 million after tax, 26 cents per share, resulting from the cumulative effect of an accounting change for asset retirement obligations.
(c) Included in the third quarter of 2003 is a charge of $232 million reflecting a change in estimate of casualty reserves. Also included in the third quarter of 2003 is a charge of



 Powered by Morningstar® Document Research℠

$108 million to account for the Company entering into two settlement agreements with Maersk that resolved all material disputes between the two companies arising out of the 1999 sale of international container shipping assets to Maersk.

(d) Included in the fourth quarter of 2003 is a charge of $34 million representing the initial charge for separation expenses related to the management restructuring announced in November 2003. Also, in the fourth quarter of 2003, the Company recorded a credit of $22 million related to revised estimates for amounts to be paid to individuals under separation plans initially recorded in 1991 and 1992.

(e) Included in the first quarter of 2002 is a charge of $83 million ($43 million after tax and minority interest) to write-down indefinite lived intangible assets, resulting from the cumulative effect of an accounting change.

**Item 9.** ***Changes in and Disagreements with Accountants on Accounting and Financial Disclosure***

None.

**Item 9A.** ***Controls and Procedures***

As of December 26, 2003, under the supervision and with the participation of the Company's Chief Executive Officer (CEO) and the Chief Financial Officer (CFO), management has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on that evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures were effective as of December 26, 2003. There were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2003 that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

## PART III

**Item 10.** ***Directors and Executive Officers of the Registrant***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement, except for the information regarding the executive officers of the Registrant which is included in Part I of this report under the caption "Executive Officers of the Registrant."

**Item 11.** ***Executive Compensation***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 13.** ***Certain Relationships and Related Transactions***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 14.** ***Principal Accounting Fees and Services***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**PART IV**

**Item 15.** ***Exhibits, Financial Statement Schedules, and Reports on Form 8-K***

(a)(1) *Financial Statements*

See Index to Consolidated Financial Statements on page 39.

(2) *Financial Statement Schedules*

The information required by Rule 3-09 is included in Note 2 to the consolidated financial statements, “Investment in and Integrated Rail Operations with Conrail” and the Audited Consolidated Financial Statements of Conrail Inc., filed herewith as exhibit 99.3. The information required by Schedule II is included in Note 9 to the consolidated financial statements, “Casualty, Environmental and Other Reserves.” All other financial statement schedules are not applicable.

(3) *Exhibits*

| | |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3.1 to the Registrant’s Form 10-Q dated October 10, 2003) |
| 3.2 | Bylaws of the Registrant, amended as of May 7, 2003 (incorporated herein by reference to Exhibit 3.2 of the Registrant’s Form 10-Q dated September 30, 2003). |
| 4.1(a) | Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant’s Form SE, dated September 7, 1990, filed with the Commission) |
| 4.1(b) | First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant’s Form SE, dated May 28, 1992, filed with the Commission) |
| 4.1(c) | Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant’s Registration Statement on Form S-4 (Registration No. 333-28523) filed with the Commission on June 5, 1997) |
| 4.1(d) | Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant’s Current Report on Form 8-K filed with the Commission on May 12, 1998) |
| 4.1(e) | Fourth Supplemental Indenture, dated as of October 30, 2001, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant’s Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 4.1(f) | Fifth Supplemental Indenture, dated as of October 27, 2003 between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the registrant’s Report on Form 8-K filed with the Commission on October 27, 2003). |

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant’s long-term debt securities, where the long-term debt securities authorized under each such instrument do not exceed 10% of the Registrant’s total assets, have been omitted and will be furnished to the Commission upon request.

| | |
|---|---|
| 10.1* | CSX Stock Plan for Directors (as amended through January 1, 2004)** |
| 10.2* | Corporate Director Deferred Compensation Plan (as amended through January 1, 2004)** |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.3* | CSX Corporation 2002 Corporate Director Deferred Compensation Plan (as amended through January 1, 2004)** |
| 10.4 | CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K dated March 4, 1994)** |
| 10.5* | CSX Directors' Matching Gift Plan (as amended through December 31, 2003)** |
| 10.6 | Employment and Consulting Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.3 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.7 | Restricted Stock Award Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.4 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.8 | Stock Option Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.5 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.9 | Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.9 to the Registrant's Annual Report on Form 10-K dated March 4, 1994)** |
| 10.10 | Employment Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.12 to the Registrant's Annual Report on Form 10-K dated March, 7, 2000)** |
| 10.11 | Special Employment Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.6 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.12 | Restricted Stock Award Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.7 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.13 | Railroad Retirement Benefits Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.13 to the Registrant's Report on Form 10-K dated February 26, 2003)** |
| 10.14 | Form of Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.6 to the Registrant's Annual Report on Form 10-K dated March 3, 1995)** |
| 10.15 | Form of Amendment to Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K dated March 14, 1997)** |
| 10.16 | Supplement to Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.15 to the Registrant's Annual Report on Form 10-K dated March 4, 2002)** |
| 10.17 | Amendment to Supplement to Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.17 to the Registrant's Report on Form 10-K dated February 26, 2003)** |
| 10.18 | Employment Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q dated September 30, 2003)** |
| 10.19 | Restricted Stock Award Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.2 to the Registrant's Report on Form 10-Q dated September 30, 2003)** |
| 10.20 | Retirement and Consulting Agreement with Paul R. Goodwin (incorporated herein by reference to Exhibit 10.1 to Registrant's Report on Form 10-Q dated April 30, 2003)** |
| 10.21 | Form of Employment Agreement with P. R. Goodwin and M. J. Ward (incorporated by reference to Exhibit 10.16 of the Registrant's Report on Form 10-K dated February 28, 2001)** |
| 10.22 | Form of Stock Option Agreement (incorporated by reference to Exhibit 10.17 of the Registrant's Report on Form 10-K dated March 4, 2002)** |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.24* | 1987 Long-Term Performance Stock Plan, as Amended and Restated effective April 25, 1996 (as amended through February 7, 2003)** |
| 10.25* | Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies (as amended through January 1, 1998)** |
| 10.26* | 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Corporations (as amended through February 7, 2003)** |
| 10.27* | Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (as Amended through February 7, 2003)** |
| 10.28 | Special Retirement Plan of CSX Corporation and Affiliated Companies, as Amended through February 14, 2001(incorporated by reference to Exhibit 10.23 of the Registrant's Report on Form 10-K dated March 4, 2002)** |
| 10.29 | Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies, as Amended through February 14, 2001 (incorporated by reference to Exhibit 10.24 of the Registrant's Report on Form 10-K dated March 4, 2002)** |
| 10.30 | Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement dated March 17, 2000)** |
| 10.31 | CSX Omnibus Incentive Plan, as Amended through February 14, 2001 (incorporated by reference to Exhibit 10.26 of the Registrant's Report on Form 10-K dated March 4, 2002)** |
| 10.32 | 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as Amended through September 8, 1999) (incorporated by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K dated March 7, 2000)** |
| 10.34 | Amended and Restated Credit Agreement (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 4, 1997) |
| 10.35 | Transaction Agreement (incorporated herein by reference to Exhibit 10 to the Registrant's Current Report on Form 8-K filed with the Commission on July 8, 1997) |
| 10.36 | Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC. (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.37 | Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings, LLC. (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.38 | Amendment No. 3, dated as of August 1, 2000, to the Transaction Agreement by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC. (incorporated herein by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K dated March 1, 2001) |
| 10.39 | Operating Agreement, dated as of June 1, 1999, by and between New York Central Lines LLC and CSX Transportation, Inc. (incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |

| | |
|---|---|
| 10.40 | Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.41 | Shared Assets Area Operating Agreement for Southern Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.42 | Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.43 | Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC, and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.44 | 364-Day, $300 Million Revolving Credit Agreement dated as of May 17, 2002 |
| 10.45* | Five-Year Revolving Credit Agreement dated as of June 8, 2001 (incorporated by reference to the Registrant's Current Report on Form 8-K filed with the Commission on October 29, 2001) [this Agreement was amended by First Amendment, dated as of May 17, 2002 and by Second Amendment, dated as of May 14, 2003] |
| 10.46 | 364-Day $345 Million Revolving Credit Agreement dated as of May 14, 2003 (incorporated by reference to the Registrant's Current Report on Form 8-K filed with the Commission on August 1, 2003) |
| 12* | Computation of Ratio of Earnings to Fixed Charges |
| 14* | Code of Ethics |
| 21* | Subsidiaries of the Registrant |
| 23.1* | Consent of Ernst & Young LLP |
| 23.2* | Consent of Ernst & Young LLP and KPMG LLP, Independent Auditors |
| 24* | Powers of Attorney |
| 31.1* | Principal Executive Officer Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Principal Financial Officer Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Principal Executive Officer Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Principal Financial Officer Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.3* | Audited Consolidated Financial Statements of Conrail Inc. for the Years Ended December 31, 2003, 2002, and 2001 |

* Filed herewith

** Management Contract or Compensatory Plan or Arrangement



 Powered by Morningstar® Document Research℠

(b) *Reports on Form 8-K*

- Form 8-K filed on October 2, 2003, to report as an “Item 5: Other Item” the issuance of a press release announcing its intention to satisfy in cash its obligation to purchase its Zero Coupon Convertible Debentures due October 30, 2021.

- Form 8-K filed on October 10, 2003, to report as an “Item 5: Other Item” Board of Director approval of Amendment No. 2 to the Rights Agreement between the Company and Harris Trust and Savings Bank, to change the final expiration date of the Rights Agreement from June 8, 2008 to October 10, 2003 and to effectively cause the expiration of the preferred stock purchase rights granted under the Rights Agreement on October 10, 2003.

- Form 8-K filed on October 27, 2003, to report as an “Item 5: Other Item” the announcement that it would make a one-time cash payment of $23.00 per $1,000 aggregate principal amount at maturity to holders of its Zero Coupon Convertible Debentures due 2021 (the “Debentures”) who do not require the Corporation to purchase their Debentures on October 30, 2003 and were holders of record as of the close of business on October 31, 2003. In addition, the Corporation announced that effective as of October 27, 2003, it amended the terms of the Debentures to permit holders of the Debentures, at their option, to cause the Corporation to purchase the Debentures on October 30, 2005, at their accreted value of $852.48 per $1,000 principal amount at maturity.

- Form 8-K filed on November 10, 2003, to report as an “Item 5: Other Item” the issuance of a press release announcing streamlining of management structure.

- Form 8-K filed on November 14, 2003, to report as an “Item 5: Other Item” entering into an Underwriting Agreement for the public offering of $200,000,000 aggregate principal amount of the Company’s 5.30% Notes due 2014 and $200,000,000 aggregate principal amount of the Company’s 2.75% Notes due 2006.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CSX CORPORATION
(Registrant)

By: /s/ CAROLYN T. SIZEMORE

Carolyn T. Sizemore
*Vice President and Controller*
*(Principal Accounting Officer)*

Dated: March 10, 2004

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on March 10, 2004.

| Signature | Title |
|---|---|
| *<br>Michael J. Ward | Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive Officer) |
| *<br>Oscar Munoz | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ ELIZABETH E. BAILEY<br>Elizabeth E. Bailey | Director |
| /s/ ROBERT L. BURRUS JR.<br>Robert L. Burrus Jr. | Director |
| /s/ BRUCE C. GOTTWALD<br>Bruce C. Gottwald | Director |
| /s/ EDWARD J. KELLY III<br>Edward J. Kelly III | Director |
| /s/ ROBERT D. KUNISCH<br>Robert D. Kunisch | Director |
| /s/ SOUTHWOOD J. MORCOTT<br>Southwood J. Morcott | Director |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| Signature | Title |
|---|---|
| /s/ DAVID M. RATCLIFFE<br>David M. Ratcliffe | Director |
| /s/ CHARLES E. RICE<br>Charles E. Rice | Director |
| /s/ WILLIAM C. RICHARDSON<br>William C. Richardson | Director |
| /s/ FRANK S. ROYAL M.D.<br>Frank S. Royal M.D. | Director |
| /s/ DONALD J. SHEPARD<br>Donald J. Shepard | Director |

*By: /s/ ELLEN M. FITZSIMMONS

Ellen M. Fitzsimmons
*Attorney-in-Fact*



 Powered by Morningstar® Document Research℠

EXHIBIT 10.1

AMENDED AND RESTATED CSX CORPORATION
STOCK PLAN FOR DIRECTORS
(APPROVED APRIL 17, 1997)

1. NAME OF PLAN. This plan shall be known as the "Amended and Restated CSX Corporation Stock Plan for Directors" (the "Plan".)

2. PURPOSE OF PLAN. The purpose of the Plan is to enable CSX Corporation, a Virginia corporation (the "Company"), to attract and retain persons of exceptional ability to serve as directors and to solidify the common interests of its directors and shareholders in enhancing the value of the Company's Stock. The Plan provides for grants of Stock, grants of options to acquire Stock, and payment of directors' retainers and fees in Stock.

3. EFFECTIVE DATE AND TERM AND SHARES SUBJECT TO PLAN. The Plan shall be effective as of the date it is adopted by the Board of Directors of the Company, subject, however, to approval by at least a majority of the outstanding shares of Stock present or represented and entitled to vote at a meeting of shareholders of the Company not later than April 17, 1997, and shall remain in effect until amended or terminated by action of the Board. Of the 1,000,000 shares subject to the Plan as of May 1, 1992, the date of original approval by shareholders of the Company, 956,728 shares remain unissued and subject to the Plan as of March 18, 1997.

4. ELIGIBLE PARTICIPANTS. Each member of the Board from time to time who is not a full-time employee of the Company or any of its subsidiaries shall be a participant ("Participant") in the Plan.

5. DEFINITIONS.

(a) "Annual Meeting" means the Company's Annual Meeting of Shareholders.

(b) "Board of Directors" or "Board" means the Board of Directors of CSX Corporation.

(c) "Business Day" means, if relevant to a determination of the value of Stock, a day on which shares of Stock are or could be traded on the New York Stock Exchange (or other national stock exchange, or if not so listed, could be traded over-the-counter). In all other cases, the term means a day on which the offices of the Company are open for the conduct of business in the normal course.

(d) "Payment Date" means the fifteenth day of the last month of each quarter of the Corporation's fiscal year or, if the fifteenth day of such month is not a Business Day, on the next Business Day following the fifteenth day of such month.

(e) "Fair Market Value" means, as of any given date, the mean between the high and low selling prices of the Stock per share on the New York Stock Exchange on such date (or, if there is no reported sale on such date, on the last preceding date on which any reported sale occurred).

 Powered by Morningstar® Document Research℠

(f) "Stock" means the Common Stock of the Company and rights, options or warrants for the purchase of securities of the Company which may be issued with shares of Stock pursuant, and subject, to plans or agreements adopted or entered into from time to time by the Company. If the par value of Stock is changed, or in the event of a change in the capital structure of the Company, the shares resulting from such a change shall be deemed to be Stock within the meaning the Plan.

6. SHARES AND STOCK OPTIONS.

(a) Commencing May 1, 1992, the annual retainer payable to each Participant for service on the Board shall be payable in part in shares of Stock subject to any applicable deferrals and restrictions set forth in Section 8 hereof. Subject to paragraphs (b) and (c) below, each Participant shall be paid 40 percent of the annual retainer payable to each Participant for service on the Board (the "Designated Percentage") in shares of Stock. The shares shall be deducted at their Fair Market Value, determined as of the Business Day immediately preceding the date of the Company's Annual Meeting of Shareholders ("Annual Meeting"), from the Participant's annual retainer.

(b) Any person who becomes a non-employee director following the Company's Annual Meeting, whether by appointment or election as a director or by change in status from a full-time employee, shall receive shares of Stock as a portion of the compensation to be paid to such Participant until the next Annual Meeting. The number of shares of Stock issued to such Participant shall be determined by dividing the product of the pro rata portion of the annual retainer to be paid to such director and the Designated Percentage by the Fair Market Value on the day such person becomes a Participant. A Participant who becomes a non-employee director following the Company's Annual Meeting may, at the beginning of such term, make his or her Annual Election as set forth in paragraph (c) below regardless of the number of months remaining until the next Annual Meeting.

(c) Each Participant may also make one election during the period from Annual Meeting to the next Annual Meeting (the "Annual Election") to receive up to 100 percent of his or her retainers and/or fees in shares of Stock, subject to any applicable deferrals and restrictions set forth in Section 8 hereof. The Annual Election must be in writing and shall be delivered to the Corporate Secretary of the Company no later than six months prior to the next Annual Meeting. The Annual Election shall be irrevocable in respect of the year to which it pertains and shall specify the applicable percentage of the annual retainers and/or fees above the Designated Percentage that such Participant wishes to receive in shares of Stock. The Annual Election shall not be effective until at least six months and one day following its execution and receipt by the Company.

(d) In addition to the awards described in the previous provisions of this Section 6, the Board may make additional awards of Stock or options to acquire Stock to Participants upon such terms as it deems fit; provided, however, that options to acquire Stock ("Stock Options") shall be subject to the restrictions in Section 10.

7. PAYMENT OF SHARES. Payments to directors of Stock or Stock Options pursuant to this Plan shall be made as follows, subject to any applicable deferrals and restrictions pursuant to Section 8 of this Plan:



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(a) Shares payable as the Designated Percentage pursuant to Section 6 of the Plan shall be payable immediately following the Company's Annual Meeting.

(b) Following payment of the Designated Percentage, the balance of each director's retainers to be paid in Stock, if any, shall be prorated and paid on the Payment Dates remaining until the next Annual Meeting.

(c) Unless otherwise specified by resolution of the Board of Directors, any compensation to be paid in Stock and any grant of Stock shall be made on or as of the Payment Date next succeeding the date on which such payments have been earned or are otherwise payable or issuable.

(d) The number of shares to be issued in payment of retainers and fees denominated in dollars shall be calculated on the basis of the Fair Market Value on the Payment Date as of which such shares are issued.

8. DEFERRALS AND RESTRICTIONS ON PAYMENT. Payment of shares issuable under Section 6 shall, at the Participant's election (which election must be in writing and shall be delivered to the Corporate Secretary of the Company no later than six months prior to the next Annual Meeting), be deferred in accordance with a deferral election made by the Participant and filed with the Company. The Company shall transfer shares of Stock or other assets equal in value to a number of shares as to which payment is deferred to a trust to secure the Company's obligation to pay shares of Stock to the Participant in the future, but any assets transferred shall remain subject to the claims of the Company's creditors and any interest the Participant may be deemed to have in the trust may not be sold, hypothecated or transferred (including, without limitation, transfer by gift or donation). The Company shall distribute Stock deferred pursuant to this Section 8 in accordance with elections made by each participant on forms approved by the Board; provided, however, that upon a Change of Control, as hereinafter defined, all Stock previously deferred shall be issued immediately, except that a Participant may elect that shares which would be distributed to him or to her upon a Change of Control may continue to be held in trust for distribution in accordance with this Section 8. Such election with respect to Change of Control described in the preceding sentence shall be effective no earlier than the Annual Meeting following such election. The Participant's right to receive the shares issued under Section 6 shall not be affected by a termination of the trust described herein.

9. SHARE CERTIFICATES, VOTING AND OTHER RIGHTS. The certificates for shares issued hereunder shall be issued in the name of the Participant or the trustee of the trust described in Section 8, as the case may be, and shall be held by such Participant or such trustee; provided, however, that each Participant shall be entitled to all rights of a shareholder with respect to Stock for all such shares issued in his name, including the right to vote the shares, and the Participant or the trustee, as the case may be, shall receive all dividends and other distributions paid or made with respect thereto.

10. PROCEDURES WITH RESPECT TO STOCK OPTIONS.

(a) Each Stock Option granted pursuant to the Plan:

(i) will consist of an option to purchase shares of Stock at a purchase price not less than 100 percent of the Fair Market Value of the Stock on the date of grant;



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(ii) will be exercisable during the time period specified in the terms of the grant and reflected in an agreement entered into with a Participant, but such exercise shall not be earlier than one year after the date of grant of the Stock Option and not later than 15 years after the date of grant of the Stock Option, with the determination of the final date of exercise of the Stock Option to be made at the time of grant.

(b) In the event of the death of a Participant who holds unexercised Stock Options awarded under the Plan, the Stock Option may be exercised by a beneficiary designated by the Participant prior to his death, or if no beneficiary is designated, by the executor or executrix of the Participant's estate or by the person or persons to whom the Participant's rights have passed by will or the laws of descent and distribution, such exercise to be in accordance with the provisions of the Plan and to the same extent as though the Participant were then living.

11. FRACTIONS OF SHARES. The Company shall not issue fractions of shares. Whenever under the terms of the Plan a fractional share would otherwise be required to be issued, the Participant or the trustee of the trust described in Section 8, as the case may be, shall be paid in cash for such fractional share based upon the same Fair Market Value which was utilized to determine the number of shares to be issued on the relevant Payment Date.

12. CHANGE OF CONTROL. "CHANGE OF CONTROL" SHALL MEAN ANY OF THE FOLLOWING:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20 percent or more of either (i) the then outstanding shares of Stock of the Company, or (ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Company; (ii) any acquisition by the Company; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 12; or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) Business Combination. Approval by the shareholders of the Company of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Company or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Surface Transportation Board or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50 percent of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or its principal subsidiary or all or substantially all of the assets of the Company or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Stock and Outstanding Company Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the Board resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Company of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 12; or

(e) Liquidation or Dissolution. Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company or its principal subsidiary.

13. WITHHOLDING TAXES. Whenever the Company proposes or is required to issue or to transfer shares of Stock under the Plan, or whenever the Company is required to withhold taxes upon exercise of Stock Options under the Plan, a Participant:

(a) Shall remit to the Company an amount sufficient to satisfy any federal, state or local withholding tax liability prior to the delivery of any certificate or certificates for such shares; or



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(b) To the extent permitted by applicable laws, including regulations promulgated under the Securities Exchange Act of 1934, such federal, state or local withholding tax liability may be satisfied prior to the delivery of any certificate or certificates for the shares by an adjustment, equal in value to such liability, in the number of shares to be transferred to the Participant.

14. AMENDMENT. This Plan may be amended by action of a majority of the Board of Directors, and approval by shareholders shall not be required for any amendment which does not authorize additional shares to be subject to the Plan.

15. ADMINISTRATION. The Plan will be administered by the Board. Except as otherwise specifically provided in the Plan, the Board will have the entire authority to interpret and administer the Plan, including the power and complete discretion with respect to any award of Stock or Stock Options to determine the terms and conditions of the award, the number of shares of Stock to be covered by the award, the time or times when an award will be granted, when Stock Options may be exercised, and the manner in which payment may be made upon the exercise of Stock Options. If the Board determines that a spin-off, stock dividend or other distribution not in the form of cash or Stock, consolidation, merger, dissolution, liquidation or other similar corporate transaction or event affects a Stock Option such that an adjustment is appropriate to preserve the intended benefits of a Stock Option, the Board may make such equitable changes or adjustments in the Stock Option as it deems necessary or appropriate. The Board may adopt rules and regulations for carrying out the Plan. The interpretation and construction of any provision of the Plan by the Board will be final and conclusive.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT TO THE AMENDED AND RESTATED
CSX CORPORTION STOCK PLAN FOR DIRECTORS

The Plan is amended, effective January 1, 2004, as follows:

1. Section 6(a) of the Plan is amended by adding the following sentence as the penultimate sentence thereof:

   "Effective January 1, 2004, the Designated Percentage of the annual retainer paid in shares of Stock shall be 50 percent."

2. Section 11 of the Plan is amended, effective January 1, 2004, by adding the following sentence to the end thereof:

   "Notwithstanding the foregoing, in the event that the recordkeeping system for the Plan is able to properly account for fractional shares, fractional shares may be issued instead of cash."


Powered by Morningstar® Document Research℠

EXHIBIT 10.2

# CSX CORPORATION
# CORPORATE DIRECTOR DEFERRED COMPENSATION PLAN

EFFECTIVE NOVEMBER 1. 1980

As Amended and Restated Effective January 1, 1995
(As Amended through December 31, 1997)

1. Purpose

The purpose of this Plan is to permit members of the Board of Directors of CSX Corporation to elect deferred receipt of director's fees. This Plan is intended to constitute a deferred compensation plan for corporate director's fees in accordance with Revenue Ruling 71-419. Cumulative Bulletin 1971-2, page 220.

2. Definitions

The following words or terms used herein shall have the following meanings:

(a) "Administrator. -- means CSX Corporation

(i) Prior to a Change of Control, the Administrator shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms of the Plan.

(ii) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(iii) The Administrator shall have sole and absolute discretion to interpret the Plan and determine eligibility for and benefits hereunder. Decisions of the Administrator regarding participation in and the calculation of benefits under the Plan shall at all times be binding and conclusive on Participants, their beneficiaries, heirs and assigns.

(iv) Notwithstanding subsection (iii) above, following a Change of Control, final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole judgment and absolute discretion.

(b) "Benefits Trust Committee" -- means the committee established pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust document.

(c) "Board" -- means the Board of Directors of CSX

(c) "Change of Control" -- means any of the following:

(i) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")](a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (B) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors


Powered by Morningstar® Document Research℠

(the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection(i), the following acquisitions shall not constitute a Change of Control (A) any acquisition directly from the Corporation; (B) any acquisition by the Corporation; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(iii) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly. 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

except to the extent that such ownership existed prior to the Business Combination, and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(v) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

(e) "CSX" or "Corporation" -- means CSX Corporation

(f) "CSX's Accountants" -- means the independent accountants, actuaries, benefits consulting firm or other entity engaged by CSX to provide Participant's accounting services for the Plan and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

(g) "Director's Fees" -- means any compensation, whether for Board meetings or for Committee meetings or otherwise, earned by a Member for services rendered as a Member during a particular calendar year in which he has elected to be a Participant

(h) "Member" -- means any person duly elected to the Board

(i) "Participant" -- means any Member who elects to participate in the Plan

(j) "Plan" -- means Corporate Director Deferred Compensation Plan

(k) "Secretary" -- means the Corporate Secretary of CSX

(l) "Trust" -- means the trust created under the CSX and Affiliated Companies Benefits Assurance Trust Agreement or a grantor trust or trusts established by CSX which will substantially conform to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422. Except as provided in Section 10. CSX is not obligated to make any contribution to the Trust.

(m) "Valuation Date" - means the last day of each calendar quarter and such other dates as the Administrator deems necessary or appropriate to value the Participants' benefits under this Plan. However, following a Change of Control,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

the selection of a Valuation Date other than the last day of each calendar quarter shall be subject to the approval of the Benefits Trust Committee.

In any instance in which the male gender is used herein, it shall also include persons of the female gender in appropriate circumstances.

3. Merger Provisions

Any person who was a Participant under the Chessie System, Inc. Corporate Director Deferred Compensation Plan or who was a director and had made an election under the Seaboard Coast Line Industries, Inc. Nonfunded Deferred Compensation Plan for Directors shall automatically become a Participant under this Plan effective upon the merger of Chessie System, Inc. and Seaboard Coast Line Industries, Inc. into the Corporation, provided that such a person shall be a Member as defined in this Plan.

Director's Fees deferred previously under the terms of the aforesaid director deferred compensation plans of Chessie System, Inc. and Seaboard Coast Line Industries, Inc. shall remain subject to the terms and conditions respectively provided therein, and the terms of this Plan shall only govern as to Director's Fees earned on and after the date of merger into the Corporation.

4. Participation

A Member may become a Participant for any calendar year by filing a written Election to Participate in the Plan with the Secretary not later than December 31 immediately prior to the year in which Director's Fees are to be earned. Following a Change of Control, all Elections to Participate are subject to the approval of the Benefits Trust Committee.

An Election to Participate may be made with respect to all or any part of Director's Fees to be earned for any year or years to which such Election to Participate may relate.

An Election to Participate, once filed, shall apply to Director's Fees earned in subsequent years in which a Participant shall serve as a Member, unless amended or revoked by written request to the Secretary.

Any person who becomes a Member and who was not a Member on the preceding December 31 may file an Election to Participate before his term as a Member begins.

5. Deferral of Director's Fees

CSX shall, during any year in which a Participant has an Election to Participate on file with the Secretary, withhold and defer payment of all or any specified part of Participant's Director's Fees in accordance with his Election to Participate. Prior to the beginning of any year, a Participant can elect to have all or any portion of the amounts withheld, including all earnings thereon, or to be withheld, credited to an interest-accruing account ("Interest Account") and/or to an enhanced interest-accruing account for calendar years 1986, 1987, 1989 and 1990 ("Enhanced Interest Account"), and/or to a CSX Phantom Stock Account ("Stock Account"). Such deferral election can be made or changed before the beginning of any year.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Interest shall accrue on the Interest Account from the date the deferred Director's Fee would otherwise have been paid to the Participant until it is actually paid, such interest to be credited to the Participant's account and compounded quarterly at the end of each calendar quarter. The rate of interest will be reviewed periodically, provided, however, following a Change of Control, any change in the rate of interest is subject to the approval of the Benefits Trust Committee.

Interest shall accrue on the Enhanced Interest Account from the first day of the month following the deferral and shall compound thereafter at an annual rate of 16% until all amounts are finally paid to the Participant.

Credits to the Stock Account shall be in full and fractional units based on the closing price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date the fees would otherwise have been paid to the Participant. Dividends shall be credited in full and fractional units to the account based on the number of units in the account on the record date and calculated based on the closing price for CSX common stock on the dividend payment date.

A Participant, while a Member, may elect prior to the beginning of any year to transfer all or any portion of amounts deferred, including all earnings thereon, to an Enhanced Interest Account, an Interest Account and/or a Stock Account, provided, however, that no transfer may be made out of an Enhanced Interest Account.

6. Distribution of Deferred Director's Fees

Amounts deferred under the Plan and credited to an Interest Account or Stock Account shall be distributed to a Participant from the account(s) maintained in respect of his account in a lump sum at the beginning of the year following the year in which a Participant ceases to be a Member, unless he shall elect installments as provided below. Amounts deferred and credited to an Enhanced Interest Account shall be distributed over an installment period elected by the Participant.

The value of a Participant's Interest Account shall be the sum of amounts deferred and all interest accrued thereon. The value of an Enhanced Interest Account shall be the sum of amounts deferred and all interest accrued thereon. The value of a Stock Account shall be the value of the units in a Participant's account based on the closing price for CSX common stock as reported on the NYSE on the last business day of the year in which a Participant ceases to be a Member, unless he shall elect annual or quarterly installments as provided below. The value of a Stock Account will fluctuate in value in line with the fluctuation in the price of CSX common stock. There can be no assurance on the market value of the phantom units either at the time of acquisition or at any time during the distribution period, nor can there be any assurance as to the continuation of dividends.

Distribution of Deferred amounts shall begin with either the first day of the calendar year immediately following the year in which a Participant shall cease to be a Member for any reason other than death, or the first day of the calendar year immediately following the year in which a Participant shall cease to be a Member and shall have attained age 65, as the Member may elect.

If installment payments are elected for Interest or Stock Accounts, payments shall be made, as the Participant may elect, for either (a) five years, (b) ten years, or (c) any other designated period which shall be not less than the period he was a Participant nor exceed ten years. For Enhanced Interest Accounts, the Participant may elect to receive payments over (a) five years, (b) ten years, or (c) fifteen years.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

For Interest Accounts and Stock Accounts, installments shall be on an annual or quarterly basis as the Member may elect. The amount of each installment shall be determined by multiplying the value of the Participant's account at the end of the calendar quarter immediately preceding the installment date by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the number of installment payments over which payment of such amount is to be made, less the number of installment payments theretofore made.

For Enhanced Interest Accounts, payments shall be in level installments on a monthly basis over the number of years (five, ten, or fifteen) as elected by the Member.

The elections provided in this Section 6 shall be made in writing in a Participant's Election to Participate and shall be subject to all other provisions of the Plan relating thereto and to the deferral of receipt of Director's Fees.

In the event a Participant shall die while he is a Member, the amount appearing as the credit balance of his account, or the value of the units in his Stock Account, shall be paid in either a lump sum or installments (consistent with the election made by the Participant as described in this Section 6) to his Designated Beneficiary. Each Participant may file with the Secretary a Designation of Beneficiary for this purpose.

In the event a Participant shall die after he ceases to be a Member and before he has received complete distribution from his account, any credit balance of his account, including interest, or the value of the units in his Stock Account, shall be paid to his Designated Beneficiary consistent with the election made by the Participant as described in this Section 6.

In the event a Participant shall not file a Designation of Beneficiary, or his Designated Beneficiary is not living at the Participant's death, the balance credited to his account, including interest, shall be paid in full to his estate not later than the tenth day of the calendar year following his date of death.

7. Death Benefit

For Participants electing to have deferred Director's Fees credited to an Enhanced Interest Account who die while a Member, a death benefit equal to the greater of three times the amount of Director's Fees deferred or the amount of Director's Fees deferred plus accumulated interest will be paid to the Member's Designated Beneficiary. For Participants in an Enhanced Interest Account who die after ceasing to be a Member, a lump sum death benefit of $10,000 will be paid to the Designated Beneficiary. This death benefit shall apply only to Director's Fees deferred after December 31, 1985 and which have been credited to an Enhanced Interest Account. This death benefit shall not apply to any amounts credited to an Enhanced Interest Account by reason of transfer from an Interest Account and/or a Stock Account.

In the event a Participant shall not file a Designation of Beneficiary, or the Designated Beneficiary is not living at the Participant's death, the death benefit shall be paid to the Participant's estate.

8. Amendment or Termination of Election to Participate

A Participant may amend or terminate his Election to Participate by written request to the Secretary, which shall become effective for the calendar year following the year in which his request is



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

made; provided, however, that no amendment shall be made to contravene the deferral of Director's Fees previously made under the provisions of this Plan.

In the event a Participant amends or terminates his Election to Participate and remains a Member, he shall not be entitled to receive any distribution from his account until he ceases to be a Member, and distributions shall be made only as provided in Section 6 of this Plan.

9. Obligation of Csx

This Plan shall be unfunded and credits to the memorandum account(s) of each Participant shall not be set apart for him nor otherwise made available so that he may draw upon it at any time, except as provided in this Plan. Neither any Participant nor his Designated Beneficiary shall have any right, title, or interest in such credits or any claim against them. Payments may only be made at such times and in the manner expressly provided in this Plan. CSX's contractual obligation is to make the payments when due. No notes or security for the payment of any Participant's account shall be issued by CSX.

10. Change of Control

10.1 If a Change of Control has occurred, the Administrator shall cause CSX to contribute to the Trust, within 7 days of such Change of Control, a lump sum payment equal to the unfunded aggregate value of the amount each Participant would be eligible to receive (determined under 10.2 below) as of the latest Valuation Date coinciding with or preceding the date of Change of Control to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 10 shall be determined by CSX's Accountants after consultation with the entity then maintaining the Plan's records. Thereafter, CSX's Accountants shall annually determine as of a Valuation Date for each Participant not receiving a lump sum payment pursuant to Section 10.2, below, the amounts which would be payable under such subsection were a Change of Control to occur at the date of such determination. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by CSX's Accountants, CSX shall make a lump sum contribution to the Trust equal to the difference. In no event, however, shall the Company's contribution to the Trust be less than the amount that would have been contributed thereto with respect to liabilities relating to the Plan (including related administrative and investment expenses), pursuant to and at the time and in the manner provided under Section l(h) of the Trust.

10.2 In the event a Change of Control has occurred, the trustee of the Trust shall, within 45 days of such Change of Control, pay to each Participant not making an election under 10.3 below, a lump sum payment equal to the amount the Participant would have been entitled to receive determined under Section 6 had he ceased to be a Member and selected an immediate lump sum payment. The amount of each Participant's lump sum payment shall be determined by CSX's Accountants.

10.3 Each Participant may elect in a time and manner determined by the Administrator but in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. New Participants in the Plan may elect in a time and



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

manner determined by the Administrator, but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

10.4 Notwithstanding anything in the Plan to the contrary, each Participant who has made an election under Section 10.3, above, may elect within 90 days following a Change of Control, in a time and manner determined by the Administrator, to receive a lump sum payment calculated under the provisions of 10.3, above, determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to CSX by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this Section 10.4 shall be made not later than 7 days following receipt by CSX of the Participant's election. The Administrator shall, no later than 7 days after a Change of Control has occurred, give written notification to each Participant eligible to make an election under this Section 10.4, that a Change of Control has occurred and informing such Participant of the availability of the election.

11. Claims Against Participant's Account

No credits to the account of any Participant under this Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to do so shall be void. Nor shall any credit be subject to attachment or legal process for debts or other obligations. Nothing contained in this Plan shall give any Participant any interest, lien, or claim against any specific asset of CSX. No Participant or his Designated Beneficiary shall have any rights other than as a general creditor of CSX.

12. Competition by Participant

In the event a Participant ceases to be a Member and becomes a proprietor, officer, partner, employee, director, or otherwise becomes affiliated with any business that is in competition with the Corporation, the entire balance credited to his account, including interest, or the value of the units in his Stock Account, if prior to a Change of Control, may, if directed by the Board in its sole discretion, be paid immediately to him in a lump sum. Following a Change of Control, such a decision by the Board is subject to the approval of the Benefits Trust Committee.

13. Payment of Credit Balance to Participant's Account

Notwithstanding anything herein to the contrary, prior to a Change of Control, the Board may, in its sole discretion, direct payment in a lump sum of any or all of the credit balance appearing at the time in the account of a Participant, and/or of the value of the units in his Stock Account. Following a Change of Control, such action by the Board is subject to the approval of the Benefits Trust Committee.

Further, the obligations of CSX and the benefit due any Participant or Designated Beneficiary under the Plan shall be reduced by any amount received in regard thereto under the Trust or any similar trust or other vehicle.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

14. Joint and Several Obligation

To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

15. Amendment or Termination

Prior to a Change of Control, this Plan may be altered, amended, suspended, or terminated at any time by the Board, on the recommendation of the Compensation Committee of the Board, provided, however, that no alteration, amendment, suspension, or termination shall be made to this Plan which would result in the distribution of amounts credited to the accounts of all Participants in any manner other than is provided in this Plan without the consent of all Participants.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT TO THE CSX CORPORATION
CORPORATE DIRECTOR DEFERRED COMPENSATION PLAN

WHEREAS, CSX Corporation (the "Company") sponsors the CSX Corporation Corporate Director Deferred Compensation Plan (the "Plan"), effective as of November 1, 1980 for the benefit of members of the Company's Board of Directors (the "Board"); and

WHEREAS, pursuant to Section 15, the Board has the right to amend the Plan; and

WHEREAS, the Board desires to amend the Plan.

NOW, THEREFORE, the Plan is amended, effective January 1, 2004, as follows:

Section 5 of the Plan is amended by adding the following sentence to the third paragraph thereof:

> "Notwithstanding the foregoing sentence, effective January 1, 2004, interest will be credited at the rate of 10-year U.S. Treasury bonds as published by the Wall Street Journal on the last day of the preceding calendar year. Such rate will be reviewed and updated annually."


Powered by Morningstar® Document Research℠

EXHIBIT 10.3

# CSX CORPORATION
# 2002 CORPORATE DIRECTOR DEFERRED COMPENSATION PLAN

EFFECTIVE JANUARY 1, 2003

The purpose of this Plan is to permit members of the Board of Directors of CSX Corporation to elect deferred receipt of director's fees. This Plan is intended to constitute a deferred compensation plan for corporate director's fees. This Plan is not intended to replace or supercede any prior Director's deferral plans.

1. Definitions

The following words or terms used herein shall have the following meanings:

(a) "Account" or "Accounts"-- means the bookkeeping account(s) maintained for each Participant to record the amount of Director's Fees he has elected to defer, as adjusted pursuant to Section 4.

(b) "Administrator" -- means CSX Corporation

(i) Prior to a Change of Control, the Administrator shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms of the Plan.

(ii) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(iii) The Administrator shall have sole and absolute discretion to interpret the Plan and determine eligibility for and benefits hereunder. Decisions of the Administrator regarding participation in and the calculation of benefits under the Plan shall at all times be binding and conclusive on Participants, their beneficiaries, heirs and assigns.

(iv) Notwithstanding subsection (iii) above, following a Change of Control, final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole judgment and absolute discretion.

(c) "Benefits Trust. Committee" -- means the committee established pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust document.

(d) "Board" -- means the Board of Directors of CSX.

(e) "Change -of Control" -- means any of the following:

(i) Stock Acquisition. The acquisition, by any individual, entity or group within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of

1934, as amended (the "Exchange Act")(a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (B) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change -of Control: (A) any acquisition directly from the Corporation; (B) any acquisition by the Corporation; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(iii) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to

 Powered by Morningstar® Document Research℠

such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;




Powered by Morningstar® Document Research℠

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(v) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

(f) "CSX" or "Corporation" -- means CSX Corporation

(g) "CSX's Accountants" -- means the independent accountants, actuaries, benefits consulting firm or other entity engaged by CSX to provide Participant's accounting services for the Plan and, if selected or changed following a Change -of Control, approved by the Benefits Trust Committee.

(h) "Deferral Agreement" -- means an agreement between a Participant and CSX under which the Participant agrees to defer Director's Fees under the Plan. The Deferral Agreement shall be on a form prescribed by the Administrator and shall include any amendments, attachments or appendices.

(i) "Director's Fees" -- means any compensation, whether for retainer, for Board meetings or for Committee meetings or otherwise, payable either in cash or in stock, earned by a Member for services rendered as a Member.

(j) "Distribution Event" -- means any of the events listed in Section 1(e), "Change -of Control," with the following modification: the words "Approval by the shareholders of the Corporation of," in the first line of Sections 1(e)(iii) and 1(e)(iv) are replaced for purposes of this Section 1(j) with the words, "Consummation of, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Securities, and/or assets of the Corporation or its principal subsidiary by reason of,".

(k) "Effective Date" -- means January 1, 2003.

(l) "Enrollment Form" -- means the form prescribed by the Administrator that a Member who has previously made deferrals under a prior CSX deferral plan for Directors may file pursuant to Section 4 in order to become a Participant in the Plan.

(m) "Form of Payment Election" -- means the election by the Participant of the form of distribution (lump sum or installments) he will receive from his Account pursuant to Section 6.

(n) "Member" -- means any person duly elected to the Board.

(o) "Partial Distribution Election" -- means a Distribution Election for a portion of a Participant's Account under Section 5.

(p) "Participant" -- means any Member who elects to participate in the Plan.

(q) "Plan" -- means the CSX Corporation 2002 Corporate Director Deferred Compensation Plan.

(r) "Secretary" -- means the Corporate Secretary of CSX.

(s) "Trust" -- means the trust created under the CSX and Affiliated Companies Benefits Assurance Trust Agreement or a grantor trust or trusts established by CSX which will substantially conform to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422. Except as provided in Section 9, CSX is not obligated to make any contribution to the Trust.

(t) "Term" -- means the annual term for which a Member is elected to serve on the Board of Directors of CSX.

(u) "Valuation Date" -- means the last day of each calendar quarter and such other dates as the Administrator deems necessary or appropriate to value the Participants' benefits under this Plan. However, following a Change -of Control, the selection of a Valuation Date other than the last day of each calendar quarter shall be subject to the approval of the Benefits Trust Committee.

In any instance in which the male gender is used herein, it shall also include persons of the female gender in appropriate circumstances.

2. Participation

A Member may elect to become a Participant for any Term by filing an initial Deferral Agreement or an Enrollment Form with the Secretary not later than (i) the Effective date or (ii) a date six months prior to the Annual Meeting for the Term for which Director's Fees are to be earned, whichever is



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

later. Such Deferral Agreement shall be effective for purposes of deferring Director's Fees only as provided in Section 3. Such Enrollment Form shall be effective for purposes of transferring balances previously deferred under a prior Company deferral plan to the Participant's Accounts only as provided in Section 4. Following a Change -of Control, all Deferral Elections are subject to the approval of the Benefits Trust Committee.

3. Deferral of Director's Fees

(a) CSX shall, during any year in which a Participant has a Deferral Election on file with the Secretary, withhold and defer payment of all or any specified part of Participant's Director's Fees in accordance with his Deferral Election. A Participant may elect to change the amount of Director's Fees he elects to defer, modify a Deferral Agreement or revoke a Deferral Agreement by filing a new Deferral Agreement with the Secretary not later than (i) a date six months prior to the Annual Meeting for the Term for which Director's Fees are to be earned or (ii) November 1 of the calendar year immediately prior to the Annual Meeting for the Term for which Director's Fees are to be earned, whichever is later.

(b) Any person who becomes a Member and who was not a Member six months prior to the beginning of his Term as a Member may file a Deferral Election during the first thirty (30) days he is a Member.

4. Participant's Accounts

(a) A Participant may elect on a Deferral Agreement to have all or any portion of the eligible deferred Director's Fees credited to an interest-accruing account ("Interest Account") and/or to a CSX Phantom Stock Account ("Phantom Stock Account").

(b) A Participant who is eligible to receive a portion of his Director's Fees in CSX common stock pursuant to the CSX Corporation Stock Plan for Directors may file with the Secretary a Deferral Agreement with respect to such CSX common stock. A Participant's Stock Account ("Stock Account") will be created when he files his initial Deferral Agreement with respect to Director's Fees payable in CSX common stock.

(c) Interest shall accrue on the Interest Account from the first day of the month following the deferred Director's Fee would otherwise have been paid to the Participant until it is actually paid, such interest to be credited to the Participant's Account and compounded quarterly at the end of each calendar quarter. The rate of interest will be reviewed periodically, provided, however, following a Change -of Control, any change in the rate of interest is subject to the approval of the Benefits Trust Committee.

(d) Credits to the Phantom Stock Account and the Stock Account shall be in full and fractional units based on the average of the high and low price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date the Director's Fees would otherwise have been paid to the Participant.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(e) Dividends shall be credited in full and fractional units to the Phantom Stock Account based on the number of units in the Account on the record date and calculated based on the average of the high and low price for CSX common stock on the dividend payment date.

(f) Dividends shall be credited in full and fractional units to the Stock Account based on the number of units in the Account on the record date and calculated based on (i) the actual purchase price of CSX common stock acquired to the extent shares are actually purchased by the trustee of the Director's Stock Trust or a successor trust, or (ii) the number of units in the Account on the record date and calculated based on the average of the high and low price for CSX common stock on the dividend payment date.

(g) A Participant, while a Member, may elect at any time to transfer all or any portion of amounts deferred, including all earnings thereon, between an Interest Account and a Phantom Stock Account. No transfer may be made into or out of a Stock Account.

(h) A Member who has previously deferred shares of CSX common stock granted pursuant to the CSX Corporation Stock Plan for Directors ("Stock Plan") may elect to have a Stock Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Secretary on or before the Effective Date. Filing the Enrollment Form will cause the transfer of such previously deferred share balances to the Participant's Stock Account on the Effective Date, and the Member will enjoy all rights and privileges of a Participant including the ability to file initial Distribution Elections and Form of Payment Elections. A properly filed Enrollment Form will cause all prior elections made with respect to such previously deferred shares to be void immediately, unless otherwise stated in this Section 4.

(i) A Member who is a participant in the CSX Corporation Corporate Director Deferred Compensation Plan ("Director Plan") may elect to have an Interest Account or a Phantom Stock Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Secretary on or before the Effective Date. Filing the Enrollment Form will cause the transfer of balances previously deferred to the Participant's Accounts on the Effective Date, and the Member will enjoy all rights and privileges of a Participant including the ability to file initial Distribution Elections and Form of Payment Elections and to transfer shares between an Interest Account and a Phantom Stock Account. A properly filed Enrollment Form will cause all prior elections made under the Director Plan to be void immediately, unless otherwise stated in this Section 4.

(j) With respect to transfers to a Participant's Accounts of amounts previously deferred pursuant to Sections 4(i) and 4(j):

(i) No initial Distribution Election made with respect to such previously deferred amounts which designates distribution upon attainment of a designated age under Section 5 that will be attained within 12 months following the Effective Date shall be filed.

(ii) No initial Distribution Election made with respect to such previously deferred amounts which designates distribution upon the Participant's retirement from the Board under Section 5 shall be effective if distribution would occur within 12 months following the Effective Date.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(iii) Any prior election made with respect to such previously deferred amounts which designates distribution upon the Participant's retirement from the Board shall remain in effect for 12 months following the Effective Date, and shall be void thereafter.

(k) The value of a Participant's Interest Account shall be the sum of amounts deferred and all interest accrued thereon. The value of a Phantom Stock Account or Stock Account shall be the value of the units in a Participant's Account based on the average of the high and low price for CSX common stock as reported on the NYSE on the last business day prior to the date of any lump sum or installment distribution. The value of a Phantom Stock Account or Stock Account will fluctuate in value in line with the fluctuation in the price of CSX common stock. There can be no assurance on the market value of CSX common stock either at the time of crediting to a Participant's Account or at any time during the distribution period, nor can there be any assurance as to the continuation of dividends.

5. Distribution of Deferred Director's Fees

(a) Amounts deferred under the Plan and credited to an Account shall be distributed to a Participant from such Account in a lump sum one year following the date in which a Participant ceases to be a Member, unless he shall file a Distribution Election as provided in this Section 5 or a Form of Payment Election as provided in Section 6.

(b) A Participant may file with the Secretary a Distribution Election for the distribution from an Account upon:

(i) attainment of a designated age, however, he shall not elect an age that he will attain less than one year subsequent to his Distribution Election; or

(ii) retirement from the Board.

(c) A Participant may file a Distribution Election or change a Distribution Election at any time prior to:

(i) a date that is 30 days subsequent to the date of his retirement from the Board in the case of his initial Distribution Election; or

(ii) one year prior to the date distribution is to commence under his Distribution Election then in effect,

after which time no Distribution Election shall be filed.

(e) A Participant may make a Partial Distribution Election with respect to any portion of a Participant's Account, provided no Distribution Election shall be made for a portion of an Account less than $2,000, as determined as of the date the election is made. No Participant shall have more than two Distribution Elections in effect for an Account at any time.

(f) Except in the event of retirement from the board, distribution made pursuant to a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Distribution Election shall not commence prior to a date that is three years subsequent to the date the Participant first makes a Deferral under either this Plan or a predecessor plan which provides for the deferral of Director's Fees

(g) Any Distribution Election made in proper form by a Participant shall be effective and distribution shall commence pursuant to such Distribution Election. Any Distribution Election not made in proper form shall be void. Distributions from a Participant's Stock Account shall be made only in shares of CSX common stock.

(h) A Participant may request and receive a withdrawal from his Account at any time without filing a Distribution Election under this Section 5. Any such withdrawal shall result in the forfeiture of an amount equal to the portion of the Participant's Account that is withdrawn, multiplied by the Mid-term Applicable Federal Rate determined as of the Valuation Date upon which the withdrawal is effective. Notwithstanding the preceding, following a Change of Control, any decisions or determinations by the Administrator under this Section 5 shall be subject to the approval of the Benefits Trust Committee.

(i) A Participant may make one additional election to defer (but not accelerate) commencement of payment under the Plan at any time six months before payments are to have commenced ("Re-deferral Election). Such Re-deferral Election shall be made in a form prescribed by the Administrator. If such Re-deferral Election is to a designated age the re-deferral shall be for a period not less than one year from the date the Re-deferral Election is made.

6. Form of Payment

The Form of Payment Elections provided in this Section 6 shall be made in writing and may be changed at any time prior to a date that is six months prior to the date distribution is to commence, after which time the Form of Payment Election shall be irrevocable. If installment payments are elected for an Account, payments shall be made, as the Participant may elect, for either (a) five years, (b) ten years, or (c) fifteen years. Installments shall be on an annual or quarterly basis as the Participant may elect. The amount of each installment shall be determined by multiplying the value of the Participant's account at the end of the calendar quarter immediately preceding the installment date by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the number of installment payments over which payment of such amount is to be made, less the number of installment payments theretofore made. In the case of installments from a Stock Account, fractional share amounts shall be rounded up to the next highest whole share amount, except in the case of the final installment, in which case a cash payment will be made for any fractional shares.

7. Death of a Participant

(a) In the event a Participant shall die while he is a Member, the balance of his Accounts shall be paid in either a lump sum or installments (consistent with the Form of Payment Elections made by the Participant as described in Section 6) to his Designated Beneficiary. Each Participant may file with the Secretary a Designation of Beneficiary for this purpose.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(b) In the event a Participant shall die after he ceases to be a Member and before he has received complete distribution from his Account, the balance credited to his Account, (including applicable interest) shall be paid to his Designated Beneficiary consistent with the Form of Payment Elections made by the Participant as described in Section 6.

(c) In the event a Participant shall not file a Designation of Beneficiary, or his Designated Beneficiary is not living at the Participant's death, the balance credited to his Accounts, (including applicable interest) shall be paid in full to his estate not later than the tenth day of the calendar year following his date of death.

8. Obligation of CSX

This Plan shall be unfunded and credits to the Accounts of each Participant shall not be set apart for him nor otherwise made available so that he may draw upon it at any time, except as provided in this Plan. Neither any Participant nor his Designated Beneficiary shall have any right, title, or interest in such credits or any claim against them. Payments may only be made at such times and in the manner expressly provided in this Plan. CSX's contractual obligation is to make the payments when due. No notes or security for the payment of any Participant's account shall be issued by CSX.

9. Change of Control

(a) If a Change of Control has occurred, the Administrator shall cause CSX to contribute to the Trust, within 7 days of such Change of Control, a lump sum payment equal to the unfunded aggregate value of the amount each Participant would be eligible to receive under 9(b) below (but calculated with respect to the Valuation Date described in this sentence, rather than the date of the applicable Distribution Event) as of the latest Valuation Date coinciding with or preceding the date of Change of Control to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 9 shall be determined by CSX's Accountants after consultation with the entity then maintaining the Plan's records. Thereafter, CSX's Accountants shall annually determine as of a Valuation Date for each Participant not receiving a lump sum payment pursuant to Section 9(b), below, the amounts which would be payable under such subsection were a Distribution Event to occur at the date of such determination. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by CSX's Accountants, CSX shall make a lump sum contribution to the Trust equal to the difference. In no event, however, shall the Company's contribution to the Trust be less than the amount that would have been contributed thereto with respect to liabilities relating to the Plan (including related administrative and investment expenses), pursuant to and at the time and in the manner provided under Section l(h) of the Trust.

(b) In the event a Distribution Event has occurred, the trustee of the Trust shall, within 45days of such Distribution Event, pay to each Participant not making an election under 9(c) below, a lump sum payment equal to the amount the Participant would have been entitled to receive determined under Section 6 had he ceased to be a Member and selected an immediate lump sum payment. The amount of each Participant's lump sum payment shall be determined by CSX's Accountants.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) New Participants in the Plan may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of the Plan as if a Distribution Event had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Distribution Event shall be invalid.

(d) Notwithstanding anything in the Plan to the contrary, each Participant who has made an election under Section 9(c), above, may elect within 90 days following a Distribution Event, in a time and manner determined by the Administrator, to receive a lump sum payment calculated under the provisions of 9(c), above, determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to CSX by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this Section 9(d)shall be made not later than 7 days following receipt by CSX of the Participant's election. The Administrator shall, no later than 7 days after a Distribution Event has occurred, give written notification to each Participant eligible to make an election under this Section 9(d), that a Distribution Event has occurred and informing such Participant of the availability of the election.

10. Claims Against Participant's Account

No credits to the account of any Participant under this Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to do so shall be void. Nor shall any credit be subject to attachment or legal process for debts or other obligations. Nothing contained in this Plan shall give any Participant any interest, lien, or claim against any specific asset of CSX. No Participant or his Designated Beneficiary shall have any rights other than as a general creditor of CSX.

11. Competition by Participant

In the event a Participant ceases to be a Member and becomes a proprietor, officer, partner, employee, director, or otherwise becomes affiliated with any business that is in competition with the Corporation, the entire balance credited to his account, including interest, or the value of the units in his Phantom Stock Account or Stock Account, if prior to a Change of Control, may, if directed by the Board in its sole discretion, be paid immediately to him in a lump sum. Following a Change of Control, such a decision by the Board is subject to the approval of the Benefits Trust Committee.

12. Payment of Credit Balance to Participant's Account

Notwithstanding anything herein to the contrary, prior to a Change of Control, the Board may, in its sole discretion, direct payment in a lump sum, of any or all of the credit balance appearing at the time in the account of a Participant, and/or of the value of the units in his Phantom Stock Account or Stock



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Account. Following a Change of Control, such action by the Board is subject to the approval of the Benefits Trust Committee.

Further, the obligations of CSX and the benefit due any Participant or Designated Beneficiary under the Plan shall be reduced by any amount received in regard thereto under the Trust or any similar trust or other vehicle.

13. Joint and Several Obligation

To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

14. Amendment or Termination

Prior to a Change of Control, this Plan may be altered, amended, suspended, or terminated at any time by the Board, on the recommendation of the Compensation Committee of the Board, provided, however, that no alteration, amendment, suspension, or termination shall be made to this Plan which would result in the distribution of amounts credited to the accounts of all Participants in any manner other than is provided in this Plan without the consent of all Participants.

15. Impact of Future Legislation or Regulation

(a) This Section 15 shall become operative upon the enactment of any change in applicable statutory law or the promulgation by the Internal Revenue Service of a final regulation or other pronouncement having the force of law, which statutory law, as changed, or final regulation or pronouncement, as promulgated, would cause any Participant to include in his federal gross income amounts accrued by the Participant under the Plan on a date (an "Early Taxation Event") prior to the date on which such amounts are made available to him or her hereunder.

(b) Notwithstanding any other Section of this Plan to the contrary (but subject to subsection (c), below), as of an Early Taxation Event, the feature or features of this Plan, or the election by a Participant that would cause the Early Taxation Event shall be null and void, to the extent, and only to the extent, required to prevent the Participant from being required to include in his federal gross income amounts accrued by the Participant under the Plan prior to the date on which such amounts are made available to him hereunder. By way of example, but not by way of limiting the generality of the foregoing, if a statute is enacted that would require a Participant to include in his or her federal gross income amounts accrued by the Participant under the Plan prior to the date on which such amounts are made available to him or her because of the Participant's right to receive a distribution of a portion of his Account under Section 6(h), the right of all Participants to receive distributions under Section 6(h) shall be null and void as of the effective date of that statute. If only a portion of a Participant's Account is impacted by the change in the law, then only such portion shall be subject to this Section, with the remainder of the Account not so affected being subject to such rights and features as if the law were not changed. If the law only impacts Participants who have a certain status with respect to the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Company, then only such Participants shall be subject to this Section.

(c) Notwithstanding Section 15(b) above, if an Early Taxation Event occurs (e.g., if a change in law is retroactive), , the amounts that become taxable on the Early Taxation Event shall be distributed to each Participant as soon as practicable following such Early Taxation Event or if later, the date of enactment or promulgation.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT TO THE 2002 DIRECTOR DEFERRED COMPENSATION PLAN

Effective January 1, 2004, interest will be credited at the rate of 10-year U.S. Treasury bonds as published by the Wall Street Journal on the last day of the preceding calendar year. Such rate will be reviewed and updated annually.


Powered by Morningstar® Document Research℠

CSX CORPORATION
DIRECTORS' MATCHING GIFT PROGRAM

DIRECTORS' MATCHING GIFT PROGRAM

CSX Corporation's Matching Gift Program is part of the Company's commitment to higher education. An educated population benefits the Company and the communities in which it does business. The Employee Matching Gift Program provides an opportunity for employees to determine directly the recipients of some of the Company's charitable donations.

Directors and retired Directors of the company are entitled to participate in the Matching Gift program under the "Directors' Matching Gift Program," Gifts by Directors or retired Directors may be made jointly with a spouse. The participant need not be an alumnus of the eligible educational institution receiving the gift.

ELIGIBLE INSTITUTIONS

Colleges, including junior colleges, technical schools or other educational institutions above the high school level, universities, graduate end professional schools, or a state association of independent colleges and universities or other national association, foundation or fund which collects an distributes donations to independent colleges and universities, which is:

1. Located within the United States or one of its territories:

2. Public or private;

3. Non-profit, non-proprietary;

4. Accredited or approved by a recognized national or regional accrediting association; and

5. Recognized by the Internal Revenue Service as an organization to which contributions are tax deductible.

CONTRIBUTIONS/CONDITIONS

- Individual contributions, with a minimum of $25 and a maximum of $5,000 per institution, per calendar year, will be matched, with a maximum annual Company match of $25,000 per Director. The matching rate is one to one.

- Contributions must be a personal gift from the Director's own funds, paid in cash or securities, and not a pledged gift.

- Funds will not be matched for extra-curricular programs or any other non-educational purposes such as sports, alumni capital improvement projects, dues, subscriptions, insurance premiums, or other such non-direct payments.

PROGRAM ADMINISTRATION

The program is administered by the Corporate Secretary of CSX Corporation, and may be suspended, revoked, terminated or amended by the Company at any time.

Questions as to interpretation, application, administration or other aspects of the program shall be decided by the Corporate Secretary.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The Corporate Secretary reserves the right to determine eligibility of an institution to receive matching funds under this program.

INSTRUCTIONS

- Part A of the Application in this folder should be completed by the Director and the entire folder should accompany the Director's gift to an eligible institution.

- The qualifying institution, upon receipt of the gift and this folder, should complete Part B of the Application and return the entire folder to the Contributions Coordinator at the address below.

- Upon request, the beneficiary institution will provide evidence of its tax exempt status under section 501 (c) (3) of the Internal Revenue Code.

- All applications for matching gifts received during any calendar year will be paid when administratively convenient but not less than semi-annually.

- Additional forms may be secured from the Contributions Coordinator. Requests for information and all correspondence relating to the Directors' Matching Gift Program should be addressed to:

Contributions Coordinator
CSX Corporation
P.O. Box 85629
Richmond, VA 23285-5629



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Part A-Director's Section

(To be completed by Director, who is to send this entire pamphlet, together with gift, to educational institution)

Date__________________

Enclosed is my personal donation of $______________________________
to_______________________________________

Name of Educational Institution

I hereby authorize the institution named above to report this gift to the Contributions Coordinator of CSX Corporation, for the purpose of qualifying for a contribution in accordance with the provisions of the Company's Matching Gift Program.

______________________________________________________________________
Director's Name (print in full)

______________________________________________________________________
Director's Address

______________________________________________________________________
City State Zip

______________________________________________________________________
Director's Signature



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research SM

Part 5-Beneficiary's Section

(To be completed by an appropriate financial officer of the educational institution, and returned to Matching Gifts Administrator, P.O. Box 85629, Richmond, VA 23285-5629

I hereby certify that a donation of $____________________ was received on______ 18___, from ____________________________________ in favor of this institution;
Name of Donor

And I further certify that this institution meets all the requirements for eligibility as set forth in CSX Corporation's Matching Gift Program. Contributions to the beneficiary institution shown are tax deductible by CSX Corporation pursuant to Section 501(c)(3) of the Internal Revenue Code, and that the beneficiary institution will provide evidence of this status upon request.

_______________________________________ ____________________________
Name of Educational Institution Signature

_______________________________________ ____________________________
Address of Educational Institution Name (print or type in full)

_______________________________________ ____________________________
Title

_______________________________________ ____________________________
Date



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

EXHIBIT 10.24

CSX CORPORATION

1987 LONG-TERM PERFORMANCE STOCK PLAN

As Amended and Restated Effective April 25, 1996
(As Amended through September 8, 1999)

1. PURPOSE.

The purpose of the CSX Corporation Long-Term Performance Stock Plan (the "Plan") is to attract and retain outstanding individuals as officers and key employees of CSX Corporation and its subsidiaries, to furnish motivation for the achievement of long-term performance objectives by providing such persons opportunities to acquire ownership of common shares of the Company, monetary payments based on the value of such shares or the financial performance of the Company; or both, on terms as herein provided. It is intended that the Incentives provided under this Plan will be treated as qualified performance-based compensation within the meaning of Section 162(m) of the Code. The Company believes there are circumstances, however, where the provision of compensation that is not fully deductible may be more consistent with the compensation philosophy of the Company and/or may be in the Company's and its shareholders' best interests. The Company reserves the right to exercise discretion and retain flexibility in this regard and in certain circumstances to provide incentives that do not qualify as deductible under Section 162(m).

2. DEFINITIONS.

Whenever the following words are capitalized and used in the Plan, they shall have the respective meanings set forth below, unless a different meaning is expressly provided. Unless the context clearly indicates to the contrary, in reading this document the singular shall include the plural and the masculine shall include the feminine.

a. "Beneficiary": The term Beneficiary shall mean the person designated by the Participant, on a form provided by the Company, to exercise the Participant's rights in accordance with Section 14 of the Plan in the event of his death.

b. "Benefits Trust Committee": The term Benefits Trust Committee means the committee established pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust.

c. "Board of Directors": The term Board of Directors or Board means the Board of Directors of CSX Corporation.

d. "Cause": The term Cause means (i) an act or acts of personal dishonesty of a Participant intended to result in substantial personal enrichment of the Participant at the expense of the Company or any of its subsidiaries, (ii) violation of the management responsibilities by the Participant which is demonstrably willful and deliberate on the Participant's part and which is not remedied in a reasonable period of time after receipt of written notice from the Company or a subsidiary, or (iii) the conviction of the Participant of a felony involving moral turpitude.


Powered by Morningstar® Document Research℠

e. "Change in Control": The term Change in Control is defined in Section 22.

f. "Code": The term Code means the Internal Revenue Code of 1986, as amended.

g. "Committee": The term Committee means the Compensation Committee of the Board of Directors.

h. "Company": The term Company means CSX Corporation.

i. "Completed Month": The term Completed Month shall mean a period beginning on the monthly anniversary date of a grant of an Incentive and ending on the day before the next monthly anniversary.

j. "Covered Employee": The term Covered Employee shall mean the chief executive officer of the Company or any other individual who is among the four (4) highest compensated officers or who is otherwise a "covered employee" within the meaning of Section 162(m) of the Code, as determined by the Committee.

k. "Disability": The term Disability means long-term disability as determined under the Company's Salary Continuance and Long-Term Disability Plan.

l. "Divisive Transaction": The term Divisive Transaction means a transaction in which the Participant's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

m. "Exchange Act": The term Exchange Act means the Securities Exchange Act of 1934, as amended.

n. "Exercisability Requirements": The term Exercisability Requirements used with respect to any grant of options means such restrictions or conditions on the exercise of such options that the Committee may, in its discretion, add to the one-year holding requirement contained in Sections 7 and 8.

o. "Fair Market Value": The term Fair Market Value shall be deemed to be the mean between the highest and lowest quoted selling prices of the stock per share as reported under New York Stock Exchange-Composite Transactions on the day of reference to any event to which the term is pertinent, or, if there is no sale that day, on the last previous day on which any such sale occurred.

p. "Functional Group": The term Functional Group means a group of employees, identified by the Compensation Committee, in its sole discretion, to be subject to a common set of Performance Objectives.

q. "Incentive": The term Incentive means any incentive under the Plan described in Section 6.

r. "Objective Standard": The term Objective Standard means a formula or standard by which a third party, having knowledge of the relevant performance results, could calculate the amount to be paid to a Participant. Such formula or standard shall specify the individual

employees or class of employees to which it applies, and shall preclude discretion to increase the amount payable that would otherwise be due upon attainment of the objective.

s. "Participant": The term Participant means an individual designated by the Committee as a Participant pursuant to Section 5.

t. "Performance Objective": The term Performance Objective shall mean a performance objective established in writing by the Committee within ninety (90) days of the commencement of the Performance Period to which the Performance Objective relates and at a time when the outcome of such objective is substantially uncertain. Each Performance Objective shall be established in such a way that a third party having knowledge of the relevant facts could determine whether the objective is met. A Performance Objective may be based on one or more business criteria that apply to the individual Participant, a business unit or the Company as a whole, and shall state, in terms of an Objective Standard, the method of computing the amount payable to the Participant if the Performance Objective is attained. With respect to Incentives granted to Covered Employees, the material terms of the Performance Objective shall be disclosed to, and must be subsequently approved by, a vote of the shareholders of the Company, consistent with the requirements of Section 162(m) of the Code and the regulations thereunder. The Performance Objectives for any Performance Period shall be based on one or more of the following measures, as determined by the Committee in writing within ninety (90) days of the commencement of the Performance Period:

1. The achievement by the Company or business unit of specific levels of Return on Invested Capital ("ROIC"). ROIC for the Company or business unit means its results of operations divided by its capital.

2. The generation by the Company or business unit of free cash flow.

3. The creation by the Company or business unit of specific levels of Economic Value Added ("EVA"). EVA for the Company or business unit means its ROIC less its cost of capital multiplied by its capital.

4. The creation by the Company of specific levels of Total Shareholder Return ("TSR"). TSR for the Company means total return to shareholders as measured by stock price appreciation plus dividends.

u. "Performance Period": The term Performance Period means a fixed period of time, established by the Committee, during which a Participant performs service for the Company and during which Performance Objectives may be achieved.

v. "Plan": The term Plan means this CSX Corporation 1987 Long-Term Performance Stock Plan as amended or restated from time to time.

w. "Retirement": The term Retirement means a termination of employment after age 55 with eligibility to begin immediately receiving retirement benefits under the Company's defined benefit pension plan.

x. "Separation From Employment": The term Separation From Employment means an employee's separation from employment with the Company or a Subsidiary as a result of



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Retirement, death, Disability, or termination of employment (voluntarily or involuntarily). A Participant in receipt of periodic severance payments shall be considered separated from employment on the day preceding the day such severance payments commenced.

y. "Subsidiary": The term Subsidiary means, with respect to any corporation, or corporation more than 50% of whose voting shares are owned directly or indirectly by the Company.

z. "Trust": The term Trust means the CSX Corporation and Affiliated Companies Executives' Stock Trust or such other trust or trusts which substantially conforms to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422.

3. NUMBER OF SHARES.

Subject to the provisions of Section 19 of this Plan, the maximum number of shares which may be issued pursuant to the Incentives shall be 21,000,000 shares of the Company's common stock, par value $1.00 per share. The maximum number of such shares that may be issued pursuant to any type of Incentive shall be 17,500,000 shares. The remaining 3,500,000 shares may be issued only pursuant to grants of Incentive Stock Options, Non-Qualified Stock Options, and Stock Appreciation Rights. Such shares shall be authorized and unissued shares of the Company's common stock. Subject to the provisions of Section 19, if any Incentive granted under the Plan shall terminate or expire for any reason without having been exercised in full, the unissued shares subject thereto shall again be available for the purposes of the Plan. Similarly, shares which have been issued, but which the Company retains or which the Participant tenders to the Company in satisfaction of income and payroll tax withholding obligations or in satisfaction of the exercise price of any option shall remain authorized and shall again be available for the purposes of the Plan, provided, however, that any such previously issued shares shall not be the subject of any grant under the Plan to any officer of the Company who, at the time of such grant, is subject to the short-swing trading provisions of Section 16 of the Exchange Act.

4. ADMINISTRATION.

a. Prior to a Change of Control, the Plan shall be administered by the Committee. The Committee shall consist of three or more members of the Board of Directors. No member of the Committee shall be eligible to receive any Incentives under the Plan while a member of the Committee. A majority of the Committee shall constitute a quorum. The Committee shall recommend to the Board individuals to receive Incentives, including the type and amount thereof, unless the Board shall have delegated to the Committee the authority and power to select persons to whom Incentives may be granted, to establish the type and amount thereof, and to make such grants.

Subject to the express provisions of the Plan, the Committee shall have authority to construe any agreements entered into with any person in respect of any Incentive or Incentives, to prescribe, amend and rescind rules and regulations relating to the Plan, to determine the terms and provisions of any such agreements and to make all other determinations necessary or advisable for administering the Plan. The Committee may correct any defect or supply any omission or reconcile any inconsistency in the Plan or in any agreement under the Plan in the manner and to the extent it shall deem expedient to carry it into effect, and it shall be the sole and final judge of such expedience. Any determination of the Committee under the Plan may be made without notice of meeting of the Committee by a writing signed by a majority of the Committee members. The determinations of the Committee on the matters referred to in this Section 4 shall be conclusive.



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

b. Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Committee as the Plan Administrator. Additionally, following a Change of Control, any and all final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under this Plan shall rest with the Benefits Trust Committee or its delegate in its sole judgment and absolute discretion.

5. ELIGIBILITY AND PARTICIPATION.

Incentives may be granted only to officers and key employees of the Company and of its Subsidiaries at the time of such grant as the Committee in its sole discretion may designate from time to time to receive an Incentive or Incentives. An officer or key employee who is so designated shall become a Participant. A director of the Company or of a Subsidiary who is not also an officer or employee of the Company or of such Subsidiary will not be eligible to receive an Incentive.

The Committee's designation of an individual to receive an Incentive at any time shall not require the Committee to designate such person to receive an Incentive at any other time. The Committee shall consider such factors as it deems pertinent in selecting Participants and in determining the type and amount of their respective Incentives, including without limitation (a) the financial condition of the Company, (b) anticipated financial results for the current or future years, including return on invested capital, (c) the contribution by the Participant to the profitability and development of the Company through achievement of established strategic objectives, and (d) other compensation provided to Participants.

6. INCENTIVES.

Incentives may be granted in any one or a combination of (a) Incentive Stock Options; (b) Non-Qualified Stock Options; (c) Stock Appreciation Rights; (d) Performance Shares; (e) Performance Units; (f) Restricted Stock; and (g) Incentive Compensation Program Shares, all as described below and pursuant to the terms set forth in Sections 3 and 7-12 hereof. With respect to Items (a)-(c), the maximum number of shares of common stock of the Company with respect to which these Incentives may be granted in any Plan Year to any Participant will be 750,000. With respect to Items (d)-(f), the maximum number of shares of common stock of the Company with respect to which these Incentives may be granted during any Plan Year to any Participant will be 150,000.

7. INCENTIVE STOCK OPTIONS.

Incentive Stock Options (ISOs) will consist of options to purchase shares of the Company's common stock at purchase prices not less than 100 percent of the Fair Market Value of such common stock on the date of grant. ISOs will be exercisable upon the date or dates specified in an option agreement entered into with a Participant but not earlier than one year after the date of grant of the options and not later than 10 years after the date of grant of the options; provided, however, that whether or not the one-year holding requirement is satisfied, any Exercisability Requirements must be satisfied. For options granted after December 31, 1986, the aggregate Fair Market Value, determined at the date of grant, of shares for which ISOs are exercisable for the first time by a Participant during any calendar year shall not exceed $100,000.

Notwithstanding the provisions of Section 5 of this Plan, no individual will be eligible for or granted an ISO if that individual owns stock of the Company possessing more than 10 percent of the total combined voting power of all classes of the stock of the Company or its Subsidiaries.



 Powered by Morningstar® Document Research℠

Any Participant who is an option holder may exercise his option to purchase stock in whole or in part upon the date or dates specified in the option agreement offered to him. In no case may an option be exercised for a fraction of a share. Except as set forth in this Section 7, Section 12 and in Sections 14 through 16, no option holder may exercise an option unless at the time of exercise he has been in the continuous employ of the Company or one of its Subsidiaries since the grant of such option. An option holder under this Plan shall have no rights as a shareholder with respect to any shares subject to such option until such shares have been issued.

For purposes of this Section 7, written notice of exercise must be received by the Corporate Secretary of the Company not less than one year nor more than 10 years after the option is granted. Such notice must state the number of shares being exercised and must be accompanied by payment of the full purchase price of such shares. Payment for the shares for which an option is exercised may be made by (1) a personal check or money order payable to CSX Corporation; (2) a tender by the employee (in accordance with procedures established by the Company) of shares of the Company's common stock having a Fair Market Value on the date of tender equaling the purchase price of the shares for which the option is being exercised; or (3) any combination of (1) and (2).

8. NON-QUALIFIED STOCK OPTIONS.

NQSOs will be exercisable upon the date or dates specified in an option agreement entered into with a Participant but not earlier than one year after the date of grant of the options and not later than 10 years after the date of grant of the options (15 years if the NQSO grant was a 15-year grant); provided, however, that whether or not the one-year holding requirement is satisfied, any Exercisability Requirements must be satisfied.

Any Participant may exercise an option to purchase stock upon the date or dates specified in the option agreement offered to him. In no case may an option be exercised for a fraction of a share. Except as set forth in this Section 7, Section 12 and in Sections 14 through 16, no option holder may exercise an option unless at the time of exercise he has been in the continuous employ of the Company or one of its Subsidiaries since the grant of his option. An option holder under this Plan shall have no rights as a shareholder with respect to any shares subject to such option until such shares have been issued.

For purposes of this Section 8, written notice of exercise must be received by the Corporate Secretary of the Company, not earlier than one year nor later than 10 years after the option is granted; provided, however, effective for grants of options after December 31, 1998, the term of the option may be 15 years instead of 10 years. Such notice must state the number of shares being exercised and must be accompanied by payment of the full purchase price of such shares. Payment for the shares for which an option is exercised may be made by (1) a personal check or money order payable to CSX Corporation; (2) a tender by the employee (in accordance with procedures established by the Company) of shares of the Company's common stock having a Fair Market Value on the date of tender equaling the purchase price of the shares for which the option is being exercised; (3) the delivery of a properly executed exercise notice, together with irrevocable instructions to a broker to promptly deliver to the Company either sale proceeds of shares sold to pay the purchase price or the amount loaned by the broker to pay the purchase price; or (4) any combination of (1), (2) and (3).

Non-Qualified Stock Options (NQSOs) will consist of options to purchase shares of the Company's common stock at purchase prices not less than 100 percent of the Fair Market Value of such common stock on the date of grant; provided, further, effective for grants of options after December 31, 1998, the term of the option may be 15 years instead of 10 years.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

9. Stock Appreciation Rights.

Any option granted under the Plan may include a stock appreciation right (SAR) by which the participant may surrender to the Company all or a portion of the option to the extent exercisable at the time of surrender and receive in exchange a payment equal to the excess of the Fair Market Value of the shares covered by the option portion surrendered over the aggregate option price of such shares. Such payment shall be made in shares of Company common stock, in cash, or partly in shares and partly in cash, as the Committee in its sole discretion shall determine, but in no event shall the number of shares of common stock delivered upon a surrender exceed the number the option holder could then purchase upon exercise of the option. Such rights may be granted by the Committee concurrently with the option or thereafter by amendment upon such terms and conditions as the Committee may determine.

The Committee may also grant, in addition to, or in lieu of options to purchase stock, SARs which will entitle the Participant to receive a payment upon surrender of that right, or portion of that right in accordance with the provisions of the Plan, equaling the difference between the Fair Market Value of a stated number of shares of Company common stock on the date of the grant and the Fair Market Value of a comparable number of shares of Company common stock on the day of surrender, adjusted for stock dividends declared between the time of the grant of the SAR and its surrender. The Committee shall have the right to limit the amount of appreciation with respect to any or all of the SARs granted. Payment made upon the exercise of the SARs may be in cash or shares of Company common stock, or partly in shares and partly in cash, as the Committee in its sole discretion shall determine.

For purposes of this Section 9, written notice must be received by the Corporate Secretary of the Company not earlier than one year nor later than 10 years after the SAR is granted. Such notice must state the number of SARs being surrendered and the method of settlement desired within the guidelines established from time to time by the Committee. The SAR holder will receive settlement based on the Fair Market Value on the day the written request is received by the Corporate Secretary of the Company.

In certain situations as determined by the Committee, for purposes of this Section 9, written notice must be received by the Corporate Secretary of the Company between the third and twelfth business days after the public release of the Company's quarterly earnings report, or between such other, different period as may hereinafter be established by the Securities and Exchange Commission. For such settlements, a Participant subject to a restricted exercise period shall receive settlement based on the highest Fair Market Value during the period described in the foregoing sentence.

The Committee may not grant an SAR or other rights under this Section 9 in connection with an incentive stock option if such grant would cause the option or the Plan not to qualify under Section 422 of the Code or if it is prohibited by such section or Treasury regulations issued thereunder. Any grant of an SAR or other rights which would disqualify either the option as an ISO or the Plan, or which is prohibited by Section 422 of the Code or Treasury regulations issued thereunder, is and will be considered as void and vesting no rights in the grantee. It is a condition for eligibility for the benefits of the option and of the Plan that the Participant agree that in the event an SAR or other right granted should be determined to be void as provided by the foregoing, the Participant has no right or cause of action against the Company.

10. Performance Unit Awards and Performance Share Awards.

The Committee may grant Performance Unit Awards (PUAs) and Performance Share Awards (PSAs) under which payment shall be made in shares of the Company's common stock, in cash, or partly in shares and partly in cash, as the Committee in its sole discretion shall determine. PUAs and PSAs may be awarded to individual Participants or to a Functional Group. Awards to a Functional Group shall be subject



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

to distribution by the Chief Executive Officer of the Company, or by his designees, to individuals within such group. At the time of the grant, the Committee shall establish in writing and communicate to Participants, and to members of a Functional Group who can be identified, Performance Objectives to be achieved during the Performance Period. Awards of PUAs and PSAs may be determined by the average level of attainment of Performance Objectives over multiple Performance Periods.

Prior to the payment of PUAs and PSAs, the Committee shall determine the extent to which Performance Objectives have been attained during the Performance Period or Performance Periods in order to determine the level of payment to be made, if any, and shall record such results in the minutes of the meeting of the Committee. In no instance will payment be made if the Performance Objectives are not attained.

Payment, if any, shall be made in a lump sum or in installments, in cash or shares of Company common stock, as determined by the Committee, commencing as promptly as feasible following the end of the Performance Period, except that (a) payments to be made in cash may be deferred subject to such terms and conditions as may be prescribed by the Company, and (b) payments to be made in Company common stock may be deferred pursuant to an election filed on forms prescribed and provided by and filed with the Company. A Participant may elect annually to defer to a date certain, or the occurrence of an event, as provided in the form, the receipt of all or any part of shares of Company common stock he may subsequently become entitled to receive. On forms provided by and filed with the Company, the Participant shall also specify whether, when the deferral period expires or when the restrictions below lapse, payment will be in a lump sum or installments over a period not exceeding twenty (20) years. The Committee shall prescribe the time periods during which the election must be filed in order to be effective. Elections to defer, once effective, are irrevocable. Changes regarding the date of payment, the period over which payments are to be made and the method of payment are subject to substantial penalties. However, a One-Time Change of Distribution Election may be made to change the timing or the form of payment without penalty. Any such election which changes a distribution election on "termination of employment" or "the earlier of termination or a specified age" shall be void in the event the Participant's employment terminates within twelve (12) months following the date of the election.

If a Participant has made an effective election to defer the payment of shares of common stock, the Company shall, within a reasonable period of time after the deferral election is made, transfer shares of common stock or other assets equal in value to the number of shares as to which payment is deferred to the Trust to secure the Company's obligation to pay shares of common stock to the Participant in the future. However, in any event, the Company shall make any previously deferred payment of shares to the Participant upon:

a. the death of the Participant;

b. the Disability of the Participant;

c. the Participant's termination of employment with the Company or a subsidiary of the Company, subject to the Participant's deferral election;

d. A Divisive Transaction, subject to the Participant's deferral election; or

e. a Change in Control.

If a former Participant who has not received distribution of his entire deferred payment under this Section is reemployed and again becomes a Participant in the Plan, he may suspend payment of any remaining amounts deferred, by notifying the Company in writing, and make a new deferral election, without penalty, with respect to those amounts and new amounts deferred so long as such change does not accelerate the timing of any payment to the Participant; provided, however, distributions shall



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

continue if the commencement of distribution was because the Participant chose a specific age for the commencement of benefits and that age has been attained.

Notwithstanding a Participant's election to defer the payment of shares of common stock pursuant to this Section 10, the Company shall make cash payments to Participants following each common stock dividend payment date equal to the dividends payable on the number of shares of Company common stock credited to the Participant's account as of the dividend record date (including shares for which an election to defer has been made and any reinvested dividends thereon). A Participant may elect to defer receipt of the cash payments pursuant to election forms prescribed and provided by and filed with the Company. Such deferred cash payments shall be credited to the Participant's account and reinvested in shares of Company common stock as of the dividend payment date. An election to defer, once effective, shall be irrevocable for the calendar year, and shall continue in effect with respect to subsequent calendar years until changed by a timely filed new election.

Any dividends paid on shares of Company common stock held in the Trust shall be paid to the Trust and shall be reinvested in shares of Company common stock, or other assets equal in value, to secure the Company's obligation to pay shares of common stock to Participants in the future.

11. RESTRICTED STOCK.

A Restricted Stock Award (RSA) shall entitle the Participant, subject to his continued employment during the restriction period determined by the Committee and his complete satisfaction of any other conditions, restrictions and limitations imposed in accordance with the Plan, to the unconditional ownership of the shares of the Company's common stock covered by the grant without payment therefore.

The Committee may grant RSAs at any time or from time to time to a Participant selected by the Committee in its sole discretion. The Committee shall establish at the time of grant of each RSA a Performance Period and Performance Objectives to be achieved during the Performance Period.

At the time of grant, the Performance Period and Performance Objectives shall be set forth either in agreements or in guidelines communicated to the Participant in such form consistent with this Plan as the Committee shall approve from time to time.

Following the conclusion of each Performance Period and prior to payment, the Committee shall determine the extent to which Performance Objectives have been attained or a degree of achievement between maximum and minimum Performance Objectives during the Performance Period in order to determine the level of payment to be made, if any, and shall record such results in the minutes of the meeting of the Committee. In no instance will payment be made if the Performance Objectives are not attained.

At the time that an RSA is granted, the Committee shall establish in the written agreement a restriction period applicable to all shares covered by such grant. Subject to the provisions of the next following paragraph, the Participant shall have all of the rights of a stockholder of record with respect to the shares covered by the grant to receive dividends or other distributions in respect of such shares (provided, however, that any shares of stock of the Company distributed with respect to such shares shall be subject to all of the restrictions applicable to such shares) and to vote such shares on all matters submitted to the stockholders of the Company, but such shares shall not be sold, exchanged, pledged, hypothecated or otherwise disposed of at any time prior to the expiration of the restriction period, including by operation of law, and any purported disposition, including by operation of law, shall result in automatic forfeiture of any such shares.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Except as hereinafter provided, if, during the restriction period applicable to such grant, a Separation From Employment of a Participant occurs for any reason other than death, Disability or Retirement, all shares covered by such grant shall be forfeited to the Company automatically. If the Participant's Separation From Employment is because of Retirement or death, or in the event of Disability, the Participant or his successor in interest shall be entitled to unconditional ownership of a fraction of the total number of shares covered by such grant of which the numerator is the number of whole calendar months in the period commencing with the first whole calendar month following the date of grant and ending with the whole calendar month including the date of death, Disability or Retirement, and of which the denominator is the number of whole calendar months in the applicable restriction period. Any fractional shares shall be disregarded.

The Committee may, at the time of granting any RSA, impose such other conditions, restrictions or limitations upon the rights of the Participants during the restriction period or upon the Participant's right to acquire unconditional ownership of shares as the Committee may, in its discretion, determine and set forth in the written agreement.

At the time of grant of an RSA, the Company shall cause to be issued and registered in the name of the Participant a stock certificate representing the full number of shares covered thereby, which certificate shall bear an appropriate legend referring to the terms, conditions and restrictions applicable to such grant, and the grantee shall execute and deliver to the Company a stock power endorsed in blank covering such shares. Such stock certificate and stock power shall be held by the Company or its designee until the expiration of the restriction period, at which time the same shall be delivered to the Participant or his designee if all of the conditions and restrictions of the grant have been satisfied, or until the forfeiture of such shares, at which time the same shall be cancelled and the shares shall be returned to the status of unissued shares.

12. INCENTIVE COMPENSATION PROGRAM SHARES.

A Participant who receives base compensation in excess of a dollar level to be determined by the Committee and who is eligible to receive an award under the Company's Incentive Compensation Program ("ICP") may elect, by filing the prescribed election form with the Company in accordance with rules established by the Committee, to receive all or part of his annual ICP award in shares of the Company's common stock, rather than cash; provided, however, the Participant must agree that his receipt of the stock will be deferred until his retirement or termination of employment, with a minimum deferral period of three (3) years. Elections to defer are irrevocable. A Participant who makes such election shall, at the time that the stock is deferred, receive an additional award of stock equal to a percentage, established by the Committee from time to time, of the amount that he elected to have deferred, but not to exceed 25% (the "Stock Premium"). The Participant's election to defer shall also apply to the Stock Premium.

If a Participant made an effective election to defer the payment of shares of common stock and receive the Stock Premium, the Company shall, within a reasonable period of time after the deferral election is made, transfer shares of common stock or other assets equal in value to the number of shares as to which payment is deferred to the Trust to secure the Company's obligation to pay shares of common stock to the Participant in the future. However, in any event, the Company shall make any previously deferred payment of shares to the Participant upon:

a. the death of the Participant;

b. the Disability of the Participant;



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

c. the Participant's termination of employment with the Company or a subsidiary of the Company, subject to the Participant's deferral election and the three (3) year deferral requirement;

d. a Divisive Transaction, subject to the Participant's deferral election; or

e. a Change in Control.

Notwithstanding any provisions of this Plan to the contrary, upon the occurrence of a Divisive Transaction, the three (3) year holding requirement of the stock premium for deferred ICP shares shall be deemed satisfied.

Notwithstanding a Participant's election to defer the payment of shares of common stock pursuant to this Section 12, the Company shall make cash payments to Participants following each common stock dividend payment date equal to the dividends payable on the number of shares of Company common stock credited to the Participant's account as of the dividend record date (including shares for which an election to defer has been made and any reinvested dividends thereon). A Participant may elect to defer receipt of the cash payments pursuant to election forms prescribed and provided by and filed with the Company. Such deferred cash payments shall be credited to the Participant's account and reinvested in shares of Company common stock as of the dividend payment date. An election to defer, once effective, shall be irrevocable for the calendar year, and shall continue in effect with respect to subsequent calendar years until changed by a timely filed new election.

13. CONTRIBUTIONS TO THE TRUST.

a. The Company shall make contributions to the Trust to secure a source of future payments with respect to Participant's deferral elections pursuant to Sections 10 and 12. The Trustee shall be responsible only for contributions actually received by it hereunder and the Trustee shall have no duty or responsibility with respect to the timing, amounts and sufficiency of the contributions made or to be made by the Company hereunder.

b. The Company may make contributions to the Trust in Common Stock.

c. A separate bookkeeping account (an "Account") shall be established by the Trustee for each Participant covered by the Trust pursuant to the Plan, as directed in writing by the Company. A Participant may have more than one Account. Each account is intended to represent the amount of a Participant's deferred and unpaid benefit under the related provisions of the Plan. The value of a Participant's Account at any time will equal the fair market value of the number of shares of Common Stock owed to a Participant under the affected provisions of this Plan at such time. The number of shares owed at any time will equal the number of shares of Common Stock which were originally deferred by the Participant (including any applicable Stock Premium), plus, the number of Common Stock Shares which would have been acquired if dividends subsequently declared by the Company had been paid with respect to such shares and reinvested in Common Stock. "Account" may also mean individual sub-accounts which have been or may be established under this Plan from time to time.

d. Within sixty days following the close of each calendar year, or more frequently or at such other time as may be required by the Trust Agreement, the Trustee shall provide the Company and each Participant with a written statement of the Account of each Participant.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

14. SEPARATION FROM EMPLOYMENT AND DIVISIVE TRANSACTIONS.

If the Participant's Separation From Employment is because of Disability or death, the right of the Participant or his successor in interest to exercise an ISO. NQSO or SAR shall terminate not later than five years after the date of such Disability or death, but in no event later than 10 years from the date of grant (15 years if the NQSO grant was a 15-year grant); provided, however, that if such Participant is eligible to retire with the ability to begin immediately receiving retirement benefits under the Company's pension plan, his or his successor in interest's right to exercise any ISOs, NQSOs or SARs shall be determined as if his Separation From Employment was because of Retirement.

If the Participant's Separation From Employment is because of his Retirement, the right of the Participant or his successor in interest to exercise an ISO, NQSO or SAR shall terminate not later than 10 years from the date of grant (15 years if the NQSO grant was a 15-year grant).

Unless the Committee deems it necessary in individual cases (except with respect to Covered Employees) to extend a Participant's exercise period, if a Participant's Separation From Employment is for any reason other than Retirement, Disability or death, the right of the Participant to exercise an ISO, NQSO or SAR shall terminate not later than one year from the date of Separation From Employment, but in no event later than 10 years after the date of grant (15 years if the NQSO grant was a 15-year grant). For any ISO, NQSO or SAR granted after December 31, 1998, the Participant must exercise within 30 days instead of one year.

At the time of his Separation From Employment for any reason other than Cause, a Participant shall vest in a portion of any Incentives granted under Sections 7 (ISOs), 8 (NQSOs) or 9 (SARs) that he has held for less than one year from the date of the grant. The portion of such Incentives in which the Participants shall vest shall be determined by multiplying all shares subject to such Incentives by a fraction, the numerator of which shall be the number of Completed Months of employment following the date of grant and the denominator of which shall be twelve.

A Participant who vests in any Incentives under the preceding paragraph may not exercise such Incentives prior to the satisfaction of the one-year holding requirement and the Exercisability Requirements pertaining to such Incentives. Any Incentives vested under the preceding paragraph must be exercised within one year from the date of the Participant's Separation From Employment.

If the Participant's employer is a Subsidiary involved in a Divisive Transaction or if the Participant's employment is terminated with the consent of the Company (as a result of a business transaction or a reduction in force or any other circumstances approved by the Committee), the right of the Participant or his successor in interest to exercise an ISO, NQSO or SAR shall terminate not less than three years after the date of the closing of such Divisive Transaction or after the date the Participant's employment is terminated with the consent of the Company, but in no event later than 10 years from the date of grant (15 years if the NQSO grant was a 15-year grant); provided, however, that if such Participant is eligible to retire with the ability to begin immediately receiving retirement benefits under the Company's pension plan, his or his successor in interest's right to exercise any ISO, NQSO' or SAR' shall be determined as if he had retired. Notwithstanding anything to the contrary in this paragraph, a Participant may not exercise such Incentives prior to satisfaction of the one year holding requirement and the Exercisability Requirements pertaining to such Incentives. In the event of a Divisive Transaction, employees of Sea-Land Service, Inc., hired by that corporation prior to January 1, 1986, shall be deemed eligible to retire upon termination of employment after age 50 with 20 years of service and eligibility to begin immediately receiving retirement benefits under the Company's defined benefit pension plan.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

As to PUAs or PSAs, in the event of a Participant's Separation from Employment because of his Retirement, Disability or death prior to the end of the applicable Performance Period, or if the Participant's employer is a Subsidiary involved in a Divisive Transaction prior to the end of the applicable Performance Period, payment, if any, to the extent earned under the applicable Performance Objectives and awarded by the Committee, shall be payable at the end of the Performance Period in proportion to the active service of the Participant during the Performance Period, as determined by the Committee. If the Separation From Employment prior to the end of the Performance Period is for any other reason, the Participant's participation in Section 10 of the Plan shall immediately terminate, his agreement shall become void and the PUA or PSA shall be canceled.

Notwithstanding anything to the contrary in this Plan, if a Participant or former Participant (a) becomes the owner, director or employee of a competitor of the Company or its subsidiaries, (b) has his employment terminated by the Company or one of its subsidiaries on account of actions by the Participant which are detrimental to the interests of the Company or its subsidiaries, or (c) engages in conduct subsequent to the termination of his employment with the Company or its subsidiaries which the Committee determines to be detrimental to the interests of the Company or its subsidiaries then the Committee may, in its sole discretion, pay the Participant or former Participant a single sum payment equal to the amount of his unpaid benefits which were awarded and deferred under Sections 10 or 12 of the Plan; provided, however, if the deferral has been for less than three (3) years under Section 12, the Participant shall not be eligible to receive the Stock Premium. The single sum payment shall be made as soon as practicable following the date the Participant or former Participant becomes an owner, director or employee of a competitor, his termination of employment or the Committee's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Participant or former Participant under this Plan.

Effective for Incentives granted after December 31, 1998, notwithstanding anything to the contrary in this Plan, if a Participant or former Participant (a) becomes associated with, recruits or solicits customers or other employees of the Company or its Subsidiaries for, is employed by, renders services to, or owns any interest in (other than any nonsubstantial interest, as determined by the Committee) any business that is in competition with the Company or one of its subsidiaries, (b) has his employment terminated by the Company or one of its subsidiaries for Cause or on account of actions, by the Participant which are detrimental to the interests of the Company or its subsidiaries, or (c) engages in, or has engaged in, conduct at the time of or subsequent to the termination of his employment with the Company or its subsidiaries which the Committee determines to be detrimental to the interests of the Company or its subsidiaries then the Committee may, in its sole discretion, except following a Change of Control, cancel all outstanding Incentives of the Participant, including immediately terminating any Options held by the Participant, regardless of whether then exercisable.

15. INCENTIVES NON-ASSIGNABLE AND NON-TRANSFERABLE.

Any Incentive granted under this Plan shall be non-assignable and non-transferable other than as provided in Section 16 and shall be exercisable (including any action of surrender and exercise of rights under Section 9) during the Participant's lifetime only by the Participant who is the holder of the Incentive or by his guardian or legal representative.

16. DEATH OF OPTION HOLDER.

In the event of the death of a Participant who is an Incentive holder under the Plan while employed by the Company or one of its subsidiaries or prior to exercise of all rights under an Incentive, the Incentive theretofore granted may be exercised (including any action of surrender and exercise of rights under



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Section 9) by the Participant's Beneficiary or, if no Beneficiary is designated, by the executor or executrix of the Participant's estate or by the person or persons to whom rights under the Incentive shall pass by will or the laws of descent and distribution in accordance with the provisions of the Plan and of the option and to the same extent as though the Participant were then living.

17. NO RIGHT TO CONTINUED EMPLOYMENT.

Notwithstanding any other provisions of this Plan to the contrary, it is a condition for eligibility for any benefit or right under this Plan that each individual agrees that his or her designation as a Participant and any grant made under the Plan may be rescinded and determined to be void and forfeited entirely in the absolute and sole discretion of the Committee in the event that such individual is discharged for Cause.

Incentives granted under the Plan shall not be affected by any change of employment so long as the Incentive holder has not suffered a Separation From Employment. A leave of absence granted by the Company or one of its subsidiaries shall not constitute Separation From Employment unless so determined by the Committee. Nothing in the Plan or in any Incentive granted pursuant to the Plan shall confer on any individual any right to continue in the employ of the Company or one of its subsidiaries or interfere in any way with the right of the Company or such subsidiary to terminate employment at any time.

18. FUNDING METHOD.

To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

19. ADJUSTMENT OF SHARES.

a. In the event of any change (through recapitalization, merger, consolidation, stock dividend, split-up, combination or exchanges of shares or otherwise) in the character or amount of the Company's common stock prior to exercise of any Incentive granted under this Plan, the Incentives, to the extent not exercised, shall entitle the Participant who is the holder to such number and kind of securities as he would have been entitled to had he actually owned the stock subject to the Incentives at the time of the occurrence of such change. If any such event should occur, prior to exercise of an Incentive granted hereunder, which shall increase or decrease the amount of common stock outstanding and which the Committee, in its sole discretion, shall determine equitably requires an adjustment in the number of shares which the Incentive holder should be permitted to acquire, such adjustment as the Committee shall determine may be made, and when so made shall be effective and binding for all purposes of the Plan.

b. Incentives may also be granted having terms and provisions which vary from those specified in the Plan provided that any Incentives granted pursuant to this paragraph are granted in substitution for, or in connection with the assumption of, then existing Incentives granted by another corporation and assumed or otherwise agreed to be provided for by the Company pursuant to or by reason of a transaction involving a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation to which the Company or a subsidiary corporation is a party.

c. The obligations of the Company or any of its affiliated corporations and the benefit due any Participant, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the CSX Corporation and Affiliated Companies Executives' Stock Trust or any similar trust or trusts or other vehicle.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

d. Notwithstanding the preceding, following a Change of Control, the authority to delay payment of a Participant's benefits rests solely with the Benefits Trust Committee

20. LOANS TO OPTION HOLDERS.

The Committee may adopt programs and procedures pursuant to which the Company may lend money to any Participant who is an Incentive holder for the purpose of assisting the Participant to acquire or carry shares of common stock issued upon the exercise of Incentives granted under the Plan.

21. TERMINATION AND AMENDMENT OF PLAN.

a. Unless the Plan shall have been previously terminated as hereinafter provided, the Plan shall terminate on April 27, 2000, and no Incentives under it shall be granted thereafter. The Board of Directors, without further approval of the company's shareholders, may at any time prior to that date terminate the Plan, and thereafter no further Incentives may be granted under the Plan. However, Incentives previously granted thereunder may continue to be exercised in accordance with the terms thereof. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee.

b. Prior to a Change of Control, the Board of Directors, without further approval of the shareholders, may, on the recommendation of the Compensation Committee of the Board, amend the Plan from time to time in such respects as the Board may deem advisable; provided, however, that no amendment shall become effective without prior approval of the shareholders which would: (i) increase (except in accordance with Section 19) the maximum number of shares for which Incentives may be granted under the Plan; (ii) reduce (except in accordance with Section 19) the Incentive price below the Fair Market Value of the Company's common stock on the date of grant of the Incentive; (iii) extend the term of the Plan beyond April 27, 2000; (iv) change the standards of eligibility prescribed by Section 5; or (v) increase the maximum awards identified in Sections 7, 8, 9, 10 and 11. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee.

c. No termination or amendment of the Plan may, without the consent of a Participant who is a holder of an Incentive then existing, terminate his or her Incentive or materially and adversely affect his or her rights under the Incentive.

22. CHANGE IN CONTROL.

a. Notwithstanding any provision of this Plan to the contrary, upon the occurrence of a Change in Control as set forth in subsection b., below: (i) all stock options then outstanding under this Plan shall become fully exercisable as of the date of the Change in Control, whether or not then otherwise exercisable; (ii) all SARs which have been outstanding for at least six months shall become fully exercisable as of the date of the Change in Control, whether or not then otherwise exercisable; (iii) all terms and conditions of RSAs then outstanding shall be deemed satisfied as of the date of the Change in Control; (iv) all PUAs and PSAs then outstanding shall be deemed to have been fully earned and to be immediately payable in cash as of the date of the Change of Control, however, Participants may defer those cash payments, as stock, into the Trust, consistent with the deferral provisions of Section 10; and (v) the three (3) year holding requirement of the Stock Premium for deferred ICP shall be deemed satisfied.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

b. A "Change in Control" shall mean any of the following:

(i) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock"), or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change of Control: (A) any acquisition directly from the Company; (B) any acquisition by the Company; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (D)any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 22(b); or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(iii) Business Combination. Approval by the shareholders of the Company of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Company or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or its principal subsidiary or all or substantially all of the assets of the Company or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of the Company of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 22(b); or

(v) Liquidation or Dissolution. Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company or its principal subsidiary.

c. Each Participant who has elected to defer the payment of PSAs pursuant to Section 10 or an ICP award pursuant to Section 12, may elect in a time and manner determined by the Committee, but in no event later than December 31, 1996 or the occurrence of a Change in Control, if earlier, to have amounts and benefits currently deferred, and to be deferred, under the Plan determined and payable under the terms of the Plan as if a Change in Control had not occurred. New Participants in the Plan may elect in a time and manner determined by the Committee, but in no event later than ninety (90) days after becoming a Participant, to have amounts and benefits currently deferred, and to be deferred, under the Plan determined and payable under the terms of the Plan as if a Change in Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change in Control shall be invalid.

d. Upon a Change of Control, the Company or Subsidiary shall, as soon as possible, but in no event more than seven (7) days following the Change of Control make an irrevocable contribution to the Trust in an amount that is sufficient to pay each Participant or beneficiary of this Plan the benefits to which Participants of this Plan or their beneficiaries would be entitled based on elections under Sections 10 and 12 (including any applicable Stock Premium), and for which the Company is liable pursuant to the terms of this Plan as of the date on which the Change of Control occurred. The amount of the Company's irrevocable contributions shall be based on the actuarial valuation and accounting for the most recent calendar year or more recent period for the Plan, as approved by the independent actuary engaged by the Company prior to the Change of Control and approved by the Benefits Trust Committee if selected or changed following a Change of Control (the "Actuary"), and shall include an amount deemed necessary to pay estimated administrative expenses for the following five (5) years. The Benefits Trust Committee shall



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

cause such actuarial valuations or accountings to be updated, using Participant data supplied to the Actuary by the Company, through a date no earlier than the date of the initial contribution and shall notify the Company of the amount of additional contributions required as soon as practicable.

23. COMPLIANCE WITH REGULATORY AUTHORITIES.

Any shares purchased or distributed pursuant to any Incentives granted under this Plan must be held for investment and not with a view to the distribution or resale thereof. Each person who shall exercise an Incentive granted under this Plan may be required to give satisfactory assurances to such effect to the Company as a condition to the issuance to him or to her of shares pursuant to such exercise; provided, however, that the Company may waive such condition if it shall determine that such resale or distribution may be otherwise lawfully made without registration under the Securities Act of 1933, or if satisfactory arrangements for such registration are made. Each Incentive granted under this Plan is further subject to the condition that if at any time the Board shall in its sole discretion determine that the listing, registration or qualification of the shares covered by such Incentive upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of or in connection with the granting of such Incentives or the purchase or transfer of shares thereunder, the delivery of any or all shares of stock pursuant to exercise of the Incentive may be withheld unless and until such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Board.

24. WITHHOLDING TAX.

Whenever the Company proposes or is required to issue or transfer shares of common stock under the Plan, a Participant shall remit to the Company an amount sufficient to satisfy any federal, state or local income and payroll tax withholding liability prior to the delivery of any certificate or certificates for such shares. Alternatively, to the extent permitted by applicable laws, such federal, state or local income and payroll tax withholding liability may be satisfied prior to the delivery of any certificate or certificates for the shares by an adjustment, equal in value to such liability, in the number of shares to be transferred to the Participant. Whenever under the Plan payments are to be made in cash, such payments shall be net of an amount sufficient to satisfy any federal, state or local income and payroll tax withholding liability.

25. NON-UNIFORM DETERMINATIONS.

Determinations by the Committee under the Plan, including, without limitation, determinations of the persons to receive Incentives and the form, amount and timing of such Incentives, and the terms and provisions of such Incentives and the agreements evidencing the same need not be uniform, and may be made by the Committee selectively among persons who receive, or are eligible to receive, Incentives under the Plan, whether or not such persons are similarly situated.

Without amending the Plan, Incentives may be granted to eligible employees who are foreign nationals or who are employed outside the United States or both, on such terms and conditions different from those specified in the Plan as may, in the judgment of the Committee, be necessary or desirable to further the purposes of the Plan. Such different terms and conditions may be reflected in Addenda to the Plan.

26. CONSTRUCTION.

The Plan shall be governed by the laws of the Commonwealth of Virginia.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ADDENDUM.

Addendum I

Pursuant to Sections 4a and 8 of the Plan, with respect to any Non-Qualified Stock Option ("NQSO") granted to any Participant who may be subject to taxation in The Netherlands at any time during the term of such NQSO, the Committee shall have the authority to impose additional conditions on the exercise of the NQSO.

Effective for any NQSO granted after December 31, 1997, the Committee may, in addition to any other conditions specified in the option agreement, require that the NQSO is granted conditionally. Such conditions shall include that the NQSO can be exercised only with the approval of the Participant's Senior Vice President - Human Resources ("SVP-HR"). Such approval shall be granted at the discretion of the SVP-HR, which shall not be unreasonably refused. Approval may be refused for reasons which shall be set forth in the option agreement such as, but not limited to, the following: (i) termination of employment for willful or gross misconduct or receipt of notice of termination for such conduct; (ii) disclosure of confidential information; or (iii) rendering services to a competitor. Once approval has been obtained, the Participant must immediately exercise the NQSO. If approval is refused or if the NQSO is not exercised immediately upon receipt of approval, it shall be forfeited.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT

CSX CORPORATION 1987 LONG-TERM PERFORMANCE STOCK PLAN

Pursuant to Section 21 of the CSX Corporation 1987 Long-Term Performance Stock Plan as Amended Through September 8, 1999 (the "Plan"), the Plan is amended effective February 7, 2003 as follows:

The penultimate paragraph of Section 14 is amended to read as follows:

> "Notwithstanding anything to the contrary in the Plan, if a Participant or former Participant (a) becomes the owner, director or employee of a competitor of the Company or its subsidiaries; (b) has his employment terminated by the Company or one of its subsidiaries on account of actions by the Participant which are detrimental to the interests of the Company or its subsidiaries, (c) engages in conduct subsequent to the termination of his employment with the Company or its subsidiaries which the Committee determines to be detrimental to the interests of the Company or its subsidiaries; or (d) is required to divest his or her interest under the Plan under applicable law, regulation or rules, then the Committee may, in its sole discretion, pay the Participant or former Participant a single sum payment equal to the amount of his unpaid benefits which were awarded and deferred under Sections 10 or 12 of the Plan; provided, however, if the deferral has been for less than three (3) years under Section 12, the Participant or former Participant shall not be eligible to receive the Stock Premium. The single sum payment shall be made as soon as practicable following the date the Participant or former Participant is affected by one of the circumstances described in this Section 14 and such payment shall be in lieu of all other benefits which may be payable to the Participant or former Participant under this Plan."

 Powered by Morningstar® Document Research℠

EXHIBIT 10.25

DEFERRED COMPENSATION PROGRAM
FOR EXECUTIVES OF CSX CORPORATION
AND AFFILIATED COMPANIES

As Amended and Restated January 1, 1998

1. Purpose

The purpose of this Program is to provide eligible executives with an opportunity to supplement their retirement income. This Program is intended to benefit a select group of management or highly compensated employees.

2. Definitions

2.1 "Administrator" means the Corporation. The duties of the administrator shall be performed by a person or persons designated by the Chief Executive Officer of the Corporation to perform such duties.

2.2 "Affiliated Company" means the Corporation and any company or corporation directly or indirectly controlled by the Corporation which the Compensation Committee designates for participation in this Program in accordance with Section 15.2.

2.3 "Award" means, for any year, the amount awarded to an employee of an Affiliated Company for that year and, in the absence of a Deferral Agreement with respect to such amount, payable to him in the succeeding year under the MICP, including any special incentive award.

2.4 "Benefits Trust Committee" means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement.

2.5 "Board" means the Board of Directors of the Corporation.

2.6 "Change of Control" shall mean any of the following:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Corporation; (ii) any acquisition by the Corporation; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 2.6; or

 Powered by Morningstar® Document Research℠

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section XI(5); or

(e) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

2.7 "Compensation Committee" means the Compensation Committee of the Board.

2.8 "Corporation" means CSX Corporation, a Virginia corporation, and any successor thereto by merger, purchase or otherwise.

2.9 "Corporation's Accountant's" means the independent accountant or accountants engaged by the Corporation and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

2.10 "Deferral Agreement" means a completed agreement, including any attachments and appendices thereto, in the form determined by the Administrator, between an Eligible Executive and the Affiliated Company of which he is an employee, under which the Eligible Executive agrees to defer all or a portion of his Award in accordance with the provisions of Section 3.

2.11 "Deferral Date" means with respect to any Deferral Agreement entered into by an Eligible Executive, the first day of the month in which the Award subject to the Deferral Agreement would be payable to the Eligible Executive in the absence of such Deferral Agreement.

2.12 "Divisive Transaction" means a transaction in which the Participant's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

2.13 "Eligible Executive" means, for any year, an employee of an Affiliated Company who is in salary grades 22 through 40 as of (a) December 30th of such year or (b) for calendar years beginning on or after January 1, 1986, the date in such year he retired from the Affiliated Companies or terminated on account of disability, as determined by the Administrator, provided, however, that the Administrator, in its sole discretion, may designate any other employee of an Affiliated Company as an Eligible Executive for such year. Notwithstanding the preceding, following a Change of Control, such action by the Administrator is subject to the approval of the Benefits Trust Committee.

2.14 "Equivalent" means of equal present or accumulated value based on the interest rates set forth in the applicable Deferral Agreements. In determining Equivalent values, only the value of benefits for which the eligibility requirements have been met shall be included.

2.15 "MICP" means the Affiliated Companies' Management Incentive Compensation Plans, as from time to time in effect.

2.16 "Normal Retirement Date" means the later of:

(a) the last day of the month in which a Participant's 62nd birthday occurs, or

(b) the earlier of (i) the last day of the month preceding the 2nd anniversary of the Participant's earliest Deferral Date or (ii) the last day of the month in which a Participant's 65th birthday occurs.

2.17 "Participant" means an Eligible Executive who elects to defer a portion of his Award in accordance with the provisions of Section 3.

2.18 "Program" means this Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies.

2.19 "Service" means an employee's months of continuous employment with the Affiliated Companies. In the event the employee has a break in his continuous employment, his period of employment prior to the break shall be credited to the employee in accordance with the rules governing breaks in service under the CSX Pension Plan.

2.20 "Subsidiary" means a corporation more than 50% of the voting shares of which are owned directly or indirectly by the Corporation.

2.21 "Trust" means the CSX Corporation and Affiliated Companies Benefits Assurance Trust. Except as provided in Section 18, the Corporation is not obligated to make any contribution to the Trust.

2.22 "Valuation Date" means the last day of each calendar quarter and such other dates as the Administrator deems necessary or appropriate to value the Participants' benefits under this Program. Following a Change of Control, the Benefits Trust Committee shall have final approval over any date selected other than the last day of each calendar year.

3. Deferral of Awards

3.1 At any time prior to the close of business on December 30 in any calendar year, an Eligible Executive may elect to defer all or a portion of his Award, if any, for that year. Such election shall be made by filing a Deferral Agreement with the Administrator on or before the close of business on December 30 of the calendar year for which the Award is made. In the event that December 30 does not fall on a weekday, such filing must be made by the close of business on the last prior business day.

3.2 Subject to the provisions of Sections 3.3 and 3.4:

(a) an Eligible Executive in 1985 may elect to defer up to 100% of his 1985 Award;

(b) an Eligible Executive in 1986 may elect to defer up to 100% of his 1986 Award;

(c) an Eligible Executive in 1988 may elect to defer up to 100% of his 1988 Award; and

(d) an Eligible Executive in 1989 may elect to defer up to 100% of his 1989 Award.

3.3 The minimum amount which an Eligible Executive may defer in any year shall be the lesser of $5,000 or the maximum amount determined under Section 3.2. If an Eligible Executive elects to defer less than this amount, his election shall not be effective.

3.4 In its sole discretion, the Compensation Committee may, at any time, impose additional limits on the maximum amount which an Eligible Executive may elect to defer under this Program in any year or may impose additional requirements on the Eligible Executive's right to defer the maximum amount under this Program in any year.

3.5 An Eligible Executive's election to defer all or a portion of his Award shall be effective on the last day such deferral may be elected, under Section 3.1, for the year for which the Award is made. An Eligible Executive may revoke or change his election to defer all or a portion of his Award at any time prior to the date the election becomes effective. Any such revocation or change shall be made in a form and manner determined by the Administrator.

3.6 Notwithstanding the preceding, following a Change of Control, any discretionary decisions made by the Compensation Committee or the Administrator with respect to this Section 3 shall be subject to the approval of the Benefits Trust Committee.

4. Normal Retirement Benefit

A Participant who retires from employment with the Affiliated Companies on his Normal Retirement Date shall receive a benefit Equivalent to the sum of the amounts set forth in the Participant's Deferral Agreement(s) plus accrued interest. The benefit shall be paid in 180 equal monthly installments commencing on the first day of the month next following the Participant's retirement date, but in no event prior to the first day of the month next following the Participant's last Deferral Date, unless the Participant elects to receive his benefit in accordance with Section 9 of this Program.

5. Delayed Retirement Benefit

A Participant who retires or otherwise terminates his employment with the Affiliated Companies after his Normal Retirement Date shall receive a benefit equal to the benefit he would have received under Section 4 had his benefit commenced on his Normal Retirement Date, increased by 5/6 of 1% for each complete calendar month between his Normal Retirement Date and the date his benefit commences. The benefit shall be paid in 180 equal monthly installments commencing on the first day of the month next following the Participant's termination of employment, but in no event prior to the first day of the month next following the Participant's last Deferral Date, unless the Participant elects to receive his benefit in accordance with Section 9 of this Program.

6. Early Retirement Benefit

A Participant who has attained age 55, has completed 120 months of Service and terminates his employment with the Affiliated Companies prior to his Normal Retirement Date shall receive a benefit



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

commencing on the first day of the month following his Normal Retirement Date but in no event prior to the first day of the month following the Participant's last Deferral Date. The Participant's benefit shall be equal to the benefit the Participant would have received under Section 4 had he terminated his employment on his Normal Retirement Date. However, the Participant may elect a lump sum under Section 9 or may elect, in a time and manner determined by the Administrator, to have payment of his benefit commence on the first day of any month preceding his Normal Retirement Date, and following the latest of (i) his termination of employment, (ii) 24 months after his earliest Deferral Date and (iii) the first of the month following his last Deferral Date, in which event the amount of his benefit shall be reduced by 5/6 of 1% for each complete calendar month between the date his benefit commences and the first day of the month next following his Normal Retirement Date. However, in no event shall the monthly benefit be less than an amount Equivalent to the Participant's deferrals with accrued interest. Benefits under this Section 6 shall be paid in 180 equal monthly installments, unless the Participant elects to receive his benefit in accordance with Section 9 of this Program.

7. Separation Benefit

7.1 A Participant who terminates his employment with the Affiliated Companies prior to being eligible for a benefit under Sections 4 or 6, but after having completed 120 months of Service, shall receive a monthly benefit commencing on the first day of the month next following his Normal Retirement Date; provided, however, that a Participant shall not be eligible for a benefit under this Section 7.1 if the Participant terminates employment without the consent of the Affiliated Companies. The benefit shall be equal to the monthly benefit the Participant would have received under Section 4 had he terminated employment on his Normal Retirement Date. However, the Participant may elect a lump sum pursuant to Section 9, or may elect, in a time and manner determined by the Administrator, to have monthly benefits commence on the first day of any month, prior to his Normal Retirement Date, and following the latest of (i) his termination of employment with the Affiliated Companies, (ii) his 55th birthday or (iii) the last day of the month prior to the 2nd anniversary of his earliest Deferral Date, in which event the amount of his benefit shall be reduced by 5/6 of 1% for each complete calendar month between the date his benefit commences and the first day of the month next following his Normal Retirement Date. However, in no event shall the monthly benefit be less than an amount Equivalent to the Participant's deferred amounts with accrued interest. Monthly benefits under this Section 7.1 shall be paid in 180 equal monthly installments. For purposes of this program and particularly this Section 7, if a Participant's employer is involved in a Divisive Transaction, the Participant will be deemed to have terminated his employment with an Affiliated Company with the consent of the Affiliated Company.

7.2 A Participant who terminates his employment with the Affiliated Companies, other than on account of death, and is not eligible for a benefit under Section 7.1 shall receive a single sum payment equal to the sum of the amounts the Participant deferred under his Deferral Agreements plus accrued interest. However, if the Participant terminates his employment with the Affiliated Companies on account of a disability within the meaning of Section 8.1, he shall receive a benefit under this Section 7.2 only if the Participant elects, in a time and manner determined by the Administrator, to receive such benefit and to cease accruing Service under Section 8.1. The single sum payment shall be made on the first day of the month next following the Participant's termination of employment, or as soon as practicable thereafter. The Participant shall not receive any other benefits under this Program.

8. Disability

8.1 A Participant who, in the sole judgment of the Administrator, becomes totally and permanently disabled prior to his termination of employment with the Affiliated Companies, and does



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

not make an election under Section 7.2 to receive a benefit under such Section, shall continue to accrue Service during his period of disability as if he remained an active employee. Such a Participant shall be eligible to receive a benefit under Sections 4, 6 or 7.1 when he meets the age and Service requirements for such a benefit, provided that following a Change of Control, any decisions of the Administrator pursuant to this Section 8.1 is subject to the approval of the Benefits Trust Committee.

8.2 The Administrator may, in its sole discretion, require a Participant to submit to a medical examination by a physician approved by the Administrator, or present other evidence satisfactory to the Administrator, to establish the existence or continuance of his disability. The Administrator may require such medical examination or other evidence not more than once per year. A Participant who refuses to submit to any required medical examination or to present any other required evidence under this Section 8.2 shall not be disabled for purposes of this Program and shall only be eligible to receive the benefit he would have received under the Program had he terminated his employment with the Affiliated Companies immediately prior to the date of such request. Notwithstanding the preceding, following a Change of Control, any decision by the Administrator made pursuant to this Section 8.2 is subject to approval by the Benefits Trust Committee.

9. Single Sum Payments

A Participant who is eligible to receive a benefit under Sections 4, 5, 6, 7.1 or 8.1 of the Program but whose benefits hereunder have not yet commenced may, with the consent of the Administrator, elect, in a time and manner determined by the Administrator, to receive his benefit in the form of a single sum. The single sum shall be in the amount of the Participant's deferred amounts plus accrued interest, provided that, in the case of a Participant then eligible for immediate commencement of monthly benefits, such single sum shall not be less than an amount Equivalent to the value of such monthly benefits. Such single sum shall be paid on the first day of the fourth month following the later of (i) the Participant's termination of employment with the Affiliated Companies, or (ii) the date such election is received by the Administrator. Notwithstanding any other provision hereof, such amount shall be determined as of a date three months prior to the date of payment and shall not accrue interest beyond such earlier date. Furthermore, following a Change of Control, any decision of the Administrator made pursuant to this Section 8.2 is subject to approval by the Benefits Trust Committee.

10. Hardship Withdrawal

10.1 While employed by the Affiliated Companies, a Participant may, in the event of a severe financial hardship, request a withdrawal of an amount which does not exceed the single sum amount determined in Section 9. The withdrawal shall be made in a time and manner determined by the Administrator, and shall not be for a greater amount than the amount required to meet the financial hardship, and shall be subject to approval by the Administrator.

10.2 For purposes of this Section 10, financial hardship shall include:

(a) Education of a dependent child where the Participant can show that without the withdrawal under this Section 10 the education would be unavailable to the child;

(b) Illness of the Participant or his dependents, resulting in severe financial hardship to the Participant;



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) The loss of the Participant's home or it contents, to the extent not reimbursable by insurance or otherwise, if such loss results in a severe financial hardship to the Participant; and

(d) Any other extraordinary circumstances of the Participant approved by the Administrator if such circumstances would result in a present or impending critical financial need which the Participant is unable to satisfy with funds reasonably available from other sources.

10.3 If a Participant makes a withdrawal under this Section 10, any other benefit which he may be entitled to under this Program on his termination of employment shall be appropriately adjusted to take into account the amount the Participant received under this Section 10.

10.4 Following a Change of Control, any decision by the Administrator made pursuant to this Section 10 is subject to the approval of the Benefits Trust Committee.

11. Death Benefits

11.1 Except as provided in Section 11.10(b), if a Participant dies while employed by an Affiliated Company, his beneficiary shall be eligible to receive a single sum benefit equal to the greatest of:

(a) three times the sum of the amount(s) the Participant deferred under his Deferral Agreement(s);

(b) the amounts the Participant deferred under his Deferral Agreement(s) plus accrued interest; or

(c) an amount Equivalent to the monthly benefit the Participant could have received under the Program, if any, had he terminated his employment with the Affiliated Companies on the day immediately preceding his death and elected to begin receiving the benefit on the first day of the following month.

The benefit is payable on the first day of the month next following the date of the Participant's death, and shall be in lieu of all other benefits payable under this Program, other than any benefit payable under Section 11.6.

11.2 If a Participant who has terminated his employment with the Affiliated Companies after becoming eligible for a benefit under Sections 4, 5 or 6, dies prior to the commencement of any benefit under this Program, his beneficiary shall receive a benefit under Section 11.1

11.3 If a Participant who is totally and permanently disabled under Section 8.1 dies prior to receiving a benefit under this Program, his beneficiary shall receive a benefit under Section 11.1

11.4 If a Participant who is eligible for a benefit under Section 7.1 dies prior to receiving a benefit, his beneficiary will receive a benefit based on the greater of the amounts determined under Sections 11.1(b)and 11.1(c).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

11.5 If a Participant dies after commencing to receive a benefit, other than a benefit under Section 7.2, but prior to receiving all remaining benefits due, the remaining benefits shall be paid to the Participant's beneficiary or contingent beneficiary, whichever is applicable.

11.6 In addition to any other benefit payable under this Section 11, in the case of a Participant (i) who dies while employed by an Affiliated Company after becoming eligible for benefits under Sections 4, 5, or 6 hereof, or (ii) who terminates employment while eligible for a benefit under Section 4, 5 or 6 of the Program and then dies, his beneficiary shall be eligible to receive a benefit of $10,000, payable in a single sum. This benefit shall be payable as soon as practicable following the presentation to the Administrator, and the Administrator's examination and approval of, any information or material, including proof of death of the Participant, the Administrator may request. Notwithstanding anything to the contrary, a benefit shall not be payable on account of the death of a Participant who received a single sum benefit under Sections 12 or 16 of the Program.

11.7 A Participant may, in a time and manner determined by the Administrator, designate a beneficiary and one or more contingent beneficiaries (which may include the Participant's estate) to receive any benefits which may be payable under this Section 11. If the Participant fails to designate a beneficiary or contingent beneficiary, or if the beneficiary and the contingent beneficiaries do not survive the Participant, such benefits shall be paid to the Participant's estate. The Participant may also designate a remainder beneficiary to receive any benefits which may be payable under Section 11.9.

11.8 A Participant may revoke or change any designation made under Section 11.7 in a time and manner determined by the Administrator.

11.9 If, pursuant to Section 11.7, payments commence to a beneficiary or contingent beneficiary and if such beneficiary or contingent beneficiary dies prior to receiving all payments due under this Program, any remaining payments shall be made to the Participant's remainder beneficiary. If, at the date of such death, there is no surviving remainder beneficiary, the remaining benefits hereunder shall be paid to the estate of the beneficiary or contingent beneficiary previously in receipt of benefits hereunder.

11.10 (a) If any benefits are payable under this Section 11 to an individual other than the Participant's spouse or child under age 21 (or child under age 25 who is a full- time student at an accredited institution of higher education), the benefit shall be paid in the form of a single sum.

(b) If benefits become payable to the Participant's spouse or his child under age 21 (or his child under age 25 who is a full-time student at an accredited institute of higher education), such benefits (other than benefits under Section 11.6) shall be payable in 180 monthly installments Equivalent to the single sum amount determined under Section 11.1 through 11.5 hereof, as applicable. Monthly benefits shall commence on the first day of the month following the Participant's death. The Participant may elect, in a time and manner determined by the Administrator to have any amounts which may be payable under the Program paid in accordance with Section 11.10(a).

(c) Notwithstanding anything to the contrary in this Program, if a Participant's child under age 21 (or child under age 25 who is a full-time student at an accredited institute of higher education) is receiving a benefit under this Program in the form of installment payments, upon his attaining age 21 (or age 25 or ceasing to be a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

full-time student at an accredited institute of higher education) he shall receive a single sum Equivalent to his remaining installments in lieu of receiving such remaining installments.

12. Special Distribution Rules

12.1 Notwithstanding anything to the contrary in this Program, if (a) a Participant becomes the owner, director or employee of a competitor of the Affiliated Companies, (b) his employment is terminated by an Affiliated Company on account of actions by the Participant which are detrimental to the interests of any Affiliated Company, or (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company, then the Administrator may, in its sole discretion, pay a Participant a single sum payment equal to the sum of the amounts the Participant deferred under his Deferral Agreements plus accrued interest, reduced by an amount Equivalent to any payments the Participant may already have received under this Program. However, if the Participant is receiving a benefit under the Program, or could be receiving an immediate benefit under the Program, the single sum shall not be less than an amount Equivalent to the remaining monthly benefit the Participant is, or could be, receiving. The single sum payment shall be made as soon as practicable following the Participant's becoming an owner, director or employee of a competitor, his termination of employment or the Administrator's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Participant under this Program.

12.2 Notwithstanding anything to the contrary contained herein, the Corporation may delay payment of a benefit under this Program to any Participant who is determined to be among the top five most highly paid executives for the year the benefit under this Program would otherwise be paid; provided, however, if a Participant's payment is delayed, the benefit to which he is entitled will not decrease after the date it would otherwise be distributed.

12.3 Notwithstanding the preceding, following a Change of Control, the Administrator's authority to make decisions under this Section 12 is subject to the approval of the Benefits Trust Committee.

13. Benefit Determinations Following a Change of Control

13.1 Following a Change of Control, final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefits under this Program shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

14. Funding

14.1 To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Program shall be joint and several.

14.2 The obligations of the Corporation and any of its affiliated corporations and the benefit due any Participant, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the Benefits Assurance Trust or any similar trust or other vehicle.

15.. Administration



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

15.1 This Program shall be administered by the Corporation. Certain administrative functions, as set forth in this Program, shall be the responsibility of the Administrator. The Administrator shall interpret the Program, establish regulations to further the purposes of the Program and take any other action necessary to the proper operation of the Program. Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

15.2 Prior to a Change of Control, the Compensation Committee, in its sole discretion and upon such terms as it may prescribe, may permit any company or corporation directly or indirectly controlled by the Corporation to participate in the Program for such periods as it may determine. Following a Change of Control, no entity shall become or cease to be a participating company without the consent of the Benefits Trust Committee.

15.3 The Administrator shall provide adequate notice in writing to any Participant, beneficiary, contingent beneficiary or remainder beneficiary whose claim for benefits under this Program has been denied, setting forth the specific reasons for such denial. A reasonable opportunity shall be afforded to any such Participant, beneficiary, contingent beneficiary or remainder beneficiary for a full and fair review by the Administrator of its decision denying the claim. Prior to a Change of Control, the Administrator's decision on any such review shall be final and binding on the Participant, beneficiary, contingent beneficiary, remainder beneficiary and all other interested persons. All acts and decisions of the Administrator shall be final and binding upon all Participants and employees of the Affiliated Companies.

15.4 Following a Change of Control, all benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under this Program shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

16. Termination and Amendment of the Program

6.1 Prior to a Change of Control, the Board may, in its sole discretion, terminate this Program and the related Deferral Agreement(s) at any time. Following a Change of Control, this Program may not be terminated without the approval of the Benefits Trust Committee. In the event the Program and related Deferral Agreement(s) are terminated. Participants shall receive a single sum payment equal to the sum of the amounts they deferred under their Deferral Agreements plus accrued interest, reduced by an amount Equivalent to any payments the Participant may already have received under this Program. However, if the Participant is receiving a benefit under the Program, or could be receiving an immediate benefit under the Program, the single sum shall not be less than an amount Equivalent to the monthly benefit the Participant is, or could be, receiving. The single sum payment shall be made as soon as practicable following the date the Program is terminated and shall be in lieu of any other benefit which may be payable to the Participant under this Program.

16.2 Prior to a Change of Control, the Board, in its sole discretion, may amend this Program and the related Deferral Agreements in any way on thirty (30) days prior notice to the Participants. Following a Change of Control, all amendments are subject to the approval of the Benefits Trust Committee. If any amendment to this Program or to the Deferral Agreements shall adversely affect the rights of a Participant, the Participant must consent in writing to such amendment prior to its effective date. If the Participant does not consent to the amendment, the Program, shall be deemed to be terminated with respect to the Participant and he shall receive a single sum payment in accordance with Section 16.1.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

16.3 Notwithstanding anything to the contrary' in this Section 16, prior to a Change of Control, the Board must act to terminate or amend the Program or the Deferral Agreements in a uniform and nondiscriminatory manner. Following a Change of Control, such actions are subject to the approval of the Benefits Trust Committee

17. Miscellaneous

17.1 The existence of this Program or a Deferral Agreement does not constitute a contract for continued employment between an Eligible Executive or a Participant and an Affiliated Company. The Affiliated Companies reserve the right to modify an Eligible Executive's or Participant's compensation and to terminate the employment of an Eligible Executive or a Participant for any reason and at any time, notwithstanding the existence of this Program or of a Deferral Agreement. The Affiliated Companies reserve the right not to grant Awards to Eligible Executives and Participants for any reason.

17.2 A Participant's rights to benefit payments under the Program are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment by creditors of the Participant, his beneficiary, contingent beneficiaries, remainder beneficiary, heirs or personal representative.

17.3 Except for Section 18 herein, nothing contained in this Program or in a Deferral Agreement shall require the Affiliated Companies to segregate any monies from their general funds, or to create any trusts, or to make any special deposits for any amounts to be paid to any Participant, beneficiary, contingent beneficiary or remainder beneficiary. Neither the Participant, his beneficiary, contingent beneficiaries, remainder beneficiary, heirs or personal representatives shall have any right, title or interest in or to any funds of the Affiliated Companies on account of this Program or on account of having completed a Deferral Agreement.

17.4 All payments under this Program shall be net of an amount sufficient to satisfy any federal, state or local withholding and payroll tax requirements.

17.5 Prior to paying any benefit under this Program, the Administrator may require the Participant, beneficiary, contingent beneficiary or remainder beneficiary to provide such information or material as the Administrator, in its sole discretion, shall deem necessary for it to make any determination it may be required to make under this Program. The Administrator may withhold payment of any benefit under this Program until it receives all such information and material and is reasonably satisfied of its correctness and genuineness.

17.6 Each Participant shall have the status of a general unsecured creditor of the Affiliated Companies, and this Program constitutes a mere promise by the Affiliated Companies to make benefit payments in the future.

17.7 The Program is intended to be unfunded for tax purposes and for purposes of Title I of ERISA.

17.8 The masculine pronoun shall mean the feminine pronoun and all singular shall include the plural wherever appropriate.

17.9 The terms of this Program and any Deferral Agreement shall be governed by the laws of the Commonwealth of Virginia.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

17.10 The invalidity or unenforceability of any provision of this Program or of a Deferral Agreement shall in no way affect the validity or enforceability of any other provision.

18. Change of Control

18.1 If a Change of Control has occurred, the Corporation shall contribute to the Trust, within 7 days of such Change of Control, a lump sum payment equal to the greater of (i) the aggregate value of the amount each Participant would be eligible to receive (determined under Section 18.2 below) as of a Valuation Date coinciding with or next preceding the date of Change of Control or (ii) the amount determined under Section 1(h) of the Trust attributable to liabilities relating to the Program, to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 18 shall be determined by the Corporation's Accountants after consultation with the entity then maintaining the Program's records. Thereafter, the Corporation's Accountants shall annually determine for each Participant not receiving a lump sum payment pursuant to subsection 18.2 below the amount which would be payable under such subsection were a Change of Control to occur at the date of such determination. To the extent that the value of the assets held in the Trust relating to this Program do not equal the amount described in the preceding sentence, at the time of the valuation, as determined by the Corporation's Accountants, the Corporation shall make a lump sum contribution to the Trust equal to the difference.

18.2 In the event a Change of Control has occurred, the trustee of the Trust shall, within 45 days of such Change of Control, pay to each Participant not making an election under 18.3 below, a lump sum payment equal to the amount the Participant would have been entitled to receive determined under Section 6 had he retired early and selected a lump sum payment. The amount of each Participant's lump sum payment shall be determined by the Corporation's Accountants after consultation with the entity then maintaining the Program's records.

18.3 Each Participant may elect in a time and manner determined by the Administrator, but in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of the Program as if a Change of Control had not occurred. New Participants in the Program may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of the Program as if a Change of Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

18.4 Notwithstanding anything in this Program to the contrary, each Participant who has made an election under 18.3 above may elect within 90 days following a Change of Control, in a time and manner determined by the Benefits Trust Committee, to receive a lump sum payment calculated under the provisions of 18.2 above, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to the Corporation by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit from the Program. Payments under this subsection 18.4 shall be made not later than 7 days following receipt by the Corporation of the Participant's election. The Benefits Trust Committee shall, no later than 7 days after a Change of Control has occurred, give written notification to each Participant eligible to make an election under this subsection 18.4, that a Change of Control has occurred and informing such Participant of the availability of the election.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

EXHIBIT 10.26

# 2002 DEFERRED COMPENSATION PLAN
# OF CSX CORPORATION AND AFFILIATED COMPANIES


Powered by Morningstar® Document Research℠

TABLE OF CONTENTS


| | Page |
|---|---|
| INTRODUCTION | 1 |
| ARTICLE 1. DEFINITIONS | 1 |
| 1.1 Account | 1 |
| 1.2 Administrator | 1 |
| 1.3 Affiliated Company | 1 |
| 1.4 Award | 1 |
| 1.5 Award Deferral Agreement | 1 |
| 1.6 Benefits Trust Committee | 1 |
| 1.7 Board of Directors | 1 |
| 1.8 Change of Control | 1 |
| 1.9 Code | 3 |
| 1.10 Committee | 3 |
| 1.11 Company Stock | 3 |
| 1.12 Compensation | 3 |
| 1.13 Corporation | 3 |
| 1.14 Deferral Agreement | 3 |
| 1.15 Distribution Election | 4 |
| 1.16 Distribution Event | 4 |
| 1.17 Divisive Transaction | 4 |
| 1.18 Effective Date | 4 |
| 1.19 Eligible Executive | 4 |
| 1.20 Enrollment Form | 5 |
| 1.21 Executive Stock Account | 5 |
| 1.22 Form of Payment Election | 5 |
| 1.23 ICP Award | 5 |
| 1.24 Independent Accountant | 5 |
| 1.25 Matching Credits | 5 |
| 1.26 Member | 5 |
| 1.27 Partial Distribution Election | 5 |
| 1.28 Participating Company | 5 |
| 1.29 Plan | 6 |
| 1.30 Salary Deferrals | 6 |
| 1.31 Salary Deferral Agreement | 6 |
| 1.32 Stock Award | 6 |
| 1.33 Subsidiary | 6 |
| 1.34 Tax Savings Thrift Plan | 6 |
| 1.35 Trust | 6 |
| 1.36 Valuation Date | 6 |
| ARTICLE 2. MEMBERSHIP | 6 |
| 2.1 In General | 6 |
| 2.2 Termination of Employment; Re-employment | 6 |
| 2.3 Change in Status | 7 |
| 2.4 Membership Following a Change of Control | 7 |




Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ARTICLES 3. DEFERRAL AGREEMENTS........................................... 7

3.1 Deferral Agreement........................................................ 7
3.2 Modification

of Deferral Agreement...................................... 8

ARTICLE 4. AWARD DEFERRAL PROGRAM.............................................. 8

4.1 Filing Requirements...................................................... 8
4.2 Amount of Deferral....................................................... 9
4.3 Crediting to Account..................................................... 9

ARTICLES 5. SALARY DEFERRAL PROGRAM............................................. 9

5.1 Filing Requirements...................................................... 9
5.2 Salary Deferral Agreement................................................ 9
5.3 Amount of Salary Deferrals............................................... 10
5.4 Effect of Hardship Withdrawal............................................ 10
5.5 Certain Additional Credits............................................... 10

ARTICLE 6. EXECUTIVE STOCK DEFERRAL PROGRAM..................................... 11

6.1 Stock Awards............................................................. 11
6.2 Executive Stock Account.................................................. 11
6.3 Dividend Reinvestment.................................................... 12

ARTICLE 7. MAINTENANCE OF ACCOUNTS.............................................. 12

7.1 Creation of Account...................................................... 12
7.2 Adjustment of Account.................................................... 13
7.3 Investment Performance Elections......................................... 13
7.4 Changing Investment Performance Elections................................ 14
7.5 Vesting of Account....................................................... 14
7.6 Action Following a Change of Control..................................... 14

ARTICLE 8. DISTRIBUTION OF BENEFITS............................................. 14

8.1 Commencement of Distribution............................................. 14
8.2 Distribution Election.................................................... 14
8.3 Delay of Payment......................................................... 15
8.4 Account Adjustment....................................................... 16
8.5 Hardship Withdrawal, Forfeiture.......................................... 16
8.6 Designation of Beneficiary............................................... 17
8.7 Special Distribution Rules............................................... 17
8.8 Status of Account Pending Distribution................................... 17
8.9 One-time Re-deferral Election............................................ 17
8.10 Change of Control....................................................... 18

ARTICLE 9. FORM OF PAYMENT...................................................... 19

9.1 Timing of Distribution................................................... 19
9.2 Form of Payment Election................................................. 19
9.3 Installments and Withdrawals Pro-Rata.................................... 20

ARTICLE 10. AMENDMENT OR TERMINATION............................................ 20

10.1 Right to Terminate...................................................... 20
10.2 Right to Amend.......................................................... 20
10.3 Uniform Action.......................................................... 21



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ARTICLE 11. GENERAL PROVISIONS.................................................. 21

11.1 No Funding.............................................................. 21
11.2 Obligation.............................................................. 21
11.3 No Contract of Employment............................................... 21
11.4 Withholding Taxes....................................................... 21
11.5 Nonalienation........................................................... 21
11.6 Administration.......................................................... 22
11.7 Impact of Future Legislation or Regulation.............................. 23
11.8 Construction............................................................ 23



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

INTRODUCTION

This 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Companies (the "Plan") was adopted July 9, 2002. This Plan is generally intended to provide certain executives eligible to participate in the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies (the "Savings Plan") with an opportunity to defer the receipt of a portion of their salary, and/or award(s) under the various incentive compensation plans and programs of CSX that may be offered from time to time and to restore employer matching contributions lost under the Savings Plan because of the application of Sections 401(a)(17), 401 (k), 401 (m) and 415 of the Internal Revenue Code of 1986, as amended. Eligible executives may, if they so elect, designate all or a portion of such deferrals to be used for payment of education expenses for one or more members of their families. The Plan is unfunded and is maintained by CSX Corporation and Affiliated Companies primarily for the purpose of providing deferred compensation for a select group of management or highly-compensated employees.

ARTICLE 1. DEFINITIONS

1.1 ACCOUNT means the bookkeeping account maintained for each Member to record his Salary Deferrals, Matching Credits and the amount of Awards he has elected to defer, as adjusted pursuant to Article 7.

1.2 ADMINISTRATOR means the Corporation. The duties of the Administrator shall be performed by a person or persons designated by the Chief Executive Officer of the Corporation to perform such duties.

1.3 AFFILIATED COMPANY means the Corporation and any company or corporation directly or indirectly controlled by the Corporation.

1.4 AWARD means the amount other than salary awarded to an employee of an Affiliated Company under the various incentive compensation plans and programs of CSX that may be offered from time to time, and which has been designated by the Administrator as eligible for deferral under the Plan, including but not limited to ICP Awards, stock awards, stock options and special incentive awards.

1.5 AWARD DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the Award deferral program described in Article 4.

1.6 BENEFITS TRUST COMMITTEE means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement.

1.7 BOARD OF DIRECTORS or "Board" means the Board of Directors of the Corporation.

1.8 CHANGE OF CONTROL means any of the following:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities


Powered by Morningstar® Document Research℠

Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Corporation; (ii) any acquisition by the Corporation; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common




Powered by Morningstar® Document Research℠

Stock and Outstanding Corporation Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(e) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

1.9 CODE means the Internal Revenue Code of 1986, as amended from time to time.

1.10 COMMITTEE means the Compensation Committee of the Board of Directors of CSX Corporation.

1.11 COMPANY STOCK means the common stock of the Corporation.

1.12 COMPENSATION means the "Base Compensation" of an Eligible Executive as defined in the Tax Savings Thrift Plan, determined prior to: (a) any Salary Deferrals under Article 5; and (b) any limit on compensation imposed by Section 401(a)(17) of the Code.

1.13 CORPORATION means CSX Corporation, a Virginia corporation, and any successor thereto by merger, purchase or otherwise.

1.14 DEFERRAL AGREEMENT means an agreement between an Eligible Executive and a Participating Company of which he is an employee under which the Eligible Executive agrees to defer an Award or make Salary Deferrals under the Plan, as the case may be. The Deferral Agreement shall be on a form prescribed by the Administrator and shall include any amendments, attachments or appendices.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.15 DISTRIBUTION ELECTION means the election by the Member of the event triggering the commencement of distribution under Section 8.2.

1.16 DISTRIBUTION EVENT means any of the events listed in Section 1.8, "Change of Control," with the following modification: the words, "Approval by the shareholders of the Corporation of," in the first line of Sections 1.8(c) and 1.8(d) are replaced for purposes of this Section 1.16 with the words, "Consummation of, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of the Corporation or its principal subsidiary by reason of,".

1.17 DIVISIVE TRANSACTION means a transaction in which the Eligible Executive's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

1.18 EFFECTIVE DATE means November 30, 2002 or with respect to the Eligible Executives of a company which adopts the Plan, it means the date such company becomes a Participating Company.

1.19 ELIGIBLE EXECUTIVE means an employee of a Participating Company, provided that:

(a) For purposes of the award deferral program described in Article 4:

(i) Such employee is employed by a Participating Company in salary band 6 or above as of December 30 of the calendar year for which the Award is made (or in the case of a multiple-year Award, December 30 of the last calendar year for which the Award is made); and

(ii) (A) is employed by a Participating Company and is receiving Compensation of one hundred thousand dollars ($100,000) or more per year; or (B) retired from the Participating Companies or terminated employment with the Participating Companies on account of disability as determined by the Administrator, and was receiving compensation of one hundred thousand dollars ($100,000) or more per year at the time of such retirement or termination.

(b) For purposes of the salary deferral program described in Article 5, such employee is:

(i) eligible for membership in the Tax Savings Thrift Plan; and

(ii) employed in salary band 6 or above; and

(iii) receiving Compensation of one hundred thousand dollars ($100,000) or more per year.

(c) The Compensation amount set forth in subsections (a)(ii) and (b)(ii) shall be adjusted no more frequently than annually, based on (i) changes in the Consumer Price Index ("CPI"), such adjustment to be made in increments of ten thousand dollars ($10,000) only, rounded to next lowest increment as



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

indicated by the CPI, or (ii) in the discretion of the Chief Executive Officer, a review of data regarding eligibility to participate in this type of program. An employee who is eligible to participate because his Compensation satisfies the requirements of subsection (a)(ii) or (b)(iii) above, and is excluded from participation only because of a subsequent increase in the Compensation requirement shall continue to be eligible to participate.

(d) The Chief Executive Officer of the Corporation or his designee may designate any other employee or former employee of an Affiliated Company as an Eligible Executive, including an employee or former employee who has previously made deferrals under a prior Company deferral plan; provided, however, only those employees or former employees considered to be a select group of management or highly compensated may be designated as Eligible Executives under this Plan. Notwithstanding the preceding, following a Change of Control, such designations are subject to the approval of the Benefits Trust Committee.

1.20 ENROLLMENT FORM means the form prescribed by the Administrator that an Eligible Executive who has previously made deferrals under a prior Company deferral plan may file pursuant to Section 2.1 in order to become a Member and participate in the Plan.

1.21 EXECUTIVE STOCK ACCOUNT means the bookkeeping account maintained for each Member to record his deferral of Stock Awards pursuant to Article 6.

1.22 FORM OF PAYMENT ELECTION means the election by the Member of the form of distribution he will receive from his Account or Executive Stock Account pursuant to Section 9.2.

1.23 ICP AWARD means the Participating Companies' Incentive Compensation Program, including but not limited to the Management Incentive Compensation Program ("MICP") and the Senior Management Incentive Compensation Program ("SMICP").

1.24 INDEPENDENT ACCOUNTANT means the independent accountants engaged by the Corporation and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

1.25 MATCHING CREDITS means amounts credited to the Account of a Member pursuant to Section 5.5.

1.26 MEMBER means, except as otherwise provided in Article 2, each Eligible Executive who has executed an initial Deferral Agreement or Enrollment Form as described in Section 2.1.

1.27 PARTIAL DISTRIBUTION ELECTION means a Distribution Election for a portion of a Member's Account under Section 8.2(d).

1.28 PARTICIPATING COMPANY means the Corporation and any company or corporation directly or indirectly controlled by the Corporation, which the Committee designates as eligible to participate in the Plan in accordance with Section 11.6(e).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.29 PLAN means this 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Companies, as amended from time to time.

1.30 SALARY DEFERRALS means the amounts credited to a Member's Account under Section 5.3.

1.31 SALARY DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the salary deferral program described in Article 5.

1.32 STOCK AWARD means an Award that is or will be payable in Company Stock issued pursuant to the CSX Omnibus Incentive Plan ("COIP") or another of the Corporation's stock incentive plans, including but not limited to Performance Shares, nonqualified stock options, Incentive Stock Options, restricted stock and stock appreciation rights.

1.33 SUBSIDIARY means a corporation more than 50% of the voting shares of which are owned directly or indirectly by the Corporation.

1.34 TAX SAVINGS THRIFT PLAN means the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies, as amended from time to time.

1.35 TRUST means the CSX Corporation and Affiliated Companies Benefits Assurance Trust.

1.36 VALUATION DATE means the last business day of each calendar month following the Effective Date.

ARTICLE 2. MEMBERSHIP

2.1 IN GENERAL:

(a) An Eligible Executive shall become a Member as of the date he files his initial Deferral Agreement or an Enrollment Form with the Administrator. Such Deferral Agreement shall be effective for purposes of deferring an Award or making Salary Deferrals only as provided in Articles 4 and 5. Such Enrollment Form shall be effective for purposes of transferring balances previously deferred under a prior Company deferral plan to the Member's Account or Executive Stock Account only as provided in Articles 6 and 7.

(b) As a condition of membership, the Administrator may require such other information as it deems appropriate.

2.2 TERMINATION OF EMPLOYMENT; RE-EMPLOYMENT:

(a) Subject to Section 2.4, membership shall not cease upon a Member's termination of employment. In the event that a Member ceases to be employed by an Affiliated Company, his Salary Deferrals and Matching Credits shall thereupon be suspended until such time as he shall be re-employed as an Eligible Executive by an Affiliated Company.

(b) In the event that a Member ceases to be employed by an Affiliated Company he shall continue to be a Member of the Plan but shall not be eligible to defer any portion of any future Awards until such time as he shall be re-employed as an Eligible Executive by an Affiliated Company.

(c) Upon re-employment as an Eligible Executive a Member may participate in the Plan as follows:

(i) in the case of a Member who prior to re-employment received the balance in his Account or Executive Stock Account, by executing a Deferral Agreement or Enrollment Form as provided in Section 2.1 as though for all purposes of the Plan the Affiliated Companies had never employed the Member;

(ii) in the case of a Member who prior to re-employment did not receive the balance in his Account or Executive Stock Account, by executing a Deferral Agreement or Enrollment Form as provided in Section 2.1, provided his Distribution Elections and beneficiary designation shall remain in effect.

(iii) distributions shall cease if the commencement of distribution was because of the Member's termination of employment (including retirement);

(iv) distributions shall continue if the commencement of distribution was because the Member chose a specific date or age for the commencement of benefits and that date or age has been attained.

2.3 CHANGE IN STATUS:

(a) In the event that a Member ceases to be an Eligible Executive with respect to Salary Deferrals but continues to be employed by an Affiliated Company, his Salary Deferrals and Matching Credits shall thereupon be suspended until such time as he shall once again become an Eligible Executive. All other provisions of his Salary Deferral Agreement shall remain in force and he shall continue to be a Member of the Plan.

(b) In the event that a Member ceases to be an Eligible Executive with respect to the deferral of Awards hereunder but continues to be employed by an Affiliated Company, he shall continue to be a Member of the Plan but shall not be eligible to defer any portion of any future Awards until such time as he shall once again become an Eligible Executive.

2.4 MEMBERSHIP FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any membership determinations or discretionary actions pursuant to this Article 2 shall be subject to the approval of the Benefits Trust Committee.

ARTICLE 3. DEFERRAL AGREEMENTS

3.1 DEFERRAL AGREEMENT: A Deferral Agreement shall be in a form, including electronic form approved by the Administrator, which shall be the sole judge of the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

proper completion thereof. Such Agreement shall provide for the deferral of an Award or for Salary Deferrals and may include such other provisions as the Administrator deems appropriate.

3.2 MODIFICATION OF DEFERRAL AGREEMENT: A Member may elect to change, modify or revoke a Deferral Agreement as follows by filing a new Deferral Agreement:

(a) A Member may change the amount of Award he elects to defer on an Award Deferral Agreement prior to the Agreement's effective date as provided in Article 4.

(b) A Member may change the rate of his Salary Deferrals or suspend his Salary Deferrals as provided in Article 5.

ARTICLE 4. AWARD DEFERRAL PROGRAM

4.1 FILING REQUIREMENTS:

(a) With respect to an ICP Award made for a calendar year or multiple years and determined and paid in the following calendar year, an Eligible Executive may elect, subject to Section 4.2(a) to defer all or a portion of his Award, if any, for that year. Such election shall be made by filing an Award Deferral Agreement with the Administrator on or before the close of business on November 15 of the calendar year (or, in the case of a multiple-year Award, the last calendar year) for which the Award is earned. An election to defer a portion of an Award shall be an integral percentage of such Award.

(b) With respect to an ICP Award, notwithstanding Section 4.1 (a), an individual who becomes an Eligible Executive after November 15 of the calendar year for which an Award is made, but prior to the first day of the month in which such Award is determined including required action by the Board, may elect, subject to Section 4.2(a) to defer all or a portion of that Award in accordance with this Section 4.1(b). Such election shall be made by filing an Award Deferral Agreement during the 30 day or shorter period beginning on the date the individual becomes an Eligible Executive and ending no later than the last day of the month preceding the month in which the Award is determined.

(c) With respect to an ICP Award, an Eligible Executive's election to defer all or a portion of his Award shall be effective on the last day that such deferral may be elected under Section 4.1 (a) or 4.1 (b) and shall be effective only for the Award in question. An Eligible Executive may revoke or change his election to defer all or a portion of his Award at any time prior to the date the election becomes effective, as described in the preceding sentence. Any such revocation or change shall be made in a form and manner determined by the Administrator.

(d) With respect to an Award other than an ICP Award, an Eligible Executive shall be entitled to defer an Award by filing an Award Deferral Agreement with the Administrator on or before the close of business on November 15 of the calendar year immediately prior to the year in which the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Award is paid or made available to the Eligible Executive. Such Award Deferral Agreement shall be effective only for the Award in question.

(e) The Committee in its sole discretion may require that certain Awards must be deferred, in which case no Award Deferral Agreement shall be required to be filed.

4.2 AMOUNT OF DEFERRAL:

(a) With respect to an ICP Award, prior to a Change of Control, the Committee in its sole discretion, may establish such maximum limit on the amount of Award an Eligible Executive may defer for a calendar year as the Committee deems appropriate. Such maximum limit shall appear on the Eligible Executive's Award Deferral Agreement for the year. Following a Change of Control, the Committee's decision is subject to the final approval of the Benefits Trust Committee.

(b) With respect to an ICP Award there shall be no minimum amount of deferral allowed unless otherwise designated by the Administrator.

(c) With respect to an Award other than an ICP Award there shall be neither minimum nor maximum amount of deferral allowed unless otherwise designated by the Administrator.

4.3 CREDITING TO ACCOUNT: The amount of Award which an Eligible Executive has elected to defer shall be credited to his Account on the date coincident with or as soon as reasonably practicable following the date the Award would have been paid to the Eligible Executive.

ARTICLE 5. SALARY DEFERRAL PROGRAM

5.1 FILING REQUIREMENTS:

(a) An individual who is an Eligible Executive immediately prior to the Effective Date may file a Salary Deferral Agreement or an Enrollment Form with the Administrator, within such period prior to the Effective Date and in such manner as the Administrator may prescribe.

(b) An individual who becomes an Eligible Executive on or after the Effective Date may file a Salary Deferral Agreement with the Administrator during the calendar month he becomes an Eligible Executive, in such manner as the Administrator may prescribe.

(c) An Eligible Executive who fails to file a Salary Deferral Agreement with the Administrator as provided in Sections 5.1 (a) and 5.1 (b) may file a Salary Deferral Agreement in any subsequent month of December.

5.2 SALARY DEFERRAL AGREEMENT:

(a) A Member's Salary Deferral Agreement shall authorize a reduction in his base pay with respect to his Salary Deferrals under the Plan. Such salary



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

reduction shall be an integral percentage not in excess of fifty (50%) percent. The Agreement shall be effective for payroll periods beginning on or after the later of: (i) the Effective Date; or (ii) the first day of the month following the date the Salary Deferral Agreement is filed with the Administrator in accordance with Section 5.1. Paychecks applicable to said payroll periods shall be reduced accordingly.

(b) A Salary Deferral Agreement shall not be revoked or modified with respect to prior deferrals and shall remain in effect until such time as the Member files with the Administrator a new Salary Deferral Agreement.

(c) A Member who is a participant in the Tax Savings Thrift Plan will have his salary deferral election under the Tax Savings Thrift Plan serve as his Salary Deferral Agreement under this Plan, and will not file a separate Salary Deferral Agreement.

5.3 AMOUNT OF SALARY DEFERRALS: On each pay date, or as soon as reasonably practicable thereafter, following the effective date of an Eligible Executive's Salary Deferral Agreement, his Account shall be credited with an amount of Salary Deferral, if any, for the payroll period ending thereon, as he elects in his Salary Deferral Agreement, provided, however, that no Salary Deferral shall be made under this Plan for any payroll period unless the Eligible Executive is prevented from making elective deferrals under the Tax Savings Thrift Plan for such payroll period as a result of Section 402(g) and/or 401 (k)(3) of the Code, and provided further that, for the payroll period in which such Salary Deferral is first made, it shall be limited to the excess of the amount otherwise determined for such payroll period under this Section 5.3 over the Eligible Executive's elective deferrals under the Tax Savings Thrift Plan for such payroll period.

5.4 EFFECT OF HARDSHIP WITHDRAWAL: In the event a Member makes a Hardship Withdrawal under Section 8.5 of the Plan, his Salary Deferrals under the Plan will be automatically suspended. The Member may apply to the Administrator to resume his Salary Deferrals with respect to payroll periods beginning on or after the January 1 following the date of suspension, at a time and in a manner determined by the Administrator; provided, that the Administrator shall approve such resumption only if the Administrator determines that the Member is no longer incurring such hardship. Notwithstanding the preceding, following a Change of Control, such action by the Administrator is subject to approval by the Benefits Trust Committee.

5.5 CERTAIN ADDITIONAL CREDITS:

On each pay date, or as soon as reasonably practicable thereafter, there shall be credited Matching Credits to the Account of a Member determined as follows: the greater of (a) or (b), minus (c), where

(a) is the employer matching contributions the Member would have received under the Tax Savings Thrift Plan if the provisions of Sections 401 (k)(3), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(b) is the employer matching contributions the Member would have received under the Tax Savings Thrift Plan if his deferrals under this Plan had



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

been contributed to the Tax Savings Thrift Plan (in addition to those amounts actually contributed to that Plan), based on Compensation as defined in this Plan and as if the provisions of Sections 401(a)(17), 401(k)(3), 401(m)(2), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(c) is the employer matching contributions made on his behalf for the applicable period to the Tax Savings Thrift Plan.

ARTICLE 6. EXECUTIVE STOCK DEFERRAL PROGRAM

6.1 STOCK AWARDS: An Eligible Executive who is eligible to receive a Stock Award, the terms of which permit its deferral, may file with the Administrator an Award Deferral Agreement with respect to a Stock Award, pursuant to Article 4.

6.2 EXECUTIVE STOCK ACCOUNT:

(a) A Member's Executive Stock Account will be created when he files his initial Award Deferral Agreement with respect to a Stock Award. An Executive Stock Account will be credited based upon the performance of Company Stock. No Member shall make an Investment Performance Election with respect to his Executive Stock Account.

(b) A Member shall be eligible to file Distribution Elections pursuant to Article 8 and Form of Payment Elections pursuant to Article 9 with respect to his Executive Stock Account. If a Member has not filed a Distribution Election distribution of his Executive Stock Account will be made pursuant to Section 8.1. If a Member has not filed a Form of Payment Election distribution of his Executive Stock Account will be made pursuant to Section 9.1. Distributions from a Member's Executive Stock Account shall be made only in shares of Company Stock.

(c) An Eligible Executive who has previously deferred shares of Company Stock granted pursuant to the CSX Omnibus Incentive Plan ("COIP") or another of the Corporation's stock incentive plans may elect to have an Executive Stock Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Administrator on or before the Effective Date. Filing the Enrollment Form will cause the transfer of such previously deferred share balances to the Member's Executive Stock Account on the Effective Date, and the Member will enjoy all rights and privileges of a Member including the ability to file initial Distribution Elections and Form of Payment Elections. A properly filed Enrollment Form will cause all prior elections made with respect to such previously deferred shares to be void immediately, unless otherwise stated in this Section 6.2.

(i) No initial Distribution Election made pursuant to this Section 6.2 with respect to such previously deferred shares which designates distribution upon attainment of a designated age under Section 8.2(a)(i) that is within one year after the Effective Date shall be filed.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(ii) No initial Distribution Election made pursuant to this Section 6.2 with respect to such previously deferred shares which designates distribution upon the Member's termination of employment with the Affiliated Companies under Section 8.2(a)(ii) shall be effective if distribution would occur within one year after the Effective Date.

(iii) Any prior election made with respect to such previously deferred shares which designates distribution upon the Member's termination of employment with the Affiliated Companies shall remain in effect until one year after the Effective Date, and shall be void thereafter.

6.3 DIVIDEND REINVESTMENT: A Member may elect annually, at such time as the Administrator may prescribe prior to the close of business on November 15 in any calendar year, in the form and manner prescribed by the Administrator to receive credit in his Executive Stock Account for dividends paid on Company Stock, in the amount with which such Executive Stock Account would have been credited assuming it had been invested in Company Stock ("Dividend Equivalents"). Absent such an election, Dividend Equivalents will be paid currently to the Member by the Company.

ARTICLE 7. MAINTENANCE OF ACCOUNTS

7.1 CREATION OF ACCOUNT:

(a) A Member's Account will be created when he files his initial Deferral Agreement.

(b) An Eligible Executive who is a Member of the Supplementary Savings And Incentive Award Deferral Plan For Eligible Executives Of CSX Corporation And Affiliated Companies (the "SSP") may elect to have an Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Administrator on or before the Effective Date. Filing the Enrollment Form will cause the transfer of balances previously deferred under the SSP to the Member's Account on the Effective Date, and the Member will enjoy all rights and privileges of a Member including the ability to file initial Investment Performance Elections, Distribution Elections and Form of Payment Elections. A properly filed Enrollment Form will cause all prior elections made under the SSP to be void immediately, unless otherwise stated in this Section 7.1, however the Member's investment fund allocations under the SSP shall remain in effect for transferred balances until such time as the Member reallocates the current balance of his Account pursuant to section 7.4(b).

(i) No initial Distribution Election made pursuant to this Section 7.1 with respect to such previously deferred amounts which designates distribution upon attainment of a designated age under Section 8.2(a)(i) that is within one year after the Effective Date shall be filed.

(ii) No initial Distribution Election made pursuant to this Section 7.1 with respect to such previously deferred amounts which designates distribution upon the Member's termination of employment



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

with the Affiliated Companies under Section 8.2(a)(ii) shall be effective if distribution would occur within one year after the Effective Date.

(iii) Any prior election made under the SSP which designates distribution upon the Member's termination of employment with the Affiliated Companies shall remain in effect until one year after the Effective Date, and shall be void thereafter.

(c) A Member shall be eligible to file Distribution Elections pursuant to Article 8 and Form of Payment Elections pursuant to Article 9 with respect to his Account. If a Member has not filed a Distribution Election distribution of his Account will be made pursuant to Section 8.1. If a Member has not filed a Form of Payment Election distribution of his Account will be made pursuant to Section 9.1.

7.2 ADJUSTMENT OF ACCOUNT:

(a) As of each pay date, or as soon as reasonably practicable thereafter, each Account shall be credited or debited with the amount of earnings or losses with which such Account would have been credited or debited, assuming it had been invested in one or more investment funds, or earned the rate of return of one or more indices of investment performance, designated by the Administrator and elected by the Member, for purposes of measuring the investment performance of his Account.

(b) The Administrator shall designate at least one investment fund or index of investment performance and may designate other investment funds or investment indices to be used to measure the investment performance of Accounts. The designation of any such investment funds or indices shall not require the Affiliated Companies to invest or earmark their general assets in any specific manner. The Administrator may change the designation of investment funds or indices from time to time, in its sole discretion, and any such change shall not be deemed to be an amendment affecting Members' rights under Section 10.2.

(c) For purposes of Section 7.2(a), the portion of a Member's Account attributable to Matching Credits shall initially be credited based upon the performance of "Fund E" (CSX Stock Fund) under the Tax Savings Thrift Plan.

7.3 INVESTMENT PERFORMANCE ELECTIONS: In the event the Administrator designates more than one investment fund or index of investment performance under Section 7.2, each Member shall file an initial investment performance election with the Administrator with respect to the investment of his Account. The election shall designate the investment fund or funds or index or indices of investment performance, which shall be used to measure the investment performance of the Member's Account. The election shall be made within such time period and on such form as the Administrator may prescribe and shall be in integral percentages of the Member's Account balance or deferral. The election shall be effective as of the beginning of the payroll period next following the date the election is filed. In the event a Member does not file an investment performance election, his Account shall be credited with earnings and losses



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

as if the Account had earned the same rate of return as the Stable Value Fund under the Tax Savings Thrift Plan.

7.4 CHANGING INVESTMENT PERFORMANCE ELECTIONS:

(a) A Member may change his election in Section 7.3 with respect to his Account by filing an appropriate written notice with the Administrator. The notice shall be effective as of the beginning of the first payroll period following the date the notice is filed with the Administrator.

(b) A Member may reallocate the current balance of his Account, thereby changing the investment fund or funds or index or indices of investment performance used to measure the future investment performance of his existing Account balance, by filing an appropriate notice with the Administrator. Such notice shall be effective as soon as administratively practicable following its receipt by the Administrator. A Member may not reallocate the balance of his Executive Stock Account to any investment other than Company Stock.

7.5 VESTING OF ACCOUNT: Each Member shall be fully vested in his Account or Executive Stock Account.

7.6 ACTION FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any action taken by the Administrator pursuant to this Article 7 is subject to the approval of the Benefits Trust Committee.

ARTICLE 8. DISTRIBUTION OF BENEFITS

8.1 COMMENCEMENT OF DISTRIBUTION: The distribution of the Member's Account or Executive Stock Account shall commence on the date that is one year following the Member's termination of employment with the Affiliated Companies, or at such time as may be designated by the Member on a Distribution Election pursuant to Section 8.2.

8.2 DISTRIBUTION ELECTION

(a) A Member may file with the Administrator a Distribution Election for the distribution upon:

(i) attainment of a designated age not earlier than age 50 nor later than age 70-1/2, however he shall not elect an age less than one year subsequent to his current age; or

(ii) termination of employment with the Affiliated Companies.

(b) A Member may file with the Administrator a Partial Distribution Election for the distribution on attainment of a designated age for the payment of the expenses directly or indirectly arising from enrollment in a college, university, another post-secondary institution of higher learning or a secondary educational institution in the name of one or more of:



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(i) each of the Member's children,

(ii) each of the Member's brothers, sisters, their spouses, the Member's spouse, or

(iii) each of the foregoing's lineal descendants.

(c) A Member may file a Distribution Election or change a Distribution Election at any time prior to:

(i) a date that is 30 days subsequent to the date of his termination of employment in the case of his initial Distribution Election; or

(ii) one year prior to the date distribution is to commence under his Distribution Election then in effect, after which time no Distribution Election shall be filed.

(d) A Member may make a Partial Distribution Election with respect to any portion of his Account or Executive Stock Account, provided no Distribution Election shall be made for a portion of an Account or Executive Stock Account less than $2,000, as determined as of the date the election is made. No Member shall have more than four Distribution Elections in effect at any time.

(e) In no event may distribution made pursuant to a Distribution Election commence prior to a date that is three years subsequent to the date the Member first makes a Salary Deferral or Award Deferral under either this Plan, the SSP, the COIP or another of the Corporation's stock incentive plans for which an Executive Stock Account has been established.

(f) For purposes of this Plan and particularly this Article 8, if the Member's employer is involved in a Divisive Transaction, the Member will be considered to have terminated his employment with an Affiliated Company on the closing date of the Divisive Transaction, provide the Member's employment with his employer has not otherwise terminated prior to that date.

(g) Notwithstanding anything in Section 8.1 or 8.2 to the contrary, upon death of a Member, the balance of his Account or Executive Stock Account shall be distributed to his beneficiary as soon as administratively practicable following the January 1 coincident with or next following his date of death.

(h) Any Distribution Election made in proper form by a Member shall be effective and distribution shall commence pursuant to such Distribution Election. Any Distribution Election not made in proper form shall be void.

8.3 DELAY OF PAYMENT

(a) Notwithstanding the foregoing, prior to a Change of Control, the Corporation may delay payment of a benefit under this Plan to any Member who is determined to be among the top five most highly paid executives for the year the benefit under this Plan would otherwise be paid; provided, however, if a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Member's payment is delayed, the benefit to which he is entitled will not decrease after the date it would otherwise be distributed.

(b) Notwithstanding the preceding, following a Change of Control, the authority to delay payment of a Member's Account or Executive Stock Account rests solely with the Benefits Trust Committee.

8.4 ACCOUNT ADJUSTMENT: The obligations of the Corporation or any of its affiliated corporations and the benefits due any Member, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the Benefits Assurance Trust or any similar trust or other vehicle.

8.5 HARDSHIP WITHDRAWAL, FORFEITURE:

(a) While employed by the Participating Companies, a. Member may, in the event of a severe financial hardship, request a withdrawal from his Account or Executive Stock Account without filing a Distribution Election under Section 8.2. The request shall be made in a time and manner determined by the Administrator, shall not be for a greater amount than the amount required to meet the financial hardship, and shall be subject to approval by the Administrator. The Administrator shall consider any requests for payment under this Section 8.5 on a uniform and nondiscriminatory basis and in accordance with the standards of interpretation described in section 457 of the Code and the regulations thereunder. The circumstances that will constitute a severe financial hardship will depend upon the facts of each case, but, in any case, no withdrawal may be made to the extent that such hardship is or may be relieved: (i) through reimbursement or compensation by available insurance or otherwise or (ii) by liquidation of the Member's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship.

(b) For purposes of this Section 8.5 severe financial hardship may include any of the following circumstances:

(i) illness or injury of the Member or his dependents,

(ii) the loss of the Member's home or its contents due to casualty, or

(iii) any other extraordinary and unforeseeable circumstances of the Member approved by the Administrator,

as long as those circumstances result in a present or impending critical financial need, including the inability to educate the Member's dependent child(ren).

(c) Notwithstanding the preceding, a Member may request and receive a withdrawal from his Account or Executive Stock Account at any time without filing a Distribution Election under Section 8.2. Any such withdrawal which is not determined by the Administrator to be a hardship withdrawal under this Section 8.5 shall result in the forfeiture of an amount equal to the portion of the Member's Account or Executive Stock Account, as applicable, that is withdrawn,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

multiplied by the Mid-term Applicable Federal Rate determined as of the Valuation Date upon which the withdrawal is effective.

(d) Notwithstanding the preceding, following a Change of Control, any decisions or determinations by the Administrator under this Section 8.5 shall be subject to the approval of the Benefits Trust Committee.

8.6 DESIGNATION OF BENEFICIARY: A Member may, at a time and in a manner determined by the Administrator, designate a beneficiary and one or more contingent beneficiaries (which may include the Member's estate) to receive any benefits which may be payable under this Plan upon his death. If the Member does not designate a beneficiary or contingent beneficiary, or if the beneficiary and the contingent beneficiaries do not survive the Member, such benefits shall be paid to the Member's estate. A Member may revoke or change any designation made under this Section 8.6 in a time and manner determined by the Administrator.

8.7 SPECIAL DISTRIBUTION RULES: Notwithstanding anything to the contrary in this Plan, if (a) a Member becomes the owner, director or employee of a competitor of the Affiliated Companies, (b) his employment is terminated by an Affiliated Company on account of actions by the Member which are detrimental to the interests of the Affiliated Company, or (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company, then the Administrator may, in its sole discretion, pay the Member a single sum payment or, in the case of an Executive Stock Account, a distribution in shares of Company Stock equal to the balance in his Account or Executive Stock Account. The single sum payment or distribution of shares shall be made as soon as practicable following the date the Member becomes an owner, director or employee of a competitor, his termination of employment or the Administrator's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Member under this Plan.

8.8 STATUS OF ACCOUNT PENDING DISTRIBUTION:

(a) Pending distribution, a Member's Account shall continue to be credited with earnings and losses as provided in Section 7.2. The Member shall be entitled to change his investment elections under Section 7.3 or apply for Hardship withdrawals under Section 8.5. In the event of the death of a Member, his Account shall be credited with earnings and losses as if the Account had earned the same rate of return as the CSX Corporation Cash Pool Earnings Rate or, in the sole discretion of the Administrator, the rate of return of such other index of investment performance or investment fund which may be designated by the Administrator as a measure for investment performance of Members' Accounts commencing with the Valuation Date coincident with or next following the Member's date of death.

(b) Pending distribution, a Member's Executive Stock Account shall continue to be credited based on the performance of Company Stock as provided in Section 6.2.

8.9 ONE-TIME RE-DEFERRAL ELECTION: A Member may make one additional election to defer (but not accelerate) commencement of payment under the Plan at any



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

time six months before payments are to have commenced pursuant to Section 8.1 or 8.2 ("Re-deferral Election). Such Re-deferral Election shall be made in a form prescribed by the Administrator. If such Re-deferral Election is to a designated age the re-deferral shall be for a period not less than one year from the date the Re-deferral Election is made.

8.10 CHANGE OF CONTROL:

(a) A Member shall be eligible to make a separate Distribution Election which shall be effective only in the event of a Change of Control.

(b) If a Change of Control has occurred, the Corporation and Participating Companies shall contribute to the Trust within 7 days of such Change of Control, a lump sum payment equal to the greater of (i) the aggregate value of the amount each Member would be eligible to receive (determined under (b) below) as of the latest Valuation Date coinciding with or preceding the date of Change of Control or (ii) the amount determined under Section 1(h) of the Trust attributable to liabilities relating to the Plan to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 8.10 shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Members' Accounts or Executive Stock Accounts for which information is readily available. Thereafter, the Independent Accountants shall annually determine as of a Valuation Date for each Member not receiving a lump sum payment pursuant to subsection (c) below the value of each Member's Accounts or Executive Stock Accounts. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by the Independent Accountants, the Corporation and Participating Companies shall make a lump sum contribution to the Trust equal to the difference.

(c) In the event a Distribution Event has occurred, the trustee of the Trust shall, within 45 days of such Distribution Event, pay to each Member not making an election under (d) below, a lump sum payment or, in the case of an Executive Stock Account, a distribution in shares of Company Stock equal to the value of the Member's Account or Executive Stock Account (determined under Article 6) as of the Valuation Date coinciding with or next preceding the date of such Distribution Event. The amount of each Member's lump sum payment or Company Stock distribution shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Member's Account or Executive Stock Account for which information is readily available.

(d) Each Member may elect in a time and manner determined by the Administrator, but in no event later than 90 days following the Effective Date, to have amounts and benefits determined and payable under the terms of the Plan as if a Distribution Event had not occurred. New Members of the Plan may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Member, to have amounts and benefits determined

and payable under the terms of the Plan as if a Distribution Event had not occurred. A Member who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Distribution Event shall be invalid.

(e) Notwithstanding anything in the Plan to the contrary, each Member who has made an election under (d) above may elect within 90 days following a Distribution Event, in a time and manner determined by the Benefits Trust Committee, to receive a lump sum payment or, in the case of an Executive Stock Account, a distribution in shares of Company Stock, calculated under the provisions of (b) above determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by an amount equal to such calculated amount, multiplied by the Mid-term Applicable Federal Rate determined as of the Valuation Date next preceding such payment and such reduction shall be irrevocably forfeited by the Member. Furthermore, as a result of such election, the Member shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this subsection (e) shall be made not later than 7 days following receipt by the Corporation of a Member's election. The Benefits Trust Committee shall, no later than 7 days after a Distribution Event has occurred, give written notification to each Member eligible to make an election under this subsection (e), that a Distribution Event has occurred and informing such Member of the availability of the election.

ARTICLE 9. FORM OF PAYMENT

9.1 TINNING OF DISTRIBUTION: Unless a Form of Payment Election is made pursuant to Section 9.2 below,

(a) a Member's Account shall be distributed to him, or in the event of his death to his Beneficiary, in a cash single sum payment as provided in Section 8.1.

(b) a Member's Executive Stock Account shall be distributed to him, or in the event of his death to his Beneficiary, in a single distribution of shares as provided in Section 8.1.

9.2 FORM OF PAYMENT ELECTION

(a) A Member may make a Form of Payment Election to receive distribution of his Account or Executive Stock Account in semi-annual installments over a period not to exceed twenty (20) years. Installments shall be determined as of each January 15 and July 15 (or in the case of an Executive Stock Account, December 30 and June 30) and shall be paid as soon as administratively practicable thereafter. The amount of each installment shall equal the balance in the Account or Executive Stock Account as of the Valuation Date of determination, divided by the number of remaining installments (including the installment being determined). If a Member dies before payment of the entire balance of his Account or Executive Stock Account, the remaining balance shall be paid in a single sum to his beneficiary as soon as administratively practicable following his date of death. Lump sum payments shall be determined and paid



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

as soon as administratively practicable following the date the Member incurs the distributable event elected on a Distribution Election under Section 8.2.

(b) A Member may make a separate Form of Payment Election with respect to any portion of his Account for which a Partial Distribution Election has been made pursuant to Section 8.2(d).

(c) A Member may change his Form of Payment Election at any time prior to a date that is six months prior to the date the distribution is to commence, after which time the Form of Payment Election shall be irrevocable.

9.3 INSTALLMENTS AND WITHDRAWALS PRO-RATA: In the event of any payment other than a single lump-sum, such as installment payment, partial distribution or hardship withdrawal, such payment or withdrawal shall be made on a pro-rata basis from the portions of the Member's existing Account balance which are subject to different measures of investment performance.

ARTICLE 10. AMENDMENT OR TERMINATION

10.1 RIGHT TO TERMINATE:

(a) Prior to a Change of Control, the Board may, in its sole discretion, terminate this Plan and the related Deferral Agreements at any time. Following a Change of Control, this Plan may not be terminated without the approval of the Benefits Trust Committee.

(b) Prior to a Change of Control, the Committee may terminate an Affiliated Company's participation as a Participating Company in this Plan for any reason at any time. Following a Change of Control, an Affiliated Company may not be terminated from participation as a Participating Company without the consent of the Benefits Trust Committee.

(c) Prior to a Change of Control, an Affiliated Company's board of directors may terminate that Affiliated Company's participation as a Participating Company for any reason at any time. Following a Change of Control, an Affiliated Company's participation as a Participating Company may not be terminated without the consent of the Benefits Trust Committee.

(d) In the event the Plan and related Deferral Agreements are terminated, each Member and Beneficiary shall receive a single sum payment, or, in the case of an Executive Stock Account, a distribution in shares of Company Stock equal to the balance in his Account or Executive Stock Account. The single sum payment shall be made as soon as practicable following the date the Plan is terminated and shall be in lieu of any other benefit which may be payable to the Member or beneficiary under this Plan.

10.2 RIGHT TO AMEND: Prior to a Change of Control, the Board may, in its sole discretion, amend this Plan and the related Deferral Agreements and Enrollment Forms on 30 days prior notice to the Members. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee. If any amendment to this Plan or to the Deferral Agreements or Enrollment Forms shall



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

adversely affect the rights of a Member, such Member must consent in writing to such amendment prior to its effective date. If such Member does not consent to the amendment, the Plan and related Deferral Agreements and Enrollment Forms shall be deemed to be terminated with respect to such Member and he shall receive a single sum payment of his Account, or, in the case of an Executive Stock Account, a distribution in shares of Company Stock, as soon thereafter as is practicable. Notwithstanding the foregoing, the Administrator's change in any investment funds or investment index under Section 7.2(b) or the restriction of future deferrals under the salary deferral program or award deferral program shall not be deemed to adversely affect any Member's rights.

10.3 UNIFORM ACTION: Notwithstanding anything in the Plan to the contrary, any action to amend or terminate the Plan or the Deferral Agreements or Enrollment Forms must be taken in a uniform and nondiscriminatory manner. Notwithstanding the preceding, any such action taken by the Administrator following a Change of Control is subject to the approval of the Benefits Trust Committee.

ARTICLE 11. GENERAL PROVISIONS

11.1 NO FUNDING: Nothing contained in this Plan or in a Deferral Agreement shall cause this Plan to be a funded retirement plan. Neither the Member, his beneficiary, contingent beneficiaries, heirs or personal representatives shall have any right, title or interest in or to any funds of the Trust or the Affiliated Companies on account of this Plan or on account of having completed a Deferral Agreement or Enrollment Form. The assets held in the Trust shall be subject to the claims of creditors of the Corporation, and the Trust's assets shall be used to discharge said claims in the event of the Corporation's insolvency. Each Member shall have the status of a general unsecured creditor of the Affiliated Companies and this Plan constitutes a mere promise by the Affiliated Companies to make benefit payments in the future.

11.2 OBLIGATION: To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

11.3 NO CONTRACT OF EMPLOYMENT: The existence of this Plan, a Deferral Agreement or an Enrollment Form does not constitute a contract for continued employment between an Eligible Executive or a Member and an Affiliated Company. The Affiliated Companies reserve the right to modify an Eligible Executive's or Member's remuneration and to terminate an Eligible Executive or a Member for any reason and at any time, notwithstanding the existence of this Plan, a Deferral Agreement or an Enrollment Form.

11.4 WITHHOLDING TAXES: All applicable FICA, RRTA or other employment taxes due on deferrals under this Plan shall be withheld from non-deferred salary, Awards or other earnings. All payments under this Plan shall be net of an amount sufficient to satisfy any federal, state or local income tax withholding requirements.

11.5 NONALIENATION: The right to receive any benefit under this Plan may not be transferred, assigned, pledged or encumbered by a Member, beneficiary or contingent beneficiary in any manner and any attempt to do so shall be void. No such benefit shall be subject to garnishment, attachment or other legal or equitable process without the prior written consent of the Affiliated Companies. Notwithstanding the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

preceding, following a Change of Control, the Administrator shall not implement such action without the consent of the Benefits Trust Committee.

11.6 ADMINISTRATION:

(a) Prior to a Change of Control, the Administrator of the Plan shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms and conditions of the Plan.

(b) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(c) The Administrator shall have sole and absolute discretion to interpret the Plan, determine eligibility for and benefits due hereunder. Decisions of the Administrator regarding benefits under the Plan shall at all times be binding and conclusive on Members, their beneficiaries, heirs and assigns. Notwithstanding the preceding, following a Change of Control, final benefit determinations for Members, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

(d) Prior to paying any benefit under this Plan, the Administrator may require the Member, beneficiary or contingent beneficiary to provide such information or material as the Administrator, in its sole discretion, shall deem necessary for it to make any determination it may be required to make under this Plan. The Administrator may withhold payment of any benefit under this Plan until it receives all such information and material and is reasonably satisfied of its correctness and genuineness. The Administrator shall provide adequate notice in writing to any Member, beneficiary or contingent beneficiary whose claim for benefits under this Plan has been denied, setting forth the specific reasons for such denial. A reasonable opportunity shall be afforded to any such Member, beneficiary or contingent beneficiary for a full and fair review by the Administrator of its decision denying the claim. The Administrator's decision on any such review shall be final and binding on the Member, beneficiary or contingent beneficiary and all other interested persons. All acts and decisions of the Administrator shall be final and binding upon all Members, beneficiaries, contingent beneficiaries and employees of the Affiliated Companies. Notwithstanding the preceding, following a Change of Control, any and all decisions by the Administrator are subject to the approval of the Benefits Trust Committee.

(e) Prior to a Change of Control, the Committee in its sole discretion and upon such terms as it may prescribe, may permit any company or corporation directly or indirectly controlled by the Corporation to participate in the Plan. After a Change of Control, such permission must be approved by the Benefits Trust Committee.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

11.7 IMPACT OF FUTURE LEGISLATION OR REGULATION

(a) This Section 11.7 shall become operative upon the enactment of any change in applicable statutory law or the promulgation by the Internal Revenue Service of a final regulation or other pronouncement having the force of law, which statutory law, as changed, or final regulation or pronouncement, as promulgated, would cause any Member to include in his or her federal gross income amounts accrued by the Member under the Plan on a date (an "Early Taxation Event") prior to the date on which such amounts are made available to him or her hereunder.

(b) Notwithstanding any other Section of this Plan to the contrary (but subject to subsection (c), below), as of an Early Taxation Event, the feature or features of this Plan, or the election by a Member that would cause the Early Taxation Event shall be null and void, to the extent, and only to the extent, required to prevent the Member from being required to include in his federal gross income amounts accrued by the Member under the Plan prior to the date on which such amounts are made available to him hereunder. By way of example, but not by way of limiting the generality of the foregoing, if a statute is enacted that would require a Member to include in his or her federal gross income amounts accrued by the Member under the Plan prior to the date on which such amounts are made available to him or her because of the Member's right to receive a distribution of a portion of his Account under Section 8.5, the right of all Members to receive distributions under Section 8.5 shall be null and void as of the effective date of that statute. If only a portion of a Member's Account is impacted by the change in the law, then only such portion shall be subject to this Section, with the remainder of the Account not so affected being subject to such rights and features as if the law were not changed. If the law only impacts Members who have a certain status with respect to the Company, then only such Members shall be subject to this Section.

(c) Notwithstanding Section 11.7(b) above, if an Early Taxation Event occurs (e.g., if a change in law is retroactive), the amounts that become taxable on the Early Taxation Event shall be distributed to each Participant as soon as practicable following such Early Taxation Event or if later, the date or enactment or promulgation.

11.8 CONSTRUCTION:

(a) The Plan is intended to constitute an unfunded deferred compensation arrangement for a select group of management or highly compensated employees and all rights hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia to the extent not preempted by federal law.

(b) The masculine pronoun means the feminine wherever appropriate.

(c) The captions inserted herein are inserted as a matter of convenience and shall not affect the construction of the Plan.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT

2002 DEFERRED COMPENSATION PLAN OF
CSX CORPORATION AND AFFILIATED COMPANIES

Pursuant to Section 10.2 of the 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Companies (the "Plan"), the Plan is amended effective February 7, 2003 as follows:

Section 8.7 is amended to read as follows:

> "Notwithstanding anything to the contrary in this Plan, if (a) a Member becomes the owner, director or employee of a competitor of the Affiliated Companies; (b) his employment is terminated by an Affiliated Company on account of actions by the Member which are detrimental to the interests of the Affiliated Company; (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company; or (d) is required to divest his or her interest under the Plan under applicable law, regulation or rules, then the Administrator may, in its sole discretion, pay the Member a single sum payment equal to the balance in his Account. In such event, the single sum payment shall be made as soon as practicable following the date the Member is affected by one of the circumstances described in this Section 8.7 and such payment shall be in lieu of all other benefits which may be payable to the Member under this Plan."


Powered by Morningstar® Document Research℠

EXHIBIT 10.27

# SUPPLEMENTARY SAVINGS AND INCENTIVE AWARD DEFERRAL PLAN FOR ELIGIBLE EXECUTIVES OF CSX CORPORATION AND AFFILIATED COMPANIES

As Amended and Restated January 1, 1995
(As Amended through September 8, 1999)


Powered by Morningstar® Document Research℠

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE 1. DEFINITIONS | | 1 |
| 1.1 | Account | 1 |
| 1.2 | Administrator | 1 |
| 1.3 | Affiliated Company | 1 |
| 1.4 | Award | 1 |
| 1.5 | Award Deferral Agreement | 1 |
| 1.6 | Benefits Trust Committee | 2 |
| 1.7 | Board of Directors | 2 |
| 1.8 | Change of Control | 2 |
| 1.9 | Code | 3 |
| 1.10 | Committee | 3 |
| 1.11 | Compensation | 3 |
| 1.12 | Corporation | 3 |
| 1.13 | Deferral Agreement | 3 |
| 1.14 | Distribution Option(s) | 4 |
| 1.15 | Divisive Transaction | 4 |
| 1.16 | Effective Date | 4 |
| 1.17 | Eligible Executive | 4 |
| 1.18 | Independent Accountant | 4 |
| 1.19 | Matching Credits | 4 |
| 1.20 | Member | 4 |
| 1.21 | MICP | 4 |
| 1.22 | Participating Company | 4 |
| 1.23 | Plan | 5 |
| 1.24 | Salary Deferrals | 5 |
| 1.25 | Salary Deferral Agreement | 5 |
| 1.26 | Salary Deferral Percentage | 5 |
| 1.27 | SMICP | 5 |
| 1.28 | Subsidiary | 5 |
| 1.29 | Tax Savings Thrift Plan | 5 |
| 1.30 | Trust | 5 |
| 1.31 | Valuation Date | 5 |
| ARTICLE 2. MEMBERSHIP AND DEFERRAL AGREEMENTS | | 5 |
| 2.1 | In General | 5 |
| 2.2 | Modification of Initial Deferral Agreement | 6 |
| 2.3 | Termination of Membership; Re-employment | 6 |
| 2.4 | Change in Status | 7 |
| 2.5 | Membership Following a Change in Control | 7 |
| ARTICLE 3. AWARD DEFERRAL PROGRAM | | 7 |
| 3.1 | Filing Requirements | 7 |
| 3.2 | Amount of Deferral | 8 |
| 3.3 | Crediting to Account | 8 |



Powered by Morningstar® Document Research℠

| | | Page |
|---|---|---|
| ARTICLE 4. SALARY DEFERRAL PROGRAM | | 9 |
| 4.1 | Filing Requirements | 9 |
| 4.2 | Salary Deferral Agreement | 9 |
| 4.3 | Amount of Salary Deferrals | 9 |
| 4.4 | Changing Salary Deferrals | 10 |
| 4.5 | Certain Additional Credits | 10 |
| ARTICLE 5. MAINTENANCE OF ACCOUNTS | | 11 |
| 5.1 | Adjustment of Account | 11 |
| 52 | Investment Performance Elections | 12 |
| 5.3 | Changing Investment Elections | 12 |
| 5.4 | Vesting of Account | 12 |
| 5.5 | Individual Accounts | 13 |
| 5.6 | Action Following a Change of Control | 13 |
| ARTICLE 6. PAYMENT OF BENEFITS | | 13 |
| 6.1 | Commencement of Payment | 13 |
| 6.2 | Method of Payment | 15 |
| 6.3 | Applicability | 16 |
| 6.4 | Hardship Withdrawal | 16 |
| 6.5 | Designation of Beneficiary | 16 |
| 6.6 | Special Distribution Rules | 17 |
| 6.7 | Status of Account Pending Distribution | 17 |
| 6.8 | Installments and Withdrawals Pro-Rata | 17 |
| 6.9 | Change of Control | 18 |
| ARTICLE 7. AMENDMENT OR TERMINATION | | 19 |
| 7.1 | Right to Terminate | 19 |
| 7.2 | Right to Amend | 19 |
| 7.3 | Uniform Action | 20 |
| ARTICLE 8. GENERAL PROVISIONS | | 20 |
| 8.1 | No Funding | 20 |
| 8.2 | Obligation | 20 |
| 8.3 | No Contract of Employment | 20 |
| 8.4 | Withholding Taxes | 20 |
| 8.5 | Nonalienation | 20 |
| 8.6 | Administration | 20 |
| 8.7 | Construction | 21 |
| ARTICLE 9. POST-SECONDARY EDUCATION SUB-ACCOUNTS | | 21 |
| 9.1 | Post-Secondary Education Sub-accounts | 21 |
| 9.2 | Distribution of Post-Secondary Education Sub-accounts | 22 |
| 9.3 | Construction | 23 |

INTRODUCTION

This Supplementary Savings and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (the "Plan") was adopted October 1, 1987 and has been subsequently amended from time to time. This restatement of the Plan is effective January 1, 1995. This Plan is generally intended to provide certain executives eligible to participate in the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies (the "Savings Plan") with an opportunity to defer a portion of their salary, and/or award(s) under the Management Incentive Compensation Program ("MICP") and/or the Senior Management Incentive Compensation Program ("SMICP") until their retirement or other termination of employment and to restore employer matching contributions lost under the Savings Plan because of the application of Sections 401(aX17), 401(k), 401(m) and 415 of the Internal Revenue Code of 1986, as amended. Commencing with respect to MICP awards paid and salary earned after 1990, eligible executives may, if they so elect, designate all or a portion of such deferrals to be used for payment of education expenses for one or more members of their families. The Plan is unfunded and is maintained by CSX Corporation and Affiliated Companies primarily for the purpose of providing deferred compensation for a select group of management or highly-compensated employees. The Plan as restated effective January 1, 1995 (and amended through December 31, 1997) reads as hereinafter set forth.

ARTICLE I. DEFINITIONS

1.1 ACCOUNT MEANS the bookkeeping account maintained for each Member to record his Salary Deferrals, Matching Credits and the amount of Awards he has elected to defer, as adjusted pursuant to Article 5. The Account shall consist of the "Education Sub-accounts", if any, established pursuant to Article 9 and all amounts not in those accounts shall be allocated to one or more "Retirement Sub- accounts". The Administrator may establish a maximum number of "Retirement Sub-accounts" which a Member may have at any time. In addition to any Retirement Sub-accounts established by the Administrator, an additional Retirement Sub-account known as the Cash Plan Retirement Sub-account shall be established for deferrals of payments from the CSX Market Value Cash Plan. The Administrator also may establish such other sub-accounts within a Member's Account as it deems necessary to implement the provisions of the Plan.

1.2 ADMINISTRATOR means the Corporation. The duties of the Administrator shall be performed by a person or persons designated by the Chief Executive Officer of the Corporation to perform such duties.

13 AFFILIATED Company means the Corporation and any company or corporation directly or indirectly controlled by the Corporation.

1.4 AWARD means for any year (i) the amount awarded to an employee of an Affiliated Company for that year (including any special incentive award) and, in the absence of an Award Deferral Agreement with respect to such amount, payable in the succeeding year under the MICP and/or SMICP or other incentive award otherwise payable in cash as determined by the Committee; and (ii) the amount paid from the CSX Market Value Cash Plan with respect to such year and, in the absence of an Award Deferral Agreement with respect to such amount and with respect to such year, payable in cash under the CSX Market Value Cash Plan.

1.5 AWARD DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the award deferral program described in Article 3.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.6 BENEFITS TRUST Committee means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement.

1.7 BOARD OF DIRECTORS or "Board" means the Board of Directors of the Corporation.

1.8 CHANGE OF CONTROL means any of the following:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(dX3) or 14(dX2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Corporation; (ii) any acquisition by the Corporation; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(e) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

1.9 CODE means the Internal Revenue Code of 1986, as amended from time to time.

1.10 COMMITTEE means the Compensation Committee of the Board of Directors of CSX Corporation.

1.11 COMPENSATION means the "Base Compensation" of an Eligible Executive as defined in the Tax Savings Thrift Plan, determined prior to: (a) any Salary Deferrals under Article 4; and (b) any limit on compensation imposed by Section 401(a)(17) of the Code.

1.12 CORPORATION means CSX Corporation, a Virginia corporation, and any successor thereto by merger, purchase or otherwise. 1.13 Deferral Agreement means either an Award Deferral Agreement or a Salary Deferral Agreement, or both if the context so requires. A Deferral Agreement shall be a completed agreement between an Eligible Executive and a Participating Company of which he is an employee under which the Eligible Executive agrees to defer an Award or make Salary Deferrals under the Plan, as the case may be. The Deferral Agreement shall be on a form prescribed by the Administrator and shall include any amendments, attachments or appendices.

1.14 DISTRIBUTION OPTION(S) means, with respect to each sub-account under the Plan, the election by the Member of (i) the event triggering the commencement of distribution, and (ii) the form of 1.11



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

payment. Distribution Option elections are made on the initial Deferral Agreement with respect to any sub-account.

1.15 DIVISIVE TRANSACTION means a transaction in which the Eligible Executive's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

1.16 EFFECTIVE DATE means October 1, 1987 or with respect to the Eligible Executives of a company which adopts the Plan, it means the date such company becomes a Participating Company.

1.17 ELIGIBLE EXECUTIVE means an employee of a Participating Company, provided that:

(a) For purposes of the award deferral program described in Article 3:

(i) prior to January 1, 1995, such employee is employed by a Participating Company in salary grades 21 through 40 inclusive, as of December 30 of the calendar year in question; or

(ii) on and after January 1, 1995 and before January 1, 1999, such employee: (A) is employed by a Participating Company and is receiving Compensation of one hundred thousand dollars ($100,000) or more per year; or (B) retired from the Participating Companies or terminated employment with the Participating Companies on account of disability as determined by the Administrator, and was receiving compensation of one hundred thousand dollars ($100,000) or more per year at the time of such retirement or termination; or

(iii) on and after January 1, 1999, such employee: (A) is employed by a Participating Company and is receiving compensation of one hundred twenty five thousand dollars ($125,000) or more per year; or (B) retired from the Participating Companies or terminated employment with the Participating Companies on account of disability as determined by the Administrator, and was receiving Compensation of one hundred twenty five thousand dollars ($125,000) or more per year at the time of such retirement or termination. An employee who, in 1998, was eligible to participate because his Compensation satisfied the requirements of subsection (ii), and is excluded from participation only because of the increase in the Compensation requirement in this subsection (iii), shall continue to be eligible to participate.

(b) For purposes of the salary deferral program described in Article 4, such employee is eligible for membership in the Tax Savings Thrift Plan, and;

(i) Prior to January 1, 1995, such employee is employed in salary grades 21 through 40 inclusive; or

(ii) Compensation of one hundred thousand dollars ($100,000) or more per year; or

(iii) on and after January 1, 1999, is receiving Compensation of one hundred twenty five thousand dollars ($125,000) or more per year. An employee who, in 1998, was eligible to participate because his Compensation satisfied the requirements of subsection (ii), but is excluded from participation only because of the increase in the Compensation requirement in this subsection (iii), shall continue to be eligible to participate.

(c) After January 1, 1999, the compensation amount set forth in subsections (a)(iii) and (b)(iii) may, in the discretion of the Chief Executive Officer, be adjusted no more frequently than annually, based on a review of data regarding eligibility to participate in this type of program.

(d) The Chief Executive Officer of the Corporation or his designee may designate any other employee or former employee of an Affiliated Company as an Eligible Executive; provided, however, only those employees or former employees considered to be a select group of management or highly compensated may be designated as Eligible Executives under this Plan. Notwithstanding the preceding, following a Change of Control, such designations are subject to the approval of the Benefits Trust Committee.

1.18 INDEPENDENT ACCOUNTANT means the independent accountants engaged by the Corporation and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee. 1.19 Matching Credits means amounts credited to the Account of a Member pursuant to Section 4.5.

1.20 MEMBER means, except as otherwise provided in Article 2, each Eligible Executive who has executed an initial Deferral Agreement as described in Section 2.1.

1.21 MICP means the Participating Companies' Management Incentive Compensation Program.

1.22 PARTICIPATING COMPANY means the Corporation and any company or corporation directly or indirectly controlled by the Corporation, which the Committee designates as eligible to participate in the Plan in accordance with Section 8.6(e).

1.23 PLAN means this Supplementary Savings and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies, as amended from time to time.

1.24 SALARY DEFERRALS means the amounts credited to a Member's Account under Section 4.3.

1.25 SALARY DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the salary deferral program described in Article 4.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.26 SALARY DEFERRAL PERCENTAGE means a percentage of an Eligible Executive's Base Compensation elected in a Salary Deferral Agreement, pursuant to Section 4.1 hereof, and shall be an integral percentage not in excess of fifty (50%) percent.

1.27 SMICP means the Participating Companies' Senior Management Incentive Compensation Program.

128 SUBSIDIARY means a corporation more than 50% of the voting shares of which are owned directly or indirectly by the Corporation.

1.29 TAX SAVINGS THRIFT PLAN means the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies, as amended from time to time. 1.30 Trust means the CSX Corporation and Affiliated Companies Benefits Assurance Trust. 1.31 Valuation Date means the last business day of each calendar month following the Effective Date.

ARTICLE 2. MEMBERSHIP AND DEFERRAL AGREEMENTS

2.1 IN GENERAL:

(a) An Eligible Executive shall become a Member as of the date he files his initial Deferral Agreement with the Administrator. However, such Deferral Agreement shall be effective for purposes of deferring an Award or making Salary Deferrals only as provided in Articles 3 and 4.

(b) A Deferral Agreement shall be in writing and properly completed upon a form approved by the Administrator, which shall be the sole judge of the proper completion thereof. Except as provided in Section 4.1(d), such Agreement shall provide for the deferral of an Award or for Salary Deferrals, shall specify the Distribution Options, and may include such other provisions as the Administrator deems appropriate. A Deferral Agreement shall not be revoked or modified with respect to the allocation of prior deferrals except pursuant to the establishment of an Education Sub-account as provided in Article 9. Distribution Options elected may not be modified or revoked except as provided in Section 6.1 or 6.2.

(c) As a condition of membership, the Administrator may require such other information as it deems appropriate.

2.2 MODIFICATION OF INITIAL DEFERRAL AGREEMENT:

(a) A Member may elect to change, modify or revoke a Deferral Agreement as follows:

(i) A Member may change the amount of Award he elects to defer on an Award Deferral Agreement prior to the Agreement's effective date as provided in Article 3.

(ii) A Member may change the rate of his Salary Deferrals, or suspend his Salary Deferrals on account of severe financial hardship, as provided in Article 4.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(iii) A Member may change the event entitling him to distribution, as designated on his election of Distribution Options, as provided in Section 6.1(c)(i).

(iv) A Member may change the event entitling him to distribution as designated on his election of Distribution Options, subject to the five percent (5%) penalty described in Section 6. l(c)(ii).

(v) A Member may change the form of payment, as designated on his election of Distribution Options, as provided in Section 6.2(c)(i).

(vi) A Member may change the form of payment as designated on his election of Distribution Options, subject to the five percent (5%) penalty described in Section 6.2(c)(ii).

(b) Notwithstanding any provision in Section 2.2(a) to the contrary, the establishment of an Education Sub-account with respect to future Salary Deferrals and Awards as provided in Article 9 shall not be deemed a change for the purposes of Section 2.2(a).

2.3 TERMINATION OF MEMBERSHIP; RE-EMPLOYMENT:

(a) Membership shall cease, subject to Section 2.4, upon a Member's termination of employment; provided that if a former Eligible Executive is receiving severance payments under a Participating Company's severance pay program or is eligible to defer an Award under Article 3, he shall not be deemed to have terminated employment until the later of the date the severance payments cease or the date the Award would have been paid. Membership shall be continued during a leave of absence approved by the Participating Companies.

(b) Upon re-employment as an Eligible Executive, a former Member may become a Member again as follows:

(i) in the case of a former Member who prior to re-employment received the balance in his Account, by executing a Deferral Agreement under Section 2.1 as though for all purposes of the Plan the Affiliated Companies had never employed the former Member,

(ii) in the case of a former Member who prior to re-employment did not receive the balance in his Account, by executing a Deferral Agreement under Section 2.1; provided his Distribution Options and beneficiary designation shall remain in effect.

(c) If a former Member is reemployed as an Eligible Executive and becomes a Member again pursuant to (b)(ii): (i) upon notice to the Administrator by the Participant, distributions from a Retirement Sub-account shall cease if the commencement of distribution was because of the Member's termination of employment (including retirement); (ii) distributions from a Retirement Sub-account shall continue if the commencement of distribution was because the Member chose a specific age for the commencement of benefits and that age has been attained. Except for distributions which must continue pursuant to (c)(ii), a reemployed Member may change Distribution Option elections with respect to his Retirement Sub-accounts without penalty so long as such change does not accelerate the timing of any payment to the Member.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

2.4 CHANGE IN STATUS:

(a) In the event that a Member ceases to be an Eligible Executive with respect to Salary Deferrals but continues to be employed by an Affiliated Company, his Salary Deferrals and Matching Credits shall thereupon be suspended until such time as he shall once again become an Eligible Executive. All other provisions of his Salary Deferral Agreement shall remain in force and he shall continue to be a Member of the Plan.

(b) In the event that a Member ceases to be an Eligible Executive with respect to the deferral of Awards hereunder but continues to be employed by an Affiliated Company, he shall continue to be a Member of the Plan but shall not be eligible to defer any portion of any future Awards until such time as he shall once again become an Eligible Executive.

2.5 MEMBERSHIP FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any membership determinations or discretionary actions pursuant to this Article 2 shall be subject to the approval of the Benefits Trust Committee.

ARTICLE 3. AWARD DEFERRAL PROGRAM

3.1 FILING REQUIREMENTS:

(a) With respect to an Award identified in Section 1.4(i), at such time as the Administrator may prescribe prior to the close of business on December 30 in any calendar year, an Eligible Executive may elect to defer all or a portion of his Award, if any, for that year. Such Award is determined and paid in the following calendar year. Such election shall be made by filing an Award Deferral Agreement with the Administrator on or before the close of business on December 30 of the calendar year for which the Award is made. In the event that December 30 does not fall on a weekday, such filing must be made by the close of business on the last prior business day.

(b) With respect to an Award identified in Section 1.4(i), notwithstanding Section 3.1(a), an individual who becomes an Eligible Executive after the calendar year for which an Award is made, but prior to the first day of the month in which such Award is determined including required action by the Board, may elect to defer all or a portion of that Award in accordance with this Section 3.1(b). Such election shall be made by filing an Award Deferral Agreement during the 30 day or shorter period beginning on the date the individual becomes an Eligible Executive and ending no later than the last day of the month preceding the month in which the Award is determined.

(c) With respect to an Award identified in Section 1.4(i), an Eligible Executive's election to defer all or a portion of his Award shall be effective on the last day that such deferral may be elected under Section 3.1(a) or 3. l(b) and shall be effective only for the Award in question. An Eligible Executive may revoke or change his election to defer all or a portion of his Award at any time prior to the date the election becomes effective, as described in the preceding sentence. Any such revocation or change shall be made in a form and manner determined by the Administrator.

(d) With respect to an Award identified in Section 1.4(ii), at such time and in accordance with such rules as the Administrator may prescribe prior to the close of business on



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

December 30 in any calendar year, an Eligible Executive may elect to defer all or a portion of any such Award. Awards identified in Section 1.4(ii) may not be deferred into Education Sub-accounts.

(e) An Eligible Executive shall not be entitled to defer an Award on or after attaining the age, if any, which he has designated under Section 6.1(c) or 6.1(d) for the purpose of commencing distribution of his Account (or, if applicable, his Retirement Sub-account). In the event a Member establishes an Education Sub-account pursuant to Article 9, he shall not be entitled to defer all or any portion of an Award into such a Sub-account after attaining the age which he has designated for the purpose of commencing distribution from that Sub-account.

(f) An Eligible Executive shall not be entitled to defer an Award if he is eligible to defer his award under another nonqualified program of deferred compensation maintained by an Affiliated Company.

3.2 AMOUNT OF DEFERRAL:

(a) With respect to an Award identified in Section 1.4(i), prior to a Change of Control, in its sole discretion, the Committee may establish such maximum limit on the amount of Award an Eligible Executive may defer for a calendar year as the Committee deems appropriate. Such maximum limit shall appear on the Eligible Executive's Award Deferral Agreement for the year. Following a Change of Control, the Committee's decision is subject to the final approval of the Benefits Trust Committee.

(b) With respect to an Award identified in Section 1.4(i), the minimum amount which an Eligible Executive may defer in any year shall be the lesser of $5,000 or the maximum amount determined under Section 3.2(a) above. If an Eligible Executive elects to defer less than this amount, his election shall not be effective.

(c) With respect to an Award identified in Section 1.4(ii), there shall be no minimum nor maximum amount of deferral allowed.

3.3 CREDITING TO ACCOUNT:

(a) The amount of Award which an Eligible Executive has elected to defer for a calendar year shall be credited to his Account as of the Valuation Date coincident with or next following the date the Award would have been paid to the Eligible Executive. (b) An additional credit shall be made to the Account as of the Valuation Date described in Section 3.3(a) above, determined as if the amount of Award deferred had earned the same rate of return as the CSX Cash Pool Earnings Rate from the date the Award would have been paid until the Valuation Date it is credited to the Eligible Executive's Account. In lieu of the CSX Corporation Cash Pool Earnings Rate, the Committee may designate, prior to a Change of Control, from time to time, such other indices of investment performance or investment funds as the measure of investment performance under this Section 3.3(b). Following a Change of Control, the Committee's decision is subject to final approval of the Benefits Trust Committee.

ARTICLE 4. SALARY DEFERRAL PROGRAM



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

4.1 FILING REQUIREMENTS:

(a) An individual who is an Eligible Executive immediately prior to the Effective Date may file a Salary Deferral Agreement with the Administrator, within such period prior to the Effective Date and in such manner as the Administrator may prescribe.

(b) An individual who becomes an Eligible Executive on or after the Effective Date may file a Salary Deferral Agreement with the Administrator during the calendar month he becomes an Eligible Executive, in such manner as the Administrator may prescribe.

(c) An Eligible Executive who fails to file a Salary Deferral Agreement with the Administrator as provided in Sections 4.1 (a) and 4.1(b) may file a Salary Deferral Agreement in any subsequent month of December.

(d) An Eligible Executive who has not otherwise Filed a Deferral Agreement shall file a Salary Deferral Agreement under Sections 4. l(a) or 4. l(b), whichever applies, in order to receive the Matching Credits described in Section 4.5, provided that such agreement need not provide for Salary Deferrals.

4.2 SALARY DEFERRAL AGREEMENT: An Eligible Executive's Salary Deferral Agreement shall authorize a reduction in his base pay with respect to his Salary Deferrals under the Plan. The Agreement shall be effective for payroll periods beginning on or after the later of: (a) the Effective Date; or (b) the first day of the month following the date the Salary Deferral Agreement is filed with the Administrator in accordance with Section 4.1. Paychecks applicable to said payroll periods shall be reduced accordingly.

4.3 AMOUNT OF SALARY DEFERRALS:

(a) On each Valuation Date following the effective date of an Eligible Executive's Salary Deferral Agreement, his Sub-accounts shall be credited with an amount of Salary Deferral, if any, for the payroll period ending thereon, as he elects in his Salary Deferral Agreement. Such Salary Deferral for any payroll period shall be determined as the sum of his Basic Salary Deferral for such payroll period determined under subparagraph (i) and his Additional Salary Deferral for such month, determined under subparagraph (ii) as follows:

(i) An Eligible Executive's Basic Salary Deferral shall be determined by multiplying his Compensation for a payroll period by the excess of his Salary Deferral Percentage over the percentage determined in subparagraph (ii) below

(ii) An Eligible Executive's Additional Salary Deferral shall be determined by multiplying his Compensation for a payroll period by a percentage determined as (A) the excess of his Salary Deferral Percentage over 15%, divided by (B) .85.

provided, however, that no Basic Salary Deferral shall be made under this Plan for any payroll period unless the Eligible Executive is prevented from making elective deferrals under the Tax Savings Thrift Plan for such payroll period as a result of Section 402(g) and/or 401(k)(3) of the Code, and provided further that, for the payroll period in which such Basic Salary Deferral is first made, it shall be limited to the excess of the amount otherwise determined for such payroll period under Section 4.3(a)(i) over the Eligible Executive's elective deferrals under the Tax Savings Thrift

Plan for such payroll period. If applicable, Additional Salary Deferrals shall be made for each payroll period of the year to which the Salary Deferral Agreement applies, without regard to whether the Eligible Executive makes elective deferrals under the Tax Savings Thrift Plan and without regard to any Basic Salary Deferrals under this Plan.

(b) An Eligible Executive shall not be entitled to make Salary Deferrals on or after attaining the age, if any, which he has designated under Section 6.1(c) or 6. l(d) for the purpose of commencing distribution of his Account (or, if applicable, his Retirement Sub-account). In the event a Member establishes an Education Sub-account pursuant to Article 9, he shall not be entitled to make Salary Deferrals into such Sub-account after attaining the age which he has designated for the purpose of commencing distribution from that Sub-account.

4.4 CHANGING SALARY DEFERRALS:

(a) An Eligible Executive's election on his Salary Deferral Agreement of the rate at which he authorizes Salary Deferrals under the Plan shall remain in effect in subsequent calendar years unless he files with the Administrator an amendment to his Salary Deferral Agreement modifying or revoking such election. The amendment shall be filed by December 30 and shall be effective for payroll periods beginning on or after the following January 1.

(b) Notwithstanding Section 4.4(a), an Eligible Executive may, in the event of a severe financial hardship, request a suspension of his Salary Deferrals under the Plan. The request shall be made at a time and in a manner determined by the Administrator, and shall be effective as of such date as the Administrator prescribes. The Administrator shall apply standards, to the extent applicable, identical to those described in Section 6.3 in making its determination. The Eligible Executive may apply to the Administrator to resume his Salary Deferrals with respect to payroll periods beginning on or after the January 1 following the date of suspension, at a time and in a manner determined by the Administrator; provided, that the Administrator shall approve such resumption only if the Administrator determines that the Eligible Executive is no longer incurring such hardship. Notwithstanding the preceding, following a Change of Control, such action by the Administrator is subject to approval by the Benefits Trust Committee.

4.5 CERTAIN ADDITIONAL CREDITS:

On each Valuation Date, there shall be credited Matching Credits to the Retirement Sub-account(s) of an Eligible Executive determined as follows:

(a) For payroll periods prior to the inception of Basic Salary Deferrals hereunder, the greater of (b)(i) or (ii)

(b) For payroll periods during which Basic Salary Deferrals are effective, the greater of (i) or (iii), minus (iv), where

(i) is the employer matching contributions the Eligible Executive would have received under the Tax Savings Thrift Plan if the provisions of Sections 401(k)(3), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(ii) is an amount determined as 3% of the Eligible Executive's additional Salary Deferrals; and



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(iii) is the employer matching contributions the Eligible Executive would have received under the Tax Savings Thrift Plan if his deferrals under this Plan had been contributed to the Tax Savings Thrift Plan (in addition to those amounts actually contributed to that Plan), based on "Compensation" as defined in this Plan and as if the provisions of Sections 401(a)(17), 401(k)(3), 401(m)(2), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(iv) is the employer matching contributions made on his behalf for the applicable period to the Tax Savings Thrift Plan.

No Matching Credits shall be credited to a Member's Education Sub-account.

ARTICLE 5. MAINTENANCE OF ACCOUNTS

5.1 ADJUSTMENT OF ACCOUNT:

(a) As of each Valuation Date each Account (and, if applicable, each Sub-account) shall be credited or debited with the amount of earnings or losses with which such Sub-account would have been credited or debited, assuming it had been invested in one or more investment funds, or earned the rate of return of one or more indices of investment performance, designated by the Administrator and, if applicable, elected by the Member or former Member, for purposes of measuring the investment performance of his Sub-accounts.

(b) The Administrator shall designate at least one investment fund or index of investment performance and may designate other investment funds or investment indices to be used to measure the investment performance of Accounts. The designation of any such investment funds or indices shall not require the Affiliated Companies to invest or earmark their general assets in any specific manner. The Administrator may change the designation of investment funds or indices from time to time, in its sole discretion, and any such change shall not be deemed to be an amendment affecting Members' or former Members' rights under Section 7.2.

(c) For purposes of Section 5. 1(a), the portion of a Member's Retirement Sub-accounts attributable to Matching Credits shall be credited or debited with earnings or losses based upon the performance of "Fund E" (CSX Stock Fund) under the Tax Savings Thrift Plan.

(d) As of February 1, 1989, there shall be credited to the Account of each Eligible Executive who participated in the Supplemental Benefit Plan of Sea-Land Corporation and Affiliated Companies the amount of deferred compensation under that plan as of January 31, 1989 attributable to amounts credited under that plan for the purpose of restoring contributions to a defined contribution plan which were limited by Section 415 of the Code. Such amounts shall be treated as Salary Deferrals under the Plan, and unless transferred pursuant to Section 5.3(a), shall earn the same rate of return as the CSX Cash Pool Earnings Rate.

5.2 INVESTMENT PERFORMANCE ELECTIONS:

(a) In the event the Administrator designates more than one investment fund or index of investment performance under Section 5.1, each Member and, if applicable, former Member, shall file an initial investment election with the Administrator with respect to the investment of his



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Salary Deferrals within such time period and on such form as the Administrator may prescribe. The election shall designate the investment fund or funds or index or indices of investment performance which shall be used to measure the investment performance of the Member's Salary Deferrals. The election shall be effective as of the beginning of the payroll period next following the date the election is filed. The election shall be in increments of 1%.

(b) In the event the Administrator designates more than one investment fund or index under Section 5.1, each Member shall file an initial investment election each calendar year in which he defers an Award with respect to the amount deferred. The election shall be made within such time period and on such form as the Administrator prescribes and shall be in increments of 1% of the amount deferred. The election shall be effective on the Valuation Date on which the amount determined is credited to the Member's Account. (c) A Member may not elect separate investment funds or indices of investment performance with respect to each Sub-account.

5.3 CHANGING INVESTMENT ELECTIONS:

(a) A Member may change his election in Section 5.2(a) with respect to his future Salary Deferrals, no more than once each calendar quarter, by filing an appropriate written notice with the Administrator. The notice shall be effective as of the beginning of the first payroll period following the date the notice is filed with the Administrator.

(b) A Member or, if applicable, former Member may reallocate the current balance of his Retirement and/or Education Sub-accounts, thereby changing the investment fund or funds or index or indices of investment performance used to measure the future investment performance of his existing Account balance, by filing an appropriate written notice with the Administrator. Each Retirement or Education Sub-account may be reallocated separately. The election shall be effective as of the last business day of the calendar quarter following the month in which the notice is filed. No election under this Section 5.3(b) shall apply to the portion of a Member's Account attributable to Matching Credits.

5.4 VESTING OF ACCOUNT: EACH MEMBER SHALL BE FULLY VESTED IN HIS ACCOUNT.

5.5 INDIVIDUAL ACCOUNTS: The Administrator shall maintain, or cause to be maintained, records showing the individual balances of each Account and each Sub-account. At least once a year, each Member and, if applicable, former Member shall be furnished with a statement setting forth the value of his Account and his Sub-accounts.

5.6 ACTION FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any action taken by the Administrator pursuant to this Article 5 is subject to the approval of the Benefits Trust Committee.

ARTICLE 6. PAYMENT OF BENEFITS

6.1 COMMENCEMENT OF PAYMENT:

(a) The distribution of the Member's or former Member's Account shall commence, pursuant to Section 6.2, on or after the occurrence of (i), (ii), (iii) or (iv) below, as designated by the Member as a Distribution Option election:



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(i) the Member's termination of employment with the Affiliated Companies,

(ii) attainment of a designated age not earlier than age 59-1/2 (on or after January 1, 1995 age 50) nor later than age 70-1/2,

(iii) the earlier of (i) or (ii) above, or

(iv) the later of (i) or (ii) above.

In the event a Member elects either (ii) or (iii) above, he may not elect an age less than three years subsequent to his current age. If a Member elects to defer an Award identified in Section 1.4(ii) (a payment from the CSX Market Value Cash Plan), such deferral must extend the commencement of distribution beyond December 31, 2004. A Member or former Member shall not change his Distribution Option election of the designation of the event which entitles him to distribution of his Account, except as provided in Section 6.1(c) below; provided, however, no change in Distribution Option election shall be allowed if it results in changing the deferral of commencement of distribution of an Award identified in Section 1.4(ii) to a time before January I, 2005. For purposes of this Plan and particularly this Section 6.l(a), if the Member's employer is involved in a Divisive Transaction, the Member will not be considered to have terminated his employment with an Affiliated Company until his employment with his employer terminates.

(b) Effective January 1, 1995, a Member or former Member shall, pursuant to Section 6.9, be eligible to make a Distribution Option election of the designation of the event which entitles him to distribution of his Account in the event of a Change of Control. (c) A Member or former Member may change his Distribution Option election of the designation of the events which entitle him to distribution of his Account under Section 6.1 (a) and Section 6.l(b), as follows:

(i) A Member or former Member may make a request in writing to the Administrator to defer the Member's designated distribution event under Section 6.1 (a). The requests must be filed with the Administrator at least one year prior to when distribution would commence based on the current designation. The deferral requests must specify a distribution event described in Section 6.1 (a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the date that is one year after the request is filed with the Administrator. If the Member's current distribution event will occur upon his termination of employment and the Member's employment terminates within one year after the deferral request is made, the deferral request shall not be effective. A deferral request under this Section 6.1(c)(i) shall not result in a forfeiture of the Member's or former Member's Account.

(ii) Notwithstanding Section 6.1(c)(i), a Member or former Member may change his designated distribution event under Section 6.1 (a) or 6.1(b), no more frequently than once in any calendar year, by filing with the Administrator an amendment to his Distribution Option election on or before December 30 (or the last preceding business day if December 30 is not a weekday). The change shall be limited to those events entitling a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Member to a distribution that are described in Section 6.1(a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the last Valuation Date of the calendar year in which the change is filed. Unless the election complies with the requirements of Section 6.1(c)(i), or unless the provisions of Section 6.1(e) apply, an election under this Section 6.1(c)(ii) shall result in the forfeiture of five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective. If the Member or former Member changes the form in which his Account is to be distributed under Section 6.2(c)(ii) at the same time as he changes his designated distribution event under this Section 6.1(c)(ii), the combined forfeitures will be five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective.

(d) Notwithstanding anything in this Section 6.1 or Article 9 to the contrary, a Member's Account shall be distributed upon his death.

(e) A Member may not change the designation of the event which entitles him to distribution of one or more Education Sub-accounts, except that a Member may transfer the entire amount in any Education Sub-account to one or more other Education Sub-accounts and one or more of his Retirement Sub-accounts, or any combination thereof, subject to a possible forfeiture of five percent (5%) of the Sub-account so transferred, as provided in Article 9.

(f) Notwithstanding the foregoing, prior to a Change of Control, the Corporation may delay payment of a benefit under this Plan to any Member who is determined to be among the top five most highly paid executives for the year the benefit under this Plan would otherwise be paid; provided, however, if a Member's payment is delayed, the benefit to which he is entitled will not decrease after the date it would otherwise be distributed.

(g) Notwithstanding the preceding, following a Change of Control, the authority to delay payment of a Member's or former Member's Account rests solely with the Benefits Trust Committee.

6.2 METHOD OF PAYMENT:

(a) A Member's or former Member's Retirement Sub-account(s) shall be distributed to him, or in the event of his death to his Beneficiary, in a cash single sum payment as soon as administratively practicable following the January 1 coincident with or next following the date the Member incurs the Distribution Option elected under Section 6.1 or his date of death, as the case may be. Matching Credits earned in respect to periods following the date of such distributable event shall be paid directly to the Member in cash as soon as practical. Notwithstanding the foregoing, a Member or former Member may make a Distribution Option election to receive distribution of his Account in semi-annual installments over a period not to exceed twenty (20) years. Installments shall be determined as of each June 30 and December 31 and shall be paid as soon as administratively practicable thereafter. Installments shall commence as of the July 1 or January 1 coincident with or next following the date the Member incurs the distributable event elected as a Distribution Option under Section 6.1, or as soon as administratively practicable thereafter. The amount of each installment shall equal the balance in the Account as of the Valuation Date of determination, divided by the number of remaining installments (including the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

installment being determined). The Distribution Option election shall be irrevocable except as provided in Section 6.2(c) below. If a Member or former Member dies before payment of the entire balance of his Account, the remaining balance shall be paid in a single sum to his Beneficiary as soon as administratively practicable following the January 1 coincident with or next following his date of death. (b) Effective January 1, 1995, a Member or former Member shall, pursuant to Section 6.9, be eligible to make a separate Distribution Option election of the form of payment of his Account in the event of a Change of Control.

(c) Notwithstanding Section 6.2(a) and Section 6.2(b), a Member or former Member may change the Distribution Option election of the form in which his Account is distributed, as follows:

(i) A Member or former Member may make a one-time request to the Administrator to change the form in which his Account is to be distributed under Section 6.2(a). A Member or former Member may also make a onetime request to change the form in which his Account is to be distributed under Section 6.2(b). The request must be filed in writing with the Administrator at least one year prior to when distribution would commence based on the current designation. The requests must specify a form of distribution described in Section 6.2(a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the date that is one year after the request is filed with the Administrator. If the Member's distribution event will occur upon his termination of employment and the Member's employment terminates within one year after the request is filed, the request shall not be effective. A request under this Section 6.2(c)(i) shall not result in a forfeiture of the Member's or former Member's Account.

(ii) Notwithstanding Section 6,2(cXD, a Member or former Member may change the form in which his Account is to be distributed under Section 6.2(a) or 6.2(b), no more frequently than once in any calendar year, by filing with the Administrator an amendment to his Distribution Option election on or before December 30 (or the last preceding business day if December 30 is not a weekday). The change shall be limited to those forms of distribution described in Section 6.2(a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the last Valuation Date of the calendar year in which it is filed. Unless the election complies with the requirements for a one-time request under Section 6.2(c)(i), or unless the provisions of Section 6.2(d) apply, an election under this Section 6.2(c)(ii) shall result in the forfeiture of five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective. If the Member or former Member changes his designated distribution event under this Section 6.2(c)(ii) at the same time as he changes the form in which his Account is to be distributed under Section 6.1(c)(ii), the combined forfeiture will be five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(d) In the event the Member's Account consists of one or more Retirement Sub-accounts and one or more Education Sub-accounts, the provisions of this Section 6.2 shall apply exclusively to the Member's Retirement Sub-accounts. A Member may not change the form in which his Education Sub-accounts are distributed, except that a Member may transfer the entire amount in any Education Sub-account to one or more other Education Sub-accounts and one or more Retirement Sub-accounts, or any combination thereof, subject to a possible forfeiture of five percent (5%) of the Sub-account so transferred, as provided in Article 9.

6.3 APPLICABILITY: In the event the Member's Account consists of one or more Retirement Sub-accounts and one or more Education Sub-accounts, the provisions of Sections 6.1 (a) and 6.1(c) and 6.2 shall apply exclusively to the Member's Retirement Sub-accounts.

6.4 ACCOUNT ADJUSTMENT: The obligations of the Corporation or any of its affiliated corporations and the benefits due any Member, former Member, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the Benefits Assurance Trust or any similar trust or other vehicle.

6.5 HARDSHIP WITHDRAWAL:

(a) While employed by the Participating Companies, a Member or former Member may, in the event of a severe financial hardship, request a withdrawal from his Account. The request shall be made in a time and manner determined by the Administrator, shall not be for a greater amount than the amount required to meet the financial hardship, and shall be subject to approval by the Administrator. (b) For purposes of this Section 6.5 financial hardship shall include:

(i) education of a dependent child where the Member or former Member shows that without the withdrawal under this Section the education would be unavailable to the child;

(ii) illness of the Member or former Member or his dependents, resulting in severe financial hardship to the Member or former Member;

(iii) the loss of the Member's or former Member's home or its contents, to the extent not reimbursable by insurance or otherwise, if such loss results in a severe financial hardship to the Member or former Member;

(iv) any other extraordinary circumstances of the Member or former Member approved by the Administrator if such circumstances would result in a present or impending critical financial need which the Member or former Member is unable to satisfy with funds reasonably available from other sources.

(c) Notwithstanding the preceding, following a Change of Control, any decisions or determinations by the Administrator under this Section 6.5 shall be subject to the approval of the Benefits Trust Committee.

6.6 DESIGNATION OF BENEFICIARY: A Member or former Member may, at a time and in a manner determined by the Administrator, designate a beneficiary and one or more contingent beneficiaries



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(which may include the Member's or former Member's estate) to receive any benefits which may be payable under this Plan upon his death. If the Member or former Member do not designate a beneficiary or contingent beneficiary, or if the beneficiary and the contingent beneficiaries do not survive the Member or former Member, such benefits shall be paid to the Member's or former Member's estate. A Member or former Member may revoke or change any designation made under this Section 6.6 in a time and manner determined by the Administrator.

6.7 SPECIAL DISTRIBUTION RULES: Notwithstanding anything to the contrary in this Plan, if (a) a Member or former Member becomes the owner, director or employee of a competitor of the Affiliated Companies, (b) his employment is terminated by an Affiliated Company on account of actions by the Member Which are detrimental to the interests of the Affiliated Company, or (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company, then the Administrator may, in its sole discretion, pay the Member or former Member a single sum payment equal to the balance in his Account. The single sum payment shall be made as soon as practicable following the date the Member or former Member becomes an owner, director or employee of a competitor, his termination of employment or the Administrator's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Member or former Member under this Plan.

6.8 STATUS OF ACCOUNT PENDING DISTRIBUTION: Pending distribution, a former Member's Account (and, if applicable, a former Member's Sub-accounts) shall continue to be credited with earnings and losses as provided in Section 5.1. The former Member shall be entitled to change his investment elections under Section 5.3 or apply for Hardship withdrawals under Section 6.5 to the same extent as if he were a Member of the Plan. In the event of the death of a Member or former Member, his Sub-accounts shall be credited with earnings and losses as if the Sub-accounts had earned the same rate of return as the CSX Corporation Cash Pool Earnings Rate or, in the sole discretion of the Administrator, the rate of return of such other index of investment performance or investment fund which may be designated by the Administrator as a measure for investment performance of Members' or former Members' Accounts (and, if applicable, their Sub-accounts), commencing with the Valuation Date coincident with or next following the Member's or former Member's date of death.

6.9 INSTALLMENTS AND WITHDRAWALS PRO-RATA: In the event of an installment payment or hardship withdrawal, such payment or withdrawal shall be made on a pro-rata basis from the portions of the Member's or former Member's existing Account balance which are subject to different measures of investment performance. In the event of a hardship withdrawal, the withdrawal shall be made on a pro-rata basis from all of the Member's or former Member's Sub-accounts. 6.10 Change of Control:

6.10 CHANGE OF CONTROLS:

(a) If a Change of Control has occurred, the Corporation and Participating Companies shall contribute to the Trust within 7 days of such Change of Control, a lump sum payment equal to the greater of (i) the aggregate value of the amount each Member or former Member would be eligible to receive (determined under (b) below) as of the latest Valuation Date coinciding with or preceding the date of Change of Control or (ii) the amount determined under Section 1(h) of the Trust attributable to liabilities relating to the Plan to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 6.10 shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Members' or former Members' Accounts for which information is readily available. Thereafter, the Independent Accountants shall annually determine as of a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Valuation Date for each Member or former Member not receiving a lump sum payment pursuant to subsection (b) below the value of each Member or former Member's Accounts. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by the Independent Accountants, the Corporation and Participating Companies shall make a lump sum contribution to the Trust equal to the difference.

(b) In the event a Change of Control has occurred, the trustee of the Trust shall, within 45 days of such Change of Control, pay to each Member or former Member not making an election under (c) below, a lump sum payment equal to the value of the Member's or former Member's Accounts (determined under Article 5) as of the Valuation Date coinciding with or next preceding the date of such Change of Control. The amount of each Member's or former Member's lump sum payment shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Member's or former Member's Accounts for which information is readily available.

(c) Each Member or former Member may elect in a time and manner determined by the Administrator, but in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. New Members of the Plan may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Member, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. A Member or former Member who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

(d) Notwithstanding anything in the Plan to the contrary, each Member or former Member who has made an election under (c) above may elect within 90 days following a Change of Control, in a time and manner determined by the Benefits Trust Committee, to receive a lump sum payment calculated under the provisions of (b) above determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited by the Member or former Member. Furthermore, as a result of such election, the Member or former Member shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this subsection (d) shall be made not later than 7 days following receipt by the Corporation of a Member's or former Member's election. The Benefits Trust Committee shall, no later than 7 days after a Change of Control has occurred, give written notification to each Member or former Member eligible to make an election under this subsection (d), that a Change of Control has occurred and informing such Member or former Member of the availability of the election.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

## ARTICLE 7. AMENDMENT OR TERMINATION

7.1 RIGHT TO TERMINATE:

(a) Prior to a Change of Control, the Board may, in its sole discretion, terminate this Plan and the related Deferral Agreements at any time. Following a Change of Control, this Plan may not be terminated without the approval of the Benefits Trust Committee.

(b) Prior to a Change of Control, the Committee may terminate an Affiliated Company's participation as a Participating Company in this Plan for any reason at any time. Following a Change of Control, an Affiliated Company may not be terminated from participation as a Participating Company without the consent of the Benefits Trust Committee.

(c) Prior to a Change of Control, an Affiliated Company's board of directors may terminate that Affiliated Company's participation as a Participating Company for any reason at any time. Following a Change of Control, an Affiliated Company's participation as a Participating Company may not be terminated without the consent of the Benefits Trust Committee.

(d) In the event the Plan and related Deferral Agreements are terminated, each Member, former Member and Beneficiary shall receive a single sum payment equal to the balance in his Account. The single sum payment shall be made as soon as practicable following the date the Plan is terminated and shall be in lieu of any other benefit which may be payable to the Member, former Member or Beneficiary under this Plan.

7.2 RIGHT TO AMEND: Prior to a Change of Control, the Board may, in its sole discretion, amend this Plan and the related Deferral Agreements on 30 days prior notice to the Members and, where applicable, former Members. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee. If any amendment to this Plan or to the Deferral Agreements shall adversely affect the rights of a Member or former Member, such individual must consent in writing to such amendment prior to its effective date. If such individual does not consent to the amendment, the Plan and related Deferral Agreements shall be deemed to be terminated with respect to such individual and he shall receive a single sum payment of his Account as soon thereafter as is practicable. Notwithstanding the foregoing, the Administrator's change in any investment funds or investment index under Section 5.1(b) or the restriction of future deferrals under the salary deferral program or award deferral program shall not be deemed to adversely affect any Member's or former Member's rights.

7.3 UNIFORM ACTION: Notwithstanding anything in the Plan to the contrary, any action to amend or terminate the Plan or the Deferral Agreements must be taken in a uniform and nondiscriminatory manner. Notwithstanding the preceding, any such action taken by the Administrator following a Change of Control is subject to the approval of the Benefits Trust Committee.

## ARTICLE 8. GENERAL PROVISIONS

8.1 NO FUNDING: Nothing contained in this Plan or in a Deferral Agreement shall cause this Plan to be a funded retirement plan. Neither the Member, former Member, his beneficiary, contingent beneficiaries, heirs or personal representatives shall have any right, title or interest in or to any funds of the Trust or the Affiliated Companies on account of this Plan or on account of having completed a Deferral Agreement. The assets held in the Trust shall be subject to the claims of creditors of the Corporation, and the Trust's assets shall be used to discharge said claims in the event of the Corporation's insolvency. Each



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Member or former Member shall have the status of a general unsecured creditor of the Affiliated Companies and this Plan constitutes a mere promise by the Affiliated Companies to make benefit payments in the future.

8.2 OBLIGATION: To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

8.3 NO CONTRACT OF EMPLOYMENT: The existence of this Plan or of a Deferral Agreement does not constitute a contract for continued employment between an Eligible Executive or a Member and an Affiliated Company. The Affiliated Companies reserve the right to modify an Eligible Executive's or Member's remuneration and to terminate an Eligible Executive or a Member for any reason and at any time, notwithstanding the existence of this Plan or of a Deferral Agreement.

8.4 WITHHOLDING TAXES: All payments under this Plan shall be net of an amount sufficient to satisfy any federal, state or local withholding and payroll tax requirements.

8.5 NONALIENATION: The right to receive any benefit under this Plan may not be transferred, assigned, pledged or encumbered by a Member, former Member, beneficiary or contingent beneficiary in any manner and any attempt to do so shall be void. No such benefit shall be subject to garnishment, attachment or other legal or equitable process without the prior written consent of the Affiliated Companies. Notwithstanding the preceding, following a Change of Control, the Administrator shall not implement such action without the consent of the Benefits Trust Committee.

8.6 ADMINISTRATION:

(a) Prior to a Change of Control, the Administrator of the Plan shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms and conditions of the Plan.

(b) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(c) The Administrator shall have sole and absolute discretion to interpret the Plan, determine eligibility for and benefits due hereunder. Decisions of the Administrator regarding benefits under the Plan shall at all times be binding and conclusive on Members, their beneficiaries, heirs and assigns. Notwithstanding the preceding, following a Change of Control, final benefit determinations for Members, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

(d) Prior to paying any benefit under this Plan, the Administrator may require the Member or former Member, beneficiary or contingent beneficiary to provide such information or material as the Administrator, in its sole discretion, shall deem necessary for it to make any determination it may be required to make under this Plan. The Administrator may withhold payment of any benefit under this Plan until it receives all such information and material and is reasonably satisfied of its correctness and genuineness. The Administrator shall provide adequate notice in writing to any Member, former Member, beneficiary or contingent beneficiary whose claim for benefits under this Plan has been denied, setting forth the specific reasons for such denial. A reasonable opportunity shall be afforded to any such Member, former Member, beneficiary or contingent beneficiary for a full and fair review by the Administrator of its decision denying the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

claim. The Administrator's decision on any such review shall be final and binding on the Member, former Member, beneficiary or contingent beneficiary and all other interested persons. All acts and decisions of the Administrator shall be final and binding upon all Members, former Members, beneficiaries, contingent beneficiaries and employees of the Affiliated Companies. Notwithstanding the preceding, following a Change of Control, any and all decisions by the Administrator are subject to the approval of the Benefits Trust Committee.

(e) Prior to a Change of Control, the Committee in its sole discretion and upon such terms as it may prescribe, may permit any company or corporation directly or indirectly controlled by the Corporation to participate in the Plan. After a Change of Control, such permission must be approved by the Benefits Trust Committee.

8.7 CONSTRUCTION:

(a) The Plan is intended to constitute an unfunded deferred compensation arrangement for a select group of management or highly compensated employees and all rights hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia to the extent not preempted by federal law.

(b) The masculine pronoun means the feminine wherever appropriate.

(c) The captions inserted herein are inserted as a matter of convenience and shall not affect the construction of the Plan.

ARTICLE 9. EDUCATION SUB-ACCOUNTS

9.1 EDUCATION SUB-ACCOUNTS:

(a) Notwithstanding any provision of this Plan to the contrary, with respect to amounts deferred under Salary Deferral Agreements and Award Deferral Agreements effective on or after December 31, 1990, a Member may direct the Administrator to establish a separate sub-account in the name of one or more of:

(i) each of the Member's children,

(ii) each of the Member's brothers, sisters, their spouses, the Member's spouse, or

(iii) each of the foregoing's lineal descendants, for the payment of their expenses directly or indirectly arising from enrollment in a college, university, another post-secondary institution of higher learning or a secondary educational institution. Each sub-account established pursuant to this Section 9.1(a) shall be referred to as an "Education Sub-account."

(b) The Member may instruct the Administrator to allocate all or a portion of any amount deferred under an Award Deferral Agreement in respect to an Award granted after December 31, 1990 to one or more of the Education Sub-accounts established pursuant to Section 9.1(a).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) A Member may instruct the Administrator to allocate all or any portion of the amount he defers for periods commencing after December 31, 1990 pursuant to his Salary Deferral Agreement to one or more of the Education Sub-accounts established pursuant to Section 9.1(a).

(d) Any elections pursuant to Sections 9.1 (a) and 9.1(b) shall be made in whole percentages.

(e) No Matching Credits shall be allocated to any Education Sub-account.

9.2 DISTRIBUTION OF EDUCATION SUB-ACCOUNTS:

(a) Amounts allocated to one or more of a Member's Education Sub-accounts shall be distributed to the Member upon the attainment of the certain age of the Member, specifically designated by the Member for this purpose with regard to that Sub-account.

(b) A Member or former Member may transfer the entire amount but not less than that amount in any Education Sub-account to one or more other Education Sub-accounts, a Retirement Sub-account, or any combination thereof, by filing the appropriate form or forms with the Administrator not later than the last business day of the calendar year preceding the calendar year in which distribution of that Education Sub-account was to begin; provided, however, if such transfer accelerates the timing of the payment to the Member, there shall be a forfeiture of five percent (5%) of the Member's or former Member's Sub-account so transferred, determined as of the Valuation Date upon which the transfer is effective. In no event may a Member transfer all or any portion of the amount in a Retirement Sub-account to his Education Sub-accounts. Except as provided in this Section 9.2(b) or 9.2(c) below, a Member or former Member may not change the time or form of distribution of his Education Sub-accounts.

(c) In the event that the individual for whom an Education Sub-account is established dies while funds remain in that Sub-account, a Member or former Member may transfer without penalty the entire amount but not less than that amount in that Sub-account in accordance with the provisions of (i) or (ii) below:

(i) to one or more existing Education Sub-accounts and/or a new Education Sub-account established in accordance with the provisions of Section 9.1 hereof; or

(ii) to a Retirement Sub-account.

If a Member or former Member elects to transfer funds in accordance with (ii) and he has not previously established a Retirement Sub-account, such a Sub-account shall be established automatically and the Member or former Member promptly thereafter will be required to execute an amendment to his Deferral Agreement which shall specify the option under Section 6.1 (a) which will entitle him to distribution of the Retirement Sub-account and the form of distribution under Section 6.2(a).

(d) A Member's or former Member's Education Sub-accounts shall be distributed to him, or in the event of his death to his Beneficiary, in a cash single sum payment as soon as administratively practicable following the January 1 coincident with or next following the date the Member incurs the distributable event or events elected under Section 9.2(a) or his date of death, as the case may be. Notwithstanding the foregoing, a Member or former Member may elect to receive



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

distribution of one or more of his Education Sub-accounts in semi-annual installments over a period not to exceed six (6) years. Installments shall be determined as of each June 30 and December 31 and shall be paid as soon as administratively practicable thereafter. Installments shall commence as of the June 30 or December 31 coincident with or next following the date the Member incurs the distributable event elected under Section 9.2(a) with regard to a Sub-account, or as soon as administratively practicable thereafter. The amount of each installment shall equal the balance in the applicable Education Sub-account as of the Valuation Date of determination, divided by the number of remaining installments (including the installment being determined). If a Member or former Member dies before payment of the entire balance of all of his Education Sub-accounts, the remaining balance or balances, as the case may be, shall be paid in a single sum to his Beneficiary as soon as administratively practicable following the January 1 coincident with or next following his date of death.

9.3 CONSTRUCTION: To the extent any provision in this Article 9 is inconsistent with any other provision of this Plan, the provisions in Article 9 shall govern.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT

SUPPLEMENTARY SAVINGS AND INCENTIVE AWARD DEFERRAL PLAN FOR
ELIGIBLE EXECUTIVES OF CSX CORPORATION AND AFFILIATED COMPANIES

Pursuant to Section 7.2 of the Supplementary Savings and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies, as Amended and Restated Through February 14, 2001 (the "Plan"), the Plan is amended effective February 7, 2003 as follows:

Section 6.7 is amended to read as follows:

"Notwithstanding anything to the contrary in the Plan, if (a) a Member or former Member becomes the owner, director or employee of a competitor of the Affiliated Companies; (b) his employment is terminated by an Affiliated Company on account of actions by the Member which are detrimental to the interests of the Affiliated Company; (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company; or (d) is required to divest his or her interest under the Plan under applicable law, regulation or rules, then the Administrator may, in its sole discretion, pay the Member or former Member a single sum payment equal to the balance in his Account. In such event, the single sum payment shall be made as soon as practicable following the date the Member or former Member or is affected by one of the circumstances described in this Section 6.7 and such payment shall be in lieu of all other benefits which may be payable to the Member or former Member under this Plan."


Powered by Morningstar® Document Research℠

Exhibit 10.45
EXECUTION COPY

# SECOND AMENDMENT

SECOND AMENDMENT, dated as of May 14, 2003 (this "AMENDMENT"), to the FIVE-YEAR REVOLVING CREDIT AGREEMENT, dated as of June 8, 2001 (as amended, supplemented or otherwise modified, the "CREDIT AGREEMENT"), among CSX CORPORATION, a Virginia corporation, as Borrower, the LENDERS parties thereto, CITIBANK, N.A. and THE BANK OF NOVA SCOTIA, as Co-Syndication Agents, CREDIT SUISSE FIRST BOSTON and MIZUHO CORPORATE BANK, LTD., as Co-Documentation Agents, and JPMORGAN CHASE BANK (formerly known as THE CHASE MANHATTAN BANK), as Administrative Agent.

W I T N E S S E T H:

WHEREAS, pursuant to the Credit Agreement, the Lenders have agreed to make certain loans and other extensions of credit to the Borrower; and

WHEREAS, the Borrower has requested and, upon this Amendment becoming effective, the Lenders have agreed, to amend certain provisions of the Credit Agreement upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

1.1 DEFINED TERMS. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given such terms in the Credit Agreement.

## SECTION 2. AMENDMENTS TO CREDIT AGREEMENT

2.1 AMENDMENT TO SECTION 5.01. Section 5.01 of the Credit Agreement is hereby amended by adding at the end of such Section the following new paragraph:

> Information required to be delivered pursuant to this Section 5.01 shall be deemed to have been delivered to the Lenders on the date on which the Borrower provides written notice to the Lenders that such information has been posted on the Borrower's website on the Internet at http://www.csx.com or is available on the website of the SEC at http://www.sec.gov (to the extent such information has been posted or is available as described in such notice). Information required to be delivered pursuant to this Section 5.01 may also be delivered by electronic communication pursuant to procedures approved by the Administrative Agent pursuant to Section 9.01(b) hereto.

2.2 AMENDMENT TO SECTION 9.01. Section 9.01 of the Credit Agreement is hereby amended by adding at the end of such Section the following new paragraph:

> (d) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent (upon any such procedures' approval, the Administrative Agent shall provide notice thereof to the applicable Lender); PROVIDED that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it prior to such communication (upon any such procedures' approval, the Administrative Agent shall provide notice thereof to the Lenders); PROVIDED that approval of such procedures may be limited to particular notices or communications.

SECTION 3. MISCELLANEOUS

3.1 LIMITED EFFECT. Except as expressly amended, modified and supplemented hereby, the Credit Agreement is, and shall remain, in full force and effect in accordance with its terms.

3.2 EFFECTIVENESS. This Amendment shall become effective as of the date hereof upon receipt by the Administrative Agent of a counterpart hereof duly executed by the Borrower and the Majority Lenders on or prior to 5:00 p.m., New York City time, on May 14, 2003.

3.3 REPRESENTATIONS AND WARRANTIES. On and as of the date hereof and after giving effect to this Amendment, the Borrower hereby confirms, reaffirms and restates the representations and warranties set forth in Article III of the Credit Agreement MUTATIS MUTANDIS, except to the extent that such representations and warranties expressly relate to a specific earlier date in which case the Borrower hereby confirms, reaffirms and restates such representations and warranties as of such earlier date.

3.4 COUNTERPARTS. This Amendment may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Amendment signed by all the parties shall be lodged with the Borrower and the Administrative Agent. This Amendment may be delivered by facsimile transmission of the relevant signature pages hereof.

3.5 GOVERNING LAW. THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CSX CORPORATION,
as Borrower

By: /s/ DAVID A. BOOR
Title: Vice President and Treasurer

JPMORGAN CHASE BANK,
as Administrative Agent and as a Lender,

By: /s/ ROBERT P. KELLAS
Title: Vice President

CITIBANK, N.A.,
as Co-Syndication Agent and as a Lender,

By: /s/ DAVID L. HARRIS
Title: Vice President

THE BANK OF NOVA SCOTIA,
as Co-Syndication Agent and as a Lender,

By: /s/ TODD S. MELLER
Title: Managing Director

CREDIT SUISSE FIRST BOSTON,
as Co-Documentation Agent and as a Lender,

By: /s/ JOSEPH ADIPIETRO
Title: Director

By: /s/ CASSANDRA DROOGAN
Title: Associate



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

MIZUHO CORPORATE BANK, LTD.,
as Co-Documentation Agent and as a Lender,

By: /s/ RAYMOND VENTURA
-----------------------------------
Title: S.V.P.

PNC BANK, NATIONAL ASSOCIATION

By: /s/ DOUGLAS WINTERS
-----------------------------------
Title: Sr. Vice President

BANK OF TOKYO-MITSUBISHI TRUST COMPANY

By: /s/ J.W. RHODES
-----------------------------------
Title: VP--Manager

THE BANK OF NEW YORK

By: /s/ STEVEN P. CAVALUZZO
-----------------------------------
Title: Vice President

BANK ONE, NA

By: /s/
-----------------------------------
Title: Managing Director

WACHOVIA BANK, NATIONAL ASSOCIATION

By: /s/ FRITZ BLUMER
-----------------------------------
Title: Vice President



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

FLEET NATIONAL BANK

By: /s/ DAVID J. DOUCETTE
-----------------------------------
Title: Vice President

SUNTRUST BANK, A GEORGIA BANK

By: /s/ MARK FLATIN
-----------------------------------
Title: Director

UBS AG, CAYMAN ISLANDS BRANCH

By: /s/
-----------------------------------
Title: Director

By: /s/
-----------------------------------
Title: Associate Director

DEUTSCHE BANK AG NEW YORK BRANCH

By: /s/ CHRIS HOWE
-----------------------------------
Title: Director

By: /s/ HARALD MILDNER
-----------------------------------
Title: Vice President

THE MITSUBISHI TRUST AND BANKING CORPORATION

By:
-----------------------------------
Title:

THE NORTHERN TRUST COMPANY

By: /s/ ERIC DYBING
-----------------------------------
Title: Second Vice President



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

FIFTH THIRD BANK

By: /s/ ANDREW L. BUSCHLE
------------------------------------
Title: Vice President

UFJ BANK LIMITED

By: /s/ JOHN T. FEENEY
------------------------------------
Title: Vice President



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

EXHIBIT 12

Computation of Earnings to Fixed Charges
CSX Corporation
Ratio of Earnings to Fixed Charges
(Millions of Dollars)

| | FOR THE FISCAL YEARS ENDED | | | | |
|---|---|---|---|---|---|
| | DEC. 26, 2003 | DEC. 27, 2002 | DEC. 28, 2001 | DEC. 29, 2000 | DEC. 31, 1999 |
| Earnings: | | | | | |
| Earnings Before Income Taxes | $ 265 | $ 723 | $ 448 | $ 277 | $ 104 |
| Interest Expense | 418 | 445 | 518 | 550 | 528 |
| Amortization of debt discount | -- | -- | -- | 1 | -- |
| Interest Portion of Fixed Rent | 62 | 77 | 88 | 109 | 151 |
| Undistributed earnings of unconsolidated subsidiaries | (40) | (44) | (2) | (18) | (58) |
| Earnings, as Adjusted | $ 705 | $ 1,201 | $ 1,052 | $ 919 | $ 725 |
| Fixed Charges: | | | | | |
| Interest Expense | $ 418 | $ 445 | $ 518 | $ 550 | $ 528 |
| Capitalized Interest | 3 | 3 | 7 | 6 | 8 |
| Amortization of Debt Discount | -- | -- | -- | 1 | -- |
| Interest Portion of Fixed Rent | 62 | 77 | 88 | 109 | 151 |
| Fixed Charges | $ 483 | $ 525 | $ 613 | $ 666 | $ 687 |
| Ration of Earnings to Fixed Charges | 1.5x | 2.3x | 1.7x | 1.4x | 1.1x |


Powered by Morningstar® Document Research℠

EXHIBIT 14

# CSX CODE OF ETHICS

## LETTER FROM THE PRESIDENT, CHAIRMAN & CEO

February 2004

Dear CSX Colleague:

Enclosed is a copy of CSX Corporation's updated and revised Code of Ethics. The Code is intended to inform all employees in the CSX family of companies of the Company's expectations and of employees' legal and ethical responsibilities and obligations. CSX and its affiliated companies strive to apply high ethical, moral and legal principles in every aspect of business conduct. That is what "Right results, right way" means.

Our corporate vision is to be the safest, most progressive North American railroad, relentless in the pursuit of customer and employee excellence. At its core, the Code of Ethics expresses the fundamental values that must drive our behavior. At CSX, we believe that living by a set of core values will guide the way we treat each other and how we make business decisions. These shared values are vital to securing and maintaining respect from our shareholders, employees, Government officials and the public at large. We regard the quality of our products and services, the safety of our employees and customers, and our integrity in business dealings among our most valuable assets. Our daily performance can add to, or detract from, our company's reputation and value as a freight transportation company, an employer, a member of our local communities and a national corporate citizen.

Although some of the policies included in this Code of Ethics may not apply to you, I ask that you read the entire booklet and agree to abide by its terms, as it applies to you. Each year, I will ask you to re-read the Code of Ethics.

Thank you for your part in maintaining our role as a leader in the marketplace and in making us a leader in legal and ethical behavior.

Sincerely,

Michael J. Ward
CSX Corporation
Chairman, President and Chief Executive Officer

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

CSX's ETHICS AND COMPLIANCE PROGRAM

CSX Corporation and its affiliated companies (referred to herein as "CSX" or the "Company") are committed to maintaining high ethical and legal standards in every aspect of its business conduct. CSX's reputation for adherence to laws, regulations and its written Code of Ethics is more important than the position or personal advancement of any one officer or employee. CSX's continued success and, most importantly, the lives and safety of its employees and customers, depends on the strength of the Company's efforts to detect, prevent and promptly remedy any actual or suspected misconduct.

CSX operates a corporate-wide program to coordinate, implement and monitor compliance with corporate values; laws and regulations applicable to the Company's business operations; and Company policies and procedures. Oversight of the Ethics and Compliance Program is the responsibility of Audit and Advisory Services.

CSX expects its directors, officers and employees to understand and abide by all legal requirements governing the Company's business and operations. The Company provides ongoing education and guidance concerning applicable laws and regulations. Employees who wish to obtain more information on these issues should talk with their supervisor or call the CSX Ethics Information Hotline at 1-800-737-1663. Complying with the law, however, is just part of what we must do. Directors, officers and employees should continually try to avoid even the appearance of impropriety in matters involving legal obligations, the Company's Code of Ethics or other Company policies and procedures.

CSX CODE OF ETHICS

CSX Corporation has in place a Code of Ethics applicable to all directors, officers and employees of the corporation and its subsidiaries, wherever located.(1) The Code covers conflicts of interest, insider trading, protection of confidential information and proper use of company assets, and compliance with laws and regulations applicable to the Company's business operations, among other issues central to our business and operations. This Code of Ethics provides the framework for the rules and policies of the subsidiary for which you work. Copies of those rules are available from your supervisor or Human Resources representative. Depending on your job description, you may be subject to additional and more specific rules covering one or more of the topics discussed in this Code of Ethics.

It is important for you to understand that:

- You are personally responsible for your own conduct in complying with all provisions of this Code of Ethics and for promptly reporting known or suspected violations of this Code of Ethics to your supervisor, manager or the CSX Ethics Information Hotline (1-800-737-1663).

- If you are a supervisor or manager, you are responsible and accountable for ensuring that your employees understand and comply with this Code of Ethics;

------------------------------

(1) CSX Corporation is comprised of principal business units, other transportation business units and non-transportation units. Principal business units of CSX Corporation are CSX Transportation, CSX Intermodal and CSX World Terminals LLC. Other transportation business units include CSX Technology; CSX Real Property; TRANSFLO; Total Distribution Services, Inc; and BridgePoint. Non-transportation business units are The Greenbrier resort hotel and Yukon Pacific Corporation.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

- No one in this Company has the authority or right to order, request or even influence you to violate this Code of Ethics or the law;

- You will not be excused for violating this Code of Ethics for any reason, even at the request of another person, including your supervisors, managers or Company officers;

- Any attempt by any person to have another violate this Code of Ethics, whether successful or not, is itself a violation and may be a violation of the law;

- Any retaliation or threat of retaliation against any person for refusing to violate this Code of Ethics or for reporting in good faith a violation or suspected violation of this Code of Ethics is itself a violation and may be a violation of the law;

- Every reported violation of this Code of Ethics will be investigated, and every actual violation will constitute a basis for disciplinary action involving the person violating this Code of Ethics and may result in civil or criminal action against that person; and

- Any employee who acts contrary to this Code of Ethics, or who knowingly gives a false report regarding a violation of this Code, may be subject to disciplinary action, up to and including termination of employment.

As part of CSX's commitment to ethics and compliance, all directors, officers and employees of CSX and its affiliated companies have a duty to promptly report any actual or suspected misconduct. Failure to fulfill this duty is a violation of CSX's Code of Ethics and may result in disciplinary measures up to and including dismissal in appropriate cases. Failure to report actual or suspected misconduct also may expose the Company and its directors, officers, and employees to potential criminal and civil penalties, and damages to the Company's reputation.

If you have questions about this Code of Ethics or concerns about someone's workplace conduct, first contact your manager. If you do not feel comfortable doing this, you may contact other CSX resources available to you:

- Law Department

- The CSX Ethics Information Hotline

THE CSX ETHICS INFORMATION HOTLINE (1-800-737-1663)

In support of its Code of Ethics and to facilitate reporting of any suspected misconduct, CSX maintains a toll-free CSX ETHICS INFORMATION HOTLINE, which is available 24 hours a day, 7 days a week at 1-800-737-1663, for individuals to report actual or suspected misconduct, ask questions, or raise concerns about business ethics and compliance matters, without fear of retaliation. CSX has a non-retaliation policy that prohibits retaliation against an employee for raising a concern or reporting actual or suspected misconduct in good faith. Anyone may contact the CSX Ethics Information Hotline if they have compliance questions or concerns, and callers have the right to remain anonymous, if they wish. Investigations will be conducted in as confidential a manner as possible, depending upon the circumstances presented.

At the direction of CSX's management, the CSX Ethics Information Hotline is administered by CSX's Senior Director, Ethics & Compliance and is staffed by members of the Ethics & Compliance Group in Audit and Advisory Services, who are responsible for receiving and handling calls made to the CSX Ethics Information Hotline. The Senior Director, Ethics & Compliance and members of the Ethics & Compliance Group under his direction have been appropriately trained on CSX's hotline procedures, including interviewing and investigative techniques. All reports to the Hotline will be reviewed and investigated promptly and appropriate

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

remedial measures will be undertaken. The Director, Ethics & Compliance will report periodically to the Audit Committee on calls received by the Ethics Information Hotline, including reports concerning financial and accounting issues.

CSX VALUES

At CSX, we believe that living by a set of fundamental core values help define the true measure of a company - they guide the way we treat each other and how we make business decisions. When all employees are aligned to fundamental guiding principles, companies consistently deliver superior financial results that ensure long-term success.

At CSX, we have developed a core ideology that is the foundation for everything we do and is embodied in the motto: "Right results, right way." This creates an environment that allows us to maintain a focus on what is important, while challenging everything else in a drive for continuous improvement. There is nothing magical about this concept. It is the discipline of execution that distinguishes great companies. It is about building an organization that has purpose, focus and alignment; that lives its values every day; and that creates an environment that allows employees to grow and to produce superior results.

This core ideology - our vision, purpose and values - is the heart and soul of our Company. We believe that adhering to this core ideology will help us become an even stronger and sustainable organization - a leader in an evolving business world. For more information about CSX values, visit our web site at http://www.csx.com/index.cfm?fuseaction=company.values.

GUIDE TO BUSINESS CONDUCT

CSX is committed to maintaining high ethical and legal standards in its business conduct. We expect every director, officer, and employee to conduct himself or herself in accordance with the following Guide to Business Conduct.

CONDUCT INVOLVING OURSELVES AND OUR FELLOW EMPLOYEES

The basis of our values is dignity and mutual respect. These fundamental values drive our business.

MANAGEMENT RESPONSIBILITY

At CSX, leaders must show a commitment to CSX's values through their actions. They must also promote an environment where compliance is expected and ethical behavior is the norm. All CSX directors, officers and employees must comply with the Company's values and principles. No one may ask any CSX director, officer or employee to break the law or violate the Company's policies, procedures and values.

RESPECT AND FAIR TREATMENT

CSX is firmly committed to the principles of equality of opportunity in employment and human relationships. Each CSX employee is expected to treat fellow employees with respect and dignity.

CSX offers employment, training, compensation and advancement on the basis of qualification, merit and business needs, regardless of race, color, religion, sex (including pregnancy, childbirth or related medical conditions), age, national origin or ancestry, physical or mental disability, veteran status, secular orientation or any status protected by law not listed here. Fulfillment of our commitment to equal employment opportunity requires action by all employees throughout CSX. We all have a responsibility to promote equal employment opportunities. CSX is pledged

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

to affirmative action programs that provides employment and promotional opportunities for minorities, women, individuals with disabilities and veterans. Employees are encouraged to contact their Human Resources representative to review the Affirmative Action Plan for the CSX company for which they work.

Similarly, business relationships with competitors, suppliers and customers of CSX must always be conducted free of discrimination based on race, color, religion, sex (including pregnancy, childbirth, or related medical conditions), age, national origin or ancestry, physical or mental disability, veteran status, sexual orientation, marital status or any status protected by law not listed here. All CSX employees are responsible for implementing CSX's policy of non-discrimination. This may require special affirmative action by all levels of executive, managerial and supervisory personnel to seek out competent persons and business entities entitled to the benefits of the broad CSX commitment to equal opportunity.

Employees are encouraged to review the Equal Employment Opportunity policy for the CSX company for which they work and to direct any questions or complaints to the appropriate individuals designated in that policy.

HARASSMENT

Our policy is to provide a work environment that is pleasant, professional and free from intimidation, hostility or other offenses that might interfere with work performance. CSX does not tolerate any form of harassment - verbal, physical or visual - by supervisors, other employees, customers, vendors, agents or other third parties. Harassment is personally offensive, lowers morale and interferes with the ability to work cooperatively. Accordingly, CSX companies have a zero tolerance for harassment based on sex, race, color, religion, national origin, age physical or mental disability, veteran status, or any other status protected by applicable federal or state law.

Employees are encouraged to review the Policy on Harassment for the CSX company for which they work and to direct any questions or complaints to the appropriate individuals designated in that policy.

EMPLOYEE PRIVACY

CSX companies respect the privacy of all employees. CSX will only use employee records as necessary for business needs, and will share employee information only for business reasons consistent with applicable laws. Some personal employee information is very sensitive and cannot be made public under many laws. This includes certain payroll records and medical history records.

CONDUCT INVOLVING OUR BUSINESS PARTNERS

Our values, honesty and standards of conduct do not stop with our actions, or at our doors. We expect the same from our suppliers, customers and others with whom we do business.

FAIR COMPETITION AND ANTITRUST REQUIREMENTS

All business activities of the CSX companies are highly competitive, and it is the policy of CSX to compete aggressively, but fairly. A major part of CSX's commitment to compete fairly is a commitment to comply with the antitrust laws. In general, these complex laws prohibit any form of agreement or understanding - whether formal or informal, written or oral, express or implied - between or among competitors that unreasonably limits or restricts competition between them. Breaking these laws can bring very severe penalties (civil and criminal) to both the Company and the individual. CSX's commitment to compliance with the antitrust laws includes the following guidelines:

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

- CSX employees may not discuss, or enter into a formal or informal agreement with competitors about prices other than joint line rates (sometimes called "through rates"). This includes agreements about matters affecting price such as demurrage terms, credit terms and other "price-like" commercial terms.

- CSX employees may not discuss, or enter into a formal or informal agreement with competitors about dividing customers, sales territories, or lines of business between themselves.

- This policy also prohibits any unfair or untrue disparagement of a CSX competitor.

- Absent compelling special circumstances, CSX companies should select all vendors and contractors on the basis of competitive bids.

GATHERING AND USING COMPETITIVE INFORMATION

To compete in the marketplace, it is necessary and legal to gather competitive information. CSX employees may only gather information through lawful means. Information about competitors' rates and other actions in the marketplace can almost always be freely received from CSX customers. Employees should maintain the confidentiality of information entrusted to them by the Company or its customers, except when disclosure is authorized or legally mandated. CSX employees must never use any illegal or unethical means to obtain information about other companies.

CSX employees should not share confidential information from suppliers or customers with anyone outside CSX without written permission. Confidential information includes all non-public information that is shared with you in the reasonable expectation that it will be kept confidential and that might be of use to that company's competitors, or harmful to CSX or CSX customers, if disclosed. If agreements are signed to protect information, be sure to follow their terms and conditions. Do not steal trade secret information, and do not suggest or ask others to disclose trade secrets, especially new employees hired from a competitor. New hires may not bring papers or computer records from prior employers, if those papers or records contain proprietary or confidential information belonging to their prior employer.

ACCURATE AND COMPLETE BOOKS, RECORDS AND ACCOUNTING

A company's credibility is judged in many ways - one fundamental way is the integrity of its books, records and accounting. In addition to our own commitment to accurately report financial performance, CSX companies are required by securities laws to report financial information in accordance with generally accepted accounting principles.

Every CSX director, officer and employee must help ensure that reporting of business and financial information - computerized, paper or otherwise - is accurate, complete and timely. This includes accurate recording of costs, revenues, time sheets, vouchers, bills, payroll and benefits records, and regulatory data, among other business information.

In addition, all directors, officers and employees of CSX companies must:

- Follow all laws, accounting requirements and company procedures for reporting financial information;

- Never deliberately make a false or misleading entry in any report or record;

- Never suppress, alter or destroy company records without authorization;

CSX Ethics Information Hotline: 1-800-737-1663

- Never sell, transfer or dispose of company assets without proper documentation and authorization;

- Cooperate with our internal and outside auditors;

- Contact the accounting or auditing organization with any questions about the proper recording of business and financial transactions; and

- Contact the Law Department with any legal questions you may have relating to these topics.

DOING BUSINESS WITH THE GOVERNMENT

Each year, CSX companies do substantial business with the U.S. and other Governments. While integrity is the foundation for our dealing with all customers, special rules apply when the Government is our customer, which are very different from those that govern our dealings with private sector companies. Violations of Government procurement laws can result in criminal and civil penalties, loss of contracts and ineligibility from doing further business with the Government. Under the civil False Claims Act, in particular, the Government can impose liability on a contractor for the submission of false claims to the Government, or a false statement in support of a claim, including the costs of the lawsuit, triple the amount of its actual damages, and a civil penalty of between $5,000 and $10,000 for each false claim. A "claim" is a request or demand for money or property submitted by a contractor to the Government, such as an invoice or contract billing. For this reason, it is important that all invoices or billings submitted by CSX to the Government be accurate and complete.

Those involved in bidding or providing products or services under a Government contract need to know these special rules, which include, but are not limited to, the following:

- Never seek or accept from any federal agency, or from any other source, a competitor's confidential bid or proposal information or an agency's source selection information prior to the award of the agency contract to which the information relates.

- Know the special rules on offering or providing gifts, gratuities or entertainment to Government employees, and obtain any advance approvals required by Company procedures.

- When dealing with a quasi-governmental body, know whether government procurement laws and/or ethics rules apply to your dealings with them.

- Know and follow the anti-kickback rules, including restrictions on gifts by those seeking business from the Government and from Government contractors.

- Understand "most favored customer" pricing and disclosure requirements and verify compliance.

- Conform strictly to the contract specifications, and all quality, quantity, delivery and testing requirements.

- Charging and allocation of costs, including employee time and overhead, provision of any cost or pricing data and billings to the Government must always be accurate, complete and in full compliance with applicable procurement rules and regulations.

- Be truthful, accurate, current and complete in all representations and certifications made to Government agencies.

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

- Do not falsify any document or provide any misleading information relating to the award, performance or payment under any Government contract or subcontract.

- Know your Government customer's rules and regulations, including the requirements of standard contract clauses incorporated in the contract, either directly or by reference.

- Refrain from initiating any employment discussions with any current or former Government employee without first consulting with the Legal Department.

If you are involved with any aspect of a Government contract, you must not take any action that would violate any of these requirements.

DEALING WITH SUPPLIERS

CSX's Purchasing and Materials group handles the procurement, materials management and transport of items and services necessary for running a railroad and the Company, including investment recovery activities. The relationships we establish with our suppliers are important to us. The values of CSX are applicable in all of our dealings with suppliers, including a commitment to achieving the right results in the right way. CSX's policy is to base all procurement decisions on the best value received by CSX. CSX companies will not knowingly use suppliers who participate in any of the following activities: supply unsafe products or services; violate laws or regulations; or use child labor or forced labor.

Good procurement conduct - which is required of any CSX employee in any department who has dealings with supplier or vendors - includes the following:

- Use established corporate-wide or regional supply (leveraged) agreements;

- Whenever possible, obtain competitive bids when leveraged agreements do not exist;

- Ensure the overall performance capability of the supplier, including delivery, quality and financial status;

- Make sure that purchase agreements clearly state the services or products to be provided, the basis for earning payment, and the applicable rate or fee;

- The fee or price paid for goods and services by CSX must represent the value of the goods or services provided;

- Avoid reciprocal agreements;

- Encourage support for minority and women-owned businesses; and

- Purchase in support of CSX's Environmental, Safety and Health values and policies.

RELATIONSHIPS AND CONFLICTS OF INTEREST

Fair Dealing: Each CSX employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No CSX director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

Conflicts of Interest: A "conflict of interest" occurs when an individual's private interest interferes in any way - or even just appears to interfere - with the interests of the Company as a whole. A conflict situation can arise when a director, officer or employee takes actions or has interests that may make it difficult to perform his or her company work objectively and effectively. Conflicts of interest also arise when a director, officer or employee, or a friend or member of his or her family, receives improper personal benefits as a result of his or her position in the Company. Loans to, or guarantees of obligations of, such persons are of special concern.

It is CSX policy that no director, officer or employee - or any member of his or her immediate family - should acquire a financial interest in, or accept employment by, an entity doing business with a CSX company if the interest or employment would conflict with the employee's performance of his or her duties. Similarly, no CSX director, officer or employee should take any business action for personal benefit, or to benefit a friend or relative.

Corporate Opportunities: Pursuant to CSX's policy prohibiting conflicts of interest, CSX directors, officers and employees are expected to make decisions in the best interests of the Company, and not for personal gain. CSX directors, officers and employees are prohibited from: (1) taking for themselves personally opportunities that are discovered through the use of corporate property, information or position; (2) using corporate property, information or position for personal gain; and (3) competing with the Company.

Directors, officers and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. CSX directors, officers and employees also have a duty to report to the CSX Ethics Information Hotline any situation that may appear to present a conflict of interest.

ENTERTAINMENT AND GIFTS

Ethical considerations are extremely important in supplier, competitor and customer relationships. CSX's position is clear: no gift, favor, hospitality or entertainment should be accepted or provided if it will create a feeling of obligation, compromise judgement or appear to influence the recipient. Kickbacks, bribes, rebates or other forms of illegal consideration are never acceptable, and should never be given or accepted by anyone acting on behalf of a CSX company. Receiving or giving gifts of cash or cash equivalents, including gift certificates, prepaid credit or charge cards, or gift cards, is never permitted.

To help ensure that your decisions are the right ones, ask yourself the following questions when giving or receiving any form of business entertainment or gift:

- Is it legal, customary and in good taste?

- Is it clearly related to the conduct of CSX business?

- Would you feel comfortable giving or receiving the entertainment or gift in a public setting?

- Could the offer influence or appear to influence your business judgement in any way?

If any doubt exists as to the impact that giving or receiving entertainment or gifts could have on the reputation of the Company or your personal reputation, the entertainment or gift should not be offered or accepted. Because these judgements sometimes can be difficult, CSX has established certain standards for exchanging entertainment and gifts which are described below. Your organization may choose to establish entertainment and gift policies that are more restrictive than those described below.

CSX Ethics Information Hotline: 1-800-737-1663

 Powered by Morningstar® Document Research℠

It is generally accepted business practice to provide and accept meals and entertainment that occur in conjunction with business meetings and conferences provided the meals and entertainment are not lavish. It is also acceptable to accompany a supplier or customer to recreational or social outings that have a clear business goal or charitable purpose. Invitations that involve customer or supplier provided overnight accommodations may be accepted only with the prior written approval of the department head. Employees should never solicit entertainment from suppliers or customers.

Gifts are defined as items, products or services given to an employee by a competitor, supplier, customer or any other party with whom CSX does business. Tickets to sporting or other events where the supplier or customer has no intention of accompanying the employee are considered gifts.

Employees may accept nominal gifts defined as having a value of up to $100 per year from a single organization. Employees may not solicit gifts. No gift may be offered in violation of another organization's standards.

CSX employees dealing with Government officials should be particularly alert to the special rules that may limit or prohibit giving gifts, gratuities, entertainment or other favors to Government officials. In conducting business with Government officials, CSX will abide by all existing regulations and laws. Specific questions regarding Government officials should be directed to Government Affairs, the Law Department or the Ethics Information Hotline.

CONDUCT INVOLVING OUR BUSINESS RESOURCES

CSX is committed to protecting its business resources. We expect every director, officer and employee to follow the standards set for the in the following Conduct Involving our Business Resources.

RESPONSIBLE USE OF COMPANY ASSETS

CSX employees should respect Company property and use Company assets, including computers and related information technology assets, only in accordance with established company policies, including the CSX Information Users Policy. Theft, carelessness, misuse and waste of company property have a direct impact on the Company's profitability. Company assets and resources should be used only to conduct company business, and not for personal gain or any non-business purpose.

DOCUMENT AND RECORDS MANAGEMENT

CSX's records and information are Company assets. The Company's Records and Information Management program assists employees in managing these assets efficiently and in accordance with Company policy.

Records and information can exist in many ways, such as documents, files, graphs, and databases, and may be kept in hard copy, electronically or on film. In order to ensure that valuable business information is well-organized and available when needed, employees should properly label and carefully handle confidential and proprietary information in accordance with procedures set forth in the CSX Records and Information Management Manual.

The Company's Record and Information Management program includes records retention policies and procedures. Check with your supervisor or the Company's Record Manager for policies regarding the retention of documents and other records that you handle, if any. Keep in mind that certain records and information pertaining to our business must be maintained for specific periods of time for legal reasons or for review by regulatory authorities.

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

In addition, from time to time, we receive requests from Government agencies or other third parties for documents and records relating to our business. Once we have received such a request, we are often prohibited by law from destroying documents or information responsive to that request. CSX companies have developed a policy to suspend records disposition when such circumstances arise. This policy, known as a "Legal Hold Policy," is designed to ensure that all affected personnel and departments are promptly notified and relevant documents and information are identified, segregated and preserved when a legal obligation arises to preserve or retain them. If you are advised that the Company has received any such document request, you must not destroy any requested or related documents or records until you have been advised by the Law Department that you are permitted to do so.

INSIDER TRADING

In the course of your employment with CSX, you may become aware of material information about CSX or other companies that has not been made public. The use of such "inside information" about CSX or another company for your financial or other benefit is not only unethical, but also may be a violation of strict Federal laws against "insider trading" in securities (for example, stocks, bonds and options).

"Inside information" means information that:

- Is not available to the public, and

- Is "material."

"Material information" means information that a reasonable investor would likely consider important in deciding whether to buy or sell a security. Many of our employees may have inside information simply by virtue of their positions. Inside information might include, for example:

- The purchase or sale of a major asset;

- Changes in dividend policy;

- Mergers, acquisitions and joint ventures;

- Significant changes in operations or business plans;

- Major developments in litigation;

- The financial condition or operating results of a company, including earnings statements and forecasts; and

- Regulatory developments.

If you have knowledge of any of these kinds of information - and the information is non-public - it is inside information, and no CSX employee may buy or sell securities while aware of inside information. Inside information can also be information you obtained confidentially during the course of your work about another company - for example, from a customer or supplier. You should also be aware that the insider trading prohibition applies to people outside of CSX companies who obtain the information from one of our employees (for example, an employee's spouse, friends or broker). This means you must never give someone outside your company a "tip" regarding non-public inside information - this includes discussions on Internet "chat rooms." If you do, and the person you provided the information to uses it to trade, both you an the person you provided the information to are subject to action under the Federal securities law.

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

Securities law violations are taken very seriously and can be prosecuted even when the amount involved is small, or the "tipper" makes no profit at all. Government agencies regularly monitor trading activities through computerized searches. CSX employees (and outsiders they are associated with) who have inside information can lawfully trade in the market once the information is made public through established channels and enough time has passed for the information to be absorbed by the public.

If you have questions or concerns about your responsibilities under the insider trading laws, contact the Law Department or the CSX Ethics Information Hotline for further guidance.

ACCURACY OF BOOKS, RECORDS AND FINANCIAL REPORTING

Investors count on CSX to use and provide accurate information so they can make informed decisions. All CSX officers and employees must properly record many kinds of business information. All financial books, records and reports must correctly reflect transactions and events on a timely basis. These records must meet both generally accepted accounting principles and CSX's internal control requirements. The following are examples of activities that are not allowed:

- Failing to record or disclose funds or assets that should be recorded in a timely manner;

- Making false claims on an expense report, time sheet or any other report;

- Giving false or misleading quality or safety results or reports;

- Understating or overstating known liabilities or assets;

- Delaying the entry of items that should be current expenses;

- Hiding the true nature of any transaction; or

- Providing inaccurate or misleading information for Company benefit programs.

CSX directors, officers and employees must be sure that any document they prepare or sign is correct and truthful.

INTELLECTUAL PROPERTY

CSX's intellectual property - patents, trade secrets, trademarks, copyrights and other proprietary information - is considered a valuable Company asset. It is CSX's policy to establish, protect, maintain and defend its rights in all commercially significant intellectual property and to use those rights in responsible ways. All CSX employees must take steps to safeguard those assets.

In addition to protecting CSX's intellectual property rights, CSX respects the valid intellectual property rights of others. Unauthorized use of the intellectual property rights of others may expose CSX to civil lawsuits and damages. Theft and misappropriation of trade secrets, proprietary information or other intellectual property may result in significant fines and criminal penalties to both CSX and to the individual. New CSX products, services (including e-commerce initiatives), processes and software, and any proposed use of the intellectual property of others, should be timely and reasonably reviewed for infringement.

USE OF COMPUTER RESOURCES

CSX companies have specific policies concerning employee use of Company e-mail, the Internet and Company intranet, and other electronic information sources while on Company time or using



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Company computers. E-mail and the Internet are powerful communication tools and valuable business assets. However, improper use of e-mail, Internet and Company intranet services can waste time and resources, and create legal liabilities and embarrassment for our employees and our Company. CSX's Information Users Policy explains what employees can and cannot do when using the Company's computer resources and includes policies pertaining to use of e-mail, the Internet and Company intranet, and the export of software and other information through CSX computer resources.

CSX employees should use extreme caution when using e-mail to transmit information that may contain our company trade secrets, business plans or any other confidential or proprietary information (including the confidential or proprietary information of others). CSX employees must not send e-mail messages or otherwise use our e-mail or Internet systems in connection with:

- Engaging in illegal, fraudulent or malicious activities;

- Copying or distributing copyrighted material - for example, software, database files, MP3 files, documentation or copyrighted articles using our Company e-mail systems;

- Engaging in activities on behalf of organizations with no professional or business affiliation with our Company;

- Sending or storing offensive, sexually explicit, obscene or defamatory material;

- Annoying or harassing other people;

- Using another person's identity without explicit authorization;

- Attempting to test, circumvent or defeat security or auditing systems, without prior authorization;

- Permitting any unauthorized person to access our company e-mail systems; or

- Distributing chain letters, solicitations or offers to buy or sell goods.

CSX does allow limited personal use of our Company e-mail and Internet systems, so long as such use is reasonable, does not violate any provision of this Code of Ethics or copyright laws, and does not interfere with your productivity or the productivity of your co-workers. You must assume that an e-mail message may be disclosed to or read by individuals other than the intended recipient(s), since messages can easily be forwarded to other individuals and retained indefinitely. Therefore, you should never create an e-mail message that you or the Company would not want used as evidence in any dispute, investigation or lawsuit. Finally, because e-mail messages can often be read out of context, it is extremely important that you avoid writing any e-mail message that even appears to violate any provision of the law or this Code of Ethics.

CONDUCT INVOLVING OUR COMMUNITIES

At CSX, we are deeply committed to enhancing the quality of life in the communities we serve.

ENVIRONMENTAL POLICY

As a global transportation leader, CSX is committed to protecting the environment and ensuring the safety and health of our employees and the public. We back our commitment by promoting best practices in environmental stewardship.

Daily decisions and actions at CSX are guided by the following environmental principles:

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

- Comply with applicable environmental laws and regulations;
- Make operations safe for employees, customers and the environment;
- Minimize waste, prevent pollution, and incorporate recycling in all practices and operations;
- Strive to eliminate releases that impact the environment;
- Employ sound environmental practices to address and redevelop environmentally impacted property;
- Encourage open and candid communication with employees, customers, and the public regarding the Company's environmental program and any hazard that may arise from its operations;
- Strive continually to improve environmental performance.

SAFETY POLICY

The safe operation of CSX activities is always a primary goal. All CSX officers and employees, without exception, are responsible for ensuring that CSX operations are conducted safely. We are committed to provide transportation services in a manner that will ensure the safety of our employees, our customers and the communities we serve. Employees are expected to observe all safety rules and practices and to follow instructions concerning safe and efficient work practices. All employees should advise their supervisor or other management representatives immediately if they see a work practice or activity they consider to be conducted in an unsafe or careless manner.

CSX provides emergency planning assistance and training to local fire, police and emergency response personnel in communities served by our Company.

POLITICAL CONTRIBUTIONS AND PUBLIC SERVICE INVOLVEMENT

CSX and its subsidiaries work hard to earn and maintain the respect of the communities in which they operate. As good neighbors and good corporate citizens, we seek to support the efforts of our many employee-volunteers who contribute time and talent to local organizations. At the same time, we support a wide variety of regional and national organizations dedicated to improving the health, safety and well-being of our nation's citizens. CSX employees are encouraged to speak out on important community issues. Employees must be careful, however, not to give the impression that they are speaking on behalf of a CSX company unless they are actually authorized to do so.

No CSX company is permitted to contribute, directly or indirectly, to any Federal political campaign. Employees may not use company expense accounts to pay for any personal political contributions or seek any other form of company reimbursement.

In addition, employees should not use company facilities or resources for the benefit of any party or candidate, including an employee individually running for office. Employees are encouraged to contribute to properly established political action committees.

THE U.S. FOREIGN CORRUPT PRACTICES ACT ("FCPA")

The FCPA prohibits the giving or offering of money or anything of value, either directly or through a third party, to an official of a foreign government, foreign government agency or instrumentality (which may include government monopolies, corporations, etc.) or to any foreign political party,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

party official or candidate, except for certain narrow exceptions as discussed below. The FCPA prohibits bribes and other improper payment regardless of the fact that they may be widely accepted or even seem necessary in the foreign country in question. A violation is a serious criminal offense for both companies and individuals, and may result in fines, loss of export privileges and imprisonment for individuals.

CSX's policy with respect to foreign corrupt practices and irregular transactions is to respect and adhere to the FCPA and laws of each country in which it does, and never to engage in bribery. In certain circumstances, so-called "facilitating payments" - small payments to foreign government officials for routine governmental actions - are permissible under the FCPA. The purpose of such payments is to expedite the performance of a duty that the Government official is otherwise required to perform, and is distinguishable from a bribe, which is a payment given to persuade an official to give favorable treatment or exercise his discretion in favor of a payment-giver. CSX policy requires written pre-approval by the Law Department of any facilitating payment.

INTERNATIONAL BUSINESS

CSX policy is to fully comply with the specific laws and regulations of all countries where we do business, and with all U.S. laws affecting international trade, such as anti-boycott, trade sanction, export control and foreign corrupt practices laws. Violations of these laws carry stiff civil and criminal penalties for individuals and the Company, and could cause serious damage not only to our corporate reputation, but also to the public at large. Employees involved in foreign operations should be aware of these laws, and should always consult with the Law Department to ensure that CSX companies do not violate any relevant laws.

-----------------

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

EXHIBIT 21

SUBSIDIARIES OF THE REGISTRANT

As of December 26, 2003, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation, Inc. (a Virginia corporation)
CSX Rail Holding Corporation (a Delaware corporation)
CSX Intermodal, Inc. (a Delaware corporation)
CSX Technology, Inc. (a Virginia corporation)
CSX Residual Company (a Delaware corporation)
SL Service, Inc. (a Delaware corporation)

As of December 26, 2003, none of the other subsidiaries included in the Registrant's consolidated financial statements constitute a significant subsidiary.


Powered by Morningstar® Document Research℠

EXHIBIT 23.1

Consent of Independent Auditors

We consent to the incorporation by reference in each Form S-3 Registration Statement or Post-Effective Amendment (Registration Nos. 33-2084, 333-54700 and 333-60134) and in each Form S-8 Registration Statement (Registration Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41736, 33-57029, 333-09213, 333-73427, 333-73429, 333-32008, 333-43382, 333-48896 and 333-66604) of our report dated February 10, 2004, with respect to the consolidated financial statements of CSX Corporation included in this Annual Report (Form 10-K) for the fiscal year ended December 26, 2003.

/s/ Ernst & Young LLP

Jacksonville, Florida
March 9, 2004


Powered by Morningstar® Document Research℠

EXHIBIT 23.2

Consent of Independent Auditors

We consent to the use of our report dated January 27, 2004, with respect to the consolidated financial statements of Conrail Inc. and subsidiaries as of December 31, 2003 in this Annual Report (Form 10-K) of CSX Corporation and subsidiaries (CSX).

We also consent to the incorporation by reference in each Form S-3 Registration Statement or Post-Effective Amendment (Registration Nos. 33-2084, 333-54700 and 333-60134) and in each Form S-8 Registration Statement (Registration Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41736, 33-57029, 333-09213, 333-73427, 333-73429, 333-32008, 333-43382, 333-48896 and 333-66604) of our report dated January 27, 2004, with respect to the consolidated financial statements of Conrail Inc. and subsidiaries as of December 31, 2003 included in this Annual Report (Form 10-K) of CSX for the fiscal year ended December 26, 2003.

/s/ Ernst & Young LLP
Jacksonville, Florida
March 9, 2004

/s/ KPMG LLP
Norfolk, Virginia
March 9, 2004


Powered by Morningstar® Document Research℠

EXHIBIT 24

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D. C., a Form 10-K (Annual Report), hereby constitutes and appoints Carolyn T. Sizemore and Ellen M. Fitzsimmons his true and lawful attorneys-in-fact and agents, for him and in his name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this 9th day of March 2004.

/s/ ELIZABETH E. BAILEY
Elizabeth E. Bailey

/s/ ROBERT L. BURRUS, JR
Robert L. Burrus, Jr.

/s/ BRUCE C. GOTTWALD
Bruce C. Gottwald

/s/ EDWARD J. KELLY, III
Edward J. Kelly, III

/s/ ROBERT D. KUNISCH
Robert D. Kunisch

/s/ SOUTHWOOD J. MORCOTT
Southwood J. Morcott

/s/ DAVID M. RATCLIFFE
David M. Ratcliffe

/s/ CHARLES E. RICE
Charles E. Rice

/s/ WILLIAM C. RICHARDSON
William C. Richardson

/s/ FRANK S. ROYAL
Frank S. Royal

/s/ DONALD J. SHEPARD
Donald J. Shepard

/s/ MICHAEL J. WARD
Michael J. Ward

/s/ OSCAR MUNOZ
Oscar Munoz


Powered by Morningstar® Document Research℠

EXHIBIT 31.1

CERTIFICATE OF CHIEF EXECUTIVE OFFICER

I, Michael J. Ward, certify that:

1. I have reviewed this annual report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) [omitted pursuant to the guidance of Release No. 33-8283 (June 5, 2003)]

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2004

/s/ MICHAEL J. WARD

---------------------------------------

Michael J. Ward
Chairman, President and Chief
Executive
Officer


Powered by Morningstar® Document Research℠

EXHIBIT 31.2

CERTIFICATE OF CHIEF FINANCIAL OFFICER

I, Oscar Munoz, certify that:

1. I have reviewed this annual report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) [omitted pursuant to the guidance of Release No. 33-8283 (June 5, 2003)]

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2004

/s/ OSCAR MUNOZ

---

Oscar Munoz
Executive Vice President and Chief
Financial Officer


Powered by Morningstar® Document Research℠

EXHIBIT 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the period ending December 26, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Ward, Chief Executive Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: March 9, 2004

/s/ MICHAEL J. WARD
--------------------------------------
Michael J. Ward
Chairman and Chief Executive Officer


Powered by Morningstar® Document Research℠

EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the period ending December 26, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Oscar Munoz, Chief Financial Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: March 9, 2004

/s/ OSCAR MUNOZ

--------------------------------------

Oscar Munoz
Executive Vice President and Chief
Financial Officer



Powered by Morningstar® Document Research℠

EXHIBIT 99.3

# REPORT OF MANAGEMENT

THE STOCKHOLDERS
CONRAIL INC.

Management is responsible for the preparation, integrity and objectivity of the Company's consolidated financial statements. The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States of America and include amounts based on management's best estimates and judgment.

The Company maintains a system of internal accounting controls and procedures, which is continually reviewed and supported by written policies and guidelines and supplemented by internal audit services. The system provides reasonable assurance that assets are safeguarded against loss from unauthorized use and that the books and records reflect the transactions of the Company and are reliable for the preparation of financial statements. The concept of reasonable assurance recognizes that the cost of a system of internal accounting controls should not exceed the benefits derived and also recognizes that the evaluation of these factors necessarily requires estimates and judgments by management.

The Company's consolidated financial statements are audited by its independent accountants. Their audit is conducted in accordance with auditing standards generally accepted in the United States of America and considers the Company's system of internal accounting controls to determine the nature, timing and extent of the auditing procedures required for expressing an opinion on the Company's financial statements.

The Company's Board of Directors, which is comprised of an equal number of directors from Norfolk Southern Corporation ("NSC") and CSX Corporation ("CSX"), pursues its oversight responsibilities for the consolidated financial statements and corporate conduct through periodic meetings with and written reports from the Company's management.

/s/ Gregory R. Weber
-------------------------
Gregory R. Weber
Chief Executive Officer

/s/ Joseph W. Rogers
-------------------------
Joseph W. Rogers
Chief Financial Officer

January 27, 2004


Powered by Morningstar® Document Research SM

# INDEPENDENT AUDITORS' REPORT

THE STOCKHOLDERS AND BOARD OF DIRECTORS
CONRAIL INC.:

We have audited the accompanying consolidated balance sheets of Conrail Inc. and subsidiaries as of December 31, 2003 and 2002, and the related consolidated statements of income, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2003. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Conrail Inc. and subsidiaries as of December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2003 the Company adopted Financial Accounting Standards Board Statement No. 143, "Accounting for Asset Retirement Obligations."

/s/ KPMG LLP
---------------------
KPMG LLP
Norfolk, Virginia

/s/ Ernst & Young LLP
------------------------
Ernst & Young LLP
Jacksonville, Florida

January 27, 2004



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONRAIL INC.
CONSOLIDATED STATEMENTS OF INCOME

| ($ In Millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| | YEARS ENDED DECEMBER 31, | | |
| REVENUES - NSC/CSX (NOTE 2) | $ 836 | $ 813 | $ 823 |
| REVENUES - THIRD PARTIES | 82 | 80 | 80 |
| Total operating revenues | 918 | 893 | 903 |
| OPERATING EXPENSES (NOTE 3) | | | |
| Compensation and benefits | 168 | 151 | 158 |
| Fuel | 7 | 6 | 7 |
| Material, services and rents | 119 | 125 | 143 |
| Depreciation and amortization | 329 | 322 | 325 |
| Casualties and insurance | 17 | 2 | (13) |
| Other | 19 | 17 | 19 |
| Total operating expenses | 659 | 623 | 639 |
| Income from operations | 259 | 270 | 264 |
| Interest expense | (99) | (104) | (109) |
| Other income, net (Note 10) | 96 | 94 | 103 |
| Income from continuing operations before income taxes and accounting change | 256 | 260 | 258 |
| Provision for income taxes (Note 7) | 93 | 80 | 84 |
| Income from continuing operations before accounting change | 163 | 180 | 174 |
| Cumulative effect of change in accounting principle, net of taxes (Note 1) | 40 | -- | -- |
| NET INCOME | $ 203 | $ 180 | $ 174 |

See accompanying notes to the consolidated financial statements.

CONRAIL INC.
CONSOLIDATED BALANCE SHEETS

| ($ In Millions) | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 18 | $ 23 |
| Accounts receivable, net | 34 | 35 |
| Due from NSR/CSXT (Note 2) | 136 | 158 |
| Material and supplies | 8 | 8 |
| Deferred tax assets (Note 7) | 45 | 65 |
| Other current assets | 16 | 11 |
| Total current assets | 257 | 300 |
| PROPERTY AND EQUIPMENT, NET (NOTE 4) | 6,119 | 6,382 |
| NOTES RECEIVABLE FROM NSC/CSX (NOTE 2) | 1,231 | 892 |
| OTHER ASSETS | 609 | 583 |
| Total assets | $ 8,216 | $ 8,157 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | 37 | 33 |
| Current maturities of long-term debt (Note 6) | 58 | 57 |
| Due to NSC/CSX (Note 2) | 5 | 9 |
| Wages and employee benefits | 31 | 31 |
| Casualty reserves | 39 | 69 |
| Accrued and other current liabilities (Note 5) | 109 | 130 |
| Total current liabilities | 279 | 329 |
| LONG-TERM DEBT (NOTE 6) | 1,067 | 1,123 |
| CASUALTY RESERVES | 125 | 119 |
| DEFERRED INCOME TAXES (NOTE 7) | 1,836 | 1,822 |
| OTHER LIABILITIES | 455 | 538 |
| Total liabilities | 3,762 | 3,931 |
| COMMITMENTS AND CONTINGENCIES (NOTE 11) | | |
| STOCKHOLDERS' EQUITY (NOTES 3 AND 9) | | |
| Common stock ($1 par value; 100 shares authorized, issued and outstanding) | -- | -- |
| Additional paid-in capital | 2,221 | 2,221 |
| Retained earnings | 2,337 | 2,134 |
| Accumulated other comprehensive loss | (104) | (129) |
| Total stockholders' equity | 4,454 | 4,226 |
| Total liabilities and stockholders' equity | $ 8,216 | $ 8,157 |

See accompanying notes to the consolidated financial statements.



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

CONRAIL INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

($ in Millions)

| | Additional Paid-In Capital | Unearned ESOP Compensation | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|
| BALANCE, JANUARY 1, 2001 | $ 2,222 | $ (20) | $ 1,780 | $ -- | $ 3,982 |
| Comprehensive income - 2001 | | | | | |
| Net Income | -- | -- | 174 | -- | 174 |
| Minimum pension liability, net of $45 million income taxes (Note 8) | -- | -- | -- | (70) | (70) |
| Total comprehensive income | | | | | 104 |
| Allocation of unearned ESOP compensation | (1) | 20 | -- | -- | 19 |
| BALANCE, DECEMBER 31, 2001 | 2,221 | -- | 1,954 | (70) | 4,105 |
| Comprehensive income - 2002 | | | | | |
| Net Income | -- | -- | 180 | -- | 180 |
| Minimum pension liability, net of $39 million income taxes (Note 8) | -- | -- | -- | (59) | (59) |
| Total comprehensive income | | | | | 121 |
| BALANCE, DECEMBER 31, 2002 | 2,221 | -- | 2,134 | (129) | 4,226 |
| Comprehensive income - 2003 | | | | | |
| Net Income | -- | -- | 203 | -- | 203 |
| Minimum pension liability, net of $16 million income taxes (Note 8) | -- | -- | -- | 25 | 25 |
| Total comprehensive income | | | | | 228 |
| BALANCE, DECEMBER 31, 2003 | $ 2,221 | $ -- | $ 2,337 | ($ 104) | $ 4,454 |

See accompanying notes to the consolidated financial statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONRAIL INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS

| ($ In Millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| | YEARS ENDED DECEMBER 31, | | |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net income | $ 203 | $ 180 | $ 174 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Net cumulative effect of change in accounting principle | (40) | -- | -- |
| Depreciation and amortization | 329 | 322 | 325 |
| Deferred income taxes | (12) | (9) | (18) |
| Equity in earnings of affiliates | (19) | (19) | (24) |
| Gains from sales of property | (7) | (3) | (2) |
| Pension credit | (4) | (17) | (19) |
| Changes in: | | | |
| Accounts receivable | 1 | (3) | 1 |
| Accounts and wages payable | 4 | (14) | (32) |
| Due from NSR/CSXT | 22 | 14 | 60 |
| Due to NSC/CSX | (4) | (3) | (19) |
| Other | (61) | (25) | 56 |
| Net cash provided by operating activities | 412 | 423 | 502 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Property and equipment acquisitions | (35) | (23) | (47) |
| Notes receivable from NSC/CSX | (339) | (377) | (424) |
| Proceeds from disposal of property and equipment | 12 | 14 | 14 |
| Other | 2 | 11 | -- |
| Net cash used in investing activities | (360) | (375) | (457) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Payment of long-term debt | (57) | (59) | (61) |
| Net cash used in financing activities | (57) | (59) | (61) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (5) | (11) | (16) |
| CASH AND CASH EQUIVALENTS | | | |
| At beginning of year | 23 | 34 | 50 |
| At end of year | $ 18 | $ 23 | $ 34 |

See accompanying notes to the consolidated financial statements.


Powered by Morningstar® Document Research℠

CONRAIL INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

DESCRIPTION OF BUSINESS

Conrail Inc. ("Conrail") is a holding company whose principal subsidiary is Consolidated Rail Corporation ("CRC"), the major freight railroad in the Northeast. Norfolk Southern Corporation ("NSC") and CSX Corporation ("CSX"), the major railroads in the Southeast, jointly control Conrail through their ownership interests in CRR Holdings LLC ("CRR"), whose primary subsidiary is Green Acquisition Corporation ("Green Acquisition"), which owns Conrail. NSC and CSX have equity interests in CRR of 58% and 42%, respectively, and voting interests of 50% each. Under operating and lease agreements, NSC and CSX operate a substantial portion of the Conrail properties through their railroad subsidiaries, Norfolk Southern Railway Company ("NSR") and CSX Transportation, Inc. ("CSXT")(Note 2).

PRINCIPLES OF CONSOLIDATION

The consolidated financial statements include Conrail and majority-owned subsidiaries. Investments in 20% to 50% owned companies are accounted for by the equity method. All significant intercompany accounts and transactions have been eliminated.

CASH EQUIVALENTS

Cash equivalents consist of highly liquid securities purchased with a maturity of three months or less, and are stated at cost which approximates market value.

MATERIAL AND SUPPLIES

Material and supplies consist of maintenance material valued at the lower of cost or market.

PROPERTY AND EQUIPMENT

Property and equipment are recorded at cost. Depreciation is provided using the composite straight-line method over estimated service lives. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Maintenance expense is recognized when repairs are performed. The cost (net of salvage) of depreciable property retired or replaced in the ordinary course of business is charged to accumulated depreciation and no gain or loss is recognized. In 2003, the overall depreciation rate averaged 3.4% for all roadway and equipment.

During 2003, the Company completed a study to update the estimated useful lives of its roadway and track property and the associated accumulated depreciation reserves. This review did not have a material impact on the Company's consolidated financial statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ASSET IMPAIRMENT

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Expected future cash flows from the use and disposition of long-lived assets are compared to the current carrying amounts to determine the potential impairment loss.

NEW ACCOUNTING PRONOUNCEMENTS

The Company adopted Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards (SFAS) No. 143, "Accounting for Asset Retirement Obligations", effective January 1, 2003. Pursuant to SFAS 143, companies are precluded from accruing removal cost expenses that are not legal obligations. Previously, Conrail and most other railroads had accrued removal costs as a component of depreciation expense. In the first quarter of 2003, the Company recorded income of $40 million for the cumulative effect of this change ($65 million before taxes). Effective with this pronouncement, removal cost are expensed as incurred. This change did not have a material impact on the Company's consolidated financial statements.

Also in 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities" (FIN 46) which requires that a variable interest entity be consolidated by the company that is subject to a majority of the economic risks and/or rewards of that entity. The FASB delayed until 2004, the implementation of FIN 46 for certain variable entities that existed prior to February 1, 2003. The Company has a fifty percent non-controlling interest in Locomotive Management Services (LMS), an unconsolidated partnership established in 1994, which will likely be consolidated pursuant to FIN 46. LMS, a locomotive leasing venture, had assets totaling $37 million as of December 31, 2003, consisting primarily of depreciable equipment property. Total liabilities as of December 31, 2003 totaled $40 million, including $30 million in long-term debt installments maturing in 2012. If consolidation is required, the impact on the consolidated financial statements will be immaterial -(Note 11).

REVENUE RECOGNITION

The Company's major sources of revenues are from NSC and CSX, primarily in the form of rental revenues and operating fees, which are recognized when earned (Note 2). Conrail also has third party revenues, which are recognized when earned, related to the operations of Indiana Harbor Belt Railroad Company, a 51% owned terminal railroad subsidiary.



 Powered by Morningstar® Document Research℠

USE OF ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets as well as liabilities for litigation, environmental remediation, casualty claims, income taxes and pension and postretirement benefits. Changes in facts and circumstances may result in revised estimates.

RECLASSIFICATIONS

Certain amounts in the consolidated financial statements and notes thereto have been reclassified to conform to the 2003 presentation.

2. RELATED PARTIES TRANSACTIONS

BACKGROUND

On May 23, 1997, NSC and CSX completed their joint acquisition of Conrail stock. On June 17, 1997, NSC and CSX executed an agreement that generally outlines the methods of governing and operating Conrail and its subsidiaries ("Transaction Agreement"). On July 23, 1998, the Surface Transportation Board ("STB") issued a written opinion that permitted NSC and CSX to exercise operating control of Conrail beginning August 22, 1998. On June 1, 1999, NSC and CSX began to operate over certain Conrail lines.

OPERATIONS BY NSR AND CSXT

The majority of CRC's routes and assets are segregated into separate subsidiaries of CRC, Pennsylvania Lines LLC ("PRR") and New York Central Lines LLC ("NYC"). PRR and NYC have separate but identical operating and lease agreements with NSR and CSXT, respectively, (the "Operating Agreements") which govern substantially all nonequipment assets to be used by NSR and CSXT and have initial 25-year terms, renewable at the options of NSR and CSXT for two 5-year terms. Payments made under the Operating Agreements are based on appraised values that are subject to adjustment every six years. NSR and CSXT have also leased or subleased certain equipment assets at rentals based on appraised values for varying term lengths from PRR and NYC, respectively, as well as from CRC.

NSC and CSX also have agreements with CRC governing other Conrail properties that continue to be owned and operated by Conrail ("the Shared Assets Areas"). NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas plus a profit factor.



 Powered by Morningstar® Document Research℠

Payments made by NSR to Conrail under the Shared Assets agreements were $135 million and $115 million during 2003 and 2002, respectively, of which $31 million and $23 million, were minimum rents. Payments made by CSXT to Conrail under the Shared Assets agreements were $124 million and $92 million during 2003 and 2002, respectively, of which $24 million and $17 million, were minimum rents.

Payments from NSR under the Operating Agreements to PRR amounted to $348 million and $339 million during 2003 and 2002, respectively. Payments from CSXT under the Operating Agreements to NYC amounted to $253 million and $248 million during 2003 and 2002, respectively. In addition, costs necessary to operate and maintain the related assets under these agreements, including leasehold improvements, are borne by NSR and CSXT.

Future minimum lease payments to be received from NSR/CSXT are as follows:

$ IN MILLIONS

| | NSR TO PRR | NSR TO CRC | CSXT TO NYC | CSXT TO CRC | TOTAL |
|---|---|---|---|---|---|
| 2004 | $ 342 | $ 32 | $ 237 | $ 23 | $ 634 |
| 2005 | 321 | 33 | 223 | 24 | 601 |
| 2006 | 307 | 34 | 212 | 24 | 577 |
| 2007 | 295 | 34 | 205 | 24 | 558 |
| 2008 | 290 | 34 | 200 | 24 | 548 |
| 2009 and Beyond | 4,128 | 551 | 2,740 | 378 | 7,797 |
| TOTAL | $ 5,683 | $ 718 | $ 3,817 | $ 497 | $10,715 |

RELATED PARTY BALANCES AND TRANSACTIONS

"Due from NSR/CSXT" at December 31, 2003 and 2002, is primarily comprised of amounts due for the above-described operating and rental activities.

PRR and NYC have interest-bearing notes receivable due from NSC and CSX. As of December 31, 2003, the notes receivable due from NSC and CSX included in noncurrent assets were $716 million and $515 million, respectively. At December 31, 2002, the notes receivable balances from NSC and CSX included in noncurrent assets were $513 million and $379 million, respectively. The interest rates on the notes receivable from NSC and CSX are variable and were both 1.66% at December 31, 2003. Interest income related to the PRR and NYC notes receivable was $16 million in 2003, $18 million in 2002 and $13 million in 2001.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

"Due to NSC/CSX" includes amounts payable for property and equipment rentals, as well as amounts related to service provider agreements with both NSC and CSX to provide certain general and administrative support to CRC.

A summary of the "Due to NSC and CSX" activity for the services described above follows:

$ IN MILLIONS

| | PAYMENTS TO NSC | | PAYMENTS TO CSX | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Service Provider Agreements | $ 7 | $ 5 | $ 3 | $- |
| Material purchases | 18 | 20 | -- | -- |
| Rental of locomotives, equipment and facilities | 5 | 5 | 4 | 4 |
| Capital Project activities | 6 | 5 | -- | -- |
| TOTAL PAYMENTS | $36 | $35 | $ 7 | $ 4 |

| | 2003 | 2002 | 2003 | 2002 |
|---|---|---|---|---|
| Due to "NSC and CSX" at December 31 | $ 3 | $ 7 | $ 2 | $ 2 |

From time to time, NSC and CSX, as the indirect owners of Conrail, may need to provide some of Conrail's cash requirements through capital contributions, loans or advances. Through December 31, 2003 there have been no transactions under these arrangements.

PROPOSED SPIN-OFF OF PRR AND NYC

In June 2003, Conrail together with NSC and CSX, filed a joint petition with the STB to establish direct ownership and control by NSR and CSXT of PRR and NYC, respectively. The proposed transaction would replace the existing operating agreements and allow NSR and CSXT to operate PRR and NYC, respectively, via direct ownership. The proposed transaction does not involve the Shared Assets Areas. The proposed transaction is subject to a number of conditions, including STB approval, an Internal Revenue Service



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(IRS) ruling qualifying it as a nontaxable distribution and obtaining consents from Conrail's debt holders. (In 2003, the IRS issued a ruling that the reorganization would qualify as a tax-free distribution. Also in 2003, the STB granted its authorization to carry out the proposed transaction, subject to certain conditions.)

As a part of the proposed transaction, Conrail would undertake a restructuring of its existing unsecured and secured public indebtedness. Currently the Company has two series of unsecured public debentures with an outstanding principal amount of $800 million at December 31, 2003 and 13 series of secured debt with an outstanding principal amount of approximately $321 million at December 31, 2003. It is currently contemplated that guaranteed debt securities of two newly formed corporate subsidiaries of NSR and CSXT would be offered in a 58%/42% ratio in exchange for Conrail's unsecured debentures. Upon completion of the proposed transaction, the new debt securities would become direct unsecured obligations of NSR and CSXT, respectively.

Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations of NSR or CSXT.

Conrail, NS and CSX are working to complete all steps necessary to consummate the spin-off in 2004. A valuation of NYC and PRR will be performed prior to effecting the spin-off transaction. The results of the valuation could impact the carrying value of the assets of NYC and PRR. Upon consummation of the proposed transaction, the Company's primary source of revenue will be related to the operation of the Shared Assets Areas instead of the operating and equipment rental activities of PRR and NYC. The Company's future operating expenses will also reflect this change in operations. Accordingly, the Company's prospective operating results will be significantly different than those currently reported.

3. TRANSITION, ACQUISITION-RELATED AND OTHER ITEMS

During the first quarter of 2002 and the fourth quarter of 2001, the Company received cash proceeds totaling $4 million and $42 million respectively, from several London-based insurance carriers as settlement for current and future exposures related to personal injury, occupational, environmental and other claims. The Company recognized pretax gains of $4 million and $14 million, respectively, which is included in the "Casualties and insurance" line item of the income statement for 2002 and 2001.

During 2002, accrued termination payments totaling $1 million were made to 6 non-union employees whose non-executive positions were eliminated as a result of the joint acquisition of Conrail. During 2001 accrued termination payments of $15 million were made. Most of these termination



 Powered by Morningstar® Document Research℠

payments have been made in the form of supplemental retirement benefits from the Company's pension plan. As of December 31, 2003, the remaining amount of this liability is less than $1 million.

During the second quarter of 2001, the Company received a $50 million cash payment for transferring to a third party certain of its rights to license, manage and market signboard advertising on the Company's property for 25 years. The payment is being recognized into other income on a straight-line basis over the 25 year contract period.

Also during 2001, the Company made final settlement of a long-term liability related to the non-union Employee Stock Ownership (ESOP) termination, which did not require use of the Company's cash for settlement. The liability, the balance of which was $20 million at December 31, 2000, was settled as the remaining cash proceeds held by the ESOP as a result of selling its ESOP preferred stock in conjunction with the joint acquisition, were allocated to eligible participants.

The Company has a long-term liability in connection with employment "change in control" agreements with certain current and former executives, which became operative as a result of the joint acquisition of Conrail. Payments were $4 million in 2003, $1 million in 2002 and $9 million in 2001 and were made primarily from the Company's pension plan. The remaining amount, approximately $24 million at December 31, 2003, will be paid out at the discretion of the participants in the program.

4. PROPERTY AND EQUIPMENT DECEMBER 31,

| | 2003 | 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Roadway | $ 7,400 | $ 7,476 |
| Equipment | 1,544 | 1,511 |
| Less: Accumulated depreciation | (3,029) | (2,828) |
| | 5,915 | 6,159 |
| Capital leases (primarily equipment) | 416 | 496 |
| Accumulated amortization | (212) | (273) |
| | 204 | 223 |
| | $ 6,119 | $ 6,382 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Substantially all assets are leased to NSR or CSXT (Note 2).

5. ACCRUED AND OTHER CURRENT LIABILITIES

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Operating leases | $ 47 | $ 47 |
| Income and other taxes | 36 | 47 |
| Other | 26 | 36 |
| | $109 | $130 |

6. LONG-TERM DEBT AND LEASES

LONG-TERM DEBT

Long-term debt outstanding, including the weighted average interest rates at December 31, 2003, is composed of the following:

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Capital leases | $ 157 | $ 192 |
| Debentures payable,7.88%,due 2043 | 250 | 250 |
| Debentures payable,9.75%,due 2020 | 550 | 550 |
| Equipment and other obligations,6.97% | 168 | 188 |
| | 1,125 | 1,180 |
| Less current portion | (58) | (57) |
| | $ 1,067 | $ 1,123 |

Interest payments were $100 million in 2003, $105 million in 2002 and $113 million in 2001.

Equipment and other obligations mature in 2004 through 2043 and are collateralized by assets with a net book value of $208 million at December 31, 2003. Maturities of long-term debt other than capital leases are $21 million in 2004, $20 million in 2005, $21 million in 2006, $43 million in 2007, $18 million in 2008 and $845 million in total from 2009 through 2043.

LEASES

The Company's noncancelable long-term leases generally include options to purchase at fair value and to extend the terms. Certain lease obligations are payable in Japanese yen, which require the maintenance of yen-denominated deposits sufficient to satisfy the yen-denominated obligation. These deposits are included in the "Other assets" line item of the balance sheet and totaled $43 million and $45 million at December 31,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

2003 and December 31, 2002, respectively. Capital leases have been discounted at rates ranging from 3.09% to 14.26% and are collateralized by assets with a net book value of $204 million at December 31, 2003.

Minimum commitments, exclusive of executory costs borne by the Company, are:

| | CAPITAL LEASES | OPERATING LEASES |
|---|---|---|
| | (IN MILLIONS) | |
| 2004 | $ 54 | $ 58 |
| 2005 | 38 | 58 |
| 2006 | 25 | 56 |
| 2007 | 27 | 55 |
| 2008 | 15 | 51 |
| 2009 - 2025 | 39 | 271 |
| Total | 198 | $549 |
| Less interest portion | (41) | |
| Present value | $ 157 | |

Operating lease rent expense was $60 million in 2003, $62 million in 2002 and $70 million in 2001.

7. INCOME TAXES

The provisions for income taxes are composed of the following:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | (IN MILLIONS) | |
| Current | | | |
| Federal | $ 94 | $ 81 | $ 77 |
| State | 11 | 8 | 25 |
| | 105 | 89 | 102 |
| Deferred | | | |
| Federal | (21) | (20) | (22) |
| State | 9 | 11 | 4 |
| | (12) | (9) | (18) |
| | $ 93 | $ 80 | $ 84 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Reconciliation of the U.S. statutory tax rates with the effective tax rates is as follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | | 4.24.2 | 4.2 |
| Settlement of IRS audit | -- | (5.6) | -- |
| Settlement of state tax issues | -- | -- | (3.5) |
| Other | (2.9) | (2.8) | (3.1) |
| Effective tax rate | 36.3% | 30.8% | 32.6% |

The Company has reached final settlements with the Internal Revenue Service ("IRS") related to all of the audits of the Company's consolidated federal income tax returns through the fiscal year May 23,1997. As a result of the settlement Conrail received tax refunds of $24 million and reduced tax expense by $14 million during 2002. The Company's consolidated income tax returns for the short tax year period May 24, 1997-December 31, 1997 and calender year periods 1998 through 2001 are currently being examined by the IRS. Federal and state income tax payments were $129 million in 2003, $113 million in 2002 and $86 million in 2001.

Significant components of the Company's deferred income tax assets (liabilities) are as follows:

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Current assets | $ 1 | $ 5 |
| Current liabilities | 44 | 60 |
| CURRENT DEFERRED TAX ASSET, NET | $ 45 | $ 65 |
| Noncurrent liabilities: | | |
| Property and equipment | (1,970) | (2,000) |
| Other | (117) | (112) |
| | (2,087) | (2,112) |
| Noncurrent assets: | | |
| Nondeductible reserves and other liabilities | 251 | 290 |
| DEFERRED INCOME TAX LIABILITIES, NET | $(1,836) | $(1,822) |

The Company has not recorded a valuation allowance, as management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred tax assets.



 Powered by Morningstar® Document Research℠

8. PENSION AND POSTRETIREMENT BENEFITS

The Company and its subsidiaries sponsor several qualified and nonqualified pension plans and other postretirement benefit plans for its employees.

PENSION PLAN ASSET MANAGEMENT

Six investment firms manage the Company's defined benefit pension plan's assets under investment guidelines approved by a pension fund investment committee. Investments are allocated among domestic fixed income investments, and domestic and international equity investments. Limitations restrict investment concentration and use of certain derivative instruments. Fixed income investments must have an average rating of `AA' or better. Equity investments must be in liquid securities listed on national exchanges. However no direct investment is permitted in the securities of either NSC or CSX. Equity investment managers have specific equity strategies and their returns are expected to exceed selected market indices by prescribed margins.

The target asset allocation range is for equity allocations to be between 44% and 56% of the fund's assets with approximately 10% of the assets allocated to international equity investments. The asset allocation on December 31, 2003, was 45% in fixed income investments and 55% in equity investments including 13% in international equities. This compared to 54% fixed income and 46% equity including 9% international equity as of December 31, 2002.

The plan's assumed future returns are based principally on the asset allocation and the historic returns for the plan's asset classes determined from both the actual plan returns and, over longer time periods, the market returns for those asset classes.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

MEDICARE CHANGES

The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the Act) was signed into law in December 2003. The Act introduces a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is at least actuarially equivalent to Medicare Part D. Because significant uncertainties exist regarding the measurement and disclosure requirements of the Act, the FASB has issued staff position No. FAS 106.1, which allows a plan sponsor to recognize or defer accounting for the effects of the Act in their 2003 financial statements. The Company has elected the deferral option and is currently evaluating how the Act may impact its postretirement benefit obligations. Specific authoritative guidance on the accounting for the Act's subsidy is pending, and that guidance, when issued, could require the Company to change previously reported information.

The following tables provide a reconciliation of the changes in the plans' benefit obligations and fair value of assets over the two-year period ending December 31, 2003, and a statement of the funded status as of December 31 of both years:

| | PENSION BENEFITS | | OTHER POSTRETIREMENT BENEFITS | |
|---|---|---|---|---|
| (IN MILLIONS) | 2003 | 2002 | 2003 | 2002 |
| CHANGE IN BENEFIT OBLIGATION | | | | |
| Net benefit obligation at beginning of year | $ 646 | $ 662 | $ 37 | $ 36 |
| Service cost | 1 | 1 | -- | -- |
| Interest cost | 41 | 44 | 2 | 3 |
| Plan participants' contributions | -- | -- | 4 | 6 |
| Actuarial losses | 32 | 5 | 4 | 2 |
| Benefits paid | (65) | (66) | (10) | (10) |
| Net benefit obligation at end of year | $ 655 | $ 646 | $ 37 | $ 37 |
| CHANGE IN PLAN ASSETS | | | | |
| Fair value of plan assets at beginning of year | $ 522 | $ 613 | $ 7 | $ 8 |
| Actual return on plan assets | 117 | (28) | -- | 1 |
| Employer contributions | 2 | 3 | 5 | 2 |
| Plan participants' contributions | -- | -- | 4 | 6 |
| Benefits paid | (65) | (66) | (10) | (10) |
| Fair value of plan assets at end of year | $ 576 | $ 522 | $ 6 | $ 7 |
| Funded status at end of year | $ (79) | $(124) | $ (31) | $ (30) |
| Unrecognized prior service cost | 7 | 8 | (1) | (1) |
| Unrecognized actuarial (gains)losses | 168 | 206 | (5) | (9) |
| Net amount recognized at year end | $ 96 | $ 90 | $ (37) | $ (40) |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The following amounts have been recognized in the balance sheets as of December 31:

| | PENSION BENEFITS | | OTHER POSTRETIREMENT BENEFITS | |
|---|---|---|---|---|
| (IN MILLIONS) | 2003 | 2002 | 2003 | 2002 |
| Prepaid pension cost | $ 131 | $ 126 | -- | -- |
| Accrued benefit cost | (214) | (257) | $ (37) | $(40) |
| Intangible asset | 7 | 8 | -- | -- |
| Accumulated other comprehensive loss | 172 | 213 | -- | -- |
| | $ 96 | $ 90 | $ (37) | $(40) |

All of the Company's plans for postretirement benefits other than pensions have no plan assets except for the retiree life insurance plan, which has $6 million and $7 million of assets in 2003 and 2002, respectively. The aggregate benefit obligation for the postretirement plans other than pensions was $37 million at, both December 31, 2003 and 2002, respectively.

The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $648 million, $641 million and $566 million, respectively, as of December 31, 2003 and $639 million, $635 million and $514 million, respectively as of December 31, 2002. As required by Statement of Financial Accounting Standard No. 87 "Employers'Accounting for Pensions", the Company has recorded an additional minimum liability of $179 million and $220 million at December 31, 2003 and December 31, 2002, respectively. The additional liability was partially offset by an intangible asset to the extent of previously unrecognized prior service costs of $7 million at both December 31, 2003 and December 31, 2002. The remaining amounts, $104 million as of December 31, 2003 and $129 million as of December 31, 2002, are recorded as a component of stockholders' equity, net of related tax benefits as "Accumulated Other Comprehensive Loss".



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONRAIL INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The assumptions used in the measurement of the Company's benefit obligation are as follows:

| | PENSION BENEFITS | | OTHER POSTRETIREMENT BENEFITS | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| FUNDED STATUS: | | | | |
| Discount rate | 6.25% | 6.75% | 6.25% | 6.75% |
| Rate of compensation increase | 5.00% | 5.00% | 5.00% | 5.00% |
| PENSION COST: | | | | |
| Discount rate | 6.75% | 7.25% | 6.75% | 7.25% |
| Expected return on plan assets | 9.00% | 9.00% | 8.00% | 8.00% |
| Rate of compensation increase | 5.00% | 5.00% | 5.00% | 5.00% |

A 10% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2003, gradually decreasing to 5% by the year 2006.

Assumed health care cost trend rates affect amounts reported for the health care plans. The effect of a one percentage point increase and (decrease) in the assumed health care cost trend rate on the accumulated postretirement benefit obligation is $1 million and $(1) million, respectively.

The components of the Company's net periodic benefit cost for the plans are as follows:

| | PENSION BENEFITS | | | OTHER POSTRETIREMENT BENEFITS | | |
|---|---|---|---|---|---|---|
| (IN MILLIONS) | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| Service cost | $ 1 | $ 1 | $ 2 | $ -- | $ -- | $ -- |
| Interest cost | 41 | 44 | 45 | 2 | 3 | 3 |
| Expected return on assets | (52) | (62) | (66) | -- | (1) | (1) |
| Amortization of: | | | | | | |
| Transition asset | -- | -- | (1) | -- | -- | -- |
| Prior service cost | 1 | 1 | 1 | -- | -- | -- |
| Actuarial (gain)loss | 5 | (1) | (1) | -- | -- | (1) |
| | $ (4) | $(17) | $(20) | $ 2 | $ 2 | $ 1 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONTRIBUTIONS FOR PENSION AND OTHER POSTRETIREMENT BENEFITS

The Company expects to contribute approximately $2 million to the pension plans and $3 million to the other postretirement benefit plans in 2004.

SAVINGS PLANS

The Company and certain subsidiaries provide 401(k) savings plans for union and non-union employees. For the non-union savings plan, the Company matches a portion of employee contributions, subject to the applicable limitations. Savings plan expense related to the non-union savings plan was $1 million in each of the years 2003, 2002 and 2001. There is no Company match provision under the union employee plan except for certain unions, which negotiated a Company match as part of their contract provisions.

INCENTIVE COMPENSATION PLANS

The Company has an incentive compensation plan for all non-union employees in which employees receive targeted cash awards upon attainment of certain performance criteria established by the Company's Board of Directors. Compensation expense under this plan was $3 million in 2003 and 2002 and $2 million in 2001.

The Company also has a long-term incentive plan under which phantom stock options are granted to officers and other key non-union employees. The option price for the phantom shares is equal to the blended fair market value of NSC and CSX common stock at the date of grant. Options will vest one year after grant date and the option term may not exceed ten years. Upon exercise, eligible participants will receive cash payments equal to the appreciation on the composite NSC and CSX common stock fair values. Compensation expense for this plan was $2 million in 2003, less than $1 million in 2002 and $2 million in 2001.

9. STOCKHOLDERS' EQUITY

COMMON STOCK

On May 23, 1997, the NSC/CSX joint tender offer for the remaining outstanding shares of Conrail's common and preferred stock was concluded, and on June 2, 1997, Conrail became the surviving corporation in a merger with Green Merger Corp. and remained the only subsidiary of Green Acquisition, an entity jointly-owned by NSC and CSX. As a result, the remaining outstanding capital stock of Conrail was acquired by NSC and CSX and Green Acquisition was issued 100 shares of Conrail's common stock.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

UNDISTRIBUTED EARNINGS OF EQUITY INVESTEES

"Retained earnings" includes undistributed earnings of equity investees of $218 million, $199 million and $180 million at December 31, 2003, 2002 and 2001, respectively.

## 10. OTHER INCOME, NET

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | (IN MILLIONS) | |
| Interest income | $ 20 | $ 23 | $ 21 |
| Rental income | 46 | 45 | 47 |
| Property sales | 7 | 3 | 2 |
| Equity in earnings of affiliates | 19 | 19 | 24 |
| Other, net | 4 | 4 | 9 |
| | $ 96 | $ 94 | $103 |

## 11. COMMITMENTS AND CONTINGENCIES

ENVIRONMENTAL

The Company is subject to various federal, state and local laws and regulations regarding environmental matters. CRC is a party to various proceedings brought by both regulatory agencies and private parties under federal, state and local laws, including Superfund laws, and has also received inquiries from governmental agencies with respect to other potential environmental issues. At December 31, 2003, CRC has received, together with other companies, notices of its involvement as a potentially responsible party or requests for information under the Superfund laws with respect to cleanup and/or removal costs due to its status as an alleged transporter, generator or property owner at 37 locations. Due to the number of parties involved at many of these sites, the wide range of costs of possible remediation alternatives, the changing technology and the length of time over which these matters develop, it is often not possible to estimate CRC's liability for the costs associated with the assessment and remediation of contaminated sites.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Although the Company's operating results and liquidity could be significantly affected in any quarterly or annual reporting period if CRC were held principally liable in certain of these actions, at December 31, 2003, the Company had accrued $61 million, an amount it believes is sufficient to cover the probable liability and remediation costs that will be incurred at Superfund sites and other sites based on known information and using various estimating techniques. The Company anticipates that much of this liability will be paid out over five years; however some costs will be paid out over a longer period. The Company believes the ultimate liability for these matters will not materially affect its consolidated financial condition.

The Company spent $5 million in 2003, $6 million in 2002 and $10 million in 2001 for environmental remediation and related costs. In addition, the Company's capital expenditures for environmental control and abatement projects were less than $1 million in each of the years 2001 thru 2003.

CASUALTY

The Company is involved in various legal actions, principally relating to occupational health claims, personal injuries, casualties and property damage. The casualty claim liability is determined using the aid of an independent actuarial firm based upon claims filed and an estimate of claims incurred but not yet reported. The Company is generally self-insured for casualty claims. Claims in excess of self-insurance levels are insured up to excess coverage limits. While the ultimate amounts of claims incurred are dependent upon future developments, in management's opinion, the recorded liability is adequate to cover expected probable payments.

Expense recognized for casualty claims is included in the "Casualties and insurance" line item of the income statement. For 2003, the expense recognized was consistent with actuarial estimates. During both 2002 and 2001, the Company, based on favorable claims development, recognized actuarial determined gains of $16 million and $12 million respectively.

LABOR

CRC had 1,346 employees at December 31, 2003; approximately 89% of whom are represented by 11 different labor organizations and are covered by 16 separate collective bargaining agreements. These agreements remain in effect until changed pursuant to the Railway Labor Act. The Company was engaged in collective bargaining at December 31, 2003 with labor organizations representing approximately 6% of its labor force.

GUARANTEES

CRC currently guarantees the principal and interest payments in the amount of $27 million on Equipment Trust Certificates for LMS. In addition, CRC is also contingently liable as guarantor with respect to $3 million of indebtedness for an affiliate company, Triple Crown Services. No liability has been recorded related to these guarantees.



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

Also the Company is contingently liable under indemnification provisions related to the sale of tax benefits. This liability is recorded in the "Other liability" line item of the balance sheet and totaled $13 million at both December 31, 2003 and December 31, 2002.

12. FAIR VALUES OF FINANCIAL INSTRUMENTS

The fair values of "Cash and cash equivalents," "Accounts receivable," "Notes receivable from NSC/CSX" and "Accounts payable" approximate the carrying values of these financial instruments at December 31, 2003 and 2002.

Using current market prices when available, or a valuation based on the yield to maturity of comparable debt instruments having similar characteristics, credit rating and maturity, the total fair value of the Company's long-term debt, including the current portion, but excluding capital leases, is $1,260 million and $1,254 million at December 31, 2003 and 2002, respectively, compared with carrying values of $968 million and $988 million at December 31, 2003 and 2002.



Created by Morningstar® Document Research
http://documentresearch.morningstar.com

Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research SM

# EXHIBIT PX0666

SLOVER & LOFTUS
ATTORNEYS AT LAW
1224 SEVENTEENTH STREET, N. W.
WASHINGTON, D. C. 20036-3003

WILLIAM L. SLOVER
C. MICHAEL LOFTUS
JOHN H. LE SEUR
KELVIN J. DOWD
ROBERT D. ROSENBERG
CHRISTOPHER A. MILLS
FRANK J. PERGOLIZZI
ANDREW B. KOLESAR III
PETER A. PFOHL
DANIEL M. JAFFE
KENDRA A. ERICSON

OF COUNSEL
DONALD G. AVERY

TELEPHONE:
(202) 347-7170

FAX:
(202) 347-3619

WRITER'S E-MAIL:
pap@sloverandloftus.com

216410

April 27, 2006

RECEIVED

**VIA HAND DELIVERY**

The Honorable Vernon Williams
Secretary
Surface Transportation Board
1925 K Street, N.W.
Room 711
Washington, DC 20423

Re: Ex Parte No. 661, *Rail Fuel Surcharges*

Dear Secretary Williams:

Enclosed for filing in the referenced proceeding, please find an original and ten copies of the Statement of the Western Coal Traffic League, along with a computer disc which contains the filing. Please note that this filing contains several pages in color (in the Exhibits). Their locations are marked with tape flags on the unbound originals.

An additional copy of the Statement also is enclosed. Kindly indicate receipt and filing by time-stamping this copy and returning it to the bearer of this letter.

Thank you for your attention to this matter.

Sincerely,

Peter A. Pfohl

Peter A. Pfohl
An Attorney for the
Western Coal Traffic League

Enclosures

216410

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

| | | |
|---|---|---|
| **RAIL FUEL SURCHARGES** | ) | **Ex Parte No. 661** |

**STATEMENT OF**
**THE WESTERN COAL TRAFFIC LEAGUE**


Of Counsel:

Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

By: William L. Slover
Peter A. Pfohl
Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

Attorneys & Practitioners


Dated: April 27, 2006

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

| | | |
|---|---|---|
| **RAIL FUEL SURCHARGES** | ) | **Ex Parte No. 661** |

**STATEMENT OF**
**THE WESTERN COAL TRAFFIC LEAGUE**

In accordance with the Notice served by the Surface Transportation Board ("STB" or "Board") in the above-captioned proceeding on March 14, 2005, the Western Coal Traffic League ("WCTL" or "League") submits this Statement to express its views on the subject of fuel surcharges being collected by railroads.

## IDENTITY AND INTEREST

WCTL is an association whose membership is composed of organizations that purchase and transport coal mined west of the Mississippi.[1] WCTL members transport over 140 million tons of coal annually, nearly all of which moves by rail. WCTL has actively participated for many years before the Board, and its predecessor, the

[1] WCTL members include the following 18 entities: Ameren Energy Fuels and Services; Arizona Electric Power Cooperative, Inc.; Arizona Public Service; CLECO Corporation; City of Austin, Texas; CPS Energy; Kansas City Power & Light Company; Lower Colorado River Authority; MidAmerican Energy Company; Minnesota Power; Nebraska Public Power District; Omaha Public Power District; Texas Genco, LP; Texas Municipal Power Agency; Western Farmers Electric Cooperative; Western Fuels Association, Inc.; Wisconsin Public Service Corporation; and Xcel Energy.

Interstate Commerce Commission ("ICC" or "Commission"), in proceedings addressing railroad issues of general transportation importance, including in proceedings addressing substantive and procedural rules governing railroad regulatory and cost reporting requirements, and on initiatives designed to prevent railroad practices or conduct that contravenes the law. Because WCTL members must pay the significant fuel cost demands of the railroads as part of, or a supplement to, their rates, it has a direct and substantial interest in the subject matter of this proceeding.

## SUMMARY

Each of the major Class I western carriers that WCTL members relies on for rail transportation service, the Union Pacific Railroad Company ("UP") and the BNSF Railway Company ("BNSF") has implemented fuel surcharge programs on coal movements. As applied to coal, neither of these programs is designed or established to recover the increased cost of fuel for a particular movement to which the surcharge is applied. Instead of using actual, carrier-specific diesel fuel costs, these programs use inapplicable national average retail on-highway diesel fuel price data from the U.S. Department of Energy ("DOE") as a surrogate for railroad fuel costs and cost changes. The retail On-Highway Diesel Fuel Price employed by the western carriers does not reflect the prices actually paid by the carriers for fuel (or their changes in fuel costs) because they buy in bulk and pay considerably less than retail on-highway diesel fuel prices, and they engage in hedging and other activities designed to reduce costs and the

impact of market fluctuations.

In sum, the carriers' fuel surcharge programs do not accurately reflect either the cost or the change in the carriers's own fuel expenses for the individual movements to which the surcharge applies. As implemented and applied today, these programs are not reasonably targeted to cover sudden and unexpected incremental increases in fuel for the carriers' movements to individual customers. Instead, they are being used by carriers as a mechanism to collect billions of dollars in revenues.

The carriers are now attempting to set up their fuel surcharge programs as a permanent fixture, with the goal of implementing the programs on all coal and other customers. Historically, fuel surcharge programs were allowed to be implemented carefully and infrequently, and only as reasonably necessary in response to emergency situations involving precipitous fuel price increases threatening the continuity of commerce. In contrast, there has been no showing by the carriers today that their programs are reasonably directed at recovering the increased costs of fuel for a particular movement to which the surcharge is applied. Additionally, for coal and other freight commodities, the carriers have had ample time to adjust their rates involving line-haul freight to reflect the sustained fuel market price increases that have occurred over the past year and a half, and they have done so. Also, the carriers are already made whole for their fuel costs utilizing industry standard price adjustment mechanisms.

Given these facts, and the fact that the carriers are reaping billions of dollars of revenues from consumers from these programs that are not cost-justified, the Board has an obligation to further investigate this matter, and take necessary actions to proscribe the carriers from continuing any fuel surcharge programs that are not cost-justified and do not reflect the increased costs of fuel for a particular movement to which the surcharge is applied.

# I.

# BACKGROUND

## A. UP and BNSF's Fuel Surcharge Programs

UP's fuel surcharge program as applied to coal (and other commodities) is based on the DOE's Retail On-Highway Diesel Fuel ("HDF") price. UP's surcharge program is contained in UP Circular 6603, General Rule Item 690. This tariff, in turn, is implemented in UP's Circular 111, UP's pricing mechanism that applies to certain coal shipped from the Wyoming Powder River Basin ("PRB") coal mines, as well as in other UP pricing instruments. The rules governing UP's fuel surcharge program are as follows:

> In the event the average price of Retail On-Highway Diesel Fuel . . . ("HDF Average Price") calculated monthly based on prices reported on the U.S. Department of Energy Website (eia.doe.gov) equals or exceeds $1.35 per gallon, UP will apply a fuel surcharge to linehaul freight charges referencing or subject to this authority. The fuel surcharge shall be applied to the linehaul freight charge for each shipment . . . .

> The HDF Average Price for a given calendar month will be determined by adding the weekly Retail On-Highway Diesel Fuel prices reported on the U.S. Department of Energy Website (eia.doe.gov) and dividing the result by the number of weeks so reported. The result will be rounded to the nearest cent. . . . The following schedule reflects the applicable fuel surcharges within the HDF Average Price ranges noted below.

| **HDF Average Price (Per Gallon)** | Fuel Surcharge (Percentage) |
|---|---|
| $0.00 to $1.349 | 0.00% |
| $1.35 to $1.399 | 1.50% |
| $1.40 to $1.449 | 2.00% |
| $1.45 to $1.499 | 2.50% |
| $1.50 to $1.549 | 3.00% |
| $1.55 to $1.599 | 3.50% |
| $1.60 to $1.649 | 4.25% |
| $1.65 to $1.699 | 5.00% |
| $1.70 to $1.749 | 5.75% |
| $1.75 to $1.799 | 6.50% |
| $1.80 to $1.849 | 7.25% |
| $1.85 to $1.899 | 8.00% |
| $1.90 to $1.949 | 8.75% |
| $1.95 to $1.999 | 9.50% |
| $2.00 to $2.049 | 10.25% |
| Each $0.05 per gallon increase thereafter | Additional 0.75% |

BNSF's fuel surcharge program as applied on western coal movements uses the same index as that utilized by UP: the DOE's HDF index. BNSF's surcharge program is set forth in BNSF Rules Book 6100-A, Items 3380A and 3381. These common carrier tariff items, in turn, are implemented in BNSF's Common Carrier pricing Authority BNSF 90068, applying on Montana and Wyoming PRB Coal movements, as well as in other BNSF pricing instruments. The rules governing BNSF's fuel surcharge program, under Item 3380A are as follows:

> [BNSF's] fuel surcharge will be applicable when the U.S. Average Price of Retail On-Highway Diesel Fuel (HDF) for the month of (Time Period) equals or exceeds $1.24 per gallon. The applicable fuel surcharge will be applied to the total freight charges for each shipment . . . . The source for the price of HDF will be the U.S. Department of Energy's (EIA) Retail On-Highway Diesel Prices Report, whose weekly average price is available on their WebPages at: http://www.eia.doe.gov.

BNSF's applicable coal fuel surcharge table is as follows:

| Time Period's Average Price of HDF Between | Applicable Fuel Surcharge Rate (CFSR) | Time Period's Average Price of HDF Between | Applicable Fuel Surcharge Rate (CFSR) |
|---|---|---|---|
| $0.00 to $1.239 | 0.0% | $2.00 TO $2.039 | 10.0% |
| $1.24 to $1.279 | 0.5% | $2.04 TO $2.079 | 10.5% |
| $1.28 to $1.319 | 1.0% | $2.08 TO $2.119 | 11.0% |
| $1.32 to $1.359 | 1.5% | $2.12 TO $2.159 | 11.5% |
| $1.36 to $1.399 | 2.0% | $2.16 TO $2.199 | 12.0% |
| $1.40 to $1.439 | 2.5% | $2.20 TO $2.239 | 12.5% |
| $1.44 to $1.479 | 3.0% | $2.24 TO $2.279 | 13.0% |
| $1.48 to $1.519 | 3.5% | $2.28 TO $2.319 | 13.5% |
| $1.52 to $1.559 | 4.0% | $2.32 TO $2.359 | 14.0% |
| $1.56 to $1.599 | 4.5% | $2.36 TO $2.399 | 14.5% |
| $1.60 to $1.639 | 5.0% | $2.40 TO $2.439 | 15.0% |
| $1.64 to $1.679 | 5.5% | $2.44 TO $2.479 | 15.5% |
| $1.68 to $1.719 | 6.0% | $2.48 TO $2.519 | 16.0% |
| $1.72 to $1.759 | 6.5% | $2.52 TO $2.559 | 16.5% |
| $1.76 to $1.799 | 7.0% | $2.56 TO $2.599 | 17.0% |
| $1.80 to $1.839 | 7.5% | $2.60 TO $2.639 | 17.5% |
| $1.84 to $1.879 | 8.0% | $2.64 TO $2.679 | 18.0% |
| $1.88 to $1.919 | 8.5% | $2.68 TO $2.719 | 18.5% |
| $1.92 to $1.959 | 9.0% | $2.72 TO $2.759 | 19.0% |
| $1.96 to $1.999 | 9.5% | $2.76 TO $2.799 | 19.5% |

Additionally, under BNSF's new mileage-based system implemented January 1, 2006 (Item 3381), BNSF utilizes the same DOE HDF index as a basis for applying a fuel surcharge, and for coal, applies the surcharge on the BNSF rail mileage applicable to individual coal generating stations. BNSF's mileage-based coal fuel surcharge table is as follows:

**Fuel Surcharge Table**

| Time Periods Average Price of HDF Between | Fuel Surcharge Cents per Mile | Time Periods Average Price of HDF Between | Fuel Surcharge Cents per Mile |
|---|---|---|---|
| $0.00 to $1.249 | 0.00 | $2.15 to $2.209 | 0.16 |
| $1.25 to $1.309 | 0.01 | $2.21 to $2.269 | 0.17 |
| $1.31 to $1.369 | 0.02 | $2.27 to $2.329 | 0.18 |
| $1.37 to $1.429 | 0.03 | $2.33 to $2.389 | 0.19 |
| $1.43 to $1.489 | 0.04 | $2.39 to $2.449 | 0.20 |
| $1.49 to $1.549 | 0.05 | $2.45 to $2.509 | 0.21 |
| $1.55 to $1.609 | 0.06 | $2.51 to $2.569 | 0.22 |
| $1.61 to $1.669 | 0.07 | $2.57 to $2.629 | 0.23 |
| $1.67 to $1.729 | 0.08 | $2.63 to $2.689 | 0.24 |
| $1.73 to $1.789 | 0.09 | $2.69 to $2.749 | 0.25 |
| $1.79 to $1.849 | 0.10 | $2.75 to $2.809 | 0.26 |
| $1.85 to $1.909 | 0.11 | $2.81 to $2.869 | 0.27 |
| $1.91 to $1.969 | 0.12 | $2.87 to $2.929 | 0.28 |
| $1.97 to $2.029 | 0.13 | $2.93 to $2.989 | 0.29 |
| $2.03 to $2.089 | 0.14 | $2.99 to $3.049 | 0.30 |
| $2.09 to $2.149 | 0.15 | $3.05 to $3.109 | 0.31 |

Each $0.06 per gallon increase thereafter, apply an additional $0.01 per mile.

Example:

If May's average monthly price of HDF is $1.856 Per Gallon then the CMBFS applied in July would be $0.11 per mile. Thus, for a shipment traveling 1,000 BNSF railway miles a Fuel Surcharge of $110.00 would apply.

UP and BNSF's programs have similar characteristics. As referenced, each utilizes DOE's HDF On-Highway Diesel Fuel price for applying surcharges. Each program's fuel surcharge percentage changes as the utilized DOE reported HDF prices change. Each program bases fuel surcharges on a percentage of line-haul revenue, and BNSF also has a separate mileage-based program. Also, each fuel surcharge program employs a two-month "lag" in applying surcharges derived from the basis month from which the surcharges are applied (e.g., the fuel surcharge to be applied by UP and BNSF in May 2006 will utilize a basis month of March 2006 for determining the applicable fuel surcharge for May).

Since implementing its price-based coal fuel surcharge program, UP's surcharge has ranged from 2.0% to 22.25% of the line-haul rate per ton of coal. For May, 2006, UP's fuel surcharge is established at 18.5% of the line-haul rate. Applying this fuel

surcharge to a unit coal train rate of $11.00 per ton for the month of May 2006, would result in a fuel surcharge of $2.04 per ton ($11.00 x .185 = $2.04). If this movement involved a typical 135-car unit coal train with a total net weight of 16,200 tons (based on 120 tons per car), applicable fuel surcharges would be $33,048.00 (16,200 x $2.04 = $33,048.00) per train.

BNSF's mileage-based fuel surcharge has ranged from $0.20 per loaded car-mile to $0.23 per loaded car-mile, per car for coal unit trains. For May 2006, BNSF's fuel surcharge is established at $0.22 per loaded car-mile. Applying BNSF's mileage-based fuel surcharge for a 135-car unit coal train moving 1,000 miles in May 2006, applicable fuel surcharges would be $29,700.00 (1,000 x $0.22 x 135 = $29,700.00).[2]

Both UP and BNSF are aggressively implementing their fuel surcharge programs and they have been very successful in collecting fuel surcharges. UP's fuel surcharge revenues increased from $112 million in 2003 to over $1 billion in 2005. See UP Form 10K Annual Report Pursuant to Section 13 or 15(d) of the Security Exchange Act of 1934 for the Fiscal Year Ended Dec. 31, 2005 at 17 ("UP 2005 10K"). Likewise, BNSF fuel surcharge revenues increased from $350 million to approximately $1.1 billion

---

[2] Under BNSF's percentage-based fuel surcharge program, BNSF's fuel surcharge is established at 16.5% per ton of coal for May 2006. Applying this fuel surcharge to a unit coal train rate of $11.00 per ton for the month of May 2006 would result in a fuel surcharge of $1.82 per ton ($11.00 x .165 =$1.82). If this movement involved a typical 135-car unit coal train with a total net weight of 16,200 tons (based on 120 tons per car), applicable fuel surcharges would be $29,484.00 (16,200 x $1.82 = $29,484.00) per train.

in 2005. See BNSF Form 10K Annual Report Pursuant to Section 13 or 15(d) of the Security Exchange Act of 1934 for the Fiscal Year Ended Dec. 31, 2005 at 13 ("BNSF 2005 10K").

## II.

## DISCUSSION

A. Railroad Fuel Surcharges do not Address the Increased Cost of Fuel for the Particular Movement to which the Surcharge is Applied

1. The Carriers Fuel Surcharge Programs do not Use Actual, Carrier-Specific Diesel Fuel Price Data

As explained above, UP and BNSF utilize the change in the DOE's HDF prices as a basis for calculating fuel surcharges. DOE's program is based upon a survey it conducts on a weekly basis that collects the retail per gallon prices for motor vehicle diesel fuel. See Form EIA-888, On-Highway Diesel Fuel Price Survey (OMB No. 1905-0174). But railroads do not use motor vehicle diesel fuels. They use No. 2 Diesel Fuel that is specifically designed to be used in high-speed diesel locomotive engines. See BNSF Fuel Surcharges – Frequently Asked Questions (at www.bnsf.com/tools/prices/fuelsurcharge/faqs.html) ("BNSF Frequently Asked Questions").

Even if the railroads did use standard motor vehicle diesel fuel, they do not pay for diesel fuel at retail gasoline outlets that sell on-highway motor vehicle diesel fuel. Railroads buy in bulk (UP and BNSF combined purchased 2.78 billion gallons of fuel in 2005), and they do not pay retail. The following are the average quarterly prices of fuel

for the fourth quarter of 2005 ("4Q05") as publicly reported by UP and BNSF, and as reported by DOE (under its On-Highway Diesel Fuel Price Survey):

| | Average Price Per Gallon Cost of Fuel (4Q05) |
|---|---|
| BNSF | $ 1.69 |
| UP | $ 2.08 |
| DOE | $ 2.70 |

As shown in the tabulation above, BNSF and UP pay significantly less per gallon than the HDF price calculated by DOE. In 4Q05, the BNSF average price per gallon was 63 percent of the DOE price while the UP's average price per gallon was 77 percent of the DOE price.

Additionally, railroads aggressively engage in strategies to minimize their fuel price volatility. Both UP and BNSF engage in a variety of activities and programs to mitigate their fuel price changes, including using swaps, collars, futures and forward contracts. See, e.g., UP's 2005 10K at 20 (describing the various instruments used by UP "as a means of mitigating the impact of adverse fuel price changes"). In 2005 BNSF reported fuel hedge benefits amounting to $535 million. BNSF 2005 10K at 28.

2. The Utilized Fuel Price Data does not Accurately Reflect the Changes in Prices Actually Paid by Railroads for Fuel

BNSF states that its fuel surcharge program is designed "to recover the incremental cost of high fuel prices." See BNSF Frequently Asked Questions. However,

neither BNSF nor UP has provided to date any analysis to demonstrate that its fuel surcharge practice is reasonable. In order to determine whether UP's and BNSF's fuel surcharge programs reasonably relate to their incremental fuel service costs, the economic consulting firm of L.E. Peabody and Associates, Inc. has conducted an analysis for WCTL for an average UP and BNSF coal movement. The analysis is designed to show the difference between the per ton fuel surcharges applied by BNSF and UP and each carrier's actual change in fuel costs as reported for the time in which the fuel surcharge programs have been in effect. This analysis is presented in Exhibit No. 1.

Exhibit No. 1 shows that, for each carrier, there is a substantial difference between the amount of fuel surcharge charged and the increase in each carrier's fuel costs. Applied on an average move, BNSF's fuel surcharge per ton under its mileage-based fuel surcharge program is $1.48 per ton. However, BNSF's actual fuel cost increase from the base year (2004) is only $0.53 per ton. The difference between the fuel surcharge and the change in BNSF's fuel costs in 2005 is $0.95 per ton.[3] Meanwhile Exhibit No. 1 also shows that for UP, the difference between UP's fuel surcharge and the change in UP fuel costs is $0.56 per ton.

In sum, the Exhibit No. 1 analysis shows significant fuel surcharge over-recoveries for each of the western carriers. Thus, in answer to the Board's principal

[3] As shown in Exhibit No. 1, if this analysis were based on BNSF's percentage fuel surcharge, the difference between the fuel surcharge and the increase in costs equals $0.77 per ton.

question posed in this proceeding, Exhibit 1 demonstrates that both UP and BNSF's programs are "[over-]recover[ing] the incremental cost of high fuel prices" [emphasis added] as applied on an average western coal movement.

B. Carriers Are Already Made Whole for Their Fuel Costs Utilizing Industry Standard Price Adjustment Mechanisms

1. Board Adoption of RCAF as Preferred Railroad Cost Index Methodology

In 1981, the ICC adopted a cost recovery index, intended as a mechanism to enable railroads to adjust their rates to cover changes in their costs of providing service, the Rail Cost Adjustment Factor ("RCAF"). See Railroad Cost Recovery Procedures, 364 I.C.C. 841 (1981). The RCAF measures the rate of inflation in railroad inputs such as fuel. The RCAF consists of seven component indexes. One of these indexes is fuel, which represents the forecasted change in the average price per gallon of No. 2 diesel fuel that will actually be paid by the Class 1 railroads, including federal excise taxes, transportation, and handling charges.

These forecasts of the average diesel fuel price are calculated by the Association of American Railroads ("AAR") and reflect current market conditions. The forecasts, submitted to the STB the month prior to the beginning of the quarter, are then corrected for the actual railroad fuel prices two quarters later as part of the forecast error applied to the RCAF. By law, the STB is directed to continue to publish the RCAF on at least a quarterly basis. See 49 U.S.C. § 10708.

As the Board is well aware, the RCAF, or similar cost recovery mechanisms, have been widely incorporated into the carriers' private contracts and common carrier pricing authorities, and use of the RCAF is a preferred method of recovering carrier costs of service. As stated by the Board:

> The . . . RCAF[] was established in the Staggers Act to track quarterly changes in railroad costs. While its initial purpose was to protect from challenge on rate reasonableness grounds rail tariff rate increases that reflected no more than increased costs, it has come to be used by many railroads and shippers as an aide in setting contractual terms.

STB Finance Docket No. 33388, CSX Corporation and CSX Transportation, Inc., Norfolk Southern Corporation and Norfolk Southern Railway Company -- Control and Operating Leases/Agreements -- Conrail Inc. and Consolidated Rail Corporation, (Decision No. 89 served July 23, 1998) at 56 n.85. In fact, even outside the rate reasonableness context, the Board has ordered the implementation of the RCAF as an effective means of protecting railroads' and shippers' interests. See id. at 56 (Board orders carriers to maintain rates, specifically tied to RCAF adjustments, as a reasonable means of protecting the parties against the loss of single-line service resulting from the consolidation of railroads).

For example, the Board's predecessor, the Interstate Commerce Commission ("ICC"), when addressing a similar issue presented in this proceeding in the motor carrier context involving a request for the implementation of a general fuel surcharge to recover fuel cost increases, rejected the request. See Ex Parte No. MC-215,

Petition of the American Trucking Associations to Provide Motor Carriers Relief from Increased Federal Fuel Taxes and other Federally Mandated Fuel Price Increases, (ICC served Sept. 20, 1993), 1993 WL 366900. The Board's reasoning in rejecting the fuel surcharge was based on the fact that the use of standard industry adjustment clauses is the preferred method for addressing carrier fuel cost increases. As stated by the ICC:

> As a matter of general business practice, the vast majority of transportation contracts currently used in the industry contain rate adjustment clauses in anticipation of just such circumstances as escalations in fuel costs. To the limited extent that certain contract carriers may not have provided for such contingencies in their agreements with shippers, the corrective measures urged by petitioner to alter commercial realities and adjust the competitive balance would appear to contravene our determination in other contexts that contract carriers and shippers alike prefer flexibility over any form of protectionism the commission may be in a position to offer.

Id., 1993 WL 366900 at *4.

Also, the modern preference is to use individual, rather than general rate initiatives, such as what the railroads are doing with their across-the-board fuel surcharge programs, to recover carriers' costs. See, e.g., Increased Freight Rates and Charges, Nationwide – 1979, 362 ICC 153, 154-55 (1979). See also 49 U.S.C. § 10101(10) (it is a national policy goal to "require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability").

### 2. The RCAF Fuel Component has Kept the Carriers Whole for Increases in Their Fuel Costs

As shown above, for an average western coal haul, the fuel surcharge programs employed by UP and BNSF have not closely correlated to the increase in the carriers' fuel costs. However, use of the RCAF does very closely track carrier per gallon prices. L.E. Peabody and Associates, Inc. also conducted an analysis on this subject for WCTL, which is reflected in Exhibit No. 2. The analysis presented in Exhibit No. 2 shows that, for UP and BNSF, the RCAF's fuel index has very closely tracked the carrier's price per gallon costs, and in fact, has modestly overcompensated each carrier for the incurred fuel costs.[4]

While the RCAF has provided a proven, fair, and effective method for the carriers and customers to adjust for changes in carrier fuel service costs, the carriers apparently have decided to move away from the RCAF (at least insofar as incorporating the RCAF's fuel index) by implementing their generally applicable fuel surcharge programs. Instead, the carriers have elected to pursue more lucrative fuel surcharge mechanisms that, as shown above in Exhibit 1, overcompensate the carriers for their incurred fuel costs.

---

[4] This analysis relies on the change in the actual RCAF fuel in order to eliminate the error in the AAR's forecast.

C. The Board has the Authority to Proscribe Unreasonable Practices

Title 49 gives authority to the STB to evaluate and prescribe railroad practices. Specifically, under 49 U.S.C. § 10702, rail carriers are required to "establish reasonable . . . rules and practices on matters related to . . . transportation." Under 49 U.S.C. § 10704(a)(1), the STB has jurisdiction to prescribe the rules and practices that a carrier must follow if the Board determines that the carrier's existing rules and/or practices are unreasonable. In a 1994 study regarding its regulatory responsibilities, the Board's predecessor commented as follows with respect to unreasonable practices generally:

> Not only must a carrier's rates be reasonable, but so must its practices. . . .
>
> This statutory requirement derives from the common law common carrier obligation. It is intended to protect against unreasonable carrier actions that impede interstate commerce. In evaluating carrier practices, '[t]he question is not whether the [questioned practice] can be described as 'rational' from the railroads' perspective, but instead whether the practice . . . is reasonable when viewed from the public perspective of the Commission, which must reconcile a multitude of factors in exercising its expert judgment on tariff issues, including economy, efficiency, fair wages and working conditions, and safety, in addition to the financial conditions of the carriers'[] . . .
>
> Rail practices that the Commission has been asked to evaluate in recent years include collection of storage charges on empty rail cars awaiting loading,[] limiting the use of private cars,[] attempting to limit carrier liability and place responsibility on a shipper to make a "reasonable" inspection of grain cars,[] refusal to compensate a shipper for the use of

> its cars,[] and adoption of minimum weight rates where rail cars were incapable of being loaded to the minimum weight.[] Other rail practices found unreasonable by the Commission have included a carrier's retroactive disavowal of a rate it had repeatedly quoted,[] and conditions making favorable rates dependent on a notation requirement.[] The Commission has also barred carriers from refusing to carry hazardous materials that have been certified as safe for transport.[]
>
> . . . Market forces may not always be strong enough to protect shippers against unreasonable railroad practices. Unreasonable practices can result in abusive treatment of shippers. Federal oversight of railroad practices is therefore necessary and should be retained in order to protect the public interest. If injured shippers could not seek independent review and redress – from an regulatory body that is familiar with the rail industry and is capable of addressing industry practices in a consistent manner throughout the nation and with a view toward balancing varying interests – their ability to compete in domestic and/or international markets could be seriously jeopardized. Such results would contravene the goals of our national transportation policy.

See "Study of Interstate Commerce Commission Regulatory Responsibility Pursuant to Section 210(A) of the Trucking Industry Regulatory Reform Act of 1994," 1994 WL 639996 (October 25, 1994) at *20-*21 (footnotes omitted) ("ICC 1994 Study")

Governing precedent clearly allows unlawful adjustment procedures to be challenged as an unreasonable practice. For example, the ICC has found the implementation of an unreasonable escalation clause as unlawful and unreasonable practice. See Incentive Rate on Coal – Cordero, Wyo., to Smithers Lake, Tex., 358 I.C.C. 537, 561 (1977) (finding proposed tariff escalation provision "an unlawful and unreasonable practice"). The agency has also rejected the application of fuel surcharges

on unit coal train hauls where, after investigation, it determined that the application of the surcharge was unlawful. See, e.g., Temporary Fuel Shortfall Recovery Surcharge, Apr. 11, 1980, 365 I.C.C. 299 (1981); Coal, Colstrip, Kuehn and Decker, MT to Superior, WI, 364 I.C.C. 152 (1980).

### D. The Board Has the Obligation to Proscribe the Carriers from Maintaining Their Fuel Surcharge Programs

#### 1. Fuel Surcharges Historically have been Authorized Only in Limited Circumstances for a Temporary Duration

Historically, in extraordinary situations, railroad fuel surcharges have been authorized to be implemented by carriers as a means to address unexpected and precipitous increases in costs. Surcharge programs were authorized as necessary to meet the immediate needs of the industry, but only upon a showing that the surcharges were necessary to offset actual increases in carrier-specific fuel costs, and that normal recovery mechanisms were not adequate to cover. See e.g., Effect of Modifying Proclamation No. 3279 and Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject to the Interstate Commerce Act, 350 I.C.C. 563 (1975) (fuel surcharge procedures adopted in emergency situation to provide an expedited method for carriers to recover increased fuel costs) ("Energy Conservation Measures"). These surcharge programs have been sparingly authorized in order to assist carriers from unexpectedly having to "absorb operating losses for any extended period" and to "be able to provide adequate service to the public." Temporary Fuel Shortfall Recovery Surcharge, Apr. 11,

1980, 364 I.C.C. 336, 338-39 (1980).

However, these programs were not allowed to continue in perpetuity. See Increases in Freight Rates and Charges to Offset Retirement Tax Increases – 1973, 350 I.C.C. 673, 712 (1975) ("[i]t is true that the Commission has from time to time permitted the maintenance of surcharges, but only in instances where there was a compelling reason therefor and in no case as a permanent form of publication"); accord Energy Conservation Measures, 350 I.C.C. at 572 (surcharges appropriate in "unusual situations" and where of "temporary duration"); Increased Freight Rates, 1951, 281 I.C.C. 557, 638 (1951) (same). Typically, fuel surcharge programs have been limited to one-year in duration. See Energy Conservation Measures, 350 I.C.C. at 581.

For example, in the wake of the dramatic and unanticipated increases in fuel prices associated with the OPEC oil embargo of the early 1970s, the ICC authorized carriers to collect fuel surcharges on an expedited basis. See Energy Conservation Measures, 350 I.C.C. at 580. Those procedures were allowed to be implemented in order to avoid a "severe impact on the Nation's commerce" that such precipitous fuel cost increases would have on carriers. Id. at 568.

However, in order to implement authorized fuel surcharges, individual carriers first had to justify their cost increases by submitting verified data demonstrating a need for the fuel surcharge based upon actual fuel cost increases. Carriers were specifically prohibited from recouping any amounts above their incurred costs. Id. at

575-79. Also, in order to ensure that the surcharges were not unnecessarily extended, the increases were authorized for a limited time, and could not be extended except upon specific authorization of the ICC. Id. at 581.

2. As Applied, the Carriers' Fuel Surcharge Programs are Unlawful

As stated in the STB's Notice, the purpose of this hearing is to examine "whether railroad fuel surcharges are being set in such a manner as to insure that they are used only to recover the increased cost of fuel for the particular movements to which the surcharge is applied." WCTL submits that this is a proper standard for the Board to utilize in determining whether the carriers' existing fuel surcharge programs constitute an unreasonable practice. This standard is also consistent with the above precedent where temporary fuel surcharge programs were authorized to be implemented only in limited instances upon a showing that they were deemed necessary under the circumstances of precipitous fuel increases, and were limited to providing carrier recoupment of its verified, actual increases in fuel costs.

As demonstrated above and in Exhibit 1, the UP and BNSF fuel surcharge programs applied on an average haul bear no reasonable relationship to their involved service costs to individual customers. Also, as demonstrated above and in Exhibit No. 2, the surcharges are unnecessary as the RCAF contains a carrier fuel adjustment mechanism that fully protects carriers against precipitous and unexpected increases in fuel costs. Thus, the carriers' implementation of supplemental fuel surcharge programs (or

fuel surcharge programs that supplant the RCAF inclusive of fuel) has not been shown to be either reasonable or necessary.

Additionally, UP's and BNSF's fuel surcharge programs appear to be anything but temporary, and instead appear to be attempts to implement an ongoing cost reimbursement plan. For example, for coal, UP reports that its "fuel surcharge will be included on all repriced business" and that all of its newly negotiated "long-term contracts" will include UP's "standard fuel surcharge." UP 2005 Analyst Fact Book, at 11, 20.[5] UP's public pricing Circular 111, which also contain's UP's coal fuel surcharge program, is typically in effect for at least one to three years in duration. Thus, the programs have been, and are designed to be, in effect for far longer than a temporary period for which fuel surcharge programs have been previously authorized. See, e.g., Central Forwarding, Inc. v. I.C.C., 698 F.2d 1226, 1271 (5th Cir. 1983) (carrier attempts to utilize fuel surcharge program as means of "regulat[ing] [carrier] compensation on a permanent basis" is strictly proscribed as an unlawful "ongoing reimbursement plan").

Additionally, by now, carriers have had more than enough time to adjust to any precipitous fuel price increases that have occurred over the past year and a half as part of their rate structures. Indeed, by all accounts, the carriers have been enormously

[5] In fact, the carriers themselves are touting high fuel prices as creating a competitive advantage for them for their business that competes with trucks. See UP 2005 Annual Report at 2 ("[l]onger-term, high fuel prices create a competitive advantage for us, as rail transportation is three times more fuel efficient than trucking").

successful in increasing their rates to cover all their expenses (including fuel) and increase profitability. In all of UP's and BNSF's recent reports to shareholders, they have highlighted their record earnings and revenues across all commodities (including coal), their ability to pay all their obligations, and their overall financial well-being.[6] Also, Wall Street has extolled the carriers' pricing achievements, labeling their successes in dramatically increasing rates to improve their bottom lines as a "secular pricing story." See, e.g., Morgan Stanley, Air Freight, and Surface Transportation, "Secular Pricing Leaves 50% to 100% More Upside Potential in Railroad Stocks," (Jan. 23, 2006).

Additionally, the carriers recently achieved a fuel savings coup through the repeal by Congress of the 4.3 cent diesel fuel tax imposed on railroads, which the industry estimated would "restore more than $170 million per year to freight railroads."[7] Neither UP nor BNSF appears to have attempted to pass-along to customers, or reflect in their fuel surcharge programs, any of these fuel tax savings. Nor, apparently, have the railroads attempted to reflect in their surcharge programs the impacts of any of their improved fuel consumption efficiencies experienced in recent years. See, e.g., UP's 2005

---

[6] See, e.g., UP's 2005 Annual Report at 1(UP reports "record revenue, yield gains and improved financial results"); UP's 1st Quarter 2006 Investors' Report (Apr. 20, 2006)(UP reports "the best first quarter earnings ever posted by the company"); BNSF's 2005 Annual Report at 1 (BNSF "post[s] a record of nearly $13 billion in revenue . . . coupled with solid expense control"); BNSF's 1st Quarter 2006 Investors' Report (Apr. 25, 2006) (BNSF reports "record" earnings and freight revenues, and "double-digit revenue increases" in coal and its other business groups).

[7] See BNSF Railway Magazine, (July/August 2004) at 6.

Annual Report, at 2 (as a result of UP's fuel conservation programs, its "consumption rate improved by 2 percent, saving 35 million gallons of fuel" in 2005).

Further, the manner in which the carriers' fuel surcharge programs are established is suspect in light of the fact that they include initial "strike" rates for the implementation of surcharges that reflect fuel costs from several years ago. Thus, the programs have not been readjusted to reflect the current market reality of sustained higher fuel prices.

In evaluating the carriers' fuel surcharge programs, the STB must remain mindful of the goals Congress seeks to achieve in regulating the railroad industry. As explained above, one of those goals is to "require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability." 49 U.S.C. § 10101(10). Another policy goal is to "encourage honest and efficient management of railroads." Id. at § 10101(9). Despite the deregulation of large sectors of the railroad industry, the close scrutiny of industry practices of this nature is essential for achieving the goals of Congress – especially in light of the carriers' renewed interest in moving their business under public pricing instruments. See, e.g., UP's 2005 Analysts Report at 20 ("UP will use Circular 111, the SPRB pricing mechanism introduced in 2004, in place of expiring contracts" and it anticipates that 20 percent of its coal business will be moving under such pricing mechanisms in 2006). As explained above, these pricing instruments permanently

implement the carriers' fuel surcharge programs.

In evaluating the railroads' fuel surcharge programs for unreasonableness, "the question is not whether the decision to [implement programs] can be described as 'rational' from the railroads' perspective, but instead whether the practice . . . is reasonable when viewed from the public perspective of the [Board]." See Consolidated Rail Corp. v. ICC, 646 F.2d 642, 647-48 (D.C. Cir. 1981). WCTL submits that, upon closer scrutiny of the above law and facts, the Board will determine that it is unquestionable that the carriers' ongoing fuel surcharge programs, as currently applied, are not reasonable or necessary and should be proscribed.

WCTL calls upon the STB to act in this instance to redress the situation as it is the single "regulatory body that is that is familiar with the rail industry and is capable of addressing industry practices in a consistent manner throughout the nation and with a view toward balancing varying interests." ICC 1994 Study, 1994 WL 639996 at *20-*21. Without such enforcement and protections by the Board "[s]hippers ability to compete in domestic . . . markets could be seriously jeopardized." Id.

## III.

## RAILROAD REPORTING REQUIREMENTS

WCTL submits that the western railroads should not be authorized to continue to collect fuel surcharges on unit coal train movements as currently applied, for the above stated reasons, and should instead be required to rely upon the RCAF as the

preferred cost index methodology for recouping fuel cost increases. If the railroads are allowed to continue to collect fuel surcharges for any specified period of time, which WCTL submits should not be allowed, then the Board has an obligation to require that each carrier accurately report meaningful fuel cost and revenue data in a manner that allows the public to see whether, and the extent to which, fuel surcharges accurately reflect a carrier's increased cost of fuel for particular movements to which the surcharge is applied.

At a minimum, on a monthly basis, each railroad should be required to identify the traffic (including tons, carloads, ton-miles, etc.) that is subject to the fuel surcharge by the principal business groups, including energy, that are regularly reported by the carriers to the financial community. For each group, the railroad should also report: (i) the fuel surcharge revenues associated with the traffic, (ii) the change in fuel costs from the prior month, and (iii) the difference between the fuel surcharge revenues and the change in fuel costs.

## IV.

## CONCLUSION

Clearly, the answer to the Board's question of "whether railroad fuel surcharges are being set in such a manner as to insure that they are used only to recover the increased cost of fuel for the particular movements to which the surcharge is applied" is no. Rail carrier fuel surcharge collection programs have been sparingly permitted to

address unexpected and precipitous increases in fuel prices as necessary to meet the immediate needs of the industry. They must be based upon carrier-specific cost information, and they are not allowed to be continued in perpetuity. The carriers' fuel surcharge programs fail to meet the above tests, and thus, should be proscribed.

Respectfully submitted,

THE WESTERN COAL TRAFFIC LEAGUE

By: William L. Slover
Peter A. Pfohl
Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

Attorneys & Practitioners

Of Counsel:

Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

Dated: April 27, 2006

Exhibit No. 1
Page 1 of 2

## Summary of Differences Between Fuel Surcharges and Increases in Fuel Costs for Coal – 2005
## BNSF and UP



**Summary of Differences between Fuel Surcharges and Increases in Variable Fuel Costs for Coal -- 2005**
**(BNSF and UP)**

| | | Amount Per Ton | | |
|---|---|---|---|---|
| | | BNSF | | UP |
| Item | Source | Percent Fuel Surcharge | Mileage Fuel Surcharge | Percent Fuel Surcharge |
| (1) | (2) | (3) | (4) | (5) |
| 1. Average Rate per Ton without Fuel Surcharge - 2005 | 1/ | $9.45 | $9.45 | $10.69 |
| 2. Rate plus Fuel Surcharge - 2005 | 2/ | 10.75 | 10.93 | 12.27 |
| 3. Amount of Fuel Surcharge per Ton | Line 2 - Line 1 | $1.30 | $1.48 | $1.58 |
| 4. Variable Fuel Costs: | | | | |
| a. Base Year | 3/ | $1.28 | $1.28 | $1.15 |
| b. 2005 | 4/ | 1.81 | 1.81 | 2.17 |
| c. Increase in Fuel Costs | Line 4b - Line 4a | $0.53 | $0.53 | $1.02 |
| 5. Difference between Fuel Surcharge and Increase in Fuel Costs | Line 3 - Line 4c | $0.77 | $0.95 | $0.56 |

1/ BNSF: Rate of $8.88 per ton as of 1Q04 based on BNSF's 2004 average coal haul of 922 miles and BNSF's average coal rate of 9.63 mills.
UP: Rate of $9.84 per ton as of 1Q03 based on UP's 2003 average coal haul of 957 miles and UP's average coal rate of 10.28 mills.

2/ BNSF (percentage): Average Fuel Surcharge for coal for 2005 (simple average of all months) of 13.9 percent x average rate on Line 1.
BNSF (mileage): Average Fuel Surcharge per mile for coal for 2005 of 18.5 cents x 922 miles.
UP: Average Fuel Surcharge for coal for 2005 (simple average of all months) of 14.8 percent x average rate on Line 1.

3/ BNSF: Variable costs based on BNSF 2004 URCS unit costs for fuel and average traffic and operating factors (115 ton load, 25 ton tare, 922 loaded miles, 100% empty return ratio, 3 locomotives, and 115 cars per train).
UP: Variable costs based on UP 2003 URCS unit costs for fuel and average traffic and operating factors (114 ton load, 25 ton tare, 957 loaded miles, 100% empty return ratio, 3 locomotives, and 115 cars per train).

4/ BNSF and UP: Variable costs based on BNSF and UP 2005 URCS unit costs for fuel and average traffic and operating factors used to develop Line 4a variable fuel costs.

**Comparison of Changes in RCAF Fuel Index to BNSF and UP Price per Gallon**

| | RCAF Fuel Index | | Fuel Price per Gallon In Fuel Surcharge Period 1/ | |
|---|---|---|---|---|
| Quarter | Forecast Index | Actual Index | BNSF | UP |
| (1) | (2) | (3) | (4) | (5) |
| 1Q03 | 100.7 | 113.8 | xxx | $1.00 |
| 2Q03 | 130.4 | 111.0 | xxx | $0.88 |
| 3Q03 | 106.3 | 108.0 | xxx | $0.90 |
| 4Q03 | 113.3 | 111.2 | xxx | $0.89 |
| 1Q04 | 110.8 | 122.2 | $0.85 | $1.02 |
| 2Q04 | 120.8 | 133.8 | $0.97 | $1.16 |
| 3Q04 | 137.7 | 144.7 | $0.99 | $1.25 |
| 4Q04 | 148.3 | 189.7 | $1.14 | $1.46 |
| 1Q05 | 171.5 | 161.8 | $1.13 | $1.45 |
| 2Q05 | 186.9 | 204.2 | $1.33 | $1.67 |
| 3Q05 | 193.6 | 212.3 | $1.43 | $1.88 |
| 4Q05 | 276.2 | 283.4 | $1.69 | $2.08 |

**Cumulative Change Between:**

| | | | | |
|---|---|---|---|---|
| 1Q03 and 4Q05 | 174.3% | 149.0% | xxx | 108.0% |
| 1Q04 and 4Q05 | 149.3% | 131.9% | 98.7% | 103.9% |

1/ Average quarterly price per quarter as reported by BNSF and UP in the Annual Investors' Report. BNSF surcharge for coal began in the 2nd quarter of 2004 and the UP surcharge for coal began in the 2nd quarter of 2003.

**Comparison of Changes in RCAF Fuel Index to BNSF and UP Price per Gallon**

| | RCAF Fuel Index | | Fuel Price per Gallon In Fuel Surcharge Period 1/ | |
|---|---|---|---|---|
| Quarter | Forecast Index | Actual Index | BNSF | UP |
| (1) | (2) | (3) | (4) | (5) |
| 1Q03 | 100.7 | 113.8 | xxx | $1.00 |
| 2Q03 | 130.4 | 111.0 | xxx | $0.88 |
| 3Q03 | 106.3 | 108.0 | xxx | $0.90 |
| 4Q03 | 113.3 | 111.2 | xxx | $0.89 |
| 1Q04 | 110.8 | 122.2 | $0.85 | $1.02 |
| 2Q04 | 120.8 | 133.8 | $0.97 | $1.16 |
| 3Q04 | 137.7 | 144.7 | $0.99 | $1.25 |
| 4Q04 | 148.3 | 189.7 | $1.14 | $1.46 |
| 1Q05 | 171.5 | 161.8 | $1.13 | $1.45 |
| 2Q05 | 186.9 | 204.2 | $1.33 | $1.67 |
| 3Q05 | 193.6 | 212.3 | $1.43 | $1.88 |
| 4Q05 | 276.2 | 283.4 | $1.69 | $2.08 |

**Cumulative Change Between:**

| | | | | |
|---|---|---|---|---|
| 1Q03 and 4Q05 | 174.3% | 149.0% | xxx | 108.0% |
| 1Q04 and 4Q05 | 149.3% | 131.9% | 98.7% | 103.9% |

1/ Average quarterly price per quarter as reported by BNSF and UP in the Annual Investors' Report. BNSF surcharge for coal began in the 2nd quarter of 2004 and the UP surcharge for coal began in the 2nd quarter of 2003.

Exhibit No. 2
Page 1 of 3

**Comparison of Changes in RCAF Fuel Index to BNSF Price per Gallon**



## Comparison of Changes in RCAF Fuel Index to UP Price per Gallon



**VERIFICATION**

I, Thomas D. Crowley, verify under penalty of perjury that I have prepared Exhibit No. 1 and Exhibit No. 2 to the Statement of The Western Coal Traffic League in this proceeding, that I know the contents thereof, and that the same are true and correct. Further, I certify that I am qualified and authorized to file this statement.

Thomas D. Crowley

Executed on April 26, 2006

# EXHIBIT PX0667

NewsRoom

10/18/06 Fin. Disclosure Wire 13:30:00

FD Wire
Copyright © 2006 CCBN, Inc. and FDCH e-Media, Inc.

October 18, 2006

# Q3 2006 **CSXEarningsConferenceCall** - Final

OPERATOR: Good morning, ladies and gentlemen, and welcome to the **CSX**Corporation third quarter 2006 earnings call.

As a reminder, today's call is being recorded. During this call, allparticipants will be in a listen-only mode. Afterwards, you will beinvited to participate in a question-and-answer session. [OPERATORINSTRUCTIONS]

For opening remarks and introduction, I would like to turn the callover to Mr. David Baggs, Assistant Vice President Investor Relationsfor **CSX** Corporation. Sir, you may begin.

DAVID BAGGS, ASSISTANT VP INVESTOR RELATIONS, **CSX** CORPORATION: Thankyou, Lisa, and good morning, everyone, and welcome to **CSX**Corporation's third quarter 2006 earnings presentation.

The presentation material that we'll review this morning, along withour **CSX** flash and our quarterly safety and service measurements, areavailable on our Web site at csx.com under "Investors". Inaddition, following the presentation, a Webcast and podcast replaywill be available.

Here representing **CSX** this morning are Michael Ward, the Company'sChief Executive Officer, Tony Ingram, Chief Operating Officer,Clarence Gooden, Chief Sales and Marketing Officer, and Oscar Munoz,Chief Financial Officer.

Before we begin the formal part of our program, let me remindeveryone that the presentation and other statements made by theCompany contain forward-looking statements and actual performancecould differ materially from the results anticipated by thesestatements.

And with that, let me turn the presentation over to **CSX** Corporation'sChairman, President, and Chief Executive Officer, Michael Ward.Michael?

MICHAEL WARD, CHAIRMAN, PRESIDENT, CEO, **CSX** CORPORATION: Thank you,David. Good morning, everyone.

**CSX** earnings for the third quarter continue to reflect ourrecord-setting pace in our service transportation businesses.Reported earnings of $0.71 per share include insurance recoveries andincome tax adjustments in the quarter. Excluding these items,earnings were $0.54 per share, up 50% from the same period last year.

Our service transportation businesses generated record third quarterrevenues of $2.4 billion and record third quarter operating income of$474 million adjusting for the insurance recoveries. This representsa 31% increase over the third quarter of 2005.

As Clarence will discuss further, we continued to see pricingmomentum across all business segments, with about 5% growth in pureprice excluding mix and fuel surcharge, and we expect similar priceincreases in 2007. In addition, we achieved volume growth in severalkey business segments, highlighted by more than 7% in coal and nearly4% in intermodal.

As Tony will discuss, the ONE Plan continued to produce strongresults and the team is now focused on raising the bar every day. Aswe look forward, transportation demand remains strong and the overalleconomy remains healthy with expected growth in the 2 to 3% range forboth 2007 and 2008. In short, we're pleased with our third quarterresults and remain on the track to deliver consistent, continuousimprovement.

At this point, Clarence will provide the details of our businesssegments. Clarence?

CLARENCE GOODEN, CHIEF SALES AND MARKETING OFFICER, CSX CORPORATION:Thank you, Michael, and good morning, everyone.

CSX achieved another successful quarter in the midst of continuedstrong demand for rail and intermodal traffic, which was driven byenergy demand, agricultural, and growth and foreign trade acrossseveral businesses. These favorable market conditions and ourimproved service led to record third quarter revenues of $2.4billion, which exceeded the prior year by $293 million.

Revenue growth during the quarter was led by our coal and merchandisemarkets with our intermodal unit also experiencing solid growth.Overall volume increased nearly 2% from a year ago as continuedstrength in coal and agriculture, plus renewed strength in intermodalmore than offset declines in phosphate, automotive, and forest andpaper markets.

We also achieved continued success in yield improvement. As you cansee on the next slide, in the third quarter of 2006 overall revenueper unit grew nearly 12%, driven by increased pricing and our fuelsurcharge program. Revenue per unit gains were strongest in themerchandise market at 17% followed by coal at 9%, automotive at 4%,and intermodal at 4%.

During the quarter, the drivers of this revenue per unit increasewere approximately 40% due to price, 35% due to fuel surcharge, and25% due to favorable mix. Declines in the short haul phosphatetraffic were the primary drivers of this mix impact.

The environment continues to be favorable for pricing. Moving forwardfor the remainder of 2006 and into 2007 we expect to continue ourmomentum in improving yield.

Now discussing our merchandise markets. Quarterly merchandise revenueof over $1.2 billion increased 16% on a volume decrease of 1%. Thisrepresented the 18th consecutive quarter of year-over-yearmerchandise revenue growth.

Merchandise markets recorded stronger yields in all markets asrevenue per unit increased 17%. The volume decrease in merchandisewas primarily driven by the continued impacts from phosphate andfertilizer plant closures and a softening in the housing market, yetgrowth was achieved in several other segments.

Excluding the phosphate declines of 18,000 carloads, overallmerchandise volumes would have been favorable by 2%. Moving forward,the outlook for revenue growth is favorable for the remainder of 2006and the outlook for revenue and volume are both expected to befavorable in 2007.

Let's take a closer look at our volume. As you can see, merchandisevolumes grew in four of the seven markets. The markets that saw thelargest gains were the agricultural products and the metal segments.

In agricultural products improvements in grain unit train servicecontinued to contribute to growth as did strong demand for ethanolshipments. In metals, service improvements led to better assetutilization which in conjunction with the strong demand led to a 3%volume growth.

Chemicals experienced renewed growth primarily driven by strongerliquid petroleum gas volumes and Katrina-related impacts during lastyear's third quarter. Strong demand for movement of aggregateproducts, municipal waste, military shipments, and machinery droveemerging markets volumes up 1% for the third quarter.

As mentioned earlier, the market which we saw the most significantdeclines in volumes was phosphates and fertilizers. Also shedding oflow-margin traffic and the softening in the housing market hasnegatively impacted volumes in forest products.

Now looking at our coal, coke, and iron ore. Quarterly coal revenueof $602 million increased nearly 18% on a volume increase of 7%.

Strong demand continues in coal. Growth was strongest in the utilityand river markets as inventories were replenished and as supplyincreased, especially in traffic from the Powder River Basin

Growth was also driven by strong steel-related demand, improvedservice and cycle times, as well as additional car resources in ourcoke and iron ore markets. Revenue per car increased 9% and webelieve that the favorable environment for pricing will continue incoal.

Revenue and volume outlook remains favorable for the remainder of2006 as electrical generation demand remains strong and alternativefuels are expected to remain expensive. Looking into 2007, overallvolume will be influenced by weather, while revenue growth willremain strong due to continued pricing opportunities associated withcontract renewals.

Now turning to our automotive business. Quarterly automotive revenueof $183 million decreased 9% on less volume. North American lightvehicle production for the big three continues to decline, more thanoffsetting growth with the new domestic producers yet, CSX shipmentsfrom Honda at Marysville and Hyundai at Montgomery continue to grow.

Continued price increases and improved fuel surcharge coverageresulted in a revenue per unit increase of 4%. The outlook forrevenue and volume for the remainder of the year is expected to beunfavorable.

Turning to our intermodal results. Quarterly intermodal revenue of$364 million increased 8% on a volume increase of 4%. Volume increasewas driven by growth in our core intermodal traffic that more thanoffset reductions in our off-core traffic.

Overall, revenue per unit increased 4% largely due to increased priceand fuel surcharge coverage that more than offset mix-related impactsfrom the loss of the off-core traffic. Third quarter 2006 alsorepresents the tenth consecutive quarter of year-over-year operatingincome improvement.

We are extremely pleased with these positive results and expect themto continue as we grow the volume profitably in the remainder of 2006and into 2007.

Turning to the next slide, the overall economic environment in ourview remains positive. Of course, there's puts and takes in theeconomy.

While the housing and automotive sectors have softened, businessinvestment in foreign trade will continue to drive the volume growth.Overall, the economy is expected to grow between 2 and 3% in 2007 andin 2008.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

Looking forward we expect 2 to 3% volume growth for the fourthquarter. This continues the improving volume trend we've seenthroughout the year with a 1% decline in the first quarter, flatvolumes in the second quarter, and 2% growth here in the thirdquarter. Service improvements will also continue to support volumegrowth.

The favorable pricing environment continues due to strong demand,high fuel prices, and tight transportation supply. We will remainfocused on improving the bottom line profitability.

Thank you very much and let me introduce Tony Ingram, our ChiefOperating Officer.

TONY INGRAM, COO, **CSX** CORPORATION: Thank you, Clarence, and goodmorning everyone.

Today I'm going to give you a quick update on our three criticalperformance drivers. First, our safety results continue to improve.We're getting these results with outstanding leadership across theorganization.

Second, the railroad is running well. We're executing better, we'returning the assets and we're running trains to schedule. Finally, ourexpansion capacity program remains on schedule.

Now let's look at our safety performance. On Slide 17, you see thepositive trend in safety continues.

Personal injuries for the 13 weeks, or the average for the thirdquarter, improved to 1.37. This is a 28% improvement versus the sameperiod of 2005.

Decreased train accidents are another great story, down 29% over thequarter and over 8% on a rolling 12 months. Our momentum in both ofthese areas remain strong.

[Inaudible] I'm very pleased with these results, the work here isnever done. The leadership that strives to improve safety also drivesimproved service. This brings me to my next slide.

These results show we are running a more disciplined operation.Trains are leaving and arriving on time with greater frequency.

Originations improved to 77% in the quarter, a 50% improvement versus2005. You can see the same trend in arrivals.

The team continues to embrace the ONE Plan and is focused onconsistent execution. In the end, our customers are getting morereliable service.

On Slide 19, you can see that better execution is making our networkmore fluid and improving asset utilization. Both dwell time and carsonline continue to improve. On average, dwell time improved to 25.5hours in the third quarter and the trend remains favorable on arolling 12 months.

Cars online remain at a low level, down to about 225,000 cars. As weremain focused on operating discipline, we should see continuousimprovements in these measures.

On Slide 20 shows our velocity, which measures average train speed onthe network. Third quarter velocity averaged 19.8 miles per hour. Therolling 12-month average remains stable at 19.5 miles per hour.

With velocity stable, the network is running better, assetutilization is improving, and our customers are seeing more reliableservice, which is critical to our success.

Looking forward to Slide 21, the safety momentum will continue.Disciplined execution of the ONE Plan is making us more reliable,fluid, and efficient and we expect that to continue.

Finally, our capital investments will stay right on schedule. Once inplace, this capacity will improve service reliability and supportgrowth in key service lanes.

Overall, we delivered another quarter of steady, continuousimprovement in safety, service, and asset utilization. Going forward,we will keep building on our foundation, which is leadership,discipline, and execution.

With that, I'll turn it over to Oscar Munoz, our CFO.

OSCAR MUNOZ, CFO, **CSX** CORPORATION: Thank you, Tony.

Moving to my charts and starting with EPS at the bottom of the page,and as Michael mentioned, we did report earnings per share of $0.71for the third quarter, an increase of $0.35 over the prior year. Ifyou move back to the top of the chart, these results were driven bysurface transportation operating income which increased $128 million,including a $15 million gain on insurance recovery.

Other operating income increased $8 million as we are cycling lastyear's wind-down costs from our former container shipping operation.As we move below the line, other income increased $14 million,primarily reflecting higher interest income of $3 million, realestate of $3 million, and an $8 million in other non-core activities,the details of which you can find in our flash document.

Interest expense for the quarter decreased $3 million as werefinanced some of our floating rate debt at lower rates.

Finally, our income tax line includes the impact of our increasedearnings and an income tax benefit of $69 million, principallyrelated to the resolution of 1994 through 1996 federal income taxaudit. Adjusting for those items we continue to have an approximate38% effective tax rate.

Turning to the next slide, I would like to review a reconciliation ofour GAAP results. On the top of the slide, you can see areconciliation of surface transportation operating income. Removingthe gain from insurance recoveries, surface trans operating incomefor the third quarter was $474 million, an improvement of $113million, or 31% for the quarter.

Turning to EPS, you can see the impacts from both the insurance gainas well as the resolution of income tax matters I previouslydiscussed. So on a comparable basis, earnings per share for the thirdquarter of 2006 were $0.54, a 50% increase from last year.

Now let me take you through the details of our surface transportationresults on the next slide. As Clarence discussed, our top line growthwas 14% reflecting continued yield strength, increased fuel surchargecoverage, favorable impact from mix, and our growing volumes.

On the cost side, total expenses increased 10%, or $180 million forthe quarter. The main driver of this was fuel, which increased $112million, or 60%.

Excluding fuel, total expenses were up 4% primarily due to inflationand higher costs associated with our 2% increase in business volumes.The net result was a 31% increase in operating income and an 80.4***o***perating ratio for the quarter. This was a 260 basis pointimprovement from prior year.

Now let's discuss our expenses on a more detailed view over the nextfew slides. On Slide 26, labor and fringe increased $11 million, or2% over last year.

This was driven by wage and benefit inflation of $18 million as wellas higher costs associated with an increase of over 400 train crewemployees due to our continued commitment to hire and train crewsahead of attrition. These increases were partially offset by lowerincentive compensation expense of $13 million.

Moving to the next slide, let me review our material supplies andother, or MS&O, expenses. Total MS&O expenses increased by$23 million, or 5%, primarily reflecting sharply higher materialsinflation, rising insurance costs, as well as expenses related to ourincreased business activity.

These increases were partially offset by productivity gains from ourimproved operations. An example of this was the improvement we saw inlocomotive costs due to increased locomotive asset utilization in thequarter.

Now let's talk about fuel on the next slide. You can look at thequarter's $300 million fuel costs as being simply driven by our 144million gallons of fuel consumed at an average fuel price of $2.09 agallon. Overall, fuel increased $112 million, or 60% versus last yearprimarily driven by $76 million in reduced hedge benefits due to ournow expired hedge positions and by a higher fuel price of $32million.

Now moving to the next slide, let me talk about rents. Current yearrent expense has moved consistent with volumes. The $6 millionincrease we saw from last year is primarily due to the cycling of aprior-year item.

On a go-forward basis, you can expect building and equipment rents tocontinue to trend with our business activity.

On the next slide, let's talk about the remaining expenses. All otherincreased $28 million, or 10% in total with each of the three expensecategories seeing an increase versus prior year.

First, depreciation expense was higher due to a net increase in ourcapital asset base, second, we saw higher inland transportationexpenses due to our increased intermodal volume and related workactivity such as higher trucking costs. And third, we are cycling aConrail federal tax benefit which is driving the year-over-yearincrease in our Conrail fees.

Let me wrap up on the next slide. First, I'd like to provide you astatus update on our share buyback program.

As you recall, we announced a $500 million share buyback program inour second quarter earnings call. I'm pleased to report that we havealready completed over 50% of the program's goal by purchasing $272million worth of shares in the last few months. That, combined withour program, we completed in the first half, brings our sharesrepurchased to a total or $422 million for the year.

Turning to cash, we are on track with our $1.4 billion capitalprogram and expect to generate $300 plus million in free cash flow in2006, including our insurance recoveries related to Hurricane Katrinaand the dividend increase we announced earlier this quarter.

Clearly, we are pleased with what we have accomplished to date, andas Michael and Clarence discussed, the outlook for rail andintermodal demand remains strong. When you combine that with thesteady operating performance we've seen from Tony's team, we arepoised to continue our solid financial performance and profitablegrowth.

So with that, let me turn it back over to Michael for his remarks.

MICHAEL WARD: Thank you, Oscar.

Once again, we are delivering for our shareholders. With the additionof volume growth in the third quarter, we have momentum across allour strategies and the team is now hitting on all cylinders.

The renaissance in our industry continues and the demand for railtransportation and intermodal services remains strong across most ofour business segments. With our advanced network and improvingservice levels across our system, our business will continue to grow.

So with that, we'll be happy to take your questions. As you do so,please identify yourself for the benefit of those on the call.Operator, we're ready to take calls at this point.

OPERATOR: Thank you. [OPERATOR INSTRUCTIONS] Thank you. Our firstquestion comes from Ken Hoexter with Merrill Lynch.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Great. Good morning. It's KenHoexter.

On the intermodal, just, as you focus now, you said the marginimprovement is slowing a bit on a year-over-year basis, still seeingthe growth there. Now that you've turned your focus back towardsgrowing the intermodal side, you posted about 4% volume growth.

What does it take, or are you looking to get back to, I guess, theentire rail group is getting about 5.5. Should we continue to seethat accelerate, or are these levels that you're more pleased withgrowing at?

CLARENCE GOODEN: Ken, this is Clarence Gooden.

I think we told you last August that you could expect to see ourgrowth going forward in our intermodal business at around the 5 to 7%range. We're ramping up to that range right now. After the first ofthe year, I think you'll start to see growth in our intermodalproduct somewhere in the neighborhood of that 5 to 7% range.

KEN HOEXTER: Okay.

And just on that same topic, other intermodal was down quitesignificantly. What is -- I think you mentioned the off-core, what isthat made up of? It's not domestic, it's not international. What isthat contributed?

CLARENCE GOODEN: That other line on our intermodal unit is not railfreight that we're moving at all, it's ancillary charges. So whatyou've seen this year in the fall peak has been some of the ancillarycharges haven't been as high as they were last year during the sameperiod of time.

KEN HOEXTER: Is that because you're more efficient so you're notgetting that income anymore?

CLARENCE GOODEN: No. It's because the trans loads mainly on the WestCoast have impacted that.

MICHAEL WARD: So there will be more efficient less [inaudible] thatis [inaudible].

CLARENCE GOODEN: That's right.

KEN HOEXTER: Okay.

And then previously, you said about 20% of your coal contracts arecoming due in the fourth quarter. Is that -- how have negotiationsgone? Can you comment on the process?

CLARENCE GOODEN: They have gone very well. We're very positive andupbeat about our coal revenues next year. We think our pricing willcontinue to be firm and very strong in our coal business next year.

KEN HOEXTER: Okay.

Last question is just on the phosphate side. Have we lapped thatclosing now? I guess they've been down pretty large for almost a yearnow. When do we lap a majority of the shutdowns?

CLARENCE GOODEN: About half of it gets lapped somewhere between themiddle of December and the middle of January and the other half getslapped somewhere around the middle of April, first of May. There weretwo sets of closings there that involved two different companies.

KEN HOEXTER: Got it. Great job. Thanks a lot.

OPERATOR: Thank you. Our next question comes from Tom Wadewitz withJPMorgan.

TOM WADEWITZ, ANALYST, JPMORGAN CHASE & COMPANY: Good morning.

MICHAEL WARD: Good morning, Tom.

TOM WADEWITZ: Let's see, so I've got, I guess, two different thingsfor you here.

On the fuel side, it looks like you've had a decline in fuel hedgeand we estimate that probably hurt you on the order of maybe 130, 150basis points in second quarter, third quarter. Obviously a prettysharp decline in fuel prices over the last month.

I want to know if you can give us a sense of, as this fuel comes downis, it much less of a headwind in fourth quarter or is there still asignificant headwind? And then I suppose looking to '07, is there abenefit from this decline in fuel or is it just purely offset by thesurcharge position?

OSCAR MUNOZ: Hi, Tom, this is Oscar.

Probably part of your last statement is the more correct one. As yougo forward, it's hard to figure out where the price of fuel isheaded, but what I can say is we expect minimal impact from any fuelprice shift, either up or down. As I think we've stated publicly, westrive for fuel price neutrality and that's probably our best lookingforward statement at this time.

TOM WADEWITZ: Can you give a sense in fourth quarter? Because I meanI think it's fair to say that the hedge reduction's been a bit of aheadwind. Is that less of a headwind in fourth quarter and does thefuel price reduction actually help a little bit in fourth quarter?

OSCAR MUNOZ: Again, it's difficult to forecast what fuel price isgoing to do and so I'll stand by the last statement. The neutrality'swhere we're headed and we're trying to stay away from trying toforecast either sharp declines or increases.

TOM WADEWITZ: Okay. Fair enough. And then one I think for Tony orMichael.

You've done a great job on improving the fluidity and showing someimprovement in the operating metrics. As you look at some of thesecapacity projects coming online in fourth quarter and then you've gotsome in '07, is there potential that they would

enable a furtherleg-up in terms of velocity or dwell that would help you on the costside, or should we not necessarily consider that with the capacityprojects? It seems that might be a possibility with capacity comingonline.

TONY INGRAM: Tom, in looking at the projects that we've been able toget in so far, we've had some improvement in the velocity on certainareas. But you've got to keep in mind this is a network, all thisties together and our route between Chicago and Jacksonville is aroute where we're putting a preponderance of our improvements.

So I think there'll be a little bit of improvement in the velocity. Idon't know if you'll see that much improvement in the cost, otherthan the fact that we'll have capacity to move the trains and be morefluid and when that happens, you'll reduce cost.

MICHAEL WARD: It also helps with the reliability. So when the issuesoccur with that extra capacity we have on there, it helps us preparefor future growth we expect as well as increase the recoverability toprovide that reliable service to our customers.

TOM WADEWITZ: Okay. Great. Good results and thanks for the time.

MICHAEL WARD: Thank you.

OPERATOR: Thank you. Our next question comes from Edward Wolfe withBear Stearns.

EDWARD WOLFE, ANALYST, BEAR, STEARNS & COMPANY: Hey, good morning,guys.

TONY INGRAM: Good morning.

EDWARD WOLFE: Clarence, could you just give a little bit of anupdate? You sound very confident in the coal business, obviously, onthe pricing side. But with all the recent Central App production cutswe're hearing from different mines, why should coal volumes grow nextyear? Can you talk to us what's specific to **CSX** about that?

CLARENCE GOODEN: Our own view of it is, is that the utilitystockpiles are approaching target levels. Having said that, theutilities are telling us that they plan to still continue to build atsome moderate pace those stockpiles as we go into 2007. So that wouldbe one factor.

The second factor is that we're still seeing strong production inCentral Appalachia and, in fact, some of the growth that weexperienced this year, about 3% of that 7% number in growth that yousaw, Ed, was from western coal.

The third factor, as you know, is that coal is highlyweather-dependent. So if we get any kind of adverse weather, verycold, very hot next year, we think that we'll have benefits fromthat.

And then on the pricing side, we have coal contracts that are up forrenewal next year, and we feel very positive about our ability to getrate in those contracts, particularly given the fact they have notbeen renewed since the 2004 time period.

EDWARD WOLFE: I don't question the demand side, I don't thinkinvestors are concerned with that, it's really the production side.Are any of the mines that you serve telling you that they're cuttingproduction, you know, because of their own cost issues production anddo you have any new utilities coming online? If I recall, there'ssomething in the fourth quarter, is there next year as well?

CLARENCE GOODEN: No, we have one that's coming on in the fourthquarter in South Carolina and our production on an annualized basison **CSX** is up about 12 million tons this year.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

EDWARD WOLFE: Is there an estimate of just your mines what they'resupposed to be up next year? Have they given you that kind ofestimates at this point?

CLARENCE GOODEN: I do not have that number.

EDWARD WOLFE: A couple of small things.

Oscar, you had mentioned a one-time negative in the rents during thequarter. I didn't quite understand what that was. The impact to rentswhen you were going over the expenses.

OSCAR MUNOZ: It's a prior-year item. We had a benefit in one of ourdivisions, just some procedural issues where we took sort of aone-time good [guy] and so we're just cycling that and it's themajority of that year-over-year variance.

EDWARD WOLFE: And the other income, how much of that is from yourenergy business, and how ongoing should we think of that?

OSCAR MUNOZ: It's the majority of that variance. I think it was 8 or$9 million that portion was, that's the majority. And as we wind downthat activity, we had costs associated with that business. So reallywe'll cycle some of that over the next three quarters probably inthat same general vicinity, but it's hard to look forward.

That other income line, if you look at it, the biggest driver thereis our real estate transactions, and those tend to be intermittent.That's really the big driver in the other income line. But, again,you've got probably three quarters of some lingering affects of this[R&L] transaction.

EDWARD WOLFE: And you're confident you can still get to $300 millionin cash flow given you're behind that pace? Is the sense there's lessCap Ex to go in the fourth quarter versus the first three?

OSCAR MUNOZ: Absolutely. Now I remind you that there are someKatrina-related insurance recoveries that are part of that 300, butas far as the money we're spending, absolutely confident.

EDWARD WOLFE: Okay. And one last question, maybe for Michael.

When you think of what the STB's doing with the fuel hedge hearingsright now, do you have any real concern here that if you're switchedto a different way of calculating it or what might come out of thatcould have a material impact to the way you look at recovery?

MICHAEL WARD: Ed, this is Michael, we really don't have that concern.One of the key findings of the STB is that the railroads did have theright to recover fuel cost increases. What they were talking more wasthe methodology. So as you know, that hearing is ongoing.

We will look, obviously, what the STB's opinion is as well as takingit to account market conditions, customer and constituent views. Butwe think when it's all said and done, we will have a fuel surchargeprogram that let's us recoup that increase in fuel costs once thesehearings are over with.

EDWARD WOLFE: I understand the unions and management are meeting aswe speak. Any sense of timing, are we getting closer to an agreement?

MICHAEL WARD: Well, we are actively in discussions with them now.They're never the easiest of discussions, as you know, we'reobviously looking for some productivity improvements in thesediscussions, but they are ongoing with the big unions at this point.

The big points we're talking about is healthcare costs and obviouslywork rule changes. We are committed to try to reach voluntaryagreements with the unions and we think we're providing competitivewages and benefits.

Just to remind you, the Railway Labor Act does provide some prettysignificant safeguards against any rail service disruption. I thinkin the last 30 years, there've only been six days lost to strike.

So we're in active negotiations. It's hard to predict exactly whenthose will reach conclusion, but both sides appear to want to makeagreements, Ed.

EDWARD WOLFE: Okay. Thanks for the time.

OPERATOR: Thank you. Our next question comes from Jason Seidl withCredit Suisse.

JASON SEIDL, ANALYST, CREDIT SUISSE SECURITIES: Thank you. Goodmorning, gentleman.

Quick question here regarding your revenue per unit on the intermodalside. It's up 4%. How much of that being up 4% was just due to mixwhen I saw domestic volumes picked up a little bit from, say, secondquarter levels [in] the decline?

CLARENCE GOODEN: Jason, this is Clarence Gooden. I'm not sure I knowthe answer to that from a pure mix standpoint.

JASON SEIDL: Okay.

I guess a better way to ask what I'm trying to get at, Clarence, whenyou're going to be taking on new business on the intermodal front,should we look at it as you're going to take it all on that 4%average level, or are you think you're going to be able to get morethan 4% revenue per unit increases going forward at the newintermodal business?

CLARENCE GOODEN: Well it would depend on the business and where it'soriginating and terminating from. On our transcon business, I thinkwe'll get a lot more price there. On our domestic business on thecore, there's pricing opportunities there, particularly where we'recompeting with trucks on a head-on basis.

On our international traffic, as we move to reprice it, we expect tobe able to get price increases in what we've traditionally beensaying, which is around 5 to 6%.

MICHAEL WARD: Clarence, would you say overall as we grow thisbusiness some of it may be lower revenue and pull down the RPU some,but the profitability level of that will be similar to the businesswe have today.

CLARENCE GOODEN: That will be definitely true on some of the shorterhaul interchange business that we have that we call watershedbusiness.

JASON SEIDL: Okay. Fair enough.

A coal question as well. Obviously coal volumes are pretty strong inthe quarter. How much of those volumes were sort of related to thatnew start-up plant that's coming on in South Carolina?

I'm sure you probably had some preshipments headed to them to getthem started up and what should we think about that adding to 4Q asthat plan opens up?

CLARENCE GOODEN: Actually, not much of that business in the thirdquarter was related to that plant. That plant had been buildingstockpiles all throughout the year in what would have been anormalized build for a start up utility.

JASON SEIDL: Okay. That plant comes online this quarter though,correct?

CLARENCE GOODEN: That is correct.

JASON SEIDL: Should we see a spike at all, or should it just be sortof just a normalized run rate?

CLARENCE GOODEN: I think you'll see a normalized run rate. Okay.Thanks a lot, gentleman.

OPERATOR: Thank You. Our next question comes from John Kartsonas withCitigroup.

JOHN KARTSONAS, ANALYST, SMITH BARNEY CITIGROUP: Hi. Just a quickquestion on your capital structure, I guess.

This quarter once again you hit, I guess, all-time low or multi-yearlow on your net debt ratio. How do you think about that goingforward? And especially as your returns improve, do you think thatyou'll be able to get some more debt [in]?

OSCAR MUNOZ: Hey, John, this is Oscar.

I generally -- I think our go-forward approach will be of a balancednature. And as you look at our debt ratios, I think we're in a prettygood place and it's certainly nice to have the dry powder there to beable to tap into it.

But I would forecast that we would stay around those levels from adebt, from a capital markets perspective, and continue to do thethings we have been doing, obviously invest in our business and thenreturn money to shareholders with regards to either dividends or muchlike we announced recently with the share repurchase program. Kind ofa balanced approach across all those with probably less emphasis inthe debt markets.

JOHN KARTSONAS: Do you think it's a case to be made to maintain thebalance more on the dividend side or on the share buyback? I mean areyou thinking about your payout ratio a little bit higher maybe goingforward?

OSCAR MUNOZ: What I can say, again, I'll continue to say that we havea balanced approach and we'll obviously explore all those areas andthat's certainly a benchmark, keeping up with the peers, keeping upwith the S&P 500 with regard to dividends, those are all factorsthat go into our analysis, but, again, let's [inaudible] the balanceissue to [inaudible] so there's no particular emphasis on any one ofthose, just a broader emphasis.

JOHN KARTSONAS: Okay. Thank you very much.

OPERATOR: Thank you. Our next question comes from Scott Flower withBanc of America Securities.

SCOTT FLOWER, ANALYST, BANC OF AMERICA SECURITIES: Good morning, all.A couple of questions.

Clarence, could you give us some sense of where you are on fuelsurcharge coverage, however you may define that. I know there aredifferent ways of getting that, and what sense do you have in '07 ofhow much can that grow in terms of your coverage percentage?

CLARENCE GOODEN: Well, about 55% of all of our revenue now, Scott, iscovered by our fuel surcharge and another 25% is covered by some formof fuel escalator.

SCOTT FLOWER: At the RCAF?

CLARENCE GOODEN: Could be RCAFU. That gets us up to about an 80%coverage. We expect our fuel surcharge coverage going forward toincrease next year.

As I probably told you this before, but since we implemented our fuelsurcharge, we do not renew contracts without our fuel surchargecoverage in those contracts. So as contracts come up for renewal thisyear, they will all be renewed with the fuel surcharge provisions inthem.

SCOTT FLOWER: So is it fair to think that maybe you picked up threeto maybe five percentage points of coverage next year?

CLARENCE GOODEN: That would be very fair.

SCOTT FLOWER: And then I know on your volume outlook that you talkedabout 2 to 3% volume growth but obviously last year, I guess, volumeswere down about 8%. So I'm just wondering, are you being veryconservative?

Is this the function of you shedded some lower margin business andthat comes into your calculations -- I'm just trying to get thesquare because obviously last year's fourth quarter the volume sidewas down, obviously, due to the hurricane impact but this year'sgrowth, obviously, is growth, but it's against fairly easycomparisons. So I'm just trying to square those two items.

CLARENCE GOODEN: I think we said early on on our volume growth thatwe expected to grow this year, that we were down in that firstquarter, we were flat in the second quarter, we've been up in thethird quarter and then I think our guidance was we expected to grow 2to 3% volume growth in the fourth quarter.

And then long-term, we still expect to continue to grow 2 to 3% andin our general freight business and in our intermodal businesslong-term, we expect to grow 5 to 7%.

SCOTT FLOWER: And then one last question, maybe this is either forMichael or Tony.

Productivity didn't fully offset inflation and I guess ex fuel costswere up 4% and I know there's some smaller comparative issues in theConrail line and volumes were up, too. How should I think about howyou look at productivity offsetting inflation?

Do you think you can offset half, more than half? I'm just trying toget a sense of how much you can offset of the normalized costinflation in your businesses as you continue to steadily move the barup.

OSCAR MUNOZ: This is Oscar, if I could, let me take that one.

Historically, the railroad industry trying to overcome inflation wascertainly a charge and a challenge that we all took on. What we'reseeing today is some pretty sharp raw material increases and so theinflationary costs are running just a little higher than they havehistorically.

Now having said that, we'll continue to focus on productivity tooffset that rising inflation and any of those things, so I think ingeneral, you can expect our kind of a normalized total cost when youexclude fuel to continue to transform, kind of similar to whatthey've done this quarter in the near-term.

SCOTT FLOWER: Okay. Very good. Well, thanks, all.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

MICHAEL WARD: Thank you.

OPERATOR: Thank you. Our next question comes from John Barnes withBB&T Capital Markets.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Hey, good morning, guys.Let's see, two things, I guess both for Clarence.

In looking at your fuel recovery, of that 25% of your businesscurrently covered by some type of escalator, whether it's an RCAF orsomething else, how much of that business do you think you canconvert over to a pure fuel surcharge and maybe get away from theseother escalators?

CLARENCE GOODEN: John, as they come up for renewal, 100%.

JOHN BARNES: Okay.

And then the second question I have is, we hear a lot aboutintermodal contracts and specifically coal contracts up for renewalover the next couple of years and the opportunity there on thepricing side. Is there any other commodity group that y'all areinvolved in that you see as good an opportunity on price as coal andintermodal that has a similar level or similar percentage ofcontracts in the next couple of years?

CLARENCE GOODEN: John, I think at least through 2007 we have pricingvibrancy in just about every commodity group that we have. We haven'tbeen adding car capacity.

The fundamentals on the highway, in my view, have not changed. Thedriver shortages still exist, the issues that were around driversthat didn't want to be away from home for long hours still exist. Thefuel issues around trucks as we go to different engines, as we go todifferent fuel sources for trucks that get less gas mileage and lessefficiencies in the engines still exist.

The highway congestion and capacity issues still exist in thecountry. So I see the pricing vibrancy for the rail industrycontinuing through 2007.

JOHN BARNES: Okay. All right. And then Oscar, maybe one for you.

Union Pacific came out and announced at their analyst meeting asignificant ramp-up in their Cap Ex and we've gotten the questionover what other rails could we see this out of. I know you laid out avery aggressive plan on certain projects that you were targeting fornew customers and that type of thing.

Do you foresee the need to see that kind of ramp-up in your Cap Ex aswell, or are you fairly comfortable with the run rate you'recurrently on in terms of Cap Ex?

OSCAR MUNOZ: John, thanks.

What we said last year was a 2.7 to $2.8 billion spend over '06 and'07 and I would expect that we would continue that so no additionalramp-up that we are planning. We'll give you the details, again, atour next quarter call, but there is no plan to deviate from thosestated numbers at this point.

JOHN BARNES: All right. Very good. Guys, nice quarter. Thanks foryour time.

OPERATOR: Thank you. Our next questions comes from John Larkin withStifel Nicolaus.

JOHN LARKIN, ANALYST, STIFEL NICOLAUS & COMPANY: Yeah, good morning.It's actually Stifel Nicolaus. First question is probably for TonyIngram.

The on time departures and arrivals have really improved quite a bit,but, again, they were easy comparisons due to the hurricane. Lookslike there's still a lot of room for improvement. What is yourultimate goal there, what's the timetable for achieving that goal,and what potentially could be the impact on improved operating marginif you were to achieve that goal?

TONY INGRAM: Steve, our goal is to get above 90. We measure our ontime performance to the minute and that is a goal that we push andstrive for.

That also gives a big opportunity, if you get the train out on time,you get the other train in on time, it turns the power and the crewsand the cars much, much quicker. That's our strive, to try to get itabove 90%.

JOHN LARKIN: Any thoughts on how long it will take to get there andwhat the impact on the OR might be?

TONY INGRAM: Well, I'd like to be there tomorrow, but we all knowthis is sort of a ramp-up. We did get a big kick-up this year. We'vegot our ONE Plan running extremely good. It will be in incrementsteps here as we ramp it up as we go forward.

JOHN LARKIN: Okay. Thank you. I had a couple of additional questionsfor Clarence, perhaps.

You mentioned there were some new train starts driving domesticintermodal growth. Were those the Schneider train starts and whatpercentage of the intermodal growth could be tied to those?

CLARENCE GOODEN: It was the Schneider train starts and I don't knowright off the top of my head the percent of the intermodal growthdirectly attributable to that, but it was part of the growth.

JOHN LARKIN: Okay.

And then on the auto side, it seemed like during the third quarterthere were some temporary planned shutdowns as well as some permanentproduction cuts and planned shutdowns. Do you have a sense forwhether that volume may at least partially kick back in the fourthquarter in going forward with maybe the third quarter having been thelow point?

CLARENCE GOODEN: I don't. We're not expecting a very robust fourthquarter or a very robust 2007 in the automotive business in general.

JOHN LARKIN: Okay. And maybe one for Oscar, just to finish up.

The way you calculated, Oscar, how close are you to earning your costto capital and how much longer, if you're still below that target, doyou think it will be before you achieve that target?

OSCAR MUNOZ: We're so close we can taste it. We're getting veryclose. We haven't forecast yet exactly when, but we have said, well,are striving to meet or exceed cost of capital so we're getting closeto that point.

JOHN LARKIN: All right. Thank you very much.

OPERATOR: Thank you. Our next question comes from Jordan Alliger withDeutsche Bank.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANK SECURITIES: Hi, good morning.Just a couple of related questions.

Is there a level of economic growth where it does get more difficultto see the type of price increases you've been seeing, whichparticularly on the industrial side, where the economy does appear tobe slowing?

And then secondly, tied into that, I know you mentioned the commentson trucks, but is there more, or could there be more pricesensitivity on the intermodal side given the truck competitiveaspects of it?

And the reason why I ask is, we have been seeing additional capacity,I think, come into the truckload sector. They have been underpressure from a volume standpoint. I'm wondering if that can trickleover into your intermodal business? Thanks.

CLARENCE GOODEN: On the first part of that question, is there somepoint which, if I understood you correctly, is there some point atwhich the economy falls to a certain level that impacts pricing. Wasthat the question?

JORDAN ALLIGER: Basically, yes.

CLARENCE GOODEN: Yes. I would say that in some of our markets, metalsmight be an example of that although metals has been very strong.They are linked to the economy.

There's other parts of our markets, agricultural markets would be anexample of that where we're feeding animals. Ethanol markets would bean example of that where there's a constant demand for the productuse.

Municipal solid waste, which has a constant demand for servicesregardless of the economy. Some of our aggregate markets that aretied into public paving projects.

Coal, which tends in these times to be a primary driver of electricalgeneration. Our food product lines that we haul, people eat when theeconomy goes down.

All of those lines tend to be recession resistant and so I'm not surethat answers your question entirely. I guess to sum it up, we've gotsome parts of the portfolio that would be subject to that but,frankly, we've got more than half that are not.

Your second question was around truck capacity and pricing. Our viewof it is that truck capacity in the short-term, particularly in Class8 trucks, has ramped up as companies have bought trucks inanticipation of the new engine laws at the first of the year.

Remember, you can have all the trucks you want, but if you don't havedrivers, if your insurance is high, if you've got those kind ofissues, highway congestion, it's not what it's knocked up to be. Andwe think you're seeing a temporary bubble there.

It is true that truck pricing will be more closely aligned withintermodal pricing, simply because of the nature of the beast there,but we've seen intermodal prices staying fairly stable.

JORDAN ALLIGER: Thank you.

OPERATOR: At this time, I show no further questions and would like toturn the call over to Mr. Ward for any closing remarks.

MICHAEL WARD: Thank you. Appreciate you joining us for our call todayand look forward to reporting good results in the fourth quarter.Thank you.

OPERATOR: Thank you. This concludes today's teleconference. Thank youfor your participation and have a great day and please disconnectyour line. Thank you.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2006 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2006Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: TOGOLAISE DES BOISSONS; UNION PACIFIC CORP; DEUTSCHE BANK SECURITIES INC; MERRILL LYNCH; CONSOLIDATED RAIL CORP; DEUTSCHE BANK AG; BEAR STEARNS COMPANIES INC; SCHNEIDER SA (OLD 95); **CSX** CORP; STIFEL FINANCIAL CORP; CONRAIL INC; ELECTRICAL AND PUMP SERVICE LTD; SOCIÉTÉ FINANCIAL SA; SITE (NETHERLANDS); BEAR STEARNS CO

News Subject: (Corporate Performance (1XO12); Corporate Financial Data (1XO59); Business Management (1BU42); Economic Statistics (1EC52); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Enterprise Performance Management (1EN49); Theoretical Analysis (1TH79); Railroads (1RA98); Chemicals (1CH04); Agrochemicals (1AG08); Automobile Insurance (1AU51); Transportation (1TR48); Industrial Construction (1IN90); Freight Railroads (1FR84); Financial Services (1FI37); Traffic (1TR52); Personal Property & Casualty Insurance (1PE46); Construction (1CO11); Land Transportation (1LA43); Fertilizers (1FE31); Property & Casualty Insurance (1PR21); Passenger Transportation (1PA35); Science & Engineering (1SC33); Passenger Railroads (1PA89); Insurance (1IN97); Business Theory (1BU14); Agriculture (1AG63); Agriculture, Food & Beverage (1AG53))

Language: EN

Other Indexing: (BEAR STEARNS; CONRAIL; CSX; CSX CORP; CSX EARNINGS CONFERENCE; DEUTSCHE BANK SECURITIES; DEUTSCHE BANK; EPS; FINANCIAL; HOEXTER; KEN HOEXTER; MERRILL LYNCH; MERRILL LYNCH KEN; OPERATOR; RAILWAY LABOR ACT; RCAF; RPU; SCHNEIDER; SITE; STB; STIFEL NICOLAUS; TOTAL MS; TRANSCRIPTION; TRANSCRIPTS; UNION PACIFIC; USERS; VOXANT) (Cap; Clarence; Clarence Gooden; David; David Baggs; Ed; Inaudible; JOHN; JORDAN; JORDAN ALLIGER; Michael; Michael Ward; Michael Ward.; North; Oscar; Oscar Munoz; Remember; SEC FILINGS; Sir; Tony; Tony Ingram; Ward)

Word Count: 9945

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0668

Intentionally omitted

# PX0669-PX0671

Filed Under Seal

# EXHIBIT PX0672

# SURFACE TRANSPORTATION BOARD
# OFFICE OF ECONOMICS, ENVIRONMENTAL ANALYSIS AND ADMINISTRATION
# STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES 2003

The tables set forth in Statistics of Class I Freight Railroads in the United States - 2003 are compiled directly from reports filed with the Board by the Class I railroads. This report contains operating and financial data for the nation's Class I railroad companies in operation as of December 31, 2003. Class I railroads are defined as railroads earning adjusted annual operating revenues for three consecutive years of $250,000,000 or more. Railroads with less than $250,000,000 revenues are classified as either Class II ($20,000,000 to $250,000,000 revenues) or Class III (less than $20,000,000 in revenues). Class II and Class III railroads are exempt from filing reports with the Surface Transportation Board. This issue covers the reports for calendar year 2003.

This is the ninth issue of Statistics of Class I Freight Railroads in the United States. It supersedes the railroad portion of Transport Statistics in the United States, which was published by the Interstate Commerce Commission from 1954 to 1994, inclusive. Transport Statistics in the United States, in turn, superseded Statistics of Railways in the United States, which was published yearly by the Interstate Commerce Commission from 1887 to 1953, inclusive

Additional copies of this document may be obtained at no charge by sending a request to:

Surface Transportation Board
Office of Economics, Environmental Analysis, and Administration
1925 K Street, NW
Suite 500
Washington, DC 20423

Abbreviations Used to Identify the Railroads Represented:

| | Abbreviation | District |
|---|---|---|
| Burlington Northern and Santa Fe Ry. Co. | BNSF | West |
| Canadian National/Grand Trunk Western R.R. Co. | CN/GTW | East |
| CSX Transportation, Inc. | CSX | East |
| Kansas City Southern Ry. Co. | KCS | West |
| Norfolk Southern Combined R.R. Subs. | NS | East |
| Soo Line R.R. Co. | Soo | West |
| Union Pacific R.R. Co. | UP | West |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 1
GENERAL BALANCE SHEET - ASSET SIDE
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 200)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CURRENT ASSETS | | | | | | | | | | | |
| 1 Cash | 17,952 | 1,034 | 0 | 8,834 | 265,578 | 3,585 | 142,967 | 266,612 | 173,338 | 439,950 | 1 |
| 2 Temporary cash investments | 0 | 0 | 14,046 | 85,183 | 2,129 | 3,200 | 9,284 | 16,175 | 97,667 | 113,842 | 2 |
| 3 Special deposits | 0 | 0 | 21 | 87 | 0 | 0 | 3,855 | 21 | 3,942 | 3,963 | 3 |
| Accounts receivable | | | | | | | | | | | |
| 4 - Loan and notes | 0 | 28 | (73) | 0 | 92 | 0 | 0 | 47 | 0 | 47 | 4 |
| 5 - Interline and other balances | 30,697 | 4,168 | 16,004 | 3,998 | 661 | 12,356 | 52,405 | 20,833 | 99,456 | 120,289 | 5 |
| 6 - Customers | 145,858 | 3,280 | 491,762 | 68,443 | 33,534 | 39,871 | 264,954 | 528,576 | 519,126 | 1,047,702 | 6 |
| 7 - Other | 21,170 | 27,867 | 140,363 | 16,809 | 48,625 | 11,003 | 137,120 | 216,855 | 186,102 | 402,957 | 7 |
| 8 - Accrued accounts receivables | 14,868 | 24,452 | 370,569 | 43,171 | 76,163 | 18,139 | 139,923 | 471,184 | 216,101 | 687,285 | 8 |
| 9 - Receivables from affiliated companies | 0 | 317,570 | (2,189) | 153 | | 6,750 | | 315,381 | 6,903 | 322,284 | 9 |
| 10 - Less: Allowance for uncollectible accounts | (84,763) | (6,211) | (5,998) | (10,255) | (6,125) | (6,592) | | (18,334) | (101,610) | (119,944) | 10 |
| 11 Working funds prepayments deferred income tax debits | 293,316 | 64,556 | 131,011 | 16,652 | 276,961 | 32,981 | 261,679 | 472,528 | 604,628 | 1,077,156 | 11 |
| 12 Materials and supplies | 265,612 | 28,790 | 159,604 | 36,000 | 92,025 | 10,017 | 267,234 | 280,419 | 578,863 | 859,282 | 12 |
| 13 Other current assets | 132,301 | 16,908 | 31,381 | 821 | 57,126 | 415 | 10,340 | 105,415 | 143,877 | 249,292 | 13 |
| 14 TOTAL CURRENT ASSETS | 837,011 | 482,442 | 1,346,501 | 269,896 | 846,769 | 131,725 | 1,289,761 | 2,675,712 | 2,528,393 | 5,204,105 | 14 |
| OTHER ASSETS | | | | | | | | | | | |
| 15 Special funds | 2,409 | 0 | 0 | 0 | 623,957 | 0 | 4,765 | 623,957 | 7,174 | 631,131 | 15 |
| 16 Investments and advances affiliated companies | 1,718,230 | 373,970 | 248,292 | 430,674 | 592,979 | 146,114 | 690,323 | 1,215,241 | 2,985,341 | 4,200,582 | 16 |
| 17 Other investments and advances | 4,091 | 888 | 2,011 | 6 | 229,974 | 0 | 31,278 | 232,873 | 35,375 | 268,248 | 17 |
| 18 Allowances for net unrealized loss on noncurrent marketable equity securities - Cr. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 |
| 19 Property used in other than carrier operation (Less depreciation) | 65,637 | 45,474 | 126,294 | 1,921 | 105,415 | 971 | 178,903 | 277,183 | 247,432 | 524,615 | 19 |
| 20 Other assets | 50,886 | 4,476 | 553,252 | 89 | 60,670 | 41,642 | 239,652 | 618,398 | 332,269 | 950,667 | 20 |
| 21 Other deferred debits | 599,458 | 28,519 | 72,826 | 84,531 | 12,458 | 3,291 | 54,014 | 113,803 | 741,294 | 855,097 | 21 |
| 22 Accumulated deferred income tax debits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 |
| 23 TOTAL OTHER ASSETS | 2,440,711 | 453,327 | 1,002,675 | 517,221 | 1,625,453 | 192,018 | 1,198,935 | 3,081,455 | 4,348,885 | 7,430,340 | 23 |
| ROAD AND EQUIPMENT | | | | | | | | | | | |
| 24 Road | 24,897,083 | 7,361,148 | 12,027,920 | 1,656,078 | 11,019,459 | 984,007 | 29,931,450 | 30,408,527 | 57,468,618 | 87,877,145 | 24 |
| 25 Equipment | 5,524,002 | 866,587 | 5,613,916 | 282,768 | 5,723,978 | 450,714 | 7,618,067 | 12,204,481 | 13,875,551 | 26,080,032 | 25 |
| 26 Unallocated items | 462,450 | 42,476 | 191,512 | 77,624 | 278,155 | 18,025 | 527,116 | 512,143 | 1,085,215 | 1,597,358 | 26 |
| 27 Accumulated depreciation and amortization | (6,039,151) | (1,100,504) | (4,994,938) | (735,326) | (5,800,090) | (438,534) | (8,506,282) | (11,895,532) | (15,719,293) | (27,614,825) | 27 |
| 28 NET ROAD AND EQUIPMENT | 24,844,384 | 7,169,707 | 12,838,410 | 1,281,144 | 11,221,502 | 1,014,212 | 29,570,351 | 31,229,619 | 56,710,091 | 87,939,710 | 28 |
| 29 TOTAL ASSETS | 28,122,106 | 8,105,476 | 15,187,586 | 2,068,261 | 13,693,724 | 1,337,955 | 32,059,047 | 36,986,786 | 63,587,369 | 100,574,155 | 29 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 1 (CONTINUED)
GENERAL BALANCE SHEET - LIABILITY SIDE & INVESTMENT USED IN TRANSPORTATION SERVICE
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 200)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CURRENT LIABILITIES | | | | | | | | | | | |
| 30 Loans and notes payable | | | 0 | | | | | 0 | 0 | 0 | 30 |
| 31 Accounts payable: interline and other balances | 55,003 | 8,578 | 31,514 | 21,092 | 13,573 | 1,396 | 26,551 | 53,665 | 104,042 | 157,707 | 31 |
| 32 Audited accounts and wages | 144,597 | 50,706 | 103,261 | 202,062 | 47,185 | 15,978 | 197,878 | 201,152 | 560,515 | 761,667 | 32 |
| 33 Other accounts payable | 138,973 | 15,239 | 69,772 | 1,811 | 191 | 626 | 44,309 | 85,202 | 185,719 | 270,921 | 33 |
| 34 Interest and dividends payable | 38,436 | 8,729 | 10,898 | 6,547 | 10,596 | 1,297 | 73,193 | 30,223 | 119,473 | 149,696 | 34 |
| 35 Payables to affiliated companies | 4,311 | 0 | 2,736,503 | 0 | 1,163,860 | 22,256 | 0 | 3,900,363 | 26,567 | 3,926,930 | 35 |
| 36 Accrued accounts payable | 1,261,252 | 184,175 | 901,556 | 84,190 | 860,110 | 130,532 | 1,509,182 | 1,945,841 | 2,985,156 | 4,930,997 | 36 |
| 37 Taxes accrued | 275,094 | 3,048 | 85,228 | 4,982 | 161,139 | 9,574 | 230,724 | 249,415 | 520,374 | 769,789 | 37 |
| 38 Other current liabilities | 111,363 | 12,480 | 97,611 | 0 | 102,144 | 3,161 | 10,005 | 212,235 | 124,529 | 336,764 | 38 |
| 39 Equipment obligations and other long-term debt due within one year | 244,641 | 10,402 | 102,054 | 8,897 | 110,320 | 3,205 | 169,909 | 222,776 | 426,652 | 649,428 | 39 |
| 40 TOTAL CURRENT LIABILITIES | 2,273,670 | 293,357 | 4,138,397 | 329,581 | 2,469,118 | 188,025 | 2,261,751 | 6,900,872 | 5,053,027 | 11,953,899 | 40 |
| NON-CURRENT LIABILITIES | | | | | | | | | | | |
| 41 Funded debt unmatured | 747,265 | 656,374 | 49,934 | 497,000 | 31,682 | 306 | 411,610 | 737,990 | 1,656,181 | 2,394,171 | 41 |
| 42 Equipment obligations | 486,897 | 425 | 620,933 | 13,732 | 562,935 | 0 | 228,755 | 1,184,293 | 729,384 | 1,913,677 | 42 |
| 43 Capitalized lease obligations | 534,253 | 8,670 | 39,793 | 1,473 | 239,125 | 41,601 | 1,419,041 | 287,588 | 1,996,368 | 2,283,956 | 43 |
| 44 Debt in default | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44 |
| 45 Accounts payable: affiliated companies | 0 | 1,808,520 | 5,201 | 0 | 741,892 | 335,600 | 4,373,194 | 2,555,613 | 4,708,794 | 7,264,407 | 45 |
| 46 Unamortized debt premium | (33,893) | (4,694) | (1,913) | 0 | (944) | 0 | (61,647) | (7,551) | (95,540) | (103,091) | 46 |
| 47 Interest in default | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47 |
| 48 Deferred revenues - transfers from government authorities | 270,907 | 11,263 | 0 | 0 | 0 | 5,162 | 0 | 11,263 | 276,069 | 287,332 | 48 |
| 49 Accumulated deferred income tax credits | 7,435,012 | 2,163,421 | 3,562,299 | 393,078 | 4,249,259 | 125,272 | 9,099,449 | 9,974,979 | 17,052,811 | 27,027,790 | 49 |
| 50 Other long-term liabilities and deferred credits | 1,786,361 | 540,188 | 1,244,161 | 54,367 | 1,037,166 | 164,585 | 1,574,532 | 2,821,515 | 3,579,845 | 6,401,360 | 50 |
| 51 TOTAL NON-CURRENT LIABILITIES | 11,226,802 | 5,184,167 | 5,520,408 | 959,650 | 6,861,115 | 672,526 | 17,044,934 | 17,565,690 | 29,903,912 | 47,469,602 | 51 |
| SHAREHOLDERS' EQUITY | | | | | | | | | | | |
| 52 Total capital stock | 1 | 1,802,429 | 181,221 | 57,504 | 166,690 | 281,994 | 15,966 | 2,150,340 | 355,465 | 2,505,805 | 52 |
| 53 Common stock | 1 | 1,802,429 | 181,221 | 36,504 | 166,690 | 281,994 | 49 | 2,150,340 | 318,548 | 2,468,888 | 53 |
| 54 Preferred stock | 0 | 0 | 0 | 21,000 | 0 | 0 | 15,917 | 0 | 36,917 | 36,917 | 54 |
| 55 Discount on capital stock | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55 |
| 56 Additional capital | 6,151,534 | 412,989 | 1,379,812 | 315,058 | 783,564 | 120,626 | 4,781,906 | 2,576,365 | 11,369,124 | 13,945,489 | 56 |
| Retained earnings: | | | | | | | | | | | |
| 57 Appropriated | 0 | 1,411 | 0 | 0 | 0 | 0 | 1,583 | 1,411 | 1,583 | 2,994 | 57 |
| 58 Unappropriated | 8,470,099 | 411,123 | 3,962,139 | 410,255 | 3,090,561 | 74,784 | 8,077,350 | 7,463,823 | 17,032,488 | 24,496,311 | 58 |
| 59 Net unrealized gain (loss) on noncurrent marketable equity securities | 0 | 0 | 5,609 | 0 | 322,676 | 0 | (124,443) | 328,285 | (124,443) | 203,842 | 59 |
| 60 Less treasury stock | 0 | 0 | 0 | 3,787 | 0 | 0 | 0 | 0 | 3,787 | 3,787 | 60 |
| 61 Net stockholders equity | 14,621,634 | 2,627,952 | 5,528,781 | 779,030 | 4,363,491 | 477,404 | 12,752,362 | 12,520,224 | 28,630,430 | 41,150,654 | 61 |
| 62 TOTAL LIABILITIES AND SHAREHOLDERS EQUITY | 28,122,106 | 8,105,476 | 15,187,586 | 2,068,261 | 13,693,724 | 1,337,955 | 32,059,047 | 36,986,786 | 63,587,369 | 100,574,155 | 62 |
| INVESTMENT IN RAILROAD PROPERTY USED IN TRANSPORTATION SERVICE (R-1 SCHEDULE 352A) | | | | | | | | | | | |
| 63 Miles of road represented | 22,676 | 6,493 | 20,091 | 2,885 | 17,484 | 1,659 | 27,061 | 44,068 | 54,281 | 98,349 | 63 |
| 64 Investment in property | 30,568,382 | 8,270,211 | 20,572,153 | 2,016,470 | 20,998,245 | 1,452,746 | 38,094,096 | 49,840,609 | 72,131,694 | 121,972,303 | 64 |
| 65 Average investment per mile | 1,348 | 1,274 | 1,024 | 699 | 1,201 | 876 | 1,408 | 1,131 | 1,329 | 1,240 | 65 |
| 66 Depreciation and amortization | 5,801,085 | 1,100,504 | 5,766,246 | 735,326 | 6,867,363 | 438,534 | 8,506,282 | 13,734,113 | 15,481,227 | 29,215,340 | 66 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 2
RESULTS OF OPERATIONS
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 210)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RAILWAY OPERATING INCOME | | | | | | | | | | | |
| 1 (101) Freight | 9,279,270 | 1,455,347 | 6,403,677 | 539,706 | 6,236,033 | 562,692 | 10,935,888 | 14,095,057 | 21,317,556 | 35,412,613 | 1 |
| 2 (102) Passenger | | | | | | | 61,590 | 0 | 61,590 | 61,590 | 2 |
| 3 (103) Passenger-related | | | | | | | 438 | 0 | 438 | 438 | 3 |
| 4 (104) Switching | 28,511 | 44,515 | 39,681 | 19,096 | 58,789 | 13,070 | 120,932 | 142,985 | 181,609 | 324,594 | 4 |
| 5 (105) Water transfers | | | | | | | | 0 | 0 | 0 | 5 |
| 6 (106) Demurrage | 37,561 | 15,847 | 23,889 | 11,552 | 79,318 | 6,834 | 77,572 | 119,054 | 133,519 | 252,573 | 6 |
| 7 (110) Incidental | 29,557 | 21,391 | 113,579 | 4,957 | 94,164 | 1,121 | 250,884 | 229,134 | 286,519 | 515,653 | 7 |
| 8 (121) Joint facility - credit | 4,992 | | | | | | 6,435 | 0 | 11,427 | 11,427 | 8 |
| 9 (122) Joint facility - debit | | | | | | | | 0 | 0 | 0 | 9 |
| 10 (501) Railway operating revenues (Exclusive of transfers from government authorities) | 9,379,891 | 1,537,100 | 6,580,826 | 575,311 | 6,468,304 | 583,717 | 11,453,739 | 14,586,230 | 21,992,658 | 36,578,888 | 10 |
| 11 (502) Railway operating revenues - transfers from government authorities | | 3,627 | | | | | 55,612 | 3,627 | 55,612 | 59,239 | 11 |
| 12 (503) Railway operating revenues - amortization of deferred transfers from government authorities | | 527 | | | | 287 | | 527 | 287 | 814 | 12 |
| 13 TOTAL RAILWAY OPERATING REVENUES | 9,379,891 | 1,541,254 | 6,580,826 | 575,311 | 6,468,304 | 584,004 | 11,509,351 | 14,590,384 | 22,048,557 | 36,638,941 | 13 |
| 14 (531) Railway operating expenses | 7,744,662 | 1,289,928 | 6,284,184 | 517,357 | 5,609,278 | 513,206 | 9,481,767 | 13,183,390 | 18,256,992 | 31,440,382 | 14 |
| 15 Net revenue from railway operations | 1,635,229 | 251,326 | 296,642 | 57,954 | 859,026 | 70,798 | 2,027,584 | 1,406,994 | 3,791,565 | 5,198,559 | 15 |
| OTHER INCOME | | | | | | | | | | | |
| 16 (506) Revenue from property used in other than carrier operations | | | 12,718 | (18) | 1,353 | | 9,246 | 14,071 | 9,228 | 23,299 | 16 |
| 17 (510) Miscellaneous rent income | | 4,883 | 11,081 | 3,469 | 36,845 | 5,014 | 69,154 | 52,809 | 77,637 | 130,446 | 17 |
| 18 (512) Separately operated properties - profit | | | | | | | | 0 | 0 | 0 | 18 |
| 19 (513) Dividend income (cost method) | 400 | | 1,632 | | 6,402 | 2 | 100 | 8,034 | 502 | 8,536 | 19 |
| 20 (514) Interest income | 31,313 | 76 | | 1,601 | 13,557 | 2,410 | 4,640 | 13,633 | 39,964 | 53,597 | 20 |
| 21 (516) Income from sinking and other funds | 0 | | | | 7 | | | 7 | 0 | 7 | 21 |
| 22 (517) Release of premiums on funded debt | | | 9 | | | | 9,234 | 9 | 9,234 | 9,243 | 22 |
| 23 (518) Reimbursements received under contracts and agreements | | | | | | | | 0 | 0 | 0 | 23 |
| 24 (519) Miscellaneous income | 17,770 | 7,288 | 1,021 | 1,461 | 155,065 | 4,959 | 91,929 | 163,374 | 116,119 | 279,493 | 24 |
| Income from affiliated companies: | | | | | | | | | | | |
| 25 a. Dividends (equity method) | | | | | | 147 | 37,637 | 0 | 37,784 | 37,784 | 25 |
| 26 b. Equity in undistributed earnings (losses) | | 9,923 | 5,624 | 10,739 | (348) | 1,559 | 22,362 | 15,199 | 34,660 | 49,859 | 26 |
| 27 TOTAL OTHER INCOME | 49,483 | 22,170 | 32,085 | 17,252 | 212,881 | 14,091 | 244,302 | 267,136 | 325,128 | 592,264 | 27 |
| 28 TOTAL INCOME | 1,684,712 | 273,496 | 328,727 | 75,206 | 1,071,907 | 84,889 | 2,271,886 | 1,674,130 | 4,116,693 | 5,790,823 | 28 |
| MISCELLANEOUS DEDUCTIONS FROM INCOME | | | | | | | | | | | |
| 29 (534) Expenses of property used in other than carrier operations | | | 9,218 | 24 | 25,460 | | 10,313 | 34,678 | 10,337 | 45,015 | 29 |
| 30 (544) Miscellaneous taxes | | | | | | | | 0 | 0 | 0 | 30 |
| 31 (545) Separately operated properties-Loss | | | | | | | | 0 | 0 | 0 | 31 |
| 32 (549) Maintenance of investment organization | | | | | | | | 0 | 0 | 0 | 32 |
| 33 (550) Income transferred under contracts and agreements | | | | | | | | 0 | 0 | 0 | 33 |
| 34 (551) Miscellaneous income charges | 20,195 | 8,460 | 36,962 | 817 | 412,350 | 905 | 44,736 | 457,772 | 66,653 | 524,425 | 34 |
| 35 (553) Uncollectible accounts | | | | 1,788 | | | | 0 | 1,788 | 1,788 | 35 |
| 36 TOTAL MISCELLANEOUS DEDUCTIONS | 20,195 | 8,460 | 46,180 | 2,629 | 437,810 | 905 | 55,049 | 492,450 | 78,778 | 571,228 | 36 |
| 37 Income available for fixed charges | 1,664,517 | 265,036 | 282,547 | 72,577 | 634,097 | 83,984 | 2,216,837 | 1,181,680 | 4,037,915 | 5,219,595 | 37 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 2 (CONTINUED)
RESULTS OF OPERATIONS
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 210)
(DOLLARS IN THOUSANDS)

| | | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FIXED CHARGES | | | | | | | | | | | |
| | (546) Interest on funded debt: | | | | | | | | | | | |
| 38 | (a) Fixed interest not in default | 139,846 | 151,297 | 55,958 | 42,146 | 25,848 | 7,541 | 155,461 | 233,103 | 344,994 | 578,097 | 38 |
| 39 | (b) Interest in default | | | | | | | | 0 | 0 | 0 | 39 |
| 40 | (547) Interest on unfunded debt | 306 | 3 | 2,557 | 204 | 104,118 | 1,772 | 332,600 | 106,678 | 334,882 | 441,560 | 40 |
| 41 | (548) Amortization of discount on funded debt | 3,881 | 458 | 405 | 3,580 | 670 | | 5,929 | 1,533 | 13,390 | 14,923 | 41 |
| 42 | TOTAL FIXED CHARGES | 144,033 | 151,758 | 58,920 | 45,930 | 130,636 | 9,313 | 493,990 | 341,314 | 693,266 | 1,034,580 | 42 |
| 43 | Income after fixed charges | 1,520,484 | 113,278 | 223,627 | 26,647 | 503,461 | 74,671 | 1,722,847 | 840,366 | 3,344,649 | 4,185,015 | 43 |
| | OTHER DEDUCTIONS | | | | | | | | | | | |
| | (546) Interest on funded debt: | | | | | | | | | | | |
| 44 | (c) Contingent interest | | | 188 | | | | 7,680 | 188 | 7,680 | 7,868 | 44 |
| | UNUSUAL OR INFREQUENT ITEMS | | | | | | | | | | | |
| 45 | (555) Unusual or infrequent items (debit) credit | | | | | | | | 0 | 0 | 0 | 45 |
| 46 | Income (Loss) from continuing operations (before inc. taxes) | 1,520,484 | 113,278 | 223,439 | 26,647 | 503,461 | 74,671 | 1,715,167 | 840,178 | 3,336,969 | 4,177,147 | 46 |
| | PROVISIONS FOR INCOME TAXES | | | | | | | | | | | |
| | (556) Income taxes on ordinary income: | | | | | | | | | | | |
| 47 | (a) Federal income taxes | 96,843 | 4,303 | (52,704) | 0 | 53,483 | 7,838 | 208,064 | 5,082 | 312,745 | 317,827 | 47 |
| 48 | (b) State income taxes | 17,864 | 4,273 | 2,197 | 22 | 7,637 | 691 | 43,321 | 14,107 | 61,898 | 76,005 | 48 |
| 49 | (c) Other income taxes | | 175 | 104 | | | | | 279 | 0 | 279 | 49 |
| 50 | (557) Provision for deferred taxes | 444,958 | 24,468 | 129,978 | 7,073 | 129,541 | 6,439 | 357,704 | 283,987 | 816,174 | 1,100,161 | 50 |
| 51 | TOTAL PROVISION FOR INCOME TAXES | 559,665 | 33,219 | 79,575 | 7,095 | 190,661 | 14,968 | 609,089 | 303,455 | 1,190,817 | 1,494,272 | 51 |
| 52 | Income from continuing operations | 960,819 | 80,059 | 143,864 | 19,552 | 312,800 | 59,703 | 1,106,078 | 536,723 | 2,146,152 | 2,682,875 | 52 |
| | DISCONTINUED OPERATIONS | | | | | | | | | | | |
| 53 | (560) Income or loss from operations of discontinued segments | | | | | | | | 0 | 0 | 0 | 53 |
| 54 | (562) Gain or loss on disposal of discontinued segments | | | | | | | | 0 | 0 | 0 | 54 |
| 55 | Income before extraordinary items | 960,819 | 80,059 | 143,864 | 19,552 | 312,800 | 59,703 | 1,106,078 | 536,723 | 2,146,152 | 2,682,875 | 55 |
| | EXTRAORDINARY ITEMS AND ACCOUNTING CHANGES | | | | | | | | | | | |
| 56 | (570) Extraordinary items (Net) | | | | | | | | 0 | 0 | 0 | 56 |
| 57 | (590) Income taxes on extraordinary items | | | | | | | | 0 | 0 | 0 | 57 |
| 58 | (591) Provision for deferred taxes - Extraordinary items | | | | | | | | 0 | 0 | 0 | 58 |
| 59 | TOTAL EXTRAORDINARY ITEMS | | | | | | | | 0 | 0 | 0 | 59 |
| 60 | (592) Cumulative effect of changes in accounting principles | | | | | 3,808 | | | 3,808 | 0 | 3,808 | 60 |
| 61 | Net income (Loss) | 960,819 | 80,059 | 143,864 | 19,552 | 316,608 | 59,703 | 1,106,078 | 540,531 | 2,146,152 | 2,686,683 | 61 |
| | RECONCILIATION OF NET RAILWAY OPERATING INCOME (NROI) | | | | | | | | | | | |
| 62 | Net revenues from railway operations | 1,635,229 | 251,326 | 296,642 | 57,954 | 859,026 | 70,798 | 2,027,584 | 1,406,994 | 3,791,565 | 5,198,559 | 62 |
| 63 | (556) Income taxes on ordinary income | 114,707 | 8,751 | (50,403) | 22 | 61,120 | 8,529 | 251,385 | 19,468 | 374,643 | 394,111 | 63 |
| 64 | (557) Provision for deferred income taxes | 444,958 | 24,468 | 129,978 | 7,073 | 129,541 | 6,439 | 357,704 | 283,987 | 816,174 | 1,100,161 | 64 |
| 65 | Income from lease of road and equipment | 12,922 | | 6,289 | | 5,335 | 1,600 | | 11,624 | 14,522 | 26,146 | 65 |
| 66 | Rent for leased roads and equipment | | 1,968 | 157,265 | 978 | 235,749 | 146 | 3,873 | 394,982 | 4,997 | 399,979 | 66 |
| 67 | Net railway operating income (loss) | 1,062,642 | 220,075 | 368,043 | 51,837 | 898,779 | 54,376 | 1,422,368 | 1,486,897 | 2,591,223 | 4,078,120 | 67 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 3
RETAINED INCOME - UNAPPROPRIATED
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 220)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Balances at beginning of year | 7,316,521 | 207,622 | 4,021,730 | 311,784 | 3,540,727 | 176,423 | 6,818,800 | | 7,770,079 | 14,623,528 | 22,393,607 | 1 |
| 2 Prior period adjustments to beginning retained earnings | | | | | | | | | 0 | 0 | 0 | 2 |
| CREDITS | | | | | | | | | | | | |
| 3 Credit balance transferred from income | 949,831 | 72,176 | 138,240 | 8,813 | 316,608 | 58,144 | 1,083,716 | | 527,024 | 2,100,504 | 2,627,528 | 3 |
| 4 Appropriations released | | | | | | | 1583 | | 0 | 1583 | 1583 | 4 |
| 5 Other credits to retained earnings | 9 | 0 | | | | | | | 0 | 9 | 9 | 5 |
| 6 TOTAL CREDITS | 949,840 | 72,176 | 138,240 | 8,813 | 316,608 | 58,144 | 1,085,299 | | 527,024 | 2,102,096 | 2,629,120 | 6 |
| DEBITS | | | | | | | | | | | | |
| 7 Debit balance transferred from income | | | | | | | | | 0 | 0 | 0 | 7 |
| 8 Other debits to retained earnings | | 152 | | | | 1,114 | | | 152 | 1,114 | 1,266 | 8 |
| 9 Appropriations for sinking and other funds | | 48 | | | | | 1,583 | | 48 | 1,583 | 1,631 | 9 |
| 10 Appropriations for other purposes | | | | | | | | | 0 | 0 | 0 | 10 |
| 11 Dividends: Common stock | | (767) | 230,000 | | 766,774 | 159,100 | 251,000 | | 996,007 | 410,100 | 1,406,107 | 11 |
| 12 Preferred stock (1) | | | | | | | | | 0 | 0 | 0 | 12 |
| 13 TOTAL DEBITS | | (567) | 230,000 | | 766,774 | 160,214 | 252,583 | | 996,207 | 412,797 | 1,409,004 | 13 |
| 14 Net increase (decrease) during year (Line 6 minus line 13) | 949,840 | 72,743 | (91,760) | 8,813 | (450,166) | (102,070) | 832,716 | | (469,183) | 1,689,299 | 1,220,116 | 14 |
| 15 Total unappropriated retained earnings and equity in undistributed earnings (losses) of affiliated companies at end of year | 8,470,099 | 411,123 | 3,962,139 | 410,255 | 3,090,561 | 74,784 | 8,077,350 | | 7,463,823 | 17,032,488 | 24,496,311 | 15 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 4
STATEMENT OF CASH FLOWS
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 240)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | | | | | | | |
| 1 Cash received from operating revenues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 2 Dividends received from affiliates | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 3 Interest received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 4 Other income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 5 Cash paid for operating expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 6 Interest paid (net of amounts capitalized) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| 7 Income taxes paid | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| 8 Other - net | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| 9 NET CASH PROVIDED BY OPERATING ACTIVITIES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| RECONCILIATION OF NET INCOME TO NET CASH PROVIDED BY OPERATING ACTIVITIES | | | | | | | | | | | |
| 10 Income from continuing operations | 960,819 | 80,059 | 143,864 | 19,552 | 312,800 | 59,703 | 1,106,078 | 536,723 | 2,146,152 | 2,682,875 | 10 |
| ADJUSTMENTS TO RECONCILE INCOME FROM CONTINUING OPERATIONS TO NET CASH PROVIDED BY OPERATING ACTIVITIES | | | | | | | | | | | |
| 11 Loss (gain) on sale or disposal of tangible property and investments | (17,746) | 0 | 286,342 | (332) | (33,657) | (4,306) | (84,007) | 252,685 | (106,391) | 146,294 | 11 |
| 12 Depreciation and amortization expenses | 929,171 | 151,167 | 563,635 | 59,644 | 543,296 | 43,678 | 1,191,206 | 1,258,098 | 2,223,699 | 3,481,797 | 12 |
| 13 Net increase (decrease) in provision for Deferred Income Taxes | 420481 | 24468 | 122348 | 2457 | 129541 | 6439 | 357704 | 276357 | 787081 | 1063438 | 13 |
| 14 Net decrease (increase) in undistributed earnings (losses) of affiliates | 10,988 | (9,923) | | (10,739) | (5,846) | (1,559) | (22,362) | (15,769) | (23,672) | (39,441) | 14 |
| 15 Decrease (increase) in accounts receivable | 16,513 | 50,514 | (834,709) | (4,149) | 30,540 | (3,667) | 69,141 | (753,655) | 77,838 | (675,817) | 15 |
| 16 Decrease (increase) in material and supplies and other current assets | (19,888) | (3,715) | 10,453 | 2,089 | (7,336) | 148 | 74,557 | (598) | 56,906 | 56,308 | 16 |
| 17 Increase (decrease) in current liabilities other than debt | 167077 | -33741 | 3577 | 125601 | 18381 | 6083 | 74022 | -11783 | 372783 | 361000 | 17 |
| 18 Increase (decrease) in other - net | (134,964) | 42,886 | (14,087) | (2,673) | 93,465 | (6,389) | (631,791) | 122,264 | (775,817) | (653,553) | 18 |
| 19 Net cash provided from continuing operations | 2,332,451 | 301,715 | 281,423 | 191,450 | 1,081,184 | 100,130 | 2,134,548 | 1,664,322 | 4,758,579 | 6,422,901 | 19 |
| 20 Add (Subtract) cash generated (paid) by reason of discontinued operations and extraordinary items | | | | | 3,808 | | | 3,808 | 0 | 3,808 | 20 |
| 21 NET CASH PROVIDED FROM OPERATING ACTIVITIES | 2,332,451 | 301,715 | 281,423 | 191,450 | 1,084,992 | 100,130 | 2,134,548 | 1,668,130 | 4,758,579 | 6,426,709 | 21 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | | | | | | | | | |
| 22 Proceeds from sale of property | 17,747 | (1,930) | 17,410 | 8,928 | 122,840 | 3,220 | 150,374 | 138,320 | 180,269 | 318,589 | 22 |
| 23 Capital expenditures | (1,697,591) | (288,204) | (939,838) | (77,324) | (711,148) | (72,339) | (1,748,860) | (1,939,190) | (3,596,114) | (5,535,304) | 23 |
| 24 Net change in temporary cash investments not qualifying as cash | | 608 | 0 | | (2,083) | | 0 | (1,475) | 0 | (1,475) | 24 |
| equivalents | | | | | | | | 0 | 0 | 0 | |
| 25 Proceeds from sale/repayment of investment and advances | | 0 | 22,633 | 31 | 102,593 | | 3,808 | 125,226 | 3,839 | 129,065 | 25 |
| 26 Purchase price of long-term investment and advances | | (8,000) | (2,901) | (6,085) | (102,662) | (48,000) | (20,097) | (113,563) | (74,182) | (187,745) | 26 |
| 27 Net decrease (increase) in sinking and other special funds | | 791 | | | (32,902) | | 289 | (32,111) | 289 | (31,822) | 27 |
| 28 Other - net | (85,950) | 12,884 | (44,257) | (963) | (393,756) | 5 | 141,486 | (425,129) | 54,578 | (370,551) | 28 |
| 29 NET CASH USED IN INVESTING ACTIVITIES | (1,765,794) | (283,851) | (946,953) | (75,413) | (1,017,118) | (117,114) | (1,473,000) | (2,247,922) | (3,431,321) | (5,679,243) | 29 |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | | | | | | | | |
| 30 Proceeds from issuance of long-term debt | 15,100 | 188,520 | 0 | 0 | 261,100 | 165,000 | 0 | 449,620 | 180,100 | 629,720 | 30 |
| 31 Principle payments of long-term debt | (330,862) | (199,353) | (273,940) | (58,244) | (165,904) | (2,353) | (279,012) | (639,197) | (670,471) | (1,309,668) | 31 |
| 32 Proceeds from issuance of capital stock | | 0 | | | | | | 0 | 0 | 0 | 32 |
| 33 Purchase price of acquiring treasury stock | | | | | (42,528) | | | (42,528) | 0 | (42,528) | 33 |
| 34 Cash dividends paid | | | (230,000) | | | (159,100) | (251,000) | (230,000) | (410,100) | (640,100) | 34 |
| 35 Other - net | (260,942) | | 1,183,516 | 18,690 | | (35,000) | (90,045) | 1,183,516 | (367,297) | 816,219 | 35 |
| 36 NET CASH FROM FINANCING ACTIVITIES | (576,704) | (10,833) | 679,576 | (39,554) | 52,668 | (31,453) | (620,057) | 721,411 | (1,267,768) | (546,357) | 36 |
| 37 NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (10,047) | 7,031 | 14,046 | 76,483 | 120,542 | (48,437) | 41,491 | 141,619 | 59,490 | 201,109 | 37 |
| 38 Cash and cash equivalents at beginning of the year | 27,999 | (5,997) | 0 | 17,621 | 145,036 | 55,222 | 101,476 | 139,039 | 202,318 | 341,357 | 38 |
| 39 CASH AND CASH EQUIVALENTS AT END OF THE YEAR | 17,952 | 1,034 | 14,046 | 94,104 | 265,578 | 6,785 | 142,967 | 280,658 | 261,808 | 542,466 | 39 |
| Footnotes to Schedule | | | | | | | | | | | |
| 40 Interest (net of amount capitalized) | 150,680 | 152,556 | 63,093 | 42,121 | 44,620 | 9,990 | (490,000) | 260,269 | (287,209) | (26,940) | 40 |
| 41 Income taxes (net) | 119,728 | (12,176) | 5,168 | (21,239) | 42,241 | 11,333 | (204,000) | 35,233 | (94,178) | (58,945) | 41 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 5
RAILWAY OPERATING EXPENSES
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 410)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAYS & STRUCTURES | | | | | | | | | | | | |
| ADMINISTRATION | | | | | | | | | | | | |
| 1 Track | 12,969 | 4,594 | 21,401 | 4,768 | 5,338 | 3,153 | 13,212 | | 31,333 | 34,102 | 65,435 | 1 |
| 2 Bridge & building | 8,003 | 1,272 | 6,256 | 424 | 1,107 | 737 | 5,609 | | 8,635 | 14,773 | 23,408 | 2 |
| 3 Signal | 9,594 | 3,155 | 21,215 | 952 | 1,496 | 395 | 8,566 | | 25,866 | 19,507 | 45,373 | 3 |
| 4 Communication | 3,850 | 1,730 | 1,140 | 273 | 6,616 | 521 | 3,299 | | 9,486 | 7,943 | 17,429 | 4 |
| 5 Other | 20,596 | 6,711 | 30,419 | 812 | 1,321 | 957 | 8,323 | | 38,451 | 30,688 | 69,139 | 5 |
| REPAIRS AND MAINTENANCE | | | | | | | | | | | | |
| 6 Roadway - running | 57,430 | 23,811 | 41,913 | 4,383 | 32,013 | 5,170 | 34,485 | | 97,737 | 101,468 | 199,205 | 6 |
| 7 Roadway - switching | 5,710 | 6,061 | 7,373 | 448 | 2,095 | 981 | 9,082 | | 15,529 | 16,221 | 31,750 | 7 |
| 8 Tunnels & subways - running | 432 | 27 | 66 | | 19 | 43 | 491 | | 112 | 966 | 1,078 | 8 |
| 9 Tunnels & subways - switching | 37 | | 2,074 | | | | 130 | | 2,074 | 167 | 2,241 | 9 |
| 10 Bridges & culverts - running | 20,505 | 3,528 | 17,183 | 734 | 23,601 | 2,218 | 22,237 | | 44,312 | 45,694 | 90,006 | 10 |
| 11 Bridges & culverts - switching | 2,028 | 31 | 56 | 42 | 1,416 | 267 | 6,284 | | 1,503 | 8,621 | 10,124 | 11 |
| 12 Ties - running | 17,917 | 2,247 | 3,660 | (1,132) | 5,387 | 430 | 8,151 | | 11,294 | 25,366 | 36,660 | 12 |
| 13 Ties - switching | 1,771 | 196 | 2,416 | 1,027 | 596 | 343 | 2,947 | | 3,208 | 6,088 | 9,296 | 13 |
| 14 Rail & other track material - running | 85,849 | 4,023 | 64,921 | 3,748 | 67,590 | 4,871 | 100,111 | | 136,534 | 194,579 | 331,113 | 14 |
| 15 Rail & other track material - switching | 8,493 | 300 | 7,263 | 1,620 | 5,229 | 2,686 | 28,335 | | 12,792 | 41,134 | 53,926 | 15 |
| 16 Ballast - running | 9,369 | 42 | 33,189 | 1,628 | 7,189 | 448 | 452 | | 40,420 | 11,897 | 52,317 | 16 |
| 17 Ballast - switching | 942 | 29 | 2,285 | 127 | 630 | 266 | 114 | | 2,944 | 1,449 | 4,393 | 17 |
| 18 Road property damaged - running | 11 | 38 | 3,670 | 341 | 12,626 | 418 | 1,040 | | 16,334 | 1,810 | 18,144 | 18 |
| 19 Road property damaged - switching | 1 | | 698 | 565 | | 152 | 273 | | 698 | 991 | 1,689 | 19 |
| 20 Road property damaged - other | | | | 597 | 65 | 133 | 94 | | 65 | 824 | 889 | 20 |
| 21 Signals & interlockers - running | 57,291 | 15,139 | 61,395 | 5,824 | 31,142 | 3,464 | 57,333 | | 107,676 | 123,912 | 231,588 | 21 |
| 22 Signals & interlockers - switching | 5,767 | 202 | 11,733 | 32 | 1,126 | 840 | 13,955 | | 13,061 | 20,594 | 33,655 | 22 |
| 23 Communications systems | 25,405 | 3,236 | 30,112 | 1,245 | 25,459 | 4,075 | 34,567 | | 58,807 | 65,292 | 124,099 | 23 |
| 24 Power systems | 1,260 | 118 | 884 | | 939 | 3 | 1,797 | | 1,941 | 3,060 | 5,001 | 24 |
| 25 Highway grade crossings - running | 3,722 | 1,669 | 7,752 | 704 | 6,626 | 290 | 13,225 | | 16,047 | 17,941 | 33,988 | 25 |
| 26 Highway grade crossings - switching | 365 | 58 | 114 | (1) | 88 | 28 | | | 260 | 392 | 652 | 26 |
| 27 Station & office buildings | 19,647 | 2,167 | 13,105 | 724 | 7,215 | 566 | 28,006 | | 22,487 | 48,943 | 71,430 | 27 |
| 28 Shop buildings - locomotives | 10,031 | 958 | 5,289 | 131 | 7,149 | 294 | 14,004 | | 13,396 | 24,460 | 37,856 | 28 |
| 29 Shop buildings - freight cars | 3,130 | 278 | 643 | 38 | 2,860 | 263 | 867 | | 3,781 | 4,298 | 8,079 | 29 |
| 30 Shop buildings - other equipment | 9,156 | 507 | 5,411 | 1 | 32 | 235 | 208 | | 5,950 | 9,600 | 15,550 | 30 |
| 101 Locomotive servicing facilities | 4,935 | 12 | 317 | 13 | 99 | 221 | 3,471 | | 428 | 8,640 | 9,068 | 101 |
| 102 Miscellaneous buildings & structures | 10,028 | 425 | 938 | 215 | 1,348 | 404 | 3,683 | | 2,711 | 14,330 | 17,041 | 102 |
| 103 Coal terminals | | | 1,405 | | 2,714 | | | | 4,119 | 0 | 4,119 | 103 |
| 104 Ore terminals | 1,647 | 722 | 1,669 | | | | | | 2,391 | 1,647 | 4,038 | 104 |
| 105 Other marine terminals | 3,781 | 729 | 358 | | | | | | 1,087 | 3,781 | 4,868 | 105 |
| 106 TOFC/COFC terminals | 24,471 | 772 | 508 | 96 | 7,092 | 1,897 | 16,845 | | 8,372 | 43,309 | 51,681 | 106 |
| 107 Motor vehicle loading & distribution facilities | | | 13 | | 1,025 | | | | 1,038 | 0 | 1,038 | 107 |
| 108 Facilities for other specialized service operations | | | 56 | | 1,786 | | | | 1,842 | 0 | 1,842 | 108 |
| 109 Roadway machines | | 19,269 | 5,131 | 1,908 | 19,748 | 1,905 | 30,192 | | 44,148 | 34,005 | 78,153 | 109 |
| 110 Small tools & supplies | 14,465 | 7,570 | (2,938) | 1,722 | 18,168 | 123 | | | 22,800 | 16,310 | 39,110 | 110 |
| 111 Snow removal | 9,117 | 1,298 | 4,342 | 32 | 3,575 | 823 | 5,190 | | 9,215 | 15,162 | 24,377 | 111 |
| 112 Fringe benefits - running | 90,888 | 15,173 | 84,574 | 4,136 | 80,558 | 5,158 | 72,538 | | 180,305 | 172,720 | 353,025 | 112 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 5 (CONTINUED)
RAILWAY OPERATING EXPENSES
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 410)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WAYS & STRUCTURES (Continued) | | | | | | | | | | | |
| REPAIRS AND MAINTENANCE (Continued) | | | | | | | | | | | |
| 113 Fringe benefits - switching | 11,706 | 1,612 | 177 | 1,223 | 2,801 | 1,661 | 15,594 | 4,590 | 30,184 | 34,774 | 113 |
| 114 Fringe benefits - other | 13,411 | 3,570 | 35,642 | 2,168 | 5,457 | 3,652 | 45,103 | 44,669 | 64,334 | 109,003 | 114 |
| 115 Casualties & insurance - running | 32,543 | | 81,681 | 990 | 19,789 | 1,188 | 30,295 | 101,470 | 65,016 | 166,486 | 115 |
| 116 Casualties & insurance - switching | 2,155 | | | | 1,430 | 784 | 6,953 | 1,430 | 9,892 | 11,322 | 116 |
| 117 Casualties & insurance - other | 8,137 | | 5,083 | | 4,812 | 126 | 9,409 | 9,895 | 17,672 | 27,567 | 117 |
| 118 Lease rentals - debit -running | 1,120 | 1,990 | 189,265 | 10 | 187,753 | | 3,890 | 379,008 | 5,020 | 384,028 | 118 |
| 119 Lease rentals - debit -switching | 111 | | | 787 | 188,466 | | | 188,466 | 898 | 189,364 | 119 |
| 120 Lease rentals - debit -other | | 8,033 | (16,099) | 2,742 | 28,637 | 2,599 | 36,998 | 20,571 | 42,339 | 62,910 | 120 |
| 121 Lease rentals - (credit) - running | 12,090 | | 6,289 | | 5,335 | | | 11,624 | 12,090 | 23,714 | 121 |
| 122 Lease rentals - (credit) - switching | 791 | | | | | | | 0 | 791 | 791 | 122 |
| 123 Lease rentals - (credit) - other | | | (30,139) | | | | | (30,139) | 0 | (30,139) | 123 |
| 124 Joint facility rent - debit - running | 6,452 | 10,834 | | 124 | 13,146 | 13,086 | 18,783 | 23,980 | 38,445 | 62,425 | 124 |
| 125 Joint facility rent - debit - switching | 674 | | 23,116 | 329 | 3,927 | 1,830 | 208 | 27,043 | 3,041 | 30,084 | 125 |
| 126 Joint facility rent - debit - other | 2,504 | | | 20 | 209 | | 91 | 209 | 2,615 | 2,824 | 126 |
| 127 Joint facility rent - (credit) - running | 8,541 | 6,454 | 2 | 496 | 5,731 | 2,744 | 13,943 | 12,187 | 25,724 | 37,911 | 127 |
| 128 Joint facility rent - (credit) - switching | 892 | | (104) | 50 | 2,100 | 155 | 192 | 1,996 | 1,289 | 3,285 | 128 |
| 129 Joint facility rent - (credit) - other | 3,314 | | 13 | | 116 | | 46 | 129 | 3,360 | 3,489 | 129 |
| 130 Other rents - debit - running | 45 | 161 | 3 | | 1,177 | | 2 | 1,341 | 47 | 1,388 | 130 |
| 131 Other rents - debit - switching | 5 | | | | 3 | | | 3 | 5 | 8 | 131 |
| 132 Other rents - debit - other | 602 | | 4 | 96 | 909 | | | 913 | 698 | 1,611 | 132 |
| 133 Other rents - (credit) - running | | 125 | | | | | | 125 | 0 | 125 | 133 |
| 134 Other rents - (credit) - switching | | | | | | | | 0 | 0 | 0 | 134 |
| 135 Other rents - (credit) - other | | | | | 63 | | | 63 | 0 | 63 | 135 |
| 136 Depreciation - running | 495,253 | 103,987 | 219,215 | 39,538 | 185,943 | 23,423 | 633,234 | 509,145 | 1,191,448 | 1,700,593 | 136 |
| 137 Depreciation - switching | 48,985 | 9,030 | | 5,396 | 14,076 | 1,597 | 167,016 | 23,106 | 222,994 | 246,100 | 137 |
| 138 Depreciation - other | 188,952 | 11,630 | 112,777 | 4,473 | 97,920 | 5,196 | 47,957 | 222,327 | 246,578 | 468,905 | 138 |
| 139 Joint facility - debit - running | 60,001 | 8,348 | | 575 | 34,819 | 11,744 | 90,665 | 43,167 | 162,985 | 206,152 | 139 |
| 140 Joint facility - debit - switching | 6,057 | 6 | 6,623 | 920 | 3,416 | 1,256 | 9,730 | 10,045 | 17,963 | 28,008 | 140 |
| 141 Joint facility - debit - other | | 516 | | 1 | 562 | | 299 | 1,078 | 300 | 1,378 | 141 |
| 142 Joint facility - (credit) - running | 40,194 | 6,194 | 5 | 3,427 | 20,334 | 2,342 | 47,735 | 26,533 | 93,698 | 120,231 | 142 |
| 143 Joint facility - (credit) - switching | 3,975 | | | 440 | 4,415 | | 3 | 4,415 | 4,418 | 8,833 | 143 |
| 144 Joint facility - (credit) - other | | | 3,373 | | 313 | | | 3,686 | 0 | 3,686 | 144 |
| 145 Dismantling retired road property - running | 80 | 2 | 2,245 | 5 | | | | 2,247 | 85 | 2,332 | 145 |
| 146 Dismantling retired road property - switching | 7 | | | 2 | | | | 0 | 9 | 9 | 146 |
| 147 Dismantling retired road property - other | | | 1 | | | | | 1 | 0 | 1 | 147 |
| 148 Other - running | 6,364 | 14 | 5,353 | (1,021) | 5,950 | | 41 | 11,317 | 5,384 | 16,701 | 148 |
| 149 Other - switching | 777 | 320 | 9,119 | 7 | 106 | | | 9,545 | 784 | 10,329 | 149 |
| 150 Other - other | 1,045 | 2,204 | 627 | 1,792 | | | 635 | 2,831 | 3,472 | 6,303 | 150 |
| 151 TOTAL WAY AND STRUCTURES | 1,377,802 | 277,581 | 1,195,402 | 93,941 | 1,155,984 | 107,679 | 1,604,100 | 2,628,967 | 3,183,522 | 5,812,489 | 151 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 5 (CONTINUED)
RAILWAY OPERATING EXPENSES
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 410)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EQUIPMENT | | | | | | | | | | | |
| LOCOMOTIVES | | | | | | | | | | | |
| 201 Administration | 26,309 | 2,768 | 19,933 | 855 | 7,945 | 1,228 | 14,047 | 30,646 | 42,439 | 73,085 | 201 |
| 202 Repair & maintenance | 447,306 | 34,062 | 248,549 | 20,925 | 162,988 | 26,244 | 449,389 | 445,599 | 943,864 | 1,389,463 | 202 |
| 203 Machinery repair | 1,157 | 107 | 1,542 | 21 | 5,509 | 211 | 2,333 | 7,158 | 3,722 | 10,880 | 203 |
| 204 Equipment damaged | 555 | | 126 | (308) | 1,155 | (20) | 529 | 1,281 | 756 | 2,037 | 204 |
| 205 Fringe benefits | 59,595 | 6,931 | 41,955 | 2,553 | 30,376 | 4,028 | 70,680 | 79,262 | 136,856 | 216,118 | 205 |
| 206 Other casualties & insurance | 30,952 | | 78,355 | (131) | 22,928 | 310 | 25,715 | 101,283 | 56,846 | 158,129 | 206 |
| 207 Lease rentals - debit | 195,936 | 28,380 | 94,790 | 20,042 | 72,710 | 20,937 | 266,101 | 195,880 | 503,016 | 698,896 | 207 |
| 208 Lease rentals - (credit) | 298 | 16,055 | 23 | | 5,382 | 138 | 1 | 21,460 | 437 | 21,897 | 208 |
| 209 Joint facility rent - debit | | | | | 38 | | 3 | 38 | 3 | 41 | 209 |
| 210 Joint facility rent - (credit) | | | | | 1 | | | 1 | 0 | 1 | 210 |
| 211 Other rents - debit | | | | 2,236 | 549 | | 552 | 549 | 2,788 | 3,337 | 211 |
| 212 Other rents - (credit) | | | | 100 | 40 | 4,700 | 606 | 40 | 5,406 | 5,446 | 212 |
| 213 Depreciation | 104,904 | 8,209 | 108,288 | 5,612 | 88,783 | 3,338 | 204,933 | 205,280 | 318,787 | 524,067 | 213 |
| 214 Joint facility - debit | 2,482 | 16 | | 90 | 117 | 739 | 4 | 133 | 3,315 | 3,448 | 214 |
| 215 Joint facility - (credit) | | | | 1,016 | (4) | | | (4) | 1,016 | 1,012 | 215 |
| 216 Repairs billed to others - (credit) | 55,712 | | | | 3,797 | | | 3,797 | 55,712 | 59,509 | 216 |
| 217 Dismantling retired property | | | | | | | | 0 | 0 | 0 | 217 |
| 218 Other | 1,105 | 1,012 | | (148) | 4,352 | | 2,263 | 5,364 | 3,220 | 8,584 | 218 |
| 219 TOTAL LOCOMOTIVES | 814,291 | 65,430 | 593,515 | 50,631 | 388,234 | 52,177 | 1,035,942 | 1,047,179 | 1,953,041 | 3,000,220 | 219 |
| FREIGHT CARS | | | | | | | | | | | |
| 220 Administration | 15,247 | 4,298 | 23,493 | 971 | 6,258 | 663 | 8,461 | 34,049 | 25,342 | 59,391 | 220 |
| 221 Repair & maintenance | 274,334 | 51,967 | 184,243 | 19,222 | 124,094 | 22,124 | 380,839 | 360,304 | 696,519 | 1,056,823 | 221 |
| 222 Machinery repair | 665 | 531 | 1,299 | 2 | 3,315 | 365 | 3,877 | 5,145 | 4,909 | 10,054 | 222 |
| 223 Equipment damaged | 30,793 | 375 | 14,093 | 1,297 | 6,233 | 2,336 | | 20,701 | 34,426 | 55,127 | 223 |
| 224 Fringe benefits | 40,233 | 8,260 | 35,509 | 2,324 | 16,087 | 2,279 | 59,101 | 59,856 | 103,937 | 163,793 | 224 |
| 225 Other casualties & insurance | 21,050 | | 95,894 | 2,127 | 13,342 | 460 | 47,037 | 109,236 | 70,674 | 179,910 | 225 |
| 226 Lease rentals - debit | 190,385 | 54,091 | 84,421 | 25,178 | 104,292 | 30,294 | 193,505 | 242,804 | 439,362 | 682,166 | 226 |
| 227 Lease rentals - (credit) | 1,717 | 7,111 | | | 7,982 | | 456 | 15,093 | 2,173 | 17,266 | 227 |
| 228 Joint facility rent - debit | | | | | 41 | | | 41 | 0 | 41 | 228 |
| 229 Joint facility rent - (credit) | | | | | 3 | | | 3 | 0 | 3 | 229 |
| 230 Other rents - debit | 426,587 | 127,339 | 333,988 | 35,614 | 461,033 | 44,978 | 763,570 | 922,360 | 1,270,749 | 2,193,109 | 230 |
| 231 Other rents - (credit) | 146,598 | 103,108 | 38,067 | 27,990 | 200,652 | 47,193 | 156,033 | 341,827 | 377,814 | 719,641 | 231 |
| 232 Depreciation | 40,344 | 14,664 | 106,681 | 3,209 | 79,870 | 8,618 | 96,777 | 201,215 | 148,948 | 350,163 | 232 |
| 233 Joint facility - debit | | 19 | | | 100 | | | 119 | 0 | 119 | 233 |
| 234 Joint facility - (credit) | | | | | 4 | | 3 | 4 | 3 | 7 | 234 |
| 235 Repairs billed to others - (credit) | 95,468 | 18,744 | 72,363 | 11,792 | 39,123 | 9,837 | 175,576 | 130,230 | 292,673 | 422,903 | 235 |
| 236 Dismantling retired property | | | | | | | | 0 | 0 | 0 | 236 |
| 237 Other | 694 | 861 | (6,547) | 22 | 14,445 | | 824 | 8,759 | 1,540 | 10,299 | 237 |
| 238 TOTAL FREIGHT CARS | 796,549 | 133,442 | 762,644 | 50,184 | 581,346 | 55,087 | 1,221,923 | 1,477,432 | 2,123,743 | 3,601,175 | 238 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 5 (CONTINUED)
RAILWAY OPERATING EXPENSES
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 410)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EQUIPMENT (Continued) | | | | | | | | | | | |
| OTHER EQUIPMENT | | | | | | | | | | | |
| 301 Administration | 4,651 | 2,422 | 753 | 391 | 2,101 | 15 | 148 | 5,276 | 5,205 | 10,481 | 301 |
| Repair & maintenance: | | | | | | | | | | | |
| 302 Trucks, trailers, & containers - revenue service | 10,059 | 2,802 | 111 | 1,858 | 39,096 | 1,236 | 31,697 | 42,009 | 44,850 | 86,859 | 302 |
| 303 Floating equipment - revenue service | | | | | 5 | | | 5 | 0 | 5 | 303 |
| 304 Passenger & other revenue equipment | 4,749 | 80 | | | | | 13,132 | 80 | 17,881 | 17,961 | 304 |
| 305 Computers and data processing equipment | 106 | | 58 | 275 | 30,476 | | 35,251 | 30,534 | 35,632 | 66,166 | 305 |
| 306 Machinery | 1,059 | 89 | 2,444 | 4 | 319 | 181 | 809 | 2,852 | 2,053 | 4,905 | 306 |
| 307 Work & other non-revenue equipment | | 11,024 | 26,257 | 2,439 | 14,317 | 367 | 21,855 | 51,598 | 24,661 | 76,259 | 307 |
| 308 Equipment damaged | 34,845 | | | 26 | | | 158 | 0 | 35,029 | 35,029 | 308 |
| 309 Fringe benefits | 3,223 | 2,466 | 535 | 56 | 3,712 | 86 | 5,101 | 6,713 | 8,466 | 15,179 | 309 |
| 310 Other casualties & insurance | 1,178 | | 968 | 398 | 1,634 | | 552 | 2,602 | 2,128 | 4,730 | 310 |
| 311 Lease rentals - debit | 35,390 | 216 | 18,396 | 8,477 | 30,677 | 751 | 100,173 | 49,289 | 144,791 | 194,080 | 311 |
| 312 Lease rentals - (credit) | | | 17,677 | | 128 | | 518 | 17,805 | 518 | 18,323 | 312 |
| 313 Joint facility rent - debit | | | | 1 | 34 | | | 34 | 1 | 35 | 313 |
| 314 Joint facility rent - (credit) | | | | | 12 | | | 12 | 0 | 12 | 314 |
| 315 Other rents - debit | 38,359 | 9,041 | 818 | 8,060 | 31,806 | 920 | 13,509 | 41,665 | 60,848 | 102,513 | 315 |
| 316 Other rents - (credit) | 34,115 | 103 | 3 | 1,217 | 13,542 | | 1 | 13,648 | 35,333 | 48,981 | 316 |
| 317 Depreciation | 50,733 | 4,174 | 16,524 | 1,189 | 74,864 | 1,506 | 41,289 | 95,562 | 94,717 | 190,279 | 317 |
| 318 Joint facility - debit | | | | | 80 | | 3,666 | 80 | 3,666 | 3,746 | 318 |
| 319 Joint facility - (credit) | | | | | 48 | | | 48 | 0 | 48 | 319 |
| 320 Repairs billed to others - (credit) | 5,013 | 18 | | (59) | 2,359 | | 13,330 | 2,377 | 18,284 | 20,661 | 320 |
| 321 Dismantling retired property | | | | | | | | 0 | 0 | 0 | 321 |
| 322 Other | (640) | (3) | | 1 | | | 222 | (3) | (417) | (420) | 322 |
| 323 TOTAL OTHER EQUIPMENT | 144,584 | 32,190 | 49,184 | 22,017 | 213,032 | 5,062 | 253,713 | 294,406 | 425,376 | 719,782 | 323 |
| 324 TOTAL EQUIPMENT | 1,755,424 | 231,062 | 1,405,343 | 122,832 | 1,182,612 | 112,326 | 2,511,578 | 2,819,017 | 4,502,160 | 7,321,177 | 324 |
| TRANSPORTATION | | | | | | | | | | | |
| TRAIN OPERATIONS | | | | | | | | | | | |
| 401 Administration | 122,414 | 6,863 | 60,965 | 8,540 | 24,278 | 5,649 | 60,079 | 92,106 | 196,682 | 288,788 | 401 |
| 402 Engine crews | 462,316 | 57,827 | 242,098 | 28,881 | 277,316 | 25,755 | 627,447 | 577,241 | 1,144,399 | 1,721,640 | 402 |
| 403 Train crews | 475,261 | 59,356 | 350,035 | 30,914 | 252,860 | 26,784 | 492,904 | 662,251 | 1,025,863 | 1,688,114 | 403 |
| 404 Dispatching trains | 32,736 | 10,180 | 50,381 | 4,298 | 32,568 | 2,498 | 34,453 | 93,129 | 73,985 | 167,114 | 404 |
| 405 Operating signals & interlockers | 4,160 | 3 | 781 | 212 | 22,898 | | 2,932 | 23,682 | 7,304 | 30,986 | 405 |
| 406 Operating drawbridges | 2,718 | | 5,389 | 315 | 4,730 | 381 | | 10,119 | 3,414 | 13,533 | 406 |
| 407 Highway crossing protection | 6,938 | 359 | 9,629 | 13 | 4,834 | | 1,483 | 14,822 | 8,434 | 23,256 | 407 |
| 408 Train inspection & lubrication | 41,627 | 18,762 | 59,387 | 1,780 | 49,913 | 4,457 | 97,127 | 128,062 | 144,991 | 273,053 | 408 |
| 409 Locomotive fuel | 1,019,302 | 96,125 | 510,540 | 45,168 | 348,847 | 39,950 | 1,106,568 | 955,512 | 2,210,988 | 3,166,500 | 409 |
| 410 Electric power electric power produced or purchased for motive power | | | | | | | | 0 | 0 | 0 | 410 |
| 411 Servicing locomotives | 29,204 | 10,553 | 41,803 | 2,287 | 27,916 | 2,299 | 67,816 | 80,272 | 101,606 | 181,878 | 411 |
| 412 Freight lost or damaged - solely related | | 2,515 | | 656 | | 2,778 | | 2,515 | 3,434 | 5,949 | 412 |
| 413 Clearing wrecks | -35 | 9,350 | 12,817 | 2,066 | 12,321 | 559 | 31,022 | 34,488 | 33,612 | 68,100 | 413 |
| 414 Fringe benefits | 367,147 | 63,716 | 315,391 | 27,123 | 226,257 | 26,197 | 471,911 | 605,364 | 892,378 | 1,497,742 | 414 |
| 415 Other casualties & insurance | 105,570 | 12,367 | 101,833 | 20,566 | 58,321 | 11,016 | 127,977 | 172,521 | 265,129 | 437,650 | 415 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 5 (CONTINUED)
RAILWAY OPERATING EXPENSES
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 410)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TRANSPORTATION (Continued) | | | | | | | | | | | |
| TRAIN OPERATIONS (Continued) | | | | | | | | | | | |
| 416 Joint facility - debit | 4,080 | 1,245 | 55,674 | 3,189 | 1,775 | 9,068 | 106,819 | 58,694 | 123,156 | 181,850 | 416 |
| 417 Joint facility - (credit) | 6,621 | 4,568 | 1 | 793 | 551 | 2,461 | 81,241 | 5,120 | 91,116 | 96,236 | 417 |
| 418 Other | 120,655 | 3,953 | 11,638 | 912 | 67,619 | | 27,618 | 83,210 | 149,185 | 232,395 | 418 |
| 419 TOTAL TRAIN OPERATIONS | 2,787,472 | 348,606 | 1,828,360 | 176,127 | 1,411,902 | 154,930 | 3,174,915 | 3,588,868 | 6,293,444 | 9,882,312 | 419 |
| 420 Administration | 2,997 | 3,110 | 43,377 | 1,719 | 2,264 | 3,867 | 27,354 | 48,751 | 35,937 | 84,688 | 420 |
| 421 Switch crews | 247,831 | 80,036 | 194,893 | 18,129 | 186,076 | 23,774 | 267,192 | 461,005 | 556,926 | 1,017,931 | 421 |
| 422 Controlling operations | 29,230 | 5,386 | 32,988 | 1,539 | 28,875 | 2,387 | 30,648 | 67,249 | 63,804 | 131,053 | 422 |
| 423 Yard and terminal clerical | 4,415 | 10,062 | 22,020 | 1,940 | 20,259 | 2,355 | 18,745 | 52,341 | 27,455 | 79,796 | 423 |
| 424 Operating switches, signals, retarders, & humps | 559 | 4 | 2,879 | 1 | 588 | 573 | 1,946 | 3,471 | 3,079 | 6,550 | 424 |
| 425 Locomotive fuel | 53,647 | 1,485 | 55,783 | 3,017 | 31,285 | 2,899 | 120,932 | 88,553 | 180,495 | 269,048 | 425 |
| 426 Electric power electric power produced or purchased for motive power | | | | | | | | 0 | 0 | 0 | 426 |
| 427 Servicing locomotives | 8,012 | 1,592 | 9,928 | 222 | 650 | 1,307 | | 12,170 | 9,541 | 21,711 | 427 |
| 428 Freight lost or damaged - solely related | | | | 21 | | | | 0 | 21 | 21 | 428 |
| 429 Clearing wrecks | 37,878 | | 7,296 | 610 | 111 | 26 | 6 | 7,407 | 38,520 | 45,927 | 429 |
| 430 Fringe benefits | 118,920 | 41,654 | 128,265 | 10,295 | 77,961 | 15,596 | 113,030 | 247,880 | 257,841 | 505,721 | 430 |
| 431 Other casualties & insurance | 27,002 | | 92,996 | | 20,978 | 980 | 30,185 | 113,974 | 58,167 | 172,141 | 431 |
| 432 Joint facility - debit | 17,995 | 272 | 40,705 | 756 | 5,529 | 1,650 | 30,208 | 46,506 | 50,609 | 97,115 | 432 |
| 433 Joint facility - (credit) | 2,057 | 168 | 63,236 | 2,908 | 3,401 | 567 | 1,362 | 66,805 | 6,894 | 73,699 | 433 |
| 434 Other | 1,630 | 1,847 | 10,533 | 370 | 311 | | | 12,691 | 2,000 | 14,691 | 434 |
| 435 TOTAL YARD OPERATIONS | 548,059 | 145,280 | 578,427 | 35,711 | 371,486 | 54,847 | 638,884 | 1,095,193 | 1,277,501 | 2,372,694 | 435 |
| 501 Cleaning car interiors | 8,516 | 1,922 | 5,596 | 590 | 1,791 | 127 | 9,252 | 9,309 | 18,485 | 27,794 | 501 |
| 502 Adjusting & transferring loads | 2,637 | 147 | 2,181 | 213 | 315 | | 9,315 | 2,643 | 12,165 | 14,808 | 502 |
| 503 Car loading devices & grain docks | | | 810 | | | | 30,220 | 810 | 30,220 | 31,030 | 503 |
| 504 Freight lost or damaged - all other | 17,743 | | 21,205 | 825 | 26,828 | | 44,200 | 48,033 | 62,768 | 110,801 | 504 |
| 505 Fringe benefits | 765 | 373 | (5) | (9) | 161 | 57 | 190 | 529 | 1,003 | 1,532 | 505 |
| 506 TOTAL TRAIN & YARD OPERATIONS COMMON: | 29,661 | 2,442 | 29,787 | 1,619 | 29,095 | 184 | 93,177 | 61,324 | 124,641 | 185,965 | 506 |
| 507 Administration | 8,106 | 3,594 | | | 29,953 | 1,520 | 7,157 | 33,547 | 16,783 | 50,330 | 507 |
| 508 Pickup & delivery and marine line haul | 21,840 | 4,209 | 271 | | 127,762 | | 22,732 | 132,242 | 44,572 | 176,814 | 508 |
| 509 Loading & unloading and local marine | 204,894 | 1,740 | 151,318 | 4,626 | 197,855 | 9,488 | 131,478 | 350,913 | 350,486 | 701,399 | 509 |
| 510 Protective services | 9,260 | | 4,385 | | 699 | | 459 | 5,084 | 9,719 | 14,803 | 510 |
| 511 Freight lost or damaged - solely related | | | | | | 4 | | 0 | 4 | 4 | 511 |
| 512 Fringe benefits | 2,664 | 2,271 | 3,291 | | 5,272 | 1,022 | 3,342 | 10,834 | 7,028 | 17,862 | 512 |
| 513 Casualties & insurance | 755 | | | | 2,878 | 63 | 679 | 2,878 | 1,497 | 4,375 | 513 |
| 514 Joint facility - debit | | | 7,814 | | 384 | | | 8,198 | 0 | 8,198 | 514 |
| 515 Joint facility - (credit) | | | | | 118 | | 111 | 118 | 111 | 229 | 515 |
| 516 Other | 4 | 355 | | 6 | | | 620 | 355 | 630 | 985 | 516 |
| 517 TOTAL SPECIALIZED SERVICE OPERATIONS | 247,523 | 12,169 | 167,079 | 4,632 | 364,685 | 12,097 | 166,356 | 543,933 | 430,608 | 974,541 | 517 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 5 (CONTINUED)
RAILWAY OPERATING EXPENSES
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 410)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TRANSPORTATION (Continued) | | | | | | | | | | | | |
| ADMINISTRATIVE SUPPORT OPERATIONS: | | | | | | | | | | | | |
| 518 Administration | 134,296 | 24,027 | 72,590 | 2,365 | 1,251 | 6,622 | 86,838 | | 97,868 | 230,121 | 327,989 | 518 |
| 519 Employees performing clerical & accounting functions | 19,570 | 3,197 | 70,221 | 5,335 | 32,560 | 3,982 | 65,576 | | 105,978 | 94,463 | 200,441 | 519 |
| 520 Communication systems operations | 32,028 | 2,598 | 423 | 6 | 3,424 | | 9,506 | | 6,445 | 41,540 | 47,985 | 520 |
| 521 Loss & damage claims processing | | | 2,699 | 293 | 2,418 | 137 | 14,734 | | 5,117 | 15,164 | 20,281 | 521 |
| 522 Fringe benefits | 27,478 | 7,085 | 37,016 | 2,610 | 14,439 | 3,845 | 56,221 | | 58,540 | 90,154 | 148,694 | 522 |
| 523 Casualties & insurance | 9,044 | | | | 3,728 | 194 | 16,374 | | 3,728 | 25,612 | 29,340 | 523 |
| 524 Joint facility - debit | | | | | 19 | | 165 | | 19 | 165 | 184 | 524 |
| 525 Joint facility - (credit) | | | | | | | | | 0 | 0 | 0 | 525 |
| 526 Other | 234 | 13,191 | 4,703 | 3 | | | 3,556 | | 17,894 | 3,793 | 21,687 | 526 |
| 527 TOTAL ADMINISTRATIVE SUPPORT OPERATIONS | 222,650 | 50,098 | 187,652 | 10,612 | 57,839 | 14,780 | 252,970 | | 295,589 | 501,012 | 796,601 | 527 |
| 528 TOTAL TRANSPORTATION | 3,835,365 | 558,595 | 2,791,305 | 228,701 | 2,235,007 | 236,838 | 4,326,302 | | 5,584,907 | 8,627,206 | 14,212,113 | 528 |
| GENERAL AND ADMINISTRATIVE | | | | | | | | | | | | |
| 601 Officers - general administration | 111,443 | 14,736 | 70,266 | 4,981 | 4,108 | 2,109 | 66,816 | | 89,110 | 185,349 | 274,459 | 601 |
| 602 Accounting, auditing, & finance | 48,854 | 9,552 | 97,730 | 2,791 | 11,587 | 3,830 | 36,848 | | 118,869 | 92,323 | 211,192 | 602 |
| 603 Management services & data processing | 108,728 | 11,588 | 203,558 | 13,263 | 29,121 | 4,248 | 63,249 | | 244,267 | 189,488 | 433,755 | 603 |
| 604 Marketing | 42,557 | 11,641 | 44,903 | 3,788 | 15,461 | 2,452 | 80,333 | | 72,005 | 129,130 | 201,135 | 604 |
| 605 Sales | 42,575 | 1,650 | 24,696 | 1,379 | 401 | 1,863 | | | 26,747 | 45,817 | 72,564 | 605 |
| 606 Industrial development | 1,887 | 1 | 2,969 | 255 | 979 | 571 | 873 | | 3,949 | 3,586 | 7,535 | 606 |
| 607 Personnel & labor relations | 24,365 | 3,936 | 50,777 | 2,964 | 15,298 | 3,026 | 30,734 | | 70,011 | 61,089 | 131,100 | 607 |
| 608 Legal & secretarial | 65,939 | 834 | 99,931 | 10,835 | 39,349 | 7,990 | 50,784 | | 140,114 | 135,548 | 275,662 | 608 |
| 609 Public relations & advertising | 3,733 | 845 | 52,281 | 19 | 3,132 | 1,231 | 16,008 | | 56,258 | 20,991 | 77,249 | 609 |
| 610 Research & development | | | 786 | | 2 | 329 | 20 | | 788 | 349 | 1,137 | 610 |
| 611 Fringe benefits | 92,695 | 6,516 | 84,080 | 5,973 | 6,638 | 5,993 | 112,260 | | 97,234 | 216,921 | 314,155 | 611 |
| 612 Casualties & insurance | 4,538 | 100,793 | 2,178 | 8,008 | 6,352 | 720 | 47,551 | | 109,323 | 60,817 | 170,140 | 612 |
| 613 Writedown of uncollectible accounts | 6,749 | (773) | (243) | | 8,695 | (405) | 13,377 | | 7,679 | 19,721 | 27,400 | 613 |
| 614 Property taxes | 151,118 | 19,324 | 73,620 | 8,899 | 76,410 | 7,031 | 151,102 | | 169,354 | 318,150 | 487,504 | 614 |
| 615 Other taxes except on corporate income or payrol | 45,910 | 3,729 | 19,982 | 5,722 | 31,310 | 2,694 | 32,395 | | 55,021 | 86,721 | 141,742 | 615 |
| 616 Joint facility - debit | 1,518 | 8,315 | 20,391 | | 706 | | 2,704 | | 29,412 | 4,222 | 33,634 | 616 |
| 617 Joint facility - (credit) | 307 | 8,455 | | 54 | 76 | | 137 | | 8,531 | 498 | 9,029 | 617 |
| 618 Other | 23,769 | 38,458 | 44,229 | 3,060 | 786,202 | 12,681 | 334,870 | | 868,889 | 374,380 | 1,243,269 | 618 |
| 619 TOTAL GENERAL AND ADMINISTRATIVE | 776,071 | 222,690 | 892,134 | 71,883 | 1,035,675 | 56,363 | 1,039,787 | | 2,150,499 | 1,944,104 | 4,094,603 | 619 |
| 620 TOTAL CARRIER OPERATING EXPENSE | 7,744,662 | 1,289,928 | 6,284,184 | 517,357 | 5,609,278 | 513,206 | 9,481,767 | | 13,183,390 | 18,256,992 | 31,440,382 | 620 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 6
DEPRECIATION BY SUBACCOUNT - WAY AND STRUCTURES
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 412)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 Grading | 20,844 | 11,230 | 9,186 | 1,390 | 5,121 | 364 | 41,522 | | 25,537 | 64,120 | 89,657 | 2 |
| 3 Other right-of-way expenditures | 674 | 2 | 78 | 12 | 104 | 14 | 1,825 | | 184 | 2,525 | 2,709 | 3 |
| 4 Tunnels and subways | 916 | 2,793 | 1,032 | 1 | 318 | 34 | 3,809 | | 4,143 | 4,760 | 8,903 | 4 |
| 5 Bridges, trestles and culverts | 23,225 | 19,171 | 11,203 | 2,317 | 8,564 | 1,150 | 47,263 | | 38,938 | 73,955 | 112,893 | 5 |
| 6 Elevated structures | | | | | 3,851 | | | | 3,851 | 0 | 3,851 | 6 |
| 7 Ties | 173,488 | 19,140 | 88,058 | 16,407 | 95,745 | 8,798 | 219,178 | | 202,943 | 417,871 | 620,814 | 7 |
| 8 Rail and other track material | 261,883 | 45,901 | 83,320 | 16,607 | 79,226 | 10,493 | 340,147 | | 208,447 | 629,130 | 837,577 | 8 |
| 9 Ballast | 107,699 | 13,725 | 31,731 | 6,956 | 23,687 | 2,814 | 75,097 | | 69,143 | 192,566 | 261,709 | 9 |
| 10 Fences, snowsheds and signs | 614 | 15 | 154 | 15 | 74 | 73 | 860 | | 243 | 1,562 | 1,805 | 10 |
| 11 Station and office buildings | 11,290 | 1,562 | 11,681 | 974 | 11,409 | 618 | 15,123 | | 24,652 | 28,005 | 52,657 | 11 |
| 12 Roadway buildings | 1,485 | 115 | 358 | 10 | 1,361 | 65 | 1,160 | | 1,834 | 2,720 | 4,554 | 12 |
| 13 Water stations | 69 | 84 | | 1 | 2 | 3 | 224 | | 86 | 297 | 383 | 13 |
| 14 Fuel stations | 6,689 | 930 | 1,820 | 142 | 789 | 205 | 3,672 | | 3,539 | 10,708 | 14,247 | 14 |
| 15 Shops and enginehouses | 5,974 | 904 | 7,011 | 901 | 4,096 | 334 | 4,516 | | 12,011 | 11,725 | 23,736 | 15 |
| 16 Storage warehouses | | 122 | | | 107 | | 20 | | 229 | 20 | 249 | 16 |
| 17 Wharves and docks | 365 | | 71 | | | 41 | 668 | | 71 | 1,074 | 1,145 | 17 |
| 18 Coal and ore wharves | 169 | 440 | 1,020 | | 3,721 | | 89 | | 5,181 | 258 | 5,439 | 18 |
| 19 TOFC/COFC terminals | 17,178 | 722 | 3,468 | 658 | 11,636 | 324 | 12,446 | | 15,826 | 30,606 | 46,432 | 19 |
| 20 Communications systems | 21,086 | 2,217 | 9,578 | 1,516 | 14,057 | 727 | 8,812 | | 25,852 | 32,141 | 57,993 | 20 |
| 21 Signals and interlockers | 59,162 | 3,237 | 33,256 | 1,079 | 13,137 | 2,408 | 41,344 | | 49,630 | 103,993 | 153,623 | 21 |
| 22 Power plants | 80 | 3 | 37 | | 100 | 1 | | | 140 | 81 | 221 | 22 |
| 23 Power transmission systems | 617 | 34 | 586 | 12 | 623 | 18 | 1,045 | | 1,243 | 1,692 | 2,935 | 23 |
| 24 Miscellaneous structures | 1,276 | 82 | | 201 | 446 | 40 | 428 | | 528 | 1,945 | 2,473 | 24 |
| 25 Roadway machines | 11,419 | 1,756 | 34,407 | 55 | 11,010 | 999 | 11,847 | | 47,173 | 24,320 | 71,493 | 25 |
| 26 Public improvements; construction | 6,834 | 454 | 3,993 | 151 | 8,385 | 679 | 15,347 | | 12,832 | 23,011 | 35,843 | 26 |
| 27 Power plant machines | 154 | 8 | (56) | 2 | 370 | 14 | | | 322 | 170 | 492 | 27 |
| 28 Other lease/rentals | 0 | | 0 | | | | 0 | | 0 | 0 | 0 | 28 |
| 29 TOTAL | 733,190 | 124,647 | 331,992 | 49,407 | 297,939 | 30,216 | 846,442 | | 754,578 | 1,659,255 | 2,413,833 | 29 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 7
DEPRECIATION - EQUIPMENT - FREIGHT PORTION
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 415)
(DOLLARS IN THOUSANDS)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCOMOTIVES | | | | | | | | | | | | |
| 1 Diesel Locomotives - Yard | 613 | 293 | 743 | 36 | 3,797 | 57 | 3,771 | | 4,833 | 4,477 | 9,310 | 1 |
| 2 Diesel Locomotives - Road | 98,629 | 7,916 | 103,587 | 5,557 | 84,249 | 3,225 | 199,211 | | 195,752 | 306,622 | 502,374 | 2 |
| 3 Other Locomotives - Yard | 2,847 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 2,847 | 2,847 | 3 |
| 4 Other Locomotives - Road | 53 | 0 | 1,915 | 0 | 0 | 0 | 0 | | 1,915 | 53 | 1,968 | 4 |
| 5 TOTAL | 102,142 | 8,209 | 106,245 | 5,593 | 88,046 | 3,282 | 202,982 | | 202,500 | 313,999 | 516,499 | 5 |
| FREIGHT TRAIN CARS | | | | | | | | | | | | |
| 6 Box - Plain 40 foot | 3 | 0 | 310 | 0 | 0 | 0 | 1 | | 310 | 4 | 314 | 6 |
| 7 Box - Plain 50 foot and longer | 477 | 1,181 | 4,297 | 214 | 35 | 30 | 6,328 | | 5,513 | 7,049 | 12,562 | 7 |
| 8 Box - Equipped | 3,990 | 3,624 | 12,871 | 1,797 | 9,990 | 302 | 12,856 | | 26,485 | 18,945 | 45,430 | 8 |
| 9 Gondola - Plain | 2,220 | 334 | 3,609 | 141 | 27,961 | 0 | 6,285 | | 31,904 | 8,646 | 40,550 | 9 |
| 10 Gondola - Equipped | 3,115 | 712 | 8,711 | 198 | 214 | 150 | 4,389 | | 9,637 | 7,852 | 17,489 | 10 |
| 11 Hopper - Covered | 9,691 | 866 | 14,875 | 567 | 3,429 | 6,395 | 14,429 | | 19,170 | 31,082 | 50,252 | 11 |
| 12 Hopper - Open Top - General Service | 3,770 | 2,568 | 30,465 | 0 | 12,331 | 239 | 14,593 | | 45,364 | 18,602 | 63,966 | 12 |
| 13 Hopper - Open Top - Special Service | 1,071 | 290 | 9,139 | 72 | 3,423 | 0 | 1,307 | | 12,852 | 2,450 | 15,302 | 13 |
| 14 Refrigerator - Mechanical | 623 | 15 | 0 | 0 | 0 | 0 | 2,904 | | 15 | 3,527 | 3,542 | 14 |
| 15 Refrigerator - Nonmechanical | 3,784 | 165 | 0 | 0 | 167 | -195 | 4,877 | | 332 | 8,466 | 8,798 | 15 |
| 16 Flat - TOFC/COFC | 441 | -13 | 0 | 0 | 306 | 8 | 894 | | 293 | 1,343 | 1,636 | 16 |
| 17 Flat - Multi-level | 299 | 1,528 | 3 | 0 | -101 | 0 | 2,083 | | 1,430 | 2,382 | 3,812 | 17 |
| 18 Flat - General Service | 61 | 92 | 33 | 0 | 85 | -12 | 179 | | 210 | 228 | 438 | 18 |
| 19 Flat - Other | 2,602 | 138 | 575 | 149 | 2,105 | 131 | 3,419 | | 2,818 | 6,301 | 9,119 | 19 |
| 20 All Other Freight Cars | 277 | 278 | 1,483 | 38 | 2,015 | 0 | 111 | | 3,776 | 426 | 4,202 | 20 |
| 21 Cabooses | 611 | 9 | 606 | 0 | 166 | 49 | 516 | | 781 | 1,176 | 1,957 | 21 |
| 22 Auto Racks | 4,290 | 2,898 | 18,132 | 0 | 14,239 | 1,496 | 19,677 | | 35,269 | 25,463 | 60,732 | 22 |
| 23 Miscellaneous Accessories | 1,420 | -21 | 0 | 0 | 2,610 | 0 | 1,021 | | 2,589 | 2,441 | 5,030 | 23 |
| 24 TOTAL | 38,745 | 14,664 | 105,109 | 3,176 | 78,975 | 8,593 | 95,869 | | 198,748 | 146,383 | 345,131 | 24 |
| OTHER EQUIPMENT - REVENUE FREIGHT | | | | | | | | | | | | |
| HIGHWAY EQUIPMENT | | | | | | | | | | | | |
| 25 Refrigerated Trailers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 25 |
| 26 Other Trailers | 0 | 0 | 0 | 0 | 10,989 | 0 | 52 | | 10,989 | 52 | 11,041 | 26 |
| 27 Refrigerated Containers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 27 |
| 28 Other Containers | 1,309 | 0 | 0 | 0 | 607 | 0 | 0 | | 607 | 1,309 | 1,916 | 28 |
| 29 Bogies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 29 |
| 30 Chasis | 701 | 174 | 0 | 0 | 38 | 12 | 0 | | 212 | 713 | 925 | 30 |
| 31 Other Highway Equipment (Freight) | 0 | 54 | 0 | 0 | 0 | 0 | 0 | | 54 | 0 | 54 | 31 |
| 32 TOTAL | 2,010 | 228 | 0 | 0 | 11,634 | 12 | 52 | | 11,862 | 2,074 | 13,936 | 32 |
| FLOATING EQUIPMENT - REVENUE SERVICE | | | | | | | | | | | | |
| 33 Marine Line-Haul | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 33 |
| 34 Local Marine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 34 |
| 35 TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 35 |
| OTHER EQUIPMENT | | | | | | | | | | | | |
| 36 Passenger & Other Revenue Equipment (Freight Portion) | 0 | 13 | 0 | 0 | 0 | 0 | 15 | | 13 | 15 | 28 | 36 |
| 37 Computer Systems & Word Processing Equip. | 24,939 | 2,209 | 0 | 603 | 47,060 | 706 | 36,261 | | 49,269 | 62,509 | 111,778 | 37 |
| 38 Machinery - Locomotives | 2,762 | 0 | 2,043 | 19 | 737 | 56 | 1,922 | | 2,780 | 4,759 | 7,539 | 38 |
| 39 Machinery - Freight Cars | 1,599 | 0 | 1,572 | 33 | 895 | 25 | 908 | | 2,467 | 2,565 | 5,032 | 39 |
| 40 Machinery - Other Equipment | 484 | 618 | 315 | 1 | 663 | 15 | 27 | | 1,596 | 527 | 2,123 | 40 |
| 41 Work and Other Nonrevenue Equipment | 23,300 | 1,106 | 16,209 | 585 | 15,507 | 773 | 4,808 | | 32,822 | 29,466 | 62,288 | 41 |
| 42 TOTAL | 53,084 | 3,946 | 20,139 | 1,241 | 64,862 | 1,575 | 43,941 | | 88,947 | 99,841 | 188,788 | 42 |
| 43 TOTAL ALL EQUIPMENT (FREIGHT PORTION) | 195,981 | 27,047 | 231,493 | 10,010 | 243,517 | 13,462 | 342,844 | | 502,057 | 562,297 | 1,064,354 | 43 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 8
RAILWAY OPERATING STATISTICS (FREIGHT)
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 755)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 MILES OF ROAD OPERATED | 32,228 | 6,493 | 22,841 | 3,084 | 21,520 | 3,258 | 32,831 | 50,854 | 71,401 | 122,255 | 1 |
| TRAIN MILES - RUNNING | | | | | | | | | | | |
| 2 Unit Trains | 43,386,955 | 1,594,942 | 20,032,550 | 3,321,897 | 10,260,809 | 1,554,910 | 44,935,666 | 31,888,301 | 93,199,428 | 125,087,729 | 2 |
| 3 Way Trains | 8,691,567 | 2,604,024 | 11,872,537 | 2,337,157 | 13,053,877 | 628,738 | 7,385,870 | 27,530,438 | 19,043,332 | 46,573,770 | 3 |
| 4 Through Trains | 101,103,283 | 12,711,461 | 62,321,395 | 1,311,457 | 50,598,459 | 5,874,853 | 110,416,555 | 125,631,315 | 218,706,148 | 344,337,463 | 4 |
| 5 TOTAL TRAIN MILES | 153,181,805 | 16,910,427 | 94,226,482 | 6,970,511 | 73,913,145 | 8,058,501 | 162,738,091 | 185,050,054 | 330,948,908 | 515,998,962 | 5 |
| 6 Motorcars | | | | | | | | 0 | 0 | 0 | 6 |
| 7 TOTAL ALL TRAINS | 153,181,805 | 16,910,427 | 94,226,482 | 6,970,511 | 73,913,145 | 8,058,501 | 162,738,091 | 185,050,054 | 330,948,908 | 515,998,962 | 7 |
| LOCOMOTIVE UNIT MILES | | | | | | | | | | | |
| ROAD SERVICE | | | | | | | | | | | |
| 8 Unit Trains | 133,296,196 | 3,200,747 | 42,579,753 | 9,017,237 | 23,692,489 | 3,394,338 | 123,805,686 | 69,472,989 | 269,513,457 | 338,986,446 | 8 |
| 9 Way Trains | 26,702,792 | 4,151,304 | 18,321,301 | 5,502,233 | 21,665,216 | 1,028,666 | 17,201,610 | 44,137,821 | 50,435,301 | 94,573,122 | 9 |
| 10 Through Trains | 310,616,012 | 27,472,482 | 151,475,025 | 3,811,820 | 120,105,853 | 11,859,993 | 294,983,955 | 299,053,360 | 621,271,780 | 920,325,140 | 10 |
| 11 TOTAL | 470,615,000 | 34,824,533 | 212,376,079 | 18,331,290 | 165,463,558 | 16,282,997 | 435,991,251 | 412,664,170 | 941,220,538 | 1,353,884,708 | 11 |
| 12 Train Switching | 4,182,390 | 2,358,589 | 8,307,447 | 721,902 | 8,675,538 | 1,590,774 | 25,422,318 | 19,341,574 | 31,917,384 | 51,258,958 | 12 |
| 13 Yard Switching | 12,495,456 | 6,522,052 | 12,805,407 | 1,264,488 | 14,526,876 | 2,006,442 | 29,310,060 | 33,854,335 | 45,076,446 | 78,930,781 | 13 |
| 14 All Other Service | 487,292,846 | 43,705,174 | 233,488,933 | 20,317,680 | 188,665,972 | 19,880,213 | 490,723,629 | 465,860,079 | 1,018,214,368 | 1,484,074,447 | 14 |
| FREIGHT CAR MILES (Thousands) | | | | | | | | | | | |
| RR OWNED AND LEASED CARS - LOADED | | | | | | | | | | | |
| 15 Box-Plain 40-Foot | 3 | | | | | | 1 | 0 | 4 | 4 | 15 |
| 16 Box-Plain 50-Foot and Longer | 8,024 | 2,680 | 8,713 | 2,581 | 6,519 | 913 | 13,029 | 17,912 | 24,547 | 42,459 | 16 |
| 17 Box-Equipped | 239,169 | 107,923 | 264,502 | 40,619 | 238,737 | 19,660 | 422,177 | 611,162 | 721,625 | 1,332,787 | 17 |
| 18 Gondola-Plain | 201,046 | 4,570 | 115,934 | 1,448 | 218,125 | 2,553 | 99,426 | 338,629 | 304,473 | 643,102 | 18 |
| 19 Gondola-Equipped | 106,822 | 24,114 | 192,346 | 4,648 | 126,929 | 6,188 | 129,828 | 343,389 | 247,486 | 590,875 | 19 |
| 20 Hopper-Covered | 589,078 | 80,751 | 197,272 | 21,323 | 134,463 | 57,212 | 399,700 | 412,486 | 1,067,313 | 1,479,799 | 20 |
| 21 Hopper-Open Top-General Service | 71,971 | 21,076 | 139,798 | 1,183 | 121,509 | 11,538 | 308,693 | 282,383 | 393,385 | 675,768 | 21 |
| 22 Hopper-Open Top-Special Service | 73,342 | 10,966 | 58,935 | 2,671 | 18,766 | 376 | 84,118 | 88,667 | 160,507 | 249,174 | 22 |
| 23 Refrigerator-Mechanical | 34,071 | 419 | 18,218 | 130 | 3,974 | 361 | 83,535 | 22,611 | 118,097 | 140,708 | 23 |
| 24 Refrigerator-Non-Mechanical | 72,233 | 1,090 | 34,176 | 103 | 13,894 | 493 | 64,312 | 49,160 | 137,141 | 186,301 | 24 |
| 25 Flat-TOFC/COFC | 215,032 | 11,997 | 178,858 | 5,199 | 122,605 | 21,345 | 1,067,796 | 313,460 | 1,309,372 | 1,622,832 | 25 |
| 26 Flat-Multi-Level | 33,539 | 8,157 | 34,279 | 83 | 29,692 | 3,193 | 71,839 | 72,128 | 108,654 | 180,782 | 26 |
| 27 Flat-General Service | 593 | 217 | 356 | 26 | 868 | 70 | 1,301 | 1,441 | 1,990 | 3,431 | 27 |
| 28 Flat-All Other | 97,947 | 42,548 | 44,288 | 4,855 | 40,068 | 9,303 | 143,090 | 126,904 | 255,195 | 382,099 | 28 |
| 29 All Other Car Types-Total | 137,882 | 7,882 | 6,133 | 2,392 | 240,220 | 111 | 1,185 | 254,235 | 141,570 | 395,805 | 29 |
| 30 TOTAL | 1,880,752 | 324,390 | 1,293,808 | 87,261 | 1,316,369 | 133,316 | 2,890,030 | 2,934,567 | 4,991,359 | 7,925,926 | 30 |
| RR OWNED AND LEASED CARS - EMPTY | | | | | | | | | | | |
| 31 Box-Plain 40-Foot | 41 | | | | | | | 0 | 41 | 41 | 31 |
| 32 Box-Plain 50-Foot and Longer | 7,312 | 2,438 | 8,026 | 2,237 | 6,567 | 947 | 11,222 | 17,031 | 21,718 | 38,749 | 32 |
| 33 Box-Equipped | 183,887 | 98,729 | 239,343 | 32,261 | 245,750 | 15,740 | 336,776 | 583,822 | 568,664 | 1,152,486 | 33 |
| 34 Gondola-Plain | 204,256 | 4,529 | 111,286 | 1,432 | 201,642 | 2,499 | 101,111 | 317,457 | 309,298 | 626,755 | 34 |
| 35 Gondola-Equipped | 98,277 | 27,495 | 173,232 | 4,730 | 110,725 | 5,614 | 122,644 | 311,452 | 231,265 | 542,717 | 35 |
| 36 Hopper-Covered | 553,957 | 83,561 | 187,071 | 20,700 | 143,750 | 51,333 | 402,139 | 414,382 | 1,028,129 | 1,442,511 | 36 |
| 37 Hopper-Open Top-General Service | 79,464 | 22,044 | 139,284 | 1,169 | 120,122 | 12,048 | 322,293 | 281,450 | 414,974 | 696,424 | 37 |
| 38 Hopper-Open Top-Special Service | 68,160 | 11,843 | 59,693 | 3,247 | 19,910 | 483 | 85,872 | 91,446 | 157,762 | 249,208 | 38 |
| 39 Refrigerator-Mechanical | 20,475 | 294 | 16,760 | 94 | 3,507 | 237 | 55,842 | 20,561 | 76,648 | 97,209 | 39 |
| 40 Refrigerator-Non-Mechanical | 45,788 | 1,391 | 30,852 | 107 | 11,812 | 403 | 49,318 | 44,055 | 95,616 | 139,671 | 40 |
| 41 Flat-TOFC/COFC | 53,208 | 2,473 | 25,413 | 889 | 17,901 | 2,361 | 86,825 | 45,787 | 143,283 | 189,070 | 41 |
| 42 Flat-Multi-Level | 17,247 | 3,191 | 20,397 | 27 | 18,933 | 1,407 | 38,798 | 42,521 | 57,479 | 100,000 | 42 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 8 (CONTINUED)
RAILWAY OPERATING STATISTICS (FREIGHT)
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 755)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RR OWNED AND LEASED CARS - EMPTY (Cntd.) | | | | | | | | | | | |
| 43 Flat-General Service | 1,140 | 258 | 291 | 27 | 1,650 | 167 | 1,273 | 2,199 | 2,607 | 4,806 | 43 |
| 44 Flat-All Other | 87,635 | 42,333 | 43,113 | 4,645 | 41,498 | 9,345 | 126,981 | 126,944 | 228,606 | 355,550 | 44 |
| 45 All Other Car Types-Total | 50,963 | 8,038 | 4,975 | 2,824 | 2,066 | 133 | 1,122 | 15,079 | 55,042 | 70,121 | 45 |
| 46 TOTAL | 1,471,810 | 308,617 | 1,059,736 | 74,389 | 945,833 | 102,717 | 1,742,216 | 2,314,186 | 3,391,132 | 5,705,318 | 46 |
| PRIVATE LINE CARS - LOADED | | | | | | | | | | | |
| 47 Box-Plain 40-Foot | | | | | | | | 41,049 | 27,022 | 68,071 | 47 |
| 48 Box-Plain 50-Foot and Longer | 27,022 | 2,894 | 38,155 | 2,373 | 20,615 | 628 | 100,568 | 24,389 | 105,425 | 129,814 | 48 |
| 49 Box-Equipped | 1,856 | 244 | 3,530 | 45 | 2,001 | 1,935 | 10,406 | 103,337 | 18,915 | 122,252 | 49 |
| 50 Gondola-Plain | 6,529 | 2,168 | 99,168 | 48,565 | 9,078 | 906 | 755,727 | 23,040 | 808,647 | 831,687 | 50 |
| 51 Gondola-Equipped | 3,449 | 359 | 13,603 | 1,520 | 5,647 | 349 | 18,277 | 358,412 | 333,535 | 691,947 | 51 |
| 52 Hopper-Covered | 313,389 | 25,656 | 327,109 | 27,502 | 185,268 | 7,159 | 654,292 | 260,418 | 704,835 | 965,253 | 52 |
| 53 Hopper-Open Top-General Service | 15,882 | 1,252 | 73,898 | 439 | 9,794 | 914 | 23,158 | 166,414 | 35,732 | 202,146 | 53 |
| 54 Hopper-Open Top-Special Service | 11,221 | 1,660 | 154,960 | 5,563 | 62,092 | 762 | 488,889 | 79,257 | 499,955 | 579,212 | 54 |
| 55 Refrigerator-Mechanical | 4,741 | 4 | 17,161 | | 788 | 498 | 9,200 | 7,970 | 10,233 | 18,203 | 55 |
| 56 Refrigerator-Non-Mechanical | 535 | 4 | 7,178 | | 1,173 | 583 | 8,631 | 384,458 | 922,541 | 1,306,999 | 56 |
| 57 Flat-TOFC/COFC | 913,327 | 34,249 | 349,036 | 12,624 | 255,149 | 24,272 | 304,529 | 609,734 | 454,635 | 1,064,369 | 57 |
| 58 Flat-Multi-Level | 113,210 | 49,971 | 304,614 | 871 | 223,778 | 30,032 | 614,997 | 223,906 | 646,055 | 869,961 | 58 |
| 59 Flat-General Service | 155 | 8 | 120 | 9 | 89 | 10 | 134 | 78,919 | 82,668 | 161,587 | 59 |
| 60 Flat-All Other | 82,515 | 9,301 | 69,529 | 3,123 | 31,597 | 11,495 | 112,046 | 193,924 | 266,424 | 460,348 | 60 |
| 61 Tank Under 22,000 Gallons | 139,760 | 10,563 | 151,764 | 11,201 | 144,367 | 522 | 159,198 | 289,984 | 389,161 | 679,145 | 61 |
| 62 Tank - 22,000Gallons and Over | 218,240 | 9,047 | 136,570 | 20,037 | 81,843 | 680 | 286,787 | 97,581 | 515,176 | 612,757 | 62 |
| 63 All Other Car Types-Total | 207,672 | 6,947 | 8,791 | 519 | | 18 | 7,479 | 1,909,513 | 2,067,519 | 3,977,032 | 63 |
| 64 TOTAL | 2,059,503 | 154,327 | 1,755,186 | 134,391 | 1,033,279 | 80,763 | 3,554,318 | 1,033,279 | 3,769,472 | 4,802,751 | 64 |
| PRIVATE LINE CARS - EMPTY | | | | | | | | | | | |
| 65 Box-Plain 40-Foot | | | | | | | | 3,325 | 957 | 4,282 | 65 |
| 66 Box-Plain 50-Foot and Longer | 5,795 | 1,554 | 20,691 | 345 | 12,782 | 349 | 33,146 | 114,319 | 38,601 | 152,920 | 66 |
| 67 Box-Equipped | 957 | 508 | 2,817 | 45 | 1,780 | 2,270 | 512 | 15,019 | 5,924 | 20,943 | 67 |
| 68 Gondola-Plain | 4,761 | 2,627 | 98,910 | 48,646 | 9,477 | 233 | 5,373 | 318,530 | 191,309 | 509,839 | 68 |
| 69 Gondola-Equipped | 3,097 | 421 | 12,818 | 1,571 | 5,122 | 322 | 18 | 75,322 | 12,522 | 87,844 | 69 |
| 70 Hopper-Covered | 137,057 | 17,309 | 291,744 | 29,192 | 192,036 | 1,758 | 990 | 347,227 | 42,321 | 389,548 | 70 |
| 71 Hopper-Open Top-General Service | 10,611 | 1,168 | 69,032 | 473 | 9,702 | 926 | 34 | 18,692 | 4,092 | 22,784 | 71 |
| 72 Hopper-Open Top-Special Service | 10,381 | 1,722 | 153,469 | 5,611 | 61,809 | 814 | 520 | 68,855 | 7,225 | 76,080 | 72 |
| 73 Refrigerator-Mechanical | 2,659 | 2 | 8,988 | | 744 | 349 | 15 | 37,991 | 102,275 | 140,266 | 73 |
| 74 Refrigerator-Non-Mechanical | 280 | 5 | 7,041 | 5 | 979 | 378 | 10 | 182,312 | 33,741 | 216,053 | 74 |
| 75 Flat-TOFC/COFC | 101,911 | 2,603 | 34,644 | 970 | 21,233 | 1,913 | 23,904 | 21,355 | 26,873 | 48,228 | 75 |
| 76 Flat-Multi-Level | 33,348 | 22,855 | 158,478 | 29 | 129,778 | 10,969 | 282,192 | 187,286 | 333,714 | 521,000 | 76 |
| 77 Flat-General Service | 86 | 16 | 106 | 10 | 218 | 11 | 161 | 156,971 | 61,283 | 218,254 | 77 |
| 78 Flat-All Other | 40,524 | 5,798 | 51,710 | 2,795 | 34,067 | 10,057 | 85,927 | 178,582 | 204,894 | 383,476 | 78 |
| 79 Tank Under 22,000 Gallons | 61,101 | 8,980 | 147,773 | 11,613 | 113,056 | 271 | 235 | 124,207 | 49,350 | 173,557 | 79 |
| 80 Tank - 22,000Gallons and Over | 106,115 | 7,934 | 136,581 | 21,144 | 88,535 | 357 | 380 | 1,367,990 | 577,795 | 1,945,785 | 80 |
| 81 All Other Car Types-Total | 37,231 | 5,829 | 5,322 | 652 | | 21 | 710 | 30,950 | 56,847 | 87,797 | 81 |
| 82 TOTAL | 555,914 | 79,331 | 1,200,124 | 123,101 | 681,318 | 30,998 | 434,127 | 1,369,376 | 4,080,012 | 5,449,388 | 82 |
| 83 Work Equipment and Company Freight Car-Miles | 55,464 | 5,403 | 25,547 | 673 | 12,785 | 5,802 | 35,601 | 1,841,768 | 4,780,287 | 6,622,055 | 83 |
| 84 No Payment Car-Miles (I) | 3,491,786 | 466,944 | 221,114 | 33,993 | 403,960 | 202,454 | 5,085,491 | 766,313 | 5,538,520 | 6,304,833 | 84 |
| TOTAL CAR-MILES BY TRAIN TYPE | | | | | | | | | | | |
| 85 Unit Trains | 4,738,211 | 162,795 | 1,666,188 | 110,017 | 991,384 | 150,191 | 5,117,839 | 2,820,367 | 10,116,258 | 12,936,625 | 85 |
| 86 Way Trains | 216,582 | 80,517 | 281,836 | 69,374 | 339,526 | 17,308 | 249,120 | 701,879 | 552,384 | 1,254,263 | 86 |
| 87 Through Traoins | 4,560,436 | 1,095,700 | 3,607,491 | 274,417 | 3,062,634 | 388,551 | 8,374,824 | 7,765,825 | 13,598,228 | 21,364,053 | 87 |

STATISTICS OF CLASS I FREIGHT RAILROADS IN THE UNITED STATES - 2003
TABLE 8 (CONTINUED)
RAILWAY OPERATING STATISTICS (FREIGHT)
(2003 ANNUAL REPORT FORM R-1, SCHEDULE 755)

| | BNSF (1) W | CN/GTW (2) E | CSX (3) E | KCS (4) W | NS (5) E | SOO (6) W | UP (7) W | | Eastern District | Western District | National Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 88 TOTAL TRAINS | 9,515,229 | 1,339,012 | 5,555,515 | 453,808 | 4,393,544 | 556,050 | 13,741,783 | | 11,288,071 | 24,266,870 | 35,554,941 | 88 |
| 89 Caboose Miles | 149 | 24 | 879 | 2 | 68 | 57 | 46 | | 971 | 254 | 1,225 | 89 |
| GROSS TON MILES (THOUSANDS) | | | | | | | | | | | | |
| 98 Road Locomotives | 88,501,299 | 6,290,527 | 41,440,643 | 2,453,661 | 30,236,142 | 3,171,777 | 86,354,204 | | 77,967,312 | 180,480,941 | 258,448,253 | 98 |
| Freight Trains, Crs., Cnts, & Caboose | | | | | | | | | | | | |
| 99 Unit Trains | 400,573,686 | 12,816,834 | 135,164,078 | 9,020,499 | 83,767,324 | 13,920,574 | 420,139,595 | | 231,748,236 | 843,654,354 | 1,075,402,590 | 99 |
| 100 Way Trains | 17,809,999 | 5,482,675 | 19,426,207 | 5,057,115 | 26,723,208 | 1,357,932 | 16,058,047 | | 51,632,090 | 40,283,093 | 91,915,183 | 100 |
| 101 Through Trains | 492,712,682 | 80,773,239 | 289,469,927 | 20,534,728 | 238,109,684 | 29,740,434 | 582,683,626 | | 608,352,850 | 1,125,671,470 | 1,734,024,320 | 101 |
| 102 Passenger Trains, Crs, & Cnts. | | | | | | | | | 0 | 0 | 0 | 102 |
| 103 Non-Revenue | 3,316,366 | 789,599 | 2,241,212 | 49,709 | 868,364 | | 3,934,121 | | 3,899,175 | 7,300,196 | 11,199,371 | 103 |
| 104 TOTAL | 1,002,914,032 | 106,152,874 | 487,742,067 | 37,115,712 | 379,704,722 | 48,190,717 | 1,109,169,593 | | 973,599,663 | 2,197,390,054 | 3,170,989,717 | 104 |
| TONS OF FREIGHT (Thousands) | | | | | | | | | | | | |
| 105 Revenue | 515,496 | 164,312 | 442,613 | 66,987 | 405,897 | 57,374 | 587,701 | | 1,012,822 | 1,227,558 | 2,240,380 | 105 |
| 106 Non-Revenue | 5,762 | 4,030 | 1,057 | 1,607 | 1,466 | 173 | 12,426 | | 6,553 | 19,968 | 26,521 | 106 |
| 107 TOTAL | 521,258 | 168,342 | 443,670 | 68,594 | 407,363 | 57,547 | 600,127 | | 1,019,375 | 1,247,526 | 2,266,901 | 107 |
| TON-MILES OF FREIGHT (Thousands) | | | | | | | | | | | | |
| 108 Revenue - Road Service | 506,356,190 | 51,618,267 | 233,670,578 | 20,513,163 | 183,094,497 | 23,305,523 | 532,879,407 | | 468,383,342 | 1,083,054,283 | 1,551,437,625 | 108 |
| 109 Revenue - Lake Transfer Service | | | | | | | | | 0 | 0 | 0 | 109 |
| 110 TOTAL | 506,356,190 | 51,618,267 | 233,670,578 | 20,513,163 | 183,094,497 | 23,305,523 | 532,879,407 | | 468,383,342 | 1,083,054,283 | 1,551,437,625 | 110 |
| 111 Non-Revenue - Road Service | 1,843,899 | 464,919 | 222,984 | 36,645 | 302,575 | 207,210 | 5,620,795 | | 990,478 | 7,708,549 | 8,699,027 | 111 |
| 112 Non-Revenue - Lake Transfer Service | | | | | | | | | 0 | 0 | 0 | 112 |
| 113 TOTAL | 1,843,899 | 464,919 | 222,984 | 36,645 | 302,575 | 207,210 | 5,620,795 | | 990,478 | 7,708,549 | 8,699,027 | 113 |
| 114 TOTAL - REVENUE & NON-REVENUE | 508,200,089 | 52,083,186 | 233,893,562 | 20,549,808 | 183,397,072 | 23,512,733 | 538,500,202 | | 469,373,820 | 1,090,762,832 | 1,560,136,652 | 114 |
| TRAIN HOURS | | | | | | | | | | | | |
| 115 Road Service | 7,824,177 | 894,534 | 5,021,441 | 418,042 | 3,816,917 | 377,598 | 7,496,341 | | 9,732,892 | 16,116,158 | 25,849,050 | 115 |
| 116 Train Switching | 292,020 | 246,582 | 784,444 | 126,486 | 880,697 | 130,149 | 1,757,768 | | 1,911,723 | 2,306,423 | 4,218,146 | 116 |
| 117 TOTAL YARD-SWITCHING HOURS | 2,082,576 | 769,741 | 2,134,237 | 210,748 | 2,162,693 | 704,741 | 1,833,199 | | 5,066,671 | 4,831,264 | 9,897,935 | 117 |
| TRAIN-MILES WORK TRAINS | | | | | | | | | | | | |
| 118 Locomotives | 1,419,819 | 30,887 | 453,625 | 79,619 | 937,342 | 32,104 | 1,630,842 | | 1,421,854 | 3,162,384 | 4,584,238 | 118 |
| 119 Motorcars | | | | | | | | | 0 | 0 | 0 | 119 |
| NUMBER OF LOADED FREIGHT CARS | | | | | | | | | | | | |
| 120 Unit Trains | 3,559,053 | 578,088 | 2,134,401 | 167,819 | 2,442,893 | 230,811 | 2,916,164 | | 5,155,382 | 6,873,847 | 12,029,229 | 120 |
| 121 Way Trains | 2,891,555 | 745,121 | 8,896,215 | 557,052 | 5,364,996 | 330,812 | 3,289,069 | | 15,006,332 | 7,068,488 | 22,074,820 | 121 |
| 122 Through Trains | 5,358,085 | 3,334,185 | 6,874,981 | 566,036 | 6,716,861 | 620,268 | 10,133,538 | | 16,926,027 | 16,677,927 | 33,603,954 | 122 |
| 123 TOFC/COFC- No. of Revenue Trailers & Containers Loaded & Unloaded | 7,386,163 | 564,457 | | 233,421 | 4,001,253 | 382,021 | 5,541,094 | | 4,565,710 | 13,542,699 | 18,108,409 | 123 |
| 124 Multi-Level Cars - No. of Motor Vehicles Loaded & Unloaded | 1,518,425 | 28,975 | 49,394,243 | | 1,040,716 | 324,325 | 5,058,720 | | 50,463,934 | 6,901,470 | 57,365,404 | 124 |
| 125 TOFC/COFC - No. of Revenue Trailers Picked Up & Delivered | 282,065 | 17,596 | | | 430,908 | | 188,071 | | 448,504 | 470,136 | 918,640 | 125 |
| REVENUE TONS - MARINE TERMINAL | | | 6378588 | | 23778000 | | | | | | | |
| 126 Marine Terminals - Coal | 10,021,856 | 3,643,639 | | | | | | | 3,643,639 | 10,021,856 | 13,665,495 | 126 |
| 127 Marine Terminals - Ore | | | | | | | | | 0 | 0 | 0 | 127 |
| 128 Marine Terminals - Other | 10,021,856 | 3,643,639 | 6,378,588 | | 23,778,000 | | | | 33,800,227 | 10,021,856 | 43,822,083 | 128 |
| 129 TOTAL | | | | | | | | | 0 | 0 | 0 | 129 |
| NUMBER OF FOREIGN PER DIEM CARS ON LINE | 20704 | 12333 | 32648 | 5484 | 35416 | 1468 | 60343 | | | | | |
| 130 Serviceable | 218 | | 111 | 49 | 695 | 148 | | | 806 | 415 | 1,221 | 130 |
| 131 Unserviceable | 474 | | | | | | | | 0 | 474 | 474 | 131 |
| 132 Surplus | 21,396 | 12,333 | 32,759 | 5,533 | 36,111 | 1,616 | 60,343 | | 81,203 | 88,888 | 170,091 | 132 |
| 133 TOTAL | | | | | | | | | 0 | 0 | 0 | 133 |

# EXHIBIT PX0673

# FREIGHT AND PASSENGER RAIL: PRESENT AND FUTURE ROLES, PERFORMANCE, BENEFITS, AND NEEDS

**(111–4)**

## HEARING

BEFORE THE

SUBCOMMITTEE ON

RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS

OF THE

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

FIRST SESSION

JANUARY 28, 2009

Printed for the use of the
Committee on Transportation and Infrastructure

U.S. GOVERNMENT PRINTING OFFICE

47–034 PDF WASHINGTON : 2009

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

JAMES L. OBERSTAR, Minnesota, *Chairman*

NICK J. RAHALL, II, West Virginia, *Vice Chair*
PETER A. DEFAZIO, Oregon
JERRY F. COSTELLO, Illinois
ELEANOR HOLMES NORTON, District of Columbia
JERROLD NADLER, New York
CORRINE BROWN, Florida
BOB FILNER, California
EDDIE BERNICE JOHNSON, Texas
GENE TAYLOR, Mississippi
ELIJAH E. CUMMINGS, Maryland
ELLEN O. TAUSCHER, California
LEONARD L. BOSWELL, Iowa
TIM HOLDEN, Pennsylvania
BRIAN BAIRD, Washington
RICK LARSEN, Washington
MICHAEL E. CAPUANO, Massachusetts
TIMOTHY H. BISHOP, New York
MICHAEL H. MICHAUD, Maine
RUSS CARNAHAN, Missouri
GRACE F. NAPOLITANO, California
DANIEL LIPINSKI, Illinois
MAZIE K. HIRONO, Hawaii
JASON ALTMIRE, Pennsylvania
TIMOTHY J. WALZ, Minnesota
HEATH SHULER, North Carolina
MICHAEL A. ARCURI, New York
HARRY E. MITCHELL, Arizona
CHRISTOPHER P. CARNEY, Pennsylvania
JOHN J. HALL, New York
STEVE KAGEN, Wisconsin
STEVE COHEN, Tennessee
LAURA A. RICHARDSON, California
ALBIO SIRES, New Jersey
DONNA F. EDWARDS, Maryland
SOLOMON P. ORTIZ, Texas
PHIL HARE, Illinois
JOHN A. BOCCIERI, Ohio
MARK H. SCHAUER, Michigan
BETSY MARKEY, Colorado
PARKER GRIFFITH, Alabama
MICHAEL E. MCMAHON, New York
THOMAS S. P. PERRIELLO, Virginia
DINA TITUS, Nevada
HARRY TEAGUE, New Mexico

JOHN L. MICA, Florida
DON YOUNG, Alaska
THOMAS E. PETRI, Wisconsin
HOWARD COBLE, North Carolina
JOHN J. DUNCAN, JR., Tennessee
VERNON J. EHLERS, Michigan
FRANK A. LOBIONDO, New Jersey
JERRY MORAN, Kansas
GARY G. MILLER, California
HENRY E. BROWN, JR., South Carolina
TIMOTHY V. JOHNSON, Illinois
TODD RUSSELL PLATTS, Pennsylvania
SAM GRAVES, Missouri
BILL SHUSTER, Pennsylvania
JOHN BOOZMAN, Arkansas
SHELLEY MOORE CAPITO, West Virginia
JIM GERLACH, Pennsylvania
MARIO DIAZ-BALART, Florida
CHARLES W. DENT, Pennsylvania
CONNIE MACK, Florida
LYNN A WESTMORELAND, Georgia
JEAN SCHMIDT, Ohio
CANDICE S. MILLER, Michigan
MARY FALLIN, Oklahoma
VERN BUCHANAN, Florida
ROBERT E. LATTA, Ohio
BRETT GUTHRIE, Kentucky
ANH "JOSEPH" CAO, Louisiana
AARON SCHOCK, Illinois
PETE OLSON, Texas

## SUBCOMMITTEE ON RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS

CORRINE BROWN, Florida *Chairwoman*

DINA TITUS, Nevada
HARRY TEAGUE, New Mexico
NICK J. RAHALL II, West Virginia
JERROLD NADLER, New York
ELIJAH E. CUMMINGS, Maryland
GRACE F. NAPOLITANO, California
JASON ALTMIRE, Pennsylvania
TIMOTHY J. WALZ, Minnesota
MICHAEL A. ARCURI, New York
CHRISTOPHER P. CARNEY, Pennsylvania
ALBIO SIRES, New Jersey
MARK H. SCHAUER, Michigan
BETSY MARKEY, Colorado
MICHAEL E. McMAHON, New York
THOMAS S. P. PERRIELLO, Virginia
PETER A. DeFAZIO, Oregon
JERRY F. COSTELLO, Illinois
BOB FILNER, California
EDDIE BERNICE JOHNSON, Texas
LEONARD L. BOSWELL, Iowa
RICK LARSEN, Washington
MICHAEL H. MICHAUD, Maine
DANIEL LIPINSKI, Illinois
STEVE COHEN, Tennessee
LAURA A. RICHARDSON, California
JAMES L. OBERSTAR, Minnesota
*(ex officio)*

BILL SHUSTER, Pennylvania
THOMAS E. PETRI, Wisconsin
JERRY MORAN, Kansas
GARY G. MILLER, California
HENRY E. BROWN, Jr., South Carolina
TIMOTHY V. JOHNSON, Illinois
SAM GRAVES, Missouri
JIM GERLACH, Pennsylvania
CHARLES W. DENT, Pennsylvania
LYNN A. WESTMORELND, Georgia
JEAN SCHMIDT, Ohio
CANDICE S. MILLER, Michigan
VERN BUCHANAN, Florida
ROBERT E. LATTA, Ohio
BRETT GUTHRIE, Kentucky
AARON SCHOCK, Illinois
ANH "JOSEPH" CAO, Louisiana
PETE OLSON, Texas

# CONTENTS

Page

Summary of Subject Matter .......... vi

TESTIMONY

Baker, Chuck, President, National Railroad Construction & Maintenance Association .......... 47
Boardman, Joseph, President and CEO, National Railroad Passenger Corporation (Amtrak) .......... 7
Buffa, Peter, Chairman, Orange County Transportation Authority (CA) .......... 7
Canby, Anne, President, Surface Transportation Policy Project, and Member, OneRail Coalition .......... 47
Fenhaus, Leon, Director of Government Affairs, Brotherhood of Maintenance of Way Employees Division, International Brotherhood of Teamsters .......... 47
Grenzeback, Lance R., Principal, Cambridge Systematics, Inc. .......... 47
Kempton, Will, Chief Executive Officer of CalTrans, on behalf of the States for Passenger Rail Coalition .......... 7
Longman, Phillip, Schwartz Senior Fellow, Research Director, Next Social Contract Initiative, New America Foundation .......... 47
Simpson, Thomas, Executive Director, Railway Supply Institute .......... 7
Stem, James, National Legislative Director, United Transportation Union .......... 7
Webb, Rick, Chief Executive Officer of Watco Companies, Inc., on behalf of the American Short Line and Regional Railroad Association .......... 7
Wolfe, Ed, Wolfe Research .......... 47
Young, James, Chairman, President, and CEO, Union Pacific Corporation, and Chairman, Association Of American Railroads .......... 7

PREPARED STATEMENTS SUBMITTED BY MEMBERS OF CONGRESS

Cohen, Hon. Steve, of Tennessee .......... 65
Costello, Hon. Jerry F., of Illinois .......... 66
Cummings, Hon. Elijah E., of Maryland .......... 67
Richardson, Hon. Laura A, of California .......... 72

PREPARED STATEMENTS SUBMITTED BY WITNESSES

Baker, Chuck .......... 76
Boardman, Joseph .......... 84
Buffa, Peter .......... 89
Canby, Anne .......... 97
Fenhaus, Leon .......... 105
Grenzeback, Lance R. .......... 120
Kempton, Will .......... 127
Longman, Phillip .......... 147
Simpson, Thomas .......... 173
Stem, James .......... 177
Webb, Rick .......... 186
Wolfe, Ed .......... 200
Young, James .......... 218

SUBMISSIONS FOR THE RECORD

National Association of Railroad Passengers, Ross B. Capon, President, written statement .......... 228

# U.S. House of Representatives
## Committee on Transportation and Infrastructure

James L. Oberstar
Chairman

Washington, DC 20515

John L. Mica
Ranking Republican Member

David Heymsfeld, Chief of Staff
Ward W. McCarragher, Chief Counsel

James W. Coon II, Republican Chief of Staff

January 26, 2009

**SUMMARY OF SUBJECT MATTER**

**TO:** Members of the Subcommittee on Railroads, Pipelines, and Hazardous Materials

**FROM:** Subcommittee on Railroads, Pipelines, and Hazardous Materials Staff

**SUBJECT:** Hearing on Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs

### PURPOSE OF HEARING

The Subcommittee on Railroads, Pipelines, and Hazardous Materials is scheduled to meet on January 28, 2009, at 10:00 a.m. in 2167 Rayburn House Office Building to receive testimony on the roles of freight and passenger railroads in the U.S. economy; the impact of the current economic crisis on the railroad industry, its suppliers, and employees; the benefits of freight and passenger rail; and freight and passenger rail investment needs.

### BACKGROUND

Railroads are the backbone of North America's transportation network. From the building of our nation's first railroad in 1828 – the 13-mile Baltimore & Ohio Railroad – throughout the next 180 years, railroads have played a central role in our nation's economic development.

Structurally, the U.S. railroad system is comprised of 140,810 miles of track, 562 common carrier freight railroads, and one national passenger railroad, Amtrak. Altogether these railroads employ more than 200,000 workers.

Under regulations prescribed by the Surface Transportation Board, all freight and passenger railroads are divided into three classes based on annual carrier operating revenues. Class I railroads are the largest railroads, with annual operating revenues of $319.3 million or more. They account for 68 percent of the industry's mileage, 89 percent of its workforce, and 93 percent of its freight

revenue. The eight Class I railroads are Amtrak; BNSF Railway; CSX Transportation; Grand Trunk Corporation, which consists of the U.S. operations of Canadian National, including the former Grand Trunk Western, Illinois Central, and Wisconsin Central; Kansas City Southern; Norfolk Southern; the former Soo Line owned by Canadian Pacific; and Union Pacific.

Class II railroads, known as regional or short line railroads, are those with annual operating revenues of more than $25.5 million but less than $319.3 million. Class III railroads, known as local line-haul carriers, are those with annual operating revenues of $25.5 million or less. In 2008, there were 30 Class II railroads and 320 Class III railroads in the U.S.

Freight Rail Needs

In the United States, freight railroads account for more than 40 percent of all intercity freight volume – more than trucks, boats, barges, or planes. They move 70 percent of all automobiles produced in the United States, 30 percent of our nation's grain harvest, and 65 percent of the coal, which in turn provides more than one-half of our nation's electricity. According to the railroad association, the railroads move enough wheat to provide every person in the United States a fresh loaf of bread six days a week; enough lumber to build almost three houses every minute of every day; and enough concrete to build 45 miles of new highway every day.

Until the recent economic crisis, business for the freight railroads was booming. The U.S. Department of Transportation ("DOT") predicted that the demand for rail freight transportation—measured in tonnage—would increase 88 percent by 2035. Ton-miles of rail freight (one ton of freight moved one mile counts as one ton-mile) carried over the national rail system had doubled since 1980, and the density of train traffic—measured in ton-miles per mile of track—had tripled since 1980.

At the request of the National Surface Transportation Policy and Revenue Study Commission, the railroad association commissioned an assessment of the capacity of the nation's rail system to accommodate the estimated increase in rail freight traffic. *The National Rail Freight Infrastructure Capacity and Investment Study*, conducted by Cambridge Systematics, Inc., found the costs of improvements needed to accommodate rail freight demand in 2035 is estimated at $148 billion (in 2007 dollars). The Class I freight railroads' share of this cost is projected to be $135 billion while the short line and regional freight railroads' share is projected to be $13 billion.

Prior to the economic crisis, the Class I railroads anticipated that they would be able to generate approximately $96 billion of their $135 billion share through increased earnings from revenue growth, higher volumes, and productivity improvements, while continuing to renew existing infrastructure and equipment, leaving a balance for the Class I freight railroads of $39 billion or about $1.4 billion per year to be funded from other sources. Without this investment, Cambridge Systematics estimates that 30 percent of the rail miles in primary rail corridors (the preponderance of rail freight traffic) will be operating above capacity by 2035, and another 25 percent will be operating near or at capacity.

The $96 billion, however, had assumed that the railroads could continue increasing their investments in capital expansion. Due to the economic crisis, some railroads are cutting back on those investments. Rail volumes are sliding considerably. Just last week, the railroad association announced that carload freight totaled 267,063 cars, down 17.9 percent from 2008, with loadings

down 13.2 percent in the West and 24.4 percent in the East. Intermodal volume of 199,117 trailers or containers was off 13.7 percent from last year, with container volume falling 10.2 percent and trailer volume dipping 27 percent. Total volume was estimated at 28.3 billion ton-miles, off 16.8 percent from 2008. Grain shipments, for example, are down 31.4 percent compared to 2008; lumber products are down 38.1 percent; chemical shipments are down 20.6 percent; auto shipments are down 64.6 percent; and coal shipments are down 2.5 percent. Employment levels in the railroad industry are also down. According to payroll data from the Bureau of Labor Statistics ("BLS"), as of December 2008, the industry employed approximately 232,000 people – a decline of 4,000 jobs in less than two years. Further cuts are anticipated. In addition, unpublished tables from BLS suggest that the unemployment rate in the railroad industry increased from 2.7 percent in the fourth quarter of 2007 to 6.3 percent in the fourth quarter of 2008 (not seasonally adjusted).

The need, therefore, for a Federal partner may be even greater, but currently the only programs available to help freight railroads invest in capital improvements are the Rail Line Relocation and Improvement program, authorized in the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users at $350 million annually for each of fiscal years 2006 through 2009 for the purpose of providing financial assistance for local rail line relocation and improvement projects; the Railroad Safety Technology Grant program, authorized in the Rail Safety Improvement Act of 2008 at $50 million annually for each of fiscal years 2009 through 2013 for assisting railroads in the deployment of positive train control and other safety technologies; the Railroad Safety Infrastructure Improvement Grant program, authorized in the Rail Safety Improvement Act of 2008 at $5 million annually for each of fiscal years 2010 through 2013 for the purpose of making safety improvements to railroad infrastructure; and a program authorized in the Energy Independence and Security Act of 2007 at $50 million annually for each of fiscal years 2008 through 2011 for making capital grants to Class II and Class III railroads for infrastructure improvements. Additionally, funding is available through the Railroad Rehabilitation and Improvement Financing program, which provides direct loans and loan guarantees up to $35 billion to finance rail infrastructure improvements. However, Congress has provided little funding for the grant programs. The only funding that has been provided is $20 million for the Rail Line Relocation and Improvement program in 2008. [It is important to note that some rail projects have been funded through the highway program.]

<u>Passenger Rail Needs</u>

During fiscal year 2008, Amtrak served more than 28.7 million passengers, representing the sixth straight fiscal year of record ridership. With concerns still high on dependence on foreign oil and greenhouse gas emissions, Amtrak and the States are looking for opportunities to expand service.

The Passenger Rail Working Group for the National Surface Transportation Policy and Revenue Study Commission reported in 2007 that the total capital cost estimate for re-establishing the national intercity passenger rail network between now and 2050 was $357.2 billion (in 2007 dollars), for an annualized cost of $8.1 billion, about $5 billion of which the States would request from the Federal Government. These funds would be used to bring existing service to a state-of-good-repair, upgrade existing service where demand is greatest, and add new service where environmental and engineering work are complete, including the Midwest Regional Rail Initiative and the California high-speed rail corridor.

Case 1:07-mc-00489-BAH Document 1229-6 Filed 11/22/24 Page 1244 of 1523



Investment in passenger rail service can have significant economic development benefits for communities, states, and the nation. An economic impact analysis of the 3,000-mile Midwest Regional Rail System proposed by nine Midwestern states (Indiana, Illinois, Iowa, Michigan, Minnesota, Missouri, Nebraska, Ohio, and Wisconsin) identified 58,000 new permanent jobs, $1.1 billion in increased household income, and $4.9 billion in increased property values around 102 stations served by the system.

These benefits can be significant for individual communities. Enhanced passenger rail service in Milwaukee, Wisconsin could generate up to 3,075 permanent jobs, $56 million in annual household income, and $227 million in increased property values around the downtown station. St. Louis, Missouri could expect an increase of up to 2,800 jobs, $57 million in household income, and $250 million in property value increases.

The State of California is anticipating a considerable boost to its economy as well, resulting from the planning, designing, and building of its high-speed passenger rail system. Estimates predict that nearly 160,000 construction-related jobs and an additional 450,000 permanent jobs are expected to be created by 2035 as a result of the economic growth the train system will bring to the state. This will result in the generation of more than $1 billion in annual revenue surplus in the state.

H.R. 2095, the Passenger Rail Investment and Improvement Act (Public Law 110-432), which was enacted at the end of the 110th Congress, authorizes a total of $13.06 billion over five years to help bring the Northeast Corridor to a state-of-good-repair, and encourage the development of new and improved intercity passenger rail service through an 80-20 Federal/State matching grant program. The Act also provides $1.5 billion for the development of high-speed rail corridors, in addition to the $30 million authorized annually through fiscal year 2013 for eligible high-speed rail corridor planning activities (see Section 26101 of Title 49, U.S. Code, as amended by Public Law 110-432). The expansion of the intercity passenger rail network presents an opportunity for new market participants to offer intercity passenger rail service. Private operators play a robust role in the U.S. transportation industry. The Alternative Passenger Rail Service Pilot Program, authorized in the Act, and Section 502, which requires the Secretary to issue a request for proposals for projects for the financing, design, construction, operation, and maintenance of a high-speed intercity passenger rail system, will provide an opportunity for private sector participants to bid on select Amtrak routes, which in turn could provide savings to U.S. taxpayers.

The draft American Recovery and Reinvestment Act of 2009 provides $800 million to Amtrak and $300 million to States for intercity passenger rail grants (and waives the State matching requirement).

Some of the Benefits of Rail

The demand for transportation is pressing the capacity of the nation's transportation systems, especially its critical highway and rail freight transportation infrastructure. On the highway system, vehicle-miles of travel grew by 96 percent between 1980 and 2005, while lane miles of road increased by only 5.7 percent. The result has been increasing highway congestion that the DOT has described as "chronic."

According to the Texas Transportation Institute's 2007 Urban Mobility Study, traffic congestion in the nation's 437 urban areas continues to increase. As congestion increases, the cost it

imposes on our economy and on motorists also increases. In 2005, traffic congestion cost urban motorists $78.2 billion, compared to $73.1 billion in 2004, and just $14.9 billion in 1982. This level of congestion equates to an average annual cost per traveler of about $710 in 2005, up from $680 in 2004, and $260 in 1982. The hours of delay and gallons of fuel consumed due to congestion are the elements that are easiest to estimate. The effect of uncertain or longer delivery times, missed meetings, business relocations, and other congestion impacts are not included in this estimate.

Congestion has also increased in the air. In 2007, U.S. airlines set an annual record by carrying 769.4 million scheduled domestic and international passengers. The Federal Aviation Administration ("FAA") forecasts that, from 2008 through 2021, aviation passenger traffic will increase by 49 percent, to 1.16 billion passengers annually. The FAA predicts that, absent any changes to the aviation system, delays will increase by 62 percent by 2014.

According to the Commission on the Future of the U.S. Aerospace Industry, estimates of the cost of aviation delays to the U.S. economy range from $9 billion in 2000 to more than $30 billion annually by 2015. Without improvement, the combined economic cost of delays from 2000-2012 will total an estimated $170 billion.

Moving freight by rail can reduce congestion and save Americans hundreds of dollars and time in the car, according to the Federal Highway Administration's Congestion Relief Index, a study of traffic congestion in 82 major urban areas.

The study estimates that if just 25% of freight volume is shifted from trucks to rail, by 2026, each American commuter could save, on average, $985 -- and 41 hours of time in their car -- a year. The railroad association estimates that one single rail intermodal train can remove 280 trucks off the roads, or the equivalent of 1,100 autos. Amtrak removes another eight million cars from the road annually and eliminates the need for 50,000 fully loaded airplanes each year.. Development of high-speed rail corridors could further reduce congestion. In California, for example, the current trip time by car between Los Angeles and San Francisco is between six and seven hours. By air, including all time spent on the ground, the same trip takes at least 3.5 hours. Once completed, California's high-speed rail project is expected to make that trip in two hours and 38 minutes.

In addition to easing highway congestion, shifting freight and passengers from trucks and cars to rail has substantial environmental and energy benefits. Freight trains are at least four times more fuel efficient than trucks, and can move one ton of freight 436 miles on a single gallon of fuel. According to the Congestion Relief Index, since modern freight locomotives emit less nitrogen oxide and particulate matter than trucks, shifting 25 percent of freight volume from trucks to trains would decrease air pollutant emissions by 920,500 tons. To reduce emissions even further, railroads are deploying innovative hybrid and "gen-set" locomotives that reduce emissions as much as 90 percent, especially in rail yards.

Like freight rail, passenger rail has substantial environmental and energy benefits. The Sightline Institute (formerly Northwest Environment Watch) estimates that the average intercity passenger train produces two-thirds less carbon dioxide greenhouse gas emissions per passenger-mile than a car or truck and half the greenhouse emissions of an airplane. The intercity passenger rail mode also generates fewer emissions of other pollutants than other modes. For example, intercity passenger rail service improvements planned for by North Carolina and Virginia between Charlotte and Washington, DC will provide a net reduction of 531,000 pounds of nitrogen oxide per

year as a result of auto diversion to rail. Electrified high-speed rail systems also have the potential to be powered with zero greenhouse gas emissions. In fact, the California High Speed Rail Authority is currently undertaking a study of how to power the system with zero greenhouse gas emissions by utilizing its surrounding energy resources such as wind and thermal solar power.

The Oak Ridge National Laboratory, which produces the annual Transportation Energy Data Book for the Department of Energy, further found that intercity passenger rail consumes 17 percent less energy per passenger mile than airlines and 21 percent less energy per passenger mile than automobiles. These energy savings can be significant in some corridors. For example, the intercity passenger rail service improvements planned for by the States of North Carolina and Virginia between Charlotte and Washington, DC will provide a net reduction of 9.7 million gallons of fuel per year. Nationally, a shift to alternative transportation modes can have a significant impact on energy usage. To illustrate, a 10 percent modal shift from surface transportation to transit would save the equivalent of all the oil we import from Saudi Arabia in a year – 550 million barrels.

Shifting freight and passengers from roads to railways can also have a positive impact on safety. Rail is one of the safest modes of travel. In 2007, there were 2,647 train accidents, resulting in eight fatalities and 293 injuries. In addition, there were 2,752 train accidents at highway-rail grade crossings, resulting in 335 fatalities and 1,048 injuries. In comparison, in 2007, there were more than six million police reported motor vehicle traffic crashes, resulting in 41,059 fatalities and nearly 2.5 million injuries. With respect to hazardous materials shipments, rail is the second safest mode of transport (water transportation of hazardous materials is the safest). In 2007, there were 748 rail incidents involving hazardous materials, resulting in no fatalities and 54 injuries. This compares to 16,887 incidents involving truck transportation of hazardous materials, resulting in 10 fatalities and 155 injuries, and 1,552 incidents involving air transportation of hazardous materials, resulting in no fatalities and eight injuries.

## Expected Witnesses

Mr. Joseph Boardman
President and CEO
National Railroad Passenger Corporation (Amtrak)

Mr. Peter Buffa
Chairman
Orange Co. Transportation Authority (CA)

Ms. Anne Canby
President
Surface Transportation Policy Project

Mr. Lance R. Grenzeback
Principal
Cambridge Systematics, Inc.

Mr. Donald Griffin

Director of Strategic Coordination and Research
Brotherhood of Maintenance of Way Employes Division
International Brotherhood of Teamsters

Mr. Norman Jester
Vice President, Business Development and Political Affairs
Herzog Contracting Corporation

Mr. Will Kempton
Chief Executive Officer
CalTrans
On Behalf of the States for Passenger Rail Coalition

Mr. Phillip Longman
Schwartz Senior Fellow; Research Director, Next Social Contract Initiative
New America Foundation

Mr. Thomas Simpson
Executive Director
Railway Supply Institute

Mr. James Stem
National Legislative Director
United Transportation Union

Mr. James Young
Chairman, President, and CEO of Union Pacific Corporation
and
Chairman of the Association of American Railroads

Mr. Rick Webb
Chief Executive Officer
Watco Companies, Inc.
On behalf of the American Short Line and Regional Railroad Association

Mr. Ed Wolfe
Wolfe Research, LLC

# FREIGHT AND PASSENGER RAIL: PRESENT AND FUTURE ROLES, PERFORMANCE, BENEFITS, AND NEEDS

**Wednesday, January 28, 2009**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE,
SUBCOMMITTEE ON RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS,
*Washington, DC.*

The Subcommittee met, pursuant to call, at 10:00 a.m., in Room 2167, Rayburn House Office Building, Hon. Corrine Brown [Chairwoman of the Subcommittee] presiding.

Ms. BROWN OF FLORIDA. Will the Subcommittee on Railroads, Pipelines, and Hazardous Materials come to order.

I want to welcome everyone to our first hearing of the 111th Congress. I am proud to say that we are now the second largest Subcommittee on the Committee on Transportation and Infrastructure. I think that is due, in large part, to the increased interest in freight and passenger rail as a solution to increased gridlock on our national roads and the environmental and economic problems that our Nation is facing. I think it is also a reflection of the big achievement that this Subcommittee made last session.

We have a number of new Members on the Subcommittee joining us this Congress, and I want to welcome them. Mr. Shuster and I are hosting a ″meet to greet″ with the new Members and representatives of the Railroads, Pipelines, and Hazardous Materials community on February 3 right here in this room, and we are asking all of our stakeholders to come out and join us for this ″meet and greet″ with the new Members.

However, I am saddened that the new Members will not have the honor to meet one of our brothers, ″Brokenrail,″ who passed away on December 19. ″Brokenrail″ served as the national legislative director of the United Transportation Union. We will have a memorial service right here in this room today at 3:00. I hope that you all will join us for that.

The Subcommittee is meeting today to receive testimony on the role of freight and passenger railroads in the U.S. economy, the impact of the current economic crisis on the rail industry, its suppliers and employees, and the benefits of freight and passenger rail and freight and passenger rail investment needs.

Congestion has been a major problem across most of our surface transportation, including railroads. The U.S. Department of Transportation predicts that the demand for freight rail transportation

will increase 88 percent by 2035. At the request of the National Surface Transportation Policy and Review Study Commission, the Railroad Association Commission has accessed the capacity of the national rail system to accommodate the estimated increase in freight traffic. The study found that the cost of improvement needs to accommodate rail freight demand to 2035 is estimated at $148 billion in 2007 dollars.

Prior to the economic crisis, the Class I railroad anticipated that they would be able to generate about $96 billion of that $135 billion share through increased earnings from revenue growth, higher volume and productive improvement, while continuing to review existing infrastructure and equipment, leaving a balance in Class I freight rail of $39 billion, or about $1.4 billion per year.

Without this investment, the study estimates that 30 percent of the rail miles and rail corridor will be operating above capacity by 2035 and that another 25 percent will be operating near capacity. Yet the economic crisis has hit the rail industry, and their investment needs may be greater than previously anticipated.

Funding must also be provided for intercity passenger and high-speed rail. With concern still high about the dependence on foreign oil and on greenhouse gas emissions, Amtrak and the States are looking for opportunities to expand service. H.R. 2095, which was enacted at the end of the last Congress, authorized about $13 billion for Amtrak and the States to help bring the Northeast Corridor to a state of good repair and for capital expenditures of the national rail passenger transportation system. We need to make sure that these programs are fully funded, and as we begin to develop and to reauthorize the next SAFETEA bill, it is critical that the needs for additional rail capacity for freight and passenger rail be addressed.

The future of ground transportation is on our rail, whether it takes freight off congested highways or moves people on high-speed rail corridors. There is no one solution that will solve rail congestion or the environmental and engine problems plaguing our Nation. New and creative ideas from the government and the private sector must be utilized to increase and to improve both freight and passenger rail capacity.

With this, I welcome today's panelists, and I thank you for joining us. I am looking forward to hearing your testimony.

Before I yield to Mr. Shuster, I ask unanimous consent that Members be given 14 days to revise and extend their remarks and to admit the submission of additional statements and materials for Members and witnesses. Without objection, so ordered.

I now yield to Mr. Shuster for his opening statement.

Mr. SHUSTER. I thank the Chairwoman.

I also would like to welcome everybody to the first hearing of the Railroads, Pipelines, and Hazardous Materials Subcommittee. Again, it is an honor for me to be the Ranking Member on this Subcommittee, and I look forward to working with Chairwoman Brown as we move through the 111th Congress.

Our government has had a history of supporting the development of a strong rail network in this country, and we have reaped the benefits of it over the past 180-200 years, starting in 1862 with the land grants that made the first transcontinental railroad possible.

The United States has supported the development of privately owned railroads. Our national investment in railroads has been repaid many times over, and I believe the continued investment will provide future generations with the building blocks for economic growth.

There is a lot that Congress can do and is doing to help the railroads. Last year, as the Chairwoman mentioned, we did pass probably the most important piece of rail legislation in over a decade, the Rail Safety and Amtrak reauthorization. The rail safety provisions of that bill will bolster railroads' already outstanding safety records by the development of new technologies such as positive train control.

The passenger rail provisions of the bill are also exciting. We are in the process of soliciting bids for the development of high-speed rail service on 11 corridors throughout the country . We also included provisions in the bill that allow private companies to bid and to operate certain routes that Amtrak now operates, whether by themselves or in conjunction with Amtrak. Private companies have a well-documented ability to lower costs in transit operations, including commuter railroads, and I expect that we will reap the same benefits for the U.S. taxpayer with regard to intercity rail travel.

Unfortunately, the freight rail industry has not avoided the economic downturn as we are all experiencing. At least one Class I railroad has been forced to furlough workers. Total rail volume is off by more than 18 percent this year as demand for rail service drops. Auto shipments are down 64 percent. Metals are down 41 percent. The chemical shipments are down 20 percent. This is a critical time for the railroad industry.

We can do more during this Congress to create an environment where railroads can succeed. We can enact a freight rail infrastructure tax credit. We can make railroads a bigger part of the next highway reauthorization bill, and we can fully fund programs that were authorized in rail safety and in Amtrak legislation that we passed last Congress.

What we should not do is to interfere with the railroads' ability to raise capital, which is critical. Railroad reregulation, I believe, is dangerous policy, and I believe that we will return the railroads to the dark days of the pre-Staggers, where dozens of railroads were bankrupted and where the government was forced to step in and prop up the industry.

Experimenting with policies that inject government further into pricing negotiations between private parties is a bad idea, I believe. Furthermore, the STB has taken dramatic steps to ensure that shippers have recourse in rate disagreements by reforming the rate case process. We should also oppose the railroad antitrust legislation. Railroads are already subject to most antitrust laws, and the limited exemptions are in areas already regulated by the STB. By allowing Federal courts to insert themselves into rate disputes, we risk undermining the STB in creating an unworkable patchwork of core decisions that would interfere with the national rail network.

Again, I am honored to be serving as Ranking Member. I look forward to working with Chairwoman Brown as we move into this Congress and make sure that we are doing the right things to

strengthen the railroads, which I believe in turn will help to strengthen the economy.

So thank you and I yield back.

Ms. BROWN OF FLORIDA. Thank you.

I understand that Members would like to make opening statements. If we could, let's try to hold those statements to a minute so we can get to the great panel that we have here. We will start with Mrs. Napolitano.

Mrs. NAPOLITANO. Thank you, Madam Chair. Congratulations to you and to Chairman Oberstar for the work in the 110th Congress, as well as to Ranking Member Shuster.

Passing the Amtrak authorization, the railroad bill, made significant steps, although not as much as needed for our Nation's safety and passenger rail network.

Welcome, our distinguished guests, especially those from California.

Mr. Will Kempton, the director of Caltrans, welcome, sir. Peter Buffa, chairman of the Orange County Transportation Authority, just south of me. Chairman Young, who I have had the pleasure of meeting several times in my office, thank you, sir, for being here and for visiting with my elected officials last year in August.

Freight and passenger rail provide great service and benefits, but it also creates a lot of problems for my area. Some of those burdens really need to be addressed, especially with the Alameda Corridor going through my whole district. We look forward to working on being able to continue to invest in the grade separations in areas all over the United States, to doing more research in the quiet zones to be able to ensure we provide sufficient safety, to working on properly training our employees and on ensuring their safety, and to working collaboratively to address the needs of our Nation and of our community to ensure the Nation's economy continues to improve.

With that, I thank you, Chairwoman Brown, as we continue to work on those issues—track repair, maintenance—and all of the other stuff that we love dearly on this Subcommittee.

I thank our distinguished panel, and look forward to your testimony.

Ms. BROWN OF FLORIDA. Mr. Moran.

Mr. MORAN. Madam Chairman, thank you very much. I will forgo an opening statement at your request so we can proceed with hearing our witnesses. Thank you.

Ms. BROWN OF FLORIDA. Mr. Miller.

Mr. MILLER OF CALIFORNIA. Thank you, Chairwoman Brown and Ranking Member Shuster, for holding this hearing today. I think it is very important to deal with this issue that tremendously has impact on our region.

When imports come through the Ports of Los Angeles and Long Beach, most of these products are transported by rail to other parts of the Nation.

On that note, I am happy to introduce Peter Buffa. He is chairman of the Orange County Transportation Authority. He is one of our witnesses today. It is good to have you here today. OCT is a multimodal transportation agency serving Orange County. Mr. Buffa also served as a Costa Mesa city councilman, and you were

the previous mayor over there, I believe. It is really good to have you here today.

The Committee welcomes the testimony of all of the experts we have today. It is going to be interesting to hear what you have to say.

While the use of passenger and freight rail corridors is critical to facilitating economic growth in southern California, the increased rail traffic has also imperiled the safety and quality of life of the surrounding communities. Not only does the increase in freight traffic cause tremendous traffic delays at local grade crossings, but it affects the quality of life for residents surrounding those communities.

A tremendous amount of goods come to the Nation through the Ports of Long Beach and Los Angeles. We have about 135 grade crossings in that region that are tremendously impacted by the ports that do ship goods over the rail. Now, a certain amount of it goes over our freeways also with truck traffic, but the bulk of it is on rail. And we have quite a challenge ahead of us in trying to deal with the emergency vehicles that have to cross those, the impact on the economy as individuals and trucks sit there, watching mile-long trains travel on our rails each day they go by. It is an issue that has to be dealt with. Billions of dollars of goods come into this Nation through our ports, and we need to take and to mitigate the impact caused by those goods.

I look forward to the testimony today.

I yield back. Thank you.

Ms. BROWN OF FLORIDA. Mr. Miller, would you like to introduce Mr. Buffa right now, your constituent?

Mr. MILLER OF CALIFORNIA. I just did.

Ms. BROWN OF FLORIDA. Mr. Walz.

Mr. Carney.

Mr. CARNEY. Thank you, Madam Chairwoman.

Just briefly, I wanted to congratulate you and my good friend, the Ranking Member, Mr. Shuster, from Pennsylvania. I anticipate a great year for this 111th Congress in terms of what we are going to do for rail and what rail will do for the Nation. As we work together, we have an enormous opportunity here to rebuild the rail, to put more freight on the rail and more passengers on the rail. When we do that, this Nation will be stronger, healthier and safer, and we look forward to working with all of you in that regard.

I want to welcome all of the folks here who are testifying today. I look forward to hearing your testimony and to tossing around a few questions.

Thank you, Madam Chair.

Ms. BROWN OF FLORIDA. Mr. Latta.

Mr. LATTA. Thank you, Madam Chair. I will waive my opening statement, and will yield back my time.

Ms. BROWN OF FLORIDA. Ms. Markey.

Ms. MARKEY. Thank you, Madam Chairman.

I look forward to working on this Committee. As a new Member from Colorado, I know that railroads have been the backbone of our transportation system and have opened the West to economic development, so I look forward to working with you on this Com-

mittee and on the future role and needs of railroads in this country. Thank you very much.

Ms. BROWN OF FLORIDA. Thank you.

Mr. Cao.

Mr. CAO. Thank you, Chairwoman Brown and Ranking Member Shuster.

At least the southern part of Louisiana has been very much impacted by Katrina. For the last 3-1/2 years, the railway system has been one of the instrumental instruments in economic development in the area. I would hope to work with all of you in order to provide greater services and also to help the Second Congressional District redevelop many of its infrastructure and also the rail systems there in order to generate more economic development systems.

So thank you very much for being here.

Ms. BROWN OF FLORIDA. Mr. Boswell.

Mr. BOSWELL. Thank you, Madam Chair. Thank you for the intense attention you are giving to this subject.

Just two short things. You have heard me say it before: Many, many years ago when I returned as a soldier from an assignment in Europe, I thought somebody has got it wrong. They are expanding their ability, and we are taking up track. Well, I thought I knew then who was wrong, and I was right.

Madam Chairwoman, I hope we get into a real solutions discussion on how we are going to deal with these bottlenecks we have in Chicago. It is one of our great cities. There is no question about that, but we have got a problem. I know you know about it. We have got to deal with that, it seems to me, to move our economy and to move freight back and forth across our country. So I commend you for taking all of this on, and I am looking forward to participating.

Ms. BROWN OF FLORIDA. Mr. Guthrie, you pass.

Mr. Michaud.

Mr. MICHAUD. I want to thank you, Madam Chair, and the Ranking Member, for having this hearing. I also want to thank the panelists for testifying today, and I look forward to hearing your testimony. Since we will have votes this morning, I will yield back the remainder of my time.

Ms. BROWN OF FLORIDA. Mr. Teague.

Mr. TEAGUE. Yes, Madam Chairwoman. Thank you for allowing me to be on this Committee.

I am a newly elected Democratic candidate from New Mexico's Second Congressional District. I am proud to be on this Committee, and I am anxious to listen to the input of people who are intimately involved in this industry.

Thank you.

Ms. BROWN OF FLORIDA. Thank you.

I am pleased to introduce and to welcome our first panel—our witnesses here this morning.

Our first witness is Mr. Jim Young, who is chair, president and CEO of Union Pacific Corporation and who is chairman of the Association of American Railroads. Welcome.

The next is Mr. Rick Webb, CEO of Watco Companies. Mr. Webb is testifying on behalf of the American Short Line and Regional Railroad Association.

Of course, Mr. Joseph Boardman, president and CEO of Amtrak. Welcome in your new capacity.

Also, we have Mr. Will Kempton, CEO of Caltrans. Mr. Kempton is testifying on behalf of the States for Passenger Rail Coalition.

We have Mr. Thomas Simpson, executive director of the Railway Supply Institute.

We have Mr. James Stem, national legislative director of the United Transportation Union.

I remember that Congressman Miller has already introduced his person.

Let me remind the witnesses that, under Committee rules, all statements must be limited to 5 minutes, but your entire statements will appear in the record. We will also allow the entire panel to testify before the questioning of the witnesses begins.

**TESTIMONY OF JAMES YOUNG, CHAIRMAN, PRESIDENT, AND CEO, UNION PACIFIC CORPORATION AND CHAIRMAN, ASSOCIATION OF AMERICAN RAILROADS; RICK WEBB, CHIEF EXECUTIVE OFFICER OF WATCO COMPANIES, INC., ON BEHALF OF THE AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION; JOSEPH BOARDMAN, PRESIDENT AND CEO, NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK); WILL KEMPTON, CHIEF EXECUTIVE OFFICER OF CALTRANS, ON BEHALF OF THE STATES FOR PASSENGER RAIL COALITION; THOMAS SIMPSON, EXECUTIVE DIRECTOR, RAILWAY SUPPLY INSTITUTE; PETER BUFFA, CHAIRMAN, ORANGE COUNTY TRANSPORTATION AUTHORITY (CA); AND JAMES STEM, NATIONAL LEGISLATIVE DIRECTOR, UNITED TRANSPORTATION UNION**

Ms. BROWN OF FLORIDA. I am pleased to have you here. We will recognize Mr. Young to start.

Mr. YOUNG. Good morning, everyone. I will be using a few slides today, so watch the screens, please.

Chairwoman Brown, Ranking Member Shuster and Members of the Subcommittee, my name is Jim Young. I am chairman of the Union Pacific Corporation. I appreciate the opportunity to testify today, and I want to commend this Committee for holding this hearing.

The United States freight rail system is the envy of the world. It is efficient and cost-effective. One train hauls the equivalent of 300 trucks at about half the cost. It is vital to our economy. Over 40 percent of our Nation's freight moves by train on a private system that costs taxpayers virtually nothing. It is friendly to the environment. Trains emit about a third of the emissions per ton compared to that of a truck. In fact, if your family vehicle were as fuel-efficient as a train, you would get about 400 miles per gallon. In short, freight rail is a vital resource for our economy that stands ready to accelerate the economic recovery that our entire country is hoping for.

Like many companies, Union Pacific is facing extraordinary economic challenges. As our company started the fourth quarter of 2008, what had been a gradual decline in loadings became a sharp drop-off that surprised, even astounded, us all. In virtually every segment of our business, from automobiles to frozen chickens to X-

boxes, our customers curtailed their shipping as credit evaporated, and consumer spending took the holiday season off.

Today, approximately 1 month into the new year, we are still searching for a firm base from which we can start to recover. At today's business levels, Union Pacific has in storage 1,200 locomotives at $2 million each and over 48,000 railcars. Even more discouraging is that over 3,100 of our employees are furloughed across our company. About half of these employees are covered by a new program that allows them to work 8 days a month and that maintains their full health care coverage. We have, essentially, stopped hiring until our furloughed employees can return to work and until the economy begins to recover.

We are taking prudent steps to protect the financial health of our economy while being certain that we retain a fast recovery capability. For example, we have frozen the salaries of our executives, have canceled meetings, have curtailed travel, and have sought the help of all of our 47,000 employees in identifying and in implementing ways to reduce costs.

We need to preserve our investment in the safety and maintenance of our railroad. That alone is well over $2 billion per year. We must also continue to invest in future growth that will make our service even more valuable to our customers. Financial returns drive growth investment. We are only able to make infrastructure investments for growth if our investors—pension funds, mutual funds, ordinary people—have some confidence that they will earn a satisfactory return on their investments. If the economy does not begin to rebound, or if we are somehow prevented from earning enough to pay for growth, they will take their money elsewhere and we will have to reduce our investment in new railroad.

There is much more to be done. Even with our record capital spending, our industry is only investing about half the level DOT studies say is needed to meet the demands on freight rail in the future. Clearly, our Nation is facing a monumental challenge. Railroads, particularly freight railroads, can be an integral part of meeting that challenge.

We have three suggestions for your consideration:

First, government must nurture policies that enhance the ability of the freight railroads to attract private investment and remain competitive. The less we utilize privately funded rail in this country, the more the taxpayer must subsidize other modes of transportation.

Second, Congress should enact an Investment Tax Credit for new rail construction. We have endorsed a proposal that has been introduced in this Congress that would provide a 25 percent Investment Tax Credit for new rail construction. This credit will allow us to accelerate our investments in rail, investments that are critical if we are going to meet the future demand for rail transportation.

Third, Congress should enact and fund programs that allow States to partner with freight railroads to move forward with projects that benefit both the freight railroad and the public. The best example of this type of project is the CREATE project in Chicago. This multibillion-dollar project will improve the fluidity of the freight railroads, will enhance passenger rail in the city and will reduce congestion on the highways. The freight railroads are will-

ing to put up the money consistent with the benefits that we would receive while local, State and Federal governments put up the resources commensurate with the public benefits.

These are but three ideas for how our freight rail system can do even more to strengthen our economy. We stand ready to work with you to make them a reality. Thank you.

Mr. WEBB. Good morning, Madam Chair and Members of the Committee. My name is Rick Webb. I am chief executive officer of Watco Companies. We own 19 short lines, operating nearly 4,000 miles of track in 16 States. I am testifying today on behalf of the American Short Line and Regional Railroad Association.

The returning Members of this Committee know the short line story, and I will not repeat it here. For the new Members, let me just say the importance of the short line industry is in who and where we serve. America's 500 short lines operate nearly 50,000 miles of track, or almost one-third of the national railroad network. For large areas of the country and particularly for small-town America, short lines are the only connection to the national railroad network. For small businesses and farmers in those areas, our ability to take a 25-car train 75 miles to the nearest Class I interchange is just as important as the Class I's ability to attach that block of traffic to a 100-car train moving across the country. My Kansas grain customers cannot make the journey to export markets in the gulf without Class I railroad service, but they cannot start the journey by rail without short line service.

The talk in Washington today is all about economic stimulus, and in the time I have this morning, let me make four points.

First, short line railroads have enormous rehabilitation needs because they operate the most vulnerable track in the system. Today, short lines are yesterday's abandonment candidates. We have been very successful in turning these into profitable lines on a P&L basis, but we serve small customers who do not ship in volumes large enough to let us fund the enormous cost of eliminating deferred maintenance. Every time the Federal Government has given us a helping hand, either through the tax credit or through the low-interest, long-term RRIF loan program, which we appreciate very much, that help has leveraged significant additional private investment.

On Watco's Kansas and Oklahoma Railroad, for instance, the tax credit allowed us to undertake a $10 million track rehabilitation project on a 40-mile segment over which 75 percent of the railroad's traffic moved. We completed that project in 2006, and it increased speeds, improved safety and allowed us to increase traffic on the line for our customers. Without the tax credit, we would have done only 1 to 2 miles per year for the next 20 years.

Second, short line projects are truly shovel-ready projects. Short lines are constantly installing new rail ties and ballasts, the amount limited only by funding availability. If extra funds became available tomorrow, the work gang that is currently installing ties and rail between milepost A and B would be hired to keep going to milepost C. Because virtually all short line capital investment is made on existing company-owned rights-of-way, there is no regulatory, engineering, or environmental delay. The Short Line Association has identified $781 million in shovel-ready projects.

Third, most short lines do not have the in-house manpower to undertake rehabilitation projects and must hire contractors and laborers to do the work. We estimate that the $781 million in shovel-ready spending would result in the creation of 30,000 jobs during the course of the projects. These are direct jobs only, and they do not account for any of the economic activity generated by our purchases of rail ties and rock.

Fourth, at the risk of sounding boastful, short line railroads are managed by entrepreneurs who have taken considerable personal financial risk to build new small businesses, and that is a process our government should be encouraging.

My father was a unionized car repairman at the Kansas City Southern before he started our company. In 1983, he took out a $25,000 bank loan to begin our rail switching operations in DeRidder, Louisiana. That began Watco Companies. Today, Watco operates nearly 4,000 miles of short line track. We have a team of people 2,220 strong, and we move over 500,000 carloads annually. Hundreds of short lines across the country can repeat some version of the same story.

I do not begrudge the stimulus dollars the Federal Government wants to devote to public infrastructure, but I can tell you that every dollar you devote to short line railroad infrastructure will leverage significant additional private investment, and it will allow us to create strong small businesses that will be an engine for continuing job creation.

I appreciate very much the opportunity to be here, Madam Chair and Ranking Member Shuster, and I look forward to answering any questions you may have.

Ms. BROWN OF FLORIDA. Thank you.

Mr. Webb, I hope you know that Mr. Oberstar had included $100 million for the short line that, thus far, has not made it into the stimulus. But we will continue to work toward making sure that rail is included in the final product that leaves this Congress and goes to the President.

Mr. Boardman, I know that you cannot comment on Members and amendments, but there is an amendment on the floor today that takes out the $800 million—billion—million—million? Yes, it gets confusing around here with ″million″ and ″billion.″ The amendment on the floor takes this out of the bill.

So would you tell us how that would affect Amtrak? I have an amendment, you know, of $5 billion for the rail industry that included a substantial amount of more money for Amtrak. So we are waiting to hear from you. Thank you.

Mr. BOARDMAN. I will do my regular opening? Okay.

Thank you, Madam Chair and Members. I am happy to be here today and to be given this opportunity.

I have been in front of this Committee in two previous roles—first, as the commissioner of transportation for New York State and then, more recently, as the Federal Railroad Administrator, but on the day before Thanksgiving, I was given the opportunity to lead the finest group of men and women in passenger railroading in Amtrak.

Amtrak just finished in the Federal fiscal year that ended in September of 2008 with a record-setting performance. The company

had an annual ridership record of 28.7 million passengers, which was an increase of over 11 percent from 2007. Each of the three rail business lines—the Northeast Corridor, short-distance corridors, and long-distance trains—grew markedly.

Both May and July were record months for ridership. Load factors were rising in the system. In time slots and services, the existing fleet was very nearly at capacity at the end of 2008. This record gave everyone a great sense of the strong demand that existed for intercity passenger rail and the importance of the rail mode in delivering safer, green and healthier transportation for all Americans. However, in the first quarter of fiscal year 2009, beginning this past October, overall ridership has fallen below our expectations by nearly 5 percent and revenue by nearly 7 percent below what we expected.

Our Northeast Corridor business line generally, and particularly Acela Express, led our decline in both ridership and in revenue. Acela ridership was down 12 percent below expectations while revenues were off by 15 percent below the expectation. We are seeing a mixed result on our short-distance corridors. Some of those that connect with the Northeast Corridor, like New York City to Albany, are seeing drops in ridership.

These circumstances demonstrate a strong need for funding, especially operations funding, at levels in our currently authorized bill. The critical need for Amtrak to be ready to meet the mobility needs of Americans in the United States faces a future marked by higher energy costs—everyone predicts that today—and a need to improve our environment.

Congress must help Amtrak with the funding to rebuild, to replace and to renew its human capital, its passenger and locomotive fleet, and the critical infrastructure owned by both Amtrak and the freight railroads that carry 71 percent of Amtrak's train miles, or they are going to face potential failure of one or of many of the components of an efficient and critical rail network. This remarkable network provides surface connectivity for passengers and freight from coast to coast and border to border. Congressional interest must make this investment a national priority for the next decade or beyond if we are to remain a competitive and healthy economic engine in the world.

One of the core competencies of our company is the specialized knowledge of our workforce in operating a nationwide passenger railroad. The men and women of our workforce keep this railroad glued together and operating. Amtrak's workforce looks like many other industries right now—gray.

More than 60 percent of our managers have been blessed with more than 50 years of life, and more than half of our total workforce is of the same vintage. Rail workers are generally eligible to retire when they reach age 60 and accumulate 30 years of railroad employment. We face the prospect of a major change in our workforce in just a few years, and we must both invest in and change our approach to human capital planning to maintain our core competence.

Our industry, both passenger and freight, is greener than our competitors'. We have got a smaller carbon footprint, but we could make a major leap forward by extending electrification. We should

connect our rail network to the electric grid all over the Nation where it makes sense. That would go a very long way toward securing our energy future and in improving our environment. Railroads do not need to depend on liquid energy when the electric option exists and is available. This cannot be done, however, without a major policy decision by Congress.

Programs on this scale are being undertaken elsewhere—in China, for instance, where they are regarded as the vital component of a future economic development and as a major element of funding in their stimulus program. I think it is $88 billion for rail.

I think it is time for us to look for the investment opportunity that will do for us in this century what the canals and transcontinental railroads did for the 19th century and what the highways did for the 20th. This is the kind of project, the kind of moment, which demands, as the noted Chicago architect Daniel Burnham once said, that we make no little plans.

Thank you.

Ms. BROWN OF FLORIDA. Thank you.

We have a vote, and we have about 10 minutes left on that vote. So we are going to take an informal recess. It is just one vote, and then we will come right back.

Thank you very much.

[Recess.]

Ms. BROWN OF FLORIDA. Will the Committee please come to order.

Joining us now is the Chairman of the full Transportation Committee and, as I say, the transportation guru, Mr. Oberstar.

Would you like to give a few words before we get started back into the hearing?

Mr. OBERSTAR. Thank you, Madam Chair and Mr. Shuster. I thank you for the good work that you have done consistently on the rail issues, and I thank our panel for participating this morning. The issue of Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs. It is a big subject, but it is a good one on which to start this first session of the 111th Congress.

There are so many distinguished members of the panel. I want to welcome Mr. Boardman, and I want to thank him for continuing his service in rail and on Amtrak.

Mr. Kempton, if I may. Will, you have been of enormous service as we move ahead with the stimulus initiative, or the recovery bill, as it is called. In the teleconference session we had a couple of weeks ago, your testimony that the State of California, Caltrans, has been receiving eight bids for every contract offered and that they are coming in 25 percent below final design and engineering estimates has been a compelling argument in favor of our initiative and in favor of retaining the $30 billion—although, I personally think it should be $60 billion—for the surface transportation portion. It is the anchor element in our argument with the Congressional Budget Office that they are talking out of their hats in saying that the States cannot spend this money and cannot commit the first half in 90 days, $15 billion in 90 days. It is with this that I cite your specific experience, the biggest Transportation Depart-

ment in the whole country. I thank you very much for your service and for your contribution.

In that vein, if we are going to make progress on unlocking the congestion in America—in our major metropolitan areas, in our extended areas, and into the suburbs and exurbs—we have to develop far more passenger rail service than we have in America today. It is the fastest growing segment of transportation. We ought to be able to do in the United States what is done in France with the TGV, and in Spain with the Talgo, and in Germany, with the ICE, and in Italy with the MTV, and move people at speeds of 184 miles an hour plus. But to do that in this country, we are going to have to have the participation and the cooperation of the freight rail sector.

In Europe, there is comparatively very little movement of freight by rail, which is why the European Council of Ministers launched a $1.3 trillion infrastructure initiative 5 years ago, a large portion of which is to develop freight rail service and to extend their existing high-speed passenger rail to build a 2,000 mile canal across Europe to link the North Atlantic with the Black Sea—they are about halfway through with that initiative—to shift freight from highways to water service, but also to extend their freight rail.

Unlocking that complexity of freight and passenger rail service on our side of the Atlantic is a challenge that this Committee has already faced and will continue to do. We passed the first major upgrade of rail safety in 100 years in the last Congress. With the participation of our ranking Full Committee Member, Mr. Mica, and the leadership of Ms. Brown and in partnership with Mr. Shuster, we passed the first authorization of Amtrak in 12 years. Now we have to invest in Amtrak.

I have already leaned on the incoming Secretary of Transportation, that among its top three priorities the first is to deal with the impasse over the air traffic controller contract. The second is to get serious about moving Amtrak ahead. The third is to partner with us in the new authorization bill.

So I think this hearing lays the groundwork for a great deal of what lies ahead of us in this country. I want to express my appreciation to the freight rail witness at this table and to the freight rail sector for getting serious about passenger rail and partnership. We have got a long way to go, but together we will do it. And I mean we will do it in this Congress, in this Committee.

Ms. BROWN OF FLORIDA. Thank you, Mr. Chairman.

Now Mr. Kempton.

Mr. KEMPTON. Thank you, Chairwoman Brown and Ranking Member Shuster and the distinguished Members of the Committee.

I would like to begin my comments by thanking our California delegation for their work in transportation—Mrs. Napolitano, Ms. Richardson, Mr. Filner, and Mr. Miller. Their Membership on this Committee is testimony to their commitment to transportation.

Speaking of commitment to transportation, Chairman Oberstar, no one in this country has the commitment to transportation that you do. And we appreciate very much the opportunity to work with you, and we were very impressed that you reached out to the States to ask our opinion on these issues, and we stand ready to assist you whenever possible.

I am Will Kempton. I am the director of the California Department of Transportation. It is also known as Caltrans. I want to thank you for the opportunity to testify before you today on the benefits of intercity passenger and freight rail. Today, in addition to representing Caltrans, I am also representing the States for Passenger Rail Coalition on behalf of Secretary Frank Busalacchi from Wisconsin.

I wanted to talk a little bit about the success that this Committee has had, the Subcommittee and the Full Committee, in terms of the Amtrak authorization and some of the other actions that you have recently taken relative to the stimulus.

First of all, the capital matching program that you have included in H.R. 2095 is a huge benefit to the States that are spending dollars on their own to try to make sure that they have a viable intercity passenger rail service. In California, we have spent over $2 billion of our own money to upgrade our intercity passenger rail system to make sure we have a viable service. Moreover, the bill stabilizes financing for Amtrak. We are hopeful, as we move through the appropriations process, that those dollars get put out very, very quickly.

I want to congratulate the Subcommittee and the Full Committee on their work on the stimulus package. As the Chairman indicated, we have I think crafted a very, very good package.

In California, on rail alone, we think we can get $342 million of intercity passenger rail work out the door very, very quickly. Our coalition of 31 States has a total of $1.6 billion of work that is ready to go. California has seen a resurgence of interest in the use of intercity passenger rail. For the State fiscal year ending last July, more than 5.3 million passengers rode California's three intercity passenger rail corridors. That is the San Joaquin service, which runs from Bakersfield to the Bay Area; that is the Capital Corridor service that runs from the city of Auburn through Sacramento to San Jose; and that is the Pacific Surfliner service which runs from San Diego through Los Angeles up to San Luis Obispo. That is a jump of 13 percent over the prior year.

California is second only to New York in total Amtrak ridership with 20 percent of all Amtrak riders, and we have the second, third and sixth busiest passenger rail routes in the country. In fact, just a tidbit of information. Last summer, when the price of gasoline had topped out, our Pacific Surfliner service was serving more passengers than the Northeast Corridor, and I am very proud of that fact.

New York, watch out.

The benefits of passenger rail are very, very significant. Obviously, there are congestion reduction benefits. One example would be, for the service that goes between Orange County and Los Angeles, we are taking away the need for an additional lane of freeway on the Interstate 5 corridor. That is very, very significant in terms of the congestion reduction benefits of rail. Passenger rail uses 15 percent less energy per passenger mile than the airlines, and 21 percent less per passenger mile than the automobiles. It produces 60 percent fewer greenhouse gas emissions than automobiles, and that is a significant environmental savings.

We also want to recognize the importance of freight rail. As a couple of Members of our delegation have indicated, the movement of goods through the State of California has a significant impact not only in our transportation system but also on the environment in the neighborhood of the ports.

So as Mrs. Napolitano and others have indicated, we need those grade separations. We need rail improvements so we can ship more of that freight traffic off of trucks, off of the roads, onto the rails, and with the grade separations, eliminate some of those bottlenecks that Mr. Miller talked about. We want to work with you on reauthorization because we think that is going to be a very, very significant step forward in terms of attention on intercity passenger rail.

In addition to the Amtrak authorization legislation, we think that the upcoming transportation authorization is important. The Surface Transportation Policy and Revenue Commission recommended $5 billion to $6 billion a year for intercity passenger rail. AASHTO, the American Association of State Highway and Transportation Officials, has suggested $35 billion over 5 years. These are levels we have never seen before, but these are levels that are needed to support intercity passenger rail in this country.

In closing, I would like to compare our investments in intercity passenger rail with other global economic competitors. In a January 23 article, The New York Times cited a World Bank report that in 2008 the People's Republic of China invested $88 billion in its intercity rail program after spending $44 billion the previous year. This is on top of massive investments in highways and ports over the past several years. If you have been to China recently, you can see the evidence of that infrastructure investment.

The European Union continues to invest heavily in alternative forms of transportation, notably passenger rail. Spain, which is similar in population and in gross domestic product to California, has spent nearly $30 billion over the last 4 years to upgrade its rail system. That nation intends to develop a 6,200-mile, high-speed rail network by 2020 at an estimated cost of approximately $150 billion. That does not include an additional $13 billion for conventional and commuter rail.

If we are to truly be competitive in the global marketplace, we have to address our infrastructure needs. The improvement of mobility and the development of alternative systems of transportation are vital—make that essential to our national economy, to our quality of life and to our standing in the world community. Intercity passenger rail is an important part of that solution.

That concludes my remarks, Madam Chairwoman. I am happy to answer any questions.

Mrs. NAPOLITANO. [Presiding] Thank you so much, Mr. Kempton, for your testimony.

Now we move on to Mr. Tom Simpson, executive director of the Railway Supply Institute.

Mr. SIMPSON. Thank you.

The Railway Supply Institute is a trade association that represents the Railway Supply Industry. Our members provide goods and services to our Nation's freight and passenger railroads and rail rapid-transit systems. There are approximately 750 railway

supply companies in the United States. In a good year, our sales volume totals somewhere between $20 billion and $25 billion. The vast majority of these companies are small, with less than $10 million in annual sales.

Our members provide locomotives, new railroad freight cars and passenger cars. As well, they provide communication and signaling technology and modern maintenance-of-way techniques to our railroads. RSI member companies also own and provide for lease around 700,000 freight cars, or almost 50 percent of the freight cars operated in North America. We build virtually all of the railroad tank cars operating today, and we own 70 percent of the approximately 300,000 railroad tank cars in service. There is no safer way to move the hazardous commodities that our Nation deserves than by railroad tank car.

I had a boss who used to say, when railroads sneezed, we caught a cold. I think that when railroads sneeze now, we catch pneumonia.

Our economic record is decidedly mixed. As long as railroads continue to reinvest in their rights-of-way, then maintenance-of-way and communication and signaling industries do well and have reported a relatively good year in 2008. They are worried about 2009. New locomotive manufacturers have enjoyed strong orders in recent years, but deliveries in 2009 may be halved from those deliveries in 2008. Railcar leasing firms, those companies that own those 700,000 cars, have seen cars returned from lease and cars idled. One of my member companies has reported that miles of cars have been idled because of the economic downturn.

There are six major freight car manufacturers in North America that belong to RSI, and we have compiled order and delivery statistics. I just have compiled the 2008 numbers today, so this is relatively new news. Orders last year were on the magnitude of 22,000 new freight cars. Deliveries were on the magnitude of 48,000. Backlog freight cars ordered but not yet delivered were at 32,000. We have not seen orders of that magnitude since the early 2000s. Analysts I have talked to recently are predicting perhaps a 50 percent reduction in orders for 2009. We have not seen orders of the magnitude of 10,000 to 11,000 since the early 1980s. You may not be surprised to find out that not only are freight car manufacturers furloughing employees, but so are the leasing companies and so are the component suppliers.

Congress can help. I ask you to pass the stimulus legislation, not only funding for Amtrak but also funding for infrastructure for the materials moved by freight car. I urge you to pass an infrastructure tax credit providing a 25 percent tax credit for certain freight-rail capital expenditures. You should extend a short line tax credit. You should fund Amtrak at the levels contained in the Amtrak reauthorization legislation you passed last year.

Because of the uncertainty of the appropriations process, we must find an alternative funding source for intercity and high-speed passenger rail. Remember that these steps that you take are preserving and are creating jobs in my industry.

I am an optimistic person. I wondered how I was going to end this today, but I am deeply concerned and am worried about the future of the railway supply industry. Thank you.

Mrs. NAPOLITANO. Thank you so very much for your testimony, Mr. Simpson.

We will move on to Mr. Buffa, chairman of the Orange County Transportation Authority.

Welcome, sir, my neighbor.

Mr. BUFFA. Thank you, Madam Chair, Ranking Member Shuster and Chairman Oberstar. Thank you very much for giving me the opportunity to testify before you today.

My name is Peter Buffa. I am chair of the Orange County Transportation Authority, a multimodal transportation agency which was formed in 1991 with the consolidation of seven separate highway, bus and rail agencies.

I will give you a little background on Orange County. It is like nothing you have seen in the OC or have heard on the Desperate Housewives of Orange County. Do not believe any of that. It is the fifth largest county in the Nation, with over 3.2 million residents. More importantly, when combined with the other counties of southern California, we represent 25 million people, about 10 percent of the population of the United States.

Keeping those 3.5 million people in Orange County moving requires a multimodal transportation system that includes the 12th largest bus system in the Nation and the 91 express lanes, a highly successful 10-mile toll road that has become an international model for fully automated toll collection and congestion price management.

What surprises some people who visit Orange County is that, even though southern California is the land of the freeway and the car is king, we also have a vibrant regional rail network, both passenger and freight. Our commuter service is called Metrolink. It carries over 4 million rail passengers annually. The peak-hour ridership on Metrolink is so successful that without it we would have to build two more lanes on Interstate 5 from south Orange County to downtown Los Angeles to accommodate that peak-hour demand.

Our rail service runs along two major corridors. The first is the BNSF, the Burlington Northern Santa Fe corridor, which runs from the ports of Los Angeles and Long Beach—which Mrs. Napolitano is very familiar with—through Orange County and east to the San Bernardino and Riverside Counties, ultimately to the remainder of the United States.

The second major rail corridor is the passenger corridor called the LOSSAN corridor, LOSSAN being Los Angeles to San Diego. Ridership in the LOSSAN corridor has grown 500 percent since 1990, from 1.6 to 8.5 million trips today. Some 10 percent of Amtrak's trips nationally take place in the LOSSAN corridor.

A critical element in this system is the Anaheim Regional Transportation Intermodal Center, or ARTIC, which will be a multimodal gateway to Orange County and to southern California and a transfer station from the LOSSAN corridor to the planned California high-speed rail and to the planned California-to-Nevada superspeed rail system. Although private participation will be sought for this project, public funding is needed now to build the foundational transportation elements of the project.

I would like to focus the rest of my remarks on the rail capacity opportunities and challenges, because that is what they represent,

presented by these two nationally significant rail corridors. OCTA hopes that we can join with the Federal Government as a funding partner in addressing these challenges. The BNSF corridor is one of the Nation's major goods movements corridors because it serves the Port of Los Angeles-Long Beach, which is the largest port complex in the United States and the fifth largest in the world.

To give you some idea of how we define "largest," it carries 16 million cargo containers a year. That is more container traffic than the ports of Oakland, Ventura, San Diego, Portland, and Seattle combined. Just under half of the imports to the United States travel through the Port of LA-Long Beach.

If you look at the graphic on your screen right now, it illustrates the goods movement flow in southern California to local, regional and national markets. Let me hasten to add that we have nothing against goods movement. We really like it because it means business, it means jobs. There are 700,000 jobs in southern California related to goods movement, 107,000 of them in Orange County. Those jobs generate a payroll of more than $6 billion. Regionally, those ports have delivered $256 billion in international trade to the rest of the country, which we think is a wonderful thing. It also creates some challenges for us.

So we are interested both in improving the capacity of rail but also in mitigating the impacts of rail. The present levels are challenging our system, particularly in terms of the interaction of rail with roads in major arterials. Grade separations are a major, major issue to us, particularly when you think that by 2010—just 1 year away—freight train traffic will increase substantially. Orange County alone will result in road traffic delays of up to 206 minutes.

If you look at the second graphic, that will give you an idea of how many grade separation projects are underway in Orange County but are not fully funded for which we very much need assistance in funding.

So, Madam Chair, if I were to make just one point today, it is that a dedicated funding source at the Federal level, both to improve goods movements capacity and to address congestion mitigation, is badly needed. We very much thank this Committee for their leadership on this issue. There have been a number of proposals for a container bill, one by Ms. Richardson. At the State level, there was a proposal last year for a $15 per container fee, which unfortunately the Governor vetoed. To give you an idea of how critical the issue is, the ports themselves have now volunteered to impose a fee which would be turned over to the MPOs, the local Metropolitan Planning Organizations, to apply to that issue of increasing capacity and goods movement.

In summary, significant as the benefits of freight and passenger corridors are to OCTA in Orange County, the challenges they present cannot be fully addressed without the Federal Government as a strong and financially involved partner. And we hope that that will become a dedicated source of funding through the reauthorization process this year. And we very much appreciate this Subcommittee's leadership on that issue. Thank you very much, Madam Chair.

Mrs. NAPOLITANO. [Presiding] Thank you, Mr. Buffa, for your eloquent testimony. And I can attest that is a big issue, not only in

the BNSF line, but the Union Pacific line, the rail crossings, the grade separations.

Now we have Mr. James Stem, National Legislative Director for the UTU, United Transportation Union. Welcome, sir. And thank you for your continued effort to keep our employees safe.

Mr. STEM. Thank you Madam Chairman. We appreciate the opportunity to speak. We are specially appreciative of the honor that Ms. Brown bestowed upon Mr. Bruckenhaver. We thank you for the opportunity to speak.

Chairman Oberstar, Ranking Member Shuster, I first want to start my remarks by thanking this Committee for their leadership and their guidance in the creation of the Rail Safety Bill of 2008. That culminated a 10-year process for the United Transportation Union and most of rail labor. In trying to move those issues to the forefront, your leadership was much appreciate. The process of implementing the requirements of that new law have just begun. We will keep the Committee posted on the application of the provisions in the law, and we will work with you on further improvements in safety. The new law addressed many significant safety issues and there remain some areas that need attention.

We would also like to take this opportunity to offer our encouragement and support for the full funding of the Federal Railroad Administration. The new safety bill contained many mandates that will require additional resources. Our message this morning is focused on safety of the operation for rail and passenger railroad.

I also want to make sure that my remarks include our strong encouragement for inclusion of buy American provisions in all stimulus activity. The Federal Transit Administration currently has that. We encourage you to continue to support the buy American provisions.

Freight and passenger rail service in the U.S. economy have played a central role in the development of our Nation. From providing the spine for westward population settlement and commercial and industrial development in the latter half of the 19th century to transporting troops, arms, supplies during World War II, the Korean War, the Vietnam War, the Persian Gulf crisis, the rail industry formed the central core of the country's transportation system.

As we look forward, a balanced transportation policy serves our Nation's needs best. A national policy that demands the best use of our fuel resources, while providing sustainable and environmentally friendly transportation must take priority over expediency. The environmental link to national transportation policies find that railroads provide the greatest option, both freight and passenger.

Historically the rail industry has provided hundreds of thousands of middle class jobs. The passenger and freight rail industry, by its very definition, provided jobs in many rural areas all over our Nation. As we discuss ways to both stimulate our economy and also to provide middle class jobs, including rail at the core of the infrastructure piece of the recovery plan is a sound investment.

The role of Amtrak and high speed rail services in the future of transportation needs is integrally woven into our balanced and environmentally sound transportation policy. Amtrak is an essential

component of our national transportation system and must be properly funded to allow the system to grow with the demand for service. Our Nation needs redundancy and reliability in our transportation system.

The impact of the current economic crisis has been significant for railroad employees. While the current economic crisis has already taken a severe toll on railroad workers, particularly operating employees, the overall health of the industry is sound, especially among Class I railroads. Financial reports for the fourth quarter of 2008 indicate that our Class I railroads and many other railroads enjoy significant growth, both in their net profits and in the reduction of their operating ratio.

As of this writing, an average of 12 percent of our operating workforce is in furlough status. We have heard from Mr. Young this morning that that figure is expected to go up by the end of this month. The unfortunate reality of moving employees around during these furlough periods, of eliminating some employees and requiring new job functions of other employees, is an inevitable compromise in safety because of the lack of experience in existing work force and the unfamiliar surroundings. We are expecting and have already seen the first signs of an increase in personal injuries as a result of this economic crisis and the reduction of forces in our industry.

Many of these furloughed employees will be needed by mid summer in order to meet the requirements from changes on the hours of service law, which were included in the new rail safety bill. Moreover, there will be strong demand for highly trained and highly skilled railroad workers when the economy begins to turn around and consumer demand is again on the rise.

I now want to talk momentarily about a significant safety issue that also is involved in our economic recovery issue. Some railroads are demanding from their employees and the Federal Railroad Administration the authority to operate trains with only one person on the locomotive, thereby, elimination of thousands of middle class jobs that are there today, willing to compromise the safety of the public and the safety of the operation.

When the demand was first made, during national negotiations the industry provided assurances and indicated that the safety of the operation could be authorized with only one person because of a pending development in positive train control. When research revealed that system wide implementation of any PTC system was many years and many billions of dollars away, the carriers continued with their demand.

Single person operation of freight trains involves a completely different analysis of the rail safety equation and a complete reassessment of the overall safety of operations that extends far beyond consideration of this specific issue. Responsibilities of the railroad to operate safely over public crossings, to inspect the moving train at every opportunity, to open public crossings quickly when stopped, and to interact with emergency responders are issues that are not addressed by any positive train control system.

Historically, each train has been considered as a self contained operating unit that had the capability of moving safely in and out of terminals and sidings and moving on main track, utilizes a vari-

ety of train control systems and methodologies. Each train was able to set out effective cars en route to provide self inspection and repair for dragging equipment, shifted lading, hot journals, broken coupling devices.

Mrs. NAPOLITANO. Mr. Stem, would you wrap it up, sir?

Mr. STEM. Yes, ma'am.

Mrs. NAPOLITANO. Thank you.

Mr. STEM. New computer and rail transactions have attempted to skirt the Railway Labor Act in some areas. We encourage the Committee to continue to insist on the application of current laws that exist today for railroads.

And my summary comment is about rail accident investigations. The National Transportation Safety Board is charged with the responsibility of investigating transportation accidents. We encourage and know that this Committee has no authority over the internal operations of the National Transportation Safety Board. However, when bureaucratic decisions are made not to investigate fatal accidents, we cannot understand the cause of those accidents or make corrective safety actions.

I thank you for the opportunity to speak.

Mrs. NAPOLITANO. Thank you so much for your testimony, sir.

We will begin the questions, and I will start with the questions.

Mr. OBERSTAR. Madam Chairman, if I might just intercede for a moment so I can run off to another Committee function. I want to observe for Mr. Buffa reference railroad grade crossings. I would like to read, ″amounts allocated from the appropriation made herein for the elimination of existing hazards to life at railroad grade crossings, including the separation or protection of grades at crossing, reconstruction of existing railroad grade crossings and relocation of highways to eliminate grade crossings shall be apportioned.″ That is not in the current recovery bill. That was in the WPA order and the law signed by President Roosevelt in 1935. I tried to include that in the current language, but it was considered new authority.

Mr. BUFFA. Don't give up, Mr. Chairman.

Mr. OBERSTAR. Don't worry. We are not giving up.

Buy America is in every feature of our Committee's jurisdiction. It was reaffirmed in the stimulus initiative. I want you to understand that.

The two-man crew issue, Mr. Stem, that you raised, the Federal Railroad Administration has assured us that they would have to approve a decrease and they have not done so, and they will not do so without an extensive review of the matter and consideration of the recommendations of the National Transportation Safety Board.

Mr. Kempton, your comments about ridership in California are right on. America's memory, however, is very short. As soon as gas prices went down, people started shifting to those big ugly SUVs. They will be running back to the rails as soon as the OPEC folks figure out how to jack the price of oil back up to $140 a barrel. But I assure you that this Committee is going to stay on top of our Amtrak legislation. The 11 corridors, Secretary of Transportation is on full notice to continue the work begun already in the previous Congress by the previous administration, but more vigorously, to im-

plement those provisions; and we look forward to working with you on imaginative, creative financial solutions. And Mr. Boardman, will welcome that, I am quite sure.

There are many other comments. I just want to make those observations before I go off to other Committee business. Thank you.

Mrs. NAPOLITANO. Thank you, Mr. Chairman. And I certainly hope that we will also include a consideration of extension of the 90-day shovel ready project to 120 because that would give the locals the ability to be able to move on those projects. States could do it but I don't think cities would be in a position in 90. 120, yes.

Mr. OBERSTAR. My amendment will be in order on the floor some time in the course of today and I expect it to pass.

Mrs. NAPOLITANO. Thank you, sir. Thank you very much for your leadership.

Let's start off with Mr. Young. I have some questions that the Chairwoman left and I will infuse some of my own into the questions. To Mr. Young, when the economy was growing the railroads were having a difficult time making capital improvements to their infrastructure. You needed track time to do it. This was difficult given the increase in train traffic. Now that business has slowed, this is the time you should be making those investments because business is going to pick up again. It is not the time for cutting back.

What would it take for Union Pacific and the industry, as a whole, to start aggressively investing in capital expansion now? That is question number one.

Number two, and I will lead into it. A recent study found the cost of improvements needed to accommodate future freight and rail demand is estimated at $148 billion. Class I freight rail, which shares the cost is projected to be $135 billion, while the short line and regional freight railroads share is projected to be $13 billion. Prior to the economic crisis, Class I railroads anticipated they would be able to generate approximately $96 billion of their $135 billion share, leaving a balance of $39 billion or about $1.4 billion a year to be funded from other sources.

Given the state of the economy, do you believe that Class I railroads will be able to generate the $96 billion? If not, how much of the $135 billion will the Class I railroads be able to generate?

Mr. Webb, how much of the $13 billion will the short lines be able to generate?

And I will leave it to you two gentleman.

Mr. YOUNG. Congresswoman Napolitano, let's start with the first question. They are both related. While you have heard from the industry that there is some cut back in capital this year, we still have a relatively healthy capital investment program. And I will talk about Union Pacific specifically. Last year we spent $3.1 billion on new capital or on capital. Of that 3.1, about a billion is new investment. What we are looking at this year is around $2.8 billion. We have slowed down some of the investment. And you hit it right. Track time, now is the time to do it. Price of goods. You think about steel, the raw materials. This is the time to do it.

So we are going to continue our program. But there is a reality that we have to deal with in our business. This industry consumes a tremendous amount of cash. The credit agencies, Moody's, Stand-

ard and Poor's that rate our bonds, and that is our ability to go borrow in the markets, our industry is rated one notch above junk bonds. And the issue is that the huge capital investment that comes in is so substantial we have to look very carefully at our debt rating. So we are going to have a good, a healthy capital program, although I would also tell you that if things continue to deteriorate, we may have to hair cut it even more.

In response to the second question, what would it take to incent more aggressive capital, you know, we have got a proposal for an investment tax credit out on the table and I think that has, can make a real difference in terms of the financial returns and cash flow. And as a consequence, we would expend our capital investment.

Mr. WEBB. Madam Chairman, thank you for the question. And from a short lines regional railroad standpoint, that 13 billion is an absolutely impossible number, I believe, that is my opinion, without the type of assistance that the Federal Government has given to the short lines over the last 5, 4 years. With the short line tax credit that was passed in 2005, we have seen hundreds of millions of dollars of investment into the short line industry that would not have been made without that.

So I believe it is absolutely imperative that we continue programs like that. And we have several other ideas along with that. But the short line tax credit is a proven process that works.

And if I may, I would love to thank Congressman Moran because he was the guy that actually wrote the first short line tax credit bill back in 2005. And so I believe, without a doubt, you go to anybody, railroad contractors, customers, Class I partners and customers, they would say that the short line tax credit has been a huge success. But that can only take us so far. That is why, in the testimony that I gave, we have found another $780 million worth of projects that could move quickly.

And the last point I will make on that is the alternative to a lack of capital investment in the short line industry is abandonment. And from what I am hearing today, that is an alternative that would benefit no one. And so we ought to work together with you, with our customers, with our partners and make sure that we find the best solution possible to fund that $13 billion gap.

Ms. BROWN OF FLORIDA. [Presiding] Well, you know, Mr. Oberstar is still here and I wanted to mention that he included $100 billion for the short line in the bill.

Mr. OBERSTAR. 100 million, not billion.

Ms. BROWN OF FLORIDA. I get confused by those numbers, Mr. Oberstar. But $100 million in the bill for the short line. And we will continue to work to try to get some inclusion for the short lines.

I am going to let Mr. Shuster go on, but let me just say that what we need to start thinking about and one of the purpose that we had when we started this hearing was to think about the reauthorization bill and what we would like to see in that bill. And so that would be a question that I will follow up on. But now, Mr. Shuster.

Mr. SHUSTER. Thank you very much. I have a number of questions so I am going to try to package them together and if you would be brief and to the point I would appreciate that.

The first one, follow up with Mr. Webb on that. In the 100 million that the chairman proposed that didn't make it in there, you said you could move quickly to get that out there. I want to know how quickly, what does quickly mean?

And also, along the same lines, the investment tax credit, if we were to put that in the stimulus, how fast could Union Pacific move to put those projects in for creating jobs and getting things moving? So if you both could take a shot, Mr. Webb first, with the 100 million if you would.

Mr. WEBB. We believe, without a doubt, that we can do all projects; we can start all projects within 90 to 120 days, and most projects, because they are time projects that can be extended, we could actually start in less than 30 days.

Mr. YOUNG. Congressman, again in our industry I would see the same kind of relationship here. You have excess resources today in terms of people ready to go, equipment, engineering design is done. In many cases, these projects are an extension of programs that you have today that you had cut off and you would keep them going.

Mr. SHUSTER. Quickly, Mr. Webb, how many jobs do you think that would create? 100 million? Do you have any idea?

Mr. WEBB. We estimated about 30,000 jobs is what we thought is what we, direct jobs that we estimated for that investment. And one other thing, to briefly touch on a point that was made earlier, all the materials that we would use would be made in America.

Mr. SHUSTER. Mr. Kempton, the stimulus, we are debating the 90 days, the 180. I guess the chairman's going to offer to squeeze that down to obligate the funds. I have heard from states, my own in particular, that said it is very difficult, it is going to be very difficult to do that. Pennsylvania, for instance, will let about a billion dollars in bids and obligate about a billion dollars in the first 6 months and they are up to receive about 1.2 billion; half of that has to be moved forward, and they have told me and a couple of States have said it is a manpower issue.

At the Department of Transportation, we just don't have enough people to review and go through the process to do that. How does California view that and compressing the time frame are you going to be able to obligate those dollars?

Mr. KEMPTON. Well, Mr. Shuster, we think we will be able to under the chairman's proposal. I will say it is more difficult, obviously the shorter the time frame, and I think Mrs. Napolitano made a very good point when she talked about local governments not being able to utilize those funds in those short time frames. That is problematic because there is federalization issues involved and work that was not planned to be federalized in the first place. There are staffing needs at the Federal agencies, the Federal Rail Administration, Federal Transit Administration, Federal Highway Administration in terms of processing those dollars through, and there are, as you have indicated, Mr. Shuster, staffing concerns at the state levels.

We are in a unique position. Because of our bond program, we think we are going to be able to spend our share of those dollars in those shortened time frames, but I think it will be problematic for other States, as well as for some of our local partners.

Mr. SHUSTER. And I even hear you saying you are going to try. I appreciate that to be a positive, but there is a——

Mr. KEMPTON. Let me rephrase that. We will do it.

Mr. SHUSTER. I hope so. And I will be pleasantly surprised if this all goes forward as quickly as we hope it does.

Mr. Boardman, if I could ask you, on the high speed rail initiative that we put in the last Amtrak reauthorization, if you would talk a little bit about where that is and how that is moving forward.

Mr. BOARDMAN. Certainly. I know that it was about 60 days after the enactment there was a requirement for the DOT to come out and talk about it and that is exactly what happened. On December 15, I think they came out and began to talk about the concept of high speed rail. It has been a little over a month since then, and I don't think there is anything that is firmed up in terms of proposals at this point in time. But there are a lot of people right now, Congressman, that are looking at what does that really mean. And there is about a 9-month period from here on that it has been set in the law for people to really get together with a more serious proposal, so we expect that that may occur but we don't see anything real at this time.

Mr. SHUSTER. You see some action, you feel it is moving forward, though, in general?

Mr. BOARDMAN. I think most of the action for the last months or so has been on our part has been trying to get ready for the stimulus and doing all the other things in the Recovery Act at this point in time necessary to do those kinds of things. So there hasn't been a great deal of discussion on the high speed rail, but there is a potential for that.

Mr. SHUSTER. Okay. Thank you very much. Mr. Buffa, in your testimony you talked about the goods moved by rail from the ports of Long Beach and Los Angeles and the projections of increased loads. Is the situation improving there? Do we need to do more? What can the Committee do to support this?

Mr. BUFFA. Mr. Shuster, the situation certainly is not improving, and our concern is, you know, there has been something of a lessening because of the economic downturn. But this is going to come back. And no one responsible is going to predict when. But this will come back. And when we get back to some of projections that we have seen in the last year of what that freight traffic is going to become, it is a huge increase that is projected.

And again, we don't, we are not opponents of that process. We are very supportive of it. But we desperately need Federal help and a dedicated funding source for the mitigation measures for that freight traffic and to increase rail capacity on those lines that we have some control over. So it is definitely not getting better, other than whatever you might consider as something as part of the economic downturn.

But in the future, and we very much hope in the reauthorization bill, that we have your support in getting that funding source in place because we are going to need it.

When I have to explain the impact of goods movement on Southern California to someone, I invite them to come ride with me on a freeway that Mrs. Napolitano is very familiar with called the 710, the Long Beach Freeway. It is a constant 24-hour a day parade of trucks going from the ports to points east and back. And frankly, it is frightening to be on that freeway in a car because you are surrounded by tens of thousands of trucks at every turn and every time of day. So it very much needs your help.

Mr. SHUSTER. Thank you very much. I seem to have endless time here on my clock. Is that because I have been good and you are giving me more time? I have one more question——

Ms. BROWN OF FLORIDA. Okay. One more question.

Mr. SHUSTER. To Mr. Kempton on positive train control. Are you familiar with the mandate we placed?

Mr. KEMPTON. Yes.

Mr. SHUSTER. Can you tell us what is going on in California? Are you preparing to implement that? And can you give us a little update?

Mr. KEMPTON. We are. As you know, we have had a couple of serious accidents in the recent past in the Southern California area, primarily, so we are working very closely with our local partners, with Amtrak, with the private railroads to meet the mandates contained in the safety bill. And we look to have implementation underway by 2012. I would have to say that there are obviously some issues, funding being one of them, and so we are working collaboratively with those partners that I outlined. It is going to have to be literally a public/private partnership, a contribution of private dollars, along with our local partners, Amtrak and the States in terms of coming up with that system, and we are gearing up for that and coordinating with those folks.

There is also an issue of technology. Clearly, we do not want to get out ahead in California with a technology that doesn't match up well with what is being done in other parts of the country, and we are working with our private rail partners in that regard as well.

I would say it is even going so far to the point where we are loaning some of our intercity passenger rail equipment to BNSF so that they can look at the braking characteristics of our equipment as we work together to implement the system. Very important to us. We are very aware of the mandates and we intend to meet them.

Mr. SHUSTER. Thank you.

Ms. BROWN OF FLORIDA. I see Mr. Clement is with us, the former Member. Welcome. And Mr. Teague.

Mr. TEAGUE. Thank you, Madam Chairman. I am Harry Teague from New Mexico. And this is my first term and I am picking up on a lot of things here. But I had a few questions that I did want to ask. How many people can we put to work, and how many contracts can we get committed before the price starts going up and the value of the money we have appropriated starts coming down?

And then also, for Mr. Webb, is the cost for building and replacing a line on a short line, a mile of track, the same as it is on a heavy traffic line like Union Pacific, or is more reasonable? Do they have different standards that they have to meet?

And then also, all of the money that you receive in the short line rehabilitation tax credit, does that have to be private money, or can you go get State and local governments to help you with that match?

Mr. WEBB. Well, first of all, thank you, Congressman. From a short line standpoint, I will answer the last one first. We have to spend a dollar of private investment before we get anything back from the Federal Government. So it is really an accountability feature. We are not going to spend the money, we are not going to put our own dollar into it in order to get the 50 cents back if we don't believe it is a good project.

In terms of how quick we can put people to work, we can put people to work very quickly. And if we do the $780 million worth of projects that we talked about, we estimated that to be 30,000 direct jobs, many more jobs associated with that.

In terms of costs from a short line standpoint for rehabilitation, it generally costs less because our volumes are lower and we maintain our railroads to acceptable Federal Railroad Administration standards, but generally, they are much lower standards because we are not, number one, handling the same volume that our Class I partners and customers are; and number two, we are not traveling at the same speeds. And so, I hate to make any comparisons because you are really talking about two different maintenance standards. But the short line maintenance standards fits our rural America, small town America customers very well.

Mr. TEAGUE. And I understand that, and I wasn't trying to make an unfair comparison. But I mean, the speed limits and the weight limits and everything is different on the short line than they are on the cross country line, right?

Mr. WEBB. The speed limits for the most part are, for example, the majority of our 4,000 miles of track is at 25 miles an hour. I think that is vastly different for Mr. Young's railroad and every Class I railroad. But the weight limits are a major issue because our weight limits have to be the same in order for our cars to fit into the national network.

Mr. TEAGUE. Okay. Yeah. I was just wanting an explanation. I wasn't trying to create a rift between the short lines and the cross country.

Mr. WEBB. Believe you me, neither am I. They are a good customer.

Ms. BROWN OF FLORIDA. Mr. Moran.

Mr. MORAN. Thank you, Madam Chairperson.

Mr. Young, first of all, your testimony about government, embrace government policies, actually you are asking government to embrace policies that enhance the ability of freight railroads to attract private investment dollars. I also know that you are supportive, as am I, of the 25 percent tax credit. Is this a separate request? Is there something more that government policies can include that, beyond the tax credit?

Mr. YOUNG. Congressman, I think it covers the whole spectrum of areas. The investment tax credit is a piece of that, but I would also point out that there is not modal equity between highway and rail today when you look at paying a fair share, and that is a government policy that has been in place for a long time.

Now, truckers are my partners here, so I am not picking on them because we work together on a lot of projects here. But I think we want to be careful, we don't incent more business to the highway. That would be a mistake.

Environmental policies, permits. Today, it is interesting. We could build a bridge in Minnesota in, I think, about half the time. And yet, when you look at the time line today to permit a project, it has been elongated over the years. It is not unusual today that it is a minimum 2 years before you can get to construction on some of these projects.

Preemption, I think, at least I use that word, you may call it uniformity. When you are in the rail business and you operate in all these States, we can't pick up our track and move to Mexico. We have been there for many years and we have to be careful about policies that force us to operate under different rules in different States. That would be a disaster for our industry.

A simple example would be you think about emissions policies. If you have one State that has one criteria, another has a different, I mean, in the real world you would be changing locomotives at the borders. So those are the types.

And then obviously, we need to be careful on new economic regulation in this industry.

Mr. MORAN. Thank you very much. Mr. Webb, you were very complimentary of me earlier, and I appreciate that. It is your company, its leadership is one reason that I am an advocate for short line railroads because you run a railroad that takes care of customers and that is something I would like for you to explore with the Subcommittee. I am not an advocate necessarily for railroads or for short lines or for Class I carriers. I am an advocate for the people they serve. And how would increased Federal support for short line rail improvements improve the lives, the economy, the benefits that your customers enjoy?

Mr. WEBB. Well, I think that is a great question. The short line industry serves roughly 13,000 customers. And when we came to you with the idea of Federal support, we have lined up over 1,000 customers that believe railroad infrastructure investment can benefit them because it will allow the short lines, I think I have heard a lot of talk about safety, it will allow the short lines to operate more safely. It can increase transit times. Excuse me. It can increase cycle times. I will get it right. It can increase velocity, reduce transit times, reduce cycle times. And why that is important is because the short line side of the business really does feed the Class I network, and we are mainly competing against truck.

And so our customers that are out there generally have at least two options, sometimes three if they have access to the waterway. And if one of those options gets weaker, for whatever reason, then it puts the other option or mode of transportation at a distinct advantage. And so even though I couldn't say it very well, it is defi-

nitely something that the customers can benefit from because they get safer, more efficient, more timely service.

Mr. MORAN. What percentage of today's short line railroads, the rail and the bed, are in the condition that they should be to run a railroad efficiently? You talked a moment ago in response to the gentleman from New Mexico's question about short line maintenance standards. How close, I don't know what the right standard is, but are most of our lines, most of our tracks at the standard they should be, or a significant portion are not?

And then I hope that the short line tax credit as you indicated has been something that has been very helpful in meeting those kinds of standards. It expires again. It is an unending challenge, battle here to make certain that it has longevity. The fact that it will expire in 2009, what does that do to your investment decisions and your ability then to get the rest of the rail to the standards that they should be at?

Mr. WEBB. I can just tell you, from our example, that without the short line tax credit over the last 5 years, we would not have invested 50 percent of the capital that we invested, and right now we invest very similar to the rest of the industry. We will invest somewhere in the neighborhood of 12 to 15 percent, maybe 18 to 20 percent in good years and when we have the short line tax credit of our revenue. If we had not had that, then a bigger part of our network would be at slower speeds because, unfortunately, the fact of the matter is the short line system has a lot of deferred maintenance in it. And one of the biggest issues we have got facing us that we haven't addressed was what we brought to you today, the bridge issues that are out there from a short line standpoint. So I, without a doubt, believe that the short line tax credit has been a huge success. It has allowed us to get our track speeds, I would say, a number off the top of our head, our track speeds up in the neighborhood of 20 to 40 percent of our network has improved because of the short line tax credit. But there is a huge amount still left.

Mr. MORAN. Thank you, Mr. Webb for being here for your testimony, and thank you for running a good railroad. I consider you a Kansas railroad, but I know that you operate in 16 States, and I know from my constituents, grain elevators and others, that the services you provide are appreciated. Thank you, Madam Chairperson.

Ms. BROWN OF FLORIDA. Mr. Nadler.

Mr. NADLER. Thank you, Madam Chairperson, and thank you for holding this very important hearing. I have a number of questions for several of our witnesses. First, Mr. Buffa, you said, you talk about that your movement action plan has identified $50 billion in needed projects to address capacity improvements and mitigation projects on freight just in your area. And you talk about either a container fee, and then say even if this local fee can be successfully implemented, more needs to be done and should be done at the Federal level to address this issue of national significance. And certainly, it is an issue of significance in terms of the ports on the West coast as well as the East Coast. You say more should be done on the Federal level. Could you suggest what?

Mr. BUFFA. Simply because up to this point there has been no dedicated funding source at the Federal level for these types of projects.

Mr. NADLER. And you think there should be.

Mr. BUFFA. I think there should be.

Mr. NADLER. Could you suggest one?

Mr. BUFFA. Well, it is not our job to get involved in the mechanics of it. The most common that has been suggested so far is a container fee and there has been some conflict between the State and the Federal Government about who actually should be imposing a container fee.

Mr. NADLER. Not both?

Mr. BUFFA. It could be both. That is for you and the State to sort out. We think there is plenty of justification for the State because those impacts are localized. But while they are localized in our area, they are part of a national process, so certainly it could also be implemented by the Federal level, as was suggested in Ms. Richardson's bill. So it needs to be figured out. But again, as a sign of, I hate to use the word desperation, but it is a sign of the importance of when you get down to the point where the ports themselves are suggesting look, if nobody can figure this out, we will impose a fee, that is quite an indication.

Mr. NADLER. Thank you. Mr. Young, you talk about Congress should enact and fund programs that allow States to partner with freight railroads to move forward with projects that benefit everybody. Obviously, I agree with you. But first of all, I don't know why we have to tell the States that they can do this. They should be able to do it without our permission.

My real question is the following: Obviously the railroads, since the Staggers Act, and you have probably heard me say this on prior occasions, the railroads have invested an enormous amount of money in plant and equipment, and yet they have taken it out of their own internal capital and raised money on Wall Street, and yet the system is still shrinking. We have fewer miles of Class I railroad, although the need for railroad miles, for rail is greater than ever for rail freight especially, and yet we have fewer miles of Class I railroad every year and fewer miles of even Class III railroads. The system is shrinking. It is less than half the size it was after the war. We are clearly putting in far too little in capital investment in the railroads.

Now, the railroads have historically opposed a Federal role in the sense of a Federal, major Federal funding for capital investment the way we do for highways and so forth. Would you think that it might be time to consider a Federal role and not just in loans, but in grant programs in addition to what the railroads raise on their own?

Mr. YOUNG. Well, Congressman, I believe, and what I talked about in my testimony here was public/private partnerships where if the government is going to get involved it should help in the local communities in terms of maybe helping with some of the grade separations, the projects that we have in there. In terms of funding specific freight rail corridors, Union Pacific has not been in support of that over the years because of the, whatever you want to call it, strings that are attached.

Mr. NADLER. Well, for example, the I-81 corridor which goes from northern New York down to Tennessee through Virginia, Pennsylvania, is way over capacity. I-81 is way over capacity on trucks. It is going to increase incredibly. And yet you have got two not very well used old Norfolk Southern rail lines paralleling it, which, if greatly improved, for that entire carrier could take a heck of a lot of traffic and mode shift from highway to rail. And yet it would cost a heck of a lot of money to do that, probably a lot more than Norfolk Southern can afford to put into that. What should our policy be with respect to getting a major mode shift from highway to rail over a long stretch, which is clearly in the national interest to do?

Mr. YOUNG. The policy needs to incent more freight business, moving trucks off the highway, and that is a great example. You look at a specific project. We have not had many when you look at this.

Mr. NADLER. Have not had what?

Mr. YOUNG. We have not had many where it has been a specific government. I know that Norfolk Southern, I think, has had maybe one or two that look at it in the context of direct government investment in the railroad business. The benefits, as you have said, are tremendous. You can build a mile of railroad less than a mile of highway. It is probably five to 10 times the cost to build a mile of new highway. We know the energy benefits, the safety benefits that are there. Most of the programs and discussions that we have had where we have looked at this at the government level, unfortunately, in some cases, bring different requirements that, for example, expanded commuter rail on some locations that you look at.

Mr. NADLER. Well, that is a different problem and, frankly, one that if I had more time, I would go into because the last thing we want to do is burden freight railroads with commuter rail. Those are two separate problems. In fact, there are three problems. There is long haul passenger rail, Amtrak, there is commuter rail, there is freight rail, and we don't want them to get in the way of each other, frankly. And so I would never suggest that.

But it seems to me that we ought to be taking a lot of money that we are now spending on the highways and be spending them on rail instead, not just, I mean, certainly we ought to do the tax credits and those things but we ought to be having a major modal shift from highways to rail, and I don't hear an interest from you on that.

Mr. YOUNG. Well, Congressman, I guess I was maybe trying to be realistic from my perspective on what might happen on new money flowing into the rail network. And I think when you look at the needs in these communities and public/private partnerships, like the Chicago Create program, that is a $2 billion project alone. It has great benefits for the communities.

Mr. NADLER. It is a great project.

Mr. YOUNG. That are out here. If we can even partially start funding some of those projects it is pretty significant. Now, if we have enough money left over, that we can move it to a direct rail investment, I would sure like to look at that.

Mr. NADLER. Well, let me ask my last question, because my time is running over. One thing we clearly ought to be doing is what Congress was looking to do before Reagan was elected, which is

major rail electrification, especially now where energy efficiency and getting off is so much more important, and how are we ever going to fund something like that if we don't have a major Federal component with major dollars in there?

Mr. YOUNG. Well, I think our first step, again, electrification is a significant investment, as you have said. We have a long ways to go with current technology. Latest generation locomotives that are being designed today will add another substantial reduction in emissions and increased fuel efficiency. So before we jump——

Mr. NADLER. But nothing can match electrification. I don't care what you are doing with locomotive.

Mr. YOUNG. No, but if you think about trying to take a railroad and convert it to electrification, in fact, I will be honest with you, I don't think it can be done.

Mr. NADLER. It can't be done?

Mr. YOUNG. I don't believe so.

Mr. NADLER. Or it can't be done for what you consider a reasonable cost?

Mr. YOUNG. It can't be done for a reasonable cost.

Mr. NADLER. Well, definitions differ on reasonable, obviously. My time is over. Thank you very much.

Ms. BROWN OF FLORIDA. Mr. Cao.

Mr. CAO. Thank you, Madam Chairwoman. This is just a question to the panel. I want to know whether or not, does any one of you have any plans for expansion in the New Orleans metropolitan area? This is for any Members.

Mr. YOUNG. Well, Congressman, Union Pacific obviously operates through the whole Louisiana area. We have been expanding for several years in terms of our capacity. There are targeted projects really along that whole southern corridor. In fact, one of our very important routes is moving business from L.A., Long Beach, along our southern corridor through to New Orleans, where we interchange with the CSX. But there is, I don't have the specific numbers, but when you look at our railroad infrastructure, you have got to have balanced capacity throughout the infrastructure. It doesn't do any good to build capacity in Arizona without recognizing you have got to get it all the way through to another State. So I have no question in my mind that we are spending money in the State of Louisiana this year.

Mr. SIMPSON. Sir, one of my member companies, Union Tank Car, through the generosity of the State of Louisiana has opened a tank car building facility in Louisiana and not in New Orleans, but nevertheless, in Louisiana.

Mr. CAO. Thank you.

Mr. KEMPTON. Congressman, we have partnered with the Kansas City Southern and ExxonMobil to build a storage facility near Baton Rouge, Louisiana, and again, it is to help improve throughput on the main lines and take the storage function into a storage function that you need into a more efficient, be handled in a more efficient manner in the Baton Rouge area.

Mr. BOARDMAN. Congressman, Amtrak, as a part of the requirement under PRIA will be doing a study on the Sunset Limited east of New Orleans into Florida at the request of the Chair.

Mr. CAO. And for those of you who are looking at expanding your businesses in the State of Louisiana, what are some of the obstacles that the New Orleans metropolitan area presents to you all? Are there any obstacles down there?

Mr. YOUNG. Well, Congressman, in terms of the freight railroad, you are always going to have some obstacle in terms of just your ability to expand the right of way to build new railroad. Again, many of these areas are residential on both sides. You have some challenges with permitting in terms of accelerating permitting for new projects. And again, to me it is one of those, does it make economic sense? We have a very large, as you know, chemical industry that we serve down there that they are struggling right now. So I think one of the challenges you have when you look long term is what is the outlook for that industry in terms of future growth.

Mr. WEBB. With our investment, there is a time frame to get it done. It is a substantial investment. I think we have 270 days to make the investment and the State and local governmental agencies have worked with us very well to meet that time frame.

Mr. CAO. Mr. Boardman, I have a question directly to you. Do you have—what are the plans that you have for emergency evacuations during a situation of crisis like hurricanes, and what are your plans for the future?

Mr. BOARDMAN. Our plans are directly related to how we work with FEMA. For example, in the evacuation where we moved over 2,000 people in the last cycle of hurricanes, we worked those plans out directly with FEMA. And each time that we have provided assistance, the plans have changed somewhat, depending on the host communities or how people needed to be moved. But again, we are available to work with FEMA and the emergency responders in both Louisiana and the entire gulf area to make those plans.

Mr. CAO. Thank you. That is all the questions I have.

Ms. BROWN OF FLORIDA. Ms. Napolitano.

Mrs. NAPOLITANO. Thank you, Madam Chair. I would like to first address my first question to Mr. Young in regard to the stimulus. Many of the projects in my district, as you well know, are seeking stimulus for the grade separation specifically. Congress has directed States to spend the money quickly or else the projects will not be funded. My question is that grade separation projects may not get the funding because of delays caused by railroads or other rail issues that come up that allow for this to happen. What can the rail industry or specifically, Union Pacific, do to ensure that these projects are constructed quickly in order to meet the time requirements that are going to be set by Congress?

Mr. YOUNG. Congresswoman, if you get the money, I can assure you that——

Mrs. NAPOLITANO. Everybody heard it.

Mr. YOUNG. Union Pacific will not be a barrier. Now, where you can help is in the permitting process, particularly in California, that there is a lengthy permitting process that we need to accelerate. We need to approach it the same way the interstate bridge was approached in Minnesota. But we have resources. We will commit them in terms of making certain that the railroad industry is not the barrier.

Mrs. NAPOLITANO. Great. Great. That is great news. And Mr. Kempton you heard that.

Mr. KEMPTON. I did Ms. Napolitano, and I agree with Mr. Young on that point, I think it is an issue at the Federal level as well as at the State level that we need to streamline these permits. We need to obviously provide for the appropriate environmental protections, but we need to make this process work faster. And we are doing our best in California to make that happen.

Mrs. NAPOLITANO. But we need to make it and making our best leads to what? What are we doing? What have you done to ensure that you begin once this goes through, that the moment that that bill is signed, that that is going to begin working the process, that the projects are being cleared, that the permitting is being done and not waiting until it goes down and then begin the process?

Mr. KEMPTON. We have in California, Ms. Napolitano, already underway a discussion with the members of the legislature on streamlining our State permitting process. And that hopefully will be approved as part of the budget which we expect to be I am hopeful is adopted in the next several days. We have also, the governor has also talked to the Obama administration about the possibility of applying similar streamlining mechanisms to the Federal process. But Mr. Young is absolutely right. We, on an emergency basis, like on the I-35W bridge in Minnesota, what we did on the MacArthur maze and the tunnel down on I-5 in Los Angeles, in those emergency situations, that is, we have an economic emergency and we need to react accordingly.

Mrs. NAPOLITANO. Thank you. And Director Kempton, the State of California may be getting $2.8 billion in highway funds and one billion in transit and then of course some of it into intercity passenger rail. The bill gives the States the authority to disburse of these funds. How will you be prioritizing and I am asking the question of some others, is who is going to get to it? How fast are we going to get these people back to work, that money working, which is the intent of Congress?

Mr. KEMPTON. Well, if you look at the total amount that is coming to California, we use a very conservative number for the amount of jobs created per billion dollars worth of capital investment. It is 18,000 jobs. The Federal Highway Administration uses $33,000. So if you do the calculations, that means the Federal stimulus money that is coming to California will create between 72,000 and 132,000 jobs. 27 percent of those jobs will be created in the first year.

Mrs. NAPOLITANO. But where?

Mr. KEMPTON. They will be created all over the State. And it will be, in large measure, driven by projects that are ready to go. So we have been gearing up in California working with the local partners, with the regions because a big share of these dollars, as you know, goes to the regions. We have been working with all these partners to get these projects ready to go. We have begun the federalization projects where those projects have not been federalized we are gearing up with our Federal Highway Administration and other Federal agencies to make sure that process flows smoothly; and we are talking about doing a new way of doing business in California so those dollars can go through much more quickly.

Mrs. NAPOLITANO. But are you targeting any of the areas that are economically depressed?

Mr. KEMPTON. We absolutely do want to look at focusing and targeting these dollars to the extent possible. But again, for the first 90 days, depending on whether these provisions go into effect, and we have good reason to believe that they will, that those dollars will primarily be focused on delivery. The longer term, going beyond the 90-day time frame, et cetera, we will be looking to try to target that more with respect to where the jobs are needed.

Mrs. NAPOLITANO. Okay. Because we received a list from COGS, the Councils of Government, where they have outlined that. I don't know if you have received it, but I would be glad to put it in your hands.

Mr. KEMPTON. I have seen it.

Mrs. NAPOLITANO. Okay. And also, States play an important role in assisting the FRA. And last year I tried to pass this particular amendment. I agree the current Federal law should continue to prohibit States from creating regulations that burden interstate commerce. But States should be allowed to regulate railroads in order to protect against local safety hazards. Do you agree with the California Public Utilities Commission that States should be allowed to regulate railroads in areas where the Federal Government has not acted?

Mr. KEMPTON. I do. From a safety perspective, I think it is important.

Mrs. NAPOLITANO. Thank you, Madam Chair.

Ms. BROWN OF FLORIDA. Mr. Arcuri.

Mr. ARCURI. Thank you, Madam Chair. Thank you, gentlemen, all for being here. Mr. Boardman, my constituent, thank you for being here again.

Just really quickly, I think Mr. Nadler was spot on when he talked about the rail lines that run along the 81 corridor. That happens to be in my district and it is my colleague's district in Pennsylvania just south of that. Mr. Young, a question that I had, you said that it cost five times as much to produce a mile of rail line as it does a mile of road?

Mr. YOUNG. No, the other way around.

Mr. ARCURI. Oh. Five times as much for road as rail.

Mr. YOUNG. Minimum.

Mr. ARCURI. Thank you. Mr. Boardman, one question for you. And thank you for attending the meeting that we had on rail in New York not too long ago. You have seen it all. You have seen it from the small transit authority, State and now as Amtrak. Some of us have grand ideas about what we would like to see rail do. But as a practical matter, as you pointed out, some of the things are achievable. Some of them are great things to wish for but much more difficult to achieve. What steps should we take incrementally to try to get us to the point where we want to get to, and that is to eventually have maybe high speed rail if we can. But what steps should we be taking as Congressmen to try to get us to the point that we want to be in a practical way?

Mr. BOARDMAN. We actually had some discussion, Congressman, and after the meeting we had the other day, how do we relate to the caucus up in New York? What would be the best way to move

forward? In fact, I had a discussion a few minutes ago with Will, telling him that some of the California model and the way that they have done things may be applicable in New York because they don't just use rail in California and ignore all other modes. They have a very strong component in what they do in California involving bus connections.

So, for example, in upstate New York, if we were dealing with a bus connection, whether it be to Watertown or to Binghamton or wherever it would be, it would be coming out from the main spine of rail, through the center part of New York State. We also talked to staff that it probably would be useful for the caucus as well to get a tour of the line. In other words, ride one of our trains or CSX's trains to really understand what are the difficulties here, what are the crossings that we are dealing with, what is the characteristics of the line itself, which then gives you an ability to understand what it is that you could do to make real improvement. Because incrementally, if we can move from 79 miles an hour to 90 miles an hour, maybe even as far as 110—one of things that I think Rick was really talking about needs to be understood by Congress and by those who want faster speeds is, if 79 works for the freight railroad and they deliver what they need to deliver in terms of freight, as they move up, as we move up speed, there is a higher cost below the rail to maintain that railroad.

So there probably is a necessity at that point in time, if public policy decides that we are going to run at 110, to understand that difference and invest in that difference on a regular basis to ensure that we can keep that railroad at that speed, one of the difficulties we are having right now in Michigan, as Norfolk Southern is considering eliminating their use of that line in Michigan.

Mr. ARCURI. So it is not just the initial cost but it is the maintenance cost if we choose to employ that?

Mr. BOARDMAN. Yes.

Mr. BUFFA. Madam Chair, could I add a brief remark to that? In Orange County, the Orange County Transportation Authority is providing seed money—there are 34 cities in Orange County—to begin planning local feeder systems that will get their citizens to our metro link stations. That is a major problem in Southern California. The rail lines are expanding but there aren't sufficient feeder systems to get people to the station from their homes or their businesses.

So we have done a first round where we have spent a couple of million dollars, and the next round we will spend 6- to $8 million to assist all the cities that want to participate in planning how are you going to get your people in your community, business and residents to the next metro link station.

Mr. ARCURI. Mr. Buffa, are these primarily computer lines?

Mr. BUFFA. Yes.

Mr. ARCURI. Thank you, gentlemen, very much. I appreciate it.

Ms. BROWN OF FLORIDA. Mr. Brown.

Mr. BROWN OF SOUTH CAROLINA. Thank you, Madam Chair, and I know I will be brief with the bells ringing which means we have got votes before us.

Mr. Young, as part of your statement you said that the railroad industry will need to invest over $135 billion in rail capacity by the

year 2035. And I know Mr. Buffa mentioned that they are almost at capacity over in Los Angeles. But I know that y'all are aware that we are in the process, as we speak, to enlarge the Panama Canal. And I know that is going to make some freight differentials between the East Coast and the West coast. And I was just wondering if y'all are planning what the new capacity is going to be influenced by that change?

Mr. YOUNG. Congressman, I think we do look at the expansions at the canals, and it will be limited. Again, you could project out with not only what they are doing on their size, but on the size of ship that can move through the canals. It will take some of the growth off, but at the end of the day if you look particularly at the Ports of L.A. and Long Beach, they have grown at about an 8 percent rate in the last 10 years. You may cut that in half, but it is still growth.

I also believe, if you look at business moving on the highway where we want to incent more moving on freight railroads, that has nothing to do with, say, the canals; that has everything to do with what we are doing domestically here. So the challenges are very, very high here, and the costs are very significant.

Ms. BROWN OF FLORIDA. We have four more Members, and we need to finish with Mr. Brown. So we have got a vote on. I know you all have been very generous with your time.

We have two votes. Then we will come right back so we can finish up with the other Members. Thank you very much. It is only 8 minutes.

Mr. BROWN OF SOUTH CAROLINA. I would like to ask Mr. Webb a question.

Mr. Webb, I noticed you stated in your presentation that you are actually losing ridership in the Northeast Corridor, so I guess those routes are not profitable at this time.

I am sorry. I meant Mr. Boardman.

Mr. BOARDMAN. No, none of the routes have been profitable for Amtrak, and they never really have been. We have come closest in the Northeast Corridor to covering our operating costs.

What is happening in the Northeast Corridor is a result of the business, especially the financial services industry, downturn and the reduction in the price of fuel. We are seeing much less use in the Northeast Corridor right now. There is also a flattening of the connections to the Northeast Corridor.

Yet there are other areas, and I think Will Kempton said it well; in the San Joaquin, for example, we are still seeing growth in ridership. When you look at services out of Chicago, we are still seeing a growth in ridership, not as much as we sustained last year, but we are still seeing that growth.

Mr. BROWN OF SOUTH CAROLINA. I thought you said, in the Northeast Corridor you are actually losing revenue and passenger load.

Mr. BOARDMAN. Yes. As our passengers go down—and about half of our ridership is in the Northeast Corridor—our revenues drop as well.

Mr. BROWN OF SOUTH CAROLINA. Do you still have the connect route between the East Coast and the West Coast?

Mr. BOARDMAN. We have several connections between the East and the West, all emanating from Chicago. There is the northern route, which is our Empire Builder service. There is our Zephyr service. There is the Texas Eagle. Then there is the Southwest Chief.

Mr. BROWN OF SOUTH CAROLINA. Thank you.

Mr. Webb, just one quick question of you.

On the short line railroads, are you all looking at expanding the passenger service in the short lines or are you just focusing primarily on freight?

Mr. WEBB. We are focusing primarily on freight, but on a couple of our lines, we have actually been asked to take over the freight portion of a commuter line. In Austin, Texas, for example, we do that. Then out in southern California, we do that as well.

So there is a role for freight railroads and for commuter lines to play. From a short line standpoint, we think we can provide that freight service in conjunction with commuter lines where it makes sense.

Mr. BROWN OF SOUTH CAROLINA. Thank you.

Thank you, Madam Chair.

Ms. BROWN OF FLORIDA. We are in a temporary recess.

[Recess.]

Ms. BROWN OF FLORIDA. This is such a high-powered panel, and the information is so important to where we want to move the industry, so I want to thank you again.

Mr. Lipinski has a question.

Mr. LIPINSKI. Thank you, Madam Chairwoman. I thank Mr. Carney for letting me butt ahead here, and I thank the panel for sticking around.

I have to run to the floor to testify on an amendment that Mr. Nadler has, to give $3 billion more to transit in this bill. Unfortunately, Chairwoman Brown's amendment to have $5 billion for rail infrastructure was not made in order by the Rules Committee. Her amendment is certainly something that I strongly support, and I hope that we can make some changes to the bill before we are finished with it.

I wanted to very quickly respond to Mr. Stem.

Mr. Stem, you talked about Buy America. We have good, strong Buy America provisions. We have had for iron and steel and for transportation projects.

I had tried myself to get an amendment in the stimulus bill to have a strong Buy America provision for all materials and products in this bill. Unfortunately, as of now, that amendment was not accepted by the Rules Committee. We are still working on that in the stimulus bill, but that is something that is very important in that if we are going to spend all of this money, we should be spending it here in America.

Mr. Kempton and Mr. Buffa had mentioned grade separations. I was talking last week to the new Transportation Secretary, Ray LaHood from Illinois. We were talking about the problems, especially in Illinois, but also in other States across the country—certainly in California, in New York and in Ohio. There are other States that have major problems with trains that are blocking roadways and that are causing congestion. It is part of the CRE-

ATE program in Chicago, but while CREATE is under way, that part unfortunately we have not gotten moving. Well, there is one grade separation that was done, but there is more to be done.

One of the problems is that Illinois right now only receives $10 million a year from the Federal Government for funding for grade separations, and this is something that I really think that we need to change. I am very hopeful in the upcoming highway bill that we will see that change. I know that certainly there is the support from some of our witnesses here today for that.

Now, there is one thing I wanted to ask. I worked last year on that Amtrak bill with Chairwoman Brown and Ranking Member Shuster and Chairman Oberstar and Ranking Member Mica. I was very happy they were able to add language to help advance—to give grants—for Positive Train Control. Also, there is something very important in there from Amtrak in terms of putting money in there to help improve on-time performance and to get rid of some of the problem areas that Amtrak has with congestion.

I took the train a few months ago from Chicago down to Springfield—to the State capital. Unfortunately, as everyone told me, we had problems. That is the Heritage Corridor there, and that is near the top of the list that Amtrak put out of congested areas that Amtrak wants to put money into fixing. It would make a great difference for Amtrak and also for metro commuter rail.

I just want to ask Mr. Boardman if he has any information—any ideas right now—about the time frame. I want to know whether you have any information right now—and you can get back to me—on a time frame for improving efficiency there along the Heritage Corridor.

Mr. BOARDMAN. I do not have it, Mr. Lipinski, right this minute, but we will get back to you with a plan for what we are going to do there. I do not know.

Mr. LIPINSKI. Does anyone want to add anything else to the grade separation? Actually, there is money there for grade separations that the Federal Government sends to the States, but it is so small—$10 million in Illinois. $10 million is not going to get you one grade separation.

Does anyone have any comments on this?

Mr. KEMPTON. Mr. Lipinski, in California, we had the voters of our State approve a $20 billion bond issue for transportation back in November of 2006. This measure was sponsored by the governor, approved by the legislature and presented to our voters, who saw the wisdom in that measure and who approved it by a 60 percent-plus vote.

I have to say that, as we divided a piece of that money, the Trade Quarter Infrastructure Fund piece of that, there was a significant amount of attention, in large measure from our partners in southern California, to focus some of those dollars on grade separations. There was also a separate component in the package for grade separations—something on the order of $250 million, as I recall—which is not as significant an amount of money given the grade crossing needs that we have in California. But for the piece of the Trade Quarter Infrastructure Fund that went to southern California, the members of the group that decided on how those dollars should be spent—including the Orange County Transportation Au-

thority, which Mr. Buffa is representing—did, in fact, dedicate a significant portion of their dollars for those projects as well.

So we have a good pot of money. We would welcome more. It is obviously critical from an air quality perspective, critical from a congestion reduction perspective and critical to getting that modal shift that Mr. Nadler talked about accomplished as well.

Mr. BUFFA. Mr. Lipinski, as you know, it is an enormously expensive undertaking. $11 million for the State of Illinois was not going to buy you one grade separation.

As Mr. Kempton said, this is finally on the public's radar screen. It is such, kind of an arcane matter that the public has not been plugged in, but they have finally realized that it is like a three-legged stool.

It certainly makes their lives better. It makes their lives safer because of the interaction of rail lines with major arterials. It is better for the rail system. It significantly increases through-put for them. So it is a hugely important issue. It just does not have a lot of sex appeal for the public.

At least in California they have finally figured out ″my daily life, my daily commute is really affected by this issue.″ As Mr. Kempton said, they supported a substantial bond issue which was called Proposition 1B to pay for it. So, yes, it is usually expensive, but it is also hugely important to metropolitan areas across the Nation.

Mr. BOARDMAN. Mr. Lipinski, if I could just add, one of the difficulties that we have with this is that the grade crossing money generally comes out of the highway side of the world. I cannot remember the particular section of that, but it is identified for grade crossings.

Some of the difficulty that the highway folks have in regard to this is when they are losing 40,000 or 50,000 people on the highway itself in terms of their safety difficulties, when they look at the highway-rail grade crossing, it is a very low number in comparison to that. Less than 1,000 is where we are at this point in time. So that huge amount of loss on the regular highway overwhelms the grade crossing parts of this thing.

I think one of the things that really could happen in the reauthorization is for Congress, for the policy to really be understood, to get 90-mile-an-hour or 110-mile-an-hour rail service, we need the funding necessary to seal a corridor, which is some of the things that are being looked at at this point in time; and that is just a rational high speed, not a super high speed where you are going to have to totally grade separate.

So there is real need out there. Amtrak operates all over this country where we could make some improvements and could increase speeds even on existing freight track if those dollars were made available.

Mr. SIMPSON. Mr. Lipinski, the program that Mr. Boardman is talking about is the Section 130 Grade Crossing Safety Program.

In the decade of the 1990s, back in ISTEA days, $160 million a year was set aside for the Section 130 Grade Crossing Program. That is allocated to each of the States. Hawaii gets money, Puerto Rico gets money, the District of Columbia gets money, and States like Illinois that really, really need the money are part of the allocation process. We argue that when you reauthorize SAFETEA-LU

that you ought to take a look at that Section 130 Program and put some real money in that.

Mr. LIPINSKI. Thank you very much. I could not agree more.

I thank the Chairwoman, and I thank Mr. Carney.

Ms. BROWN OF FLORIDA. Mr. Carney.

Mr. CARNEY. Thank you, Madam Chair.

I think when we were leaving, Mr. Boardman and Mr. Webb, we were talking about the profitable or the close-to-profitable Amtrak lines. Where are those? It is not in the Northeast anymore, or it is still the Northeast? Is it getting worse in the Northeast?

Mr. BOARDMAN. No. There has been a decline in the Northeast since the end of the fiscal year last year. It is not a question of, I think, getting worse. What is really going to happen here is that we are going to be in the same situation again in just a few months. As the economy rebounds or as the price of energy increases, there is going to be a shifting again to the Northeast Corridor. So part of our difficulty is short term in some ways.

Part of my point was that we need to make sure that we get the operating assistance, because we talk about capital; and we are very thankful for the $800 million, and we are very thankful for the $500 million in our normal appropriation for capital for stated good repair.

But our difficulty at this point in time is, because our revenues are down and we are trying to demonstrate where that was happening and why that was happening, we are in a situation where, in order to maintain our services, we are going to need additional assistance.

Mr. CARNEY. This is for everybody. How much thought has gone into the notion of intermodal transportation connected to rail?

Mr. BOARDMAN. Well, I think connected transportation today is being talked about more and more by many folks, whether it is Will here in California or whether it is perhaps Anne Canby later when she speaks on the next panel.

Part of the need here today and part of the concept that I think even the freight railroads understand and that everybody understands is, we need to work together whether we are in the freight business or whether we are in the passenger business or whether we are in the bus business. If we are going to move people or if we are going to move freight onto the railroads, we have got to have trucking as partners on the freight side. We have got to have buses and light rail and commuters as partners.

Mr. CARNEY. I could not agree more. I am asking, how far down the road are you in this discussion with bus folks and with truckers and things like that.

Mr. BOARDMAN. I will let Will answer that. There are tremendous improvements in California, and we are making them in other places as well.

Mr. KEMPTON. We have a great partnership with the bus services in California, and I will use the San Joaquin service which, as you may recall, Mr. Carney, is the service from Bakersfield into the Bay Area.

We have a number of connecting routes that provide for service over the Tehachapis to Los Angeles, as an example, and connec-

tions to other parts of California, too. It is absolutely integral to the success of our rail system.

You also talked about intermodal activities. As Mr. Buffa spoke earlier on the ARTIC project in Anaheim, we are proposing to build and are working together to build a regional intermodal transportation center in Anaheim. That will bring high-speed rail, intercity rail, bus operations together, the Transbay Terminal in the San Francisco area, which is the granddaddy of them all perhaps, maybe next to Union Station in New York.

We are really making an effort to tie our services together where you can come in on an intercity rail service and go cross-platform to a commuter rail service, and you can have a rail-to-rail pass, a ticket structure that will allow the passenger to step off one train and get onto another so that there is an ease of interface.

These are all things to accomplish the intermodal goal that you are talking about.

Mr. BOARDMAN. If I could just add for a minute, one of the places in Pennsylvania, which you are familiar with, is with the 110-mile-an-hour service into Harrisburg. At this point in time, there is tremendous growth on that particular corridor. So many of the other corridors connected to the Northeast Corridor have had a flattening and a reduction in ridership. The Keystone Corridor has not. There are additional announcements today. I do not know exactly how the bus service out of Pittsburgh to Harrisburg is working, but it is one of the things that is attracting attention and activity by the private sector.

Mr. CARNEY. From Pittsburgh to Harrisburg?

Mr. BOARDMAN. Yes.

Mr. CARNEY. It is kind of a long bus ride.

Mr. BOARDMAN. It is, but it is a high-quality, Megabus-type service, just like is operating out of Washington, DC.

Mr. CARNEY. We do it well in Pennsylvania.

I submit you would probably increase your Northeast ridership if you would tap into the Northeast part of Pennsylvania, frankly. We have a lot of folks in my district along the Delaware River who work in New York City every day and who would love a train to get into work rather than to clog I-80.

Mr. BOARDMAN. There is a study right now going on in that area that involves Binghamton into Scranton, so we understand that.

Mr. CARNEY. Yes. We want to see that come on line as quickly as possible.

This is a larger question for all of us to ponder: How do we change the culture in this country so people want to get on a train again? I think that is the fundamental root of this whole discussion.

Mr. BUFFA. Mr. Carney, could I take a shot at that? Will and I were discussing that. Particularly in California but in the West, it is a huge problem.

We are talking about a cultural issue. I happen to be a former New Yorker. I grew up with trains. I had no desire to drive a car until I was 18, and that is only because I was leaving to go to Arizona to go to college. I would not have done it then.

Californians, in their heart of hearts, still kind of think, if you get on a train, you ain't coming back. They are scared of them.

They are not sure how they work. That is a huge cultural issue for us to deal with. So, in addition to all of the infrastructure problems we have been talking about—I mentioned earlier this go-local problem where we, as an agency, are going to spend tens of millions of dollars to encourage communities to come up with these feeder lines.

The big problem is a psychological one. Californians are married to their cars. They are very reluctant to get out of their cars. They have to be convinced that, yes, you will return home.

More important are the people who are parents, who are worried during the day about getting that call about their kids at school or, you know, that your husband has had appendicitis and he is in the hospital. They are frantic about, how can I deal with that if I begin to use public transit?

Easterners are very used to that. They know how to do that. Now, they have the infrastructure to support it.

We need to greatly expand the infrastructure. That psychological element, that cultural element, is a huge barrier that we are not close to solving in the western United States.

Mr. CARNEY. I am not sure we are close to solving it in most of the country, frankly, with the exception of New York and the Northeast. But it does, I think, get to the heart of this entire issue of passenger rail, which I think everyone in this room would agree we have to promote. We have to do more to ease congestion and to clean the environment and to be efficient in how we move folks around.

I appreciate your time. I am late for another meeting, but I really appreciate all of your insights, and I look forward to working with you closely in the coming years. Thank you.

Thank you, Madam Chair.

Ms. BROWN OF FLORIDA. Mr. Schauer.

Mr. SCHAUER. Thank you, Madam Chair. It was certainly worth the wait.

I represent the Michigan Seventh. To put it in Amtrak parlance, it includes the Wolverine line and the Blue Water line. I have worked with CN, with Norfolk Southern and with Watco to tackle a number of freight issues.

I want to talk mostly about passenger here, and I understand there is a clear relationship with, I think, an entirety of leased lines within my district. There is a lot of interest in my district in expanding passenger rail. Maybe you can help me distinguish what I think of as a traditional intercity passenger Amtrak service, which we have now. The Detroit-Chicago corridor has been designated as a high-speed rail corridor. There are a number of other commuter rail projects kind of percolating up.

I think one of the reasons that this is important to my district is that times are tough in Michigan. I have a number of smaller, urban core communities as well as smaller rural communities that I think would like to see the economic impact of being connected, for example, to Jackson, Michigan, which has a station that I think Amtrak owns and that we are trying to repair and turn into an intermodal hub.

Jackson, for example, would very much like to hook up with Ann Arbor with some kind of high-speed commuter service. So how do we do this?

I am certainly interested in the Chair's support and in Chairman Oberstar's support as to the resources that it would take to do this. I guess, to all of you: What do we need to do to make this happen in a way that helps create jobs in the short term, but helps create economic stimulus over the longer haul?

Mr. BOARDMAN. I will take a start at answering the question you have asked.

I think it has been a question that has been asked in the past, not about Michigan so much, but about other places. How do we get these things done? There is usually a different way to get it done in every community that you operate in or in every State that you operate in.

One of the things that the Federal Government and this Committee and the Senate did 2 years ago was to begin to establish a program of matching with State governments for improvements in rail. It was a small program to begin with, and we are on a continuing resolution right now, but we believe that we will have a program out of normal appropriation that will come forward again this year. It allows the States and the Federal Government to work together to make those kinds of improvements, the ones that you are really talking about.

I think what you are talking about is, there is almost a no-man's land between the transit program of commuter rail and the need or the request. Part of what I think Mr. Webb was talking about in Austin was, it is related both to the transit side, and it is also a commuter-freight kind of a connection, so it takes a relationship with either a short line or with one of the Class I's.

It a commitment from the State. The State puts forward the dollars necessary. It takes a Federal program, as you have already produced here, to make that happen. Then, if it is an Amtrak that operates this, it takes Amtrak's being involved from early on to figure out where the equipment is going to come from. How do we get the crews in place? What is the commitment to really provide that service?

Mr. Carney, who is gone now, really talked earlier about the need for connectivity so there is enough ridership here that it is a success in the end.

So it really does fit together. There is a program here. There is a way for Michigan and for the people who are involved to get the right parties at the table to make this happen.

Mr. SCHAUER. Madam Chair, I would look forward to working with you and with the Committee and with all of you to make that corridor a priority. I mean, I just saw an estimate of the time. If we can make that line between Detroit and Chicago more efficient, I think the sort of door-to-door time would be something like 3 hours and 45 minutes. It is 5 hours-plus now. I think that would have an incredible economic stimulative impact for all of the communities there.

So it is a high priority in the short run in terms of the jobs. And we can create, obviously, any new equipment; we have the capacity in Michigan in terms of plants and people. But for me, this is all

about creating jobs and helping communities become more healthy economically.

Mr. BOARDMAN. I think Michigan is a member of the Midwest Rail Coalition as well.

Mr. SCHAUER. Thank you, Madam Chair.

Ms. BROWN OF FLORIDA. Thank you.

Mr. Young, Mr. Nadler asked about providing Federal funds for freight rail. The Senate stimulus bill provides $5.5 billion to States to use on highways, bridges or freight and passenger rail.

When we look at the SAFETEA-LU reauthorization, or whatever we are going to call it, don't you think that this type of funding is needed for freight rail?

Mr. YOUNG. I think it has the potential to be a great program, and we are going to take a hard look at it in terms of how it works and how quickly it can be used. But we will see; it still needs to get out there, and I am looking forward potentially to taking advantage of it.

Ms. BROWN OF FLORIDA. I guess, if freight is competing with highways and bridges, it is going to be very difficult.

Mr. YOUNG. It will. Although I think that is the program that is set for high-impact projects that I believe—when you look at high-impact projects that include the freight, I think they will clearly be at the top of that list in terms of priorities.

Ms. BROWN OF FLORIDA. Mr. Boardman, you don't have to answer this question. I just want you to think about it.

What is it that we need to do to get passenger rail up and operating efficiently and effectively and competitively? Where do we need to be?

Mr. BOARDMAN. I will come back and meet with you on that.

Ms. BROWN OF FLORIDA. Yes, sir.

Mr. Kempton, there is an amendment that I was just talking to Mr. Shuster about that is on the floor, which is about Mr. Oberstar's amendment pertaining to 90 days, that the money has to be spent in 90 days.

Is that going to be a problem for the States to obligate this money? By its very nature, a "stimulus" means that you are going to be able to spend that money to kick-start the economy.

Mr. KEMPTON. Madam Chair, as I responded earlier, I think, in an exchange with Mr. Shuster, California as a State will meet that requirement if that is deemed to be appropriate by the Congress.

It will be difficult for some States, and it will be difficult for local governments. I think that was the point I made earlier, that some of them will have difficulty in terms of federalizing projects and in going through the steps that will be necessary to be able to spend those dollars.

I believe we are going to be ahead of the game in California because we do have a bond program that has been stalled by our State's budget problems, and we will be able to move those dollars out very, very quickly.

Again, I think there will be issues in other localities around the country.

Ms. BROWN OF FLORIDA. Mr. Stem, a question about the layoffs in the industry now:

What do you think we need to do in the stimulus to get the industry to bounce back so that we can put people back to work?

Mr. STEM. Find a way to generate freight. Find a way to generate projects on the railroads. As for those projects that were discussed here earlier and as Mr. Young and as Mr. Oberstar referred to, those people are in place. They are at home, wishing they had a job; and they are ready to go back to work tomorrow once they have funding for those projects and once they have a need for the employment.

Ms. BROWN OF FLORIDA. Now, there was one person there. I went out to see him in Orange County, and he actually had an earthquake arranged so that I could know the urgency of having that rail project out there.

Mr. BUFFA. Madam Chair, Mayor Pringle of Anaheim is quite proud of that. You have become a legend in Orange County politics because you were the Congresswoman who came to visit us and who had the bad misfortune of being on the seventh floor of the Anaheim City Hall when a 5.2 earthquake hit.

Not only that, but you were apparently the coolest head in the room. Some of my Orange County compatriots were either under the table or in a doorjamb.

Ms. BROWN OF FLORIDA. Definitely under the table.

Mr. BUFFA. You stood your ground, so you are famous in Orange County.

Ms. BROWN OF FLORIDA. We will forever bond.

I want to thank you all so very much. This has been so timely, particularly while we are dealing with this stimulus and are getting ready to start the TEA-LU process. I am hoping that everyone in this capital is listening to what you are saying, because I do think that you all are the engine that will really move this country forward.

Thank you very much for the time that you have given us today.

I want to welcome you all. Sorry that the first panel went so long, but I understand that we are on a real time frame because we are having the memorial here this afternoon, so we will get through this quickly. I would like to welcome and introduce our second panel.

We have Mr. Ed Wolfe from Wolfe Research; Mr. Lance Grenzeback of Cambridge Systematics; Ms. Anne Canby, President of the Surface Transportation Policy Project and member of the OneRail Coalition—you are going to tell us about that; I understand you all had a major announcement recently.

We have Mr. Phillip Longman, Research Director of the Next Social Contract Initiative at the New America Foundation. We have Mr. Chuck Baker, President of the National Railroad Construction and Maintenance Association. Finally, we have Mr. Leon Fenhaus, Director of Government Affairs for the Brotherhood of Maintenance of Way Employees Division of the International Brotherhood of Teamsters.

**TESTIMONY OF ED WOLFE, WOLFE RESEARCH; LANCE R. GRENZEBACK, PRINCIPAL, CAMBRIDGE SYSTEMATICS, INC.; ANNE CANBY, PRESIDENT, SURFACE TRANSPORTATION POLICY PROJECT, AND MEMBER, OneRAIL COALITION; PHILLIP LONGMAN, SCHWARTZ SENIOR FELLOW; RESEARCH DIRECTOR, NEXT SOCIAL CONTRACT INITIATIVE, NEW AMERICA FOUNDATION; CHUCK BAKER, PRESIDENT, NATIONAL RAILROAD CONSTRUCTION & MAINTENANCE ASSOCIATION; AND LEON FENHAUS, DIRECTOR OF GOVERNMENT AFFAIRS, BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES DIVISION, INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

Ms. BROWN OF FLORIDA. Let me remind the witnesses that under our Committee rules, all statements must be limited to 5 minutes, but your entire statements will appear in the record. We will also allow the entire panel to testify before the questioning begins.

I will begin with Mr. Wolfe.

Mr. WOLFE. Thank you, Madam Chairman and Ranking Member Shuster, as well as the other distinguished Members and your staffs, for the invitation to present today.

My name is Ed Wolfe. I am the Managing Member of Wolfe Research, which is the leading boutique research firm on Wall Street focused on freight transportation and the macro economy.

Our clients are the shareholders and debt holders of the public and some private railroads and other transport companies. My slides and testimony are available outside, and they also should be up on the screen.

I see they are. That is good. They are also on our Web site.

In my 13 years on Wall Street as well as my several years prior as an attorney, I have never before seen the U.S. or global financial markets and the economy deteriorate in such a broad-based manner or at such a rapid pace. These are truly unprecedented times.

The following slides show how quickly freight transportation demand has fallen off by mode and, more specifically, for the railroad-by-end-user segment. I have also added some slides on rail and truck pricing, on rail capital spending, returns and recent stock performance, as well as your estimates for rail volumes, yields, revenue, and EPS for the rails in 2009 relative to 2008.

Am I going to have to change these slides? Okay. Well, you are going to need good eyes.

Slide 1 lists several of the key reasons why rail infrastructure is critical and is becoming more so for our Nation's transportation needs. Railroads comprise only about 7 percent of total freight transportation spent in the U.S., but they have become an increasingly critical line-haul component of moving bulk commodities and consumer goods to businesses and, ultimately, to consumers throughout the U.S. and between Canada and Mexico.

This has been accelerated over the past decade with the rise of global trade and offshore Asian imports into the U.S., which lend themselves to large, less expensive, non-time-sensitive, long-haul moves on railroads rather than other modes of transportation. We estimate that rails are more than three times more fuel efficient than trucks.

With increasing highway congestion, the rails are one of the few alternatives for truck freight with meaningful potential capacity to

help decongest highways and make America more productive, safe and environmentally responsible.

Slide 2 lists some of the major multiyear U.S. capacity expansion projects currently under way by each of the major railroads. These are some of the questions that have come up already. Someone mentioned I-81. Norfolk has a project, for instance, on the Crescent Corridor, but they are listed on slide 2.

I will now turn to some thoughts on the freight macro economy generally and on Chairwoman Brown's request for an update on how railroads are faring in the current economic crisis.

Our sense is that the recent further freight downturn since Thanksgiving reflects a material inventory drawdown and extended production shutdowns around and since the holiday as freight has seemingly ground to a halt. Based on our channel checks, we expect these very weak freight trends to continue well into the first quarter of 2009; hence, our expectation for minus 5 percent GDP during both the fourth quarter 2008 and the first quarter 2009.

Beyond extended shutdowns from the Big Three auto makers, we have seen announced production curtailments from a broad array of companies and industries. We expect these shutdowns to further negatively impact already weakened freight volumes, as we have seen in December and January.

Slide 3 summarizes 13 freight data series that we track each month. As shown in the column on the right, only one of those 13 series improves sequentially in the most recent month of available data from November or December versus the prior month. The one positive trend of truck bankruptcy showing relative improvement likely reflects the recent plunge in oil prices, keeping the small truckers in the game a bit longer than normal, given how weak demand is.

Slide 4 shows the Cass Freight Index, which has plummeted recently, including a 23 percent year-over-year drop in December, the sharpest decline in the 18-year history of the index, which is now at its lowest absolute level since January 2004. This shows how bad freight is currently in December and January.

Slide 5 shows monthly year-over-year changes in freight volumes for the past 3 years for domestic truck, airfreight and rail volumes as well as West Coast ocean import and export volumes. Each of these modes of transportation fell materially in November and December from recent trends. Notably, export ocean volumes were up 20 percent on average in the first 8 months of 2008, but were down almost 20 percent year over year in November and were down over 27 percent during December. That is quite a swing.

Slide 6 breaks out the eight major rail product segments showing annual year-over-year growth for the past 6 years on the left side of the slide and data for the past eight quarters on the right side. Fourth quarter 2008 and full year 2008 total rail volumes were down 9 percent and down 4 percent respectively. This marks the worst quarter since at least 1990 and the worst full year since 1985. Note that in the fourth quarter, as was the case for full year 2008, seven of eight segments were negative year over year with only coal volumes positive. In the fourth quarter, automotive, metals, paper, and lumber volumes were the worst-performing volume segments for the rail—down 30 percent, 25 percent and 16 per-

cent—while coal volume, up three, remained the only positive segment during the fourth quarter, although it turned negative in December and remains weak thus far in January amidst the shutdown of several mines and a weaker demand generally.

Slides 7 and 8 show the 62 percent correlation between U.S. GDP and rail carload volumes and the even higher, 68 percent, historical correlation between industrial production and rail volumes.

Slide 9 tracks rail and truck pricing over the past 32 years. Since rail deregulation in 1980, the spread between truck and rail pricing has widened, in part driven by trucks being less fuel-efficient and requiring higher fuel surcharges as oil prices have risen.

Slide 10 highlights rail capital spending as a percentage of total rail revenue for each of the Class I railroads since 1995, compared to the average capital expenditures as a percentage of revenue for the Dow Jones 30 industrials.

On average, over the past 5 and 10 years, as reflected at the bottom of the table, railroads have spent 16.5 and 16.8 percent of their total revenue on capital spending. This is almost three times higher than the spend by the average Dow Jones 30 company during these periods.

Slide 11 looks at each rail's return on capital relative to the rail industry's cost of capital as published each year by the STB. While the rails' returns have, on average, improved from a low of about 6 percent in 2000 to 10.7 in 2007, they remained below the industry's cost of capital during 2007. Norfolk Southern was the only U.S. railroad to return its cost of capital in 2007. While rail returns were likely higher in 2008, they will be materially lower in 2009.

Slide 12 lists our current forecasted volume, yield, revenue, and EPS declines for the railroads in 2009. Our numbers have been coming down quickly over the past 6 months. While we think we are getting closer to a bottom, at least for 2009, we are not yet confident our estimates have bottomed.

In our current assumptions, we are assuming about a 6 percent decline in volumes, on average, for the four major U.S. rails next year despite easy comparisons of minus 4 and minus 3, on average, in the previous 2 years. In the prior 3 years from 2004 to 2006, the four U.S. railroads averaged volume growth of nearly 4 percent. These significant volume declines, along with slower real pricing gains and materially lower fuel surcharge revenue, should translate to about a 14 percent revenue decline on average in 2009. This is down from 10 percent revenue growth on average in the previous 5 years through 2008.

Combined with negative operating leverage for the high fixed-cost rail networks, we anticipate about a 16 percent drop in rail earnings per share next year down from a 27 percent earnings growth on average over the previous 5 years.

Finally, slide 13 reflects recent annual and quarterly stock performances of the rails relative to truck and airfreight and logistics stocks, as well as the S&P 500. While the rails outperformed the other transports in the market over most of the past 8 years, in 2008 during the past fourth quarter and thus far in January, the rail stocks have underperformed as prospects have become less positive, reflected by our expectations on Slide 12.

In conclusion, the rails are vital to the North American transportation network and will be increasingly important to infrastructure in order to alleviate highway congestion and to promote a more efficient and environmentally conscious transport grid. While the group has seen strong earnings and stock performance in recent years, this is the most capital-intensive industry of which we are aware.

2009 looks to be very challenging for volumes, yields and profitability, yet the group intends to minimally reduce their strong spending initiatives. Given low financial returns, if the downturn lasts beyond 2009, we would expect shareholders would demand more substantial capital plan reductions and shippers would demand some pricing rollbacks.

I thank you for your time, and I look forward to answering your questions.

Ms. BROWN OF FLORIDA. No signal? Okay. We are ready.

Mr. GRENZEBACK. Thank you.

Madam Chairman and Mr. Petri, my name is Lance Grenzeback. I am Senior Vice President with Cambridge Systematics. We provide transportation, policy planning and management consulting services. We authored the Freight-Rail Bottom Line Report for AASHTO and, more recently, the National Rail Freight Infrastructure Capacity and Investment Study for the AAR and the National Transportation Policy Commission.

Freight rail is a critical part of the freight transportation spectrum. Intermodal rail competes with trucking to move international and domestic containers. Rail carload service carries thousands of products from lumber in bulkhead flatcars to chemicals in tank cars, and unit trains haul enormous quantities of bulk commodities, including 30 percent of the Nation's grain harvest and some 65 percent of the coal used to generate electricity.

Rail productivity and cost effectiveness have improved significantly. Rail rates are about half of what they were in 1980. Freight tonnage has doubled; today, it accounts for about 30 percent of all ton-miles of freight movement and over 40 percent of the long-distance intercity ton-miles. Rail reduces the cost of maintaining public highways and bridges by keeping the equivalent of 100 million trucks and 1.5 trillion ton-miles of freight off the highways.

Rail is more than twice as energy efficient as trucking on a ton-mile basis. In a world worried about climate change, rail accounts for less than 3 percent of all U.S. transportation petroleum use and greenhouse gas emissions.

However, rail traffic has not grown significantly since 2005, in part because of growing rail system congestion. Rail traffic is now dropping. As Mr. Wolfe noted, volumes in 2008 were the fourth highest in history, but in December, rail carload traffic fell 14.2 percent, intermodal 13.7 percent. The decline continued in January, and all indications are that it will continue through the rest of the year.

In the AASHTO and the AAR studies, we reported that the economy would grow at about 2.8 percent per year, resulting in a 70 percent increase in rail tonnage between 2005 and 2035. With the economy now estimated to grow at 2.5 percent or lower over that

same period, we expect that forecast to be delayed at least 3 to 5 years.

More importantly, the recession will reduce revenue for new capacity expansion. Investment in new capacity has been increasing from about $1.1 billion in 2005 to $1.9 billion in 2007, but this performance will not be replicated in 2009 and in 2010.

Maintenance and replacement will be cut back, and investment in new capacity expansion will largely cease. We will not see investment to untangle congestion at major rail hubs, such as Chicago, or to add track or to rebuild and expand rail terminals.

As a result, when the recession eases and the demand for rail freight picks up, we will likely find ourselves with less capacity than we have today and well behind what we will need for tomorrow.

What might that look like? In 2007, we estimated that about 13 percent of the primary rail corridor miles were operating near or above capacity. This is shown in the slide in the red and yellow. We projected that without capacity expansion improvements totaling nearly $150 billion over the period, 30 percent of mileage would be operating above capacity by 2035. If we delay improvements to the freight rail system, we may find ourselves closer to this hypothetical 2035 situation than we anticipated.

Two events could and will likely accelerate the need for rail capacity. If oil prices increase again, as is likely with an economic recovery, we can expect to see freight shift from truck to rail, which will quickly absorb any available capacity. If we follow through on our promises to make much-needed improvements to our intercity passenger rail services, we will need to add capacity to many, already congested, freight lines. Five to 8 years from now, we could find ourselves out of capacity and struggling to catch up.

In closing, we have an opportunity now to prepare for the recovery and to position the freight rail industry to absorb future growth. To do this, we need to establish a national rail policy and outline the future of a national rail system. We do not need a detailed blueprint, but we do need a broad consensus on when and where we must make major improvements.

We should increase the public and private investment, as has been much discussed today, in both freight and passenger rail, but we also need to agree on how we will share the benefits, costs and risks of doing so.

We should create a mechanism, such as a national infrastructure investment bank, to finance freight and passenger rail improvements—those projects of national significance where the costs are too high for a single railroad or State to undertake, but where the improvements benefit many States and industries.

Finally, we should look to expand State and local rail programs to coordinate freight and passenger services, to build grade separations—which are going to be critically important as the volumes and speeds increase—and to mitigate the community impacts of more train traffic.

I thank you for the opportunity to appear before you today, and I would be happy to answer questions later.

Ms. CANBY. Thank you very much, Madam Chair and Representative Petri.

My name is Anne Canby. I am head of the Surface Transportation Policy Partnership and am the founding member of OneRail, a new coalition dedicated to advancing rail as a critical element of our national transportation system.

Earlier this month, 10 organizations came together to form the OneRail Coalition. Our goal is to promote the benefits of rail, both passenger and freight—which is the first time these interests have come together—as an essential element to the future of the economic growth and well-being of our Nation.

In our principles, which are attached to my statement, my OneRail colleagues and I propose and recommend to you three major areas of activity:

One, expanding and strengthening the Nation's passenger train network and ensuring capacity for both passenger and freight growth in the years ahead;

Two, enacting policies and programs that expand public and private investment in rail freight mobility;

Three, supporting a dedicated funding source for intercity passenger train expansion.

We must maximize the transportation options that enhance our mobility, achieve energy efficiency, reduce greenhouse gas emissions while boosting economic growth and improving the quality of life for all Americans.

Working separately on intercity passenger rail or freight makes no more sense than looking independently at highway corridors. As we identify critical corridors, we must create the institutional capability for all interests to work in concert to identify the optimal investment regardless of mode.

With regard to the economic recovery proposals pending, OneRail has urged the Congress to recognize rail as a full partner in the economic recovery measure; and we greatly appreciate this Committee's effort, under the leadership of Chairman Oberstar, for the $5 billion, and we share your disappointment that the figure is considerably less than that. We are, however, pleased with the Senate appropriations actions yesterday, allocating substantial amounts to rail as well as expanding eligibility for rail projects.

Our preference is that currently authorized programs for both passenger and freight, such as the rail-freight relocation, Positive Train Control, capital grants for Class II and III railroads be fully funded. In the case of Amtrak, our view is that their capital investments should be augmented with additional funding for major catch-up investments.

Our second proposal is to permit funds allocated to States and localities to be used for investments in passenger and freight transportation. Because the source of these stimulus funds will be general funds, broad eligibility should apply. Even if the stimulus funds are allocated pursuant to Title 23 provisions, the recipients should be able to invest in projects with the highest payback in terms of job creation and environmental benefit without regard to mode. We are encouraged so far by the progress in both the House and the Senate, and are ready to work with you to ensure that rail receives its full due in the final economic recovery program.

The benefits of rail have been well stated today, and I have also highlighted them in my testimony. Let me speak for a moment to

my experience when I ran the Transportation Department in Delaware.

It was troubling to me that our Federal funds could be used for commuter rail, but not for intercity rail service on the Northeast Corridor, which is a critical link for my State of Delaware. Because we were funding commuter rail, we were able to use our Federal funds. However, many States do not have this option today. Federal funds, in our view—in my view—flowing to the State DOTs should be eligible for both intercity freight and passenger improvements.

Also, while I was in Delaware, we recognized the growing truck volumes along I-95 between Washington and Delaware, and actually asked Mr. Grenzeback to help on a study to determine what rail improvements in that corridor would enable us to improve both the performance on the highway as well as on the rail network. This resulted in the Mid-Atlantic Rail Operations Study, which identified over $6 billion worth of improvements, including the Howard Street tunnel in Baltimore, supported by five State DOTs and three railroads. These projects remain basically unfunded.

In terms of the authorization that your Committee will be dealing with later this year, since we have just gotten organized, OneRail is still considering the specific proposals that we will make, but let me make a few comments from my position at STPP:

First, we need a clear national purpose and strong provisions for accountability and measurable outcomes that reflect the national interest. The new law must, in my view, incorporate all forms of surface transportation, and that means rail. We have one system that is made up of several modes. Each of them plays a very important role in the moving of both people and goods, but we have not really put this together into a systematic and integrated network. We must do so.

Finally, the Federal policy and programmatic framework that emerges from this next authorization should reshape our transportation systems to meet the goals of energy independence and a dramatic reduction in the level of greenhouse gas emissions, while assuring that we are positioned to meet both passenger and freight travel in a safe, economically and efficient way. These are not separable goals. We must meet them all. And I thank you for this opportunity to testify.

Ms. BROWN OF FLORIDA. Mr. Longman.

Mr. LONGMAN. Madam Chairman, Members of the Committee, my name is Phil Longman. Good afternoon. I am a senior fellow at the New America Foundation, which is a public policy institute here in Washington. And I am also the author of a cover story in the current issue of the Washington Monthly that addresses what is for many folks a rather novel idea, and I am grateful to have the opportunity to sketch it out for you. It is a proposal that offers stunning improvements in highway safety, maintenance and congestion costs, energy use, greenhouse gas emissions, public health, shipping costs, and plenty of economic stimulus as well. If it was fully implemented, it would get 83 percent of all long-haul trucks off the road by 2030. It would reduce carbon emissions by 39 percent and reduce energy consumption by 15 percent.

The best way to explain this project is to use a concrete example that has been alluded to several times in this hearing; that is, I-81. This is a highway that starts in northern New York, Canadian border, goes down through the Shenandoah valley into Roanoke and on into Tennessee. It is a rather obscure interstate as they go, because it doesn't connect much of any big population center.

Nonetheless, the road is being pounded to pieces by trucks. One out of every four vehicles on this road is a long-haul truck. And people in Virginia have been trying to figure out, what should we do? What can we do? Most of these trucks are not even stopping in Virginia. They are on their way to somewhere else. So the conventional idea would be, you know, add more lanes. That is what highway departments do. But it turns out that is incredibly expensive. So the next conventional wisdom thing to do is let us put tolls on their road. And that idea was floated early last year, created a political firestorm.

Thankfully, there is a better way and some progressive-minded folks in Virginia, particularly Virginia Rail Solutions advocacy group and Virginia DOT, have had the idea of, instead of taking the money—take the money that would have gone to adding lanes on I-81 and put it into rail infrastructure. There happens to be two parallel lines owned by Norfolk Southern going along the same route as 81. Norfolk Southern says they can divert 2 million trucks off the road with this infrastructure.

Now, I don't aim to tell you all the advantages that come from that, the improvements and congestion. You know, trucks kill 5,000 people a year nationally. But I do want to add that there is the opportunity here for something much broader, using that I-81 example as a beginning point.

There has been some allusions to railroad electrification. One hundred years ago there was a railroad called the Chicago, Milwaukee, St. Paul and Pacific that took 100-car freight trains over the Rockies and Cascade Mountains using electricity generated entirely by hydropower, which is abundant in the region. You think about what that is. That is zero-emissions freight transportation.

The Millennial Institute, which is best known for its work on modeling environmental scenarios, has calculated that for an investment of about $250 billion, we could, by electrifying major Class 1 mainline railroads, bring all these tremendous reductions in carbon emissions and gas use that I alluded to before.

It is work that can start right away. Importantly, too, it is work that doesn't beg any questions about what kind of energy you use. You can use wind. In fact, wind power, the most sensible use for it in many ways is for powering passenger trains, because you don't have any transmission laws; solar where it is appropriate; hydro where it is appropriate; coal; nuclear, if you want to go there. But this is an opportunity to do something truly dramatic about a whole host of problems. It is kind of like the Swiss Army knife of public policy proposals in that we just solve so many problems.

My feeling is that some of the Class 1 railroads are a bit reluctant to take this on; it sounds like pie in the sky. But I think dramatic national interests are at stake here, and it may be even appropriate to think about compelling some electrification, because

when you look into the details, there are just tremendous opportunities here.

Thank you, ma'am.

Ms. BROWN OF FLORIDA. Mr. Baker.

Mr. BAKER. Madam Chairman, Congressman Petri, and Members of the Committee, good afternoon. I am Chuck Baker, the president of the National Railroad Construction and Maintenance Association, known as the NRC. Norm Jester, who is a vice president of Herzog Contracting Corporation and a member of the board of the NRC, was scheduled to testify, but the winter weather caused his flight into D.C. to be cancelled, so I will be your witness today.

I am speaking on behalf of the NRC and RAILCET. The NRC is the trade association representing the independent railroad construction and supply industry. RAILCET is a group of 30 NRC member companies that have signed a national labor agreement with the Laborers International Union of North America and the International Union of Operating Engineers. LIUNA is supporting this testimony.

We believe that freight and passenger railroads provide important benefits to the American economy and environment. Our freight-rail system is widely regarded as the world's most efficient, and it is a major contributor to the economic competitiveness of American industry.

Railroads are three to four times more fuel efficient than trucks on a freight-ton mile basis. Passenger rail also benefits the environment, and investments into rail transit systems encourage more efficient and environmentally sound land use patterns.

Freight and passenger rail play a crucial role in removing cars and trucks from the road. A typical freight train takes over 200 18-wheelers off the road. And last year alone there were over 4 billion trips taken on rail transit systems. Without these rail systems, highway congestion would become even more intolerable.

Railroads also play a crucial role in the safety and security of our country by efficiently transporting military personnel and equipment, lessening our dependence on foreign oil, providing disaster evacuations and safely transporting hazardous materials.

Given the economic, environmental, safety and security benefits of rail, it should be a goal of public policy to shift more freight and passenger traffic to rail. To do that, additional capacity must be added to the system. The rail network is currently constrained by a lack of capacity, which causes higher prices for shippers and decreased efficiency for carriers.

An investment of $148 billion for rail infrastructure expansion over the next 28 years is required just to keep pace with economic growth and meet the forecasted demand from shippers. Freight railroads will be able to supply much of this capital through internally generated cash flow, but a significant amount will need to be funded from outside sources. The economic stimulus package being debated right now is an excellent and timely opportunity to direct funding and improvements into the rail network.

Investing in rail infrastructure is an efficient way to stimulate the domestic economy. These investments create well-paying, local construction and permanent operating jobs that cannot be outsourced, and the effect is immediate. Shovel-ready rail projects

are constructed on existing company-owned right of way and require no additional permitting or review.

Beyond the stimulus, the NRC believes the Congress should use the opportunity of the next transportation reauthorization to revamp transportation law in this country. As many of the leaders of this Committee have stated, the next reauthorization should not be incremental in nature; it should be transformational. As a basis for this transformation, we endorse the Transportation for Tomorrow framework put forward by the National Surface Transportation Policy and Revenue Study Commission.

Specifically, we recommend, in the stimulus bill, invest at least $12 billion into the rail transit system as proposed by Chairman Oberstar, and we do support the Nadler-DeFazio-Lipinski amendment being offered on this topic today.

Congress should adopt the proposed 25 percent freight-rail infrastructure capacity expansion tax credit with Davis-Bacon provisions.

Congress should extend the Short line Railroad Rehabilitation Tax Credit through 2015 and raise the credit cap from $3,500 per mile to $10,000.

Congress should appropriate at least $100 million for capital grants to Class 2 and 3 railroads, as proposed by Chairman Oberstar.

Congress should provide $1.5 billion for capital grants to Amtrak, as proposed by Chairman Oberstar.

We can also leverage additional private investment into rail by improving the RRIF loan program by setting an interest rate of 1 percent and deferring initial principal repayment by up to 6 years.

We recommend strong Federal support of public/private partnerships, such as Chicago CREATE and CSX's National Gateway.

And finally, Congress should invest $3.4 billion into high-speed and intercity passenger rail capital grants, as proposed by Chairman Oberstar and Chairwoman Brown.

In the reauthorization we do support increased investment into intercity passenger rail, with reform of the current Amtrak system.

We believe that the Alternate Passenger Rail Service Pilot Program and the High-Speed Rail Corridors program provided in last year's Passenger Rail Investment and Improvement Act is a good start towards reform, and that efforts such as this to encourage greater private participation in the intercity passenger rail network should be expanded.

Thank you.

Ms. BROWN OF FLORIDA. Mr. Fenhaus.

Mr. FENHAUS. Madam Chairman, my name is Leon Fenhaus, and I am the Director of Government Affairs for the Brotherhood of Maintenance of Way Employes/International Brotherhood of Teamsters. BMWED represents over 35,000 men and women who perform the infrastructure work on the Nation's Class 1 railroads and many regional and short line carriers as well. The BMWED is a member of the Teamsters Rail Conference, which includes the Brotherhood of Locomotive Engineers and Trainmen, representing the interests of over 40 percent of the Nation's railroad employees. Railroads have played a major role in the U.S. economy since the Baltimore & Ohio Railroad began operations in 1830.

Railroad industry employee productivity increased by 42 percent between 1997 and 2006, compared to 12 percent in trucking. Rail transportation is efficient due to a highly skilled and productive professional workforce that is vital to the U.S. economy.

No nation's economy is strong if those who toil within its industries do not receive wages and benefits sufficient for them and their families to thrive. The railroad industry provides such solid middle-class jobs. As of 2007, collective bargaining resulted in an $11.6 billion payroll for the 167,000 overwhelmingly unionized employees of the Nation's Class 1 railroads, employees with disposable income. In 2008, the medical plan will pay out $1.7 billion in benefits. This collectively bargained benefit supports the U.S. economy because railroad employees do not forego medical care and do not rely on financially strapped local and State governments for health care.

Additionally, all railroad employees in the United States participate in the Railroad Retirement System, which provides, in essence, a financially sound and solvent defined benefit retirement annuity. Given the great influx of employees to the industry during the 1970s, an entire generation of railroaders are nearing retirement age. The ability of those long-serving workers to retire with a secure pension will open up positions for younger workers, especially those workers who have become unemployed in other industries.

Investment in passenger rail is a necessary part of any coherent national energy and transportation policy. Rail passenger operations are the only intercity transportation mode that delivers passengers directly to the heart of cities.

The BMWED commends the hard work performed by this Subcommittee that resulted in the passage of the Passenger Rail Investment and Improvement Act of 2008. That commitment helps preserve existing jobs and should create new employment opportunities.

The major Class 1 railroads performed well in 2008 and remain in strong financial shape. However, it must be noted that the slowing down of the U.S. economy is being felt by the railroads as reflected in lower car loadings. Historically, freight railroads have been responsible for the investment in their infrastructures, but today there appears to be a perceptible slowing of private investment in infrastructure by the major railroads.

It is in our Nation's and the railroads' interests to continue to perform maintenance and capacity work, especially during the current economic downturn, for the inevitable rebound of the economy, but in order to accomplish this, the industry must keep all of its current workforce employed and immediately hire new employees to learn the skills and acquire the experience necessary to seamlessly transition through the imminent retirement of the baby boomers.

BMWED supports further investment in the expansion of passenger rail and new investment in freight rail, but Congress should ensure that it is not done on the cheap with unqualified workers, with contractors who lack experience and do not have overall responsibility for all rail operations.

Congress should act to ensure that owners of rail lines in the Interstate Rail System and that the persons who perform rail work,

especially work involved with the movement of people, are the professional, qualified railroad workers already employed in the industry, and that they must be subject to the Federal laws created for railroads and railroad workers.

BMWED continues to study the various proposals and suggestions for ways freight railroads can invest in improving and expanding their infrastructure. We can offer no specific proposal at this time, but we intend to continue to study the matter and hope the Subcommittee will hold additional hearings.

I thank you for the opportunity to express BMWED's issues.

Ms. BROWN OF FLORIDA. Thank you.

And thank all of the panelists.

Question for the panelists. What specific actions should the Federal Government take in the short term and the long term to increase rail capacity, reduce congestion and improve service and reliability? Let us start with Mr. Wolfe, and anyone can respond.

Mr. WOLFE. I think it is pretty clear, since deregulation in 1980, that the railroads respond best to the carrot relative to the stick. So I would say the 25 percent tax credit as a way to stimulate investment is probably the best measure that I have seen.

At the same time, you have got the issue of captive shippers and pricing, so I think that is an area that needs to be addressed as well, but not by reregulation, by stimulating through incentive. And I think that is very clear. So I think a tax credit during this period of highway reauthorization and infrastructure is something that is tied in and comprehensive, involves rail, highway and port, and looking from a Federal Government standpoint of the needs of all those, I think the railroads look very good. And yet we don't see any dollars for other than the 100 million for the short line railroads right now in the stimulus bill. I would like to see the tax credit get in there. I think that would be very important and effective. I'll leave the specifics of how to spend the funding to the railroads and policymakers

Mr. GRENZEBACK. Madam Chairman, I would suggest perhaps we focus on three areas. One would be projects of national and regional significance. The Chicago CREATE program was a good example. There are Mississippi River bridges and other projects out there which are simply too large for a single railroad or State to risk taking on at the time, whether you use grants or loans or loan credits for those. There are good examples in the TIFIA program of how that could be done.

I think there is a second tier of work that needs to be done, which is on the corridors that are going to be sharing freight and rail, passenger rail, we are going to—in most of those areas, we are going to be looking at either adding track or adding right of way. And in many areas of the country, we have done the easy work now. When we go from one- to two-track and then existing right of way, it is not a problem. When you go to a third one, you have to sort of add bridges and improve the systems considerably. That is going to be a very expensive area.

The third area is a very quiet, hidden one. The railroads do a very good job of investing in upgrading the lines, the long-haul lines between cities. But when we get into the cities, particularly in our very densely developed urban areas, we are going to have

terrible problems and a lot of expense sorting out the rerationalization of rail lines, upgrading rail terminals, sorting out truck access. We are seeing in the rail industry a tendency to consolidate long haul, move it to the outskirts of the city, and then worry about the city—let the State and the city figure out how to manage the traffic inbound. I think that is a third-tier program where Federal action and State action combined will be very, very helpful.

Ms. CANBY. Madam Chair, I would just reiterate what I said. First, broadening eligibility so that States are able to make an intelligent decision as to the best investment on intercity transport versus the highway programs that they might normally do. As a former DOT director, we didn't have that flexibility.

Secondly, ensuring that there are clear outcomes that are expected from the investment of these funds, and particularly focusing on the energy and the climate emissions issues; and as Lance suggested, using potentially the program that is in the Senate proposal now for major corridors, to take advantage of the discretion that is there. Longer term, clearly, at the State level, we have to find ways in the current safety law to have much better integration across modes and to rationalize a system that has just been piled one on top of the other without thinking about how they work together.

Mr. LONGMAN. In the short term, there are a few small projects that would make an enormous difference. CREATE is one example. Another example is just a few feet from us actually, literally. Why are there so many trucks on I-81? It is because I-95, going from Maine to Florida, is so overwhelmed with trucks that other trucks divert to get around it. The railroads only have 2 percent market share on that lane. And why is that? It is because the Virginia Avenue tunnel right over here is too narrow to let double-stack trains through, and it is because the Howard tunnel in downtown Baltimore, which is listed on the Register of Historic Places, is too old and too antiquated to let these trains through.

So, just focusing on those little projects has an enormous bang for the buck. And this is very different than with the highway projects because typically you can't do anything to increase the capacity of a highway except add new lanes. With rail you can often do that.

The other thing I would say in the slightly longer term is that many studies were done in the 1970s of rail electrification. People like Governor Milton Schapp of Pennsylvania got very involved. These studies are sitting on shelves. They are ready. We would have to update them somewhat, but it is not entirely pie-in-the-sky stuff. The business of putting up cantonary involves special skills, but it is not something that a laid-off auto worker couldn't learn in short order.

Thank you.

Mr. BAKER. I think if you are looking at short term, you obviously have to focus on the stimulus, which is the only real opportunity, you know, today. I think there is three categories. First, you have got to make sure that on the House side you guys keep the good stuff that you have already achieved in the bill. That would be the intercity passenger rail program, although we wish it was more; the Amtrak grants; and then all the transit funding.

I think then you have to look at—in the inevitable conference committee that is coming with the Senate, you have to try to take what was good about the Senate packages, especially that $5.5 billion Competitive Surface Transportation Grants program; and also the $2 billion High-Speed Rail Corridors program is excellent. And then I would love to see both the 25 percent capacity expansion tax credit and the 50 percent short line tax credit added in. I think those would both provide an excellent carrot to the railroads.

Mr. FENHAUS. As I stated earlier, we have no specific proposals at this time; however, any of the number of proposals that have been presented today, we would take a critical look at them from the standpoint of, first, what is the impact on rail labor; secondly, certainly the impact on the carriers; and finally, at a minimum, analysis of the impact to the Federal Treasury. But that would be our start point.

Ms. BROWN OF FLORIDA. The safety bill that we passed had language in there to ensure that we have qualified people to run the trains, to make sure that safety provisions are taken care of. Did you have any comments about that?

Mr. FENHAUS. No, I do not.

Ms. BROWN OF FLORIDA. Mr. Petri.

Mr. PETRI. Thank you very much. Thank you all for the testimony that you have spent.

I have lots of questions. I will only ask one or two. And I think the first was of Mr. Wolfe, and that has to do with investment in the rail industry from private sources. There, for years, there was disinvestment in the industry. More recently, I guess is it because mainly high energy prices, there has been—smart money has been moving into the rail industry, Warren Buffett and other long-term investors. Is that trend continuing? And how is anything that we do in terms of public/private partnerships or infrastructure investment at the Federal level likely to affect private support of the rail industry?

Mr. WOLFE. Thank you for the question.

We have seen what on Wall Street is referred to as a railroad renaissance, and I showed some levels where the stocks really since 2000 have outperformed the market and done very well. And there has been increased investing by some very high-profile people; as you say, Mr. Buffett. Some well-known hedge funds as well have entered into railroads, something they have never invested in before. I think it is a combination of a sense long term that the need for infrastructure, and being fuel efficient, and generally a push towards commodities and everything that moves them or touches them.

The most recent downturn has been particularly harsh for commodities and everything that moves them. And in the last quarter, as I noted, in fourth quarter and so far in January, the rail stocks have underperformed, and we have seen a lot of capital leave this space.

At some point, while the rails have grown earnings, the valuations of the railroads have really not accelerated. They are still trading at the same valuations that they traded at, the same multiples of earnings and cash flow that they traded at all the way back in the 1980s and 1990s.

What has grown has been the earnings. The railroads have done a better job through productivity, through mergers, and through some pricing recently that they haven't had. The reason investors haven't yet given them higher multiples is because the returns on capital and the asset intensity is so great. So I showed slides that show that CapEx is 17 percent of revenue, and for most industrials it is only 6 or 7.

That is a real issue longer term, and I think the only thing that is going to increase investing ultimately long term in the railroads is if we can improve those returns. In trucking, there has always been the Federal Government, through taxes and tolls and gas taxes paying for the maintenance of the highways. The railroads pay all of the maintenance of their own track and facilities. So when Jim Young was testifying that he is going to spend $2.8 billion, down from $3 billion, you know, 2 billion of that is maintenance of his way, and to spend more is going to require a carrot and some infrastructure, I think.

Interestingly, last night Canadian Pacific filed for a $500 million equity deal. What is interesting about that is after the railroads have pulled back so much, to offer equity to dilute shareholders and not offer debt is a sign that they don't feel comfortable they can find debt. So we did some math, and if they had—based on the amount of equity they issued, to be equally dilutive they would have been paying a coupon of about 14 percent on their debt, which is very high cost to do business. So I think that the credit markets and those issues are a further issue for railroads if this downturn continues as we go on.

Mr. PETRI. Thank you. I would like to explore that, but I only have a limited time. And I have a question I wonder if Ms. Canby and maybe Mr. Grenzeback would like to comment on, and that has to do with both what the Senate is working on in their economic package is a $5.5 million pot of money for infrastructure, and your testimony about possibly national infrastructure bank. You were talking about the CREATE project in Chicago and the need for—the difficulty of local people doing some of these projects.

We did not cover ourself with glory in the last transportation bill where we had projects of national significance, and it all kind of got hijacked or earmarked. Could you comment on how we can do that? If we turn it over to the Secretary, there is this big risk going down the road that it tends to be a—the Secretary's discretionary funds historically end up getting earmarked somewhere in the process or allocated by Congress, congressional people or whatever, so there doesn't seem to be a pristine way of doing this in the real world. Could you just expand a little bit about what we can do in this area, or should be doing in this area, besides just sort of laying out a broad plan, but to actually make things happen?

Ms. CANBY. Mr. Petri, let me try and give you a few thoughts on this. I would say, first, hope springs eternal that we might get it right one of these days, you know? Our sense is that if we are able to establish a clear national purpose in this law, which in our view has been somewhat absent in the past, and have also very clear outcomes that we are seeking, then it might be possible to structure a discretionary program around meeting those particular objectives with clearly a feedback loop to see whether or not it is hap-

pening. I mean, the more light we can shed on potential projects and then the outcomes, I think, helps keep within more reasonable bounds the tendency to earmark without any concern about the outcomes.

So I would say that this is the first instance where we have really had an across-all-modes opportunity to look at a range of potential investments and to pick the ones that make the most sense from a clear set of objectives, and that is what I would hope we could come out with.

The points you raise are very well taken, and history does not necessarily bode overly well for it to work, but I think we need to keep trying because I think this will spur competitive and creative thinking that may be missing now, absent having this kind of a competitive process.

Mr. GRENZEBACK. I have a colleague who keeps telling me that earmarks are really a symptom of a failed program; that earmarks are money looking for solutions that aren't coming out of a program. And I think that very broadly what in the next authorization you might attempt to achieve is to balance that by building up the programs.

If we take a look at the national freight network, including rail, the kind of problems out there that are really very big, expensive problems pop up pretty quickly. There were a number of them cited here today. What we have now done to date is to collect that into a national vision of what we have to fix and where we have to go.

We know something about the capacity of the railroads to invest. We know demand patterns, we know where the population growth is. We can pretty well estimate where our needs are and where the bottlenecks are. That needs to be elevated to the point where, when people say there is money in a program, but by the way, I would like to earmark it somewhere else, it becomes very visible and very difficult to earmark it to other needs.

You want people to say: what happened to Chicago? What happened to the east coast problems? I don't know that there is a clear and obvious answer, but I think it is the failure on the program side and a failure of the national mandate for the last years that have been the problem. We haven't had to worry about investment in rail because we have had a mandate and a consensus to invest in highways as the practical engine for economic development.

We basically filled up both the highway and the rail systems, and now we are going to have to make a series of very specific choices about where to invest to improve pieces of those systems. I think the demand will be there, the revenues will be there, but there are going to be some projects that are simply going to pop up and be very visible, and it would help to make them very visible, to target the money and set criteria—which Congress can do—and then to say we don't want to waste it. Why isn't it going to that project? It will take continual oversight by Congress to force us to behave logically.

Mr. PETRI. Thank you. Thank you all very much.

Ms. BROWN OF FLORIDA. Mr. Grenzeback, you were making great points until you started talking about earmarks. In this Committee, we call it Members' priority.

Mr. GRENZEBACK. Well, when I get them, I call them wonderful.

Ms. BROWN OF FLORIDA. We will talk about that later.

But I had a question for Ms. Canby. Given that the freight railroads are privately and profitable to some extent, Congress has been reluctant to provide funding for freight infrastructure improvement. We have always believed that they are able to help themselves and improve their infrastructure. I personally think it is a bit shortsighted, since the railroads have different priorities than the Federal Government does when it comes to rail expansion. They look at the bigger bang for the buck, and we are looking at opportunities for public benefits, reduced congestion, increased passenger rail service, et cetera.

The Committee will reauthorize the surface transportation program in Congress. As president of the Surface Transportation Policy Project, what role shall rail play in reauthorization? Should we provide funds in the bill for rail? If so, why?

And, Mr. Longman, you may want to respond to that also.

Ms. CANBY. Thank you, Madam Chair.

We definitely believe that rail should be a part of the next authorization because it is such a critical part of addressing some clear national objectives that have come to the forefront. And so the challenge is going to be to figure out how do we integrate the public and private aspects of our rail network and the public benefits that it brings in ways that can enhance the overall performance of the transportation system, both on the road side as well as on the rail side, passenger and freight, intercity as well as metro area.

And so there is a lot to sort out. And as Lance suggested, there are probably a need of some overhaul of the overall program structures as we think about this so that we can incorporate rail and have the kind of partnership that benefits both the private sectors needs and what they are able to provide as well as then having it augmented by the public sector.

But I definitely think that as we move forward, we have got to find creative ways to incorporate the public and private interests into a collective strategy, which now doesn't particularly exist. We don't have the institutional structures which we need to give some thought to, and I am hoping that this is one of the areas where OneRail can contribute and advance the conversation and the thoughts in terms of how we would move forward.

Ms. BROWN OF FLORIDA. Okay. Mr. Petri, did you have another? You could have 1 minute if you want to have a closing statement before I close.

Anyone?

Mr. LONGMAN. Well, I would just amplify, think big, big enough to capture the public's imagination. In my limited time in working this issue, I have found that what gets people's attention is trucks off the road; whether or not you believe in the global warming or all the rest, trucks off the road.

Ms. BROWN OF FLORIDA. Anyone else?

Well, in closing I want to thank the witnesses for their testimony and the Members for their questions. Again, if the Members of this Subcommittee have additional questions for the witnesses and ask a response, the hearing record will be held open for 14 days, and

Members wishing to make additional statements or to ask further questions will have the opportunity to do that.

Ms. BROWN OF FLORIDA. At 3 o'clock today we are going to have a memorial for "Mr. Brokenrail" here in this room. And on February 3rd, at 5 p.m., we are going to have a meet and greet for the new Members of the Committee to meet with our stakeholders.

With that, if there are no additional questions or comments, thank you very much for your time, and we are looking forward to moving rail forward.

[Whereupon, at 2:30 p.m., the Subcommittee was adjourned.]

**OPENING STATEMENT OF REP. STEVE COHEN**

Railroads, Pipelines and Hazardous Materials Subcommittee Hearing

"Freight and Passenger Rail: Present and Future Roles, Performance, Benefits and Needs"

January 28, 2009

This hearing today coincides with House consideration of landmark economic recovery legislation, which includes $800 million for grants to Amtrak for capital projects as well as $300 million for discretionary grants to states to help fund capital costs associated with intercity rail services, with an emphasis on developing high-speed rail services.

Freight and passenger rail is certainly important in the City of Memphis, which I represent. We have an Amtrak station as well as five Class I railroads operating through the region: Norfolk Southern, Burlington Northern Santa Fe, Canadian National, Union Pacific and CSX.

During the 110th Congress, this subcommittee laid the foundation for enactment of the Railroad Safety Enhancement Act. The law authorizes $13.06 billion over five years for passenger rail – more than $2.6 billion annually for Amtrak, intercity passenger rail, and high speed rail programs. The law also includes a feasibility study to extend the South Central High-Speed Rail Corridor from its current end point in Little Rock to Memphis.

Improvements to the South Central High Speed Rail Corridor will yield substantial improvements in mobility, transportation efficiency, environmental quality, safety and health for residents and business throughout the Mid-South. The extension would greatly benefit travelers in Memphis as well as enhance the critical role that Memphis and the greater Mid-South region play in our national transportation network.

I look forward to hearing from our witnesses today regarding the impact of the current economic crisis on the railroad industry as well as determine rail investment needs that would further economic development and overall transportation efficiency and safety in our communities.

Statement by Congressman Jerry F. Costello
Committee on Transportation and Infrastructure
Subcommittee on Railroads
Hearing on the Roles of Freight and Passenger Railroads in the US Economy
January 28, 2009

Thank you, Madame Chairwoman. I am pleased to be here today as we discuss the role of freight and passenger railroads in the US economy. I would like to welcome today's witnesses.

During these trying economic times, many of our transportation modes have been hard hit. I am Chairman of the Aviation Subcommittee and that industry has slashed jobs; cut capacity; cut service routes; and increased prices to combat increased fuel costs, decreased passengers and to preserve the solvency of the industry.

I understand that the railroad industry is also starting to experience decreased tonnage. Our current rail network spans approximately 143,000 route miles. This rail network connects businesses all over the country to move commerce efficiently and effectively.

The rail system and the rail workforce are extremely vital to ensuring a safe, efficient, and effective means of movement for both passengers and cargo.

Again, thank you Madame Chairwoman for calling today's hearing.

**Committee on Transportation and Infrastructure**
**Subcommittee on Railroads, Pipelines, and Hazardous Materials**

**"Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs"**

**January 28, 2009**
**10:00 a.m.**
**2167 Rayburn House Office Building**

**Opening Statement of Congressman Elijah E. Cummings**

Madam Chair:

I thank you for calling today's hearing to enable us to examine the present and future roles of our freight and passenger rail networks—as well as the performance, benefits and needs of these two systems.

As you know, America's railroads are essential to maintaining a robust economy and a world-class transportation network. Whether moving freight or the traveling public, it is critical that our railroads function in an effective and efficient manner.

Railroads offer businesses and citizens a safe, environmentally friendly alternative from our increasingly congested highways.

As we witness record ridership numbers from Amtrak and commuter rail services around the country, we must explore and adopt comprehensive strategies that will allow Congress to help passenger rail operators meet this new demand.

H.R. 2095, the Passenger Rail Investment and Improvement Act (P.L. 110-432), which was enacted at the end of the 110th Congress, is an excellent beginning; however, there is still much work to do to make our passenger rail network a model for the rest of the world.

We must also be sure to take the needs of our freight rail operators into consideration. Before we realized the depth of the problems plaguing our economy, we witnessed an escalation in the amount of freight shipped by rail and statistics indicated that our freight lines would soon be as congested as our highways.

In fact, some reports indicated that rail tonnage would grow some 60 percent by 2035. However, with our economy facing continuing struggles, freight volumes have declined over the past few months.

If volumes continue to decline, this will greatly reduce the amount of capital freight rail companies can invest in equipment and infrastructure improvements.

Unfortunately, there are a limited number of programs available to help freight railroads invest in capital improvements and these programs are not funded at the levels that are required. In response, some rail projects have been funded through the highway program.

We are all aware of the efforts Chairman Oberstar and Ranking Member Mica have made to obtain as much funding as possible for our railroads in H.R. 1, the American Recovery and Investment Act of 2009, and I applaud their efforts.

It is imperative that the Members of this Subcommittee continue to work with our partners in both the public and private sectors as we continue to work towards a modern, world-class train network. The benefits of these efforts will be abundant, including helping to stimulate the American economy.

I look forward to hearing the testimony of today's witnesses and any insight they may be able to offer.

Thank you and I yield back the remainder of my time.

**Congresswoman Laura Richardson**
**Statement at Transportation and Infrastructure Subcommittee on Railroads, Pipelines, and Hazardous Materials**
**Hearing on "Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs"**
**2167 Rayburn House Office Building**
**Wednesday, January 28, 2009**
**10:00 A.M.**

1/28/09

Madame Chairwoman, as a new Member of the Railroad Subcommittee, I am honored to join you, Ranking Member Shuster, and the rest of the Members of this Subcommittee. I thank you for holding this hearing on the present and future roles of freight and passenger rail.

As the Representative of the 37th District of California, I understand first-hand the importance of rail, and its deep connection to creating jobs and

strengthening our economy. In 1869, the railroad line connecting Los Angeles and San Pedro was completed, which was the same year our nation's first transcontinental railroad was completed. Today, the Alameda Corridor, which connects rail lines in downtown Los Angeles to the ports of Long Beach and Los Angeles, is an essential aspect to the goods movement.

45% of the nation's imports coming onto American soil enter the San Pedro Bay Port Complex and pass through my District. Many of these goods are transported by rail to the rest of our nation, and freight rail transports more than 40% of all intercity freight volume. Rail infrastructure is a crucial component of the goods movement and inevitably tied to our economy.

The current state of the economy is negatively affecting the railroad industry and ultimately affects our country's global competitiveness. Freight rail investments have decreased, shipment volumes have decreased, and unemployment levels have increased. Investment in rail is critical and the more than 200,000 workers employed by the U.S. railroad system must be protected.

The future of rail in our country greatly depends upon the partnership provided by the federal government. Emerging new technology such as a maglev freight system can greatly reduce congestion at the ports, and along with my colleague Representative Rohrabacher, I am interested in promoting this sector. The existing state of our passenger rail system must be

improved for its environmental, energy, and safety benefits.

I am looking forward to working with Chairwoman Brown and the other Members of this Subcommittee to implement real change to our nation's railroad structure. Our witnesses will undoubtedly shed light on the benefits and needs of freight and passenger rail, and I eagerly await their testimony.

Thank you, Madame Chairwoman.

NRC
National Railroad Construction & Maintenance Association
The Voice of the Railroad Construction Industry

RAILROAD COOPERATION AND EDUCATION TRUST
RAILCET

**Written Submission of Norm Jester**
Vice President of Herzog Contracting Corporation
Member, Board of Directors, National Railroad Construction and Maintenance Association (NRC)

**Testimony Submitted on Behalf Of:**
National Railroad Construction and Maintenance Association (NRC)
Railroad Cooperation and Education Trust (RAILCET)

**Submitted to the:**
Transportation and Infrastructure Committee of the Unites States House of Representatives
Subcommittee on Railroads, Pipelines, and Hazardous Materials

**Hearing on:**
Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs
Wednesday, January 28, 2009, 10:00am
2167 Rayburn House Office Building

**Witness:**
Norman Jester
Vice President of Herzog Contracting Corporation
Member, Board of Directors, National Railroad Construction and Maintenance Association (NRC)
1100 Park Central Blvd. South, Suite 1400
Pompano Beach, FL 33064
305.970.1661, njester@herzogcompanies.com
http://www.herzogcompanies.com

**For further information, contact:**
Chuck Baker
President of the National Railroad Construction & Maintenance Association (NRC)
500 New Jersey Ave NW, Suite 400
Washington, DC 20001
202.715.2920, cbaker@nrcma.org
http://www.nrcma.org

**NRC Overview**
The National Railroad Construction and Maintenance Association, known as the NRC, is the national trade association representing the independent railroad construction and supply industry. There are over 650 independent railroad contracting companies in the United States performing over $10 billion worth of rail infrastructure construction and maintenance work every year.

The majority of the rail contracting industry is unionized and over 30 of the NRC's most active members have signed a national labor agreement with the Laborers International Union of North America (LIUNA) and the International Union of Operating Engineers (IUOE), forming a joint group known as the Railroad Cooperation and Education Trust (RAILCET). **This testimony is presented as a joint effort of the NRC and RAILCET, with the support of LIUNA.**

NRC members perform every type of rail infrastructure work imaginable - from design and engineering to basic construction and maintenance to highly specialized and custom jobs, including Design, Build, Operate and Maintain (DBOM) projects which in some cases involve Public Private Partnerships (PPPs). Work includes installing new rail, rail welding, rail grinding and surfacing, ballast distribution, tie insertion and removal, grade crossings, signal systems, switches, turnouts, re-railments, bridge maintenance, track design, and track inspection.

NRC members provide service to every type of track owner, including Class 1 railroads, short line and regional railroads, industrial track owners, the United States military, port facilities and terminals, and rail transit agencies operating light rail systems, street cars, subways, metro systems, and commuter rail systems.

In addition, some NRC member companies operate commuter railroads and intercity passenger trains on a contract basis, including such services as Trinity Railway Express in Dallas, New Mexico's RailRunner, the Altamont Commuter Express from San Jose to Stockton, CA, and the Coaster from San Diego to Oceanside, CA.

**Benefits of Rail**
The improvement of the rail freight industry since de-regulation by the Staggers Act in 1980 and the growth in rail transit have provided tremendous benefits to America. Our rail freight system is widely regarded as the **world's most efficient**, and is a major contributor to the economic competitiveness of American industry. The railroad industry employs well over a quarter million people, pays billions of dollars in taxes, efficiently serves tens of thousands of shippers, and is one of the true economic success stories of the last 25 years.

Moreover, moving freight and people by rail is **environmentally friendly**. Railroads are three to four times more fuel efficient than trucks on a freight-ton mile basis. A railroad can move one ton of freight from here in Washington DC to Boston on one gallon of diesel fuel. Moving freight by rail, as compared to trucks or even water barges, dramatically reduces greenhouse gas emissions and cuts fuel consumption. Steel wheel on steel rail is simply the most efficient way available to move freight in this country.

Moving people by rail transit on public transportation systems has an equally dramatic effect. By taking existing public rail transportation instead of driving a car, a single person saves 4,800 pounds of carbon dioxide emissions per year. Commuting by rail transit to work provides greater benefit to the environment than adjusting the thermostat in your home, installing energy efficient light bulbs, and buying Energy Star appliances combined.

Investments into rail transit systems also have the benefit of encouraging more efficient and environmentally sound land-use patterns and facilitating high-density economic development focused around rail transit stations.

Taken together, freight rail and passenger rail play a crucial role in removing cars and trucks from the road and **decongesting our crowded highway system**, which is already unacceptably saturated – the Texas Transportation Institute tells us that motorists in the largest urban areas in the country are spending 54 hours in traffic delays every year. That is more than a full working week each year of completely unproductive time spent sitting in traffic. TTI also estimates that traffic congestion cost our economy $78 billion last year. A typical freight train takes over 200 18-wheelers off the road, eliminating close to 100 million truck trips last year. Last year alone, there were over 4 billion trips taken on rail transit systems. Without these rail systems, highway congestion would become intolerable and result in gridlock across much of America. With increased investment into these rail systems, highway congestion can be significantly reduced and the pressure and expense of building new highways can be relieved.

Railroads also play a crucial role in the **safety and security** of our country by:

- efficiently transporting military personnel and equipment;
- lessening our dependence on foreign oil;
- providing disaster evacuation and recovery assistance during catastrophes (railroads are often the most resilient form of transportation); and
- safely transporting the vast majority of hazardous materials in the country

**Capacity**

Given the economic, environmental, safety, and security benefits of freight and passenger rail, it should be a goal of **public policy to shift more freight and passenger traffic to rail**. To do that, the current rail network must be maintained properly and made more efficient, and additional capacity must be added to the system.

Even taking into account the recent economic weakness, the **rail network is constrained by insufficient capacity**, and it will undoubtedly get worse unless we start prioritizing the issue and fixing the problem as soon as possible. Commissioners on the National Surface Transportation Policy and Revenue Study Commission believe that freight volumes will be 70% higher by 2020 than they were in 1998. According to AASHTO, the organization of State DOTs, tons of freight shipped into the U.S. will rise from 16 billion in 2007 to 31 billion in 2035. A lack of capacity causes higher prices for shippers, decreased efficiency for carriers, and the loss of the benefits that rail transportation can provide for our country.

The major recent study by Cambridge Systematics estimates that, using today's dollars, an investment of $148 billion for rail infrastructure expansion over the next 28 years is required to keep pace with economic growth and meet the U.S. DOT's forecasted demand for rail freight. And this does not take into account the desired shift in market share to rail that would provide further benefits to the country. Of this $148 billion amount, the Class 1 freight railroads' share is $135 billion and the short line and regional freight railroads' share is $13 billion.

The Class 1 railroads anticipate that they will be able to generate approximately $96 billion of their $135 billion share through internally generated cash flow. This would leave a balance for the Class 1 freight railroads of $39 billion, or about $1.4 billion per year to be funded from outside sources, simply to maintain their current share of the freight market. The amount of funding required is much higher if we aim for our goal of expanding freight rail market share.

This problem, of more funding being required than the private rail system can generate on its own, is precisely the issue this Committee will have to grapple with during the next transportation re-authorization legislation. The short line and regional railroads face the same issue as the Class 1s, and rail transit systems throughout the country are also seeing demand for their services far exceeding funding resources that are currently available.

So, it seems clear that freight and passenger rail transportation is highly beneficial to America. And it is equally clear that the current rail system is lacking in capacity and needs an infusion of new investment to meet demand in the future. **The rail system is an integral component of the nation's intermodal transportation network, but it can and must do more.** And I think we would all agree that the current transportation legislation framework is not organized in a way that makes it easy for Congress to direct increased funding to the rail system.

**Rail Infrastructure Investments as Economic Stimulus**

The timing is right! The economic stimulus package being debated right now is an excellent opportunity to direct some immediate funding and improvements into the rail network. Investing in rail infrastructure is an efficient and cost effective way to stimulate the domestic economy. These investments create well-paying local construction and permanent operating jobs that **cannot be outsourced**. The supply industry that supports the rail industry is almost entirely based in the U.S. – everything from the railroad ties to the steel track to the heavy earth moving equipment required for rail construction is produced domestically and investments into rail infrastructure will create jobs in these sectors too.

Shovel-ready rail projects are generally constructed on existing company owned right-of-way, and thus require no additional local permitting or environmental review. These projects will not be delayed by regulations and the **stimulus effect will begin immediately**. Tax credits and RRIF loan interest rate reductions can also leverage substantial additional private investment into rail infrastructure.

**Legislative and Policy Proposals**

The NRC believes that Congress should use the opportunity of the next transportation re-authorization legislation to completely revamp transportation law in this country. As many of the leaders of this Committee believe and have stated publicly, the next transportation re-authorization legislation should not be incremental in nature – it should be **transformational.**

**Transportation for Tomorrow**
As a basis for this transformation, we endorse the Transportation for Tomorrow framework put forward by the **National Surface Transportation Policy and Revenue Study Commission.**

**Specifically, we support:**

- In the stimulus bill, invest at least $12 billion into **the rail transit system**, as proposed by Chairman Oberstar, including $6b for Transit Capital Assistance (as proposed by the House Appropriations Committee), $3.5b for Fixed Guideway Infrastructure Investment (up from proposed $2b), and $2.5b for Capital Investment Grants/New Starts Funding (up from proposed $1b)
    - o In the SAFETEA-LU Reauthorization, **grow the current federal transit program in size, while maintaining the overall structure and funding guarantee system.** This system has been very successful and simply needs to be bigger to meet rail transit demand. Transit projects would also benefit from expedited review and project delivery reforms, which would help limit their high cost.
        - I. The simplest and most efficient way to grow the Highway Trust Fund (which should be renamed the Surface Transportation Trust Fund) that the transit program is funded out of is to **increase the gas tax**, and the NRC supports this method. We reject the notion that the political will for a gas tax increase does not exist. We believe that the American public will support a gas tax increase if it believes the additional funding will be invested efficiently into useful transportation infrastructure.

- The adoption of the proposed Freight Rail Infrastructure Capacity Expansion Act (H.R. 272) with Davis-Bacon provisions, which provides a **25% tax credit for rail infrastructure investments that would expand capacity**. This credit has been introduced by Representative Kendrick Meek (D-FL).

- Extend the **Short Line Railroad Rehabilitation Tax Credit**, which provides a 50% tax credit for railroad rehabilitation spending to preserve the viability of short line and regional railroads as feeder lines for the national rail network, through 2015 (expires December 31, 2009) and raise the credit cap from $3,500 per track mile owned to $10,000 per mile

- Appropriate at least $100 million over two years for **capital grants for Class II and III railroads** through a DOT competitive grant program as authorized by 49 U.S.C. 22301, as amended by section 1112 of the Energy Independence and Security Act of 2007 (P.L. 110-140) and proposed by Chairman Oberstar in his "Proposal To Rebuild America By Investing In Transportation And Environmental Infrastructure"

- Of all the potential stimulus spending proposals that we are aware of, we believe that grants to short line railroads would be spent the quickest and most efficiently. Most of the 550 short line railroads in America have additional infrastructure maintenance and improvement work that they could literally begin tomorrow if the funding became available, and railroad contractors are ready and available to perform this work.

- Leverage additional private investment by improving the **Railroad Rehabilitation and Improvement Financing (RRIF) loan program** by setting an interest rate of **1%** on all qualified rail infrastructure investment projects and deferring initial principal repayment by 6 years
  - Innovative financial tools and programs such as **TIFIA** are already working well, and they should be expanded. RRIF is a valuable infrastructure program that is under-utilized by the railroads. RRIF provides low interest, 35 year money for railroad rehabilitation and construction. The FRA has approved 20 RRIF loans for a combined total of $743.6 million. One of the reasons the program is underutilized is the unnecessary length of time it takes to process an application, due to institutional opposition to the program in the OMB. The OMB should not oppose a successful program that would increase rail capacity. The RRIF program was enacted in 1998 and no railroad has ever missed a single RRIF loan payment. The program should be expanded and improved.
  - One of the benefits of RRIF and TIFIA, in addition to the tax credit programs I have noted, is that they **leverage private investment**, rather than providing direct government funding. This ensures that taxpayer money will never be invested in projects that should not be funded.

- Strong federal support of **public-private partnerships** such as the Alameda Corridor, Chicago CREATE, Norfolk Southern's Heartland Corridor, CSX's National Gateway, and the Orlando commuter rail/CSX deal.

- Invest $3.4 billion in **high-speed and intercity passenger rail capital grants to States** through DOT competitive grant programs as authorized by 49 U.S.C. 26106, as added by section 501 of the Passenger Rail Investment and Improvement Act of 2008 (Division B of P.L. 110-432) and chapter 244 of 49 U.S.C, as added by section 301 of the Passenger Rail Investment and Improvement Act of 2008 (Division B of P.L. 110-432), and as proposed by Chairman Oberstar (up from $300m in proposal by the House Appropriations Committee)
  - It is the NRC/RAILCET position that intercity passenger rail operators should be under the railroad labor laws and railroad retirement system, even for intrastate operations. However, we are adamant that employers who provide contract services to public authorities or private entities for maintenance of track, infrastructure and signal systems are not rail operators and should not be treated as such. It would not make sense for these private construction contractors who provide services to a broad array of transportation providers to operate under the

very unique railroad carrier specific labor and retirement laws. They should continue to operate under the National Labor Relations Act, Social Security and the standard industrial laws of the country as they do today.

- In the SAFETEA-LU Re-Authorization, the NRC supports a **major increase in investment into intercity passenger rail, with reform of the current Amtrak system.** The eventual goal should be true high speed rail, with dedicated track and right of way. However, the current reality is a system of joint use by freight and passenger rail. Passenger rail should be improved, but that can not come at the expense of freight rail or else it is counter-productive to the country and our goal of increased rail capacity.
- We believe that the **"Alternate Passenger Rail Service Pilot Program"** provided in Section 214 of the Passenger Rail Investment and Improvement Act of 2008 (Division B of P.L. 110-432) is a good start towards reform and that efforts such as this to encourage **greater private participation** in the intercity passenger rail network should be expanded – competition between Amtrak and qualified private operators with the approval of track owners will result in better service for all rail passengers.
- This Committee should consider the establishment of a dedicated **Passenger Rail Trust Fund**, which could be funded through a combination of ticket surcharges, a portion of a new carbon tax, a portion of a gas tax increase, or general fund revenues.

- Provide $1.5 billion for **capital grants to Amtrak**, as proposed by Chairman Oberstar (up from $800m in proposal by the House Appropriations Committee)

- The continuation and enhancement of the **Section 130 Grade Crossing Program**, which has a long record of success in improving public safety.

- This Committee should also consider the establishment of a national, multi-modal freight transportation program, paid for with a new, dedicated **freight trust fund**, as called for by the National Surface Transportation Policy and Revenue Commission. This program would be mode-neutral and direct federal funding towards projects on a strictly **merit-based approach**. The program would provide public investment in crucial, high-cost transportation infrastructure including strategic intermodal connectors, key freight corridors, and national rail bridges and tunnels where the cost of construction exceeds the return on privately invested capital.
    - This concept is being developed by The Coalition for America's Gateways and Trade Corridors (CAGTC), a group that the NRC is a member of, along with various State DOTs, ports, planning commissions, and private engineering and construction companies.
    - Revenue raising options for this fund include a national bill of lading fee, a new freight consumption fee, increased customs fees, or a dedicated national sales tax, with the following three conditions:

I. Any freight fee should be paid by the beneficial cargo owner, not transportation intermediaries such as steamship, trucking, or rail companies.
II. The private sector should neither bill nor administer the fee.
III. A national freight fee should preempt all local fees.

The **project delivery process** must be reformed by significantly shortening the time it takes to complete reviews and obtain permits. Projects must be designed, approved and built as quickly as possible if we are to meet the huge transportation capacity challenges facing us. It takes too long to deliver projects, and the waste due to delay in the form of administrative and planning costs, inflation, and lost opportunities for alternative use of the capital hinder us from achieving our capacity expansion goals.

- This expediting of transportation projects can be accomplished while retaining all current environmental safeguards.

Finally, we'd like to strongly urge that all rail construction and maintenance work performed with federal assistance be **competitively bid** out to the independent railroad construction industry, to the fullest extent possible, to ensure the most efficient use of taxpayer dollars.

There should be fair treatment for employees in all circumstances, with prevailing wage criteria applied to federally funded projects. To the extent consistent with railroad labor agreements, all federally financed or subsidized rail projects should be subjected to fair and competitive contracting between responsible contractors which adhere to a set of professional standards.

Railroad contractors have a long and well-documented history of providing quality services at competitive prices. We have learned how to do more with less, and the efficiency and competence we bring to this task will be a big benefit as we all search for ways to improve America's transportation infrastructure and **stretch available capitol dollars** as far as possible.

**TESTIMONY**

**OF**

**JOSEPH H. BOARDMAN**
**PRESIDENT AND CHIEF EXECUTIVE OFFICER**
**AMTRAK**

**BEFORE THE**

**SUBCOMMITTEE ON RAILROADS, PIPELINES AND HAZARDOUS MATERIALS**

**OF THE**

**HOUSE COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE**

**WEDNESDAY, JANUARY 28, 2009**
**10:00 A.M.**
**2167 RAYBURN HOUSE OFFICE BUILDING**

Good morning, Madam Chair and members, thank you for the opportunity to testify today. I have been blessed in my working lifetime to have spent nearly forty years in the transportation business. I have appeared before this committee in two previous roles--first as the Commissioner of Transportation for the State of New York and then more recently as the Federal Railroad Administrator.

On the day before Thanksgiving of 2008, I was given the opportunity to lead the finest group of men and women in passenger railroading. On that day, I was asked to accept the leadership of Amtrak as its newest President and CEO.

As I took that leadership role, Amtrak had just finished FY 2008 with a record-setting performance. The company set an annual ridership record, carrying 28.7 million passengers, an increase of 11.1% over FY 2007. Each of the three rail business lines (Northeast Corridor, short distance corridors, and long distance trains) grew markedly, and both May and July were record ridership months. Load factors (the percentage of a train's seats or sleeping accommodations that are occupied) were rising across the system and in some time slots and services, the existing fleet was very near capacity at the end of FY 2008. This new record gave everyone a great sense of the strong demand that existed for intercity passenger rail service and of the importance of the rail mode in delivering safer, greener, and healthier transportation for Americans.

However, in the first quarter of FY 2009 beginning this past October, overall ridership has fallen below our expectations by nearly 5%, and revenue is nearly 7% below what we expected. Our Northeast Corridor business line generally, and particularly Acela Express, led our decline in both ridership and in revenue. Acela ridership was 12% below expectations, while revenues were 14% below our expectation. That contributed to a combined decline of ticket revenue for the NEC over 12% below what we expected, and nearly 7% below last year. We are seeing mixed results on our short-distance corridors. Those that connect with our NEC service, like New York City to Albany, are seeing drops in ridership. Our New York to Albany service on the Empire corridor is 10% lower than our expectations, and we are seeing a flattening out on other corridors and our long-distance trains.

These circumstances demonstrate a strong need for investment at the levels in our recently enacted authorization bill, and the critical need for Amtrak to be ready to meet mobility needs of Americans as the United States faces a future marked by higher energy costs, and a need to improve our environment. Congress must help Amtrak with the funding to rebuild, replace and renew its human capital, its passenger and locomotive fleet, and the critical infrastructure owned by both Amtrak and the freight railroads that carry 71% of Amtrak's train miles, or face potential failure of one or many of the components of an efficient and critical rail network. This remarkable network provides surface connectivity for passengers and freight from coast to coast, and border to border. Congressional interest must make this investment a national priority for the next decade or beyond if we are to remain a competitive and healthy economic engine in the world.

We recognize that Congress generally, and both you and Chairman Oberstar specifically, are prepared to step beyond the funding levels authorized in the recent bill. We see the projected $800 million that we currently have in the House version of the stimulus bill as a real opportunity for Amtrak to invest in some much-needed improvements and repairs that have gone wanting for lack of funds. We thank Congress for that opportunity, and we are preparing to move those funds quickly into productive effort for our nation and for our railroad.

One of the core competencies of our company is the specialized knowledge of our workforce in operating a nationwide passenger railroad. The men and women or our workforce number just a little over 16,000 strong, and they keep this railroad glued together and operating. We were all proud not only of the fact that President Obama and Vice-President Biden made a specific choice to use Amtrak trains to come to Washington for the inauguration, but that the Vice President would choose one of Amtrak's own, veteran conductor Greg Weaver, to introduce him in Wilmington on January 17. Last week was historic for Amtrak, as it was for the nation. Amtrak's workforce looks like many other industries right now: Gray. More than 60% of our managers have been blessed with more than fifty years of life, and more than half of our total workforce is of the same vintage. Rail workers are generally eligible to retire when they reach age sixty and accumulate thirty years of railroad employment. We face the prospect of a major change in our workforce in just a few short years, and we must both invest in and change our approach to human capital planning to maintain our core competence. Amtrak offers an excellent opportunity for those interested in railroading, and our wages and benefits are competitive both within the industry and in the larger economy, so we have the foundation that will allow us to maintain and improve our company with the right decisions.

Our industry (freight and passenger) is greener than our competitors; we have a smaller carbon footprint. But we could make a major leap forward by extending electrification. Amtrak operates the only intercity electrified corridor in the nation from Boston to Washington, DC through New York City. That corridor should be extended so that it operates from Miami to Maine for a greener and healthier future for the East Coast of the United States. Electrification should, however, not stop there; we should endeavor to connect our rail network to the electric grid all over our nation. This is not a new idea, but it is one that would go a very long way toward securing our energy future and improving our environment. Railroads do not need to depend on liquid energy when the electric option exists and is available. This cannot be done, however, without a major policy decision by Congress. I would settle for help extending our electrified territory to Richmond within the next five years, and making plans to extend that on to Atlanta or beyond in the next ten. In fact, Madam Chair, let's electrify to Jacksonville by then. Programs on this scale are being undertaken elsewhere – China, for instance – where they are regarded as a vital component of future economic development. I think it's time for us to look for the investment opportunity that will do for this century what the canals and the transcontinental railroads did for the nineteenth century, and the highways did for the twentieth. This is that kind of project I dream about, and the kind of moment which demands, as the noted architect Daniel Burnham once said, that we make no little plans.

Thank you for the opportunity to testify today, thank you for your support for the men and women of Amtrak, and thank you for providing the support that allowed 28 million Americans to choose Amtrak last year.

# The Orange County Transportation Authority

**Written Testimony of Peter Buffa, Chairman of the Board of Directors**
**Thursday, January 28, 2009**

550 S. Main Street
P.O. Box 14184
Orange, CA 92863-1584
(714) 560-6282

**United States House of Representatives**
**Subcommittee on Railroads, Pipelines, and Hazardous Materials**
**Of**
**Committee on Transportation and Infrastructure**

**Written Testimony of Peter Buffa**
**Thursday, January 28, 2009**

Madam Chair and Members of the Subcommittee:

My name is Peter Buffa, and I am Chairman of the Orange County Transportation Authority (OCTA). It is an honor to have the opportunity to testify before you Madam Chair, and before this Subcommittee, which plays such a major role in determining national transportation rail policy and will be involved in writing the next transportation authorization legislation.

The Orange County Transportation Authority

OCTA was established as a multimodal transportation authority in 1991, in order to bring about a more efficient and comprehensive approach to transportation by consolidating seven separate transportation agencies. Since that time, Orange County has grown to be the fifth most populous county in the nation with over 3.2 million residents. OCTA has kept apace of that growth, and now operates a multimodal transportation system which includes the twelfth busiest bus system in the nation and the 91 Express lanes, a highly successful ten mile toll road connecting Orange and Riverside Counties.

In order to meet our growing mobility needs, we also provide regional commuter rail service, operated by Metrolink under the direction of OCTA and Los Angeles, Riverside, San Bernardino and Ventura counties. Metrolink is now providing over 4 million rail passenger trips annually in the three commuter rail lines which serve Orange County. This is the highest annual ridership since inception of service in 1994.

Rail service in Orange County is provided along two major corridors. The first major rail corridor in Orange County is the Burlington Northern Santa Fe (BNSF) corridor from the ports of Los Angeles and Long Beach through Orange County and east to San Bernardino and Riverside Counties, and ultimately to the remainder of the United States. While there is a large and growing commuter ridership on this corridor, the major use of the corridor is national freight movement into and out of the ports.

The second major Orange County rail corridor is between Los Angeles, Orange County and San Diego. This corridor, often referred to as the LOSSAN corridor, is the second busiest passenger rail corridor in the nation, surpassed only by the Northeast Corridor. Ridership on the LOSSAN Corridor has grown from 1.6 million annual trips in the 1990's to 8.5 million annual trips today.

I would like to focus my remarks today on an in-depth description of the rail capacity opportunities and challenges presented by these two nationally significant rail corridors. As we seek to implement the Passenger Rail Investment and Improvement Act of 2008 and draft new transportation authorization legislation, I hope that OCTA will be able to rely on the Federal government as a financial partner in addressing these challenges.

The BNSF Corridor and the Ports of Los Angeles and Long Beach.

Running across the northern part of Orange County, the BNSF corridor is one of the nation's major goods movement distribution corridors serving the ports of Los Angeles and Long Beach. This port complex is the largest in the United States and the fifth largest in the world. In 2007 nearly 16 million cargo containers traveled through these ports to or from the rest of the country. This container traffic represents more than the total container traffic in Seattle, Portland, Oakland Ventura and San Diego, combined.

The accompanying map illustrates commodity flows between Southern California and its local, regional and national markets. The map demonstrates the importance of both domestic and international trade shipments between Southern California and the rest of the nation and the need for effective transportation networks to link the region's economy to the rest of the country.

There is little doubt that goods movement is an important source of good jobs. In Southern California alone, goods movement has fueled the creation of 700,000 jobs, including 107,000 goods movement related jobs in Orange County. In turn, these jobs have generated a payroll of more than $6 billion. Regionally, ports have delivered over $256 billion in international trade to the rest of the country.

However, goods movement also presents a number of challenges for those areas impacted by goods movement activity. Even the present levels of trade volumes are challenging our rail system capacity and providing heavy congestion impacts. The future can only be expected to bring greater challenges. In 20 years the number of containers moving through southern California is expected to triple to an estimated 48 million. In 2025 daily freight trains moving through Orange County on the BNSF are expected to increase 123% from 112 to 250. By 2010 freight train traffic will increase street and road traffic delays from about 30 minutes to up to 206 minutes.

The result from this goods movement today in Orange County is persistent grade crossing congestion. In addition, this increased goods movement activity in southern California negatively impacts air quality and promises greater health-related and productivity impacts, including increased respiratory diseases and lost work days.

The southern California region has come together to recognize the challenges regarding goods movement and is working to identify those rail improvement projects which help to mitigate the adverse local impacts of goods movement. A Multi-County Goods

Movement Action Plan has identified $50B in needed projects to address capacity improvements and mitigation projects related to goods movement.

Critical to the capacity needs on both the BNSF and LOSSAN corridors are nineteen new railroad grade separation projects in Orange County (shown on the attached map). The cost to complete these grade separations exceeds $1.1 billion. Yet only a little more than $400 million is available for these projects from existing state and local funding sources.

No one in the region doubts the need for new revenue sources to address the dual objectives of keeping these ports competitive and mitigating the congestion and air quality impacts of a viable rail distribution corridor. Several bills on this subject have been introduced in Congress, but none have yet been enacted. State legislation passed last year would have assessed a $15 per container fee for mitigation and infrastructure projects in the region. Unfortunately, the Governor vetoed this legislation. The ports themselves adopted an infrastructure cargo fee in January of 2008. Beginning this summer, a $6 dollar per container fee will be placed on cargo containers entering or leaving any terminal by truck or train and will be used for goods movement-related projects along the entire corridor, including projects such as grade separation in Los Angeles, Orange, Riverside and San Bernardino Counties. Even if this local fee can be successfully implemented, more needs to be done, and should be done at the federal level to address this issue of national significance.

The LOSSAN Corridor.

Currently, three passenger rail services, Amtrak, Coaster, and Metrolink and one freight carrier, Burlington Northern Santa Fe Railway, operate along this corridor. Amtrak, with state financial assistance, operates the Pacific Surfliner intercity rail and bus service between San Luis Obispo and San Diego. The Southern California Regional Rail Authority (SCRRA), a joint powers authority created by the OCTA and the four other southern California counties, operates Metrolink commuter rail service between Los Angeles and Oceanside, and Los Angeles and Oxnard. The North County Transit District (NCTD) operates Coaster commuter rail service between Oceanside and San Diego. The OCTA owns one-third of the 126 miles of railroad right-of-way between Los Angeles and San Diego.

First opened in 1994, Metrolink's Orange County line currently offers 19 trains per weekday and serves 11 stations along the LOSSAN corridor in Orange County. Approximately 10% of Amtrak's total national trips take place in this corridor. Aside from its proven capacity to carry passengers from Orange County to Los Angeles or San Diego, if managed efficiently, we believe the LOSSAN Corridor offers great opportunities to increase mobility within Orange County and throughout the entire San Diego to Los Angeles corridor.

Two thirds of the population in Orange County, and two thirds of the jobs in Orange County, are located within a four-mile radius of the LOSSAN corridor. By increasing the

frequency of service, there is an opportunity to use this rail corridor for traveling within and through Orange County and relieve congestion on the adjacent I-5 freeway. In fact, the peak hour ridership on Metrolink is so successful, that without it we would have to build 2 more lanes on I-5 from south Orange County to downtown Los Angeles just to ensure that traffic congestion would not get any worse. We think that Metrolink has been an excellent financial investment for Orange County and southern California and is an increasingly important component of the southern California economy.

With that purpose in mind, the OCTA Board approved a Metrolink service expansion plan in October 2005. This plan will implement high frequency Metrolink service between north and south Orange County. Engineering design is now complete for track improvements, signal system upgrades, and station and parking enhancements necessary to support this new service. Construction is anticipated to start in May of 2009. New locomotives and rail cars have also been ordered to support the expansion of the rail service.

While we have planned to largely fund this expansion program with local sales tax and state transportation funds, the recent severe downturn in economic activity has resulted in an inability to fund key components of this program. In order to keep this important program on track, we are seeking federal assistance for key project components, including $50 million for double track capacity expansion (Laguna Niguel to San Juan Capistrano), $30 million for station parking improvements (Laguna Niguel) and $50 million for the Anaheim Regional Transportation Intermodal Center (ARTIC)

These key components of expanding service in the LOSSAN Corridor are planned and are ready to become reality. In addition, these rail improvements can be accomplished without the delay of a Federal new start process or the expense and displacement of acquiring major new right-of-way.

A critical component of this corridor is the Anaheim Regional Transportation Intermodal Center (ARTIC) which will be a rail gateway to Orange County and provide a convenient transfer station from the LOSSAN corridor to future California high speed rail and the planned California to Nevada super speed or maglev system. ARTIC will combine a transportation gateway and a mixed-use activity center on a 16 acre site owned by the City of Anaheim and OCTA, a short walk from Angel Stadium and Honda Center professional sports venues, and a short shuttle to Disneyland and the Anaheim Resort. Although private participation will be sought for this project, public funding is needed now to build the foundational transportation elements of the project.

Recently, the OCTA conducted market research with focus groups to determine how we can provide better service in this essential corridor. That research has shown us that customers who ride on the LOSSAN Corridor, and more importantly, those who do not ride, experience confusion in navigating the complex set of logos, timetables, and administrative rules that come with Amtrak, Metrolink and the Coaster all providing service along the same corridor. We believe it would be far more efficient and customer friendly for there to be one service seen by the public, even if that service were to be jointly provided behind the scenes.

To that end, we have initiated efforts to work with the three current service providers to look at service integration and coordination opportunities. Some of these are as simple

as integrated timetables or shared ticket offices. However, the full realization of this effort may lead to an entirely new manner in which to plan and manage the LOSSAN corridor as one coordinated and integrated passenger rail service. This may take the form of a joint powers authority or some other form of regional governance to fully realize the opportunities before us. We believe that this type of coordinated and integrated approach will lead to more service for the public, more efficient use of tax payer funds, and ensure that the LOSSAN Corridor lives up to its full potential.

We are excited about opportunities to partner with Amtrak on making key capital investments and provide integrated, coordinated and expanded operations in this highly successful corridor. If planned and implemented correctly, we have the opportunity to create a southern California version of the highly successful Northeast Corridor.

Conclusion.

In summary, as significant as the benefits of the BNSF and LOSSAN rail corridors are to the OCTA and Orange County, the challenges they present cannot be fully addressed without the federal government as a strong and financially involved partner. We certainly hope to receive additional federal funding for these projects from the Passenger Rail Investment and Improvement Act of 2008 and the next reauthorization bill. That funding will match the significant local funding already committed for these projects. Just as important, we need the federal recognition in the next reauthorization legislation that assistance with these projects will further the nation's mobility goals and expand our national strategic rail infrastructure.

In the upcoming 111th Congress, we stand ready to work with you, and hope that your subcommittee will commit the federal government to work in active partnership with us, to increase capacity on these two corridors of national significance which serve riders in southern California and consumers nationwide.


Orange County, CA
A Gateway to the Nation
OCTA
70%
of imports through Southern California's ports are delivered to the nation
One-third
of all container traffic in the U.S. and 54% of U.S. - Asian trade originate from the ports
ORANGE COUNTY


Rail-highway crossings
Propelling economic growth
& protecting our quality of life
PORTS OF
LOS ANGELES &
LONG BEACH
No. 1
largest port in the U.S.
No. 5
largest port in the world
LOS
ANGELES
SAN
BERNARDINO
RIVERSIDE
SAN
DIEGO
ORANGE
COUNTY
2nd Busiest
railway
in the U.S.
Acacia Ave.
Jefferson St.
Van Buren Ave.
Richfield Road
Kellogg Drive
Ball Rd.
State College Blvd.
17th St.
Santa Ana Blvd.
Grand Ave.
Redhill Ave.
Unfunded Projects
State Prop 1B –
Trade Corridors Improvement Fund
Under Construction
OCTA

**Testimony of**
**Anne Canby**
**President, Surface Transportation Policy Partnership**
**and**
**Member, OneRail Coalition**
**before the**
**House Committee on Transportation and Infrastructure**
**Subcommittee on Railroads, Pipelines, and Hazardous Materials**

Chairman Brown, Ranking Member Shuster, and Members of the Subcommittee, I am Anne Canby, President, Surface Transportation Policy Partnership ("STPP") and a founding member of OneRail, a new coalition dedicated to advancing rail as a critical element of our national transportation system. Thank you for this opportunity to appear before you today.

For the first time, freight and passenger rail stakeholders, environmental advocates, a group of bipartisan public officials, and reform-minded transportation experts have come together, forming a new OneRail coalition to promote the benefits of rail – both passenger and freight – as essential to the future economic growth and well-being of the nation.

OneRail urges the Congress to include two critical priorities in the economic recovery measure: <u>(1) full funding of all currently authorized rail infrastructure and development programs in addition to amounts proposed in the House economic recovery legislation; and (2) flexibility in the general funds allocated to states and localities for surface transportation so they can invest in rail projects as needed.</u>

We call for change in our approach to surface transportation funding because the public's perception has changed. In a national survey recently commissioned by OneRail partner Building America's Future together with the National Association of Governors, pollster Frank Luntz found that 94 percent of Americans are concerned about our nation's infrastructure. 84 percent want more money spent by the federal government to address these needs. *And 81 percent would be willing to pay one percent more in taxes to improve America's infrastructure.* And, according to Luntz, more than 98 percent of Americans feel they have "the right to demand" infrastructure that is "efficient, convenient and modern."

We believe that includes rail.

In my testimony I will explain why our ten organizations have formed OneRail. I'd like to highlight, from my perspective as a former secretary of the Delaware Department of Transportation and now president of STPP, why it is important that our nation's surface transportation policies and programs fully embrace rail. I will detail our recommendations for the economic recovery program, and offer some preliminary thoughts on priorities for the pending surface transportation authorization.

**OneRail**

Recognizing that freight had finally arrived as a topic of national interest, STPP determined that it would be important to have a balanced discussion on how this growing demand should be addressed. At the same time, the public's increasing interest in intercity and high-speed passenger rail indicated that the next authorization must include an integrated rail strategy for passenger as well as freight service. Hence our drive to forge a new coalition of stakeholders – OneRail – to ensure that all aspects of rail would be incorporated into the basic structure of the legislation

On January 15, 2009, ten founding organizations announced a new joint initiative supporting both freight and passenger rail objectives to maximize transportation options that enhance mobility, achieve energy efficiency, reduce greenhouse gas ("GHG") emissions from global warming, boost economic growth and improve quality of life for all Americans:

American Public Transportation Association
Amtrak
American Short Line & Regional Railroad Association
Association of American Railroads
Building America's Future
National Association of Railroad Passengers
Natural Resources Defense Council
Railway Supply Institute
States for Passenger Rail Coalition
Surface Transportation Policy Partnership

My OneRail colleagues and I urge the Congress to:

- Expand and strengthen the nation's passenger train network by encouraging the development of commuter and intercity passenger train choices for Americans and addressing a critical missing link in our nation's surface transportation system. Needed solutions must ensure safety, achieve reasonable service levels, and provide enough capacity to protect the operations and future growth of both freight and passenger train service.

- Enact policies and programs that expand public and private investment in rail freight mobility. This includes encouraging continued private investment in rail freight

capacity to ensure that rail freight capacity will meet growing demand and public investment when that investment supports appropriate public benefits.

- Support state efforts to seek an ongoing, dedicated funding source for intercity passenger train expansion. This includes designing a federal-state partnership and cost sharing agreements similar to those that built the nation's federal-aid highways and transit systems.

We believe strongly that rail must be an essential component of any national infrastructure investment initiative. Rail provides a solution for many of our most urgent transportation, energy and environmental problems. Our OneRail partners have declared:

> *Our nation's surface transportation infrastructure should strive to provide interconnectivity and be environmentally sound. Increasing investment in rail – both passenger and freight – is a critical step toward achieving this goal.*
> **Amtrak President Joseph Boardman**

> *As we look to increase recovery and sustain economic growth, we ask that Congress and the administration focus investment on our U.S. rail system. That focus can help de-congest choke points, put more freight and passengers on fuel-efficient trains, and lower our nation's greenhouse gas emissions.* **Frank Busalacchi, Secretary, Wisconsin Department of Transportation and Chairman, States for Passenger Rail Coalition and a member of the National Surface Transportation Policy and Revenue Study Commission**

> *The 2008 Commission's findings were clear. Increased investment in railroad infrastructure is essential to our continued mobility, economic competitiveness, and ability to create jobs, as well as to meeting the energy and climate challenges of the 21st century.* **Edward Hamberger, President and CEO, Association of American Railroads**

> *It is essential that all parties work together to ensure the Commission's recommendations are acted upon and that all Americans experience the benefits that increased investment in rail infrastructure will bring.* **Matthew Rose, Chairman, President and CEO of BNSF Railway and a member of the National Surface Transportation Policy and Revenue Study Commission.**

> *Rail should be a key element of any federal response to climate concerns. Improving surface transportation offers both immediate and long-term benefits by decreasing traffic congestion, helping to mitigate rising energy costs and reducing emissions related to global warming.* **Peter Lehner, Executive Director, Natural Resources Defense Council**

> *The formation of the OneRail Coalition will enable the rail industry to speak with one voice to federal, state and local policymakers and overcome years of serious public underinvestment in our nation's rail network.* **Polly Trottenberg, Executive Director, Build America's Future, an infrastructure initiative organized by Pennsylvania Governor Edward Rendell, California Governor Arnold Schwarzenegger, and New York City Mayor Michael Bloomberg**

*Trends all point to a robust future for railroads – passenger and freight. America's railroad community can gain strength with increased investment and through partnership, working together and growing together to serve America in the years ahead.*
**William W. Millar, President, American Public Transportation Association**

A copy of OneRail Principles agreed to by all founding organizations is attached. I commend it to the Subcommittee for your consideration.

**Benefits of Rail**

The energy and environmental benefits of rail are significant and well documented. Expanding passenger train options between and within U.S. urban centers would reduce highway and air congestion, fuel consumption and greenhouse gas emissions. Increasing intermodal freight shipments on rail also reduces greenhouse gas emissions: on average every ton mile of freight that moves by rail instead of long-haul truck reduces greenhouse gas emissions by at least two-thirds. A coordinated approach of rail and truck shipping is already showing substantial efficiencies and net reductions in carbon emissions.

These benefits have been highlighted by prior witnesses testifying before this Subcommittee, are well-documented in the literature, and will be further reinforced by my colleagues on the panel here. I would like therefore to convey my personal perspective, having served with the Massachusetts Bay Transportation Authority and the New Jersey Department of Transportation before becoming secretary of the Delaware Department of Transportation, and now at STPP, on the scope of these benefits and why our nation's surface transportation policies must emphasize and promote rail.

Enhancing our rail network would provide a framework for successful public-private partnerships. Because most rail infrastructure is privately operated and maintained, there can be significant public benefit in shifting a greater share of freight to rail through reduced costs for new highway capacity and ongoing maintenance, as well as the reduced energy use and GHG emissions.

<u>Delaware Insights</u>

When I was in charge of Delaware's state highway system, as well as all transit services in the state, I came to understand the limits on the investments that we could make to improve mobility, efficiency and performance of the transportation system. Particularly in older, developed areas of our nation, many of us have concluded that adding highway capacity, when even possible, provides only short term improvement in performance while adding long term costs to the public sector in terms of maintenance and operating expenses. It was troubling that our state could only use the federal funds we received to improve rail services along our stretch of the Northeast Corridor if dedicated to commuter rail – intercity service improvements for either freight or passenger are not an eligible expense in current law. Fortunately, we were able to use our federal funds because we were adding commuter rail service. Many other states do not have this option. Federal funds flowing to the state DOTs should be eligible for intercity freight and passenger improvements.

More than a decade ago, through the I-95 Corridor coalition, Delaware helped launch a joint study to determine what rail improvements were needed along the I-95 corridor from Washington to New York to improve both freight and passenger rail service in this heavily travelled corridor. The result was the Mid-Atlantic Rail Operations Study (MAROPS) which identified $6.2 billion in improvements, including the rebuilding of the CSX Howard Street Tunnel in Baltimore, MD, a critical link in this corridor. The study was supported by five state DOTs and three railroads (Amtrak, CSX, and NS).

Despite the compelling findings of the MAROPS study, the bulk of the rail improvements identified, all desperately needed, remain unfunded.

Even without the funding required, my state found ways to emphasize investments in rail. When the CEOs of NS and CSX asked then-Governor Carper for his support in the division of Conrail, the governor made it clear that Delaware's endorsement was predicated on achieving a measurable shift in freight from highway to rail.

STPP Perspective

STPP has historically focused on passenger and public transportation issues including sustainable development. But with study after study indicating that we can expect a significant increase in freight volumes, the need for including freight in the discussion soon became obvious. Even if the freight estimates are high or are realized a few years later, we must prepare to handle the added demand in a very different environment. The national imperatives of achieving energy independence and dramatically reducing greenhouse gas emissions require that the transportation sector incorporate these goals into the core mission for transportation at all levels of government.

We believe it is time to advance the integration of our surface transportation networks by including rail as a critical element of the next authorization.

**OneRail Recommendations for the Economic Recovery Legislation**

My OneRail partners and I greatly appreciate the Committee's recommendation under the leadership of Chairman Oberstar of $5 billion for rail programs in the House economic recovery legislation. We are disappointed that this amount has been reduced to $1.1 billion in the pending House legislation. This level is not sufficient with respect either to the urgent infrastructure and job creation needs that rail investment can meet, or compared with the level of funding contemplated for highways and transit.

OneRail accordingly urges that the economic recovery legislation encompass the following:

- Full funding for the remainder of FY 09 and FY 10 of all authorized rail infrastructure programs in addition to the amounts proposed in the House economic recovery legislation. These include:

- Freight Rail Relocation – $350 million per year in FY 09 and FY 10 to fund both rail line relocation and improvement projects (including track work, signal system improvements and siding enhancements).

- Positive Train Control (PTC) – $50 million per year in FY 09 and FY 10 to expedite installation of a new generation of signaling technologies to keep trains safely apart.

- Capital Grants for Class II and Class III Railroads – $50 million per year in FY 09 and FY 10 to fund both rail capital projects on short line freight railroad per 49 U.S.C. 22301.

- Amtrak Capital Grants – $715 million in FY 09 and $945 million in FY 10 to fully fund Amtrak's authorized capital investment needs, in addition to the amounts proposed in the House economic recovery legislation.

- Intercity Rail Corridor Capital Assistance – $300 million for intercity rail passenger service corridor assistance as included in the pending House economic recovery legislation.

- Intercity Congestion Grants – $50 million in FY 10 for facilities, infrastructure and equipment for high priority rail corridor projects necessary to reduce congestion or facilitate intercity passenger ridership growth.

- High-Speed Rail Corridor Program – $150 million in FY 09 and $300 million in FY 10 for high-speed rail corridor development.

Fully funding these rail investment programs at the authorized levels or greater would have an enormous, immediate stimulative effect, *and* provide a solid foundation for long-term growth and mobility.

- Flexibility to enable investment in rail of formula funding distributed to states and localities for surface transportation improvements. In addition to fully funding all authorized rail investment programs, we believe that Congress should let states and localities decide how to invest economic recovery funds targeted for surface transportation. Because these stimulus funds will be ***general funds***, broad eligibility should apply. Even if the stimulus funds are allocated pursuant to Title 23 formulas and criteria, because the stimulus funding does not originate from the Highway Trust Fund, recipients should be able to invest in projects with the highest payback in terms of job creation and environmental benefit – whether they be highway improvements, transit enhancements, or rail investments.

**Priorities for Surface Authorization**

OneRail has just organized, and we are actively considering unified proposals for the upcoming surface authorization. In the interim, I would like to offer my preliminary thoughts on behalf of STPP.

STPP believes the new law must incorporate all forms of surface transportation including rail. We have one transportation system made up of several modes. They should work together as an integrated system. Each form of transport plays a key role in the effective movement of both people and goods. But we have not really put this together into a systematic and integrated network. We must do so.

Working separately on intercity passenger or freight makes no more sense than looking independently at highway corridors. As we identify critical corridors, we must create the institutional capability for all interests to work in concert to identify the optimal investment across modes.

There is wide recognition that the next authorization for the federal surface transportation programs needs to embrace a significant new approach. There must be a clear national purpose.

We must reshape our transportation systems to meet the goals of energy independence and a dramatic reduction in the level of greenhouse gas emissions, while assuring that we are positioned to meet passenger and freight travel in a safe, economically effective and efficient way. These are not separable goals – we must meet them all. It is essential to update the nation's transportation policies, programs, and processes to address these overarching issues.

The long range planning processes at both the state and metropolitan levels in current law should be revised to include scenario planning for intercity, intrastate and intra-regional corridors that include rail as well as roadway with the explicit goal of demonstrating the appropriate investments that will advance our nation's energy and climate goals. To ensure greater accountability for results, current program structures must be redesigned.

In summary, states and localities must have the flexibility to make the best investments over the long term that improve our economic competitiveness, reduce long term public costs, decrease our energy dependence, and stop harmful GHG emissions. Establishing a clear national purpose, a strong, accountable planning regime, and a new program structure that enables investment in all forms of transportation, including rail, would heighten our ability to address our national goals.

Thank you for this opportunity to testify. I would be pleased to answer any questions you may have.

# ONERAIL COALITION

## STATEMENT OF PRINCIPLES

Railroads are a critical element of our national transportation system. Public policy must expand passenger train options, critical freight rail network capacity, and intermodal connectivity in our national transportation system. A **OneRail policy supporting both freight and passenger rail objectives is needed to maximize transportation options** that enhance mobility, achieve energy efficiency, address climate change, boost economic growth and improve quality of life for all Americans.

The 2008 National Surface Transportation Policy and Revenue Study Commission report found that our nation must **increase railroad infrastructure investment** to ensure our continued mobility, economic competitiveness, and job creation in the United States to meet the energy and climate challenges of the 21st century. In addition, the American Association of State Highway and Transportation Officials (AASHTO), through a series of studies, has shown that private investment alone will fall short of the levels necessary to invest in freight and passenger rail network capacity to meet needed public policy goals.

A **OneRail policy** recognizes and recommends the following:

The **nation's passenger train network must be strengthened and expanded**. Expanding intercity and commuter passenger train options for travel between and into the nation's urban centers would substantially reduce vehicle miles traveled, aviation and highway congestion, fuel consumption and related greenhouse gas emissions.

A **sound and balanced transportation policy should encourage the development of passenger train options for the public**, addressing a critical missing link in our nation's surface transportation system. Investments must ensure safety, achieve reasonable service levels, provide enough capacity to protect the operations and future growth of both rail freight and passenger service, and address liability concerns. Going forward, capacity will be a critical factor shaping the freight rail–passenger rail interface. Access to freight infrastructure and rights of way for new passenger service should be achieved on a cooperative, voluntary basis, without infringing on Amtrak's existing rights. To ensure that both freight and passenger service is maximized in high-density corridors, public policy should also envision separate rights of way for freight and passenger operations where separation is warranted.

OneRail **supports state efforts to seek an ongoing, dedicated funding source for intercity passenger rail expansion**, including a federal-state partnership and cost sharing agreements similar to the partnerships that built the nation's federal-aid highways and transit systems. Rail freight capacity must expand to meet projected economic demand and increase the railroad industry's current traffic share. Private investment in the nation's freight rail network has been, and will remain, the primary means of maintaining and expanding freight rail infrastructure.

To ensure that freight rail capacity meets growing demand, **Congress should enact policies and programs that expand public and private investment in rail freight mobility** and assure continued growth in private investment in rail freight capacity.

The **OneRail coalition supports additional investment in the nation's rail infrastructure to create American jobs**, de-congest chokepoints, put more freight and passengers on fuel-efficient trains, and reduce our nation's greenhouse gas emissions.

Testimony of the Brotherhood of Maintenance of Way Employes
Division/International Brotherhood of Teamsters

Committee on Transportation and Infrastructure
Subcommittee on Railroads, Pipelines, and Hazardous Materials
January 28, 2009

Witness:
Leon R. Fenhaus, Director of Government Affairs
Brotherhood of Maintenance of Way Employes Division, IBT
25 Louisiana Avenue, NW
7th Fl.
Washington, DC 20001

Tel.: (202) 508-6445
Fax: (202) 508-6450

*Testimony of the Brotherhood of Maintenance of Way Employes Division/*

*International Brotherhood of Teamsters*

*Committee on Transportation and Infrastructure*

*Subcommittee on Railroads, Pipelines, and Hazardous Materials*

*January 28, 2009*

The Brotherhood of Maintenance of Way Employes Division/International Brotherhood of Teamsters (BMWED) respectfully submits the following written testimony to the Subcommittee on Railroads, Pipelines, and Hazardous Materials pertinent to the January 28, 2009 hearing regarding "Freight and Passenger Rail: Present and Future Roles, Performance, Benefit and Needs." The BMWED is an autonomous Division within the International Brotherhood of Teamsters representing over 35,000 men and women who perform the infrastructure work on the nation's Class I railroads and many regional and short line carriers as well. The BMWED is a member of the Teamsters Rail Conference which includes the Brotherhood of Locomotive Engineers and Trainmen. The Rail Conference speaks for the interests of over 40% of the nation's railroad employees.

The Subcommittee requested our comments on the following topics: (1) the role of freight and/or passenger rail in the U.S. economy; (2) the impact of the current economic crisis on the railroad industry and its workers; and (3) the benefits and importance of investing in freight and/or passenger rail. We will address those topics in turn.

*(1) THE ROLE OF FREIGHT AND/OR PASSENGER RAIL IN THE U.S. ECONOMY*

One cannot dispute that the railroads played a major role in the development of the U.S. economy since the Baltimore & Ohio Railroad began operations in 1830. On a more somber note, the boiler explosion on "Best Friend of Charleston" in 1831 led to the establishment of railroad operating rules and specific training and job assignments for railroad employees. However, simply because railroading is a venerable industry, some may consider it "obsolete" or nothing more than a glorified operating museum. Such sentiments are wrong. The BMWED will leave to others to demonstrate in detail that which is obvious upon reasonably diligent research: railroads are among the most energy efficient means of moving goods and people that exist today. However, a very

quick glance at some statistics demonstrate how important rail transportation remains to the U.S. economy.

In 2005, even though railroads carried more ton-miles of freight than trucks, fuel usage by rail was dwarfed by rubber tired transportation. The Class I railroads used 4,098 million gallons of fuel compared to a whopping 24,411 million gallons for combination trucks.[1] Employee productivity in the railroad industry increased by 42% between 1997 and 2006, while it only increased 12% in trucking over the same period. This is not to say that trucking is an "inefficient" mode of transportation. The transport of goods by truck is an integral part of any balanced transportation system. But those figures do show that rail transportation is energy efficient and provided by a highly productive workforce. It is that workforce, and what it brings to the U.S. economy that we will next address.

The recent problems in the U.S. auto industry focused unwarranted attention on the wages and benefits obtained by unionized workers in that industry. Some misguided commentators alleged that those "union wages" were the root of the industry's problems and for some, the solution was simple – slash wages and benefits and all will be well in time. What those purveyors of industrial misery do not understand is that no nation's economy is strong if those who toil within its industries do not receive wages and benefits sufficient for them and their families to thrive, and not merely subsist. Reasonable wages and benefits permit workers to have the security to accept new financial burdens – ownership of a home, higher education for their children and purchases of durable goods because they know they will have the income security both in work and retirement to take such risks. The railroad industry today provides such solid middle class jobs, but they are at risk from "market forces" interested in short term gain at the expense of social stability and growth.

Railroad labor relations are governed by the Railway Labor Act, this nation's oldest labor law. A cornerstone of that Act is expressed in one of its general purposes: "to forbid any limitation upon freedom of association among employees or any denial as a condition of employment or otherwise, of the right of employees to join a labor organization." In other words, the national labor policy, first enunciated in 1926, favored collective bargaining in this vital industry. Indeed, Congress directed that "all disputes" should be considered and, if possible, decided expeditiously by duly designated representatives of the

---

1 Bureau of Transportation Statistics, *National Transportation Statistics*, Table 4-5.

railroads and their employees. Clearly, Congress believed that collective bargaining was the preferred mode in the rail industry because through collective bargaining disputes could be resolved "with expedition" and rates of pay, rules and working conditions would be established through collectively bargained agreements.

The results of collective bargaining as of 2007 resulted in a $11.6 billion payroll for the 167,000 overwhelmingly unionized employees of the nation's Class I railroads.[2] Additionally, collective bargaining created a medical social insurance system with the Class I carriers called the "National Railroad Employees Health & Welfare Plan" which has existed since 1954. That Plan provides health insurance to railroad employees, their spouses and dependents through a nationally administered Plan providing access to managed care to almost all railroad employees. In 2008, that Plan will pay out about $1.7 billion in benefits on behalf of those employees and their families and will be paid from premiums collected from the railroads and partly reimbursed by the employees. While the cost of medical care for railroad employees is substantial, this collectively bargained benefit supports the U.S. economy because railroad workers and their families will not forego medical care because of a lack of insurance or because a particular medical procedure is too costly. As we have all learned by now, the lack of health insurance for some simply means economic misery and poor health for them and their families. Ultimately the absence of affordable health insurance places an increased burden on local and state governments which are often burdened with the cost of caring for the uninsured. Additional, the financial burdens of families struggling to provide insurance and medical care for loved ones ripples through the economy and manifests in home foreclosures, personal bankruptcies and demands on social services.

Additionally all railroad employees in the United States participate in the Railroad Retirement system which provides, in essence, a defined benefit retirement annuity. The Railroad Retirement and Survivors Improvement Act of 2001 (RRSIA) lowered the retirement age to 60, provided that the railroad employee had 30 years (360 months) of credited service in the industry. Given the great influx of employees to the rail industry during the 1970's, an entire generation or railroaders are nearing retirement age. Given the current state of the economy, the ability of those long service workers to retire with a secure

---

2 2007 Statement No. B-300, Surface Transportation Board

pension will open up positions for younger workers and those workers who have become unemployed in other fields.

The Railroad Retirement system also is sound financially. The most recent annual report from the Board states that under any of the three assumptions used by its actuary, the Trust Fund is solvent through 2032.[3] Additionally, the RRSIA permitted the investment of part of the Trust Fund in the private equity markets. The most recent quarterly report from the National Railroad Retirement Investment Trust (NRRIT) shows that although the recent financial reverses suffered by others also have affected the assets managed by the NRRIT, the sound investment of Trust funds grew from $20.7 billion in 2002 to almost $26.8 billion on September 30, 2008 despite paying out $6.3 billion in benefits during that period.[4]

Railroad employees are the beneficiaries of a national labor policy that favors and expects collective bargaining in the industry. Collective bargaining, especially on the Class I railroads, has resulted in solid, middle class jobs for railroaders and a health insurance system that protects them and their families. The Railroad Retirement system provides for a defined benefit age-based annuity and because retirement can occur in the industry as early as age 60, the system provides the financial means to exit the industry so that new employees may be incorporated into it. The BMWED submits railroad workers presently have a wage and benefit structure that forms the backbone of the U.S. economy and will sustain it until other sectors of the economy rebound.

While we will discuss the effects of the current crisis on railroad employees, we must stress that another systemic attack is being made on the economic security of railroad employees completely unrelated to the current financial woes afflicting the country. There have been a number of new passenger rail operations that have been created as non-railroad operations, even in situations where the service is provided on rail lines that are owned by railroads, or were owned by railroads, and are still being used for interstate freight and passenger rail operations. Not only is this unfair to, and abusive of, the employees who have worked on those lines for decades, it is bad for safety and efficiency of operations and will lead to balkanization of the interstate rail system.

---

3 Source - Railroad Retirement Board Annual Report, June 2008 at 3.

4 Source – NRRIT Quarterly Update for the Period Ending September 30, 2008 at 3.

BMWED submits that the laws governing railroads and any funding for expansion of passenger rail operations must ensure that railroad operations and railroad work on existing rail lines used in interstate commerce, and on new lines on existing railroad rights of way, must be subject to the federal laws that were created especially for railroads and railroad workers such as the Interstate Commerce Act, the Railway Labor Act, the Federal Employees Liability Act, Federal Railroad Safety Act, and the Railroad Retirement Act. Such laws have applied to all railroad operations and persons who perform railroad work for decades, but there have recently been developed a number of schemes to evade the railroad laws through sorts of chicanery and shenanigans that resemble the empty shell "investments" on Wall Street, Enron-like pseudo-transactions and Ponzi schemes that have so damaged our financial system. The result has been that persons performing railroad work are not covered by railroad laws, rates of pay and benefits for good railroad jobs are being undercut, railroad functions on individual lines and systems are being divided among multiple entities none of whom has overall responsibility for operations and safety, and whole lines of railroad integral to the interstate system have been taken out of the system by sleight of hand.

Under the Interstate Commerce Act, a rail carrier is defined as a person providing common carrier rail transportation for compensation, but not a street, suburban or interurban electric railway operated apart from the general interstate rail system (49 U.S.C.§10102(5)). The ICA gives the Surface Transportation Board jurisdiction over transportation between states and within states as part of the interstate rail network, and transportation by rail carriers and over routes, services and facilities of carriers (49 U.S.C.§10501(b)(1)). The ICA also provides that a person that is not already a carrier may not construct or acquire a line of railroad without STB approval only pursuant to 49 U.S.C. §10901, and a carrier may abandon a rail line or discontinue service on a line only pursuant to ICC/STB approval under 49 U.S.C. §10903. The RLA, FELA, FRSA, and RRRA all cover entities that are defined as carriers under the ICA. The ICA (as amended by the Interstate Commerce Commission Termination Act) now exempts provision of mass transportation service by local government authorities from STB regulation, but expressly states that the other railroad laws that use the ICA definitions still apply to local governments.

For decades it was clear that transfers of rail lines were subject to ICC/STB jurisdiction, that a non-carrier, including a state, required ICC/STB approval

to acquire rail lines that are part of the interstate rail system, that acquisition or abandonment of rail lines that are part of the interstate rail system required ICC/STB approval, and that persons that are not carriers become carriers once they acquire rail lines that are part of the interstate rail system. And for many years through today, the major commuter rail systems (Long Island Railroad, Metro-North, New Jersey Transit, Massachusetts Bay Transportation Authority, Southeastern Pennsylvania Transportation Authority and others) have been carriers under the ICA, and the other railroad laws; and their employees have been covered by those laws. Moreover, the question of whether an intra-state, state agency-owned rail line used for intra-state commuter operations but also used for interstate train movements as part of the general national rail system was decided by the Court of Appeals for the Second Circuit which held that state agency was a rail carrier subject to ICC jurisdiction and the Federal railroad laws. Staten Island Rapid Transit Operating Authority v. I.C.C., 718 F.2d 533 (2d Cir. 1983).

However, in recent years, certain state entities and purported rail operators have employed a scheme to acquire rail lines still involved in the general interstate rail transportation system while avoiding carrier status and application of the railroad laws to the state agencies and their operators.

Under the new scheme, the freight railroad "sells" a line used in interstate commerce to a state agency which grants a so-called "operating easement" back to the freight railroad that allows the freight railroad, and only that railroad, to continue to serve shippers on the line and continue freight operations over the line; the freight railroad retains a so-called "residual common carrier obligation" for freight. As owner of the line, the state agency assumes responsibility for the maintenance of way, signal and dispatching work on the line that is still being used for interstate operations, but retains contractors to do that work; the state agency also retains contractors to operate the trains, perform work for inspection and maintenance of locomotives and rail cars and clerical work. The train operator may or may not be a carrier entity and the other contractors are usually not carrier entities; typically, there are multiple contractors responsible for operations, maintenance of way, signal, maintenance of equipment dispatching and railroad clerical work. While the sale of a carrier's rail line, or abandonment of a line by a carrier, are expressly subject to STB authorization, the new scheme evades that by the fiction that nothing really happens since the freight carrier retains an operating easement for freight and an inchoate common carrier duty for freight. In recent

decisions the STB has held that it lacks jurisdiction over transactions structured in this manner. Not only is this at odds with the decisions in *Staten Island Transit*, it is also without basis in the statute, The ICA is a very detailed statute that was amended several times to expand and clarify its coverage; it addresses many varied forms of railroad transactions and transfers of ownership, control, and operating rights over rail lines. The statute never refers to or uses the term "operating easement" and it does not describe or refer to anything like that concept. The "operating easement"/retained common carrier obligation concept is merely an artificial construct designed to allow the supposed sale of rail lines with retained operating rights without application of the ICA and railroad statutes.

*STB Decisions Enabling the New Scheme*

Despite the language of the Statute and the Staten Island decision the STB has allowed an increasing number of these transactions of increasingly larger sizes. The line of cases runs back to *State of Maine, Department of Transportation*, 8 I.C.C.2d 835, 1991 WL 84430 (I.C.C.), where the State of Maine sought to obtain 15 miles of track from the Maine Central Railroad Company when the carrier was planning to discontinue service. Under the deal, the State would own the track and the real estate and would "explore the possibility of commuter service", but the freight carrier would have a permanent easement to continue its common carrier freight operations; the freight carrier would also continue to be responsible for maintenance of the track, right of way and signal system. The State filed a petition with the ICC requesting an exemption from approval under Section 10901, and then filed a motion to dismiss the petition claiming the ICC lacked jurisdiction because it was not actually acquiring a "railroad line" under Section 10901. The ICC found that it did indeed lack jurisdiction because no common carrier rights or obligations would be transferred with the sale since the carrier could continue to perform its common carrier obligations, including maintenance and renewal of the line. The ICC cautioned, that its decision was limited to the facts of the case; and that varied circumstances could result in a different determination. This decision was followed by *Utah Transit Authority*, 8 I.C.C.2d 835, 1991 WL 84430 (I.C.C.), where a state agency and Union Pacific entered an agreement under which UTA would operate a light rail through use of a right-of-way on UP's tracks while UP retained the exclusive right to perform freight operations on the tracks for five hours per day during the night. The ICC found that it lacked jurisdiction over the transaction because UP retained the common

carrier obligation. In State of Wisconsin Department of Transportation, STB Finance Docket No. 34181, (July 30, 2002) the Wisconsin DOT sought a declaration that it would not be a carrier when it would acquire a rail line from a carrier and would contract for provision of commuter service, but the carrier would retain the common carrier obligation through a perpetual easement for freight operations. The STB noted that the normal rule is that when a noncarrier, including a state, acquires a freight line that has not been abandoned, it must seek STB approval and the new owner would be presumed to succeed the previous owner in maintaining the common carrier obligation. But in this instance, where only the physical assets would be conveyed and the common carrier obligation remains with the previous owner, STB approval was not required. Recently, in *New Mexico Department of Transportation*, STB Finance Docket 34793 (February 3, 2006) New Mexico acquired 297 miles of rail line from BNSF. New Mexico would provide commuter rail service but BNSF would retain an exclusive operating easement for freight service, and Amtrak service over the line would continue as before. New Mexico would be responsible for track and signal maintenance and it would use contractors to perform those responsibilities. The STB concluded that it need not approve the transaction because the common carrier rights and obligations that attach to the lines would not be transferred, New Mexico would not hold itself out as a common carrier for freight service, and the State would acquire only physical assets.

Thus over a number of years a decision of allowing a State to acquire a 15 mile line that could have been abandoned, where the carrier would continue to be responsible for maintaining the track, right of way and signal system, and which was characterized as unique, has been expanded into a doctrine and been the basis for a transfer of almost 300 miles of line where there were ongoing significant freight and Amtrak operations and the carrier was not responsible for maintaining the track, right of way and signal system.

*PROBLEMS WITH THE NEW SCHEME*

*WORKERS*

When these new entities buy rail lines and set up new commuter rail operations, freight employees, particularly maintenance of way, signal and dispatcher employees are often displaced because the freight carrier has given up responsibility for the line; operating employees may also be affected because while freight movements continue, they may be reduced. Additionally, many of

these new commuter operations are deliberately structured to be non-carrier/non-union operations in order to avoid industry standard wages and benefits. That is the main point of invoking the line of cases that circumvent the ICA and the federal railroad laws. Those who promote these schemes routinely promote the possibility of at least 20% savings in costs by running as a non-carrier operation. Indeed, Rail labor has documentation from a number of cases where there was an express plan to avoid using railroad workers who belong to unions. Moreover, even if railroad workers are willing to stay on the conveyed lines and take lower paying jobs with lesser benefits, they do not do so. They are compelled to decline these jobs because use of non-carrier contractors means that they would be working for non-carrier entities and would not be railroad workers, thereby severing their connection with the industry which means substantial reductions in their vested Railroad Retirement benefits, in addition to the wage and benefit cuts they would endure.

Additionally, the use of this device undercuts standard national railroad worker pay and benefits replacing good, middle class jobs with lower paying jobs with lesser benefits. Furthermore, railroad entities that might want to bid on these contracts are placed at a great competitive disadvantage in doing so because the lower paying/lower benefits/non-union bidders can submit substantially lower bids. And in the long run, creation of a cadre of non-railroad railroad workers paid at substantially below standard salaries and benefits will place downward pressure on the pay and benefits of railroad, railroad workers.

*SAFETY*

Proliferation of this new scheme will have significant safety ramifications. Because qualified and certified professional railroad workers will not take these jobs, they will be filled by less qualified workers. It is perverse that employees who will be involved in the movement of things will be more qualified and expert than employees involved in the movement of people. Another safety problem arises from the splintering of responsibility of rail operations. When there is a single carrier operator that is responsible for train movements; maintenance of the track, right of way and signal system, and maintenance of the locomotives and rail carriers, it has a powerful incentive to maintain safe, efficient and quality operations because all responsibility ultimately runs to that carrier. But under the model where there is one contractor for train movements, another for maintenance of way, one for signal work, another for maintenance of locomotives and cars, one for railroad clerical work, and

another for dispatching, there are incentives for each to minimize its responsibility and leave concerns to the other contractors. And in the event of an accident the operator whose engineer was driving the train might blame the signal contractor, or the maintenance of equipment operator who inspected the air brakes; or one or more of them might blame the maintenance of way contractor for poor maintenance of the track, or all of them might blame each other. Instead of determining what went wrong to prevent a recurrence, there will be a blame-game and years of litigation. This is no way to run a railroad.

*BALKANIZATION OF THE NATIONAL RAIL SYSTEM*

The ICA was amended and the ICC was given more powers after World War I because it became apparent that we had a patchwork rail system; that patterns of ownership, connections and responsibility were not conducive to an effective national rail system and that the system could be hurt by failures of disconnected parts over which there was no meaningful oversight and service standards. The current new scheme, which developed at the same time as the new and unregulated financial instruments developed, threatens our rail system with the sort of problems that occurred with our rail system prior to the 1930s and that currently plague our financial system. When entities that own right of way and trackage in the middle of our interstate rail system are not carriers, when the STB has no authority over the entities that own track used in heavy interstate freight and intercity passenger movements, when a state agency that owns a line of railroad could walk away from the line with the STB powerless to act, there is danger to our rail system. While we are beginning to take steps to develop a top flight passenger rail system, our freight system has been the envy of the world and our established commuter rail systems have been quite effective. We are ill-served by a system where rail lines cease to owned by responsible carriers and subject to STB oversight and regulation, and where passenger rail operations are a mere hodge-podge of disconnected entities who do not see the operation as a unified whole.

*(2) THE IMPACT OF THE CURRENT ECONOMIC CRISIS ON THE RAILROAD INDUSTRY AND ITS WORKERS*

The U.S. economy has been in a recession since December 2007 according to most economists. No one can dispute that the financial and housing sectors of our economy are in dire economic shape with bad news coming almost daily from those sectors. The nation's automobile manufacturers, both domestic companies and "transplants" face declining sales and economic difficulties.

There also can be no disputing that railroads are part of our national economy; however, their financial performance in 2008 was a bright spot.

Three of the four largest railroads recently issued their financial reports for the fourth quarter of 2008.[5] These results glittered in comparison with other financial news received recently:

CSX – operating income up 22% over the full year in 2007[6];
UP – operating income up 21% over the full year in 2007[7];
BNSF – operating income up 14% over the full year in 2007[8]

These results were achieved despite falling unit volumes. Simply put, the major Class I railroads remain in strong financial shape and performed well throughout 2008 despite the U.S. economy slipping into a recession. As late as November 2008, total employment for all Class I railroads was slightly below that of November 2007.[9] However, that month did show drops in train and engine crew employment of between 3 and 4 per cent over the previous year. We also note that all of the Class I railroads report that carloadings for January 2009 are below those for the previous year. Clearly, the slowing down of the U.S. economy is being felt by the railroads, at least as that slowdown is reflected in lower carloadings.

We will defer to our brothers and sisters in the UTU to describe the impact of this drop in carloadings on their membership. For those of us in the BMWED, the drop in carloadings does not year appear to have had an impact on employment. The primary reason is seasonal. Most railroads engage in reductions of forces around Thanksgiving as weather conditions preclude the operation of production gangs in many areas of the country. Therefore, a rise in layoffs during the months of November and December is a "normal" phenomenon. The real test will begin in late March and April when the railroads traditionally increase their forces to accommodate the need for extra employees to staff production gangs that had been idle during the winter. As of today, we have received no direct information from any railroad that it intends

---

5 Norfolk Southern will announce its fourth quarter results on January 27, 2009, after this testimony has been submitted to the Subcommittee.
6 CSX Quarterly Financial Report, Fourth Quarter 2008
7 UP News Release "Union Pacific Reports Fourth Quarter Earnings Growth Driven by Productivity and Lower Energy Costs"
8 BNSF Form 8-K, January 21, 2009
9 Statement M-350, Surface Transportation Board – November 2008

to make substantial cuts in its capital maintenance budget for 2009 that will impact on force levels in the maintenance of way department.

One must remember that railroad production maintenance gangs and trains compete for the use of the rails. Production gangs can have upwards of 100 employees working on them, so they cannot "hop" on and off the tracks to work around train traffic. Once such a large gang begins work on the tracks, it needs a reasonable block of uninterrupted time to perform work. In times of high traffic, those track "windows" are necessarily smaller. When traffic drops, as it has recently, those same gangs can gain additional time to work on the tracks. Therefore, it is in the railroads' interests to continue to work these gangs during a downturn in business because they become more "productive." Indeed, since the railroads were complaining that at some points on their systems they were "capacity constrained" before the economic slowdown, the current recession will give them the opportunity to improve capacity for the inevitable rebound of the economy from this recession. Indeed, the railroads' need for capacity improvements brings us to the last topic suggested by the Subcommittee.

(3) *THE BENEFITS AND IMPORTANCE OF INVESTING IN FREIGHT AND/OR PASSENGER RAIL*

*Passenger Rail*

Investment in passenger rail is a necessary part of any coherent national energy and transportation policy. None of us will forget that in the immediate aftermath of the September 11, 2001 attacks, Amtrak continued to provide intercity passenger service while the nation's airlines were grounded. Rail passenger operations are the only intercity transportation mode that delivers passengers directly to the heart of cities, both large and small. Unfortunately, to the detriment of our nation's transportation network, Amtrak has been unfairly targeted by some ideologues as undeserving of public assistance. The BMWED commends the hard work performed by this Subcommittee in the last Congress that resulted in passage of the Passenger Rail Investment and Improvement Act of 2008 which provides a generous multi-year authorization for capital improvements at Amtrak. Finally, we have a coherent plan for the development and <u>growth</u> of Amtrak, a policy which will ease transportation congestion in the Northeast Corridor and create new, good paying railroad jobs for those involved in Amtrak's expansion.

While BMWED supports investment for the expansion of passenger rail, Congress should insure that it is not done on the cheap with unqualified workers, with contractors who lack experience and do not have overall responsibility for all rail operations, and with rail line owners who are not carriers and subject to the federal railroad laws. The long-established major commuter rail operations in the United States operate safely and efficiently and they are rail carriers that employ railroad workers for all railroad functions. That is the model for expansion of commuter rail. Congress should act to insure that owners of rail lines are rail carriers, that the STB has jurisdiction over entities that own rail lines in the interstate rail system, and that the persons who perform rail work (especially work involved with the movement of people) are professional, qualified railroad workers. And any program of grants for expansion of passenger rail should be conditioned on requirements that mandate that those involved will be rail carriers and railroad employees.

*Freight Rail*

Historically, freight railroads have been responsible for the investment in their infrastructure. Indeed, as we discussed earlier, the three of the four major Class I railroad reported financial performance for 2008 that exceeded that of 2007. However, we are in uncharted economic and financial waters. The Rail Safety Improvement Act of 2008 mandates the implementation of positive train control on many of the lines operated by the Class I railroads (and some regional and short line railroads as well). Additionally, the entire U.S. economy faces a credit squeeze that prevents even credit-worthy companies from obtaining bank credit at any terms at all. We do note that BNSF announced its proposed capital expenditures for 2009 at $2.7 billion, a figure about $150 million less than that for 2008. Similarly, the two Canada based Class I carriers, Canadian National and Canadian Pacific, have announced cuts in capital expenditures, although the exact affect on U.S. expenditures is unknown. Certainly there appears to be a perceptible slowing of private investment in infrastructure by the major railroads.

Presently, the BMWED continues to study the various proposals and suggestions for ways freight railroads can invest in improving and expanding their infrastructure. We can offer no specific proposal at this time, but we intend to continue to study the matter and hope this Subcommittee will hold additional hearings on this significant issue.

We thank you again for the opportunity to express our views to the Subcommitte.

**TESTIMONY**

of

**LANCE R. GRENZEBACK**
Senior Vice President
Cambridge Systematics, Inc.
100 CambridgePark Drive, Suite 400
Cambridge, MA 02140

on

**FREIGHT AND PASSENGER RAIL: PRESENT AND FUTURE ROLES, PERFORMANCE, BENEFITS, AND NEEDS**

before

**THE SUBCOMMITTEE ON RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS**
**COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE**
**U.S. HOUSE OF REPRESENTATIVES**

Wednesday, January 28, 2008

***Introduction***

Madam Chairwoman, Mr. Shuster, distinguished committee members:

My name is Lance Grenzeback. I am a senior vice president with Cambridge Systematics.

We provide transportation policy, planning, and management consulting services to federal, state, and local transportation agencies and to private-sector transportation and investment companies. We authored the *Freight-Rail Bottom Line Report* for AASHTO, and more recently, the *National Rail Freight Infrastructure Capacity and Investment Study* for the Association of American Railroads and National Surface Transportation Policy and Revenue Study Commission. We also work directly with state departments of transportation (DOTs) and railroads to develop freight and passenger rail policies and programs.

My testimony this morning will focus on:

- Role of freight rail in the economy;
- Impact of the economic crisis on freight rail; and
- Freight and passenger rail needs.

### *Role of Freight Rail in the Economy*

Freight rail is a critical part of the freight transportation spectrum (see Figure 1. Freight Transportation "Service Spectrum"). It provides cost-effective transportation for long-distance shipments and movement of heavy bulk commodities:

- Intermodal rail competes with trucking to move international and domestic containers, truck trailers, and finished automobiles.
- Rail carload service carries thousands of products—machine parts, building materials, lumber, and chemicals—in boxcars, tank cars, and other specialized rail equipment; and
- Unit trains haul enormous quantities of bulk commodities, including 30 percent of the nation's grain harvest and 65 percent of coal used to generate electricity.




Figure 1. Freight Transportation "Service Spectrum"

The productivity and cost-effectiveness of the freight rail system has improved significantly (see Figure 2. U.S. Railroad Performance, 1964 to 2007). Inflation-adjusted rail rates are about half today what they were in 1980, and freight tonnage has doubled. Rail presently accounts for about 30 percent of all ton-miles of freight movement in the United States and over 40 percent of long-distance, intercity freight movement. Rail reduces the cost of production and distribution, contributing to greater industry productivity and competitiveness in U.S. and global markets.




Rail also relieves truck pressure on our congested highways and the cost to state DOTs of maintaining highways and bridges. The freight carried by rail keeps the equivalent of 100 million trucks and 1.5 trillion ton-miles of truck travel off our highways.

And rail is energy efficient. Locomotive fuel efficiency has increased by more than 80 percent since 1980. On a ton-mile basis, rail is about twice as energy efficient as trucking. Moreover, in a world worried about climate change, rail accounts for less than 2½ percent of all U.S. transportation petroleum use and GHG emissions.

### *Impact of the Economic Crisis on Freight Rail*

However, rail traffic has not grown significantly since 2005. We believe this is the result of tightening capacity in the freight rail system and the resulting deterioration in rail reliability.

The recession will bring unwanted short-term "relief" to rail system congestion because rail traffic is dropping (see Figure 3. Weekly U.S. Railroad Traffic, 2007 and 2008). Rail traffic in 2008 was the fourth-highest in history, but traffic dropped sharply in the fourth quarter of 2008. By December, carload traffic was down 14.2 percent and intermodal traffic was down 13.7 percent compared to 2007. Shipments of agricultural products and chemicals dropped by about 20 percent; forest products by 30 percent; motor vehicles by over 40 percent; and metals by nearly 45 percent. The decline has continued through the first weeks of January 2009, and all indications are that rail traffic volumes will drop further over the next year.




In the AASHTO and AAR studies, we reported that the economy would grow at about 2.8 percent per year, resulting in a 70 percent increase in the demand for rail freight transportation between 2005 and 2035. With the economy now estimated to grow at 2.5 percent or less over the period, we expect that forecast to be delayed three to five years. We may not see the 2035 volumes until 2040.

### *Freight and Passenger Rail Needs*

The recession will also reduce revenue available for investment in new capacity. Railroad investment in new capacity had been increasing—from about $1.1 billion per year in 2005 to almost $1.9 billion per year in 2007. 2008 was a profitable year for the railroads and there was continued investment in new capacity, but this performance will not be repeated in 2009 and 2010. Investment in ongoing maintenance and replacement will be cut back because of lower revenues, and investment in new capacity expansion projects will largely cease. We will not see new investment to untangle congestion at major rail hubs such as Chicago, to add track and clear lines for doublestack intermodal trains, or to rebuild rail yards and terminals.

As a result, when the recession eases and the demand for freight transportation picks up, we will likely find ourselves with less capacity than we have today and well behind what we need for tomorrow.

In 2007, we estimated that 12 percent of primary rail corridor miles were operating at or near capacity, with about 1 percent—shown in red—operating above capacity (see Figure 4. Current Corridor Volumes Compared to Current Corridor Capacity, 2007).




We projected that without capacity expansion improvements totaling nearly $150 billion over the next 28 years, 30 percent of primary corridor mileage would be operating above capacity by 2035 (see Figure 5. Future Corridor Volumes Compared to Current Corridor Capacity, 2035 Without Improvements).



If we delay improvements to the freight rail system, we may find ourselves closer to this hypothetical 2035 situation than we anticipated, especially if oil prices increase over the next years and if we decide to expand intercity and passenger rail services.

When oil prices shot up in 2008, we saw long-haul truck traffic shift to rail. If oil prices increase again with an economic recovery—even if they stabilize at rates below $100 per barrel—we can expect to see a substantial and long-term increase in the demand for rail freight service. This will quickly absorb any remaining capacity in the rail system.

And if we follow through on our promises to make much needed improvements to our intercity passenger and commuter rail services, we will need to add capacity and improve signal systems on many already congested freight rail lines (see Figure 6. Proposed 2050 Intercity Passenger Rail Network).

Five years from now we could be pressing hard against the capacity of the rail system and struggling to catch up.




### *Policy Recommendations*

We have an opportunity to take advantage of the lull in rail traffic growth to prepare for the recovery and position the rail industry to absorb future growth. This will be critically important if we are looking to the freight rail system to help reduce future highway congestion, cut back on the nation's fuel use and greenhouse gas emissions, and make space for passenger rail service.

To reposition the rail system, we should –

- Establish a national rail policy and outline the future of the national rail freight system. We do not need a detailed blueprint for the rail system, but we do need a broad consensus on where we must make improvements to keep pace with economic growth and meet freight and passenger demand.
- Increase public and private investment in freight and passenger rail systems and agree on how we will share the benefits, costs, and risks equitably.
- Create a mechanism such as a national infrastructure investment bank to finance improvements in economically important freight and passenger rail corridors where the costs are too high for a single railroad or state to undertake, but the improvements benefit many states and industries.
- Expand state and local rail programs to coordinate freight, short line, intercity passenger, and commuter rail services; to separate busy rail lines and highways at crossings; to improve intermodal connectors for trucking; and to mitigate the community impacts of more and more frequent freight and passenger rail trains.

The capacity of our rail system has not been keeping pace with economic growth. The rail capacity problem is not limited to a few chokepoints, hubs, and heavily traffic corridors. It is nationwide, affecting almost all the nation's critically important trade gateways, rail hubs, and intercity freight corridors. We must look past the immediate recession and put in place policies and programs that ensure we will have adequate capacity and efficient freight and passenger rail services tomorrow.

I thank you for the opportunity to appear before you today. I would be happy to answer your questions.

# Testimony on the

# Benefits of Intercity Passenger Rail

before the

Subcommittee on Railroads, Pipelines

and

Hazardous Materials

of the

House Committee on Transportation and Infrastructure

By

Will Kempton

Director, California Department of Transportation

Wednesday, January 28, 2009

STATEMENT OF WILL KEMPTON
DIRECTOR,
CALIFORNIA DEPARTMENT OF TRANSPORTATION
(DEPARTMENT)
BEFORE THE
HOUSE TRANSPORTATION AND INFRASTRUCTURE
COMMITTEE, SUBCOMMITTEE ON RAILROADS, PIPELINES
AND HAZARDOUS MATERIALS

JANUARY 28, 2009

CHAIRMAN BROWN, RANKING MEMBER SHUSTER AND DISTINGUISHED MEMBERS OF THE COMMITTEE;

MY NAME IS WILL KEMPTON AND I AM THE DIRECTOR OF THE CALIFORNIA DEPARTMENT OF TRANSPORTATION, ALSO KNOWN AS CALTRANS. THANK YOU FOR THE OPPORTUNITY TO TESTIFY BEFORE YOU TODAY ON THE BENEFITS OF INTERCITY PASSENGER AND FREIGHT RAIL.

BEFORE GOING INTO MY PREPARED REMARKS, I WOULD LIKE TO TAKE A MINUTE TO EXPRESS MY APPRECIATION TO THIS SUBCOMMITTEE AND TO THE COMMITTEE AS A

WHOLE FOR YOUR EFFORTS AND SUPPORT IN THE PASSAGE OF THE "PASSENGER RAIL IMPROVEMENT AND INVESTMENT ACT" (PRII) CONTAINED IN LAST SESSION'S HR. 2095. TWO MAJOR COMPONENTS OF THAT LEGISLATION WILL AID IN THE FURTHER DEVELOPMENT OF A NATIONWIDE INTERCITY PASSENGER RAIL PROGRAM. FIRST, THE FINANCIAL STABILIZATION OF AMTRAK WILL MAKE IT EASIER FOR STATES TO PLAN FOR THE FUTURE. FROM A STATE PERSPECTIVE, THAT EFFORT WAS OFTEN HINDERED BY THE UNCERTAINTY OF WHETHER OR NOT YOUR NATIONAL PARTNER WOULD CONTINUE TO BE IN EXISTENCE. THE SECOND IS THE CAPITAL MATCHING GRANT PROGRAM CONTAINED IN THE LEGISLATION THAT ESTABLISHES THE SAME FEDERAL/STATE PARTNERSHIP THAT ALREADY EXISTS FOR HIGHWAYS AND AVIATION. THAT SAME PARTNERSHIP CAN NOW BE USED TO GROW AND DEVELOP INTERCITY RAIL. THE CHALLENGE AHEAD WILL BE TO SECURE THE FUNDING FOR THE PROGRAMS AUTHORIZED IN THE ACT.

I WOULD ALSO LIKE TO APPLAUD THIS COMMITTEE'S EFFORTS TO CRAFT, IN CONJUNCTION WITH THE APPROPRIATIONS COMMITTEE, THE TRANSPORTATION COMPONENT OF THE ECONOMIC STIMULUS LEGISLATION. COMING FROM A STATE WITH A ROBUST RAIL CAPITAL IMPROVEMENT PROGRAM, A STATE THAT BY ITSELF HAS $340 MILLION OF "SHOVEL READY" PROJECTS, WE BELIEVE THAT A GREATER AMOUNT COULD GO TO PASSENGER RAIL PROJECTS. I KNOW THE STATES FOR PASSENGER RAIL COALITION IDENTIFIED ANOTHER $1.2 BILLION WORTH OF PROJECTS IN OTHER STATES THAT COULD BE OBLIGATED WITHIN 90 TO 180 DAYS. HOWEVER, I APPRECIATE THE CHALLENGES THAT THE APPROPRIATIONS COMMITTEE FACED IN THIS EFFORT. I WANT TO ASSURE YOU THAT WE ARE WORKING WITH OUR LOCAL PARTNERS TO ENSURE THAT WHEN ECONOMIC STIMULUS FUNDS BECOME AVAILABLE, CALIFORNIA WILL BE IN A POSITION TO USE THEM QUICKLY AND EFFICIENTLY.

AS THE DIRECTOR OF CALTRANS, I OVERSEE A DEPARTMENT WITH MORE THAN 23,000 EMPLOYEES, A $13.8 BILLION DOLLAR BUDGET, AND A STATE HIGHWAY SYSTEM OF MORE THAN 50,000 LANE MILES. WE ALSO CONTRACT WITH AMTRAK FOR INTERCITY PASSENGER RAIL SERVICES AND ARE HOME TO THE 2ND, 3RD AND 6TH BUSIEST INTERCITY PASSENGER RAIL CORRIDORS IN THE COUNTRY.

EVERY DAY I SEE THE POTENTIAL OF INTERCITY PASSENGER RAIL TO HELP ADDRESS, NOT ONLY CALIFORNIA'S, BUT THE NATION'S, MOBILITY, ENVIRONMENTAL, AND ECONOMIC CHALLENGES. I AM A REGULAR USER OF THE CAPITOL CORRIDOR SERVICE TO TRAVEL BETWEEN SACRAMENTO AND THE BAY AREA. I FREQUENTLY TRAVEL THROUGHOUT THE STATE AND, WHENEVER POSSIBLE, I USE CALIFORNIA'S OTHER STATE-SUPPORTED INTERCITY RAIL SERVICES. TO ENCOURAGE MY OWN STAFF, AND OTHER STATE EMPLOYEES IN NEARBY BUILDINGS, TO USE INTERCITY TRAINS, I HAVE HAD AN AMTRAK "QUIK-TRAK" TICKET MACHINE INSTALLED ON THE FIRST FLOOR OF OUR

HEADQUARTERS BUILDING IN SACRAMENTO. I BELIEVE THIS IS THE ONLY AMTRAK TICKET MACHINE WEST OF THE MISSISSIPPI THAT IS NOT HOUSED IN AN AMTRAK STATION.

CALIFORNIA IS OFTEN CITED AS BEING "ON THE CUTTING EDGE." I DON'T THINK IT WOULD BE INACCURATE TO SAY, "THE CHALLENGES WE ARE FACING TODAY ARE ONES THAT MANY STATES WILL FACE IN THE NOT TOO DISTANT FUTURE."

LIKE MANY PARTS OF THE COUNTRY, CALIFORNIA ONCE HAD A ROBUST PASSENGER RAIL NETWORK RUN BY THE PRIVATE RAILROADS. THESE RAILROADS CARRIED BOTH FREIGHT AND PASSENGERS AND WERE FASTER, MORE RELIABLE, SAFER, AND LESS EXPENSIVE THAN OTHER MODES OF TRANSPORTATION.

FOLLOWING THE SECOND WORLD WAR, HOWEVER, THE ECONOMICS OF RAIL TRANSPORTATION BEGAN TO SHIFT. THE RAPID ECONOMIC GROWTH THAT OCCURRED FOLLOWING THE SECOND WORLD WAR

PRODUCED UNPRECEDENTED WEALTH FOR OUR CITIZENS. THAT WEALTH MADE THE PRIVATE AUTOMOBILE AFFORDABLE TO A MAJORITY OF FAMILIES. THE AVAILABILITY OF INEXPENSIVE LAND, THE EXPLOSION IN AUTOMOBILE USE, AND CHEAP ENERGY RESULTED IN A MIGRATION OUT OF THE CITIES TO LESS DENSELY POPULATED SUBURBS. THAT GROWTH PATTERN WAS STRENGTHENED BY A FEDERAL TRANSPORTATION FUNDING STRUCTURE THAT ENCOURAGED FUEL CONSUMPTION AND A LAND USE PLANNING THAT ENCOURAGED SUBURBAN SPRAWL.

DURING THAT SAME PERIOD, WE SAW OUR FREIGHT AND PASSENGER RAIL INFRASTRUCTURE SHRINK UNDER THE PRESSURES OF COMMUNITY DEVELOPMENT, HIGHWAY AND AVIATION SYSTEM EXPANSION, AND FEDERAL FUNDING POLICIES. THE RAILROAD'S RETURN ON INVESTMENT DWINDLED TO LESS THAN THE COST OF MAINTAINING THEIR TRACK. OFTEN THIS RESULTED IN TRACK BEING REMOVED AND THE RIGHT-OF-WAY SOLD. AS A RESULT, IN MANY AREAS OF THE COUNTRY

PEOPLE HAVE BEEN LEFT WITH NO MOBILITY OPTIONS OTHER THAN DRIVING.

OVER THE PAST SEVERAL YEARS IN CALIFORNIA, HOWEVER, WE HAVE SEEN A RESURGENCE OF INTEREST IN AND USE OF INTERCITY PASSENGER RAIL. FOR THE STATE FISCAL YEAR, ENDING LAST JULY, MORE THAN 5.3 MILLION PASSENGERS RODE CALIFORNIA'S THREE INTERCITY PASSENGER RAIL CORRIDORS—A JUMP OF 13 PERCENT OVER THE PRIOR YEAR. CALIFORNIA IS SECOND ONLY TO NEW YORK IN TOTAL AMTRAK RIDERSHIP. TWENTY PERCENT OF ALL AMTRAK RIDERS COME FROM CALIFORNIA. OUR STATE SUPPORTED CORRIDORS INCLUDE:

- THE PACIFIC SURFLINER CORRIDOR PARALLELING CALIFORNIA'S COAST FROM SAN DIEGO THROUGH LOS ANGELES AND NORTH TO SANTA BARBARA AND SAN LUIS OBISPO IS THE NATION'S SECOND BUSIEST INTERCITY RAIL CORRIDOR SERVING 2.8 MILLION PASSENGERS ANNUALLY. ONLY THE NORTHEAST CORRIDOR IS BUSIER AND, AT TIMES LAST SUMMER,

RIDERSHIP ON THE CORRIDOR EXCEEDED THE RIDERSHIP ON THE ACELA IN THE NORTHEAST CORRIDOR.

- THE CAPITOL CORRIDOR CONNECTS THE CITY OF AUBURN THROUGH SACRAMENTO AND OAKLAND TO SAN JOSE. AT 1.6 MILLION RIDERS, THIS ROUTE IS AMTRAK'S THIRD BUSIEST AND ITS FASTEST GROWING. WITH 16 ROUND TRIPS BETWEEN SACRAMENTO AND OAKLAND, THE CAPITOL CORRIDOR HAS THE SAME LEVEL OF FREQUENCY AS THE NEW YORK-BOSTON SEGMENT OF THE NORTHEAST CORRIDOR.

- THE SAN JOAQUIN CORRIDOR CONNECTS THE BAY AREA AND SACRAMENTO WITH THE CITIES OF CALIFORNIA'S CENTRAL VALLEY. IT IS AMTRAK'S SIXTH BUSIEST CORRIDOR, SERVING JUST UNDER 900,000 PASSENGERS ANNUALLY. THE SAN JOAQUIN ROUTE IS UNIQUE BECAUSE ITS EXTENSIVE FEEDER BUS NETWORK CONNECTS THE TRAIN WITH ALL

PARTS OF CALIFORNIA, AS WELL AS THE STATES OF OREGON AND NEVADA.

THE FOLLOWING GIVES A PERSPECTIVE TO THE POTENTIAL I THINK INTERCITY RAIL HAS TO MEET OUR MOBILITY NEEDS. BETWEEN JULY 2001 AND JULY 2008, CALIFORNIA'S POPULATION GREW JUST OVER 9.7 PERCENT. DURING THAT SAME PERIOD, THE NUMBER OF VEHICLE MILES TRAVELED GREW APPROXIMATELY 6.6 PERCENT. INTERCITY RAIL RIDERSHIP, ON THE OTHER HAND, GREW BY MORE THAN 56 PERCENT DURING THAT PERIOD AND THE TOTAL NUMBER OF PASSENGER MILES GREW BY JUST OVER 40 PERCENT. ALTHOUGH THE ORDER OF MAGNITUDES ARE CLEARLY DIFFERENT—HUNDREDS OF MILLIONS OF PASSENGER MILES VERSUS BILLIONS OF VEHICLE MILES OF TRAVEL, IT CLEARLY DEMONSTRATES THE POTENTIAL OF INTERCITY RAIL TO HANDLE A SIGNIFICANT SHARE OF OUR TRAVEL MARKET.

THIS GROWTH SHOULD NOT BE DISMISSED AS SOLELY THE OUTCOME OF THE RECENT INCREASES IN THE

PRICE OF GASOLINE AND THE COST OF AIR TRAVEL. THE PERFORMANCE OF THE SAN JOAQUIN CORRIDOR OVER THIS PAST YEAR, I BELIEVE TRULY REFLECTS THE UNDERLYING POTENTIAL OF INTERCITY PASSENGER RAIL TO MEET OUR MOBILITY NEEDS. FOR THOSE UNFAMILIAR WITH CALIFORNIA'S SAN JOAQUIN VALLEY, IT STRETCHES SEVERAL HUNDRED MILES THROUGH THE CENTER OF OUR STATE ROUGHLY FROM STOCKTON TO BAKERSFIELD. ITS PRIMARY INDUSTRY IS AGRICULTURE, IT IS ETHNICALLY DIVERSE, IT HAS THE STATES LOWEST PER CAPITA INCOME AND AN UNEMPLOYMENT RATE FOR THE LAST QUARTER THAT AVERAGED IN EXCESS OF 12 PERCENT. IN MANY WAYS IT IS "GROUND ZERO" OF THE MORTGAGE CRISIS IN CALIFORNIA. THIS LAST YEAR, BETWEEN JULY 2007 AND JULY 2008, RIDERSHIP ON THE SAN JOAQUIN SERVICE GREW 13 PERCENT. THE RIDERSHIP GROWTH WAS NOT SURPRISING WHEN GAS PRICES WERE OVER $4 PER GALLON. WHAT WAS SURPRISING WAS THAT THE GROWTH WOULD CONTINUE EVEN AFTER GAS PRICES DROPPED TO BELOW $2 A GALLON. WE SAW RIDERSHIP INCREASES IN NOVEMBER AND DECEMBER

NEARLY TEN PERCENT ABOVE THE SAME MONTHS OF THE PRIOR YEAR. CLEARLY, IF YOU PROVIDE A RELIABLE, CONVENIENT, AND REASONABLY PRICED INTERCITY PASSENGER RAIL TRANSPORTATION OPTION, PEOPLE WILL CHOOSE TO USE IT.

IN ADDITION TO PROVIDING A TRANSPORTATION ALTERNATIVE, INTERCITY PASSENGER RAIL PROVIDES A NUMBER OF OTHER BENEFITS. WHEN THE PRICE OF GASOLINE TOPPED $4 PER GALLON THIS LAST SUMMER AND FALL, WE SAW THE ECONOMIC IMPLICATIONS OF OUR EARLIER LAND USE AND TRANSPORTATION DECISIONS. WE WERE ALL REMINDED THAT OUR SUPPLY OF OIL IS FINITE, THAT WORLDWIDE DEMAND IS GROWING, AND, EXCEPT FOR LIMITED DOMESTIC PRODUCTION, OUR NATION'S ENERGY SUPPLY IS LARGELY CONTROLLED BY OTHERS. INTERCITY PASSENGER RAIL IS ESTIMATED TO USE AT LEAST 15 PERCENT LESS ENERGY ON A PER PASSENGER MILE BASIS THAN THE AIRLINES AND 21 PERCENT LESS THAN THE AUTOMOBILE.

INTERCITY RAIL ALSO PROVIDES SIGNIFICANT ENVIRONMENTAL BENEFITS, PARTICULARLY AS IT RELATES TO THE ROLE CARBON DIOXIDE PLAYS IN GLOBAL WARMING. THE AVERAGE INTERCITY TRAIN PRODUCES 60 PERCENT FEWER CO2 EMISSIONS ON A PER PASSENGER MILE BASIS THAN THE AVERAGE AUTO AND ABOUT HALF THE GREEN HOUSE GAS EMISSIONS OF AN AIRPLANE. IN 2008, WE ESTIMATE CALIFORNIA'S INTERCITY RAIL SYSTEMS HELPED ELIMINATE 82,000 TONS OF CARBON DIOXIDE EMISSIONS. EFFORTS TO CONTROL GREENHOUSE GAS EMISSIONS MUST RECOGNIZE THE ROLE OF THE TRANSPORTATION SECTOR AND ENCOURAGE CHANGES BOTH IN TRAVEL AND IN LAND USE PATTERNS THAT FOSTER THE USE OF RAIL AND PUBLIC TRANSIT.

EVEN WITH A STATE AND FEDERAL FOCUS ON REDUCING CONGESTION ON OUR HIGHWAY SYSTEMS, BOTTLENECKS ARE STILL OCCURRING. AS OUR POPULATION GROWS, SO TOO WILL CONGESTION IN URBAN AREAS. BUILDING ADDITIONAL HIGHWAY CAPACITY IS OFTEN PROHIBITIVELY EXPENSIVE AND

DIFFICULT TO ACCOMPLISH. INTERCITY AND COMMUTER RAIL PROVIDE TRANSPORTATION PLANNERS WITH ANOTHER OPTION TO MEETING MOBILITY NEEDS. PROBABLY ONE OF THE BEST EXAMPLES IS IN SOUTHERN CALIFORNIA BETWEEN IRVINE IN ORANGE COUNTY AND DOWNTOWN LOS ANGELES. THE PACIFIC SURFLINER CORRIDOR ROUGHLY PARALLELS INTERSTATE 5 BETWEEN THESE CITIES. THE STATE SUPPORTED PACIFIC SURFLINER SERVICE, IN PARTNERSHIP WITH METROLINK COMMUTER SERVICE, CARRY THE EQUIVALENT OF ONE FULL LANE OF TRAFFIC DURING COMMUTE PERIODS. EFFECTIVELY, THIS IS A LANE OF URBAN FREEWAY THAT DOES NOT NEED TO BE CONSTRUCTED AT A COST OF HUNDREDS OF MILLIONS OF DOLLARS. PUT ANOTHER WAY, THE RAIL SERVICE RELIEVES CONGESTION IN THIS IMPORTANT CORRIDOR. THERE ARE ALSO TANGIBLE AIR QUALITY AND CONGESTION MANAGEMENT BENEFITS THAT ACCRUE TO THE PUBLIC FROM THE EXISTENCE OF THE RAIL SERVICES AND TO HIGHWAY USERS IN THE FORM OF IMPROVED TRAFFIC FLOW ON THE EXISTING ROADWAY SYSTEM.

FINALLY, OVER THE PAST 30 YEARS THAT THE STATE OF CALIFORNIA HAS HAD AN INTERCITY RAIL PROGRAM, WE HAVE INVESTED NEARLY $2 BILLION IN PUBLIC FUNDS IN THE INFRASTRUCTURE NECESSARY TO PROVIDE A VIABLE INTERCITY RAIL SERVICE FOR THE STATE. MORE THAN HALF THAT AMOUNT HAS BEEN DIRECT INVESTMENTS IN TRACK AND SIGNALS OWNED BY THE FREIGHT RAILROADS. ALTHOUGH THESE INVESTMENTS WERE PRIMARILY FOR PASSENGER RAIL, MANY HAVE ALSO BENEFITED THE CLASS ONE FREIGHT RAILROADS OPERATING IN CALIFORNIA. FREIGHT RAIL IS VITAL TO BOTH THE STATE'S AND THE NATION'S ECONOMY AND WHEN WE NEGOTIATE WITH THE FREIGHT RAILROADS FOR PASSENGER RAIL IMPROVEMENTS, WE WORK WITH THEM TO ENSURE WE ACCOMMODATE THEIR FUTURE GROWTH POTENTIAL. THIS HAS HELPED US DEVELOP STRONG WORKING RELATIONSHIPS WITH OUR FREIGHT RAILROAD PARTNERS. AT THE SAME TIME, IT HAS ALLOWED THEM TO IMPROVE THE EFFICIENCY AND INCREASE THE CAPACITY OF THEIR INFRASTRUCTURE, AND ENHANCED

THEIR ABILITY TO MOVE GOODS TO MARKET. THESE STATE INVESTMENTS IN RAIL HAVE ALSO HELPED REDUCE CONGESTION AND IMPROVE AIR QUALITY BY REMOVING TRUCKS FROM THE HIGHWAYS AND LOCAL ROADWAYS AROUND PORTS AS WELL AS THROUGH CONGESTED URBAN COMMUNITIES.

ALTHOUGH NOT DIRECTLY RELATED TO PASSENGER RAIL, WE ALSO WORK WITH OUR CLASS ONE FREIGHT RAIL PARTNERS TO ENHANCE GOODS MOVEMENT IN CALIFORNIA. AMONG THE COMPONENTS OF THE "HIGHWAY SAFETY, TRAFFIC REDUCTION, AIR QUALITY, AND PORT SECURITY BOND ACT" ENACTED IN 2006, WAS $2 BILLION FOR IMPROVEMENTS TO THE TRANSPORTATION INFRASTRUCTURE TO IMPROVE THE FLOW OF GOODS THROUGH OUR MAJOR TRADE CORRIDORS. AMONG THE PROJECTS ELIGIBLE FOR FUNDING WERE FREIGHT RAIL IMPROVEMENTS. THIS THE MARKED THE FIRST TIME PUBLIC FUNDS WERE MADE AVAILABLE TO FREIGHT RAIL PROJECTS IN CALIFORNIA.

INTERCITY PASSENGER RAIL HAS CLEARLY DEMONSTRATED ITS CAPABILITY TO BE A VIABLE, COST-EFFECTIVE WAY TO PROVIDE AN INTER- AND INTRA REGIONAL MOBILITY OPTION. THIS HAS BEEN WELL DOCUMENTED BY THE SUCCESSES OF SERVICES NOT ONLY IN CALIFORNIA, BUT ALSO IN STATES LIKE WASHINGTON, WISCONSIN, ILLINOIS, NORTH CAROLINA, FLORIDA, AND THE STATES OF THE NORTHEAST CORRIDOR.

HOWEVER, IF WE ARE ALSO GOING TO BE SERIOUS ABOUT REDUCING OUR DEPENDENCE ON FOREIGN OIL, ENHANCING OUR ENVIRONMENT BY REDUCING GREENHOUSE GAS EMISSIONS, DEVELOPING SUSTAINABLE AND LIVABLE COMMUNITIES, AND FOSTERING ECONOMIC DEVELOPMENT, WE NEED TO MAKE INTERCITY PASSENGER RAIL A FULL PARTNER IN OUR TRANSPORTATION SYSTEM. WE CAN NO LONGER AFFORD, AS A POLICY, TO CHOOSE TO NOT INVEST IN INTERCITY PASSENGER RAIL. ALTHOUGH LAST SESSION'S PASSENGER RAIL INVESTMENT AND IMPROVEMENT ACT MARKED A POSITIVE START WITH

$1.9 BILLION OVER FIVE YEARS FOR STATE MATCHING GRANTS FOR CONVENTIONAL RAIL AND $1.5 BILLION FOR HIGH-SPEED RAIL, IT SHOULD ONLY BE VIEWED AS A DOWN PAYMENT.

AMONG THE MYRIAD OF THE CHALLENGES BEFORE THIS CONGRESS WILL BE THE AUTHORIZATION OF A NEW SURFACE TRANSPORTATION BILL. INTERCITY PASSENGER RAIL SHOULD BE AN ELEMENT OF THAT LEGISLATION. THE SURFACE TRANSPORTATION POLICY AND REVENUE COMMISSION, IN ITS FINAL REPORT ISSUED LAST JANUARY, SUGGESTED A FEDERAL INVESTMENT OF BETWEEN $5 AND $6 BILLION PER YEAR. THE AMERICAN ASSOCIATION OF STATE HIGHWAY AND TRANSPORTATION OFFICIALS, OR "AASHTO" ALSO BELIEVES INTERCITY PASSENGER RAIL MUST BE A STRONGER COMPONENT IN OUR TRANSPORTATION SYSTEM. IN ITS ADOPTED SURFACE TRANSPORTATION AUTHORIZATION POLICY, AASHTO IS RECOMMENDING NEARLY $35 BILLION FOR INTERCITY RAIL INVESTMENT OVER FIVE YEARS. WE BELIEVE THESE FUNDING LEVELS WARRANT SERIOUS

CONSIDERATION DURING DELIBERATIONS ON THE NEW SURFACE TRANSPORTATION BILL.

IN CLOSING, I WOULD LIKE TO COMPARE OUR INVESTMENTS IN INTERCITY RAIL WITH ANOTHER GLOBAL ECONOMIC COMPETITOR. THE NEW YORK TIMES, IN A JANUARY 23RD ARTICLE, CITES A WORLD BANK REPORT THAT IN 2008, THE PEOPLE'S REPUBLIC OF CHINA WILL BE INVESTING $88 BILLION IN ITS INTERCITY RAIL PROGRAM AFTER SPENDING $44 BILLION LAST YEAR ALONE. THIS IS ON TOP OF MASSIVE INVESTMENTS IN HIGHWAYS AND PORTS OVER THE PAST SEVERAL YEARS.

IN ADDITION, THE EUROPEAN UNION CONTINUES TO INVEST HEAVILY IN ALTERNATIVE FORMS OF TRANSPORTATION, NOTABLY PASSENGER RAIL. SPAIN, WHICH IS SIMILAR IN POPULATION AND GROSS DOMESTIC PRODUCT TO HAS SPENT NEARLY $30 BILLION OVER THE LAST FOUR YEARS TO UPGRADE ITS RAIL SYSTEM. THAT NATION INTENDS TO DEVELOP A 6,200 MILE HIGH SPEED RAIL NETWORK BY 2020 AT AN

ESTIMATED COST OF APPROXIMATELY $150 BILLION. THAT DOESN'T INCLUDE AN ADDITIONAL $13 BILLION FOR CONVENTIONAL AND COMMUTER RAIL.

IF WE ARE TO BE TRULY COMPETITIVE IN THE GLOBAL MARKETPLACE, WE HAVE TO ADDRESS OUR INFRASTRUCTURE NEEDS. IMPROVED MOBILITY AND THE DEVELOPMENT OF ALTERNATIVE SYSTEMS OF TRANSPORTATION ARE VITAL—MAKE THAT ESSENTIAL—TO OUR NATIONAL ECONOMY, OUR QUALITY OF LIFE, AND OUR STANDING IN THE WORLD COMMUNITY.

THAT CONCLUDES MY PREPARED REMARKS, I'LL BE HAPPY TO ANSWER ANY QUESTIONS.

STATEMENT FOR THE RECORD

PHILLIP LONGMAN
SENIOR FELLOW
NEW AMERICA FOUNDATION

BEFORE THE

UNITED STATES HOUSE OF REPRESENTATIVES
TRANSPORTATION INFRASTRUCTURE COMMITTEE
SUBCOMMITTEE ON RAILROADS, PIPELINES,
AND HAZARDOUS MATERIALS

HEARING ON
"FREIGHT AND PASSENGER RAIL: PRESENT AND FUTURE ROLES, PERFORMANCE, BENEFITS, AND NEEDS"

JANUARY 28, 2009

New America Foundation
1630 Connecticut Avenue, N.W.
7th floor, Washington, D.C. 20009
(202) 986-2700

NEW AMERICA
FOUNDATION

Testimony of Phillip Longman

New America Foundation

**Steel Wheel Interstates**

Madam Chairman and members of the Subcommittee, good morning. My name is Phil Longman.

I am a senior fellow of the New America Foundation, a non-partisan public policy institute headquartered here in Washington. I am also the author of a cover story in the current issue of the *Washington Monthly* ("Back on Tracks") that addresses what is for many a novel idea.

It is a proposal that offers stunning improvement in highway safety, maintenance and congestion costs, energy use, green house gas emissions, public health, shipping costs and plenty of short-term economic stimulus as well. If fully implemented, it could get as many as 83 percent of all long-haul trucks off our nation's highways by 2030, reduce carbon emissions by 39 percent and oil consumption by 15 percent compared to business as usual. I call it the "Back on Tracks" project.

The best way to explain this proposal is to begin with a concrete example. Six days before Thanksgiving, a truck driver heading south on Interstate 81 through Shenandoah County, Virginia ploughed his tractor-trailer into a knot of cars that had slowed on the rain-slicked highway. The collision killed eighty-year-old Cordula Elma Leara, her 4-year-old grandson, Ivan Ryman, and her one-year-old granddaughter, Maggie.

It was a tragedy, but not an unusual one. Semis account for roughly one out of every four vehicles that travel through Virginia on I-81's four lanes, the highest percentage of any interstate. They are there for a reason: I-81 traces a mostly rural route from the Canadian border to Tennessee, and the cities in its path—Syracuse, Scranton, Harrisburg, Hagerstown, and Roanoke among them—are mid-sized and slow-growing. This makes the highway a tempting alternative to I-95, the interstate that connects the eastern seaboard's major metropolises, which is so beset with tolls and congestion that truckers will drive hundreds of extra miles to avoid it.

This is bad news for just about everyone. Even truckers have to deal with an increasingly overcrowded, dangerous I-81, and for motorists it's a white-knuckle terror. Because much of the road is hilly, they find themselves repeatedly having to pass slow-moving trucks going uphill, only to see them

looming large in the rear view mirror on the down grade. For years, state transportation officials have watched I-81 get pounded to pieces by tractor-trailers—which are responsible for almost all non-weather-related highway wear and tear. Making matters worse are projections that traffic will rise by 67 percent in just ten years. [1]




The conventional response to this problem would be simply to build more lanes. It is what highway departments do. But at a cost of $11 billion, or $32 million per mile, Virginia cannot afford to do that without installing tolls, which might have to be set as high as 17 cents per mile for automobiles. When Virginia's Department of Transportation proposed doing this early last year, truckers and ordinary Virginian's alike set off a firestorm of protest. At the same time, just making I-81 wider without adding tolls would make its truck traffic problems worse as still more trucks would divert from I-95 and other routes.

[1] Alan Meyers, Cambridge Systematics, Inc., Update on Opportunities for Truck to Rail Diversion in Virginia's I-81 Corridor, Presented to the Commonwealth Transportation Board September 17, 2008, http://www.drpt.virginia.gov/special/files/I-81%20Freight%20Rail%20Study%20Update.pdf, p. 6., retrievied January 25, 2009.

Volume of Truck Traffic on U.S. Interstates




Source: Virginia Department of Transportation Traffic Counts (2005)
Alan Meyers, Cambridge Systematics (2008)

There is, however, another way. As it happens, running parallel to I-81 through the Shenandoah Valley and across the Piedmont are two mostly single-track rail lines belonging to the Norfolk Southern Railroad. These lines, like America's freight railroads generally, have seen a resurgence of trains carrying containers, just like most of the trucks on I-81 do. Due to driver shortages, energy costs and highway congestion, more and more shippers want to use rail these days, and many more would do so if trains moved faster. The problem is insufficient rail capacity to accommodate all the freight that would go by train. Without upgrading track and removing various choke points, the Norfolk Southern cannot run trains fast enough to be time-competitive with most of the trucks hurtling down I-81. Even before the recent financial meltdown, the railroad could not generate enough interest from Wall Street investors to improve the line sufficiently.




**An alternative to widening Interstate 81 or making it a toll road, as envisioned by the advocacy group, Virginia Rail Solutions.**

Here's where the "Back on Tracks" proposal comes in. *Instead of using public money to endlessly widen I-81 and other Interstates to accommodate more and more trucks, use it to improve parallel freight rail infrastructure.* A study sponsored by the Virginia DOT finds that a cumulative investment over 10 to 12 years of less than $8 billion would divert 30 percent of the growing truck traffic on I-81 to rail.[2] That would be far more bang for the state's buck than the $11 billion it would take to add more lanes to the highway, especially since it would bring many other public benefits, from reduced highway accidents and lower repair costs to enormous improvements in fuel efficiency and pollution. *Today, a single train can move as many containers as 280 trucks using one-third as much energy, and that's before any improvements to rail infrastructure.*[3]

---

[2] *The Northeast – Southeast – Midwest Corridor Marketing Study: Examining The Potential To Divert Highway Traffic From Interstate 81 To Rail Intermodal Movement*, Executive Summary. Table 1. Virginia Department of Transportation, http://www.drpt.virginia.gov/studies/files/I-81-Executive-Summary-revised.pdf, retrieved January 25, 2009.

[3] Gil Carmichael, (former Federal Railway Administrator and now Senior chairman of the board of directors for the Intermodal Transportation Institute at the University of Denver), "The Case For Interstate II," *Traffic World*, July 10, 2006, p. 6. http://www.du.edu/transportation/documents/July10Commentary.pdf, retrieved January 25, 2009.




**With modest public investment, existing private rail infrastructure parallel to I-81 could become the nation's first "steel wheel interstate," diverting million of trucks off roadways.**

Virginia has made a modest investment in helping Norfolk Southern improve its infrastructure, but there is much more that could and *should* be done, both along the I-81 corridor and nationally. All over the country there are opportunities in which relatively modest amounts of capital could unclog rail traffic bottlenecks and divert large volumes of trucks off highways. A few such public/private projects have already been done successfully, but many more are sitting on planners' shelves awaiting funding.

**Key Statistics: Energy and the Environment**

Greenhouse gas emission from heavy-duty vehicles, according to the Environmental Protection Agency, grew by 57 percent between 1990 and 2003, the largest increase of any transportation source.

- Average fuel mileage for tractor-trailer trucks has fallen to just 5.3 miles per gallon and is now no better than in 1980, according to the National Commission on Energy.
- In 2007, according to the Association of American Railroads, U.S railroads were able to move one ton of freight 436 miles using just one gallon of fuel. Moreover, the railroads' energy efficiency keeps getting better, improving 3.1 percent between 2006 and 2007. Railroads can now move a ton of freight from coast to coast using just seven gallons of fuel.
- The Environmental Protection Agency calculates that for distances of more than 1,000 miles, a system in which trucks haul containers only as far as the nearest railhead and then transfer them to a train produces a 65 percent reduction in both fuel use and greenhouse gas emissions.

Looking to future, the potential of a 21st Century rail system to improve national life is truly astonishing—including a near zero-emission, zero-oil freight transportation system. In a peer-reviewed study recently presented to the Transportation Research Board, the Millennium Institute, a nonprofit known for its expertise in energy and environmental modeling, calculated the likely benefits of a $250 to $500 billion expenditure on improved rail infrastructure. It found that such an investment would get 83 percent of all long-haul trucks off the nation's highways by 2030, while also delivering ample capacity for high-speed passenger rail. If high-traffic rail lines were also electrified and powered in part by renewable energy sources, that investment would reduce nationwide carbon emissions by 38 percent and oil consumption by 17 percent. By moderating the growing cost of logistics, it

would also leave the nation's economy 10 percent larger by 2030 than it would otherwise be.[4]

**Electrified Railroads Using Renewable Energy Results in 2030 vs Business as Usual**




Yet despite this astounding short- and long-term potential, almost all the focus on infrastructure spending these days is on building more "shovel ready" road and highway bridge projects —and at scale not seen in more than a generation. Soon we'll be moving earth like it's 1959.

*This could be an epic mistake. We need to be funding projects that are not just shovel ready, but shovel worthy*—projects that provide short-term stimulus without deepening our dependence on foreign oil or worsening pollution. Just as the Interstate Highway System changed, for better and for

4 A. Drake, A. M. Bassi and E. L. Tennyson, H. R. Herren, "Evaluating the Creation of a Parallel Non-Oil Transportation System in an Oil Constrained Future," Millennium Institute, January 2009; http://www.millenniuminstitute.net/resources/elibrary/papers/Transportation_MI09.pdf, retrieved January 25, 2009. Presentation by Alan Drake, National Academy of Engineering, Transportation Research Board, 87 Annual Meeting, January 12, 2009; Correspondence with Andrea Bassi, Millennium Institute, January 22, 2009.

worse, the economy and the landscape of America, so too will the infrastructure investment decisions members of Congress and the President are about to make. The choice of infrastructure projects is *de facto* industrial policy; it is also *de facto* energy, land use, housing and environmental policy, with implications for nearly every aspect of American life going far into the future.

On the doorstep of an era of infrastructure spending unparalleled in the past half-century, we need to conceive of a transportation future in which each mode of transport is put to its most sensible use, deployed collaboratively instead of competitively. To see what that future could look like, let's again look to a concrete example, this time from the past.

## *The Lost Vision*

At the beginning of the 20th Century, a "Good Roads" movement emerged calling for more paved highways. It was led by farmers and bicyclists, but railroads were strong supporters; they reasoned, logically enough, that with more paved roads, more people and goods could travel from greater distances to reach their lines. Farmers wouldn't get stuck in the mud trying to move their crops to market, but could use newly available trucks traveling on all-weather macadam highways to reach railheads. The Pennsylvania, Southern and Illinois Central railroads, among others, ran "object lesson trains" to small towns along their routes, carrying the men and materials needed to pave a short stretch of local roadway so the locals could see the possibilities. U.S. Senator J.W. Daniel, on hand to welcome one such train's visit to Lynchburg, Virginia in 1901, described it enthusiastically as "an itinerant college on wheels."[5]

The vision of intermodal transport the railroads were seeking to promote made perfect sense. Rail transport lacks the flexibility of the rubber-wheel kind, but it has other advantages that make it far superior when the circumstances allow. The biggest is a unique quality of the technology itself. Steel wheels on steel rails meet with very little rolling resistance. They do not compress and absorb energy from the surface the way a tire does, and the rail itself is much smoother than any road, so trains have only about one-tenth the rolling resistance of trucks. And because of the way rails absorb and spread the weight of a vehicle over long distances, this advantage increases as freight is added. The more you load up a train, the more efficient it becomes compared to a fleet of trucks carrying the same cargo.

---

5 Stephen B. Goddard, *Getting There: The Epic Struggle between Road and Rail in the American Century*, (Chicago: University of Chicago Press, 1994) 52-53.



**For long distance freight, the optimal energy and environmental benefits come when trucks haul containers only as far as the nearest railhead. Yet the U.S. lacks sufficient rail capacity to take full advantage of this intermodal strategy.**

*The Environmental Protection Agency calculates that for distances of more than 1,000 miles, a system in which trucks haul containers only as far as the nearest railhead and then transfer them to a train produces a 65 percent reduction in both fuel use and greenhouse gas emissions.*[6] As the volume of freight is expected to increase by 57 percent between 2000 and 2020, the potential economic and environmental benefits of such an inter-modal system will go higher and higher. Railroads are also potentially very labor efficient. Even in the days of the object lesson train, when brakes had to be set manually and firemen were needed to stoke steam engines, a five man crew could easily handle a fifty-car freight train, doing the work of ten times as many modern long-haul truckers.

In the first half of the last century, railroads used these and other advantages of steel wheel technology to provide services that in our own time seem

[6] "A Glance at Clean Freight Strategies: Intermodal Shipping," Smartway Transportation Partnership, U.S. Environment Protection Agency, http://epa.gov/smartway/transport/documents/carrier-strategy-docs/intermodal%20shipping.pdf, retreived January 25, 2009

futuristic. The rhythmically named Chicago Milwaukee, St. Paul, and Pacific (a.k.a Milwaukee Road) hauled hundred-car freight trains over the Rockies and Cascade Mountains using electric engines drawing on the region's abundant hydropower—a highly efficient, zero-emission freight transportation system that has no parallel in the United States today. The Railway Express Agency, which attached special cars to passenger trains, provided Americans with a level of express freight service that cannot be had for any price today, offering door-to-door delivery of everything from canoes to bowls of tropical fish to, in at least one instance, a giraffe. Into the 1950s, it was not uncommon for a family to ship its refrigerator to and from a lakeside cabin for the summer via the REA; thanks to the physics of steel-on-steel conveyance, appliance-sized items could be moved for not much more money than smaller goods. (Today, by contrast, many airline passengers must pay $50 to check a suitcase of dirty clothes on a domestic flight.)

High-speed Railway Post Office trains also offered efficient mail service to even the smallest towns that is not matched today. In his book *Train Time*, Harvard historian and rail expert John R. Stilgoe describes the Pennsylvania Railroad's Fast Mail No. 11, which, because of its speed and on-board crew of fast sorting mail clerks, ensured next-day delivery on a letter mailed with a standard two-cent stamp in New York to points as far west as Chicago.[7] Today, that same letter is likely to travel by air first to Fed Ex's Memphis hub, then be unloaded, sorted, and reloaded onto another plane, a process that demands far greater expenditures of money, carbon, fuel and in many instances even time than the one used 80 years ago.

The glory days of American railroads are now beyond the memory of most Americans. Rail service was already in decline during the Depression, and the gas rationing and logistical strains of World War II made train travel a standing-room-only horror. In large part because of that generational experience, most Americans came to believe the decline of railroads was an inevitable outcome of the march of progress. But the reality is close to the opposite. Especially for long-haul freight, steel wheel on steel rail is a far superior technology, and its eclipse by rubber wheels is mostly the result of special interest politics, ill-considered public policies, and other factors that have nothing to do with efficiency.

Manipulated by Wall Street and often badly managed, railroads were ultimately no match for the growing combination of interests—Standard Oil, General Motors, tire and asphalt makers—that grew into the auto-highway

[7] John R. Stilgoe, *Train Time: Railroads and the Imminent Reshaping of the United States Landscape* (Charlottesville: University of Virginia Press, 2007), 43–49, 72–73;

complex. For decades, railroads were also slowly crippled by state and federal laws that forced them to run money-losing passenger trains and to keep on featherbedding employees rendered obsolete by new technology. Rail companies, as private-sector entities, remained responsible for maintaining their own infrastructure and for paying increasingly high property taxes on it, even as public money poured into highway and airport construction. And when railroads improved their efficiency, as they did substantially after World War II, they were often prevented by the now defunct Interstate Commerce Commission from passing the savings on to shippers, which resulted in further loss of market share to trucks.

Many railroads died in the 1970s. At the beginning of the decade, the Erie-Lackawanna Railroad had moved very fast trains loaded with United Parcel Service vans on flat cars along its two-track, wide-clearance mainline stretching from Jersey City to Chicago—a model of intermodal transportation. But the railroad did not live to see the 1980s and now most of the line is abandoned. On the eve of the 1973 oil crisis, the proprietors of the Milwaukee Road ripped out its once state-of-the-art electrical wiring to raise cash. Much of the line is now a bike trail. By the start of 1980s, the federal government had eased some of the policy constraints on the railroads. Staggers Rail Act of 1980 for example, provided a substantial measure of price deregulation. But by then the damage was done. Thinking their industry was in terminal decline, many railroad managements continued to tear up tracks and use what little capital they had to diversify into new businesses, like theme parks, and in one instance, even mutual funds.

Starting in the late 1980s, however, something unexpected happened. As fuel and labor costs rose, and highway congestion worsened, more and more shippers started looking for an alternative to trucking. Once reduced to transporting mostly heavy, low-value commodities such as coal, railroads started gaining business in the transport of more time-sensitive, high value items—everything from Japanese computers to California wine—typically using containers double-stacked on flat cars. On routes where they still have adequate infrastructure, railroads have won back fantastic amounts of business from trucks, especially on long hauls such as Los Angeles to New York, where railroads now have a 72 percent market share in container traffic and could have more.

*Railroads have gone from having too much track to having not enough.* Today, the nation's rail network is just 94,942 miles, less than half of what it was in 1970, yet it is hauling 137 percent more freight, making for extreme

congestion and lengthening shipping times.[8] Mostly because of time stuck in yards and sidings, the typical freight car in the United States has an average speed of only 2 to 7 mph.[9]

**More and More Freight on Less and Less Track**




The half-conscious decision by Washington, Wall Street and the last generation of rail management to abandon much of the rail system thus prevents railroads from getting more trucks off the road. For example, UPS desperately wants to use fast trains like the Erie Lackawanna once had to reduce the cost of moving parcels coast to coast in less than 4 days, a feat currently requiring a tag-team of truck drivers at enormous cost in fuel and labor. For a brief time in 2004, UPS did persuade two railroads to run a train fast enough to handle this business. But due to insufficient track to allow slower trains to get out of its way, the UPS bullet train caused massive congestion, freezing up the Union Pacific system for months until the railroad at last cancelled the service. Big trucking companies like J.B. Hunt,

[8]: *System Mileage Within the United States*, Bureau of Transportation Statistics, Table 1-1 http://www.bts.gov/publications/national_transportation_statistics/html/table_01_01.html, retrieved January 25, 2009; American Association of Railroads, http://www.aar.org/PubCommon/Documents/AboutTheIndustry/Statistics.pdf, retrieved January 25, 2009.

[9] Roy Blanchard, "Does Speed Matter?" *Trains*, January 2009, p. 56.

meanwhile, have become the railroad's biggest intermodal customers, sending as many of their containers as they can by rail.

This raises the question, if so many shippers now want to use rail, why don't the railroads just build the new tracks, tunnels, switchyards, and other infrastructure they need to handle the business? In the wake of what we have learned in the last six months about how Wall Street works, the answer is clearer than it was before the financial breakdown. America's major railroad companies are publicly-traded companies answerable to global capital markets. While those markets were pouring the world's savings into underwriting credit cards and sub-prime mortgages on overvalued tract houses, America's railroads were pleading for the financing they needed to increase their capacity. And for the most part, the answer that came back from Wall Street was no, or worse. CSX, one of the nation's largest railroads, spent much of last year trying to fight off two hedge funds intent on gaining enough control of the company to cut its spending on new track and equipment in order to maximize short-term profits.[10]

So the industry, though gaining in market share and profitability after decades of decline, is starved for capital. While its return on investment improved to a respectable 8 percent by the beginning of this decade, its cost of capital outpaced it at around 10 percent—and that was before the credit crunch arrived. This is no small problem, since railroads are capital intensive, spending about five times more just to maintain remaining rail lines and equipment than the average U.S. manufacturing industry does on plant and equipment. Increased investment in railroad infrastructure would produce many public goods, including fewer fatalities from truck crashes, which kill some 5,000 Americans a year. Public goods, however, do not impress Wall Street. Nor does the long-term potential for increased earnings that improved rail infrastructure would bring, except in the eyes of Warren Buffet—who is bullish on railroads—and a few other smart, patient investors.

The alternative is for the public to help pay for rail infrastructure, or else pay in other ways. Unlike private investors, government must either invest in shoring up the railroads' overwhelmed infrastructure, or else see ever greater burdens placed on the public purse by increasing truck traffic. The American Association of State Highway and Transportation Officials (hardly a shill for the rail industry) estimates that, without public investment in rail capacity, 450 million tons of freight will shift to highways, costing shippers $162 billion and highway users $238 billion (in travel time, operating, and accident

[10] "Hedge Funds Propose CSX Directors, Starting Proxy Battle," *New York Times*, December 20, 2007.

costs), and adding $10 billion to highway costs over the next 20 years. "Inclusion of costs for bridges, interchanges, etc., could double this estimate," their report adds. The additional costs of such externalities as increased environmental damage, oil dependency and adverse consequences to public health would be still greater.[11]

Key Statistics: Health and Quality of Life

- In 2007, crashes involving large trucks killed 4,808 Americans and injured 83,908, according to the Federal Highway Administration.
- California's Environmental Protection Agency has found that in that state alone, pollution from heavy trucks kills 1,500 people a year.
- The Reason Foundation projects that by 2030 peak-hour traffic congestion delays will rise 89 percent in urban areas with populations between 1 and 3 million.
- Frequently-cited mass transit critic, Wendell Cox estimates that diverting 25 percent of truck traffic to rail by 2025 would save the average peak-hour auto commuter in urban areas 100 hours a year in time not stuck in traffic jams.

[11] *Freight-Rail Bottom Line Report*, American Association of State Highway and Transportation Officials, http://freight.transportation.org/doc/FreightRailReport.pdf, p. 2, retrieved January 25, 2009.

## *Choke Points*

Begin with the small-scale projects that could bring short-term stimulus and long-term public gain. There are many examples around the country where a small amount of public investment in rail infrastructure would bring enormous social and economic returns. Why is I-95 so congested with truck traffic that drivers divert to I-81 and overwhelm that interstate as well? One big reason is that railroads can capture only 2 percent of the container traffic traveling up and down the eastern seaboard because of obscure choke points, such as the Howard Street tunnel in downtown Baltimore. It is too small to allow double-stack container trains through, and so antiquated it's been listed on the National Register of Historic Places since 1973. When the tunnel shut down in 2001 due to a fire, trains had to divert as far as Cincinnati to get around it. Owner CSX has big plans for capturing more truck traffic from I-95, and for creating room for more passenger trains as well, but cannot do so until it finds the financing to fix or bypass this tunnel and make other infrastructure improvements down the line. In 2007, it submitted a detailed plan to the U.S. Department of Transportation to build a steel wheel interstate from Washington to Miami, but no federal funding has been forthcoming.[12]

The Howard Tunnel is the worst of some 70 rail choke points in the Mid-Atlantic region alone. According to a study commissioned by the I-95 Corridor Coalition, a group of transportation officials along the highway's route, fixing these choke points would cost $6.2 billion and return twice that amount in benefits. The returns would include $2.9 billion in reduced freight transportation costs; $6.3 billion in direct savings due to reduced highway congestion for vehicles still on the road, and $3.7 billion in indirect economic benefits generated throughout the economy by these transportation savings.[13]

---

[12] *U.S. Department of Transportation Corridors of the Future Program Application, The Southeast I-95 Corridor*, CSX Corporation. May 25, 2007. http://www.vhsr.com/system/files/CSX+CFP+Submission.pdf., retrieved January 25, 2009.

[13] TESTIMONY OF NEIL J. PEDERSEN, Chair, I-95 Corridor Coalition, Administrator, Maryland State Highway Administration, Chair, AASHTO Policy Committee on Future Expansion of the Interstate System, On CONDITION AND NEEDS OF THE NATIONAL AND NORTHEAST TRANSPORTATION SYSTEM, before NATIONAL SURFACE TRANSPORTATION POLICY AND REVENUE STUDY COMMISSION, Field Hearing, New York City, Thursday, November 16, 2006.

*Importantly, rail capacity can often be improved substantially by relatively low-cost measures such as adding signals, occasional switches and new, computerized train control devices, whereas with rubber wheel interstates the only way to add to capacity is to add lanes. This is another reason why the social rate of return on rail investment is much higher than on most highway projects.*




**The antiquated Howard Street rail tunnel in Baltimore, and the Virginia Avenue tunnel in Washington, are two choke points that prevent a major diversion of freight from trucks to rail along this corridor. From Maine to Florida, motorists travelling I-95 endure the effects, while manufacturers pay a price in lost competiveness as well.**

Another notorious set of choke points is in Chicago, America's rail capitol, which is visited by some 1,200 trains a day. Built in the 19th century by non-cooperating private companies, lines coming from the East to this day have no or insufficient connections with those coming from the West. Consequently, thousands of containers on their way elsewhere must be unloaded each day, "rubber wheeled" across the city's crowded streets by truck, and reloaded onto other trains. It takes forty-eight hours for a container to travel five miles

---

http://www.i95coalition.org/PDF/Pedersen_I95Coalition_Commission_2006_Nov%2016.pdf, retrieved January 25, 2009

across Chicago, longer than it does to get there from New York. This entire problem could be fixed for just $1.5 billion, with benefits including not just faster shipping times and attendant economic development, but drastically reduced road traffic, energy use, and pollution. [14]

### *The Greening of America's Freight Transportation System*

Removing choke points is the most immediate priority, because such projects offer both short-term economic stimulus and high rates of economic and social return. As Congress moves to toward comprehensive legislation on surface transportation later this year, however, we need to broaden our horizons. The potential costs in lost opportunities are enormous.

Electrification of major U.S. rail mainlines offers so many diverse potential benefits it might be characterized as the Swiss Army knife of public policy proposals. Start with the first order effects.



**Drawing on electricity generated by hydropower, electric locomotives like this one once hauled 100 car trains over the Rockies and Cascade mountains, consuming no oil and producing no emissions. Electrifying America's mainline railroads using hydropower, solar, wind, and other renewable energy sources will provide "green jobs" and pay economic and environmental dividends far into the future.**

[14] Chicago Region Environmental and Transportation Efficiency Program (CREATE), homepage: http://www.createprogram.org/, retrieved January 25, 2009.

Today, most other industrial countries make extensive use of electric locomotives, and for good reason. They are 2.5 to 3 times more efficient than diesels, more powerful, and cheaper to maintain. They also last longer, accelerate faster, and have much higher top speeds. Running highly energy efficient trains carrying containers at 100 mph is easily achievable. SBB (SwissRail) is planning a new class of freight service operating at 100 mph on the same tracks as 150 mph passenger trains.

**Electric Railways Can Take Full Advantage of Clean Energy**




**Electric railroads may be powered from any source, including emission-free renewable energy, and in many areas with very little loss in transmission. Through "regenerative" breaking, an electric locomotive descending a grade also converts otherwise wasted kinetic energy into electricity that helps power other trains on the grid.**

Powered by an overhead wire or third rail, electric locomotives don't have to lug the weight of their own fuel around with them. Another remarkable feature is called "regenerative breaking." Electric locomotives, when they brake, transfer their kinetic energy into electricity which is fed back into the

grid and used to power other trains. An electric locomotive braking down one side of a mountain, for example, sends energy to trains struggling up the other side. With all these advantages, electric railroads are fully 20 times more fuel efficient than trucks.

Rail electrification also offers significant opportunities for zero-emission freight and passenger transportation. Just as the Milwaukee Road's electrified line once used hydro-power to haul freight over the Continental Divide, today's major freight railroad could use electricity derived from renewable energy sources, including wind and solar. In fact, there is probably no more practical use for wind than using it to power "wind trains" running across the heartland. Most wind farms are and will be concentrated near rail lines in any event, because the large size of windmills makes them difficult and expensive to move by truck. There is also no loss of energy in transmission when windmills power passing trains—a big problem in other applications. Some companies are already exploring the possibilities: BNSF Railway, which traverses many wind zones, is investigating a deal by which it would lease space for power lines along its right-of-ways to utilities in exchange for access to discounted wind power for its trains.[15]

Much of the electrification could start almost immediately. In the 1970s, the National Academies of Science and many others concerned about that decade's energy crisis did extensive work in mapping out the specific lines most suitable to electrification. In 1977, at one of the many technical conferences on the subject, Milton J. Shapp, then governor of Pennsylvania, spoke for many of the visionaries involved when he observed that "particularly in view of the energy crisis, it is essential to the well being of our nation that our major railroads electrify."[16] A temporary fall in oil prices and an abundance of short-term thinking killed almost every last project, but we still have benefit of all the studies sitting on shelves.

The work involved in constructing overhead wires, or centenary, requires unique skills, but one can imagine laid-off construction workers taking to it far better than, say, to nursing, and with less retraining. Current studies indicate that labor and construction costs would come to about $2 million dollars per mile; maybe less if steel prices continue to sink. Wiring the 36,000 miles of mainline track on the nation's high-density routes would thus come in

---

[15] William C. Vantuono, "Time to revisit electrification?" *Railway Age*, Sept, 2008. http://findarticles.com/p/articles/mi_m1215/is_/ai_n29476448, retrieved January 25, 2009.
[16] *Railroad Electrification : the Issues*, Washington: National Academy of Sciences, 1977.

at around $72 billion. Completing such a project could take as little as 6 years, according John Schumann P.E. of LTK Engineering.[17]




Additional funds would be needed, of course, for new locomotives and generating capacity. But building or retrofitting locomotives to operate under the new grid could put lots of laid-off auto workers back to work. General Motors, until it sold off its Electro-Motive Division in 2005 to private investors, was long the nation's dominate diesel-electric locomotive maker. The spinoff company is still headquartered in LaGrange, Illinois, though most production has shifted to London, Ontario. General Electric, which remains a world leader in locomotive building, with a big plant in hard-pressed Erie, Pennsylvania, could also use the business and would bring much expertise to it. The plant recently suffered a layoff.

## *Financing the "Back on Tracks" Project*

To say the federal government should invest in railroads is not to say it should own them. It's true that countries with nationalized railroad systems

[17] Personal correspondence.

can take a broader view of the social value of railroad investment, which is why the Swiss, having voted to put all trucks crossing their country on to trains, are busy carving rail tunnels--one 35 miles long--through the Alps.[18] But nationalizing U.S. railroads would bring with it all the problems attendant to genuine socialism, and buying out current shareholders would cost taxpayers a bundle. What the government should do instead is make creative use of public/private partnerships to fund more rail infrastructure and better integration of trucks and trains.

There are many ways this could be done. During the Great Depression, for example, the Reconstruction Finance Corporation offered loan guarantees to the Pennsylvania Railroad to electrify its lines between New York, Washington and Harrisburg, which brought such efficiency to the railroad that it was one of the few to avoid bankruptcy during the 1930s. (Amtrak's high-speed Acela service runs under the same wire today.) A national infrastructure bank--which many have proposed--could play the same role as the RFC is spurring rail infrastructure investment. Reduced capital gains taxes for investors in rail infrastructure could also help direct capital to where it is needed. Flat out grants, akin to federal highway money, would also be appropriate, since they would directly reduce the amount of money needed for highway construction and maintenance, not to mention all the other economic and environmental benefits.

If the public helps railroads make these investments in electrification and other infrastructure improvements, it will of course earn important quid pro quos. Railroads, for example, could be required to apportion a certain amount of their increased capacity to public use, such as for commuter trains, which the railroads might or might not operate themselves (some show interest). It should also be possible to negotiate open access to publicly-financed rail infrastructure. This would allow outside companies to rent the rails and run their own freight, package express, fast mail, or passenger trains on them. It would also be a good check on any tendency toward monopoly pricing and provide for many other synergies as well.

In Great Britain, a subsidiary of Virgin Airlines called Virgin Trains operates passenger trains on publicly financed infrastructure, as do other private passenger and freight companies. Following this example would create something very much like the current interstate highway system: publicly financed transportation infrastructure maintained for the benefit of private operators. America's major railroads are wary of the full, open-access model

[18] "Swiss dig world's longest tunnel," BBC News, 20 March 2007, http://news.bbc.co.uk/2/hi/europe/6471241.stm , retrieved January 25, 2009.

and want to retain ownership of their track. With the promise of enough public capital, however, and the threat of re-regulation, deals can be struck that will bring profound benefits across the economy.

For example, there is no reason we cannot again have fast, efficient express freight service of the kind the Railway Express Agency once provided. For cities as far apart as New York and Chicago, trains can beat planes on next day mail service. As consulting engineer Alan Drake points out, when passengers and express freight or mail are borne by the same train, the economics of passenger rail improve dramatically, making possible far wider service.[19] We also have the chance to reduce drastically the cost and the huge carbon footprint caused by using trucks and planes almost exclusively to ship perishables across the country. Until the 1970s, railroads handled nearly all fresh food movement from California and Florida, and could again, making healthy winter fruits and vegetables cheaper, and less hard on the planet.




[19] Alan Drake, Edson Tennyson, *Semi-High Speed Railroad: A Novel Cost-Effective Approach for Passengers and Express Freight*, forthcoming. Alan_Drake@Juno.com; ESTennyson@Cox.net.

**Ancillary Benefits of a "Steel Wheel Interstate" System**

- Consumers save due to reduced auto commuting costs and reduced freight transportation costs.
- Express freight and parcel delivery becomes cheaper, particularly for heavy items, and more energy efficient. Mid-size American cities receive better logistical services.
- Transport of most perishables, such as fruit and vegetables from California or Florida, no longer requires heavy use of long-haul, heavy trucks.
- Facilitates the coming of true high-speed railroad passenger service and the expansion of conventional passenger, commuter, and auto trains.
- Facilitates the rebuilding of America's manufacturing base by reducing the cost of moving both commodities and finished goods.
- Lowers the amount of greenhouse gas reduction needed from other sectors of the economy to achieve overall emission targets.

Another potential use of steel wheel interstates would be auto trains. Today, Amtrak offers a service that allows motorists to drive their cars onto special auto racks that are attached to the back of a passenger train. The train runs daily between Northern Virginia and Central Florida, saving users 855 miles of driving down I-95. The service is particularly popular among northern "snowbirds" who spend the winter in Florida and want to have their cars with them. For now, this is a specialty market, and it is not cheap because of the energy required to haul the weight of the automobiles. But with the potential energy efficiency of an electrified steel wheel interstate system, auto trains could make sense in many markets, whether run by Amtrak or private firms.



**Switzerland's "Rolling Highway." Drivers sleep in a coach attached to the train while traversing the Alps and taking their mandatory hours of rest.**

A similar service might also appeal to remaining independent long-haul truckers (we'll still need some for transport of time-sensitive cargo to and from remote locations). In Europe, a company called HUPAC offers a service known as "the rolling highway." By attaching a coach to the end of its container trains, it allows drivers to rest as they and their rigs traverse the Alps. Truckers in this country, before exceeding their daily legal maximum of 11 hours behind the wheel, could load their rigs onto a rolling highway and get some nine hundred miles down the road while they took their mandatory 10 hours rest. [20]

Is all this politically feasible? Certainly more so than a year ago, before the consensus formed that we must invest massively in infrastructure of some kind. Importantly, too, we're not talking about bailing out a failing industry, but about helping an expanding, more energy efficient one to grow fast enough to meet pressing public needs. Nor would we be making big bets on unproven technology. Also, it is important to remember that big trucking companies, facing acute driver shortages and increasing highway congestion, are increasingly shifting their containers to rail and so have an interest in improved rail infrastructure. With trucking companies morphing into logistics companies, it's a new day in the special interest politics of freight.

[20] HUPAC webpage, *Rolling Highway: Switzerland the Relaxing Way*. http://www.hupac.com/en/index.php?p=prod_autostrada&mt=2, retrieved January 25, 2009.

Finally, the proposal has an additional political advantage: it does not involve pricing or guilt tripping people out of their automobiles. Electrifying and otherwise improving rail infrastructure would indeed facilitate the coming of true high-speed rail passenger service to the United States, a goal President Obama committed to as a candidate. Its success, however, would not depend on persuading a single American to take the train instead of flying or driving. This is change we can believe in•

**RAILWAY SUPPLY INSTITUTE, INC.**
50 F Street, N.W., Suite 7030, Washington, DC 20001
(P) (202) 347-4664 (F) (202) 347-0047
www.rsiweb.org

**Marshall G. Beck**
New York Air Brake Company
Chairman

**Robert J. Pokorski**
Miner Enterprises, Inc.
Vice Chairman

**Thomas D. Simpson**
Executive Director
Washington

STATEMENT BY

THOMAS D. SIMPSON
EXECUTIVE DIRECTOR
RAILWAY SUPPLY INSITUTE

BEFORE THE

HOUSE COMMITTEE ON TRANSPORTATION & INFRASTRUCTURE

RAILROAD SUBCOMMITTEE

Wednesday, January 28, 2009

Good Morning, my name is Tom Simpson and I'm the Executive Director of the Railway Supply Institute (RSI), the international trade association of the railway and rail rapid transit supply industry. Our members provide goods and services to our nation's freight and passenger railroads and rail rapid transit systems. We celebrated our 100th year of service to railway suppliers and their customers in 2008.

There are approximately 750 railway supply companies in the United States. In a good year, their sales volume totals approximately $20-25 billion per year with one fourth of that volume coming from sales to Amtrak, transit authorities and commuter railroads. The vast majority of these companies are small with less than $10 million in annual sales.

RSI has approximately 250 member companies that exist primarily in the United States; we also have members from Canada, Australia, China and India. Our members build locomotives, new railroad freight cars and passenger cars, as

well as, providing communications and signaling technology and modern maintenance-of-way techniques to our railroads. RSI member companies also own and provide for lease around 700,000 freight cars or almost 50% of the freight cars operating in North America. RSI member companies build virtually all the railroad tank cars operating today, in addition, they own and provide lease for around 70% of the approximately 300,000 railroad tank cars in service today.

A word about railroad tank cars, since the late 1970s, RSI and our partners at the Association of American Railroads have jointly funded the Railroad Tank Car Safety Research and Test Project. The Project has invested more than $20 million in research to make tank cars safer. Based on the conclusions from that research, tank car owners have invested more than $700 million in safety improvements to the tank car fleet. There is no safer way to move the hazardous commodities our nation uses than by railroad tank car.

Entering 2009, the economic record of the railway supply industry is decidedly mixed. As long as railroads continue to reinvest in their rights-of-way, then maintenance-of-way and communication & signaling companies find that business is relatively good, but our suppliers are concerned that railroads will not continue to invest due to the economic downturn in the industry. Locomotive manufacturers, who have enjoyed strong orders in recent years, have seen orders drop and prosperity disappear. The downturn in freight traffic being reported by our nation's freight railroads has had an adverse affect on freight car owners and new freight car builders. Railcar leasing companies are increasingly reporting that demand for freight cars is weakening. One freight car leasing company has reported that "miles of cars" have been idled because of the economic downturn.

There are six major railroad freight car manufacturers that belong to RSI. They manufacture over 95% of new railroad freight cars delivered each year. RSI reports quarterly new freight car orders, deliveries, and backlog of cars ordered but not yet delivered. Those of us who have been in the railway supply industry are painfully aware of the cyclical nature of the new freight car market. In the early 1980s, freight car orders had dwindled to fewer than 10,000. The last downturn in the industry was in 2000, but since 2001 this sector of the industry has enjoyed strong growth. In 2001, we reported orders of 20,000 new cars and, in 2002, we reported deliveries of just 18,000 new cars. In 2006, we reported near historic high orders of 91,000 and deliveries of 75,000. While 2008 statistics are not yet available, orders may be reduced from those historic 2006 levels by more than 50%.

Analysts are predicting fewer orders for freight cars in 2009, with some estimating orders dropping by 50% or more over 2008 levels. Freight car manufacturers are closing manufacturing facilities and furloughing employees. This has us all concerned as component suppliers such as wheel, brake, spring, axle and coupler manufacturers struggle to survive.

The passenger market is different. Suppliers to transit authorities and commuter railroads find that the dedicated funding for these railroads provided by SAFETEA-LU legislation allows those railroads to plan long term purchases and that market has been relatively steady. As Amtrak, our nation's intercity passenger railroad, has historically been under funded, the market for new intercity passenger cars has virtually disappeared.

Congress can help. I urge you to pass an infrastructure tax credit providing a 25% tax credit for certain freight rail capital expenditures to increase capacity. I also urge you

to extend the short line tax credit, allowing those small railroads to take a tax credit for investment in their rights-of-way. Ask your colleagues on the Appropriations Committee to fund Amtrak at the levels contained in the legislation passed last year in Amtrak reauthorization legislation. Because of the uncertainty of the appropriations process, we must find an alternative funding source for intercity and high speed passenger rail. Taking these steps will create a stronger railroad industry in our country and create jobs in my industry.

Finally, RSI is a member of the OneRail coalition and endorse the statement of Anne Canby concerning reauthorization of SAFETEA-LU transportation legislation. As part of that legislation, I urge you to continue to fund the Section 130 grade crossing safety program and Operation Lifesaver, Inc., the nationwide volunteer education organization warning of the dangers at highway rail crossings.

**House Transportation and Infrastructure Committee**

**Railroads Subcommittee**

Testimony of
United Transportation Union

James Stem
National Legislative Director

304 Pennsylvania Avenue, SE
Washington, DC 20003
202-543-7714

January 28, 2009

Good Morning!

Chairperson Ms. Brown, Ranking Member Mr. Shuster, and Members of the Committee, on behalf of the men and women that are operating the trains moving on our nation's railroads today, I want to thank you for giving us the opportunity to testify on our priorities for rail freight and passenger services today and in the future.

My name is James Stem. I serve in the capacity of National Legislative Director for the United Transportation Union (UTU) with our office located here in Washington, DC. I also have the assignment of coordinating our participation with the Federal Railroad Safety Administration Rail Safety Advisory Committee (RSAC), at the direction of UTU International President Mike Futhey.

I am here today representing President Mike Futhey, and the values of our 70,000 plus active members of the UTU. We sincerely appreciate the opportunity to offer our input directly to the Rail Subcommittee.

I first would like to express our appreciation to this Committee for addressing many major safety issues in our rail industry during the last session. The Rail Safety Improvement Act of 2008 that originated in this Committee will provide a much higher level of safety in our industry. The process of implementing the requirements of that new law has just begun. We will keep the Committee posted on the application of the provisions in that law and will work with you on further improvements in safety. The new law addressed many significant safety issues and there remain other areas that need attention.

We would also like to take this opportunity to offer our encouragement and support for full funding for the Federal Railroad Safety Administration (FRSA). The FRSA has received many new mandates in the Rail Safety Bill of 2008 that will require additional resources. Our message this morning is focused on safety of the operations for rail and passenger railroads. The significant safety improvements contained in the Rail Safety Bill cannot be implemented fully without the needed resources, especially in the immediate future. We look forward to new opportunities to work with this Committee and the Appropriations Committee to make sure Rail Safety continues to be a top priority.

## Roles of Freight and Passenger Rail

Freight and passenger rail services in the U. S. economy have played a central role in the development of our nation. From providing the spine for westward population settlement, and commercial and industrial development in the latter half of the 19th century, to transporting troops, arms, and supplies during World War II, the Korean War, the Vietnam War, and our latest deployments in the Persian Gulf region, the railroad industry formed the central core of the country's transportation system.

The last half of the 20th Century saw an industry in decline and in crisis, in part because it failed to change with the times, and in part because other competing modes – most notably aviation and highway – received substantial Federal assistance that enabled them to erode rail's share of freight and passenger traffic. Even after decades of erosion, however, the railroad industry entered the 21st Century as a key component of our nation's transportation infrastructure.

As we look forward, a balanced transportation policy serves our nation's needs. A national policy that demands the best use of our fuel resources while providing sustainable and environmentally friendly transportation must take priority over expediency. The environmental link to national transportation policies find that railroads provide the "greenest" options.

Historically, the railroad industry has provided hundreds of thousands of middle class jobs. The passenger and freight rail industry by its very definition, provided jobs in many rural areas all over our nation. As we discuss ways to both stimulate our economy and also to provide middle class jobs, including rail at the core of the infrastructure piece of the recovery plan is a sound investment.

The role of Amtrak and high speed rail services in the future transportation needs of our nation is integrally woven into our balanced and environmentally sound transportation policy. Amtrak is an essential component of our national transportation system and must be properly funded to allow the system to grow with the demand for service. Our nation needs redundancy and reliability in our transportation system. Never was the reliability issue greater than in the days after 9/11 when our airspace was shut down, our roads congested, yet Amtrak was able to bring families back together.

For many Americans who are unable to drive, and flying is not an option, Amtrak serves as a vital link for business, friends, and family. The demand for rail passenger service and ridership continue to grow every year. With the unpredictable price of fuel in the global market, rail passenger options must be part of our overall strategy. Moreover, Amtrak and our commuter rail authorities support many thousands of middle class jobs in numerous communities around the country.

## Impact of Current Economic Crisis

While the current economic crisis has already taken a severe toll on railroad workers, particularly operating employees, the overall health of the industry is sound, especially among Class 1 railroads. The financial reports for the fourth quarter of 2008 indicate that our Class 1 railroads enjoyed significant growth both in their net profits and in a reduction of their operating ratios.

As of this writing, an average of 12% of our operating workforce is in furlough status, with more furloughs expected by the end of January. In addition, many other mechanical, clerical, and shop craft forces are facing furloughs. Also, many additional rail employees are now required to work in different locations and in different jobs. There are many safety concerns that follow this process, because many employees are now working in crafts that have different types of physical demands than their routine job assignment.

The unfortunate reality of a downturn in business in the rail industry is that the youngest employees are pushed out of the bottom of the seniority lists into furlough status. These usually are the families that are the most financially insecure.

Many of these furloughed employees will be needed by mid-summer in order to meet the requirements from changes to the hours of service law which were included in the new rail safety law. Moreover, there will be strong demand for highly-trained and highly skilled railroad workers when the economy begins to turn around and consumer demand is again on the rise.

As Congress continues the debate about an economic stimulus package, we encourage investments that will produce jobs in our country. We hope that the requirements of receiving any Federal funds

will specify traditional job creation, and will not allow a "Race to the Bottom" on wages, or elimination of existing jobs.

At least one railroad is planning to pay for the implementation of their Positive Train Control (PTC) system required by Congress by attempting to operate their trains with only one employee on the train and using Federal funds to accomplish this goal.

## Single Person Operation

The rail industry is demanding from their employees and the Federal Railroad Safety Administration the authority to operate trains with only one person on the locomotive. When this demand was first made during the current round of national negotiations, the industry provided assurances and indicated that the safety of the operation could be authorized with one person because of a pending development in PTC systems.

When research revealed that system wide implementation of any PTC system was many years and many billions of dollars away, the carriers continued with their demands. One railroad even attempted to receive back door approval for such controversial operations by filing a Product Safety Plan with FRSA that promoted single person operation with a waiver request for a second tier non-vital PTC overlay system.

Single person operation of freight trains involves a completely different analysis of the rail safety equation and a complete reassessment of the overall safety of operations that extends far beyond consideration of this specific issue. The responsibilities of the railroad to operate safely over public crossings, to inspect the moving train at every opportunity, to open public crossings quickly when stopped, and to interact with emergency responders are issues that are not addressed by any PTC system, and were not designed to do so.

A study of the data available on the FRSA website indicates there were a total of more than 17,500 grade crossing collisions between 2002 and 2007. Single person operation also ignores more than 5,000 trespasser incidents from the same period. Clearly, with more than 22,500 documented incidents occurring during these six years, an immediate response from the second operating crew member is essential to protect the safety of the public. Also, based on industry estimates more than 100 trespasser fatalities each year are ruled as suicides and are not reflected in the FRSA data.

Historically, each train has been considered as a self-contained operating unit that had the capability of moving safely in and out of terminals and sidings, and moving on main track utilizing a variety of train control systems and methodologies. Each train was able to set out defective cars en-route, to provide self inspection and repair for dragging equipment, shifted lading, hot journals, broken coupling devices, sticking brakes, and importantly, the ability to expeditiously open public grade crossings when necessary. Today, each operating crew is trained, equipped, and expected to make simple repairs and take other actions that ensure the safety of their train and the public. Each operating crew is also trained and equipped to interact with local emergency responders following a derailment, a grade crossing collision, a trespasser injury or fatality, and the myriad of operational events that occur daily in over-the-road railroad train operations.

The railroad carriers, who desire the authority to operate trains with a single individual, are ignoring their responsibility for the safety of their employees, the local communities that they travel through, the local emergency responders, and the general public. PTC systems are not designed to reduce the numbers of hot journals on freight trains. PTC has no effect on reducing the numbers of grade crossing collisions or the striking of trespassers. PTC has no effect on busted air hoses, broken coupling devices, or shifted lading. PTC systems were not designed to interact with emergency responders following a derailment or a collision, or to open a public grade crossing to allow emergency vehicles and the general public to cross.

The current method of operation today addresses these identified safety requirements by having a qualified, trained employee at hand to provide immediate response to critical safety needs. The new rail safety law mandates certification for conductors, so they would have the proper training and skills to respond to these daily events.

With single person operation, if one train sustains any operational failure (grade crossing collision, derailment, hot journal, broken coupling device, etc), then every other train on that route will be unable to open a grade crossing and will be able to make only limited reverse movements. The safety of the entire rail operation is compromised by the creation of this new concept of train movements that are not independent functioning units.

UTU, and other unions, have expressed our safety concerns about this attempt to compromise rail safety. We will keep you up to date on future developments with this controversial issue. We anticipate common sense coming to the rescue and this safety issue going away.

The use of Federal funds to install a PTC system, while attempting to experiment with single person operation, would disregard the safety of other railroad crews, the communities that are served, and the customers' well being. We encourage Congress to clearly specify how any Federal funds could be used by railroads.

## Transportation Worker Identity Card and other Federal Licenses

Congress recently mandated the issuance of a Transportation Worker Identity Card (TWIC). Our rail employees are now involved in obtaining these required credentials. Many rail employees already are required to carry other Federal license credentials, such as an Engineer Certification license. In the coming months, there will be other Federal licenses and certification issued. Conductor certification is coming in the next few months, and the possibility of a credential showing a proper level of training for transporting hazardous materials is also a possibility.

UTU recommends that Congress help find a way to coordinate these processes and allow the issuance of one Federal credential, with the required endorsements. A certified engineer or conductor would have a TWIC, with all the other required credentials shown on that single card. This process would use less Federal resources and also simplify the process for railroads and their employees.

## Investment in Freight and Passenger Rail

There has been a substantial public benefit from investment in freight and passenger rail for nearly all of the past 175 years. As America rebounds from the current severe economic crisis, we will need to rely upon safe and efficient rail freight and passenger transportation more than perhaps at any time in our lives. A sound recovery plan can bring stability both to employment in the industry and to the future of our retirement system.

China has recently dedicated new levels of funding to build new railroad lines and other transportation infrastructure projects. New passenger lines linking population centers with high speed rail and a significant expansion of the Chinese freight rail network was a significant part of their Stimulus package.

While we continue this debate about how best to stimulate our economy, we encourage a review of history. The percentage of stimulus funds that are dedicated to transportation infrastructure projects provide the best long term investment strategy. During the start of the 20th century in our nation, the rapid growth of transportation systems around the country resulted in major economic growth. We support and encourage a much higher percentage of the stimulus package be focused on transportation projects.

The concept of public-private partnerships is not a new thought, just new to the rail industry. A few years ago, railroads did not want to discuss shared use of rights of way and shared expense of increases in capacity on that right of way. Today, a sound and balanced transportation policy embraces the concept of mutual benefit and mutual contributions for increases in freight and passenger rail capacities. The growth of commuter rail authorities, and the demand for local commuter rail services, represent a significant growth opportunity for rail employment, and a significant expansion of capacity for freight railroads. Operating freight trains on shared trackage during non peak commuter times works very well for both services in many communities today.

Some new commuter rail transactions have attempted to skirt the Railway Labor Act and create an entity that looks like a railroad, acts like a railroad, but declares they are not a railroad. This "Race to the Bottom" on wages and benefits for those employees working for the commuter authority undermines the safety of that operation. A commuter authority that operates trains needs the same expertise and stability in their employees that every other rail operation requires. We think it is logical for that issue to be settled in advance of the transfer of any Federal funds.

We hope that the use of Federal funds in support of both passenger and freight rail operations would continue to create job opportunities for our children --a job that is safe, a job that pays a living wage, and a job that provides good health care and a comfortable retirement. A job that we all hope our children and grandchildren can find, not a temporary job with low wages and no benefits. As you continue the discussion about rail funding, we encourage you to overlay the values of middle class jobs on your requirements.

## Rail Accident Investigation

The National Transportation Safety Board (NTSB) is charged with the responsibility of investigating transportation accidents for many reasons. The safety input of every accident investigation is focused on determining all the causes of each accident, and then using that information to make recommendations for changes in systems, processes, equipment, and training values to prevent similar occurrences.

Recently the NTSB has ignored many rail employees' fatalities and not launched an investigation to determine the cause of the accident that created the fatality. We find that part of the problem with this lack of investigation of fatalities is that the Rail Division of NTSB has been combined with other Divisions which has obviously diluted their focus on Rail Safety.

We are aware that this Committee does not have authority to control the day to day operations of this Federal Safety agency. We are just sharing our frustrations and our determination to find a solution to this significant safety concern. The pressure coming from within the past administration to stop virtually all rail accident investigations is unacceptable to many different constituencies, and we are sharing our resolve to work with our New Administration to resolve this major issue quickly.

We appreciated the opportunity to speak today, and I will be glad to answer any questions or clarify my remarks.

STATEMENT OF

RICK WEBB, CHIEF EXECUTIVE OFFICER

WATCO COMPANIES

ON BEHALF OF THE

AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION

BEFORE THE

U.S. HOUSE OF REPRESENTATIVES

SUBCOMMITTEE ON RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS

REGARDING

FREIGHT AND PASSENGER RAIL: PRESENT AND FUTURE ROLES, PERFORMANCE, BENEFITS, AND NEEDS

JANUARY 28, 2009

Rick Webb
Chief Executive Officer
WATCO Companies
315 W. 3rd Street
Pittsburg, KS 66762
620-231-2230

Madam Chairwoman and Members of the Committee, I appreciate the opportunity to testify today on behalf of the U.S. short line railroad industry. I am the Chief Executive Officer of Watco Companies headquartered in Pittsburg, Kansas. Watco owns and operates 19 short lines which together have nearly 4,000 track miles in 16 states. Our first short line railroad operation was purchased in 1983 in DeRidder, Louisiana and it is still in operation today. Watco also operates railroad repair shops, transload facilities and property management services so we have exposure to virtually every aspect of the railroad industry.

The short line industry is not the largest segment of our national transportation system, indeed in market share and annual revenues we may be among the smallest. Our importance is not our size or our total market share but in who and where we serve. For large areas of the country and particularly for small town America short line rail service is the only connection to the national railroad network. For the small businesses and farmers in those areas, our ability to a take a 25-car train 75 miles to the nearest Class I interchange is just as important as the Class I's ability to attach that block of traffic to a 100-car train and move it across the country. My Kansas grain Customers cannot make the journey to export markets in the Gulf without Class I railroad service. But they can't start the journey without short line service.

While today's topic is about where we are and where we are going, it is worth noting where we came from, because the short line industry has undergone tremendous change in the last 30 years.

There have always been short lines, but today's short lines are far different than the short lines of the past. They come in all shapes and sizes, some privately owned, some government owned, some traded on the national stock exchanges. Some are members of rail holding companies, some are large regional entities, some are small family owned businesses. Together they represent a diverse, dynamic and entrepreneurial collection of small businesses that have moved well beyond the traditional short lines of America's railroad lore. These are aggressive and agile companies which have invested in modern equipment and new technologies. They employ a skilled, productive workforce, offering them a good quality of living and place considerable emphasis on training them to be as safe as possible. They are aggressive marketers that fight as hard for single carload business as they do for unit trains.

I think it can be fairly said that today's short line industry was launched by the federal government's decision in the 1980's that it was better to save light density branch lines than to abandon them. Short lines have grown from 8,000 miles of track in 1980 to nearly 50,000 miles today. There are over 500 short lines operating in 49 states. In five states short lines operate 100 percent of the state's rail network. In 10 states they operate more than 50 percent of the railroad network and in 30 states at least one quarter of the rail network. In the Chairman's home state of Minnesota short lines operate 30 percent of the state's total network. In Florida, the home of Railroad Subcommittee Chairwoman Brown and Ranking Member Mica, short lines operate 39 percent of the state's total railroad network.

Short lines are the "first mile-last mile" for over 14 million carloads of goods annually – nearly one out of every four carloads moving on the national rail network. This interchange with our partners, the Class I railroads earns for those Class I railroads 18 to 20 percent of their revenues.

The short line railroad industry has preserved and grown railroad service and jobs for a number of reasons and I think it is important that key decision-makers such as you understand those reasons.

First, as I mentioned beginning in the 1980's the federal government made changes to outdated laws and regulations that made it more economically sensible to save light density lines than to abandon them.

Second, and I say this at the risk of sounding boastful, the short line industry is blessed with a large number of entrepreneurs who took large financial risks to purchase and subsequently rehabilitate these light density lines. Most of us borrowed heavily from the bank and contributed substantial amounts of our own capital to make these new ventures go.

Third, short lines have worked very hard on building relationships with their Customers. In the beginning many of them were our partners in helping save the most marginal lines. They did so by helping finance rehabilitation through realistic rates and by agreeing to meaningful traffic volumes. We have continued to work closely and cooperatively with our Customers. As you all know the short industry undertook an aggressive campaign to secure a rehabilitation tax credit and I am pleased to say that our Customers played an active and perhaps decisive role in that effort. To date over 1,000 individual shippers have publicly supported the creation and extension of the credit and I have attached a newspaper ad they approved in that regard. In the course of organizing that effort we have collected many testimonials from our Customers and I have also attached a sampling of those so you can get some sense of the importance of short line service to railroad Customers.

Fourth, short lines reinvest on average nearly 30 percent of their annual gross revenues in repairing and upgrading their infrastructure. As a rail industry, we believe this is higher than almost any other industry in the country.

Fifth, that private investment has been supplemented by some very important help from the federal government, much of it developed by and moved through Congress by Members of this Committee. The short line rehabilitation tax credit which was enacted for a three year period in 2004 and subsequently extended through 2009 has allowed the short line industry to maximize investment in track rehabilitation. Just to give you some idea of the magnitude of this the National Railroad Tie Association estimates the tax credit has resulted in the purchase of an additional 750,000 ties annually by short line railroads. I might add, in the spirit of Economic Stimulus, that every one of those ties are produced in the United States. Short lines must spend $1 dollar for every 50 cents in

credit up to a credit cap equivalent to $3,500/mile. Thus the tax credit is leveraging significant additional private investment.

The Railroad Rehabilitation and Improvement Financing or so-called RRIF loan program has provided another important tool in our effort to maximize rehabilitation spending. The Transportation and Infrastructure Committee developed this program in 1998, has improved it over the years and perhaps most important, has been steadfast in protecting the program from those in previous Administrations who would have killed it. I want to particularly call out Congressmen Oberstar, Corrine Brown, Bill Shuster and Jerry Moran who led the charge last year to put a stop to a set of Administration proposed rules that could have effectively killed the program through the back door.

Like the tax credit, the RRIF loan program leverages substantial private investment in short line infrastructure. These are loans that must be paid back in full. The relatively low interest rate and the 35 year amortization are terms short lines cannot secure in the private market and the program has allowed those who have taken advantage of it to undertake projects that could not have been done or that would have to have been stretched out over many years. I am proud to say in the ten years the RRIF loan program has been on the books, not a single short line railroad has missed a single quarterly payment on its debt. In today's world we might be one of the only groups that can say that.

One of my own short lines, the Stillwater Central in Oklahoma secured one of the very first RRIF loans in Feb. 2004. That loan was very important in acquiring and preserving that property. Since 2004 the Stillwater Central has increased carloads by 30 percent, improved its profitability by 40 percent and increased jobs by 20 percent. In addition to this, we have kept rates beneath the increases in inflation, while investing millions of dollars in our infrastructure.

Infrastructure funding is at the center of the current discussions over economic recovery. The government is looking to fund "shovel ready" projects that result in immediate job creation, that use materials made in the United States, that help leverage additional private investment and that provide long term benefits to our transportation network. It will come as no great shock to the Committee that we believe that increasing short line spending meets every one of those criteria. The Short Line Association has proposed a number of programs, including an extension of our existing tax credit and changes to the existing RRIF program and I have attached a paper describing that proposal to my written testimony. Time does not permit reviewing that proposal and, in any event, I suspect that I am preaching to the choir on most of these items.

The long term success of the short line industry is directly related to sustained economic growth, to heavy investment in infrastructure improvements and to our capacity to adapt quickly to changing conditions in the marketplace as our Class I partners seize new opportunities and implement new strategies and technologies. Change is always challenging, and it is particularly challenging in today's very difficult economic climate. But is our responsibility to understand and adapt to that change. Rail customers and the

Class I community need and expect short lines to meet this challenge by moving freight consistently, efficiently, safely and at competitive rates. This is particularly important if the national railroad system is to handle the large freight increases expected over the next 10-15 years.

We in the short line industry believe we have succeeded during some very tough times in the past. I won't say we began our new companies with just a wing and a prayer, but we did take on a big challenge in preserving rail infrastructure that most thought was lost. We got a lot of help from our Customers, our people and from good government policies. With the continued help of all three we are confident we can continue to grow and play an important role in the national transportation network.

American Short Line and Regional Railroad Association

*The Voice of America's Independent Railroads*

**Why Include Short Line Railroad Infrastructure in a Stimulus Bill**

America's 545 short line and regional railroads operate 50,000 miles of track or approximately one third of the national rail network. They operate in vast areas of the country no longer served by the seven large Class I railroads and keep tens of thousands of small businesses and communities connected to the national main line rail system.

Today's short lines were the abandonment candidates of a Class I railroad industry that could no longer make a profit operating these light density lines. As such, every new short line company began its existence with track that had received little investment under previous owners. Short lines invest nearly 30 percent of their gross revenues in infrastructure repairs and maintenance, a figure several times greater than the national average for business reinvestment. Eliminating deferred maintenance is a particular challenge because short lines serve smaller customers which do not ship the large volumes needed to generate the extra revenue needed for capital investment.

**Using Existing Authorizations to Fund Short Line Capital Projects**

- Appropriate $100 million over two years for capital grants for Class II and III railroads, as authorized by the Energy Independence and Security Act of 2007 (49 USC 22301; as amended by Pub.L. No. 110-140).
- Extend the short line rehabilitation tax credit (26 USC 45G) through 2015 and raise the credit cap from $3,500 per mile to $10,000 per mile (credit currently expires Dec. 31, 2009).
- Appropriate $500 million to reduce the interest rate to one percent on Railroad Rehabilitation and Improvement Financing for eligible projects. This subsidy would support over $1 billion in loans. The RRIF program is currently authorized at $35 billion (45 USC 822).
- Allow RRIF principal payments to be deferred for up to six years.

**What is the Stimulus Impact?**

- Most short line capital projects require no additional engineering or other lead time. Short lines are constantly installing new rail and ties, the amount limited only by funding availability.
- Most short line capital investment is made on existing company owned rights-of-way, requiring no regulatory or environmental delay.
- Most short lines do not have the in-house manpower to undertake these projects and must hire contractors and laborers to do the work. The Federal Railroad Administration estimates that nearly 50 percent of every railroad capital dollar goes to labor.
- Rail projects require the purchase of large quantities of materials such as timber and steel, almost all of which is manufactured in America, and are currently experiencing a downturn.
- The short line tax credit requires the railroad to spend two dollars for every one dollar in credit, thus leveraging substantial additional private infrastructure spending.
- RRIF is a loan program where the federal government will be repaid in full. In the program's 10-year history not a single short line RRIF recipient has missed a single quarterly payment.

50 F Street N.W. Suite 7020 Washington, D.C 20001
Phone: (202) 628-4500 Fax: (202) 628-6430 E-Mail: aslrra@aslrra.org

## Short Line Railroad Customers Talk About Service and the Short Line Rehabilitation Tax Credit

R.A. Geurts, AVP & General Manager – Cargill, Inc., Wahpeton, North Dakota
*A Customer of the Red River Valley & Western Railroad*

Cargill's Wahpeton facility ships thousands of cars a year over the Red River Valley & Western (RRVW). It operates on a 24/7 basis and cannot afford any interruption in bringing in raw materials or shipping out finished product. Said Mr. Geurts, **"The RRVW was very involved in our site selection process for this facility and has provided exemplary service since the plant's inception. They understand the importance of flexible, customer-based service. They know we depend on daily high quality rail service to operate profitably. Our plant has 160 employees and I can assure you that our success as a business is important to each and every one of them."**

Steve Zika, CEO Hampton Lumber, Portland, Oregon
*A Customer of the Portland & Western Railroad*

**"The short line tax credit helped us lower our transportation costs and sell more lumber to more customers. Hampton is one of the largest employers in rural Oregon and an efficient local railroad helps keep it that way,"** said Mr. Zika.

May-May Ng, Director – CK International, Ltd., Waukee, Iowa
*A Customer of the Iowa Interstate Railroad*

CK International, Ltd., exports Iowa agricultural products to Asia. Utilizing the Iowa Interstate Railroad allows them to ship heavier loads than can be accommodated by truck. **"The ability to load heavier freight cars reduces our freight costs by 2.5 cents per pound. In this very competitive market the ability to reduce costs by as little as 1/8 of a cent per pound can make the difference in getting the business."**

Warren Fisk, General Manager – Farmers' Cooperative Elevator, Manly, Iowa
*A Customer of the Iowa Northern Railway*

The Section 45G tax credit made it possible for the Iowa Northern Railway to complete a $1.5 million track rehabilitation between Manly and Nora Springs to better serve the Farmer's Coop Elevator at Manly, and Rock Falls Grain and Cartersville Elevator at Nora Springs. Without this upgrade, the railroad could not handle the increased volume required by the customers. **Warren Fisk of the Farmers' Coop said, "The Iowa Northern track rehabilitation project will help us increase volumes and lower transportation costs and that is good for every farmer that uses the elevator. To the extent the short line tax credit made that possible it is a real success story."**

Sonia Meehl, Owner/General Manager – Crete Grain, Crete, North Dakota
*A Customer of the Red River Valley & Western Railroad*

Crete Grain purchases grain from North Dakota farmers for resale to exporters and domestic end-users, mostly outside of the state. The majority of the grain is moved to the Pacific Northwest ports for export. In recent years Crete has shipped over 4,000 carloads of grain per year on the Red River Valley & Western which is the only link to the Class I railroad system. "**Truck transportation is simply not feasible for moving large volumes to the west coast ports. We collect our corn from over 200 family farmers and the railroad is what allows us to find markets for this corn. Without the short line railroad these farmers would be limited to what they could truck short distances within our state. For many it is what makes their farming operation viable," said Sonia Meehl, owner and general manager of Crete Grain."**

David Geers, President – Michigan Agricultural Commodities, Lansing, Michigan
*A Customer of the Huron & Eastern Railroad*

Michigan Agricultural Commodities owns 10 grain elevators in Michigan, two of which ship some 3,000 railcars a year over the Huron & Eastern Railroad. Most of these cars are bound for processors and feed mills in the southeastern U.S. "**We purchased these two facilities in 2001 and have experienced significant growth at both. Reliable short line service has contributed to that growth. In fact, nine of our 10 locations are served exclusively by short line railroads and they are part of what has helped us make Michigan agricultural products very competitive throughout the southeastern U.S.," said David Geers, president of Michigan Agricultural Commodities.**

Ronald Harlow, Dixie Business Director – Georgia Pacific, Naheola, Alabama
*A Customer of the Meridian & Bigbee Railroad*

The Meridian & Bigbee Railroad serves 22 customers in central Alabama and Mississippi. Those customers in turn employ over 3,900 high quality, industrial workers. The Section 45G credit allowed the railroad to undertake an aggressive $5.6 million improvement project. With the renovations, the railroad will be able to attract new industries and jobs to the region while continuing to provide high quality service to existing customers. "**The Georgia-Pacific mill at Naheola depends on the Meridian & Bigbee Railroad to provide critical rail service," said Ronald Harlow, director of Dixie Business for Georgia-Pacific Corporation, the largest single on-line customer.**

Gene Carrier, General Manager – East Texas Asphalt Company, Lufkin, Texas
*A Customer of the Timber Rock Railroad*

The Timber Rock Railroad provides a crucial connection to the BNSF and KCS Railroads, necessary to deliver needed aggregate into east Texas. The Timber Rock utilized the Section 45G tax credit to make needed bridge improvements to handle long heavy trains of rock cars and deliver them safely and economically to deep east Texas. "**We count on the Timber Rock to supply multiple grades of aggregate to meet the construction needs of our region, " said Gene Carrier, General Manager of East Texas Asphalt. "Their ability to make needed**

**repairs to the railroad allows our communities to compete economically with the urban areas that have more transportation choices."**

Gary Beachner, General Manager – Beachner Grain, St. Paul, Kansas
*A Customer of the South Kansas & Oklahoma Railroad*

The SKOL railroad installed more than 20,000 ties and relayed five miles of rail with a heavier, more secure type of steel to make the movement of trains safer and more reliable in Southeast Kansas. **Gary Beachner of Beachner Grain said, "Beachner Grain depends on the SKOL to move more than 6.5 million bushels of grain to market every year. It is critical for our business and for family farmers throughout the area that the SKOL be able to maintain an infrastructure adequate to keep Southeastern Kansas farmers competitive in the global marketplace."**

Brian Whipple, Transportation Manager – Amalgamated Sugar, McMillan, Idaho
*A Customer of the Eastern Idaho Railroad*

The Eastern Idaho Railroad utilized the section 45G tax credit to provide for a major reconstruction of the main line between Burley and Twin Falls, Idaho. At a press conference in the summer of 2006, **Brian Whipple of Amalgamated Sugar said, "Without the Eastern Idaho Railroad, Amalgamated Sugar would not be able to be in business in the Magic Valley. We depend on the EIRR for inbound and outbound products to keep Amalgamated Sugar operating."**

Mike Purdy, Owner – Delta Trading Company, Bakersfield, California
*A Customer of the San Joaquin Valley Railroad*

Delta Trading is a distribution facility located on the Sunset branch of the San Joaquin Valley Railroad in Bakersfield, CA. **Mike Purdy of Delta Trading said, "The track rehabilitation made possible by the tax credit is directly responsible for Delta Trading Company's decision to invest nearly $3 million in its facility and almost triple its number of employees. We now have a short line railroad partner that can provide the volume and level of service that allows us to significantly grow our business. This tax credit was a very smart decision by the federal government and I suspect it will more than pay for itself as our experience is repeated on short lines across the country."**

Ron Walters, President – Erie Plastics, Corry, Pennsylvania
*A Customer of the Western New York & Pennsylvania Railroad*

The Western New York & Pennsylvania Railroad has used funds freed up by the Section 45G credit to match a Pennsylvania grant program to undertake a $3.5 million project to provide stronger and higher speed railroad track that can provide more efficient and competitively priced transportation for Pennsylvania shippers. **Ron Walters, President of Erie Plastics, said, "This facility molds 30 million plastic parts a day and we bring 80 to 90 percent of our plastic resin into the plant by rail. Rail transportation is the most economical way to get our raw materials, and anything that helps make the railroad more efficient and more viable is critically important to our success."**

*Short Line Railroad Customers Benefit from Section 45G Investments*

Arthur Kroot, President – Kroot Corp., Columbus, Indiana
*A Customer of the Louisville & Indiana Railway*

Arthur Kroot and the 60 employees of Kroot Corp. are southern Indiana's principal scrap yard, working closely with the area's auto manufacturing plants and steel mills. For the past ten years, the Kroot Corp's business has heavily relied on continued investment in the Louisville & Indiana Railway, including a recent bridge replacement program made possible by Section 45G. According to Mr. Kroot, **"If we did not have this railroad, we would be out of business. The L&I has done an incredible job for us. The benefits are significant to not only industry, but the community. This is the lifeblood of our area and the auto manufacturing plants could not operate without the railroad."**

Bill Dozier, Division Logistics Rail Manager – Georgia-Pacific, Crossett, Arkansas
*A Customer of the Arkansas, Louisiana & Mississippi Railroad*

In Crossett, AR, the Arkansas, Louisiana, & Mississippi Railroad's aggressive tie replacement program funded by Section 45G will benefit a plywood plant, a lumber mill, a paper mill, and a chemical facility, in aggregate employing 3,000 workers. The plywood plant in Crossett is the largest softwood plant in the world and the paper mill is one of largest Georgia-Pacific plants producing tissue and other paper. **According to Bill Dozier, division logistics rail manager for Georgia-Pacific Corporation, "Our company depends on the railroad and it is important that the ALM continues to reinvest in their railroad infrastructure."**

Tony Johannesen, Manager – Dakota Prairie Ag, North Dakota
*A Customer of the Red River Valley & Western Railroad*

The rehabilitation of this line allows Dakota Prairie Ag, a wholesale grain, farm supplies and field bean merchant, to ship 110 pound shuttle trains to distant export and domestic markets. This marks the first time in history that the farmers in the region will have this opportunity. **"The ability to utilize these longer, heavier trains is going to reduce transportation costs by about 10 cents per bushel and that is going to make North Dakota grain more competitive in the marketplace," stated Tony Johannesen, Dakota Prairie Ag manager.**

Cliff Forrest, President – Rosebud Mining Company, Penfield, Pennsylvania
*A Customer of the Buffalo & Pittsburgh Railroad*

Due to the investment funds made available by the Section 45G tax credit, the Buffalo & Pittsburgh Railroad is upgrading its tracks from Dubois to Driftwood, Pennsylvania. This $2.2m investment will enable Rosebud Mining Company to expand its coal preparation and railcar loading facility in Penfield, Pennsylvania and expand its coal mining operations in the region. This project enables Rosebud Mining to open a new coal mine in the region with forecasted shipments of 8,000 railcars (800,000 tons of coal) annually. The upgrade provides a positive economic impact to the region by creating 45 new mining jobs, 5 new railroad jobs and 30 temporary construction jobs. **Cliff Forrest of Rosebud Mining Company said, "Having the Buffalo & Pittsburgh Railroad make this investment was essential in our decision to expand the coal load-out facility, which will now enable us to handle 800,000 tons by the opening of new coal mines."**

*Short Line Railroad Customers Benefit from Section 45G Investments*

Butch Reed, Sales Manger – Columbus Brick, Columbus, Mississippi

*A Customer of the Columbus & Greenville Railway*

The Section 45G credit allowed the Columbus and Greenville Railway to undertake a $400,000, 2.5-mile track rehabilitation to benefit Columbus Brick. As a result of this improvement, Columbus brick has increased outbound rail from 100 cars per year in 2001 to over 550 cars per year today. For the 90 employees at the Columbus facility, it is critical to have the ability to ship via rail. **Butch Reed, sales manager of Columbus Brick noted that, "by allowing us to use 100 ton rail cars, this rehabilitation project has reduced our transportation costs and made this Mississippi company a stronger and more competitive player in our industry."**

Greg Wheelan, Plant Manager – National Gypsum, Medicine Lodge, Kansas

*A Customer of the V&S Railway*

The largest customer of V&S Railway is National Gypsum, a building products manufacturer and one of the leading gypsum wallboard producers in the world. Before the passage of Section 45G, track conditions limited train speed on the line to below 10 mph. Improvements made because of Section 45G have increased train speed to 25 mph. **This increase in train speed has led to improved customer service. According to Greg Wheelan, local National Gypsum plant manager. "Before the improvements, several cars of our materials would bunch up, but now we are able to get to the mainline faster. The upgrades in the track and switches provided by the short line tax credit helped speed things up, lessening delays and improving reliability to the rail line."**

Greg Gould, Vice President – Rogers Group, Inc., Bloomington, Indiana

*A Customer of the Indiana Rail Road*

Rogers Group, Inc. of Bloomington, IN provides customers with crushed stone, sand and gravel, asphalt, and concrete masonry. Funds made available by Section 45G have allowed Indiana Rail Road to haul 3,000 tons of stone per week from the Rogers Group limestone quarry to a Hoosier Energy electrical power plant to reduce air pollution emissions. **"This simplified the transportation dynamic for our customer, who already had existing rail infrastructure. The movement of the products by rail replaced all the truck traffic, increasing safety and reducing energy consumption. The customer service provided to the power plant improved the delivery speed and reliability of our product," continued Gould.** The dependability and sustainability of the improvements also created job security for the fifty employees at the Rogers Group location. **"Stimulating the economy, economic development and creating new jobs through the short line tax credit are the things we need to continue doing," lauded Gould.**

David Roche, President & CEO – Minn-Dak Farmers Coop, Wahpeton, North Dakota

*A Customer of the Red River Valley & Western Railroad*

The timely and safe rail transportation provided by the Red River Valley & Western Railroad is essential to the business of the Minn-Dak Farmers Coop and its 250 employees. The Coop ships 95% of their outbound sugar and sugar products over the RRVW and they receive 100% of their

inbound coal and limestone vie the short line. According to Mr. Roche, **"Short lines excel in meeting the individual needs of their customers. They are local companies that are in daily contact with us and the work overtime tailoring their service to our particular needs. They do so overt track which requires substantial capital investment both to make up for past neglect and to meet the ever increasing requirements for heavier cars and faster turn around times.**

Steve McLaurin, Live Production Manager/Operations Manager – Peco Foods, Bay Springs, Mississippi

*A Customer of the Mississippi Southern Railroad*

The Mississippi Southern Railroad (MSR) was able to utilize the Section 45G tax credit to insert thousands of cross ties into their main line between Newton and Bay Springs, Mississippi. Until that point, this line had been embargoed by the previous Class I railroad owner due to poor track conditions. The MSR was able to use the tax credits to install enough ties on the line to re-open the railroad and resume service to their customers. **According to Steve McLaurin of Peco Foods "Our company feeds tens of thousands of chickens every day, and we count on the Mississippi Southern Railroad to be able to deliver the necessary corn and soybean meal in an economical fashion. Without the MSR being in business, and without their ability to rehabilitate and upgrade their track, we would have had to close our doors, which would have meant a meaningful loss of jobs and a major direct economic hit to our community."**

Roger Simon, Vice President – Alma Iron and Metal, Alma, Michigan

*A Customer of the Huron & Eastern Railroad*

The City of Alma worked for some time to move the Alma Iron and Metal facility from its present downtown site along the Pine River mill pond so the city could redevelop the river front. That goal was recently accomplished when the company was able to justify relocation to an industrial park site formerly occupied by Total Petroleum. **"The availability of direct rail service at the site was a major factor in making the economics of the move work. When you consider that one railcar holds four truckloads, the economics become real clear. Ours is a very price competitive business and we cannot get to the markets we need to reach without good short line rail service," said Roger Simon, VP of Alma Iron and Metal.**

Cliff Vennix, President – Auburn Bean & Grain, Auburn, Michigan

*A Customer of the Huron & Eastern Railroad*

Auburn Bean and Grain is a major rail shipper based in Auburn, MI. AB&G, which also has locations in Oakley, Hemlock, and Saginaw, is in the business of seed cleaning and processing and has a combined storage of 13 million bushels. ""**Auburn Bean and Grain depends on the Huron and Eastern Railroad to move some 2,200 cars a year to get its product to market. The short line operates in areas the large Class I railroads no longer serve and over track that received limited investment by previous owners. The rehabilitation tax credit has allowed the railroad to increase it annual track investment by approximately $300,000 per year. Those track improvements are critical to the success of agricultural shippers in Michigan. They improve service and help keep transportation cost down. It's a smart program that should be continued," said Cliff Vennix, president of Auburn Bean & Grain.**

David Skjaerlund, President – Liberty Renewable Fuels, LLC, Owosso, Michigan
*A Customer of the Great Lakes Central Railroad*

**"Short line railroads like Great Lakes Central provide service over track that was going to be abandoned by the large Class I railroads. For that reason most of this track received little or no investment for many years prior to the purchase by the short line. Catching up is very expensive and in rural areas such as ours small shippers do not generate enough volume to fully foot the bill. The tax credit has helped fill that gap. It allows the short line to catch up and lower operating expenses so that there is more revenue left to finish the necessary rehabilitation."**

Jerry Moen, General Manager – Larson Grain Co., LaMoure, North Dakota
*A Customer of the Red River Valley & Western Railroad*

Larson Grain Co. collects grain from 150 family farmers in Southeastern North Dakota. **"It is not an exaggeration to say that if this railroad could not serve our facility we would have to close down. We ship approximately 10 million bushels a year and it is just not feasible to move that kind of volume by truck. Even if could, the damage that level of truck traffic would do to our local roads would be enormous."**

Brian Arnhalt, GM – Minn-Kota Ag Products, Breckenridge, Minnesota
*A Customer of the Red River Valley & Western Railroad*

Minn-Kota collects grain from Minnesota and North Dakota farmers and ships approximately 4,500 rail cars per year over the Red River Valley Railroad (RRVW). According to Mr. Arnhalt, **"the tax credit is more than just the credit itself. My company recently helped RRVW finance the rehabilitation of two yard tracks that were needed to load heavier, longer trains. The tax credit helped make this upgrade economically feasible for the railroad and their willingness to proceed is what convinced us to participate. It seems to me this is a very positive outcome that the government should continue to encourage in the future."**

# OVER A THOUSAND REASONS TO SAVE SHORT LINE RAILROADS.

ALABAMA Baldwin Transfer, Buchanan Hardwoods, Farmers' Cooperative Market, Frank Currie Gin Co., Huxford Pole & Timber Co., Inc., Johnson Materials, Kimberly-Clark Corp., Lafarge Aggregates Southeast, Meader Warehousing & Distribution, Inc., Nucor Steel Tuscaloosa; Omya Inc., Red Fox Fertilizer; Renosol Seating LLC, Selma Oil Mill, Inc., UAP Distribution, Inc., Vulcan Materials Co. ARIZONA Apache Nitrogen Products, Inc., Fertizona, Matrix Nutrition LLC, Superior Cement; Tessenderlo Kerley Inc. ALASKA Lynden Incorporated ARKANSAS Domtar Corp., Frontyaire of Arkansas, Inc., Gill Elrod Ragon Owen & Sherman, P.A., Hanna's Candle Co., Keith Smith Co., Inc., North Little Rock Economic Development Corp., OK Industries; Poinsett Rice and Grain (Cherry Valley, Corning, Diaz, Jonesboro, Osceola, Waldenburg), Powell & Powell Milling, Producers Rice Mill, Ridgewood Timber Corp., Seaclock Industries, Skelton Motor Co., Inc., Tyson Foods (Nashville, Springdale), Wayne Farms LLC CALIFORNIA Acargo, Amber Chemical, AmeriGas Propane LP, Anton Feed Inc., Basic Chemical Solutions; Bell Carter Foods, Inc., Best Logistics, Inc., BMD, Button Willow Wilbur Co., California Family Food, California Grain & Spice Corp. California Portland Cement Co., Cantam Minerals/Kleen Blast, Channel Lumber Co., Compton Ag Services, L.L.C., Crisp Warehouse, Dairymen's Feed & Supply Coop., Delta Trading; E Street Cold Logistics, Ferro Metal, Inc., Fruit Lay-Kern, Gang Nail Truss Co., Global Auto Processing Services, Inc., Golden State Metals, Harbor Association of Industry & Commerce, Hobbs Container Co., IMTT Richmond CA, Ingomar Packing Co. LLC, Innovative Cold Storage, Jim Hicks & Co., Inc., Johnston Trading, Kern Oil & Refining Co., Kleen Blast Abrasives, Levin-Richmond Terminal Liberty Packing Co. (Morning Star), Los Angeles Harbor Grain Terminal, Los Gatos Tomato Products, Madepro Inc "Lumber Wholesale", Marusez Trucking Inc., MJ Swoon, North Pacific Pacific Coast Producers, Pacific Coast Recycling, LLC; Pacific National Transportation, White System Corp., PDM Steel, Plastic Express, Port of Stockton; Richard Best Transfer, Inc., Rio Bravo Tomato Co. San Joaquin Refining Co., Inc., Stockton United Terminal Spreckels Sugar Co., Sun Valley Rice Co. LLC Superior Soil Supplements, Taiga Building Products The J M Smucker Co., The Morning Star Packing Co. (Los Banos, Williams) Thru MTB, Tricor Refinery Truck-Rail Handling, Inc., TXI Riverside Cement; Univar USA, Inc., Weber Distribution, West Coast Warehousing Westway Terminal Co., Yandell Truckaway, Inc. COLORADO Absolute Logistics, Cattlemen's Choice Loomix, Dorman Bros LLC; Dry Creek Seed Co. LLC F.A.S. Inc., Flagler Coop Association, GCC of America, High Sierra Energy, LLC Lodgepole Energy Marketing LLC, MATX, Inc., Stratton Equity Cooperative, The Western Sugar Cooperative CONNECTICUT 7 D H Lumber 7 D Lumber, Anastasio & Sons/Circle of Life; Atlas Containers, Atoglas N.A. Inc. Babylon, LLC, C. C Foundary Inc., Capital Recycling, Enfield Lumber, Ferraleto Steel Co., Inc., Hartford Freezers, Headwaters Resources, Inc., Kimberly-Clark Corp., Kofkoff Feed, Laureno Lumber, Logistec, USA, Inc., Pioneer Valley Refing Warehouse, Willimantic Waste Paper Co. FLORIDA Accurate Containers, Alpena Lumber, Inc., Arizona Chemical, Berg Steel Pipe Corp. Lesman Bros. Inc., Conrad Yelvington Distributors, Inc., Couch Ready Mix USA Coastal Division, Douglass Fertilizer & Chemical, Inc., Ferris Moving & Storage Co., Inc., Fiskars Brands Inc. Gerdau Ameristeel, Gold Coast Beverage Distributors, Inc., Landers Auto Recycling; Ocala/Marion County C.D.C., Panama City Port Authority, Plastic Conversion Services, Inc., Rebman Properties, Inc., Rinker Materials-Quarries, Stock Building Supply, States Shores, Inc., Titan America Florida, W Therow Locomotive Svc., West Florida Gin Co. GEORGIA Ampro Products Inc. Beadles Lumber Co., C. S. Grain, LLC C Thompson & Associates, Carbo Ceramics. Eka Chemicals Inc., Imerys, Langboard Inc., NuStar Energy, Osmose Inc., Paper & Forest Industry Transportation Committee; Rayonier, Shaw Industries, Inc., Tankersley & Associate LLC, Tronox Pigments, Wayne Farms LLC IDAHO Agri Trading; Bennett Lumber Co., Busch Agricultural Resources, Challenger Pallet, Coleman Oil Co. ConAgra Foods dba Peavey Grain General Mills, Genesee Union Warehouse George F Brocke & Son Idaho Pacific J. D. Henkell and Co., Johnson Grain, Mountain West Trading Pacific Steel & Recycling (Lewiston, Twin Falls), Performance Plus, Plum Creek Northwest Lumber; Port Of Lewiston Container, Potlatch Forest Products Corporation, Rigby Produce, Inc., Rine Grain, Rocky Mountain Agronomics, Sobotka Farms Transportation LLS, Taylor Produce, The Amalgamated Sugar Co., LLC ILLINOIS Agridyne LLC, American Milling LP, AMG Resources Corp., Aventine Renewable Energy, Inc., Bardia America Inc. Behr Iron & Steel, Caterpillar Logistics Services, Inc., ConAgra International Fertilizer Co., Corn Products International, Inc., Danforth Gilman Grain Co. FF Jas Motor Transports, Inc., Grainland Cooperative, Great Northern Lumber L&I Barge Services, Jack Kennedy Metal Products & Bldgs., Inc., JBS United Inc. Keystone Steel & Wire Co., Packaging Corporation of America, Plains Marketing Canada, LP PMP Fermentation Products, Inc., Prairie Central Cooperative, Inc. (Chenoa Fairbury, Meadows, Weston), Rickett Grain Co. Smurfit Stone Container, Steel Warehouse UPM Kymore, Weaver Popcorn Co. INDIANA Boyd Grain, Calumet-Cutton Valley; Calumet-Princeton Ceres Midland Inc., Co-Alliance LLP; CountryMark Cooperative, LLP, Farmers Cooperative Co., H. C. Spinks Clay Co., Indianapolis Power & Light Co. (Campbells, Indianapolis, Petersburg) J L M Farm Services Inc., Kentland Elevator & Supply Inc., Lowe's Pellets & Grain, Inc., Midwest Agri, Inc., OmniSource Corp., Vectron Fuels, Inc. IOWA Active Link Logistics (Des Moines, Waukee) Ag Partners, LLC, American Profol Inc., Beisser Lumber; Bettendorf Chamber of Commerce C K International, Ltd., Central Petroleum Co., City Carton Recycling; Cooperative Elevator Assn., Determann Industries, Inc., East Central Iowa Coop, Farmers Co-op Elevator, Farmers Farmers Cooperative (Marble Rock, Tripoliansville), Farmers Co-operative Society Farmers Feed & Grain, Five Star Coop, Gerdau Ameristeel Gold Eagle Coop (Wesley, Goldfield), Grain Processing Corporation Great Lakes Coop [illegible], Heartland Coop, Homeland Energy Solutions, Innovative Ag Services, [illegible] MN IC&E Shippers Assoc., MaxYield Cooperative Merchants Distribution Service, North Central Cooperative, North Iowa Cooperative, Northern Country Coop, On-Time Delivery LLC, Renewable Energy Group Inc., River Gulf Grain Co. Sethness Products Co., Shear Elevator Inc. Stateline Cooperative, Luana-Benton Cooperative Two Star, Inc. Verasun Charles City, Wilbur Bulk Transfer KANSAS ADM Grain, AgMark LLC, Alpena Agri Services, Ash Grove Cement Co., Beachner Grain Inc (Altamont, Chanute, Humboldt, Independence, Neodesha, St. Paul, Thayer), Cairo Cooperative, Centennial Energy Central Plains Co-op (Alfred Smith Center), Cereal Food Processors Inc. Clean Harbors Cloud County Co-op Elevator Assn., Collegeville Resources [illegible] Resources Terminal LLC Compass Minerals Int'l LLC, Conagra Mills Inc., Cornerstone Ag; D.E. Bouchard Grain Co., Darling International, DeBruce Grain, Dorrance Coop Association, Delphos Coop Assn.; F + F Iron & Metal Co., Farmers Coop, Fairway Co-op, Inc.; FCE Farmers Coop Equity Co.; Frontier Ag, Inc.; Fuller Brush Co., Garvey Public Warehouse; Golden Valley Cooperative, Golden Valley, Inc., Great Bend Cooperative Association, Hall Industrial Services, Inc., Heckert Construction; Horizon Milling, LLC; Kanorado Cooperative, Kansas Quality Stone, Kaw River Shredding; KC Hardwood, Kiowa Construction Co., Lafarge North American, Lamoure Works, Inc., McKinnon Iron and Metal, MGP Ingredients, Inc., Mid State Farmers Coop, Inc., Midland Marketing; Midway Coop Assn., Midwest Iron and Metal, Monarch Cement; National Compressed Steel, Pawnee Co. Coop; Pitt Plastics; PQ Corporation, Prairie Horizon Agri-Energy, Pro-Ag Marketing Assn. Inc., Rangeland Cooperative, Inc., Republican Valley Cattle Feeders, Inc., Rich Mix, Rubbermaid Products, Salina Area Chamber of Commerce, SEK Grain Inc (Colleyville, Liberty), Sibert Grain, The Scoular Co., Valley Coop, Inc. (Burden, Winfield) VVF LLC, Weyerhaeuser Co., Wichita Iron & Metals, Wight-Lorenz Grain Co. Inc KENTUCKY CC Metals & Alloys LLC; Dairyman's Supply Co. Inc. EON U.S., MARTIS Inc., Old Hickory Clay Co., Parker Commercial Storage & Distribution, Inc., Steel Technologies, Inc. LOUISIANA Boise Paper Solutions, Calumet Lubricants, Consolidated Grain and Barge; Mike Baker Brick Co., Inc., M-I SWACO, Planters Rice Mill The Bayou Companies LLC; Valentine Chemicals Westway Trading Corporation MAINE DCP Midstream; Fore River Distribution Center; In-Terminal Services, NEPW Logistics, Safe Handling, Inc., The Maine Wood Treaters Inc. MARYLAND Belair Road Supply Co. Inc., Congoleum Corporation, Kemar Fertilizer Inc., Laurel Sand and Gravel, Inc., Lehigh Cement Co. Reisterstown Lumber Co., Snavely International UFPI MASSACHUSETTS A & R Packaging and Distribution, A&K Transportation Inc., American Carbonated Corp., American Dry Ice Corp., Ashland, Inc., Jen-Coat Inc., JEP, Inc. d/b/a Delta Bulk Transport; Kleer Lumber, LLC; Little Rill Corporation, Mapleleaf Distribution Services, Inc., Mass Soho, Inc., Quality Carriers/Transplastics, Sonoco Products Co., Southern State Coop, United Cooperative Farmers, Inc MICHIGAN Active Feed Co., Agrium U.S. Inc., Alma Iron & Metal Co., Inc., Auburn Bean & Grain, Bay Logistics, Bayside Best Beans L.L.C. Bulk Materials International, Burroughs Materials, Central Warehouse Operations, Inc., Cooperative Elevator Co. (Akron, Bad Axe, Deckerville, Elkton, Fairgrove, Pigeon, Ruth, Sebewaing), Falmouth Co-operative Co., Fremont Co-operative Produce, Fratcher Bean Co., Harson Track Technologies Ittner Bean & Grain, Liberty Renewable Fuels, LLC, Michigan Agri-Business Assn., Michigan Agricultural Commodities, Inc. (Blissfield, Breckenridge, Brown City, Lansing, Marlette, Middleton), Michigan Sugar Co. (Bay City, Caro, Carrollton, Croswell, Sebewaing), Midwest Agri-Commodities (Bay City, Caro, Croswell, Sebewaing), Nugent Sand Co. Inc., Precision Poly Inc., RSI Logistics, Inc., Star of the West Milling Co. (Frankenmuth, Gera, Gilford Saginaw, Vassar) Van's Logistics Service, LLC MINNESOTA Agassiz Valley Grain, LLC, Agriliance, Al-Corn Clean Fuel, Bornholt Concrete, Inc. Cold Spring Granite Co. Commodity Specialists Co., Coop Country Farmers Elevator (Dundee, Olivia, Renville, Sacred Heart); Del Monte Foods Farmers Co-op of Hanska, Farmers Co-operative Elevator Co. Farmers Elevator Co., Frank Bros Feed & Grain Co., Grain Millers Inc. Martin Marietta Aggregates Mathiowetz Construction Co., McNeilus Steel, Inc., Minnesota Grain and Feed Assn., Minnesota Valley Regional Rail Authority; Minn-Kota Ag Products, Inc., New Ulm Quartzite, Northern Contours, Peterson Grain & Brokerage Co. Red River Grain Co., Renewable Products Marketing Group, LLC, River Region Coop Rothsay Farmers Co-op Simonson Lumber, Southern Minnesota Beet Sugar Coop., Sun Opta Sunflower, Sunopta MISSISSIPPI Columbus Brick Co., Fishbelt Feeds, Inc. Greenville Port Terminal Heritage Plastics, Inc., Indi-Bel, Inc., Platte Chemical Co. Pyco Industries Inc. Scott Petroleum Corp. Warfield Point Associates, Inc MISSOURI Abengoa Bioenergy Corp., Albert Tamm Lumber, Carter Waters; Central Missouri Reload Chula Farmers Cooperative, Cliffstar Corp., Compass Big Blue; Consumers Oil & Supply, Dyke Industries, Inc., Ex-L-Tube; F C Stone, Four States Distribution, Gunderson, Intermountain Reload Llc Joplin Building Material Co., Lafarge Cement, Longleaf Energy Associates LLC Mancel Inc., Meek's Building Centers, MFA Inc., Missouri Metal Recycling Pizza Blend Prime Pride, Inc., Redland Brick, Scoular Co., Smorgon Steel Smurfit Stone Container Standard Transportation Services Inc., Vanform Plastics MONTANA Bitterroot Valley Forest Products, Breaking Pacific Inc., Bull Mountain Coal Mining, Inc. Cenex Supply & Mkting Inc Columbia Grain Int. Eagle Stud Mill Gwynn Lumber and Reload, J & R Planing Montana Tunnels Mining, Inc., Mt. West, Northwest Drywall & Building Supply Inc. Pacific Steel & Recycling (Kalispell, Sidney, Great Falls) Plum Creek Marketing, Inc. Plum Creek Northwest Lumber (Fortine, Kalispell, Pablo) Plum Creek Northwest Plywood, Plum Creek Timber, Power Townsend, R & S Supply Inc., Sidney Sugars, Inc. Simkins-Hallin Lumber Specialty Exports, Superior Propane, Timberweld Manufacturing; Tricon Timber LLC, Tripp Lumber, W.F. Dust Control & De-Icing Inc NEBRASKA Ag Valley Cooperative, Agri Co-op; Hansen Mueller Co. Mid America Bio Energy, Standard Ethanol, LLC, The Scoular Co. NEVADA Envirotech Services Inc. NEW HAMPSHIRE Gas Supply Resources Jackson Structural Steel, Inc., New England Wood Pellet, LLC NEW JERSEY Campbell Soup Co. GAF/ELK Corp. NEW YORK Allied Fire Protection Systems Cass Creek International, LLC Community Development Association LLC Elm Global Logistics, Feed Ingredient Trading Corp., Gernatt Asphalt Products Inc. Great Lakes MDF LLC; Inergy Midstream LLC; Interstate Commodities Inc. King Forest Products King Timberlands, LLC L & L Sawmills Inc., Lacon Farms Hay Terminal, LLC Nucor Steel Auburn, Sweeteners Plus, Inc NORTH CAROLINA 84 Lumber Co., Ararat Rock Products, BPS, Braswell [illegible] Co., A Percy Cape Fear Bulk, Carolina Marine Terminal, Carolina Stalk Bank, Inc. Cohen & Green Salvage Co., Inc., Colonial Materials of Fayetteville Inc. Cotton Creek Chip Co., DuBose Steel, FCI Greenstone Iron & Steel Goldston Carpet, Jordan Lumber & Supply, Locust Lumber Co., McDonald Brothers Inc., Mid-Atlantic Freeholding, Parks Building Supply, Perdue Farms Inc., Polyblum Films, Raeford Hoke Economic Development Commission, The Contractor Yard BMW NORTH DAKOTA CHS-Milton, Colter Farmers Elevator, Crew Grain Co., Dakota Farmers Elevator, Dacco Grain Inc. (Mountain, Woonsocket), Enderlin Cooperative Market Association, Lake Region Grain Coop, Larimore Grain Co., Minn-Dak Farmers Cooperative, Munich Elevator Co. Ottertreck Farmers Elevator, Renville Elevator Co., Sioux River Coop, Sun Prairie Grain LLC, [illegible] Equity Exchange Co., Crook Inc. Champaign Landmark, [illegible] Bulk Terminals, DHI [illegible] Distributors, Dysart Coop, Empire Wholesale Lumber Co., Mercer Landmark, Inc. (Celina Convoy); National Lime & Stone Co., North American Paper Co., O-N Minerals (Michigan) Co., Ralston Foods; Rohm and Haas, Southwest Landmark, Inc. (Catawba, Lebanon, Melvin, Pleasant Plain, S. Charleston, Wilmington), TimberTech OKLAHOMA ADM Grain, ADM Milling; Allied Custom Gypsum (Bessie, Norman), Ambar Lonestar Drilling Fluids; Arrowhead Lumber; Ash Grove Cement Headquarters, Atlas Resin Proppants Lp; Baker Hughes Drilling Fluids, Beaver Ace Home Center and Lumber Co., Bluelinx, Brainerd Chemical, C.G. Martin Co., Inc., Cardinal FG, Carnegie Ace Home Center and Lumber Co; Cassidy Grain Co (Frederick, Hollister, Manitou), Chemcentral, City of Clinton Economic Development; Clinton Ace Home Center and Lumber Co; Clinton Farmers Coop; Cordell Ace Home Center and Lumber Co. Custer City Farmers Coop Exchange (Custer City, Putnam) D & M Distribution Services; Dallas-Miller Logistics, Doane Pet Care (Mars), Durant Metal Shredding LLC, Elk City Ace Home Center and Lumber Co, Elk City Economic Development Authority Elk Supply Co. (Ace Hardware), Equity Marketing Alliance, Farmers Coop Association, Farmers Coop Elevator Association (Anadarko, Carnegie, Hobart, Mountain), Farmers Cooperative Exchange (Bessie, Clinton, Cordell) Farmers Union Coop Gin-Humphreys (Altus, Olustee, Tipton), Fox Building Supply Francis Drilling Co., Garret Trucking, Harrison Gypsum (Anadarko, Norman), Haskell Lemon Construction Co. Hughes Lumber Company JB's Ace Home Center; Jones Seed, Kimberly-Clark Corp., Lawton Coop, Lesley Ace Home Center and Lumber Co; Livestock Nutrition Center, Mac Steel, Major County Economic Development Authority; Mangum Ace Home Center and Lumber Co, Martin Marietta Materials, National Standard Co., Newpark Drilling Fluids LLC (Clinton, Hammon, Krebs, Oklahoma City, Woodward Oklahoma City) Oilfield Pipe Supply; Oklahoma City Reload, Oklahoma Construction Material (Del City, Catoosa), Oneok, Planters Coop Association (Altus, Brinkman, Carter, Duke, Elmer, Gotebo, Hobart, Lone Wolf, Roosevelt), Quebecor World, Rocky Farmers Coop (Dill City, Gotebo, Rocky), Sayre Ace Home Center and Lumber Co, SemStream LP; Sentinel Farmers Coop, Sherwood Construction Co. Inc., Silverline Plastics, Snyder Farmers Coop Association (Headrick, Snyder), Southwestern Tank Lines, Stillwater Milling Co. Stockman's Milling, Thomas Ace Home Center and Lumber Co, Thomas Economic Development Authority Tillman Producers Coop (Davidson, Frederick, Hollister), Trinity Chemical Ind., Weatherford Ace Home Center and Lumber Co Weatherford Farmers Coop (Corn, Weatherford), Weatherford Fracturing Technologies, Wheeler Brothers Grain (Alva, Canton, Cordell, Dill City, Eagle City Enid, Fay, Greenfield Kingfisher Loyal Oakwood, Omega Seiling Taloga Thomas Watonga), Williams Midstream Energy, Woodward Ace Home Center and Lumber Co, Zoeller Pipe & Steel OREGON American Bridge Manufacturing Autumn Seed Inc. Certainteed Corp., City of Willamina Collins Pine Co., Keller Lumber Co., Knife River-Western Oregon Div. LaFarge NA Marion County Forest Products; McGovern Metals Co. Inc. Pope & Talbot Inc. Roseburg Forest Products, Sabroso Co., Schnitzer Steel Industries, Inc. Smith Frozen Foods Southport Forest Products, LLC Stimson Lumber Co. Suncrest Sawmill Co. Teevin Bros Land & Timber LLC Waste Management PENNSYLVANIA Clarion Boards, Inc. Cresson Steel Co., Crown Cork & Seal USA Dad's Products Co., Domtar Paper Co. LLC, Energy Link Inc., Fox Haynes Essroc Cement Corp., Fosmex Corp. Frank Calandra, Inc., Franklin Investment Co. Freeport Terminals Goodman Services, Inc., Growmark FS LLC James Anteo Co., Koppers, Lord Corporation M & M Lime Co. Inc., MHF Logistical Solutions, Pennsylvania Brine Treatment, Inc., Presque Isle Trucking; Quaker Warehouse, Inc., Reed Minerals-Hershey Corporation, Renkert Oil LLC S & S Industrial Minerals Superior Well Services. Tube City IMS United Refining Co., Waroquier Coal, Inc. SOUTH CAROLINA Ambassador Steel CA [illegible], Chester County, Chester Development Association, Coatex Inc., Crown, Cork & Seal, Darlington Auto Auction, Diamond Hill Plywood Domtar Paper Co., LLC Flakeboard America Limited Georgia Pacific Hanson Aggregates Hartsville Oil Mill Isopoly Films, Lancaster County Economic Development, Lydia Soybeans National Cement, N I M Plastics Oliphant & Co., Inc., Porter Warner Ind LLC, Royster Clark, Smith-Galey, Sonoco Paper; South Atlantic Canners, Southern States, Swift Galey, Teknor Apex, Wellman, Inc. SOUTH DAKOTA AgFirst Farmers Coop, Dakota Ag Coop; Dakota Mill & Grain Inc. (Belle Fourche, Midland, Rapid City Wall), Dakotaland Feeds LLC Farmers Coop Elevator Co. Farmers Union Co-operative Elevator; GCC Dakotah Harrold Grain LLC, L.G. Everist, Inc. Lake Preston Coop North Central Farmers Elevator, Sioux Valley Regional Railroad Authority, Yale Farmers Coop TENNESSEE Burkhart Enterprises Inc. International Paper Johnson City Chemical Co. Inc. [illegible] Co. Inc. Kimberly-Clark Corp. Kova Ag Products Old Hickory Clay Co. Tindell's Inc TEXAS American Gypsum C [illegible] Recycling-Liberty, Commercial Metals Co., ConAgra International Fertilizer DLX-Fairway Terminals, El Dorado Chemical Co., Energy Wise [illegible] Farmers Coop; Farmers Coop Association (Goodlett Kirkland) Fort Worth Grain Exchange, Gantex Industries Gore Bros Inc., Gorman Milling Co., Inc., Henson Lumber Ltd., Huntsman Corp., Kimberly Clark Corp. Lattimore Materials Co., Inc., Lonestar Distributing Inc. MCI llc, Newpark Drilling Fluids LLC, Paris Economic Development Corp. Pennzoil; Poly America Reagent Chemical & Research, Inc., Synsil Products Inc. Temple Inland Forest Products Texana Tank Car & Mfg. Ltd., Texas Star Wire & Dist. Inc. We Pack Logistics & Harmon Walker and Harper, Wilstream International William George Co. Inc. UTAH Allied Waste, ETCRA LLC, H.C.2, Kimberly-Clark Corp., Nelson & Sons Inc. Sinclair Oil Corp., Western Hay Co., Inc. VERMONT Barrett Trucking Co. Inc. Burlington Electric Dept. Omya Inc. RCP Trout Inc. (Island Pond) [illegible] Service VIRGINIA Alpha Natural Resources, Cydall [illegible] Valley Proteins Inc. Vulcan Materials WASHINGTON ALAB [illegible] Warehouse Co. [illegible] Trucking Co. Inc., Building [illegible], Cascade Grain Products LLC Central WA Grain Growers Inc. Columbia Cedar Inc., Columbia Grain Inc. Columbia River Carbonates, Hoquiam Plywood Co. Inc., Imperium Grays Harbor Lewis County Forest Products, Mason County Forest Products, Mountain Oil Inc., North Mason Fiber Co., Inc. Northwest Grain Growers [illegible] Food Products Oroville Reman & Reload [illegible] & Supply Inc. Panchock International, PLS Pole Yard, Port of Grays Harbor, Port of Shelton, Port Of Whitman County Portac Inc. Reload St. John Grain Growers, [illegible] West Inc. TAB Forest Products Tri-County EDD [illegible] Brothers Lumber Warehouse Co., Wheat Growers of Endicott, Whistler Fuel LLC, Wilbur-Ellis Co. WEST VIRGINIA Central Lumber Co. ICG LLC PW Eagle Inc. WISCONSIN Kimberly-Clark Corp., Seneca Foods Corporation

Short line railroads are a lifeline for America's small businesses. Over 1,000 railroad customers have endorsed **H.R. 1584** and **S. 881** to preserve their rail service. Please join them in supporting this legislation to move more freight quicker, further, safer, and cheaper. For more information and a complete list of customer petitions visit **www.savingourservice.org**

Paid for by the Short Line Tax Policy Coalition

WOLFE RESEARCH

January 28, 2009

Thank you Chairwoman Brown, Chairman Oberstar and Ranking Member Mica, as well as your staffs for the invitation to present today on the state of the railroad industry.

My name is Ed Wolfe; I am the Managing Member of Wolfe Research, the leading boutique research firm on Wall Street focused on freight transportation and the macro economy. My team has been fortunate enough to be voted by investors as the top analysts on Wall Street for each of the past six years and eight of the past nine years.

I will make some comments for the record and submit the slides I hope to present to the subcommittee today.

In my thirteen years on Wall Street, as well as several years prior as an attorney, I have never before seen the U.S. or global financial markets and economy deteriorate in such a broad-based manner or at such a rapid pace. These truly are unprecedented times. The following slides show how quickly U.S. freight transportation demand has fallen off by mode and more specifically for the railroads by end user segment. I have also added some slides on rail and truck pricing, rail capital spending, returns and recent stock performance as well as our estimates for rail volumes, yields, revenue and EPS for the rails in 2009 relative to 2008.

**Slide 1** lists several of the key reasons why rail infrastructure is critical and becoming more so for our nation's transportation needs. Railroads only comprise about 7% of total freight transportation spend in the U.S. but have become an increasingly critical line-haul component of moving bulk commodities and consumer goods to businesses and ultimately consumers throughout the U.S. and between Canada and Mexico. This has been accelerated over the past decade with the rise of global trade and offshore Asian imports into the U.S., which lend themselves to large, less expensive, non-time sensitive, long-haul moves on railroads rather than other modes of transportation. We estimate that rails are more than 3x more fuel efficient than trucks and with increasing highway congestion, the rails are one of the few alternatives for truck freight with meaningful potential capacity to help decongest highways and make America more productive, safe, and more environmentally responsible.

**Slide 2** lists some of the major multi-year U.S. capacity expansion projects currently underway by each of the major railroads.

I will now turn to some thoughts on the freight macro economy generally and Chairwoman Brown's request for an update on how railroads are faring in the current economic crisis.

Our sense is that the recent further freight downturn since Thanksgiving reflects a material inventory drawdown and extended production shutdowns around, and since, the holidays, as freight has seemingly ground to a halt. Based on our channel checks, we expect these very weak freight trends to continue well into the first quarter of 2009, hence our expectation for -5% GDP during both fourth quarter 2008 and first quarter 2009.

Beyond extended shutdowns from the Big 3 automakers, we have seen announced production curtailments from a broad array of companies and industries including Peabody Energy, Toshiba, U.S. Steel, Caterpillar, Dow Chemical and Potash Corp among many others. We expect these shutdowns to further negatively impact already weakened freight volumes, as we have seen in December and January.

WOLFE RESEARCH, LLC

708 Third Avenue | 6th Floor | New York, New York 10017 | 212.209.3880

**Slide 3** summarizes the 13 freight data series that we track each month, the rough date during the month the data series is released and the source of the data. As shown in the column on the right, only one of these 13 series improved sequentially in the most recent month of available data from November or December versus the prior month. The one positive trend of truck bankruptcies showing relative improvement likely reflects the recent plunge in oil prices keeping small truckers in the game a bit longer than normal given how weak demand is.

**Slide 4** shows the Cass Freight Index, which has plummeted recently, including a 23% year-over-year drop in December, the sharpest decline in the 18-year history of the index, which is now at its lowest absolute level since January 2004. For the full year, the Shipment Index declined by an average of nearly 12%. The separate Cass Freight Shipper Spending Index is distorted, because it includes fuel surcharges. This index declined 16% year-over-year in December, its steepest decline since January 2002. Cass Information Systems is a financial company which processes over $14 billion in annual freight payables. Its freight index is a compilation of truck, rail and airfreight volumes and pricing.

**Slide 5** shows monthly year-over-year changes in freight volumes for the past three years for Domestic Truck, Airfreight and Rail volumes as well as West Coast ocean import and export volumes. Each of these modes of transportation fell materially in November from recent trends, with reported truck tonnage holding up the best to date and down only 2%. Meanwhile, rail and combined import/export ocean volumes declined 9% and 15%, respectively in November. Rail volumes were down also 16% year-over-year in December and are down 18% thus far in January, 2009.

Rail and West Coast port volumes, the only modes that we have December data for, were materially worse in December compared to November, likely a bad sign for the other modes of freight when December volumes are reported. Export ocean volumes were up 20% on average for the first eight months of 2008 but were down almost 20% year-over-year in November and down over 27% during December.

**Slide 6** breaks out the eight major rail product segments, showing annual year-over-year growth for the past six years on the left side of the slide, and data for the past eight quarters on the right side. Fourth quarter 2008 and full-year 2008 total rail volumes were down 9% and 4%, respectively. This marks the worst quarter since at least 1990 and the worst full year since 1985.

Note that in the fourth quarter, as was the case for full-year 2008, seven of eight segments were negative year over year, with only coal volumes positive. In the fourth quarter, automotive, metals and paper and lumber volumes were the worst performing volume segments for the rails, down 30%, 25% and 16%, respectively. While coal volumes, up 3%, remained the only positive segment during the fourth quarter, coal turned negative in December and remains weak thus far in January amidst the shutdown of several mines and weaker demand generally.

**Slides 7 and 8** show the 62% correlation between U.S. GDP and rail carload volumes and then the even higher 68% historical correlation between Industrial Production and Rail volumes.

**Slide 9** tracks Rail and Truck pricing over the past 32 years. Since Rail deregulation in 1980 the spread between Truck and Rail pricing has widened, in part driven by trucks being less fuel efficient and requiring higher fuel surcharges as oil prices have risen.

**Slide 10** highlights Rail Capital Spending as a percentage of total rail revenue for each of the Class I railroads since 1995 compared to the average capital expenditures as a percentage of revenue for the Dow Jones 30 Industrials. On average, over the past five and ten years as reflected in the bottom table, Railroads have spent an average of 16.5% and 16.8% of their total revenue on capital spending. This is almost three times higher than the spend by the average of the DJ 30 during those periods. Also note that during 2009, the rails, on average, still expect to spend about 17% of their revenue on capex. Capital spending guidance thus far indicates that capex for the rails will be down about 10% overall and down about 5%-10% for the U.S. rails only. This compares to some industrials, such as Alcoa, which have recently announced 50% capex reductions.

**Slide 11** looks at each Rail's Return on Capital relative to the rail industry's Cost of Capital as published each year by the STB. While the Rails' returns have, on average, improved from a low of about 6% in 2000 to 10.7% in 2007, they remained below the industry's cost of capital of 11.3% during 2007. Norfolk Southern was the only U.S. railroad to return its cost of capital in 2007. While rail returns were likely higher in 2008, they will be materially lower in 2009.

**Slide 12** lists our current forecasted volume, yield, revenue and EPS declines for the Rails for 2009. Our numbers have been coming down quickly over the past six months, and while we think we are getting closer to a bottom at least for 2009, we are not yet confident that our estimates have bottomed. In our current assumptions, we are assuming about a 6% decline in volumes, on average, for the four major U.S. rails next year, despite easy comparisons of -4% and -3%, on average, in the previous two years. In the prior three years from 2004-06, the four U.S. rails averaged volume growth of nearly 4%. These significant volume declines, along with slower real pricing gains and materially lower fuel surcharge revenue, should translate to about a 14% revenue decline on average in 2009. This is down from 10% revenue growth, on average, in the previous five years through 2008. Combined with negative operating leverage for the high fixed cost rail networks, we anticipate about a 16% drop in rail earnings per share next year, down from 27% earnings growth, on average, over the previous five years.

**Finally, Slide 13** reflects recent annual and quarterly stock performance of the Rails relative to Truck and Airfreight & Logistics stocks as well as the S&P 500. On average, the rail stocks returned 11.5% annually from 2000-2008, above the other freight sectors which returned about 7% and well above the S&P 500, which, because of poor returns in the early 2000's and 2008, produced an average 5.3% annual decline over that period. Note that while the Rails outperformed the other transports and the market over most of the past eight years and 2008, during the past fourth quarter and thus far in January, the rail stocks have underperformed as prospects have become less positive, reflected by our expectations on slide 12.

In conclusion, the rails are vital to the North American transportation network and will be increasingly important to infrastructure in order to alleviate highway congestion and promote a more efficient and environmentally conscious transport grid. While the group has seen strong earnings and stock performance in recent years, this is the most capital intensive industry of which we are aware. 2009 looks to be very challenging for volumes, yields and profitability, yet the group intends to minimally reduce their strong spending initiatives. Given low financial returns, if the downturn lasts beyond 2009, we would expect that shareholders would demand more substantial capital plan reductions.

I thank you for your time and welcome your questions. Also, for any interested congressional or administrative staff members who wish to receive our award winning daily transportation research, you can sign up free of charge on our website at www.WolfeResearch.com


WOLFE
RESEARCH
Airfreight & Surface Transportation
House Subcommittee on Railroads
Freight & Passenger Rail: Present & Future Roles,
Performance, Benefits, and Needs
January 28, 2009
Edward M. Wolfe
(212) 209-3880
ewolfe@wolferesearch.com
WOLFE

1

# Investment In Rail Infrastructure Is Critical

- Rails are a fuel efficient way to move bulk commodities such as coal, grain, steel, etc.
  - Rails can move 1 ton of freight 400-450 miles per gallon of fuel – about 3x more fuel efficient than trucks
- Our channel checks reveal that Railroad rates are about 20% cheaper than comparable lane-by-lane Truck rates
- Rails can help relieve highway congestion – 1 double-stack Intermodal train can take up to 280 trucks off the nation's congested highways
- Rails are a pipeline for offshore goods to move within the U.S.
  - Large shipments of consumer freight that are produced well in advance in Asia and transported by ocean to U.S. ports lend themselves to longer-haul, Rail shipments throughout the nation
- Safety – Railroads provide a safe way to move hazardous materials, mitigating the risk of an accident with civilians.
  - The Rails continue to improve their safety levels


Edward M. Wolfe
(212) 209-3880
ewolfe@wolferesearch.com

# Major Capacity Expansion Projects by Railroad

- The Rails Spent 15%-20% of Total Capital Spending in 2008 on Capacity Expansion.
- BNSF: Southern Transcon line; PRB track expansion and upgrade; L.A./Long Beach rail and terminal expansion.
- CSX: National Gateway – public-private partnership to create link between Mid-Atlantic ports and the Midwest; Southeast Corridor – adding extra tracks on Chicago to Florida route.
- Norfolk Southern: Heartland Corridor – clear route between Norfolk, VA and Chicago, IL to raise the height of 28 tunnels for double-stack container trains; Crescent Corridor – seeking public funding to extend tracks between New York and New Orleans to handle more freight and avoid expensive highway widening.
- Union Pacific: Sunset Corridor – adding terminals and double-tracking line between L.A. and El Paso, TX, to be completed 2013-2014.
- Canadian Pacific – Possible build-out into the Powder River Basin coal mines.
- Canadian National – Recent EJ&E Rail acquisition provides long term solution to Chicago congestion problems.
- Kansas City Southern: Meridian Speedway (NSC and KSU) – shortcut between Meridian, MS and Shreveport, LA; Victoria-Rosenberg build out – creates more efficient route near Houston, TX.


Edward M. Wolfe
(212) 209-3880
ewolfe@wolferesearch.com

# Summary of Freight Data & Expected Release Dates

| Data Series | Date Released | Source | Recent Trend |
|---|---|---|---|
| **General Freight Data:** | | | |
| Cass Freight Index Tracking Expenditures and Shipments | End of Month (3 to 4-week lag) | Cass Information Systems, Inc. | - (December) |
| **Railroad Data:** | | | |
| Weekly Rail Volumes | Thursday Morning (<1-week lag) | Association of American Railroads | - (January) |
| **Trucking Data:** | | | |
| Truck Tonnage Index | End of Month (3 to 4-week lag) | American Trucking Associations (ATA) | - (November) |
| Wolfe Research Truck Bankruptcy Index | Mid-Month (6-week lag) | Federal Bankruptcy Filings | + (November) |
| Monthly Class 8 Tractor Builds and Net Orders | Mid-Month (2 to 3-week lag) | A.C.T. Research | - (December) |
| Truckload Rate Trends by Equipment Type | Mid-Month (2 to 3-week lag) | truckloadrate.com | - (December) |
| **Ocean Data:** | | | |
| West Coast Port Volumes | Mid-Month (2 to 3-week lag) | Ports of LA, Long Beach and Oakland | - (December) |
| East Coast Port Volumes [1] | Mid-Month (2 to 3-week lag) | Ports of NY/NJ, Savannah, Norfolk and Charleston | - (November) |
| Ocean Containership Pricing | 1st Week of Month (1-week lag) | Clarkson Research Services | - (December) |
| **Airfreight Data:** | | | |
| U.S. Domestic and International Air Cargo RTMs | After the 30th (4-week lag) | Air Transport Association (ATA) | - (November) |
| International (Cross Border) Air Cargo FTKs and ATKs [2] | End of Month (4-week lag) | International Air Transport Association (IATA) | - (November) |
| European and Asian Air Cargo FTKs | End of Month (8-week lag) | Association of European Airlines (AEA)<br>Association of Asian Pacific Airlines (AAPA) | - (November)<br>- (December) |

Note: Recent trend compares most recent monthly data point (shown in parenthesis) with prior month; "+" represents sequential increase/improvement in y/y metric versus prior month. (1) Port of New York and New Jersey data reported on a roughly six week lagged basis. Currently reported through October. (2) Freight-Tonne-Kilometer (FTK) and Available-Tonne-Kilometer (ATK). Source: Wolfe Research, LLC.



Edward M. Wolfe
(212) 209-3880
ewolfe@wolferesearch.com

## Cass Freight Index Tracking Expenditures (Including Fuel) and Shipments (Year-over-Year Growth)




Source: Cass Information Systems, Inc.; Wolfe Research, LLC.

# An Overview of the Freight Recession Across Modes

| | ATA Truck Tonnage | Domestic Air Cargo Ton Miles | US Class I Rail Volumes [(1)] | West Coast Port Volumes: Imports | West Coast Port Volumes: Exports | West Coast Port Volumes: Combined |
|---|---|---|---|---|---|---|
| Nov-05 | .7% | 3.5% | 1.8% | 0.3% | 4.9% | 1.6% |
| Dec-05 | [illegible].8% | -1.1% | 6.1% | 7.8% | 9.0% | 8.2% |
| Jan-06 | -[illegible].0% | -0.5% | 5.7% | 11.7% | 14.0% | 12.3% |
| Feb-06 | -[illegible].9% | -0.5% | -0.8% | -7.0% | 11.7% | -1.5% |
| Mar-06 | -1.1% | 2.1% | 2.6% | 32.9% | 12.9% | 25.9% |
| Apr-06 | -[illegible].7% | 2.7% | 2.7% | 14.5% | 2.0% | 10.8% |
| May-06 | [illegible].4% | 7.5% | 5.4% | 13.6% | 8.8% | 12.2% |
| Jun-06 | [illegible].6% | 4.5% | 5.6% | 11.4% | 8.3% | 10.6% |
| Jul-06 | [illegible].1% | 1.3% | 4.3% | 9.9% | 5.5% | 8.7% |
| Aug-06 | -[illegible].7% | 9.1% | 3.9% | 14.9% | 7.8% | 12.9% |
| Sep-06 | -[illegible].9% | 0.7% | 2.6% | 11.0% | 10.8% | 11.0% |
| Oct-06 | -2.3% | -0.4% | 1.3% | 10.7% | 15.9% | 12.1% |
| Nov-06 | -[illegible].9% | 0.3% | -1.0% | 11.3% | 8.7% | 11.0% |
| Dec-06 | -2.2% | -5.2% | 1.5% | 7.2% | 11.3% | 8.4% |
| Jan-07 | -4.5% | 2.0% | -4.5% | 6.5% | 15.5% | 9.0% |
| Feb-07 | -1.8% | -0.6% | -2.2% | 25.7% | 4.4% | 18.6% |
| Mar-07 | .2% | -3.3% | -1.5% | -8.4% | 2.2% | -5.0% |
| Apr-07 | -2.5% | -3.9% | -3.0% | -2.7% | 9.4% | 0.7% |
| May-07 | -3.1% | 3.2% | -3.0% | -1.7% | 10.3% | 1.8% |
| Jun-07 | -3.5% | -2.3% | -2.2% | 2.8% | 23.1% | 8.2% |
| Jul-07 | -3.3% | 2.1% | -2.6% | 1.[illegible]% | 17.8% | 5.6% |
| Aug-07 | 0.6% | 0.5% | -2.7% | -6.6% | 20.4% | 0.5% |
| Sep-07 | -2.2% | -1.3% | -1.9% | -1.1% | 19.5% | 4.3% |
| Oct-07 | -1.3% | 1.1% | -1.7% | -4.9% | 19.1% | 1.8% |
| Nov-07 | [illegible].6% | 1.6% | 1.6% | -3.2% | 22.5% | 3.9% |
| Dec-07 | 0.7% | 0.1% | -3.0% | -2.9% | 18.4% | 3.6% |
| Jan-08 | [illegible].3% | 3.1% | -2.1% | -8.4% | 12.3% | -2.3% |
| Feb-08 | [illegible].4% | 3.8% | 0.6% | -8.2% | 31.9% | 3.5% |
| Mar-08 | [illegible].5% | -5.5% | -3.8% | -8.6% | 21.0% | 1.4% |
| Apr-08 | [illegible].2% | 5.6% | -1.2% | -8.3% | 24.1% | 1.0% |
| May-08 | [illegible].2% | -3.5% | -1.6% | -5.3% | 13.9% | 1.8% |
| Jun-08 | [illegible].3% | -8.6% | -4.7% | -12.8% | 11.7% | -5.3% |
| Jul-08 | [illegible].8% | 0.0% | -1.2% | -10.0% | 13.5% | -1.4% |
| Aug-08 | [illegible].5% | -11.8% | -1.8% | -3.3% | 13.1% | 1.9% |
| Sep-08 | [illegible].9% | -9.6% | -5.1% | -11.5% | 1.6% | -7.6% |
| Oct-08 | -1.8% | -6.0% | -3.7% | -6.5% | -9.6% | -7.5% |
| Nov-08 | -1.9% | -18.7% | -9.1% | -12.2% | -19.5% | -14.6% |
| Dec-08 | NA | NA | -16.1% | -18.8% | -27.4% | -21.8% |
| Jan-09 | | | -17.8% | | | |

(1) January Rail volumes shown through week ending January 17.
Source: American Trucking Associations; Air Transport Association; Association of American Railroads; Port of Los Angeles, Port of Long Beach; Port of Oakland; Wolfe Research, LLC.

# Annual & Quarterly Rail Volume Growth By Segment

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 1Q07 | 2Q07 | 3Q07 | 4Q07 | 1Q08 | 2Q08 | 3Q08 | 4Q08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Intermodal | 6.3% | 8.3% | 5.4% | 4.4% | -2.8% | -4.9% | -0.5% | -3.0% | -3.8% | -3.6% | -4.4% | -3.2% | -3.1% | -8.4% |
| Automotive | -3.1% | -1.7% | -2.9% | -3.8% | -3.1% | -21.9% | -9.9% | -3.8% | 3.3% | -0.3% | -12.0% | -20.8% | -24.3% | -30.3% |
| Coal | -1.3% | 2.7% | 2.2% | 4.1% | -1.3% | 3.1% | -1.9% | -2.6% | -0.7% | -0.1% | 4.0% | 2.1% | 3.9% | 3.0% |
| Grain | 2.3% | 2.1% | 0.1% | 4.7% | -0.9% | -2.3% | -4.9% | -3.9% | 1.4% | 3.9% | 6.3% | 5.5% | -6.1% | -11.8% |
| Chemicals | 1.5% | 5.0% | -1.5% | -0.8% | 5.2% | -3.9% | 5.6% | 6.6% | 3.2% | 5.5% | 2.1% | 0.0% | -2.1% | -14.2% |
| Paper/Lumber | 0.5% | 5.8% | -1.3% | -7.7% | -13.6% | -13.7% | -16.0% | -12.3% | -12.7% | -13.1% | -15.7% | -12.5% | -10.4% | -15.5% |
| Metals | 3.8% | 7.7% | -1.8% | 4.6% | -3.0% | -3.8% | -5.0% | -2.6% | -6.0% | 2.1% | 2.3% | 3.8% | 5.0% | -24.9% |
| Minerals/Stone | 2.8% | 4.9% | 1.7% | -2.0% | -5.5% | -6.7% | -9.5% | -6.4% | -5.2% | -0.6% | -4.9% | -3.6% | -4.8% | -12.5% |
| **Total** | **2.7%** | **5.2%** | **3.1%** | **2.8%** | **-2.3%** | **-4.1%** | **-2.8%** | **-2.8%** | **-2.4%** | **-1.0%** | **-1.7%** | **-2.4%** | **-2.6%** | **-8.8%** |
| **Real GDP** | **2.5%** | **3.6%** | **2.9%** | **2.8%** | **2.0%** | **-0.5%** | **0.1%** | **4.8%** | **4.8%** | **-0.2%** | **0.9%** | **2.8%** | **-0.5%** | **-5.0%** |
| **Industrial Production (y/y)** | **1.5%** | **3.1%** | **4.2%** | **2.8%** | **1.8%** | **-2.4%** | **0.9%** | **1.7%** | **2.2%** | **2.5%** | **2.0%** | **-0.2%** | **-3.5%** | **-7.7%** |

# 2008 Volume Breakout by Commodity




Note: 4Q:08 GDP based on Wolfe Research estimate. Source: Association of American Railroads; Bureau of Economic Analysis; Federal Reserve; Wolfe Research, LLC estimates.

7

# Total Annual Rail Volumes Versus GDP




Source: Association of American Railroads; Bureau of Economic Analysis; Wolfe Research, L.L.C.

WOLFE RESEARCH
Edward M. Wolfe
(212) 209-3880
ewolfe@wolferesearch.com

## Total Annual Rail Volumes Versus Industrial Production




Source: Association of American Railroads; Federal Reserve; Wolfe Research, LLC.

9

## Truck Versus Rail Pricing




Source: Association of American Railroads; American Trucking Associations; Company reports Wolfe Research, LLC estimates.



Edward M. Wolfe
(212) 209-3880
ewolfe@wolferesearch.com

# Rail Capital Spending Well Above Broader Market

**Total Capital Spending ($ in Millions)**

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008E | 2009E | 5-Yr. Avg. | 10-Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BNI | $1,935 | $2,714 | $2,598 | $2,767 | $2,526 | $1,762 | $1,608 | $1,505 | $1,726 | $1,990 | $2,179 | $2,071 | $2,598 | $2,850 | $2,700 | $2,338 | $2,082 |
| CNI (US$) | 410 | 398 | 663 | 724 | 738 | 743 | 684 | 598 | 749 | 825 | 975 | 1,141 | 1,296 | 1,347 | 1,138 | $1,117 | $910 |
| CP (US$) | 519 | 393 | 620 | 738 | 567 | 385 | 359 | 357 | 493 | 519 | 731 | 698 | 834 | 853 | 671 | $727 | $580 |
| CSX | 972 | 1,220 | 943 | 1,115 | 1,256 | 859 | 879 | 1,036 | 1,059 | 1,030 | 1,136 | 1,639 | 1,773 | 1,740 | 1,600 | $1,464 | $1,241 |
| NSC | 939 | 957 | 960 | 956 | 912 | 731 | 746 | 695 | 720 | 1,041 | 1,025 | 1,178 | 1,341 | 1,505 | 1,400 | $1,218 | $989 |
| UNP | 1,903 | 2,076 | 2,101 | 2,110 | 2,158 | 2,315 | 2,196 | 2,359 | 2,071 | 2,402 | 2,863 | 2,729 | 3,096 | 3,100 | 2,800 | $2,838 | $2,529 |
| **Total (US$)** | **$6,678** | **$7,759** | **$7,885** | **$8,410** | **$8,157** | **$6,795** | **$6,472** | **$6,550** | **$6,818** | **$7,807** | **$8,908** | **$9,456** | **$10,938** | **$11,396** | **$10,308** | **$9,701** | **$8,330** |
| Canadian Rails | 929 | 792 | 1,283 | 1,462 | 1,305 | 1,128 | 1,043 | 955 | 1,242 | 1,344 | 1,705 | 1,839 | 2,130 | 2,201 | 1,809 | 1,844 | 1,489 |
| US Rails | 5,749 | 6,967 | 6,602 | 6,948 | 6,852 | 5,667 | 5,429 | 5,595 | 5,576 | 6,463 | 7,203 | 7,617 | 8,808 | 9,195 | 8,500 | 7,857 | 6,841 |

**% Change (Y-o-Y)**

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008E | 2009E | 5-Yr. Avg. | 10-Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BNI | - | 40.3% | -4.3% | 6.5% | -8.7% | -30.2% | -8.7% | -6.4% | 14.7% | 15.3% | 9.5% | -5.0% | 25.4% | 9.7% | -5.3% | 11.0% | 1.6% |
| CNI | - | -2.9% | 66.5% | 9.2% | 1.9% | 0.7% | -8.0% | -12.6% | 25.2% | 10.2% | 18.1% | 17.1% | 13.5% | 4.0% | -15.6% | 12.6% | 7.0% |
| CP | - | -24.2% | 57.6% | 19.1% | -23.2% | -32.2% | -6.7% | -0.7% | 38.4% | 5.1% | 40.9% | -4.5% | 19.6% | 2.2% | -21.4% | 12.7% | 3.9% |
| CSX | 9.3% | 25.4% | -22.7% | 18.2% | 12.6% | -31.6% | 2.3% | 17.9% | 2.2% | -2.7% | 10.3% | 44.3% | 8.2% | -1.9% | -8.0% | 11.6% | 6.2% |
| NSC | -6.9% | 2.0% | 0.3% | -0.4% | -4.6% | -19.8% | 2.1% | -6.8% | 3.6% | 44.6% | -1.5% | 14.9% | 13.8% | 12.2% | -7.0% | 16.8% | 5.8% |
| UNP | 29.0% | 9.1% | 1.2% | 0.4% | 2.3% | 7.3% | -5.1% | 7.4% | -12.2% | 16.0% | 19.2% | -4.7% | 13.4% | 0.1% | -9.7% | 8.8% | 4.4% |
| **Total (US$)** | **13.1%** | **16.2%** | **1.6%** | **6.7%** | **-3.0%** | **-16.7%** | **-4.8%** | **1.2%** | **4.1%** | **14.5%** | **14.1%** | **6.1%** | **15.7%** | **4.2%** | **-9.5%** | **10.9%** | **3.5%** |

**% of Revenue**

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008E | 2009E | 5-Yr. Avg. | 10-Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BNI | 23.7% | 33.1% | 30.9% | 30.9% | 27.5% | 19.1% | 17.5% | 16.8% | 18.3% | 18.2% | 16.8% | 13.8% | 16.4% | 15.8% | 18.0% | 16.2% | 18.0% |
| CNI | 10.7% | 10.5% | 17.5% | 20.9% | 20.9% | 20.3% | 18.7% | 15.4% | 17.7% | 15.9% | 15.8% | 16.4% | 17.6% | 16.8% | 17.0% | 16.5% | 17.5% |
| CP | 18.7% | 14.5% | 24.5% | 31.5% | 24.1% | 15.6% | 15.0% | 15.3% | 18.8% | 17.3% | 20.1% | 17.3% | 19.0% | 18.5% | 17.3% | 18.4% | 18.1% |
| CSX | 13.7% | 17.1% | 12.4% | 15.6% | 19.1% | 11.9% | 12.2% | 14.4% | 14.2% | 12.8% | 13.2% | 17.1% | 17.7% | 15.5% | 16.7% | 15.3% | 14.8% |
| NSC | 15.2% | 15.3% | 15.1% | 15.4% | 14.7% | 11.9% | 12.1% | 11.1% | 11.1% | 14.2% | 12.1% | 12.5% | 14.3% | 14.0% | 14.8% | 13.4% | 12.8% |
| UNP | 20.1% | 20.5% | 21.0% | 22.3% | 21.2% | 21.4% | 20.3% | 21.1% | 17.9% | 19.7% | 21.1% | 17.5% | 19.0% | 17.3% | 18.2% | 18.9% | 19.7% |
| **Total Class I's** | **17.0%** | **18.5%** | **20.2%** | **22.8%** | **21.2%** | **16.7%** | **16.0%** | **15.7%** | **16.4%** | **16.3%** | **16.5%** | **15.8%** | **17.3%** | **16.3%** | **17.0%** | **16.5%** | **16.8%** |
| | | | | | | | | | | | | | | | | | |
| **DJ 30 Industrial Avg.** | **8.4%** | **8.1%** | **8.3%** | **8.4%** | **7.7%** | **7.9%** | **8.4%** | **6.6%** | **5.7%** | **5.6%** | **5.9%** | **6.1%** | **6.1%** | | | **5.9%** | **6.7%** |

Note: 5-year average includes period from 2004-2008E; 10-year average includes period from 1999-2008; Includes off-balance sheet leases; Excludes JPM from DJIA.
Source: FactSet Research Systems Inc; Company reports; Wolfe Research, LLC estimates.

# Railroad Returns Versus Industry Cost of Capital




| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BNI | 8.6% | 8.4% | 9.7% | 9.5% | 8.8% | 7.1% | 6.4% | 6.2% | 5.8% | 9.8% | **11.4%** | 10.0% |
| CSX | 8.9% | 9.8% | 8.1% | 3.8% | 3.6% | 4.6% | 5.2% | 4.0% | 4.4% | 6.2% | 8.2% | 7.6% |
| KSU | 7.2% | 3.6% | 9.1% | 6.4% | 6.3% | 7.0% | 6.5% | 3.7% | 8.3% | 5.9% | 9.3% | 9.4% |
| NSC | **13.0%** | **13.1%** | 10.5% | 5.2% | 5.5% | 8.3% | 9.1% | 9.1% | **11.6%** | **13.2%** | **14.4%** | **13.6%** |
| UNP | 8.3% | 5.2% | 2.9% | 6.8% | 6.9% | 7.6% | 8.6% | 7.3% | 4.5% | 6.3% | 8.2% | 8.9% |
| **Average Rail ROTC** | **9.2%** | **8.0%** | **8.1%** | **6.3%** | **6.2%** | **6.9%** | **7.2%** | **6.1%** | **6.9%** | **8.3%** | **10.3%** | **9.9%** |
| **STB Cost of Capital** | **11.9%** | **11.8%** | **10.7%** | **10.8%** | **11.0%** | **10.2%** | **9.8%** | **9.4%** | **10.1%** | **12.2%** | **9.9%** | **11.3%** |

Note: Shown as average of BNI, CSX, NSC, KSU and UNP. Source: Surface Transportation Board; Wolfe Research, LLC.

# Wolfe Research C09 Estimates

- **Our Estimates Today Versus Six Months Ago and Compared with Prior 5-Year Average**

| | Wolfe Research 2009 Forecasts | | |
|---|---|---|---|
| | Today | Six Months Ago | Prior 5-year Average |
| Total Volumes (y/y) | -6% | 2% | 1% |
| Total Revenue Per Carload, Gross of fuel (y/y) | -9% | 5% | 10% |
| Total Revenue Per Carload, Net of fuel (y/y) | 4% | 6% | 5% |
| Total Revenue Growth (y/y) | -14% | 7% | 10% |
| Continuing EPS Growth (y/y) | -16% | 20% | 27% |

Note: Based on averages of four major U.S. railroads – BNI, CSX, NSC and UNP. Prior 5-year average based on 2004-2008 period. Source: Company reports; Wolfe Research estimates.

## Historical Annual Transportation Sector Performance

| | C03 | C04 | C05 | C06 | C07 | C08 | 00-08 CAGR [1] |
|---|---|---|---|---|---|---|---|
| Airfreight & Logistics Average | 62.7% | 60.2% | 20.8% | 8.5% | -3.3% | -21.0% | 7.1% |
| Trucking Average | 35.3% | 41.9% | -1.5% | -4.8% | -19.1% | -12.9% | 7.2% |
| Railroad Average | 34.1% | 26.4% | 29.6% | 15.3% | 7.6% | -20.3% | 11.5% |
| **All Our Transport Universe** | **43.1%** | **42.7%** | **14.1%** | **5.3%** | **-6.3%** | **-17.6%** | **8.4%** |
| **S&P 500** | **26.4%** | **9.0%** | **3.0%** | **13.6%** | **3.5%** | **-38.5%** | **-5.3%** |

## Recent Transportation Sector Performance

| | 1H06 | 2H06 | 1H07 | 2H07 | 1H08 | 2H08 |
|---|---|---|---|---|---|---|
| Airfreight & Logistics Average | 23.1% | -9.8% | 7.8% | -10.3% | 3.7% | -23.4% |
| Trucking Average | 19.5% | -19.8% | 11.8% | -28.6% | 12.0% | -23.4% |
| Railroad Average | 21.8% | -4.9% | 16.3% | -8.8% | 25.4% | -36.2% |
| **All Our Transport Universe** | **21.3%** | **-12.3%** | **11.8%** | **-16.9%** | **13.2%** | **-27.1%** |
| **S&P 500** | **1.8%** | **11.7%** | **6.0%** | **-2.3%** | **-12.8%** | **-29.4%** |

| | 1Q08 | 2Q08 | 3Q08 | 4Q08 | 1Q09 [2] |
|---|---|---|---|---|---|
| Airfreight & Logistics Average | 6.5% | -3.0% | -6.9% | -16.9% | -15.7% |
| Trucking Average | 12.1% | -0.9% | -1.1% | -23.6% | -11.6% |
| Railroad Average | 13.3% | 10.9% | -5.8% | -32.6% | -14.0% |
| **All Our Transport Universe** | **10.6%** | **1.8%** | **-4.3%** | **-24.0%** | **-13.6%** |
| **S&P 500** | **-9.9%** | **-3.2%** | **-8.9%** | **-22.6%** | **-8.4%** |

Note: Airfreight & Logistics avg includes FDX, TNT, UPS, CHRW, EXPD, FWRD, HUBG, LSTR, UACL, UTIW; Truck avg includes CLDN, CVTI, HTLD, JBHT, KNX, WERN, ABFS, CNW, ODFL, SAIA, YRCW, R; Rail avg includes BNI, CNI, CP, CSX, NSC, UNP, GWR, KSU, PACR. (1) Reflects nine-year CAGR from 12/31/99 to 12/31/08 unless otherwise stated. Note: UACL started trading on 2/11/05; reflects three-year CAGR from end of 2005. UTIW started trading on 11/2/00; reflects eight-year CAGR from end of 2000. SAIA started trading on 9/11/02; reflects six-year CAGR from end of 2002. CP started trading on 9/11/02; reflects six-year CAGR from end of 2002. KSU started trading separately from Stillwell Financial on 7/13/00; reflects eight-year CAGR from end of 2000. PACR started trading on 6/21/02; reflects six-year CAGR from end of 2002. (2) 1Q:09 stock performance through 01/22/09.
Source: FactSet Research Systems Inc.; Wolfe Research, LLC.







WOLFE RESEARCH

Edward M. Wolfe
(212) 209-3880
ewolfe@wolferesearch.com

WOLFE RESEARCH

**Testimony**
**of**
**James R. Young**
**Chairman, CEO, and President**
**Union Pacific Corporation**
**And Chairman**
**Association of American Railroads**
**1400 Douglas Street**
**Omaha, Nebraska 68179**

**January 28, 2009**

**Before the**
**United States House of Representatives**
**Committee on Transportation and Infrastructure**
**Subcommittee on Railroads, Pipelines, and Hazardous Materials**

**Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs**

Chairwoman Brown, Ranking Member Shuster, and Members of the Subcommittee, my name is Jim Young, and I am Chairman, CEO, and President of Union Pacific Corporation. I appreciate the opportunity to testify today on behalf of the rail industry. My testimony will be in two parts. The first will look at the role of the freight rail industry in the economy and the benefits associated with freight railroads. The second will discuss how we are faring in today's economy and the future needs of the freight railroads.

America's freight rail system provides the most efficient, cost-effective freight rail network in the world; it is vital to the economic health of U.S. industry, and it keeps American companies competitive in the world market. America's freight rail network is also the safest, most environmentally friendly, and energy efficient mode of surface transportation. Freight railroads are the backbone of the United State's transportation network, moving more than 41% of the freight ton miles. This is more than any other mode of transportation.

What does 41% of the freight ton miles mean? Let me give you a glance behind this number. Railroads move 70% of all automobiles produced in the U.S. We move 30% of the entire nation's grain harvest -- enough wheat to provide every man, woman, and child a fresh loaf of bread six days a week. We move 70% of the coal in this country, which provides more than

half the nation's electricity needs. During normal economic times, we move enough lumber to build almost three houses every minute of every day and enough cement to build 45 miles of new highway every day. Our intermodal business, which provides the door-to-door convenience of trucks with the long-haul economy of freight railroads, brings a vast array of products to U.S. consumers. Everything that we touch in our daily lives -- from orange juice, to the clothes we wear, to toys, bicycles, computers, DVDs -- all have had some part of their journey on a train. In fact, over the past 25 years, we have gone from moving 3 million trailers and containers a year to more than 12 million a year. We also carry steel, the wind turbines that create renewable electricity, and chemical products that are used to make the medicines we take, protect the water we drink, help grow the food we eat, and produce the products that make our lives more comfortable. In short, 41% of the freight ton miles mean just about anything that touches our lives.

Freight railroads also directly employ approximately 187,000 people, and the vast majority of these are union jobs. These are good U.S. jobs where the average total compensation is roughly $95,000. This makes freight railroads one of America's highest-paying industries. In addition, railroads and their employees pay for and are covered by the Railroad Retirement System, which provides benefits considerably more generous than Social Security. Roughly 550,000 retired railroad workers and family members receive more than $8 billion in retirement and survivor benefits each year.

In addition, all of the large, and the vast majority of smaller freight railroads, are privately owned. This means that we must build and maintain our own tracks and rights-of-way. We must also purchase the equipment that operates on these tracks as well as the signal control systems, and we do this with virtually no governmental assistance. (In fact, in 2007, we paid almost $600 million in state and local property taxes on this same infrastructure and equipment.) From 1980 through 2007, freight railroads invested approximately $420 billion in both operating expense and capital investment -- more than 40 cents out of every revenue dollar -- to maintain, renew, and expand track and equipment. This investment generates billions of dollars in economic activity to the rail supplier community through the purchase of locomotives, cars, steel, timber and concrete for ties, rock and aggregate for ballast, circuits for our train control

and communications systems, and much, much more. In fact, we estimate that for every billion dollars in increased rail investment, 20,000 jobs are created.

So, as you can see, freight railroads play a vital role in the U.S. economy, but this is really only part of the story. An even more exciting story concerns the benefits we provide – and they are many.

First and foremost, we move all this freight safely. Nothing is more important to railroads than the safety of our employees, our customers, and the communities we serve, and our safety record is excellent. From 1980 to 2007, the last full year for which data is available, railroads have reduced the overall train accident rate by 71% and our employee casualties by 80%, with 2007 being a record year in terms of overall safety. Today, railroads have lower employee injury rates than other modes of transportation and most other major industry groups – including agriculture, construction, manufacturing, and even some types of retail activity.

As the nation's only privately funded transportation system operating a 140,000-mile network, railroads require vast amounts of private investment to meet the large capital demands necessary to support our infrastructure. In fact, the two largest railroads each spent more to operate, maintain and expand their infrastructure than did the State of New York on its highway system and almost as much as California. Other modes of transportation rely on government funding to support their infrastructure. Our ability to facilitate this private investment is a tremendous asset and benefit to our country. If we were not able to attract this investment, the government would have to find the billions of dollars necessary to fund our network in addition to those of our competitors (trucks and the inland waterways for barges), or alternatively would have to spend vastly more on highways to handle the business we carry, thereby forcing an even heavier burden on taxpayers.

Moreover, railroads are also a cost-effective mode of transportation. Based on revenue per ton mile, on average it cost 54% less (in inflation adjusted terms) to move freight by rail in 2007 than it did in 1981. These reductions have saved our economy countless billions of dollars over the years.

Then, of course, there are the major energy efficiency and environmental benefits rail offers. Railroads are more fuel efficient than other modes of transportation. On average, railroads are three times more fuel efficient than trucks, and our fuel efficiency is improving all the time. In 1980, railroads, on average, moved a ton of freight 235 miles per gallon of fuel. Today, that figure is 436 miles per gallon.

If just 10% of the freight that moves by highways moved by rail instead, our country's annual fuel savings would exceed one billion gallons. In addition, due to our fuel efficiency, freight that moves by rail instead of truck reduces greenhouse gas emissions by two-thirds or more per ton mile. In fact, the EPA estimates that for every ton-mile, the typical truck emits roughly three times more nitrogen oxides and particulates than a locomotive. The EPA also found that while railroads accounted for over 40% of the nation's freight ton miles, they produce only 9% of total transportation related nitrogen oxide emissions and 4% of transportation related particulate emissions.

Freight railroads also help reduce highway gridlock. A typical train takes the equivalent of several hundred trucks off the highways. Overcrowded highways act as an inefficiency tax that seriously constrains economic growth, and costs commuters days per year in lost time. Freight railroads help relieve this tax by reducing congestion, enhancing personal mobility, reducing the cost of maintaining existing roads and reducing the pressure to build costly new ones.

I would be remiss if I did not mention our relationship with passenger rail as a public benefit. Virtually all passenger rail operations outside the Northeast Corridor (including Amtrak) run on track owned by the freight railroads. We have a very healthy and robust relationship with passenger rail operators, and we often partner with them to take hundreds of thousands of commuters out of their cars and onto trains. The one thing we must guard against in these arrangements is to avoid robbing Peter to pay Paul. Taking rail capacity from freight to provide rail capacity for passengers is not the answer to America's urban congestion problems, as it will only shift thousands of trucks onto the highways. The real answer is to grow capacity

for both freight and passenger. This concept was recognized in the recently passed Amtrak Reauthorization legislation, which provides additional funds for new capacity.

To sum up the freight railroads' benefits and role in the economy, when one considers the amount of freight we carry, our investment in American jobs and infrastructure, the safe and efficient manner in which we operate, and our benefits to energy consumption, the environment, and congestion relief, the industry provides enormous benefits to the country. When comparing those benefits to the total cost to shippers and taxpayers, we have the world's best, most cost-effective, environmentally friendly freight system in the world – one that keeps American industries competitive in the world marketplace.

Now, let me turn to how we are faring in today's tough economy and what the needs will be in the future.

To insure that this presentation is fully compliant with the antitrust laws, I think it would be appropriate for me to talk about how Union Pacific is faring in today's economy rather than talk about other railroads. Having said that, I fully believe the other Class I railroads share the same economic hurdles as do we.

Just last week we reported our earnings for the fourth quarter and full year of 2008. Frankly, we had a good year in 2008 as we reported record returns as well as record investments. However, we began to see the impact of the weakening economy in the second half of the year as rail traffic dropped sharply in the fall, and that weakness is clearly continuing into 2009. In the fourth quarter of 2008, our car loadings dropped 12%. So far in January, car loadings have dropped further, and we have not seen anything that makes us believe the first quarter of this year will bring anything different. The one piece of positive news has been the falling cost of fuel. Because we (Union Pacific) use 1.3 billion gallons of diesel fuel a year (41 gallons per second) to carry our customers' goods, the falling price of oil has benefited both our company and our customers in the form of lower fuel charges.

This year will clearly be a year that challenges our company, our customers, and our employees. During our peak periods, we have handled up to 205,000 car loads a week, and in 2006 and 2007 we averaged over 190,000 car loads per week for the entire year. Just last week, our car loads were below 150,000, and in prior weeks, the number was much lower. These are numbers we have not seen since the 1990s, and the reduction in car loadings cuts across every commodity group we carry. This drop in business translates into a reduction in earnings. With volumes running well below last year's levels, it is unlikely that we will be able to reach last year's First Quarter earnings of .85 cents per share.

How are we dealing with this reduction in car loadings and revenue? First, I am confident that the long-term fundamentals of our industry are sound. These reductions are a symptom of a worldwide decline in manufacturing and consumption. We clearly feel its effects as do our customers. We will act carefully to avoid making short-term decisions that could impact the strong, long-term opportunities we see for the future. Nevertheless, we will take aggressive steps to ensure we remain viable during this severe recession.

Today, we have unused assets all over the railroad. We have over 1,200 locomotives and 48,000 cars in storage. We expect these numbers to grow. These are assets we must maintain in place for the long-term and continue to absorb in our cost structure, notwithstanding the fact that they are not now producing revenue. We must also spend significant amounts of money to maintain our railroad. As you know, we are one of the most capital intensive industries in the country. We cannot afford – both from a safety standpoint and a customer service standpoint – to defer maintenance on our system, and we are not doing that. However, we will need to cut back on our capital for growth. We simply cannot afford to spend money we don't have to continue with our aggressive capital growth strategy. As I reported last week, our projected 2009 capital budget will be $2.8 billion. This is down from the past two years, which were both over $3 billion. Our reduction in spending also hurts the thousands of rail suppliers who support our industry as our orders shrink.

We are also implementing other forms of cost control across our system in an attempt to make sure the money we do spend is spent in an efficient manner. In fact, these cost

containment efforts have lead to a significant reduction in our operating ratio, which is one of the things that helped us deal with the business reductions in 2008's fourth quarter and will continue to help us in 2009.

Unfortunately, we must also reduce the number of active employees. Over the last five years, we have hired over 27,000 people to accommodate growth and replace retired workers. Today, Union Pacific has roughly 3,150 employees out on furlough or in a part-time work program. I can tell you, as Chairman, that this is a very painful but necessary step to protect the rest of our workforce. However, the majority of those furloughed are in a program we call Alternative Work and Training Service (AWTS). Under this program, we guarantee an employee 8 days of paid service per month. This can be in the form of work or training. We usually designate the weekends as paid service days to cover weekend vacancies and to allow the employee to get another job during the week. We also continue to provide health care coverage and pay railroad retirement taxes for the employees in this program. We started AWTS as a mechanism to keep otherwise furloughed, well trained employees available to return to service when we see an uptick in demand.

Retaining excess assets (locomotives and cars) and ensuring a readily available pool of trained employees – while expensive – is a deliberate strategy that we have undertaken to insure the long-term health and responsiveness of our company. We want to be ready to meet increased demand for rail transportation should the economy respond to the stimulus proposals currently before Congress.

At this point it isn't at all clear what will happen throughout the remainder of 2009. However, one thing is certain – Union Pacific will be required to take the cost containment steps necessary to reflect economic reality. If the economy grows, we will make the much needed investments for the future. If not, we will contain spending, reduce costs, and reduce capital to reflect the weaker economy.

Earlier in my testimony, I described the role freight railroads play in the economy and the enormous public benefits we provide to society – both of which are significant. Today, we are in

a major economic downturn, but we all know, from a historical perspective, this will not last forever. To capture all the benefits rail can provide to our economy and our society, the industry must continue to invest for the future.

A recent Department of Transportation study projects total freight transportation demand will increase 92% from 2002 to 2035, with an 88% increase in demand for rail service during that same time period. Other studies conclude the same thing. Moreover, a September 2007 study (The National Rail Freight Infrastructure Capacity and Investment Study) found that Class I railroads need $135 billion in investment to expand their network capacity by 2035 to keep pace with DOT's forecasted demand. This equates to over $4.5 billion annually for capacity expansion for the next 27 years. Several times that amount will also be needed to maintain and renew existing infrastructure. Today, on an annual basis, our industry is spending less than 40% of this amount for new infrastructure capacity. We all know that studies that project growth this far into the future may not be 100% accurate, but let's assume, for the sake of argument, these studies are off by 50%. We are still not now able to invest in infrastructure to the level the nation needs us to invest.

Another area that will bring huge costs to the rail industry is replacing existing assets that have come to the end of their useful life and replacing assets that are destroyed by natural events such as fire, floods, and earthquakes. Let me give you a few examples of these costs because they are staggering.

Union Pacific owns a bridge over the Mississippi River that is nearing the end of its useful life. This single bridge will cost hundreds of millions of dollars to replace. Last year, we started construction to replace another bridge in Boone, Iowa, that will ultimately cost over $50 million.

Because we operate outdoors, we are constantly battered by Mother Nature, and these costs can be astounding. For instance, in 2005, our Salt Lake City to Los Angeles line in Nevada was destroyed by a flood. The book value on that line at the time was $4 million. However, to rebuild the asset, it cost us $87 million. Similarly, a fire destroyed a bridge in Sacramento in

2007 whose book value was $0, yet we had to spend $14 million to replace it. Most recently, we had a mud slide on a line in Oregon that wiped out a significant portion of our railroad. The slide was as wide as a football field and the equivalent height of the Sears Tower. This took months to repair at a cost of over $100 million. All of this must be done using private dollars.

These are some big numbers associated with some big projects. Equally staggering are the day-to-day numbers. For example, Union Pacific wears out two miles of track every day – 365 days a year. At a cost of $450,000 to $600,000 per mile for replacement rail, this adds up very quickly. It costs on average $2.5 million per mile to build new track, and this figure does not include the cost of acquiring land or environmental issues that may need to be addressed.

These are the challenges we have before us, and we at Union Pacific are prepared to meet them head on. What can the government do to assist in this effort? While the government could be helpful in a number of areas, I will only make three recommendations today.

First, government must embrace policies that enhance the ability of the freight railroads to attract private investment dollars. As mentioned earlier, our ability to attract private investment in rail infrastructure literally frees up billions of dollars in public money that can be used to support other modes of transportation in this country. In fact, one could argue that the less we utilize rail in this country, the more the taxpayer must pay to subsidize other modes of transportation. We must be able to earn an adequate rate of return to attract private dollars. As returns improve to market levels, additional investment will follow.

Second, Congress should enact an investment tax credit for new rail capacity. We have endorsed a proposal that has been introduced in this Congress that would provide for a 25% investment tax credit for new rail construction that expands freight capacity. This credit will allow us to increase our return and make additional investments in rail – investments that are critical if we are going to meet the future, projected demands for rail transportation. In today's economic environment, where we must conserve our cash, this would enable us to spend more than we could otherwise. Moreover, it would have a stimulative effect on the economy.

According to U.S. Department of Commerce data, for every $1 of rail investment that would be stimulated by the tax incentive, $3 in total economic output would be generated.

Third, Congress should enact and fund programs that allow states to partner with freight railroads to move forward with projects that benefit both the freight railroad and the public. The best example of this type of project is the CREATE project in Chicago. This project will improve the fluidity of the freight railroads, enhance passenger rail service in the City, and reduce congestion on the highways. The freight railroads are willing to put up money consistent with the benefits we would receive, while the local, state, and federal governments put up the resources commensurate with the public benefits. These types of projects allow both sides – private and public – to develop and implement projects that would not otherwise move forward.

Madame Chairwoman and Members of the Committee, freight rail is vital to the overall health of our economy. We offer huge societal benefits that need to be maximized, and while we are currently dealing with the economic downturn, we have a great future. I look forward to working with you to fully develop a vibrant rail system in this country.

Statement of

Ross B. Capon

President

National Association of Railroad Passengers

Submitted to the

Subcommittee on Railroads, Pipelines, and Hazardous Materials
The Honorable Corinne Brown, Chairman

Committee on Transportation and Infrastructure, U.S. House of Representatives

* * *

Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs

* * *

January 28, 2009
Statement Submitted for the Record on February 11, 2009

* * *

Thank you for this opportunity to present our views for the record. We are pleased to be part of the OneRail Coalition and to endorse the statement of your witness Anne Canby. I will not repeat what other witnesses said, or what was in my statement for the record in the full committee's October 29, 2008, infrastructure hearing.

The Committee and its leaders have our thanks for your role in securing $1.1 billion for intercity passenger rail in the House-passed economic recovery bill. The funding, among other things, will help Amtrak get more cars back into service and let states that have been awaiting a federal funding partner get to work on their passenger train improvement projects. We of course continue to look forward to full funding of the authorization that reflects your hard, successful work.

It is significant that that Amtrak ridership outside the Northeast Corridor continued to rise through the first quarter of Fiscal 2009. In the most recent month for which we have data, December, passenger revenues ("unadjusted") on the overnight ("long distance") trains were 7.4% above the year-earlier month, while ridership was up 4.0% and passenger-miles (one passenger carried one mile) were up 4.6%.

For the shorter-distance "state corridors," revenues were up 2.0%, ridership 1.3% and passenger-miles 1.7%. In the Northeast Corridor, the trends were negative -- 5.8%, 6.2% and 6.8%, respectively.

The most important message is that people desperately want the train travel choice and that choice needs to be provided for many more trips than currently. That positive numbers persisted on most Amtrak routes in the face of sharply lower gasoline prices and a severe economic recession suggests that travelers are looking beyond the price of gasoline to total driving costs and may be more inclined to leave the car at home and take the train as a way to prolong the life of a car that they cannot afford to replace.

Other factors in play probably include:

- Growing senior population that has above-average interest in avoiding the hassles of long auto trips.
- A changed psychology among young people, who increasingly are "forced" into driving when they see that public transportation doesn't meet their needs rather than eagerly getting their license at the youngest possible age as a "rite of passage."
- Mistrust that gasoline prices will stay low, giving sharp price volatility, especially over the past several months.
- Many people trying the train for the first time like it and stick with it.

The decline in Amtrak's Northeast Corridor is partly explained by the high number of business travelers, the very high fares Amtrak charges, even on the Regionals, and perhaps by new bus competition. For example, checking departures 24 hours hence, Amtrak's basic fare Washington to New York was $103 for the 1:05 PM Regional departure on February 12 and $124 for the 3:02 PM, while BoltBus was asking $22 for both its 1 PM and 3 PM departures, the majority of the fleet brand new, offering AC outlets just like Amtrak and—unlike Amtrak—free Wi fi, 45 minutes slower schedule (offset for some by greater choice of departures). For taxpayers to realize the greatest benefit from the billions they have invested and will invest in the Northeast Corridor there needs to be a re-look at how Amtrak service is priced.

In an op ed that I co-authored with Dr. Vukan Vuchic of the University of Pennsylvania which was published by the Newark *Star-Ledger* on Sunday, February 1, we discussed the need for greater track capacity under the Hudson River, with one major rationale "expansion for Amtrak's future capacity needs, which will be much greater than what today's overpriced and often sold-out services require."

The main focus of the column was on our continuing effort to alert the public and legislators all along the Northeast Corridor that design of New Jersey Transit's Access to the Region's Core must be changed if any of us are going to live to see intercity train capacity under the Hudson increased, a subject discussed at length in my statement for the record of the full committee's October 29, 2008, infrastructure hearing.

Thank you for considering our views.

# EXHIBIT PX0674

Search... GO

Business Management

# Freight Train Blues

Source: www.americainfra.com
© 2010 GDS Publishing Ltd. All rights reserved.

N...nents

The freight rail industry has long played a crucial role in supporting the US economy. But in today's tight markets the importance of that relationship is hanging in the balance, as Union Pacific CEO, James R. Young, explains.



*"Over the past 25 years, the American freight rail system has gone from moving three million trailers and containers a year to more than 12 million a year"*
*-James Young*

It cannot be argued that the American freight rail system provides nothing short of the most efficient, cost-effective freight rail network in the world. Not only is it vital to the economic health of US industry, but it also keeps American companies competitive in the world market. America's freight rail network is also the safest, most environmentally friendly and energy efficient mode of surface transportation. And freight railroads have long been considered the backbone of the US's transportation network, moving more than 41 percent of the freight ton miles, which is more than any other mode of transportation.

But what does 41 percent of the freight ton miles mean? Looking behind the number reveals that US railroads actually move 70 percent of all automobiles produced in the US; 30 percent of the entire nation's grain harvest – enough wheat to provide every man, woman and child with a fresh loaf of bread six days a week; and 70 percent of the coal in the US, which provides half the nation's electricity needs.

In fact, everything that we touch in our daily lives – from orange juice, to the clothes we wear, to toys, bicycles, computers, DVDs – all have had some part of their journey on a train. Over the past 25 years, the American freight rail system has gone from moving three million trailers and containers a year to more than 12 million a year. It also carries steel, the wind turbines that create renewable electricity, and chemical products that are used to make the medicines we take, protect the water we drink, help grow the food we eat, and produce the products that make our lives more comfortable. In short, 41 percent of the freight ton miles means just about anything that touches our lives.

Freight railroads also directly employ approximately 187,000 people, and the vast majority of these are union jobs. These are good US jobs, where the average total compensation is roughly $95,000, marking freight railroads as one of America's highest-paying industries. Employees also pay for, and are covered by, the Railroad Retirement System, which provides benefits considerably more generous than those associated with Social Security. In fact, roughly 550,000 retired railroad workers and family members currently receive more than $8 billion in retirement and survivor benefits each year.

In addition, all of the large, along with the vast majority of smaller freight railroads are privately owned, which means they must build and maintain their own tracks and rights-of-way. Not only do they own the tracks, but freight railroads also have to also purchase the equipment that operates on these tracks, and they do this with virtually no governmental assistance. In fact, in 2007, freight railroads paid almost $600 million in state and local property taxes on this same infrastructure and equipment, and between 1980 and 2007 freight railroads invested approximately $420 billion in both operating expense and capital investment – more than 40 cents out of every revenue dollar – to maintain, renew and expand track and equipment. This investment generates billions of dollars in economic activity to the rail supplier community and estimations show that for every billion dollars in increased rail investment, 20,000 jobs are created.

But while during normal economic conditions the freight railroad network moves enough lumber to build almost three houses every minute of every day, and enough cement to build 45 miles of new highway every day, these are not normal economic conditions and this is unquestionably affecting how our railroad companies are operating.

**Downturn**
In January 2009, Union Pacific reported earnings for both the fourth quarter and the full year of 2008. Frankly, it was a good year for the company, with the firm reporting record returns as well as record investments. However, Union Pacific did begin to see the impact of the weakening economy in the second half of the year as rail traffic dropped sharply in the fall. In fact, in the fourth quarter of 2008, Union Pacific car loadings dropped by 12 percent and have continued to drop further in 2009.

This year will clearly be a year that challenges the company, its customers, and its employees. During peak periods, Union

Pacific has handled up to 205,000 car loads a week, and in 2006 and 2007 the company averaged over 190,000 car loads per week for the entire year. But in January 2009, car loads were below 150,000, and in prior weeks, the number was much lower. These are numbers that the company has not seen since the 1990s, and the reduction in car loadings cuts across every commodity group Union Pacific carries.

As a result of such reductions, Union Pacific has also had to face the arduous task of having to reduce their number of active employees, and over the last five years, the company has hired over 27,000 people to accommodate growth and replace retired workers.

Today, Union Pacific has roughly 3150 employees out on furlough or in a part-time work program. However, the majority of those furloughed are in a program called Alternative Work and Training Service (AWTS), which was started as a mechanism to keep otherwise furloughed, well-trained employees available to return to service when the company sees an uptick in demand.

Under the direction of AWTS, employees are guaranteed eight days of paid service every month, which can be in the form of work or training. Usually weekends are designated as the paid service days so that weekend vacancies are covered and so that those employees in the program are able to get another job during the week. Union Pacific also continues to provide healthcare coverage and pay railroad retirement taxes for the employees in this program.

Ensuring there is a readily available pool of trained employees – while expensive – is a deliberate strategy that Union Pacific has undertaken to ensure the long-term health and responsiveness of the company. We want to be ready to meet increased demand for rail transportation should the economy respond to the current stimulus.

While it isn't clear what will happen throughout the remainder of 2009, one thing is certain – Union Pacific will be required to take the cost containment steps necessary to reflect economic reality. If the economy grows, the company will make the much-needed investments for the future; if not, it will contain spending, reduce costs and reduce capital to reflect the weaker economy.

**Supply and demand**
To capture all the benefits that rail can provide to our economy and society, the industry must continue to invest for the future. A recent Department of Transportation (DOT) study projects total freight transportation demand will increase by 92 percent from 2002 to 2035, with an 88 percent increase in demand for rail service during that same period. Other studies conclude much of the same. Moreover, a September 2007 study (The National Rail Freight Infrastructure Capacity and Investment Study) found that, by 2035, Class I railroads need $135 billion in investment to expand their network capacity if they are to keep pace with DOT's forecasted demand.

This figure equates to over $4.5 billion annually for capacity expansion for the next 27 years, meaning that that amount will be needed several times to maintain and renew existing infrastructure. However, today, on an annual basis, the industry is spending less than 40 percent of this amount on new infrastructure capacity, and while studies that project growth this far into the future may not be 100 percent accurate, even if these studies are off by as much as 50 percent we will still not be able to invest in infrastructure to the level the nation needs us to.

Another area that continues to bring huge costs to the rail industry is replacing existing assets that have either come to the end of their useful life and need because of damage caused by natural events such as fire, floods and earthquakes.

Union Pacific, for example, owns a bridge over the Mississippi River that is nearing the end of its useful life and this single bridge alone will cost hundreds of millions of dollars to replace, and last year construction was started to replace another bridge in Boone, Iowa, that will ultimately cost over $50 million.

While these are big numbers associated with big projects, equally staggering are the day-to-day numbers. Union Pacific currently wears out two miles of track every day, and at a cost of between $450,000 and $600,000 for replacement rail per mile, this adds up very quickly. While estimations show that it costs on average $2.5 million per mile to build new track, this figure does not include the additional cost of acquiring land or environmental issues that may need to be addressed before a new track can be built.

**Challenges**
These are the challenges we have before us. Our government must embrace policies that enhance the ability of the freight railroads to attract private investment dollars. Our ability to attract private investment in rail infrastructure literally frees up billions of dollars in public money that can be used to support other modes of transportation in this country. In fact, one could argue that the less we utilize rail in this country, the more the taxpayer must pay to subsidize other modes of transportation. We must be able to earn an adequate rate of return to attract private dollars. As returns improve to market levels, additional investment will follow.

Congress must enact an investment tax credit for new rail capacity. We have endorsed a proposal that has been introduced in this Congress that would provide for a 25 percent investment tax credit for new rail construction that expands freight capacity. This credit will allow us to increase our return and make additional investments in rail – investments that are critical if we are going to meet the future, projected demands for rail transportation. In today's economic environment, where we must conserve our cash, this would enable us to spend more than we could otherwise. In fact, according to US Department of Commerce data, for every $1 of rail investment that would be stimulated by the tax incentive, $3 in total economic output would be generated.

Lastly, Congress should enact and fund programs that allow states to partner with freight railroads to move forward with

projects that benefit both the freight railroad and the public. The best example of this type of project is the CREATE project in Chicago. This project will improve the fluidity of the freight railroads, enhance passenger rail service in the City, and reduce congestion on the highways. The freight railroads are willing to put up money consistent with the benefits we would receive, while the local, state and federal governments put up the resources commensurate with the public benefits. These types of projects allow both sides – private and public – to develop and implement projects that would not otherwise move forward.

*This article is based on testimony by James R. Young, Chairman, CEO and President of Union Pacific Corporation, given before the United States House of Representatives in January 2009.*

**Class I railroads**

In the US, The Surface Transportation Board (STB) defines a Class I railroad as ‘having annual carrier operating revenues of $250 million or more’, after adjustments for inflation, which are calculated using the Railroad Freight Price Index developed by the Bureau of Labor Statistics (BLS). According to data from the Association of American Railroads (AAR), in 2006, Class I railroads had minimum carrier operating revenues of $346.8 million.

**About CREATE: A project of national significance**

CREATE will invest billions in critically needed capital improvements to increase the efficiency of the region's rail infrastructure. CREATE will reduce train delays and congestion throughout the Chicago area by focusing rail traffic on five rail corridors. The work includes:

- 25 new roadway overpasses or underpasses at locations where auto and pedestrian traffic currently crosses railroad tracks at grade level
- Six new rail overpasses or underpasses to separate passenger and freight train tracks
- Viaduct improvements
- Grade crossing safety enhancements
- Extensive upgrades of tracks, switches and signal systems

For area residents, CREATE means reduced traffic congestion, shorter commuting times, better air quality and increased public safety. For workers and businesses, it means more jobs and economic opportunity.

**Feeling the benefit**

A closer look at some of the other ways freight railroads impact the infrastructure industry as a whole

All freight is moved safely. Nothing is more important to railroads than the safety of its employees, its customers, and the communities it serves, and its safety record is unmatched. Between 1980 and 2007, the last full year for which data is available, railroads have reduced the overall train accident rate by 71 percent and employee casualties are down by 80 percent. Today, railroads have lower employee injury rates than other mode of transportation and most other major industry groups – including agriculture, construction, manufacturing and even some types of retail activity.

The two largest railroads in the US each spent more to operate, maintain and expand their infrastructure than the State of New York did on its entire highway system. As the nation’s only privately funded transportation system operating a 140,000-mile network, railroads require vast amounts of private investment to meet the large capital demands necessary to support their infrastructure. While other modes of transportation rely on government funding to support their infrastructure, the railroads ability to facilitate this private investment is a tremendous asset and benefit to the country.

If just 10 percent of the freight that moves by highway moved by rail instead, the US’s annual fuel savings would exceed one billion gallons. Freight that moves by rail instead of truck reduces greenhouse gas emissions by two-thirds per ton mile. The EPA estimates that for every ton-mile, the typical truck emits roughly three times more nitrogen oxides and particulates than a locomotive.

Freight reduces highway gridlock. A typical train takes the equivalent of several hundred trucks off the highways. Overcrowded highways act as an inefficiency tax that seriously constrain economic growth and costs commuters days in lost time every year. Freight railroads help relieve this tax by reducing congestion, enhancing personal mobility, reducing the cost of maintaining existing roads and reducing the pressure to build costly new ones.

Virtually all passenger rail operations outside the Northeast Corridor (including Amtrak) run on track owned by the freight railroads. There is currently a very healthy and robust relationship between passenger rail operators and freight railroads, and both often partner together to take thousands of commuters out of their cars and onto the trains. However, to take rail capacity from freight to provide rail capacity for passengers is not the answer to America’s urban congestion problems, as it will only shift thousands of trucks onto the highways. The real answer is to grow capacity for both freight and passenger and this concept was recognized in the recently passed Amtrak Reauthorization legislation, which provides additional funds for new capacity.

*Disclaimer: All comments posted in a personal capacity*

POST A COMMENT

In order to post a comment you need to be regsitered and signed in.

Register | Sign in

## No Comments Have Been Submitted

*Disclaimer: All comments posted in a personal capacity*

In order to post a comment you need to be registered and signed in.
Register | Sign in

# EXHIBIT PX0675

# Rail Common Carrier Obligation / Contracts

THOMPSON HINE



Nicholas J. DiMichael, presented to the Southwest Association of Rail Shippers

February 19, 2009

ATLANTA BRUSSELS CINCINNATI CLEVELAND COLUMBUS DAYTON NEW YORK WASHINGTON, D.C.

# Overview

- Rail Common Carrier Obligation
  - Basis and Definition
  - Statutory and Regulatory Requirements
  - Application of the Common Carrier Obligation to the transportation of hazardous materials
  - STB proceedings on the common carrier obligation
- Do you have a contract or not? -- STB Rulemaking and Decisions on the Definition of Contracts

Thompson Hine

# Historical Basis for Rail Common Carrier Obligation

- An ancient legal doctrine – some trace it as far back as the Phoenecians !!
- Part of U.S. legal doctrine for well over 100 years
- Part of the "common law" – railroads are "affected with the public interest" and thus have a "duty to provide service"
- *Missouri Pacific Railway Co. v. Larabec Flour Mills Co.*, 211 U.S. 612, 619 (1909) ("No legislative enactment, no special mandate from any commission, or other administrative board was necessary, for the duty arose the fact that it was a common carrier").
- Carriers' right of way are similar to public highways

THOMPSON HINE

# Current Basis for Common Carrier Obligation

- The common carrier obligation is now statutory – and even broader than it was at common law
- Part of the rail regulatory statute since 1906
- Continued in Staggers Act
- Continued in ICC Termination Act of 1995 (ICCTA)
- The only real change in 103 years is to eliminate tariff filing at the agency, in favor of requiring tariff rates, terms and conditions to be made available by railroads
- CCO applies to all non-contract, non-exempt traffic – and potentially to these as well

THOMPSON HINE

# The Statutory Obligations - STB

- To provide “transportation or service on reasonable request,” with “reasonable dispatch”
- To provide “to any person, on request, the carrier’s rates and other service terms”
- The response must be made “in writing” and “promptly” -- by regulation within 10 days
- Rail carrier must “provide transportation or service in accordance with” its rates and service terms”
- These carrier service terms must be “reasonable”
- Carriers can’t contract away all their capacity

THOMPSON HINE

# Some Regulatory Gloss on the Statute

- Railroad can't deny service merely because it is inconvenient or unprofitable to do so. (*GS Roofing* case, 1997)
- The requirement is not absolute – the shipper's request must be "reasonable," and an inquiry into the facts and circumstances is necessary in particular cases. (*Granite Slate* case, 2005)
- Railroad can't refuse to transport a commodity based on its dangerous characteristics. (*Central RR* case, 1914, many others)

THOMPSON HINE

# Common Carrier Obligation and Hazmats

- This issue of the transportation of TIHs has been "ground zero" for debate on what, if any, restrictions should be permitted on the transportation of TIHs and how, if at all, the common carrier obligation should be restricted
- Railroads have admirable safety record
- BUT – it is generally agreed that railroads cannot purchase enough insurance to cover the amount of all conceivable liabilities if their negligence results in a catastrophic accident involving TIHs.
- Class I carriers have about $1 billion in insurance.
- Some railroads say that they do not want to transport these goods, and would not, if they could

THOMPSON HINE

# Other Relevant Statutory Obligations for Transportation of Hazmats

- DOT is authorized to develop a comprehensive regulatory scheme for the transportation of hazmats. Within its sphere, these regs preempt state statute
- 2007 Amendment to Federal Railroad Safety Act – state law negligence claims based on a railroad's failure to comply with federal law, with state regulations not preempted by federal law, or with a railroad's own procedures, are not preempted

THOMPSON HINE

# Recent Precedent on CCO and Hazmats

- *Radioactive Materials* cases (1978-1981): Carrier requirement for special train service: struck down in 1978 ICC case involving radioactive materials
- *Akron, Canton* case (1979) : Board may not hold that a commodity is too dangerous to transport if DOT regulations have been complied with.
- *Conrail* case (1981): Railroad conditions in addition to DOT rules carry a rebuttable presumption that they are unnecessary and fail to satisfy reasonableness criteria
- *Easterwood* case (1993): Where federal regs apply, compliance with federal regs preempts state tort law

THOMPSON HINE

# STB Proceedings on CCO and Hazmats

- XP 677, *Common Carrier Obligation of Railroads* (April 08)
  - Effect of capacity constraints; requirements for investments
  - Transportation of Hazmats, especially TIHs
  - Impact of volume requirements or incentives
  - Economically-motivated service reductions
- XP 677 (Sub-No. 1), *Common Carrier Obligation of Railroads–Transportation of Hazardous Materials* (July 08)
  - AAR proposed STB issuance of policy statement that it would be reasonable for railroad to require shippers of TIHs to (1) indemnify railroad for all liability in excess of $500 million, and (2) require shippers to carry insurance at levels required by railroad
- No decision issued in either case

THOMPSON HINE

# Issues / Arguments in STB Proceedings

- Railroads
  - Board has authority to authorize liability shift
  - Proposal consistent with safety and public policy
  - Unfair for railroads to shoulder burden of liability
  - Railroads are exposed even if they follow DOT regs
- Shippers
  - Congress has recently evinced intent to lodge liability with railroads
  - Requested policy statement would unlawfully preempt state tort law
  - Would be contrary to federal law and precedent
  - Would be inconsistent with FRA rules and regs
  - Would be inconsistent with fundamental legal principles
  - This issue for Congress and private sector discussions

Thompson Hine

# Do You Have a Contract Or Not?

## STB Rulemaking and Decisions on Contracts

THOMPSON HINE

# Defining A "Contract" – The STB's First Attempt

- STB Ex Parte 669, *Interpretation of the Term "Contract" in 49 U.S.C. 10709* (March 2007):

  A "contract" would be defined as "any bilateral agreement" between a carrier and a shipper in which the railroad agrees to a "specific rate for a specific period of time" in exchange for a shipper commitment
- Comments filed: Both shippers and carriers had problems, but shippers liked it more than carriers
- March 2008: STB decides to take a "different course"

Thompson Hine

# Defining A "Contract" – The STB's Second Attempt

- STB Ex Parte 676, *Rail Transportation Contracts Under 49 U.S.C. 10709* (March 2008):
  - (a) Full disclosure statement – document is a contract, and shipper has right to a tariff
  - (b) Written informed consent statement –shipper acknowledges agreement
- Comments Filed: Both railroads and shippers had greater or less problems

THOMPSON HINE

# Defining A "Contract" – The STB's Third Attempt

- STB Ex Parte 676, *Rail Transportation Contracts Under 49 U.S.C. 10709* (January 2008):
  - (a) Disclosure statement – Conclusive presumption that document is a contract if statement is included, regardless of other facts; and rebuttable presumption that document is not a contract if no statement is included
  - (b) No written informed consent statement
- Comments Filed 2/5/09:
  - Some railroads had some problems with proposed rule
  - Shippers completely opposed to proposed rule
- Reply Comments due 3/9/09

THOMPSON HINE

# Existence of a Contract: *DuPont* Case

- DuPont filed a rate complaint against a CSXT, challenging a CSXT Private Price Quotation ("PPQ")
- CSXT moved to dismiss, arguing that the PPQ could not be a tariff, and had to be a contract
- STB ruled that PPQ was challengeable as a tariff rate:
  - DuPont never agreed to a contract
  - The document indicated that it was not a contract
  - The fact that the document set a private rate for DuPont did not automatically make it a contract
- LESSON: The individual facts must be carefully considered to determine whether a document is a contract or not

THOMPSON HINE

Questions?

Thank you.

Nicholas J. DiMichael
Thompson Hine LLP
1920 N St. N.W., Suite 800
Washington, D.C. 20036
202.263.4103
nick.dimichael@thompsonhine.com

THOMPSON HINE

# EXHIBIT PX0676

**House Committee On Transportation and Infrastructure**
**Hearing on Rail Competition and Service**
**September 25, 2007**

**STB CHAIRMAN CHARLES D. NOTTINGHAM**
**ORAL STATEMENT**

Good afternoon Chairman Oberstar, Ranking Member Mica, and Members of the Committee. My name is Charles Nottingham, and I am Chairman of the Surface Transportation Board. This is my first appearance before this Committee since becoming Chairman of the STB in August 2006, and I appreciate the opportunity to appear before you today to address the important issues of rail competition and service, the relationship between railroads and shippers, the state of the railroad industry, and the role of the STB in resolving disputes between railroads and their customers. I will briefly summarize my written testimony.

Ensuring effective competition is one of the central goals of the nation's rail transportation policy. Yet throughout railroad history there have been some rail customers who do not enjoy the

full benefits of a competitive market. What do we mean when we refer to captive traffic that falls under the jurisdiction of the STB's regulation of rates? Our most recent data indicates over 71% of the nation's rail traffic moves at rates deemed by statute to have been the product of a competitive market. Of the remaining 29%, some is traffic that is exempted from regulation because the particular commodities and services involved, such as intermodal traffic, have competitive transportation alternatives available, and some is traffic that moves under private contract and is therefore outside the Board's jurisdiction. Less than 10% of the nation's freight rail traffic is recognized as captive and eligible for STB rate regulation. As we focus on this important, but relatively small portion of rail traffic at the STB, we strive to assess and anticipate how our regulatory and policy decisions might impact the broader universe of rail customers as well as national transportation policies, such as the development of an efficient system of interstate commerce.

As is the case in many markets, some freight rail customers pay higher rates than others. Under the principle of "differential pricing," railroads, with high "sunk" costs and with fierce competition for most traffic, are expected to charge more, even substantially more, from their captive traffic than from their competitive traffic if they are to achieve enough revenues to cover their costs and invest in necessary facilities. Although differential pricing is practiced in many other industries as well, it is understandable that shippers on the captive end of this differential pricing scale would not be satisfied with the status quo. As policy makers examine alternatives to this longstanding differential pricing system, several important questions merit consideration, including: if the railroads' ability to differentially price their services based on the market forces of supply and demand is significantly constrained, who will make up the difference? Who will end up paying more? How will the railroads in this highly capital-intensive industry maintain their existing infrastructure, not to mention attract additional private investment needed to expand

their capacity to meet projected dramatic growth in future demand for access to the rail network?

The Board recently commissioned the economic consulting firm Christensen Associates to conduct an extensive study on the extent of competition in the railroad industry. The study will also assess various policy issues, including current and near-future capacity constraints in the industry; how competition and regulation impact capacity investment; how capacity constraints impact competition; and how competition, capacity constraints, and other factors affect the quality of service provided by railroads. The study team will have the full benefit of all of the STB's powers to inquire into and gather information from the freight rail industry. I look forward to briefing this committee on the results of this study next year.

Examples of ways that the STB promotes competition can be found in our major merger rules; in cases where we impose competition-protecting conditions such as in previous merger cases; in other cases where the Board has prevented larger carriers

from interfering with the ability of smaller carriers to meet their obligation to provide service; in our management of the federal environmental review process required for the proposed construction of new rail lines; and in decisions authorizing the construction of those new rail lines.

With regard to the financial condition of the nation's rail system, I can report that our data reinforces what others will report today – the rail industry has gradually recovered from its pre-Staggers Act state of ruin and the industry is currently in good health.

The Board is currently awaiting final comments on an important rulemaking that proposes to change a key measure of the financial health of the railroads – the annual cost of capital determination. That calculation ties into our required annual determination of the railroads' revenue adequacy and is also a significant factor in rate cases and other Board proceedings. I believe that the Board must continue to examine all of our

procedures and to constantly explore improvements, no matter how controversial the issue may be to stakeholders.

As for the rail system's physical condition, in recent years, the U.S. rail network, like other transportation sectors, has become capacity-constrained. On April 11, 2007, the Board held a public hearing focused on rail capacity, traffic forecasts, and infrastructure requirements. At the hearing, we heard a broad consensus that rail capacity will become increasingly constrained by traffic growth. It is clear that the rail system's capacity shortfall that we see in many markets today will dramatically worsen unless bold new policies and strategies are adopted. The energy sector is especially vulnerable to rail capacity constraints and service problems. I am committed to improving communications and coordination between the rail sector and its energy customers in the coal, ethanol, biodiesel, utility and related businesses. The Board recently formed a new federal advisory committee consisting of industry leaders in the energy and rail sectors and charged with advising us on these issues. The Committee is expected to address

matters such as rail performance, capacity constraints, infrastructure planning and development, and effective coordination among suppliers, railroads and energy-resource users. The committee's first meeting takes place in October. I look forward to keeping this Committee apprised of its progress.

The Board's procedures for handling rate disputes are particularly important, and I will now turn to that issue. Under our statute, the Board must ensure that rates are reasonable while at the same time not precluding railroads from obtaining adequate revenues. Balancing these potentially conflicting objectives is not an easy task. Rates that are too high can harm rail-dependent businesses, while rates that are too low will deprive railroads of revenues sufficient to pay for the infrastructure investments needed to give shippers the level and quality of service that they require.

The Board has recently improved its procedures for handling rate cases. In the fall of 2006, we made some significant changes in how we apply the Stand-Alone Cost test and calculate the amount of relief in large rate cases, in an effort to reduce litigation

costs, create incentives for private settlement of disputes, and shorten the time required to litigate large rate cases. And just this month, the Board revised its rules for reviewing rate complaints in smaller cases where the cost of a full SAC case is not warranted or practicable. The new rules allow smaller rate cases to proceed on one of two tracks. First, freight rail customers may seek up to $1 million in relief using a revised version of the three-benchmark test with more predictability built into it. Under a second approach, customers can seek up to $5 million in relief using a new, simplified version of the Stand-Alone Cost test. The Board's new procedures ensure that the rate review process will be accessible to all captive traffic that moves under common carrier rates.

Another important issue that the Board is keeping a close eye on relates to fuel surcharges imposed by railroads. In January of this year we issued a decision declaring it an industry-wide unlawful practice for carriers to use a fuel surcharge to recover more than the increased fuel costs attributable to the particular movement to which the surcharge is applied. This action ended an

industry practice of charging fuel surcharges as a percentage of a shipper's base rate regardless of the actual fuel costs associated with the transportation of the shippers' goods. The Board will aggressively use the authority granted to us by statute to stop unreasonable practices, thereby protecting shippers and advancing the public interest. It is worth noting that the Board investigated and acted on the fuel surcharge problem on our own initiative and without any formal complaint. This Board has not received a single formal complaint about fuel surcharges. We will remain vigilant on this issue and will expeditiously review any formal complaints related to fuel surcharges or other unreasonable practices or unreasonable rates.

Moreover, in addition to our processes for adjudicating formal disputes, we have an effective Rail Consumer Assistance Program, which is available as a resource for seeking assistance in informally resolving disputes. Since the program's inception several years ago, our consumer assistance staff has addressed a variety of issues, in addition to rates and service, including: car

supply issues; claims for damages; demurrage issues (charges for holding rail cars for too long); employee complaints; and community concerns. In many instances, informal dispute resolution and problem solving by the STB is an effective alternative to litigation.

In sum, the STB is actively engaged in the pursuit of enhanced competition, the implementation of accessible and affordable dispute resolution procedures, and continuous process improvement aimed at making our agency a more effective economic regulator of the freight rail industry. Our initiation of a major national study of the state of rail competition and related policy alternatives, along with our recently improved rate dispute resolution procedures, our pending rule on how the railroads' cost of capital should be measured, and the other proactive steps outlined in my full statement, all combine to demonstrate this Board's strong commitment to providing robust regulatory oversight of the freight rail industry. I look forward to the opportunity today to discuss our record of reform in more detail

and to returning to this committee in the future to report on our progress.

Thank you.

# # #

# EXHIBIT PX0677

12/12/05 CEO Wire (Pg. Unavail. Online)
2005 WLNR 19971699

CEO Wire
Copyright 2005 Voxant

**December 12, 2005**

Norfolk Southern - Chairman; Pres. & CEO Interview

Mark Haines

xfdce CNBC/DOW JONES BUSINE 01

Show: CNBC/DOW JONES BUSINESS VIDEO

Date: December 12, 2005

Time: 00:00:00

Tran: 121201cb.y53

Type: INTERVIEW

Head: **NorfolkSouthern** - Chairman; Pres. & CEO Interview

Sect: Business

Byline: Mark Haines

Guest: David Goode, Wick Moorman, David Sowerby

Spec: Business; Railroad Industry; NSC (NYSE); SIC: 4011

Time: 09:41:00

MARK HAINES, CNBC ANCHOR: **NorfolkSouthern**, plenty to celebrate this holiday season. The stock has had a great year, as you can see, just off its November highs. On Christmas Day, Norfolk will turn 175, tracing back to when it launched the country`s first regularly scheduled train service on, are you ready for this, six miles of track. That train could carry 140 passengers at speeds approaching 25 miles an hour. Joining us fresh from ringing the opening bell at the Big Board, Wick Moorman, president and CEO of **NorfolkSouthern**; as well as the company`s outgoing chairman, David Goode.Gentlemen, thank you very much for being with us, appreciate it.

WICK MOORMAN, PRES. CEO, **NORFOLKSOUTHERN**: Thank you.


© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

DAVID GOODE, CHAIRMAN, **NORFOLKSOUTHERN**: Thank you, it`s a great day being here.

HAINES: Yes. And congratulations on 175 years in the railroad business. The stock has been pretty good. Are you guys making money?

GOODE: Well, it`s 175 years. And as we`re saying, we`re running strong. It has been a good year for **Norfolk-Southern**, a good year for the railroads.

HAINES: Is it going to be -- as you look into the future, Mr. Moorman, of course, you will be there. If -- there has been a lot of talk about more reliance on coal. I would imagine that makes you kind of happy given how much coal your railroad carries.

MOORMAN: It does. Our coal business this year has been extremely strong. We have set volume records for two of the four quarters. And we think the prospects for coal for energy generation are very bright indeed.

HAINES: How are you doing on the cost side of the equation, though, with the cost of diesel fuel?

MOORMAN: Well, we, like almost every other transportation company, have a **fuelsurcharge** program in which we are able to pass on the increased cost of fuel. So our concern about fuel really is that it not damage the overall state of the economy. And, of course, we haven`t seen that. So fuel right now is not a big concern for us.

DAVID SOWERBY, CHIEF MARKET STRATEGIST, LOOMIS SAYLES: Gentlemen, the story has been good for the turn around in the rails. But what is the best evidence that this is a long-term secular story as opposed to simply taking market share from some of the troubled trucking industry?

GOODE: Well, as the outgoing CEO and chairman, I guess I would say that don`t forget that energy costs as they remain consistently high favor rail, because we have about 3.5 or 4 to 1 advantage in moving a ton of freight a mile as opposed to moving it on the highway. We have talked about that before on this program. And that is an important advantage, which we believe is going to be a sustainable advantage. Also, as we have improved our service, and as Wick Moorman and his new team improve it even further, we think that rail is just going to be consistently a desirable option for our shippers and we look forward to a great future.

SOWERBY: Versus your competition, train speed is an important business metric business measurement. How are you faring in train speed versus some of your major rivals?

MOORMAN: Well, our train speed has remained pretty good. It has slowed down a little this year, as we have seen some volume come on. But we are making the necessary investments to not only get it back to where it was a year ago, but then to get it even higher. The important thing, though, is that our services remain good. And as David said, that`s the key to our continued business growth as the years come on.

HAINES: How much can you take away from trucks? I mean, I suppose intermodal gives you that opportunity, as long as fuel is an issue, I guess some people may find it better just to put the trailer on the train.

MOORMAN: That`s certainly part of it. We think there is a lot of business opportunity still to be had out there. And, of course, what we are seeing more and more is that the trucking companies are working as partners with us. We handle the long haul transportation, they handle the pick up and delivery. That is a very fuel efficient and service effective means of distribution. So we have seen more and more partnerships with our trucking companies coming along as well.

 © 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

GOODE: And we think that long term rail is going to be an important help in improving highway congestion.

MOORMAN: Absolutely.

HAINES: OK, gentlemen, thank you very much. And again, congratulations on the milestone for your company.

GOODE: Thanks for having us.

MOORMAN: Thanks very much.

HAINES: Wick Moorman, president and CEO of **NorfolkSouthern**. The company`s chairman, David Goode, who is soon to retire.

END

Content and programming copyright 2004 CNBC/Dow Jones Business Video, a division of CNBC/Dow Jones Desktop Video, LLC. Transcription copyright 2004 FDCH e-Media, Inc. (f/k/a Federal Document Clearing House Inc., eMediaMillWorks, Inc.), No portions of the materials contained herein may be used in any media without attribution to CNBC/Dow Jones Business Video, a division of CNBC/Dow Jones Desktop Video, LLC. This transcript may not be copied or resold in any media.

---- INDEX REFERENCES ---

COMPANY: NORFOLK SOUTHERN CORP

INDUSTRY: (Transportation (1TR48); Freight Transportation (1FR88); Railroads (1RA98); Land Transportation (1LA13); Trucking (1TR88); Freight Railroads (1FR84); Passenger Transportation (1PA35))

REGION: (USA (1US73); Americas (1AM92); North America (1NO39))

Language: EN

OTHER INDEXING: (BIG BOARD; END; HAINES; HAINES: OK; HOUSE INC; MOORMAN; **NORFOLK-SOUTHERN**; NYSE); SIC) (CEO; Content; Date; David; David Goode; Interview; Joining; Mark Haines; Moorman; Show; Time; Wick Moorman)

KEYWORDS: (CNBC/DOW-JONES-BUSINE-01); (w)

Word Count: 1083
12/12/05 CEOWIRE (No Page)
END OF DOCUMENT


© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT PX0678

An official website of the United States government



# About STB

The Surface Transportation Board is an independent federal agency that is charged with the economic regulation of various modes of surface transportation, primarily freight rail.

The agency has jurisdiction over railroad rate, practice, and service issues and rail restructuring transactions, including mergers, line sales, line construction, and line abandonments. The STB also has jurisdiction over certain passenger rail matters, the intercity bus industry, non-energy pipelines, household goods carriers' tariffs, and rate regulation of non-contiguous domestic water transportation (marine freight shipping involving the mainland United States, Hawaii, Alaska, Puerto Rico, and other U.S. territories and possessions).

Created on January 1, 1996 by the ICC Termination Act of 1995 (https://prod.stb.gov/resources/legal-resources/#legislation), the Board is the successor to the former Interstate Commerce Commission (1887-1995) and was administratively aligned with the U.S. Department of Transportation from 1996 to mid-December 2015. The STB Reauthorization Act of 2015 (https://prod.stb.gov/resources/legal-resources/#legislation) established the STB as a wholly independent federal agency on December 18, 2015.

The STB consists of five Board Members (https://prod.stb.gov/about-stb/board-members/), one of which serves as the Chairman. The STB staff is divided into six offices (https://prod.stb.gov/about-stb/offices/), in addition to an Equal Employment

Opportunity (https://prod.stb.gov/about-stb/offices/equal-employment-opportunity/) office. To view materials about the STB's functions (such as Annual Reports, Budget Requests, among others), click here (https://prod.stb.gov/about-stb/agency-materials/).

---

*Surface Transportation Board*

395 E Street SW
Washington, DC 20423
(202) 245-0245 | TTY (800) 877-8339

Email Us (mailto:rcpa@stb.gov)

## Policies

Privacy (/privacy/)

Vulnerability Disclosure Policy (/vulnerability-disclosure-policy/)

Freedom of Information Act (/foia/)

No FEAR Act (/no-fear-act/)

Whistleblower Protection (/whistleblower-protection/)

Accessibility (/policies-and-notices/#Accessibility)

## Help

webmaster@stb.gov (mailto:webmaster@stb.gov)

## Careers

Search STB Announcements (/about-stb/jobs/)

## Other Government

Whitehouse.gov (https://www.whitehouse.gov/)

USA.gov (https://www.usa.gov/)

Office of Inspector General (https://www.oig.dot.gov/)

# EXHIBIT PX0679

# U.S. Freight Railroad Productivity

**ASSOCIATION OF AMERICAN RAILROADS** **FEBRUARY 2009**


## Summary

America's freight railroads are the **most productive in the world**, and their productivity has skyrocketed since the Staggers Rail Act of 1980 instituted a system of balanced regulation. Railroads generated 93 percent more ton-miles of freight in 2007 than they did in 1980, but they did so with 41 percent fewer miles of track, 64 percent fewer employees, 14 percent fewer locomotives, and just 4 percent more gallons of diesel fuel — and at rates that, on average, were 54 percent lower when adjusted for inflation. Future rail productivity gains will require continued massive spending on infrastructure and equipment (including large amounts of new capacity) and innovative new technologies.


## U.S. Freight Railroads Are the Most Productive in the World

- From 1980 to 2007, rail employee productivity **rose 428 percent**, locomotive productivity **rose 124 percent**, the productivity of each mile of track **rose 225 percent**, and fuel efficiency **rose 85 percent**. In each case, railroad productivity improvements in the post-Staggers era have been far higher (usually two to three times higher) than in the comparable pre-Staggers period.




- Overall railroad productivity **rose 163 percent** since Staggers was passed — compared to only around 15 percent in the comparable pre-Staggers period.

- The vast majority of rail productivity gains have been **passed through to rail customers** in the form of **sharply reduced rail rates**. From 1980 to 2007, average rail rates (in terms of revenue per ton-mile) **fell 54 percent** in inflation-adjusted terms. These rate reductions have saved shippers and consumers billions of dollars each year and greatly enhanced America's competitiveness in the global economy.

## Continued Railroad Productivity Gains Are Needed to Meet Growing Demand

- As America's population and economy grow, **demand for rail transportation will grow too**. In fact, the U.S. Department of Transportation projects that demand for freight

transportation will rise **92 percent** by 2035 from 2002 levels. Railroads are the **affordable**, **environmentally-friendly** way to meet this demand. But to do so, they must continue to improve their productivity.

- The "easy" productivity gains have already been made. Looking ahead, future rail productivity gains will have to come from things like improved **signaling systems**, more powerful **locomotives**, more efficient **classification yards**, and new **bridges and tunnels**. All of these require continued, massive re-investments in rail networks.

- The Staggers Rail Act of 1980 created a **balanced** regulatory system that protects shippers against anti-competitive railroad conduct while allowing railroads to largely decide for themselves how to manage their operations. Returning to an era of excessive regulation would destroy this balance. It would severely limit railroads' ability to invest and innovate — and their ability to provide the **safe, affordable, efficient, and environmentally-responsible** rail service that America needs.

## U.S. Freight Railroad Productivity












# EXHIBIT PX0680

# Fuel Efficiency



Railroads are the most fuel-efficient mode of surface transportation. Steel wheels moving on steel rails, combined with the lower aerodynamic drag of a single train pulling hundreds of loads of freight, provide inherent advantages for rail. In fact, rail is more than three times as fuel efficient as long-haul trucks.

Because railroads run on diesel fuel, the pursuit of energy efficiency is one of BNSF's most important strategies to reduce both our environmental impact and our operating costs. BNSF's fuel efficiency has increased by 7.7 percent since 1999. Over the last decade, BNSF has acquired more than 2,700 new locomotives while retiring many older units. Our newest locomotives are about 15 percent more fuel efficient than the engines they replaced.

Improvements in operating and maintenance practices have a substantial impact on our fuel efficiency. First and foremost, our machinists maintain our locomotives and railcars in top condition. Our engineering team lubricates rails to help reduce the friction between the wheels and the rails. In addition, locomotive engineers are trained to shut down idling locomotives, isolate or shut down unneeded locomotives in trains, pace trains and adjust acceleration and braking to conserve fuel.


**©2010 BNSF Railway Company. All Rights Reserved.**